**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re                                              :          **Chapter 11 Case No.**
                                                   :
**LEXINGTON PRECISION CORP., et al.,**              :          **08- _____ (  )**
                                                   :
         **Debtors.**                              :          **(Jointly Administered)**
                                                   :
-------------------------------------------------------------x

**AFFIDAVIT OF DENNIS J. WELHOUSE**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

STATE OF NEW YORK            )
                             )      ss:
COUNTY OF NEW YORK           )

   Dennis J. Welhouse, being duly sworn, hereby deposes and says:

   1.  I am Senior Vice President, Chief Financial Officer and Secretary of Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber Group" and together with Lexington Precision, "Lexington" or the "Debtors").  In those capacities, I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

   2.  I submit this affidavit pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Commencement Date") and (ii) the requested relief, in the form of motions and applications, that the Debtors have filed with the Court.

3.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of Lexington's senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning Lexington's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Affidavit.  I am authorized to submit this Affidavit on behalf of Lexington.

4.      This Affidavit is intended to provide a summary overview of Lexington and these chapter 11 cases.  Sections I through V of this Affidavit provide an overview of Lexington's businesses, organizational structure, capital structure, history, and events giving rise to the commencement of these chapter 11 cases.  Section VI lists the schedules of information required by Local Rule 1007-2.

## I.

### Lexington's Businesses

5.      Lexington manufactures large volumes of high-quality rubber and metal components at competitive prices for use primarily in automobiles and medical devices. Lexington operates through two operating segments – the Rubber Group and the Metals Group. Lexington's components are generally sold to other manufacturers, primarily tier-one automotive parts manufacturers, which supply parts to the industry's leading automobile producers.

6.      For the year ending December 31, 2007, Lexington's unaudited financial statements show consolidated revenues of approximately $88.5 million and consolidated earnings before interest, taxes, depreciation, and amortization (commonly referred to as "EBITDA") approximately $11.7 million.  Approximately 84% of the Metals Group's and 77% of the Rubber Group's 2007 net sales were automotive-related.  Approximately 16% of the

Metals Group's 2007 net sales were to industrial customers.  Approximately 21% of Rubber

Group's 2007 net sales were to medical device manufacturers, and the remaining 2% of Rubber

Group's net sales were to other customers.

**The Rubber Group**

7.      The Rubber Group is one of North America's largest manufacturers of

rubber components for the automotive industry.  Indeed, Lexington is the leading supplier of

connector seals used in primary wire harnesses, the second largest supplier of insulators for

ignition wire sets manufactured by tier-one suppliers to the major automakers in the United

States, and the largest supplier of insulators for ignition wire sets sold in the automotive

aftermarket.

8.      The Rubber Group operates three production facilities, which are located

in Japser, Georgia; Vienna, Ohio; and Rock Hill, South Carolina, and a mold-making and

engineering facility. which is located in North Canton, Ohio.  The automotive industry uses

molded rubber components, such as seals, gaskets, diaphragms, mounts, bushings, and dampers,

for a variety of vehicle applications.  The Rubber Group focuses its automotive business

primarily on two products with respect to which it believes it has a competitive advantage:

connector seals used in primary harnesses and insulators for ignition wire sets.

9.      Connector seals are molded rubber components used to ensure the

integrity of many of the electrical connections throughout the wiring systems of cars and trucks.

As the number of lights, instruments, motors, switches, sensors, and electrically-powered

accessories in the average vehicle have increased, vehicles have required larger and more

complex wiring systems with more connectors and connector seals.  During the last ten years,

automakers have designed more compact connectors that have a multitude of terminals and

require seals with an equal number of ribbed holes molded in close proximity. Lexington has

become the industry leader in manufacturing these types of multi-hole seals, which are very

difficult to manufacture without defects. Lexington's plant that focuses on the manufacture of

connector seals shipped fewer than two defective parts per million parts shipped (PPM) in 2007.

10.     Ignition wire insulators seal and insulate the electrical connections in the

ignition systems of cars and trucks.  In the traditional automotive ignition system, there are two

insulators, one that seals the connection of the ignition wire at the distributor and one that seals

the connection at the spark plug.  In recent years there has been a trend toward "coil-on-plug"

ignition systems, which eliminate the need for a distributor insulator but require a more

complicated, and more expensive, insulator at the spark plug.  There also has been a trend toward

higher performance engines, which has led to a need for insulators that are made of more

expensive materials able to withstand the high temperatures these engines generate.  These trends

have led to an increase of sales of insulators, and increased margins for such sales, by the Rubber

Group.

11.     The Rubber Group also manufactures and sells rubber components used in

a variety of medical devices, including drug delivery systems, syringes, laparoscopic

instruments, and catheters, which are sold to some of the world's largest medical device

manufacturers.  The Rubber Group's medical business has been growing rapidly and has become

a major contributor to the Rubber Group's operating profit and cash flow.

12.     In 2007, Lexington's unaudited financial statements show that

approximately $74.5 million of net sales was attributable to the Rubber Group, which represents

approximately 84.4% of Lexington's consolidated net sales.  For this same period, the Rubber

Group's EBITDA was approximately $13.7 million, which represents approximately 18% of Lexington's consolidated EBITDA.

**The Metals Group**

13.    The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks, primarily for automotive customers.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.  The Metals Group operates a single production facility, which is located in Rochester, New York.  Similar to the Rubber Group, the Metals Group services primarily manufacturers within the automotive industry.

14.    In 2007, Lexington's unaudited financial statements show that approximately $13.8 million of net sales is attributable to the Metals Group, which represents approximately 15.6% of Lexington's consolidated net sales.  For this same period, Lexington's unaudited financial statements show the Metals Group's EBITDA to be approximately $490,000, which represents approximately 3.5% of Lexington's consolidated EBITDA.

**Lexington's Customers**

15.    Lexington sells its rubber and metal components to other manufacturers, particularly tier-one automotive part suppliers.  Its largest customer is General Cable Corporation.  During 2007, Lexington's net sales to General Cable totaled $9.4 million, which represented 10.7% of the consolidated net sales for the Lexington corporate group and 12.7% of the Rubber Group's net sales.   Another large customer of Lexington is Delphi Corporation.  During 2007, Lexington's net sales to Delphi totaled $8.5 million, which represented 9.6% of the consolidated net sales for the Lexington corporate group.  Rubber Group's net sales to Delphi in 2007 totaled $7.3 million, or 9.9% of Rubber Group's net sales.

