WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| **In re** : | |
| : | **Chapter 11 Case No.** |
| **LEXINGTON PRECISION CORP., et al.,** : | **08-_____  (      )** |
| : | |
| : | **(Jointly Administered)** |
| **Debtors.** : | |

------------------------------------------------------------x

**APPLICATION PURSUANT TO 28 U.S.C. § 156(c) AND LOCAL RULE**
**5075-1(a) FOR AUTHORIZATION TO (i) EMPLOY AND RETAIN EPIQ**
**BANKRUPTCY SOLUTIONS, LLC AS CLAIMS AND NOTICING**
**AGENT FOR THE DEBTORS AND (ii) APPOINT EPIQ**
**BANKRUPTCY SOLUTIONS, LLC AS AGENT FOR THE BANKRUPTCY COURT**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation and Lexington Rubber Group, Inc., as debtors

and debtors in possession (collectively, "Lexington" or the "Debtors"), respectfully represent:

**Background**

        1.      On the date hereof (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.       Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Lexington's Business**

3.       Lexington manufactures large volumes of high-quality rubber and metal components at competitive prices for use primarily in automobiles and medical devices. Lexington operates through two operating segments—the Rubber Group and the Metals Group. Lexington's components are generally sold to other manufacturers.

4.       Lexington is one of North America's largest manufacturers of rubber components for the automotive industry.  The Rubber Group's principal products are connector seals used in primary wire harnesses and insulators for ignition wire sets.  The Rubber Group also manufactures and sells rubber components used in a variety of medical devices, including drug delivery systems, syringes, laparoscopic instruments, and catheters, which are sold to some of the world's largest medical device manufacturers.

5.       The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks primarily for manufacturers within the automotive industry.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

6.       Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of February 29, 2008, Lexington employed approximately 651 permanent and 22 temporary employees, of which 134 are salaried employees and 517 are hourly employees.  In 2007, Rubber Group net sales totaled $74.5 million and Metals Group net sales totaled $13.8 million.  As of December 31,

2007, Lexington's consolidated unaudited financial statements reflected assets totaling

approximately $52.6 million, and current liabilities totaling approximately $88.5 million.

Notwithstanding the Debtors' negative "book net worth" calculated in accordance with generally

accepted accounting principles, the Debtors have received a number of offers for all or portions

of the assets and business of the Lexington Rubber Group, the largest of the Debtors' operations

and the generator of the preponderance of the Debtors' sales and earnings, each of which clearly

indicates that the value of the Debtors' assets far exceeds the Debtors' liabilities. Consequently,

the Debtors believe that they are solvent and that the equity securities of Lexington Precision

have significant value.

### Jurisdiction

7.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

8.     By this application (the "Application"), the Debtors seek authorization to

employ Epiq Bankruptcy Solutions, LLC. ("Epiq") as the Debtors' claims and noticing agent

(the "Agent") in connection with the Debtors' chapter 11 cases pursuant to the terms and

conditions of the Standard Bankruptcy Services Agreement, dated April 1, 2008, a copy of which

is annexed hereto as Exhibit A (the "Retention Agreement").

## The Retention of Epiq

9.      Section 156(c) of title 28 of the United States Code, which governs the

staffing and expenses of the Bankruptcy Court, authorizes the Court to use facilities other than

those of the Clerk's Office for the administration of chapter 11 cases.  It provides:

> [a]ny court may utilize facilities or services, either on or off the
> court's premises, which pertain to the provision of notices,
> dockets, calendars, and other administrative information to parties
> in cases filed under the provisions of title 11, United States Code,
> where the costs of such facilities or services are paid for out of the
> assets of the estates and are not charged to the United States.

28 U.S.C. § 156(c).

10.      Further, Local Rule 5075-1(a) of the Local Rules of the Bankruptcy

Procedure for the United States Bankruptcy Court for the Southern District of New York (the

"Local Rules") provides:

> The Court may direct… the use of agents either on or off the
> Court's premises to file Court records, either by paper or electronic
> means, to issue notices, to maintain case dockets, to maintain
> Judge's calendars, and to maintain and disseminate other
> administrative information where the costs of such facilities or
> services are paid for by the estate.

Local Rule 5075-1(a).

11.      The Debtors estimate that they have in excess of 800 creditors.  Noticing,

receiving, docketing and maintaining proofs of claims from such a large number of creditors may

be unduly time consuming and burdensome for the Clerk of the Court.

