WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**LEXINGTON PRECISION CORP., et al.,** : **08- _____ (  )**
:
**Debtors.** : **(Jointly Administered)**
:
-------------------------------------------------------------x

**DEBTORS' MOTION (A) FOR AUTHORIZATION PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 364(c)(1), AND 364(e) TO (i) USE CASH COLLATERAL,**
**(ii) GRANT ADEQUATE PROTECTION TO PREPETITION SENIOR LENDERS,**
**AND (iii) OBTAIN POSTPETITION INTERIM AND FINAL FINANCING, AND**
**(B) TO SCHEDULE A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

**SUMMARY OF RELIEF REQUESTED[1]**

1.      By this motion, the Debtors request entry of interim (the "Interim Order")

and final orders (the "Final Order," and together with the Interim Order, the "DIP Orders") (a)

---

[1] Unless stated otherwise, all capitalized terms not defined in this summary shall have the
meaning ascribed to such term later in the proposed Interim Order annexed hereto.

granting, pursuant to sections 105, 361, 362, 363, 364(c)(1), and 364(e) of chapter 11 of title 11

of the United States Code (the "Bankruptcy Code"), (i) approval to use Cash Collateral (as

defined below), (ii) authorization to grant adequate protection to the Debtors' prepetition senior

lenders, and (iii) authorization to obtain a postpetition super-priority, unsecured loans in the

aggregate principal amount of $4 million, of which $2 million is to be borrowed on an interim

basis, with all loans to be evidenced by and subject to the terms and conditions of one or more

Notes (as hereinafter defined) and the DIP Orders, and (b) scheduling a final hearing (the "Final

Hearing") thereon.  In accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), below is a summary[2] of the terms of the proposed use of Cash

Collateral (as defined below) and DIP Loans (as defined below):

### A.    Cash Collateral

(i)     Parties with Interest in Cash Collateral. The parties with interest in Cash
        Collateral are (i) CapitalSource Finance LLC and Webster Business Credit
        Corporation, as agents and lenders under that certain Credit and Security
        Agreement, dated as of May 31, 2006, and any other lenders thereto, and
        (ii) CSE Mortgage LLC, as agent and lender, DMD Special Situations,
        LLC, as lender, and any other lenders under that certain Loan and Security
        Agreement, dated as of May 31, 2006. Motion, ¶¶ 11, 13.

(ii)    Use of Cash Collateral. The Debtors shall use Cash Collateral for (a)
        working capital and capital expenditures, (b) other general corporate
        purposes of the Debtors, and (c) the costs of administration of these
        chapter 11 cases, each in compliance with the Budget. Motion, ¶ 19;
        Interim Order, ¶ 4.

(iii)   Termination Date. Subject to notice and an opportunity to cure within five
        (5) business day of receiving the notice, the Debtors' use of Cash
        Collateral will terminate on the earlier of (i) the closing or dismissal of the
        chapter 11 cases, (ii) the conversion of the Debtors' cases to cases under
        chapter 7 of the Bankruptcy Code, (iii) the appointment of a chapter 11

---

[2] To the extent anything in this summary is inconsistent with the proposed Interim Order,
annexed hereto, the proposed Interim Order shall control.  Additionally, to the extent anything in
the summary of the DIP loans is inconsistent with the Note (as hereinafter defined), the Notes
shall control.

trustee or an examiner with expanded powers in these chapter 11 cases, (iv) non-compliance with any of the terms of the Interim Order, (v) expiration of the applicable Budget Period without extension as provided therein, (vi) if (a) the Debtors' cumulative expenditures from the Commencement Date through the Date of Determination (as defined in the Interim Order) are more than 110% of the cumulative expenditures for such periods, as set forth in the Budget and the New Budgets, or (b) the aggregate of the Debtors' short-term investments and the cash available in their Master Operating Account and the DIP Account, is less than $1,000,000 at the close of business on May 2, 2008, less than $500,000 at the close of business on May 30, 2008 and on the last day of each four-week period thereafter, (vii) if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four-week period thereafter, net sales are less than 90% of the net sales reflected in the Budget or any New Budget; (viii) Debtors' failure to satisfy the plan of reorganization (the "Plan") deadlines described in paragraph 1(A)(vii) below, (ix) expiration of thirty (30) days after entry of the Interim Order unless the Final Order is entered prior to the expiration of such thirty (30) day period, (x) entry of an order providing for the sale of more than $1,000,000 (to be measured in aggregate purchase price and/or book value, whichever is greater for each asset sold) of the Debtors' assets that does not provide that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be applied to Prepetition Senior Secured Debt in accordance with the terms set forth in the Prepetition Senior Lender Loan Documents (subject to Intercreditor Agreement) on the sale closing date, or for which sale the Prepetition Senior Lenders have not provided prior written consent (subject to Intercreditor Agreement); provided, however, that in no case shall the aggregate of any sales permitted hereunder exceed $5,000,000, (xi) the lapse or termination of Debtors' exclusive periods to file and solicit a plan of reorganization pursuant to section 1121 of the Bankruptcy Code, (xii) entry of any order pursuant to section 364 of the Bankruptcy Code authorizing Debtors to obtain credit that is *pari passu* with or has priority over the Prepetition Senior Secured Debt and does not provide for the indefeasible payment in full in cash of the Prepetition Senior Secured Debt (subject to the provision regarding waiver of Default Rate Differential in paragraph 8(i) of the Interim Order and the provision regarding outstanding letters of credit in paragraph 24 of the Interim Order) and any outstanding Adequate Protection Payments on the closing date of such financing; (xiii) the automatic stay is lifted as to any party in order to take possession or to permit foreclosure on any portion of the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens, the value of which, as measured by fair market value or book value, whichever is greater, exceeds $1,000,000 in the aggregate, or (xiv) any uninsured loss with respect to the Senior Lender Prepetition

Collateral or any other collateral subject to the Adequate Protection Liens in an amount equal to or exceeding $1,000,000. Interim Order, ¶ 11.

(iv)   Adequate Protection. The Debtors will (i) make adequate protection payments ("Adequate Protection Payments") in amounts equal to (a) interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein, provided that in consideration for the receipt of principal payments, Prepetition Senior Lenders shall forever waive any and all claims for the difference between the contractual non-default rate and the contractual default rate (the "Default Rate Differential") from the Commencement Date until the occurrence of a Termination Event; provided, further that (i) the Debtors (x) acknowledge that sections 3.1 of each of the Credit Agreement and the Loan Agreement refer to the payment of default interest and (y) refer to said sections as to the terms and provisions thereof, and (ii) the Prepetition Senior Lenders reserve their rights to assert that the Debtors have an obligation to pay the Default Rate Differential on or after the occurrence of a Termination Event and the Debtors and all other parties-in-interest shall have the right to challenge or otherwise object to the payment of such Default Rate Differential. For the avoidance of doubt, in the event Prepetition Senior Secured Debt is, and the amounts due to the Prepetition Senior Lenders hereunder are, indefeasibly paid in full in cash prior to the occurrence of or in connection with a Termination Event (subject to provisions regarding outstanding letters of credit in paragraph 24 of the Interim Order), Prepetition Senior Lenders shall automatically be deemed to forever waive their claims to the Default Rate Differential with respect to the period between the Commencement Date and the date of such payment, and (b) reasonable fees and expenses of (I) two legal counsel (i.e., two law firms) for the Agents, one of which shall be local counsel, (II) a single financial advisor (one financial advisor firm) for the Agents, provided that, until a Termination Event shall have occurred, the fees and expenses of such financial advisor shall not exceed $20,000 per month in the aggregate (the "Financial Advisor Monthly Cap") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Financial Advisor Monthly Cap; provided, however, that nothing in this paragraph 8(i) shall prejudice the rights of (x) any Prepetition Senior Lender under section 506(b) of the Bankruptcy Code to seek its reasonable fees and expenses pursuant to the Prepetition Senior Lender Loan Documents and (y) the Debtors to challenge or otherwise object to any such request; (III) other legal counsel retained by any of the Prepetition Senior Lenders, provided that, until a Termination Event shall have occurred, the fees and expenses of each such counsel shall not exceed $7,500 per month in the aggregate with respect to each Prepetition Senior Lender (or local counsel retained by Agents) (the "Participant Monthly Cap") on a rolling

basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Participant Monthly Cap; provided, only in the event that it is determined that the claims of the Agents and the Prepetition Senior Lenders are not fully secured, the Adequate Protection Payments shall be subject to reallocation, recharacterization, or disgorgement, after notice and a hearing before the Court; (ii) for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, grant the Prepetition Senior Lenders (a) replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date (including, without limitation, cash and receivables and the proceeds thereof, whether existing or hereafter acquired after the Commencement Date and whether or not deposited in the Master Operating Account), (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and, subject to entry of the Final Order, causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all encumbered assets which were not otherwise subject to the Prepetition Senior Lenders' liens as of the Commencement Date (collectively, the "Adequate Protection Liens"); provided, however, that the Adequate Protection Liens shall (w) be subject to the Carve-Out, (x) exclude any insurance policy (but not exclude the Debtors' entitlement, if any, to payments thereunder (subject to the Senior Lender Prepetition Liens and the Adequate Protection Liens) net of any amounts that may be due to an Insurance Premium Finance Party (as such term is defined in the Prepetition Senior Lender Loan Documents) with respect to such policy) where, subject to authorization of the Court, security interests and liens are granted to an Insurance Premium Finance Party on the Insurance Premium Collateral (as such term is defined in the Prepetition Senior Lender Loan Documents, provided that in no instance will the Insurance Premium Finance Party be granted a security interest in or lien on the DIP Account or the Master Operating Account) to secure the indebtedness of the Debtors to an Insurance Premium Finance Party in connection with insurance policies maintained by the Debtors arising as a result of such Insurance Premium Finance Party entering into arrangements to allow the Debtors to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided that the Debtors shall continue to abide by the requirements under sections 4.11 of each of the Credit Agreement and the Loan Agreement, provided, however, that notwithstanding anything contained in said sections to the contrary, amounts payable to Agents as loss payees under a casualty or property insurance coverage shall be reduced by amounts owed, if any, to the Insurance Premium Financing Parties with respect to such policies; and

provided further that such indebtedness of the Debtors to all Insurance Premium Parties shall not exceed the aggregate principal amount outstanding of $800,000 at any one time ("<u>Insurance Premium Financing</u>"); and (y) neither prime nor impair any perfected liens or perfected security interests in the same collateral that are senior in rank and priority to the Senior Lender Prepetition Liens or the Adequate Protection Liens under applicable nonbankruptcy law as of the Commencement Date, such as statutory liens, if any, that are senior in priority as a result of being perfected under applicable state law prior to the granting of the Adequate Protection Liens; and <u>provided further, however</u>, except as expressly set forth in the Interim Order, the Adequate Protection Liens shall not be subject to any liens that are avoided and preserved for the benefit of any of the Debtors' estates under section 551 of the Bankruptcy Code, and shall not be subordinated to or made *pari passu* with any other lien under section 364(d) or any other section of the Bankruptcy Code or otherwise; and (iii) for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, grant the Prepetition Senior Lenders an administrative expense claim pursuant section 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Claim</u>"), which shall be senior to any and all other claims (including the DIP Super-Priority Claim), but subject to the Carve-Out.  Interim Order, ¶ 8.

(v)     <u>Carve-Out</u>.  The Carve-Out shall consist of payment of (i) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000, <u>provided</u> that the first $400,000 only shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition Senior Lenders in respect of the Adequate Protection Claim (the "<u>Prepetition Senior Lenders' Fee Carve-Out Amount</u>"), and the balance between $500,000 and the Prepetition Senior Lenders' Fee Carve-Out Amount shall be paid from whatever assets would be distributed on account of the DIP Super-Priority Claim;

provided, however, that prior to the occurrence of the Termination Date or
the Maturity Date, the Debtors shall be permitted to pay from the Cash
Collateral and the Interim DIP Loan, as the same may be due and payable,
all professional fees and expenses pursuant to sections 330 and 331 of the
Bankruptcy Code as authorized by the Court that were rendered or
incurred, as applicable, prior to the occurrence of the Termination Date or
the Maturity Date. Interim Order, ¶ 23.

(vi)    <u>Determination of the Validity, Enforceability, Priority, and Amount of the
Prepetition Senior Secured Debt</u>. Subject to the right of any other party to
challenge within a specified time period, *inter alia*, the amount and the
validity of liens securing the Prepetition Senior Secured Debt, the Interim
Order contains acknowledgments by the Debtors as to the validity,
enforceability, priority and amount of the Prepetition Senior Secured Debt.
Interim Order, ¶ D-E, 29.

(vii)    <u>Establishment of Plan Related Deadlines</u>. The Interim Order provides that
it shall be a Termination Event if the Debtors fail to (1) file, within ninety
(90) days from the Commencement Date, a plan of reorganization (the
"<u>Plan</u>") providing for the indefeasible payment of the Prepetition Senior
Secured Debt in full in cash on the effective date of such Plan (subject to
the provision of waiver of Default Rate Differential in paragraph 8(i) of
the Interim Order and the provision regarding outstanding letters of credit
in paragraph 24 of the Interim Order); or (2) file a disclosure statement
regarding such Plan within one hundred twenty (120) days of the
Commencement Date; or (3) consummate such Plan and emerge from
chapter 11 of the Bankruptcy Code within two hundred seventy (270) days
of the Commencement Date, <u>provided</u> such consummation of the Plan and
emergence from chapter 11 of the Bankruptcy Code actually results in the
indefeasible payment of the Prepetition Senior Secured Debt in full in cash
on the effective date of the Plan (subject to the provision of waiver of
Default Rate Differential in paragraph 8(i) of the Interim Order and the
provision regarding outstanding letters of credit in paragraph 24 of the
Interim Order). Interim Order, ¶ 11.

(viii)    <u>Releases</u>. In consideration of Debtors' use of Cash Collateral, the Debtors
(on behalf of themselves and any successor to the Debtors, including any
chapter 11 trustee or chapter 7 trustee) voluntarily and knowingly release
and forever discharge the Prepetition Senior Lenders in all their respective
capacities, their predecessors, agents, attorneys, financial advisors, direct
and indirect parents, subsidiaries and affiliates, members, managers,
servicers, directors, officers, employees, successors and assigns from all
possible claims, counterclaims, demands, actions, causes of action,
damages, costs, expenses and liabilities whatsoever, known or unknown,
anticipated or unanticipated, suspected or unsuspected, at law or in equity,
originating in whole or in part on or before the date hereof, which the
Debtors may now know or hereafter come to know they have against

Prepetition Senior Lenders in all of their respective capacities, their predecessors, agents, attorneys, direct and indirect parents, subsidiaries and affiliates, members, managers, servicers, directors, officers, employees, successors and assigns, if any, and irrespective of whether any such claims arise out of contract, tort, violation of law or regulations, or otherwise; provided, however, that these releases shall not preclude the Committee or any other statutory committee appointed in these chapter 11 cases, if so authorized by the Court, subject to certain time limitations, from commencing, fully prosecuting, and collecting upon, any and all claims of whatever kind or nature that the Debtors' estates could otherwise assert but for the releases contained herein. Interim Order, ¶ 30.

(ix)    Section 506(c). Subject to the entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the Prepetition Senior Lenders or any of the Senior Lender Prepetition Collateral pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, except as provided in paragraphs 7 (use of Cash Collateral for Committee's investigation), 8 (adequate protection payments), and 23 (Carve-Out). Motion, ¶ 27; Interim Order, ¶ 6.

(x)    Liens on Chapter 5 Causes of Action. Subject to entry of the Final Order, as adequate protection for the use of the Prepetition Senior Lenders' Cash Collateral, the Debtors will grant the Prepetition Senior Lenders, for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, first priority security interests and liens upon causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code. Motion, ¶ 27; Interim Order, ¶ 8.

## B.    DIP Loans

(i)    DIP Loan Borrowers. Lexington Precision and Lexington Rubber Group. Note at Preamble.

(ii)    DIP Loan Lenders. Lubin Partners, LLC, William B. Conner, and ORA Associates LLC. Lubin Partners, LLC and William B. Conner are either insiders of the Debtors or affiliated with insiders. Motion, ¶ 22; Note ¶ 1.

