Hearing Date:  April 22, 2008 at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline:  April 16, 2008 at 4:00 p.m. (prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :          Chapter 11 Case No.
                                                            :
**LEXINGTON PRECISION CORP., et al.,**                      :          08-11153 (MG)
                                                            :
          Debtors.                                          :          (Jointly Administered)
                                                            :
------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 362(d), 363(b),
AND 503(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001
AND 6004 FOR ORDER (I) (a) AUTHORIZING DEBTORS TO CONTINUE
THEIR WORKERS' COMPENSATION PROGRAMS AND THEIR LIABILITY,
PRODUCT, PROPERTY, AND OTHER INSURANCE PROGRAMS AND
(b) AUTHORIZING DEBTORS TO PAY ALL OBLIGATIONS IN RESPECT
THEREOF AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

           PLEASE TAKE NOTICE THAT Lexington Precision Corporation and its

subsidiary, Lexington Rubber Group, Inc., (together, the "Debtors"), in the above-captioned

chapter 11 cases filed in the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court") filed a motion, dated April 2, 2008 (the "Motion"), for entry of

an order, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the title 11 of the United

States Code (the "Bankruptcy Code"), authorizing (i) continuation of their Insurance Programs

uninterrupted; (ii) payment, in the Debtors' discretion, the undisputed prepetition obligations

thereunder; and (iii) modification of the automatic stay solely and for the limited purpose of

permitting employees with claims under the workers' compensation program to proceed with

their claims in accordance with such program in the appropriate judicial or administrative forum.

PLEASE TAKE FURTHER NOTICE that objections or responses, if any, to the

Motion must be in writing, must conform to the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of

New York, must set forth the name of the objecting party, the nature and amount of claims or

interests held or asserted by the objecting party against the Debtors' estates or property, the basis

for the objection and the specific grounds therefor, and must be filed no later than **April 16, 2008

at 4:00 p.m. (Prevailing Eastern Time)]** with the Bankruptcy Court electronically in

accordance with General Order M-242 (General Order M-242 and the User's Manual for the

Electronic Case Filing System may be found at www.nysb.uscourts.gov, the official website for

the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by

all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182, and be served upon:  (a) the

Debtors, Lexington Precision Corp., 800 Third Ave. 15th Floor, New York, New York 10023

(Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153 (Attn:  Christopher J. Marcus, Esq. and John W.

Lucas, Esq.); (c) the Office of the United States Trustee for the Southern District of New York,

33 Whitehall Street, 21st Floor, New York, New York 10004, (Attention:  Paul Schwartzberg,

Esq.); (d) Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, TN,

37219 (Attn:  John C. Tishler), attorneys for the Debtors' prepetition lenders; (e) attorneys for

any statutory committees appointed in these cases; and (f) O'Melveny & Meyers, LLP, Times

Square Tower, 7 Times Square, New York, NY 10036 (Attn.:  Gerald Bender, Esq.), attorneys

for Debtors' proposed postpetition lenders, so as to be received no later than **April 16, 2008, at**

**4:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that a hearing to consider the relief

requested in the Motion shall be held before the Honorable Martin Glenn, United States

Bankruptcy Judge, on **April 22, 2008 at 10:00 a.m. (prevailing Eastern Time)**, at the United

States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York,

New York 10004 or as soon thereafter as counsel may be heard.

Dated:  April 2, 2008
      New York, New York

/s/ Richard P. Krasnow         
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                       :
In re                                  :    Chapter 11 Case No.
                                       :
LEXINGTON PRECISION CORP., et al.,     :    08-11153 (MG)
                                       :
          Debtors.                     :    (Jointly Administered)
                                       :
------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 362(d), 363(b), AND 503(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001 AND 6004 FOR ORDER (I) (a) AUTHORIZING DEBTORS TO CONTINUE THEIR WORKERS' COMPENSATION PROGRAMS AND THEIR LIABILITY, PRODUCT, PROPERTY, AND OTHER INSURANCE PROGRAMS AND (b) AUTHORIZING DEBTORS TO PAY ALL OBLIGATIONS IN RESPECT THEREOF AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

# I.

## Background

1.     On April 1, 2008 (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.     The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").

## Lexington's Businesses

3.     Lexington manufactures large volumes of high-quality rubber and metal

components at competitive prices for use primarily in automobiles and medical devices.

Lexington operates through two operating segments—the Rubber Group and the Metals Group.

Lexington's components are generally sold to other manufacturers.

4.     Lexington is one of North America's largest manufacturers of rubber

components for the automotive industry.  The Rubber Group's principal products are connector

seals used in primary wire harnesses and insulators for ignition wire sets.  The Rubber Group

also manufactures and sells rubber components used in a variety of medical devices, including

drug delivery systems, syringes, laparoscopic instruments, and catheters, which are sold to some

of the world's largest medical device manufacturers.

5.     The Metals Group manufactures high-volume aluminum, brass, steel, and

stainless steel components machined from bars, forgings, and cold-headed blanks primarily for

manufacturers within the automotive industry.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

6.      Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of February 29, 2008, Lexington employed approximately 651 permanent and 22 temporary employees, of which 134 are salaried employees and 517 are hourly employees.  In 2007, Rubber Group net sales totaled $74.5 million and Metals Group net sales totaled $13.8 million.  As of December 31, 2007, Lexington's consolidated unaudited financial statements reflected assets totaling approximately $52.6 million, and current liabilities totaling approximately $88.5 million. Notwithstanding the Debtors' negative "book net worth" calculated in accordance with generally accepted accounting principles, the Debtors have received a number of offers for all or portions of the assets and business of the Lexington Rubber Group, the largest of the Debtors' operations and the generator of the preponderance of the Debtors' sales and earnings, each of which clearly indicates that the value of the Debtors' assets far exceeds the Debtors' liabilities. Consequently, the Debtors believe that they are solvent and that the equity securities of Lexington Precision have significant value.

