1               UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK
2

3       ---------------------------------------X
        In Re:                              :  08-11153 (MG)
4                                           :
            LEXINGTON PRECISION CORPORATION,  :  One Bowling Green
5                                           :  New York, New York
                        Debtor.             :  April 2, 2008
6       ---------------------------------------X

7
                        TRANSCRIPT OF MOTIONS
8           BEFORE THE HONORABLE ARTHUR J. GONAZALEZ
                UNITED STATES BANKRUPTCY JUDGE
9

10      APPEARANCES:

11
        For the Debtors:        MARCIA GOLDSTEIN, ESQ.
12                              Weil, Gotshal & Manges LLP
                                767 Fifth Avenue
13                              New York, New York  10153

14      For the Ad Hoc:         PAUL SILVERSTEIN, ESQ.
         Bondholders Committee  Andrews Kurth LLP
15                              450 Lexington Avenue
                                New York, New York  10017
16
        For Lubin Partners:     GERALD C. BENDER, ESQ.
17                              O'Melveny & Myers LLP
                                7 Times Square
18                              New York, New York  10036

19      For the U.S. Trustee:   Office of the United States Trustee
                                BY:  PAUL SCWARTZBERG, ESQ.
20                                   TRACY HOPE DAVIS, ESQ.
                                Assistant United States Trustee
21                              33 Whitehall Street
                                New York, New York  10004
22
        For Webster:            SCOTT A. ZUBER, ESQ.
23                              Day Pitney, LLP
                                200 Campus Drive
24                              Florham Park, New Jersey  07932

25
                        (Appearances continued on next page)

APPEARANCES CONTINUED:


For Capital Source:         AARON R. CAHN, ESQ.
 Funding                    Carter, Ledyard & Milburn LLP
                            8 Wall Street
                            New York, New York  10005


For Secured Lenders:        JOHN TISHLER, ESQ.
                            Waller, Lansden, Dortch & Davis LLP
                            Nashville City Center
                            511 Union Street
                            Nashville, Tennessee  37219


Court Transcriber:          CARLA NUTTER
                            TypeWrite Word Processing Service
                            356 Eltingville Boulevard
                            Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1          THE COURT:  Please be seated.  All right.

2          The debtor.  Go ahead.

3          MS. GOLDSTEIN:  Good morning, Your Honor.  Marcia

4    Goldstein of Weil, Gotshal & Manges on behalf of the debtors.

5          Your Honor, the debtors are Lexington Precision and

6    Lexington Rubber Group, Inc., which is a wholly-owned

7    subsidiary of Lexington Precision.

8          Your Honor, we are here -- you know the background

9    from Judge Glenn -- solely at this time with respect to the

10   proposed cash collateral motion, proposed cash collateral order

11   and our motion to approve a DIP financing.

12         I had understood that Your Honor wanted to talk about

13   the timing?

14         THE COURT:  Yes.  There are two issues I must deal

15   with; one is that Judge Glenn as best I understand has recused

16   himself from the DIP financing aspect of the case at least for

17   the moment because of -- who is here from O'Melveny?

18         MR. BENDER:  Gerald Bender, Your Honor.

19         THE COURT:  All right.  Because O'Melveny was

20   representing the DIP lender?  Is that correct?

21         MS. GOLDSTEIN:  Yes, that is correct, Your Honor.

22         THE COURT:  I must disclose as well and, no, it's not

23   to disqualify, that my daughter will be an associate there at

24   O'Melveny in September.

25         MS. GOLDSTEIN:  It's a very popular law firm, Your

4

1   Honor.

2           THE COURT:  The last couple of days, yes, in the

3   bankruptcy court.

4           The second piece is the scheduling.  What do you need

5   in terms of time to try to work things out?

6           MS. GOLDSTEIN:  Well, we believe, Your Honor, that we

7   have worked out issues -- well, we've worked out all issues

8   with the secured lender on cash collateral, I believe, at this

9   point; that we've clarified -- I think my associate went to

10  tell the assistant U.S. Trustee that we're back here, she was

11  in a hearing with Judge Bernstein -- but we believe that we've

12  worked out all matters with respect to the U.S. Trustee, all

13  clarifications.

14          I understand from Mr. Silverstein, who represents an

15  ad hoc committee of bondholders that he has a slight objection

16  to the DIP.  You know, obviously given that this is the --

17  there are no encumbered assets of this company so the debtor in

18  order to operate does need relief under these motions.  We

19  contemplate, obviously, interim relief, we hope, today and

20  setting a final hearing the week of -- the earliest date that

21  that could be on fifteen day's notice would be April 16th so we

22  would like the final hearing as early as possible on or after

23  April 16th.

24          So those were the timing issues.  Obviously, the

25  debtor will need to be using cash as soon as possible.  Checks

5

1  will be clearing -- payroll checks.  We have a payroll also, I

2  believe, to be made this week so that this is of critical

3  importance.

4          THE COURT:  All right.  But do you still need time to

5  try to work any issues out or has that been exhausted at least

6  at the moment?

7          MS. GOLDSTEIN:  I don't think that Mr. Silverstein

8  has any specific points to work out.

9          MR. SILVERSTEIN:  I don't have specific -- well,

10 there's one specific point to work out that I'd like to explain

11 to the Court.

12         MS. GOLDSTEIN:  I don't know what it is --

13         THE COURT:  Well, my point is I need to set a

14 schedule.  Everybody ready to go forward right now and whatever

15 efforts have been made to work it out have been exhausted and I

16 just need to hear what the issue is?

17         MR. SILVERSTEIN:  Yes.

18         MS. GOLDSTEIN:  I think so, Your Honor.

19         THE COURT:  All right.  Then we need the U.S.

20 Trustee's Office.

21         MS. GOLDSTEIN:  Okay.  With respect to the U.S.

22 Trustee, she has -- we have incorporated all changes that the

23 U.S. Trustee has suggested.  However, we were dealing with

24 language issues with the secured lender up until we filed and

25 so we then provided a blackline to the U.S. Trustee's Office

6

1  and they haven't had a full opportunity to review the blackline

2  changes.  So while we don't think those are material we would

3  be happy to go back in terms of the order and clarify anything

4  that they raise with respect to those changes which really were

5  issues between us and the secured lender.  As I said, we don't

6  think they were material but she still hasn't had a chance to

7  review everything and she may, indeed, have an issue and she

8  has reserved her rights.

9         THE COURT:  All right.  Do you have any indication

10  from her whether or not she would be ready at eleven o'clock?

