```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      ---------------------------------------X
        In Re:                                 :   08-11153 (MG)
 4                                             :
            LEXINGTON PRECISION CORPORATION,   :   One Bowling Green
 5                                             :   New York, New York
                      Debtor.                  :   April 2, 2008
 6      ---------------------------------------X

 7
                           TRANSCRIPT OF MOTIONS
 8                 BEFORE THE HONORABLE MARTIN GLENN
                     UNITED STATES BANKRUPTCY JUDGE
 9

10      APPEARANCES:

11

        For the Debtors:          MARCIA GOLDSTEIN, ESQ.
12                                 Weil, Gotshal & Manges LLP
                                   767 Fifth Avenue
13                                 New York, New York  10153

14      For the Bondholders:      PAUL SILVERSTEIN, ESQ.
          Committee                Andrews Kurth LLP
15                                 450 Lexington Avenue
                                   New York, New York  10017
16
        For Lubin Partners:       GERALD C. BENDER, ESQ.
17                                 O'Melveny & Myers LLP
                                   7 Times Square
18                                 New York, New York  10036

19      For the U.S. Trustee:     Office of the United States Trustee
                                   BY:  TRACY HOPE DAVIS, ESQ.
20                                 Assistant United States Trustee
                                   33 Whitehall Street
21                                 New York, New York  10004

22      For Webster:              SCOTT A. ZUBER, ESQ.
                                   Day Pitney, LLP
23                                 200 Campus Drive
                                   Florham Park, New Jersey  07932
24

25
                              (Appearances continued on next page)
```

APPEARANCES CONTINUED:


For Capital Source:          AARON R. CAHN, ESQ.
 Funding                     Carter, Ledyard & Milburn LLP
                             8 Wall Street
                             New York, New York  10005

For Secured Lenders:         JOHN TISHLER, ESQ.
                             Waller, Lansden, Dortch & Davis LLP
                             Nashville City Center
                             511 Union Street
                             Nashville, Tennessee  37219

Court Transcriber:           CARLA NUTTER
                             TypeWrite Word Processing Service
                             356 Eltingville Boulevard
                             Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

3

1          THE COURT:  Good morning, counsel.

2          We're here on No. 08-11153, <u>Lexington Precision Corp.</u>

3          Before we begin I want to bring to everyone's

4  attention a matter that my chambers discovered last night and

5  advised the debtor's counsel; in reviewing the first day motion

6  papers, specifically with respect to the debtor-in-possession

7  financing motion, in reviewing those papers we observed that

8  O'Melveny & Myers is counsel to the DIP lenders.  I am a

9  retired partner of O'Melveny & Myers and receive retirement

10  income from the firm.  Consequently, I may not hear any matter

11  in which O'Melveny & Myers appears.  That doesn't necessarily

12  mean that I need to recuse from the entire case but I do need

13  to have a better understanding of the role that O'Melveny &

14  Myers has in this matter.  As I say, the only place where we

15  observed this was in the debtor-in-possession motion.  So to be

16  clear, at a minimum I will not hear the DIP and cash collateral

17  motions.  Another Judge is prepared to hear those this morning.

18          The issue for me is whether I need to recuse myself

19  from the entire case or only from the DIP and cash collateral

20  motions.  As I say, we advised -- one of my clerks advised

21  Weil, Gotshal of these basic facts last night.  No one else who

22  is here was aware of that.

23          Let me ask -- and this isn't going to be the final

24  word on it -- but whether any parties-in-interest, debtor or

25  anyone else, objects to my handling of matters other than the

4

1   DIP and cash collateral motion?  I don't mean to put anybody on

2   the spot and no offense will be taken by it.  So if the case

3   needs to go back on the wheel, it will go back on the wheel

4   this morning.  I still reserve the right -- after I understand

5   better what O'Melveny's role is I may decide that I need to

6   recuse myself anyway but maybe somebody could address what

7   O'Melveny's role is.

8           MR. BENDER:  Good morning, Your Honor.  Gerald Bender

9   of O'Melveny & Myers.

10          THE COURT:  We've never met before.

11          MR. BENDER:  We've never met before.

12          THE COURT:  Mr. Bender came to the firm after I left.

13          MR. BENDER:  That's correct, Your Honor.  Just last

14  May.

15          I have been representing Lubin Partners and acting on

16  behalf of the DIP lenders in connection solely with respect to

17  the DIP loan that they offered to make and agreed to make on

18  behalf of the debtors and for the past, I'd say, three or four

19  weeks we've been engaged in negotiations and discussions with

20  the debtors and interacting with the pre-petition lenders with

21  respect to that DIP loan and the cash collateral and how the

22  two would work together and --

23          THE COURT:  Let me ask you, Mr. Bender, in reviewing

24  -- I think it was probably the 1007 affidavit -- last night I

25  observed that Mr. Lubin is also one of the owners of subdebt

5

1   and I don't know whether that's through Lubin LLC or held

2   differently.  He's also a common stockholder.  Are you

3   representing Mr. Lubin or the holder of the subdebt?

4           MR. BENDER:  I think that was the general idea but I

5   haven't discussed that with Mr. Lubin but, honestly, Your

6   Honor, it's just really been with respect to the DIP loan and I

7   have not had any actions or interactions with respect to

8   anything else.  So if that's a problem, then the answer is I

9   won't have to do that.

10          THE COURT:  All right.  Thank you, Mr. Bender.

11          MR. BENDER:  Okay.  Thank you.

12          THE COURT:  Does someone else want to be heard on

13  this subject?

14          MR. SILVERSTEIN:  Yes, Your Honor.  Paul Silverstein

15  from Andrews, Kurth.  I represent the ad hoc bondholders

16  committee in this case.

17          THE COURT:  Yes.

18          MR. SILVERSTEIN:  This is about eighteen months old

19  although it's not been in this Court.  It's been --

20          THE COURT:  Right.

21          MR. SILVERSTEIN:  -- an attempt to simulate what

22  should have happened outside this Court.

23          I don't really have a position on Your Honor's

24  comments about the O'Melveny connection but I think Your Honor

25  needs to be apprised of the facts just so Your Honor can

6

1  understand what's going on here.

2          THE COURT:  Yes.

3          MR. SILVERSTEIN:  This is basically from our

4  perspective an effort by Mr. Lubin, Mr. Delano, by those who

5  manage this company and own the significant equity stake in

6  this company to essentially entrench themselves and keep this

7  company to the detriment of the creditors who obviously want to

8  be paid.  So Messrs. Lubin and Delano occupy a lot of roles

9  here; not only do they own some subordinated debt, they have

10  some of the bond debt of which my clients own 75 percent of,

11  they own 50 odd percent of the equity and so, again, this

12  doesn't address your comments --

13          THE COURT:  Yes.

14          MR. SILVERSTEIN:  -- and Your Honor will deal with

15  that as Your Honor deems appropriate and sees fit and I'm sure

16  I don't have an objection but the history that's painted in the

17  pleadings that were submitted in connection with the first day

18  of the petition are to a large extent fictionalized in terms of

19  the history so there's another story which we would like at

20  some point to tell.  I know today is not the day to tell the

21  whole story --

22          THE COURT:  Right.

23          MR. SILVERSTEIN:  -- but I think we'd like to touch

24  on some of those points.  That's my only comment on that.

25          THE COURT:  Okay, Mr. Silverstein, thank you.  Anyone

7

1   else want to be heard on this subject?

2          MS. GOLDSTEIN:  Your Honor, Marcia Goldstein of Weil,

3   Gotshal on behalf of the debtors.

4          We do not object to Your Honor conducting the case.

5   We understand your issue with respect to the DIP loan and cash

6   collateral motions.  I do take issue for the record that

7   anything in our pleadings is fictionalized, I just want to be

8   sure that Your Honor understands that and --

9          THE COURT:  I thought you were going to agree but I

10  mean I'm surprised --

11          MS. GOLDSTEIN:  -- we will reserve arguments about -

12  - this is a one issue case which you'll identify as you proceed

13  with it.  It's about the valuation of the company and the

14  allocation of the equity and there will be evidence -- not on

15  the first day, of course.

16          THE COURT:  Yes, and I see that from the 1007

17  affidavit that management believes that there's substantial

18  equity value so I understand that will be an issue.

19          MS. GOLDSTEIN:  Yes.  But, Your Honor, I would point

20  out as you, yourself, identified that Mr. Lubin and Lubin

21  Partners, in particular, Mr. Delano is not part of the DIP

22  lenders so I just want to clarify that.  But we represent the

23  company.  So Weil, Gotshal will not be representing Mr. Lubin

24  or Mr. Delano in any individual capacities in this case --

25          THE COURT:  Okay.

8

1          MS. GOLDSTEIN:  -- and there may be a time -- it

2  hasn't happened yet -- where Mr. Bender is asked to represent

3  Mr. Lubin or Lubin Partners.  I can't answer that question and

4  it would probably not be the case if they would seek multiple

5  lawyers with their multiple hats.  So I just wanted to make

6  sure that everybody understood our role versus the potential

7  role of O'Melveny.

8          THE COURT:  Okay.  Is anyone here from the UST?

9          MS. DAVIS:  Good morning, Your Honor, Tracy Hope

10  Davis, assistant U.S. Trustee to Diana Adams, the U.S. Trustee.

11  I haven't had the pleasure of appearing before you.

12          THE COURT:  Good morning.

13          MS. DAVIS:  I have nothing to comment on with respect

14  to Your Honor's decision as to whether or not you would keep

15  the case or not.  I'll communicate to Your Honor that we have

16  been in lengthy discussions with debtor's counsel with respect

17  to this case for, I would say, probably the last two to three

18  weeks.  I will add to that, however, Your Honor, that,

19  unfortunately, we were not able to get blackline copies with

20  respect to some -- reflecting some of the concerns that we

21  raised until just this morning.  While counsel did send them to

22  us last night it was after, unfortunately, our hours that we

23  keep in our office.

