Hearing Date: June 11, 2008 at 2:00 p.m. (EDT)
Response Deadline: June 6, 2008 at 10:00 a.m. (EDT)

ANDREWS KURTH LLP
Paul N. Silverstein (PS 5098)
Jonathan Levine (JL 9674)
450 Lexington Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

Counsel to the Official Committee
of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                    :      Chapter 11
                                                          :
LEXINGTON PRECISION CORP, et al.,                         :      Case No. 08-11153 (MG)
                                                          :      Jointly Administered
                                                          :
                                  Debtors.                :
-----------------------------------------------------------x

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS MOTION FOR ORDER TERMINATING DEBTORS' EXCLUSIVITY UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors (the "Committee") of Lexington Precision Corporation ("LEXP") and Lexington Rubber Group, Inc. ("Rubber" and collectively with LEXP, the "Debtors") for its Motion for Order Terminating Debtors' Exclusivity Under Section 1121(d) of Title 11, United States Code (the "Bankruptcy Code") respectfully represents:

### INTRODUCTION

1. Approximately eighteen months ago, LEXP defaulted on payment of its 12% Senior Subordinated Notes due August 1, 2009 (the "12% Notes"). As of the Petition Date (defined below), the Debtors had unsecured liabilities of approximately $44 million with respect to the 12% Notes and approximately $5 million, in the aggregate, with respect to various vendors, suppliers and other providers. As of the Petition Date, the Debtors also had secured debt of approximately $37 million.

NYC:176325.4

2.  The Debtors are not entitled to exclusivity pursuant to Section 1121(b) of the Bankruptcy Code because:

A.  The Debtors' officers and directors, specifically Warren Delano and Michael Lubin (collectively, "Management"), who are the Debtors' Chairman and President, respectively, and controlling shareholders of LEXP, are not acting as fiduciaries to creditors. Rather than attempting to pay or satisfy unsecured creditor claims and maximize recoveries to unsecured creditors, the Debtors' "reorganization" efforts revolve solely around maintaining Management's ownership of, and control over, the Debtors' business post-confirmation; and

B.  "Cause" to terminate the Debtors' exclusivity likewise exists because such relief would expedite the resolution of these Chapter 11 cases. Management and unsecured creditors are at an impasse - - an impasse stemming from eighteen months of pre-petition discussions. There is no justification for further delays. The Committee's competing plan would be on the same timetable as Management's proposed plan. Proceedings, including valuation proceedings in respect of both proposed plans, would be consolidated, as would the disclosure statements with respect thereto and solicitation of acceptances. There is no justification for unsecured creditors to be held hostage by Management.

3.  <u>At the very least</u>, the Debtors are in the zone of insolvency. As such, it is beyond dispute that the Debtors owe fiduciary duties to creditors. The Debtors, however, have expressly <u>disclaimed</u> any such fiduciary duty to creditors. "To the extent a party in interest can demonstrate a debtor is either using exclusivity . . . to entrench management . . . and not to maximize values for all parties in interest, the court should allow the party to propose a competing plan" and exclusivity should be terminated under Section 1121(d).[1] Further, where, as here, termination of exclusivity would expedite the reorganization process, such relief is

---

[1] Bienenstock, *"Conflicts Between Management and the Debtor in Possession's Fiduciary Duties,"* 736PLI/Comm 555 (1996)

2

appropriate. The Debtors have been afforded eighteen months to reach an agreement with creditors, and have failed.

4.  For all of the reasons set forth herein and in the Committee's submissions in connection herewith, the Debtors' exclusivity should be terminated pursuant to Section 1121(d) of the Bankruptcy Code.

## JURISDICTION

5.  This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§157 and 1334 and 11 U.S.C. §1104(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

## FACTUAL BACKGROUND

### General Background

6.  The Debtors each filed petitions for relief with this Court on April 1, 2008 (the "Petition Date").

7.  As indicated above, as of the Petition Date, the Debtors owed approximately $86 million: (a) approximately $37 million in secured debt; and (b) approximately $49 million in liquidated unsecured claims. In addition, pursuant to an Order of this Court under Section 364 of the Bankruptcy Code, the Debtors borrowed $4 million in unsecured "superpriority" debt (the "DIP Loan"), raising total indebtedness to approximately $90 million.

8.  The Committee was appointed on April 11, 2008 to represent unsecured creditors in these cases. No trustee or examiner has yet been appointed in the Debtors' cases.

