UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                                    :
                                                          :     Chapter 11
                                                          :
LEXINGTON PRECISION CORP, et al.,                         :     Case No. 08-11153 (MG)
                                                          :
                                                          :     (Jointly Administered)
                      Debtors.                            :
------------------------------------------------------------x

### AFFIDAVIT OF NICHOLAS W. WALSH IN SUPPORT OF MOTION
### FOR ORDER TERMINATING DEBTORS' EXCLUSIVITY
### UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK   )

NICHOLAS W. WALSH, being duly sworn, deposes and says:

1. I am Principal of Wilfrid Aubrey LLC ("Wilfrid Aubrey") which is located at 100 William Street, New York, New York.

2. Affiliates of Wilfrid Aubrey own approximately $4.5 million principal amount of the Lexington Precision Corporation's 12% Senior Subordinated Notes due 2009 (the "12% Notes"). I was a member of the Ad Hoc Noteholders' Committee prior to the Petition Date. I am currently a member of the Official Committee of Unsecured Creditors of the Debtors (the "Committee").

3. I submit this affidavit in support of the Committee's Motion for an Order terminating the Debtors' exclusivity under Section 1121(d) of the Bankruptcy Code. I have personal knowledge of the facts and circumstances described herein, except as otherwise indicated.

4. In November 2006, the Debtors defaulted in payment under the 12% Notes (the "Default"). On or about December 5, 2006, holders of approximately 75% of the 12% Notes

(the "Noteholders") organized and requested a meeting with Messrs. Lubin and Delano (collectively, "Management") - - who are the Chairman and President of the Debtors, respectively - - to address the Default.

5. From the outset, commencing with a call held on December 14, 2006, Management, by its conduct - - i.e., Management's erratic actions and constantly changing strategies - - has conveyed a message to unsecured creditors that its primary goal is, and always has been, to maintain control over the Company, regardless of whether such goal is in the best interests of creditors. Repayment of creditors has never been the focus of Management's efforts. Management has run the Debtors from an overleveraged position - - the Debtors have been in default or very close to it for at least three years. Indeed, the fact that the 12% Notes have warrants attached bears witness to a default that predates my involvement. Management's focus throughout this process and its involvement with the Debtors has been to stall and delay repayment of its creditors.

6. During the six-month period following the Default, the Noteholders, in good faith, continued, on numerous of occasions, to engage with Management in an attempt to address the Default. With each respective phone call, however, the arrogance and disingenuousness of Management became more and more apparent. For instance, in connection with the negotiation of the Forebearance Agreement (identified below), the Noteholders requested, as a condition to forebearing, that if Management received a bona fide acquisition proposal that would repay the 12% Notes in full, Management would accept such offer. In response to such request, Management stated that such a provision would be meaningless because Management had the ability to "scuttle" any deal if they did not wish to accept the offer.

2

7.  Nonetheless, in order to avoid the costs and delays of a bankruptcy, on May 25, 2007, the Noteholders entered into a forebearance agreement with the Debtors (the "Forebearance Agreement"), a copy of which is annexed hereto as Exhibit "A". The Forebearance Agreement was conditioned upon the premise that the Debtors would "use commercially reasonable efforts to either conduct a Sale or consummate a Refinancing." (Forbearance Agreement, ¶ 4(a)(i)). The Forbearance Agreement defined "Sale" and "Refinancing" as follows:

> "Sale" shall mean a sale of either (i) Lexington; (ii) the stock of LRGI; or (iii) the assets and business of LRGI."
>
> "Financing" shall mean a refinancing of the Indebtedness of Lexington and LRGI in sufficient amount and on such terms as permit Lexington to repay in full the Notes (other than the Notes held by affiliates of Lexington."

The Noteholders agreed to the Forebearance Agreement based upon Management's representations during several phone calls that it would be able to "take out", or repay, the 12% Notes.

8.  For the next several months, the Noteholders waited patiently while Management allegedly conducted a bona fide sale process. During that period, Management and its financial advisor, W.Y. Campbell, provided bi-weekly updates to the Noteholders in which they claimed progress was being made with respect to a sale of the Debtors' entire business. In connection therewith, on September 24, 2007, the Noteholders and the Debtors entered into a First Amendment to the Forbearance Agreement, a copy of which is annexed hereto as Exhibit "B", which extended the term of the forbearance until January 24, 2008. The Noteholders initiated this extension unsolicited by Management, as we wanted to provide whatever support we could to allow sufficient time to complete a sale process, which we were told was progressing on a satisfactory path.

