Hearing Date: June 11, 2008 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: June 4, 2008 at 4:00 p.m. (prevailing Eastern Time)
Reply Deadline:  June 6, 2008 at 4:00 p.m. (prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak
Christopher J. Marcus

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
**In re**                                                    :    **Chapter 11 Case No.**
                                                             :
**LEXINGTON PRECISION CORP., et al.,**                       :    **08-11153 (MG)**
                                                             :
        **Debtors.**                                         :    **(Jointly Administered)**
                                                             :
-------------------------------------------------------------x

### DEBTORS' OBJECTION TO THE OFFICIAL
### CREDITORS' COMMITTEE'S MOTION FOR ORDER TERMINATING
### EXCLUSIVITY UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington"

or the "Debtors"), as debtors and debtors in possession, respectfully submit this objection to the

motion, dated May 21, 2008 (the "Motion"), of the Official Committee of Unsecured Creditors

(the "Committee"), for entry of an order pursuant to section 1121(d) of title 11 of the United

States Code (the "Bankruptcy Code") terminating the Debtors' exclusive period under section

1121(b) of the Bankruptcy Code to file a plan of reorganization.

## PRELIMINARY STATEMENT

1.      A fundamental right afforded to a debtor under the Bankruptcy Code is the exclusive opportunity to negotiate and propose a chapter 11 plan.  To terminate a debtor's exclusivity period, a moving party must demonstrate "cause" sufficient to deprive the debtor of this important protection.

2.      The Committee attempts to demonstrate cause by asserting (i) a breach of fiduciary duties, (ii) an impasse in negotiations that have yet to occur regarding a plan that has yet to be proposed, and (iii) a need to expedite these chapter 11 cases, which are a mere two months old.  The Committee's asserted "cause" is insufficient as a matter of law and unsupported by the facts and circumstances that have occurred both prior to and following the Commencement Date (as defined below).  First, governing case law makes crystal clear that the Debtors' management does not owe fiduciary duties to creditors.  Moreover, even if such duties existed, there is no evidence of a breach.  The evidence demonstrates nothing more than a disagreement between management and the Ad Hoc Committee (as defined below) over the terms of prepetition proposed restructuring plans.

3.      Second, the Committee's allegations of an impasse are premature.  The Debtors have not yet met with the Committee nor has the Committee requested a meeting to discuss the terms of the proposed plan.  Applicable case law supports the Debtors' opportunity to propose a plan, solicit acceptances from the various classes, and prosecute confirmation of the plan, before the Court concludes that an impasse exists sufficient to terminate exclusivity.

4.      Finally, the Committee's desire to expedite these chapter 11 cases is insufficient to terminate exclusivity.  The Debtors are not aware of a single case in which a bankruptcy court has held that the desire to expedite a case can amount to "cause" to terminate

exclusivity, especially when the case is a mere two months old. More importantly, the

Committee fails to demonstrate how terminating exclusivity so that competing reorganization

plans can be litigated on parallel tracks will expedite resolution of these chapter 11 cases.

5.      The Committee's Motion is nothing more than a platform for the Ad Hoc

Committee to prematurely object to the Debtors' putative valuation and form of consideration

that may be provided to holders of the Senior Subordinated Notes (as defined below) under a

plan of reorganization. There is a time and place for confirmation objections -- confirmation.

At this early stage of the Debtors' chapter 11 cases, however, the Committee has offered no

legal or factual basis to eliminate the Debtors' statutory entitlement to exclusivity.

6.      For the reasons set forth below and in the accompanying Memorandum

of Law, the Motion should be denied.

