UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                  :
                                                        :     Chapter 11
                                                        :
LEXINGTON PRECISION CORP, et al.,                       :     Case No. 08-11153 (MG)
                                                        :
                                                        :     (Jointly Administered)
                              Debtors.                  :
-----------------------------------------------------------x

**AFFIDAVIT OF NICHOLAS W. WALSH IN SUPPORT OF COMMITTEE'S
REPLY TO DEBTORS' OBJECTION TO MOTION FOR ORDER TERMINATING
DEBTORS' EXCLUSIVITY UNDER SECTION 1121(D) OF THE BANKRUPTCY CODE**

STATE OF NEW YORK    )
                     )  ss.:
COUNTY OF NEW YORK   )

NICHOLAS W. WALSH, being duly sworn, deposes and says:

1.  I am Principal of Wilfrid Aubrey LLC ("Wilfrid Aubrey") which is located at 100 William Street, New York, New York.

2.  Affiliates of Wilfrid Aubrey own approximately $4.5 million principal amount of Lexington Precision Corporation's ("Lexington") 12% Senior Subordinated Notes due 2009 (the "12% Notes"). I was a member of the Ad Hoc Noteholders' Committee prior to the Petition Date (the "Ad Hoc Committee"). I am currently a member of the Official Committee of Unsecured Creditors of the Debtors (the "Committee").

3.  I submit this affidavit in support of the Committee's Reply to the Debtors' Objection to Motion for an Order terminating the Debtors' exclusivity under Section 1121(d) of

NYC:177805.4

the Bankruptcy Code. I have personal knowledge of the facts and circumstances described herein, except as otherwise indicated.

4. As described in my prior affidavit, sworn to in May 21, 2008, the Ad Hoc Committee was engaged in discussions with Messrs. Lubin and Delano (collectively "Management") for approximately eighteen (18) months prior to April 1, 2008 (the "Petition Date"). According to Lexington's Schedule 14A filed with the SEC on April 29, 2008, Management, along with other officers and directors (collectively with Management, the "Insiders"), beneficially own 70.7% of the common stock of Lexington.

5. Immediately prior to the Petition Date, Management ceased all discussions and negotiations with the Ad Hoc Committee regarding a proposed plan of reorganization. It is hard to believe that the Debtors do not know how to get in touch with the Committee as it is comprised of three members of the Ad Hoc Committee - - i.e., there were already established lines of communication between the two parties. As for our part, we took the Debtors at their word when they delivered the March Proposal (as defined below) to us that we could "take it now or take it in court." Having been the recipient of this ultimatum with respect to a deeply flawed proposal (as further described below), we felt the Debtors would not be receptive to any further overtures on our part. Management has not shared a term sheet or any other information regarding a proposed plan with the Committee despite the fact that they intend to file a proposed plan by the end of the month.

6. Despite the characterizations to the contrary set forth in the Declaration of Michael A. Lubin in support of Debtors' Objection to the Official Creditors' Committee's Motion for Order Terminating Exclusivity Under Section 1121(d) of the Bankruptcy Code dated June 4, 2008 (the "Lubin Declaration"), as I describe in further detail below: (a) Management

2

never negotiated in good faith with the Ad Hoc Committee pre-Petition Date and has ceased all negotiations with the Committee post-Petition Date; and (b) all of the pre-Petition Date proposals made by to the Ad Hoc Committee share the following flaws and/or characteristics: (i) each of the proposals were specifically designed so that the Insiders would retain, at a minimum, 50% of the common stock of Lexington post-reorganization; (ii) the implied total enterprise value of Lexington under each of the proposals was based upon unrealistic assumptions for an over-levered auto supply company in a deteriorating market -- i.e., the multiples used to derive the enterprise value in each of the proposals were in excess of 9.0x whereas a cursory review of the marketplace suggests a proper multiple of 4.0x - 5.5x; and (iii) none of the proposals provided a solution for the problem which has plagued Lexington throughout its recent history -- overleverage. A strategically sound restructuring, which we would seek to implement, would bring the company's debt load to a more manageable level and more in line with its peers.

7.    As Lubin admits in the Lubin Declaration, the basis for entering into the Forbearance Agreement was Lexington's agreement to sell all or substantially all of its assets or pursue a refinancing that would repay the 12% Notes in full. On this premise, the Ad Hoc Committee allowed the Debtors ample time - - including a four month extension of the Forbearance Agreement which we offered up as a gesture of good faith without having been solicited by Management - - to find potential purchasers and/or obtain new financing. During this time, Management received several indications of interest to acquire all of Lexington yet Management chose not to pursue these bids in good faith in direct contravention of the Forbearance Agreement. According to Management, none of the non-binding indications of interest were pursued because the indications of interest did not assign a sufficiently large total enterprise value according to Management -- as these cases progress it will become clear that, no

3

independent third party has ever, nor likely will ever, assign a value to Lexington that equals the value ascribed to Lexington by Management. Becoming increasing skeptical of Management's lack of action, decisions and underlying motives, the Ad Hoc Committee attempted to diligence the sale process -- beginning with a review of the actual non-binding indications of interest. Interestingly, having requested such on several occasions, they were never provided to the Ad Hoc Committee

**January 23, 2008 Proposal**

8.  In January 2008, Management informed the Ad Hoc Committee that it intended to sell the Rock Hill, South Carolina facility (the "Medical Division"). In connection therewith, Management made a restructuring proposal to the Ad Hoc Committee on January 23, 2008 which is attached hereto as Exhibit A (the "January Proposal"). The January Proposal was premised on satisfying the Notes via (i) a cash payment of approximately $19.8 million equal to the aggregate of 100% of the accrued interest for all Noteholders (including affiliates) and 50% of the outstanding principal amount of the 12% Notes held by non-affiliates of Lexington (the Noteholders") and (ii) the issuance of new notes -- with a 12% coupon and a 5-year maturity -- in the amount of approximately $13.2 million. In connection therewith, the $7.772 million of 12% Notes held by affiliates would be converted to common stock (the "Affiliate Note Conversion"). Management intended to fund the January Proposal via the sale of the Medical Division and obtaining $36 million in financing from North Fork Bank (the "North Fork Financing").

