```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    --------------------------------X
                                     :  08-11153
4    In re:                          :
                                     :
5       LEXINGTON PRECISION CORP.    :  June 11, 2008
                                     :
6                         Debtor.    :  One Bowling Green
     --------------------------------X  New York, New York
7

8

         TRANSCRIPT OF MOTION FOR ORDER TERMINATING
9                     DEBTORS' EXCLUSIVITY
           BEFORE THE HONORABLE MARTIN GLENN
10            UNITED STATES BANKRUPTCY JUDGE

11

12

     APPEARANCES:
13

     For the Debtor:        CHRISTOPHER MARCUS, ESQ.
14                          JOHN LUCAS, ESQ.
                            RICHARD KRASNOW, ESQ.
15                          Weil, Gotshal and Manges
                            767 5th Avenue
16                          New York, New York 10153

17

     For the Committee:     PAUL SILVERSTEIN, ESQ.
18                          JONATHAN I. LEVINE, ESQ.
                            Andrews Kurth
19                          450 Lexington Avenue
                            New York, New York 10017
20

21

22

23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

2

1              THE COURT:  All right.  We're here in Lexington

2  Precision Corp. under 08-11153.  Counsel, please make your

3  appearances.

4              MR. SILVERSTEIN:  Good afternoon, Your Honor.  Paul

5  Silverstein, Andrews Kurth for the Committee.  With me is

6  Jonathan Levine.

7              THE COURT:  Thank you.

8              MR. MARCUS:  Good afternoon, Your Honor.  Christopher

9  Marcus, Weil, Gotshal and Manges for Lexington.  With me at

10 counsel table, John Lucas and Richard Krasnow as well.

11             THE COURT:  Thank you very much.

12             MR. MARCUS:  I'll just quickly introduce Mr. Mike

13 Lubin and Warren Delano from Lexington who are here in the

14 courtroom as well.

15             THE COURT:  Thank you.

16             MR. SILVERSTEIN:  Your Honor, as an aside, Nicholas

17 Walsh is likewise in the courtroom as well.

18             THE COURT:  All right.  Mr. Silverstein, it's your

19 motion.

20             MR. SILVERSTEIN:  Thank you, Your Honor.

21             Your Honor, this is the committee's -- first let me

22 say that I'm a bit under the weather so any crackle in my voice

23 has nothing to do with puberty.  It's purely my voice.

24             Your Honor, this is the committee's motion for an

25 order terminating the debtors' exclusivity under Section

3

1   1121(d) of the Bankruptcy Code.  There have been rather fulsome

2   briefings and affidavits on this matter, so I'll try to be

3   brief, Your Honor.

4        First, the statutory underpinnings.  Section 1121 was

5   enacted, Your Honor, to cure or solve the imbalances of a

6   former bankruptcy act, specifically under former Chapter 11,

7   only the debtor had a right to file a claim.  Under Chapter 10

8   where there was a mandatory reorganization trustee, any party

9   could file a claim.

10       In enacting Section 1121 Congress sought to provide

11   flexibility in the context of a new Bankruptcy Code that had as

12   its underpinning the fostering of consensual negotiations for a

13   consensual Chapter 11 plan.  Negotiation is the core of a

14   Chapter 11.

15       In Public Service of New Hampshire, 99 BR 155,

16   Bankruptcy Judge Yacos articulated it well when the Court said

17   that a debtor earns or pays for continued exclusivity by

18   negotiating in good faith with the creditors.  In other words,

19   according to Judge Sigmund in the Lehigh Valley case, given

20   bankruptcy's overarching all of consensual reorganization,

21   exclusivity is intended to promote the environment in which

22   consensual planning may be negotiated.

23       THE COURT:  Did you pick up the phone and call Mr.

24   Marcus and Mr. Krasnow and say let's sit down and negotiate?

25       MR. SILVERSTEIN:  After 18 months --

4

1        THE COURT:  No, just since the filing of the petition

2   have you picked up the phone and called Mr. Marcus and Mr.

3   Krasnow and said on behalf of the committee -- since you've

4   been retained on behalf of the committee, not for your ad hoc

5   committee.  Since you're counsel for the committee have you

6   picked up the phone and called and said let's sit down and

7   start negotiating?

8        MR. SILVERSTEIN:  I patiently waited for them to call

9   us, Your Honor.

10       THE COURT:  That wasn't my question.

11       MR. SILVERSTEIN:  No, I have not because under the

12  circumstances, Your Honor, it made absolutely no sense because

13  basically what we have before us in terms of the dynamic --

14       THE COURT:  You know, when I was practicing law, Mr.

15  Silverstein, I used to find that the phone was right there on

16  my desk and I could pick it up and there wasn't a set of rules

17  that said they've got to call me before I call them.

18       MR. SILVERSTEIN:  It's not a question of standing on

19  ceremony, it's a question of the history of these cases and the

20  history of the last 18 months because basically to sort of get

21  to the end, Your Honor, what has basically happened is that

22  management said to the pre-petition committee either take this

23  deal or we'll ram this deal down your throat in a Chapter 11.

24  And on that note, there's no reason for me --

25       THE COURT:  You know, I'll be quite candid, I don't

5

1    find -- you know, the affidavits that you submitted with the

2    affidavit of your initial filing and with your reply which

3    focused almost exclusively, not entirely, almost exclusively on

4    the pre-petition period, I don't find it particularly

5    persuasive as to the issue of terminating exclusivity once this

6    case started.

7          MR. SILVERSTEIN:  Your Honor, we understand the plan

8    that the debtor will propose because the debtor told us pre-

9    petition what plan they would propose, and therefore, there's

10   been no activity in terms of plan negotiations by the debtor

11   whatsoever.  The debtor has an obligation to negotiate with

12   creditors.

13         THE COURT:  On what day after the filing of a case

14   are they supposed to pick up the phone and call you and say

15   it's time to start negotiating?

16         MR. SILVERSTEIN:  Well, they're supposed to pick up

17   the phone when either the committee's appointed or when the

18   committee's first set of professionals, specifically counsel,

19   is retained to say okay -- at least that's what I've done 25

20   years of practicing in this arena.  You call up the committee

21   and you say it's time to start exchanging, for us to give you

22   the following information and let's try to streamline the

23   process, let's try to get whatever data we need to have back

24   and forth and let's sit down and start this case in earnest.

25   That has never happened.

6

1      THE COURT:  You and Mr. Marcus have been in Court

2  together at prior hearings in this case.  Did you turn around

3  to Mr. Marcus and say on behalf of the committee we want to sit

4  down with you next week, two weeks?  Have you sent him a letter

5  saying we have the specific information requests?

6      MR. SILVERSTEIN:  Yes.

7      THE COURT:  What response have you gotten?

8      MR. SILVERSTEIN:  The initial letter or the initial

9  e-mail was to Mr. Krasnow and I said to Mr. Krasnow, "Are you

10 involved in the flow of information with SRR, the committee's

11 financial advisor?  Because it's not flowing too well, Mr.

12 Krasnow."  He said he would get back.  One of my litigators has

13 been in communication with one of Mr. Krasnow's litigators on

14 that subject and, you know, it's not going extremely well, but

15 apparently [unintelligible] but it's slow.  SRR was retained on

16 May 13th.  It is now June 11th.  It's been a very slow and

17 painful -- well, let me rephrase it.  It's not been that

18 painful but it's been a very slow struggle to get the

19 information.  And that was one of the things that I think we

20 pointed out in the Walsh affidavit.  The Walsh affidavit is,

21 even as an example, the initial indications of interest that

22 the debtors claim that they got from various prospective

23 buyers.

24      THE COURT:  You're focusing on --

25      MR. SILVERSTEIN:  We haven't even seen those.

7

1          THE COURT:  You're focusing on the pre-petition

2    period again; correct?

3          MR. SILVERSTEIN:  I'm focusing on both because to me,

4    Your Honor, the difference between the pre-petition period,

5    it's sort of a continuation, Your Honor.  We view this

6    restructure as having commenced approximately more than 18

7    months ago.  There was significant negotiations and frankly,

8    the holders of the 12 percent notes bent over backwards to

9    avoid a filing, bent over backwards to accommodate the debtors

10   and bent over backwards to see if there was a way consensually

11   to resolve this matter out of Court.  My constituency has bent

12   over backwards to negotiate.  My constituency has bent over

13   backwards to meet and try to reach a consensual --

14         THE COURT:  But you didn't bend over forwards and

15   pick up a phone on your desk and call Mr. Krasnow and Mr.

