**Hearing Date: July 29, 2008 at 10:00 a.m. ET**

ANDREWS KURTH LLP
Paul N. Silverstein (PS 5098)
Jonathan I. Levine (JL 9674)
450 Lexington Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

Counsel to the Official Committee
of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re:                                          :     Chapter 11
                                                :
LEXINGTON PRECISION CORP., et al.,              :     Case No. 08-11153 (MG)
                                                :
                                                :
                Debtors.                        :
----------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OBJECTION TO DEBTORS' MOTION FOR AN ORDER
PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE
EXTENDING THE DEBTORS' EXCLUSIVITY PERIODS**

TO:    THE HONORABLE MARTIN GLENN
       UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors (the "Committee") of Lexington Precision Corporation, et al. (collectively, the "Debtors"), for its objection (the "Objection") to the Debtors' motion for an Order pursuant to Section 1121(d) of the Bankruptcy Code extending the Debtors' exclusive periods (the "Exclusivity Motion"), respectfully represents:

**INTRODUCTION**

1.    The Debtors have not demonstrated the existence of "cause" to warrant the extension of their exclusive periods under Section 1121(d) of the Bankruptcy Code. As discussed herein, the Debtors have not used exclusivity to negotiate a consensual plan with their

creditors and the specific facts of these cases militate against extending exclusivity. For the reasons set forth herein, the Exclusivity Motion should be denied.

2. A prompt and efficient reorganization in these cases centers on the valuation of the Debtors. In other words, a valuation trial must be held and concluded for any plan of reorganization for the Debtors to proceed on an efficient and timely track. The result of such valuation determination will likely go a very long way towards curtailing the various "side shows," such as classification and solicitation issues and the like. The Committee respectfully requests that, as a matter of case management and this Court's inherent power under Section 105(a) of the Bankruptcy Code, in addition to denying the Exclusivity Motion, this Court put all plan matters on hold and a trial (including an appropriate discovery schedule) for determining the Debtors' valuation should be scheduled forthwith. The Committee believes, and respectfully submits, that such an approach would move these cases forward materially and productively focus the energy and resources of all parties in interest.

## FACTUAL BACKGROUND

**The Committee and its Termination Motion**

3. On April 11, 2008, pursuant to Section 1102 of the Bankruptcy Code, the United States Trustee appointed the Committee. The Committee consists of Wilmington Trust Company, as Indenture Trustee, Jefferies High Yield Trading, Wilfrid Aubrey LLC, Valhalla Capital Partners, LLC, Momentive Performance Materials, Inc., Wacker Chemical Corporation and Environmental Products & Services of Vermont, Inc. The Committee is the statutory representative of, and fiduciary to, all of the Debtors' unsecured creditors. In the aggregate, the members of the Committee hold very substantial amounts of the Debtors' total unsecured claims both at the parent level (Lexington Precision Corp.) and at the subsidiary level (Lexington Rubber Group, Inc.).

2

4.     On May 21, 2008, the Committee filed a motion (the "Termination Motion") to terminate the Debtors' exclusive periods pursuant to Section 1121(d) of the Bankruptcy Code. The Committee determined, however, not to proceed with the Termination Motion given that the Debtors moved to extend exclusivity under Section 1121(d) and have the burden with respect thereto.  Because there exist legal and factual issues common to the Termination Motion and the Exclusivity Motion, the Committee hereby incorporates by reference in this Objection its submissions in support of the Termination Motion as if set forth at length in this submission.[1]

5.     On June 30, 2008, the Debtors filed their proposed Joint Plan of Reorganization (the "Proposed Plan").  The Proposed Plan is substantially similar to a restructuring proposal made to holders of the Lexington Precision Corp.'s 12% Senior Subordinated Notes (the "12% Notes") on or about March 10, 2008.  The Debtors have yet to file their disclosure statement in respect of the Proposed Plan.

