August 8, 2008 Proposed Disclosure Statement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :  Chapter 11 Case No. |
| | : |
| **LEXINGTON PRECISION CORP., et al.,** | :  08-11153 (MG) |
| | : |
| Debtors. | :  (Jointly Administered) |
| | : |

------------------------------------------------------------x

## PROPOSED DISCLOSURE STATEMENT FOR DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Bankruptcy Court has not approved this proposed disclosure statement as containing adequate information pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of acceptances or rejections of the chapter 11 plan described herein and attached hereto.  Accordingly, the filing and dissemination of this disclosure statement are not intended to be, and should not in any way be construed as, a solicitation of votes on the plan, nor should the information contained in this disclosure statement be relied on for any purpose until a determination by the Bankruptcy Court that the proposed disclosure statement contains adequate information.

The Debtors reserve the right to amend or supplement this proposed disclosure statement at or before the hearing to consider this disclosure statement.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000

Dated: New York, New York
_____ __, 2008

I.     Introduction .............................................................................................. 1

II.    Executive Summary ................................................................................. 4

       A.     Summary of Classification and Treatment of Claims and Interests Under
              the Amended Plan ......................................................................... 4

       B.     Summary of Voting Procedures ..................................................... 5

       C.     Overview of the Chapter 11 Process .............................................. 6

III.   Overview of the Debtors' Operations and Chapter 11 Cases ......................... 7

       A.     Description of the Debtors' Operations ............................................ 7

              1.     The Rubber Group ............................................................... 7

                     a.     The Automotive Aftermarket ....................................... 7

                     b.     The Automotive OEM Market ...................................... 8

                     c.     The Medical Device Market ........................................ 8

                     d.     The Rubber Group's Competitive Strengths ................... 8

                     e.     Facilities of the Rubber Group; Capacity for Growth ........ 11

                     f.     Insulators for Automotive Ignition Systems .................. 11

                     g.     Molded Rubber Components for Medical Devices ........... 14

                     h.     Connector Seals for Automotive Wiring Harnesses ......... 16

                     i.     Financial Performance of the Rubber Group ................. 17

              2.     The Metals Group ............................................................... 20

                     a.     The Metals Group's Competitive Strengths ................... 21

                     b.     Financial Performance of the Metals Group .................. 21

              3.     Non-Operating Assets ......................................................... 22

                     a.     Land in East Ellijay, Georgia ..................................... 22

                     b.     Land and Buildings in Lakewood, New York ................ 23

              4.     Lexington's Employees ........................................................ 23

       B.     Significant Indebtedness .............................................................. 23

              1.     The Prepetition Credit Agreement ......................................... 23

              2.     The Prepetition Loan Agreement ........................................... 24

              3.     Senior Subordinated Notes ................................................... 24

              4.     Junior Subordinated Note ..................................................... 25

       C.     The Asbestos Cases .................................................................... 25

       D.     Significant Events Leading to the Commencement of the Chapter 11 Cases ...... 27

# TABLE OF CONTENTS
## (continued)

**Page**

1.  Liquidity Crisis ..................................................................... 27

2.  Restructuring Efforts ........................................................... 27

E.  The Chapter 11 Cases ................................................................. 30

1.  Commencement of the Chapter 11 Cases and the "First-Day" Orders.................................................................................. 30

a.  Case Administration Orders......................................... 30

b.  Critical Obligations..................................................... 30

c.  Customer and Employee Programs............................. 30

d.  Financing Arrangements ............................................. 31

2.  Appointment of the Creditors' Committee ............................. 31

3.  Debtor-in-Possession Financing ........................................... 31

4.  The Creditors' Committee's Motion to Terminate Exclusivity.............. 32

5.  The Claims Reconciliation Process ....................................... 32

IV.  The Amended Plan................................................................................ 33

A.  Summary and Treatment of Unclassified Claims ............................ 33

1.  Administrative Expense Claims.............................................. 33

2.  Professional Compensation and Reimbursement Claims ........................ 34

3.  Indenture Trustee Fee Claims ................................................ 34

4.  Debtor-in-Possession Loan Claims........................................ 34

5.  Priority Tax Claims................................................................ 34

B.  Classification and Treatment of Classified Claims and Interests ........................ 35

1.  Claims against and Interests in LPC ...................................... 35

a.  Class 1 – Other Priority Claims against LPC (Unimpaired)........ 35

b.  Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired).............. 35

c.  Class 2(b) – CSE Secured Claims against LPC (Unimpaired).............. 36

d.  Class 3 – Secured Tax Claims against LPC (Unimpaired) .......... 36

e.  Class 4 – Other Secured Claims against LPC (Unimpaired) ....... 36

f.  Class 5 – Senior Subordinated Note Claims (Impaired)............. 37

ii

# TABLE OF CONTENTS
## (continued)

**Page**

g. Class 6 – Junior Subordinated Note Claims (Impaired) .............. 37

h. Class 7 – General Unsecured Claims against LPC (Impaired) ................................................................................ 37

i. Class 8 – Convenience Claims against LPC (Unimpaired) ........ 38

j. Class 9 – Asbestos-Related Claims (Impaired) .......................... 38

k. Class 10 – Series B Preferred Stock Interests (Impaired)............ 39

l. Class 11 – Other Equity Interests in LPC (Impaired).................. 39

2. Claims against and Interests in LRGI ...................................................... 39

a. Class 12 – Other Priority Claims against LRGI (Unimpaired)................................................................................ 39

b. Class 13(a) – CapitalSource Secured Claims against LRGI (Unimpaired)................................................................................ 40

c. Class 13(b) – CSE Secured Claims against LRGI (Unimpaired)................................................................................ 40

d. Class 14 – Secured Tax Claims against LRGI (Unimpaired)...... 40

e. Class 15 – Other Secured Claims against LRGI (Unimpaired)................................................................................ 41

f. Class 16 – General Unsecured Claims against LRGI (Impaired) ................................................................................... 41

g. Class 17 – Convenience Claims against LRGI (Unimpaired)................................................................................ 41

h. Class 18 –Interests in LRGI (Unimpaired) ................................. 42

C. Distributions Pursuant to the Amended Plan ..................................................... 42

1. Distributions................................................................................................ 42

2. Surrender or Transfer of the Senior Subordinated Notes and Junior Subordinated Note ...................................................................................... 43

D. Implementation of the Amended Plan and Related Documents ......................... 43

1. The Exit Facility ........................................................................................ 43

2. Cancellation of Documents, Agreements, and Debt Instruments ............ 43

3. Charter Amendment.................................................................................... 44

4. Series C Preferred Stock ............................................................................ 44

a. Liquidation Preference ................................................................ 44

iii

## TABLE OF CONTENTS
### (continued)

Page

|  | b. | Dividend | 44 |
|  | c. | Conversion | 45 |
|  | d. | Optional Redemption | 45 |
|  | e. | Board of Directors | 45 |
|  | f. | Voting Rights | 45 |
| 5. | | New Subordinated Notes | 45 |
|  | a. | Interest Payments | 45 |
|  | b. | Ranking | 46 |
|  | c. | Optional Redemption | 46 |
|  | d. | Maturity | 46 |
|  | e. | Indenture | 46 |
|  | f. | Standstill Provision | 46 |
| 6. | | Corporate Action, Effectuating Documents, and Further Transactions | 46 |
| E. | | Provisions for the Treatment of Disputed Claims | 47 |
|  | 1. | Objections to Claims and Prosecution of Disputed Claims | 47 |
|  | 2. | Resolution of Administrative Expense Claims and Other Claims | 47 |
|  | 3. | Claim Estimation | 47 |
|  | 4. | Payment and Distribution on Disputed Claims | 48 |
| F. | | Prosecution of Claims Held by the Debtors | 48 |
| G. | | Executory Contracts and Unexpired Leases | 48 |
|  | 1. | Assumption of Executory Contracts and Unexpired Leases | 48 |
|  | 2. | Cure of Defaults | 48 |
|  | 3. | Rejection Damage Claims | 49 |
|  | 4. | Indemnification and Reimbursement of Directors and Officers | 49 |
|  | 5. | Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits | 49 |
| H. | | Reservation of "Cram Down" Rights | 50 |
| I. | | Conditions Precedent to the Effective Date of the Amended Plan | 50 |
| J. | | Effects of Confirmation | 51 |

iv

# TABLE OF CONTENTS
## (continued)

Page

1.   Discharge of Claims and Termination of Series B Preferred Stock Interests .................................................................................. 51

2.   Discharge of Debtors .............................................................. 51

3.   Injunctions and Stays ............................................................. 51

4.   Exculpation ............................................................................ 52

5.   Releases ................................................................................. 53

6.   Limits on Releases and Exculpation ...................................... 53

K.   Dissolution of the Creditors' Committee ........................................... 53

L.   Management of the Reorganized Debtors ........................................... 54

M.   Jurisdiction and Choice of Law ......................................................... 54

1.   Governing Law ...................................................................... 54

2.   Retention of Jurisdiction ....................................................... 54

N.   Miscellaneous Provisions ................................................................... 55

1.   Payment of Statutory Fees ..................................................... 55

2.   Post-Confirmation Date Professional Fees and Expenses ...... 55

3.   Indenture Trustee as Claim Holder ........................................ 55

4.   Plan Supplement .................................................................... 55

5.   Substantial Consummation ..................................................... 55

6.   Severability ............................................................................ 55

7.   Binding Effect ........................................................................ 56

8.   Notices ................................................................................... 56

9.   Time ....................................................................................... 57

10.  Section Headings .................................................................... 57

O.   Modifications, Revocation, or Withdrawal of the Amended Plan ...... 57

V.   Financial Information, Projections and Valuation Analysis ............................ 58

A.   Selected Historical and Projected Financial Information .................... 58

B.   Projected Financial Statements .......................................................... 63

C.   Valuation of the Reorganized Debtors ............................................... 63

1.   Introduction ........................................................................... 63

2.   Basis of Valuation ................................................................. 63

v

# TABLE OF CONTENTS
## (continued)

|  |  |  |  |
|---|---|---|---|
| | a. | The Rubber Group | 63 |
| | b. | The Metals Group | 63 |
| | c. | Non-Operating Assets | 64 |
| | d. | Tax Attributes | 65 |
| | e. | Corporate Office | 65 |
| 3. | | Reorganization Value | 65 |
| 4. | | Valuation Methodologies | 67 |
| | a. | Discounted Cash Flow Analysis | 68 |
| | b. | Publicly Traded Company Analysis | 68 |
| | c. | Precedent Transactions Analysis | 69 |
| | d. | Sum-of-the-Parts Valuation | 70 |

VI. Certain Factors to be Considered ... 70

A. Certain Risk Factors Relating to Confirmation of the Amended Plan ... 70

1. Risk of Non-Confirmation of the Amended Plan ... 70

2. Non-Consensual Confirmation ... 70

3. Risk of Non-Occurrence of the Effective Date ... 70

B. Additional Factors to be Considered ... 71

1. The Debtors Have No Duty to Update ... 71

2. No Representations Outside This Disclosure Statement Are Authorized ... 71

3. Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary ... 71

4. This Disclosure Statement Is Not Legal or Tax Advice ... 71

5. No Admission Made ... 71

6. Business Factors and Competitive Conditions ... 72

   a. General Economic Conditions ... 72

   b. Business Factors ... 72

   c. Competitive Conditions ... 72

   d. Customers ... 72

7. Access to Financing and Trade Terms ... 72

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 8. | Variances from Projections | 73 |
| 9. | Significant Holders | 73 |
| 10. | Illiquid Market | 73 |
| 11. | Restrictions on Transfer | 74 |
| VII. | Certain Federal Income Tax Consequences of the Amended Plan | 74 |
| A. | Consequences to the Debtors | 75 |
| 1. | Cancellation of Debt | 76 |
| 2. | Limitations on NOL Carryforwards and Other Tax Attributes | 76 |
| a. | Built In Gains and Losses | 77 |
| b. | Special Bankruptcy Exception | 78 |
| 3. | Alternative Minimum Tax | 78 |
| B. | Consequences to Holders of Certain Claims | 79 |
| 1. | Holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims | 79 |
| a. | If Existing Note Does Not Constitute a Security | 80 |
| b. | If Existing Note Constitutes a Security | 80 |
| 2. | Holders of General Unsecured Claims against LPC and General Unsecured Claims against LRGI | 81 |
| 3. | Character of Gain or Loss | 82 |
| 4. | Distributions in Respect of Accrued Interest | 83 |
| 5. | Ownership and Disposition of New Subordinated Notes | 84 |
| a. | Stated Interest and Original Issue Discount | 84 |
| b. | Acquisition and Bond Premium | 84 |
| c. | Sale, Exchange or Other Disposition of the New Subordinated Notes | 85 |
| 6. | Ownership and Disposition of Series C Preferred Stock and LPC Common Stock | 86 |
| a. | Distributions | 86 |
| b. | Constructive Dividend Potential | 87 |
| c. | Sale or Other Disposition (Other Than Conversion) | 87 |

vii

## TABLE OF CONTENTS
### (continued)

Page

|     |     | d.  | Conversion of Series C Preferred Stock into LPC Common Stock | 88 |

| | C. | Consequences to Holders of Series B Preferred Stock Interests | 89 |
| | D. | Information Reporting and Backup Withholding | 89 |
| VIII. | Securities Law matters | | 90 |
| | A. | Issuance and Resale of the New Subordinated Notes, Series C Preferred Stock, and LPC Common Stock under the Amended Plan | 90 |
| | B. | Listing | 91 |
| | C. | Legends | 91 |
| IX. | Voting Procedures and Requirements | | 91 |
| | A. | Voting Deadline | 91 |
| | B. | Holders of Claims Entitled to Vote | 93 |
| | C. | Vote Required for Acceptance by a Class | 93 |
| | D. | Voting Procedures | 93 |
| | | 1. | Voting Procedures | 93 |
| | | 2. | Withdrawal of Ballot | 93 |
| X. | Confirmation of the Amended Plan | | 94 |
| | A. | The Confirmation Hearing | 94 |
| | B. | Objections to Confirmation | 94 |
| | C. | General Requirements for Confirmation | 95 |
| | D. | Best Interests Test | 96 |
| | E. | No Unfair Discrimination/Fair and Equitable Test | 98 |
| | | 1. | No Unfair Discrimination | 98 |
| | | 2. | Fair and Equitable Test | 98 |
| | | | a. | Secured Claims | 98 |
| | | | b. | Unsecured Claims | 98 |
| | | | c. | Interests | 99 |
| | F. | Classification of Claims and Interests | 99 |
| | G. | Feasibility | 99 |
| XI. | Conclusion | | 100 |

# I.  INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), Lexington Precision Corporation ("LPC") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("LRGI"), as debtors and debtors in possession (together, the "Debtors" or "Lexington"), in jointly-administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") to all holders of Claims against and Interests in the Debtors in connection with the Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated August 8, 2008 (the "Amended Plan"), attached hereto as **Exhibit A**.  Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the Amended Plan.  **Please note that to the extent any inconsistencies exist between the Disclosure Statement and Amended Plan, the Amended Plan shall govern.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Amended Plan and alternatives to the Amended Plan, (4) the rights of holders of Claims and Interests under the Amended Plan, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Amended Plan.

The Debtors have developed the Amended Plan in order to provide a rapid repayment program for their suppliers and other general unsecured creditors, while achieving a significant reduction in their consolidated indebtedness through a conversion of LPC's Series B Preferred Stock and Junior Subordinated Note, and a substantial portion of its Senior Subordinated Notes to equity at a value per share based upon the valuation of the Debtors prepared by the Debtors' financial advisor, W.Y. Campbell & Company ("Campbell"), and set forth in this Disclosure Statement.  Based upon discussions with a number of large customers, the Debtors believe that substantial incremented business may be made available to them upon their emergence from chapter 11 with a reduced debt level.  The Debtors are confident that they have in place the infrastructure and the equipment to take advantage of these new business opportunities profitably and without the need for significant additional investment in plant and equipment.  The Debtors believe that any incremental volume should enable them to increase the value of the equity securities that will be issued pursuant to the Amended Plan beyond the values at which they will be issued.

The Debtors recommend that all holders of Claims and Interests vote to accept the Amended Plan because the Amended Plan will (1) enable suppliers and other general unsecured creditors to recover their Claims promptly, while retaining a healthy and rapidly-growing customer and (2) enable all other holders to participate on an equitable basis in the ownership of a highly profitable and expanding enterprise.

**Please note that not all holders of Claims or Interests are entitled to vote.  If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement.  For more information as to which holders of Claims and Interests may vote, please refer to Section IV.B, *"Classification and Treatment of Classified Claims and Interests"* starting on**

**page 35.  For voting procedures and important deadlines, please refer to Section IX, "** *Voting Procedures and* Requirements**" starting on page 91.**

On __, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Amended Plan.  **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Amended Plan.**

On ___ __, 2008 at __:00 _.m., the Bankruptcy Court shall hold a hearing to consider whether to approve and confirm the Amended Plan (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time without notice.  For more information on the confirmation process, please refer to Section X, " *Confirmation of the Amended* Plan" starting on page 94.

For your reference, the following documents have also been attached to the Disclosure Statement:

(i)     The Amended Plan (Exhibit A);

(ii)    Order of the Bankruptcy Court, dated __, 2008 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Amended Plan (attached without exhibits) (Exhibit B);

(iii)   LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 (attached without exhibits) (Exhibit C);

(iv)    LPC's Form 10-Q for the quarter ended June 30, 2008 (Exhibit D);

(v)     LPC's Proxy Statement issued in connection with its Annual Meeting of Stockholders held on May 28, 2008 (Exhibit E);

(vi)    The Debtors' Projected Consolidated Financial Statements (the "Projected Financial Statements") for the Five Years ending December 31, 2012 (Exhibit F); and

(vii)   The Debtors' Liquidation Analysis (Exhibit G).

**This Disclosure Statement does not replace a careful and detailed review and analysis of the Amended Plan by each holder of a Claim and an Interest.  Please use this Disclosure Statement to aid and supplement that review.  The description of the Amended Plan contained herein is only a summary and is qualified in its entirety by reference to the full text of the Amended Plan; if any inconsistencies exist between the Amended Plan and this Disclosure Statement, the Amended Plan shall govern.  The Debtors urge holders of**

Claims and Interests and other parties in interest to review the Amended Plan and any related attachments in order to obtain a full understanding of the Amended Plan.

IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.

* * *

The offer of New Subordinated Notes, Series C Preferred Stock, and LPC Common Stock in exchange for certain existing Claims and outstanding securities of the Lexington Precision Corporation has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or similar state securities or "blue sky" laws.  The issuance of such securities pursuant to the Amended Plan is being done pursuant to the exemption under section 1145 of the Bankruptcy Code.  The New Subordinated Notes, Series C Preferred Stock, and LPC Common Stock to be issued pursuant to the Amended Plan have not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Amended Plan.

Certain statements contained in this Disclosure Statement, including the Projected Financial Statements and other forward-looking statements, are based on estimates and assumptions.  There can be no assurance that such statements will be reflective of actual outcomes.  Forward-looking statements are provided in this Disclosure Statement and the attachments hereto pursuant to the safe harbor established under the Private Securities Litigation Reform Act of 1995 and should be evaluated in the context of the estimates, assumptions, uncertainties, and risks described herein.

## II.  EXECUTIVE SUMMARY

A.    <u>Summary of Classification and Treatment of Claims and Interests Under the Amended Plan</u>

The following summarizes the classification of Claims and Interests under the Amended Plan and the respective distributions and recoveries to each such class.  The following summary is qualified in its entirety by reference to the full text of the Amended Plan.  For a more detailed description of the terms of the Amended Plan, please refer to Section IV, " *The Amended* Plan" starting on page 33.

The Amended Plan provides for 18 classes of Claims and Interests.  Classes 1 through 11 are comprised of Claims against or Interests in LPC, and Classes 12 through 18 are comprised of Claims against or Interests in LRGI.  A Claim or Interest is impaired if the Amended Plan modifies or changes the rights of the Claims or Interests included in the Class.  Holders of Claims and Interests in classes that are impaired may vote to accept or reject the Amended Plan.  If a Class of Claims or Interests is not impaired pursuant to the Amended Plan, holders of the Claims or Interests in that Class are automatically deemed to accept the Amended Plan.

| Class | Designation | Status | Entitled to Vote? | Estimated Recovery |
|---|---|---|---|---|
| | **Claims against and Interests in LPC** | | | |
| **Class 1** | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 2(a)** | CapitalSource Secured Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 2(b)** | CSE Secured Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 3** | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 4** | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 5** | Senior Subordinated Note Claims | Impaired | Yes | 100% |
| **Class 6** | Junior Subordinated Note Claims | Impaired | Yes | 100% |
| **Class 7** | General Unsecured Claims against LPC | Impaired | Yes | 100% |
| **Class 8** | Convenience Claims against LPC | Unimpaired | No (deemed to accept) | 100% |
| **Class 9** | Asbestos Personal Injury Claims | Impaired | Yes | Limited to insurance proceeds |
| **Class 10** | Series B Preferred Stock Interests | Impaired | Yes | 100% |
| **Class 11** | Other Equity Interests in LPC | Impaired | Yes | Subject to dilution |

| Class | Designation | Status | Entitled to Vote? | Estimated Recovery |
|---|---|---|---|---|
| **Claims against and Interests in LRGI** | | | | |
| **Class 12** | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 13(a)** | CapitalSource Secured Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 13(b)** | CSE Secured Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 14** | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 15** | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 16** | General Unsecured Claims against LRGI | Impaired | Yes | 100% |
| **Class 17** | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) | 100% |
| **Class 18** | Equity Interests in LRGI | Unimpaired | No (deemed to accept) | 100% |

**B.    Summary of Voting Procedures**

        If you are entitled to vote, you shall receive a ballot with this Disclosure Statement.  On the ballot, you may elect either to accept or reject the Amended Plan.  If you return a ballot that does not indicate either an acceptance or rejection of the Amended Plan, your vote shall be counted as a vote to accept the Amended Plan.

        ___ __, **2008**, is the record date (the "Voting Record Date") to determine which holders of Claims or Interests may vote to accept or reject the Amended Plan.

        ___ __, **2008 at 4:00 p.m. (Eastern Standard Time)** is the last day to vote (the "Voting Deadline").

        Please send your ballot to ___ (the "Voting Agent"):

        **The Voting Agent must receive your ballot before the Voting Deadline for your vote to be counted.**  The Voting Agent is not required to accept ballots sent by facsimile or e-mail.  If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot.  If your ballot is damaged or lost, you should also contact the Voting Agent.

        For more information on voting procedures, please refer to Section IX, " *Voting Procedures and* Requirements" starting on page 91.  Before voting, please review and consider all information outlined in the Amended Plan, this Disclosure Statement, and any documents attached thereto.

C.      **Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest.  In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponent to conduct such solicitation, pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III.  OVERVIEW OF THE DEBTORS' OPERATIONS AND CHAPTER 11 CASES

### A.    Description of the Debtors' Operations

        The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described in detail below. The business and assets of the Rubber Group are conducted by LRGI, a Delaware corporation, and a wholly-owned subsidiary of LPC, which is also a Delaware corporation. The business and assets of the Metals Group are conducted by LPC. The following table sets forth actual net sales for the Rubber Group and the Metals Group for 2006 and 2007 and their forecasted net sales for 2008 (dollar amounts in thousands):

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Rubber Group | $ 76,090 | 86.6 % | $ 74,587 | 84.4 % | $ 68,051 | 85.2 % |
| Metals Group | 11,811 | 13.4 | 13,821 | 15.6 | 11,815 | 14.8 |
| Total | $ 87,901 | 100.0 % | $ 88,408 | 100.0 % | $ 79,866 | 100.0 % |

### 1.    The Rubber Group

        The Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices. The following table sets forth the Rubber Group's actual net sales to each of its principal markets for 2006 and 2007 and forecasted net sales for 2008 (dollar amounts in thousands):

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Automotive Aftermarket | $ 22,728 | 29.9 % | $ 22,034 | 29.5 % | $ 25,198 | 37.0 % |
| Automotive OEM | 41,246 | 54.2 | 35,799 | 48.0 | 24,675 | 36.3 |
| Medical Devices | 11,039 | 14.5 | 15,928 | 21.4 | 16,504 | 24.3 |
| Other Industries | 1,077 | 1.4 | 826 | 1.1 | 1,674 | 2.4 |
| Total | $ 76,090 | 100.0 % | $ 74,587 | 100.0 % | $ 68,051 | 100.0 % |

#### a.    The Automotive Aftermarket

        In the automotive aftermarket, the Rubber Group supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors believe that the Rubber Group is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket, with an estimated market share of 50%.

### b.        The Automotive OEM Market

In the automotive OEM market, the Rubber Group has focused on three principal products:

(i)     Insulators for automotive ignition systems;

(ii)    Connector seals for automotive wire harnesses; and

(iii)   Seals for automotive transmissions.

The Debtors believe that the Rubber Group is the largest supplier of connector seals in North America the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market.  The Debtors further believe that the Rubber Group's sales of insulators to the OEM market have been limited by customer concerns about the Debtors' financial condition and that the Rubber Group's market share of insulators for automotive ignitions to the automotive OEM market may increase significantly following the conclusion of the Chapter 11 Cases.

### c.        The Medical Device Market

In the medical device market, the Rubber Group has chosen to avoid commodity products that are characterized by lower quality requirements and extreme price competition. Instead, the Rubber Group concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.  The Debtors believe that the Rubber Group has become a leading supplier of these types of components because of its capabilities in product design and materials development and because its molding technology offers process repeatability and product quality.

The Rubber Group has three production facilities, each of which is a stand-alone business unit, with a complete management team, focused on a single product line.  The Jasper, Georgia, facility specializes in insulators for automotive ignition systems, the Vienna, Ohio, facility specializes in automotive connector seals and transmission seals, and the Rock Hill, South Carolina, facility specializes in components for medical devices.

### d.        The Rubber Group's Competitive Strengths

The Rubber Group's leading market positions, high profit margins, and prospects for growth once the Debtors' financial issues are behind them are a function of its ability to offer its customers a complete system for the design, development, and delivery of the complex, molded-rubber components, with very high quality and at competitive prices.  In accomplishing this, the Rubber Group has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including

materials development, computer simulation, mold-making, rubber mixing, molding, process
automation, and process management.

(i)    Materials Development. Any new product development initiative begins
with the selection of the appropriate compound to meet the product
specification at the lowest possible cost.  The Rubber Group has extensive
experience in molding of numerous elastomers and works closely with its
customers to choose the optimal material for any given application.  The
Rubber Group's in-house mixing operation in Jasper, Georgia, is equipped
with a complete facility for materials development, including lab-style
mixers, mills and molding presses, and analytical equipment for testing all
critical performance characteristics.  In addition, the Rubber Group's Rock
Hill, South Carolina, facility contains an analytical laboratory that is utilized
for detailed analysis of polymers, fillers, and contaminants.

(ii)    Computer Simulation. The Rubber Group's computer simulation capability
is a critical component of its offering to customers.  The Rubber Group uses
proprietary computer simulation software for both product design and mold
design.  By incorporating computer simulation into the product development
process, the Rubber Group is often able to design a component that meets
the customer's application without the time and expense required to create a
physical prototype.  The Rubber Group also uses computer simulation to
design both its molds and its molding process in order to maximize the
probability of success in the production environment.

(iii)    Mold-Making. The Rubber Group has invested over $14 million in a state-
of-the-art mold-making operation within the Debtors' North Canton, Ohio
facility (the "Engineering Center").  Through this investment, the Rubber
Group controls 100% of its mold-making activities and has the capability to
produce flashless molds, cut-in-plate molds, standard injection molds, and
LSR injection molds.  The mold-making operation permits the Rubber
Group to significantly reduce turnaround times for prototype molds,
production molds, modifications, and repairs.  Moreover, the strong
relationship between the Rubber Group's mold-making operation and its
production-molding operations has enabled the Rubber Group to make
numerous technological advances in both its mold-making and its molding
processes.

Unlike most rubber molding businesses, the Rubber Group utilizes high-
tolerance, "flashless" molds whenever possible.  In a flashless mold, each
cavity is comprised of a separate stack of precisely-machined,
self-registering inserts.  These inserts, which are assembled in multiple,
hinged plates, have thousands of laser-cut vents that permit gases to escape
from the cavities during the molding process while limiting flash extension
to nominal levels. As illustrated in the following table, flashless molds offer
multiple benefits compared to conventional cut-in-plate molds.

| Attribute | Resulting Benefit |
|---|---|
| Produce tighter-tolerance components | Better assembly and better end-use performance |
| Forces on mold surface are balanced | Parts remain concentric and symmetrical even after extensive mold usage |
| Cavities are vented | Trapped air issues are prevented, improving quality and reducing scrap |
| Most secondary operations, such as deflashing, trimming, and die-cutting, are eliminated | Lower risk of damaged parts and contamination; reduced costs |
| Part handling is reduced | Lower risk of contamination |
| Extended mold life | Lower mold cost over the life of the part; less deterioration in part quality over time |
| Individual cavities can be replaced. | Molds have full cavitation at all times, increasing productivity and reducing costs |

(iv)   <u>Automation</u>. The Rubber Group makes extensive use of automation throughout its operations to improve productivity, reduce labor costs, and improve the quality of its products.  A substantial portion of the Rubber Group's automation equipment is designed and built at the Engineering Center.  This gives the Rubber Group a competitive advantage because its automation equipment is less expensive than similar equipment that could be purchased from outside vendors and is designed specifically to optimize the Rubber Group's manufacturing processes.

(v)   <u>Proprietary Press Controls</u>. The Rubber Group currently operates over 200 rubber molding presses, all of which are equipped with proprietary programmable logic controllers ("<u>PLCs</u>") designed and built at the Engineering Center.  PLCs permit the Rubber Group to select the optimal processing parameters for each mold and ensure strict adherence to those parameters, in order to maximize quality and minimize costs.  PLCs collect and store large amounts of data that can be used to determine the root cause of any molding problem.

(vi)   <u>Management Operating System</u>. The Debtors have developed a management operating system that is used on a real-time basis to ensure the efficient operation of every area of each plant.  The system increases management effectiveness, accountability, and communication.  As a result, management is able to more closely control labor cost, productivity, and overall performance.  The management operating system establishes performance expectations and enables management to hold every operator, every supervisor, and every department accountable for meeting these expectations.  Performance is measured and evaluated on a short-interval

basis, usually every two hours, so that real-time adjustments can be made to
bring performance into line with expectations.

### e.    *Facilities of the Rubber Group; Capacity for Growth*

The Rubber Group operates four modern manufacturing facilities encompassing
256,000 square feet of floor space on 72 acres of land.  All of the operating facilities are owned
by the Debtors.

All of the Rubber Group's facilities and equipment are well-maintained.  Because
of reductions in volume and increases in productivity, each of the Rubber Group's plants has
substantial unused capacity in all functional areas at current volume levels.  As a result,
management believes that the Rubber Group can accommodate the sales growth reflected in the
Projected Financial Statements (from $68.1 million in 2008 to $115.2 million in 2012) without
the need for significant additional expenditures for plant and equipment.

The Rubber Group's production facilities are supported by the Engineering Center
and a materials-development and rubber-mixing facility within the Jasper facility.  The
Engineering Center and the materials development facility have helped the Rubber Group to
differentiate itself from many other custom molders by offering its customers a number of
proprietary services, including computer simulation to optimize the design of the component,
materials development to determine the optimal material for the component, and automation to
produce complete assemblies.  When coupled with the Rubber Group's low-cost manufacturing
operations and outstanding quality record, these services have made the Rubber Group a market
leader in each of the markets it serves.

### f.    *Insulators for Automotive Ignition Systems*

Insulators for automotive ignition systems (aftermarket and OEM) represent the
Rubber Group's largest product category, accounting for 50.1% of the Rubber Group's net sales
for the first six months of 2008, and 50% of forecasted net sales for all of 2008.

Insulators are molded rubber components that are used in ignition systems to seal
and insulate the terminals on the spark plug and the distributor in a traditional ignition system,
and the connection between the coil and the spark plug in a coil-on-plug ("COP") style ignition
system.  Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers
that assemble ignition-wire sets for the automotive OEMs and for retailers serving the
automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

The Debtors believe that the Rubber Group is North America's largest
manufacturer of insulators, with forecasted 2008 sales volume of 232 million units, representing
net sales of approximately $33.6 million, and the leading supplier of insulators to companies,
including General Cable, Standard Motor Products, and Federal Mogul, that supply ignition-wire
sets to automotive parts retailers.  During 2008, the Rubber Group's sales of insulators to the
automotive aftermarket are forecasted to be $25.2 million, which represents an estimated North
American market share of 50%.

The Rubber Group is also a major supplier of insulators to companies that supply ignition-wire sets to the automobile manufacturers.  Through its customers, Prestolite Wire, Diamond Electric, Weastec, and Ford, the Rubber Group is the largest supplier of insulators used on new Ford and Chrysler vehicles produced in North America.  For 2008, the Rubber Group's sales of insulators for new vehicles are forecasted to be $8.4 million, which represents an estimated North American market share of 22%.

The Rubber Group has become the leading supplier of insulators in North America, while continuing to achieve significant profit and cash flow margins, for the following reasons:

(i)   Product Knowledge. Because the Jasper facility is focused almost exclusively on the production and sale of insulators, the Rubber Group has developed vast knowledge of the product and its end-markets.  This knowledge, coupled with the Rubber Group's proprietary computer simulation software, enable the Rubber Group to provide invaluable assistance to its customers in designing insulators with superior performance characteristics, while minimizing cost.

(ii)  Cost Competitiveness. The same product focus has enabled the Rubber Group to develop cost-effective methods for delivering each type of insulator, including:

- High-cavitation tools for high-volume parts;

- Flashless tools for 180° parts;

- Unique, hybrid tools blending flashless and cut-in-plate technology, for certain difficult-to-mold insulators;

- Proprietary automation for molding, demolding, inspection, and assembly; and

- Offshore sourcing of lower-volume parts.

(iii) Proprietary Materials. The Rubber Group has developed an extensive library of proprietary materials for the insulator market.  These materials enable the Rubber Group to meet demanding specifications (including engine temperatures as high as 600° F) at a competitive price.

(iv)  The Broadest Aftermarket Product Line. The Rubber Group has developed a very broad line of insulators for the automotive aftermarket by:

- Investing more than $7 million over the past ten years to build over one hundred high-cavitation tools for the aftermarket;

- ■ Making further significant investments to acquire the right to use excess capacity on many of the high-cavitation tools owned by its OEM customers to supply the aftermarket; and

- ■ Developing reliable, low-cost, off-shore sourcing for lower volume aftermarket parts.

(v) <u>Aftermarket Growth</u>. Rubber Group's aftermarket business is expected to grow and not be adversely affected by any decline in the automotive OEM industry.

Although the Rubber Group is already the leading supplier of insulators in North America, the Projected Financial Statements reflect a significant increase in sales of insulators once the Chapter 11 Cases are concluded. Management believes that this growth is achievable for the following reasons:

(i) <u>New Programs Awarded</u>. The Rubber Group has been awarded a number of significant new OEM programs that are presently in ramp-up.

(ii) <u>General Motors Potential</u>. Prior to July 2008, General Cable, which assembles the ignition-wire sets for most of the new GM vehicles pursuant to an agreement with Delphi Corporation ("<u>Delphi</u>"), has been prohibited by Delphi from purchasing insulators for those sets from the Rubber Group. In late July 2008, Delphi authorized General Cable to purchase insulators from the Rubber Group and the Rubber Group received its first purchase order for insulators to be used on Delphi ignition wire sets. Management believes that a meaningful portion of this business will be sourced with the Rubber Group over the next several years.

(iii) <u>Returning Business</u>. A number of OEM customers that had re-sourced products away from the Rubber Group to other suppliers (both domestic and Far East) have experienced price increases and/or quality issues with their new suppliers and are shifting major portions of this business back to the Rubber Group.

(iv) <u>Aftermarket Strength</u>. The Rubber Group is expected to continue to capture market share in the aftermarket due to:

- ■ Its innovative product design;

- ■ Its program of continuing to build high-cavitation molds for high-volume parts;

- ■ Its off-shore sourcing of low-volume parts; and

- ■ The inability of its competitors to match the Rubber Group's prices, quality, and service.

g.    *Molded Rubber Components for Medical Devices*

Components for medical devices are the Rubber Group's second largest product line, accounting for 23.4% of the Rubber Group's net sales for the first six months of 2008, and 24% of forecasted net sales for all of 2008.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery devices, and catheters. The Rubber Group has chosen to avoid commodity-type components (like plunger tips for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that the Rubber Group is able to offer. These types of products include seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

The Rubber Group is rapidly becoming a leading supplier for these types of components because of its technical capabilities, including:

(i)    <u>Product Design</u>. The Rubber Group uses proprietary computer simulation software to help its customers design components that function optimally in their required application and can be produced without significant problems.

(ii)    <u>Materials Development</u>. The Rubber Group's extensive materials library and its experience with a broad range of elastomers enable it to develop the optimal material for each application at a competitive price.

(iii)    <u>Tight-Tolerance, Flashless Molds</u>. The Rubber Group's state-of-the-art flashless molds allow it to:

- Maintain part concentricity, which is critical to the functioning of high-speed assembly equipment and to the delivery of precise dosages, even after extensive mold usage;

- Deliver consistently flash-free parts; and

- Hold extremely tight tolerances on even the most difficult features, including seals with very thin walls and seals with variable wall thickness.

(iv)    <u>Proprietary Press Controls</u>. The Rubber Group's proprietary press controls allow it to provide its customers with a high level of assurance regarding process repeatability and traceability.

(v)    <u>In-House Automation Capability</u>. The Rubber Group's in-house automation design/build capability enables it to solve difficult assembly, inspection, and packaging issues for its customers.

The Debtors believe that the Rubber Group is in the early stages of a period of meaningful growth in its medical components business. From 2006 to 2007, the Rubber Group's medical device business grew by 44%. A substantial portion of projected future growth is attributable to major programs that are currently ramping up with existing customers. The balance is attributable primarily to new projects currently in the development stage, both with existing customers and with new customers that have been or will be attracted to the Rubber Group's capabilities.

The following is a description of the Rubber Group's principal products for the medical device industry, by application.

(i) <u>Medication Delivery Systems</u>. The Rubber Group supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and process repeatability. Medication delivery products include injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly equipment and plunger tips for syringes used in applications where dosages must be controlled with precision. Medical applications that utilize the Rubber Group's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology applications, cardiac applications, and cosmetic surgery (Botox delivery). The Debtors believes growth opportunities in this product segment are strong because:

- Demands for the products should increase as the average age of the population increases;

- Device-makers will continue to move to higher-speed assembly, which should increase the demand for the ability to consistently symmetrical parts; and

- The Debtors anticipates that there will be meaningful growth in applications where dosages must be tightly controlled.

(ii) <u>Laparoscopic Surgery Devices</u>. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively-small punctures rather than through a large incision. Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection. Since 2005, the Rubber Group has built significant relationships with three of the major manufacturers of laparoscopic surgery devices, and has received purchase orders for 21 different components for laparoscopic surgery devices. These programs are in the early stages of their life-cycle and are expected to grow significantly in volume over the next several years.

h.        *Connector Seals for Automotive Wiring Harnesses*

Connector seals for automotive wiring harnesses are the Rubber Group's third-largest product line, accounting for 18.9% of the Rubber Group's net sales for the first six months of 2008 and 18.7% of forecasted net sales for all of 2008.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.

There are three standard types of connector seals. Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition. Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

The Debtors believe that the Rubber Group is North America's largest manufacturer of connector seals, with a forecasted 2008 sales volume of over one billion units. The Rubber Group currently manufactures connector seals using both high-consistency silicone rubber ("HCR") and liquid silicone rubber ("LSR") at its 53,000-square-foot facility in Vienna, Ohio (approximately equidistant between Cleveland and Pittsburgh). The LSR-production operation was relocated to Vienna in the first half of 2008, resulting in one-time costs of approximately $213,000.

The Rubber Group's sales of connector seals have declined significantly in recent years for the following reasons:

(i)        Customer in-sourcing of a number of commodity-type seals;

(ii)       Customer re-sourcing of some connector seals due to price increases implemented by the Rubber Group in 2005 and 2006;

(iii)      Customer concerns about sourcing new business with an already-dominant supplier viewed as having financial issues; and

(iv)      The industry-wide reduction in domestic car and truck production.

Despite these sales declines, the Rubber Group continues to be a leader in the manufacture of connector seals, while maintaining profit and cash flow margins above the norm for the automotive supply industry, for the following reasons:

(i)        Product Design. The Rubber Group's focus on connector seals, coupled with its proprietary computer simulation software, has made the Rubber Group uniquely capable of assisting its customers in designing the seals for their electrical connectors.

    (ii)  <u>Competitive Advantages in Multi-Hole Seals</u>. The Rubber Group has developed very cost-effective technology for manufacturing large volumes of the highly-complex, multi-hole seals that have become the industry standard.  This technology encompasses:

- State-of-the-art, flashless tools that eliminate the need for most costly deflashing operations;

- Advanced wasteless molding technology, utilizing proprietary cold pots that minimize material waste;

- Proprietary, "split-pin" technology that facilitates demolding without tears or flashed-over holes;

- High-cavitation tools that increase productivity and reduce cost; and

- Use of automated inspection equipment to meet stringent customer quality requirements.

    (iii)  <u>Process Flexibility</u>. The Rubber Group has the capability to produce connector seals using both HCR and LSR and, as a result, can offer its customers a more cost-effective method to manufacture each part.

The Projected Financial Statements reflect gradual increase in sales of connector seals for 2009 and 2010 consistent with industry projections for changes in the auto build and further increases in 2011 and 2012 that reflect management's belief that the Rubber Group's market share in connector seals will once again begin to grow once the Chapter 11 Cases are concluded.

### i.    *Financial Performance of the Rubber Group*

The following table sets forth the actual income from operations of the Rubber Group for 2006 and 2007 and its forecasted income from operations for 2008 and the reconciliation of the Rubber Group's income from operations to its Earnings Before Interest, Taxes, Depreciation, and Amortization ("<u>EBITDA</u>") for those periods (dollar amounts in thousands).

Please refer to Exhibit F, attached here to, for the reconciliation of the Debtors' consolidated loss from continuing operations for 2007 and their forecasted loss from continuing operations for 2008 to their consolidated forecasted EBITDA.

EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("<u>GAAP</u>") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP.  The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors'

business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)     EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to The Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)    EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to The Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)   EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)    EBITDA does not reflect cash provided or used as a result of changes in The Debtors' working capital.

(v)     The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in their industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBTTDA used to calculate compliance with the financial covenants in the loan agreements governing the Debtors' senior, secured credit facility.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, the Debtors monitor gross profit and operating profit, both in dollars and as a percentage of net sales. In addition, when setting prices for components that the Debtors manufacture, they use a cost system that calculates the gross profit margin of each component. Accordingly, where the Debtors have used EBITDA, this Disclosure Statement also provides a reconciliation of the same with GAAP numbers.

The following table sets forth the actual operating results and EBITDA of the Rubber Group for 2006 and 2007 and its forecasted operating results and EBITDA for 2008 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
| --- | --- | --- | --- | --- | --- | --- |
| Net Sales | $ 76,090 | 100.0 % | $ 74,587 | 100.0 % | $ 68,051 | 100.0 % |
| Cost of Sales | 64,772 | 85.1 | 63,039 | 84.5 | 55,308 | 81.3 |
| Gross Profit | 11,318 | 14.9 | 11,548 | 15.5 | 12,743 | 18.7 |
| Selling and Admin. Exp. | 3,676 | 4.9 | 3,573 | 4.8 | 2,867 | 4.2 |
| Income from Operations | 7,642 | 10.0 | 7,975 | 10.7 | 9,876 | 14.5 |
| Add Back: Depreciation and Amortization | 6,455 | 8.5 | 5,727 | 7.7 | 4,771 | 7.0 |
| EBITDA | $ 14,097 | 18.5 % | $ 13,702 | 18.4 % | $ 14,647 | 21.5 % |

The following table sets forth a reconciliation of the forecasted operating results and EBITDA of the Rubber Group for 2008 to its pro forma operating results and EBITDA for 2008 (dollar in thousands) and reconciles those numbers to GAAP numbers:

|  | 2008 Forecasted | | Pro Forma Adjustments | | 2008 Pro Forma | |
| --- | --- | --- | --- | --- | --- | --- |
| Net Sales | $ 68,051 | 100 % | $ 98 | (1) | $ 68,149 | 100.0 % |
| Cost of Sales | 55,308 | 81.3 | (819) | (2) | 54,489 | 80.0 |
| Gross Profit | 12,743 | 18.7 | 917 | | 13,660 | 20.0 |
| Selling and Admin. Exp. | 2,867 | 4.2 | | | 2,867 | 4.2 |
| Income from Operations | 9,876 | 14.5 | 917 | | 10,793 | 15.8 |
| Add Back: Depreciation and Amortization | 4,771 | 7.0 | | | 4,771 | 7.0 |
| EBITDA | $ 14,647 | 21.5 % | $ 917 | | $ 15,564 | 22.8 % |

(1) Reflects the pro forma effect of a price increase implemented in July 2008 with respect to one laparoscopic surgery program, as if that increase had been implemented prior to January 1, 2008.

(2) $606,000 of the pro forma adjustment relates to a productivity-enhancement project that is in process at the Rock Hill facility under the direction of a consulting firm that has guaranteed the Debtors a minimum annualized reduction in labor costs of $808,000 at current volume levels; the Rubber Group's forecast for 2008 reflects the portion of these guaranteed savings that should be realized during 2008 and the pro forma adjustment reflects the portion of the guaranteed annual savings that will not be realized during 2008 because the projected commenced in late July.  $213,000 of the pro forma adjustments reflect the elimination of the one-time costs incurred to move the Debtors' LSR  production to the Vienna, Ohio facility as part of a productivity-improvement project in the Debtors' connector seals business.

The following table sets forth the projected operating results and EBITDA of the Rubber Group for the years 2009 through 2012 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

|  | 2009 Projected | | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 82,448 | 100.0% | $ 92,353 | 100.0% | $ 104,767 | 100.0% | $ 115,168 | 100.0% |
| Cost of Sales | 63,445 | 77.0 | 68,615 | 74.3 | 75,046 | 71.6 | 80,758 | 70.1 |
| Gross Profit | 19,003 | 23.0 | 23,758 | 25.7 | 29,721 | 28.4 | 34,410 | 29.9 |
| Selling and Admin. Exp. | 3,389 | 4.1 | 3,758 | 4.1 | 3,874 | 3.7 | 3,987 | 3.5 |
| Income from Operations | 15,614 | 18.9 | 19,980 | 21.6 | 25,847 | 24.7 | 30,423 | 26.4 |
| Add Back: Depreciation and Amortization | 4,619 | 5.6 | 4,209 | 4.6 | 3,723 | 3.5 | 3,445 | 3.0 |
| EBITDA | $ 20,233 | 24.5% | $ 24,189 | 26.2% | $ 29,570 | 28.2% | $ 33,868 | 29.4% |

## 2.    The Metals Group

The Metals Group consists of the Debtors' machining business located in Rochester, New York.  The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks.  The Metals Group primarily uses multi-spindle screw machines and specially-designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time.  The components produced by the Metals Group include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components, primarily for use by the automotive OEMs.

The following table sets forth the Metals Group's actual net sales to each of its principal markets for 2006 and 2007 and forecasted net sales for 2008 (dollar amounts in thousands):

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Automotive OEM | $ 9,490 | 80.3% | $ 11,597 | 83.9% | $ 9,715 | 82.2% |
| Other Industries | 2,321 | 19.7 | 2,224 | 16.1 | 2,100 | 17.8 |
| Total | $ 11,811 | 100.0% | $ 13,821 | 100.0% | $ 11,815 | 100.0% |

The Metals Group's automotive OEM customers have historically included such major domestic suppliers as BorgWarner, Cooper-Standard Automotive, Delphi, and Jiffy-Tite. Over the past eighteen months, the Metals Group has been awarded substantial volume of additional business by these customers as well as a number of new customers, including a Japanese-based airbag supplier that has opened a U.S. plant to supply the North American operations of the Japanese automakers, and a German-based transmission-systems supplier that has opened a plant in Canada to supply the U.S.-based auto companies and the North American operations of the German and Japanese automakers.

### a. The Metals Group's Competitive Strengths

The Metals Group has a number of competitive advantages within the markets it serves, which have enabled it to build a solid base of customers. These advantages include:

(i)     The ability to design and build specialized manufacturing equipment, which allows the Metals Group to offer its customers comparatively short lead times and low prices;

(ii)    The ability to design and build automation equipment for many of its processes, which allows the Metals Group to offer its customers excellent quality components and low prices; and

(iii)   The ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

### b. Financial Performance of the Metals Group

The following table sets forth the actual operating results and EBITDA of the Metals Group for 2006 and 2007 and its forecasted operating results and EBITDA for 2008 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Net Sales | $ 11,811 | 100.0% | $ 13,821 | 100.0% | $ 11,815 | 100.0% |
| Cost of Sales | 12,387 | 104.9 | 13,490 | 97.6 | 11,307 | 95.7 |
| Gross Profit | (576) | (4.9) | 331 | 2.4 | 508 | 4.3 |
| Selling and Admin. Exp. | 669 | 5.6 | 523 | 3.8 | 498 | 4.2 |
| Income (Loss) from Operations | (1,245) | (10.5) | (192) | (1.4) | 10 | 0.1 |
| Add Back: Depreciation and Amortization | 820 | 6.9 | 682 | 4.9 | 546 | 4.6 |
| EBITDA | $ (425) | (3.6)% | $ 490 | 3.5% | $ 556 | 4.7% |

The following table sets forth the projected operating results and EBITDA of the Metals Group for the years 2009 through 2012 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

| | 2009 Projected | | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 18,083 | 100% | $ 27,813 | 100.0% | $ 30,164 | 100.0% | $ 33,130 | 100.0% |
| Cost of Sales | 15,584 | 86.2 | 22,665 | 81.5 | 24,337 | 80.7 | 26,280 | 79.3 |
| Gross Profit | 2,499 | 13.8 | 5,184 | 18.5 | 5,827 | 19.3 | 6,850 | 20.7 |
| Selling and Admin. Exp. | 596 | 3.3 | 747 | 2.7 | 846 | 2.8 | 898 | 2.7 |
| Income from Operations | 1,903 | 10.5 | 4,401 | 15.8 | 4,981 | 16.5 | 5,952 | 18.0 |
| Add Back: Depreciation and Amortization | 562 | 3.1 | 666 | 2.4 | 871 | 2.9 | 962 | 2.9 |
| EBITDA | $ 2,465 | 13.6% | $ 5,067 | 18.2% | $ 5,852 | 19.4% | $ 6,914 | 20.9% |

The Metals Group has made significant progress in strengthening its operations and building its sales base but, to date, it has not been able to generate adequate cash flow to justify the Debtors' continuing investment. For 2008, the Metals Group is forecasting EBITDA of $556,000 or 4.7% of net sales. Based upon the additional business that has been awarded and additional orders that customers have promised, the Metals Group projects that its net sales and EBITDA will increase substantially over the next two years, as set forth above. Although the Debtors believe that the projections for the Metals Group, which are included in the Projected Financial Statements, are reasonable and achievable, the Debtors intend to monitor the progress of the Metals Group closely.

### 3. Non-Operating Assets

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their on-going business and will be disposed of in an orderly fashion. The most significant of those assets are the following:

#### a. Land in East Ellijay, Georgia

The Debtors own a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site. The adjacent area, however, has seen extensive commercial development. The Debtors believe that this adjacent development has likely increased the value of this property, and making it uneconomical to consider building a manufacturing plant there. The Debtors have substantially completed the grading work necessary to prepare the property for sale and expect to commence marketing of this parcel shortly after the Chapter 11 Cases are concluded.

The Debtors also own six abutting residential lots aggregating 6.6 acres in East Ellijay, Georgia.

###### b.    Land and Buildings in Lakewood, New York

The Debtors own a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of the Debtors' former die casting business, under a lease that expires on December 31, 2009. The lessee pays the Debtors $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,400. The lease provides for a single, three-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

The Debtors also own a vacant 10,000-square-foot building on 2.5 acres adjacent to the leased property discussed above.

###### 4.    Lexington's Employees

As of June 30, 2008, the Debtors employed approximately 625 permanent and 20 temporary employees, of which 124 were salaried employees and 521 were hourly employees. Because the Debtors' Rock Hill, South Carolina manufacturing facility is an "open-shop," only certain of its hourly employees are covered by a collective bargaining agreement with the United Steel Workers of America, AFL-CIO, which expires on October 18, 2008. All of the hourly employees at the Vienna, Ohio manufacturing facility are covered by a collective bargaining agreement with IUE – CWA, which expires on December 10, 2008. Lexington's Relationship with its employees is good. The Debtors expect the collective bargaining agreements to be renewed or extended on reasonably similar terms.

### B.    Significant Indebtedness

The Debtors' significant prepetition indebtedness is described below. In addition to this indebtedness for money borrowed, the Debtors have prepetition trade accounts payable and other general unsecured claims of approximately $6 million.

###### 1.    The Prepetition Credit Agreement

The Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement"). The Credit Agreement provides for: (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit and (ii) an equipment term loan facility in the original principal amount of $12.5 million.

Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of the Debtors' assets other than real estate and second priority liens on the Debtors' real estate.

The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements. As of the Commencement Date, approximately $22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

As described in greater detail in Section IV.B.1.b, "*Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired)*" starting on page 35, pursuant to the Amended Plan, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims. Holders of Class 2(a) Claims shall receive Cash in the full amount of their Allowed Claims.

## 2.      The Prepetition Loan Agreement

The Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"), as amended pursuant to the Default Waiver Agreement. The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

Pursuant to the Loan Agreement, CSE, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the Debtors' real estate, and second priority liens on substantially all of the Debtors' other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements. As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

As described in greater detail in Section IV.B.1.c, "*Class 2(b) – CSE Secured Claims against LPC (Unimpaired)*" starting on page 36, pursuant to the Amended Plan, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims. Holders of Class 2(b) Claims shall receive Cash in the full amount of their Allowed Claims.

## 3.      Senior Subordinated Notes

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes"). Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

Approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates. Approximately 74.4% of the Senior Subordinated Notes are held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date. Three members of the Ad Hoc Committee and the Indenture Trustee now serve as members of the statutory creditors' committee (the "Creditors' Committee") in the Chapter 11 Cases.

As described in greater detail in Section IV.B.1.f, "*Class 5 – Senior Subordinated Note Claims (Impaired)*" starting on page 37, pursuant to the Amended Plan, Claims arising from the Senior Subordinated Notes are classified as Class 5 Claims. Each holder of a Class 5 Claim shall receive (a) a *pro rata* share (based upon the principal amount of Senior Subordinated Notes held by each holder) of $15 million in principal amount of New Subordinated Notes and (b) a number of shares of Series C Preferred Stock equal to the quotient of (x) the excess of such holder's Allowed Claim over the principal amount of New Subordinated Notes issued to such holder divided by (y) $100.

### 4. Junior Subordinated Note

LPC is indebted to Michael A. Lubin, Chairman of the Board of the Debtors, in respect of an unsecured Junior Subordinated Note due November 1, 2009 in the principal amount of $346,666.67, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note"). Interest on the Junior Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, $75,111.33 of accrued interest was outstanding with respect to the Junior Subordinated Note.

As described in greater detail in Section IV.B.1.g, "*Class 6 – Junior Subordinated Note Claims (Impaired)*" starting on page 37, pursuant to the Amended Plan, Claims arising from the Junior Subordinated Note are classified as Class 6 Claims, a. The Holder of the Class 6 Claims shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the full amount of the Allowed Class 6 Claims, divided by (b) $7.25.

### C. The Asbestos Cases

LPC is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos Actions"). In each case, the plaintiffs generally allege that LPC or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers. Generally, none of the complaints allege any specific facts as to which products LPC allegedly produced that contained asbestos or the time of exposure.

LPC has denied and continues to deny any liability with respect to the Asbestos Actions. To date, the Debtors have never been found liable on any asbestos-related Claims and approximately 1,000 cases were dismissed.

To date, Liberty Mutual and Home Insurance Company, who insured the Debtors for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors' defense costs. On June 13, 2003, Home Insurance Company became subject to a state insurance liquidation proceeding. Since then, Liberty Mutual has continued to pay the Debtors' defense and other asbestos-related costs.

The Debtors believe the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
|---|---|
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and bodily injury, $1,000,000 per occurrence, $1,000,000 in aggregate coverage for products liability |

In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund. The Debtors believe Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage. The Debtors believe that the Fireman's Fund coverage is as follows:

| Period | Coverage |
|---|---|
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |
| 10/10/78-06/01/79 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

As described in greater detail in Section IV.B.1.j, "*Class 9 – Asbestos-Related Claims (Impaired)*" starting on page 38, pursuant to the Amended Plan, Asbestos-Related Claims are classified as Class 9 Claims. Recoveries to holders of Class 9 Claims shall be limited to proceeds of the Debtors' insurance policies. **Holders of Class 9 Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Insurance Policies).**

**Nothing in this Disclosure Statement or the Amended Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

**Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

**D.    Significant Events Leading to the Commencement of the Chapter 11 Cases**

Historically over 75% of the Debtors' business represented sales of rubber and metal components used by tier-one automotive part manufacturers, which supply automotive parts to domestic original OEMs.  Over the past decade, there has been a decline in the market share of U.S.-based OEMs as well as a reduction in the number of vehicles produced annually in the U.S.  These factors have caused tier-one suppliers, particularly those focused on the U.S.-based OEMS, to experience declining sales and increased pricing pressures.  This challenging industry environment has been exacerbated by industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of component suppliers like the Debtors.

The Debtors have responded to the reduction in OEM sales by restructuring their operations to reduce costs, which has enabled the Debtors to maintain significant operating and EBITDA margins despite declining sales and to increase their focus on their automotive aftermarket and medical device business.

**1.    Liquidity Crisis**

Notwithstanding the operational restructuring and their efforts to diversify their business, the industry-wide reduction in automotive OEM orders began to affect the Debtors in a significant way in mid-2006.  Although the Debtors were able to maintain superior margins, the reduction in sales to the automotive OEMs had a significant impact on the Debtors' overall cash flow.  At the same time, the Debtors' Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort.  The combination of these factors caused a significant drain on the Debtors' cash.

On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes.  As a result of the liquidity issues described above, the Debtors were not in a position to make the scheduled payment on the due date or within the thirty-day grace period.  The failure to make this interest payment within the grace period constituted a default under the Indenture, and by February 1, 2007, that default created a cross-default under the Prepetition Credit Agreement and the Prepetition Loan Agreement.  Shortly thereafter, certain holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee.

**2.    Restructuring Efforts**

During this period and through mid-March 2007, the Debtors held extensive discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues.  In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc

Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all stakeholders.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers. The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date. In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code. The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

Although the Debtors were forced to undertake their asset sale and refinancing efforts in an extremely difficult economic environment, the Debtors, assisted by Campbell, were able to obtain a number of offers for all or portions of LRGI, each of which indicated to the Debtors that, notwithstanding the Debtors' negative book net worth calculated in accordance with generally accepted accounting principles ("GAAP"), the value of the Debtors' assets far exceeded their liabilities.

Upon reviewing the various sale proposals, the Debtors' determined that the course of action that offered the best prospect of maximizing value was to proceed with a proposal from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase LRGI's facility in Rock Hill, South Carolina, which produces molded rubber components for use in medical devices, at a price of $32 million in cash (the "Rock Hill Sale"). The Rock Hill Facility had $16 million in net sales for 2007, and the net book value of that facility was $5.3 million on December 31, 2007. The sale would have generated a pre-tax gain on sale of approximately $26 million for U.S. federal income tax purposes, all of which was anticipated to be sheltered by the Debtors' net operating loss carryforward (subject to a possible alternative minimum tax).

In conjunction with that sale process, the Debtors began to seek senior secured financing arrangements that would have enabled them, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, make substantial payments in respect of the Senior Subordinated Notes, and finance the operations and growth of the Debtors' remaining businesses. The financing efforts were successful and the Debtors were able to obtain a proposal from a prospective institutional lender (the "Potential New Secured Lender") for a $36.7 million senior secured credit facility that, had it closed, would have enabled Lexington to (a) repay the Prepetition Secured Lenders, (b) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (c) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates of the Debtors. The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a 5-year maturity and a cash-pay interest rate of 12%. The Junior Subordinated Note and the Senior Subordinated Notes held by the affiliated holders would

have been converted to common stock, reducing the Debtors' remaining debt by an additional $8 million.

In mid-January 2008, the Debtors advised the Ad Hoc Committee that they believed that, in order to move forward with the Rock Hill Sale and the related financing, it required an extension of the current standstill arrangement, which was due to expire on January 24, 2008, to April 30, 2008; the requested extension reflected the time periods requested by the Rock Hill Buyer and the Potential New Secured Lender in order to permit them to complete their respective due-diligence investigations. The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that the Debtors and their advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale, and most significantly, a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion. The Debtors and their advisors believed that a series of two-week extensions and a right of veto would dissuade the Rock Hill Buyer from devoting the significant resources necessary to complete due-diligence on a transaction that could disappear unexpectedly, or encourage the Rock Hill Buyer to proceed but ultimately reduce its price because of the "fire-sale" atmosphere. The Debtors made extensive efforts to persuade the Ad Hoc Committee to permit them to proceed with the Rock Hill Sale, without success. Ultimately, the Debtors had no choice but to abandon the Rock Hill Sale and prepare for chapter 11.

In a final effort to avoid the expense and disruption of a chapter 11 case, Lexington made two additional restructuring proposals. The first proposal, which was made to the Ad Hoc Committee, included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process. In support of this recapitalization, Lexington was able to obtain from the Proposed New Secured Lender a modified financing proposal that would have provided for a $43.3 million senior, secured credit facility, conditioned upon completion of the recapitalization. The Debtors believe that this facility would have been adequate to finance their entire business without the Rock Hill Sale. The proposed recapitalization would have enabled the Debtors to repay the Prepetition Secured Lenders in full, and in the Debtors' view, would have provided a full recovery to the holders of the Senior Subordinated Notes. This recapitalization was also rejected.

The second proposal was made to Jefferies High Yield Trading ("Jefferies"), the largest holder of the Senior Subordinated Notes with approximately 37.1% of the issue. To the knowledge of the Debtors, the second proposal was not shared with the other members of the Ad Hoc Committee. That proposal provided for a full conversion of the Senior Subordinated Notes to equity and would likely have given a majority of the voting power in the Debtors to non-affiliated holders of the Senior Subordinated Notes, conditioned upon reaching agreement on the following: (a) a continuing interest for existing stockholders consistent with the values reflected in the sale offers the Debtors had received; (b) shared control of the Board of Directors for at least two years following the restructuring; (c) continuation of current management of the Debtors for at least two years following the restructuring; and (d) a one-time right to purchase the shares issued to Jefferies if the shared control arrangements were terminated after two years,

at a 40% premium to the amount owed to Jefferies at the time of conversion.  This proposal was also rejected.

In light of the foregoing, the Debtors determined that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code.  The Debtors believed that the short-term standstill arrangements under which they had been operating for approximately a year prior to the Commencement Date were having a significant adverse effect on their business because of customer concerns about awarding additional business to a company with an uncertain future, and that further delay would only exacerbate the negative impact.

## E.    The Chapter 11 Cases

### 1.    Commencement of the Chapter 11 Cases and the "First-Day" Orders

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases.  Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

#### a.    Case Administration Orders

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases.  These orders: (i) authorized the joint administration of the Chapter 11 Cases, (ii) established notice procedures, (iii) granted an extension of time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix.  In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

#### b.    Critical Obligations

To allow the Debtors to maintain certain critical operations during the chapter 11 cases, the Bankruptcy Court authorized certain payments on prepetition obligations.  The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits, (ii) sales and use taxes, and (iii) claims of common carriers, equipment processors, and warehouses.

#### c.    Customer and Employee Programs

Further, the Bankruptcy Court granted authority to continue certain business operations.  Among other things, the Bankruptcy Court authorized the Debtors to: (i) continue certain customer service programs and (ii) continue certain workers compensation and all other insurance policies.

### d. Financing Arrangements

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to (i) use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing, (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral, and (iii) maintain their existing bank accounts and forms.

### 2. Appointment of the Creditors' Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the seven-member Committee to represent the interests of all unsecured creditors in the Chapter 11 Cases. The members of the Creditors Committee' are:

Wilmington Trust Company;

Jefferies High Yield Trading;

Wilfrid Aubrey, LLC;

Valhalla Capital Partners, LLC;

Momentive Performance Materials, Inc.;

Wacker Chemical Corporation; and

Environmental Products & Services of Vermont, Inc.

Representatives of Jefferies High Yield Trading, Wilfrid Aubery, LLC, and Valhalla Capital Partners, LLC also served on the Ad Hoc Committee, as described in Section III.B.3, "*Senior Subordinated Notes*" starting on page 24.

The Creditors' Committee retained Andrews Kurth LLP as counsel to the Committee, and Stout Risius Ross as financial advisor to the Committee.

### 3. Debtor-in-Possession Financing

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements. The Debtors also obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008. Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' board of directors and the Debtors' Co-Chief Executive Officer. William B.

Connor currently serves as a director on the Debtors' board of directors. To the Debtors' knowledge, ORA Associates is not an insider of the Debtors.

The Bankruptcy Court authorized, on a final basis, the use of cash collateral and approved the DIP Note on April 17, 2008.

As described in Section IV.A.4, "*Debtor-in-Possession Loan Claims*" starting on page 34, below, Claims arising from the DIP Note shall be paid in full, in Cash, on the Effective Date.

**4.      The Creditors' Committee's Motion to Terminate Exclusivity**

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case. In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case. A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Creditors' Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit votes in support thereof. The Debtors objected. On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan and solicit acceptances thereof to and including October 28, 2008 and December 27, 2008, respectively. On July 17, 2008, the Creditors' Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend of the Debtors' exclusive periods for an additional 90-days. On July 22, 2008, the Creditors' Committee filed that objection. On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods. Thereafter, by decision and order dated July 31, 2008, the Court overruled the Creditors' Committee's objection and granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

**5.      The Claims Reconciliation Process**

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline for any claimant other than a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of claim. The deadline for Government Units to file a proof of claim is September 29, 2008. In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of claim form. The notice included information as to how to file a proof

of claim and whether filing a proof of claim is necessary.  On July 18, 2008, the Debtors also published the same notice in the national edition of <u>The Wall Street Journal</u>.

      For more information on the bar date and whether you need to file a proof of claim, please refer to the bar date notice, which can be found at http://chapter11.epiqsystems.com/lexington.

## IV.  THE AMENDED PLAN

      This Section of the Disclosure Statement summarizes the Amended Plan, which is attached hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the full text of the Amended Plan.  To the extent any inconsistencies exist between the Disclosure Statement and Amended Plan, the Amended Plan shall govern.

**A.**    <u>**Summary and Treatment of Unclassified Claims**</u>

      The Amended Plan does not classify all Claims and Interests.  In particular, Claims incurred during the course of the Chapter 11 Cases (*i.e.*, Administrative Expense Claims) and Priority Tax Claims are unclassified.  A summary of these Claims is set forth below.

**1.**    **Administrative Expense Claims**

      Administrative Expenses are the actual and necessary costs and expenses of the Chapter 11 Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Commencement Date.  Other administrative expenses include the actual, reasonable, and necessary professional fees and expenses of the advisors to the Debtors and Creditors' Committee that are incurred during the pendency of the Chapter 11 Cases.

      The Debtors will pay Administrative Expenses incurred in the ordinary course of business and consistent with past practice or arising under loans or advances to the Debtors after the Commencement Date, whether or not incurred in the ordinary course of business, in accordance with the terms and conditions of the particular transaction and any related agreements and instruments.  The Debtors will pay all other Administrative Expenses, in full, in cash, on the Effective Date or as soon thereafter as is practicable, or on such other terms to which the Debtors and the holder of such Administrative Expense agree.

      Pursuant to Section 2.1 of the Amended Plan, each holder of an Allowed Administrative Expense Claim shall receive Cash in the amount of its Allowed Administrative Expense Claim on or soon as reasonably practicable following the later of (a) the Effective Date or (b) the date on such Claim is Allowed, except that (i) any Allowed Administrative Expense Claim incurred in the ordinary course of business shall be paid in the ordinary course of business, consistent with past practice and (ii) any Allowed Administrative Expense Claims arising from liabilities incurred under loans, advances, or other obligations shall be paid in accordance with the terms and subject to the conditions of the documents governing such

obligations.  Holders of Allowed Administrative Expense Claims may also elect to receive less favorable treatment.

### 2.    Professional Compensation and Reimbursement Claims

Professional compensation and reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court shall fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date.  Each holder of such a Claim shall be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (a) the Effective Date or (b) the date which such Claim is Allowed.  The Debtors are authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

### 3.    Indenture Trustee Fee Claims

Indenture Trustee Fee Claims are Administrative Expense Claims of the Indenture Trustee for reimbursement of its reasonable accrued and unpaid fees and expenses under the Indenture.  The Indenture grants the Indenture Trustee a lien (the "Charging Lien") upon and priority in payment with respect to any distributions made to holders of the Senior Subordinated Note Claims for payment of any Indenture Trustee Fees Claims arising prior to the Effective Date.

The holder of the Indenture Trustee Fee Claims shall be paid in Cash on the Effective Date by Reorganized LPC without the need for Bankruptcy Court approval.  The Charging Lien shall be discharged upon payment in full of the Indenture Trustee Fee Claims.  Nothing in the Amended Plan shall impair, waive, or discharge the Charging Lien with respect to any fees or expenses not paid by Reorganized LPC.

### 4.    Debtor-in-Possession Loan Claims

DIP Loan Claims are all Claims arising under the DIP Note and the DIP Financing Order with respect to the DIP Note.  Holders of the DIP Loan Claims shall be paid in full, in Cash, on the Effective Date.

### 5.    Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive, at the Debtors' or the Reorganized Debtors' option, (a) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date and (ii) the date such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

## B.    Classification and Treatment of Classified Claims and Interests

Pursuant to the Amended Plan, there are a total of 18 Classes, with Classes 1 through 11 being Claims against or Interests in LPC and Classes 12 through 18 being Claims against or Interests in LRGI.

Unless indicated otherwise, all distributions shall be in full satisfaction of each Allowed Claim or Interest and shall be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed. Further, claimholders can generally agree to receive less favorable treatment than the treatment provided for by the Amended Plan. Unless otherwise indicated, the Debtors have based the characteristics and amounts of the Claims or Interests on the Debtors' books and records.

### 1.    Claims against and Interests in LPC

#### a.    *Class 1 – Other Priority Claims against LPC (Unimpaired)*

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LPC shall receive Cash in the amount of its Allowed Other Priority Claims against LPC. Because Class 1 Claims are not impaired pursuant to the Amended Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

#### b.    *Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired)*

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CapitalSource Secured Claim against LPC shall receive Cash in the amount of its Allowed CapitalSource Secured Claim against LPC.  Because Class 2(a) Claims are not impaired pursuant to the Amended Plan, holders of CapitalSource Secured Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

### c.       Class 2(b) – CSE Secured Claims against LPC (Unimpaired)

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CSE Secured Claim against LPC shall receive Cash in the amount of its Allowed CSE Secured Claim against LPC.  Because Class 2(b) Claims are not impaired pursuant to the Amended Plan, holders of CSE Secured Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

### d.       Class 3 – Secured Tax Claims against LPC (Unimpaired)

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC shall receive, at the Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against LPC, which includes any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LPC, which includes interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LPC deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim against LPC.  Because Class 3 Claims are not impaired pursuant to the Amended Plan, holders of Secured Tax Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

### e.       Class 4 – Other Secured Claims against LPC (Unimpaired)

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LPC or Reorganized LPC, the Debtors may (i) reinstate any Other Secured Claim against LPC or (ii) distribute to holders of an Allowed Other Secured Claim against LPC (w) Cash in the amount of such Claim, (x) the sale or disposition of proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released. Because Class 4 Claims are not impaired pursuant to the Amended Plan, holders of Other Secured Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

### f.    Class 5 – Senior Subordinated Note Claims (Impaired)

Class 5 Claims are all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as indenture trustee, and LPC, as issuer, which shall include interest at 12% per annum.

Each holder of an Allowed Senior Subordinated Note Claim shall receive, as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed, (a) a *pro rata* share of $15,000,000 in principal amount of New Subordinated Notes and (b) a number of shares of Series C Preferred Stock equal to the quotient of (x) the excess of such holder's Allowed Senior Subordinated Note Claim against LPC over the principal amount of New Subordinated Notes issued to such holder divided by (y) $100.  Because Class 5 Claims are impaired pursuant to the Amended Plan, holders of Allowed Senior Subordinated Note Claims are entitled to vote to accept or reject the Amended Plan.

### g.    Class 6 – Junior Subordinated Note Claims (Impaired)

Class 6 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which shall include interest at 13% per annum.

The holder of the Allowed Junior Subordinated Note Claims shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the aggregate amount of such Claim divided by (b) $7.25.  Because Class 6 Claims are impaired pursuant to the Amended Plan, the holder of the Allowed Junior Subordinated Note Claims is entitled to vote to accept or reject the Amended Plan.

### h.    Class 7 – General Unsecured Claims against LPC (Impaired)

Class 7 Claims are all Unsecured Claims against LPC not classified in any other Class (*e.g.*, Classes 5, 6, 8, or 9).

Each holder of an Allowed General Unsecured Claim against LPC shall receive (i) Cash in the amount of 25% of its Allowed General Unsecured Claim against LPC as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed and (ii) three equal Cash payments, each in an amount equal to 26.5% of its Allowed General Unsecured Claim against LPC, payable six, twelve, and eighteen months after the later of (a) the Effective Date and (b) the date such Claim is Allowed.  Because Class 7 Claims are impaired pursuant to the Amended Plan, holders of Allowed General Unsecured Claims against LPC are entitled to vote to accept or reject the Amended Plan.

### i.       Class 8 – *Convenience Claims against LPC (Unimpaired)*

Class 8 Claims comprise all Unsecured Claims against LPC that are any Unsecured Claim in the amount of $2,000.00 or less, and any other Unsecured Claim that is reduced to such amount by the holder of such Claim.

As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Amended Plan to exercise its election.

Each holder of an Allowed Convenience Claim against LPC shall receive Cash in the amount of its Allowed Convenience Claim against LPC.  Because Class 8 Claims are not impaired pursuant to the Amended Plan, holders of Convenience Claims against LPC are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

### j.       Class 9 – *Asbestos-Related Claims (Impaired)*

Class 8 Claims are any Asbestos-Related Claims, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.

Each holder of an Asbestos-Related Claim shall be deemed a Disputed Claim without the need for the Debtors to file a separate formal objection thereto.  Each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date.  Any claimant who has filed an Asbestos Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible commence a proceeding after the Effective Date in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.

Any recovery on any Asbestos-Related Claim shall be limited to the proceeds of the Insurance Policies and holders of Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than the Insurance Policies).

Because Class 9 is impaired pursuant to the Amended Plan, holders of Asbestos-Related Claims are entitled to vote to accept or reject the Amended Plan.

**Nothing in this Disclosure Statement or the Amended Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

       k.       *Class 10 – Series B Preferred Stock Interests (Impaired)*

Class 10 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

On the Effective Date, the Series B Preferred Stock Interests shall be cancelled and each holder of a Series B Preferred Stock Interest shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the amount of such holder's Series B Preferred Stock Interest <u>divided by</u> (b) $7.25. Because Class 10 Interests are impaired pursuant to the Amended Plan, holders of Series B Preferred Stock Interests are entitled to vote to accept or reject the Amended Plan.

       l.       *Class 11 – Other Equity Interests in LPC (Impaired)*

Class 11 Equity Interests are Interests of any holder of LPC Common Stock, LPC Warrants, or any other instrument evidencing an ownership interest in LPC, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, other than the Series B Preferred Stock Interests.

Although Other Equity Interests in LPC will be unaltered, the increase in the number of authorized shares of LPC Common Stock pursuant to the Amended Plan will dilute the Other Equity Interests in LPC. Because Class 11 Equity Interests are impaired pursuant to the Amended Plan, holders of Other Equity Interests in LPC are entitled to vote to accept or reject the Amended Plan.

       **2.**       **Claims against and Interests in LRGI**

       *a.*       *Class 12 – Other Priority Claims against LRGI (Unimpaired)*

Class 12 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LRGI shall receive Cash in the amount equal of its Allowed Other Priority Claim against LRGI. Because Class 12 Claims are not impaired pursuant to the Amended Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

**b.      *Class 13(a) – CapitalSource Secured Claims against LRGI
(Unimpaired)***

Class 13(a) Claims are all Claims against LRGI arising under the Prepetition
Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit
Agreement and all lenders thereunder, for adequate protection arising under the Final Cash
Collateral Order less all payments made subsequent to the Commencement Date in respect of
and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CapitalSource Secured Claim against LRGI shall
receive Cash in the amount of its Allowed CapitalSource Secured Claim against LRGI.  Because
Class 13(a) claims are not impaired pursuant to the Amended Plan, holders of CapitalSource
Secured Claims against LRGI are conclusively presumed to have accepted the Amended Plan
and are not entitled to vote to accept or reject the Amended Plan.

**c.      *Class 13(b) – CSE Secured Claims against LRGI (Unimpaired)***

Class 13(b) Claims are all Claims against LRGI arising under the Prepetition
Loan Agreement and all Claims of CSE, as agent for the Prepetition Lenders and all lenders
thereunder, for adequate protection arising under the Final Cash Collateral Order less all
payments made subsequent to the Commencement Date in respect of and Claims under the Final
Cash Collateral Order.

Each holder of an Allowed CSE Secured Claim against LRGI shall receive Cash
in the amount of its Allowed CSE Secured Claim against LRGI.  Because Class 13(b) is not
impaired pursuant to the Amended Plan, holders of CSE Secured Claims are conclusively
presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the
Amended Plan.

**d.      *Class 14 – Secured Tax Claims against LRGI (Unimpaired)***

Class 14 Claims are Claims against LRGI that, absent their status as Secured
Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code,
and includes any interest on such Secured Tax Claim required to be paid pursuant to section
506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI shall receive, at the
Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against
LRGI; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured
Tax Claim against LRGI with interest at the applicable non-bankruptcy rate, commencing as
soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim
is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five
(5) years after the Commencement Date); or (c) such other treatment as shall be determined by
the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LRGI
deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured
Claim against LRGI.  Because Class 14 Claims are not impaired pursuant to the Amended Plan,

holders of Secured Tax Claims against LRGI are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

> **e.    *Class 15 – Other Secured Claims against LRGI (Unimpaired)***

Class 14 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LRGI or Reorganized LRGI, the Debtors may (i) reinstate any Other Secured Claim against LRGI or (ii) distribute to holders of an Allowed Other Secured Claim against LRGI  (w) Cash in the amount of such Claim, (x) the sale or disposition proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral, which secures Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released.  Because Class 15 Claims are not impaired pursuant to the Amended Plan, holders of Other Secured Claims against LRGI are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

> **f.    *Class 16 – General Unsecured Claims against LRGI (Impaired)***

Class 16 Claims are all Unsecured Claims against LRGI not classified in Class 17.

Each holder of an Allowed General Unsecured Claim against LRGI shall receive (i) Cash in the amount of 25% of its Allowed General Unsecured Claim against LRGI as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Claim is Allowed and (ii) three equal Cash payments, each in an amount equal to 26.5% of their Allowed General Unsecured Claim against LRGI, payable six, twelve, and eighteen months after the later of (a) the Effective Date or (b) the date such Claim becomes Allowed.  Because Class 16 Claims are impaired pursuant to the Amended Plan, holders of General Unsecured Claim against LRGI are entitled to vote to accept or reject the Amended Plan.

> **g.    *Class 17 – Convenience Claims against LRGI (Unimpaired)***

Class 17 Claims comprise all Unsecured Claims against LRGI that are (i) Allowed in the amount of $2,000.00 or (ii) Allowed in a larger amount but reduced to $2,000.00 or less by the holders thereof by.

As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Amended Plan to exercise its election.

Each holder of an Allowed Convenience Class Claim shall receive Cash in the amount of its Allowed Convenience Claim against LRGI.  Because Class 17 Claims are not impaired pursuant to the Amended Plan, holders of Convenience Claims against LRGI are conclusively presumed to have accepted the Amended Plan and are not entitled to vote to accept or reject the Amended Plan.

h.      *Class 18 –Interests in LRGI (Unimpaired)*

Class 18 Equity Interests are all Interests in LRGI, all of which are owned by LPC.  All the Interests in LRGI shall be unaltered.  Because Class 18 Equity Interests are not impaired pursuant to the Amended Plan, the holder of Interests in LRGI is conclusively presumed to have accepted the Amended Plan and is not entitled to vote to accept or reject the Amended Plan.

C.      **Distributions Pursuant to the Amended Plan**

1.      **Distributions**

A Disbursing Agent shall make all distributions under the Amended Plan.  For all distributions except those made with respect to Allowed Senior Subordinated Notes, Reorganized LPC or its designated agent shall be the Disbursing Agent.  For distributions made with respect to Allowed Senior Subordinated Notes, the Indenture Trustee, or such other entity as designated by the Debtors, shall be the Disbursing Agent.

The Disbursement Record Date is three (3) days after the Confirmation Date, at which time the claims registry shall be closed.  The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the Debtors' schedules, books and records, or in any proofs of claim filed.  Any Cash distribution shall be made by check or wire transfer or as otherwise provided by any applicable agreements.

No Cash distributions under $50 shall be made unless the holder sends a written request to the Disbursing Agent.  No fractional shares of LPC Common Stock or Series C Preferred Stock shall be distributed under the Amended Plan.  If an Allowed Claim results in distribution of a number of shares that is not a whole number, the number of share shall be rounded up to the next whole number if the fraction is one-half (½) or greater and rounded down to the next lower whole number if the fraction is less than one-half (½).

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent shall use its reasonable efforts to locate the holder.  If the distribution remains undeliverable one year after the Effective Date, the distribution shall revert back to respective Reorganized Debtor.

The Debtors may, but shall not be required to, set off any Claim held by the Debtor against any distribution to be made pursuant to Amended Plan.  Neither the failure to set off nor the allowance of any Claim constitute a waiver or release by either Debtor of any claims against the holder of any Claim.

2.      **Surrender or Transfer of the Senior Subordinated Notes and Junior Subordinated Note**

Unless this requirement is waived by LPC or Reorganized LPC, in order to receive any distribution, holders of the Senior Subordinated Notes Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the Amended Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

Unless this requirement is waived by LPC or Reorganized LPC, to be able to participate in any distribution, the holder of the Junior Subordinated Note Claim shall surrender the Junior Subordinated Note to Reorganized LPC, unless Reorganized LPC is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If the note is lost, stolen, or otherwise destroyed, Reorganized LPC may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) to hold the Debtors harmless with respect to any distributions made on any Claims arising from the lost, stolen or otherwise destroyed note.

If a holder of a Junior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(c) of the Amended Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

D.      **Implementation of the Amended Plan and Related Documents**

1.      **The Exit Facility**

To fund the distributions under the Amended Plan and the continued operations of the Reorganized Debtors, the Reorganized Debtors shall enter into the Exit Facility.  The Debtors are currently engaged in negotiations with a financial institution that may provide the Exit Facility.  As the date hereof, however, that institution has not committed to providing the Exit Facility.  The Exit Facility shall be approved concurrently with confirmation of the Amended Plan.

2.      **Cancellation of Documents, Agreements, and Debt Instruments**

As noted in Sections IV.A and IV.B of this Disclosure Statement, Cash payments or other consideration will be distributed pursuant to the Amended Plan in satisfaction of all Claims and the Series B Preferred Stock Interests and any document, agreement, or debt

instrument evidencing any Claim or Series B Preferred Stock Interest shall be automatically cancelled upon the Effective Date without any requirement for any further act or action. Affected documents include, but are not limited to, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture, the Senior Subordinated Notes, the Junior Subordinated Note, and shares of the Series B Preferred Stock.

### 3.    Charter Amendment

On the Effective Date or as soon as practicable thereafter, Reorganized LPC shall file an amendment to LPC's certificate of incorporation (the "Charter Amendment") with the Secretary of State of the State of Delaware.  The Charter Amendment will amend LPC's certificate of incorporation in order to, among other things, (i) establish the rights and priorities of the Series C Preferred Stock, (ii) increase the number of authorized shares of LPC Common Stock to 20,000,000, and (iii) reduce the par value of LPC Common Stock from $0.25 to $0.01 per share.

The Amended Plan authorizes LPC to file the Charter Amendment without any further corporate action or any action by holders of Claims, Series B Preferred Stock Interests, or Other Equity Interests.

A copy of the proposed Charter Amendment will be included in the Plan Supplement.  As described in Section IV.N.4, "*Plan Supplement*" starting on page 55, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, ___ __, 2008.

### 4.    Series C Preferred Stock

Holders of Allowed Senior Subordinated Note Claims will receive, as part of their distributions under the Amended Plan, shares of Series C Preferred Stock that will be issued by Reorganized LPC.  The key terms of the Series C Preferred Stock are as follows:

#### a.    *Liquidation Preference*

The liquidation preference (the "Liquidation Preference") shall be $100 per share, plus any accumulated but unpaid dividends thereon.  In the event of the sale or liquidation of Reorganized LPC, each holder will be entitled to receive the greater of (1) the Liquidation Preference or (2) the amount such holder would have received if its shares of Series C Preferred Stock had been converted into shares of the LPC Common Stock immediately prior to the sale or liquidation of Reorganized LPC.

#### b.    *Dividend*

The dividend rate shall be 12% per annum.  When, as and if declared by the Board of Directors, dividends will be payable quarterly in cash on each January 1, April 1, July 1, and October 1, commencing on the first such date to occur after the Effective Date.  Any dividend that (1) is not declared or (2) is declared but is not paid on the scheduled dividend payment date will be added to the Liquidation Preference.

### c.    Conversion

Each share of Series C Preferred Stock may be converted at any time at the option of the holder into a number of shares of LPC Common Stock equal to $100 <u>divided</u> by $7.25, subject to standard anti-dilution adjustments for stock splits, stock dividends, and other similar transactions.

### d.    Optional Redemption

Reorganized LPC may redeem the Series C Preferred Stock at any time, in its entirety, at 100% of the Liquidation Preference, upon 90 days' prior written notice to the holders of record of the Series C Preferred Stock.

### e.    Board of Directors

So long as at least 100,000 shares (as adjusted for stock splits, stock dividends, and other similar transactions) of Series C Preferred Stock are issued and outstanding, the holders of the Series C Preferred Stock, voting together as a single Class, will have the right to elect two (2) members of the Board of Directors of Reorganized LPC.

So long as at least 50,000 shares (as adjusted for stock splits, stock dividends, and other similar transactions) of Series C Preferred Stock are issued and outstanding, the holders of the Series C Preferred Stock, voting together as a single Class, will have the right to elect one (1) member of the Board of Directors of Reorganized LPC.

The Creditors' Committee shall select the two members of the initial Board of Directors of Reorganized LPC that would otherwise be elected by holders of the Series C Preferred Stock.

### f.    Voting Rights

The Series C Preferred Stock shall have no voting rights except as described in the preceding sub-section (e) above and as required by law.

### 5.    New Subordinated Notes

Holders of Allowed Senior Subordinated Note Claims will receive as part of their distributions under the Amended Plan, a *pro rata* share of $15 million principal amount of New Senior Subordinated Notes.  The key terms of the New Subordinated Notes are as follows:

### a.    Interest Payments

Interest shall accrue from the Effective Date at the rate of 12% per annum and  be payable semi-annually in arrears with the first payment to be made on the first day of the first calendar month that commences after the five-month anniversary of the Effective Date, and at maturity.

### b.        Ranking

The New Subordinated Notes will be subordinate and junior in right of payment to all indebtedness except for (1) instruments that explicitly state that they are not senior in right to the New Subordinated Notes, (2) debt of Reorganized LPC to its subsidiaries or affiliates, (3) liabilities for compensation to employees of the Reorganized LPC, and (4) liabilities incurred for the purchase of goods, materials or services in the ordinary course of business.  The subordination provisions of the New Subordinated Notes will be substantially the same as those contained in the Indenture.

### c.        Optional Redemption

The New Subordinated Notes will be redeemable at the option of Reorganized LPC at any time, in whole or in part, on thirty days prior written notice, at 100% of the principal amount to be redeemed plus accrued interest thereon to the date of redemption.

### d.        Maturity

The New Subordinated Notes will mature on December 31, 2013.

### e.        Indenture

Reorganized LPC shall issue the New Subordinated Notes under an indenture between Reorganized LPC and the trustee named therein (the "New Indenture").  Except as set forth below with respect to the standstill period, the New Indenture will be in substantially the same form as the Indenture.

A copy of the New Indenture will be included in the Plan Supplement.  As described in Section IV.N.4, "*Plan Supplement*" starting on page 55, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, ___ __, 2008.

### f.        Standstill Provision

Holders of the New Subordinated Notes may not accelerate the New Subordinated Notes or enforce remedies against Reorganized LPC for 120 days after the occurrence of an event of default.  During such 120-day period, interest on the New Subordinated Notes shall accrue at the same rate as before an event of default.

### 6.        Corporate Action, Effectuating Documents, and Further Transactions.

On the Effective Date, all matters provided for under the Amended Plan that would otherwise require the approval of stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment; the authorization and issuance of the New Subordinated Notes, the Series C Preferred Stock, and the additional shares of the LPC Common Stock; the increase in the size of the Boards of Directors of the Reorganized Debtors; and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) shall be deemed to have been approved and

such approval shall be in effect from and after the Effective Date pursuant to the applicable General Corporation Law of the State of Delaware, without the necessity for any further acts by the stockholders or directors of the Debtors or the Reorganized Debtors.

Upon confirmation of the Amended Plan, the Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment and the New Subordinated Note Indenture) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Amended Plan and any securities to be issued pursuant to the Amended Plan.

## E.    Provisions for the Treatment of Disputed Claims

### 1.    Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated shall not receive a distribution as provided under the Amended Plan unless and until such Claim is Allowed.

Only the Debtors or the Reorganized Debtors may object to a Claim.  The Debtors may object to any Claim until the Effective Date and the Reorganized Debtors may object to any Claim from and after the Effective Date.  Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court or (ii) a date to be fixed by the Bankruptcy Court.

### 2.    Resolution of Administrative Expense Claims and Other Claims

On or after the Effective Date the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims other than any Claims for professional compensation and reimbursement, without further order of the Bankruptcy Court.

### 3.    Claim Estimation

The Debtors and the Reorganized Debtors may request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, regardless of whether the Claim is subject to an objection.  If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.        **Payment and Distribution on Disputed Claims**

When a Disputed Claim is Allowed, the holder of such Claim shall receive the distribution provided by the Amended Plan to the extent such Claim is Allowed.

F.        **Prosecution of Claims Held by the Debtors**

From and after the Effective Date, the Reorganized Debtors shall, as representatives of the Debtors' estates, litigate any claims or causes of action that constituted assets of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or other actions instituted by the Debtors.

G.        **Executory Contracts and Unexpired Leases**

1.        **Assumption of Executory Contracts and Unexpired Leases**

As of the Effective Date, the Debtors shall assume all executory contracts and unexpired leases to which the Debtors are a party, except for (i) any executory contract or lease that the Debtors previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (ii) any executory contract or lease, with respect to which the Debtors served and filed before the Confirmation Date a motion to assume, assume and assign, or reject, or (iii) any executory contract or lease scheduled on Schedule 8.1 of the Plan Supplement.

The Debtors may amend Schedule 8.1 of the Plan Supplement at any time before the Confirmation Date.  If the Debtors add an executory contract or lease to Schedule 8.1, the Debtors shall provide notice to all counterparties.

Unless otherwise specified, the inclusion of any executory contract or lease on Schedule 8.1 shall include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease, even if Schedule 8.1 does not include such documents.  The inclusion of any executory contract or lease on Schedule 8.1 is not an admission that such document or any related documents is an executory contract or unexpired lease.

2.        **Cure of Defaults**

Prior to assuming any executory contract or unexpired lease, the Debtors must cure any monetary defaults and compensate counterparties for any non-monetary defaults.  At least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve on all counterparties to executory contracts and unexpired leases a notice indicating a proposed cure amount for the respective contract or lease.  Counterparties shall have twenty (20) days from the date of service to object to the proposed cure amount.  If any objection is filed, the Bankruptcy Court shall hold a hearing to resolve such objection.

Notwithstanding Section 8.1 of the Amended Plan and Section IV.F.1 of this Disclosure Statement, the Debtors reserve the right to reject any executory contract or lease if any objection is filed with respect to the cure amount.

### 3.    Rejection Damage Claims

If the Debtors reject an executory contract or lease, the counterparty must assert any Claim by filing a proof of claim with the Debtors' claim agents, Epiq Bankruptcy Solutions LLC, within 30 days following the later of (i) the date of service of the notice of the Confirmation Date, (ii) the date of service of the notice of modification to Schedule 8.1 of the Plan Supplement, or (iii) the date of service of the notice of such rejection.  If the counterparty fails to file a proof of claim, the counterparty shall be barred from asserting any Claim related to the rejection of the contract or lease in the future and shall not receive any distribution under the Amended Plan.

For more information regarding how to file a proof of claim, please refer to the bar date notice found at http://chapter 11.epiqsystems.com/lexington.

### 4.    Indemnification and Reimbursement of Directors and Officers

All the Debtors' obligations to indemnify and reimburse directors, officers, and employees who served in such positions on or before the Confirmation Date shall survive confirmation of the Amended Plan and remain unaffected thereby.

### 5.    Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits

With the exception of any insurance policy, employee compensation, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order, the Amended Plan shall treat all insurance policies and compensation and benefit programs as executory contracts and the Debtors shall assume all such policies and programs.

To the extent the Insurance Policies are determined not to be executory contracts, they will  remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of  Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory.  The Plan shall not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors shall be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which shall continue in full force and effect. Notwithstanding anything contained in the Plan or the Disclosure Statement to the contrary, to the extent that there is an inconsistency between the Insurance Policies and any provision of the

Plan or Disclosure Statement, the terms of the Insurance Policies shall control.  No provision of the Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, and/or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X and anything supervening or preemptory, the Plan and Confirmation of the Plan shall be without prejudice to any of insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

The Reorganized Debtors shall continue to pay all the Debtors' retiree benefits for the same duration for which the Debtors were obligated to provide such benefits.

## H.    Reservation of "Cram Down" Rights

In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Amended Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (a) request that the Bankruptcy Court confirm the Amended Plan in accordance with section 1129(b) of the Bankruptcy Code or (b) amend the Amended Plan.  As described in Section VI.A.2, "*Non-Consensual Confirmation*" starting on page 70, the Debtors may confirm the Amended Plan without the consent of all parties in interest.

## I.    Conditions Precedent to the Effective Date of the Amended Plan

The Effective Date shall not occur and the Amended Plan shall not become effective unless and until the following conditions precedent are satisfied or waived:  (a) a Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered and shall not be subject to any stay or injunction; (b) all actions, documents, and agreements that are necessary to implement the Amended Plan shall have been completed and be effective; (c) all conditions precedent to the completion of the Exit Facility shall have been satisfied or waived and the Reorganized Debtors shall have access to the funding thereunder; and (d) all authorizations, consents, regulatory approvals, and other authorizations necessary to the implementation of the Amended Plan, as is required by law, regulation, or order shall have been received.

At their sole discretion, the Debtors may waive any of the aforementioned conditions precedent other than items (a) and (b) without Bankruptcy Court approval.

If the conditions precedent are not satisfied on or prior to the 120th (one hundred twentieth) day after the Confirmation Order becomes a Final Order and upon the Debtors' motion, then (i) the Confirmation Order shall be vacated, (ii) no distributions under the Amended Plan shall be made, (iii) the Debtors and all holders of Claims and Interests shall be restored to their *status quo ante* as of the day immediately proceeding the Confirmation Date as though the

Confirmation Date had never occurred, and (iv) all of the Debtors' obligations shall remain unchanged.

## J.    Effects of Confirmation

Upon the Effective Date, all the Debtors' property shall vest in the Reorganized Debtors free and clear of all liens, encumbrances, charges, and other interests, except as provided by the Amended Plan.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, as if no case was pending under any provision or chapter of the Bankruptcy Code.

### 1.    Discharge of Claims and Termination of Series B Preferred Stock Interests

Except as provided in the Amended Plan, the rights afforded in and the payments and distributions to be made under the Amended Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests in and all existing debts and Claims, (including any interest accrued on such debts or Claims from and after the Commencement Date), against the Debtors or any of their assets or properties.

Except as provided in the Amended Plan, upon the Effective Date, all existing Claims and all Series B Preferred Stock Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Series B Preferred Stock Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assigns, or any of their assets or properties, any other or further Claim or Series B Preferred Stock Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Series B Preferred Stock Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 2.    Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made under the Amended Plan, except as otherwise expressly provided in the Amended Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Series B Preferred Stock Interests, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Series B Preferred Stock Interest in the Debtors.

### 3.    Injunctions and Stays

Except as otherwise expressly provided in the Amended Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals

and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim against or Interest in the Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Amended Plan.  Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.

Unless otherwise provided in the Amended Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Amended Plan.

**4.      Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Creditors' Committee, the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, the lenders party to the DIP Note, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Amended Plan, property to be distributed under the Amended Plan, or any other act or omission in connection with the Chapter 11 Cases, the Amended Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

5.      **Releases**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, attorneys, and representatives of the Debtors who acted in such capacities after the Commencement Date, (b) the Creditors' Committee, (c) the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, and (d) the lenders party to the DIP Note, the Debtors and the Reorganized Debtors, each holder of a Claim or Interest that votes to accept the Amended Plan (or is deemed to accept the Amended Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Amended Plan, shall release, unconditionally and forever, each present or former director, officer, employee, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Creditors' Committee, the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, the lenders party to the DIP Note, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such claim or equity prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Amended Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; _provided_, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or _ultra vires_ acts of any such person or entity.**

6.      **Limits on Releases and Exculpation**

Nothing in Sections 10.7 or 10.8 of the Amended Plan shall (i) be construed to release or exculpate any entity from fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or _ultra vires_ acts, or (ii) limit the liability of the professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

## K.      **Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the

Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

## L.   Management of the Reorganized Debtors

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the responsibility of the Boards of Directors of the Reorganized Debtors.

The Boards of Directors of each of the Reorganized Debtors shall consist of eight members, two of which will be designated by holders of Series C Preferred Stock. The initial board of directors shall consist of the Debtors' directors as of the Effective Date and two new members selected by the Creditors' Committee to be the designated members of the Series C Preferred Stock; provided, however, that neither of the new board members is a competitor of the Reorganized Debtors or an employee or affiliate thereof. If the Committee does not select the board members which will be designated by holders of Series C Preferred Stock, the holders of Series C Preferred Stock shall elect the board members at the first annual shareholders' meeting following the Effective Date.

Each member of the initial Board of Directors shall serve in accordance with the applicable non-bankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors.

The Debtors anticipate that the officers the Reorganized Debtors will be substantially in the same as the Debtors' current officers. The Debtors anticipate Messrs. Michael A. Lubin and Warren Delano will continue as Co-Chief Executive Officers and Mr. Dennis J. Welhouse will continue as Chief Financial Officer. At or prior to the Confirmation Hearing, the Debtors will identify all the members of the Board of Directors and officers for the Reorganized LPC and LRGI.

## M.   Jurisdiction and Choice of Law

### 1.   Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Amended Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 2.   Retention of Jurisdiction

The Bankruptcy Court shall retain and have exclusive jurisdiction over, in addition to other matters specified in the Amended Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Amended Plan.

N.      **Miscellaneous Provisions**

1.      **Payment of Statutory Fees**

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.      **Post-Confirmation Date Professional Fees and Expenses**

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Debtors.

3.      **Indenture Trustee as Claim Holder**

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of claim timely filed by the Indenture Trustee in respect of any Claims under the Indenture.  Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

4.      **Plan Supplement**

A draft of the form of each of the Plan Documents to be entered into as of the Effective Date, which shall include, among other things, the New Indenture and the Charter Amendment, and any other relevant documents that are necessary to allow a holder of Claims or Interests to make an informed decision shall be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which holders of impaired Claims may vote to accept or reject the Amended Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Amended Plan must be received.

5.      **Substantial Consummation**

On the Effective Date, the Amended Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

6.      **Severability**

Prior to the entry of the Confirmation Order, if the Bankruptcy Court determines any term or provision of the Amended Plan to be invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret such term or provision so as to render the term or provision valid and

enforceable to the maximum extent practicable and consistent with the original purpose of such term or provision.

Notwithstanding any such determination, alteration, or interpretation, the remainder of the terms and provisions of the Amended Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such determination, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Amended Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**7.      Binding Effect**

The Amended Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

**8.      Notices**

In order to be effective, all notices, requests, and demands to or upon the Debtors and, after the Effective Date, the Reorganized Debtors, must be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

>Lexington Precision Corporation
>800 Third Avenue, 15th Floor
>New York, New York 10022
>Attn:  Michael A. Lubin
>Title:  Chairman of the Board
>Telephone:  (212) 319-4655
>Facsimile:  (212) 319-4659
>
>- and -
>
>Weil, Gotshal & Manges LLP
>767 Fifth Avenue
>New York, New York 10153
>Attn:  Richard P. Krasnow
>Telephone:  (212) 310-8000
>Facsimile:  (212) 310-8007

**9.    Time**

In computing any period of time prescribed or allowed by the Amended Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**10.    Section Headings**

The section headings contained in the Amended Plan and this Disclosure Statement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Amended Plan.

**O.    Modifications, Revocation, or Withdrawal of the Amended Plan**

The Debtors reserve the rights to alter, amend, or modify the Amended Plan at any time prior to the Confirmation Date, provided that the Amended Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors comply with section 1125 of the Bankruptcy Code.

After the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Amended Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Amended Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Amended Plan.

A holder of a Claim or Interest that has accepted the Amended Plan shall be deemed to have accepted the Amended Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

The Debtors may revoke or withdraw the Amended Plan any time prior to the Effective Date.  If the Debtors revoke or withdraw the Amended Plan or the Amended Plan does not otherwise become effective, the Amended Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by the Debtors or to prejudice in any manner the Debtors' rights in any further proceedings involving the Debtors.

## V. FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

### A.    Selected Historical and Projected Financial Information

The Projected Financial Statements are set forth in their entirety in Exhibit F attached to this Disclosure Statement.

The table below sets forth the following data:

(i)    Actual results of continuing operations for 2007;

(ii)    Projected results of continuing operations for 2008, 2009, 2010, 2011, and 2012; and

(iii)    Pro forma projected operating results of continuing operations for 2008, adjusted as if the reorganization had been effective as of January 1, 2008.

In addition, the table includes a reconciliation of the income or loss from continuing operations to EBITDA for those periods. EBITDA is not a measure of performance under GAAP and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)    EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to The Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)    EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to The Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)    EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)    EBITDA does not reflect cash provided or used as a result of changes in The Debtors' working capital.

     (v)      The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in their industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Debtors' senior, secured credit facility.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, the Debtors monitor gross profit and operating profit, both in dollars and as a percentage of net sales. In addition, when setting prices for components that the Debtors manufacture, they use a cost system that calculates the gross profit margin of each component.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Selected Financial Data -- Continuing Operations Only**
**(in thousands of dollars)**

| | 2007 Actual | 2008 Forecast | 2008 Pro Forma (1) | Projected 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Net sales | 88,408 | 79,866 | 79,964 | 100,531 | 120,166 | 134,931 | 148,298 |
| Income from operations: | 5,373 | 7,572 | 8,693 | 14,949 | 21,762 | 28,156 | 33,650 |
| Other income (expense): | | | | | | | |
|   Interest expense | (11,507) | (8,593) | (4,554) | (4,124) | (3,514) | (2,509) | (2,016) |
|   Interest income | – | 68 | – | – | – | 93 | 496 |
|   Gain on sale of property | – | – | – | – | 3,863 | – | – |
|   Reorganization expense | (698) | (4,585) | – | – | – | – | – |
|     Total | (12,205) | (13,110) | (4,554) | (4,124) | 349 | (2,416) | (1,520) |
| Income (loss) before income taxes | (6,832) | (5,538) | 4,139 | 10,825 | 22,111 | 25,740 | 32,130 |
| Income taxes | 6 | 41 | 217 | 1,392 | 3,550 | 6,487 | 8,388 |
| Income (loss) from continuing operations | (6,838) | (5,579) | 3,922 | 9,433 | 18,561 | 19,253 | 23,742 |
| Add back: | | | | | | | |
|   Interest expense | 11,507 | 8,593 | 4,554 | 4,124 | 3,514 | 2,509 | 2,016 |
|   Interest income | – | (68) | – | – | – | (93) | (496) |
|   Income tax provision | 6 | 41 | 217 | 1,392 | 3,550 | 6,487 | 8,388 |
|   Depreciation and amortization | 6,437 | 5,366 | 5,366 | 5,229 | 4,908 | 4,615 | 4,428 |
|   Gain on sale of property | – | – | – | – | (3,863) | – | – |
|   Reorganization expense | 698 | 4,585 | – | – | – | – | – |
| EBITDA (2) | 11,810 | 12,938 | 14,059 | 20,178 | 26,670 | 32,771 | 38,078 |
| Common shares outstanding (000)(3) | 5,022 | 9,505 | 9,505 | 9,505 | 9,505 | 9,505 | 9,505 |
| Income (loss) per share | $ (1.35) | $ (0.59) | $ 0.41 | $ 0.99 | $ 1.95 | $ 2.03 | $ 2.50 |
| Capital expenditures | 2,664 | 3,497 | 3,497 | 3,945 | 5,164 | 3,961 | 4,180 |

(1) The 2008 forecasted income statement was adjusted on a pro forma basis to reflect (a) $917,000 of pro forma improvements to the income from operations of the Rubber Group as described on page ___ of this Disclosure Statement, (b) $204 of pro forma reductions in Corporate Office expenses as described on page ___ of this Disclosure Statement, and (c) the effects of the planned refinancing and conversion of indebtedness in connection with the consumation of the Amended Plan, as if the Amended Plan had been consummated prior to January 1, 2008.

(2) Earnings from operations before interest, taxes, deprecation, amortization. Excludes any gain on sale of property and any reorganization expenses.

(3) Outstanding shares for 2008 and thereafter assumes conversion of debt and accrued interest in the amount of $32,501,000 at $7.25 per common share.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Selected Financial Data -- Continuing Operations Only**
**(in thousands of dollars)**

|  | 12/31/07 Actual | 12/31/08 Forecast | 12/31/08 Pro Forma (1) | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|---|
| Current assets | 21,877 | 22,215 | 22,215 | 25,597 | 31,065 | 42,207 | 66,991 |
| Current liabilities (2) | 11,121 | 9,538 | 9,538 | 12,373 | 13,851 | 14,578 | 15,639 |
| Net working capital | 10,756 | 12,677 | 12,677 | 13,224 | 17,214 | 27,629 | 51,352 |
| Total assets | 51,019 | 50,737 | 50,737 | 54,219 | 57,697 | 68,279 | 93,012 |
| Senior debt | 33,821 | 35,971 | 35,971 | 19,486 | 9,352 | – | – |
| Total debt (3) | 69,091 | 50,971 | 50,971 | 40,886 | 24,352 | 15,000 | 15,000 |
| EBITDA / Interest expense | 1.0X | 1.5X | 3.1X | 4.9X | 7.6X | 13.1X | 18.9X |
| Senior debt / EBITDA | 2.9X | 2.8X | 2.6X | 1.0X | 0.3X | – | – |
| Total debt / EBITDA | 5.9X | 3.9X | 3.6X | 2.0X | 0.9X | 0.5X | 0.4X |

(1) The forecasted income statements were adjusted on a pro forma basis to reflect (a) $917,000 of pro forma improvements to the income from operations of the Rubber Group as described on page ___ of this Disclosure Statement, (b) $204 of pro forma reductions in Corporate Office expenses as described on page ___ of this Disclosure Statement, and (c) the effects of refinancing and conversion of indebtedness in connection with the consumation of the Amended Plan as if the Amended Plan had been consummated prior to January 1, 2008.

(2) Current liabilities exclude liabilities for borrowed money and interest accrued on the Senior Subordinated Notes and the Junior Subordinated Note.

(3) In 2007, includes accrued interest of $7,564,000 on the Senior Subordinated Notes and the Junior Subordinated Note.

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Operating Segment Selected Financial Data -- Continuing Operations Only
(in thousands of dollars)**

| | 2007 Actual | 2008 Forecast | 2008 Pro Forma (1) | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | | | | Projected | | | |
| Net sales: | | | | | | | |
| Rubber Group | 74,587 | 68,051 | 68,149 | 82,448 | 92,353 | 104,767 | 115,168 |
| Metals Group | 13,821 | 11,815 | 11,815 | 18,083 | 27,813 | 30,164 | 33,130 |
| Total | 88,408 | 79,866 | 79,964 | 100,531 | 120,166 | 134,931 | 148,298 |
| | | | | | | | |
| Income from operations: | | | | | | | |
| Rubber Group | 7,975 | 9,876 | 10,793 | 15,614 | 19,980 | 25,847 | 30,423 |
| Metals Group | (192) | 10 | 10 | 1,903 | 4,401 | 4,981 | 5,952 |
| | 7,783 | 9,886 | 10,803 | 17,517 | 24,381 | 30,828 | 36,375 |
| Corporate Office | (2,410) | (2,314) | (2,110) | (2,568) | (2,619) | (2,672) | (2,725) |
| Total | 5,373 | 7,572 | 8,693 | 14,949 | 21,762 | 28,156 | 33,650 |
| | | | | | | | |
| Depreciation and amortization: | | | | | | | |
| Rubber Group | 5,727 | 4,771 | 4,771 | 4,619 | 4,209 | 3,723 | 3,445 |
| Metals Group | 682 | 546 | 546 | 562 | 666 | 871 | 962 |
| | 6,409 | 5,317 | 5,317 | 5,181 | 4,875 | 4,594 | 4,407 |
| Corporate Office | 28 | 49 | 49 | 48 | 33 | 21 | 21 |
| Total | 6,437 | 5,366 | 5,366 | 5,229 | 4,908 | 4,615 | 4,428 |
| | | | | | | | |
| EBITDA (2): | | | | | | | |
| Rubber Group | 13,702 | 14,647 | 15,564 | 20,233 | 24,189 | 29,570 | 33,868 |
| Metals Group | 490 | 556 | 556 | 2,465 | 5,067 | 5,852 | 6,914 |
| | 14,192 | 15,203 | 16,120 | 22,698 | 29,256 | 35,422 | 40,782 |
| Corporate Office | (2,382) | (2,265) | (2,061) | (2,520) | (2,586) | (2,651) | (2,704) |
| Total | 11,810 | 12,938 | 14,059 | 20,178 | 26,670 | 32,771 | 38,078 |

(1) The forecasted income statements were adjusted on a pro forma basis to reflect (a) $917,000 of pro forma improvements to the income from operations of the Rubber Group as described on page ___ of this Disclosure Statement, (b) $204 of pro forma reductions in Corporate Office expenses as described on page ___ of this Disclosure Statement, and (c) the effects of refinancing and conversion of indebtedness in connection with the consumation of the Amended Plan as if the Amended Plan had been consummated prior to January 1, 2008.

(2) Earnings from operations before interest, taxes, deprecation, amortization. Excludes any gain on sale of property and any reorganization expenses.

**B.**     **Projected Financial Statements**

The Projected Financial Statements are set forth in their entirety in Exhibit F attached to this Disclosure Statement.

**C.**     **Valuation of the Reorganized Debtors**

**1.**     **Introduction**

The Debtors have been advised by Campbell, their financial advisors, with respect to the aggregate reorganization value of the Reorganized Debtors. Campbell has undertaken this valuation analysis for the purpose of estimating the value available for distribution to holders of Claims and Interests pursuant to the Amended Plan.

Campbell's estimate of reorganization value does not constitute an opinion as to fairness on a going concern basis of the consideration to be received under the Amended Plan or of the terms and provisions of the Plan.

**2.**     **Basis of Valuation**

In preparing its estimate of the reorganization value of the Debtors, Campbell determined that there were five separate elements contributing to the aggregate reorganization value:

**a.**     *The Rubber Group*

The Rubber Group has strong technical capabilities, leading market positions, and a long history of earning superior profit and cash flow margins, with pro forma EBITDA for 2008 forecasted to be $15.6 million on net sales of $68.1 million, for an EBITDA margin of 22.8%.  The Rubber Group has suffered declining sales over the past several years, largely due to customer concerns about the Debtors' financial condition, but is believed to have excellent prospects for accelerated sales growth once the recapitalization of the Debtors is completed. Campbell determined that the Rubber Group should be valued on a "going-concern" basis, applied a number of recognized valuation methodologies, and determined that the reorganization value of the Rubber Group is $108 million.

**b.**     *The Metals Group*

The Metals Group has a long history of erratic operating results and an inability to earn an adequate return on the capital employed in its business.  For 2008, the Metals Group's EBITDA is forecasted to be $556,000 on net sales of $11.8 million, for an EBITDA margin of 4.7%.  The Debtors have made substantial investments to enhance the operational capabilities of the Metals Group, which has enabled the Metals Group to improve its operating results over the past two years in spite of stagnant sales.  The Debtors believe that (a) the Metals Group has been, or will soon be, awarded substantial amounts of new business, with respect to which production will commence in 2009 and 2010; and (b) if this anticipated business materializes at the

projected volumes, the Metals Group will be able to more than double its net sales and increase its EBITDA seven-fold over the next two years.

Campbell observed that favorable results in the start-up of this new business would significantly enhance the reorganization value of the Metals Group; however, Campbell ultimately determined that in light of its history of erratic and sub-par performance, it was appropriate to assume, for valuation purposes, that the Metals Group's efforts to improve its cash flow would not ultimately result in an adequate return on capital.  As such, Campbell determined that the best indicator of value for the Metals Group would be its orderly liquidation value. In this connection, the Debtors, at Campbell's request, developed a plan for the orderly wind-down of the Metals Group and prepared a financial projection reflecting the implementation of that wind-down plan.  The financial projection indicated that the wind-down plan (which was modeled on the Debtors' successful wind-down of their diecasting business during 2004 and 2005) would generate net cash proceeds after payment of all expenses and post-petition liabilities of the Metals Group of $8.0 million, with a present value of $7.4 million.

### c.    *Non-Operating Assets*

The Debtors own certain assets of significant value that are superfluous to their ongoing operations. The most significant of these assets are the following:

(i)     A 19.85 acre parcel of commercial/industrial land located in East Ellijay, Georgia, which was appraised in July, 2008, at a fair market value of $4,550,000, and six abutting residential building lots aggregating 6.6 acres, which were appraised in July 2008 at an aggregate fair market value of $210,000.

(ii)    A 93,000 square foot industrial building located in Lakewood, New York, which is occupied by the purchaser of the Debtors' former diecasting business under a lease expiring on December 31, 2009, at an annual rental rate of $159,000 with an option to purchase at $1,595,000.

(iii)   A second building in Lakewood, New York, which is currently vacant, with a fair market value, estimated by the Debtors, of $150,000.

(iv)    8,198 shares of common stock of Federal-Mogul Corporation with a market value of $120,000 at the close of business on August 7, 2008.

Filed claims in the Chapter 11 proceeding of Delphi Corporation in the aggregate amount of $360,000, of which not less than $352,000 has been acknowledged by Delphi as the amount that it would have to pay to cure pre-petition defaults in connection with its supply contracts with the Debtors.

Campbell determined that (i) the most accurate method of valuing these Non-Operating Assets was to assume an orderly disposal of these assets, and (ii) in light of the uncertainties regarding Delphi's prospects for a successful reorganization, no value should be assigned to the Delphi chapter 11 claims.

### d.       Tax Attributes

The Debtors forecast that at the assumed effective date of October 31, 2008, they will have, for federal income purposes, $37.1 million of consolidated net operating loss carryforwards and $1.0 million of consolidated tax credit carryforwards. In determining the reorganization value of the Debtors, Campbell assumed that these favorable tax attributes would first be utilized to shelter anticipated taxable gains on the wind-down of the Metals Group and the sale of Non-Operating Assets.  Tax attributes remaining thereafter were, subject to the limitations imposed by the Internal Revenue Code, (a) assumed to be utilized to shelter projected income from operations; (b) assumed to be utilized to shelter anticipated gains on additional asset sales; or (c) set forth as a separate element of value based on the net present value of the projected income taxes to be sheltered, in each case, as appropriate to the valuation method being utilized.

### e.       Corporate Office

The Debtors forecast that their pro forma Corporate Office expenses for 2008 will aggregate $2.0 million, and project that their Corporate Office expenses will increase thereafter, primarily to reflect incentive compensation to corporate management based upon future operating performance of the Debtors' businesses as reflected in the Projected Financial Statements. In determining reorganization value, Campbell assumed that Corporate Office Expenses would continue as long as the operations of the Rubber Group continue. Consequently, the element of value represented by the Corporate Office is included in the valuation of the Rubber Group.

### 3.       Reorganization Value

Campbell has determined that the aggregate reorganization value of the assets and business of the Debtors is $122 million, representing the sum of the elements of value set forth above. Campbell then adjusted this aggregate reorganization value for the following:

(i)      the projected cash available immediately prior to the Effective Date in the amount of $9.5 million;

(ii)     the projected benefit of the normalized credit terms the Reorganized Debtors expect to obtain from suppliers to the Rubber Group subsequent to the Effective Date in the amount of $2.8 million;

(iii)    the estimated aggregate amount of liabilities of the Debtors other than post petition accounts payable and accrued liabilities generated in the ordinary course of business in the aggregate amount of $92.5 million;

(iv)     the liquidation preference of the Series B Preferred Interests in the amount of $0.7 million;

(v)      projected unpaid professional fees and expenses of the Chapter 11 Cases immediately prior to the Effective Date in the amount of $1.0 million; and

      (vi)     a reserve of $2.0 million for to account for additional costs that may be incurred in connection with the Chapter 11 Cases;

to arrive at a net value available to the holders of LPC Common Stock of $40.1 million.

      This net value was further adjusted to reflect the assumed exercise of the 345,000 outstanding warrants to purchase LPC Common Stock at a exercise price of $3.50 per share, to generate a fully diluted per share equity value of the LPC Common Stock of $7.33, rounded to $7.25 per share.

      **THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF OCTOBER 31, 2008, REFLECTS WORK PERFORMED BY CAMPBELL ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS THAT WAS AVAILABLE TO CAMPBELL AS OF AUGUST 8, 2008. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT CAMPBELL'S CONCLUSION, CAMPBELL DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

      With respect to the Projected Financial Statements, Campbell assumed that such Financial Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors.

      In addition, Campbell did not independently verify or express any opinion with respect to management's projections or the reasonableness of management's assumptions in connection with estimating the reorganization value and equity value.

      The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.  As a result, the estimate of the reorganization value of the Reorganized Debtor set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Debtors, Campbell, nor any other person assumes responsibility for their accuracy.

      Campbell's valuation represents a hypothetical value that reflects the estimated intrinsic value of the Company derived through the application of various valuation techniques. Such analysis does not purport to represent valuation levels which would be achieved in, or assigned by, the public markets for debt and equity securities or private markets for corporations. Estimates of enterprise value do not purport to be appraisals or necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

4.      **Valuation Methodologies**

The following is a brief summary of certain financial analyses performed by
Campbell to arrive at its estimation of the reorganization value of the Reorganized Debtors. In
preparing its analysis, Campbell has, among other things:

(i)      reviewed internal financial and operating data of the Debtors;

(ii)     discussed with senior executives the current operations and prospects of
the Debtors;

(iii)    reviewed certain operating and financial forecasts prepared by the
Debtors, including the Projected Financial Statements;

(iv)     discussed with senior executives of the Debtors key assumptions related to
the Projected Financial Statements;

(v)      visited the Debtors' major manufacturing facilities;

(vi)     prepared discounted cash flow analyses based on the Projected Financial
Statements;

(vii)    considered the prevailing trading multiples of certain publicly-traded
companies in businesses deemed reasonably comparable by Campbell to
the operating business of the Debtors;

(viii)   considered the transaction multiples of acquisitions involving companies
in businesses deemed reasonably comparable by Campbell to the
operating business of the Debtors;

(ix)     considered the indications of interest received from various third parties
regarding a transaction with the Debtors; and

(x)      considered the results of estimates of value for certain non-operating
assets.

Campbell relied upon and assumed, without independent verification the accuracy
and completeness of the financial and other information provided to or discussed with it by the
Debtors or obtained by it from public sources.  Campbell has not audited, reviewed or compiled
the accompanying information in accordance with Generally Accepted Accounting Standards, or
otherwise.  With respect to all projections furnished to it, Campbell has assumed that they have
been reasonably prepared on bases reflecting the best currently available estimates, judgments
and assumptions of the senior management of the Debtors as to the expected future performance
of the Debtors.  Campbell has not assumed any responsibility for the independent verification of
any such information and has further relied upon the assurances of the senior management of the
Debtors that they are unaware of any facts that would make such information incomplete or

misleading.  Campbell expresses no opinion as to the reasonableness of management's estimates, judgments and assumptions.

In arriving at its estimate of the reorganization value, Campbell applied the following recognized valuation methodologies.

### a.      Discounted Cash Flow Analysis

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business.  The DCF methodology is a "forward looking" approach pursuant to which the expected future cash flows of the subject company are discounted to present value by applying a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the subject company.  This approach has two components: the present value of the projected un-levered after-tax free cash flows for a finite period and the present value of the terminal value of cash flows (representing enterprise value beyond the time horizon of the projections).

As the estimated cash flows, estimated discount rate and expected capital structure of the subject company are used to derive a potential value, an analysis of the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the subject company, as well as other factors that could affect the future prospects and cost of capital for the subject company.

### b.      Publicly Traded Company Analysis

A publicly traded company analysis estimates value based on a comparison of the subject company's financial statistics with the financial statistics of public companies that are similar to the subject company.  The analysis establishes a benchmark for asset valuation by deriving the value of comparable assets, as a function of a common variable such as revenue, earnings before interest and taxes ("EBIT") and EBITDA.  This analysis includes a multi-variable comparison whereby each company's performance, profitability, margins and business trends are examined in relation to the subject company. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A critical factor to the successful application of this approach is the selection of companies with relatively similar business and operational characteristics to the subject company. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similarity of lines of business, business risks, growth prospects, maturity of business, market presence, size and scale of operations.  The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information.  However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for estimating enterprise value.

c.      *Precedent Transactions Analysis*

A precedent transactions analysis estimates value by examining public and, to the extent available to Campbell, private, merger and acquisition transactions.  These multiples of businesses deemed reasonably comparable to the subject company are then applied to the same financial variables of the subject company to determine a value of the subject company in the context of a sale of the business involving similar lines of business or serving similar end markets as the subject company, in order to derive the enterprise values assigned to such companies as a function of common variables (or multiples) such as revenue, EBIT and EBITDA.

Unlike the publicly traded company analysis, the enterprise value derived using this methodology reflects a "control" premium (*i.e.*, a premium paid to purchase a majority or controlling position in a company's stock or assets).  Thus, this methodology generally produces higher valuations than the publicly traded company analysis. In addition, other factors not directly related to a company's business operations can affect valuation based on precedent transactions, including:

(i)     circumstances surrounding a merger transaction may bring "diffusive quantitative results" into the analysis (*e.g.*, a buyer may pay an additional premium for reasons that are not solely related to competitive bidding);

(ii)    the market environment is not identical for transactions occurring at different periods of time;

(iii)   circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage); and

(iv)    marketing efforts or conditions may have been substantially different.

As with any comparable company transaction analysis, because no precedent merger and acquisition used in any analysis will be identical to the subject transaction, valuation conclusions cannot be based solely on quantitative results.  The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each.  Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition.  The number of completed transactions for which public data is available also limits this analysis.  Furthermore, the data available for precedent transactions may have discrepancies due to varying sources of information and the accuracy and completeness thereof. As described above, the precedent transaction analysis may involve other aspects of value besides the inherent value of a company.

### d.    Sum-of-the-Parts Valuation

A sum-of-the-parts valuation is a variation of the precedent transaction valuation methodology in which the business of the subject company is valued based upon the sale of each of the separate operating units of the subject company to one of a group of prospective buyers who are determined to have particular interest in that business unit.  The application of this methodology requires the calculation of metrics relating transaction values to relevant measures of financial performance for each of the separate operating units of the subject company, based upon the end markets served by that operating unit and other relevant considerations.

## VI.  CERTAIN FACTORS TO BE CONSIDERED

**A.    Certain Risk Factors Relating to Confirmation of the Amended Plan**

### 1.    Risk of Non-Confirmation of the Amended Plan

Although the Debtors believe that the Amended Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Amended Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2.    Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept the Amended Plan, the Bankruptcy Court may nevertheless confirm the Amended Plan at the Debtors' request if at least one impaired Class of Claims has accepted the Amended Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Amended Plan, the Bankruptcy Court determines that the Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  The Debtors believe that the Amended Plan satisfies these requirements.  For more information on this topic, please refer to Section X.C, "*General Requirements for Confirmation*" starting on page 95.

### 3.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the 120th day after entry of the Confirmation Order, the Bankruptcy Court may, upon the Debtors' motion, vacate the Confirmation Order, in which event the Amended Plan would be deemed null and void.

**B.**     **Additional Factors to be Considered**

**1.**     **The Debtors Have No Duty to Update**

Absent a Bankruptcy Court order to the contrary, the Debtors have no duty to update this Disclosure Statement or the attachments hereto.  Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of ___ __, 2008.  Delivery or receipt of this Disclosure Statement after ___ __, 2008 does not imply that no changes have occurred in the information contained herein and in the attachments hereto since ___ __, 2008.

**2.**     **No Representations Outside This Disclosure Statement Are Authorized**

The Bankruptcy Court has not authorized any representations concerning or related to the Debtors, these Chapter 11 Cases, or the Amended Plan, other than representations made in this Disclosure Statement and the attachments hereto.  In arriving at your decision to vote to accept or reject the Amended Plan, you should not rely upon any representations that are not contained herein or included with this Disclosure Statement.

**3.**     **Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may differ materially from actual future events.  Because uncertainties exist with respect to any projection, assumption, or estimate, you should not consider any projection, assumption, or estimate to be an assurance or guarantee of actual results.

**4.**     **This Disclosure Statement Is Not Legal or Tax Advice**

This Disclosure Statement is <u>not</u> legal, business, or tax advice.  You should not construe the contents of this Disclosure Statement as such.  Please consult your own legal counsel or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Amended Plan or whether to object to confirmation of the Amended Plan.

**5.**     **No Admission Made**

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Amended Plan on the Debtors or on holders of Claims or Interests.

6.    **Business Factors and Competitive Conditions**

a.    *General Economic Conditions*

In the Projected Financial Statements, the Debtors have assumed that the general economic conditions of the United States economy will be stable over the next several years and that automotive OEM sales and production levels will be substantially in accordance with the forecast provided to the Debtors in late June and early July 2008 by an internally recognized automotive industry forecasting service.  The stability of economic conditions is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There can be no guarantee that economic conditions or automotive industry conditions will not deteriorate further.

b.    *Business Factors*

The Debtors believe that they will succeed in continuing and achieving significant growth in their business operations for the benefit of all constituencies.  However, the Reorganized Debtors may not achieve all the goals of their going-forward business plan.  In such event, the Reorganized Debtors may sell all or parts of their business, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.  Because the Amended Plan will convert the Junior Subordinated Note Claims and significant portions of the Senior Subordinated Note Claims to equity in Reorganized LPC, the equity interests of the holders of such Claims could be substantially diluted or even cancelled in the event of further restructurings or insolvency proceedings.

c.    *Competitive Conditions*

In addition to uncertain economic and business conditions, the Reorganized Debtors will face competition for business from existing and possibly new competitors.  Such competition may affect the overall operating performance of the Reorganized Debtors.

d.    *Customers*

The Debtors believe that the majority of their customer relationships are strong; the loss of a significant customer could have a material adverse impact on operating performance.

7.    **Access to Financing and Trade Terms**

The Reorganized Debtors' operations will depend on, among other things, access to working capital through the Exit Facility (which has not yet been obtained), operating cash flow, and the availability of customary trade terms from their supplies.   While the Debtors believe that projected operating cash flow, the Exit Facility (once obtained), and trade credit will provide adequate cash to consummate the Amended Plan and provide for sufficient ongoing working capital, the Reorganized Debtors may nonetheless require greater working capital.  No

assurance can be given that additional financing will be available on terms favorable or acceptable to the Reorganized Debtors. If the Reorganized Debtors meet their projected cash flows, the Debtors believe that their suppliers will continue to provide customary terms; however, no assurances can be given.

### 8. Variances from Projections

The fundamental premise of the Amended Plan is the deleveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projected Financial Statements. The Projected Financial Statements reflect numerous assumptions concerning the Reorganized Debtors' anticipated future performance, some of which may not materialize. Such assumptions include assumptions concerning the general economy, business conditions in the industries in which the Debtors operate, and the ability of the Debtors to obtain additional business from existing and new customers. The Debtors believe that the assumptions underlying the Projected Financial Statements are reasonable. However, unanticipated events and circumstances that may occur subsequent to the preparation of the Projected Financial Statements may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projected Financial Statements are likely to vary from the projected results, and such variations may be material and adverse.

### 9. Significant Holders

Under the Amended Plan, certain holders of Allowed Claims and Interests may receive, or obtain the right to receive equity securities in Reorganized LPC representing in excess of five (5%) percent of the outstanding LPC Common Stock or Series C Preferred Stock. If holders of a significant number of shares of Reorganized LPC were to act as a group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

Further, the possibility that one or more large holders of equity securities may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the shares.

### 10. Illiquid Market

The New Subordinated Notes, the Series C Preferred Stock, and the LPC Common Stock will not be listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell them in the future or as to the price at which any sale may occur. If a holder of such securities is able to sell them in the future, the price of the securities could be higher or lower than the value ascribed to them in this Disclosure Statement, depending upon many factors, including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Reorganized LPC.

11.    **Restrictions on Transfer**

Holders of the New Subordinated Notes, the Series C Preferred Stock, and LPC Common Stock who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code will be unable to offer or sell securities of Reorganized LPC received pursuant to the Amended Plan, except pursuant to an available exemption from registration under the Securities Act of 1933 and under equivalent state securities or "blue sky" laws. This would include persons who (a) purchase a Claim with a view to distribution of any security to be received in exchange for the Claim other than in ordinary trading transactions, (b) offer to sell securities issued under the Amended Plan for holders of such securities, (c) offer to buy securities issued under the Amended Plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with the Amended Plan, with the consummation of the Amended Plan, or with the offer or sale of securities under the Amended Plan, or (d) are an issuer, a person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer.

## VII.  CERTAIN FEDERAL INCOME
## TAX CONSEQUENCES OF THE AMENDED PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Amended Plan to the Debtors and to certain holders of Claims or Interests. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or otherwise entitled to payment in full in Cash under the Amended Plan, or to holders of Asbestos-Related Claims (since the restriction on their recovery to the proceeds of the Insurance Policies should be without U.S. federal income tax significance).

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested and do not expect to request a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold existing notes through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding existing notes that are a

hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction).  If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.  Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

This discussion also assumes that the Senior Subordinated Notes, Junior Subordinated Notes, Series B Preferred Stock, New Subordinated Notes, Series C Preferred Stock, and LPC Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or Equity Interests.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations, of which LPC is the common parent, and file a single consolidated U.S. federal income tax return (the "Lexington Group").  The Lexington Group reported in the most recent Form 10-K filed by LPC and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $26 million as of the end of 2007.  *See* Lexington Precision Corporation 2007 Form 10-K, at Note 7 (Income Taxes).  The Lexington Group expects to incur further operating losses during the taxable year ending December 31, 2008.  The amount of the NOL carryforwards and any such current year losses remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Amended Plan, the amount of the Lexington Group's NOL carryforwards and other tax attributes (including current year losses) may be reduced.  In addition, the subsequent utilization of any losses and NOL carryforwards remaining following the Effective Date may be restricted.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan.  The COD incurred is generally the amount by which the indebtedness discharged (reduced by any unamortized original issue discount) exceeds any consideration given in exchange therefor.  Certain statutory or judicial exceptions can generally apply to limit the amount of COD incurred for U.S. federal income tax purposes (such as where the payment of the cancelled debt would have given rise to a tax deduction).  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of excluded COD income does not occur until the end of the taxable year in which the COD is incurred.

Accordingly, the extent (if any) to which the Debtors incur COD and any consequent attribute reduction in connection with the implementation of the Amended Plan will depend, in part, on the fair market value of the Series C Preferred Stock and the LPC Common Stock and the issue price of the New Subordinated Notes.  [Based on the value of the LPC Common Stock at $7.25 a share, as described in Section V, " *Financial Information, Projections and Valuation* Analysis" starting on page 58, the Debtors do not anticipate incurring any COD].

### 2.    Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the changes in ownership of the Lexington Group as described below.  These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD arising in connection with the Amended Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose).  The Debtors anticipate that the issuance of the Series C Preferred Stock and the LPC Common Stock pursuant to the Amended Plan will constitute an "ownership change" of the Lexington Group.

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.65% for ownership changes occurring in August 2008). As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built in gains discussed below.

Accordingly, the impact of an ownership change of the Lexington Group pursuant to the Amended Plan depends upon, among other things, the amount of pre-change losses remaining after any reduction of attributes due to the COD, the value of both the stock and assets of the Debtors at or about the Effective Date, and the amount and timing of future taxable income.

### a.    Built In Gains and Losses

Among the pre-change losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors anticipate that the Lexington Group will be in a net unrealized built-in gain position as of the Effective Date.

### b.      Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

The receipt of the Series C Preferred Stock and LPC Common Stock by holders of Claims and the continuing ownership by holders of Other Equity Interests in LPC pursuant to the Amended Plan may qualify for this exception. Neither the statute nor the regulations address, however, whether this exception can be applied on a consolidated basis or only on a separate company basis. Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the change occurs. For purposes of the Projected Financial Information, the Debtors have taken the position that their pre-change losses will be limited on an annual basis under section 382.

### 3.      Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a

corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

## B.    Consequences to Holders of Certain Claims

Pursuant to the Amended Plan, and in satisfaction of their respective Claims:  (i) holders of Allowed Senior Subordinated Note Claims (Class 5) will receive New Subordinated Notes and Series C Preferred Stock; (ii) holders of Allowed Junior Subordinated Note Claims (Class 6) will receive LPC Common Stock; and (iii) holders of Allowed Lexington Precision General Unsecured Claims (Class 7) and Allowed Lexington Rubber Group General Unsecured Claims (Class 16) will receive Cash payments over an eighteen month period.

### 1.    Holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims

The U.S. federal income tax consequences of the Amended Plan to holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims depend, in part, on (i) whether the holder's existing notes constitute "securities" for U.S. federal income tax purposes, and (ii) as to Allowed Senior Subordinated Note Claims, whether any New Subordinated Notes received also constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt.  One of the most significant factors considered in determining whether a particular debt is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Additionally, the IRS has ruled that new debt instruments with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represented a continuation of the holder's investment in the corporation in substantially the same form.  All holders of Senior Subordinated Note Claims and Junior Subordinated Note Claims are urged to consult their tax advisors regarding the appropriate status for U.S. federal income tax purposes of their existing notes and, if applicable, the New Subordinated Notes to be received.

Whether the receipt of a new debt instrument in satisfaction of an existing debt obligation is respected as an "exchange" for U.S. federal income tax purposes or, instead, is regarded merely as an amendment depends on whether the changed terms constitute a "significant modification" of the existing debt for U.S. federal income tax purposes, as determined under applicable Treasury regulations.  The New Subordinated Notes have certain similarities and differences in terms as contrasted with the Senior Subordinated Notes.  The Debtors believe, and the following discussion assumes, that the receipt of New Subordinated Notes by holders of Allowed Senior Subordinated Note Claims should be treated as an "exchange" for U.S. federal income tax purposes.

### a.    *If Existing Note Does Not Constitute a Security*

If the Junior Subordinated Note does not constitute a security for U.S. federal income tax purposes, a holder of an Allowed Junior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any LPC Common Stock received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).

Similarly, if the Senior Subordinated Notes do not constitute securities, the holder of an Allowed Senior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" of New Subordinated Notes (see Section VII.B.5.a, "*Stated Interest and Original Issue Discount*" starting on page 84) and the fair market value of any Series C Preferred Stock received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).

In addition, a holder of an Allowed Junior Subordinated Note Claim or Allowed Senior Subordinated Note Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income.  *See* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" starting on page 83.

For a discussion of the character of any recognized gain or loss, please refer to Section VII.B.3, "*Character of Gain or Loss*" starting on page 82.

A holder's tax basis in any Series C Preferred Stock or LPC Common Stock received should equal the fair market value of such stock on the Effective Date, and a holder's initial tax basis in the New Subordinated Notes received should equal the issue price of such notes.  A holder's holding period in such stock and notes should begin the day following the Effective Date.

### b.    *If Existing Note Constitutes a Security*

The receipt of stock of Reorganized LPC in whole or partial satisfaction of an Allowed Senior Subordinated Note Claim or Allowed Junior Subordinated Note Claim that constitutes a security for U.S. federal income tax purposes will qualify as a "recapitalization" for U.S. federal income tax purposes.  The classification of an exchange as a recapitalization for

U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder. However, a holder that would otherwise have taxable gain on the exchange will generally still be required to recognize that gain to the extent, if any, that the holder receives consideration other than stock or securities.

Accordingly, if the Junior Subordinated Notes constitute securities, a holder of Allowed Junior Subordinated Note Claims generally will not recognize gain or loss in respect its receipt of LPC Common Stock (aside from the treatment of accrued interest, *see* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" starting on page 83).

Similarly, if both the existing Senior Subordinated Notes and the New Subordinated Notes constitute securities, a holder of a Senior Subordinated Note Claim generally will not recognize gain or loss in respect of its receipt of New Subordinated Notes and the stock of Reorganized Lexington (aside from the treatment of accrued interest, *see* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" starting on page 83).

If, however, the existing Senior Subordinated Notes constitute securities but the New Subordinated Notes do not constitute securities, a holder of an Allowed Senior Subordinated Note Claim generally will not recognize loss, but will be required to recognize any gain (computed as described in the preceding section) but not in excess of the "issue price" of the New Subordinated Notes received in exchange (*see* Section VII.B.5.a, "*Stated Interest and Original Issue Discount*" starting on page 84). For a discussion of the character of any recognized gain or loss, please refer to Section VII.B.3, "*Character of Gain or Loss*" starting on page 82.

In a recapitalization exchange, a holder's aggregate tax basis in any stock or securities received generally should equal the holder's aggregate adjusted tax basis in the existing notes exchanged therefor, increased by any gain or interest income recognized in the exchange, and decreased (in the case of the Allowed Senior Subordinated Claims) by the issue price of the New Subordinated Notes in the event such notes do not constitute securities. In general, a holder's holding period in any stock or securities received will include the holder's holding period in the existing notes exchanged, except to the extent of any notes treated as received in respect of accrued but unpaid interest. In the event the New Subordinated Notes do not constitute securities, a holder's initial tax basis in any New Subordinated Notes received should equal the issue price of such notes, and the holding period of such notes should begin the day following the Effective Date.

2.    **Holders of General Unsecured Claims against LPC and General Unsecured Claims against LRGI**

Pursuant to the Amended Plan, each holder of an Allowed General Unsecured Claim against LPC or LRGI will receive Cash payable in four payments in respect of its Allowed Claim. The first such payment will be in the amount of 25% of the holder's Allowed Claim, and the remaining three payments (hereafter, collectively referred to as the "GUC Payment Obligation") will each be in the amount of 26.5% of such Allowed Claim over an 18 month period.

In general, each holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of the initial Cash payment and the "issue price" (as discussed below) of the GUC Payment Obligation (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  For a discussion of the character of any recognized gain or loss, and the treatment of amounts received in respect of any Claim for accrued but unpaid interest, see Section VII.B.3, "*Character of Gain or Loss*" starting on page 82 and Section VII.B.4, "*Distributions in Respect of Accrued Interest*" starting on page 83.

The GUC Payment Obligation should be treated as a debt obligation for U.S. federal income tax purposes, and thus should be subject to the original issue discount ("OID") rules of the Tax Code.  In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the sum of the three later payments) exceeds its "issue price," subject to a *de minimis* exception.

If, as is expected, the GUC Payment Obligation is not considered traded on an "established market," the issue price of the GUC Payment Obligation will be the present value of all payments discounted at a rate based on the applicable federal rate for short term instruments (which discount rate is currently in the range of 2.5% compounded semi-annually).  Such rate will then be the yield to maturity in respect of the obligation.  If the GUC Payment Obligation is traded on an "established market" during the 60 day period ending 30 days after the Effective Date, the issue price of the GUC Payment Obligation will be its fair market value (with the yield to maturity computed accordingly).  For a discussion of what qualifies as an "established market," please refer to Section VII.B.5.a, "*Stated Interest and Original Issue Discount*" starting on page 84.

Each holder of an Allowed General Unsecured Claim generally will be required to accrue the OID in respect of the GUC Payment Obligation received and include such amount in gross income as interest over the term of such obligation based on the constant yield method.  Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of Cash in respect of such income.  A holder's tax basis in a GUC Payment Obligation will be increased by the amount of any OID included in income and reduced by any Cash received made with respect to such GUC Payment Obligation.

A holder's initial tax basis in the GUC Payment Obligation received should equal the issue price of such obligation, and the holding period of such obligation should begin the day following the Effective Date.

### 3.    Character of Gain or Loss

Where gain or loss is recognized by a holder in respect of the satisfaction its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and

whether and to what extent the holder previously had claimed a bad debt deduction. Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

Holders of Claims who recognize capital losses as a result of the distributions under the Amended Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and the portion of their ordinary income described in the immediately preceding sentence for an unlimited number of years, but cannot carry capital losses back to a prior taxable year. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five (5) taxable years following the capital loss year, but are allowed to carry back unused capital losses to the three (3) taxable years preceding the capital loss year.

A holder that purchased its existing notes from a prior holder at a "market discount" (relative to the adjusted issue price of the existing notes at the time of acquisition) may be subject to the market discount rules of the Tax Code. Under these rules, any gain recognized on the exchange of such existing notes generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of such notes did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its existing notes, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the holder recognizes in the exchange.

### 4. Distributions in Respect of Accrued Interest

In general, to the extent that any consideration received pursuant to the Amended Plan by a holder of an Allowed Claim (whether in cash, new debt or stock) is received in satisfaction of accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

5.       **Ownership and Disposition of New Subordinated Notes**

a.       *Stated Interest and Original Issue Discount*

A holder of New Subordinated Notes will be required to include the stated interest on the notes in income in accordance with the holder's regular method of accounting.

It is possible that the New Subordinated Notes could be issued with OID.  A debt instrument generally has OID if its "stated redemption price at maturity" (in this case, the principal amount of the New Subordinated Notes) exceeds its "issue price" by more than a *de minimis* amount.

The issue price of the New Subordinated Notes will be their fair market value if such notes are traded on an "established market" during the 60 day period ending 30 days after the Effective Date.  Otherwise, the issue price should be the principal amount of the New Subordinated Notes (in which event there would be no OID regardless of their fair market value).  Pursuant to Treasury Regulations, an "established market" need not be a formal market.  It is sufficient that the New Subordinated Notes appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, or that, under certain circumstances, price quotations for such notes are readily available from brokers, dealers, or traders.

If the New Subordinated Notes are issued with OID, each holder generally will be required to accrue the OID in respect of the New Subordinated Notes received and include such amount in gross income as interest over the term of such notes based on the constant yield method.  Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of cash in respect of such income.  A holder's tax basis in a New Subordinated Note will be increased by the amount of any OID included in income and reduced by any cash received (other than payments of stated interest) with respect to such New Subordinated Note.

b.       *Acquisition and Bond Premium*

It is possible that a holder of an Allowed Senior Subordinated Note Claim will have a tax basis in the New Subordinated Notes received that is different from the issue price of the New Subordinated Notes, if such notes are received in a "recapitalization" exchange and constitute securities for U.S. federal income tax purposes.

If a holder of an Allowed Senior Subordinated Note Claim has a tax basis in the New Subordinated Notes received that *exceeds* the issue price of such New Subordinated Notes, but is *less than or equal to* the sum of all remaining amounts payable under such New Subordinated Notes (other than stated interest), the amount of OID includible in the holder's gross income generally is reduced in each period in proportion to the percentage of the OID represented by the excess basis.  Alternatively, if a holder treats all stated interest as OID, such holder may elect to recompute the OID accruals by treating its acquisition as a purchase at

original issue and applying the constant yield method.  Such an election may not be revoked without the consent of the IRS.

If a holder has a tax basis in any New Subordinated Notes received that *exceeds* the sum of all remaining amounts payable under such New Subordinated Notes, other than stated interest (*i.e.*, at a "bond premium"), the holder will not include any of the OID in income.  Moreover, a holder may elect to deduct any bond premium over the period from its acquisition of such New Subordinated Note to the maturity date of such New Subordinated Note (or, if it results in a smaller amount of amortizable bond premium, until an earlier call date), but not in excess of the stated interest.  If such bond premium is amortized, the amount of stated interest on the New Subordinated Notes that must be included in the holder's gross income for each period ending on an interest payment date or at the maturity date, as the case may be, will (except as Treasury Regulations may otherwise provide) be reduced by the portion of bond premium allocable to such period based on the New Subordinated Note's yield to maturity.  The holder's tax basis in its New Subordinated Notes will be reduced by a like amount.  If such an election to amortize bond premium is not made, a holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the New Subordinated Note, or upon the full or partial payment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds (regardless of issuer) the interest on which is includable in the holder's gross income and that are held at, or acquired after, the beginning of the holder's taxable year as to which the election is made.  The election may be revoked only with the consent of the IRS.

### c.    Sale, Exchange or Other Disposition of the New Subordinated Notes

Except as discussed below with respect to market discount, any gain or loss recognized by a holder on a sale, exchange or other disposition of a New Subordinated Note generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the note immediately before the sale, exchange, redemption or other disposition.  Any such capital gain or loss generally should be long-term capital gain or loss if the holder's holding period in its note is more than one year at that time.

In the case of an exchange of existing Senior Subordinated Notes that qualifies as a recapitalization for U.S. federal income tax purposes, the Tax Code indicates that any accrued market discount in respect of the Senior Subordinated Notes in excess of the gain recognized in the exchange should not be currently includible in income.  However, such accrued market discount would carry over to any non-recognition property received in exchange therefor (*i.e.*, to the New Subordinated Notes if such notes constitute securities for U.S. federal income tax purposes, and to the stock of Reorganized LPC, on an allocable basis presumably in accordance with fair market value), such that any gain recognized by the holder upon a subsequent disposition or repayment of the notes or stock (as applicable) would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury regulations implementing this rule have not been issued.

If a holder of accrued market discount notes did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry such notes, such deferred amounts would become deductible at the time of a later taxable disposition, up to the amount of gain that the holder recognizes in the disposition.

### 6.    Ownership and Disposition of Series C Preferred Stock and LPC Common Stock

#### a.    *Distributions*

Distributions with respect to the Series C Preferred Stock or LPC Common Stock will be taxable as dividend income when paid to the extent of LPC's current and accumulated earnings and profits as determined for U.S. federal income tax purposes.  To the extent the amount of any distributions exceeds LPC's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in respect of the stock as to which the distribution was made (but not below zero).  Any remaining excess will be treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below in "—Sale or Other Disposition (Other Than Conversion)."

(i)    Dividends to Non-Corporate Shareholders.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate holders in taxable years beginning on or before December 31, 2010, may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

(ii)    Dividends to Corporate Shareholders.

In general, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here).  A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction.  No assurance can be given that LPC will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions to be eligible for a dividends received deduction.  Dividend income that is not subject to regular U.S. federal income tax as a consequence of the dividends received deduction may be subject to the U.S. federal alternative minimum tax.

The dividends received deduction is only available if certain holding periods and taxable income requirements are satisfied.  The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the

dividends received deduction may be disallowed.  Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend were treated as an "extraordinary dividend" under applicable rules.

### b.    Constructive Dividend Potential

Under section 305 of the Tax Code, a holder of preferred stock may be treated as receiving constructive distributions over the term of the stock based on principles analogous to the OID rules described above in respect of the New Subordinated Notes.  These "preferred OID" rules do not apply if the stock participates in corporate growth to any significant extent (disregarding conversion privileges).  A right to participate in corporate growth that lacks substance (*i.e.*, as to which it is reasonable to anticipate at the time of the distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

The Debtors believe that the Series C Preferred Stock should qualify as participating preferred stock and, thus, should not be subject to the preferred OID rules.  Moreover, the Series C Preferred Stock is perpetual preferred stock and, thus, as a technical matter, would have no finite period over which to accrue any preferred OID reflective of the excess of liquidation preference over the fair market value of the preferred stock.  In general, each holder is bound by LPC's determination as to whether there is accruable preferred OID, unless the holder explicitly discloses that it is taking a contrary position in a statement attached to its timely filed tax return for the taxable year in which it acquires the stock.

Aside from the treatment of any preferred OID, the presence or absence of an adjustment for certain events to the conversion price at which the Series C Preferred Stock is convertible into LPC Common Stock, such as under the anti-dilution provisions, may result in constructive distributions to the holders of the Series C Preferred Stock (or, in certain cases, to common stockholders of LPC), which would be taxable similar to an ordinary distribution on stock.

### c.    Sale or Other Disposition (Other Than Conversion)

Subject to the discussion below, any gain or loss recognized by a holder on the sale, exchange, or other disposition of the Series C Preferred Stock or the LPC Common Stock (including common stock issued upon the conversion of such Series C Preferred Stock) generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the Series C Preferred Stock or the LPC Common Stock immediately before the sale, exchange, or other disposition.  Any such capital gain or loss generally should be long-term capital gain or loss if the holder's holding period for its stock is more than one year at that time.  The use of capital losses is subject to limitations.

In the case of a redemption of stock (either the Series C Preferred Stock or any LPC Common Stock) for cash or property, the U.S. federal income tax treatment depends on the particular facts relating to such holder at the time of the redemption.  If the redemption of such stock (i) is "not essentially equivalent to a dividend" with respect to the holder, (ii) is

"substantially disproportionate" with respect to the holder (as defined generally as a greater than 20% reduction in a shareholder's relative voting stock and common stock of a corporation where such shareholder owns less than 50% of the voting stock of the corporation immediately following the redemption), or (iii) results in a "complete termination" of all of such holder's equity interest in the corporation, then the receipt of cash or property by such holder will be treated as a sale or exchange of its stock and taxed accordingly.  In applying these tests, certain constructive ownership rules apply to determine stock ownership.  If the redemption does not qualify for sale or exchange treatment, the holder will instead be treated as having received a distribution on such stock (in an amount that generally will be equal to the amount of cash and the fair market value of property received in the redemption) with the general consequences described above under "—Distributions", and the holder's basis in the stock redeemed will shift to the other shares actually owned by such holder.  If the holder does not retain any actual stock ownership in the company following such redemption, the holder may lose its tax basis completely.  If such distribution is taxable as a dividend to a corporate shareholder, it may be subject to the "extraordinary dividend" provisions of the Tax Code.

As discussed above (see VII.B.5.c, "*Sale, Exchange or Other Disposition of the New Subordinated Notes*" starting on page 85), any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount to the stock not previously included in income.

In addition, any gain recognized by the holder upon a subsequent taxable disposition of the stock received in respect of its Claim (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### d.     *Conversion of Series C Preferred Stock into LPC Common Stock*

As a general rule, a holder of Series C Preferred Stock will not recognize any gain or loss in respect of the receipt of LPC Common Stock upon the conversion of the Series C Preferred Stock, except in respect of any cash paid to holder in lieu of fractional shares.  The adjusted tax basis of the LPC Common Stock received on conversion generally will equal the adjusted tax basis of the Series C Preferred Stock converted less the portion of the holder's tax basis allocable to any fractional share, and the holding period of such LPC Common Stock received on conversion will generally include the period during which the converted Series C Preferred Stock was held prior to conversion.

C.    **Consequences to Holders of Series B Preferred Stock Interests**

        The exchange of Series B Preferred Stock Interests for LPC Common Stock should qualify as a recapitalization for U.S. federal income tax purposes.  A holder of Series B Preferred Stock Interests generally will not recognize any gain or loss upon the exchange of such preferred stock for common stock, except in respect of any common stock received that is attributable to any dividend arrearages, which generally should be treated as a distribution on the Series B Preferred Stock Interests, with similar consequences described above under Section VII.B.6.a, "*Distributions*" starting on page 86.

        In general, the common stock received will be considered attributable to any dividend arrearages to the extent the value of the common stock received exceeds the issue price of the Series B Preferred Stock (but not by more than the amount of the dividend arrearages).

        A holder's aggregate tax basis in any LPC Common Stock received generally should (except with respect to any dividend arrearages taxable on the exchange) equal the holder's aggregate adjusted tax basis in the Series B Preferred Stock Interests exchanged therefor.  In general, a holder's holding period in any LPC Common Stock received, other than any such stock received attributable to any dividend arrearages, will include the holder's holding period in the Series B Preferred Stock exchanged.  The tax basis of any LPC Common Stock received that is attributable to any dividend arrearages will be equal to its fair market value on the date of the exchange, and the holding period of such common stock will commence on the day after the exchange.

        For a discussion of the U.S. federal income tax consequences of the ownership and disposition of LPC Common Stock, see generally Section VII.B.6 "*Ownership and Disposition of Series C Preferred Stock and LPC Common Stock*" starting on page 86.

D.    **Information Reporting and Backup Withholding**

        Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Amended Plan and payments of proceeds from the sale, retirement or other disposition of new securities, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information or to make certain certifications.  Backup withholding is not an additional tax.  Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, if any, provided that appropriate proof is provided to the IRS under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but that does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the exchanges contemplated by the Amended Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests receiving a distribution under the Amended Plan are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the Amended Plan.**

## VIII.  SECURITIES LAW MATTERS

A.   <u>Issuance and Resale of the New Subordinated Notes, Series C Preferred Stock, and LPC Common Stock under the Amended Plan</u>

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate.  In reliance upon this exemption, the New Subordinated Notes, the Series C Preferred Stock, and LPC Common Stock issued to holders of claims and interests in LPC generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of new securities issued under the Amended Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with a chapter 11 plan, with the consummation of the chapter 11 plan, or with an offer or sale of securities under the chapter 11 plan, or (d) is the issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities

Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

**B.**    **Listing**

> The New Subordinated Notes, the Series C Preferred Stock, and the LPC Common Stock are not, and upon the consummation of the Amended Plan, such securities will not be, listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

**C.**    **Legends.**

> Certificates evidencing shares of New Subordinated Notes, the Series C Preferred Stock, and the LPC Common Stock received by holders of at least 10% of the LPC Common Stock will bear a legend substantially in the form below (except no legend shall be required on certificates issued in "street name" or in the name of, or by a nominee, of the Depository Trust Company):

> > [THIS NOTE] [THE SHARES OF [SERIES C PREFERRED] [COMMON] STOCK REPRESENTED BY THIS CERTIFICATE] MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

### IX.  VOTING PROCEDURES AND REQUIREMENTS

**A.**    **Voting Deadline**

> **IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:**

> > **Class 5 – Senior Subordinated Note Claims**

> > **Class 6 – Junior Subordinated Note Claims**

> > **Class 7 – General Unsecured Claims against LPC**

**Class 9 – Asbestos-Related Claims**

**Class 10 – Series B Preferred Stock Interests in LPC**

**Class 11 – Other Equity Interests in LPC**

**Class 16 – General Unsecured Claims against LRGI**

All known holders of Senior Subordinated Note Claims, Junior Subordinated Note Claims, General Unsecured Claims, Asbestos-Related Claims, Series B Preferred Stock Interests, and Other Equity Interests in LPC as of the Record Date are entitled to vote on the Amended Plan and have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein.  To vote, please use only the ballot that accompanies this Disclosure Statement.

The Debtors have engaged _____, as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Amended Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON ___ __, 2008**.

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**FAXED OR E-MAILED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

**B.**      **Holders of Claims Entitled to Vote**

Class 5 – Senior Subordinated Note Claims, Class 6 – Junior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims, Class 10 – Series B Preferred Stock Interests in LPC, Class 11 – Equity Interests in LPC, and Class 16 – General Unsecured Claims against LRGI are the only Classes under the Amended Plan that are impaired and entitled to vote to accept or reject the Amended Plan.  Each holder of a Claim in any of these classes as of _____ __, 2008 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Amended Plan.

**C.**      **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, a Class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that Class that vote to accept or reject the plan.  Thus, Classes 5, 6, 7, 8, and 16 will accept the Amended Plan if at least two-thirds in dollar amount and a majority in number of the holders of that Class that cast their ballots vote in favor of acceptance.

A Class of Interests accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in amount of the allowed interests of that Class that vote to accept or reject the plan.  Thus, Class 10 or Class 11 will accept the Amended Plan if at least two-thirds in amount of that Class cast their ballots in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.**      **Voting Procedures**

    **1.**      **Voting Procedures**

Voting procedures shall be as described in the Disclosure Statement Order.

    **2.**      **Withdrawal of Ballot**

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline.  In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## X.  CONFIRMATION OF THE AMENDED PLAN

### A.        The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for ___ __, 2008.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

### B.        Objections to Confirmation

Objections or responses to confirmation of the Amended Plan, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor.

All objections and responses to the confirmation of the Amended Plan must be filed with the Bankruptcy Court no later than ___ __, **2008 at 4:00 p.m. (prevailing Eastern Time)**.  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

All objections and responses must be served, so as to be received no later than ___ __, **2008, at 4:00 p.m. (prevailing Eastern Time)**, upon:  (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Richard P. Krasnow); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (d) the attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn:  John C. Tishler); (e) the attorneys for the statutory committee of unsecured creditors, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn:  Paul Silverstein and Jonathon Levine); and (f) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn:  Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Amended Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**     **General Requirements for Confirmation**

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Amended Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)   The Amended Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Amended Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Amended Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Amended Plan is reasonable, or if such payment is to be fixed after confirmation of the Amended Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Amended Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the Amended Plan with the Debtors, or a successor to the Debtors under the Amended Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)    With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the Amended Plan or will receive or retain under the Amended Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(vii)   Except to the extent the Amended Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VI.A.2, "*Non-Consensual Confirmation*" starting on page 70, each Class of Claims or

Interests has either accepted the Amended Plan or is not impaired under the Amended Plan.

(viii)    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Amended Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide to the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the Amended Plan, determined without including any acceptance of the Amended Plan by any insider holding a Claim in such Class.

(x)    Confirmation of the Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Amended Plan, unless such liquidation or reorganization is proposed in the Amended Plan.  See discussion of "Feasibility" below.

(xi)    The Amended Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Amended Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## D.    Best Interests Test

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accepts the Amended Plan or (b) receives or retains under the Amended Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Amended Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Creditors' Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Amended Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each Class of Allowed Claims in a chapter 7 case would likely be reduced further because such distributions in a chapter 7 case could be delayed for a year or more after the completion of the liquidation of assets in order to resolve the Claims and prepare

for distributions.  In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and administrative could be expenses further increased.

**The Debtors' liquidation analysis estimates the proceeds generated from a hypothetical chapter 7 liquidation of the Debtors' assets.  The Debtors base the analysis upon a number of significant assumptions which are described therein.  The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit 5 to this Disclosure Statement and utilized therein.

**E.    No Unfair Discrimination/Fair and Equitable Test**

The Bankruptcy Court may confirm the Amended Plan over the rejection or deemed rejection of the Amended Plan by a Class of Claims or Equity Interests if the Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

**1.    No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Amended Plan.  The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

**2.    Fair and Equitable Test**

This test applies to Classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the allowed amount of the Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class:

**a.    Secured Claims**

The Amended Plan must provide each holder of an impaired Secured Claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such Allowed Secured Claim with deferred cash payments equal in value to the amount of such Allowed Secured Claim, as of the effective date of the plan, or (ii) the "indubitable equivalent" of such Allowed Secured Claim.

**b.    Unsecured Claims**

The Amended Plan must provide that either (i) each holder of an impaired Unsecured Claim will receive under the Amended Plan a distribution equal in value to the amount of the Allowed Unsecured Claim or (ii) no distribution will be made under the Amended Plan to any holders that is junior to the Claims in the dissenting Class.

*c.*      *Interests*

The plan must provide that either (i) each holder of an Interest will receive under the Amended Plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of Interest that is junior to the dissenting Class.

The Debtors believe that (i) the Amended Plan satisfies the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) the Amended Plan satisfies the "fair and equitable" requirement notwithstanding the rejection of the Amended Plan by any Class of Claims or Interests, because each Class of Claims or Interests will receive under the Amended Plan a distribution equal in value to (x), with respect to any Class of Claims, the amount of such Claims and (y), with respect to any Class of Interests, the greater of the fixed liquidation value, the redemption price, or the value of the stock that is the basis for such Interests.

## F.    Classification of Claims and Interests

The Debtors believes that the Amended Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Amended Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above. Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

## G.    Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization. For purposes of determining whether the Amended Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the Projected Financial Statements set forth in Exhibit F to this Disclosure Statement. Certain selected financial information from the Projected Financial Statements and certain key financial ratios are set forth in Section V, " *Financial Information, Projections and Valuation* Analysis" starting on page 58. These projections are based upon the assumption that the Bankruptcy Court will confirm the Amended Plan and, for projection purposes, that the Effective Date of the Amended Plan and its substantial consummation will take place in _____ __, 2008. Based upon the Projected Financial Statements, the Debtors believe they will be able to make all payments required to be made pursuant to the Amended Plan.

## XI.  CONCLUSION

The Debtors believe the Amended Plan is in the best interests of all holders of Claims and Interests and urges the holders of impaired Claims and Interests in Classes 5, 6, 7, 9, 10, 11, 16 to vote to accept the Amended Plan and to evidence acceptance by returning their ballots such that the Voting Agent will received the ballots no later than ___ __, 2008.

Dated: New York, New York
       August 8, 2008

Respectfully submitted,

LEXINGTON PRECISION CORPORATION

By: _____
       Name: Michael A. Lubin
       Title:   Chairman of the Board

LEXINGTON RUBBER GROUP, INC.

By: _____
       Name: Michael A. Lubin
       Title:   Chairman of the Board

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000
Attorneys for the Debtors and Debtors in Possession

## Exhibit A

**The Amended Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

|  | : |  |
|---|---|---|
| In re | : | Chapter 11 Case No. |
|  | : |  |
| LEXINGTON PRECISION CORP., et al., | : | 08-11153 (MG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

--------------------------------------------------------------x

**DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
    Debtors in Possession

Dated:  August 8, 2008

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS AND INTERPRETATION ........................................................1

    A.    Definitions ........................................................................................1

        1.1.    Administrative Expense Claim ...............................................1

        1.2.    Allowed ...............................................................................1

        1.3.    Asbestos-Related Claim ........................................................2

        1.4.    Bankruptcy Code ..................................................................2

        1.5.    Bankruptcy Court ..................................................................2

        1.6.    Bankruptcy Rules ..................................................................2

        1.7.    Business Day .........................................................................2

        1.8.    CapitalSource .......................................................................2

        1.9.    CapitalSource Secured Claim ................................................2

        1.10.    Cash ....................................................................................2

        1.11.    Chapter 11 Cases ................................................................2

        1.12.    Charging Lien ......................................................................3

        1.13.    Charter Amendment .............................................................3

        1.14.    Claim....................................................................................3

        1.15.    Class ....................................................................................3

        1.16.    Collateral .............................................................................3

        1.17.    Commencement Date ...........................................................3

        1.18.    Confirmation Date ...............................................................3

        1.19.    Confirmation Hearing ..........................................................3

        1.20.    Confirmation Order ..............................................................3

        1.21.    Contingent Claim .................................................................3

        1.22.    Convenience Claim ..............................................................3

        1.23.    Creditors' Committee ...........................................................3

        1.24.    CSE Mortgage .....................................................................3

        1.25.    CSE Secured Claim ..............................................................3

        1.26.    Debtors ................................................................................4

        1.27.    Debtors in Possession ..........................................................4

        1.28.    DIP Lenders ........................................................................4

        1.29.    DIP Loan Claims ................................................................4

# TABLE OF CONTENTS
## (continued)

Page

1.30.    DIP Note ...............................................................................................4

1.31.    Disallowed Claim ...............................................................................4

1.32.    Disbursing Agent ...............................................................................4

1.33.    Disclosure Statement ........................................................................4

1.34.    Disclosure Statement Order .............................................................4

1.35.    Disputed Claim ..................................................................................4

1.36.    Distribution Record Date ..................................................................4

1.37.    Effective Date ....................................................................................4

1.38.    Entity .................................................................................................4

1.39.    Exit Facility .......................................................................................5

1.40.    Final Cash Collateral Order .............................................................5

1.41.    Final Order ........................................................................................5

1.42.    General Unsecured Claim .................................................................5

1.43.    Indenture ...........................................................................................5

1.44.    Indenture Trustee ..............................................................................5

1.45.    Indenture Trustee Fee Claim ............................................................5

1.46.    Insurance Policies .............................................................................5

1.47.    Intercompany Claim ..........................................................................5

1.48.    Interest ...............................................................................................5

1.49.    Junior Subordinated Note .................................................................6

1.50.    Junior Subordinated Note Claim ......................................................6

1.51.    LPC ...................................................................................................6

1.52.    LPC Common Stock ..........................................................................6

1.53.    LPC Warrant ......................................................................................6

1.54.    LRGI .................................................................................................6

1.55.    Lien ...................................................................................................6

1.56.    New Subordinated Notes ..................................................................6

1.57.    New Indenture ...................................................................................6

1.58.    Other Equity Interest ........................................................................6

1.59.    Other Priority Claim .........................................................................6

1.60.    Other Secured Claim .........................................................................6

# TABLE OF CONTENTS
## (continued)

Page

1.61.  Plan Documents ...................................................................6

1.62.  Plan ...................................................................6

1.63.  Plan Supplement ...................................................................7

1.64.  Prepetition Credit Agreement ...................................................................7

1.65.  Prepetition Loan Agreement ...................................................................7

1.66.  Priority Tax Claim ...................................................................7

1.67.  Reorganized Debtors ...................................................................7

1.68.  Reorganized LPC ...................................................................7

1.69.  Reorganized LRGI ...................................................................7

1.70.  Schedules ...................................................................7

1.71.  Secured Claim ...................................................................7

1.72.  Secured Tax Claim ...................................................................7

1.73.  Senior Subordinated Notes ...................................................................7

1.74.  Senior Subordinated Note Claim ...................................................................7

1.75.  Series B Preferred Stock Interest ...................................................................7

1.76.  Series C Preferred Stock ...................................................................8

1.77.  Unliquidated Claim ...................................................................8

1.78.  Unsecured Claim ...................................................................8

B.  Interpretation; Application of Definitions and Rules of Construction ...................................................................8

ARTICLE II  ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ...................................................................8

2.1.  Administrative Expense Claims ...................................................................8

2.2.  Professional Compensation and Reimbursement Claims ...................................................................8

2.3.  Indenture Trustee Fee Claims ...................................................................9

2.4.  DIP Loan Claims ...................................................................9

2.5.  Priority Tax Claims ...................................................................9

ARTICLE III  CLASSIFICATION OF CLAIMS AND INTERESTS ...................................................................10

ARTICLE IV  TREATMENT OF CLAIMS AND INTERESTS ...................................................................10

4.1.  Class 1:  Other Priority Claims against LPC ...................................................................10

4.2.  Class 2(a):  CapitalSource Secured Claims against LPC ...................................................................11

4.3.  Class 2(b):  CSE Secured Claims against LPC ...................................................................11

4.4.  Class 3:  Secured Tax Claims against LPC ...................................................................11

# TABLE OF CONTENTS
## (continued)

Page

4.5.  Class 4: Other Secured Claims against LPC ....................................................... 12

4.6.  Class 5:  Senior Subordinated Note Claims ........................................................ 12

4.7.  Class 6:  Junior Subordinated Note Claims ........................................................ 12

4.8.  Class 7:  General Unsecured Claims against LPC ............................................. 13

4.9.  Class 8: Convenience Claims against LPC ......................................................... 13

4.10.  Class 9:  Asbestos-Related Claims ..................................................................... 13

4.11.  Class 10:  Series B Preferred Stock Interests ................................................... 14

4.12.  Class 11:  Other Equity Interests in LPC ......................................................... 14

4.13.  Class 12:  Other Priority Claims against LRGI ............................................... 14

4.14.  Class 13(a):  CapitalSource Secured Claims against LRGI .............................. 14

4.15.  Class 13(b):  CSE Secured Claims against LRGI ............................................. 14

4.16.  Class 14:  Secured Tax Claims against LRGI ................................................... 15

4.17.  Class 15: Other Secured Claims against LRGI ................................................. 15

4.18.  Class 16:  General Unsecured Claims against LRGI ........................................ 16

4.19.  Class 17: Convenience Claims against LRGI .................................................... 16

4.20.  Class 18:  Interests in LRGI .............................................................................. 16

ARTICLE V     MEANS FOR IMPLEMENTATION ...................................................... 16

5.1.  Intercompany Claims ........................................................................................... 16

5.2.  Cancellation and Surrender of Existing Securities and Agreements ................... 16

5.3.  Charter Amendment ............................................................................................. 17

5.4.  Incurrence of New Indebtedness ......................................................................... 17

5.5.  Issuance of Series C Preferred Stock .................................................................. 18

5.6.  Issuance of LPC Common Stock ......................................................................... 18

5.7.  Issuance of the New Subordinated Notes ............................................................ 18

5.8.  Exemption from Securities Laws ......................................................................... 18

ARTICLE VI     VOTING AND DISTRIBUTIONS ......................................................... 18

6.1.  Voting of Claims .................................................................................................. 18

6.2.  Nonconsensual Confirmation .............................................................................. 18

6.3.  Distribution Record Date ..................................................................................... 18

6.4.  Date of Distributions ........................................................................................... 19

6.5.  Disbursing Agent ................................................................................................. 19

iv

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 6.6. | Rights and Powers of Disbursing Agent | 19 |
| 6.7. | Expenses of the Disbursing Agent | 19 |
| 6.8. | Delivery of Distributions | 19 |
| 6.9. | Unclaimed Distributions | 20 |
| 6.10. | Manner of Payment | 20 |
| 6.11. | Fractional Shares | 20 |
| 6.12. | Minimum Cash Distributions | 20 |
| 6.13. | Setoffs | 21 |
| ARTICLE VII | PROCEDURES FOR DISPUTED CLAIMS | 21 |
| 7.1. | Objections | 21 |
| 7.2. | No Payment Pending Allowance | 21 |
| 7.3. | Distributions After Allowance | 21 |
| 7.4. | Resolution of Administrative Expense Claims and other Claims | 21 |
| 7.5. | Estimation of Claims | 22 |
| 7.6. | Interest | 22 |
| ARTICLE VIII | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 22 |
| 8.1. | Assumption or Rejection of Executory Contracts and Unexpired Leases | 22 |
| 8.2. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases | 23 |
| 8.3. | Inclusiveness | 23 |
| 8.4. | Cure of Defaults | 23 |
| 8.5. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 23 |
| 8.6. | Indemnification Obligations | 24 |
| 8.7. | Insurance Policies | 24 |
| 8.8. | Compensation and Benefit Programs | 24 |
| 8.9. | Retiree Benefits | 25 |
| ARTICLE IX | CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS | 25 |
| 9.1. | General | 25 |
| 9.2. | Directors and Officers of the Reorganized Debtors | 25 |
| 9.3. | Issuance of Non-Voting Securities | 26 |

v

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE X    EFFECT OF CONFIRMATION ......................................................................26

      10.1.    Vesting of Assets ..............................................................................26

      10.2.    Discharge of Claims and Termination of Series B Preferred Stock
Interests ...........................................................................................26

      10.3.    Discharge of Debtors ........................................................................26

      10.4.    Injunction or Stay.............................................................................27

      10.5.    Term of Injunctions or Stays ...........................................................27

      10.6.    Injunction Against Interference With Plan ........................................27

      10.7.    Exculpation ......................................................................................27

      10.8.    Releases ...........................................................................................28

      10.9.    Avoidance Actions............................................................................28

      10.10.    Retention of Causes of Action/Reservation of Rights .......................28

      10.11.    Limitations on Exculpation and Releases of Representatives ............29

ARTICLE XI    CONDITIONS PRECEDENT to effective date .....................................29

      11.1.    Conditions Precedent to Effectiveness...............................................29

      11.2.    Waiver of Conditions .......................................................................29

      11.3.    Effect of Failure of Conditions to Effective Date ..............................29

ARTICLE XII    RETENTION OF JURISDICTION ........................................................30

ARTICLE XIII    MISCELLANEOUS PROVISIONS .......................................................31

      13.1.    Effectuating Documents and Further Transactions.............................31

      13.2.    Withholding and Reporting Requirements .........................................31

      13.3.    Corporate Action...............................................................................32

      13.4.    Exemption from Transfer Taxes ........................................................32

      13.5.    Expedited Tax Determination. ..........................................................32

      13.6.    Payment of Statutory Fees ................................................................32

      13.7.    Post-Confirmation Date Professional Fees and Expenses ..................33

      13.8.    Dissolution of Statutory Committees.................................................33

      13.9.    Indenture Trustee as Claim Holder ...................................................33

      13.10.    Plan Supplement ..............................................................................33

      13.11.    Substantial Consummation ...............................................................33

      13.12.    Amendments or Modifications of the Plan ........................................33

      13.13.    Revocation or Withdrawal of the Plan...............................................34

## TABLE OF CONTENTS
### (continued)

13.14.    Severability. ...............................................................................................34

13.15.    Governing Law ...........................................................................................34

13.16.    Binding Effect.............................................................................................34

13.17.    Exhibits/Schedules .....................................................................................34

13.18.    Notices ........................................................................................................35

13.19.    Time.............................................................................................................35

13.20.    Section Headings ........................................................................................35

**<u>EXHIBITS</u>**

Exhibit 1.55 – Summary of Terms of New Subordinated Notes

Exhibit 1.74 – Summary of Terms of Series C Preferred Stock

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                           :
In re                                      :        **Chapter 11 Case No.**
                                           :
**LEXINGTON PRECISION CORP., et al.,**     :        **08-11153 (MG)**
                                           :
          **Debtors.**                     :        **(Jointly Administered)**
                                           :
-----------------------------------------------------------------x

### DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

          Lexington Precision Corporation and Lexington Rubber Group, Inc. propose the following amended joint chapter 11 plan of reorganization, pursuant to section 1121(a) of title 11 of the United States Code:

### ARTICLE I

### DEFINITIONS AND INTERPRETATION

A.       **Definitions**.

          The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

          1.1.     ***Administrative Expense Claim*** means any Claim constituting a cost or expense of administration of the Chapter 11 Cases allowed under sections 503(b) (including 503(b)(9)), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any actual and necessary costs and expenses of the administration and implementation of the Plan, any indebtedness or obligations incurred or assumed by the Debtors, as Debtors in Possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code.

          1.2.     ***Allowed*** means that, with respect to a Claim, (i) such Claim has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and no contrary proof of claim has been filed, (ii) a proof of claim with respect to such Claim has been timely filed and no objection thereto has been interposed within the time period set forth in Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or an objection thereto has been interposed and such Claim has been allowed in whole or in part by a Final Order, (iii) such Claim has been expressly allowed by a Final Order or under the Plan, or (iv) such Claim has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under

Sections 7.1, 7.4, or 7.5 of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" under the Plan.

1.3.    ***Asbestos-Related Claim*** means any Claim, remedy or liability against any Debtor, whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise (including piercing the corporate veil, alter ego and similar theories), for damages for property damage or for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent allegedly arising out of or based on, directly or indirectly, in whole or in part, the presence of or exposure to asbestos or asbestos-containing products or things that were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced or disposed of by any Debtor or an Entity for whose products or operations any Debtor allegedly has liability or for which any Debtor is otherwise allegedly liable, including any Claim, remedy or liability for compensatory damages (such as loss of consortium, lost wages or other opportunities, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) or punitive damages related thereto, and any Claim under any settlement of an Asbestos-Related Claim entered into by or on behalf of any Debtor prior to the Commencement Date.

1.4.    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.5.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or such other court that exercises jurisdiction over the Chapter 11 Cases.

1.6.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases.

1.7.    ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.8.    ***CapitalSource*** means CapitalSource Finance LLC.

1.9.    ***CapitalSource Secured Claim*** means all Claims arising under the Prepetition Credit Agreement and all Claims of the agents and lenders thereunder arising under the Final Cash Collateral Order, less all payments made subsequent to the Commencement Date in respect of such Claims under the Final Cash Collateral Order.

1.10.    ***Cash*** means legal tender of the United States of America.

1.11.    ***Chapter 11 Cases*** means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on April 1, 2008 in the United States Bankruptcy Court for the Southern District of New York and styled *In re Lexington Precision Corporation*, *et al.*, Chapter 11 Case No. 08-11153 (MG) (Jointly Administered).

1.12.    ***Charging Lien*** means any right of the Indenture Trustee to a Lien upon or other priority in payment with respect to distributions to be made to holders of Senior Subordinated Note Claims for payment of any Indenture Trustee Fee Claim arising prior to the Effective Date.

1.13.    ***Charter Amendment*** means the amendment to the certificate of incorporation of LPC to be filed in accordance with Section 5.3 of the Plan, a form of which is to be included in the Plan Supplement.

1.14.    ***Claim*** shall have the meaning ascribed in section 101 of the Bankruptcy Code.

1.15.    ***Class*** means any group of Claims or Interests classified by the Plan as set forth in Article III of the Plan.

1.16.    ***Collateral*** means any property or interest in property of the Debtors' estates subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.17.    ***Commencement Date*** means April 1, 2008, the date on which the Debtors commenced the Chapter 11 Cases.

1.18.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases.

1.19.    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.20.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.21.    ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence of, or is triggered by, an event, which event has not yet occurred as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.22.    ***Convenience Claim*** means any Unsecured Claim in the amount of $2,000.00 or less, and any other Unsecured Claim that is reduced to such amount by the holder of such Claim pursuant to the procedures set forth in the Disclosure Statement Order.

1.23.    ***Creditors' Committee*** means the statutory creditors' committee appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Cases, as may be reconstituted from time to time.

1.24.    ***CSE Mortgage*** means CSE Mortgage LLC.

1.25.    ***CSE Secured Claim*** means all Claims arising under the Prepetition Loan Agreement and all Claims of the agents and lenders thereunder arising under the Final Cash Collateral

Order, less all payments made subsequent to the Commencement Date in respect of such Claims under the Final Cash Collateral Order.

1.26.    ***Debtors*** means LPC and LRGI.

1.27.    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.28.    ***DIP Lenders*** means Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC, as the lenders under the DIP Note.

1.29.    ***DIP Loan Claims*** means all Claims arising under the DIP Note, as authorized and approved by that certain Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Authorizing Postpetition Financing, entered by the Bankruptcy Court on April 17, 2008, in the Chapter 11 Cases, as may be amended or supplemented.

1.30.    ***DIP Note*** means that certain Super-Priority DIP Note issued by the Debtors in favor of the DIP Lenders on April 21, 2008, in the amount of $4 million.

1.31.    ***Disallowed Claim*** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or any other court of competent jurisdiction.

1.32.    ***Disbursing Agent*** means such Entity as is designated pursuant to Section 6.5 of the Plan to be a disbursing agent.

1.33.    ***Disclosure Statement*** means the disclosure statement with respect to the Plan filed with and approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code, as such disclosure statement may be amended, modified or supplemented.

1.34.    ***Disclosure Statement Order*** means the order of the Bankruptcy Court approving the Disclosure Statement and establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.35.    ***Disputed Claim*** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, that is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.

1.36.    ***Distribution Record Date*** means, with respect to holders of all Claims, the date that is three (3) days after the Confirmation Date.

1.37.    ***Effective Date*** means a Business Day specified by the Debtors on or after the Confirmation Date, on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in Article 12 of the Plan have been satisfied or waived.

1.38.    ***Entity*** means a person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint

venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee.

1.39.    ***Exit Facility*** means any financing arrangement that the Reorganized Debtors enter into on or about the Effective Date in connection with the consummation of the Plan, and any amendments, modifications or supplements thereto.

1.40.    ***Final Cash Collateral Order*** means that certain Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Authorizing Postpetition Financing, entered by the Bankruptcy Court on April 17, 2008, in the Chapter 11 Cases, as may be amended or supplemented.

1.41.    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, that has not been reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.42.    ***General Unsecured Claim*** means any Claim against any of the Debtors other than a Convenience Claim, an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, an Other Secured Claim, a CapitalSource Secured Claim, a CSE Secured Claim, a Senior Subordinated Note Claim, a Junior Subordinated Note Claim, or an Asbestos-Related Claim.

1.43.    ***Indenture*** means the Indenture, dated as of December 18, 2003, entered into by LPC, with Wilmington Trust Company, as trustee, under which the Senior Subordinated Notes were issued, as such Indenture is or has been amended, modified or supplemented from time to time.

1.44.    ***Indenture Trustee*** means Wilmington Trust Company, in its capacity as the indenture trustee for the Senior Subordinated Notes, or any successor thereto.

1.45.    ***Indenture Trustee Fee Claim*** means any Claim of the Indenture Trustee for the reimbursement of its reasonable accrued and unpaid fees and expenses under the Indenture.

1.46.    ***Insurance Policies*** means any and all insurance policies issued to LPC or any predecessor in interest that insure LPC against losses that give rise to any Asbestos-Related Claim.

1.47.    ***Intercompany Claim*** means any Claim against any Debtor held by another Debtor.

1.48.    ***Interest*** means any Other Equity Interest or Series B Preferred Stock Interest.

1.49.    ***Junior Subordinated Note*** means that certain 13% Junior Subordinated Note due November 1, 2009, issued on December 18, 2003 by LPC to Michael A. Lubin.

1.50.    ***Junior Subordinated Note Claim*** means all Claims arising under the Junior Subordinated Note, which shall include interest from and after the Commencement Date at the rate of 13% per annum.

1.51.    ***LPC***  means Lexington Precision Corporation, a Delaware corporation.

1.52.    ***LPC Common Stock*** means the shares of common stock of LPC.

1.53.    ***LPC Warrant*** means a warrant issued on December 18, 2003, entitling the holder to purchase one share of the LPC Common Stock for $3.50 from August 1, 2005, through August 1, 2009.

1.54.    ***LRGI***  means Lexington Rubber Group, Inc., a Delaware corporation.

1.55.    ***Lien*** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.56.    ***New Subordinated Notes*** means the 12% Senior Subordinated Notes due December 31, 2013, to be issued by Reorganized LPC pursuant to the New Indenture, and having the principal terms set forth on Exhibit 1.56 (as same may be amended or supplemented).  In the event of any inconsistencies between such term sheet and the New Indenture, the terms of the New Indenture shall govern.

1.57.    ***New Indenture*** means that certain indenture pursuant to which the New Subordinated Notes will be issued, substantially in the form to be included in the Plan Supplement.

1.58.    ***Other Equity Interest*** means the interest of any holder of an equity security of any of the Debtors represented by the LPC Common Stock, the LPC Warrants, or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, other than the Series B Preferred Stock Interests.

1.59.    ***Other Priority Claim*** means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim, a DIP Loan Claim, or a Priority Tax Claim.

1.60.    ***Other Secured Claim*** means any Secured Claim other than a Secured Tax Claim, the CapitalSource Secured Claim and the CSE Secured Claim.

1.61.    ***Plan Documents*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date, including but not limited to (i) the New Indenture, (ii) the Charter Amendment, and (iii) the list of executory contracts and unexpired leases listed on Schedule 8.1.  Each of the Plan Documents to be entered into as of the Effective Date will be included in draft form in the Plan Supplement.

1.62.    ***Plan*** means this Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the exhibits and schedules hereto and thereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan.

1.63.    ***Plan Supplement*** means the document (as may be amended, modified or supplemented) containing the forms of documents specified in Section 13.10 of the Plan.

1.64.    ***Prepetition Credit Agreement*** means that certain Credit and Security Agreement, dated May 31, 2006 (as amended), between the Debtors, as borrowers, and CapitalSource, as a lender, as collateral agent and administrative agent for itself and other lenders, and as co-documentation agent, and Webster Business Credit Corporation as a lender and as co-documentation agent.

1.65.    ***Prepetition Loan Agreement*** means that certain Loan and Security Agreement, dated May 31, 2006 (as amended), between the Debtors, as borrowers, and CSE Mortgage, as a lender and a collateral agent for itself and each other lender, and DMD Special Situations Funding LLC, as a lender.

1.66.    ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.67.    ***Reorganized Debtors*** means each of the Debtors, as reorganized as of the Effective Date in accordance with the Plan, and their successors.

1.68.    ***Reorganized LPC*** means LPC, as reorganized as of the Effective Date in accordance with the Plan.

1.69.    ***Reorganized LRGI*** means LRGI, as reorganized as of the Effective Date in accordance with the Plan.

1.70.    ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be supplemented or amended on or prior to the Effective Date.

1.71.    ***Secured Claim*** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.72.    ***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

1.73.    ***Senior Subordinated Notes*** means the 12% Senior Subordinated Notes due August 1, 2009, issued by LPC pursuant to the Indenture.

1.74.    ***Senior Subordinated Note Claim*** means any Claim arising under the Senior Subordinated Notes, which shall include interest from and after the Commencement Date at the rate of 12% per annum.

1.75.    ***Series B Preferred Stock Interest*** means the interest of any holder of issued and outstanding shares of LPC's $8 Cumulative Convertible Preferred Stock, Series B.

1.76.    ***Series C Preferred Stock*** means the shares of preferred stock, par value $100 per share, of LPC authorized as of the Commencement Date that will be issued hereunder and delivered to holders of certain Claims under the Plan, and having the principal terms set forth on Exhibit 1.74 (as same may be amended or supplemented).  In the event of any inconsistencies between such term sheet and the Charter Amendment, the terms of the Charter Amendment shall govern.

1.77.    ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.78.    ***Unsecured Claim*** means any Claim that is not a Secured Claim, an Administrative Expense Claim, a Priority Tax Claim or Other Priority Claim.

**B.**    **Interpretation; Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  In the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

**ARTICLE II**

**ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

2.1.    ***Administrative Expense Claims***.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, each Allowed Administrative Expense Claim shall be paid by the Reorganized Debtors in full, in Cash, in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date on which such Administrative Expense Claim shall become an Allowed Claim; *provided, however*, that Allowed Administrative Expense Claims against any of the Debtors representing liabilities incurred in the ordinary course of business by any of the Debtors, as Debtors in Possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as Debtors in Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.    ***Professional Compensation and Reimbursement Claims***.

The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 328 and 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising

under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.  Unless otherwise agreed to by the claimant and the Debtors or the Reorganized Debtors, as applicable, the Allowed Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code shall be paid in full, in Cash, as soon as practicable following the later to occur of (a) the Effective Date and (b) the date upon which any such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.  The Debtors and the Reorganized Debtors, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

2.3.    *Indenture Trustee Fee Claims*.

Notwithstanding any provision contained in this Plan to the contrary, unless otherwise agreed to by an indenture trustee and Reorganized LPC, all Indenture Trustee Fee Claims and fees for services related to distributions pursuant to the Plan shall be paid in Cash on the Effective Date by Reorganized LPC as Administrative Expense Claims, without the need for application to, or approval of, any court.  The Indenture Trustee's Charging Lien will be discharged solely upon payment in full of the Indenture Trustee Fee Claims.  Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by Reorganized LPC.

2.4.    *DIP Loan Claims.*

Except to the extent that a DIP Lender agrees to a different treatment, the DIP Loan Claims shall be paid in full, in Cash, as soon as reasonably practicable following the Effective Date.

2.5.    *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Priority Tax Claim shall become an Allowed Priority Tax Claim, (b) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| CLASS | Designation | STATUS | ENTITLED TO VOTE? |
|-------|-------------|--------|-------------------|
| **Class 1** | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 2(a)** | CapitalSource Secured Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 2(b)** | CSE Secured Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 3** | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 4** | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 5** | Senior Subordinated Note Claims | Impaired | Yes |
| **Class 6** | Junior Subordinated Note Claims | Impaired | Yes |
| **Class 7** | General Unsecured Claims against LPC | Impaired | Yes |
| **Class 8** | Convenience Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 9** | Asbestos-Related Claims | Impaired | Yes |
| **Class 10** | Series B Preferred Stock Interests | Impaired | Yes |
| **Class 11** | Other Equity Interests in LPC | Impaired | Yes |
| **Class 12** | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 13(a)** | CapitalSource Secured Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 13(b)** | CSE Secured Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 14** | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 15** | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 16** | General Unsecured Claims against LRGI | Impaired | Yes |
| **Class 17** | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) |
| **Class 18** | Interests in LRGI | Unimpaired | No (deemed to accept) |

# ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

4.1.    ***Class 1:  Other Priority Claims against LPC***

(a)    <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Other Priority Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Other Priority Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full satisfaction

of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.2.    *Class 2(a):  CapitalSource Secured Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 2(a) is unimpaired by the Plan.  Each holder of an Allowed CapitalSource Secured Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed CapitalSource Secured Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Allowed CapitalSource Secured Claim (including accrued and unpaid postpetition interest at the non-default rate and any reasonable fees and costs payable under the Prepetition Credit Agreement and the Final Cash Collateral Order) on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.3.    *Class 2(b):  CSE Secured Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 2(b) is unimpaired by the Plan.  Each holder of an Allowed CSE Secured Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed CSE Secured Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Allowed CSE Secured Claim (including accrued and unpaid postpetition interest at the non-default rate and any reasonable fees and costs payable under the Prepetition Loan Agreement and the Final Cash Collateral Order) on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.4.    *Class 3:  Secured Tax Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Secured Tax Claim against LPC agrees to a less favorable treatment, each holder shall receive, at the sole option of LPC or Reorganized LPC, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

4.5. *Class 4: Other Secured Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 4 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Other Secured Claim against LPC agrees to a less favorable treatment, at the sole option of LPC or Reorganized LPC, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Allowed Other Secured Claim, either (w) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of the holder's security interest in such Collateral, (y) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event LPC or Reorganized LPC elects to treat a Claim under clause (w) or (x) of this Section, the Liens securing such Secured Claim shall be deemed released.

4.6. *Class 5:  Senior Subordinated Note Claims*

(a)    <u>Impairment and Voting</u>.  Class 5 is impaired by the Plan.  Each holder of an Allowed Senior Subordinated Note Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Senior Subordinated Note Claim agrees to a less favorable treatment, as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed, (a) a *pro rata* share of $15,000,000 in principal amount of New Subordinated Notes and (b) a number of shares of Series C Preferred Stock equal to the quotient of (x) the excess of such holder's Allowed Senior Subordinated Note Claim against LPC over the principal amount of New Subordinated Notes issued to such holder <u>divided by</u> (y) $100.

4.7. *Class 6:  Junior Subordinated Note Claims*

(a)    <u>Impairment and Voting</u>.  Class 6 is impaired by the Plan.  Each holder of an Allowed Junior Subordinated Note Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Junior Subordinated Note Claim shall receive in full satisfaction of such Junior Subordinated Note Claim, as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date the Junior Subordinated Note Claim becomes Allowed a number of shares of reorganized LPC Common Stock equal to the quotient of (a) the aggregate amount of such Claim <u>divided by</u> (b) $7.25.

### 4.8.    *Class 7:  General Unsecured Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 7 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against LPC is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed General Unsecured Claim against LPC shall receive, in full satisfaction of such Allowed General Unsecured Claim, (i) Cash in the amount of 25% of such Allowed General Unsecured Claim as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date such General Unsecured Claim becomes Allowed, and (ii) three equal Cash payments, each in an amount equal to 26.5% of such allowed claim, payable six months, twelve months and eighteen months after the Effective Date or, if later, the date such claim becomes Allowed.

### 4.9.    *Class 8: Convenience Claims against LPC*

(a)    <u>Impairment and Voting</u>.  Class 8 is unimpaired by the Plan.  Each holder of an Allowed Convenience Claim in LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Convenience Claim against LPC shall receive, in full satisfaction of such Allowed Convenience Claim, Cash in an amount equal to 100% of such Allowed Convenience Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.10.    *Class 9:  Asbestos-Related Claims*

(a)    <u>Impairment and Voting</u>.  Class 9 is impaired by the Plan.  Each holder of an Asbestos-Related Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Treatment</u>.  Each Asbestos-Related Claim shall be deemed a Disputed Claim without the need for the Debtors to file a separate formal objection thereto.

(c)    <u>Distributions</u>.  Any recovery on any Asbestos-Related Claim shall be limited to the proceeds of the Insurance Policies and holders of Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Insurance Policies); *provided* that after the Effective Date, each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; and *provided further* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible commence a proceeding after the Effective Date in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.

(d)    **Nothing in this Amended Plan or the Disclosure Statement is an admission of any liability by the Debtors or an admission of insurance coverage by Liberty Mutual or Fireman's Fund.  Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or an admission of insurance coverage by Liberty Mutual or Fireman's Fund.**

4.11.   ***Class 10: Series B Preferred Stock Interests***

    (a)    <u>Impairment and Voting</u>. Class 10 is impaired by the Plan. Each holder of a Series B Preferred Stock Interest is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>. On the Effective Date, the Series B Preferred Stock Interests shall be cancelled and each holder of a Series B Preferred Stock Interest shall receive a number of shares of reorganized LPC Common Stock equal to the quotient of (a) the amount of such holder's Series B Preferred Stock Interest <u>divided by</u> (b) $7.25.

4.12.   ***Class 11: Other Equity Interests in LPC***

    (a)    <u>Impairment and Voting</u>. Class 11 is impaired by the Plan. Each holder of an Other Equity Interest in LPC is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>. Although Other Equity Interests in LPC shall be unaltered, Other Equity Interests in LPC will be diluted because of the increase in the number of authorized shares of LPC Common Stock.

4.13.   ***Class 12: Other Priority Claims against LRGI***

    (a)    <u>Impairment and Voting</u>. Class 12 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>. Except to the extent that a holder of an Allowed Other Priority Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

4.14.   ***Class 13(a): CapitalSource Secured Claims against LRGI***

    (a)    <u>Impairment and Voting</u>. Class 13(a) is unimpaired by the Plan. Each holder of an Allowed CapitalSource Secured Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>. Except to the extent that a holder of an Allowed CapitalSource Secured Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Allowed CapitalSource Secured Claim (including accrued and unpaid postpetition interest at the non-default rate and any reasonable fees and costs payable under the Prepetition Credit Agreement and the Final Cash Collateral Order), on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

4.15.   ***Class 13(b): CSE Secured Claims against LRGI***

    (a)    <u>Impairment and Voting</u>. Class 13(b) is unimpaired by the Plan. Each holder of an Allowed CSE Secured Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that a holder of an Allowed CSE Secured Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Allowed CSE Secured Claim (including accrued and unpaid postpetition interest at the non-default rate and any reasonable fees and costs payable under the Prepetition Loan Agreement and the Final Cash Collateral Order) on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.16.    *Class 14:  Secured Tax Claims against LRGI*

(a)    Impairment and Voting.  Class 14 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim against LRGI agrees to a less favorable treatment, each holder shall receive, at the sole option of LRGI or Reorganized LRGI, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Senior Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Senior Tax Claim.

### 4.17.    *Class 15: Other Secured Claims against LRGI*

(a)    Impairment and Voting.  Class 15 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that a holder of an Allowed Other Secured Claim against LRGI agrees to a less favorable treatment, at the sole option of LRGI or Reorganized LRGI, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Allowed Other Secured Claim, either (w) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of the holder's security interest in such Collateral, (y) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event LRGI or Reorganized LRGI elects to treat a Claim under clause (w) or (x) of this Section, the Liens securing such Secured Claim shall be deemed released.

4.18.    ***Class 16:  General Unsecured Claims against LRGI***

(a)    <u>Impairment and Voting</u>.  Class 16 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against LRGI is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed General Unsecured Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Allowed General Unsecured Claim, (i) Cash in the amount of 25% of such Allowed General Unsecured Claim as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date such General Unsecured Claim becomes Allowed, and (ii) three equal Cash payments, each in an amount equal to 26.5% of such allowed claim, payable six months, twelve months and eighteen months after the Effective Date or, if late, the date such claim becomes Allowed.

4.19.    ***Class 17: Convenience Claims against LRGI***

(a)    <u>Impairment and Voting</u>.  Class 17 is unimpaired by the Plan.  Each holder of an Allowed Convenience Claim in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Convenience Claim against LRGI shall receive, in full satisfaction of such Allowed Convenience Claim, Cash in an amount equal to 100% of such Allowed Convenience Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

4.20.    ***Class 18:  Interests in LRGI***

(a)    <u>Impairment and Voting</u>.  Class 18 is unimpaired by the Plan.  Each holder of an Interest in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  All Interests in LRGI shall be unaltered.

## ARTICLE V

## MEANS FOR IMPLEMENTATION

5.1.    ***Intercompany Claims.***

Notwithstanding anything to the contrary herein, Intercompany Claims shall be adjusted, continued or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their sole discretion.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of any of the Debtors, the Debtors in Possession or the Reorganized Debtors.

5.2.    ***Cancellation and Surrender of Existing Securities and Agreements***.

(a)    Except (i) as otherwise expressly provided in the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (iii) for purposes of evidencing a right to distributions under the Plan, or (iv) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, any document, agreement, or debt instrument evidencing any Claim or Series B Preferred Stock Interest, including without limitation, the Prepetition

Credit Agreement, the Prepetition Loan Agreement, the DIP Notes, the Indenture and all notes issued thereunder, shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

(b)    Unless waived by LPC or Reorganized LPC, each holder of the Senior Subordinated Notes shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Debtors shall follow the applicable procedures of the Depository Trust Company for book-entry transfer of the Senior Subordinated Notes to the Indenture Trustee.  No distributions hereunder shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to (i) submit a lost instrument affidavit and an indemnity bond and (ii) hold the Debtors and the Indenture Trustee harmless in respect of such note and any distributions made in respect thereof.  Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under this Plan, be deemed to have surrendered such note.  Any holder of Senior Subordinated Notes that fails to surrender such note or satisfactorily explain its non-availability to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, or their property or against the Indenture Trustee in respect of such Claim and shall not participate in any distribution hereunder, and the distribution that would have otherwise been made to such holder shall be returned to Reorganized LPC by the Indenture Trustee.

(c)    Unless waived by LPC or Reorganized LPC, any holder of the Junior Subordinated Note shall surrender such note to Reorganized LPC.  No distributions hereunder shall be made for or on behalf of any such holder unless and until such note is received by Reorganized LPC, or the loss, theft or destruction of such note is established to the reasonable satisfaction of Reorganized LPC, which satisfaction may require such holder to (i) submit a lost instrument affidavit and an indemnity bond and (ii) hold the Debtors harmless in respect of such note and any distributions made in respect thereof.  Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under this Plan, be deemed to have surrendered such note.  Any holder of the Junior Subordinated Note that fails to surrender such note or satisfactorily explain its non-availability to Reorganized LPC within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, or their property in respect of such Claim and shall not participate in any distribution hereunder, and the distribution that would have otherwise been made to such holder shall be retained by Reorganized LPC.

5.3.    *Charter Amendment*

On the Effective Date or as soon as practicable thereafter, LPC will file the Charter Amendment with the Secretary of State of the State of Delaware.  The Charter Amendment will amend LPC's certificate of incorporation in order to, among other things, (i) establish the rights and priorities of the Series C Preferred Stock, (ii) increase the number of authorized shares of LPC Common Stock to 20,000,000, and (iii) reduce the par value of LPC Common Stock from $0.25 to $0.01 per share.  LPC is hereby authorized to file the Charter Amendment without the need for any further corporate action and without any further action by holders of Claims or Interests.

5.4.    *Incurrence of New Indebtedness*.

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests.

5.5.    ***Issuance of Series C Preferred Stock***.

The issuance by Reorganized LPC of the Series C Preferred Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests.  The Series C Preferred Stock shall have the principal terms set forth in Exhibit 1.74 to the Plan and shall be distributed to holders of Allowed Senior Subordinated Note Claims pursuant to Section 4.6 of the Plan.

5.6.    ***Issuance of LPC Common Stock.***

The issuance by Reorganized LPC of additional shares of LPC Common Stock on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests.  Newly-issued shares of LPC Common Stock shall be distributed to holders of Allowed Senior Subordinated Note Claims, Allowed Junior Subordinated Note Claims and Series B Preferred Stock Interests pursuant to Sections 4.6, 4.7, and 4.11 of the Plan.

5.7.    ***Issuance of the New Subordinated Notes.***

Reorganized LPC is hereby authorized, on the Effective Date, to execute and deliver the New Indenture and to issue the New Subordinated Notes without the need for any further corporate action and without any further action by holders of Claims or Interests.  The New Subordinated Notes shall be distributed to holders of Allowed Senior Subordinated Note Claims pursuant to Section 4.6 of the Plan.

5.8.    ***Exemption from Securities Laws***.

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of the New Subordinated Notes, Series C Preferred Stock and LPC Common Stock will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and under applicable state securities laws.

## ARTICLE VI

## VOTING AND DISTRIBUTIONS

6.1.    ***Voting of Claims***.

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order, or any other order or orders of the Bankruptcy Court.

6.2.    ***Nonconsensual Confirmation***.

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

6.3.    ***Distribution Record Date***.

On the Distribution Record Date the claims register shall be closed and any transfer of any Claim therein shall be prohibited.  The Disbursing Agent shall instead be authorized and entitled to

recognize and deal for all purposes under the Plan with only those record holders stated on the claims register as of the close of business on the Distribution Record Date.

6.4.    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.5.    *Disbursing Agent*.

All distributions under the Plan (other than with respect to the Allowed Senior Subordinated Note Claims) shall be made by Reorganized LPC as the Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent.  The Indenture Trustee, or such other entity designated by the Debtors, shall be the Disbursing Agent for the Senior Subordinated Notes.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

6.6.    *Rights and Powers of Disbursing Agent*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.7.    *Expenses of the Disbursing Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.8.    *Delivery of Distributions*.

(a)    General.  Subject to Bankruptcy Rule 9010, all distributions to a holder of an Allowed Claim shall be made at the address of the holder thereof as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.

(b)    Distributions to Holders of Allowed Senior Subordinated Note Claims.  Reorganized LPC shall deliver all distributions in respect of Allowed Senior Subordinated Note Claims to the Indenture Trustee or such other entity designated by the Debtors as the Disbursing Agent under the Senior Subordinated Notes.  Upon delivery of the foregoing distributions to the Indenture Trustee or such designee, Reorganized LPC shall be released of all liability with respect to the delivery of such distributions.  The Indenture Trustee or such designee shall transmit the distributions to the holders of the

Allowed Senior Subordinated Note Claims.  Reorganized LPC shall provide whatever reasonable assistance may be required by the Indenture Trustee or such designee with respect to such distributions.

(c)    Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, including any party described in Section 6.5 above, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

6.9.    *Unclaimed Distributions*.

In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest from the original distribution date through the new distribution date; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property (including any stock) shall revert to Reorganized LPC or Reorganized LRGI, as applicable, and the Claim of any other Entity to such property or interest in property shall be discharged and forever barred.

6.10.    *Manner of Payment*.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.11.    *Fractional Shares*.

No fractional shares of LPC Common Stock or Series C Preferred Stock shall be distributed under the Plan.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of LPC Common Stock or Series C Preferred Stock that is not a whole number, the actual distribution of shares of LPC Common Stock or Series C Preferred Stock shall be rounded as follows:  (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment or other distribution therefor.  The total number of authorized shares of LPC Common Stock or Series C Preferred Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the rounding provided in this Section 6.11.

6.12.    *Minimum Cash Distributions.*

Notwithstanding anything set forth herein to the contrary, no payment of Cash less than $50 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Disbursing Agent.

6.13.    *Setoffs*.

The Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim.

## ARTICLE VII

## PROCEDURES FOR DISPUTED CLAIMS

7.1.    *Objections*.

Objections to all Claims against the Debtors may be interposed and prosecuted only by the Debtors and the Reorganized Debtors.  The Reorganized Debtors shall be entitled to object to any Claim through and after the Effective Date.  Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) one hundred twenty (120) days after the Effective Date, as such time may be extended by order of the Bankruptcy Court and (ii) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.

7.2.    *No Payment Pending Allowance*.

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, then no payment or distribution provided hereunder shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.3.    *Distributions After Allowance*.

To the extent that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim, the property distributable with respect to such Claim in accordance with Article IV of the Plan.  Such distributions shall be made as soon as practicable after the later of (i) the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order, (ii) the date on which any objection to such Disputed Claim has been withdrawn, or (iii) the date on which such Disputed Claim has been settled, compromised or otherwise resolved.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed and any property withheld, if any, pending the resolution of such Claim shall revest in the applicable Reorganized Debtor.

7.4.    *Resolution of Administrative Expense Claims and other Claims*.

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims and any other Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals.

7.5.    ***Estimation of Claims***.

Requests for estimation of all Claims against the Debtors may be interposed and prosecuted only by the Debtors and the Reorganized Debtors.  The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.6.    ***Interest***.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon from the Effective Date to the date such Claim becomes Allowed.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1.    ***Assumption or Rejection of Executory Contracts and Unexpired Leases***.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment, or rejection has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.1, which Schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.1 to delete therefrom or add thereto any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either assumed or rejected as of the Effective Date.  The Debtors shall provide notice of any amendments to Schedule 8.1 to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedule 8.1 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

8.2.     ***Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases***.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the executory contracts and unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such executory contracts and unexpired leases and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

8.3.     ***Inclusiveness***.

Unless otherwise specified on Schedule 8.1 of the Plan Supplement, each executory contract and unexpired lease listed or to be listed on Schedule 8.1 shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedule 8.1.

8.4.     ***Cure of Defaults***.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, at least 20 days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 8.1 of the Plan, a notice (the "Assumption Notice"), which shall list the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of the Assumption Notice to file and serve any objection to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

8.5.     ***Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan***.

In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors, or assigns, unless a proof of claim is filed with Epiq Bankruptcy Solutions, LLC and served upon the attorneys for the Debtors on or before the thirtieth (30th) day after the later of (i) the date of service of notice of the Confirmation Date, (ii) notice of modification to Schedule 8.1 of the Plan Supplement (solely with respect to the party directly affected by such modification), or (iii) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such modification).

8.6.    *Indemnification Obligations*.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are or were directors, officers or employees of the Debtors on or before the Confirmation Date, against any claims or causes of action, as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

8.7.    *Insurance Policies*.

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan and will be assumed pursuant to the Plan, effective as of the Effective Date.  Nothing contained in this Section 8.7 shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' insurance policies.

To the extent the Insurance Policies are determined not to be executory contracts, they will  remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory.  The Plan shall not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors shall be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which shall continue in full force and effect.  Notwithstanding anything contained in the Plan or the Disclosure Statement to the contrary, to the extent that there is an inconsistency between the Insurance Policies and any provision of the Plan or Disclosure Statement, the terms of the Insurance Policies shall control.  No provision of the Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, and/or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X and anything supervening or preemptory, the Plan and Confirmation of the Plan shall be without prejudice to any of insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

8.8.    *Compensation and Benefit Programs*.

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all employment and severance policies and workers' compensation programs, and all compensation and benefit plans, policies and programs of the Debtors

applicable to their present and former employees, officers and directors, including, without express or implied limitation, all savings plans, retirement plans, health care plans, disability plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are deemed assumed under the Plan, and the Debtors' obligations under such plans, policies, and programs shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, shall survive confirmation of the Plan, shall remain unaffected thereby, and shall not be discharged in accordance with section 1141 of the Bankruptcy Code.  Any default existing under any of such plans, policies, or programs shall be cured promptly after it becomes known by the Reorganized Debtors.

8.9.    *Retiree Benefits*.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## ARTICLE IX

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF THE REORGANIZED DEBTORS

9.1.    *General*.

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the general responsibility of the Boards of Directors of Reorganized LPC and Reorganized LRGI, respectively.

9.2.    *Directors and Officers of the Reorganized Debtors*.

(a)    Boards of Directors of the Reorganized Debtors.  The Boards of Directors of the Reorganized Debtors shall consist of eight members each.  Two members of each Board shall be the designated members of holders of Series C Preferred Stock.  The initial directors of the Reorganized Debtors shall consist of the directors of the Debtors immediately prior to the Effective Date and two new members selected by the Creditors' Committee to become the designated members of the Series C Preferred Stock; *provided*, *however*, that such new members are not competitors of the Reorganized Debtors nor employees or affiliates thereof; *provided further, however,* that if the Creditors' Committee does not select the designated members as provided herein, holders of Series C Preferred Stock shall elect their designated members at the next shareholders' meeting.  The Creditors' Committee shall file with the Court the identity and biographical information (including any information required to be disclosed by LPC under Item 5.02(d) of Form 8-K under the Securities Exchange Act of 1934) of its designees no later than ten (10) days prior to the last day by which holders of impaired Claims may vote to accept or reject the Plan.  Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors, as the same may be amended from time to time.  At or prior to the Confirmation Hearing, the Debtors will identify all the members of the Board of Directors and officers for the Reorganized LPC and LRGI.

(b)    Officers of the Reorganized Debtors.  The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the

Effective Date.  Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with the Reorganized Debtors, and the certificates of incorporation and by-laws of the Reorganized Debtors, as the same may be amended from time to time.

9.3.    ***Issuance of Non-Voting Securities.***

From and after the Effective Date, the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code so long as it is applicable.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1.    ***Vesting of Assets***.

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in each of the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2.    ***Discharge of Claims and Termination of Series B Preferred Stock Interests***.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests and all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Series B Preferred Stock Interests in the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Series B Preferred Stock Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Series B Preferred Stock Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Series B Preferred Stock Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.3.    ***Discharge of Debtors***.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Series B Preferred Stock Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Series B Preferred Stock Interest in the Debtors.

10.4.    *Injunction or Stay*.

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against or Interest in the Debtors or the Reorganized Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan.  Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interest in properties.

10.5.    *Term of Injunctions or Stays*.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.6.    *Injunction Against Interference With Plan*.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.7.    *Exculpation*.

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Creditors' Committee, the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, the lenders party to the DIP Note, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of this Amended Plan, property to be distributed under the Amended Plan, or any other act or omission in connection with the Chapter 11 Cases, this Amended Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; <u>provided</u>, <u>however</u>, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

10.8.    *Releases*.

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the present and former directors, officers, employees, affiliates, agents, financial advisors, attorneys, and representatives of the Debtors who acted in such capacities after the Commencement Date, (b) the Creditors' Committee, (c) the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, and (d) the lenders party to the DIP Note, the Debtors and the Reorganized Debtors, each holder of a Claim or Interest that votes to accept the Amended Plan (or is deemed to accept the Amended Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Amended Plan, shall release, unconditionally and forever, each present or former director, officer, employee, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Creditors' Committee, the agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, the lenders party to the DIP Note, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such claim or equity prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Amended Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; <u>provided</u>, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.**

10.9.    *Avoidance Actions*.

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the sole right to prosecute any and all avoidance actions, equitable subordination actions or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

10.10.    *Retention of Causes of Action/Reservation of Rights*.

(a)    Except as provided in Section 0 hereof, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Entity, to the extent such Entity asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)    Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense

that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Commencement Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.11.  *Limitations on Exculpation and Releases of Representatives*.

Nothing in Sections 10.7 or 0 of the Plan shall (i) be construed to release or exculpate any entity from fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts, or (ii) limit the liability of the professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

# ARTICLE XI

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

11.1.  *Conditions Precedent to Effectiveness*.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a)      The Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered and shall not be subject to any stay or injunction;

(b)      All actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(c)      The conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived by the parties thereto and the Reorganized Debtors shall have access to funding under the Exit Facility; and

(d)      The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan or that are required by law, regulation, or order.

11.2.  *Waiver of Conditions.*

Each of the conditions precedent in Section 11.1 hereof may be waived in whole or in part by the Debtors, in their sole discretion.  Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

11.3.  *Effect of Failure of Conditions to Effective Date*.

In the event the conditions precedent specified in Section 11.1 hereof have not been satisfied or waived pursuant to Section 11.2 hereof on or prior to the 120th day after the Confirmation Order becomes a Final Order, then, upon the Debtors' motion (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Interests

shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) all of the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## ARTICLE XII

## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, arising under, and related to the Chapter 11 Cases and the Plan pursuant to, and for the purpose of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to the facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is stayed, reversed, revoked, modified, or vacated for any reason;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to prevent interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments

contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following the Effective Date;

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(n)     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(o)     To recover all assets of the Debtors and all property of the Debtors' estates, wherever located;

(p)     To hear and determine any rights, claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code, any other federal or state statute, or any legal theory;

(q)     To enter a final decree closing the Chapter 11 Cases;

(r)     To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order any of the Plan Documents, or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement; and

(s)     To hear and determine any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

### 13.1.     *Effectuating Documents and Further Transactions*.

The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment and the New Indenture) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

### 13.2.     *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereunder, any party issuing any instrument or making any distribution under the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting

requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligation.

13.3.    *Corporate Action*.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment, the authorization to issue or cause to be issued the New Subordinated Notes, the Series C Preferred Stock or the LPC Common Stock, the increase in the size of the Boards of Directors of the Reorganized Debtors, and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated, without any requirement for further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

13.4.    *Exemption from Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New Subordinated Notes, the LPC Common Stock, the Series C Preferred Stock, the Exit Facility, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.  All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

13.5.    *Expedited Tax Determination*.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any and all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through, and including, the Effective Date.

13.6.    *Payment of Statutory Fees*.

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.7.    ***Post-Confirmation Date Professional Fees and Expenses.***

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Debtors.

13.8.    ***Dissolution of Statutory Committees***.

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, accountants and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

13.9.    ***Indenture Trustee as Claim Holder***.

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of claim timely filed by any Indenture Trustee in respect of any Claims under the Indenture. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

13.10.    ***Plan Supplement***.

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date by which holders of impaired Claims may vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at a website identified in the Disclosure Statement as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Plan must be received.

13.11.    ***Substantial Consummation***.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.12.    ***Amendments or Modifications of the Plan***.

Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  After the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Plan, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as

altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

### 13.13.    *Revocation or Withdrawal of the Plan*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims against or Series B Preferred Stock Interests in the Debtors, any claims or rights of the Debtors against any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

### 13.14.    *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision as altered or interpreted shall then be applicable.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.15.    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 13.16.    *Binding Effect*.

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 13.17.    *Exhibits/Schedules*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.18.  *Notices*.

In order to be effective, all notices, requests, and demands to or upon the Debtors must be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Lexington Precision Corporation
> 800 Third Avenue, 15th Floor
> New York, New York 10022
> Attn:  Michael A. Lubin
> Title:  Chairman of the Board
> Telephone:  (212) 319-4655
> Facsimile:  (212) 319-4659
>
>     - and -
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Richard P. Krasnow, Esq.
>         Christopher J. Marcus, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007

13.19.  *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.20.  *Section Headings*.

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

Dated:  August 8, 2008
        New York, New York

Respectfully submitted,

LEXINGTON PRECISION CORPORATION

By:     /s/ Michael A. Lubin
        Name: Michael A. Lubin
        Title:  Chairman of the Board

LEXINGTON RUBBER GROUP, INC.

By:     /s/ Michael A. Lubin
        Name: Michael A. Lubin
        Title:  Chairman of the Board

**EXHIBIT 1.55**

**SUMMARY OF TERMS OF NEW SUBORDINATED NOTES**

<u>Exhibit 1.55</u>

**Lexington Precision Corporation**
**Summary of Terms of New Subordinated Notes**

| | |
|---|---|
| **Issuer** ................................................ | Lexington Precision Corporation (the "<u>Company</u>"). |
| **Securities to be Issued** ..................... | $15,000,000 aggregate principal amount of 12% Senior Subordinated Notes due 2013 (the "<u>Notes</u>"). |
| **Maturity** ........................................... | December 31, 2013. |
| **Interest Payments** ........................... | Payable semi-annually in arrears with the first payment to be made on the first day of the first calendar month that commences after the five-month anniversary of the Effective Date, and at maturity. |
| **Ranking** ............................................ | The Notes will be subordinate and junior in right of payment to all indebtedness except for (1) instruments that explicitly state that they are not senior in right to the Notes, (2) debt of the Company to its subsidiaries or affiliates, (3) liabilities for compensation to employees of the Company, and (4) liabilities incurred for the purchase of goods, materials or services in the ordinary course of business.  The subordination provisions of the Notes will be substantially the same as those contained in the Company's Indenture with Wilmington Trust Company, as trustee, dated December 18, 2003. |
| **Optional Redemption** ..................... | Redeemable at the option of the Company at any time, in whole or in part, on thirty days prior written notice, at 100% of the principal amount to be redeemed plus accrued interest thereon to the date of redemption. |
| **Indenture** ......................................... | The Notes will be issued under an indenture between the Company and the trustee named therein.  Except as set forth below with respect to the standstill period, the indenture will be in substantially the same form as the Company's Indenture with Wilmington Trust Company, as trustee, dated December 18, 2003. |
| **Standstill Provision** ......................... | Holders of the Notes may not accelerate the Notes or enforce remedies against the Company until 120 days after an event of default.  During such 120-day period, interest on the Notes shall accrue at the same rate as before an event of default. |

**EXHIBIT 1.74**

**SUMMARY OF TERMS OF SERIES C PREFERRED STOCK**

Exhibit 1.74

## Lexington Precision Corporation
## Summary of Terms of Series C Preferred Stock

**Issuer** ................................................. Lexington Precision Corporation (the "Company").

**Securities to be Issued** .................... Assuming the Effective Date is October 31, 2008, the Company will issue 313,350 shares of the Company's Series C Preferred Stock, par value $100 per share.

**Liquidation Preference** ................... $100 per share, plus any accumulated but unpaid dividends thereon. In the event of any sale or liquidation of the Company each holder will be entitled to receive the greater of (1) the Liquidation Preference or (2) the amount such holder would have received if its shares of Series C Preferred Stock had been converted into shares of the Company's common stock immediately prior to the sale or liquidation of the Company.

**Dividend Rate** ................................. 12% per annum.

**Dividends** ......................................... When, as and if declared by the Board, dividends will be payable quarterly in cash on each January 1, April 1, July 1, and October 1, commencing on the first such date to occur after the Effective Date.  Any dividend that is (1) not declared or (2) is declared but is not paid on the scheduled dividend payment date, will be added to the Liquidation Preference.

**Conversion** ...................................... Each share of Series C Preferred Stock may be converted at any time at the option of the holder into a number of shares of the Company's common stock equal to $100 divided by the price per share at which the Company's 13% Junior Subordinated Notes, Series B Preferred Stock, and 12% Senior Subordinated Notes were converted or had the option to convert on the Effective Date, subject to standard anti-dilution adjustments for stock splits, stock dividends and other similar transactions.

**Optional Redemption** ...................... The Company may redeem the Series C Preferred Stock at any time, in its entirety, at 100% of the Liquidation Preference, upon 90 days' prior written notice to the holders of record of the Series C Preferred Stock.

**Board of Directors Seats** ................. So long as at least 100,000 shares (as adjusted for stock splits, stock dividends and other similar transactions) of Series C Preferred Stock are issued and outstanding, the holders of the Series C Preferred Stock, voting together as a single class, will have the right to select two (2) members of the Company's Board of Directors.

So long as at least 50,000 shares (as adjusted for stock splits, stock dividends and other similar transactions) of Series C Preferred Stock are issued and outstanding, the holders of the Series C Preferred Stock, voting together as a single class, will have the right to select one (1) member of the Company's Board

- 3 -

of Directors.

**Voting Rights**................................... The Series C Preferred Stock shall have no voting rights except as described in the heading "Board of Directors Seats" above and as required by law.

**<u>Exhibit B</u>**

**Order of the Bankruptcy Court**

**To be filed**

<u>**Exhibit C**</u>

**LPC's Annual Report on Form 10-K
for the fiscal year ended December 31, 2007**

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

þ  **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Year Ended December 31, 2007**

or

o  **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Commission File Number: 0-3252

# LEXINGTON PRECISION CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 22-1830121 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 800 Third Avenue, New York, NY | 10022 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: (212) 319-4657

Securities registered pursuant to Section 12(b) of the Act: None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $0.25 par value
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in rule 405 of the Securities Act. Yes o    No þ

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o    No þ

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes þ    No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. þ

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer o          Accelerated filer o          Non-accelerated filer þ          Smaller reporting company o
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes o    No þ

The aggregate market value of the registrant's common stock, $0.25 par value per share, held by non-affiliates of the registrant, as of June 30, 2007, was approximately $822,000.

The number of shares of common stock outstanding as of March 20, 2008, was 5,021,767.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement to be issued in connection with its 2008 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III. Only those portions of the Proxy Statement which are specifically incorporated by reference are deemed filed as part of this report on Form 10-K.

**LEXINGTON PRECISION CORPORATION**
**Annual Report on Form 10-K**
**Table of Contents**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 11 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| | | |
| **PART II** | | |
| Item 5. | Market for Our Common Stock and Other Stockholder Matters | 12 |
| Item 6. | Selected Financial Data | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 38 |
| Item 8. | Financial Statements and Supplementary Data | 40 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 72 |
| Item 9A(T). | Controls and Procedures | 72 |
| Item 9B. | Other Information | 74 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance of the Registrant | 75 |
| Item 11. | Executive Compensation | 75 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 75 |
| Item 14. | Principal Accountant Fees and Services | 75 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 76 |
| EX-10.6 | | |
| EX-10.39 | | |
| EX-21.1 | | |
| EX-31.1 | | |
| EX-31.2 | | |
| EX-31.3 | | |
| EX-32.1 | | |
| EX-32.2 | | |
| EX-32.3 | | |

Table of Contents

**PART I**

**Item 1. BUSINESS**

    Our company was incorporated in Delaware in 1966. Substantially all of our business is conducted in the continental United States. Through our two operating segments, the Rubber Group and the Metals Group, we manufacture rubber and metal components that are sold to other manufacturers.

    In 2007, net sales of the Rubber Group totaled $74,587,000, or 84.4% of our consolidated net sales. The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's principal products are connector seals used in automotive wiring systems, insulators used in both original-equipment and aftermarket automotive ignition-wire sets, and molded rubber components used in a variety of medical devices, such as intravenous feeding systems, syringes, and surgical equipment. We believe that we are the leading manufacturer of automotive connector seals and insulators for ignition-wire sets in North America.

    In 2007, net sales of the Metals Group totaled $13,821,000, or 15.6% of our consolidated net sales. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks.

    The following table summarizes net sales of the Rubber Group and the Metals Group during 2007, 2006, and 2005 by the type of product in which each segment's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | **2007** | | **2006** | | **2005** | |
| **Rubber Group:** | | | | | | |
| Automotive original equipment | $ 35,799 | 48.0% | $ 41,246 | 54.2% | $ 49,793 | 58.6% |
| Automotive aftermarket | 22,034 | 29.5 | 22,728 | 29.9 | 23,928 | 28.2 |
|    Total automotive | 57,833 | 77.5 | 63,974 | 84.1 | 73,721 | 86.8 |
| Medical devices | 15,928 | 21.4 | 11,039 | 14.5 | 9,989 | 11.8 |
| Other | 826 | 1.1 | 1,077 | 1.4 | 1,174 | 1.4 |
| | $ 74,587 | 100.0% | $ 76,090 | 100.0% | $ 84,884 | 100.0% |
| **Metals Group:** | | | | | | |
| Automotive original equipment | $ 11,597 | 83.9% | $ 9,490 | 80.3% | $ 9,856 | 82.4% |
| Industrial and commercial equipment | 1,549 | 11.2 | 1,623 | 13.8 | 1,429 | 12.0 |
| Other | 675 | 4.9 | 698 | 5.9 | 673 | 5.6 |
| | $ 13,821 | 100.0% | $ 11,811 | 100.0% | $ 11,958 | 100.0% |

    Financial data for our operating segments can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, under the section titled "Results of Operations — Comparison of 2007, 2006, and 2005," and in Note 8, "Segments," in the notes to our consolidated financial statements in Part II, Item 8.

Table of Contents

**Filing of Chapter 11**

During the second half of 2006, we experienced a significant decrease in sales of automotive components. We believe that this reduction was primarily a result of production cutbacks by the Detroit-based automakers and resultant production cutbacks and inventory adjustments by our customers, who are primarily tier-one suppliers to automobile manufacturers. Although we reduced expenses in an effort to offset the impact of the lower sales, our operating profit and cash flow during the second half of 2006 were adversely affected, as was the availability under our revolving line of credit.

We have not made any of the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of our affiliates and members of their families.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our secured debt. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the secured lenders. We have remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the Detroit-based investment banking firm of W.Y. Campbell & Company to assist in the review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone is significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that control our Senior Subordinated Notes to advise them of the following:

1.    We had decided to pursue the proposal to purchase the Rock Hill facility;

2.    We had received a proposal from a new secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.    We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

-2-

Table of Contents

4.   In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.   We agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock. At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interest of all of our creditors and equity holders to proceed with an extension on the terms proposed; further discussions on this matter were unproductive and, as a result, the forbearance agreement expired on January 24, 2008. Subsequent to the expiration, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the United States Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with this petition, we obtained a financing package that we believe provides us more that adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consists of (1) an arrangement with our senior, secured lenders to freeze the loans under their revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to use the collections on our accounts receivable in the operation of our business through February 25, 2009, and (2) a $4,000,000 debtor-in-possession ("DIP") loan that matures on April 1, 2009. The arrangement with the senior, secured lenders provides for a continuation of our monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates return to the original contractual rates. The DIP loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. At April 30, 2008, the DIP loan had been fully funded and we had approximately $8,000,000 of cash on hand.

Upon the commencement of the chapter 11 proceedings, the interest rate on our Senior Subordinated Notes, which had been increased to 16% under the forbearance arrangement, was reduced to the contractual rate of 12%.

We do not believe that we will need to utilize the provisions of the Bankruptcy Code to effect any significant operational restructuring or to eliminate or renegotiate any unprofitable executory contracts that are material to our business. Our operations are healthy and profitable and, although there can be no assurance, we expect that to continue throughout the term of chapter 11 proceedings. We have experienced no disruptions in our operations to date and, based upon discussions with a significant number of major suppliers and customers, we do not expect any such disruption during the term of the chapter 11 proceedings.

Although there can be no assurance that we will be successful, our intent in filing for chapter 11 protection is to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that results in a significant reduction in our total indebtedness on a basis that is fair and equitable to all of our creditors and stockholders. We intend to file a plan of reorganization with the bankruptcy court no

-3-

Table of Contents

later that June 30, 2008, and hope to confirm that plan by September 30, 2008. We expect that our plan of reorganization will result in a significant reduction in our aggregate indebtedness by means of a conversion of a significant portion of our subordinated debt to equity at a valuation that is reflective of the offers that were received during the sale process. We also intend to retain all of our operations, including the medical business.

## Major Customers

Our largest customer is General Cable Corporation. During 2007, 2006, and 2005, net sales to General Cable totaled $9,436,000, $9,557,000, and $10,971,000, which represented 10.7%, 10.9%, and 11.3%, respectively, of our consolidated net sales and 12.7%, 12.6%, and 12.9%, respectively, of the Rubber Group's net sales. During 2007, 2006, and 2005, net sales to Delphi Corporation totaled $8,505,000, $10,719,000, and $17,426,000, which represented 9.6%, 12.2%, and 18%, respectively, of our consolidated net sales. During 2007, 2006, and 2005, the Rubber Group's net sales to Delphi Corporation totaled $7,381,000, $10,719,000, and $17,426,000, which represented 9.9%, 14.1%, and 20.5%, respectively, of the Rubber Group's net sales. During 2007, the majority of the products we sold to Delphi were covered by supply contracts that expire on December 31, 2008 and 2009. In October 2005, Delphi filed for protection from its creditors under chapter 11 of the United States Bankruptcy Code. Our unpaid, prepetition accounts receivable from Delphi total approximately $360,000. In connection with its proposed chapter 11 plan, Delphi has proposed to assume our supply contracts and to pay substantially all of our prepetition accounts receivable in order to cure its defaults under those contracts. No other customer accounted for more than 10% of our consolidated net sales during 2007, 2006, or 2005. Loss of a significant amount of business from General Cable, Delphi, or any of our other large customers could have a material adverse effect on our results of operations and financial condition if that business were not replaced by additional business from existing or new customers. We believe that our reserve for uncollectible accounts receivable is adequate; however, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay or fail to make payments for goods sold to them.

## Marketing and Sales

Our marketing and sales effort is carried out by management personnel and account managers.

## Raw Materials

Our principal raw materials are silicone and organic rubber compounds and aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. We generally have had access to adequate amounts of each of our principal raw materials from a number of suppliers. During 2007 and 2006, price increases for our principal raw materials were generally not significant. During 2005, we experienced increased prices for most of our principal raw materials.

We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

We have not experienced any disruption in our production as a result of raw material shortages.

-4-

Table of Contents

**Patents and Trademarks**

We do not currently hold any patents, trademarks, or licenses that we consider to be material to the successful operation of our business.

**Seasonal Variations**

Our business generally is not subject to significant seasonal variation; however, we generally experience decreased sales during the third calendar quarter of each year due to shutdowns of our customers' plants in July as a result of vacations and model-year changeovers and during the fourth calendar quarter of each year due to shutdowns of our customers' plants for vacations and holidays in December.

**Backlog**

Sales of our products are made pursuant to a variety of arrangements and practices. Our customers regularly revise release schedules to correspond to their own production requirements. We believe that the aggregate value of scheduled releases outstanding on our books at any time cannot be considered firm backlog because those releases may be revised at any time. We also believe that increases or decreases in the aggregate value of scheduled releases are not necessarily indicative of any trend in our net sales.

**Competition**

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

**Research and Development**

During 2007, 2006, and 2005, we spent approximately $915,000, $1,093,000, and $931,000, respectively, on our research and development activities, which are primarily related to improving our manufacturing processes in order to reduce the cost and increase the quality of our products.

**Environmental Compliance**

Our operations are subject to numerous laws and regulations controlling the discharge of materials into the environment or otherwise relating to the protection of the environment. Although we make expenditures relating to the protection of the environment, compliance with environmental laws and regulations has not had a significant impact on our capital spending requirements, earnings, or competitive position. We cannot assure you that changes in environmental laws and regulations, or in the interpretation or enforcement of those laws and regulations, will not require material expenditures in the future.

-5-

Table of Contents

## Employees

We believe that our employee relations are generally good. The following table shows the number of employees at December 31, 2007, 2006, and 2005.

|  | December 31 | | |
|---|---|---|---|
|  | 2007 | 2006 | 2005 |
| Rubber Group | 538 | 594 | 685 |
| Metals Group | 121 | 104 | 107 |
| Corporate Office | 7 | 8 | 5 |
|  | 666 | 706 | 797 |

At December 31, 2007, 2006, and 2005, employees at the Rubber Group included 224, 277, and 321 hourly workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2008, and December 11, 2008. Negotiations have not commenced regarding the extension of these agreements.

## Discontinued Operations

During 2005, we sold or liquidated all of the assets of our die casting business except its land and buildings. In this Form 10-K, the die casting business is reported as discontinued operations. For more information about the closing of the die casting business, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and to Note 13, "Discontinued Operations," in the notes to our consolidated financial statements in Part II, Item 8. Unless otherwise indicated, the data set forth in this Form 10-K relate solely to our continuing operations.

## Filings with the Securities and Exchange Commission

We do not make available through a website our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, or any amendments to those reports. We will furnish free of charge, upon written request to our President at 800 Third Avenue, 15th Floor, New York, NY 10022, a paper copy of the reports that we file with the Securities and Exchange Commission. The reports have been filed electronically with the Commission and are accessible on the Commission's website at www.sec.gov.

## Item 1A. RISK FACTORS

### We are subject to risks associated with bankruptcy proceedings.

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.

We do not believe that we will need to utilize the provisions of the Bankruptcy Code to effect any significant operational restructuring or to eliminate or renegotiate any unprofitable executory contracts that are material to our business. Our operations are healthy and profitable and, although there can be no assurance, we expect that to continue throughout the term of chapter 11 proceedings. We have experienced no disruptions in our operations to date and, based upon discussions with a significant number of major suppliers and customers, we do not expect any such disruption during the term of the chapter 11 proceedings.

-6-

Table of Contents

Although there can be no assurance that we will be successful, our intent in filing for chapter 11 protection is to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that results in a significant reduction in our total indebtedness on a basis that is fair and equitable to all of our creditors and stockholders. We intend to file a plan of reorganization with the Bankruptcy Court no later that June 30, 2008, and hope to confirm that plan by September 30, 2008. We expect that our plan of reorganization will result in a significant reduction in our aggregate indebtedness by means of a conversion of a significant portion of our subordinated debt to equity. We also intend to retain all of our operations, including the medical business.

The risks and uncertainties associated with the chapter 11 proceedings may have a material adverse effect on our results of operations and financial condition.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to reorganize the Company is subject to risks and uncertainties. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**We are dependent on a few major customers.**

In 2007, the three largest customers of the Rubber Group accounted for 30.5% of the Rubber Group's net sales, and the three largest customers of the Metals Group accounted for 55.2% of the Metals Group's net sales. Loss of a significant amount of business from any of our large customers would have a material adverse effect on our results of operations and financial condition if such business were not substantially replaced by additional business from existing or new customers. Additionally, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay, or fail to make, payments for goods sold to them.

**We are highly dependent on the automotive industry.**

Net sales to customers in the automotive industry represented approximately 78.5%, 83.6%, and 86.3% of our consolidated net sales in 2007, 2006, and 2005, respectively. Approximately 40.5% of our net sales in 2007 were to companies that supply electrical wiring and ignition systems to manufacturers of new cars and trucks. Sales to these customers are in part tied to the rate of sales of new vehicles. Further declines in new vehicle sales could have an adverse effect on our results of operations and financial condition.

**We encounter significant competition.**

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

-7-

Table of Contents

**A lack of effective internal control over financial reporting may result in an inability to accurately report our financial results.**

In connection with management's evaluation of our internal control over financial reporting, management identified significant deficiencies that, in the aggregate, constitute a material weakness. Our management concluded that we have incomplete documentation of the internal control system, we lack a procedure for documenting certain internal control activities, interdivisional internal control duties are not completely segregated, and we have been unable to test the operational effectiveness of our internal control over financial reporting. A failure to implement and maintain effective internal control over financial reporting could result in a material misstatement of our financial statements or otherwise cause us to fail to meet our financial reporting obligations. This, in turn, could result in a loss of investor confidence in the accuracy and completeness of our financial reports. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**We may not be able to remediate the material weakness in our internal control over financial reporting.**

Although its is our intention to remediate the material weakness in our internal control over financial reporting, on April 1, 2008, we filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy filing and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate these weaknesses prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the weaknesses prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**Part of our labor force is unionized.**

At December 31, 2007, employees at the Rubber Group included a total of 224 hourly workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2008, and December 11, 2008. We cannot assure you that our existing union contracts will be successfully renegotiated when they expire. Negotiations have not commenced regarding the extension of those agreements. If we were to experience a strike or work slowdown, it would have a material adverse effect on our results of operations and financial condition.

**Our major customers may be subject to labor interruptions.**

Many of our customers and the three Detroit-based automobile manufacturers have union contracts with various unions. Protracted strikes or work slowdowns at our customers or at any of the Detroit-based automobile manufacturers could have a material adverse effect on our results of operations and financial condition.

**We are vulnerable to fluctuations in the cost and supply of raw materials.**

We purchase raw materials from various suppliers. While all of our raw materials are available from a number of suppliers, commodity raw materials are subject to fluctuations in price. Because raw materials in the aggregate constitute approximately 36% of our cost of goods sold, upward movement of

-8-

Table of Contents

raw material prices could have a material adverse effect on our results of operations. We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

We have not experienced any disruption in our production as a result of raw material shortages, but, if any such shortage were to occur, it could have a material adverse effect on our results of operations and financial condition.

**We are subject to numerous environmental laws and regulations.**

Our past and present business operations and our ownership and operation of real property are subject to extensive and changing environmental laws and regulations pertaining to the discharge of materials into the environment, the handling and disposal of wastes, including hazardous wastes, and the protection of the environment. Some of our existing and former locations use and have used substances and generate or have generated or disposed of wastes that are or may be considered hazardous or otherwise are subject to applicable environmental requirements. In addition, we utilize storage tanks and bulk containers for petrochemicals and other substances at our facilities. Based on our experience to date, we do not expect environmental claims or the costs of compliance with federal, state, and local, environmental laws and regulations to have a material impact on our capital expenditures, operating results, or financial condition. We cannot assure you, however, that the discovery of presently unknown environmental conditions, changes in environmental laws and regulations or their interpretation, or other unanticipated events will not give rise to expenditures or liabilities that may have a material adverse effect on our results of operations and financial condition.

**We may be subject to product liability claims and litigation.**

Our business exposes us to potential product liability. Many of the components manufactured and sold by us are designed to be used for long periods of time. Component failures, manufacturing flaws, design defects, or inadequate disclosure of product-related risks with respect to our components or the products in which they are incorporated could result in product failure or an unsafe condition or injury to, or death of, consumers. The occurrence of such a problem could result in product liability claims or a recall of, or safety alert relating to, our components or the products in which they are incorporated. We cannot assure you that the product liability insurance maintained by us would be available or sufficient to satisfy all claims against us or that we will be able to obtain insurance in the future at satisfactory rates, in adequate amounts, or at all. Future product liability claims, regardless of their ultimate outcome, or product recalls could result in costly litigation and could have a material adverse effect on our results of operations and financial condition and could damage our reputation and limit our ability to attract and retain customers.

**Self-insurance may subject us to possible liability that may be partially or completely uninsured.**

We maintain insurance coverage for many aspects of our business and operations. Based on our evaluation of the various risks to which we may be exposed, we retain all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although there can be no assurance that we will be successful in our efforts, we attempt to limit our liability through, among other things, the ongoing training and education of our employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of our workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of

-9-

Table of Contents

contracts with our customers. However, we cannot assure you that we will be successful in our efforts to limit our liability.

**We are subject to interest rate changes**.

At December 31, 2007, we had a total of $33,821,000 of outstanding floating-rate debt at interest rates equal to either the London Interbank Offered Rate ("LIBOR") or the prime rate plus a fixed interest component. Currently, we do not purchase derivative financial instruments to hedge or reduce our interest rate risk. As a result, changes in either LIBOR or the prime rate affect the rates at which we borrow funds.

## Item 2. PROPERTIES

The following table shows the locations and square footage of our manufacturing facilities at December 31, 2007:

|  | Square Feet |
|---|---|
| Rubber Group: |  |
| Jasper, Georgia | 100,000 |
| North Canton, Ohio | 42,000 |
| Vienna, Ohio | 64,000 |
| Rock Hill, South Carolina | 61,000 |
| Total Rubber Group | 267,000 |
| Metals Group: |  |
| Rochester, New York | 60,000 |
| Total Company | 327,000 |

All of our plants are general manufacturing facilities suitable for our operations. We believe that our facilities are adequate to meet our current operating needs. All of our manufacturing facilities are owned by us, and all are encumbered by mortgages.

We occupy, in the aggregate, 4,000 square feet of office space for corporate executive and administrative purposes. We lease an office in Cleveland, Ohio, and reimburse an affiliate for the cost of leasing an office in New York City.

The manufacturing facility that was utilized by our discontinued die casting business is located in Lakewood, New York, has 93,000 square feet of space, and is being held for sale. The facility is currently leased to a third party for $159,000 per annum. The lessee has an option to purchase the facility for $1,590,000. We also own a 10,000 square foot building in Lakewood, New York, that is vacant and available for sale.

We own approximately 18 acres of land bordering State Route 515 in Ellijay, Georgia. This land, which was acquired as a potential plant site, is currently being graded so that it will be more suitable for industrial or commercial development. The property has a book value of $813,000 and an appraised value of $4,200,000 as of March 27, 2006. Additionally, we own six abutting residential lots, comprising approximately 7 acres.

-10-

Table of Contents

### Item 3. LEGAL PROCEEDINGS

On April 1, 2008, we filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under the provisions of chapter 11 of the United States Bankruptcy Code (Case No. 08-11153). We will continue to operate our businesses and manage our properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with the chapter 11, we filed a motion seeking Bankruptcy Court approval of (a) an arrangement pursuant to which we are permitted to use the cash in our various bank accounts and cash receipts in respect of our accounts receivable, all of which are part of the collateral securing our senior, secured financing arrangements, in return for certain adequate protection, and (b) an unsecured, super-priority, debtor-in-possession ("DIP") credit agreement, among us, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC, as lenders. The DIP credit agreement provides for an unsecured, super-priority loan of $4,000,000. Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company, is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The cash collateral and proceeds of the loans under the DIP credit agreement will be used by us for working capital, capital expenditures, and other general corporate purposes of ours and for the costs of administration of the chapter 11. The arrangement for the use of cash collateral and the DIP credit agreement contain certain financial and other covenants and certain events of default. On April 2, 2008, the Court issued an order authorizing us to utilize up to $2,000,000 under the DIP credit agreement. On April 17, 2008, the Court issued a final order authorizing us to obtain DIP loans in the aggregate amount of $4,000,000.

In addition, we are subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of our business activities. It is our policy to record accruals for claims and legal proceedings when we consider a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although there can be no assurance as to the outcome of existing or potential litigation, we currently believe, based upon the information available to us, that the outcome of those actions will not have a material adverse effect upon our results of operations or financial condition.

### Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

We did not submit any matters to a vote of security holders during the fourth quarter of 2007.

Table of Contents

**PART II**

**Item 5. MARKET FOR OUR COMMON STOCK AND OTHER STOCKHOLDER MATTERS**

Our common stock is traded in the over-the-counter market through the Pink Sheets. At March 27, 2008, there were approximately 575 holders of record of our common stock. Trading in shares of our common stock is limited. During 2007 and 2006, certain trading data for our stock was available on the OTC Bulletin Board operated by the National Association of Securities Dealers, Inc. (NASD). The following table sets forth prices at which transactions in our common stock were reported on the OTC Bulletin Board. Additional trading data can be found at the NASD website, www.nasdaq.com.

| | Years Ended December 31 | | | |
| | 2007 | | 2006 | |
| | High | Low | High | Low |
|---|---|---|---|---|
| First quarter | $0.41 | $0.10 | $0.80 | $0.67 |
| Second quarter | $0.70 | $0.13 | $1.01 | $0.60 |
| Third quarter | $0.80 | $0.60 | $0.90 | $0.70 |
| Fourth quarter | $0.70 | $0.25 | $0.80 | $0.41 |

These prices reflect inter-dealer prices and may not necessarily represent actual transactions. We are not able to determine whether retail markups, markdowns, or commissions were included in the above prices. We believe that eight brokerage firms currently make a market in our common stock, although both bid and asked quotations may be limited.

We have not paid dividends on our common stock since 1979, and we have no current plans to reinstate the payment of dividends. In addition, agreements defining the rights of the holders of our debt currently restrict us from paying cash dividends on our common stock. At December 31, 2007, we were in arrears in the payment of five quarterly dividends in the aggregate amount of $33,000 on our $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), and we are in arrears with respect to the redemption of all of the outstanding Series B Preferred Stock for an aggregate redemption price of $660,000, representing the scheduled redemptions for 2000 through 2007.

-12-

Table of Contents

**Performance Graph**

The following graph compares the five year cumulative total return on our common stock to the total returns on the Standard & Poor's 500 Stock Index, the NASDAQ (National Stocks Data and Automated Quotes) Composite Index, and the NASDAQ Industrial Index. The graph shows the growth of a $100 investment in our common stock and each of the above indices on December 31, 2002, and the reinvestment of all dividends. The comparisons in this table are required by the Securities and Exchange Commission and are not intended to forecast or be indicative of possible future performance of our common stock or the referenced indices.



|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| Lexington Precision Corporation | 100.00 | 150.94 | 113.21 | 132.08 | 77.36 | 47.17 |
| S&P 500 Index | 100.00 | 128.69 | 142.69 | 149.70 | 173.34 | 182.86 |
| NASDAQ Composite Index | 100.00 | 150.02 | 162.90 | 165.14 | 180.87 | 198.61 |
| NASDAQ Industrial Index | 100.00 | 155.74 | 180.41 | 180.63 | 203.01 | 211.58 |

For information on "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters," please refer to Part III, Item 12.

-13-

Table of Contents

**Equity Compensation Plan Information**

The following table sets forth information about our equity compensation plans at December 31, 2007 (share amounts in thousands):

| | Shares of common stock to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Shares of common stock remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $         NA | 310 |
| Equity compensation plans not approved by security holders | | NA | — |
| Total | — | $         NA | 310 |

-14-

Table of Contents

**Item 6. SELECTED FINANCIAL DATA**

The following table sets forth selected consolidated financial data, including the reconciliation of income or loss from continuing operations to earnings from continuing operations before interest, taxes, depreciation, amortization, and other non-operating items of income or expense ("EBITDA") and the reconciliation of EBITDA to net cash provided by our operating activities, for each of the years in the five-year period ended December 31, 2007 (dollar amounts in thousands, except per share amounts). The financial data has been derived from our consolidated financial statements, which have been audited by Malin, Bergquist & Company, LLP (2007) and Ernst & Young LLP (2003 through 2006), independent registered public accounting firms. This information is not necessarily indicative of the results of future operations and should be read in conjunction with, and is qualified by, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and our consolidated financial statements in Part II, Item 8.

|  | Years Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 | 2004 | 2003 |
| **Summary of operations:** | | | | | |
| Net sales | $ 88,408 | $ 87,901 | $ 96,842 | $110,353 | $113,231 |
| Cost of sales | 76,529 | 77,159 | 87,369 | 98,304 | 99,773 |
| Gross profit | 11,879 | 10,742 | 9,473 | 12,049 | 13,458 |
| Selling and administrative expenses | 7,204(1) | 6,658 | 6,747 | 7,383 | 7,904 |
| Gain on sale of assets held for sale | — | — | (1,671) | — | — |
| Impairment of goodwill | — | — | — | — | 47 |
| Income from operations | 4,675 | 4,084 | 4,397 | 4,666 | 5,507 |
| Other income (expense): | | | | | |
| Interest expense (2) | (11,339)(3) | (10,943) | (9,200) | (8,662) | (6,980) |
| Gain on repurchase of debt | — | — | 77 | 8,598 | — |
| Income (loss) from continuing operations before income tax | (6,664) | (6,859) | (4,726) | 4,602 | (1,473) |
| Income tax provision (benefit) | 6 | 18 | (299) | (196) | 76 |
| Income (loss) from continuing operations | (6,670) | (6,877) | (4,427) | 4,798 | (1,549) |
| Income (loss) from discontinued operations | (289) | (472) | 644 | (3,208) | (4,653) |
| Cumulative effect of change in accounting principle | — | — | — | — | (247) |
| Net income (loss) | $ (6,959) | $ (7,349) | $ (3,783) | $ 1,590 | $ (6,449) |
| Net income (loss) per diluted common share | $ (1.41) | $ (1.49) | $ (0.77) | $ 0.32 | $ (1.36) |

*(continued on next page)*

-15-

Table of Contents

*(continued from prior page)*

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| Other data (continuing operations): | 2007 | 2006 | 2005 | 2004 | 2003 |
| Reconciliation of income (loss) from continuing operations to EBITDA from continuing operations: | | | | | |
| Income (loss) from continuing operations | $ (6,670) | $ (6,877) | $ (4,427) | $ 4,798 | $ (1,549) |
| Adjustments: | | | | | |
| Depreciation and amortization included in income from continuing operations | 6,437 | 7,295 | 8,374 | 8,444 | 8,955 |
| Gain on repurchase of debt | — | — | (77) | (8,598) | — |
| Interest expense | 11,339 | 10,943 | 9,200 | 8,662 | 6,980 |
| Income tax provision (benefit) | 6 | 18 | (299) | (196) | 76 |
| EBITDA from continuing operations (4) | 11,112 | 11,379 | 12,771 | 13,110 | 14,462 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities: | | | | | |
| Interest expense | (11,339) | (10,943) | (9,200) | (8,662) | (6,980) |
| Amortization and write-off of deferred financing expenses included in interest expense | 1,249 | 3,078 | 1,315 | 1,098 | 610 |
| Interest expense converted to debt | — | — | — | — | 3,953 |
| Impairment of goodwill | — | — | — | — | 47 |
| Income tax (provision) benefit | (6) | (18) | 299 | 196 | (76) |
| Gain on sale of assets held for sale | — | — | (1,671) | — | — |
| Net change in operating assets and liabilities | 4,420 | (940) | 3,628 | 1,326 | 1,454 |
| Net cash provided by operating activities | $ 5,436 | $ 2,556 | $ 7,142 | $ 7,068 | $ 13,470 |
| Net cash provided (used) by investing activities | $ (2,741) | $ (2,628) | $ 683 | $ (6,085) | $ (4,778) |
| Net cash provided (used) by financing activities | $ (2,333) | $ 621 | $ (11,212) | $ (580) | $ (7,830) |
| Capital expenditures (5) | $ 2,664 | $ 2,661 | $ 3,330 | $ 6,057 | $ 5,686 |

| | December 31 | | | | |
|---|---|---|---|---|---|
| Financial position (6): | 2007 | 2006 | 2005 | 2004 | 2003 |
| Current assets | $ 21,877 | $ 20,222 | $ 22,396 | $ 28,907 | $ 30,101 |
| Current liabilities | 87,771 | 82,211 | 41,092 | 35,777 | 37,687 |
| Net working capital deficit | $(65,894) | $(61,989) | $(18,696) | $ (6,870) | $ (7,586) |
| Total assets | $ 52,367 | $ 54,440 | $ 62,343 | $ 78,377 | $ 83,687 |
| Long-term debt, excluding current portion | $ 5 | $ 406 | $ 41,545 | $ 58,949 | $ 63,681 |
| Total stockholders' deficit | $(35,941) | $(28,991) | $(21,656) | $(17,875) | $(19,492) |

*(footnotes on next page)*

-16-

Table of Contents

*(footnotes for the table on prior pages)*

---

(1)  Selling and administrative expenses for 2007 include $698,000 of expenses incurred in connection with the Company's efforts to refinance or restructure its indebtedness.

(2)  Includes the amortization and write-off of deferred financing expenses of $1,249,000, $3,078,000, $1,315,000, $1,098,000, and $610,000 in 2007, 2006, 2005, 2004, and 2003, respectively.

(3)  Interest expense for 2007 includes $698,000 of default interest expense on our secured debt, $1,279,000 of forbearance interest expense on our Senior Subordinated Notes, and $390,000 of interest on the interest payments that we failed to make on the Senior Subordinated Notes in 2006 and 2007.

(4)  EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. For more information on the use of EBITDA as a financial measure, please refer to our discussion of EDITDA in "Results of Operations — Comparison of 2007, 2006, and 2005" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7.

(5)  Includes $28,000 of equipment purchased under capital leases in 2007. Includes $157,000 of equipment acquired with seller-provided financing in 2006.

(6)  Data includes assets and liabilities of discontinued operations.

-17-

Table of Contents

**Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

Some of our statements in this Form 10-K are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approval with respect to motions in the chapter 11 proceedings;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- changes in the cost of raw materials;

- strength or weakness in the North American automotive market;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- the filing of chapter 11 by one or more of our customers or suppliers;

- labor interruptions at our facilities or at our customers' or suppliers' facilities;

- our ability to develop adequate policies regarding and testing of internal control over financial reporting; and

- other risks and uncertainties regarding the Company and its industry identified from time to time in the Company's reports filed with the Securities and Exchange Commission, including the risk factors identified in its annual report on Form 10-K for the year ended December 31,

-18-

Table of Contents

2006, and in its quarterly reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2007.

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size and because those borrowings require us to make substantial interest and principal payments, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part I, Item 1A.

**Results of Operations — Comparison of 2007, 2006, and 2005**

Unless otherwise indicated, the data set forth below in this Item 7 relate solely to our continuing operations.

The following table sets forth our consolidated operating results for 2007, 2006, and 2005, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash used by our operating activities for those periods. EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. We have presented EBITDA here and elsewhere in this Form 10-K because (a) we believe that this measure enhances the ability of our investors to evaluate our ability to satisfy our interest and principal obligations with respect to our outstanding indebtedness, (b) management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and other non-operating items, and (c) because certain financial covenants in our secured credit agreements are calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

1.  EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2.  EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3.  EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

Table of Contents

4.  EBITDA does not reflect cash provided or used as a result of changes in our working capital.

5.  Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry: as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in our secured loan agreements.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, we monitor gross profit and operating profit in dollars and as a percentage of net sales and net cash provided by operating activities. In addition, when setting prices for components that we manufacture, we use a cost system that calculates the gross profit margin of each component.

-20-

Table of Contents

Also included in the table are the net cash flows provided or used by our investing activities and financing activities. (Dollar amounts in thousands.)

| | Years Ended December 31 | | | | | |
| | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| Net sales | $ 88,408 | 100.0% | $ 87,901 | 100.0% | $ 96,842 | 100.0% |
| Cost of sales | 76,529 | 86.6 | 77,159 | 87.8 | 87,369 | 90.2 |
| Gross profit | 11,879 | 13.4 | 10,742 | 12.2 | 9,473 | 9.8 |
| Selling and administrative expenses | 7,204 | 8.1 | 6,658 | 7.6 | 6,747 | 7.0 |
| Gain on sale of assets held for sale | — | — | — | — | 1,671 | 1.7 |
| Income from operations | 4,675 | 5.3 | 4,084 | 4.6 | 4,397 | 4.5 |
| Interest expense | (11,339) | (12.8) | (10,943) | (12.4) | (9,200) | (9.5) |
| Gain on repurchase of debt | — | — | — | — | 77 | 0.1 |
| Loss before income taxes | (6,664) | (7.5) | (6,859) | (7.8) | (4,726) | (4.9) |
| Income tax provision (benefit) | 6 | — | 18 | — | (299) | (0.3) |
| Loss from continuing operations | (6,670) | (7.5) | (6,877) | (7.8) | (4,427) | (4.6) |
| Add back: | | | | | | |
| Depreciation and amortization (1) | 6,437 | 7.3 | 7,295 | 8.3 | 8,374 | 8.7 |
| Gain on repurchase of debt | — | — | — | — | (77) | (0.1) |
| Interest expense | 11,339 | 12.8 | 10,943 | 12.4 | 9,200 | 9.5 |
| Income tax provision (benefit) | 6 | — | 18 | — | (299) | (0.3) |
| EBITDA | 11,112 | 12.6 | 11,379 | 12.9 | 12,771 | 13.2 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities: | | | | | | |
| Interest expense | (11,339) | (12.8) | (10,943) | (12.4) | (9,200) | (9.5) |
| Amortization and write-off of deferred financing expenses included in interest expense | 1,249 | 1.4 | 3,078 | 3.5 | 1,315 | 1.4 |
| Income tax (provision) benefit | (6) | — | (18) | — | 299 | 0.3 |
| Gain on sale of assets held for sale | — | — | — | — | (1,671) | (1.7) |
| Net change in operating assets and liabilities | 4,420 | 5.0 | (940) | (1.1) | 3,628 | 3.7 |
| Net cash provided by operating activities | $ 5,436 | 6.1% | $ 2,556 | 2.9% | $ 7,142 | 7.4% |
| Net cash provided (used) by investing activities | $ (2,741) | (3.1)% | $ (2,628) | 3.0% | $ 683 | 0.7% |
| Net cash provided (used) by financing activities | $ (2,333) | (2.6)% | $ 621 | 0.7% | $(11,212) | (11.6)% |

*(footnote on following page)*

-21-

Table of Contents

*(footnote for table on prior page)*

_____

(1)    Does not include the amortization and write-off of deferred financing expenses, which totaled $1,249,000, $3,078,000, and $1,315,000, in 2007, 2006, and 2005, respectively, and which is included in interest expense in the consolidated financial statements.

The following table presents a summary of our net sales by type of product in which our components are utilized (dollar amounts in thousands):

|  | Years Ended December 31 | | | | | |
|  | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| Automotive | $ 69,430 | 78.5% | $ 73,464 | 83.6% | $ 83,577 | 86.3% |
| Medical | 15,928 | 18.0 | 11,039 | 12.6 | 9,989 | 10.3 |
| Industrial | 1,549 | 1.8 | 1,623 | 1.8 | 1,429 | 1.5 |
| Other | 1,501 | 1.7 | 1,775 | 2.0 | 1,847 | 1.9 |
| Total net sales | $ 88,408 | 100.0% | $ 87,901 | 100.0% | $ 96,842 | 100.0% |

Our net sales for 2007 were $88,408,000, compared to net sales of $87,901,000 for 2006, an increase of $507,000, or 0.6%. The increase in net sales was principally a result of increased unit sales of metal components and of rubber components used in medical devices, offset, by decreased unit sales of rubber components for the automotive industry. EBITDA for 2007 was $11,112,000, or 12.6% of net sales, compared to EBITDA of $11,379,000, or 12.9% of net sales, for 2006. The change in EBITDA reflected a $915,000 increase in EBITDA at the Metals Group, a $395,000 decrease in EBITDA at the Rubber Group, and a $787,000 decrease in EBITDA at the Corporate Office.

During 2006, our net sales decreased $8,941,000, or 9.2%, compared to 2005. The decrease in net sales was principally a result of decreased unit sales of rubber components for the automotive industry, offset, in part, by increased unit sales of metal components and of rubber components used in medical devices, and price increases on selected products. EBITDA for 2006 was $11,379,000, or 12.9% of net sales, compared to EBITDA of $12,771,000, or 13.2% of net sales, for 2005. The change in EBITDA reflected a $163,000 decrease in EBITDA at the Rubber Group, a $1,248,000 decrease in EBITDA at the Metals Group, and a $19,000 increase in EBITDA at the Corporate Office.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for 2007, 2006, and 2005.

Table of Contents

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are connector seals used in automotive wiring systems, insulators used in both original equipment and aftermarket automotive ignition-wire sets, and molded rubber components used in a variety of medical devices, such as intravenous feeding systems, syringes, and surgical equipment.

The following table sets forth the operating results of the Rubber Group for 2007, 2006, and 2005 and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

|  | Years Ended December 31 | | | | | |
|  | 2007 | | 2006 | | 2005 | |
| Net sales | $ 74,587 | 100.0% | $ 76,090 | 100.0% | $ 84,884 | 100.0% |
| Cost of sales | 63,039 | 84.5 | 64,772 | 85.1 | 74,719 | 88.0 |
| Gross profit | 11,548 | 15.5 | 11,318 | 14.9 | 10,165 | 12.0 |
| Selling and administrative expenses | 3,573 | 4.8 | 3,676 | 4.9 | 3,702 | 4.4 |
| Gain on sale of assets held for sale | — | — | — | — | 571 | 0.7 |
| Income from operations | 7,975 | 10.7 | 7,642 | 10.0 | 7,034 | 8.3 |
| Add back: depreciation and amortization | 5,727 | 7.7 | 6,455 | 8.5 | 7,226 | 8.5 |
| EBITDA | $ 13,702 | 18.4% | $ 14,097 | 18.5% | $ 14,260 | 16.8% |

During 2007, total net sales of the Rubber Group decreased by $1,503,000, or 2%, compared to 2006. Net sales to automotive customers decreased by $6,141,000, or 9.6%, to $57,833,000, net sales to medical device manufacturers increased by $4,889,000, or 44.3%, to $15,928,000, and all other net sales decreased by $251,000, or 23.3%, to $826,000. The three largest customers of the Rubber Group accounted for 30.5%, 36.5%, and 42.9% of the Rubber Group's net sales during 2007, 2006, and 2005, respectively.

The increase in net sales of medical components was primarily due to the sale of components to a medical device manufacturer that began purchasing production parts from us in January of 2007.

The decrease in net sales to automotive customers was primarily due to decreased unit sales to original equipment manufacturers of connector seals for automotive wire harnesses, components for use in automotive computer control modules, and insulators for automotive ignition-wire sets, which we believe resulted primarily from production cutbacks by Detroit-based automakers, and decreased unit sales of insulators to manufacturers of aftermarket automotive ignition-wire sets primarily due to the decision of a large customer to reduce their on-hand inventory.

Cost of sales as a percentage of net sales decreased to 84.5% of net sales during 2007, compared to 85.1% of net sales during 2006, primarily due to improved product mix, lower depreciation and amortization expense, and lower employee benefit expenses.

-23-

Table of Contents

Selling and administrative expenses of the Rubber Group expressed as a percentage of net sales decreased to 4.8% of net sales during 2007, compared to 4.9% during 2006, primarily because of reduced employee wage and benefit expenses.

During 2007, income from operations totaled $7,975,000, an increase of $333,000, or 4.4%, compared to 2006. EBITDA for 2007 was $13,702,000, or 18.4% of net sales, compared to $14,097,000, or 18.5% of net sales, for 2006.

During 2006, net sales of the Rubber Group decreased by $8,794,000, or 10.4%, compared to 2005. Net sales to automotive customers decreased by $9,747,000, or 13.2%, to $63,974,000, net sales to medical device manufacturers increased by $1,050,000, or 10.5%, to $11,039,000, and all other net sales decreased by $97,000, or 8.3%, to $1,077,000.

The decrease in net sales to automotive customers was primarily due to (1) the in-sourcing by Delphi Corporation of certain connector seals that were previously manufactured by us, (2) the resourcing by Delphi during the fourth quarter of 2005 of two high-volume components unrelated to our connector seal business as a result of price increases instituted by us, (3) decreased unit sales of connector seals for automotive wire harnesses, which we believe resulted primarily from market share losses and third and fourth quarter production cutbacks by Detroit-based automakers, (4) reduced unit sales to original equipment manufacturers of insulators for automotive ignition-wire sets due to the end of the product life-cycle of certain components, the loss of certain business by one of our customers, and third and fourth quarter production cutbacks by Detroit-based automakers, (5) reduced unit sales of insulators to manufacturers of aftermarket automotive ignition-wire sets primarily due to the loss of business by one of our customers, and (6) price reductions on certain components. The factors reducing sales were partially offset by price increases on certain components. During 2006, the Rubber Group's net sales to Delphi totaled $10,719,000, a decrease of $6,707,000, or 38.5%, compared to net sales of $17,426,000 during 2005.

Cost of sales as a percentage of net sales decreased to 85.1% of net sales during 2006, compared to 88% of net sales during 2005, primarily due to (1) the closing and sale, during 2005, of our unprofitable manufacturing facility in LaGrange, Georgia, and the consolidation of our connector seal production in Vienna, Ohio, (2) price increases on certain of our components, (3) reduced expenses related to scrap, (4) reduced consulting fees, (5) lower depreciation and amortization expense, and (6) a reduction in the operating loss at our captive tool making facility. The factors reducing cost of sales as a percentage of net sales were partially offset by (a) price reductions on certain components, (b) the under-absorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume, and (c) expenses related to the roll-out of new medical components.

Selling and administrative expenses of the Rubber Group were essentially unchanged during 2006, compared to 2005, but increased as a percentage of net sales because of the reduction in net sales.

During 2006, income from operations totaled $7,642,000, an increase of $608,000, or 8.6%, compared to 2005. EBITDA for 2006 was $14,097,000, or 18.5% of net sales, compared to $14,260,000, or 16.8% of net sales, for 2005. EBITDA for 2005 included a gain the sale of the LaGrange, Georgia, manufacturing facility of $571,000. Excluding that gain, our EBITDA for 2005 was $13,689,000, or 16.1%, of net sales.

During 2005, we sold our facility in LaGrange, Georgia, which was part of our connector seals business, for net proceeds of $1,882,000 and recorded a pre-tax gain on the sale of $571,000. Excluding the gain on the sale of the LaGrange facility, losses from operations of the LaGrange facility totaled $1,667,000 during 2005, including $633,000 of expenses related to the closure of the facility.

-24-

Table of Contents

### Metals Group

The Metals Group manufactures machined metal components primarily for automotive industry customers from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks.

The following table sets forth the operating results of the Metals Group for 2007, 2006, and 2005 and the reconciliation of the Metals Group's loss from operations to its EBITDA (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| |2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| Net sales | $ 13,821 | 100.0% | $ 11,811 | 100.0% | $ 11,958 | 100.0% |
| Cost of sales | 13,490 | 97.6 | 12,387 | 104.9 | 12,650 | 105.8 |
| Gross profit (loss) | 331 | 2.4 | (576) | (4.9) | (692) | (5.8) |
| Selling and administrative expenses | 523 | 3.8 | 669 | 5.6 | 723 | 6.0 |
| Gain on sale of assets held for sale | — | — | — | — | 1,100 | 9.2 |
| Loss from operations | (192) | (1.4) | (1,245) | (10.5) | (315) | (2.6) |
| Add back: depreciation and amortization | 682 | 4.9 | 820 | 6.9 | 1,138 | 9.5 |
| EBITDA | $    490 | 3.5% | $    (425) | (3.6)% | $    823 | 6.9% |

During 2007, net sales of the Metals Group increased by $2,010,000, or 17%, compared to 2006, primarily as a result of sales to new customers. The three largest customers of the Metals Group accounted for 55.2%, 51.2%, and 61.1% of the Metals Group's net sales during 2007, 2006, and 2005, respectively.

Cost of sales as a percentage of net sales decreased to 97.6% during 2007 from 104.9% during 2006, primarily because of (1) improved production efficiencies, (2) improved absorption of fixed or partially fixed manufacturing overhead during a period of increasing net sales, (3) lower depreciation expense, and (4) reduced material costs as a percentage of net sales.

Selling and administrative expenses of the Metals Group decreased from $669,000 during 2006 to $523,000 during 2007, primarily because of a reduction in headcount.

During 2007, the loss from operations was $192,000, compared to a loss from operations of $1,245,000 during 2006. EBITDA for 2007 was positive $490,000, compared to negative $425,000 for 2006.

During 2006, net sales of the Metals Group decreased by $147,000, or 1.2%, compared to 2005, primarily because of decreased unit sales to most existing automotive industry customers, substantially offset by sales to a new automotive customer and the effects of the pass-through of certain increases in raw material costs.

-25-

Table of Contents

Cost of sales as a percentage of net sales decreased to 104.9% of net sales during 2006 from 105.8% of net sales during 2005, primarily because of (1) improved production efficiencies, (2) lower depreciation expense, and (3) reduced consulting fees, offset, in part, by increased raw material costs.

During 2005, we sold our land and building in Casa Grande, Arizona, for net proceeds of $2,636,000, and we recorded a pre-tax gain on the sale of $1,100,000.

Selling and administrative expenses of the Metals Group decreased by $54,000, or 7.5%, during 2006 compared to 2005, primarily because of a reduction in bad debt expense.

During 2006, the loss from operations was $1,245,000, compared to a loss from operations of $315,000 during 2005, which included the one-time gain of $1,100,000 on the sale of our land and building in Casa Grande, Arizona. EBITDA for 2006 was negative $425,000 compared to positive $823,000 for 2005. Excluding the gain on the sale of the Casa Grande, Arizona, facility, the loss from operations for 2005 was $1,415,000, and EBITDA was negative $277,000.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for 2007, 2006, and 2005 and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Loss from operations | $ (3,108) | $ (2,313) | $ (2,322) |
| Add back: depreciation and amortization (1) | 28 | 20 | 10 |
| EBITDA | $ (3,080) | $ (2,293) | $ (2,312) |

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $1,249,000, $3,078,000, and $1,315,000, in 2007, 2006, and 2005, respectively, and which is included in interest expense in the consolidated financial statements.

During 2007, corporate administrative expenses increased by $795,000, compared to 2006, primarily because we incurred expenses of $698,000 in connection with our efforts to refinance, restructure, or repay our senior, secured debt and Senior Subordinated Notes as more fully discussed in the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7. The balance of the increase in cost was primarily due to higher premiums for liability insurance.

Corporate Office expenses were essentially unchanged in 2006, compared to 2005.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of our former die casting business have been classified as discontinued operations in the consolidated financial statements.

Table of Contents

Interest expense allocated to discontinued operations totaled $168,000, $178,000, and $262,000 for 2007, 2006, and 2005, respectively.

During 2007 and 2006, we increased our provision for environmental remediation by $87,000 and $255,000, respectively, to cover the current and projected cost of certain environmental remediation at the former die casting business's manufacturing facility. On March 7, 2007, the State of New York Department of Environmental Conservation informed us that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

The following table summarizes certain operating data of discontinued operations for 2007, 2006, and 2005 (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Net sales | $    — | $    — | $  3,381 |
| | | | |
| Income (loss) from operations before increase in carrying value of assets held for sale and gain on the sale of assets | $   (121) | $   (294) | $   130 |
| Increase in carrying value of assets held for sale | — | — | 542 |
| Gain on sale of assets | — | — | 568 |
| | | | |
| Income (loss) from discontinued operations | (121) | (294) | 1,240 |
| Allocated interest expense | 168 | 178 | 262 |
| | | | |
| Income (loss) from discontinued operations before income taxes | (289) | (472) | 978 |
| Income tax provision (1) | — | — | 334 |
| | | | |
| Income (loss) from discontinued operations | $   (289) | $   (472) | $   644 |

(1)   The income tax provision in 2005 was offset by an income tax benefit recorded in continuing operations. Income tax benefits in 2007 and 2006 were offset by provisions for valuation allowances.

-27-

Table of Contents

### Interest Expense

A breakdown of interest expense for 2007, 2006, and 2005 is set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Contractual interest rates: | | | |
| Senior, secured loans | $ 3,698 | $ 3,334 | $ 2,903 |
| Senior Subordinated Notes | 4,101 | 4,101 | 4,101 |
| All other | 92 | 525 | 1,143 |
| Subtotal | 7,891 | 7,960 | 8,147 |
| | | | |
| Incremental interest rates: | | | |
| Senior, secured loans — default or forbearance premium | 698 | 62 | — |
| Senior Subordinated Notes — forbearance premium | 1,279 | — | — |
| Senior Subordinated Notes — interest on missed interest payments | 390 | 21 | — |
| Subtotal | 2,367 | 83 | — |
| | | | |
| Costs and fees, including amortization and write-off of deferred financing costs | 1,249 | 3,078 | 1,315 |
| | | | |
| Total interest expense | 11,507 | 11,121 | 9,462 |
| Less: Interest expense allocated to discontinued operations | 168 | 178 | 262 |
| | | | |
| Interest expense related to continuing operations | $ 11,339 | $ 10,943 | $ 9,200 |

The average amount of debt outstanding in 2007, 2006, and 2005 was $72,377,000, $69,736,000, and $73,832,000, respectively. In 2007, 2006, and 2005 cash interest payments were $4,431,000, $6,749,000, and $8,196,000, respectively. For more information about the status of our senior, secured debt and our Senior Subordinated Notes, please refer to the discussion under the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

### Gain on the Repurchase of Debt

During 2005, we repurchased $133,000 principal amount of Senior Subordinated Notes together with accrued interest thereon of $97,000, for $153,000 and recorded a pre-tax gain of $77,000.

### Income Tax Provision

The income tax provisions recorded in 2007 and 2006 consisted of estimated state income taxes. The federal income tax benefit recognized by our continuing operations in 2005 resulted from the recognition of an offsetting amount of federal income tax expense by the Company's discontinued operations in 2005. For additional information concerning income taxes and related matters, see Note 7, "Income Taxes," in the notes to our consolidated financial statements in Part II, Item 8.

-28-

Table of Contents

**Liquidity and Capital Resources**

### Operating activities

During 2007, operating activities of our continuing operations provided net cash of $5,436,000. Accounts receivable increased by $1,256,000 during 2007, primarily because (1) outstanding billings for sales of tools and automation equipment increased by $398,000, from $270,000 at December 31, 2006, to $668,000 at December 31, 2007, and (2) a number of automotive and medical customers increased the time they took to remit payment for their invoices. Inventories increased by $543,000. Accrued interest expense increased by $5,824,000 because of additional accruals of interest on our Senior Subordinated Notes and Junior Subordinated Note.

Net cash used by operating activities of our discontinued operations totaled $158,000.

### Investing Activities

During 2007, investing activities of our continuing operations used net cash of $2,741,000. Capital expenditures during 2007 attributable to the Rubber Group, the Metals Group, and the Corporate Office, including $28,000 of equipment purchased under capital leases, totaled $2,068,000, $519,000, and $77,000, respectively. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $3,010,000, $511,000, and $10,000, respectively, for the year ending December 31, 2008. At December 31, 2007, we had approximately $113,000 of unrecorded commitments outstanding to purchase equipment.

### Financing Activities

During 2007, our financing activities used net cash of $2,333,000. We used $3,232,000 of cash to make scheduled principal payments on our equipment and real estate term loans, $78,000 of cash to repay other debt, and $1,286,000 of cash to fund capitalized financing expenses that were incurred in connection with our efforts to restructure, refinance, or repay our secured debt and our Senior Subordinated Notes. Capitalized financing expenses incurred during 2007 were amortized over the terms of the respective forbearance agreements. The forbearance agreements, which are discussed in more detail below, expired in January 2008.

### Liquidity and Filing of Chapter 11

During the second half of 2006, we experienced a significant decrease in sales of automotive components. We believe that this reduction was primarily a result of production cutbacks by the Detroit-based automakers and resultant production cutbacks and inventory adjustments by our customers, who are primarily tier-one suppliers to automobile manufacturers. Although we reduced expenses in an effort to offset the impact of the lower sales, our operating profit and cash flow during the second half of 2006 were adversely affected, as was the availability under our revolving line of credit.

We have not made any of the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of our affiliates and members of their families. We agreed to raise the interest rate on the Senior Subordinated

-29-

Table of Contents

Notes from 12% to 16% for the period from March 9, 2007, through the earlier of the repayment of the Senior Subordinated Notes or the filing of a petition for relief under the United States Bankruptcy Code. At December 31, 2007, accrued interest on our Senior Subordinated Notes totaled $7,500,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our secured debt. Additionally, we were not in compliance with a financial covenant related to fixed charge coverage on February 28, March 31, and April 30, 2007, or with a financial covenant related to leverage on March 31, 2007. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the secured lenders. The forbearance agreement (1) provided that the secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we have remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the Detroit-based investment banking firm of W.Y. Campbell & Company to assist in the review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone is significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that control our Senior Subordinated Notes to advise them of the following:

1.    We had decided to pursue the proposal to purchase the Rock Hill facility;

2.    We had received a proposal from a new secured lender to provide us with a, $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.    We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.    In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.    We agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock. At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and

-30-

Table of Contents

the new secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interest of all of our creditors and equity holders to proceed with an extension on the terms proposed; further discussions on this matter were unproductive and, as a result, the forbearance agreement expired on January 29, 2008. Subsequent to the expiration, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the United States Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with this petition, we obtained a financing package that we believe provides us more that adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consists of (1) an arrangement with our senior, secured lenders to freeze the loans under their revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to use the collections on our accounts receivable in the operation of our business through February 25, 2009, and (2) a $4,000,000 debtor-in-possession ("DIP") loan that matures on April 1, 2009. The arrangement with the senior, secured lenders provides for a continuation of our monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates return to the original contractual rates. The DIP loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. At April 30, 2008, the DIP loan had been fully funded and we had approximately $8,000,000 of cash on hand.

Upon the commencement of the chapter 11 proceedings, the interest rate on our Senior Subordinated Notes, which had been increased to 16% under the forbearance arrangement, was reduced to the contractual rate of 12%.

We do not believe that we will need to utilize the provisions of the Bankruptcy Code to effect any significant operational restructuring or to eliminate or renegotiate any unprofitable executory contracts that are material to our business. Our operations are healthy and profitable and, although there can be no assurance, we expect that to continue throughout the term of chapter 11 proceedings. We have experienced no disruptions in our operations to date and, based upon discussions with a significant number of major suppliers and customers, we do not expect any such disruption during the term of the chapter 11 proceedings.

Although there can be no assurance that we will be successful, our intent in filing for chapter 11 protection is to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that results in a significant reduction in our total indebtedness on a basis that is fair and equitable to all of our creditors and stockholders. We intend to file a plan of reorganization with the Bankruptcy Court no later that June 30, 2008, and hope to confirm that plan by September 30, 2008. We expect that our plan of reorganization will result in a significant reduction in our aggregate indebtedness by means of a conversion of a significant portion of our subordinated debt to equity at a valuation that is reflective of the offers that were received during the sale process. We also intend to retain all of our operations, including the medical business.

-31-

Table of Contents

Our senior, secured credit facility is secured by substantially all of our assets and consists of the following:

1.  At December 31, 2007, there were $10,632,000 of loans and $907,000 of letters of credit outstanding under a $17,500,000 revolving line of credit; at April 1, 2008, there were $14,219,000 of loans and $907,000 of letters of credit outstanding. The contractual interest rate on loans under the revolving credit is LIBOR plus 2.75%. From February 1, 2007, through March 31, 2008, a default premium of 2% was charged on the outstanding loan balances.

2.  An equipment term loan with an outstanding principal balance of $9,167,000 at December 31, 2007, and $8,333,000 at April 1, 2008. The contractual interest rate on the equipment term loan is LIBOR plus 4.5%. From February 1, 2007, through March 31, 2008, a default premium of 2% was charged on the outstanding loan balances.

3.  A real estate term loan with an outstanding principal balance of $14,022,000 at December 31, 2007, and $13,778,000 at April 1, 2008. The contractual interest rates on the real estate term loan are prime rate plus 6% on $4,000,000 principal amount and LIBOR plus 4.5% on the balance. From February 1, 2007, through March 31, 2008, a default premium of 2% was charges on the outstanding loan balances.

During 2007, the financial covenants contained in our revolving line of credit and our secured term loans as revised by the terms of the forbearance agreement are as set forth below. At the end of the forbearance period on January 24, 2008, the financial covenants reverted back to those in effect before the forbearance agreement became effective. For the purpose of determining compliance with the covenants set forth below certain expenses are excluded from the determination of EBITDA. Please refer to the financing documents for definitions of capitalized terms.

1.  Fixed Charge Coverage Ratio. The Fixed Charge Coverage Ratio is calculated by dividing consolidated EBITDA, less Unfinanced Capital Expenditures, by consolidated Fixed Charges, and was required to be not less than 0.75 to 1.0 for the five-, six-, and seven-month periods ending July 31, August 31 and September 30, 2007, respectively, and not less than 0.85 to 1.0 for each period commencing March 1, 2007, and ending on the last day of each month following September 30, 2007, until the forbearance period terminated. At December 31, 2007, our Fixed Charge Coverage Ratio was 1.16 to 1.00.

2.  Leverage Ratio. The Leverage Ratio is calculated by dividing Senior Debt by consolidated EBITDA and was required to be not more than 3.75 to 1.0 for the five-, six-, and seven-month periods ending July 31, August 31 and September 30, 2007, respectively, and not more than 3.5 to 1.0 for each period commencing March 1, 2007, and ending on the last day of each month following September 30, 2007, until the forbearance period terminated. At December 31, 2007, our Leverage Ratio was 2.60 to 1.00.

3.  Minimum Revenue. Revenue was required to be not less than specified amounts on a cumulative basis starting on March 1, 2007, through the last day of each month from May 2007 through the end of the forbearance period. At December 31, 2007, our cumulative revenue exceeded the minimum revenue requirement of $65,778,000 by $8,101,000.

4.  Minimum EBITDA. EBITDA was required to be not less than specified amounts on a cumulative basis starting on March 1, 2007, through the last day of each month from May 2007 through the end of the forbearance period. At December 31, 2007, our cumulative

-32-

Table of Contents

EBITDA exceeded the minimum cumulative EBITDA requirement of $8,973,000 by $908,000.

Since the filing of chapter 11 on April 1, 2008, the financial covenants have been modified as follows:

1.  Minimum Cash. Our aggregate cash must exceed $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and on the last day of each four-week period thereafter. At May 2, 2008, aggregate cash was $7,538,000.

2.  Maximum Expenditures. Our cumulative expenditures must be less than 110% of budgeted cumulative expenditures. At May 2, 2008, cumulative expenditures were $2,756,000 less than 110% of budgeted cumulative expenditures.

3.  Minimum Net Sales. Our cumulative net sales must be greater than 90% of budgeted net sales. At May 2, 2008, cumulative net sales exceeded 90% of budgeted cumulative net sales by $596,000.

Our aggregate indebtedness at December 31, 2007, totaled $69,091,000 plus accrued interest on our Senior Subordinated Notes and Junior Subordinated Note of $6,484,000, compared to $70,107,000 plus accrued interest on our Senior Subordinated Notes and Junior Subordinated Note of $1,036,000 at December 31, 2006.

We had a net working capital deficit of $65,894,000 at December 31, 2007, compared to a net working capital deficit of $61,989,000 at December 31, 2006.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our senior, secured debt and Senior Subordinated Notes is subject to risks and uncertainties. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect this uncertainty.

**Contractual Obligations**

The following table summarizes our expected cash outflows from financial contracts and commitments in effect as of December 31, 2007 (dollar amounts in thousands). We have not included information on recurring purchases of raw materials for use in our manufacturing operations: those amounts are normally consistent from year to year and do not represent a long-term commitment. Contractual commitments also include $907,000 of letters of credit, which are not reflected in the table.

| | | | Payments Due by Period | | |
| | Total | 2008 | 2009 & 2010 | 2011 & 2012 | More than 5 years |
|---|---|---|---|---|---|
| Equipment term loan | $ 9,167 | $ 9,167 | $ — | $ — | $ — |
| Real estate term loan | 14,022 | 14,022 | — | — | — |
| Subordinated debt | 42,088 | 42,088(1) | — | — | — |
| Series B Preferred Stock | 693 | 693(1) | — | — | — |
| Other long-term debt | 67 | 67 | — | — | — |
| Capital lease obligations | 19 | 14 | 5 | — | — |
| Operating lease obligations | 188 | 71 | 115 | 2 | — |
| Equipment purchase obligations | 113 | 113 | — | — | — |
| Fixed interest payments | 8,316 | 8,316(2) | — | — | — |
| Total | $ 74,673 | $ 74,551 | $   120 | $   2 | $   — |

_____

(1)  Includes interest accrued at December 31, 2007.

(2)  Assumes (a) interest at the rate of 12% and 13%, respectively, on the Senior Subordinated Notes and Junior Subordinated Notes outstanding on December 31, 2007, and the interest accrued thereon, (b) interest on the equipment and real estate term loans at the contractual rates in effect on December 31, 2007, excluding default interest premiums and (c) interest on the revolving line of credit equivalent to the interest paid on the revolving line during 2007 excluding default interest premiums.

**Inflation**

We generally attempt to pass through to our customers fluctuations in raw material costs; however, many of our customers will not accept price increases from us to compensate for increases in labor and overhead expenses that result from inflation. To offset inflationary increases in costs that we cannot pass through to our customers and to maintain or improve our operating margins, we attempt to improve our production efficiencies and manufacturing processes. We believe that, over time, prices are affected by many factors, but that the price we can charge our customers is governed by the competitive pricing set by the marketplace, rather than by increases or decreases in particular components of our cost.

**Environmental Matters**

We have been named from time to time as one of numerous potentially responsible parties or third-party defendants under applicable environmental laws for restoration costs at waste-disposal sites, and as a defendant or potential defendant in various other environmental law matters. It is our policy to record accruals for matters of these types when we deem a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although we cannot assure you as to the outcome of existing or potential environmental litigation we believe, based upon the information currently available to us, that the outcome thereof will not have a material adverse effect upon our results of operations or financial condition.

-34-

Table of Contents

**Quarterly Financial Data**

For quarterly financial data please refer to Note 14, "Quarterly Financial Data," in the notes to our consolidated financial statements in Part II, Item 8.

**Off-Balance Sheet Arrangements**

There are no material off-balance sheet arrangements that we believe have or are reasonably likely to have a material current or future effect on our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources.

**Critical Accounting Policies and Estimates**

Our accounting policies are more fully described in Note 1, "Summary of Significant Accounting Policies," in the notes to our consolidated financial statements in Part II, Item 8. The preparation of our consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses during each reporting period. Actual results could differ from those estimates. The significant estimates included in the preparation of our financial statements are related to valuation of accounts receivable, inventories, long-lived assets, and goodwill and estimates related to the determination of liabilities for environmental matters, litigation, product liability matters, income taxes, and other contingencies.

We believe that the most critical accounting policies inherent in the preparation of our consolidated financial statements are the following:

*Valuation of Accounts Receivable and Provision for Credit Losses*

We record accounts receivable due from our customers at the time a sale is recorded in accordance with our revenue recognition policy. We operate primarily in the domestic automotive market, which has been characterized by intense price competition and increasing customer requirements for quality and service. These factors, among others, may have a sudden and adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of our accounts receivable from those customers. We attempt to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examinations of financial statements of our customers, and discussions with management of our customers, as deemed necessary. Provisions for credit losses are based upon historical experience and such ongoing evaluations. We generally do not require collateral from our customers to support the extension of trade credit.

*Valuation of Inventory*

Inventory is valued at the lower of cost (first-in, first-out method) or market. We evaluate our inventory on a quarterly basis to ensure that it is properly valued. We record allowances against inventory where appropriate to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, we apply consistent practices, which include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with new generation components, and actual margins generated from the sales of our components.

-35-

Table of Contents

### *Valuation of Long-Lived Assets other than Goodwill*

We evaluate for impairment our plant and equipment and other long-term, amortizable assets when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in our use of these assets may cause the original estimated useful lives of these assets to change and result in the impairment of these assets.

To perform our impairment evaluation, we compare the undiscounted projected cash flow of an asset or group of assets to the carrying value thereof. If the projected cash flow is less than the carrying value of the asset or asset group, we recognize an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although we believe that our estimates of future cash flows are reasonable, changes in unit sales, pricing, cost of goods sold, and other factors could significantly affect our cash flow projections.

### *Valuation of Goodwill*

At December 31, 2007 and 2006, our unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2007, the assets of the Rubber Group, exclusive of goodwill, totaled $34,613,000. In 2007, EBITDA of the Rubber Group was $13,702,000. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

In connection with our efforts to refinance or restructure our indebtedness during 2007, we pursued a possible sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell & Company, prepared an offering memorandum. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers, and, during the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. As a result, during 2007, we tested our goodwill for impairment by comparing the values implied by the various offers for all or portions of the Rubber Group's business. Based on our analysis, we determined that the fair value of the Rubber Group's assets exceeded the carrying value of those assets by an amount substantially in excess of the goodwill, and, consequently, the goodwill related to the Rubber Group was not deemed to be impaired.

### *Revenue Recognition*

All of our revenues result from the sale of rubber and metal components and mixed rubber compounds. We recognize revenue from the sale of these items when title and risk of loss pass to our customers according to shipping schedules and terms of sale mutually agreed to by us and our customers. Shipping and handling costs are typically paid by the customer. If paid by us, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience; these accruals may be adjusted subsequent to the date of shipment as new information becomes available.

### *Other*

Other critical accounting policies include estimates used to determine liabilities related to environmental matters, litigation, product liability matters, self-insurance, income taxes, and other contingencies. The process of making estimates takes into account historical experience, specific facts and circumstances, present and projected economic and business conditions, projected unit volumes, projected operating efficiencies, and other relevant factors and assumptions. We reevaluate our estimates whenever factors relevant to the making of the estimates change.

Table of Contents

**Recently Issued Accounting Standards**

Listed below are recently issued accounting standards and a discussion of how they have affected or will affect our consolidated financial statements:

### Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an Amendment of ARB No. 51"

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an Amendment of ARB No. 51 ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. FAS 160 is effective for fiscal years beginning on or after December 15, 2008. Based on our current operations, we do not believe that FAS 160 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Based on our current operations, we do not believe that FAS 141R will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. FAS 159 also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. We are currently evaluating the effect the adoption of FAS 159 will have on our results of operations and financial position.

### Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value in U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does

-37-

Table of Contents

not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In December 2007, the FASB issued FSP FAS 157-b to, if adopted, delay the effective date of FAS 157 for all nonfinancial assets and liabilities, except those that are recognized or disclosed, at least annually, at fair value in the financial statements. We are currently assessing the impact, if any, that FAS 157 will have on our results of operations and financial position.

### *Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes"*

In July 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), an interpretation of Statement of Financial Accounting Standard No. 109, "Accounting for Income Taxes," ("FAS 109"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in accordance with FAS 109 by prescribing a minimum recognition threshold that a tax position must meet before being recognized in financial statements. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and transition. FIN 48 was effective for fiscal years beginning after November 15, 2006, and was therefore effective for us on January 1, 2007. Adoption of FIN 48 did not affect our results of operations or financial position. We are subject to federal taxation in the United States and to state income tax in various states. We remain subject to examination by United States federal taxing authorities and to state taxing authorities for the years 2004 through 2006 and for any years prior to 2004 if, in the future, we use operating loss carryforwards from any year prior to 2004 to affect current-period taxable income. Although we do not anticipate that our income tax liabilities would significantly increase or decrease upon audit, actual results could differ from our estimates.

## Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant.

At December 31, 2007, we had a total of $33,821,000 of floating rate debt outstanding at interest rates equal to either the London Interbank Offered Rate ("LIBOR") or the prime rate plus a fixed premium. Currently, we do not purchase derivative financial instruments to hedge or reduce our interest rate risk. As a result, changes in either LIBOR or the prime rate affect the rates at which we borrow funds under these agreements.

At December 31, 2007, we had $35,270,000 of fixed-rate debt outstanding with a weighted-average interest rate of 15.7%.

Assuming that our subordinated debt and our secured debt were outstanding for all of 2008 and that we accrued and paid interest during 2008 at the specified contractual rates (no default premiums), we currently estimate that our average monthly cash interest expense during 2008 would be approximately $663,000 and that a one percentage point increase or decrease in both LIBOR and the prime rate would increase or decrease our monthly interest expense by approximately $29,000.

For further information about our indebtedness, we recommend that you also read Note 4, "Debt," in the notes to our consolidated financial statements in Part II, Item 8.

-38-

Table of Contents

THIS PAGE INTENTIONALLY LEFT BLANK

-39-

Table of Contents

**Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

## Table of Contents

| | Page |
|---|---|
| Report of Malin, Bergquist & Company, LLP, Independent Registered Public Accounting Firm (2007) | 41 |
| Report of Ernst & Young LLP, Independent Registered Public Accounting Firm (2006 and 2005) | 42 |
| Consolidated Statements of Operations for the Years Ended December 31, 2007, 2006, and 2005 | 43 |
| Consolidated Balance Sheets at December 31, 2007 and 2006 | 44 |
| Consolidated Statements of Stockholders' Deficit for the Years Ended December 31, 2007, 2006, and 2005 | 46 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2007, 2006, and 2005 | 47 |
| Notes to Consolidated Financial Statements | 48 |

Table of Contents

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Lexington Precision Corporation and Subsidiary

We have audited the accompanying consolidated balance sheet of Lexington Precision Corporation and subsidiary as of December 31, 2007, and the related consolidated statements of operations, stockholders' deficit, and cash flows for the year then ended. Our audit also included the financial statement schedule listed in the Index at Item 15(a). Lexington Precision Corporation's management is responsible for these consolidated financial statements and schedule. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lexington Precision Corporation and subsidiary as of December 31, 2007, and the consolidated results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that Lexington Precision Corporation and subsidiary will continue as a going concern. As more fully described in Notes 1 and 4, on April 1, 2008, Lexington Precision Corporation and Lexington Rubber Group, Inc. (collectively, the "Debtors") filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") and its continuation as a going concern is contingent upon, among other things, the Debtors ability (i) to comply with the terms and conditions of the debtors-in-possession financing arrangements; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to generate sufficient cash flow from operations to fund working capital, capital expenditures and debt service requirements, and; (iv) to obtain financing sources to meet future obligations. These matters raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that may result from the outcome of this uncertainty.

/s/ Malin, Bergquist & Company, LLP

Malin, Bergquist & Company, LLP
Pittsburgh, Pennsylvania
May 15, 2008

Table of Contents

**REPORT OF ERNST & YOUNG LLP, INDEPENDENT REGISTERED
PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders
Lexington Precision Corporation and Subsidiaries

We have audited the accompanying consolidated balance sheet of Lexington Precision Corporation and subsidiaries as of December 31, 2006, and the related consolidated statements of operations, stockholders' deficit, and cash flows for each of the two years in the period ended December 31, 2006. Our audits also included the data for 2006 and 2005 appearing on the financial statement schedule listed in the Index at Item 15 (a). These consolidated financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lexington Precision Corporation and subsidiaries at December 31, 2006, and the consolidated results of their operations and their cash flows for each of the two years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the data for 2006 and 2005 appearing on the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that Lexington Precision Corporation and subsidiaries will continue as a going concern. As more fully described in Notes 1 and 4, the Company failed to pay quarterly interest payments that were due on its Senior Subordinated Notes on November 1, 2006 and February 1, 2007, resulting in substantially all of the Company's debt to be in default as of December 31, 2006. As of February 28, 2007, the Company failed to comply with a fixed charge coverage ratio covenant that is contained in its secured borrowing arrangements. On April 5, 2007, the Company was notified that the Company's ability to borrow under its revolving line of credit would be terminated after May 7, 2007. On April 6, 2007, the Company received a notice of acceleration demanding immediate payment in full of a portion of the obligations due under its real estate term loan. Further, the Company has a working capital deficiency and a stockholders' deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Ernst &Young LLP

Cleveland, Ohio
April 12, 2007

-42-

Table of Contents

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Statements of Operations
(thousands of dollars, except per share data)**

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Net sales | $ 88,408 | $ 87,901 | $ 96,842 |
| Cost of sales | 76,529 | 77,159 | 87,369 |
| Gross profit | 11,879 | 10,742 | 9,473 |
| Selling and administrative expenses | 7,204 | 6,658 | 6,747 |
| Gain on the sale of assets held for sale | — | — | 1,671 |
| Income from operations | 4,675 | 4,084 | 4,397 |
| Other income (expense): | | | |
|   Interest expense | (11,339) | (10,943) | (9,200) |
|   Gain on repurchase of debt | — | — | 77 |
| Income (loss) from continuing operations before income taxes | (6,664) | (6,859) | (4,726) |
| Income tax provision (benefit) | 6 | 18 | (299) |
| Income (loss) from continuing operations | (6,670) | (6,877) | (4,427) |
| Income (loss) from discontinued operations | (289) | (472) | 644 |
| Net income (loss) | $ (6,959) | $ (7,349) | $ (3,783) |
| Basic and diluted income (loss) per share of common stock: | | | |
|   Continuing operations | $ (1.35) | $ (1.39) | $ (0.90) |
|   Discontinued operations | (0.06) | (0.10) | 0.13 |
| Net income (loss) | $ (1.41) | $ (1.49) | $ (0.77) |

*See notes to consolidated financial statements*

-43-

Table of Contents

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Balance Sheets
(thousands of dollars, except share data)**

|  | December 31 | |
|---|---|---|
|  | 2007 | 2006 |
| **Assets:** | | |
| Current assets: | | |
| Cash | $    212 | $      35 |
| Marketable securities | 214 | — |
| Accounts receivable, net of allowances of $476 and $412, respectively | 10,981 | 9,852 |
| Inventories, net of allowances of $612 and $417, respectively | 9,330 | 8,787 |
| Prepaid expenses and other current assets | 1,032 | 1,073 |
| Deferred income taxes | 98 | 374 |
| Current assets of discontinued operations | 10 | 101 |
| Total current assets | 21,877 | 20,222 |
| Plant and equipment: | | |
| Land | 1,817 | 1,776 |
| Buildings | 13,370 | 13,368 |
| Equipment | 110,723 | 110,980 |
|  | 125,910 | 126,124 |
| Accumulated depreciation | 105,056 | 101,898 |
| Plant and equipment, net | 20,854 | 24,226 |
| Plant and equipment of discontinued operations, net | 1,338 | 1,418 |
| Goodwill, net | 7,623 | 7,623 |
| Other assets, net | 675 | 951 |
|  | $ 52,367 | $ 54,440 |

*See notes to consolidated financial statements*

*(continued on next page)*

-44-

Table of Contents

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Balance Sheets
(thousands of dollars, except share data)**

| | December 31 | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Liabilities and stockholders' deficit:** | | |
| Current liabilities: | | |
| Accounts payable | $ 6,558 | $ 6,370 |
| Accrued expenses, excluding interest expense | 3,932 | 3,789 |
| Accrued interest expense | 7,954 | 2,130 |
| Debt in default | 68,345 | 68,967 |
| Current portion of long-term debt | 741 | 734 |
| Current liabilities of discontinued operations | 241 | 221 |
| Total current liabilities | 87,771 | 82,211 |
| Long-term debt, excluding current portion | 5 | 406 |
| Deferred income taxes | 98 | 374 |
| Other long-term liabilities | 434 | 440 |
| Stockholders' deficit: | | |
| Common stock, $0.25 par value, 10,000,000 shares authorized, 5,021,767 and 4,981,767 shares issued and outstanding at December 31, 2007 and 2006, respectively | 1,238 | 1,235 |
| Additional paid-in-capital | 13,187 | 13,181 |
| Accumulated deficit | (50,366) | (43,407) |
| Total stockholders' deficit | (35,941) | (28,991) |
| | $ 52,367 | $ 54,440 |

*See notes to consolidated financial statements*

-45-

Table of Contents

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Statements of Stockholders' Deficit
(thousands of dollars)**

|  | Common Stock | Additional Paid-in-Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|
| Balance at January 1, 2005 | $ 1,233 | $ 13,169 | $ (32,277) | $ (17,875) |
| Net income | — | — | (3,783) | (3,783) |
| Vesting of restricted stock grants | — | — | 2 | 2 |
| Balance at December 31, 2005 | 1,233 | 13,169 | (36,058) | (21,656) |
| Net loss | — | — | (7,349) | (7,349) |
| Vesting of restricted stock grants | 2 | 12 | — | 14 |
| Balance at December 31, 2006 | 1,235 | 13,181 | (43,407) | (28,991) |
| Net loss | — | — | (6,959) | (6,959) |
| Vesting of restricted stock grants | 3 | 6 | — | 9 |
| Balance at December 31, 2007 | $ 1,238 | $ 13,187 | $ (50,366) | $ (35,941) |

*See notes to consolidated financial statements*

-46-

Table of Contents

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Statements of Cash Flows**
**(thousands of dollars)**

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2007** | **2006** | **2005** |
| **Operating activities:** | | | |
| Net loss | $ (6,959) | $ (7,349) | $ (3,783) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities of continuing operations: | | | |
| Net loss (income) from discontinued operations | 289 | 472 | (644) |
| Depreciation | 6,036 | 6,919 | 8,012 |
| Amortization included in cost of sales | 401 | 376 | 362 |
| Amortization and write-off of deferred financing expenses included in interest expense | 1,249 | 3,078 | 1,315 |
| Gain on repurchase of debt | — | — | (77) |
| Gain on sale of assets held for sale | — | — | (1,671) |
| Changes in operating assets and liabilities that provided (used) cash: | | | |
| Accounts receivable, net | (1,256) | 2,849 | 2,621 |
| Inventories, net | (543) | (1,003) | 1,007 |
| Prepaid expenses and other assets | 108 | (457) | 1,151 |
| Accounts payable | 188 | (2,683) | (700) |
| Accrued expenses, excluding interest expense | 143 | (912) | (138) |
| Accrued interest expense | 5,824 | 1,281 | (126) |
| Other long term liabilities | (2) | 12 | (31) |
| Other | (42) | (27) | (156) |
| Net cash provided by continuing operations | 5,436 | 2,556 | 7,142 |
| Net cash provided (used) by discontinued operations | (158) | (514) | 1,023 |
| Net cash provided by operating activities | 5,278 | 2,042 | 8,165 |
| **Investing activities:** | | | |
| Purchases of plant and equipment | (2,636) | (2,504) | (3,330) |
| Proceeds from sales of assets and assets held for sale | 118 | — | 4,518 |
| Expenditures for tooling owned by customers | (197) | (174) | (544) |
| Other | (26) | 50 | 39 |
| Net cash provided (used) by continuing operations | (2,741) | (2,628) | 683 |
| Net cash provided (used) by discontinued operations | (27) | (13) | 2,360 |
| Net cash provided (used) by investing activities | (2,768) | (2,641) | 3,043 |
| **Financing activities:** | | | |
| Net increase (decrease) in borrowings under revolving lines of credit | 2,263 | (3,585) | (2,555) |
| Proceeds from issuance of debt | — | 28,500 | 1,500 |
| Repayment of debt | (3,310) | (22,527) | (9,705) |
| Payment of financing expenses | (1,286) | (1,767) | (452) |
| Net cash provided (used) by financing activities | (2,333) | 621 | (11,212) |
| Net increase (decrease) in cash | 177 | 22 | (4) |
| Cash at beginning of year | 35 | 13 | 17 |
| Cash at end of year | $    212 | $    35 | $    13 |

*See notes to consolidated financial statements*

-47-

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 — Summary of Significant Accounting Policies**

*The Company*

Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"), have two operating segments, the Rubber Group and the Metals Group. The Rubber Group is engaged in the manufacture of connector seals used in automotive wiring systems, insulators used in both original equipment and aftermarket ignition-wire sets, and molded rubber components used in a variety of medical devices. The Metals Group is engaged in the manufacture of machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks for sale to automotive and industrial customers.

*Principles of Consolidation*

The consolidated financial statements include the accounts of Lexington Precision Corporation and Lexington Rubber Group, Inc. All significant intercompany accounts and transactions have been eliminated. Unless otherwise indicated all disclosures and amounts relate solely to the continuing operations of the Company.

*Basis of Presentation*

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with this petition, the Company obtained a financing package that consists of (1) an arrangement with the Company's senior, secured lenders to freeze the loans under their revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to use the collections on its accounts receivable in the operation of its business through February 25, 2009, and (2) a $4,000,000 debtor-in-possession ("DIP") loan that matures on April 1, 2009. The arrangement with the senior, secured lenders provides for a continuation of the Company's monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that the Company's interest rates returned to the original contractual rates. The DIP loan is unsecured, subordinated to the senior, secured loans and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. At April 30, 2008, the DIP loan had been fully funded and the Company had approximately $8,000,000 of cash on hand.

The Company does not believe that it will need to utilize the provisions of the Bankruptcy Code to effect any significant operational restructuring or to eliminate or renegotiate any unprofitable executory contracts that are material to its business. The Company has experienced no disruptions in its operations to date and, based upon discussions with a significant number of major suppliers and customers, the Company does not expect any such disruption during the term of the chapter 11 proceedings.

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection is to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that results in a significant reduction in its total indebtedness on a basis that is fair and equitable to all of its creditors and stockholders. The Company intends to file a plan of reorganization with the Bankruptcy Court no later that June 30, 2008, and hopes to confirm that plan by September 30, 2008. The Company expects that its plan of reorganization will result in a significant reduction in its

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

aggregate indebtedness by means of a conversion of a significant portion of its subordinated debt to equity. We also intend to retain all of our operations, including the medical business.

See also Note 4, "Debt."

The Company's consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its senior, secured debt and Senior Subordinated Notes is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Use of Estimates

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with any certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

### Marketable Securities

The Company had marketable securities in the amount of $214,000 at December 31, 2007, classified as available-for-sale. Unrealized holding gains and losses on available-for-sale securities are reported in accumulated other comprehensive income to the extent such gains and losses are deemed material. Declines in the fair value of available-for-sale securities below their cost that are deemed to be other than temporary are reflected in earnings as realized losses. In estimating other-than-temporary impairment losses, management considers (1) the length of time and the extent to which the fair value has been less than cost, (2) the financial condition and near-term prospects of the issuer, and (3) the intent and ability of the Company to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in fair value. For the year ended December 31, 2007, there were no write downs to realizable value considered necessary.

### Valuation of Accounts Receivable and Provision for Credit Losses

The Company records accounts receivable due from its customers at the time a sale is recorded in accordance with its revenue recognition policy. The Company operates primarily in the domestic automotive market, which has been characterized by price competition, increasing requirements for quality and service, and reduced volume because of slowing sales of automobiles. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of financial statements of its customers, and discussions with management of its customers. Provisions for credit losses are based upon historical experience and such ongoing evaluations.

-49-

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company generally does not require collateral from its customers to support the extension of trade credit.

### Valuation of Inventory

Inventory is valued at the lower of cost (first-in, first-out method) or market. The Company evaluates its inventory on a quarterly basis to ensure that it is properly valued. The Company records allowances against inventory to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, the Company applies consistent practices that include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with a new generation of components, and actual margins generated from the sales of its components.

Inventory levels by principal classification are set forth below (dollar amounts in thousands):

|  | December 31 | |
| --- | --- | --- |
|  | 2007 | 2006 |
| Finished goods | $  5,201 | $  4,595 |
| Work in process | 2,185 | 2,279 |
| Raw materials | 1,944 | 1,913 |
|  | $  9,330 | $  8,787 |

### Plant and Equipment

Plant and equipment are carried at cost less accumulated depreciation. Depreciation is calculated principally on the straight-line method over the estimated useful lives of the various assets (3 to 8 years for equipment and 15 to 31 years for buildings). When an asset is retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the Company's records. Maintenance and repair expenses are expensed as incurred, while major improvements that increase the useful life of plant and equipment are capitalized. Maintenance and repair expenses were $4,067,000, $4,265,000, and $4,483,000 for 2007, 2006, and 2005, respectively.

### Valuation of Long-Lived Assets other than Goodwill

The Company evaluates the value of its plant and equipment and other long-term assets other than goodwill when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in the Company's use of these assets may cause the estimated useful lives of these assets to change and result in the impairment of these assets.

When performing this evaluation, the Company prepares a projection of the future cash flow it will derive from an asset or group of assets. If the projected cash flow is less than the carrying value of the asset or asset group, the Company recognizes an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although the Company believes that its projections of future cash flows are reasonable, changes in unit

-50-

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

sales, pricing, cost of goods sold, and other factors could significantly affect the accuracy of the Company's cash flow projections.

#### *Valuation of Goodwill*

At December 31, 2007 and 2006, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2007, the assets of the Rubber Group, exclusive of goodwill, totaled $34,613,000. In 2007, the Rubber Group's income from operations totaled $7,975,000 and its depreciation and amortization totaled $5,727,000. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

In connection with the Company's efforts to refinance or restructure its indebtedness during 2007, the Company pursued a possible sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell & Company, prepared an offering memorandum. During the summer and fall of 2007, the Company distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers, and, during the fourth quarter of 2007, the Company received several offers to purchase all or portions of the assets of the Rubber Group. As a result, during 2007, the Company tested its goodwill for impairment by comparing the values implied by the various offers for all or portions of the Rubber Group's business. Based on the Company's analysis, it determined that the fair value of the Rubber Group's assets exceeded the carrying value of those assets by an amount substantially in excess of the goodwill, and, consequently, the goodwill related to the Rubber Group was not deemed to be impaired.

#### *Deferred Financing Expenses*

Deferred financing expenses are typically amortized on a straight-line basis until the date that the debt is due and payable either because of a stated maturity date or because of an event of default. During the fourth quarter of 2006, the Company wrote off $1,829,000 of the unamortized deferred financing costs related to its Senior Subordinated Notes and its senior, secured debt, which was reclassified as debt in default in the Company's consolidated balance sheet at December 31, 2006.

#### *Research and Development Expenses*

Research and development expenses are expensed as incurred. These expenses totaled $915,000, $1,093,000, and $931,000 in 2007, 2006, and 2005, respectively.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### *Interest Expense*

A breakdown of interest expense for 2007, 2006, and 2005 is set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | ---: | ---: | ---: |
| | **2007** | **2006** | **2005** |
| Contractual interest rates: | | | |
| Senior, secured loans | $ 3,698 | $ 3,334 | $ 2,903 |
| Senior Subordinated Notes | 4,101 | 4,101 | 4,101 |
| All other | 92 | 525 | 1,143 |
| Subtotal | 7,891 | 7,960 | 8,147 |
| | | | |
| Incremental interest rates: | | | |
| Senior, secured loans — default or forbearance premium | 698 | 62 | — |
| Senior Subordinated Notes — forbearance premium | 1,279 | — | — |
| Senior Subordinated Notes — interest on missed interest payments | 390 | 21 | — |
| Subtotal | 2,367 | 83 | — |
| | | | |
| Costs and fees, including amortization and write-off of deferred financing costs | 1,249 | 3,078 | 1,315 |
| | | | |
| Total interest expense | 11,507 | 11,121 | 9,462 |
| Less: Interest expense allocated to discontinued operations | 168 | 178 | 262 |
| | | | |
| Interest expense related to continuing operations | $ 11,339 | $ 10,943 | $ 9,200 |

### *Net Income or Loss per Common Share*

Basic net income or loss per common share is computed using the weighted-average number of common shares outstanding. Diluted net income or loss per share is calculated after giving effect to all potential common shares that were dilutive, using the treasury stock method. Potentially dilutive common shares consist of convertible preferred stock, unvested restricted stock, and warrants to purchase common stock. See also Note 9, "Net Income or Loss per Common Share."

### *Revenue Recognition*

All of the Company's revenues result from the sale of rubber and metal components and mixed rubber compounds. The Company recognizes revenue from the sale of these items when title and risk of loss pass to its customers according to shipping schedules and terms of sale mutually agreed to by the Company and its customers. Shipping and handling costs are typically paid by the customer. If paid by the Company, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience. These accruals may be adjusted subsequent to the date of shipment as new information becomes available.

-52-

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Recently Issued Accounting Standards*

Listed below are recently issued accounting standards and a discussion of how they have affected the Company's consolidated financial statements:

*Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an Amendment of ARB No. 51"*

In December 2007, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements — an Amendment of ARB No. 51" ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements. FAS 160 is effective for fiscal years beginning on or after December 15, 2008. Based on the Company's current operations, it does not believe that FAS 160 will have a significant impact on its results of operations or financial position.

*Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Early adoption of FAS 141R is not permitted. Based on its current operations, the Company does not believe that FAS 141R will have a significant impact on its results of operations or financial position.

*Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"*

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. The standard also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. The Company is currently evaluating the effect the adoption of FAS 159 will have on its results of operations and financial position.

-53-

**Table of Contents**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"*

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value in U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In December 2007, the FASB issued FSP FAS 157-b to, if adopted, delay the effective date of FAS 157 for all nonfinancial assets and liabilities, except those that are recognized or disclosed, at least annually, at fair value in the financial statements. The Company is currently assessing the impact, if any, that FAS 157 will have on its results of operations and financial position.

*Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes"*

In July 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), an interpretation of Statement of Financial Accounting Standard No. 109, "Accounting for Income Taxes," ("FAS 109"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in accordance with FAS 109 by prescribing a minimum recognition threshold that a tax position must meet before being recognized in financial statements. FIN 48 also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, and transition. FIN 48 was effective for the Company beginning January 1, 2007. The adoption of FIN 48 did not affect the Company's results of operations or financial position. The Company is subject to federal taxation in the United States and to state income tax in various states. The Company remains subject to examination by United States federal taxing authorities and to state taxing authorities for the years 2004 through 2006 and for any years prior to 2004 if, in the future, the Company uses operating loss carryforwards from any year prior to 2004 to affect current-period taxable income. Although the Company does not anticipate that its income tax liabilities would significantly increase or decrease upon audit, actual results could differ from its estimates.

**Note 2 — Other Noncurrent Assets**

The Company has paid a portion of the cost of certain tooling that was purchased by customers and is being used by the Company to produce components under long-term supply arrangements. The payments have been recorded as a noncurrent asset and are being amortized on a straight-line basis over three years or, if shorter, the period during which the tooling is expected to produce components. At December 31, 2007 and 2006, noncurrent assets included $449,000 and $634,000, respectively, of unamortized capitalized payments. During 2007, 2006, and 2005, the Company amortized $497,000, $459,000, and $476,000, respectively, of such capitalized payments.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 3 — Accrued Expenses, excluding Interest Expense**

Accrued expenses, excluding interest expense, at December 31, 2007 and 2006, are summarized below (dollar amounts in thousands):

|  | December 31 | |
|  | 2007 | 2006 |
|---|---|---|
| Employee fringe benefits | $ 2,617 | $ 2,530 |
| Salaries and wages | 298 | 356 |
| Taxes | 148 | 117 |
| Other | 869 | 786 |
|  | $ 3,932 | $ 3,789 |

**Note 4 — Debt**

Debt at December 31, 2007 and 2006 is set forth below (dollar amounts in thousands):

|  | December 31 | |
|  | 2007 | 2006 |
|---|---|---|
| Debt in default: | | |
| Senior, secured credit facility: | | |
| Revolving line of credit | $ 10,632 | $ 8,369 |
| Equipment term loan | 9,167 | 11,666 |
| Real estate term loan | 14,022 | 14,755 |
| Subtotal | 33,821 | 34,790 |
| Senior Subordinated Notes | 34,177 | 34,177 |
| Junior Subordinated Note | 347 | — |
| Total debt in default | 68,345 | 68,967 |
| Current portion of long-term debt | 741 | 734 |
| Long-term debt: | | |
| Junior Subordinated Note | — | 347 |
| Series B Preferred Stock | 660 | 657 |
| Other | 86 | 136 |
| Subtotal | 746 | 1,140 |
| Less current portion | (741) | (734) |
| Total long-term debt | 5 | 406 |
| Total debt | $ 69,091 | $ 70,107 |

-55-

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Senior, Secured Credit Facility*

On December 31, 2007, prior to its chapter 11 filing, the Company had available a senior, secured credit facility consisting of the following:

1.    A $17,500,000 revolving line of credit that had a stated maturity of May 15, 2009. At December 31, 2007, there were $10,632,000 of loans and $907,000 of letters of credit outstanding under the revolving line of credit, and unused availability was $1,433,000. The revolving line of credit, loans and reimbursement obligations with respect to letters of credit were limited to the lesser of $17,500,000 or an amount equal to (1) 85% of eligible accounts receivable, plus (2) the lesser of 65% of eligible inventories or 51% of eligible accounts receivable, minus (3) $500,000. The contractual interest rate on loans under the revolving line of credit was LIBOR plus 2.75%. The Company's obligations under the revolving line of credit are secured by a first priority lien on substantially all of the Company's assets other than real estate and a second priority lien on the Company's real estate.

2.    An equipment term loan with an outstanding principal balance of $9,167,000 at December 31, 2007. The equipment term loan is payable in monthly principal installments of $208,000 through May 1, 2009, with the unpaid balance payable on May 15, 2009. The contractual rate of interest on the equipment term loan is LIBOR plus 4.5%. The equipment term loan is secured by a first priority lien on substantially all of the Company's assets other than real estate and a second priority lien on the Company's real estate.

3.    A real estate term loan with an outstanding principal balance of $14,022,000 at December 31, 2007. The real estate term loan is payable in monthly principal installments of $61,000 through May 1, 2009, with the unpaid balance payable on May 15, 2009. The contractual interest rates on the real estate term loan were the prime rate plus 6% as to $4,000,000 principal amount and LIBOR plus 4.5% as to the balance. Principal payments made on the real estate term loan are allocable first to the portion of the loan that bears interest at LIBOR plus 4.5% and then to the portion of the loan that bears interest at the prime rate plus 6%. The real estate term loan is secured by a first priority lien on the Company's real estate and a second priority lien on substantially all of the Company's other assets.

All of the loans under the senior, secured credit facility were classified as debt in default at December 31, 2007, and the interest rates on all of these loans were increased by 2% from February 1, 2007, through March 31, 2008. At December 31, 2007, the interest rates on the revolving loans and the equipment term loan were 9.82% and 11.56%, respectively, and the weighted average interest rate on the real estate term loan was 12.64%.

At December 31, 2007, the agreements governing the revolving line of credit and the secured term loans contained covenants that (1) required the Company to maintain a maximum ratio of senior debt to earnings before interest, taxes, depreciation and amortization ("EBITDA") and minimum levels of fixed charge coverage, revenue, and EBITDA, (2) limited the Company's capital expenditures to $5,500,000 and $6,000,000 per annum during the years ending December 31, 2007 and 2008, respectively, (3) limited the amount of new secured financing that the Company can incur for the purchase of plant and equipment to $2,500,000 during the term of the revolving line of credit, and (4) placed certain other restrictions on the Company's business and operations, including limitations on

-56-

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

On April 1, 2008, Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc., filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code.

In connection with the financing arrangements for the Company's chapter 11 proceedings, the senior, secured credit facility was modified in the following manner:

1.   The interest rates on all of the senior, secured loans were reduced to the contractual rates.

2.   The principal amount of loans under the revolving line of credit was fixed at $14,219,000 for the term of the chapter 11 proceedings.

3.   The Company agreed to continue to make the regular monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

Since the filing of chapter 11 on April 1, 2008, the financial covenants have been modified as follows:

1.   Minimum Cash. The Company's aggregate cash must exceed $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and on the last day of each four-week period thereafter. At May 2, 2008, aggregate cash was $7,538,000.

2.   Maximum Expenditures. The Company's cumulative expenditures must be less than 110% of budgeted cumulative expenditures. At May 2, 2008, cumulative expenditures were $2,756,000 less than 110% of budgeted cumulative expenditures.

3.   Minimum Net Sales. The Company's cumulative net sales must be greater than 90% of budgeted net sales. At May 2, 2008, cumulative net sales exceeded 90% of budgeted cumulative net sales by $596,000.

Also, the Company's postpetition financing with the senior, secured lenders will terminate if it does not file a plan of reorganization providing for the payment of the prepetition senior, secured debt by June 30, 2008, file a disclosure statement regarding such plan by July 30, 2008, and consummate such plan and emerge from chapter 11 by February 25, 2009.

### Senior Subordinated Notes

The Senior Subordinated Notes mature on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, or any of the quarterly payments since that date. Pursuant to a forbearance agreement between the Company

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

and a group of six hedge funds that hold approximately 74.4% of the Senior Subordinated Notes, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes was reduced to 12%.

### Junior Subordinated Note

The Junior Subordinated Note matures on November 1, 2009, and is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. At December 31, 2007, accrued interest on the Junior Subordinated Note totaled $64,000.

### Series B Preferred Stock

At December 31, 2007, there were 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, outstanding with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), and (4) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. Redemptions of $90,000 are scheduled on November 30 of each year in order to retire 450 shares of Series B Preferred Stock annually. The Company did not make scheduled redemptions in the aggregate amount of $660,000 during the years 2000 through 2007, and the Company did not make the scheduled dividend payments on the Series B Preferred Stock on December 15, 2006, and March 15, June 15, September 15, and December 15, 2007, in the aggregate amount of $33,000.

The Series B Preferred Stock is classified as debt in the consolidated financial statements in accordance with the provisions of Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of Both Liabilities and Equity."

### Fair Value of Financial Instruments

The Company believes that, at December 31, 2007, the fair values of the loans outstanding under the revolving line of credit, the equipment term loan, and the real estate term loan approximated the principal amounts of such loans.

Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

### Cash Interest Paid

Cash interest paid during 2007, 2006, and 2005, including amounts allocated to discontinued operations, totaled $4,431,000, $6,749,000, and $8,196,000, respectively.

-58-

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Non-Cash Investing and Financing Activities*

Capital expenditures for 2007 included $28,000 of equipment purchased under capitalized lease obligations. Also during 2007, the Company received 8,198 shares of Class A Common Stock of Federal-Mogul Corporation with a value of $214,000 as of December 31, 2007, in full satisfaction of its prepetition bankruptcy claim against Federal-Mogul. The Company obtained seller financing for the purchase of equipment in the aggregate amount of $157,000 in 2006.

## Note 5 — Common Stock, Warrants, and Other Equity Securities

*Common Stock, $.25 Par Value*

At December 31, 2007, there were 5,021,767 shares of the Company's common stock outstanding, 48,889 shares reserved for issuance on the conversion of the Series B Preferred Stock, and 310,000 shares reserved for issuance under the Company's 2005 Stock Award Plan.

*Warrants*

At each of December 31, 2007 and 2006, there were 345,237 warrants outstanding, each of which entitles the holder to purchase one share of the Company's common stock for $3.50 from August 1, 2005, through August 1, 2009. Because the exercise price of the warrants substantially exceeded the market price of the Company's common stock at the date of issuance, the Company did not record any expense related to the issuance.

*Other Authorized Preferred Stock*

The Company's restated certificate of incorporation provides that the Company is authorized to issue 2,500 shares of 6% Cumulative Convertible Preferred Stock, Series A, par value $100 per share, and 2,500,000 shares of other preferred stock having a par value of $1 per share. No shares of either of these classes of preferred stock have been issued.

## Note 6 — Employee Benefit Plans

*Retirement and Savings Plan*

The Company maintains a retirement and savings plan pursuant to Section 401 of the Internal Revenue Code (a "401(k) plan"). All employees of the Company are entitled to participate in the 401(k) plan after meeting the eligibility requirements. Employees may generally contribute up to 60% of their annual compensation but not more than prescribed dollar amounts established by the United States Secretary of the Treasury. Employee contributions, up to a maximum of 6% of an employee's compensation, are matched 50% by the Company. During 2007, 2006, and 2005, matching contributions made by the Company totaled $432,000, $443,000, and $456,000, respectively. Company contributions to the 401(k) plan vest at a rate of 20% per year commencing after the participant's second year of service; the participant becomes fully vested after six years of service.

-59-

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### *Incentive Compensation Plan*

The Company has an incentive compensation plan that provides for the payment of annual cash bonus awards to certain officers and key employees of the Company if specified targets are met. The Compensation Committee of the Company's Board of Directors, which consists of two directors who are not employees of the Company, oversees the administration of the incentive compensation plan and approves the cash bonus awards. Bonus awards for eligible employees at our operating divisions are typically based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization ("EBITDA") at each operating division. Bonus awards for corporate officers are typically based upon the attainment of predetermined consolidated EBITDA targets. The consolidated financial statements include provisions for bonuses totaling $77,000 and $136,000 in 2007 and 2006, respectively. No cash bonus awards were provided for in 2005.

### *2005 Stock Award Plan*

The Company also has a plan that permits it to award incentive stock options, nonqualified stock options, stock appreciation rights, awards of restricted common stock, performance shares, and performance units to directors, employees, or consultants of the Company (the "2005 Stock Award Plan" or the "Plan"). Under the Plan, the maximum number of shares of common stock that may be granted or optioned to eligible participants is 400,000 and the maximum grant to any eligible participant in a fiscal year for each type of award is set forth below:

Stock options: 50,000 shares
Stock appreciation rights: 50,000 shares
Restricted stock: 50,000 shares
Performance shares: fair market value of 50,000 shares
Performance units: fair market value up to $100,000

On January 26, 2006, 50,000 shares of restricted common stock were awarded to a key employee of the Company and, on October 9, 2007, 10,000 shares of restricted common stock were awarded to each of the Company's four outside directors. The price per common share on the respective grant dates was $0.79 and $0.70, respectively. The Restricted Stock Award Agreement governing the shares granted on January 26, 2006, specifies that 10,000 shares vest on March 31, 2006, and 10,000 shares on each March 31 thereafter until all of the shares granted are vested. The Restricted Stock Award Agreements governing the shares granted on October 9, 2007, specify that, for each grant, 2,000 shares will vest on each subsequent anniversary date of October 9 until all shares granted are vested. If a grantee leaves the Company prior to shares becoming fully vested, any unvested shares will be returned to the Company. Compensation expense equal to the market value of the shares on the date of grant will be charged to earnings over the respective vesting periods. During 2007 and 2006, the Company's restricted stock amortization expense totaled $9,000 and $14,000, respectively. No restricted stock amortization expense was recorded during 2005.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 7 — Income Taxes**

Income taxes are accounted for in accordance with Financial Accounting Standards Board Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." Deferred tax assets are reduced by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

The components of the provisions for income taxes related to continuing operations in 2007, 2006, and 2005, are set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Current: | | | |
| Federal | $ — | $ — | $ (334) |
| State | 6 | 18 | 35 |
|  | 6 | 18 | (299) |
| Deferred: | | | |
| Federal | — | — | — |
| Income tax provision (benefit) | $ 6 | $ 18 | $ (299) |

The income tax provisions recorded during 2007 and 2006 consisted of state income taxes. The federal income tax benefit recognized by the Company's continuing operations in 2005 results from the recognition of an offsetting amount of federal income tax expense by the Company's discontinued operations in 2005. See Note 13, "Discontinued Operations."

Income taxes paid during 2007, 2006, and 2005 totaled $0, $0, and $75,000, respectively.

The difference between the Company's income tax provision (benefit) for income (loss) from continuing operations in 2007, 2006, and 2005 and the income taxes that would have been payable at the federal statutory rate for income (loss) from continuing operations is reconciled as follows (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Federal statutory income tax provision | $ (2,364) | $ (2,495) | $ (1,607) |
| Change in valuation allowance | 1,807 | 2,317 | 1,265 |
| Expiration of operating loss carryforwards | 360 | 163 | — |
| Adjustment of impairment of long-lived assets | 163 | — | — |
| State income taxes, net of federal benefit | 4 | 12 | 23 |
| Other | 36 | 21 | 20 |
| Income tax provision (benefit) | $ 6 | $ 18 | $ (299) |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table sets forth the Company's deferred tax assets and deferred tax liabilities at December 31, 2007 and 2006 (dollar amounts in thousands):

|  | December 31 | |
|  | 2007 | 2006 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating losses and tax credit carryforwards: | | |
| Federal net operating losses | $ 8,843 | $ 9,267 |
| State net operating losses | 2,056 | 2,079 |
| Federal alternative minimum taxes | 864 | 864 |
| Investment tax credit | 100 | 100 |
| Other tax credit | 81 | 81 |
| Total tax carryforwards | 11,944 | 12,391 |
| Deductible temporary differences: | | |
| Impairment of long-lived assets | 12 | 175 |
| Accounts receivable and inventory reserves | 418 | 310 |
| Tax inventory over book | 103 | 142 |
| Interest | 2,583 | 590 |
| Compensation accruals | 292 | 321 |
| Other accruals | 333 | 384 |
| Other | 141 | 145 |
| Total deferred tax assets | 15,826 | 14,458 |
| Valuation allowance | (14,752) | (12,945) |
| Net deferred tax assets | 1,074 | 1,513 |
| Deferred tax liabilities: Tax over book depreciation | (1,074) | (1,513) |
| Net deferred taxes | $ — | $ — |

During 2007, the Company's valuation allowance increased by $1,807,000, primarily due to the net loss reported by the Company for 2007.

At December 31, 2007, the Company had (1) net operating loss carryforwards for federal income tax purposes of $26,009,000, which expire in the years 2011 through 2026, (2) alternative minimum tax net operating loss carryforwards of $25,681,000, which can be used to reduce future taxable income for purposes of calculating alternative minimum taxable income, if any, without any time limitation, and (3) alternative minimum tax credit carryforwards of $864,000, which can be used to offset future payments of regular federal income taxes, if any, without any time limitation. During 2007, $260,000 of the Company's net operating loss carryforwards were utilized and $986,000 expired.

-62-

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The expiration of the Company's federal net operating loss carryforwards by year of expiration is set forth in the table below (dollar amounts in thousands):

| | |
|---|---:|
| 2008 | $ — |
| 2009 | — |
| 2010 | — |
| 2011 | 1,379 |
| 2012 | 1,371 |
| Thereafter | 23,259 |
| | |
| Total federal net operating loss carryforwards | $ 26,009 |

## Note 8 — Segments

### Description of Segments and Products

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily, connector seals used in automotive wiring systems, insulators used in original equipment and aftermarket automotive ignition-wire sets, and molded rubber components used in a variety of medical devices, such as intravenous feeding systems, syringes, and surgical equipment. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States. At December 31, 2007, 21.4% of the Rubber Group's employees were covered by a collective bargaining agreement that expires on December 11, 2008 and, 20.3% of the Rubber Group's employees were subject to a collective bargaining agreement that expires on October 19, 2008.

The Corporate Office consists primarily of general administrative expenses that are not a result of any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, certain prepaid expenses and other miscellaneous current assets, deferred tax assets, and deferred financing expenses.

### Measurement of Segment Profit or Loss

The Company evaluates its performance based upon several measures, including income from operations, earnings before income taxes, depreciation, and amortization, and asset utilization.

The accounting policies of the Company's operating segments are the same as those described in Note 1, "Summary of Significant Accounting Policies," except that debt, deferred financing expenses, interest expense, and income tax expense are excluded from segment reporting. Also, expenses that are not considered direct expenses of the Rubber Group or the Metals Group are not allocated to those segments.

-63-

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Factors Management Used to Identify Reportable Segments*

Although all of the Company's production facilities are similar manufacturing operations, selling to similar customers, the Company presents financial data for the Rubber Group and the Metals Group because of the significant difference in financial performance between those businesses.

*Industry Concentration, Reliance on Large Customers, and Credit Risk*

The following table summarizes net sales during 2007, 2006, and 2005 by the type of product in which the Company's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2006 | | 2005 | |
| Automotive | $ 69,430 | 78.5% | $ 73,464 | 83.6% | $ 83,577 | 86.3% |
| Medical | 15,928 | 18.0 | 11,039 | 12.6 | 9,989 | 10.3 |
| Industrial | 1,549 | 1.8 | 1,623 | 1.8 | 1,429 | 1.5 |
| Other | 1,501 | 1.7 | 1,775 | 2.0 | 1,847 | 1.9 |
| Total net sales | $ 88,408 | 100.0% | $ 87,901 | 100.0% | $ 96,842 | 100.0% |

During 2007, 2006, and 2005, net sales from continuing operations to customers in the automotive industry totaled $69,430,000, $73,464,000, and $83,577,000, respectively, which represented 78.5%, 83.6%, and 86.3%, respectively, of the Company's net sales. At December 31, 2007 and 2006, accounts receivable from automotive industry customers totaled $8,711,000 and $8,844,000, respectively. The Company operates primarily in the domestic automotive market, which has been characterized by price competition, increasing requirements for quality and service, and reduced volumes because of slowing sales of automobiles. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of customer financial statements, and discussions with customer management. Provisions for credit losses are based upon historical experience and such ongoing evaluations. The Company generally does not require collateral from its customers to support the extension of trade credit. At December 31, 2007 and 2006, the Company had reserves for credit losses of $476,000 and $412,000, respectively.

During 2007, 2006, and 2005 net sales to General Cable Corporation, the Company's largest customer, totaled $9,436,000, $9,557,000, and $10,971,000, which represented 10.7%, 10.9%, and 11.3%, respectively, of the Company's consolidated net sales and 12.7%, 12.6%, and 12.9%, respectively, of the Rubber Group's net sales. At December 31, 2007, 2006, and 2005, accounts receivable due from General Cable represented 3.7%, 11.5%, and 12.8% of the Company's accounts receivable, respectively. During 2007, 2006, and 2005, net sales to Delphi Corporation totaled $8,505,000, $10,719,000, and $17,426,000. During 2007, 2006, and 2005, the Rubber Group's net sales to Delphi Corporation totaled $7,381,000, $10,719,000, and $17,426,000. Sales to Delphi in 2007, 2006, and 2005, represented 9.6%, 12.2%, and 18%, respectively, of the Company's consolidated net sales and 9.9%, 14.1%, and 20.5%, respectively, of the Rubber Group's net sales. In October 2005, Delphi filed for protection from its creditors under chapter 11 of the United States Bankruptcy Code. The Company's unpaid, prepetition accounts receivable from Delphi total approximately $360,000 at December 31, 2007. No other customer

-64-

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

accounted for more than 10% of the Company's net sales during 2007, 2006, or 2005. The three largest customers of the Rubber Group accounted for 30.5% of the Rubber Group's net sales and 20.7% of the Company's accounts receivable at December 31, 2007. The three largest customers of the Metals Group accounted for 55.2% of the Metals Group's net sales and 11.3% of the Company's accounts receivable at December 31, 2007. Loss of a significant amount of business from General Cable, Delphi, or any of the Company's other large customers would have a material adverse effect on the Company if such business was not substantially replaced by additional business from existing or new customers. The Company believes that its reserve for uncollectible accounts receivable is adequate; however, the Company's results of operations could be materially adversely affected if any of the Company's large customers experience financial difficulties that cause them to delay or fail to make payments for goods sold to them.

Net sales to Delphi of connector seals for automotive wiring harnesses totaled $5,496,000, $7,742,000, and $11,527,000 during 2007, 2006, and 2005, respectively. During 2005, Delphi in-sourced 34 high-volume connector seals that had been produced by the Company's connector seals business. The majority of in-sourced parts were taken over by Delphi on January 1, 2005, although several parts were taken over at various times during the first half of 2005. Effective January 1, 2005, Delphi and the connector seals business entered into an agreement pursuant to which Delphi agreed to purchase from the business through December 31, 2009, 100% of its requirements for all connector seals not designated to be in-sourced. Pursuant to the agreement, the connector seals business received price increases on a majority of the connector seals covered by the new agreement.

-65-

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Segment Financial Data*

Information relating to the Company's operating segments and the Corporate Office for 2007, 2006, and 2005, and at December 31, 2007, 2006, and 2005, is summarized below (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| *Net sales*: | | | |
| Rubber Group | $ 74,587 | $ 76,090 | $ 84,884 |
| Metals Group | 13,821 | 11,811 | 11,958 |
| Total net sales | $ 88,408 | $ 87,901 | $ 96,842 |
| | | | |
| *Income (loss) from operations*: | | | |
| Rubber Group | $ 7,975 | $ 7,642 | $ 7,034 |
| Metals Group | (192) | (1,245) | (315) |
| Subtotal | 7,783 | 6,397 | 6,719 |
| Corporate Office | (3,108) | (2,313) | (2,322) |
| Total income from operations | $ 4,675 | $ 4,084 | $ 4,397 |
| | | | |
| *Depreciation and amortization* (1): | | | |
| Rubber Group | $ 5,727 | $ 6,455 | $ 7,226 |
| Metals Group | 682 | 820 | 1,138 |
| Subtotal | 6,409 | 7,275 | 8,364 |
| Corporate Office | 28 | 20 | 10 |
| Total depreciation and amortization | $ 6,437 | $ 7,295 | $ 8,374 |
| | | | |
| *Capital expenditures* (2): | | | |
| Rubber Group | $ 2,068 | $ 2,118 | $ 3,034 |
| Metals Group | 519 | 511 | 292 |
| Subtotal | 2,587 | 2,629 | 3,326 |
| Corporate Office | 77 | 32 | 4 |
| Total capital expenditures | $ 2,664 | $ 2,661 | $ 3,330 |

| | December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| *Assets*: | | | |
| Rubber Group | $ 42,236 | $ 45,056 | $ 50,412 |
| Metals Group | 7,963 | 7,381 | 7,692 |
| Subtotal | 50,199 | 52,437 | 58,104 |
| Corporate Office | 820 | 484 | 2,511 |
| Total assets (3) | $ 51,019 | $ 52,921 | $ 60,615 |

_____

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $1,249,000, $3,078,000, and $1,315,000, during 2007, 2006, and 2005, respectively, and which is included in interest expense in the consolidated financial statements.

(2) Capital expenditures for 2007 included $28,000 of equipment purchased under capitalized lease obligations. Capital expenditures for 2006 included $157,000 of equipment acquired with seller-provided financing.

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(3)    Excludes the assets of discontinued operations, which totaled $1,348,000, $1,519,000, and $1,728,000, at December 31, 2007, 2006, and 2005, respectively.

**Note 9 — Net Income or Loss per Common Share**

The calculations of basic and diluted net income or loss per common share for the 2007, 2006, and 2005, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock were not dilutive. In addition, non-vested shares of restricted common stock issued under the Company's 2005 Stock Award Plan (the "Plan") are not considered outstanding common shares for purposes of the calculation of basic net income or loss per share of common stock because the effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of net income or loss per common share set forth below does not reflect the assumed conversion of the Series B Preferred Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the Plan.

|  | Years Ended December 31 | | |
|  | 2007 | 2006 | 2005 |
|---|---|---|---|
| Numerator — Net income (loss): |  |  |  |
| Continuing operations | $ (6,670) | $ (6,877) | $ (4,427) |
| Discontinued operations | (289) | (472) | 644 |
| Net income (loss) | $ (6,959) | $ (7,349) | $ (3,783) |
| Denominator — Weighted average shares outstanding | 4,949 | 4,939 | 4,932 |
| Basic and diluted income (loss) per share of common stock: |  |  |  |
| Continuing operations | $ (1.35) | $ (1.39) | $ (0.90) |
| Discontinued operations | (0.06) | (0.10) | 0.13 |
| Net income (loss) | $ (1.41) | $ (1.49) | $ (0.77) |

**Note 10 — Commitments and Contingencies**

*Purchase Commitments*

At December 31, 2007, the Company had $113,000 of unrecorded commitments outstanding to purchase equipment.

*Leases*

The Company is lessee under various operating leases relating to warehouse and office space, temporary, on-site office units, and equipment. Total rent expense under operating leases aggregated $326,000, $395,000, and $438,000 for 2007, 2006, and 2005, respectively. At December 31, 2007, future

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

minimum lease commitments under noncancelable operating leases totaled $71,000, $68,000, and $47,000 for 2008, 2009, and 2010, respectively. Commitments subsequent to 2010 are not significant.

#### *Legal Actions*

In addition to our pending bankruptcy proceedings, the Company is subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of its business activities. It is the Company's policy to record accruals for such other matters when a loss is deemed probable and the amount of such loss can be reasonably estimated. The various other actions to which the Company is or may in the future be a party are at various stages of completion. Although there can be no assurance as to the outcome of existing or potential litigation, the Company currently believes, based upon the information currently available to it, that the outcome of those actions will not have a material adverse effect upon its results of operations or financial condition.

#### *Other*

The Company maintains insurance coverage for certain aspects of its business and operations. Based on the Company's evaluation of the various risks to which it may be exposed, the Company retains all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although there can be no assurance that it will be successful in its efforts, the Company attempts to limit its liability through, among other things, the ongoing training and education of its employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of its workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of contracts with its customers.

## Note 11 — Related Parties

The Chairman of the Board and the President of the Company are the Company's two largest stockholders, with beneficial ownership of 33% and 27.9%, respectively, of the Company's common stock. They are also the holders of the Junior Subordinated Note, and, together with affiliated entities that include family members, the holders of $7,772,000 principal amount of Senior Subordinated Notes and 69,449 warrants to purchase common stock.

In 2007, 2006, and 2005 the Chairman of the Board and the President of the Company, through an investment banking firm of which they are the only partners, were paid $700,000 to provide management and investment banking services. Additionally, they may receive incentive compensation tied to the Company's operating performance and other compensation for specific transactions completed by the Company with their assistance, although no such compensation was paid in 2007, 2006, or 2005. The Company also reimburses their firm for certain out-of-pocket expenses. During 2007, 2006, and 2005, the Company reimbursed their firm for expenses of $115,000, $116,000, and $102,000, respectively.

For more information on the compensation of the Company's executive officers, refer to the Company's proxy statement that was issued and filed during April 2008 in connection with the Company's Annual Meeting of Stockholders.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 12 — Gain on the Repurchase of Debt**

During 2005, the Company repurchased $133,000 principal amount of 12³/₄% Senior Subordinated Notes, together with accrued interest thereon of $97,000, for $153,000, and recorded a $77,000 pre-tax gain.

**Note 13 — Discontinued Operations**

The results of operations, assets, liabilities, and cash flows of the Company's former die casting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to the die casting business totaled $168,000, $178,000, and $262,000 for 2007, 2006, and 2005, respectively.

During 2007 and 2006, the Company increased its provision for environmental remediation by $87,000 and $255,000, respectively, to cover the current and projected cost of certain environmental remediation at the former die casting business's manufacturing facility. In March 2007, the State of New York Department of Environmental Conservation informed the Company that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

The following table summarizes certain operating data of the die casting business for 2007, 2006, and 2005 (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| Net sales | $      — | $      — | $  3,381 |
| | | | |
| Income (loss) from operations before increase in carrying value of assets held for sale, and gain on the sale of assets | $   (121) | $   (294) | $    130 |
| Increase in carrying value of assets held for sale | — | — | 542 |
| Gain on sale of assets | — | — | 568 |
| | | | |
| Income (loss) from discontinued operations | (121) | (294) | 1,240 |
| Allocated interest expense | 168 | 178 | 262 |
| | | | |
| Income (loss) from discontinued operations before income taxes | (289) | (472) | 978 |
| Income tax provision (1) | — | — | 334 |
| | | | |
| Income (loss) from discontinued operations | $   (289) | $   (472) | $    644 |

(1)  The income tax provision in 2005 was offset by an income tax benefit recorded in continuing operations. Income tax benefits in 2006 were offset by provisions for valuation allowances.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 14 — Quarterly Financial Data (Unaudited)**

Quarterly unaudited financial data for the four fiscal quarters of each of 2007 and 2006 is set forth below (dollar amounts in thousands, except per share amounts).

| 2007 | Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | Mar. 31 | June 30 | Sept. 30 | Dec. 31 |
| Net sales | $ 22,530 | $ 23,778 | $ 23,060 | $ 19,040 |
| Gross profit | $ 3,053 | $ 3,576 | $ 3,310 | $ 1,940 |
| Loss from continuing operations | $ (915) | $ (1,305) | $ (1,806) | $ (2,644) |
| Loss from discontinued operations | (2) | (56) | (53) | (178) |
| Net loss | $ (917) | $ (1,361) | $ (1,859) | $ (2,822) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.19) | $ (0.26) | $ (0.37) | $ (0.53) |
| Discontinued operations | — | (0.01) | (0.01) | (0.04) |
| Net loss | $ (0.19) | $ (0.27) | $ (0.38) | $ (0.57) |

| 2006 | Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| | Mar. 31 | June 30 | Sept. 30 | Dec. 31 |
| Net sales | $ 24,798 | $ 24,439 | $ 20,371 | $ 18,293 |
| Gross profit | $ 3,739 | $ 3,411 | $ 2,186 | $ 1,406 |
| Loss from continuing operations | $ (330) | $ (1,033) | $ (1,456) | $ (4,058) |
| Loss from discontinued operations | (70) | (69) | (49) | (284) |
| Net loss | $ (400) | $ (1,102) | $ (1,505) | $ (4,342) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.07) | $ (0.21) | $ (0.29) | $ (0.82) |
| Discontinued operations | (0.01) | (0.01) | (0.01) | (0.06) |
| Net loss | $ (0.08) | $ (0.22) | $ (0.30) | $ (0.88) |

Results of operations for the three-month periods ended March 31, June 30, September 30, and December 31, 2007, included costs and expenses of $448,000, $1,191,000, $1,498,000, and $1,177,000, repectively, relating to the Company's efforts to refinance or restructure its indebtedness, including additional interest on its senior, secured debt and the Senior Subordinated Notes, and various financing fees, legal fees, and consulting fees charged to the Company by the holders of the Company's senior, secured debt and the Senior Subordinated Notes.

Results of operations for the fourth quarter of 2006 included the write-off of $1,829,000 of unamortized deferred financing costs related to the Company's senior, secured debt and the Senior Subordinated Notes.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 15 — Plant Closings and Sales of Land and Buildings**

In May 2005, the Metals Group sold its land and building in Casa Grande, Arizona, and received net proceeds of $2,636,000, which were applied to reduce the Company's real estate term loan. As a result of the sale, the Company recorded a pre-tax gain of $1,100,000 during the second quarter of 2005.

In October 2005, the Rubber Group sold its land and building in LaGrange, Georgia, and received net proceeds of $1,882,000, which were applied to reduce the Company's real estate term loan. As a result of the sale, the Company recorded a pre-tax gain of $571,000 during the fourth quarter of 2005. During 2005, the Company incurred costs of $633,000 related to the closing of the facility, which were included in cost of sales in the consolidated statement of operations.

**Note 16 — Subsequent Event**

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. In connection with this petition, the Company obtained a financing package that consists of (1) an arrangement with the Company's senior, secured lenders to freeze the loans under their revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to use the collections on its accounts receivable in the operation of its business through February 25, 2009, and (2) a $4,000,000 debtor-in-possession ("DIP") loan that matures on April 1, 2009. The arrangement with the senior, secured lenders provides for a continuation of the Company's monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that the Company's interest rates returned to the original contractual rates. The DIP loan is unsecured, subordinated to the senior, secured loans and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. At April 30, 2008, the DIP loan had been fully funded and the Company had approximately $8,000,000 of cash on hand. See also Note 1, "Summary of Significant Accounting Policies," and Note 4, "Debt."

-71-

Table of Contents

## Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## Item 9A(T). CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of December 31, 2007, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based on that evaluation, our principal executive officers and our principal financial officer have concluded that, because of the deficiencies in our internal control over financial reporting described below, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of the significant deficiencies which, in the aggregate, constitute a material weakness, as described below. Notwithstanding management's assessment that our internal control over financial reporting as of December 31, 2007, was ineffective and the material weaknesses described below, we are not aware that such deficiencies have resulted in the issuance of any material errors or omissions in our consolidated financial statements contained in our annual report on Form 10-K for 2007 or related disclosures, and we received unqualified audit reports from our independent registered public accounting firms on these consolidated financial statements.

### Management's Report on Internal Control over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Due to inherent limitations, internal control over financial reporting, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives have been met. The design of an internal controls system must take into account the realities of limited resources, and the benefits derived from any system of internal control must be balanced against the cost of implementing and maintaining the system. Inherently, all internal control systems are limited by the realities of errors in human judgment and decision making, collusion, and management's ability to override the system of internal control. Also, as business conditions or requirements change in the future, internal control systems in place today may become obsolete.

With the participation of our principal executive officers and our principal financial officer, our management conducted an evaluation of effectiveness of our internal controls over financial reporting as of December 31, 2007, based on the framework and criteria established in "*Internal Control — Integrated Framework*," issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The evaluation included a review of, among other things, the documentation of controls, the overall design of the internal controls, and the documentation related to the performance of control activities.

A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the

-72-

Table of Contents

Company's quarterly or annual financial statements will not be detected or prevented on a timely basis. During the course of our evaluation, we identified certain significant deficiencies as of December 31, 2007, that, in our opinion, only when considered in the aggregate, would constitute a "material weakness" in the Company's internal control over financial reporting as of December 31, 2007. The significant deficiencies noted during our evaluation are set forth below:

- *Incomplete documentation of the internal control system.* The Company maintains numerous internal financial controls. Certain controls and procedures are properly documented within the Company's "Authorization Guidelines and Policy Memoranda." Many controls are embedded within our third-party enterprise resource planning system software in use at all of the Company's manufacturing locations, the software of our third-party cash management system provider, and the software of our Company-wide third-party payroll provider, but are not documented in a methodical fashion outside of these software systems. Other controls, including higher level entity controls, such as the review of our pre-formatted monthly divisional financial reporting package by division controllers and our Chief Financial Officer and President, are not formally documented.

- *We do not have a procedure for documenting the internal control activities performed within the internal control system by our employees.* We currently do not have a procedure in place for our employees to document the internal control activities they perform on a routine basis, such as the review of monthly financial packages, so we do not have evidence that such controls are being performed.

- *Incomplete segregation of duties.* At December 31, 2007, the Company consisted of six operating divisions and the corporate office. All six divisions function as independent businesses with their own management staffs and are required, on a monthly basis, to complete an extensive monthly financial reporting package. Because of the size of these facilities, complete segregation of accounting duties is not cost-effective. In its place, we believe that we have sufficient entity-level oversight controls to mitigate the lack of segregation of duties. However, because the completion of oversight controls is not documented, the Company cannot test these oversight controls to prove that the lack of segregation of duties is not an internal control deficiency.

- *The Company has not tested the operational effectiveness of its internal controls over financial reporting.* Because we have not adequately documented certain internal controls over financial reporting and lack a procedure for documenting the completion of certain control activities, we are unable to test and prove the effectiveness of those internal controls over financial reporting in accordance with COSO standards. Since we have not completely tested our controls, we have determined that our controls over financial reporting were ineffective.

Because of the material weakness described above, management has concluded that we did not, based on the COSO framework for internal control, maintain effective controls over financial reporting as of December 31, 2007.

This annual report does not include an attestation of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accountant firm because of the temporary rules of the Securities and Exchange Commission that permit us to provide only management's report in this annual report.

Table of Contents

### *Remediation of Weaknesses*

At December 31, 2007, the several significant deficiencies noted above may, in the aggregate, constitute a material weakness in our internal control over financial reporting. Although its is our intention to remediate these weaknesses, on April 1, 2008, we filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy filing and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate the weaknesses identified above prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the weaknesses identified above prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission.

If we have the ability to do so, we intend to take the following actions to address the material weakness described above:

1.    Establish a set of procedures for documentation of the performance of internal control processes by our employees.

2.    Establish formal documentation for higher level entity controls that are currently undocumented.

3.    Develop a plan for testing of our internal controls in accordance with COSO standards.

4.    Dedicate additional personnel resources to the improvement, monitoring and testing of our internal controls over financial reporting.

### *Changes in Internal Controls over Financial Reporting*

In reviewing our internal controls, we determined that there have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. Other Information.

None.

-74-

Table of Contents

**PART III**

**Item 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE OF THE REGISTRANT**

Information required by Item 10 is incorporated by reference to the sections entitled "Election of Directors" and "Executive Officers" in the Company's proxy statement issued in connection with its 2008 Annual Meeting of Stockholders and filed with the Securities and Exchange Commission (the Commission) on April 29, 2008.

**Item 11. EXECUTIVE COMPENSATION**

Information required by Item 11 is incorporated by reference to the section entitled "Executive Compensation" in the Company's proxy statement issued in connection with its 2008 Annual Meeting of Stockholders and filed with the Commission on April 29, 2008.

**Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

Information required by Item 12 is incorporated by reference to the sections entitled "Security Ownership" and "Equity Compensation Plan Information" in the Company's proxy statement issued in connection with its 2008 Annual Meeting of Stockholders and filed with the Commission on April 29, 2008.

**Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

Information required by Item 13 is incorporated by reference to the section entitled "Certain Relationships and Transactions" in the Company's proxy statement issued in connection with its 2008 Annual Meeting of Stockholders and filed with the Commission on April 29, 2008.

**Item 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Information required by Item 14 is incorporated by reference to the section entitled "Ratification of Appointment of Independent Auditors" in the Company's proxy statement issued in connection with its 2008 Annual Meeting of Stockholders and filed with the Commission on April 29, 2008.

-75-

Table of Contents

**PART IV**

**Item 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)    1.    **Financial Statements**

The consolidated financial statements of Lexington Precision Corporation and its wholly owned subsidiaries, Lexington Rubber Group, Inc. and Lexington Precision GmbH, are included in Part II, Item 8.

2.    **Financial Statement Schedule**

Schedule II, "Valuation and Qualifying Accounts and Reserves," is included in this Part IV, Item 15, on page 77. All other schedules are omitted because the required information is not applicable, not material, or included in the consolidated financial statements or the notes thereto.

3.    **Exhibits**

The exhibits listed on the accompanying Exhibit Index are filed herewith or incorporated herein by reference.

-76-

Table of Contents

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Schedule II — Valuation and Qualifying Accounts and Reserves
of Continuing Operations
(thousands of dollars)**

|  | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions From Reserves | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for Doubtful Accounts** | | | | |
| Year ended December 31, 2007 | $ 412 | $ 210 | $ 146 | $ 476 |
| Year ended December 31, 2006 | $ 697 | $  55 | $ 340 | $ 412 |
| Year ended December 31, 2005 | $ 537 | $ 170 | $  10 | $ 697 |
| **Inventory Reserve** | | | | |
| Year ended December 31, 2007 | $ 417 | $ 379 | $ 184 | $ 612 |
| Year ended December 31, 2006 | $ 435 | $ 245 | $ 263 | $ 417 |
| Year ended December 31, 2005 | $ 845 | $  11 | $ 421 | $ 435 |

-77-

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LEXINGTON PRECISION CORPORATION
(Registrant)

By:  /s/ Warren Delano
Warren Delano, President


May 15, 2008

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on May 15, 2008:

**Principal Executive Officers and Directors:**

/s/ Michael A. Lubin
Michael A. Lubin, Chairman of the Board

/s/ Warren Delano
Warren Delano, President and Director

**Principal Financial and Accounting Officer:**

/s/ Dennis J. Welhouse
Dennis J. Welhouse, Senior Vice President,
Chief Financial Officer, and Secretary

**Directors:**

/s/ William B. Conner
William B. Conner, Director

/s/ Kenneth I. Greenstein
Kenneth I. Greenstein, Director

/s/ Joseph A. Pardo
Joseph A. Pardo, Director

/s/ Elizabeth H. Ruml
Elizabeth H. Ruml, Director

-78-

Table of Contents

## EXHIBIT INDEX

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 3 — 1 | Articles of Incorporation and Restatement thereof | Incorporated by reference from Exhibit 3-1 to Lexington Precision Corporation's (the "Company") Form 10-K for the year ended May 31, 1981, located under Securities and Exchange Commission File No. 0-3252 ("1981 10-K") |
| 3 — 2 | By-laws, as amended | Incorporated by reference from Exhibit 3-2 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 ("1998 10-K") |
| 3 — 3 | Certificate of Correction dated September 21, 1976 | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for the year ended May 31, 1983, located under Securities and Exchange Commission File No. 0-3252 ("1983 10-K") |
| 3 — 4 | Certificate of Ownership and Merger dated May 24, 1977 | Incorporated by reference from Exhibit 3-4 to 1983 10-K |
| 3 — 5 | Certificate of Ownership and Merger dated May 31, 1977 | Incorporated by reference from Exhibit 3-5 to 1983 10-K |
| 3 — 6 | Certificate of Reduction of Capital dated December 30, 1977 | Incorporated by reference from Exhibit 3-6 to 1983 10-K |
| 3 — 7 | Certificate of Retirement of Preferred Shares dated December 30, 1977 | Incorporated by reference from Exhibit 3-7 to 1983 10-K |
| 3 — 8 | Certificate of Reduction of Capital dated December 18, 1978 | Incorporated by reference from Exhibit 3-8 to 1983 10-K |
| 3 — 9 | Certificate of Retirement of Preferred Shares dated December 28, 1978 | Incorporated by reference from Exhibit 3-9 to 1983 10-K |
| 3 — 10 | Certificate of Reduction of Capital dated January 9, 1979 | Incorporated by reference from Exhibit 3-10 to 1983 10-K |
| 3 — 11 | Certificate of Reduction of Capital dated December 20, 1979 | Incorporated by reference from Exhibit 3-11 to 1983 10-K |
| 3 — 12 | Certificate of Retirement of Preferred Shares dated December 20, 1979 | Incorporated by reference from Exhibit 3-12 to 1983 10-K |
| 3 — 13 | Certificate of Reduction of Capital dated December 16, 1982 | Incorporated by reference from Exhibit 3-13 to 1983 10-K |
| 3 — 14 | Certificate of Reduction of Capital dated December 17, 1982 | Incorporated by reference from Exhibit 3-14 to 1983 10-K |
| 3 — 15 | Certificate of Amendment of Restated Certificate of Incorporation dated September 26, 1984 | Incorporated by reference from Exhibit 3-15 to the Company's Form 10-K for the year ended May 31, 1985, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 16 | Certificate of Retirement of Stock dated September 24, 1986 | Incorporated by reference from Exhibit 4-3 to the Company's Registration Statement in Form S-2 located under Securities and Exchange Commission File No. 33-9380 ("1933 Act Registration Statement") |
| 3 — 17 | Certificate of Amendment of Restated Certificate of Incorporation dated November 21, 1986 | Incorporated by reference from Exhibit 3-17 to the Company's Form 10-K for the year ended May 31, 1987, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 18 | Certificate of Retirement of Stock dated January 15, 1987 | Incorporated by reference from Exhibit 4-5 to Amendment No. 1 to 1933 Act Registration Statement |

-79-

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 3 — 19 | Certificate of Retirement of Stock dated February 22, 1988 | Incorporated by reference from Exhibit 3-19 to the Company's Form 10-K for the year ended May 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("May 31, 1989 10-K") |
| 3 — 20 | Certificate of Amendment of Restated Certificate of Incorporation dated January 6, 1989 | Incorporated by reference from Exhibit 3-20 to May 31, 1989 10-K |
| 3 — 21 | Certificate of Retirement of Stock dated August 17, 1989 | Incorporated by reference from Exhibit 3-21 to May 31, 1989 10-K |
| 3 — 22 | Certificate of Retirement of Stock dated January 9, 1990 | Incorporated by reference from Exhibit 3-22 to the Company's Form 10-K for the seven months ended December 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("December 31, 1989 10-K") |
| 3 — 23 | Certificate of the Designations, Preferences and Relative Participating, Optional and Other Special Rights of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, and the Qualifications, Limitations and Restrictions thereof dated January 10, 1990 | Incorporated by reference from Exhibit 3-1 to the Company's Form 10-Q for the quarter ended November 30, 1989, located under Securities and Exchange Commission File No. 0-3252 ("November 30, 1989 10-Q") |
| 3 — 24 | Certificate of Ownership and Merger dated April 25, 1990 | Incorporated by reference from Exhibit 3-24 to December 31, 1989 10-K |
| 3 — 25 | Certificate of Elimination of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, dated June 4, 1990 | Incorporated by reference from Exhibit 3-25 to the Company's Form 10-K for the year ended December 31, 1990, located under Securities and Exchange Commission File No. 0-3252 ("1990 10-K") |
| 3 — 26 | Certificate of Retirement of Stock dated March 6, 1991 | Incorporated by reference from Exhibit 3-26 to 1990 10-K |
| 3 — 27 | Certificate of Retirement of Stock dated April 29, 1994 | Incorporated by reference from Exhibit 3-28 to the Company's Form 10-K for year the ended December 31, 1994, located under Securities and Exchange Commission File No. 0-3252 ("1994 10-K") |
| 3 — 28 | Certificate of Retirement of Stock dated January 6, 1995 | Incorporated by reference from Exhibit 3-27 to 1994 10-K |
| 3 — 29 | Certificate of Retirement of Stock dated January 5, 1996 | Incorporated by reference from Exhibit 3-29 to the Company's Form 10-K for year the ended December 31, 1995, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 30 | Certificate of Retirement of Stock dated January 6, 1997 | Incorporated by reference from Exhibit 3-30 to the Company's Form 10-K for the year ended December 31, 1996, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 31 | Certificate of Retirement of Stock dated January 9, 1998 | Incorporated by reference from Exhibit 3-31 to the Company's Form 10-K for the year ended December 31, 1997, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 32 | Certificate of Retirement of Stock dated January 13, 1999 | Incorporated by reference from Exhibit 3-32 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 |
| 3 — 33 | Certificate of Retirement of Stock dated January 26, 2000 | Incorporated by reference from Exhibit 3-33 to the Company's Form 10-K for the year ended December 31, 1999, located under Securities and Exchange Commission File No. 0-3252 |
| 4 — 1 | Certificate of Designations, Preferences, Rights and Number of Shares of Redeemable Preferred Stock, Series B | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for the year ended December 31, 1981, located under Securities and Exchange Commission File No. 0-3252 |

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 4 — 2 | Purchase Agreement dated as of February 7, 1985, between Lexington Precision Corporation ("LPC") and L&D Precision Limited Partnership ("L&D Precision") and exhibits thereto | Incorporated by reference from Exhibit 4-1 to the Company's Form 8-K dated February 7, 1985, (date of earliest event reported) located under Securities and Exchange Commission File No. 0-3252 |
| 4 — 3 | Amendment Agreement dated as of April 27, 1990, between LPC and L&D Precision with respect to Purchase Agreement dated as of February 7, 1985 | Incorporated by reference from Exhibit 10-2 to 1990 10-K |
| 4 — 4 | Recapitalization Agreement dated as of April 27, 1990, between LPC and L&D Woolens Limited Partnership ("L&D Woolens") and exhibits thereto | Incorporated by reference from Exhibit 4-10 to December 31, 1989 10-K |
| 4 — 5 | Indenture, dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 4-1 to Form 8-K filed December 18, 2003, located under Securities and Exchange Commission File No. 0-3252 ("December 18, 2003 8-K") |
| 4 — 6 | Registration Rights Agreement, dated as of December 18, 2003, between the Company and Purchasers listed therein | Incorporated by reference from Exhibit 4-2 to December 18, 2003 8-K |
| 4 — 7 | Form of Unit | Incorporated by reference from Exhibit 4-3 to December 18, 2003 8-K |
| 4 — 8 | Form of Warrant | Incorporated by reference from Exhibit 4-4 to December 18, 2003 8-K |
| 4 — 9 | Form of 12% Senior Subordinated Note due August 1, 2009 | Incorporated by reference from Exhibit 4-5 to December 18, 2003 8-K |
| 4 — 10 | Form of 13% Junior Subordinated Note due November 1, 2009 | Incorporated by reference from Exhibit 4-6 to December 18, 2003 8-K |
| 10 — 1 | Purchase Agreement dated as of February 7, 1985, between LPC and L&D Precision and exhibits thereto | See Exhibit 4-2 hereto |
| 10 — 2 | Amendment Agreement dated as of April 27, 1990, between LPC and L&D Precision with respect to Purchase Agreement dated as of February 7, 1985 | See Exhibit 4-3 hereto |
| 10 — 3 | Lexington Precision Corporation Flexible Compensation Plan, as amended | Incorporated by reference from Exhibit 10-3 to the Company's Form 10-K for the year ended December 31, 1991, located under Securities and Exchange Commission File No. 0-3252 ("1991 10-K") |
| 10 — 4 | 1986 Restricted Stock Award Plan, as amended | Incorporated by reference from Exhibit 10-38 to December 31, 1989 10-K |
| 10 — 5 | Lexington Precision Corporation Retirement and Savings Plan, as amended | Incorporated by reference from Exhibit 10-5 to December 31, 1998 10-K |
| 10 — 6 | Description of 2007 Compensation Arrangements with Lubin, Delano & Company | Filed herewith |
| 10 — 7 | Corporate Office 2002 Management Cash Bonus Plan | Incorporated by reference from Exhibit 10-7 to the Company's Form 10-K for the year ended December 31, 2002, located under Securities and Exchange Commission File No. 0-3252 ("2002 10-K") |
| 10 — 8 | Recapitalization Agreement dated as of April 27, 1990, between LPC and L&D Woolens and exhibits thereto | See Exhibit 4-4 hereto |
| 10 — 9 | Exchange Agreement, dated as of December 18, 2003, between the Company and each of Michael A. Lubin and Warren Delano | Incorporated by reference from Exhibit 10-1 to December 18, 2003 8-K |

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 10 — 10 | Warrant Agent Agreement, Dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Warrant Agent | Incorporated by reference from Exhibit 10-2 to December 18, 2003 8-K |
| 10 — 11 | Payoff Agreement, dated as of December 18, 2003, by and between Nomura Special Situations Investment Trust and the Company | Incorporated by reference from Exhibit 10-9 to December 18, 2003 8-K |
| 10 — 12[1] | Delphi Corporation Lifetime Contract, dated as of November 22, 2004, by and between Delphi Automotive Systems LLC and Lexington Connector Seals | Incorporated by reference from Exhibit 10-1 to Form 8-K filed November 29, 2004, located under Securities and Exchange Commission File No. 0-3252 |
| 10 — 13 | Purchase Agreement, dated as of February 22, 2005, by and between Lexington Precision Corporation and City of Casa Grande | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended March 31, 2005, located under Securities and Exchange Commission File No. 0-3252 |
| 10 — 14 | Lexington Precision Corporation 2005 Stock Award Plan — incorporated by reference from Exhibit A to the Proxy Statement on Schedule 14A of Lexington Precision Corporation filed with the Securities and Exchange Commission on April 22, 2005 | Incorporated by reference from Exhibit A to the Proxy Statement on Schedule 14A of Lexington Precision Corporation filed with the Securities and Exchange Commission on April 22, 2005 |
| 10 — 15 | Form of the Incentive Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-2 to Form 8-K filed May 19, 2005, located under Securities and Exchange Commission File No. 0-3252 ("May 19, 2005 8-K") |
| 10 — 16 | Form of the Non-Qualified Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-3 to May 19, 2005 8-K |
| 10 — 17 | Form of the Restricted Stock Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-4 to May 19, 2005 8-K |
| 10 — 18 | Equipment Purchase Agreement dated as of August 2, 2005, between Lexington Precision Corporation and Premier Tool & Die Cast Corp. | Incorporated by reference from Exhibit 10-1 to Form 8-K filed August 8, 2005, located under Securities and Exchange Commission File No. 0-3252 ("August 8, 2005 8-K") |
| 10 — 19 | Bailment Agreement dated as of August 2, 2005, between Lexington Precision Corporation and Premier Tool & Die Cast Corp. | Incorporated by reference from Exhibit 10-2 to August 8, 2005 8-K |
| 10 — 20 | Indemnity Agreement dated as of August 2, 2005, between Lexington Precision Corporation and Premier Tool & Die Cast Corp. | Incorporated by reference from Exhibit 10-3 to August 8, 2005 8-K |
| 10 — 21 | Credit and Security Agreement, dated as of May 31, 2006, by and among LPC and LRG, as borrowers, the lenders from time to time party thereto (the "Lenders"), CapitalSource Finance LLC, as collateral agent and administrative agent for the Lenders, and CapitalSource Finance LLC and Webster Business Credit Corporation, as co-documentation agents | Incorporated by reference from Exhibit 10-4 to the Company's Form 10-Q for the period ended March 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2006 10-Q") |
| 10 — 22 | Pledge Agreement, dated as of May 31, 2006, made by LPC in favor of CapitalSource Finance LLC, as agent | Incorporated by reference from Exhibit 10-5 to March 31, 2006 10-Q |

---

[1] *Portions of this exhibit have been omitted pursuant to a request for confidential treatment under Rule 24b-2 of the Securities Exchange Act of 1934, as amended, and the omitted material has been separately filed with the Securities and Exchange Commission.*

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 10 — 23 | Loan and Security Agreement, dated as of May 31, 2006, by and among LPC and LRG, as borrowers, the lenders from time to time party thereto (the "Term Lenders"), and CSE Mortgage LLC, as collateral agent and administrative agent for the Term Lenders | Incorporated by reference from Exhibit 10-6 to March 31, 2006 10-Q |
| 10 — 24 | Pledge Agreement, dated as of May 31, 2006, made by LPC in favor of CSE Mortgage LLC, as agent | Incorporated by reference from Exhibit 10-7 to March 31, 2006 10-Q |
| 10 — 25 | Termination Agreement, dated as of May 31, 2006, by and among Wachovia Bank, National Association, as agent and lender, Ableco Finance LLC, as lender, LPC, LRG, and CapitalSource Finance LLC | Incorporated by reference from Exhibit 10-8 to March 31, 2006 10-Q |
| 10 — 26 | Intercreditor Agreement, dated as of May 31, 2006, by and between CapitalSource Finance LLC, as agent, and CSE Mortgage LLC, as agent, with the acknowledgment of LPC and LRG, as borrowers, and Webster Business Credit Corporation, CapitalSource Finance LLC, CSE Mortgage LLC, and DMD Special Situations, LLC, as lenders | Incorporated by reference from Exhibit 10-9 to March 31, 2006 10-Q |
| 10 — 27 | First Amendment and Default Waiver Agreement dated as of November 20, 2006, among Lexington Precision Corporation and Lexington Rubber Group, Inc., as borrowers, and CapitalSource Finance LLC, as a lender, as Agent and as Co-Documentation Agent, Webster Business Credit Corporation, as a lender and as Co-Documentation Agent, CSE Mortgage LLC, as a lender and an Agent, and DMD Special Situations, LLC, as a lender | Incorporated by reference from Exhibit 10-31 to the Company's Form 10-K for the year ended December 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("2006 10-K") |
| 10 — 28 | Amendment Agreement dated as of January 31, 2006, between LPC and Michael A. Lubin with respect to the 13% Junior Subordinated Note | Incorporated by reference from Exhibit 10-31 to the 2006 10-K |
| 10 — 29 | Agreement, dated May 19, 2007, by and among Lexington Precision Corporation, Lexington Rubber Group, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended March 31, 2007, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2007 10-Q") |
| 10 — 30 | Forbearance Agreement, dated May 25, 2007, by and among Lexington Precision Corporation and the holders of 12% Senior Subordinated Notes due August 1, 2009, signatory thereto | Incorporated by reference from Exhibit 10-2 to the March 31, 2007 10-Q |
| 10 — 31 | First Supplemental Indenture, dated May 25, 2007, by and between Lexington Precision Corporation and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 10-3 to the March 31, 2007 10-Q |
| 10 — 32 | First Amendment, dated July 20, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among Lexington Precision Corporation, Lexington Rubber Group, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended June 30, 2007, located under Securities and Exchange Commission File No. 0-3252 |

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 10 — 33 | Second Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among Lexington Precision Corporation, Lexington Rubber Group, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended September 30, 2007, located under Securities and Exchange Commission File No. 0-3252 ("September 30, 2007 10-Q") |
| 10 — 34 | First Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 25, 2007, by and among Lexington Precision Corporation and the holders of the 12% Senior Subordinated Notes due August 1, 2009, signatory thereto | Incorporated by reference from Exhibit 10-2 to the September 30, 2007 10-Q |
| 10 — 35 | Restricted Stock Award Agreement, dated as of October 9, 2007, between Lexington Precision Corporation (the "Company") and William B. Conner, a current member of the Company's Board of Directors | Incorporated by reference from Exhibit 10-3 to the September 30, 2007 10-Q |
| 10 — 36 | Restricted Stock Award Agreement, dated as of October 9, 2007, between Lexington Precision Corporation (the "Company") and Kenneth I. Greenstein, a current member of the Company's Board of Directors | Incorporated by reference from Exhibit 10-4 to the September 30, 2007 10-Q |
| 10 — 37 | Restricted Stock Award Agreement, dated as of October 9, 2007, between Lexington Precision Corporation (the "Company") and Joseph A. Pardo, a current member of the Company's Board of Directors | Incorporated by reference from Exhibit 10-5 to the September 30, 2007 10-Q |
| 10 — 38 | Restricted Stock Award Agreement, dated as of October 9, 2007, between Lexington Precision Corporation (the "Company") and Elizabeth H. Ruml, a current member of the Company's Board of Directors | Incorporated by reference from Exhibit 10-6 to the September 30, 2007 10-Q |
| 10 — 39 | Super-Priority DIP Note, dated April 3, 2008, of Lexington Precision Corporation and Lexington Rubber Group, Inc. payable to the order of Lubin Partners LLC, William B. Connor, and ORA Associates LLC in the aggregate principal amount of $2,000,000 | Filed herewith |
| 21 — 1 | Significant Subsidiary of Registrant | Filed herewith |
| 31 — 1 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 — 2 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 — 3 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant | Filed herewith |
| 32 — 1 | Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

-84-

Table of Contents

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 32 — 2 | Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 — 3 | Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

-85-

**<u>Exhibit D</u>**

**LPC's Form 10-Q**
**for the quarter ended June 30, 2008**

**To be filed**

## Exhibit E

**LPC's Proxy Statement issued in connection with its
Annual Meeting of Stockholders held on May 28, 2008**

Table of Contents

**LEXINGTON PRECISION CORPORATION**
800 Third Avenue, 15th Floor
New York, New York 10022

_____

**PROXY STATEMENT**

**ANNUAL MEETING OF STOCKHOLDERS
TO BE HELD ON MAY 28, 2008**

This Proxy Statement is being mailed to stockholders on or about May 8, 2008, in connection with the solicitation by the Board of Directors of LEXINGTON PRECISION CORPORATION, a Delaware corporation (the "Company"), of proxies to be voted at the annual meeting of stockholders of the Company to be held on May 28, 2008 (the "Annual Meeting"). Accompanying this Proxy Statement are the Notice of Annual Meeting of Stockholders, a form of proxy for the meeting, and a copy of the Company's Annual Report for the year ended December 31, 2007, which contains financial statements and related data.

All proxies that are properly completed, signed, and returned to the Company in time will be voted in accordance with the instructions thereon. Proxies may be revoked prior to the exercise thereof by filing with the Secretary of the Company a written revocation or a duly executed proxy bearing a later date, or by voting in person at the Annual Meeting. The cost of preparing and mailing the accompanying form of proxy and related materials and the cost of soliciting proxies will be borne by the Company. The Company has requested brokers, custodians, and other like parties to distribute proxy materials to the beneficial owners of shares and to solicit their proxies and will reimburse such persons for their services in doing so. Without additional compensation, officers and regular employees of the Company may solicit proxies personally or by telephone. The cost of additional solicitation incurred other than by use of the mails is estimated not to exceed $3,000.

Only stockholders of record at the close of business on the record date, April 4, 2008, are entitled to notice of, and to vote at, the Annual Meeting and any adjournments thereof. As of the record date, there were outstanding 5,021,767 shares of the Company's common stock, $0.25 par value (the "Common Stock"), and 3,300 shares of its $8 Cumulative Convertible Preferred Stock, Series B, $100 par value (the "Series B Preferred Stock"), each entitling the holder thereof to one vote. The holders of a majority of the outstanding shares of Common Stock and Series B Preferred Stock present in person or represented by proxy, voting together, will constitute a quorum for all matters before the Annual Meeting. The affirmative vote of a plurality of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting, voting together, is required for the election of the six directors. All other matters require the affirmative vote of a majority of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting.

With regard to the election of directors, votes may be cast in favor or withheld. Votes withheld from the election of directors will be counted to determine the presence or absence of a quorum for the transaction of business at the Annual Meeting, but they have no legal effect under Delaware law and, consequently, will not affect the outcome of the voting on such proposal. With regard to other proposals, abstentions may be specified and will have the same effect as votes against the subject proposal at the Annual Meeting. Broker nonvotes (that is, proxies from brokers or nominees indicating that such persons

Table of Contents

have not received instructions from the beneficial owners or other persons entitled to vote shares on a particular matter as to which the brokers or nominees do not have discretionary power) are counted for purposes of determining a quorum for the transaction of business at the Annual Meeting but are not considered as votes for purposes of determining the outcome of voting on a proposal.

## PROPOSAL 1 — ELECTION OF DIRECTORS

The bylaws of the Company provide for the election of directors for one-year terms. The holders of Common Stock and Series B Preferred Stock, voting together, will be asked to vote at the Annual Meeting for the election of six directors, each to serve until the annual meeting of stockholders to be held in 2009 and until his or her successor has been elected and qualified. Unless authority to vote for the election of a director is specifically withheld by appropriate designation on the face of the proxy, it is the intention of the persons named in the accompanying proxy to vote such proxy for the election of William B. Conner, Warren Delano, Kenneth I. Greenstein, Michael A. Lubin, Joseph A. Pardo, and Elizabeth H. Ruml as directors to be elected by the holders of Common Stock and Series B Preferred Stock, voting together, to serve until the annual meeting of stockholders to be held in 2009 and until their respective successors shall have been elected and qualified. Messrs. Conner, Delano, Greenstein, Lubin, and Pardo and Ms. Ruml are presently members of the Board of Directors. The proxies cannot be voted for a greater number of persons than six in respect of Proposal 1. Management has no reason to believe that the named nominees will be unable or unwilling to serve, if elected. However, in such case, it is intended that the individuals named in the accompanying proxy will vote for the election of such substituted nominees as the Board of Directors may recommend.

Certain information concerning the nominees for election pursuant to Proposal 1 is set forth in the following table. The Board of Directors recommends that shareholders vote **FOR** the election of the named nominees.

| Name | Age | Principal Occupation, Business Experience, and Directorships |
|---|---|---|
| William B. Conner | 75 | Private Investor. President and Director of Conner Holding Company, a holding company for aviation companies, and Chairman of the Board of the subsidiaries thereof for more than five years. Director of the Company since 1981. |
| Warren Delano | 57 | President of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Kenneth I. Greenstein | 78 | Secretary of the Company from September 1979 to April 2004. Consultant for more than five years. Prior to becoming a consultant, stockholder of a professional corporation that was a partner in Nixon, Hargrave, Devans & Doyle LLP (now known as Nixon Peabody LLP), a law firm for more than five years. Director of the Company since 1978. |

-2-

Table of Contents

| Name | Age | Principal Occupation, Business Experience, and Directorships |
|---|---|---|
| Michael A. Lubin | 58 | Chairman of the Board of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Joseph A. Pardo | 74 | Consultant for more than five years. Chairman of Phoenix Advisors, LLC for more than five years. Served as a financial consultant to a number of public and private companies, including as trustee of various creditor trusts in connection with reorganizations under chapter 11 of the federal bankruptcy code during the past five years. Served as Chairman of the Board of Brothers Gourmet Coffee Co. from October 2000 through March 2004. Director of the Company since 2002. |
| Elizabeth H. Ruml | 55 | Retired for more than five years. Managing Director and Co-Head of the Group Market Risk Management function at Deutsche Bank from June 1999 through October 1999. Managing Director and Head of the Corporate Portfolio Management Group at Bankers Trust Company (now known as Deutsche Bank) from March 1998 through June 1999. Managing Director and Chief Credit Officer at Salomon Brothers from May 1993 through December 1997. Director of the Company since 2002. |

Each of the nominees for director is a current director of the Company, and Messrs. Delano, Lubin, and Conner each own, directly or indirectly, greater than 5% of the Company's common stock. On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with the Chapter 11 Cases, the Debtors filed a motion seeking Bankruptcy Court approval of (a) an arrangement pursuant to which the Debtors are permitted to use the cash in their various bank accounts and cash receipts in respect of their accounts receivable (collectively, the "Cash Collateral"), all of which are part of the collateral securing the Debtors' senior secured financing arrangements, in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession credit agreement, (collectively, the "DIP Credit Agreement") among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). The DIP Credit Agreement provides for a super-priority unsecured loan of $4 million. Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The Cash Collateral and proceeds of the loans under the DIP Credit Agreement will be used by the Debtors for working capital, capital expenditures, and other general corporate purposes of the Debtors and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of Cash Collateral and the DIP Credit Agreement contain certain financial and other covenants and certain events of default. On April 2, 2008, the court issued an order authorizing the

-3-

Table of Contents

Debtors to utilize up to $2 million under the DIP Credit Agreement. On April 17, 2008, the court issued a final order authorizing the Debtors to obtain unsecured DIP Loans in the aggregate amount of $4,000,000.

## BOARD OF DIRECTORS AND COMMITTEES OF THE BOARD

The Board of Directors met eight times during 2007. Each director attended at least 75% of the meetings held by the Board of Directors and all meetings held by the committees of the Board of Directors on which such person served.

The Board of Directors has a standing Audit Committee and a standing Compensation Committee. The members of those committees are as follows:

| Name of Committee | Chairman | Other Member(s) |
|---|---|---|
| Audit Committee | Joseph A. Pardo | Kenneth I. Greenstein<br>Elizabeth H. Ruml |
| Compensation Committee | William B. Conner | Kenneth I. Greenstein |

The Audit Committee, which is comprised of three non-employee members of the Board of Directors, met five times during 2007. The primary purpose of the Audit Committee is to review the financial information provided to the Company's stockholders and others, to oversee the system of internal financial controls, and to monitor the independent audit process. Its functions include recommending the independent auditors for appointment by the Board of Directors, consulting periodically with the Company's independent auditors as to the nature, scope, and results of their audit of the accounts of the Company, reviewing the Company's internal accounting controls and procedures, and such other related matters as the Audit Committee deems advisable. The Audit Committee Charter was attached as appendix A to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The Board of Directors has determined that each member of the Audit Committee is independent, as defined by the NASDAQ Manual. In addition, the Board of Directors has determined that Joseph A. Pardo is qualified to serve as the "audit committee financial expert" of the Company as defined in Item 407(d) of Securities and Exchange Commission's Regulation S-K.

The Compensation Committee, which is comprised of two non-employee members of the Board of Directors, met two times during 2007. The meetings were held at regularly scheduled Board meetings where other members of the Board could participate. When appropriate, executive officers whose compensation was being discussed excused themselves from the meetings. The functions of the Compensation Committee include reviewing salaries and cash bonus awards for the Company's executive officers and existing or potential compensation plans for the executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. Additionally, the Compensation Committee administers the Company's 2005 Stock Award Plan. The Compensation Committee does not delegate its authority in this regard. The Compensation Committee Charter was attached as appendix B to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Compensation Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

Table of Contents

The Board of Directors does not have a standing nominating committee, or formal policy regarding nominations by securityholders. The Board of Directors has determined that it is not necessary to have a nominating committee or nomination policy because of the relatively small size of the Company and the Board of Directors. The Board of Directors considers recommendations for director nominees from directors and members of management. The Board of Directors is also willing to consider stockholder recommendations for director nominees that are properly received in accordance with all applicable rules and regulations although no such recommendations have ever been received. The Board of Directors evaluates each prospective nominee on the basis of his or her qualifications. Each member of the Board of Directors is independent, other than Messrs. Lubin and Delano.

In view of the small size of the Board of Directors, as well as the infrequency with which shareholder communications are received, the Company does not have a formal process in place for its stockholders to communicate with its Board of Directors but is receptive to communications from its stockholders, which may be made by writing to Michael A. Lubin, Chairman of the Board, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, at any time prior to December 1, 2008, for the 2009 annual meeting of stockholders.

For the past five years, all of the directors have attended each of the annual meetings of stockholders of the Company. The Company does not have a policy with regard to attendance by directors at annual meetings of stockholders of the Company.

Each member of the Board of Directors, and each nominee for election as director, other than Mr. Lubin and Mr. Delano, is independent, as defined in Rule 4200(a)(15) of the NASDAQ Manual.

Pursuant to the Company's bylaws, the Company has agreed to indemnify its directors and executive officers to the fullest extent permitted by law.

The following table sets forth, for 2007, the fees earned by Directors of the Company other than Messrs. Delano and Lubin, whose fees are set forth in the section titled Executive Compensation, and the value of the restricted stock awards on the date the awards were granted.

## DIRECTOR COMPENSATION TABLE

| Name | Fees Earned or Paid in Cash ($) | Restricted Stock Award ($) | Total ($) |
| --- | --- | --- | --- |
| William B. Conner | 18,250 | 7,000 (1) | 25,250 |
| Kenneth I. Greenstein | 24,350 | 7,000 (1) | 31,350 |
| Joseph A. Pardo | 24,350 | 7,000 (1) | 31,350 |
| Elizabeth H. Ruml | 24,350 | 7,000 (1) | 31,350 |

(1)    Awarded on October 9, 2007. Equals 10,000 shares at $0.70 per share, the closing price per share on the grant date.

Each member of the Board of Directors receives an annual fee of $12,000. Each member of the Audit Committee receives an annual fee of $2,000. Directors receive $1,500 for each Board or committee meeting attended in person as well as reasonable out-of-pocket expenses incurred in connection with attending such meetings. Directors receive $350 for each Board meeting attended by telephone and $750 for each committee meeting attended by telephone. On October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to Ms. Ruml and to Messrs. Conner, Greenstein, and Pardo. Each of the four Restricted Stock Award Agreements governing the grants specify that 2,000 shares of the

-5-

Table of Contents

restricted Common Stock will vest over the service life of each respective Director on each subsequent October 9 until all 10,000 shares are vested. There were no other fees, stock options, stock appreciation rights, restricted stock, performance shares, performance units, non-equity incentive plan compensation, pension or nonqualified compensation earnings or other compensation paid, awarded, or granted to or exercised by directors for services rendered as members of the Board during 2007.

## EXECUTIVE OFFICERS

The following table sets forth certain information concerning the executive officers of the Company.

| Name | Position and Offices | Age |
|------|---------------------|-----|
| Michael A. Lubin | Chairman of the Board | 58 |
| Warren Delano | President and Director | 57 |
| Dennis J. Welhouse | Senior Vice President, Chief Financial Officer, and Secretary | 59 |

Mr. Lubin has been Chairman of the Board of the Company since 1991, and a director of the Company since 1985. For more than five years, Mr. Lubin has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Delano has been President of the Company since 1988, and a director of the Company since 1985. For more than five years, Mr. Delano has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Welhouse has been Senior Vice President since 1992 and Chief Financial Officer of the Company since 1989. Since 2004, Mr. Welhouse has also served as Secretary of the Company. Prior to April 2004, for more than five years, Mr. Welhouse was Assistant Secretary of the Company.

Each of the Company's executive officers serves at the pleasure of the Board of Directors. The Chairman of the Board must be a director of the Company to be elected such.

### Code of Ethics

The Company has adopted a Code of Ethics that applies to its co-principal executive officers and key financial and accounting personnel. A paper copy of the Code of Ethics may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

## SECURITY OWNERSHIP

The following table sets forth the beneficial ownership of the Company's Common Stock, as of April 4, 2008, by (1) each director and director nominee, (2) each executive officer, (3) all directors and executive officers as a group, and (4) each person known by the Company to be the beneficial owner of more than 5% of its outstanding Common Stock. The business address of each officer, director, or stockholder listed below is c/o Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The persons named in the table have sole voting and dispositive power with respect to

-6-

Table of Contents

all shares of the Common Stock shown as beneficially owned by them, subject to community property laws, where applicable, except as set forth in the notes to the table.

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned | Percent of Class Owned |
|---|---|---|
| Michael A. Lubin | 1,686,341 (1) | 33.0% |
| Warren Delano | 1,401,097 (2) | 27.9 |
| William B. Conner | 391,494 (3) | 7.8 |
| Dennis J. Welhouse | 108,000 | 2.2 |
| Joseph A. Pardo | 56,205 | 1.1 |
| Kenneth I. Greenstein | 45,636 (4) | * |
| Elizabeth H. Ruml | 10,000 | * |
| Directors and executive officers as a group (7 persons) | 3,597,550 (5) | 70.7% |

_____

\*       Less than 1 percent.

(1)    Includes (a) 70,000 shares of Common Stock and 169 warrants to purchase Common Stock ("Warrants") owned by a limited liability corporation of which Mr. Lubin is the managing member, (b) 50,000 shares and 40,980 Warrants owned by individual retirement accounts of Mr. Lubin, (c) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Lubin and Mr. Delano are both beneficiaries, and (d) 11,510 Warrants owned jointly with Mr. Lubin's wife. Also includes an aggregate of 9,180 Warrants that are owned by members of Mr. Lubin's family, as to which Mr. Lubin shares dispositive power but has no voting power.

(2)    Includes (a) 110,750 shares owned by individual retirement accounts of Mr. Delano and (b) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Delano and Mr. Lubin are both beneficiaries.

(3)    Includes 238,194 shares owned by Conner Holding Company, a Nevada corporation, of which Mr. Conner is president, a director, and majority stockholder.

(4)    Includes 8,170 shares owned by a retirement benefit plan of which Mr. Greenstein is the sole beneficiary.

(5)    See footnotes 1 through 4, above. Total includes 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Messrs. Delano and Lubin are beneficiaries that are reported in the shares beneficially owned by both Mr. Delano and Mr. Lubin. For purposes of the calculation of "Percent of Class Owned" for the directors and executive officers as a group, the 89,062 shares and 7,610 Warrants owned by the retirement benefit plan of which Messrs. Delano and Lubin are officers are included in the numerator and the denominator only once.

-7-

Table of Contents

**Equity Compensation Plan Information**

At the 2005 Annual Meeting, the stockholders of the Company voted to adopt the Lexington Precision Corporation 2005 Stock Award Plan (the "Plan"). The Plan is administered by the Company's Compensation Committee and permits the Compensation Committee to award to officers and other key employees of the Company stock options, stock appreciation rights, restricted stock, performance shares, or performance units. In January 2006, the Company awarded 50,000 shares of restricted Common Stock to an employee of the Company, and, on October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to each of the Company's four independent directors.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder require the Company's officers and directors and persons who own more than 10 percent of the Common Stock to file reports of ownership and changes in ownership with the Securities and Exchange Commission and to furnish to the Company copies of all such filings.

Based solely on its review of the copies of such reports and written representations from certain reporting persons that certain reports were not required to be filed by such persons, the Company believes that all of its directors, officers, and beneficial owners complied with all of the filing requirements applicable to them with respect to transactions during the year ended December 31, 2007.

### EXECUTIVE COMPENSATION

The following table summarizes, for the Company's past three fiscal years, the compensation paid to each of the Company's co-principal executive officers and to each of the Company's other executive officers whose total annual salary and bonus exceeded $100,000.

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Michael A. Lubin | 2007 | 350,000 (1) | 18,600 (2) | 368,600 |
| Chairman of the Board | 2006 | 350,000 (1) | 18,700 (2) | 368,700 |
| (co-principal executive officer) | 2005 | 350,000 (1) | 14,500 (2) | 364,500 |
| Warren Delano | 2007 | 350,000 (1) | 18,600 (2) | 368,600 |
| President and Director | 2006 | 350,000 (1) | 18,700 (2) | 368,700 |
| (co-principal executive officer) | 2005 | 350,000 (1) | 14,500 (2) | 364,500 |
| Dennis J. Welhouse | 2007 | 161,200 | 5,827 (3) | 167,027 |
| Senior Vice President, | 2006 | 159,867 | 5,090 (3) | 164,957 |
| Chief Financial Officer, and Secretary | 2005 | 158,000 | 4,715 (3) | 162,715 |

-8-

Table of Contents

_____

(1)    Represents compensation, paid indirectly to Messrs. Lubin and Delano through Lubin, Delano & Company, during each of 2007, 2006, and 2005 for services rendered as an executive officer of the Company. Lubin, Delano & Company is an investment banking and consulting firm of which Messrs. Lubin and Delano are the only partners. See "Compensation Discussion and Analysis," "Compensation Committee Report on Executive Compensation," and "Certain Relationships and Transactions."

(2)    Represents fees paid indirectly to Messrs. Lubin and Mr. Delano through Lubin, Delano & Company during each of 2007, 2006, and 2005 for serving as directors on the Company's Board of Directors.

(3)    Includes (a) Company contributions of $4,836, $4,152, and $3,753 made to Mr. Welhouse's account under the Company's 401(k) Plan in 2007, 2006, and 2005, respectively, and (b) insurance premiums of $991, $938, and $962 paid by the Company in 2007, 2006, and 2005, respectively, for term life insurance owned by Mr. Welhouse.

   No bonuses, stock options, stock appreciation rights, restricted stock, performance shares, performance units, non-equity incentive plan compensation, or pension or nonqualified compensation earnings were paid, awarded, or granted to or exercised by any of the persons named in the summary compensation table above during 2007, 2006, or 2005. For a narrative description of material factors necessary to provide an understanding of the compensation disclosed in the summary compensation table above, see the section entitled "Compensation Discussion and Analysis" below.

## COMPENSATION DISCUSSION AND ANALYSIS

### Compensation Objectives, Philosophy, and Policy

   The Company's compensation program is designed to motivate and reward the Company's executive officers for attaining financial, operational, and strategic objectives that will contribute to the overall goal of enhancing stockholder value and promote the Company's success in attracting, developing, and retaining key executives and management personnel critical to its long-term success. The Company believes that executive compensation should be based on objective measures of performance at the individual, divisional, and corporate levels, should be driven primarily by the long-term interests of the Company and its stockholders, and should be linked to the enhancement of stockholder value. In addition to reviewing compensation of executive officers, the Compensation Committee also considers recommendations from the co−principal executive officers regarding compensation for those employees reporting directly to them. The principal elements of the compensation plan include base salary and cash bonus awards.

### Components of Executive Compensation

   The compensation program for executive officers consists of the following components:

   **Base Salary.** Base salary is paid by the Company to executive officers as a result of market practices and competitive factors. In determining the base pay levels for executive officers of the Company, the Compensation Committee considers the compensation paid by a group of industrial companies that are generally similar to the Company with respect to type of business, sales volume, cash flow, and market capitalization. The companies that make up the comparable group are subject to change as companies merge with, or are acquired by, other companies or because companies cease publishing compensation data for other reasons. Base pay levels, prior to taking into account other factors considered

-9-

Table of Contents

by the Compensation Committee, are at the mid-range of base pay levels for such group of companies. The base salaries of the Messrs. Delano and Lubin were last adjusted effective January 1, 2004. The increase in the compensation payable to Messrs. Delano and Lubin was made in order to adjust their compensation to a level that the Compensation Committee considered appropriate at that time and under the prevailing circumstances. Messrs. Delano and Lubin had previously been paid a base salary of $250,000 each since 1999. The base salary of Mr. Welhouse was last adjusted on June 1, 2006, to an annual salary level of $161,200. The increase in Mr. Welhouse's compensation was also made to adjust his compensation to a level that the Compensation Committee considered appropriate at that time and under the prevailing circumstances. Prior to June 1, 2006, Mr. Welhouse's annual base salary was $158,000. The Company's most direct competitors are private companies that do not publicly disclose information regarding executive compensation, financial condition, or operating performance. The Company believes that the companies with which it compares itself for the purpose of determining executive compensation are not necessarily included in the indices used to compare stockholder returns that are contained elsewhere in this Proxy Statement. In determining the salary component of compensation packages for executive officers, the Compensation Committee also takes into consideration the recent performance of the individual and the Company, the experience of the individual, and the scope and complexity of the position. The Compensation Committee does not assign weights to these factors and does not consider any one factor more important than another. The 2007, 2006, and 2005 salaries of the named executive officers are shown in the "Salary" column of the summary compensation table in the section entitled "Executive Compensation" above. Salaries for executive officers are reviewed on an annual basis, as well as at the time of a promotion or other change in responsibilities. Increases in salary are based on subjective evaluation of such factors as the individual's level of responsibility and performance.

**Incentive Compensation Plan.** In response to market practices and competitive factors, the Company's executive officers can qualify for incentive compensation. To provide incentives to increase profitability, the Company has an incentive compensation plan that provides for the payment of cash bonus awards to executive officers and other eligible employees of the Company. Bonus awards for eligible divisional employees are usually based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization (EBITDA) at each respective division. Bonus awards for executive officers and other eligible corporate employees are based upon the attainment of a predetermined consolidated EBITDA target. No bonuses were paid to Messrs. Delano, Lubin, and Welhouse for 2007, 2006, or 2005. The Compensation Committee is responsible for the supervision of the incentive compensation plan.

**2005 Stock Award Plan.** The Company also has an incentive stock plan (the "2005 Stock Award Plan") that permits it to award nonqualified stock options, incentive stock options, stock appreciation rights, restricted stock, performance shares, or performance units to officers and key employees of the Company. These varying types of long-term incentives, each focusing on different elements of performance and retention, are intended to benefit shareholders by enabling the Company to better attract and retain talent in a marketplace where such incentives are prevalent. Stock options are intended to reward for increases in shareholder value. Restricted stock is intended to help to retain directors, executive officers, and other key employees in a challenging business environment and to reward for increases in stockholder value. Performance shares and performance units are intended to provide focus on transforming the Company and attaining growth in stockholder value over a multi-year period. In January 2006, the Company awarded 50,000 shares of restricted Common Stock to an employee of the Company, and, on October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to each of the Company's four outside directors. No awards under the 2005 Stock Award Plan were granted

-10-

Table of Contents

to, exercised by, or held by any of the persons named in the summary compensation table above during 2007, 2006, or 2005.

**Compensation of Messrs. Delano, Lubin, and Welhouse.** Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2007, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, totaled $700,000. The Company's arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2007, 2006, or 2005 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2007, 2006, or 2005.

During 2007, the aggregate payments made to Mr. Welhouse for services provided by him as Senior Vice President, Chief Financial Officer, and Secretary totaled $161,200. Mr. Welhouse received no payments under the incentive compensation plan for 2007, 2006, or 2005.

The Company believes that the quality of executive leadership significantly affects long term performance and that it is in the best interest of the stockholders to compensate executive leadership fairly for achievements that meet or exceed the standards set by the Compensation Committee, so long as there is corresponding risk when performance falls short of such standards.

The compensation paid for the combined services of Messrs. Delano, Lubin, and Welhouse in their respective roles as executive officers of the Company was agreed to after considering the responsibilities of such positions and the competitive marketplace for executive talent. The Company believes that the compensation paid to Lubin, Delano & Company during 2007 for the combined services of Messrs. Delano and Lubin as executive officers of the Company and to Mr. Welhouse during 2007 comports with the Compensation Committee's subjective perception of the base compensation levels of executive officers in their respective positions employed by other industrial companies, both public and private.

## Role of the Compensation Committee

The Compensation Committee is comprised of two non-employee members of the Board of Directors. The Compensation Committee is responsible for reviewing salaries, cash bonus awards, and existing or potential compensation plans for the Company's executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. The membership of the Compensation Committee is determined by the Board.

-11-

Table of Contents

### COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION

The Compensation Committee is composed entirely of independent directors. The members of the Compensation Committee consist of William B. Conner and Kenneth I. Greenstein.

The committee met with management to review and discuss the Compensation Discussion and Analysis disclosures included in this proxy statement. Based on such review and discussion, the committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Proxy Statement and incorporated by reference in the Company's Form 10-K for its 2007 fiscal year, and the Board has approved that recommendation.

COMPENSATION COMMITTEE

William B. Conner, *Chairman*
Kenneth I. Greenstein, *Member*

### AUDIT COMMITTEE REPORT

The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors and performs the other duties and responsibilities set forth in the Audit Committee's charter. It is the responsibility of the Company's independent auditors to perform an independent audit of and express an opinion on the Company's financial statements. The Audit Committee's responsibility is one of review and oversight.

Since the audit of the Company's financial statements for the year ended December 31, 2007, has not been completed, the Audit Committee has not reviewed and discussed with management the audited financial statements. In addition, for the foregoing reasons, the Audit Committee has also not discussed and reviewed with its independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees). The Audit Committee intends to do these things upon completion of the audit.

The Audit Committee has received the written disclosures and the letter from its independent registered public accounting firm required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and has discussed with its independent registered public accounting firm the independence of that firm as the Company's auditors.

Upon completion of the audit of the Company's financial statements for the year ended December 31, 2007, the Audit Committee intends to make a recommendation as to inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007, for filing with the Securities and Exchange Commission.

In 2000, the Board of Directors adopted a written charter for the Audit Committee, which sets forth the operating practices and responsibilities of the Audit Committee. A copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. Each member of the Audit Committee is independent, as defined in Rule 4200(a) of the listing standards of the National Association of Securities Dealers.

The members of the Audit Committee are not professionally engaged in the practice of auditing or accounting and, except insofar as Mr. Pardo has been designated as the "audit committee financial

-12-

Table of Contents

expert" of the Company, are not experts in the fields of accounting, auditing, or auditor independence. Members of the committee rely without independent verification on the information provided to them and on the representations made by management and the independent auditors.

AUDIT COMMITTEE

Joseph A. Pardo, *Chairman*
Kenneth I. Greenstein, *Member*
Elizabeth H. Ruml, *Member*

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Company's Compensation Committee are William B. Conner and Kenneth I. Greenstein. Neither Mr. Conner nor Mr. Greenstein has ever been an employee of the Company, and Mr. Conner, who is the Chairman of the Compensation Committee, has never been an officer of the Company. Mr. Greenstein served as Secretary of the Company from September 1979 to April 2004 although he received no compensation for acting in such capacity. Neither Mr. Conner nor Mr. Greenstein is party to any interlock relationships as defined in applicable Securities and Exchange Commission rules.

## CERTAIN RELATIONSHIPS AND TRANSACTIONS

Warren Delano and Michael A. Lubin beneficially own 27.9% and 33.0%, respectively, of the Common Stock of the Company.

Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2007, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, were $700,000. The Company's arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2007 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2007.

In addition to his ownership of Common Stock, and Warrants, Mr. Lubin and his family members own $346,666.67 aggregate principal amount of the Company's 13% Junior Subordinated Note due November 1, 2009, and $7,011,000 aggregate principal amount of the Company's 12% Senior Subordinated Notes due August 1, 2009. The Lubin, Delano & Company Profit Sharing Plan & Trust, of which Messrs. Delano and Lubin are currently the sole beneficiaries, owns $761,000 principal amount of the 12% Senior Subordinated Notes due August 1, 2009. The Company is in default under its 13% Junior Subordinated Note due November 1, 2009, and its 12% Senior Subordinated Notes due August 1, 2009, although the Company believes that any efforts to enforce the payment obligations under the notes are stayed as a result of the Company's filing of a voluntary petition for bankruptcy, as described below under the heading "Bankruptcy Proceeding."

The Company's principal executive offices at 800 Third Avenue, 15th Floor, New York, New York are leased by Lubin, Delano & Company for aggregate annual base rent of $109,000. Messrs. Delano and Lubin have guaranteed the obligations of Lubin, Delano & Company under the lease.

-13-

Table of Contents

The Company reimburses Lubin, Delano & Company for rent, utilities and other expenses relating to the lease and will reimburse Messrs. Delano and Lubin if any payments are made by them under their guaranties. Substantially all of the business conducted at those offices is the business of the Company.

**Bankruptcy Proceeding**

On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with the Chapter 11 Cases, the Debtors filed a motion seeking Bankruptcy Court approval of (a) an arrangement pursuant to which the Debtors are permitted to use the cash in their various bank accounts and cash receipts in respect of their accounts receivable (collectively, the "Cash Collateral"), all of which are part of the collateral securing the Debtors' senior secured financing arrangements, in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession credit agreement, (collectively, the "DIP Credit Agreement") among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). The DIP Credit Agreement provides for a super-priority unsecured loan of $4 million. Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The Cash Collateral and proceeds of the loans under the DIP Credit Agreement will be used by the Debtors for working capital, capital expenditures, and other general corporate purposes of the Debtors and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of Cash Collateral and the DIP Credit Agreement contain certain financial and other covenants and certain events of default. On April 2, 2008, the court issued an order authorizing the Debtors to utilize up to $2 million under the DIP Credit Agreement. On April 17, 2008, the court issued a final order authorizing the Debtors to obtain unsecured DIP Loans in the aggregate amount of $4,000,000.

-14-

## PROPOSAL 2 — RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS

The Board of Directors, on the recommendation of the Audit Committee, has appointed the firm of Malin, Bergquist & Company, LLP, independent public accountants, to audit the accounts of the Company for the year ending December 31, 2008. Malin, Bergquist & Company, LLP has been employed by the Company as its independent auditor since the Company's fiscal year ended December 31, 2007. Prior to that time, the Company employed Ernst & Young LLP as its independent auditor. Set forth below is a breakdown of the aggregate fees billed to the Company by Malin, Bergquist & Company, LLP and Ernst & Young LLP for the twelve-month periods ended December 31, 2007 and 2006:

|  | 2007 | 2006 |
|---|---|---|
| Audit Fees (1) | $240,000 | 357,131 |
| Audit-Related Fees (2) | 53,000 | 49,000 |
| Tax Fees (3) | 17,000 | 24,000 |
| All Other Fees | 9,500 | 11,037 |
|  | $319,500 | 441,168 |

(1)   Includes fees for the respective annual audit and review of the Company's financial statements included in Form 10-Qs.

(2)   Includes fees for the audit of Lexington Rubber Group, Inc., a wholly-owned subsidiary of Lexington Precision Corporation, and the audit of the Lexington Precision Corporation Retirement & Savings Plan.

(3)   Assistance with the preparation of federal and state income tax returns.

## Changes in Accountants

At a meeting held on October 9, 2007, the Board of Directors of the Company authorized Joseph A. Pardo, the Chairman of its Audit Committee and an independent director of the Company, to engage Malin, Bergquist & Company, LLP as its independent registered public accounting firm for the year ended December 31, 2007, at such time and on such terms as may be determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. At the same meeting, the Board of Directors of the Company authorized and directed Mr. Pardo, in his capacity as Chairman of the Audit Committee, to accept the resignation of Ernst & Young LLP as the independent registered public accounting firm of the Company at such time as determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. The audit committee of the Board of Directors, through the action of Mr. Pardo in his capacity as Chairman of the Audit Committee, engaged Malin, Bergquist & Company, LLP as the Company's independent registered public accounting firm on January 12, 2008, and accepted the resignation of Ernst & Young LLP on January 14, 2008. The Company did not consult with Malin, Bergquist & Company, LLP prior to this date regarding the application of accounting principles or type of audit that might be rendered on the Company's financial statements or any matter that was either the subject of a disagreement or reportable event as defined in Item 304(a)(1)(iv) and (v) of Regulation S-K.

The reports of Ernst & Young LLP on the Company's financial statements for the years ended December 31, 2005 and 2006, contained an uncertainty qualification for conditions that raised substantial doubt about the ability of the Company to continue as a going concern. Such financial statements did not

Table of Contents

contain an adverse opinion, a disclaimer of opinion and were not qualified or modified as to audit scope or accounting principles.

In connection with the audits of the Company's financial statements for the years ended December 31, 2005 and 2006, and the subsequent interim period preceding their resignation, there were no disagreements with Ernst & Young LLP on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedures which, if not resolved to the satisfaction of Ernst & Young LLP would have caused Ernst & Young LLP to make reference to the matter in their report. The Company has provided Ernst & Young LLP with a copy of this disclosure, and Ernst & Young LLP has furnished the Company with a letter addressed to the Commission stating that it agrees with the above statements, as previously disclosed. A copy of that letter, dated January 25, 2008, is filed as Exhibit 16.1 to the Company's Form 8-K/A filed on January 30, 2008.

**Audit Committee Pre-Approval Policies and Procedures**

The Audit Committee adopted a pre-approval policy in 2003 pursuant to which the Audit Committee pre-approves each non-audit engagement or service performed by the Company's independent auditor. Prior to pre-approving any such non-audit engagement or service, it is the committee's practice to first gather information regarding the engagement or requested service that explains the specific engagement or service and enables the committee to make a well-reasoned assessment of the impact of the engagement or service on the auditor's independence. In addition, the Audit Committee may authorize the executive officers of the Company to incur fees for non-audit services without the specific approval of the committee, provided that the fees for such services do not exceed $15,000. As required by the Sarbanes-Oxley Act of 2002, the Audit Committee pre-approved all non-audit engagements for services provided by our independent auditor after May 6, 2003.

The bylaws of the Company do not require that the stockholders ratify the appointment of Malin, Bergquist & Company, LLP as our independent auditor; however, we are seeking ratification because we believe it is a matter of good corporate governance practice. It is intended that, unless any proxy is marked to the contrary, the shares represented by such proxy shall be voted for the ratification of such appointment. If the stockholders do not ratify the appointment, the Audit Committee will reconsider whether to retain Malin, Bergquist & Company, LLP, but may nevertheless retain Malin, Bergquist & Company, LLP as the Company's independent auditor. If the appointment is ratified, the Audit Committee in its discretion may change the appointment at any time during the year if it determines that a change would be in the best interests of the Company and its stockholders.

It is expected that a representative of Malin, Bergquist & Company, LLP will be present at the Annual Meeting to answer questions of stockholders and will have the opportunity, if desired, to make a statement.

The Board of Directors recommends that shareholders vote **FOR** such ratification.

**STOCKHOLDER PROPOSALS**

Proposals by stockholders intended to be presented at the next annual meeting (to be held in 2009) must be received by the Secretary of the Company on or before December 1, 2008, in order to be included in the proxy statement and the proxy for that meeting. Proposals should be directed to the Secretary, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, and must comply with applicable requirements of the federal securities laws and the Company's bylaws.

-16-

Table of Contents

## OTHER MATTERS

Management does not know of any other matters that are likely to be brought before the Annual Meeting; however, in the event that any other matters properly come before the Annual Meeting, the persons named in the enclosed proxy will vote in accordance with their judgment on such matters.

Accompanying this Proxy Statement is a copy of the Company's Annual Report, which includes financial statements and related data.

According to the rules of the Securities and Exchange Commission, the information presented in this Proxy Statement under the captions "Audit Committee Report" and "Compensation Committee Report on Executive Compensation" will not be deemed to be "soliciting material" or filed with the Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, and nothing contained in any previous filings made by the Company under such Acts shall be interpreted as incorporating by reference the information presented under the specified captions.

By Order of the Board of Directors,

Dennis J. Welhouse
*Secretary*

Dated: May 8, 2008
New York, New York

-17-

**<u>Exhibit F</u>**

**The Debtor's Projected Consolidated Financial Statements
for the Five Years ending December 31, 2012**

**Exhibit F**

**Projected Financial Statements**

The Debtors' projected consolidated financial statements for the five years ending December 31, 2012, that are contained in this Exhibit F (the "Projected Financial Statements") were prepared by the Debtors in July 2008 in connection with the development of the Amended Plan. Set forth below is a description of the manner in which the Projected Financial Statements were developed and the assumptions upon which the Projected Financial Statements were based.

## A.  Development of the Projected Financial Statements

The Projected Financial Statements represent a summation of separate financial projections developed by the management teams at each of the Debtors' operating units (the "Divisional Projections") and for the Corporate Office, based upon (1) the underlying assumptions set forth below, and (2) the information available to the management team of each operating unit regarding the cost structure of that operating unit and critical factors in the market segments served by that operating unit. The market factors considered by the operating unit management teams included input from existing and prospective customers regarding the following:

(i)   the relative quality, service, and pricing offered by the operating units and their competitors;

(ii)   additional business that may become available to the operating units as a result of new programs being developed by those customers;

(iii)   additional business that may become available to the operating units as a result of re-sourcing of existing components due to quality, service, or pricing issues with current suppliers; and

(iv)   the potential for the operating units to lose business as a result of possible in-sourcing, offshore sourcing, or other re-sourcing decisions.

## B.  Assumptions Underlying the Projected Financial Statements

The Divisional Projections were developed utilizing the following key assumptions:

**1.  Consummation of the Amended Plan.** The Amended Plan will be confirmed by the Bankruptcy Court and the Effective Date will be October 31, 2008. The Debtors do not believe that a delay of one to four months in the consummation of the Amended Plan would have a material effect on the Projected Financial Statements.

**2.  Exit Financing.** On the Effective Date, the Debtors will enter into a senior, secured credit facility (the "Exit Facility") that will consist of (a) a $17.5 million revolving line of credit, (b) $20.4 million of term loans, and (c) a $2.0 million facility for

the financing of new equipment purchased subsequent to the Effective Date. In addition, the Debtors will make arrangements for the $4.0 million Debtor-In-Possession Financing being repaid on the Effective Date to be reinvested as a junior participation in the Exit Financing.

       **3.  Automotive Aftermarket.** The demand for automotive replacement parts will remain at the current level. The Debtors' sales of insulators for aftermarket ignition-wire sets have increased during 2008, despite the slowdown of the economy and the decrease in sales of new cars and light trucks.

       **4.  Automotive OEM.** Overall production of new cars and light trucks will be in accordance with the projections received by the Debtors during the last week of June 2008 from a leading, automotive-industry forecasting service, which indicated the following North American production levels (in millions of units):

| | **Actual** | **Projected** | | | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| GM, Ford, Chrysler | 9,548 | 8,127 | 7,779 | 7,746 | 8,395 | 8,708 |
| All Other | 5,553 | 5,518 | 5,707 | 6,079 | 6,856 | 7,522 |
| | 15,101 | 13,645 | 13,486 | 13,825 | 15,251 | 16,230 |

       The forecasting service also provided an automotive engine-build forecast that correlated to the vehicle production forecast. The engine-build forecast was the basis for forecasting the Debtors' sales of insulators for OEM ignition systems.

       **5.  Medical Device Market.** The market for medical devices, including single-use products, will continue to grow.

       **6.  Availability of New Business.** As a result of the consummation of the Amended Plan, customers of the Debtors who have restricted the ability of the Debtors to obtain new business because of concerns about the Debtors' financial condition will remove those restrictions and permit the Debtors to compete for new business solely on the basis of quality, delivery, and price.

       **7.  Raw Material Costs.** The Reorganized Debtors will be able to offset any raw material price increases subsequent to the date of the preparation of the Projected Financial Statements through the use of one or more of the following methods:

      (i)   Substitution or reformulation of raw materials (including substitution of internally mixed rubber compounds for purchased compounds);

      (ii)  Shifting purchases to suppliers offering lower prices for comparable raw materials; and

      (iii) Price increases to customers, some of which are already provided for by contract and some of which will be negotiated at the time of the raw material price increase.

**8.   Net Operating Loss Carryforwards.** Upon the consummation of the Amended Plan, there will be a "change of control" of the Debtors, as defined under the Internal Revenue Code (the "Code"). The Reorganized Debtors will elect to utilize their net operating loss carryforwards pursuant to the provisions of Section 382(1)b of the Code, based on an equity value of $7.25 per share.

## C.   Forward-Looking Statements

Some of the statements in this Disclosure Statement are "forward-looking statements." Forward-looking statements usually can be identified by the Debtors' use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when strategy is discussed, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

(i)    increases and decreases in business awarded to the Debtors by their customers;

(ii)   unanticipated price reductions for the Debtors' products as a result of competition;

(iii)  the ability of the Debtors to offset any increases in the cost of raw materials;

(iv)   North American automotive production significantly above or below the production forecast utilized by the Debtors in preparing the Projected Financial Statements;

(v)    changes in the competitive environment;

(vi)   unanticipated operating results;

(vii)  changes in economic conditions;

(viii) changes in interest rates;

(ix)   financial difficulties encountered by the Debtors' customers or suppliers;

(x)    chapter 11 filings by one or more of the Debtors' customers or suppliers; and

(xi)  labor interruptions at facilities of the Debtors or their customers or suppliers.

The Debtors' results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Statements of Operations**
**(in thousands of dollars)**

| | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | 88,408 | 79,866 | 100,531 | 120,166 | 134,931 | 148,298 |
| Cost of sales | 76,529 | 66,615 | 79,029 | 91,280 | 99,383 | 107,038 |
| Gross profit | 11,879 | 13,251 | 21,502 | 28,886 | 35,548 | 41,260 |
| Selling & administrative expense | 6,506 | 5,679 | 6,553 | 7,124 | 7,392 | 7,610 |
| Income from operations | 5,373 | 7,572 | 14,949 | 21,762 | 28,156 | 33,650 |
| Other income (expense): | | | | | | |
|   Interest expense | (11,507) | (8,593) | (4,124) | (3,514) | (2,509) | (2,016) |
|   Interest income | 68 | – | – | – | 93 | 496 |
|   Gain on sale of property | – | – | – | 3,863 | – | – |
|   Discontinued operations | (189) | 110 | – | – | – | – |
|   Reorganization expense | (698) | (4,585) | – | – | – | – |
|     Subtotal | (12,326) | (13,068) | (4,124) | 349 | (2,416) | (1,520) |
| Income (loss) before income taxes | (6,953) | (5,496) | 10,825 | 22,111 | 25,740 | 32,130 |
| Provision for income taxes | 6 | 41 | 1,392 | 3,550 | 6,487 | 8,388 |
| Net income (loss) | (6,959) | (5,537) | 9,433 | 18,561 | 19,253 | 23,742 |
| EBITDA (continuing operations): | | | | | | |
|   Income from operations | 5,373 | 7,572 | 14,949 | 21,762 | 28,156 | 33,650 |
|   Depreciation | 6,036 | 5,142 | 4,960 | 4,552 | 4,173 | 3,997 |
|   Amortization (operating only) | 401 | 224 | 269 | 356 | 442 | 431 |
|     EBITDA | 11,810 | 12,938 | 20,178 | 26,670 | 32,771 | 38,078 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Statements of Operations**
**(expressed as a percent of net sales)**

| | Actual | Forecast | Projected | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 86.6 | 83.4 | 78.6 | 76.0 | 73.7 | 72.2 |
| Gross profit | 13.4 | 16.6 | 21.4 | 24.0 | 26.3 | 27.8 |
| Selling & administrative expense | 7.4 | 7.1 | 6.5 | 5.9 | 5.5 | 5.1 |
| Income from operations | 6.1 | 9.5 | 14.9 | 18.1 | 20.9 | 22.7 |
| Other income (expense): | | | | | | |
|    Interest expense | (13.0) | (10.8) | (4.1) | (2.9) | (1.9) | (1.4) |
|    Interest income | 0.1 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 |
|    Gain on sale of property | 0.0 | 0.0 | 0.0 | 3.2 | 0.0 | 0.0 |
|    Discontinued operations | (0.2) | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
|    Reorganization expense | (0.8) | (5.7) | 0.0 | 0.0 | 0.0 | 0.0 |
|      Total | (13.9) | (16.4) | (4.1) | 0.3 | (1.8) | (1.0) |
| Income (loss) before income taxes | (7.9) | (6.9) | 10.8 | 18.4 | 19.1 | 21.7 |
| Income taxes | 0.0 | 0.1 | 1.4 | 3.0 | 4.8 | 5.7 |
| Net income (loss) | (7.9) % | (6.9) % | 9.4 % | 15.4 % | 14.3 % | 16.0 % |
| EBITDA: | | | | | | |
|    Income from operations | 6.1 % | 9.5 % | 14.9 % | 18.1 % | 20.9 % | 22.7 % |
|    Depreciation | 6.8 | 6.4 | 4.9 | 3.8 | 3.1 | 2.7 |
|    Amortization (operating only) | 0.5 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
|      EBITDA | 13.4 % | 16.2 % | 20.1 % | 22.2 % | 24.3 % | 25.7 % |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Statements of Cash Flows
(in thousands of dollars)**

| | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Income from operations | 5,373 | 7,572 | 14,949 | 21,762 | 28,156 | 33,650 |
| Depreciation | 6,036 | 5,142 | 4,960 | 4,552 | 4,173 | 3,997 |
| Amortization (operating only), net | 401 | 224 | 269 | 356 | 442 | 431 |
| EBITDA | 11,810 | 12,938 | 20,178 | 26,670 | 32,771 | 38,078 |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (1,256) | 529 | (3,120) | (3,380) | (1,983) | (1,514) |
| Inventories | (543) | (904) | (509) | (1,672) | (1,244) | (899) |
| Prepaid expenses | (287) | 1 | 187 | (440) | (123) | (77) |
| Other current assets | 328 | (66) | 60 | 24 | – | – |
| Accounts payable | 188 | 4,182 | 2,514 | 1,257 | 635 | 817 |
| Accrued expenses | 147 | 273 | 262 | 300 | 164 | 244 |
| Net change in operating working capital | (1,423) | 4,015 | (606) | (3,911) | (2,551) | (1,429) |
| | | | | | | |
| Capital expenditures | (2,664) | (3,497) | (3,945) | (5,164) | (3,961) | (4,180) |
| Sales of P & E, excl. gains or losses on sales | – | 22 | – | 4,500 | – | – |
| Other assets | (184) | (282) | (651) | (484) | (503) | (503) |
| Post-retirement liability, excl. current portion | (2) | 11 | – | (40) | (30) | (30) |
| Other long-term liabilities | 101 | 13 | 170 | 110 | 95 | 50 |
| Cash provided (used) by discontinued operations | (17) | (50) | 77 | 1,698 | – | – |
| | | | | | | |
| Net cash provided (used) | 7,621 | 13,170 | 15,223 | 23,379 | 25,821 | 31,986 |
| | | | | | | |
| Nonoperating profit (loss) incl. income tax expense | (12,211) | (13,151) | (5,516) | (7,064) | (8,903) | (9,908) |
| Amortization of deferred financing costs | 1,249 | 589 | 288 | 298 | 298 | 216 |
| Deferred financing charges | (1,286) | (1,652) | – | – | – | – |
| Income taxes payable, net | (4) | 43 | – | – | – | – |
| Accrued interest | 5,824 | 4,874 | 92 | (41) | (112) | – |
| Term loans | (3,279) | (2,579) | (7,202) | (12,277) | (7,209) | – |
| Revolving line of credit | 2,263 | (1,349) | (2,883) | (4,257) | (2,143) | – |
| | | | | | | |
| Net cash flow | 177 | (55) | – | – | 7,792 | 22,294 |
| | | | | | | |
| Add cash on hand at beginning of period | 35 | 212 | 157 | 157 | 157 | 7,949 |
| Cash on hand at end of period | 212 | 157 | 157 | 157 | 7,949 | 30,243 |
| | | | | | | |
| Net cash transferred to (from) corporate | – | – | – | – | – | – |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Balance Sheets
### (in thousands of dollars)

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 212 | 157 | 157 | 157 | 7,949 | 30,243 |
| Marketable securities | 214 | 177 | 177 | 177 | 177 | 177 |
| Trade receivables, net | 10,981 | 10,452 | 13,572 | 16,952 | 18,935 | 20,449 |
| Inventories | 9,330 | 10,234 | 10,743 | 12,415 | 13,659 | 14,558 |
| Prepaid expenses | 926 | 925 | 738 | 1,178 | 1,301 | 1,378 |
| Deferred income taxes | 98 | 98 | 98 | 98 | 98 | 98 |
| Other current assets | 106 | 172 | 112 | 88 | 88 | 88 |
| Current assets of discontinued operations | 10 | – | – | – | – | – |
| Total current assets | 21,877 | 22,215 | 25,597 | 31,065 | 42,207 | 66,991 |
| Plant & equipment | | | | | | |
| Land | 1,817 | 2,159 | 2,159 | 946 | 946 | 946 |
| Buildings | 13,370 | 13,394 | 13,406 | 13,406 | 13,406 | 13,406 |
| Machinery & equipment | 110,723 | 113,414 | 117,345 | 122,509 | 126,470 | 130,650 |
| | 125,910 | 128,967 | 132,910 | 136,861 | 140,822 | 145,002 |
| Accumulated depreciation | 105,056 | 109,780 | 114,738 | 119,290 | 123,463 | 127,460 |
| Plant & equipment, net | 20,854 | 19,187 | 18,172 | 17,571 | 17,359 | 17,542 |
| Plant & equipment of discontinued operations | 1,338 | 1,230 | 1,122 | – | – | – |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| Deferred financing expenses | 37 | 1,100 | 812 | 514 | 216 | – |
| Other assets | 638 | 612 | 893 | 924 | 874 | 856 |
| | 52,367 | 51,967 | 54,219 | 57,697 | 68,279 | 93,012 |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Balance Sheets (cont.)**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 6,558 | 4,748 | 7,262 | 8,519 | 9,154 | 9,971 |
| Accrued income taxes | (43) | – | – | – | – | – |
| Accrued interest expense | 7,954 | 511 | 601 | 522 | 450 | 450 |
| Accrued expenses excl. interest and income taxes | 3,975 | 4,248 | 4,510 | 4,810 | 4,974 | 5,218 |
| Short-term debt | 10,632 | 9,283 | 6,400 | 2,143 | – | – |
| Current portion of long-term debt | 58,454 | 7,236 | 6,189 | 7,209 | – | 15,000 |
| Current liabilities of discontinued operations | 241 | 31 | – | – | – | – |
| Total current liabilities | 87,771 | 26,057 | 24,964 | 23,203 | 14,578 | 30,639 |
| | | | | | | |
| Long-term debt, net of current portion | 5 | 34,452 | 28,297 | 15,000 | 15,000 | – |
| | | | | | | |
| Long-term portion of post-retirement obligation | 258 | 269 | 269 | 229 | 199 | 169 |
| | | | | | | |
| Other long-term liabilities | 176 | 90 | 145 | 151 | 129 | 83 |
| | | | | | | |
| Deferred income taxes | 98 | 98 | 98 | 98 | 98 | 98 |
| | | | | | | |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,240 | 1,240 | 1,245 | 1,247 | 1,249 |
| Additional paid-in-capital | 13,187 | 45,701 | 45,715 | 45,717 | 45,721 | 45,725 |
| Accumulated income (deficit) | (50,366) | (55,940) | (46,507) | (27,946) | (8,693) | 15,049 |
| Stockholders' equity (deficit) | (35,941) | (8,999) | 448 | 19,016 | 38,275 | 62,023 |
| | | | | | | |
| | 52,367 | 51,967 | 54,219 | 57,697 | 68,279 | 93,012 |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

**Consolidating Outstanding Debt**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | 12/31/09 | 12/31/10 | 12/31/11 | 12/31/12 |
| Revolving loans | 10,632 | 9,283 | 6,400 | 2,143 | – | – |
| Equipment term loan | 9,167 | – | – | – | – | – |
| New equipment term loan | – | 8,755 | 6,475 | 3,209 | – | – |
| Real estate term loan A | 10,022 | – | – | – | – | – |
| Real estate term loan B | 4,000 | – | – | – | – | – |
| New real estate term loan | – | 10,694 | 7,898 | – | – | – |
| Second lien secured note | – | 4,000 | 4,000 | 4,000 | – | – |
| Retirement obligations | 6 | – | – | – | – | – |
| General unsecured claims | – | 3,239 | 1,113 | – | – | – |
| 12% Senior Subordinated Notes due July 31, 2009 | 34,177 | – | – | – | – | – |
| 12% Senior Subordinated Notes due December 31, 2013 | – | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| 13% Junior Subordinated Note | 347 | – | – | – | – | – |
| Redeemable preferred stock | 660 | – | – | – | – | – |
| Other | 80 | – | – | – | – | – |
| Total debt | 69,091 | 50,971 | 40,886 | 24,352 | 15,000 | 15,000 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Rubber Group Statements of Operations**
**(in thousands of dollars)**

|  | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | 74,587 | 68,051 | 82,448 | 92,353 | 104,767 | 115,168 |
| Cost of sales | 63,039 | 55,308 | 63,445 | 68,615 | 75,046 | 80,758 |
| Gross profit | 11,548 | 12,743 | 19,003 | 23,738 | 29,721 | 34,410 |
| Selling & administrative expense | 3,573 | 2,867 | 3,389 | 3,758 | 3,874 | 3,987 |
| Income from operations | 7,975 | 9,876 | 15,614 | 19,980 | 25,847 | 30,423 |
| EBITDA: |  |  |  |  |  |  |
| Income from operations | 7,975 | 9,876 | 15,614 | 19,980 | 25,847 | 30,423 |
| Depreciation | 5,335 | 4,562 | 4,364 | 3,860 | 3,287 | 3,020 |
| Amortization (operating only) | 392 | 209 | 255 | 349 | 436 | 425 |
| EBITDA | 13,702 | 14,647 | 20,233 | 24,189 | 29,570 | 33,868 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Rubber Group Statements of Operations**
**(expressed as a percent of net sales)**

| | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 84.5 | 81.3 | 77.0 | 74.3 | 71.6 | 70.1 |
| Gross profit | 15.5 | 18.7 | 23.0 | 25.7 | 28.4 | 29.9 |
| Selling & administrative expense | 4.8 | 4.2 | 4.1 | 4.1 | 3.7 | 3.5 |
| Income from operations | 10.7 % | 14.5 % | 18.9 % | 21.6 % | 24.7 % | 26.4 % |
| EBITDA: | | | | | | |
|   Income from operations | 10.7 % | 14.5 % | 18.9 % | 21.6 % | 24.7 % | 26.4 % |
|   Depreciation | 7.2 | 6.7 | 5.3 | 4.2 | 3.1 | 2.6 |
|   Amortization (operating only) | 0.5 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 |
|     EBITDA | 18.4 % | 21.5 % | 24.5 % | 26.2 % | 28.2 % | 29.4 % |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Rubber Group Statements of Cash Flows
(in thousands of dollars)**

| | Actual | Forecast | Projected | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income from operations | 7,975 | 9,876 | 15,614 | 19,980 | 25,847 | 30,423 |
| Depreciation | 5,335 | 4,562 | 4,364 | 3,860 | 3,287 | 3,020 |
| Amortization (operating only) | 392 | 209 | 255 | 349 | 436 | 425 |
| EBITDA | 13,702 | 14,647 | 20,233 | 24,189 | 29,570 | 33,868 |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (728) | 373 | (1,644) | (1,583) | (1,549) | (966) |
| Inventories | (288) | (585) | (353) | (953) | (701) | (378) |
| Prepaid expenses | (20) | (63) | 14 | (74) | (49) | (49) |
| Other current assets | 430 | (266) | 60 | 24 | – | – |
| Accounts payable | 177 | (1,036) | 1,891 | 441 | 658 | 561 |
| Accrued expenses | (91) | 364 | 466 | 200 | 205 | 167 |
| Net change in operating working capital | (520) | (1,213) | 434 | (1,945) | (1,436) | (665) |
| | | | | | | |
| Capital expenditures | (2,068) | (2,985) | (2,734) | (3,154) | (2,951) | (2,670) |
| Sales of P & E, excl. gains or losses on sales | – | – | – | 4,500 | – | – |
| Other assets | (337) | (311) | (651) | (484) | (503) | (503) |
| Post-retirement liability, excl. current portion | (12) | – | – | (20) | (20) | (20) |
| Other long-term liabilities | 101 | 13 | 170 | 110 | 95 | 50 |
| | | | | | | |
| Net cash provided (used) | 10,866 | 10,151 | 17,452 | 23,196 | 24,755 | 30,060 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Rubber Group Balance Sheets**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 51 | 49 | 49 | 49 | 49 | 49 |
| Trade receivables, net | 8,961 | 8,588 | 10,232 | 11,815 | 13,364 | 14,330 |
| Inventories | 7,268 | 7,853 | 8,206 | 9,159 | 9,860 | 10,238 |
| Prepaid expenses | 646 | 709 | 695 | 769 | 818 | 867 |
| Other current assets | (94) | 172 | 112 | 88 | 88 | 88 |
| Total current assets | 16,832 | 17,371 | 19,294 | 21,880 | 24,179 | 25,572 |
| | | | | | | |
| Plant & equipment | | | | | | |
| Land | 1,696 | 2,038 | 2,038 | 825 | 825 | 825 |
| Buildings | 11,012 | 11,013 | 11,025 | 11,025 | 11,025 | 11,025 |
| Machinery & equipment | 85,356 | 87,998 | 90,720 | 93,874 | 96,825 | 99,495 |
| | 98,064 | 101,049 | 103,783 | 105,724 | 108,675 | 111,345 |
| Accumulated depreciation | 80,780 | 85,342 | 89,706 | 93,566 | 96,853 | 99,873 |
| Plant & equipment, net | 17,284 | 15,707 | 14,077 | 12,158 | 11,822 | 11,472 |
| | | | | | | |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| | | | | | | |
| Other assets | 497 | 500 | 781 | 812 | 762 | 744 |
| | | | | | | |
| | 42,236 | 41,201 | 41,775 | 42,473 | 44,386 | 45,411 |
| | | | | | | |
| **Liabilities & Invested Capital:** | | | | | | |
| | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 4,353 | 3,317 | 5,208 | 5,649 | 6,307 | 6,868 |
| Accrued operating expenses | 2,138 | 2,502 | 2,968 | 3,168 | 3,373 | 3,540 |
| Total current liabilities | 6,491 | 5,819 | 8,176 | 8,817 | 9,680 | 10,408 |
| | | | | | | |
| Long-term portion of post-retirement obligation | 170 | 170 | 170 | 150 | 130 | 110 |
| | | | | | | |
| Other long-term liabilities | 176 | 90 | 145 | 151 | 129 | 83 |
| | | | | | | |
| Invested capital | 35,399 | 35,122 | 33,284 | 33,355 | 34,447 | 34,810 |
| | | | | | | |
| | 42,236 | 41,201 | 41,775 | 42,473 | 44,386 | 45,411 |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Metals Group Statements of Operations
(in thousands of dollars)**

| | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net product sales | 13,821 | 11,815 | 18,083 | 27,813 | 30,164 | 33,130 |
| Cost of product sales | 13,490 | 11,307 | 15,584 | 22,665 | 24,337 | 26,280 |
| Gross profit | 331 | 508 | 2,499 | 5,148 | 5,827 | 6,850 |
| Selling & administrative expense | 523 | 498 | 596 | 747 | 846 | 898 |
| Income (loss) from operations | (192) | 10 | 1,903 | 4,401 | 4,981 | 5,952 |
| EBITDA: | | | | | | |
| Income (loss) from operations | (192) | 10 | 1,903 | 4,401 | 4,981 | 5,952 |
| Depreciation | 682 | 546 | 562 | 666 | 871 | 962 |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | 490 | 556 | 2,465 | 5,067 | 5,852 | 6,914 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Statements of Operations**
**(expressed as a percent of net sales)**

|  | Actual 2007 | | Forecast 2008 | | Projected 2009 | | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | 100.0 | % | 100.0 | % | 100.0 | % | 100.0 | % | 100.0 | % | 100.0 | % |
| Cost of sales | 97.6 | | 95.7 | | 86.2 | | 81.5 | | 80.7 | | 79.3 | |
| Gross profit | 2.4 | | 4.3 | | 13.8 | | 18.5 | | 19.3 | | 20.7 | |
| Selling & administrative expense | 3.8 | | 4.2 | | 3.3 | | 2.7 | | 2.8 | | 2.7 | |
| Income (loss) from operations | (1.4) | % | 0.1 | % | 10.5 | % | 15.8 | % | 16.5 | % | 18.0 | % |
| EBITDA: | | | | | | | | | | | | |
| Income (loss) from operations | (1.4) | % | 0.1 | % | 10.5 | % | 15.8 | % | 16.5 | % | 18.0 | % |
| Depreciation | 4.9 | | 4.6 | | 3.1 | | 2.4 | | 2.9 | | 2.9 | |
| Amortization (operating only) | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 | | 0.0 | |
| EBITDA | 3.5 | % | 4.7 | % | 13.6 | % | 18.2 | % | 19.4 | % | 20.9 | % |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Metals Group Statements of Cash Flows
(in thousands of dollars)**

|  | Actual | Forecast | Projected | | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income (loss) from operations | (192) | 10 | 1,903 | 4,401 | 4,981 | 5,952 |
| Depreciation | 682 | 546 | 562 | 666 | 871 | 962 |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | 490 | 556 | 2,465 | 5,067 | 5,852 | 6,914 |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (401) | 156 | (1,476) | (1,797) | (434) | (548) |
| Inventories | (255) | (319) | (156) | (719) | (543) | (521) |
| Prepaid expenses | (67) | 51 | 43 | (110) | (24) | (28) |
| Other current assets | 38 | – | – | – | – | – |
| Accounts payable | 469 | (658) | 623 | 688 | (23) | 256 |
| Accrued expenses | 41 | 95 | 16 | 248 | 59 | 77 |
| Net change in operating working capital | (175) | (675) | (950) | (1,690) | (965) | (764) |
| Capital expenditures | (519) | (503) | (1,209) | (2,000) | (1,000) | (1,500) |
| Sales of P & E, excl. gains or losses on sales | – | 22 | – | – | – | – |
| Other assets | (61) | 29 | – | – | – | – |
| Post-retirement liability, excl. current portion | 10 | 11 | – | (20) | (10) | (10) |
| Net cash provided (used) | (255) | (560) | 306 | 1,357 | 3,877 | 4,640 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Balance Sheets**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 1 | 4 | 4 | 4 | 4 | 4 |
| Trade receivables, net | 2,020 | 1,864 | 3,340 | 5,137 | 5,571 | 6,119 |
| Inventories | 2,062 | 2,381 | 2,537 | 3,256 | 3,799 | 4,320 |
| Prepaid expenses | 343 | 292 | 249 | 359 | 383 | 411 |
| Total current assets | 4,426 | 4,541 | 6,130 | 8,756 | 9,757 | 10,854 |
| | | | | | | |
| Plant & equipment | | | | | | |
| Land | 121 | 121 | 121 | 121 | 121 | 121 |
| Buildings | 2,325 | 2,345 | 2,345 | 2,345 | 2,345 | 2,345 |
| Machinery & equipment | 25,280 | 25,325 | 26,534 | 28,534 | 29,534 | 31,034 |
| | 27,726 | 27,791 | 29,000 | 31,000 | 32,000 | 33,500 |
| Accumulated depreciation | 24,251 | 24,381 | 24,943 | 25,609 | 26,480 | 27,442 |
| Plant & equipment, net | 3,475 | 3,410 | 4,057 | 5,391 | 5,520 | 6,058 |
| | | | | | | |
| Other assets | 62 | 33 | 33 | 33 | 33 | 33 |
| | 7,963 | 7,984 | 10,220 | 14,180 | 15,310 | 16,945 |
| | | | | | | |
| **Liabilities & Invested Capital:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 1,538 | 880 | 1,503 | 2,191 | 2,168 | 2,424 |
| Accrued operating expenses | 433 | 528 | 544 | 792 | 851 | 928 |
| Total current liabilities | 1,971 | 1,408 | 2,047 | 2,983 | 3,019 | 3,352 |
| | | | | | | |
| Long-term portion of post-retirement obligation | 88 | 99 | 99 | 79 | 69 | 59 |
| | | | | | | |
| Invested capital | 5,904 | 6,477 | 8,074 | 11,118 | 12,222 | 13,534 |
| | 7,963 | 7,984 | 10,220 | 14,180 | 15,310 | 16,945 |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Corporate Office Statements of Operations
(in thousands of dollars)**

| | Actual | Forecast | Projected | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | – | – | – | – | – | – |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2,410 | 2,314 | 2,568 | 2,619 | 2,672 | 2,725 |
| Loss from operations | (2,410) | (2,314) | (2,568) | (2,619) | (2,672) | (2,725) |
| EBITDA: | | | | | | |
| Loss from operations | (2,410) | (2,314) | (2,568) | (2,619) | (2,672) | (2,725) |
| Depreciation | 19 | 34 | 34 | 26 | 15 | 15 |
| Amortization (operating only) | 9 | 15 | 14 | 7 | 6 | 6 |
| EBITDA | (2,382) | (2,265) | (2,520) | (2,586) | (2,651) | (2,704) |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Corporate Office Statements of Operations
(expressed as a percent of net sales)**

|  | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | – % | – % | – % | – % | – % | – % |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2.7 | 2.9 | 2.6 | 2.2 | 2.0 | 1.8 |
| Loss from operations | (2.7) % | (2.9) % | (2.6) % | (2.2) % | (2.0) % | (1.8) % |
| EBITDA: |  |  |  |  |  |  |
| Loss from operations | (2.7) % | (2.9) % | (2.6) % | (2.2) % | (2.0) % | (1.8) % |
| Depreciation | – | – | – | – | – | – |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | (2.7) % | (2.8) % | (2.5) % | (2.2) % | (2.0) % | (1.8) % |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Corporate Office Statements of Cash Flows
(in thousands of dollars)**

| | Actual 2007 | Forecast 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Loss from operations | (2,410) | (2,314) | (2,568) | (2,619) | (2,672) | (2,725) |
| Depreciation | 19 | 34 | 34 | 26 | 15 | 15 |
| Amortization (operating only) | 9 | 15 | 14 | 7 | 6 | 6 |
| EBITDA | (2,382) | (2,265) | (2,520) | (2,586) | (2,651) | (2,704) |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (127) | – | – | – | – | – |
| Prepaid expenses | (200) | 13 | 130 | (256) | (50) | – |
| Other current assets | (140) | 200 | – | – | – | – |
| Accounts payable | (458) | 5,876 | – | 128 | – | – |
| Accrued expenses | 197 | (186) | (220) | (148) | (100) | – |
| Net change in operating working capital | (728) | 5,903 | (90) | (276) | (150) | – |
| Capital expenditures | (77) | (9) | (2) | (10) | (10) | (10) |
| Other assets | 214 | – | – | – | – | – |
| Discontinued operations | (87) | | | | | |
| Net cash provided (used) | (3,060) | 3,629 | (2,612) | (2,872) | (2,811) | (2,714) |
| Nonoperating loss incl. income tax expense | (12,211) | (13,151) | (5,977) | (7,542) | (9,381) | (11,050) |
| Amortization of deferred financing costs | 1,249 | 589 | 288 | 298 | 298 | 216 |
| Deferred financing charges | (1,286) | (1,652) | – | – | – | – |
| Income taxes payable, net | (4) | 43 | – | – | – | – |
| Accrued interest | 5,824 | 4,874 | 92 | (41) | (112) | – |
| Term loans | (3,279) | (2,579) | (7,202) | (12,277) | (7,209) | – |
| Revolving line of credit | 2,263 | (1,349) | (2,424) | (3,817) | (3,042) | – |
| Net cash flow | (10,504) | (9,596) | (17,835) | (26,251) | (22,257) | (13,548) |
| Add cash on hand at beginning of period | (17) | 160 | 104 | 104 | 104 | 6,479 |
| Less cash on hand at end of period | 160 | 104 | 104 | 104 | 6,479 | 27,631 |
| Net cash transferred to (from) corporate | (10,681) | (9,540) | (17,835) | (26,251) | (28,632) | (34,700) |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Balance Sheets**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | 12/31/10 | 12/31/11 | 12/31/12 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 160 | 104 | 104 | 104 | 6,479 | 27,631 |
| Marketable securities | 214 | 177 | 177 | 177 | 177 | 177 |
| Trade receivables, net | – | – | – | – | – | – |
| Inventories | – | – | – | – | – | – |
| Prepaid expenses | (63) | (76) | (206) | 50 | 100 | 100 |
| Deferred income taxes | 98 | 98 | 98 | 98 | 98 | 98 |
| Other current assets | 200 | – | – | – | – | – |
| Total current assets | 609 | 303 | 173 | 429 | 6,854 | 28,006 |
| Plant & equipment | | | | | | |
| Land | – | – | – | – | – | – |
| Buildings | 33 | 36 | 36 | 36 | 36 | 36 |
| Machinery & equipment | 87 | 91 | 91 | 101 | 111 | 121 |
| | 120 | 127 | 127 | 137 | 147 | 157 |
| Accumulated depreciation | 25 | 57 | 89 | 115 | 130 | 145 |
| Plant & equipment, net | 95 | 70 | 38 | 22 | 17 | 12 |
| Deferred financing expenses | 37 | 1,100 | 812 | 514 | 216 | – |
| Other assets | 79 | 79 | 79 | 79 | 79 | 79 |
| | 820 | 1,552 | 1,102 | 1,044 | 7,166 | 28,097 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Balance Sheets (cont.)**
**(in thousands of dollars)**

| | Actual 12/31/07 | Forecast 12/31/08 | Projected 12/31/09 | 12/31/10 | 12/31/11 | 12/31/12 |
|---|---|---|---|---|---|---|
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 667 | 551 | 551 | 679 | 679 | 679 |
| Accrued income taxes | (43) | – | – | – | – | – |
| Accrued interest expense | 7,954 | 511 | 603 | 562 | 450 | 450 |
| Accrued expenses excl. interest and income taxes | 1,404 | 1,218 | 998 | 850 | 750 | 750 |
| Short-term debt | 10,632 | 9,283 | 6,859 | 3,042 | – | – |
| Current portion of long-term debt | 58,454 | 7,236 | 6,189 | 7,209 | – | 15,000 |
| Total current liabilities | 79,068 | 18,799 | 15,200 | 12,342 | 1,879 | 16,879 |
| | | | | | | |
| Long-term debt, net of current portion | 5 | 34,452 | 28,297 | 15,000 | 15,000 | – |
| | | | | | | |
| Deferred income taxes | 98 | 98 | 98 | 98 | 98 | 98 |
| | | | | | | |
| Intercompany | (42,410) | (42,798) | (42,480) | (44,473) | (46,669) | (48,344) |
| | | | | | | |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,240 | 1,240 | 1,245 | 1,247 | 1,249 |
| Add'l paid-in-capital | 13,187 | 45,701 | 45,715 | 45,717 | 45,721 | 45,725 |
| Accumulated deficit | (50,366) | (55,940) | (46,968) | (28,885) | (10,110) | 12,490 |
| Stockholders' equity (deficit) | (35,941) | (8,999) | (13) | 18,077 | 36,858 | 59,464 |
| | | | | | | |
| | 820 | 1,552 | 1,102 | 1,044 | 7,166 | 28,097 |

**<u>Exhibit G</u>**

**The Debtor's Liquidation Analysis**

**To be filed**