1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3     ---------------------------------X
                                       :  08-11153
4     In re:                           :
                                       :
5       LEXINGTON PRECISION CORP.      :  April 22, 2008
                                       :
6                     Debtor.          :
      ---------------------------------X  New York, New York
7

8

         TRANSCRIPT OF INITIAL CASE CONFERENCE AND MOTIONS
9              BEFORE THE HONORABLE MARTIN GLENN
               UNITED STATES BANKRUPTCY JUDGE
10

11

12    APPEARANCES:

13    For the Debtor:          CHRISTOPHER MARCUS, ESQ.
                               JOHN LUCAS, ESQ.
14                             Weil, Gotshal and Manges
                               767 5th Avenue
15                             New York, New York 10153

16

17    For the Committee:       PAUL SILVERSTEIN, ESQ.
                               Andrews Kurth
18                             450 Lexington Avenue
                               New York, New York 10017

19

20    For the U.S. Trustee:    MARYLOU MARTIN, ESQ.

21

22

23

24

25

      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.

2

1          THE COURT:  Please be seated.  We're here in

2   Lexington Precision Corp. number 08-11153.  Good morning.

3          MR. MARCUS:  Good morning.

4          THE COURT:  Has everybody made their appearances?

5   Okay.  I have the list.

6          MR. MARCUS:  Good morning, Your Honor.  Christopher

7   Marcus from Weil, Gotshal and Manges on behalf of --

8          THE COURT:  Good morning, Mr. Marcus.

9          MR. MARCUS:  Good morning.  I'm here with my

10  colleague, John Lucas, at counsel table.  Let me introduce

11  Warren Delano.  He's the president of the Lexington debtors, is

12  here as well.

13         Your Honor, we're here for a number of matters.  Some

14  of these motions were presented to Your Honor in connection

15  with some first day relief.  Some of them were noticed out for

16  the 20 days.

17         THE COURT:  Right.

18         MR. MARCUS:  We're before Your Honor for the very

19  first time today.

20         THE COURT:  Before we begin with that, as I

21  understand it, Mr. Silverstein, are you representing the

22  committee?

23         MR. SILVERSTEIN:  Yes, Your Honor.

24         THE COURT:  Okay.  I made the disclosure at the start

25  of the last hearing and Mr. Silverstein was here and I thought

3

1   I would just repeat it, and that is that the DIP lenders I

2   guess are represented by O'Melveny and Myers where I practiced

3   before coming on the bench.  That was the reason that -- and I

4   cannot hear any matters in which O'Melveny is counsel.  That

5   was the reason that Judge Gonzalez handled the DIP motion.  I

6   gather you've had your final DIP hearing and that was

7   completed.  I concluded at this stage that I am proceeding with

8   the handling of the main case.  If other conflict issues arise,

9   I will deal with it at the time.  Okay.

10          MR. MARCUS:  Thank you.

11          THE COURT:  Go ahead.

12          MR. MARCUS:  I thought actually I might start with

13   just a little bit of background and let you know what's

14   happened since the first day hearing.

15          I'm going to tell you that Judge Gonzalez had set

16   down the final DIP hearing for April 17th and we proceeded in

17   front of Judge Gonzalez on that day on an uncontested basis,

18   and he did enter the order authorizing debtor in possession

19   financing up to $4 million as well as the use of cash

20   collateral.  So that was obviously very important to the

21   company.

22          The United States trustee has appointed a seven

23   member creditors committee.  As was just noted, Mr. Silverstein

24   and his firm were selected by the creditors committee as

25   counsel.

4

1          What else has happened since then?  I think not much.

2     I think as Ms. Goldstein suggested at the very first day

3     hearing, this case is probably going to be more about fixing

4     the balance sheet than the operation.  So I expect that the

5     significant work that's done throughout this case will be work

6     on the balance sheet, work with the committee and the banks on

7     restructuring the capital structure rather than fixing the

8     operations which the company believes is very strong, Your

9     Honor.

10         Unfortunately, we're not -- the down turn in the

11    automotive market and that's hit us a little bit and perhaps

12    affected the sort of over-leverage position.  But as far as the

13    business operations go, the company is continuing to operate,

14    believes the business is very strong, has had some very

15    positive responses from its vendors as well as its customers in

16    connection with the message that we've put out about the

17    continued operation and the need for Chapter 11.  So hopefully

18    that's all we'll need to achieve in the Chapter 11, Your Honor.

19         Your Honor, I would propose to proffer some

20    testimony -- incidentally, I don't believe there are any

21    objections to any of the motions that are on for today.  So

22    what I'd like to do with Your Honor's permission is to just

23    proffer some testimony of Mr. Delano in support of the motions

24    that require some factual support and perhaps run through the

25    motions for Your Honor.

