```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
     In Re:                             :  08-11153 (MG)
 4                                       :
         LEXINGTON PRECISION CORPORATION,  :  One Bowling Green
 5                                       :  New York, New York
                     Debtor.             :  July 29, 2008
 6   ------------------------------------X

 7
                   TRANSCRIPT OF ENTRY OF AN ORDER PURSUANT TO
 8              SECTION 365(d)(4) EXTENDING TIME TO ASSUME
               OR REJECT NONRESIDENTIAL REAL PROPERTY LEASES
 9                 BEFORE THE HONORABLE MARTIN GLENN
                    UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12

13   For the Debtors:        JOHN W. LUCAS, ESQ.
                             RICHARD P. KRASNOW, ESQ.
14                           ADAM P. STROCHAK, ESQ.
                             Weil, Gotshal & Manges LLP
15                           767 Fifth Avenue
                             New York, New York  10153

16

17   For the Bondholders:    PAUL SILVERSTEIN, ESQ.
      Committee              JONATHAN LEVINE, ESQ.
18                           GERALD BRACHT, ESQ.
                             Andrews Kurth LLP
19                           450 Lexington Avenue
                             New York, New York  10017

20   For Webster:            SCOTT A. ZUBER, ESQ.
                             Day Pitney LLP
21                           PO Box 1945
                             Morristown, New Jersey 07962

22

23

24   Court Transcriber:      LETHA J. WHEELER
                             TypeWrite Word Processing Service
25                           211 N. Milton Road
                             Saratoga Springs, New York 12866


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE DEBTOR:** | | | | | |
| Kurt Haras | 11 | 28 | 60 | 64 | |
| Jessie Ultz | 70 | 105 | | | |
| Robert Welch | 127 | 135 | 144 | | |

| **EXHIBITS:** | | Marked | Received |
|---|---|---|---|
| **Debtor's:** | | | |
| 1 | Tracking Document | 18 | 22 |
| **Committee's:** | | | |
| A | Original information request | 29 | 31 |
| B | The May 30 list | 31 | 37 |
| C | Information request dated 6/13/08 | 38 | -Not offered |
| D | Sensitivity analysis | 43 | 50 |
| E | The financial projection | 47 | 50 |
| F | E-mail | 53 | -Not offered |
| G | Analysis showing what the five serious offers implied | 77 | -Not offered |
| H | Backup Projections | 82 | -Not offered |
| I | Data Request | 86 | -Not offered |
| K | Four-Year Projection | 95 | 95 |
| L | CSM Volume Projections | 102 | 102 |

3

1          THE COURT:  All right.  I am now going to call

2 Lexington Precision Corp., Number 08-11153.

3          I would first like to take up the debtor's motion for

4 entry of an order pursuant to Section 365(d)(4) extending time

5 to Assume or Reject Nonresidential Real Property Leases.

6          Am I correct counsel made their appearances before we

7 started?

8          MR. KRASNOW:  Your Honor, for the debtors --

9          THE COURT:  Go ahead, Mr. Krasnow.

10          MR. KRASNOW:  Oh, I'm sorry, Your Honor.

11          THE COURT:  No, go ahead.  I think I have a list.

12 Did everyone make their appearance already?

13          MR. KRASNOW:  On the debtor's side, yes, we have.

14          MR. SILVERSTEIN:  We have certainly signed in, Your

15 Honor.

16          THE COURT:  Oh, okay.

17          MR. SILVERSTEIN:  Paul Silverstein, Gerry Bracht, and

18 Jon Levine.

19          THE COURT:  Right.  Okay.

20          MR. LUCAS:  Good morning, Your Honor.  John Lucas of

21 Weil, Gotshal & Manges on behalf of Lexington.

22          As Your Honor noted, the first matter on the calendar

23 today is the debtor's motion for entry of an order pursuant to

24 365(d)(4) of the Bankruptcy Code extending time to Assume or

25 Reject Nonresidential Resident -- Nonresidential Real Property

4

1  Leases.

2       As the motion notes the motion was filed on July 3,

3  and we are seeking extension of time from the earlier of the

4  effective date under a plan or 90 days from tomorrow, which is

5  October 28, 2008.  There are six leases subject to the motion:

6  Two for Lexington Precision and four for Lexington Rubber

7  Group.  And, Your Honor, we received no responses from any of

8  the landlords or any other party in this case.

9       THE COURT:  All right, Mr. Lucas.  The Court is going

10  to approve an extension of time to Assume or Reject Executory

11  Contracts until the earlier of October 28, 2008 or entry of an

12  order confirming a plan of reorganization, which is different

13  from what you've requested.

14       MR. LUCAS:  I miss --

15       THE COURT:  And the court's concern if and when it

16  becomes necessary to address the point is that most recently

17  the Supreme Court in the Piccadilly case, which is at 128 SC

18  2326(2008) said, "We agree with Bill Disco's commonsense

19  observation that the decision whether to reject a contract or

20  lease must be made before confirmation but that in no way

21  undermines the fact that the rejection takes effect upon or

22  after confirmation of a Chapter 11 plan or before confirmation

23  if pursuant to Section 365(d)(2)."

24       There is an open issue whether a debtor can reject

25  executory contracts post confirmation.  There is some authority

5

1  on it.  At this stage there is no reason to get into that.  So

2  the order -- the motion will be granted, but as I say the

3  earlier of October 28, 2008 or the order confirming the plan of

4  reorganization.

5            MR. LUCAS:  Your Honor, would you like us to amend

6  the order and we can send one down later this afternoon?

7            THE COURT:  Do we have a disc first?

8            THE CLERK:  No.

9            MR. LUCAS:  I have a disc here, Your Honor.

10           THE COURT:  Why don't you amend it and send it down

11  this afternoon?

12           MR. LUCAS:  Absolutely.

13           THE COURT:  Thank you very much.

14           MR. LUCAS:  Thank you, Your Honor.

15           THE COURT:  All right.  Next we have the debtor's

16  motion pursuant to Section 1121(d) of the Bankruptcy Code to

17  Extend the debtor's Exclusivity Period.

18           Mr. Krasnow?

19           MR. KRASNOW:  Good morning, Your Honor.  Your Honor,

20  the debtor has filed a motion and there is before the Court

21  today its request pursuant to Section 1121(d) to extend its

22  exclusive periods that is with respect to the filing of a plan

23  as well as the solicitation of acceptances in each case for 90

24  days.  As to the plan that would bring us to October 28 as to

25  the solicitation of acceptances or solicitation of votes that

6

1  would be until December 27.

2         Your Honor, the motion was served upon all parties

3  who requested notices in connection with this case and the only

4  party who have filed an objection was the committee, Your

5  Honor.

6         Your Honor, it is without question that a key purpose

7  that is served with regards to the extension of exclusive

8  periods is to try to achieve one of the goals of Chapter 11,

9  which is to attempt to obtain a consensual plan.  That in part

10 is the reasons why the debtor has indeed sought these

11 extensions.

12        Your Honor, with respect to the one and only

13 objection that has been filed here, the objection that has been

14 filed by the committee, they have for the most part ignored the

15 so-called seven criteria that courts typically consider and

16 address when a motion such as the debtor's motion is before it

17 and has, in our view as reflected in our reply to their

18 objection, really focused on three prongs.

19        First, notwithstanding the fact that they had

20 withdrawn their motion to terminate exclusivity, they have

21 incorporated that motion in this objection and in that regard

22 they appear to be raising the same claims that the Court heard

23 argument about last month, which was these allegations that

24 some how the debtors had prior to the commencement of the case

25 breached their fiduciary duties in connection with the failed

7

1   attempt prior to the Chapter 11 to obtain a consensual out-of-

2   court workout.

3           We believe that while Your Honor hasn't rendered --

4   didn't render a decision in connection with that matter because

5   the motion was withdrawn that Your Honor certainly raised

6   serious questions which -- regarding those accusations and

7   indeed whether there was any breach of fiduciary duty or simply

8   failed negotiations.

9           THE COURT:  Mr. Krasnow, that's certainly true.  But

10  in a conference call with counsel I also determined that the --

11  at that point the motion of the committee to terminate

12  exclusivity raised contested material issues of fact in that an

13  evidentiary hearing would be required.  You then went ahead and

14  filed your motion to extend exclusivity.  I think both sides

15  agree that under Judge Gerber's Adelphia decision and other

16  decisions the same nine factors that Judge --

17          MR. KRASNOW:  I misspoke, Your Honor.

18          THE COURT:  -- Gerber identifies apply to both the

19  motion to extend exclusivity or to terminate exclusivity.  As

20  you know on July 23, I entered an order determining that this

21  would be an evidentiary hearing.  So I consider it to be

22  contested factual issues and, you know, if you want to very

23  briefly address what it is you expect to -- to show today, I'll

24  give Mr. Silverstein or his colleagues a brief opportunity to

25  address that and then I suggest we just get on with the

8

1  evidence.

2          MR. KRASNOW:  Your Honor, I'm just going to address

3  the two other prongs that we think that they raise.  One are a

4  variety of alleged confirmation issues.  And then the third,

5  which really raises the evidentiary issues pertains to the

6  assertions made in connection with the original motion to

7  terminate exclusivity with respect to information flow.  And,

8  Your Honor, we are prepared to go forward and address those

9  issues through the -- an evidentiary record, Your Honor, and,

10 Your Honor, we'll -- after Mr. Silverstein speaks my partner,

11 Mr. Strochak, will handle that aspect of the hearing.

12          THE COURT:  Thank you, Mr. Krasnow.

13          MR. KRASNOW:  Thank you, Your Honor.

14          THE COURT:  Mr. Silverstein.

15          MR. SILVERSTEIN:  Thank you, Your Honor.  Paul

16 Silverstein of Andrews and Kurth for the committee.  As I

17 indicated with me is Gerald Bracht and Jon Levine.

18          Your Honor, I'll be very brief.  The case law makes

19 clear that the debtors have the burden of proof with respect to

20 the motion to extend exclusivity.

21          THE COURT:  I'm sure that's why you withdrew your

22 motion to terminate since there were only nine days left on --

23          MR. SILVERSTEIN:  Precisely.

24          THE COURT:  -- on the period.  You've shifted the

25 burden from you to Mr. Krasnow.

9

1          MR. SILVERSTEIN:   Precisely, Your Honor, as I

2     indicated in that earlier hearing.

3          The case law further suggests that exclusivity

4     extensions should not be granted routinely or without a

5     compelling reason.

6          As set forth in the committee's objection the debtors

7     have not carried that burden.  The debtor's submissions to the

8     Court were devoid of any factual showing that there exists

9     cause to extend exclusivity.  Rather the debtors chose to

10    superficially touch on the case law with conclusory statements.

11    Essentially the debtors just threw their hands up and said, we

12    are the debtor.  We are entitled to an extension of

13    exclusivity.  The case law, however, says otherwise.  The

14    debtors need to put on an affirmative case, which they will.

15         When looking at the various factors, Your Honor,

16    which courts have fashioned to assist in determining whether

17    cause exists the factors that were set forth in Judge Gerber's

18    bench memo in Adelphia, if you look at those factors and apply

19    them to this case those factors militate against granting an

20    extension.  One, the debtors have not used exclusivity to

21    attempt to reach a consensual plan with the creditors nor have

22    they made any progress with respect thereto.  More importantly

23    or as importantly the debtor's proposed plan of reorganization

24    will not result in a successful reorganization.  In other

25    words, the plan is not viable.

Haras – Direct                                    10

1          The committee intends to factually show during this

2   hearing that in this case the factors necessitate that a

3   finding of cause does not exist and, therefore, the motion

4   should be denied.

5          Mr. Bracht will handle the evidentiary portion of the

6   hearing.

7          THE COURT:  All right.  Thanks.  And we will proceed

8   with the evidence.  Let me just tell you on schedule for today.

9   We are going to recess at noon if we haven't finished before.

10  And then we are going to resume as close to 2:00 as I can.  I

11  have a speaking commitment in midtown at 12:30.  I should be

12  back by 2:00.  If I'm back a few minutes later, it will be a

13  few minutes later.  It may not be necessary to go into the

14  afternoon, but just so that everybody knows the schedule I need

15  to recess at noon to get uptown.

16         Okay.  Mr. Krasnow, or Mr. Strochak may proceed.

17         MR. KRASNOW:  Mr. Strochak, yeah.

18         THE COURT:  Go ahead, Mr. Strochak.

19         MR. STROCHAK:  Good morning, Your Honor.  Adam

20  Strochak of Weil, Gotshal & Manges for the debtors.  We have

21  proposed one witness and potentially one rebuttal witness

22  today, Your Honor.

23         THE COURT:  All right.

24         MR. STROCHAK:  The witness is Kurt Haras who is a

25  director with W. Y. Campbell & Company, the debtor's financial

Haras – Direct                                    11

1   advisors.  He is in the courtroom today.  We have one exhibit

2   to use with his testimony, which I'm not anticipating any

3   problems with.  And we would propose to do his testimony by

4   proffer if there's no objection.

5            THE COURT:  No, I would like to hear -- I'd like to

6   hear a witness.  So why won't you call your witness?

7            MR. STROCHAK:  That's fine.  We are prepared to do

8   that.

9            THE COURT:  All right.

10           MR. STROCHAK:  We call Kurt Haras, Your Honor.

11           THE COURT:  Mr. Haras, if you would --

12           THE CLERK:  Please raise your right hand.

13           (KURT HARAS, THE DEBTOR'S WITNESS WAS SWORN.)

14           THE COURT:  Please have a seat.

15           THE WITNESS:  Thank you.

16                        DIRECT EXAMINATION

17  BY MR. STROCHAK:

18  Q.   Good morning, Mr. Haras.  Would you just briefly describe

19  for the Court your educational and professional background?

20  A.   I have a bachelors of art from Michigan State University

21  and an MBA from the University of Michigan and I'm a CPA.

22  Q.   And your bachelors of art is in?

23  A.   It's in accounting.

24  Q.   Are you currently a licensed --

25  A.   I'm not.

Haras - Direct                                                       12

1   Q.    -- CPA?

2   A.    I'm not.  I'm registered not licensed to practice.

3   Q.    And why are you not licensed currently?

4   A.    Because I do not fulfill the continuing education

5   requirements.

6   Q.    Are you currently practicing accounting?

7   A.    I am not.

8   Q.    If you could just briefly describe your employment

9   history, your professional employment history for the Court.

10  A.    I began my career at PriceWaterhouseCoopers.  I worked in

11  two areas there.  I was in their audit group as well as their

12  valuation group.  I left PriceWaterhouseCoopers and joined

13  Fahnestock and Company.  I was there for roughly two-and-a-half

14  years, and I have been at W. Y. Campbell since 2001.

15  Q.    What kind of work did you do at Fahnestock?

16  A.    At Fahnestock it's self investment banking.  So I worked

17  on a variety of south side mergers and acquisitions.  I did

18  some valuations and then assisted in certain public offerings.

19  Q.    And what's your work at W. Y. Campbell involve as a

20  general matter?

21  A.    As a general matter W. Y. Campbell predominately we focus

22  on south side mergers and acquisitions, which means we

23  represent sellers in a sale process or in -- we also do capital

24  advisory, capital raising services.  My role specifically is to

25  work with clients assisting them in putting together various

Haras - Direct                                    13

1   information pursuant to a sale or refinancing transaction and

2   also work with three other folks that are in my respective

3   team.

4   Q.   Has W. Y. Campbell had a role in information exchange with

5   the committee in this case?

6   A.   We have.  We have served as the primary conduit between

7   the company or the debtor and the committee's advisors.

8   Q.   Was W. Y. Campbell involved in any engagement for the

9   debtors prior to the Chapter 11 cases?

10  A.   We were.  W. Y. Campbell was representing Lexington

11  Precision Corporation with respect to, again, various

12  alternatives with respect to its Rubber Group.  That was an

13  engagement that was -- we were retained in 2007.

14  Q.   Could you explain for me the segments in which the debtor

15  operates?  What are the debtor's business segments?   You

16  mention the Rubber Group.

17  A.   The debtor, there are two primary segments.  The largest

18  segment is the Rubbers Group, that's the substantial portion of

19  the revenues.  And then the second division is the Metals

20  Group.

21         Specifically within the Rubbers Group the business is

22  really segmented into three areas and it's really driven by

23  their operational footprint.  The company functions as a

24  supplier of precision rubber molded components.  They

25  predominately serve three markets.  They serve the automotive

Haras – Direct                                    14

1   after market, which is supply and replacement components.  They

2   also supply automotive original equipment components, the chair

3   one suppliers, which are then sold to automotive vehicle

4   manufacturers.  And then the last segment is they supply rubber

5   components used in medical devices, laparoscopic minimally

6   invasive surgical requirements as well as medication delivery.

7   Q.   Could you describe for the Court, if you would, the

8   debtor's financial management team?  Who is on the debtor's

9   financial management team?

10  A.   The financial management team of the debtor is lead by

11  Dennis Wellhouse and he is supported by a group of two to three

12  people that work below him.  And then at each divisional

13  facility there is a controller.

14  Q.   Have you worked closely with Mr. Wellhouse during the

15  Chapter 11 cases?

16  A.   I have.  I've worked with Dennis both prior, Mr.

17  Wellhouse, you know, during our role in 2007 as well as during

18  this bankruptcy process.

19  Q.   And in the course of working with Mr. Wellhouse did you

20  come to an understanding of what his duties were with respect

21  to the Chapter 11 cases?

22  A.   Yes, I have.

23  Q.   What duties does Mr. Wellhouse have with respect to the

24  Chapter cases?

25  A.   Dennis is principally responsible for gathering, analyzing

Haras – Direct                                    15

1   and finalizing the information with respect to some of major

2   operating financial reports that the company files and he is

3   also responsible for developing financial projections and

4   working with the various divisional managers to finalize those

5   projections.

6   Q.   Let me just go back and cover something that I may have

7   missed and forgive me if I have forgotten it.  Did you mention

8   the Metals Group when you described the debtor's businesses?

9   A.   Yes.

10  Q.   If you will just generally describe the Metals Group.

11  A.   The Metals Group simply manufacture a machine, a variety

12  of components principally sold to the automotive market, the

13  original equipment work.

14  Q.   The debtor's financial advisor is the Stout, Risius, Ross,

15  or SRR.  Is that correct?

16  A.   The committee's financial advisor, yes, it is.

17  Q.   Yes.  And have you worked with SRR during the Chapter 11

18  cases?

19  A.   Yes, yes, I have.

20  Q.   Describe for me the interaction between your organization,

21  W. Y. Campbell, and SRR during the Chapter 11 cases.

22  A.   We have worked with SRR in a variety of capacities.  We

23  invited and hosted them to tour the Lexington facilities.  To

24  date they have been to the Jasper, Georgia facility, the Rock

25  Hill, South Carolina facility as well as the company's

Haras - Direct                              16

1   technical center and their Vienna facility in Ohio.  Secondly,

2   we have engaged in a variety of conference calls addressing

3   specific questions they have had and finally we have obviously

4   worked with them to share financial information or other

5   information they have requested as that has been made available

6   by the debtor.

7   Q.   Do you recall approximately when SRR first requested

8   financial information regarding the debtors?

9   A.   I believe the date was May 16.

10  Q.   You mentioned plant visits.  Has SRR now visited all the

11  debtor's manufacturing facilities?

12  A.   They have not.  They have visited all the Rubber Group

13  facilities and the SRR folks have requested to see the Metals

14  facility.  They provided us with a list of dates in August and

15  we have now confirmed their visit to the Metals Group in

16  Rochester on August 11.

17  Q.   You mentioned earlier the sale process prior to the

18  bankruptcy.  Did W. Y. Campbell receive any documents in

19  connection with the sale process?

20  A.   We did.

21  Q.   What documents did you receive, to the best of your

22  recollection?

23  A.   Well, we -- I mean relative obviously we received a

24  variety of information from the debtor as well.  We went out

25  and solicited potential interest in the transaction and

Haras – Direct                                    17

1  received indications of interest and letters of intent from

2  those folks that express interest in acquiring the business.

3  Q.   How about financial data from the debtors.  Did you

4  receive any financial data from the debtors in connection with

5  the sale process?

6  A.   We did.  We've received a variety of financial information

7  for the Rubber Group by division and a lot of that information

8  was put into what we call an online data room.

9  Q.   Has the online data room been made available to SRR?

10 A.   It has.

11 Q.   How about other materials from the sale process.  Let me

12 ask you this way.  What other materials from the sale process

13 have been made available to SRR?

14 A.   We furnished SRR with a copy of our confidential offering

15 memorandum, which in great detail explains the Lexington Rubber

16 Group.  Additionally, we have provided them with a management

17 presentation, which provides additional level of information

18 regarding the Rubber Group.  Those are the two primary kind of

19 marketing materials that were shared with SRR.

20 Q.   How about correspondence with potential bidders in that

21 sale process, has that been shared with SRR?

22 A.   We've provided SRR with a copy of our deal tracking sheet,

23 essentially it's a 165-page document, which highlights the

24 various conversations, correspondence we have had with the

25 potential bidders.  So that has been provided.

Haras – Direct                                      18

1  Q.   Have you provided any letters of interest from potential

2  purchasers?

3  A.   To my knowledge, all the other letters of interests,

4  whether it be letters of intent, indications of interest, were

5  shared with SRR.

6          THE COURT:  Were those all pre-petition?

7          THE WITNESS:  Yes, sir.

8          MR. STROCHAK:  Your Honor, I'd like to show the

9  witness what we have marked as Debtor's Exhibit 1 for

10 identification.   May I approach?

11         THE COURT:  Yes, have you given Mr. Bracht --

12         MR. STROCHAK:  Yes, I have, counsel has.

13         THE COURT:  Thank you.  Thank you.

14 (Debtor's Exhibit 1, Marked.)

15 BY MR. STROCHAK:

16 Q.   Mr. Haras, I have given you Debtor's Exhibit 1 for

17 identification purposes.  Could you please tell the Court what

18 it is?

19 A.   This document is used to track the information that we

20 have shared with SRR and have attempted to cross-reference the

21 information request to items either outlined in previous

22 correspondence with the counsel for creditors as well as SRR.

23 Q.   Let me just walk you across the columns from left to

24 right.  The first column is description and could you tell me

25 what that means?

Haras - Direct                                    19

1   A.   These are descriptions obviously just generally of the

2   information that was requested.  You will see at the top of the

3   schedule it says Rock Hill monthly management report.  That's

4   roughly a 20-page document that is used by the divisional team

5   to track their monthly performance.  It goes into great detail

6   analyzing a variety of financial and efficiency manufacturing

7   metric.

8   Q.   Let me just ask you if you could, just to work your way

9   down that left-hand column and I don't need you to focus on

10  every item, but if you could just describe in general for the

11  Court the major categories of documents that have been provided

12  to SRR?

13  A.   Working from the top down the major documents that have

14  been provided, as you note there's financial -- we have

15  provided them with the financial projections, which were shared

16  with them on July 15 and then the details to those financial

17  projection files have been shared on July 22 and 23.

18  Additionally, we have been sharing --

19  Q.   Let me -- I'm sorry.  Let me just stop you there for one

20  second on the projections.  When did W. Y. Campbell first

21  receive the projections from the debtors?

22  A.   July 15.

23  Q.   Okay.  Please, if you would just continue with your next

24  item.

25  A.   In addition to the projections the other major elements

Haras – Direct                                    20

1  have been historical financial information.  We've shared with

2  SRR the by month financial information from  2003 through 2007,

3  and you will see that noted below.

4  Q.    Was that at their request?

5  A.    It was.  And then the other major packages there's

6  something called the director's package is what looks at the --

7  with both the Rubber Group and the Metals Group and those are

8  fairly substantial documents numbering in excess of a hundred

9  pages.  Those have been also shared with -- with SRR.  And then

10 tax returns and prior real estate appraisals and I have alluded

11 to the transaction correspondence, i.e., the indications of

12 interest, the letters of intent, the offering memorandum,

13 management presentation and additional information on customers

14 and vendors of Metals Group.

15 Q.    Let me just move you one column to the right with where it

16 says, "SRR item number."

17 A.    Yes.

18 Q.    And can you just describe what that column indicates?

19 A.    That column indicates that -- it talks to cross referenced

20 items provided to -- items that were included on the original

21 information request list provided by SRR.

22 Q.    And where it says either AK letter or SRR e-mail, what

23 does those references refer to?

24 A.    Just refer to a -- tie back to a letter provided by

25 counsel to the creditors as well as a -- or just reference an

Haras – Direct                                    21

1   e-mail from SRR replying to.

2   Q.    The next column says date provided.  What does that mean?

3   A.    That's the date that W. Y. Campbell provided the

4   information to SRR.

5   Q.    The next column indicates publication or publications.

6   What does that refer to?

7   A.    Simply counts the number of files that were shared and

8   then another column to the right is basically the number of

9   pages that are in each of -- or the total number of pages that

10  were provided from those files.

11  Q.    And if we tally up at the bottom the total page count is

12  34,448.  Is that correct?

13  A.    That's correct.

14  Q.    And is this list current as of today?

15  A.    That is current -- I think that basically represents -- it

16  says July 23.  I think that's roughly as of last week.  That's

17  reasonably accurate.

18            MR. STROCHAK:  Your Honor, we offer Debtor's Exhibit

19  1 in evidence.

20            MR. KRASNOW:  No objection.

21            THE COURT:  Hearing no objection, Debtor's Exhibit 1

22  is admitted in evidence.

23  (Debtor's Exhibit 1, Received.)

24  BY MR. STROCHAK:

25  Q.    Thank you.  If I could just roll back a little bit and

Haras - Direct                                        22

 1  focus you on a little bit of the process of exchange between W.

 2  Y. Campbell and SRR.  Did there come a time when you met or had

 3  a conference call to discuss information requests with SRR?

 4  A.   We did.  We obviously received the initial information

 5  request list on a late Friday.  I think that was May 16.

 6  Subsequent to that we did share with them the offering

 7  memorandum management presentation and 2007 financial results.

 8  Following submitting that information to SRR we had a follow-up

 9  call in which we discussed each of the items included on their

10  list and asked them to prioritize the information on the list

11  as I alluded to earlier the debtor has a limited finance staff

12  so we attempt to try to prioritize which items were most

13  germane to their analysis.  And subsequent to that began, you

14  know, supplying more information as soon as it was made

15  available.

16          THE COURT:  Have you been the principal point person

17  with SRR?

18          THE WITNESS:  I have, Your Honor.

19          THE COURT:  Is there a person at SRR with whom you

20  usually deal?

21          THE WITNESS:  There is a -- yes.  I guess we have

22  attempted to.  Generally speaking I would say it is Jessie Ultz

23  of SRR and then as a practical matter what we do each time we

24  forward information is we forward it to all the members of the

25  SRR team to ensure that they receive it.

Haras – Direct                                      23

1              THE COURT:  Okay.  Thank you.

2    BY MR. STROCHAK:

3    Q.   Did SRR or the committee request any information that the

4    debtors considered highly confidential or proprietary?

5    A.   Yes, they did.

6    Q.   Could you describe for the Court the process by which the

7    debtors worked out confidentiality issues associated with those

8    documents?

9    A.   There are some specific documents specific that had very

10   detailed information in terms of price margins and, you know,

11   specific data that the debtors were concerned about because

12   they thought if it got in the open it would compromise their

13   ability to compete in the marketplace.  As a result they asked

14   the committee to sign an additional confidentiality to protect

15   those documents from potentially getting out.  So as soon as

16   those issues related to confidentiality were resolved.  That

17   information was provided.  And really that speaks to, to be

18   specific, it's new business wins and losses.  It's something

19   that the debtor tracks on a monthly basis.  In addition to that

20   some of the information included in the monthly operating

21   management reports are very specific and those were the two

22   major items that were protected under the most recent

23   confidentiality agreement.

24   Q.   Has SRR requested any additional detail regarding the

25   financial projections?

