Hearing Date: October 28, 2008 at 10:00 a.m.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11 Case No.
                                                            :
**LEXINGTON PRECISION CORP., et al.,**                      :    08-11153 (MG)
                                                            :
Debtors.                                                    :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

**DEBTORS' REPLY TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS TO MOTION FOR AN ORDER**
**PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE FURTHER**
**EXTENDING THE EXCLUSIVITY PERIODS**

TO:    THE HONORABLE MARTIN GLENN,
       UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation and Lexington Rubber Group, Inc. (together, "Lexington" or the "Debtors"), as debtors and debtors in possession, submit this reply to the objection, dated October 21, 2008 (the "Objection"), of the official creditors' committee (the "Committee") to the Debtors' motion, dated October 7, 2008 for entry of an order extending the Debtors' exclusive right to file a plan of reorganization (the "Motion"), and respectfully represent:

1.      The Debtors continue to make progress toward confirmation of a plan of reorganization and the Committee's position that the case has not progressed is incorrect. It is undisputed that the Debtors have proposed a plan of reorganization and filed a proposed disclosure statement. They have completed detailed, bottom-up, five-year financial projections for each of their businesses, and, as economic circumstances have changed over the past several months, particularly in the automotive industry, they have updated and revised the projections. W.Y. Campbell & Co., the Debtors' financial advisor, has completed a valuation of the Debtors' business and on September 19, 2008, delivered to the Committee a 74-page valuation report that explains its conclusions on valuation in exhaustive detail. The Debtors intend to move the Court to approve the disclosure statement shortly and have that motion heard on November 24 – a schedule that will allow confirmation of a plan within the deadline set out in the cash collateral order at the beginning of the case.

2.      The Committee posits the theory that the Debtors are intentionally stalling these cases. Nothing could be further from the truth, and the evidence at the hearing will demonstrate that the Debtors have tried their level best to move the chapter 11 case forward. One need only glance at the headlines of any newspaper over the past two months to recognize the absurdity of the Committee's suggestion. Since early September, the economy has been in free fall and it shows little signs of improving any time before the February 25, 2009, deadline for confirmation of a plan under the cash collateral order. If the Debtors' motivation were, as the Committee alleges, to try to time the market in an effort to preserve a recovery for equity, they would have been rushing to confirmation in August and September in the hope that they could get out of chapter 11 before things worsened, not stalling in the hope of a miraculous economic recovery between now and February. Further, as the Court will see at the confirmation hearing,

the Debtors' valuation is premised upon 2008 operating results rather than on a forecast of earnings and cash flows for future years; any improvement in business based on the "hope that market and economic conditions get better," Obj. at ¶ 2, would have no effect on the valuation and is not necessary for the confirmation of the Debtors' Plan.

        3.      An extension of the exclusivity period through the deadline for confirmation set out in the cash collateral order is appropriate.  The Committee argues that it should have the right to propose a competing plan before the deadline established by the cash collateral order, but it points to no authority in support of its argument that the possibility the current financing for a case may expire necessarily compels denial of an extension of exclusivity. Obj. at ¶ 11.  Extension of exclusivity up to a financing termination date is not uncommon in Chapter 11.  See, e.g., In re Farmland Indus., Inc., 286 B.R. 888 (W.D.Mo. 2002) (noting that exclusivity had been extended until same date that debtor-in-possession financing expired).  In any event, the existence of a competing plan would not make it any more certain that a plan will be confirmed by the February 25 deadline.  A competing plan would just raise exactly the same valuation dispute that will be before the Court at confirmation if negotiations between the Debtors and the Committee are unsuccessful, while causing customers, vendors, and employees to question Lexington's ability to reorganize successfully.

        4.      At the hearing on the Motion, the Debtors will again demonstrate that they have provided the Committee's financial advisors with exhaustive financial information and have responded to their every request for clarification and backup detail.  The Debtors have made revisions to their forecasts – both downward and upward – based on issues raised by the Committee's financial advisors, as well as changes in the overall economy, changes in the markets the Debtors serve, and the most up-to-date input from their customers.  The evidence

will demonstrate the Debtors have not slow-rolled anything and have responded in a reasonable time period to every request. The Committee's implication, in footnote 3 of its Objection, that the Debtors did not provide critical information relating to the connector seals business until October 20, is a mischaracterization of the record. In fact, the Debtors provided the connector seals forecast to the Committee in July and furnished detailed backup data on August 25, 2008. The document delivered on October 20 was a *revised* forecast reflecting changes that have occurred in that business since July due to the recession in the OEM automotive segment. These changes, and the revised forecast, had been discussed previously with the Committee and its financial advisors, so there can be no contention that the Committee was first learning this information on October 20 as the Objection implies.

5. The Debtors have attempted in good faith to engage in negotiations with the Committee, but the Committee has insisted on a very formalistic process and declined to meet until it had satisfied itself that it had received every iota of financial information from the Debtors, and then received revisions to the projections it already had. For instance, the Debtors requested a meeting with the Committee in September or early October to discuss their valuation report, but the Committee declined to meet until it had received revised financial projections, even though the Debtors had advised the Committee informally of the nature of the forthcoming revisions and explained why they would not materially affect valuation. The Committee's approach to negotiations has demanded more time, and more of the Debtors' resources, than might be expected for a case of this size and complexity and this in itself is cause for an extension of exclusivity.

