1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3      ---------------------------------------X
       In Re:                              :   08-11153 (MG)
4                                          :
           LEXINGTON PRECISION CORPORATION,  :   One Bowling Green
5                                          :   New York, New York
                     Debtor.               :   October 28, 2008
6      ---------------------------------------X

7

8              TRANSCRIPT OF MOTION TO EXTEND EXCLUSIVITY
           APPLICATION FOR FEES OF WEIL, GOTSHAL & MANGES LLP
                APPLICATION FOR FEES OF ANDREWS KURTH, LLP
9           APPLICATION FOR FEES OF W.Y. CAMPBELL & COMPANY
            APPLICATION FOR FEES OF STOUT RISIUS ROSS, INC.
10               BEFORE THE HONORABLE MARTIN GLENN
                    UNITED STATES BANKRUPTCY JUDGE
11

12     APPEARANCES:

13

       For the Debtors:          ADAM P. STROCHAK, ESQ.
14                               CONRAY C. TSENG, ESQ.
                                 Weil, Gotshal & Manges LLP
15                               767 Fifth Avenue
                                 New York, New York  10153
16
       For the Bondholders:      PAUL N. SILVERSTEIN, ESQ.
17      Committee                JONATHAN I. LEVINE, ESQ.
                                 GERALD BRACHT, ESQ.
18                               Andrews Kurth LLP
                                 450 Lexington Avenue
19                               New York, New York  10017

20     For Webster:              SCOTT A. ZUBER, ESQ.
                                 Day Pitney LLP
21                               PO Box 1945
                                 Morristown, New Jersey 07962
22

23                               (Appearances continued on next page.)

24

25

       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

For Capital Source:          AARON R. CAHN, ESQ.
 Finance                     Carter Ledyard & Milburn LLP
                             2 Wall Street
                             New York, New York 10005

U.S. Trustee:                PAUL SCHWARTZBERG, ESQ.
                             U.S. Department of Justice
                             Office of the United States Trustee
                             33 Whitehall Street, 21st Floor
                             New York, New York 10004


Court Transcriber:           SALLY REIDY
                             TypeWrite Word Processing Service
                             211 N. Milton Road
                             Saratoga Springs, New York 12866

3

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES FOR THE DEBTOR:

| Dennis Wilhouse | 6 | 19 | 39 | | |
| Michael Lubin | 43 | 63 | 82 | | |

WITNESSES FOR THE COMMITTEE:

| Jesse Aultz | 88 | 101 | 110 | | |

EXHIBITS:

| | | Marked | Received |
|---|---|---|---|

Debtors:

| 1 | Summary of Operating Activities | -- | 8 |
| 2 | Unknown | -- | 15 |
| 3 | Valuation Report | -- | 17 |
| 4 | Document List | -- | 17 |
| 5 | Correspondence | -- | |
| 6 | Correspondence | -- | |
| 7 | Correspondence | -- | |
| 8 | Correspondence | -- | |
| 9 | Correspondence | -- | |
| 10 | Correspondence | -- | |
| 11 | Disclosure Statement | -- | 17 |
| 12 | Monthly Operating Report | -- | |
| 13 | Monthly Operating Report | -- | |
| 14 | Monthly Operating Report | -- | |
| 15 | Monthly Operating Report | -- | |
| 16 | Monthly Operating Report | -- | |
| 17 | E-Mail with Attachment | -- | 104 |

4

<u>INDEX</u>

<u>EXHIBITS</u>:                                    <u>Marked</u>      <u>Received</u>

<u>Committee's</u>:

H     Message from Kurt Haras              --          113

L     Series of E-Mails                    --           34

M     E-Mail                               --           35

N     Letter of Proposal                   --           81

O     Chart of Financial Performance       --           19

P     Source Document for Exhibit O        --           92

R     Comparison of Projections            --           99

S     Offer for Purchase                   --           95

V     September Monthly Operating Report   --           71

5

1   (Proceedings begin at 10:08 a.m.)

2           THE COURT:  Let me just check.  Am I correct that not

3   all counsel are here on IFL?  Okay.  They'll have to wait.

4           All right.  Lexington Precision, No. 08-11153.

5           MR. STROCHAK:  Good morning, Your Honor.  Adam

6   Strochak and Conray Tseng, Weil, Gotshal & Manges, for the

7   debtors.

8           THE COURT:  Mr. Strochak, I want to take the

9   exclusivity motion first.

10          MR. STROCHAK:  Fine, Your Honor.  Happy to do that.

11  Shall we start with the evidence?

12          THE COURT:  Yes, please.

13          MR. STROCHAK:  All right.  Your Honor, we would call

14  Dennis Wilhouse, the debtors' CFO.

15          THE COURT:  Okay.

16          You have to come up to the witness box.  And the

17  Reporter will swear you.  If you'd just stand and raise your

18  right hand.

19       [DENNIS WILHOUSE, THE DEBTORS' WITNESS, WAS SWORN.]

20          MR. STROCHAK:  Your Honor, I have a set of exhibits

21  for the bench.  May I approach?

22          THE COURT:  Yes, please.

23          MR. STROCHAK:  Thank you.

24          THE COURT:  And with respect to approaching the

25  witness, you don't need to ask permission.

Wilhouse - Direct                                          6

1          MR. STROCHAK:  Thank you, Judge.

2                      DIRECT EXAMINATION

3   BY MR. STROCHAK:

4   Q.   Mr. Wilhouse, would you just tell me what your employment

5   is, sir?

6   A.   I'm Senior Vice-President and Chief Financial Officer of

7   Lexington Precision Corporation.

8   Q.   And how long have you held that position?

9   A.   Since approximately 1990.

10  Q.   Sir, I'd like to start with a couple of questions about

11  the debtors' cash position.  Could you tell the Court what is,

12  as of as close to today as you come, the debtors' current cash

13  position.

14  A.   As of the close of business on Friday, October 24th, the

15  company had approximately $5.99 million of cash on hand.

16  Q.   Mr. Wilhouse, is that amount of cash sufficient to fund

17  the debtors' operating needs for cash?

18  A.   Yes.

19  Q.   Do you foresee the debtors having adequate cash through

20  February of 2009 based on your projections and the current

21  level?

22  A.   I do.

23          THE COURT:  Mr. Wilhouse, is Lexington drawn down on

24  its debt facility?

25          THE WITNESS:  No, sir, it has not.

Wilhouse – Direct                          7

1          THE COURT:  Okay.

2    BY MR. STROCHAK:

3    Q.    Mr. Wilhouse, is the company burning cash, that is is it

4    using more than it's generating from operations?

5    A.    The company is cash flow positive from operations.  We are

6    consuming cash in the Chapter 11 process.

7    Q.    Could you elaborate on that?  What do you mean by

8    consuming cash in the Chapter 11 process?

9    A.    I'll just give some numbers.  For the first eight months

10   of the year the company's cash flow from operating activities

11   is approximately $3.4 million and the reorganization expenses

12   that we've recorded on the books total $3.8 million.

13   Q.    Is there any other items that are draining cash from the

14   debtors?

15   A.    Just one correction.  The cash flow from operations is

16   $1.7 million, and if we add back to that the paid

17   reorganization expenses, the cash flow from true operating

18   activities would be $3.4 million.

19   Q.    On a monthly basis, you know, from year beginning January

20   1 through today, can you give an estimation of the average

21   monthly cash burn in connection with those reorganization

22   expenses and anything else?

23   A.    Well, I guess the way I would look at that is the cash

24   flow from operating activities is $3.4 million before

25   reorganization expense.  The reorganization expense for the

Wilhouse – Direct                                  8

1   eight months ended August 31st is $3.8 million.  In addition,

2   the other non-operating cash requirements we would have would

3   be principal payments to Capital Source, which over an eight-

4   month period would total about 1.9 million, and interest, cash

5   interest payments to Capital Source and the DIP holders, which

6   would be approximately another $1.9 million.

7   Q.   Capital Source is the debtors' pre-petition secured

8   lender; is --

9   A.   Yes.

10  Q.   -- that correct?

11  A.   Yes.  So what that would all work out to generally,

12  because there are considerable ups and downs in the cash flow

13  statement as receivables go up or down or inventories go up or

14  down or cap ex is more or less than you might anticipate, that

15  works out to a use of cash of roughly 500,000 a month after all

16  requirements.

17  Q.   Thank you.  Mr. Wilhouse, I'm going to approach and hand

18  you what we've marked as Debtors Exhibit 1 for the hearing.  It

19  is, just for the purposes of the record, it is the same

20  document that was Exhibit A to the reply papers we filed last

21  week.

22              [Pause in proceedings.]

23  Q.   Mr. Wilhouse, would you describe for the Court what

24  Exhibit 1 is?

25  A.   Exhibit 1 is a summary of the operating activities of

Wilhouse - Direct                                             9

1   Lexington Precision Corporation for the three months ended

2   August 31st, 2008.

3   Q.    And could you describe, sir, in general terms, the

4   financial performance for each of the debtors' business

5   segments, and let's start with the insulator's business.  How

6   has the insulator's business been performing?

7   A.    The insulator business has basically been performing right

8   to forecast.  I would -- I would guess like to answer your

9   question by addressing, if I may, the shortfall in EBIDA, which

10  on the schedule shows as $544,000.  So if I could ask everyone

11  to focus to the center of the page, you can see that the

12  shortfall in EBIDA really is being -- is a result of shortfall

13  at our Lexington connectors seals location and our metals

14  location, which is Lexington Machining in Rochester, New York.

15  Both of those businesses are essentially OEM automotive

16  component manufacturers.  And the shortfall in EBIDA there is a

17  direct result of the rather unexpected steep slide in the sale

18  of new cars and trucks in the U.S. and Europe.  The rest of the

19  business, the insulators business and the medical business --

20  now, the insulator business, I would like to add, is

21  essentially after market automotive components.  And the

22  medical components business, the parts we manufacture for

23  medical device manufactures, the forecast for those facilities

24  is essentially right on target from the EBIDA standpoint and a

25  net sales standpoint.

Wilhouse - Direct                        10

1   A.   And, pardon me, I'm not sure I remember if you said this

2   or not, but what segment does the connector seals business

3   serve, what market does it serve?

4           THE COURT:  Mr. Strochak, could you put that exhibit

5   up on the projector?

6           MR. STROCHAK:  Sure, Your Honor, I'd be happy to.

7                   [Pause in proceedings.]

8           THE COURT:  The 544 is in the last column; is that

9   correct, under --

10          THE WITNESS:  Yes, sir.

11          THE COURT:  -- increase or decrease the forecast?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  What you're saying is it's 544,000 below

14  forecast --

15          THE WITNESS:  Yes.

16          THE COURT:  -- on the total company basis?

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.

19          THE WITNESS:  Yeah, and you can see, just if you move

20  up a few lines, you can see the shortfall at connector seals of

21  450.

22          THE COURT:  Yes.

23          THE WITNESS:  And the shortfall at our machining,

24  which is called metals, Lexington Machining, you see the

25  shortfall at 198 there.

Wilhouse - Direct                         11

1          THE COURT:  So the only segment performing above

2    projections is the insulators and medical components?

3          THE WITNESS:  Yeah.  Actually, the OEM component of

4    our business is maybe a third of our business and I would say

5    roughly maybe 20 or 25 percent of our EBIDA.  But the insulator

6    business, which is automotive after market, and the medical

7    components businesses are basically right on.

8          THE COURT:  Okay, thank you.

9          Go ahead, Mr. Strochak.

10   BY MR. STROCHAK:

11   Q.   Let me turn, if I could, Mr. Wilhouse, to the process by

12   which the debtors prepared projections.  Could you just

13   describe in general terms for the Court the process by which

14   the debtors prepared financial projections.

15   A.    I can.  In basically June and July we began to prepare

16   forecasts for all of the facilities.  It started with sort of a

17   grounds-up approach, customer by customer, part by part.  The

18   forecasts were based on either CSM data or conversations with

19   customers in terms of their specific requirements.  So

20   basically we prepared sales projections based on that data for

21   the five years ended December 31st, 2012.  From that point the

22   controllers at all the locations took the sales data and went

23   through a process where they, you know, converted it to

24   financial statements, balance sheets and cash flow statements.

25   That information was all consolidated in our Cleveland office.

```
                        Wilhouse - Direct                    12
```

1  Q.   And when you say consolidated, was it consolidated into a

2  package of information?

3  A.   Yeah, it was consolidated into a package of information.

4  Q.   And was that the package that was done in July of this

5  year --

6  A.   Yes.

7  Q.   -- finalized in July of this year?

8  A.   Yes.

9  Q.   Have there been -- have you participated in any

10 discussions with representatives of the creditors committee and

11 their financial advisers regarding the debtors' projections?

12 A.   I haven't participated directly in discussions with the

13 creditors committee except for yesterday.  But I have

14 participated in discussions with their financial advisors, and

15 throughout that process it's fair to say their financial

16 advisors did find several sales items and so forth in the

17 budget that were incorrect.  So we basically just decided to

18 take it upon ourselves to make those corrections, and we're

19 currently working on a revised forecast.  In the revised

20 forecast some of the corrections --

21          THE COURT:  What do you mean they were incorrect?

22          THE WITNESS:  There were simply mistakes made, Your

23 Honor.  So basically what we're doing now is we're in the

24 process of preparing another forecast which will be completed

25 by the end of this week.  We're making adjustments for things

Wilhouse - Direct                    13

1  cited by the folks from SRR, and we're also making adjustments

2  the other way, as things have changed amongst customers.  So

3  there's some adjustments that take the sales number down,

4  there's some adjustments that take the sales numbers up.  And I

5  can tell you at this point in time, based on the numbers I

6  have, the numbers in the medical products division are pretty

7  much the same as they were in the first forecast, the numbers

8  in the after market business at Lexington insulators are pretty

9  much the same, but the numbers will be down at the OEM

10 facilities, connector seals and Lexington Machine.

11         THE COURT:  Are you using the same August 31 date or

12 are you rolling it forward to the end of September?

13         THE WITNESS:  Basically we'll use actual through

14 September and then do a re-forecast out through the end of

15 2012.

16         THE COURT: Okay.

17         Mr. Strochak, before you continue, are you going to

18 offer the exhibits as a group or are you going to do them one

19 by one, and have you discussed with the Committee's counsel

20 objections, are there objections to exhibits?

21         MR. STROCHAK:  We did confer as directed by your

22 Court's, the Court's order.  I don't believe there are any

23 objections to the exhibits.  I'm happy to just offer them all

24 as a group if there's no objection.

25         MR. BRACHT:  We have no objections to their exhibits,

```
                         Wilhouse - Direct                     14
```

1   Your Honor.  Gerry Bracht.

2           THE COURT:  Okay.  So what we can do, since there are

3   no objections, what's the full range of exhibit numbers that

4   you're going to be offering?  We can deal with it now and I

5   don't have to think about it again.

6           MR. STROCHAK:  It will be Debtors Exhibits 1 through

7   16, Your Honor.

8           THE COURT:  All right.  Debtors Exhibits 1 through 16

9   are admitted into evidence.

10          (Debtor Exhibits 1 through 16, Received.)

11          MR. STROCHAK:  Thank you, Judge.  Just one point of

12  clarification that I think will save us some time as we go on.

13  One exhibit that we've put in evidence is Debtors Exhibit No.

14  3, which it the draft valuation report prepared by the debtors'

15  financial advisors --

16          THE COURT:  Yes.

17          MR. STROCHAK:  -- W. Y. Campbell.  Just point of

18  clarification, we're not offering that as evidence of valuation

19  in this proceeding.  It's not offered as expert testimony.

20  It's offered simply to establish that the report was prepared.

21  You know, [indiscernible] that it was delivered to the

22  creditors committee, and we don't intend to turn this into a

23  evaluation hearing.

24          THE COURT:  All right.  Go ahead, Mr. Strochak.

25  BY MR. STROCHAK:

Wilhouse - Direct                          15

1  Q.   Mr. Wilhouse, I'm going to give you Debtors Exhibit 2 in

2  evidence.

3                    [Pause in proceedings.]

4            MR. STROCHAK:  Your Honor, just a point of

5  clarification.  Exhibit 2 addresses the question Your Honor

6  raised in the order last week, which we also --

7            THE COURT:  Yeah, I read your reply.

8            MR. STROCHAK:  -- elaborated on.

9            THE COURT:  Yeah.

10           MR. STROCHAK:  I'm happy to cover this as a matter of

11 evidence if the Court would like, but if the Court's satisfied

12 --

13           THE COURT:  I read the reply.  We'll see whether

14 there's cross-examination about it.  I'm -- I was -- I don't

15 have questions now at this point, so you don't need to cover it

16 unless you --

17           MR. STROCHAK:  Very well.  Thank you.  All right.

18 Your Honor, that's my final question.  We'll pass the witness.

19           THE COURT:  Okay.

20           MR. BRACHT:  Your Honor --

21           THE COURT:  Before you do that.

22           Now that I've admitted all these exhibits, I mean the

23 one thing I don't usually do is just let people dump exhibits

24 in, which is what I feel like sort of happened.  I thought you

25 actually were going to use these exhibits.  Could you elaborate

Wilhouse - Direct                                    16

1  on what you're doing?

2          MR. STROCHAK:  Sure, I'd be happy to, Your Honor.

3          THE COURT:  I mean I'm not looking -- because I do

4  review the evidence and I'm not looking forward to reading all

5  of your exhibits if they're not linked to the testimony.  Nor

6  do I want to prolong the examination unnecessarily, so if you

7  would just enlighten me.

8          MR. STROCHAK:  Sure, Your Honor.  There are certain

9  items on the exhibit list, exhibit -- items 12 through 16 are

10 the debtors' monthly operating reports.  They're submitted

11 essentially as background information.  I think the data in

12 those reports ties to the Exhibit No. 1 that we went over --

13         THE COURT:  All right.

14         MR. STROCHAK:  -- already, so they're essentially

15 offered as background.

16         THE COURT:  All right.  That's 12 through 16?

17         MR. STROCHAK:  12 through 16, exactly.

18         THE COURT:  Okay.

19         MR. STROCHAK:  Exhibits 5 through 10 is a series of

20 correspondence between myself and counsel for the creditors

21 committee.  It's, you know, a back and forth concerning the

22 negotiation and information flow process in the case.  Mr.

23 Lubin may allude to some of those documents in his testimony.

24 But, again, for the most part they're provided to establish a

25 record that we've had a series of communications with the

Wilhouse - Direct                              17

1  committee, and I may address some of them in closing arguments

2  --

3              THE COURT:  Okay.

4              MR. STROCHAK:  -- on the matter.  The Exhibit 3, the

5  valuation report, is as previously discussed.

6              THE COURT:  Right.

7              MR. STROCHAK:  Exhibit 4 is simply a list of

8  documents that have been provided to the creditors committee.

9  Mr. Lubin will allude to that in his testimony.  And the last

10 one is Exhibit 11, Your Honor.  That's the copy of the

11 disclosure statement --

12             THE COURT:  All right, that's fine.

13             MR. STROCHAK:  -- that we filed.  Is that helpful?

14             THE COURT:  Yes, that is.  That's helpful.

15             All right.  Cross-examination?

16             MR. BRACHT:  Thank you, Your Honor.  Gerry Bracht

17 with Andrews Kurth for the debtors.

18             THE COURT:  Nice to see you again, Mr. Bracht.

19             MR. BRACHT:  Thank you, sir.  Same to you.  Your

20 Honor, I've got an exhibit, a Debtors Exhibit O, and I don't

21 believe, Your Honor, that there are any objections to this

22 exhibit and just, I guess -- or perhaps any of them.  I'm not

23 going to --

24             THE COURT:  Do you have a set of the --

25             MR. BRACHT:  I'm not going to introduce all of them

                    Wilhouse - Direct                    18

1   yet.

2           THE COURT:  Okay.  Do you have a set of exhibits --

3           MR. BRACHT:  Yes, I do, Your Honor.

4           THE COURT:  -- to hand up and --

5           MR. BRACHT:  Do you want all of them?

6           THE COURT:  Yeah, why don't you give me all, and I'll

7   return whatever doesn't get --

8           MR. BRACHT:  Okay.

9           THE COURT:  -- introduced.

10          MR. BRACHT:  After your comment, Your Honor, I took

11  out O [inaudible].

12          THE COURT:  That's fine.

13          MR. BRACHT:  [Inaudible].

14          THE COURT:  Okay.  Mr. Strochak, what's the -- do you

15  have objections to --

16          MR. STROCHAK:  I don't have any objections to the

17  exhibits.  Some were offered for limited purposes is my

18  understanding.

19          THE COURT:  Okay.

20          MR. STROCHAK:  So -- and I could comment on those

21  specifically if we want to go through them.  I have no

22  objection to O if you want to start with that.

23          THE COURT:  Well, I've leave it to Mr. Bracht to --

24  all right, so Committee's Exhibit O is admitted in evidence.

25                  (Committee Exhibit O, Received.)

Wilhouse - Cross                              19

                        CROSS-EXAMINATION

1

2    BY MR. BRACHT:

3    Q.    And, Mr. Wilhouse, let me show you a copy of that --

4    A.    Thank you, sir.

5    Q.    -- as well.

6    A.    Okay.

7    Q.    And at the same time we're talking about this Exhibit I

8    want to compare it to Exhibit A that -- excuse me, Exhibit 1

9    that you prepared.  Now, you don't -- you've never seen Exhibit

10   O before, but I'll tell you that this is a chart that the SRR

11   people have prepared breaking down the financial performance of

12   the company from June through August.  And it -- you can see

13   the minus 18.5 percent variance on EBIDA for the consolidated

14   company right up at the top.

15                      [Pause in proceedings.]

16   Q.    Top box, bottom right-hand corner.

17   A.    Yes, I see it.  Thank you.

18   Q.    And that is the same basic number that you have for the

19   total company EBIDA on Exhibit 1, correct?

20   A.    Yes.

21   Q.    Okay.  And if you look at Exhibit 1, and I'm referring to

22   your testimony about how the various parts of the company had

23   been doing over these months, and we start in July because by

24   the time the forecast -- because that's when the forecasts were

25   prepared, that was basically the first month of the forecast,

                              Wilhouse - Cross                    20

1   maybe June.  But you had a lot of data in for June already at

2   that time; is that right?

3   A.    I'd have to check but I think June was forecast data.

4   Q.    Okay.  Okay.  And Exhibit O shows June through August,

5   right?

6   A.    Yes.

7   Q.    Okay.  And on Exhibit 1 you said earlier that the

8   insulators and medical components are pretty much right on

9   track, and you were referring, I think, to perhaps the first

10  entry under net sales and also the first entry under EBIDA that

11  shows, you know, basically an increase to forecast of 1.5

12  percent and an increase to EBIDA of 2.3 percent, correct?

13  A.    Yes.

14  Q.    Okay.  And actually the insulator and medical components

15  line, that is a combination of those two businesses, correct?

16  A.    Yes.  And --

17  Q.    And if you were to look at the medical business

18  separately, and I think if you look on maybe the second page of

19  Exhibit O --

20  A.    I have it.

21  Q.    -- again first box, bottom right-hand corner, the SRR

22  folks have determined that the medical component of your

23  business is actually behind budget of almost 6 percent,

24  correct?

25  A.    59,000 on a million 61.

Wilhouse - Cross                          21

1   Q.   Is the 5.6 percent an accurate number as far as you know,

2   Mr. Wilhouse?

3   A.   I would say yes.  Yes.

4   Q.   Okay.  So, as a matter of fact, the parts of your business

5   that produce products, let's just go down them very quickly.

