December 17, 2008 Proposed Disclosure Statement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
In re                                                     :
                                                          :    **Chapter 11 Case No.**
                                                          :
**LEXINGTON PRECISION CORP., et al.,**                    :    **08-11153 (MG)**
                                                          :
                          Debtors.                        :    **(Jointly Administered)**
                                                          :
----------------------------------------------------------x

## PROPOSED DISCLOSURE STATEMENT
## FOR DEBTORS' SECOND AMENDED JOINT PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Bankruptcy Court has not approved this proposed disclosure statement as containing adequate information pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of acceptances or rejections of the chapter 11 plan described herein and attached hereto.  Accordingly, the filing and dissemination of this disclosure statement are not intended to be, and should not in any way be construed as, a solicitation of votes on the plan, nor should the information contained in this disclosure statement be relied on for any purpose until a determination by the Bankruptcy Court that the proposed disclosure statement contains adequate information.

The Debtors reserve the right to amend or supplement this proposed disclosure statement at or before the hearing to consider this disclosure statement.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000

Dated: New York, New York
           _____ __, 2008

# TABLE OF CONTENTS

**Page**

I.    Introduction ........................................................................................... 1

II.    Executive Summary .............................................................................. 5

    A.    Summary of Classification and Treatment of Claims and Interests Under the Second Amended Plan ............................................... 5

    B.    Summary of Voting Procedures .................................................. 7

    C.    Overview of the Chapter 11 Process ........................................... 8

III.    Overview of the Debtors' Operations and the Chapter 11 Cases ..................... 9

    A.    Description of the Debtors' Operations ....................................... 9

        1.    The Rubber Group ........................................................ 9

            a.    The Automotive Aftermarket ........................... 10

            b.    The Automotive OEM Market ........................... 10

            c.    The Medical Device Market .............................. 10

            d.    The Rubber Group's Competitive Strengths ........... 10

            e.    Facilities of the Rubber Group; Capacity for Growth ........ 13

            f.    Insulators for Automotive Ignition Systems ............. 13

            g.    Molded Rubber Components for Medical Devices ....... 16

            h.    Connector Seals for Automotive Wiring Harnesses ...... 18

            i.    Financial Performance of the Rubber Group ............ 20

        2.    The Metals Group ........................................................ 24

            a.    The Metals Group's Competitive Strengths ............. 25

            b.    Financial Performance of the Metals Group ............ 26

            c.    Strategic Alternatives ..................................... 27

        3.    Non-Operating Assets ................................................... 28

            a.    Land in East Ellijay, Georgia ........................... 28

            b.    Land and Buildings in Lakewood, New York ........... 28

        4.    Lexington's Employees .................................................. 28

    B.    Significant Indebtedness ........................................................ 29

        1.    The Prepetition Credit Agreement .................................... 29

        2.    The Prepetition Loan Agreement ..................................... 29

        3.    Senior Subordinated Notes ............................................. 30

# TABLE OF CONTENTS
## (continued)

Page

    4.       Junior Subordinated Note ........................................................ 30

C.    The Asbestos Cases................................................................. 31

D.    Significant Events Leading to the Commencement of the Chapter 11 Cases...... 33

    1.       Liquidity Crisis ...................................................................... 33

    2.       Restructuring Efforts............................................................... 34

E.    The Chapter 11 Cases ................................................................ 36

    1.       Commencement of the Chapter 11 Cases and the "First-Day" Orders................................................................................... 36

        a.       Case Administration Orders....................................... 36

        b.       Critical Obligations................................................... 36

        c.       Customer and Employee Programs.............................. 37

        d.       Financing Arrangements ............................................ 37

    2.       Appointment of the Creditors' Committee ............................... 37

    3.       Debtor-in-Possession Financing .............................................. 38

    4.       The Debtors' Exclusive Periods............................................... 38

    5.       The Claims Reconciliation Process ......................................... 39

IV.    The Second Amended Plan ................................................................. 39

A.    Summary and Treatment of Unclassified Claims ................................. 39

    1.       Administrative Expense Claims................................................ 39

    2.       Professional Compensation and Reimbursement Claims ........................ 40

    3.       Indenture Trustee Fee Claims .................................................. 40

    4.       Debtor-in-Possession Loan Claims........................................... 41

    5.       Priority Tax Claims................................................................. 41

B.    Classification and Treatment of Classified Claims and Interests ....................... 41

    1.       Claims against and Interests in LPC ....................................... 42

        a.       Class 1 – Other Priority Claims against LPC (Unimpaired)........ 42

        b.       Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired)................................................................ 42

        c.       Class 2(b) – CSE Secured Claims against LPC (Unimpaired)................................................................ 42

## TABLE OF CONTENTS
### (continued)

Page

d.  Class 3 – Secured Tax Claims against LPC (Unimpaired) .......... 42

e.  Class 4 – Other Secured Claims against LPC (Unimpaired) ....... 43

f.  Class 5 – Senior Subordinated Note Claims (Impaired) .............. 43

g.  Class 6 – Junior Subordinated Note Claims (Impaired) .............. 44

h.  Class 7 – General Unsecured Claims against LPC (Impaired) ................................................................................. 44

i.  Class 8 – Convenience Claims against LPC (Unimpaired) ......... 44

j.  Class 9 – Asbestos-Related Claims (Impaired) .......................... 45

k.  Class 10 – Series B Preferred Stock Interests (Impaired) ........... 46

l.  Class 11 – LPC Common Stock Interests (Impaired) .................. 46

m.  Class 12 – Other Equity Interests in LPC (Unimpaired) ............. 46

2.  Claims against and Interests in LRGI ...................................................... 46

a.  Class 13 – Other Priority Claims against LRGI (Unimpaired) .................................................................................. 46

b.  Class 14(a) – CapitalSource Secured Claims against LRGI (Unimpaired) .................................................................................. 47

c.  Class 14(b) – CSE Secured Claims against LRGI (Unimpaired) .................................................................................. 47

d.  Class 15 – Secured Tax Claims against LRGI (Unimpaired) ...... 47

e.  Class 16 – Other Secured Claims against LRGI (Unimpaired) .................................................................................. 48

f.  Class 17 – General Unsecured Claims against LRGI (Impaired) ........................................................................................ 48

g.  Class 18 – Convenience Claims against LRGI (Unimpaired) .................................................................................. 48

h.  Class 19 – Interests in LRGI (Unimpaired) ................................ 49

C.  Distributions Pursuant to the Second Amended Plan .......................................... 49

1.  Distributions ........................................................................................... 49

2.  Surrender or Transfer of the Senior Subordinated Notes and the Junior Subordinated Note ...................................................................... 50

D.  Implementation of the Second Amended Plan and Related Documents ............. 50

1.  The New Secured Credit Facility ............................................................ 50

# TABLE OF CONTENTS
## (continued)

**Page**

|  |  |  |
|---|---|---|
| 2. | The Investor Loan | 51 |
| 3. | Cancellation of Documents, Agreements, and Debt Instruments | 51 |
| 4. | Charter Amendment | 51 |
| 5. | Series C Preferred Stock | 52 |
|  | a. | Liquidation Preference | 52 |
|  | b. | Board of Directors | 52 |
|  | c. | Voting Rights | 52 |
| 6. | Corporate Action, Effectuating Documents, and Further Transactions | 53 |
| E. | Provisions for the Treatment of Disputed Claims | 53 |
| 1. | Objections to Claims and Prosecution of Disputed Claims | 53 |
| 2. | Resolution of Administrative Expense Claims and Other Claims | 53 |
| 3. | Claim Estimation | 53 |
| 4. | Payment and Distribution on Disputed Claims | 54 |
| F. | Prosecution of Claims Held by the Debtors | 54 |
| G. | Executory Contracts and Unexpired Leases | 54 |
| 1. | Assumption of Executory Contracts and Unexpired Leases | 54 |
| 2. | Cure of Defaults | 55 |
| 3. | Rejection Damage Claims | 55 |
| 4. | Indemnification and Reimbursement of Directors and Officers | 55 |
| 5. | Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits | 55 |
| H. | Reservation of "Cram Down" Rights | 56 |
| I. | Conditions Precedent to the Effective Date of the Second Amended Plan | 56 |
| J. | Effects of Confirmation | 57 |
| 1. | Discharge of Claims and Termination of Series B Preferred Stock Interests | 57 |
| 2. | Discharge of Debtors | 58 |
| 3. | Injunctions and Stays | 58 |
| 4. | Exculpation | 58 |

# TABLE OF CONTENTS
## (continued)

Page

5.      Releases of Directors, Officers, and Employees ..................................... 59

6.      Other Releases ..................................................................... 59

7.      Limits on Releases and Exculpation ...................................... 61

K.      Dissolution of the Creditors' Committee ................................................ 61

L.      Management of the Reorganized Debtors ............................................... 61

M.      Jurisdiction and Choice of Law ............................................................. 62

1.      Governing Law ..................................................................... 62

2.      Retention of Jurisdiction ....................................................... 62

N.      Miscellaneous Provisions ...................................................................... 62

1.      Payment of Statutory Fees .................................................... 62

2.      Post-Confirmation Date Professional Fees and Expenses ...................... 62

3.      Indenture Trustee as Claim Holder ....................................... 63

4.      Plan Supplement ................................................................... 63

5.      Substantial Consummation .................................................... 63

6.      Severability .......................................................................... 63

7.      Binding Effect ....................................................................... 64

8.      Notices ................................................................................. 64

9.      Time ..................................................................................... 64

10.     Section Headings .................................................................. 64

O.      Modification, Revocation, or Withdrawal of the Second Amended Plan ............ 64

V.      Financial Information, Projections and Valuation Analysis ........................................... 65

A.      Selected Historical and Projected Financial Information ..................... 65

B.      Projected Financial Statements ............................................................. 70

C.      Valuation of the Reorganized Debtors ................................................... 70

1.      Introduction .......................................................................... 70

2.      Basis of Valuation ................................................................ 70

3.      Core Assets ........................................................................... 70

a.      The Rubber Group (excluding the Connector Seals Business) ................................................................. 70

b.      The Corporate Offices ................................................. 71

**TABLE OF CONTENTS**
**(continued)**

Page

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | c. | The Debtors' Tax Attributes | 71 |
|  | 4. | Non-Core Assets | | 72 |
|  |  | a. | Connector Seals Business Unit of the Rubber Group | 72 |
|  |  | b. | The Metals Group | 73 |
|  |  | c. | Non-Operating Assets | 73 |
|  | 5. | Enterprise Value of the Reorganized Debtors | | 74 |
|  | 6. | The Committee's Valuation Comments | | 75 |
| VI. | Certain Factors to be Considered | | | 75 |
| A. | Certain Risk Factors Relating to Confirmation of the Second Amended Plan | | | 75 |
|  | 1. | Risk of Non-Confirmation of the Second Amended Plan | | 75 |
|  | 2. | Non-Consensual Confirmation | | 75 |
|  | 3. | Risk of Non-Occurrence of the Effective Date | | 75 |
| B. | Additional Factors to be Considered | | | 76 |
|  | 1. | The Debtors Have No Duty to Update | | 76 |
|  | 2. | No Representations Outside This Disclosure Statement Are Authorized | | 76 |
|  | 3. | Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary | | 76 |
|  | 4. | This Disclosure Statement Is Not Legal or Tax Advice | | 76 |
|  | 5. | No Admission Made | | 76 |
|  | 6. | Business Factors and Competitive Conditions | | 77 |
|  |  | a. | General Economic Conditions | 77 |
|  |  | b. | Competitive Conditions | 77 |
|  |  | c. | Customers | 77 |
|  | 7. | Access to Financing and Trade Terms | | 78 |
|  | 8. | Variances from the Projected Financial Statements | | 78 |
|  | 9. | Significant Holders | | 78 |
|  | 10. | Illiquid Market | | 78 |
|  | 11. | Restrictions on Transfer | | 79 |

## TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| VII. | Certain Federal Income Tax Consequences of the Second Amended Plan | | 79 |
| | A. | Consequences to the Debtors | 80 |
| | | 1. Cancellation of Debt | 81 |
| | | 2. Limitations on NOL Carryforwards and Other Tax Attributes | 81 |
| | | a. Built In Gains and Losses | 82 |
| | | b. Special Bankruptcy Exception | 83 |
| | | 3. Alternative Minimum Tax | 84 |
| | B. | Consequences to Holders of Certain Claims | 84 |
| | | 1. Holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims | 84 |
| | | a. If Existing Note Does Not Constitute a Security | 85 |
| | | b. If Existing Note Constitutes a Security | 85 |
| | | 2. Holders of General Unsecured Claims against LPC and General Unsecured Claims against LRGI | 86 |
| | | 3. Character of Gain or Loss | 87 |
| | | 4. Distributions in Respect of Accrued Interest | 88 |
| | | 5. Ownership and Disposition of Series C Preferred Stock and LPC Common Stock | 88 |
| | | a. Distributions | 88 |
| | | b. Constructive Dividend Potential | 89 |
| | | c. Sale or Other Disposition (Other Than Conversion) | 89 |
| | | d. Conversion of Series C Preferred Stock into LPC Common Stock | 91 |
| | C. | Consequences to Holders of Series B Preferred Stock Interests | 91 |
| | D. | Information Reporting and Backup Withholding | 91 |
| VIII. | SECURITIES LAW MATTERS | | 92 |
| | A. | Issuance and Resale of the Series C Preferred Stock and LPC Common Stock under the Second Amended Plan | 92 |
| | B. | Listing | 93 |
| | C. | Legends | 93 |

# TABLE OF CONTENTS
### (continued)

**Page**

IX.   Voting Procedures and Requirements ................................................................ 94

    A.   Voting Deadline ........................................................................................ 94

    B.   Holders of Claims Entitled to Vote .......................................................... 95

    C.   Vote Required for Acceptance by a Class ................................................. 95

    D.   Voting Procedures .................................................................................... 96

        1.   Voting Procedures ........................................................................... 96

        2.   Withdrawal of Ballot ....................................................................... 96

X.   Confirmation of the Second Amended Plan ....................................................... 96

    A.   The Confirmation Hearing ........................................................................ 96

    B.   Objections to Confirmation ...................................................................... 96

    C.   General Requirements for Confirmation ................................................... 97

    D.   Best Interests Test .................................................................................... 99

    E.   No Unfair Discrimination/Fair and Equitable Test ................................. 100

        1.   No Unfair Discrimination .............................................................. 100

        2.   Fair and Equitable Test .................................................................. 100

            a.   Secured Claims .................................................................. 101

            b.   Unsecured Claims .............................................................. 101

            c.   Interests ............................................................................. 101

    F.   Classification of Claims and Interests .................................................... 101

    G.   Feasibility .............................................................................................. 101

XI.   Conclusion ...................................................................................................... 103

# I.  INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), Lexington Precision Corporation ("LPC") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("LRGI"), as debtors and debtors in possession (together, the "Debtors" or "Lexington"), in jointly-administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") to all holders of Claims against and Interests in the Debtors in connection with the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated December 8, 2008 (the "Second Amended Plan"), attached hereto as **Exhibit A**.  Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the Second Amended Plan.  **Please note that to the extent any inconsistencies exist between the Disclosure Statement and Second Amended Plan, the Second Amended Plan shall govern.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Second Amended Plan and alternatives to the Second Amended Plan, (4) the rights of holders of Claims and Interests under the Second Amended Plan, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Second Amended Plan.

The Debtors have developed the Second Amended Plan in order to provide a rapid repayment program for their suppliers and other general unsecured creditors, while achieving a significant reduction in their consolidated indebtedness through a conversion of LPC's Senior Subordinated Notes, Junior Subordinated Note, and Series B Preferred Stock into equity securities of LPC at values based upon the valuation of the Debtors prepared by the Debtors' financial advisor, W.Y. Campbell & Company ("Campbell"), and set forth in this Disclosure Statement.  Based upon discussions with a number of large customers, including, Ethicon Endo-Surgery, Inc., Smiths Medical, Delphi Corporation, Ford Motor Corporation, Sumitomo Electric, the Debtors believe that substantial incremental business may be made available to them upon their emergence from chapter 11 with a reduced debt level.  The Debtors are confident that they have in place the infrastructure and the equipment to take advantage of these new business opportunities profitably and without the need for significant additional investment in plant and equipment.  The Debtors believe that any incremental volume should enable them to increase the value of the equity securities that will be issued pursuant to the Second Amended Plan beyond the values at which they will be issued.

Pursuant to the Second Amended Plan, holders of LPC's Senior Subordinated Notes will receive shares of Series C Preferred Stock and holders of LPC's Junior Subordinated Note and Series B Preferred Stock will receive newly-issued shares of LPC Common Stock.  The Series C Preferred Stock was designed to permit the holders thereof to participate fully in the anticipated increase in the enterprise value of the Debtors following the completion of the Chapter 11 Cases, while retaining their priority position relative to the classes junior to them in the capital structure of LPC.  Holders of LPC's Junior Subordinated Note, Series B Peferred Stock, and Common Stock should be aware that, in the event that the aggregate value of the equity of the Debtors increases at a rate of less than six percent (6%) per annum, or if it declines,

following the Effective Date, the six percent (6%) annual accretion to the liquidation preference of the Series C Preferred Stock will erode the value of the LPC Common Stock that these holders will receive or retain pursuant to the Second Amended Plan.  The following table sets forth the relative per share of the Series C Preferred Stock and the LPC Common Stock on the fourth anniversary of the Effective Date, at several assumed rates of growth or decline in the aggregate value of the equity of LPC:

| Rate of Growth | Future Value Per Share | |
| --- | --- | --- |
| | **Series C Preferred Stock** | **LPC Common Stock** |
| -12% | $5.36 | $0.00 |
| -6% | $5.66 | $1.20 |
| 0% | $5.66 | $3.17 |
| 6% | $5.66 | $5.66 |
| 12% | $7.16 | $7.16 |

The Debtors recommend that all holders of Claims and Interests vote to accept the Second Amended Plan because the Second Amended Plan will (1) enable suppliers and other general unsecured creditors to recover their Claims promptly and (2) enable all other holders to participate on an equitable basis in the ownership of a highly profitable and expanding enterprise.

**Please note that not all holders of Claims or Interests are entitled to vote.  If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement.  For more information as to which holders of Claims and Interests may vote, please refer to Section IV.B, "*Classification and Treatment of Classified Claims and Interests*" on page 43. For voting procedures and important deadlines, please refer to Section IX, "*Voting Procedures and Requirements*" on page 100.**

On December __, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Second Amended Plan.  **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Second Amended Plan or as to the accuracy or truth of the statements, information, and data contained in this Disclosure Statement.**

On February 9, 2009 at 10:00 a.m. and, if necessary, February 10, 2009, the Bankruptcy Court shall hold a hearing to consider whether to approve and confirm the Second

Amended Plan (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time without notice. For more information on the confirmation process, please refer to Section X, "Confirmation of the Second Amended Plan" on page 103.

For your reference, the following documents have also been attached to the Disclosure Statement:

(i)    The Second Amended Plan (Exhibit A);

(ii)   Order of the Bankruptcy Court, dated __, 2008 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Second Amended Plan (attached without exhibits) (Exhibit B);

(iii)  LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 (attached without exhibits) (Exhibit C);

(iv)   LPC's Form 10-Q for the quarter ended September 30, 2008 (attached without exhibits as Exhibit D);

(v)    LPC's Proxy Statement issued in connection with its Annual Meeting of Stockholders held on May 28, 2008 (Exhibit E);

(vi)   The Debtors' Projected Consolidated Financial Statements (the "Projected Financial Statements") for the Five Years ending December 31, 2012 (Exhibit F); and

(vii)  The Debtors' Liquidation Analysis (Exhibit G).

**This Disclosure Statement does not replace a careful and detailed review and analysis of the Second Amended Plan by each holder of a Claim or Interest. Please use this Disclosure Statement to aid and supplement that review. The description of the Second Amended Plan contained herein is only a summary and is qualified in its entirety by reference to the full text of the Second Amended Plan; if any inconsistencies exist between the Second Amended Plan and this Disclosure Statement, the Second Amended Plan shall govern. The Debtors urge holders of Claims and Interests to review the Second Amended Plan and any related attachments in order to obtain a full understanding of the Second Amended Plan.**

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the**

transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

\* \* \*

The offer of Series C Preferred Stock and LPC Common Stock in exchange for certain existing Claims and outstanding securities of Lexington Precision Corporation has not been registered under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or similar state securities or "blue sky" laws.  The issuance of such securities pursuant to the Second Amended Plan is being done pursuant to the exemption available under section 1145 of the Bankruptcy Code.  The Series C Preferred Stock and LPC Common Stock to be issued pursuant to the Second Amended Plan have not been approved or disapproved by the Securities and Exchange Commission (the "<u>SEC</u>") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Second Amended Plan.

Certain statements contained in this Disclosure Statement, including the Projected Financial Statements, are forward-looking statements.  Forward-looking statements usually can be identified by the use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof.  They may be used in discussions of strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.  Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements.  Some of those risks and uncertainties include:

- Increases and decreases in business awarded to the Debtors by their customers;

- Unanticipated price reductions for the Debtors' products as a result of competition;

- Changes in the cost of raw materials;

- Strength or weakness in the North American automotive market;

- Changes in the competitive environment;

- Unanticipated operating results;

- Changes in economic conditions;

- Changes in interest rates;

- **Financial difficulties encountered by customers or suppliers of the Debtors;**

- **Labor interruptions at the Debtors' facilities or at their customers' or suppliers' facilities;**

- **The Debtors' ability to develop adequate policies regarding and testing of internal control over financial reporting; and**

- **Other risks as disclosed in Section VI of this Disclosure Statement.**

**The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. There can be no assurance that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.**

## II. EXECUTIVE SUMMARY

### A.    Summary of Classification and Treatment of Claims and Interests Under the Second Amended Plan

The following summarizes the classification of Claims and Interests under the Second Amended Plan and the respective distributions and recoveries to each such class. The following summary is qualified in its entirety by reference to the full text of the Second Amended Plan. For a more detailed description of the terms of the Second Amended Plan, please refer to Section IV, *"The Second Amended Plan"* on page 41.

