WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for the Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
                                               :

| | | |
|---|---|---|
| **In re:** | : | Chapter 11 |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | Case No. 08-11153 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

------------------------------------------------------------------------x

**DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS
TO DEBTORS' MOTION TO (I) APPROVE THE PROPOSED
DISCLOSURE STATEMENT, (II) APPROVE THE PROCEDURES TO
SOLICIT ACCEPTANCES OF THE DEBTORS' PROPOSED PLAN, AND
(III) SCHEDULE A HEARING AND ESTABLISH NOTICE AND OBJECTION
<u>PROCEDURES FOR CONFIRMATION OF THE DEBTORS' PROPOSED PLAN</u>**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation ("<u>Lexington Precision</u>") and its wholly-owned subsidiary, Lexington Rubber Group, Inc. ("<u>Lexington Rubber Group</u>" and together with Lexington Precision, the "<u>Debtors</u>"), as debtors and debtors in possession, as and for their response to the objections (the "<u>Objections</u>") of the Agents for the Prepetition Senior Lenders (the "<u>Prepetition Lenders</u>") and the Official Creditors' Committee (the "<u>Committee</u>") to the Debtors' motion, dated October 24, 2008 (the "<u>Motion</u>"), to (I) approve the proposed disclosure statement, (ii) approve the procedures to solicit acceptances of the Debtors' proposed plan, and

(III) schedule a hearing and establish notice and objection procedures for confirmation of the Debtors' proposed plan, respectfully represent:

## Background

1. On April 1, 2008 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. Since the filing of the Motion, the Debtors filed a revised proposed disclosure statement, dated December 8, 2008, for the Debtors' second amended joint plan of reorganization under chapter 11 of the Bankruptcy Code, dated December 8, 2008 (the "Second Amended Plan").

## Preliminary Statement

3. The Committee and the Prepetition Lenders object to the Disclosure Statement (as defined below) and the voting procedures and their objections fall into three categories: (i) an objection to feasibility of the Second Amended Plan on the ground that the Debtors have not yet obtained a firm commitment for exit financing, or that the exit financing contemplated will not be sufficient; (ii) objections that the Disclosure Statement does not contain "adequate information;" and (iii) objections to certain aspects of the Debtors' proposed voting procedures.

4.     The objections to feasibility of the Second Amended Plan are not appropriate at this stage of the case.  The Debtors are in active negotiations with a major bank on terms for exit financing sufficient to fund the Second Amended Plan.  While it is correct that the Second Amended Plan requires financing in order to be feasible, the Debtors have reasonable prospects of obtaining that financing.  Accordingly, the Second Amended Plan is not futile and the Debtors should be permitted the opportunity to continue negotiations, obtain a commitment, and demonstrate at a confirmation hearing that they are likely to satisfy all applicable conditions to any financing and consummate the Second Amended Plan.  Neither the Committee nor the Prepetition Lenders point to any case – and the Debtors are aware of none – establishing a rule of law that the lack of a firm commitment for exit financing at the time a disclosure statement is considered for approval renders a plan of reorganization unconfirmable.  Nor should this Court accept the invitation to create such a rule because doing so would unduly delay this case and possibly many others.

5.     As for the objections to the adequacy of the information contained in the Disclosure Statement, amendments filed concurrently herewith address each issue raised by the Committee and the Prepetition Lenders.  Specifically, the amendments to the Disclosure Statement include (i) a more detailed description regarding the Debtors' proposed exit financing and the risks associated with exit financing; (ii) revised financial projections; (iii) a revised valuation of the Debtors' businesses; and (iv) the addition of comments from the Committee that reflect its views on the Debtors' financial projections, valuation, and other issues.

6.     The primary objection to the voting procedures is the Committee's assertion that over 4,000 asbestos personal injury claims (the "<u>Asbestos Related Claims</u>") should not be entitled to vote.  The proposed voting procedures would allow each of these claimants to

vote in the amount of $1 per claim. Because the Asbestos Related Claims are separately classified, their vote – whether for or against the Second Amended Plan – will not swamp the votes of other creditors and there is nothing unfair about permitting them to vote. While the Debtors do believe they have meritorious defenses to all of these Asbestos Related Claims, the proposed voting procedure avoids the need for either an estimation or a temporary allowance hearing and is consistent with the procedures for voting disputed claims commonly approved in chapter 11 cases. The Court should approve such procedures in this case as well.

