WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | **08-11153 (MG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------x

**NOTICE OF THE DEBTORS' MOTION FOR**
**AUTHORIZATION, PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
**AND 363(c), FOR CONTINUED USE OF CASH COLLATERAL**

PLEASE TAKE NOTICE that Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (together, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, filed a motion, dated February 2, 2009 (the "Motion"), pursuant to sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the use of cash collateral, all as more fully described in the Motion.

PLEASE TAKE FURTHER NOTICE that any objections or responses to the Motion, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court"); and (c) set forth the name of the objecting party, the basis for the objection, and specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be filed with the Bankruptcy Court no later than **February 13, 2009 at 12:00 p.m. (prevailing Eastern Time)**. In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. General Order M-242 may be found at www.nysb.uscourts.gov. All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be served, so as to be received no later than **February 13, 2009, at 12:00 p.m. (prevailing Eastern Time)**, upon: (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn: Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Christopher J. Marcus and Victoria Vron); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); (d) attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn: John C. Tishler); (e) attorneys for the statutory creditors' committee, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Paul Silverstein); and (f) attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

PLEASE TAKE FURTHER NOTICE that a hearing to consider the relief requested in the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, on **February 23, 2008 at 10:00 a.m. (prevailing Eastern Time)**, at the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 or as soon thereafter as counsel may be heard.

Dated: February 2, 2009
      New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                   :

**In re**                          :          **Chapter 11 Case No.**
                                   :

**LEXINGTON PRECISION CORP., et al.,**  :          **08-11153 (MG)**
                                   :

       **Debtors.**                 :          **(Jointly Administered)**
                                   :

-------------------------------------------------------------x

## DEBTORS' MOTION FOR AUTHORIZATION, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 363(c), FOR CONTINUED USE OF CASH COLLATERAL

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

### Summary of Releif Requested[1]

    1.       By this motion, the Debtors request entry of an order (the "Cash Collateral

Order") granting, pursuant to sections 105, 361, 362, and 363 of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"), approval to use Cash Collateral (as defined below)

---

[1] Unless stated otherwise, all capitalized terms not defined in this summary shall have the meaning
ascribed to such term later in the proposed Cash Collateral Order annexed hereto.

in accordance with terms set forth in the proposed Cash Collateral Order annexed hereto as

Exhibit A. The lenders of the debtor-in-possession financing facility (the "DIP Loan") have

consented to the extension of the termination date of the DIP Loan and the Debtors are preparing

a separate motion for authorization to extend the termination date of the DIP Loan, which will be

filed prior to the hearing on this Motion.[2] In accordance with Rule 4001 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), the following is a summary of the terms of the

proposed use of Cash Collateral:[3]

(i)    Parties with Interest in Cash Collateral. The parties with interest in Cash Collateral (collectively, the "Prepetition Senior Lenders") are (a) CapitalSource Finance LLC and Webster Business Credit Corporation, as agents and lenders under that certain Credit and Security Agreement, dated as of May 31, 2006, and any other lenders thereto, and (b) CSE Mortgage LLC, as agent and lender, DMD Special Situations, LLC, as lender, and any other lenders under that certain Loan and Security Agreement, dated as of May 31, 2006. Motion, ¶¶ 9-14.

(ii)   Purposes for Use of Cash Collateral. The Debtors shall use Cash Collateral for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors, and (c) the costs of administration of these chapter 11 cases, each in compliance with the Budget. Motion, ¶¶ 26-28; Cash Collateral Order, ¶ G.

(iii)  Termination Date. The Debtors' use of Cash Collateral will terminate on the earlier of (a) the closing or dismissal of the chapter 11 cases, (b) the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (c) the appointment of a chapter 11 trustee in these chapter 11 cases, (d) noncompliance with the terms of the Cash Collateral Order, (e) entry of an order of the Court prohibiting the Debtors' use of Cash Collateral in accordance with a Contested New Budget, (f) the Debtors' are unable to consummate a chapter 11 plan of reorganization on or before December 31, 2009, subject to the Debtors' right to seek further extensions of such period or by consent of the Prepetition Senior Lenders, or (g) entry of an order for the sale of more than $1,000,000 of the Debtors' assets that does not provide that the proceeds of such sale to be

---

[2] The DIP financing motion will be noticed for hearing before the Honorable Arthur J. Gonzalez.

[3] To the extent anything in this summary is inconsistent with the proposed Cash Collateral Order, annexed hereto, the proposed Cash Collateral Order shall control.

applied to the Prepetition Senior Secured Debt.  Cash Collateral Order ¶¶ 4 and 7.

(iv)    <u>Adequate Protection</u>.  As previously provided by the "First Cash Collateral Order",[4] the Debtors will continue to make adequate protection payments ("<u>Adequate Protection Payments</u>") in amounts equal to interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein, until the occurrence of a Termination Event.  Further, for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, the Prepetition Senior Lenders shall have, subject to the Carve-Out defined below and the conditions and limitations identical to those imposed by the First Cash Collateral Order: (a) continued replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date and as provided by the First Cash Collateral Order (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all encumbered assets which were not otherwise subject to the Prepetition Senior Lenders' liens as of the Commencement Date and as provided by the First Cash Collateral Order (collectively, the "<u>Adequate Protection Liens</u>")  Motion ¶¶ 29-45; Cash Collateral Order, ¶ 5.

(v)    <u>Carve-Out</u>.  The Carve-Out, as provided under the First Cash Collateral Order and as modified under the Cash Collateral Order, shall consist of payment of (a) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (b) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (c) upon the occurrence of the Termination Date or the Maturity Date (as defined in the First Cash Collateral Order) (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses

---

[4] Final Order, dated April 17, 2008, Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection to Prepetition Secured Lenders, and Authorizing Postpetition Financing [Docket No. 61].

payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000; provided, however, that prior to the occurrence of the Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the DIP Loan (as defined in the First Cash Collateral Order), as the same may be due and payable, all professional fees and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date.  Cash Collateral Order, ¶ 10.

## **Jurisdiction**

2.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Background**

3.    On April 1, 2008 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors in possession.

4.    The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On April 11, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of creditors (the "Creditors' Committee").

5.    Lexington is one of North America's leading manufacturers of rubber components for the automotive and medical device industries.  Lexington operates through two business divisions—the Rubber Group and the Metals Group.  Lexington's products are component parts and its primary customers are other manufacturers.

6.     The Rubber Group serves three principal markets.  Connector seal products are used in primary wire harnesses and sold mostly to companies which supply parts to original equipment manufacturers ("OEMs") in the automotive industry.  The connector seals business thus is sensitive to production levels in the North American automotive OEM industry.  Insulator products are used in ignition wire sets and the primary purchasers of these products are replacement parts suppliers to the automotive aftermarket segment, although Lexington also sells some insulators to the OEM segment.  The insulators business thus is less sensitive to OEM production levels.  The Rubber Group also manufactures and sells high-precision rubber components used in a variety of medical devices, including drug delivery systems, syringes, laparoscopic instruments, and catheters; these parts are sold to some of the world's largest medical device manufacturers.

7.     The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks primarily for manufacturers within the OEM automotive industry.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

8.     Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of December 31, 2008, Lexington had approximately 480 employees, of which 114 are salaried employees and 366 are hourly employees.

## The Prepetition Credit Facilities

9.     The Debtors are parties to a Credit and Security Agreement, dated as of May 31, 2006 (the "Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as

lender and co-documentation agent, and other lenders, as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver"). The Credit Agreement provides for a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and an equipment term loan facility in the original amount of $12.5 million. As of February 2, 2009, approximately $21.3 million of the principal amount, inclusive of letters of credit, was outstanding under the Credit Agreement.

