HEARING DATE: February 23, 2008 at 10:00 a.m. (prevailing Eastern Time)
OBJECTION DEADLINE: February 13, 2008 at 12:00 noon (prevailing Eastern Time)

WALLER LANSDEN DORTCH & DAVIS LLP
John C. Tishler (*Pro Hac Vice*)
Robert J. Welhoelter (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com
Email: Robert.Welhoelter@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for the Senior Prepetition Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                            :
**In re**                                   :   **Chapter 11 Case No.**
                                            :
**LEXINGTON PRECISION CORP., et al.,**      :   **08-11153 (MG)**
                                            :
     Debtors.                               :   **(Jointly Administered)**
                                            :
-----------------------------------------------------------x

**OBJECTION OF AGENTS FOR PREPETITION SENIOR LENDERS TO
DEBTORS' MOTION FOR CONTINUED USE OF CASH COLLATERAL**

By and through the undersigned attorneys, CapitalSource Finance LLC, as Revolver

Agent (defined below) to the Prepetition Revolver Lenders (defined below) and CSE Mortgage

LLC, as Term Loan Agent (defined below) to the Senior Term Loan Lenders (defined below,

and collectively with the Prepetition Revolver Lenders and the Agents, the "Prepetition Senior

2658391.5

Lenders"), hereby object to the *Debtors' Motion For Authorization Pursuant To 11 U.S.C. §§ 105, 361, 362 and 363(c), For Continued Use of Cash Collateral* (the "Cash Collateral Motion") and state as follows:

### Introduction

1.  The Debtors have enjoyed consensual use of Cash Collateral (defined below) during these bankruptcy cases for over ten (10) months. Despite having negotiated a consensual arrangement designed to expire if no reorganization plan was forthcoming before February 25, 2009, the Debtors now seek non-consensual use of Cash Collateral on similar terms[1] as the consensual arrangement despite the Debtors' indefinite adjournment of its plan process, exit financing having proven to be unavailable, and negotiations with the creditors constituencies being at an impasse. Through this motion, the Debtors seek to pause the plan process while they implement an operational restructuring, yet continue their refusal to explore the possibility of the sale of assets to exit bankruptcy.

2.  Although the Prepetition Senior Lenders don't oppose the use of Cash Collateral outright, they object to the proposed terms and conditions and request that (i) the duration of any usage be limited in scope, (ii) non-core assets (including the metals group and non-operating assets) be marketed and sold in the near term, (iii) a marketing process of the medical device business be conducted by an independent investment banker to shed light on all possible resolutions for these cases, and (iv) additional financial covenants and benchmarks be implemented to protect the creditors' respective downside risk should the case posture deteriorate. Each of the foregoing requests provides incentive for these cases to progress and for

---

[1] The proposed order to the Cash Collateral Motion has similar provisions to the Cash Collateral Order, but many material provisions of the Cash Collateral Order have been removed. The proposed order is not acceptable to the Prepetition Senior Lenders.

2658391.5                                                           2

the parties to develop realistic options for an ultimate conclusion. Accordingly, the Prepetition Senior Lenders object to the Cash Collateral Motion.

## Background Facts

3. Prior to the Commencement Date, the Prepetition Senior Lenders made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, forbearance agreements and discretionary funding letters executed by any Debtor and any Other Documents (as defined in each of the Credit Agreement (defined below) and the Loan Agreement (defined below), the "Prepetition Senior Lender Loan Documents"):

(a) that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent; and

(b) that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the

Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as lenders, the "Prepetition Term Lenders").

4.   The Revolver Agent and Term Loan Agent are referred to collectively herein as the "Agents." Any capitalized terms not defined herein shall have the meanings ascribed to them in the Prepetition Senior Lender Loan Documents or the Cash Collateral Order (as defined below), as applicable.

