Exhibit D

Westlaw.

Slip Copy
Slip Copy, 2008 WL 1990887 (Bkrtcy.D.R.I.)
**(Cite as: 2008 WL 1990887 (Bkrtcy.D.R.I.))**

Page 1

Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Rhode Island.
In re PAWTUXET VALLEY PRESCRIPTION & SURGICAL CENTER, INC., Debtor.
In re Sandy Bottom Properties, LLC, Debtor.
**Nos. BK 07-11767, BK 07-12699.**

March 10, 2008.

Andrew S. Richardson, Esq., Steven J. Boyajian, Esq., Boyajian Harrington & Richardson, Providence, RI, for Debtor, Pawtuxet Valley Prescription & Surgical Center, Inc.
Peter J. Furness, Esq., Sinapi Formisano & Co., Cranston, RI, for Debtor, Sandy Bottom Properties, LLC.
Robert D. Wieck, Esq., Providence, RI, for Creditor, Bank Rhode Island MacAdams Wieck Deluca & Gemma, Inc.
Joseph P. Ferrucci, Esq., Christopher M. Mulhearn, Esq., Providence, RI, for Creditor, Amerisource-Bergen Drug Corporation Ferrucci Russo PC.

*DECISION*

ARTHUR N. VOTOLATO, United States Bankruptcy Judge.

*BACKGROUND*

*1 Before the Court are: (1) Pawtuxet Valley Prescription & Surgical Center, Inc.'s (PVP) Motion to continue the use of Bank Rhode Island's cash collateral; and (2) BankRI's Motion for relief from stay in the related case of Sandy Bottom Properties, LLC, seeking relief from stay as to 59-85 Sandy Bottom Road in Coventry, Rhode Island, the real estate where PVP operates its business. For purposes of our discussion, the same issue is dispositive of both motions-whether there is adequate protection of BankRI's interest in its collateral. With relief from stay, the Debtor must also establish that the real estate in question is necessary for an effective reorganization. *See* 11 U.S.C. §§ 362(d)(2) & (g). PVP argues that for purposes of the use of cash collateral, the Court should not consider whether PVP will likely reorganize, that the decision rests simply on whether the total value of BankRI's collateral exceeds the debt, and that as long as the Bank is over-secured the Court should allow PVP to continue to use BankRI's cash collateral, with no other questions asked. I disagree.

PVP filed its Chapter 11 case on September 4, 2007, and the first contested cash collateral hearing was commenced on the following day, September 5. Since that time, we have met on at least eight occasions to monitor cash collateral issues and to have PVP report and answer questions about its operations. To say that this case has been excessively contentious and over litigated is a gross understatement. On January 28, 2008, we convened again for a hearing that was spread over six days and is the subject of this decision.

*DISCUSSION*

Section 363(c)(2) of the Bankruptcy Code provides that: "The Trustee may not use sell or lease cash collateral ... unless (A) each entity that has an interest in such collateral consents; or (B) the court, after notice and hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The section also provides that at the request of the secured creditor the Court "shall prohibit or condition such use [of cash collateral] ... as is necessary to provide adequate protection" of the secured creditor's interest. 11 U.S.C. § 363(e).

In addition, § 361 provides:

When adequate protection is required under section 362, 363, or 364... such adequate protection may be provided by-

(1) requiring the trustee to make a cash pay-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*2 11 U.S.C. § 361. In considering whether the secured creditor is adequately protected, the Court must determine the value of the Bank's interest in the collateral and whether the Debtor's proposed use of cash collateral will impair that interest. *See In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr.D.N.H.1993).

With regard to value, the legislative history to Section 361 is instructive:

The section specifies four means of providing adequate protection. They are neither exclusive nor exhaustive. They all rely, however, on the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result....

Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes. In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations based on the facts of the case....

S.Rep. No. 989, 95th Cong., 2d Sess., 54 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840. It is generally understood that adequate protection relates to maintaining the status quo for the period between filing the petition and before confirmation or rejection of the plan of reorganization, *U.S. v. Smithfield Estates, Inc. (In re Smithfield Estates, Inc.),* 48 B.R. 910, 914 (Bankr.D.R.I.1985), and as part of its analysis, the Court must monitor the Debtor's operations to determine whether the Bank is being exposed to a significant risk of harm on account of its collateral being depleted. *See Dynaco,* 162 B.R. at 394. "Because courts are reluctant to terminate a reorganization at the outset of the case unless **reorganization** is clearly impossible, it is probable that the court will authorize the use of **cash collateral** if the debtor makes a credible showing of adequate protection. Therefore, in many instances the secured creditor will prevail at a cash collateral hearing at the early stage of the chapter 11 case only if, as part of its case, it demonstrates that there is no realistic prospect of reorganization,"*Commercial Bankruptcy Litigation,* § 7:25. If the reorganization hopes of the debtor are nothing more than wishful thinking, no useful purpose can be accomplished by allowing the debtor to use cash collateral.

