<u>Exhibit B</u>

file:///C|/Documents%20and%20Settings/dmbanach/Local%20Settings/Temporary%20Internet%20Files/OLK159/012909saltneu.txt

```
0001
 1   UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ----------------------------------------x
 3
     In re:              Case No.
 4                       08-11153(mg)
 5   LEXINGTON PRECISION CORP, et al.,
 6            Debtors.
 7   ----------------------------------------x
 8              10:33 a.m.
                January 29, 2009
 9
10            450 Lexington Avenue
              New York, New York 10017
11
12
13
14
15       DEPOSITION of STEPHEN E. ALTNEU, testifying
16   on behalf of CAPITAL ONE LEVERAGE FINANCE CORP. in
17   the above entitled matter, taken pursuant to
18   Subpoena, before Suzanne F. Moore, a Registered
19   Professional Reporter, Certified Realtime Reporter
20   and Notary Public of the State of New York.
21
22
23
24
25
0002
 1            STEPHEN E. ALTNEU
 2   A P P E A R A N C E S:
 3
 4   WEIL, GOTSHAL & MANGES LLP
            Attorneys for Debtors
 5        1300 Eye Street, N.W.
          Washington, D.C. 20005
 6
     BY:   ADAM P. STROCHAK, ESQ.
 7
```

8
      ANDREWS & KURTH, LLP
9         Attorneys for Creditors Committee
         600 Travis - Suite 4200
10        Houston, Texas 77002
11   BY:  GERALD L. BRACHT, ESQ.
12
13
      CARTER LEDYARD & MILBURN LLP
14       Attorneys for Capital Source Finance
       2 Wall Street
15       New York, New York 10005
16   BY:  AARON R. CAHN, ESQ.
17
18    LAZER, APTHEKER, ROSELLA & YEDID, P.C.
       Attorneys for Capital One Leverage Finance
19      Corp. and the Witness
      225 Old Country Road
20      Melville, New York 11747-2712
21   BY:  JOSEPH C. SAVINO, ESQ.
22
23
24
25
0003
1       STEPHEN E. ALTNEU
2  S T E P H E N  E.  A L T N E U, called as a
3    witness, having been first duly sworn by
4    the Notary Public, was examined and
5    testified as follows:
6
7  EXAMINATION BY MR. BRACHT:
8
9    Q    Could you please state your
10 name, sir.
11   A   Stephen Altneu.
12    Q    How are you employed,
13 Mr. Altneu?
14   A   I work for Capital One Leverage
15 Finance in business development as a Senior
16 Vice President.
17    Q    You're here pursuant to a
18 subpoena that was issued to Capital One, your

10    A    Well, I'm not sure, I mean, I
11    would put myself in that category, however the
12    person -- I wasn't in the office when the
13    service was made, and that person making the
14    service apparently was specifically asking for
15    me.
16        So it wasn't just necessarily
17    Capital One's choice, but obviously someone
18    had mentioned me.
19    Q    Okay.  The point I guess is as
20    far as you are concerned, are you as
21    knowledgeable as anyone at Capital One about
22    those negotiations?
23    A    I believe I am.
24    Q    Okay.  And the subpoena also
25    requested that Capital One produce documents
0006
1        STEPHEN E. ALTNEU
2    in connection with those negotiations, and as
3    far as you know and are aware, has Capital One
4    made its best efforts to do so?
5    A    I made, we made our best
6    efforts to supply the documentation that was
7    requested.
8    Q    I understand.
9        I want to talk with you about
10    the, I guess more or less the sequence of
11    events concerning the negotiations.
12        In the documents that were
13    produced the first date that I could find was
14    February the 6th of 2008.
15        MR. BRACHT:  I'm going to mark
16       that e-mail as Exhibit 2.
17        MR. SAVINO:  It would be
18       helpful if you'd give us the Bates
19       stamp numbers.
20        MR. BRACHT:  It's 59.
21        (The above described document was
22       marked Exhibit 2 for identification, as of
23       this date.)
24    Q    This is from Mr. Lubin.  You
25    understand Michael Lubin to be a principal for
0007

1          STEPHEN E. ALTNEU
2 Lexington Precision?
3      A    Yes.
4      Q    It refers to a new proposal,
5 and it appears that there was a proposal sent
6 to Mr. Lubin by you on or about February 6th
7 of 2008.
8      A    That's correct.
9      Q    It says it's a new proposal.
10 Had Capital One been involved in making
11 previous proposals to Lexington?
12     A    Yes.
13     Q    Do you happen to remember
14 approximately when Capital One got involved
15 with Lexington Precision?
16     A    It was in 2007.
17     Q    Was it in the latter part of
18 2007?
19     A    When you say involved, what do
20 you mean?
21     Q    Well, in negotiating with
22 Lexington for financing of any sort.
23     A    The answer is yes.  I could
24 give some detail, but I --
25     Q    Okay, would you do so?
0008
1          STEPHEN E. ALTNEU
2          MR. SAVINO:  Well, you ask the
3      question.
4      Q    I'm asking you to give detail.
5          MR. SAVINO:  We're talking
6      about the first instance?
7      A    Well, I'll tell you I knew the
8 company before I joined Capital One.
9      Q    Okay.
10     A    So I was probably responsible
11 for introducing Capital One, which was then
12 North Fork Business Capital, to the company
13 regarding financing opportunities.
14     Q    How did you know the company
15 prior to coming to Capital One?
16     A    I had actually introduced them
17 to the CIT Group, where I had worked, and they

9  believe that we were discussing a proposal
10  with the company, and we may have shared a
11  draft, but I don't believe I necessarily
12  signed this proposal, because in my records I
13  couldn't find a letterhead version.
14        Q     So this is a draft of a
15  proposal that never was finished, so to speak?
16        A     Yes.  The company at the time
17  was going through a number of strategic
18  evaluations, and our interest in providing
19  financing would be dependent upon the
20  strategic direction they chose to take.
21              And we were attempting to craft
22  a proposal that would lend itself to whatever
23  that strategic direction might have been, and
24  this one probably was in connection with one
25  of the directions they were evaluating.
0011
1              STEPHEN E. ALTNEU
2        Q     Do you recall what other
3  strategic directions they were evaluating at
4  the time?
5        A     Yes, I do recall.
6        Q     All right.
7        A     One was, and I can't remember
8  the specific dates, but I believe the first
9  thing they were looking to do, which I think
10  was in 2007, was they had, the company had
11  existing financing, and they were
12  contemplating spinning off their metals group.
13              So the very first draft
14  proposal, if you will, which I believe was in
15  2007, which was going to be a much smaller
16  situation where we would simply finance the
17  metals group and the existing financing would
18  stay in place.
19              The second proposal or draft
20  proposal, which I believe is this one --
21        Q     Meaning Exhibit 3?
22        A     -- Exhibit 3, was for the
23  entire company, because they decided they were
24  not going to spin off the metals group.  And
25  that's all I can recall about this particular

