Hearing Date: February 23, 2009 at 10:00 a.m. ET

ANDREWS KURTH LLP
Paul N. Silverstein (PS 5098)
Jonathan I. Levine (JL 9674)
450 Lexington Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

Counsel to the Official Committee
of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:                                                          :    Chapter 11
                                                                :
LEXINGTON PRECISION CORP., et al.,                              :    Case No. 08-11153 (MG)
                                                                :
                                                                :
                        Debtors.                                :
-----------------------------------------------------------------x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OBJECTION TO DEBTORS' THIRD MOTION FOR AN ORDER
PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE
EXTENDING THE DEBTORS' EXCLUSIVITY PERIODS**

TO:     THE HONORABLE MARTIN GLENN
        UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors (the "Committee") of Lexington Precision Corporation, et al. (collectively, the "Debtors"), for its objection (the "Objection") to the Debtors' third motion for an order pursuant to Section 1121(d) of the Bankruptcy Code extending the Debtors' exclusive periods (the "Motion"), respectfully represents:

NYC:186255.1

**INTRODUCTION AND SUMMARY OF OBJECTION**

1. The Debtors' third request for an extension of the exclusive periods under Section 1121(d) is unwarranted and should be denied.[1] The Debtors cannot demonstrate that "cause" exists for granting such relief.

2. On two prior occasions, the Debtors have requested and received extensions of exclusivity on the bases that the extensions would allow them to negotiate plan issues with the Committee, obtain exit financing and meaningfully move these cases forward. Now, for a third time, the Debtors request an extension of exclusivity, alleging that cause exists because: (i) the Debtors must now undertake an operational restructuring of the Connector Seals division due to an unanticipated, precipitous decline in the automotive segment (Motion, at ¶6) and (ii) the Debtors have made substantial progress in the cases (Motion, at ¶¶ 21-23). No matter how the Debtors attempt to spin it, the fact of the matter is that the Debtors have made no progress in these cases either with the Committee or generally (as discussed below in detail).

3. The timing of the decision to undertake an "operational restructuring" is dubious. The proposition that the precipitous decline in the automotive market was unanticipated is absurd. The dramatic deterioration of the automotive markets is not "news" to anyone -- at the very least not to the Committee who has pointed this out on numerous occasions throughout these cases nor to any person who has read the newspaper in the last two-plus years. One would certainly hope that this was not "news" to the Debtors, its management and advisors. Further, as discussed in detail below, the Debtors' claim that the "operational restructuring" will dramatically enhance their ability to obtain exit financing (Motion, at ¶25) is unsubstantiated. The Debtors' request for an extension so that they can undertake an "operational restructuring"

---

[1] The Debtors have already received two exclusivity extensions and have maintained exclusivity for approximately eleven (11) months.

2

amounts to nothing more than a further attempt to stall these Chapter 11 cases in the hope that they can somehow obtain exit financing -- i.e., when, and if, market and economic conditions improve dramatically.

4.    The Debtors have represented to the Court and suggested throughout these Chapter 11 cases that they will be able to obtain the exit financing necessary to consummate the Proposed Plan (as defined below). Dating back to the commencement of these cases, the Debtors have pinned their hopes on obtaining exit financing from a single lender, Capital One Leverage Finance Corporation ("Capital One"), and have, time and again, stated how close they were to obtaining a commitment from them. The Motion continues to perpetuate this false reality as it insinuates that if the Debtors successfully restructure its operations, Capital One will provide the exit financing. To the contrary, the Debtors have not and cannot produce any evidence that they have a reasonable prospect of exit financing. Clearly, without the requisite exit financing, the Proposed Plan is not viable and moot.

5.    Further, as discussed below, while the Debtors continue to stall these Chapter 11 cases, the Debtors' entire business -- automotive and medical -- is in serious decline. Recognizing the businesses' deterioration and the potential impact such deterioration may have on creditor recoveries, the Court cannot allow the Debtors to maintain exclusivity as such would hamper and prejudice the Committee's efforts to confirm a plan of reorganization for the Debtors. After 300 plus days, the Committee and its constituents must be afforded the opportunity to maximize the value of the estate by allowing it to proceed with its own plan of reorganization.

