WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for the Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
: 
In re:                                                    :    Chapter 11
                                                          :
**LEXINGTON PRECISION CORP., et al.,**    :    Case No. 08-11153 (MG)
                                                          :
         Debtors.                                   :    (Jointly Administered)
                                                          :
------------------------------------------------------------------------x

# DEBTORS' REPLY TO PREPETITION SENIOR LENDERS' OBJECTION AND CREDITORS' COMMITTEE'S RESPONSE TO DEBTORS' MOTION FOR AUTHORIZATION FOR USE OF CASH COLLATERAL

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, as and for their reply to the objection (the "Objection") of (the "Prepetition Senior Lenders") and the response, dated February 17, 2009 (the "Committee Response"), of the Official Committee of Unsecured Creditors (the "Creditors' Committee") to the Debtors' motion, dated February 2, 2009 (the "Motion"), for authorization for use of cash collateral, respectfully represent:

**Preliminary Statement**

1.  The Prepetition Senior Lenders' portrayal of the Debtors' financial position as "precarious" and the decline in the value of their collateral as "precipitous" is dramatically overstated and aimed toward the Prepetition Senior Lenders' desire to break up the Debtors' businesses and sell the most profitable and fastest growing one – the medial business – in order to pay themselves with the proceeds rather than maximizing value for all parties-in-interest. By their own assessment of enterprise value, the Prepetition Senior Lenders enjoy an equity cushion of more than 100% over the value of their claims. The Debtors will present evidence at the hearing that value actually is substantially greater than the $68 million ascribed by the Prepetition Senior Lenders, even when considering only the core medical and insulators businesses.

2.  To be sure, the Debtors' overall enterprise value has declined, but the decline is modest and the Debtors are hardly alone in these circumstances as the economy took its toll on every industry and market index in 2008. The facts will show that the Debtors are maintaining profitability in each of their businesses other than their two smallest businesses, which are focused on the automotive OEM segment, connector seals and machining. The Debtors have developed and are implementing a feasible business plan to restructure the connector seals operations and return them to profitability; the Debtors have taken aggressive cost-reduction actions at their machining operations and firmly believe that additional committed business will allow this unit to become profitable by the second half of this year. It is beyond dispute that the Prepetition Senior Lenders are adequately protected by any objective measure.

3.  The lack of a commitment for exit financing is not the result of any lack of diligence by the Debtors or any fundamental flaw in their businesses or business plan. It is the

unfortunate consequence of difficult credit markets and the dramatic reduction in vehicle sales and production that has affected *every* supplier to the automotive OEM business and now necessitates restructuring of the Debtors' connector seals business. The evidence at the hearing will demonstrate that the Debtors' business can be financed, that management remains in negotiations with large, institutional lenders for a commitment, and they have plans to obtain any additional financing that may be necessary beyond what may be available from an institutional lender through conversion and possible expansion of the DIP financing facility into a second lien exit loan and separate financing of their real estate assets.

4.     The Prepetition Senior Lenders' answer to these circumstances is to push the company into a sale process. This logic would have profound implications for this case and others like it and for the interests of unsecured creditors, shareholders, customers, and employees in all of these. If companies whose only flaw is the inability to obtain exit financing are given no choice but to put themselves up for sale, then very few companies will emerge intact from chapter 11 in this crisis. The purpose of chapter 11 is to give a troubled businesses the time necessary to reorganize, not to force a sale that will benefit only an oversecured lender.

5.     Because it is undisputed that they are oversecured and protected by an ample equity cushion, the Prepetition Senior Lenders "don't oppose the use of Cash Collateral outright" but rather seek to have the Court impose conditions on the Debtors' use of Cash Collateral. The conditions they seek, however, are not "necessary to provide adequate protection" and therefore are unwarranted under section 363(e) of the Bankruptcy Code.

6.     The Prepetition Senior Lenders always can move for relief from the automatic stay or to impose conditions on use of cash collateral under section 363(e) if circumstances change. If there is any dramatic deterioration in the Debtors' business, or if it

becomes apparent that there is no possibility of moving forward with a plan of reorganization, then the Court can promptly act to protect the Prepetition Secured Lenders and the case can shift to a partial or complete sale process. There is no reason to make that shift now by distracting management from the operation of the business to market non-core assets that will not bring substantial value in a distressed sale. As for sale of the medical business, establishing a deadline for its sale will only frustrate the Debtors' ability to enhance value for all constituencies, because customers likely will be unwilling to commit new business to the Debtors in the face of additional uncertainty about whether the company will be able to reorganize or will be sold off in pieces. Imposing an artificial deadline for a sale is unnecessary to adequately protect the Prepetition Secured Lenders.

