WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
**In re** : **Chapter 11 Case No.**
: 
**LEXINGTON PRECISION CORP., et al.,** : **08-11153 (MG)**
: 
Debtors. : **(Jointly Administered)**
: 
---------------------------------------------------------------x

## DEBTORS' OMNIBUS REPLY TO
## OBJECTIONS TO THIRD MOTION TO EXTEND EXCLUSIVITY

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or the "Debtors"), as debtors and debtors in possession, submit this reply to the objections of the Official Committee of Unsecured Creditors (the "Committee") and the Agents for the Prepetition Senior Lenders (the "Prepetition Senior Lenders") to the Debtors Third Motion for an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Debtors' Exclusivity Periods (the "Third Exclusivity Motion").

**Preliminary Statement**

1.  The Committee bases its objection on unsubstantiated accusations about the Debtors' management, willful ignorance of developments in the automotive industry and the general economy over the past five months, slipshod financial analysis, and complete mischaracterization of the Debtors' conduct of the chapter 11 cases to date. The Debtors address each of these points below. The central flaw in the Committee's objection, however, is the lack of any showing that it could propose a plan of reorganization that would lead the Debtors out of chapter 11 any faster than would the path charted by the Debtors themselves.

2.  The Committee does not allege that it has a commitment for exit financing in hand, or even that it has a proposal for obtaining one. Its prospects of confirming a chapter 11 plan are thus no better than the Debtors' and ending exclusivity would do nothing to expedite these cases. Indeed, the Committee's prospects of obtaining sufficient financing to pay off the Prepetition Senior Lenders, fund payments to unsecured creditors, and provide necessary working capital are substantially worse than the Debtors' because the Committee would not have the prospect of rolling the current debtor-in-possession loan into a post-emergence second-lien facility. In the absence of any showing by the Committee that its prospects for financing a plan of reorganization are any better than the Debtors', the Court should extend exclusivity to give the Debtors the time necessary to restructure the connector seals business and continue their efforts toward obtaining exit financing for the plan that is on file. This does not prejudice the Committee in any way because it always retains the right to seek termination of exclusivity for cause.

3.  The Prepetition Senior Lenders object with the goal of substituting their business judgment for the Debtors' on the question of whether the Debtors should put some or all

of itself up for sale. The Prepetition Senior Lenders' desire for a sale is understandable, because a sale of just the Debtors' medical business – even in a distress-sale environment – likely would pay them off in full. The desires of an oversecured, and adequately protected, creditor for an easy way out of a chapter 11 case, however, do not trump the Debtors' responsibility to maximize value for all constituencies. Continuation of exclusivity will allow the Debtors to do exactly that. In contrast, requiring the Debtors to market the medical business or other assets would signal to customers that the Debtors will not be a long-term partner for them and likely will frustrate the Debtors' ability to enhance the value of the estates for all constituencies because customers will defer decisions to offer new business to the company.

4.  The Debtors' path, if successful, will increase value, continue and enhance customer relationships, and preserve the jobs of as many as possible of the Debtors' nearly 500 employees. Extending exclusivity to provide the time necessary for the Debtors to fix the connector seals business will enhance the Debtors' chances of securing exit financing to pay off the Prepetition Senior Lenders in full.

**Argument**

A.  The Debtors Have Strong Prospects of Obtaining Exit Financing

5.  The Debtors remain in active negotiations with two large institutional lenders, Capital One and Wells Fargo, for exit financing facilities. To be sure, in these incredibly difficult credit markets there is no guarantee that the Debtors will be able to obtain a commitment, but with positive cash flow, diversified operations, a strong management team, a sound business plan, and prospects for meaningful growth after emerging from Chapter 11 the Debtors believe their business can be financed. The evidence at the hearing on this motion will show:

- The Debtors remain engaged in negotiations with Capital One and Wells Fargo for first-lien exit financing facilities, although neither lender appears willing at this time to lend on real estate.

- The Debtors are exploring additional financing for their real estate assets with lenders specializing in commercial real estate assts.

- The Debtors intend to restructure the current DIP loan as a second-lien investor-loan facility to provide some of the necessary financing.

- The Debtors are exploring the possibility of expanding participation in the investor loan to increase its amount.

- As an alternative, if new financing proves unavailable in a sufficient amount, the Debtors have concluded that they could modify the plan of reorganization to cram down some or all of the prepetition secured credit facilities.

