WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                          :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | **08-11153 (MG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 364 FOR**
**AUTHORIZATION TO EXTEND POSTPETITION FINANCING**

        PLEASE TAKE NOTICE that Lexington Precision Corporation and its wholly-

owned subsidiary, Lexington Rubber Group, Inc. (together, the "Debtors"), as debtors and

debtors in possession in the above-captioned chapter 11 cases, filed a motion, dated February 20,

2009 (the "Motion"), pursuant to sections 105 and 364 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), authorizing extension of postpetition financing, all as more

fully described in the Motion.

        PLEASE TAKE FURTHER NOTICE that any objections or responses to the

Motion, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure

and the Local Rules for the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court"); and (c) set forth the name of the objecting party, the basis for the objection, and specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be filed with the Bankruptcy Court no later than **March 16, 2009 at 4:00 p.m. (prevailing Eastern Time)**. In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. General Order M-242 may be found at www.nysb.uscourts.gov. All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of the Honorable Arthur J. Gonzalez.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be served, so as to be received no later than **March 16, 2009, at 4:00 p.m. (prevailing Eastern Time)**, upon: (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn: Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow and Victoria Vron); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); (d) attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn: John C. Tishler); (e) attorneys for the statutory creditors' committee, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Paul Silverstein); and (f) attorneys for Debtors' postpetition lenders, O'Melveny & Myers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

PLEASE TAKE FURTHER NOTICE that a hearing to consider the relief requested in the Motion shall be held before the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge, on **March 23, 2009 at 11:00 a.m. (prevailing Eastern Time)**, at the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 or as soon thereafter as counsel may be heard.

Dated: February 20, 2009
      New York, New York

                    /s/ Adam P. Strochak
                    Richard P. Krasnow
                    Adam P. Strochak

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone:    (212) 310-8000
                    Facsimile:    (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                                :
**In re**                                                       :        **Chapter 11 Case No.**
                                                                :
**LEXINGTON PRECISION CORP., et al.,**                          :        **08-11153 (MG)**
                                                                :
            **Debtors.**                                        :        **(Jointly Administered)**
                                                                :
----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 364 FOR**
**AUTHORIZATION TO EXTEND POSTPETITION FINANCING**

TO THE HONORABLE ARTHUR J. GONZALEZ,
UNITED STATES BANKRUPTCY JUDGE:

            Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

**Summary of Relief Requested[1]**

            1.      By this motion, the Debtors request, pursuant to sections 105 and 364 of

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), authorization to extend

the Debtors' existing debtor-in-possession financing facility (the "DIP Loan", and the extension

---

[1] Unless stated otherwise, all capitalized terms not defined in this summary shall have the meaning
ascribed to such term in the proposed order (the "DIP Extension Order") annexed hereto.

thereof, the "DIP Loan Extension").    On February 2, 2009, the Debtors filed a motion (the

"Second Cash Collateral Motion") to authorize continued use of Cash Collateral (as defined

therein) through and including December 31, 2009.  The Second Cash Collateral Motion is

currently pending before the Honorable Judge Martin Glenn.  The DIP Lenders have agreed to

extend the DIP Loan through and including the date that the use of Cash Collateral (as defined in

the Second Cash Collateral Motion) terminates.  In accordance with Rule 4001 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the following is a summary of the

terms of the DIP Loan Extension, which terms are set forth in the form of an amended and

restated promissory note attached hereto as Exhibit A (the "Note") and the DIP Extension

Order:[2]

    (i)     DIP Loan Borrowers.  Lexington Precision and Lexington Rubber Group.
Note at Preamble.

    (ii)     DIP Loan Lenders.  Lubin Partners, LLC, William B. Conner, and ORA
Associates LLC.  Lubin Partners, LLC and William B. Conner are either
insiders of the Debtors or affiliated with insiders.  Motion, ¶ 17; Note ¶ 1.

    (iii)     DIP Loan Amount.  Pursuant to the First Cash Collateral/DIP Order,[3] the
DIP Lenders loaned to the Debtors $4,000,000 pursuant to the Super-
Priority DIP Note between the Debtors and DIP Lenders issued on April
21, 2008.  $4,000,000 remains outstanding under the DIP Loan and this
Motion does not seek to increase the amount of the DIP Loan.  Motion,
¶ 17;  DIP Extension Order, ¶ C&D.

    (iv)     Availability and Term.  The maturity date shall be the earliest of (i)
December 31, 2009, (ii) the date upon which the Debtors' use of Cash
Collateral (as defined in the Second Cash Collateral Motion) terminates,
(iii) the effective date of a  confirmed chapter 11 plan of reorganization in
these chapter 11 cases, (iv) the conversion of any of these chapter 11 cases

---

[2] To the extent anything in this summary is inconsistent with the proposed DIP Extension Order, annexed
hereto, the proposed DIP Extension Order shall control.

[3] See Final Order, dated April 17, 2008, Authorizing Debtors to Use Cash Collateral, Granting Adequate
Protection to Prepetition Secured Lenders, and Authorizing Postpetition Financing [Docket No. 61] (the
"First Cash Collateral/DIP Order").

to cases under chapter 7 of the Bankruptcy Code, and (v) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor, and (vi) the date of acceleration by the DIP Lenders pursuant to section 7 (Events of Default) of the Note.  Note ¶ 1; DIP Extension Order, ¶ 2.

(v)    Interest Rate.  As previously provided in the First Cash Collateral/DIP Order, the interest rate shall continue to be LIBOR plus 7% per annum with a LIBOR floor of 3% per annum, which is payable monthly in arrears; provided that any principal amount not paid when due, and to the extent permitted by applicable law, any interest not paid when due, in each case whether at Maturity Date, by required prepayment, declaration, acceleration or demand or otherwise (both before as well as after judgment), shall bear interest payable upon demand at the rate that is 2% per annum in excess of the rate of interest otherwise payable upon the Note.  Note ¶ 1.

(vi)    Lender Fee.  Pursuant to the First Cash Collateral/DIP Order, the Debtors paid the DIP Lenders a fee in cash in the aggregate amount of $80,000, which was allocated to the DIP Lenders pro rata based upon their funding commitment.  No additional fee shall be paid to the DIP Lenders in connection with the DIP Loan Extension.  Note ¶ 3.

(vii)    Unsecured, Super-Priority Claim Status.  As previously provided in the First Cash Collateral/DIP Order, all obligations under the DIP Loans will continue to be unsecured but entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code payable from any prepetition and postpetition property of the Debtors and all proceeds thereof and senior to any and all other unsecured claims; provided, however, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Liens (as defined in the Second Cash Collateral Motion).  Subject to the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code.  With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to section 1112 of the Bankruptcy Code shall rank prior to, or on parity with, the DIP Super-Priority Claims.  Note ¶ 5.

(viii)    <u>Use of Proceeds</u>.  As previously provided in the First Cash Collateral/DIP Order, the proceeds of the DIP Loans shall continue to be used by the Debtors to the extent Cash Collateral (as defined in the Second Cash Collateral Motion) is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the Second Cash Collateral Order or the DIP Extension Order or as otherwise authorized by the Court; <u>provided</u> that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders.  Note ¶ 4.

(ix)    <u>Carve-Out</u>.  As previously provided in the First Cash Collateral/DIP Order, the Carve-Out shall continue to consist of payment of (i) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000, <u>provided</u> that the first $400,000 only shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition Senior Lenders in respect of the Adequate Protection Claim (the "<u>Prepetition Senior Lenders' Fee Carve-Out Amount</u>"), and the balance between $500,000 and the Prepetition Senior Lenders' Fee Carve-Out Amount shall be paid from whatever assets would be distributed on account of the DIP Super-Priority Claim; <u>provided</u>, <u>however</u>, that prior to the occurrence of the Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the DIP Loan, as the same may be due and payable, all professional fees and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date.  DIP Extension Order, ¶ 4.

(x)     Covenants.  As previously provided in the First Cash Collateral/DIP Order, each of the Debtors continue to covenant and agree that until the Note(s) is paid in full, neither of the Debtors shall, without the prior written consent of the DIP Lenders holding more than 50% of the principal amount of the Note(s):  (a) enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business;  (b) incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any chapter 11 case (other than for existing secured claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the DIP Lenders against such Debtor in respect of the obligations hereunder, or apply to the Court for authority to do so; or  (c) (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to section 361 of the Bankruptcy Code (other than the Adequate Protection Liens, or apply to the Court for the authority to do any of the foregoing; provided that the Debtors may make payments as permitted in the DIP Extension Order or the Second Cash Collateral Order or as authorized in any other order of the Court.  Note, ¶ 6.

