1                        UNITED STATES BANKRUPTCY COURT
                         SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
     In re:                            :   08-11153
4                                      :
         LEXINGTON PRECISION CORPORATION, :   One Bowling Green
5                                      :   New York, New York
                         Debtor.       :
6                                      :   February 9, 2009
     ------------------------------------X
7

8              TRANSCRIPT OF CONFERENCE CALL REGARDING
          STATUS OF EXCLUSIVITY AND CASH COLLATERAL MOTIONS
9              BEFORE THE HONORABLE MARTIN GLENN
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtor:          ADAM P. STROCHAK, ESQ.
                              Weil, Gotshal & Manges, LLP
13                            1300 Eye Street, NW
                              Suite 900
14                            Washington, D.C. 20005

15   For the Creditors'       PAUL N. SILVERSTEIN, ESQ.
     Committee:               JONATHAN LEVINE, ESQ.
16                            JERRY BROCK, ESQ.
                              Andrews, Kurth, LLP
17                            450 Lexington Avenue
                              15th Floor
18                            New York, New York 10017

19   For the U.S. Trustee:    PAUL KENAN SCHWARTZBERG, ESQ.
                              Office of U.S. Trustee
20                            33 Whitehall Street
                              21st Floor
21                            New York, New York 10004

22   For Capital Source       AARON R. CAHN, ESQ.
     Finance:                 Carter, Ledyard and Milburn, LLP
23                            2 Wall Street
                              New York, New York 10005
24

25                           (Appearances continued on next page.)


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

```
 1                     UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3
       APPEARANCES CONTINUED:
 4
       For Capital Source       JOHN C. TISHLER, ESQ.
 5     Finance:                 ROBERT J. WELHOELTER, ESQ.
                                Waller, Lansden, Dortch and Davis, LLP
 6                              511 Union Street
                                Suite 2700
 7                              Nashville, Tennessee 37219

 8
       For Webster Business     MICHAEL P. TURNER, ESQ.
 9     Corporation:             Day, Pitney, LLP
                                200 Campus Drive
10                              Florham Park, New Jersey 07932

11
       Court Transcriber:       RUTH ANN HAGER
12                              TypeWrite Word Processing Service
                                211 N. Milton Road
13                              Saratoga Springs, New York 12866

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  (Proceedings began at 10:05 a.m.)

2          THE COURT:  Judge Glenn.  We're here in <u>Lexington</u>

3  <u>Precision</u>.  It's number 08-11153.  Who is on for the debtor's

4  counsel?

5          MR. STROCHAK:  Good morning, Judge.  It's Adam

6  Strochak from Weil, Gotshal, and John Lucas is on as well.

7          THE COURT:  Okay.  Why doesn't everyone else make

8  their appearances?

9          MR. SILVERSTEIN:  Your Honor, Paul Silverstein and

10 Jon Levine and Jerry Brock of Andrews Kurth for the Creditors'

11 Committee.  Good morning.

12         THE COURT:  Good morning.

13         MR. SCHWARTZBERG:  Paul Schwartzberg for the U.S.

14 Trustee's Office.

15         THE COURT:  Good morning, Mr. Schwartzberg.

16         MR. SCHWARTZBERG:  Good morning, Your Honor.

17         MR. CAHN:  Aaron Cahn, Carter, Ledyard and Milburn

18 for the Capital Source.

19         THE COURT:  Anyone else?

20         MR. TISHLER:  John Tishler and Rob Welhoelter for

21 Capital Source, and we have on the line from Capital Source

22 Mark Fadoddy [Ph.] and Lisa Linderman [Ph.].

23         THE COURT:  All right.  Anyone else on the phone?

24         MR. LUBIN:  Mike Lubin, Warren Delno [Ph.] and Dennis

25 Welhouse for Lexington.

4

1          THE COURT:  Thank you.  Good morning.

2          MR. TURNER:  Excuse me, Judge.  Mike Turner from Day

3    Pitney representing Webster Business Credit Corp.

4          THE COURT:  All right.  Anyone else?

5          Mr. Strochak?

6          MR. STROCHAK:  Yes.  Good morning, Judge.  Let me

7    just give you an update on where we are since our last call.

8    We have filed our motion for continued use of cash collateral.

9    We've had some discussions with counsel for the prepetition

10   senior lenders.  Unfortunately, we've not been able to reach

11   agreement on consensual use of cash collateral, so right now

12   we're anticipating that that motion will continue to be

13   contested.  Although I think it's safe to say that, you know,

14   we're not done talking and there's still, you know,

15   opportunities for us to continue to talk, although the central

16   issue appears to be the desire to -- that the prepetition

17   lenders have for the debtors to commit to, you know, some type

18   of sale process which we don't think would be in the best

19   interest of the estate so we're very, very reluctant to do

20   that, so we do have that obstacle.

