```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      ------------------------------------X
        In Re:                              :   08-11153 (MG)
 4                                          :
            LEXINGTON PRECISION CORPORATION, :   One Bowling Green
 5                                          :   New York, New York
                         Debtor.            :   January 23, 2009
 6      ------------------------------------X

 7                    TRANSCRIPT OF STATUS CONFERENCE
                      BEFORE THE HONORABLE MARTIN GLENN
 8                    UNITED STATES BANKRUPTCY JUDGE

 9      APPEARANCES:
        For the Debtors:          ADAM STROCHAK, ESQ.
10                                JOHN LUCAS, ESQ.
                                  Weil, Gotshal & Manges LLP
11                                1300 I Street, N.W.
                                  Washington, D.C.  20005
12
        For the Ad Hoc:           PAUL SILVERSTEIN, ESQ.
13       Bondholders Committee    GERALD BRACT, ESQ.
                                  JONATHAN LEVINE, ESQ.
14                                Andrews Kurth LLP
                                  450 Lexington Avenue
15                                New York, New York  10017

16      For Webster:              SCOTT A. ZUBER, ESQ.
                                  Day Pitney, LLP
17                                200 Campus Drive
                                  Florham Park, New Jersey  07932
18
        For Secured Lenders:      JOHN TISHLER, ESQ.
19                                Waller, Lansden, Dortch & Davis LLP
                                  Nashville City Center
20                                511 Union Street
                                  Nashville, Tennessee  37219
21
        For the U.S. Trustee:     Office of the United States Trustee
22                                BY:  PAUL SCWARTZBERG, ESQ.
                                  Assistant United States Trustee
23                                33 Whitehall Street
                                  New York, New York  10004
24
        Court Transcriber:        CARLA NUTTER
25                                TypeWrite Word Processing Service
                                  211 N. Milton Road
                                  Saratoga Springs, New York  12866


        Proceedings recorded by electronic sound recording,
        transcript produced by transcription service
```

2

1          MR. STROCHAK:  Yes, Your Honor.  The Court requested

2   this status and I'm happy to kind of give you an update as to

3   where we are on things and where we see the case going if you'd

4   like me to start that way.

5          THE COURT:  Please.

6          MR. STROCHAK:  Ten days or so ago or a couple of

7   weeks ago we asked the Court to adjourn the January 7th hearing

8   on approval of the disclosure statement and the reason for that

9   as we articulated in our papers was that in the last weeks of

10  last year we essentially learned from the exit lenders -- that

11  we were exploring exit financing with -- that we were not

12  likely to get a commitment for an amount of financing

13  sufficient to provide adequate working capital and make the

14  payments anticipated by our plan and in light of the objections

15  to the disclosure statement and some of the comments that the

16  Court had made at our telephone status conference, we decided

17  that rather than try and proceed with solicitation when there

18  was still some uncertainty about exit financing that we were

19  better off taking some additional time and doing some

20  operational restructuring of the connector seals business

21  serving primarily the OEM auto market in order to increase the

22  likelihood that we'd be able to get a sufficient exit financing

23  commitment.  So we decided that it made sense to take a step

24  back and do that recognizing, of course, that we were not

25  likely under those circumstances -- you know, unless something

3

1  change dramatically -- we are not likely to be able to

2  consummate a plan by February 25th which was the deadline under

3  the cash collateral order that had been negotiated consensually

4  with the pre-petition lenders at the beginning of the case.

5       So the debtors have developed a plan for

6  consolidation of the operations of the connector seals

7  business.  They are moving forward with implementing that plan.

8  They've had discussions with key customers of that business.

9       THE COURT:  We have a speaker in the background,

10 please mute or stop.  Go ahead, Mr. Strochak.

11      MR. STROCHAK:  Thank you, Judge.

12      So that operation is underway; the plan is to move

13 key equipment and the production of key parts for that business

14 to the debtor's other facilities to reduce overhead costs.  We

15 anticipate that once that's accomplished the business will

16 return to a moderate level of profitability.  For last year, I

17 believe, on revenues of something like $13 million, that

18 business generated about half a million dollars of cash flow

19 so, really, not at a level that was making a contribution to

20 the debtor's financial performance.  So that is underway.

21      I think it's a little difficult to know exactly how

22 long that's going to take.  Our anticipation is that it's going

23 to take several months to accomplish it.  We're probably

24 talking a May/June type time frame in order to consummate that

25 operational restructuring and get those tools moved and

4

1  production established in the other facilities.

2         We currently are scheduled for a hearing on the

3  disclosure statement on February 9th.  I don't think that we're

4  going to be able to move forward at that time, Your Honor, so

5  in all likelihood we would need to adjourn that again.

6         In the last couple of weeks we have been in

7  negotiations with the pre-petition lenders to try and work out

8  a consensual extension of the cash collateral order.  I will

9  tell the Court, very candidly, there hasn't been much progress.