## II.

## Organizational Structure

16.     The following is an organizational chart depicting Lexington's corporate

and operational structure:



17.     Lexington is headquartered in New York, New York, and maintains an

administrative office in Cleveland, Ohio.  Lexington also owns a building in Lakewood, New

York, which it currently leases to a manufacturer of die cast components for $159,540 per annum

plus specified charges, for the term January 1, 2008 through December 31, 2010.

18.     Lexington Precision is a public company whose shares are traded on the

over the counter market operated by the National Association of Securities Dealers.  It is the

parent company of one wholly-owned subsidiary, Lexington Rubber Group.  Each of

Lexington's production facilities operates as an independent business unit with a complete

management team.  Each facility focuses on a single product line, and as a result, the facilities have developed highly-efficient manufacturing processes essential to the production of large volumes of high-quality products at low cost.  Through Lexington's highly specialized product knowledge and competitive cost structure, the Rubber Group has become the market leader in each of its automotive product lines.

19.     As of February 29, 2008, Lexington employed approximately 651 permanent and 22 temporary employees, of which 134 are salaried employees and 517 are hourly employees.  Because Lexington's Rock Hill, South Carolina manufacturing facility is an "open-shop," only certain of its hourly employees are covered by a collective bargaining agreement with the United Steel Workers of America, AFL-CIO, which expires on October 18, 2008.  All of the hourly employees at the Vienna, Ohio manufacturing facility are covered by a collective bargaining agreement with IUE – Division of Communication Workers of America, which expires on December 10, 2008.  Lexington's Relationship with its employees is good.

## III.

## Capital Structure

20.     The instruments evidencing Lexington's significant indebtedness are described below.  In addition, the Debtors have trade debt of approximately $6 million.

## Credit and Security Agreement

21.     Lexington Precision and Lexington Rubber Group (collectively, the "Borrowers"), as borrowers, are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit

Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver

Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement").  The Credit

Agreement provides for:  (i) a revolving credit facility (the "Revolving Credit Facility") in the

maximum aggregate amount of $17.5 million, including letters of credit and (ii) an equipment

term loan facility in the original principal amount of $12.5 million.

22.     Pursuant to the Credit Agreement, the Borrowers granted to

CapitalSource, as agent for the Credit Agreement Lenders, first priority liens on, and security

interests in, substantially all of the Borrowers' assets other than real estate — including, among

other things, Receivables,[1] Equipment, General Intangibles, Inventory, Contract Rights,

Subsidiary Stock, Securities Leasehold Interests, Commercial Tort Claims, and proceeds and

products of the foregoing — and second priority liens on the Borrowers' real estate.

23.     Lexington uses the amounts borrowed under the Credit Agreement to fund

general working capital requirements.  As of March 31, 2008, approximately $22.3 million,

inclusive of the outstanding letters of credit, was outstanding under the Credit Agreement.

**Loan and Security Agreement**

24.     The Borrowers also are parties to that certain Loan and Security

Agreement, dated as of May 31, 2006 (the "Loan Agreement"), with CSE Mortgage LLC

("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC

("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement

Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"),

as amended pursuant to the Default Waiver Agreement.  The Loan and Security Agreement

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the agreement or document in which they are referenced.

provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

25.     Pursuant to the Loan Agreement, the Borrowers granted to CSE, as agent for the Loan Agreement Lenders, first priority liens on, and security interests in, the Borrowers' real estate, and second priority liens on substantially all of the Borrowers' other assets, including, among other things, Receivables, Equipment, General Intangibles, Inventory, Contract Rights, Subsidiary Stock, Securities, Leasehold Interests, Tort Claims, and proceeds and products of any of the foregoing.

26.     Lexington uses the amounts borrowed under the Loan and Security Agreement to fund general working capital requirements.  As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

**Senior Subordinated Notes**

27.     Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee, and Lexington Precision, Lexington Precision issued $34.17 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes").  Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, approximately $9.1 million of accrued and unpaid interest was outstanding.  Approximatley 74.4% of the Senior Subordinated Notes are held by a group of six hedge funds that have formed an ad hoc committee to negotiate with the Debtors (the "Ad Hoc

Committee"). Approximately 22.7% of the Senior Subordinated Notes are held by Michael A.

Lubin and Warren Delano, the co-Chief Executive Officers, and their families and affiliates.

**Junior Subordinated Notes**

28.    Pursuant to an agreement, dated as of January 31, 2006 between

Lexington Precision and Michael A. Lubin, Lexington Precision issued $346,666.67 in principal

amount of unsecured Junior Subordinated Notes due November 1, 2009, which bear interest at

the rate of 13% per annum (as amended, the "Junior Subordinated Notes").  Interest on the Junior

Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of

each year.

**Recent Financial Information**

29.    As of December 31, 2007, Lexington's unaudited consolidated financial

statements reflected assets totaling approximately $52.3 million and liabilities totaling

approximately $88.2 million.  As of December 31, 2007, Lexington reported cash, cash

equivalents, and marketable investments of approximately $426,000.

30.    Lexington Precision is a reporting company under Section 12(b) of the

Securities and Exchange Act of 1934.  As of March 20, 2007, there were 5,021,767 shares of

Lexington's common stock outstanding.  While Lexington Precision's shares are traded on the

over the counter market operated by the National Association of Securities Dealers, the volume

of trading has been extremely low.  For example, approximately 14,000 shares were traded

during the last six months, which represents .2% Lexington's outstanding shares.

# IV.

## History of the Debtors

31.    Lexington, which was originally named Blasius Industries, Inc., was formed in the late 1960s through the acquisition and consolidation of several small manufacturing businesses.  Those businesses produced a wide variety of metal, plastic, and rubber components for other manufacturers.

32.    In 1985, the current, controlling shareholders, Warren Delano and Michael Lubin, made their first investment in Lexington through a limited partnership.  In 1987, Messrs. Delano and Lubin took over the management of the business.  In 1989, Lexington acquired a rubber molding business that has transitioned into its connector seal business and its medical device business.  In the 1980's and early 1990s it divested several businesses, including a tool shop and an office-systems furniture business.