12.      The Debtors believe that the retention of Epiq as the Court's outside agent

is in the best interests of their estates and parties in interest.  As set forth more fully in the

Affidavit of Daniel C. McElhinney, attached hereto as Exhibit B (the "McElhinney Affidavit"),

Epiq is a nationally recognized specialist in chapter 11 administration and has vast experience in

noticing and claims administration in chapter 11 cases in this and other districts, including,

among others:  In re PRC, et al., No. 08-10239 (JMP) (Bankr. S.D.N.Y. Jan. 25, 2008) [Doc.

No. 35]; In re Global Crossing Ltd., et al., No 02-40188 (Bankr. S.D.N.Y. Jan. 29, 2002) [Doc.

No. 31]; In re Worldcom, Inc., et al., No. 02-13533 (Bankr. S.D.N.Y. July 25, 2002) [Doc.

No. 102]; and In re Enron Corp., et al. No. 01-16034 (Bankr. S.D.N.Y. Jan 30, 2002) [Doc.

No. 1191].

## **Scope of Services**

13.    Subject to the Court's approval, Epiq has agreed to provide the following

services among others at the Debtors' request in the Debtors' chapter 11 cases:[1]

    (a)    notifying all potential creditors of the filing of the bankruptcy
petition and of the setting of the first meeting of creditors pursuant
to section 341(a) of the Bankruptcy Code, under the proper
provisions of the Bankruptcy Code and the Bankruptcy Rules;

    (b)    assisting with and maintaining an official copy of the Debtors'
schedules of assets and liabilities and statements of financial
affairs (collectively, the "Schedules"), listing the Debtors' known
creditors and the amounts owed thereto;

    (c)    notifying all potential creditors of the existence and amount of
their respective claims as set forth in the Schedules;

    (d)    docketing all claims received, maintaining the official claims
register (the "Claims Register") for the Debtors on behalf of the
Clerk, and providing the Clerk with a certified, duplicate,
unofficial Claims Register on a monthly basis, unless otherwise
directed;

    (e)    recording all transfers of claims and providing any notices of such
transfers required by Bankruptcy Rule 3001; and

    (f)    making changes in the Claims Register pursuant to Court Order;

---

[1]  To the extent that this Application and the terms of the Retention Agreement are inconsistent, the terms
of the Retention Agreement shall control. Capitalized terms used in this Application without definition
shall have the meanings assigned to them in the Retention Agreement; provided, however, that to the
extent plan voting and tabulation services are needed with respect to beneficial holders of public debt
and/or equity, such services will not be provided except as approved by the Court upon a separate
application therefor.

## Compensation

14.      The Debtors request authority to compensate and reimburse Epiq in accordance with the payment terms of the Retention Agreement for all services rendered and expenses incurred in connection with the Debtors' chapter 11 cases.  The Retention Agreement also provides for a $5,000 retainer.  Courts in this and other districts have approved similar retainers in other chapter 11 cases, including, among others: In re PRC, et al., No. 08-10239 (JMP) (Bankr. S.D.N.Y. Jan. 25, 2008) [Doc. No. 35]; In re Global Crossing Ltd., et al., No 02-40188 (Bankr. S.D.N.Y. Jan. 29, 2002) [Doc. No. 31]; and In re Worldcom, Inc., et al., No. 02-13533 (Bankr. S.D.N.Y. July 25, 2002) [Doc. No. 102].

15.      The Debtors believe that such compensation rates are reasonable and appropriate for services of this nature and comparable to those other providers charge for similar services.  In an effort to reduce the administrative expenses related to Epiq's retention, the Debtors seek authorization to pay Epiq's fees and expenses in accordance with the provisions of the Retention Agreement without Epiq filing formal fee applications.

16.      Epiq has acknowledged that it will perform its duties if the Debtors retain Epiq in the Debtors' chapter 11 cases regardless of payment and to the extent that Epiq requires redress, Epiq will seek appropriate relief from the Court.  Epiq will continue to perform the services as the Retention Agreement contemplates in the event the Debtors' chapter 11 cases are converted to chapter 7 cases.  In the event that Epiq's services are terminated, Epiq shall perform its duties until the occurrence of a complete transition with the Clerk's Office or any successor claims/noticing agent.