(iii)    DIP Loan Amount. The DIP Lenders agree to lend $4,000,000 pursuant to terms of one or more Notes substantially in the form annexed hereto as Exhibit B; with the first $2,000,000 sought to be authorized in the Interim Order. Motion, ¶ 22; Interim Order, ¶ 14.

(iv)    Availability and Term. The maturity date shall be the earlier of (i) one year anniversary of the Commencement Date, (ii) the effective date of a confirmed chapter 11 plan of reorganization in these chapter 11 cases, (iii) the conversion of any of these chapter 11 cases to cases under chapter 7 of

the Bankruptcy Code, and (iv) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor, and (v) the date of acceleration by the DIP Lenders pursuant to section 7 (Events of Default) of the Note(s). Note ¶ 1; Interim Order, ¶ 22.

(v)     <u>Interest Rate</u>. LIBOR plus 7% per annum with a LIBOR floor of 3% per annum, which is payable monthly in arrears; <u>provided</u> that any principal amount not paid when due, and to the extent permitted by applicable law, any interest not paid when due, in each case whether at Maturity Date, by required prepayment, declaration, acceleration or demand or otherwise (both before as well as after judgment), shall bear interest payable upon demand at the rate that is 2% per annum in excess of the rate of interest otherwise payable upon the Note. Note ¶ 1.

(vi)    <u>Lender Fee</u>. The Debtors shall pay to the DIP Lenders a fee in cash in the aggregate amount of $80,000 ($40,000 of which is sought to be authorized pursuant to the Interim Order) to be allocated to the DIP Lenders pro rata based upon their funding commitment. Note ¶ 3, Interim Order ¶ 14.

(vii)   <u>Unsecured, Super-Priority Claim Status</u>. All obligations under the DIP Loans shall be unsecured but entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code payable from any prepetition and postpetition property of the Debtors and all proceeds thereof and senior to any and all other unsecured claims; <u>provided, however</u>, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Liens. Under no circumstances are the DIP Lenders to be paid any amount (other than the interest, fees and expenses required to be paid under the Note(s) and in accordance with the Budget or the New Budget, as applicable) in respect of any claim or obligation under the Interim DIP Loan or the DIP Loans, unless and until the Prepetition Senior Secured Debt is indefeasibly paid in full in cash (subject to the provision of waiver of Default Rate Differential in paragraph 8(i) of the Interim Order and provision regarding outstanding letters of credit in paragraph 24 of the Interim Order). Subject to the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to section 1112 of the Bankruptcy Code shall rank prior to, or on parity

with, the DIP Super-Priority Claims. Motion, ¶ 23; Note ¶ 5; Interim Order, ¶ 20.

(viii)   <u>Use of Proceeds</u>. The proceeds of the DIP Loans shall be used by the Debtors to the extent Cash Collateral is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the Interim Order, the Final Borrowing Order or as otherwise authorized by the Court; <u>provided</u> that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders. Motion, ¶ 22; Note ¶ 4; Interim Order, ¶ 19.

(ix)   <u>Carve-Out</u>. The Carve-Out shall consist of payment of (i) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000, <u>provided</u> that the first $400,000 only shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition Senior Lenders in respect of the Adequate Protection Claim (the "<u>Prepetition Senior Lenders' Fee Carve-Out Amount</u>"), and the balance between $500,000 and the Prepetition Senior Lenders' Fee Carve-Out Amount shall be paid from whatever assets would be distributed on account of the DIP Super-Priority Claim; <u>provided</u>, <u>however</u>, that prior to the occurrence of the Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the Interim DIP Loan, as the same may be due and payable, all professional fees and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date. Interim Order, ¶ 23.

(x)     Covenants. Each of the Debtors covenant and agree that until the Note(s) is paid in full, neither of the Debtors shall, without the prior written consent of the DIP Lenders holding more than 50% of the principal amount of the Note(s):  (a) enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business;  (b) incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any chapter 11 case (other than for existing secured claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the DIP Lenders against such Debtor in respect of the obligations hereunder, or apply to the Court for authority to do so; or  (c) (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to section 361 of the Bankruptcy Code (other than the Adequate Protection Liens, or apply to the Court for the authority to do any of the foregoing; provided that the Debtors may make payments as permitted in the Interim Order, the Final Order, or any other order of the Court, including, for example, making Adequate Protection Payments. Note, ¶ 6.

(xi)    Events of Default. The following constitute Events of Default: (a) failure by the Debtors to pay any installment of principal on this Note when due or pay any installment of interest within 3 business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due; (b) with respect to these chapter 11 cases, (i) the entry of an order authorizing any Debtor in any of the chapter 11 cases to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing); (ii) the appointment of an interim or permanent trustee in any of the chapter 11 cases or the appointment of an examiner in any of the chapter 11 cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the chapter 11 cases, or the conversion of any of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order

granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect (as defined in the Note(s)); (v) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the DIP Orders or the Note(s) or any of the DIP Lenders' rights, benefits, privileges or remedies under the DIP Orders or the Note(s); (vi) the entry of an order consolidating or combining any Debtor with any other person (other than a Debtor); (vii) an order shall be entered approving, or there shall arise, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under the Note(s); or (viii) use of the proceeds of the Note(s) for any purpose that is prohibited under section 6(c) thereof; (c) the Bankruptcy Court shall fail to enter the Final Order on or prior to the date that is 30 days after entry of the Interim Order; (d) any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in the Note or any term or agreement relating to the Note that is contained in the Interim Order or the Final Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; (e) (i) any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect (as defined in the Note(s)) and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (f) funds or Cash Collateral are co-mingled with the proceeds of the DIP Loans in the DIP Account or the proceeds of the DIP Loans are used in a manner prohibited by the Note(s).  Note, ¶ 7.

(xii)    <u>Indemnification for Expenses</u>.  The Debtors agree to pay all reasonable out-of-pocket expenses of the DIP Lenders incurred in connection with the preparation, execution, delivery, enforcement and administration of the Note(s), the documents and instruments referred to therein and any amendments, waivers or consents relating thereto or thereto including, without limitation, the reasonable fees and expenses of O'Melveny & Myers LLP, counsel for the DIP Lenders.  In addition, the Debtors agree

to pay, and save the DIP Lenders harmless from all liability for, any stamp or other documentary taxes which may be payable in connection with the execution or delivery of the Note(s) by the Debtors. Note, ¶ 16.

(xiii)   <u>Indemnification of Holders</u>. The Debtors agree to protect, indemnify, pay and save harmless the DIP Lenders from and against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses (including reasonable fees, expenses and disbursements of outside counsel and allocated costs of internal counsel) that the DIP Lenders may incur or be subject to as consequence, direct or indirect, of the issuance of the Note(s) by the Debtors other than as a result of the gross negligence or willful misconduct of the DIP Lenders as determined by a final judgment of a court of competent jurisdiction. Note, ¶ 17.

## Background

2.      On the date hereof (the "<u>Commencement Date</u>"), the Debtors each commenced with this Court a voluntary case under the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

## Lexington's Businesses

4.      Lexington manufactures large volumes of high-quality rubber and metal components at competitive prices for use primarily in automobiles and medical devices. Lexington operates through two operating segments—the Rubber Group and the Metals Group. Lexington's components are generally sold to other manufacturers.

5.      Lexington is one of North America's largest manufacturers of rubber components for the automotive industry. The Rubber Group's principal products are connector seals used in primary wire harnesses and insulators for ignition wire sets. The Rubber Group also manufactures and sells rubber components used in a variety of medical devices, including

drug delivery systems, syringes, laparoscopic instruments, and catheters, which are sold to some of the world's largest medical device manufacturers.

6.    The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks primarily for manufacturers within the automotive industry.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

7.    Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of February 29, 2008, Lexington employed approximately 651 permanent and 22 temporary employees, of which 134 are salaried employees and 517 are hourly employees.  In 2007, Rubber Group net sales totaled $74.5 million and Metals Group net sales totaled $13.8 million.  As of December 31, 2007, Lexington's consolidated unaudited financial statements reflected assets totaling approximately $52.6 million, and current liabilities totaling approximately $88.5 million. Notwithstanding the Debtors' negative "book net worth" calculated in accordance with generally accepted accounting principles, the Debtors have received a number of offers for all or portions of the assets and business of the Lexington Rubber Group, the largest of the Debtors' operations and the generator of the preponderance of the Debtors' sales and earnings, each of which clearly indicates that the value of the Debtors' assets far exceeds the Debtors' liabilities. Consequently, the Debtors believe that they are solvent and that the equity securities of Lexington Precision have significant value.

## Jurisdiction

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9.      By this Motion, the Debtors request (a) authorization pursuant to sections

105, 361, 362, 363, 364(c)(1), and 364(e) to (i) use Cash Collateral (as defined below), (ii) grant

adequate protection to the Debtors' Prepetition Senior Lenders (as defined below), and (iii)

obtain postpetition financing, on an unsecured basis, in the amount of $4,000,000, of which

$2,000,000 is sought to be used on an interim basis, and (b) the scheduling of the Final Hearing.

## Prepetition Funding of the Debtors' Operations

**A.      Credit and Security Agreement**

10.      Lexington Precision and Lexington Rubber Group (collectively, the

"Borrowers"), as borrowers, are parties to that certain Credit and Security Agreement, dated as

of May 31, 2006 (the "Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"),

as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as

lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit

Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver

Agreement, dated as of November 20, 2006 (the "Default Waiver").  The Credit Agreement

provides for (i) a revolving credit facility (the "Revolving Credit Facility") in the maximum

aggregate amount of $17.5 million including letters of credit, and (ii) an equipment term loan

facility in the original amount of $12.5 million.  As of March 31, 2008, approximately $22.3

million of the principal amount, inclusive of outstanding letters of credit, was outstanding under

the Credit Agreement.

11.     Pursuant to the Credit Agreement, the Borrowers granted first priority liens and security interests to CapitalSource, as agent for the Credit Agreement Lenders, in substantially all of the Borrowers' assets other than real estate — including, among other things, Receivables,[3] Equipment, General Intangibles, Inventory, Contract Rights, Subsidiary Stock, Securities, Leasehold Interests, Commercial Tort Claims, and proceeds and products of the foregoing — and second priority liens on the Borrowers' real estate (collectively, the "Collateral").

**B.     Loan and Security Agreement**

12.     The Borrowers also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Loan Agreement" and, together with the Credit Agreement, the "Prepetition Credit Agreements"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent (together with CapitalSource, as collateral and administrative agent under the Credit Agreement, the "Prepetition Agents"), DMD Special Situations, LLC, as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders" and, together with the Credit Agreement Lenders, the "Prepetition Senior Lenders"), as amended pursuant to the Default Waiver. The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original amounts of $11 million and $4 million, respectively. As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

---

[3] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the agreement or document in which they are referenced.

13.    Pursuant to the Loan Agreement, the Borrowers granted to CSE, as agent for the Loan Agreement Lenders, first priority liens and security interests in the Borrowers' real estate and second priority liens on substantially all of the other Collateral.

## C.    Amounts Outstanding Under the Prepetition Credit Agreements

14.    As of March 31, 2008, the Debtors were obligated to the Prepetition Senior Lenders under the Prepetition Credit Agreements in the approximate aggregate principal amount of $36.1 million plus accrued and unpaid interest in the amount of approximately $278,000.  The borrowings under the Prepetition Credit Agreements have been used by the Debtors to purchase equipment for use in their businesses and meet their working capital needs in the ordinary course of business.  The Debtors believe that, as of the Commencement Date, the value of the assets encumbered by the Prepetition Senior Lenders' liens significantly exceeds the aggregate amount of the obligations owed under the Prepetition Credit Agreements.

### The Debtors' Prepetition Cash Management System

15.    The Debtors utilize a centralized cash management system (the "Cash Management System") to collect and transfer the funds generated by the collective operations of the Debtors and to disburse funds to satisfy their obligations.  At present, the Cash Management System funnels all of the Debtors' receivables into lockbox accounts (the "Lockboxes") at FirstMerit Bank N.A., Akron, Ohio ("FirstMerit").  On a daily basis, funds received into the Lockboxes are automatically swept into a consolidation account at FirstMerit (the "Master Lockbox Account").  The funds in the Master Lockbox Account are automatically wired to the Credit Agreement Lenders.  The Credit Agreement Lenders then use these funds to repay borrowings under the Revolving Credit Facility.  Only the Credit Agreement Lenders have access the funds in the Lockboxes.

16.     Subject to authorization to use Cash Collateral (as defined below) as requested herein, the Debtors have concurrently filed a motion requesting authorization to continue to utilize their Cash Management System as modified to enable the Debtors to use Cash Collateral (the "Cash Management Motion").  Accordingly, in the Cash Management Motion, consistent with the Prepetition Senior Lenders' consent to the use of Cash Collateral (as defined below) subject to the terms and conditions set forth in the proposed Interim Order annexed hereto, the Debtors have requested that all available funds currently in the Lockboxes or the Master Lockbox Account and all funds that are received into the Lockboxes or the Master Lockbox Account on or after the Commencement Date be automatically transferred on a daily basis into the Debtors' master operating account (the "Master Operating Account") at First Merit rather than to the Credit Agreement Lenders.

### The Proposed Use of Cash Collateral and Postpetition Financing

**A.     Need for Postpetition Financing**

17.     As described in detail in the Affidavit of Dennis Welhouse Pursuant to Local Rule 1007-2 filed contemporaneously herewith (the "Welhouse Affidavit"), prior to the Commencement Date, the Debtors financed their operations with cash from operating activities and a variety of financing arrangements, including loans under the Revolving Credit Facility, term loans under the Prepetition Credit Agreements, and the unsecured Senior Subordinated Notes.  Although the Debtors maintain that their businesses generally generate sufficient cash to fund the collective operations of the Debtors, to fund their operations and to pay the costs and expenses of administering these chapter 11 cases, the Debtors project that they will need to obtain postpetition financing in addition to the use of the cash that they generate.  Accordingly, the Debtors propose to (i) use the cash the Debtors generate, including the funds currently in the Lockboxes and the Master Lockbox Account, which constitutes the Prepetition Senior Lenders'

cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), and (ii) obtain postpetition financing in the amount of $4,000,000, with $2,000,000 being borrowed on an interim basis, pursuant to the terms and conditions set forth in the Note(s) (as defined below), to be used to the extent Cash Collateral is insufficient.

**B.      Use of Cash Collateral and Proposed Adequate Protection**

18.      Currently, the Debtors lack sufficient unencumbered funds with which to operate their businesses on an ongoing basis.  The Debtors, therefore, have an urgent and immediate need for cash to continue to operate.  Absent authorization from the Court to use the Cash Collateral, the Debtors will be immediately and irreparably harmed.  The Debtors' ability to maintain business relationships with, among others, their customers and suppliers (many of which are also financially distressed) and to meet payroll and other operating expenses is essential to the Debtors' continued viability and the value of their businesses as going concerns. In the absence of the use of the Cash Collateral, the continued operation of the Debtors' businesses would not be possible.

19.      For the above reasons, the Debtors have determined, in the exercise of their sound business judgment, that they require the use of Cash Collateral for the maintenance and preservation of their property, the operation of their businesses in the ordinary course, the payment of expenses attendant thereto, and the costs and expenses of administering these chapter 11 cases.  Accordingly, the Debtors hereby request authority to use Cash Collateral for working capital and capital expenditures, other general operating purposes, and to pay the costs and expenses of administering these chapter 11 cases, all in compliance with an initial eleven (11) week budget (the "Budget"), which is annexed hereto as Exhibit A, and which may be extended as provided in paragraph 6 of the proposed Interim Order.

20.     After an extensive negotiation, the Prepetition Senior Lenders have consented to the use of the Cash Collateral pursuant to the terms and conditions outlined in the proposed Interim Order annexed hereto.

21.     Although the Debtors maintain that the Prepetition Senior Lenders are oversecured and the surplus of the Collateral's value in excess of the amount outstanding under the Prepetition Credit Agreements constitutes more than sufficient adequate protection for the use of the Cash Collateral, in order to further protect the Prepetition Senior Lenders from any diminution in value of their interests in the Cash Collateral, the Debtors propose to provide additional protection to the Prepetition Senior Lenders (the "Proposed Adequate Protection"). The terms of the Proposed Adequate Protection and the other material terms of the use of Cash Collateral are summarized in paragraph 1(A) of this Motion.