## Jurisdiction

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.      In connection with the operation of their businesses, the Debtors maintain certain workers' compensation programs and various liability, product, property, and other

insurance programs and policies (collectively, the "Insurance Programs") through several

different insurance carriers (the "Insurance Carriers").  Annexed hereto as Exhibit A is a list of

each of the Insurance Programs, disclosing with respect to each Insurance Program as applicable:

the Insurance Carrier, the type of coverage, the insured entity, the limits and deductibles under

the policy, the coverage period, the insurance broker, and the aggregate annual premium due

thereunder.[1]  By this Motion, the Debtors request entry of an order authorizing, pursuant to

sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001

and 6004, (i) continuation of their Insurance Programs uninterrupted; (ii) payment, in the

Debtors' discretion, the undisputed prepetition obligations thereunder (the "Insurance

Obligations"); and (iii) modification of the automatic stay solely and for the limited purpose of

permitting employees with claims under the Workers' Compensation Program to proceed with

their claims in accordance with such program in the appropriate judicial or administrative forum.

9.      As part of their cash management system, the Debtors maintain bank

accounts at certain banks and financial institutions (the "Banks"), including, but not limited to,

the Banks listed on Exhibit B annexed hereto and any other bank that is approved as part of the

Debtors' cash management system.  The Debtors draw upon funds in their accounts at the Banks

to satisfy their obligations arising from the Insurance Programs.  In addition to the relief

requested above, the Debtors request that the Court authorize the Banks to receive, honor,

process, and pay any and all checks drawn, or electronic fund transfers requested or to be

requested on the Debtors' general disbursement accounts (collectively, the "Disbursement

---

[1] In addition to the Insurance Programs listed on Exhibit A, the Debtors maintain numerous other insurance policies and programs with respect to employee benefits including health, dental, disability, and life insurance.  These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage policies and benefit programs.

Accounts"), including, but not limited to, the Disbursement Accounts listed on Exhibit B, to the extent that such checks or electronic fund transfers relate to any of the foregoing.

## II.

## Workers' Compensation Programs

10.    The laws of the various states in which the Debtors operate require the Debtors to maintain workers' compensation policies and programs to provide their employees with workers' compensation benefits for claims arising from or related to their employment with the Debtors.  The Debtors maintain workers' compensation coverage through a fully-insured, third-party insurance program, and various self-insured programs in each of the states in which they operate or used to operate the Workers' Compensation Programs (as defined below).

### A.    AIG Program

11.    Currently, in Georgia, New York, South Carolina, California,[2] and Tennessee,[3] the Debtors' employees are insured for workers' compensation claims under a fully-insured program purchased through American International Group and its affiliates ("AIG"). Under this program (the "AIG Program"), the Debtors pay an annual premium to AIG but incur no other costs, subject to a True-Up (as defined and discussed below) regardless of the number of claims or whether closed claims reopen subject to a True-Up (as defined below).

12.    The AIG Program obligates the Debtors to pay an annual premium in the amount of $816,000 (the "Estimated Premium") for the period July 1, 2007 through and including June 30, 2008. As the Commencement Date, the Estimated Premium has been paid in full.

_____

[2] The Debtors previously employed a salesperson in California.  This individual's employment was terminated several months prior to the Commencement Date.

[3] The Debtors currently employ one salesperson in Tennessee.

13.     AIG performs an audit of the Debtors' actual payroll and claims history at the conclusion of each policy year.  If the Debtors' payroll and actual claims exceed the Estimated Premium the Debtors are required to pay an additional premium to AIG (the "True-Up").  If, however, the payroll is less than the Estimated Premium the Debtors receive a refund from AIG.  Accordingly, at some point subsequent to the Commencement Date, AIG may have a liquidated claim arising from periods before the Commencement Date.  The Debtors are seeking the Court's authorization to pay such claims, in their discretion, as they come due.

B.     **The Ohio Program**

14.     In Ohio, the Debtors purchase workers' compensation insurance through a mandatory state-sponsored, managed workers' compensation system (the "Ohio Program").  The state of Ohio (rather than the market) sets the individual and aggregate deductible levels for all employers participating in the state program based on the state's evaluation of the applicant's credit and claims history.  Under the Ohio Program, Lexington pays an annual premium in the amount of $255,000, plus a deductible in the amount of $200,000 per claim or approximately $460,000 in the aggregate for all claims asserted during a one-year period.

15.     Premiums for the Ohio Program are paid in arrears in four installments during the year in February, April, August, and September, each in the amount of $63,750.  On February 29, 2008, the Debtors made their first installment under the Ohio Program for six months ending December 31, 2007.  The second installment for this same period is due on or about April 30, 2008.  Accordingly, the Debtors are seeking the Court's authorization to pay, in their discretion, the prepetition premiums for the Ohio Program as they come due.

C.    **The Retrospective Policies**

16.    During the period June 1, 1991 through June 30, 2005, the Debtors

maintained workers' compensation insurance for employees in California, Georgia, Michigan,[4]

New York, South Carolina, Arizona,[5] and Tennessee under various self-insured programs

(collectively, the "Retrospective Policies").  Although the terms of the Retrospective Policies

have expired and the Debtors are no longer required to pay premiums under these policies, they

are required to keep the Retrospective Policies in effect until all claims are resolved and are

required to reimburse certain Insurance Carriers for any claims and related expenses actually

paid thereunder.