11  How much time do they need to --

12         MS. GOLDSTEIN:  She's at a hearing in front of Judge

13  Bernstein, Your Honor.

14         THE COURT:  Right.

15         MS. GOLDSTEIN:  I mean we could let her know that.

16         MR. SILVERSTEIN:  I think she's in a hearing in

17  connection with the appointment of an examiner which I'd be

18  shocked if that was done by 11:00.  I mean I'm in that case but

19  I think I can reasonably say it's not going to be over by

20  11:00.

21         MS. GOLDSTEIN:  Perhaps we can hear every other issue

22  that's raised.  I mean I think the only other party raising

23  anything may be Mr. Silverstein and, you know, if we still have

24  an issue with her, come back, but I hope we can work out the

25  U.S. Trustee's issues.

7

1        MR. SILVERSTEIN:  Your Honor, that probably makes

2   sense for the issues that the ad hoc bondholders committee --

3        THE COURT:  All right.  Mr. Silverstein, you're going

4   to have to use either a microphone on the table or move to the

5   podium.

6        MR. SILVERSTEIN:  I think what Ms. Goldstein says

7   makes sense.  Perhaps -- I understand Your Honor has this case

8   very temporarily.  It's sort of a drive-by hearing if you will,

9   I'm mindful of that and I just need to give you a context for

10  where this arises and then to raise several points that we have

11  in respect of the DIP.  It's not a particularly protracted or

12  long presentation.

13       THE COURT:  All right.  Ms. Goldstein, why don't you

14  go through -- I don't have a blackline copy at this point, do

15  I?  Is there one in a binder?

16       MS. GOLDSTEIN:  Your Honor, the binder is up-to-date

17  but for one change that was really inadvertent and it dealt

18  with notice of any termination event.  This was a point raised

19  by the U.S. Trustee which we had agreed to and the secured

20  lender had agreed to and on Page 20 -- let me hand you the

21  revised one.

22       THE COURT:  All right.  Thank you.

23       MS. GOLDSTEIN:  On Page 20 we have added language

24  which was inadvertently left out that the revolver agent and

25  the term loan agent shall serve notice of any termination event

8

1   on the debtors, the U.S. Trustee, the committee and if no

2   committee is yet appointed on the top twenty creditors holding

3   unsecured claims.  But this is clearly is agreed to.  It was

4   asked for by the U.S. Trustee.  No one has had any issue with

5   this.  There were other blacklines that arose in the last day

6   or so that the U.S. Trustee had not had time to fully review

7   and I can now tell you the one issue she did have was that in

8   the carve out, particularly for the creditors committee, in the

9   current draft there is allocated only $25,000.00 to investigate

10  the secured creditors' liens.  She did not feel that was high

11  enough and so we do have an issue there and I'm hoping that we

12  can compromise that issue, hopefully, before the end of the day

13  or as soon as she's available.

14          THE COURT:  All right.  What happened with the 506(c)

15  issue?  Is that still in this -- the waiver --

16          MS. GOLDSTEIN:  Not for the interim hearing, Your

17  Honor.

18          THE COURT:  All right.

19          MS. GOLDSTEIN:  That is in there subject to final

20  hearing.

21          THE COURT:  All right.

22          MS. GOLDSTEIN:  Now, Your Honor, I can give an

23  overview of where we are.

24          THE COURT:  Why don't you do that and then I'll hear

25  whatever objections or objection --

9

1          MS. GOLDSTEIN:  Or I also have a proffer of testimony

2  of Mr. Warren Delano, who is the co-chief executive officer of

3  the company in support.  So I'll give a very short overview and

4  if Your Honor permits I can then go to the proffer.

5          THE COURT:  All right.  Go ahead.

6          MR. SILVERSTEIN:  Your Honor, may I?  Are we going

7  with cash collateral now or DIP now?

8          MS. GOLDSTEIN:  We basically have prepared one

9  proffer for both because they work together.  We're seeking

10  approval of both, they're in one motion, obviously there are

11  two different components but from the debtor's point of view

12  the combination of the cash collateral and the proposed DIP

13  loan is the proposed method of financing the company.

14          MR. SILVERSTEIN:  Your Honor, I do not have an

15  objection to cash collateral usage on an interim basis.  So I

16  guess I'll have to see how the proffer comes out.  My issues

17  are with the proposed DIP loan.

18          THE COURT:  All right.

19          MS. GOLDSTEIN:  Okay.  We'll cover both, Your Honor.

20          THE COURT:  We'll get there.

21          MS. GOLDSTEIN:  Your Honor, prior to the commencement

22  date which was yesterday the debtor's operation were funded

23  through a revolving credit facility and borrowings under that

24  revolving credit facility terminated upon the commencement

25  date.  As a result, the debtors need to fund its operations and

10

1   costs and expenses of administering these Chapter 11 cases

2   through cash received from their operations and from

3   supplementary post-petition financing.

4          All of the cash received by the debtors from its

5   operations constitutes the pre-petition lender's cash

6   collateral.  After extensive negotiations the debtors and the

7   pre-petition senior lenders reached a consensual agreement

8   regarding the use of cash collateral and that is one piece of

9   what we are seeking approval of today.

10          We have summarized the terms of the cash collateral

11  and the DIP motions in the motion and, of course, the terms are

12  also set forth in the proposed interim order.  We'll cover some

13  of those terms in Mr. Delano's proffer.

14          Now, although many of the terms of the proposed use

15  of cash collateral are common to cash collateral stipulations

16  there are certain provisions that are very specific to this

17  case and these will in fact be specifically covered through the

18  proffered testimony.  In addition to the provisions specific to

19  this case the agreed terms on the cash collateral contain two

20  provisions that are normally considered extraordinary; the

21  granting of adequate protection liens on Chapter 5 causes of

22  action and the waiver of the 506(c) Bankruptcy Code provisions.

23  These proposed extraordinary provisions are not part of the

24  interim relief and would not be effective until entry of a

25  final order.  They were requested by the pre-petition senior

1   lenders as part of the overall agreement to use cash collateral

2   and the debtors submit and believe that the agreement was

3   negotiated at arm's length and in good faith.  So those would

4   be considered at the final hearing.

5           In addition to the use of cash collateral, the

6   debtors propose to obtain an additional $4 million in post-

7   petition financing.  The post-petition financing in this case

8   is no typical for two particular reasons; the DIP lenders are

9   not the pre-petition secured lenders and although two of the

10  DIP lenders are either insiders or affiliates of an insider,

11  the third lender is not an affiliate of either the debtor's or

12  the other DIP lenders.  The lenders are Michael A. Lubin, who

13  is chairman of the board and a co-CEO of the companies; William

14  B. Connor, another director on the board and ORA Associates

15  LLC, an entity that is not affiliated with the debtors or the

16  other DIP lenders.  Second -- and this is perhaps the more

17  unusual part -- the DIP lenders have agreed to provide this

18  financing on an unsecured super priority basis.  They have

19  further agreed that their super priority claim will be junior

20  to the administrative expense claim that the pre-petition

21  secured lenders will receive for the diminution of their

22  interests in the cash collateral but the DIP lenders have

23  agreed that payment of DIP loans other than payment of

24  interests of fees will be subordinated to the payment of the

25  pre-petition obligations owed to the pre-petition secured

12

1    lenders.