24          THE COURT:  Right.

25          MS. DAVIS:  So it's possible that some of our

9

1  communications might slow up your proceedings but what we would

2  request, Your Honor, respectfully -- and I did confer with

3  counsel very briefly to advise her -- we may ask that any order

4  that Your Honor considers today or that your successor if that

5  should occur considers today, we have an opportunity to review

6  before they get entered.

7         THE COURT:  Okay.

8         MS. DAVIS:  Thank you.

9         THE COURT:  All right.  Ms. Goldstein.

10        MS. GOLDSTEIN:  Your Honor, I would just like to make

11 one correction.  Mr. Lubin just advised me that it is not the

12 case that O'Melveny would be asked to represent Mr. Lubin

13 individually.

14        THE COURT:  In what?

15        MR. GOLDSTEIN:  Mr. Lubin individually with respect

16 to individual holdings.

17        THE COURT:  Okay.  All right.

18        I'm reserving decision whether to recuse myself

19 entirely from the case.  We'll proceed now with the first day

20 motions other than the DIP and cash collateral motions.  These

21 are, really, for the most part administrative and so if someone

22 winds up inheriting the case today, you know, so be it.  But

23 we'll go forward with that.

24        Let me ask, does anybody else want to be heard on

25 this recusal issue?

10

1                    [No response.]

2          THE COURT:  Okay.  My chambers will advise you --

3    we'll see what time we finish.  I think we had told Weil,

4    Gotshal last night -- I have an all-day mediation starting at

5    ten o'clock so we'll go as far as we can on matters but we're

6    adjourning, certainly, a few minutes before ten o'clock and

7    with respect to who will handle the DIP and cash collateral

8    motions, I need to confer with Chief Judge Bernstein -- if he

9    is able to confer with me because of the Weil, Gotshal

10   connection -- about who will handle the DIP and cash collateral

11   motions and whether just on the recusal issue generally, I

12   think that he won't be impaired from talking about those

13   issues, he just can't take the case.  So at least one of my

14   colleagues has already indicated he is available later this

15   morning to handle the cash collateral and debtor-in-possession

16   financing motion but, Ms. Goldstein, are you going to speak?

17         MS. GOLDSTEIN:  Yes.

18         THE COURT:  Go ahead.

19         MS. GOLDSTEIN:  Your Honor, first, I know that you

20   have a full day today on another matter and we appreciate your

21   making the time early this morning.  Let me make some

22   introductions.  My team is here; Victoria Barns [Ph.] at

23   counsel table, Don Rubick [Ph.] behind her and there's probably

24   Conraid -- I can't see him but Conraid Sang [Ph.] is also here.

25         Also, from the company, I would like to introduce you

1    to three of their executive officers who are here; Michael

2    Lubin [Ph.], who is sitting in the second row who is the

3    chairman of the board of directors and co-chief executive

4    officer, Warren Delano, right behind me who is the president

5    and co-CEO and Dennis Welhouse [Ph.], who is the senior vice

6    president and chief financial officer.

7             I think from the standpoint of, I know, your time

8    today -- although I guess we opened up a little more time --

9             THE COURT:  We did.

10            MS. GOLDSTEIN:   -- what I would propose is give a

11   little bit of background on the company, a very brief summary

12   of the circumstances of the filing and then proceed with the

13   first day motions, at least the procedural motions.

14            THE COURT:  Okay.  Anything that's in the 1007

15   affidavit I've read carefully so you don't need to repeat

16   what's in the affidavit.

17            MS. GOLDSTEIN:  We won't take a lot of time on those.

18            THE COURT:  Okay.

19            MS. GOLDSTEIN:  With respect to substantive motions

20   other than the cash collateral and DIP financing, we do have

21   three motions that come up under Section 363; a motion to pay

22   the common carriers, a motion to continue a customer program

23   and also a motion to pay wages and to continue employee

24   benefits.  I do have some proffers of testimony from Mr.

25   Welhouse on those.  Then we also, Your Honor, had filed -- we

12

1    also have a cash management motion and we had filed a motion

2    with respect to investment guidelines.  Because the U.S.

3    Trustee would prefer that that not be considered until the

4    final hearing, on reflection yesterday we determined that we

5    would not proceed with the investment guideline motion today

6    but, instead, ask the Court to defer it to the final hearing

7    and we've modified our proposed order on that.

8              THE COURT:  Okay.

9              MS. GOLDSTEIN:  So basically we're asking you for a

10   hearing date rather than a substantive ruling.

11             THE COURT:  All right.

12             MS. GOLDSTEIN:  We did file an affidavit from Epic

13   Systems.  We will be asking for approval to retain them but in

14   the meantime there is an affidavit from them that notice of the

15   commencement of the case and of this hearing has been faxed to

16   the largest thirty creditors and we did send copies of the

17   first day pleadings to the U.S. Trustee, bondholders' counsel,

18   that's Mr. Silverstein, and John Tishler, who is counsel -- he

19   is here -- for the pre-petition senior secured lender.

20             With respect to the blacklined pleadings, I will be

21   in a position to provide the Court with what the changes are.

22   Most of the blacklining was in the DIP and cash collateral

23   motion because we were discussing many of those things with the

24   bank counsel right until yesterday.

25             THE COURT:  Right.

13

1          MS. GOLDSTEIN:  So I think, frankly, that with that

2     being a little later this morning there probably is time to go

3     through those items with the U.S. Trustee.

4          THE COURT:  Okay.

5          MS. GOLDSTEIN:  In terms of the background to the

6     company, we have filed two debtors; Lexington Precision

7     Corporation and Lexington Rubber Group, Inc.  Lexington Rubber

8     Group, Inc. is a wholly-owned subsidiary of Lexington Precision

9     Corporation.  They have a number of businesses which we'll talk

10    about but it's two companies.  The corporate headquarters is in

11    New York, New York, there's also an administrative office in

12    Cleveland, Ohio and manufacturing divisions in Rochester, New

13    York; Jasper, Georgia; Rockhill, South Carolina; Vienna, Ohio

14    and North Canton, Ohio.  As of the end of February, Lexington

15    had approximately 665 employees.  Lexington manufactures large

16    volumes of high quality rubber and metal components for use

17    primarily in automobiles and medical devices.  There are two

18    operating segments not surprisingly called the rubber group and

19    the metals group.  The rubber group comprises the majority of

20    Lexington's assets; manufacturing high-precision rubber

21    components for the automotive and medical device industry.

22    Their products include insulators for ignition systems,

23    connector seals for wire harnesses and molded rubber products

24    medical devices.  Manufacturing these products at specified

25    product lines, the rubber group has actually excelled in

14

1   manufacturing high-tolerance parts that others in their

2   marketplace have not achieved.  The metals group manufactures

3   high-volume aluminum, brass, steel and stainless steel

4   components, machines from bars, forgings and cold-headed

5   blanks, primarily for automotive customers.

6           Now, to put some context to what I just said in terms

7   of all those parts, we do actually have with us the pieces that

8   our client manufactures.  I'm not making an offer of evidence

9   of any kind but it could put some context to what this company

10  does.  May we approach?

11          THE COURT:  Certainly.

12            [Court examining pieces of equipment.]

13          THE COURT:  Okay.

14          MALE VOICE:  Well, I don't know if they want to a

15  speaking objection [sic].

16          THE COURT:  You can take them now or later.  It's

17  okay.  Sure.

18          MS. GOLDSTEIN:  Your Honor, we'll take them back at

19  the appropriate time but we thought it would put context to

20  your -- these are technologically advanced components and they

21  actually occupy a significant market share in their markets and

22  they sell these rubber and metal components to other

23  manufacturers, particularly, Tier 1 automotive suppliers which

24  include General Cable Corp. and Delphi Corp. and also,

25  increasingly, these are sold in the after market.

15

1              In terms of the company's capital structure, the

2     company has secured loans pre-petition from Capital Source

3     Finance Company, a revolver and term loan in the aggregate

4     amount of approximately $21 million.  That is secured by a

5     first priority lien on all of the debtor's personal property

6     and a second priority lien on the real property.  CSC Mortgage

7     is also a secured lender with term loans in the aggregate

8     amount of $15 million, the majority of which is outstanding and

9     they have a first priority lien on the debtor's real property

10    and a second priority lien on personal property.  So,

11    essentially, between those two loans all the debtor's property

12    is encumbered.  Unsecured debt is comprised of senior

13    subordinated notes which were issued by Lexington Precision in

14    the amount of approximately $34 million.  It's senior

15    subordinated notes and they're due August 1st or were due

16    August 1, 2009 with interest payable quarterly and that is one

17    issue of notes in which Mr. Lubin and Mr. Delano hold

18    approximately 22 percent.  There are junior subordinated notes

19    in the amount of $346,000.00 with interest payable quarterly.

20    Mr. Lubin is the sole holder of those notes.

21              THE COURT:  When you say he's the "holder," is it

22    through Lubin LLC or does he hold it differently?

23              MS. GOLDSTEIN:  I believe these are held by Mr. Lubin

24    individually.

25              THE COURT:  I'm sorry?

16

1          MS. GOLDSTEIN:  Individually.

2          THE COURT:  Thank you.

3          MS. GOLDSTEIN:  The trade debt of Lexington as of the

4   last count was $6.8 million.  The equity holdings, Your Honor -

5   - this is a publicly-traded company with over $5 million shares

6   of common stock outstanding and 3,300 shares of preferred

7   stock.  Now, although it is a publicly-traded company, it's

8   traded over the counter and very, very thinly traded with only

9   .2 percent of the outstanding stock traded during the past six

10  months.  Approximately seventy percent of the common stock is

11  held by Lexington Precision's officers, directors and

12  affiliates.  As of the year-end, the unaudited consolidated

13  financial statements reflected assets at book value totaling

14  approximately $52.6 million, liabilities totaling approximately

15  $88.5 million --

16          THE COURT:  What's the status of the audit?

17          MS. GOLDSTEIN:  I am not sure, Your Honor, what the

18  status of the audit is.  I can --

19          MR. WELHOUSE:  The audit has just been finished and

20  we're in the process of completing the Form 10(k).