9.  Although nominally a "public" company, Lexington is controlled by two individuals - - i.e., Management. Management acquired the Debtors in or about 1985 and have controlled the Debtors since that time. The Debtors' officers and directors own over 70% of

3

LEXP's common stock.  Messrs. Lubin and Delano, themselves, own approximately 61% of LEXP's common stock.

10.    Trading over the counter under the symbol LEXP, LEXP's common stock price has averaged approximately $1.26 per share over the last twenty (20) years (on a monthly basis); $.82 per share over the last ten (10) years (on a weekly basis); and $.58 per share for the last three (3) years (on a daily basis).  Although the aggregate compensation of Messrs. Delano and Lubin (and their affiliates) is not clear in terms of total compensation, reimbursement and other remuneration and benefits, they receive, indirectly through payments to Lubin, Delano & Company, a base fee of $700,000 per annum.  Upon information and belief, Management, in the aggregate, owns approximately 23% of the outstanding 12% Notes.  Mr. Lubin owns approximately $350,000 of the 13% Junior Subordinated Notes issued by LEXP in 2006.  In addition, the DIP Loan, referenced to in the last sentence of paragraph 7 above, was funded by Mr. Lubin as well as William Conner, a director of the Debtors who owns 7.8% of LEXP's common stock.

**Pre-Petition Default And Negotiations With Bondholders**

11.    In November 2006, the Debtors defaulted in payment under the 12% Notes (the "Default").  On or about December 5, 2006, holders of approximately 75% of the 12% Notes (the "Noteholders") organized and communicated with Management in an attempt to address the Default.  As set forth in more detail below, and in the affidavit of Nicholas W. Walsh, sworn to on May 21, 2008 (the "Walsh Affidavit") submitted herewith, the pre-petition negotiations between the Noteholders and Management amounted to nothing more than a protracted exercise in stalling by Management.  It became clear to Noteholders that Management had no interest in repaying, or maximizing value for, unsecured creditors.

4

12. As set forth in the Walsh Affidavit, from the outset of the pre-petition negotiations, Management, by its conduct, conveyed a message to unsecured creditors that its primary goal is, and always has been, to maintain control over the Debtors, regardless of whether such goal is in the best interests of creditors. Management's focus throughout this process and its involvement with the Debtors has been to stall and delay repayment of its creditors.

13. During the six-month period following the Default, the Noteholders, in good faith, continued, on numerous occasions, to engage with Management in an attempt to address the Default. As set forth in the Walsh Affidavit, throughout that process, the arrogance and disingenuousness of Management became more and more apparent to Noteholders. For example, in connection with the negotiation of the Forebearance Agreement (identified below), the Noteholders requested, as a condition to forebearing, that if Management received a bona fide acquisition proposal that would repay the 12% Notes in full, Management would accept such offer. In response to such request, Management stated that such a provision would be meaningless because Management had the ability to "scuttle" any deal if they did not wish to accept the offer.

14. Nonetheless, in order to avoid the costs and delays of a bankruptcy, on May 25, 2007, the Noteholders entered into a forebearance agreement with the Debtors (the "Forebearance Agreement"), a copy of which is annexed to the Walsh Affidavit as Exhibit "A". The Forebearance Agreement was conditioned upon the premise that the Debtors would "use commercially reasonable efforts to either conduct a Sale or consummate a Refinancing." (Forbearance Agreement, ¶ 4(a)(i)). The Forebearance Agreement defined "Sale" and "Refinancing" as follows:

"Sale" shall mean a sale of either (i) Lexington; (ii) the stock of LRGI; or (iii) the assets and business of Rubber."

5

NYC:176325.4

"Financing" shall mean a refinancing of the Indebtedness of Lexington and LRGI in sufficient amount and on such terms as permit Lexington to repay in full the Notes (other than the Notes held by affiliates of Lexington."

As set forth in the Walsh Affidavit, the Noteholders agreed to the Forebearance Agreement based upon Management's representations during several phone calls that it would be able to "take out", or repay, the 12% Notes.

15. For the next several months after the execution of the Forebearance Agreement, Noteholders waited patiently while Management allegedly conducted a bona fide sale process. During that period, Management and its financial advisor, W.Y. Campbell, provided bi-weekly updates to Noteholders in which Management claimed progress was being made with respect to a sale of the Debtors' entire business. In connection therewith, on September 24, 2007, the Noteholders and the Debtors entered into a First Amendment to the Forbearance Agreement, a copy of which is annexed to the Walsh Affidavit as <u>Exhibit "B"</u>, which extended the term of the forbearance until January 24, 2008. As set forth in the Walsh Affidavit, the Noteholders initiated this extension unsolicited by Management to allow sufficient time to complete a sale process, which Management informed Noteholders was progressing on a satisfactory path.