9. From October 2007 through December 2007, the Noteholders pressed Management for specific details of any and all indications of interests and/or bids received during the sale process.

10. On or about December 13, 2007, Management provided the Noteholders with a "summary" of the process and informed the Noteholders that the "bids" were either too low or there was some structural "glitch," tax problem, or other "entanglement", which prevented the Debtors from consummating a Sale and repaying creditors as Management had "promised" to do. Thereafter, Management instead decided to sell a portion of the Debtors' business, the Rock Hill Facility (referred to as the "Medical Division"), rather than sell all of Lexington or LRGI. When the Noteholders contended that this was in violation of the Forebearance Agreement, Management contended that it had never agreed to sell all of Lexington or LRGI and that the Forebearance Agreement could not be read as such. Management's contention directly contradicted Management's previous representations to Noteholders and the language of the Forebearance Agreement, itself, upon which Noteholders relied.

11. The Noteholders, in good faith, continued to attempt to negotiate with Management with respect to a sale of the Medical Division in conjunction with one or more other transactions, including a complete refinancing of the 12% Notes. The Noteholders also sought Management's written agreement - - as Management had verbally committed to Noteholders as early as February 17, 2007 - - to subordinate and/or equitize the 12% Notes owned by Management.

12. On January 9, 2008, Management reneged on its prior commitments to the Noteholders and made a proposal in which the 12% Notes would not be repaid. Rather, under the proposal Noteholders would receive new illiquid notes (having a value of less than principal

4

amount) plus an illiquid minority equity position in the Debtors based upon an unsubstantiated valuation of the Debtors' business. The Noteholders rejected that proposal and indicated that Management was acting in bad faith and not honoring or complying with its fiduciary duties to creditors. I and other Noteholders' had, and continue to have, serious concerns about the "softening" economy, in particular the automotive sector, which could deteriorate further. The notion of receiving illiquid extended maturity debt and an illiquid minority equity stake, particularly where there would exist a substantial amounts of senior secured debt, was, and continues to be, unacceptable to Noteholders.

13. Because the amended Forebearance Agreement was set to expire at the end of January 2008, Management attempted to persuade the Noteholders to further extend the Forbearance Agreement. As indicated in ¶ 11 above, Noteholders insisted that Management honor its earlier verbal commitment to equitize their 12% Notes in the event of a partial sale of the Debtors' business. As further indicated above, Management continued to renege on its earlier commitment and "threatened" to "cram down" - - in a Chapter 11 case - - an unfavorable plan of reorganization (and, in the Noteholders' view, unconfirmable plan) on unsecured creditors.

14. By letter, dated March 4, 2008 (less than a month before the Petition Date), a copy of which is annexed hereto as Exhibit "C", Debtors' counsel informed the Noteholders that Management owed no fiduciary duties to the Debtors' creditors and that "regardless of whether the corporation is solvent or insolvent, creditors have no right to assert direct claims for breach of fiduciary duty against officers and directors."

15. On March 10, 2008, Management delivered another proposal under which the Medical Division would not be sold and which would allow Management to maintain control of

5

NYC:176493.5

the Debtors. The proposal provided for creditors to receive illiquid extended maturity notes and an illiquid minority equity stake in the Debtors. The Noteholders viewed this proposal as further evidence of Management's singular goal of maintaining control of the Company without any regard to the Debtors' obligation to repay, or maximize value for, creditors.

16. I have a reasonable amount of experience in the business of corporate reorganizations, debt restructurings, and the like. I have served on numerous official creditors' committees and ad hoc groups of creditors and stockholders. For example, I currently sit on the official creditors committee of Dura Automotive Systems Inc. and served on the official creditors committee of the recently concluded Federal Mogul cases. Based upon my experience, Management has had more than ample time, approximately 18 months, to negotiate a restructuring of its debt with its creditors and has failed to do so. Unsecured creditors are, in essence, being unfairly and unjustifiably held hostage to Management's desire to keep control of the Debtors.

17. I respectfully request that the Debtors' exclusivity be terminated under Section 1121(d) of the Bankruptcy Code so that creditors can propose their own plan on the same timetable as Management's proposal and that the Committee's motion for such relief be granted.

Nicholas W. Walsh, CFA

Sworn to and submitted before me
this 21st day of May, 2008.

_____
Notary Public

ALISSA WILSON
Notary Public, State of New York
No. 01WI6133750
Qualified in Kings County
Commission Expires September 19, 200\_

6

NYC:176493.5