## I.

## FACTUAL BACKGROUND

### A.      Prepetition Negotiations with the Ad Hoc Committee

7.      As set forth in the accompanying Declaration of Michael A. Lubin (the

"Lubin Declaration") annexed hereto as Exhibit A, as a result of liquidity issues in 2006,

Lexington defaulted on payment of interest on its 12% Senior Subordinated Notes due August

1, 2009 (the "Senior Subordinated Notes"). Lubin Declaration, ¶ 11. Promptly thereafter,

Lexington commenced negotiations with Lexington's senior secured lenders (the "Prepetition

Senior Lenders") and the *ad hoc* committee of holders of the Senior Subordinated Notes (the

"Ad Hoc Committee") on standstill agreements while Lexington pursued efforts to sell certain

assets with the aim of restructuring its capital structure. Lubin Declaration, ¶ 13-14. During

2008, in an effort to effect an out-of-court restructuring of its capital structure, Lexington made

several proposals to the Ad Hoc Committee that would have provided new notes and either cash or stock, depending on the proposal, in an amount equal to the outstanding obligations under the Senior Subordinated Notes.  Lubin Declaration, ¶¶ 23-28.  The Ad Hoc Committee rejected every one of these proposals.  Lubin Declaration ¶¶ 24-28.

8.      The prepetition negotiations and the proposals made to the Ad Hoc Committee are more fully discussed in the Lubin Declaration.  Lubin Declaration, ¶¶ 13-28.

**B.      Commencement of the Chapter 11 Cases**

9.      On April 1, 2008 (the "Commencement Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to be authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      On the Commencement Date, the Debtors filed a motion for Authorization Pursuant to 11 U.S.C. Sections 105, 361, 362, 364(c)(1), and 364(e) to (i) Use Cash Collateral, (ii) Grant Adequate Protection to Prepetition Secured Lenders, and (iii) Obtain Postpetition Financing (the "DIP Motion").  [Docket No. 11].  One April 17, 2008, the Court (J. Gonzalez) entered a final order granting the DIP Motion (the "DIP Order").  [Docket No. 61].  Unless the Debtors and the Prepetition Secured Lenders agree otherwise, the Debtors' use of cash collateral during these chapter 11 cases is conditioned upon, among other things, (i) the filing of a plan of reorganization on or before June 30, 2008; (ii) the filing of a disclosure statement on or before July 30, 2008; and (iii) emerging from chapter 11 on or before February 25, 2009.  DIP Order at ¶ 11.

C.    **Exclusive Period to File a Plan of Reorganization**

11.    Pursuant to section 1121(b) of the Bankruptcy Code, the Debtors' initial

exclusive period to file a plan of reorganization expires on July 30, 2008. The Debtors are

currently drafting their proposed plan and disclosure statement and intend to file them on or

before June 30, 2008 and July 30, 2008, respectively.

D.    **Appointment of the Committee**

12.    On April 11, 2008, the United States Trustee (the "U.S. Trustee")

appointed the Committee to represent the holders of unsecured claims against the Debtors.

[Docket No. 49]. The Committee is comprised of seven members, one of which is Wilmington

Trust Company, the indenture trustee for the Senior Subordinated Notes, and three of which

were members of the Ad Hoc Committee. *Id.*; Lubin Declaration, ¶ 12.

13.    On May 13, 2008, the Court entered an order granting the Committee's

application to retain Andrews Kurth LLP ("Andrews Kurth"), as counsel for the Committee.

[Docket No. 101]. Andrews Kurth was also counsel for the Ad Hoc Committee. Application

to Employ Andrews Kurth LLP as Counsel to the Official Committee of Unsecured Creditors.

[Docket No. 64 at ¶ 10].

14.    On May 13, 2008 at 2:00 p.m., the U.S. Trustee held a meeting of

creditors pursuant to section 341 of the Bankruptcy Code (the "Section 341 Meeting"). Neither

the attorneys for the Committee nor any member of the Committee appeared at the 341

meeting. To date, the Committee has not requested a meeting with the Debtors. Lubin

Declaration, ¶ 30.

E.    **The Motion**

15.    On May 21, 2008 – that is, 50 days after the commencement of these
chapter 11 cases and 40 days after the appointment of the Committee – the Committee filed the
Motion seeking an order, pursuant to section 1121(d) of the Bankruptcy Code, terminating the
Debtors' exclusivity period in which to file a plan of reorganization under section 1121(b) of
the Bankruptcy Code.  In support of the Motion, the Committee filed the Affidavit of Nicholas
W. Walsh [Docket No. 134] (the "Walsh Affidavit"), which purports to describe Lexington's
prepetition negotiations with the Ad Hoc Committee.