9.  The Ad Hoc Committee rejected the financing for several reasons. First, the North Fork Financing was premised upon a non-binding indication of interest received from North Fork Bank which was subject to a variety of due diligence and other outs. Based on my, and others, review of the North Fork Financing, it did not appear that the loan was feasible -- i.e.

4

North Fork Bank, after performing its due diligence, would not make the loan. Further, given the projected leverage and estimated fixed charge coverage reflected in the February 6, 2008 North Fork Financing Proposal, the Ad Hoc Committee believed that, at a minimum, North Fork Bank would place significant restrictions on the new subordinated notes (including, restricting the Noteholder's ability to accelerate and restricting cash interest payments). These general market terms should have been clear to Management and its advisors. Yet, Management decided to present the Ad Hoc Committee with what appeared to be another empty promise.

10.    Second, despite claims to the contrary in the Lubin Declaration, the January Proposal did not provide for a full recovery to Noteholders on their claims. Although the January Proposal provided for a possibility of a material cash payment (which the Ad Hoc Committee substantially discounted the probability of occurring as indicated in the prior paragraph) to the Noteholders, it was the collective view of the Ad Hoc Committee that the new notes, based upon their terms (i.e., 12% coupon, 5 year maturity, etc.) and the fact that the new notes were to be issued by a highly-levered (5.5x) auto supply company, would trade on the market at a significant discount. Therefore, the Noteholders viewed their actual recovery to be well below 100%, or recovery in full.

11.    Third, the Lubin Declaration conspicuously sidesteps another reason why the Ad Hoc Committee rejected the January Proposal. The Ad Hoc Committee told Management that in order to consummate a deal premised upon the January Proposal, Management would have to commit, in writing, to the Affiliate Note Conversion. Although Management had verbally committed to convert the 12% Notes owned by them to equity, Management would not honor such commitment stating that there were too many contingencies and that they would not commit

5

NYC:177805.4

to a conversion at that time. We were being asked to sign up to a deal to which Management itself would not commit. This is hardly evidence of good faith.

**March 10, 2008 Proposal**

12. Over the next few months, Management continued to string the Ad Hoc Committee along telling us one day that they intended to file for Chapter 11 and the next that there was a deal to be done. On March 10, 2008, Management made another restructuring proposal to the Ad Hoc Committee which is attached hereto as Exhibit B (the "March Proposal"). The March Proposal was presented to the Ad Hoc Committee by Management as "take it now out of court" or we will force it on you in a Chapter 11.

13. Pursuant to the March Proposal, Noteholders would receive (i) the issuance of new notes -- with a 12% coupon and a 5-year maturity -- for 50% of their claims or approximately $16.95 million and (ii) 50% of their claims in Lexington Common Stock at a conversion rate of $4.50 per share. The mechanics of the March Proposal were structured so that the Insiders would retain 60% of common stock of Lexington post-reorganization.

14. The March Proposal was insulting to the Ad Hoc Committee as the projected recovery to Noteholders, based upon realistic market assumptions, was well below one hundred cents on the dollar and substantially less than the recovery pursuant to the January Proposal, while still giving substantial recovery to equity interests. Rather than taking a step forward in the negotiations, Management took several steps backward. When formulating the proposal, management calculated the implied total enterprise value at approximately $104.6 million or a 9.4 multiple of 2007 EBITDA (i.e., $11.112 million). A cursory review of the marketplace, however, suggests a proper EBITDA multiple for Lexington is undoubtedly far less and, as a result, the proposed equity conversion rate was extremely inflated.

15.     Moreover, as discussed in paragraph 10 herein, the new notes would trade at a discount in the marketplace due to Lexington being highly-levered and in the auto supply industry. Not to mention that the proposed size of the new note would render it hopelessly illiquid. Again, Lubin's assertions to the contrary are not in touch with the realities of the marketplace -- the March Proposal would not even come close to pay Noteholders in full. As a result, the Ad Hoc Committee - - as any reasonable business person would do - - rejected the March Proposal as the proposed recovery was far less than payment in full.

16.     Since the Petition Date, neither the Debtors nor Management has approached any members of the Ad Hoc Committee nor have they approached the Committee to discuss the Debtors' proposed plan of reorganization. Based upon prior communications in March 2008, I can only assume that the Debtors intend to propose a plan of reorganization along the lines of the March Proposal -- a plan which is unacceptable to Noteholders whose claims comprise the vast bulk of the Debtors' unsecured claims.

17.     Management has, time and again, proposed plans which have been solely designed to maintain their control of Lexington to the detriment of creditors. Nothing has changed post-Petition Date but for the fact that Management has been "radio silent." Management has purposefully decided not to engage with the Committee regarding the negotiation of a plan of reorganization.

18. Therefore, again, I respectfully request that the Debtors' exclusivity be terminated under Section 1121(d) of the Bankruptcy Code so that creditors can propose their own plan on the same timetable as Management's proposal and that the Committee's motion for such relief be granted.

Nicholas W. Walsh, CFA

Sworn to and submitted before me
this 10th day of June, 2008.

Notary Public

ALISSA WILSON
Notary Public, State of New York
No. 01WI6133750
Qualified in Kings County
Commission Expires September 19, 2009