16   Marcus.

17         MR. SILVERSTEIN:  No, because that would have been

18   inappropriate under the circumstances, Your Honor.

19         THE COURT:  It would?

20         MR. SILVERSTEIN:  Yes.

21         THE COURT:  How's that?

22         MR. SILVERSTEIN:  Because of the history of this

23   case, Your Honor.  It would have been extremely inappropriate

24   and frankly we were hoping, and that hope did not come to

25   fruition, we were hoping that there would be some semblance of

8

1  recognition by the debtors' management of their fiduciary

2  duties in Chapter 11 and that never came to pass.

3           THE COURT:  How have they breached the fiduciary duty

4  in Chapter 11?  Let's not talk about the pre-petition period.

5           MR. SILVERSTEIN:  Well, they take the position that

6  they're not fiduciaries to creditors.

7           THE COURT:  You attach a letter that was written in a

8  pre-petition exchange.

9           MR. SILVERSTEIN:  Right.

10          THE COURT:  What is it that they have -- I didn't see

11 anything in the Walsh or Welsh affidavits that showed that the

12 debtor or its professionals said that they don't owe a

13 fiduciary duty to the estate once the Chapter 11 petition was

14 filed.  Is there something I missed?

15          MR. SILVERSTEIN:  Yeah.  I think what you missed is

16 that --

17          THE COURT:  Where is that?

18          MR. SILVERSTEIN:  -- they said in their papers that

19 they don't owe fiduciary duties to the creditors.  They didn't

20 say they don't --

21          THE COURT:  No, point to me where in the post

22 petition period that the debtors, the debtor in possession, or

23 its professionals have said they do not owe a fiduciary duty to

24 the estate.

25          MR. SILVERSTEIN:  They didn't use the word estate.

9

1   They said they don't owe it to creditors.

2          THE COURT:  Just show me where that is.

3          MR. SILVERSTEIN:  I believe it's in the brief, Your

4   Honor.  I believe it is all over their brief when they say that

5   they're solvent and therefore, because they're solvent, there

6   are no fiduciary duties owing to creditors.  I can pull it out.

7          THE COURT:  Yes.  Go ahead.  Show me where they say

8   it.  I mean solvent or not, once they're in this Chapter 11

9   proceeding, the Bankruptcy Code and case law imposes certain

10  fiduciary obligations on the debtor in possession and on its

11  professionals.  Where have they disputed that they -- well, you

12  say they say they don't owe any fiduciary duty?

13         MR. SILVERSTEIN:  To creditors.

14         THE COURT:  Show me.

15         MR. SILVERSTEIN:  Your Honor, I'm looking at their

16  brief at this moment to point that.  Your Honor, Paragraph 2 of

17  the debtor's brief that says, quote --

18         THE COURT:  Just give me a second and I'll find it.

19         MR. SILVERSTEIN:  [Unintelligible] in Paragraph 2.  I

20  can quote it if you'd like.

21         THE COURT:  Go ahead.

22         MR. SILVERSTEIN:  It says --

23         THE COURT:  Is this the official committee of

24  unsecured creditors motion for order terminating those

25  specific?  Is that what you're looking at?

10

1          MR. SILVERSTEIN:   No.   It's the debtor's objection to

2   the committee's --

3          THE COURT:   The debtor's objection.

4          MR. SILVERSTEIN:   Yes.

5          THE COURT:   Okay.   Just a second.

6          MR. SILVERSTEIN:   It says, and I quote, first --

7          THE COURT:   Hold on, hold on.

8          MR. SILVERSTEIN:   Sure.   Certainly.

9          THE COURT:   Go ahead.

10          MR. SILVERSTEIN:   It says, quote, "First, governing

11   case law makes crystal clear that the debtor's management does

12   not owe fiduciary duties to creditors," end quote.   They didn't

13   say did not pre-petition owe fiduciary duties.   They said does

14   not owe fiduciary duties to creditors.   Your Honor, based on

15   that statement, it's not a statement talking about the past,

16   it's a statement talking about today.   And based on their

17   papers, we believe that the debtors are of the position that

18   they do not -- that the debtor does not owe fiduciary duties to

19   creditors which we think is contrary to the law, and it's

20   contrary to the law that we have cited in our cases.   I think

21   the debtor would say that they owe fiduciary duties to the

22   estate, but the debtor makes a distinction between all the

23   fiduciary duties to the estate and fiduciary duties to

24   creditors.

25          THE COURT:   All right.   So show me the case law that

11

1   says they owe the fiduciary duty to the creditors as opposed

2   to -- I mean I'm familiar with cases, I've written on the

3   subject --

4           MR. SILVERSTEIN:  I'm aware of that.

5           THE COURT:  -- about them owing a fiduciary duty to

6   the estate.  But where -- give me a case that says they owe a

7   fiduciary duty to creditors.

8           MR. SILVERSTEIN:  That would be specifically in our

9   reply to the brief on Page 6.  We cited Ionosphere, 113 BR 164;

10  Centennial Textiles, 227 BR 606; Bowman, 181 BR 836, and the

11  cases cited therein.

12          THE COURT:  Okay.

13          MR. SILVERSTEIN:  Frankly, you know, as to -- again,

14  my [unintelligible], I apologize [unintelligible].  The --

15          THE COURT:  I always interrupt.

16          MR. SILVERSTEIN:  As do --

17          THE COURT:  It's hard to get an argument out, Mr.

18  Silverstein, without me interrupting, so get used to it.

19          MR. SILVERSTEIN:  It's okay.  We have something in

20  common in that respect.

21          THE COURT:  The difference is that you've got to stop

22  when I --

23          MR. SILVERSTEIN:  You're the judge and what you say

24  is the law.  I understand that, Your Honor.  As to their -- how

25  about if I back up and go back [unintelligible] Your Honor.

12

1          THE COURT:  Okay.

2          MR. SILVERSTEIN:  Thank you.  Many Courts, Your

3   Honor, have attempted to look to delineate factors by which

4   cause exists or doesn't exist.  The Court's inquiry is very

5   fact specific that exclusivity is typically not terminated in

6   the first 120 days of the case.  It does not mean that

7   exclusivity can't be terminated in the first 120 days of the

8   case.  It's very fact specific.

9          The facts here, as we submit, suggest, Your Honor,

10  that it should be terminated.  The debtors are not, in the

11  words of Judge Yacos, paying for continued exclusivity because

12  they are not negotiating.  Despite Your Honor's comments that I

13  should have called them which --

14         THE COURT:  No, I'm not saying you should have but

15  there was nothing that stopped you from --

16         MR. SILVERSTEIN:  There was nothing --

17         THE COURT:  For you to come in here and say terminate

18  exclusivity because they haven't negotiated with us, I

19  understand what your affidavit showed with respect to pre-

20  petition subject to interpretation.  I don't want to get into

21  that.  But in the post petition period, okay, I've got

22  questions for Mr. Marcus or Mr. Krasnow, whoever is going to

23  argue it, about why haven't you picked up the phone and called

24  Mr. Silverstein?  They'll get those questions too.

25         MR. SILVERSTEIN:  I appreciate that.

13

1   THE COURT:  But there's nothing that stopped you from

2   picking up the phone.  You're the one who's moved to terminate

3   exclusivity you say because they haven't negotiated, but you

4   never tried.  You know, you might have a stronger position if

5   you said I wrote at least six letters, I called them three

6   times.  When we left Court on such and such date I said to them

7   we want to sit down with you now.  We don't want to do it two

8   months from now.  We want to do it now.  But that's not your

9   showing.