6.     On July 15, 2008, the Debtors provided the Committee with their five-year financial projections (the "Projections").  As of the date hereof, however, the Debtors have yet to provide the Committee or its Professionals with the detailed backup underlying the Projections[2]. As discussed below, the Projections appear unrealistic on their face and seem nothing more than a continuation of Debtors' management's ("Management") efforts to maintain control over the Debtors.

---

[1]     Those submissions consist of the: Motion for Order Terminating Debtors' Exclusivity (Docket No. 133); Affidavit of Nicholas W. Walsh in Support of Motion for Order Terminating Debtors' Exclusivity (Docket No. 134); Reply Memorandum in Support of Committee's Motion for Order Terminating Debtors' Exclusivity Under Section 1121(d) of the Bankruptcy Code (Docket No. 168); Affidavit of Nicholas W. Walsh in Support of Committee's Reply to Debtors' Objection to Motion for Order Terminating Debtors' Exclusivity under Section 1121(d) of the Bankruptcy Code (Docket No. 169); and Affidavit of Robert J. Welch in Support of Committee's Reply to Debtors' Objection to Motion for Order Terminating Debtors' Exclusivity under Section 1121(d) of the Bankruptcy Code (Docket No. 170).

[2]     The Debtors, through counsel, have advised the Committee that they are in the process of "compiling" and "formatting" such backup data.

3

**The Exclusivity Motion**

7. The Debtors predicate their Exclusivity Motion on the fact that they "have not completed their financial projections." (Exclusivity Motion, at ¶ 5) The Exclusivity Motion contends that once their projections are completed, the "Debtors anticipate more robust negotiations with the Committee." (Exclusivity Motion, at ¶ 5) The Exclusivity Motion also alleges that the Debtors "have strived to be amenable to substantially all of the Committee's demands and otherwise provide information as it becomes available." (Exclusivity Motion, at ¶ 5) The Committee believes that the Debtors words are hollow and disingenuous. As to information sharing, the Debtors meaningfully began providing data and requested documents to the Committee only after this Court directed the Debtors to do so at a status conference on June 25, 2008 in connection with the Committee's Termination Motion and, nonetheless, continue to "slow roll" the information flow. By way of example, the Debtors provided the Projections to the Committee on July 15th, but, as of the date hereof, have failed to provide the requested underlying backup which is necessary to understand and evaluate the Projections. This process should not be as frustrating and arduous as it has been.

8. Because the Debtors have been advised by the Committee that the vast bulk of their creditors will reject the Proposed Plan, the Exclusivity Motion attempts, in the most conclusory fashion, to create the impression that the Debtors have some "support" for their Proposed Plan: "[T]he Debtors have . . . engaged in talks with other creditors and their counsel such as individual holders of general unsecured claims and asbestos-related claims. Based upon those discussions, the Debtors believe sufficient support exists for the Plan to be accepted as proposed." (Exclusivity Motion, at ¶ 7) The Debtors' reliance on asbestos-related claimants is startling. The Debtors' financial statements and SEC filings have never mentioned any liability

4

NYC:179357.3

of the Debtors to asbestos-related claimants (by footnote or otherwise).  Upon information and belief, the Debtors: (i) do not have liability to the asbestos-related claimants; (ii) have never paid anything to any asbestos-related claimants; and (iii) would seek to estimate any such claims at zero (and, in any event, any potential liability to such asbestos-related claimants is amply covered by insurance).  The Proposed Plan provides for asbestos-related claimants to have recourse to any insurance maintained by the Debtors, which is precisely what such claimants now have.  For a variety of reasons, such claimants do not and cannot constitute an impaired accepting class within the meaning of Section 1129(a)(10) of the Bankruptcy Code.  Similarly, the Debtors' reference to discussions with "individual holders of general unsecured claims" likewise suggests that the Debtors are attempting to manufacture or "gerrymander" a class of claims which they hope will accept the Proposed Plan.  The Committee understands that there exists approximately $1 million of trade debt at the "parent" Debtor, Lexington Precision Corp.  Such creditors are pari passu and of equal rank with the 12% Notes, which are also obligations of the "parent."  No basis whatsoever exists to separately classify such claims.