5

1          THE COURT:  Okay, Mr. Marcus.  Go ahead.

2          MR. MARCUS:  Your Honor, I offer through a proof of--

3     through a proffer of testimony rather, Mr. Delano's testimony.

4     He's the president of Lexington Precision Corporation and

5     Lexington Rubber Group which I will refer to collectively as

6     Lexington, all the debtors in this proffer.

7          Mr. Delano is present in Court today and pursuant to

8     Federal Rule of Evidence 103, the Court may accept a proffer of

9     his testimony in lieu of direct examination.

10         Mr. Delano is certainly familiar with all material

11    aspects of Lexington's day-to-day operations, business, and

12    financial affairs.  I will be offering Mr. Delano's testimony

13    in support of the following motions:  The motion to pay pre-

14    petition wages and honor employee benefits; the motion to honor

15    customer programs or a customer program; the motion to pay pre-

16    petition common carrier charges, warehouse needs, and third

17    party processor fees; the debtor's motion to honor its

18    insurance programs; and the motion to pay pre-petition use

19    taxes.

20         I would note for Your Honor that at the first day

21    hearing some testimony was proffered from Dennis Welhouse who's

22    the chief financial officer of the debtor's.  I will try not to

23    be too repetitive given the uncontested nature, but Mr. Delano

24    did support with testimony the wage motion and I believe common

25    carriers and some for customer programs although I have read

6

1   the transcript and I understood that Your Honor wanted then to

2   offer 20 days.  So I'm not sure if any of that testimony would

3   come to play at all, but just for Your Honor's reference.

4         If called to testify, Mr. Delano would testify as

5   follows.  As to his background, Mr. Delano would testify that

6   he received a Bachelor of Arts Degree from Harvard University

7   in 1974.  Thereafter, Mr. Delano worked as a commercial loan

8   officer specializing in problem loans.  In the early '80s he

9   worked for Nortel Simon, Inc. in the area of strategic

10  planning.

11        Since 1985, Mr. Delano, along with Mr. Michael Lubin

12  who is the chairman of the board of the debtor's, worked as a

13  work out consultant working with troubled companies.  For the

14  last five years, however, they focused exclusively on

15  Lexington.

16        Mr. Delano would testify that he first became

17  involved with Lexington in 1985 when he made his first

18  investment in Lexington through a limited partnership.

19        Mr. Delano became a director in 1985 and has retained

20  a seat on Lexington's board ever since.

21        Mr. Delano will testify that in 1987 he and Mr. Lubin

22  took over management of Lexington's businesses and that for the

23  past 21 years he has been integrally involved in the management

24  of Lexington's business.

25        Mr. Delano will testify that he is the president of

7

1  Lexington since 1988.

2          In support of Lexington's motion for authority to pay

3  employee wages, compensation, and benefits Mr. Delano will

4  testify that he has read the motion and is familiar with its

5  contents.

6          Mr. Delano would testify that payment and

7  continuation of employee pre-petition wages, health and welfare

8  benefits is critical to Lexington's reorganization.

9          He would testify that in the ordinary course of

10  Lexington business it incurs payroll obligations to employees,

11  the operating division facilities in Rochester, New York;

12  Jasper, Georgia; Rockville, South Carolina; Vienna, Ohio; and

13  North Canton, Ohio.

14          Mr. Delano will testify that as of February 29, 2008

15  Lexington employed approximately 651 individuals of which 134

16  are salaried employees, 517 are hourly employees, and 22

17  individuals on a temporary basis through a temporary agency.

18          Mr. Delano will testify that Lexington's average

19  monthly gross payroll for all their employees is approximately

20  $2 million and as of the commencement date there were

21  approximately $365,000.00 of accrued unpaid pre-petition wage

22  and salary obligations.

23          He would testify that Lexington has established

24  various employee benefit plans and policies for its employees.

25  Such benefit plans and policies can be divided into the

8

1   following categories.  Medical and health insurance, life

2   insurance, dental and disability benefits, vacation, personal

3   days, sick time, holiday pay, flex spending, 401K plan, and

4   expense reimbursement.

5        Mr. Delano would testify that the amount of the wage,

6   salary, and benefit obligations to any individual employee do

7   not exceed the cap of $10,950.00 as prescribed in Section

8   507(a)(4) of the Bankruptcy Code.

9        Mr. Delano would testify that Lexington's business

10  relies heavily on an ability to produce superior products, by

11  employing skilled individuals whose efficiency maintains

12  production level acceptable cost.

13       Mr. Delano will testify that any delay or failure to

14  pay employee wages and employee benefits would be devastating

15  to the morale, dedication, confidence and cooperation of these

16  employees.  Unplanned or premature employee attrition during

17  this critical stage of Lexington's restructuring would be

18  devastating to Lexington's future prospects.  Without

19  authorization to pay wages and benefits, Lexington would suffer

20  immediate irreparable harm.