Haras - Direct                                    24

1   A.    They have.  We received an e-mail last week.  We have --

2   the detail that was provided to SRR with respect to projections

3   was on a part by part basis.  And as a result the SRR folks

4   requested some additional information to better understand the

5   part-by-part build up and have requested some additional backup

6   to the projections that the debtors were currently working

7   through.

8   Q.    And what's the status of that request?

9   A.    It's still being -- it's in process.

10  Q.    What do you mean, it's in process?

11  A.    I'm sorry.  The debtor is currently working to provide

12  that information.

13  Q.    Is the information that's being requested something that

14  the debtor has readily available or is it something that needs

15  to be developed?

16  A.    It's something that needs to be put into a format that's

17  consistent with SRR's request.

18  Q.    You mentioned earlier some detail about specific parts.

19  Do you have a sense as to how many parts the debtor produces in

20  any given period?

21  A.    On an annual basis the debtor ships roughly a billion

22  parts and that's across, obviously, you know, thousands of

23  individual part numbers so it's fairly expensive.

24  Q.    So the order of magnitude is a billion or more, is that

25  what you said?

Haras – Direct                                    25

1          THE COURT:  No, he said, thousands of individual

2    parts.  He said they ship billions of parts but there are

3    thousands of individual parts.  Did I understand you correctly?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Go ahead.

6    BY MR. STROCHAK:

7    Q.   Mr. Haras, let me direct your attention to valuation

8    issues for a moment.  Is W. Y. Campbell preparing a valuation

9    for the debtors?

10   A.   Yes, we are.

11   Q.   What's the status of the valuation?

12   A.   We are currently working through the valuation.  It's in

13   process and we are working on gathering some additional

14   information that'll help us in that process.

15   Q.   Has any of the information that is the debtor-specific

16   information, financial information that you have been using in

17   your valuation work, not been provided to SRR and the

18   committee?

19   A.   At this point no, it is not.

20   Q.   Mr. Haras, are you aware of any particular financial

21   management tools or reports that the debtors regularly use to

22   run their business that have not been made available to SRR

23   pursuant to its request?

24   A.   To my knowledge, all the major business -- the financial

25   management tools used by the debtor those were the monthly

Haras – Direct                                    26

1   operating management reports, the director's packages, the

2   divisional packages, those are the major tenants to their

3   financial reporting and management.  Those documents were by

4   month for the last five years have been provided to SRR.

5   Q.   In terms of the quantity and quality of information that

6   has been provided to SRR and the committee, how would you

7   compare it to, say, an ordinary merge and acquisition sale

8   process?

9   A.   I think from a financial reporting perspective I think the

10  team at Lexington does an outstanding job of financial

11  management and reporting and understanding the numbers.

12  Clearly I would consider them in the top decile of transactions

13  I have worked on where I have seen -- I mean Dennis Wellhouse

14  and his team do an outstanding job.

15  Q.   And how does that information -- in terms of quantity, how

16  does that information compare to what might be provided in a

17  typical M&A deal?

18  A.   In a typical M&A transaction -- as an example we recently

19  worked on transaction -- the number of pages in a particular

20  data room numbered seven to eight thousand pages.  So I think

21  you can square that against the, you know, the 34,000 pages

22  that they've provided to SRR to date.

23  Q.   Mr. Haras, to your knowledge, are there any outstanding

24  requests for information from the committee right now?

25  A.   Based on some recent correspondence from the creditor's

Haras – Cross                                        27

1   legal counsel I understand there's three major items they are

2   looking for.  They are looking for updated appraisals.  They

3   are looking for some additional information on the net

4   operating loss carry forward and, obviously, some additional

5   information on the financial projections, which I alluded to

6   earlier.

7   Q.   Let me just start with the appraisals.  Are these

8   appraisals that the debtor has already completed?

9   A.   To my knowledge, those appraisals have not been provided

10  to the debtor and they are still in process.

11  Q.   And have any prior appraisals been provided to the

12  committee?

13  A.   They have.  We've provided them historical operating both

14  equipment appraisals as well as real estate appraisals.

15  Q.   With respect to the net operating loss carry forward

16  request, when is the first you learned that the committee was

17  looking for additional information on this issue?

18  A.   It was the e-mail this morning that I received.

19  Q.   And with respect to the third matter, the projections --

20  A.   Oh, the detail projections that was in an e-mail

21  correspondence that we received last week.

22  Q.   And that's the same matter that you described earlier that

23  the debtors are working on?

24  A.   Yes, it is.

25       MR. STROCHAK:  Thank you, no further questions, Your

Haras – Cross                                               28

1   Honor.  I pass the witness.

2              THE COURT:  Cross-examination.

3              MR. BRACHT:  Yes, Your Honor.  Thank you.

4                        CROSS-EXAMINATION

5   BY MR. BRACHT:

6   Q.   Good morning, Mr. Haras, how are you?

7   A.   Good morning.  Well, how are you?

8   Q.   I'm Gerry Bracht.  We have never met, have we?

9   A.   We have not.

10  Q.   Prior to today.  Nice to meet you.

11  A.   Nice to meet you.

12  Q.   Mr. Haras, you mentioned that the first information

13  request from SRR came on May 16, 2008. Is that correct?

14  A.   That is correct.

15  Q.   Okay.

16             MR. BRACHT:  Your Honor, may I approach?

17             THE COURT:  Yes, you may.

18             MR. BRACHT:  I don't have this marked.  Do you have

19  some exhibit stickers?

20             THE COURT:  No you don't.  You are responsible for --

21  yes, you can -- everybody is responsible for marking their own

22  exhibits.

23             MR. BRACHT:  I'll remember that, Your Honor. I'm

24  sorry.  I'll just go ahead and mark it Exhibit 2.

25             THE COURT:  Well, actually you should mark yours with

Haras - Cross                                    29

1   letters so why don't you -- this is Committee A.

2            MR. BRACHT:  Committee?

3            THE COURT:  The debtor will use the numbers and you

4   will use the letters.

5            MR. BRACHT:  Okay.

6            THE COURT:  Call it A.

7            MR. BRACHT:  Thank you, Your Honor.

8   (Committee's Exhibit A, Marked.)

9   BY MR. BRACHT:

10  Q.   Committee A.

11           MR. STROCHAK:  Which is Committee A?

12           MR. BRACHT:  5/16, the one right on top, you see the

13  date.

14           MR. STROCHAK:  Okay. Thank you.

15  BY MR. BRACHT:

16  Q.   Mr. Haras, let me show you what's been marked as Exhibit

17  Committee A.  Do you recognize that document, sir?

18           THE COURT:  Mr. Bracht, do you have a copy for me?

19           MR. BRACHT:  I'm sorry, Your Honor, I do.  Do you

20  want me to mark it?

21           THE COURT:  No, I can do that.  Thank you very much.

22           MR. BRACHT:  I'm sorry.

23           THE COURT:  That's okay.

24  BY MR. BRACHT:

25  Q.   Do you recognize it, Mr. Haras?

                        Haras – Cross                               30

1   A.    I do.

2   Q.    And is this the first information request?

3   A.    This is the original information request, I'm sorry.

4   Q.    And this was a document that was put together by SRR and

5   was shared with you folks at W. Y. Campbell.  Correct?

6   A.    Correct.

7   Q.    Okay.  And did you understand that this -- the information

8   requests contained in here were information requests from SRR?

9   A.    That is my understanding.

10  Q.    Were you told by SRR that they needed this information in

11  order to do their job?

12  A.    Yes, it was.

13  Q.    Okay.  And if you'll note on Exhibit Committee A there's

14  nothing in the columns there.  So this is the first one and

15  this prompted the conference call that you talked about

16  earlier?

17  A.    That is correct.

18  Q.    Okay.  And then there was a subsequent information

19  request, wasn't there?

20  A.    There was a revised information request list to this

21  original list.

22  Q.    And that was dated May 30.  Is that correct?

23  A.    I believe that's correct.

24  Q.    Okay.

25          MR. BRACHT:  May I approach, Your Honor?

Haras – Cross                                                31

1          THE COURT:  Yes, you may.  You don't need to ask

2  permission.

3          MR. BRACHT:  Thank you.

4          THE COURT:  Thank you.  This is going to be Committee

5  Exhibit B?

6          MR. BRACHT:  Yes, Your Honor.  Committee Exhibit B.

7  (Committee's Exhibit B, Marked.)

8          MR. BRACHT:  Before I forget, Your Honor, I would

9  like to offer Committee Exhibit A.

10         THE COURT:  Any objection?

11         MR. STROCHAK:  No objection.

12         THE COURT:  All right.  Committee Exhibit A is

13  admitted in evidence.

14  (Committee's Exhibit A, Received.)

15  BY MR. BRACHT:

16  Q.   If you go through Committee Exhibit B, this is the list,

17  the May 30 list that SRR presented to you.  Is that right?

18  A.   Correct, conference call.

19  Q.   And that was when you asked them to prioritize and they

20  prioritized it and that's reflected on the May 30 request.

21  Correct?

22  A.   Correct.

23  Q.   Now, before we move on from these initial requests a lot

24  of this data that's requested in the middle of May 2008, this

25  is data that was in existence at that point in time.  Was it

Haras - Cross                                                    32

1  not?

2  A.   There's a large portion that is historical information,

3  right.

4  Q.   And it was as you pointed out in your direct examination,

5  it was readily available, correct?

6  A.   Well, I don't know that I'd characterize it as that.

7  There's certain information that we had relative to the Rubber

8  Group and certain information included on this list was not --

9  we did not have readily available, i.e., it was not in our

10 possession.

11 Q.   Not in your possession, but it was in Lexington's

12 possession, wasn't it?

13 A.   Yeah, they are the source of the information.  So I would

14 say yes.

15 Q.   You made a comment earlier in your testimony that

16 Lexington had a lot of good data.  They were very careful and

17 very thorough in collecting financial data and retaining it,

18 correct?

19 A.   Correct.

20 Q.   Okay.  Now, if you will go through Committee Exhibit B you

21 will notice that in some of the columns there's a column there

22 that's called W. Y. Campbell Comments.  Do you see that?

23 A.   I do.

24 Q.   Okay.  And if you will perhaps turn the page, if you

25 could, to the columns that talk about the fact that no

Haras – Cross                                             33

1   information is going to be provided until checking with

2   counsel.  Do you see those columns?

3   A.    Yes.

4   Q.    Now, did W. Y. Campbell make those comments?

5   A.    Those were comments made by SRR.

6   Q.    Were?

7   A.    Oh, yes, yes.

8   Q.    Okay.  So you were told by counsel not to produce that

9   information, correct?

10  A.    We told SRR that we needed to check with counsel relative

11  to providing that information.

12  Q.    Okay.  And did you check with counsel?

13  A.    We did.

14  Q.    All right.  And do you know whether or not the information

15  was forthcoming?

16  A.    To my knowledge, the information was ultimately provided

17  to SRR.

18  Q.    Ultimately, do you know when?

19  A.    It would be on Exhibit 1.

20  Q.    Could you point it out to me?

21  A.    The transaction correspondence there's a an item halfway

22  down a portion of the information was provided on the 5th of

23  June.

24  Q.    And that is the information with respect to the sale

25  process that took place back pre-petition in the -- before

Haras - Cross                                    34

1   December 2007 time frame?

2   A.    Yes.

3   Q.    Okay.  And this was basically letters of interest and

4   other correspondence between potential bidders and W. Y.

5   Campbell concerning the information flow between those

6   companies and what their bids were based on?

7   A.    Yes.

8   Q.    Okay.  And that information was available as you testified

9   back in at least as of December of 2007 and even before,

10  correct?

11  A.    Correct.

12  Q.    Okay.  Do you have any understanding as to why it was not

13  until June the 6 that the information was produced?

14  A.    Again, it was W. Y. Campbell wanted to check with counsel,

15  which we did and subsequent to that May 30 we provided the

16  information on June 5.  So it took that time to verify that

17  that information was appropriate to share and which point it

18  was.

19  Q.    Okay.  And any other information that was subsequently

20  provided that you can point out on Exhibit 1?

21  A.    Our deal tracking or status sheet, which is the top of --

22  near the top of Exhibit 1, Section 2.4.  That was provided

23  recently to SRR.

24  Q.    Okay.  Requested back in May and provided really just

25  about a week ago.

Haras – Cross                                            35

1   A.    Correct.

2   Q.    All right.  And that was deal tracking data that SRR had

3   explained to W. Y. Campbell that it was important to have in

4   order to make its evaluation and do its job, right?

5   A.    They explained that the information was important to have.

6   Q.    Okay.  And it was information that was readily available,

7   correct?

8   A.    It was available, yes.

9   Q.    It was historical data.  It was with respect to a sale

10  process that had taken place back in late 2007, correct?

11  A.    Correct.

12  Q.    All right.  And isn't it true that the debtors originally

13  objected to producing that data?

14  A.    Correct.

15  Q.    All right.  And isn't it true that it was only when I

16  deposed Mr. Lubin and your colleague from W. Y. Campbell that

17  that data was produced?

18  A.    I believe that's correct.

19  Q.    All right.  Now, do you know of any reason why it took two

20  months to produce that data?

21  A.    I do not.  I do not.

22  Q.    Okay.  Now, any other information on Exhibit 1 that you

23  think was produced after checking with counsel?

24  A.    Let me just step back to 2.4.  You will note on Exhibit

25  Com. B that the section 2.4 was deemed N/A as a priority.  So

Haras – Cross                                    36

1   it was not a priority as accordingly.  So we put that kind of

2   on the back burner if you will and worked on providing the more

3   information that was more germane to the analysis and valuation

4   of the debtor.

5   Q.   Okay.  I understand that.  I appreciate that comment.

6   Now, can you point out any other information that was provided

7   after checking with counsel that's set forth on Exhibit 1,

8   which we have identified as the list of documents and

9   information that had been supplied in this case?

10  A.   Section 1.7, Section 2.2, Section 2.4, Section 2.5,

11  Section 2.6, 2.7, 2.8 and 2.9.

12  Q.   Are you reading -- you are reading the transaction

13  correspondence.  You have already pointed that out to us.

14  A.   Yes.

15  Q.   Okay.  And that was 24 documents equaling 65 pages?

16  A.   Yes, it was.

17  Q.   Okay.  Let's move on.  Let's see if there -- and before we

18  leave this exhibit just tell me if you can identify any other

19  documents other than what you have already identified that were

20  produced after checking with counsel?

21  A.   Those are the ones that I see offhand.

22  Q.   All right.  The transaction correspondence and the deal

23  tracking data, which actually is 165 pages, the transaction

24  correspondence 65 so basically we are talking about 230 pages

25  of documents.

Haras – Cross                                            37

1   A.   (Nonverbal response.)

2          THE COURT:  You have to answer that audibly.

3          THE WITNESS:  Oh, yeah.  Yes.

4          THE COURT:  All right.

5          MR. BRACHT:  Your Honor, I would like to move the

6   admission of Exhibit Committee B, please.

7          MR. STROCHAK:  No objection, Your Honor.

8          THE COURT:  Committee Exhibit B is admitted in

9   evidence.

10  (Committee's Exhibit B, Received.)

11  BY MR. BRACHT:

12  Q.   Now, I want to move on to one more information request if

13  I could, Mr. Haras.  I'm going to mark it as -- that C-o-m

14  stands for Committee, Committee C.

15  (Committee's Exhibit C, Marked.)

16  BY MR. BRACHT:

17  Q.   And this is an information request that's dated June 13 of

18  2008, correct?

19  A.   Correct.

20  Q.   All right.  Now, if you'll notice in the columns

21  concerning W.Y.'s comments there's additional or a little bit

22  different language with regard to may provide information after

23  -- and it says, "May provide after discussion with counsel."

24  Correct?

25  A.   Yes.

Haras - Cross                                      38

1   Q.   Okay.  Now, was that something that you were told by

2   debtor's counsel or was this something that you came up with on

3   your own?

4   A.   Those comments from SRR -- they are their comments.  They

5   are not W. Y. Campbell's comments.

6   Q.   Okay.  You didn't tell them that you may provide that

7   information after discussion with counsel?

8   A.   That could have -- I don't recall having a subsequent

9   conversation with SRR and making that statement other than what

10  we said on the May 29 conference call.

11  Q.   Did you understand by making that comment that there was

12  an indication that this information existed and that you may

13  provide it if your lawyers tell you to provide it?

14  A.   Again, that was a comment that was made by SRR.  I think

15  it reflects a prior comment from a May 29 conference call.

16  Q.   Hey, well did you --

17           THE COURT:  Mr. Haras, -- excuse me.  Mr. Haras, have

18  you seen Exhibit C before?  Did SRR provide you --

19           THE WITNESS:  I don't recall seeing the June 13

20  correspondence.

21           THE COURT:  Did you see Exhibit B before?  I mean did

22  they share with you their tracking sheets?

23           THE WITNESS:  I have, Your Honor.  I have seen

24  Exhibit Committee A and Committee B.  I have seen both of

25  those.  I don't recall seeing C.

Haras – Cross                                        39

1          THE COURT:  All right.  And did you share with them

2   your tracking sheet, Exhibit 1?

3          THE WITNESS:  I did not, but we did not.

4          THE COURT:  Go ahead.

5   BY MR. BRACHT:

6   Q.   Did you know as of June 13 of 2008, whether or not there

7   was additional data or information that existed that had not

8   been produced that falls within the categories that are with

9   the comment of "may provide after discussion with counsel"?

10  A.   To my knowledge, the information we shared with SRR June 5

11  substantially represented all of the information relative to

12  transaction correspondence.

13  Q.   And how do you gain that knowledge, sir?

14  A.   That knowledge is based on experience and working with the

15  company pre-petition and based on the offers that we'd receive

16  and collected and aggregated and that was -- at the time that

17  was the information that we shared with them based on

18  everything we thought we had.

19  Q.   Did you go to Lexington and ask them for that information

20  or did you just provide the information that you and your

21  colleagues of W. Y. Campbell had in your files?

22  A.   It was information from our files.

23  Q.   From your files?  Okay.  So as we sit here today you have

24  not checked with W. Y. Campbell -- excuse me -- with the

25  debtors to determine whether or not there is the existence of

                        Haras – Cross                           40

1    additional documentation that may fall within those categories?

2    A.   I believe there were some conversations with the debtor

3    and I think the information that the -- that the information

4    has been provided.

5    Q.   Is that what the debtor told you?

6    A.   Based on our information -- based on our files internally

7    and additional conversations with the debtor that's what we

8    believe to be accurate.

9    Q.   Did the debtor tell you that, sir?

10           MR. STROCHAK:  Objection, Your Honor, asked and

11   answered.

12           THE COURT:  Overruled.

13           THE WITNESS:  Yes, that's -- yes.

14   BY MR. BRACHT:

15   Q.   Who?

16   A.   It was a conversation that my colleague had I think with

17   senior management at Lexington.

18   Q.   Your colleague being?

19   A.   Andre Aljay [Ph.].

20   Q.   And do you know the senior management in Lexington?

21   A.   It was -- It would have been Mike Lubin or Warren Domino

22   [Ph.].

23   Q.   Okay.  Now, do you know when this conversation took place?

24   Would it have been on or about near the time in May early June

25   when these requests were being made?

Haras - Cross                                                    41

1   A.    I don't recall.

2   Q.    Okay.  Now, do you now understand that perhaps that

3   information was not quite correct?

4   A.    It was what we believed to be accurate at the time it was

5   provided out of the 34,000 sheets of information there's a few

6   pieces of information that slipped through the cracks.  That

7   could have been the case.  I'm not suggesting we're -- it's a

8   perfect process.

9   Q.    Well, you were aware, were you not, sir, of something that

10  has been referred to as a sensitivity analysis?

11  A.    Yes.

12  Q.    Okay.  And that is a document actually that was created by

13  W. Y. Campbell, correct?

14  A.    Correct.

15  Q.    And it was created by W. Y. Campbell post-petition and

16  prior to the time Mr. Lubin submitted the declaration in this

17  case.  Isn't that correct?

18  A.    I don't think that's correct.  I think that was a pre-

19  petition document.  I do not believe that was a post-petition

20  document.

21  Q.    All right.  Who do you think would have a better

22  understanding of whether that petition was pre-petition or

23  post-petition, you or Mr. Aljay?

24  A.    I would believe Andre Aljay.

25  Q.    So if he were to have testified in his deposition that it

Haras – Cross                                      42

1   was post-petition you wouldn't disagree with that?

2   A.   I would defer to Andre's testimony.

3   Q.   All right.  Now, do you remember when that document was

4   produced?

5   A.   I recall it as a document that was recently produced.  I

6   can't speak to the exact date.

7   Q.   Within the last week or so?

8   A.   Perhaps.

9   Q.   Okay.  And it was produced after Mr. Lubin's deposition,

10  wasn't it?

11  A.   I believe that's correct.

12  Q.   And it was produced at a point in time when Mr. Lubin --

13  after Mr. Lubin under oath identified the document as being in

14  existence, correct?

15  A.   I didn't participate in the testimony but I believe that's

16  correct.

17  Q.   Okay.  So was it your understanding that prior to the time

18  we took Mr. Lubin's deposition that people on the committee

19  didn't even know the document existed?

20  A.   I would assume that to be the case.

21  Q.   And that document is a document that sets forth W. Y.

22  Campbell's views of a transaction value sensitivity analysis

23  based on the various bids that have been received by W. Y.

24  Campbell in the post -- in the pre-petition, correct?

25  A.   I don't believe --

Haras - Cross                                        43

1          MR. STROCHAK:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. STROCHAK:   Thank you.

4    BY MR. BRACHT:

5    Q.   Well, let's look at I show you what's been marked as

6    Commission Exhibit D.

7          THE COURT:  Committee Exhibit D.

8          MR. BRACHT:  Committee --

9          THE COURT:  That's all right.

10   (Committee's Exhibit D, Marked.)

11   BY MR. BRACHT:

12   Q.   Instead of me trying to describe what this document is,

13   Mr. Haras, why don't you tell the Court what your understanding

14   is about this document.  What is it?

15   A.   This document is a sensitivity analysis that essentially

16   looks at each major division of Lexington and estimates an

17   approximate evaluation based on a range of multiples divided by

18   division.

19   Q.   All right.  And just so we will have a good understanding

20   of what we are dealing with here.  There are various footnotes.

21   The divisions are divided along the lines as you previously

22   described in your testimony, correct?

23   A.   Correct.

24   Q.   There is a conservative view and there's an aggressive

25   view, correct?

Haras – Cross                                    44

1   A.   Correct.

2   Q.   All right.  And the footnotes basically -- I mean what

3   you've done apparently is you have divided up the multiples --

4   you have applied a multiple to each division of the company,

5   right?

6   A.   That's what this analysis sets forth.

7   Q.   All right.  And you come to an analysis that shows a

8   conservative value of 112 million and an aggressive value of

9   137 million, correct?

10  A.   That's what the analysis shows, correct.

11  Q.   All right.  And that's based on EBDA, E-B-D-A of 2008 of

12  over 17 million, correct?

13  A.   That's based on an estimated EBDA for 2008, correct, of

14  $17 million.

15  Q.   All right.  This is valuation information, isn't it, sir?

16  A.   Yes.

17  Q.   And this is information that was requested by SRR in May

18  of 2008, correct?

19  A.   Correct.

20  Q.   And it was -- let me ask you, sir, did you personally know

21  about this document in May of 2008?

22  A.   I did not.

23  Q.   All right, sir.  And this is a document that the debtor

24  objected to producing in the course of this proceeding,

25  correct?

Haras - Cross                                                45

1   A.   I don't --

2   Q.   Okay.  But this is clearly a document that was requested

3   by SRR back in May of 2008?

4        MR. STROCHAK:  Objection, Your Honor, asked and

5   answered.

6        THE COURT:  Sustained.

7        MR. BRACHT:  Thank you.

8   BY MR. BRACHT:

9   Q.   Now you're familiar with the financial performance of the

10  company?

11  A.   Yes.

12  Q.   The estimated 2008 EBDA of over 17 million, that is not

13  even close, is it, sir?

14       MR. STROCHAK:  Objection, Your Honor.

15       THE COURT:  Sustained.

16  BY MR. BRACHT:

17  Q.   What was -- what is through -- what is -- do you know the

18  trailing 12 months EBDA for as of May of 2008?

19  A.   I do not know the trailing 12 months but the -- I don't

20  know the revised 2008 pro forma EBDA.

21  Q.   And what is it?

22

23

24  A.   It's roughly $16 million.

25  Q.   And what was the projection that was contained in the

Haras - Cross                                              46

1  projections that you provided to us in July of 2008 for 2008

2  EBDA?

3  A.   It would -- It would be --

4           MR. STROCHAK:  Objection, Your Honor, best evidence.

5           THE COURT:  Overruled.

6           THE WITNESS:  It was -- it would be the $16 million

7  figure.

8  BY MR. BRACHT:

9  Q.   Is Lexington Account B your company?

10 A.   It is.

11 Q.   We're up to E I think.

12 A.   Yes.

13          THE COURT:  Thank you.

14 (Committee's Exhibit E, Marked.)

15 BY MR. BRACHT:

16 Q.   Let me hand you what's been marked as Committee Exhibit E.

17          MR. STROCHAK:  Mr. Bracht, could you tell me which

18 one you are --

19          MR. BRACHT:  I'm sorry.  It's 7/14 -- it's this one.

20 BY MR. BRACHT:

21 Q.   Do you recognize the document, Mr. Haras?

22 A.   I do.

23 Q.   And what is it?

24 A.   It's the financial projection.

25 Q.   Okay.

Haras – Cross                                          47

1   A.   The baseline financial projection.

2   Q.   And this was the projection that was provided to the

3   committee –

4   A.   Yes.

5   Q.   -- on or about July 15 of 2008?

6   A.   Correct.

7   Q.   Now, just as a point of -- as an aside do you recall

8   whether or not that delivery date of those projections

9   corresponded with promise dates that were made earlier in the

10  process?

11  A.   Due to the nature of the forecast and the building of the

12  forecast I believe the -- there was a delay in getting the

13  information ultimately to SRR.

14  Q.   And to you as well, correct?

15  A.   Correct.

16  Q.   And your company -- your -- W. Y. Campbell are the -- is

17  the advisor for the debtors, correct?

18  A.   Correct.

19  Q.   And W. Y. Campbell did not have one thing to do with these

20  projections, correct?

21  A.   They were developed based on estimates and assumptions

22  from management of the debtor.

23  Q.   My point -- my question is, did you guys have any input

24  into these projections?

25  A.   No, sir.

Haras - Cross                                    48

1   Q.   And, in fact, you received these projections at the same

2   time the people at SRR did, correct?

3   A.   Correct.

4   Q.   All right.  Now I'm -- tell me what I'm reading wrong

5   here, but I'm looking down forecast 2008 on the first page and

6   I'm looking at EBDA of 12.9.

7   A.   For the consolidated business, that's correct.

8   Q.   Okay.  And that's to compare to the EBDA of 17.2 on the

9   transaction value sensitivity analysis?

10  A.   No, it is not.

11  Q.   Why is that?

12  A.   Because that is for the consolidated entity and not for

13  the Rubber Group only.  I think the sensitivity analysis from

14  the Committee D Exhibit is just for the Rubber Group only --

15  I'm sorry.  No, that's correct.  That's correct.

16  Q.   Machining?

17  A.   Yes.

18  Q.   Okay.  So it is apples to apples, correct?

19  A.   Yes.

20  Q.   Okay.  Just tell me, Mr. Haras, do you have any idea or

21  explanation as to why this particular document, the sensitivity

22  analysis was not produced back in May of 2008?

23  A.   I don't.  I do not.

24        MR. STROCHAK:  Objection, Your Honor, asked and

25  answered.