6. Although the path to the negotiating table has been arduous, on October 13, 2008, the Debtors met with the Committee for several hours to discuss the Debtors' forecasts

and valuation and to attempt to negotiate a plan. That meeting did not result in any narrowing in the gap between the parties on valuation, but the Committee has indicated it shortly will provide its own valuation to the Debtors and another meeting is scheduled for October 27, so the process continues.

7. Although it concedes, as it must, that it acts as a fiduciary to "*all* of the Debtors' unsecured creditors," Obj. at ¶ 4 (emphasis in original), the Committee dismisses the Debtors attempts to negotiate with asbestos personal injury claimants as irrelevant. While the Committee may be comfortable ignoring this constituency, the Debtors do not believe they have that luxury and have been working to formulate plan treatment for the several thousand asbestos personal injury claimants that will preserve the Debtors' argument that they have no liability on these claims while simultaneously conforming to the requirements of section 1129, all without triggering the need for a costly estimation proceeding. This is exactly the purpose of the exclusivity period – time for the Debtor to attempt to resolve issues rather than undertake litigation of every potential dispute.

8. The evidence will show that the Debtors continue their progress toward obtaining a commitment for exit financing. The Debtors are in negotiations with a prospective exit lender who has continued to express an interest in providing the exit financing on terms that will permit the Debtors to demonstrate the feasibility of their Plan. The lender has visited the Debtors' facilities, completed its field audit of the Debtors' current assets, and obtained appraisals of the Debtors' real estate, equipment, and inventories. At the request of the prospective lender, the Debtors are currently working with the appraiser to reconcile a difference between the appraiser's assessment of the liquidation value of the inventory and the Debtors' estimate of that value, all in the interest of maximizing the Debtors' borrowing availability. The

Debtors have already made meaningful progress and expect to make more progress in the next several days; however, it should be emphasized that, even at the current valuation of inventory, the proposed financing will still be viable.  Although the Debtors have not yet secured a commitment, the lender has indicated it intends to begin marketing this opportunity to prospective participants sometime next week and has been in near daily contact with the Debtors as the process moves forward, providing assurance that its interest is genuine.  The Committee suggests that conducting negotiations with a single lender is insufficient to demonstrate progress toward confirmation, but cites no authority for this proposition, nor are the Debtors aware of any.

9. The Committee points out that the Debtors' EBITDA is 18.5% below its projections for the three months ended August 31, 2008, and concludes from this "the value of the Debtors' business has diminished since the Petition Date."  Obj. at ¶ 2.  The Debtors direct the Court's attention to the attached Exhibit A, which details the Debtors' sales and EBITDA by operating division.  As Exhibit A demonstrates, the Debtors' Jasper, Georgia facility, which primarily supplies the automotive after market, and its Rock Hill, South Carolina facility , which supplies the medical device market exclusively, are actually slightly ahead of forecast for the three-month period.  These two divisions are the primary drivers of the Debtors' valuation and the Debtors believe that their value in the aggregate has actually increased since the valuation report was prepared.  As Exhibit A shows, the entire shortfall in EBITDA for this three-month period occurred in the Vienna, Ohio (connector seals), and Rochester, New York (metals), facilities, each of which is focused almost exclusively on the automotive OEM market.  The Debtors believe the financial performance of their Vienna and Jasper facilities is consistent with the experience of other companies serving the OEM market in these difficult times.  Furthermore, this shortfall has little, if any, impact on the Debtors' aggregate valuation because

W.Y. Campbell valued the Rochester facility on a wind-down basis and the Vienna facility at an amount that is very close to its wind-down value.  Obviously, the floor on the value of any business unit is the amount that could be realized in such a wind-down.

10. The Court's October 22, 2008 Order requested a reconciliation of the statement in the Motion to the effect that EBITDA for the April-August 2008 period was $4.5 million against information contained in the Debtors' monthly operating reports ("MORs").  The Debtors are prepared, if necessary, to present evidence at the hearing, but they believe that the table below and the attached Exhibit B should suffice to explain the difference.  In summary, the EBITDA of $1,196,000 as presented in the MORs is calculated after the deduction of all Reorganization Expenses incurred, a total of $3,348,000.  The Reorganization Expenses of $1,496,000 that the Court added back come from the schedules of cash disbursements, which excluded the accrued but unpaid Reorganization Expenses as of August 31, 2008, of $1,852,000.

| EBITDA (from MORs) | $1,196,000 |
| --- | --- |
| Plus Add-Back for GAAP Reorganization Expenses (Paid and Accrued) | +$3,348,000 |
| Equals EBITDA Before Reorganization Expenses | =$4,544,000 |

WHEREFORE, the Debtors respectfully request the Court grant the Motion.

Dated: October 24, 2008
New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and Debtors in Possession