6   Connector seals, it's doing very poorly, correct?

7   A.   The OEM business is down, yes.

8   Q.   But you don't divide your businesses into OEM and after

9   market.  You've got, well, I'm going to call them divisions,

10  but you basically got four divisions the way you've run your

11  company since the very beginning, and that's insulators,

12  connector seals, metals, and medical, correct?

13  A.   Well, that's true.  But the insulator business is like 80

14  percent after market.

15  Q.   That's not what you've said publicly in the past, is it,

16  sir?

17  A.   I can't confirm or deny that.  I'd have to -- to look.

18  Q.   All right.  Well, we'll cover that later perhaps.  But the

19  fact of the matter is that if you look at it on the basis that

20  you -- the way you guys keep your books, the medical business

21  is below budget, the metals business is below budget, the

22  connector seal business is below budget, and insulators is the

23  one of the four divisions that's running ahead of budget,

24  correct?

25  A.   Yes.

Wilhouse - Cross                           22

1  Q.   And the trend -- go back to the first page of Exhibit O --

2  starting in June -- you're at the top box again on a

3  consolidated basis.  Starting in June and moving through August

4  the shortfall budget-to-actual consistently gets worse.  Starts

5  in June and just a little bit, .3 percent negative, right?

6  A.   That's true.  But it's all driven by the OEM business.

7  Q.   Well, the numbers are the numbers, aren't they, sir?

8           MR. STROCHAK:  Objection, Your Honor.

9           THE WITNESS:  I would agree.

10 BY MR. BRACHT:

11 Q.   The OEM business is part of your business, isn't it?

12 A.   It is.

13 Q.   And actually you sell insulators to original equipment

14 manufacturers, don't you.

15 A.   We do sell some, yes.

16 Q.   Okay.  But as you see, the trend in the business on a

17 consolidated basis starting in June and going through August

18 gets consistently worse.  And that's just three months into the

19 year, correct?

20 A.   That's three months, that's correct.

21 Q.   Now, just yesterday after we had filed our exhibit

22 designations the debtors filed their September monthly

23 operating report, correct?

24 A.   Yes.

25           MR. BRACHT:  And that is Exhibit V, Your Honor, in --

Wilhouse - Cross                                23

1   it was added late.

2           THE COURT:  That's fine.  I actually have a copy that

3   we printed out off of ECF.  I have that in front of me.  So

4   that's Exhibit B?

5           MR. BRACHT:  V as in Victor.

6           THE COURT:  Oh, V as in Victor.  Okay.

7           MR. BRACHT:  So I would move -- at this -- I don't

8   know kind of where we are procedurally, but I -- Exhibit O's

9   in.  I'd like Exhibit V to be in as well.

10          THE COURT:  Fine.  Any objection?

11          MR. STROCHAK:  No objection, Your Honor.

12          THE COURT:  Exhibit V is in evidence.

13              (Committee Exhibit V, Received.)

14              [Pause in proceedings.]

15  BY MR. BRACHT:

16  Q.   Now, do you -- are you familiar with the contents of

17  Exhibit V, the --

18  A.   Yes.

19  Q.   -- September monthly operating report?

20  A.   Yes.

21  Q.   If you turn to about the fourth page in, the page entitled

22  Preliminary Consolidated Statement of Earnings, and down at the

23  bottom under EBIDA number it shows 202; is that right?  That's

24  on a consolidated basis, right?

25  A.   Yes.

Wilhouse – Cross                            24

1  Q.   And the monthly operating report is not divided or broken

2  out into separate divisions, correct?

3  A.   That's correct.  But the EBIDA number there is after

4  deducting the 408,000 reorganization expenses, so it's really

5  610.

6  Q.   Okay.  And how does that compare, if you know, to the

7  forecasted EBIDA number for September?

8  A.   I don't have the exact EBIDA number in my head, but it is

9  below the EBIDA forecast for September.

10 Q.   It's significantly below, isn't it, sir?  In fact, it's in

11 -- it's greater than the 38.1 percent that's shown on Exhibit

12 O, isn't it?

13 A.   I don't know if I can cite the exact number but I know the

14 OEM business was -- continued to be below forecast in

15 September.  Significantly.

16 Q.   And but we don't -- we haven't had -- we, meaning the

17 committee, hasn't had the benefit of seeing the broken-out

18 financials with respect to various divisions so we don't know

19 how the other divisions have done but we do know OEM is bad.

20 A.   That's correct.

21 Q.   But the point is it's on a consolidated basis, your

22 company for the fourth month in a row has missed your mark,

23 missed your numbers, and missed them by a wide margin.  Would

24 you agree with that, sir?

25 A.   The company as a whole has missed its margins, but some of

Wilhouse - Cross                                25

1  the specific divisions, specific divisions that are of

2  particular interest, have not.

3  Q.   I'm sorry, sir.  I didn't hear that last --

4  A.   I said as a whole that's correct but --

5  Q.   Okay.

6  A.   -- certain of our divisions where we believe there is a

7  particular value have basically been on their -- on their

8  budget.

9  Q.   As far as we can see, based on what we've looked at here

10 today in the documents, there's one division that's on budget

11 and the other three are not.

12 A.   Well, I agree.  Connector seals is above budget.  Medical

13 is 59,000 or 5.6 below budget, if we want to consider that a

14 big miss.  You know, that would be your interpretation.  It's

15 not my interpretation.

16  Q.  Well, it's not my interpretation.  I don't want to

17 characterize it.  The point is is it's below budget by 5.6

18 percent, correct?

19 A.   Yes.

20         THE COURT:  Mr. Wilhouse, just how much were the

21 reorganization expenses in September?

22         THE WITNESS:  408,000, Your Honor.

23         THE COURT:  That was -- if you go to the next page of

24 the report, reorganization items.

25         THE WITNESS:  Uh-huh.

Wilhouse - Cross                                26

1              THE COURT:  That adds up to $894,714.60.

2              THE WITNESS:  Correct.

3              THE COURT:  So the reorganization expenses were a

4   million and a half for the month.

5              THE WITNESS:  Permit me to explain.

6              THE COURT:  Please do.

7              THE WITNESS:  The -- the reorganization expenses on

8   the next page are on a paid basis.  Most of those would have

9   been previously accrued in the financial statements, Your

10  Honor.

11             THE COURT:  Okay.  All right.

12             Go ahead, Mr. Bracht.

13             MR. BRACHT:  Thank you.

14  BY MR. BRACHT:

15  Q.   Mr. Wilhouse, you talked a little bit about the process of

16  preparing the projections, and you described what sounds like a

17  fairly vigorous -- excuse me -- rigorous process to get to the

18  numbers that you got initially, correct?  Would you agree with

19  me, you think it was --

20  A.   Yes.

21  Q.   -- pretty rigorous?

22  A.   I would.

23  Q.   You tried to be complete.  As I understand it, the sales

24  people and managers of the various divisions would give you

25  sales projections and other data, and you would push back at

Wilhouse - Cross                              27

1   them and you'd make sure that what they were giving you was the

2   best that you guys had available and could present to the Court

3   and to us --

4   A.    Uh-huh.

5   Q.    -- correct?

6   A.    That's correct.

7   Q.    Okay.  And as the data came out -- and, as you know, SRR

8   has requested a lot of backup data with respect to the

9   projections, correct?

10  A.    Yes.

11  Q.    And as a result of that due diligence, as you indicated,

12  there were some errors, some mistakes in the projections that

13  were pointed out by SRR, correct?

14  A.    And some we found ourselves --

15  Q.    I understand.

16  A.    -- later on.

17  Q.    But SRR served a purpose --

18  A.    Uh-huh.

19  Q.    -- in requesting the backup data and in trying to make

20  sure that the projections contained correct information whether

21  or not they necessarily agreed with the conclusions.  Is that a

22  fair statement?

23  A.    That's a fair statement.

24  Q.    Okay.  And as a result of that process, sometime, I

25  believe, in early September after going through a lot of -- a

Wilhouse - Cross                         28

1  rigorous process to try to come to grips with these numbers,

2  Mr. Lubin and the debtors indicated that there would be a re-

3  forecast not only with respect to connector seals, which was

4  obviously going down the tubes, but also with respect to

5  medical and with respect to insulators, correct?

6  A.   That's correct.  It was our understanding that SRR wanted

7  us to make the changes and to develop as current a forecast as

8  possible.

9  Q.   Well --

10 A.   So we did.  I -- I would like to add that when we did the

11 connector seals forecast that was driven in large part by the

12 CSM data, which changed just several months later, and that in

13 the revised forecast we're using the new revised CSM data for

14 Carville's [Ph.] in 2009 and thereafter.

15 Q.   In any event, there's been a big change in the forecast,

16 correct?

17 A.   At connector seals, yes.

18 Q.   And I believe you said it was down 20 percent from the

19 previous forecast; is that correct?

20 A.   I don't have the exact number for connector seals in my

21 head, but it will be down.

22 Q.   And connector seals is not an insignificant part of your

23 business, is it, sir.

24                    [Pause in proceedings.]

25 A.   Well, today, today it's a relatively small part of the

Wilhouse - Cross                                    29

1  business.  As I -- you know, the sale --

2  Q.   Historically --

3          THE COURT:  Let him finish.  Go ahead.

4          Go ahead.

5          MR. BRACHT:  I'm sorry.

6          THE COURT:   That's fine.

7          THE WITNESS:  I mean in the past it was a significant

8  part of our business but, you know, we're all aware of what's

9  happening in OEM automotive today, and the sales trend there

10  has clearly been down.

11  BY MR. BRACHT:

12  Q.   Historically is the -- connector seals is something like,

13  what, 17 to 18 percent of your business?

14  A.   I'd have to check the numbers.

15  Q.   Does that sound about right?

16  A.   From the sales standpoint?

17  Q.   Yes, sir.

18  A.   Let's see.  That should be, I would say, approximately

19  correct.

20  Q.   Now, you said earlier that the adjustments -- well, let me

21  back up just one second just to make sure.  Is it your

22  testimony that you did, that the debtors did the re-forecasting

23  because SRR requested it?

24  A.   Well, the re-forecasting was -- is being done to pick up

25  all the items SRR pointed out and to update the forecast for

Wilhouse - Cross                    30

1    the latest CSM data and any other changes, any other

2    significant changes that have taken place in the last two or

3    three months.

4    Q.   But just to be clear, SRR did not request to you to re-

5    forecast your sales projections, did they?

6    A.   [No audible response.]

7    Q.   They pointed out mistakes, but you can't point me to any

8    e-mail or any correspondence or anything else that says, hey,

9    and as a result of this you guys need to go out and do your re-

10   forecasting.

11   A.   I can't.  It's just my understanding that the intention

12   was that we should re-forecast and get the forecast as correct

13   as possible.

14   Q.   And you wanted that too.

15   A.   Uh-huh.

16   Q.   And --

17            THE COURT:  You have to answer audibly.

18            THE WITNESS:  Yes.

19   BY MR. BRACHT:

20   Q.   And, as a matter of fact, you knew or -- I say you kind of

21   in the royal sense, but Mr. Lubin and SRR and I'm sure you as

22   the CFO knew that in the period of time since June or July that

23   there had been some changes that SRR hadn't talked about and

24   that you guys felt like you needed to go back and make those

25   changes as well, correct?

Wilhouse - Cross                                          31

1   A.    That's correct.

2   Q.    Okay.  And --

3   A.    In particular in the CSM data.

4   Q.    Right.  But in the process you changed the forecast on

5   medical and you changed the forecast on insulators, and that

6   information was not presented to SRR until really in early

7   October of 2008, this month; is that right?

8   A.    I'm not exactly sure when it was given to them.

9   Q.    Recently.

10  A.    Fairly recently.

11  Q.    Okay.  And with respect to connector seals, we didn't get

12  that, SRR didn't get that until last week.

13          THE COURT:  Didn't get what?

14  BY MR. BRACHT:

15  Q.    The revised projections and the backup data of -- first of

16  all, the backup data that we had with respect to the other

17  divisions that we had been asking for since probably May; is

18  that right?

19          THE COURT:  Break that in -- I'd like to hear --

20          MR. BRACHT:  Okay.  I'm sorry.

21          THE COURT:  I'd like to hear that separated --

22          MR. BRACHT:  Okay.

23          THE COURT:  -- when you received backup data on the

24  initial set of forecasts and when revised forecasts were

25  provided and when backup data -- you sort of mushed it all

Wilhouse - Cross                                    32

1  together, and I want to be sure I understand it all, Mr.

2  Bracht.

3              MR. BRACHT:  I agree, Your Honor.  Thank you.

4  BY MR. BRACHT:

5  Q.   Let's take them one at a time.  The revised forecast for

6  medical was received in early October; is that a fair

7  statement?

8  A.   I would say yes.

9  Q.   Okay.  The revised forecast for insulators was received in

10 early October as well, correct?

11 A.   I believe that's correct.

12 Q.   When was the revised forecast for connector seals

13 provided, to the best of your recollection?

14                      [Pause in proceedings.]

15 A.   I believe that was sent a week and a half or two weeks

16 ago, but I would have to check that.

17 Q.   Okay.  And --

18 A.   To be sure.

19 Q.   -- there -- I don't want to use them if I don't have to,

20 but, in terms of the backup data for connector seals, that was

21 provided, I believe, on October the 23rd.  Is that consistent

22 with your recollection?

23 A.   I can't answer that.  I don't believe that came directly

24 from my office.

25 Q.   Okay.  Do you have any reason to believe that it was

Wilhouse - Cross                              33

1   provided any earlier than October the 23rd?

2   A.   I don't know the answer to that.

3   Q.   Okay.

4   A.   I would have to check.

5   Q.   But, in any event, it was provided recently.  Would you

6   agree with that?

7   A.   Within the last several weeks, yes.

8   Q.   Okay.

9           THE COURT:  Mr. Wilhouse, with the initial forecasts

10  that you provided SRR, had they been provided with the backup

11  data for those forecasts?

12          THE WITNESS:  As I recall, Your Honor, all of the

13  backup data was provided to SSR [sic] essentially with the

14  forecast.

15          THE COURT:  Okay.

16          THE WITNESS:  They did have questions -- well, they

17  had questions on all the sales forecasts.  They went through

18  all the sales forecasts.  But they did request more information

19  on the connector seals forecast.

20  BY MR. BRACHT:

21  Q.   Mr. Wilhouse, you remember that one of the things that SRR

22  wanted with respect to your forecast was a breakdown of sales

23  forecast by booked business, you know, whatever the next

24  category would be, and on down the line from the most likely to

25  the least likely.  Remember that?

Wilhouse - Cross                           34

1    A.    I do, but I did not handle that.

2    Q.    Okay.  And you know, don't you, that that type of data was

3    provided pretty early on with respect to insulators and

4    medical, correct?

5    A.    Yes.

6    Q.    But the data, that data with respect to connector seals

7    was not provided until much later, was it?

8    A.    It was provided later.

9    Q.    Okay.  And let me, just to --

10   A.    But we did provide what we had.  I think SRR did not like

11   what we provided.

12   Q.    Okay.  We'll go in -- we'll cover that later.

13           MR. BRACHT:  Your Honor, Exhibits 11 and -- L and M.

14                   [Pause in proceedings.]

15   BY MR. BRACHT:

16   Q.    Do you see Exhibit L, Mr. Wilhouse?

17   A.    Yes.

18   Q.    That is a series of e-mails that indicates -- and I

19   misspoke -- that indicates that the Vienna -- that's connector

20   seals, correct?

21   A.    Yes.

22   Q.    -- that the updated financial projections for Vienna were

23   provided to SRR representatives on October the 20th.  You see

24   that?

25   A.    Yes.

Wilhouse - Cross                                   35

1  Q.   Okay.  And then if you go to Exhibit M down at the very

2  bottom on the first page, an e-mail from Mr. Lubin to Mr.

3  Haras.

4  A.   Uh-huh.

5  Q.   He says, "Kurt --" Mr. Haras is with W. Y. Campbell.  He

6  says, "Attached is the backup to the Vienna sales forecast."

7  And that's dated October 20th, correct?

8  A.   Yes.

9  Q.   And then you see where Mr. Haras has then forwarded that

10 on to the folks at SRR on the 20th, correct?

11 A.   Yes.

12 Q.   I think -- is it fair to say that when the original

13 projections came out, Mr. Wilhouse, that you had gone through a

14 process to where you were comfortable with the projections that

15 you had produced?

16 A.   At the time they were issued, yes.

17 Q.   Okay.  We now see that for a period of four months from

18 the very beginning of the projections as they go forward you've

19 missed your budget.  Do you still consider the budget to be a

20 reasonable budget?

21 A.   The original forecast?

22 Q.   Yes.

23 A.   Not with respect to connector seals or machining based on

24 what I know today.

25 Q.   Okay.

Wilhouse - Cross                    36

1  A.    And I would like to add in medical the reason we missed

2  there is primarily because of a delayed price increase on the

3  dextrous program with ETHICON Endo-Surgical Unit of Johnson &

4  Johnson.  We have received those price increases.

5  Q.    Have you received them today?

6  A.    I would say last week.

7  Q.    You have something signed?

8  A.    I believe we do.

9  Q.    Have you produced it to the folks at SRR?

10 A.    I have not, but I believe it was discussed in a

11 conversation that was held with SRR last week.

12 Q.    But that signed price -- even it's a signed price

13 increase, that price increase does not affect your projections.

14 Because that price increase was imbedded in your projections

15 from the original version, correct?

16 A.    That's correct.  But my point is in terms of the medical

17 forecast for June, July and August, I believe we had the price

18 increase going in there on July 1st.

19 Q.    Right.

20 A.    And I don't have the precise numbers.  My sense is that if

21 we'd actually had the price increase then instead of now,

22 medical would be pretty much right on the money.

23 Q.    Okay.  Doesn't change the numbers though.

24 A.    No.

25 Q.    Okay.  Do you have any estimation -- strike that.  Changes

Wilhouse - Cross                                    37

1  were made as well to medical and insulators, correct?

2  A.   Yes.

3  Q.   And there were some negative changes, in other words there

4  were some reductions in revenue --

5  A.   Yes.

6  Q.   -- or volumes.

7  A.   Yes.

8  Q.   Some of those were pointed out by SRR.  And those

9  reductions were made because they actually occurred, correct?

10 A.   (No audible response.)

11 Q.   There was something that happened that caused you to say

12 we're not going to get that business.

13 A.   I can't answer directly yes or no because the change in

14 the sales forecast wasn't handled by my office.

15 Q.   It was done by the divisions on a one-to-one basis, right?

16 By the managers and the --

17 A.   Yes.

18 Q.   -- sales managers.

19 A.   Yes.

20 Q.   Okay.  The changes in the positives, in other words the

21 increases in volumes that went into this revised budget that

22 basically at the end of the day puts you basically in the same

23 place, those changes were forecasted or projections of future

24 business, correct?

25 A.   Yes, based on discussions with customers or other relevant

Wilhouse - Cross                          38

1   data.

2   Q.    Okay.  So in the one instance you've got situations where

3   you know you've lost business that requires a change in a

4   negative sense but then there are projections that are made in

5   the future in a positive sense that are based on your best

6   hope, your best information but still not business in the door

7   and not booked, right?

8   A.    Well, in the automotive business and the medical business

9   in terms of orders, I don't know that anyone issues firm orders

10  for extended periods of time.  They'll give you their estimated

11  annual requirements and place releases with you over the course

12  of the year.  But the changes in the forecast could have been

13  because of just simple mistakes that were made in terms of

14  quantities and new information that arose.  I can't give you a

15  litany of why changes -- you know, why each one of the changes

16  was made, because -- and I'm not dodging the question -- they

17  weren't made in my office.

18  Q.    Okay.  Well, in fact in those businesses you really don't

19  have that business until it's on the floor being produced.

20  That's pretty much correct, isn't it?

21  A.    That's true.  But there is a process where some of the new

22  business we may receive, prototype tooling or we may talk to

23  the customer.  So we basically have a relatively short list of

24  customers, and we're in contact with them, I would say, all the

25  time.  We have a very good sense of the projects they're

Wilhouse - Redirect                              39

1  working on and how we fit or don't fit in those projects.

2  Q.   I have just a few questions about the DIP, and I'm a

3  little confused.  You said that you have not drawn on the DIP?

4  A.   That's correct.

5  Q.   But you're paying interest on it?

6  A.   Yes.

7  Q.   Have you -- is it -- could it be that you've drawn on it

8  but you've just got it sitting in cash?

9  A.   From my perspective, we haven't drawn on the DIP.  DIP is,

10  as you know, $4 million.  We have $6 million available to us.

11  Q.   Does that include the DIP?

12  A.   Yes.

13  Q.   Is there a reason why you're paying interest on the DIP if

14  you haven't drawn on it?

15  A.   I would have to respond by saying those were the terms of

16  the DIP agreement.  We do have the cash, the company does have

17  the cash.

18  Q.   Where is the cash?

19  A.   It's in Capital One Bank.

20  Q.   Okay.

21       MR. BRACHT:  I believe that's all I have, Your Honor.

22       THE COURT:  Thank you very much, Mr. Bracht.

23       Mr. Strochak, redirect?

24                    REDIRECT EXAMINATION

25  BY MR. STROCHAK:

Wilhouse - Redirect                        40

1   Q.   Mr. Wilhouse, have the debtors undertaken any efforts to

2   contain costs to deal with what's been going on in the OEM auto

3   market and the conductor seals business.

4   A.   Yes.

5   Q.   And what efforts are those?

6   A.   Within the last two months or so there has been an

7   extremely aggressive program to realign the resources within

8   the connectors field -- connector seal division with the near-

9   term sales requirements that we see coming out of that

10  division.  Significant number of head count reductions and

11  direct labor, indirect labor, and the salary ranks.  Some of

12  those reductions will -- I think the final reductions right now

13  will be taking place this week and next week.  And we're

14  obviously looking at [inaudible] --

15              THE COURT:  That means layoffs this week?

16              THE WITNESS:  Pardon?

17              THE COURT:  That means layoffs?

18              THE WITNESS:  Yes.  Yes, Your Honor.

19  BY MR. STROCHAK:

20  Q.   Have the steps that debtors have taken to control costs in

21  that business, have they yet hit the bottom line?

22  A.   No.  No.  Most of the layoffs took place in October.  So

23  you're not going to see it in the September statements, and

24  you'll see a small portion in October.  We believe with the

25  cost reductions and the -- the sales projections we currently

Wilhouse - Redirect                              41

1   have we should be able to run that business at a breakeven

2   point in November and thereafter.

3   Q.   Now, I know it's obviously been reported widely in the

4   press, but could you just generally describe from your

5   perspective what's been happening in the OEM auto market over

6   the last several months?

7   A.   Well, I guess as most of us know, the build of new cars

8   and trucks in the U.S. has fallen from roughly an annualized

9   rate of 16, 17 million in the last seven or eight years to -- I

10  think the latest number I have in my head is 12 and a half to

11  13 million.  In addition to that, our OEM business has been hit

12  hard because our OEM customers, who manufacture subassemblies

13  that then go on to the assemblers -- GM, Ford, Chrysler, Toyota

14  -- have all dramatically slashed their inventories.  So there's

15  sort of what I would say is, not to be cute, but a double

16  whammy.  Lower production sales and then in our customers'

17  inventories.

18  Q.   And with -- does the reduction in your customers'

19  inventory suggest anything to you about the future?

20  A.   It suggests to me that they're anticipating the build in

21  North America to remain low for some time.

22  Q.   In your experience, sir, is it unusual to go back and do

23  adjustments to a forecast?