The Second Amended Plan provides for 19 classes of Claims and Interests. Classes 1 through 12 are comprised of Claims against or Interests in LPC, and Classes 13 through 19 are comprised of Claims against or Interests in LRGI. A Claim or Interest is impaired if the Second Amended Plan modifies or changes the rights of the Claims or Interests included in the Class. Holders of Claims and Interests in classes that are impaired may vote to accept or reject the Second Amended Plan. If a Class of Claims or Interests is not impaired pursuant to the Second Amended Plan, holders of the Claims or Interests in that Class are automatically deemed to accept the Second Amended Plan.

| LPC CLASS | Designation | STATUS | ENTITLED TO VOTE? | DISTRIBUTION UNDER PLAN |
|---|---|---|---|---|
| **Class 1** | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 2(a)** | CapitalSource Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 2(b)** | CSE Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 3** | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full (i) on the Effective Date or (i) by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more than 5 years from the date of assessment. |
| **Class 4** | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 5** | Senior Subordinated Note Claims | Impaired | Yes | Paid in full on the Effective Date by the issuance of a number of shares of Series C Preferred Stock equal to the amount of the Allowed Claim divided by the Equity Value Per Share. |
| **Class 6**[1] | Junior Subordinated Note Claims | Impaired | Yes | Paid in full on the Effective Date by the issuance of a number of shares of LPC Common Stock equal to the amount of the Allowed Claim divided by the Equity Value Per Share. |
| **Class 7** | General Unsecured Claims against LPC | Impaired | Yes | Cash payments in the aggregate amount equal to 106.75% of Allowed Claim comprised of an initial payment of 10% of the Allowed Claim on the Effective Date and 9 payments equal to 10.75% of the Allowed Claim payable quarterly commencing 3 months after the Effective Date or when the Claim is Allowed. |
| **Class 8** | Convenience Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |

---

[1] Class 6 Junior Subordinated Note Claims are held by "insiders" as defined under section 101(31)(B) of the Bankruptcy Code.

| LPC CLASS | Designation | STATUS | ENTITLED TO VOTE? | DISTRIBUTION UNDER PLAN |
|---|---|---|---|---|
| **Class 9** | Asbestos-Related Claims | Impaired | Yes | Paid in full by (i) insurance proceeds and (ii) to the extent insurance proceeds are insufficient to pay Allowed Claims, the deficiency will be paid as follows, (a) Allowed Claims exceeding available insurance proceeds by $2,000 or less will be paid upon Allowance and (b) Allowed Claims exceeding insurance proceeds in excess of $2,000 will receive 10% of such amount upon Allowance and 9 payments equal to 10.75% of such amount payable quarterly commencing 3 months after the Effective Date or , if later, the date the Claim is Allowed. |
| **Class 10** | Series B Preferred Stock Interests | Impaired | Yes | Paid in full on the Effective Date by the issuance of a number of shares of LPC Common Stock equal to the amount of Allowed Claim divided by the Equity Value Per Share. |
| **Class 11** | LPC Common Stock Interests | Impaired | Yes | Interests are retained. |
| **Class 12** | Other Equity Interests in LPC | Unimpaired | No (deemed to accept) | Interests are retained. |
| **LRGI CLASS** | Designation | STATUS | ENTITLED TO VOTE? | |
| **Class 13** | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 14(a)** | CapitalSource Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 14(b)** | CSE Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 15** | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full (i) on the Effective Date or (i) by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more than 5 years from the date of assessment. |
| **Class 16** | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 17** | General Unsecured Claims against LRGI | Impaired | Yes | Cash payments in the aggregate amount equal to 106.75% of Allowed Claim  that is comprised of an initial payment of 10% of the Allowed Claim on the Effective Date and 9 payments equal to 10.75% of the Allowed Claim payable quarterly commencing 3 months after the Effective Date or when the Claim is Allowed |

| LRGI CLASS | Designation | STATUS | ENTITLED TO VOTE? | |
|---|---|---|---|---|
| Class 18 | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| Class 19 | Interests in LRGI | Unimpaired | No (deemed to accept) | Interests are retained. |

**B.      Summary of Voting Procedures**

If you are entitled to vote, you will receive a ballot with this Disclosure Statement.  On the ballot, you may elect either to accept or reject the Second Amended Plan.  If you return a ballot that does not indicate either an acceptance or rejection of the Second Amended Plan, your vote shall be counted as a vote to accept the Second Amended Plan.  If return a ballot that indicates both an acceptance and rejection of the Second Amended Plan, your vote shall not be counted as either an acceptance or rejection.

___ __, **2009**, is the record date (the "Voting Record Date") to determine which holders of Claims or Interests may vote to accept or reject the Second Amended Plan.

___ __, **2009 4:00 p.m. (Eastern Standard Time)** is the last day to vote (the "Voting Deadline").

Please send your ballot to:

**FINANCIAL BALLOTING GROUP LLC (the "Voting Agent")
ATTN: LEXINGTON PRECISION BALLOT TABULATION
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK 10017**

**- OR -**

**tabulation@fbgllc.com**

**The Voting Agent must receive your ballot by (i) mail at street address above or (ii) e-mail in PDF form, each before the Voting Deadline for your vote to be counted.** The Voting Agent will not accept ballots sent by facsimile.  If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot.  If your ballot is damaged or lost, you should also contact the Voting Agent.

For more information on voting procedures, please refer to Section IX, "*Voting Procedures and Requirements*" on page 100.  Before voting, please review and consider all information outlined in the Second Amended Plan, this Disclosure Statement, and any documents attached thereto.

C.    **Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest.  In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponent to conduct such solicitation pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III.  OVERVIEW OF THE DEBTORS' OPERATIONS AND THE CHAPTER 11 CASES

A.    **Description of the Debtors' Operations**

The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described in detail below. The business of the Rubber Group is conducted by LRGI, and the assets utilized in that business are owned by LRGI, a Delaware corporation, and a wholly-owned subsidiary of LPC, which is also a Delaware corporation. The business of the Metals Group is conducted by LPC, and the assets utilized in that business are owned by LPC.  The following table sets forth actual net sales for the Rubber Group and the Metals Group for 2006 and 2007 and their forecasted net sales for 2008 (dollar amounts in thousands):

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Rubber Group | $ 76,090 | 86.6% | $ 74,587 | 84.4% | $ 62,383 | 85.3% |
| Metals Group | 11,811 | 13.4 | 13,821 | 15.6 | 10,719 | 14.7 |
| Total | $ 87,901 | 100.0% | $ 88,408 | 100.0% | $ 73,102 | 100% |

### 1.    The Rubber Group

The Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices. The following table sets forth the Rubber Group's actual net sales to each of its principal markets for 2006 and 2007 and forecasted net sales for 2008 (dollar amounts in thousands):

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Automotive Aftermarket | $ 22,728 | 29.9% | $ 22,034 | 29.5% | $ 28,167 | 45.2% |
| Automotive OEM | 41,246 | 54.2 | 35,799 | 48.0 | 16,262 | 26.1 |
| Medical Devices | 11,039 | 14.5 | 15,928 | 21.4 | 16,500 | 26.4 |
| Other Industries | 1,077 | 1.4 | 826 | 1.1 | 1,454 | 2.3 |
| Total | $ 76,090 | 100.0% | $ 74,587 | 100.0% | $ 62,383 | 100% |

The Rubber Group currently has three production facilities, each of which is a stand-alone business unit, with a complete management team, focused on a single product line. The Jasper, Georgia, facility specializes in insulators for automotive ignition systems, the Vienna, Ohio, facility specializes in automotive connector seals and transmission seals, and the Rock Hill, South Carolina, facility specializes in components for medical devices. In view of the dramatic downturn in volume in the automotive original equipment market, the Debtors have been reviewing their strategic alternatives with respect to the Vienna, Ohio facility. Those strategic alternatives are discussed in more detail under the heading **"Connector Seals for Automotive Wiring Harnesses"** starting on page 19.

#### a.    The Automotive Aftermarket

In the automotive aftermarket, the Rubber Group supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors believe that the Rubber Group is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket, with an estimated North American market share of 50%.

#### b.    The Automotive OEM Market

In the automotive OEM market, the Rubber Group has focused on two principal products, insulators for automotive ignition systems and connector seals for automotive wiring harnesses. The Debtors believe that the Rubber Group is one of the two largest suppliers of

connector seals in North America and the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market. The Debtors further believe that the Rubber Group's sales of insulators to the OEM market have been limited by customer concerns about the Debtors' financial condition and that the Rubber Group's market share of insulators for automotive ignition systems in new vehicles will increase significantly following the conclusion of the Chapter 11 Cases.

### c.       The Medical Device Market

In the medical device market, the Rubber Group has chosen to avoid commodity products that are characterized by lower quality requirements and extreme price competition. Instead, the Rubber Group concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision. The Debtors believe that the Rubber Group has become a leading supplier of these types of components because of its capabilities in product design and materials development and because its molding technology offers excellent process repeatability and product quality.

### d.       The Rubber Group's Competitive Strengths

The Rubber Group's leading market positions, high profit margins, and prospects for growth once the Debtors' financial issues are behind them are a function of its ability to offer its customers a one-stop source for the development and delivery of complex molded-rubber components, with high quality and at competitive prices. In accomplishing this, the Rubber Group has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including materials development, computer simulation, mold-making, rubber mixing, molding, process automation, and process management.

> (i)     <u>Materials Development</u>. Any new product development initiative begins with the selection of the appropriate compound to meet the product specification at a low cost. The Rubber Group has extensive experience in molding of numerous elastomers and works closely with its customers to choose the optimal material for any given application. The Rubber Group's in-house mixing operation in Jasper, Georgia, is equipped with a complete facility for materials development, including lab-style mixers, mills and molding presses, and analytical equipment for testing all critical performance characteristics. In addition, the Rubber Group's Rock Hill, South Carolina, facility contains an analytical laboratory that is utilized for detailed analysis of polymers, fillers, and contaminants.

> (ii)    <u>Computer Simulation</u>. The Rubber Group's computer simulation capability is a critical component of its offering to customers. The Rubber Group uses proprietary computer simulation software for both product

design and mold design.  By incorporating computer simulation into the product development process, the Rubber Group is often able to design a component that meets the customer's application without the time and expense required to create a physical prototype.  The Rubber Group also uses computer simulation to design both its molds and its molding process in order to maximize the probability of success in the production environment.

(iii)    Mold-Making.  The Rubber Group has invested over $14 million in a state-of-the-art mold-making operation within the Debtors' North Canton, Ohio facility (the "Engineering Center").  Through this investment, the Rubber Group controls 100% of its mold-making activities and has the capability to produce flashless molds, cut-in-plate molds, standard injection molds, and LSR injection molds.  The mold-making operation permits the Rubber Group to significantly reduce turnaround times for prototype molds, production molds, modifications, and repairs.  Moreover, the strong relationship between the Rubber Group's mold-making operation and its production-molding operations has enabled the Rubber Group to make numerous technological advances in both its mold-making and its molding processes.

Unlike most rubber molding businesses, the Rubber Group utilizes high-tolerance, "flashless" molds whenever possible.  In a flashless mold, each cavity is comprised of a separate stack of precisely-machined, self-registering inserts.  These inserts, which are assembled in multiple, hinged plates, have thousands of laser-cut vents that permit gases to escape from the cavities during the molding process while limiting flash extension to nominal levels. As illustrated in the following table, flashless molds offer multiple benefits compared to conventional cut-in-plate molds.

| Attribute | Resulting Benefit |
| --- | --- |
| Produce tighter-tolerance components | Easier assembly and better end-use performance |
| Forces on mold surface are balanced | Parts remain concentric and symmetrical even after extensive mold usage |
| Cavities are vented | Trapped air issues are prevented, improving quality and reducing scrap |
| Most secondary operations, such as deflashing, trimming, and die-cutting, are eliminated | Lower risk of damaged parts and contamination; reduced costs |
| Part handling is reduced | Lower risk of contamination |
| Extended mold life | Lower mold cost over the life of the part; less deterioration in part quality over time |
| Individual cavities can be replaced. | Molds have full cavitation at all times, increasing productivity and reducing costs |

(iv)   <u>Automation</u>. The Rubber Group makes extensive use of automation throughout its operations to improve productivity, reduce labor costs, and improve the quality of its products.  A substantial portion of the Rubber Group's automation equipment is designed and built at the Engineering Center.  This gives the Rubber Group a competitive advantage because its automation equipment is less expensive than similar equipment that could be purchased from outside vendors and is designed specifically to optimize the Rubber Group's manufacturing processes.

(v)   <u>Proprietary Press Controls</u>. The Rubber Group currently operates over 200 rubber molding presses, all of which are equipped with proprietary programmable logic controllers ("<u>PLCs</u>") designed and built at the Engineering Center.  PLCs permit the Rubber Group to select the optimal processing parameters for each mold and ensure strict adherence to those parameters, in order to maximize quality and minimize costs.  PLCs collect and store large amounts of data that can be used to determine the root cause of any molding problem.

(vi)   <u>Management Operating System</u>. The Debtors have developed a management operating system that is used on a real-time basis to ensure the efficient operation of every area of each plant.  The system increases management effectiveness, accountability, and communication.  As a result, management is able to more closely control labor cost, productivity, and overall performance.  The management operating system establishes performance expectations and enables management to hold every operator, supervisor, and department accountable for meeting these expectations.  Performance is measured and evaluated on a short-interval basis, usually

every two hours, so that real-time adjustments can be made to bring performance into line with expectations.

### e.        *Facilities of the Rubber Group; Capacity for Growth*

The Rubber Group operates four modern manufacturing facilities encompassing 256,000 square feet of floor space on 72 acres of land.  All of the operating facilities are owned by the Debtors.

All of the Rubber Group's facilities and equipment are well-maintained.  Because of reductions in volume and increases in productivity, each of the Rubber Group's plants has substantial unused capacity in all functional areas at current volume levels.  As a result, management believes that the Rubber Group can accommodate the sales growth reflected in the Projected Financial Statements (from $62.4 million in 2008 to $93.4 million in 2012) without the need for significant additional capital expenditures for plant and equipment.

The Rubber Group's production facilities are supported by the Engineering Center and a materials-development and rubber-mixing facility within the Jasper, Georgia facility.  The Engineering Center and the materials development facility have helped the Rubber Group to differentiate itself from many other custom molders by offering its customers a number of proprietary services, including computer simulation to optimize the design of the component, materials development to determine the optimal material for the component, and automation to produce complete assemblies.  When coupled with the Rubber Group's low-cost manufacturing operations and outstanding quality record, these services have made the Rubber Group a market leader in each of the markets it serves.

### f.        *Insulators for Automotive Ignition Systems*

Insulators for automotive ignition systems (aftermarket and OEM) represent the Rubber Group's largest product category, accounting for 51.5% of the Rubber Group's net sales for the first nine months of 2008, and 50.7% of forecasted net sales for all of 2008.

Insulators are molded rubber components that are used in ignition systems to seal and insulate the terminals on the spark plug and the distributor in a traditional ignition system, and the connection between the coil and the spark plug in a coil-on-plug ("COP") style ignition system.  Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers that assemble ignition-wire sets for the automotive OEMs and for retailers serving the automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

The Debtors believe that the Rubber Group is North America's largest manufacturer of insulators, with forecasted 2008 sales volume of 210 million units, representing net sales of approximately $31.1 million, and the leading supplier of insulators to companies, including General Cable, Standard Motor Products, and Federal Mogul, that supply ignition-wire sets to automotive-parts retailers.  During 2008, the Rubber Group's sales of insulators to the automotive aftermarket are forecasted to be $28.2 million, which represents an estimated North American market share in excess of 50%.

The Rubber Group is also a major supplier of insulators to companies that supply ignition-wire sets to the automobile manufacturers.  Through its customers, Prestolite Wire, Diamond Electric, Weastec, and Ford, the Rubber Group is the largest supplier of insulators used on new Ford and Chrysler vehicles produced in North America.  For 2008, the Rubber Group's sales of insulators for new vehicles are forecasted to be $2.9 million, which represents an estimated North American market share of approximately 18%.

The Rubber Group has become the leading supplier of insulators in North America, while continuing to achieve significant profit and cash flow margins, for the following reasons:

(i)     <u>Product Knowledge</u>. Because the Jasper facility is focused almost exclusively on the production and sale of insulators, the Rubber Group has developed vast knowledge of the product and its end-markets.  This knowledge, coupled with the Rubber Group's proprietary computer simulation software, enable the Rubber Group to provide invaluable assistance to its customers in designing insulators with superior performance characteristics, while minimizing cost.

(ii)    <u>Cost Competitiveness</u>. The same product focus has enabled the Rubber Group to develop cost-effective methods for delivering each type of insulator, including:

- High-cavitation tools for high-volume parts;

- Flashless tools for 180° parts;

- Unique, hybrid tools blending flashless and cut-in-plate technology, for certain difficult-to-mold insulators;

- Proprietary automation for molding, demolding, inspection, and assembly; and

- Offshore sourcing of lower-volume parts.

(iii)   <u>Proprietary Materials</u>. The Rubber Group has developed an extensive library of proprietary materials for the insulator market.  These materials enable the Rubber Group to meet demanding specifications (including engine temperatures as high as 600° F) at a competitive price.

(iv)    <u>The Broadest Aftermarket Product Line</u>. The Rubber Group has developed a very broad line of insulators for the automotive aftermarket by:

- Investing more than $7 million over the past ten years to build over one hundred high-cavitation tools for the aftermarket;

- ▪ Making further significant investments to acquire the right to use excess capacity on many of the high-cavitation tools owned by its OEM customers to supply the aftermarket; and

- ▪ Developing reliable, low-cost, off-shore sourcing for lower volume aftermarket parts.

(v)   <u>Aftermarket Growth</u>.  Rubber Group's aftermarket business is expected to grow and not be adversely affected by any decline in the automotive OEM industry.

Although the Rubber Group is already the leading supplier of insulators in North America, the Projected Financial Statements reflect a significant increase in sales of insulators once the Chapter 11 Cases are concluded.  Management believes that this growth is achievable for the following reasons:

(i)   <u>New Programs Awarded or Considered Highly Likely</u>.  The Rubber Group has been working closely with a number of suppliers to the Automotive OEMs, including Robert Bosch, Diamond Electric Manufacturing, Mitsubishi Electric, and Remy, Inc., on programs with an annualized value of approximately $3.4 million at full volume.  Based upon customer feedback, the management of the Rubber Group believes that it is highly likely that this business will be awarded to the Debtors.

(ii)   <u>General Motors Potential</u>. Prior to July 2008, General Cable, which assembles the ignition-wire sets for most new GM vehicles pursuant to an agreement with Delphi Corporation ("<u>Delphi</u>"), has been prohibited by Delphi from purchasing insulators for those sets from the Rubber Group. In late July 2008, Delphi authorized General Cable to purchase insulators from the Rubber Group and the Rubber Group received its first purchase order for insulators to be used on Delphi ignition-wire sets.  Management believes that a meaningful portion of this business will be sourced with the Rubber Group over the next several years.

(iii)   <u>Ford Potential</u>.  Ford Motor Company has stated a desire to source additional insulators with the Debtors as soon as they are satisfied with the resolution of the Chapter 11 Cases.

(iv)   <u>Returning Business</u>.  Certain OEM customers that had re-sourced products away from the Rubber Group to other suppliers (both domestic and Far East) have experienced price increases and/or quality issues with their new suppliers and are shifting major portions of this business back to the Rubber Group.  Prestolite Wire, the Debtors' largest OEM Insulator customer, has returned to the Debtors four parts with annual sales value of approximately $435,000 and has asked the Debtors to requote an additional ten parts with annual sales value of approximately $2 million.

(v)    <u>Aftermarket Strength</u>.  The Rubber Group is expected to continue to capture market share in the aftermarket due to:

- Its innovative product design;

- Its program of continuing to build high-cavitation molds for high-volume parts;

- Its off-shore sourcing of low-volume parts; and

- The inability of its competitors to match the Rubber Group's prices, quality, and service.

During 2008, the Rubber Group has been awarded new aftermarket business with an annual sales value of approximately $2,250,000.

### g.    *Molded Rubber Components for Medical Devices*

Components for medical devices are the Rubber Group's second largest product line, accounting for approximately 26.1% of the Rubber Group's net sales for the first nine months of 2008, and 26.4% of forecasted net sales for all of 2008.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery devices, and catheters.  The Rubber Group has chosen to avoid commodity-type components (like plunger tips for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that the Rubber Group is able to offer.  These types of products include seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

The Rubber Group is rapidly becoming a leading supplier for these types of components because of its technical capabilities, including:

(i)    <u>Product Design</u>. The Rubber Group uses proprietary computer simulation software to help its customers design components that function optimally in their required application and can be produced without significant problems.

(ii)    <u>Materials Development</u>. The Rubber Group's extensive materials library and its experience with a broad range of elastomers enable it to develop the optimal material for each application at a competitive price.

(iii)    <u>Tight-Tolerance, Flashless Molds</u>. The Rubber Group's state-of-the-art flashless molds allow it to:

▪ Maintain part concentricity, which is critical to the functioning of high-speed assembly equipment and to the delivery of precise dosages, even after extensive mold usage;

▪ Deliver consistently flash-free parts; and

▪ Hold extremely tight tolerances on even the most difficult features, including seals with very thin walls.

(iv)     <u>Proprietary Press Controls</u>. The Rubber Group's proprietary press controls allow it to provide its customers with a high level of assurance regarding process repeatability and traceability.

(v)      <u>In-House Automation Capability</u>. The Rubber Group's in-house automation design/build capability enables it to solve difficult assembly, inspection, and packaging issues for its customers.

The Debtors believe that the Rubber Group is in the early stages of a period of meaningful growth in its medical components business. From 2006 to 2007, the Rubber Group's medical device business grew by 44%. A substantial portion of projected future growth is attributable to major programs that are currently ramping up with existing customers. The balance is attributable primarily to new projects currently in the development stage, both with existing customers and with new customers that have been or will be attracted to the Rubber Group's capabilities.