7.  The disclosure statement, dated and filed December 17, 2008 (the "Disclosure Statement"), as modified, contains "adequate information", as required by section 1125 of the Bankruptcy Code, because it contains complete and accurate information sufficient to permit voting parties in interest to make an informed decision as to whether to accept or reject the Second Amended Plan. Accordingly, the Court should approve the Disclosure Statement and authorize the solicitation of acceptances and rejections of the Second Amended Plan be authorized.

## I.

## Prepetition Lenders' Objections

**A.    Feasibility**

8.  The issues raised by the Prepetition Lenders go to feasibility of the Second Amended Plan and it is not appropriate to consider them now. If the Disclosure Statement "contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation." *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988). Confirmation issues and challenges should be determined at the hearing to consider confirmation of a plan of reorganization, subject to the full panoply of due process protections available to parties in interest at that time.

9. Indeed, review of issues affecting confirmation of a plan is permitted only when the proposed plan of reorganization is "patently" or "facially" unconfirmable. *See In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("Where objections relating to confirmability of a plan of reorganization raise novel or unsettled issues of law, *the Court will not look behind the disclosure statement to decide such issues at the hearing on the adequacy of the disclosure statement*.") (emphasis added); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) ("Occasionally it might be appropriate to disapprove of a disclosure statement, even if it properly summarizes and provides adequate information, when the court is convinced that the plan could not possibly be confirmed.").

10. The Prepetition Lenders contend that the Disclosure Statement should not be approved because the Debtors have not obtained an exit financing commitment to fund the Second Amended Plan and their business upon emergence. As described in the Disclosure Statement, the Debtors have been actively engaged in negotiations with an institutional lender for exit financing. As conditions in the automotive original equipment segment deteriorated in October and November, the Debtors decided to delay their efforts to complete the proposed exit financing until they were able to develop a plan to restructure their connector seals business, which has been particularly hard-hit by the downturn. The Debtors believe that the prospective lender would be receptive to a comprehensive plan for this business that assures a significant contribution to the Debtors' on-going EBITDA even at the reduced volume levels the industry is currently projecting and wanted to present the lender with such a plan, together with complete projected financial statements demonstrating the projected financial impact of the plan.

11. On December 5, 2008, the Debtors met with the proposed exit lender to outline their plan to partially consolidate the connector seal business into the other three facilities

of the Rubber Group. The Debtors explained to the lender that this consolidation would enable them to generate significant incremental EBITDA, even at depressed levels of demand, because much of the fixed overhead costs related to operating a stand-alone facility would be eliminated, with the necessary functions being performed by personnel already in place at the other facilities. The Debtors advised the lender that each dollar of incremental sales transferred to the other facilities should produce incremental EBITDA of $0.30 to $0.35. The proposed lender reacted positively to this plan and requested certain additional information in order to make a revised proposal. The proposed exit lender is currently reviewing this information provided by the Debtors and are expected to make a proposal during the week of December 22, 2008.

12. As the Prepetition Lenders concede, the amount to be borrowed under the proposed exit financing is more than sufficient to pay their claims in full. The Second Amended Plan contemplates as a condition to emergence that the Debtors will enter into a new secured credit facility (the "New Secured Credit Facility") the proceeds of which will be used to pay the Prepetition Lenders' claims in full and fund other distributions under the Second Amended Plan.

13. The Prepetition Lenders suggest that the Debtors must repay the $4 million post-petition financing (the "DIP Facility") on the effective date, the Second Amended Plan, however, contemplates that the DIP Facility of $4 million would be converted into a second lien loan (the "Investor Loan") junior to the New Secured Credit Facility for the purpose of funding the Debtors' operations upon emergence from chapter 11. The proceeds from a New Secured Credit Facility, the Investor Loan, and the approximately $6 million in cash that the Debtors currently have on hand should enable to the Debtors to pay in full the claims to be paid on the effective date and thereafter and to operate their businesses going forward.

14. The Prepetition Lenders' objection does not take into consideration that the Debtors have reduced the amount of cash necessary to fund distributions to holders general unsecured claims. On effective date under the Second Amended Plan, holders of allowed claims in classes 7 and 17 will receive a payment on the effective date equal to 10% of their allowed claims and 9 equal payments of 10.75% of the allowed claim commencing every quarter thereafter. This amendment reduces the Debtors' immediate cash requirements as of the effective date by approximately $640,000 but still pays the holders of claims in classes 7 and 17 in full upon completion of the installment payments.