10.    Pursuant to the Credit Agreement, the Debtors granted to CapitalSource, as agent for the Credit Agreement Lenders, first priority liens and security interests in substantially all of the Debtors' assets – including receivables, equipment, general intangibles, inventory, contract rights, subsidiary stock, securities, leasehold interests, commercial tort claims, and proceeds and products of the foregoing – and second priority liens on the Debtors' real estate (collectively, the "Collateral").

11.    The Debtors also are parties to a Loan and Security Agreement, dated as of May 31, 2006 (the "Loan Agreement" and, together with the Credit Agreement, the "Prepetition Credit Agreements"), with CSE Mortgage LLC, as lender, collateral agent, and administrative agent (together with CapitalSource, as collateral and administrative agent under the Credit Agreement, the "Prepetition Agents"), DMD Special Situations, LLC, as lender, and other lenders, as amended pursuant to the Default Waiver. The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original amounts of $11 million and $4 million, respectively. As of February 2, 2009, approximately $9.2 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

12.    Pursuant to the Loan Agreement, the Debtors granted to CSE, as agent for the Loan Agreement lenders, first priority liens and security interests in the Debtors' real estate and second priority liens on substantially all of the other Collateral.

13.    As of February 2, 2009, the Debtors were obligated to the Prepetition Senior Lenders in the approximate aggregate principal amount of $33.6 million, plus accrued and unpaid interest in the amount of approximately $9,000.  The borrowings under the Prepetition Credit Agreements have been used by the Debtors to purchase equipment for use in their businesses and meet their working capital needs in the ordinary course of business.  As discussed at ¶¶ 23-24 and 29-45, below, the value of the assets encumbered by the Prepetition Senior Lenders' liens significantly exceeds the aggregate amount of the obligations owed under the Prepetition Credit Agreements.

14.    Since the Commencement Date, and pursuant to the First Cash Collateral Order, the Debtors have made principal payments of $2,694,444.40 to the Prepetition Senior Lenders, reducing the indebtedness under the Prepetition Credit Agreements.  They also have paid, in cash, all interest accrued during the chapter 11 cases, in the aggregate amount of $1,959,153.10, and paid $423,812.37 in fees and expenses of the Prepetition Senior Lenders.

**Events During the Chapter 11 Case and the Debtors' Financial Performance**

15.    Notwithstanding extraordinarily challenging general economic conditions and the collapse of sales in the North American automobile OEM sector, the Debtors have continued to generate positive cash flow and their business lines that are not heavily dependent on the OEM sector have performed well during the chapter 11 cases.  For 2008, the insulators business, which primarily serves the automotive aftermarket, generated net sales of $32.3 million and earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $7.8 million,

or 24.1% of net sales.  The medical business generated net sales of $16.4 million and EBITDA of $5.0 million, or 30.5%of net sales.  The connector seals business, serving primarily the OEM market, was roughly break-even for 2008, generating sales of $13.9 million and EBITDA of under $300,000.  Overall, the Debtors' EBITDA for 2008 was $8.6 million, before deducting reorganization expenses.

16.     Despite the challenges posed by economic conditions and continued uncertainty regarding the ultimate outcome of these chapter 11 cases, the insulators and medical businesses are poised for growth and increased profitability in 2009.  The aftermarket portion of the insulators business is experiencing widely-recognized counter-cyclical growth as consumers defer purchases of new automobiles and increase spending on maintenance of older vehicles, resulting in greater demand for replacement parts, particularly consumable parts such as ignition wire sets.[5]  The medical business is seeing increased volumes for existing parts and orders for new parts, based largely on customer satisfaction with the Debtors' performance in quality, service, and price.  For 2009, the Debtors forecast that the insulators business will generate net sales of $36.7 million and EBITDA of $8.7 million, or 23.6% of net sales, and the medical business will generate net sales of $20.9 million and EBITDA of $6.6 million, or 31.6% of net sales.

17.     When these cases began in April of 2008, the Debtors anticipated a relatively brief stay in chapter 11 to de-leverage the company's balance sheet without the need for operational restructuring.  This was reflected in a schedule to complete the chapter 11 cases within 330 days, which was negotiated with the Prepetition Senior Lenders and incorporated into the First Cash Collateral Order.  The First Cash Collateral Order set forth milestones for the

---

[5] *See* Jonathan Welsh, "The Hot New Car Is Your Old Car," The Wall Street Journal, January 14, 2009, at p, D1 (discussing increasing sales trends in the automobile parts and service sector).

filing of a chapter 11 plan, the filing of a proposed disclosure statement, and the consummation of a chapter 11 plan. Under the First Cash Collateral Order, the Debtors' use of cash collateral during these cases ends on the earlier of February 25, 2009 or the expiration of the Debtors' exclusive right to propose a chapter 11 plan.

18.     The Debtors worked diligently to adhere to the original 330-day schedule. They filed their Joint Plan of Reorganization, dated June 30, 2008 (the "Plan"),[6] which provided for satisfaction in full of the claims of all creditors and for a return for existing equity holders. On August 8, 2008, the Debtors filed an Amended Joint Plan of Reorganization[7] and a proposed disclosure statement.[8] On October 24, 2008, the Debtors moved for approval of the disclosure statement. The Debtors subsequently filed a Second Amended Joint Plan of Reorganization (the "Second Amended Plan")[9] and a revised disclosure statement (the "Proposed Disclosure Statement").[10]

19.     The Second Amended Plan is conditioned on the closing of an exit financing facility in an amount sufficient to pay off the Prepetition Senior Lenders, make other payments to creditors on the effective date, and provide necessary working capital for the continued operation and growth of the Debtors' business. The Debtors are actively pursuing exit

---

[6] Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 30, 2008 [Docket No. 196].

[7] Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 8, 2008 [Docket No. 305].

[8] Proposed Disclosure Statement for Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 8, 2008 [Docket No. 306].

[9] Exhibit A to the Proposed Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated December 17, 2008 [Docket No. 489].

[10] Proposed Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated December 17, 2008 [Docket No. 489].

financing from two large, institutional lenders, as well as other sources of capital, and will present evidence at the hearing on this Motion regarding the status of negotiations with prospective exit lenders and the Debtors' prospects for obtaining financing. During the last weeks of 2008, however, it became clear to the Debtors that the institutional lenders with whom they were in negotiations were unlikely, in the near term, to commit to lend in an amount sufficient to fund the Second Amended Plan due to the dramatic deterioration in the credit markets and general hesitancy to make loans secured by industrial real estate assets. In addition, the Debtors determined that their ability to complete a satisfactory exit financing was being adversely affected by the lack of cash flow from their connector seals business; as a result, the Debtors concluded it was necessary to undertake an operational restructuring of their connector seals business, both to maximize the value of the Debtors' estates for the benefit of all parties-in-interest and to improve the prospects of obtaining new financing. The operational restructuring should have multiple benefits, including a reduction in the aggregate amount of exit financing required, a significant increase in the cash flows available to support that financing, and a reduction in the risk to the Debtors' cash flows in the event that automotive production deteriorates further.

20.      The Debtors have developed an operational restructuring plan for the closing of the Vienna, Ohio facility, which produces connector seals, and the transfer of a portion of the connector seals business to the Jasper, Georgia, Rock Hill, South Carolina, and North Canton, Ohio facilities (the "Connector Seals Consolidation"). The Debtors have also produced a financial forecast reflecting the implementation of the Connector Seals Consolidation, which indicates that this consolidation should generate net cash proceeds of approximately $6.4 million, after the costs of completing the transfers, and that the business transferred to the Debtors' other

facilities should generate net sales of approximately $11.0 million and EBITDA of approximately $3.6 million in 2010, based upon the projected automotive production levels provided by the industry forecasting services the Debtors utilize. The Debtors believe that the implementation of the Connector Seals Consolidation will serve to maximize value and will significantly enhance their ability to consummate their exit financing on satisfactory terms.