5.   On April 17, 2008, this Court entered that certain *Final Order Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, & 364 (i) Authorizing Debtors To Use Cash Collateral, (ii) Granting Adequate Protection To Prepetition Secured Lenders, and (iii) Authorizing Postpetition Financing* (the "Cash Collateral Order"), whereby the Prepetition Senior Lenders consented to the use of their Cash Collateral (as defined in the Cash Collateral Order) subject to certain conditions. Chief among those conditions is that the Debtors' confirm and consummate a plan of reorganization that provides for the indefeasible payment in full of the obligations to the Prepetition Senior Lenders within three hundred thirty (330) days of the Commencement Date, i.e. February 25, 2009 (the "Cash Collateral Deadline"). (Cash Collateral Order, ¶ 11(viii).)

6.   In addition, certain financial covenants were included in the Cash Collateral Order, including the requirement to meet net sales of at least 90% of the forecasted amounts in the applicable budgets, measured from the beginning of the case through the relevant measuring date.[2] The Debtors' most recent reconciliation certificate, dated February 11, 2009, a copy of

---

[2] Section 11(vii) of the Cash Collateral Order provides, in relevant part:

   With respect to the use of Cash Collateral hereunder, each of the following shall constitute a "Termination Event":

2658391.5                                                4

which is annexed hereto as <u>Exhibit A</u>, indicates that for the period from April 2, 2008 through February 6, 2009, cumulative net sales were 10.6% below the budgeted forecast. Accordingly, a Termination Event has occurred, the Debtors are in default of the Cash Collateral Order (the "<u>Net Sales Default</u>"), and the Prepetition Senior Lenders have reserved, by letter dated February 12, 2009, any and all rights stemming from such default.

7.  To date, the Debtors have developed its proposed plan (the "<u>Proposed Plan</u>"), and its accompanying disclosure statement (the "<u>Proposed Disclosure Statement</u>"). Unfortunately, such progress has come to a grinding halt, as exit financing has proven to be extremely difficult to obtain in the current market.

8.  As a result, the hearing (the "<u>Disclosure Statement Hearing</u>") regarding the adequacy of the Proposed Disclosure Statement has been adjourned numerous times to allow the Debtors to, among other things, make progress with respect to obtaining exit financing. Ultimately, because the prospects of exit financing have proven to be remote, the Disclosure Statement Hearing has been adjourned indefinitely.

9.  On February 2, 2009, the Debtors filed their Cash Collateral Motion, whereby they seek continued use of Cash Collateral through December 31, 2009, or what equates to an extension of three hundred ten (310) days from the existing agreed-upon Cash Collateral Deadline. The proposed terms and conditions of such use of Cash Collateral are similar to those negotiated under the prior Cash Collateral Order.[3] The Prepetition Senior Lenders have not

---

…
(vii) if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four-week period thereafter, net sales are less than 90% of the net sales reflected in the Budget or any New Budget…

[3] See footnote 1 above.

consented to use of Cash Collateral beyond the current period on any terms nor have they consented to any extension of the Cash Collateral Deadline.

10. In light of the contested nature of these cases and the Debtors' pending request for further extension of the Debtors' exclusive plan periods (the "<u>Exclusivity Motion</u>"), the Court combined the hearing on the Cash Collateral Motion with the Exclusivity Motion and set an objection deadline for February 13, 2009 at 12:00 noon (prevailing Eastern Time) with respect to both motions.

11. In support of this objection, the Prepetition Senior Lenders intend to rely on the expert report and testimony of Dean R. Vomero, of Bridge Associates LLC. Mr. Vomero is familiar with the Debtors' business operations and financial condition, as he has served as consultant to the Agents with respect to the Debtors both before and after the commencement of these cases. In addition, Mr. Vomero has analyzed certain financial and other relevant information in connection with the Cash Collateral Motion.

## **Prepetition Senior Lender's Objection**

12. Section 363(c)(2)(A) requires consent by the Prepetition Senior Lenders in order for the Debtors to use Cash Collateral. Non-consensual use may be granted so long as the Debtors provide the Prepetition Senior Lenders with adequate protection of their interests in the Cash Collateral. 11 U.S.C. § 363(c)(2)(B) & 363(e). It is axiomatic that adequate protection is determined on a case by case basis.