Since the equity holders and the general unsecured creditors are at the bottom of the "totem pole" of priority of claims against the assets of the enterprise, it is often tempting for those junior interests to don rose-colored glasses in evaluating the prospects for future operations and reorganization. It is the Court's task to scrutinize the data

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 1990887 (Bkrtcy.D.R.I.)
(Cite as: 2008 WL 1990887 (Bkrtcy.D.R.I.))

Page 3

and projections supplied by the debtors with this danger in mind. When the issue is raised early in the reorganization proceeding, the Court will generally permit the business operation to continue, at least to the point of plan formulation, if the debtors make a solid evidentiary showing to support their projections that survive the appropriate scrutiny. It is always a difficult judgment call early in the case....

*3 *Dynaco,* 162 B.R. 395.

On October 5, 2007, when BankRI enjoyed a significant equity cushion and was adequately protected, the Debtor was allowed the use of cash collateral on an interim basis, with frequent reporting and regular examination of its operations. BankRI was owed approximately $2.5 Million and the parties stipulated to the market value of the real estate at $2.2 Million. The Bank also has a first lien on machinery and equipment which was valued at $253,700 (at forced liquidation), and inventory and vehicles [FN1] at $125,000 (again at liquidation). In October 2007, a major area of dispute was PVP's accounts receivable, with the Bank arguing that the receivables were worthless and that most were over 90 days old. PVP said the receivables were worth in excess of $1,000,000. In the October 2007 interim order, giving no value to the receivables, and based on these values, the Bank was deemed to be adequately protected.

> FN1. BankRI expressed concern at the most recent hearing that it may not be secured as to any of PVP's vehicles, an argument that was not raised during the initial hearings. For purpose of our current analysis, very little weight is placed on the inventory and vehicles.

What has changed since October 2007?

(1) In December 2007, PVP brought on as a consultant, Alan Carey,[FN2] a pharmacy industry expert, to provide guidance during the Debtor's reorganization. Carey testified that two pill-packaging machines originally valued by PVP at $95,000 each are now virtually worthless because there is really no market for this used equipment. He also testified that: (a) PVP's acquisition of these machines for its long term care division was a poor decision because they did not provide a cost efficient way to distribute medications to long term care patients; (b) that PVP's decision to abandon its long term care division just prior to filing the petition was also very ill-advised because it squandered the prospect of receiving between $900,000 and $1,500,000 for the sale of this business. Carey also opined: (c) that PVP should, and will explore re-entering the long-term care business as part of the reorganization; and (d) that PVP's operations were top heavy, especially as to executive salaries. In December 2007, Carey, while still employed by Amerisource, specifically recommended that PVP should reduce and reconfigure management, including reducing the $175,000 salary of CEO Mark Gilmore to $100,000, and requiring the President (Leo Blais) to be paid solely based on hours worked as a pharmacist, rather than his regular salary of $185,000. To date the Debtor has implemented neither of these recommendations, with no acceptable [FN3] explanation given as to why. The failure to implement these two specific recommendations places the Debtor's good faith in this reorganization in question. This Court's reaction to cuts made only to lower level employees can have had only a negative effect on rank and file morale at a critical time in the Debtor's existence, the decision to ignore Mr. Carey was very shortsighted by management, and reflects poorly on Mr. Carey's ability to achieve compliance by the Debtor with his recommendations.

> FN2. Carey was previously employed as a consultant in this (and other) matter(s) by PVP's largest unsecured creditor, AmerisourceBergen Drug Corporation.

> FN3. Instead of accepting its own expert's recommendations and tightening their belts

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

as leaders in the cost-cutting department, top management looked only at lower level personnel to achieve the recommended cost savings.

(2) PVP's projections prior to enlisting Carey as a consultant have never been achieved, and PVP has now abandoned those projections. In fact, PVP has posted losses every month since the September 2007 filing, and monthly sales in PVP's core business have declined from $414,000, as of the filing date, to $294,000 for December 2007.