4   would advance a certain amount against certain
5   collateral, you know, would also factor into
6   what the financial structure was, and these
7   things were evolving.
8        Q    Do you recall, in the May 12th
9   time frame or afterwards, do you recall
10  receiving a marked up term sheet from
11  Mr. Lubin?
12       A    I believe I did.
13       Q    Let me show you what I'm going
14  to mark as Exhibit 8.
15            (The above described document was
16       marked Exhibit 8 for identification, as of
17       this date.)
18       Q    Do you remember just offhand as
19  to when you might have received that after May
20  the 12th?
21       A    No, I'm sorry.
22       Q    Okay.
23            Let me show you what has been
24  marked as Exhibit 8 and ask you, sir, if you
25  could identify that for me.
0036
1            STEPHEN E. ALTNEU
2            MR. STROCHAK:  Is there a
3   production number?
4            MR. SAVINO:  173.
5            MR. STROCHAK:  Thank you.
6       A    Yes.
7       Q    Excuse me?
8       A    I've looked at it.
9       Q    What is it?  Identify it,
10  please.
11       A    This is a proposal letter, a
12  draft proposal letter I sent to the company,
13  and there are comments and revisions that I
14  believe were made by principals at Lexington
15  Precision telling me what would be acceptable
16  to them.
17       Q    Now, there's an indication
18  "OSH&R." Do you know what that refers to?
19       A    Yes, I see that.  I was going
20  to ask you.  I don't know what that is.

file:///C|/Documents%20and%20Settings/dmbanach/Local%20Settings/Temporary%20Internet%20Files/OLK159/012909saltneu.txt

```
21    Q    Did you --
22    A    I didn't write that.
23    Q    You didn't write that.
24    A    No.
25    Q    That's not your handwriting at
0037
 1         STEPHEN E. ALTNEU
 2    all?
 3    A    No.
 4    Q    Did you have a law firm or an
 5    attorney at a firm called Otterbourg?
 6    A    Yes, it might have been
 7    Otterbourg.  Now that you're mentioning it,
 8    that's probably what it is.
 9    Q    Did --
10    A    So possibly this was a markup
11    from Otterbourg.
12    Q    Are they bankruptcy lawyers, or
13    do they have bankruptcy lawyers?
14         MR. SAVINO:  They do.
15    A    However, we were dealing with
16    Otterbourg primarily as a commercial law firm
17    to do the documentation if we got the deal
18    done.
19    Q    Right.
20    A    And I think they may have, our
21    primary lawyer at Otterbourg probably shared
22    this with a bankruptcy specialist.
23    Q    I noticed that what changes are
24    made, many of them seem to be kind of a
25    bankruptcy type in referring to confirmation
0038
 1         STEPHEN E. ALTNEU
 2    orders, et cetera.
 3    A    Yes.  It's coming back to me
 4    now.  I remember this more extensively than I
 5    did five minutes ago, with what was going on.
 6    Q    All right, but now here we are
 7    on June the 10th.  The only other term sheet
 8    or proposal letter that I've seen that
 9    predates this is in February.
10         Is it safe to assume that
11    between February and June the 10th that there
```

12   may have been other proposal letters going
13   back and forth?
14       A      Only in draft form.  I can say
15   with a high degree of certainty I've never
16   issued one with my signature.
17       Q      Okay.
18       A      And some of these, the early
19   ones were in anticipation of something being
20   worked out with the unsecured creditors, and I
21   forget exactly when the filing was, and then
22   the subsequent letters were modified to
23   reflect the fact the company was in Chapter
24   11.
25       Q      Exhibit 8, in the second
0039
1            STEPHEN E. ALTNEU
2   paragraph there is a number that's mentioned
3   there of $43,300,000, up to a $43,300,000
4   senior secured credit facility to be provided
5   by Capital Source.
6       A      No, Capital One.
7       Q      I'm sorry, Capital One.
8            MR. SAVINO:  Capital Source is
9       the prior sentence.
10           MR. BRACHT:  You're correct,
11       thank you.
12       Q      Do you know where that number
13   came from, the $43 million number?
14       A      Yes.
15       Q      Where did it come from?
16       A      Well, it came from a -- well,
17   it came together from a number of sources.
18   First of all, it was A, what we felt we could
19   provide based upon collateral values that were
20   supplied to us and appraisal values that were
21   anticipated subject to being confirmed by a
22   new appraisal taking place.
23            And it was an amount that we
24   felt at the time would probably be sufficient
25   that, when and if approved, would give the
0040
1            STEPHEN E. ALTNEU
2   company sufficient liquidity to operate and

10          Additionally, and I can't
11  remember the detail, but a lot of the -- there
12  were a lot of things occurring in the
13  bankruptcy proceedings which were influencing
14  their direction, and it may have had something
15  to do with how much subdebt would be converted
16  to equity, things along those lines.
17          But in any case, we had finally
18  come to a point in July that we were prepared
19  to issue our proposal.
20          I don't want to sound like I'm
21  going around in circles, but I can't recall
22  specifically what had changed at that time.
23          I think part of it may have
24  been the fact that they had been very busy
25  with W.Y. Campbell or Y.W. Campbell in
0049
1          STEPHEN E. ALTNEU
2  generating valuations for the various
3  businesses, and we wanted to see that as well.
4      Q      Do you know when you saw that
5  valuation?
6      A      I don't recall exactly when.
7      Q      Do you think you saw a
8  valuation sometime in the July time period
9  that would allow you --
10     A      I'm sorry.
11     Q      That's all right, my fault.
12            -- that would enable you to
13  make a new proposal, a signed proposal?
14          MR. STROCHAK:  Objection,
15      asked and answered.
16          MR. SAVINO:  You can answer.
17          THE WITNESS:  I can answer?
18     A      I know I saw -- we weren't
19  making our proposal based upon the valuations,
20  but we were using the valuations to generate
21  additional comfort.
22          But I'll be honest with you,
23  and I can look in my records, I don't recall
24  when I received the valuation.
25          But I was -- I will say this,
0050