## BACKGROUND

6.    Pursuant to Section 1102(a)(1) of the Bankruptcy Code, the United States Trustee appointed the Committee on April 11, 2008. The Committee consists of Wilmington Trust

3

Company, as Indenture Trustee, Jefferies High Yield Trading, Wilfrid Aubrey LLC, Valhalla Capital Partners, LLC, Momentive Performance Materials, Inc. and Environmental Products & Services of Vermont, Inc. The Committee is the statutory representative of, and fiduciary to, <u>all</u> of the Debtors' unsecured creditors.

7.      On June 30, 2008, the Debtors filed their proposed Joint Plan of Reorganization. On August 8, 2008, the Debtors filed their proposed Amended Joint Plan of Reorganization and a proposed draft disclosure statement with respect thereto. On December 17, 2008, the Debtors filed their proposed Second Amended Joint Plan of Reorganization (the "Proposed Plan") and a proposed draft disclosure statement with respect thereto (the "Proposed Disclosure Statement").

8.      On July 9, 2008, the Debtors filed their first motion to extend their exclusive periods. On July 31, 2008, a lengthy evidentiary was held before this Court and an order was entered extending the Debtors exclusive periods to propose a Chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

9.      On October 7, 2008, the Debtors filed their first motion to extend their exclusive periods. On October 28, 2008, a lengthy evidentiary was held before this Court. On October 31, 2008, an order was entered extending the Debtors exclusive periods to propose a Chapter 11 plan and solicit acceptances thereof to January 26, 2009 and February 25, 2009, respectively.

10.     The hearing regarding the proposed disclosure statement was set January 7, 2009 but was adjourned until February 9, 2009 as the Debtors hoped to obtain exit financing prior thereto. The disclosure statement hearing set for February 9th has been adjourned indefinitely again because of a lack of exit financing.

4

NYC:186255.1

**DISCUSSION**

**I.     The Debtors Have Not Demonstrated That "Cause"
        Exists to Extend Exclusivity For a Third Time**

11.     It is well settled that a "debtor seeking to extend the 120-day exclusive period bears the burden of proof and must show that cause exists for granting an extension." *In re Southwest Oil Company of Jourdanton, Inc.*, 84 B.R. 448, 450 (Bankr. W.D. Texas 1987). *See also In re Gen. Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (same); *In re Curry Corporation*, 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992) (Debtor must make a clear showing of "cause" to support an extension of the exclusivity period); *In re McLean Industries*, *Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (debtor bears burden of proof that cause exists for extending exclusivity). Considering the history and purpose of Section 1121 of the Bankruptcy Code, specifically to limit the delay that makes creditors the hostages of Chapter 11 debtors,[2] a "request to extend . . . exclusivity is a **serious matter**." *In re Matter of All Seasons Indus., Inc.* 121 B.R. 1002, 1004 (Bankr. N.D. Ind. 1990), emphasis added. Such a motion must not "be granted routinely" or without a compelling reason. *McLean Industries*, *Inc.*, 87 B.R. at 834; *Matter of All Seasons,* 121 B.R. at 1004.[3]

---

[2]   *See In re Timbers of Inwood Forest Assocs, Ltd.* 808 F.2d 363, 372 (5th Cir. 1987) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"); *In re Curry Corp.,* 148 B.R. at 755 (same); *In re Gen. Bearing Corp.*, 136 B.R. at 367 (same).

[3] When determining whether a debtor has demonstrated that "cause" exists to extend exclusivity, courts look to the facts of each specific case. Among the "factors" that courts have considered in assessing whether "cause" exists include, but are not limited to, the following:
(i)      the size and complexity of the case;
(ii)     the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
(iii)    the existence of good faith progress toward reorganization;
(iv)    the fact that the debtor is paying its bills as they become due;
(v)     whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(vi)    whether the debtor has made progress in negotiations with its creditors;
(vii)   the amount of time which has elapsed in the case;
(viii)  whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
(ix)    whether an unresolved contingency exists.