7. The Creditors' Committee agrees with the Debtors that the Prepetition Senior Lenders are oversecured and adequately protected. Committee Response at ¶ 2. The Creditors' Committee states that it "understand[s] that the Debtors' continued use of cash collateral is necessary to operate their business." Committee Response at ¶ 1. Notably, it also acknowledges that the current environment is not well suited for a sale of the Debtors' assets, especially for the sole purpose of satisfying the Prepetition Senior Lenders' claims. Committee Response at ¶¶ 3 and 4. The Creditors' Committee, however, contends that use of cash collateral should be terminated if the Court extends the Debtors' exclusive periods. Committee Response at ¶ 4. The Creditors' Committee's positions are irreconcilable. By conditioning use of cash collateral upon the Court's termination of exclusivity, the Creditors' Committee is effectively requesting the Court to shut down and liquidate the Debtors' businesses if it determines to extend exclusivity. This result would destroy the significant value of the estates and only serve to harm the recovery of the entire unsecured creditor constituency that the Creditors' Committee is

supposed to represent. There can be no clearer indication of the Creditors' Committee's lack of concern for what is in the best interest if these estates than its apparent willingness to have the Debtors' use of cash collateral terminated if the Creditors' Committee is required to wait a while longer to propose a competing plan.

### Debtors' Request Should Be Granted Given The Substantial Equity Cushion And Additional Adequate Protection Offered Pursuant To The Motion

A.   Exit Financing

8.   The Debtors have not, as the Prepetition Senior Lenders suggest, failed to "lock in" a commitment for exit financing by declining to execute proposal letters offered by Capital One. The proposals Capital One proffered were not commitments to finance, nor even commitments to enter into commitments. The Debtors, after evaluating them carefully, concluded that entering into the proposal letters would have obligated the estates to pay substantial, non-refundable fees to Capital One, in excess of the actual costs of Capital One's due diligence, while leaving Capital One with complete discretion to walk away from any transaction. In light of Capital One's willingness to continue its due diligence efforts and negotiations toward a commitment *without* an executed proposal letter, the Debtors prudently decided to preserve estate assets and declined to execute a proposal letter that did not move the company any further toward securing exit financing. That judgment has proven sound as Capital One did in fact continue and complete its diligence and is still exploring the possibility of financing the Debtors, although the likelihood of the Debtors closing a financing with Capital One appears far lower in light of the conditions expressed in its February 5, 2009 letter.

9.   The current status of the Debtors' efforts to obtain exit financing commitments is discussed in the Debtors' reply to the objections to their motion to extend exclusivity and will not be repeated here. In sum, the Debtors continue to work toward an exit

financing commitment with either Capital One or Wells Fargo, as well as other sources of financing.  An extension of the use of cash collateral will allow this process to continue, with an aim toward achieving exactly what the Prepetition Senior Lenders desire – payment of their claims in full, in cash.

10.    The Debtors of course have a statutory right, pursuant to section 1129(b)(2)(A) of the Bankruptcy Code, to seek confirmation of a plan of reorganization over the objection of the Prepetition Senior Lenders, leave their liens intact, and pay their claims over time.  The Prepetition Senior Lenders view this approach as a "threat," but the Debtors mention it not to coerce but only to illustrate that a distressed sale of some or all of Lexington's assets is not the only option available to accomplish a restructuring if it turns out to be impossible to raise the necessary financing in the credit markets.  The Debtors strong preference is to avoid expensive litigation with both the Prepetition Senior Lenders and the Creditors' Committee.  The path to avoiding litigation, however, is not to condition further use of cash on an inflexible and unnecessary sale process that will reduce value for unsecured creditors and shareholders.  Rather, the path that will minimize the risk of litigation is to grant the Debtors a reasonable extension of the use of cash collateral to allow them the time necessary to complete the consolidation of the connector seals business and continue efforts to finance the current plan of reorganization.  The Prepetition Senior Lenders can hardly say their alternative is cooperative because it requires the Debtors to dismantle and liquidate their estates for the purpose of immediately repaying the Prepetition Senior Lenders in full, a step neither the Debtors nor the Creditors' Committee believe would enhance value.