6. It is ironic that the Committee complains of a lack of progress on exit financing because its own conduct has placed unnecessary obstacles in the Debtors' path. Unwilling to accept the Debtor's representations regarding the status of their negotiations with exit lenders, or to participate in any meaningful way to assist the Debtors in obtaining a commitment, the Committee instead served a subpoena and took a five-hour deposition from the Capital One Senior Vice President responsible for the Lexington relationship. That deposition established in painstaking detail exactly what the Debtors already had told the Committee and this Court – that the Debtors had been in extended negotiations with Capital One over many months (see, generally, Altneu Dep.),[1] that Capital One recently had decide it would not finance the Debtors' real estate (Altneu Dep. at 142-149), that there remained a gap between the amount of financing Capital One would commit to provide and the Debtors' needs (Altneu Dep. at 123-

---

[1] The deposition transcript of Stephen E. Altneu, dated January 29, 2009 (the "Altneu Dep."), will be provided to the Court by the Committee's counsel in its pre-hearing filings.

24), and that, despite adverse credit markets, Capital One remained interested in providing financing to the Debtors if agreement could be reached on appropriate terms. (Altneu Dep. at 170-71).

7. A week after the Committee took its deposition of a non-party whose only connection to this case is that it is a *prospective* exit lender, Capital One sent the Debtors a letter stating that it did not intend to continue negotiations past March 15, 2009. The Committee attached this letter to its objection and trumpets it as evidence that "the Debtors are *not* very far along with Capital One." Comm. Obj. at ¶ 18. The letter, however, is unequivocal evidence that the Debtors are indeed very far along in the process but that a pause is necessary to execute the plan for operational changes to the connector seals business because turning that business back into a significant cash generator is a threshold issue for exit financing. The letter thus supports an extension of exclusivity to give the Debtors time to accomplish the necessary restructuring. The Debtors are working to repair the damage the Committee has caused to their relationship with Capital One and have encouraged the lender to reconsider its March 15 deadline, but the bottom line is that *any* lender is going to want to see some improvement in the financial performance of the connector seals business before issuing a commitment; neither the Committee nor the Prepetition Senior Lenders dispute this.

8. The Committee's discussion of exit financing issues is far removed from the actual record of this case. The Debtors have never represented, either to this Court or to the Committee, that an exit financing commitment was "imminent," and the Committee's failure to provide even a single quotation or citation in support of its allegations of misrepresentation is indicative of the Committee's recklessness and the lack of merit of its arguments. For example, the Committee alleges, without citation, that the Debtors represented in July 2008 that they were

"on the doorstep" of obtaining exit financing. The Debtors made no such statement.[2]

9.   The Debtors have taken great care throughout these chapter 11 cases to provide accurate statements regarding the status of exit financing negotiations and have been cautious in characterizing both the likelihood and the timing of any prospective commitments. The disclosure statement, for instance, contains specific warnings about the possibility that exit financing may not be available.[3] In October 2008, the Debtors provided extensive evidence regarding the status of exit financing negotiations in connection with the second exclusivity motion and never stated or implied that a commitment was imminent.[4]

10.   On December 17, the Debtors filed responses to the Committee's and the Prepetition Senior Lenders' objections to the disclosure statement, describing the status of the Debtors' exit financing negotiations and noting that the Debtors had decided to defer further negotiations until they had developed a plan for consolidation of the connector seals business. Debtors' Response to Disclosure Statement Objections, December 17, 2008, at ¶¶ 10-11 [Docket

---

[2] *See* Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement, dated July 9, 2008 [Docket No. 238], Debtors' Reply to Official Creditors' Committee Objection to Debtors' Motion for an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusivity Period [Docket No. 275], Transcript Of Hearing Held On July 29, 2008, RE: Debtors' Motion for Entry of an Order Extending the Time to Assume or Reject Non-Residential Real Property Leases and Debtors' Motion for an Order Extending the Debtors' Exclusivity Period [Docket No. 421].

[3] "To fund the distributions under the Second Amended Plan and the continued operations of the Reorganized Debtors, the Reorganized Debtors shall enter into the New Secured Credit Facility. The Debtors are currently engaged in negotiations with a financial institution that has expressed an interest in providing the New Secured Credit Facility. *As of the date hereof, however, that institution has not committed to providing the New Secured Credit Facility. It should be noted that given the current global economic conditions that obtaining a commitment for the New Secured Credit Facility could prove to be difficult.*" Proposed Disclosure Statement at 53 [Docket No. 489] (emphasis added).