(xi)    Events of Default.  As previously provided in the First Cash Collateral/DIP Order, the following continue to constitute Events of Default: (a) failure by the Debtors to pay any installment of principal on the Note when due or pay any installment of interest within 3 business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due; (b) with respect to these chapter 11 cases, (i) the entry of an order authorizing any Debtor in any of the chapter 11 cases to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing); (ii) the appointment of an interim or permanent trustee in any of the chapter 11 cases or the appointment of an examiner in any of the chapter 11 cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the chapter 11 cases, or the conversion of any of the chapter 11 cases to a

case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect (as defined in the Note); (v) exercise of rights by the Prepetition Senior Lenders (as defined in the Second Cash Collateral Motion) pursuant to Paragraph 9 of the proposed Second Cash Collateral Order against the Senior Lender Prepetition Collateral and/or the other collateral in which Adequate Protection Liens were granted to the Prepetition Senior Lenders; (vi) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Second Cash Collateral Order, the First Cash Collateral/DIP Order (as it pertains to the DIP Loan or DIP Lenders), the DIP Extension Order or the Note or any of the DIP Lenders' rights, benefits, privileges or remedies under the Second Cash Collateral Order, the First Cash Collateral/DIP Order, the DIP Extension Order or the Note; (vii) the entry of an order consolidating or combining any Debtor with any other person (other than a Debtor); (viii) an order shall be entered approving, or there shall arise, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under the Note; or (ix) use of the proceeds of the Note for any purpose that is prohibited under section 6(c) thereof; (c) any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in the Note or any term or agreement relating to the Note that is contained in the First Cash Collateral/DIP Order or the DIP Extension Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; (d) (i) any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect (as defined in the Note) and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (e) funds or Cash Collateral are co-mingled with the proceeds of the DIP Loans in the DIP Account or the proceeds of the DIP Loans are used in a manner prohibited by the Note.  Note, ¶ 7.

(xii)    <u>Indemnification for Expenses</u>.  As previously provided in the First Cash Collateral/DIP Order, the Debtors agree to continue paying all reasonable out-of-pocket expenses of the DIP Lenders incurred in connection with the preparation, execution, delivery, enforcement and administration of the Note(s), the documents and instruments referred to therein and any amendments, waivers or consents relating hereto or thereto including, without limitation, the reasonable fees and expenses of O'Melveny & Myers LLP, counsel for the DIP Lenders.  In addition, the Debtors agree to pay, and save the DIP Lenders harmless from all liability for, any stamp or other documentary taxes that may be payable in connection with the execution or delivery of the Note(s) by the Debtors.  Note, ¶ 16.

(xiii)   <u>Indemnification of Holders</u>.  As previously provided in the First Cash Collateral/DIP Order, the Debtors continue to agree to protect, indemnify, pay and save harmless the DIP Lenders from and against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses (including reasonable fees, expenses and disbursements of outside counsel and allocated costs of internal counsel) that the DIP Lenders may incur or be subject to as a consequence, direct or indirect, of the issuance of the Note(s) by the Debtors other than as a result of the gross negligence or willful misconduct of the DIP Lenders as determined by a final judgment of a court of competent jurisdiction.  Note, ¶ 17.

## **<u>Jurisdiction</u>**

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **<u>Background</u>**

3.      On April 1, 2008 (the "<u>Commencement Date</u>"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors in possession.

4.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On

April 11, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of creditors (the "Creditors' Committee").

5.      Lexington is one of North America's leading manufacturers of rubber components for the automotive and medical device industries.  Lexington operates through two business divisions—the Rubber Group and the Metals Group.  Lexington's products are component parts and its primary customers are other manufacturers.

6.      The Rubber Group serves three principal markets.  Connector seal products are used in primary wire harnesses and sold mostly to companies that supply parts to original equipment manufacturers ("OEMs") in the automotive industry.  The connector seals business thus is sensitive to production levels in the North American automotive OEM industry.  Insulator products are used in ignition wire sets and the primary purchasers of these products are replacement parts suppliers to the automotive aftermarket segment, although Lexington also sells some insulators to the automotive OEM segment.  The insulators business thus is less sensitive to OEM production levels.  The Rubber Group also manufactures and sells high-precision rubber components used in a variety of medical devices, including drug delivery systems, syringes, laparoscopic instruments, and catheters; these parts are sold to some of the world's largest medical device manufacturers.

7.      The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks primarily for manufacturers within the automotive OEM industry.  These components are used in many applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

8.      Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of December 31, 2008, Lexington had approximately 480 employees, of which 114 are salaried employees and 366 are hourly employees.

### Use of Cash Collateral and the DIP Loan

9.      On April 17, 2008, the Court entered the First Cash Collateral/DIP Order authoring the Debtors to use Cash Collateral and obtain postpetition financing in the amount of $4 million on a final basis.   Pursuant to the First Cash Collateral/DIP Order, the Debtors' use of Cash Collateral expires on the earlier of February 25, 2009 or the expiration of the Debtors' exclusive right to propose a chapter 11 plan.   As of February 2, 2009, since the Commencement Date, and pursuant to the First Cash Collateral/DIP Order, the Debtors have made principal payments of $2,694,444.40 to the Prepetition Senior Lenders (as defined in the First Cash Collateral/DIP Order), reducing the indebtedness under the Prepetition Credit Agreements.  They also have paid, in cash, all interest accrued during the chapter 11 cases under the Prepetition Credit Agreements, in the aggregate amount of $1,959,153.10, and paid $423,812.37 in fees and expenses of the Prepetition Senior Lenders (as such term is defined in the First Cash Collateral/DIP Order).

10.      On April 21, 2008, pursuant to the First Cash Collateral Order/DIP, the Debtors issued to the DIP Lenders a Super-Priority DIP Note in the amount of $4,000,000 (the "Existing DIP Note").  The Existing DIP Note matures on the earliest of April 1, 2009 or certain other dates.

## Events During the Chapter 11 Case and the Debtors' Financial Performance

11.     When these cases began in April of 2008, the Debtors anticipated a relatively brief stay in chapter 11 to de-leverage the company's balance sheet without the need for operational restructuring.  This was reflected in a schedule to complete the chapter 11 cases within 330 days, which was negotiated with the Prepetition Senior Lenders and incorporated into the First Cash Collateral/DIP Order.  The First Cash Collateral/DIP Order set forth milestones for the filing of a chapter 11 plan, the filing of a proposed disclosure statement, and the consummation of a chapter 11 plan.  As mentioned above, under the First Cash Collateral/DIP Order, the Debtors' use of cash collateral during these cases ends on the earlier of February 25, 2009 or the expiration of the Debtors' exclusive right to propose a chapter 11 plan.

12.     The Debtors worked diligently to adhere to the original 330-day schedule. They filed their Joint Plan of Reorganization, dated June 30, 2008 (the "Plan"),[4] which provided for satisfaction in full of the claims of all creditors and for a return for existing equity holders. On August 8, 2008, the Debtors filed an Amended Joint Plan of Reorganization[5] and a proposed disclosure statement.[6]  On October 24, 2008, the Debtors moved for approval of the disclosure statement.  The Debtors subsequently filed a Second Amended Joint Plan of Reorganization (the

---

[4] Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated June 30, 2008 [Docket No. 196].

[5] Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 8, 2008 [Docket No. 305].

[6] Proposed Disclosure Statement for Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated August 8, 2008 [Docket No. 306].

"Second Amended Plan")[7] and a revised disclosure statement (the "Proposed Disclosure Statement").[8]

13.    The Second Amended Plan is conditioned on the closing of an exit financing facility in an amount sufficient to pay off the Prepetition Senior Lenders, make other payments to creditors on the effective date, and provide necessary working capital for the continued operation and growth of the Debtors' business.  The Debtors are actively pursuing exit financing from two large, institutional lenders, as well as other sources of capital, and will present evidence at the hearing on this Motion regarding the status of negotiations with prospective exit lenders and the Debtors' prospects for obtaining financing.  During the last weeks of 2008, however, it became clear to the Debtors that the institutional lenders with whom they were in negotiations were unlikely, in the near term, to commit to lend in an amount sufficient to fund the Second Amended Plan due to the dramatic deterioration in the credit markets and general hesitancy to make loans secured by industrial real estate assets.  In addition, the Debtors determined that their ability to complete a satisfactory exit financing was being adversely affected by the lack of cash flow from their connector seals business; as a result, the Debtors concluded it was necessary to undertake an operational restructuring of their connector seals business, both to maximize the value of the Debtors' estates for the benefit of all parties-in-interest and to improve the prospects of obtaining new financing.  The operational restructuring should have multiple benefits, including a reduction in the aggregate amount of exit financing required, a significant increase in the cash flows available to support that financing, and a

---

[7] Exhibit A to the Proposed Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated December 17, 2008 [Docket No. 489].

[8] Proposed Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated December 17, 2008 [Docket No. 489].

reduction in the risk to the Debtors' cash flows in the event that automotive production

deteriorates further.

14.     The Debtors have developed an operational restructuring plan for the

closing of the Vienna, Ohio facility, which produces connector seals, and the transfer of a portion

of the connector seals business to the Jasper, Georgia, Rock Hill, South Carolina, and North

Canton, Ohio facilities (the "Connector Seals Consolidation").  The Debtors have also produced

a financial forecast reflecting the implementation of the Connector Seals Consolidation, which

indicates that this consolidation should generate net cash proceeds of approximately $5.0 million,

after the costs of completing the transfers, and that the business transferred to the Debtors' other

facilities should generate net sales of between $11.0 million and $14.0 million and EBITDA of

between $3.6 million and $4.6 million in 2010, based upon the projected automotive production

levels provided by the industry forecasting services the Debtors utilize.  The Debtors believe that

the implementation of the Connector Seals Consolidation will serve to maximize value and will

significantly enhance their ability to consummate their exit financing on satisfactory terms.