21          We've coordinated on discovery and there will be some

22   discovery going on this week and next on both the exclusivity

23   and the cash collateral motions and I think that's moving

24   forward smoothly at this point and that is -- you know, that is

25   a summary of the status right now.

5

1          We are, you know, continuing discussions with

2    potential exit lenders.  I don't have any concrete information

3    to provide the Court with in terms of an update.  It's really

4    the same status as it was last time.  We're still negotiating,

5    discussing with a couple of financial institutions and other

6    sources of capital.

7          We still believe that we're going to need to make

8    some progress on the consolidation of the connector seals

9    business in order to firm up exit financing, which is, you

10   know, the basis for our request for continued exclusivity and

11   continued use of cash collateral.  We think that's just going

12   to be a necessary step in order to move the case toward

13   conclusion and make sense from -- really from everyone's

14   prospective in terms of maximizing the value of this business

15   going forward.  So that's a summary of where we are.

16         THE COURT:  Now I didn't -- I haven't gone through it

17   myself but I know -- I have a copy in front of me which I

18   haven't looked at carefully -- there was a new budget attached

19   to the cash collateral motion.  What -- what's the current cash

20   availability?

21         MR. STROCHAK:  I think the best thing for me to do is

22   to defer to Mr. Lubin or Mr. Welhouse on that question because

23   they'll have the most up-to-date information.

24         MR. WELHOUSE:  Your Honor, as of right now --

25         THE COURT:  Just identify who's speaking.

6

1    MR. WELHOUSE:  Dennis Welhouse, CFO --

2    THE COURT:  Thank you, Mr. Welhouse.

3    MR. WELHOUSE:  -- of Lexington.

4    THE COURT:  Yes.

5    MR. WELHOUSE:  Your Honor, right now the cash balance

6    is 4.1 million dollars.

7    THE COURT:  Okay.  Mr. Tishler or Mr. Cahn, do you

8    want to address any comments to the Court?

9    MR. TISHLER:  Your Honor, this is John Tishler.  I

10   believe Mr. Strochak has accurately described things except for

11   one thing.  We're not asking that the company immediately start

12   a sales process.  Rather, we're asking them to explore what

13   those alternatives would be as a condition to further use of

14   cash collateral.  We understand it would be difficult in this

15   market to get a sale but we do think it prudent to find out

16   what options are out there to this company besides just

17   proceeding down the current path.

18   THE COURT:  Can you tell me, Mr. Tishler, what the

19   prepetition lenders -- what position they're going to take with

20   respect to exclusivity?

21   MR. TISHLER:  We really haven't decided yet, Your

22   Honor, because frankly if we are going to get continued

23   unwaiveringness by the debtors we may consider our own

24   competing plan, in which case we would want exclusivity

25   terminated.  We do think that if we could find a place where we

7

 1   could work with the debtors, that is our first preference here

 2   in which case we would like for exclusivity to stay in place

 3   because we think that obviously with an opportunity at exit

 4   financing or checking out to find out what assets could be sold

 5   here and what the prices would bring that that would be the

 6   appropriate approach, but we haven't completely determined

 7   that.

 8          THE COURT:  All right.  Mr. Silverstein or Mr. Brock?

 9          MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein.

10   I have nothing to add.  I don't -- I have nothing to say at

11   this point that's additive to anything.

12          THE COURT:  Okay.  Is the Committee going to take a

13   position on the cash collateral motion?  I know you're opposing

14   exclus -- extension of exclusivity, but are you going to take a

15   position with respect to the cash collateral motion?

16          MR. SILVERSTEIN:  Yes, we will.

17          THE COURT:  And the position is?

18          MR. SILVERSTEIN:  I don't think I -- I'd prefer not

19   to articulate on that because it's not perfectly articulated in

20   my mind because obviously I don't believe the Court's going to

21   shut the debtor down.  I believe the Court's going to allow the

22   debtor to continue using cash collateral.  The question is

23   under what circumstances and under what conditions, if any,

24   will -- any are going to be imposed on the debtors and I think

25   we're still thinking about that.  We're still addressing the

8

1   issue internally.

2        THE COURT:  No one should have assume anything with

3   respect to the cash collateral motion, you know, and in

4   particular the debtors should keep that in mind.

5        MR. SILVERSTEIN:  Your Honor, as you know, I

6   sometimes take liberties with the assumptions that I make about

7   what people are going to do and I apologize for that.