10  I mean there have been proposals back and forth and I think I'm

11  constrained Rule 408 from speaking too much about the details

12  of those proposals but I don't think I'd be breaching any

13  confidentiality restrictions by saying that the conditions that

14  the pre-petition lenders have asked for are ones that the

15  debtors don't feel that they can agree to at this point.  So I

16  anticipate right now that we will be filing a motion to extend

17  the use of cash collateral and to continue the adequate

18  protection provisions that have been in place in this case

19  including current pay of interest to the pre-petition lenders

20  and the existing liens that are in place and everything else

21  that we've continued to adhere to during the case.  I

22  anticipate that that will be contested right now, although, we

23  obviously will continue to talk and if we can make progress on

24  something consensual we will but right now I anticipate that

25  that would be recontested and the committee and the pre-

5

1   petition lenders as well, I believe, have indicated to us that

2   they are likely to oppose the motion to extend exclusivity that

3   we have on file that is currently scheduled for a hearing on

4   February 2nd.

5          I think that's an overall status update as to what we

6   see happening.  A little bit longer term, what our plan is is

7   to work through this operational consolidation of the connector

8   seals business.  We are continuing negotiations with potential

9   exit lenders.  The debtors are talking to two financial

10  institutions, Capital One and a division of Wells Fargo, and

11  continuing to talk.  Those negotiations are ongoing.  Due

12  diligence is underway and those are active discussions that

13  obviously have not yet produced a commitment for exit financing

14  but our hope is that when the operational consolidation is

15  underway and some results can be demonstrated from that, that

16  that will facilitate the process and we are hopeful that we'll

17  be able to move towards completion of the plan reorganization

18  process towards the middle of the year, say the end of June of

19  2009.

20         I think that's probably a summary of what we see

21  happening short-term and long-term and I'd be happy to answer

22  any questions the Court has.

23         THE COURT:  Well, let me give the committee a chance.

24  I don't know whether Mr. Bract or Mr. Silverstein wants to

25  speak.

6

1          MR. LEVINE:  Your Honor, it's John Levine of Andrews,

2     Kurth on behalf of the committee.

3          Mr. Strochak is correct, the committee will be

4     opposing the extension of exclusivity.  To address the debtor's

5     prospects for exit financing, I think we've heard this song

6     before.  They hope to have exit financing.  Upon its admission

7     and belief, they're basically nowhere with Capital One and the

8     committee just feels that this "operational restructuring"

9     which has all of a sudden come to pass in the last few weeks is

10    really nothing more than a guise to stall these cases in the

11    hopes that they can find exit financing somewhere.  That being

12    said, we will put on our case at the exclusivity hearing.

13         THE COURT:  All right.  Anything else, Mr. Levine?

14         MR. LEVINE:  That's it for the committee.

15         MR. TISHLER:  Your Honor, this is John Tishler.  I'm

16    the agent's counsel.  Mr. Cahn is our local counsel.  We

17    appreciate the opportunity to speak on this.

18         The pre-petition lenders understand that this company

19    will need to use cash collateral past February 25th.  Our

20    issues are relatively numerous.  We have tried to be a good

21    steward of this case.  We have agreed to most of the things all

22    along with the debtors but we have grown increasingly concerned

23    that there seem to be more and more difficulties in moving this

24    case to a resolution.

25         Our position is relatively simple.  While we

7

1    understand that there may be a need to continue to use cash

2    collateral we have no interest in just continuing or staying

3    the course and what we hear from the debtor is they intend just

4    to simply stay the course.  While this consolidation may be

5    necessary, we are in agreement with the committee that we think

6    that the exit financing is a long shot at best.

7          What we do think needs to be done -- and we think

8    it's probably best done either through the exclusivity hearing

9    or the use of cash collateral -- would be conditioning the

10   continuation of exclusivity or the use of cash collateral with

11   a dual process; one that would include a sale of some of the

12   assets here, at least a sufficient number that would

13   significantly pay down the secured debt to either enable the

14   debtors to obtain exit financing or a sale of sufficient assets

15   to take us out altogether at which point the remainder of the

16   company could be reorganized without there being any leverage

17   to it.  To this point as Mr. Strochak accurately espoused, that

18   is a position that the debtors are wholly opposed to and we do

19   believe that that will have to come before you for some

20   resolution.

21          THE COURT:  Mr. Strochak.

22          MR. STROCHAK:  On two things.  First, Mr. Levine's

23   point about the consolidation of the connector seals business

24   being a guise for something, I'm not quite sure what.  We

25   strongly disagree with that comment.  We think it's a

8

1  restructuring that needs to be done.  It's one that we did not

2  anticipate at the beginning of the case.  It's one that really

3  could not be clearer from what's going on in the OEM auto

4  market and the performance of this business itself that it

5  needs to be accomplished.  We think the plan makes sense and we

6  think it benefits everyone in the case, certainly not

7  management or any other constituency greater than anybody else.

8        We are continuing negotiations with Capital One.  Mr.

9  Levine may have been eluding to the motion to quash that

10  Capital One filed on the discovery that the committee is

11  seeking from Capital One.  I think that there are some

12  statements in those papers that don't quite reflect what's

13  going on and there may have been perhaps a lack of

14  communication between the lawyers for Capital One and the

15  business people that we're dealing with but the debtors have

16  paid with Court approval a due diligence fee to Capital One as

17  recently as yesterday, I believe.  I had discussions with the

18  lead business person at Capital One and Capital One is still

19  interested in exploring the possibility of financing this

20  business.  So that process is ongoing.