33.    During the early 1990s, Lexington implemented a strategy to turn its manufacturing facilities into focused factories specializing in the production of specific product lines, with the goal of becoming the dominant supplier in each of these product lines by reducing its manufacturing costs and developing extensive product and market knowledge.  As part of its efforts, Lexington invested significant funds in state-of-the-art equipment and high-tech tooling technology.  Its focused plants became highly-efficient and capable of meeting the highest quality standards and, as a result, gained significant market share and economies of scale, which made it even more competitive.

34.    Over the last several years, Lexington has lost some market share in the automotive original equipment market because of heightened concern by the auto makers about highly leveraged suppliers. Nevertheless, Lexington remains the market leader in its principal

automotive product lines and continues to generate superior levels of cash flow.  Lexington is

confident that with the deleveraging of its balance sheet through the chapter 11 process, it will be

able to quickly recover the lost market share and improve its already impressive operating

results.

## V.

## Events Leading to the Chapter 11 Cases

35.    A substantial portion of Lexington's business relates to the automotive

industry.  In fact, as noted above, over 78% of Lexington's net consolidated sales for 2007 were

of rubber and metal components utilized in automotive products.  Lexington typically sells its

components to tier-one automotive part manufacturers, which supply automotive parts to

domestic original equipment manufacturers (each, an "OEM").  The continued decline in market

share of U.S.-based OEMs, however, has resulted in a reduced number of vehicles produced

annually in the U.S., causing tier-one suppliers to experience declining sales and increased

pricing pressures.  This challenging economic climate has been further compounded by

substantial commodity cost increases (e.g., steel, natural gas, oil, and aluminum), a portion of

which typically cannot be passed on to the OEMs because of previously established contractual

terms.  This trend already has taken its toll on several of Lexington's customers, some of which

have been forced to commence cases under chapter 11 of the Bankruptcy Code.[2]

36.    The negative effects encountered by tier-one suppliers as a result of the

struggling automotive market have, in turn, affected tier-two manufacturers such as Lexington,

---

[2] In October 2005, Delphi, which is Lexington's second largest customer, filed for relief under chapter 11 of the Bankruptcy Code.  Delphi's chapter 11 plan, pursuant to which Delphi will close certain plants, was confirmed by the Bankruptcy Court on January 25, 2008, but has not yet become effective. Lexington's unpaid accounts receivable from Delphi relating to transactions prior to Delphi's filing total approximately $300,000.

which have experienced a corresponding decrease in sales and increase in pricing pressures. Lexington has responded to these pressures by restructuring its operations to reduce costs. These cost-reduction initiatives have enabled Lexington to maintain superior operating and EBITDA margins despite the impact of declining sales.  During 2007, Lexington's two principal operating units supplying the automotive industry, the Jasper, Georgia, facility, which manufactures insulators for automotive ignition systems, and the Vienna, Ohio, facility, which manufactures seals for automotive wire harnesses, achieved EBITDA of approximately $6.5 million, or 20.2% of net sales and approximately $4.48 million, or 18.4% of net sales respectively.  These ratios of EBITDA-to-net-sales are far above the mean of 9-10% for automotive industry suppliers (excluding any public companies in bankruptcy) and, in fact, are outstanding when compared to manufacturing companies generally.

**Liquidity Crisis**

37.     Despite maintaining superior margins, the reduction in sales to the automotive industry has had a significant impact on Lexington's cash flow.  During the second half of 2006, Lexington's automotive customers substantially reduced their orders, in line with industry-wide effort to reduce inventories, which reduced Lexington's EBITDA levels accordingly.  At the same time, Lexington's Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort.  The combination of these factors caused a significant drain on Lexington's cash.

38.     On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes.  As a result of the liquidity issues described above,

Lexington was not in a position to make the scheduled payment on the due date or within the

thirty-day grace period.  The failure to make this interest payment within the grace period

constituted a default under the Indenture, and by February 1, 2007, that default created a cross-

default under the Credit Agreement and under the Loan Agreement.  Shortly thereafter, certain

holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee.

**Restructuring Efforts**

39.    During this period and through mid-March 2007, Lexington held extensive

discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to

negotiate a financial restructuring that would resolve Lexington's liquidity issues.  In mid-

March, Lexington reached agreements with the Prepetition Secured Lenders and the Ad Hoc

Committee on a standstill arrangement while Lexington pursued potential asset sales and

refinancing arrangements in order to stabilize its finances and maximize value for all

stakeholders.

40.    The cost to Lexington of obtaining a standstill agreement with the

Prepetition Secured Lenders included interest at two points above the contract rates, financing

fees, and fees and expenses of outside counsel, financial advisors, and appraisers, which have

aggregated approximately $2.2 million since November 1, 2006.  In addition, in return for a

standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a

condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes

from 12% to 16% until the Senior Subordinated Notes are paid in full or until Lexington files a

petition for relief under the Bankruptcy Code.  The increased interest accrued on the Senior

Subordinated Notes totals approximately $2.3 million as of today.

41.     Although Lexington was faced with the pursuit of asset sales and refinancing efforts in one of the worst financing environments in recent memory, Lexington, assisted by the investment banking firm of WY Campbell & Company, was able to obtain a number of offers for all or portion of the business of Lexington Rubber Group, each of which clearly indicated that, notwithstanding the Debtors' book negative net worth calculated in accordance with generally accepted accounting principles ("GAAP"), the value of Lexington's assets far exceeds its liabilities.  Consequently, the Debtors believe that the GAAP net worth is not reflective of the Debtors' fair market value and that the equity securities of Lexington Precision have significant value.

42.     Upon reviewing the various sale proposals, Lexington determined that the course of action that offered the best prospect of maximizing value was to proceed with a proposal from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase Lexington Rubber Group's facility in Rock Hill, South Carolina, which produces molded rubber components for use in medical devices, at a price of $32 million in cash (the "Rock Hill Sale").  The Rock Hill Facility had net sales and EBITDA of $16 million and $2.9 million, respectively, for 2007, and the net book value of such facility was $5.3 million on December 31, 2007.  The sale would have guaranteed a pre-tax gain on sale of approximately $26 million, all of which would have been sheltered by Lexington's net operating loss carried forward.

43.     In conjunction with that sale process, Lexington began to seek senior, secured financing arrangements that would enable it, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, make substantial payments in respect of the Senior Subordinated Notes, and finance the operations and growth of Lexington's remaining businesses.