## Epiq's Disinterestedness

17.      The Debtors have been advised that, except as set forth more fully in the McElhinney Affidavit, based on the results of the search performed to date (i) Epiq has no

connection with the Debtors, their creditors or other parties in interest in these cases, and (ii) Epiq does not hold or represent any interest adverse to the Debtors' estates.

18.   To the best of the Debtors' knowledge Epiq is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.  Epiq has represented to the Debtors that Epiq will not represent any entities or individuals other than the Debtors in these chapter 11 cases or in connection with any matters that would be adverse to the interests of the Debtors.

19.   As set forth in the McElhinney Affidavit, Debtors owe no amount to Epiq.

20.   Epiq has advised the Debtors that Epiq will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new facts or circumstances are discovered, Epiq will supplement its disclosure to the Court.

21.   Epiq has also advised the Debtors that, Epiq has agreed not to share with any person or firm, other than its own affiliates, partners, and employees, the compensation to be paid for professional services rendered in connection with these cases.

22.   Because the claims-related services are necessary in these cases, the Debtors believe that the employment of Epiq for the services set forth above is appropriate and in the best interests of the Debtors' estates.  The Debtors request, therefore, authority to employ and retain Epiq on the terms and conditions set forth therein.

## **Notice**

23.   No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases.  Notice of this Application has been provided to (i) the United States Trustee for the Southern District of New York, (ii) the attorneys for the agents for the Debtors' prepetition lenders, (iii) the attorneys for the Debtors' proposed postpetition lenders, (iv) the attorneys for the ad hoc committee of noteholders, and (v) the holders of the 30 largest unsecured

claims against the Debtors (on a consolidated basis). The Debtors submit that no other or further notice need be provided.

24.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated:  April 1, 2008
        New York, New York

LEXINGTON PRECISION CORPORATION

By:  /s/ Michael A. Lubin
     Michael A. Lubin
     Chairman of the Board of Directors
     (Co-Principal Executive Officer)

LEXINGTON RUBBER GROUP, INC.

By:  /s/ Michael A. Lubin
     Michael A. Lubin
     Chairman of the Board of Directors
     (Co-Principal Executive Officer)

Debtors and Debtors in Possession

**EXHIBIT A**
**Retention Agreement**



P 646 282 2500  F 646 282 2501
757 THIRD AVENUE, NEW YORK, NY 10017
WWW.EPIQSYSTEMS.COM

## EPIQ BANKRUPTCY SOLUTIONS, LLC

### STANDARD BANKRUPTCY SERVICES AGREEMENT

Between Epiq Bankruptcy Solutions, LLC (formerly known as Bankruptcy Services LLC), a New York limited liability company ("Epiq") and Lexington Precision Corporation (the "Customer" or "Debtor"), dated as of April 1, 2008.

In consideration of the premises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### General Terms and Conditions

1. Services.

In accordance with the charges, terms and conditions contained in this Agreement and in the schedule attached hereto (the "Agreement"), Epiq agrees to furnish Customer with computerized bankruptcy support services and bankruptcy administrative services according to the pricing schedule annexed hereto (the "Schedule"). This Schedule sets forth individual unit pricing for services provided by Epiq. The price listed for each service represents a bona fide proposal for that service and the Customer may accept separate Service components or may accept the Services listed in their entirety. Services will be provided when requested by the Customer. Services are mutually exclusive and are deemed delivered and accepted when provided by Epiq.

2. Term.

This Agreement shall become effective on the later of (i) the date of its acceptance by Epiq and (ii) the date of entry of an order by the Bankruptcy Court approving this Agreement (or such earlier date set by the Bankruptcy Court). **The Agreement shall remain in effect until terminated by the Customer on one (1) month's prior written notice received by Epiq and entry of an order of the Court discharging Epiq as claims agent or by Epiq upon three (3) month's prior written notice received by the Customer and entry of an order of the Court discharging Epiq as claims agent.**

3. Charges.

3.1  For services and materials furnished by Epiq under this Agreement, Customer shall pay the charges set forth in the schedule annexed hereto attached hereto and made a part of this Agreement. Epiq will bill Customer monthly. All invoices shall be due and payable upon receipt.

3.2  Epiq reserves the right to reasonably increase its prices, charges and rates annually on January 2nd of each year. However, if such increases exceed 10%, Epiq will be required to give sixty (60) days prior written notice to Customer.