## C.     The DIP Loans

22.     As reflected in the Budget, the Debtors project that they will need postpetition financing in addition to the use of Cash Collateral to meet and satisfy their ongoing business, operational, and administrative expenses.  In addition, because of the inherent uncertainty regarding the timing of collection of accounts receivable, the Debtors need additional sources of funds in order to operate and to provide necessary assurance to their customers and suppliers of the Debtors' ability to continue their businesses without interruption.  Accordingly, the Debtors propose to obtain $4 million in postpetition financing (the "DIP Loans") to be evidenced by promissory notes, substantially in the form attached hereto as Exhibit B (the "Note"), from Lubin Partners, LLC, an investment firm of which Michael A. Lubin[4] is managing

---

[4] Michael A. Lubin is the co-Chief Executive Officer of the Debtors.  With respect to the Senior Subordinated Notes, Lubin and his affiliates own $7,011,000 of the principal amount, and the Lubin, Delano & Co. Profit Sharing Trust owns $761,000 of the principal amount.  Lubin also

member, William B. Conner,[5] and ORA Associates LLC[6] (collectively, the "DIP Lenders") on

an unsecured, super-priority basis, which will provide the Debtors with cash sufficient to ensure

that the Debtors can meet their ongoing obligations in the ordinary course when Cash Collateral

alone is insufficient.  The Debtors submit that they would need to borrow $2 million of the DIP

Loans on an interim basis (the "Interim DIP Loan") in order to satisfy, pending entry of the Final

Order, the Debtors' cash needs and to assure their customers and suppliers of the Debtors' ability

to continue their businesses without interruption.

      23.     The DIP Lenders are willing to provide debtor-in-possession financing to

the Debtors on an unsecured basis; this proposal, however, is expressly conditioned upon the

receipt by the DIP Lenders of a super-priority claim (the "DIP Super-Priority Claim") pursuant

to section 364(c)(1) of the Bankruptcy Code payable from any prepetition and postpetition

property of the Debtors and all proceeds thereof, and senior to any and all other claims,

including, without limitation, all administrative expenses or other claim arising under sections

105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy

Code, but shall be junior, subordinate, and subject to the prepetition obligations owed to the

Prepetition Senior Lenders, the Adequate Protection Liens, the Adequate Protection Claim, and

the Carve-Out.

---

owns the 13% Junior Subordinated Note.  With respect to the equity of the Debtors, (a) Lubin
and his affiliates hold 1,523,279 common shares, (b) Lubin beneficially owns an additional
89,062 shares held by the Lubin, Delano & Co. Profit Sharing Trust, (c) Lubin and his affiliates
own 78,077 warrants to purchase the common stock of Lexington at $3.50 per share, and (d) the
Lublin, Delano & Co. Profit Sharing Trust owns an additional 3,110 warrants.

[5] William B. Conner is a director of the Debtors.  With respect to the equity, Conner and his
affiliates own 364,894 common shares.

[6] ORA Associates LLC is not an affiliate of the Debtors or of the other DIP Lenders.

24.    The material terms and conditions of the DIP Loans are summarized in paragraph 1(B) of this Motion.

25.    Additionally, concurrently herewith, the Debtors are requesting in the Cash Management Motion that they be authorized to open a new interest-bearing bank account at a bank that has been approved by the Office of the U.S. Trustee as an authorized bank depository (the "DIP Account") so that proceeds of the DIP Loans could be wired or deposited into a separate account for more efficient record keeping; provided, however, that the DIP Account shall be subject to any and all security interests and liens granted in the DIP Orders in favor of the Prepetition Senior Lenders.

26.    The Debtors are seeking authorization to enter into the DIP Loans on an interim basis pending a Final Hearing. Based on their cash needs during the interim period (as reflected in the Budget) and the inherent uncertainties in collection of accounts receivable, the Debtors have determined that during the interim period and until the Final Order is entered, they will need to borrow from the DIP Lenders approximately $2 million. The availability of the Interim DIP Loan will ease the Debtors' liquidity constraints beyond access to the Cash Collateral. Although the Budget shows that the DIP Lenders will need to use approximately $1 million of the proposed Initial DIP Loan in the first 15 days, it is crucial that the Debtors have the other $1 million during the interim period as a cushion in the event receivables are lower than expected. The DIP Lenders' willingness to lend on an unsecured basis and the availability of funds in the DIP Account will also provide necessary assurance to the Debtors' customers, vendors, and employees of the Debtors' ability to meet their near-term obligations. In addition, the availability of credit under the DIP Loans should give the Debtors' suppliers the necessary confidence to continue their relationships with the Debtors, including the extension of credit

terms for the payment of goods and services.  Authorization of the DIP Loans is therefore critical

to preserve and maintain the going-concern value of the Debtors and essential to the

reorganization effort.

**D.**    **There Are Two Extraordinary Provisions Under General Order No. M-274**

        27.    The following are terms of the proposed use of Cash Collateral that are

considered to be "Extraordinary Provisions" under the General Order M-274 of the United States

Bankruptcy Court for the Southern District of New York, both of which will be effective only

upon entry of the Final Order:

- Section 506(c) Waiver.  Subject to the entry of the Final Order, in no event shall any costs or expenses of administration be imposed upon the Prepetition Senior Lenders or any of their prepetition Collateral pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise without the prior written consent of the Prepetition Senior Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the Prepetition Senior Lenders.

- Liens on Chapter 5 Causes of Action.  Subject to entry of the Final Order, as adequate protection for the use of the Prepetition Senior Lenders' Cash Collateral, the Debtors will grant the Prepetition Senior Lenders, for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, first priority security interests and liens upon causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code.

    **The Proposed Postpetition Financing Arrangement Should Be Approved**

**A.**    **The Use of Cash Collateral is Warranted and Should Be Approved**

        28.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not

use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section." 11 U.S.C. § 363(c)(2).

        29.    As set forth above, the Debtors' ability to maintain business relationships

with their customers and vendors and to meet payroll and other critical operating expenses is

essential to the Debtors' continued viability and the value of their businesses as a going concern.

Indeed, absent use of the Cash Collateral, the Debtors' businesses will be brought to an

immediate halt, with disastrous consequences for the Debtors and their estates and creditors. Use

of the Cash Collateral is therefore of the utmost importance to the preservation and maintenance

of the value of the Debtors and essential to the reorganization effort. Moreover, the Prepetition

Senior Lenders have consented to the use of their Cash Collateral upon the terms set forth in the

proposed Interim Order and outlined in this Motion.

**B.    The Proposed Adequate Protection Should Be Approved**

30.    Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection'

is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate

protection listed in § 361." In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of

adequate protection, including a cash payment or periodic cash payments, additional liens,

replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11

U.S.C. § 361.

31.    The determination of adequate protection is a "fact-specific inquiry." In re

Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("Its application is left to the vagaries of

each case....") (citation omitted). The focus of the adequate protection requirement is to

preserve the secured creditor's position at the time of the bankruptcy filing and protect the

secured creditor from diminution in the value of its collateral during the reorganization process.

Id. at 288 (citation omitted); Beker, 58 B.R. at 736.  See In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").  "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties."  Id. at 619.  See Beker, 58 B.R. at 741 ("Adequate protection, not absolute protection, is the statutory standard.").

32.     Despite the fact that the Debtors believe that the Prepetition Senior Lenders are oversecured, they believe that it is cost effective and in the best interests of their estates, creditors and shareholders that they reach a consensual rather than a litigated resolution regarding the use of Cash Collateral and provide the Prepetition Senior Lenders the Proposed Adequate Protection. The Proposed Adequate Protection includes (i) the making of Adequate Protection Payments, (ii) granting the Prepetition Senior Lenders the Adequate Protection Liens, and (iii) granting the Prepetition Senior Lenders the Adequate Protection Claims.  The Proposed Adequate Protection will sufficiently protect the Prepetition Senior Lenders' interests in the Cash Collateral.  Especially when viewed in light of the Prepetition Senior Lenders' oversecured status, the Proposed Adequate Protection is fair and reasonable and sufficient to satisfy the requirement of section 363(c)(2) of the Bankruptcy Code.

**C.     The DIP Loans Should Be Approved**

33.     As set forth above, the Debtors propose to obtain the proposed unsecured

debtor-in-possession financing by providing a super-priority claim to the DIP Lenders pursuant

to section 364(c)(1) of the Bankruptcy Code.

34.     Section 364(c) of the Bankruptcy Code provides, among other things, that

if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or

incur debt with priority over any and all administrative expenses of the kind specified in sections

503(b) or 507(b) of the Bankruptcy Code.  11 U.S.C. § 364(c)(1).

35.     The Debtors' immediate working capital needs can be ensured only if the

Debtors are authorized to borrow $4,000,000 under the DIP Loans and to use such proceeds,

along with the Cash Collateral, to fund their operations.  As noted above, the Prepetition Senior

Lenders have liens on and security interests in substantially all of the Debtors' real estate assets

and other assets, including, among other things, Receivables, Equipment, General Intangibles,

Inventory, Contract Rights, Subsidiary Stock, Securities, Leasehold Interests, Commercial Tort

Claims, and proceeds and products of the foregoing.  The Debtors submit that they are unable to

obtain the funds to be provided under the DIP Loans on more favorable terms than those

contained in the Note and the DIP Orders.  Although the Debtors did not actively seek to obtain

funds on an unsecured, non super-priority basis, the Debtors believed that they could not (y)

obtain the required funds in the ordinary course of business on an unsecured basis allowable

under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or (z) obtain the

required funds in the non-ordinary course as an administrative expense allowable under section

503(b)(1) of the Bankruptcy Code.  See 11 U.S.C. § 364(a),(b).  Considering the current market

conditions and because the Debtors have virtually no unencumbered assets, the Debtors believed

it would be more efficient and cost effective to seek a loan on terms that a lender would likely

agree to rather than incur the costs and expenses to search for a lender that is not willing to

provide an unsecured loan on a regular administrative priority basis.  In addition, the Debtors, in

their sound business judgment, determined that it would be extraordinarily difficult and costly to

obtain financing on a secured basis.

36.     The Debtors also believe that the terms offered by the DIP Lenders are

significantly more favorable than any terms that would be offered by other lenders (even on a

super-priority basis).  Specifically, the proposed DIP Loans are unsecured and junior in priority

to a significant amount of senior, secured debt and the interest rate, which currently equals to

10% based on the calculation set forth in the Note, is reasonable in light of the unsecured nature

of the DIP Loans.  Importantly, not only are the proposed DIP Loans junior in priority to the

Prepetition Senior Lenders' Adequate Protection Liens and Adequate Protection Claims, but the

proposed DIP Loans are subordinated to the prepetition obligations owed to the Prepetition

Senior Lenders.  The Debtors, in the exercise of their sound business judgment, determined to

accept the terms of the proposed financing because it addresses the Debtors' immediate working

capital and liquidity needs and, together with the Cash Collateral, will enable the Debtors to

continue to operate their businesses and maintain their going concern value during these chapter

11 cases.

37.     Provided that a debtor's business judgment does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable

deference in exercising its sound business judgment. See, e.g., In re Snowshoe Co., 789 F.2d

1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). See also In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981). Here, the Debtors have determined that financing is available only under section 364(c) of the Bankruptcy Code and that entering into the DIP Loans is in the best interests of the Debtors and their estates. The fact that two of the three DIP Lenders are insiders of the Debtors should not make the proposed DIP Loans any less reasonable. In fact, nothing in the Bankruptcy Code prevents insiders from providing postpetition financing to a debtor. Moreover, it is not uncommon for insiders to provide a debtor with postpetition financing because in some cases loans from insiders may be the only source for postpetition financing. See, e.g., In re Lewiston Steam & Power Assoc., No. 1989 WL 1109341, *3 (Bankr. N.D. Ohio, Aug. 24, 1989) ("Sec. 364 contains no proscriptions against disinterested insiders extending credit. In a bankruptcy settling such persons may often be the only source of unsecured credit."). In addition, the proposed DIP Loans do not have a break up fee or any other terms making it prohibitive for the Debtors to obtain a postpetition loan from an alternative source on better terms and repay the funds already borrowed under the DIP Loans, subject to the consent of the Prepetition Senior Lenders. See In re Adelphia Business Solutions, Inc., 280 B.R. 63, 72 n.43 (Bankr. S.D.N.Y. 2002) (recognizing that the court had previously approved a postpetition loan made by insiders of the debtors in which it found that there was no harm because the loan was on fair terms and the lenders were "willing to step aside should the Debtors be able to find a third-party lender to replace them prior to a final hearing on the DIP motion").

Like in Adelphia, the Debtors are willing to entertain any other offers for a postpetition loan in an amount equal to the proposed DIP Loan but on more favorable economic terms.

38.    The Debtors negotiated with the DIP Lenders at arms-length, in good faith and pursuant to their sound business judgment. Although some of the DIP Lenders are insiders of the Debtors, the DIP Lenders had their own counsel and each side negotiated at arm's length and in good faith. The terms and conditions of the DIP Loans are fair and reasonable under the circumstances. Accordingly, the DIP Lenders and all obligations incurred under the DIP Loans should be afforded the benefits of section 364(e) of the Bankruptcy Code.

39.    The Debtors have a critical need for funds to continue to operate their businesses in chapter 11. For the reasons set forth above, the DIP Loans are vital to the Debtors' continued operations and preservation of the going concern value of their enterprise for the benefit of their estates and creditors. The proposed DIP Loans should be viewed favorably by the Debtors' customers, suppliers, and employees and will thereby help promote the Debtors' successful reorganization. Indeed, absent the proposed DIP Loans, the Debtors may be unable to meet their payroll and other direct operating expenses and unable to meet their commitment to their customers, and would suffer irreparable harm, and their prospects for a successful reorganization would be severely jeopardized.

### The Interim Approval Should Be Granted

40.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

41.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (a) authorize the Debtors to use the Cash Collateral of the Prepetition Senior Lenders and borrow $2 million as the Interim DIP Loan in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a Final Hearing on the relief requested herein.

42.    Absent authorization from the Court to use Cash Collateral and obtain the Interim DIP Loan on an interim basis pending a Final Hearing, the Debtors will be immediately and irreparably harmed. As set forth above, the Debtors' ability to use Cash Collateral and enter into the DIP Loans is critical to the success of their chapter 11 cases. Without immediate liquidity provided by the use of Cash Collateral and access to the Interim DIP Loan, the Debtors will simply be unable to conduct normal business operations, and their estates, creditors, and equity holders will be immediately and irreparably harmed.

### Waiver of Memorandum of Law

43.    The Debtors submit that the relevant authorities are set forth herein, and accordingly, that the requirement contained in Local Bankruptcy Rule 9013-1(b) for the filing of a separate memorandum in support of the Motion is satisfied.

### Notice

44.    No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) the attorneys for the agents for the Prepetition Senior Lenders, (iii) the attorneys for the DIP Lenders, (iv) the attorneys for the Ad Hoc Committee, and (v) the holders of the 30 largest

unsecured claims against the Debtors (on a consolidated basis).  The Debtors submit that no other or further notice need be provided.

45.    No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: April 1, 2008
   New York, New York

        /s/ Richard P. Krasnow   
        Richard P. Krasnow, Esq.
        Christopher J. Marcus, Esq.