17.    The Debtors' liability for claims under the Retrospective Policies is

limited to $250,000 per claim, per occurrence.  The Debtors' total obligation for workers'

compensation claims in each policy year under the Retrospective Policies is also limited by an

aggregate retention amount set forth in each individual annual policy.  For example, the

aggregate cap under these policies for the period ending June 30, 2005 was $1.43 million.

18.    The Debtors are billed each month by the applicable Insurance Carriers for

actual workers' compensation claims paid by them under the Retrospective Policies up to the

applicable cap.  It is the Debtors' responsibility to reimburse the carriers for these billings on net

30-day payment terms and others on an annual basis.

19.    Certain Insurance Carriers secure the Debtors payment obligations under

the Retrospective Policies through letters of credit or cash security deposits.  Lumbermens

---

[4] The Debtors previously employed approximately three to five sales and engineer employees in
Michigan.  There are no longer are any employees working in this state.

[5] The Debtors previously operated a die casting division in Arizona.  During 2005, the Debtors sold or
liquidated all of the assets of this division except the land and buildings.  There no longer are any
employees working at this division or in the state of Arizona.

Mutual Casualty Company, a subsidiary of Kemper Insurance Company, is a beneficiary of a letter of credit in the amount of $200,000.  The Travelers Indemnity Company is the beneficiary of a separate letter of credit in the amount of $707,000.  Zurich Insurance Company and Kemper Insurance Company hold a cash security deposits in the aggregate amount of $75,262 as further security for past years' claims under the applicable Retrospective Policies.

20.     On March 14, 2008, the Debtors paid the amounts then outstanding under the Retrospective Policies.  Accordingly, as of the Commencement Date, there are no unpaid prepetition claims outstanding under the Retrospective Policies that have been invoiced to the Debtors.  At some time subsequent to the Commencement Date, certain Insurance Carriers may have liquidated claims under the Retrospective Policies that related to the period prior to the Commencement Date.

**D.     Prepetition Claims Arising After Commencement Date**

21.     Payment of the premiums for the Workers' Compensation Programs and the payment of prepetition workers' compensation claims is essential to the continued operation of the Debtors' businesses.  As of the Commencement Date, there are no outstanding obligations under the Workers' Compensation Programs.  At some time subsequent to the Commencement Date, certain Insurance Carriers may have liquidated claims arising from policies under the Workers' Compensation Program for periods prior to the Commencement Date.  Therefore, the Debtors request authority to pay, in their discretion, any and all undisputed amounts due and owing with respect to any Workers' Compensation Program as they come due in the ordinary course of these chapter 11 cases.

E.    **Debtors Seek a Waiver of the Automatic Stay**
      **As it Applies to Valid Workers' Compensation Claims**

22.    Section 362(a) of the Bankruptcy Code, commonly known as the

"automatic stay," operates to stay

> the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other
> action or proceeding against the debtor that was or could have been
> commenced before the commencement of the case under this title,
> or to recover a claim against the debtor that arose before the
> commencement of the case under this title.

11 U.S.C. § 362(a)(1).  Section 362, however, permits a debtor or other parties in interest to

request a modification or termination of the automatic stay for "cause."  Id. § 362(d)(1).

23.    To the extent the Debtors' employees hold valid workers' compensation

claims, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit

these employees to proceed with their claims in the appropriate judicial or administrative forum.

The Debtors believe cause exists to modify the automatic stay because prohibiting the Debtors'

employees from proceeding with their claims could have a detrimental effect on the financial

well-being and morale of such employees and lead to their departure.  As discussed above, such

departures could cause a severe disruption in the Debtors' businesses to the detriment of all

parties in interest.

24.    To this end, and solely with respect to workers' compensation claims

covered under the Workers' Compensation Programs, the Debtors seek to modify the automatic

stay solely as it relates to valid workers' compensation claims; provided, that such claims are

pursued in accordance with the Workers' Compensation Program and recoveries, if any, are

limited to the proceeds from the applicable policy.  Any claims relating to any of the other

Insurance Programs will remain subject to the automatic stay.  To effectuate the aforementioned

modification of the automatic stay, the Debtors request that the Court waive the stay of a

judgment under Bankruptcy Rule 7062 and the requirements under Bankruptcy Rule 9014

relating to contested matters with respect to claims under the Workers' Compensation Programs.

25.    Pursuant to this Motion, the Debtors do not seek a waiver, termination, or

modification of the automatic stay with respect to any other claims.

### III.

### Liability, Product, and Property Insurance Programs

26.    The Debtors maintain various liability-, product-, and property-related

insurance programs, which provide the Debtors with insurance coverage for liabilities relating to,

among other things, general commercial claims, property damage, business interruptions, general

foreign liability, directors' and officers' liability, fiduciary liability, commercial crime,

employment practices, umbrella, and various other product- and property-related and general

liabilities (collectively, the "Liability, Product, and Property Insurance Programs").

Continuation of these policies is essential to the ongoing operation of the Debtors' businesses.

27.    The Debtors are required to pay premiums under the Liability, Product,

and Property Insurance Programs based upon fixed rates established by the applicale Insurance

Carrier.  The annual premiums for these policies aggregate approximately $514,400.  In most

instances, the Debtors pay these premiums directly to the Insurance Carriers as they come under

their respective policies.