2          The interim relief sought with respect to the DIP

3    loan is to seek approval to use $2 million of the $4 million

4    and at this time I would like to offer the testimony of Warren

5    Delano, the co-CEO and president of the debtors in support of

6    both motions.  Mr. Delano is present in the courtroom today.

7          THE COURT:  All right.  The question I have is the

8    DIP lenders are agreeing to be junior to the pre-petition

9    lenders and administrative --

10         MS. GOLDSTEIN:  The secured lenders.

11         THE COURT:  Secured lenders for purposes of an

12   administrative claim.

13         MS. GOLDSTEIN:  Yes.

14         THE COURT:  But do they have a super priority

15   administrative claim with respect to other administrative

16   claims?

17         MS. GOLDSTEIN:  Yes.

18         THE COURT:  All right.  Go ahead.

19         MS. GOLDSTEIN:  So they are proposing a super

20   priority claim, junior only to the super priority claim we

21   would give to the pre-petition secured lenders.

22         With respect to the proffer, Mr. Delano is here in

23   the courtroom and pursuant to Federal Rule of Evidence

24   103(a)(2) this Court may accept that proffer in lieu of

25   testimony and I would request permission to do so.

13

1          THE COURT:  All right.  Go ahead.

2          MS. GOLDSTEIN:  Mr. Delano, who is the co-CEO and

3  president of Lexington is thoroughly familiar with all material

4  aspects of Lexington's day-to-day operations, business and

5  financial affairs and has been integrally involved with the

6  negotiation of the cash collateral and DIP financing

7  arrangements.  If Mr. Delano were called to testify in support

8  of the cash collateral and DIP motions his direct testimony

9  would be as follows:  Mr. Delano would testify as to his

10  educational background; that he received a bachelor of arts

11  degree from Harvard University in 1974.  He, thereafter, worked

12  as a commercial loan officer specializing in problem loans and

13  in the early 1980s he worked for Norton Simon, Inc. in the area

14  of strategic planning, worked as a loan officer at Bankers

15  Trust Company.  Since 1985, Mr. Delano along with Mr. Lubin,

16  worked as workout consultants with troubled companies and for

17  the last five years they have focused exclusively on Lexington.

18          Mr. Delano would testify that he first became

19  involved with Lexington in 1985 when he and Michael Lubin, the

20  current chairman of the board of directors and co-chief

21  executive officer made their first investments in Lexington

22  through a limited partnership.  Mr. Delano became a director in

23  1985 and has retained a seat on Lexington's boards ever since.

24  Mr. Delano would testify that in 1987 he and Mr. Lubin took

25  over the management of Lexington's businesses and for the past

14

1   21 years he has been integrally involved in the management of

2   Lexington's businesses.  Mr. Delano would further testify that

3   he has been the president of Lexington since 1988 and co-chief

4   executive officer since 1997.

5           Mr. Delano would testify that as of the commencement

6   date Lexington had amounts outstanding under several secured

7   term and revolving credit facilities which I'll refer to as the

8   pre-petition senior credit facilities.  Mr. Delano would

9   testify that the pre-petition senior credit facilities were

10  secured by essentially all of Lexington's property including

11  accounts receivable.  Mr. Delano would also testify that prior

12  to the commencement date all of Lexington's operations were

13  funded through the revolving credit facilities, that every

14  night the agent under the pre-petition revolving credit

15  facility would sweep Lexington's lock box accounts into which

16  accounts receivables were received in order to pay down the

17  revolving credit facility and would periodically make advances

18  under the revolving credit facility requested by Lexington.

19  Mr. Delano would testify that as a result of filing these

20  Chapter 11 cases the lenders under the pre-petition senior

21  credit facilities which I will refer to as the pre-petition

22  senior lenders have refused to make further advances under the

23  revolving credit facility.  Mr. Delano would testify that as a

24  result the debtors seek authority to fund their operations and

25  pay the costs and expenses of administering these Chapter 11

15

1  cases through the use of the pre-petition senior lenders' cash

2  collateral and the supplementary post-petition financing.

3          Mr. Delano would testify that prior to the

4  commencement date Lexington prepared thirteen week budgets int

5  the ordinary course of business that Lexington delivered to its

6  agents for its pre-petition senior credit facilities and that

7  Mr. Delano was involved in the preparation of those budgets.

8  Mr. Delano would testify that he was likewise involved in

9  preparing the latest budget that's attached as Exhibit A to the

10  cash collateral DIP motion.  Mr. Delano would testify that

11  based on previous budgets prepared by Lexington this budget

12  reasonably predicts the debtor's cash-in flows and expenditures

13  and is accurate to the best of his knowledge.  Mr. Delano would

14  testify that the use of cash collateral and proceeds of the

15  proposed post-petition financing will be sufficient to pay the

16  costs and expenses of administering these Chapter 11 cases.

17          Mr. Delano would testify that after several weeks of

18  extensive negotiations with the pre-petition senior lenders of

19  which Mr. Delano is part, Lexington and the pre-petition senior

20  lenders agreed on the proposed terms for use of the cash

21  collateral.  Mr. Delano would testify that the pre-petition

22  senior lenders were represented by multiple counsel for the

23  different lenders, all of whom were involved in the

24  negotiations.  Mr. Delano would testify that the negotiations

25  with the pre-petition senior lenders were at arm's length and

16

1   were done in good faith.  Mr. Delano would testify that these

2   negotiated terms of the use of cash collateral are accurately

3   summarized in the cash collateral DIP motion and in the

4   proposed interim order.  Mr. Delano would testify that the

5   terms of the use of cash collateral that were agreed to with

6   the pre-petition senior lenders include certain terms that are

7   particular to this specific Chapter 11 case.  He would testify

8   that under the proposed terms the debtor's use of cash

9   collateral will be closely tied to the budgets, such that use

10  of cash collateral will terminate if, for example, actual

11  cumulative expenditures for a particular period exceed 110

12  percent of the budgeted expenditures or if net sales for a

13  particular period are less than ninety percent of the budgeted

14  net sales.  Mr. Delano would also testify that use of cash

15  collateral will terminate if without written consent of the

16  pre-petition secured lender and orders entered providing for

17  the sale of assets valued at more than $1 million that does not

18  require the proceeds of such sale be applied to pay the pre-

19  petition senior credit facilities.