21          MS. GOLDSTEIN:  Your Honor, I don't know if you heard

22  Mr. Welhouse but the audit is being finished and we're in the

23  process of completing the 10(k).

24          THE COURT:  Okay.  Who are the auditors?

25          MS. GOLDSTEIN:  The auditors?

17

1          MR. WELHOUSE:  Maile & Berquist [Ph.], Pittsburgh.

2          MS. GOLDSTEIN:  Now, I mentioned the book value of

3     the assets, however, I think as Your Honor indicated, you noted

4     in our papers the debtors believe that indicative letters of

5     intent that Lexington received in connection with its an

6     attempt at an out-of-court restructuring would indicate that

7     the market value of these assets significantly exceeds $52.6

8     million book value.  Just as an example, one of the facilities

9     -- the Rockville facility -- has a book value of $5 million

10    but, specifically, a purchase offer for that facility gave an

11    indicative value of $32 million.

12          So one issue in this case, as you can tell from the

13    opening remarks of counsel, and perhaps the only issue that

14    will be disputed down the road is the valuation of this

15    company.  The debtors have a positive EBITDA, which is another

16    factor that will go into that consideration and in fact the

17    consolidated revenues and EBITDA from the rubber and metals

18    group in 2007 were approximately $88.5 million and $11.7

19    million respectively.

20          THE COURT:  So what's the annual debt service then?

21          MS. GOLDSTEIN:  The annual debt service -- I don't

22    think I have that number handy.  I can get that number for you,

23    Your Honor, but the annual debt service --

24          THE COURT:  Well, I understand you've got great

25    EBITDA but that's before paying interest so --

18

1          MS. GOLDSTEIN:  We understand.  This is a balance

2    sheet restructuring.

3          THE COURT:  Right.

4          MS. GOLDSTEIN:  The company today is over-levered.

5          THE COURT:  I would be interested in knowing what the

6    annual debt service has been but, go ahead, Ms. Goldstein.

7          MS. GOLDSTEIN:  Okay.  We'll get you that figure.

8          As I indicated in terms of the financial

9    circumstances of the company at least from the debtor's point

10   of view these are health businesses generating revenue but they

11   do require a restructuring of the balance sheets; I'm talking

12   about over-leverage and also interest rates that at some point

13   were excessive in today's market.

14          In terms of their business, again, they are the

15   leading manufacturer of insulators for automobile ignition

16   systems and hold 55 percent of the after market and thirty

17   percent of the OEM market in that business and the leading

18   manufacturer of connector seals in North America.  As far as

19   the medical division is concerned, the net sales are $16

20   million.

21          Your Honor, the point of all of this is really just

22   to show what the operations are like.  We'll be getting into

23   this much more detailed later in the case.

24          THE COURT:  All right.

25          MS. GOLDSTEIN:  Despite this business being a healthy

19

1   and solid and revenue-generating business they have, indeed,

2   been impacted by the decline in the U.S. based auto parts

3   manufacture in the U.S. auto industry and this has had an

4   effect upon their sales volume.  I mentioned that one of their

5   largest customers, Delphi, is still in Chapter 11.  They have

6   suffered in recent times some liquidity issues.  There have

7   been reductions in orders because of the auto industry

8   situation, also, start-up costs for Rock Hill's division's

9   program for surgical devices and, frankly, it's been this

10  combination of factors impacting the company's liquidity that

11  led to missed interest payments on the senior subordinated

12  notes starting in November 2006.  That caused cross-defaults to

13  the secured facilities and until recently the company was able

14  to engage in negotiations with these parties and have

15  forbearance agreements with the secured lenders.  The cost of

16  those forbearance agreements, however, has been significant;

17  over $2.1 million in fees and expenses to date with respect to

18  a secured lender forbearance agreement and with respect to the

19  ad hoc committee of senior subordinated notes which essentially

20  is comprised of six hedge funds which hold approximately 74

21  percent of the senior subordinated notes.  So when you add that

22  to the 22 percent that is owned by Mr. Lubin and Mr. Delano the

23  entire issue is practically accounted for.  The exchange with

24  the bondholders for a forbearance agreement was pushing the

25  interest rate from twelve to sixteen percent and so accrued and

20

1    unpaid interest on the bonds today is $8.8 million.

2            In terms of Lexington's efforts at restructuring and

3    deleveraging, they've hired W.Y. Campbell [Ph.].  We will be

4    filing a motion to retain them in this case but pre-petition

5    they were hired to assist in selling some of the assets.  They

6    solicited numerous offers for various assets including the

7    latest offer that I've already mentioned which was to purchase

8    the rubber group's Rock Hill, South Carolina facility for $32

9    million.  The debtors also went out to seek alternative

10   financing for the company and they did get a commitment for a

11   loan that would replace the existing secured facilities.  Your

12   Honor, we think that commitment, although it will have to be

13   redone, forms the basis for an ability to get exit financing

14   for this company down the road.  However, in late January the

15   forbearance agreements with both the subordinated noteholders

16   and with the senior lenders expired.  The company sought a

17   further extension from the ad hoc committee to pursue the Rock

18   Hill sale but the ad hoc committee's terms were not acceptable

19   to the company and were not achievable by the company and any

20   further discussion was not successful.

21           It's the company's view that unlike other automotive

22   part suppliers currently in bankruptcy, the debtors believe

23   that their businesses have been less adversely effected by

24   recent economic conditions because a substantial portion of

25   their business is derived from after market products that's 55

21

1  percent and also the high manufacturing standard of their

2  product makes it difficult for other manufacturers to compete

3  with them for these specific products.

4         So, here we are, Your Honor.  Those are the

5  circumstances of the filing.  Again, this is a case about a

6  balance sheet restructuring.  I think at least this side of the

7  table -- the debtors and we think it's unfortunate that the

8  company had to seek Chapter 11 protection but it did become

9  apparent that we were at a stalemate with our bondholders as to

10  how to restructure the balance sheet and how to achieve long-

11  term viability for the company.  Continued discussions were not

12  leading anywhere and the company determined that Chapter 11

13  provided the best option at this time in terms of having a

14  resolution of these issues.

15         Again, because the company does not have any

16  overbearing operational issues, we don't have any major

17  contracts that we're seeking to reject, for example, no

18  collective bargaining agreements that we have to deal with.  It

19  is the company's intention to move forward as quickly as it can

20  to propose a plan and to exit Chapter 11 as expeditiously as

21  possible.

22         THE COURT:  Am I correct that two of the collective

23  bargaining agreements expire this year?

24         MS. GOLDSTEIN:  That is correct, Your Honor, although

25  we don't anticipate that -- those will be dealt with in the

22

1  normal course.

2           THE COURT:  Okay.

3           MS. GOLDSTEIN:  We do not anticipate having to come

4  to this Court to deal with the collective bargaining

5  agreements.

6           THE COURT:  All right.

7           MS. GOLDSTEIN:  As I mentioned, based on

8  conversations with a prospective lender we believe that we will

9  be able to achieve exit financing to refinance at least the

10 pre-petition senior secured facility.  The company also

11 believes that all creditors including the bondholders and

12 including trade should receive full value for their claims and

13 that there will be sufficient value for the equity.

14          So on that note of background, I'd like to turn,

15 first, to the procedural motions.

16          THE COURT:  Yes.

17          MS. GOLDSTEIN:  I don't know what order you'd like to

18 go in, Your Honor, but --

19          THE COURT:  Mr. Silverstein, you wanted to be heard?

20          MS. GOLDSTEIN:  I'm sorry?

21          MR. SILVERSTEIN:  If I may, Your Honor, I know again

22 this is a preliminary first day hearing but if I can have

23 thirty seconds to sixty seconds to basically comment on Ms.

24 Goldstein's background because it's not from our prospective

25 particularly accurate in certain respects.

23

1          THE COURT:  Just go ahead and do it rather than

2    giving a lead-in as to why you want to do it.

3          MR. SILVERSTEIN:  I'm asking permission to do that,

4    Your Honor.

5          THE COURT:  Yes, go ahead.

6          MR. SILVERSTEIN:  Thank you.

7          THE COURT:  You know, I'm -- go ahead.

8          MR. SILVERSTEIN:  Thank you, Your Honor.

9          THE COURT:  Nobody's positions are getting locked in

10   here.  These are first day motions.

11         MR. SILVERSTEIN:  I'm well aware of that and that's

12   why --

13         THE COURT:  Please, go ahead.  Just make your

14   appearance again for the record.

15         MR. SILVERSTEIN:  Paul Silverstein of Andrews, Kurth

16   for the ad hoc bondholder group.

17         Your Honor, Ms. Goldstein is correct that management

18   owns the bulk of the equity.  Management owns twenty percent of

19   the bonds that my client owns.  Management owns the

20   subordinated bonds.  We view this as essentially -- although

21   it's a public company it's essentially a closely-held company.

22         The purpose of management's efforts here are

23   essentially to preserve equity value and ownership for

24   management because this is fundamentally their candy store,

25   their business, it's what they do.

24

1          THE COURT:  There's nothing wrong with preserving

2     equity value, Mr. Silverstein.

3          MR. SILVERSTEIN:  Well, there's nothing wrong with

4     preserving equity value if you can appropriately deal with

5     creditors and, you know, in terms of the history of this case a

6     year and a half ago the bonds went into default.  My clients

7     entered into a forbearance agreement with the express

8     understanding in that forbearance agreement that the intent and

9     the goal was that my clients would be paid for the sale of the

10    business or some sort of a refinancing transaction or both.

11    The contemplation was never that the company would sell a

12    couple of assets, in particular, a key asset such as medical

13    and if you look at what the company is essentially attempting

14    to do here is to essentially to leave the bondholders with a

15    minority equity position so Mr. Lubin and Mr. Delano and that

16    crowd can keep control of the company and it's not payments

17    and, clearly, they're going to have to gerrymander an impaired

18    accepting [sic] class but that's way ahead of where we are

19    today.