16. From October 2007 through December 2007, the Noteholders pressed Management for specific details of any and all indications of interests and/or bids received during the sale process. On or about December 13, 2007, Management provided the Noteholders with a "summary" of the process. As set forth in the Walsh Affidavit, Management informed the Noteholders that the "bids" were either too low or there was some structural "glitch," tax problem, or other "entanglement", which prevented the Debtors from consummating a sale and repaying creditors as Management had promised to do. Thereafter, Management instead decided to sell a portion of the Debtors' business, the Rock Hill Facility (referred to as the "Medical Division"), rather than sell all of Lexington or Rubber. Management then contended that it had

never agreed to sell all of Lexington or Rubber and that the Forebearance Agreement could not be read as such. As set forth in the Walsh Affidavit, Management's contention directly contradicted Management's previous representations to Noteholders and the language of the Forebearance Agreement itself, upon which Noteholders relied.

17. The Noteholders, in good faith, continued to attempt to negotiate with Management with respect to a sale of the Medical Division in conjunction with one or more other transactions, including a complete refinancing of the 12% Notes. As described in the Walsh Affidavit, Noteholders also sought Management's written agreement - - as Management had verbally committed to Noteholders as early as February 17, 2007 - - to subordinate and/or equitize the 12% Notes owned by Management.

18. As set forth in the Walsh Affidavit, on January 9, 2008 Management reneged on its prior commitments to the Noteholders and made a proposal under which the 12% Notes would not be repaid. Rather, under such proposal, Noteholders would receive new illiquid notes (having a value of less than principal amount) plus an illiquid minority equity position in the Debtors based upon an unsubstantiated valuation of the Debtors' business. The Noteholders rejected that proposal and indicated that Management was acting in bad faith and not honoring or complying with its fiduciary duties to creditors. As set forth in the Walsh Affidavit, Noteholders' had, and continue to have, serious concerns about the "softening" economy, in particular the automotive sector, which could deteriorate further. The notion of receiving illiquid extended maturity debt and an illiquid minority equity stake, particularly where there would exist a substantial amounts of senior secured debt, was, and continues to be, unacceptable to Noteholders.

19. Because the amended Forebearance Agreement was set to expire at the end of January 2008, Management attempted to persuade the Noteholders to further extend the

Forbearance Agreement. As indicated in the Walsh Affidavit, Noteholders insisted that Management honor its earlier verbal commitment to equitize their 12% Notes in the event of a partial sale of the Debtors' business. As set forth in the Walsh Affidavit, Management threatened to "cram down" - - in a Chapter 11 case - - an unfavorable plan of reorganization (and, in the Noteholders' view, an unconfirmable plan) on unsecured creditors.

20.    By letter dated March 4, 2008 (less than a month before the Petition Date), a copy of which is annexed to the Walsh Affidavit as <u>Exhibit "C"</u>, Debtors' counsel informed the Noteholders that Management owed no fiduciary duties to the Debtors' creditors and that "regardless of whether the corporation is solvent or insolvent, creditors have no right to assert direct claims for breach of fiduciary duty against officers and directors."

21.    As set forth in the Walsh Affidavit, on March 10, 2008 Management delivered another proposal under which the Medical Division would not be sold and which would allow Management to maintain control of the Debtors. The proposal, like the earlier proposal from Management, provided for creditors to receive illiquid extended maturity notes and an illiquid minority equity stake in the Debtors. The Noteholders viewed this proposal as further evidence of Management's singular goal of maintaining control of the Debtors without any regard to the Debtors' obligation to repay, or maximize value for, creditors. As set forth in the Walsh Affidavit, the Noteholders agreed to the Forebearance Agreement based upon Management's representations that it would be able to "take out" the 12% Notes in a transaction if allowed the time to do so.

22.    Through the term of the Forbearance Agreement, the Debtors failed to effect a Sale or a Refinancing and failed to use commercially reasonable efforts towards that end. During this period, Management refused to consider and analyze, in good faith, several potential restructuring proposals. Indeed, as described in the Walsh Affidavit, Management alleged that it

8

had never committed to use commercially reasonable efforts to either sell the Debtors' in their entirety or Rubber. As set forth in the Walsh Affidavit, based on their protracted contact with Management prior to the Petition Date, the Noteholders, which comprise the vast bulk of the Debtors' unsecured creditors, believe that Management was not acting in good faith. Rather, it is evident that Management had, and continues to have, the singular goal of maintaining their ownership and control over the Debtors despite outwardly representing to the Noteholders that it would take a course of action - - specifically, the sale of the Debtors or entering into one or more refinancing transactions - - which would give creditors the highest probability of maximizing recovery on their claims.