16.    The Motion is premised on (i) a breach of fiduciary duties, (ii) an
impasse in negotiations that have yet to occur regarding a plan that has yet to be proposed, and
(iii) a need to expedite these chapter 11 cases, which are a mere two months old.

## II.

## OBJECTION

17.    For the reasons summarized below and set forth in detail in the
accompanying Memorandum of Law and the Lubin Declaration, the Committee's assertions are
legally or factually unsupportable and the Motion should be denied accordingly.

### The Committee Has Failed to Show Cause
### to Terminate Debtors' Exclusive Period

18.    A debtor's statutory exclusivity period within the initial 120 days of a
case may only be reduced upon satisfying a heavy burden by demonstrating either (i) gross
mismanagement of the debtor's operations or (ii) feuding among a debtor's principals that
prevents the proposal of a plan, neither of which are present in these cases nor have been
alleged in the Motion or the Walsh Affidavit.

19.      Even if, as the Committee contends, a prepetition breach of fiduciary duties could be the basis for terminating a debtor's exclusivity during the initial 120-day statutory period, the Committee misstates the governing Delaware law regarding the fiduciary duties of officers and directors of a corporation in the "zone of insolvency." Such duties are owed to the corporation and its shareholders, not its creditors.

20.      Even if it is assumed the Debtors' officers and directors owed direct fiduciary duties to the Debtors' creditors, their conduct does not comes close to breaching such duties. Prepetition, the Debtors' officers and directors undertook efforts to restructure the Debtors' entire capital structure, search for new financing, and conduct a sales process while at the same time running a business in the face of a deteriorating automotive industry and a collapse of the financing markets. Their actions were well informed, in furtherance of their duties to the corporation and its shareholders, and the exercise of their sound business judgment. It can hardly be said that such conduct was a breach of their obligations to any party.

21.      The Committee contends that termination of the Debtors' exclusivity period is warranted because an "impasse" exists between the Committee and the Debtors regarding the plan evidenced solely by the collapse of the prepetition negotiation with the Ad Hoc Committee. Even if such an impasse could be the basis for the termination of exclusivity, the assertion is at best premature. How can there be an impasse with respect to a yet to be filed plan? It is the entire section of creditors, not a subset of creditor interests that dominate the Committee, that should first be afforded an opportunity to review and vote on the plan after it is filed before any judgment can be made that an impasse exists. Moreover, the Committee has

not requested a meeting with the Debtors to discuss plan terms, and for that matter, anything else.

22.     The Committee has not shown, nor can it show, how these chapter 11 cases will be expedited by termination of the Debtors' 120-day statutory exclusivity period. If anything, it is self-evident these chapter 11 cases are already on a fast track. As set forth in the DIP Order and subject to further agreements, the Debtors have agreed with their prepetition lenders to file a plan and disclosure statement on or before June 30, 2008 and July 30, 2008, respectively. If anything, it is more likely that adopting the Committee's litigious agenda will result in a more protracted and costly confirmation process to the detriment of all parties in interest.

WHEREFORE for the reasons set forth herein, the Memorandum of Law, and the Lubin Declaration, each filed contemporaneously herewith, the Debtors respectfully request that the Court deny the Motion and grant them such other and further relief as is just.

Dated: June 4, 2008
       New York, New York


                                        _____/s/ Richard P. Krasnow_____
                                        Richard P. Krasnow
                                        Adam P. Strochak
                                        Christopher J. Marcus
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors and
                                        Debtors in Possession

**EXHIBIT A**

**(Lubin Declaration)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak
Christopher J. Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEXINGTON PRECISION CORP., et al.,** | : | **08-11153 (MG)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

-------------------------------------------------------------x

**DECLARATION OF MICHAEL A. LUBIN IN SUPPORT**
**OF DEBTORS' OBJECTION TO THE OFFICIAL CREDITORS'**
**COMMITTEE'S MOTION FOR ORDER TERMINATING**
**EXCLUSIVITY UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE**

I, Michael A. Lubin, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

        1.      I am Chairman of the Boards of Directors and Co-Chief Executive Officer

of Lexington Precision Corporation and Lexington Rubber Group, Inc., which are debtors and

debtors in possession in the above-referenced chapter 11 cases (collectively, the "Debtors" or