10   MR. SILVERSTEIN:  Again, Your Honor, the reason we

11   didn't do that was because the debtors' management made it

12   very, very clear to the 12% note holders who hold the bulk of

13   the single class --

14   THE COURT:  Well, if you didn't have the burden --

15   you do have, you acknowledged the other day, obviously you have

16   the burden on a motion to terminate.  Now, this is not the

17   debtors' motion to extend exclusivity.  Then the question would

18   be well, what have you done until now?  Why haven't you picked

19   up the phone and called Mr. Silverstein?  Why haven't you done

20   anything to engage them in discussion?  But we're not that.  I

21   mean --

22   MR. SILVERSTEIN:  I clearly --

23   THE COURT:  I viewed your -- you know, when I first

24   read your motion I viewed this, you know, oh give me a break,

25   this is a stalking horse.  You know, they want to file this now

14

1   so if the debtor comes and seeks to extend exclusivity they're

2   going to say oh, but we told you back then.

3           MR. SILVERSTEIN:  Yes, and that wasn't the purpose,

4   Your Honor.  The purpose was exactly what we said.  The purpose

5   was that we've spent 18 months in what we view as as

6   fundamentally a bad faith exercise by management.  I

7   understand, Your Honor, why management wants to keep a company

8   that they formed, you know, 20, 30, whatever years ago.  Okay.

9   This is their baby.  I understand that.  The problem is they're

10  insolvent, and they're insolvent under the Castro equity test

11  which we've cited in our papers.  It's not just a balancing

12  test because we don't have to get to the balancing test today.

13          THE COURT:  Sounds like some day we're going to have

14  an interesting evaluation hearing.  It's not today.

15          MR. SILVERSTEIN:  At some point we will.

16          THE COURT:  It's not today.

17          MR. SILVERSTEIN:  It's not today.  It's not today but

18  on a cash flow [unintelligible] test there's no question under

19  applicable case law that we cited --

20          THE COURT:  That doesn't say -- you know, they may be

21  insolvent, and therefore, they belong in a chapter proceeding.

22  It doesn't mean there's value in the equity.  You can have

23  companies who can't pay their debts as they mature, and that

24  may well be this situation.

25          MR. SILVERSTEIN:  But for the purpose of duties and

15

1   for the purpose of fiduciary duties under both state law and

2   under the Bankruptcy Code, they cannot take the position, as

3   they are, that they --

4       THE COURT:  If they didn't pick up the phone and call

5   you on the first day you were selected as committee counsel,

6   they violated their fiduciary duty because the company is

7   insolvent and they were obligated to pick up the phone that day

8   and say come on over, let's start negotiating.

9       MR. SILVERSTEIN:  I didn't say that, Your Honor.

10      THE COURT:  So where's the line drawn?  Why -- hasn't

11  Congress in giving the debtor exclusivity for 120 days

12  presumptively said they've got at least that long?

13      MR. SILVERSTEIN:  No.  I don't think that's what

14  Congress said they have at least that long.  Congress said

15  we'll give you 120 days as an initial exclusivity period

16  subject to increasing that period or reducing that period for

17  cause.  That's what Section 1121(d) of the Bankruptcy Code

18  says.  There's no guarantee of 120 days.  Typically, do they

19  get 120 days?  Yes.  Typically, in a normal case they do when

20  there's nothing unusual and there's no history and there's no

21  facts as we have alleged here.

22      THE COURT:  But you now tell me that you're not happy

23  with the way the document flow has been going, you're

24  grudgingly -- you say they grudgingly started to give us

25  documents.

16

1          MR. SILVERSTEIN:  As I understand, that's correct,

2    yes.

3          THE COURT:  Okay.  So doesn't this come down to that

4    they didn't call you?

5          MR. SILVERSTEIN:  No.  It doesn't come down to that

6    at all, Your Honor.  I did not expect them to call me because

7    their position was -- and if you go back to the affidavits, and

8    I'm referring to the March 10th proposal, they said take this

9    or we'll shove this down your throats in bankruptcy.  So when

10   you set the stage that way, I did not expect them to call me.

11   I'm not about to call them when they've said that to me because

12   I know exactly what they're doing.  Precisely what they're

13   doing is management is attempting to control this company at

14   all cost.  If you look at the Walsh affidavit and the Welsh

15   affidavit --

16         THE COURT:  Conclusory statements by you and the

17   affiants.

18         MR. SILVERSTEIN:  Certainly not.  I heard your

19   comment, Your Honor, when we had the hearing --

20         THE COURT:  On the telephone.

21         MR. SILVERSTEIN:  -- the telephonic hearing, and that

22   was with respect to the principal Walsh affidavit.  Frankly,

23   that was a little conclusory because frankly I did not really

24   want to go into the specific details of the pre-petition

25   negotiations when Mr. Lugon's affidavit attempted to detail and

17

1   attempted to mischaracterize the pre-petition negotiations and

2   the three proposals that were made.  I felt it was incumbent

3   upon us to tell Your Honor exactly what happened.  There were

4   specific details in the Walsh affidavit in support of the

5   reply.  There were specific facts in the Welsh affidavit in

6   support of the reply.  These are not conclusory --

7         THE COURT:  Then focus on the pre-petition period

8   because I'm -- you know, you have not excited me about anything

9   that happened in the pre-petition period.  Once the Chapter 11

10  petition was filed, okay, tell me -- I didn't see any non-

11  conclusory evidence that supported the rather conclusory

12  statements you make as to what they've done wrong since the

13  petition was filed.  I understand that 18 months of contentious

14  pre-petition workout negotiations and you were unable to reach

15  a satisfactory conclusion and so you're here now.

16        MR. SILVERSTEIN:  But that's a very kind description

17  of the 18 months, Your Honor, because the 18 months were not

18  just an unsatisfactory --

19        THE COURT:  I have enough to worry about what's going

20  to happen in this case now that it's before me and will hold

21  you and the debtors' counsel to the standards that are expected

22  of them now that you're here.  I'm not going to go back and --

23  it's not as if your affidavits say they were self-dealing, they

24  stole money, they did this that would justify appointment, you

25  know -- at some hearing early on you said oh, we're thinking

18

 1  about moving for the appointment --

 2           MR. SILVERSTEIN:  Yes.

 3           THE COURT:  -- of a trustee.  The next thing it was

 4  terminating exclusivity.  From day one, you know, with or

 5  without -- I'm not saying that you don't have a basis for your

 6  skepticism.

 7           MR. SILVERSTEIN:  Your Honor, I think that if you

 8  read the facts in the Welsh affidavit and the Walsh affidavit--

 9           THE COURT:  I've read them more than once.

10           MR. SILVERSTEIN:  I trust you have, Your Honor.  It's

11  not just skepticism.  I don't think one can divorce the pre-

12  petition period from the post petition period when there's been

13  nothing demonstrated to the committee as a fiduciary for all

14  the unsecured creditors of these estates that nothing

15  whatsoever has changed and the debtors' position is basically

16  the same.  The debtor says in its papers that the debtor does

17  not owe fiduciary duties to creditors.  They said that.  Again,

18  they didn't say the debtors didn't pre-petition owe fiduciary

19  duties.  They said the debtor does not owe fiduciary duties.

20  When a debtor says to a creditors committee that they do not

21  owe fiduciary duties in a Chapter 11, that is a very troubling

22  statement.  I --

23           THE COURT:  They didn't deny they owe fiduciary

24  duties to the estate.

25           MR. SILVERSTEIN:  I understand that.  I understand

19

1  that they didn't.  You know, if they denied that, I think we

2  have, you know, [unintelligible], Your Honor.  But they did

3  deny that they had fiduciary duties to creditors at a time when

4  pre-petition they were unable to pay their debts as they came

5  due.  But more importantly post petition they are denying that

6  they owe fiduciary duties.  As I said before and as our papers

7  I think amply demonstrate, we know the plan they will propose

8  because they told us what they will propose.  All they said in

9  their papers, Your Honor, is that we have a deadline of June

10  30th to file a plan pursuant to the cash collateral order.  We

11  have a deadline of July 30th to file a disclosure statement in

12  accordance with the cash collateral order, and we will do so.

13  So they basically said that we are not negotiating with

14  creditors.

15          They've also accused us of course of doing something

16  terrible in that we did not attend the Section 341 meeting.  I

17  say this in jest because, you know, in this world I can't

18  remember the last time a creditors committee counsel attended a

19  341 meeting because that's the province of the U.S. Trustee.

20  We usually call the U.S. Trustee and say did anything

21  interesting happen?  I say that again half joking because of

22  the absurdity of the statement by the debtors that we did not

23  attend the 341 meeting, and therefore, you know, we're not

24  negotiating with them which is an absurdity.