9.   The Debtors further allege that their adherence to the milestones set forth in the Cash Collateral Order - - the filing of a plan by June 30, 2008 and a disclosure statement by July 30, 2008 - - shows "progress in their reorganization" and "supports an extension of exclusivity."  For the reasons set forth herein and in the Committee's prior submissions, such so-called "progress" is insufficient to warrant an extension of exclusivity under Section 1121(d) of the Bankruptcy Code.

5

NYC:179357.3

## DISCUSSION

**A.    The Debtors Cannot Demonstrate "Cause"
Exists to Extend Exclusivity**

10.    It is well settled that a "debtor seeking to extend the 120-day exclusive period bears the burden of proof and must show that cause exists for granting an extension." *In re Southwest Oil Company of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Texas 1987). *See also In re Gen. Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (same); *In re Curry Corporation*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (Debtor must make a clear showing of "cause" to support an extension of the exclusivity period); *In re McLean Industries*, *Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (debtor bears burden of proof that cause exists for extending exclusivity). Considering the history and purpose of Section 1121 of the Bankruptcy Code, specifically to limit the delay that makes creditors the hostages of Chapter 11 debtors,[3] a "request to extend . . . exclusivity is a serious matter." *In re Matter of All Seasons Indus., Inc.* 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990). Such a motion must not "be granted routinely" or without a compelling reason. *McLean Industries*, *Inc.*, 87 B.R. at 834; *Matter of All Seasons,* 121 B.R. at 1004.

11.    When determining whether a debtor has demonstrated that "cause" exists to extend exclusivity, courts look to the facts of each specific case. Among the "factors" that courts have considered in assessing whether "cause" exists include, but are not limited to, the following:

(i)    the size and complexity of the case;

(ii)   the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;

---

[3] *See In re Timbers of Inwood Forest Assocs, Ltd.* 808 F.2d 363, 372 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"); *In re Curry Corp.,* 148 B.R. at 755 (same); *In re Gen. Bearing Corp.*, 136 B.R. at 367 (same).

6

    (iii)    the existence of good faith progress toward reorganization;

    (iv)    the fact that the debtor is paying its bills as they become due;

    (v)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    (vi)    whether the debtor has made progress in negotiations with its creditors;

    (vii)    the amount of time which has elapsed in the case;

    (viii)    whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

    (ix)    whether an unresolved contingency exists.

*In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). *See also In re Tripodi*, No. 04-30793, 2005 WL 2589185, at *1-2 (Bankr. D. Conn., Oct. 9, 2005); *In re Service Merchandise Company, Inc.*, 256 B.R. 744, 751 (Bankr. M.D. Tenn. 2000); *McLean Industries*, *Inc.*, 87 B.R. at 834.

12.    Here, the Debtors <u>have</u> <u>not</u> made any factual showing in the Exclusivity Motion that cause exists to extend exclusivity. Rather, the Debtors choose superficially to touch on the case law and make conclusory statements regarding the existence of "facts" in support thereof. As described in detail below, the aforementioned "factors" militate against a finding that "cause" exists to extend exclusivity in this case. Moreover, granting an extension of exclusivity would only delay the process and would not "move the case forward." As discussed herein, this Court should now set a valuation trial. Once the valuation issues are settled, a plan for the Debtors can proceed in earnest.