21       Mr. Delano would testify that absent an order

22  granting the relief requested by Lexington the employees will

23  suffer undo hardship and in many instances serious financial

24  difficulties as the amounts in question are needed to enable

25  certain employees to meet their own personal financial

9

1  obligations.

2        Without the requested relief, the stability of

3  Lexington will be undermined by the possibility of the

4  otherwise loyal employees will seek other employment

5  alternatives.

6        In support of the debtor's motion for authority to

7  continue customer programs, Mr. Delano will testify that he has

8  reviewed the motion, is familiar with its contents.  He would

9  testify and describe the debtor's customer programs as follows.

10 Prior to the commencement date the debtors, in the ordinary

11 course of business, maintain a limited customer program which

12 in effect enabled customers to return parts which did not meet

13 customer specifications for replacement products.  Under this

14 program the debtors would ship and customers would expect

15 replacement parts within approximately one week or less.

16       Frequently, the debtors would ship replacement parts

17 for the new invoice before return products are received.  For

18 each returned part, the customer would receive a credit to be

19 applied to the amounts previously invoiced in the original

20 order.  As of the commencement date only approximately

21 $20,000.00 worth of returned goods were being processed.

22       Mr. Delano would testify that customers predicate

23 their expectations on timely and quality service, a hallmark of

24 Lexington's operations.  Continuation of the debtor's customer

25 program is part and parcel of meeting those expectations.

10

1           As such, given the above, granting authority to
2   continue the debtor's return program is necessary and in the
3   best interest of the debtor's and all parties' interest.
4           In support of the debtor's motion for authority to
5   pay certain common carrier charges, processor fees and
6   warehouse fees owed to certain common carriers, third party
7   processors and warehouses, Mr. Delano will testify that he has
8   reviewed the motion and is familiar with the contents.  As to
9   Lexington's common carriers, Mr. Delano will testify that to
10  expedite the shipment of raw materials and other goods from
11  vendors and the delivery of the debtor's products to their
12  customers and distributors the debtors employ various common
13  carriers usually through a third party shipping consultant,
14  commercial traffic.
15          In addition to commercial traffic the Rochester
16  facility does some direct shipping through Landstar and Harden
17  Transport, Inc., very de minimis amounts.  As of the
18  commencement date the debtors owe Landstar and Harden $575.00
19  and $56.00 respectively.
20          Mr. Delano will testify that as of the commencement
21  date approximately $350,000.00 worth of goods were in transit
22  and in the possession of common carriers and that the debtors
23  owe commercial traffic, Landstar, Harden, and other common
24  carriers approximately $60,000.00.
25          Mr. Delano will testify that the raw materials and

11

1  supplies in transit are the means by which the debtors

2  manufacture products and without such goods the debtors could

3  not continue to operate and supply their customers.

4          As to third party processors, Mr. Delano would

5  testify that in the ordinary course of business the debtors

6  engage approximately 24 third party processors to perform

7  services with respect to their products before the products are

8  shipped to customers including plating, grinding, heat

9  treating, and other processing of metal and irons and

10  components of [inaudible] have been produced by the debtors for

11  use in producing components made by the rubber group.

12          The overall estimated book value of the components in

13  third party processors possession as of the commencement date

14  was approximately $175,000.00 and as of the commencement date

15  the debtors estimate that they owe the third party processors

16  approximately $97,000.00.

17          Mr. Delano would testify that if the processors

18  refused to return the debtors components which are required for

19  the debtors to produce their products, the debtors will suffer

20  significant harm and will be unable to meet their commitments

21  to customers.

22          Finally, with this motion, Your Honor, as to the

23  warehouses, Mr. Delano will testify that to store excess

24  inventory and the spare equipment the debtors employ five

25  warehouses in the ordinary course of business.  The estimated

1   book value of the goods and equipment in the warehouses'

2   possession is approximately $953,000.00.  As of the

3   commencement date the debtors owed the warehouses approximately

4   $37,000.00 in warehouse fees.

5        Mr. Delano would testify that he has been advised

6   that pursuant to applicable law the warehouses may have

7   possessory liens and that absent payment they may not turn over

8   the debtor's property in their possession.  He would testify

9   that without access to the equipment and inventory, the debtors

10  would suffer significant harm and their operations may be

11  adversely affected.

12       In support of the debtor's motion for authority to

13  continue insurance and worker's compensation programs, Mr.

14  Delano would testify that he has reviewed the motion and is

15  generally familiar with the contents therein.

16       Mr. Delano would testify that the debtors maintain

17  various worker's compensation coverage in each of the states in

18  which they operate or used to operate through fully insured

19  third party insurance programs and various self-insured

20  programs.  At this time there are no pre-petition obligations

21  owing; however, certain insurers may have claims for pre-

22  petition amounts that are processed in the ordinary course.