Haras - Cross                                    49

1          THE COURT:  Sustained.

2          MR. BRACHT:  Your Honor, I would move the admission

3    of Committee Exhibit D, the sensitivity analysis.

4          MR. STROCHAK:  Your Honor, could I ask what the

5    purpose for the admission is and what's it being sought for the

6    truth of the matter asserted or just for the fact that --

7          THE COURT:  Do you have -- what's your objection, Mr.

8    Strochak.  Do you have an objection?

9          MR. STROCHAK:  My objection is no foundation for the

10   truth of the matter asserted.

11         MR. BRACHT:  Your Honor, I'm offering it for the fact

12   that it occurred.  I'd certainly -- we certainly do not agree

13   with the conclusions that are stated in the valuation

14   sensitivity.  So we are not offering it for the truth, but we

15   are offering it for the -- to show that the event occurred and

16   that they had the information.

17         MR. STROCHAK:  No objection for that limited purpose,

18   Your Honor.

19         THE COURT:  All right.  Exhibit D is admitted into

20   evidence for the purpose stated.

21   (Committee's Exhibit D, Received.)

22         MR. BRACHT:  Your Honor, I would also like at this

23   time to move the admission of Committee Exhibit E.

24         MR. STROCHAK:  No objection, Your Honor.

25         THE COURT:  All right.  Committee Exhibit E is

Haras – Cross                                        50

1  admitted in evidence.

2  (Committee's Exhibit E, Received.)

3  BY MR. BRACHT:

4  Q.   Let's go back and look at Exhibit 1.  There's no doubt

5  there's been a lot of information that's been provided to SRR.

6  That's correct, isn't it?

7  A.   Yes.

8  Q.   Now have you gone through this list and analyzed how much

9  of this information was provided after let's say June 25 of

10  2008?

11  A.   I did not specifically go through that exercise, no.

12  Q.   Okay.  It looks like if you -- well you can start from the

13  bottom and it's almost chronological and you can see kind of

14  the volume of information.  And if you start say about where it

15  says projections provided to cap source in connection with

16  refinancing at 1.4 on, let's say, July 09, 2008.  Do you see

17  that?

18  A.   Uh-huh.

19  Q.   And you work up -- it looks like most of those entries --

20  I think my quick count except for maybe -- no, I think maybe

21  most of those entries if not all of them were provided after

22  June 25, 2008.  Is that -- well, the document speaks for

23  itself.

24         Do you -- did you recall or were you advised that

25  there was a court conference with His Honor and counsel on or

                         Haras - Cross                              51

1   about June 25, 2008?

2   A.   Yes.

3   Q.   Were you told that?

4   A.   Yes.

5   Q.   Is it in your mind just coincidence that the information

6   began to flow a little bit quicker and maybe a little bit more

7   fuller after that date?

8           MR. STROCHAK:  Objection, Your Honor, argumentative.

9           THE COURT:  Sustained.

10  BY MR. BRACHT:

11  Q.   You mentioned that you accompanied the SRR people on

12  various site visits.  Is that right?

13  A.   For a portion of them, yes.

14  Q.   At one point were you advised as to whether or not the SRR

15  personnel would have access to Lexington's CFO and plant

16  managers?

17  A.   They were provided access to the plant managers and their

18  respective manager teams at the -- at the facility.  Yes.

19  Q.   At the plant -- plant sites.  But in terms of contacting

20  directly those managers or the CFO, were you advised whether or

21  not that was permitted?

22  A.   We -- we asked the SRR team to facilitate all their

23  correspondence and questions through W. Y. Campbell.

24  Q.   All right.  And do you know whether or not that

25  restriction has been complied with?

Haras - Cross                                52

 1  A.   I don't understand.  I'm sorry.  I don't understand what

 2  you are asking.

 3              MR. BRACHT:  I'm sorry, Your Honor.

 4              THE COURT:  You're saying the restriction.  He

 5  indicated --

 6  BY MR. BRACHT:

 7  Q.   Well, has -- to your knowledge, did -- has SRR complied

 8  with that restriction and not contacted the CFO and managers

 9  without going through you?

10  A.   With one exception I think the answer is yes.

11  Q.   Okay.  And what exception is that?

12  A.   I believe one of the SRR folks did contact Dennis directly

13  with some information requests and subsequent to that we asked

14  them to direct correspondence through W. Y. Campbell.

15  Q.   Okay.

16  A.   Which they have complied with.

17  Q.   All right.  So it was before the restriction was imposed

18  when they contacted --

19  A.   No.  No.  We asked them at the beginning of the process to

20  facilitate all questions and correspondence through W. Y.

21  Campbell.

22  Q.   Okay.  And they did it once and then from that point

23  forward they have complied?

24  A.   To my knowledge, yes.

25  Q.   Okay.  Now, just a couple more.  This detail -- additional

Haras - Cross                                53

1  detail that SRR has requested just recently that was a request

2  that was made in an e-mail to you and I think Mr. Wellhouse,

3  correct?

4  A.   Yes.

5          THE COURT:  Thank you, Mr. Bracht. Are you marking

6  this as Exhibit F?

7          MR. BRACHT:  This is Committee Exhibit F, Your Honor.

8          THE COURT:  Thank you.

9  (Committee's Exhibit F, Marked.)

10  BY MR. BRACHT:

11  Q.   Mr. Haras, could you identify it, please?

12  A.   On page 2 it's the e-mail that you referenced relative to

13  Jess, Mr. Ultz sending both Dennis Wellhouse and myself a list

14  of additional follow-up questions to the 5-year forecast.

15  Q.   Had you had discussions or were you privy to discussions

16  with Mr. Ultz and other people at SRR regarding the need for

17  this type of backup data that is reflected in this e-mail?

18  A.   As part of their initial original request they asked us to

19  furnish them with backup to the financial projections, which

20  was the information that was shared with them on July 22.

21  Subsequent to that these are the follow-up questions to the

22  backup to the projections.

23  Q.   All right.  So at least as of the date of this e-mail you

24  didn't have an understanding that Mr. Ultz and the SRR people

25  were looking for that kind of data all along?

Haras - Cross                                      54

1   A.   We furnished them with the -- the assumptions that

2   management put forth relative to the forecasts very detailed,

3   part-by-part and this follow-up -- this and the folks from SRR

4   wanted some additional clarification in summary form on the

5   projections.

6   Q.   I understand that's your testimony.  What I'm trying to

7   find out is prior to receiving this e-mail, didn't you have an

8   understanding that they wanted that kind of data all along?

9   A.   They asked us for the detail -

10       MR. STROCHAK:  Objection, Your Honor.  Calls for

11  speculation.

12       THE COURT:  Overruled.

13       THE WITNESS:  We provided them with the assumptions

14  that management put together relative to the forecast.  I -- we

15  assumed there was going to be follow-up questions to which

16  degree and what specificity was unclear.  This -- this e-mail

17  from Mr. Ultz addresses those -- those follow-up questions.

18  BY MR. BRACHT:

19  Q.   And that's the first time you have heard it is in this e-

20  mail?

21  A.   Yes.

22  Q.   Okay.  You don't recall having or being in discussions

23  between SRR and Mr. Lubin where it was discussed that they

24  needed this kind of detail and that Mr. Lubin confirmed that

25  that is the way the buildup was going to take place as

Haras – Cross                                              55

1  reflected in these requests?

2  A.   Are you speaking to a specific question on the e-mail from

3  Mr. Ultz?

4  Q.   I'm speaking about the type of detailed information that

5  Mr. Ultz is asking for in that e-mail as opposed to a buildup

6  by part number.

7  A.   A portion of the projections are built using -- relative

8  to this e-mail from Mr. Ultz.  Item Number 1 on that list

9  speaks to projections that were built up by CSM.  As explained

10 to SRR during the facility tours only a portion of the business

11 gets forecasted using that information.

12 Q.   Right.  But some of it is, correct?

13 A.   A portion of it is.

14 Q.   Okay.  And that data exists, correct?

15 A.   Yes, to my knowledge.

16 Q.   And in those conversations during the site visits wasn't

17 it made clear to you that Mr. -- that SRR wanted that type of

18 data built up by CSM data?

19 A.   Yes.

20 Q.   And also data that was built up or volume that was built

21 up by customer budgets?

22 A.   They asked us for the -- for the CSM data that

23 corresponded in the forecasts.

24 Q.   Okay.  And all -- but didn't they also ask you for data

25 that -- that is based or projections that is based on what

                        Haras – Cross                                 56

1   their customers are telling them in terms of what they're

2   budgeting?

3   A.    In some cases that -- that may be true.

4   Q.    Okay.  And do -- do you know that that data exists as

5   well, correct?

6   A.    I -- I assume that it does.

7   Q.    And it -- and it's existed since May of 2008, hasn't it?

8   A.    I don't  -- I don't -- I do not think that's correct.

9   Q.    Okay.  In Committee Exhibit F at the bottom there's a

10  response to Mr. Ultz's e-mail request, correct?

11  A.    Yes.

12  Q.    And that's from Mr. Lubin, correct?

13  A.    Yes.

14  Q.    And I'm not going to -- I don't want --

15          THE COURT:  Looking at the bottom of the first page

16  you are saying?

17          MR. BRACHT:  Yes, Your Honor.

18  BY MR. BRACHT:

19  Q.    And in that response I mean -- I'm not going to go over

20  the whole e-mail but in that response Mr. Lubin's response is

21  basically, "Hey, no problem.  We can get you that information

22  and we can get it to you by the middle now of this week,"

23  correct?

24  A.    That's what the e-mail says.

25  Q.    Okay.  Is that consistent with your understanding?

Haras – Cross                                           57

1          MR. STROCHAK:  Objection, Your Honor, vague.

2          THE COURT:  Sustained.

3    BY MR. BRACHT:

4    Q.   Do you have an understanding as to -- when you were

5    talking about that it needed to be put in a format to meet the

6    SRR request, do you have an understanding one way or another as

7    to whether or not the middle of this week is a doable date?

8    A.   I haven't had -- I have not had a follow-up conversation

9    on the timing of this.

10   Q.   Okay.  Are you involved -- excuse me -- is W. Y. Campbell

11   involved at all in this effort?

12   A.   It's -- it's a management -- it's a management endeavor.

13   Q.   Okay.  Do you recall having a conversation with Mr. Ultz

14   around this time when this request had come in in which he

15   explained further SRR's need for this data?

16   A.   Yes.

17   Q.   And did you agree with him that it was important to have?

18   A.   I thought it was a reasonable request, yes.

19   Q.   All right.

20         MR. BRACHT:  Excuse me, Your Honor, just one minute.

21         THE COURT:  Certainly.

22         MR. BRACHT:  I'll pass the witness, Your Honor.

23         THE COURT:  All right.  I have a few questions before

24   -- before further redirect.

25         Mr. Haras, on Committee Exhibit D, which is the

Haras – Cross                                          58

1   sensitivity analysis you were asked about the 2008 EBDA

2   projection seventeen million two seventy-eight.  And then you

3   testified that you were aware of a revised pro forma 2000 EBDA

4   of approximately sixteen million.

5           THE WITNESS:  Yes, Your Honor.

6           THE COURT:  When did you become aware that it was

7   reduced sixteen million?

8           THE WITNESS:  The -- that was pursuant to the

9   projections that was -- that were provided on the 15 and I

10  guess I should -- I should caveat that with there are some pro

11  forma adjustments and the number I was speaking of was really

12  specific to the Rubber Group and there were some additional

13  adjustments that factored into that $16 million calculation.

14          THE COURT:  All right.  What I'm -- then in Committee

15  Exhibit E that Mr. Bracht showed you, these are the projections

16  prepared by management, correct?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  And it -- we looked in the column

19  Forecast for 2008 and the roll up was EBDA of twelve million

20  nine hundred and thirty-eight thousand, correct?

21          THE WITNESS:  Yes, Your Honor, for the consolidated

22  entity.

23          THE COURT:  And do you understand how the figure

24  reduced from approximately sixteen million down to the twelve

25  million nine hundred thirty-eight?

Haras - Cross                                59

1              THE WITNESS:  I -- I have some perspective on that,

2    Your Honor.

3              THE COURT:  All right.  Can you explain for me?

4              THE WITNESS:  In part some of the -- some of the

5    change in EBDA was really driven by -- by some of the changes

6    in the automotive OEM market, which is -- which is

7    predominately the delta offset by some new business and other

8    volume.  From other segments of the business notably after Merc

9    [Ph.] and medical.

10             THE COURT:  When was the EBDA projection reduced to

11   the approximate sixteen million?  I want to be sure I

12   understand that.

13             THE WITNESS:  The -- I guess I was mixing apples and

14   oranges there, Your Honor.  I was speaking more of the $16

15   million number was reference to -- to the Rubber Group only.

16             THE COURT:  Okay.

17             THE WITNESS:  And then there's some additional

18   adjustments that factor in if you look on page 3 of Committee

19   Exhibit E it's --there's a -- it's -- there's a fourteen

20   million six number and there's some adjustments that bring that

21   to sixteen.  So I apologize for -- for the confusion.

22             THE COURT:  Okay.  You have explained.  Thank you

23   very much.

24             Redirect?

25             MR. STROCHAK:  Thank you, Your Honor, Adam Strochak.

Haras – Redirect                                                    60

1                          REDIRECT EXAMINATION

2    BY MR. STROCHAK:

3    Q.   Mr. Haras, Mr. Bracht asked you about the deal tracking

4    status sheets that were produced.  Could you just give a little

5    more detail as to what's actually in that -- that package?

6    A.   The deal tracking system tracks conversations that we have

7    with -- with potential buyers during the sale process.  So it

8    would include correspondence from -- from both potential buyers

9    as well as W. Y. Campbell and Company adding comments to this

10   deal tracking system as conversations occur.  And the intent is

11   to try to add -- as discussions occur that information is

12   updated.

13   Q.   Is W. Y. Campbell relying on the data and the deal

14   tracking system from the deal back in or the prospective deal

15   back in 2007 early 2008 in any way in its valuation work that

16   it's doing now?

17   A.   We're -- we're basing our valuation analysis based on the

18   forecast that's been provided by management and so the answer

19   is no.

20   Q.   In your view, sir, is the information in the deal tracking

21   status sheets necessary in any way for effective exchange of

22   information and ideas between Campbell and SRR about issues of

23   valuation?

24   A.   It's a -- it's -- it's historical information and it's --

25   there's elements of valuation embedded in the deal tracking

Haras - Redirect                                        61

1  system, but substantially it's -- it includes a variety of

2  other things that I wouldn't consider germane to the valuation.

3  Q.    The sensitivity analysis, Exhibit D, Committee Exhibit D,

4  could you just briefly describe for me the process of preparing

5  that document?

6  A.    That was a document that I did not prepare, I did not work

7  on.  So I don't have -- I -- I mean I can just give you the

8  general parameters.  It's simply a mathematical calculation

9  using management's best estimate at the time of what 2008 EBDA

10  was in looking at the various business divisions of Lexington

11  to approximate a valuation.

12  Q.    Does that document Exhibit D represent a final conclusion

13  or opinion of W. Y. Campbell on valuation?

14  A.    It does not.

15  Q.    Mr. Bracht asked you whether or not W. Y. Campbell has had

16  any input in the creation of the debtor's financial

17  projections.  In your experience, sir, would it be normal for a

18  financial advisor in a bankruptcy case to be heavily involved

19  in management's preparation of financial projections?

20  A.    I mean other than asking -- asking questions about the

21  projections and trying to get a better understanding I think

22  it's incumbent on management of the debtor to put forth their

23  own set of projections.

24  Q.    Mr. Bracht asked a couple of questions relating to CSM

25  data.  Could you explain for the Court what CSM data is?

Haras - Redirect                                      62

1   A.    Sure.  CSM is a -- it's a third-party industry consultant.

2   They provide volume estimates relative to production for the

3   automotive industry.  So specifically on a platform basis they

4   would estimate for each of the major automotive vehicle

5   manufacturers what the production is going to be for a given

6   platform.

7   Q.    During any of your plant tours did SRR identify any CSM

8   data that it needed and didn't have?

9   A.    They did.  There was a -- there was -- in the Jasper

10  facility there was a large -- large piece of paper that had CSM

11  data that was pasted up on the wall as a poster and that was --

12  that information was requested by SRR and -- and we did provide

13  that to them on roughly July 3.  It's in the middle of Exhibit

14  1 halfway down.

15  Q.    Mr. Bracht suggested through his questions that the data

16  flow increased after June 25.  Let me just ask it this way,

17  sir.  To your knowledge, has there been any effort by W. Y.

18  Campbell to slow down the flow of data to SRR in any way?

19  A.    We've attempted to provide the information on a realtime

20  basis as it's been avail -- made available to W. Y. Campbell.

21  As, you know, based on -- so, in other words, as we receive

22  information -- for example, the projections that -- that

23  information has been immediately forwarded to the team at SRR.

24  Q.    Have there been instances where you and your firm

25  communicated with me and my firm regarding document production

Haras - Recross                                                63

1   issues, what should be produced, what should not be produced?

2   A.    Yes.   In certain cases where there's -- there's an issue

3   concern of confidentiality we've -- we've had discussions and

4   obviously worked through those and then until we receive

5   authorization from you then that information is furnished.

6   Q.    Now, Mr. Bracht noted with respect to Exhibit 1 that there

7   was a large volume of documents produced after June 25 in terms

8   of page count.   Could you just very briefly look at the large

9   numbers of page count after June 25 and just explain what those

10  matters -- what those page counts reflect in terms of the

11  documents produced?

12  A.    Those documents are predominately Excel files prepared on

13  a month to month basis for each of the divisions.   I know that

14  information was extremely cumbersome in putting together in a

15  central location.   What we try to -- to facilitate the

16  transmission that information was uploaded to an FTP site and

17  then when speaking with Mr. Wellhouse he alluded to the fact

18  that it took roughly eight hours just to simply upload that

19  information after he had gathered it from all the divisions

20  because some of the information wasn't in one central location

21  which increased the timing associated with furnishing that

22  data.

23          MR. STROCHAK:   Thank you.

24          No further questions, Your Honor.   Oh, I'm sorry.

25  Excuse me one second.   May I have the Court's indulgence for

Haras - Recross                                    64

1   one moment?  I'm sorry.

2           THE COURT:  Yes, absolutely.

3           MR. STROCHAK:  Just one further follow-up.  I'm

4   sorry.

5   BY MR. STROCHAK:

6   Q.   The CSM data is that -- is that a data source that's

7   generally available for purchase or available to the public or

8   is that something that is uniquely in the possession of the

9   debtors or W. Y. Campbell?

10  A.   It's a premium access data base.  It's -- they have some

11  general information available on their website, but generally

12  speaking some of the specific platform type data is something

13  you need to purchase via subscription.

14  Q.   And SRR could purchase that just as easily as could the

15  debtors, correct?

16  A.   Correct.

17  Q.   And in any event have the debtors provided the CSM data?

18  A.   Yes.

19          MR. STROCHAK:  All right.  Thank you, Your Honor.  No

20  further questions.

21          THE COURT:  Thank you.  Further cross-examination?

22          MR. BRACHT:  Your Honor, just a couple of questions.

23                      RECROSS-EXAMINATION

24  BY MR. BRACHT:

25  Q.   Mr. Haras, your company, W. Y. Campbell you're a -- you

Haras - Recross                                      65

1   specialize or have a -- have a space in the automotive world,

2   right?

3   A.   We do.

4   Q.   That's kind of your speciality, correct?

5   A.   We do a number of transactions in the automotive industry,

6   yes.

7   Q.   Okay.  So in terms of information concerning the auto --

8   trends in the automotive industry, you would -- your company

9   would be a good source of information for that, would it not?

10  A.   I guess it would -- we are not CSM.  We do not forecast

11  vehicle volume productions as CSM does.  So we have a general

12  flavor for what's occurring on a macro basis, I would say yes,

13  but do we have the level of specific data?  Do we have a

14  research department specific to developing forecasts for

15  individual platforms?  We do not.

16  Q.   But you have access as you've talked about to the CSM

17  data, correct?

18  A.   We do.

19  Q.   And you look at it all the time, don't you?

20  A.   We look at it periodically, yes.

21  Q.   And you use that data in making your own predictions as to

22  how the industry is going to go, don't you?

23  A.   We do -- we do not make -- we do look at the information

24  for analysis but we don't make our own predictions.

25  Q.   No, I understand.  But you use it to come up with your

Haras – Recross                                    66

1   analysis as to, you know, maybe well, how are we going to

2   project growth?  We might look at CSM data to see how the CSM

3   group is projecting growth into the future, right?

4   A.    We use the information to assist clients in building their

5   own set of forecasts.

6   Q.    Right. And you could have done that here if you would have

7   been asked by the debtor, correct?

8           MR. STROCHAK:  Objection, Your Honor, this is

9   speculation.

10          THE COURT:  Sustained.

11          THE WITNESS:  I --

12          THE COURT:  Don't answer.  I sustained the objection.

13          THE WITNESS:  I'm sorry.

14          THE COURT:  Ask your next question.

15          MR. BRACHT:  Oh, you sustained it.  Okay, Your Honor,

16  I'm sorry.

17  BY MR. BRACHT:

18  Q.    You had that information available, correct?

19  A.    Which information?

20  Q.    The CSM data with respect to --

21          THE COURT:  He has already testified he did.

22          MR. BRACHT:  All right.  Thank you, Your Honor.

23  BY MR. BRACHT:

24  Q.    Were you asked for that information by Lexington?

25  A.    We did provide the CSM data to Lexington.

67

1   Q.   And do you know whether or not that data was included in

2   the projections?

3   A.   It is our understanding it was.

4   Q.   Okay.  Do you know what CSM is projecting for growth in

5   the big three for the next two or three years?

6           MR. STROCHAK:  Objection, Your Honor, beyond the

7   scope of relevance.

8           THE COURT:  Sustained.

9           MR. BRACHT:  That's all I have, Your Honor.

10          THE COURT:  Thank you.  Any further examination, Mr.

11  Strochak?

12          MR. STROCHAK:  No, Your Honor.

13          THE COURT:  You are excused, Mr. Haras.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  Thank you very much.

16          Additional witnesses?

17          MR. STROCHAK:  Your Honor, we have two documents that

18  we'd like to offer I think the Court can take judicial notice

19  of them.  They are just monthly monitoring reports.  And then

20  with the Court's indulgence I'd like to take just five minutes

21  just to confer with my colleagues to see if we have -- we are

22  going to call Mr. Lubin or hold him for rebuttal.

23          THE COURT:  That's fine.  It's 11:32.  Let's take a

24  10 minute recess.  Why don't you talk with Mr. Bracht about the

25  additional exhibit that you want to introduce, see whether

68

1   there's any objection to it and also decide whether you are

2   going to call an additional witness.  So we will be in recess

3   for ten minutes.

4          MR. STROCHAK:  Thank you, Judge.

5          THE COURT:  Thank you.

6                    (Recess taken.)

7          THE COURT:  Please be seated.

8          Mr. Strochak.

9          MR. STROCHAK:  Thank you, Your Honor.  We are going

10  to hold Mr. Lubin for rebuttal.

11         THE COURT:  Okay.

12         MR. STROCHAK:  And I have a series of documents --

13  we'd like the Court to take judicial notice of, you know, all

14  the pleadings and orders entered in the case.

15         THE COURT:  I don't -- I don't do that.  I don't do

16  that.  I do not take judicial notice of the entire file in

17  connection with evidentiary hearings.  If there are specific

18  matters that you are asking the Court to consider, I will

19  consider your request.  But you don't dump everything in.

20         MR. STROCHAK:  I'll be happy to do that, Your Honor.

21  Let me just go through a hand full of documents one by one.

22  The first is the corrected version of the April 2008 monthly

23  operating report, which is filed at Docket Number 201.  I don't

24  believe there's any objection.

25         MR. BRACHT:  Your Honor, we are not sure why but we

Ultz – Direct                                      69

1   have no objection.

2         THE COURT:  I'll take judicial notice of ECF Document

3   201.

4         MR. STROCHAK:  Thank you, Your Honor.

5         The second is the monthly operating report --

6   corrected monthly operating report for May 2008 filed at Docket

7   Number 192.

8         THE COURT:  Hearing no objection that's also I'll

9   take judicial notice of that.

10         MR. STROCHAK:  The next is the interim dip and cash

11   collateral order filed at Docket Number 18.

12         MR. BRACHT:  Yeah, same response, Your Honor.  We

13   don't know why but we have no objection.

14         THE COURT:  All right.  Go ahead.

15         MR. STROCHAK:  Thank you, Your Honor.  The final dip

16   and cash collateral order at Docket Number 61.

17         THE COURT:  All right.  I'll listen to the whole list

18   and if there's no objection along the way I'm going to take

19   judicial notice of them, so --

20         MR. STROCHAK:  Thank you, Judge.

21         The plan of reorganization filed at Docket Number

22   196.  And the bar date order file at Docket Number 195.

23         Four more items, Your Honor, the statement of

24   financial affairs at -- for Lexington Precision at Docket

25   Number 173.  The schedules for Lexington Precision at Docket

                        Ultz - Direct                          70

1    Number 174.  The statement of financial affairs for debtor

2    Lexington Rubber at Docket Number 175, and the schedules for

3    Lexington Rubber at Docket 176.

4              THE COURT:  All right.  The Court takes judicial

5    notice of ECF documents 201, 192, 1861, 196, 195, 173, 174, 175

6    and 176.

7              MR. STROCHAK:  Thank you, Your Honor, we rest at this

8    point.

9              THE COURT:  Okay.

10             Mr. Bracht?

11             MR. BRACHT:  Your Honor, the Committee will call

12   Jessie Ultz from SRR.

13             (JESSIE ULTZ, THE COMMITTEE'S WITNESS, SWORN.)

14             THE COURT:  Have a seat, Mr. Ultz.

15             Go ahead, Mr. Bracht.  As I said, we are going to

16   break at noon, but we may as well -- I don't want to waste any

17   time so let's continue on.

18             MR. BRACHT:  Thank you, Your Honor.

19                       DIRECT EXAMINATION

20   BY MR. BRACHT:

21   Q.   Please state your name for the record.

22   A.   Jessie Ultz.

23   Q.   How do you spell your last name, Mr. Ultz?

24   A.   U-l-t-z.

25   Q.   All right.  And who are you with?  How are you employed?

Ultz – Direct                                                71

1  A.    I work for Stout, Risius, Ross.

2  Q.    What is your capacity with Stout, Risius, Ross?

3  A.    I'm a manager in the valuation and financial opinions

4  group.

5  Q.    Okay.   What is -- I'm going to call them SRR.

6  A.    Okay.

7  Q.    What is SRR?

8  A.    SRR is a financial advisory firm with offices in Detroit,

9  Chicago, Cleveland, Washington, DC, and recently in New York.

10  And they provide three primary services: investment banking,

11  valuation and financial opinions, and dispute advisory.

12  Q.    Do you specialize in any particular industry, does SRR?

13  A.    It depends on the individual more.   Particularly I work in

14  the Detroit office so we see a lot of the automotive business

15  being in Detroit.

16  Q.    Okay.  And you are a part of the SRR team that's involved

17  in this proceeding.   Is that correct?

18  A.    Correct.

19  Q.    And are there others as well?

20  A.    There are.   There are three primary individuals right now,

21  Jeff Risius who is the head of the team and Brian Hock [Ph.]

22  who is an analyst working on the project.

23  Q.    Okay.  And you?

24  A.    And myself.

25  Q.    Okay.  And I know that you've done a variety of different

Ultz - Direct                                          72

1   things in connection with this assignment, but what -- what has

2   been your primary role at least with respect to the issues that

3   we are talking about here today?

4   A.   My primary role has been the main contact between the

5   Company, the Committee and W. Y. Campbell.  Primary information

6   gathering to this point and kind of moving the process.