24  A.   No.

25  Q.   And has the company done that in the past in connection

Wilhouse – Redirect                                    42

1   with its --

2   A.   Yes.

3   Q.   -- forecasting processes?

4   A.   Yes.

5   Q.   Have the -- did the SRR team point out anything that

6   struck you as particularly unusual in reviewing your forecasts?

7   A.   Based on the ones I'm aware of, I would say no.  But they

8   did find some things we agreed were incorrect.  And we told

9   them so.

10          MR. STROCHAK:  All right.  Thank you, sir.  No

11  further questions.

12          THE COURT:  All right.  Mr. Bracht?

13          MR. BRACHT:  Your Honor, I would just like to offer,

14  just for the record, make sure that the record's clean, I

15  believe --

16          THE COURT:  You've got L and M that you haven't

17  offered yet.

18          MR. BRACHT:  I haven't offered L and M?

19          THE COURT:  No.

20          MR. BRACHT:  I'll offer L and M --

21          THE COURT:  All right.

22          MR. BRACHT:  -- at this time.

23          MR. STROCHAK:  No objection.  Thank you.

24          THE COURT:  All right.  Exhibits L and M are in

25  evidence.

Lubin - Direct                                    43

1              (Committee Exhibits L and M, Received.)

2              MR. BRACHT:  No further questions, Your Honor.

3              THE COURT:  Thank you very much.  The witness can be

4    excused.  Please step down.

5              THE WITNESS:  Thank you, Your Honor.

6                      [Pause in proceedings.]

7              MR. STROCHAK:  We call Michael Lubin, Your Honor.

8              THE COURT:  Okay.

9              THE COURT:  If you'd just raise your right hand, Mr.

10   Lubin.

11         (MICHAEL LUBIN, THE DEBTOR'S WITNESS, WAS SWORN.)

12             THE COURT:  Thank you.  Have a seat.

13                     DIRECT EXAMINATION

14   BY MR. STROCHAK:

15   Q.   Good morning, Mr. Lubin.  Would you just state your

16   position with the debtors, please?

17   A.   I'm the Chairman of the Board of the company.

18   Q.   Mr. Lubin, have you been involved with the process of

19   exchanging information with the creditors committee and its

20   financial advisers?

21   A.   Yes, I have.

22   Q.   I'm going to give you what we've marked as Debtors Exhibit

23   4, it's in evidence now.

24             MR. STROCHAK:  I apologize to everyone for the type

25   size on this.  I know it's a little bit hard to read but --

Lubin - Direct                                    44

1   it's small but it's clear, I hope.

2        THE WITNESS:  It's discrimination against older

3   people like me who need reading glasses and maybe stronger ones

4   for this.

5   BY MR. STROCHAK:

6   Q.   Mr. Lubin, what is Exhibit 4?

7   A.   I believe it's a list of the information that was

8   requested and provided -- requested by SRR provided to them by

9   the debtors.

10  Q.   Now, is it before it's prepared by whom?

11  A.   I believe it was prepared by W. Y. Campbell, who handled

12  the actual exchange of the information with SRR.

13  Q.   Could you describe sort of in general terms the exchange

14  of information, financial data and other information with the

15  committee and its financial advisers since the last hearing

16  before this Court on -- in July on exclusivity?

17  A.   Well, I would say we've endeavored to provide the

18  committee, as quickly as we had it available, the information

19  that was requested by SRR.  Some of it frankly took longer than

20  we hoped it would.  The effort was to make it as accurate as

21  possible and to present the current situation of the company is

22  in as best possible.  But I think we responded to essentially

23  every request they've made, although, again, some things may

24  have taken a bit longer than we would have liked them to take.

25  Q.   Have the debtors intentionally delayed providing any

Lubin - Direct                          45

1   information to the creditors committee?

2   A.   No, we have not.

3   Q.   Now, there was some testimony from Mr. Wilhouse and some

4   questions from Mr. Bracht regarding the connector seals

5   forecast.  Do you recall the process by which the connector

6   seals data was provided to the committee and SRR?

7   A.   Well, I believe as every -- as everything else, it was

8   provided to W. Y. Campbell.  I think they may have put it on a

9   -- on a web site that SRR had access to, but I don't know

10  precisely.

11  Q.   The backup data for the initial forecast in July, to the

12  best of your knowledge, sir, was that information provided to

13  SRR?

14  A.   I believe it was provided to them.  I think, if I remember

15  from looking at the list, it was provided sometime in late

16  August.  And, frankly, that was a document we thought had been

17  provided earlier.  We thought the issue was that SRR was not

18  satisfied that there was enough solid backup for that, and we

19  were endeavoring to figure out what else we could give them

20  beyond that.  But, in any case, I believe they got it late

21  August and have had it for some time.

22  Q.   With respect to the updated connector seals forecast, what

23  was the process for providing that information?

24  A.   I'm sorry, for providing it?

25  Q.   Right.

Lubin - Direct                                46

1  A.   Well, we -- we determined -- sometime in late August we

2  were notified that we had lost a couple of large volume parts

3  that would have some significant impact on the forward going

4  sales forecast.  In addition, we began to note that there were

5  significant reductions being made in the overall car build that

6  was going to be driving the -- the sales level in this business

7  going forward, and we determined --

8  Q.   Let me interrupt you for one second.

9  A.   Okay.

10 Q.   I think the Court has a question.

11       THE COURT:  You said you lost a number of parts.  I

12 assume that you lost orders parts --

13       THE WITNESS:  We --

14       THE COURT:  -- is that what --

15       THE WITNESS:  We were informed by the customer that

16 these parts had been resourced.

17       THE COURT:  What does that mean?

18       THE WITNESS:  That they had found another supplier

19 actually using the material that's different from the materials

20 we mold that let them purchase those parts at a lower cost.

21       THE COURT:  Okay.  Go ahead, Mr. Strochak.

22 BY MR. STROCHAK:

23 Q.   I'm sorry, I interrupted you.  Were you through?

24 A.   I'm not sure where we were.  But we were aware that the

25 overall OEM sales build forecasts were coming down across the

Lubin - Direct                          47

1   board, and we requested the most up-to-date information from

2   CSM, which is the forecasting service we've been using for this

3   purpose.  When we got that we asked the connector seals

4   division personnel to take a look at their forecast, to speak

5   with their customers, get the most updated information they

6   had, and try to revise that forecast to reflect the new sales

7   data and the parts that we knew we would have going forward or

8   believed we would have going forward.

9   Q.   And at this point that process has been completed or is it

10  still under way?

11  A.   It has been completed.

12  Q.   And the revised forecast was provided to the committee,

13  correct?

14  A.   Yes, it was.  I believe Mr. Bracht said October 20th.

15  That sounds like it's very possible.  It was provided as soon

16  as it was available.

17  Q.   Mr. Lubin, I'm going to give you a copy of Debtors Exhibit

18  3 in evidence.  Exhibit 3 is the draft valuation report

19  prepared by W. Y. Campbell.  Could you just briefly explain for

20  the Court the process that the debtors and its financial

21  advisers engaged in to provide valuation information.

22  A.   Well, basically we provided to Campbell all the forecast

23  data we had, all the additional data that reflected the views

24  of the values of the businesses, and Campbell assembled this

25  report using their expertise in the industries that we work in.

Lubin - Direct                               48

1   Q.   Now, was there any valuation information in the disclosure

2   statement, proposed disclosure statement?

3   A.   There was.  It was a summary of where Campbell's valuation

4   conclusions were at that point in time.

5   Q.   And the disclosure statement was filed, if I remember

6   correctly, in early August; is that right?

7   A.   I thought August 8th.  I think it's the same date as the

8   date this is written.

9   Q.   Now, the draft valuation report, Exhibit 3, is dated as of

10  August 8th but in fact it was provided later, correct?

11  A.   That's correct.

12  Q.   And approximately when, do you recall?

13  A.   I want to say the second week in September but I'm not

14  sure exactly.  It's probably on this list but I don't -- I'm

15  not sure I could find it.

16  Q.   I think the approximation is okay.

17       THE COURT:  When did Lexington receive the draft

18  report from Campbell?

19       THE WITNESS:  It was provided as soon as it was

20  available, Your Honor.  I'd say in September.

21  BY MR. STROCHAK:

22  Q.   Mr. Lubin, with respect to the debtors different business

23  segments, could you just describe in general terms how, from

24  the debtors' perspective, they view the allocation of value

25  between those segments?  And again I'm not looking for

Lubin - Direct                                    49

1   valuation testimony, just the debtors' view as to where they

2   believe the value lies.

3   A.   Well --

4           THE COURT:  I don't understand your question.

5           MR. STROCHAK:  Let me rephrase if I could.

6   BY MR. STROCHAK:

7   Q.   Do the debtors have a view as to the relative values of

8   their different business segments?

9   A.   I'd say yes, we do.

10  Q.   What's the debtors' perspective on which segments are

11  driving positive valuation?

12  A.   We believe that the bulk of the value of this enterprise

13  is centered in the medical business and the insulator business,

14  which, as Mr. Wilhouse testified, has become primarily an after

15  market business.  And I would say that that represents the

16  great bulk of the value in the company.  The OEM business,

17  which had been an important segment, has become a much smaller

18  segment and a much smaller piece of the valuation.  In fact,

19  our view is that, as to the present time, those values that are

20  attributable to the businesses primarily serve those end

21  markets or that end market is really the wind-down value of

22  those businesses.  In effect, it's liquidation value of those

23  businesses.

24  Q.   And with respect to the -- let me rephrase.  To your

25  knowledge, did the debtors have any communications with the

Lubin - Direct                          50

1    committee regarding the implications of revised forecasting in

2    the connector seals business to discussions and negotiations

3    over value?

4    A.   I'd say in general as we were updating, the forecasts, in

5    our view, reflect the most up-to-date information we had

6    available.  We indicated to the committee and to SRR that we

7    didn't believe that the forecasts for the medical or the after

8    market business would change materially when we got done with

9    them but that clearly the forecasts for the connector seals

10   division and for the [indiscernible] business would be reduced

11   in line with the new overall car build forecast.  However, we

12   told them that we believe that at this point the valuation

13   built into those business in this valuation report was

14   essentially equal to the wind-down value of those units, and,

15   as a result, that should not have any significant impact on the

16   overall value of the company.

17                    [Pause in proceedings.]

18   Q.   With respect to what the debtors have been experiencing in

19   their OEM businesses, in the connector seals and the metals

20   businesses, from your perspective, sir, do you believe the

21   debtors are affected any differently than the bulk of

22   automobile suppliers in the industry?

23   A.   We haven't studied every supplier in the industry, but I

24   read plenty of reports that say that essentially the entire

25   industry is forecasting down and that everyone is being

Lubin – Direct                          51

1  significantly affected in a negative way by what's happening

2  with the car builds and with the changes in inventory levels

3  throughout the supply chain.

4  Q.   Now, Mr. Wilhouse testified briefly about the steps that

5  debtors have taken to control costs in the connector seals

6  business.   Is there anything that he might have missed that you

7  wanted to add to that?

8  A.   Well, no.  I would say perhaps we could have acted a

9  little quicker.  We, I would say, were not thinking that from

10  the reductions that we got from CSM in June and early July that

11  things would drop again by a dramatic amount.  So perhaps we

12  would have taken more costs out earlier.  But, in any case,

13  we've reacted to it, tried to react to it as quickly as we can.

14  There are delays to some extent because we have to give people

15  severance or notification, and we believe they will have a

16  beneficial impact.  As Mr. Wilhouse said, the goal here is

17  we're now looking at this in the near term as being an $800,000

18  a month business for the next several months, and our goal is

19  to get it to the point that it's operating break even, which

20  would mean probably a $140,000 or thereabouts of EBIDA positive

21  from that business.  What it does mean is that once we've done

22  that, if sales pick up, then we should make a handsome increase

23  in cash flow every month.

24  Q.   Now, Mr. Wilhouse mentioned that your customers are

25  reducing their own inventories of parts.  Does that suggest to

Lubin - Direct                              52

1  you anything about possible trends for the future for

2  Lexington?

3  A.   Well, we -- we've talked to the customers and gotten a --

4  the best input we could get from them.  We -- you don't get

5  perfect information from customers, I've found.  That's just

6  fact.  But we -- we know that they've brought their inventory

7  levels down significantly, we think in some cases 30 days and

8  some cases as much as 45 days.  What it says to us is at some

9  point in time -- no, what it says to us is today the volumes

10  we're experiencing are not really indicative of the true demand

11  that would be created by the sale -- by the bill level and the

12  sales level in the auto industry.  We know that if they are

13  buying let's say a million dollars of product over a nine-month

14  period, that probably that only represents seven and a half or

15  eight months worth of real demand once they get through their

16  inventory reductions.  Because we know that they're pulling

17  their inventories down.  So it suggests that at some point in

18  time once the business stabilizes, and I have to believe that

19  they will be making cars and at some -- we're at a very

20  historically low level.  If it just stabilizes, we should see

21  an uptick in demand just because they have no more inventories

22  to deplete, so they're going to have to buy what they build.

23  Q.   Mr. Lubin, have you participated in negotiations with the

24  committee and creditor constituencies in the case?

25  A.   I have to some degree, yes.

Lubin - Direct                                    53

1  Q.   Let's start with negotiations with the committee.   Could

2  you describe for the Court the status of negotiations with the

3  committee over the restructuring.

4  A.   I would say we've had two meetings within the last two

5  weeks, really the first two meetings we've had on any real

6  effort to discuss a plan, how a plan might be structured.

7  We're certainly far apart in terms of valuation, no question

8  about that.   I would say we made some reasonable progress in

9  terms of perhaps creating a structure that would let us deal

10 with the gap of valuation to some degree, but we're not there.

11 I think that we had some productive discussions yesterday.   But

12 we're certainly not there in terms of having a deal, but I

13 don't think there's any reason not to keep trying.

14 Q.   From your perspective, is that process with the committee

15 at an impasse?

16 A.   I don't think it's an impasse, but, clearly, we have a

17 wide gap in value.

18          THE COURT:   Any further meetings been scheduled?

19          THE WITNESS:   We have not yet, Your Honor, but we're

20 hoping to.

21 BY MR. STROCHAK:

22 Q.   Was the committee at all reluctant to meet with the

23 debtors to discuss plan negotiations?

24 A.   I would say the committee was not reluctant to meet but

25 the committee wanted to delay the meetings until it felt that

Lubin - Direct                              54

1  SRR had all the information, absolutely all the information it

2  felt it needed in order to give them the best advice it could

3  on valuation.  We have no argument with that, but we do believe

4  that we could have begun the discussions earlier as the

5  forecasts essentially came out as we told them it would, and we

6  believe that the pieces that they're most -- the pieces where

7  the information is most delayed, essentially the automotive OEM

8  businesses, really are not going to change in terms of value.

9  Because, as I said, they're at the floor of their value in our

10  minds.  They're at the value which they could be wound down, in

11  our minds.  And the fact that that forecast might well get

12  worse, as it did, was not going to have a major impact on

13  value.

14  Q.    Has the company had any negotiations with asbestos

15  claimants?

16  A.    Well, we have.  I've not participated directly with them

17  but I've had several discussions with the lawyers involved.  I

18  know there have been discussions between your firm and the firm

19  that's been representing us over the years at the insurance

20  company's expense and the plaintiff's attorneys.

21  Q.    And could you just give the Court a brief summary of where

22  things stand in those negotiations.

23  A.    I believe we originally proposed that they receive a

24  treatment that limited their recovery to the recovery on

25  insurance.  We've, I guess, agreed with them at this point,

Lubin - Direct                          55

1    although I'm not sure they've signed off on this, that we would

2    modify that treatment to give them whatever recovery they're

3    entitled to through the insurance coverage and, then to the

4    extent there's a claim that can be proven above that amount,

5    that it would be treated as a general unsecured claim like all

6    the others, either paid in cash for a small amount or termed

7    out over a short period of time if it were a larger amount.

8    Q.   Have the debtors in the past paid any liability on

9    asbestos claims?

10   A.   I don't believe we -- we've actually paid anything out-of-

11   pocket.  We've been completely covered by insurance.  I'm not

12   sure we paid -- if we paid legal expenses up to a deductible,

13   frankly I don't know the answer to that.  But that would have

14   been a long time in the past.  But we have not been paying

15   anything out-of-pocket nor do we think there's any real

16   liability.  But obviously, as we all know from following some

17   of the asbestos cases over the years, these are liabilities

18   that have to be dealt with.

19   Q.   Mr. Lubin, are you responsible at all for the debtors'

20   efforts to obtain exit financing?

21   A.   I've been involved in that quite directly, yes.

22   Q.   And could you provide the Court with a status report, so

23   to speak, or what is the status of the debtors' negotiations on

24   exit financing?

25   A.   Well, we're still talking with Capital One Business

Lubin - Direct                                56

1  Credit.  I believe that's their name.  They continue to

2  indicate that they're extremely interested and that they're in

3  fact in business and doing new deals.  We have talked to them

4  over an extended period of time.  I think they like the

5  company, I think they like the business, I think they like the

6  management.  And they have completed -- they received

7  appraisals of the real estate and the equipment that would form

8  a portion of their collateral.  They and we are satisfied with

9  those.  They've completed their field audit work with respect

10 to the current asset collateral, the receivables and

11 inventories, and they've received a preliminary report with

12 respect to the appraisal of the inventory on liquidation.  And,

13 you know, frankly, they're not satisfied with that report and

14 we're not satisfied with that report.  It does create a gap

15 which is a gap we would have to bridge, and we're working on

16 that.  But we believe we can convince them and convince the

17 appraiser that their appraisal was way below the true

18 liquidation value and that really that appraisal is driven by

19 the conditions that were put on the way this could be

20 liquidated.  We actually believe that there would be no problem

21 liquidating that inventory for at least its cost and probably

22 more, and they've applied some methodologies that -- you can

23 understand them but they really don't make sense in the real

24 world, that suggest a lot of that inventory would not even

25 count.

Lubin – Direct                    57

1  Q.    What --

2  A.    But I would say the gap is probably now under a million

3  dollars, and we've already gotten the appraisal increased by

4  $700,000.  We've gotten the bank to acknowledge some of the

5  expenses that were counted in this appraisal were duplicative

6  and would not count such that we've already bridged a portion

7  of the gap, and we believe we'll get that taken care of.

8  Q.    What's the implication of the inventory appraisal for

9  availability under the exit financing?

10  A.    Well, I'd say at this point we're probably short by

11  something a little bit -- it reduces the availability by

12  something a little bit under a million dollars.

13        THE COURT:  What's the amount of exit financing

14  you're looking for?  My recollection is from prior hearings it

15  was $40 million.

16        THE WITNESS:  I think it's probably something less,

17  Your Honor, probably about 35 million in total and probably

18  using about 30 million initially.  And this is a gap of a

19  million.  And we understand that we may have to bridge that gap

20  if we can't convince them.  We're working on that and believe

21  we will be able to accomplish that, but obviously what we'd

22  like to do is have them, in this marketplace, as comfortable as

23  they can possibly be with the value of their collateral.

24  BY MR. STROCHAK:

25  Q.    Has Capital One given you any indication that due to, you

Lubin - Direct                                    58

1  know, conditions in the credit markets, they're not prepared to

2  continue to proceed toward an exit financing?

3  A.    Actually not.  Quite the contrary.  They're in contact

4  with us on a regular basis.  They were the ones who came to us

5  and said you need to work with the appraiser on the inventory

6  appraisal, this doesn't look right to us.  And, in fact, we're

7  setting up, we hope, a face-to-face meeting with the appraiser

8  to run through the details because we think we can get that

9  nailed there.  But they tell us they're in business, they like

10 this.  They've indicated that they would like our permission to

11 go out and begin to talk to participants [indiscernible] at the

12 size of this financing.  They would need a participant.  We've

13 told them we're good with you going out and doing that.  We

14 suggested they wait till we finalize the new forecast package

15 because Mr. Wilhouse is pulling that together right now.  But

16 that should be done end of this week, early next week, and we

17 think they're going to be gin to talk to people.

18         THE COURT:  Mr. Strochak, remind me, I -- we earlier

19 had a hearing and I approved reimbursement of expenses for due

20 diligence for lender.  I thought it was Wachovia then.  Was it

21 Capital One?  It was Capital One?

22         MR. STROCHAK:  I believe it was Capital One.

23         THE COURT:  Okay.  All right.  Thank you.

24         THE WITNESS:  That's correct, Your Honor.  It's

25 Capital One.

Lubin - Direct                                     59

1   BY MR. STROCHAK:

2   Q.   Mr. Lubin, let me switch gears a little bit and I wanted

3   to ask you about your sense of what a denial of of exclusivity,

4   what implications that could have for Lexington's business.

5   And so let me start this way.  As a general matter, do you

6   believe that your customers are sensitive to Lexington's

7   financial position and its path through the reorganization

8   process?

9   A.   I think in this day and age any customer, and particularly

10  in the automotive business, is very nervous about any company

11  that's involved in a reorganization procedure or in financial

12  distress.  I'd say pretty soon that may be their entire supply

13  base the way things are going.  But they're very sensitive.

14  There are a number of customers that have policies about

15  granting new business to companies in Chapter 11 or in a

16  forbearance arrangement of some kind.

17           I think that the customers feel we're a good supplier

18  because the way the company is operated, the kinds of services

19  we provide them.  I think it's why in at least two of our --

20  our two principal business lines right now we're making we

21  think extraordinary margins.  And we're able to do it because

22  we're that good a supplier.  But clearly we will be, to a

23  substantial degree, on new business hold for these people until

24  we get this resolved.

25           I think that anything that represents a disruption or

Lubin - Direct                    60

1    a potential disruption to the way the company is run or the

2    possibility that the company might not be around in the future,

3    might be broken up, might be sold can only have a detrimental

4    effect on people saying I think I need to re-source some of

5    this.  We're a very big supplier of the rubber commodities we

6    make.  We have huge market shares with a lot of the customers.

7    And as a result they're particularly sensitive to the fact that

8    we are in a reorganization proceeding and they don't know how

9    it's going to come out.  And as much as we try to reassure them

10   that the business will be here one way or another, it just

11   doesn't make them comfortable.

12          A lot of them are big companies, just have policies

13   that are doctrine and you can't change them.  But that's the

14   reality.  We think the only thing that -- I can't guarantee

15   we'd lose business, I can't guarantee this business we'd be --

16   we would be granted but clearly won't get.  But I think it can

17   only have a detrimental effect to have a potential disruption

18   and potential chaotic situation here.

19   Q.   Let me ask about a matter that Mr. Wilhouse touched on.

20   Just from your perspective, Mr. Lubin, what is the status of

21   the debtor-in-possession loan?

22   A.   Well, I think -- I don't think Mr. Wilhouse intentionally

23   made a misstatement, but the debtor-in-possession loan was

24   drawn day one or half of it was drawn day one, half of it was

25   drawn as soon as the final order was entered in accordance with

Lubin - Direct                                61

1   the orders.  It's in the bank.  It's earning interest.  But

2   it's really there to give comfort to the suppliers and the

3   customers that we're going to be able to meet our obligations.

4   The hope was never to have to draw it, although we had some

5   indication in some of the forecasts that we might.  But we

6   don't believe that that's the real issue.  The real issue is

7   the -- to give them confidence that we're going to be running

8   this business successfully and continue to supply them.

9   Because that's when they get panicked.

10          THE COURT:  What's your debt cost on the debt?

11          THE WITNESS:  We're paying 7 over LIBOR with a 10

12   percent floor, Your Honor.

13          THE COURT:  And you're earning a half a percent?

14          THE WITNESS:  I think it's 3 percent.  I -- I know

15   it's at least that but I'm not sure if they raised that.