The following is a description of the Rubber Group's principal products for the medical device industry, by application.

(i)      <u>Medication Delivery Systems</u>. The Rubber Group supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and process repeatability. Medication delivery products include injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly equipment and plunger tips for syringes used in applications where dosages must be controlled with precision. Medical applications that utilize the Rubber Group's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology applications, cardiac applications, and cosmetic surgery (Botox delivery). The Debtors believes growth opportunities in this product segment are strong because:

▪ Demands for the products should increase as the average age of the population increases;

▪ Device-makers will continue to move to higher-speed assembly, which should increase the demand for the ability to produce consistently symmetrical parts; and

- ▪ The Debtors anticipate that there will be meaningful growth in applications where dosages must be tightly controlled.

(ii)    <u>Laparoscopic Surgery Devices</u>. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively-small punctures rather than through a large incision.  Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection.  Since 2005, the Rubber Group has built significant relationships with three of the major manufacturers of laparoscopic surgery devices, and has received purchase orders for 21 different components for laparoscopic surgery devices.  These programs are in the early stages of their life-cycle and are expected to grow significantly in volume over the next several years.

### h.    *Connector Seals for Automotive Wiring Harnesses*

Connector seals for automotive wiring harnesses are the Rubber Group's third-largest product line, accounting for 18.2% of the Rubber Group's net sales for the first nine months of 2008 and 17.2% of forecasted net sales for all of 2008.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.

There are three standard types of connector seals.  Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition.  Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

The Debtors believe that the Rubber Group is one of North America's two largest manufacturers of connector seals, with a forecasted 2008 sales volume of over 380 million units. The Rubber Group currently manufactures connector seals using both high-consistency silicone rubber ("<u>HCR</u>") and liquid silicone rubber ("<u>LSR</u>") at its 53,000-square-foot facility in Vienna, Ohio (approximately equidistant between Cleveland and Pittsburgh).  The LSR-production operation was relocated to Vienna in the first half of 2008, resulting in one-time costs of approximately $213,000.

The Rubber Group's sales of connector seals have declined significantly in recent years for the following reasons:

(i)    Customer in-sourcing of a number of commodity-type seals;

(ii)     Customer re-sourcing of some connector seals due to price increases implemented by the Rubber Group in 2005 and 2006;

(iii)    Customer concerns about sourcing new business with an already-dominant supplier viewed as having financial issues; and

(iv)     The industry-wide reduction in domestic car and truck production.

Despite these sales declines, the Rubber Group continues to be a leader in the manufacture of connector seals, while maintaining profit and cash flow margins above the norm for the automotive supply industry, for the following reasons:

(i)      <u>Product Design</u>. The Rubber Group's focus on connector seals, coupled with its proprietary computer simulation software, has made the Rubber Group uniquely capable of assisting its customers in designing the seals for their electrical connectors.

(ii)     <u>Competitive Advantages in Multi-Hole Seals</u>. The Rubber Group has developed very cost-effective technology for manufacturing large volumes of the highly-complex, multi-hole seals that have become the industry standard. This technology encompasses:

- State-of-the-art, flashless tools that eliminate the need for most costly deflashing operations;

- Advanced wasteless molding technology, utilizing proprietary cold pots that minimize material waste;

- Proprietary "split-pin" technology that facilitates demolding without tears or flashed-over holes;

- High-cavitation tools that increase productivity and reduce cost; and

- Use of automated inspection equipment to meet stringent customer quality requirements.

(iii)    <u>Process Flexibility</u>. The Rubber Group has the capability to produce connector seals using both HCR and LSR and, as a result, can offer its customers a more cost-effective method to manufacture each part.

As a result of the recent dramatic downturn in volume in the automotive original equipment segment, the Debtors have undertaken a strategic review of the their connector seals manufacturing operation, which is conducted through the Rubber Group's Vienna, Ohio facility. The Vienna facility is currently forecasted to generate net sales of $13,762,000 and pro forma EBITDA of $714,000 for 2008. Although the Debtors have taken aggressive actions during the fourth quarter to reduce costs and improve profitability at the Vienna facility, the Debtors do not

believe it will be possible to return the plant to an adequate level or profitability in the near future at the production levels that are currently projected in the automotive OEM segment.

Based upon their review, the Debtors have determined to pursue simultaneously the following two strategic alternatives with respect to the connector seals business:

(i)    Partial Consolidation.  The Debtors have developed a plan to transfer the majority of their connector seal business to the other three plants of the Rubber Group.  In order to facilitate these transfers as well as certain transfers to facilities of other suppliers, the Debtors would temporarily increase the level of production at the Vienna facility in order to build "inventory banks" to ensure that there will no interruption of supply during the transition.  Under this alternative, the Debtors currently anticipate that they will complete the transition and cease operations at the Vienna facility by the end of the second quarter of 2009.

Based upon projected automotive productions levels for 2009, the Debtors believe that the connector seals business that would be transferred to the Rubber Group's other facilities will represent annualized sales of $10 million to $12 million.  The Debtors believe that the consolidation would permit the Debtors to eliminate significant amounts of duplicative overhead expenses and that, as a result the consolidation would generate incremental EBITDA of between $3.3 million and 4.0 million on an annualized basis, once the transition is completed.

(ii)    Sale of the Business Line.  While the Debtors are finalizing the plan for the partial consolidation alternative, they are also engaged in preliminary discussions with their two principal competitors in the connector seals business regarding a strategic consolidation pursuant to which one of those competitors would purchase the business conducted at the Vienna facility and consolidate that business with its existing operations, which are also suffering from reduced demand as a result of the downturn in the automotive OEM segment.  The Debtors can give no assurance that a sale transaction on acceptable terms will occur and, in fact, are moving forward with their plan for partial consolidation on the assumption that no such sale will take place.

The Projected Financial Statements have been prepared on the assumption that the Debtors will implement the consolidation alternative commencing on January 1, 2009.  With respect to the portion of the connector seals business that is being transferred to the other Rubber Group facilities, the Projected Financial Statements reflect sales levels consistent with industry projections for changes in the auto build, and, commencing in 2011, increases in sales consistent with management's belief that the Rubber Group's market share in connector seals will once again begin to grow once the Chapter 11 Cases are concluded.

### i.    *Financial Performance of the Rubber Group*

The following table sets forth the actual income from operations of the Rubber Group for 2006 and 2007 and its forecasted income from operations for 2008 and the reconciliation of the Rubber Group's income from operations to its Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for those periods (dollar amounts in thousands).

Please refer to Exhibit F, attached here to, for the reconciliation of the Debtors' consolidated loss from continuing operations for 2007 and their forecasted consolidated loss from continuing operations for 2008 to their consolidated forecasted EBITDA.

EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP.  The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA.  Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)     EBITDA excludes interest expense.  Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)    EBITDA excludes provisions for taxes.  Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)   EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling.  Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue.  EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)   EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(v)     EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vi)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement and the Prepetition Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP.  In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

The following table sets forth the actual operating results and EBITDA of the Rubber Group for 2006 and 2007 and its forecasted operating results and EBITDA for 2008 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

|  | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Net Sales | $76,090 | 100.0% | $74,587 | 100.0% | $62,383 | 100.0% |
| Cost of Sales | 64,772 | 85.1 | 63,039 | 84.5 | 52,151 | 83.6 |
| Gross Profit | 11,318 | 14.9 | 11,548 | 15.5 | 10,232 | 16.4 |
| Selling and Admin. Exp. | 3,676 | 4.9 | 3,573 | 4.8 | 2,882 | 4.6 |
| Income from Operations | 7,642 | 10.0 | 7,975 | 10.7 | 7,350 | 11.8 |
| Other Income (Loss): | | | | | | |
| Interest Income | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 6,455 | 8.5 | 5,727 | 7.7 | 4,747 | 7.6 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $14,097 | 18.5% | $13,702 | 18.4% | $12,097 | 19.4% |

The following table sets forth a reconciliation of the forecasted operating results and EBITDA of the Rubber Group for 2008 to its pro forma operating results and EBITDA for 2008 (dollar in thousands):

| | 2008 Forecasted | | Pro Forma Adjustments | | 2008 Pro Forma | |
|---|---|---|---|---|---|---|
| Net Sales | $ 62,383 | 100% | $ 245 | (1) | $62,628 | 100.0% |
| Cost of Sales | 52,151 | 83.6 | (1,040) | (2) | 51,111 | 81.6 |
| Gross Profit | 10,232 | 16.4 | 1,285 | | 11,517 | 18.4 |
| Selling and Admin. Exp. | 2,882 | 4.6 | (23) | (2) | 2,859 | 4.6 |
| Income from Operations | 7,350 | 11.8 | 1,308 | | 858 | 13.8 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 4,747 | 7.6 | | | 4,747 | 7.6 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 12,097 | 19.4% | $ 1,308 | | $13,405 | 21.4% |

(1) Reflects the pro forma effect of a price increase implemented in October 2008 with respect to one laparoscopic surgery program, as if that increase had been implemented prior to January 1, 2008.

(2) $869,000 of the pro forma adjustment relates to a productivity-enhancement project that has recently been completed at the Rock Hill facility under the direction of a consulting firm that specializes in improving productivity at manufacturing facilities. Upon completion of the project on November 21, 2008, the consulting firm advised the Debtors that, based upon the observed productivity improvements, the Debtors would achieve a minimum annualized reduction in labor costs of $1,250,000 at current volume levels. The Rubber Group's forecast for 2008 reflects the portion of the $1,250,000 of achieved annual savings that have been realized during 2008 and the pro forma adjustment reflects the portion of those annual savings that would have been realized during 2008 if the project had been completed prior to January 1, 2008. $213,000 of the pro forma adjustments reflect the elimination of the one-time costs incurred to move the Debtors' LSR production to the Vienna,

Ohio facility as part of a productivity-improvement project in the Debtors' connector seals business.

The following table sets forth the projected operating results and EBITDA of the Rubber Group for the years 2009 through 2012 (dollar amounts in thousands):

| | 2009 Projected | | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 75,986 | 100.0 % | $ 78,407 | 100.0 % | $ 86,413 | 100.0 % | $ 93,419 | 100.0 % |
| Cost of Sales | 52,208 | 75.3 | 55,401 | 70.7 | 58,862 | 68.1 | 62,837 | 67.3 |
| Gross Profit | 18,778 | 24.7 | 23,006 | 29.3 | 27,551 | 31.9 | 30,582 | 32.7 |
| Selling and Admin. Exp. | 3,107 | 4.1 | 2,784 | 3.6 | 2,853 | 3.3 | 2,919 | 3.1 |
| Income from Operations | 15,671 | 20.6 | 20,222 | 25.8 | 24,698 | 28.6 | 27,663 | 29.6 |
| Other Income (Loss): | | | | | | | | |
| Interest Expense | | | | | | | | |
| Gain on Repurchase of Debt | | | | | | | | |
| Reorganization Expense | | | | | | | | |
| Total Other Income | | | | | | | | |
| Income Tax | | | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | | | |
| Add Back: | | | | | | | | |
| Depreciation and Amortization | 3,917 | 5.2 | 3,523 | 4.5 | 2,908 | 3.4 | 2,772 | 3.0 |
| Interest Expense | | | | | | | | |
| Gain on Repurchase of Debt | | | | | | | | |
| Reorganization Expense | | | | | | | | |
| Income Tax | | | | | | | | |
| EBITDA from Continuing Operations | $ 19,588 | 20.8 % | $ 23,750 | 30.3 % | $ 27,606 | 31.9 % | $ 30,435 | 32.6 % |

As more fully discussed in Section 5.A, **_Selected Historical and Projected Financial Information_** starting on page 66, since the preparation of the Projected Financial Statements, industry forecasts of automotive production levels have been reduced several times. Based upon the most recent production forecast available to the Debtors, the Debtors' estimate that the net sale and EBITDA of the Rubber Group included in the Projected Financial Statements would be adjusted by the following amounts:

|  | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|
| Change in Net Sales |  |  |  |  |
| Change in EBITDA |  |  |  |  |
| Total |  |  |  |  |

## 2.    The Metals Group

The Metals Group consists of the Debtors' machining business located in Rochester, New York.  The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks.  The Metals Group primarily uses multi-spindle screw machines and specially-designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time.  The components produced by the Metals Group include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components, primarily for use by the automotive OEMs.

The following table sets forth the Metals Group's actual net sales to each of its principal markets for 2006 and 2007 and forecasted net sales for 2008 (dollar amounts in thousands):

|  | **2006** **Actual** | | **2007** **Actual** | | **2008** **Forecast** | |
|---|---|---|---|---|---|---|
| Automotive OEM | $ 9,490 | 80.3% | $ 11,597 | 83.9% | $ 8,732 | 81.5% |
| Other Industries | 2,321 | 19.7 | 2,224 | 16.1 | 1,987 | 18.5 |
| Total | $ 11,811 | 100.0% | $ 13,821 | 100.0% | $ 10,719 | 100.0% |

The Metals Group's automotive OEM customers have historically included such major domestic suppliers as BorgWarner, Cooper-Standard Automotive, Delphi, and Jiffy-Tite. Over the past eighteen months, the Metals Group has been awarded substantial volume of additional business by these customers as well as a number of new customers.

### a.    The Metals Group's Competitive Strengths

The Metals Group has a number of competitive advantages within the markets it serves, which have enabled it to build a solid base of customers.  These advantages include:

(i)     The ability to design and build specialized manufacturing equipment, which allows the Metals Group to offer its customers comparatively short lead times and low prices;

(ii)    The ability to design and build automation equipment for many of its processes, which allows the Metals Group to offer its customers excellent quality components and low prices; and

(iii)   The ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

### b.    *Financial Performance of the Metals Group*

The following table sets forth the actual operating results and EBITDA of the Metals Group for 2006 and 2007 and its forecasted operating results and EBITDA for 2008 (dollar amounts in thousands).

| | 2006 Actual | | 2007 Actual | | 2008 Forecast | |
|---|---|---|---|---|---|---|
| Net Sales | $ 11,811 | 100.0 % | $ 13,821 | 100.0 % | $ 10,719 | 100.0 % |
| Cost of Sales | 12,387 | 104.9 | 13,490 | 97.6 | 10,865 | 101.4 |
| Gross Profit | (576) | (4.9) | 331 | 2.4 | (146) | (1.4) |
| Selling and Admin. Exp. | 669 | 5.6 | 523 | 3.8 | 534 | 4.9 |
| Income from Operations | (1,245) | (10.5) | (192) | (1.4) | (680) | 6.3 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 820 | 6.9 | 682 | 4.9 | 538 | 5.0 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ (425) | (3.6)% | $ 490 | 3.5 % | $ (142) | (1.3)% |

The following table sets forth the projected operating results and EBITDA of the Metals Group for the years 2009 through 2012 (dollar amounts in thousands):

|  | 2009 Projected | | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | $ 17,034 | 100% | $ 26,937 | 100.0% | $ 29,506 | 100.0% | $ 32,963 | 100.0% |
| Cost of Sales | 15,783 | 92.7 | 23,404 | 86.9 | 25,020 | 84.8 | 27,143 | 82.4 |
| Gross Profit | 1,251 | 7.3 | 3,533 | 13.1 | 4,486 | 15.2 | 5,820 | 17.6 |
| Selling and Admin. Exp. | 582 | 3.4 | 739 | 2.7 | 840 | 2.8 | 904 | 2.7 |
| Income from Operations | 609 | 3.9 | 2,794 | 10.4 | 3,646 | 12.4 | 4,916 | 14.9 |
| Other Income (Loss): | | | | | | | | |
| Interest Expense | | | | | | | | |
| Gain on Repurchase of Debt | | | | | | | | |
| Reorganization Expense | | | | | | | | |
| Total Other Income | | | | | | | | |
| Income Tax | | | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | | | |
| Add Back: | | | | | | | | |
| Depreciation and Amortization | 562 | 3.3 | 666 | 2.4 | 871 | 2.9 | 962 | 2.9 |
| Interest Expense | | | | | | | | |
| Gain on Repurchase of Debt | | | | | | | | |
| Reorganization Expense | | | | | | | | |
| Income Tax | | | | | | | | |
| EBITDA from Continuing Operations | $ 1,231 | 7.2% | $ 3,460 | 12.3% | $ 4,517 | 15.3% | $ 5,878 | 17.8% |

As more fully discussed in Section 5.A, **"*Selected Historical and Projected Financial Information*"** starting on page 66, since the preparation of the Projected Financial Statements, industry forecasts of automotive production levels have been reduced several times. Based upon the most recent production forecast available to the Debtors, the Debtors' estimate that the net sale and EBITDA of the Metals Group included in the Projected Financial Statements would be adjusted by the following amounts:

|  | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Change in Net Sales | | | | |
| Change in EBITDA | | | | |
| Total | | | | |

### c.    Strategic Alternatives

The Metals Group has made significant progress in strengthening its operations and building its sales base, but, to date, it has not been able to generate adequate cash flow to justify the Debtors' continuing investment.  For 2008, the Metals Group is forecasting EBITDA of negative $142,000 or (1.3)% of net sales.  Based upon the additional business that has been awarded and additional orders that customers have promised, the Metals Group projects that its net sales and EBITDA will increase substantially over the next two years, as set forth above. Although the Debtors believe that the projections for the Metals Group, which are included in the Projected Financial Statements, are reasonable and achievable, the Debtors intend to monitor the progress of the Metals Group closely.  If the Debtors determine that, in spite of the awarded and anticipated new business, the Metals Group will not generate significantly improved cash flow, the Debtors will likely pursue an orderly wind-down of the business of the Metals Group and an orderly realization on its assets.  The Debtors have prepared a plan for such a wind-down and a financial projection related to that plan; based upon that financial projection, the Debtors believe that the net present value of the proceeds from such a wind-down would be approximately $7.6 million.  Campbell utilized the wind-down analysis as the basis for its valuation of the Metals Group, although Campbell indicated that it believed the value of the Metals Group would be greater if the Debtors were able to achieve the Metal Group's projections that are included in the Projected Financial Statements.

### 3.    Non-Operating Assets

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their on-going business.  The Debtors plan to dispose of such assets in an orderly fashion.  The most significant of those assets are the following:

### a.    Land in East Ellijay, Georgia

The Debtors own a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site, however, the adjacent area has seen extensive commercial development.  An independent appraisal of this property, dated June 10, 2008, indicates that the value of this property has increased significantly, making it uneconomical to consider building a manufacturing plant there.  The Debtors have substantially completed the grading work necessary to prepare the property for sale and expect to commence marketing of this parcel after the Chapter 11 Cases are concluded.

The Debtors also own six residential lots aggregating 6.6 acres abutting this commercial property.

### b.    Land and Buildings in Lakewood, New York

The Debtors own a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of the Debtors' former die

casting business, under a lease that expires on December 31, 2009. The lessee pays the Debtors $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,000. The lease provides for a single, three-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

The Debtors also own a vacant 10,000-square-foot building on 2.5 acres adjacent to the leased property discussed above.

### 4.    Lexington's Employees

As of September 30, 2008, the Debtors employed approximately 569 permanent employees, of which 116 were salaried employees and 453 were hourly employees, and 15 temporary employees.  The Debtors believe that their relationship with their employees is good. The Debtors' operations are subject to collective bargaining agreements at two facilities. Because the Debtors' Rock Hill, South Carolina manufacturing facility is an "open-shop," only certain of its hourly employees are covered by a collective bargaining agreement with the United Steel Workers of America, AFL-CIO, which expires on October 18, 2009.  All of the hourly employees at the Vienna, Ohio manufacturing facility are covered by a collective bargaining agreement with IUE-CWA, which was recently extended to March 11, 2009, pending discussions about the future of the facility.  The Debtors expect that the collective bargaining agreement at the Vienna facility will be extended to expire upon the closing of that facility.

## B.    Significant Indebtedness

The Debtors' significant prepetition indebtedness is described below.  In addition to this indebtedness for money borrowed, the Debtors have prepetition trade accounts payable and other general unsecured claims of approximately $6 million.

### 1.    The Prepetition Credit Agreement

The Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement").  The Credit Agreement provides for: (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and (ii) an equipment term loan facility in the original principal amount of $12.5 million.

Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of the Debtors' assets other than real estate and second priority liens on the Debtors' real estate.

The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements.  As of the Commencement Date, approximately

$22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

As described in greater detail in Section IV.B.1.b, "*Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired)*" on page 44, pursuant to the Second Amended Plan, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims. Holders of Class 2(a) Claims shall receive Cash in the full amount of their Allowed Claims.

## 2.    The Prepetition Loan Agreement

The Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"), as amended pursuant to the Default Waiver Agreement.  The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

Pursuant to the Loan Agreement, CSE, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the Debtors' real estate, and second priority liens on substantially all of the Debtors' other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements.  As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

As described in greater detail in Section IV.B.1.c, "*Class 2(b) – CSE Secured Claims against LPC (Unimpaired)*" on page 44, pursuant to the Second Amended Plan, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims.  Holders of Class 2(b) Claims shall receive Cash in the full amount of their Allowed Claims.

## 3.    Senior Subordinated Notes

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes").  Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

Approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates.  Approximately 74.4% of the Senior Subordinated Notes are held by a group of six

hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the
Debtors prior to the Commencement Date. Three members of the Ad Hoc Committee and the
Indenture Trustee now serve as members of the statutory creditors' committee (the "Creditors'
Committee") in the Chapter 11 Cases.

As described in greater detail in Section IV.B.1.f, "*Class 5 – Senior Subordinated
Note Claims (Impaired)*" on page 46, pursuant to the Second Amended Plan, Claims arising from
the Senior Subordinated Notes are classified as Class 5 Claims. Each holder of a Class 5 Claim
shall receive a number of shares of Series C Preferred Stock equal to the quotient of (a) such
holder's Allowed Claim <u>divided by</u> (b) $4.46, the value per share determined by the Debtors'
financial advisor, W.Y. Campbell (the "Equity Value Per Share").