15. The Prepetition Lenders' assertion that the professional fees in these cases will exceed $5 million is not only inaccurate but misrepresents the actual amounts outstanding. Assuming there are two more interim fee periods, the Debtors believe that the professional fees will most likely be $1 million less than the Prepetition Lenders' estimate. Moreover, 80% of the professional fees in these cases have been or will have been paid prior to the final fee applications in these cases, which means that the outstanding amounts relating to professional fees will be approximately $800,000, far less than the $5 million that the Prepetition Lenders seem to suggest that the Debtors will have to pay on or around the effective date.

16. In the end, the Prepetition Lenders' feasibility objection is nothing more than a collection of citations to cases standing for the boilerplate proposition that a court need not approve a disclosure statement if it can be shown that the plan is patently unconfirmable. Upon review of these cases, not a single case has facts that are similar to the Debtors or held that a bankruptcy court should not approve a disclosure statement because a debtor does not yet have a commitment for exit financing.[1] The Second Amended Plan is far from "patently"

---

[1] *See*, *e.g.*, *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (denying approval of disclosure statement because the purpose of plan was to avoid restrictions under federal securities laws as prohibited under

unconfirmable. Contrary to the Prepetition Lenders' assertions, the Debtors' cash on hand together with the proceeds from a New Secured Credit Facility and the Investor Loan will provide them with sufficient cash to fund distributions under the Second Amended Plan and operate their businesses upon emergence from chapter 11.

17. The Prepetition Lenders' positions are inconsistent. They conditioned their consent to use of cash collateral on a fast-moving chapter 11 case process, but now when the condition they imposed necessitates proceeding with a motion to approve a disclosure statement before an exit financing commitment is in place they ask the Court to deny approval, making it impossible for the Debtors to meet the condition the Prepetition Lenders themselves imposed. The Court should reject this attempt to have it both ways.

B. **Adequacy of Information**

18. The Prepetition Lenders' informational objections to the Disclosure Statement's description of the Debtors' proposed New Senior Credit Facility have been addressed in the Disclosure Statement. For example, in Article IV.D.1 of the Disclosure Statement, the Debtors clearly disclose that (i) they are in negotiations with a proposed exit lender, (ii) given the current economic environment that could be difficult obtaining an exit

---

section 1129(d) of the Bankruptcy Code); *In re Curtis Center LP*, 195 B.R. 631, 638 (Bankr, E.D. Pa. 1996) (denying approval of disclosure statement because plan was not confirmable over the objecting classes when debtor was not able to show the possibility of an impaired accepting class); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D. N.Y. 1992) (denying approval of the disclosure statement because plan's classification scheme violated section 1122 of the Bankruptcy Code); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1989) (denying approval of disclosure statement because it failed to adequately describe the claims comprised of each class); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) (denying approval of disclosure statement because conflict resulting from the debtor's professional being a shareholder of the plan proponent prohibited confirmation); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) (denying approval of disclosure statement because the plan's classification scheme violated section 1122 of the Bankruptcy Code); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 792 (Bankr. N.D. Okla. 1988) (denying approval of disclosure statement because payments proposed under plan were insufficient as a matter of law); *In re Ferretti*, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) (denying approval of disclosure statement because it did not contain projections); *In re Olive St. Invs.*, Inc., 117 B.R. 488, 490-92 (Bankr. E.D. Mo. 1990) (denying approval of disclosure statement on numerous grounds including the debtors' inability to obtain financing because its sole asset had been sold in a foreclosure sale previously authorized by the bankruptcy court).

financing facility, and (iii) if the Debtors are not able to obtain an exit financing facility that they might not be able to confirm the Second Amended Plan. The amendments to the Disclosure Statement and the Second Amended Plan address the remaining informational disclosure concerns of the Prepetition Lenders.

## II.

## Committee's Objections

### A.     Releases

19.    The Committee's position is wrong with respect to the voting procedures regarding the third party release provision in the Second Amended Plan.  First, the United States Court of Appeals for the Second Circuit has held that third party releases under a chapter 11 plan are permissible when they are voluntary. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Moreover, this Court has approved third party releases upon a creditor's affirmative vote to accept or deemed acceptance of a chapter 11 plan without having the option to opt out. *See In re PRC, LLC*, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. June 20, 2008) [Docket Nos. 512 and 514]. Here, the Debtors' voting procedures provide voting parties with even greater latitude by permitting a voting party to opt out of the release provisions even when such party affirmatively accepts the Second Amended Plan.