### **Anticipated Path to Conclusion of the Chapter 11 Cases**

21.    The Debtors seek authorization to continue use of cash collateral through December 31, 2009, to allow sufficient time to complete the Connector Seals Consolidation, obtain a commitment for exit financing that would allow payment in full of the claims of the Prepetition Senior Lenders, and confirm and consummate the Second Amended Plan or, if appropriate, an amended version of that plan that would reflect Campbell's most up-to-date valuation after the completion of the Connector Seals Consolidation. Because the Prepetition Senior Lenders are adequately protected, as discussed herein at ¶¶ 23-24 and 29-45, the Court should authorize continued use of cash collateral and allow the reorganization process to continue on the current path, which offers the highest probability of achieving exactly what the Prepetition Senior Lenders desire: satisfaction of their claims in full, in cash.

22.    While the Debtors remain optimistic about their prospects of obtaining exit financing, they recognize that current conditions in the credit markets are incredibly difficult even for a well-diversified business with positive cash flow, such as Lexington, and acknowledge that there is no guarantee that exit financing will be available during 2009. Even if it proves impossible for the Debtors to obtain a timely exit financing commitment, however, there remains a path to successful and timely consummation of the Debtors' plan of reorganization without the necessity for the sale of some or all of the Debtors' assets in a "fire-sale" atmosphere that is likely to wipe out substantial value that otherwise would be available for

distribution to unsecured creditors and holders of equity interests. Section 1129(b)(2)(A) of the Bankruptcy Code permits confirmation of a plan over the objection of a class of secured creditors. The Debtors have determined that the Second Amended Plan could be amended further to provide that the Prepetition Secured Lenders' claims could be "crammed down" over their objection under section 1129(b)(2)(A)(i) in the event the Debtors cannot obtain a timely commitment for new financing. Deferring the payment in full of the Prepetition Secured Lenders' claims and leaving their existing liens intact pursuant to section 1129(b)(2)(A)(i) is not the Debtors' first choice, but doing so would leave Lexington with sufficient resources to make principal and interest payments to the Prepetition Senior Lenders and the other payments required by the Second Amended Plan and provide sufficient working capital for its post-emergence business needs. Accordingly, the Debtors have determined that confirmation under section 1129(b)(2)(A) is a viable alternative, or "Plan B", if an exit financing commitment cannot be obtained within a reasonable time period.

**The Value of the Secured Assets Exceeds the Claims of the Prepetition Senior Lenders**

23.    The value of the collateral securing the interests of the Prepetition Secured Lenders significantly exceeds their claims. There is, therefore, virtually no risk to the Prepetition Secured Lenders that the value of that collateral will diminish below the value of their claims. For starters, even in an absolute worst-case scenario – conversion of these cases to a chapter 7 liquidation – the value likely to be recovered substantially exceeds the claims under the Prepetition Credit Agreements. The Debtors' liquidation analysis shows likely net proceeds of $42 million, after expenses of liquidation – more than enough to satisfy in full the claims of the Prepetition Senior Lenders. *See* Proposed Disclosure Statement at Exhibit G. The Prepetition

Senior Lenders did not contest the liquidation analysis in their objection to the Debtors' motion for approval of the Proposed Disclosure Statement. [11]

24.    At the hearing on this Motion, the Debtors will demonstrate that, on a going-concern basis, the Collateral in which the Prepetition Senior Lenders hold security interests is worth several *multiples* of the claims under the Prepetition Credit Agreements. The Debtors' financial advisors, W.Y. Campbell ("Campbell"), updated their valuation analysis in December 2008 to take into account changes in the marketplace that occurred in the fourth quarter of 2008, the Debtors' actual financial performance, and their updated financial projections. Campbell's conclusion is that the Debtors' going-concern value is $120 million, more than three times the aggregate claims of the Prepetition Senior Lenders. The value of the "core" assets alone – just the insulators business and the medical business – is over $90 million. [12] While the Committee disagrees with the Campbell valuation and urges a lower number, the limited information it has shared with the Debtors to date indicates that its professionals also value the Debtors at an amount far in excess of the claims of the Prepetition Secured Lenders. The Prepetition Secured Lenders thus enjoy a substantial equity cushion, which more than adequately protects them against any risk of diminution in the value of their collateral.

---

[11] Objection - Supplement To Objection Of Agents For Prepetition Senior Lenders To Debtors' Motion For Approval Of Disclosure Statement, Solicitation Procedures, And Confirmation Procedures, dated December 17, 2008 [Docket 484].

[12] The projections and valuations of Campbell reference herein are discussed in greater detail in Article V of the Proposed Disclosure Statement.

## Argument

### A.    Extraordinary Provision Under General Order No. M-274

25.    The following term of the proposed use of Cash Collateral is considered an "Extraordinary Provision" under the General Order M-274 of the United States Bankruptcy Court for the Southern District of New York:

- Liens on Chapter 5 Causes of Action.  Subject to entry of the Cash Collateral Order, as adequate protection for the use of the Prepetition Senior Lenders' Cash Collateral, Prepetition Senior Lenders shall continue to hold a first priority security interests and liens upon causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date.

### B.    Necessity for Use of Cash Collateral

26.    Without the use of Cash Collateral, the Debtors lack sufficient unencumbered funds with which to operate their businesses on an ongoing basis.  The Debtors, therefore, have an urgent and immediate need to continue their use of Cash Collateral for, among other reason, (i) working capital and capital expenditures, including the completion of the Connector Seals Consolidation, (ii) operating costs and expenses, and (iii) restructuring costs, including professional fees and expenses.

27.    Absent authorization from the Court to continue use of the Cash Collateral, the Debtors will be immediately and irreparably harmed.  The Debtors' ability to maintain business relationships with their customers and suppliers and to meet payroll and other operating expenses is essential to the Debtors' continued viability and the value of their businesses as going concerns, the maintenance of which inures to the benefit of all stakeholders in these cases.  Without the continued use of Cash Collateral, the Debtors  would be forced to cease business operations, terminate substantially all of their employees, and, in all likelihood, seek conversion of these cases to chapter 7.  That outcome likely would result in no recovery for

unsecured creditors and equity holders.  According to the Debtors' liquidation analysis, attached

as Exhibit G to their Proposed Disclosure Statement for the Second Amended Plan, liquidation

under chapter 7 would generate net proceeds of approximately $42 million from the sale of

assets on which the Prepetition Secured Lenders have liens.  While this amount is more than

sufficient to satisfy the claims of the Prepetition Secured Lenders, after payment of the DIP loan,

post-petition payables, and chapter 11 administrative expenses, there would be no value left for

distribution to holders of priority claims or general unsecured claims.

28.     The Debtors propose to continue their use of the cash in compliance with a

thirteen (13) week budget (the "Budget"), which is annexed hereto as Exhibit B.[13]  Two (2)

weeks prior to the expiration of the thirteen (13) week period covered by the Budget, the Debtors

shall provide a new budget (said budget and all subsequent budgets, the "New Budget") to the

Revolver Agent and Term Loan Agent, to cover the subsequent thirteen (13) week period.  The

Debtors' use of Cash Collateral under the New Budget shall automatically be deemed to be

approved by this Order unless and until (a) the Revolver Agent and Term Loan Agent object to

the New Budget by filing a motion seeking authorization to discontinue the Debtors' use of Cash

Collateral pursuant to the contested New Budget (the "Contested New Budget") and (b) obtain

an order prohibiting the Debtors' further use of Cash Collateral pursuant to a Contested New

Budget.  The Debtors shall be permitted to continue use of Cash Collateral pursuant to a

Contested New Budget until the Court orders otherwise.