13. At the outset, the Prepetition Senior Lenders stress that they do not oppose an extension of the use of Cash Collateral per se, but object to several significant features of the current request, including without limitation: the duration of the current request, the lack of exploration of all available options for exiting bankruptcy, and the lack of adequate controls to

monitor the Debtors' precarious financial situation. Based on the facts and circumstances of this case, the Prepetition Senior Lenders propose the following terms and conditions be placed on the Debtors for any further use of Cash Collateral beyond the agreed-upon Cash Collateral Deadline:

    (a)    the duration of any extension should be limited to the end of July 2009 at the latest, to allow simultaneous exploration of a sale of certain of the Debtors' assets as well as continued pursuit of the connector seals operational restructuring (subject to reasonable benchmarks being met) and exit financing for the Proposed Plan;

    (b)    any non-core assets (including the metals group and non-operating assets) should be marketed and sold immediately pursuant to 11 U.S.C. § 363 prior to the expiration of the extended Cash Collateral period, with such proceeds applied against the obligations to the Prepetition Senior Lenders. The proposed timeline for such sale process is that bids be solicited by April 30, 2009, that a sale procedures order be entered by May 30, 2009, and that the sale itself be approved and consummated by June 30, 2009;

    (c)    a marketing process, which shall be structured to provide ample updates and insights to the Court, the Prepetition Senior Lenders, and the Committee, should be commenced immediately by an independent investment banker with respect to the medical device business so that potential sale options can be explored on the following timeline:

        (i)    bids be solicited by April 30, 2009, with potential bids due by May 22, 2009;

        (ii)    transmission of the material details of the bids received to the Prepetition Senior Lenders and the Committee by June 1, 2009;

(iii) a status conference (the "Status Conference") on or about June 10, 2009, at which time the Debtors shall provide an update regarding status of the connector seals restructuring, the pursuit of exit financing for the Proposed Plan, an evaluation of the marketing process, and discussions regarding the ultimate resolution of these cases;

(iv) absent a firm commitment for exit financing sufficient to consummate the Proposed Plan by the Status Conference, the Court shall require the Debtors to develop and commence a sale process for the medical device business based on the bids received through the marketing process

; and

(d) additional or tighter financial covenants and benchmarks should be implemented that protect against the further decline of the creditors' position in these cases, including, for example, more frequent budget reconciliations and tighter measurement standards, such as:

(i) approval by the Prepetition Senior Lenders of any subsequent cash budgets, with budget figures for the entire extension period agreed-upon prior to the current Cash Collateral Deadline;

(ii) covenants regarding net sales and EBITDA, at a reasonable tolerance to budget;

(iii) covenants regarding certain cash metrics, requiring 90% compliance with budgeted cash receipts, cash disbursements, and net book cash available, with a reconciliation of net book cash to the account balances in the Debtors' operating and debtor-in-possession bank accounts; and

      (iv)  covenants regarding borrowing base availability.

  14.  The need for such limited duration, exploration of all available options, and tightened controls are supported by four grounds: (i) deterioration in the relationship with the proposed exit lender whose interest in providing the exit facility for the Proposed Plan has waned to the point that significant operational restructuring steps must be taken to even engage in a conversation regarding an exit facility ; (ii) the Debtors' precipitous percentage decline in total enterprise value[4] since the commencement of these cases; (iii) the Debtors' deteriorating cash position, as reflected in the Net Sales Default and the recent projections in support of the Cash Collateral Motion, and (iv) the Debtors' demonstrated historical inability to meet projections. In addition, this objection will also address the authority cited by the Debtors in the Cash Collateral Motion and provide some further case law that will help inform the Court's decision regarding these issues.

A.  <u>Deterioration of Capital One's Appetite to Provide Exit Lending</u>

  15.  As revealed by the deposition of the representative from Capital One Leverage Finance Corporation ("<u>Capital One</u>") on January 29, 2009 (the "<u>Deposition</u>"), the Debtors received several different proposals from Capital One, the first one in Spring 2008, the second in July, 2008, and a final one in Fall 2008. *See* Deposition,[5] pp. 7, 11, 36, 38, 50-51, & 94 (excerpts of the transcript of the Deposition are annexed hereto as <u>Exhibit B</u>). The Debtors never

---

[4] The Prepetition Senior Lenders do not assert that total enterprise value is the proper or only measure for determining adequate protection of their interest, and are simply using such measure to illustrate the percentage decline of total enterprise value and associated trends. Moreover, the Prepetition Senior Lenders expressly reserve any and all rights to argue that other methodologies are the proper measure for any adequate protection determination, confirmation, or any other issue in these cases.