**\*4** (3) Until its under-performance became obvious, PVP argued repeatedly and strenuously that sales of the drug Synagis would be the key to success in the reorganization, but that has not materialized and Synagis sales are off at least 27% from last year. In addition, Carey feels that Synagis is not a profitable item anyway, and noted that Synagis receivables generated to date barely equal what is owed to HD Smith, the manufacturer of the drug.

(4) While Leo Blais insists that the poor Synagis figures are the result of negative press and publicity regarding the Chapter 11 filing, these are uncontrollable facts of life faced by most business debtors, and cannot affect the Court's evaluation of their performance.

(5) Although specific numbers were not provided, Carey projects that the Debtor will continue to lose money in January 2008 and will not break even until sometime in March 2008. "Break-even," incidentally, does not include payment of rent to Sandy Bottom or installment payments to BankRI, and according to Carey, for PVP to even reach "break-even," it will need to increase monthly sales from its current level of $293,000 to $593,000. Carey has not explained in any detail how the Debtor will achieve this goal, but says that as part of becoming profitable the Debtor will reduce payroll costs from $230,000 per month to $150,000, and reduce general expenses to $75,000 per month. Again, Carey provides no specifics as to how these numbers will be achieved by March 2008.

(6) Carey believes PVP's accounts receivable are worth approximately $1,000,000 and that over the next 60 to 120 days the Debtor will collect all of the over 90 day receivables. His goal is to reduce the receivables to $600,000 and that all remaining receivables should be less than 90 days old. Under Carey's scenario, PVP will use at least $400,000 of (the Bank's) receivables to purchase additional inventory to grow sales.

During five-plus months in Chapter 11, the Debtor has not met any of its projections, while pre and post-petition management made a depressing series of poor business decisions, and that same management is now the Debtor's turn-around team. The Debtor argues that Mr. Carey can correct past mistakes and should be given the opportunity to do so, considering that his application to employ was just filed on January 18, 2008. Amerisource, which in one breath claims to be an "undersecured creditor," and in the next acknowledges that it may be completely unsecured, supports the Debtor's request to use cash collateral. The UST on behalf of unsecured creditors also supports the continued use of cash collateral. Considering the assets of PVP only, it is clear that BankRI is under water and that Amerisource is unsecured. If the real estate in the Sandy Bottom case is considered, BankRI still has an equity cushion, but Amerisource and other unsecured creditors of PVP receive no comfort from Sandy Bottom assets because they are not creditors of Sandy Bottom, and they have no security interest in Sandy Bottom assets.

**\*5** It also appears that since October 2007, BankRI's collateral position has deteriorated by at least $190,000, based on Mr. Carey's opinion that the value of the pill-packaging machines is zero. Additionally, as PVP continues to operate, at least $400,000 of accounts receivable will be depleted and not replaced, all in what this Court sees as the still vague hope of PVP becoming profitable.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Given its consistently subpar performance to date, the significant equity cushion enjoyed by BankRI between both Chapter 11 estates is the Debtors' only redeeming feature. In order to still support that conclusion, however, the receivables must now be included in the mix. The real estate is still valued at fair market value because Mr. Carey is entitled to a brief period within which to show that a reasonable likelihood of reorganization is in prospect. The Debtor is cautioned, however, that the continued passage of time, without such a showing, the more closely the Court will have to look at liquidation value of the collateral because, frankly, the Court does not share the same optimism over the Debtor and Mr. Carey's ability to stop the bleeding, as do Amerisource and the UST.

Although Mr. Carey has set very aggressive (although largely unsupported) goals for the Debtor, because the evidence still shows that BankRI still has an equity cushion even with an expected reduction in receivables, I will allow the continued use of cash collateral, to see if Carey can achieve the milestones he has established, for a period of approximately 60 days from the date the last hearing on cash collateral was concluded (February 5, 2008). A continued hearing on cash collateral and relief from stay will be held on **April 16, 2008, at 11:00 a.m.** Also, the Debtor is **ORDERED** to file and circulate a draft plan of reorganization by **Monday, April 14, 2008,** and at the continued hearing, PVP shall report the *actual results* of its performance through March 31, 2008. The Debtor is forewarned that if it does not substantially achieve the projections of Mr. Carey, and if the prospect of reorganization has not significantly improved, the Debtor will be expected to show cause why an independent trustee should not be appointed for cause under 11 U.S.C. § 1104(a).

Bkrtcy.D.R.I.,2008.
In re Pawtuxet Valley Prescription & Surgical Center, Inc.
Slip Copy, 2008 WL 1990887 (Bkrtcy.D.R.I.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: FEB 10,2009

## KEYCITE

**In re Pawtuxet Valley Prescription & Surgical Center, Inc., 2008 WL 1990887 (Bankr.D.R.I. Mar 10, 2008) (NO. BK 07-11767, BK 07-12699)**

No references were found within the scope of KeyCite's citing case coverage.