1          STEPHEN E. ALTNEU
2   in advance of receiving the written valuation,
3   I was told about the values by Mr. Lubin, and
4   I know him to be a pretty credible person.
5          He wouldn't say well, the value
6   on this unit came in at $20 million when it
7   was $5. He wouldn't say that; so.
8      Q     My question is directed more
9   towards the time period of the July, I think
10  we'll see in a minute that the final version
11  of the proposal letter that you in fact signed
12  was dated July the 29th of 2008.
13     A     Yes, that's correct.
14         Let me say one more thing,
15  because I just recalled something.
16         We, in anticipation of sending
17  out a proposal letter, had commissioned real
18  estate appraisals and equipment appraisals,
19  and I think they were coming back, and those
20  numbers helped drive us to make proposals,
21  because, as an example, certain pieces of --
22  the fixed assets had been appraised I believe
23  a year or so before, and we weren't willing to
24  base our new proposal on year plus old
25  valuations, and we were waiting for those
0051
1          STEPHEN E. ALTNEU
2   numbers to come back.
3      Q     Did the proposals that you were
4   making going back and forth, did they depend
5   in whole or in part, probably would be more
6   appropriate, on the projections that you were
7   receiving periodically?
8      A     Yes.
9      Q     Let me show you what has been
10  marked as Exhibit 10, which is production 179,
11  and ask you, sir, if you could just identify
12  it for me, please.
13         (The above described document was
14         marked Exhibit 10 for identification, as
15         of this date.)
16     A     This looks like a draft
17  proposal that was prepared shortly before we

18  put it on letterhead and sent it out.
19      Q    So this would have been Capital
20  One's handiwork, so to speak?
21      A    Yes.
22      Q    In other words, the changes
23  that are shown on the far right-hand side were
24  changes that were made by Capital One?
25      A    Absolutely.  These are not
0052
1          STEPHEN E. ALTNEU
2  Lexington changes, these are our changes.
3      Q    And one change that was made --
4      A    Although they may have, some
5  changes may have been made because we got new
6  information from the company.
7      Q    Sure.
8      A    Like they may have said we
9  don't need $43 million, we only need $39
10  million, or something like that.
11      Q    Do you recall that happening?
12  I was going to ask you why did the number
13  change from $43,300,000 to 39,500,000?
14      A    Well, it may have been that, or
15  it may have been a couple of things.
16          I believe at some point we
17  decided to lower our advance rate on
18  undeveloped real estate.
19          There was a piece of real
20  estate in Georgia, and we decided that we
21  would only advance 50 percent, I can't
22  remember specifically in connection with this,
23  but that made a change.
24          And I can't remember -- I think
25  that was primarily it.  I mean, it may have
0053
1          STEPHEN E. ALTNEU
2  been also that I know that the values on the
3  equipment came in a little bit lower because
4  we were going into, you know, the downturn.
5          So, you know, this number, as I
6  mentioned before, anticipated what they would
7  need, but it was also based upon what these
8  asset valuations were able to generate in a

0055
1          STEPHEN E. ALTNEU
2  been marked as Exhibit 11.
3          (The above described document was
4      marked Exhibit 11 for identification, as
5      of this date.)
6      Q    Can you identify that for the
7  record, please, sir.  It's production number
8  65.
9      A    This is the letter we put on
10  letterhead and I signed which was sent to
11  Lexington Precision in anticipation of their
12  execution.
13     Q    Did Lexington ever sign this
14  proposal letter?
15     A    No.
16     Q    Do you know why?
17     A    I think I know why.
18     Q    Okay.  Would you tell me,
19  please?
20     A    Part of it had to do with I
21  think disagreements with the wording,
22  specifically in connection with the exit plan.
23          And I believe they were also
24  concerned that they would be giving us a fee
25  that would, if indeed we generated a
0056
1          STEPHEN E. ALTNEU
2  commitment, might be -- might not be in
3  keeping with what the eventual resolution of
4  the Chapter 11 would produce.
5          In other words, let me see if I
6  can -- I'll get to that in a second.
7          I guess what they wanted was,
8  we wanted to issue a letter and have them
9  execute it, and we wanted to produce a
10  commitment based upon our requirements, and
11  they wanted to be closer to a resolution with
12  the unsecured creditors before committing to
13  go with us.
14          And I'll see if I can point out
15  what I'm talking about here, if you just give
16  me a second.

25  the bridge term loan?
0060
1          STEPHEN E. ALTNEU
2      A    Yes, because they told me they
3  had the intention to sell it, and it wasn't an
4  operating piece of property.
5      Q    That's the property in Ellijay,
6  Georgia?
7      A    That's right.
8      Q    Then the final component was a
9  $2 million capital equipment line?
10     A    Right.
11     Q    Maximum.  Over time, and we'll
12 go over documents with respect to this
13 question, but from the July 29, 2008 time
14 period to today, did the amounts that Capital
15 One would consider loaning under these four
16 components of the credit facility, did those
17 change?
18     A    Yes.
19     Q    Did they go up or did they go
20 down?
21     A    Well, the advance rates didn't
22 go down.  To give you an example, I think that
23 the revolving credit facility was going to go
24 down to reflect a reduction in revenue from
25 Connector Seals.
0061
1          STEPHEN E. ALTNEU
2          So at their request they said
3  they might not need $17 1/2 million, and I
4  can't remember what it went down to.
5          Furthermore, furthermore, we
6  had told the company that we would not, and
7  this was after the big financial crisis
8  occurred, we would like them to seek a
9  separate funding source for their real estate.
10         So that would mean that the
11 term loan would go down to reflect the
12 advances that we would be willing to make on
13 the equipment.
14     Q    And do you recall if, for
15 example, did the cap ex line, did it continue