5

*Size and Complexity of Case*

12.     These Chapter 11 cases are neither large nor complex. The Debtors themselves made this point when they commenced the cases by telling the Court that these cases boiled down to a "clean up" of a relatively simple balance sheet. In fact, but for the preparation of the proposed Plan and Disclosure Statement, the Debtors have not utilized these Chapter 11 cases to effectuate any "reorganization issues."

*Adequate Time to Propose and Negotiate a Plan of Reorganization/Amount of Time Elapsed*

13.     The Debtors commenced these cases on April 1, 2008 -- approximately 315 days ago. The Debtors have had more than an adequate time to negotiate a plan of reorganization and prepare adequate information especially in light of the fact that the Debtors have done little else in these cases. In fact, the Debtors filed their initial proposed plan in late June 2008 and had finalized their initial disclosure statement in early August 2008. Recognizing such, it is evident that the Debtors have had ample time to attempt to negotiate and confirm a plan of reorganization. Further evidencing such is the fact that Debtors have had the opportunity and/or time to set numerous disclosure statement hearings and confirmation related scheduling only to adjourn them for one reason or another (including, on the past several occasions, the lack of exit financing). The Debtors have had almost a year to consummate a plan for a reorganization which consists of "cleaning up" a simple balance sheet as the Debtors advised this Court on numerous occasions. The fact the Debtors have not been able to do so or obtain exit financing in this period argues against an extension of exclusivity.

---

*In re Adelphia Communications Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). *See also In re Tripodi*, No. 04-30793, 2005 WL 2589185, at *1-2 (Bankr. D. Conn., Oct. 9, 2005); *In re Service Merchandise Company, Inc.*, 256 B.R. 744, 751 (Bankr. M.D. Tenn. 2000); *McLean Industries, Inc.*, 87 B.R. at 834.

6

NYC:186255.1

*Existence of Good Faith Progress Towards Reorganization/Progress with Creditors*

14. Early in these cases, the Committee maintained that the Debtors' sole goal was to maintain control and preserve their equity stake. The Committee was correct in its assertion. Throughout these cases, the Debtors have done everything in their power to maintain such control -- including manipulating their projections and stalling the process in the hope that the lending markets would turn so that they could obtain exit financing -- and, as a result, there has been no good faith progress toward reorganization in these Chapter 11 cases, and no progress whatsoever in negotiations with the Committee.

15. Going as far back as 2006, the fundamental disagreement between the Debtors and the Committee[4] has been enterprise value. The Committee has consistently maintained, since at least 2006, that the Debtors' opinion regarding value was grossly overstated. Since 2006, as the Debtors' rightfully admit, the automotive industry, specifically, and the economy, generally, has suffered. Yet, the Debtors' opinion on enterprise value has increased over time as opposed to decreased as one would logically deduct.

16. Further, despite the Debtors being forced during these Chapter 11 cases, on several occasions, to revise their projections downward because of the economic slump (and because the Debtors have badly missed their budgets on a monthly basis by a wide margin), the Debtors' lofty and flawed opinions concerning the value of their core assets has fundamentally not changed. One telling example of the Debtors' lack of credibility and integrity is that despite the fact that the Debtors' consolidated 2008 EBITDA was approximately $9 million,[5] the

---

[4] As the Court is aware, prior to the Petition Date, an *ad hoc* bondholder group was organized and attempted to negotiate with the Debtors. The majority of the *ad hoc* bondholders group either sits on the Committee as either official members or *ex officio* members.

[5] See Debtors' Motion for Authorization, Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363(c), For Continued Use of Cash Collateral [Docket No. 544] ("Overall, the Debtors' EBITDA for 2008 was $8.6 million, before deducting reorganization expenses.").