B.     The Value of the Debtors' Businesses
<u>Remains Strong and its Business Plan is Sound</u>

11.     The Debtors' financial advisors, W.Y. Campbell, have concluded that the value of the core assets alone (the insulators and medical businesses) is more than $90 million. The Prepetition Senior Lenders' own valuation of $68 million, which the Debtors believe is unreasonably low, is more than *twice* the value of their claims. Continued use of cash collateral does not impair or harm the Prepetition Senior Lenders' interests.

12.     The Prepetition Senior Lenders suggest that any decline in the value of the collateral securing their claims is unacceptable. The Bankruptcy Code, however, does not require a debtor to provide a secured lender with "absolute protection" but only "adequate protection." *In re Beck Indus. Corp.*, 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986). An equity cushion is "the value of the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect." *In re New Era Co.*, 125 B.R. 725, 728-29 (S.D.N.Y. 1991); *In re Elmira Litho*, *Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection.").

13.     Courts routinely hold that an equity cushion of twenty percent or more provides sufficient adequate protection. *See*, *e.g*., *In re Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (recognizing that courts routinely find that a twenty percent equity provides sufficient adequate protection); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1090 (4th Cir. 1986) (same); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (twenty percent equity cushion sufficient to constitute adequate protection); *In re Wilson*, 378 B.R. 862, 890 (Bankr. D. Mont. 2007) (thirty-nine percent equity cushion sufficient to constitute adequate protection). The Prepetition Senior

Lenders cannot deny that they remain substantially oversecured and adequately protected in accordance with the relevant provisions of the Bankruptcy Code.

14. The Prepetition Senior Lenders rely on *In re Pawtuxet Valley Prescription & Surgical Ctr., Inc.*, 2008 WL 1990887 (Bankr. D.R.I. Mar. 10, 2008), for the proposition that when collateral is declining in value, a debtor's use of cash collateral should be short. In *Pawtuxet*, the debtor's poor management resulted in a seventy-one percent reduction in sales during the short span of five months. *Id.* at *4. The debtor's prospects to turn things around were remote because it would have been required to increase its sales by 100% just to break even. *Id.* In addition, the decline in the prepetition lender's collateral was also a significant factor because there was little, if any, equity protecting the lender's interest. *Id.*; *see also*, *Bank of Rhode Island v. Pawtuxet Valley Prescription & Surgical Ctr., Inc.* (*In re Pawtuxet Valley Prescription & Surgical Ctr., Inc.*), 386 B.R. 1, 5 (D.R.I. 2008) (on appeal from a previous order, finding that the lender's four percent equity cushion was insufficient and remanded the matter to the bankruptcy court to conduct a thorough valuation of the debtor's collateral). In the end, the facts of *PVP* are distinguishable. The equity cushion here, even after taking into account the difficulties of the OEM market and the general economy, remains over 100%, even using the Prepetition Senior Lenders' low assessment of value. And the company's revenue and cash flow performance is not suffering from any mismanagement by the Debtors. The medical and insulators businesses are performing well and the connector seals and machining businesses are down due to circumstances beyond the Debtors' control.

15. It is telling that the Prepetition Senior Lenders do not complain about any steps the Debtors have taken to *run* their businesses, only about management's ability to *forecast* its financial results and its decision not to put assets up for sale. Neither the Prepetition Senior

Lenders nor the Committee dispute that the consolidation of the connector seals business is a prudent and necessary step toward rehabilitating the Debtors, nor do they suggest any other ways of preserving and enhancing value.

16.     The Debtors' management has demonstrated responsible stewardship of the business during trying economic times. This is shown by the very financial data attached to the Prepetition Senior Lenders' Objection. Exhibit A to the Objection, which the Prepetition Senior Lenders cite as evidence of missed forecasts and poor performance, actually shows that the Debtors have reduced costs by more than the amount of the revenue, which was shortfall caused mostly by the crisis in the OEM automotive sector. Specifically, the comparison shows that actual sales from April 2, 2008 to February 6, 2009 are $6.9 million, or 10.6%, under budget, but expenses are $7.9 million, or 10.7%, under budget for the same period. Thus, the Debtors have succeeded in reducing expenses better than dollar-for-dollar as sales declined. The recent turmoil in the OEM sector makes it all but impossible to predict sales volumes with any certainty. The test of good management, however, is not its clairvoyance but its ability to react effectively to what actually happens in the marketplace, and the Debtors' record in these chapter 11 case is strong.