[4] *See* Debtors' Reply to Committee's Objection to Second Exclusivity Motion at ¶ 8, Oct. 23, 2008 [Docket No. 444]. The evidence at the hearing established that the Debtors had made progress, but did not even imply that a commitment was "imminent." Tr., Oct. 28, 2008, at pp. 55-58 (testimony of Michael Lubin) [Docket No. 469]. And in oral argument at the October 28 hearing, the Debtors reiterated that exit financing, far from being imminent, was an unresolved contingency warranting an extension of exclusivity. *Id*. at pp. 122.

No. 491]. The Debtors further stated that they expected to receive a *proposal* (not a commitment) during the week of December 22. *Id*. at ¶ 11. When that proposal did not materialize, and instead the Debtors learned that Capital One would not finance the Debtors' real estate, the Debtors promptly advised the Court and all parties of these circumstances and sought an adjournment of the disclosure statement hearing.[5] There simply is zero support in the record for the Committee's allegation that the Debtors have misrepresented the status of their negotiations for exit financing, much less done so "time and again." Comm. Obj. at ¶ 4.

        11.    It is the Committee that misrepresents the status of exit financing negotiations in suggesting to the Court that the Debtors have not sought financing from any source other than Capital One "until very recently." Comm. Obj. at ¶ 18. The Committee is fully aware that the Debtors have been in parallel negotiations with Wells Fargo for more than 8 weeks, and even gratuitously pointed this out to the Capital One representative in his deposition. Altneu Dep. at 160:1-4.

        12.    Exit financing is a substantial, unresolved contingency. Because the Debtors continue to work toward a commitment of financing sufficient to fund the plan of reorganization, cause exists to extend exclusivity.

    B.    <u>Plan of Reorganization Process</u>

        13.    The Debtors have made significant progress in the chapter 11 cases and were well into the confirmation process in early January when the Debtors informed the Court that they believed deferral of the disclosure statement hearing was advisable because it was not likely that they would have an exit financing commitment in hand in time to consummate a plan

---

[5] *See*, Debtors' Motion to Adjourn the Hearing on the Approval the Proposed Disclosure Statement and to Vacate the Discovery Schedule with Respect to Confirmation of the Second Amended Plan, dated January 5, 2009 [Docket No. 507], at ¶¶ 10-13 and Transcript of the January 23, 2009 status conference at 1-6, the relevant portion of which is annexed hereto as <u>Exhibit A</u>.

by the February 25, 2009, expiration of the original cash collateral order.  The only thing that stopped the plan process was the lack of an exit financing commitment.

14.    This is not a case where financing was readily available and the Debtors declined to take it in order to extend their stay in chapter 11, and the Committee's allegations of purposeful delay are simply untrue.  The Debtors advanced the plan of reorganization process as far and as quickly as they could and only sought to defer the process only in early January, when it became clear that historically difficult credit markets made it unlikely that they would obtain a commitment large enough to finance the plan without first restructuring the connector seals business.  While there are differences of opinion about the amount of time necessary and the ultimate likelihood of success, neither the Committee nor the Prepetition Senior Lenders disagree that more time is required to obtain a commitment.  The Committee wants propose its own plan, Any plan it could propose, however, would require financing comparable to that the Debtors are seeking.  The Committee's position thus demonstrates its own belief that the Debtors' business *is* financeable and that there *are* reasonable prospects of obtaining financing and confirming a viable plan of reorganization.

15.    Lacking any substance or support, the Committee's vituperative allegations are an effort to mask its own lack of good faith in negotiating with the Debtors.  The evidence, rather than the rhetoric, will show that it is the Committee that has refused to negotiate with the Debtors and has made progress on the valuation dispute impossible to date.  The Debtors provided the Committee with an extensive valuation report in September 2008, nearly five months ago.  Since then, despite numerous requests by the Debtors and hundreds of thousands of dollars in fees and expenses billed by the Committee's professionals, the Committee has provided the Debtors with nothing but a three-page spreadsheet purportedly

supporting its argument that the Debtors' valuation is too high.[6] The Debtors several times proposed a meeting between financial advisors to see if they could find any common ground meeting separately from principals; the Committee never responded to this overture. The Debtors pleaded with the Committee to provide some kind of analysis supporting its views on value; the Committee refused, citing advice of its counsel. The Debtors requested a meeting of both principals and financial advisors; the Committee did not respond. In the alternative, the Debtors indicated they would be prepared to work with a mediator, as the Court had suggested at a status conference; the Committee did not respond to this proposal either. The lack of progress to date in negotiations is the direct result of the Committee's unwillingness to share any information on valuation with the Debtors or participate meaningfully in a candid discussion about value. Ending exclusivity will not change that.