## Anticipated Path to Conclusion of the Chapter 11 Cases

15.     The Debtors' Second Cash Collateral Motion, which seeks authorization

to continue the use of Cash Collateral through December 31, 2009, is currently pending before

the Honorable Judge Martin Glenn.   By this Motion, the Debtors seek authorization to extend

the maturity date of the DIP Loan for a commensurate period of time.  The Debtors seek to

extend the use of Cash Collateral and the DIP Loan to allow sufficient time to complete the

Connector Seals Consolidation, obtain a commitment for exit financing that would allow

payment in full of the claims of the Prepetition Senior Lenders, and confirm and consummate the

Second Amended Plan or, if appropriate, an amended version of that plan that would reflect the

Debtors' financial advisors' most up-to-date valuation after the completion of the Connector

Seals Consolidation.   The DIP Lenders have agreed to the requested extension of the term of the

DIP Loan and are seeking no additional fees for such extension.

## Argument

### A.    Extraordinary Provision Under General Order No. M-274

16.    None of the terms of the DIP Loan Extension are considered an

"Extraordinary Provision" under the General Order M-274 of the United States Bankruptcy

Court for the Southern District of New York.

### B.    Necessity for DIP Loan Extension

17.    As reflected in the Budget attached hereto as Exhibit B, the Debtors

project that they will need postpetition financing in addition to the use of Cash Collateral to meet

and satisfy their ongoing business, operational, and administrative expenses.  In addition,

because of the inherent uncertainty regarding the timing of collection of accounts receivable, the

Debtors need additional sources of funds in order to operate and to provide necessary assurance

to their customers and suppliers of the Debtors' ability to continue their businesses without

interruption.  Pursuant to the First Cash Collateral/DIP Order, and as provided in more detail

therein, this Court authorized the Debtors to obtain the DIP Loan in the aggregate amount of $4

million, which was evidenced by the Existing DIP Note between the Debtors and Lubin Partners,

LLC, an investment firm of which Michael A. Lubin[9] is managing member, William B.

---

[9] Michael A. Lubin is the co-Chief Executive Officer of the Debtors.  With respect to the Senior
Subordinated Notes, Lubin and his affiliates own $7,011,000 of the principal amount, and the
Lubin, Delano & Co. Profit Sharing Trust owns $761,000 of the principal amount.  Lubin also
owns the 13% Junior Subordinated Note.  With respect to the equity of the Debtors, (a) Lubin
and his affiliates hold 1,523,279 common shares, (b) Lubin beneficially owns an additional
89,062 shares held by the Lubin, Delano & Co. Profit Sharing Trust, (c) Lubin and his affiliates
own 78,077 warrants to purchase the common stock of Lexington at $3.50 per share, and (d) the
Lublin, Delano & Co. Profit Sharing Trust owns an additional 3,110 warrants.

Conner,[10] and ORA Associates LLC[11] (collectively, the "DIP Lenders") on an unsecured, super-priority basis, which provides the Debtors with cash sufficient to ensure that the Debtors could meet their ongoing obligations in the ordinary course if Cash Collateral alone were insufficient.

18.    As provided in the First Cash Collateral/DIP Order, the DIP Loan is unsecured.  Pursuant to the First Cash Collateral/DIP Order, the DIP Lenders were granted a super-priority administrative expense claim (the "DIP Super-Priority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code payable from any prepetition and postpetition property of the Debtors and all proceeds thereof, which is senior to any and all other claims, including, without limitation, all administrative expenses or other claim arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, but is junior, subordinate, and subject to the prepetition obligations owed to the Prepetition Senior Lenders, the Adequate Protection Liens, the Adequate Protection Claim, and the Carve-Out (all as defined in the First Cash Collateral/DIP Order).

19.    As provided in the Existing DIP Note, the DIP Loan matures on April 1, 2009 at the latest.  As discussed above, the Debtors seek to extend the use of Cash Collateral to December 31, 2009.  In order to allow sufficient time to complete the Connector Seals Consolidation, obtain a commitment for exit financing that would allow payment in full of the claims of the Prepetition Senior Lenders, and confirm and consummate the Second Amended Plan or, if appropriate, an amended version of that plan that would reflect the Debtors' financial advisors' most up-to-date valuation after the completion of the Connector Seals Consolidation, the Debtors also require an extension of the maturity date of the DIP Loan.  The DIP Lenders

---

[10] William B. Conner is a director of the Debtors.  With respect to the equity, Conner and his affiliates own 364,894 common shares.

[11] ORA Associates LLC is not an affiliate of the Debtors or of the other DIP Lenders.

have consented to an extension of the DIP Loan to the date upon which the Debtors' use of Cash

Collateral terminates.  The DIP Lenders are not seeking any additional fees for the DIP Loan

Extension.

      20.    The material terms and conditions of the DIP Loan and the DIP Loan

Extension are summarized in paragraph 1 of this Motion.

**C.    The DIP Loan Extension Should Be Approved**

      21.    As set forth above, the Debtors propose to extend the maturity date of the

DIP Loan for a coterminous period of time as their requested extension of use of Cash Collateral.

All other terms of the DIP Loan will remain essentially the same, including the grant of a super-

priority claim to the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code.

      22.    Section 364(c) of the Bankruptcy Code provides, among other things, that

if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or

incur debt with priority over any and all administrative expenses of the kind specified in sections

503(b) or 507(b) of the Bankruptcy Code.  11 U.S.C. § 364(c)(1).

      23.    The Debtors' continuing working capital needs can be ensured only if the

Debtors are authorized to continue to borrow $4,000,000 under the DIP Loan and to use such

proceeds, along with the Cash Collateral, to fund their operations.  The Prepetition Senior

Lenders have liens on and security interests in substantially all of the Debtors' real estate assets

and other assets, including, among other things, Receivables, Equipment, General Intangibles,

Inventory, Contract Rights, Subsidiary Stock, Securities, Leasehold Interests, Commercial Tort

Claims, and proceeds and products of the foregoing.  The Debtors submit that they are unable to

obtain the funds to replace the DIP Loan on more favorable terms than those contained in the

DIP Extension Order and the Note. Although the Debtors did not actively seek to obtain replacement financing on an unsecured, non-super-priority basis, the Debtors believed that they could not (y) obtain the required funds in the ordinary course of business on an unsecured basis allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or (z) obtain the required funds in the non-ordinary course as an administrative expense allowable under section 503(b)(1) of the Bankruptcy Code. See 11 U.S.C. § 364(a),(b). Considering the current market credit conditions and because the Debtors have virtually no unencumbered assets, the Debtors believe it would be more efficient and cost effective to extend an existing loan with no change in terms rather than incur the costs and expenses conduct a likely futile search for a lender to replace that loan.

24.    The Debtors also believe that the terms of the DIP Loan are significantly more favorable than any terms that would be offered by other lenders (even if such lenders could be found). Specifically, the DIP Loan is unsecured and junior in priority to a significant amount of senior, secured debt and the interest rate, which currently equals to 10% based on the calculation set forth in the Note, is reasonable in light of the unsecured nature of the DIP Loan. Importantly, not only is the DIP Loan junior in priority to the Prepetition Senior Lenders' Adequate Protection Liens and Adequate Protection Claims, but the DIP Loan is subordinated to the prepetition obligations owed to the Prepetition Senior Lenders. The Debtors, in the exercise of their sound business judgment, determined to extend terms of the DIP Loan on its existing terms because it addresses the Debtors' continuing working capital and liquidity needs and, together with the Cash Collateral, will enable the Debtors to continue to operate their businesses and maintain their going concern value during these chapter 11 cases.

25.    Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment.  See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  See also In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).  Here, the Debtors have determined that continued financing is available only under section 364(c) of the Bankruptcy Code and that extending the maturity of the DIP Loan is in the best interests of the Debtors and their estates.   The fact that two of the three DIP Lenders are insiders of the Debtors should not make the DIP Loan Extension any less reasonable.  In fact, nothing in the Bankruptcy Code prevents insiders from providing postpetition financing to a debtor.  Moreover, it is not uncommon for insiders to provide a debtor with postpetition financing because in some cases loans from insiders may be the only source for postpetition financing.  See, e.g., In re Lewiston Steam & Power Assoc., No. 1989 WL 1109341, *3 (Bankr. N.D. Ohio, Aug. 24, 1989) ("Sec. 364 contains no proscriptions against disinterested insiders extending credit.  In a bankruptcy setting such persons may often be the only source of unsecured credit.").  In addition, the DIP Loan does not have a break-up fee or any other terms making it prohibitive for the Debtors to obtain a postpetition loan from an alternative source on better terms and repay the funds already borrowed under the DIP Loan, subject to the consent of the Prepetition Senior Lenders.  See In re Adelphia Business Solutions, Inc., 280 B.R. 63, 72

n.43 (Bankr. S.D.N.Y. 2002) (recognizing that the court had previously approved a postpetition

loan made by insiders of the debtors in which it found that there was no harm because the loan

was on fair terms and the lenders were "willing to step aside should the Debtors be able to find a

third-party lender to replace them prior to a final hearing on the DIP motion").  As was the case

in <u>Adelphia</u>, the Debtors are willing to entertain any other offers for a postpetition loan in an

amount equal to the DIP Loan but on more favorable economic terms.