8        THE COURT:  Okay.  Mr. Strochak, Mr. Tishler, you

9   know, it seems to me that his carefully articulated statement

10  about what it is they want the debtors to consider he -- it was

11  a far cry from saying that they expect the debtors to sell all

12  or part of the business.  I mean, it was -- am I correct that

13  debtors are not even prepared to explore what other options

14  might be available now?

15       MR. STROCHAK:  Well, Your Honor, this is Adam

16  Strochak.  I guess it depends on what "explore" means, you

17  know.  If the businesses were going to be put on the block and

18  sold I think doing it, you know, short of, you know, a full-

19  fledged marketing effort to try and generate as much interest

20  in the business as possible in a difficult general economy

21  would have to be done.  Then, you know, once you head down that

22  road you publicly disclose that the businesses are being

23  shopped and you have all the issues that are attendant to that

24  type of situation with, you know, employees, customers being

25  concerned about what's going on and you have to devote the

9

1    effort to managing that process and making sure your employees

2    and your customers and all the other aspects of your business

3    are able to keep functioning as best as they can in an

4    environment where there's going to be significant uncertainty

5    about the future of this business.  So, you know, if explore --

6           THE COURT:  You know, in the current climate how

7    anyone could have anything other than great uncertainty about

8    the future of the business, I'm not sure what surprises -- you

9    know, that there's any surprise in any of this, but go ahead.

10          MR. STROCHAK:  Well, I can speak to that a little

11   bit, Your Honor.  I'm -- you know, obviously the debtors have

12   been in, you know, constant contact with their key customers

13   through this whole process and their customers have, you know,

14   a lot of reliance and comfort in the management of this

15   business.  It's one message to say that, you know, we're out

16   there, we're taking some steps in the Chapter 11 to solve some

17   of the business problem with the connector seals business but,

18   you know, we've got a strong management team in place and we're

19   committed to serving you, and our goal for this business is to

20   keep it together and to continue to have the same management

21   place and team at the end of the Chapter 11 process.  That's

22   the message that has been, you know, delivered to customers and

23   employees at this point.

24          When you start marketing a business, then it's a much

25   different message to customers.  Right?  And the message to

10

1  customers becomes, well, you know, we had pressure from our

2  creditors and we think we -- what we have to do is go out and

3  see if we could sell this business.  So we can't give you any

4  assurance anymore that the management team will continue in

5  place.  We can't give you any assurance that this business will

6  continue to operate in the way this management team envisions.

7  That's a very different process to manage and, you know, lots

8  of businesses do it.  I'm not saying it's an impossible

9  process, Judge, but it's a very different process and a very

10  different communication strategy and a very different customer

11  strategy.

12          THE COURT:  Is that any different than what you're

13  going to face with a contested cash collateral motion?

14          MR. STROCHAK:  Certainly, Your Honor, if the Court

15  decides that we can't continue to use cash collateral, then we

16  have to come to a -- you know, a different plan for moving the

17  case forward and for the business.  So if that happens then,

18  you know, we'll have to have a communication strategy.

19          THE COURT:  More than a communication strategy,

20  Mr. Strochak.  I mean --

21          MR. LUBIN:  I would agree with that, Your Honor.

22  This is Mike Lubin.  If I can say, the way Mr. Tishler

23  articulated this is a bit different from anything we had heard

24  before.  We're obviously open to exploring what alternatives

25  there are.  We talk to people, I would say, on a fairly regular

11

1    basis, both lenders, investors.  Our bankers get calls about

2    parts of the business and we are -- we field them and no one

3    takes them lightly.  We continue to believe as we've said

4    before that the best thing for everyone is to reorganize this.

5    It will result in the greatest value for everyone.  We believe

6    that when we get the consolidation of this one -- a relatively

7    small piece of the business completed, that we will

8    significantly enhance our ability to get financing and that is

9    born out by the discussions we're having with people about the

10   financing.  It doesn't mean we have commitments by any means.

11   I don't think anyone's committing to anything at this point in

12   time with any companies, but we -- we are very much open to

13   exploring the alternatives.

14          We believe that, given the fact that we have two

15   business units here that make enormous cash flows, that selling

16   them in a 363-sale-type process is not conducive to getting the

17   best value for anyone and we believe really that we'll get far

18   more doing it a different way.

19          But if someone came to us with an offer we believe

20   credible for what we consider to be a reasonably fair value on

21   any one of our business units, we would be open to that and we

22   would not by any means reject it.