21        With respect to Mr. Tishler's comments, it is the

22  debtor's view that this is not a good time to put any part of

23  the debtor's businesses up for sale in order to maximize the

24  value for all constituents.  It is an extraordinarily difficult

25  time and any buyer in this market would have difficulty

9

1  financing an acquisition given the state of the credit markets.

2  The debtors are not opposed to a sale at any time, they just

3  don't think that a sale process when the prospect for a

4  reorganization that would keep the company intact still exists

5  and we do believe in those prospects and that's why we want to

6  move forward with the plan that we have out there and on a

7  schedule that, hopefully, would get us to be able to consummate

8  that plan in the middle of the year.  The schedule that the

9  pre-petition lenders have proposed for a sale of the business

10  is primarily what we disagree with, not so much the concept.

11  We just think it would be a bad time to put these businesses on

12  the market and signal to customers that there's significant

13  uncertainty about the ability of these businesses to continue

14  in the form that they currently are or to be able to attract a

15  value for the businesses.

16          THE COURT:  Frankly, that can't be a surprise to

17  anybody, Mr. Strochak, given the market.

18          I have an observation that -- I question the premise

19  of your statement but so what's Plan B if you don't get an

20  extension of exclusivity?  That's the first step; right?

21  February 2nd?

22          MR. STROCHAK:  That's correct, Judge.

23          Well --

24          THE COURT:  I mean I must say that you've got the

25  hearing on February 2nd and then a hearing on -- when are you

10

 1   going to bring on the cash collateral motion?

 2           MR. STROCHAK:  We have a draft prepared and

 3   anticipate filing it early next week, Judge.

 4           THE COURT:  Let me ask the committee and also Mr.

 5   Tishler -- Mr. Levine and Mr. Tishler -- what their views would

 6   be about moving the exclusivity hearing to coincide with the

 7   cash collateral hearing?  It does seem to me that those two are

 8   going to be sort of inextricably linked.

 9           MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein,

10   if I may.

11           I don't think they're inextricably linked, obviously,

12   they're related but I think the arguments for not extending

13   exclusivity and the debtor's inability to meet that burden are

14   separate issues and my instinct would be not to consolidate

15   them but I guess people could have different views on that.

16           MR. TISHLER:  Your Honor, this is John Tishler.

17           I think in the interests of efficiency I would

18   consolidate them.  I think there will be some overlap in

19   testimony.  I think I assume the Court would like to hear a

20   more detailed discussion of the financial status of the debtors

21   and where they are headed with exit financing and it sort of

22   gives the Court an opportunity to direct the entirety of the

23   case as opposed to a smaller case.

24           MR. STROCHAK:  Judge, it's Adam Strochak.

25           From the debtor's perspective we'd be fine with

11

1    consolidating them.  It makes sense to us as well.

2              MR. SILVERSTEIN:  Your Honor, it's Paul Silverstein

3    again.

4              I guess I'm in the minority in terms of viewpoints on

5    this.  I understand judicial economy and I appreciate not

6    wanting an overlap but I do believe that the legal issues in

7    those matters are entirely different.  I don't want to lose in

8    any way addressing the issues in the exclusivity aspect of a

9    joint hearing to the cash collateral issues, they're just

10   somehow different to me and, again, maybe I'll come around but

11   I'm not seeing it.  I see very different issues and I see

12   reasonable grounds for having them done separately.

13             THE COURT:  Where I'm coming from -- and I believe

14   you're very clear about it is -- I'm just trying to understand

15   where this case is going.

16             Let's assume exclusivity is extended and we get to

17   the cash collateral hearing and the motion is denied or it's

18   granted on such tight conditions that would make it extremely

19   difficult for the debtor to continue.  I'm very concerned about

20   where this case is heading and --

21             MR. SILVERSTEIN:  Your Honor, may I?  It's Paul

22   Silverstein again.

23             THE COURT:  Go ahead, Mr. Silverstein.

24             MR. SILVERSTEIN:  Thank you.  Looking at it in a

25   slightly different way, if exclusivity is terminated first

12

1    there might well be a growing consensus between Cap Source and

2    the committee such as by the time we get to the cash collateral

3    hearing after a termination of exclusivity you might have more

4    of a consensual spirit because I think that although Cap Source

5    and the committee are not on the same page at this point I

6    think we are getting closer.  So I think that has to be put in

7    the mix because, again, if exclusivity is terminated I believe

8    the dynamic of the cash collateral hearing may well change and

9    Mr. Tishler may want to comment but that's what I think.

10             THE COURT:  Mr. Tishler.

11             MR. TISHLER:  Your Honor, I think there are lot of

12   moving parts going on and I hear what Paul is saying at the

13   same time.  I tend to still lean towards what you're saying

14   because I think we're at a crossroads in the case and the two

15   orders are likely to be related and I think it gives you an

16   opportunity to make sure that the case is situated in such a

17   way that it's going in the right direction.  You could have

18   inconsistent orders and I think that's the fear.

19             MR. STROCHAK:  Judge, it's Adam Strochak for the

20   debtors.