The financing efforts were successful and Lexington was able to obtain from a prospective institutional lender (the "New Secured Lender") a proposal for a $36.7 million senior secured credit facility that would have enabled Lexington to (a) repay the Prepetition Secured Lenders, (b) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (c) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates of Lexington.  The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a 5-year maturity and a cash-pay interest rate of 12%.  The Senior Subordinated Notes held by the affiliated holders would be converted to common stock, reducing the Company's remaining debt by approximately $8 million.

44.     In mid-January, Lexington advised the Ad Hoc Committee that it believed that, in order to move forward with the Rock Hill Sale and the related financing, it required an extension of the current standstill arrangement, which was due to expire on January 24, 2008, to at least April 30, 2008.  The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that Lexington and its advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale, and significantly, a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion.  Lexington and its advisors believed strongly that a series of two-week extensions and a right to veto would dissuade the Rock Hill Buyer from devoting the significant resources necessary to complete due diligence on a transaction that could disappear unexpectedly or encourage the Rock Hill Buyer to proceed but ultimately reduce its price because of the "fire-sale" atmosphere.

45.    In a final effort to avoid the expense and disruption of a chapter 11 case, Lexington proposed to the Ad Hoc Committee an alternative restructuring.  This proposal included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process.  In support of this recapitalization, Lexington was able to obtain from the New Secured Lender a modified financing proposal that would have provided for a $43.3 million senior, secured credit facility, conditioned upon completion of the recapitalization.  Lexington is confident that this facility would have been adequate to finance its entire business without the Rock Hill Sale.  The proposed recapitalization would have enabled the Debtors to repay the Prepetition Secured Lenders in full, and in Lexington's view, would have provided a full recovery to the holders of the Senior Subordinated Notes.  Unfortunately, this recapitalization was also rejected.

46.    In light of the foregoing, Lexington has determined that the only available method to protect the interests of all stakeholders is to seek protection under the Bankruptcy Code.  The Debtors believe that the expense of obtaining the standstill agreements and the delays attendant to the Debtors' out-of-court restructuring efforts have adversely impacted the Debtors' liquidity, causing a tightening of trade credit, and derailing Lexington's restructuring plan, which would have allowed Lexington to pay all of its creditors in full with value left for equity, without the need to resort to chapter 11.

**Conclusion**

47.    By the commencement of these chapter 11 cases, Lexington believes that the singular focus will be to address and restructure their finances as they relate to Lexington's balance sheet as opposed to restructuring the Lexington's operations.  During this process, the Lexington intends to continue normal operations, including their high standards of customer

service and support, as it completes the reorganization process for the benefit of their creditors

and all other parties in interest.

## VI.

### Information Required by Local Rule 1007-2

48.     Local Rule 1007-2 requires certain information related to the Debtors,

which is set forth below.

49.     Pursuant to Local Rule 1007-2(a)(3), Schedule 1 hereto lists the names

and addresses of the members of the Ad Hoc Committee and attorneys therefore, and provides a

brief description of the circumstances surrounding the formation of the Ad Hoc Committee and

the date of its formation.

50.     Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the following

information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a

consolidated basis, excluding claims of insiders:  the creditor's name, address (including the

number, street, apartment or suite number, and zip code, if not included in the post office

address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts,

the amount of the claim, and an indication of whether the claim is contingent, unliquidated,

disputed, or partially secured.

51.     Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto provides the

following information with respect to each of the holders of the five largest secured claims

against the Debtors on a consolidated basis: the creditor's name, address (including the number,

street, apartment or suite number, and zip code, if not included in the post office address), and

telephone number; the amount of the claim; a brief description of the collateral securing the

claim; an estimate of the value of the collateral and whether the claim or lien is disputed.

52.     Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the Debtors' assets and liabilities.

53.     Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of Lexington Precision that are publicly held and the number of record holders thereof; the number and classes of shares of stock, debentures, and other securities of Lexington that are held by Lexington's directors and officers and the amounts so held.

54.     Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

55.     Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

56.     Pursuant to Local Rule 1007-2(a)(10), Schedule 8 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

57.     Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property.

58.     Pursuant to Local Rule 1007-2(a)(12), Schedule 10 hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

59.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 11 hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by the Debtors, for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

60.     Pursuant to Local Rule 1007-2(b)(3), Schedule 12 hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

61.    The foregoing is true and correct to the best of my knowledge,

information, and belief.


_____/s/ Dennis J. Welhouse_____
Dennis J. Welhouse


Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 1st day of April, 2008


/s/ Duke Amponsah_____
Notary Public


Duke Amponsah_____
Notary Public, State of New York
No. 01AM6172357
Qualified in Kings County
Commission Expires August 6, 2011

## Schedule 1

### Ad Hoc Committee

Pursuant to Local Rule 1007-2(a)(3), the following is a list of members of, and attorneys for, the Ad Hoc Committee and their respective addresses.  The Ad Hoc Committee was formed in or about November 2006 after the Debtors did not make the interest payment due on the November 1, 2006.

| Name of Member | Address |
|---|---|
| Wilfrid Aubrey LLC | 100 William Street, Suite 1850<br>New York, NY 10038<br>Attn: Nicholas Walsh |
| Jefferies & Company, Inc. | 11100 Santa Monica Boulevard, 11th Floor<br>Los Angeles, CA 90025<br>Attn: Michael Satzberg |
| Hedgehog Capital LLC | 1117 East Putnam Avenue, #320<br>Riverside, CT 06878<br>Attn: Robert Chung |
| Cape Investments, LLC | One Georgia Center, Suite 1560<br>600 West Peachtree Street<br>Atlanta, GA 30308<br>Attn: J. T. King |
| Valhalla Capital Partners LLC | 2527 Nelson Miller Parkway, Suite 207<br>Louisville, KY 40223<br>Attn: Rip Mercherle |
| Sandler Capital Management | 711 Fifth Avenue, 15th Floor<br>New York, NY 10022<br>Attn: Douglas Schimmel |

| Attorney for Ad Hoc Committee | Address |
|---|---|
| Andrews Kurth LLP | 450 Lexington Avenue<br>New York, NY 10017<br>Attn: Paul N. Silverstein, Esq. |