3.3  Customer agrees to pay Epiq for all materials necessary for Epiq's performance under this Agreement, other than computer hardware and software, and any reasonable out of pocket expenses including, without limitation, transportation, long distance communications, printing, postage and related items.



3.4  In addition to all charges for services and materials hereunder, Customer shall pay to Epiq all taxes, however designated, levied or based that are applicable to this Agreement or are measured directly by payments made under this Agreement and are required to be collected by Epiq or paid by Epiq to taxing authorities.  This provision, includes but is not limited to, sales, use and excise taxes, but does not include personal property taxes or taxes based on net income.

3.5  In addition to all other charges for services and materials hereunder, Customer shall pay to Epiq any actual charges related to, arising out of or as a result of any Customer error or omission, as mutually agreed by Epiq and Customer. Such charges shall include but not be limited to re-runs and any additional clerical work billed at the Epiq then prevailing standard rates, supplies, long distance phone calls, travel expenses and overtime expenses for work chargeable at the rates set forth on the schedule annexed hereto.

3.6  Where the Customer requires measures that are unusual and beyond normal business practice of Epiq such as but not limited to CPA audit, errors and omissions insurance, or off premises storage of data, the cost of such measures, if provided by Epiq, shall be charged to the Customer at a competitive rate.

3.7  In the event of termination due to Customer's default, Customer shall be liable for all amounts then owing.

3.8  Upon the Court's approval of the Agreement, Customer shall pay Epiq a retainer in the amount of $5,000 to be applied against Epiq's final invoice for the services provided herein.

4. Confidentiality.

All of Customer's data given to Epiq will be safeguarded by Epiq to the same extent that Epiq safeguards data relating to its own business; provided, however, that if data is publicly available, was already in Epiq's possession or known to it, or was rightfully obtained by Epiq from a third party, Epiq shall bear no responsibility for disclosure.  Customer agrees that Epiq shall not be liable for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any material supplied by Customer to Epiq in the performance of this Agreement.

5. Title to Property.

Epiq reserves all property rights in and to all materials, concepts, know-how, techniques, programs, systems and other information, including, without limitation, data processing programs, specifications, applications, routines, sub-routines, procedural manuals and documentation furnished or developed by Epiq for itself or for use by the Customer ("Property").  Charges paid by Customer do not vest in Customer any rights to the Property, it being expressly understood that the Property is made available to Customer under this Agreement solely for Customer's use during and in connection with each use of the Epiq equipment and services.  Customer agrees not to copy or permit others to copy any of the Property.

6. Disposition of Data.

Any data, programs, storage media or other materials furnished by the Customer to Epiq in connection with this Agreement may be retained by Epiq until the services provided herein are paid for, or until this Agreement is terminated with the services provided herein having been paid for in full.  Customer shall remain liable for all charges imposed under this Agreement as a result of data or physical media maintained by Epiq.  Epiq shall dispose of the data and media in the manner requested by Customer.  Customer agrees to pay Epiq for reasonable expenses incurred as a result of the disposition of the data or media.  After giving Customer thirty (30) days advance notice, Epiq reserves the right to dispose of data or media maintained by Epiq for Customer if Customer has not utilized the services provided herein for a period of at least ninety (90) days or if Customer has not paid all charges due to Epiq.

7. Limitation of Liability, Warranty and Indemnity.

7.1  Except as provided herein, Epiq's liability to Customer or any person claiming through or under Customer for any claim, loss, damage, expense of any kind, or for any lost profits, loss of business or other consequential damages even



if Epiq has been advised of the possibility of such damages, whether direct or indirect and unless due to gross negligence or willful misconduct of Epiq shall be limited to the total amount billed or billable to Customer for the portion of the particular work which gave rise to the loss or damage. In no event shall Epiq be liable to Customer for any special or consequential damages (including loss of anticipated profits) incurred by Customer in connection with or arising out of the services provided for in this Agreement.

7.2  Customer is responsible for the accuracy of the programs and data it submits for processing to Epiq and for the output. Customer agrees to initiate and maintain backup files that would allow Customer to regenerate or duplicate all programs and data submitted by Customer to Epiq.