        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York  10153
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtors
        and Debtors in Possession

## **EXHIBIT A**

Budget

**LEXINGTON PRECISION CORPORATION**

**FORECAST OF CASH RECEIPTS AND DISBURSEMENTS FROM APRIL 2 THROUGH JUNE 20, 2008**
(in thousands of dollars)

| | Week Ended | | | | | | | | | | | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| | 2-4 Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun |
| **Cash receipts:** | 1,286 | 1,365 | 1,578 | 1,664 | 1,562 | 1,664 | 1,794 | 1,400 | 1,889 | 1,511 | 1,433 | 1,425 |
| **Cash disbursements:** | | | | | | | | | | | | |
| Debt service: | | | | | | | | | | | | |
| CapitalSource principal (1) | - | - | - | - | 269 | - | - | - | - | 269 | - | - |
| CapitalSource interest | - | - | - | - | 207 | - | - | - | - | 207 | - | - |
| CapitalSource fees (LOC & unused line) | - | - | - | - | 5 | - | - | - | - | 5 | - | - |
| DIP interest and fees | 40 | - | 40 | 23 | - | - | - | - | 34 | - | - | - |
| L&D | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll and payroll taxes | 339 | 338 | 666 | 333 | 666 | 333 | 666 | 334 | 665 | 334 | 659 | 326 |
| Retirement & Savings Plan 401(k) | 25 | 25 | 57 | 25 | 57 | 25 | 57 | 25 | 57 | 25 | 57 | 25 |
| Group Medical Care Plan Administrative Fees | - | - | 20 | - | - | - | 20 | - | - | - | - | 20 |
| Prescription drug plan | - | 25 | - | 25 | - | 25 | - | 25 | - | 25 | - | 25 |
| Reorganization professional fees and expenses | - | 125 | 125 | 25 | 175 | 175 | 25 | 90 | 25 | 75 | 125 | - |
| DIP legal counsel | - | - | - | - | 10 | - | - | - | - | 10 | - | - |
| Ordinary course professionals | - | - | - | - | 35 | - | - | - | - | 35 | - | 35 |
| Vendors - check disbursements (excluding Dow & Wacker): | | | | | | | | | | | | |
| Dow Corning | 34 | 40 | 51 | 69 | 133 | 44 | 51 | 83 | 75 | 83 | 75 | 83 |
| Wacker | 51 | 145 | 265 | 26 | 187 | 164 | 48 | 126 | 130 | 108 | 126 | 128 |
| All other excluding capex | 1,000 | 648 | 636 | 625 | 590 | 559 | 700 | 614 | 541 | 578 | 671 | 579 |
| Capex | 35 | 23 | 33 | 23 | 23 | 33 | 23 | 23 | 18 | 13 | 48 | 13 |
| Ohio BWC and UMR Health Disbursements | 36 | 60 | 60 | 60 | 60 | 120 | 60 | 60 | 60 | 60 | 60 | 60 |
| Commercial Traffic | 19 | 20 | 19 | 20 | 19 | 20 | 19 | 19 | 20 | 21 | 19 | 20 |
| Utilities | - | - | 130 | - | - | - | - | - | - | - | - | - |
| Total cash disbursed | 1,579 | 1,449 | 2,102 | 1,254 | 2,436 | 1,498 | 1,669 | 1,399 | 1,625 | 1,848 | 1,840 | 1,314 |
| **Net cash received (used)** | (293) | (84) | (524) | 410 | (874) | 166 | 125 | 1 | 264 | (337) | (407) | 111 |
| **Cumulative net cash received (used)** | (293) | (377) | (901) | (491) | (1,365) | (1,199) | (1,074) | (1,073) | (809) | (1,146) | (1,553) | (1,442) |
| **DIP loan proceeds** | 2,000 | 2,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| **Net cash available** | 1,707 | 1,623 | 3,099 | 3,509 | 2,635 | 2,801 | 2,926 | 2,927 | 3,191 | 2,854 | 2,447 | 2,558 |
| (1) Subject to agreement on the waiver of default interest | | | | | | | | | | | | |
| **Net sales (based on date shipped)** | 955 | 1,498 | 1,535 | 1,626 | 1,896 | 1,610 | 1,637 | 1,616 | 1,731 | 1,634 | 1,633 | 1,799 |
| **Net cumulative sales** | 955 | 2,453 | 3,988 | 5,614 | 7,510 | 9,120 | 10,757 | 12,373 | 14,104 | 15,738 | 17,371 | 19,170 |

## EXHIBIT B

Form of Note

## SUPER- PRIORITY DIP NOTE

$_____                          New York, New York
                                     Issue Date: _____ ___, 2008

        FOR VALUE RECEIVED, the undersigned, Lexington Precision
Corporation and Lexington Rubber Group, Inc., each a Delaware corporation and a
debtor in possession (collectively, the "Debtors"), hereby jointly and severally and
unconditionally promise to pay to the order of Lubin Partners, LLC, a Delaware limited
liability company, William B. Connor and ORA Associates, LLC, a New York limited
liability company (collectively, the "Holders"), the aggregate principal sum of ___
Million Dollars ($_____), to be allocated among the Holders as follows:

| | |
|---|---|
| Lubin Partners, LLC | $ _____ |
| William B. Connor | $ _____ |
| ORA Associates, LLC | $ _____ |

       1.    Payment of Principal and Interest. The principal amount of this
Note shall be paid on the earliest of (i) the one year anniversary of the Petition Date, (ii)
the effective date of a confirmed chapter 11 plan of reorganization in the Chapter 11
Cases,[1] (iii) the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the
Bankruptcy Code, (iv) the appointment of a chapter 11 trustee in any of the Chapter 11
Cases or the appointment of an examiner with expanded powers to operate or manage the
financial affairs, the business or the reorganization of any Debtor and (v) the date of
acceleration by the Holders pursuant to Section 7 hereof (such date, the "Stated Maturity
Date"). The Debtors also promise to pay interest on this Note on the first business day of
each month (in arrears) and upon the date this Note matures or otherwise becomes due
and payable at the rate of LIBOR plus 7% per annum with a LIBOR floor of 3% per
annum (computed on the basis of a 360 day year for the actual number of days lapsed);
provided that any principal amount not paid when due, and to the extent permitted by
applicable law, any interest not paid when due, in each case whether at Stated Maturity
Date, by required prepayment, declaration, acceleration or demand or otherwise (both
before as well as after judgment), shall bear interest payable upon demand at the rate that
is 2% per annum in excess of the rate of interest otherwise payable upon this Note. All
payments hereunder, including any prepayment, shall be made to the Holders on a pro
rata basis based on the respective principal amounts owed to each Holder.

       2.    Optional Prepayment. Debtors shall have the right at any time or
from time to time and without premium or penalty, to voluntarily prepay all or any
portion of this Note. Each prepayment shall be accompanied by the payment of accrued

---

[1] Capitalized terms used but not otherwise defined shall have the meanings ascribed to
such terms in Section 9 hereof.

and unpaid interest on the amount being prepaid, through the date of prepayment. Any amounts prepaid hereunder may not be reborrowed.

3.    <u>Lender Fee</u>. Pursuant to the Interim Order and the Final Borrowing Order, the Debtors shall pay to the Holders a fee in cash in the aggregate amount of $80,000,[2] to be allocated to the Holders pro rata based upon their funding commitment.

4.    <u>Use of Proceeds</u>. The proceeds of this Note shall be used by the Debtors to the extent Cash Collateral (as defined in the Interim Order and Final Borrowing Order) is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the Interim Order, the Final Borrowing Order or as otherwise authorized by the Bankruptcy Court; <u>provided</u> that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Bankruptcy Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders. The Debtors shall use the entire amount of the proceeds in accordance with this Section 4; <u>provided, however</u>, that nothing herein shall in any way prejudice the Holders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest; and <u>provided, further</u>, that Debtor shall not use the proceeds for any purpose that is prohibited under the Bankruptcy Code. The proceeds of this Note shall be deposited and held in a new bank account at a bank that has been approved by the Office of the United States Trustee for the Southern District of New York as an authorized bank depository (the "<u>DIP Account</u>") as described in the Interim Order and the Final Borrowing Order and no other funds or cash collateral of the Debtors shall be co-mingled with the proceeds of this Note or deposited in the DIP Account.

5.    <u>Superpriority Nature of Obligations</u>. All obligations of the Debtors under this Note (including the obligation to pay principal, interest, fees, costs, charges, commissions and expenses) shall be paid as provided herein when due, without defense, offset, reduction or counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors arising under Section 364(c)(1) of the Bankruptcy Code, and senior to any and all other claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code; <u>provided, however</u>, that

---

[2] Payment of the first $40,000 (assuming the amount of the initial loan is $2,000,000) shall be authorized in the Interim Order, with the remaining $40,000 to be authorized in the Final Borrowing Order.

notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Lien (all as defined in the Interim Order and the Final Borrowing Order). Subject to the Carve-Out, the Adequate Protection Liens (as defined in the Interim Order and the Final Borrowing Order), the Prepetition Senior Secured Debt (as defined in the Interim Order and the Final Borrowing Order) and the Adequate Protection Claim (as defined in the Interim Order and the Final Borrowing Order), the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to Section 1112 of the Bankruptcy Code shall rank prior to, or on parity with, the DIP Super-Priority Claims.

6.    Covenants.  Each of the Debtors covenant and agree that until this Note is paid in full, neither of the Debtors shall, without the prior written consent of the Required Holders:

(a)    Asset Sales.  enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business;

(b)    Chapter 11 Claims.  incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any Chapter 11 Case (other than the Existing Secured Claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the Holders against such Debtor in respect of the obligations hereunder, or apply to the Bankruptcy Court for authority to do so; or

(c)    Limitation on Payments Related to Prepetition Obligations.  (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to Section 361 of the Bankruptcy Code (other than the Adequate Protection Liens (as such term is defined in the Interim Order and the Final Borrowing Order), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided that the Debtors may make payments as permitted in the Interim Order, the Final Borrowing Order, or as authorized

in any other order of the Bankruptcy Court, including, for example, making Adequate Protection Payments (as such term is defined in the Interim Order and the Final Borrowing Order).

       7.    <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, if any of the following conditions or events ("<u>Events of Default</u>") shall occur:

       (a)    <u>Failure to Make Payments When Due</u>.  Failure by the Debtors to pay any installment of principal on this Note when due or pay any installment of interest within 3 business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due;

       (b)    <u>Chapter 11 Cases</u>.  With respect to the Chapter 11 Cases, (i) the entry of an order authorizing any Debtor in any of the Chapter 11 Cases to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing, as defined in the Interim Order and the Final Borrowing Order); (ii) the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect; (v) exercise of rights by the Prepetition Senior Lenders (as defined in the Interim Order and the Final Borrowing Order) pursuant to Paragraph 13 of the Interim Order and the corresponding paragraph of the Final Borrowing Order against the Senior Lender Prepetition Collateral and/or the other collateral in which Adequate Protection Liens were granted to the Prepetition Senior Lenders; (vi) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the Interim Order, the Final Borrowing Order or this Note or any of the Holders' rights, benefits, privileges or remedies under the Interim Order, the Final Borrowing Order or this Note; (vii) the entry of an order consolidating or combining any Debtor with any other Person (other than another Debtor); (viii) an order shall be entered approving, or the Debtor shall have consented to, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under this Note; or (ix) use of the proceeds of this Note for any purpose that is prohibited under Section 6(c) hereof;

(c)      The Final Borrowing Order. The Bankruptcy Court shall fail to enter the Final Borrowing Order on or prior to the date that is 30 days after entry of the Interim Order;

(d)      Default. Any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in this Note or any term or agreement relating to this Note that is contained in the Interim Order or the Final Borrowing Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; or

(e)      Judgments. (i) Any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days.

(f)      Use of Proceeds. Funds or Cash Collateral (as defined in the Interim Order and Final Borrowing Order) are co-mingled with the proceeds of this Note in the DIP Account or proceeds of this Note are used in a manner prohibited by this Note.

Upon the occurrence and during the continuance of any Event of Default, the Holders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors declare (i) the unpaid principal amount of and accrued interest on the Notes and (ii) all other obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become, immediately due and payable.

9.      Definitions. The following terms shall have the following meanings in this Note:

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Business Day" means each day that is not a Legal Holiday.

"Chapter 11 Cases" means those certain proceedings for relief filed by the Debtors under Chapter 11 of the Bankruptcy Code and being jointly administered under Case No. [_____] in the United States Bankruptcy Court for the Southern District of New York.

"Existing Secured Claims" means any secured claims in existence as of the commencement of the Chapter 11 Cases.

"Final Borrowing Order" means an order substantially in the form of the Interim Order entered by the Bankruptcy Court in these Chapter 11 cases after a final hearing under Bankruptcy Rule 4001.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review or rehearing has been waived or (ii) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"Interim Order" means that certain Interim Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, (iii) Authorizing Post-Petition Financing, and (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001.

"Issue Date" means the issue date of this Note on March ___, 2008.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or required by law to close. If a payment date is a Legal Holiday, payment shall be made on the next succeeding date that is not a Legal Holiday, and interest shall accrue for the intervening period at the rate set forth in Section 1 hereof. If a regular record date is a Legal Holiday, the record shall not be affected.

"LIBOR" means a fluctuating rate of interest determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London Time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR" means the fluctuating rate of interest calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen LIBO Page as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR" shall mean a fluctuating rate of interest based upon a comparable rate designated by the Holders as a substitute therefore. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that

are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Material Adverse Effect" means (i) a material adverse effect upon the business, operations, liabilities (whether contractual, environmental or otherwise), properties, assets, condition (financial or otherwise) or prospects of the Debtors taken as a whole or (ii) the material impairment of the ability of any Debtor to perform the obligations of the Debtors under the Note.

"Motion" means the Debtors' Motion (A) for Authorization Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), and 364(e) to (i) Use Cash Collateral, (ii) Grant Adequate Protection to Prepetition Secured Lenders, and (iii) Obtain Postpetition Financing, and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001.

"Note" means this $_____ Super-Priority DIP Note by and between the Debtors and the Holders and issued on _____ ___, 2008.

"Person" an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" means the date on which the Debtors filed their petitions for relief commencing these Chapter 11 Cases.

"Prepetition Indebtedness" means indebtedness of any Debtor outstanding on the Petition Date, including Indebtedness under the Prepetition Credit Agreements, the Senior Subordinated Notes and the 13% Junior Subordinated Note (as those terms are defined and/or referenced in the Motion).

"Required Holders" means Holders holding more than 50% of the principal amount of the Note.

    10.    Successors and Assigns. This Note shall inure to the benefit of the Holders and their respective successors and assigns and shall bind the Holders, their respective successors and assigns, and any chapter 7 or chapter 11 trustee appointed after the Petition Date or elected for the estates of the Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code.

    11.    Presentment and Demand. Demand, presentment, protest and notice of nonpayment and protest are hereby waived by the Debtors.

12.    <u>Amendment and Non-Waiver</u>.

(a)    This Note may not be amended, modified, or waived except by an agreement in writing signed by the Debtors and the Required Holders; <u>provided</u> that consent of all Holders shall be required to reduce the principal amount, the interest rate, or extend any payment date.

(b)    To the extent permitted by law, no failure to exercise and no delay on the part of the Holders in exercising any power or right in connection with this Note or available at law or in equity, shall operate as a waiver thereof, and no single or partial exercise of any such rights or power, or any abandonment or discontinuance of steps to enforce such a right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.

13.    <u>Notices</u>.  Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Note shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or three (3) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, or by telecopy and confirmed by telecopy answerback, addressed as follows:

(a)    If to the Debtors:

Lexington Precision Corporation
Lexington Rubber Group, Inc.
800 Third Avenue, 15th Floor
New York, NY 10022
Attn:  Warren Delano
Telecopy No.:  212-319-4695

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telecopy No.:  212-310-8000
Attn:  Marcia L. Goldstein, Esq.
        Christopher J. Marcus, Esq.

(b)    If to the Holders:

c/o Michael A. Lubin
Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Telecopy No.:  212-319-4659

with a copy to:

> O'Melveny & Myers LLP
> 7 Times Square
> New York, NY 10036
> Telecopy No.: 212-362-2061
> Attn: Gerald C. Bender, Esq.

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

14.    <u>Submission to Jurisdiction: Waiver of Jury Trial</u>.

(a)    The Debtors and the Holders hereby irrevocably submit to the jurisdiction of the Bankruptcy Court, and they hereby irrevocably agree that any action concerning the Note shall be heard and determined in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably waive, to the fullest extent they may effectively do so, the defense of an inconvenient forum to the maintenance of any such action in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably agree that the summons and complaint or any other process in any such action may be served by mailing in accordance with the provisions set forth in Section 13 hereof.

(b)    EACH OF THE DEBTORS AND THE HOLDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OBLIGATIONS UNDER THIS NOTE.

15.    <u>Governing Law</u>. This Note shall be governed by, construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed in such State and without giving effect to the conflict of laws principles thereof.