28.    With respect to the property and directors and officers' policies, the

Debtors finance the premium payments.  The Debtors' property policy (the "Property Policy") is

provided by FM Insurance Company for a period of one year commencing December 1, 2007.

AICCO, Inc. ("AICCO") pays the $175,785 premium at the policy's inception and after making

a down payment, the Debtors are required to make 10 equal payments over the term of the

policy.  AICCO receives a finance charge approximately in the approximate amount of $4,380 and a security interest in the policy and it proceeds.  As of the Commencement Date, the Debtors are obligated to make six (6) payments to AICCO under the financing arrangement for the Property Policy.  Accordingly, the Debtors are seeking the Court's authorization to make these payments, in their discretion, as they come due in the ordinary course of the Debtors' businesses.

29.     The Debtors also financed the premiums due under their directors and officers' policy (the "<u>D&O Policy</u>") provided by Chubb Insurance in the amount of $60,000.  As of the Commencement Date, there are no outstanding installments to be paid to under the D&O Policy.

30.     In addition to the annual premiums, pursuant to certain of the Liability, Product, and Property Insurance Programs, the Debtors are required to pay various deductibles for claims asserted under the policies.  The amounts of the applicable deductibles are set forth in Exhibit A.  As of the Commencement Date, the Debtors are not aware of any prepetition claims for which the deductible has not been paid.  At some time subsequent to the Commencement Date, deductibles for claims relating to the period prior to the Commencement Date may arise.  Accordingly, the Debtors are seeking the Court's authorization to pay such undisputed claims, in their discretion as they come due.

## IV.

## <u>Insurance Brokers</u>

31.     The Debtors employ two insurance brokers, Leonard Insurance Services Agency, Inc. and Accordia of Western Pennsylvania (together, the "<u>Brokers</u>"), to assist them with the procurement and negotiation of their Insurance Programs, and in certain circumstances, to remit payments to the Insurance Carriers on behalf of the Debtors.  The Brokers are paid a commission by the Insurance Carriers, not by the Debtors.  In addition, the Debtors also contract

with the Insurance Carriers or their affiliates to administer and pay the Debtors' workers'

compensation claims.  The Insurance Carriers or their affiliates collect a fee for their services

based upon a percentage of the workers' compensation claims paid.  On average, the Debtors are

charged approximately $3,000 to $4,000 per month for such services.  These amounts, however,

are built into the premiums discussed herein and only due and owing to the extent any premiums

are due.

## V.

### Debtors Request Authority to (i) Continue the
### Insurance Programs and (ii) Pay All Obligations in Respect Thereof

32.    Pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy

Code and Bankruptcy Rules 4001, and 6004, the Debtors seek authority to continue, in their sole

discretion, the Insurance Programs on an uninterrupted and same basis, and in accordance with

the same practices and procedures as were in effect prior to the Commencement Date.

Furthermore, the Debtors seek authority to pay, in their sole discretion, all undisputed premiums,

deductibles, administrative fees, broker fees, and other obligations arising under the Insurance

Programs, as applicable, that were or are due and payable, or related to the period before or after,

the Commencement Date.

33.    Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur,

and the court, after notice and a hearing, shall allow as administrative expenses, among other

things, "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C.

§ 503(b)(1).  In addition, pursuant to section 363(b) of the Bankruptcy Code, a debtor may, in the

exercise of its sound business judgment and after notice and a hearing, use property of the estate

outside of the ordinary course of business.  Id. § 363(b).  The Debtors submit that the use of

estate funds for payment of the Insurance Obligations is permitted by sections 503(b)(1) and

363(b) of the Bankruptcy Code as necessary costs of preserving the estate.

34.    Furthermore, to supplement these explicit powers, section 105(a) of the

Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions of this title." Id. § 105(a).  A bankruptcy court's use of

its equitable powers to "authorize the payment of pre-petition debt when such payment is needed

to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc.,

98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  "Under 11 U.S.C. § 105 the court can permit pre-plan

payment of a pre-petition obligation when essential to the continued operation of the debtor." In

re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at

177).

35.    In a long line of well-established cases, federal courts consistently have

permitted postpetition payment of prepetition obligations where necessary to preserve or enhance

the value of a debtor's estate for the benefit of all creditors.  See, e.g., Miltenberger v.

Logansport C. & S.W. Ry. Co., 106 U.S. 286, 312 (1882) (payment of pre-receivership claim

prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); Dudley v.

Mealey, 147 F.2d 268 (2d Cir. 1945) (extending doctrine for payment of prepetition claims

beyond railroad reorganization cases); Mich. Bureau of Workers' Disability Comp. v.

Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving

lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

36.    The "doctrine of necessity" functions in a chapter 11 reorganization as a

mechanism by which the bankruptcy court can exercise its equitable power to allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code.  See In re Lehigh &

New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize the payment of pre-petition claims if such payment was essential to the continued operation of the debtor); In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation).  The doctrine is frequently invoked early in a chapter 11 case, particularly in connection with the payment of prepetition claims.  The court in In re Structurelite Plastics Corp. indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'"  86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (quoting Chateaugay Corp., 80 B.R. at 287).  The court stated that "a per se rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code."  Id. at 932.  The rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor."  Ionosphere Clubs, 98 B.R. at 176.  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

37.    Moreover, numerous courts in this jurisdiction have granted the relief requested herein in other chapter 11 cases.  See, e.g., In re Fortunoff Fine Jewelry and Silverware, LLC, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 29, 2008)[Docket No. 312], (Bankr. S.D.N.Y. Feb. 5, 2008)[Docket No. 42]; In re PRC, LLC, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Jan. 25, 2008)[Docket No. 37]; Silicon Graphics, Inc., et. al., Case No. 06-10977 (BRL)  (Bankr. S.D.N.Y May 31, 2006)[Docket No. 144], (Bankr. S.D.N.Y May 10,

2006)[Docket No. 49]; In re Atkins Nutritionals, Inc., et al., Case No. 05-15913 (ALG) (Bankr.