20          Mr. Delano would testify that based on his review of

21  the budget and his knowledge of Lexington's operations, these

22  termination events are reasonable and not likely to be

23  [inaudible -- someone coughing].  Mr. Delano would also testify

24  that in addition to other triggering events use of cash

25  collateral will terminate if the debtors fail to file a plan of

17

1   reorganization within ninety days of the commencement date,

2   file a disclosure statement with respect to such plan within

3   120 days of the commencement date and consummate such plan

4   within 270 days of the commencement date.

5           Mr. Delano would testify that these time lines are

6   reasonable because if it's a balance sheet restructuring rather

7   than an operational restructuring the debtors intend to propose

8   a plan as quickly as possible.  Mr. Delano would testify that

9   although the debtors believe that the pre-petition senior

10  lenders are oversecured, they further believe that it is cost

11  effective and in the best interests of their estates, the

12  creditors and shareholders that they reach a consensual rather

13  than a litigated resolution regarding the use of cash

14  collateral.  Mr. Delano would testify that as a result

15  Lexington agreed to provide the pre-petition senior lenders the

16  adequate protection proposed in the cash collateral and DIP

17  motion.  Mr. Delano would testify that the proposed adequate

18  protection consists of the following:  adequate protection

19  payments equal to current payment of interest at the

20  contractual, non-default rate.  The contractual, non-default

21  rate is LIBOR plus two and a half percent for the revolving

22  credit facility, LIBOR plus four percent for the equipment

23  loan, LIBOR plus four and a half percent for term loan A,

24  prime, which under the document is no less than five percent

25  plus six percent for the term loan B.

18

1          In addition, as adequate protection there will be

2    payment of agents' and lenders' legal fees and expenses up to

3    certain limitations under the agreement and without prejudice

4    to the lender seeking reasonable fees and expenses under

5    Section 506(d) of the Bankruptcy Code and the debtor's rights

6    to challenge such request and in consideration for the pre-

7    petition senior lenders waiving until the occurrence of a

8    termination event, any right they may have to an additional two

9    percent of interest that would be payable if interests were

10   paid at the contractual default rate, the debtors agreed to

11   continue making principal payments due under the pre-petition

12   senior credit facilities which amounts to $269,000.00 a month.

13          Mr. Delano would testify that it is in the best

14   interest of the debtor's estates, its creditors and

15   shareholders to continue to make scheduled principal payments

16   under the pre-petition senior credit facilities in lieu of

17   paying an additional -- or possibly paying an additional two

18   percent in interest pending confirmation or a termination

19   event.

20          Further, the pre-petition senior lenders will to the

21   extent of the diminution in value of their interests in the

22   cash collateral receive replacement liens on all of the

23   debtor's property including proceeds of the post-petition

24   financing and subject to entry of the final order Chapter 5

25   causes of action.  Mr. Delano would testify that liens on both

19

1  of these were required by the senior lenders as part of the

2  overall agreement.

3        Finally, the pre-petition senior lenders will to the

4  extent of the diminution and the value of their interests in

5  the cash collateral receive an administrative priority expense

6  claim under Section 507(b) of the Bankruptcy Code which will be

7  senior to the super priority claim proposed for the post-

8  petition lenders but subject to the carve out for court fees,

9  fees for the Chapter 7 Trustee in the amount of $100,000.00 if

10  these cases are converted to Chapter 7 and after termination of

11  the use of cash collateral, allowed fees and expenses of

12  professionals in an amount not to exceed $400,000.00.

13        With respect to the proposed DIP loans, Your Honor,

14  Mr. Delano would testify that the debtors need to obtain post-

15  petition financing because based on the budget use of cash

16  generated by operations post-petition will be insufficient to

17  fund operations and pay the costs and expenses of

18  administration of these Chapter 11 cases.  Mr. Delano would

19  testify that Lexington was able to obtain post-petition

20  financing in the amount of $4 million, that two of the three

21  proposed post-petition lenders, Lubin Partners LLC and William

22  B. Conner, are either insiders or affiliates of insiders of the

23  debtors.  Mr. Delano would testify that he is not a DIP lender

24  and is not affiliated with one.  Mr. Delano would testify that

25  even though two of the three proposed post-petition lenders are

20

1   either insiders or affiliates of insiders of the debtors the

2   DIP loans were negotiated ar arm's length and in good faith.

3   Mr. Delano would testify that the proposed DIP lenders were

4   represented by counsel and that negotiations of the terms of

5   the DIP loans and the DIP lenders' counsel took place over the

6   course of a couple of weeks.  Mr. Delano would testify that the

7   terms of the proposed DIP loans are set forth in the form of a

8   note which is attached as Exhibit B to the cash collateral DIP

9   motion.  Mr. Delano would testify that the form of the note

10  accurately reflects the terms of the DIP loans negotiated with

11  the DIP lenders and that each of the DIP loans will be made

12  pursuant to a note that will be substantially in the form of

13  the note attached to the motion.

14          Mr. Delano would testify that although the debtors

15  seek to borrow an aggregate of $4 million under the DIP loans,

16  they seek to borrow $2 million on an interim basis pending

17  entry of the final order.  Mr. Delano would testify that

18  although the budget does not project the entire $2 million

19  being used up within the next two and a half weeks,

20  approximately $1 million is projected to be used.  He believes

21  that it is necessary that Lexington have cash on hand as a

22  cushion during both of these periods, both the interim period

23  and the period thereafter.  Mr. Delano would testify that the

24  debtors' only other source of cash, accounts receivable, tend

25  to fluctuate and may come in lower than expected.  Mr. Delano

21

1  would also testify that as recent events in the marketplace

2  have shown, perceptions about a company's ability to pay its

3  obligations are often more important than the company's actual

4  ability to pay its debts.  Accordingly, Mr. Delano would

5  testify that Lexington needs to have extra cash on hand at all

6  times so that customers and suppliers are confident that

7  Lexington would be able to meet its obligations.  Mr. Delano

8  would testify that maintaining suppliers and customers is

9  especially important so that suppliers can continue to sell

10 goods to Lexington on credit.

11         Mr. Delano would testify that the DIP loans are term

12 loans payable only on the maturity date which is the earlier of

13 the one year anniversary of the commencement date or the

14 occurrence of certain events such as conversion or dismissal of

15 these Chapter 11 cases or acceleration of the notes by the DIP

16 lenders after an event of default.  Mr. Delano would testify

17 that it's the debtor's intent to exit bankruptcy expeditiously

18 and that a one year term for the DIP loan is reasonable in this

19 case.