20          THE COURT:  It is.

21          MR. SILVERSTEIN:  Way ahead of where we are today and

22    cram down issues are way premature.

23          But as far as -- Your Honor inquired how much

24    interest is and interest on the bonds --

25          THE COURT:  What's the annual debt service?

25

1          MR. SILVERSTEIN:  That service, I think, on the bonds

2    is roughly $6 million a year.  Indeed, the $11 million EBITDA

3    number that the debtor used in its papers, I believe, doesn't

4    reflect $2 million of corporate overhead so the numbers are a

5    little bit skewed and rather than take more time, my point to

6    you is that in terms of the dynamic of this eighteen month old

7    or approximately eighteen month old situation there's another

8    side of the story that obviously needs to be explained to the

9    Court.

10          THE COURT:  It doesn't effect joint administration

11   and all these other procedural --

12          MR. SILVERSTEIN:  It clearly doesn't effect -- it

13   effects the DIP which Your Honor is not dealing with but it

14   does effect joint administration.  We have no objection to

15   joint administration, we have no objection to paying employees,

16   we have no objection to --

17          THE COURT:  Whether it's me or someone else, you'll

18   have plenty of chance to express your views, Mr. Silverstein.

19          MR. SILVERSTEIN:  I'm well aware of that but I did

20   not want that to be forgotten and --

21          THE COURT:  That's fine.  Okay.  Because I have

22   limited time, let's move on with the motions.  Okay?

23          MR. SILVERSTEIN:  Sixty seconds.  I kept my word.

24          THE COURT:  Well, more or less.  Go ahead, Ms.

25   Goldstein.

26

1          MS. DAVIS:  Your Honor, if I may?

2          THE COURT:  Yes.  Just make your appearance, Ms.

3    Hope.

4          MS. DAVIS:  Yes.  Tracy Hope Davis for the U.S.

5    Trustee.

6          Your Honor, my points are two-fold.  We would like

7    for the order, as all of the orders, to be all inclusive.  They

8    should provide that the motions are granted to the extent

9    provided herein.  We would appreciate that but at the current

10   drafts they say the motion is granted and the reason that's

11   significant is one of the requested reliefs in the joint

12   administration order is that the debtor be allowed to file

13   consolidated monthly operating reports.  We have no problem

14   with that.  We'll probably confer with the debtor as to the

15   substance of those reports but we want a breakdown as to

16   disbursements per debtor.  Thank you.

17         THE COURT:  Okay.

18         Ms. Goldstein, I assume you have no problem with

19   respect to the form of the orders that get approved conferring

20   with the UST.

21         MS. GOLDSTEIN:  No.

22         THE COURT:  I'll be here all day and anything that

23   gets approved, if you get the orders to me by the end of the

24   day they'll get entered today.  Okay?

25         MS. GOLDSTEIN:  We shouldn't have a problem with

27

 1   showing the U.S. Trustee all the orders and making sure that

 2   she's comfortable.

 3                THE COURT:  I don't expect so.  Okay.

 4                MS. GOLDSTEIN:  Your Honor, we did ask for the debt

 5   service so we'll give you those figures before proceeding with

 6   the orders or the motions.

 7                THE COURT:  Okay.

 8                MS. GOLDSTEIN:  With respect to the bond debt at the

 9   contract interest rate of twelve percent, that would be a $4.1

10   million annual debt service.

11                THE COURT:  Right.

12                MS. GOLDSTEIN:  Sixteen percent is no longer relevant

13   because that terminated with the forbearance agreement.

14                THE COURT:  Right.

15                MS. GOLDSTEIN:  As to the bank debt, principal

16   payments that would be due under the bank agreement are $3.2

17   million a year and interest at the non-default contract rate,

18   $2.5 million.

19                THE COURT:  Okay.

20                MS. GOLDSTEIN:  With respect to the procedural orders

21   --

22                THE COURT:  Let's deal with joint administration

23   first.

24                MS. GOLDSTEIN:  Joint administration, Your Honor, I

25   wouldn't think there is anything controversial on that one.

28

1          THE COURT:  It's granted.  Okay.

2          MS. GOLDSTEIN:  We will show the form of order on all

3     of these to the U.S. Trustee.

4          THE COURT:  Okay.

5          MS. GOLDSTEIN:  I don't think it's -- it was in the

6     letter that we sent you, Your Honor, but we also will ask for

7     an order scheduling an initial case conference.  It is in the

8     binder that you received and maybe we'd like to talk about the

9     dates --

10         THE COURT:  Yes, we can talk about dates at the end

11    and we'll talk about dates on the assumption that I still have

12    the case.

13         MS. GOLDSTEIN:  Yes.  Another procedural order is a

14    request to extend the time to file schedules and statements of

15    financial affairs.

16         THE COURT:  You asked for 45 days, I think.  The U.S.

17    Trustee frequently wants to limit that to thirty but do you

18    have any problem with the 45 days?

19         MS. DAVIS:  We do not, Your Honor, and in fact just

20    for Your Honor's edification and the debtor's counsel's

21    edification, we anticipate having an organizational leader

22    [sic] in this case on April 11th and at that time we can maybe,

23    hopefully, call on the creditors committee with respect to

24    equity, I think, if that should arise [sic].  We'll communicate

25    with counsel to get the list [sic].

29

1          THE COURT:  All right.  So the request to extend the

2     time and file schedules is granted for the 45 days that you've

3     asked for.

4          MS. GOLDSTEIN:  Thank you, Your Honor.

5          We've also asked for authority for waiver to file a

6     list of creditors and for approval of the form and manner of

7     notifying creditors of the commencement of the case.  Instead

8     of filing a list of all creditors we would prefer to have the

9     noticing agent service notice of commencement on all creditors

10    and parties-in-interest.

11         THE COURT:  Let's deal with that first.  If that's

12    granted then this isn't going to be a problem.  So let's deal

13    with retaining the noticing agent.

14         MS. GOLDSTEIN:  Yes.  We propose, Your Honor, to

15    retain Epic Systems.  There are over 800 creditors and parties-

16    in-interest in this case so, therefore, retaining a noticing

17    and claims agent is necessary.  They will effect service of

18    motions and other pleadings, maintain the claims registry.  At

19    this time we're not seeking retention of Epic as balloting

20    agent, that may come later.  They are disinterested.  They've

21    filed an affidavit of Daniel --

22         THE COURT:  Just remind me which tab number in the

23    binder is that.

24         MS. GOLDSTEIN:  In Tab 11, Your Honor.

25         THE COURT:  Thank you.

30

1          MS. GOLDSTEIN:  They have filed an affidavit as to

2   their disinterest.

3          THE COURT:  Any objections on retaining Epic?

4          MS. DAVIS:  No, Your Honor.

5          THE COURT:  All right.  That motion is granted.

6          All right.  Now let's come back to the --

7          MS. GOLDSTEIN:  Now, let's go back to the list of

8   creditors.

9          THE COURT:  -- list of creditors.

10          MS. GOLDSTEIN:  So with the assistance of Epic we

11   would, instead, propose to have the noticing agent service

12   notice of commencement on all creditors and parties-in-

13   interest, publish notice in The Wall Street Journal and all

14   that would be done as soon as practicable once we know the 341

15   hearing date from the U.S. Trustee.

16          THE COURT:  Any objection to that?

17          MS. DAVIS:  No, Your Honor.

18          THE COURT:  All right.  That motion is granted as

19   well.

20          MS. DAVIS:  We've also asked for notice procedures

21   motion and we would propose to establish a master service list,

22   obviously, including the Court.

23          THE COURT:  Which tab is this now?

24          MS. GOLDSTEIN:  This is Tab 9.

25          THE COURT:  Tab 9.  Thank you.

31

1          MS. GOLDSTEIN:  Sorry for going out of order.

2          THE COURT:  All right.

3          MS. GOLDSTEIN:  This would include, obviously, the

4   Court, the United States Trustee, Weil, Gotshal, counsel for

5   the ad hoc committee, the proposed DIP lender counsel, any

6   statutory committee that is appointed and those who request

7   service.  Service would include the top thirty unsecured

8   creditors until a committee is appointed.  We also would

9   request in that motion that the automatic stay not be

10  automatically lifted as 362(e) would provide with respect to

11  motions for stay relief that are adjourned on consent of both

12  parties beyond the thirty days.  Essentially, Your Honor, we're

13  trying not to come back to the Court if the parties agree to

14  adjourn those motions.

15         THE COURT:  Does anybody wish to be heard on that?

16  The twist was with respect to the automatic stay.  Are there

17  any objections?

18         MS. DAVIS:  No, Your Honor, with the exception that I

19  don't think there's been a mention with respect to those that

20  are pre-petition secured.  Are they going to be noticed as

21  well?

22         MS. GOLDSTEIN:  Yes, they should be noticed.

23         THE COURT:  Are they in the order -- you'll make sure

24  it's in the order.

25         MS. GOLDSTEIN:  I'll make sure they're in the order.

32

1          THE COURT:  Okay.  All right.  Hearing no objection,

2     the motion on notice procedures is approved with the provision

3     regarding the automatic stay.

4          MS. GOLDSTEIN:  Thank you, Your Honor.

5          We also have a motion to approve an administrative

6     expense claim for goods ordered pre-petition but delivered

7     post-petition.  We consider this as a procedural order because,

8     Your Honor, this is more of a comfort order.  We wouldn't

9     normally ask you for a comfort order on something where we're

10    satisfied that that would be the law.  However, in dealing with

11    the vendors who supply the debtors with goods --

12         THE COURT:  Yes, I understand.

13         MS. GOLDSTEIN:  -- it's a lot easier just to hand

14    them this order.