23. Based on the foregoing and the Walsh Affidavit, Management has made it abundantly clear to the Debtors' creditors that repayment of creditors or maximization of creditor recoveries is not Management's primary objective.

## ARGUMENT

### CAUSE EXITS FOR TERMINATION OF EXCLUSIVITY UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE

**Section 1121 Generally**

24. Section 1121(b) of the Bankruptcy Code provides the debtor in possession with a 120-day period in which it has the exclusive right to file a plan. Under Section 1121(d) of the Bankruptcy Code, the exclusive periods may be reduced or extended for "cause," a term which is not defined in the statute.

25. Section 1121(d) of the Bankruptcy Code's contemplation of a termination of the debtor's exclusive periods was a major departure from the former Bankruptcy Act of 1898, as amended (the "Act").[2] Under the former Act, the debtor in Chapter XI cases retained the exclusive right to file and solicit acceptances of a plan throughout the case, while the debtor in

---

[2] Pub. L.696, 30 Stat. 541 (repealed 1978).

9

Chapter X was required to relinquish control of its operations to a trustee and any party in interest could propose a plan at any time during the case.[3] In contrast, Section 1121, was crafted to provide courts with flexibility to preserve negotiating leverage between the debtor, creditors, equity security holders, and other parties in interest. It is well settled, however, that "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostage of Chapter 11 debtors." *Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987).

26. One of the basic premises underlying this motion is that the Debtors owe fiduciary duties to their creditors. Because the Debtors' efforts are centered on preserving Management's ownership and control of the Debtors, as opposed to paying creditors or maximizing recoveries for creditors, they are conflicted and are incapable of fulfilling or honoring their duties to creditors. Despite the Debtors defaulting on the 12% Notes in November 2006, the Debtors have explicitly stated that they <u>do</u> <u>not</u> owe fiduciary duties to their creditors. *See* Walsh Affidavit and Exhibit "C" thereto. "Cause" under Section 1121(d) exists because the Debtors do not intend to fulfill their fiduciary duties to creditors. As a consequence, the Debtors exclusivity should be terminated under Section 1121(d).

**The Debtors' Management Owes
Fiduciary Duties to Creditors**

27. If a corporation becomes insolvent or enters what is referred to as the "zone" or "vicinity" of insolvency, its directors and officers are subject to the same duties of loyalty and care to creditors as those that run to stockholders when the corporation is solvent. There is no question that, having defaulted on the 12% Notes eighteen (18) months ago, the Debtors are, at the very least, in the "zone" or "vicinity" of insolvency. Generally two standards are used to

---

[3] H.R. Rep. No. 95-595 at 231 (1978); *see.In re Public Service Co. of New Hampshire*, 88 B.R. 521, 534-35 (Bankr. D. N.H. 1988)

10

NYC:176325.4

identify actual insolvency: (a) the "balance sheet" test and (b) the "equity" or "cash flow" test. A company is deemed "balance sheet" insolvent when the fair value of its liabilities exceed the fair value of its assets. *See, e.g., In re Koubourlis*, 869 F.2d 1319, 1321 (9th Cir. 1989); *In re Healthco Int'l, Inc.*, 208 B.R. 288, 301 (Bankr. D Mass. 1977). A company is deemed equitably insolvent when it is unable to meet is debts as they come due in the ordinary course of business. *See, e.g. MFS/SUN Life Trust-High Yield Services v. Van Dusen Airport Servs. Co*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995). In determining a corporation's solvency, both tests must be considered. The fiduciary duties of a corporation's directors and officers shift to creditors if the corporation is insolvent under either test. *See Pereira v. Cogan*, 294 B.R. 449, 520 (S.D.N.Y. 2003) *vacated on other grounds*, 413 F. 3r 330 (2d Cir. 2005) (interpreting Delaware law as stating that a corporation is insolvent if it is insolvent under either the balance sheet test or the cash flow test).

28. The United States Supreme Court has stated that "[a] court's willingness to allow a debtor's management to remain in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Fixtures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) (stating that, in bankruptcy, the interests of shareholders become subordinate to those of creditors). The term "fiduciary" was aptly described by Justice Cardozo in the seminal case of *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) as follows:

> Many forms of conduct, permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honestly alone, but the punctilio of honor the most sensitive, is then the standard of behavior.