"Lexington").   I have held the position of Chairman of the Boards of Directors since 1992 and

the position of Co-Chief Executive Officer of Lexington since 1997.   I and other insiders of

Lexington, and our families and affiliates, hold approximately 22.7% of the 12% Senior

Subordinated Notes due August 1, 2009, issued by Lexington Precision Corporation (the

"Notes").   I also hold all of the 13% Junior Subordinated Notes due November 1, 2009 (the

"Junior Notes").   In addition, I and my family and affiliates own approximately 33% of Lexington's common stock.   I submit this Declaration in support of the Debtors' objection (the "Objection") to the motion of Official Creditors' Committee (the "Committee"), dated May 21, 2008 (the "Motion"), to terminate the Debtors' exclusivity period to file a plan of reorganization and in response to the Affidavit of Nicholas W. Walsh, sworn to on May 21, 2008, filed in support of the Motion (the "Walsh Affidavit").   Prior to the commencement of these chapter 11 cases, I was involved in the unsuccessful negotiations with the "ad hoc committee" of holders of the Notes (the "Ad Hoc Committee") regarding a potential restructuring of Lexington's capital structure out of court.   Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

### Introduction

2.      Although I deny all the allegations and disagree with virtually all characterizations and speculations made in the Walsh Affidavit, I do not believe it is necessary to engage in a point by point rebuttal of the Walsh Affidavit.

3.      As I describe below, (i) Lexington made numerous prepetition restructuring proposals to the Ad Hoc Committee, and (ii) there was a fundamental disagreement between Lexington and the members of that committee regarding the value of such proposals. Lexington was, and remains, of the view that such proposals, if implemented, would have resulted in a full recovery for the non-insider holders of the Notes, and members of the Ad Hoc Committee apparently believed otherwise.   I believe that the issue at the core of the Motion is the disagreement regarding the value of the consideration that the non-insider holders of the Notes would have received under such proposals, rather than any alleged breach of fiduciary duties or contractual breach.

## Chapter 11 Filing

4.      Each of the Debtors commenced their voluntary cases under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code") on April 1, 2008 (the

"Commencement Date").

5.      On April 17, 2008, the court entered a final order (the "DIP Order")

authorizing the Debtors to use cash collateral during these chapter 11 cases and to obtain

postpetition financing of up to $4 million.

6.      Pursuant to the DIP Order, the continued use of cash collateral is

conditioned upon, among other things, the Debtors (i) filing a plan of reorganization on or before

June 30, 2008; (ii) filing a disclosure statement on or before July 30, 2008; and (iii) emerging

from chapter 11 on or before February 25, 2009.   DIP Order at ¶ 11.

7.      The Debtors anticipate filing their schedules and statements of financial

affairs on or before June 13, 2008.   In addition, the Debtors are currently preparing their

proposed plan of organization and a disclosure statement with respect thereto.   Consistent with

the DIP Order, the Debtors anticipate filing their proposed plan of reorganization on or before

June 30, 2008, and a proposed disclosure statement with respect thereto by July 30, 2008.

## Events Leading to Chapter 11 Filing

8.      In 2007, Lexington generated consolidated revenues of approximately

$88.5 million and consolidated earnings before interest, taxes, depreciation, and amortization

(commonly referred to as "EBITDA") of approximately $11.7 million.   However, because over

78% of Lexington's net consolidated sales for 2007 were of rubber and metal components

utilized in automotive products, Lexington's businesses have been affected by the recent

problems in the automotive industry.   Lexington's customers, which are typically tier-one

automotive parts manufacturers, have experienced declining sales, increased pricing pressures, and substantial commodity cost increases (*e.g.*, steel, natural gas, oil, and aluminum). This trend already has taken its toll on several of Lexington's customers, some of which, such as Delphi Corporation, have been forced to commence cases under chapter 11 of the Bankruptcy Code.

        9.     The negative effects encountered by tier-one suppliers as a result of the struggling automotive market have, in turn, affected tier-two manufacturers such as Lexington, which have experienced a corresponding decrease in sales and increase in pricing pressures.