25          This goes, Your Honor, to good faith.  The debtor --

20

1    although it's my burden to show Your Honor why cause exists to

2    terminate exclusivity, once we present evidence that says and

3    that shows by affidavit that the debtor is not acting in good

4    faith, it's just a little bit for the debtor to have to come

5    forward to show that they are acting in good faith.  The

6    allegations in the Walsh affidavit and the allegations in the

7    Welsh affidavit were not mere conclusory allegations.  They

8    detailed in response to the Lubin affidavit the facts

9    surrounding those negotiations and I cannot and they cannot

10   divorce the post petition period from the pre-petition period

11   because nothing has happened to suggest that anything has

12   changed.  That's why I submit to Your Honor that the conduct

13   during the pre-petition period, that has not changed during the

14   post petition period where there's been no interaction and no

15   engagement among the debtor and the creditors.  That's why I

16   suggest to you that the lack of good faith that existed pre-

17   petition continues post petition.

18          But again, if I can continue with the argument, Your

19   Honor?  What would happen here and what's the significance of

20   termination of exclusivity?  Management would then still have

21   the right to pursue their plan that keeps them in control.  If

22   you look at the March 28th offer that's in the Welsh affidavit,

23   that was an offer that was made only to Jeffries.  It was not

24   made to the ad hoc group.

25          THE COURT:  I read it.  I read it.

21

1          MR. SILVERSTEIN:  That basically was predicated on

2     the corporate governance issues where for two years they would

3     have a right to essentially buy it back or keep in control.

4     It's all about control, Your Honor.

5          THE COURT:  What's wrong with that proposal?  It

6     wasn't acceptable but --

7          MR. SILVERSTEIN:  Because it --

8          THE COURT:  -- what was wrong with it?

9          MR. SILVERSTEIN:  Because it didn't pay creditors in

10    full when creditors were entitled --

11         THE COURT:  Okay.  So Jeffries didn't agree with the

12    proposal that was made.  They didn't accept it.

13         MR. SILVERSTEIN:  But Your Honor, once the company

14    files Chapter 11, the machinations and the proposals that they

15    could make pre-petition are off - it's a different universe.

16    They have fiduciary duties to creditors under all standards,

17    both U.S. state law standards and under Chapter 11.

18         THE COURT:  Other than picking up the phone and

19    calling you, what have they done in the post -- since the

20    petition was --

21         MR. SILVERSTEIN:  Nothing in respect of negotiation.

22    A fundamental precept of exclusivity and a fundamental precept

23    of continuation of exclusivity is that the debtor has shown

24    something in the way of negotiating a plan.

25         THE COURT:  So on what day after the filing of the

22

1    petition were they obligated to call you and say let's sit

2    down?

3            MR. SILVERSTEIN:  No particular day, Your Honor, but

4    they haven't done it.  So the answer is to date it hasn't

5    happened.  It's not just a phone call.  Phone calls are empty,

6    phone calls are easy, phone calls are words.  It would have

7    been nice to get a phone call but there's been no engagement

8    with the statutory representative of creditors, and that is one

9    of the grounds to terminate exclusivity.  It's the breach of

10   fiduciary duty pre-petition that's not abated post petition

11   because nothing's changed.  Had they done anything

12   affirmatively post petition --

13           THE COURT:  I didn't see anything in the Walsh

14   affidavit that persuaded me that even pre-petition there was a

15   breach of fiduciary duty.  What the affidavit showed was a real

16   lack of agreement about how to work this out.  But that doesn't

17   equate to breach of fiduciary duty.

18           MR. SILVERSTEIN:  Let's accept that for a second

19   there's no breach of fiduciary duty.  There's certainly a lack

20   of good faith in the negotiations because each of the

21   proposals  --

22           THE COURT:  That was Mr. Walsh's conclusion.

23           MR. SILVERSTEIN:  And Mr. Welsh's conclusion, and the

24   conclusion --

25           THE COURT:  Fine.  Walsh and Welsh thought it was bad

23

1   faith, and they say it's good faith.  They say, you know,

2   okay -- go ahead.

3          MR. SILVERSTEIN:  Mr. Walsh, Mr. Welsh, and several

4   other sophisticated holders of notes who were on the ad hoc

5   committee all are of the same view and they were there.  What

6   they said, and what I think the documents demonstrate, is that

7   what the debtors were doing was something other than attempting

8   to repay creditors.

9          THE COURT:  It clearly --

10          MR. SILVERSTEIN:  It was fundamentally a stall.

11          THE COURT:  It clearly shows a very unsuccessful pre-

12   petition workout.

13          MR. SILVERSTEIN:  Without question.  Without question

14   it shows an unsuccessful pre-petition workout.  But I'm

15   submitting to Your Honor --

16          THE COURT:  That often leads to where you are now.

17          MR. SILVERSTEIN:  Correct.  That's correct.  There is

18   nothing unusual about an unsuccessful workout.  It happens

19   every day.  But the facts of that unsuccessful workout are such

20   that given the debtor continued exclusivity when there's no

21   longer a -- where there's not a level playing field is

22   prejudicial to creditors.

23          What I was saying a moment ago is that if exclusivity

24   is terminated, management can still pursue their own plan.

25   They can still try to convince Your Honor various things that

24

1  would enable them to keep control of the company which we

2  believe will be unsuccessful.  But at the same time, Your

3  Honor, creditors would be able to pursue their own plan so that

4  there's a level playing field.  Exclusivity was never intended

5  to allow management of the debtor or to allow a debtor to

6  basically push for a plan on behalf of 70% of the equity --

7       THE COURT:  Unless or until exclusivity is

8  terminated, it's not a level playing field, and that's the way

9  the code is drafted.

10      MR. SILVERSTEIN:  Correct.  That's the way the code

11 is drafted but the code is drafted to say that when there's

12 cause, and cause is undefined, but when there's cause you can

13 create a level playing field if it fosters the reorganization

14 process, if it fosters speed, which we believe it will foster,

15 and if it fosters a reorganization process as opposed to the

16 debtor or management acting -- what this is akin to --

17      THE COURT:  So hypothetically if you and your clients

18 were being intransigent and were holding out for what you

19 wanted, that would mean automatically that exclusivity should

20 be terminated because you're not making progress in

21 negotiations.

22      MR. SILVERSTEIN:  No.  Who am I on that question?

23      THE COURT:  You're counsel for the ad hoc committee

24 or now you're counsel for the creditors committee.

25      MR. SILVERSTEIN:  Okay.  I don't have exclusivity.

25

1          THE COURT:  But the point is let's assume you sat

2     down and you're being absolutely intransigent.  Here's the only

3     thing we're willing to accept.  Maybe we'll mess with it in the

4     edges, but we're not willing to do anything like what you were

5     talking about in the pre-petition period and we're not prepared

6     to talk about anything else, so that's it.  Does that mean you

7     get to file a motion to terminate exclusivity and have

8     exclusivity lifted?

9          MR. SILVERSTEIN:  Not necessarily and not on that

10    fact alone.  Those aren't the facts.  If I'm being intransigent

11    and I basically blow off the negotiation --

12         THE COURT:  It's all in the eyes of the beholder, Mr.

13    Silverstein.

14         MR. SILVERSTEIN:  Everything, Your Honor, everything,

15    everything is in the eyes of the beholder.  That's why you have

16    evidence and that's why you have to decide what's credible and

17    what's not credible, and what's believable.

18         THE COURT:  Well, first I have to decide what the

19    evidentiary showing that you made at least in the initial

20    affidavit because if I don't take into account the Lubin

21    affidavit, I'm not sure I take into account your reply

22    affidavit.  That was part of what we talked about on the phone.

23    Have you in your moving papers established a prima facie

24    showing that would be required to lift, terminate exclusivity?

25    If I think you have and there are disputed issues of material

26

1    fact and I want to consider to the Lupin affidavit, we'll have

2    an evidentiary hearing.  But while Gotshal certainly took the

3    position, even assuming that everything that's in that

4    affidavit is true, they haven't established the legal basis to

5    terminate exclusivity.

6         MR. SILVERSTEIN:  On that theory that they didn't owe

7    fiduciary duties pre-petition and they don't owe fiduciary

8    duties post petition --

9         THE COURT:  I don't think it hinged on whether they

10   did or didn't owe pre-petition fiduciary duties.