13.    In their Exclusivity Motion, the Debtors seem to recognize that Section 1121 was designed to "give the debtor time to reach an agreement with its creditors regarding a plan of reorganization." (Exclusivity Motion, at ¶ 12 citing *Gaines v. Perkins* [*In re Perkins*], 71 B.R. 294, 297-98 (W.D. Tenn. 1987)). The Debtors seem to place great weight on Bankruptcy Judge

7

Gerber's "bench memorandum" in *In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y 2006), in support of their requested extension of exclusivity. In *Adelphia*, a far more complex and challenging case than the present one, the debtors' plan proposal had significant support from the official creditors committee and other principal constituencies: "[W]e have a plan that's about to be solicited, and the support of it by creditor groups holding billions of dollars in par amount strongly suggests that its hardly dead on arrival . . ." *Adelphia Comm. Corp.*, 352 B.R. at 589. The *Adelphia* court held that it "believe[d] that the proposed plan plainly deserves to be put up for a vote." *Id.* at 582. Here, in stark contrast, the Debtors do not have the support of any creditor constituency. The Committee believes that the sole purpose of Debtors' efforts to maintain exclusivity is for Management and controlling stockholders to remain in control with the hope of cramming down a plan on unsecured creditors under Section 1129(b) or otherwise attempting to force unsecured creditors to accept a plan that they deem unacceptable. The facts of *Adelphia* are plainly inapposite to the present case.

**B.    The Debtors Have Not: (I) Shown Good Faith Progress Towards Reorganization; (II) Used Exclusivity to Attempt to Negotiate a Consensual Plan; or (III) Made Progress Negotiating with Creditors**

14.    One of the "most important reasons for extending the debtor's period of exclusivity is to give the Chapter 11 process of negotiation and compromise an opportunity to be fulfilled, so that a consensual plan can be proposed and confirmed without opposition." *See In re Southwest Oil Co. of Jourdanton,* 84 B.R. at 452; *Matter of All Seasons,* 121 B.R. at 1006. Despite the Debtors' words, the Committee believes that Management has no intention of engaging in <u>bona fide</u> negotiations with the bulk of the Debtors' unsecured creditors, the Committee, which acts as a fiduciary to all unsecured creditors. Leaving aside the typically

8

arduous process of getting information and data from the Debtors, there exists no possibility that common ground will be found between the Debtors and its creditors upon which to base a plan because the fundamental and sole premise of Management's negotiating position is, and has always been, for Management to retain control of the Debtors' business post-confirmation.

15. Approximately 80-90% of the Debtors' business relates to the automobile sector. Despite the significant downturn in that sector, the Projections provide that annual EBITDA will significantly increase over the next few years. The Debtors' "hockey stick" Projections are not credible, but they are entirely consistent with the Management's behavior throughout these proceedings as well as during the pre-petition negotiations with holders of the 12% Notes. Unsecured creditors have lost faith in Management and its integrity. The Court must consider this fact in determining whether to extend exclusivity. *See Matter of All Seasons,* 121 B.R. at 1006. Particularly where, as here, the Debtors' sole reason to extend exclusivity is to attempt to cram down a plan on the vast bulk of the Debtors' unsecured creditors, "cause" to extend exclusivity does not exist.

**C.    The Proposed Plan Will Not Result in a
        Successful Reorganization -- i.e., It is Not
        Viable**

16. A Chapter 11 debtor must demonstrate that there is a reasonable probability that it will be able to propose a plan that will result in a successful reorganization. *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D.Pa. 1986). A "reasonable probability cannot be grounded solely on speculation. The Code requires the debtor to prove that an effective reorganization is possible." *In re Craghead*, 57 B.R. 366, 370 (W.D. Mo. 1985).

17. The Exclusivity Motion states that "the Plan is viable and can be accepted as proposed despite the Committee's potential opposition." (Exclusivity Motion at ¶ 22). This conclusory statement, however, is unfounded and amounts to nothing more than wishful thinking

9

NYC:179357.3

or pure speculation. As discussed below, the probability of a successful reorganization by the Debtors under the Proposed Plan is dismal at best.

18.     First, the Proposed Plan is unconfirmable given that there exists no bona fide impaired class that will accept the Proposed Plan.  As discussed at paragraph 6 above, asbestos-related claims and the $1 million of "parent" trade creditors do not and cannot satisfy the requirements of Section 1129(a)(10).