23       Mr. Delano would testify that in addition to the

24  worker's compensation program the debtors maintain and are

25  required to maintain various liability product, property-

13

1   related insurance programs which provide the debtors with

2   insurance coverage for liabilities relating to, among other

3   things, general commercial claims, property damage claims,

4   business interruption, general farm liability, directors and

5   officers liability, fiduciary liability, commercial prime

6   employment practices, umbrella, and various other product and

7   property related and general liabilities.  Continuation of all

8   of these insurance programs is essential to the ongoing of the

9   debtor's businesses and indeed is required in many instances.

10       As of the commencement date the debtors are not aware

11  of any pre-petition claims for which a deductible under the

12  liability product and property insurance programs has not been

13  paid; however, at some time subsequent to the commencement date

14  deductibles for claims relating to the period prior to the

15  commencement date may arise.

16       Finally, Your Honor, in support of the debtor's

17  motion for authority to pay use taxes, Mr. Delano will testify

18  that he has reviewed the motion and is familiar with the

19  contents therein.

20       Mr. Delano would testify that in connection with the

21  normal operation of their business the debtors incur use tax

22  obligations to various state taxing authorities and that the

23  debtors are responsible for the payment of use taxes when the

24  debtors purchase certain tangible personal property for use in

25  a jurisdiction where the acquisition of the property is taxable

14

1   but the vendor, for whatever reason, did not charge a sales

2   tax.

3          Mr. Delano would testify that as of February 29, 2008

4   the debtors estimate that outstanding pre-petition liabilities

5   for use taxes are approximately $5,000.00.

6          He would testify that he understands and has been

7   advised that many federal and state statutes hold officers and

8   directors of collecting entities personally liable or

9   criminally responsible for certain taxes owed by those entities

10  and to the extent that any of the use taxes remain unpaid by

11  the debtors, the debtors' officers and directors and perhaps

12  other employees may be subject to lawsuits or criminal

13  prosecution during the pendency of these Chapter 11 cases.

14         Mr. Delano would testify the threat of a lawsuit or

15  criminal prosecution and any ensuing liability would distract

16  the debtors and their personnel from important tasks to the

17  detriment of all parties and interest.

18         The dedicated and active participation of the

19  debtor's officers and directors and other employees is not only

20  integral to the debtor's continued uninterrupted operations but

21  also essential to the orderly administration of these Chapter

22  11 cases.

23         Accordingly, payment of the pre-petition use taxes is

24  necessary and appropriate and in the best interest of the

25  debtors and their estates and creditors.

15

1          Your Honor, that concludes the proffer of testimony--

2          THE COURT:  Okay.

3          MR. MARCUS:  -- for Mr. Delano.

4          THE COURT:  Does anybody wish to cross examine Mr.

5    Delano?  All right.  Mr. Marcus, you can proceed.

6          MR. MARCUS:  Your Honor, the first motion on the

7    agenda is the motion for approval of investment guidelines.

8          As I mentioned earlier, Your Honor, Judge Gonzalez

9    has now approved $4 million in debtor in possession financing.

10   Prior to the commencement date the debtor's bank accounts were

11   swept daily by the pre-petition lenders so they did not have

12   any cash overnight.  But now that they've commenced their

13   Chapter 11 cases and had a cash collateral usage order in

14   place, the bank account is not swept, so cash sits in the

15   operating account overnight.  Cash also sits in the DIP account

16   which has been established at Northfolk Bank overnight as well.

17         The debtors are seeking the ability to invest the

18   money that is in these accounts overnight in high quality U.S.

19   dollar denominated money market obligations that receive the

20   highest short term rating from at least two nationally

21   recognized statistic rating organizations, a long term debt

22   rating of single A or better, are fully guaranteed by U.S.

23   insured securities.

24         Basically, Your Honor, rather than allowing the money

25   to sit there idle the debtors would like to safely invest for

16

1   at least some return the money again rather than just letting

2   it sit in the accounts overnight.

3         No objections were filed to this motion, Your Honor,

4   and I would ask Your Honor to enter the order to approve the

5   investment guidelines.

6         THE COURT:  Let me just ask Mr. Silverstein.

7         MR. SILVERSTEIN:  Yes, Your Honor.  We did not file

8   an objection.  I don't have an objection as such but I have

9   some heartburn I would like to talk to Your Honor about.

10        THE COURT:  Okay.

11        MR. SILVERSTEIN:  Heartburn is not the technical

12  term, but Your Honor, a year ago none of us would have had any

13  problem with the investment guidelines set forth in Exhibit A

14  to the motion.

15        In the current environment --

16        THE COURT:  Well, I read carefully to see whether,

17  for example, what auction rate notes --

18        MR. SILVERSTEIN:  Yeah, exactly.  That's my point.  I

19  have a situation --

20        THE COURT:  -- an eligible investment and --

21        MR. SILVERSTEIN:  As an example, I have a situation

22  where in order to get 30 or 40 more basis points on an

23  investment there had to be put, you know, $50 million in and

24  back rated the auction notes that seemed pretty good to us way

25  back when.