7   Q.   Okay.  And from -- and have you been pretty much involved

8   on a day-to-day basis when that has been occurring?

9   A.   I have.

10  Q.   Okay.  And could you describe please how the information

11  flow has proceeded?

12  A.   We have a lot of information as we have heard testimony

13  today.  Starting it off I believe May 16 was the original data

14  request.  We got a couple pieces of information early on and

15  then it slowed down through the end of May and June and really

16  a lot of the critical information has come over the last couple

17  of weeks related to forward looking performance and the process

18  of trying to sell the company.

19  Q.   Okay.

20       MR. BRACHT:  I'm going to -- Your Honor, excuse me.

21  I want to approach and leave exhibits.

22       THE COURT:  Let me just before you go on.  On ECF is

23  -- ECF document 277 is the application pro hac vice admission

24  of Mr. Bracht.  The motion was granted.

25       MR. BRACHT:  Thank you, Your Honor.  I was --

Ultz - Direct                                          73

1           MR. STROCHAK:  In that case, no objection, Your

2   Honor.

3           MR. BRACHT:  I was hoping that had it taken place --

4   I was beginning to wonder at the break.

5           THE COURT:  I saw it there this morning.  It hadn't

6   been entered, but the motion is granted just continue on.

7           MR. BRACHT:  That makes me feel a little bit better.

8   Thank you.  As you can tell I'm not from around here, but I

9   enjoy it.

10          THE COURT:  I'm not sure how to take that but go

11  ahead.

12          MR. BRACHT:  I've been here quite a bit and I have

13  always enjoyed myself.

14  BY MR. BRACHT:

15  Q.   I don't want to kind of go over plowed ground, but your

16  first request was in May -- May 16, 2008.  And this was a

17  request that SRR put together.

18  A.   Yes.

19  Q.   And was it information that SRR needed to complete its

20  evaluation and do its job?

21  A.   It was.

22          MR. STROCHAK:  Objection, Your Honor.

23          THE COURT:  Overruled.

24  BY MR. BRACHT:

25  Q.   When you put together --

Ultz – Direct                                                74

1        THE COURT:  You can answer the question.

2        THE WITNESS:  It was.

3  BY MR. BRACHT:

4  Q.   Go ahead and answer the question.

5  A.   That was the information that we thought we needed to --

6  to do our job.

7  Q.   Did you try to put in nonessential information just to

8  make their job harder?

9  A.   No.

10  Q.   Okay.  The -- I think it's probably Committee Exhibit B,

11  the May 30 information request.  You were in the court-room

12  when Mr. Haras was testifying.  The comments that are made in

13  the columns under WYC comments that say, check with counsel.

14  A.   Yes.

15  Q.   Were those comments made by SRR?

16  A.   We made this document so we wrote them, but that was what

17  we were told in our conference call by W. Y. Campbell.

18  Q.   Okay.  These information requests were shared with W. Y.

19  Campbell?

20  A.   Correct.

21  Q.   Now, in terms of the information that is lined up with the

22  comments check with counsel you heard what Mr. Haras testified

23  to, is that pretty much accurate in terms of what information

24  has been eventually provided, it fell into those categories?

25  A.   I believe so.

Ultz – Direct                                           75

1   Q.   Okay.  And do you know sitting here today, one way or

2   another, whether there is other information available that has

3   not been produced?

4   A.   I have no way of knowing if there's more information.   I

5   know what we have been provided fits into some of these

6   categories.

7   Q.   Okay.  Now, when did SRR receive the -- what I'm going to

8   refer to as the letters of interest from the bidders that came

9   in during the sale process that took place prior to January of

10  2008?

11  A.   From memory I believe it was the beginning of June.

12  Q.   Does June 5 sound about right?

13  A.   That sounds right.

14  Q.   Within that information was there a summary sheet that

15  more or less summarized the bids that had been made and

16  implications from those bids?

17  A.   There was a summary sheet.

18  Q.   And was this a summary sheet that was prepared by W. Y.

19  Campbell?

20  A.   That was our understanding, W. Y. Campbell prepared it.

21          THE COURT:  I take it he's marking this as Committee

22  Exhibit G.

23              (Committee's Exhibit G, Marked.)

24          MR. BRACHT:  Yes, Your Honor.  Committee Exhibit G.

25  BY MR. BRACHT:

Ultz - Direct                                    76

1   Q.   For the record, Mr. Ultz, would you identify Committee

2   Exhibit G?

3   A.   There's no heading but -- as to who prepared it.  We were

4   told W. Y. Campbell prepared this document looking at the five

5   offers that they believed were serious offers and they put

6   together an analysis showing what those offers implied.

7            MR. STROCHAK:  I'm sorry.  I don't seem to have a

8   copy, Mr. Bracht.  Can I ask you for a copy or point me to it?

9            MR. BRACHT:  Oh, I'm sorry.  You sure it's not within

10  the stack that I gave you?

11           MR. STROCHAK:  It may be but I just can't find it.

12           MR. BRACHT:  We are down to our last copy, Your

13  Honor.  I thought I provided one to counsel.  You should have

14  one.

15           MR. STROCHAK:  I just don't have it.  I don't even

16  know what it looks like.  You don't have another one?

17           MR. BRACHT:  It's the summary sheet.  You know I

18  think I can -- Your Honor, I'm sorry.  Can I take just a few

19  minutes here?

20           THE COURT:  Here's what we are going to do.  It's

21  11:55 so we are going to take our recess now.  We will resume

22  people hopefully right at 2:00.  If I'm a few minutes late it

23  shouldn't be more than that and we will resume then.  Okay.

24           MR. BRACHT:  Okay.  Thank you, Your Honor.

25           MR. STROCHAK:  Thank you, Judge.

                    Ultz – Direct                          77

1   (Recess 11:55 a.m. to 2:16 p.m.)

2           THE COURT:  Please be seated.  I apologize to

3   everyone for being late in getting back.  This is choosing the

4   subway.  Mr. Krasnow?

5           MR. KRASNOW:  Your Honor, just one housekeeping

6   matter and maybe counsel will just agree to indulge me on this.

7   The 365(d)(4) period expires, the last day is tomorrow, and it

8   does not appear that we will necessarily be in a position to

9   provide chambers with a revised order.  There's a minor

10  revision that has been made consistent with Your Honor's

11  finding and determination this morning and if we may, Your

12  Honor, can we provide your clerk with the --

13          THE COURT:  You can.

14          MR. KRASNOW:  -- the mark up?

15          THE COURT:  Yes.

16          MR. KRASNOW:  Thank you, Your Honor.

17          THE COURT:  All right.  It might be -- you can give

18  it to Deana and see if she could get it entered now.  Okay?

19          MR. KRASNOW:  Thank you, Your Honor.

20          THE COURT:  All right.  Mr. Ultz, do you want to

21  resume the witness chair?

22          MR. BRACHT:  Your Honor, one housekeeping matter.  Do

23  you allow bottled water in the courtroom?

24          THE COURT:  Yes, I do.

25          MR. BRACHT:  Thank you.

Ultz - Direct                                                          78

1           MR. STROCHAK:  I think [inaudible] question.

2           THE COURT:  At least if I know about it.

3           All right.  Mr. Ultz, you know you're still under

4    oath.

5           THE WITNESS:  Yes.

6           THE COURT:  Mr. Bracht, go ahead.

7                 CONTINUED DIRECT EXAMINATION

8    BY MR. BRACHT:

9    Q.   Okay.  Mr. Ultz, when we last -- I think we were just

10   talking about -- we just got through identifying Committee

11   Exhibit G.  For the record, this is a document that was

12   prepared by WY Campbell; is that correct?

13   A.   That's our understanding.

14   Q.   Okay.  Was it your understanding that it was presented to

15   the, at that time the ad hoc committee pre-petition?

16   A.   I believe so.

17          MR. BRACHT:  Your Honor, I would like to move the

18   admission of Committee Exhibit G.

19          MR. STROCHAK:  Relevance, Your Honor?

20          THE COURT:  What's the relevance?

21          MR. BRACHT:  Your Honor, it's relevant in at least

22   two respects.  One, it shows what the debtor was representing

23   the value of the company to be in December of 2007.  It also,

24   and I'll tie this up, but it also is evidence and relevant to

25   the question of the reliability of the debtor's projections.

Ultz - Direct                                    79

1              THE COURT:  All right.  The objection, if there was

2    an objection, is overruled.  Exhibit G is admitted in evidence.

3              [Analysis, Committee's Exhibit G, Received.]

4    Q.   Mr. Ultz, just so we can understand what's here --

5              MR. BRACHT:  Can you still hear me, Your Honor?

6              THE COURT:  Yes, I can.  Did you get a lesson in my

7    projector?  I'll be able to hear you.  You're nice and loud.

8              MR. BRACHT:  Okay.

9    Q.   Just real quickly, just so we'll kind of get a context and

10   understanding --

11             THE COURT:  Can you just do me a favor, Mr. Bracht?

12   Just enlarge it slightly.  I know you'll have to move it up and

13   down but there's a button there.

14             MR. BRACHT:  Yeah.

15             THE COURT:  Zoom in.  Just zoom in a little bit.  No,

16   you're going the wrong way.  That's good.  Maybe a little less

17   so I can see the -- look at the screen there and what you see

18   is -- that's good.

19             MR. BRACHT:  Right.

20             THE COURT:  What you see there is what I see here.

21             MR. BRACHT:  Right.  How's that?

22             THE COURT:  It's fine with me.

23             MR. BRACHT:  Okay.  Good.

24   Q.   Mr. Ultz, at the top there's a description starting with

25   Parker number one.  These are various, are meant to describe

Ultz – Direct                                        80

1   various bids that were made for various parts and in some cases

2   all of the Lexington business; correct?

3              MR. STROCHAK:  Objection, Your Honor.

4   A.   The rubber group only.

5              MR. STROCHAK:  The form of the question, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  This is for the rubber group only?

8   That was the portion that WY Campbell was trying to sell and

9   that didn't include metals.

10  Q.   Okay.  The line item called total value of transaction

11  just down towards the middle of the page, what is that value

12  supposed to represent?

13  A.   That's effectively the implied enterprise value of these

14  transactions including the portions that were to be sold as

15  well as the value of the remaining assets.

16  Q.   Okay.  The value of the retained assets is down at the

17  bottom which indicates which parts of the business were not

18  being sold based on the particular bid in question; is that

19  right?

20  A.   Correct.

21  Q.   Now, in connection with Exhibit G, did you subsequently,

22  did SRR subsequently retain copies of the actual letters of

23  intent or letters of interest that contained the bids?

24  A.   We did.

25  Q.   Did you determine at least somewhat based on what was

Ultz - Direct                                                 81

1   contained in the bids what the bids were based on?

2   A.   There was a little uncertainty there.   Some of the bids

3   explicitly stated that they are based on a certain level of

4   EBIDA and that it implied multiple, and other said that they

5   were based on basically information known at that point.   That

6   was one of the reasons we were hoping to get the deal tracking

7   system to understand what the potential buyers knew at the time

8   they made the offers.

9   Q.   These bids were made pursuant to an offering memorandum

10  that I think Mr. Harris talked about earlier?

11  A.   Right.

12  Q.   The offering memorandum contained the projections?

13  A.   It did.

14  Q.   Based on reviewing of the bids is it your understanding

15  that at least some of these bids were based on the contents of

16  the offering agreement and specifically with respect to the

17  projections of EBIDA?

18          MR. STROCHAK:   Objection, Your Honor.   I think it

19  calls for speculation as to what any particular bidder might

20  have been thinking.

21          THE COURT:   I think he's asking for what his

22  understanding about what he read was.   On that basis I'm going

23  to overrule the objection.

24  A.   It was my understanding, and at least some of these offers

25  explicitly said what they were based on and when it did, it

Ultz - Direct                                          82

1  tied up the offering memorandum.

2  Q.    And the EBIDA projections there?

3  A.    Right.

4  Q.    Did SRR subsequently receive the projections in the

5  offering memorandum that were part of the offering memorandum

6  upon which the bids were based?

7  A.    We did.  Received that background information.

8  Q.    Okay.

9                     [Pause in proceedings.]

10          THE COURT:  H is your next exhibit if that's what

11  you're trying to --

12        [Backup projections, Committee's Exhibit H, Marked.]

13  Q.    Committee Exhibit H is what, Mr. Ultz?

14  A.    Exhibit H is the backup for the projections contained in

15  the offering memorandum as provided by the company to WY

16  Campbell.

17  Q.    Okay.  Does Exhibit H, does it contain projections of 2007

18  EBIDA on which these offers or bids were made?

19  A.    It contains at least a base, but in addition, in the

20  offering memorandum there were certain adjustments made to this

21  base that changed what the offering memorandum provided.  So

22  it's slightly different from this projection but you can back

23  into the offering memorandum from this sheet.

24  Q.    What is the projection on Exhibit H?

25  A.    Exhibit H is projected 2007 EBIDA $16.4 million.

Ultz - Direct                                                          83

1  Q.    How about after the adjustments?

2  A.    It was $17.4 million.

3  Q.    All right.  Does Exhibit H also contain projections for

4  2008?

5  A.    It does, $19.2 million.

6  Q.    All right.  Now, going forward, how did the projection of

7  2007 EBIDA upon which the implied enterprise values shown on

8  Exhibit G, how did they compare to actual results?

9  A.    2007 actual I believe was about $13.5 million, about $3

10  million less than the number here and about $4 million less

11  than the adjusted number from the write-up.

12  Q.    Okay.  In terms of comparison for 2008, how does the $19

13  million compare to where we are today here at the end of July,

14  2008?

15  A.    It's a little bit different.  They are projecting -- this

16  is the rubber group only whereas the projection for 2008 now

17  includes the whole company.  But I believe the projection is

18  approximately $16 million for the rubber group versus the 19

19  for 2008 before considering any overhead.

20  Q.    Does the overhead add to the EBIDA or lower the EBIDA?

21  A.    That would decrease the EBIDA.

22  Q.    We talked a little bit with Mr. Harris about Committee

23  Exhibit -- that is the information request for 613.  I think

24  maybe Exhibit C.

25  A.    Yes.

Ultz - Direct                                        84

1   Q.   I don't want to spend a lot of time on it but this is the

2   exhibit, the information request that contains a statement that

3   says WY, among other things, may provide additional information

4   pending a discussion between WY and counsel.  Now, was that

5   information that you learned from WY Campbell?

6   A.   That was based on a conference call that we had with them.

7   Some of the information we knew existed and asked if that was

8   something we could have and they said they'd have to talk to

9   counsel.

10  Q.   Okay.  You took that to indicate that the information did

11  in fact exist but they were still questioning whether or not

12  they were going to produce it?

13  A.   Correct.

14  Q.   This listing of information on these information request

15  lists, it hasn't really changed any from the original; correct?

16  A.   There were very minor revisions even from the May 16th

17  version.

18  Q.   But again, but these were requests that you wanted, that

19  SRR wanted?

20  A.   Correct.

21  Q.   We talked a little bit about deal tracking data.  I know

22  that it had been requested.  From SRR's perspective, why don't

23  you explain to the Court why the deal tracking data is

24  important to your analysis and your work?

25  A.   The reason we were interested in it is one good indication

Ultz – Direct                                      85

1   of value for a company is what someone is willing to pay.  Now,

2   I understand that it's getting a little bit outdated at this

3   point.  There's a lot of information in there because they ran

4   a negotiated process.  WY Campbell ran a process to try and

5   find a buyer for this company.  So as they said, we could find

6   out indications of interest from independent third parties.

7   That's a good way for us to at least begin to understand the

8   value of this company.  Also the back and forth with the buyers

9   and how the negotiation went, how the offers changed over time

10  as they did was relevant for our purposes.

11  Q.   For example, are you aware of at least one instance based

12  on the review of the letters of interest and the correspondence

13  that an offer did change?

14  A.   Yes.  There was at least one offer that had mentioned that

15  the offer was changing based on new financial statements that

16  the buyer did receive.

17  Q.   Which way was it changing?

18  A.   It had been lowered due to I believe the statement in the

19  letter of interest was that internal statements were not

20  looking they were going to come out of projection, so they

21  lowered the offer.

22  Q.   Now, to put things in context, this data was being

23  presented, it was created, I think it might even have a date on

24  it, in the middle of December of 2007; is that right?

25  A.   The summary sheet?

Ultz - Direct                                           86

1   Q.    Yes.

2   A.    On the screen?  Yes.

3   Q.    Now, we talked a little bit about the before and after on

4   this June 25, 2008 date where there was a conference call with

5   His Honor.  From your perspective sitting in the seat of SRR

6   contrast the information flow from before that date and after

7   that date.

8   A.    We received a good deal of information before the date

9   that was primarily historical in nature and a lot of the items

10  in the data request which mentioned may provide or based on

11  discussions with counsel were not produced prior to that date.

12  Since then the vast majority of the information that we

13  requested has been provided.  All the forward looking

14  information and the deal information I believe was subsequent

15  to that date.

16  Q.    On the 30th of June, 2008 do you recall that there was an

17  information request in a letter form that went out?

18  A.    Yes.

19         MR. BRACHT:  Excuse me, Your Honor.  I think I found

20  it and it's Exhibit I?  Committee Exhibit I, Your Honor.

21         [Data request, Committee Exhibit I, marked.]

22  Q.    Do you recognize Committee Exhibit I, Mr. Ultz?

23  A.    Yes.

24  Q.    Would you please identify it for the record?

25  A.    This is a follow-up data request.  I don't believe there's

Ultz - Direct                                        87

1   anything new in here from the data request that we provided

2   previously, but it's potentially broken out in a little more

3   detail, exactly what we were asking for.

4   Q.   Now, are you aware that before this letter went out from

5   counsel, did you consult with counsel concerning what you guys

6   needed --

7   A.   Yeah we did.

8   Q.   -- so to speak?

9   A.   We helped prepare this.

10  Q.   Now, this is the same day, just maybe coincidentally, that

11  the debtor's filed their plan.  Do you recall that?

12  A.   Yes.

13  Q.   You and your colleagues at SRR reviewed that plan?

14  A.   Yeah.

15  Q.   You've done some analysis of that plan?

16  A.   Yeah, we've looked into the details of it a little bit.

17  Q.   Okay.  Based on SRR's review, what amount of exit

18  financing will be needed under the plan?

19  A.   It appears it will be about --

20          MR. STROCHAK:  Objection, Your Honor.  It calls for

21  speculation.

22          THE COURT:  Does the plan specify an amount or exit

23  financing?

24          THE WITNESS:  It specifies the conversion and what

25  would be left.  So based on that you can back into what's

                         Ultz - Direct                         88

1   required.

2              THE COURT:  Overruled.  Go ahead.

3              THE WITNESS:  I believe it's about $42 million in

4   exit financing on the senior secured portion.

5   Q.   How about total debt?

6   A.   About 60 in total with $15 million of senior solvent and

7   $3 million of trade that turns into --

8   Q.   I don't know the answer to this, Mr. Ultz, but there was a

9   meeting with the debtor representatives concerning a term sheet

10  that preceded the plan back in sometime perhaps mid-June.  Did

11  you participate in that meeting by a conference call?

12  A.   In a meeting with the debtor?

13  Q.   Yes.

14  A.   We did not participate.

15  Q.   Okay.  Thank you.

16             THE COURT:  Who's the "we" in your --

17             THE WITNESS:  SRR.

18             THE COURT:  Thank you.

19             MR. BRACHT:  Sorry, Your Honor.  I just couldn't

20  remember whether they were on the phone.

21  Q.   Now, with respect to the total debt number of $60 million,

22  roughly how does that compare to 2008 projected EBIDA?

23  A.   2008 projected EBIDA for the company I believe is

24  approximately $12.9 million on an adjusted basis.  That

25  includes about $4.5 million of reorganization expenses that are

Ultz - Direct                                  89

1   being added back.  So adjusted, it's almost five times EBIDA

2   for 2008 projected.

3   Q.    Okay.  In SRR's work in the automotive industry, has SRR

4   become familiar with what is a kind of a standard debt to EBIDA

5   ratio within the industry?

6            MR. STROCHAK:  Objection, Your Honor.  It's

7   speculation.  It calls for expert testimony.

8            THE COURT:  Sustained.

9   Q.    Do you know what the industry standard is, Your Honor?

10  Excuse me, Mr. Ultz.

11           MR. STROCHAK:  Same objection.

12           THE COURT:  Sustained.  Are you tendering him as an

13  expert?  Do you want to go ahead and qualify him, attempt to

14  qualify him as an expert?  I'm not sure that's appropriate for

15  this hearing.

16           MR. BRACHT:  Well --

17           THE COURT:  I'm not going to allow him to give what

18  appears to me to be expert testimony unless he's been qualified

19  as an expert which I don't fully understand the importance of

20  for this hearing.

21           MR. BRACHT:  Okay.  Well --

22           MR. STROCHAK:  I would just add, Your Honor, that we

23  haven't received a Rule 26 report.  This is not a confirmation

24  hearing.

25           THE COURT:  Well --

Ultz - Direct                                    90

1            MR. BRACHT:  Let me try.  Let me --

2            THE COURT:  Try to what?

3            MR. BRACHT:  Let me try to qualify him, at least give

4    you an idea of his background in terms of his expertise in this

5    area.

6    Q.   Where did you graduate from college?

7    A.   Michigan State University.

8    Q.   What did you graduate -- what degree did you take?

9    A.   I have a Bachelor's in finance.

10   Q.   Okay.  After graduating did you go to work for SRR?

11   A.   I did.

12   Q.   In the Detroit office?

13   A.   Correct.

14   Q.   Primarily working in the automotive field?

15   A.   We have probably a disproportionate share of automotive

16   being in Detroit.

17   Q.   How many valuations do you estimate that you have worked

18   on in your tenure with SRR?

19   A.   I've done approximately 288 projects over the course of my

20   time there.

21   Q.   In connection with those projects are you familiar with

22   industry standards concerning debt to EBIDA ratios?

23   A.   We come across that quite often and companies are looking

24   to raise financing and wondering what level of debt they'll be

25   able to obtain.

Ultz - Direct                                    91

1          MR. BRACHT:  Your Honor, I would submit that he's

2    qualified to answer this question.

3          THE COURT:  Mr. Strochak?

4          MR. STROCHAK:  Your Honor, I think primarily it's a

5    relevance objection.  I'm happy to voir dire and deal with the

6    credentials if Your Honor is going to consider this as a matter

7    of relevance, but I don't see how expert testimony on what is a

8    confirmation issue could be relevant to this proceeding, Your

9    Honor.

10          MR. BRACHT:  Your Honor, I'm sorry, let me respond if

11   the Court doesn't have a comment, but I believe in our papers,

12   this goes directly to one of the factors in terms of the

13   extension of exclusivity and it goes to whether or not this is

14   a plan that's filed and has a reasonable probability of

15   success.

16          THE COURT:  Well, Mr. Strochak, I'm not going to have

17   you do voir dire.  I'm going to take it for what it's worth

18   which as far as I'm concerned the terms of confirmation issues

19   is nothing.

20          MR. STROCHAK:  Thank you, Your Honor.

21          THE COURT:  So if we get to a confirmation hearing

22   and evaluation -- the fact that I'm listening to this testimony

23   today doesn't mean I'll listen to it again.

24          MR. BRACHT:  I understand, Your Honor.

25          THE COURT:  Go ahead.

Ultz – Direct                                        92

1    Q.    Well, then what is the industry standard?

2    A.    In the current marketplace, automotive companies typically

3    can't get above four times debt to EBIDA on a total net basis

4    senior and subordinate.

5    Q.    Even if -- let me ask you this.  Have you seen any binding

6    term sheets from an exit financier to Lexington?

7    A.    We have not seen any term sheets for current.

8    Q.    Have you asked for them?

9    A.    We did.

10   Q.    Have you been told that you would receive them?

11   A.    We were told that we would receive them when it was

12   available.

13   Q.    Have you done an analysis concerning Lexington's potential

14   for making a fixed cost even assuming that the exit financing

15   is available?

16           MR. STROCHAK:  Objection, Your Honor.

17           THE COURT:  Sustained.

18   Q.    Even if the exit financing is made available, has SRR done

19   an analysis concerning the ability of the reorganized debtor to

20   meet fixed payments like interest costs?

21   A.    We looked at the industry standard fixed cost coverage

22   ratio as well which tends to be 1.1 to 1.2 when you look at

23   EBIDA minus CAPEX over fixed charges being interest and

24   principal repayment.  Based on the projection for 2008 it does

25   not appear the company would be able to meet those covenants.

Ultz - Direct                                    93

1  Q.   Now, going back to the letter of June 30th, '08, did you

2  see a response from the debtor's counsel to that letter?

3  A.   I don't recall what the immediate response was.  We have

4  since that time received a vast majority of information that

5  was included in this reply.

6  Q.   Okay.  Well, let me --

7       MR. BRACHT:  Your Honor, before I forget, if I

8  haven't already done so, I'd like to move the admission of

9  Committee Exhibit I.

10      THE COURT:  Counsel?

11      MR. STROCHAK:  No objection, Your Honor.  I'm sorry.

12      THE COURT:  Committee Exhibit I is admitted into

13 evidence.

14      [Data request, Committee Exhibit I, received.]

15 Q.   Committee Exhibit J, you have that in front of you, sir?

16 A.   I do.

17 Q.   Okay.  Now, does that refresh your recollection if you've

18 seen this response?

19 A.   Yes.  They went through each point with a response.

20 Q.   Okay.  One of the requests in Exhibit I was a request for

21 five-year plans.  Tell me the basis of that request.  Why did

22 you think that those types of things existed?

23 A.   When we visited the facilities in Jasper and Rock Hill, we

24 were speaking with the general manager of the Jasper facility

25 about prospective new business and he mentioned that a lot of

Ultz - Direct                                        94

1  the new business in the current plan was the same as the five-

2  year plan they prepared the year before.  So we asked if we

3  could receive a copy of that plan and also if that was

4  something they did annually.  He said that they did those

5  annually.

6      Mike Lubin was there as well and responded that the last

7  two years they had done very detailed five-year plans for the

8  refinancing and the offering memorandum.  Prior to that they

9  had been -- it was less detailed.

10 Q.   Didn't say they didn't exist, just less detail?

11 A.   Right.

12 Q.   Now, these plant visits that you talked about, how were

13 they structured?

14 A.   Someone from WY Campbell and Mike Lubin either met us

15 there or drove us to each facility and we had a management

16 presentation with members of the management team at each

17 location and then did a facility tour and had an opportunity to

18 ask questions.

19 Q.   Did you have free and independent access to the management

20 team at each facility?

21 A.   Yeah.  Each management team was there and went through

22 their management presentation with us with occasional

23 commentary from either WY Campbell or Mr. Lubin.

24 Q.   All right.  Now, apparently there were as a result of this

25 July 2nd letter, there were two five-year plans that were

Ultz - Direct                                                         95

1  produced.

2  A.    Right.

3  Q.    Do you recall that?

4  A.    Yes.  There was one for 2006 for the cash source

5  refinancing and one for 2007 for the WY Campbell offering

6  memorandum.

7  Q.    Okay.  We've already gone over the offering memorandum

8  projections; correct?

9  A.    Correct.

10           MR. BRACHT:  This is Committee Exhibit K.

11           THE COURT:  Thank you.

12           [Projection, Committee's Exhibit K, marked.]

13  Q.    Mr. Ultz, what is Committee Exhibit K?

14  A.    Exhibit K is the five-year projection that was -- excuse

15  me, I do believe it's a four-year projection that was put

16  together by Lexington related to the 2006 cap source

17  refinancing.

18  Q.    Would you -- strike that.  This was what was provided to

19  you in response to requests to Lexington and WY Campbell?