16   BY MR. STROCHAK:

17   Q.   Mr. Lubin, let me go back, if I could, to the projection

18   process and the re-forecasting process.  Could you just

19   generally describe for the Court the types of items that SRR

20   has identified to the debtors in scrubbing the projections.

21   A.   I would say SRR, number one, wanted to see a tie of the

22   OEM business forecast to the industry data, which I believe we

23   provided to them.  We think it ties properly.  The other piece

24   that they focused on was individual items of sales, individual

25   parts, and they questioned not necessarily car and part numbers

Lubin – Direct                                    62

1   but -- I know there were a couple of items where they indicated

2   they thought these projected items of business were

3   speculative.   In some cases we agreed with them and said we

4   think you're right, we should pull those out of the forecast.

5   In other cases we disagreed with them.   In certain cases we

6   said perhaps we're too aggressive on the volumes, maybe we've

7   assumed that we're going to be sole sourced on this part, more

8   likely we'll be a 50 percent source, and we made adjustments

9   that reflected those kind of change.   I wouldn't say we agreed

10  with everything they said but I would say they pointed out some

11  items that were perhaps questionable, and we determined that it

12  was more conservative to pull those items out or reduce them.

13  Q.   Let me direct you back, if I could, to Exhibit 4 for a

14  moment.   That's the data list.   I was just looking over the

15  list in late August, and I did not see anything that

16  corresponded to the backup information on the connector seals

17  forecast.   And I was just -- I just wanted to confirm that in

18  your view that this information was in fact provided to SRR.

19  A.   I thought that it was provided late August.   Frankly, we

20  thought it had been provided in July with the other backup

21  information.   But we're working through a third party, and I

22  wouldn't say there isn't some miscommunication.   It's entirely

23  possible.   But I believe it was provided in late August.   We

24  provided the similar backup at the same time we provided the

25  new forecast that reflects the new car builds.

Lubin - Cross                              63

1          MR. STROCHAK:  Thank you.

2          Your Honor, I'll pass the witness.

3          THE COURT:  Thank you.  Let's take a ten-minute

4    recess before cross-examination.

5          MR. BRACHT:  Thank you, Judge.

6          THE COURT:  Is counsel for IFL here?

7          (Recess was taken.)

8          THE COURT:  All right, Mr. Lubin, you're still under

9    oath.  Mr. Bracht, cross-examination?

10         MR. BRACHT:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. BRACHT:

13   Q.   Mr. Lubin, Mr. Strochak took the words right out of my

14   mouth with respect to Exhibit 4.  I also didn't find anything

15   in September at all that dealt with the backup detail for

16   Vienna.  But I would like to again, just maybe to put a close

17   on this issue, to point you to the entries that are dated up at

18   about, what, sixth or seventh entry down from the top, 10/20

19   entry, labeled Vienna Sales Support, dated provided 10/20/2008.

20   Do you see that, sir?

21   A.   Yes, I do.

22   Q.   Do you believe that to be correct?

23   A.   Yes.  I believe that's sales support for the updated

24   forecast.  That was delivered the same day.

25   Q.   You were talking about this issue of exclusivity.  I'm

Lubin – Cross                    64

1   curious, have you actually had a conversation with a customer

2   that has indicated to you that if you don't get exclusivity

3   extended, that they're going to take business away from you?

4   A.   No.

5   Q.   You indicated that the liquidation value -- that the value

6   of connector seals is basically its liquidation value?  Did I

7   hear you say that correctly?  Did I hear that correctly?

8   A.   I think I said wind-down value, yes.

9   Q.   Wind-down value?  So is -- does that mean that the

10  liquidation value of connector seals, in your view, is the same

11  as the going concern value?

12  A.   I would say it's in the same range, the 10 to $11 million

13  range --

14  Q.   Okay.

15  A.   -- as the going concern value that was built into the

16  valuation report, yeah.

17  Q.   Okay.  We talked a lot about revisions to projections.

18  But in a way it's a little bit irrelevant from your point of

19  view.  Because, as I understand the W. Y. Campbell report, the

20  debtors' valuation is premised upon 2008 operating results; is

21  that correct?

22  A.   That's correct.

23  Q.   And that changes in the projections, as far as Campbell is

24  concerned, would have no effect on valuation.

25  A.   Well, I would say that if Campbell believed that all of a

Lubin - Cross                              65

1   sudden the after market business was going to head south

2   instead of north, that the medical business was going to head

3   south instead of north, that might change their view on the

4   multiples that would be applied to the business.  So I wouldn't

5   say totally irrelevant, but I believe that, given their belief

6   that those businesses should be growing and in the case of

7   medical very significantly, I don't think those forecasts in

8   total would have any significant impact on their valuation.

9   Q.   Okay.  I'm not sure if that's responsive to my question.

10  But let me just quote to you from the debtors' reply to the

11  objection of the official committee of unsecured creditors to

12  Motion for an Order Pursuant to Section 1121(d) of the

13  Bankruptcy Code, further extending the exclusivity periods

14  filed in this court.  And in those papers -- let me just quote

15  to you and ask you if you agree.

16         At the bottom of page 2, the sentence starts,

17  "Further, as the Court will see at the confirmation hearing,

18  the debtors' valuation is premised upon 2008 operating results

19  rather than on a forecast of earnings and cash flows for future

20  years: Any improvement in business based on the 'hope that

21  market and economic conditions get better' would have no effect

22  on the valuation and is not necessary for the confirmation of

23  the debtors' plan."

24         Do you agree with those statements made by your

25  counsel in this case?

Lubin – Cross                          66

1   A.    I do, but I would premise it the same way, that if

2   Campbell believed that the medical business was in fact going

3   to be seeing reduced sales and reduced profitability, they

4   might accord a different multiple.  But I don't think they're

5   seeing that in '08.

6   Q.    In fact, even with the revised projections that we've

7   talked about, Campbell has not intending to do a revised

8   valuation report, correct?

9   A.    At the moment they haven't been requested --

10  Q.    Right.

11  A.    -- but I'm sure they will be by the time we get to

12  confirmation, yeah.

13  Q.    Okay.  So at this point in time, as I understand it,

14  you've not requested them to do that, correct?

15  A.    No.

16          THE COURT:  What's -- I haven't -- it's in evidence

17  just presented today, I haven't looked at it.  What's the

18  methodology that Campbell is using, using a multiple of 2008?

19          THE WITNESS:  Yes, Your Honor.  I would say that

20  they're --

21          THE COURT:  Multiple on EBIDA or what's the

22  methodology?

23          THE WITNESS:  They're looking each piece of the

24  company and they are applying a multiple that they believe is

25  appropriate to the adjusted EBIDA for this year.  Except in the

Lubin – Cross                                    67

1  case of businesses where clearly the wind-down value is greater

2  than the going concern value, they're applying the wind-down

3  value.

4  BY MR. BRACHT:

5  Q.   Just to make clear that -- make sure that we're all on the

6  same page, and we can look at it if we need to but I know

7  you're familiar with it.  Campbell has done various different

8  methodologies or used various different methodologies in its

9  report from discounted cash flow to comparable company to

10 comparable transaction, and ultimately -- and also they did

11 what they apparently have decided is the most logical or best

12 indication.  They're done a sum of the parts valuation, and

13 that's the number that everybody seems to talk about.  It's

14 about 115 or $120 million number, correct?

15 A.   Somewhere in there.

16 Q.   Yeah.  And that's a technique where what they've done is

17 they have taken each segment of the business and applied a

18 different multiple to each segment and then taken, in essence,

19 an average or a prorated proportion of blending of those

20 multiples applied to the 2008 expected EBIDA based on your

21 forecasts, correct?

22 A.   That's correct.

23 Q.   Okay.  And one piece of that analysis with respect to the

24 sum of the parts is that they don't apply any corporate

25 overhead to that value, correct?

Lubin – Cross                                68

1   A.    That's correct.

2   Q.    Right.  And my understanding is that, as far as you are

3   concerned, your intention would be to continue to operate this

4   company in the future, right?

5   A.    That's correct.

6   Q.    You're not intending to sell this company, to break it up

7   into parts and sell it.

8   A.    Not tomorrow, but I would say at a point in time in the

9   future probably.

10  Q.    All of it or some of it?

11  A.    Probably all of it.

12  Q.    Okay.  How far in the future?

13  A.    I don't have an answer to that, but I'd say when we

14  believe we can provide maximum value to all constituencies.

15  Q.    Okay.  Let's talk a little bit about the industry.  Now,

16  in listening to your testimony and Mr. Wilhouse's testimony,

17  I'm getting the impression that, for reasons that are beyond my

18  ken, that the after market, automotive after market business is

19  not part of the automotive industry or is somehow different?

20  A.    Did someone say it's not part of the automotive industry?

21  Q.    Well --

22  A.    I can't believe that's possible.

23  Q.    It's true, is it not -- I mean and we don't -- not to

24  state the obvious but that the automotive industry as a whole

25  has fallen on really hard times.

Lubin – Cross                    69

1   A.   The automakers, people who are making new cars I would say

2   have fallen on about as hard times as you possibly can fall on.

3   Q.   Did you happen to read the USA Today today?  This morning?

4   A.   I did not.

5   Q.   Did you see the article -- that's about as sophisticated

6   as I get, Mr. Lubin.  But there's an article at the very top of

7   the fold, top of the front that says auto parts suppliers are

8   in dire straits.  My point is is that the impact of the

9   automobile --

10          THE COURT:  Are you testifying now, Mr. Bracht?

11          MR. BRACHT:  I wish I had that article, Your Honor,

12   but I don't.

13          THE COURT:  I'm not sure you'd get it in, but that's

14   (inaudible).

15          MR. STROCHAK:  I object to the article.  It hasn't

16   been offered, Your Honor.

17   BY MR. BRACHT:

18   Q.   But the point, Mr. Lubin, is the automotive industry as a

19   whole is hurting, we all know that, and the after market part

20   of that industry -- the after market part is part of that

21   industry, is it not?

22   A.   It's part of the automotive industry --

23   Q.   It is.

24   A.   -- but it's driven by totally different economic forces --

25   Q.   Right.

Lubin - Cross                          70

1  A.    -- than the forces that are driving the results of people

2  making parts for new cars and people making new cars.

3  Q.    Right.

4          THE COURT:  Would you like to see my repair bills for

5  my old cars?

6          MR. BRACHT:  Well, I bet you, Your Honor -- I'll be

7  happy to look at them but I'll betcha they don't include an

8  insulator.

9          THE COURT:  I wouldn't bet on it.

10          MR. BRACHT:  How old is your car?

11          THE COURT:  Old enough.

12  BY MR. BRACHT:

13  Q.    It may be true that the after market part of this business

14  has not been impacted as bad as the OEM business but it's still

15  been impacted in a negative way, hasn't it?

16  A.    I couldn't speak to that because our business is up and

17  it's up substantially.

18  Q.    Okay.  So -- and your business apparently, your after

19  market business is different than every other after market

20  business that we've looked at and that W. Y. Campbell has

21  looked at in terms --

22          THE COURT:  Mr. Bracht.  Mr. Bracht.

23          MR. BRACHT:  I'm sorry, Your Honor.

24          THE COURT:  Let's -- you know, before Mr. Strochak

25  even has to get up to --

Lubin - Cross                              71

1          MR. BRACHT:  Okay.

2          THE COURT:  -- object, let's confine yourself to real

3    questions --

4          MR. BRACHT:  Thank you, Your Honor.

5          THE COURT:  -- not your testimony.

6          MR. BRACHT:  Thank you.

7    BY MR. BRACHT:

8    Q.   Have you studied the trends in multiples that have taken

9    place in the industry, including the after market industry,

10   since even starting in August of '07 and even as recent as

11   March of '08?

12   A.   I have not.

13   Q.   Okay.  And you couldn't tell me then what those trends are

14   in the after market industry.

15   A.   I could not.

16   Q.   Okay.  As I understand what has occurred over the six

17   months or so since we've started this process, do you recall in

18   March of '08 that you indicated in a letter to the, at that

19   point the ad hoc committee that the enterprise value of the

20   combined company would be approximately $100 million?

21   A.   I don't recall that.

22   Q.   You don't recall that?

23   A.   No.

24   Q.   Okay.  Let me show you what's been marked as Exhibit T.

25          MR. STROCHAK:  I thought we had an understanding of

Lubin – Cross                          72

1   this document, Your Honor.  I do have an objection to Exhibit

2   T.

3           THE COURT:  Can I look at it first?

4           MR. STROCHAK:  Absolutely, yeah.

5                   [Pause in proceedings.]

6           THE COURT:  Well, Mr. Bracht, certainly he can't ask

7   questions about the contents of it till he's tried to lay a

8   foundation for it but --

9           MR. BRACHT:  Well --

10          THE COURT:  -- I don't think you have a basis to

11  object yet.

12          MR. BRACHT:  Your Honor, I'm not offering it to show

13  that an offer was made or that any settlement proposals were

14  made.  I'm offering it simply for impeachment or refresh the

15  witness's recollection.  And --

16          THE COURT:  Tell me what the document is.

17          MR. BRACHT:  Your Honor, this is a --

18          THE COURT:  I see where it says, "confidential for

19  settlement discussion purposes only."

20          MR. BRACHT:  This is a proposal that was made by

21  Lexington to the ad hoc committee back in March of 2008.

22          THE COURT:  So why doesn't Rule 408 preclude you from

23  questioning on this document?

24          MR. BRACHT:  Why does it?

25          THE COURT:  Yeah, why does it not -- why are you able

Lubin - Cross                                    73

1   --

2          MR. BRACHT:  Because I think Rule 408, Your Honor, is

3   meant to prevent a determination or discussion or evidence

4   concerning the fact that offers had been made or proposals had

5   been made, and I'm not offering it for this purpose.  I'm

6   offering it simply to establish that Mr. Lubin indicated back

7   in March that the company -- he thought, given the various

8   offers that had been made, that the company was worth $100

9   million.

10          MR. STROCHAK:  Your Honor, I think that's classic use

11  of 408 information for an improper purpose.

12          THE COURT:  Objection sustained.

13          MR. BRACHT:  I can't use it to refresh his

14  recollection, Your Honor, but --

15          MR. STROCHAK:  There's been no foundation of a

16  failure of recollection, Your Honor.

17          MR. BRACHT:  I just dis -- well, I'll ask you.

18  BY MR. BRACHT:

19  Q.   Did you -- do you recall stating that in a proposal --

20          THE COURT:  In a settlement meeting?

21          MR. BRACHT:  Excuse me?

22          THE COURT:  In a settlement meeting?

23          MR. BRACHT:  No.  In this letter.

24          THE COURT:  Well, this is a -- objection sustained.

25  Go on to your next question.

Lubin – Cross                          74

1          MR. BRACHT:  Okay.

2          THE COURT:  This specifically says it's for

3   settlement discussion purposes only.

4          MR. BRACHT:  Okay.  Let me move back --

5          THE COURT:  If you've got something outside of

6   settlement discussions where you say he used that number, go

7   ahead and ask about it and maybe you could use it to refresh

8   recollection, but you can't use the -- objection sustained.

9          MR. BRACHT:  All right, Your Honor.  I'll move back a

10  little in time.

11  BY MR. BRACHT:

12  Q.   Let's go back to December of '07.  That was a point in

13  time when the company was trying to -- was soliciting offers

14  for the sale of the company, either in whole or in part,

15  correct?

16  A.   Yes.

17  Q.   And the company had received various letters --

18  indications of interest over that process.

19  A.   Yes.

20  Q.   And W. Y. Campbell prepared a chart that indicated that --

21  it was called an analysis of various sale transactions.  It was

22  dated December 13th of '07.  Do you recall that?

23  A.   I do.

24  Q.   And do you recall that in that chart that there was two

25  analyses of the value of the company based on selling all of

Lubin - Cross                                          75

1    the company and not just a part of the company?

2    A.    Well, they're -- I believe they're analyses of the value

3    based on the offers we'd received for the entire company.

4    Q.    Right.

5    A.    Yes.

6    Q.    And two of those offers were for to buy all of the

7    company.

8    A.    Yes.

9    Q.    Okay.  And do you recall that the offer -- the indication

10   of interest, as far as W. Y. Campbell indicated, the Parker

11   LRG-1 -- that's the Lexington Rubber Group, Inc., that the

12   total value of that transaction was just over $91 million?

13   A.    I don't remember the number but that's very possible.

14   Q.    Let me --

15            MR. BRACHT:  Your Honor, it's Exhibit S.

16                      [Pause in proceedings.]

17            THE COURT:  Okay.

18   BY MR. BRACHT:

19   Q.    The two on the far -- the very first two that are listed,

20   the Parker offer and then I believe the Watermill offer, those

21   were for all of the company, correct?

22   A.    All of the rubber group.

23   Q.    Right.  And all -- and that was roughly, those two offers

24   were basically in the 90 million, 90 to $92 million range?

25   A.    Well, when you got done with the taxes, the ultimate

Lubin – Cross                              76

1   value, because of the structure of that offer, was in that

2   range, yeah.

3   Q.   I'm sorry, was what?

4   A.   When you got done with taxes, because of the structure of

5   that proposal, the net value remaining was approximately $91

6   million, that's correct.

7   Q.   Okay.  All right.  And today, approximately ten months

8   since December of '07 and in the midst of the difficulties

9   experienced, that we all agree experienced by the automotive

10  industry, the value today that your adviser has put on this

11  business is somewhere in the 115 to $120 million range?

12  A.   I would say that that's not necessarily comparable to this

13  value.  This was an offer that the company did not accept, was

14  not prepared to accept.  But I would say yes, that the range is

15  somewhere in that -- the number is somewhere in that range of

16  value.

17  Q.   Yeah.  Basically more than a 20 percent increase over the

18  last ten months.

19  A.   Maybe, yeah.  Again, that wasn't an offer that was

20  accepted.  I think if you look at the other proposals that were

21  made and the ones that the company wanted to accept, in fact

22  the values were greater.

23  Q.   Right.  And one of those actually is -- that is listed

24  there, the Trowberg [Ph.] offer.

25  A.   That's correct.

Lubin – Cross                    77

1  Q.   Okay.  And that was the offer that was a part of the March

2  10th proposal that we talked about, right?

3          THE COURT:  The objection has been sustained on the

4  March 10th proposal, Mr. Bracht.

5          THE WITNESS:  I don't remember.

6          MR. BRACHT:  I'm not asking him anything.

7          THE WITNESS:  I -- I don't remember.

8          THE COURT:  You -- Mr. Bracht --

9          Just a second.

10          Mr. Bracht, don't step over the bounds.  I've

11  precluded you from dealing with the March 10th --

12          MR. BRACHT:  So I can't talk about it at all --

13          THE COURT:  That's right, you can't.

14          MR. BRACHT:  -- not even with respect to that

15  document.

16          THE COURT:  That's right, you can't.

17          MR. BRACHT:  Okay.  Thank you, Your Honor.

18  BY MR. BRACHT:

19  Q.   And this is in a time when, according to your lawyers,

20  that the economy has been in a free fall.  Do you agree with

21  that statement?

22  A.   I wouldn't --

23          MR. STROCHAK:  Objection, Your Honor.  I'm sorry, I

24  didn't quite understand the time period.  Are we talking about

25  December or currently.

Lubin - Cross                              78

1            THE COURT:  Overruled.

2            Do you understand the question?

3            THE WITNESS:  (No audible response.)

4            THE COURT:  Ask another question.  He said he didn't

5    understand it.

6            THE WITNESS:  I don't know what it is I'm answering

7    happened as a result of this free fall that I -- I wouldn't

8    make that characterization.

9    BY MR. BRACHT:

10   Q.   Okay.  Well, in fact your -- let me just ask you if you

11   agree with this statement that's contained in the same document

12   I quoted from earlier.  It's in paragraph two.  It's in the

13   middle of the paragraph.  It says, "Since early September --"

14           THE COURT:  Which document are you looking at?

15           MR. BRACHT:  I'm sorry, Your Honor.  It's the

16   objection 1 that I was referring to earlier.

17           THE COURT:  All right.  Go ahead.

18   BY MR. BRACHT:

19   Q.   "Since early September the economy has been in a free

20   fall, and it shows little signs of improving any time before

21   February 25th, 2009."

22           Do you agree with that statement?

23   A.   Since September.  I guess that's probably a pretty fair

24   statement given what's going on [inaudible].

25   Q.   You mentioned and talked a little bit about the exit

Lubin - Cross                          79

1  financing.  Do you remember at our last hearing with respect to

2  exclusivity was on July the 29th?  Does that sound about right?

3  A.    Sounds close enough to me.

4  Q.    Okay.  And do you recall that at that hearing you had or

5  Lexington had what I'm going to refer to as a letter of

6  proposal from Capital One Bank?

7  A.    That's correct.

8  Q.    Dated, actually dated July 29th of 2008.

9  A.    I'm not sure of the date, but.

10 Q.    Let me show you Exhibit N.  Is that the letter of

11 proposal?

12 A.    We've had several from them over time, but this looks like

13 the one to me.

14 Q.    And if you'll turn to -- (Pause).  If you'll turn to --

15 let me see what page it would be.  It's the ninth page.

16 A.    Okay.

17 Q.    Do you see the expiration date, it shows that the proposal

18 letter expires on August 31, 2008?

19 A.    (No audible response.)

20 Q.    And you've not received another proposal letter; is that

21 correct?

22 A.    No.

23 Q.    You had nothing in writing from Capital One regarding exit

24 financing.

25 A.    Nothing further than this.

Lubin – Cross                              80

1   Q.   Just a couple of questions about this inventory issue.   I

2   mean you're not suggesting that you're a million dollars parked

3   with Capital One and that if you bridge that gap that you're

4   going to get your exit financing?

5   A.   We believe we will, yeah.

6   Q.   The earlier indications were that Lexington felt like that

7   the inventory was worth 12 million and that the appraisal had

8   come back at five; is that correct?

9   A.   That's correct.

10  Q.   With respect to asbestos, I've looked at your public

11  filings.   There's been no public disclosure of any potential

12  claims or exposure or liability with respect to asbestos

13  claims?

14  A.   I think that's correct.

15  Q.   Okay.   And you have indicated in the past, haven't you,

16  that the company in fact has no exposure?

17  A.   We don't believe the company is liable for these claims,

18  no.

19  Q.   All right.   And you believe that if there is any exposure,

20  that insurance would cover it

21  A.   That's correct.

22  Q.   Okay.   Have you or the debtors sought to estimate the

23  asbestos claims?

24  A.   No, we've not.

25            MR. BRACHT:   I'll pass the witness, Your Honor.

Lubin - Cross                    81

1          THE COURT:  Mr. Lubin, in Exhibit N on the first page

2     it indicated that the proposed senior secured credit facility

3     was 39 and a half million.  I think I asked you earlier about

4     the amount of exit facility.  I think you said 35 million.

5          THE WITNESS:  I --

6          THE COURT:  Did they advise you that they were

7     reducing the amount?

8          THE WITNESS:  No, Your Honor.  I just recalled the

9     number badly.  It happens in my old age occasionally.

10         THE COURT:  Okay.  Thank you.

11         Any further redirect?

12         MR. STROCHAK:  Just a couple, Your Honor.  Thank you.

13         THE COURT:  Let me just ask before you begin.

14         Are you offering any of your exhibits, Mr. Bracht?

15         MR. BRACHT:  Your Honor, exhibit, I think Exhibit N

16    is -- you do a better job than I do.