### 4. Junior Subordinated Note

LPC is indebted to Michael A. Lubin, Chairman of the Board of the Debtors, in
respect of an unsecured Junior Subordinated Note due November 1, 2009 in the principal amount
of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of
13% per annum (as amended, the "Junior Subordinated Note"). Interest on the Junior
Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of
each year. As of the Commencement Date, $75,000 of accrued interest was outstanding with
respect to the Junior Subordinated Note.

As described in greater detail in Section IV.B.1.g, "*Class 6 – Junior Subordinated
Note Claims (Impaired)*" on page 46, pursuant to the Second Amended Plan, Claims arising from
the Junior Subordinated Note are classified as Class 6 Claims, a. The Holder of the Class 6
Claims shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the
full amount of the Allowed Class 6 Claims, <u>divided by</u> (b) the Equity Value Per Share.

## C. The Asbestos Cases

LPC is one of many defendants named in approximately 3,500 pending asbestos-
related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos
Actions"). In each case, the plaintiffs generally allege that LPC or one of its predecessors
produced a product containing asbestos, with which the plaintiffs came into contact during the
course of their careers. Generally, none of the complaints allege any specific facts as to which
products LPC allegedly produced that contained asbestos or the time of exposure.

LPC has denied and continues to deny any liability with respect to the Asbestos
Actions. To date, the Debtors have never been found liable on any asbestos-related Claims and
approximately 1,000 cases were dismissed.

To date, Liberty Mutual and Home Insurance Company, who insured the Debtors
for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors'
defense costs. On June 13, 2003, Home Insurance Company became subject to a state insurance
liquidation proceeding. Since then, Liberty Mutual has continued to pay the Debtors' defense
and other asbestos-related costs.

The Debtors believe the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
|--------|----------|
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and bodily injury, $1,000,000 per occurrence, $1,000,000 in aggregate coverage for products liability |

In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund. The Debtors believe Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage. The Debtors believe that the Fireman's Fund coverage is as follows:

| Period | Coverage |
|--------|----------|
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |
| 10/10/78-06/01/79 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

It should be noted that there may be filed certain Asbestos Related Claims with respect to years for which there may not be any insurance coverage. As described below, and as provided for in the Second Amended Plan, the lack of insurance coverage for a valid and enforceable Asbestos Related Claim will not preclude a holder of such claim from receiving a distribution under the Second Amended Plan.

As described in greater detail in Section IV.B.1.j, "*Class 9 – Asbestos-Related Claims (Impaired)*" on page 47, pursuant to the Second Amended Plan, Asbestos-Related Claims are classified as Class 9 Claims. After the Effective Date, each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; *provided, however,* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall as promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including

without limitation, statute of limitations, and laches. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies). To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors shall pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); *provided, however*, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim shall receive (i) Cash in the amount of ten percent (10%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (ii) nine (9) equal Cash payments, each in an amount equal to 10.75% of such Insurance Proceeds Deficiency, payable quarterly, commencing three (3) months after the Effective Date or if later, the date such Claim is Allowed.

**Nothing in this Disclosure Statement or the Second Amended Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

## D.    Significant Events Leading to the Commencement of the Chapter 11 Cases

Historically over 75% of the Debtors' business represented sales of rubber and metal components used by tier-one automotive part manufacturers, which supply automotive parts to domestic original OEMs. Over the past decade, there has been a substantial decline in the market share of the Detroit-based OEMs. Since 2005, but during 2008 in particular, there has been a meaningful reduction in the aggregate number of vehicles produced annually in the U.S. by all manufacturers. These factors have caused tier-one suppliers, particularly those focused on the Detroit-based OEMS, to experience declining sales and increased pricing pressures. This challenging industry environment has been exacerbated by industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of component suppliers like the Debtors.

The Debtors have responded to the reduction in OEM sales by restructuring their operations to reduce costs, which has enabled the Debtors to maintain significant operating and EBITDA margins despite declining sales and to increase their focus on their automotive aftermarket and medical device businesses.

1.      **Liquidity Crisis**

Notwithstanding the operational restructuring and their efforts to diversify their business, the industry-wide reduction in automotive OEM orders began to affect the Debtors in a significant way in mid-2006.  Although the Debtors were able to maintain superior margins, the reduction in sales to the automotive OEMs had a significant impact on the Debtors' overall cash flow.  At the same time, the Debtors' Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort.  The combination of these factors caused a significant drain on the Debtors' cash.

On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes.  As a result of the liquidity issues described above, the Debtors were not in a position to make the scheduled payment on the due date or within the thirty-day grace period.  The failure to make this interest payment within the grace period constituted a default under the Indenture, and by February 1, 2007, that default created a cross-default under the Prepetition Credit Agreement and the Prepetition Loan Agreement.  Shortly thereafter, certain holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee.

2.      **Restructuring Efforts**

From November 2006 through mid-March 2007, the Debtors held extensive discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues.  In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all stakeholders.  Upon entering into the standstill agreement, the Debtors engaged Campbell to assist them in seeking a refinancing or a sale of all or a portion of the Rubber Group.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers.  The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date.  In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code.  The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

Thereafter, the Debtors began their asset sale and refinancing efforts.  Despite an extremely difficult economic environment, the Debtors, assisted by Campbell, were able to obtain a number indications of interest for all or portions of LRGI.  Based upon those indications of interest and the advice of Campbell, the Debtors concluded that, notwithstanding the Debtors'

negative book net worth calculated in accordance with GAAP, the value of the Debtors' assets far exceeded their liabilities.

Upon reviewing the various sale proposals, the Debtors' determined that the course of action that offered the best prospect of maximizing value was to proceed with a non-binding proposal, subject to due diligence, from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase LRGI's facility in Rock Hill, South Carolina, which produces molded rubber components for use in medical devices, at a price of $32 million in cash subject to a standard purchase price adjustment provision related to increases or decreases in working capital (the "Rock Hill Sale").  The Rock Hill Facility had $16 million in net sales for 2007, and the net book value of that facility was $5.3 million on December 31, 2007.  The sale would have generated a pre-tax gain of approximately $26 million for U.S. federal income tax purposes, all of which was anticipated to be sheltered by the Debtors' net operating loss carryforward (subject to a possible alternative minimum tax).

In conjunction with that sale process, the Debtors began to seek senior secured financing arrangements that would have enabled them, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, make substantial payments in respect of the Senior Subordinated Notes, and finance the operations and growth of the Debtors' remaining businesses.  The Debtors were able to obtain a non-binding proposal, subject to due diligence, from a prospective institutional lender (the "Potential New Secured Lender") for a $36.7 million senior secured credit facility that, had it closed, would have enabled Lexington to (a) repay the Prepetition Secured Lenders, (b) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (c) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates of the Debtors.  The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a 5-year maturity and a cash-pay interest rate of 12%.  The Junior Subordinated Note and the Senior Subordinated Notes held by the affiliated holders would have been converted to common stock, reducing the Debtors' remaining debt by an additional $8 million.

In mid-January 2008, the Debtors advised the Ad Hoc Committee that they believed that, in order to move forward with the Rock Hill Sale and the related financing, they required an extension of the current standstill arrangement, which was due to expire on January 24, 2008, to April 30, 2008; the requested extension reflected the time periods requested by the Rock Hill Buyer and the Potential New Secured Lender in order to permit them to complete their respective due-diligence investigations.  The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that the Debtors and their advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale and a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion.  The Debtors made extensive efforts to obtain the Ad Hoc Committee's agreement to the Rock Hill Sale and negotiate further extensions of the Standstill Agreement.  After Debtors and the Ad Hoc Committee were not able to come to agreement, the Debtors began preparations for chapter 11.

In a final effort to avoid the expense and disruption of a chapter 11 case, Lexington made two additional restructuring proposals. The first proposal, which was made to the Ad Hoc Committee, included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process. In support of this recapitalization, Lexington was able to obtain from the Potential New Secured Lender a modified, non-binding financing proposal that would have provided for a $43.3 million senior, secured credit facility, conditioned upon due diligence and the completion of the recapitalization. The Debtors believe that this facility would have been adequate to finance their entire business without the Rock Hill Sale. The proposed recapitalization would have enabled the Debtors to repay the Prepetition Secured Lenders in full, and in the Debtors' view, would have provided a full recovery to the holders of the Senior Subordinated Notes. The Ad Hoc Committee rejected the recapitalization proposal because it believed, based upon its valuation of the Debtors, that it would not have provided a full recovery to the holders of the Senior Subordinated Notes.

The second proposal was made to Jefferies High Yield Trading ("Jefferies"), the largest holder of the Senior Subordinated Notes with approximately 37.1% of the issue. To the knowledge of the Debtors, the second proposal was not shared with the other members of the Ad Hoc Committee. That proposal provided for a full conversion of the Senior Subordinated Notes to equity and would likely have given a majority of the voting power in the Debtors to non-affiliated holders of the Senior Subordinated Notes, conditioned upon reaching agreement on the following: (a) a continuing interest for existing stockholders consistent with the values reflected in the sale offers the Debtors had received; (b) shared control of the Board of Directors for at least two years following the restructuring; (c) continuation of current management of the Debtors for at least two years following the restructuring; and (d) a one-time right to purchase the shares issued to Jefferies if the shared control arrangements were terminated after two years, at a 40% premium to the amount owed to Jefferies at the time of conversion. After negotiations between the Debtors and Jefferies, and a counterproposal by Jefferies, the Debtors and Jefferies were not able to reach an agreement.

In light of the foregoing, the Debtors determined that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code. The Debtors believed that the short-term standstill arrangements under which they had been operating for approximately a year prior to the Commencement Date were having a significant adverse effect on their business because of customer concerns about awarding additional business to a company with an uncertain future, and that further delay would only exacerbate the negative impact.

## E.    The Chapter 11 Cases

### 1.    Commencement of the Chapter 11 Cases and the "First-Day" Orders

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases. Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

### a.    Case Administration Orders

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases. These orders: (i) authorized the joint administration of the Chapter 11 Cases, (ii) established notice procedures, (iii) granted an extension of time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix. In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

### b.    Critical Obligations

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations. The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits, (ii) sales and use taxes, and (iii) claims of common carriers, equipment processors, and warehouses.

### c.    Customer and Employee Programs

Further, the Bankruptcy Court granted authority to continue certain business operations. Among other things, the Bankruptcy Court authorized the Debtors to: (i) continue certain customer service programs and (ii) continue certain workers compensation and all other insurance policies.

### d.    Financing Arrangements

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to (i) use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing, (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral, and (iii) maintain their existing bank accounts and forms.

### 2.    Appointment of the Creditors' Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the seven-member Creditors' Committee to represent the interests of all unsecured creditors in the Chapter 11 Cases. The original members of the Creditors' Committee were:

Wilmington Trust Company;

Jefferies High Yield Trading;

Wilfrid Aubrey, LLC;

Valhalla Capital Partners, LLC;

Momentive Performance Materials, Inc.;

Wacker Chemical Corporation; and

Environmental Products & Services of Vermont, Inc.

Representatives of Jefferies High Yield Trading, Wilfrid Aubery, LLC, and Valhalla Capital Partners, LLC also served on the Ad Hoc Committee, as described in Section III.B.3, "*Senior Subordinated Notes*" on page 32.

Wacker Chemical Corporation resigned from the Creditors' Committee on August 20, 2008.

The Creditors' Committee retained Andrews Kurth LLP as counsel to the Creditors' Committee, and SRR as financial advisor to the Creditors' Committee.

### 3.    Debtor-in-Possession Financing

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements.  The Debtors also obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008.  Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' board of directors and the Debtors' Co-Chief Executive Officer.  William B. Connor currently serves as a director on the Debtors' board of directors.  To the Debtors' knowledge, ORA Associates is not an insider of the Debtors.

The Bankruptcy Court authorized, on a final basis, the use of cash collateral and approved the DIP Note on April 17, 2008.

As described in Section IV.A.4, "*Debtor-in-Possession Loan Claims*" on page 43, Claims arising from the DIP Note shall be paid in full, in Cash, on the Effective Date.

### 4.    The Debtors' Exclusive Periods

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case.  In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case.  A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Creditors' Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit acceptances thereof.  The Debtors objected.  On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively. On July 17, 2008, the Creditors' Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend of the Debtors' exclusive periods for an additional 90-days. On July 22, 2008, the Creditors' Committee filed that objection. On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods. Thereafter, by decision and order dated July 31, 2008, the Court granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

On October 7, 2008, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to January 26, 2009, and February 25, 2009, respectively. The Creditors' Committee objected to the Debtors' motion. On October 28, 2008, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors' motion.

5.      **The Claims Reconciliation Process**

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline for any claimant other than (i) a counterparty to an executory contract rejected by the Debtors after July 16, 2008 or (ii) a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of claim. The deadline for a counterparty to an executory contract rejected by the Debtors after July 16, 2008 is discussed under the caption **"Rejection Damage Claims,"** on page 57. The deadline for Government Units to file a proof of claim is September 29, 2008. In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of claim form. The notice included information as to how to file a proof of claim and whether filing a proof of claim is necessary. On July 18, 2008, the Debtors also published the same notice in the national edition of The Wall Street Journal.

For more information on the bar date and whether you need to file a proof of claim, please refer to the bar date notice, which can be found at http://chapter11.epiqsystems.com/lexington.

## IV. THE SECOND AMENDED PLAN

This Section of the Disclosure Statement summarizes the Second Amended Plan, which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the full text of the Second Amended Plan. To the extent any inconsistencies exist between the Disclosure Statement and Second Amended Plan, the Second Amended Plan shall govern.

A.    **Summary and Treatment of Unclassified Claims**

        The Second Amended Plan does not classify all Claims and Interests.  In particular, Claims incurred during the course of the Chapter 11 Cases (*i.e.*, Administrative Expense Claims) and Priority Tax Claims are unclassified.  A summary of these Claims is set forth below.

      1.    **Administrative Expense Claims**

        Administrative Expense Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Commencement Date.  Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to the Debtors and Creditors' Committee that are incurred during the pendency of the Chapter 11 Cases.

        The Debtors will pay Administrative Expense Claims incurred in the ordinary course of business and consistent with past practice or arising under loans or advances to the Debtors after the Commencement Date, whether or not incurred in the ordinary course of business, in accordance with the terms and conditions of the particular transaction and any related agreements and instruments.  The Debtors will pay all other Administrative Expense Claims, in full, in cash, on the Effective Date or as soon thereafter as is practicable, or on such other terms to which the Debtors and the holder of such Administrative Expense Claim agree.

        Pursuant to Section 2.1 of the Second Amended Plan, each holder of an Allowed Administrative Expense Claim shall receive Cash in the amount of its Allowed Administrative Expense Claim on or soon as reasonably practicable following the later of (a) the Effective Date or (b) the date on such Claim is Allowed, except that (i) any Allowed Administrative Expense Claim incurred in the ordinary course of business shall be paid in the ordinary course of business, consistent with past practice and (ii) any Allowed Administrative Expense Claims arising from liabilities incurred under loans, advances, or other obligations shall be paid in accordance with the terms and subject to the conditions of the documents governing such obligations.  Holders of Allowed Administrative Expense Claims may also elect to receive less favorable treatment.

      2.    **Professional Compensation and Reimbursement Claims**

        Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

        In the Confirmation Order, the Bankruptcy Court shall fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date.  Each holder of such a Claim shall be paid in Cash in the amount of its Allowed

Administrative Expense Claim as soon as practicable following the later of (a) the Effective Date or (b) the date which such Claim is Allowed.  The Debtors are authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

### 3.      Indenture Trustee Fee Claims

Indenture Trustee Fee Claims are Administrative Expense Claims of the Indenture Trustee for reimbursement of its reasonable accrued and unpaid fees and expenses under the Indenture.  The Indenture grants the Indenture Trustee a lien (the "Charging Lien") upon and priority in payment with respect to any distributions to holders of the Senior Subordinated Note Claims for payment of any Indenture Trustee Fees Claims arising prior to the Effective Date.

The holder of the Indenture Trustee Fee Claims shall be paid in Cash on the Effective Date by Reorganized LPC without the need for Bankruptcy Court approval.  The Charging Lien shall be discharged upon payment in full of the Indenture Trustee Fee Claims. Nothing in the Second Amended Plan shall impair, waive, or discharge the Charging Lien with respect to any fees or expenses not paid by Reorganized LPC.

### 4.      Debtor-in-Possession Loan Claims

DIP Loan Claims are all Claims arising under the DIP Note and the DIP Financing Order with respect to the DIP Note.  Holders of the DIP Loan Claims shall be paid in full, in Cash, on the Effective Date.

### 5.      Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive, at the Debtors' or the Reorganized Debtors' option, (a) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date and (ii) the date such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

### B.      Classification and Treatment of Classified Claims and Interests

Pursuant to the Second Amended Plan, there are a total of 19 Classes, with Classes 1 through 12 being Claims against or Interests in LPC and Classes 13 through 19 being Claims against or Interests in LRGI.

Unless indicated otherwise, all distributions shall be in full satisfaction of each Allowed Claim or Interest and shall be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed.  Further, claimholders can generally agree to receive less favorable treatment than the treatment provided for by the Second Amended Plan.  Unless otherwise indicated, the Debtors have based the characteristics and amounts of the Claims or Interests on the Debtors' books and records.

### 1.    Claims against and Interests in LPC

#### a.    Class 1 – Other Priority Claims against LPC (Unimpaired)

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LPC shall receive Cash in the amount of its Allowed Other Priority Claims against LPC.  Because Class 1 Claims are not impaired pursuant to the Second Amended Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

#### b.    Class 2(a) – CapitalSource Secured Claims against LPC (Unimpaired)

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CapitalSource Secured Claim against LPC shall receive Cash in the amount of its Allowed CapitalSource Secured Claim against LPC.  Because Class 2(a) Claims are not impaired pursuant to the Second Amended Plan, holders of CapitalSource Secured Claims against LPC are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

#### c.    Class 2(b) – CSE Secured Claims against LPC (Unimpaired)

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CSE Secured Claim against LPC shall receive Cash in the amount of its Allowed CSE Secured Claim against LPC.  Because Class 2(b) Claims are not impaired pursuant to the Second Amended Plan, holders of CSE Secured Claims against LPC are

conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### d.    Class 3 – Secured Tax Claims against LPC (Unimpaired)

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC shall receive, at the Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against LPC; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LPC, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LPC deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim against LPC.  Because Class 3 Claims are not impaired pursuant to the Second Amended Plan, holders of Secured Tax Claims against LPC are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### e.    Class 4 – Other Secured Claims against LPC (Unimpaired)

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claims against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LPC or Reorganized LPC, the Debtors may (i) reinstate any Other Secured Claim against LPC or (ii) distribute to holders of an Allowed Other Secured Claim against LPC (w) Cash in the amount of such Claim, (x) the sale or disposition of proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released. Because Class 4 Claims are not impaired pursuant to the Second Amended Plan, holders of Other Secured Claims against LPC are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### f.    Class 5 – Senior Subordinated Note Claims (Impaired)

Class 5 Claims are all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as Indenture Trustee, and LPC, as issuer, which shall include interest at 12% per annum.

Each holder of an Allowed Senior Subordinated Note Claim shall receive, as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed a number of shares of Series C Preferred Stock equal to the quotient of (a) such holder's Allowed Senior Subordinated Note Claim against LPC divided by (b) the Equity Per Share Value.  Because Class 5 Claims are impaired pursuant to the Second Amended Plan, holders of Allowed Senior Subordinated Note Claims are entitled to vote to accept or reject the Second Amended Plan.

### g.    Class 6 – Junior Subordinated Note Claims (Impaired)

Class 6 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which shall include interest at 13% per annum.

The holder of the Allowed Junior Subordinated Note Claims shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the aggregate amount of such Claim divided by (b) the Equity Value Per Share.  Because Class 6 Claims are impaired pursuant to the Second Amended Plan, the holder of the Allowed Junior Subordinated Note Claims is entitled to vote to accept or reject the Second Amended Plan.

### h.    Class 7 – General Unsecured Claims against LPC (Impaired)

Class 7 Claims are all Unsecured Claims against LPC not classified in any other Class (e.g., Classes 5, 6, 8, or 9).

Each holder of an Allowed General Unsecured Claim against LPC shall receive Cash payments in the aggregate amount of 106.75% of such claim as follows, (i) ten percent (10%) of its Allowed General Unsecured Claim against LPC will be paid in Cash as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed and (ii) nine (9) equal Cash payments, each in an amount equal to ten and three quarters percent (10.75%) of its Allowed General Unsecured Claim against LPC, payable quarterly, commencing three (3) months after the Effective Date or if later, the date such Claim is Allowed.  Because Class 7 Claims are impaired pursuant to the Second Amended Plan, holders of Allowed General Unsecured Claims against LPC are entitled to vote to accept or reject the Second Amended Plan.

### i.    *Class 8 – Convenience Claims against LPC (Unimpaired)*

Class 8 Claims comprise all Unsecured Claims against LPC that are Allowed in the amount of $2,000.00 or less or (ii) Allowed in a larger amount but reduced to $2,000 by the holder of such Claim.

As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline. Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Second Amended Plan to exercise its election.

Each holder of an Allowed Convenience Claim against LPC shall receive Cash in the amount of its Allowed Convenience Claim against LPC. Because Class 8 Claims are not impaired pursuant to the Second Amended Plan, holders of Convenience Claims against LPC are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### j.    *Class 9 – Asbestos-Related Claims (Impaired)*

Class 8 Claims are any Asbestos-Related Claims, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.

After the Effective Date, each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; *provided, however,* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, and laches. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies).

To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors shall pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); *provided, however*, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim shall receive (i) Cash in the amount of ten percent (10%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the

Adjudication Amount of such Asbestos-Related Claim, and (ii) nine (9) equal Cash payments, each in an amount equal to 10.75% of such Insurance Proceeds Deficiency, payable quarterly, commencing three (3) months after the Effective Date or if later, the date such Claim is Allowed.