### B.     Voting Rights of Holders of Asbestos Related Claims

20.    Contrary to the Committee's assertions, the Debtors have never stated they have no liability to the "Asbestos Related Claims." Rather, the Disclosure Statement clearly provides, just as the Committee quotes in its objection, that the Debtors have never been found liable on any Asbestos Related Claim and that the Debtors' proposed treatment of allowed Asbestos Related Claims under the Second Amended Plan "is not an admission of liability." Disclosure Statement at Article III.C.

21. Holders of Asbestos Related Claims have filed more than 4,100 proofs of claim in these chapter 11 cases. While the Debtors' ultimate liability under these claims has not been determined, the Debtors cannot unilaterally deem each of these claim invalid and ineligible to vote without an adjudication of each proof of claim or a formal estimation by the Court pursuant to section 502(c) of the Bankruptcy Code.

22. Instead of adjudicating each Asbestos Related Claim or estimating each claim under section 502(c) of the Bankruptcy Code, Bankruptcy Rule 3018(a) provides that a court "may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." The statutory predicate to Bankruptcy Rule 3018(a) is section 502(c) of the Bankruptcy Code, which permits the estimation of "any contingent or unliquidated claim, the fixing of which, as the cases may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996). Because the Bankruptcy Code and the Bankruptcy Rules do not prescribe a method for estimating a claim, it is left to the discretion of the court and does not entail consideration of the merits of the claim. *Id.* A creditor's voting power should be commensurate with its economic interest in the case. *In re Quigley Co.*, 346 B.R. 647, 654 (Bankr. S.D.N.Y. 2006); *In re Enron Corp.*, 2004 WL 2434928, *5 (Bankr. S.D.N.Y. Nov. 1, 2004).

23. The Committee does not dispute that requiring the Debtors to adjudicate each and every Asbestos Related Claim prior to confirmation would unduly delay the administration of these chapter 11 cases. The adjudication of the Asbestos Related Claims in state court has lasted for years and the process in this Court would not change the rate at which they are being adjudicated. The Debtors agree that the voting power of the holders of the

Asbestos Related Claims should not be unlimited. However, it does not follow that the Debtors have the right to completely disenfranchise the holders of the Asbestos Related Claims from voting on the Second Amended Plan that provides a recovery to holders of allowed claims.

24. As the foregoing demonstrates, the Committee's assertion that there is no "legal or factual basis" to support that the voting procedures for the Disclosure Statement for holders of Asbestos Related Claims is wrong. The United States Court of Appeals for the Second Circuit has held that it is permissible to assign a value of $1.00 per asbestos claim if the reorganization would be delayed if the debtor were required to first determine a dollar value of each disputed asbestos claim prior to the solicitation of each holder's vote. *Kane v. Johns-Mansville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 647-48 (2d Cir. 1988).

25. More importantly, the cases that the Committee relies upon have no legal or factual application to the issue whether a bankruptcy court assign a value of $1.00 per asbestos claim for the limited purpose of voting on a chapter 11 plan. Instead, the Committee cites *In re Ryan v. Loui* (*In re Corey*), 892 F.2d 829, 834 (9th Cir. 1989) for the proposition that speculative claims should be estimated at zero. In *Corey*, however, the court affirmed the court's estimation of a claim at zero under section 502(c) of a claim arising from the disputed transfer of real property, not an asbestos claim. *Id.* The claimant's right to the property was speculative because the claimant's rights had been adjudicated in a separate state court action. The Committee also relies upon *In re Pacific Gas & Elec. Co.*, 295 B.R. 635, 675 (Bankr. N.D. Cal. 2003) for the proposition that claims should be estimated at zero where the claimants could not establish any potential liability. In *PGE*, the court estimated the claims at zero after a three day estimation trial under section 502(c) of the Bankruptcy Code in which the claimants were not able to establish any potential antitrust claims. *Id.* at 640.

26.     Finally, the Committee relies upon another factually inapposite case, *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y. 1994), in support of the proposition that the estimated value of a claim should be reduced by the probability it will be sustainable. While the facts in *Windsor* are not similar to this case, the Debtors do not disagree with the proposition and believe that it actually supports the Debtors' request to estimate the claims of the holders of Asbestos Related Claims in an amount that is commensurate with the economic value of their claims, $1.00 as opposed to a greater amount.