## C.     Legal Standard For Use of Cash Collateral And Adequate Protection

29.     Section 363 of the Bankruptcy Code governs a debtor's use of cash

collateral.  Under section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity

---

[13] The initial Budget will be updated prior to the hearing on this Motion to cover a period that extends 13
weeks from the hearing date.

that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(a) defines "cash collateral" as follows:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(c)(2).

30.    It is universally acknowledged that a debtor's cash "is the life blood of the business" and the bankruptcy court must assure that such "is available for use even if to a limited extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a debtor to use cash collateral to continue its operations so long as the interests asserted by affected creditors in such cash are adequately protected.

31.    If a secured creditor objects to the debtor's proposed use of cash collateral, the court must ensure that the creditor's interests are adequately protected. *Id.* at § 363(e) (" . . . [O]n request of an entity that has an interest in property used . . . the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest"). Thus, courts are required to balance the protection offered to a secured creditor against the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In determining whether a creditor is adequately protected, courts "will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections . . . ." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

32.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

33.    The determination of adequate protection is a "fact-specific inquiry." *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The focus of the adequate protection requirement is to preserve a secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. *Id.* at 288 (citation omitted); *Beker*, 58 B.R. at 736; *see In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."). "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties." *Id.* at 619; *see Beker*, 58 B.R. at 741 ("*Adequate* protection, not *absolute* protection, is the statutory standard.") (emphasis added).

34.    Consistent with these requirements, courts have repeatedly recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. *See, e.g., Dynaco,* 162 B.R. at 394 (granting motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business"); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (George Ruggiere Chrysler-Plymouth, Inc.),* 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1399 (10th Cir. 1987) (permitting debtor to use cash collateral to expand operations after finding there was only a low risk that secured creditor's interest would diminish); *Stein,* 19 B.R. at 459 (granting cash collateral motion and declaring that access to cash is imperative for a debtor to operate its business). Courts have also authorized similar relief in other chapter 11 cases. *See, e.g., In re Constable Plaza Assocs., L.P.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (recognizing that the debtor's use of cash collateral to operate and maintain office building would serve to preserve or enhance the value of the building, which in turn would protect the collateral covered by the lender's mortgage); *In re 499 W. Warren Street Assocs., L.P.,* 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (allowing the use of cash collateral to maintain property).

35.    In *Dynaco,* for example, the court approved the debtor's use of cash collateral over the creditor's objection and explained that, in ensuring that a secured creditor is adequately protected, courts must first determine the value of the creditor's interest and whether

the debtor's use of the cash collateral will impair that interest. 162 B.R. at 394. The court stated

that, early in a case, it will generally permit use of cash collateral (at least until confirmation) if a

debtor presents sufficient evidence of its ability to continue to operate and restructure. *Id.* at 395.

It noted that in the case of a floating lien,

> the appropriate adequate protection, and the concomitant valuation
> of collateral appropriate for a determination of adequate protection,
> is a showing that the *level* of such a fluctuating base of items of
> collateral that are constantly cycling through different shapes and
> forms, as the business operation continues, will in fact remain at
> the same magnitude (in terms of ongoing operating values) during
> the relevant period of debtor-in-possession business operation in
> the chapter 11 reorganization proceedings.

*Id.* at 394. Moreover,

> [i]f the debtors make a solid showing that their continued operation
> of their business during the relevant period will pose no serious
> danger of [a permanent decline in the level of the soft collateral
> supporting the creditor's floating lien], there is no need for any
> additional adequate protection in terms of "new money" to be
> infused into the enterprise to protect the secured creditor's present
> position in the collateral.

*Id.* at 394-95.

36.    The court ruled that, in the case before it, the debtors had presented

sufficient evidence illustrating that the recent decline in the value of the creditor's soft collateral

was an aberration and "did not take away from the debtors' demonstrated ability to generate new

business . . ., to collect a high percentage of receivables from their customers, and to manage

their affairs more efficiently and effectively . . . ." *Id.* Although the record indicated that the

debtors' collateral base would decline for a brief period postpetition, the court found that

evidence indicated that "the debtors will reverse that decline and restore the original level over a

more extended operational period." *Id.* at 392. The court explained that a long-term view of the

debtor's business projections was more appropriate than a "short-term snapshot." *Id.; see also In*

*re Megan-Racine Assocs. Inc.*, 202 B.R. 660, 663 (Bankr. N.D.N.Y. 1996) (noting, in connection

with motion to approve use of cash collateral, that "[w]hat is important at this juncture in the

case in any determination of additional adequate protection is the future stability of the value of

the Collateral, rather than any particular level of value at any one time since the case was

commenced."). The court concluded that the debtors had established that there was no

significant danger to the secured creditor that its secured interest "would not be restored within

the projected period of operations of the debtors' business." *Dynaco*, 162 B.R. at 398.

37.    In *Ruggiere*, a creditor held a security interest in a debtor automobile

dealer's property and its proceeds. 727 F.2d at 1018. The debtor proposed to provide protection

by: (i) continuing required interest payments, (ii) granting a security interest in all of the debtor's

existing collateral and newly-acquired inventory; and (iii) remitting to the creditor the wholesale

value of automobiles sold. *Id.* The bankruptcy court granted the motion, and the creditor

appealed, arguing that the debtor had not provided adequate protection. *Id.* at 1018-19. On

appeal, the Eleventh Circuit upheld the order allowing the debtor to use cash collateral

notwithstanding the creditor's opposition. *Id.* at 1018. The court acknowledged the competing

interests of allowing the debtor to use cash to rebuild and the need to protect creditors' security

interests. *Id.* at 1019. The court explained that "when a creditor opposes a proposed use of

collateral, the guiding inquiry is whether the security interests are 'adequately protected' absent

the additional protection that the cash collateral would provide." *Id.* The court determined that

the creditor's secured claim greatly exceeded the value of the collateral (*i.e.*, the creditor was

undersecured). *Id.* Nevertheless, because the car inventory was the principal collateral, the

wholesale value of the cars (the amount available from a commercially reasonable disposition)

was the only amount entitled to adequate protection. *Id.* Thus, the court ruled that allowing the

debtor to use cash collateral and requiring it to remit the wholesale value to the creditor did not

impair the creditor's secured interest. *Id.*

38.     In *MBank*, debtors sought to use cash collateral from a court-controlled

bank account to drill additional gas wells. 808 F.2d 1395. The debtors offered replacement liens

as protection for creditors claiming interests in the cash. *Id.* One creditor, claiming an interest in

the cash collateral, objected. *Id.* At a hearing, the debtor presented evidence of the revenue that

the drilling would likely generate as well as the value of the monthly income that the secured

party would receive. *Id.* The bankruptcy court concluded that the debtors' use of cash collateral

was in the best interest of the estate, and that the replacement liens adequately protected the

secured creditor. *Id.* The district court reversed, concluding that the bankruptcy erred in finding

the creditor adequately protected. *Id.*

39.     The Tenth Circuit, however, determined that the bankruptcy court did not

err in authorizing the debtor's use of cash collateral. *Id.* The appellate court, observing that

adequate protection is a question of fact, concluded that the bankruptcy court had ample

evidence to support its conclusion. *Id.* at 1397. One of the debtors had testified that wells would

be located in areas with a strong likelihood of success, that 148 of 150 existing wells were still

producing, and that buyers existed to buy the product and provide cash flow greater than the

creditor's proceeds lien. *Id.* The Tenth Circuit further opined that the debtors sought to use cash

collateral for "the purpose of enhancing the prospects of reorganization," and that "this quest is

the ultimate goal of chapter 11." *Id.* The court explained that, when authorizing the use of cash

collateral, courts must preserve the value of the collateral. *Id.* at 1398. Prior to confirmation of a

reorganization plan, however, courts should be flexible in applying the adequate protection

standard. *Id.* The Tenth Circuit stated that the only distinction between the creditor's security

interest in the existing cash compared with its potentially greater interest provided by the substitute liens was the risk associated with drilling the new wells. *Id.* The court concluded that the bankruptcy court did not err in determining that such risk was insignificant. *Id.* Accordingly, the court reversed, directing the bankruptcy court to reinstitute its order authorizing the debtors to use the cash collateral. *Id.* at 1399.