[5] Reference to page numbers are references to the transcript pages, the pagination of which does not correspond exactly with the printed pages of Exhibit B.

2658391.5      9

signed and returned any of the proposal letters to Capital One despite Capital One's ability and willingness to underwrite the exit facility. Id. at pp. 55, 66.

16. Unfortunately, as the economy deteriorated, so did Capital One's desire and ability to provide the exit facility. Id. at 61, 94-95, 98-99. From the original proposal, which represented a fully underwritten loan, each subsequent proposal was adjusted negatively, ultimately resulting in a proposed exit facility with multiple contingencies and modified terms that have precluded obtaining exit financing for the Proposed Plan. Id. at 60-61, 94-95, 98-99, 100-01, 119-20, 135-36. Specifically, the adjustments include, but are not limited to, the following negative features: (i) requirement that there be around a $15 million mezzanine financing to be provided by the debtors' management or some other participating entity (id. at 41, 140-41); (ii) that a commitment from a separate real property lender be obtained (id. at 140-41, 143-44, 147; (iii) that a significant percentage of the participants in the loan subscribe to such participation in advance of the loan being funded (id. at 100-01); and (iv) that the connector seals operational restructuring be completed before the loan is processed (id. at 120-21, 123, 124-25).

17. The window of opportunity is indeed nearly closed, as Capital One has indicated, by letter dated February 5, 2009 (a copy of which is annexed hereto as Exhibit C), that discussions for a financing arrangement will only continue with the Debtors through March 15, 2009. In light of the Debtors' failure to lock in the exit facility when the terms were favorable, the creditor constituents are left with significant hurdles between the expiration of the Cash Collateral Deadline and the Debtors' pursuit of either the Proposed Plan or some modified version with cramdown features. Accordingly, the Prepetition Senior Lenders object to an open-ended extension of use of Cash Collateral without adequate controls to keep progress moving forward in these cases.

B.      Percentage Decline in Enterprise Value

18.     As will be supported by the Prepetition Senior Lenders' proposed expert, the Debtors' total enterprise value[6] has declined by 26 % from March 31, 2008 (the day before the commencement of these cases) to December 31, 2008.[7] Looking to a peer group containing OEM suppliers in the automotive industry, healthcare manufacturing companies, and aftermarket automotive part manufacturers, valuation multiples based on EBITDA have contracted since the filing date. Given the Debtors decline in trailing-twelve-month adjusted EBITDA[8] from $10.9 million to $9.4 million, inclusive of add-backs of $0.6 million, over the same period, an implied value diminution of $23.3 million arises (from $90.8 million to $67.6 million), which represents a 26% decline for the Debtors total enterprise value as a result of the decline in multiple and the decline in trailing-twelve-month EBITDA.

19.     The unpredictable state of the economy at large and the rapid decline in total enterprise value during the first nine (9) months of these cases provide a solid basis for the Prepetition Senior Lenders' concerns regarding the long horizon of the Debtors' request. Although the total enterprise value does not appear to dip below the amount of the Prepetition Senior Lenders' claims, a continued trend of declining total enterprise value could threaten the adequacy of the Prepetition Senior Lender's security on a very quick timetable; thus, the Prepetition Senior Lenders seek adequate financial covenants and benchmarks in any order

---

[6] See footnote 4 above.

[7] It should be noted that the Prepetition Senior Lenders has calculated this percentage decline using figures developed from a reasonable peer group, as will be supported by the Prepetition Senior Lenders' proposed expert, but given the decline in the overall economy in recent months, a similar calculation using the Debtors' or the Committee's valuation figures is likely to produce the same significant trend.

[8] EBITDA measured before expenses classified by the Debtors as Reorganization Expenses.

extending use of Cash Collateral to protect against a further rapid decline in collateral value below the Prepetition Senior Lenders' claim amounts.