© 2009 Thomson Reuters. All rights reserved.

Westlaw.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))

Page 1

Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. Pennsylvania.
In re ARCHIBALD ALLAN ASSOCIATES, INC.,
Debtor.
No. 03-31412DWS.

Feb. 20, 2004.

Paul Jude Winterhalter, Didonato & Winterhalter, P.C., Philadelphia, PA, for Debtor.
Thomas Biron, Blank Rome LLP, Philadelphia, PA, for Lighthouse Financial Corp.
Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, for United States Trustee.

*MEMORANDUM OPINION*

SIGMUND, Bankruptcy J.

*1 Before the Court is the Debtor's Emergency Motion for Further Authorization to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(B) and Bankruptcy Rule 4001(b), 4001(d) and 9014 (the "Emergency Motion") and the Objection of Lighthouse Financial Corp. to the Motion and Cross Motion to Enforce Seventh Interim Stipulation and Agreed Order Permitting Use of Cash Collateral (the "Cross Motion"). Pursuant to this Court's Order dated February 18, 2004, an expedited hearing was held on February 19, 2004. For the reasons that follow, the Emergency Motion and Cross Motion are denied.[FN1]

> FN1. The facts recited below are based on docket of this case, the record of this hearing and the prior hearing on January 27, 2004 as well as the undisputed pleadings filed in connection with the use of cash collateral. Fed.R.Evid. 201, incorporated in these proceedings by Fed.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995). While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Augenbaugh,* 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." *In re Indian Palms Assoc.,* 61 F.3d 197, 205 (3d Cir.1995) (*citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules). Moreover, "factual assertions in pleadings, which have not been superceded by amended pleadings, are judicial admissions against the party that made them. *Larson v. Gross Bank,* 204 B.R. 500, 502 (W.D.Tex.1996) (statements in schedules). *See also In re Musgrove,* 187 B.R. 808 (Bankr.N.D.Ga.1995)(same); *In re Leonard,* 151 B.R. 639 (Bankr.N.D.N.Y.1992) (same).

BACKGROUND

On August 1, 2003 Archibald Allen Associates, Inc. ("Debtor") filed this Chapter 11 case.[FN2] It began as it is ending with a hotly contested emergency motion to use the cash collateral held by Lighthouse Financial Corp. ("Lighthouse").[FN3] After an evidentiary hearing, the parties agreed to its use and for the following five months Debtor and Lighthouse entered into a series of stipulations setting forth the terms and conditions as agreed. The events that gave rise to this contested manner began on January 20, 2003 when the Sixth Interim Stipulation and Order Authorizing Use of Cash Collateral expired by its own terms on January 18, 2004.[FN4] Unable to reach agreement, on January

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
**(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))**

Page 2

23, 2004 Lighthouse filed a Motion for Expedited Consideration of its Motion for Relief from the Automatic Stay alleging that Debtor was unable to provide it with adequate protection, the continued operation of the business would only increase Debtor's administrative insolvency and no agreement had been reached for the windup of operations and turnover of the collateral. Doc. No. 155. The Debtor for its part, now without the use of cash collateral to operate its business, filed on January 26, 2004 a Renewed Emergency Motion for Authorization to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(B) and Bankruptcy Rule 4001(b), 4001(d) and 9014 (the "Prior Emergency Motion") along with a motion for expedited consideration. Doc. No. 157, 158. Both parties' Motions were scheduled to be heard on January 27, 2004.

> FN2. The Debtor is in the business of printing and direct mail marketing. Its largest customer is the Trump casino which account represents 35-40% of its revenue.

> FN3. Lighthouse was Debtor's pre-petiton lender and holds liens on all the Debtor's assets.

> FN4. By agreement the parties continued negotiating a further extension of such use and requested that the scheduled hearing be continued until January 20, 2004.