16  to be part of the financing?
17      A    You know, we didn't really
18  address it.  My guess is it probably would
19  have stayed in place, because it was
20  equipment, and we were willing to make loans
21  against equipment.
22          But it was really kind of an
23  elective, not elective, it was an added bonus
24  we were looking to provide, but it wasn't
25  necessary for them to exit Chapter 11 with, in
0062
1          STEPHEN E. ALTNEU
2  our opinion.
3      Q    Okay.  You mentioned earlier
4  the process of, in kind of turning a proposal
5  into a commitment letter, and part of that
6  process at least includes getting credit
7  approval.
8          Would you explain that process
9  at Capital One.
10     A    Well, credit approval implies a
11  commitment.  I mean, generally what happens,
12  as I think I mentioned before, is if we send a
13  proposal out to a prospective borrower who
14  executes it, it means he's agreed to the terms
15  and conditions that we've outlined.
16          And then we engage in a credit
17  underwriting process that looks more deeply
18  into the financial performance and the
19  operations of the company, and the lead
20  underwriter puts together a fairly extensive
21  credit analysis that's circulated amongst
22  members of the credit committee who have
23  credit decision-making authority, and they
24  meet together and discuss it and either issue
25  a commitment or decline to issue a commitment.
0063
1          STEPHEN E. ALTNEU
2          And if they agree to issue a
3  commitment, they may add additional terms and
4  conditions, return it to us and say okay, take
5  this proposal, which was signed, we approve it
6  subject to these additional conditions, if

file:///C|/Documents%20and%20Settings/dmbanach/Local%20Settings/Temporary%20Internet%20Files/OLK159/012909saltneu.txt

24  respect to the July 29th proposal?
25      A    No.  We wouldn't do that
0065
1          STEPHEN E. ALTNEU
2  without a signed letter and a, you know, a
3  deposit, indicating that there was a complete
4  meeting of the minds with the prospective
5  borrower.
6      Q    And by its terms, it's
7  reflected somewhere in Exhibit 11, the July
8  29th proposal, this proposal expired on August
9  31st of 2008?
10      A    Yes.
11      Q    In general, up to and including
12  today, are you aware of other proposal letters
13  that have been made to Lexington since July
14  the 29th of 2008?
15          MR. SAVINO:  By Capital One?
16      Q    By Capital One.
17          MR. SAVINO:  Subsequent to
18      this.
19      A    No.
20      Q    To your knowledge has Lexington
21  Precision ever agreed to a proposal letter
22  that was made by Capital One?
23          MR. SAVINO:  Objection to the
24      form.  Do you mean executed?'
25      Q    That was executed by Capital
0066
1          STEPHEN E. ALTNEU
2  One?
3          MR. SAVINO:  Do you
4      understand?
5      A    No, I don't understand the
6  question.
7          MR. SAVINO:  Signed.
8      Q    I'll start over.
9          To your knowledge has Lexington
10  Precision ever executed a proposal letter?
11      A    No.
12      Q    Do you know or do you have
13  knowledge to indicate that they indicated
14  agreement with some proposal letter but did

15  not sign it?
16      A    They indicated -- yes, well,
17  they've sent me marked up versions and said if
18  you will accept these changes, we will sign
19  it.  That's as far as it went.
20      Q    Okay, I got you.
21          THE WITNESS:  Can I just take
22  a break for a moment?
23          MR. BRACHT:  Sure.
24          (At this point in the proceedings
25          there was a recess, after which the
0067
1          STEPHEN E. ALTNEU
2      deposition continued as follows:)
3      Q    Right before we broke I was
4  going to move forward and ask you some
5  questions concerning a meeting that you
6  apparently had with Lexington in late August.
7  Let me mark Exhibit 12.
8          (The above described document was
9          marked Exhibit 12 for identification, as
10         of this date.)
11     Q    Would you please identify
12  Exhibit 12 for the record, sir.
13     A    It's an e-mail I sent around to
14  my -- the team at Capital One that was working
15  on Lexington Precision.
16     Q    And it references a meeting
17  that's going to be held on August the 27th?
18     A    Yes.
19     Q    And it looks, if you look at
20  your notes/history, that meeting did in fact
21  take place?
22     A    Yes.
23     Q    And it says on your notes, it
24  says "presentation."  Do you recall what was
25  being presented at the meeting on August the
0068
1          STEPHEN E. ALTNEU
2  27th?
3      A    The presentation is just a
4  little multiple choice thing that shows up,
5  you know.

1          STEPHEN E. ALTNEU
2  unbelievable coincidence, it's production
3  number 19 as well as Exhibit 19.
4          (The above described document was
5      marked Exhibit 19 for identification, as
6      of this date.)
7      Q    Would you identify the bottom
8  portion of this exhibit.
9      A    This is an e-mail from me to
10 Mike Burns and Barry Fein, the people to whom
11 I report, stating that we'd be unwilling to
12 fully underwrite the entire debt facility,
13 however, we would probably try to bring in
14 people.  You may recall I discussed that.
15     Q    But that's different than the
16 concept of taking the entire risk and then
17 trying to sell it.
18     A    Right.
19     Q    This is taking less than a
20 hundred percent of the loan and trying to
21 syndicate the rest.
22     A    Right.  But we would try to do
23 this in advance of issuing the letter.  In
24 other words, we would want to get other
25 partners signed up.
0094
1          STEPHEN E. ALTNEU
2      Q    Right.  At this point in time,
3  when you were proposing this letter to be sent
4  to Mr. Lubin, had Capital One determined how
5  much of the debt facility Capital One was
6  willing to underwrite?
7      A    I believe we were looking to
8  retain at least half, or maybe more.
9      Q    Half of what?
10     A    Well, at this point, maybe $21
11 million, $22 million.
12     Q    That's the half?
13     A    That would be half.
14     Q    That would be half, so half of
15 $42 million?
16     A    Maybe up to $25 million.
17     Q    All right.