7

Debtors maintain, in an undeniably difficult macroeconomic environment, that the projected consolidated 2009 EBITDA of approximately $18 million is accurate without being able to provide a credible bridge. As a result of the Debtors' bad faith refusal to realistically adjust their opinions on value, there has been no progress in narrowing the gap regarding valuation with the Committee, and likely will never be a deal between the two parties on this issue.[6]

17. Similarly, the Debtors have made no good faith progress towards obtaining exit financing. Since at least July of 2008, the time of the first hearing on exclusivity, the Debtors have made numerous representations to the Committee and this Court that exit financing from Capital One was imminent. The Committee has always questioned these statements as misleading and false. The Committee was correct. To the detriment of the estate, these representations have not come to pass. The Debtors are no closer to obtaining exit financing today than they were ten months ago when this proceeding began.

18. In fact, the prospects of obtaining the levels of exit financing required under the Proposed Plan have drastically diminished since July 2008, when the Debtors first represented to the Court that they were on the doorstep of obtaining such. In January 2009, the Debtors were informed by Capital One that, at most, it may, subject to future diligence, be willing to provide approximately $21 million in exit financing -- about forty-five percent (45%) of the financing required under the Proposed Plan. Additionally, via a letter dated February 5, 2009 (which is attached hereto as Exhibit A), it is clear that the Debtors are not very far along with Capital One, and, moreover, Capital One has informed the Debtors that "given the time and effort already expended, COLF will not entertain discussions regarding a potential financing arrangement after March 15, 2009." (Emphasis added). Yet, despite all of this information and being fiduciaries to

---

[6] In conversations between the two parties, Debtors' management has in no uncertain terms stated that they don't believe a consensual deal can be struck.

8

the estate, upon information and belief, the Debtors, until very recently, have never approached any other potential exit financing lenders.

19. The Debtors cannot claim that progress has been made in these cases and one has to question whether or not the Debtors' representations regarding exit financing were based on something tangible and in good faith. Although the Debtors may have tried mightily to move these cases forward, they are spinning their wheels and are no closer towards a reorganization than when they started. All the while, unsecured creditors have continued to lose faith in the Debtors' management and their integrity. The Court must consider this fact in determining whether to extend exclusivity. *See Matter of All Seasons,* 121 B.R. at 1006. The Debtors' businesses continue to deteriorate on a monthly basis, to the detriment of the creditors. The Court cannot allow this to go on any further. To date, exclusivity has hamstrung the Committee from pursuing its own plan of reorganization, including raising the necessary funding to enable the Debtors to emerge from Chapter 11. The Committee cannot be hamstrung any longer.

*No Reasonable Prospects for Filing a Viable Plan*

20. The Proposed Plan is premised on the Debtors' ability to obtain exit financing in an amount, at a minimum, in excess of $45 million. Without such requisite exit financing, the Proposed Plan is not viable. The Debtors readily admit such. (Motion, at ¶9). As aforementioned, the Debtors have continually represented to the Court that they are in negotiations with Capital One to provide exit financing and that a commitment was imminent. Yet, when pushed on this issue, time and again, the Debtors have reluctantly had to back off their misleading and false statements. It is for this reason, and no other, that the Debtors have had to derail the confirmation process and adjourn the disclosure statement hearing indefinitely as the Debtors fear that the Court will not let the confirmation process move forward without a

9

NYC:186255.1

commitment for exit financing. No such commitment exists as of the date hereof and the Debtors cannot produce any evidence that they have reasonable prospects to obtain such financing in the next several months.

21.  Nonetheless, the Debtors choose to continue their charade. In the Motion, the Debtors insinuate in several places that an "operational restructuring"[7] of Connector Seals is all that stands between them and an exit financing commitment from Capital One and that they are still very close to obtaining such financing (Motion, at ¶¶ 8, 9, 20, 25, 26). Additionally, the Debtors states that they "are continuing their discussions with prospective exit lenders[8] and believe they will obtain a satisfactory exit financing commitment once they demonstrate progress on the consolidation plan. (Motion, at ¶26). Nothing could be further from the truth. The Debtors have made such assertions throughout these cases, dating back to July 2008, with no tangible results.