17.     While it is correct that the Debtors were unable to achieve their revenue goals under the most recent cash collateral budget, the amount by which they missed is quite narrow – just 0.6%. The reason for the difference between the budget and actual performance is mostly attributable to the dramatic decline in sales to the OEM market in December 2008 and January 2009 as automakers largely stopped manufacturing vehicles and suppliers of wire

harnesses, ignition wire sets, and other parts containing the Debtors' products reduced their own inventories accordingly.[1]

18.     The Debtors will have adequate cash to meet their operating requirements. The budget comparison attached to the Prepetition Senior Lenders' objection shows that actual net cash available as of February 6, 2009, was nearly $4.2 million, $2.7 million *above* the budgeted amount. The proposed new cash collateral budget shows net cash available of more than $1.7 million *at its lowest point* and ending the 13-week period at $2.0 million. The reduction in available cash over this period is due in large part to the forecasted implementation of the connector seals consolidation and is substantially offset by an increase in accounts receivable generated as a result of the build of the "inventory banks" that are required for that process. Other causes of the decline in available cash over the projection period are payments of $800,000 in principal to the Prepetition Senior Lenders, reducing their claims, as well as nearly $1.7 million in professional fees and expenses associated with the reorganization.

19.     The Prepetition Senior Lenders' assertion, at paragraph 26 of their objection, that the Debtors projected cash availability as of the end of May 2009 changed by $5 million over the course of three weeks is based on an erroneous comparison of two very different forecasts. The business plan delivered to the Prepetition Senior Lenders on January 16 actually

---

[1] The Prepetition Senior Lenders' reliance on *In re Archibald Allan Assocs., Inc.*, 2004 WL 422047, *4-*5 (Bankr. E.D. Pa. Feb. 20, 2004), for the proposition that the expiration of a consensual cash collateral ordinarily entitles a secured lender to relief from the automatic stay, is misplaced. In that case, after the expiration of the *seventh* stipulation and order regarding use of cash collateral, the court determined that the lender was entitled to immediate relief from the automatic stay if the debtor was unable to obtain a loan sufficient to pay the lender in full by a date certain. *Id.* at *4. The debtor in *Archibald* had agreed that in such event it would not "request further use of cash collateral." *Id.* at *4. The court held there were no extenuating circumstances to relieve the debtor from the order especially when there was no equity in the collateral securing the lender's claim. *Id.* at *4-*5. Here, Lexington never agreed to refrain from seeking use of cash collateral beyond the February 25, 2009 deadline in First Cash Collateral Order, and nothing in that order prohibits the Debtors from seeking an extension.

had been developed in December and was based on the assumption that the consolidation of the connector seals business would take place over a longer time period than the Debtors currently project. The earlier forecast assumed production of larger inventory banks, and thus greater sales revenue, in the earlier part of the year, with lower revenues later in the year. Based on discussions with their customers, the Debtors now believe that the transition period will be shorter and therefore revised their forecasts to reflect less revenue early in the year from the sale of the inventory banks and more later in the year as production of parts in new locations resumes. This change is not the result of any inherent inability of the Debtors' management to forecast accurately, as both the Prepetition Senior Lenders and the Committee argue, and it does not suggest any "systemic flaws" in the Debtors' projections. Rather, it reflects the challenges facing the Debtors in forecasting the financial results of a business undergoing significant change in an extremely difficult environment, and demonstrates the Debtors' efforts to adapt to changing business circumstances in a way that is aimed at maximizing value.