16. The Prepetition Senior lenders acknowledge the progress the Debtors have made to date on its reorganization, Obj. at ¶ 18, but advocate ending exclusivity so that "other avenues of reorganization" can be pursued. The only other avenue they suggest, however, is a sale process that neither the Debtors nor the Committee think is wise to undertake. The Debtors hoped to have concluded these cases by now and, in a different economy and a different credit market, they may have succeeded in doing so on the schedule outlined last April. Eleven months, however, is not an extended chapter 11 case and additional time is warranted before setting this case on a path toward the breakup of the company. This is particularly so in light of the severe disruption to the economy.

17. The Debtors' request for an extension of exclusivity has nothing to do

---

[6] In comparison to its non-existent efforts to *negotiate* valuation, the Committee has spared little effort in preparing to *litigate* it. The monthly fee statement of Andrews Kurth for December 2008 was substantially higher than that of the Debtors' counsel and the firm had 15 attorneys, 8 of whom are partners, billing to the file in that month.

with brinksmanship, as the Prepetition Senior Lenders argue.  The Bankruptcy Code gives the Debtors the right to seek extension of exclusivity and exercising rights granted by the Bankruptcy Code is hardly unusual conduct.  The Debtors are firmly convinced that restructuring the connector seals business is necessary to preserve and enhance value and that the Prepetition Senior Lenders' proposed path – breakup and sale of the company in the "fire-sale" context of a Chapter 11 case – would result in substantial loss of value.  Asking the Court to extend exclusivity to prevent the occurrence of events that the Debtors believe would harm the estates is not brinksmanship; it is common sense.

C. Performance of the Business

18. As it has done before in contested matters relating to termination and extension of exclusivity, the Committee makes vague and unsubstantiated accusations that the Debtors are "manipulating their projections" and lack "credibility and integrity."  Comm. Obj. at ¶¶ 14, 16.  The evidence at the hearing will show that the Debtors are doing their level best to create forecasts that are as accurate as they can be in a difficult economic environment and updating them frequently as circumstances change.  And while both the Committee and the Prepetition Senior Lenders complain about the Debtors' forecasting, neither of them (or their two financial advisors) suggests even a single thing they would do differently to improve financial performance.

19. The Committee's and the Prepetition Senior Lenders' assertions of dramatic deterioration in the Debtors' business and financial performance are exaggerated.  To be sure, the Debtors are navigating difficult economic circumstances and perhaps the worst times ever in the automotive OEM sector.  Through all this, however, the Debtors have maintained positive cash flow and have reduced their expenses aggressively to offset declines in revenue that

are beyond their control.

20. The Debtors have not succeeded in meeting their July 2008 forecasts because the economy and the auto industry unraveled in the fall of last year and the shortfall on revenue and cash flow is caused largely by the problems of the connector seals business. The need to fix that business is cause for an extension of exclusivity. Absent from the Committee's objection is any suggestion, much less any evidence, that the Debtors' plan for consolidation of the connector seals business is not an appropriate response to economic circumstances, financially viable, and a necessary step for preserving value and moving these cases toward completion.

21. The Debtors are hardly the only company to miss forecasts. For example, CSM, a leading independent forecasting service for the automotive industry, projected in July 2008 that the North American auto build for the second half of 2008 would be 6.39 million vehicles. The actual number built in the second half 2008 was 5.67 million, more than 11 percent lower than CSM's July forecast. Also in July 2008, CSM projected that the build for 2009 would be 12.98 million vehicles; in February of 2009, they are projecting 9.28 million for 2009, a miss of more than 28 percent.

22. The Committee's isolated comparisons to 6-month-old forecasts do not demonstrate poor performance of either the medical or the insulators business. It is highly misleading to suggest the performance of a business during just one month, or even a few months, is indicative of any trend. For example, the Committee points to the medical business as being 22 percent off budget for EBITDA in November 2008, but neglects to mention this was a month in which the plant suffered a fire that reduced production. The insulator business performed well during 2008 despite the challenges of the economy, generating $7.9 million of

EBITDA against a mid-year projection of $8.4. While the Committee sees every glass as half full, generating 94 percent of projected cash flow in this economic environment is a substantial achievement. Moreover, the Debtors have never stated that the insulators business is "impervious" to economic downturn, only that it has a high concentration of aftermarket business and is expected to perform well in an environment where consumers keep cars on the road longer and divert spending on new vehicles to repair and maintain older ones.

## Conclusion

For the reasons stated herein and in the Motion, the Court should extend exclusivity.

Dated: February 19, 2009
      New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# **EXHIBIT A**

**(Transcript January 23, 2009 Status Conference)**

NY2:\1968714\02\1672$02!.DOC\26690.0008