26.     The Debtors negotiated with the DIP Lenders over the DIP Loan

Extension at arms-length, in good faith and pursuant to their sound business judgment.  Although

some of the DIP Lenders are insiders of the Debtors, the DIP Lenders had their own counsel and

each side negotiated at arm's length and in good faith.  The terms and conditions of the DIP

Loan are fair and reasonable under the circumstances.  Accordingly, the DIP Lenders and all

obligations incurred under the DIP Loan should be afforded the benefits of section 364(e) of the

Bankruptcy Code.

27.     The Debtors have a critical need for funds to continue to operate their

businesses in chapter 11.  For the reasons set forth above, the DIP Loan Extension is vital to the

Debtors' continued operations and the preservation of the going-concern value of their enterprise

for the benefit of their estates and creditors.  The Debtors believe that the DIP Loan Extension

will be viewed favorably by the Debtors' customers, suppliers, and employees and will thereby

help promote the Debtors' successful reorganization.

<u>**Notice**</u>

28.     No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this motion has been provided to (i) the United States Trustee for the Southern District

of New York, (ii) the attorneys for the agents for the Debtors' Prepetition Lenders, (iii) the

attorneys for the Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee,

and (v) all other parties that have requested notice in these chapter 11 cases. The Debtors submit

that no other or further notice need be provided.

29.    Other than the relief provided under the First Cash Collateral/DIP Order,

no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.


Dated: February 20, 2009
          New York, New York


/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

**(Form of Note)**

# AMENDED AND RESTATED
## SUPER- PRIORITY DIP NOTE

$4,000,000                                                    New York, New York
                                                             Issue Date:  April 21, 2008


         FOR VALUE RECEIVED, the undersigned, Lexington Precision Corporation and
Lexington Rubber Group, Inc., each a Delaware corporation and a debtor in possession
(collectively, the "Debtors"), hereby jointly and severally and unconditionally promise to pay to
the order of Lubin Partners, LLC, a Delaware limited liability company, William B. Connor and
ORA Associates, LLC, a New York limited liability company (collectively, the "Holders"), the
aggregate principal sum of Four Million Dollars ($4,000,000), to be allocated among the Holders
as follows:

|                       |             |
|-----------------------|-------------|
| Lubin Partners, LLC   | $2,000,000  |
| William B. Connor     | $1,500,000  |
| ORA Associates, LLC   | $500,000    |

         1.    Payment of Principal and Interest.  The principal amount of this Note shall
be paid on the earliest of (i) December 31, 2009, (ii) the date upon which the Debtors' use of
Cash Collateral (as defined in the Second Cash Collateral Order) terminates, (iii) the effective
date of a  confirmed chapter 11 plan of reorganization in the Chapter 11 Cases,[12] (iv) the
conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (v)
the appointment of a chapter 11 trustee in any of the Chapter 11 Cases or the appointment of an
examiner with expanded powers to operate or manage the financial affairs, the business or the
reorganization of any Debtor and (vi) the date of acceleration by the Holders pursuant to Section
7 hereof (such date, the "Stated Maturity Date").  The Debtors also promise to pay interest on
this Note on the first business day of each month (in arrears) and upon the date this Note matures
or otherwise becomes due and payable at the rate of LIBOR plus 7% per annum with a LIBOR
floor of 3% per annum (computed on the basis of a 360 day year for the actual number of days
lapsed); provided that any principal amount not paid when due, and to the extent permitted by
applicable law, any interest not paid when due, in each case whether at Stated Maturity Date, by
required prepayment, declaration, acceleration or demand or otherwise (both before as well as
after judgment), shall bear interest payable upon demand at the rate that is 2% per annum in
excess of the rate of interest otherwise payable upon this Note.  All payments hereunder,
including any prepayment, shall be made to the Holders on a pro rata basis based on the
respective principal amounts owed to each Holder.

         2.    Optional Prepayment.  Debtors shall have the right at any time or from
time to time and without premium or penalty, to voluntarily prepay all or any portion of this
Note.  Each prepayment shall be accompanied by the payment of accrued and unpaid interest on

---

[12] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such
terms in Section 9 hereof.

the amount being prepaid, through the date of prepayment. Any amounts prepaid hereunder may not be reborrowed.

3.      <u>Lender Fee</u>. Pursuant to the Final Borrowing Order, the Debtors have paid to the Holders a fee in cash in the aggregate amount of $80,000, which was allocated to the Holders pro rata based upon their funding commitment. No additional fees are payable.

4.      <u>Use of Proceeds</u>. The proceeds of this Note shall be used by the Debtors to the extent Cash Collateral (as defined in the Second Cash Collateral Order) is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the DIP Extension Order or the Second Cash Collateral Order or as otherwise authorized by the Bankruptcy Court; <u>provided</u> that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Bankruptcy Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders (in their capacity as Holders). The Debtors shall use the entire amount of the proceeds in accordance with this Section 4; <u>provided</u>, <u>however</u>, that nothing herein shall in any way prejudice the Holders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest; and <u>provided</u>, <u>further</u>, that Debtors shall not use the proceeds for any purpose that is prohibited under the Bankruptcy Code. The proceeds of this Note have been deposited and shall be held in the bank account at a bank that has been approved by the Office of the United States Trustee for the Southern District of New York as an authorized bank depository (the "<u>DIP Account</u>") as described in the Final Borrowing Order and no other funds or cash collateral of the Debtors shall be co-mingled with the proceeds of this Note or deposited in the DIP Account.

5.      <u>Superpriority Nature of Obligations</u>. All obligations of the Debtors under this Note (including the obligation to pay principal, interest, fees, costs, charges, commissions and expenses) shall be paid as provided herein when due, without defense, offset, reduction or counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors arising under Section 364(c)(1) of the Bankruptcy Code, and senior to any and all other claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Lien (all as defined in the Second Cash Collateral Order). Subject to the Carve-Out, the Adequate Protection Liens (as defined in Second Cash Collateral Order), the Prepetition Senior Secured Debt (as defined in the Second Cash Collateral Order) and the Adequate Protection Claim (as defined in the Second Cash Collateral Order), the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred

after any conversion of this case pursuant to Section 1112 of the Bankruptcy Code shall rank prior to, or on parity with, the DIP Super-Priority Claims.

      6.     <u>Covenants.</u>  Each of the Debtors covenant and agree that until this Note is paid in full, neither of the Debtors shall, without the prior written consent of the Required Holders:

      (a)     <u>Asset Sales</u>.  enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to sell, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, provided that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be subject to the priorities set forth in the Second Cash Collateral Order and the DIP Extension Order.

      (b)     <u>Chapter 11 Claims</u>.  unless all obligations under this Note have been indefeasibly paid in full in cash, incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any Chapter 11 Case (other than the Existing Secured Claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the Holders against such Debtor in respect of the obligations hereunder, or apply to the Bankruptcy Court for authority to do so; or

      (c)     <u>Limitation on Payments Related to Prepetition Obligations</u>.  (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to Section 361 of the Bankruptcy Code (other than the Adequate Protection Liens (as such term is defined in the Second Cash Collateral Order), or apply to the Bankruptcy Court for the authority to do any of the foregoing; <u>provided</u> that the Debtors may make payments as permitted in the DIP Extension Order or the Second Cash Collateral Order, or as authorized in any other order of the Bankruptcy Court, including, for example, making Adequate Protection Payments (as such term is defined in the Second Cash Collateral Order).

      7.     <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, if any of the following conditions or events ("<u>Events of Default</u>") shall occur:

      (a)     <u>Failure to Make Payments When Due</u>.  Failure by the Debtors to pay any installment of principal on this Note when due or pay any installment of interest within 3

business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due;

(b)     Chapter 11 Cases.  With respect to the Chapter 11 Cases, (i) the entry of an order authorizing any Debtor in any of the Chapter 11 Cases to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing, as defined in the Second Cash Collateral Order) if such order does not provide for the indefeasible payment in full in cash of all obligations under this Note; (ii) the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect; (v) exercise of rights by the Prepetition Senior Lenders (as defined in the Second Cash Collateral Order) pursuant to Paragraph 9 of the Second Cash Collateral Order against the Senior Lender Prepetition Collateral and/or the other collateral in which Adequate Protection Liens were granted to the Prepetition Senior Lenders; (vi) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the Final Borrowing Order (as it pertains to this Note or the Holders), the DIP Extension Order, or the Second Cash Collateral Order or this Note or any of the Holders' rights, benefits, privileges or remedies under the Final Borrowing Order, the DIP Extension Order, the Second Cash Collateral Order or this Note; (vii) the entry of an order consolidating or combining any Debtor with any other Person (other than another Debtor); (viii) an order shall be entered approving, or the Debtor shall have consented to, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under this Note; or (ix) use of the proceeds of this Note for any purpose that is prohibited under Section 6(c) hereof;

(c)     Default.  Any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in this Note or any term or agreement relating to this Note that is contained in the Final Borrowing Order or the DIP Extension Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; or

(d)     Judgments.  (i) Any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition

Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days.

        (e)    <u>Use of Proceeds</u>.  Funds or Cash Collateral (as defined in the Second Cash Collateral Order) are co-mingled with the proceeds of this Note in the DIP Account or proceeds of this Note are used in a manner prohibited by this Note.

Upon the occurrence and during the continuance of any Event of Default, the Holders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors declare (i) the unpaid principal amount of and accrued interest on the Notes and (ii) all other obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become, immediately due and payable.