23          THE COURT:  Well, let me ask, Mr. Lubin, without

24   getting into details.  Have you and your colleagues had recent

25   face-to-face meetings with the business people from Capital

12

1   Source to talk about what alternatives are, what's the best way

2   to maximize everybody's recovery?  I mean, at least, you know,

3   Mr. Tishler's -- or at -- you've clearly identified

4   Mr. Tishler's articulation of what Capital Source's short-term

5   objectives are don't sound all that different from what you're

6   expressing as the debtors' willingness to explore alternatives.

7   I'm just wondering whether you've sort of -- I'm not saying

8   without the lawyers present, but have the business people from

9   Capital Source and from the debtor sat down with each other and

10  tried to talk through this?

11          MR. LUBIN:  Your Honor, we've -- we had a face-to-

12  face discussion, I would say, four weeks ago.  I don't remember

13  exactly.  We have not otherwise had face-to-face discussions

14  recently with the bank, although we do talk, I would say, on a

15  fairly regular basis with them.  We have a -- I think a bi-

16  weekly conference call to bring them up to date on what's

17  happening.

18          But I would say what Mr. Tishler articulated today is

19  again quite a bit different from what he's -- from the way he's

20  said it before and I've said this before on behalf of the

21  debtors.  We don't believe -- we are not ultimately, totally

22  opposed to selling anything.  We think this is the -- this is

23  not the best way to go to the maximized value.  That's for the

24  benefit of the Committee and its constituencies, shareholders,

25  and even Capital Source, but we're -- we understand at some

13

1  point in time we may have to do something different if the

2  world doesn't change to some degree or we can't change

3  ourselves enough to get the world to believe what we're telling

4  them.

5          So we are open to that.  We're happy to sit down with

6  them.  I don't know if it needs to be face to face, but we

7  certainly can talk.  We're all in different cities.  We can get

8  together and do it face to face or we could do it over the

9  phone.  But I guess we -- we would prefer to play it out a bit

10  further in terms of being able to get the financing because we

11  believe this consolidation it has a dramatic favorable impact.

12  You know, we're preparing contracts now for the long-term

13  commitments of customers to purchase these parts from us.  We

14  think it's clearly demonstrable that is has a dramatic

15  favorable impact on the cash flow.  We're eliminating an entire

16  structure of overhead and taking maybe 11 to 12 million

17  dollars' worth of business that's producing a negative cash

18  flow now and turning it into probably four million dollars a

19  year of cash flow.  That's dramatic.

20          MR. SILVERSTEIN:  Your Honor.  It's Paul Silverstein.

21  Just for the record, I'd like it clear that the Court is aware

22  that Mr. Lubin and his statements have no credibility with the

23  Committee.  It's the same, you know, euphoria and the same

24  statements that we've been hearing for a very long time.

25  There's no credibility whatsoever.

14

1          THE COURT:  All right.  Mr. Tishler, your

2    articulation -- I'm not certainly holding you or your clients

3    to it, but it was a little different than I recall having heard

4    before.  Now let me ask whether from -- I don't remember now.

5    Do you have any of your principals present on the phone?

6          MR. TISHLER:  Yes, Your Honor.  Mark Fadoddy is on

7    for Capital Source.  Your Honor, I don't think it's different.

8    We've -- we proposed at the last status conference -- I think

9    the phrase I used is rather than being "afraid of the dark"

10   that we should "illuminate what's in the dark" by finding out

11   what these prices -- what the potential options are to this

12   company and that's been our position all along.

13          We understand a fire sale, as Mr. Lubin has

14   repeatedly said in that face-to-face meeting, is a no-go.

15   That's not what we're talking about here.  But we do think it

16   is wise for all constituents to know what all the options are

17   that are available to this company, including what certain

18   sale -- a sale of assets, maybe not all the assets, but some of

19   the assets here would bring because among other things sales of

20   assets may de-lever [ph.] this company to a point where they

21   could get exit financing, among other things.

22          But that is -- that has been and consistently has

23   been our approach is we understand this company has to use cash

24   collateral.  We're not seeking to shut the company down.  At

25   the same time we do think it's time to start looking at some

15

1   other options here.  That doesn't mean we're going to take any

2   options but we also think that, you know, instead of a 12-month

3   use of cash, a six-month use of cash and an examination of

4   options, then coming back in the middle of the summer and

5   looking at what our options are makes the most sense here.  We

6   have proposed that to the debtors.  They have not accepted that

7   proposal.  But we're happy to go back and talk to them further

8   about it.

9        THE COURT:  Where -- Mr. Fadoddy, I don't know what

10  city you're located in.

11       MR. FADODDY:  It's Mark Fadoddy from Capital Source,

12  Your Honor.  Our headquarters of Capital Source is located

13  outside of Washington, D.C.  I work out of a satellite office

14  in Baltimore, Maryland.