21             It sounds like what Mr. Silverstein is eluding to is

22   some type of deal between the committee and the pre-petition

23   lenders and any deal if there's going to be a plan no matter

24   who it's proposed by at least if it's going to be a

25   reorganization plan, there's going to have to be some exit

13

1  financing and if the committee has a prospect for exit

2  financing for some plan that would be different from the

3  debtor's plan, then at some point they're going to have to put

4  that on the table.  We haven't heard that yet, certainly

5  nothing in terms of details or any type of commitment.  If

6  there is going to be some type of consensual deal between the

7  committee and the pre-petition lenders I don't see any reason

8  in terms of the timing of the hearings that an extra week or

9  ten days or so until that ripens and have all these matters

10  heard at the same, I don't see why that would be inefficient in

11  any way or inappropriate in any way.

12          So if the question is really related to when should

13  these hearings be held, should they be held separately or

14  together, I don't see how the prospect of any deal that does

15  not include the debtors makes much of a difference there.  If

16  there is a deal we'd like to hear about it and it's something

17  the Court would obviously want to consider in connection with

18  both of these motions.

19          MR. LEVINE:  Your Honor, this is John Levine of

20  Andrews, Kurth.

21          When does debtor propose having this joint hearing if

22  the Judge so chooses timing wise?

23          THE COURT:  Well, it's got to be before February

24  25th; right?

25          MR. STROCHAK:  Yes, that's the only end point from

14

1   our perspective, Your Honor.  I think the case management order

2   requires twenty day's notice on a motion and as I've indicated

3   I think we'll be in a position to file our papers early next

4   week so, obviously, it would depend on --

5          THE COURT:  Let me put this into the mix.  I'm away

6   from February 11th through the 18th.  My first day back in is

7   the 19th.

8                    [Pause in proceedings.]

9          THE COURT:  With that announcement coming in I'd just

10  repeat what I said that I'm out of town from the 11th through

11  the 18th.  The 19th is my first day back in.

12         MR. STROCHAK:  From our perspective, Your Honor, the

13  week of February 19th is fine.

14         THE COURT:  Now, the following week is the week of

15  the 23rd.  Daniel, what do we have on Monday the 23rd?

16         THE CLERK:  The 23rd is free.

17         THE COURT:  If we have a contested cash collateral

18  hearing what evidence does each side anticipate?

19         MR. STROCHAK:  From the debtor's perspective I think

20  there would be evidence about the performance of the business

21  over the past period through the Chapter 11 process and then

22  probably some valuation evidence and possibly in connection

23  with exclusivity issues there would be evidence about the

24  status of negotiations with potential exit financiers and

25  probably some testimony about the needs for financing.

15

1        THE COURT:  And on behalf of the committee what do

2   you anticipate in evidence?  If we had a combined

3   exclusivity/cash collateral hearing what do you anticipate?

4        MR. SILVERSTEIN:  Jerry Bract, you may want to

5   address that.  Your Honor, I haven't fully thought it out.  Mr.

6   Bract may have already.

7        MR. BRACT:  Your Honor, we're anticipating putting on

8   some evidence concerning the performance of the company

9   throughout the past year and perhaps even pre-bankruptcy.  We

10  also will be offering testimony from a committee member

11  concerning the committee's views regarding the prospects for a

12  consensual plan and we've got depositions scheduled next week

13  of a Capital One representative and Mr. Lubin and we received a

14  notice of a deposition for a committee member yesterday.  So I

15  believe all of that testimony will go to the exit financing

16  issue and I guess depending on what the testimony is you might

17  hear some evidence in that regard as well from Capital One and

18  the committee.

19       I will just in passing -- since everybody is on the

20  phone -- we've worked out the motion to quash that was filed by

21  Capital One and the only difference is that it's now scheduled

22  for Thursday of next week as opposed to Wednesday.

23       THE COURT:  What is scheduled for then?

24       MR. BRACT:  The deposition of the Capital One

25  representative.

16

1          THE COURT:  Is that motion to quash going to get

2    withdrawn?

3          MR. BRACT:  Your Honor, I will ask the lawyer to

4    withdraw it but it has been resolved and I talked to him

5    yesterday and I told him that I would represent that to you in

6    this conference today and he didn't have any problems with that

7    but I will get back to him and ask him to formally withdraw.

8          THE COURT:  That's fine.  If issues remain, Mr. Bract

9    -- if the issue is about the scope of discovery and, you know,

10   I consider it like any other discovery-related motion which I

11   won't hear discovery motions, we'll have a telephone

12   conference, I don't usually see papers but it sounds like

13   you've got it worked out but if you don't -- if the issue is

14   discovery at all versus what discovery will be permitted, if

15   it's the scope then arrange at your earliest possible time a

16   telephone conference to resolve it.  I see the motion is

17   noticed for February 9th.

18         MR. BRACT:  Right.  I will, Your Honor.  I believe

19   it's been completely resolved.

20         THE COURT:  All right.

21         MR. TISHLER:  Your Honor from the lender's standpoint

22   on evidence we would add --

23         THE COURT:  Is this Mr. Tishler speaking?

24         MR. TISHLER:  Yes, I'm sorry, Your Honor.

25         THE COURT:  Just so we have a clear transcript.

17

1        MR. TISHLER:  Sure.  We would also put on proof of

2    valuation and the debtor's historical ability to project

3    accurately and --

4        THE COURT:  I don't know how anybody projects in this

5    market.

6        MR. TISHLER:  -- and how well it has performed.

7        THE COURT:  Daniel, do we have anything on Tuesday,

8    the 24th?