**Schedule 2**

**Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)[1]**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of March 21, 2008, the 30 largest unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| (1) Name of creditor and complete mailing address, including zip code | (2) Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | (5) Amount of claim as of March 21, 2008 (if secured also state value of security) |
|---|---|---|---|---|
| Wilmington Trust Company Corporate Capital Markets 11100 North Market Street Rodney Square North Wilmington, DE 19890 | Steve Cimalore, Senior Administrator Phone: (302) 636-6058 Fax: (302) 636.6436 | 12% Senior Subordinated Notes Due August 1, 2009 | | $43,154,457.40 |
| Wacker Silicones 3301 Sutton Road Adrian, MI 49221 | Luann Noelanders Phone: (800) 554-1715 Fax: (517) 264-8580 | Trade Payable | | $1,016,845.51 |
| Dow Corning STI 111 S. Progress Drive Kendallville, IN 46755 | Anne Tipple Phone: (260) 347-5813 Fax: (866) 804-8812 | Trade Payable | | $587,294.42 |
| Chase Brass & Copper, Inc. P.O. Box 152 Montpelier, OH 43543 | Cheryl Nofziger Phone: (419) 485-3193 Fax: (419)485-5949 | Trade Payable | | $445,086.77 |
| Momentive Performance Materials, Inc. 187 Danbury Road Wilson, CT 06897 | Linda Ayers Phone: (800) 332-3390 Fax: (304) 746-1623 | Trade Payable | | $314,342.75 |
| Earle M. Jorgensen Company 2060 Enterprise Parkway Twinsburg, OH 44087 | David O'Brien Phone: (215) 949-6639 Fax: (215) 949-6637 | Trade Payable | | $240,981.22 |
| Environmental Products & Services PO Box 4620 Burlington, VT 05406 | Phone: (802) 862-1212 Fax: (315) 471-3846 | Professional services | Disputed | $173,948.25 |
| Signature Aluminum 500 Edward Ave Richmond Hill, ONT L4C4Y | Chip Moore Phone: (905) 427-2228 Fax: (614) 262-5036 | Trade Payable | | $119,526.91 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | *Amount of claim as of March 21, 2008 (if secured also state value of security)* |
| Shin-Etsu Silicones of America, Inc. 1150 Damar Drive Akron, OH 44305 | Elaine McDowell Phone: (330) 630-9460 Fax: (330) 630-9460 | Trade Payable | | $110,710.63 |
| Ohio Edison PO Box 3637 Akron, OH 44309-3637 | Customer Service Phone: (800) 633-4766 Fax: (877) 289-3674 | Utility | | $105,335.25 |
| Keystone Profiles 220 Seventh Ave Beaver Falls, PA 15010 | Frank Cremeens Phone: (800) 777-1533 Fax: (724) 846-3901 | Trade Payable | | $87,090.44 |
| Channel Prime Alliance 800 Connecticut Ave Norwalk, CT 06854 | Ciara Dolloway Phone: (866) 92-9456 Fax: (484) 242-7174 | Trade Payable | | $86,493.00 |
| Vitex Corporation 43 Industrial Park Drive PO Box 6149 Franklin, NH 03235 | Brenda Goodearl Phone: (603) 934-1508 Fax: (314) 867-4304 | Trade Payable | | $81,325.94 |
| American Express PO Box 36001 Ft Lauderdale, FL 33336-0001 | Ann Jacobs Phone: (800) 528-2122 Fax: (626) 492-3888 | Trade Payable | | $77,877.99 |
| PPG Industries, Inc Dept at 40177 Atlanta, GA 31192 | Anew Johnson Phone: (724) 325-5262 Fax: (724) 325-5045 | Trade Payable | | $71,580.72 |
| Haley & Aldrich, Inc. 465 Medford Street Ste 2200 Boston, MA 02129-1400 | Steve Schalabba Phone: (617) 886-7400 Fax: (617) 886-7600 | Professional fees | | $63,452.48 |
| Degussa-Huls Corporation 379 Interpace Parkway Parsippany, NJ 07660 | Fred Pacinich Phone: (973) 541-8410 Fax: (973) 541-8410 | Trade Payable | | $56,305.29 |
| Lintech International PO Box 10225 Macon, GA 31297 | Julie Van Brunt Phone: (800) 652-9297 Fax: (800) 652-9297 | Trade Payable | | $54,038.40 |
| Imperial Die & mfg Co 22930 Royalton Road Strongsville, OH 44149 | Ron Lapossy Phone: (440) 268-9080 Fax: (440) 268-9040 | Trade Payable | | $53,220.00 |
| Gold Key Processing, LTD 14910 Madison Road Middlefield, OH 44062 | Steve Harsh Phone: (440) 632-0901 Fax: (440) 632-0929 | Trade Payable | | $51,451.37 |
| Process Oils, Inc. 11601 Katy Freeway Ste 223 Houston, TX 77079 | Bob Hoch Phone: (330) 494-9630 Fax: (330) 494-9630 | Trade Payable | | $50,886.27 |

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | *Amount of claim as of March 21, 2008 (if secured also state value of security)* |
| Goodyear Tire & Rubber Co. 5055 MLK Drive Beaumont, TX 38024 | Derick McGinness Phone: (330) 796-2121 Fax: (330) 796-1113 | Trade Payable | | $50,457.06 |
| Copper & Brass Sales 5755 Grant Avenue Cleveland, OH 44105 | Dale Sawchik Phone: (216) 883-8100 Fax: (216) 883-1066 | Trade Payable | | $50,068.27 |
| Dalton Box 612 East Callahan Rd Dalton, GA 30721 | Sheila Blair Phone: (706) 226-3580 Fax: (706) 277-3689 | Trade Payable | | $44,221.05 |
| Gosiger Machine Tools PO Box 712288 Cincinnati, OH 45271 | Linda Duale Phone: (440) 248-3111 Fax: (440) 248-3112 | Trade Payable | | $43,757.02 |
| Tecnnical Machine Products 5500 Walworth Avenue Cleveland, OH 44102 | Sherry Fess Phone: (216) 281-9500 Fax: (281) 281-0408 | Trade Payable | | $41,613.75 |
| Excellus Blue Cross PO Box 4752 Rochester, NY 14692 | Customer Service Phone: (585) 232-3310 Fax: (585) 238-4348 | Insurance | | $41,548.43 |
| Preferred Rubber Compounding 1020 Lambert Street Barberton, OH 44203 | Michelle Parks Phone: (330) 798-4909 Fax: (330) 798-4796 | Trade Payable | | $39,695.65 |
| China Auto Group 17815 Sky Park Circle, Suite D Irvine, CA 92614 | Kim Taylor Domines Phone: (949) 261-8208 Fax: (949) 767-5949 | Trade Payable | | $38,077.50 |
| Burnt Mountain Center, Inc 515 Pioneer Rd Jasper, GA 30143 | Kim Hyde Phone: (706) 692-6016 Fax: (706) 277-3689 | Trade Payable | | $37,832.78 |

## Schedule 3

**Consolidated List of Holders of 5 Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following lists the creditors holding, as of March 21, 2008 the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Creditor[1] | Contact | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| CapitalSource Finance LLC | Akim Grate | 4445 Willard Ave. 12th Floor Chevy Chase, MD 20815 (301) 841-2763 | $13,153,987.96[2] | Substantially all of the assets of Lexington Precision Corporation and Lexington Rubber Group, Inc. | Orderly liquidation value as of February 2006 (last appraisal date) of machinery and equipment, approximately $17,484,000; Accounts receivable as of January 31, 2008, approximately $10,539,000; Inventory as of January 31, 2008, approximately $9,731,000; Real estate value as of March 2006 (last appraisal date), approximately $15,080,000. | No |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.