**7.3  Customer agrees that except as set forth in the paragraph 7.1 above, Epiq makes no representations or warranties, express or implied, including but not limited to, any implied or express warranty of merchantability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity.**

7.4  The Customer shall indemnify and hold Epiq, its affiliates and each of their respective officers, members, directors, agents, consultants and employees (each an "Indemnified Person") harmless, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, costs of preparation and attorneys' fees) and expenses as incurred (collectively, "Losses"), to which any Indemnified Person may become subject or involved in any capacity arising out of or relating to this Agreement or Epiq's rendering of services pursuant hereto, regardless of whether any of such Indemnified Persons is a party thereto, other than Losses resulting solely from Epiq's gross negligence or willful misconduct. Without limiting the generality of the foregoing, "Losses" includes any liabilities resulting from claims by third persons against any Indemnified Person. The Customer shall notify Epiq in writing promptly of the commencement, institution, threat, or assertion of any claim, action or proceeding of which the Customer is aware with respect to the services provided by Epiq under this Agreement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Customer and shall survive the termination of this Agreement until the expiration of all applicable statutes of limitation with respect to Epiq's liabilities.

8. Bank Accounts

At the Customer's request, Epiq shall be authorized to establish accounts with financial institutions in the name of and as agent for the Customer. To the extent certain financial products are provided to the Customer pursuant to Epiq's agreement with certain financial institutions, Epiq may receive compensation from such financial institutions for the services Epiq provides pursuant to such agreement.

9. Confidential On-Line Workspace

Epiq shall be authorized to: (a) establish a confidential on-line workspace with IntraLinks in connection with the provision of its services to the Customer pursuant to this Agreement; and (b) with the consent of the Customer and/or its designees, publish documents and other information to such confidential workspace. By publishing documents and other information to this confidential workspace in accordance with the foregoing, Epiq shall not be considered in violation of any of the provisions of this Agreement, including, but not limited to, Section 4 (Confidentiality).

10. General

10.1  No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

10.2  This Agreement may not be assigned by Customer without the express written consent of Epiq, which consent shall not be unreasonably withheld. The services provided under this Agreement are for the sole benefit and use of Customer, and shall not be made available to any other persons.



10.3  This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law.

10.4  The parties agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

10.5  Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by certified mail, postage prepaid, and addressed as follows:

> If to Epiq:
>
> > Epiq Bankruptcy Solutions, LLC
> > 757 Third Avenue, Third Floor
> > New York, NY 10017
> > Attn:  Ron Jacobs
>
> If to Customer:
>
> > Lexington Precision Corporation
> > 800 Third Avenue, 15th Floor
> > New York, NY 10023
> > Attn: Michael A. Lubin
>
> With a copy to:
>
> > Marcia L. Goldstein, Esq.
> > Weil Gotshal & Manges LLP
> > 767 Fifth Avenue
> > New York, NY 10153



10.6  This Agreement shall be subject to approval of the United States Bankruptcy Court for the Southern District of New York.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

EPIQ BANKRUPTCY SOLUTIONS, LLC

Name:   Daniel C. McElhinney
Title:    Sr. Vice President, Director of Operations

LEXINGTON PRECISION CORPORATION

By:_____

Name:   Michael A. Lubin
Title:    Chairman of the Board of Directors and Co-Chief Executive Officer



# Pricing

Case Management Services:

| Title | Rate Range | Average Rate |
|---|---|---|
| Clerk | $40 - $60 per hour | $ 50.00 |
| Case Manager (Level 1) | $125 - $175 per hour | $142.50 |
| IT Programming Consultant | $140 - $190 per hour | $165.00 |
| Case Manager (Level 2) | $185 - $220 per hour | $202.50 |
| Senior Case Manager | $225 - $275 per hour | $247.50 |
| Senior Consultant | TBD | TBD* |

The level of Senior Consultant activity will vary by engagement. If such services are required, the usual average rate is $295 per hour. Please note, fees for services rendered by Dan McElhinney, Senior Vice President and Director of Operations, during the first 6 months of this engagement will be waived. Also, any additional professional services not specifically covered by this proposal will be charged at hourly rates, including any outsourced data input services performed under our supervision and control. Outside vendors may charge a premium for weekend and overtime work.