16.    <u>Indemnification for Expenses</u>. The Debtors agree to pay all reasonable out-of-pocket expenses of the Holders incurred in connection with the preparation, execution, delivery, enforcement and administration of this Note, the documents and instruments referred to herein and any amendments, waivers or consents relating hereto or thereto including, without limitation, the reasonable fees and expenses of O'Melveny & Myers LLP, counsel for the Holders. In addition, the Debtors agree to pay, and save Holders harmless from all liability for, any stamp or other documentary taxes which may be payable in connection with the execution or delivery of this Note by the Debtors.

17.    <u>Indemnification of Holders</u>. The Debtors hereby agree to protect, indemnify, pay and save harmless the Holders from and against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses (including reasonable

fees, expenses and disbursements of outside counsel) that Holders may incur or be subject to as consequence, direct or indirect, of the issuance of this Note by the Debtors other than as a result of the gross negligence or willful misconduct of the Holders as determined by a final judgment of a court of competent jurisdiction.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Debtors have executed and delivered this Note as of the day and year and at the place first above written.

LEXINGTON PRECISION CORPORATION

By: _____

     Name:  Warren Delano
     Title:     President

LEXINGTON RUBBER GROUP, INC.

By:_____

     Name:  Warren Delano
     Title:     President

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEXINGTON PRECISION CORP., et al.,** | : | 08- _____ ( ) |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |

-----------------------------------------------------------x

### INTERIM ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, AND 364 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS, (III) AUTHORIZING POSTPETITION FINANCING, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Upon the Motion, dated April 1, 2008 (the "Motion") of Lexington Precision

Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber"

and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, for

an order pursuant to sections 105(a), 361, 362, 363, 364(c)(1), and 364(e) of chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") authorizing them to (i) use Cash Collateral (as

defined below), (ii) grant adequate protection to the Debtors' Prepetition Senior Lenders (as

defined below), and (iii) obtain postpetition financing, on a super-priority, unsecured basis, in the

amount of $4,000,000 (the "DIP Loans"), of which $2,000,000 is sought to be used on an interim

basis, and requesting the scheduling of a final hearing (the "Final Hearing") on the Motion, all as

more fully described in the Motion; and the Court having jurisdiction to consider the Motion and

the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings

Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to (i) the United States Trustee for the Southern District of

New York (the "U.S. Trustee"), (ii) the attorneys for the agents for the Debtors' prepetition

senior lenders, (iii) the attorneys for the proposed postpetition lenders, (iv) the attorneys for the

ad hoc committee of noteholders, and (v) the holders of the 30 largest unsecured claims against

the Debtors (on a consolidated basis); and it appearing that no other or further notice need be

provided; and the relief requested being within the guidelines for financing requests set forth in

General Order M-274 of the United States Bankruptcy Court for the Southern District of New

York; and the relief requested in the Motion being in the best interests of the Debtors and their

estates and creditors; and the Court having reviewed the Motion; and based on the evidence

adduced at a hearing before the Court (the "Interim Hearing") in support of the Motion; and the

appearances of all interested parties having been noted in the record of the Interim Hearing; and

the Court having determined that the legal and factual bases set forth in the Motion and at the

Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings

had before the Court and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS:**

A.       On April 1, 2008 (the "Commencement Date"), Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

B.       Debtors have retained possession of their property and continue to operate and

manage their business as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code. No trustee, examiner, statutory committee of unsecured creditors (the

"Committee") or any other committee has yet been appointed in these chapter 11 cases.

C.    Prior to the Commencement Date, the Prepetition Senior Lenders (as defined below) made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, and discretionary funding letters executed by any Debtor and any Other Documents (as defined in each of the Credit Agreement (defined below) and the Loan Agreement (defined below)), the "Prepetition Senior Lender Loan Documents"):

(i)    that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent;

(ii)    that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent") (Revolver Agent and Term Loan Agent, collectively, the "Agents"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as the Term Loan Agent and a

lender under the Loan Agreement, along with the Revolver Agent and the Prepetition Revolver

Lenders, collectively, the "Prepetition Senior Lenders");

(iii)    that certain First Amendment and Default Waiver Agreement between

Debtors and CapitalSource, Webster, CSE and DMD in their various capacities dated as of

November 20, 2006; and

(iv)    that certain Agreement dated as of May 18, 2007 by and among the

Debtors, Agents (in their capacities as agents and lenders) and the other Prepetition Senior

Lenders, as amended by that certain First Amendment to Forbearance Agreement, dated as of

July 20, 2007, as further amended by that certain Second Amendment to Forbearance Agreement

effective as of September 24, 2007, and as further amended by that certain Third Amendment to

Forbearance Agreement executed December 11, 2007 and deemed effective as of November 26,

2007 (collectively, the "Forbearance Agreement").

D.    Debtors acknowledge that as of March 31, 2008, the aggregate principal amount

of $21,416,893.71 and $152,310.42 in accrued but unpaid interest was outstanding under the

Credit Agreement and $907,000.00 of letters of credit that were issued under the Credit

Agreement were outstanding, and the aggregate principal amount of $13,838,888.91 and

$126,158.92 in accrued but unpaid interest was outstanding under the Loan Agreement

(collectively with all other Obligations, as defined in the Prepetition Senior Lender Loan

Documents, including, without limitation, costs, fees and expenses that were outstanding under

the Prepetition Senior Lender Loan Documents as of the Commencement Date, the "Prepetition

Senior Secured Debt").

E.    Without prejudice to the rights of any other party (including the Committee or any

other statutory committee that may be appointed in these chapter 11 cases), but subject to the

time limitations specified in paragraph 29 below, the Debtors represent, stipulate, acknowledge, and agree that:

(i)      the Prepetition Senior Secured Debt is (i) legal, valid, binding, and enforceable against each Debtor; and (ii) not subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of re-characterization, claim of avoidance of any nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, or otherwise;

(ii)      all the Prepetition Senior Secured Debt is secured by the security interests in the Collateral (as defined below) previously granted under the Prepetition Senior Lender Loan Documents to the Prepetition Senior Lenders, that the Agents have, and will continue to have after entry of this Order, a legal, valid, enforceable, non-avoidable and continuing duly-perfected first priority security interest (and junior security interest, as applicable, subject to the terms of that certain Intercreditor Agreement dated as of May 31, 2006 between Revolver Agent, as agent and lender, Revolver Lenders, Term Loan Agent, as agent and lender, and Term Loan Lenders (the "Intercreditor Agreement")) in and lien on the Collateral, as more fully described and defined in the Prepetition Senior Lender Loan Documents (all such "Collateral", as the same existed on or at any time prior to the Commencement Date, together with all cash and non-cash proceeds thereof, shall be hereinafter referred to as "Senior Lender Prepetition Collateral" and such liens thereon shall be referred to as the "Senior Lender Prepetition Liens"), subject to no liens or security interests other than the liens expressly permitted under the Prepetition Senior Lender Loan Documents;

(iii)    nothing contained herein in any way impairs the Prepetition Senior

Lenders' first and junior (as applicable in accordance with the terms of the Intercreditor

Agreement) priority lien status in the Senior Lender Prepetition Collateral;

(iv)    as of the Commencement Date, and without giving effect to this Order, the

Debtors are not aware of any liens or security interests having priority over the Senior Lender

Prepetition Liens, except certain "Permitted Encumbrances" (as defined in the applicable

Prepetition Senior Lender Loan Documents);

(v)    the Senior Lender Prepetition Liens in the Senior Lender Prepetition

Collateral were granted to the Prepetition Senior Lenders for fair consideration and reasonably

equivalent value, and were granted contemporaneously with the making of the loans secured

thereby; and

(vi)    all cash of the Debtors wherever located on the Commencement Date

(other than the funds in the DIP Account (as defined below)) represents either proceeds of loans

under the Prepetition Senior Lender Loan Documents or proceeds of the Senior Lender

Prepetition Collateral; and pursuant to the Prepetition Senior Lender Loan Documents and

section 552(b) of the Bankruptcy Code, the Prepetition Senior Lenders have a valid, duly

perfected, first-priority lien upon and security interest in and to all of the cash of the Debtors

(other than the cash in the DIP Account (as defined below)), and these funds, along with the

proceeds of the Senior Lender Prepetition Collateral, constitute "cash collateral" within the

meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

F.    The Debtors have an immediate need to use Cash Collateral and obtain funds in

order to permit, among other things, the orderly continuation of the operation of their businesses,

to maintain business relationships with vendors, suppliers and customers, to meet payroll, to

make capital expenditures and to satisfy other working capital and operational needs.  Good

cause has been shown for the entry of this Order.  Use of Cash Collateral and the obtaining of

funds is vital to avoid immediate and irreparable harm to Debtors' estates.

G.     The Debtors are unable to obtain the funds being provided pursuant to the DIP

Loans on more favorable terms than those contained in the form of note (the "Note") attached

hereto as Exhibit A.  The Debtors are unable to obtain the required funds in the forms of (x)

unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, or (y) an

administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code.

H.     The Debtors have requested that the Prepetition Senior Lenders consent to the use

of their Cash Collateral.  The ability of the Debtors to continue their businesses and reorganize

under chapter 11 of the Bankruptcy Code depends upon the Debtors using such Cash Collateral.

The Prepetition Senior Lenders have consented to the Debtors' use of Cash Collateral in reliance

upon the terms outlined in this Order. The adequate protection provided herein and other benefits

and privileges contained herein are consistent with and authorized by the Bankruptcy Code,

Bankruptcy Rules 4001 and 6003 and Local Bankruptcy Rule 4001-3 and are necessary in order

to obtain such consent or non-objection of the Prepetition Senior Lenders.

I.     The Debtors have also requested that, pursuant to the terms of the Note(s), the

DIP Lenders make DIP Loans to the Debtors, which are to be used in the event that Cash

Collateral is insufficient to fund working capital requirements and general corporate purposes

relating to the Debtors' postpetition operations and for other expenditures authorized by this

Order, the final order granting the relief requested in the Motion (the "Final Order"), or that are

otherwise authorized by the Court; provided, however, that no portion of the proceeds shall be

used, directly or indirectly, to (a) finance or make any payment or prepayment to any person with

respect to a prepetition indebtedness unless authorized by this Order or another order of the Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the DIP Lenders or the Prepetition Senior Lenders. The DIP Lenders are willing to make the DIP Loans only on a super-priority, unsecured basis, pursuant to the terms of the Note(s), subject to the limitations set forth herein.

J.    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2). The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors using Cash Collateral and obtaining the DIP Loans. Accordingly, the relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and is in the best interests of the Debtors, their estates and creditors. Use of Cash Collateral and the Interim DIP Loan (as defined below) under the terms and conditions set forth herein and in the Note(s) is necessary to avoid immediate and irreparable harm to the estate pending the Final Hearing. Accordingly, good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Order.

K.    Based on the record before the Court, (i) the terms of the use of the Prepetition Senior Lenders' Cash Collateral as provided in this Order and (ii) the terms of the Note(s), pursuant to which the DIP Loans will be made to the Debtors by the DIP Lenders, have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      The Motion is hereby granted on an interim basis, with the foregoing findings incorporated herein by reference, and with any objections to the Motion that have not previously been withdrawn or resolved being hereby overruled.

Authorization to Use Cash Collateral

2.      Subject to the terms and conditions set forth in this Order, the Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Cash Collateral for the period of time from the date hereof until the earlier of two hundred seventy (270) days after the Commencement Date or the occurrence of a Termination Event (as defined below).

3.      Upon entry of an order by the Court on or about the date hereof approving the Debtors' motion to use, as modified, the Debtors' centralized cash management system (the "Cash Management Order"), FirstMerit Bank N.A., Akron, Ohio ("FirstMerit") shall, subject to the terms of the Cash Management Order (including the reservation of Debtors' rights to modify their cash management system to comply with section 345(b) of the Bankruptcy Code), commence immediately the automatic transfers on a daily basis of all available funds currently in or received in the Debtors' lockbox accounts and the consolidation account at FirstMerit into the Debtors' master operating account at FirstMerit (the "Master Operating Account"), without the necessity to comply with any lockbox or blocked account agreement or any preexisting transfer arrangement concerning such accounts; provided, however, that the Master Operating Account, along with all other bank accounts, deposit accounts and securities accounts established or in existence on or after the Commencement Date, shall be subject to any and all security interests and liens granted hereunder and this Order shall be deemed the only action necessary to perfect such liens in favor of the Revolver Agent for the benefit of the Senior Prepetition Lenders.

4.      The Debtors shall use Cash Collateral only for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors (including, without limitation, the making of Adequate Protection Payments (as defined below)), and (c) the costs of administration of these chapter 11 cases, with each of the foregoing in compliance with an eleven (11) week budget (the "Budget"), the initial form of which is annexed hereto as Exhibit B and incorporated herein by reference, subject to the permitted variances as provided for in this Order.

5.      Debtors may, with the prior written consent of the Revolver Agent and Term Loan Agent, use Cash Collateral in excess of the limits set forth in the Budget or the New Budget (as defined below), as applicable; provided, however, that such consent shall not be necessary for variances that do not exceed, in the aggregate, 10% of the cumulative expenditures set forth in the Budget and the New Budget, as applicable, as measured from the Commencement Date through the Date of Determination (as defined below), with bi-weekly reports due to the Revolver Agent and Term Loan Agent by 5:00 p.m. on Tuesday following the end of the second week being reported, showing comparisons and percentage variance by line item as well as on a cumulative basis; provided further that the Debtors shall be allowed to make advance cash payments or deposits of cash (collectively, "Advances") in the amount of goods and services to be provided, if required by vendors, so long as all projected Advances are included as expenditures in the Budget and the New Budget, as applicable, and all actual Advances are included in the reconciliation referred to in paragraph 11(vi)(a).  The "Date of Determination" shall initially be the third Friday after the Commencement Date, and subsequently shall be every other Friday thereafter.

6.      Two (2) weeks prior to the expiration of the eleven (11) week period covered by the Budget (or such other schedule as the parties may agree), Debtors shall provide a

proposed new budget (said budget and all subsequent budgets, the "New Budget") for Revolver

Agent's and Term Loan Agent's approval, to cover the subsequent thirteen (13) week period (the

said interim eleven (11) week period, the thirteen (13) week period, and all periods covered by

subsequent budgets, the "Budget Period") ; and one (1) week prior to the expiration of the

Budget Period (or such other schedule as the parties may agree), Revolver Agent and Term Loan

Agent shall approve or reject the New Budget; provided, however, that the New Budget shall

automatically be deemed to be approved if (a) the average weekly disbursements reflected in the

New Budget do not exceed 110% of the average weekly expenditures reflected in the budget

then in effect and (b) the New Budget indicates that the Debtors have adequate financing to

operate their business in accordance with the New Budget (assuming the continued use of Cash

Collateral and proceeds from the DIP Loans).   For the avoidance of doubt, subject to the proviso

in the preceding sentence, failure to secure Revolver Agent's and Term Loan Agent's approval

of the New Budget prior to the expiration of the Budget Period shall result in the expiration of

the Budget Period.  Extension of the Budget Period shall occur in the same manner with respect

to each New Budget.  Notwithstanding the foregoing, the failure of the Revolver Agent or Term

Loan Agent to object to the Budget or the New Budget, or the consent or agreement of the

Revolver Agent and Term Loan Agent to the Budget does not constitute an admission, nor shall

it be deemed an admission, that any such budgeted expenses constitute reasonable, necessary

costs, and expenses of preserving or disposing of the Senior Lender Prepetition Collateral.

Subject to the entry of the Final Order, in no event shall any costs or expenses of administration

be imposed upon the Prepetition Senior Lenders or any of the Senior Lender Prepetition

Collateral pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, except

as set forth in paragraphs 7, 8 and 23.