S.D.N.Y. Aug. 1, 2005)[Docket No. 32].

## VI.

### Continuing the Insurance Programs and Paying All Obligations in Respect Thereof Is Necessary to Preserve the Value of the Debtors' Estates

38.     The nature of the Debtors' businesses and the extent of their operations

make it essential for the Debtors to maintain their Insurance Programs on an uninterrupted basis.

The nonpayment of any premiums, deductibles, or related fees under one of the Insurance

Programs could result in one or more of the Insurance Carriers declining to renew their insurance

policies or refusing to enter into new insurance agreements with the Debtors in the future.  If the

Insurance Programs lapse without renewal, the Debtors could be exposed to substantial liability

for personal and/or property damages to the detriment of all parties in interest.  Furthermore, the

Debtors would then be required to obtain replacement policies on an expedited basis at a

significant cost to the estates.

39.     Moreover, the Insurance Programs are vital to all aspects of the Debtors'

operations.  Applicable state law mandates that the Debtors maintain workers' compensation

coverage for their employees.  Failure by the Debtors to pay the premiums associated with their

Workers' Compensation Programs would jeopardize their coverage and expose the Debtors to

substantial liability in fines by various state workers' compensation boards.

40.     In addition, the risk that eligible workers' compensation claimants will not

receive timely payment for prepetition employment-related injuries could have a devastating

effect on the financial well-being and morale of the Debtors' current employees.  Departures by

employees at this critical time may result in a severe disruption of the Debtors' businesses with a

substantially adverse impact on the Debtors, the value of their assets and businesses, and their

ability to reorganize.  The retention of the Debtors' qualified and dedicated senior management also is linked to the continued effectiveness of the directors' and officers' liability insurance policies.

41.      Finally, pursuant to the terms of the guidelines established by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), the Debtors are obligated to remain current with respect to their primary Insurance Programs. Therefore, the continuation of the Insurance Programs, on an uninterrupted basis, and the payment of all undisputed prepetition and postpetition Insurance Obligations arising under the Insurance Programs are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.  Accordingly, the Debtors are seeking the Court's authorization to continue the Insurance Program and related policies as such practices, programs, and policies were in effect as of the date of the commencement of the Debtors' chapter 11 cases and authorize, but not direct, the Debtors to pay any undisputed prepetition claims arising under the Insurance Program as they come due.

42.      To the extent any Insurance Program or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of reviewing these matters and reserve all of their rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts on account of the Insurance Obligations shall not affect the Debtors' right to contest the amount or validity of these obligations.

43.     In addition, the Debtors also seek a waiver of the notice requirements
under Bankruptcy Rule 6004(a) and the stay of the order authorizing the use, sale, or lease of
property under Bankruptcy Rule 6004(h).[6]

## VII.

**Applicable Banks Should Be Authorized to Honor and
Pay Checks Issued and Make Other Transfers to Pay Insurance Obligations**

44.     As a result of the commencement of the Debtors' chapter 11 cases, and in
the absence of an order of the Court providing otherwise, the Banks may dishonor or reject
Debtors' checks and electronic fund transfers with respect to the Insurance Obligations.
Therefore, the Debtors request that the Court authorize the Banks listed on Exhibit B annexed
hereto to, and any other bank the Debtors are authorized to do business with under the motion,
dated April 1, 2008 (the "Cash Management Motion"), seeking authorization to (i) continue
using existing centralized cash management system; (ii) implement an automatic transfer of
lockbox funds to the master operating account; (iii) maintain existing bank accounts and business
forms; and (iv) an extension of time to comply with section 345(b) of the Bankruptcy Code, to
process, honor, and pay all prepetition and postpetition checks issued or to be issued, and
electronic fund transfers requested or to be requested, by the Debtors with respect to their
Insurance Obligations.  The Debtors also seek authority to issue new postpetition checks or
effect new electronic fund transfers with respect to the Insurance Obligations to replace any
prepetition checks or electronic fund transfer requests that may be dishonored or rejected.

45.     The Debtors represent that each of these checks or transfers is or will be
drawn on the Debtors' Disbursement Accounts, or any other account authorized by the Court

---

[6] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

under the Cash Management Motion, and can be readily identified as relating directly to payments under the Insurance Programs. Accordingly, the Debtors believe that prepetition checks and transfers other than those relating to the Insurance Programs will not be honored inadvertently.

## **Memorandum of Law**

46.     The Debtors submit that the relevant authorities are set forth herein, and accordingly, that the requirement contained in Local Bankruptcy Rule 9013-1(b) for the filing of a separate memorandum in support of the Motion is satisfied.

## **Notice**

47.     No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) the attorneys for the agents for the Debtors' prepetition lenders, (iii) the attorneys for the Debtors' proposed postpetition lenders, (iv) the attorneys for the ad hoc committee of noteholders, and (v) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis). The Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request entry of an Order substantially in the form annexed hereto as granting the relief requested herein and  such other and further relief as is just.