20         Mr. Delano would testify that this is a somewhat

21 unique type of post-petition financing and that the DIP loans

22 are being provided on an unsecured super priority basis but are

23 contractually subordinated to the obligations owing the pre-

24 petition senior lenders.  Mr. Delano would also testify that in

25 light of the DIP loans being unsecured the DIP lenders required

22

1   that the DIP loans be entitled to a super priority claim status

2   pursuant to 364(c)(1) of the Bankruptcy Code payable from all

3   property of the debtors and senior to any and all other

4   unsecured claims.  The DIP loans, however, would be junior,

5   subordinate and subject to the pre-petition obligations owed to

6   the pre-petition senior lenders, the liens thereon, the

7   adequate protection liens and the claims proposed to be granted

8   to the pre-petition senior lenders and the carve out which is

9   substantially similar to the carve out that applies to the pre-

10  petition senior lenders.

11          Mr. Delano would testify that interest on the DIP

12  loans is payable monthly at a rate of LIBOR plus seven percent

13  per annum with a LIBOR floor of three percent.  Mr. Delano

14  would testify that because LIBOR rates are below three percent,

15  the current one month LIBOR being 2.7 percent, the current

16  interest rate on the DIP loans would be ten percent.  Mr.

17  Delano would testify that Lexington asked its financial

18  advisor, W.Y. Campbell, to collect data on interest rates,

19  applicable and comparable post-petition financings.  Mr. Delano

20  would testify that based on his conversation with W.Y. Campbell

21  the post-petition financing sought to be approved in this case

22  is very unusual and exact comparables are difficult to find.

23  Mr. Delano would testify, however, that based on one other

24  recent post-petition loan and the interest rates applicable to

25  recent loans obtained by or offered to Lexington the interest

23

1  rate on the proposed DIP loans is reasonable in light of its

2  unsecured subordinated status.  Mr. Delano would testify that

3  he is aware of only one post-petition loan that would at all be

4  comparable which was approved in the Chapter 11 case of Eagle

5  Pitcher Incorporation, its second Chapter 11 case, which had an

6  interest rate of LIBOR plus twelve and a half percent for a $50

7  million loan secured by a third priority lien.  The interest

8  rate on the proposed DIP loans is lower than the rate in the

9  Eagle Pitcher's post-petition loan which was secured, although

10 by a third priority lien.  In addition, Mr. Delano would

11 testify that even a better comparable are the secured loans

12 that Lexington obtained in 2006 from the pre-petition senior

13 lenders and which are still outstanding.  Mr. Delano would

14 testify that the interest rate on the $4 million term loan B

15 carries an interest rate that is currently higher than the

16 proposed DIP loan -- prime rate plus at least six percent which

17 currently equates to 11.25 percent -- even though term loan B

18 is secured and is in a better position than the DIP loans.

19        Moreover, Mr. Delano would testify that the financing

20 proposal Lexington obtained prior to the commencement date in

21 connection with a potential out-of-court restructuring carried

22 an interest rate of LIBOR plus six percent for the bottom

23 portion of the loan even though that loan would be secured by

24 all assets of the companies.

25        Accordingly, Mr. Delano would testify that the

24

1   interest rate on the DIP loans provided in this case is

2   reasonable in light of the unsecured and subordinated nature of

3   the DIP loans.  Mr. Delano would testify that as consideration

4   for making the proposed DIP loans, the proposed DIP lenders

5   will receive a fee in cash in the aggregate amount of

6   $80,000.00 which amounts to two percent of the total DIP loans.

7   Mr. Delano would testify that the debtors seek approval to pay

8   only $40,000.00 on an interim basis with the remainder to be

9   sought in the final hearing.  Mr. Delano would testify that he

10  has reviewed fees given to post-petition lenders in other cases

11  and has concluded that the $80,000.00 fee to be paid to the DIP

12  lenders in this case is much lower than the average fees of

13  other cases.  Mr. Delano would testify that this two percent

14  fee is very reasonable in light of the unsecured and

15  subordinated nature of the DIP loans.

16          Mr. Delano would testify that because the pre-

17  petition senior lenders have liens on and security interest in

18  substantially all of the debtor's real estate and other assets,

19  the debtors are unable to obtain the funds to be provided under

20  the DIP loans on more favorable terms than those proposed by

21  the DIP lenders.  Mr. Delano would testify that the debtors

22  would be unable to obtain funds on an unsecured, non-super

23  priority basis even if administrative priority were granted.

24  Mr. Delano would testify that the DIP lenders would only lend

25  on a super priority basis.  Mr. Delano would testify that

25

1   considering the current market conditions and because the

2   debtors have virtually no unencumbered assets the debtors

3   believed it would be more efficient and cost effective to seek

4   the loan on terms that a lender would likely agree to rather

5   than incur the costs and expenses to search for a lender that

6   is not willing to provide an unsecured loan on a regular

7   administrative priority basis.  Mr. Delano would also testify

8   that the debtors in their sound business judgment determined

9   that it would be extraordinarily difficult and costly to obtain

10  financing on a secured basis.

11          Mr. Delano would also testify that because the

12  proposed DIP loans have no break-up fees, no prepayment

13  penalties or other provisions that would prevent some other

14  lender coming to provide post-petition financing the debtors

15  would welcome any other proposals for DIP financing that

16  contain better economic terms.

17          Your Honor, the only limitation on that is in the

18  cash collateral order that would have to be agreed to by the

19  senior secured lender.

20          Your Honor, that concludes the testimony with respect

21  to both the proposed use of cash collateral and the proposed

22  terms of the DIP loan.

23          THE COURT:  Mr. Delano is here?

24          MS. GOLDSTEIN:  Yes, Mr. Delano is here and is

25  available.

26

1          THE COURT:  All right.  What I'm going to do is ask

2    that he be sworn in and then I will ask him if the statements

3    made by counsel would be his direct -- you can stay there, you

4    don't need to come to the witness box -- would be your direct

5    testimony if called upon to testify and then ask if you want to

6    make any modifications, additions, changes, etc., and then

7    offer you for cross-examination.  If someone wants to cross-

8    examine you then you would come to the stand.

9               (Warren Delano, Debtor's Witness, Sworn.)

10         THE COURT:  All right.  Were the statements made by

11   counsel on your behalf be your direct testimony if you were

12   called upon to testify?

13         THE WITNESS:  Yes, it would have been.

14         THE COURT:  All right.  Does anyone wish to cross-

15   examine the witness?