15         THE COURT:  Which tab again?  I just need you to walk

16    me through the --

17         MS. GOLDSTEIN:  No. 10.

18         THE COURT:  Thank you.

19         MS. GOLDSTEIN:  So we have about 800 vendors that

20    supply the debtors and they have numerous pre-petition orders

21    that are awaiting delivery.  It's about $2.7 million in that

22    and in order to insure prompt delivery of those goods we're

23    seeking a comfort order if you will that grants an

24    administrative claim for those orders made pre-petition but not

25    delivered until after the commencement date and that is tab 10?

33

1              THE COURT:  Any objection?

2              MS. DAVIS:  Your Honor, we do view it as a comfort

3    order.  We defer to the Court.

4              MR. SILVERSTEIN:  Your Honor, I have no objection as

5    to the question as to whether the folks who are getting paid

6    are listed on the thirty creditor lists that's [inaudible].

7    But I clearly have no objection.

8              MS. GOLDSTEIN:  Your Honor, I wouldn't be able to

9    tell you if it's on our list of thirty creditors.

10             THE COURT:  Yes.

11             MS. GOLDSTEIN:  Some of them may very well be and

12   they'll fall off if they're fully paid.

13             MS. DAVIS:  Yes, Your Honor, and I will just note

14   that, indeed, one of the parts of the whole process of the

15   claim committee involves, I think, a question and answer

16   process where we actually ask those creditors what their claims

17   are and whether they've changed from whatever their schedule

18   [inaudible].

19             THE COURT:  Okay.  That motion will be granted as

20   well.

21             MS. GOLDSTEIN:  All right.  Now, Your Honor, we have

22   three motions:  the wage and employee benefit motion, a motion

23   to continue customer programs and a motion to pay common

24   carriers that are tabs 16, 17 and 18.  I have a proffer that I

25   would like to offer in support of those motions from Dennis

34

1   Welhouse.

2           THE COURT:  Sure.

3           MS. GOLDSTEIN:  And rather than my explaining them

4   and then doing the proffer, I propose to go right to the

5   proffer.

6           THE COURT:  Okay.

7           MS. GOLDSTEIN:  Just one comment before I do that.

8   On particularly the motion to pay common carriers, we're

9   seeking interim relief today just to pay common carriers.  We

10  agreed with the U.S. Trustee to put off for the final hearing

11  other elements of that motion including payments to inventory

12  processors.  An inventory processor is a party to whom

13  Lexington would ship goods for a final process before it's

14  ready for delivery to the customer.  Those would then be

15  shipped back to Lexington and then Lexington would ship them to

16  the customer.  We are hoping that we do not experience any

17  glitches in terms of getting those processors paid.  We believe

18  with the final order, hopefully, that it will be timely enough

19  not to create a problem but if we do have a problem we'd just

20  reserve our right to come back for expedited relief.  Some of

21  them may in fact be covered by the comfort order.  We're going

22  to look at that a little closely since the orders may have gone

23  pre-petition and the delivery may be coming post-petition.  So

24  we may be able to cover that but I'd just like to reserve our

25  right to come back on that.

35

1          THE COURT:  Okay.

2          MS. GOLDSTEIN:  Your Honor, as I mentioned, I'm going

3    to offer a proffer of Dennis J. Welhouse in support of the wage

4    motion, the common carrier motion and the customer motion.  Mr.

5    Welhouse is the chief financial officer, senior vice president

6    and assistant treasurer of Lexington Precision Corporation and

7    Lexington Rubber Group, Inc. and I will refer to both of them

8    as Lexington.  Mr. Welhouse is present today and pursuant to

9    Federal Rule of Evidence 103(a)(2), this Court may accept a

10   proffer in lieu of his testimony.

11         Mr. Welhouse is thoroughly familiar with all material

12   aspects of Lexington's day-to-day operations, business and

13   financial affairs.  If Mr. Welhouse were called to testify in

14   support of the wage motion his direct testimony would be as

15   follows:  Mr. Welhouse holds a bachelors of business

16   administration from the University of Wisconsin, Whitewater,

17   where he majored in accounting and minored in economics.  Mr.

18   Welhouse is also a certified public accountant.  Prior to

19   joining Lexington, Mr. Welhouse was a controller at Moxness

20   [Ph.] Products, Inc. from 1974 to 1980 and from 1970 to 1974 he

21   was employed by a predecessor of Deloitte.  Mr. Welhouse was

22   appointed senior vice president and chief financial officer in

23   June 2004.  In these capacities Mr. Welhouse is responsible for

24   overseeing all aspects of Lexington's financial operations.

25   Mr. Welhouse has over 35 years of experience in managing a

1   company's financial operations.  Mr. Welhouse would testify

2   that payment and continuation of employee pre-petition wages

3   and health and welfare benefits is critical to Lexington's

4   reorganization.  He would testify that in the ordinary course

5   of Lexington's business it incurs payroll obligations to

6   employees in the operating division facilities in Rochester,

7   New York; Jasper, Georgia; Rockhill, South Carolina; Vienna,

8   Ohio and North Canton, Ohio for the performance of services.

9   Mr. Welhouse would testify that as of February 29, 2008

10  Lexington employed 651 individuals of which 134 are salaried

11  employees, 517 are hourly employees and 22 individuals are on a

12  temporary basis through a temporary agency.  Mr. Welhouse would

13  testify that Lexington's average monthly gross payroll for all

14  of their employees is approximately $2 million and as of the

15  commencement date there are approximately $364,000.00 of

16  accrued and unpaid pre-petition wage and salary obligations.

17  This amount, frankly, is only the hourly employee obligations.

18  There is nothing due at this time, Your Honor, in salaried

19  employee obligations.  Their normal course payroll for the

20  salaried employees was yesterday -- March 31st, not yesterday.

21  Those amounts are in inclusive of the local, state and federal

22  income taxes owing to the taxing authorities.  Mr. Welhouse

23  would testify that as the amount of these wage and salary

24  obligations do not exceed the cap of $10,950.00 per employee,

25  which is the cap as you know under Section 507(a)(4) of the

37

1    Bankruptcy Code.  So there's nothing due to any employee in

2    excess of that amount.  Mr. Welhouse would testify that

3    Lexington's obligations to the temporary agency for temporary

4    employees is approximately $70,000.00 for the period ending

5    March 31, 2008.

6            Mr. Welhouse would also testify that in addition to

7    the local, state and federal income taxes, Lexington is

8    required to pay matching amounts from its own funds for social

9    security and Medicare taxes and additional amounts for state

10   and federal unemployment insurance based on a percentage of

11   gross payroll.  As of the commencement date Lexington owes the

12   appropriate taxing authorities approximately $95,000.00 on

13   account of wages and salaries incurred during the pre-petition

14   period.  With respect to the payroll taxes in particular, Mr.

15   Welhouse would testify that the portion of those taxes withheld

16   from an employee's wages on behalf of the applicable taxing

17   authority are held in trust by Lexington for the benefit of

18   such taxing authorities.

19           Mr. Welhouse would testify that Lexington has

20   established various employee benefit plans and policies for its

21   employees.  Such benefit plans and policies can be divided into

22   the following categories; (1) medical and health insurance,

23   life insurance, dental insurance and disability benefits, (2)

24   vacation, personal days, sick time and holiday pay, (3)

25   flexible spending, (4) 401(k) plans and (5) expense

38

1  reimbursement.  Mr. Welhouse would testify that Lexington

2  sponsors several health and welfare plans including medical and

3  dental insurance, short-term and long-term disability

4  insurance, life insurance and accidental death and

5  dismemberment insurance.  He would estimate that Lexington's

6  aggregate monthly expenditures under the health and welfare

7  plans are approximately $325,000.00.  Mr. Welhouse would

8  testify that because of the manner in which expenses are

9  incurred and claims processed under such plans it is difficult

10 for Lexington to determine with certainty the accrued

11 obligations under the health and welfare plans at any

12 particular time.  Nevertheless, he would testify that Lexington

13 estimates that as of the commencement date it's accrued, unpaid

14 obligations to their employees under the health and welfare

15 plans aggregate approximately $544,000.00 as of the end of this

16 March which represents a reserve for unprocessed claims.  He

17 would further testify that the debtor's average accrued but

18 unpaid monthly obligations of $544,000.00 divided by the number

19 of employees -- 651 -- would be approximately $835.00 per

20 employee.

21        Your Honor, you're never going to know how much each

22 employee has so this is the best way to present those figures.

23        Mr. Welhouse would testify that as of the

24 commencement date the accrued and unpaid vacation, personal

25 days, sick time and holiday pay is approximately $890,000.00

39

1  which would average approximately $1,360.00 per employee and if

2  you take all of these amounts together with unpaid wages it is

3  still less than the $10,950.00 cap per employee under Section

4  507(a)(4).

5          With respect to the 401(k) plan Mr. Welhouse would

6  testify that Lexington withholds from the wages and salary of

7  participating employees contributions towards a 401(k) plan.

8  In addition to employee contributions Lexington matches

9  employee contributions at a rate of fifty percent of the

10 employee's contribution up to a maximum contribution of three

11 percent of such employee's annual compensation.  Contributions

12 by Lexington to an employee's 401(k) plan vests at a rate of

13 twenty percent per year, commencing in the employee's second

14 year of service and fully vests after six years of service.

15 Mr. Welhouse would testify that as of the commencement date the

16 obligations related to the debtor's contribution to pre-

17 petition 401(k) contributions aggregate approximately

18 $13,000.00.

19         Mr. Welhouse would testify that Lexington believes

20 that most if not all of the pre-petition wage and benefit

21 obligations as they relate to each employee are in the

22 aggregate less than the $10,950.00 cap.  Mr. Welhouse would

23 further testify that Lexington believes that sufficient assets

24 are available to pay all wage and benefit plans in full under

25 any plan of reorganization that may ultimately be proposed and

40

1    confirmed by this Court.