29. In the present case, Management, in their capacity as controlling stockholders, may be entitled to attempt to maximize the value of their own equity interests. They may not,

11

however, do so under the veil of exclusivity under Section 1121 of the Code as fiduciaries to the Debtors' estate and creditors when their conduct clearly demonstrates that they are incapable and unwilling to act as fiduciaries to creditors in this restructuring process.

**Management's Goals and Conduct Are
Inconsistent With Its Fiduciary Duties to Creditors**

30.     It is fundamental that, "[t]he job of debtor in possession remains under the Code as that described by Judge Friendly - to get the creditors paid." *In re Pied Piper Casuals, Inc.*, 40 B.R. 723 (Bankr. S.D.N.Y 1984) citing *In Re Grayson Robinson Stores, Inc. v. Securities and Exchange Commission*, 320 F.2d 940 (2d Cir. 1963).

31.     As discussed above and in the Walsh Affidavit, Management does not, in Judge Friendly's words, seek "to get the creditors paid." Management likewise does not seek to maximize creditor recoveries. Instead, Management is pursuing a course geared solely at maintaining their ownership and control of the Debtors, without regard to the interests of creditors. As described above, such conduct is not the conduct demanded of those owing fiduciary duties to creditors as eloquently described by Justice Cardozo in *Meinhand v. Salmon*. As such, "cause" exists to terminate the Debtors' exclusivity under Section 1121(d) of the Code.

**Termination of Exclusivity Will
Expedite the Resolution of These Cases;
Creditors Should be Allowed to Propose
and Prosecute Their Own Plan On the Same
Timetable as Management's Proposed Plan**

32.     Over the last eighteen months, the Debtors have unsuccessfully attempted to negotiate a restructuring of the 12% Notes. During that period, the Debtors have not demonstrated a willingness to propose a "plan" acceptable to their creditors. Management committed to engage in a *bona fide* process to sell the entire company or otherwise to repay creditors in full. Management breached its commitments and its conduct has been disingenuous.

NYC:176325.4

33.   Management has made it very clear to creditors that they are attempting to use Chapter 11 to force upon their creditors a plan that does not repay creditors. Instead, as indicated in the Walsh Affidavit and above, Management seeks to provide creditors with new illiquid debt and a minority equity stake in the reorganized Debtors aimed solely at allowing management to retain control over the Debtors.

34.   One of the elements in analyzing whether "cause" exists under Section 1121(d) of the Bankruptcy Code to terminate exclusivity is whether such relief would "avoid allowing the debtor to hold the creditors and other parties in interest 'hostage' so that the debtor can force its view of an appropriate plan upon the other parties." *In re Public Service Co. of New Hampshire*, 88 B.R. 521, 537 (Bankr. D. N.H. 1988). It has also been said that continuation of a debtors exclusivity must be "paid for" by 'hard bargaining . . . in formulating and gaining acceptance of a plan of reorganization" *In re Public Service Co. of New Hampshire*, 99 B.R. 155, 173 (Bankr. D. N.H. 1989).

35.   The Debtors' "restructuring" efforts, *i.e.*, Management's plan proposal, will be rejected by creditors. Accordingly, Management's proposed plan cannot be confirmed by this Court. As a consequence, maintaining exclusivity will only unnecessarily delay these Chapter 11 cases. If, on the other hand, exclusivity is terminated, the resolution of these Chapter 11 cases and the Debtors' emergence from Chapter 11 will be expedited. If this Court terminates exclusivity, the Committee's proposed Chapter 11 plan would be on the same timetable as Management's proposed plan. Disclosure statements in respect of the Committee's plan and Management's plan can be consolidated and mailed together. Similarly, the inevitable valuation trial in these cases can likewise be consolidated such that it addresses the Committee's proposed plan and Management's proposed plan, including the value of any securities or paper proposed to be issued under either plan. When a requested termination of exclusivity under Section 1121(d)

13

will expedite the reorganization process, such relief should be granted: "When the Court is determining whether to terminate exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward." *In re Dow Corning Company*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997). Therefore, Debtors' exclusivity should be terminated in order to expedite resolution of these cases.

WHEREFORE, the Committee respectfully requests that the Debtors' exclusive period to file a plan be terminated pursuant to Section 1121(d) of the Bankruptcy Code together with such other and further relief as is just and proper.

Dated: New York, New York
May 21, 2008

> Respectfully submitted,
>
> /s/ Paul N. Silverstein
> Paul N. Silverstein (PS 5098)
> Jonathan I. Levine (JL 9674)
> 450 Lexington Avenue, 15th Floor
> New York, New York 10017
> Tel: (212) 850-2800
> Fax: (212) 850-2929
>
> Counsel to the Official Committee of Unsecured Creditors

NYC:176325.4