        10.    Although Lexington has responded to these pressures by adjusting its operations to reduce costs, the reduction in sales to the automotive industry has adversely affected Lexington's cash flow. During the second half of 2006, Lexington's automotive customers substantially reduced their orders, in line with lower automobile production and an industry-wide effort to reduce inventories, which caused a decline in the EBITDA generated by Lexington's automotive business from original equipment manufacturers. At the same time, Lexington's Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort. While Lexington maintained positive EBITDA during its fiscal year ending December 31, 2006, and has continued to do so since that time, the combination of these factors caused Lexington's EBITDA to be below planned levels and had an adverse effect on its cash position.

        11.    As a result of the reduction in its cash position, Lexington was not able to make its November 1, 2006, quarterly interest payment with respect of the Notes. The failure to

make this interest payment within the grace period constituted a default under the indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), and by February 1, 2007, that default created a cross-default under certain credit agreements ("Prepetition Credit Agreements") with Lexington's senior secured lenders (the "Prepetition Senior Lenders").

12.    It was around that time that the Ad Hoc Committee was organized. The Ad Hoc Committee is comprised of six groups of funds or affiliated funds (Wilfrid Aubrey LLC; Jefferies & Company, Inc. (together with affiliated funds, "Jefferies"); Hedgehog Capital LLC; Cape Investments, LLC; Valhalla Capital Partners LLC; and Sandler Capital Management), none of which, upon information and belief, were the original holders of the Notes.   Notably, three of the six groups of funds on the Ad Hoc Committee have affiliates sitting on the Committee (*i.e.*, Wilfrid Aubrey LLC; Jefferies; and Valhalla Capital Partners LLC).   Since the indenture trustee for the Notes also sits on the Committee, a majority of the Committee is controlled by holders of the Notes.

**Negotiations with the Ad Hoc Committee and the Prepetition Senior Lenders**

13.    Promptly after the occurrence of the defaults under the Prepetition Credit Agreements and the Indenture, Lexington commenced negotiations with both the Ad Hoc Committee and the Prepetition Senior Lenders in order to address these defaults.

14.    Through mid-March 2007, Lexington held numerous discussions with the Ad Hoc Committee and the Prepetition Senior Lenders in an effort to negotiate an out-of-court restructuring that would resolve Lexington's liquidity issues.   In mid-March, Lexington reached agreements with the Ad Hoc Committee and the Prepetition Senior Lenders on respective standstill arrangements.   The cost to Lexington of obtaining a standstill agreement with the Prepetition Secured Lenders included interest at two points above the contract rates, financing

fees, and fees and expenses of outside counsel, financial advisors, and appraisers, which have aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date.   The cost to Lexington of the standstill agreement with the Ad Hoc Committee included an increase in the rate of interest on all of the Senior Subordinated Notes from 12% to 16%, which cost Lexington approximately $2.3 million.   In the standstill agreement with the Ad Hoc Committee, Lexington also agreed to use commercially reasonable efforts to either sell all or substantially all of its assets or pursue a refinancing that would repay in full the Notes held by non-affiliates of Lexington.

15.    During the course of the next 12 months, while still running a multi-million dollar company, Lexington undertook an extensive process to find potential purchasers and obtain new financing – all in the face of a further deteriorating automotive market and an unexpected collapse of the financing markets in August of 2007.

16.    Lexington commenced the sale and refinancing processes promptly after entering into the standstill agreements with the Ad Hoc Committee and the Prepetition Senior Lenders.   In May 2007, Lexington retained W.Y. Campbell & Company ("Campbell") to help it to explore strategic alternatives, including refinancing and asset sale options.   With the assistance of Campbell, Lexington prepared an offering memorandum to be used in connection with solicitation of offers for the sale of Lexington's rubber molding business (the "Lexington Rubber Group").   In that regard, Campbell, with Lexington's assistance, established a data room containing hundreds of documents to assist interested parties in connection with their due diligence.