11        MR. SILVERSTEIN:  Well, I think it did hinge on --

12        THE COURT:  Any last points you want to make?

13        MR. SILVERSTEIN:  Yeah, I'd like to make a couple.

14        THE COURT:  Let's make them.

15        MR. SILVERSTEIN:  Your Honor, as stated in the Walsh

16   affidavit, the debtors have already told the committee what

17   their plan will be.  It's the March 10th proposal.

18        THE COURT:  They haven't told the creditors committee

19   that.

20        MR. SILVERSTEIN:  Yes.  They've told --

21        THE COURT:  You haven't had any discussion --

22        MR. SILVERSTEIN:  They've told the ad hoc committee,

23   okay?  The ad hoc committee has told the creditors committee.

24   So effectively they've told the creditors committee.  Okay?

25   They've told them, again, pre-petition, they said take it or

27

1   we'll force it on you at a Chapter 11 case.  So we know what

2   the plan will be.  They haven't shown us anything to the

3   contrary and they have an obligation to show us something to

4   the contrary to have a continuation of exclusivity.

5          Your Honor, there's one class of unsecured creditors

6   excluding consigners.  The pre-petition group dominates that

7   class.  So the debtor cannot confirm a plan over the objection

8   of that class.  That is just a fact in this case as we see it.

9   It just is staggering that the debtor and the debtor's

10  management can take the position that essentially what the

11  debtor really is is an equity committee.  The debtor's acting

12  as an equity committee.  Your Honor, an equity committee

13  doesn't have exclusivity to the exclusion of creditors.  But

14  that is effectively in essence what's happening here and what

15  this case is about.

16         That's why this case is different.  When 70% of the

17  stock is owned by management and the insider group and

18  management and the insider group has shown for an 18 month

19  period that they're basically negotiating for -- not

20  negotiating, but they're basically acting for themselves and

21  for their own interests and nothing whatsoever in the post

22  petition period has changed, and nothing whatsoever in the post

23  petition period has been shown to suggest that they've seen --

24  that they understand that their duties are different, because

25  they haven't, that's when it's appropriate to level the playing

28

1  field so that equity, i.e. stockholders and creditors can each

2  be pursuing their own respective plans.

3        Again, I don't need to talk about [unintelligible].

4  I think we've talked about that in our papers.  I think their

5  alliance was misplaced.

6        THE COURT:  Well, okay, go ahead.

7        MR. SILVERSTEIN:  I think that the test for

8  insolvency which, you know, again, if the debtors are now going

9  to say we recognize that we're fiduciaries to creditors post

10  petition that ought to be interesting because they didn't say

11  that and their papers flatly contradict that because what it

12  does is pretty clear.  There was no reference to the pre-

13  petition period.

14        You know, the Bowman case, 181 at 843, when referring

15  to a debtor's fiduciary duty was interesting.  I mean there's

16  lots of cases that have nice language, but that one

17  particularly struck me as being relevant here in terms of the

18  legal concepts.  It said that such duties include a duty of

19  care, a duty of loyalty, a duty of impartiality, and a duty to

20  avoid self-dealing.  Everything we've seen in the 18 months

21  prior to the petition and everything that we've seen post

22  petition --

23        THE COURT:  Are you accusing them of self-dealing?

24        MR. SILVERSTEIN:  I'm suggesting that management is

25  acting on their own behalf.  If that's self-dealing --

29

1          THE COURT:  Are you accusing them of self-dealing?

2          MR. SILVERSTEIN:  I'm suggesting that --

3          THE COURT:  Tell me what self --

4          MR. SILVERSTEIN:  -- they're not acting in good

5    faith.

6          THE COURT:  Tell me what the self-dealing has been.

7          MR. SILVERSTEIN:  Self-dealing is that management is

8    acting as stockholders to protect and to enhance --

9          THE COURT:  Do you have a case that says that that's

10   self-dealing?

11         MR. SILVERSTEIN:  I don't have a case that says it's

12   self-dealing because if I was accusing them of self-dealing I'd

13   be moving for a trustee right now.  I'm not moving for a

14   trustee, Your Honor.  I'm moving to terminate exclusivity so I

15   can level the playing field so that creditors can be

16   represented in a plan process hearing.

17         THE COURT:  You used the term self-dealing.  That has

18   a very specific legal connotation to me and since you've used

19   it I want to know whether you're accusing the debtor's

20   management of self-dealing.

21         MR. SILVERSTEIN:  I don't know what connotation it

22   has to Your Honor so, you know, I can't really respond.

23         THE COURT:  Well, then don't use it if you don't know

24   what you're talking about.

25         MR. SILVERSTEIN:  Well, I'm quoting a case, Your

30

1   Honor.

2          THE COURT:  Are you?  Which case?

3          MR. SILVERSTEIN:  The Bowman case.

4          THE COURT:  What was the self-dealing in that case?

5          MR. SILVERSTEIN:  I don't know what the self-dealing

6   in that case was because I'm not dealing with the facts in

7   Bowman.  What I'm dealing with, Your Honor, is when

8   management --

9          THE COURT:  Did Bowman involve self-dealing?

10         MR. SILVERSTEIN:  Your Honor, I don't have the facts

11  of Bowman off the top of my head.

12         THE COURT:  All right.  But --

13         MR. SILVERSTEIN:  What I'm saying to Your Honor is

14  that when management is acting as a 70% stockholder, when

15  management is not fulfilling its fiduciary obligations to

16  creditors, there's cause to terminate exclusivity.

17         THE COURT:  Okay.  Tell me specifically how

18  management has failed to fulfill its fiduciary duty to

19  creditors since the filing of the Chapter 11 petition.

20         MR. SILVERSTEIN:  Because they've essentially through

21  their silence and through inactivity have continued the pattern

22  during the 18 months prior to the petition date.  The pattern

23  during the 18 months prior to the petition date --

24         THE COURT:  Don't tell me about the 18 months.  You

25  say they've breached their fiduciary duty by silence since the

31

1  filing of the petition.  Is there any other way in which you

2  allege that management has breached its fiduciary duty since

3  the filing of the petition?

4       MR. SILVERSTEIN:  Just by a continuation of their

5  conduct pre-petition.

6       THE COURT:  Which specific conduct have they

7  continued since the filing of the petition which you say is a

8  breach of management's fiduciary duty?

9       MR. SILVERSTEIN:  The conduct is that based on what

10 management told us pre-petition, they are continuing to attempt

11 to further a plan or to foster a plan --

12      THE COURT:  What evidence do you have that supports

13 that?  You said you've had no communication with them.

14      MR. SILVERSTEIN:  Because there's no evidence to the

15 contrary and their conduct is --

16      THE COURT:  I didn't think that, you know, no

17 evidence to the contrary satisfies your evidentiary burden.

18      MR. SILVERSTEIN:  Your Honor, I don't know that I

19 have an evidentiary burden today to demonstrate with certainty

20 that they're breaching their fiduciary duty.  I think cause and

21 fiduciary duty are not the same standard.

22      THE COURT:  Okay.  So you're relying --

23      MR. SILVERSTEIN:  Fiduciary duty is indicia of lack

24 of good faith.

25      THE COURT:  So you're not relying on breach of

32

1  fiduciary duty to establish cause?

2          MR. SILVERSTEIN:  I am relying on a breach of

3  fiduciary duty in the context of showing that their conduct has

4  not been in good faith pre-petition and their conduct has not

5  been in good faith post petition.

6          THE COURT:  Anything else?

7          MR. SILVERSTEIN:  No, Your Honor, not at the moment.

8          THE COURT:  All right.  Thank you.

9          MR. SILVERSTEIN:  Thank you.

10         THE COURT:  Why didn't you pick up the phone and call

11 Mr. Silverstein?

12         MR. MARCUS:  Your Honor, what Mr. Silverstein had

13 said I actually disagree with.  I had a call --

14         THE COURT:  That was -- okay.

15         MR. MARCUS:  I did is the answer.  We did.  On Monday

16 I had a call with my partner --

17         THE COURT:  Monday of this week?

18         MR. MARCUS:  This Monday of this week.

19         THE COURT:  Okay.

20         MR. MARCUS:  I don't know if a call was ever made

21 before that.