19.     Second, the Proposed Plan is premised upon the Projections which, on their face, are patently absurd and wholly unrealistic.  The Projections provide for the Debtors' EBITDA to increase by: (i) approximately 60% between FYE 2008 and FYE 2009 and (ii) nearly triple between FYE 2008 and FYE 2012.  It is astounding that the Debtors can tout such numbers as the basis for their Proposed Plan recognizing that: (i) the Debtors' EBITDA between FYE 2003 and FYE 2007 decreased by approximately 12% and (ii) significantly, the U.S. automobile industry, an industry upon which 80-90% of the Debtors' business relies, is undergoing an unprecedented decline with bleak prospects for the future.

20.     Third, it is the view of the Committee that lenders would be extremely reluctant to lend into the highly leveraged capital structure contemplated by the Proposed Plan.  The Proposed Plan requires the Debtors to obtain approximately $60 million of new debt financing upon exit from Chapter 11, including the obtaining of a senior secured exit facility of approximately $41 million.[4]  Although the Debtors will no doubt claim otherwise, a cursory review of lending standards and market metrics for auto suppliers suggests that maximum lending levels for senior secured debt in this industry are 3.0 - 3.5 times EBITDA and lenders will not allow for the ratio of total debt to EBITDA to exceed 4.0 times EBITDA.  The amount

---

[4] The $60 million is comprised of: (a) $41 million senior secured exit facility; (b) $15 million of senior subordinated notes; and (c) $3 million note payable with respect to pre-petition trade vendor claims.

10

of total debt to EBITDA under the Proposed Plan (based upon the Debtors' adjusted 2007 EBITDA), would be 5.0 times EBITDA.  Additionally, based upon the incurrence required under the Proposed Plan, the Debtors will likely have trouble covering fixed charges, including interest, principal and capital expenditures to maintain their businesses.  It is highly unlikely that the Debtors will be able to obtain the requisite exit financing.  Even if the Debtors obtain such financing, they: (i) will barely have the ability to cover interest payments, (ii) will not be able to comply with the debt service covenant, and (iii) will not be able to service the new senior subordinated notes in cash.  In layman's terms, if the Debtors attempt to reorganize around the Proposed Plan, a reasonable probability exists that the Debtors will be facing Chapter 22 - - i.e., a subsequent Chapter 11 filing in the very near future.

21.    Based on the foregoing and in Committee's submissions in support of its Termination Motion, "cause" does not exist to extend the Debtors' exclusivity periods under Section 1121(d).  Creditors should not be held "hostage" to a Chapter 11 process in which the Debtors intend to force the Proposed Plan on them, especially where the Proposed Plan is not viable and will likely not lead to a successful reorganization.

## **CONCLUSION**

22.    The focus of the parties efforts, and this Court's efforts, should be to reach a valuation determination of the Debtors' businesses. Once such a determination is made, the other elements of a plan - - specifically how to divide up such value - - should fall into place.  As a matter of case management and consistent with the Court's power under Section 105(a) of the Bankruptcy Code, the Debtors' exclusivity should not be extended, and all plan matters other than the determination of valuation should be put on hold.  The Court should schedule a valuation trial (with an appropriate discovery schedule, etc.) so that such matter can be resolved at the earliest possible time.  As extension of the Debtors' exclusivity periods only serves to

11

NYC:179357.3

create an unlevel playing field between the Debtors and its creditors and to hold creditors "hostage" without any justification.

WHEREFORE, the Committee respectfully requests that the Court deny the Exclusivity Motion, grant the relief requested herein and grant such other relief as the Court deems appropriate under the circumstances.

Dated: New York, New York
July 22, 2008

                                                  ANDREWS KURTH LLP

                                      By:  /s/  Paul N. Silverstein
                                          Paul N. Silverstein (PS 5098)
                                          Jonathan I. Levine (JL 9674)
                                          450 Lexington Avenue, 15th Floor
                                          New York, New York  10017
                                          Telephone:  (212) 850-2800
                                          Facsimile:  (212) 850-2929

                                          Counsel to the Official Committee of
                                          Unsecured Creditors

NYC:179357.3