17

1          My preference, if possible, and I don't think there's

2  a huge amount of money at stake, my preference would be that

3  [inaudible] of the United States can be behind any investments

4  that the debtors make consistent with 345.  I don't think this

5  is a major issue because I don't think there is a huge amount

6  of money.  I prefer that we be a little more conservative on

7  this.

8          I apologize for not filing an objection but when you

9  think about it given this environment, I think we ought to be

10  as conservative as possible.  Again, this is not a dry run of

11  this case but I think it gives everyone a bit more comfort if

12  we comply a little more tightly with 345 if possible.  If the

13  debtors are telling me it's impossible, I'd like to hear that.

14  That's my only comment as to the quote/unquote heartburn.

15          THE COURT:  Mr. Marcus, I guess my first -- I was

16  intending to ask the question about whether, for example,

17  auction rate notes are an eligible investment under the

18  investment guidelines that the debtor has proposed.

19          MR. MARCUS:  I sort of have to defer to Mr. Delano on

20  this.  I think the answer to that is no.  I think the expected

21  investment, overnight investment would be in the bank money

22  market funds.  But you know, I think that to alleviate this,

23  you know, the debtors are happy to discuss with the committee

24  before the investments are made and get the committee's

25  approval before any money is invested.  So if that's helpful

18

1   here, I assume it would be --

2           THE COURT:  Well, you're not going to do that --

3   you're not going to have to do that on a regular basis.  I mean

4   I would suggest that you -- let me ask the U.S. Trustee's

5   Office first what their view is.  Ms. Martin?

6           MS. MARTIN:  Marylou Martin, The Office of the U.S.

7   Trustee.  Your Honor --

8           THE COURT:  Just speak up a little bit.

9           MS. MARTIN:  I'm sorry.  We have no objection to the

10  motion.  We're seeking a statement from the committee to

11  indicate that they really had no objection since we believe

12  it's really their issue.

13          THE COURT:  Okay.

14          MR. SILVERSTEIN:  Well, which, Your Honor, is what I

15  mean by heartburn.  It seems to me that the normal -- normally

16  Exhibit A wouldn't have been what was done in this district

17  because I know that debtor's counsel did not make up this list

18  anew.  This has been used many times before.

19          THE COURT:  Sure.

20          MR. SILVERSTEIN:  There's just more sensitivity these

21  days to where the money is put and frankly, 345 is a section

22  that none of us really spent a lot of time [inaudible] but I

23  think there's a reason why the statute was written the way it

24  was written which is that investments [inaudible] credit of the

25  U.S. behind it.

19

1          So I appreciate Mr. Marcus' comments as far as

2    consulting but I don't know that that's necessarily necessary.

3    It seems to me they can pick something that has no risk.  If

4    it's, you know, five basis points lower in terms of return, we

5    will not be troubled by [inaudible].

6              THE COURT:  Let me just look at the guidelines again.

7                     [Pause in proceedings.]

8              THE COURT:  How do you want to proceed on this, Mr.

9    Marcus?  You know, I'm sensitive to Mr. Silverstein's issue but

10   he didn't file an objection, so --

11             MR. MARCUS:  Right.  [Inaudible].

12             THE COURT:  Yes, go ahead.  Go ahead.

13             Here's what I'd like to do with respect to this

14   motion.  Mr. Marcus?

15             MR. MARCUS:  I'm sorry.

16             THE COURT:  Are you going to try and modify the

17   [inaudible]?

18             MR. MARCUS:  I was going to see if we could agree on

19   which of the romanettes on Exhibit A we might be able to agree

20   are acceptable investments.  I think we're probably one apart

21   right now.  So maybe if we just have two minutes.

22             THE COURT:  Go ahead, go ahead.

23             MR. SILVERSTEIN:  I apologize, Your Honor.

24             THE COURT:  That's okay.  I intended to ask about

25   this issue.

20

1                    [Pause in proceedings.]

2          MR. MARCUS:  Thank you very much, Your Honor.  I

3   appreciate that brief moment.  What we'd like to do, and I

4   think this will satisfy the committee's concerns is to change

5   Exhibit A to permit the investments in Categories 1, 2, and 3

6   and eliminate 4 through 8 if that is acceptable.

7          THE COURT:  If that's acceptable to the debtor and

8   the committee, the motion will be granted on that basis.  Why

9   don't you just submit a revised formal order?

10         MR. MARCUS:  Thank you.

11         MR. SILVERSTEIN:  Thank you, Your Honor.

12         MR. MARCUS:  Your Honor, the next motion is the wage

13  and benefits motion.  Your Honor granted this motion on an

14  interim basis on the very first day.  There was an agreement

15  between the debtors and the U.S. Trustee, I don't recall --

16         THE COURT:  I guess it was just some expense

17  reimbursement that --

18         MR. MARCUS:  That's correct, just on Mr. Lubin's for

19  a total of about $5,000.00.