20  A.    Correct.

21  Q.    Have you looked at the projections that were made with

22  respect to the cap source refinancing in connection with this

23  proceeding?

24  A.    Yes, we have reviewed this budget.

25  Q.    How do the cap source projections compare to actual

Ultz – Direct                                                          96

1    performance?

2    A.    The 2006 projected EBIDA for Lexington in the cap source

3    refinancing was about $16.5 for the entire company and I

4    believe the actual was approximately 12.

5    Q.    Have you looked at the five-year period prior to 2008 in

6    terms of projections?  Did you have that information available

7    to you?

8    A.    We did.  We received a one-year budget for each of the

9    last five years.

10   Q.    In terms of actual performance, how has the debtor

11   performed with respect to EBIDA levels during those five years?

12          MR. STROCHAK:  Objection, Your Honor.  Relevance to

13   all the historical performance?

14          THE COURT:  Overruled.

15          MR. STROCHAK:  A lot of history.

16          THE COURT:  Overruled.

17   A.    The projections historically have been relatively

18   consistent on a projection basis.  The actuals have also been

19   relatively consistent.  Each year has been at least 30% below

20   the budget.

21   Q.    Has the actual performance in that five-year period, has

22   it been in a fairly narrow range?

23   A.    It's been a relatively consistent period.  I believe from

24   2003 to 2007 the company's EBIDA levels ranged from 11 to $14

25   million.

08-11153-scc   Doc 421   Filed 10/01/08   Entered 10/01/08 11:00:29   Main Document
Pg 97 of 190

Ultz - Direct                                      97

1  Q.   All right.  This would encompass a period prior to say the

2  last two years where the automotive industry has had so much

3  problem?

4  A.   Correct.

5          MR. BRACHT:  Your Honor, I would like to move the

6  admission of Committee Exhibit I.

7          THE COURT:  Exhibit I is in evidence already.  Do you

8  mean K?

9          MR. BRACHT:  K.

10         MR. STROCHAK:  I'm sorry, which one are we moving?

11         THE COURT:  Okay.

12         MR. STROCHAK:  No objection.

13         THE COURT:  All right.  Exhibit K is admitted in

14 evidence.

15         [Projection, Committee's Exhibit K, Received.]

16 Q.   Do you recall on July 15, 2008 that the five-year

17 projections from the debtor were produced and received by SRR?

18 A.   Yes.

19 Q.   The date of reception, how did that compare to when they

20 were originally promised?

21 A.   Originally when we first started the project I believe

22 June 3rd was the target date for the five-year plan.  That had

23 been moved back a couple of times and ultimately July 15th was

24 the actual receipt.

25 Q.   Now, during the plant visits that we previously talked

Ultz - Direct                                    98

1   about, what were you told, and the SRR representatives, by Mr.

2   Lubin and the plant managers as to how these projections were

3   created and the existence of backup data supporting the

4   projections?

5   A.   We were told that --

6            THE COURT:  I'm sorry, I lost my train of thought.

7   Can you just repeat it?  I apologize.

8            MR. BRACHT:  I hope I can, Your Honor.

9            THE COURT:  Come close.

10           MR. BRACHT:  Okay.

11           THE COURT:  I'm sure you will.

12  Q.   During these --

13           THE COURT:    I apologize for that.

14           MR. BRACHT:  That's okay.  No apology necessary, sir.

15  Q.   During these plant visits that you previously testified

16  about, you testified you had an opportunity to discuss with Mr.

17  Lubin and plant managers about their projections.  What did

18  they tell you as to how these projections were going to be

19  created and the existence of backup data that supported the

20  projections?

21  A.   They said that each projection was going to be created by

22  each local facility and that they were going to be based on a

23  ground up approach where they looked at each part that the

24  company sold and they would project volume and pricing by part.

25  Then for the components that could be tied to a specific

Ultz – Direct                                99

1  automotive platform it would be based on CSN data for volume.

2  For the components that couldn't be tied to a platform it would

3  be based on their customers' budgets and the volume of pricing

4  would be based on that backup then for the automotive

5  component.  On the medical side, it was more based on the

6  salesmen's projections and to some extent what they were

7  getting from their customers.

8  Q.   Was there discussion with them about the need for what

9  I'll refer to as an historical bridge between the historical

10 financial performance and the projections?

11 A.   Yes.  We talked about the fact that in order to I guess

12 corroborate or understand how credible the projections were we

13 would like to see how they changed from the past since we have

14 detailed historical financial statements but we don't

15 necessarily have detailed historical volumes and pricing by

16 part.

17 Q.   Was it your understanding based on those conversations

18 that that data will be provided with the projections?

19 A.   That was our understanding.  In discussions at each

20 facility, that's what the projections were based on.  In order

21 to understand them, we would need that backup data.

22 Q.   Did anybody quibble with you about that or quarrel with

23 you about the need to have it to understand the projections?

24 A.   No.  It seemed like a relatively understood fact that they

25 knew that we would need those.

Ultz – Direct                                              100

1   Q.   Okay.  These side visits, approximately when did they take

2   place in this chronology?

3   A.   I believe we went to Rock Hill and Jasper on June 16th and

4   17th and we were in Ohio at the Canton facility and Vienna

5   facility, I don't recall.  I think it was in the beginning of

6   July.

7   Q.   Okay.  Just to kind of complete the loop, this is part of

8   the information that you had since requested just recently

9   again from Mr. Harris and Mr. Welhouse, we marked that exhibit

10  earlier, in which Mr. Lubin responded and said you'd have it

11  the middle of this week; is that right?

12  A.   That's correct.

13  Q.   Okay.  Now, from SRR's perspective, I think you may have

14  already covered this, but specifically why is this information

15  important?

16  A.   We need to understand what the projections are based on in

17  order to assess the reasonableness or the riskiness.  To the

18  extent all the business is booked and they're on platforms that

19  are projected by CSM, then we can fairly accurately determine

20  what the future volumes will be.  We need to understand if it's

21  book versus prospectiveness and we need to understand how to

22  compare it to the historicals so we can understand the growth

23  that's being projected and ultimately assess the reasonableness

24  of the projections.

25  Q.   Now, you've seen the projections and you've looked at them

Ultz - Direct                                        101

1  and analyzed them; is that correct?

2  A.   That's correct.

3  Q.   Just in a general sense, and we can get into specific

4  detail if necessary, but how much growth do the projections,

5  the five-year projections that the debtor has provided, how

6  much growth do those projections predict over the next two to

7  three years?

8          MR. STROCHAK:  Objection, Your Honor.

9          THE COURT:  Before you answer that, are you referring

10 to Committee Exhibit E?  Are these the projections we're

11 talking about?

12         MR. BRACHT:  E, Your Honor.

13         THE COURT:  That's E.  Okay.

14         MR. STROCHAK:  My objection, Your Honor, is the

15 document speaks for itself and says what it says and the

16 question is vague as to what measure we're talking about.

17         THE COURT:  Overruled.

18 A.   The five-year projection compared to the historical, as I

19 stated previously, over the last five years this company has

20 generated approximately 11 to $14 million EBIDA each of the

21 last five years.  The budget calls for a growth of

22 approximately, I believe the math is about 60% in 2009 and then

23 30% or so thereafter.  So going from 11 to $14 million

24 historical result to $20 million in 2009 and $38 million by

25 2012.

Ultz - Direct                                    102

1   Q.   Now, we talked a little bit -- before we get into that,

2   this might be too fundamental for this body, but you mentioned

3   the term platform.   What does that mean in the automotive

4   industry?

5   A.   Every OEM or original equipment manufacturer produces

6   certain platforms of vehicles.  So multiple vehicles are built

7   on the same fundamental platform.  CSM looks at each platform

8   by auto maker and projects volume for that given platform which

9   may encompass more than one vehicle.

10  Q.   So I mean I don't want to over-simplify it --

11              THE COURT:  I understand this.

12              MR. BRACHT:  Thank you, Your Honor.

13  Q.   We talked about CSM data.  Have you looked at CSM

14  projections over the next several years?

15  A.   We have.

16              MR. BRACHT:  This is Committee Exhibit L.

17        [Volume projections, Committee's Exhibit L, marked.]

18  Q.   What is Committee Exhibit L?

19  A.   This appears to be the CSM volume projections by platform.

20  Q.   Okay.  It's kind of broken up but it goes from 2004, if

21  you turn back to about the fourth page I think it picks up

22  there at 2007 and continues.  Have you looked at this data?

23  A.   We have.

24  Q.   How does it compare, how does the projected growth of the

25  company in their projections compare to the CSN projections?

Ultz - Direct                                        103

1   A.   We look primarily at the Detroit 3 auto makers given that

2   I believe approximately 90% of Lexington's business is

3   currently with Detroit 3 OEMs, and the projected volume for

4   those companies over the next several years.  I believe 2008 is

5   slightly negative growth and then 2009 to 2012 is flat to I

6   believe an 83% growth.

7   Q.   Based on what you know right now without the benefit of

8   the backup that you've requested, do you consider these

9   projections to be realistic?

10          MR. STROCHAK:  Objection, Your Honor.  It's

11  speculation.

12          THE COURT:  Sustained.

13  Q.   One final question, Mr. Ultz.  I don't know if I've asked

14  you this.  Have you looked at the LTM results and EBIDA over

15  the last 12 months?

16  A.   We have.  We looked at it through the end of May which is

17  the last financial we received.

18  Q.   Okay.  What was the LTM for EBIDA?

19  A.   The trailing LTM EBIDA was $11.8 million which was I

20  believe the exact same result as 2007 full year.

21          MR. BRACHT:  I'll pass the witness, Your Honor.

22          THE COURT:  Thank you very much.  Cross examination?

23          MR. STROCHAK:  Your Honor, could I ask the Court's

24  indulgence for just a five-minute break to organize my thoughts

25  and get the documents organized?

                                Ultz - Direct                          104

1              THE COURT:  Absolutely.  Ten minutes.  We'll resume

2    at ten after 3.

3              MR. STROCHAK:  Thank you very much.

4                        [Off the record.]

5              THE COURT:  Be seated.  Excuse me.  Before you

6    proceed, I'm actually -- I want to change -- first, Mr. Ultz,

7    why don't you come up and take the stand.

8              I'm going to change one of my prior evidence rulings.

9    I sustained the objection to Mr. Bracht's question to Mr. Ultz

10   about his opinion about just the reasonableness of the

11   projections which I think was Exhibit E.  I'm going to allow

12   him -- I'm going to reverse.  I sustained the objection but I'm

13   going to overrule it.  I'm not reopening everything.  I'm going

14   to accept it for what it's worth today which is worth nothing

15   for purposes of any confirmation hearing if there is a

16   confirmation hearing.

17             So I'd like to hear the witness's answer to that

18   question.  Do you understand where we are, Mr. Ultz?

19             THE WITNESS:  The question of the reasonableness of

20   the projections in the current five-year plan?  Based on our

21   review of the historical results, on their face they don't

22   appear to be reasonable and that's one of the reasons we would

23   like to get the backup data so we can try and corroborate that

24   and understand what they're based on.  The information we have

25   today doesn't support it.

Ultz - Cross                                               105

1          THE COURT:  Mr. Bracht, if you feel a very strong

2    urge to examine further on this I'll give you a little leeway,

3    but I just wanted to hear it.  I wanted to get that in the

4    record.

5          MR. BRACHT:  Okay.  That's fine, Your Honor.  I'm

6    satisfied with that.  Thank you.

7          THE COURT:  Okay.  Mr. Strochak, I wanted, before you

8    begin your cross I wanted to get that on the record.  If you

9    want to cross on it, you can.

10         MR. STROCHAK:  Thank you, Judge.

11                     CROSS EXAMINATION

12   BY MR. STROCHAK:

13   Q.   This is Adam Strochak, Weil, Gotshal, Manges for the

14   debtors.  Good afternoon, Mr. Ultz.

15         Let me just start where the Court left off just for

16   purposes of keeping the examination clear.  I think you

17   indicated that you see some information that suggests to you

18   that the company may have trouble meeting its most recent

19   financial projections; correct?

20   A.   Correct.

21   Q.   That is because you've seen a historical pattern where the

22   company in the past has not met financial projections; is that

23   right?

24   A.   That's one of the primary reasons.

25   Q.   You also see a troubling environment in the original

Ultz – Cross                                    106

1    equipment manufacturer market, that is the Detroit Big 3.  I

2    think you said something to that effect on direct; correct?

3    A.    Right.

4    Q.    Is there anything else other than the economic environment

5    in the automobile industry and the company's historical

6    performance based on your assessment of it, is there anything

7    else that leads you to believe that the company may have

8    trouble meeting the projections?

9    A.    Those are probably the primary issues that we see.  Just

10   to recap what you said, historical performance in absolute

11   dollars as well as relative to budget and then the current

12   automotive environment which is approximately 80% of the

13   business.

14   Q.    So you say the current automotive environment is 80% of

15   the business.  So what you're suggesting is that the company

16   gets 80% of its revenues from the automobile industry?

17   A.    That's correct.

18   Q.    Now, you haven't examined what portion of that is the OEM

19   market and what portion of that is the aftermarket; correct?

20   A.    We did look at that.  That was one of our talking points

21   at each facility.

22   Q.    What's the answer?  How much of it is original equipment

23   manufacturer and how much of it is aftermarket?

24   A.    From my recollection I believe the connector seals is 100%

25   original equipment and insulators is approximately 30% OEM and

Ultz - Cross                                    107

1   70% aftermarket.

2   Q.   So insulators is 70% aftermarket, is that correct?

3   A.   Correct.

4   Q.   Okay.  Connector seals is all OEM?

5   A.   That's my understanding.

6   Q.   So that's the only -- any connector seals the company

7   makes, those are all going out to the OEM markets; is that

8   correct?

9   A.   That's what we were told.

10  Q.   Okay.  In terms of EBIDA, how much of the company's EBIDA

11  -- let me ask it this way.  Have you reached any conclusions as

12  to how much of the company's EBIDA on a current basis comes

13  from the OEM market?

14  A.   They don't keep track of it, to my understanding, on a

15  cost basis necessarily historically.  We don't have historicals

16  that break it out between OEM and aftermarket.  We did ask the

17  question about margin between the two, so we could probably

18  back into an estimate of what portion relates to each.

19  Q.   Well, you haven't done that yet?

20  A.   We haven't done a detailed analysis of that, no.

21  Q.   Is it your understanding in general -- well, let me ask it

22  this way.  You have some familiarity with the automobile

23  industry I assume; correct?

24  A.   Yes.

25  Q.   But that's not a particular area of expertise for you

Ultz - Cross                                           108

1   personally; right?

2   A.   I do a disproportionate share probably given my location

3   in Detroit, so a lot of the projects we work on are in the

4   automotive industry.

5   Q.   I see.  Your CV on your company's web site indicates that

6   you have experience in a variety of different industries;

7   correct?

8   A.   That's true.

9   Q.   In fact, it goes alphabetically from advertising through

10  wholesale distribution; correct?

11  A.   True.

12  Q.   You don't indicate on your CV on your web site that you

13  are a specialist in any way in the automobile industry;

14  correct?

15  A.   I don't believe it says that.

16  Q.   Now, based on the experience that you do have in the

17  automobile industry, is it your understanding that the

18  aftermarket moves in the same economic direction as the

19  original equipment market?

20  A.   Not necessarily.

21  Q.   In fact, there might be circumstances where the

22  aftermarket is performing more robustly than the OEM market;

23  correct?

24  A.   That's possible.

25  Q.   In fact, it's logical in a circumstance where in difficult

Ultz - Cross                                                    109

1    economic times people may put off purchases of a new vehicle,

2    that they may keep their old vehicle longer, and therefore,

3    necessitate more spare parts for that vehicle; correct?

4    A.   Yes, that's possible.

5    Q.   Okay.  To date, you haven't assessed the debtor's

6    projections against that measure; correct?  That is how much of

7    its future business may be coming from the aftermarket as

8    opposed to the OEM market?

9    A.   Upon a sales level which is what we have at this point the

10   detail is volume and pricing which gives us sales, and I

11   believe that the projection has the aftermarket business

12   staying relatively flat in the next five years with minor

13   growth.  The vast majority of the volume growth comes from

14   OEMs.  When I speak of that, that's going to be the Jasper

15   facility because that's the one that has the split whereas

16   connector seals is obviously 100% OEM.  So my initial look at

17   the budget which we were to provide the detail recently

18   indicated that the aftermarket was not the area for growth.

19   Q.   So the answer to my question is yes, you have had the

20   opportunity to review and analyze that issue based on the

21   information that you've been provided to date?

22   A.   We can look at sales, yes.

23   Q.   Let me turn you to the Committee's Exhibit A.  Do you have

24   it in front of you?

25   A.   The May 16th data request?

Ultz - Cross                                    110

1   Q.   Yes.

2   A.   Okay.

3   Q.   That's your initial data request to WY Campbell; correct?

4   A.   Yes.  This was our first request once we had been

5   retained.

6   Q.   You prepared it personally?

7   A.   I had a big part of it.  I was involved in the

8   preparation.

9   Q.   It was sent on the day that it's dated; correct, May 16th?

10  A.   I believe so.

11  Q.   That was a Friday; wasn't it?

12  A.   Could be.  I'm not sure.

13         MR. STROCHAK:  Your Honor, I'd just ask the Court to

14  take judicial notice May 16th was a Friday.

15  Q.   Mr. Ultz, this document, Committee Exhibit A in evidence,

16  that was transmitted to the debtors late in the evening on May

17  16th; correct?

18  A.   I don't remember the time.  Could have been.

19  Q.   It doesn't stick out in your mind as working particularly

20  late that night?

21  A.   No, we worked late most days in May on this project.

22  Q.   Let me ask you to turn to Debtor's Exhibit 1 which was the

23  summary that WY Campbell prepared, information transmitted.

24  A.   Okay.

25  Q.   The first transmission of data -- well, let me just ask

Ultz - Cross                                111

1    you, the information in Exhibit 1 in evidence, do you have any

2    reason to believe that any of this is not correct in any way?

3    That is that SRR did not receive any of this documentation on

4    or about the dates indicated?

5    A.   I'm seeing this for the first time today but I haven't

6    looked at it in detail.  At first glance it appears reasonable

7    to me.

8    Q.   Okay.  Let me turn your attention to the bottom of Exhibit

9    1 and it indicates that the first data provided to SRR was on

10   or about May 21st.  Does that sound right to you, roughly five

11   days or so after the Friday when you sent your original

12   information request you started receiving information?

13   A.   Yeah, I believe that was the information that WY Campbell

14   had prepared themselves, the offering memorandum and management

15   presentation.  We received that from them relatively quickly.

16   Q.   So the management presentation, refresh my memory, what

17   was in that document?

18   A.   My recollection is that was what each facility walked

19   through prospective buyers with on the facility tours so each

20   local branch was working through kind of the history of their

21   product and some of the outlook.  It was good general

22   information about the company.

23   Q.   You also got the offering memorandum and I think you

24   testified just a few moments ago about the financial

25   information that was included in the offering memorandum;

Ultz - Cross                                              112

1   correct?

2   A.    Correct.

3   Q.    Exhibit 1 indicates that you received the offering

4   memorandum also on May 21st; correct?

5   A.    Correct.

6   Q.    Working our way up the page a little bit, there's a line

7   for a transaction correspondence indicating that it was

8   provided to SRR on June 5th; correct?

9   A.    I believe that was the letters of intent and the one-page

10  summary that we received with that package.

11  Q.    That's the document that you also testified about in your

12  direct examination.  If you just bear with me one second --

13  A.    Exhibit G I believe.

14  Q.    -- I'll point you to the exhibit number.  I believe that

15  was Exhibit G.

16  A.    Yes.

17  Q.    So you had that document on or about June 5th; correct?

18  A.    Correct.

19  Q.    Now, you also indicated that you received the deal

20  tracking status information from WY Campbell; correct?

21  A.    Yeah, I believe that was last week.

22  Q.    So as of last week at least you had all the information

23  regarding the sale process; correct?

24  A.    We have the majority.  I did have one phone call with WY

25  Campbell asking a specific question related to one item that I

Ultz - Cross                                    113

1   didn't find with the deal tracking system which was something

2   that I mentioned earlier.  When one of the offers was revised

3   they said it was revised based on new information and we wanted

4   to find out what the new information was because it wasn't an

5   entry on the deal tracking system.

6   Q.   Let me ask you about that revised deal.  So are what

7   you're saying is that the offer information that you had

8   suggested a transaction price that was higher than the one

9   eventually agreed on or lower than the one eventually agreed

10  on?

11  A.   The one that referenced new information I believe lowered

12  the offer.

13  Q.   So there was a previous offer.  The company that made the

14  offer reduced it and the reduced offer is the one that would

15  have been reflected in the transaction correspondence that you

16  received?

17  A.   We did not -- what we were looking for was to understand

18  what they received that led them to change their offer.  That

19  was what we didn't understand.

20  Q.   Maybe I didn't make myself clear.  What I'm trying to

21  figure out is what the change was.  Was the change -- was there

22  an original offer that went down and the lower offer was

23  reflected in the transaction correspondence that you initially

24  received?  Is that correct?

25  A.   That's correct.

Ultz - Cross                                114

1    Q.    You indicated in your direct testimony that you thought

2    that prior expressions of interest might be a valid data point

3    to consider in valuing companies; is that right?

4    A.    Yes.

5    Q.    You also indicated in the direct testimony that you

6    thought that there was some indication that the expressions of

7    interest or offers that you did review might have been based on

8    financial projections that the company did not meet; is that

9    right?

10   A.    That's correct.

11   Q.    So the transaction prices that you had access to, while

12   you'd agree that they might be a relevant data point, you also

13   agree that they might require some adjustment in order to

14   actually translate into current market conditions; correct?

15   A.    That's correct.  They could take an adjustment to look at,

16   for example, the EBIDA multiple that was offered instead of the

17   dollar amount that was offered.

18   Q.    That's one of the things that you're working on in your

19   work for the committee; correct, is adjusting those numbers?

20   A.    That's one data point.

21   Q.    You mentioned that you picked up the phone and called

22   someone at WY Campbell for some clarification or additional

23   information.  Do you have that type of relationship with WY

24   Campbell where you feel comfortable picking up the phone and

25   asking them for clarification or additional information?

Ultz - Cross                                    115

1   A.    I do now.  I didn't previous to this engagement but I've

2   worked with Fred Harris numerous times over the course of the

3   last few months and he's been helping me.

4   Q.    That's over the course of the entire engagement; correct?

5   A.    Right.

6   Q.    Let me ask you about the engagement.  You indicated in

7   your direct testimony that the information you requested in

8   Exhibit A was necessary for SRR to do its work in this matter.

9   What exactly is SRR's work in this matter?  What projects are

10  you working on for which this data was necessary?

11  A.    We are working on estimating a value for the company in

12  order for negotiation purposes.  We're working on current cash

13  flow modeling for the committee to understand even week to week

14  at this point budgets versus actuals and basically keeping them

15  apprised of the current situation for the company.

16  Q.    Any other work that SRR is doing?

17  A.    I mean there's probably other things that are tangential

18  to that but ultimately it's probably going to be coming up with

19  an estimation of the value for Lexington as well as monitoring

20  the process throughout the process, throughout this proceeding.

21  Q.    Let me just summarize.  So you're doing valuation work;

22  correct?

23           THE COURT:  You don't need to summarize.  He's

24  testified.

25           MR. STROCHAK:  All right.  Thank you, Your Honor.

Ultz - Cross                                              116

1    Q.   Is SRR preparing a disclosure statement for use in these

2    Chapter 11 cases?

3    A.   We have not worked on that to date.

4    Q.   You mentioned negotiations, planned negotiations.  Do you

5    believe that the committee in this case is prepared to

6    negotiate the plan of reorganization?

7    A.   I guess I don't know every member of the committee's mind

8    but my understanding is they want us to give them our best

9    indication of values so that they can decide what the best

10   course of action is.

11          THE COURT:  I don't think you answered the question.

12   You didn't answer the question.

13          THE WITNESS:  Do I know what the committee is

14   thinking?  Is that your question?

15   Q.   I'm happy to do that.  Based on -- I assume you have

16   communications with the committee and its counsel during the

17   course of your work; correct?  Based on your work to date in

18   this case, your communications with the committee and its

19   counsel regarding negotiations, have you come to an

20   understanding as to whether or not the committee is prepared to

21   negotiate a planned reorganization of the debtors as opposed

22   to --

23   A.   Prepared today?

24   Q.   As opposed to having thrown up their hands and saying we

25   can't negotiate this?

Ultz – Cross                                                    117

1  A.   Prepared today or prepared ever?

2  Q.   Well, as you sit here today do you think the committee is

3  prepared to negotiate?  Not necessarily reach an agreement.  I

4  realize that negotiations happen and sometimes you don't get to

5  an agreement.  But based solely on your understanding and the

6  work that you've done in assisting the negotiation process, do

7  you believe that the committee is prepared to negotiate?

8  A.   I believe that they would like to negotiate this and I

9  think that I would like to clarify the prepared portion being

10 that there is one significant piece of information we're still

11 hoping to obtain before they're willing to put a plan out there

12 or to negotiate what they would like to negotiate.

13 Q.   Okay.  That's a fair distinction, the distinction between

14 being prepared and intent and I appreciate that clarification.

15 Let me see if I can follow up on the preparation portion.

16 Apart from the additional data on the projections that you've

17 testified about, is there anything else that SRR needs in order

18 to advise the committee in preparation for plan negotiations?

19 A.   I believe there were three items this morning that were

20 discussed, the most important being the detail behind the five-

21 year plan, and there were also two others which they were minor

22 items, the appraisals and the use of the NOL balance.

23 Q.   With respect to the appraisals you've been advised that as

24 soon as those appraisals are completed they'll be provided to

25 SRR; correct?

Ultz - Cross                                118

1   A.   Correct.

2   Q.   In fact, you've received some older appraisals and are

3   still waiting for the new ones; correct?

4   A.   Right.  We received 2006 appraisals.

5   Q.   With respect to the net operating loss data, you're e-

6   mail, I believe it was yesterday or early today, was your first

7   follow-up request for additional information on NOLs; correct?

8   A.   It wasn't the first follow up.  It was in the original

9   data request and we were told to seek out the 10K for

10  information.  But upon getting the new plan it didn't

11  necessarily make sense to us how they were using that given the

12  balance and the fact that they were still paying significant

13  taxes in the early years.  So we wanted to understand how the

14  taxes were projected.

15  Q.   That's right.  If you refer back to Committee Exhibit A,

16  item 1.13, what you asked for originally was the amount of any

17  net operating loss, carried forward balances, or tax credits;

18  correct?

19  A.   What are you referencing?

20  Q.   I'm referencing Committee Exhibit A in evidence, item

21  number 1.13.

22  A.   That's correct.  We were directed to the 10K for the

23  balance and then we assumed that that would be applied against

24  earnings going forward and it doesn't appear to be as we

25  expected, so we'd like to understand that.

Ultz - Cross                                                    119

1   Q.    Okay.  Let's go back to projections for a second.  We

2   talked a little bit about the automotive industry and those

3   issues.  Let me focus you a little bit on the debtor's historic

4   performance.  I take it you must in many Chapter 11 cases;

5   correct?

6   A.    I've worked in several.

7   Q.    How many?

8   A.    I've probably been involved in three or four.

9   Q.    This being fourth?

10  A.    Yeah.  It's either the third or the fourth.

11  Q.    Is it your experience based on those three or four cases

12  that companies generally end up in Chapter 11 because they've

13  historically exceeded their forecasts?

14  A.    Probably not the general trend.

15  Q.    It's the general experience that the company is in

16  financial distress and up in bankruptcy because they may have

17  missed their historical projections; correct?