17         THE COURT:  Well, you know, that's -- I really prefer

18    before you sit down from examining if you want to move

19    exhibits.  I don't like to have to catch up with it later or --

20         MR. BRACHT:  Okay.  Yes, I would like to offer

21    Exhibit N, Your Honor.

22         THE COURT:  What about S?  You examined on S as well.

23         MR. BRACHT:  Oh, yeah, sure.  Exhibit S as well.

24         THE COURT:  Do you have any objections to S or N?

25         MR. STROCHAK:  No, Your Honor.

Lubin - Redirect                                                82

1          THE COURT:  All right.

2          MR. BRACHT:  Thank you, Your Honor.

3          THE COURT:  Committee's Exhibits N and S are in

4    evidence.

5              (Committee Exhibits N and S, Received.)

6          THE COURT:  Go ahead, Mr. Strochak.

7                    REDIRECT EXAMINATION

8    BY MR. STROCHAK:

9    Q.   Mr. Lubin, let me ask you to pick up Debtors Exhibit 3 in

10   evidence, which is the valuation, the draft valuation report.

11   And just to clarify a couple of points, if you turn to page 38

12   there's a section entitled "Conclusion of Valuation of the Core

13   Assets."

14   A.   I see it.

15   Q.   Could you just explain for the Court what Lexington

16   considers to be its core assets, just in general terms.

17   A.    In this valuation we viewed the core assets as the

18   businesses that were clearly going to be part of the going

19   company, that is the rubber group and the corporate office and

20   the NOLs that would potentially shelter the profitability of

21   the rubber group.

22   Q.   Now, Campbell reached its conclusions, in this draft

23   report anyway, on four different valuation methods, correct?

24   And those are the four set forth in the middle of page 38?

25   A.    Well, I would say they applied four different

Lubin - Redirect                    83

1   methodologies to that and reached valuation conclusions.  But

2   when they got done evaluating, then they selected one method

3   as, in their mind, being the most accurate method.

4   Q.   And which method was that, sir?

5   A.   That was what we call the sum of the parts method.

6   Q.   And Campbell's conclusion on the valuation on sum of the

7   parts was roughly $111 million, correct?

8   A.   That's correct.

9   Q.   And then Campbell also performed a valuation of noncore

10  assets, correct?

11  A.   Yes.  Yes, they did.

12  Q.   And what are -- what's Lexington's view of what the

13  noncore assets are?

14  A.   Well, the noncore assets are certain pieces of real estate

15  and certain receivables that are -- certain pieces of real

16  estate that are not part of the going business and certain

17  receivables that we have basically from bankruptcy proceedings

18  that are not valued on the books.  Perhaps properly so.  The --

19          THE COURT:  These are claims you have in other

20  companies --

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  -- that are reorganization?

23          THE WITNESS:  Yes, Your Honor.

24          But basically it's the real estate that is held for

25  sale and it's the metals business, which at that point in time

Lubin - Redirect                          84

1   Campbell advised us they felt should not be viewed on a going

2   concern basis but should be viewed as a, in effect,

3   liquidation.

4   BY MR. STROCHAK:

5   Q.    And then turn, if you would, to page 46 of Exhibit 3.

6   Page 46 is Campbell's preliminary conclusions on the value of

7   the noncore assets, correct?

8   A.    That's correct.

9   Q.    And that's 13.2 million, roughly, correct?

10  A.    That's correct.

11  Q.    So if we add core and noncore together, we get a total

12  value, at least on this preliminary basis, of 124 if I did the

13  math right?

14  A.    Close enough.

15          MR. STROCHAK:   Thank you, Your Honor.   No further

16  questions.

17          THE COURT:   Thank you.

18          Further cross?

19          MR. BRACHT:   No, Your Honor.

20          THE COURT:   Thank you.   Witness is excused.   Thank

21  you very much, Mr. Lubin.

22          Mr. Strochak, any further witnesses?

23          MR. STROCHAK:   No, Your Honor.   That's our final

24  witness.   Thank you.

25          THE COURT:   Okay.   Does the debtor rest?

Lubin - Redirect                                    85

1          MR. STROCHAK:  We do, Your Honor.  I'm sorry.

2          THE COURT:  Mr. Bracht?

3          MR. BRACHT:  Yes, Your Honor.

4          THE COURT:  You have a witness you're going to call?

5          MR. BRACHT:  I do, Your Honor, Would you like to

6   proceed or -- I might be able to cut it down if I have a little

7   bit of a short lunch break and be able to kind of cut out some

8   of my questions that might be repetitive.

9          THE COURT:  Okay.  We'll take a lunch break.  You

10  know, I have what I thought was going to be the first matter on

11  the calendar.  There's some confusion about when it was going

12  to be heard.  It's a 363 sale.  There have been no objections

13  filed, so I expect it will be short.  So they're going to come

14  back at 2 o'clock.  How long do you -- do you have an estimate

15  of how long you -- you have one witness, right?

16         MR. BRACHT:  I have one witness, Your Honor, and I

17  think in light of what's been said today and kind of the way

18  things have gone, it will be I think probably 30 minutes maybe,

19  maybe 45 at the most but certainly no longer than that.

20         THE COURT:  Okay.  My suggestion is why don't you

21  come back at 2:15.  I'll hear the other matter at 2 o'clock and

22  we'll resume, we should be able to resume testimony at 2:15.

23  Mr. Silverstein looks like he has something he wants to suggest

24  to you.

25              [Pause in proceedings.]

Lubin – Redirect                              86

1          MR. BRACHT:  That will be fine, Your Honor.

2          THE COURT:  Okay.  Now, with respect to -- you know,

3    once the evidence is closed I'll hear argument from both sides

4    on this.  We obviously have something you all care about a lot,

5    your fee applications, which are on for today as well.  There

6    have been no objections filed but I don't know whether the U.S.

7    Trustee will -- what the U.S. Trustee will have to say.

8          UNIDENTIFIED SPEAKER:  Your Honor, the U.S. Trustee

9    has taken a position, and that is that they requested a 5

10   percent holdback, and we both agreed to that.

11         THE COURT:  Well, let me just say that with respect

12   to the committee's counsel, you didn't give us the backup for

13   the expenses.  You had just a brief summary schedule and none

14   of the backup.

15         UNIDENTIFIED SPEAKER:  We certainly have it.

16         THE COURT:  That's fine, but you have to give it to

17   me.  So I will -- I'll hear -- hopefully I don't think, if no

18   one filed any objections, if the U.S. Trustee -- I think Mr.

19   Schwartzberg assume that was what he was here for, so.  He's

20   left but we'll go ahead and take them but just so -- don't be

21   disappointed, I'm not going to rule on your application till I

22   get the backup data.

23         UNIDENTIFIED SPEAKER:  That's fine, Your Honor.

24         THE COURT:  Okay.

25         UNIDENTIFIED SPEAKER:  That's fine.

Lubin - Redirect                              87

1          MR. TSENG:  Oh.  I was just going to speak --

2          THE COURT:  You have to identify yourself.

3          MR. TSENG: I'm sorry.  This is Conray Tseng for the

4   debtors.  With regards to Weil Gotshal's fee application, we

5   have voluntarily reduced our fee application request by $15,000

6   pursuant to discussions with the United States Trustee.  We

7   also have a proposed revised order for the Court to reflect

8   certain changes that have been made for the requested amounts

9   in the proposed order we filed earlier with regards to SRR.

10  There were some typographical errors as to Exhibit A, and those

11  have been corrected.

12         THE COURT:  Let me suggest this.  If you've got

13  revised proposed orders, give them to my law clerks now.  It is

14  my plan when we finish the evidence and argument on exclusivity

15  I will hear motions on fees.  I have a few issues to -- you

16  know, that we have to raise but nothing earthshaking.

17         MR. TSENG:  Obviously it's the Court's preference,

18  but we could do them now if the Court would prefer.  If you'd

19  rather wait, obviously it's fine with us.

20         THE COURT:  Well, Mr. Bracht, what do you want to do?

21  Do you want to -- well, it's 12:20.  Let's break until --

22         MR. BRACHT:  I'm not going to be a part of that, Your

23  Honor, so I can sit here and do my work while you're having the

24  hearing.

25         THE COURT:  No, let's break now until 2:15.  I'll

Aultz - Direct                                    88

1  hear the sale motion in the other case right at 2:00 and it

2  won't take very long.  If you're -- it may not even take 15

3  minutes, so if you're ready to go we'll start as soon as I

4  finish that sale motion.

5          MR. STROCHAK:  Thank you, Your Honor.

6          MR. TSENG:  We'll be here at 2:00 and ready to go.

7  (Recess 12:22 p.m. to 2:01 p.m.)

8          THE COURT:  All right, why doesn't counsel in

9  Lexington Precision, No. 08-11153, come on back up.

10                     [Pause in proceedings.]

11         THE COURT:  Mr. Bracht, call your first witness.

12         MR. BRACHT:  Thank you, Your Honor.

13         THE COURT:  First and only, right?

14         MR. BRACHT:  My first and only witness, Your Honor.

15 Jesse Aultz called by the committee.

16         THE COURT:  Why don't you stand and raise your right

17 hand.

18          (JESSE AULTZ, COMMITTEE'S WITNESS, SWORN.)

19         THE COURT:  Have a seat, Mr. Aultz.

20         Go ahead, Mr. Bracht.

21                  DIRECT EXAMINATION

22 BY MR. BRACHT:

23 Q.   Mr. Aultz, you're with SRR; is that right?

24 A.   Correct.

25 Q.   What's your title?

Aultz - Direct                          89

1  A.    Manager.

2  Q.    All right.  And you're involved in working on the

3  valuation and other business concerning Lexington Precision?

4  A.    That's correct.

5  Q.    You and at least two other individuals at that firm have

6  been involved in working on that issue?

7  A.    Right.

8  Q.    Okay.  And you were sworn in and testified in the last

9  hearing on July the 29th; is that correct?

10 A.    That's correct.

11 Q.    Okay.  We've talked a lot about information.  At the risk

12 of belaboring it, I want to ask you just a couple of questions.

13 A.    Okay.

14 Q.    With respect to the connector seal portion of this

15 business, did SRR receive, ever receive the backup information

16 that you requested with respect to the original plan?

17 A.    With respect to the original plan we requested to receive

18 information about the type of business that was being

19 projected, whether it was booked or speculative or highly

20 likely, and we never did receive that for the original plan.

21 Q.    Okay.  That --

22         THE COURT:  When you say -- the original plan or the

23 original --

24         MR. BRACHT:  Original projection.

25         THE WITNESS:  Original projection.

Aultz - Direct                                    90

1              MR. BRACHT:  I'm sorry.

2              THE COURT:  Thank you.

3    BY MR. BRACHT:

4    Q.   Now, with respect to the revised projections on connector

5    seals, did you receive that type of information that you just

6    described?

7    A.   We did receive it along with the revised projection on

8    October 20th.

9    Q.   On October 20th of this year.

10   A.   Yes.

11   Q.   Okay.

12             MR. BRACHT:  I want to move to Exhibit O.  It's been

13   previously introduced, Your Honor.  I have a few questions

14   about that.

15             THE COURT:  Certainly.  It's in evidence, go ahead.

16   BY MR. BRACHT:

17   Q.   Mr. Aultz, will you identify Exhibit O, please?

18   A.   Exhibit O is the comparison of forecasted results to

19   actual for each segment of the Lexington business for the

20   months June through August.

21   Q.   Okay.  And the presentation of this exhibit at the top is

22   the consolidated results?

23   A.   Correct.

24   Q.   And then what's the second box?

25   A.   The rubber group.

Aultz - Direct                              91

1   Q.   And what does the rubber group include?

2   A.   The rubber group includes the connector seals division,

3   insulators, medical, and technologies.

4   Q.   Okay.  And then the metals group is the additional part?

5   A.   The metals group and the corporate group are added to get

6   to the consolidated.

7   Q.   Okay.  Now, the numbers --

8        THE COURT:  Can I just ask a question?

9        You have rubber group and connector seals in separate

10  boxes.  They're both part of the same group then?

11       THE WITNESS:  The rubber group is composed of

12  connector seals, insulators, medical, and technologies.  The

13  four segments below rubber group --

14       THE COURT:  They roll into the --

15       THE WITNESS:  Correct.

16       THE COURT:  -- into the rubber group?

17       THE WITNESS:  That's correct.

18       THE COURT:  Okay.  Go ahead.

19  BY MR. BRACHT:

20  Q.   The numbers that are on Exhibit O, where do they come

21  from?

22  A.   These come from the director's packages, which is the

23  monthly financial results provided by the company.  Which is --

24  is the same as the monthly operating reports.

25  Q.   And is Exhibit P the source documents for what's contained

Aultz – Direct                                    92

1    on Exhibit O?

2    A.    Yes, that's correct.

3              MR. BRACHT:  We would offer Exhibit P, Your Honor.

4              MR. STROCHAK:  No objection, Your Honor.

5              THE COURT:  Exhibit P is in evidence.

6                   (Committee Exhibit No. P, Received.)

7    BY MR. BRACHT:

8    Q.    Mr. Aultz, are the debtors hitting their forecasted

9    numbers?

10   A.    They are not since the release of the five-year plan.

11   Q.    How does this three-month snapshot that's contained on

12   Exhibit O, how does that compare to the debtors' historical

13   results regarding budget versus actual?

14   A.    We have the 2000 -- I believe 2004 through 2007 budgets,

15   and in each of those years the company missed its projections

16   by approximately 30 to 35 percent at an EBIDA level.  So --

17             THE COURT:  So they're doing better now?

18             THE WITNESS:  Theoretically through -- through

19   August.  September changed a little again.

20   BY MR. BRACHT:

21   Q.    All right.  And through August, on a consolidated basis,

22   how far off are they?

23   A.    On a consolidated basis through August, it's 18 and a half

24   percent below budget.

25   Q.    You mentioned the September results.  You've looked at the

Aultz - Direct                                    93

1  September operating statement?

2  A.   We did receive that later in the day yesterday, and the

3  September results were, I believe, 50.4 percent below budget.

4  Q.   If you add in the September results on a consolidated

5  basis, how far off are the debtors with respect to their

6  numbers?

7  A.   28 percent on a consolidated basis.

8  Q.   And that would be on a four-month -- June through

9  September.

10 A.   June through September, the first four months of the plan.

11 Q.   Okay.  Moving on to revised projections, just a few

12 questions there.  We've heard and talked a lot about the fact

13 that the debtors had revised their projections in September and

14 October of this year; is that right?

15 A.   That's correct.

16 Q.   Okay.  And you have reviewed those revised projections?

17 A.   I have.

18 Q.   All right.  And let me show you what's been marked as

19 Exhibit R.  Would you identify Exhibit R, please?

20 A.   Exhibit R is a comparison of the insulators and medical

21 projections as they've changed over time.

22 Q.   Okay.  You've had conversations with the debtors

23 concerning these revised projections and with W. Y. Campbell as

24 well?

25 A.   We have.

Aultz - Direct                    94

1   Q.   Okay.  And what was your understanding, based on those

2   conversations, as to what was the catalyst for the revised

3   projections?

4   A.   Some item --

5   Q.   As shown on Exhibit R.

6   A.   Some of the items have changed.  We asked questions about

7   specific line items and what the backup was or the reasoning

8   for the projections, and some of those items had changed since

9   July when the plan had come originally.  So they were making

10  projections to -- to account for those changes and to take out

11  some business that had been lost and add new business that they

12  were hoping to get.

13  Q.   All right.  So the reductions, as you're understanding,

14  were based on actual events, for lack of a better term?

15  A.   Yes.

16  Q.   And the additions that resulted in what we see on Exhibit

17  R were basically forecasts or projections in the future?

18  A.   They were projections for new business, yes.

19  Q.   Okay.  Have you -- moving on.  Have you done, you and NSR,

20  done an analysis of the multiple trends among comparable

21  companies in these industries that the debtor is involved in?

22  A.   We have looked at the trends in multiples of comparable

23  companies in the medical business as well as the automotive

24  business.

25  Q.   How are the multiples trending in the automotive business?

Aultz - Direct                                    95

1  A.   In the automotive business over the last year the average

2  multiple is down about 50 percent.  Over the last six months I

3  believe it's down about 40 percent.

4          THE COURT:  Could you explain what you mean by the

5  average multiples are down?

6          THE WITNESS:  Sure.  If we look at a set of

7  comparable automotive companies, looking at companies that were

8  chose by us as well as W. Y. Campbell in their report, and look

9  at the average multiple of that comp set from, say, March 31st

10 to September 30th --

11         THE COURT:  Multiple of what?

12         THE WITNESS:  Enterprise value to EBIDA.  Primarily

13 EBIDA multiples are what we were considering.

14         THE COURT:  Okay.

15         THE WITNESS:  The average multiple has declined about

16 40 percent over that time.

17         THE COURT:  All right.

18 BY MR. BRACHT:

19 Q.   In fact, you indicated that that analysis included both

20 sets of comparable companies, both in automotive and in

21 medical?

22 A.   Correct.

23 Q.   And including the W. Y. Campbell comparables?

24 A.   Yes.

25 Q.   And did it include companies, comparable companies in the

Aultz - Direct                                      96

1  after market industry or after market segment of the automotive

2  industry?

3  A.   It did.  It was OEM and after market companies.

4  Q.   Okay.  Did the multiples with respect to the after market

5  companies, did they show similar negative trends over a period

6  of time?

7  A.   They did.  The after market companies are also declining

8  at a significant rate at this point.

9  Q.   Okay.  And what about medical, what is being shown with

10 respect to multiples there?

11 A.   Medical is less severe.  Over the last six months to a

12 year the medical multiples are down on average 10 to 15

13 percent.

14 Q.   Now, when the multiples of companies go down over time,

15 what does that indicate with respect to value?

16 A.   That implies that, all else being equal, the value would

17 decline, assuming you're applying it to the same earnings

18 level.

19 Q.   Okay.  Now, how does that -- how does the trend that

20 you've analyzed with respect to the industries in question, how

21 does that negative trend compare to what you understand to be

22 management's view of the value of this company over time?

23 A.   Our understanding from discussions with them is that they

24 believe the value is increasing.

25 Q.   By what percentage?  Approximately.

Aultz - Direct                                    97

1   A.   I guess it's changed over time, maybe 10 to 20 percent in

2   the last six months.

3   Q.   Okay.  Would you consider that position to be inconsistent

4   or consistent with the industry trends that you've talked

5   about?

6   A.   It seems inconsistent with what the market's showing.

7   Q.   We've talked a bit about after market.  Why is the after

8   market portion of this industry impacted by the same kind of

9   general malaise that is affecting the automotive industry as a

10  whole?

11  A.   There are numerous factors that affect both the OEM and

12  the after market business.  The after market business is

13  affected by the fact that if less cars are built, there's less

14  cars that need repairs down the line.  The less cars on the

15  road is a negative impact.  People are driving less given

16  prices of gas, and so the total miles on vehicles is declining,

17  which leads to fewer replacements.  And then the average age of

18  vehicles could go up if production stays low, so that would be

19  an offsetting factor.  So there are factors that goes both --

20  go both ways but in the marketplace the values of these

21  companies is declining.

22  Q.   Is -- based on your analysis, is there any material

23  difference between the current multiples between the after

24  market industry and the OEM industry?

25  A.   If we look at companies that are comparable, we don't

Aultz - Direct                                98

1  believe there's a material difference in the multiple, assuming

2  they're comparable in the first place, which is always the

3  important point.

4  Q.   Let me show you what's been marked as Exhibit Q.  Could

5  you identify Exhibit Q, please?

6  A.   This is a -- a comparable company trend over the last year

7  or so looking at enterprise value to EBIDA multiples.

8  Q.   This is the work product of what you just testified to?

9  A.   Yes.  This is our industry snapshot.

10 Q.   Okay.  And this is something that SRR completed and it

11 indicates what their views are with respect to industry trends.

12 A.   That's correct.

13 Q.   Okay.

14       MR. BRACHT:  Your Honor, we would offer Exhibit Q at

15 this time.

16       MR. STROCHAK:  Your Honor, I don't have any objection

17 to being offered for the fact that SRR has performed this

18 analysis.  I do have a problem with it being offered for the

19 truth of the matter asserted.  I think it's properly the

20 subject of expert testimony and not appropriate for this

21 hearing for that purpose.

22       THE COURT:  Mr. Bracht?

23       MR. BRACHT:  Your Honor, we're offering it as in the

24 nature of expert or opinion testimony concerning the trends.

25       THE COURT:  Objection sustained then.  You didn't lay

Aultz - Direct                                          99

1   the foundation for this to be --

2           MR. BRACHT:  Well --

3           THE COURT:  -- as expert testimony.  If you have a

4   more limited purpose, I'll take it but --

5           MR. BRACHT:  Well --

6           THE COURT:  -- this is not the valuation hearing.

7   This is not -- I'm going to sustain the objection for the

8   purpose if you're offering it as expert opinion on value.

9           MR. BRACHT:  Your Honor, the -- this is not related

10  directly to value, and Mr. Aultz was qualified as an expert in

11  the last hearing.

12          THE COURT:  Well, if you go back to the transcript of

13  the last hearing, I did not hear testimony -- I think I made

14  clear that I was not hearing testimony for purposes of

15  valuation.  The objection is sustained.

16          MR. BRACHT:  Your Honor, I would offer Exhibit R.

17          MR. STROCHAK:  No objection, Your Honor.

18          THE COURT:  Exhibit R is in evidence.

19              (Committee Exhibit No. R, Received.)

20  BY MR. BRACHT:

21  Q.   Mr. Aultz, has SRR done a preliminary analysis of the

22  company's value?

23  A.   We have done a preliminary analysis.

24  Q.   And have you presented it to the company?

25  A.   We did.

Aultz - Direct                                          100

1   Q.   And you had discussions with the company about it?

2   A.   We did.

3   Q.   Is it your final analysis?

4   A.   No, it is not.

5   Q.   It may change?

6   A.   It may change.

7   Q.   And was this done at the company's request so we could

8   talk about values?

9   A.   They asked for something in writing so that we could have

10  a discussion about values.

11  Q.   All right.  And in terms of what you -- and you presented

12  it to the company.  In terms of what you preliminary concluded,

13  have you concluded whether or not the company is insolvent?

14  A.   Based on our preliminary valuation, it appears that the

15  value of the debt exceeds the value of the assets.

16  Q.   Okay.

17       MR. BRACHT:  No further questions, Your Honor.

18       THE COURT:  Thank you.

19       Cross --

20       MR. STROCHAK:  Again, Your Honor, little late but

21  same objection.  To the extent it's offered for the truth of

22  the matter asserted, we think it's inappropriate expert

23  testimony.

24       THE COURT:  You know, I told my law clerks this

25  morning a story that a judge many years ago when I was

1   practicing, I finished my examination of a witness, and the

2   opposing counsel got up and with feigned outrage complained

3   about a lot of things he had heard.  And the judge said I'm not

4   an umpire calling balls and strikes, so if you want to timely

5   object when a question is asked, I'll entertain it.

6            The objection, late objection is overruled.  Cross-

7   examination.

8                        [Pause in proceedings.]

9            MR. STROCHAK:  Your Honor, I have one further exhibit

10  to offer and bring a copy to the bench.

11           THE COURT:  Okay.  I've been handed what's been

12  marked for identification as Exhibit 17.

13                        CROSS-EXAMINATION

14  BY MR. STROCHAK:

15  Q.   For the record, Adam Strochak, Weil Gotshal for the

16  debtors.  Mr. Aultz, I've handed you Debtors Exhibit 17.  The

17  first page is an e-mail, and you can skip over the top half of

18  the page, which is just the forwarding information.  If I could

19  direct your attention to the from and sent lines at the --

20  about two-thirds of the way down the page where it says from

21  Kurt Haras to Brian Hock [Ph.], Jeff Risius, and Jesse Aultz,

22  and it's dated August 25th, 2008.