**Nothing in this Disclosure Statement or the Second Amended Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.  Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

### k.        Class 10 – Series B Preferred Stock Interests (Impaired)

Class 10 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

On the Effective Date, the Series B Preferred Stock Interests shall be cancelled and each holder of a Series B Preferred Stock Interest shall receive a number of shares of LPC Common Stock equal to the quotient of (a) the amount of such holder's Series B Preferred Stock Interest divided by (b) the Equity Value Per Share.  Because Class 10 Interests are impaired pursuant to the Second Amended Plan, holders of Series B Preferred Stock Interests are entitled to vote to accept or reject the Second Amended Plan.

### l.        Class 11 – LPC Common Stock Interests (Impaired)

Class 11 LPC Common Stock Interests are Interests of any holder of LPC Common Stock.

Although the LPC Common Stock Interests will be unaltered, the increase in the number of authorized shares of LPC Common Stock pursuant to the Second Amended Plan will dilute the LPC Common Stock Interests.  Because Class 11 Equity Interests are impaired pursuant to the Second Amended Plan, holders of LPC Common Stock Interests are entitled to vote to accept or reject the Second Amended Plan.

### m.        Class 12 – Other Equity Interests in LPC (Unimpaired)

Class 12 Other Equity Interests are Interests of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including the LPC Warrants, but excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests.

All Other Equity Interests will be unaltered and deemed to accept the Second Amended Plan.

2.      **Claims against and Interests in LRGI**

a.      ***Class 13 – Other Priority Claims against LRGI (Unimpaired)***

Class 13 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LRGI shall receive Cash in the amount equal of its Allowed Other Priority Claim against LRGI.  Because Class 13 Claims are not impaired pursuant to the Second Amended Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

b.      ***Class 14(a) – CapitalSource Secured Claims against LRGI (Unimpaired)***

Class 14(a) Claims are all Claims against LRGI arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CapitalSource Secured Claim against LRGI shall receive Cash in the amount of its Allowed CapitalSource Secured Claim against LRGI.  Because Class 14(a) claims are not impaired pursuant to the Second Amended Plan, holders of CapitalSource Secured Claims against LRGI are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

c.      ***Class 14(b) – CSE Secured Claims against LRGI (Unimpaired)***

Class 14(b) Claims are all Claims against LRGI arising under the Prepetition Loan Agreement and all Claims of CSE, as agent for the Prepetition Lenders and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.

Each holder of an Allowed CSE Secured Claim against LRGI shall receive Cash in the amount of its Allowed CSE Secured Claim against LRGI.  Because Class 14(b) is not impaired pursuant to the Second Amended Plan, holders of CSE Secured Claims are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

d.      ***Class 15 – Secured Tax Claims against LRGI (Unimpaired)***

Class 15 Claims are Claims against LRGI that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code,

and includes any interest on such Secured Tax Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI shall receive, at the Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against LRGI; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LRGI with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LRGI deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Claim against LRGI. Because Class 15 Claims are not impaired pursuant to the Second Amended Plan, holders of Secured Tax Claims against LRGI are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### e.        Class 16 – Other Secured Claims against LRGI (Unimpaired)

Class 16 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LRGI or Reorganized LRGI, the Debtors may (i) reinstate any Other Secured Claim against LRGI or (ii) distribute to holders of an Allowed Other Secured Claim against LRGI  (w) Cash in the amount of such Claim, (x) the sale or disposition proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral, which secures Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released. Because Class 15 Claims are not impaired pursuant to the Second Amended Plan, holders of Other Secured Claims against LRGI are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### f.        Class 17 – General Unsecured Claims against LRGI (Impaired)

Class 17 Claims are all Unsecured Claims against LRGI not classified in Class 16.

Each holder of an Allowed General Unsecured Claim against LRGI shall receive Cash payments in the aggregate amount of 106.75% of such claim as follows, (i) ten percent (10%) of its Allowed General Unsecured Claim against LRGI will be paid in Cash as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Claim is Allowed and (ii) nine (9) equal Cash payments, each in an amount equal to ten and three quarters

percent (10.75%) of their Allowed General Unsecured Claim against LRGI, payable quarterly, commencing three (3) months after the Effective Date or, if later, the date such Claim becomes Allowed.  Because Class 16 Claims are impaired pursuant to the Second Amended Plan, holders of General Unsecured Claim against LRGI are entitled to vote to accept or reject the Second Amended Plan.

### g.  *Class 18 – Convenience Claims against LRGI (Unimpaired)*

Class 18 Claims comprise all Unsecured Claims against LRGI that are (i) Allowed in the amount of $2,000.00 or less or (ii) Allowed in a larger amount but reduced to $2,000.00 by the holder of such Claim.

As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Second Amended Plan to exercise its election.

Each holder of an Allowed Convenience Class Claim shall receive Cash in the amount of its Allowed Convenience Claim against LRGI.  Because Class 18 Claims are not impaired pursuant to the Second Amended Plan, holders of Convenience Claims against LRGI are conclusively presumed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

### h.  *Class 19 – Interests in LRGI (Unimpaired)*

Class 19 Equity Interests are all Interests in LRGI, all of which are owned by LPC.  All the Interests in LRGI shall be unaltered.  Because Class 19 Equity Interests are not impaired pursuant to the Second Amended Plan, the holder of Interests in LRGI is conclusively presumed to have accepted the Second Amended Plan and is not entitled to vote to accept or reject the Second Amended Plan.

## C.  Distributions Pursuant to the Second Amended Plan

### 1.  Distributions

A Disbursing Agent shall make all distributions under the Second Amended Plan.  For all distributions except those made with respect to Allowed Senior Subordinated Notes, Reorganized LPC or its designated agent shall be the Disbursing Agent.  For distributions made with respect to Allowed Senior Subordinated Notes, the Indenture Trustee, or such other entity as designated by the Debtors, shall be the Disbursing Agent.

The Disbursement Record Date is three (3) days after the Confirmation Date, at which time the claims registry shall be closed.  The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the Debtors' schedules, books and records, or in any

proofs of claim filed.  Any Cash distribution shall be made by check or wire transfer or as otherwise provided by any applicable agreements.

No Cash distributions under $50 shall be made unless the holder sends a written request to the Disbursing Agent.  No fractional shares of LPC Common Stock or Series C Preferred Stock shall be distributed under the Second Amended Plan.  If an Allowed Claim results in distribution of a number of shares that is not a whole number, the number of share shall be rounded up to the next whole number if the fraction is one-half (½) or greater and rounded down to the next lower whole number if the fraction is less than one-half (½).

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent shall use reasonable efforts to locate the holder.  If the distribution remains undeliverable one year after the Effective Date, the distribution shall revert back to respective Reorganized Debtor.

The Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Debtors shall not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement.

## 2.    Surrender or Transfer of the Senior Subordinated Notes and the Junior Subordinated Note

Unless this requirement is waived by LPC or Reorganized LPC, in order to receive any distribution, holders of the Senior Subordinated Notes Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the Second Amended Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

Unless this requirement is waived by LPC or Reorganized LPC, to be able to participate in any distribution, the holder of the Junior Subordinated Note Claim shall surrender the Junior Subordinated Note to Reorganized LPC, unless Reorganized LPC is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If the note is lost, stolen, or

otherwise destroyed, Reorganized LPC may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) to hold the Debtors harmless with respect to any distributions made on any Claims arising from the lost, stolen or otherwise destroyed note.

If a holder of a Junior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(c) of the Second Amended Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

## D.    Implementation of the Second Amended Plan and Related Documents

### 1.    The New Secured Credit Facility

To fund the distributions under the Second Amended Plan and the continued operations of the Reorganized Debtors, the Reorganized Debtors shall enter into the New Secured Credit Facility. The Debtors are currently engaged in negotiations with a financial institution that has expressed an interest in providing the New Secured Credit Facility. As of the date hereof, however, that institution has not committed to providing the New Secured Credit Facility. It should be noted that given the current global economic conditions that obtaining a commitment for the New Secured Credit Facility could prove to be difficult. The New Secured Credit Facility shall be approved concurrently with confirmation of the Second Amended Plan. If the Debtors are not able to obtain the New Secured Credit Facility, the Debtors might not be able to confirm the Second Amended Plan.

### 2.    The Investor Loan

The Debtors are currently in discussions with the providers of the DIP Loan regarding an arrangement pursuant to which an amount equal to the principal amount of the DIP Loan will be reinvested in the Reorganized Debtors in the form of a second-lien loan (the "Investor Loan") junior to the New Secured Credit Facility. The terms currently under discussion are (i) a maturity date three months after the expiration date of the New Secured Credit Facility, (ii) an interest rate of 700 basis points above the 30-day LIBOR, and (iii) the issuance of five-year warrants permitting the lenders to purchase an amount of LPC Common Stock equal in value to the amount of the Investor Loan. It is a condition precedent to the making of the Investor Loan that the holders of LPC Common Stock have the right to elect a majority of the Board of Directors for the first thirty months following the Effective Date and, thereafter, until the Investor Loan has been paid in full or the holders have received an unconditional offer to purchase the Investor Loan immediately for the principal amount thereof and accrued interest thereon.

The Debtors have not sought alternative financing sources to replace the Investor Loan. The Committee believes that the Debtors must "market-test" the Investor Loan prior to finalizing the terms thereof. In connection with discussions of alternative corporate governance arrangements for the Reorganized Debtors, the Debtors have proposed that the holders of Senior Subordinated Note Claims who are members of the Committee participate in the Investor Loan; those holders have indicated an unwillingness to participate in the Investor Loan.

### 3.    Cancellation of Documents, Agreements, and Debt Instruments

As noted in Sections IV.A and IV.B of this Disclosure Statement, Cash payments or other consideration will be distributed pursuant to the Second Amended Plan in satisfaction of all Claims and the Series B Preferred Stock Interests and any document, agreement, or debt instrument evidencing any Claim or Series B Preferred Stock Interest shall be automatically cancelled upon the Effective Date without any requirement for any further act or action. Affected documents include, but are not limited to, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture, the Senior Subordinated Notes, the Junior Subordinated Note, and shares of the Series B Preferred Stock.

### 4.    Charter Amendment

On the Effective Date or as soon as practicable thereafter, Reorganized LPC shall file an amendment to LPC's certificate of incorporation (the "Charter Amendment") with the Secretary of State of the State of Delaware. The Charter Amendment will amend LPC's certificate of incorporation in order to, among other things, (i) establish the rights and priorities of the Series C Preferred Stock, (ii) increase the number of authorized shares of Series C Preferred Stock to 15,000,000, and (iii) reduce the per value of the Series C Preferred Stock from $1.00 to $0.01 per share, and (iv) reduce the par value of LPC Common Stock from $0.25 to $0.01 per share.

The Second Amended Plan authorizes LPC to file the Charter Amendment without any further corporate action or any action by holders of Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, or Other Equity Interests.

A copy of the Charter Amendment will be included in the Plan Supplement. As described in Section IV.N.4, "*Plan Supplement*" on page 65, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2009.

### 5.    Series C Preferred Stock

Holders of Allowed Senior Subordinated Note Claims will receive, as part of their distributions under the Second Amended Plan, shares of Series C Preferred Stock that will be issued by Reorganized LPC. The key terms of the Series C Preferred Stock are as follows:

#### a.    *Liquidation Preference*

The liquidation preference (the "Liquidation Preference") per share shall be equal to the Equity Value Per Share, which will increase at the rate of six percent (6%) per annum, compounded quarterly. In the event of the sale or liquidation of Reorganized LPC, each holder will be entitled to receive the greater of (1) the Liquidation Preference or (2) the amount such holder would have received if it held an equal number of shares of the LPC Common Stock.

### b.    Board of Directors

For the first thirty (30) months following the Effective Date, the Board of Directors will consist of nine (9) members, for (4) of which will be elected by the holders of the Series C Preferred Stock and five (5) of which will be elected by the holders of LPC Common Stock.  Thereafter, if the Investor Loan has been paid in full (of if the holders of the Series C Preferred Stock have made an unconditional offer to purchase the Investor Loan immediately for Cash in an amount equal to principal and accrued interest), the Board of Directors will be increased to eleven (11) members, six (6) of which will be elected by the holders of the Series C Preferred Stock and five (5) of which will be elected by the holders of LPC Common Stock.

The Creditors' Committee shall have the right to select the four (4) members of the initial Board of Directors of Reorganized LPC that would otherwise be elected by holders of the Series C Preferred Stock.

### c.    Voting Rights

The Series C Preferred Stock shall have no voting rights except as described in sub-section (b) above and as required by law.

### 6.    Corporate Action, Effectuating Documents, and Further Transactions.

On the Effective Date, all matters provided for under the Second Amended Plan that would otherwise require the approval of stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment; the authorization and issuance of the Series C Preferred Stock and the issuance of the additional shares of the LPC Common Stock; the increase in the size of the Boards of Directors of the Reorganized Debtors; and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) shall be deemed to have been approved and such approval shall be in effect from and after the Effective Date pursuant to the applicable General Corporation Law of the State of Delaware, without the necessity for any further acts by the stockholders or directors of the Debtors or the Reorganized Debtors.

Upon confirmation of the Second Amended Plan, the Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Second Amended Plan and any securities to be issued pursuant to the Second Amended Plan.

## E.    Provisions for the Treatment of Disputed Claims

### 1.    Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated shall not receive a distribution as provided under the Second Amended Plan unless and until such Claim is Allowed.

Only the Debtors or the Reorganized Debtors may object to a Claim.  The Debtors may object to any Claim until the Effective Date and the Reorganized Debtors may object to any Claim from and after the Effective Date.  Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court or (ii) a date to be fixed by the Bankruptcy Court.

**2.  Resolution of Administrative Expense Claims and Other Claims**

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims, other than Professional Compensation and Reimbursement Claims, without further order of the Bankruptcy Court.

**3.  Claim Estimation**

The Debtors and the Reorganized Debtors may request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, regardless of whether the Claim is subject to an objection.  If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**4.  Payment and Distribution on Disputed Claims**

When a Disputed Claim is Allowed, the holder of such Claim shall receive the distribution provided by the Second Amended Plan to the extent such Claim is Allowed.

**F.  Prosecution of Claims Held by the Debtors**

From and after the Effective Date, the Reorganized Debtors shall, as representatives of the Debtors' estates, litigate any claims or causes of action that constituted assets of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or other actions instituted by the Debtors.

**G.**    **Executory Contracts and Unexpired Leases**

**1.**    **Assumption of Executory Contracts and Unexpired Leases**

As of the Effective Date, the Debtors shall assume all executory contracts and unexpired leases to which the Debtors are a party, except for (i) any executory contract or lease that the Debtors previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (ii) any executory contract or lease, with respect to which the Debtors served and filed before the Confirmation Date a motion to assume, assume and assign, or reject, or (iii) any executory contract or lease listed on Schedule 8.1 of the Plan Supplement.

The Debtors may amend Schedule 8.1 of the Plan Supplement at any time before the Confirmation Date. If the Debtors add an executory contract or lease to Schedule 8.1, the Debtors shall provide notice to all counterparties.

Unless otherwise specified, the inclusion of any executory contract or lease on Schedule 8.1 shall include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease, even if Schedule 8.1 does not include such documents. The inclusion of any executory contract or lease on Schedule 8.1 is not an admission that such document or any related documents is an executory contract or unexpired lease.

**2.**    **Cure of Defaults**

Prior to assuming any executory contract or unexpired lease, the Debtors must cure any monetary defaults and compensate counterparties for any non-monetary defaults. At least twenty (20) days prior to the Confirmation Hearing, the Debtors shall serve on all counterparties to executory contracts and unexpired leases a notice indicating a proposed cure amount for the respective contract or lease. Counterparties shall have twenty (20) days from the date of service to object to the proposed cure amount. If any objection is filed, the Bankruptcy Court shall hold a hearing to resolve such objection.

Notwithstanding Section 8.1 of the Second Amended Plan and Section IV.F.1 of this Disclosure Statement, the Debtors reserve the right to reject any executory contract or lease if any objection is filed with respect to the cure amount.

**3.**    **Rejection Damage Claims**

If the Debtors reject an executory contract or lease, the counterparty must assert any Claim by filing a proof of claim with the Debtors' claim agents, Epiq Bankruptcy Solutions LLC, within 30 days following the later of (i) the date of service of the notice of the Confirmation Date, (ii) the date of service of the notice of modification to Schedule 8.1 of the Plan Supplement, or (iii) the date of service of the notice of such rejection. If the counterparty fails to file a proof of claim, the counterparty shall be barred from asserting any Claim related to the rejection of the contract or lease in the future and shall not receive any distribution under the Second Amended Plan.

For more information regarding how to file a proof of claim, please refer to the bar date notice found at http://chapter 11.epiqsystems.com/lexington.

**4.      Indemnification and Reimbursement of Directors and Officers**

All the Debtors' obligations to indemnify and reimburse directors, officers, and employees who served in such positions on or before the Confirmation Date shall survive confirmation of the Second Amended Plan and remain unaffected thereby.

**5.      Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits**

With the exception of any Insurance Policy, employee compensation program, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order, the Second Amended Plan shall treat all Insurance Policies and employee compensation and benefit programs as executory contracts and the Debtors shall assume all such policies and programs.

To the extent the Insurance Policies are determined not to be executory contracts, they will  remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of  Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory.  The Second Amended Plan shall not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Second Amended Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors shall be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which shall continue in full force and effect.  Notwithstanding anything to the contrary contained in the Second Amended Plan or the Disclosure Statement, to the extent that there is any inconsistency between the Insurance Policies and any provision of the Second Amended Plan or Disclosure Statement, the terms of the Insurance Policies shall control.  No provision of the Second Amended Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or be deemed to create any insurance coverage that does not otherwise exist under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Second Amended Plan, including Article X thereof and anything supervening or preemptory, the Second Amended Plan and Confirmation of the Second Amended Plan shall be without prejudice to any of the insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue,

including any litigation in which the insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

The Reorganized Debtors shall continue to pay all the Debtors' retiree benefits for the same duration for which the Debtors were obligated to provide such benefits.

## H.    Reservation of "Cram Down" Rights

In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Second Amended Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (a) request that the Bankruptcy Court confirm the Second Amended Plan in accordance with section 1129(b) of the Bankruptcy Code or (b) amend the Second Amended Plan.  As described in Section VI.A.2, "*Non-Consensual Confirmation*" on page 81, the Debtors may confirm the Second Amended Plan without the consent of all parties in interest.

## I.    Conditions Precedent to the Effective Date of the Second Amended Plan

The Effective Date shall not occur and the Second Amended Plan shall not become effective unless and until the following conditions precedent are satisfied or waived:  (a) a Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered and shall not be subject to any stay or injunction; (b) all actions, documents, and agreements that are necessary to implement the Second Amended Plan shall have been completed and be effective; (c) all conditions precedent to the completion of the New Secured Credit Facility shall have been satisfied or waived and the Reorganized Debtors shall have access to the funding thereunder; and (d) all authorizations, consents, regulatory approvals, and other authorizations necessary to the implementation of the Second Amended Plan, as is required by law, regulation, or order shall have been received.

In their sole discretion, the Debtors may waive any of the aforementioned conditions precedent other than items (a), (b), and (c) without Bankruptcy Court approval; *provided, however* that the consent of the Agents shall be required to waive the condition in Section 11.1(b) of the Second Amended Plan that by, or simultaneously with, the Effective Date, the Debtors indefeasibly pay in full in cash both the Allowed CapitalSource Secured Claim and the Allowed CSE Secured Claim.  Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

If the conditions precedent are not satisfied on or prior to the 180th (one hundred eightieth) day after the Confirmation Order becomes a Final Order and upon the Debtors' motion, then (i) the Confirmation Order shall be vacated, (ii) no distributions under the Second Amended Plan shall be made, (iii) the Debtors and all holders of Claims and Interests shall be restored to their *status quo ante* as of the day immediately proceeding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) all of the Debtors' obligations shall remain unchanged.

**J.      Effects of Confirmation**

Upon the Effective Date, all the Debtors' property shall vest in the Reorganized Debtors free and clear of all liens, encumbrances, charges, and other interests, except as provided by the Second Amended Plan.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, as if no case was pending under any provision or chapter of the Bankruptcy Code.

**1.      Discharge of Claims and Termination of Series B Preferred Stock Interests**

Except as provided in the Second Amended Plan, the rights afforded in and the payments and distributions to be made under the Second Amended Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests in and all existing debts and Claims, including any interest accrued on such debts or Claims from and after the Commencement Date, against the Debtors or any of their assets or properties.

Except as provided in the Second Amended Plan, upon the Effective Date, all existing Claims and all Series B Preferred Stock Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Series B Preferred Stock Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assigns, or any of their assets or properties, any other or further Claim or Series B Preferred Stock Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Series B Preferred Stock Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

**2.      Discharge of Debtors**

Upon the Effective Date and in consideration of the distributions to be made under the Second Amended Plan, except as otherwise expressly provided in the Second Amended Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Series B Preferred Stock Interests, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Series B Preferred Stock Interest in the Debtors.

**3.      Injunctions and Stays**

Except as otherwise expressly provided in the Second Amended Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim against or Interest in the Debtors,

(ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Second Amended Plan. Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.

Unless otherwise provided in the Second Amended Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Second Amended Plan.

4.      **Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, the lenders party to the DIP Note, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Second Amended Plan, property to be distributed under the Second Amended Plan, or any other act or omission in connection with the Chapter 11 Cases, the Second Amended Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

5.      **Releases of Directors, Officers, and Employees**

**Subject to Section 10.10 of the Second Amended Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in**

consideration of the services provided to the Debtors by the present and former directors, officers, and employees of the Debtors, the Debtors, the Reorganized Debtors, each holder of a Claim or Interest that votes to accept the Second Amended Plan (or is deemed to accept the Second Amended Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Second Amended Plan, shall release, unconditionally and forever, each present or former director, officer, and employee from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such claim or equity prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Second Amended Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.