27.     The Debtor Lexington Precision is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio. In each case, the plaintiffs generally allege that Lexington Precision or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers. None of the complaints allege any specific facts as to which products Lexington Precision allegedly produced contained asbestos or the time of exposure thereto. To date, the Debtors have never been found liable on any Asbestos-Related Claims and approximately 1,000 cases have been dismissed but the prior adjudication of separate claims does not provide a basis to estimate the Asbestos Related Claims at zero. In these circumstances and because the Debtors are providing for a distribution to holders of allowed Asbestos Related Claims, the assignment of $1.00 to each Asbestos-Related Claim fairly represents the economic interests in these cases.

C.     **The Committee's Proposed Letter**

28.     The Committee proposes to include in the solicitation package a letter to holders of general unsecured claims in Classes 7 and 17. The Debtors do not object to the inclusion of such a letter, but the text proposed by the Committee is inaccurate and does not

contain "adequate information" and the Committee thus far has resisted the Debtors' request that it make changes to the letter to address these deficiencies.

29.     The proposed Plan would pay Class 7 and 17 creditors 106.75% of their allowed claims in 10 installments over a 27-month period.  The Committee's draft letter screams, in bold, capitalized text, that this recovery is "**INADEQUATE, UNACCEPTABLE AND MUST BE REJECTED**."  The Committee, however, offers no explanation for its conclusion that the Plan "**MUST**" be rejected by these classes of creditors who will receive payment in full on their claims over time, together with interest, pursuant to the Second Amended Plan.  The Committee simply provides no analysis of the Debtors' business or its financial projections, no assessment of the feasibility of the Debtors' plan, and no reasoning as to why or how unsecured creditors could expect a better recovery under any alternate reorganization scenario.

30.     The sole basis for the Committee's position is its conclusory and incorrect assertion that, "based upon the Debtors' valuation," unsecured creditors are "entitled to receive, on the Effective Date, cash in the amount of 100%" of their allowed claims "plus post-petition interest accrued thereon."  This is an incorrect statement of the law and should not be included in any solicitation package.  It appears to be a (mis)reference to the cram-down requirements of section 1129(b)(2)(B)(i), but that section of the code does *not* entitle unsecured creditors to receive payment in full, in cash, on the effective date of a plan, as the Committee states.  It requires that unsecured creditors receive "property of a value, as of the effective date of the plan, equal to the allowed amount of [their claims]."  There is no "cash" requirement and there is no requirement that it be paid on the effective date, only that the property received must have a value, *measured* as of the effective date, equal to the allowed claim.  The Debtors believe the treatment they have proposed for unsecured creditors satisfies this test.  The Committee may

dispute that, but it should not be allowed to misstate the requirements of the Bankruptcy Code and mislead trade creditors into rejecting a plan that would pay them in full, over time.

### III.

### IUE-CWA Unions' Response

31.     The local president of the union (the "Union") for the Debtors' hourly workers at the Vienna, Ohio facility (the "Vienna Facility") filed a letter, dated December 16, 2008, in response to the Motion.  In short, the Union's letter is not an objection to the approval of the Disclosure Statement but rather is an objection to the Debtors' business decision to close the Vienna Facility as part of the consolidation of the Rubber Group described in the Disclosure Statement.  The Union is asking the Court to carefully consider the Debtors' decision to close the Vienna Facility before determining whether to confirm the Second Amended Plan.  Because this issue is not before the Court, the Union's letter has no relevance to the Court's consideration of the approval of the Disclosure Statement.

### Conclusion

32.     During the course of these chapter 11 cases, the Debtors have made substantial progress in formulating a chapter 11 plan that not only pays creditors in full but also reorganizes the Debtors' businesses in an unfavorable economic environment.  The Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and that approval of the Disclosure Statement is in the best interest of the Debtors, their estates, their creditors, and all parties in interest, so that the solicitation of votes on the Second Amended Plan may begin promptly in accordance with the proposed procedures.

33.     For the foregoing reasons, the Debtors respectfully request that the Motion be granted, the Disclosure Statement be approved, the Objections be denied with prejudice, the proposed order as revised be entered, and that the Court grant such other and further relief as is just.

WHEREFORE the Debtors respectfully requests that the Court deny the Objections and enter an order granting the relief requested in the Motion and such other and further relief as is just.

Dated: December 17, 2008
      New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007
Attorneys for Debtors
and Debtors in Possession