40.     In *Stein*, the bankruptcy court for the Eastern District of Pennsylvania granted a debtor's request to use cash collateral over the secured creditor's objection. *Stein*, 19 B.R. at 458. In that case, the debtor sought to use cash proceeds, from a contract with a third party, for operational costs during the chapter 11 case. *Id.* at 459. A secured creditor, holding liens on the debtor's collateral and proceeds therefrom, objected to the debtor's request. *Id.* Ruling in the debtor's favor, the court acknowledged two competing concerns: (i) "protecting the holder of a lien on cash collateral against unrestricted use of such collateral," and (ii) rehabilitating the chapter 11 debtor by allowing it to use the cash collateral where necessary to operate the debtor's business." *Id.* In weighing these two factors, the court first observed that the objecting creditor was undersecured. *Id.* at 460. Nevertheless, the court explained that the debtor's continued operation was the only means by which the creditor's secured position could be enhanced. *Id.* A creditor is not entitled to more protection that it received when making the loan. *Id.* The court concluded that the facts of the case and the "[Bankruptcy] Code's policy favoring rehabilitation" justified allowed the debtor to utilize the cash proceeds of its operations. *Id.*

D.     **The Use Of Cash Collateral And Proposed Adequate Protection Should Be Approved**

41.     Cash is necessary for working capital and capital expenditures, and operating costs and expenses during these chapter 11 cases. As set forth above, the Debtors do

not have adequate sources of working capital and financing to carry on the operation of their

businesses without the use of Cash Collateral. The Debtors' ability to maintain business

relationships with their vendors, suppliers and customers and to meet payroll and other operating

expenses is essential to the Debtors' continued viability and the value of their businesses as

going concerns. The use of Cash Collateral is therefore critical to the preservation and

maintenance of the going concern value of the Debtors, as well as the value of the Prepetition

Senior Lenders' Collateral, and is critical to the Debtors' ability to reorganize.

42.    As this Motion establishes, and as will be demonstrated at the hearing on

the Motion, the Prepetition Senior Lenders are oversecured and the surplus of the Prepetition

Senior Lenders' collateral's value in excess of the amount outstanding under the Prepetition

Credit Agreements constitutes more than sufficient adequate protection for the use of the Cash

Collateral. Even though the Prepetition Senior Lenders are oversecured, continuation of certain

economic terms under the First Cash Collateral Order adequately protect the Prepetition Senior

Lenders' interest in the Cash Collateral from any diminution in value (the "Proposed Adequate

Protection").

43.    The strength of the Debtors' businesses and the Proposed Adequate

Protection is more than sufficient to allow the Debtors to utilize cash for the necessary operation

of their businesses during these chapter 11 cases, while at the same time protecting the

Prepetition Senior Lenders' interest in the estates from any diminution of value. *See Stein*, 19

B.R. at 459. In addition, the substantial equity cushion in the Prepetition Senior Lenders'

collateral further protects their interest. Accordingly, the risk to the Prepetition Senior Lenders is

very low and the Court should, therefore, determine that they are adequately protected. *See, e.g.,*

*MBank*, 808 F.2d at 1398 (observing that prior to confirmation of a reorganization plan, courts should be flexible in applying the adequate protection standard).

44.    The Debtors have made substantial progress in the chapter 11 process, but unanticipated events in the OEM automotive sector have necessitated further restructuring efforts and a longer stay in chapter 11.  Discontinuing use of cash collateral at this critical juncture would "force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case." *Dynacorp*, 162 B.R. at 396.  Because this result would contravene the rehabilitative purpose of chapter 11, approval of the Debtor's motion is warranted.  *Id.* at 394 (noting that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible") (quoting *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

45.    In the circumstances of these chapter 11 cases, the Debtors' ability to complete the Connector Seals Consolidation, maintain business relationships with their customers and vendors, and to meet payroll and other critical operating expenses is essential to the Debtors' continued viability and the value of their businesses as a going concern.  Indeed, absent continued use of the cash collateral, the Debtors' businesses will be brought to an immediate halt, with disastrous consequences for the Debtors, their estates, and creditors.  Continued use of the cash collateral is therefore the utmost importance to the preservation and maintenance of the value of the Debtors, essential to the completion of the Connector Seals Consolidation and necessary for the successful consummation of a chapter 11 plan.

## Conclusion

46.     The Prepetition Senior Lenders are significantly oversecured.  They are adequately protected by a substantial equity cushion and have virtually no risk that they will not be able to realize the value of their claims in full even in an absolute worst-case scenario of conversion to a chapter 7 liquidation.  The equity cushion alone is sufficient to adequately protect the interests of the Prepetition Secured Lenders, but on top of that the Debtors propose to continue cash payments to reduce the principal of the outstanding secured debt and current payment of accruing interest.  And as further adequate protection, the Debtors propose to continue replacement liens in all Article 5 causes of action.  This more than satisfies the adequate protection requirements of section 363(c)(2).  The Court therefore should authorize the Debtors to continue use of cash collateral.

## Notice

47.     No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this motion has been provided to (i) the United States Trustee for the Southern District of New York, (ii) the attorneys for the agents for the Debtors' Prepetition Lenders, (iii) the attorneys for the Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee, and (v) all other parties that have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

48.    Other than the relief provided under the First Cash Collateral Order, no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: February 2, 2009
        New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **EXHIBIT A**

**(Cash Collateral Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                   :

In re                             :         **Chapter 11 Case No.**

                                   :

**LEXINGTON PRECISION CORP., et al.,**   :         **08-11153 (MG)**

                                   :

        **Debtors.**                    :         **(Jointly Administered)**

                                   :

---------------------------------------------------------------x

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 362, AND 363 AUTHORIZING DEBTORS USE OF CASH COLLATERAL

Upon the Motion, dated February 2, 2009 (the "Motion") of Lexington Precision

Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber"

and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, for

an order, pursuant to sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), authorizing the use of Cash Collateral (as defined below),

all as more fully described in the Motion and herein; and the Court having jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and

the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) the attorneys for the

agents for the Debtors' Prepetition Senior Lenders (as defined below), (iii) the attorneys for the

Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee (as defined below),

1

and (v) all other parties that have requested notice in these chapter 11 cases, and it appearing that

no other or further notice need be provided; and a hearing having been held on February 23,

2009, to consider the Motion (the "Hearing"); and the relief requested in the Motion being within

the guidelines for financing requests set forth in General Order M-274 of the United States

Bankruptcy Court for the Southern District of New York; and the relief requested in the Motion

being in the best interests of the Debtors and their estates and creditors; and the Court having

reviewed the Motion; and based on the evidence adduced at the Hearing in support of the

Motion; and the Court having determined that the legal and factual bases set forth in the Motion

and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

**THE COURT HEREBY FINDS:**

A.      On April 1, 2008 (the "Commencement Date"), Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

B.      Debtors have retained possession of their property and continue to operate and

manage their business as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  On April 11, 2008, a statutory committee of unsecured creditors (the

"Creditors' Committee") was appointed in these chapter 11 cases.  No trustee, examiner, or any

other committee has yet been appointed in these chapter 11 cases.