20.     The deterioration of total enterprise value is particularly poignant when considered against the backdrop of the Debtors' refusal to sell the medical device business and/or the businesses as a whole during the prepetition period, despite a bidding process being run and producing at least three proposals for sale amounts that were nearly equal to or in excess of the obligations owed to the Prepetition Senior Lenders.  And once in bankruptcy, the Debtors' resistance has continued with their refusal to even consider soliciting preliminary bids to determine whether a sale process might be a fruitful resolution of these cases for the constituents.

21.     Given the amount of time spent in bankruptcy already without a possible exit and the uncertain nature of the economy, failure to even explore a sale process recklessly disregards the creditors' respective interests in these cases.  In response to the Court's requests that the Debtors present a "Plan B" to the Proposed Plan should exit financing not be forthcoming, the Debtors' do not propose any sale exploration, but rather threaten cramdown of the Prepetition Senior Lenders.  Such threat is a clear indication of the increasingly adversarial approach taken by the Debtors and is not fostering a negotiated resolution of these cases.

C.      Deterioration of Net Cash Position

22.     Assuming for argument the validity of the Debtors' revised 13-week budget (the "Budget") in support of the Cash Collateral Motion, the net cash position of the Debtors will decline over the 13-week period from nearly $4 million as of the week ending February 27, 2009 to under $2 million as of the week ending May 22, 2009.  In addition, the Net Sales Default shows that the anticipated sales have been dissipating compared to expectation over time. Continuation of this trend would undercut the Projections.

23. Any significant unanticipated events could render the cash position untenable for the continued operation of the Debtors' businesses without infusion of additional capital. For instance, as will be supported by the Prepetition Senior Lenders' proposed expert, the Debtors' assumptions regarding continued automotive customer support during the migration of connector seals production to the alternative sites is highly sensitive to, among other things, the following factors: (i) customer consent to the operational restructuring, (ii) potential requests for price concessions from customers, (iii) streamlining and implementation of the parts approval process, and (iv) the need to lock up customers to supply arrangements to ensure that inventory banks are not used for resourcing away from the Debtors to alternative suppliers. Any one of the proceeding factors could have a profound negative impact on the success of the connector seals restructuring.

D. Demonstrated Inability to Accurately Project

24. Throughout the loan history, including these bankruptcy cases, the Debtors have shown an inability to accurately forecast with any degree of certainty. Although many companies have had difficulties in accurately forecasting results, the Debtors' struggles are important when considering the statutory requirement that they are required to provide adequate protection to the Senior Prepetition Lenders for the continued use of Cash Collateral. Any evaluation by the Court of the Debtors' assertions that the long-term forecasts illustrate little or no negative impact to the Prepetition Senior Lender's collateral position must be considered against such backdrop of inaccuracy. The most glaring example is the Net Sales Default, which is even based on cumulative 13-week budgets as opposed to year-long forecasting.

25. As will be supported by the Prepetition Senior Lenders' proposed expert, the Debtors' Budget is likely to suffer from certain systemic flaws that have pervaded the Debtors'

2658391.5                                    13

projections for as long as the Prepetition Senior Lenders have been in the loan. In fact, the Debtors have missed 97% of monthly projections for EBITDA during the past 32 months, with a cumulative deficiency of $14.9 million, which represents a 35% shortfall when comparing actual to forecast. Such continued misses are reflected in the Net Sales Default. The Debtors developed the Budget using the same management team that established the track record enumerated above, and the only conclusion is that the Budget will again miss the mark.

26. As will be supported by the Prepetition Senior Lenders' proposed expert, the Debtors' forecast for 2009 (the "Business Plan"), which was provided to the Prepetition Senior Lenders on January 16, 2009, provided for a balance sheet cash position of approximately $7.3 million as of the end of May, 2009, which is significantly higher than the $1.994 million provided in the Projections in support of the Cash Collateral Motion. Given the short amount of timing to analyze the Budget, coupled with the fact that the Budget is not supported by a full set of financial documents (unlike the Business Plan), it is unclear what, if any, systemic problems have been addressed in the Budget. At the very least, the vast discrepancy between the Budget and the Business Plan despite being separated by a mere three (3) weeks in time, calls into the question the Debtors' ability to accurately project the impact of the connector seals restructuring.