The basis of the Prior Emergency Motion was Debtor's identification of a prospective lender, Patriarch Management, L.P. ("Patriarch") [FN5] which "almost miraculously" presented a proposal which the Debtor averred "will form the foundation for its ability to present a viable Plan of Reorganization."Prior Emergency Motion ¶ 14. "A non-binding outline of the general lending and investment proposal" was attached as an exhibit to the Motion which noted that the "prospective lender requires a brief period of time to perform certain due diligence investigation of the debtor's business and financial operations."*Id.* ¶ 14, 15.The referenced outline, Exhibit L-1 (1/27/04 hearing), is a letter from John Cullen on behalf of Patriarch expressing its interest in "providing financing to replace the Lighthouse facility conditioned on our ability to obtain an equity interest in excess of 50% in the surviving or reorganized entity" and anticipating a capital infusion into the surviving company to improve its normal business functions. Significantly, Cullen stated "[a]s further evidence of our interest in this investment opportunity, we are willing to advance up to a sum of $200,000 to you individually, Archibald J. Allen, based on your personal guarantee of repayment along with your commitment to use these funds exclusively to assist in the funding of business operations of Archibald Allen, Inc. during the period of due diligence."He also noted Patriarch's expectation that Lighthouse would permit use of cash collateral during the due diligence period.

> FN5. John Cullen, its Treasurer, testified that Patriarch is a family owned investment vehicle formed fairly recently. Its interest is in providing private financing and capital to companies that it views can be made profitable by such support.

*2 At the hearing on the Prior Emergency Motion, Cullen fleshed out his intentions regarding the Debtor. He maintained his interest but acknowledged that until Patriarch and its agents had the opportunity to complete a due diligence review of the business, he could make no commitments to move forward. He estimated that he would need three weeks to perform this task.[FN6]He also "clarified" his letter which had been interpreted by its readers to contain a $200,000 committed fund for operations during the due diligence period. Rejecting any financial undertaking on Patriarch's part during the due diligence period, he stated that the $200,000 was a maximum amount of funds that would be available at Patriarch's discretion if the Debtor did not have cash collateral to use, *i.e.,* where the Debtor's business had not generated sufficient cash to operate. While Lighthouse was underwhelmed with

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-11153-scc    Doc 551-4    Filed 02/13/09    Entered 02/13/09 11:17:30    Exhibit D -
Cases    Pg 10 of 15

Page 4 of 10

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))

Page 3

Cullen's testimony and indeed suspicious given his "miraculous" appearance on the eve of their motion for relief and refusal to consent to further use of cash collateral, it was apparently persuaded, with some encouragement by the Court and presumably some recognition of its own self interest in avoiding a liquidation, to allow the use of cash collateral during the period Patriarch required to complete its due diligence.

> FN6. At this latest hearing his recollection was that the time frame was three to four weeks. My notes support the shorter peri- od.

The terms of the agreement for continued use were memorialized in the Seventh Interim Stipulation and Agreed Order Permitting Limited Use of Cash Collateral (the "Seventh Stipulation") subsequently presented to the Court and so ordered on January 28, 2004. Doc. No. 164. The Seventh Stipulation, which acknowledged Lighthouse's claim in the amount of $2,360,586.92 as of January 27, 2004, [FN7] provided that the Debtor is authorized to use cash collateral from January 23, 2003 through February 20, 2004 limited to the amounts stated in the attached budget and not to exceed 85% of the aggregate Eligible Receivables. However, the Debtor may only request such use if "it is in full compliance of all provisions of this Stipulation and Agreed Order and no default or Termination Event shall have occurred ."Seventh Stipulation ¶ 2. As the use of cash collateral was made available to facilitate the Patriarch loan/investment, the Seventh Stipulation sets forth the parties' agreement concerning the relationship between that transaction and further use. I quote the controlling paragraph in full:

> FN7. It is also stated that Lighthouse's claim as of August 6, 2003, the filing date, was $1,216,639.93. Since Lighthouse has made no new loans, the increase is attributed to accrued and unpaid interest of $42,383.59 (in excess of the adequate protection payments received) and expenses (including attorneys' fees) of $102,564.00.

6. *Replacement Financing by Patriarch and Relief From The Automatic Stay*

a. Debtor represents and warrants that Patriarch is presently conducting its due diligence review of the Debtor's business operations. In the event that either (i) before February 20, 2004 Patriarch informs Debtor or Lender that it will not be proceeding further or (ii) that a binding commitment to loan sufficient funds to repay or to buy Lender's loan in full is not received from Patriarch or an affiliate of Patriarch before 5:00 p.m. (prevailing Eastern time) on February 20, 2004 (each a "Termination Event"), Lender shall immediately, and without further order of this Court, be granted relief from the automatic stay provisions of 11 U.S.C. § 362(a) to pursue all of its legal and equitable rights against the Collateral, and Debtor shall without delay turnover to Lender possession of all books and records and other Collateral that Lender desires to take possession of.