18          You describe that amount as a
19  plurality.  What do you mean by that?
20      A      That we would have more than
21  anybody else.
22      Q      Thank you.
23          Now, in July, the date of the
24  July 29th, the date of the proposal letter,
25  Capital One was willing to underwrite a
0095
1          STEPHEN E. ALTNEU
2  hundred percent of the facility, and now
3  obviously not, as of October 22nd of 2008.
4          What had changed?
5      A      I think the Wall Street crisis
6  and the real estate crisis were the primary
7  drivers there.
8      Q      And --
9      A      And, let me just finish.
10          Because of the financial crisis
11  my world changed in that prior to, say,
12  September, we had 10 or 15 or 20 lenders we
13  could have sold this to, potentially sold
14  this, active lenders that participate on
15  senior asset based facilities.
16          But we noticed with the
17  financial crisis a lot of our competitors, who
18  were also our financial potential partners,
19  exited the business, were acquired by somebody
20  else, or were no longer active.
21          And therefore, we lost the
22  confidence that we could just lay it off and
23  underwrite it.  We felt that we would have to
24  find someone, because there were fewer
25  players.
0096
1          STEPHEN E. ALTNEU
2      Q      Now, since the date of this
3  letter has Capital One made attempts to
4  syndicate --
5          MR. SAVINO:  Since October --
6      Q      Since the October 22nd date of
7  the letter has Capital One made attempts to
8  syndicate the loan?

0098
1          STEPHEN E. ALTNEU
2     Q     What was his response?
3     A     I think he felt confident that
4  we'd be able to find partners, so I don't
5  think he was terribly surprised.
6     Q     Now, did this period of time,
7  and I'm focusing on October the 22nd, the date
8  of this e-mail, Exhibit 19, was the issue
9  regarding inventory appraisal, was that a part
10  of the reason why Capital One had decided not
11  to fund or fully underwrite the entire debt
12  facility for Lexington?
13     A     No, it had nothing to do with
14  it.
15     Q     Now, just to be clear, at this
16  point in time, October the 22nd of 2008, had
17  Capital One expressed to Lexington a
18  willingness to finance all of the debt, all of
19  the facility that Lexington needed to get out
20  of bankruptcy?
21          MR. SAVINO:  Objection to the
22          form.  If you understand you can
23          answer it.
24     A     You mean prior to our decision
25  to seek partners, up until that time, is that
0099
1          STEPHEN E. ALTNEU
2  your question?
3     Q     Let's start there, up until
4  that time, up until October the 22nd of 2008.
5     A     As I stated before, we were, up
6  until that date we were willing to provide
7  that amount of financing on a fully
8  underwritten basis, but whether it was
9  sufficient to allow them to get out of
10  bankruptcy was dependent upon how much -- what
11  the uses were relative to the sources.
12          If the sources -- we were
13  willing to provide all the sources on the
14  senior side.  If that was sufficient to pay
15  off all of the uses and leave some liquidity,
16  the answer is yes.

17          But they were aware that there
18  might be a need for them, as an example, to
19  put additional equity in to get that cushion
20  up.
21          And they had been aware of that
22  and they were willing to do it, I believe.
23      Q    After --
24      A    If it was insufficient.
25      Q    After October 22nd of 2008, did
0100
1           STEPHEN E. ALTNEU
2   Capital One express an interest in providing
3   all of the exit financing that had been
4   requested by Lexington?
5           MR. SAVINO:  In the beginning?
6       Q    After October the 22nd?
7           MR. SAVINO:  Yes, but in the
8   beginning?
9           MR. BRACHT:  Yes.
10          MR. SAVINO:  Do you
11  understand?
12          THE WITNESS:  Yes.
13      A    The answer is yes, however not
14  on a fully underwritten basis.
15          We were going to find a partner
16  or maybe two partners, on a combined basis
17  we'd have the largest piece.  Whether it would
18  be sufficient to provide, I'm just going to
19  say all the senior financing, whether that's
20  sufficient to get them out of Chapter 11, I
21  can't answer.
22      Q    Okay, but standing alone --
23      A    Yes.
24      Q    -- had Capital One after
25  October the 22nd expressed an interest at any
0101
1           STEPHEN E. ALTNEU
2   time in providing the entire amount of the
3   debt?
4       A    On a best efforts basis, yes,
5   but not on a fully underwritten basis.
6       Q    When you say a fully
7   underwritten basis, you mean not willing to

8  take a hundred percent of the risk.
9       A       We were willing to arrange
10  financing for a hundred percent and keep 50
11  percent or more, but we were not willing to
12  provide on a fully committed basis one hundred
13  percent.
14       Q       Do you know whether or not the
15  letter that you were drafting that's on
16  Exhibit 19, whether that was ever sent to
17  Mr. Lubin?
18       A       I don't believe it was.
19       Q       And do you know why?
20       A       I think at the time, quite
21  frankly, other things had come up which made
22  it less clear, other aspects of what our
23  structure would be like.
24              And I do want to add that, as
25  an addition to my previous statement to your
0102
1              STEPHEN E. ALTNEU
2  previous question, the answer was yes,
3  everything I said was true, assuming that the
4  overall composition of the company remained
5  the same.
6              To segue into your next
7  question, about the same time that this
8  October 22nd discussion occurred, things were
9  changing at Lexington from the standpoint that
10  they were contemplating the sale of their
11  Connector Seals business.
12              And had that occurred, it would
13  have changed how much financing they would
14  need from us at Capital One, because that
15  would have generated proceeds of sale because
16  that unit would have been sold.
17              So that kind of muddied the
18  waters a little bit, and in answering your
19  present question, one of the reasons I'm
20  guessing we didn't send out a subsequent
21  proposal wasn't just that the new proposal
22  would have different language regarding best
23  efforts underwriting, but it also would have
24  had different numbers reflecting the fact that

22  believe I have it, though.
23          MR. SAVINO:  We'll try to get
24      it over to you.  What I produced to
25      you this morning was all that he
0118
1          STEPHEN E. ALTNEU
2  provided to me.
3          MR. BRACHT:  That's fine.
4          MR. SAVINO:  This was probably
5      his attachment, it probably didn't
6      get downloaded.
7          MR. BRACHT:  That's fine, I'm
8      not upset.  I would like you to go
9      ahead if you can find it and produce
10     it.
11     Q      What is FLD?
12     A      Forced liquidation value.
13     Q      I'm sorry, we talked about that
14  a little bit.
15         I'm trying to understand why
16  he's asking, "why go above a hundred percent
17  of FLD?"
18     A      I can answer that.
19     Q      Tell me why.
20     A      It's kind of ironic when you
21  hear me out.
22         One form of valuation is forced
23  liquidation value.  That's the most distressed
24  type of valuation.  And he is suggesting we
25  not lend more than a hundred percent of forced
0119
1          STEPHEN E. ALTNEU
2  liquidation value, which is inclusive of
3  expenses.
4          Our earlier proposals were 85
5  percent of net orderly liquidation value,
6  which is a less stressful valuation.
7     Q      Okay.
8     A      The irony is 85 percent of net
9  orderly liquidation value in this case, as I
10  recall, is greater than a hundred percent of
11  FLV, so he's mistaken there.  We aren't
12  advancing more than a hundred percent of FLV.