22.  The Debtors have no way of assuring the Court or its stakeholders that this "operational restructuring" will yield the results they say it will. Given the Debtors' track record regarding projections, their statements regarding how the operational improvements will yield a vastly superior company are just words and nothing more. More importantly, the Debtors have no evidence that Capital One, or any other potential exit financing lender, has indicated that a successful "operational restructuring" will yield the requisite exit financing commitment to consummate the Proposed Plan. The evidence clearly suggests otherwise. The reality of the situation is that the Debtors are merely stalling these cases under the guise of an "operational restructuring" in the hope that the markets turn -- which seems highly unlikely in the near term.

---

[7] It should be noted that as of the date hereof, the Debtors have not commenced their "operational restructuring."
[8] It should be noted that on several occasions that the Debtors have admitted that the only lender they have been in discussions with is Capital One. The Debtors have never produced evidence as to who the "other" prospective exits lenders are -- if they exist.

10

Recognizing such, it is abundantly evident that the Debtors have no reasonable prospect of filing a viable plan.

*No Unresolved Contingencies*

23. Based upon the Debtors' previous filings in these cases, there exist no unresolved contingencies.

## II. Debtors' Businesses are Deteriorating

24. That the Debtors' businesses are deteriorating to the detriment of creditors cannot be controverted. Yet, the Debtors ask this Court to allow them to maintain control over the Chapter 11 processes -- a "control" which clearly prejudices creditors who must "sit on the sidelines" and watch the value of estates deteriorate.

25. The Debtors have underperformed their EBITDA forecast on a consolidated basis in every month, through November, since the filing of the 5-year plan in July. The variance below budget has increased in virtually every month, reaching 55% below forecast in November.[9] Although the Debtors attempt to persuade the Court that the shortfall is almost solely related to the automotive OEM business, the Insulators business -- which the Debtors claim is primarily automotive aftermarket and thus impervious to the decline in the general automotive industry -- has underperformed its EBITDA budget by a significant amount in each of the last three months, including by 22% in November.[10] Further, the Medical division has underperformed its EBITDA budget by a considerable amount in each of the last four months, including by 34% in November.[11]

---

[9] Comparison of the Debtors' Monthly Directors' Financial Reporting Package to the 5-Year Plan dated July 14, 2008.
[10] Comparison of the Debtors' Monthly Directors' Financial Reporting Package to the 5-Year Plan dated July 14, 2008.
[11] Comparison of the Debtors' Monthly Directors' Financial Reporting Package to the 5-Year Plan dated July 14, 2008.

11

**CONCLUSION**

26.  The Debtors have not made any factual showing that "cause" exists to extend exclusivity.  The Motion lacks substance.  Even a cursory review yields the same conclusion - - there is no justification for these cases to be delayed any further.  The reality is that the Debtors want to stall theses cases as they hope that, in time: (i) businesses improves so drastically that the Debtors can justify their inflated valuation and (ii) the lending markets improve so that they can obtain exit financing.  The Debtors' "hopes," however, do not constitute "cause" sufficient to extend exclusivity.  No rational justification exists for prejudicing creditors' ability to propose a plan so that the Debtors can emerge from Chapter 11 before all value is eroded from these estates.  Creditors should have the ability to file and confirm their own plan that addresses CapSource's pre-petition secured claims and protects and preserves, to every extent possible, recoveries on unsecured claims.

WHEREFORE, the Committee respectfully requests that the Court deny the Motion and grant such other relief as the Court deems appropriate.

Dated: New York, New York
February 13, 2009

                        ANDREWS KURTH LLP

                        By:  /s/  Paul N. Silverstein
                            Paul N. Silverstein (PS 5098)
                            Jonathan I. Levine (JL 9674)
                            450 Lexington Avenue, 15th Floor
                            New York, New York  10017
                            Telephone:  (212) 850-2800
                            Facsimile:  (212) 850-2929

                            Counsel to the Official Committee of
                            Unsecured Creditors