20. There are, of course, execution risks associated with the consolidation of the connector seals business, but the Debtors have apprised all of the risks noted by the Prepetition Senior Lenders, and more, and have concluded in the exercise of their business judgment that undertaking this restructuring will improve the financial performance of the business. The Debtors have spoken with key customers about the transition plans and are working to put in place appropriate contracts that will commit customers to short-term purchases of the inventory banks and long-term purchases, on a requirements basis, of the parts that Lexington will relocate to other facilities. The Prepetition Senior Lenders' suggestion that customers may request price concessions appears based on an incorrect understanding of the current dynamics of the OEM parts supplier market; Lexington believes its customers are most

concerned about maintaining reliable sources of supply in circumstances where many parts manufacturers are facing severe financial difficulty and seeking price <u>increases</u> to offset declining volumes. If continued use of cash collateral is granted, Lexington believes its customers will perceive it as offering more stability than some of its competitors and that there will be no pressure on pricing.

C.  <u>The Proposed Sale Process Will Undermine the Debtors' Reorganization Efforts</u>

21.  Contrary to the Prepetition Senior Lenders' assertions, the Debtors have acted prudently in rejecting their demands to sell some or all of the businesses. A sale process would accomplish nothing more than providing the Prepetition Senior Lenders with an early exit from these cases at the expense of every other constituency in these cases. That the Creditors' Committee, which has opposed every step the Debtors have taken in these cases and relentlessly criticizes management's every decision, supports continued use of cash collateral and opposes a sale process is a telling indicator that a sale process would not maximize value. Because the Prepetition Senior Lenders are adequately protected by the equity cushion, and will continue to receive current pay interest and principal reduction payments, there is no need to risk harm to every other constituency in this case by ordering a sale process.

22.  Although prepetition events have no relevance to the issues before the Court on this Motion, the Debtors did not, as the Prepetition Senior Lenders state, "refuse" to sell the medical device business during the prepetition period. The Debtors were prepared to sell the medical business for $32 million before commencement of the bankruptcy cases, but the sale could not proceed without consent of the company's bondholders (who now make up the majority of members of the Committee) and the bondholders imposed conditions on the sale that were unworkable and unacceptable to other stakeholders. With respect to the postpetition period, the Debtors likewise have not acted "recklessly." They have acted prudently and

NY2:\1967552\07\1666807!.DOC\26690.0008             12

diligently to restructure the company in a way that will pay the Prepetition Senior Lenders in full, in cash, pay unsecured creditors in full, provide a return for shareholders, maintain and enhance the value of the company for the benefit of all constituencies, and preserve as many jobs as possible. If it ultimately proves impossible to reorganize the company due to a lack of financing, there will be adequate time to market and sell some or all of Lexington's businesses and the Debtors are fully prepared to take that path if it ever becomes necessary. For now, however, the Debtors are far from exhausting all possible sources of exit financing and will stand a far better chance of obtaining a commitment if they are permitted the time to implement the restructuring of the connector seals business. Seeking additional time to try to achieve the goal of a reorganization is hardly reckless in circumstances where the top of the capital structure is adequately protected by a wide margin.

23.     The Debtors requested use of cash collateral through December 31, 2009. That date was chosen based on the recognition that exclusivity will end, pursuant to section 1121(d)(2)(A), on October 1, 2009, thus providing a three-month period for any other constituency to propose a plan before continued use of cash collateral, if granted, expired once again. In their objections, the Prepetition Senior Lenders counter-proposed use of cash collateral through July 31, conditioned on a two-phase sale process for non-core assets and the medical business. For reasons previously stated, the conditions the Prepetition Senior Lenders seek to impose on continued use of cash collateral are unnecessary and unwise and the Court should not order them. If the Court, however concludes that an extension shorter than December 31 is appropriate, the Debtors believe that an extension until July 31, 2009 will allow them sufficient time to demonstrate progress on the connector seals consolidation and is an appropriate date as long as it is without prejudice to their right to seek a further extension if circumstances warrant.

## **Conclusion**

24.     The Debtors' path, if successful, will increase value, continue and enhance customer relationships, and preserve the jobs of as many as possible of the Debtors' nearly 500 employees.  The Debtors' business judgment should not be replaced by the Prepetition Senior Lenders' desire to be paid to the detriment of all other stakeholders in these cases, especially in light of the substantial equity cushion protecting the Prepetition Senior Lenders' claims.  For the reasons discussed herein, the Court should authorize the Debtors' continued use of Cash Collateral.

WHEREFORE the Debtors respectfully request that the Court overrule the Objection, granting the relief requested in the Motion, and such other and further relief as is just.

Dated: February 19, 2009
      New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

Attorneys for Debtors
and Debtors in Possession