        9.    <u>Definitions</u>.  The following terms shall have the following meanings in this Note:

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Business Day" means each day that is not a Legal Holiday.

"Chapter 11 Cases" means those certain proceedings for relief filed by the Debtors under Chapter 11 of the Bankruptcy Code and being jointly administered under Case No. 08-11153 in the United States Bankruptcy Court for the Southern District of New York.

"DIP Extension Order" means that certain Order Pursuant to 11 U.S.C. §§ 105 And 364 Authorizing Extension of Postpetition Financing, entered by the Bankruptcy Court on March ___, 2009.

"Existing Secured Claims" means any secured claims in existence as of the commencement of the Chapter 11 Cases.

"Final Borrowing Order" means that certain Final Order (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Authorizing Post-Petition Financing entered by the Bankruptcy Court on April 17, 2008.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review or rehearing has been waived or (ii) the time to appeal or seek

certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"Issue Date" means the issue date of this Note on April 21, 2008.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or required by law to close.  If a payment date is a Legal Holiday, payment shall be made on the next succeeding date that is not a Legal Holiday, and interest shall accrue for the intervening period at the rate set forth in Section 1 hereof.  If a regular record date is a Legal Holiday, the record shall not be affected.

"LIBOR" means a fluctuating rate of interest determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London Time) on the second preceding Business Day.  If for any reason such rate is not available, "LIBOR" means the fluctuating rate of interest calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen LIBO Page as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR" shall mean a fluctuating rate of interest based upon a comparable rate designated by the Holders as a substitute therefore.  "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto).  As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Material Adverse Effect" means (i) a material adverse effect upon the business, operations, liabilities (whether contractual, environmental or otherwise), properties, assets, condition (financial or otherwise) or prospects of the Debtors taken as a whole or (ii) the material impairment of the ability of any Debtor to perform the obligations of the Debtors under the Note.

"Motion" means the Debtors' Motion for Authorization Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), and 364(e) to (i) Use Cash Collateral, (ii) Grant Adequate Protection to Prepetition Secured Lenders, and (iii) Obtain Postpetition Financing.

"Note" means this $4,000,000 Amended and Restated Super-Priority DIP Note by and between the Debtors and the Holders.  Upon execution, the Note will supersede in its entirety the $4,000,000 Super-Priority DIP Note by and between the Debtors and the Holders, issued on April 21, 2008, which shall be promptly returned to the Debtors.

"Person" an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" means April 1, 2008, the date on which the Debtors filed their petitions for relief commencing these Chapter 11 Cases.

"Prepetition Indebtedness" means indebtedness of any Debtor outstanding on the Petition Date, including Indebtedness under the Prepetition Credit Agreements, the Senior Subordinated Notes and the 13% Junior Subordinated Note (as those terms are defined and/or referenced in the Motion).

"Required Holders" means Holders holding more than 50% of the principal amount of the Note.

"Second Cash Collateral Order" means that certain Order Pursuant to Bankruptcy Code Sections 105, 361, 362, And 363 Authorizing Debtors Use of Cash Collateral, entered by the Bankruptcy Court on February __, 2009.

10.    <u>Successors and Assigns</u>.  This Note shall inure to the benefit of the Holders and their respective successors and assigns and shall bind the Holders, their respective successors and assigns, and any chapter 7 or chapter 11 trustee appointed after the Petition Date or elected for the estates of the Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code.

11.    <u>Presentment and Demand</u>.  Demand, presentment, protest and notice of nonpayment and protest are hereby waived by the Debtors.

12.    <u>Amendment and Non-Waiver</u>.

(a)    This Note may not be amended, modified, or waived except by an agreement in writing signed by the Debtors and the Required Holders; <u>provided</u> that consent of all Holders shall be required to reduce the principal amount, the interest rate, or extend any payment date.

(b)    To the extent permitted by law, no failure to exercise and no delay on the part of the Holders in exercising any power or right in connection with this Note or available at law or in equity, shall operate as a waiver thereof, and no single or partial exercise of any such rights or power, or any abandonment or discontinuance of steps to enforce such a right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.

13.    <u>Notices</u>.  Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Note shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or three (3) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, or by telecopy and confirmed by telecopy answerback, addressed as follows:

(a)    If to the Debtors:

Lexington Precision Corporation
Lexington Rubber Group, Inc.

800 Third Avenue, 15th Floor
New York, NY 10022
Attn:  Warren Delano
Telecopy No.:  212-319-4659

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telecopy No.:  212-310-8000
Attn:  Richard P. Krasnow, Esq.
         Adam P. Strochak, Esq.

(b)    If to the Holders:

c/o Michael A. Lubin
Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Telecopy No.:  212-319-4659

with a copy to:

O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Telecopy No.:  212-362-2061
Attn:  Gerald C. Bender, Esq.

or at such other address as may be substituted by notice given as herein provided.  The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

14.    <u>Submission to Jurisdiction:  Waiver of Jury Trial</u>.

(a)    The Debtors and the Holders hereby irrevocably submit to the jurisdiction of the Bankruptcy Court, and they hereby irrevocably agree that any action concerning the Note shall be heard and determined in the Bankruptcy Court.  The Debtors and the Holders hereby irrevocably waive, to the fullest extent they may effectively do so, the defense of an inconvenient forum to the maintenance of any such action in the Bankruptcy Court.  The Debtors and the Holders hereby irrevocably agree that the summons and complaint or any other process in any such action may be served by mailing in accordance with the provisions set forth in Section 13 hereof.

(b)    EACH OF THE DEBTORS AND THE HOLDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY
OBLIGATIONS UNDER THIS NOTE.

15.     Governing Law.  This Note shall be governed by, construed and enforced
in accordance with the laws of the State of New York applicable to agreements made and to be
wholly performed in such State and without giving effect to the conflict of laws principles
thereof.

16.     Indemnification for Expenses.  The Debtors agree to pay all reasonable
out-of-pocket expenses of the Holders (solely in their capacity as Holders) incurred in
connection with the preparation, execution, delivery, enforcement and administration of this
Note, the documents and instruments referred to herein and any amendments, waivers or
consents relating hereto or thereto including, without limitation, the reasonable fees and expenses
of O'Melveny & Myers LLP, counsel for the Holders.  In addition, the Debtors agree to pay, and
save Holders (solely in their capacity as Holders) harmless from all liability for, any stamp or
other documentary taxes that may be payable in connection with the execution or delivery of this
Note by the Debtors.

17.     Indemnification of Holders.  The Debtors hereby agree to protect,
indemnify, pay and save harmless the Holders (solely in their capacity as Holders) from and
against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses
(including reasonable fees, expenses and disbursements of outside counsel) that Holders (solely
in their capacity as Holders) may incur or be subject to as a consequence, direct or indirect, of
the issuance of this Note by the Debtors other than as a result of the gross negligence or willful
misconduct of the Holders (solely in their capacity as Holders) as determined by a final judgment
of a court of competent jurisdiction.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Debtors have executed and delivered this Note as of the day and year and at the place first above written.

LEXINGTON PRECISION CORPORATION


By: _____
    Name:  Warren Delano
    Title:    President



LEXINGTON RUBBER GROUP, INC.


By:_____
    Name:  Warren Delano
    Title:    President

**<u>EXHIBIT B</u>**

**(Budget)**

**LEXINGTON PRECISION CORPORATION**

**FORECAST OF CASH RECEIPTS AND DISBURSEMENTS AND NET SALES FROM FEBRUARY 23 THROUGH MAY 22, 2009**
**(in thousands of dollars)**