15       THE COURT:  I mean, you know, I'm not going to order

16  that it be done but I strongly urge that business people

17  from -- the appropriate business people from the debtors and

18  appropriate business people from Capital Source sit down and

19  while, you know, phones are fine but I really do think there's

20  a real advantage face to face.  You know, there might be some

21  phone calls as a preliminary -- for preparation as to what

22  specific information each of you wants or wants to share, but I

23  really encourage you sooner rather than later, so we don't get

24  right up to the date for the cash collateral hearing, that you

25  sit down and -- because I'm really not hearing such enormous

16

1  differences between the position of the debtors and the

2  position that's been articulated for Capital Source.

3           There is going to be -- whatever happens about the

4  cash collateral, there's no doubt there's going to be a

5  contested hearing with respect to extension of exclusivity but,

6  I mean, the reason that I wanted to hear those together, I do

7  think that they are going to be necessarily linked as to what

8  direction this case is going in.  And, you know, I would

9  definitely encourage if you can do it within the next week or

10 so that you have the face-to-face meeting, obviously with your

11 lawyers present but with business people with sufficient

12 authority to try and resolve the issues regarding the cash

13 collateral motion.  It may not put off those issues forever but

14 even if it provides just as the initial cash collateral order

15 had this February drop-dead date in it, it may be that, you

16 know, a reasonable extension on that date is the most

17 appropriate resolution of the cash collateral motion for now.

18 So I would hope that that would take place.

19          With respect to -- and I know, Mr. Strochak, you

20 indicated that discovery is going forward.  Let me ask you,

21 Mr. Silverstein or Mr. Brock, is the Committee undertaking

22 discovery with respect to the exclusivity motion?

23          MR. BROCK:  Yes, Your Honor.  We -- this is Jerry

24 Brock.  We have deposed the representative of Capital One and

25 I'm scheduled to take Mr. Lupin's deposition tomorrow.  We are

17

1    preparing to let Mr. Strochak talk with a committee

2    representative on an informal basis.  He's welcome to take a

3    deposition if he wants to but he had indicated that an informal

4    discussion would be okay, so we're trying to set that up.  I'm

5    not aware of any other discovery that is contemplated --

6                  THE COURT:  Okay.

7                  MR. BROCK:  -- with respect to the exclusivity

8    motion.

9                  THE COURT:  All right.  Thank you, Mr. Brock.

10                 MR. LUBIN:  For the sake of openness, Mr. Brock --

11                 THE COURT:  Just identify yourself, please.

12                 MR. LUBIN:  I'm sorry.  Mike Lubin.

13                 THE COURT:  Okay.

14                 MR. LUBIN:  I just wanted to tell you, I strained my

15   back yesterday and I'm still in spasm.  I'm not going to be

16   able to sit through a deposition tomorrow, I don't think.  I'm

17   going to have to push that to Thursday or Friday.  I think I'll

18   be in good shape by then.

19                 MR. BROCK:  Well, I guess we ought to talk about it

20   offline and not take up the Court's -- Jerry Brock, I'm

21   sorry -- take up the Court's time. but I'm going to be out of

22   the country later on this week, so --

23                 THE COURT:  All right.  Why don't you all endeavor --

24   you ought to be able to work out something.

25                 MR. LUBIN:  I didn't want anybody to be misled here,

18

1   Your Honor, that's all.

2           THE COURT:  Okay.  All right.  Anybody else want to

3   be heard?

4           All right.  Well, that does give me some update.  You

5   have a schedule for the various filings that I want to see

6   before the hearing.  Certainly if you're -- again, I would hope

7   that this wouldn't come down to the wire with respect to the

8   cash collateral.  I don't -- it doesn't sound to me that you're

9   going to be able to resolve the exclusivity issue.  That's

10  between the Committee and the debtors.  We'll go forward with

11  the hearing on that.  If you're able to resolve it for some

12  period of time, that certainly I think would be in everybody's

13  interest as well, but with respect to the cash collateral

14  please keep the Court posted if you're able to resolve the

15  issue.  Even if you get to the point where you've reached an

16  agreement in principal, it still has to be documented.  I'd

17  appreciate it if you'd let the Court know.

18          MR. STROCHAK:  We certainly will, Judge.  It's Adam

19  Strochak.

20          THE COURT:  All right.  Anybody else want to be

21  heard?

22          Okay.  Thank you all for the report.

23          MR. STROCHAK:  Thank you, Judge.  Good day.

24          THE COURT:  Thank you.

25          (Proceedings ended at 10:28 a.m.)

19

1          I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6   _____

7                              Ruth Ann Hager

8   Dated:   February 17, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25