9        THE CLERK:  Yes, Your Honor.  We have a bunch of

10    matters in <u>Bethlehem Steel</u> but I don't know if that's going to

11    amount to anything and we have a contempt hearing in one of our

12    other cases.

13        THE COURT:  Is the contempt hearing in the afternoon

14    or the morning?

15        THE CLERK:  In the afternoon at two.

16        THE COURT:  Here's what I want to do.

17        Mr. Silverstein, I appreciate your views that the

18    issues are separate but it does seem to me that this is really

19    fairy inextricably linked.  I mean it really is going to

20    determine what the direction of this case is so what I'd like

21    to do is schedule the hearing on exclusivity and the hearing on

22    the cash collateral motion for Monday, February 23rd, and if

23    necessary the morning of Tuesday, February 24th, and what I

24    would ask is that, certainly, if any of the parties-in-interest

25    want discovery in advance of the dates, work cooperatively to

18

1    work that out.  By 5:00 p.m., Thursday, February 19th --

2    actually, by noon, Thursday, February 19th.  I want all

3    parties-in-interest to submit to chambers two copies of all

4    exhibits they anticipate using during these hearings on the

5    23rd and 24th as well as written narrative summaries of what

6    testimony you anticipate eliciting at the hearing.  To the

7    extent you anticipate relying on deposition testimony, submit

8    at that same time, noon, Thursday, the 19th, designations of

9    deposition testimony.

10          MR. LEVINE:  Your Honor, John Levine of Andrews,

11   Kurth if I may?

12          THE COURT:  Sure.  Go ahead, Mr. Levine.

13          MR. LEVINE:  Being that the context of this kind of

14   joint hearing that's taking place now we'd request that the

15   objection deadline for the exclusivity issue be extended

16   accordingly because I think the tenor of our papers may change?

17          THE COURT:  I agree.  Let's agree on a date.  Mr.

18   Strochak, Mr. Levine, can you agree on a date for it?

19          MR. LEVINE:  I'd say a week before the hearing so

20   that's not a Saturday.  I guess the 16th.  It wouldn't be a

21   Saturday, it would be a Monday.  Monday, February 16th?

22          THE COURT:  That's President's Day.  That's fine.

23          MR. LEVINE:  How about we make it February 17th at

24   noon since people may have off?

25          THE COURT:  That's fine.  February 17th at noon.  Mr.

19

1   Strochak is that agreeable?

2          MR. STROCHAK:  Yes, I think that will be okay for us,

3   Judge.  So we'll get all the papers on both motions on that

4   day.  Is that what the Court contemplates?

5          THE COURT:  I'd like to say noon on the 19th I'd like

6   any legal memoranda that -- I'd like to get a whole package of

7   everything from you on the 19th at noon.  It's my first day

8   back but that --

9          MR. LEVINE:  You might as well make it a good day,

10  Your Honor.

11         MR. STROCHAK:  Judge, this is Adam Strochak.  That

12  might be a little bit of a press for us if we have to respond

13  to the objection papers in just less than two days.  That might

14  be a bit tight if we're not going to get the objections until

15  the 17th.  Is there any chance we could push the objections

16  back to the Friday before?

17         THE COURT:  Friday, the 13th.  I think that's fair.

18  Friday, the 13th, at noon on the objections and I do want a

19  complete package on the 19th of exhibits and the debtor should

20  use numbers, the other parties-in-interest should use letters.

21  Agree on -- you can use double letters and agree on how you're

22  going to separate it out.  Lenders can work it out as AA and

23  then through Z.  I'd just like to get clearly -- and we'd like

24  two sets of everything for chambers.

25         MR. STROCHAK:  Judge, just one point of

20

1   clarification, on the narrative summaries of the testimony are

2   you referring to just a short kind of paragraph describing the

3   nature of the testimony or would you mean --

4          THE COURT:  Exactly.  Yes, it's not a substitute for

5   the testimony but I'd just like to see a brief summary of what

6   you anticipate eliciting and it will also give --

7          MR. BRACT:  Your Honor, this is Jerry Bract.

8          Would that brief summary include potential cross-

9   examination topics or just direct --

10          THE COURT:  I just want the direct and you can keep

11  your cross to yourself.

12          MR. BRACT:  Thank you, Your Honor.

13          THE COURT:  You're also obviously identifying the

14  witnesses you anticipate calling in your case-in-chief and what

15  the anticipated brief narrative summary of the direct testimony

16  will be.  It will give each side a chance to better prepare for

17  cross-examination.

18          MR. BRACT:  Thank you, Your Honor.

19          THE COURT:  I'll leave it to you if -- if you're

20  going to take depositions they ought to be relatively short.

21  Look, you each know what's going on here.

22          Let me come back to the issue of valuation which

23  since the start of the case has always been identified as a big

24  issue.

25          Mr. Strochak, given what's happening in the

21

1    marketplace do you stand by the valuation reports that you've

2    received or are you in the process of revising them?

3           MR. STROCHAK:  It will need to be revised, Your

4    Honor.  The valuation report that we did was done, I believe,

5    in late August or early September so that report will have to

6    be updated but that shouldn't be difficult.

7           The valuation data that's out there -- the

8    information that we had in the last version of the disclosure

9    statement, I think, accurately reflects where we are today on

10   valuation.

11          THE COURT:  Mr. Levine or Mr. Bract, do you

12   anticipate updating your own valuation analysis?