[2] Amounts of claim is as of March 27, 2008.

| Creditor[1] | Contact | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| CapitalSource Finance LLC | Akim Grate | 4445 Willard Ave. 12th Floor Chevy Chase, MD 20815 (301) 841-2763 | $8,333,333.40[3] | Substantially all of the assets of Lexington Precision Corporation and Lexington Rubber Group, Inc. | Orderly liquidation value as of February 2006 (last appraisal date) of machinery and equipment, approximately $17,484,000; Accounts receivable as of January 31, 2008, approximately $10,539,000; Inventory as of January 31, 2008, approximately $9,731,000; Real estate value as of March 2006 (last appraisal date), approximately $15,080,000. | No |

---

[3] Amount of claim as of April 1, 2008.

| Creditor[1] | Contact | Mailing Address & Phone Number | Amount of Claim | Type of Collateral | Value of Collateral | Disputed |
|---|---|---|---|---|---|---|
| CapitalSource Finance LLC | Akim Grate | 4445 Willard Ave. 12th Floor Chevy Chase, MD 20815 (301) 841-2763 | $9,777,777.80 | Substantially all of the assets of Lexington Precision Corporation and Lexington Rubber Group, Inc. | Orderly liquidation value as of February 2006 (last appraisal date) of machinery and equipment, approximately $17,484,000; Accounts receivable as of January 31, 2008, approximately $10,538,000; Inventory as of January 31, 2008, approximately $9,731,000; Real estate value as of March 2006 (last appraisal date), approximately $15,080,000. | No |
| CSE Mortgage LLC | Akim Grate | CSE, as lender c/o CapitalSource Finance LLC 4445 Willard Avenue 12th Floor Chevy Chase, MD 20815 (301) 841-2763 | $4,000,000.00[4] | Specified real estate | Real estate value as of March 2006 (last appraisal date), approximately $15,080,000. | No |
| Commercial Alloys Corporation | George Heinemann | 1831 East Highland Road Twinsburg, OH 44087 (330) 405-5431 | $55,558.88[5] | Prab Metal Chip Processing Unit | Estimated at $150,000.00 | No |

---

[4] Amount of claim as of April 1, 2008.

[5] Amount of claim as of February 29, 2008.

**Schedule 4**

**Consolidated Balance Sheet[1] (Preliminary, unaudited)
as of December 31, 2007 and December 31, 2006**

**(dollars in thousands, except for share data)**

| | December 31, 2007 | December 31, 2006 |
|---|---|---|
| **Assets**: | (unaudited) | (audited) |
| | | |
| Current assets: | | |
| Cash and marketable securities | $ 426 | $ 35 |
| Accounts receivable, net | 10,981 | 9,852 |
| Inventories, net | 9,330 | 8,787 |
| Prepaid expenses and other current assets | 1,032 | 1,073 |
| Deferred income taxes | 98 | 374 |
| Current assets of discontinued operations | 10 | 101 |
| Total current assets | 21,877 | 20,222 |
| | | |
| Property, plant, and equipment, net | 20,854 | 24,226 |
| Plant and equipment of discontinued operations, net | 1,338 | 1,418 |
| Goodwill | 7,623 | 7,623 |
| Other assets, net | 675 | 951 |
| Total assets | 52,367 | $54,440 |
| | | |
| **Liabilities and stockholders' deficit:** | | |
| | | |
| Current liabilities: | | |
| Accounts payable | $ 6,558 | $6,370 |
| Accrued expenses, excluding accrued interest | 3,932 | 3,789 |
| Accrued interest expense | 7,954 | 2,130 |
| Debt in default | 68,739 | 68,967 |
| Current portion of long-term debt | 741 | 734 |
| Current liabilities of discontinued operations | 181 | 221 |
| Total current liabilities | 87,364 | 82,211 |
| | | |
| Long-term debt, excluding current portion | 352 | 406 |
| | | |
| Deferred income taxes | 98 | 374 |
| | | |
| Other long-term liabilities | 444 | 440 |
| Total Liabilities | 88,248 | 83,431 |
| Stockholders' deficit: | | |
| Common stock, $0.25 par value, 10,000,000 shares authorized, 4,981,767 shares issued | 1,238 | 1,235 |
| Additional paid-in-capital | 13,187 | 13,181 |
| Accumulated deficit | (50,306) | (43,407) |
| Total stockholders' deficit | (35,881) | (28,991) |
| Total liabilities and stockholders' deficit | $52,367 | $54,440 |

---

[1] This consolidated balance sheet includes Lexington Precision Corp. and Lexington Rubber Group, Inc.

## Schedule 5

### Publicly Held Securities

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, and other securities of Lexington Precision that are publicly held ("Securities") and the number of holders thereof.  The Securities held by Lexington Precision's directors and officers are listed separately.

### Common Stock

| Type of Security | Number of Shares | Approximate Number of Record Holders | As of |
|---|---|---|---|
| Common stock $0.25 par value, 10,000,000 shares authorized | 5,021,767 shares issued and outstanding [1] | 575 | April 1, 2008 |

[1] Includes 40,000 unvested shares with voting rights as of April 1, 2008.