Claims Management Services:

| | |
|---|---|
| Database and System Access (No restriction on number of users) | $ .10 per record per month |
| Data Transfer | $ .10 per creditor |
| Manual Claims Input | $ .35 per claim plus hourly rates |
| Document Storage | Waived |



# Pricing

Printing, Mailing and Noticing:

| | |
|---|---|
| Set up | Waived |
| Printing | $ .10 per image and/or page including the envelope face) |
| Collate, fold and/or insert | $ .10 each piece |
| Postage and overnight delivery | At cost |
| Electronic noticing | $ .02 per page |
| Legal notice publishing | Quote prior to publishing |
| Claim acknowledgement card | $ .25 per notice |
| Fax | $ .20 per page |

Document Management/Imaging:

| | |
|---|---|
| Electronic imaging (scanning/bar coding) | $ .30 per image |
| Additional OCR capture | $ .10 per image |
| CD burning (mass document storage) | Varies upon requirements |
| Development/Hosting Case Specific Website | Waived |
| Case Data Web Traffic | Waived |

Confidential Document Management:

| | |
|---|---|
| Standard Confidential on-line workspace | $1.30 per page per 6 months |

Voting Tabulation and Reports:

| | |
|---|---|
| Set-up, tabulation and vote verification | Applicable consulting fees only |
| Printing and mailing of ballots | Subject to unit pricing for mailing and noticing above |
| Solicitation and Notification of Public Securities Holders | Varies upon requirements |



# Pricing

Please note that Epiq will coordinate outside services for notice publication, printing and scanning upon request. Reimbursable expenses including travel, envelopes and courier services are billed at cost. Postage is payable in advance of any mailings.

Disbursements:

   Transaction fees:

     Per check or Form 1099      $1.50 each
     Per record to transfer agent    $ .25 each

<u>**EXHIBIT B**</u>

**Affidavit of Daniel C. McElhinney**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                           :
                                                :        **Chapter 11 Case No.**
**LEXINGTON CORPORATION, et al.,**              :        **08-_____ (      )**
                                                :
                                                :        **(Jointly Administered)**
                            **Debtors.**        :
-------------------------------------------------------------x

**AFFIDAVIT OF DANIEL C. MCELHINNEY IN SUPPORT OF THE
APPLICATION TO EMPLOY AND RETAIN EPIQ BANKRUPTCY SOLUTIONS, LLC
AS CLAIMS AND NOTICING AGENT FOR THE DEBTORS**

STATE OF NEW YORK      )
                       )        ss:
COUNTY OF NEW YORK     )

      Daniel C. McElhinney, being duly sworn, deposes and says:

      1.      I am Senior Vice President and Director of Operations of Epiq Bankruptcy Solutions, LLC ("Epiq"), which provides chapter 11 claims management, noticing, case administration and related services.  I submit this affidavit in support of the application (the "Application") of Lexington Precision Corporation and Lexington Rubber Group, as debtors and debtors in possession (collectively, the "Debtors"), for entry of an order to employ and retain Epiq as claims and noticing agent in these chapter 11 cases (the "Agent").

      2.      The Application and that certain Standard Bankruptcy Services Agreement, dated as of April 1, 2008, attached to the Application as Exhibit A (the "Retention Agreement") and incorporated herein by reference, describe the services Epiq proposes to render as Agent.

      3.      Epiq specializes in providing claims management, noticing, case administration and related services to chapter 11 debtors in connection with the administration, reconciliation and negotiation of claims and solicitation of votes to accept or reject plans of

reorganization.  Epiq specializes and has expertise in serving as outside claims agent to United

States bankruptcy courts with respect to all aspects of claims administration, including docketing

and storage of claims, maintenance of claims registers and related noticing services.  Epiq has

provided identical or substantially similar services to chapter 11 debtors in other cases,

including, among others: In re PRC, et al., No. 08-10239 (JMP) (Bankr. S.D.N.Y. Jan. 25, 2008)

[Doc. No. 35]; In re Global Crossing Ltd., et al., No 02-40188 (Bankr. S.D.N.Y. Jan. 29, 2002)

[Doc. No. 31]; In re Worldcom, Inc., et al., No. 02-13533 (Bankr. S.D.N.Y. July 25, 2002) [Doc.

No. 102]; and In re Enron Corp., et al. No. 01-16034 (Bankr. S.D.N.Y. Jan 30, 2002) [Doc.

No. 1191].  Accordingly, I believe Epiq is well qualified to act as Agent for these cases.

      4.      Epiq does not have or represent any interest materially adverse to the

interests of the Debtors by reason of any direct or indirect relationship to, or connection with,

any class of creditors of the Debtors, or for any other reason.  Epiq has no connection with the

Debtors, their creditors or other parties in interest in these cases.  Further, Epiq does not hold or

represent any interest adverse to the Debtors' estates.