7.    Notwithstanding anything herein to the contrary, no Cash Collateral

(including without limitation the amounts held in the Master Operating Account) may be used by

any of the Debtors (or any subsequent trustee), the Committee, any other statutory committee or

any other person or entity (i) to object to or contest in any manner, or raise any defense or contest

to, the validity, perfection, priority or enforceability of the Prepetition Senior Secured Debt, the

Senior Lender Prepetition Liens, and the Prepetition Senior Lender Loan Documents or under

this Order, or to assert or prosecute any action for preferences, fraudulent conveyances, other

avoidance power claims (whether under chapter 5 of the Bankruptcy Code or otherwise) or any

other claims or causes of action against the Prepetition Senior Lenders, including without

limitation for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, or 550 of the

Bankruptcy Code (collectively, the "Claims and Defenses"); provided, however, that, subject to

the time limitations specified in paragraph 29 below, Cash Collateral may be used directly or

indirectly by the Committee or any other statutory committee to investigate the obligations and

liens under the Prepetition Senior Lender Loan Documents, in an amount not to exceed $25,000

in the aggregate; or (ii) subject to paragraph 11(x) below, to sell any portion of the Senior Lender

Prepetition Collateral (other than sales of inventory in the ordinary course of business, sales to

customers of tooling and equipment that will be used by the Debtors to produce inventory for

sale to such customers in the ordinary course of business, and sales of surplus or obsolete

equipment, provided that the fair market value of the surplus or obsolete equipment to be sold

after the Commencement Date shall not exceed $50,000 in the case of any single transaction or

$200,000 in the aggregate) without either providing for the indefeasible payment of the

Prepetition Senior Secured Debt in full in cash on the sale closing date (subject to the provisions

of paragraphs 8(i) and 24 hereof) or obtaining prior written consent to such sale from the Agents

(subject to the Intercreditor Agreement); (iii) to incur any new indebtedness that would be *pari passu* with or have priority over the Prepetition Senior Secured Debt; or (iv) to modify the rights of the Prepetition Senior Lenders under this Order.

Adequate Protection

8.      As adequate protection for the use of Cash Collateral, the Prepetition Senior Lenders shall receive:

(i)      adequate protection payments ("Adequate Protection Payments") in amounts equal to the following amounts, provided, only in the event that it is determined that the claims of the Agents and the Prepetition Senior Lenders are not fully secured, the Adequate Protection Payments shall be subject to reallocation, recharacterization, or disgorgement, after notice and a hearing before the Court:

(a) interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein; provided that in consideration for the receipt of principal payments, Prepetition Senior Lenders shall forever waive any and all claims for the difference between the contractual non-default rate and the contractual default rate (the "Default Rate Differential") from the Commencement Date until the occurrence of a Termination Event; provided, further that (i) the Debtors (x) acknowledge that sections 3.1 of each of the Credit Agreement and the Loan Agreement refer to the payment of default interest and (y) refer to said sections as to the terms and provisions thereof, and (ii) the Prepetition Senior Lenders reserve their rights to assert that the Debtors have an obligation to pay the Default Rate Differential on or after the occurrence of a Termination Event and the Debtors and all other parties-in-interest shall have the right to challenge or otherwise object to the payment of such Default Rate Differential.

For the avoidance of doubt, in the event Prepetition Senior Secured Debt is, and the amounts due to the Prepetition Senior Lenders hereunder are, indefeasibly paid in full in cash prior to the occurrence of or in connection with a Termination Event (subject to the provisions of paragraph 24 hereof), Prepetition Senior Lenders shall automatically be deemed to forever waive their claims to the Default Rate Differential with respect to the period between the Commencement Date and the date of such payment; and

(b)   payment of reasonable fees and expenses of (i) two legal counsel (i.e., two law firms) for the Agents, one of which shall be local counsel, (ii) a single financial advisor (one financial advisor firm) for the Agents, provided that, until a Termination Event shall have occurred, the fees and expenses of such financial advisor shall not exceed $20,000 per month in the aggregate (the "Financial Advisor Monthly Cap") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Financial Advisor Monthly Cap; (iii) other legal counsel retained by any of the Prepetition Senior Lenders, provided that, until a Termination Event shall have occurred, the fees and expenses of each such counsel shall not exceed $7,500 per month in the aggregate with respect to each Prepetition Senior Lender (the "Participant Monthly Cap") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Participant Monthly Cap; provided, however, that nothing in this paragraph 8(i) shall prejudice the rights of (x) any Prepetition Senior Lender under section 506(b) of the Bankruptcy Code to seek its reasonable fees and expenses pursuant to the Prepetition Senior Lender Loan Documents and (y) the Debtors to challenge or otherwise object to any such request;

(ii)    for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, (a) replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date (including, without limitation, cash and receivables and the proceeds thereof, whether existing or hereafter acquired after the Commencement Date and whether or not deposited in the Master Operating Account), (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and, subject to entry of the Final Order, causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all encumbered assets which were not otherwise subject to the Prepetition Secured Lenders' liens as of the Commencement Date (collectively, the "Adequate Protection Liens"); provided, however, that the Adequate Protection Liens shall (w) be subject to the Carve-Out (as defined below), (x) exclude any insurance policy (but not exclude the Debtors' entitlement, if any, to payments thereunder (subject to the Senior Lender Prepetition Liens and the Adequate Protection Liens) net of any amounts that may be due to an Insurance Premium Finance Party (as such term is defined in the Prepetition Senior Lender Loan Documents) with respect to such policy) where, subject to authorization of the Court, security interests and liens are granted to an Insurance Premium Finance Party on the Insurance Premium Collateral (as such term is defined in the Prepetition Senior Lender Loan Documents, provided that in no instance will the Insurance Premium Finance Party be granted a security interest in or lien on the DIP Account or the Master Operating Account) to secure the indebtedness of the Debtors to an Insurance Premium Finance Party in connection with insurance policies maintained by the Debtors arising as a result of such Insurance Premium Finance Party

entering into arrangements to allow the Debtors to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided that the Debtors shall continue to abide by the requirements under sections 4.11 of each of the Credit Agreement and the Loan Agreement, provided, however, that notwithstanding anything contained in said sections to the contrary, amounts payable to Agents as loss payees under a casualty or property insurance coverage shall be reduced by amounts owed, if any, to the Insurance Premium Finance Parties with respect to such policies; and provided further that such indebtedness of the Debtors to all Insurance Premium Finance Parties shall not exceed the aggregate principal amount outstanding of $800,000 at any one time ("Insurance Premium Financing"); and (y) neither prime nor impair any perfected liens or perfected security interests in the same collateral that are senior in rank and priority to the Senior Lender Prepetition Liens or the Adequate Protection Liens under applicable nonbankruptcy law as of the Commencement Date, such as statutory liens, if any, that are senior in priority as a result of being perfected under applicable state law prior to the granting of the Adequate Protection Liens; and provided further, however, except as expressly set forth in this Order, the Adequate Protection Liens granted herein shall not be subject to any liens that are avoided and preserved for the benefit of any of the Debtors' estates under section 551 of the Bankruptcy Code, and shall not be subordinated to or made *pari passu* with any other lien under section 364(d) or any other section of the Bankruptcy Code or otherwise; and

(iii)    for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, an administrative expense claim pursuant section 507(b) of the Bankruptcy Code (the "Adequate Protection Claim"), which shall

be senior to any and all other claims (including the DIP Super-Priority Claim, as defined below), but subject to the Carve-Out (as defined below).

9.     The Adequate Protection Liens on property of the Debtors' estates granted herein, including without limitation the security interests and liens in postpetition cash and receivables, the Master Operating Account, the DIP Account and proceeds of each of the foregoing, are valid, binding, effective, enforceable, and fully perfected, and no filing or recordation or other act in accordance with any applicable local, state, for federal law, rule, or regulation, is necessary to create or perfect such Adequate Protection Liens.  The above provision notwithstanding, Debtors shall cooperate with Prepetition Senior Lenders to execute such documents and instruments, and do such other things as Prepetition Senior Lenders may reasonably request, to evidence and perfect such Adequate Protection Liens for the convenience and information of third parties, and to evidence the obligations undertaken by the Debtors hereunder.

10.     None of the Prepetition Senior Lenders shall be deemed to be in control of the Debtors or their operations or to be acting as a "responsible person," "managing agent," or "owner or operator" with respect to the operation or management of the Debtors.

Termination Events

11.     With respect to the use of Cash Collateral hereunder, each of the following shall constitute a "Termination Event":

(i)     the closing or dismissal of the chapter 11 cases;

(ii)     the conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code;

(iii)    the appointment in these chapter 11 cases of a chapter 11 trustee or an examiner with expanded powers to operate or manage the financial affairs, the businesses or the reorganization of any Debtor;

(iv)    non-compliance by any Debtor with any of the terms or provisions of this Order;

(v)    expiration of the applicable Budget Period without extension pursuant to paragraph 6 above;

(vi)    (a) the Debtors' cumulative expenditures from the Commencement Date through the Date of Determination are more than 110% of the cumulative expenditures for such periods, as set forth in the Budget and the New Budgets, or (b) the aggregate of the Debtors' short-term investments and the cash available in their Master Operating Account and the DIP Account, is less than $1,000,000 at the close of business on May 2, 2008, less than $500,000 at the close of business on May 30, 2008 and on the last day of each four-week period thereafter;

(vii)    if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four-week period thereafter, net sales are less than 90% of the net sales reflected in the Budget or any New Budget; provided, that the Debtors shall report such net sales in writing certified by Debtors' CFO within five (5) days of the end of each four-week period and provide comparison to the amounts reflected in the Budget and the New Budgets with a narrative explaining the reasons for any deviations, provided, however, that "net sales" shall not include any sales of tooling or equipment provided for in paragraph 7(i) above or other sales of Debtors' assets;

(viii)    Debtors' failure to (1) file, within ninety (90) days from the Commencement Date, a plan of reorganization (the "Plan") providing for the indefeasible

payment of the Prepetition Senior Secured Debt in full in cash on the effective date of such Plan

(subject to the provisions of paragraphs 8(i) and 24 hereof); or (2) file a disclosure statement

regarding such Plan within one hundred twenty (120) days of the Commencement Date; or (3)

consummate such Plan and emerge from chapter 11 of the Bankruptcy Code within two hundred

seventy (270) days of the Commencement Date, provided such consummation of the Plan and

emergence from chapter 11 of the Bankruptcy Code actually results in the indefeasible payment

of the Prepetition Senior Secured Debt in full in cash on the effective date of the Plan, subject to

the provisions of paragraphs 8(i) and 24 hereof;

(ix)    expiration of thirty (30) days after entry of this Order unless the Final

Order is entered prior to the expiration of such thirty (30) day period;

(x)    entry of an order providing for the sale of more than $1,000,000 (to be

measured in aggregate purchase price and/or book value, whichever is greater for each asset

sold) of the Debtors' assets that does not provide that the proceeds of such sale (less all costs,

expenses and fees related thereto) shall be applied to the Prepetition Senior Secured Debt in

accordance with the terms set forth in the Prepetition Senior Lender Loan Documents (subject to

the Intercreditor Agreement) on the sale closing date, or for which sale the Prepetition Senior

Lenders have not provided prior written consent (subject to the Intercreditor Agreement);

provided, however, that in no case shall the aggregate of any sales permitted hereunder exceed

$5,000,000;

(xi)    the lapse or termination of Debtors' exclusive periods to file and solicit a

plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(xii)    entry of any order pursuant to section 364 of the Bankruptcy Code

authorizing Debtors to obtain credit that is *pari passu* with or has priority over the Prepetition

Senior Secured Debt and does not provide for the indefeasible payment in full in cash of the

Prepetition Senior Secured Debt (subject to the provisions of paragraphs 8(i) and 24 hereof) and

any outstanding Adequate Protection Payments on the closing date of such financing;

(xiii)    the automatic stay is lifted as to any party in order to take possession or to

permit foreclosure on any portion of the Senior Lender Prepetition Collateral or any other

collateral subject to the Adequate Protection Liens, the value of which, as measured by fair

market value or book value, whichever is greater, exceeds $1,000,000 in the aggregate; or

(xiv)    any uninsured loss with respect to the Senior Lender Prepetition Collateral

or any other collateral subject to the Adequate Protection Liens in an amount equal to or

exceeding $1,000,000.

12.    Following the occurrence of a Termination Event, Debtors shall have five

(5) business days after receipt of written notice from Revolver Agent and Term Loan Agent, on

behalf of themselves, and the Prepetition Senior Lenders to cure such Termination Event, if it is

capable of cure (the "Cure Period").

13.    If, upon the expiration of the Cure Period, the Debtors have not cured the

Termination Event (assuming such Termination Event is curable) and the notice referred to in

paragraph 12 has not been withdrawn (herein referred to as the "Termination Date"), (a) the

Debtors shall cease all use of Cash Collateral and any authority of Debtors under this Order to

use Cash Collateral shall terminate; and (b) the Prepetition Senior Lenders shall be granted,

without further action of the Prepetition Senior Lenders or the Court, immediate and automatic

relief from the automatic stay under section 362 of the Bankruptcy Code, which shall be

automatically terminated as it relates to the Senior Lender Prepetition Collateral and all other

collateral in which Adequate Protection Liens have been granted without further action of the

Prepetition Senior Lenders or this Court. Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Prepetition Senior Lenders under this Order shall survive the Termination Date. In addition, upon the occurrence of the Termination Date, if instructed by the Revolver Agent and the Term Loan Agent, FirstMerit or any other bank or financial institution with which the Debtors establish an account, shall transfer all of the available funds on deposit in such account as directed by the Revolver Agent and the Term Loan Agent; provided, however, that if it is subsequently determined that the Prepetition Senior Lenders did not have Senior Lender Prepetiton Liens or Adequate Protection Liens on such accounts, the Prepetition Secured Lenders shall disgorge and repay to the Debtors' estates such portion of the funds as to which they did not have Senior Lender Prepetiton Liens or Adequate Protection Liens; provided, further, however, that notwithstanding the foregoing, (i) any existing deposit account control agreements shall continue in full force and effect subject to the terms of this Interim Order, and (ii) within 45 days of the establishment of a new bank account, deposit account, securities account or other account, the Debtors, the Revolver Agent (for the benefit of the Prepetition Senior Lenders, subject to the Intercreditor Agreement) and each bank or financial institution with which the Debtors establish such deposit account shall enter into a deposit account control agreement or similar applicable agreement, which shall be in form and substance reasonably satisfactory to the Revolver Agent; provided, further, that the Debtors shall notify the Revolver Agent in writing within five (5) business days thereof of the establishment of any new bank account, deposit account, securities account, or other account.

The DIP Loans

14.     The Debtors are hereby authorized to obtain an interim unsecured DIP Loan in the amount of $2,000,000 (the "Interim DIP Loan") to be evidenced by a Note, and on terms and conditions, substantially in the form annexed hereto as Exhibit A, including, without limitation, monthly payment of interest on the Interim DIP Loan at the rate set forth therein and payment of a fee in the amount of $40,000.

15.     The Debtors are hereby authorized to execute a Note substantially in the form attached hereto as Exhibit A and are hereby authorized and directed to do and perform all acts, including, without limitation, making, executing, and delivering all instruments and documents, that may be necessary or desirable to implement the Interim DIP Loan and perform under the Note.

16.     The Debtors are hereby authorized and directed to deposit the proceeds of the Interim DIP Loan into a new bank account at a bank that has been approved by the Office of the U.S. Trustee as an authorized bank depository (the "DIP Account") and no other funds or Cash Collateral of the Debtors shall be commingled with the proceeds of the Interim DIP Loan or deposited into the DIP Account; provided, however, that the DIP Account shall be subject to any and all security interests and liens granted hereunder and hereby perfected in favor of the Senior Prepetition Lenders, including without limitation the requirements for entering into a deposit account control agreement set forth in paragraph 13.

17.     Upon entry of this Order, and subject to the terms of the Note, the Debtors' obligations under the Note shall constitute valid, binding, and enforceable obligations of the Debtors.

18.     No obligation, payment, or transfer under the Interim DIP Loan or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law except as may be in violation of the terms of this Order.

Use of the Interim DIP Loan

19.     The Debtors are hereby authorized to use proceeds of the Interim DIP Loan only to the extent Cash Collateral is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' postpetition operations and for other expenditures authorized by this Order, the Final Order or that are otherwise authorized by the Court; provided, however, that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any person with respect to a prepetition indebtedness unless authorized by this Order or another order of the Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the DIP Lenders or the Prepetition Senior Lenders.