Dated: April 2, 2008
       New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow, Esq.
Christopher J. Marcus, Esq.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:   (212) 310-8000
Facsimile:    (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Hearing Date:  April 22, 2008 at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline:  April 16, 2008 at 4:00 p.m. (prevailing Eastern Time)

## EXHIBIT A

| INSURER POLICY | COVERAGE/ TYPE | INSURED | LIMITS | DEDUCTIBLE | TERM | EXPIRATION | BROKER | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| American International Group WC 3425470 and 3425471 | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Fully-insured plan | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $815,790 |
| The Travelers Indemnity Company of America No. TC2HUB-133D983-5-04 (St. Paul Travelers Insurance company) (The Travelers Indemnity Company) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | 52 weeks starting July 1, 2004 | June 30, 2005 | Leonard Insurance Services Agency, Inc. | $513,621 |
| St. Paul Fire and Marine Insurance Company (St. Paul Travelers Insurance Company) (The Travelers Indemnity Company) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | 52 weeks starting July 1, 2003 | June 30, 2004 | Leonard Insurance Services Agency, Inc. | $593,080 |
| Lumbermens Mutual Casualty Company (Kenper) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | Seven policy years starting July 1, 1996 | June 30, 2003 | Leonard Insurance Services Agency, Inc. | Different for each policy year |
| Zurich Insurance Company | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | Eleven policy years starting July 1, 1995 | June 30, 2006 | Accordia of Western Pennsylvania | $431,314 |
| The Home Insurance Company in Liquidation | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | June 1, 1991 through June 30, 1995 | June 30, 1995 | Accordia of Western Pennsylvania | Various |
| CHUBB  3581-73-98-CLE  Occurrence | Employer's Liability Stop Gap (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $1,000,000 aggregate and each accident | $0.0 SIR | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | Included in general liability premium |
| CHUBB 3581-73-98 CLE Occurrence | General Liability, Products & Advertisers, Specified Third Parties and Employers' | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $1 million per occurrence, $2 million general aggregate and products aggregate. (coverage policy period) | $0.0 Deductible Primary | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $87,068 |
| State of Ohio Occurrence | Workers' Compensation retrospectively rated plan (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | $200,000 per claim $460,000 aggregate (approx.) | 52 weeks | June 30, 2008 | N/A | $255,000 |
| State of Ohio Occurrence | Workers' Compensation retrospectively rated plan (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Various | 52 Weeks starting July 1, 2007 | From July 1, 2007 to June 30, 2008 | N/A | Various |

| INSURER POLICY | COVERAGE/ TYPE | INSURED | LIMITS | DEDUCTIBLE | TERM | EXPIRATION | BROKER | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| Fireman's Fund Insurance Company SU0-000-9929-6262 Occurrence | Umbrella Liability | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $25 million each occurrence and in the aggregate | Excess primary | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $41,244 |
| CHUBB 7980-25-32 Occurrence | Excess Umbrella Liability | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $25 million each occurrence and in the aggregate | Excess primary and umbrella | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $28,785 |
| Affiliated FM Insurance Company MG480 Occurrence | Property Damage & Business Interruption Boiler & Machinery | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Blanket replacement cost, except for replacement of tools and molds, which is actual cash value | Property/Boiler: $100,000 Earthquake & Flood: $100,000 | 52 weeks starting Dec. 1, 2007 | December 1, 2008 | Leonard Insurance Services Agency, Inc. | $175,7850 |
| CHUBB 7498-03-09-CLE Occurrence | Foreign General Liability, including Auto Liability, Property, Workers' Compensation, and Fidelity | Lexington Precision Corporation and Lexington Rubber Group, Inc. | General Liability, Products, Advertising, Employee Benefits & Auto $1 million | None | 52 weeks starting July 1, 2006 | June 30, 2007 | Leonard Insurance Services Agency, Inc. | $2,750 |
| CHUBB 7498-03-09-CLE Occurrence | Ocean Cargo & War | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Various with respect to type of occurrence. | $1,000 | 52 Weeks starting Aug. 10, 2007 | August 10, 2008 | Leonard Insurance Services Agency, Inc. | $2,000 |
| CHUBB 6801-1252 Claims Made | Directors & Officers Liability | Lexington Precision Corporation | $2.5 million annual aggregate | Executive liability and indemnification: none All others: $250,000 | 52 Weeks starting Jan. 1, 2008 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $60,0000 |
| CHUBB 6801-1252 Claims made | Pension / Welfare Fiduciary Liability | Lexington Precision Corporation | $10 million | $25,000 retention | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $7,500 |
| CHUBB 6801-1252 Claims made | Crime | Lexington Precision Corporation | $5 million | $100,000 | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $17,500 |
| CHUBB 6801-1252 Claims made | Employment Practices | Lexington Precision Corporation | $2 million | $125,000 | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $29,000 |
| **TOTAL CURRENT INSURANCE/ANNUAL PREMIUM (excludes deductibles, retentions, payments for prior years' workers' compensation claims under retrospective policies issued in prior years. etc.)** | | | | | | | | **$1,582,422** |

## EXHIBIT B

### DISBURSEMENT ACCOUNTS

| | |
|---|---|
| FirstMerit Bank N.A.<br>295 FirstMerit Circle<br>Akron, OH 44307<br>Attn: Thomas Heidy | 5999000546<br>5999000554<br>5999000562<br>5999000570<br>5999000588<br>5999000596<br>5999000619<br>5999000627<br>5999000855 |