16         MR. SILVERSTEIN:  Your Honor, I think I'd like to

17   make a few statements and then I think we can discuss whether

18   it's necessary or appropriate to cross-examine.  I'd like to

19   reserve the right to cross-examine after I give argument, this

20   is a first day hearing on an interim basis and I understand the

21   context of the time constraints and the context of Your Honor

22   having this case on a, perhaps, limited basis.  So if I can

23   explain what I'm thinking and if I could explain the arguments

24   maybe that could segue into whether we do or do not take

25   testimony but at this point I'd like to reserve because I think

27

1    there are a lot of contradictions in Ms. Goldstein's proffer.

2    They may not all be germane on an interim basis though, so if I

3    could have the opportunity to explain that might be helpful.

4            THE COURT:  All right.

5            MR. SILVERSTEIN:  Thank you.

6            First, I'm Paul Silverstein of Andrews, Kurth,

7    counsel to the ad hoc bondholders committee.

8            Your Honor, I need to put this situation in context.

9    The case filed yesterday.  The case as a restructuring has been

10   going on for approximately a year and a half.  In May 2007, my

11   clients entered into a forbearance agreement because there was

12   a payment default under the bond indenture.  There's

13   approximately $43 million presently owed to creditors under

14   that indenture and there is a payment default.

15           The reason that this company was not put into

16   proceedings at that point was that my clients entered into a

17   forbearance agreement under which the company agreed that they

18   shop the business and sell the business as a whole and pay the

19   creditors off.  There was never a discussion or agreement that

20   the company would sell pieces of the business.  Subsequently,

21   in September 2007 an extension of the forbearance agreement was

22   also entered into with the same understanding; that the

23   business would be sold and the creditors would be paid.

24           If you look at the capital structure here, although

25   this is technically a public company it's fundamentally a

28

1    closely-held company controlled by Messrs. Delano and Lubin who

2    collectively hold over fifty percent of the stock.  They also

3    hold some subordinated debt, they also hold, I believe, in the

4    range of twenty percent of the outstanding bonds that my

5    clients own.  Essentially, our view on this case -- and, again,

6    I understand the context of this being first day hearings on a

7    case so I understand this is not the time for the full

8    explanation -- but essentially what this case is about is

9    management/stockholders keeping control of their business -- of

10   their candystore -- and at the same time not paying or

11   satisfying the claims of creditors.  That being said, Your

12   Honor, the cash collateral we have no objection to because

13   obviously the debtor has to operate using the proceeds of its

14   receivables.  The ad hoc committee has been in contact

15   throughout the last eighteen or nineteen months with Capital

16   Source, the pre-petition secured lender.

17         Our objection is to the DIP on a couple of reasons;

18   (1) it's not clear that the debtor in fact actually needs a DIP

19   loan.  The proffered testimony was that the budget suggests

20   they might need it but it's really more important for cushion

21   and perception of having access is more important to the trade

22   than actually needing the money, which there is some truth to

23   that, there's some truth to the statement that it's nice to

24   have a cushion so that the trade believes that you have money

25   available to you.  The problem is that when the insiders who

29

1  were essentially trying to keep control of this company and

2  essentially have the bondholders end up as their minority

3  stockholders going forward is that the proposed DIP lenders

4  have an easy piece of paper that at a certain point they can

5  say it has to be converted to equity and, therefore, it's an

6  additional part of our control over the business.

7          THE COURT:  But that piece of paper -- well, I may

8  over simplify it but it seems circular -- if they don't need

9  the money and they don't use it, then they're not owed very

10 much from the estate.

11         MR. SILVERSTEIN:  That's true.

12         THE COURT:  So what advantage do they then get?  The

13 only advantage they seem to get is if they use it and,

14 presumably, if they use it they needed it.

15         MR. SILVERSTEIN:  Correct.  But the problem here is

16 that this DIP has not been shopped and the proffered testimony

17 from Ms. Goldstein was that Mr. Delano consulted with W.Y.

18 Campbell with respect to appropriate interest rates, whether

19 other DIP loans were available.  There's no basis and no

20 foundation for suggesting that W.Y. Campbell has any experience

21 in bankruptcy and any experience in DIP loans.

22         But let me get to my point that really gets us to

23 where we are today.  If on solely an interim basis the debtor

24 believes that it needs a DIP loan that can easily be replaced

25 if it's necessary at a final hearing -- because there are folks

30

1  out there who would fund a DIP loan on better terms than is

2  being offered by Mr. Delano and Mr. Lubin -- that option ought

3  to be preserved.

4        THE COURT:  I thought it was preserved or at least I

5  heard a statement to that effect.

6        MR. SILVERSTEIN:  I have not seen that in an order.

7  I heard some vague statement that if anyone wants to do better,

8  they can do better, but I want to be explicit that there are

9  people who have expressed --

10        THE COURT:  There's nothing that prohibits that from

11  happening in any order --

12        MR. SILVERSTEIN:  Then I particularly in that case

13  don't really think it's appropriate for the full half of the

14  commitment fee of $40,000.00 to be paid up front, that ought to

15  wait until the final hearing on the DIP.  I don't think it's

16  necessary at this point to actually pay them $40,000.00 for a

17  DIP that either may be replaced or may not be used, No. 1, (2)

18  there is a covenant in the DIP that prohibits any sales,

19  mergers, liquidation, leasing, disposing of assets -- it's on

20  Page 11 and I don't know what binder tab you have, Your Honor,

21  I have a different numbering.  It's (x) in the covenant

22  section, it's on Page 11 of the --

23        MS. GOLDSTEIN:  Tab 14.

24        MR. SILVERSTEIN:  Tab 14, Your Honor, Page 10.

25        That Covenant A should not be there because it's not

31

1  appropriate if this DIP ends up finally approved by this Court

2  at a subsequent hearing.

3           THE COURT:  Fine.  So that's -- do you agree that

4  that's an issue for a final hearing or you're saying I need to

5  rule on that now?

6           MR. SILVERSTEIN:  I think you should not include that

7  now and say that any covenants such as that should wait for a

8  final hearing because it's not appropriate now and basically

9  what's happening here as I can see -- and, again, it's very

10 early in the case and we've not seen the financials of the

11 company recently so we don't know as a matter of fact whether

12 they need the money or not or how necessary a DIP is, if it

13 turns out a DIP is necessary we're going to have to deal with

14 that, but I think that should not be in the DIP at this point

15 in time and my point, Your Honor, is that the DIP, I believe,

16 is being used strategically.  If I'm wrong, I'm wrong, but it

17 seems to me that all rights of creditors need to be preserved

18 on this issue and if the debtor's testimony is that they need

19 the cash I can understand that the Court is not in a position

20 to say, you don't need the cash, because I don't have evidence

21 today to say they don't need the cash, but this should be

22 approved with the most minimal provisions for the lenders.  The

23 lenders are getting a super priority.  At present, I'm not

24 going to object to the ten percent interest rate on the DIP.