2            Mr. Welhouse would also testify that the debtor's

3    employees and offers either pay out-of-pocket for business

4    expenses or use an American Express corporate card to make such

5    purposes on behalf of the business.  These individuals incur

6    these expenses for the benefit of the debtor's businesses while

7    traveling and include air fare, hotel, purchasing equipment and

8    tools and other goods used in conjunction with the services

9    provided by the employees to the debtors.  In some instances

10   the equipment, tools or other goods may only be purchased by

11   credit card.  Mr. Welhouse would further testify that it was

12   the debtor's policy to reimburse employees for expenses

13   incurred for the benefit of the debtors.  As of the

14   commencement date Mr. Welhouse would testify that pre-petition

15   reimbursement obligations are approximately $115,135.00.  If

16   debtors did not reimburse the employees for these expenses they

17   would not only suffer immediate hardship but the debtors would

18   risk the departure of such employees at a critical stage in

19   these cases.

20           Mr. Welhouse would also testify that the debtors hold

21   approximately $10,600.00 of pre-tax income contributed by

22   employees participating in the flexible spending program for

23   the period January 1, 2008 through February 29, 2008 and these

24   amounts represent property of the employees not the debtors.

25           Mr. Welhouse would testify as well that Lexington

41

1    hires temporary employees to assist with among other things

2    clerical and quality control work.  The employment of a

3    temporary agency is cost effective and is essential to the

4    efficient management and administration of the debtor's

5    businesses.  If the debtors did not honor the pre-petition

6    obligations to the temporary agencies the debtors risk that

7    such agencies might cease doing business with the debtors,

8    thereby, causing significant damage to the debtor's operations

9    in excess of the small amounts they are owed.

10           Mr. Welhouse would testify that Lexington's

11   businesses rely heavily on the ability to produce a superior

12   product by employing skilled individuals whose efficiency

13   maintains production level at acceptable costs.  Mr. Welhouse

14   would testify that any delay or failure to pay employee wages

15   and employee benefits would be devastating to the morale,

16   dedication, confidence and cooperation of these employees;

17   unplanned or premature attrition during these critical stages

18   of Lexington's restructuring would be devastating to

19   Lexington's future prospects and without authorization to pay

20   wages and benefits Lexington would suffer immediate and

21   irreparable harm.  Mr. Welhouse would testify that absent an

22   order granting the relief requested by Lexington the employees

23   will suffer undo hardship and in many instances serious

24   financial difficulties as the amounts in question are needed to

25   enable certain of these employees to meet their own personal

42

1   financial obligations.  Without the requested relief the

2   stability of Lexington would be undermined, perhaps irreparably

3   by the possibility that otherwise loyal employees would seek

4   other employment alternatives.

5          Your Honor, that concludes the testimony on behalf of

6   the wage and benefits motion.  I don't know if you prefer to

7   ask if there are any questions on that or --

8          THE COURT:  I do.  Let me ask first.  Does anybody

9   wish to cross-examine on the wages and benefits?

10         MS. DAVIS:  Your Honor, the U.S. Trustee would.

11         THE COURT:  Okay.

12         MS. DAVIS:  [Inaudible] unless counsel would like to

13  supplement her proffer?

14         MS. GOLDSTEIN:  Your Honor, I'd be happy to

15  supplement the proffer if I knew the subject.

16         MS. DAVIS:  We recognize the Court's limitations in

17  time here.

18         THE COURT:  Why don't you just go over and confer

19  with Ms. Goldstein and let her know what your areas -- does

20  anybody else wish to examine?

21         MR. SILVERSTEIN:  No, Your Honor.

22         THE COURT:  Why don't you just confer with Ms.

23  Goldstein so that she understands where your areas of concern

24  are and perhaps she can supplement the proffer.

25         MS. DAVIS:  Yes and I don't want to articulate it to

43

1  the Court but our areas of concern are primarily the

2  [inaudible] of Section [inaudible] of the Bankruptcy Code.

3  They're primarily actually the expenses, Your Honor.

4          THE COURT:  Not under the Code, under the Rules.

5          MS. DAVIS:  I'm sorry, the Bankruptcy Rules

6  [inaudible].

7          MS. GOLDSTEIN:  Yes.  Your Honor, if that went to

8  whether we are paying --

9          THE COURT:  Why don't the two of you just confer

10 briefly and you may be able to resolve this issue.

11         MS. DAVIS:  Okay.

12         MS. GOLDSTEIN:  Okay.

13              [Pause in proceedings.]

14         MS. GOLDSTEIN:  Your Honor, my colleague, Mr. Lucas,

15 is checking on a few points but I think the essence of which I

16 thought I had already proffered what the U.S. Trustee is asking

17 is how are the employees prejudiced.

18         THE COURT:  You're getting some further feedback.

19              [Pause in proceedings.]

20         MS. GOLDSTEIN:  I'm sorry, Your Honor.

21         THE COURT:  That's all right.  Go ahead.

22         MS. GOLDSTEIN:  The essential point that the U.S.

23 Trustee has asked us to supplement our proffer on is how will

24 the employees be prejudiced if they're not required to wait the

25 twenty days to a final hearing.  Your Honor, as I indicated

44

1   earlier in the proffer, the salaried employees which generally

2   would include the officers were paid on March 31st.  We're not

3   asking for any relief with respect to those employees.  With

4   respect to the hourly employees -- these are the people working

5   in the plants -- we have a payroll coming up this week and then

6   they're paid again in two weeks.  These people rely on their

7   paychecks every week to pay their own expenses.  If we do not

8   make the payroll this week these employees will be irreparably

9   injured because they need their money to pay their bills.  If

10  they do not receive their paychecks on time or if a paycheck

11  bounces that they received in the last payroll but hadn't

12  cashed or cleared yet they will be irreparably injured and we

13  believe that this relief is more than justified.

14          We were also asked whether and how the employees were

15  notified of the filing.  The division managers are meeting with

16  employees today to explain the filing, why it happened and what

17  it means to them.

18          THE COURT:  Is there anything else in your proffer

19  that you want to add?

20          MS. GOLDSTEIN:  Your Honor, I think there is nothing

21  else.  I think in terms of insiders being paid since the

22  salaried employees are not covered, really, by this order we do

23  not believe that there are insiders who will be receiving any

24  wages or salary pursuant to this order.  There was one salesman

25  that the U.S. Trustee asked about whose expenses were over

45

1   $11,000.00 and we clarified that as to that salesman that was

2   not compensation but reimbursement of expenses and I'm hoping

3   that that covers --

4           MS. DAVIS:  Yes, Your Honor.  That's satisfactory

5   with respect to the issues that I have concerning factual

6   issues I have but I'll [inaudible] to make my judgment.

7           THE COURT:  Okay.  So you don't wish to cross-

8   examine?

9           MS. DAVIS:  No, I do not, Your Honor.

10          THE COURT:  All right.  So let's deal with this

11  motion right now since I don't know whether we're going to get

12  through everything so does anybody want to be heard on the wage

13  motion?

14          MS. DAVIS:  Thank you, Your Honor.  I trust Your

15  Honor does -- you have the Rule in front of you.  I just want

16  to reiterate that the standard for obtaining relief of this

17  kind under the Rule is immediate and irreparable harm and, Your

18  Honor, the U.S. Trustee objects to the motion only to the

19  extent that the debtors seek to pay expenses to employees in

20  the amount of $115,000.00 today, the first day of this

21  bankruptcy case.

22          Your Honor, if there is a hearing on this motion with

23  respect to this aspect of the relief that's being sought, the

24  hearing would be most likely on or before April 21st and we

25  submit to Your Honor that there is no prejudice shown here for

46

1    the Court to deny the relief at this time.  In fact, the

2    debtors represent in the motion at Paragraph 38 that the

3    debtors are billed directly by American Express for the

4    expenses charged on the corporate cards which they provide to

5    the employees and the directors and they are personally liable.

6         Your Honor, typically, American Express sends the

7    bills out on the 20th of the month and those bills are not due

8    until about the 15th or the 20th of the month and if Your Honor

9    would adhere to perhaps a hearing scheduled on this motion as

10   to this aspect of the motion on the 20th or the 21st of the

11   month there would be no prejudice shown here to the employees.

12   They would in fact be able to pay these bills.

13        THE COURT:  I take it with respect to the hourly wage

14   earners you're not objecting to the payment of their wages?

15        MS. DAVIS:  Not at all, Your Honor.

16        THE COURT:  You're talking about this is on expense

17   reimbursement?

18        MS. DAVIS:  Purely expense reimbursement.  Indeed, we

19   think that the debtor has met their showing with respect to the

20   payment of wages.

21        Okay.

22        THE COURT:  Okay.

23        MS. DAVIS:  That's really my point, Your Honor.

24        THE COURT:  All right.  Anybody else wish to be heard

25   on this?

47

1          MS. GOLDSTEIN:  Your Honor, I would just like to

2    clarify one point.

3          THE COURT:  Go ahead, Ms. Goldstein.

4          MS. GOLDSTEIN:  You know, in asking for the

5    reimbursement of expenses many of these expenses are incurred

6    on a corporate credit card which the company pays but then the

7    employees are held liable for and there is an AMEX bill due on

8    April 9th which is before the final hearing and, you know, if

9    the employees have to come out of pocket to pay that that could

10   be burdensome to these employees because the expenses they

11   incur for the company may well exceed the type of expenses they

12   would personally incur on their own credit card and it would be

13   --

14         THE COURT:  Just remind me what's the total amount of

15   the expenses that you're seeking today.

16         MS. GOLDSTEIN:  The total amount that we are seeking

17   is $115,000.00.  The AMEX bill due on April 9th is $75,000.00.

18         MS. DAVIS:  Your Honor, to the extent that this is an

19   obligation of the debtor to the company itself I would expect

20   that the cash collateral [inaudible] of this type of

21   [inaudible] debt would be paid as to the ordinary course

22   [inaudible] as it would in the ordinary course and the

23   employees do not have to bear this expense until it's approved

24   by the Court.  So we have a committee that's been appointed to

25   address some of these issues and raise concerns they may have.