17.    In July 2007, Campbell began soliciting offers for the sale of Lexington Rubber Group.   At the end of August 2007, Campbell received initial indications of interest

from potential purchasers.   In September and October 2007, Lexington's management made

presentations to six different prospective purchasers.   From late October through early

December 2007, Lexington obtained proposals from four of the six prospective purchasers for

the purchase of all or portions of Lexington Rubber Group.   Lexington also commenced

discussions with a prospective institutional lender ("New Secured Lender") regarding a potential

refinancing in the event that Lexington decided to sell only a portion of the Lexington Rubber

Group.

18.     From June 2007 and through this entire process, Lexington and Campbell

continued to provide the Ad Hoc Committee with updates on the sale/refinancing process

through approximately 18 bi-monthly conference calls.

**Decision to Sell Medical Division**

19.     In January 2008, Lexington's management and its Boards of Directors

completed their review of the sale proposals.   Based on the proposals that Lexington received

for the various components of its businesses, and the implied enterprise values for all of

Lexington's operations that Campbell provided on the basis of those proposals, Lexington and its

Boards of Directors, with input from its professionals, concluded, in the exercise of their

business judgment, that the aggregate enterprise value of Lexington exceeded the aggregate

amount of Lexington's liabilities and that, accordingly, Lexington was solvent.

20.     Based on this, I and the other members of the Boards of Directors

concluded, consistent with our fiduciary duties and in the exercise of our business judgment, that

the course of action that offered the best prospect of maximizing overall value for Lexington and

its stakeholders, including holders of the Notes, was to proceed with a proposal from a multi-

national industrial company (the "Rock Hill Buyer") to purchase Lexington Rubber Group's

facility in Rock Hill, South Carolina, which produces molded rubber components for use in medical devices, at a price of $32 million in cash (the "Rock Hill Sale"), coupled with a refinancing of its senior secured debt.

21.     In connection with that potential sale, in February 2008, Lexington received a proposal from the New Secured Lender for a $36.7 million senior secured credit facility, which would have refinanced in full the obligations owing to the Prepetition Senior Lenders.

22.     Although Lexington had received proposals for the sale of either assets or stock of Lexington Rubber Group, Lexington's Board of Directors concluded that those proposals would have generated a lower overall value for Lexington and its stakeholders.

### Negotiations with Ad Hoc Committee Regarding
### Additional Extension to Standstill Agreement

23.     In mid-January, Lexington advised the Ad Hoc Committee that it intended to pursue the Rock Hill Sale and that, in order to move forward with that sale and the related financing, it required an extension of the current standstill arrangement, which was due to expire on January 24, 2008, to at least April 30, 2008, in order to provide the Rock Hill Buyer and the New Secured Lender with sufficient time to perform due diligence.   The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that Lexington and its advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale, and significantly, a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion.   Lexington and its advisors believed strongly that a series of two-week extensions and a right to veto would dissuade the Rock Hill Buyer from devoting the significant resources necessary to complete due diligence on a transaction that could disappear unexpectedly or

encourage the Rock Hill Buyer to proceed but ultimately reduce its price because of the "fire-sale" atmosphere.   Negotiations on the extension of the standstill agreement, which included discussions regarding the restructuring proposal discussed below, continued until March 2008. On March 4, 2008, during a conference call with the Ad Hoc Committee, the committee refused to modify their terms for the proposed extension of the standstill agreement and instead demanded that Lexington either agree to its terms, file for chapter 11, or face an involuntary filing by the Ad Hoc Committee.

### Lexington's Restructuring Proposals to the Ad Hoc Committee Would Have Satisfied in Full the Outstanding Obligations Under the Notes

24.   On January 28, 2008, Lexington made a restructuring proposal to the Ad Hoc Committee based upon the Rock Hill Sale.   That proposal, in addition to refinancing in full the Prepetition Senior Lenders, would also have satisfied the Notes in full through (i) a cash payment equal to 100% of the accrued interest and 50% of the outstanding principal amount of the Notes held by non-affiliates of Lexington, and (ii) new notes in the amount of the remaining outstanding principal amount of the Notes held by non-affiliates of Lexington with a 5-year maturity and a cash-pay interest rate of 12%.   The $7,772,000 principal amount of the Notes held by the affiliated holders and the Junior Note held by me would have been converted to common stock, reducing Lexington's remaining debt by approximately $8.2 million.   Because the proposal was going to satisfy the Notes with cash and new notes (which were to have 5-year maturity and a market interest rate of 12%), rather than stock, nothing in this proposal depended on the valuation of the total enterprise.   The Ad Hoc Committee nevertheless rejected it.