22         THE COURT:  Why didn't somebody pick up the phone and

23 call Mr. Silverstein or why didn't you talk to him outside in

24 the hallway after one of the hearings?  Why the Monday of the

25 Wednesday hearing did you finally pick up the phone and call?

33

1          MR. MARCUS:  Your Honor, I think the answer to that

2     is I'm going to agree with something Mr. Silverstein said and

3     what he said was a call would have been nice but it's more than

4     that.  It's more than just a call.  I agree with that because I

5     don't know if Mr. Krasnow did or anybody else at Weil Gotshal

6     specifically said, until this Monday, would you like to get

7     together for a meeting?  We can facilitate that.  However, I

8     don't know, maybe five or ten days after the committee was

9     appointed we began negotiations with the creditors committee

10    for a confidentiality agreement for SRR to begin receiving

11    information.  I don't think there's any reason to delve into

12    the specifics of the information flow.  Mr. Silverstein has

13    made the point several times that it's been slow, it's been

14    arduous.

15          THE COURT:  Did you enter into a confidentiality --

16          MR. MARCUS:  We did enter into a confidentiality

17    agreement with them, Your Honor.  In fact, we began delivering

18    information even in advance of that confidentiality agreement

19    with the agreement that it would be covered by the subsequent

20    confidentiality --

21          THE COURT:  So I'm intrigued.  You said you called --

22    you tried to reach Mr. Silverstein on Monday of this week?

23          MR. MARCUS:  No.  My partner Adam Strocheck [Ph.] and

24    I had a call with I believe Mr. Silverstein's partner, Mr.

25    Bracht, if I'm pronouncing that correctly --

34

 1              THE COURT:  About beginning negotiations?

 2              MR. MARCUS:  No, no, actually we were negotiating --

 3    well, where I was going with the more than a phone call is the

 4    delivery of information which I disagree.  Information has been

 5    flowing.  They have access to an online data room that has over

 6    4,000 pages of documents in it.  We have delivered to date

 7    7,224 pages of documents.  That's 432 documents pursuant to a

 8    huge document request that they gave us I believe even before

 9    the confidentiality agreement was entered into.  Mr.

10    Silverstein's papers and Mr. Walsh's affidavit say we still

11    haven't gotten, this is on June 10th, we still haven't gotten

12    the indications of interest that were delivered to the company

13    in the pre-petition period.  Not true.  Those were delivered by

14    WY Campbell to SRR on June 5th, all of those.  So they had

15    them.

16              MR. SILVERSTEIN:  That's not true.

17              MR. MARCUS:  They had them when all of this stuff was

18    filed.  That's my understanding.  So as far as I'm concerned,

19    information --

20              THE COURT:  Mr. Silverstein, please be quiet over

21    there.

22              MR. SILVERSTEIN:  I'm sorry, Your Honor.

23              MR. MARCUS:  Information has been flowing quite well.

24              THE COURT:  Let me just -- I want to make clear --

25              MR. SILVERSTEIN:  I apologize, Your Honor.

35

1          THE COURT:  -- I do not permit sota voce comments

2   when other counsel are arguing.

3          MR. SILVERSTEIN:  I apologize, Your Honor.

4          THE COURT:  Go ahead, Mr. Marcus.

5          MR. MARCUS:  So Your Honor, it is more than that.  It

6   is more than just a phone call.  It's the continued delivery of

7   information.  My --

8          THE COURT:  Address the issue of whether the debtor's

9   management owes a fiduciary duty and to who since the filing of

10  the petition.

11         MR. MARCUS:  I'm sorry, owes a fiduciary duty and to

12  who?

13         THE COURT:  Yes, because Mr. Silverstein points out

14  to the place in your brief where you say -- unclear whether

15  you're talking -- could well be talking about the current post

16  petition period.  Does the debtor in possession and its

17  management owe a fiduciary duty and to whom?

18         MR. MARCUS:  The debtor in possession and management

19  certainly owes fiduciary duties post filing.

20         THE COURT:  To who?

21         MR. MARCUS:  We owe fiduciary duties to the estate.

22  I don't believe that we have direct fiduciary duties to

23  creditors.  Now, I think you have to layer on top of that some

24  facts and circumstances here.  Mr. Silverstein's argument is,

25  and he said very clearly, I wrote it down, all of the offers

36

1   that management has made to creditors he said we didn't accept

2   it because quote, "It didn't pay creditors in full when

3   creditors are entitled."  That to me means that the company is

4   solvent.

5          THE COURT:  But I made -- you know, maybe there's a

6   repaid in full plus a penny.  I don't know what the situation--

7   I'm really not moved by either side's explication of the failed

8   pre-petition negotiations.  Okay.  So Mr. Silverstein, I'll say

9   that to you as well.  What is your view of -- you say that

10  management owes a fiduciary duty to the estate.  What does that

11  mean in terms of the creditors in your view?

12         MR. MARCUS:  That means that I certainly agree that

13  management has the duty to preserve the value of the estate, to

14  maximize the value of the estate for the benefit of creditors.

15  The management has a duty to maximize the value of the estate

16  for all parties.  If management proposes a plan that pays

17  creditors in full, which we believe we're going to propose,

18  then I believe that the company has discharged its duties.

19  Even if you assume that the company is insolvent and management

20  has direct fiduciary duties to creditors, I think as Your Honor

21  pointed out, there's no evidence that any of those duties have

22  been breached.  We believe that proposing a plan that pays

23  creditors in full is about as good a discharge of that duty as

24  one can possibly be.

25         THE COURT:  Does the management owe a fiduciary duty

37

1  to negotiate the potential terms of a plan during the period of

2  exclusivity?

3          MR. MARCUS:  Maybe yes, maybe no.  I mean I think the

4  answer to the question as a general matter is absolutely.  I

5  think a debtor in possession --

6          THE COURT:  The cases seem to say that one of the

7  things expected of management, and I would assume it's their

8  duty therefore, during the period of exclusivity is to seek to

9  negotiate with the creditors.

10          MR. MARCUS:  Actually, Your Honor, I take back my

11  answer and let me modify it.  What I was referring to was the

12  cases, and Your Honor referred to this when Mr. Silverstein was

13  up here, that if the creditors just sit back and they're

14  calcitrant and they say we're not going to accept anything that

15  they manufactured cause for termination of an exclusivity.  I

16  think the answer to that is no.  I think Judge Sigmund makes

17  that absolutely clear in the Lehigh Valley case.

18          THE COURT:  But the counter to that is that if

19  management just sits back and says take it or leave it, this is

20  the deal, has the management fulfilled its obligations to --

21  well, do you agree that management has an obligation to

22  endeavor to negotiate with the creditor constituencies, here

23  really just one, one constituency, during the exclusivity

24  period?

25          MR. MARCUS:  I think management has an obligation to

38

1  continue to negotiate with creditors.  I think that as much

2  as --

3          THE COURT:  When you say continue, that assumes a

4  start.  Has it started here?

5          MR. MARCUS:  I don't think it really has.

6          THE COURT:  So when is it going to start, Mr. Marcus?

7          MR. MARCUS:  Well, in the call that I had on Monday

8  the question was would you like us to facilitate a meeting --

9          THE COURT:  I don't really care so much about the

10 call.  Tell me.

11         MR. MARCUS:  My understanding is the creditors

12 committee would like more information before they're ready to

13 sit down with the debtors.  The debtors are ready today to sit

14 down with the creditors and I'll go on record and say we'll

15 reach out and call after this hearing if that's what it takes

16 to get it started, but the debtors are ready to start today to

17 discuss.  Now, there are underlying documents that need to be

18 completed; objections, valuations, financial documents that we

19 haven't finished yet.

20         THE COURT:  They need to be completed but they don't

21 necessarily need to be completed before you commence your

22 discussions with the committee.

23         MR. MARCUS:  I agree.

24         THE COURT:  I mean -- all right, you agree with that.

25         MR. MARCUS:  I agree with that.  I don't think that

39

1  we need to finalize and I have in many cases commenced

2  negotiations with the creditors committee before --

3         THE COURT:  So why has that happened here?

4         MR. MARCUS:  My understanding is the creditors

5  committee is waiting for more information before that process

6  begins.