20         THE COURT:  Right.  No objection having been filed,

21  the motion is approved on a final basis.

22         MR. MARCUS:  Thank you, Your Honor.

23         Your Honor, customer programs, this was one where

24  Your Honor had suggested that we continue to ship the goods

25  back and we would come back and determine which way the credits

21

1   are allocated.

2           THE COURT:  Right.

3           MR. MARCUS:  What we'd like to do is allocate those

4   credits to the pre-petition invoices in accordance with the

5   program itself to satisfy, you know, our obligations to our

6   customers.  Again, it's a de minimis amount, $20,000.00.

7           THE COURT:  Again, no objection has been filed.  The

8   motion is granted.

9           MR. MARCUS:  Thank you, Your Honor.

10          Your Honor, the next motion is the motion to pay

11  common carriers, third party processors and warehouses.  On the

12  first day, Your Honor, you had granted us authority to pay the

13  common carrier.  We're back here to ask for the processors who

14  hold almost twice the amount of goods than they are owed and

15  warehouses who again are holding approximately $975,000.00

16  worth of goods and are only owed about $37,000.00.

17          THE COURT:  Yes.  Anyone want to be heard?  All

18  right.  The motion is granted.

19          MR. MARCUS:  Your Honor, the next motion is the

20  debtor's insurance motion.  As Mr. Delano noted in his proffer,

21  there is very little that remains outstanding pre-petition as

22  of right now.  The importance of this motion is really for

23  claims that may arise in the future that might be related to

24  the pre-petition period and we want to be able to maintain all

25  of our liability programs, especially worker's comp which the

22

1   company believes is very important really to all companies but

2   especially one in the manufacturing industry.

3          THE COURT:  Do you know how -- is there any amount

4   due, any pre-petition amounts due on worker's compensation

5   programs?

6          MR. MARCUS:  I'm not aware of any.  I don't think

7   that there are any amounts due.  However, we do have policies

8   that --

9          THE COURT:  Look back.

10          MR. MARCUS:  -- go back for quite some time and

11   claims might still be asserted.  So it is possible that

12   something would arise, but as of now there shouldn't be any

13   pre-petition amounts outstanding.

14          There is, Your Honor, I believe one worker's

15   compensation program where there are premiums paid in seven or

16   ten installments if I'm remembering correctly.  I can get the

17   motion.  Certainly that's more accurate than my memory.

18          THE COURT:  Mr. Marcus, I don't have a problem with

19   this.  I have a question for you.  What happens if you don't

20   pay the pre-petition amounts?

21          MR. MARCUS:  For insurance policies?

22          THE COURT:  Worker's comp policies.  Look, I don't

23   want [inaudible].  I mean there are no objections that have

24   been filed to this.  It's the Howard Delivery case that raises

25   questions about it, what the analytical basis for approving

23

1  payment of pre-petition worker's comp premiums.

2         MR. MARCUS:  Well, I guess theoretically there are I

3  think two possible consequences.  One is a motion to terminate

4  the contract or to just terminate the contract if it is no

5  longer executory.

6         THE COURT:  You have policies in lots of different

7  states as well.

8         MR. MARCUS:  Yes.

9         THE COURT:  The motion is granted.  There's no

10  objections.  But this is an issue -- it's an interesting issue

11  in light of the Supreme Court's Howard Delivery decision, but

12  the motion is granted.

13        MR. MARCUS:  Thank you, Your Honor.

14        Your Honor, the next motion is the motion to pay use

15  taxes.  Again, this is a relatively de minimis amount and based

16  upon the potential for some personal liability.

17        THE COURT:  All right.  The motion is granted.  No

18  objection having been filed, the motion is granted.

19        MR. MARCUS:  Thank you, Your Honor.

20        Your Honor, the next motion is our utility motion.

21  We had offered utilities a two week deposit as adequate

22  assurance of payment.  We've received three responses to this.

23  Rochester Gas and Electric, who all they wanted was a two week

24  deposit and we agreed to that and gave it to them.  Georgia

25  Power, who you might have seen filed an objection --

24

1          THE COURT:  I did.

2          MR. MARCUS:  -- we worked out a resolution with them

3    for a one month deposit and they withdrew their objection.  We

4    had some informal communications with Ohio Edison who was

5    represented by counsel and we worked out a similar arrangement

6    with them eliminating the need to file an objection.  So just

7    those three responses, no other objections.

8          THE COURT:  All right.  The utility motion is

9    granted.