18  A.    Correct.

19  Q.    I'm sure you've become familiar with the reasons that

20  Lexington Precision and Lexington Rubber Group filed these

21  cases; correct?

22  A.    Yes.

23  Q.    You understand that it's fundamentally a balance sheet

24  problem; right?

25  A.    It appears to be, yes.

Ultz - Cross                              120

1   Q.   You haven't done an assessment yet of the amount of

2   business pickup that the company may be able to do once it

3   fixes its balance sheet; correct?

4   A.   We have not, as I said, we did not receive the underlying

5   data for projections to understand where that's coming from.

6   Q.   So you're still waiting for that?  You don't have that

7   yet?

8   A.   We don't have the detail platform by platform as we

9   discussed or what's booked and what's prospective which would

10  go to that question of what's going to get picked up when they

11  come out.  So that would be a prospective business issue versus

12  a booked business issue.

13  Q.   But I'm sure you have an open mind as to that issue;

14  right?  I mean if the debtor has a credible forecast

15  demonstrating that it thinks it's going to get a business

16  pickup as a result of the fix of the balance sheet in the

17  Chapter 11 cases, that's something you would certainly consider

18  in evaluating reasonable projections; correct?

19  A.   Right.  If they have good indications from their

20  customers, that's a very fair point.

21  Q.   I take it you still have an open mind about that.  You

22  haven't said these projections are totally incredible, they'll

23  never achieve this.  This is still something that you're

24  exploring; correct?

25  A.   Right.  That's why we asked for the backup.  We'd like to

Ultz - Cross                                    121

1   give them the benefit of the doubt to understand where it's

2   coming from.

3   Q.   Have you completed your evaluation work at this point?

4   A.   No.

5   Q.   That's still in process I take it?

6   A.   Yes.

7   Q.   How far off do you think you are from finishing evaluation

8   in terms of time?  That's what I meant.

9   A.   Depending on when we receive the detail we requested and

10  how self-explanatory it is to the extent we need to have

11  discussions with either the CFO or plan level management, that

12  would delay the process.  But I think that our goal would be to

13  have an early indication within a couple of weeks after getting

14  our questions answered.

15  Q.   So that would put us in -- let's just assume for purposes

16  of argument that you get that data within the next week, that

17  would put us sometime in the third week in August; is that

18  about right?

19  A.   Assuming we have access to management and can get all our

20  questions answered.

21  Q.   Now, you indicated that the company's historical EBIDA has

22  been in the 11 to $14 million range; correct?

23  A.   Correct.

24  Q.   The projection for 2008 is roughly $13 million; right?

25  A.   Correct.

Ultz - Cross                                            122

1   Q.   So again, that's in that range of historical EBIDA

2   numbers; correct?

3   A.   Right.  We're six months through the year this year, so

4   we're looking at the trailing 12 months as well as the full

5   2008.

6   Q.   So in terms of the $13 million or so projected for 2008,

7   that's based on six months or so of actual experience and six

8   months or so of projection; correct?

9   A.   That is my understanding.

10  Q.   Mr. Ultz, has Campbell told you when they're going to

11  finish their evaluation?

12  A.   They have not.

13  Q.   Have you asked them?

14  A.   No.  We asked them what their status was probably about at

15  least a week ago and they said they're running multiples and

16  looking at the company just like we are and they're waiting on

17  the plan and waiting on the information.  I have spoken with

18  people over there and they said they also had numerous

19  questions for the company based on the plan.  They were waiting

20  for the details.

21  Q.   Let me turn you to the testimony that you gave regarding

22  projected debt levels in the plan of reorganization.  How much

23  is the total debt projected at confirmation?

24  A.   My recollection is approximately $60 million with 42 being

25  a senior exit facility, 15 being senior subordinated debt, and

Ultz – Cross                                              123

1   then $3 million note for the trade payables.

2   Q.    How much of that $60 million or so is projected to

3   actually be drawn at confirmation?

4   A.    I'm not sure of the current projection and it depends on

5   the status of the company on that day I guess.  You're

6   referring to the line of credit drawn?

7   Q.    Yeah, in terms of the information that you've analyzed to

8   date about the company's projected debt on emergence, my

9   question was had you analyzed how much -- that is have you

10  analyzed the difference between availability to the company on

11  emergence and what it anticipates would actually be drawn on

12  emergence?

13  A.    We don't know what availability is because we haven't seen

14  a term sheet for any facility yet.  $42 million is our estimate

15  of what it would take based on the information we have.

16  Q.    I think you indicated in your direct testimony that you

17  thought, based on your experience in the automobile industry,

18  that a ratio of four times EBIDA would be the most you could

19  expect in this circumstance; is that right?

20  A.    I wouldn't say it's always the most.  I would say that

21  that's the industry standard as they don't typically like to go

22  above four times the EBIDA.

23  Q.    That's based on all your interactions with lenders during

24  the course of your work in the automobile industry?

25  A.    Mine as well as we discussed it with other professionals

Ultz - Cross                                                    124

1   in our company that specialize in that segment of the business.

2   Q.   By that segment you mean the OEM segment; correct?

3   A.   No, in this case I mean finding finances for companies.

4   We have people that specialize in that as well and they do a

5   lot of work in the automotive industry.  So we asked them what

6   they're seeing in the marketplace today for current leverage

7   ratios.

8   Q.   Their answer was that for any automobile business the

9   current standard leverage ratio is four regardless of whether

10  it's primarily an OEM business, primarily an aftermarket

11  business; is that right?

12  A.   We probably didn't get that detail.  We talked about

13  automotive in general.

14  Q.   You didn't focus on the distinction between OEM and

15  aftermarket?

16  A.   Not in that discussion, no.

17  Q.   So as you sit here today you're not even aware if there

18  might be such a distinction; correct?

19  A.   There could be.

20  Q.   Well, let me ask you this way.  What's the leverage ratio,

21  a standard leverage ratio for a company that supplies high

22  technology parts in the medical industry?

23  A.   I don't know off the top of my head.

24  Q.   Now, the company's projected EBIDA is $13 million for 2008

25  and a multiple of four gives us 52; right?  Is that right?

Ultz - Cross                                   125

1   A.    That's correct.

2   Q.    So $52 million of secured -- so is that correct then -- do

3   I understand that correct that his company, based on your

4   average standard of four for some companies in the automobile

5   industry that this company, Lexington, might be able to support

6   as much as 52 on emergence; is that right?

7   A.    Potentially, yes.

8   Q.    You indicated that your calculations suggested that the

9   company would have implied debt of 42 secured on emergence; is

10  that right?

11  A.    The four multiplied I referred to is total, not secured,

12  so --

13  Q.    Total.

14  A.    -- the comparable number would be $60 million.

15  Q.    Okay.  So we're off by $8 million roughly in your

16  calculation.  That's based on a four factor.

17  A.    Yes.  That was projected 2008.

18  Q.    Let me just flip back now.  We talked about whether the

19  committee was prepared and had adequate information.  You've

20  indicated what you thought was still necessary.  Let me talk

21  about intent for just a moment.  Do you believe that this

22  committee has given up hope based on the communications that

23  you've had regarding your work?  Do you believe that this

24  committee has given up hope in reaching a negotiated plan of

25  reorganization?

Ultz - Cross                                    126

1           MR. BRACHT:  Objection, Your Honor.  I think --

2           THE COURT:  Sustained.

3           MR. BRACHT:  Thank you.

4    Q.   As you understand your assignment today, is SRR still

5    working to assist the committee in gaining the knowledge and

6    information it needs in order to negotiate a plan

7    reorganization?

8    A.   We are.

9    Q.   Mr. Ultz, have you been privy to all the correspondence

10   that's gone back and forth between myself and Mr. Bracht and

11   Mr. Silverstein, and my partner, Mr. Krasnow, regarding

12   document production issues, confidentiality issues?

13   A.   I don't know that I've received every correspondence but

14   I've received a good number back and forth.

15   Q.   Do you recall receiving correspondence where we indicated

16   to counsel at Andrews and Kurth that we would be providing

17   valuation information in connection with the disclosure

18   statement to the planned reorganization, that is current

19   valuation information?

20   A.   I don't recall that.

21   Q.   Nobody advised you of that one way or the other?

22   A.   That there would be a valuation in the disclosure

23   statement?

24   Q.   No, that the debtors will be providing information

25   pertinent to current valuation issues in connection with the

```
                        Ultz - Cross                      127
```

1  disclosure statement when it was prepared.

2  A.   I mean I know that there are pieces of information with

3  the disclosure statement that did not come with the plan so I

4  guess -- I don't know the details of each component that will

5  be provided.

6           MR. STROCHAK:  Thank you.  I have no further

7  questions, Your Honor.  Thank you.

8           THE COURT:  Redirect?

9           MR. BRACHT:  No questions, Your Honor.

10          THE COURT:  All right.  You're excused.  Thank you

11  for your testimony, Mr. Ultz.  Mr. Bracht?

12          MR. BRACHT:  Yes, Your Honor, we'd like to call Bob

13  Welch.

14          THE CLERK:  Please raise your right hand.

15  (AT THIS TIME THE WITNESS, ROBERT WELCH, WAS SWORN.)

16          THE COURT:  Please have a seat, Mr. Welch.

17          THE WITNESS:  Thank you.

18                       DIRECT EXAMINATION

19  BY MR. BRACHT:

20  Q.   Good afternoon, Mr. Welch.

21  A.   Good afternoon.

22  Q.   Would you state your name, please, sir?

23  A.   Robert J. Welch.

24  Q.   How are you employed, Mr. Welch?

25  A.   I am the chief financial officer of Jeffries

Welch - Direct                                         128

1   [unintelligible], LLC and the managing director of Jeffries and

2   Company, Inc.

3   Q.   Okay.   Does Jeffries own Lexington senior subordinated

4   notes?

5   A.   Yes, we do.

6   Q.   Approximately how much?

7   A.   Slightly less than $13 million principal amount.

8   Q.   Was Jeffries a member of the ad hoc litigation and

9   noteholders -- excuse me.   That's a Freudian slip there.   The

10  ad hoc Lexington noteholders committee?

11  A.   Yes, we were.

12  Q.   Is Jeffries now a member of the unsecured creditors

13  committee?

14  A.   Yes, we are and I am the chairman.

15  Q.   Okay.   Now --

16          THE COURT:   You're chairman of the unsecured

17  creditors?

18          THE WITNESS:   Yes, I am.

19  Q.   In kind of a little bit of background, we've heard a lot

20  about this, was Jeffries involved in the discussions between

21  the ad hoc committee and the Lexington principals in the pre-

22  petition period?

23  A.   Yes, we were.   They began shortly after the company missed

24  its interest payment November 1, 2006 and were ongoing through

25  the end of March, up and through the filing of the case.

Welch - Direct                                    129

1   Q.   So at least 18 months or so you've been engaged and tried

2   to work something out?

3   A.   Yeah.  Yes.

4   Q.   I want to move forward to -- we've heard probably a lot

5   about the presentation that was made by Lexington in December

6   of 2007 and you recall, you've been in the courtroom for that

7   testimony?

8   A.   Yes.

9   Q.   For the record, as reflected on Exhibit G, and I think you

10  might have Exhibit G in front of you there, Mr. Welch?

11  A.   Yes, I do.

12  Q.   Now, Mr. Welch, what I'm looking for from you is to kind

13  of give us the committee's perspective of how they viewed this

14  presentation.

15  A.   When --

16          THE COURT:  Exhibit G?  How they viewed Exhibit G?

17          MR. BRACHT:  Yes, and the presentation surrounding

18  Exhibit G.

19  A.   Up until the time, I guess it's dated December 13th which

20  fairly coincides with the time that our discussions with the

21  company transferred from one in which they were operating under

22  the forbearance agreement which they had agreed to sell a

23  sufficient number of assets in order to pay ourselves down and

24  pay down the senior secured notes.  It was clear to us that the

25  company was not moving down that road expeditiously and we

Welch - Direct                                      130

1   asked for a summary of all the bids.  This is what they

2   provided us with.  It was clear to us the company through this

3   analysis was trying to make a case for a value for the company

4   in excess of $100 million.

5   Q.   When you received that representation from the company,

6   did you attempt to -- did the committee attempt to analyze the

7   reliability of that representation?

8   A.   The ad hoc committee asked for the bids that backed up

9   this analysis and we were told that we could not get it because

10  it was confidential to the company and they wanted to keep it

11  in confidence among themselves.  Then that was all we were

12  given.

13  Q.   Was the --

14  A.   We did have a conference call with WY Campbell but they

15  didn't go into any great detail as to the terms of each of

16  these bids, whether they were binding or not binding, whether

17  they were an indication of an interest or not.

18  Q.   Did you subsequently find out the answers to those

19  questions?

20  A.   After the filing and the request for the -- various

21  requests for information from SRR, the actual non-binding

22  proposals were shared with us which we reviewed and which our

23  advisers, SRR, reviewed.

24  Q.   What did you conclude at that point as to the committee

25  post petition concerning the reliability of this presentation?

Welch - Direct                              131

1  A.   Well, we were a little taken aback to say the least

2  because the company had in the December meetings with them and

3  then through our negotiations in February and March as to a

4  consensual plan, a prepackaged plan, had pointed to these

5  valuations or these bids that they had received as being a firm

6  indication to them that the company was worth in excess of $100

7  million.

8        When I reviewed the bids, the actual indication of

9  interest that they had received, they were predicated on EBIDA

10 projections from the company that were provided from the

11 company to the prospective bidders of some $17 million in 2007

12 and some $19 million in 2008.  It became perfectly clear to me

13 that during these December meetings and the January and March

14 meetings that we had had with the management team and the

15 discussions that we had that they were basing this analysis on

16 EBIDA numbers that they knew were not reached, could not be

17 reached which was then, you know, the predication for the bids

18 that they had built this piece of paper from.

19 Q.   Now, you mentioned in your answer negotiations that took

20 place in March, and I want to direct your attention

21 specifically to a March 10 presentation, March 10, 2008.  I'm

22 not sure there's an exhibit up there that reflects it.

23        THE COURT:  I don't think that's an exhibit; is it?

24        MR. BRACHT:  No, I don't believe so.

25 Q.   But do you recall the presentation that was made on March

Welch – Direct                                                    132

1   10, 2008?

2   A.    You mean their proposal?

3   Q.    Their proposal.  I'm sorry.

4   A.    Yes, yes.  I recall it from memory, yes.

5   Q.    I'm not going to ask you about the specific details of

6   that proposal but how was the proposal presented to the ad hoc

7   committee at that time?

8   A.    The proposal essentially valued the company at $105

9   million.  It was structured in a manner such that the principal

10  management and shareholders of the company retained control of

11  the company, retained the majority of interest in the equity of

12  the company.  When we pushed back on their valuation, they

13  principally said well, this is the best deal that you're going

14  to get.  Either you take it here or we'll cram it down on you

15  in bankruptcy.  They also intimated to the fact that should we

16  try to bring in our own buyer or bring in a transaction around

17  them that they would crush it.

18  Q.    Now, based on what you had learned about, or subsequently

19  learned about the December 2007 presentation and based on this

20  kind of take it now or take it in Court offer, what did that do

21  to your mind set concerning prospects of reaching a consensual

22  plan?

23  A.    Well, we're, you know -- the committee is always

24  optimistic about reaching a plan and avoiding expenses and

25  going through any kind of bankruptcy proceeding.  The longer

Welch – Direct                                133

1   this drags out, you know, our view is the worse off the estate

2   is.  So we're always interested in striking a transaction or

3   coming to an agreement of terms.

4       But we view the information that comes out of the company

5   with a healthy dose of skepticism and we view the current

6   position of the debtor as having been dug in at a valuation

7   that is in excess of where we think the market would reasonably

8   value this company in our opinion.  We continue to wait for

9   information from the debtor in order to -- if there is

10  something in there that can convince us that will take us to a

11  higher value, we're willing to look at it.  But we still wait

12  for information from them.  We're willing to negotiate but

13  we're at somewhat of an impasse here.

14  Q.   You're the chairman of the unsecured creditors committee?

15  A.   Yes, I am.

16  Q.   Will the committee support this plan as it presently has

17  proposed?

18  A.   No.

19  Q.   Why not?

20  A.   From a number of different perspectives.  One, we're

21  uncomfortable with the projections for EBIDA and our view of

22  the -- as a result, our view of the balance sheet that likely

23  results from the plan as presented by the debtor will leave the

24  company excessively levered and in no better position than it

25  was coming into this Court with leverage in excess of five

Welch – Direct                                    134

1  times.

2       In addition to that, from the perspective of the

3  noteholders the instruments that are being offered for

4  consideration we don't view as having significant -- or value,

5  or significant value as purported by the debtor.  The notes,

6  for instance, are 12% notes.  They have a 120 day standstill

7  period in them.  We don't think that notes on top of four terms

8  of leverage potentially that a rate of 12% would be reasonable

9  in the marketplace.  We think it's substantially low.  In

10  addition, the preferred that they offer, the summary term sheet

11  calls for -- well, we will review that preferred and we'll end

12  up with a majority interest, equity interest in this company,

13  yet it takes two board seats and its seats control to a

14  minority equity, common equity position.  So on the fact of the

15  term sheets, we're not happy with the terms, therefore, we're

16  not happy with the consideration.

17       From the perspective of the -- from the trade, there are

18  three members of the trade that are on the committee and their

19  view is that they're not being fairly treated and they do not

20  understand why they would be asked to take anything less than

21  100 cents on the dollar in cash for their claims based on their

22  position in capital structure.

23            MR. BRACHT:  Your Honor, that's all the questions I

24  have.  Thank you.

25            THE COURT:  Thank you.  Cross examination?

Welch - Cross                                          135

 1          MR. STROCHAK:  Your Honor, if I can just ask your

 2   indulgence one more time for a very brief recess before the

 3   cross?

 4          THE COURT:  No.  Let's go.

 5          MR. STROCHAK:  Okay.

 6                    CROSS EXAMINATION

 7   BY MR. STROCHAK:

 8   Q.    Adam Strochak, Weil, Gotshal, Manges for the debtors.  Mr.

 9   Welch, the trade gets 104.5 cents on the dollar over 18 months

10   after confirmation; correct?

11   A.    Per the debtor's plan?

12   Q.    That's right.  I'm sorry.

13   A.    Yes.

14   Q.    Have the debtors ever indicated to you in any way, shape

15   or form that the terms of the notes under the plan are non-

16   negotiable?

17   A.    I wouldn't say they've said they're non-negotiable but

18   when we ask questions as to how they arrived at the terms or

19   what were the additional terms of the indenture would be they

20   were very vague and nonspecific.  So when we inquired as to --

21   when we had our face-to-face meeting and we tried to engage in

22   a conversation around the terms, we were essentially -- we

23   received the same response that we had received before which

24   was 12% is a reasonable rate in our view and the terms on the

25   term sheet, although it's not a [unintelligible] term sheet, we

Welch – Cross                               136

 1  view those terms as being reasonable.  So we asked and their

 2  response was we think the pieces of paper put in front of you

 3  are reasonable, which is a response to me that they're somewhat

 4  inflexible on their terms.

 5  Q.   But nobody told you in any way, shape or form that there

 6  would never be any movement on that issue; correct?  You pushed

 7  and the debtors pushed back; correct?

 8  A.   Yeah.

 9  Q.   Mr. Welch, did the committee ever make a specific

10  counterproposal to the terms of the note?

11  A.   We were reluctant to make a specific counterproposal until

12  SRR completed a sufficient amount of work to come up with a

13  view as to, you know, what was and what was not reasonable in

14  their projections.  They gave us an understanding of their

15  preliminary view but for the purpose of offering the debtor the

16  opportunity to prove that there's something in the projections

17  that would point us to a higher value, we thought it was

18  appropriate to wait at least initially.

19  Q.   You're still waiting; correct?

20  A.   Well, yes.  The information coming out of the debtor is, I

21  have to say, painfully slow.  Some of this information I don't

22  understand why it's not forthcoming.  They provided us with

23  projections some five or six weeks ago.  The projections --

24  when did we get projections?  Three weeks ago?

25          MR. BRACHT:  July 15th.

Welch - Cross                           137

```
 1  A.    Right.   The projections should have been based on a
 2  bottoms up analysis.  We asked for the information that created
 3  those projections and we're still waiting for the information.
 4  So it confuses me just as to process, how you can have
 5  projections prepared without the supporting documents being
 6  readily available when projections are presented to us.
 7  Q.    Have you actually reviewed the projections?
 8  A.    I reviewed them myself, the projections themselves, yes.
 9  Q.    You couldn't understand them?
10  A.    I can understand them from a very high level but that's
11  why we hired advisors who have substantial experience in this
12  area so that they could advise us as to the, you know, the
13  viability of the projections.  Their initial reaction was that
14  they didn't seem viable on their face.  But they too said let's
15  wait for a little more information.  But on the face of them
16  they were confused as to how this company could grow some 20%
17  on the revenue line when the rest of the industry is in
18  contraction just by the year over year basis, '07 into '08.
19  Q.    It's your expectation that a debtor with the financial
20  management team of size and capability of this one should be
21  able to immediately produce all the backup information for its
22  projections; is that right?  Is that what you think?
23  A.    I would think that once you have the projections done you
24  should have the backup materials available, yeah.
25  Q.    You think two weeks is an unreasonably long period of time
```

Welch - Cross                                    138

1   for that to happen?

2   A.    I don't know that we've received everything that we've

3   looked for in the last two weeks.  Our advisors received some

4   information but it's been effectively a data dump and not

5   really information that they can connect, at least from their

6   advice to us, where they can say here are the line items on the

7   projections that they're putting forth, here's how they get

8   from A to B based on a business lineup.

9   Q.    It's your understanding that information is going to be

10  forthcoming; correct?

11  A.    Potentially, yes.

12  Q.    Did you not hear the testimony here in Court today;

13  correct?

14  A.    Yes, I was here.

15  Q.    Did you not hear Mr. Harris testify that that information

16  is being prepared and will be forthcoming?

17  A.    Well, Mr. Harris is receiving the information from the

18  debtor, so it's up to the debtor to provide the information.

19  If that's Mr. Harris' testimony, that's his testimony.

20  Q.    Perhaps you didn't understand my question.  My question

21  was is based on testimony you heard do you understand --

22          THE COURT:  It's argumentative.  It's argumentative.

23  Ask your next question.

24          MR. STROCHAK:  Thank you, Judge.

25  Q.    Mr. Welch, you first became involved in this matter in

Welch - Cross                              139

1    February of 2008; correct?

2    A.   No.   I became involved in this matter about this time last

3    year.   I started monitoring the case with my associate, Michael

4    Saxberg.   He and I attended most of the conference calls.   It

5    was either he or I.   We shared notes, shared conversations,

6    views, attended the ad hoc calls together.   So it was from

7    about this time last year, maybe September.   About 12 months

8    I've been involved.

9    Q.   I think you suggested in your direct testimony that the ad

10   hoc committee never received any of the offer letters in

11   connection with the sale process until after the Chapter 11

12   cases; is that right?

13   A.   Correct.

14   Q.   Let me refer you to Exhibit G which is the analysis of the

15   sale transactions.

16   A.   Yes.

17   Q.   The right-hand column is captioned [unintelligible]

18   Medical and there's an indication of gross proceeds of $32

19   million.   That was the [unintelligible] offer for the medical

20   business; correct?

21   A.   Correct.

22   Q.   That was a transaction that the ad hoc committee decided

23   it was not interested in pursuing; correct?

24   A.   I don't think the answer is that easy.   We were interested

25   in pursuing the [unintelligible] transaction if management

Welch - Cross                                    140

1   would agree with us in writing to advertise their notes.   So we

2   were interested in pursuing the  [unintelligible] transaction

3   but it had conditions on the management team.

4   Q.   Ultimately you did not give consent to that transaction;

5   correct?

6   A.   Because the management team wouldn't agree with us in

7   writing to advertise their notes.  We didn't see -- our view

8   was that if the [unintelligible] transaction went through it

9   would leave a very highly levered entity behind.  The

10  management team had intimated to us in the past that they would

11  agree to advertise their notes.  We said fine, we'll proceed

12  with the [unintelligible] transaction if you agree in writing

13  to advertise your notes because then we're left with a less

14  levered automotive based, you know, principally rubber business

15  and that would have been a transaction that we thought was

16  viable and ended up in a viable company going forward.

17  Q.   In terms of the $32 million value for the medical

18  business, the ad hoc committee believed that that was an

19  acceptable value for that business; correct?

20  A.   If the company could get it, yes.  I will tell you that we

21  were skeptical --

22  Q.   I think you answered my question.  I think the answer was

23  yes.

24  A.   Okay.

25  Q.   If the transaction could be done, the committee was

Welch - Cross                                          141

1   satisfied with that value; correct?

2   A.   Sure, sure.

3   Q.   Now, you indicated on your direct that -- let me ask you,

4   when you said in your direct that you believe the debtor was

5   dug into a valuation higher than market for these assets, were

6   you referring to the ad hoc committee, the official committee,

7   or both?

8   A.   The official committee and the ad hoc committee.

9   Q.   You also indicated that to the extent the debtors had

10  indications of value that support their views, that that's

11  something that you were willing to consider in negotiations;

12  correct?

13  A.   Sure.

14  Q.   So you're not suggesting that the committee is inflexible

15  and that there's an impasse.  You're just suggesting that you

16  need to see more information in order to perhaps consider

17  moving off your position on value; is that right?

18  A.   As well as more information to potentially reaffirm what

19  our position is and enter into a negotiation that's a little

20  bit more forceful from our part I would say.

21          THE COURT:  I don't understand what you just said.

22          THE WITNESS:  We haven't really pushed this

23  management team in terms of valuation.  We've had conversations

24  where they prop up the value and where we say it's not

25  reasonable.  But without having an advisor inside the company

Welch – Cross                                                   142

1  to review all their business lines, it's difficult to

2  articulate an argument with your counterparty when they

3  potentially know the asset better than you do.  Now that we

4  have an advisor, I'm personally more comfortable pressing the

5  company as to their view of value because I still think it's

6  unreasonably high.

7  Q.   Am I correct in understanding that your ability to press

8  and push back and negotiate with the debtor on value will be

9  further enhanced by the time that you have a valuation of your

10 own in hand; is that right?

11 A.   Sure.  We think we have a good idea of value right now and

12 a good understanding of the company right now.  But certainly

13 more information is always better when you enter into

14 negotiations.  It's our hope that we can, you know, come to a

15 common ground here but we want to be advised, properly advised

16 by SRR.  Sure.

17 Q.   Apart from the additional backup information on the

18 projections, are you aware of any other information that the

19 committee needs from the debtor in order to allow

20 negotiations --

21 A.   I would have to defer that --

22 Q.   -- on value to continue?

23          THE COURT:  Just wait until the question is finished.

24          THE WITNESS:  I'm sorry.

25          THE COURT:  Go ahead.

Welch - Cross                                143

1  Q.   The end of my question was just in order to allow the

2  valuation -- in order to allow negotiations on valuation to

3  continue.

4  A.   I would have to defer to SRR on that.

5  Q.   So if they said that all they need is the additional data

6  and the two other items that were mentioned this morning, the

7  NOL information and the -- I apologize, I'm just losing the

8  third item there, those three items, if that's what SRR says,

9  from the committee's perspective you're comfortable; is that

10 right?

11 A.   Not necessarily.  I mean we would want to sit down with

12 SRR, do a full summary review of their view and then determine

13 if we have a sufficient amount of information to move forward.

14 At present we've had conversations with SRR.  We have a

15 preliminary view as to value and a preliminary view on their

16 view of the company at this point, but more would be better.

17 Q.   That's the process; correct?  As you get more data --

18 A.   Certainly.  It's --

19 Q.   -- it prompts additional questions; right?

20 A.   It could result in additional questions.  We're hoping

21 that it doesn't though.  We're hoping that the responses we get

22 are dispositive of the questions we have.