23           Do you recall receiving an e-mail from Mr. Haras on

24  August 25th, 2008?

25  A.   We receive a lot of e-mails, but I do definitely recognize

Aultz - Cross                                    102

1  this -- this attachment that came with it.

2  Q.    And Mr. Haras was forwarding to you with that attachment -

3  - excuse me, was forwarding to you with that e-mail the

4  attached document which is behind the first page, which is

5  Lexington Precision Corporation Vienna facility sales forecast

6  2008 through 2012, correct?

7  A.    Correct.

8  Q.    This is, that is Exhibit 17, the attachment to the e-mail,

9  is backup detail relating to the Vienna facility forecast,

10 correct?

11 A.    That's correct.

12 Q.    And the Vienna facility, that is Vienna facility is where

13 they manufacture connector seals products, correct?

14 A.    Right.

15 Q.    Now, you received this package of information in late

16 August.  Is that the first time that you had received it?

17 A.    I believe this was the first time we received this

18 information.

19 Q.    You indicated in your direct testimony that you thought

20 something was missing from this package.  What information did

21 you think was missing from this detail package that existed

22 that you did not get?

23 A.    I believe when we received this I sent an e-mail back to

24 Kurt I'm assuming within a day or two asking if this was what

25 we expected to receive or if there would also be more

Aultz – Cross                               103

1  information coming that we had requested related to booked

2  business, highly likely versus prospective.  And Kurt's

3  response was that's still coming and that's in addition to what

4  you received yesterday.

5  Q.   When you say booked business, what does booked business

6  mean in this industry?

7  A.   It could potentially be better classified as current

8  business or in production business.  I believe that's the

9  category the company uses for the other divisions that we

10  received.

11  Q.   So you received this booked business backup for the other

12  divisions but none for connector seals?

13  A.   Correct.

14  Q.   As you sit here today are you aware that there was any

15  booked business detail information for the July forecast?

16  A.   Whenever we requested it we were told that it was being

17  aggregated for us so that we could use it.  I don't know that

18  it was ever finished or that it existed, no.

19  Q.   And you did get that level of detail with respect to the

20  updated projections that were delivered to you just a week or

21  ten days or so ago?

22  A.   That's correct.

23          MR. STROCHAK:

24          MR. STROCHAK:  Your Honor, just to clean the record

25  up, we would offer Exhibit 17 into evidence.

Aultz – Cross                          104

1              MR. BRACHT:  No objection, Your Honor.  Just one

2   point of clarification.  Does it include the detail that --

3              THE COURT:  My understanding it's the whole -- it's

4   both.

5              MR. BRACHT:  Both.  Okay.  No objection.

6              THE COURT:  Okay.

7              MR. STROCHAK:  That's the intention, Your Honor, the

8   e-mail and --

9              THE COURT:  Yes.

10             MR. STROCHAK:  -- the attachment.

11             THE COURT:  Exhibit 17 is in evidence.

12                  (Debtors Exhibit No. 17, Received.)

13             MR. STROCHAK:  Thank you.

14  BY MR. STROCHAK:

15  Q.   Let me turn you to Exhibit R, which I think you have in

16  front of you, Mr. Aultz.

17  A.   Uh-huh.

18  Q.   Exhibit R is your comparison of the debtors' various

19  projections that they've evolved over the last several months;

20  is that correct?

21  A.   Right.  We put this document together.

22  Q.   And you've only looked at two business segments here, the

23  insulator segment and the medical segment, right?

24  A.   In this document, yes.  We have now compared the connector

25  seals now that we have it.

Aultz – Cross                          105

1  Q.   With respect to the differences, if we look for example at

2  Jasper, and let's just focus on EBIDA, you've got the July

3  number for 2008 is 84, excuse me, 8.4 million and the October

4  number for 2008 is 8.5 million.  I'm rounding here.  Do you

5  view that as a significant change in the projections?

6  A.   No, we do not.

7  Q.   And the next line over, the 2009 projection, 10 million,

8  just a hair over 10 million in July and 9.8 million, roughly,

9  in October, do you view that as a significant deviation?

10 A.   No.  I wouldn't view any of the years as significant

11 deviations.

12 Q.   Now, when Mr. Bracht asked you a question I think you

13 indicated in sum or substance that you believe that some

14 adjustments to the projections were firmer in some respect than

15 other adjustments.  Is that correct, do you believe that to be

16 true?

17 A.   For some of the adjustments we were told it was newly

18 signed up or they had new information from the client and other

19 was new prospective business that was not as firm, yes.

20 Q.   And is it your testimony, sir, that the downward revisions

21 are categorically firmer than the upward revisions?

22 A.   For some of the items I think it goes both ways.  Some of

23 the items that came out, they know they've lost the business so

24 it's no longer in the budget.  Some of the items that came in

25 are now in production, and some of the items that came in now

Aultz - Cross                    106

1  are not in production but they expect to get or they're

2  prospective.  I don't think they took out anything that they

3  don't expect to lose.

4  Q.   And that's an ordinary part of the projection process,

5  correct, is that, you know, some projections are firmer than

6  others, right?

7  A.   Right.  And that's why we're asking for the different

8  levels of confidence.  That's why that was important to us was

9  because, as you just said, some items are firmer than others.

10                     [Pause in proceedings.]

11 Q.   With respect to Exhibit Q, your calculation of multiples.

12 A.   Uh-huh.

13 Q.   On what basis were those values calculated?  Were they

14 based on --

15           THE COURT:  Are you sure you want to go into it since

16 this is not in evidence.  But if you want to, go ahead.

17           MR. STROCHAK:  Well, the testimony --

18           THE COURT:  I'll -- I'll --

19           MR. STROCHAK:  -- was offered, Your Honor.  I know

20 the document's not in evidence.

21           THE COURT:  Go ahead.

22           MR. STROCHAK:  I appreciate that.

23 BY MR. STROCHAK:

24 Q.   Were you basing your connection -- your projections --

25           THE COURT:  I just may reconsider my earlier ruling.

Aultz – Cross                                    107

1    Go ahead.

2            MR. STROCHAK:  I'll stop right there, Your Honor.

3    Thank you.

4                    [Pause in proceedings.]

5    BY MR. STROCHAK:

6    Q.   Turn with me to Exhibit O, if you would.

7    A.   The budget to actual?

8    Q.   Yes, exactly.  You've calculated 18 percent off on a

9    consolidated basis over the three-month period, and that's

10   cumulative for the three months.  And that totals $545,000; is

11   that correct?

12   A.   That's correct.

13   Q.   What makes up the bulk of the $545,000?  That is what

14   business segments make up the bulk of that?

15   A.   The largest segment is connector seals, and I believe the

16   second largest segment is metals.

17   Q.   Medical is -- if we turn to page 2 of Exhibit O, is

18   $59,000 over the three-month period?

19   A.   That's correct.

20   Q.   Is it your view, sir, that $59,000 off on projections for

21   this business with sales of roughly $4.2 million over the

22   three-month period is a material deviation from the

23   projections?

24   A.   I don't think that 59,000 over three months is necessarily

25   material.  I guess the issue that we -- that we've considered

Aultz – Cross                              108

1   is if that trends continues through the -- through the year, 6

2   percent could be material by the end of the year.  So we don't

3   have the detail on September.  I think it was offered earlier.

4   All we have is the consolidated number.

5   Q.   Mr. Aultz, have you dived into the numbers to see exactly

6   where the company is missing on the medical projection in

7   particular?  Where does that $59,000 come from?  Where's that

8   level of granularity that you haven't looked into?

9   A.   Well, we don't have as much detail on the actual as we do

10  the budget actually, but it's not a sales level.  As you can

11  see, medical is hitting its sales numbers or approximately 1

12  percent above budget on sales.  So it appears to be a cost

13  issue given that margin is not where it is expected to be.

14  Q.   You don't have a level of detail to determine, for

15  example, what particular parts might be at issue or what might

16  be the reasons why costs in those parts might be greater than

17  anticipated?

18  A.   We don't receive part-by-part financial statements for the

19  actuals.

20                    [Pause in proceedings.]

21  Q.   You indicated before that you had provided preliminary

22  valuation information to the debtors.  When was that done?

23  When did you complete your valuation work, at least to the

24  extent that it's been done so far?

25  A.   I believe the preliminary indication was sent out on

Aultz – Cross                                     109

 1   Friday.

 2   Q.    This past Friday?

 3   A.    Yeah.  Five days ago, yeah.

 4   Q.    And that was discussed at the meeting that you and I both

 5   attended yesterday, correct?

 6   A.    Correct.

 7   Q.    Based on, you know, your perceptions from working with the

 8   committee and participating in the negotiations with the

 9   debtor, do you believe that the committee and the debtors have

10   reached an impasse where no further progress could possibly be

11   made on valuation?

12   A.    I don't believe so.

13   Q.    Mr. Aultz, at this point does SRR have all the information

14   that it's requested from the debtors?  Is there anything

15   outstanding?

16   A.    I don't believe there's anything outstanding currently

17   with the receipt of the connector seals information.

18   Q.    Is there anything else you need?  As you sit here today do

19   you anticipate that you need any additional detail on anything?

20   A.    I believe from an enterprise value perspective we have the

21   information we requested.  Obviously this is a fluid situation,

22   and issues related to cash balances and reorganization fees are

23   changing.  The original projection was an emergence on October

24   31st in the Campbell report, which obviously is not going to

25   happen.  So some of the add backs and the deductions from

Aultz - Redirect                              110

1   enterprise value are not set in stone.  So that is information

2   that we've had a recent call with -- with Dennis Wilhouse to

3   get his most recent projections.  And that's something that

4   will continue to change, I would imagine, throughout this

5   process.  But I believe from the enterprise value perspective

6   we have the information we've requested.

7              MR. STROCHAK:  Thank you, Your Honor.  I have no

8   further questions.

9              THE COURT:  Thank you.

10             MR. STROCHAK:  Thank you.

11             THE COURT:  Redirect?

12             MR. BRACHT:  Yes, Your Honor.  Just a few.

13                      REDIRECT EXAMINATION

14  BY MR. BRACHT:

15  Q.   Exhibit H, Mr. Aultz.  At the top of Exhibit H there's a

16  message from Mr. Kurt Haras at W. Y. Campbell; is that correct?

17  A.   That's correct.

18  Q.   And this is what date?

19  A.   August 26th.

20  Q.   And that would be a day after the previous Exhibit 17 that

21  Mr. Strochak asked you about?

22  A.   That's correct.

23  Q.   Okay.  And what does the message from Mr. Haras say?

24  A.   It says that "per my voice mail the information described

25  in item 1, which is below, which details the information we

Aultz - Redirect                        111

1   were looking for on connector seals broken out by level of

2   confidence, is being aggregated and put into a format that we

3   can understand, which is in addition to the detail provided

4   yesterday," and they will pass it along as soon as it's

5   available.

6   Q.   All right.  And the addition -- in addition to material

7   that was provided yesterday, was that the material that was

8   part of Exhibit 17?

9   A.   That's correct.

10  Q.   Okay.  And the material that Mr. Haras says in August the

11  25th that they're aggregating and will provide to you as soon

12  as he gets it, that's the information that you got on October

13  the 23rd?

14  A.   October 20th.

15  Q.   October 20th.  Excuse me.  One question about needed

16  information.  You were careful to say from an enterprise value

17  point of view that you have the information that you need.

18  What about with respect to the noncore assets, do you have all

19  the information you need with respect to the noncore assets?

20  A.   I think we're still discussing that with the company to

21  get the best information.  We have -- I don't have any specific

22  request today.  As we work through that, that may require

23  further clarification.  And I think they're aware of that,

24  we've had that discussion with them in the last week.

25  Q.   Okay.  So there's still some to come with respect to the

112

1  noncore assets?

2  A.   Eventually.

3          THE COURT:  That's not what he said.

4          THE WITNESS:  There could be more to come.

5          MR. BRACHT:  I'm sorry, Your Honor.

6  BY MR. BRACHT:

7  Q.   Could be more to come.

8  A.   Yes.

9  Q.   Okay.  Thank you.

10         MR. BRACHT:  That's all I have.

11         THE COURT:  Thank you.  Any further questions, Mr.

12 Strochak?

13         MR. STROCHAK:  No further questions, Your Honor.

14 Thank you.

15         THE COURT:  All right.  You're excused, Mr. Aultz.

16         THE WITNESS:  Thank you.

17         THE COURT:  Committee rests?

18         MR. BRACHT:  We rest, Your Honor.

19         THE COURT:  Okay.  Any rebuttal case?

20         MR. STROCHAK:  No, Your Honor.  We're through.

21         THE COURT:  All right.  Both sides rest?

22         MR. BRACHT:  Yes, Your Honor.

23         MR. STROCHAK:  Yes.

24         THE COURT:  Okay.  All right.  I'll hear argument.

25              [Pause in proceedings.]

113

```
 1              MR. STROCHAK:  Your Honor, let me start --

 2              THE COURT:  Before you do that.

 3         Are you offering Exhibit H?

 4              MR. BRACHT:  Yes, Your Honor.  Thank you.  Sorry.

 5              THE COURT:  Any objection?

 6              MR. STROCHAK:  I just need to pull it out.  I've just

 7    forgotten what it was.  No objection, Your Honor.

 8              THE COURT:  All right.  Exhibit H is in evidence.

 9              (Committee Exhibit No. H, Received.)

10              THE COURT:  I'm sorry, Mr. Strochak.  Go ahead.

11              MR. STROCHAK:  Thank you.  Your Honor, we're here

12    seeking extension of exclusivity to get us through the next

13    phase of this case, the plan process.  We have a plan on file,

14    we have a disclosure statement on file.  We have scheduled a

15    hearing on the disclosure statement for the third week of

16    November, November 24th I believe it is.  We are in a position

17    now to move the case forward toward confirmation of a plan of

18    reorganization.

19              THE COURT:  Are you going to have to amend the

20    disclosure statement before the hearing?

21              MR. STROCHAK:  There will be amendments, Your Honor.

22    Our intention is to go through and do whatever amendments are

23    necessary to the disclosure statement.  You know, we're still

24    cautiously optimistic that we're going to have -- continue

25    negotiations and maybe we can get to a resolution.  There would
```

1    be an amendment to deal with that if necessary.

2              THE COURT:  Okay.  Have you discussed the contents of

3    the disclosure statement with Mr. Silverstein?  Have you

4    received I mean comments on the disclosure statement at this

5    point?

6              MR. STROCHAK:  I don't believe we've received

7    anything from the committee specific --

8              THE COURT:  Have you asked them for it at this point

9    or not?

10             MR. STROCHAK:  Pardon me?

11             THE COURT:  Have you asked them for it?

12             MR. STROCHAK:  I don't think we made a specific

13   request saying, you know, do you have any problems with the

14   disclosure statement.  I don't think we specifically asked them

15   to give us comments, but we're certainly --

16             THE COURT:  Okay.

17             MR. STROCHAK:  -- welcome to take them.  Working

18   through the Adelphia factors or the factors outlined by the

19   Court in the Adelphia opinion, Your Honor, size and complexity

20   of the case.  It's not an enormous case.  It's also not a

21   terribly simple case.  It's required a lot of attention from

22   the company in terms of information demands.  The committee has

23   probed very deep into the company's finances down to the

24   purchase order level in many respects, and that's taken time to

25   get us here.

115

1          The company has tried its level best to provide the

2     information that's been requested, the information that it had

3     at all times.  Could we have done it a little bit faster in

4     some cases?  I'm sure there are instances when it could have

5     moved a little bit faster but just due to circumstances it

6     didn't.  But we're here, the committee has the information it's

7     requested, it has the information that it needs, and we're

8     hopeful that the plan process can move forward from that basis.

9          The committee in this case, you know, made a choice.

10    They made a choice in terms of how they wished to proceed with

11    negotiations.  And they were more comfortable waiting until

12    they had all the information, until they had all the updated

13    forecasts before sitting down and starting to talk about

14    valuation and negotiation of the plan.  That's okay.  That was

15    their decision.  I'm sure they had plenty of good reasons for

16    wanting to proceed that way.  And we're a little bit frustrated

17    with it at times.  We would have liked to start a little bit

18    earlier.  That's not to say that I'm talking dramatically

19    earlier.  I'm talking, you know, the end of September rather

20    than the second week in October.  So we're not talking about a

21    dramatic difference here.  But that's the way the case has

22    proceeded.

23          I think we've demonstrated good faith progress toward

24    a reorganization in this case, Your Honor, as demonstrated by

25    the documents we filed with the Court, by the information

1  exchange, by our continuing to work with -- to try and resolve

2  planned treatment for the asbestos claimants.

3          THE COURT:  Let me ask you this, Mr. Strochak.  In my

4  July 31, 2008 order granting your motion to extend exclusivity,

5  at page 6 I said, "Based on the testimony during the hearing,

6  the Court believes that the parties should be in a position to

7  undertake serious plan negotiations no later than early

8  September 2008."  So tell me what it is that kept that from

9  happening.

10          MR. STROCHAK:  I think we were off by about a month

11  what we anticipated as we were -- when we were here in July,

12  Your Honor.  I think that delay was accounted for in part by

13  the time it took us to prepare the valuation report, which you

14  have as Debtors Exhibit --

15          THE COURT:  3.

16          MR. STROCHAK:  -- 3, I believe.  That took longer

17  than we had hoped, and that was a conscious decision on our

18  part.  We felt that we would advance the process most by

19  putting forward a very well-developed valuation report,

20  something that was very close to a final report of a type that

21  we would use almost as a Rule 26 type document in the case.  So

22  while we put summary valuation information in the disclosure

23  statement, which was filed on August 8th and that was available

24  to the committee then, we took a step back at that point and

25  said, well, what makes sense here, should we give the committee

1   some summary schedules and use that as a framework for

2   discussion of valuation and should we take the time that we

3   need to prepare a more complete report, and we opted for the

4   latter.

5          THE COURT:  Remind me when the debtors provided the

6   committee and its advisors with the Campbell valuation report.

7          MR. STROCHAK:  I believe it was the third week in

8   September, Your Honor.  I think it was September 19th.  It may

9   be listed on Exhibit 4.  It is.  It's listed on Exhibit 4, and

10  Exhibit 4 indicates that the Campbell draft valuation report

11  was provided to the committee on September 19th.  In fairness,

12  that was a Friday so I really wouldn't expect them to look at

13  it until the following week.

14          I really think that that largely accounts for the

15  delay off of what we anticipated in July.  The other factor

16  really is what's been going on in the industry, Your Honor.  I

17  mean we all recognize that the OEM segment has been subject to

18  very, you know, significant changes during the period.  And the

19  debtors took a step back and realized that they were going to

20  have to look at their forecasts again, and that process took

21  some time.  And I think as the Court heard testimony, it really

22  wasn't until the third week in October that we were able to

23  complete revised forecasts for that and provide those to the

24  committee.

25          THE COURT:  But the -- how does the deterioration of

1  the OEM business affect your valuation?

2         MR. STROCHAK:  It's the debtors' position that it

3  really doesn't move the needle on valuation --

4         THE COURT:  But that's what I thought I heard

5  [indiscernible].

6         MR. STROCHAK:  Exactly, Your Honor.  And that was our

7  position, we made that clear in correspondence to the

8  committee.  We explained why we felt that was the case, and

9  we've given Your Honor some of that correspondence in the

10 exhibits, which I don't have the exact number but I can -- if I

11 take a moment I can find you it.  But, you know, we took the

12 position that we don't think it's really going to change much

13 on connector seals.  The valuation that Campbell did on

14 connector seals was -- although it wasn't a wind-down value, it

15 was very close to the value you would get if you did a wind-

16 down value.  So we explained to the committee that we don't

17 really think the change in the connector seals forecast is

18 going to move the needle overall on valuation because we're

19 already valuing it at pretty much what it would be worth if we

20 just, you know, sold it off.

21        THE COURT:  So what you're telling me is that -- you

22 make the point, both in your reply and in some of the

23 testimony, about what you can read about in the paper every

24 day, the OEM business, not only for Lexington but everybody

25 else in the auto industry, has substantially declined.  But

119

1  what I'm hearing you say now is that doesn't affect your

2  valuation because you essentially put that in as the winding up

3  or liquidation value.

4         MR. STROCHAK:  For the most part that's correct, Your

5  Honor.  That is our view of it at this point.  Now, you know,

6  it doesn't -- the business does have prospects.  I mean it's

7  not without prospects, and I think Mr. Lubin testified -- I

8  can't remember if it was Mr. Lubin or Mr. Wilhouse but one of

9  them testified that you have the company's customers,

10  Lexington's customers are operating at much reduced

11  inventories.  So there is a possibility for an uptick there.

12  At some point they will need to replenish those inventories.

13         THE COURT:  Hopefully.

14         MR. STROCHAK:  So there are prospects there.  If you

15  look at the forecasts and use a discounted cash flow-type

16  valuation forward, you might get a larger number than a wind-

17  down value for connector seals.  But where we are now in

18  Campbell's draft valuation is that it's very close to a wind-

19  down value.  So, you know, we told the committee that was our

20  view of the valuation.

21         THE COURT:  When you say very close, how much -- did

22  they -- I didn't get to read the report yet.  Do they show what

23  going concern versus liquidation value would be?

24         MR. STROCHAK:  I don't think Campbell formally looked

25  at it as a liquidation value-type business.  Our assessment

120

1  was, you know, Campbell came up with a number in their

2  projections, and it would take me a moment or two to find it,

3  but, you know, they came up with a number and the debtors'

4  assessment is that number is fairly close to what an orderly

5  wind down would be.  No, I don't mean a liquidation, I don't

6  mean, you know, appoint a Chapter 7 trustee tomorrow but more

7  of an orderly wind down of the business.

8          And, you know, we expressed that view to the

9  committee, and the committee decided that it really wanted to

10 wait until it had the revised connector seals forecast in order

11 to really sit down at the table and start talking.  You know,

12 that was their decision and we understood it.  We think we

13 could have met perhaps a little bit sooner but that's the way

14 it shook out, and I think that was part of -- accounted for

15 part of the delay.

16         THE COURT:  So there have been two meetings with the

17 committee since September, is that -- am I correct in that?

18 Did I hear that?

19         MR. STROCHAK:  Well, I think there were some other

20 communications going on.  There were --

21         THE COURT:  No, meetings.

22         MR. STROCHAK:  -- other communications.

23         THE COURT:  Meetings.

24         MR. STROCHAK:  But formal meetings with the committee

25 --

1          THE COURT:  Two?

2          MR. STROCHAK:  -- we had two.  We had one yesterday

3    for several hours, three, four hours I believe it went, and

4    then we had one -- I'm just drawing a blank on the date.  I

5    want to say October 13th but I may be wrong on the date.  It

6    was a couple weeks ago at this point.  Again, you know, a

7    couple hour meeting.  And, you know, I think, as it's been

8    characterized in the hearing, we're still far apart on value

9    and we don't have a deal, we don't have anything close to a

10   deal.

11         I think yesterday for the first time we felt, at

12   least on our side we felt like we were at least making progress

13   in terms of talking about a structure.  That's where things

14   stand right now.  And as the Court heard, I don't think either

15   side believes that we're at an impasse where, you know, further

16   negotiations would be futile.  In fact, you know, my personal

17   view is that the groundwork has been laid --

18         THE COURT:  I don't -- let's leave your personal view

19   out.