###### 6.     Other Releases

Subject to Section 10.10 of the Second Amended Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the present and former affiliates, agents, financial advisors, attorneys, and representatives of the Debtors who acted in such capacities after the Commencement Date, (b) the Creditors' Committee, (c) the Agents, (d) the Prepetition Revolver Lenders, (e) the Prepetition Term Loan Lenders, and (f) the lenders party to the DIP Note, (1) the Debtors, (2) the Reorganized Debtors, (3) each holder of a Claim or Interest that votes to accept the Second Amended Plan but does not elect to "opt-out," (4) each holder of a Claim or Interest that is deemed to accept the Second Amended Plan, and (5) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Second Amended Plan and that does not elect to "opt-out," shall release, unconditionally and forever, each present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, the lenders party to the DIP Note, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date,

**or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Second Amended Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.**

It should be noted that under applicable non-bankruptcy law, the Debtors would either be vicariously liable for claims against the Debtors' directors, officers, and employees or required to indemnify such individuals from such claims given the Debtors' assumption of their indemnification obligations of their officers, directors, and employees under the Second Amended Plan. When such claims indirectly affect a debtor's reorganization efforts, courts have found that releases of the type proposed in the Second Amended Plan are justified. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005); *Menard-Sanford v. Mabey* (*In re A.H. Robbins Co.*), 880 F2d 694, 701 (4th Cir. 1989). Moreover, releases are justified if the plan of reorganization provides, as the Second Amended Plan does, for full payment of claims or if creditors consent to such releases. *Metromedia*, 416 F3d at 142. All holders of Claims and Interest entitled to vote on the Second Amended Plan may elect to opt out of the release provision of section 10.9 of the Second Amended Plan whether they choose to accept, reject, or not to vote on the Second Amended Plan.

7.    **Limits on Releases and Exculpation**

**Notwithstanding anything to the contrary in the Second Amended Plan or in the Confirmation Order, the releases set forth in Sections 10.8 and 10.9 of the Second Amended Plan shall not effect a release of any claim against a non-Debtor by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority. Nothing in Sections 10.8 or 10.9 of the Second Amended Plan nor the Confirmation Order shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against a non-Debtor for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority. Other than as set forth in Section 10.7 of the Second Amended Plan, nothing in the Second Amended Plan or the Confirmation Order shall exculpate any non-Debtor from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.**

**K.**     **Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

**L.**     **Management of the Reorganized Debtors**

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the responsibility of the Boards of Directors of the Reorganized Debtors.

For the first thirty (30) months following the Effective Date, the Board of Directors will consist of nine (9) members, four (4) of which will be elected by the holders of the Series C Preferred Stock and five (5) of which will be elected by the holder of LPC Common Stock.  Thereafter, if the Investor Loan has been paid in full (of if the holders of the Series C Preferred Stock have made an unconditional offer to purchase the Investor Loan immediately for Cash in an amount equal to principal and accrued interest), the Board of Directors will be increased to eleven (11) members, six (6) of which will be elected by the holders of the Series C Preferred Stock and five (5) of which will be elected by the holders of LPC Common Stock.

The Creditors' Committee shall have the right to select the four (4) members of the initial Board of Directors of Reorganized LPC that would otherwise be elected by holders of the Series C Preferred Stock.

Each member of the initial Board of Directors shall serve in accordance with the applicable non-bankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors.

The Debtors anticipate that the officers the Reorganized Debtors will be substantially the same as the Debtors' current officers.  The Debtors anticipate that Mr. Michael A. Lubin will continue a Chairman of the Board, Mr. Warren Delano will continue as President and Mr. Dennis J. Welhouse will continue as Chief Financial Officer.  At or prior to the Confirmation Hearing, the Debtors will identify all officers and members of the Boards of Directors of Reorganized LPC and Reorganized LRGI.

**M.**     **Jurisdiction and Choice of Law**

**1.**     **Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Second Amended Plan shall be

governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 2.    Retention of Jurisdiction

The Bankruptcy Court shall retain and have exclusive jurisdiction over, in addition to other matters specified in the Second Amended Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Second Amended Plan.

## N.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

### 2.    Post-Confirmation Date Professional Fees and Expenses

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Debtors.

### 3.    Indenture Trustee as Claim Holder

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of claim timely filed by the Indenture Trustee in respect of any Claims under the Indenture.  Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

### 4.    Plan Supplement

A draft of the form of each of the Plan Documents to be entered into as of the Effective Date, which shall include, among other things, the Charter Amendment, and any other relevant documents that are necessary to allow a holder of Claims or Interests to make an informed decision shall be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which holders of impaired Claims may vote to accept or reject the Second Amended Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Second Amended Plan must be received.

**5.      Substantial Consummation**

On the Effective Date, the Second Amended Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**6.      Severability**

Prior to the entry of the Confirmation Order, if the Bankruptcy Court determines any term or provision of the Second Amended Plan to be invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret such term or provision so as to render the term or provision valid and enforceable to the maximum extent practicable and consistent with the original purpose of such term or provision.

Notwithstanding any such determination, alteration, or interpretation, the remainder of the terms and provisions of the Second Amended Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such determination, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Second Amended Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

**7.      Binding Effect**

The Second Amended Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

**8.      Notices**

In order to be effective, all notices, requests, and demands to or upon the Debtors and, after the Effective Date, the Reorganized Debtors, must be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Lexington Precision Corporation
> 800 Third Avenue, 15th Floor
> New York, New York 10022
> Attn:  Michael A. Lubin
> Title:  Chairman of the Board
> Telephone:  (212) 319-4655
> Facsimile:  (212) 319-4659

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Richard P. Krasnow
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007

**9.      Time**

In computing any period of time prescribed or allowed by the Second Amended Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**10.      Section Headings**

The section headings contained in the Second Amended Plan and this Disclosure Statement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Second Amended Plan.

**O.      Modification, Revocation, or Withdrawal of the Second Amended Plan**

The Debtors reserve the rights to alter, amend, or modify the Second Amended Plan at any time prior to the Confirmation Date, provided that the Second Amended Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors comply with section 1125 of the Bankruptcy Code.

After the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Second Amended Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Second Amended Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Second Amended Plan.

A holder of a Claim or Interest that has accepted the Second Amended Plan shall be deemed to have accepted the Second Amended Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

The Debtors may revoke or withdraw the Second Amended Plan any time prior to the Effective Date.  If the Debtors revoke or withdraw the Second Amended Plan or the Second Amended Plan does not otherwise become effective, the Second Amended Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by the Debtors or to prejudice in any manner the Debtors' rights in any further proceedings involving the Debtors.

## V.  FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

### A.    Selected Historical and Projected Financial Information

The Projected Financial Statements are set forth in their entirety in Exhibit F attached to this Disclosure Statement.

The table below sets forth the following data:

(i)      Actual results of continuing operations for 2007;

(ii)     Projected results of continuing operations for 2008, 2009, 2010, 2011, and 2012; and

(iii)    Pro forma projected operating results of continuing operations for 2008, adjusted as if the reorganization had been effective as of January 1, 2008.

In preparing the Projected Financial Statements, the Debtors assumed that (i) unit sales in the Automotive Aftermarket of replacement components that are critical to the operation an performance of the vehicle will grow at the rate of one percent (1%) per annum; (ii) unit sales of medical devices will grow at the rate of two percent (2%) per annum; and (iii) the aggregate level of production of new automobiles in North America will be as follows:

- 2008 13.0 million units
- 2009 12.5 million units
- 2010 13.1 million units
- 2011 13.9 million units
- 2012 14.7 million units

The production levels set forth above were based upon a forecast issued by a a nationally-recognized automotive industry forecasting service in early October 2009.  Since the Projected Financial Statements were prepared, industry projections for automobile production have been reduced several times.  The latest such forecast available to the Debtors projects that the aggregate level of production of new automobiles in North America will be as follows:

- 2008 12.7 million units
- 2009 10.1 million units
- 2010 11.7 million units
- 2011 13.7 million units
- 2012 15.0 million units

Based upon the updated production forecast, the Debtors estimate that net sales and EBITDA included in the Projected Financial Statements for the Connector Seals Division and the Machining Division, which primarily serve the automotive OEM segment, would be adjusted by the following amounts:

| | Change in Net Sales | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Connector Seals | | | | |
| Machining | | | | |
| Total | _____ | _____ | _____ | _____ |


| | Change in Net EBITDA | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Connector Seals | | | | |
| Machining | | | | |
| Total | _____ | _____ | _____ | _____ |

The Debtors believe that any reduction in sales of insulators for ignition-wire sets to the automotive OEM segment would be offset by increased sales of insulators for the automotive aftermarket, as a result of increases in the average age of vehicles on the road.

The level of demand in the Debtors' end-markets is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors. There can be no guarantee that economic conditions or automotive industry conditions will not deteriorate further.

EBITDA is not a measure of performance under GAAP and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)     EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)    EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)    EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling.  Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue.  EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)    EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(v)    EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vi)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement and the Prepetition Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Selected Financial Data -- Continuing Operations Only**
**(in thousands of dollars)**

| | 2007 Actual | 2008 Forecast | 2008 Pro Forma (1) | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| | | | | Projected | | | |
| Net sales | 88,408 | 73,102 | 73,347 | 93,020 | 105,344 | 115,919 | 126,382 |
| Income from operations: | 5,373 | 4,393 | 5,701 | 13,753 | 20,377 | 25,652 | 29,834 |
| Other income (expense): | | | | | | | |
| Interest expense | (11,507) | (8,913) | (8,913) | (3,379) | (1,889) | (1,101) | – |
| Interest income | – | 96 | 96 | – | – | 130 | 530 |
| Gain on sale of property | – | – | – | – | 3,287 | – | – |
| Reorganization expense | (698) | (5,814) | (5,814) | (590) | – | – | – |
| Total | (12,205) | (14,631) | (14,631) | (3,969) | 1,398 | (971) | 530 |
| Income (loss) before income taxes | (6,832) | (10,238) | (8,930) | 9,784 | 21,775 | 24,681 | 30,364 |
| Income taxes | 6 | 40 | 40 | 1,000 | 4,300 | 6,000 | 8,300 |
| Income (loss) from continuing operations | (6,838) | (10,278) | (8,970) | 8,784 | 17,475 | 18,681 | 22,064 |
| Add back (deduct): | | | | | | | |
| Interest expense | 11,507 | 8,913 | 8,913 | 3,379 | 1,889 | 1,101 | – |
| Interest income | – | (96) | (96) | – | – | (130) | (530) |
| Income tax provision | 6 | 40 | 40 | 1,000 | 4,300 | 6,000 | 8,300 |
| Depreciation and amortization | 6,437 | 5,334 | 5,334 | 4,527 | 4,227 | 3,800 | 3,755 |
| Gain on sale of property | – | – | – | – | (3,287) | – | – |
| Reorganization expense | 698 | 5,814 | 5,814 | 590 | – | – | – |
| EBITDA (2) | 11,810 | 9,727 | 11,035 | 18,280 | 24,604 | 29,452 | 33,589 |
| Common shares outstanding (000)(3) | 5,022 | 5,022 | 5,022 | 16,312 | 16,312 | 16,312 | 16,312 |
| Income (loss) per share | ($1.35) | ($2.05) | ($1.79) | $0.54 | $1.07 | $1.15 | $1.35 |
| Capital expenditures | 2,664 | 2,971 | 2,971 | 3,580 | 5,010 | 3,708 | 3,927 |

(1) The forecasted income statements were adjusted on a pro forma basis to reflect $1,308,000 of pro forma improvements to the income from operations of the Rubber Group as described on page 21 of this Disclosure Statement

(2) Earnings from operations before interest, taxes, deprecation, amortization. Excludes any gain on sale of property and any reorganization expenses.

(3) Outstanding shares for 2009 and thereafter assumes conversion of debt and accrued interest in the amount of $49,251,000 at $4.50 per common share and the exercise of 345,237 warrants at $3.50 per share.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Selected Financial Data -- Continuing Operations Only**
**(in thousands of dollars)**

| | 12/31/07 Actual | 12/31/08 Forecast | Projected 12/31/09 | Projected 12/31/10 | Projected 12/31/11 | Projected 12/31/12 |
|---|---|---|---|---|---|---|
| Current assets | 21,877 | 25,186 | 27,876 | 27,876 | 37,256 | 59,788 |
| Current liabilities (2) | 10,880 | 12,369 | 9,784 | 11,204 | 11,579 | 12,399 |
| Net working capital | 10,997 | 12,817 | 18,092 | 16,672 | 25,677 | 47,389 |
| | | | | | | |
| Total assets | 51,019 | 52,145 | 45,146 | 51,619 | 60,556 | 83,370 |
| | | | | | | |
| Senior debt | 33,821 | 34,175 | 16,065 | 4,901 | – | – |
| | | | | | | |
| Total debt (3) | 76,655 | 86,540 | 24,177 | 10,073 | 0 | 0 |
| | | | | | | |
| EBITDA / Interest expense | 1.0X | 1.1X | 5.4X | 13.0X | 26.8X | N/A |
| | | | | | | |
| Senior debt / EBITDA | 2.9X | 3.5X | 0.9X | 0.2X | N/A | N/A |
| | | | | | | |
| Total debt / EBITDA | 6.5X | 8.9X | 1.3X | 0.4X | N/A | N/A |

(1) Current liabilities exclude liabilities for borrowed money and interest accrued on the Senior Subordinated Notes and the Junior Subordinated Note.

(2) In 2007 and 2008, includes accrued interest of $7,564,000 and $13,165,000, respectively, on the Senior Subordinated Notes and the Junior Subordinated Note.

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Operating Segment Selected Financial Data -- Continuing Operations Only
(in thousands of dollars)**

| | 2007 Actual | 2008 Forecast | 2008 Pro Forma (1) | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Net sales: | | | | | | | |
| Rubber Group | 74,587 | 62,383 | 62,628 | 75,986 | 78,407 | 86,413 | 93,419 |
| Metals Group | 13,821 | 10,719 | 10,719 | 17,034 | 26,937 | 29,506 | 32,963 |
| Total | 88,408 | 73,102 | 73,347 | 93,020 | 105,344 | 115,919 | 126,382 |
| | | | | | | | |
| Income from operations: | | | | | | | |
| Rubber Group | 7,975 | 7,350 | 8,658 | 15,671 | 20,222 | 24,698 | 27,663 |
| Metals Group | (192) | (680) | (680) | 669 | 2,794 | 3,646 | 4,916 |
| | 7,783 | 6,670 | 7,978 | 16,340 | 23,016 | 28,344 | 32,579 |
| Corporate Office | (2,410) | (2,277) | (2,277) | (2,587) | (2,639) | (2,692) | (2,745) |
| Total | 5,373 | 4,393 | 5,701 | 13,753 | 20,377 | 25,652 | 29,834 |
| | | | | | | | |
| Depreciation and amortization: | | | | | | | |
| Rubber Group | 5,727 | 4,747 | 4,747 | 3,917 | 3,528 | 2,908 | 2,772 |
| Metals Group | 682 | 538 | 538 | 562 | 666 | 871 | 962 |
| | 6,409 | 5,285 | 5,285 | 4,479 | 4,194 | 3,779 | 3,734 |
| Corporate Office | 28 | 49 | 49 | 48 | 33 | 21 | 21 |
| Total | 6,437 | 5,334 | 5,334 | 4,527 | 4,227 | 3,800 | 3,755 |
| | | | | | | | |
| EBITDA (2): | | | | | | | |
| Rubber Group | 13,702 | 12,097 | 13,405 | 19,588 | 23,750 | 27,606 | 30,435 |
| Metals Group | 490 | (142) | (142) | 1,231 | 3,460 | 4,517 | 5,878 |
| | 14,192 | 11,955 | 13,263 | 20,819 | 27,210 | 32,123 | 36,313 |
| Corporate Office | (2,382) | (2,228) | (2,228) | (2,539) | (2,606) | (2,671) | (2,724) |
| Total | 11,810 | 9,727 | 11,035 | 18,280 | 24,604 | 29,452 | 33,589 |

(1) The forecasted income statements were adjusted on a pro forma basis to reflect $1,308,000 of pro forma improvements to the income from operations of the Rubber Group as described on page 21 of this Disclosure Statement.

(2) Earnings from operations before interest, taxes, deprecation, amortization. Excludes any gain on sale of property and any reorganization expenses.

B.    **Projected Financial Statements**

The Projected Financial Statements are set forth in their entirety in Exhibit F attached to this Disclosure Statement.

In preparing the Projected Financial Statements, the Debtors assumed that (i) unit sales in the Automotive Aftermarket of replacement components that are critical to the operation an performance of the vehicle will grow at the rate of one percent (1%) per annum; (ii) unit sales of medical devices will grow at the rate of two percent (2%) per annum; and (iii) the aggregate level of production of new automobiles in North America will be as follows:

- 2008 13.0 million units
- 2009 12.5 million units
- 2010 13.1 million units
- 2011 13.9 million units
- 2012 14.7 million units

The production levels set forth above were based upon a forecast issued by a a nationally-recognized automotive industry forecasting service in early October 2009.  Since the Projected Financial Statements were prepared, industry projections for automobile production have been reduced several times.  The latest such forecast available to the Debtors projects that the aggregate level of production of new automobiles in North America will be as follows:

- 2008 12.7 million units
- 2009 10.1 million units
- 2010 11.7 million units
- 2011 13.7 million units
- 2012 15.0 million units

Based upon the updated production forecast, the Debtors estimate that net sales and EBITDA included in the Projected Financial Statements for the Connector Seals Division and the Machining Division, which primarily serve the automotive OEM segment, would be adjusted by the following amounts:

|  | Change in Net Sales | | | |
|---|---|---|---|---|
|  | **2009** | **2010** | **2011** | **2012** |
| Connector Seals |  |  |  |  |
| Machining | _____ | _____ | _____ | _____ |
| Total |  |  |  |  |

| | Change in Net EBITDA | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Connector Seals Machining | | | | |
| Total | _____ | _____ | _____ | _____ |

The Debtors believe that any reduction in sales of insulators for ignition-wire sets to the automotive OEM segment would be offset by increased sales of insulators for the automotive aftermarket, as a result of increases in the average age of vehicles on the road.

The level of demand in the Debtors' end-markets is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors. There can be no guarantee that economic conditions or automotive industry conditions will not deteriorate further.

The Committee believes that the Debtors' Projected Financial Statements are extremely optimistic and materially overstated based upon the information that has been provided to the Committee's advisors and the due diligence performed by SRR. SRR's review of the Debtors' historical projections revealed a consistent record of creating optimistic projections and then missing those projections by a material amount. For example, a comparison of the consolidated Debtors' actual results to forecasts for the period 2004 through 2007, show that the average actual EBITDA has been 32.9% below forecast. Further, it should be noted that a comparison of actual results for the Debtors for the period June 2008 through October 2008 to the Debtors' July 2008 5-year plan, show that the Debtors' consolidated net sales are 8.2% below forecast and the Debtors' EBITDA is 31% below forecast.

Notwithstanding the views of the Committee, the Debtors believe that the Projected Financial Statements, with the adjustments set forth above to reflect the recent reductions to the industry projections of automotive production, are reasonable and achievable. The Debtors note that, with respect to the variances for the period form June through October 2008, compared to the July 2008 projections, approximately 84% of the shortfall in net sales and approximately 86% of the shortfall in EBITDA were attributable to reductions in sales to the automotive original equipment segment at the Debtors' Connector Seals Business and Metals Group. The Debtors believe that virtually every supplier to this end-market has experienced similar shortfalls.

## C.    Valuation of the Reorganized Debtors

### 1.    Introduction

The Debtors have been advised by Campbell, their financial advisor, with respect to the aggregate enterprise value of the Reorganized Debtors and the Equity Value Per Share. In preparing its analysis, Campbell has assumed the Second Amended Plan will be confirmed on or around January 31, 2009 and that that the Effective Date will be February 25, 2009.

2.      **Basis of Valuation**

In preparing its estimate of enterprise value of the Reorganized Debtors and the Equity Value Per Share, Campbell determined that the Debtors' assets should be classified into two categories:  Core Assets and Non-Core Assets.  For valuation purposes, the Core Assets have been treated as an on-going business and valued on a going-concern basis, and the Non-Core Assets have been treated as assets held for sale and have been valued at estimated orderly liquidation value.  A summary of the Core Assets and Non-Core Assets, and the reasons for classifying them as such, is set forth below.

3.      **Core Assets**

Campbell classified the following assets of the Debtors as Core Assets:

a.      *The Rubber Group (excluding the Connector Seals Business)*

The Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to manufacturers of medical devices, and to customers who supply the automotive original-equipment manufacturers ("OEMs").  The Rubber Group currently has three world class production facilities, each which is a stand-alone business unit, with a complete management team, focused on a single product line.  The Jasper, Georgia, facility specializes in insulators for automotive ignition systems, the Rock Hill, South Carolina, facility specializes in components for medical devices, and the Vienna, Ohio, facility specializes in automotive connector seals for OEMs.  As a result of the recent dramatic downturn in demand by the automotive OEMs, the Debtors have determined that the Vienna facility is not viable as a stand-alone operation and have developed a plan to transfer a majority of the business now conducted at the Vienna facility to the Rubber Group's other facilities of to sell the business unit.  As discussed below under the caption "Non-Core Assets," Campbell's valuation of the Rubber Group assumes the Connector Seals Business is sold.

The remaining businesses of the Rubber Group have strong technical capabilities, leading market positions, and a long history of earning superior profit and cash flow margins, with pro forma EBITDA for 2008 forecasted to be $12.7 million on net sales of $48.6 million, for an EBITDA margin of 26.1%.

b.      *The Corporate Offices*

The Debtors operate two corporate offices, in New York City and Cleveland, Ohio.  The Debtors forecast that the pro forma expenses of the corporate offices, for 2008 will aggregate $2.1 million, and project that their corporate office expenses will increase thereafter, primarily to reflect incentive compensation to corporate management based upon future operating performance of the Debtors' businesses, as reflected in the Projected Financial Statements.  In preparing its estimate of the enterprise value of the Reorganized Debtors, Campbell determined that the expenses of the corporate offices should be treated as part of the Core Assets of the Debtors and assumed to continue as long as the Debtors retain the operations of the Rubber Group.