C.      Prior to the Commencement Date, the Prepetition Senior Lenders (as defined

below) made certain loans and other financial accommodations available to the Debtors pursuant

to, among other things, the following documents (collectively, with any and all other agreements,

instruments, and related documents, including without limitation, guaranties, pledges, and

2

discretionary funding letters executed by any Debtor and any Other Documents (as defined in each of the Credit Agreement (defined below) and the Loan Agreement (defined below)), the "Prepetition Senior Lender Loan Documents"):

        (i)      that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent;

        (ii)      that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent") (Revolver Agent and Term Loan Agent, collectively, the "Agents"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as the Term Loan Agent and a lender under the Loan Agreement, along with the Revolver Agent and the Prepetition Revolver Lenders, collectively, the "Prepetition Senior Lenders");

        (iii)      that certain First Amendment and Default Waiver Agreement between Debtors and CapitalSource, Webster, CSE and DMD in their various capacities dated as of November 20, 2006; and

(iv)      that certain Agreement dated as of May 18, 2007 by and among the

Debtors, Agents (in their capacities as agents and lenders) and the other Prepetition Senior

Lenders, as amended by that certain First Amendment to Forbearance Agreement, dated as of

July 20, 2007, as further amended by that certain Second Amendment to Forbearance Agreement

effective as of September 24, 2007, and as further amended by that certain Third Amendment to

Forbearance Agreement executed December 11, 2007 and deemed effective as of November 26,

2007 (collectively, the "Forbearance Agreement").

D.    The Court (J. Gonzalez) approved the use of Cash Collateral by order dated April

17, 2008 [Docket No. 61] (the "First Cash Collateral Order").

E.    As of the date of the Motion, the aggregate principal amount of $20,469,468.82

and $4,260.86 in accrued but unpaid interest was outstanding under the Credit Agreement and

$853,000 of letters of credit that were issued under the Credit Agreement were outstanding, and

the aggregate principal amount of $13,166,666.70 and $4,962.86 in accrued but unpaid interest

was outstanding under the Loan Agreement (collectively with all other Obligations, as defined in

the Prepetition Senior Lender Loan Documents, including, without limitation, costs, fees

(including without limitation allowed prepayment or termination fees) and expenses that were

outstanding under the Prepetition Senior Lender Loan Documents as of the Commencement

Date, the "Prepetition Senior Secured Debt").

F.    All the Prepetition Senior Secured Debt is secured by the security interests in the

Collateral (as defined below) previously granted under the Prepetition Senior Lender Loan

Documents to the Prepetition Senior Lenders, that the Agents have, and will continue to have

after entry of this Order, a legal, valid, enforceable, non-avoidable and continuing duly-perfected

first priority security interest (and junior security interest, as applicable, subject to the terms of

that certain Intercreditor Agreement dated as of May 31, 2006 between Revolver Agent, as agent

and lender, Revolver Lenders, Term Loan Agent, as agent and lender, and Term Loan Lenders

(the "Intercreditor Agreement")) in and lien on the Collateral, as more fully described and

defined in the Prepetition Senior Lender Loan Documents (all such "Collateral", as the same

existed on or at any time prior to the Commencement Date, together with all cash and non-cash

proceeds thereof, shall be hereinafter referred to as "Senior Lender Prepetition Collateral" and

such liens thereon shall be referred to as the "Senior Lender Prepetition Liens"), subject to no

liens or security interests other than the liens expressly permitted under the Prepetition Senior

Lender Loan Documents;

G.    All cash of the Debtors wherever located from the Commencement Date through

the date hereof (other than the funds in the DIP Account (as defined in the First Cash Collateral

Order)) represents either proceeds of loans under the Prepetition Senior Lender Loan Documents

or proceeds of the Senior Lender Prepetition Collateral; and pursuant to the Prepetition Senior

Lender Loan Documents and section 552(b) of the Bankruptcy Code, the Prepetition Senior

Lenders have a valid, duly perfected, first-priority lien upon and security interest in and to all of

the cash of the Debtors (other than the cash in the DIP Account (as defined below)), and these

funds, along with the proceeds of the Senior Lender Prepetition Collateral, constitute "cash

collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

H.    The Debtors have an immediate need to continue their use Cash Collateral and

obtain funds in order to permit and as previously provided by the First Cash Collateral Order,

among other things, the orderly continuation of the operation of their businesses, to maintain

business relationships with vendors, suppliers and customers, to meet payroll, to make capital

expenditures, to satisfy other working capital and operational needs, and satisfy the cost of

administering these chapter 11 cases. Good cause has been shown for the entry of this Order. Use of Cash Collateral and the obtaining of funds is vital to avoid immediate and irreparable harm to Debtors' estates.

      I.      The Debtors have requested that the Prepetition Senior Lenders consent to the use of their Cash Collateral. The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors using such Cash Collateral. The Prepetition Senior Lenders have not consented to the Debtors' use of Cash Collateral. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code, Bankruptcy Rules 4001 and 6003 and Local Bankruptcy Rule 4001-3 and serve to adequately protect the Prepetition Senior Lenders'interest the Collateral securing their claims under the Prepetition Credit Agreements.

      J.      Based on the record before the Court, the terms of the use of the Prepetition Senior Lenders' Cash Collateral as provided in this Order are in the best interests of the Debtors, their estates, and creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

      1.      The Motion is hereby granted, with the foregoing findings incorporated herein by reference, and with any objections to the Motion that have not previously been withdrawn or resolved being hereby overruled.

<u>Authorization to Use Cash Collateral</u>

      2.      Subject to the terms and conditions set forth in this Order, the Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use the Cash Collateral for the period of time from the date hereof until the earlier of December 31, 2009 or the occurrence of a Termination Event (as defined below).

      3.      The Debtors shall use Cash Collateral only for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors (including, without

limitation, the making of Adequate Protection Payments (as defined below)), and (c) the costs of administration of these chapter 11 cases, with each of the foregoing in compliance with a thirteen (13) week budget (the "Budget");[1] provided, however, that such use does not exceed, in the aggregate, 10% of the cumulative expenditures set forth in the Budget and the New Budget, as applicable, as measured from the date of this Order through the Date of Determination (as defined below), with bi-weekly reports that will be provided to the Revolver Agent and Term Loan Agent by 5:00 p.m. on Tuesday following the end of the second week being reported, showing comparisons and percentage variance by line item as well as on a cumulative basis.

4.    Two (2) weeks prior to the expiration of the thirteen (13) week period covered by the Budget, the Debtors shall provide a new budget (said budget and all subsequent budgets, the "New Budget") to the Revolver Agent and Term Loan Agent, to cover the subsequent thirteen (13) week period.  The Debtors' use of Cash Collateral under the New Budget shall automatically be deemed to be approved by this Order unless and until (a) the Revolver Agent and Term Loan Agent object to the New Budget by filing a motion seeking to discontinue the Debtors' use of Cash Collateral pursuant to the contested New Budget (the "Contested New Budget") and (b) obtain an order prohibiting the Debtors' further use of Cash Collateral pursuant to a Contested New Budget.  The Debtors shall be permitted to continue use of Cash Collateral pursuant to a Contested New Budget until the Court orders otherwise.

Adequate Protection

5.    As adequate protection for the Debtors' continued use of Cash Collateral, the Prepetition Senior Lenders shall receive the following:

(i)    adequate protection payments ("Adequate Protection Payments") in amounts equal to the following amounts, provided, only in the event that it is determined that the claims of the Agents and the Prepetition Senior Lenders are not fully secured, the Adequate Protection Payments shall be subject to reallocation, recharacterization, or disgorgement, after

---

[1] The Budget is annexed hereto as Exhibit A.

notice and a hearing before the Court, (a) interest payments (at the contractual non-default rate) and (b) principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein.