27. As will be supported by the Prepetition Senior Lenders' proposed expert, the Business Plan contains a high degree of risk and the assumptions upon which the Business Plan is based fail to incorporate any potential deviations. If any one of these assumptions does not come to fruition, cash would be adversely affected. In sum, the Business Plan is overly optimistic.

E.   Cited Authority Is Unpersuasive

28.   The cases cited by the Debtors in the Cash Collateral Motion are highly distinguishable and do not reflect the concerns present in the case at hand.  In fact, each case cited by the Debtors represents litigation at the early stages of a case where even preliminary formulation of a plan of reorganization does not appear to have taken place yet. *See, e.g.,* In re Dynaco Corp., 162 B.R. 389, 395 (Bankr. D.N.H. 1993) (considering extension of final cash collateral usage after series of interim orders in the first six months of the case); In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017 (11th Cir. 1984) (considering creditor's appeal from final cash collateral order entered within first three months of case); In re O'Connor, 808 F. 2d 1393, 1398 (10th Cir. 1987) (making no clear indication of timing, but posing the "question of whether use of cash collateral shall be permitted *during the early stages of administration*") (emphasis added); In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982) (considering cash collateral motion within first three months of case).  While the analytical factors and policies of granting further use of cash collateral may not differ whenever contested use of cash collateral arises, the unique facts and circumstances for consideration in this case (and in particular the fact that the Debtors have had eleven months at the helm in these cases with access to Cash Collateral) are not considered in the authority presented by the Debtors.

29.   For instance, the central case cited by the Debtor, Dynaco, indicates that courts will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make solid evidentiary showing to support their projections.  Dynaco, 162 B.R. at 395.  In the case at hand, the plan formulation point has been reached, as evidenced by the Proposed Plan, but unfortunately for the Debtors, the Proposed Plan has proven not to be a viable option at this point.  The prior Cash Collateral Order provided sufficient time for the Debtors to

formulate and implement a plan of reorganization.  It is now time for the Prepetition Senior Lenders to have some more direct influence over the ultimate resolution of these cases.

30.     Moreover, the Dynaco court discusses short-term dips in collateral value being restored over time, however, the Projections provided to support the Cash Collateral Motion only go out 13 weeks of the proposed 45-week extension.  The Debtors' Projections reveal a decline of net cash available from nearly $4 million down to under $2 million at the end of the 13-week period.  The effects beyond that period are not apparent.  In Dynaco, the Debtors were seeking continued use of cash collateral in the early stages of the case, after a series of interim orders for the first four to five months of the case.  The secured lenders in that case were also seeking full denial of the usage of cash collateral.  In sum, the comparison to the case at hand is not convincing.

31.     The Debtors attempt to draw in authority from this district with a simple statement that "Courts have also authorized similar relief in other chapter 11 cases."  However, the only case cited from this district is a commercial real estate case, and the unique nature of such case does not translate to the case at hand.  *See* In re Constable Plaza Associates, L.P., 125 B.R. 98 (Bankr. S.D.N.Y. 1991).  In fact, the unique nature of rents is highlighted by the Court.  Id. at 104.  Moreover, the key issue was again framed in light of the case posture being in the early stages of the reorganization process.  Id. at 104 ("In the present case, on its particular facts, the issue before the Court really comes down to the question as to whether the movants are entitled *at this early stage of the case* to prohibitions or conditions upon the use of rents") (emphasis in original).

32.     Research revealed two unreported cases that are not exactly on point but that more closely approximate the factual scenario at hand, with a debtor attempting to obtain further

use of cash collateral despite facing significant doubts with respect to its proposed reorganization. In re Pawtuxet Valley Prescription & Surgical Center, Inc., 2008 WL 1990887 (Bankr. D.R.I., Case No. BK 07-11767, March 10, 2008); In re Archibald Allan Associates, Inc., 2004 WL 422407 (Bankr. E.D. Pa., Case No. 03-31412DWS, Feb. 20, 2004). Neither of these cases is reported, and copies of each are annexed hereto as Collective Exhibit D.