*3 b. Patriarch has indicated the possibility of interim loans up to $200,000 to Allan individually for Allan to fund into Debtor as equity or as an unsecured loan. No such loan shall be made without Lender's approval.

c. Debtor and Patriarch shall keep Lender fully informed of the status of Patriarch's due diligence review and of its determinations concerning its interest in providing the financing and/or funding to Debtor.

Following the January 27 hearing, Patriarch immediately commenced due diligence activities. On February 5, 2004 it met with attorneys Dilworth Paxton LLP ("Dilworth") to discuss the contemplated transaction and was advised that a financing which would retire the Lighthouse debt was not advisable. Rather Dilworth recommended that Patriarch buy the Debtor's assets either through a bankruptcy sale under § 363 or a plan of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-11153-scc    Doc 551-4    Filed 02/13/09    Entered 02/13/09 11:17:30    Exhibit D -
Cases    Pg 11 of 15

Page 5 of 10

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))

Page 4

FN8 When Lighthouse was approached with the change in structure of the deal, it objected since its agreement to support the Debtor during the Patriarch due diligence was premised, as the Seventh Stipulation states, on replacement financing being provided to pay off its debt. Facing that reaction, Cullen ceased further due diligence activities, cancelling the appraisal of the machinery and equipment he ordered on February 9th so as not to assume any further "soft costs" in connection with the transaction. Efforts by Lighthouse's Vice President Robert Bradley to schedule a meeting at the end of last week were unsuccessful as Cullen was otherwise engaged with his family.

> FN8. Discussions with the United States Trustee discouraged the § 363 route outside of a plan of **reorganization**, and the Debtor now requests eight weeks of use of **cash collateral** to pursue a plan of **reorganization**, the centerpiece of which is an asset sale to Patriarch.

Nonetheless, Cullen appeared with counsel at the hearing to express Patriarch's continued interest in purchasing the Debtor's assets through a plan of reorganization provided that the Debtor was still operating the business and its important accounts, *i.e.*, Trump, and salespersons would be maintained.FN9 He projected that it would take another four weeks to reach a signed agreement and acknowledged that while he was trying to develop a fair and reasonable price, he had put that activity "on hold" when Lighthouse was not receptive to its new deal structure. Accordingly, he could not state what the purchase offer would be. Moreover, he indicated that to the extent he had made any commitment of financial support of the Debtor during the due diligence period, that offer was withdrawn. Patriarch has no intention of providing any financial backstop during the period the sale agreement is being negotiated and the plan of reorganization proposed and confirmed. As recognized by the United States trustee, that period will be closer to 12 to 16 weeks than the eight weeks requested by the Debtor to continue the use of Lighthouse's cash collateral.

> FN9. He acknowledged that there have been no discussions with any of the salespeople about their future employment.

The Debtor contends that Lighthouse cannot be harmed since it has agreed to only use up to 85% of the new billings and never more than the cash it has on hand. It will continue the monthly adequate protection payments of $10,000, the use of the lock box and provide replacement liens on new receivables. Lighthouse counters that its collateral position has and continues to deteriorate and it is not adequately protected for continued use. However, it is its primary argument that the Seventh Stipulation precludes the use requested which compels the outcome in this case. I turn to that contention now.

DISCUSSION

*4 As noted above, the Seventh Stipulation provides "in the event that either (i) before February 20, 2004 Patriarch informs Debtor or Lender that it will not be proceeding further or (ii) that a binding commitment to loan sufficient funds to repay or buy Lender's loan in full is not received from Patriarch or an affiliate of Patriarch before 5:00 p.m. (prevailing eastern time) on February 20, 2004 (each a "Termination Event"),"FN10 Lender shall be granted relief from the automatic stay without further order of Court. Moreover, upon such Termination Event, Debtor may not request further use of cash collateral. Stipulation ¶¶ 6.a. and 2. As I find that neither Patriarch nor its affiliate has presented a binding commitment to repay Lender's loan, FN11 I conclude that a Termination Event has occurred under the terms of the Stipulation. The consequences of the Termination Event are the granting of relief from stay to Lighthouse without further order of Court and Debtor being precluded from requesting further use of cash collateral. To grant the Emergency Motion requires me to excuse Debtor from performing its agreements under the Seventh Stipulation.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-11153-scc    Doc 551-4    Filed 02/13/09    Entered 02/13/09 11:17:30    Exhibit B -
Cases    Pg 12 of 15
Page 6 of 10

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))

Page 5

FN10. Debtor agreed that while the 5:00 p.m. February 20th deadline had not been reached at the time of the hearing, the contingency would not be met in the next 24 hours.