13    Q    You are or you're not?
14    A    We're not.
15    Q    I'm a little I guess confused
16  about point number 2, about the real estate.
17  He says, "65 advance rate and eliminate land,"
18  and then talks about, "maybe advance probably
19  should not exceed 50 percent."
20         Was there a change in the
21  advance rate, or was he suggesting a change?
22    A    He was suggesting a change.
23    Q    From 65 to 50?
24    A    No.  Our earlier proposal --
25  hold on a second, give me a second.
0120
1         STEPHEN E. ALTNEU
2         Our proposal earlier and in
3  this ICM was to advance 75 percent, and he was
4  suggesting 65 percent on improved primary
5  property.
6    Q    And still the 50 percent on raw
7  land?
8    A    No, he says here to eliminate
9  the land.  When he said eliminate land, he's
10  referring to specifically that one unimproved
11  property.
12    Q    Okay.
13         He goes on to indicate, down
14  towards the bottom, next to the last
15  paragraph, that "a cap ex line may not be
16  warranted."
17         Do you know whether or not a
18  cap ex line is under consideration as being
19  part of, currently under consideration as
20  being part of any loan?
21    A    You know, it hasn't come up in
22  a while, and it's not the primary thing we're
23  interested in, so I can't say yes or no.
24    Q    When he says, "I don't think we
25  can get approval without a big infusion," do
0121
1         STEPHEN E. ALTNEU
2  you know what he's referring to when he says a
3  big infusion?

file:///C|/Documents%20and%20Settings/dmbanach/Local%20Settings/Temporary%20Internet%20Files/OLK159/012909saltneu.txt

4      A     Yes.
5      Q     What is he referring to?
6      A     He could be referring to --
7  he's referring to more cash going into the
8  company, but he's being general.
9           And from my standpoint it means
10 either/or a combination of additional equity
11 being contributed either by Mr. Lubin and
12 Mr. Delano or by somebody else, and/or a sale
13 of Connector Seals, I mean, any one of those
14 things, but what he means by big infusion is
15 additional money going into the business below
16 us in the capital structure.
17     Q     Is it at least your
18 understanding that his number for that big
19 infusion would be $11.5 million?
20     A     Well, that's what he comes up
21 with.
22     Q     That's his number.
23     A     That's his number.
24     Q     Now, have you done, you
25 personally or anybody else at Capital One done
0122
1           STEPHEN E. ALTNEU
2  a similar analysis as set forth on Exhibit 22?
3      A     Informally we have.
4      Q     Do you have anything in
5  writing?
6      A     No.
7      Q     Do you know if Mr. Vavoules'
8  analysis as set forth on Exhibit 22 was
9  communicated to Mr. Lubin or any other
10 representative of Lexington?
11     A     Not in its entirety, but
12 certainly many portions were by me.
13     Q     Okay.  Could you tell me what
14 portions were communicated or that you can
15 recall were communicated?
16     A     Well, we discussed it amongst
17 ourselves.  I didn't take this memo and just
18 directly convey things.  But we, for example,
19 told him that we didn't want to do any
20 advancing on raw land, okay?

file:///C|/Documents%20and%20Settings/dmbanach/Local%20Settings/Temporary%20Internet%20Files/OLK159/012909saltneu.txt

21          And I ignore the first one,
22  because it's not relevant since we were
23  already providing more financing than a
24  hundred percent of FLV.
25          We also discussed unsecured
0123
1          STEPHEN E. ALTNEU
2  creditors, we were talking specifically about
3  vendors, and he came back to us with a plan to
4  repay vendors.  You know, this is all verbal.
5          We discussed excess
6  availability and the need for $4 million.  I
7  think he came back and offered something.
8          But bottom line is we
9  conveyed -- I will not say with any degree of
10  certainty that I told him $11.5 million,
11  because I personally think that's being overly
12  conservative, but we said there was a
13  shortfall, and he acknowledged that, and he
14  told me that's why A, they were considering
15  the sale of Connector Seals, and B, that's why
16  they were prepared to put in additional, I'll
17  call it equity.  It could be junior capital.
18    Q    Just so I'm clear, this
19  additional equity or additional infusion, this
20  is different than the difference between what
21  Capital One is willing to fund and the
22  syndication part of it, correct?
23    A    Correct.
24          In the draft ICM, I think if
25  you look at Exhibit 21 it says, "We're
0124
1          STEPHEN E. ALTNEU
2  requesting approval to arrange on a best
3  efforts basis a $38.6 million senior secured
4  facility."  And later on I think it says that
5  they, that Capital One will hold up to $28.6
6  million.
7          So that syndication would,
8  under this proposal, would require an
9  additional $10 million from somebody else, and
10  what Mr. Vavoules is saying is that in
11  addition to that, there needs to be a big

12  infusion.
13          All these comments are separate
14  and apart from the total senior financing
15  amount.
16      Q    Right.
17      A    We took it upon ourselves to
18  say okay, we'll find a partner for $10 million
19  or whatever.  This is in excess.
20      Q    Referring to Exhibit 22.
21      A    Yes.
22      Q    That's on October the 25th.  It
23  looks like, in referring back to your notes
24  and history document, that there were some
25  communications made in November concerning the
0125
1          STEPHEN E. ALTNEU
2  possible sale of Connector Seals and that type
3  of thing.
4      A    Yes.
5      Q    Other than what is set forth on
6  the notes/history, which is production number
7  336 through 339, that lay out the contacts
8  that were made in November of 2008, do you
9  recall any other communications with
10  Lexington?
11      A    Yes.
12      Q    Tell me what you recall.
13      A    Well, I had, you know, as you
14  can see, I had other calls.  He had actually
15  mentioned to me -- I'm sorry, can you repeat
16  the question?
17      Q    I'm talking about in November,
18  other than what's set forth in your
19  notes/history document, do you recall any
20  other communications with Mr. Lubin?
21      A    I'm sure I had them, but I
22  didn't note them because it was nothing of
23  special newness, but it was basically how
24  these things were progressing, how the
25  discussions with QSR and how the discussions
0126
1          STEPHEN E. ALTNEU
2  with this Austrian company were progressing