| | 27-Feb | 6-Mar | 13-Mar | 20-Mar | 27-Mar | 3-Apr | 10-Apr | 17-Apr | 24-Apr | 1-May | 8-May | 15-May | 22-May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash receipts:** | 1,476 | 1,290 | 1,260 | 1,436 | 1,233 | 1,843 | 1,622 | 1,681 | 1,777 | 2,026 | 1,761 | 1,817 | 1,751 |
| **Cash disbursements:** | | | | | | | | | | | | | |
| Debt service: | | | | | | | | | | | | | |
| CapitalSource principal (1) | - | 269 | - | - | - | 269 | - | - | - | 269 | - | - | - |
| CapitalSource interest | - | 165 | - | - | - | 150 | - | - | - | 145 | - | - | - |
| CapitalSource miscellaneous fees | - | 8 | - | - | - | 8 | - | - | - | 8 | - | - | - |
| DIP Interest and fees | - | 35 | - | - | - | 35 | - | - | - | 35 | - | - | - |
| L&D | - | - | - | - | - | 203 | - | - | - | - | - | - | - |
| Payroll and payroll taxes | 566 | 344 | 627 | 346 | 443 | 563 | 357 | 931 | 352 | 646 | 371 | 656 | 362 |
| Retirement & Savings Plan 401(k) | 30 | - | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Group Medical Care Plan Administrative Fees | - | - | - | 13 | - | - | - | 13 | - | - | - | 13 | - |
| Prescription drug plan | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Stop Loss | - | 15 | - | - | - | 15 | - | - | - | 15 | - | - | - |
| | - | - | - | | | - | | | | | | | |
| Reorganization professional fees and expenses | 153 | 155 | 155 | 155 | 155 | 122 | 122 | 122 | 122 | 99 | 99 | 99 | 99 |
| DIP legal counsel | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ordinary course professionals | - | - | - | 8 | 84 | - | - | 8 | - | 11 | - | - | 33 |
| | - | - | - | | | - | | | | | | | |
| Vendors - check disbursements (excluding Dow & Wacker): | - | - | - | | | - | | | | | | | |
| Dow Corning | 19 | 19 | 19 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Wacker | 127 | 148 | 76 | 78 | 70 | 70 | 80 | 106 | 145 | 145 | 145 | 150 | 150 |
| All other excluding capex | 436 | 578 | 648 | 564 | 601 | 704 | 682 | 743 | 713 | 703 | 688 | 782 | 683 |
| Capex | 10 | 10 | 60 | 10 | 10 | 10 | 10 | 60 | 10 | 10 | 10 | 60 | 10 |
| Ohio BWC and UMR Health Disbursements | 228 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Commercial Traffic | 13 | 13 | 14 | 14 | 14 | 14 | 15 | 16 | 16 | 15 | 16 | 17 | 17 |
| Utilities | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Disbursements (receipts) related to the Rock Hill fire (1) | 47 | 47 | 47 | 171 | - | (300) | - | - | 153 | - | - | - | 153 |
| Total cash disbursed | 1,629 | 1,846 | 1,716 | 1,515 | 1,533 | 2,019 | 1,422 | 2,155 | 1,667 | 2,257 | 1,485 | 1,933 | 1,663 |
| **Net cash received (used)** | (153) | (556) | (456) | (79) | (300) | (176) | 200 | (474) | 110 | (231) | 276 | (116) | 88 |
| **Cumulative net cash received (used)** | (153) | (709) | (1,165) | (1,244) | (1,544) | (1,720) | (1,520) | (1,994) | (1,884) | (2,115) | (1,839) | (1,955) | (1,867) |
| **Ending FirstMerit cash balance from prior period** | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 | 777 |
| **DIP loan proceeds and interest thereon** | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 | 3,084 |
| **Net cash available** | 3,708 | 3,152 | 2,696 | 2,617 | 2,317 | 2,141 | 2,341 | 1,867 | 1,977 | 1,746 | 2,022 | 1,906 | 1,994 |
| **Net sales (based on date shipped)** | 1,141 | 1,665 | 1,739 | 1,770 | 1,861 | 1,827 | 1,541 | 1,748 | 1,864 | 1,851 | 1,896 | 1,912 | 2,051 |
| **Net cumulative sales** | 1,141 | 2,806 | 4,545 | 6,315 | 8,176 | 10,003 | 11,544 | 13,292 | 15,156 | 17,007 | 18,903 | 20,815 | 22,866 |

(1)   The Company estimates that $412,000 of expenditures made for the clean-up and restoration of the Rock Hill, South Carolina manufacturing facility as a result of the fire that occurred on November 19, 2008, will be receivable from Affiliated Factory Mutual Insurance Company at the close of business on May 22, 2009.

Note:   The forecast of cash receipts and disbursements for the the thirteen-week period ended May 22, 2009, assumes that no insurance recoveries under the provisions of the Company's business interruption insurance will be received by the Company on or before May 22, 2009.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                  :
In re                                             :        **Chapter 11 Case No.**
                                                  :
**LEXINGTON PRECISION CORP., et al.,**            :        **08-11153 (MG)**
                                                  :
        **Debtors.**                              :        **(Jointly Administered)**
                                                  :
-------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 364
### AUTHORIZING EXTENSION OF POSTPETITION FINANCING

        Upon the Motion, dated February __, 2009 (the "Motion") of Lexington Precision

Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber"

and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, for

an order, pursuant to sections 105 and 364 of chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), authorizing the extension of the DIP Loan (as defined below), all as more

fully described in the Motion and herein; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to (i) the United States Trustee for the

Southern District of New York (the "U.S. Trustee"), (ii) the attorneys for the agents for the

Debtors' Prepetition Senior Lenders (as defined below), (iii) the attorneys for the Debtors'

postpetition lenders, (iv) the attorneys for the Creditors' Committee (as defined below), and (v)

all other parties that have requested notice in these chapter 11 cases, and it appearing that no

other or further notice need be provided; and a hearing having been held on March 23, 2009, to

consider the Motion (the "Hearing"); and the relief requested in the Motion being within the

guidelines for financing requests set forth in General Order M-274 of the United States

Bankruptcy Court for the Southern District of New York; and the relief requested in the Motion

being in the best interests of the Debtors and their estates and creditors; and the Court having

reviewed the Motion; and based on the evidence adduced at the Hearing in support of the

Motion; and the Court having determined that the legal and factual bases set forth in the Motion

and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court and after due deliberation and sufficient cause appearing

therefor,

**THE COURT HEREBY FINDS:**

A.       On April 1, 2008 (the "Commencement Date"), Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

B.       Debtors have retained possession of their property and continue to operate and

manage their business as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  On April 11, 2008, a statutory committee of unsecured creditors (the

"Creditors' Committee") was appointed in these chapter 11 cases.  No trustee, examiner, or any

other committee has yet been appointed in these chapter 11 cases.

C.       On April 17, 2008, the Court entered an order approving the use of Cash

Collateral (as defined therein) and authorized the Debtors to obtain postpetition financing in the

aggregate amount of $4 million (the "DIP Loan") from the DIP Lenders (as defined in the

Motion) [Docket No. 61] (the "First Cash Collateral/DIP Order").

D.      On February __, 2009, the Court (J. Glenn) entered an order authorizing the continued use of Cash Collateral (as defined therein) through and including December 31, 2009 (the "Second Cash Collateral Order").

E.      On April 21, 2008, the Debtors issued a note in the amount of $4 million to the DIP Lenders (as defined in the Motion) (the "Existing DIP Note").

F.      Pursuant to the First Cash Collateral/DIP Order, the DIP Lenders were granted a super-priority administrative expense claim (the "DIP Super-Priority Claim") payable from any prepetition and postpetition property of the Debtors and all proceeds thereof and senior to any and all other unsecured claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, provided, however, that notwithstanding the foregoing, the DIP Super-Priority Claim is junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Liens (all as defined in the First Cash Collateral/DIP Order).

G.      Pursuant to the First Cash Collateral/DIP Order, subject to the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt and the Adequate Protection Claim, the DIP Super-Priority Claim is and will be at all times senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code, and with the exception of the Carve-Out, the Adequate Protection Liens, Prepetition Senior Secured Debt and the Adequate Protection Claim, no cost or expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to section 1112 of the Bankruptcy Code rank prior to, or on parity with, the DIP Super-Priority Claim.

H.      Pursuant to the First Cash Collateral/DIP Order, the Debtors may continue to use the DIP Loan proceeds until the earliest of (i) the one year anniversary of the Commencement Date, (ii) the effective date of a confirmed chapter 11 plan of reorganization in these chapter 11 cases, (iii) the conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and (iv) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor, and (v) the date of acceleration by the DIP Lenders pursuant to section 7 (Events of Default) of the Existing DIP Note (collectively, the "Maturity Date").

I.      The Debtors have an immediate need to extend the Maturity Date of the DIP Loan in order to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to meet payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to satisfy the cost of administering these chapter 11 cases.  Good cause has been shown for the entry of this Order. Extension of the Maturity Date is vital to avoid immediate and irreparable harm to the Debtors' estates.

J.      The DIP Lenders have consented to the extension of the Maturity Date.

K.      Based on the record before the Court, the terms of the extension of the Maturity Date have been negotiated at arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors.

L.       Based on the record before the Court, the extension of the Maturity Date of the DIP Loan as provided in this Order is in the best interests of the Debtors, their estates, and creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.       The Motion is hereby granted, with the foregoing findings incorporated herein by reference, and with any objections to the Motion that have not previously been withdrawn or resolved being hereby overruled.

2.       The Maturity Date of the DIP Loan is hereby extended to earliest of (i) December 31, 2009, (ii) the date upon which the Debtors' use of Cash Collateral (as defined in the Second Cash Collateral Motion) terminates, (iii) the effective date of a  confirmed chapter 11 plan of reorganization in these chapter 11 cases, (iv) the conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and (v) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor, and (vi) the date of acceleration by the DIP Lenders pursuant to section 7 (Events of Default) of the Note (as defined below) (collectively, the "DIP Loan Extension").

3.       The Debtors are hereby authorized to execute an amended and restated promissory note substantially in the form attached hereto as Exhibit A (the "Note") to effectuate the DIP Loan Extension (upon which execution, the DIP Lenders shall return to the Debtors the Existing DIP Note) on the terms and conditions set forth in the Note and this Order, including without limitation, monthly payment of interest on the DIP Loan at the rate set forth therein, and are hereby authorized and directed to do and perform all acts, including, without limitation, making, executing, and delivering all instruments and documents, that may be necessary or desirable to implement the DIP Loan Extension.