13          MR. BRACT:  Your Honor, up until the phone call I had

14   not anticipated doing that with respect to the exclusivity

15   hearing.  We were anticipating pointing out that in fact in

16   light of the economy, what we consider to be the curious and

17   somewhat unreasonable fact that essentially the debtor's

18   valuation of its core assets has not changed appreciably since

19   the bankruptcy was filed or, I guess, since the first

20   disclosure statement was filed in -- I believe that was in

21   June.  So that was going to be part of the testimony that we

22   were going to offer at the exclusivity hearing.

23          At this point I need to talk with Paul and Jonathan

24   before deciding on whether we're going to go forward with

25   valuation.

22

1          THE COURT:  That's fine.  Okay.

2          I encourage you all to keep talking.  Mr. Strochak,

3     the obvious point -- I have no idea what the evidence is going

4     to be or what the Court ruling is going to be but you're going

5     to go into this evidentiary hearing on the 23rd, you'd better

6     have a Plan B.

7          MR. STROCHAK:  Understood, Judge, and I think in

8     terms of negotiations there is certainly willingness on our

9     side.  I mean it's been difficult and we certainly wouldn't

10    want to sugar coat it, there hasn't been much progress made but

11    there's willingness to keep trying if we can get to an

12    agreement that gets this case done.

13         THE COURT:  What's happened with -- I don't have the

14    operating reports in front of me -- the company's cash

15    positioning in the last --

16         MR. BRACT:  Your Honor, this is Jerry Bract.  I can

17    address that, I think.

18         According to our analysis, Your Honor, the cash

19    balance has decreased about 43 percent over six months.  It's

20    down from $8.2 million as of June 6, 2008 to $4.7 million as

21    January 16, 2009.

22         MR. STROCHAK:  Judge, it's Adam Strochak.  I don't

23    have the reports in front of me.  I apologize.

24         My understanding is that the cash position has been

25    relatively stable.  I know Mr. Lubin and Mr. Delano are on the

23

1   phone and they're in a much better position to kind of apprise

2   the Court of the most current situation and if there's no

3   objection they could comment on that.

4        THE COURT:  It's fine with me.  I think it would be

5   worth hearing.

6        MR. LUBIN:  This is Mike Lubin.

7        I believe as of today we have about $4.7 million in

8   cash.  We believe we have adequate cash to operate the business

9   without a problem even through these times.  We have, I would

10  say, taken every step we know how to do to conserve cash and

11  reduce expenses and we think we've been relatively effective at

12  that but we believe there's adequate cash to operate the

13  business without a problem however long these cases run.

14       The balance has declined.  I think a lot of the build

15  up of the balance earlier related to the fact that we had not

16  yet paid any of the -- I would call them remarkably large

17  administration expenses of the case and we have now gotten into

18  the mode of paying them and paying them when due.  So I think

19  that's a substantial chunk of what's happened to the cash here

20  but it is adequate to operate the business.  We see it without

21  a problem.

22       MR. BRACT:  Your Honor, this is Jerry Bract.

23       The debtors have put forth a thirteen week forecast

24  of cash receipts and disbursements and based on our analysis of

25  that forecast their cash balance will decline to $1.8 million

24

1   as of March 20, 2009 with represents a decline of 61 percent

2   over the next two months.

3          THE COURT:  Mr. Tishler.

4          MR. TISHLER:  Your Honor, the pre-petition lenders

5   agree with you that while we are flexible to some degree we're

6   looking for Plan B and we would much prefer to have an exit

7   facility paying us out but --

8          THE COURT:  I'm sure you would but given the current

9   market conditions, you know, that may not be realistic.

10         MR. TISHLER:  That's where we are and we think that

11  the debtor needs to become a little bit more realistic about

12  what the options are and --

13         THE COURT:  It sort of goes two ways as well and one

14  of my colleagues in referring to a situation arising with DIP

15  financing, he told the pre-petition secured lenders, would you

16  like to roll your trucks up and take everything out?  I mean

17  what's the reality from the standpoint of the pre-petition

18  lenders as well?  If you succeeded in pulling the plug you're

19  likely to come out a heck of a lot worse.  So all of you have

20  got a lot at stake.

21         MR. TISHLER:  We agree 100 percent, Your Honor, and

22  that's why we have not filed any sort of motion to terminate

23  the stay.  It's a delicate dance.

24         THE COURT:  It is for all of you.

25         MR. TISHLER:  Absolutely and what we think needs to

25

1   be done is something along the lines of exploring the market.

2   It's one thing to be afraid of the dark and what may be lurking

3   in the dark but if you don't shine a light in there you may not

4   be getting the full picture and that's along the lines of what

5   we're looking for.  We're not trying to conduct fire sales in a

6   really bad economy unless obviously there's a concomitant

7   deterioration of the business and that may be something that

8   the committee can point to that we are not aware of at this

9   point.  At the same time just merely staying the course for

10  month on month on month, especially if the valuation as we all

11  suspect is going down, is not a viable alternative.

12          We remain open as Mr. Strochak has.  We have traveled

13  to New York in December and sat with the debtors hoping to hear

14  of a Plan B and have not yet heard one and we remain open to

15  that.