### Securities Held By the Debtor's Directors and Officers

| Name of Officer or Director | Number of Shares Owned | As of |
|---|---|---|
| Michael A. Lubin | 1,572,906 | February 29, 2008 |
| Warren Delano | 1,304,425 | February 29, 2008 |
| William B. Conner | 391,484 | February 29, 2008 |
| Dennis J. Welhouse | 108,000 | February 29, 2008 |
| Lubin, Delano & Co. | 92,172 | February 29, 2008 |
| Kenneth I. Greenstein | 45,636 | February 29, 2008 |
| Joseph A. Pardo | 56,205 | February 29, 2008 |
| Ruml, Elizabeth | 10,000 | February 29, 2008 |

**Preferred Stock**

| Type of Security | Number of Shares | Approximate Number of Record Holders | As Of |
|---|---|---|---|
| $8 Cumulative Convertible Preferred Stock, Series B, Par Value $100 Per Share | 3,300 | 15 | April 1, 2008 |

**Notes**

| Type of Security | Approximate Number of Record Holders | As Of |
|---|---|---|
| 12.00% Senior Subordinated Notes due August 1, 2009 | 29[2] | May 25, 2007 |

[2] Approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers, and their families and affiliates.

## Schedule 6

**Debtors' Property Not in the Debtors' Possession**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors'
property that is in the possession or custody of any custodian, public officer, mortgagee,
pledge, assignee of rents, secured creditor, or agent for any such entity.

| Type of Property | Person or Entity in Possession of the Property | Address & Telephone Number of Person or Entity in Possession of the Property | Location of Court Proceeding, if Applicable |
|---|---|---|---|
| Work in process | Roy Metal Finishing | 112 Conestee Road Conestee, SC 29636 (864) 527-2386 | N/A |
| Work in process | Wolverine Plating Corp. | 29456 Groesbeck Highway Roseville, MI 48066 (586) 771-5000 | N/A |
| Work in process | Jasco Heat Treating, Inc. | 820 Turk Hill Road Fairport, NY 14450 (585) 388-1040 | N/A |
| Work in process | Centerless Technology | 45 Wells Street Rochester, NY 14611 (585) 436-2240 | N/A |
| Work in process | Varland Metal Services, Inc. | 3231 Fredonia Avenue Cincinnati, OH 45229 (513) 861-0555 | N/A |
| Work in process | Summit Corporation | 1430 Waterbury Road Thompson, CT 06787 (860) 83-4391 | N/A |
| Work in process | General Metal Finishing | Attleboro Industrial Park 42 Frank Mossberg Driver Attleboro, MA 02703 (508) 226-5606 | N/A |
| Work in process | Craftsman Plating & Tinning Corp. | 1250 Melrose Street Chicago, IL 60657 (888) 473-4061 | N/A |
| Work in Process | Bradley Technologies NC Inc. | 152 Walker Rd. Statesville, NC 28625 (704) 872-0763 | N/A |
| Work in process | Production Metal Cutting | PO Box 60635 1 Curlew St. Rochester, NY 14611 (585) 458-7136 | N/A |
| Dies | Oerlion Balzers | 30 General Abrams Drive Agawan, MA 01001 (847) 844-1753 | N/A |
| Dies | Advanced Coating Systems | 30 Hytec Circle, Suiter 100 Rochester, NY 14606 (585) 247-3970 | N/A |

| Equipment | Boulter Industrial Contractor, Inc. | 610 Salt Road<br>Webster, NY 14580<br>Attn: Willis Boulter<br>(585) 265-3260 | N/A |
|---|---|---|---|
| Finished goods | Baxter Healthcare | U.S. Highway 221 North<br>Marion, NC 28752<br>Attn: Diana Buckner<br>(828) 756-6541 | N/A |
| Finished goods | General Cable | 3101 Pleasant Valley<br>Boulevard<br>Altoona, PA 16602<br>Attn: Michael Sgro<br>(814) 944-5002 | N/A |
| Equipment | CSC Partnership | 7901 Cleveland Ave.<br>North Bay C<br>North Canton, OH 44720<br>Attn: Wick Hartung<br>(330) 498-4400 | N/A |
| Equipment | Canton Erectors Incorporated | 2009 Quimby Ave. S.W.<br>Canton, OH 44705<br>(330) 453-7363 | N/A |
| Equipment | Kings Grave Road | 4255 Kings Grave Road (D<br>and F)<br>Vienna, OH 44473<br>(330) 898-8843 | N/A |
| Equipment | Mullinax Properties | 1893 Talking Rock Road,<br>Jasper, GA 30143<br>(706) 692-3439 | N/A |
| Equipment | Melching Machine Inc. | 1630 Baker Drive<br>Ossian, IN 46777<br>(260) 622-4315 | N/A |
| Equipment | Blick Tool & Die Inc. | 117 East Front<br>Dover, OH 44622<br>(330) 343-1277 | N/A |
| Work in process | Anodizing Specialists Inc. | 7547 Tyler Blvd.<br>Mentor, OH 44060-4869<br>(440) 951-0257 | N/A |
| Work in process | Hardcoating Technologies LTD | 103 S. Main St.<br>Munroe Falls, OH 44262<br>(330) 686-2136 | N/A |
| Work in process | Hi-Tech Laser, Inc. | 1220 SE Broadway Dr.<br>Lee's Summit, MO 64081-4604<br>(816) 524-4168 | N/A |
| Work in process | Key Laser Technologies | 1669 W 130th St.<br>Unit #402<br>Hinckley, OH 44233<br>(330) 273-0604 | N/A |
| Work in process | Micro Plating Inc. | 8110 Hawthorne Drive<br>Erie, PA 16509<br>(814) 866-0804 | N/A |

| Work in process | Hi-Tech Plating | 1015 West 18 Street<br>Erie, PA 16502<br>(814) 455-4231 | N/A |
|---|---|---|---|
| Work in process | Solar Atmospheres, Inc. | 30 Industrial Road<br>Hermitage, PA 16148<br>(724) 982-0660 | N/A |
| Finished goods | Lone Star Quality Services | 1117 Eagle Ridge Drive<br>El Paso, TX 79912<br>(915) 877-3024 | N/A |
| Repair | Melching Machine | 1630 Baler Drive<br>Ossian, IN 46777<br>(260) 622-4315 | |