      5.      To the best of my knowledge, Epiq is a "disinterested person" as that term

is defined in section 101(14) of Title 11 of the United States Code (as amended, the "Bankruptcy

Code"), as modified by section 1107(b) of the Bankruptcy Code.

      6.      Epiq will conduct an ongoing review of its files to ensure that no conflicts

or other disqualifying circumstances exist or arise.  If any new facts or circumstances are

discovered, Epiq will supplement its disclosure to the Court.

      7.      Epiq has not been retained to assist any entity or person other than the

Debtors on matters relating to these chapter 11 cases.  If Epiq's proposed retention is approved

by this Court, Epiq will not accept any engagement or perform any service for any entity or

person other than the Debtors in these chapter 11 cases.  Epiq may, however, provide professional services to entities or persons that may be creditors or parties in interest in these chapter 11 cases, provided that such services do not relate to the Debtors or their chapter 11 cases.  In addition, Epiq may utilize services provided by vendors that may be creditors or parties in interest of the Debtors.

8.      To date, there are no outstanding amounts owed by the Debtors to Epiq.

9.      As compensation for Epiq's services, Epiq will charge the rates set forth on the Pricing Schedule attached to the Retention Agreement.  These rates are at least as favorable as those Epiq charges to other chapter 11 debtors for similar services.  Epiq will comply with all requests of the office of the clerk of the bankruptcy court and follow the guidelines the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c) promulgated.  Epiq proposes to be paid by the Debtors in the ordinary course of their business without further application to this Court.

10.     Epiq will not share with any person or firm, other than Epiq's own affiliates, partners, and employees, the compensation to be paid for professional services rendered in connection with this case.

11.     Epiq will comply with all of its obligations and responsibilities under the Protocol for the Employment of Claims Agents, dated May 8, 2006, issued by the Clerk of the Court.  To that end, I am informed by counsel that proposals from three court-approved claims agents (including Epiq) were obtained and reviewed by the Debtors prior to selection of Epiq to serve as claims and noticing agent in these cases.

12.     Epiq will perform its duties if it is retained in the Debtors' chapter 11 case regardless of payment.  To the extent that Epiq requires redress, it will seek appropriate relief

from the Court.  Epiq will continue to perform the services as the Retention Agreement

contemplates in the event the Debtors' chapter 11 cases are converted to chapter 7 cases.  In the

event that Epiq's services are terminated, Epiq shall perform its duties until the occurrence of a

complete transition with the Clerk's Office or any successor claims/noticing agent.

/s/ Daniel C. McElhinney
Name:  Daniel C. McElhinney
Title:  Senior Vice President

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 1st day of April, 2008.

/s/ Diane M. Streany

Notary Public
Notary Public, State of New York
No.01ST5003825
Qualified in   Westchester County
Commission Expires  November 2, 2010

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                          :
                                                               :      **Chapter 11 Case No.**
**LEXINGTON PRECISION CORP., et al.,**          :      **08-_____ (      )**
                                                               :
                                                               :      **(Jointly Administered)**
                              Debtors.                  :
-------------------------------------------------------------x

### ORDER PURSUANT TO 28 U.S.C. § 156(c) AND LOCAL RULE 5075-1(a) (i) AUTHORIZING THE EMPLOYMENT OF EPIQ BANKRUPTCY SOLUTIONS LLC AS CLAIMS AND NOTICING AGENT FOR THE DEBTORS AND (ii) APPOINTING EPIQ BANKRUPTCY SOLUTIONS, INC. AS AGENT OF THE BANKRUPTCY COURT

Upon the application dated April 1, 2008 (the "Application") of Lexington

Precision Corporation and Lexington Rubber Group, Inc., as debtors and debtors in possession

(collectively, the "Debtors"), for an order pursuant to section 156(c) of title 28 of the United

States Code for authorization to employ Epiq Bankruptcy Solutions, LLC. ("Epiq") as noticing

and claims agent, as more fully set forth in the Application; and upon consideration of Affidavit

of Daniel C. Mc.Elhinney in Support of the Application, annexed to the Application as

Exhibit B; and the Debtors having estimated that in excess of 800 creditors and other parties in

interest exist in these chapter 11 cases, many of which the Debtors expect to file proofs of claim;

and it appearing that noticing, receiving, docketing and maintaining proofs of claim in this

volume will be unduly time consuming and burdensome for the Clerk; and the Court being

authorized under 28 U.S.C. § 156(c) and Local Rule 5075-1(a) of the Local Rules of the United