Super-Priority Claim

20.     Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Lenders are hereby granted a super-priority claim (the "DIP Super-Priority Claim") payable from any prepetition and postpetition property of the Debtors and all proceeds thereof and senior to any and all other unsecured claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, provided, however, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out (as defined below), and the Adequate Protection Liens.  As provided above, under no circumstances

are the DIP Lenders to be paid any amount (other than the interest, fees and expenses required to

be paid under the Note(s) and in accordance with the Budget or the New Budget, as applicable)

in respect of any claim or obligation under the Interim DIP Loan or the DIP Loans, unless and

until the Prepetition Senior Secured Debt is indefeasibly paid in full in cash, subject to the

provisions of paragraphs 8(i) and 24 hereof.

21.    Subject to the Carve-Out, the Adequate Protection Liens, the Prepetition

Senior Secured Debt and the Adequate Protection Claim, the DIP Super-Priority Claim shall at

all times be senior to any unsecured claims of any creditor or other entity in this and any

subsequent case under the Bankruptcy Code, and with the exception of the Carve-Out, the

Adequate Protection Liens, Prepetition Senior Secured Debt and the Adequate Protection Claim,

no cost or expense of administration or any claims in this case, including those resulting from or

incurred after any conversion of this case pursuant to section 1112 of the Bankruptcy Code shall

rank prior to, or on parity with, the DIP Super-Priority Claims.

<u>Maturity Date</u>

22.    The Debtors may continue to use the Interim DIP Loan proceeds until the

earliest of (i) the one year anniversary of the Commencement Date, (ii) the effective date of a

confirmed chapter 11 plan of reorganization in these chapter 11 cases, (iii) the conversion of any

of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and (iv) the

appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an

examiner with expanded powers to operate or manage the financial affairs, the business or the

reorganization of any Debtor, and (v) the date of acceleration by the DIP Lenders pursuant to

section 7 (Events of Default) of the Note (collectively, the "<u>Maturity Date</u>").

Carve-Out

23.     The Senior Lender Prepetition Liens, the Adequate Protection Claim, the

Adequate Protection Liens, and the DIP Super-Priority Claim shall be subject to the payment of

the following items (collectively, the "Carve-Out"): (i) fees of the clerk of the Bankruptcy Court,

the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to

28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable

fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a

case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (iii)

upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall be

the trigger dates of this clause and not the measuring points with respect to any fees or expenses),

the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331

of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the

Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services

rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner

appointed or elected in these chapter 11 cases, to the extent this Court allows the payment

thereof, in an amount not to exceed $500,000, provided that the first $400,000 only shall be paid

from the assets subject to Senior Lender Prepetition Liens and the Adequate Protection Liens

(including Cash Collateral) and that would otherwise be paid to the Prepetition Senior Lenders in

respect of the Adequate Protection Claim (the "Prepetition Senior Lenders' Fee Carve-Out

Amount"), and the balance between $500,000 and the Prepetition Senior Lenders' Fee Carve-Out

Amount shall be paid from whatever assets would be distributed on account of the DIP Super-

Priority Claim; provided, however, that prior to the occurrence of the Termination Date or the

Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the Interim

DIP Loan, as the same may be due and payable, all professional fees and expenses pursuant to

sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or

incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date.

For the avoidance of doubt, with respect to the Prepetition Senior Lenders, the Carve-Out for

clauses (ii) and (iii) of the preceding sentence shall not exceed $500,000 in the aggregate.

Protection of Prepetition Senior Lenders and DIP Lenders' Rights

        24.     With respect to any issued and outstanding letters of credit (collectively,

the "Outstanding Letters of Credit"), the Debtors shall comply with the terms of section 2.7(k) of

the Credit Agreement, provided that in any event, such Outstanding Letters of Credit shall be

released and returned to the holder thereof within ninety (90) days of indefeasible payment in

full of the Senior Lender Prepetition Debt (subject to the provisions of paragraph 8(i) hereof),

including without limitation any such payment in full in connection with the Plan referenced in

paragraph 11(viii) hereof.

        25.     The provisions of the Interim DIP Loan and this Order are binding upon

all the parties in interest in these chapter 11 cases, including, without limitation, the Prepetition

Senior Lenders, the DIP Lenders and the Debtors, the Committee, and their respective successors

and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the

estates of the Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy

Code), and inure to the benefit of the Prepetition Senior Lenders, the DIP Lenders and the

Debtors and, except with respect to any trustee hereinafter appointed or elected for the estates of

the Debtors, their respective successors and assigns. In addition, neither the terms of this Order,

nor the filing of these bankruptcy cases generally, shall be deemed to modify or affect the

respective rights and obligations among the Prepetition Senior Lenders under the Intercreditor

Agreement.

26.    Notwithstanding anything herein to the contrary, this Order is without prejudice to, and does not constitute a waiver (other than the waiver set forth in paragraph 8(i) regarding the Default Rate Differential), expressly or implicitly, of the rights of the Prepetition Senior Lenders to seek additional adequate protection should circumstances warrant.

27.    Entry of this Order shall not in any way (i) constitute agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this Order; or (ii) prevent the Prepetition Senior Lenders or the DIP Lenders from objecting, for any reason, to any requests, motions or applications made in this Court (other than this Order), including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

28.    The Prepetition Senior Lenders and the DIP Lenders, having been found to be acting in good faith, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and, therefore, if any or all of the provisions of this Interim Order are hereafter reversed, stayed, modified, or vacated, such reversal, stay, modification, or vacation shall not affect (i) the validity of any obligation, indebtedness, or liability incurred by the Debtors to the Prepetition Senior Lenders or the DIP Lenders prior to written notice to such party of the effective date of such reversal, stay, modification, or vacation, or (ii) the validity and enforceability of any priority authorized or created hereby or pursuant to the Note with respect to any such indebtedness, obligation, or liability, including, without limitation, the Adequate Protection Liens, the Adequate Protection Claim, the DIP Super-Priority Claim, the Prepetition Senior Secured Debt, and the Senior Lender Prepetition Liens. Notwithstanding any such reversal, stay, modification, or vacation, any indebtedness, obligations, or liabilities incurred by the Debtors to

the Prepetition Senior Lenders and the DIP Lenders prior to written notice to such party of the

effective date of such reversal, stay, modification, or vacation shall be governed in all respects by

the original provisions of this Order, and the Prepetition Senior Lenders and the DIP Lenders

shall be entitled to all the claims, priorities, rights, remedies, privileges, and benefits granted

herein and/or pursuant to the Note until the Senior Prepetition Secured Debt (subject to the

provisions of paragraphs 8(i) and 24 hereof),  Adequate Protection Claim and all of the

obligations under the Note are indefeasibly paid in full and discharged in cash.

Releases

29.    All representations, stipulations, acknowledgments, and agreements of the

Debtors above, are for all purposes subject to the rights of the Committee, any other statutory

committee or, as authorized by the Court, any other party in interest (other than the Debtors or

any successor to the Debtors, including, without limitation, any chapter 11 trustee or chapter 7

trustee), to file a complaint pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate

or otherwise challenge (including, without limitation, a determination of the validity, priority,

and extent of any lien) the obligations under the Prepetition Senior Lender Loan Documents or

the Senior Lender Prepetition Liens, including asserting any other Claims and Defenses;

provided, however, (i) that any such complaint must be filed in this Court within the later of

sixty (60) days from the date of entry of the order approving the appointment of counsel for such

committee (or if no committee is formed, seventy five (75) days from the Commencement Date)

or any subsequent date that may be ordered by the Court for cause shown before the expiration

of such period (the "Challenge Period"); and (ii) if no such action is commenced during the

Challenge Period, all Claims and Defenses shall be deemed, immediately, and without further

action by the Prepetition Senior Lenders or the Court, to have been forever relinquished and

waived by the Committee and any other person or entity with actual or constructive notice of

these chapter 11 cases, including any chapter 11 trustee or chapter 7 trustee.

30.    In consideration of Debtors' use of Cash Collateral, the Debtors (on behalf

of themselves and any successor to the Debtors, including any chapter 11 trustee or chapter 7

trustee) voluntarily and knowingly release and forever discharge the Prepetition Senior Lenders

in all their respective capacities, their predecessors, agents, attorneys, financial advisors, direct

and indirect parents, subsidiaries and affiliates, members, managers, servicers, directors, officers,

employees, successors and assigns from all possible claims, counterclaims, demands, actions,

causes of action, damages, costs, expenses and liabilities whatsoever, known or unknown,

anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole

or in part on or before the date hereof, which the Debtors may now know or hereafter come to

know they have against Prepetition Senior Lenders in all of their respective capacities, their

predecessors, agents, attorneys, direct and indirect parents, subsidiaries and affiliates, members,

managers, servicers, directors, officers, employees, successors and assigns, if any, and

irrespective of whether any such claims arise out of contract, tort, violation of law or regulations,

or otherwise; provided, however, that these releases shall not preclude the Committee or any

other statutory committee appointed in these chapter 11 cases, if so authorized by the Court,

from commencing, fully prosecuting, and collecting upon, any and all claims of whatever kind or

nature that the Debtors' estates could otherwise assert but for the releases contained herein but

subject in any event to the terms of paragraph 29.

31.    No provision of the Interim DIP Loan or the implementation thereof is

intended to or shall be deemed to create any claim or cause of action against the DIP Lenders or

any of their affiliates or disallowance or subordination of any of the claims of the DIP Lenders or

any of their affiliates based upon lender liability, equitable subordination or otherwise.

Reporting

        32.    Existing reporting requirements shall continue, including without

limitation full financial reports required under the Prepetition Senior Lender Loan Documents,

which shall be provided on a monthly basis within thirty (30) days of the end of each month and

on a quarterly and yearly basis pursuant to and in the form prescribed by the Prepetition Senior

Lender Loan Documents (or on such other schedule or in such other form as the parties may

agree); provided, however, that the deadline for delivery of the Debtors' report on Form 10-K for

the fiscal year ended December 31, 2007, is extended by thirty (30) days and the deadlines for

delivery of the Debtors' reports on Form 10-Q for the fiscal quarters ending March 31 and June

30, 2008 are extended by fifteen (15) days. In addition, and without limiting the foregoing or

any other reporting requirement contained hereunder, the Debtors shall prepare and submit (a)

the reports referred to in paragraphs 5 and 11(vii) hereof prior to the deadlines set forth therein,

(b) reports indicating any and all information that is required by the borrowing base certificates

under the Prepetition Senior Lender Loan Documents for the previous week prior to 5:00 p.m. on

Tuesday following the week being reported (or by such other date and time as the parties may

agree); and (c) any other and further reports reasonably requested by the Prepetition Senior

Lenders. Commencing on or about April 16, 2008, the Prepetition Senior Lenders and the

Debtors shall have a bi-weekly phone conference (the "Status Call"), on such dates, at such

times, and on such other schedule as the parties may agree, to update the Prepetition Senior

Lenders on the Debtors' financial and operational status, including updates as to relations with

customers, vendors and suppliers.

33.    The Debtors shall also provide the Prepetition Senior Lenders copies of all reports made for or documents given to the United States Trustee in these chapter 11 cases.

34.    Debtors shall permit representatives, agents, and/or employees of the Prepetition Senior Lenders, including professionals retained by the Prepetition Senior Lenders' legal professionals, to have reasonable access to its premises and records during normal business hours (without unreasonable interference with the proper operation of Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

Modifications/Amendments

35.    Any material and substantive modifications to the terms of this Order, the Interim DIP Loans or the Note require the prior written consent of the Prepetition Senior Lenders.  Any modifications to the terms of the Interim DIP Loans or the Note require the prior written consent of the DIP Lenders, and any material and substantive modifications to the terms of this Order require the prior written consent of the DIP Lenders.

Notice

36.    Under the circumstances, the notice given by the Debtors of the Motion and of the Interim Hearing constitutes due and sufficient notice of the Motion and of the Interim Hearing.  The Debtors shall promptly mail copies of this Order to the parties given notice of the Interim Hearing, any party that has filed a request for notices with this Court, and any statutory committee appointed in these bankruptcy cases or its counsel.

Final Hearing

37.    The Court shall conduct the Final Hearing on the Motion to consider entry of the Final Order on _____, 2008, at _____ _.m., prevailing Eastern Time. Any party in

interest objecting to the relief sought at the Final Hearing must file a written objection with the

Clerk of the United States Bankruptcy Court for the Southern District of New York, and serve

any such objection on the following parties, so that it is received no later than five (5) business

days before the Final Hearing:  (a) Counsel for the Debtors, Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, NY 10153, Attention: Richard P. Krasnow, Esq. (Facsimile:

212.310.8007), Christopher Marcus, Esq. (Facsimile: 212.310.8007), (b) Counsel for the

Prepetition Senior Lenders: Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700,

Nashville, TN 37219, Attention: John C. Tishler, Esq., (Facsimile: 615-244-6804), Robert L.

Welhoelter, Esq. (Facsimile: 615-244-6804); Day Pitney LLP, 200 Campus Drive, Florham Park,

NJ 07932, Attention Scott Zuber, Esq. (Facsimile: 973-966-1015); Katten Muchin Rosenman

LLP, 525 West Monroe Street, Chicago, IL 60661, Attention Jeffrey L. Elegant, Esq. (Facsimile:

312-577-4676); (c) the DIP Lenders, c/o Michael A. Lubin, Lexington Precision Corporation,

800 Third Avenue, 15th Floor, New York, NY 10022 (Facsimile: 212.319.4659), (e) counsel for

the DIP Lenders, O'Melveny & Myers LLP, 7 Times Square, New York, NY 10036, Attention:

Gerald C. Bender, Esq. (Facsimile:  212-362-2061); and (f) the Office of the United States

Trustee for the Southern District of New York.

38.    In the event that any provision of this Order conflicts with any term of the

Note, this Order shall govern.

39.    The requirement set forth in Local Bankruptcy Rule 9013-1(b) for the

filing of a separate memorandum of law in support of the Motion is satisfied.

Dated: April __, 2008.
New York, New York


_____

United States Bankruptcy Judge

Acknowledgement:

Prepetition Senior Lenders hereby consent to the use of Cash Collateral as provided in this
Order, including, without limitation, the waiver of the Default Rate Differential in paragraph 8(i)
of this Order.

By: /s/ John C. Tishler
    John C. Tishler, Esq.
    WALLER LANSDEN DORTCH & DAVIS, LLP
    511 Union Street, Suite 2700
    Nashville, TN 37219

By: /s/ Scott Zuber
    Scott Zuber, Esq.
    DAY PITNEY LLP
    200 Campus Drive
    Florham Park, NJ 07932

By: /s/ Jeffrey L. Elegant
    Jeffrey L. Elegant, Esq.
    KATTEN MUCHIN ROSENMAN LLP
    525 West Monroe Street
    Chicago, IL 60661

Attorneys for the Prepetition Secured Lenders

## **EXHIBIT A**

Form of Note

## SUPER- PRIORITY DIP NOTE

$_____                                        New York, New York
                                                   Issue Date: _____ ___, 2008

     FOR VALUE RECEIVED, the undersigned, Lexington Precision Corporation and Lexington Rubber Group, Inc., each a Delaware corporation and a debtor in possession (collectively, the "Debtors"), hereby jointly and severally and unconditionally promise to pay to the order of Lubin Partners, LLC, a Delaware limited liability company, William B. Connor and ORA Associates, LLC, a New York limited liability company (collectively, the "Holders"), the aggregate principal sum of ___ Million Dollars ($_____), to be allocated among the Holders as follows:

| | |
|---|---|
| Lubin Partners, LLC | $ _____ |
| William B. Connor | $ _____ |
| ORA Associates, LLC | $ _____ |

     1.    Payment of Principal and Interest. The principal amount of this Note shall be paid on the earliest of (i) the one year anniversary of the Petition Date, (ii) the effective date of a  confirmed chapter 11 plan of reorganization in the Chapter 11 Cases,[1] (iii) the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iv) the appointment of a chapter 11 trustee in any of the Chapter 11 Cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor and (v) the date of acceleration by the Holders pursuant to Section 7 hereof (such date, the "Stated Maturity Date"). The Debtors also promise to pay interest on this Note on the first business day of each month (in arrears) and upon the date this Note matures or otherwise becomes due and payable at the rate of LIBOR plus 7% per annum with a LIBOR floor of 3% per annum (computed on the basis of a 360 day year for the actual number of days lapsed); provided that any principal amount not paid when due, and to the extent permitted by applicable law, any interest not paid when due, in each case whether at Stated Maturity Date, by required prepayment, declaration, acceleration or demand or otherwise (both before as well as after judgment), shall bear interest payable upon demand at the rate that is 2% per annum in excess of the rate of interest otherwise payable upon this Note.  All payments hereunder, including any prepayment, shall be made to the Holders on a pro rata basis based on the respective principal amounts owed to each Holder.