### MASTER OPERATING (DISBURSEMENT) ACCOUNT

| Bank Name and Address | Account Number |
|---|---|
| FirstMerit Bank N.A.<br>295 FirstMerit Circle,<br>Akron, Ohio 44307<br>Attn: Thomas Heidy | 5923007871 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
In re                                         :        **Chapter 11 Case No.**
                                              :
**LEXINGTON PRECISION CORP., et al.,**        :        **08-11153 (MG)**
                                              :
            **Debtors.**                       :        **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a), 362(d),
363(b), AND 503(b) OF THE BANKRUPTCY CODE
AND RULES 4001 AND 6004 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE (I) (a) AUTHORIZING
DEBTORS TO CONTINUE THEIR WORKERS' COMPENSATION
PROGRAMS AND THEIR LIABILITY, PRODUCT, PROPERTY,
AND OTHER INSURANCE PROGRAMS AND (b) AUTHORIZING
DEBTORS TO PAY ALL OBLIGATIONS IN RESPECT THEREOF
AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS**

Upon the motion, dated April 2, 2008 (the "Motion"),[1] of Lexington Precision

Corporation and Lexington Rubber Group, Inc., as debtors and debtors in possession (together,

the "Debtors"), pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the title 11 of the

United States Code (the "Bankruptcy Code") and Rules 4001 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (I) authorizing, but not

directing, the Debtors to (a) continue their workers' compensation programs (the "Workers'

Compensation Programs") and their liability, product, property, and other insurance programs,

including, without limitation, all of the policies set forth on Exhibit A annexed hereto (together

with the Workers' Compensation Programs, the "Insurance Programs") and (b) pay all

obligations in respect thereof, on an uninterrupted basis, consistent with their practices in effect

prior to the commencement of the Debtors' chapter 11 cases, including the payment of all

---

[1] Terms not defined herein shall have the meaning used in the Motion.

premiums, claims, deductibles, administrative expenses, and all other charges incurred, whether

relating to the period prior to or after the commencement of these chapter 11 cases (collectively,

"Insurance Obligations"), and (II) authorization for certain banks and financial institutions (the

"Banks"), including, but not limited to, the Banks listed on Exhibit B, to honor and process

checks and transfers related to such obligations, as more fully described in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided to (i) the United States Trustee for the Southern District of New York, (ii) the attorneys

for the agents for the Debtors' prepetition lenders, (iii) the attorneys for the Debtors' proposed

postpetition lenders, (iv) the attorneys for the ad hoc committee of noteholders, and (v) the

holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis), and it

appearing that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested

parties having been noted in the record of the Hearing; and upon the Affidavit of Dennis J.

Welhouse Pursuant to Local Bankruptcy Rule 1007-2, sworn to on April 1, 2008 (the "Welhouse

Affidavit"), the record of the Hearing, and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

the Debtors, their estates and creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized and empowered to maintain their

Insurance Programs without interruption, on the same basis, and in accordance with the same

practices and procedures that were in effect prior to the commencement of the Debtors' chapter

11 cases; and it is further

ORDERED that the Debtors are authorized, but not required, to pay, in their sole

discretion, all Insurance Obligations, including, without limitation, all premiums, claims,

deductibles, excess, retrospective adjustments, administrative and brokers' fees, and all other

obligations arising under the Insurance Programs, including those Insurance Obligations that (i)

were due and payable or related to the period before the commencement of these chapter 11

cases, without further Order of the Court, and (ii) are or become due and payable or related to the

period after the commencement of these chapter 11 cases; and it is further

ORDERED that, pursuant to section 362(d) of the Bankruptcy Code, to the extent

any of the Debtors' employees hold claims under the Debtors' Workers' Compensation

Programs, these employees are authorized, at the Debtors' discretion, to proceed with their

workers' compensation claims through and including the collection of any judgment in the

appropriate judicial or administrative forum under the Workers' Compensation Programs;

provided, that the prosecution of such claims is in accordance with the Workers' Compensation

Program and the recoveries are limited to the proceeds available under the applicable policy; and

it is further

ORDERED that the Banks, including, but not limited to those on the list annexed hereto as Exhibit B, are authorized to honor, process, and pay, to the extent of funds on deposit, any and all prepetition checks or electronic fund transfer requests issued by the Debtors in respect of any Insurance Obligation, whether pre or postpetition; and it is further

ORDERED that any Bank, including, but not limited to those on the list annexed hereto as Exhibit B, may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Commencement Date should be honored pursuant to this Order, and such Bank shall not have any liability to any party for relying on such representations by the Debtors as provided for herein; and it is further

ORDERED that nothing in this Order or the Motion shall be construed as prejudicing the rights of the Debtors to dispute or contest the amount of or basis for any claims against the Debtors in connection with or relating to the Debtors' Insurance Programs; and it is further

ORDERED that, to the extent that any Insurance Program or any related contract or agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, neither this Order nor any payments made in accordance with this Order shall constitute the postpetition assumption of any such Insurance Program, contract, or related agreement pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that notwithstanding any applicability of Rules 6004(h),[2] 7062, or 9014 of the Bankruptcy Rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

---

[2] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

ORDERED that the requirement set forth in Local Bankruptcy Rule 9013-1(b) for

the filing of a separate memorandum of law in support of the Motion is satisfied.