25 The LIBOR is set at three plus seven.  But there should not be

32

1   bells and whistles such as this covenant.

2          That's basically the position.  This case is, again,

3   an eighteen month old case out of court.  There's a history in

4   this case.  If a DIP is done solely on an interim basis without

5   any bells and whistles, without any advantage to the insiders

6   who are essentially as I said before, you know, fighting to

7   save their little candystore that they live off, that's fine

8   but more than that is not appropriate under the circumstances.

9          THE COURT:  You're saying the covenants on Page 11,

10  subparagraph (x) --

11         MR. SILVERSTEIN:  Yes, subparagraph (x), subparagraph

12  (a) within the Romanette ten, within the (x), "To enter into

13  any transaction or consolidation to convey, sell, lease,

14  sublease, transfer, otherwise dispose of," I mean that's a

15  serious provision for a DIP loan and it's not appropriate

16  particularly on an interim basis at this point and I don't

17  think it's necessary and I don't think the debtor would

18  credibly argue that they need it.  It's a very bad message to

19  my clients and I don't think Your Honor needs to approve that

20  so if Your Honor is going to approve a DIP loan as I suspect

21  you will I think it has to be approved on the most minimal

22  standard super priority interest rate, no fees at this point,

23  and so again, as to the cross-examination, I think that's

24  probably taking up too much of your time, Your Honor, because

25  this is interim-interim and very preliminary.

33

1          THE COURT:  There's a lot of modifiers there.

2          MR. SILVERSTEIN:  There's a lot of modifiers and I

3  apologize for that.

4          THE COURT:  All right.  Ms. Goldstein.

5          MS. GOLDSTEIN:  Your Honor, I would like to respond

6  to a few points.

7          I think the first point made by Mr. Silverstein is

8  that the testimony that I proffered on behalf of Mr. Delano

9  indicated that the DIP loan in the interim was needed only as a

10  cushion.  That was not the testimony.  If I may repeat, the

11  testimony was that while the debtor does not anticipate using

12  all of the $2 million, the budget attached to the motion shows

13  that there will be a shortfall of approximately $1 million in

14  the interim period and that it would be critical because I

15  think that as we all understand, particularly at the beginning

16  of a case, there will be fluctuations particularly in

17  receivables collections, particularly in how much trade credit

18  the company gets.  So having the extra million available would

19  be very important to the stability of the debtor.

20          So we're not just talking about a cushion that's

21  nice, we're talking about actually projecting a use of a

22  million and really needing to have the excess to prevent

23  shortfalls.  So that's the first response.

24          The concerns expressed by Mr. Silverstein about

25  management entrenchment, etc., that really has nothing to do

34

1    with this DIP loan.  This is a one issue case, Your Honor.

2    This is about ultimately at the end of the day allocation of

3    equity.  This is not an operational restructuring.

4    Unfortunately, this has been bifurcated so we had discussion in

5    front of Judge Glenn earlier today about the fact that the pre-

6    petition solicitation of bids for this company indicated that

7    the market value of the assets were significantly in excess of

8    the debt.  There is no intention here to keep debt, to keep

9    equity and not pay creditors, indeed, the intention is to file

10   a plan promptly that provides full value to all creditors and

11   preserves a certain amount of equity for the current equity.

12       So I don't think we need to characterize the

13   insiders, we don't need to characterize the management.  There

14   is nothing in this DIP loan that requires conversion to equity.

15   In fact, the DIP lenders -- the documentation requires that

16   they get paid just like any other DIP lender.  So we are not

17   here today to presume what the plan negotiations will be like,

18   these are plan issues; what the capital structure will be, how

19   to value the recovery to the bondholders.  That will all be

20   taken up not in connection with certainly this interim DIP

21   hearing but at the appropriate time when we talk about plans

22   and disclosure statements.

23       With respect to the covenant that Mr. Silverstein is

24   talking about, let me point out that that is not an unusual

25   covenant.  What it says is that you can't sell assets without

35

1    paying the DIP loan.  It doesn't say you can't do it and if Mr.
2    Silverstein would like a representation from me as counsel that
3    we are not filing any motion to sell assets between now and the
4    final hearing I will give that with my client's blessing.
5    That's not what this case is about.  If there is a motion to
6    sell assets they can object to it because we can't do that
7    without coming to court.  We can't sell assets out of the
8    ordinary course of business without coming to court.  All this
9    says is that the DIP lenders would be paid unless they agree
10   otherwise.  This is a fairly standard provision.
11           The other thing I'd like to point out is that the
12   fact that we have two insiders participating as DIP lenders,
13   the terms of it being subordinated with a super priority claim
14   and unsecured were disclosed to Mr. Silverstein probably within
15   the last two weeks.  He made some indication that perhaps some
16   of his clients would be interested but we have not received any
17   indication of interest; no proposal, no term sheet to evaluate.
18   Again, there is nothing in the DIP loan that would preclude
19   this DIP loan being totally taken out and replaced by a DIP
20   loan on better terms.  As I said before, I think we would have
21   to get the senior secured lender to agree.  I couldn't imagine
22   that if the terms were better or equal that they would have a
23   problem but there is nothing in the DIP loan that is of any
24   kind of strategic point.  You know, the deadlines are not
25   imposed by the DIP lenders in terms of the plan, they're

36

1   imposed by the pre-petition secured lender.  The debtor didn't

2   have a problem with any of that because they intend to move

3   quickly with a plan and try to proceed as efficiently and as

4   expeditiously as possible.

5        So I think, Your Honor, the only issue left is the

6   fee.  This is a loan that is going to be used.  We project

7   usage during the interim period.  There isn't any reason

8   whatsoever -- this is not a strategic play by anybody because

9   we've assured the Court that other proposals will be

10  entertained, no sales of assets are going to be made in the

11  interim period but the fact that two out of the three lenders

12  are insiders doesn't mean that they can't be fairly compensated

13  for making this cash available.  This cash is going to be used

14  to support the operations and we're asking only for $40,000.00

15  which is half of the fee to be paid now and the other half to

16  be paid later.  Indeed, Your Honor, you've seen many DIP loans

17  as have I where the bank demands the full payment of the fee in

18  advance.

19       Mr. Tishler, counsel for the secured creditors is

20  acknowledging that because I'm sure -- I think at one point we

21  saw a DIP proposal from them and it would not have been on

22  terms like this.

23       So, Your Honor, we would request that the DIP loan be

24  approved on an interim basis.  You have my representation that

25  there will be no sales of assets and no motion to sell assets

37

1   between now and the interim hearing and, again, you have my

2   assurance that the documents do not contain any provision

3   required by the DIP lenders that would preclude an alternative

4   that would preclude a take-out but in order to get money today

5   and to have funds available between now and the first day that

6   we could possibly have a final hearing which is April 16th the

7   debtor really does need $2 million.  It anticipates spending as

8   much of about a million of that and we can't project.  If

9   receivables don't come in as projected, if there are customers

10  who hold back or suppliers who don't give credit they may need

11  to use more than that $1 million.