48

1   We're not talking about [inaudible], Your Honor.

2           THE COURT:  So your position is that if the DIP or

3   cash collateral motion is approved and there's $75,000.00 due

4   on AMEX on April 9th that that could be paid?

5           MS. DAVIS:  Yes, by the company without prejudice to

6   the employees.

7           MS. GOLDSTEIN:  Your Honor, I think that was the

8   essence of the relief requested because no matter -- the April

9   9th payment is a pre-petition debt so we need the Court to

10  approve us paying that.  I'm informed that the secured lender

11  does not object to cash collateral being used to pay that.  One

12  way or the other we need the Court to approve the payment of

13  that $75,000.00 because it relates to a pre-petition period but

14  the company can pay it.

15          THE COURT:  Okay.  Subject to the consideration of

16  the cash collateral and debtor-in-possession motions, the

17  objection is overruled but the payment is going to be subject

18  to the approval of the debtor-in-possession and the cash

19  collateral motions.  All right?

20          MS. DAVIS:  Thank you, Your Honor.

21          THE COURT:  Okay.

22          MS. GOLDSTEIN:  And we'll make clear that the order

23  allows the company to pay it on behalf of the employees.

24          THE COURT:  Yes, that's fine.  All right.  Next.  The

25  common carriers?

49

1          MS. GOLDSTEIN:  I think the next is the common

2     carriers.  Well, actually, I have the next one.  The next tab

3     is the customer programs, Your Honor.

4          THE COURT:  Okay.  I've got the customer programs.

5     Go ahead.

6          MS. GOLDSTEIN:  With respect to the debtor's motion

7     for authority to continue their customer programs, Mr. Welhouse

8     would testify that he has reviewed the debtor's motion and is

9     familiar with its contents.  He would testify and describe the

10    debtor's customer programs as follows:  Before the commencement

11    of the Chapter 11 cases the debtors in the ordinary course of

12    their businesses maintained a limited customer program which in

13    effect enabled customers to return parts which did not meet

14    customer specifications for replacement parts.  Under this

15    program the debtors would ship and the customers would expect

16    replacement parts within one week or less.  Frequently, the

17    debtors would ship the replacement parts before the returned

18    parts were received.  Mr. Welhouse would testify that timely

19    delivery of replacement parts is particularly important given

20    many of the debtor's customers maintain just-in-time supply

21    policies under which the parts are delivered just before the

22    parts are needed.  Because of the just-in-time policies,

23    customers' expectations and operations are predicated on the

24    prompt and timely delivery of parts including replacement

25    parts.  If the debtors cannot continue to meet expectations

50

1   customers may lose confidence in the debtors and seek

2   alternative part sources.  Given the nature of these

3   expectations a delay in granting the requested authority could

4   alienate customers which would adversely effect revenues and

5   subsequently undermine the debtor's ability to reorganize.

6          Mr. Welhouse would testify that relevant to the

7   potential harm to the debtor's estate the amounts at issue are

8   de minimis.  As of the commencement date only an estimated

9   $20,000.00 worth of returns are being processed.  Mr. Welhouse

10  would testify that given the above, granting authority to

11  continue the debtor's return program is in the best interest of

12  the debtors and all parties.

13         That concludes the testimony.

14         THE COURT:  All right.  Does anybody wish to cross-

15  examine on this subject?

16                    [No response.]

17         THE COURT:  Anybody have objections to this motion?

18         MS. DAVIS:  Your Honor, the U.S. Trustee objects to

19  the motion that's being requested at this time again, Your

20  Honor, pursuant to Bankruptcy Rule 6003.  We think the debtor

21  has to make an appropriate showing of immediate and irreparable

22  harm.

23         This goes to in the opening remarks commenting on the

24  fact that these debtors are leaders in this particular

25  industry, that the customers here basically cannot obtain these

51

1   parts from any other type of manufacturer or supplier and we

2   submit, Your Honor, since this is the only game in town where

3   they would not go anywhere if they [inaudible] twenty days for

4   this motion to be approved.

5          We think that a creditors committee, should one be

6   appointed, have an opportunity to visit these programs and

7   [inaudible].

8          THE COURT:  Okay.  Ms. Goldstein.

9          MS. GOLDSTEIN:  Your Honor, we're asking the Court to

10  balance here a de minimis cost against the need to service

11  customers on a timely basis.  That is what this business is

12  about and the reason they're leaders is because they're capable

13  of delivering a part when the customer needs it.  I think a

14  disruption in their ability to process replacement parts --

15         THE COURT:  Nothing stops them from shipping the

16  replacement parts.  The issue is where credits are going to

17  wind up being given for returns.  Am I wrong about that?

18         MS. GOLDSTEIN:  Well, I think that the replacement

19  part is in effect -- we're not asking authority, I don't

20  believe, to give credits but, really, to replace --

21         THE COURT:  Isn't that effectively what you're doing?

22         MS. GOLDSTEIN:  -- it is a credit.  Yes.

23         THE COURT:  You can ship new parts and the issue is

24  are they going to get a credit for the replacement or not.  Am

25  I wrong?

52

1              MS. GOLDSTEIN:  Well, Your Honor, I don't think the

2    customer would appreciate if the new part is then charged again

3    to them.  So effectively it's a set-off and that's why we've

4    asked for authority and it really is a small amount as compared

5    to the harm in terms of customer relations.

6              The key to this business is maintaining customer

7    relations and this is really a small request and compared to

8    the harm that would inure to the company if they can't continue

9    this even in the next twenty days --

10             THE COURT:  But they continue shipping the parts.

11   Nobody is stopping them from continuing to ship parts including

12   parts that are essentially replacement parts for allegedly

13   defective components that they ship.

14             All it means is waiting until a hearing after twenty

15   days to sort out the credits for it.

16             MS. GOLDSTEIN:  Your Honor, may I just talk with my

17   client for a minute about how they would normally handle this?

18             THE COURT:  Yes, please.  Go ahead.

19             They're not going to keep their customers waiting for

20   parts.

21                    [Pause in proceedings.]

22             MS. GOLDSTEIN:  Your Honor, as a practical matter

23   what will happen is we'll keep shipping the parts --

24             THE COURT:  Yes, you will.

25             MS. GOLDSTEIN:  -- the customer will withhold the

53

1   portion of what they owe the company --

2           THE COURT:  They will and in twenty days you'll work

3   it out.  So the objection is sustained.

4           MS. GOLDSTEIN:  I assume in twenty days that will

5   just be blessed.

6           THE COURT:  Well, then that's fine.  In twenty days

7   there will be a committee and the committee can speak and I

8   assume there won't be any objections and then it will be

9   blessed.

10          MS. GOLDSTEIN:  Right.

11          THE COURT:  So the objection is sustained.  It just

12  means a matter of waiting for a final hearing.

13          MS. GOLDSTEIN:  Your Honor, is the result that we

14  would continue to ship parts without an order?

15          THE COURT:  I'm not going to tell you about shipping

16  parts.

17          MS. GOLDSTEIN:  All right.

18          THE COURT:  That does seem to me to be in the

19  ordinary course of business.

20          MS. GOLDSTEIN:  All right.  We will proceed in the

21  ordinary course.

22          THE COURT:  Does the U.S. Trustee disagree about

23  that?

24          MS. DAVIS:  No, Your Honor.  Thank you.

25          THE COURT:  Okay.  All right.  Next.

54

1          MS. GOLDSTEIN:  Okay.

2          THE COURT:  Common carriers?

3          MS. GOLDSTEIN:  Common carriers.

4          Your Honor, I mentioned earlier that in addition to

5    common carriers at the final hearing we will also --

6          THE COURT:  Warehouses.

7          MS. GOLDSTEIN:  -- be dealing with inventory

8    processors and perhaps some other parties but with respect to

9    common carriers, the debtor's motion covers certain undisputed

10   pre-petition obligation owing to the common carriers and in

11   terms of interim relief that's all we're going to be asking for

12   today.

13         THE COURT:  Let me ask, does the UST have an

14   objection on this motion?

15         MS. DAVIS:  Your Honor, our objection is similarly as

16   laid out before under Bankruptcy Rule 6003.

17         THE COURT:  Well, here -- I'm sure Ms. Goldstein

18   would make a proffer -- but here isn't the problem that a

19   common carrier simply is going to not deliver?

20         MS. GOLDSTEIN:  Correct.

21         THE COURT:  Here, there is a real risk that if a

22   common carrier holds the goods that are in transit and they

23   don't get delivered, that's a real injury.  I mean it's not

24   like them just deciding to send replacement parts if there's a

25   problem as in the customer care program.  This one, if a

55

1  railroad decides, until we get paid we're not letting go of the

2  inventory --

3         MS. DAVIS:  Indeed, Your Honor, the -- and thank you

4  for the clarification.

5         THE COURT:  Am I wrong?

6         MS. DAVIS:  No, you're correct, Your Honor, but I

7  would just like to modify just to one extent.  We're dealing

8  here with the interim relief that's being sought.

9         Again, I don't need to reiterate the point that Your

10 Honor would like the committee to have an opportunity to review

11 and to revisit some of these issues.  If that type of language

12 can be carved into the existing order just so the committee

13 would have a right to revisit it, that's all I ask.

14        THE COURT:  Let me hear your proffer quickly.

15        MS. GOLDSTEIN:  Your Honor, I think our proffer

16 covers this point.  I mean in fact our motion seeks to pay not

17 just common carriers but --

18        THE COURT:  You've got somebody trying to whisper in

19 your ear.

20        MS. GOLDSTEIN:  -- third party processors and

21 warehouse --

22        THE COURT:  Why don't you get your --

23                    [Pause in proceedings.]