25.   Lexington and its advisors believe firmly that the restructuring proposal involving the Rock Hill Sale and the $36.7 million refinancing with the New Secured Lender would have provided the holders of the Notes with a full recovery of their claims, including the

claims for the premium interest accrued during the standstill period. Nevertheless, after the Ad Hoc Committee rejected this proposal, Lexington saw no choice but to abandon the Rock Hill Sale and prepare for a chapter 11 filing.

26.    Although it moved forward with its preparations for a chapter 11 filing, Lexington still hoped to avoid the need for a chapter 11 and, during March 2008, Lexington made two additional restructuring proposals that did not involve any sale of the Rock Hill facility. Lexington and its advisors believe that each of these proposals would also have resulted in a full recovery to the holders of the Notes.

27.    On March 10, 2008, Lexington made a restructuring proposal that would have refinanced in full the Prepetition Senior Lenders and which would have exchanged the Notes for a combination of approximately $17 million of new notes, bearing an interest rate of 12%, and common stock, which would have resulted in non-affiliated holders of Notes owning approximately 34% of outstanding common stock.   Based, in part, on an analysis of the results of the sale process described above and with the input of our advisors, I and Lexington's Board of Directors believed that the aggregate value of the new notes and the common stock to be distributed to such holders of the Notes would have equaled or exceeded the amounts outstanding under the Notes.   Additionally, the Notes held by affiliated holders, as well as the Junior Note held by me, would have been converted to common stock, resulting in an overall reduction in Lexington's total debt by approximately $26 million.   This proposal was supported by a $43.3 million financing proposal from the New Secured Lender.   The Ad Hoc Committee rejected this proposal as well.

28.    Finally, days before the ultimate chapter 11 filing, Lexington made a proposal directly to Jefferies, the largest holder of the Notes, that would have involved a full

conversion of the Notes to common stock and resulted in unaffiliated holders of the Notes

owning a majority of the common stock of Lexington, provided that an agreement could be

reached regarding (a) the continuing interest of existing stockholders, (b) the corporate

governance of Lexington following the conversion, and (c) the right of Lexington to buy out the

non-affiliated holders (at the full amount of their claims plus a post-conversion return of nearly

20% per annum) should they decide to terminate the governance arrangements.   Although

Lexington and its advisors believed that this proposal, too, would have offered the holders of the

Notes a full recovery, this proposal also was rejected.

29.    Consistent with Lexington's belief that its aggregate enterprise value

exceeds its aggregate liabilities, Lexington's proposals to the Ad Hoc Committee necessarily

contemplated that equity holders would retain their equity interests, subject to dilution as a result

of common stock being provided to holders of the Notes and the Junior Note. The Ad Hoc

Committee's positions throughout the negotiations seemed designed to force Lexington to breach

its fiduciary duties to its stockholders, who clearly are entitled to participate in the future of this

solvent enterprise.

30.    I understand that the Ad Hoc Committee did not like any of the

restructuring proposals that were made prepetition, but it was and is my belief that each of the

foregoing proposals was well thought out, fair, proposed in good faith, and would have resulted

in satisfying the Notes in full.   Moreover, while the Committee has not yet requested a meeting

with Lexington, if afforded the opportunity, I intend to negotiate in good faith with all

constituents in these chapter 11 cases to attempt to reach a consensual plan of reorganization that

satisfies creditors in full and treats all constituents fairly.   Failing that, however, on or before

June 30, 2008, Lexington will propose a plan that will accomplish that goal in a manner that is

fair, properly takes into account the interests of all stakeholders, including holders of equity

interests, and results in Lexington's successful emergence as a viable restructured enterprise.

Dated: June 4, 2008
New York, New York

/s/ Michael A. Lubin
Michael A. Lubin