7         THE COURT:  What information do you understand that

8  they're waiting to receive?

9         MR. MARCUS:  Off the top of my head the only I think

10  pertinent information that hasn't been provided yet would be

11  the financials, underlying disclosure statement, and the plan

12  which I don't think are ready to go to the committee yet.

13  Perhaps the schedules which my understanding is they'll be

14  filed on Friday.  Those might play into the equation as well.

15  It's not my experience that all of that information is

16  delivered to be digested prior to the start of the

17  negotiations.

18         THE COURT:  I pressed Mr. Silverstein pretty hard

19  about why he didn't pick up the phone and call you or Mr.

20  Krasnow.  Why didn't you pick up the phone and call him before

21  Monday of this week?  Mr. Krasnow, you want to answer that?

22         MR. KRASNOW:  Your Honor, I think just since I -- Mr.

23  Marcus has been involved in other matters --

24         THE COURT:  Right.

25         MR. KRASNOW:  -- so I probably have been a little

40

1  more involved for the past two months.  Your Honor, I did not

2  pick up the phone.  I'm not going to deny that.  Certainly it's

3  been my experience over the past few decades that I've been

4  practicing in this area that usually at the beginning of the

5  case there is communication between counsel for the committee

6  and counsel for the debtor regarding protocols and starting

7  discussions and information flow.  Usually that occurs with

8  counsel to the committee picking up the phone.  But putting

9  aside who picks up the phone first, indeed and to my

10  recollection the first person who picked up the phone was in

11  fact Mr. Silverstein.  Mr. Silverstein contacted me and

12  inquired of me not when will we have a meeting but rather he

13  advised me as to who the committee had selected as their

14  financial advisor and had requested of the company whether or

15  not even before papers had been filed to retain that financial

16  advisor whether or not the debtors would be prepared to provide

17  information that might be confidential in nature and indeed

18  enter into a confidentiality agreement.  I perhaps was a little

19  ahead of my client but I wasn't as it turned out and said of

20  course.

21      Indeed our initial attention was focused on preparing

22  a confidentiality agreement, negotiating that agreement which

23  frankly did not take that long, and then proffering that

24  agreement.  Indeed, I may be off a day or so, even before an

25  application had been filed seeking authority for the committee

41

1   to retain SRR, I believe we entered into the agreement.  It

2   might have been on the day the application was filed.  It might

3   have been the day thereafter.

4        So in fact one of those elements of what typically

5   occurs in a Chapter 11 at the outset of a Chapter 11 occurred

6   which is trying to get in place a mechanism where there could

7   be information provided to the committee so that they would

8   have financial information and other information that would be

9   relevant to their discharging their fiduciary duties and to

10  facilitate whatever meetings might take place.

11       THE COURT:  So is the plan you're going to propose as

12  Mr. Silverstein believes going to be identical to one of the

13  rejected workout term sheets?

14       MR. KRASNOW:  It will be identical in the following

15  respect.  The core of the dispute that existed pre-Chapter 11,

16  and I think this is evident when you read all the affidavits

17  and declarations whether it's Mr. Lubin's, Mr. Walsh's, or Mr.

18  Welsh's -- I was worried that I would confuse the two -- is

19  that there was a fundamental disagreement between the parties

20  with respect to valuation.  That is a key element of a plan.

21  The company, its board of directors -- and I might add, Your

22  Honor, there was a board of directors that is more than just

23  two individuals.  There are five members on the board.  The

24  board of directors believed based on information that had been

25  provided to them and their own individual analysis, they are

42

1   sophisticated parties, that Lexington, the debtors, are solvent

2   and that what flows from that are two things.  One, that it's

3   appropriate for there to be a return to equity and that any

4   restructure outside of 11 but particularly in Chapter 11 must

5   provide for creditors to be paid in full.

6           THE COURT:  Can I ask Mr. --

7           MR. KRASNOW:  I'm sorry, Your Honor.

8           THE COURT:  I'll let you go ahead and answer but are

9   you telling me that what you're going to propose is identical

10  to what you previously proposed and was rejected?

11          MR. KRASNOW:  It is going to be a plan that will

12  provide for two things.

13          THE COURT:  Because if it is, you better do it sooner

14  and let's get on with it.

15          MR. KRASNOW:  Well, I'll answer the question, Your

16  Honor, and then I'll go to timing and that timing doesn't

17  preclude and shouldn't preclude and will not preclude on our

18  side an attempt to have negotiations.  But I can tell you --

19          THE COURT:  But if what you're going to give them is

20  the same as they got before, you may as well start the

21  negotiations today and see what happens --

22          MR. KRASNOW:  Well Your Honor --

23          THE COURT:  -- than wait to the very last day of

24  exclusivity and give them something that you know they're going

25  to reject.

43

1          MR. KRASNOW:  Your Honor, a couple of observations.

2    The plan will provide for return to equity and that's because

3    we have one view of value.  They may or may not have a

4    different view.  Presumably they have a different view of

5    value.  In terms of timing, as has been said multiple times, as

6    a result of the requirements of the final cash collateral order

7    the debtor is required to file a plan by the end of this month.

8    So we will be filing a plan by the end of this month.  We, as

9    Mr. Marcus says, we are ready to sit down and have discussions

10   with the committee with respect to the plan that will be filed

11   and irrespective of the outcome of those discussions we will be

12   ready, willing, and frankly desirous of having negotiations

13   about the plan after the, I'll call it the June 30th plan is

14   filed because from our perspective --

15          THE COURT:  Why does it have to wait until then?

16          MR. KRASNOW:  Your Honor --

17          THE COURT:  It sounds like you know what it's going

18   to be.

19          MR. KRASNOW:  Your Honor, actually we are still

20   having internal discussions with respect to the components of

21   the plan.  So in that respect it's a little premature.  I

22   realize June 30th is close.  But the reason I made my point is

23   that we do not view the filing of the plan, whether it were to

24   occur today or June 30th, well within the 120 days, as an event

25   which triggers people folding their arms, at least on our side,

44

1   and saying we're unprepared to have discussions and hopefully

2   negotiations with the creditors committee because if we had our

3   druthers at the end of the day we would rather have a

4   consensual plan rather than a nonconsensual plan.

5          THE COURT:  Do you agree with Mr. Silverstein that

6   you can't confirm a plan over the objections of this only

7   unsecured creditors class?

8          MR. KRASNOW:  Absolutely not.  I'm sure you're not

9   surprised at that statement.

10         THE COURT:  I'm not.  I just wanted to -- since Mr.

11  Silverstein was so definitive in his response I wanted to --

12         MR. KRASNOW:  Your Honor, Your Honor made an

13  observation and I'll second, and that is while Mr. Silverstein

14  denies it, at least our view of their motion was sure they were

15  trying to terminate exclusivity within the first 120 days, and

16  I'm going to defer to Mr. Marcus to really articulate our view

17  of what standards have to be shown in order to terminate

18  exclusivity within the initial 120 days, something Mr.

19  Silverstein has conveniently ignored in our view addressing

20  which was really our first point in our brief.  We don't

21  believe that he has demonstrated anything close to the

22  standards that the few cases that have addressed termination

23  within the 120 days have indicated the appropriate standards.

24  But again, I'll defer to Mr. Marcus on that.

25         But what this motion is is a somewhat obvious attempt

45

 1  from our perspective of trying to educate the Court as to what

 2  the Court will see --

 3           THE COURT:  Oh, this has been going on since day one

 4  of the case and I don't particularly appreciate it.

 5           MR. KRASNOW:  Your Honor, and I think that's a very

 6  good point and I'd like to focus on that for a moment.

 7           THE COURT:  You don't need to focus on it.

 8           MR. KRASNOW:  Then I won't.  We are not going to

 9  propose a plan --

10           THE COURT:  You know, there's all this jockeying

11  going on.  You know, get on with the --

12           MR. KRASNOW:  Your Honor, we're not going to propose

13  a plan that we don't believe has a legal basis that this Court

14  could rely upon to confirm the plan.  So we disagree with Mr.

15  Silverstein's observations.  Whether they support the plan or

16  not, we believe we will be submitting a plan that creditors

17  will be able to vote on and hopefully we have the note holders

18  and the creditors committee's consent to the plan.  But if not,

19  Your Honor will ultimately determine the issues relating to

20  valuation and classification and any other issues that may be

21  pertinent to that.