10         MR. MARCUS:  Thank you.

11         Your Honor, the next motion is the motion to employ

12   ordinary course professionals.  On this one we did receive some

13   comments from the U.S. Trustee's Office.  The comment was that

14   the proposed order should be revised so that there's an

15   aggregate cap of $500,000.00 for all professionals, for all

16   ordinary course professionals, for the entire case.  The

17   debtors agreed to that concept and you'll find that in the

18   revised order now.  So I think we have no other comments about

19   this order or certainly no objections to it.

20         THE COURT:  All right.  That motion is granted as

21   well.

22         MR. MARCUS:  Thank you.

23         Your Honor, the interim compensation procedures

24   motion, again, an informal discussion with the United States

25   Trustee where the trustee proposed that they should be -- that

25

1  parties in interest should be permitted to object to the

2  payment of fees to the extent that the debtors were not filing

3  the operating reports I believe was the substance of the

4  paragraph that they wanted insertion.  An objection and a

5  request to hold back fees for professionals that were not

6  timely filing monthly fee statements and we agreed to both of

7  those changes and Your Honor will find those in the order as

8  well.

9        THE COURT:  Okay.  Then the motion is approved on

10  that basis.

11        MR. MARCUS:  Thank you, Your Honor.

12        The last motion on for today is the debtor's

13  application to employ Weil, Gotshal and Manges.  We filed

14  obviously in connection with the application the affidavit of

15  Richard Krasnow which discloses the disinterestedness and the

16  potential connections.  There were no objections to this.

17        I would note for the record, Your Honor, we will file

18  a supplemental affidavit, but Mr. Krasnow wanted me to note for

19  the record in his affidavit we had estimated there was a

20  remaining balance, a retainer balance of approximately I

21  believe $65,000.00.  It turns out that after calculation and

22  true-up it's about $97,000.00.

23        THE COURT:  Okay.

24        MR. MARCUS:  We'll figure those numbers out and file

25  supplemental disclosure to the extent necessary.  We've already

26

1   disclosed that to the creditors committee.  But there were no

2   objections to this, Your Honor.  I would ask that this one be

3   approved as well.

4   　　　THE COURT:  No objections having been filed, the

5   motion is granted.

6   　　　MR. MARCUS:  Thank you very much, Your Honor.  That's

7   all you have unless Your Honor has questions.

8   　　　THE COURT:  No.  Just I guess I think in part with my

9   initial uncertainty as to whether I would keep the case or not,

10   we did not set dates for omnibus motions.  I don't know what

11   motion practice, if any, you expect over the next few months,

12   either the rejection of contracts -- what do you anticipate

13   coming up, Mr. Marcus?

14   　　　MR. MARCUS:  We don't anticipate actually rejecting

15   any contracts or leases now.  I don't want to preclude the

16   debtors from doing that.  They only have a few leases of non-

17   residential real property.  I assume there's equipment leases

18   as well.  But for the most part I believe the business will

19   remain untouched and will just continue to operate.  Again, I

20   don't want to eliminate our ability to come to the Court and

21   ask for rejection to the extent that would be helpful, but I

22   don't anticipate that right now.  I think that what I see on

23   the horizon is probably kick starting the plan process, getting

24   a planning disclosure statement, getting the process up and

25   running very quickly.  Motions that -- the only motion that I

27

1  could see upcoming in addition to disclosure statement and

2  confirmation would be a motion to establish [inaudible], a

3  motion to deal with our leases on probably the 120th day of the

4  case.  As of right now, Your Honor, you know, we've been in

5  numerous discussions with the debtors and we don't anticipate,

6  you know, filing any other motion practice.  No contemplated

7  asset sales at this time, no contemplated assumptions or

8  rejections at this time.

9            THE COURT:  All right.  Mr. Silverstein?

10           MR. SILVERSTEIN:  Yes, Your Honor.

11           THE COURT:  Your retention motion is going to be

12  coming up?

13           MR. SILVERSTEIN:  Yeah, that obviously will come

14  but -- and again, the committee was just formed and we've

15  really not deliberated about the substantive matters other than

16  retention of various professionals and the like.

17           Mr. Marcus gave a summary as to what the case was

18  about.  I think he described it as a very simple balance sheet

19  restructuring.

20           One of the things that the committee is going to have

21  to consider, and I'm not looking for a date now so don't

22  misunderstand, but one of the things that the committee will

23  have to deliberate on and consider is whether it's appropriate

24  and warranted to move for a Chapter 11 trustee under Section

25  1104 because the position here from the debtor at least pre-

28

1   petition and I believe post petition is that they are not

2   fiduciaries to creditors.  That's something that I just need

3   Your Honor to be aware of because this is not just as vanilla

4   as Mr. Marcus described.

5        So again, I'm not here to just spout about something

6   that hasn't been filed yet but that should be on your radar as

7   something that is a possibility.  The committee has not made

8   any determination as to whether it wants to proceed on that,

9   but frankly they have to consider it given the fact that the

10  debtor is taking the position that they're not fiduciaries.  I

11  think the fact that the debtor is taking that position skews

12  the conduct in this case of how the debtor will proceed.  You

13  know, substantively I think it's premature.  I think it was

14  worth noting, however, Your Honor.