23          MR. STROCHAK:  I have no further questions, Your

24 Honor.

25          THE COURT:  Thank you, Mr. Strochak.  Redirect?

Welch - Cross                                           144

1          MR. BRACHT:   Thank you, Your Honor, just a few.

2                    REDIRECT EXAMINATION

3    BY MR. BRACHT:

4    Q.   Mr. Welch, I forgot to ask you the plan that's been

5    proposed here, how does that compare to the March 10 take it

6    now or take it in Court plan?

7    A.   It's principally the same plan.  It actually on the one

8    point with respect to the preferred, it backs it up even a

9    little bit.

10   Q.   So it's the same almost?

11   A.   Correct.  Absent -- I have to say that the plan that they

12   proposed does not have a value in it.  It doesn't actually

13   purport to give a value to the components of the consideration

14   being offered to the noteholders.

15   Q.   Have you --

16   A.   But absent that, the terms are less --

17   Q.   Have you --

18   A.   -- attractive.

19   Q.   I'm sorry.  I thought you were finished.

20   A.   The terms are less attractive.

21   Q.   Thank you.  In your position on the committee have you

22   been asking the debtor for information concerning the progress

23   of the exit financing?

24   A.   Yes, we have.

25   Q.   Have you been asking for a definitive term sheet with

                        Welch - Redirect                    145

1    respect to that financing?

2    A.   We have via their counsel.  Their response was that the

3    company will provide us with a final term sheet when it's

4    available.

5    Q.   How long have you been pressing the debtors for a final

6    term sheet on exit fundings?

7    A.   Well, one could go back a long way with that.  They were

8    negotiating with Northfork for some time.  I mean a Northfork

9    proposal was on the table last January and February as my

10   recollection serves me.  Capital One they propped up during our

11   meeting in early July as being the successor to Northfork,

12   Capital One having acquired them and that they were negotiating

13   now with Capital One and that they were well along in the

14   negotiations and within a week or so they expected a term sheet

15   from them.  Whether it was preliminary or final wasn't clear to

16   us, but they had expected a term sheet within a week or so in

17   that meeting and we have yet to see one.

18             MR. BRACHT:  No more questions, Your Honor.

19             THE COURT:  Further cross?

20             MR. STROCHAK:  No redirect [sic], Your Honor.

21             THE COURT:  All right.  You're excused, Mr. Welch.

22   Thank you very much.  Additional witnesses?

23             MR. BRACHT:  We rest, Your Honor.

24             THE COURT:  All right.  Rebuttal?

25             MR. STROCHAK:  I know Your Honor is hesitant, but can

146

1    I ask for a minute or two?

2              THE COURT:  Sure.

3              MR. STROCHAK:  Thank you.

4                        [Off the record.]

5              THE COURT:  Mr. Strochak?

6              MR. STROCHAK:  Thank you, Judge.  The debtor has

7    rested and my partner, Mr. Krasnow, is going to do the argument

8    with the Court's permission.

9              MR. KRASNOW:  Good afternoon, Your Honor.  Richard

10   Krasnow for the debtors.

11             Your Honor, I would like to if I may, Your Honor, go

12   through the nine factors that are relevant in the court's

13   determination as to whether or not there is cause for an

14   extension of the exclusive periods that the debtors requested,

15   an extension of ninety days both as to the plan exclusivity as

16   well as the solicitation of the acceptances.  In going through

17   these various factors, Your Honor, I will say and I will focus

18   on those pertaining to the plan negotiations and where the

19   parties may be and what their views are.  I must say that based

20   upon the evidence that I heard and as I understand it, there

21   may be more areas of agreement than I would have thought based

22   upon the Committee's objection to the motion.

23             Your Honor, the first factor that the Adelphia court

24   addresses is the size and complexity of the case, Your Honor.

25             THE COURT: And I have the Adelphia decision at 352

147

1  Bankruptcy Reporter 578 open at Page 587 that lists the nine

2  factors.

3            MR. KRASNOW: Your Honor. I apologize. I keep on

4  thinking of something less than nine and --

5            THE COURT: Some of them are not relevant to the

6  discussion anyway.

7            MR. KRASNOW: Some are not relevant --

8            THE COURT: I have them right in front of me.  Go

9  ahead.

10           MR. KRASNOW: All right, Your Honor.  Your Honor, let

11 me focus on a few of them and those that --

12           THE COURT: Better than focusing on all of them.

13           MR. KRASNOW: Those that are particularly relevant and

14 let me at least make one point, Your Honor, with respect to the

15 factor that relates to are we paying our post-petition

16 obligations as they become due. That was one of the reasons,

17 Your Honor, that we asked that the Court take judicial notice

18 of our monthly operating reports which state --

19           THE COURT: I assume that.  They haven't contended

20 otherwise.

21           MR. KRASNOW: Your Honor, another factor is how long

22 has the case been going on.  It is 120 days.  Your Honor, this

23 has been a remarkable case in some respects.  One doesn't

24 typically see in a Chapter 11 that is not a prepackaged Chapter

25 11 as many things occurring as have occurred here.   In

148

1  particular, the fact that we have filed a claim.  Another

2  factor --

3          THE COURT: Well, part of that is that you committed

4  yourself in the final DIP order to do that.

5          MR. KRASNOW: Yes, Your Honor, we did but we committed

6  to --

7          THE COURT: And you'd have a problem if you didn't.

8          MR. KRASNOW: Yes, we would have had a problem had we

9  not but we felt we were in a position to do that and we did.

10         THE COURT: Ms.  Goldstein told me at the first day

11 motions and it was repeated today, that this case does not

12 involve reorganizing the debtor's businesses but its balance

13 sheet.  I was told at the outset of the case that the debtor's

14 business was basically a stable business; it was just over

15 leveraged and you had to restructure -- not restructuring the

16 debtor's business but restructuring the balance sheet.

17         MR. KRASNOW: Yes, Your Honor, and that actually goes

18 to one of the factors that the Adelphia court addresses, and

19 that is whether the debtor has demonstrated a reasonable

20 prospects for filing a viable plan.

21         THE COURT: Where you and Mr. Silverstein differ is on

22 the viable plan.

23         MR. KRASNOW: Well, I think we may also differ as to

24 what that means or what the Adelphia court meant when it said

25 that and I think the Court was very specific in that regard.

149

1  The Court noted that this factor, and that is the factor

2  relating to the prospects for filing a viable plan, and this is

3  a quote, Your Honor.  "This factor requires only that a debtor

4  be able to attain confirmation of at least some viable plan,

5  not necessarily the plan currently proposed."  Our

6  interpretation of that means that what you need to determine at

7  some level, and it's not frequently that you can determine this

8  within the first 120 days, Your Honor, but for the reasons that

9  Your Honor pointed out as to what the issues are with respect

10  to this case.  And I don't believe that the Committee has

11  challenged it which is that it's a balance sheet issue, that

12  indeed you have a viable enterprise as to which a plan can be

13  proposed, one that can be confirmed whether it is a plan that

14  we have filed or an amended plan arising from negotiations that

15  the Committee has clearly indicated through its witnesses its

16  prepared to have which is what was not clear to us based upon

17  the objection they had filed but is now evident.  That is a

18  standard, Your Honor, which we believe we can clearly satisfy

19  and it is not one notwithstanding some of the evidence that the

20  Committee has put on and that Your Honor has considered.  It is

21  not whether or not there are confirmation issues with respect

22  to, for example, the plan we have on file.

23          Your Honor, I would simply refer the Court to

24  Footnote 18 of the Adelphia decision in which the Court

25  referred to the Dow Corning decision and if I may just quote,

1   Your Honor.  If it's not necessary I won't do it.

2          THE COURT: No, I'm looking at the footnote.

3          MR. KRASNOW: All right.  So, Your Honor, what the

4   Adelphia court clearly indicated and has been indicated in

5   other cases which were referred to in our reply is exclusivity

6   and the evidence that needs to be proffered, the Court's

7   consideration as to whether or not to extend exclusivity does

8   not entail issues pertaining to confirmation.  So valuation

9   issues, we submit, which is a fair amount of time that we spent

10  today was on generally speaking valuation issues, feasibility

11  of the plan, those we would submit, Your Honor, are not

12  appropriate issues to be considered in the context of an

13  extension of exclusivity.

14         Again, Your Honor, the question is can there be a

15  viable plan and we submit, Your Honor, that there is more than

16  ample evidence here to indicate that this is a viable business

17  and that there is prospect for a viable plan.

18         The rest for the most part of the issues addressed by

19  the Adelphia court, and this may be the reason why I go from

20  seven to nine, really go to the plan negotiation process.  Have

21  there been or is there an indication that there will be an

22  effort undertaken by the parties to negotiate a plan, has the

23  debtor indicated that, has the objecting party, in this case in

24  the form of a Committee, indicated that they're prepared to

25  negotiate or as we suspected based on their objection, are they

151

1   simply crossing their arms being intransigent and saying we're

2   not going to negotiate.  The courts clearly indicate, Your

3   Honor, that if that is the case then that cannot be a basis for

4   a termination of exclusivity.  Your Honor --

5           THE COURT: You would agree that if the debtor simply

6   crossed its arms and said we're not -- take it or leave it,

7   we're not prepared to negotiate.  I'm not saying that's the

8   position you've taken, but that wouldn't mean you get what you

9   want necessarily.

10          MR. KRASNOW: Your Honor, I agree.  Generally there

11  may be particular circumstances where it would be appropriate

12  for a debtor to take that position.  In this case, we have not

13  taken that position and had we taken --

14          THE COURT: I would find it hard to conceive of the

15  situation where that would be justified but that's not the

16  position you've taken.

17          MR. KRASNOW: That's not this case, Your Honor.  Your

18  Honor, when I was before the Court in connection with the

19  Committee's motion for the termination of exclusivity I

20  indicated to the Court and represented on behalf of my client

21  that this was the case, that notwithstanding the fact that we

22  intended to file a plan which we did on June 30th that that did

23  not represent and does not represent a line in the sand from

24  the debtor's perspective.

25          THE COURT: If I understand correctly, you're filing

152

1   your disclosure statement tomorrow.

2         MR. KRASNOW: Your Honor, we do not anticipate filing

3   the disclosure statement tomorrow.  The projections --

4         THE COURT: I thought that was the date that I had

5   signed an order giving you until tomorrow.

6         MR. KRASNOW: Yes, Your Honor.  That order was entered

7   towards the latter part of last week.

8         THE COURT: You asked for it; you got it.

9         MR. KRASNOW: Yes, Your Honor.  Tomorrow is the date

10  that is provided for in the cash collateral order which is why

11  we had anticipated filing it tomorrow. The disclosure statement

12  is not yet complete.  The projections, as the evidence

13  indicates, took longer to complete than what we had

14  anticipated.  It was, as has been testified to today, Your

15  Honor.  It was a bottom's up analysis.  It was a very thorough

16  analysis and those projections were not completed until on or

17  about July 25th -- July 15th.

18        THE COURT: July 15th is the date on the exhibit.

19        MR. KRASNOW: That is correct, Your Honor.  That was

20  the date that those projections were provided as the evidence

21  indicates to the company's financial advisors and to the

22  Committee's advisors as well.  Those projections become the

23  basis upon which the valuation analysis is done and a valuation

24  analysis is an important component of a disclosure statement as

25  well as an important component of the whole plan negotiation

153

1   process.  That has not yet been completed.  We anticipate -- we

2   will.  I'm going to strike the word anticipate.  We will be

3   filing the disclosure statement next week.  We have so advised

4   the pre-petition secured lenders.  They have indicated to us

5   that they have no objection with a filing of the disclosure

6   statement next week, certainly no later than a week from this

7   Friday although we would hope and expect to be able to file it

8   earlier than that and it would be at that time, Your Honor,

9   that we would be in a position to provide to the Committee and

10  its professionals and financial advisor what we acknowledge and

11  agree is a very significant component of any plan negotiation

12  process, whether it's this case or any other case.

13          As the SRR witness testified, once they obtain that

14  information plus the additional information -- I think there

15  were three items that they requested and there may be other

16  information that they will be seeking once they do get our

17  valuation.  It will take them approximately three weeks for

18  them to be in a position to provide the Committee with the

19  benefits of their views with respect to the valuation.

20          THE COURT: I didn't hear any evidence about when you

21  would give them the three categories of information they're

22  still waiting for.

23          MR. KRASNOW: It is my understanding I believe that

24  some of that will be provided this week and perhaps by

25  tomorrow.  I'm not sure as to the timing of the other items.

154

1          MR. STROCHAK: I could speak to that if permitted,

2     Your Honor.  The two requests, the NOLs and -- I apologize.

3     I'm just drawing a blank on the other one.  The appraisals. The

4     appraisals will be done as soon as they're completed.  They're

5     just not completed yet.

6          THE COURT: I don't know what that means, Mr.

7     Strochak.

8          MR. STROCHAK: I don't know either, Your Honor.

9          THE COURT: Are we going to come back in November and

10    I'm going to be told the appraisals aren't done or what's

11    the --

12         MR. STROCHAK: No, I don't think so, Your Honor.  I

13    think it's just a matter of getting the final documents from

14    the appraisers and I just don't exactly where that is in the

15    process.

16         With respect to the NOLs, we just got the request

17    yesterday.  We'll look into it and whatever information is

18    necessary I'm sure it can be provided very quickly.

19         The additional detail on the projections, the company

20    is working to pull it together.  The CFO, Mr. Wellhouse, has

21    been sick this week with either a stomach flu or poisoning or

22    food poisoning or something like that.  So he's working as hard

23    as he can to get that information done.  It's my understanding

24    that we anticipate providing that this week.

25         MR. KRASNOW: We're getting an update, Your Honor.

155

1                    [Pause in proceedings.]

2           MR. STROCHAK:   Thank you again for the indulgence,

3   Your Honor.

4           There's an equipment appraisal which is going to be

5   transmitted very, very shortly, almost immediately to them.

6   That's apparently done.   The real estate appraisals, as I've

7   indicated, we're waiting for the information to come back from

8   the appraisers.

9           The backup data on the financial projections, my

10  understanding is that most of it has been transmitted already

11  and whatever else may be left will be very, very shortly this

12  week.

13          MR. KRASNOW:   Your Honor, the normal process that

14  I've seen over the years with respect to the negotiation of a

15  plan, albeit it usually takes place before a plan is filed, but

16  here necessity required us to file the plan when we did is the

17  debtor provides the Committee's professionals with projections.

18  The Committee's professionals review that and the backup and

19  challenge the assumptions and the like.   That's part of the

20  process.   The Committee's professionals and the Committee are

21  provided with the company's valuation analysis.   There are

22  challenge to that which are then all part of the negotiation

23  process.   Not all of the information which we know they need

24  has been provided but some of it is in process and certainly

25  most of it will have been provided.

156

1          Your Honor, as the debtor's exhibit indicates, it's

2    not as if there haven't been a significant amount of

3    documentation and information provided to the Committee.  Over

4    34,000 pages.  Are there one or two documents that they got

5    later than they had hoped?  Apparently that's the case.  This

6    can't be the only case where there are certain sometimes delays

7    with respect to specific items.  But, Your Honor, I think in

8    the context of this case within the first 120 days this debtor

9    has endeavored to try to give as much information as is

10   possible in order to get us to the point, to the point where

11   both sides can engage in the kinds of negotiations we would

12   like to see and we've set, Your Honor, that we are prepared to

13   engage in and which the Committee through its witnesses have

14   said they are prepared to engage in.

15         As I said, Your Honor, their witness, their financial

16   advisor has indicated that assuming that they have all or

17   substantially all of the additional items that they were

18   seeking that they will not be in a position to provide the

19   Committee with its feedback with respect to the valuation and

20   presumably provide the debtor with the Committee's feedback so

21   we can engage.

22         That means, Your Honor, that while we would hope that

23   during the interim we can have discussions, that we can receive

24   a counterproposal from the Committee addressing the issues that

25   have been raised today.  Do they have an issue about the

157

1   interest rate, do they have an issue with respect to certain

2   other plan components.  We're more than willing to hear what

3   they have to say.  Does that mean there will ultimately be an

4   agreement?  I don't know, Your Honor, but I think, Your Honor,

5   based on the evidence that Your Honor has heard today it should

6   be evident that the parties do need additional time to try to

7   negotiate a plan.

8          We're not going to be in a position, it would appear,

9   to have meaningful substantive negotiations with the Committee

10  based upon everything that they need and we agree that they

11  need until towards the latter part of August which basically

12  gets us into September and October presumably as well to see

13  whether or not we and they can negotiate a plan which is

14  something other than the plan we filed.

15         The fact that we will have filed a disclosure

16  statement by next week, Your Honor, does not mean as it did not

17  mean when we filed the plan that we are not ready, willing and

18  desirous of entertaining and engaging in good faith

19  negotiations, Your Honor.  It would be much better for the

20  debtor and for all parties if indeed there could be a

21  consensual plan.  I am frankly slightly more optimistic that

22  there's a possibility in that regard based upon the testimony

23  that I heard today from the Committee's representative and its

24  professionals because again, Your Honor, the way we read their

25  objection they were simply crossing their arms and they were

158

 1  saying that, for example, our projections were totally

 2  unrealistic.  What their financial advisor said today is that

 3  there's a fair amount of information which they have not yet

 4  obtained, particularly with respect to future business, and

 5  they have an open mind.

 6          THE COURT: Well, their advisor expressed -- these are

 7  my terms, not his.  What I took away from it was great

 8  skepticism about the projections because historically revenue

 9  was -- growth was very modest.  It was pretty flat.  He made

10  the contention that going back several years the company has

11  more often than not missed its projections on the downside but

12  let's put that aside.  I think Mr. Silverstein used the term

13  I've seen used before in his brief where he referred to the

14  hockey stick projections which I've seen before and without

15  hearing the debtor's evidence on it I would just say the Court

16  has healthy skepticism when I see projections that have been

17  largely -- particularly in the environment where all you have

18  to do is pick up the newspaper, the automobile industries in

19  the toilet bowl to see projections that in 2010 look to me to

20  be -- raise significant questions.

21          But that's not -- I would agree that that ultimately

22  is not the issue today.  This is not a valuation trial.  I

23  listened to the purported expert testimony for what it's worth

24  today and made clear that doesn't necessarily mean how I would

25  rule on its admissibility or weight at any confirmation

159

1   hearing, but -- I think that going to the factor of whether the

2   debtor has made progress in negotiations with the creditors

3   where the baseline set of projections that the debtor is

4   operating off of at least raise questions of whether they're

5   totally unrealistic.

6           MR. KRASNOW: Your Honor, of course today was not a

7   day for the hearing on the feasibility of the plan and the

8   valuation --

9           THE COURT: I know you thought this was irrelevant but

10  I thought -- I wanted to hear it.

11          MR. KRASNOW: Your Honor, I appreciate that and we can

12  understand why Your Honor would react that way which is why

13  certain of the questions which were directed to the Committee's

14  witness and witnesses really went to the nature of the debtor's

15  businesses and there are -- I'm going to characterize it as

16  three businesses although two are within one name plate which

17  is automotive.  There is the medical, Your Honor, but under the

18  automotive there is what has been referred to as the OEM

19  business which is --

20          THE COURT: I understand what OEM and what replacement

21  market is.

22          MR. KRASNOW: Your Honor, we believe that we can be in

23  a position to explain to the Committee and its professionals,

24  whether they accept it or not we don't know, and if we do not

25  have a consensual plan we'll be able to demonstrate to the

160

1    Court that there really are significant differences between

2    those two businesses and what is happening in one of those

3    segments, which is clearly negative, doesn't mean that the

4    other segment is being adversely affected and that the other

5    segment in fact is a bigger driver of the cash flow in the

6    EBIDA than the OEM business.

7         But, Your Honor, in saying that, it really goes to

8    the point, and we acknowledged in our motion, that there needs

9    to be the kinds of discussions that would typically take place

10   with the Committee and its professionals to address those

11   issues, respond to questions.  They may or may not accept our

12   answers but at least to engage.

13        THE COURT: Mr. Krasnow, give me a representation of

14   when you are going to -- let me back up.  It seems to me

15   largely uncontroverted that the Committee's advisor has

16   requested additional information in three categories that both

17   the company and the Committee's advisors agree need to be

18   provided.

19        MR. KRASNOW: Yes, Your Honor.

20        THE COURT: I didn't hear any dispute about the three

21   categories of information.  So tell me when are they going to

22   have it.

23        MR. KRASNOW: Your Honor, we -- based on what Mr.

24   Strochak said, the information relating to the projections

25   unrelated to the NOL we think may have been provided either

161

1  today -- it will be certainly this week.  The information with

2  respect to the NOLs given what I was advised yesterday is the

3  financial condition of our CFO, I'm reluctant to say precisely

4  what --

5         THE COURT: Not the financial condition.  His health.

6         MR. KRASNOW: I misspoke.  His health.  I'm reluctant

7  to give a precise date but we will provide that information and

8  make people available, including our tax lawyers as well to the

9  extent required, as promptly as possible.  We really want to

10  move forward with the process, Your Honor.

11        With respect to the equipment appraisals, my

12  understanding is that should be available to us.

13        THE COURT: How much real estate do you have?  I mean

14  the equipment -- the equipment you indicated though, those are

15  going to be promptly forthcoming.  There was no answer with

16  respect to the real estate.  I don't know how much real estate

17  you have.

18        MR. STROCHAK: Could I speak to that for a moment,

19  Your Honor?

20        THE COURT: Go ahead, Mr. Strochak.

21        MR. STROCHAK: The appraisals relate to I think assets

22  that are not core to the core business.  This is kind of an

23  extrinsic assets and things like that.  So it's probably a

24  couple of facilities.

25        THE COURT: Are you valuing leaseholds or do you own

162

1  the fee or what's the --

2        MR. STROCHAK: I think it's owned property, Your

3  Honor, and I just don't have an answer as to exactly where the

4  appraisers are in that process, but I think it's very

5  collateral to the core issues of valuation in this case.  The

6  core issue is the business to be reorganized around as opposed

7  to the extraneous assets.  I'm not suggesting that it's not

8  appropriate information for the Committee to request and for

9  them to get.

10        THE COURT: Can you even give me order of magnitude of

11  what you think there in real estate?

12        MR. STROCHAK: I think I need to consult with my

13  client on that one, Your Honor.

14        MR. KRASNOW:  He wants to know what the real estate

15  is.

16        THE COURT: Order of magnitude of what the real estate

17  is.

18        MR. STROCHAK: I've been told roughly -- approximately

19  in the order of magnitude of $14 million.

20        MR. KRASNOW: Your Honor, that real estate is not

21  going to drive -- it certainly has --

22        THE COURT: I didn't ask for detail.  I was just --

23  you seem to agree the appraisals need to be forthcoming and I

24  was just trying to get an understanding of how big an issue is

25  it.

163

1          MR. KRASNOW:  We don't believe it should be a

2    significant issue in terms of the overall negotiations.  That

3    doesn't mean that they're not entitled to the information.

4    They should certainly have it and will be provided. As soon as

5    we get it we will forward it to them.

6          THE COURT: I heard testimony earlier about some

7    agreed dates for additional site visits.  When is that coming

8    up?  Remind me of the testimony.

9          MR. STROCHAK: August 11th, Your Honor, to visit the

10   metals facility in Rochester, I believe.

11         THE COURT: Are there any other additional site visits

12   that need to be scheduled?

13         MR. STROCHAK: That's the only one.

14         THE COURT: Do you agree with that, Mr. Silverstein,

15   or Mr. Bracht?

16         MR. SILVERSTEIN: Yes, Your Honor.

17         THE COURT: Go ahead, Mr. Krasnow.

18         MR. KRASNOW: So, again, Your Honor, what we see here

19   is -- we hope to be in a position -- we will commit, Your

20   Honor, to provide the information --

21         THE COURT: You're not taking August off?

22         MR. KRASNOW: Your Honor, during my past thirty plus

23   years there was an August, I remember one summer, where I said

24   at the end of August I could have taken that month off.  I

25   should do it --

164

1              THE COURT: Bankruptcy is slow, Mr. Krasnow.

2              MR. KRASNOW: Your Honor, in my 35 years there was one

3      August that I was able to take off.

4              THE COURT: This is a slow bankruptcy year.

5              MR. KRASNOW: Your Honor, times have changed.  But

6      there are people who will be away and --

7              THE COURT: So the partners are going to continue

8      working and your associates are going away.

9              MR. KRASNOW: Your Honor, isn't that always the case.

10     I don't mean to make light of it but I think what this all

11     points out is that it will take at least two months for the

12     parties to test the waters, review the information, challenge

13     one another and try to determine whether or not indeed we can

14     have a consensual plan.

15             THE COURT: Let me hear from Mr. Bracht or Mr.

16     Silverstein.  I don't mean to cut you off but I think I --

17             MR. KRASNOW: No, Your Honor.

18             MR. SILVERSTEIN: Thank you, Your Honor.  Paul

19     Silverstein, Andrews Kurth for the Committee.

20             Your Honor, the debtors haven't adduced any evidence

21     supporting the continuation of exclusivity.  I say that because

22     what I hear the debtor saying is that -- they're saying we're

23     the debtors and we should get it.

24             THE COURT: I don't hear them saying that at all.

25     What I heard in the evidence was -- Debtor's Exhibit 1 was a

165

1   fairly complete time line of when specific requests were filled

2   and the Committee's Exhibits A, B and C were its requests for

3   information.   Exhibit A was the first request; Exhibit B set

4   priorities for receiving the information.   It had comments

5   about when things -- various things would be received or what

6   they were told.   So listening to the evidence from both sides

7   it appears to me that there has been, with some starts and

8   stops there has been between the professionals at least there

9   has been an exchange of information.   34,000 pages isn't

10  necessarily meaningful to me in a sense because you can get a

11  lot of --

12          MR. SILVERSTEIN: A lot of public filings can make up

13  those 34 --

14          THE COURT: On the other hand, I didn't hear your

15  professionals saying they refused to give us stuff that we

16  absolutely need or -- say look, from my own experience and

17  practice I wasn't a bankruptcy lawyer but I know how long it

18  takes to do projections.   I put on all these experts on

19  valuation and I just -- it was like pulling teeth sometimes to

20  get them to put their valuations together, the projections, the

21  assumptions and tinkering with the numbers and moving them.   It

22  doesn't happen overnight.   We're four months into the case.

23          MR. SILVERSTEIN: But, Your Honor, what I heard from

24  the testimony and what I think the transcript will verify what

25  I heard was that essentially it was a version of teeth pulling

166

1   and only until Your Honor on June 25th in a conference call,

2   and I think you kind of threw your hands up and said give the

3   Committee what they want.

4       THE COURT: I was on the phone.  You couldn't see

5   whether my hands were up or not.

6       MR. SILVERSTEIN: I said I assume.  Figuratively you

7   threw your hands up and you said to the debtors give the

8   Committee the documents that they want.

9       THE COURT: No.  You know what, Mr. Silverstein.  On

10  that call I, with all due respect to both sides because I

11  thought you were all being childish, quite honestly.  That's

12  been sort of the tone and tenor of this case from the start.

13  The Committee initially all it wanted to talk about was the

14  pre-petition period and the frustration and problems you had,

15  and the debtor, the Committee is being unreasonable.  You can

16  behave collectively.  This is not singling you out the way you

17  want but when I heard the evidence today as opposed to the

18  arguments of counsel, either on the phone or in court, what I

19  got was a much clearer picture that -- as between Mr. Haras and

20  Mr. Ultz they've had a professional relationship and requests

21  have been made and -- on some of them a big surprise.  They

22  said we have to go back -- before we can agree to give you that

23  I got to go back and check with counsel and they've done it and

24  largely stuff has come.  You're saying you think it's been

25  unreasonably slow.  They say we think we've been responsive.  I

167

1  think the answer is you've gotten a lot of information.