20         MR. STROCHAK:  -- to move forward, but that's not

21   evidence and -- the company is paying its bills as they come

22   due.  That's not an issue here.  We certainly have already

23   filed the plan, so that factor is satisfied.  There has been

24   progress in negotiations with creditors.  Certainly not

25   dramatic progress.  I can't point to anything with the

122

1    committee that's resolved.  We do think that we've made

2    progress with the asbestos claimants in this case.

3            The time elapsed in this case has been relatively

4    modest.  The case is moving along toward a schedule that we

5    hope will get us to confirmation and consummation of the plan

6    by the end of February, in accordance with an agreement in the

7    cash collateral order.  That would have the whole case wrapped

8    up in ten months, which we believe is a reasonable time period

9    for a Chapter 11 case.

10           We certainly are not using the Chapter 11 process to

11   pressure creditors into meeting our demands.  We have a dispute

12   about value.  We have a view as to what the value is.  The

13   creditors committee has its view as to what value is.  We're

14   not using the Chapter 11 process as a lever.  We think that it

15   is an appropriate use of the Chapter 11 process to continue to

16   maintain control of the business, continue to demonstrate to

17   customers, vendors, employees that this company has prospects

18   of reorganizing.

19           There is an unresolved contingency of course, and

20   that is the exit financing.  We've certainly made progress on

21   exit financing.  We do not have a firm commitment letter in

22   hand.  We think that we've laid the groundwork to move forward

23   toward obtaining that.  But that is of course an unresolved

24   contingency in the case that we will need to resolve in order

25   to get a plan concerned.

1          THE COURT:  You and a lot of other folks at this

2   point.

3          MR. STROCHAK:  We are certainly not alone in that

4   respect, Your Honor.  And in that respect we are pleased that

5   we have a good relationship with a prospective exit lender at

6   this point who has not told us no.  So we view that as a

7   positive development and not a negative one.  The creditors

8   committee has characterized it as essentially lack of an

9   alternate option and as a not positive development, but we

10  really see the glass as half full there rather than half empty

11  in this economy and in these credit markets.

12         THE COURT:  I didn't hear evidence on this, but --

13  well, never mind, I didn't hear evidence.  Go ahead.

14         MR. STROCHAK:  I'm sorry, Your Honor, did --

15         THE COURT:  No, I was going to ask a question, then I

16  decided it's not in the record so I'm not going to ask it.

17         MR. STROCHAK:  Let me address if I could, Your Honor,

18  some of the committee's objections, some of the arguments

19  they've asserted.  They've asserted in their papers that the

20  cash collateral order put a too tight schedule on the case,

21  that the case is somehow moving too fast with that schedule in

22  place.  You know, that schedule has been in place since the

23  very beginning of the case.  We agreed to it because we thought

24  it was reasonable at the time.  We still think it's reasonable

25  and achievable given where we are in the case.  I don't think

124

 1  it's improper in any way for us to continue exclusivity toward

 2  and until that deadline under the circumstances.

 3          And I'd note that to the extent the committee is

 4  afraid that we will get to February and not be able to confirm

 5  a plan, essentially that they will win on valuation and we

 6  won't be able to confirm a plan and that that will leave them

 7  in a bind, we really don't think that's the case, Your Honor.

 8  Even the valuation information that they've put forward shows

 9  value well over the amount of the secured debt in this case.

10  So if we get to the point in February and -- and essentially

11  and they win --

12          THE COURT:  I don't -- I haven't seen evidence of

13  that so -- I mean, you're saying that what they've shown you is

14  evidence of value above the debt.  But that wasn't introduced

15  in the record today so it's not proper to argue it.

16          MR. STROCHAK:  Thank you, Judge.  We certainly are

17  not attempting to stall the case.  They seem to say in some

18  respect we're going too fast and some respect we're going too

19  slow.  We certainly are not attempting to stall the case.  We

20  have no intention whatsoever of stalling the case.  We are

21  trying to move the case forward to completion.  In this

22  economy, in this market this company does not want to hang

23  around in Chapter 11 and see what develops.  We want to be out

24  of Chapter 11 so we can go out to customers and say look, we

25  fixed the problems with the capital structure, we're out of

125

1   Chapter 11, give us the business that you think you can give us

2   and don't let that be a concern for you.

3        We don't think the value of the business has

4   diminished at all.  Sure, there are small misses in certain

5   segments and a big miss in the OEM business, there's no doubt

6   about that.  But as we've indicated, we think the OEM business,

7   the connector seals business and metals is a relatively small

8   portion of the overall value of this company.  The places where

9   we think there is significant value, in the insulators business

10  and the medical business, we think are overall performing very

11  well in this environment.  Sure, $59,000.  It's a rounding

12  error in our view, Your Honor.  It's not significant.  Maybe

13  September won't look terrific but it's not going to be off by

14  dramatic, dramatic numbers.  And those businesses in the

15  debtors' view, and I think the Court has heard evidence, that

16  those are performing relatively well under the circumstances in

17  a very difficult environment overall in the economy, certainly.

18       The committee argues that we have no reasonable

19  prospect of getting exit financing, and I think we've

20  demonstrated through evidence that we do have a reasonable

21  prospect.  Is it a sure bet?  Certainly not, but we do have a

22  reasonable prospect.  We are in continued negotiations with a

23  prospective exit lender.

24       The back and forth, Your Honor, has heard over the

25  projections and the changes to the projections, and we do feel,

1  Your Honor, like we're between a rock and a hard place on that.

2  Had we taken the view that, you know, our July projections were

3  exactly right and we weren't going to change anything, had we

4  ignored the committee's and their financial adviser's comments

5  on the projections, we certainly would have been criticized for

6  standing behind projections that in their view weren't

7  feasible.  We listened, we took things into account.  They

8  pointed out some things that we agreed with.  We went back and

9  looked further at a lot of different things.  The projections

10  have been revised.  Connector seals obviously has been revised

11  downward.  The other businesses are largely flat in terms of

12  the revision.  Some ups, some downs.  They come out about the

13  same as where they were before.  I think overall the process

14  has demonstrated credibility in the projections, not

15  incredibility in the projections.  And with respect to the OEM

16  segment, you know, there aren't a whole lot of people out there

17  who foresaw what has happened in August and September and

18  October in those markets.  I'm sure there are some people who

19  did.  But certainly nobody in July was sitting around saying

20  the world is ending.  I think there was optimism in July that

21  things would either stabilize or get better.

22          The argument has been made, Your Honor, that the

23  debtors are acting simply to preserve value for equity.  We're

24  preserving value for everybody.  Whatever value there is, we're

25  trying to preserve it for whoever gets it at the end of this

127

1   case in terms of the resolution of the dispute over value if we

2   can't do it consensually.

3           It's a very difficult thing, Your Honor, to be able

4   to prove what would happen if we don't get an extension of

5   exclusivity.  You know, we're very much in the position of

6   being the doomsayers that all sorts of horrible things could

7   happen.  Mr. Lubin has given the Court his best appraisal of

8   where things stand.  This is a business that is very sensitive

9   to concerns about its capital structure, its management, its

10  ability to see its way through the Chapter 11 process in a

11  coherent, organized fashion and not have disruption to the

12  business.  Customers definitely are sensitive to that and of

13  course has heard a little bit about that.

14          I don't want to stand here and behave like Chicken

15  Little and say the world is going to end if exclusivity isn't

16  extended.  But it is our reasoned judgment that this company

17  will have a harder time in the marketplace, that value will not

18  be enhanced, that it will be reduced if the perception among

19  customers, among vendors, among employees is that this

20  management is going to be tossed out, that this reorganization

21  process is going to devolve into a free-for-all that could end

22  very abruptly in February with no satisfactory result from

23  their perspective.

24          Your Honor, I believe that's all I have.

25          THE COURT:  Thank you, Mr. Strochak.

128

1          MR. STROCHAK:  If the Court has any questions.  Thank

2   you.

3          THE COURT:  Thank you.

4          MR. SILVERSTEIN:  Good afternoon, Your Honor.  Paul

5   Silverstein for the creditors committee.

6          THE COURT:  Good afternoon.

7          MR. SILVERSTEIN:  I'll be extremely brief.  We are

8   again discussing whether the debtors can demonstrate sufficient

9   cause to extend exclusivity.  Your Honor, nothing much has

10  changed since we were last here in terms of progress in these

11  Chapter 11 cases other than a further deterioration of the

12  debtors' businesses.  The parties have twice met, most recently

13  yesterday.  There's no progress to report.  We'll obviously

14  continue to negotiate because that's what we have to do and

15  that's we do do.  The continuation of exclusivity doesn't --

16         THE COURT:  What was the evidence that I heard today

17  that no progress has been made?  The evidence was not that

18  there was great progress but the evidence I heard from the

19  debtor was there was progress.  Mr. Aultz testified that in his

20  view they're not at an impasse.  The debtors' witnesses

21  certainly testified they're not at an impasse.  What's the

22  evidence that supports your statement that there's no progress?

23         MR. SILVERSTEIN:  First, I don't think Mr. Aultz's is

24  -- what he thinks of that progress is particularly --

25         THE COURT:  He -- his testimony about was whether --

129

1    the question was whether there was an impasse.

2            MR. SILVERSTEIN:  Correct.  I don't think his --

3            THE COURT:  And his --

4            MR. SILVERSTEIN:  -- personal opinion as to whether

5    there's an impasse is particularly relevant because he's not

6    the committee, he's not negotiating on behalf of the committee.

7    He's the committee's --

8            THE COURT:  You had him present at a meeting because

9    he's one of the committee's advisers.

10           MR. SILVERSTEIN:  Because he's one of our valuation

11   people, yes, that's right, Your Honor.  And what I'm telling

12   Your Honor is that there's --

13           THE COURT:  All right.  You want me to exclude his

14   testimony?

15           MR. SILVERSTEIN:  No, I don't want you to -- I want

16   you to take his testimony for it's worth.

17           THE COURT:  So what evidence -- that was the only

18   evidence you offered was his testimony.  And I heard some

19   cross-examination but I didn't hear anything that supports your

20   statement that there's been no progress.

21           MR. SILVERSTEIN:  The --

22           THE COURT:  You can make the argument but I want to

23   hear evidence.

24           MR. SILVERSTEIN:  It's not an argument, it's a

25   representation by me to Your Honor that --

130

1          THE COURT:  Don't give me representation.  This is a

2     contested matter --

3          MR. SILVERSTEIN:  Yes.

4          THE COURT:  -- with an evidentiary hearing.  I reach

5     a decision based on the evidence before me.  If you wanted to

6     introduce evidence that there has been no progress, you had to

7     put on a witness to establish it.  The witnesses I heard

8     testified that there has been some, not a lot, there's been

9     some progress.

10         MR. SILVERSTEIN:  Well, I think what you heard was

11    that the debtors testified that they were hopeful because the

12    parties are still talking to each other and the parties --

13         THE COURT:  I heard specifically that -- I'm not sure

14    exactly what it means but I heard testimony that, based on the

15    meeting yesterday, apparently there's a structure.  I'm not

16    sure what the structure means but I also didn't hear cross-

17    examination trying to tear that apart either.  So --

18         MR. SILVERSTEIN:  Correct, Your Honor.

19         THE COURT:  -- I understand your -- you can say

20    whatever you want as argument, but I base a decision on

21    evidence.  And the only evidence I heard today was there has

22    been some progress, and I do credit Mr. Aultz's testimony that

23    there's no impasse.

24         MR. SILVERSTEIN:  And again, Your Honor, I'm

25    representing to Your Honor that --

131

1          THE COURT:  I don't --

2          MR. SILVERSTEIN:  -- there's no impasse as such

3    because we continue to talk, as we are obligated to, because we

4    are fiduciaries to the creditors.  And we will continue to

5    talk.

6          THE COURT:  Okay.

7          MR. SILVERSTEIN:  Because that's the responsible

8    thing to do.  But I'm representing to the Court that at this

9    time there has been no progress in negotiations.  Your Honor

10   could take that --

11         THE COURT:  You and I --

12         MR. SILVERSTEIN:  -- for whatever it's worth.

13         THE COURT:  You and I don't seem to be communicating,

14   Mr. Silverstein.  This is a contested matter at an evidentiary

15   hearing.  I have a motion pending before me that I have to

16   decide based on the evidence, not on Mr. Strochak's

17   representations or your representations.

18         MR. SILVERSTEIN:  Correct.  I don't think you have

19   any evidence with respect to whether or not there is an impasse

20   or not.  I think that --

21         THE COURT:  Well, I do.  I have testimony, unrebutted

22   testimony there's no impasse.  Both sides' witnesses have

23   testified there's no impasse.  And you're telling me I can't

24   credit that testimony?

25         MR. SILVERSTEIN:  What I'm saying, Your Honor, is

132

1    that that testimony is fundamentally meaningless in terms of --

2            THE COURT:  All right, go on to your next point.

3            MR. SILVERSTEIN:  -- whether or not there is progress

4    or no progress.  And I think if you really listen or read, you

5    know, what Mr. Strochak, what the other witnesses for the

6    debtor said, I think they said that nothing's really happened

7    but we're hopeful I think is what they said.  So I don't think

8    they really gave -- there was any evidence in the record that

9    there's anything other than an impasse but they said that

10   they're hopeful.  And again that's their personal views as to

11   their hopes and aspirations and whatever, but you don't have

12   evidence in this record with respect to any progress in

13   negotiations.  I think -- and again I don't have a transcript,

14   you don't have a transcript, we have our notes, but I think

15   that's pretty clear to me.  My point, Your Honor, was that

16   there has been no material progress in negotiation

17   notwithstanding anyone's hopes about that and anyone's desires

18   about that.  And --

19           THE COURT:  I'm listening to you.

20           MR. SILVERSTEIN:  I'm just going to let you --

21           THE COURT:  No, go ahead.  I'm listening to you.

22           MR. SILVERSTEIN:  Thanks.  Exclusivity and a

23   continuation of exclusivity doesn't help a potential for

24   progress.  Because what it does is that it fosters an unhealthy

25   imbalance in negotiations.  Your Honor, the -- what has

133

1   changed, Your Honor, and what should concern Your Honor and

2   what concerns the committee is that with each day the value of

3   the debtors' businesses declines.  The debtors at every

4   opportunity state that the businesses are doing well and

5   everything is just fine.  And that even though some things are

6   going down, they correspond -- they find a corresponding factor

7   to move it up so that everything's equal and everything's fine.

8   That's just not the case.  And I think the testimony reflects

9   that.  I think the debtors have taken certain positions with

10  respect, you know, OEM and after market.  The bottom line is

11  from what I think Mister -- the SRR testimony, Mr. Aultz's

12  testimony, is that the auto sector has declined generally, and

13  there is no distinction between the two.

14          THE COURT:  Well, he testified about the industry

15  generally.  I heard testimony from Mr. Wilhouse and Mr. Lubin

16  that with respect to Lexington the after market business is

17  actually up.  I understand Mr. Aultz testified about companies

18  in the industry generally, but he didn't testify that with

19  respect to Lexington their after market business is down.

20          MR. SILVERSTEIN:  I think he testified with respect

21  to, for example, the comps that were used by W. Y. Campbell,

22  that those companies that are in the after market business,

23  their multiples have substantially declined over time.

24          THE COURT:  You're -- okay.

25          MR. SILVERSTEIN:  Over the last -- over the recent

134

1   period of time.   Excuse me.

2           THE COURT:  All right.  Go ahead.

3           MR. SILVERSTEIN:  I think that what you also heard is

4   that over the last four months the debtors' EBIDA is tracking

5   far down from budget.  I think September was down 50 percent,

6   August was down 38.1 percent, July was down 12.4 percent.  I

7   think you heard testimony that, again, the auto industry as a

8   whole has serious problems and is in serious decline, and,

9   again as I said before, valuation of multiples in the auto

10  parts industry, throughout the auto parts industry has

11  substantially declined.

12          THE COURT:  This is not the valuation trial.

13          MR. SILVERSTEIN:  I agree.  I absolutely agree with

14  you, it's not the valuation trial.  It's just the -- what I'm

15  trying to point out is that what's happened since we were last

16  here on exclusivity is that things have gotten worse.  The

17  business has gotten worse.  Despite the fact that the debtors

18  again tried to say every time something is bad, we have a

19  corresponding good event.

20          THE COURT:  But what -- I heard testimony about --

21  and I'd like to hear you address it.

22          MR. SILVERSTEIN:  Sure.

23          THE COURT:  Is that -- again, not a valuation trial.

24  But essentially that Campbell's valuation of the connector

25  business and the metals business is close to a liquidate --

1  it's not the term they used -- close to a liquidation analysis.

2  That they have -- so that the changes, the downward changes

3  that have taken place, I must say I'll express a little

4  skepticism about it but it's not a valuation trial, but that

5  the values they placed on those segments of the business aren't

6  really adversely affected because they already put essentially

7  close to a liquidation value on them.

8         MR. SILVERSTEIN:  Well --

9         THE COURT:  And with respect to the medical business

10  and the insulator business, that those are -- Because they're

11  heavily dependent on the after market, are performing

12  reasonably well.

13         MR. SILVERSTEIN:   I think -- Your Honor, again, I

14  agree, this is not the valuation trial.  But I think what you

15  heard was that Campbell at one point had the going concern

16  valuation approach towards those businesses.  But given how

17  poorly those businesses are functioning, the debtors basically

18  said okay, we'll sell them at some point in time perhaps and

19  therefore they're worth liquidation value.  And by the way, we

20  won't include corporate overhead as we compile the sum of the

21  parts.  And it sorts of results --

22         THE COURT:  If we get to the valuation here we're

23  going to have --

24         MR. SILVERSTEIN:  Sure.

25         THE COURT:  -- I'm going to have some questions about

136

1  how they avoid the corporate overhead.  But we'll --

2        MR. SILVERSTEIN:  My point is --

3        THE COURT:  -- that's not today's issue.

4        MR. SILVERSTEIN:   -- that I think, you know, reading

5  between the lines and reading -- hearing the testimony, there's

6  a lot of result-oriented things going on.

7        THE COURT:  Could you do this, Mr. Silverstein?

8  Address the Adelphia factors.  When I ruled granting the first

9  extension --

10        MR. SILVERSTEIN:  Right.

11        THE COURT:  -- the order I entered focused -- because

12  both side, both parties had focused on it in their briefs and

13  to some extent do here.  You cited Adelphia in a footnote.  You

14  didn't really put as much emphasis on the Adelphia factors in

15  your objection this time but it's there.  But address what the

16  evidence in the record today shows with respect to the Adelphia

17  factors on the Court's decision whether to extend exclusivity.

18        MR. SILVERSTEIN:  I think one of the most significant

19  factors set forth in Adelphia is the prospects of a viable

20  plan.  And one of the significant elements of that is that as

21  of this time the debtors have no exit financing.  They just

22  have not.  And I know they're very hopeful.  And I would submit

23  to Your Honor that merely because Mr. Lubin is hopeful just

24  doesn't make it true.  They talked about negotiations and

25  negotiations and negotiations.  At one point they talk about a

137

1  spread in the inventory valuation of -- Im' probably saying the

2  wrong number -- 7, 8, $9 million.  Now they say it's a million

3  dollars.  Numbers always always change.  But they're nowhere

4  close to having any exit financing.  And it's not a great

5  market right now --

6      THE COURT:  Well, what was the evidence that supports

7  your statement that they're nowhere close?

8      MR. SILVERSTEIN:  Because they have -- they don't

9  even have a revised letter of intent.  That expired.  That

10  doesn't -- there's no letter of intent anymore, no soft letter

11  that they had that expired.

12      THE COURT:  That's certainly in evidence, that there

13  is no -- that the term for that letter of intent has now

14  passed.  But the testimony I heard is that they continue to

15  have ongoing discussions with Capital One, Capital One

16  continues to do due diligence, Capital One continues to discuss

17  the differences in inventory valuation.  You make the very bold

18  statement that they have no prospects for exit financing, but I

19  don't -- I didn't hear the evidence --

20      MR. SILVERSTEIN:  I don't --

21      THE COURT:  -- that supports your --

22      MR. SILVERSTEIN:  I didn't say --

23      THE COURT:  -- bold statement.

24      MR. SILVERSTEIN:  -- they had -- and, again, I'm not

25  trying to make bold statements here and I didn't say they had

1   no prospects.  What I'm saying is that they haven't

2   demonstrated any meaningful prospects other than their serious

3   desire to have exit financing.

4        THE COURT:  So and you're -- in your view the

5   evidence about the prior letter, which wasn't binding certainly

6   on Capital One, and the continued ongoing discussions with

7   Capital One, their continued due diligence, the continued

8   efforts of the company to try and narrow valuation differences,

9   to focus on the appraisals of non-core assets.  In your view

10  that all indicates no reasonable prospects of exit financing?

11       MR. SILVERSTEIN:  I'll tell you what I heard, Your

12  Honor.  What I heard was that Mr. Lubin testified that they

13  have now narrowed the gap, according to his testimony, on

14  inventory to a million dollars.  We have a debtor where Mr.

15  Lubin made a DIP loan, okay, to the debtor.  I think it was

16  Lubin and one of his associates or employees, it's million, I

17  think $4 million DIP loan that's been drawn.  If there was only

18  a million dollar gap with respect to exit financing and I were

19  Mr. Lubin, I would say to my exit lender you know what, I have

20  a $4 million DIP loan, I will take a million dollars and I'll

21  participate my portion.  That would be my logically conclusion

22  when the testimony is that there's a million dollar spread.

23       THE COURT:  Well, Mr. Silverstein, this is an evi- --

24  I just had an evidentiary hearing.  I mean you make all of

25  these arguments that don't bear on the record evidence before

139

1  me.

2         MR. SILVERSTEIN:  I think it's a reasonable inference

3  to make, Your Honor, when someone says that --

4         THE COURT:  So why do you --

5         MR. SILVERSTEIN:  -- the hangup --

6         THE COURT:  Why didn't you or Mr. Bracht cross-

7  examine more about it?  I -- you're making these frankly bold,

8  potentially wild statements --

9         MR. SILVERSTEIN:  I don't mean to do that.

10         THE COURT:  -- that are unsupported by any record

11  evidence, which is what -- that's the basis on which I have to

12  reach a decision.

13         MR. SILVERSTEIN:  And I'm not attempting or trying to

14  make a bold unsupported statement, Your Honor.  I just think

15  it's a reasonable inference when someone says that there's a

16  million dollar spread for Mr. Lubin not to basically say he can

17  bridge that million dollars because he's bridged $4 million in

18  a DIP loan.  That's just my conclusion.  I think that was the

19  committee's conclusion yesterday.

20         THE COURT:  I didn't hear at the end of the day they

21  wouldn't do it.  I mean I didn't hear any evidence one way or

22  the other about it.

23         MR. SILVERSTEIN:  Correct.  I didn't hear any

24  evidence one way or the other --

25         THE COURT:  I mean I didn't hear that, you know --

140

          MR. SILVERSTEIN:  -- because when we --

          THE COURT:  -- if Capital One, the letter, which is
expired by its terms, was $39,500,000, if Capital One came back
and said we're only willing to do $36 million.  I haven't heard
what the debtor would do to try and close the gap --

          MR. SILVERSTEIN:  Correct because --

          THE COURT:  -- if they needed to close the gap.  But
I don't think I had to hear that today.

          MR. SILVERSTEIN:  I don't think you had to hear that
today either.  I think what you did hear is that if they were
anywhere close, you would have heard something on that.  You
would have heard something meaningful.  What you basically
heard was we hope we get it and we think we're going to get it
but we don't got it is what you heard, for lack of better
words.  That's what you heard.  So I think Your Honor has to
make inferences --

          THE COURT:  And I didn't hear contrary evidence
offered by you.