### c.    The Debtors' Tax Attributes

The Debtors forecast that, on the Effective Date, they will have, for federal income tax purposes, $36.7 million of consolidated net operating loss ("NOL") carryforwards (of which $5.3 million is usable only upon the sale or liquidation of the Debtors' businesses) and $0.9 million of consolidated tax credit carryforwards (collectively, the "Tax Attributes"). Campbell has assumed that $5.9 million of the NOL carryforwards will be used to shelter taxable gains on sales of the Non-Core Assets.  In determining the enterprise value of the Reorganized Debtors, the remaining Tax Attributes were (a) assumed to be utilized to shelter projected income from operations, (b) assumed to be utilized to shelter anticipated gains on sales of the Core Assets, or (c) set forth as a separate element of value based on the net present value of the projected income taxes to be sheltered, in each case, as appropriate to the valuation method being utilized.

Campbell determined that the Core Assets should be valued on a going-concern basis and applied a number of well-recognized valuation methodologies, including (a) discounted cash flow (which results in a value for the Core Assets of $113.2 million), (b) publicly traded company (which resulted in a value for the Core Assets of $78.8 million), (c) precedent M&A transactions (which resulted in a value for the Core Assets of $98.7 million), and (d) sum-of-the-parts (which resulted in a value for the Core Assets of $90.9 million).

Campbell considered the results of each of these valuation methodologies in its analysis, but ultimately concluded that the use of the sum-of-the-parts valuation methodology was the most appropriate for the following reasons:

(i)    Sum-of-the-Parts is a practical approach that recognizes the fact that (1) the Debtors' medical business and insulator business are self-contained operations, each with complete management teams, focusing on a single product line and serving substantially a single end market, and (2) the Engineering Center is a world-class operation that would be of significant interest to a number of other rubber molding companies, either in a stand-alone sale or as part of a strategic sale of one or more of the Rubber Group's production facilities.

(ii)    Sum-of-the-parts allows Campbell to isolate the significant differences in the valuation multiples observed within each of the Debtors' served end markets; and

(iii)    Sum-of-the-parts is an approach that is consistent both with Campbell's transaction experience in each of the Debtors' end markets, and with Campbell's experience in marketing the Debtors and their businesses.

Utilizing the sum-of-the-parts valuation methodology, Campbell estimated the value of the Core Assets to be $90.9 million.

4.     **Non-Core Assets**

Campbell classified the following assets of the Debtors as Non-Core Assets:

a.     ***Connector Seals Business Unit of the Rubber Group***

The Debtors' Connector Seals Business is conducted through the Vienna, Ohio facility of the Rubber Group.  Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.  Connector seals are sold exclusively to suppliers to the automotive OEMs.

As a result of the recent downturn in the volume in the automotive original equipment market, the Debtors have undertaken a strategic review of their connector seals manufacturing operation, which is currently projected to produce net sales of $13,762,000 and pro forma EBITDA of $714,000 for 2008.  Based upon this review, the Debtors have determined that it is unlikely that they will be able to return this business unit to a satisfactory level of profitability in the near future and have elected to pursue simultaneously two strategic alternatives:  (i) a partial consolidation pursuant to which a majority of this business would be transferred to the other three facilities of the Rubber Group, and (ii) a sale of the business line to another rubber molder who could consolidate this volume into their facilities.

The Debtors have prepared a partial consolidation plan, which indicates that the consolidation would generate approximately $8 million of cash during 2009, after costs of the transfer, while transferring between $10 million and $12 million of annual sales to the other Rubber Group plants.  Because the consolidation would allow the Debtors to eliminate significant amounts of duplicative overhead expenses, the incremental sales are projected to generate incremental EBITDA of between $3.3 million and $4.0 million.

The Debtors have commenced discussions with their two principal competitors in this business segment regarding a possible sale of the business line.  Based upon the projected results of a partial consolidation and the estimated incremental cash flow this volume would provide to a competitor, the Debtors have determined that a sale of this type would have to generate net proceeds, including the value of the assets retained, with a present value of at least $16 million in order for the Debtors to forego the partial consolidation alternative.

The estimated value of this business unit in the partial consolidation alternative is $16 million, however, because of the Debtors' willingness to offer this business in a transaction that would result in net proceeds, including the value of the assets retained, of $16 million, Campbell determined that it was appropriate to treat the Connector Seals business unit as a Non-Core Asset and valued it at $16 million.

b.     ***The Metals Group***

The Metals Group is the Debtors' metal-machining operation located in Rochester, New York.  The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks.  The Metals

Group primarily uses multi-spindle screw machines and specially designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time.  The components produced by the Metals Group include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components that are primarily sold to tier-one suppliers to automotive OEMs.

For 2008, the Metals Group's EBITDA is forecasted to be negative $142,000 on net sales of $10.7.  The Debtors have made substantial investments to enhance the operational capabilities of the Metals Group, which has enabled the Metals Group to improve its operating results over the past two years.   The Metals Group has been awarded substantial amounts of new business, with respect to which production will commence in 2009 and 2010 and, if this anticipated business materializes at the projected volumes, the Metals Group will be able to more than double its net sales and increase its EBITDA to almost $3.5 million over the next two years.

Campbell is of the opinion that the addition of this new business would significantly enhance the value of the Metals Group.  However, Campbell ultimately determined that, in light of its weak historical operating performance, the Metals Group should, at this time, be treated as an asset held for sale and that the best indicator of value for the Metals Group would be its orderly liquidation value.  Using this methodology, Campbell determined that the value of the Metals Group is $7.6 million.

### c.    *Non-Operating Assets*

The Debtors own certain assets of significant value that are superfluous to their ongoing operations. The most significant of these assets are the following:

(i)    Commercial and residential land located in East Ellijay, Georgia;

(ii)    Industrial land and buildings located in Lakewood, New York;

(iii)    Common stock of Federal-Mogul Corporation; and

(iv)    Filed claims in the chapter 11 cases of Delphi Corporation.

Campbell determined that the Non-Operating Assets should be treated as assets held for sale and that the most accurate method of valuing these Non-Operating Assets would be to assume that they were liquidated in an orderly manner.  Using this methodology, Campbell determined that the value of the Non-Operating Assets is $5.6 million.

### 5.    Enterprise Value of the Reorganized Debtors

Campbell has determined that the enterprise value of the Reorganized Debtors is $120.1 million, representing the sum of the value of the Core Assets and the value of the Non-Core Assets.  The enterprise value has been adjusted for the following:

(i)  the projected cash available immediately prior to the Effective Date in the amount of $6.7 million;

(ii)  the projected benefit of the normalized credit terms the Reorganized Debtors expect to obtain from suppliers to the Rubber Group subsequent to the Effective Date in the amount of $2.2 million;

(iii)  the estimated aggregate amount of liabilities of the Debtors other than post-petition accounts payable and accrued liabilities generated in the ordinary course of business in the aggregate amount of $92.0 million;

(iv)  the liquidation preference of the Series B Preferred Interests in the amount of $0.7 million;

(v)  projected unpaid professional fees and expenses of the Chapter 11 Cases immediately prior to the Effective Date in the amount of $0.9 million;

(vi)  the assumed exercise of the 345,000 outstanding warrants to purchase LPC Common Stock at a exercise price of $3.50 per share; and

(vii)  a 15% discount to reflect the relative difficulty of marketing the equity securities of LPC because of its relatively small size.

After making the foregoing adjustments, Campbell determined that the Equity Value Per Share is $4.46 per share.

**THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS AND THE EQUITY VALUE PER SHARE AS OF AN ASSUMED CONFIRMATION DATE ON OR ABOUT JANUARY 31, 2008 AND AN ASSUMED EFFECTIVE DATE OF FEBRUARY 25, 2009, REFLECT WORK PERFORMED BY CAMPBELL ON THE BASIS OF INFORMATION WITH RESPECT TO THE BUSINESS AND ASSETS OF THE DEBTORS THAT WAS AVAILABLE TO CAMPBELL AS OF DECEMBER 8, 2008. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT CAMPBELL'S CONCLUSION, CAMPBELL DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

### 6.  The Committee's Valuation Comments

The Committee believes that Campbell's valuation conclusion is materially overstated due to Campbell's reliance on financial projections and other valuation inputs provided by the Debtors' management that the Committee believes to be overstated, as well as Campbell's failure, in the Committee's opinion, to fully consider relevant current market dynamics.  Additionally, the Committee believes that (i) Campbell's ultimate reliance on the "sum of the parts" valuation technique is inappropriate; (ii) the Debtors' available cash upon the Effective Date will be significantly lower than the Debtors' projections; (ii) the Debtors' liabilities other than post-petition accounts payable and accrued liabilities generated in the

ordinary course of business will be significantly higher that the Debtors' projections; and (iii) the discount to reflect the relative difficulty of marketing the equity securities of a small company should be greater than the 15% discount applied by Campbell.  The Debtors disagree with the Committee's assertions and note that Campbell placed little reliance on the Debtors' financial projections in preparing its valuation.

## VI.  CERTAIN FACTORS TO BE CONSIDERED

### A.   Certain Risk Factors Relating to Confirmation of the Second Amended Plan

#### 1.   Risk of Non-Confirmation of the Second Amended Plan

Although the Debtors believe that the Second Amended Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Second Amended Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

#### 2.   Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept the Second Amended Plan, the Bankruptcy Court may nevertheless confirm the Second Amended Plan at the Debtors' request if at least one impaired Class of Claims has accepted the Second Amended Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Second Amended Plan, the Bankruptcy Court determines that the Second Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Debtors believe that the Second Amended Plan satisfies these requirements.  For more information on this topic, please refer to Section X.C, "*General Requirements for Confirmation*" on page 104.

#### 3.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the 120th day after entry of the Confirmation Order, the Bankruptcy Court may, upon the Debtors' motion, vacate the Confirmation Order, in which event the Second Amended Plan would be deemed null and void.

### B.   Additional Factors to be Considered

#### 1.   The Debtors Have No Duty to Update

Absent a Bankruptcy Court order to the contrary, the Debtors have no duty to update this Disclosure Statement or the attachments hereto.  Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of December 8, 2008.

Delivery or receipt of this Disclosure Statement after December 8, 2008 does not imply that no changes have occurred in the information contained herein and in the attachments hereto since December 8, 2008.

2.        **No Representations Outside This Disclosure Statement Are Authorized**

The Bankruptcy Court has not authorized any representations concerning or related to the Debtors, these Chapter 11 Cases, or the Second Amended Plan, other than representations made in this Disclosure Statement, the attachments hereto, and the other solicitation materials from the Debtors and the Committee that are included with this Disclosure Statement.  In arriving at your decision to vote to accept or reject the Second Amended Plan, you should not rely upon any representations that are not contained herein or included with this Disclosure Statement.

3.        **Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may differ materially from actual future events.  Because uncertainties exist with respect to any projection, assumption, or estimate, you should not consider any projection, assumption, or estimate to be an assurance or guarantee of actual results.

4.        **This Disclosure Statement Is Not Legal or Tax Advice**

This Disclosure Statement is <u>not</u> legal, business, or tax advice.  You should not construe the contents of this Disclosure Statement as such.  Please consult your own legal counsel or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Second Amended Plan or whether to object to confirmation of the Second Amended Plan.

5.        **No Admission Made**

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Second Amended Plan on the Debtors or on holders of Claims or Interests.

6.        **Business Factors and Competitive Conditions**

a.        ***General Economic Conditions***

In preparing the Projected Financial Statements, the Debtors assumed that (i) unit sales in the Automotive Aftermarket of replacement components that are critical to the operation an performance of the vehicle will grow at the rate of one percent (1%) per annum; (ii) unit sales

of medical devices will grow at the rate of two percent (2%) per annum; and (iii) the aggregate level of production of new automobiles in North America will be as follows:

- 2008 13.0 million units
- 2009 12.5 million units
- 2010 13.1 million units
- 2011 13.9 million units
- 2012 14.7 million units

The production levels set forth above were based upon a forecast issued by a a nationally-recognized automotive industry forecasting service in early October 2009. Since the Projected Financial Statements were prepared, industry projections for automobile production have been reduced several times. The latest such forecast available to the Debtors projects that the aggregate level of production of new automobiles in North America will be as follows:

- 2008 12.7 million units
- 2009 10.1 million units
- 2010 11.7 million units
- 2011 13.7 million units
- 2012 15.0 million units

Based upon the updated production forecast, the Debtors estimate that net sales and EBITDA included in the Projected Financial Statements for the Connector Seals Division and the Machining Division, which primarily serve the automotive OEM segment, would be adjusted by the following amounts:

| | **Change in Net Sales** | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Connector Seals | | | | |
| Machining | | | | |
| Total | | | | |

| | **Change in Net EBITDA** | | | |
|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2012** |
| Connector Seals | | | | |
| Machining | | | | |
| Total | | | | |

The Debtors believe that any reduction in sales of insulators for ignition-wire sets to the automotive OEM segment would be offset by increased sales of insulators for the automotive aftermarket, as a result of increases in the average age of vehicles on the road.

The level of demand in the Debtors' end-markets is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There can be no guarantee that economic conditions or automotive industry conditions will not deteriorate further.

### b.    Competitive Conditions

In addition to uncertain economic and business conditions, the Reorganized Debtors will face competition for business from existing and possibly new competitors.  Such competition may affect the overall operating performance of the Reorganized Debtors.

### c.    Customers

The Debtors believe that the majority of their customer relationships are strong, however, the loss of a significant customer could have a material adverse impact on operating performance.

## 7.    Access to Financing and Trade Terms

The Reorganized Debtors' operations will depend on, among other things, access to working capital through the New Secured Financing Facility (which has not yet been obtained), operating cash flow, and the availability of customary trade terms from their supplies. While the Debtors believe that (i) projected operating cash flow, (ii) the New Secured Financing Facility (if and when obtained), (iii) the Investor Loan, and (iv) improved trade credit will provide adequate cash to consummate the Second Amended Plan and provide for sufficient ongoing working capital, the Reorganized Debtors may nonetheless require greater working capital.  No assurance can be given that additional financing will be available on terms favorable or acceptable to the Reorganized Debtors.  If the Reorganized Debtors meet their projected cash flows, the Debtors believe that their suppliers will continue to provide customary terms; however, no assurances can be given.

## 8.    Variances from the Projected Financial Statements

The fundamental premise of the Second Amended Plan is the deleveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projected Financial Statements.  The Projected Financial Statements reflect numerous assumptions concerning the Reorganized Debtors' anticipated future performance, some of which may not materialize.  Such assumptions include assumptions concerning the general economy, business conditions in the industries in which the Debtors operate, and the ability of the Debtors to obtain additional business from existing and new customers.  The Debtors believe that the assumptions underlying the Projected Financial Statements are reasonable; however, unanticipated events and circumstances that may occur subsequent to the preparation of the Projected Financial Statements may affect the actual financial results of the Reorganized Debtors.  Therefore, the actual results achieved throughout the periods covered by the Projected

Financial Statements are likely to vary from the projected results, and such variations may be material and adverse.

### 9.    Significant Holders

Under the Second Amended Plan, certain holders of Allowed Claims and Interests may receive, or obtain the right to receive equity securities in Reorganized LPC representing in excess of five (5%) percent of the outstanding LPC Common Stock or Series C Preferred Stock. If holders of a significant number of shares of Reorganized LPC were to act as a group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

Further, the possibility that one or more large holders of equity securities may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the shares.

### 10.    Illiquid Market

The Series C Preferred Stock and the LPC Common Stock will not be listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell them in the future or as to the price at which any sale may occur. If a holder of such securities is able to sell them in the future, the price of the securities could be higher or lower than the value ascribed to them in this Disclosure Statement, depending upon many factors, including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Reorganized LPC.

### 11.    Restrictions on Transfer

Holders of the Series C Preferred Stock and LPC Common Stock who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code will be unable to offer or sell securities of Reorganized LPC received pursuant to the Second Amended Plan, except pursuant to an available exemption from registration under the Securities Act of 1933 and under equivalent state securities or "blue sky" laws. This would include persons who (a) purchase a Claim with a view to distribution of any security to be received in exchange for the Claim other than in ordinary trading transactions, (b) offer to sell securities issued under the Second Amended Plan for holders of such securities, (c) offer to buy securities issued under the Second Amended Plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with the Second Amended Plan, the consummation of the Second Amended Plan, or the offer or sale of securities under the Second Amended Plan, or (d) are an issuer, a person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer.

## VII.  CERTAIN FEDERAL INCOME
## TAX CONSEQUENCES OF THE SECOND AMENDED PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Second Amended Plan to the Debtors and to certain

holders of Claims or Interests.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or otherwise entitled to payment in full in Cash under the Second Amended Plan, or to holders of Asbestos-Related Claims.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties.  The Debtors have not requested and do not expect to request a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction).  If a partnership (or other entity taxed as a partnership) holds a Claim or Interest, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.  Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

This discussion also assumes that the Senior Subordinated Notes, Junior Subordinated Note, Series B Preferred Stock, Series C Preferred Stock, and LPC Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or Interests.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to**

**be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (the "Lexington Group"), of which LPC is the common parent, and file a single consolidated U.S. federal income tax return.  The Lexington Group reported in the most recent Form 10-K filed by LPC and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $26 million as of the end of 2007.  *See* Lexington Precision Corporation 2007 Form 10-K, at Note 7 (Income Taxes).  The Lexington Group expects to incur further operating losses during the taxable year ending December 31, 2008.  The amount of the NOL carryforwards and any such current year losses remains subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Second Amended Plan, the amount of the Lexington Group's NOL carryforwards and other tax attributes (including current year losses) may be reduced.  In addition, the subsequent utilization of any losses and NOL carryforwards remaining following the Effective Date may be restricted.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan.  The COD incurred is generally the amount by which the indebtedness discharged (reduced by any unamortized original issue discount) exceeds any consideration given in exchange therefor.  Certain statutory or judicial exceptions can generally apply to limit the amount of COD incurred for U.S. federal income tax purposes (such as where the payment of the cancelled debt would have given rise to a tax deduction).  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of excluded COD income does not occur until the end of the taxable year in which the COD is incurred.

Accordingly, the extent (if any) to which the Debtors incur COD and any consequent attribute reduction in connection with the implementation of the Second Amended Plan will depend, in part, on the fair market value of the Series C Preferred Stock and the LPC Common Stock.  Based on the Second Amended Plan value of the LPC Common Stock at $4.46

a share, as described in Section V, "***Financial Information, Projections and Valuation Analysis***" on page 68, the Debtors do not anticipate incurring any COD.

## 2.    Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the changes in ownership of the Lexington Group as described below.  These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD arising in connection with the Second Amended Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose).  Whether the Lexington Group will undergo an ownership change as a result of the implementation of the Second Amended Plan depends on the value of the capital stock of Reorganized LPC that is issued to holders of Claims and Interests pursuant to the Second Amended Plan.  Based on the Plan value of the LPC Common Stock at $4.46 a share, as described in Section V, "***Financial Information, Projections and Valuation Analysis***" on page 68, the Debtors anticipate that the issuance of the Series C Preferred Stock and the LPC Common Stock pursuant to the Second Amended Plan will cause an "ownership change" of the Lexington Group.

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (5.40% for ownership changes occurring in December 2008).  As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation (or consolidated group) does not continue its historic business or

use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built in gains discussed below.

Accordingly, the impact of an ownership change of the Lexington Group pursuant to the Second Amended Plan depends upon, among other things, the amount of pre-change losses remaining after any reduction of attributes due to the COD, the value of both the stock and assets of the Debtors at or about the Effective Date, and the amount and timing of future taxable income.

### a.    Built In Gains and Losses

Among the pre-change losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors anticipate that the Lexington Group will be in a net unrealized built-in gain position as of the Effective Date.

### b.    Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, which applies only if an ownership change occurs pursuant to a chapter 11 plan, a debtor's pre-

change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

The receipt of the Series C Preferred Stock and LPC Common Stock by holders of Claims and the continuing ownership by holders of Other Equity Interests in LPC pursuant to the Second Amended Plan may qualify for this exception. Neither the statute nor the regulations address, however, whether this exception can be applied on a consolidated basis or only on a separate company basis. Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the change occurs. For purposes of the Projected Financial Information, the Debtors have taken the position that their pre-change losses will be limited on an annual basis under section 382 of the Tax Code.

### 3.    Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### B.    Consequences to Holders of Certain Claims

Pursuant to the Second Amended Plan, and in satisfaction of their respective Claims: (i) holders of Allowed Senior Subordinated Note Claims (Class 5) will receive New Subordinated Notes and Series C Preferred Stock; (ii) holders of Allowed Junior Subordinated Note Claims (Class 6) will receive LPC Common Stock; and (iii) holders of Allowed Lexington

Precision General Unsecured Claims (Class 7) and Allowed Lexington Rubber Group General Unsecured Claims (Class 16) will receive Cash payments over an eighteen month period.

**1.    Holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims**

The U.S. federal income tax consequences of the Second Amended Plan to holders of Allowed Senior Subordinated Note Claims and Allowed Junior Subordinated Note Claims depend, in part, on whether the holder's existing notes constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. All holders of Senior Subordinated Note Claims and Junior Subordinated Note Claims are urged to consult their tax advisors regarding the appropriate status for U.S. federal income tax purposes of their existing notes.

*a.    If Existing Note Does Not Constitute a Security*

If the Junior Subordinated Note does not constitute a security for U.S. federal income tax purposes, a holder of an Allowed Junior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any LPC Common Stock received (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).

Similarly, if the Senior Subordinated Notes do not constitute securities, the holder of an Allowed Senior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any Series C Preferred Stock received (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).

In addition, a holder of an Allowed Junior Subordinated Note Claim or Allowed Senior Subordinated Note Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income. *See* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" on page 94.

For a discussion of the character of any recognized gain or loss, please refer to Section VII.B.3, "*Character of Gain or Loss*" on page 93.

A holder's tax basis in any Series C Preferred Stock or LPC Common Stock received should equal the fair market value of such stock on the Effective Date.  A holder's holding period in such stock should begin the day following the Effective Date.

### b.    If Existing Note Constitutes a Security

The receipt of stock of Reorganized LPC in whole or partial satisfaction of an Allowed Senior Subordinated Note Claim or Allowed Junior Subordinated Note Claim that constitutes a security for U.S. federal income tax purposes will qualify as a "recapitalization" for U.S. federal income tax purposes.  The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder. However, a holder that would otherwise have taxable gain on the exchange will generally still be required to recognize that gain to the extent, if any, that the holder receives consideration other than stock or securities.