(ii)    for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, (a) replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date (including, without limitation, cash and receivables and the proceeds thereof, whether existing or hereafter acquired after the Commencement Date and whether or not deposited in the Master Operating Account), (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all encumbered assets which were not otherwise subject to the Prepetition Secured Lenders' liens as of the Commencement Date (collectively, the "Adequate Protection Liens"); provided, however, that the Adequate Protection Liens shall (w) be subject to the Carve-Out (as defined below), (x) exclude any insurance policy (but not exclude the Debtors' entitlement, if any, to payments thereunder (subject to the Senior Lender Prepetition Liens and the Adequate Protection Liens) net of any amounts that may be due to an Insurance Premium Finance Party (as such term is defined in the Prepetition Senior Lender Loan Documents) with respect to such policy) where, subject to authorization of the Court, security interests and liens are granted to an Insurance Premium Finance Party on the Insurance Premium Collateral (as such term is defined in the Prepetition Senior Lender Loan Documents, provided that in no instance will the Insurance Premium Finance Party be granted a security interest in or lien on the DIP

8

Account or the Master Operating Account) to secure the indebtedness of the Debtors to an

Insurance Premium Finance Party in connection with insurance policies maintained by the

Debtors arising as a result of such Insurance Premium Finance Party entering into arrangements

to allow the Debtors to pay all or a portion of the applicable insurance premiums on such

insurance policies in installments rather than in one lump sum annual payment; _provided_ that the

Debtors shall continue to abide by the requirements under sections 4.11 of each of the Credit

Agreement and the Loan Agreement, _provided_, _however_, that notwithstanding anything

contained in said sections to the contrary, amounts payable to Agents as loss payees under a

casualty or property insurance coverage shall be reduced by amounts owed, if any, to the

Insurance Premium Finance Parties with respect to such policies; and _provided_ _further_ that such

indebtedness of the Debtors to all Insurance Premium Finance Parties shall not exceed the

aggregate principal amount outstanding of $800,000 at any one time ("Insurance Premium

Financing"); and (y) neither prime nor impair any perfected liens or perfected security interests

in the same collateral that are senior in rank and priority to the Senior Lender Prepetition Liens

or the Adequate Protection Liens under applicable nonbankruptcy law as of the Commencement

Date, such as statutory liens, if any, that are senior in priority as a result of being perfected under

applicable state law prior to the granting of the Adequate Protection Liens; and _provided_ _further_,

_however_, except as expressly set forth in this Order, the Adequate Protection Liens granted

herein shall not be subject to any liens that are avoided and preserved for the benefit of any of

the Debtors' estates under section 551 of the Bankruptcy Code, and shall not be subordinated to

or made _pari passu_ with any other lien under section 364(d) or any other section of the

Bankruptcy Code or otherwise; and

(iii)        for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, an administrative expense claim pursuant section 507(b) of the Bankruptcy Code (the "Adequate Protection Claim"), which shall be senior to any and all other claims (including the DIP Super-Priority Claim (as defined in the First Cash Collateral Order, as defined below), but subject to the Carve-Out (as defined below).

6.        The Adequate Protection Liens on property of the Debtors' estates granted herein, including without limitation the security interests and liens in postpetition cash and receivables, the Master Operating Account, the DIP Account and proceeds of each of the foregoing, are valid, binding, effective, enforceable, and fully perfected, and no filing or recordation or other act in accordance with any applicable local, state, for federal law, rule, or regulation, is necessary to create or perfect such Adequate Protection Liens. The above provision notwithstanding, Debtors shall cooperate with Prepetition Senior Lenders to execute such documents and instruments, and do such other things as Prepetition Senior Lenders may reasonably request, to evidence and perfect such Adequate Protection Liens for the convenience and information of third parties, and to evidence the obligations undertaken by the Debtors hereunder.

Termination Events

7.        With respect to the use of Cash Collateral hereunder, each of the following shall constitute a "Termination Event":

(i)        the closing or dismissal of the chapter 11 cases;

(ii)        the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code;

(iii)        the appointment in these chapter 11 cases of a chapter 11 trustee or an examiner with expanded powers to operate or manage the financial affairs, the businesses or the reorganization of any Debtor;

(iv)        non-compliance by any Debtor with any of the terms or provisions of this Order;

(v)        entry of an order by the Court prohibiting the use of Cash Collateral pursuant to a Contested New Budget;

(vi)        Debtors' failure to consummate their chapter 11 plan of reorganization and emerge from chapter 11 of the Bankruptcy Code on or before December 31, 2009, subject to the Debtors' right to seek further extensions of such period or by consent of the Prepetition Senior Lenders; or

(vii)        entry of an order providing for the sale of more than $1,000,000 (to be measured in aggregate purchase price and/or book value, whichever is greater for each asset sold) of the Debtors' assets that does not provide that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be applied to the Prepetition Senior Secured Debt in accordance with the terms set forth in the Prepetition Senior Lender Loan Documents (subject to the Intercreditor Agreement) on the sale closing date, or for which sale the Prepetition Senior Lenders have not provided prior written consent (subject to the Intercreditor Agreement).

8.        Following the occurrence of a Termination Event, Debtors shall have five (5) business days after receipt of written notice from Revolver Agent and Term Loan Agent, on behalf of themselves, and the Prepetition Senior Lenders to cure such Termination Event, if it is capable of cure (the "Cure Period"). The Revolver Agent and the Term Loan Agent shall serve notice of the Termination Event on the Debtors, the U.S. Trustee, and the Creditors' Committee.

9.        If, upon the expiration of the Cure Period, the Debtors have not cured the Termination Event (assuming such Termination Event is curable) and the notice referred to in paragraph 8 has not been withdrawn (herein referred to as the "Termination Date"), (a) the Debtors shall cease all use of Cash Collateral and any authority of Debtors under this Order to use Cash Collateral shall terminate; and (b) the Prepetition Senior Lenders shall be granted,

without further action of the Prepetition Senior Lenders or the Court, immediate and automatic relief from the automatic stay under section 362 of the Bankruptcy Code, which shall be automatically terminated as it relates to the Senior Lender Prepetition Collateral and all other collateral in which Adequate Protection Liens have been granted without further action of the Prepetition Senior Lenders or this Court; provided, however, that upon the occurrence of a Termination Event pursuant to paragraph 7(iii), the termination of authority and relief referred to in clauses (a) and (b) above shall not be effective until the expiration of five (5) business days from such Termination Event under paragraph 7(iii). Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Prepetition Senior Lenders under this Order shall survive the Termination Date. In addition, upon the occurrence of the Termination Date, if instructed by the Revolver Agent and the Term Loan Agent, FirstMerit or any other bank or financial institution with which the Debtors establish an account, shall transfer all of the available funds on deposit in such account as directed by the Revolver Agent and the Term Loan Agent; provided, however, that if it is subsequently determined that the Prepetition Senior Lenders did not have Senior Lender Prepetiton Liens or Adequate Protection Liens on such accounts, the Prepetition Secured Lenders shall disgorge and repay to the Debtors' estates such portion of the funds as to which they did not have Senior Lender Prepetiton Liens or Adequate Protection Liens; provided, further, however, that notwithstanding the foregoing, (i) any existing deposit account control agreements shall continue in full force and effect subject to the terms of this Order, and (ii) within 45 days of the establishment of a new bank account, deposit account, securities account or other account, the Debtors, the Revolver Agent (for the benefit of the Prepetition Senior Lenders, subject to the Intercreditor Agreement) and each bank or financial institution with which the Debtors establish such deposit account shall enter into a deposit account control agreement or similar applicable agreement, which shall be in form and substance reasonably satisfactory to the Revolver Agent; provided, further, that the Debtors shall notify the Revolver

12

Agent in writing within five (5) business days thereof of the establishment of any new bank account, deposit account, securities account, or other account.