33.     In Pawtuxet Valley, significant changes arising in the case over several months required a very short extension for further use of cash collateral in light of the significant concerns of the court regarding adequate protection. Pawtuxet Valley, 2008 WL 1990887. Changes included, among other things, failure to achieve projections, posting monthly losses, declining monthly sales, and decline in collateral position. Id. at *3-4. While the facts in Pawtuxet Valley differ in some respects from the record in the case at hand, the potential for significant decline is very similar, especially in light of the current economic climate. As a result, the Debtors' performance could continue to decline to levels that would threaten the Prepetition Senior Lenders' position. Accordingly, the Court in this case should limit, as the Pawtuxet Valley court did (id. at *5) the duration of the extension, and should further ensure there are adequate measures in place to protect against dramatic slippage in the Prepetition Senior Lenders' collateral position.

34.     In Archibald Allan, the Debtors and their lender reached several interim stipulations regarding the use of cash collateral, including one final extension to allow the debtors to pursue a plan involving a sale of its assets to a private equity fund, which was engaging in due diligence in connection with the potential sale. Archibald Allan, 2004 WL 422407, at *1-3. Failure to meet the deadlines in the stipulation, absent the (i) Debtors' entry into the stipulation involuntarily, (ii) the stipulation being a violation of public policy, or (iii)

extenuating circumstances, the automatic stay relief provided for under the stipulation was respected despite the dire consequences to the Debtors' estates. Id. at *4-5.  In the case at hand, the Cash Collateral Deadline is imminent, which in theory should give the Prepetition Senior Lenders stay relief pursuant to the terms of the Cash Collateral Order.  However, the Prepetition Senior Lenders do not seek immediate termination of the use of the Cash Collateral, but instead seek to limit any further use of Cash Collateral in duration and scope, and to protect against further decline in the value of the collateral and the Debtors' businesses as a whole.

## Reservation of Rights

35.    The Prepetition Senior Lenders reserve the right to amend, supplement, or withdraw this objection prior to or at the hearing on the Cash Collateral Motion, and reserve the right to oppose the Cash Collateral Motion at the hearing on any grounds whatsoever, whether or not contained in this objection or any amendment or supplement hereto.

Based on the foregoing, the Agents object to the Cash Collateral Motion and urge the Court to deny further use of Cash Collateral except on the grounds set forth herein, and not to enter the proposed order.

Respectfully submitted:

WALLER LANSDEN DORTCH & DAVIS LLP

*/s/ Robert J. Welhoelter*
John C. Tishler (*Pro Hac Vice*)
Robert J. Welhoelter (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com
Email: Robert.Welhoelter@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP

*/s/ Aaron R. Cahn*
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for Senior Prepetition Lenders*

**Certificate of Service**

   I hereby certify that a true and correct copy of the foregoing pleading was served by email and hand delivery, upon the following parties in accordance with that certain *Notice of the Debtors' Motion for Authorization, Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363(c), For Continued Use of Cash Collateral* on this the 13th day of February, 2009.

   Lexington Precision Corporation
   (Attn: Michael A. Lubin)
   800 Third Avenue, 15th Floor
   New York, New York 10023

   Weil, Gotshal & Manges, LLP
   (Attn: Adam Strochak)
   767 Fifth Avenue
   New York, New York 10153

   Office of the United States Trustee for the Southern District of New York
   (Attn: Paul Schwartzberg)
   33 Whitehall Street
   New York, New York 10004

   Andrews Kurth LLP
   (Attn: Paul Silverstein)
   450 Lexington Avenue
   New York, New York 10017

   O'Melveny & Meyers, LLP
   (Attn: Gerald Bender)
   Times Square Tower
   7 Times Square
   New York, New York 10036

   I hereby further certify that a hard copy of same was delivered by hand delivery to Judge Glenn's chambers.

                  */s/ Aaron R. Cahn*
                  Aaron R. Cahn