FN11. Lighthouse also contends that a Termination Event has occurred by reason of ¶ 6.a. (i). I find that position debatable but need not discuss my reasoning as it is superfluous to this decision.

It is well settled that stipulations between the parties and settlement of litigation are favored by the law and should not be lightly set aside, *Waldorf v. Shuta,* 142 F.3d 601, 616 (3rd Cir.1998); *Martin v. North Penn Savings & Loan,* 253 B.R. 346, 350 (M.D. Pa.2000). Enforcing a stipulated agreement also is supported by policy considerations such as the avoidance of costly and time-consuming litigation, *In re Buzzworm, Inc.,* 178 B.R. 503, 512 (Bankr.D.Co.1994). Indeed refusing to enforce a stipulated agreement undermines the willingness of parties to enter into future agreements which promote the prompt and efficient administration of bankruptcy cases. The integrity of stipulations regarding the use of **cash collateral** is essential to the Chapter 11 **reorganization** process. Lenders would be naturally reluctant to allow a debtor-in-possessions to use their cash collateral if the protections they negotiated would not be honored. The consequence of non-enforcement would be contested cash collateral hearings that would be disruptive and undermine the legislative policy of giving the debtor a breathing spell to reorganize its affairs. Therefore, unless a stipulation has not been entered into voluntarily, or its terms violate public policy, or other extenuating circumstances exist, a court will enforce the clear terms of a stipulation of the parties previously approved by the court at the request of the parties. *Sellersville Savings and Loan Association v. Kelly,* 29 B.R. 1016, 1018 (E.D.Pa.1983). There is no contention that the Stipulation has not been entered voluntarily or that its terms violate public policy. Debtor does maintain that there are extenuating circumstances that justify it being relieved of its agreement.

In support of its position, Debtor's principal Archibald Allen testified that he would have never agreed to this Termination Event had he known that Patriarch was going to change its position and insist on an asset sale instead of replacement financing. This circumstance, he contends, was not within his control and could not have been anticipated since it was driven by Patriarch's post-Stipulation consultation with its attorney. This is the alleged extenuating circumstance that he contends excuses Debtor from the self-executing terms of the Seventh Stipulation.

*5 The problem with Allen's argument is that it is not merely the change in structure of the transaction that fails to meet the condition for further use of cash collateral but the absence of any binding commitment on Patriarch's behalf at all, without regard to legal form, as of February 20th.[FN12] Cullen could not have been clearer. He seeks another month to come to a binding agreement. He refuses to even suggest the price range he is thinking about and is firmly opposed to making any financial commitment to the Debtor while the reorganization awaits the outcome of Patriarch's further investigation. While Patriarch was apparently interested enough in the Debtor as a potential business opportunity to appear at two hearings and engage counsel, Cullen has not even completed the due diligence that was contemplated to be performed by now per his January 27 testimony. Indeed when Patriarch met with opposition from Lighthouse to the change in the transaction, he called off the appraisers, put his analysis of the price parameters of the deal "on hold," and failed to respond to Bradley's request to meet. From this I conclude that Patriarch is interested but is so far from being committed to any transaction that would accomplish the payment of Lighthouse's claim (or fund a Chapter 11 plan) that the unexpected change in form of the transaction is not an extenuating circumstance for excusing Debtor's performance of the Seventh Stip-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
**(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))**

Page 6

ulation.

> FN12. A commitment for replacement financing would have required a payment of $1.3 million, the stipulated Lighthouse debt. However, a sale of assets free and clear of liens (which I assume Patriarch would want) would also require Lighthouse to be paid in full. The difference seems to me to be one of timing with the plan process requiring Lighthouse to wait longer to find out if Patriarch is real and to support the Debtor in the interim. Had Debtor produced a binding commitment by Patriarch to purchase the assets for an amount at least equal to Lighthouse's debt, the Debtor would have at least had an argument.

It is with a heavy heart that a court must acknowledge the failure of a reorganization of a business with a substantial number of employees as here.[FN13] The result today is warranted not only because the Debtor agreed to it but because as a matter of bankruptcy law Lighthouse is entitled to it. This Debtor after a rocky start made improvements in its billing practices, reduced its costs and integrated a new operation that contributed to its profitability. It has had six months of bankruptcy protection to come up with a plan to deal with Lighthouse which has kept the pressure on in this case to protect its own interests. Regrettably, Debtor has not been able to secure new financing to satisfy the Lighthouse claim. It attributes that failure to an insufficient time to build its sales to secure the level of funds it would need. Thus it seeks to keep Lighthouse captive to this proceeding on the grounds that its position will not worsen because the Debtor will only use the cash it has and only an amount not to exceed 85% of eligible receivables. While Debtor and Lighthouse disagree as to the prejudice to Lighthouse,[FN14] it is evident that at best there is no cushion in the collateral over the Lighthouse debt.[FN15] Because I find that the Debtor has no exit strategy from this case, the one form of adequate protection that might have made a difference, *i.e*., viable prospects of a reorganization, I conclude that there is no legal basis to prevent Lighthouse from exercising its contractual remedies under its loan agreements. Moreover, to the extent the administrative expenses of this case are growing, the reorganization effort should be terminated. To allow it to continue promises to be more harmful to creditors than the potential benefit of the speculative asset sale being proposed.