10    the meeting.  Yes, that's right.
11           It was held December 3rd.
12       Q    All right.
13           The memo that was produced in
14   response to the subpoena has, it says a number
15   of different things, and I want to ask you
16   about a few things.
17           It indicates that adjusted
18   EBITDA for fiscal year 2008 was estimated at
19   $9.7 million.
20       A    Yes.
21       Q    Do you recall how that adjusted
22   number compared to Lexington's forecast or
23   projections for 2008?
24       A    I'm certain it's lower.
25       Q    Now, if you'll turn the page
0135
1            STEPHEN E. ALTNEU
2    you'll see some other items to note down at
3    the bottom.
4        A    Yes.
5        Q    You're having these meetings,
6    you're looking at new financial projections.
7            At this point in time was
8    Capital One expressing an interest in
9    providing all of the amount needed for the
10   exit financing?
11           MR. STROCHAK:  Objection,
12           vague and ambiguous.
13       Q    What I'm really trying to find
14   out is had your, for lack of a better word,
15   had your attitude changed between October and
16   December in terms of your willingness to
17   underwrite the entire debt facility?
18       A    The answer is, as I stated
19   before, yes, in that first of all, we had
20   moved to a best efforts underwriting.
21       Q    Well, that was what you did in
22   October.
23       A    Well, you said from October.
24           Then we took note of
25   Mr. Vavoules' comments, and therefore were
0136

1           STEPHEN E. ALTNEU
2  reducing our advances on real estate.  But
3  separate and apart from that, as of this date
4  I think the interest was still there.
5        Q     Okay.  Now, one of the other
6  items to note is, "The company would like to a
7  commitment letter with closing and funding
8  subject to certain conditions, such as
9  performance hurdles."
10           Is this what you were referring
11 to earlier when you said that later on, after
12 July, the company was willing to enter into a
13 commitment letter or sign a commitment letter
14 or sign a proposal?
15       A     Yes.
16       Q     Can you describe for me what
17 the certain conditions were and what the
18 performance hurdles were that they were
19 proposing, if in fact they were proposing
20 them?
21       A     That they were proposing?
22       Q     Yes.
23       A     Well, we hadn't agreed on
24 anything specifically, but conceptually I
25 believe there was going to be some kind of
0137
1           STEPHEN E. ALTNEU
2  reserve that we would require, like a minimum
3  availability, that they would request be
4  removed if they could meet certain, you know,
5  regular EBITDA hurdles.
6        Q     Did you talk numbers or just
7  concepts?
8        A     At that point we just talked
9  concepts.
10       Q     In terms of this request, at
11 least as it's stated in this exhibit, for a
12 commitment letter, what was the response, or
13 was there a response to that request?
14       A     I'm sorry, ask me that question
15 again.
16       Q     The way it's stated under other
17 items to note, it says the company would like

9    point.
10        Q        But is this a statement that,
11    to the effect that the company expects or that
12    Lexington expects that all subordinated notes
13    will be converted to equity?
14        A        You know, part of the problem
15    here is I didn't write this.
16        Q        I understand.
17        A        If I had written this I would
18    know what it was saying.  I can't necessarily
19    answer it.
20        Q        Okay.
21        A        My interpretation is that --
22        Q        Well, you were there, though.
23    I mean, you were at the meeting.
24        A        I was at the meeting, but I
25    can't remember everything, I take my own
0140
1                    STEPHEN E. ALTNEU
2    notes.  Sometimes I ignore what's being said
3    as I take a different note.
4                My interpretation of this, I
5    wish I had written this, I'd be able to tell
6    you exactly what this meant, is that we
7    expected by this point all subordinate notes
8    would be converted to equity.  I think they
9    expected it, that means Lexington, also did.
10                And they did tell us, because
11    this was different in previous months, they
12    put in, they did, Warren and Mike Lubin put in
13    additional capital in the form of a DIP
14    facility.
15                And we had known and they had
16    known that, we had told them by this point we
17    wanted that money, I think it was even in some
18    of the Plan of Reorganization, they wanted to
19    be repaid as soon as practicable, but we
20    wanted it converted to equity.
21        Q        You're talking about the $4
22    million DIP facility?
23        A        Yes.  That's what that means.
24        Q        The next line says, "Assumes
25    the company will raise $15 million in

0141
1         STEPHEN E. ALTNEU
2 mezzanine debt."
3      A    Yes.
4      Q    Who assumes, if you know?
5      A    I think we assumed, because
6 this was all in the wake of the Perry Vavoules
7 commentary and the noted shortfall.
8      Q    Right.
9      A    I don't know if $15 million is
10 a set in stone number, but we were trying to
11 estimate on the conservative, you know -- I
12 don't know if conservative is the right word.
13         We were trying to indicate
14 that, you know, between the additional debt,
15 well, the additional expenses that would have
16 to be paid upon exit, there was going to be a
17 shortfall.
18      Q    And it goes on to say, "and
19 assumes the company to obtain mortgages
20 totaling $9 million against real estate
21 assets."
22         At this meeting, were those two
23 concepts, the $15 million in mezzanine debt,
24 the $9 million in mortgages, were those
25 communicated to Lexington?
0142
1         STEPHEN E. ALTNEU
2      A    I don't remember, I'm sorry.
3      Q    Do you recall whether at or
4 near this time Lexington indicated that part
5 of its plan was to obtain or raise $15 million
6 in mezzanine debt and raise $9 million in
7 mortgages?
8         MR. SAVINO: Objection. When
9      you say its plan, you mean the
10      Reorganization Plan?
11         MR. BRACHT: Yes.
12         MR. SAVINO: Do you
13      understand?
14         THE WITNESS: Yes.
15      A    First of all, I'll take the
16 last thing first, the $9 million in real