4.       The DIP Lenders, having been found to be acting in good faith, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and, therefore, if any or

all of the provisions of the First Cash Collateral/DIP Order, the Second Cash Collateral Order or this Order are hereafter reversed, stayed, modified, or vacated, such reversal, stay, modification, or vacation shall not affect (i) the validity of any obligation, indebtedness, or liability incurred by the Debtors to the DIP Lenders prior to written notice to such party of the effective date of such reversal, stay, modification, or vacation, or (ii) the validity and enforceability of any priority authorized or created hereby or pursuant to the Note with respect to any such indebtedness, obligation, or liability, including, without limitation, the DIP Super-Priority Claim. Notwithstanding any such reversal, stay, modification, or vacation, any indebtedness, obligations, or liabilities incurred by the Debtors to the DIP Lenders prior to written notice to such party of the effective date of such reversal, stay, modification, or vacation shall be governed in all respects by the original provisions of this Order, and the DIP Lenders shall be entitled to all the claims, priorities, rights, remedies, privileges, and benefits granted herein and/or pursuant to the Note until all of the obligations under the Note are indefeasibly paid in full and discharged in cash.

5.      All terms and provisions, including the findings and conclusions of law, of the First Cash Collateral/DIP Order pertaining to the DIP Loan are incorporated herein by reference to the extent not inconsistent with this Order.

6.      Any material and substantive modifications to the terms of this Order require authorization of the Court.

7.      Notice given by the Debtors of the Motion and of the Hearing constitutes due and sufficient notice of the Motion and of the Hearing.

8.      In the event that any provision of this Order conflicts with any term of the

Note, this Order shall govern.

Dated: February __, 2009
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

**(Form of Note)**

## AMENDED AND RESTATED
## SUPER- PRIORITY DIP NOTE

$4,000,000                                                        New York, New York
                                                                 Issue Date:  April 21, 2008


          FOR VALUE RECEIVED, the undersigned, Lexington Precision Corporation and
Lexington Rubber Group, Inc., each a Delaware corporation and a debtor in possession
(collectively, the "Debtors"), hereby jointly and severally and unconditionally promise to pay to
the order of Lubin Partners, LLC, a Delaware limited liability company, William B. Connor and
ORA Associates, LLC, a New York limited liability company (collectively, the "Holders"), the
aggregate principal sum of Four Million Dollars ($4,000,000), to be allocated among the Holders
as follows:

          Lubin Partners, LLC          $2,000,000
          William B. Connor            $1,500,000
          ORA Associates, LLC          $500,000


          1.      Payment of Principal and Interest.  The principal amount of this Note shall
be paid on the earliest of (i) December 31, 2009, (ii) the date upon which the Debtors' use of
Cash Collateral (as defined in the Second Cash Collateral Order) terminates, (iii) the effective
date of a  confirmed chapter 11 plan of reorganization in the Chapter 11 Cases,[1] (iv) the
conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (v)
the appointment of a chapter 11 trustee in any of the Chapter 11 Cases or the appointment of an
examiner with expanded powers to operate or manage the financial affairs, the business or the
reorganization of any Debtor and (vi) the date of acceleration by the Holders pursuant to Section
7 hereof (such date, the "Stated Maturity Date").  The Debtors also promise to pay interest on
this Note on the first business day of each month (in arrears) and upon the date this Note matures
or otherwise becomes due and payable at the rate of LIBOR plus 7% per annum with a LIBOR
floor of 3% per annum (computed on the basis of a 360 day year for the actual number of days
lapsed); provided that any principal amount not paid when due, and to the extent permitted by
applicable law, any interest not paid when due, in each case whether at Stated Maturity Date, by
required prepayment, declaration, acceleration or demand or otherwise (both before as well as
after judgment), shall bear interest payable upon demand at the rate that is 2% per annum in
excess of the rate of interest otherwise payable upon this Note.  All payments hereunder,
including any prepayment, shall be made to the Holders on a pro rata basis based on the
respective principal amounts owed to each Holder.

          2.      Optional Prepayment.  Debtors shall have the right at any time or from
time to time and without premium or penalty, to voluntarily prepay all or any portion of this
Note.  Each prepayment shall be accompanied by the payment of accrued and unpaid interest on

---

[1] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such
terms in Section 9 hereof.

the amount being prepaid, through the date of prepayment. Any amounts prepaid hereunder may not be reborrowed.

       3.    <u>Lender Fee</u>. Pursuant to the Final Borrowing Order, the Debtors have paid to the Holders a fee in cash in the aggregate amount of $80,000, which was allocated to the Holders pro rata based upon their funding commitment. No additional fees are payable.

       4.    <u>Use of Proceeds</u>. The proceeds of this Note shall be used by the Debtors to the extent Cash Collateral (as defined in the Second Cash Collateral Order) is insufficient to fund working capital requirements and general corporate purposes relating to the Debtors' post-petition operations and for other expenditures as authorized in the DIP Extension Order or the Second Cash Collateral Order or as otherwise authorized by the Bankruptcy Court; <u>provided</u> that no portion of the proceeds shall be used, directly or indirectly, to (a) finance or make any payment or prepayment to any Person with respect to a Prepetition Indebtedness unless authorized by an order of the Bankruptcy Court; or (b) finance in any way any investigation, adversary action, suit, arbitration, proceeding or other litigation of any type against the Holders (in their capacity as Holders). The Debtors shall use the entire amount of the proceeds in accordance with this Section 4; <u>provided</u>, <u>however</u>, that nothing herein shall in any way prejudice the Holders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest; and <u>provided</u>, <u>further</u>, that Debtors shall not use the proceeds for any purpose that is prohibited under the Bankruptcy Code. The proceeds of this Note have been deposited and shall be held in the bank account at a bank that has been approved by the Office of the United States Trustee for the Southern District of New York as an authorized bank depository (the "<u>DIP Account</u>") as described in the Final Borrowing Order and no other funds or cash collateral of the Debtors shall be co-mingled with the proceeds of this Note or deposited in the DIP Account.

       5.    <u>Superpriority Nature of Obligations</u>. All obligations of the Debtors under this Note (including the obligation to pay principal, interest, fees, costs, charges, commissions and expenses) shall be paid as provided herein when due, without defense, offset, reduction or counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors arising under Section 364(c)(1) of the Bankruptcy Code, and senior to any and all other claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out, and the Adequate Protection Lien (all as defined in the Second Cash Collateral Order). Subject to the Carve-Out, the Adequate Protection Liens (as defined in Second Cash Collateral Order), the Prepetition Senior Secured Debt (as defined in the Second Cash Collateral Order) and the Adequate Protection Claim (as defined in the Second Cash Collateral Order), the DIP Super-Priority Claim will at all times be senior to any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Out, the Adequate Protection Liens, the Prepetition Senior Secured Debt, and the Adequate Protection Claim, no cost or

expense of administration or any claims in this case, including those resulting from or incurred after any conversion of this case pursuant to Section 1112 of the Bankruptcy Code shall rank prior to, or on parity with, the DIP Super-Priority Claims.

       6.    <u>Covenants.</u>  Each of the Debtors covenant and agree that until this Note is paid in full, neither of the Debtors shall, without the prior written consent of the Required Holders:

       (a)    <u>Asset Sales</u>.  enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub-lease (as lessor or sublessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, other than sales of inventory and equipment in the ordinary course of business and sales of obsolete equipment or equipment that is no longer required in the business; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to sell, in one transaction or a series of transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired, provided that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be subject to the priorities set forth in the Second Cash Collateral Order and the DIP Extension Order.

       (b)    <u>Chapter 11 Claims</u>.  unless all obligations under this Note have been indefeasibly paid in full in cash, incur, create, assume, suffer or permit any claim or encumbrance against it or any of its property or assets in any Chapter 11 Case (other than the Existing Secured Claims, the Carve-Out, the Adequate Protection Claim, and the Insurance Premium Financing) to be pari passu with or senior to the claims of the Holders against such Debtor in respect of the obligations hereunder, or apply to the Bankruptcy Court for authority to do so; or

       (c)    <u>Limitation on Payments Related to Prepetition Obligations</u>.  (i) make any payment or prepayment on or redemption or acquisition for value of any Prepetition Indebtedness or other pre-Petition Date obligations of such Debtor, (ii) pay any interest on any Prepetition Indebtedness of such Debtor, including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due (whether in cash, in kind, in securities or otherwise), or (iii) make any payment or create or permit any lien pursuant to Section 361 of the Bankruptcy Code (other than the Adequate Protection Liens (as such term is defined in the Second Cash Collateral Order), or apply to the Bankruptcy Court for the authority to do any of the foregoing; <u>provided</u> that the Debtors may make payments as permitted in the DIP Extension Order or the Second Cash Collateral Order, or as authorized in any other order of the Bankruptcy Court, including, for example, making Adequate Protection Payments (as such term is defined in the Second Cash Collateral Order).