16          THE COURT:  Let me ask you all.  You're all

17  sophisticated lawyers representing sophisticated clients and

18  I'm not saying this is where you are.  I hate to see

19  Brinkmanship that we get down to a February 23rd and 24th

20  hearing with everybody sort of hanging tough with their

21  positions, have you considered having a mediator -- not a

22  lawyer -- a business person trying to mediate among you to see

23  whether you can try and bridge these gaps?

24          My only concern -- and I'm not saying that this is

25  the case -- is that there is some Brinkmanship going on.

26

1          MR. STROCHAK:   Judge, it's Adam Strochak.

2          We haven't considered it in any kind of open sense

3    and it's something that's been in the back of our mind is would

4    there be a way to somehow bridge the gap, more so between the

5    debtors and the committee in terms of working out a consensual

6    plan.

7          We've kind of thought about that and concluded that

8    the parties seem to be so far apart on value that it didn't

9    seem like it would likely be successful and that's why we

10   really haven't pursued it but we're not opposed to it.   If the

11   committee thought it might be helpful we'd certainly consider

12   it and if the Court thought it would be helpful we would

13   consider it but our assessment so far has been that there's

14   been a sufficient gap that it didn't look terribly likely that

15   a mediator would be able to kind of help close that.   We're

16   hopeful that we make a little more progress and then perhaps if

17   we stalled and used someone to restart that process but haven't

18   gotten that far.

19         THE COURT:   Mr. Strochak, usually when sophisticated

20   parties are so far apart someone is just being unrealistic and

21   sometimes neutral [phone cuts out here] reality in people.   I'm

22   not forcing this on anybody but I just -- it does concern me

23   that you are all so far apart and I think at this stage just

24   negotiating with the committee isn't going to be the answer.   I

25   think the pre-petition lenders -- because barring some real

27

1  surprise your report, I think, was sobering in the sense that

2  anything can happen but it sounds like you don't anticipate

3  being able to secure exit financing until the current

4  restructuring is done so you're really talking about summertime

5  and you're not going to get to the summer unless you get to use

6  cash collateral and what adequate protection you're able to

7  provide at this point, everything is sort of hocked up to the

8  hilt.  Any moving this case forward with or without exclusivity

9  is going to require agreement between the pre-petition lenders,

10  the committee and the debtors and since you all are so far

11  apart I have no reason to think that you all aren't firmly of

12  the views that you've taken with each other and believe those

13  to be accurate but Brinkmanship can result in all of you

14  losing.

15        MR. LUBIN:  Your Honor, this is Mike Lubin. Can I

16  make a couple of observations not quite related to what you

17  just said?

18        THE COURT:  Sure, Mr. Lubin.

19        MR. LUBIN:  With respect to the question of selling

20  assets or the potential of selling assets, we are not adverse o

21  that idea at all.  Prior to the Chapter 11 we made an effort to

22  sell our medical business.  We're not permitted to move forward

23  with it.

24        THE COURT:  I'm familiar with that history.

25        MR. LUBIN:  I understand that, Your Honor, but my

28

1   point is really that we believe that the value of that business

2   has been enhanced since the Chapter 11.  Notwithstanding the

3   marketplace, it has grown substantially and is continuing to

4   grow this year and we believe, quite frankly, towards more than

5   the total amount of the secured debt even though it's a

6   relatively small part of our sales base.  So we believe there's

7   a substantial amount of protection there and we are open to the

8   idea of selling it but at the moment we believe that a

9   reorganization of the entire company is the best alternative in

10  terms of maximizing value for everyone and we believe that that

11  is viable once we complete this restructuring we're talking

12  about.

13           As to the restructuring, I heard it characterized as

14  something like a ruse.  I don't think that was the exact word

15  but I think --

16           THE COURT:  Forget the characterization.

17           MR. LUBIN:  I understand.  We believe it is simply a

18  matter of business people doing something businesslike.  We do

19  believe it's a substantial step in the right direction in terms

20  of the ability to obtain financing because it takes a business

21  that right now because of its overhead structure and the fact

22  it's in a self-contained facility that has to have the overhead

23  to operate is basically contributing nothing and moves

24  essentially that same business to other plants that already

25  have the overhead structures in place and the room to fit that

29

1    business and it converts it from effectively half a million

2    dollars of EBITDA to, we believe, between $4 million and $4.5

3    million of EBITDA.  I think that (1) makes the cash flow

4    characteristics of the financing much, much better and (2) it

5    should ultimately help to bridge the gap in terms of value.

6    We won't necessarily agree on multiples but I think it's clear

7    to all of us that $4 million of cash flow is worth more than a

8    half million dollars of cash flow without a question at

9    whatever multiple we believe is the appropriate one.

10          So obviously we think this is an important step.  We

11   think it will help us get out and we believe we can get out but

12   if we can't get out we are not adverse to trying to sell a

13   portion of the business.  We think we can get enough for even

14   the medical business to more than pay the total secured debt

15   but we don't believe it's the way to go in the short run in

16   terms of maximizing value for all constituencies.

17          MR. TISHLER:  Your Honor, the pre-petition lenders

18   are happy to hear that and maybe this will be the impetus for

19   us to cut a deal with the debtors.  We encourage them to

20   respond to our latest proposal.