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

| Owned or Lease Address | City | State | Zip Code | Country |
|---|---|---|---|---|
| Lexington Precision Corporation 30195 Chagrin Blvd., Suite 208W (Lease) | Pepper Pike | OH | 44124 | USA |
| Lexington Insulators 1076 Ridgewood Road (Lease) | Jasper | GA | 30143 | USA |
| Lexington Connector Seals 1510 Ridge Road (Own) | Vienna | OH | 44473 | USA |
| Lexington Insulators 1076 Ridgewood Road (Own) | Jasper | GA | 30143 | USA |
| Lexington Machining 1000 Pittsburg-Victor Road (Lease) | Pittsford | NY | 14534 | USA |
| Lexington Medical 633 Bryant Blvd. (Own) | Rock Hill | SC | 29732 | USA |
| Lexington Technologies 3565 Highland Park Street, NW (Own) | North Canton | OH | 44720 | USA |
| Lexington Precision Corporation 201 Winchester Road (Own) | Lakewood | NY | 14750 | USA |
| Lexington Machining 677 Buffalo Road (Own) | Rochester | NY | 14611 | USA |
| Lexington LSR 3565 Highland Park Street, NW (Own) | North Canton | OH | 44720 | USA |
| Lexington Insulators (Own) | Ellijay | GA | | USA |

## Schedule 8

### Location of Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

| Debtor (and name of division, if applicable) | Location of Substantial Assets |
| --- | --- |
| Lexington Rubber Group, Inc. (Lexington Connector Seals) | 1510 Ridge Road Vienna, OH 44473 |
| Lexington Rubber Group, Inc. (Lexington Insulators) | 1076 Ridgewood Road Jasper, GA 30143 |
| Lexington Rubber Group, Inc. (Lexington Medical) | 633 Bryant Blvd. P.O. Box 4477 Rock Hill, SC 29732 |
| Lexington Rubber Group, Inc. (Lexington Technologies) | 3565 Highland Park Street, NW P.O. Box 3076 N. Canton, OH 44720-8076 |
| Lexington Rubber Group, Inc. | Ellijay, GA (Vacant land, no street address) |
| Lexington Precision Corporation | 201 Winchester Road Lakewood, NY 14750 |
| Lexington Precision Corporation (Lexington Machining) | 677 Buffalo Road Rochester, NY 14611 |
| Lexington Precision Corporation | c/o Jefferies & Company, Inc. 11100 Santa Monica Blvd., 11th Floor Los Angeles, CA 90025 |
| Lexington Rubber Group, Inc. (Lexington LSR) | 3565 Highland Park Street, NW PO Box 3076 N. Canton, OH 44720-8076 |

**Books and Records**

| Debtor (and name of division, if applicable) | Location of Books & Records |
|---|---|
| Lexington Rubber Group, Inc. (Lexington Connector Seals) | 1510 Ridge Road Vienna, OH 44473 |
| Lexington Rubber Group, Inc. (Lexington Insulators) | 1076 Ridgewood Road Jasper, GA 30143 |
| Lexington Rubber Group, Inc. (Lexington Medical) | 633 Bryant Blvd P.O. Box 4477 Rock Hill, SC 29732 |
| Lexington Rubber Group, Inc. (Lexington Technologies) | 3565 Highland Park Street, NW P.O. Box 3076 N. Canton, OH 44720-8076 |
| Lexington Precision Corporation | 30195 Chagrin Blvd., Ste 208W Cleveland, OH 44124 |
| Lexington Precision Corporation (Lexington Machining) | 677 Buffalo Road Rochester, NY 14611 |
| Lexington Rubber Group Inc. | 30195 Chagrin Blvd., Ste. 208W Cleveland, OH 44124 |
| Lexington Rubber Group, Inc. (Lexington LSR) | 3565 Highland Park Street, NW PO Box 3076 N. Canton, OH 44720-8076 |

**Debtors' Assets Outside the United States**

None

## **Schedule 9**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Nature of the Action | Status of the Action |
|---|---|---|
| None | | |

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name / Position | Experience / Responsibilities |
| --- | --- |
| Michael A. Lubin / Chairman of the Boards of Directors and co-Chief Executive Officer | Mr. Lubin has been the Chairman of the Debtors' Boards of Directors since 1992 and a co-Chief Executive Officer of the Debtors since 1997.  He has been also a partner of Lubin, Delano & Company, an investment banking and consulting firm, since 1983.  Mr Lubin has been a director of the Debtors since 1985.  For more than five years, Mr. Lubin and Lubin, Delano & Company have devoted virtually 100% of their efforts to activities on behalf of the Debtors. |
| Warren Delano / President and co-Chief Executive Officer | Mr. Delano has been President of the Debtors since 1988 and a co-Chief Executive Officer of the Debtors since 1997.  He has also been a partner of Lubin, Delano & Company, an investment banking and consulting firm, since 1983.  Mr. Delano has been a director of the Debtors since 1985.  For more than five years, Mr. Delano and Lubin, Delano & Company have devoted virtually 100% of their efforts to activities on behalf of the Debtors. |
| Dennis J. Welhouse / Senior Vice President and Chief Financial Officer | Mr. Welhouse has been Senior Vice President and Chief Financial Officer of the Debtors for more than five years. Since 2004, Mr. Welhouse has also served as Secretary of the Company.  Prior to April 2004, for more than five years, Mr. Welhouse was Assistant Secretary of the Debtors. |

## Schedule 11

**Payroll**

   Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the chapter 11 petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)** | $475,000[1] |
| **Payments to Officers, Stockholders, and Directors** | $42,000[2] |
| **Payments to Financial and Business Consultants** | $25,000[3] |

---

[1] Includes the estimated weekly gross payroll for employees, not including officers, directors, and stockholders.

[2] Includes approximately $14,000 of payroll for an officer, and $28,000 for directors' fees.

[3] This does not include any payments to attorneys or auditors.

**Schedule 12**

**Cash Receipts and Disbursements,**
**Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the thirty 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $8,602,000 |
| **Cash Disbursements** | $7,081,000 |
| **Net Cash Gain or Loss** | Loss $1,521,000 |
| **Unpaid Obligations** | Trade accounts payable outstanding as of February 29, 2008 that were also outstanding on or before January 30, 2008 were approximately $3,281,000.<br><br>Trade accounts payable outstanding as of February 29, 2008 that resulted from purchases occurring between January 31, 2008 and February 29, 2008 were approximately $3,190,000. |
| **Unpaid Receivables** | Estimate of trade accounts receivable outstanding as of February 29, 2008 that were outstanding on or before January 30, 2008 were approximately $4,362,000.<br><br>Estimate of trade accounts receivable outstanding as of February 29, 2008 that resulted from sales made between January 30, 2008 and February  29, 2008 were approximately $7,863,000. |