States Bankruptcy Court for the Southern District of New York to utilize, at the Debtors'

expense, outside agents and facilities to provide notices to parties in title 11 cases and to receive,

docket, maintain, photocopy and transmit proofs of claim; and the Court being satisfied that Epiq

has the capability and experience to provide such services and that Epiq does not hold an interest

adverse to the Debtors or the Debtors' estates with respect to the matters upon which Epiq is to

be engaged; and the Court having jurisdiction to consider the Application and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Application and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Application having been provided to (i) the United States Trustee for the Southern District of

New York, (ii) the attorneys for the agents for the Debtors' prepetition lenders, (iii) the attorneys

for the Debtors' proposed postpetition lenders, (iv) the attorneys for the ad hoc committee of

noteholders, and (v) the holders of the 30 largest unsecured claims against the Debtors (on a

consolidated basis), and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Application (the "Hearing"); and

the appearances of all interested parties having been noted in the record of the Hearing; and upon

the Affidavit of Dennis J. Welhouse Pursuant to Local Bankruptcy Rule 1007-2, sworn to on

April 1, 2008, the record of the Hearing, and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Application is in the best

interests of the Debtors, their estates and creditors, and all parties in interest and that the legal

and factual bases set forth in the Application establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

       ORDERED that the Application is granted; and it is further

       ORDERED that the Debtors are authorized to retain and employ Epiq, effective

as of the commencement of these chapter 11 cases, to perform the noticing and other services

described in the Application and to receive, maintain, record, and otherwise administer the

proofs of claim filed in these chapter 11 cases; and it is further

   ORDERED that Epiq is appointed as agent for the Clerk and custodian of court

records and, as such, is designated as the authorized repository for all proofs of claim filed in

these chapter 11 cases and is authorized and directed to maintain official claims registers for

each of the Debtors and to provide the Clerk with a certified duplicate thereof on a monthly basis

unless otherwise directed by the Clerk; and it is further

   ORDERED that Epiq is authorized and directed to perform all related tasks to

process the proofs of claim and maintain a claims register including, without limitation:

  (a)  notifying all potential creditors of the filing of the bankruptcy petition and of the setting of the first meeting of creditors pursuant to section 341(a) of the Bankruptcy Code, under the proper provisions of the Bankruptcy Code and the Bankruptcy Rules;

  (b)  assisting with and maintaining an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"), listing the Debtors' known creditors and the amounts owed thereto;

  (c)  notifying all potential creditors of the existence and amount of their respective claims as set forth in the Schedules;

  (d)  docketing all claims received, maintaining the official claims register (the "Claims Register") for the Debtors on behalf of the Clerk, and providing the Clerk with a certified duplicate unofficial Claims Register on a monthly basis, unless otherwise directed;

  (e)  recording all transfers of claims and providing any notices of such transfers required by Bankruptcy Rule 3001; and

  (f)  making changes in the Claims Register pursuant to Court Order;

   ORDERED that Epiq is authorized to take such other action as is reasonably

necessary to comply with all duties set forth in the Application and this Order; and it is further

ORDERED that the Debtors are authorized to compensate Epiq on a monthly basis, in accordance with the Standard Bankruptcy Services Agreement, dated April 1, 2008, annexed to the Application as <u>Exhibit A</u>, upon receipt of reasonably detailed invoices setting forth the services Epiq provided in the prior month and the rates charged for each service, and to reimburse Epiq for all reasonable and necessary expenses Epiq may incur upon the presentation of appropriate documentation and without the necessity for Epiq to file an application for reimbursement with the Court; and it is further

ORDERED if these cases convert to cases under chapter 7, Epiq will continue to be paid for its services until the claims filed in these chapter 11 cases have been completely processed; if claims agent representation is necessary in the converted chapter 7 cases, Epiq will continue to be paid in accordance with 28 U.S.C. §156(c) under the terms set out herein; and it is further

ORDERED that in the event Epiq is unable to provide the services set out in this Order, Epiq will immediately notify the Clerk and the Debtors' attorneys and cause all original proofs of claim and computer information to be turned over to another claims agent with the advice and consent of the Clerk and Debtors' attorneys.

Dated:  April __, 2008
         New York, New York

_____
United States Bankruptcy Judge