     2.    Optional Prepayment. Debtors shall have the right at any time or from time to time and without premium or penalty, to voluntarily prepay all or any portion of this Note. Each prepayment shall be accompanied by the payment of accrued

---

[1] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such terms in Section 9 hereof.

and unpaid interest on the amount being prepaid, through the date of prepayment. Any amounts prepaid hereunder may not be reborrowed.

      3.     Lender Fee. Pursuant to the Interim Order and the Final Borrowing Order, the Debtors shall pay to the Holders a fee in cash in the aggregate amount of $80,000,[2] to be allocated to the Holders pro rata based upon their funding commitment.

      4.     Use of Proceeds. The proceeds of this Note shall be used by the Debtors to the extent Cash Collateral (as defined in the Interim Order and Final Borrowing Order) is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the Interim Order, the Final Borrowing Order or as otherwise authorized by the Bankruptcy Court; provided that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Bankruptcy Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders. The Debtors shall use the entire amount of the proceeds in accordance with this Section 4; provided, however, that nothing herein shall in any way prejudice the Holders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest; and provided, further, that Debtor shall not use the proceeds for any purpose that is prohibited under the Bankruptcy Code. The proceeds of this Note shall be deposited and held in a new bank account at a bank that has been approved by the Office of the United States Trustee for the Southern District of New York as an authorized bank depository (the "DIP Account") as described in the Interim Order and the Final Borrowing Order and no other funds or cash collateral of the Debtors shall be co-mingled with the proceeds of this Note or deposited in the DIP Account.

      5.     Superpriority Nature of Obligations. All obligations of the Debtors under this Note (including the obligation to pay principal, interest, fees, costs, charges, commissions and expenses) shall be paid as provided herein when due, without defense, offset, reduction or counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors arising under Section 364(c)(1) of the Bankruptcy Code, and senior to any and all other claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code; provided, however, that

---

[2] Payment of the first $40,000 (assuming the amount of the initial loan is $2,000,000) shall be authorized in the Interim Order, with the remaining $40,000 to be authorized in the Final Borrowing Order.

notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Lien (all as defined in the Interim Order and the Final Borrowing Order). Subject to the Carve-Out, the Adequate Protection Liens (as defined in the Interim Order and the Final Borrowing Order), the Prepetition Senior Secured Debt (as defined in the Interim Order and the Final Borrowing Order) and the Adequate Protection Claim (as defined in the Interim Order and the Final Borrowing Order), the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to Section 1112 of the Bankruptcy Code shall rank prior to, or on parity with, the DIP Super-Priority Claims.

6.    Covenants. Each of the Debtors covenant and agree that until this Note is paid in full, neither of the Debtors shall, without the prior written consent of the Required Holders:

(a)    Asset Sales. enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business;

(b)    Chapter 11 Claims. incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any Chapter 11 Case (other than the Existing Secured Claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the Holders against such Debtor in respect of the obligations hereunder, or apply to the Bankruptcy Court for authority to do so; or

(c)    Limitation on Payments Related to Prepetition Obligations. (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to Section 361 of the Bankruptcy Code (other than the Adequate Protection Liens (as such term is defined in the Interim Order and the Final Borrowing Order), or apply to the Bankruptcy Court for the authority to do any of the foregoing; provided that the Debtors may make payments as permitted in the Interim Order, the Final Borrowing Order, or as authorized

in any other order of the Bankruptcy Court, including, for example, making Adequate Protection Payments (as such term is defined in the Interim Order and the Final Borrowing Order).

       7.    <u>Events of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, if any of the following conditions or events ("<u>Events of Default</u>") shall occur:

       (a)    <u>Failure to Make Payments When Due</u>. Failure by the Debtors to pay any installment of principal on this Note when due or pay any installment of interest within 3 business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due;

       (b)    <u>Chapter 11 Cases</u>. With respect to the Chapter 11 Cases, (i) the entry of an order authorizing any Debtor in any of the Chapter 11 Cases to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing, as defined in the Interim Order and the Final Borrowing Order); (ii) the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect; (v) exercise of rights by the Prepetition Senior Lenders (as defined in the Interim Order and the Final Borrowing Order) pursuant to Paragraph 13 of the Interim Order and the corresponding paragraph of the Final Borrowing Order against the Senior Lender Prepetition Collateral and/or the other collateral in which Adequate Protection Liens were granted to the Prepetition Senior Lenders; (vi) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the Interim Order, the Final Borrowing Order or this Note or any of the Holders' rights, benefits, privileges or remedies under the Interim Order, the Final Borrowing Order or this Note; (vii) the entry of an order consolidating or combining any Debtor with any other Person (other than another Debtor); (viii) an order shall be entered approving, or the Debtor shall have consented to, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under this Note; or (ix) use of the proceeds of this Note for any purpose that is prohibited under Section 6(c) hereof;

(c)   The Final Borrowing Order. The Bankruptcy Court shall fail to enter the Final Borrowing Order on or prior to the date that is 30 days after entry of the Interim Order;

(d)   Default. Any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in this Note or any term or agreement relating to this Note that is contained in the Interim Order or the Final Borrowing Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; or

(e)   Judgments. (i) Any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days.

(f)   Use of Proceeds. Funds or Cash Collateral (as defined in the Interim Order and Final Borrowing Order) are co-mingled with the proceeds of this Note in the DIP Account or proceeds of this Note are used in a manner prohibited by this Note.

Upon the occurrence and during the continuance of any Event of Default, the Holders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors declare (i) the unpaid principal amount of and accrued interest on the Notes and (ii) all other obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become, immediately due and payable.

9.   Definitions. The following terms shall have the following meanings in this Note:

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Business Day" means each day that is not a Legal Holiday.

"Chapter 11 Cases" means those certain proceedings for relief filed by the Debtors under Chapter 11 of the Bankruptcy Code and being jointly administered under Case No. [_____] in the United States Bankruptcy Court for the Southern District of New York.

"Existing Secured Claims" means any secured claims in existence as of the commencement of the Chapter 11 Cases.

"Final Borrowing Order" means an order substantially in the form of the Interim Order entered by the Bankruptcy Court in these Chapter 11 cases after a final hearing under Bankruptcy Rule 4001.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review or rehearing has been waived or (ii) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"Interim Order" means that certain Interim Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, (iii) Authorizing Post-Petition Financing, and (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001.

"Issue Date" means the issue date of this Note on March ___, 2008.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or required by law to close. If a payment date is a Legal Holiday, payment shall be made on the next succeeding date that is not a Legal Holiday, and interest shall accrue for the intervening period at the rate set forth in Section 1 hereof. If a regular record date is a Legal Holiday, the record shall not be affected.

"LIBOR" means a fluctuating rate of interest determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London Time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR" means the fluctuating rate of interest calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen LIBO Page as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR" shall mean a fluctuating rate of interest based upon a comparable rate designated by the Holders as a substitute therefore. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that

are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Material Adverse Effect" means (i) a material adverse effect upon the business, operations, liabilities (whether contractual, environmental or otherwise), properties, assets, condition (financial or otherwise) or prospects of the Debtors taken as a whole or (ii) the material impairment of the ability of any Debtor to perform the obligations of the Debtors under the Note.

"Motion" means the Debtors' Motion (A) for Authorization Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), and 364(e) to (i) Use Cash Collateral, (ii) Grant Adequate Protection to Prepetition Secured Lenders, and (iii) Obtain Postpetition Financing, and (B) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001.

"Note" means this $_____ Super-Priority DIP Note by and between the Debtors and the Holders and issued on _____ ___, 2008.

"Person" an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" means the date on which the Debtors filed their petitions for relief commencing these Chapter 11 Cases.

"Prepetition Indebtedness" means indebtedness of any Debtor outstanding on the Petition Date, including Indebtedness under the Prepetition Credit Agreements, the Senior Subordinated Notes and the 13% Junior Subordinated Note (as those terms are defined and/or referenced in the Motion).

"Required Holders" means Holders holding more than 50% of the principal amount of the Note.

10. <u>Successors and Assigns</u>. This Note shall inure to the benefit of the Holders and their respective successors and assigns and shall bind the Holders, their respective successors and assigns, and any chapter 7 or chapter 11 trustee appointed after the Petition Date or elected for the estates of the Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code.

11. <u>Presentment and Demand</u>. Demand, presentment, protest and notice of nonpayment and protest are hereby waived by the Debtors.

12.    <u>Amendment and Non-Waiver</u>.

(a)    This Note may not be amended, modified, or waived except by an agreement in writing signed by the Debtors and the Required Holders; <u>provided</u> that consent of all Holders shall be required to reduce the principal amount, the interest rate, or extend any payment date.

(b)    To the extent permitted by law, no failure to exercise and no delay on the part of the Holders in exercising any power or right in connection with this Note or available at law or in equity, shall operate as a waiver thereof, and no single or partial exercise of any such rights or power, or any abandonment or discontinuance of steps to enforce such a right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.

13.    <u>Notices</u>.  Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Note shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or three (3) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, or by telecopy and confirmed by telecopy answerback, addressed as follows:

(a)    If to the Debtors:

Lexington Precision Corporation
Lexington Rubber Group, Inc.
800 Third Avenue, 15th Floor
New York, NY 10022
Attn:  Warren Delano
Telecopy No.:  212-319-4695

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telecopy No.:  212-310-8000
Attn:  Marcia L. Goldstein, Esq.
Christopher J. Marcus, Esq.

(b)    If to the Holders:

c/o Michael A. Lubin
Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Telecopy No.:  212-319-4659

with a copy to:

O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Telecopy No.: 212-362-2061
Attn: Gerald C. Bender, Esq.

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

14.    Submission to Jurisdiction: Waiver of Jury Trial.

(a)    The Debtors and the Holders hereby irrevocably submit to the jurisdiction of the Bankruptcy Court, and they hereby irrevocably agree that any action concerning the Note shall be heard and determined in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably waive, to the fullest extent they may effectively do so, the defense of an inconvenient forum to the maintenance of any such action in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably agree that the summons and complaint or any other process in any such action may be served by mailing in accordance with the provisions set forth in Section 13 hereof.

(b)    EACH OF THE DEBTORS AND THE HOLDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OBLIGATIONS UNDER THIS NOTE.

15.    Governing Law. This Note shall be governed by, construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed in such State and without giving effect to the conflict of laws principles thereof.

16.    Indemnification for Expenses. The Debtors agree to pay all reasonable out-of-pocket expenses of the Holders incurred in connection with the preparation, execution, delivery, enforcement and administration of this Note, the documents and instruments referred to herein and any amendments, waivers or consents relating hereto or thereto including, without limitation, the reasonable fees and expenses of O'Melveny & Myers LLP, counsel for the Holders. In addition, the Debtors agree to pay, and save Holders harmless from all liability for, any stamp or other documentary taxes which may be payable in connection with the execution or delivery of this Note by the Debtors.

17.    Indemnification of Holders. The Debtors hereby agree to protect, indemnify, pay and save harmless the Holders from and against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses (including reasonable

fees, expenses and disbursements of outside counsel) that Holders may incur or be subject to as consequence, direct or indirect, of the issuance of this Note by the Debtors other than as a result of the gross negligence or willful misconduct of the Holders as determined by a final judgment of a court of competent jurisdiction.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Debtors have executed and delivered this Note as of the day and year and at the place first above written.

LEXINGTON PRECISION CORPORATION

By: _____
    Name:  Warren Delano
    Title:    President

LEXINGTON RUBBER GROUP, INC.

By:_____
    Name:  Warren Delano
    Title:    President

## **EXHIBIT B**

Budget

**LEXINGTON PRECISION CORPORATION**

**FORECAST OF CASH RECEIPTS AND DISBURSEMENTS FROM APRIL 2 THROUGH JUNE 20, 2008**
  (in thousands of dollars)

| | Week Ended | | | | | | | | | | | |
| | 2-4 Apr | 11-Apr | 18-Apr | 25-Apr | 2-May | 9-May | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash receipts:** | 1,286 | 1,365 | 1,578 | 1,664 | 1,562 | 1,664 | 1,794 | 1,400 | 1,889 | 1,511 | 1,433 | 1,425 |
| **Cash disbursements:** | | | | | | | | | | | | |
| Debt service: | | | | | | | | | | | | |
| CapitalSource principal  (1) | - | - | - | - | 269 | - | - | - | - | 269 | - | - |
| CapitalSource interest | - | - | - | - | 207 | - | - | - | - | 207 | - | - |
| CapitalSource fees (LOC & unused line) | - | - | - | - | 5 | - | - | - | - | 5 | - | - |
| DIP Interest and fees | 40 | - | 40 | 23 | - | - | - | - | 34 | - | - | - |
| L&D | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll and payroll taxes | 339 | 338 | 666 | 333 | 666 | 333 | 666 | 334 | 665 | 334 | 659 | 326 |
| Retirement & Savings Plan 401(k) | 25 | 25 | 57 | 25 | 57 | 25 | 57 | 25 | 57 | 25 | 57 | 25 |
| Group Medical Care Plan Administrative Fees | - | - | 20 | - | - | - | 20 | - | - | - | - | 20 |
| Prescription drug plan | - | 25 | - | 25 | - | 25 | - | 25 | - | 25 | - | 25 |
| | | | | | | | | | | | | |
| Reorganization professional fees and expenses | - | 125 | 125 | 25 | 175 | 175 | 25 | 90 | 25 | 75 | 125 | - |
| DIP legal counsel | - | - | - | - | 10 | - | - | - | - | 10 | - | - |
| Ordinary course professionals | - | - | - | - | 35 | - | - | - | - | 35 | - | 35 |
| | | | | | | | | | | | | |
| Vendors - check disbursements (excluding Dow & Wacker): | | | | | | | | | | | | |
| Dow Corning | 34 | 40 | 51 | 69 | 133 | 44 | 51 | 83 | 75 | 83 | 75 | 83 |
| Wacker | 51 | 145 | 265 | 26 | 187 | 164 | 48 | 126 | 130 | 108 | 126 | 128 |
| All other excluding capex | 1,000 | 648 | 636 | 625 | 590 | 559 | 700 | 614 | 541 | 578 | 671 | 579 |
| Capex | 35 | 23 | 33 | 23 | 23 | 33 | 23 | 23 | 18 | 13 | 48 | 13 |
| Ohio BWC and UMR Health Disbursements | 36 | 60 | 60 | 60 | 60 | 120 | 60 | 60 | 60 | 60 | 60 | 60 |
| Commercial Traffic | 19 | 20 | 19 | 20 | 19 | 20 | 19 | 19 | 20 | 21 | 19 | 20 |
| Utilities | - | - | 130 | - | - | - | - | - | - | - | - | - |
| Total cash disbursed | 1,579 | 1,449 | 2,102 | 1,254 | 2,436 | 1,498 | 1,669 | 1,399 | 1,625 | 1,848 | 1,840 | 1,314 |
| **Net cash received (used)** | (293) | (84) | (524) | 410 | (874) | 166 | 125 | 1 | 264 | (337) | (407) | 111 |
| **Cumulative net cash received (used)** | (293) | (377) | (901) | (491) | (1,365) | (1,199) | (1,074) | (1,073) | (809) | (1,146) | (1,553) | (1,442) |
| **DIP loan proceeds** | 2,000 | 2,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 |
| **Net cash available** | 1,707 | 1,623 | 3,099 | 3,509 | 2,635 | 2,801 | 2,926 | 2,927 | 3,191 | 2,854 | 2,447 | 2,558 |
| (1) Subject to agreement on the waiver of default interest | | | | | | | | | | | | |
| **Net sales (based on date shipped)** | 955 | 1,498 | 1,535 | 1,626 | 1,896 | 1,610 | 1,637 | 1,616 | 1,731 | 1,634 | 1,633 | 1,799 |
| **Net cumulative sales** | 955 | 2,453 | 3,988 | 5,614 | 7,510 | 9,120 | 10,757 | 12,373 | 14,104 | 15,738 | 17,371 | 19,170 |