Dated:  April __, 2008
           New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

| INSURER POLICY | COVERAGE/ TYPE | INSURED | LIMITS | DEDUCTIBLE | TERM | EXPIRATION | BROKER | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| American International Group WC 3425470 and 3425471 | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Fully-insured plan | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $815,790 |
| The Travelers Indemnity Company of America No. TC2HUB-133D983-5-04 (St. Paul Travelers Insurance company) (The Travelers Indemnity Company) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | 52 weeks starting July 1, 2004 | June 30, 2005 | Leonard Insurance Services Agency, Inc. | $513,621 |
| St. Paul Fire and Marine Insurance Company (St. Paul Travelers Insurance Company) (The Travelers Indemnity Company) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | 52 weeks starting July 1, 2003 | June 30, 2004 | Leonard Insurance Services Agency, Inc. | $593,080 |
| Lumbermens Mutual Casualty Company (Kenper) | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | Seven policy years starting July 1, 1996 | June 30, 2003 | Leonard Insurance Services Agency, Inc. | Different for each policy year |
| Zurich Insurance Company | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | Eleven policy years starting July 1, 1995 | June 30, 2006 | Accordia of Western Pennsylvania | $431,314 |
| The Home Insurance Company in Liquidation | Workers' Compensation | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Self-insured plan | June 1, 1991 through June 30, 1995 | June 30, 1995 | Accordia of Western Pennsylvania | Various |
| CHUBB  3581-73-98-CLE  Occurrence | Employer's Liability Stop Gap (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $1,000,000 aggregate and each accident | $0.0 SIR | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | Included in general liability premium |
| CHUBB 3581-73-98 CLE Occurrence | General Liability, Products & Advertisers, Specified Third Parties and Employers' | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $1 million per occurrence, $2 million general aggregate and products aggregate. (coverage policy period) | $0.0 Deductible Primary | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $87,068 |
| State of Ohio Occurrence | Workers' Compensation retrospectively rated plan (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | $200,000 per claim $460,000 aggregate (approx.) | 52 weeks | June 30, 2008 | N/A | $255,000 |
| State of Ohio Occurrence | Workers' Compensation retrospectively rated plan (Monopolistic States) | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Statutory | Various | 52 Weeks starting July 1, 2007 | From July 1, 2007 to June 30, 2008 | N/A | Various |

| INSURER POLICY | COVERAGE/ TYPE | INSURED | LIMITS | DEDUCTIBLE | TERM | EXPIRATION | BROKER | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| Fireman's Fund Insurance Company SU0-000-9929-6262 Occurrence | Umbrella Liability | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $25 million each occurrence and in the aggregate | Excess primary | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $41,244 |
| CHUBB 7980-25-32 Occurrence | Excess Umbrella Liability | Lexington Precision Corporation and Lexington Rubber Group, Inc. | $25 million each occurrence and in the aggregate | Excess primary and umbrella | 52 weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $28,785 |
| Affiliated FM Insurance Company MG480 Occurrence | Property Damage & Business Interruption Boiler & Machinery | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Blanket replacement cost, except for replacement of tools and molds, which is actual cash value | Property/Boiler: $100,000 Earthquake & Flood: $100,000 | 52 weeks starting Dec. 1, 2007 | December 1, 2008 | Leonard Insurance Services Agency, Inc. | $175,7850 |
| CHUBB 7498-03-09-CLE Occurrence | Foreign General Liability, including Auto Liability, Property, Workers' Compensation, and Fidelity | Lexington Precision Corporation and Lexington Rubber Group, Inc. | General Liability, Products, Advertising, Employee Benefits & Auto $1 million | None | 52 weeks starting July 1, 2006 | June 30, 2007 | Leonard Insurance Services Agency, Inc. | $2,750 |
| CHUBB 7498-03-09-CLE Occurrence | Ocean Cargo & War | Lexington Precision Corporation and Lexington Rubber Group, Inc. | Various with respect to type of occurrence. | $1,000 | 52 Weeks starting Aug. 10, 2007 | August 10, 2008 | Leonard Insurance Services Agency, Inc. | $2,000 |
| CHUBB 6801-1252 Claims Made | Directors & Officers Liability | Lexington Precision Corporation | $2.5 million annual aggregate | Executive liability and indemnification: none All others: $250,000 | 52 Weeks starting Jan. 1, 2008 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $60,0000 |
| CHUBB 6801-1252 Claims made | Pension / Welfare Fiduciary Liability | Lexington Precision Corporation | $10 million | $25,000 retention | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $7,500 |
| CHUBB 6801-1252 Claims made | Crime | Lexington Precision Corporation | $5 million | $100,000 | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $17,500 |
| CHUBB 6801-1252 Claims made | Employment Practices | Lexington Precision Corporation | $2 million | $125,000 | 52 Weeks starting July 1, 2007 | June 30, 2008 | Leonard Insurance Services Agency, Inc. | $29,000 |
| **TOTAL CURRENT INSURANCE/ANNUAL PREMIUM (excludes deductibles, retentions, payments for prior years' workers' compensation claims under retrospective policies issued in prior years. etc.)** | | | | | | | | **$1,582,422** |

## EXHIBIT B

## DISBURSEMENT ACCOUNTS

| | |
|---|---|
| FirstMerit Bank N.A.<br>295 FirstMerit Circle<br>Akron, OH 44307<br>Attn: Thomas Heidy | 5999000546<br>5999000554<br>5999000562<br>5999000570<br>5999000588<br>5999000596<br>5999000619<br>5999000627<br>5999000855 |

## MASTER OPERATING (DISBURSEMENT) ACCOUNT

| Bank Name and Address | Account Number |
|---|---|
| FirstMerit Bank N.A.<br>295 FirstMerit Circle,<br>Akron, Ohio 44307<br>Attn: Thomas Heidy | 5923007871 |