12          THE COURT:  All right.

13          MR. SILVERSTEIN:  Your Honor, very briefly, may I?

14          THE COURT:  Go ahead.

15          MR. SILVERSTEIN:  Thank you.  Again, for the record

16  Paul Silverstein of Andrews, Kurth for the ad hoc bondholders

17  committee.

18          MR. SILVERSTEIN:  Your Honor, I think Ms. Goldstein

19  used the correct word, that my client's concern here is about

20  entrenchment.  That's what we believe this case is about and it

21  seems to me that we don't want a DIP loan to have any impact on

22  plan issues here and we want to make certain that replacing

23  that DIP loan if it is approved on a final basis is cost

24  effective and not made more difficult by payment of $40,000.00,

25  albeit $40,000.00 does not seem like a huge amount of money it

38

1    adds up in a $2 million draw.  So what we are concerned about

2    is that it not change the dynamics and skew the dynamics toward

3    the insider group that as I indicated before is attempting to

4    entrench itself and control this company to the detriment of

5    creditors.

6            Again, I know words are easy to say just as Ms.

7    Goldstein's words are easy to say and we'll get to the details

8    on those matters at a subsequent date.  Today is not the day

9    for that but I would urge Your Honor just to sanitize this

10   interim preliminary DIP loan as much as possible by addressing

11   the covenant, notwithstanding Ms. Goldstein's comments, and by

12   addressing the fee.

13           Thank you.

14           THE COURT:  All right.  Now, what I'd like to do

15   before I rule -- before I rule I was going to say the U.S.

16   Trustee can have an opportunity to review whatever changes were

17   made.  It's my understanding that there were some changes made

18   to reflect concerns raised by the U.S. Trustee that they hadn't

19   seen the changes or were in the process of reviewing those

20   changes?

21           MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg from

22   the U.S. Trustee's Office.

23           I don't think we've seen --

24           THE COURT:  Fine.  That's enough said.

25           I'll take a five minute break, take a look at the

1  changes.  If you have any issues, when I come back out you can

2  tell me and if we need more time I'll give you more time but

3  their representation earlier before you were here was that the

4  changes that were made reflect the concerns that were raised

5  but we'll see.

6          MS. GOLDSTEIN:  There are some additional ones, Your

7  Honor, that need to be discussed.

8          THE COURT:  All right.  I'll come back at a quarter

9  to twelve.

10          ALL ATTORNEYS:  Thank you, Your Honor.

11                  (Recess.)

12          THE COURT:  Please be seated.

13          Ms. Davis, do you want to speak for Mr. Schwartzberg

14  because I don't see him or should we wait?

15          MS. DAVIS:  Your Honor, Mr. Schwartzberg was called

16  back to Judge Peck's chambers [inaudible].

17          I know I didn't have the edification of hearing the

18  prior proceedings with respect to the DIP but I am [inaudible].

19  Until he comes back [inaudible].

20          THE COURT:  What?

21          MS. DAVIS:  I'm going to sit in his place until he

22  comes back if that's acceptable to Your Honor.

23          THE COURT:  Well, no, the problem is we came back to

24  specifically find out whether he had any problems with the

25  changes that were made.

40

1          MS. DAVIS:  All right.  Well, I do not know and

2    cannot speak to it.  He's going to be back in maybe ten

3    minutes.  I'm sorry.

4          MS. GOLDSTEIN:  Your Honor, we agreed to -- we

5    believe that with one change that we've all agreed on that --

6    and I hate to speak for --

7          MS. DAVIS:  Well, just one moment [inaudible].

8          MS. GOLDSTEIN:  Yes.

9          MS. DAVIS:  Is this for the committee carve out?

10         MS. GOLDSTEIN:  Yes.

11         MS. DAVIS:  That's fine.

12         MS. GOLDSTEIN:  Okay.  On the committee carve out

13   issue, Your Honor, that I mentioned earlier, the draft that we

14   had filed said that they could not exceed $25,000.00 to

15   investigate the pre-petition secured creditors' liens.  We've

16   agreed to change that language to say that that would be an

17   amount not to exceed an amount which would be negotiated with

18   the committee.

19         MS. DAVIS:  And that's acceptable to us, Your Honor.

20         MS. GOLDSTEIN:  Our understanding is that with that

21   change the U.S. Trustee has no other issues.

22         MS. DAVIS:  That's correct, Your Honor.

23         THE COURT:  Thank you.  All right.  So we have

24   outstanding issues raised by the ad hoc committee.

25         With respect to the general issue of entrenchment, I

41

1   don't see any of these issues that were objected to creating an

2   issue regarding entrenchment at the level at which (1) the

3   amount of the $40,000.00 and (2) the fact that any sale would

4   have to be approved and there would certainly be an opportunity

5   to oppose that.  So I don't see the provision with respect to

6   the covenants really something that the Court should alter at

7   this point nor with respect to the fee.  The $40,000.00 can get

8   paid.  Obviously, that's without prejudice to raising issues

9   with respect to the balance of the fee or the covenants in that

10  section that was discussed earlier or any other issue at the

11  final.  But for purposes of the interim I will grant the

12  relief, overrule the objections and you may mark up and then

13  submit the order after showing it to counsel if any counsel are

14  involved in the marking up.

15          MS. GOLDSTEIN:  Yes, Your Honor.

16          THE COURT:  Now, a hearing date for the final.

17          MS. GOLDSTEIN:  Yes.

18          THE COURT:  I'll give you April 17th at two o'clock.

19          MS. GOLDSTEIN:  Thank you, Your Honor.

20          THE COURT:  That is a Thursday.  You can fill in

21  whatever other appropriate dates for responses, etc.

22          MS. GOLDSTEIN:  Okay.

23          THE COURT:  Now, I am assuming that I will handle the

24  balance of the cash collateral DIP loan.  Obviously, if that

25  changes then you will be notified and take it from there.

42

1          MS. GOLDSTEIN:  Yes, Your Honor, we're making that

2    assumption.  We'll notice it for your Court for April 17th at

3    two o'clock and thank you very much, Your Honor.

4          THE COURT:  All right.  Thank you.

5                         *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

* * * * *

1

2      I certify that the foregoing is a transcript from an

3  electronic sound recording of the proceedings in the above-

4  entitled matter.

5

6                      _____

7                              CARLA NUTTER

8

9  Dated:  April 8, 2008

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25