24        MS. GOLDSTEIN:  All of these third parties possess

25 the debtor's property and hold state law possessory liens and

56

1   Mr. Welhouse would testify that the debtors have evaluated --

2   in response to our communications with the U.S. Trustee --

3   their immediate needs and at this time seek authority only to

4   pay the common carriers and so that being said that while

5   payment to the third party processors and warehousemen are

6   necessary to the debtor's overall reorganization as well the

7   Court need not hear the balance of the requested relief for

8   that on the same kind of expedited basis but Mr. Welhouse would

9   testify and describe the debtor's use of common carriers as

10  follows:  To expedite the shipment of raw materials and other

11  goods from vendors and delivery of debtor's products to their

12  customers and distributors, the debtors employ various common

13  carriers through a third party shipping consultant called

14  Commercial Traffic, Inc.  While the debtors are solely liable

15  for payment to the common carriers, Commercial Traffic

16  negotiates shipping rights on the debtor's behalf, audits

17  invoices and disburses payments to each common carrier.

18          Mr. Welhouse will testify that as of the commencement

19  date approximately $350,000.00 in goods is currently in transit

20  and in the possession of the common carriers and that the

21  debtors owe Commercial Traffic and the common carriers paid

22  through Commercial Traffic approximately $60,000.00.  Mr.

23  Welhouse would testify that the raw materials and supplies in

24  transit are the means by which the debtors manufacture

25  products.  Without such goods the debtors could not continue to

57

1  operate and supply their customers.  Mr. Welhouse would testify

2  that as noted in the customer program proffer, customers expect

3  and demand timely delivery of products and goods under just-in-

4  time supply policies.  A disruption to the debtor's supply

5  chain will impair the debtor's ability to meet those

6  expectations which in turn will harm the debtor's overall

7  reorganization.

8          Mr. Welhouse would testify that given the above

9  granting the authority to pay the common carriers and

10  Commercial Traffic in the ordinary course of business is in the

11  best interest of the debtors and all parties-in-interest.

12          I do believe, Your Honor, our proposed order at Tab

13  18 has a provision for the creditors committee to revisit any

14  of this.

15          THE COURT:  Okay.

16          MS. DAVIS:  Your Honor, with Ms. Goldstein's caveat

17  with respect to the order of the amounts being paid at this

18  time limited to common carriers not included in the other two

19  areas, the U.S. Trustee would have no objection.

20          THE COURT:  Thank you.  Does anybody else wish to be

21  heard on it?

22                  [Pause in proceedings.]

23          THE COURT:  All right.  That motion is granted then

24  with the caveats that have been provided.

25          Okay.  What else do we need to do?  Quickly.

58

1          MS. GOLDSTEIN:  Your Honor, I think that concludes --

2          THE COURT:  So, cash management you're putting off

3     until the next --

4          MS. GOLDSTEIN:  Well, cash -- no, that concludes the

5     evidentiary.

6          THE COURT:  All right.  Okay.

7          MS. GOLDSTEIN:  We need the cash management frankly -

8     -

9          THE COURT:  I was serious about my time limits.

10         MS. GOLDSTEIN:  We do need the cash management

11    relief, Your Honor.

12         THE COURT:  Yes, that's what I thought.

13         MS. GOLDSTEIN:  I will quickly describe that.  We

14    don't have a proffer for that and that is critical in fact to

15    the operation of the cash collateral provisions.

16         THE COURT:  Right.

17         MS. GOLDSTEIN:  Before the filing the debtors

18    operated on basically a zero balance system in which each

19    division maintained a lock box for receivables which were swept

20    daily into a master lock box account, then available funds in

21    the master lock box account were swept daily and wired to the

22    pre-petition secured lenders to pay off the revolver debt.

23    Each division maintained an individual disbursement account on

24    which checks to the suppliers would be drawn and on a daily

25    basis Lexington calculated the funds needed to satisfy payables

59

1   and their pre-petition secured lenders wired such funds to the

2   master operating account.  Lexington's expenses were debited

3   from the master operating account even when checks are drawn

4   from the division's individual disbursement account.  The

5   debtors effectively do not possess much cash in their bank

6   accounts on a long-term basis in the past and their operations

7   were funded through a revolving credit facility.

8          What is being proposed post-petition is that the

9   debtors are no longer being funded through a revolver.  Instead

10  of wiring funds in the master lock box to the pre-petition

11  lenders the funds will be transferred to the debtor's master

12  operating account.  In addition, the debtors, subject to the

13  cash collateral and DIP orders would supplement their need for

14  capital with a proposed $4 million DIP loan and the proceeds of

15  that will be deposited into a UST authorized depository.

16         THE COURT:  Is First Merit an authorized depository?

17         MS. GOLDSTEIN:  First Merit is where they currently

18  have the operating account.  That is not -- and we recognize

19  that is something we need to work out with the U.S. Trustee.

20  The new account for the DIP proceeds will be at North Fork

21  which is an authorized depository.

22         THE COURT:  Okay.  Let me hear from the UST.

23         MS. DAVIS:  A very narrow issue, Your Honor, as to

24  the debtor's interlineation on their checks that they will

25  indicate DIP.  They don't want to start doing it until seven

60

1   days after today or yesterday I should say, Your Honor.  That's

2   inappropriate to us, Your Honor [sic].  There should be

3   transparency with respect to the process, we're not talking

4   about very much, simply just a stamping [sic], most of these

5   you want to probably computerize.  We just ask that that be

6   immediately.

7           THE COURT:  I agree.

8           Ms. Goldstein, get a stamp and stamp the checks.

9           MS. GOLDSTEIN:  Your Honor, in some of the other

10  cases this condition is waived entirely but if the U.S. Trustee

11  insists we're going to stamp the checks, I guess we can make

12  that happen.

13          MS. DAVIS:  Yes, and just to add that during my

14  tenure with the program which is about twelve years, it's never

15  been waived but I just want to say that that's under the

16  requirements --

17          MS. GOLDSTEIN:  Thank you, Your Honor.

18          THE COURT:  Does anybody else want to be heard on

19  this?

20                      [No response.]

21          THE COURT:  All right.  Change the order, checks will

22  be stamped.

23          MS. GOLDSTEIN:  Okay.

24          THE COURT:  Granted.

25          MS. GOLDSTEIN:  Okay, Your Honor, we are not going to

61

1    proceed with the investment guidelines motion as I mentioned.

2              THE COURT:  Right.

3              MS. GOLDSTEIN:  We'll just get a hearing date set and

4    I think the only thing left -- unless I've missed something --

5    is to talk about a hearing date.

6              THE COURT:  All right.

7              MS. GOLDSTEIN:  We would like to have -- well, I

8    guess we can't talk about the DIP filing hearing date so we'll

9    go right to the initial case conference.  We are thinking that

10   the final hearing on wages, what's left of the common carrier

11   motion, what's left of the customer program motion, the

12   investment guidelines and also hearings on motions that we are

13   filing today on twenty day's notice including the utility

14   retention application for Weil, Gotshal -- let me just tell you

15   what else -- interim compensation procedures, ordinary course

16   professional procedures, use tax motion, reclamation claim

17   procedures, we'd like to get a hearing the week of April 22nd

18   on all of that.

19             Your Honor, a footnote on the Weil, Gotshal

20   retention.  This is a corporate debtor.  They obviously need to

21   have counsel in this case.  We agreed with the U.S. Trustee to

22   do it on twenty day's notice and not seek interim relief.

23   We're assuming that that does not prejudice our clients in

24   using us and we're assuming that that does not prejudice our

25   ability to get nunc pro tunc relief on that retention.

62

1          THE COURT:  Okay.  So here's what we're going to do

2    if this works for you.  Two o'clock, Wednesday, April 23rd.  It

3    doesn't work?

4          MS. GOLDSTEIN:  That is the one day in the week that

5    may present a difficulty.

6          THE COURT:  Because your partner, Mr. Perez, is

7    before in the morning on the PRC --

8          MS. GOLDSTEIN:  If I can get Mr. Perez to come before

9    you at two o'clock -- is there any other possible -- I mean we

10   will take that date obviously if you have --

11         THE COURT:  No, I was trying to simplify my life.

12         This is all subject to whether I'm going to keep the

13   case or not --

14         MS. GOLDSTEIN:  Okay.

15         THE COURT:  Thursday, April 24th at 10:00 a.m.

16         MS. GOLDSTEIN:  Okay.

17         Thank you, Your Honor.

18         We would like to schedule the initial case conference

19   as well on that date.

20         THE COURT:  Right.  I should tell you that I may or

21   may not -- well, no, I'll have a courtroom.  I've been playing

22   musical courtrooms.  My new courtroom is supposed to be

23   finished by then.  If not, we'll have another courtroom.  There

24   won't be a problem with that day.

25         So subject to whether I continue to have the case,

63

1  10:00 a.m., April 24th and perhaps -- can you have the final

2  DIP hearing that day too?  If it gets approved today you could

3  --

4           MS. GOLDSTEIN:  We were going to ask, assuming the

5  interim DIP is approved today, for a final DIP hearing earlier

6  than that, maybe April 16th or 17th?

7           THE COURT:  Well, that's not going to be for me so --

8           MS. GOLDSTEIN:  So I guess we should deal with the

9  other Judge --

10          THE COURT:  You'll deal with whoever, yes.  You may

11  be dealing with the same Judge for everything.  I just don't

12  know yet.

13          MS. GOLDSTEIN:  Okay.

14          THE COURT:  I will let you know as soon as possible.

15          Does that conclude with what we need to deal with

16  today?

17          MS. GOLDSTEIN:  I think that concludes what we need

18  to do.  We will make sure the U.S. Trustee is happy with the

19  orders and get them to your chambers so that they can be

20  entered today.

21          THE COURT:  Okay.  Why don't you all sit tight.  Let

22  me see if I can resolve what's going to happen.

23          MS. GOLDSTEIN:  That was my next question.

24          THE COURT:  We're keeping people waiting upstairs but

25  I'll do that.  Let me must -- we'll be in recess for about five

64

1    or ten minutes and let me see if I can resolve the issue of

2    where your fate is going to be.

3                          (Recess.)

4                        *  *  *  *  *

65

1                              * * * * *

2        I certify that the foregoing is a transcript from an

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5

6                        _____

7                                 CARLA NUTTER

8

9    Dated:  April 8, 2008

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25