22           THE COURT:  All right.  Here's what I'd like to do.

23  I want to take a ten minute recess.  Actually, we'll take a 12

24  minute recess, a quarter after 3.  In that recess, Mr. Marcus,

25  Mr. Krasnow, Mr. Silverstein, when I come back on the bench

46

1   you're going to tell me what day you're going to meet to begin

2   negotiations.  I can tell you I'm going to take this matter

3   under advisement today.  I still haven't decided whether there

4   are material factual issues that are in dispute such that an

5   evidentiary hearing would be required.  I need to spend some

6   more time thinking about that.  But that in the meantime is not

7   going to give anybody a pass from -- I want to know what your

8   schedule is going forward.  So I'll be back on the bench at

9   quarter after 3 and you'll tell me what that is and then we'll

10  figure out how we're going from here.

11          MR. SILVERSTEIN:  Very well, Your Honor.

12                      [Off the record.]

13          THE COURT:  Please be seated.  Mr. Krasnow, you want

14  to enlighten me?

15          MR. KRASNOW:  The negotiations were successful, Your

16  Honor.

17          THE COURT:  You've been able to negotiate a meeting?

18          MR. KRASNOW:  We've negotiated a meeting which --

19          MR. SILVERSTEIN:  Not totally successful you ought to

20  tell him.

21          MR. KRASNOW:  A week from Thursday, June 19th.  Just

22  for Your Honor's benefit we couldn't do anything earlier than

23  next week -- oh, never mind, Your Honor.  So we will have a

24  meeting --

25          THE COURT:  Where are you meeting?

47

1          MR. SILVERSTEIN:  We don't know when yet.  So it

2    wasn't a complete negotiation, Your Honor, if I might add.

3          MR. KRASNOW:  Not everybody has their Blackberry or

4    their paper calendar so I can't tell you exactly what time.

5    Presumably it will be either Mr. Silverstein's office or our

6    office.

7          THE COURT:  Okay.

8          MR. KRASNOW:  In Manhattan.

9          MR. SILVERSTEIN:  Whoever has the best air

10   conditioning is what I think it will be.

11         THE COURT:  Fine.  Are there information requests

12   that need to be satisfied before then?

13         MR. KRASNOW:  The --

14         THE COURT:  I'll give you a chance, Mr. Silverstein.

15         MR. SILVERSTEIN:  Okay.

16         MR. KRASNOW:  I don't want to speak for Mr.

17   Silverstein as to --

18         THE COURT:  Let me stop you.

19         MR. KRASNOW:  But I may have -- we would anticipate

20   prior to that meeting providing them with an outline of certain

21   of the terms of a plan that we are contemplating.  It will not

22   be a definitive document because it continues to be a work in

23   process and there are certain particular issues we need to

24   focus on and have not been able to fully --

25         THE COURT:  Let me suggest this.  Mr. Silverstein, if

48

1  there's information -- obviously you want to see this outline

2  of the plan, but if there's additional information -- the

3  schedule is going to be filed on Friday?

4          MR. KRASNOW:  The schedules will be filed by no later

5  than Friday.  There is certain information which is critical to

6  finalizing the plan which we discussed briefly that relate to

7  such things as projections which are not complete and probably

8  will not be complete by Thursday of next week, but that isn't

9  to say that we can't begin the discussions, Your Honor, and

10  that's --

11         THE COURT:  Well, if you file your schedules by

12  Friday it would seem to me that on Monday or Tuesday of next

13  week you want to have a telephone conversation and you want to

14  discuss whether there's other information that would be helpful

15  to have before the Thursday meeting where you're able to

16  accommodate those requests.

17         MR. KRASNOW:  That's fine.

18         MR. SILVERSTEIN:  Monday sounds perfect.

19         THE COURT:  So try and make the Thursday the 19th

20  meeting as useful as possible.

21         MR. KRASNOW:  Without question, Your Honor.

22         THE COURT:  Okay.

23         MR. KRASNOW:  We will respond to all reasonable

24  requests.  Would Your Honor care to hear one aspect of our

25  argument, maybe not, Your Honor, as to --

49

1          THE COURT:  Only if -- you know, I don't want this to

2   become more contentious than it already is.

3          MR. KRASNOW:  It's simply an observation, Your Honor,

4   and --

5          THE COURT:  Go ahead.  I'm sure Mr. Silverstein wants

6   to respond as well.

7          MR. KRASNOW:  -- rapidly switching back and forth --

8   very brief, Your Honor.  We believe that there are very few

9   cases that have been decided in the context of a motion to

10  terminate exclusivity within the initial 120 days.  We cite

11  them in our brief.  None of those cases were really addressed

12  in that context by Mr. Silverstein.  There's the Lehigh case,

13  there's the Texaco case, there was, if I'm getting the name

14  correct, the Geriatrics case, and what all of those cases in

15  substance say is that whatever basically issues, factors would

16  apply in considering a motion to extend exclusivity beyond the

17  initial 120 days or a motion to terminate the exclusive

18  periods, they simply don't apply within the initial 120 days

19  because Congress intended the debtor simply has the 120 days.

20  Those factors, those limited factors which those Courts

21  indicate --

22          THE COURT:  I'm mindful of the case law.

23          MR. KRASNOW:  Very well, Your Honor.

24          THE COURT:  Let me just ask this.  This tentative

25  meeting scheduled for the 19th, obviously the lawyers will be

50

1   present.  Have you discussed which of the principals will be

2   present?

3           MR. KRASNOW:  One of the reasons we suggested that

4   date is because the principals, the debtors the beginning of

5   next week are going to be traveling with the financial advisor

6   to the committee to some of the debtor's facilities.

7           THE COURT:  Okay.

8           MR. KRASNOW:  So I believe both members of senior

9   management will be --

10          THE COURT:  They will be present on the 19th?

11          MR. KRASNOW:  They will be -- one or both of them

12   will be present.  We've been advised by Mr. Silverstein that

13   they will at this meeting.  I gather most of the, but not all

14   of the committee members will be participating by phone.

15          MR. SILVERSTEIN:  The committee will be well

16   represented in person or by phone.

17          THE COURT:  I'm not opposed to having people

18   participate by phone.  Having people, having some

19   representation face to fact really does make a difference.

20          MR. SILVERSTEIN:  Your Honor, we agree and that will

21   happen.

22          THE COURT:  Okay.  Do we have other dates when you're

23   back in front of me?

24          MR. KRASNOW:  I'm sorry, Your Honor?

25          THE COURT:  Do we have any other dates when you're in

51

1    front of me again?

2         MR. SILVERSTEIN:  I don't recall.

3         MR. KRASNOW:  I don't believe so, Your Honor.

4         THE COURT:  I'd like to have a telephone status

5    conference on the afternoon of Tuesday, June 24th.

6         MR. SILVERSTEIN:  Your Honor, I have a confirmation

7    hearing in Fort Worth on that day.  Is there any way we can do

8    it --

9         THE COURT:  Absolutely, absolutely.

10        MR. SILVERSTEIN:  Wednesday would be good.

11        MR. KRASNOW:  Wednesday, that would be the 25th?

12        MR. SILVERSTEIN:  Yeah, that will be perfect.

13        THE COURT:  If we could do it, because I have a

14   calendar both in the morning and in the afternoon on the 25th,

15   but if we can do it at say 5:00 on the 25th.

16        MR. SILVERSTEIN:  That would work for us.

17        THE COURT:  All right.  One of you arrange a

18   conference calling number and just advise my chambers about it.

19   It'll be short but I'd like to have a status report.  We're

20   working on this motion, the motion to terminate exclusivity but

21   I'd like to hear where things stand as we work on it.

22        MR. KRASNOW:  Very well.

23        THE COURT:  Okay.  Anything else for today?

24        MR. KRASNOW:  No, Your Honor.

25        MR. SILVERSTEIN:  No, Your Honor.

52

1          THE COURT:  Thank you.  All right.  We're adjourned.

2     MR. KRASNOW:  Thank you, Your Honor.

3                    *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

1      I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                                  Mary Greco

7  Dated:  June 13, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25