15       THE COURT:  The only thing I would say in that

16  regard, Mr. Silverstein, is that if the committee -- Mr. Marcus

17  has indicated an intention to move forward with the disclosure

18  statement and plan process.  If the committee intends to move

19  for the appointment of a trustee, it better do it sooner than

20  later.  It's not going to come in the middle of -- after I've

21  got a disclosure statement in front of me.

22       MR. SILVERSTEIN:  That's why I raised it.  That's why

23  I raised it now to give a heads up as a possibility.  Again,

24  the committee was just formed and we've not had substantive

25  deliberations on that issue.

29

1          THE COURT:  Mr. Marcus, do you want a date for a

2    hearing date, as a holding date or you don't anticipate the

3    need for that now?

4          MR. MARCUS:  I think, Your Honor, I actually

5    neglected to mention one other motion that I am aware of and

6    that's the debtor's application to retain W.Y. Campbell as

7    financial advisor.  I think that that should be filed in

8    relatively short order and perhaps the next hearing date would

9    be one that can accommodate that.  Without speaking to the U.S.

10   Trustee, I think the U.S. Trustee probably has a position on

11   how long the financial advisory application needs to be out on

12   notice.  I think that's the case, probably 20 or 25 days or 25

13   days or so is --

14         THE COURT:  Isn't it 20?  Is it 20 days, Ms. Martin?

15         MS. MARTIN:  I believe it's 20 days.

16         THE COURT:  I think it's 20 days particularly where

17   there's a committee in place.  It's an issue if there's no

18   committee, but you've got a committee.

19         Why don't we set a hearing date, next hearing date as

20   Tuesday, May 27th?  It is the day after Memorial Day.  I don't

21   know whether that presents a problem for anybody.

22         MR. MARCUS:  That does not present a problem for me,

23   Your Honor.

24         THE COURT:  All right.  You're getting your weekend

25   unless you wind up with briefing.  All right.

30

1          MR. SILVERSTEIN:  Is there a time of day, Your Honor,

2     that --

3          THE COURT:  Yes, 10 a.m.

4          MR. MARCUS:  10 a.m.

5          THE COURT:  It'll be in courtroom 501.  Anything

6     else, anybody?

7          MR. MARCUS:  Yeah.  I guess, Your Honor, when I --

8     just one clarification.  I mentioned we were going to sort of

9     start down the road to disclosure statement and confirmation

10    and that wasn't, you know, without the participation of the

11    creditors committee, so I don't mean to insinuate we're just

12    going to file a motion to approve a disclosure statement in the

13    next week or so.  That's not the timing that I had in mind.  I

14    just though, you know, a general sort of case status as well.

15         THE COURT:  Okay.

16         MR. MARCUS:  If there's a motion for a trustee, we'll

17    deal with it when it comes.

18         THE COURT:  Do you have an estimate of when you think

19    you can be in a position to move forward with the disclosure

20    statement?

21         MR. MARCUS:  I think probably best guess right now

22    would be near the end of May.

23         THE COURT:  Okay.

24         MR. MARCUS:  But don't hold me to that.

25         MR. SILVERSTEIN:  To file it or to proceed?

31

1          MR. MARCUS:  Probably to file, yeah.

2          THE COURT:  All right.  If issues come up and you

3    need a hearing date in advance of Tuesday, May 27th, let my

4    chambers know and we'll schedule a date earlier than that.  It

5    doesn't sound like you need a series of omnibus motion days

6    scheduled in this case so we'll just go forward with that May

7    27th date.  If because of discussions between the committee and

8    the debtor you need to reschedule the date for some reason,

9    just let me know sufficiently in advance and we'll give you a

10   new date.  Okay?

11         MR. MARCUS:  Thank you, Your Honor.

12         THE COURT:  All right.

13         MR. MARCUS:  I have all of the orders other than the

14   interim --

15         THE COURT:  Investment guidelines?

16         MR. MARCUS:  Investment guidelines rather, order.

17         THE COURT:  You want to just please hand them up to

18   my law clerk?

19         MR. MARCUS:  Would it be acceptable to e-mail the

20   revised exhibit to chambers?

21         THE COURT:  Yes, it would.  Yes.  You'll get an e-

22   mail address from one of my law clerks --

23         MR. MARCUS:  Thank you.

24         THE COURT:  -- and you can e-mail that.

25         Okay.  We're adjourned.  Thank you very much.

32

1          MR. SILVERSTEIN:   Thank you.

2     MR. MARCUS:   Thank you, Your Honor.

3                    *  *  *  *  *  *

33

1     I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                          _____

6                                    Mary Greco

7 Dated:  July 25, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25