2         MR. SILVERSTEIN: We certainly got information and

3  certainly --

4         THE COURT: And you're down into the three categories

5  that Mr. Ultz says he needs in order to sort of complete his

6  valuation analysis.

7         MR. SILVERSTEIN: Right.  The focus, Your Honor, if

8  you will, on one of the three and one of the three is very

9  significant.  One of the three is the backup for the

10  projections and what's bizarre to me --

11         THE COURT: No, he said he got a lot of the backup.

12  There's still some backup items that he wants.

13         MR. SILVERSTEIN: There's a lot of backup that he

14  doesn't have and what's absurd to me for someone who's been in

15  this arena --

16         THE COURT: Don't overstate it.  I'm sure it's not --

17         MR. SILVERSTEIN: I'm not trying to overstate it, Your

18  Honor.  The testimony was the testimony and Mr. Bracht will --

19  he'll correct me if I'm overstating something I assure you.

20  He's done that on occasion in the past.

21         But the fact that we don't have the backup to the

22  projections is telling because when the debtor kept sending us

23  emails saying well, we're reformatting it for you so it's more

24  easy for you to understand --

25         THE COURT: I'm not going to go through all these

168

1    exhibits with you.

2              MR. SILVERSTEIN: And I don't want you to.

3              THE COURT: Mr. Silverstein, stop.  Stop.  I won't go

4    through all of these but my -- I will go back and look at my

5    notes and look at the exhibits but what I took away from the

6    testimony was a lot of backup has been provided.  Some of it

7    for reasons I can understand you want -- was it, CSM as opposed

8    to the part by part build up, and you want it in a different

9    format.  Reasonable request.  I didn't have any doubt --

10             MR. SILVERSTEIN: We would have taken the raw backup,

11   Your Honor, because we could look at the raw backup just like

12   the debtor's professionals --

13             THE COURT: Their position is they gave you the raw

14   backup.

15             MR. SILVERSTEIN: I don't think that's the testimony,

16   Your Honor.  They didn't give us the raw backup at all.

17             THE COURT: They say they do a part by part build up.

18   That's what they gave you.

19             MR. SILVERSTEIN: I don't mean to correct you but

20   that's not the testimony.  The testimony is that we do not have

21   -- SRR does not have the backup for the projections to make

22   sense of the projections.

23             THE COURT: That's not what the testimony was.

24             MR. BRACHT: May I, Your Honor?

25             THE COURT: Go ahead.

169

1              MR. BRACHT: I don't know if this is appropriate or

2    not.  There's two sets of backup.  The one set is the part by

3    part which is --

4              THE COURT: Which you got.

5              MR. BRACHT: Which we got but is -- I don't want to

6    overstate but I think it's basically meaningless because we

7    don't have a part -- we don't -- we can't associate those parts

8    with a particular platform or a particular customer.

9              THE COURT: I understand you want by platform.

10   Reasonable request.

11             MR. BRACHT: What we thought we were going to get was

12   the CSM build up and the customer budget or customer projection

13   build up and historical bridge so we could look at the

14   projections and see whether or not they are at all consistent

15   with what has happened in the past.

16             THE COURT: Perfectly reasonable.

17             MR. BRACHT: And that's what we didn't have.

18             THE COURT: A perfectly reasonable request you made.

19             MR. SILVERSTEIN: Your Honor, the process by which we

20   -- again, we've talked about it.  I don't need to explain it

21   again.  I think our papers have described the process.  I think

22   the witnesses have described the process but let me talk about

23   the law for a minute.

24             Adelphia has been focused on because even though I'm

25   sure Judge Gerber's bench memorandum was in his mind never

170

1   going to be viewed as the seminal case in the Southern District

2   but apparently it is now.

3           THE COURT: I don't know.  That's what you both

4   focused on.

5           MR. SILVERSTEIN: Well, we both focused on it so we're

6   dealing with those factors.  Those factors are not --

7           THE COURT: He didn't make these up.  He took them

8   from other cases.

9           MR. SILVERSTEIN: Exactly.  He took them -- Lackman &

10  Woods was 1980 or whatever, but what does it mean for the

11  debtors not to get an extension of exclusivity.  I think what

12  you've heard and I think what you should have taken away from

13  today's testimony is that the Committee today because its

14  processionals are truly professionals is not prepared to

15  propose a plan because we want to finish our work.  SRR wants

16  to finish its work.  Shortly the Committee will be in a

17  position to propose a plan if the Committee cannot reach a

18  consensual resolution with the debtors and we're clearly

19  willing to try it. As the debtor said they're willing to try

20  and sit down and I think that will happen.

21          But the difference between the debtor having

22  continued exclusivity or not having continued exclusivity is

23  that there's not a level playing field and the debtor always

24  keeps with this exclusivity that I don't believe they've set

25  forth a basis for.  They always have the upper hand in terms of

171

1    the take it or leave it, it's our plan, we'll go cram you down.

2    That's why to us -- not extending exclusivity it is appropriate

3    here given that there's no evidentiary basis for it.   It also

4    doesn't hurt the debtor.   It puts everyone in a level playing

5    field so that in the two weeks that the debtor suggests that

6    we're going to need to finish our work because they say they're

7    going to give us the documents which I trust they will --

8              THE COURT: Your witness said three weeks.

9              MR. SILVERSTEIN: Three weeks.   Two weeks, three

10   weeks, whatever the time is, and I'm sure that the debtor will

11   do its best because it's in open court today saying it's going

12   to do it to get us those materials.   We will have those

13   materials.   We're not going to file a plan in three weeks.   But

14   we're going to sit down at the table with the debtors and

15   there's going to come a point where we're going to decide which

16   direction we need to go in.   Based on the prior history, as I

17   think Your Honor recognized from the testimony, we're very

18   skeptical.   We're skeptical but we're professionals and we're

19   going to see the entirety of the backup for the debtor's

20   numbers.

21             One of the interesting things is that Mr. Krasnow

22   made a factual argument here about how the after market

23   business is really going to carry the day and change the

24   business.   As of today 47 percent is OEM.   29 percent of the

25   business is after market, and I think the other 20 is medical.

172

1   These are dramatic astounding numbers but as the witness --

2           THE COURT: The OEM goes down and the after market

3   remains the same the percentage will increase but that's not

4   going to help anybody.

5           MR. SILVERSTEIN:  That's a fair point.

6           But my point, Your Honor, is all you would be doing

7   by extending the debtor's exclusivity without a factual

8   basis --

9           THE COURT: They made a factual.

10          MR. SILVERSTEIN:  The factual basis is we're the

11  debtors and we're being a debtor and we filed our operating

12  reports and we're paying our debts as they come due --

13          THE COURT: Mr. Krasnow went through the -- most of

14  the Adelphia factors.

15          MR. SILVERSTEIN: I'd like to go through the factors.

16          THE COURT: Go ahead.

17          MR. SILVERSTEIN: How about the existence of good

18  faith progress toward reorganization; we say no.  How about

19  whether the debtor has demonstrated reasonable prospects for

20  filing a viable plan.

21          THE COURT: Do you have any cases that say into four

22  months into the case with facts anything similar to this is

23  appropriate to either terminate exclusivity or refuse to extend

24  exclusivity?

25          MR. SILVERSTEIN: I don't have a case with a simple

173

1  capital structure and I don't have a case with an 18 month

2  negotiation pre-petition.  I think those are particularly

3  significant factors that we have here and the answer is it's a

4  fact based determination.  I don't think Your Honor relies on

5  cases because if you talk about Adelphia, Your Honor --

6          THE COURT: I think the cases made clear that the

7  court has discretion in deciding whether or not to extend

8  exclusivity.

9          MR. SILVERSTEIN: Correct.

10         THE COURT: But I'm looking for what are the guide

11 posts in prior case law.

12         MR. SILVERSTEIN: I'll give you a guide post from

13 Adelphia.  According to Judge Gerber, there were billions of

14 dollars in support of the plan.  There was a small group of

15 bondholders represented by Mr. Krasnow's former partner who

16 referred to the factors as platitudes if I remember because he

17 said that they really didn't matter and Judge Gerber said no,

18 this plan seems viable to me.  I have billions of dollars of

19 creditors supporting this plan and therefore I think it should

20 go out for a vote.

21         THE COURT: It was a decision on the motion to

22 terminate exclusivity although the same factors --

23         MR. SILVERSTEIN: Same factors, different burden.

24 Same factors, different burden.  Here, the debtors have the

25 burden and again, the debtor --

174

1          THE COURT: Fortunately for you all this case is not

2    Adelphia.

3          MR. SILVERSTEIN: Fortunately for Your Honor as well

4    because that was a nightmare of a case.

5          But I think that leveling the playing field so the

6    parties can attempt to negotiate is the right thing to do here

7    because it basically fosters the interests of what the debtor

8    needs and fosters the interests of what the Committee needs.

9    You level the playing field.  They can file a plan, we can file

10   a plan.  We're telling you we're not going to file a plan for

11   three weeks because we're not going to be ready.  We're also

12   telling you that we're going to sit down with the debtors.

13         THE COURT: Well, I don't know that it levels the

14   playing field.  If and when exclusivity ends for whatever

15   reason it ends, there's lots of arguments that the playing

16   field has shifted strongly to the creditors rather than it

17   being a level playing field but that's all hypothetical.

18         MR. SILVERSTEIN: I suppose it depends on which side

19   of the glass one's looking at perhaps, but the answer is to us

20   that again, we frankly appreciate Your Honor's time today

21   because I think we feel comfortable based upon the comments --

22   the debtors will give us the documents and the data that we

23   have not received today.

24         THE COURT: I think they would have done it anyway.

25         MR. SILVERSTEIN: I'm not so sure.  I don't think they

175

1  would have done it so quickly before the July -- before the

2  June 25th conference call and before the proceedings in respect

3  of the Committee's motion.  I think the notion of an extended

4  exclusivity period for the debtors here is just unwarranted

5  because there's no basis.  The debtor has to do something more

6  than say we filed our operating reports, we're paying our debts

7  as they become due, we filed our schedules.  Your Honor,

8  they --

9        THE COURT: They've said a lot more.  They're going to

10 have a disclosure statement.  You have a plan on file

11 without -- didn't have the backup.  You're going to have the

12 disclosure --

13       MR. SILVERSTEIN: Right.  Which is a place holder.

14       THE COURT: You're going to have a disclosure

15 statement next week.  You've gotten 34,000 pages of material.

16 There's still more to come.  You've appropriate -- your

17 financial advisors appropriately indicated information that SRR

18 believes it needs to complete its analysis and I've heard the

19 debtor say they're working to get it to you as soon as

20 possible.  Between -- listening to the testimony of the

21 professionals I didn't hear anything about them being at logger

22 heads.  Your professionals wished they had the information

23 sooner but they're working to get it.

24       MR. SILVERSTEIN: Correct.  The logger heads are in

25 respect of the extreme skepticism at the hockey stick

176

1    projections in this environment.  That's the logger heads.

2            THE COURT: At some stage we'll probably find out,

3    right, because if -- if they can't sustain a valuation that

4    would support anything to the equity there won't be anything

5    for the equity and that's going to -- they're going to have to

6    show that.

7            MR. SILVERSTEIN: They're going to have to show that,

8    Your Honor, but I think -- that's correct, they will have to

9    show that.

10            THE COURT: But I don't find any cases that say that

11    that's appropriate -- that's the appropriate test for

12    determining whether to extend exclusivity.  I was interested in

13    listening to it because I thought it would go to -- it would

14    help enlighten me whether the debtor has been proceeding in

15    good faith with respect to proposed negotiations.  I heard you

16    in our last phone call say that, quite properly, that the

17    Committee wasn't going to be in a position to move forward

18    because I asked -- you had a meeting. We had a hearing.  I

19    asked all to agree on a date.  You had a date.  You met, and

20    then I asked you where -- I got a report on what happened and

21    you told me quite reasonably that the Committee wasn't going to

22    be in a position to move forward with negotiations until it had

23    the projections and that I take to mean the backup for the

24    projections as well.

25            MR. SILVERSTEIN: At that point we didn't have the

177

1  projections.

2          THE COURT: Right. And you filed your brief and you

3  said we don't have backup.  They filed their reply and they say

4  now you have the backup.  Today -- here, well, you have some of

5  the backup but not all the backup, it's going to be

6  forthcoming.  So four months into the case you've gotten a lot

7  of information.  Most cases I'd be surprised if a Committee has

8  gotten financial projections that support a plan because most

9  cases you've got to restructure the business.  Nobody knows

10 what the stabilized business is going to be like.

11         MR. SILVERSTEIN: Again --

12         THE COURT: So now you have projections.  You're

13 getting the remaining backup.  Your advisor says we need

14 approximately three weeks once we have the remaining

15 information.  Mr. Krasnow is telling me more or less it's going

16 to take them another few weeks, three weeks, I don't know, to

17 get the remaining information that SRR has asked for.

18         Is that a fair comment, Mr. Krasnow?

19         MR. KRASNOW: Your Honor, I don't want to commit on --

20         THE COURT: That's your appraisers.

21         MR. KRASNOW: Since we can't generate on the appraisal

22 side --

23         THE COURT: You pay them though.

24         MR. KRASNOW: Your Honor, we will endeavor to get that

25 information as promptly as possible.  Certainly with respect to

178

1    the other of the three items, some of it has -- one of those

2    items I believe has been satisfied or certainly will this week.

3    The NOLs shortly.

4             THE COURT: You'll communicate as to whether it has or

5    not.

6             MR. KRASNOW: Absolutely.  So well within that time

7    frame.

8             THE COURT: Go ahead, Mr. Silverstein.

9             MR. SILVERSTEIN: I'm sorry, Your Honor.

10            THE COURT: Go ahead.

11            MR. SILVERSTEIN: Thank you.  Your Honor, the one

12   thing that I need to focus back on is really the testimony,

13   including Mr. Welch's testimony, where in the most gentlemanly

14   fashion possible I think he suggested to Your Honor that the

15   debtors have drawn a line in the sand and the debtors basically

16   are seeking control here and they're seeking exclusivity to

17   continue to exercise control over the case and over the

18   business.

19            THE COURT: I didn't hear the same testimony you're

20   referring to.  I was very interested in Mr. Welch's testimony

21   and I heard him express that the Committee was taken back since

22   the company -- this is with respect to the pre-petition bids,

23   the information they got once they got post petition, when they

24   got to see the actual documents.  They were surprised by that.

25   I heard him talk about the 2007 and 2008 EBIDA projections that

1  he said the company knows the numbers can't be reached, but

2  what I heard him say is the Committee is always optimistic

3  about arranging a consensual plan.  They view the information

4  from the company with healthy skepticism.  That's all

5  completely appropriate.  He said we're willing to negotiate.

6  We're still at an impasse.  The Committee will not support --

7  he said the Committee wouldn't support this plan because "we're

8  uncomfortable with the projections."  Until you've gotten all

9  the backup I could understand that but I didn't hear Mr. Welch

10  say that they just -- that the Committee thinks that -- at this

11  stage based on what the debtors told it it makes no sense to go

12  ahead and negotiate.

13        MR. SILVERSTEIN: No, I --

14        THE COURT: I heard Mr. Welch express appropriate

15  skepticism but a willingness to sit down and negotiate.

16        MR. SILVERSTEIN: I --

17        THE COURT: In which I've heard the same thing from

18  the debtor.

19        MR. SILVERSTEIN: I think there is a willingness to

20  negotiate but I think that the skepticism is very, very

21  significant and the history here, including the projections

22  that Your Honor got a little taste of today which are hockey

23  stick projections, make the debtor's plan in our view, in the

24  Committee's view not viable.

25        THE COURT: Mr. Krasnow says we never said that this

180

1  plan is it.  You've got to sit down.  You need to talk about

2  the projections.  If your advisors say hey, look, the projected

3  volumes for the auto industry over the next five years are so

4  dismal now there's -- you can't support projections that expect

5  beginning in 2010 numbers his company has never in its wildest

6  dreams achieve.  I didn't hear Mr. Krasnow say that the debtor

7  is going to take the position no, this is it, this is the basis

8  for the valuations, this is the basis for the plan.

9          MR. SILVERSTEIN: I think Mr. Krasnow is very careful

10  to say that -- I'm not saying we're not going to take that

11  position but we will try to negotiate which obviously no one is

12  going to come before Your Honor and say we're not going to

13  negotiate.  I don't -- I think that's pretty absurd to suggest

14  that someone is going to say that.

15          But my point, Your Honor, is that if you're

16  suggesting a two, three-week extension so that the parties can

17  exchange the documentation --

18          THE COURT: I'm not.  I'm not suggesting that, no.

19          MR. SILVERSTEIN: Because that --

20          THE COURT: I have a motion for a ninety-day extension

21  and I'll rule on it.

22          MR. SILVERSTEIN: Correct.

23          THE COURT: And I may grant nothing and I may grant

24  something less than the ninety days.  I haven't decided what

25  I'm going to do yet.

181

1          MR. SILVERSTEIN: I appreciate that, Your Honor.  I

2    just -- again, I don't need to rehash what Your Honor has heard

3    today, but based on the case law and based on Adelphia, they

4    haven't met the standard.  It's not -- Adelphia, again, sets

5    forth the standards but if you go through them size and

6    complexity, not large, not complex.  Necessity for sufficient

7    time to permit the debtor to negotiate, I mean they've had

8    ample time.  They just haven't really done it.

9          THE COURT: Four months is --

10         MR. SILVERSTEIN: Four months in a eighteen-month pre-

11   petition really, Your Honor, is a significant amount of time

12   particularly when the debtors know where they're going because

13   where the debtors are going is the debtors are attempting --

14   the equity is attempting to keep control of this business.

15         Your Honor, as I think I said at an earlier

16   hearing --

17         THE COURT: What I told you at an earlier hearing

18   either on the phone or in person or both what I care about is

19   what has gone on post petition --

20         MR. SILVERSTEIN: I know that.

21         THE COURT: -- and not what went on pre-petition.

22         MR. SILVERSTEIN: I appreciate that but it's very hard

23   for people who are involved pre-petition for eighteen months

24   not to have some of their perceptions and views affected by

25   what happened in the past because typically in the past -- what

182

1  happens in the past affects the present and affects the future.

2  We understand where Messrs. Delino and Lubin.  Again, I think I

3  said this in a prior hearing.  This is their business from the

4  last twenty, thirty years.  We understand what they're fighting

5  for.  Essentially an extension of exclusivity would be akin to

6  giving an equity committee exclusivity because that's what

7  they're doing.

8          Your Honor, we didn't talk about -- in the testimony

9  here we didn't talk about the whole classification issue

10 because I don't think Your Honor wants to deal with

11 confirmation issues but it just goes to viability.  When a

12 debtor has to reach to try to create an asbestos class --

13         THE COURT: As you say, I didn't hear any testimony

14 about it.  I read stuff in the briefs about it.  I didn't hear

15 any testimony about it.  I'm not going to deal with it.

16         MR. SILVERSTEIN: Right.  But you saw things in the

17 briefs about it and --

18         THE COURT: I know but I'm going to base a decision on

19 the record evidence.

20         MR. SILVERSTEIN: I understand but the plan is on

21 file.  I believe the plan -- the plan is in the record and the

22 plan talks about an asbestos class and I think it's undisputed

23 and uncontroverted that never in the history of this company

24 has asbestos liabilities ever been mentioned in a public

25 filing.

183

1          THE COURT: So why didn't you put on some evidence
2  about it?  If you wanted to deal -- first of all,
3  classification is not relevant.
4          MR. SILVERSTEIN: That's why we didn't put evidence
5  on, Your Honor.
6          THE COURT: Then don't argue about it.
7          MR. SILVERSTEIN: I'm mentioning it because it's
8  relevant.  It wasn't necessary to put testimony on, Your Honor,
9  because I think it's clear what the --
10         THE COURT: If you didn't put evidence on it it's not
11 relevant to my decision.
12         MR. SILVERSTEIN: Again, the plan is a matter of
13 record, Your Honor, and I think the debtor --
14         THE COURT: I'm not ruling on classification.
15         MR. SILVERSTEIN: I don't expect you to rule on
16 classification. What I expect -- what I would request that you
17 consider strongly in ruling on this is the viability of a plan
18 that has to stretch to the point where it appears or one is
19 skeptical that there's manufacturing classes --
20         THE COURT: I assume it's your position that equity
21 gets zero unless --
22         MR. SILVERSTEIN: I'm not positive.
23         THE COURT: -- unless the unsecured creditors recover
24 full value.
25         MR. SILVERSTEIN: Correct.  I'm not positive what that

184

1    number is because I think as you heard --

2              THE COURT: I'm not either.

3              MR. SILVERSTEIN: We're not finished with --

4              THE COURT: Correct.

5              MR. SILVERSTEIN: -- our valuation analysis.  But

6    based on what we know today and based on what we've heard and I

7    think based on the testimony Your Honor heard, the skepticism

8    seems to be based in some fact that we know.

9              THE COURT: And Mr. Welch, assuming that exclusivity

10   is extended, Mr. Welch as chairman of the Committee and your

11   financial advisors -- I'm sure you've got sophisticated --

12   you've got a sophisticated Committee and sophisticated

13   professionals and you'll go and you'll knock heads in

14   negotiations.

15             MR. SILVERSTEIN: That may happen, Your Honor.  We can

16   knock heads in negotiations but giving the debtor --

17             THE COURT: What I don't know want them to see, Mr.

18   Silverstein, is until negotiations have gone forward with the

19   grounding that each side needs, in this case meaning the

20   Committee needs, the information your financial advisors say

21   they need and the testimony supports that they need, until they

22   have that serious negotiations can't go forward.  Maybe we're

23   three or four weeks away from that.  So how am I supposed to

24   decide that post petition there -- there haven't been and can't

25   be good faith negotiations between the creditors and the debtor

185

1  when you've made clear and I agree with you a hundred percent

2  until you have the information the Committee is not in a

3  position to go forward with the negotiations.  I'm hearing

4  today that we're three or four -- we're three or four weeks,

5  maybe a little longer because you're -- Mr. Ultz testified they

6  need approximately three weeks when they have the remaining

7  information.  If they've gotten -- if there are a few remaining

8  items I'm not sure whether the real estate appraisals are going

9  to really drive the outcome here.  I think it's the ongoing

10  business and the projections of the ongoing business.  So when

11  you have that he's going to be -- you're not going to wait to

12  get that last little bit of information to go ahead and

13  complete his work.

14          MR. SILVERSTEIN: I suspect that's right.

15          THE COURT: So by Labor Day you're all going to be

16  ready to sit down and have a serious negotiation.

17          MR. SILVERSTEIN: Your Honor, I have no problem as I

18  think Mr. Welch's testimony as chairman of the Committee, the

19  Committee has no problem with the serious negotiations.  We

20  frankly would look forward to it.  The problem is that when one

21  extends the debtor's exclusivity one gives the debtor an

22  advantage or a club in the negotiation.  It's like taking the

23  protective shield of Chapter 11 and turning it into an

24  offensive sword.

25          THE COURT: I've heard your argument on that.  I've

186

1   read it in the papers.

2           Any additional points, Mr. Silverstein?

3           MR. SILVERSTEIN: No, Your Honor.

4           THE COURT: Mr. Krasnow.

5           MR. KRASNOW: No, Your Honor.  I actually have no

6   argument.

7           THE COURT: Then you don't need to.

8           MR. KRASNOW: I just want to raise two points or one

9   point.

10          THE COURT: Okay.

11          MR. KRASNOW:  I'm not sure when Your Honor will be

12  rendering a decision with respect to the motion.  Our exclusive

13  period -- the initial exclusive period ends tomorrow and so I

14  was going to request of the Court that if the Court would

15  entertain entering a bridge order to extend exclusivity until

16  Your Honor makes a determination with respect to the motion so

17  that we don't have an inadvertence.

18          THE COURT: Mr. Silverstein.

19          MR. SILVERSTEIN: We obviously do not object to a

20  bridge order until Your Honor decides.

21          MR. KRASNOW: Perhaps Your Honor could so order the

22  record.  That would I think deal with it.

23          THE COURT: Why don't you -- it's going to be easier

24  for me if you just submit just a one or two sentence order.

25  Just email it to us and it will get entered tomorrow a bridge

187

1   order extending exclusivity until the Court rules on the

2   pending motion which is not going to take a long time.  It

3   won't be tomorrow. So it's wholly appropriate.  I appreciate

4   your agreements.

5              MR. KRASNOW: I'm a very cautious guy and things could

6   happen which is why I was -- but that's fine, Your Honor.

7              The only other ministerial --

8              THE COURT: It's already twenty after five.

9              MR. KRASNOW: The only other ministerial matter I'd

10  like to --

11             THE COURT: Orally stay on the record.  I'm granting

12  the bridge --

13             MR. KRASNOW: Thank you, Your Honor.

14             THE COURT: An oral motion to enter a bridge order

15  extending exclusivity until the Court rules on the pending

16  motion.

17             MR. KRASNOW: Thank you, Your Honor.

18             THE COURT: Mr. Krasnow or one of his colleagues will

19  submit a written order tomorrow just confirming what I've ruled

20  from the bench.

21             MR. KRASNOW: Your Honor, one other ministerial --

22             THE COURT: Go ahead.

23             MR. KRASNOW: That is with respect to the disclosure

24  statement.  As I indicated --

25             THE COURT: You mean the last order I signed doesn't

188

1   do it for you.

2           MR. KRASNOW: Yes, Your Honor.

3           THE COURT: I just signed it.  The ink is barely dry.

4           MR. KRASNOW: Your Honor, at the time we filed the

5   motion we thought that we would be filing it tomorrow.  It's

6   not the case.  If Your Honor would entertain yet another oral

7   application to extend the date until a week from Friday which I

8   believe is August 8th.  As to that, Your Honor, we actually do

9   have an order which we would like to submit.  We have not yet

10  shown it to counsel.  They certainly hadn't objected to the

11  last motion --

12          THE COURT: Mr. Silverstein.

13          MR. SILVERSTEIN: Again, the exclusivity -- as far as

14  that order -- I don't know what the order means.  I defer to

15  Your Honor's judgment.  I have nothing to say.

16          THE COURT: Okay.  Do you need the consent of your

17  lender to do this?

18          MR. KRASNOW: Your Honor, we have been advised by

19  the -- we don't need the consent of a lender but the lender has

20  indicated that it has no objection to the extension.  So it's

21  not going to trip anything.

22          THE COURT: Have you shown Mr. Bracht and Mr.

23  Silverstein the order?

24                  [Pause in proceedings.]

25          MR. SILVERSTEIN: Again, I don't like decretal

189

1  paragraphs to say order the motion is granted.  I like the ones

2  that say the motion is granted.  So if you take that out I'm

3  fine.

4          THE COURT: I'm sorry.

5          MR. SILVERSTEIN: I don't like decretal paragraphs

6  that say the motion is granted because there are a lot of

7  things in motions but the -- two succeeding decretal paragraphs

8  that say when their time extends until is fine.

9          THE COURT: The motion is granted to the extent

10 provided below.

11         MR. SILVERSTEIN: That's fine.

12         THE COURT: Just add --

13         MR. KRASNOW: To the extent, I'm sorry, Your Honor.

14         THE COURT: To the extent provided below and then --

15         MR. KRASNOW: Your Honor, we'll mark it and if we can

16 hand the disk --

17         MR. SILVERSTEIN: Thank you, Your Honor.

18         THE COURT: Thank you.

19         Anything else for today?

20         MR. KRASNOW: No, Your Honor.

21         MR. SILVERSTEIN: Nothing, Your Honor.

22         THE COURT: We're adjourned.

23                         * * * * *

24

25

190

1       I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5       _____

6                              Letha J. Wheeler

7  Dated:  August 17, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25