          MR. SILVERSTEIN:  Because I don't have evidence that
says they're not going to get it, Your Honor.  Okay?  We would
hope that the debtor could get it.  But we haven't heard that
the debtor is anywhere close to getting it.

          THE COURT:  Okay.

          MR. SILVERSTEIN:  And that's the problem we have.  So
we really have two issues in particular that are troubling in

141

1   terms of the prospects for a reorganization here.  One is the

2   continued diminution of the debt -- of the value of the

3   debtors' business; two, the continued diminution of the auto

4   sector generally, and we do not believe that Lexington

5   Precision is exempt from the deterioration in the auto parts

6   business generally.  We do not believe that Lexington Precision

7   is a medical part business now.  We believe Lexington Precision

8   is still in the auto parts business, which I think Mr. LUbin

9   acknowledged in his testimony.

10          So in terms of the Adelphia factors, we talked about

11  progress in negotiations with its creditors.  Mr. Lubin didn't

12  say there was progress in negotiations with his creditors.

13  What Mr. Lubin said is we don't think it's dead yet, we're

14  still hopeful.

15          THE COURT:  You could have called -- who from the

16  committee was present at the negotiations but it was certainly

17  within your ability to call a member of the committee to

18  testify about the negotiations.  You didn't do that.  The only

19  evidence I heard about the negotiations came from Mr. Lubin

20  and, contrary to what you say, I would say from Mr. Aultz on --

21  I don't want to carry that point too far --

22          MR. SILVERSTEIN:  Sure.

23          THE COURT:  -- I've already made that point.  But I

24  understand your points on the -- they don't have reasonable

25  prospects of a viable plan.  One, they don't have exit

1  financing; two, the diminution in value of the debtors'

2  business; and, three, the continued diminution of the value of

3  the auto industry.  Those are your three points?

4          MR. SILVERSTEIN:  Those are basically my three

5  points.

6          THE COURT:  Okay.

7          MR. SILVERSTEIN:  I can go through the other factors.

8  I mean, you know, the size and complexity, you know, I think

9  it's sort of irrelevant for this case because it's not a

10  particularly --

11          THE COURT:  No, I'm just trying -- those -- I want to

12  make sure I have your points down, those three points.

13          MR. SILVERSTEIN:  Point number two, necessity for

14  sufficient time.  They've had sufficient time to negotiate a

15  plan.  Three --

16          THE COURT:  Let me ask you this with respect to

17  sufficient time to negotiate a plan.  What is your view about

18  the constriction of the credit markets and deterioration of the

19  business climate generally with respect to the issue of

20  sufficient time to negotiate a plan?  I mean this debtor is not

21  alone, they join a long list of companies who can't file for

22  Chapter 13 because they can't get DIP financing, and those who

23  are in and can't get out.

24          MR. SILVERSTEIN:  I guess that's the old adage things

25  are so bad, companies can't afford to file Chapter 11.

143

1          THE COURT:  And that seems to be the case right now.

2          MR. SILVERSTEIN:  We recognize the deterioration of

3     the debtors' business.  We recognize the deterioration of the

4     auto industry.  The problem that we're having is that the

5     debtor doesn't so recognize, the debtor doesn't recognize that

6     its business has some real problems and that there's been a

7     diminution in its value and there's been a diminution in its

8     performance.  And the problem, Your Honor, is --

9          THE COURT:  Well, they recognize the diminution of

10    performance.  They acknowledged it today.

11         MR. SILVERSTEIN:  But --

12         THE COURT:  They say they're ready to go forward with

13    the disclosure statement hearing and then plan confirmation.

14         MR. SILVERSTEIN:  But what happens, Your Honor, I

15    think -- I think if you really listen, you know, listen to the

16    testimony, and I'm sure you did, what the debtors have done is

17    every time they're faced with the poor performance of the

18    company they try to make it up somewhere with, you know,

19    cutting back here or shifting here or making a between OEM and

20    after market.  We --

21         THE COURT:  Day one if this case, Mr. Silverstein,

22    Ms. Goldstein I think argued first day of motions.  My

23    recollection is from day one the distinction between OEM and

24    after market was a point that was made day one and it's been

25    made -- this is not, you know, a recently thought of

144

1   distinction.  I remember being told right from day one that

2   whatever the problems of the OEM business, which have only

3   gotten worse --

4           MR. SILVERSTEIN:  Right.

5           THE COURT:  -- the after market remains strong.  It's

6   been a consistent theme of the debtor throughout.  So it's not

7   -- you seem to be suggesting that they've come up with this

8   explanation to try and explain, you know, what's happened

9   since.  But, I mean, I was told that from day one.

10          MR. SILVERSTEIN:  I don't think you were told from

11  day one that the debtors are really no longer in the OEM

12  business, if you will.

13          THE COURT:  No, no, no, absolutely.  I agree with you

14  completely.

15          MR. SILVERSTEIN:  And at this point where the debtors

16  are going is or going is they're saying, well, we're not really

17  in the OEM business but, you know what, we could sell that

18  business for the same amount that we valued it at as a going

19  concern.  We can liquidate it and get the same results, so

20  nothing's changed.  That's part of the problem.  It's not

21  credible, Your Honor.

22          THE COURT:  I guess if and when we get to a valuation

23  trial we'll hear about that, right?

24          MR. SILVERSTEIN:  I appreciate that.  But it's just

25  not credible.  And our point -- and again I said I'd be brief

1  and I'd like to be brief.  Our point is that it's somewhat of a

2  game, and we're sitting here, the creditors are sitting here,

3  there's a diminution in value of the business, they don't have

4  exit financing, right?  They've not shown that they're likely

5  to get it.  We all hope they get it.  Okay?  They want to get

6  it.  And it's great to believe.  Okay?  But we're sitting here

7  and the dynamic of the negotiation is not helped by continuing

8  exclusivity.

9          THE COURT:  All right.

10         MR. SILVERSTEIN:  Because it continues in a balance

11 that's, in our view, not appropriate.  Thank you, Your Honor.

12         THE COURT:  Thank you, Mr. Silverstein.

13         Mr. Strochak, any rebuttal?  Don't feel compelled.

14         MR. STROCHAK:  No, I don't think I have anything

15 further, Your Honor.

16         THE COURT:  All right.  I'm going to take the motion

17 to extend exclusivity under advisement and issue an opinion or

18 order in due course.  There is a bridge order that maintains

19 exclusivity pending the decision.  All right.  Let's move on to

20 the applications.  Yeah.

21         Mr. Bracht, let me return to you all the exhibits

22 that were marked for identification but were not used.  I said

23 I'd do that.

24         MR. BRACHT:  Your Honor, [inaudible].

25         THE COURT:  No, that's okay.  And I appreciate both

146

1   sides being very well-organized with the exhibits.  It really

2   did help.  All right.  Let me just clear away a few things.

3   Let me just say we'll -- and, Mr. Bracht, I think you said you

4   wanted to be excused after -- if you want to stay for fees,

5   that's fine.  Are you --

6           MR. BRACHT:  I'm here for the long haul, Your Honor.

7           THE COURT:  Okay.

8           MR. BRACHT:  I'll be fine.  Would it all right if I

9   stepped out for just a minute?

10          THE COURT:  Oh, sure.

11          MR. BRACHT:  Thank you.

12          THE COURT:  At about five minutes to 4:00 I'm going

13  to take a brief recess.  Because I have a conference call --

14          MR. SILVERSTEIN:  Hopefully we'll be done.

15          THE COURT:  -- in another -- if we're done, that's

16  great.  If not, I have to take a recess then because I've got a

17  conference call in another case.

18          MR. SILVERSTEIN:  Thank you, Your Honor.

19          THE COURT:  Let me just leave these.  Okay.

20          MR. TSENG:  Your Honor, Conray Tseng for the debtors.

21  Before you are four interim fee applications, those of Weil,

22  Gotshal & Manges, which is Docket No. 412; W. Y. Campbell,

23  financial advisers to the debtors, Docket No. 397; Andrews

24  Kurth, Docket No. 396; and Stout Risius and Ross, Docket No.

25  390.  We previously provided your Clerk with a new proposed

147

1  order with a clean and black line.

2         There are no objections currently with any of the

3  applications, though the Court previously mentioned that W. Y.

4  -- I'm sorry -- Andrews Kurth did not provide the backup for

5  the expenses.  We have addressed the concerns of the United

6  States Trustee, which -- and I assume there's no further

7  objections.

8         THE COURT:  No, I want to hear from Mr. Schwartzberg

9  [Ph.].  I was told before the lunch break that, based on

10  discussions with the U.S. Trustee, Weil Gotshal has reduced the

11  amount of its fee application.  Is that correct?

12         MR. TSENG:  That's correct.

13         THE COURT:  By $15,000?

14         MR. TSENG:  That is correct.

15         THE COURT:  All right.  And what about with respect

16  to expenses?

17         MR. TSENG:  The expenses remain the same.

18         THE COURT:  Mr. Schwartzberg have anything to say on

19  the Weil Gotshal application?

20         MR. SCHWARTZBERG:  Sure.  Your Honor, Paul

21  Schwartzberg for the U.S. Trustee's Office.  We had two

22  concerns with the time records provided by Weil Gotshal's firm.

23  One related to travel time and another one related to a project

24  category denoted actions in response to the U.S. Trustee,

25  something of that nature.  I don't have it exact.  Those two

148

1   came up to about $30,000.  We sort of split the difference, and

2   they agreed to take $15,000 off.  I had reviewed the other

3   portions of the fee applications.  I didn't see anything at

4   this point that was objectionable.

5          I did have a concern with Andrews and Kurth regarding

6   the travel time as well, and Mr. Silverstein represented to me

7   that their firm doesn't even try -- doesn't even charge for

8   travel time unless they're actually performing work while

9   traveling, which in that instance they would be permitted to

10  charge all time.  So based on Mr. Silverstein's representation,

11  we had no concerns with the committee's fees.

12         I did look at the fees for both financial advisers

13  who in both instances are charging a flat fee.  I just did a

14  quick hours per dollar or dollar per hour, and they came within

15  the ballpark of reasonableness.  I don't remember off the top

16  of my head what they were but it wasn't anything that I found

17  objectionable.  And those are both 328 applications, although

18  we do have 330 review on those.

19         So based on that and the $15,000 reduction from Weil

20  Gotshal as well as an agreement by the professionals that I

21  thought there needed to be a holdback pending the confirmation

22  hearing, in light of the fact that there was already a plan on

23  the table, it looked like parties are moving forward towards

24  confirmation, although albeit one or two plans I don't know and

25  I don't want to presuppose whether it's going to be one or two.

1          THE COURT:  Maybe the holdback should be larger if

2     they really haven't made any progress.

3          MR. SCHWARTZBERG:  Yeah.  But in light of all that

4     and just in terms of reaching an agreement, we agreed on a 5

5     percent holdback for this interim period.

6          THE COURT:  Okay.  The question -- thank you, Mr.

7     Schwartzberg.

8          If the U.S. Trustee had not raised the issue about

9     travel time, that was on my agenda.  I think the $15,000 agreed

10    reduction in fees adequately accounts for all of the time

11    charge items that the Court would otherwise have raised.  For

12    future billing purposes, there were some entries by paralegals

13    that seemed excessive in time, at least for the tasks that were

14    described.  As I say, I will approve the fees in the amount

15    requested as adjusted by agreement with the U.S. Trustee

16    because the specific entries that I was going to question

17    probably total less than the $15,000.  But for future

18    reference, that is an issue.

19         The other thing you ought to build into your review

20    of statements are the discrepancies when you have multiple

21    attorneys attending the same meeting and each bills a different

22    amount of time.  There were five or six entries where there

23    were variations of a half to an hour with the same people.

24    Now, it may be somebody left the meeting, but you ought to --

25    you know, the entries ought to reflect -- because we actually

150

1   do look at those.  When three people that attend a meeting and

2   somebody bills a half hour and somebody bills an hour and a

3   half, it raises a question.  So I'm comfortable -- and I really

4   raise this point for everybody's benefit for future fee

5   applications.

6          Now, with respect to the expenses.  Our General Order

7   M104 paragraph 12 states that taxi travel must be justified as

8   the subway system is a good alternative.  And General Order

9   M151 caps overtime meals at $20 a person.  And there were -- my

10  law clerks picked up seven meals that exceeded the guidelines

11  permissible.  I'll give you your choice, okay?  I mean the

12  total involved -- if I aggregate all of these amounts for the

13  expenses, it's $577.43.  If you want to accept the reduction of

14  expenses at $577.43, I'll approve your expenses today.

15  Otherwise you'll have to wait while we do an order and it goes

16  through each of these items.

17         MR. STROCHAK:  As a member of the firm, Your Honor,

18  I'm happy to accept your suggestion.

19         THE COURT:  I thought you would do that.

20         MR. SILVERSTEIN:  Door number one.

21         THE COURT:  Okay.  So the Weil Gotshal fees reduced

22  by $15,000 and expenses as requested less $577.43 are approved

23  on the interim basis with a 5 percent holdback on the fees, not

24  on -- 100 percent of expenses, 5 percent holdback on fees.

25         Mr. Silverstein?

151

1          MR. SILVERSTEIN:  Yes.

2          THE COURT:  What I would -- as I indicated before the

3   break, we don't have any backup for you on the expenses.  Let

4   me see specifically on fees what I --

5          Now, was there an adjustment, Mr. Schwartzberg?

6          MR. SCHWARTZBERG:  If -- Paul Schwartzberg, U.S.

7   Trustee Office.  No, Your Honor.  There was the inquiry

8   regarding travel time which I was advised that it was not even

9   being charged, so.

10         THE COURT:  Okay.

11         MR. SCHWARTZBERG:  I believe backup -- I don't even

12   know if I still have it anymore but I do believe I have it.

13         THE COURT:  You probably got the backup and we

14   didn't.

15         MR. SCHWARTZBERG:  Yeah.

16         THE COURT:  But we --

17         MR. SILVERSTEIN:  Yeah, I don't recall who has

18   [indiscernible].  It exists, I can tell you that, Your Honor.

19   And we will provide it.  Anything stand out in your mind?

20         THE COURT:  Well, here, I'll give you which door to

21   select.  You sought fees of $551,484.

22         MR. SILVERSTEIN:  Yes.

23         THE COURT:  The specific adjustments we made -- would

24   make, unless you want to litigate them all, are --

25         MR. SILVERSTEIN:  Oh, yes, I'm sure --

152

1          THE COURT:  -- are $3,394.50 in fees.

2          MR. SILVERSTEIN:  Can you tell me what they are so I

3    -- actually I don't want to litigate them, Your Honor, but I'm

4    curious as to what they are.

5          THE COURT:  They were -- on 5/29/08 a paralegal spent

6    0.4 hours printing an order.  On 6/16/08 an associate spent 7.9

7    hours of her 14.1 hours on the case reviewing documents

8    regarding procedures for professional compensation.  That

9    totaled $2,175.50.  Would you like me to continue?

10          MR. SILVERSTEIN:  No, don't.  Sold.

11          THE COURT:  Okay.  I mean I've got eight items on

12   fees.  They have this grand total of three -- we didn't wipe

13   them out completely, we made adjustments.

14          MR. SILVERSTEIN:  I defer to Your Honor's judgment.

15          THE COURT:  $3,394.50.

16          MR. SILVERSTEIN:  And I will read them more carefully

17   apparently next time.

18          THE COURT:  Okay.

19          MR. SILVERSTEIN:  What date was that one about

20   professional compensation?

21          THE COURT:  June 16th, 2008.

22          MR. SILVERSTEIN:  Thank you.

23          THE COURT:  You worked this poor woman associate 14.1

24   hours on that day but 7.9 of those hours were reviewing

25   documents regarding procedures for professional compensation.

153

1          MR. SILVERSTEIN:  I will look into that amount

2   expense.

3          THE COURT:  Okay.  Okay.  More seriously, and I'm not

4   -- not reflected in these adjustments.

5          MR. SILVERSTEIN:  Well, Your Honor, what was the

6   number so I can just write that down, three?

7          THE COURT:  Yes. $3,394.50.

8          MR. SILVERSTEIN:  Thank you, Your Honor.

9          THE COURT:  Okay.  92,000 -- this is not an

10  adjustment, it's an issue I'm raising. $92,726.50 of your fee

11  application was incurred in connection with the first

12  exclusivity motion.

13         MR. SILVERSTEIN:  Lot of money.

14         THE COURT:  And the question that I'm raising is

15  whether -- and I recognize that I during a telephone hearing

16  determined that it was a contested matter, I gave you limited

17  discovery, and I understand it's expensive.  You know, the

18  standard in the Second Circuit is whether the services are

19  necessary at the time in which the services were rendered.  And

20  services are necessary if they benefit the estate.  Judge

21  Bernstein's opinion In Re Keene Corp, 205 B.R. 690 and 695

22  (Bankr. S.D.N.Y. 1997).  And there's nothing astounding about

23  that proposition.

24         I've not made any adjustment.  And I flagged the

25  exclusivity hearing but there was also -- and actually we

154

1   couldn't -- you put in an objection to the debtors' application

2   to extend time to file schedules.  And I have to tell you it

3   seemed like a absolute waste of time to me and a waste of money

4   of the estate.  That was earlier, that was even earlier in the

5   case.  I mean it's the first time.  Look, Mr. Silverstein, I've

6   only been on the bench two years but I don't think I've ever

7   had anybody file a written opposition to a relatively modest

8   request to extend time to file schedules.

9           MR. SILVERSTEIN:  Yeah, I think -- I'm refreshing my

10  recollection from my colleague, Mr. Levine.  I think the

11  committee requested that we did that, that we do that, and I

12  think it was a very modest cost in doing that.  I don't think

13  had a hearing on that.

14          THE COURT:  Well, it was -- we did have a hearing.

15          MR. SILVERSTEIN:  But it wasn't just for that, I

16  think it was --

17          THE COURT:  No, we didn't just do that.

18          MR. SILVERSTEIN:  -- on account with other matters.

19  But I --

20          THE COURT:  My point is this.  Early in this case it

21  seemed that you objected to everything the debtor proposed to

22  do.  And at one hearing I thought you more or less said that,

23  you know, your theme and theory was that the debtor was wasting

24  time, that this was -- they had -- they're -- you know, the

25  pre-petition negotiations didn't get anywhere, all they're

1   doing is proposing the same thing.  And then everything you

2   did, you objected to everything the debtor proposed, even as

3   simple as a motion to extend time to file schedules.  I mean

4   this may not be the biggest case in the world but it's still a

5   relatively complicated case.  I'm just telling you that I'm

6   going to be mindful reviewing fee applications in the future

7   whether the services performed viewed from the time when they

8   were done benefitted the estate.  And if they didn't, they're

9   not going to get compensated.  Okay?  Now, with respect to your

10  expenses.

11          MR. SILVERSTEIN:  Yes.

12          THE COURT:  Submit the detail.  I would ask you

13  before you submit it, the expenses you were seeking of

14  $21,817.18.

15          MR. SILVERSTEIN:  Yes.

16          THE COURT:  Please review them carefully.

17          MR. SILVERSTEIN:  Yeah, we will.

18          THE COURT:  If --

19          MR. SILVERSTEIN:  If I find something that --

20          THE COURT:  Yeah.  I mean I do -- this issue -- I

21  mean we haven't revised the guidelines on overtime meals for a

22  very long time.  But, you know, if people are working hard,

23  it's hard to actually eat something for more than $20.  But I

24  do regularly enforce it, okay?  So if -- submit the backup.  If

25  you adjust the amount, so indicate and what you've reduced, and

156

1   I'll act on it promptly.

2         MR. SILVERSTEIN:  Certainly.

3         THE COURT:  Okay?

4         MR. SILVERSTEIN:  Thank you, Your Honor.

5         THE COURT:  All right.  Thank you.

6         Okay, we had the SRR fee application seeking fees of

7 $180,645.16.

8         MR. SILVERSTEIN:  And we have the six --

9         THE COURT:  And expenses of $11,013.06.

10        MR. SILVERSTEIN:  And we have the 16 cents

11 [inaudible].  And that's a fixed monthly fee, as I recall?

12        THE COURT:  It is.  $50,000 fees for each of June and

13 July, May fee was pro rata.

14        MR. SILVERSTEIN:  Yes.

15        THE COURT:  SRR did not submit any supporting

16 documents or schedules for the expenses.

17        MR. SILVERSTEIN:  I think the expenses were also

18 capped, and they will submit them, Your Honor.

19        THE COURT:  So when I get -- and actually with

20 respect to your fees and expenses I'm going to sign one order

21 that includes -- so the faster you get the backup --

22        MR. SILVERSTEIN:  I'm not sure W. Y. Campbell did

23 either, but --

24        THE COURT:  We'll get --

25        MR. SILVERSTEIN:  -- debtors would know that better.

157

1          THE COURT:  We'll get -- we haven't -- we'll get to

2     that.  So with respect to SRR their fees will be approved, the

3     expenses will be reviewed.  I ask you review them again

4     yourself and make sure that they meet our, you know,

5     appropriate guidelines.  You'll both submit an order that

6     includes both fees and expenses.  When I've had a chance to

7     review the expenses I'll act on it.  So I'm indicating I'm

8     going to approve the fees for both your firm and for SRR but

9     it's also pending the review and getting the backup.

10          MR. SILVERSTEIN:  Certainly, Your Honor.

11          THE COURT:  Thank you.

12          MR. SILVERSTEIN:  Thank you.

13          THE COURT:  All right.  W. Y. Campbell seeks 200,000

14    in fees and $13,777.58 in expenses.  And W. Y. Campbell

15    submitted invoices for their expenses.

16          MR. STROCHAK:  Yes, Your Honor.

17          THE COURT:  With respect to the W. Y. Campbell

18    expense requests there was one meal that exceeds the $20

19    guideline.  It was in the amount of $41.59.  It will be reduced

20    by $21.59.  So their request for fees and expenses less $21.59

21    will be approved.

22          MR. STROCHAK:  Thank you, Your Honor.

23          THE COURT:  Okay.  Anything else for today?

24          MR. STROCHAK:  I'd just like to make one minor note

25    on the order.

158

1        THE COURT:  Okay.

2        MR. STROCHAK:  The committee has requested and the

3   debtors have no objection to including the language that the

4   fees are allowed pursuant to Section 331 of the Bankruptcy Code

5   and are subject to final approval under Section 330 of the

6   Bankruptcy Code.

7        THE COURT:  Absolutely.

8        MR. SILVERSTEIN:  And in the context of that, context

9   of that, Your Honor, is whereas that I think Capital Source,

10  the pre-petition lender, had asked Andrews Kurth to clarify

11  that and we said of course.  And there's some stipulation that

12  might have been uploaded, I'm not sure, but it says the same --

13  it's the same effect.

14       THE COURT:  That's fine.  All right.  Do we have --

15  Mr. Schwartzberg, do we have another omnibus motion day

16  scheduled at this point?

17       MR. TSENG:  Your Honor, the next -- Conray Tseng for

18  the debtors.  The next omnibus hearing date will be the 24th of

19  November, which is a debtors disclosure statement hearing.

20       THE COURT:  Okay.  I have just a couple of minutes.

21  What are you -- let's go off.  Let's go off the record.  We're

22  off the record.

23  (Proceedings ended at 3:54 p.m.)

24                          *  *  *  *  *

25

159

1      I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5      _____

6                        Sally Reidy

7  Dated: October 31, 2008