Accordingly, if the Junior Subordinated Notes constitute securities, a holder of Allowed Junior Subordinated Note Claims generally will not recognize gain or loss in respect its receipt of LPC Common Stock (aside from the treatment of accrued interest, *see* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" on page 94).

Similarly, if the Senior Subordinated Notes constitute securities, a holder of a Senior Subordinated Note Claim generally will not recognize gain or loss in respect of its receipt of Series C Preferred Stock (aside from the treatment of accrued interest, *see* Section VII.B.4, "*Distributions in Respect of Accrued Interest*" on page 94).

In a recapitalization exchange, a holder's aggregate tax basis in any stock received generally should equal the holder's aggregate adjusted tax basis in the existing notes exchanged therefor, increased by any gain or interest income recognized in the exchange.  In general, a holder's holding period in any stock received will include the holder's holding period in the existing notes exchanged.

### 2.    Holders of General Unsecured Claims against LPC and General Unsecured Claims against LRGI

Pursuant to the Second Amended Plan, each holder of an Allowed General Unsecured Claim against LPC or LRGI will receive Cash payable in four payments in respect of its Allowed Claim.  The first such payment will be in the amount of 25% of the holder's Allowed Claim, and the remaining three payments (hereafter, collectively referred to as the "GUC Payment Obligation") will each be in the amount of 26.5% of such Allowed Claim over an 18 month period.

In general, each holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of the initial Cash payment and the "issue price" (as discussed below) of the GUC Payment Obligation (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  For a discussion of the character of any recognized gain or loss, and the treatment of amounts received

in respect of any Claim for accrued but unpaid interest, see Section VII.B.3, "*Character of Gain or Loss*" on page 93 and Section VII.B.4, "*Distributions in Respect of Accrued Interest*" on page 94.

The GUC Payment Obligation should be treated as a debt obligation for U.S. federal income tax purposes, and thus should be subject to the original issue discount ("OID") rules of the Tax Code.  In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the sum of the three later payments) exceeds its "issue price," subject to a *de minimis* exception.

If, as is expected, the GUC Payment Obligation is not considered traded on an "established market," the issue price of the GUC Payment Obligation will be the present value of all payments discounted at a rate based on the applicable federal rate for short term instruments (which discount rate is currently in the range of 2.5% compounded semi-annually).  Such rate will then be the yield to maturity in respect of the obligation.  If the GUC Payment Obligation is traded on an "established market" during the 60 day period ending 30 days after the Effective Date, the issue price of the GUC Payment Obligation will be its fair market value (with the yield to maturity computed accordingly).

Each holder of an Allowed General Unsecured Claim generally will be required to accrue the OID in respect of the GUC Payment Obligation received and include such amount in gross income as interest over the term of such obligation based on the constant yield method. Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of Cash in respect of such income.  A holder's tax basis in a GUC Payment Obligation will be increased by the amount of any OID included in income and reduced by any Cash received made with respect to such GUC Payment Obligation.

A holder's initial tax basis in the GUC Payment Obligation received should equal the issue price of such obligation, and the holding period of such obligation should begin the day following the Effective Date.

## 3.    Character of Gain or Loss

Where gain or loss is recognized by a holder in respect of the satisfaction its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.  Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

Holders of Claims who recognize capital losses as a result of the distributions under the Second Amended Plan will be subject to limits on their use of capital losses.  For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) and may be used to offset ordinary income to the extent of the lesser of (1)

$3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and the  portion of their ordinary income described in the immediately preceding sentence for an unlimited number of years, but cannot carry capital losses back to a prior taxable year.  For corporate holders, losses from the sale or exchange of capital assets may be used only to offset capital gains.  Corporate holders may carry back unused capital losses to the three (3) taxable years preceding the capital loss year and may carry forward unused capital losses to the five (5) taxable years following the capital loss year.

A holder that purchased its existing notes from a prior holder at a "market discount" (relative to the adjusted issue price of the existing notes at the time of acquisition) may be subject to the market discount rules of the Tax Code.  Under these rules, any gain recognized on the exchange of such existing notes generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  A holder of such notes that did not elect to include market discount in income as it accrued is required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its existing notes.  Such deferred amounts become deductible at the time of the exchange, up to the amount of gain that the holder recognizes in the exchange.

4.      **Distributions in Respect of Accrued Interest**

In general, to the extent that any consideration received pursuant to the Second Amended Plan by a holder of an Allowed Claim (whether in cash, new debt or stock) is received in satisfaction of interest or OID that accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be viewed by the Internal Revenue Service as required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

5.      **Ownership and Disposition of Series C Preferred Stock and LPC Common Stock**

a.      *Distributions*

Distributions with respect to the Series C Preferred Stock or LPC Common Stock will be taxable as dividend income when paid to the extent of LPC's current and accumulated earnings and profits as determined for U.S. federal income tax purposes.  To the extent the amount of any distributions exceeds LPC's earnings and profits with respect to such distribution, the excess will be applied against and will reduce the holder's adjusted tax basis in respect of the stock as to which the distribution was made (but not below zero).  Any remaining excess will be

treated as gain or loss from the sale or exchange of such stock, with the consequences discussed below in "—Sale or Other Disposition (Other Than Conversion)."

(i)        Dividends to Non-Corporate Shareholders.

Dividends are generally taxed as ordinary income; however, dividends received by non-corporate holders in taxable years beginning on or before December 31, 2010, may qualify for taxation at lower rates applicable to long-term capital gains, provided certain holding period and other requirements are satisfied.  Non-corporate holders should consult their own tax advisors regarding the applicability of such lower rates under their particular factual situation.

(ii)        Dividends to Corporate Shareholders.

In general, a distribution to a corporate shareholder that is treated as a dividend for U.S. federal income tax purposes will qualify for the 70% dividends received deduction that is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here).  A corporate shareholder holding 20% or more of the distributing corporation may be eligible for an 80% dividends received deduction.  No assurance can be given that LPC will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause distributions to be eligible for a dividends received deduction.  Dividend income that is not subject to regular U.S. federal income tax as a consequence of the dividends received deduction may be subject to the U.S. federal alternative minimum tax.

The dividends received deduction is only available if certain holding periods and taxable income requirements are satisfied.  The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.  Finally, the tax consequences of the receipt of a dividend by a corporate shareholder may be different if the dividend were treated as an "extraordinary dividend" under applicable rules.

**b.        *Constructive Dividend Potential***

Under section 305 of the Tax Code, a holder of preferred stock may be treated as receiving constructive distributions over the term of the stock based on the excess, if any, of the stock's liquidation preference over the stock's fair market value on the Effective Date (subject to a de minimis exception) –sometimes referred to as "preferred OID."  These "preferred OID" rules do not apply if the stock participates in corporate growth to any significant extent (disregarding conversion privileges).  A right to participate in corporate growth that lacks substance (*i.e.*, as to which it is reasonable to anticipate at the time of the distribution that there is little or no likelihood of participating beyond a fixed preferential return) will not be respected.

The Debtors believe that the Series C Preferred Stock should qualify as participating preferred stock and, thus, should not be subject to the preferred OID rules.

Moreover, the Series C Preferred Stock is perpetual preferred stock and, thus, as a technical matter, would have no finite period over which to accrue any preferred OID reflective of the excess of liquidation preference over the fair market value of the preferred stock. In general, each holder is bound by LPC's determination as to whether there is accruable preferred OID, unless the holder explicitly discloses that it is taking a contrary position in a statement attached to its timely filed tax return for the taxable year in which it acquires the stock.

Aside from the treatment of any preferred OID, the presence or absence of an adjustment for certain events to the conversion price at which the Series C Preferred Stock is convertible into LPC Common Stock, such as under the anti-dilution provisions, may result in constructive distributions to the holders of the Series C Preferred Stock (or, in certain cases, to common stockholders of LPC), which would be taxable similar to ordinary distribution on such stock.

### c.    Sale or Other Disposition (Other Than Conversion)

Subject to the discussion below, any gain or loss recognized by a holder on the sale, exchange, or other disposition of the Series C Preferred Stock or the LPC Common Stock (including common stock issued upon the conversion of such Series C Preferred Stock) generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the Series C Preferred Stock or the LPC Common Stock immediately before the sale, exchange, or other disposition. Any such capital gain or loss generally should be long-term capital gain or loss if the holder's holding period for its stock is more than one year at that time. The use of capital losses is subject to limitations as discussed above.

In the case of a redemption of stock (either the Series C Preferred Stock or any LPC Common Stock) for cash or property, the U.S. federal income tax treatment depends on the particular facts relating to such holder at the time of the redemption. If the redemption of such stock (i) is "not essentially equivalent to a dividend" with respect to the holder, (ii) is "substantially disproportionate" with respect to the holder (defined generally as a greater than 20% reduction in a shareholder's percentage ownership of voting stock and common stock of a corporation where such shareholder owns less than 50% of the voting stock of the corporation immediately following the redemption), or (iii) results in a "complete termination" of all of such holder's equity interest in the corporation, then the redemption will be treated as a sale or exchange of the holder's stock and taxed accordingly. In applying these tests, certain constructive ownership rules apply to determine stock ownership. If the redemption does not qualify for sale or exchange treatment, the holder will instead be treated as having received a distribution on such stock (in an amount that generally will be equal to the amount of cash and the fair market value of property received in the redemption) with the general consequences described above under "—Distributions", and the holder's basis in the stock redeemed will shift to the other shares actually owned by such holder. If the holder does not retain any actual stock ownership in the company following such redemption, the holder may lose its tax basis completely. If the redemption distribution is taxable as a dividend to a corporate shareholder, it may be subject to the "extraordinary dividend" provisions of the Tax Code.

In the case of an exchange of the existing Senior Subordinated Notes or the existing Junior Subordinated Note that qualifies as a recapitalization for U.S. federal income tax purposes, the Tax Code indicates that any accrued market discount in respect of the Senior Subordinated Notes or the Junior Subordinated Note, as the case may be, in excess of the gain recognized in the exchange should not be currently includible in income. However, such accrued market discount would carry over to any non-recognition property received in exchange therefor (i.e., to the stock of Reorganized LPC on an allocable basis presumably in accordance with fair market value), such that any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

In addition, any gain recognized by the holder upon a subsequent taxable disposition of the stock received in respect of its Claim (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deducted upon satisfaction of the Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### d.    Conversion of Series C Preferred Stock into LPC Common Stock

As a general rule, a holder of Series C Preferred Stock will not recognize any gain or loss in respect of the receipt of LPC Common Stock upon the conversion of the Series C Preferred Stock, except in respect of any cash paid to holder in lieu of fractional shares. The adjusted tax basis of the LPC Common Stock received on conversion generally will equal the adjusted tax basis of the Series C Preferred Stock converted less the portion of the holder's tax basis allocable to any fractional share, and the holding period of such LPC Common Stock received on conversion will generally include the period during which the converted Series C Preferred Stock was held prior to conversion.

## C.    Consequences to Holders of Series B Preferred Stock Interests

The exchange of Series B Preferred Stock Interests for LPC Common Stock should qualify as a recapitalization for U.S. federal income tax purposes. A holder of Series B Preferred Stock Interests generally will not recognize any gain or loss upon the exchange of such preferred stock for common stock, except in respect of any common stock received that is attributable to any dividend arrearages, which generally should be treated as a distribution on the Series B Preferred Stock Interests, with similar consequences to those described above under Section VII.B.5.a, "*Distributions*" on page 94.

In general, the common stock received will be considered attributable to any dividend arrearages to the extent the value of the common stock received exceeds the issue price of the Series B Preferred Stock (up to the amount of the dividend arrearages).

A holder's aggregate tax basis in any LPC Common Stock received generally should (except with respect to any dividend arrearages taxable on the exchange) equal the holder's aggregate adjusted tax basis in the Series B Preferred Stock Interests exchanged therefor.  In general, a holder's holding period in any LPC Common Stock received, other than any such stock received attributable to any dividend arrearages, will include the holder's holding period in the Series B Preferred Stock exchanged therefor.  The tax basis of any LPC Common Stock received that is attributable to any dividend arrearages will be equal to its fair market value on the date of the exchange, and the holding period of such common stock will commence on the day after the exchange.

For a discussion of the U.S. federal income tax consequences of the ownership and disposition of LPC Common Stock, see generally Section VII.B.5 "*Ownership and Disposition of Series C Preferred Stock and LPC Common Stock*" on page 94.

## D.    Information Reporting and Backup Withholding

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Second Amended Plan and payments of proceeds from the sale, retirement or other disposition of new securities, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information or to make certain certifications.  Backup withholding is not an additional tax.  Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, if any, provided that appropriate proof is provided to the IRS under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the exchanges contemplated by the Second Amended Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests receiving a distribution under the Second Amended Plan are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the Second Amended Plan.**

## VIII.  SECURITIES LAW MATTERS

**A.**    **Issuance and Resale of the Series C Preferred Stock and LPC Common Stock under the Second Amended Plan**

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate.  In reliance upon this exemption, the Series C Preferred Stock and LPC Common Stock issued to holders of claims and interests in LPC generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of new securities issued under the Second Amended Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with a chapter 11 plan, with the consummation of the chapter 11 plan, or with an offer or sale of securities under the chapter 11 plan, or (d) is the issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

**B.**    **Listing**

The Series C Preferred Stock and the LPC Common Stock are not, and upon the consummation of the Second Amended Plan, such securities will not be, listed on any national securities exchange.  Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

**C.      Legends**

         Certificates evidencing shares of the Series C Preferred Stock and LPC Common Stock received by holders of at least 10% of the LPC Common Stock will bear a legend substantially in the form below (except no legend shall be required on certificates issued in "street name" or in the name of, or by a nominee, of the Depository Trust Company):

         THE SHARES OF [SERIES C PREFERRED] [COMMON] STOCK REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

### IX.  VOTING PROCEDURES AND REQUIREMENTS

**A.      Voting Deadline**

         **IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE SECOND AMENDED PLAN:**

         **Class 5 – Senior Subordinated Note Claims**

         **Class 6 – Junior Subordinated Note Claims**

         **Class 7 – General Unsecured Claims against LPC**

         **Class 9 – Asbestos-Related Claims**

         **Class 10 – Series B Preferred Stock Interests in LPC**

         **Class 11 – LPC Common Stock Interests**

         **Class 17 – General Unsecured Claims against LRGI**

         All known holders of Senior Subordinated Note Claims, Junior Subordinated Note Claims, General Unsecured Claims against LPC, Asbestos-Related Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, and General Unsecured Claims against LRGI as of the Record Date are entitled to vote on the Second Amended Plan and have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully

and follow the instructions contained therein.  To vote, please use only the ballot that accompanies this Disclosure Statement.

The Debtors have engaged Financial Balloting Group LLC, as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Second Amended Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE STREET ADDRESS OR E-MAIL ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON [___ __], 2009**.

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE SECOND AMENDED PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE SECOND AMENDED PLAN WILL NOT BE COUNTED AS A VOTE TO EITHER ACCEPT OR REJECT THE SECOND AMENDED PLAN.**

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

>**Financial Balloting Group LLC**
>**757 Third Avenue, 3rd Floor,**
>**New York, New York 10017**
>**Telephone:  (646) 282-1800**

>**- OR –**

>**tabulation@fbgllc.com**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

**B.      Holders of Claims Entitled to Vote**

Class 5 – Senior Subordinated Note Claims, Class 6 – Junior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims,

Class 10 – Series B Preferred Stock Interests in LPC, Class 11 – LPC Common Stock Interests, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Second Amended Plan that are impaired and entitled to vote to accept or reject the Second Amended Plan.  Each holder of a Claim in any of these classes as of [_____ __], 2008 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Second Amended Plan.

## C.      Vote Required for Acceptance by a Class

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that vote to accept or reject the plan.  A class of interests accept a chapter 11 plan when it is accepted by at least two-thirds in amount of the interest of that class that vote to accept or reject the plan.  Thus, Classes 5, 6, 7, 8, and 16 will accept the Second Amended Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance and Class 10 or Class 11 will accept the Second Amended Plan if at least two-thirds in amount of that Class cast their ballots in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## D.      Voting Procedures

### 1.      Voting Procedures

Voting procedures shall be as described in the Disclosure Statement Order.

### 2.      Withdrawal of Ballot

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline.  In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## X.  CONFIRMATION OF THE SECOND AMENDED PLAN

### A.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for February 9, 2009 and, if needed, February 10, 2009.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.      Objections to Confirmation

Objections or responses to confirmation of the Second Amended Plan, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor.

All objections and responses to the confirmation of the Second Amended Plan must be filed with the Bankruptcy Court no later than **[___ __], 2009 at 4:00 p.m. (prevailing Eastern Time)**.  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

All objections and responses must be served, so as to be received no later than **[___ __], 2009, at 4:00 p.m. (prevailing Eastern Time)**, upon:  (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Richard P. Krasnow); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (d) the attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn:  John C. Tishler); (e) the attorneys for the statutory committee of unsecured creditors, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn:  Paul Silverstein and Jonathon Levine); and (f) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn:  Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Second Amended Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**     <u>**General Requirements for Confirmation**</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Second Amended Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)   The Second Amended Plan has been proposed in good faith and not by any means proscribed by law.

(iv)    Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Second Amended Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Second Amended Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Second Amended Plan is reasonable, or if such payment is to be fixed after confirmation of the Second Amended Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Second Amended Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the Second Amended Plan with the Debtors, or a successor to the Debtors under the Second Amended Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)    With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the Second Amended Plan or will receive or retain under the Second Amended Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(vii)   Except to the extent the Second Amended Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VI.A.2, "*Non-Consensual Confirmation*" on page 81, each Class of Claims or Interests has either accepted the Second Amended Plan or is not impaired under the Second Amended Plan.

(viii)  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Second Amended Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide to the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the Second Amended Plan, determined without including any acceptance of the Second Amended Plan by any insider holding a Claim in such Class.

(x)     Confirmation of the Second Amended Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Second Amended Plan, unless such liquidation or reorganization is proposed in the Second Amended Plan.  See discussion of "Feasibility" below.

(xi)    The Second Amended Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Second Amended Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## D.    **Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accepts the Second Amended Plan or (b) receives or retains under the Second Amended Plan property of a value, as of the Effective Date, that is not less

than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Second Amended Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Creditors' Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Debtors have determined that there would be no distribution under chapter 7 of the Bankruptcy Code to any Class of unsecured Claims or Interests and, consequently, confirmation of the Second Amended Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Debtors' liquidation analysis estimates the proceeds generated from a hypothetical chapter 7 liquidation of the Debtors' assets. The Debtors base the analysis upon a number of significant assumptions which are described therein. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The Debtors' chapter 7 liquidation analysis and the assumptions utilized therein are set forth in Exhibit 5 to this Disclosure Statement.

E.      **No Unfair Discrimination/Fair and Equitable Test**

As provided under the Bankruptcy Code, the Bankruptcy Court may confirm a chapter 11 plan over the rejection or deemed rejection of such plan by a class of claims or interests if the chapter 11 plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

1.      **No Unfair Discrimination**

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the chapter 11 plan. The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

2.      **Fair and Equitable Test**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims or interests receive more than 100% of the allowed amount of the claims or interests in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

a.      ***Secured Claims***

The Bankruptcy Code requires that a chapter 11 plan must provide each holder of an impaired secured claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such allowed secured claim with deferred cash payments equal in value to the amount of such allowed secured claim, as of the effective date, or (ii) the "indubitable equivalent" of such allowed secured claim.

b.      ***Unsecured Claims***

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an impaired unsecured claim will receive under the chapter 11 plan a distribution equal in value to the amount of the allowed unsecured claim or (ii) no distribution will be made under the second amended plan to any holder that is junior to the claims in the dissenting class.

### c.    Interests

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an Interest will receive under the chapter 11 plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of an interest that is junior to the dissenting class.

The Debtors believe that (i) the Second Amended Plan satisfies the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) the Second Amended Plan satisfies the "fair and equitable" requirement notwithstanding the rejection of the Second Amended Plan by any Class of Claims or Interests, because each Class of Claims or Interests will receive under the Second Amended Plan a distribution equal in value to (x), with respect to any Class of Claims, the amount of such Claims and (y), with respect to any Class of Interests, the greater of the fixed liquidation value, the redemption price, or the value of the stock that is the basis for such Interests.

## F.    **Classification of Claims and Interests**

The Debtors believes that the Second Amended Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." The Second Amended Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above.  Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

## G.    **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Second Amended Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  As part of this analysis, the Debtors have prepared the Projected Financial Statements set forth in Exhibit F to this Disclosure Statement.  Certain selected financial information from the Projected Financial Statements and certain key financial ratios are set forth in Section V, "*Financial Information, Projections and Valuation Analysis*" on page 68.  These projections are based upon the assumption that the Bankruptcy Court will confirm the Second Amended Plan and, for projection purposes, that the Effective Date of the Second Amended Plan and its substantial consummation will take place within 180 days after entry of the Confirmation Order.  Based upon the Projected Financial Statements, the Debtors believe they will be able to make all payments required to be made pursuant to the Second Amended Plan.  The Committee believes that the Second Amended Plan is not feasible unless and until the Debtors have secured a binding commitment for the New Secured Credit Facility.

## XI.  CONCLUSION

The Debtors believe the Second Amended Plan is in the best interests of all holders of Claims and Interests and urges the holders of impaired Claims and Interests in Classes 5, 6, 7, 9, 10, 11, and 17 to vote to accept the Second Amended Plan and to evidence acceptance by returning their ballots such that the Voting Agent will received the ballots no later than [____ __], 2009.

Dated: New York, New York
          December __, 2008

                                        Respectfully submitted,

                                        LEXINGTON PRECISION CORPORATION


                                        By: _____
                                             Name: Michael A. Lubin
                                             Title:  Chairman of the Board

                                        LEXINGTON RUBBER GROUP, INC.


                                        By: _____
                                             Name: Michael A. Lubin
                                             Title:  Chairman of the Board

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000
Attorneys for the Debtors and Debtors in Possession