Carve-Out

10.     The Senior Lender Prepetition Liens, the Adequate Protection Claim, the Adequate Protection Liens, and the DIP Super-Priority Claim shall be subject to the payment of the following items (collectively, the "Carve-Out"): (i) fees of the clerk of the Bankruptcy Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000; provided, however, that prior to the occurrence of the Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the DIP Loans, as the same may be due and payable, all professional fees and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date.  For the avoidance of doubt, with respect to the Prepetition Senior Lenders, the Carve-Out for clauses (ii) and (iii) of the preceding sentence shall not exceed $500,000 in the aggregate.

13

Protection of Prepetition Senior Lenders

11.    With respect to any issued and outstanding letters of credit  (collectively,

the "Outstanding Letters of Credit"), the Debtors shall comply with the terms of section 2.7(k) of

the Credit Agreement, provided that in any event, such Outstanding Letters of Credit shall be

released and returned to the holder thereof within ninety (90) days of indefeasible payment in

full of the Senior Lender Prepetition Debt (subject to the provisions of paragraph 5(i) hereof).

12.    The provisions of this Order are binding upon all the parties in interest in

these chapter 11 cases, including, without limitation, the Prepetition Senior Lenders, the DIP

Lenders (as defined in the First Cash Collateral Order) and the Debtors, the Creditors'

Committee, and their respective successors and assigns (including any chapter 7 or chapter 11

trustee hereafter appointed or elected for the estates of the Debtors or an examiner appointed

pursuant to section 1104 of the Bankruptcy Code), and inure to the benefit of the Prepetition

Senior Lenders, the DIP Lenders and the Debtors and, except with respect to any trustee

hereinafter appointed or elected for the estates of the Debtors, their respective successors and

assigns.  In addition, neither the terms of this Order, nor the filing of these bankruptcy cases

generally, shall be deemed to modify or affect the respective rights and obligations among the

Prepetition Senior Lenders under the Intercreditor Agreement.

13.    The Prepetition Senior Lenders, having been found to be acting in good

faith, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and,

therefore, if any or all of the provisions of this Order are hereafter reversed, stayed, modified, or

vacated, such reversal, stay, modification, or vacation shall not affect (i) the validity of any

obligation, indebtedness, or liability incurred by the Debtors to the Prepetition Senior Lenders

prior to written notice to such party of the effective date of such reversal, stay, modification, or

vacation, or (ii) the validity and enforceability of any priority authorized or created hereby,

including, without limitation, the Adequate Protection Liens, the Adequate Protection Claim, the,

the Prepetition Senior Secured Debt, and the Senior Lender Prepetition Liens.  Notwithstanding

any such reversal, stay, modification, or vacation, any indebtedness, obligations, or liabilities

14

incurred by the Debtors to the Prepetition Senior Lenders prior to written notice to such party of the effective date of such reversal, stay, modification, or vacation shall be governed in all respects by the original provisions of this Order, and the Prepetition Senior Lenders shall be entitled to all the claims, priorities, rights, remedies, privileges, and benefits granted herein until the Senior Prepetition Secured Debt (subject to the provisions of paragraphs 5(i) and 11 hereof), Adequate Protection Claim is indefeasibly paid in full and discharged in cash.

Modifications/Amendments

14.    Any material and substantive modifications to the terms of this Order require (i) authorization of the Court or (ii) the prior written consent of the Prepetition Senior Lenders.

Notice

15.    Notice given by the Debtors of the Motion and of the Hearing constitutes due and sufficient notice of the Motion and of the Hearing.

Dated: February ___, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

15

**<u>EXHIBIT B</u>**

**(Budget)**

# LEXINGTON PRECISION CORPORATION

## FORECAST OF CASH RECEIPTS AND DISBURSEMENTS AND NET SALES FROM DECEMBER 26 THROUGH March 20, 2009

(in thousands of dollars)

| | Week Ended | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan | 6-Feb | 13-Feb | 20-Feb | 27-Feb | 6-Mar | 13-Mar | 20-Mar |
| **Cash receipts:** | 611 | 977 | 1,192 | 1,105 | 1,229 | 1,136 | 969 | 1,060 | 996 | 1,266 | 1,194 | 1,301 | 1,340 |
| **Cash disbursements:** | | | | | | | | | | | | | |
| Debt service: | | | | | | | | | | | | | |
| CapitalSource principal (1) | - | 269 | - | - | - | - | 269 | - | - | - | 269 | - | - |
| CapitalSource interest | - | 207 | - | - | - | - | 207 | - | - | - | 207 | - | - |
| CapitalSource fees (LOC & unused line) | - | 8 | - | - | - | - | 8 | - | - | - | 8 | - | - |
| DIP interest and fees | - | 35 | - | - | - | - | 35 | - | - | - | 35 | - | - |
| L&D | - | 203 | - | - | - | - | - | - | - | - | - | - | - |
| Payroll and payroll taxes | 214 | 417 | 68 | 554 | 255 | 556 | 277 | 566 | 266 | 517 | 282 | 581 | 282 |
| Retirement & Savings Plan 401(k) | 20 | 48 | 20 | 48 | 20 | 48 | 20 | 48 | 20 | 48 | 20 | 48 | 20 |
| Group Medical Care Plan Administrative Fees | - | - | - | 14 | - | - | - | - | 14 | - | - | - | 14 |
| Prescription drug plan | - | - | 15 | - | - | 25 | - | 15 | - | 25 | - | 15 | - |
| Reorganization professional fees and expenses | 240 | 80 | - | 40 | 160 | 80 | 40 | 196 | 100 | 160 | 50 | 80 | 100 |
| DIP legal counsel | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ordinary course professionals | 63 | - | - | - | 50 | 18 | 6 | - | 50 | 28 | - | - | 50 |
| Vendors - check disbursements (excluding Dow & Wacker): | | | | | | | | | | | | | |
| Dow Corning | 13 | 5 | 22 | 32 | 32 | 32 | 25 | 25 | 33 | 33 | 33 | 33 | 33 |
| Wacker | 103 | 102 | 35 | 124 | 94 | 92 | 32 | 32 | 122 | 122 | 132 | 132 | 132 |
| All other excluding capex | 543 | 481 | 473 | 420 | 477 | 525 | 593 | 409 | 486 | 511 | 534 | 430 | 521 |
| Capex | 3 | 3 | 3 | 3 | 28 | 3 | 3 | 28 | 3 | 253 | 3 | 28 | 3 |
| Ohio BWC and UMR Health Disbursements | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 52 |
| Commercial Traffic | 13 | 14 | 15 | 16 | 17 | 18 | 16 | 17 | 17 | 18 | 17 | 18 | 18 |
| Utilities | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total cash disbursed | 1,264 | 1,924 | 703 | 1,303 | 1,185 | 1,449 | 1,583 | 1,388 | 1,163 | 1,767 | 1,642 | 1,417 | 1,225 |
| Net cash received (used) | (653) | (947) | 489 | (198) | 44 | (313) | (614) | (328) | (167) | (501) | (448) | (116) | 115 |
| Cumulative net cash received (used) | (653) | (1,600) | (1,111) | (1,309) | (1,265) | (1,578) | (2,192) | (2,520) | (2,687) | (3,188) | (3,636) | (3,752) | (3,637) |
| Ending cash balance from prior period | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 | 1,406 |
| DIP loan proceeds and interest thereon | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 | 4,067 |
| Net cash available | 4,820 | 3,873 | 4,362 | 4,164 | 4,208 | 3,895 | 3,281 | 2,953 | 2,786 | 2,285 | 1,837 | 1,721 | 1,836 |
| | | | | | | | | | | | | | |
| Net sales (based on date shipped) | 10 | 75 | 450 | 1,691 | 1,608 | 1,884 | 1,620 | 1,546 | 1,504 | 1,702 | 1,578 | 1,651 | 1,605 |
| Net cumulative sales | 10 | 85 | 535 | 2,226 | 3,834 | 5,718 | 7,338 | 8,884 | 10,388 | 12,090 | 13,668 | 15,319 | 16,924 |