> FN13. The Debtor's payroll of 87 employees at filing now supports 64 persons.

> FN14. Lighthouse's premise is that its loan balance has increased by interest and legal fees and its collateral base has shrunk. The receivable base was $1,302,00 on January 31 and $1,252,000 on February 19, 2004. However, Allen testified that the Debtor was billing approximately $100,000 just that day which would indicate no erosion of the receivable base. While Allen testified that Debtor has been profitable since July, Lighthouse introduced an analysis of the Debtor's operating statements since August that undercut that statement. Exhibit L-2. It also shows mounting post-petition liabilities although they appear to be heavily related to accrued professional fees and Lighthouse expenses. *Id.* To the extent these are administrative expenses they would have to be paid in full under a plan of reorganization.

> FN15. It is also evident, as Debtor repeatedly stated, that upon cessation of business operations, the receivables will be worth much less than face value. Debtor stressed the deleterious impact a business cessation would have on Lighthouse's collateral, a proposition of which Lighthouse is not unmindful. Had it had any confidence in the Patriarch transaction, it would have gone that route to avoid that outcome. However, it views the impact on collectab-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

08-11153-scc    Doc 551-4    Filed 02/13/09    Entered 02/13/09 11:17:30    Exhibit D -
Cases    Pg 14 of 15    Page 8 of 10

Not Reported in B.R.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)
**(Cite as: 2004 WL 422047 (Bkrtcy.E.D.Pa.))**

Page 7

ility from cessation of business to be an inevitable result of the failure of this reorganization and is prepared to mitigate its loss now.

*6 Finally with respect to Lighthouse's Cross Motion, I have enforced the Seventh Stipulation insofar as I have relied upon its terms to refuse the Debtor's request for further use of cash collateral. The Seventh Stipulation does not require an Order of this Court for relief from stay, and accordingly Lighthouse is free to exercise its contractual remedies. The request for an order directing Debtor to turnover its books and records and other collateral as required by the Seventh Stipulation upon the occurrence of a Termination Event is premature. Lighthouse certainly knew that Debtor was seeking to gain relief from the agreement, and pending a hearing (which is contemplated by the Seventh Stipulation), would not do so. Now that the contested cash collateral matter has been adjudicated, I would hope that the parties could work together in their mutual best interests to wind down the business. I will schedule a follow-up hearing to address the future of this bankruptcy case at which I will entertain any further needs for enforcement orders.

An Order consistent with the foregoing Memorandum Opinion shall be issued.

### ORDER

AND NOW, this 20th day of February 2004, upon consideration of Debtor's Emergency Motion for Further Authorization to Use Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(B) and Bankruptcy Rule 4001(b), 4001(d) and 9014 (the "Emergency Motion") and the Objection of Lighthouse Financial Corp. to the Motion and Cross Motion to Enforce Seventh Interim Stipulation and Agreed Order Permitting Use of Cash Collateral (the "Cross Motion"), after notice and hearing and for the reasons set for the in accompanying Memorandum Opinion;

It is hereby ORDERED and DECREED that:

1. The Emergency Motion and Cross Motion are DENIED.

2. A status hearing shall be held on MARCH 2, 2004 at 9:30 a.m. in the Robert N.C. Nix, Sr. Federal Courthouse, 2nd floor, 900 Market Street, Courtroom # 3, Philadelphia, PA to consider the future of this Chapter 11 case.

Bkrtcy.E.D.Pa.,2004.
In re Archibald Allan Associates, Inc.
Not Reported in B.R., 2004 WL 422047 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: FEB 10,2009

## KEYCITE

**In re Archibald Allan Associates, Inc., 2004 WL 422047 (Bankr.E.D.Pa. Feb 20, 2004) (NO. 03-31412DWS)**
No references were found within the scope of KeyCite's citing case coverage.

© 2009 Thomson Reuters. All rights reserved.