17  estate mortgages was I think not unrealistic,
18  but it was reflective of the fact that we were
19  become being more conservative on real estate,
20  but we assumed that if we couldn't provide the
21  $9 million in real estate mortgages, they
22  would be able to get it.
23          The mezzanine debt, I remember
24  them talking about raising mezzanine debt, but
25  I don't remember it necessarily being $15
0143
1           STEPHEN E. ALTNEU
2  million.
3      Q    Okay, fair enough.
4           The next document that I have
5  seen in terms of chronology is an e-mail
6  that's dated January the 7th.
7           Let me show it to you and ask
8  you to identify that e-mail.  It's Exhibit 26.
9           (The above described document was
10          marked Exhibit 26 for identification, as
11          of this date.)
12     A    Yes.
13     Q    It indicates that you told
14  Mr. Lubin two weeks ago, which is two weeks I
15  take it prior to January the 7th of 2009, that
16  we cannot do the real estate.
17     A    Yes.
18     Q    Now, is that something
19  different than what was originally
20  contemplated and had been contemplated up
21  until this point in time?
22     A    Up until?
23     Q    Two weeks before?
24     A    I had a meeting with Mike Lubin
25  on December 19th.  That's when I told him,
0144
1           STEPHEN E. ALTNEU
2  yes.
3      Q    When you say, "we cannot do the
4  real estate," it means you can't loan against
5  the real estate.
6      A    Correct.
7      Q    And we talked about why.  I

8   think you go on to say you introduced him,
9   Mr. Lubin, to a fellow by the name of Rory
10  Phillips.
11          Now, did you introduce them in
12  a face-to-face or did you just tell Mr. Lubin
13  about Mr. Phillips?
14      A   I told Mr. Lubin, and they have
15  had subsequent conversations.
16      Q   You're aware of those?
17      A   I'm aware they had
18  conversations, yes.
19      Q   How did you become aware of
20  that?
21      A   I spoke with both Mr. Lubin and
22  Mr. Phillips.
23      Q   Can you tell me what is the sum
24  and substance of those conversations?
25      A   Mr. Phillips said that, you
0145
1           STEPHEN E. ALTNEU
2   know, well, part of it is explained right
3   here.
4           I got off the phone with
5   Phillips, who told me, and has already
6   explained to Lubin, that while he doesn't
7   think the real estate can support conventional
8   real estate loans, he had conversations with a
9   number of his sources and believes he can get
10  Lexington bridge financing in the $9 to $10
11  million range.  This financing will have a
12  term of 18 to 36 months.  He told me that.
13      Q   Mr. Phillips told you that?
14      A   Yes.
15      Q   And do you know what progress,
16  as we sit here today, has been made concerning
17  securing any lending on the real estate?
18      A   Frankly I also introduced
19  Mr. Lubin to two other real estate sources.
20  Whereas here Mr. Phillips is kind of an
21  intermediary.
22      Q   Right.
23      A   Mr. Lubin told me specifically
24  he'd rather deal, he would talk to

25  Mr. Phillips about it if he to, but he'd
0146
1           STEPHEN E. ALTNEU
2  rather talk to principals, and I introduced
3  him to two principals also.
4       Q     Who did you introduce him to?
5       A     I introduced him to a guy named
6  John Douthit, who works for an industrial real
7  estate financing outfit in Chicago, and I
8  can't think of the name of it right off the
9  top of my head, I think it's like an
10  industrial REIT, and they're having
11  discussions as we speak, I believe.
12       Q     With this outfit out of
13  Chicago?
14       A     Yes.
15           And I also introduced him to an
16  organization called Icon Capital, which is not
17  specifically a real estate financing source,
18  but they do what I call turnkey financing,
19  which means they will do a financing against
20  building and equipment for manufacturing
21  facilities, and they're having a discussion.
22       Q     Do you know whether or not
23  Mr. Lubin has chosen or picked any one of the
24  three potential financiers?
25       A     My most recent conversation
0147
1           STEPHEN E. ALTNEU
2  with Mr. Lubin along these lines was this
3  week, and I know he's still talking to John
4  Douthit.
5           I know he's put Mr. Phillips
6  kind of on the back burner, and I believe his
7  conversations with Icon are just getting
8  ramped up this week.
9       Q     You indicated or you indicate
10  in your e-mail that you had a conversation
11  with Mr. Lubin two weeks prior to January 7th.
12           After that conversation and up
13  until the time of this e-mail of January the
14  7th, were you in negotiation with Lexington?
15       A     During this period of time we

16   at Capital One came to the conclusion that
17   unless and until Lexington pretty much had
18   someone lined up to do the real estate, that
19   our providing financing secured by the current
20   assets, meaning the receivables and the
21   inventory and the equipment alone, would not
22   be sufficient, and therefore we wanted to wait
23   to do anything actively until he came back to
24   us and said I think I have someone who can
25   bridge the gap that we left.
0148
1              STEPHEN E. ALTNEU
2        Q    And did you communicate that to
3   Mr. Lubin?
4        A    Yes.
5        Q    And do you recall when you
6   communicated?  Was it at the time you told him
7   that you couldn't do the real estate?
8        A    No, it was later.  I mean, I
9   think it was kind of understood amongst people
10  there and amongst ourselves that it didn't
11  make sense to have half a loaf.
12             So I think he knew that unless
13  he could get the real estate part proposed on
14  it would be, you know, insufficient for us to
15  produce a proposal that even if he executed
16  and we approved couldn't get him there.
17             So our attitude at Capital One
18  was the ball's not in our court, the ball's
19  really in the company's court and any
20  potential real estate lender's court until
21  such time as they were able to come, you know,
22  he was able to come to me and say I think I
23  got someone lined up, at which point we would
24  have kicked back in actively.
25        Q    Going back to Exhibit 26 a
0149
1              STEPHEN E. ALTNEU
2   minute, if you'd look on the second page, it
3   actually starts with an e-mail from Mr. Burns
4   where he's requesting of Ms. Bailey an update
5   memo on the status, recent financial results
6   and a recap of the Disclosure Statement, et