       7.    <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court, if any of the following conditions or events ("<u>Events of Default</u>") shall occur:

(a)      <u>Failure to Make Payments When Due</u>.  Failure by the Debtors to pay any installment of principal on this Note when due or pay any installment of interest within 3 business days of when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or failure by the Debtors to pay any fee or any other amount due under this Note within three days after the date due;

(b)      <u>Chapter 11 Cases</u>.  With respect to the Chapter 11 Cases, (i) the entry of an order authorizing any Debtor in any of the Chapter 11 Cases to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code (other than Insurance Premium Financing, as defined in the Second Cash Collateral Order) if such order does not provide for the indefeasible payment in full in cash of all obligations under this Note; (ii) the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner in any of the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or the reorganization of any Debtor; (iii) the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iv) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (a) to allow any creditor to execute upon or enforce a lien on any material portion of the property or assets of any Debtor or (b) with respect to any lien of, or the granting of any lien on any other property or assets of any Debtor to, any state or local environmental or regulatory agency or authority, but only to the extent that it would have a Material Adverse Effect; (v) exercise of rights by the Prepetition Senior Lenders (as defined in the Second Cash Collateral Order) pursuant to Paragraph 9 of the Second Cash Collateral Order against the Senior Lender Prepetition Collateral and/or the other collateral in which Adequate Protection Liens were granted to the Prepetition Senior Lenders; (vi) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the Final Borrowing Order (as it pertains to this Note or the Holders), the DIP Extension Order, or the Second Cash Collateral Order or this Note or any of the Holders' rights, benefits, privileges or remedies under the Final Borrowing Order, the DIP Extension Order, the Second Cash Collateral Order or this Note; (vii) the entry of an order consolidating or combining any Debtor with any other Person (other than another Debtor); (viii) an order shall be entered approving, or the Debtor shall have consented to, any claim or administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the super-priority administrative expense claim of the obligations under this Note; or (ix) use of the proceeds of this Note for any purpose that is prohibited under Section 6(c) hereof;

(c)      <u>Default</u>.  Any Debtor shall default in the due performance or observance by it of any term, covenant or agreement contained in this Note or any term or agreement relating to this Note that is contained in the Final Borrowing Order or the DIP Extension Order, and such default shall continue for a period of 5 days after receipt by the Debtors of notice from the Holders of such default; or

(d)      <u>Judgments</u>.  (i) Any money judgment, writ or warrant of attachment or similar process as to post-Petition Date liability or debt (a) in any individual case an amount in excess of $50,000 or (b) in the aggregate at any time an amount in excess of $250,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against the Debtors or any of

their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Debtor that would reasonably be expected to result in a Material Adverse Effect and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days.

(e)    Use of Proceeds.  Funds or Cash Collateral (as defined in the Second Cash Collateral Order) are co-mingled with the proceeds of this Note in the DIP Account or proceeds of this Note are used in a manner prohibited by this Note.

Upon the occurrence and during the continuance of any Event of Default, the Holders may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Bankruptcy Court) by written notice to the Debtors declare (i) the unpaid principal amount of and accrued interest on the Notes and (ii) all other obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Debtors, and the same shall forthwith become, immediately due and payable.

9.    Definitions.  The following terms shall have the following meanings in this Note:

"Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Business Day" means each day that is not a Legal Holiday.

"Chapter 11 Cases" means those certain proceedings for relief filed by the Debtors under Chapter 11 of the Bankruptcy Code and being jointly administered under Case No. 08-11153 in the United States Bankruptcy Court for the Southern District of New York.

"DIP Extension Order" means that certain Order Pursuant to 11 U.S.C. §§ 105 And 364 Authorizing Extension of Postpetition Financing, entered by the Bankruptcy Court on March __, 2009.

"Existing Secured Claims" means any secured claims in existence as of the commencement of the Chapter 11 Cases.

"Final Borrowing Order" means that certain Final Order (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Authorizing Post-Petition Financing entered by the Bankruptcy Court on April 17, 2008.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and

effect and has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review or rehearing has been waived or (ii) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"Issue Date" means the issue date of this Note on April 21, 2008.

"Legal Holiday" means a Saturday, a Sunday or a day on which banking institutions in the State of New York are authorized or required by law to close. If a payment date is a Legal Holiday, payment shall be made on the next succeeding date that is not a Legal Holiday, and interest shall accrue for the intervening period at the rate set forth in Section 1 hereof. If a regular record date is a Legal Holiday, the record shall not be affected.

"LIBOR" means a fluctuating rate of interest determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London Time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR" means the fluctuating rate of interest calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen LIBO Page as the 30-day London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR" shall mean a fluctuating rate of interest based upon a comparable rate designated by the Holders as a substitute therefore. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Material Adverse Effect" means (i) a material adverse effect upon the business, operations, liabilities (whether contractual, environmental or otherwise), properties, assets, condition (financial or otherwise) or prospects of the Debtors taken as a whole or (ii) the material impairment of the ability of any Debtor to perform the obligations of the Debtors under the Note.

"Motion" means the Debtors' Motion for Authorization Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), and 364(e) to (i) Use Cash Collateral, (ii) Grant Adequate Protection to Prepetition Secured Lenders, and (iii) Obtain Postpetition Financing.

"Note" means this $4,000,000 Amended and Restated Super-Priority DIP Note by and between the Debtors and the Holders. Upon execution, the Note will supersede in its entirety the $4,000,000 Super-Priority DIP Note by and between the Debtors and the Holders, issued on April 21, 2008, which shall be promptly returned to the Debtors.

"Person" an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" means April 1, 2008, the date on which the Debtors filed their petitions for relief commencing these Chapter 11 Cases.

"Prepetition Indebtedness" means indebtedness of any Debtor outstanding on the Petition Date, including Indebtedness under the Prepetition Credit Agreements, the Senior Subordinated Notes and the 13% Junior Subordinated Note (as those terms are defined and/or referenced in the Motion).

"Required Holders" means Holders holding more than 50% of the principal amount of the Note.

"Second Cash Collateral Order" means that certain Order Pursuant to Bankruptcy Code Sections 105, 361, 362, And 363 Authorizing Debtors Use of Cash Collateral, entered by the Bankruptcy Court on February __, 2009.

    10.    Successors and Assigns.  This Note shall inure to the benefit of the Holders and their respective successors and assigns and shall bind the Holders, their respective successors and assigns, and any chapter 7 or chapter 11 trustee appointed after the Petition Date or elected for the estates of the Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code.

    11.    Presentment and Demand.  Demand, presentment, protest and notice of nonpayment and protest are hereby waived by the Debtors.

    12.    Amendment and Non-Waiver.

    (a)    This Note may not be amended, modified, or waived except by an agreement in writing signed by the Debtors and the Required Holders; provided that consent of all Holders shall be required to reduce the principal amount, the interest rate, or extend any payment date.

    (b)    To the extent permitted by law, no failure to exercise and no delay on the part of the Holders in exercising any power or right in connection with this Note or available at law or in equity, shall operate as a waiver thereof, and no single or partial exercise of any such rights or power, or any abandonment or discontinuance of steps to enforce such a right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.

    13.    Notices.  Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, delivery or other communication hereunder to be made pursuant to the provisions of this Note shall be sufficiently given or made if in writing and either delivered in person with receipt acknowledged or three (3) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, or by telecopy and confirmed by telecopy answerback, addressed as follows:

    (a)    If to the Debtors:

Lexington Precision Corporation
Lexington Rubber Group, Inc.
800 Third Avenue, 15th Floor
New York, NY 10022
Attn: Warren Delano
Telecopy No.: 212-319-4659

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telecopy No.: 212-310-8000
Attn: Richard P. Krasnow, Esq.
      Adam P. Strochak, Esq.

(b)      If to the Holders:

c/o Michael A. Lubin
Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Telecopy No.: 212-319-4659

with a copy to:

O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Telecopy No.: 212-362-2061
Attn: Gerald C. Bender, Esq.

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice.

14.      Submission to Jurisdiction: Waiver of Jury Trial.

(a)      The Debtors and the Holders hereby irrevocably submit to the jurisdiction of the Bankruptcy Court, and they hereby irrevocably agree that any action concerning the Note shall be heard and determined in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably waive, to the fullest extent they may effectively do so, the defense of an inconvenient forum to the maintenance of any such action in the Bankruptcy Court. The Debtors and the Holders hereby irrevocably agree that the summons and complaint or any other process in any such action may be served by mailing in accordance with the provisions set forth in Section 13 hereof.

(b)    EACH OF THE DEBTORS AND THE HOLDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO ANY OBLIGATIONS UNDER THIS NOTE.

15.    <u>Governing Law</u>.  This Note shall be governed by, construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed in such State and without giving effect to the conflict of laws principles thereof.

16.    <u>Indemnification for Expenses</u>.  The Debtors agree to pay all reasonable out-of-pocket expenses of the Holders (solely in their capacity as Holders) incurred in connection with the preparation, execution, delivery, enforcement and administration of this Note, the documents and instruments referred to herein and any amendments, waivers or consents relating hereto or thereto including, without limitation, the reasonable fees and expenses of O'Melveny & Myers LLP, counsel for the Holders.  In addition, the Debtors agree to pay, and save Holders (solely in their capacity as Holders) harmless from all liability for, any stamp or other documentary taxes that may be payable in connection with the execution or delivery of this Note by the Debtors.

17.    <u>Indemnification of Holders</u>.  The Debtors hereby agree to protect, indemnify, pay and save harmless the Holders (solely in their capacity as Holders) from and against any and all claims, demands, liabilities, damages, losses, costs, chargers and expenses (including reasonable fees, expenses and disbursements of outside counsel) that Holders (solely in their capacity as Holders) may incur or be subject to as a consequence, direct or indirect, of the issuance of this Note by the Debtors other than as a result of the gross negligence or willful misconduct of the Holders (solely in their capacity as Holders) as determined by a final judgment of a court of competent jurisdiction.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Debtors have executed and delivered this Note as of the day and year and at the place first above written.

LEXINGTON PRECISION CORPORATION

By: _____
    Name:  Warren Delano
    Title:    President

LEXINGTON RUBBER GROUP, INC.

By: _____
    Name:  Warren Delano
    Title:    President