21          MR. LUBIN:  We will do so if that was --

22          THE COURT:  All right.  Let me actually go back and

23   ask once again about -- I don't need an answer but I would like

24   you all to think about and discuss -- counsel to discuss the

25   issue of mediation.  It doesn't have to be a lawyer, it can be

30

1  a person.

2          Judge Lifland, who confirmed the <u>Dana</u> case, there

3  were huge valuation issues in that case and Judge Lifland wound

4  up appointing a Court-appointed valuation expert.  Ultimately,

5  the parties as I understand it finally came to an agreement

6  after the Court-appointed valuation expert got involved.  I'm

7  not suggesting that there ought to be at this stage a Court-

8  appointed valuation expert but if valuation is the issue that

9  you're so far apart on, getting a neutral mediator who is a

10  sophisticated financial advisor type to see whether you can try

11  and close the gap and see whether there's a plan.  Anyway, I

12  would like you all to discuss it.  I'm not forcing anybody to

13  do this now but if you want to get to that February 23rd

14  hearing and be playing Brinkmanship somebody is going to be

15  really disappointed in however it comes out and from the

16  debtor's standpoint if it doesn't go well for you you could be

17  left with no options at that point and from the other

18  constituents it may be that you don't have any options but your

19  options may be fairly limited.

20          MR. STROCHAK:  Adam Strochak for the debtors, Judge.

21          We'll certainly be happy to consider it and perhaps

22  we can convene a conference call with counsel for the parties-

23  in-interest to discuss the possibility and we certainly

24  recognize the significance to of the implications for cash

25  collateral and we're very mindful of that.

31

1          THE COURT:  Okay.  So I take it the hearing on the

2  9th is going to be adjourned.  That was the disclosure

3  statement hearing.  Am I correct?

4          MR. STROCHAK:  Correct.

5          THE COURT:  Post a notice on ECF to that effect.

6          MR. STROCHAK:  We will do that.

7          THE COURT:  I'd like to have a telephone status

8  conference on the 9th just for an update on where things stand

9  just before I've gone away so what time of the day is

10  convenient for people?

11          MR. LEVINE:  John Levine, Your Honor.  I'll stick

12  with the 10:00 a.m. time.  It works for us usually depending on

13  Your Honor's schedule.

14          MR. STROCHAK:  I don't believe I have anything that

15  day, Your Honor, so at the Court's convenience.

16          THE COURT:  All right.  Let's do it at 10:00 a.m. on

17  Monday, February 9th and a telephone conference again and just

18  somebody provide us with call in number.

19          That's all we had on that date; right?

20          THE CLERK:  Yes, well that was the disclosure

21  statement hearing day so we had that blocked out anyway.

22          THE COURT:  Is that all we had?  We don't have

23  anything else that morning?

24          THE CLERK:  No, nothing.

25          THE COURT:  Schedule a telephone status conference at

32

1   10:00 a.m.

2           MR. LUCAS:  Your Honor, this is John Lucas.  We also

3   had scheduled actually a week before the disclosure statement

4   hearing, on February 2nd, a status conference.

5           THE COURT:  Let's skip that date.  We'll have the

6   conference on the 9th.  It sounds like you've got your plate

7   full at this point.

8           MR. LUCAS:  Yes.  We had, obviously, the exclusivity

9   hearing as well on the 2nd and that will be adjourned to the

10  23rd.

11          THE COURT:  Yes.  The 23rd, not the 21st.

12          MR. ZUBER:  Your Honor, this is Scott Zuber.

13          I didn't get the time for the hearing on the 23rd.

14  Is that going to be at ten?

15          THE COURT:  At 10:00 a.m.  If you all wind up with a

16  lot of witnesses we'll plan on working into the night if we

17  need to.  The hearing will go into the evening.  I know I'm

18  setting aside the following morning but plan on working late if

19  we need to.

20          Anything else for today?

21          MR. STROCHAK:  I think that's all from the debtor's

22  perspective, Judge.

23          THE COURT:  Lenders?

24          MR. TISHLER:  I assume the debtors will submit a

25  bridge order extending exclusivity.

33

1          THE COURT:  I don't remember because I don't have it

2  in front of me.  The bridge order that got entered was it only

3  until --

4          MR. LUCAS:  Your Honor, this is John Lucas.

5          I will check and verify it but I believe the terms of

6  the order said that it would be extended to the time that the

7  Court rendered its decision on the exclusivity motion so it

8  should be fine.

9          THE COURT:  Hold on.  I've got the order here.

10                    [Pause in proceedings.]

11         THE COURT:  Yes.  It provides that the debtor's

12  exclusive periods are extended to and including the time the

13  Court enters an order on the debtor's exclusivity motion

14  without prejudice to the debtor's pending exclusivity motion or

15  any other further, etc.  So the bridge order that's on file

16  covers this.  If you all want to double check it's ECF 528

17  entered on January 16th.

18         Okay.  It sounds like -- Mr. Bract said it looks like

19  the discovery issues with the lenders have been resolved.  If

20  not, arrange a telephone call and we'll resolve it.

21         MR. BRACT:  Thank you, Your Honor.

22         THE COURT:  Okay.  We're adjourned.  Thank you very

23  much.

24                    *  *  *  *  *

25

34

1                              * * * * *

2        I certify that the foregoing is a transcript from an

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6                      _____

7                              CARLA NUTTER

8

9   Dated:  February 17, 2009

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25