```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3      -----------------------------------X
       In re:                          :   08-11153
4                                      :
          LEXINGTON PRECISION CORPORATION, :  One Bowling Green
5                                      :   New York, New York
                         Debtor.       :
6                                      :   February 23, 2009
       -----------------------------------X
7
                         TRANSCRIPT OF TRIAL
8            BEFORE THE HONORABLE MARTIN GLENN
                UNITED STATES BANKRUPTCY JUDGE
9
       APPEARANCES:
10
       For the Debtor:          ADAM P. STROCHAK, ESQ.
11                              JOHN LUCAS, ESQ.
                                ALEX LEVINE, ESQ.
12                              Weil, Gotshal & Manges, LLP
                                1300 Eye Street, NW – Suite 900
13                              Washington, D.C. 20005

14     For the Creditors'       JONATHAN LEVINE, ESQ.
       Committee:               GERALD L. BRACHT, ESQ.
15                              Andrews, Kurth, LLP
                                450 Lexington Avenue
16                              15th Floor
                                New York, New York 10017
17
       For Capital Source       AARON R. CAHN, ESQ.
18     Finance:                 Carter, Ledyard and Milburn, LLP
                                2 Wall Street
19                              New York, New York 10005

20     For Capital Source       JOHN C. TISHLER, ESQ.
       Finance:                 ROBERT J. WELHOELTER, ESQ.
21                              Waller, Lansden, Dortch and Davis, LLP
                                511 Union Street
22                              Suite 2700
                                Nashville, Tennessee 37219
23

24     Court Transcriber:       RUTH ANN HAGER
                                TypeWrite Word Processing Service
25                              211 N. Milton Road
                                Saratoga Springs, New York 12866


       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

1                                                                                      2

2

3                              I N D E X

4

5   <u>Witness</u>          <u>Exam-Court</u>   <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>   <u>Recross</u>

6   <u>DEBTORS</u>:

7   Michael Lubin                   9        51 (Bracht)   96
                                             90 (Cahn)
8
    Dennis Welhouse          109   135 (GB)
9                                  146 (AC)

10  Andre Augier             154   172

11      Voir dire examination by Mr. Bract at P. 158

12

13
    <u>PSL:</u>
14
    Dean Vomero              175   208 (AS)
15

16
                          E X H I B I T S
17
                    <u>Description</u>                    <u>ID.</u>   <u>EV.</u>
18
    <u>DEBTORS</u>:
19
       1      Cash Forecast                            28
20
       2      Email from Deirdre Martini               48
21
       3      Monthly P&Ls                             20
22
       4      Monthly P&Ls for 2009                    20
23
       5      Consolidated P&L forecasts               20
24
       6      Monthly operating report                167
25
       7      Monthly operating report                167

       8      Monthly operating report                167

       9      CSM Worldwide Forecast History           39

```
 1                                                                        3

 2

 3                          E X H I B I T S

 4                        Description                    ID.    EV.

 5
       10     Email to Mr. Deleneau                              51
 6
       11     Debtor's liquidation analysis                     167
 7
       15     Schedule                                          117
 8
       16     13 Week Cash Flows                                125
 9
       13     Chart                                             129
10
       14     Chart
11

12

13     COMMITTEE'S:

14     L      Lexington's 10K from 2003                          78

15     N      Lexington's 2005 10K                               88

16     P      Lexington 10K                                      83

17     PP     Letter from Capital One                            53

18

19
       PSL:
20
       F      Slides – six pages                   182          207
21
       A      Expert report                                     207
22

23
       CAPTIAL SOURCE'S
24
       B      Certificate
25
```

4

1    (Proceedings began at 10:03 a.m.)

2            THE COURT:  Please be seated.  Counsel, please make

3    your appearances.

4            MR. STROCHAK:  Good morning, Your Honor.  Adam

5    Strochak, Weil, Gotshal & Manges for the debtors.

6            THE COURT:  Good morning.

7            MR. STROCHAK:  With me in John Lucas and Alex Levine.

8            THE COURT:  Thank you.

9            MR. TISHLER:  Good morning, Your Honor.  John Tishler

10   on behalf of Capital Source Finances, the agent and senior

11   lender.  With me is Aaron Cahn and Rob Welhoelter.  I also have

12   in the courtroom Mark Fadoddy [Ph.], who is our client

13   representative, and Scott Zuber who represents Webster Bank,

14   which is one of our participants.

15           THE COURT:  Good morning.

16           MR. LEVINE:  Good morning, Your Honor.  John Levine

17   of Andrews Kurth on behalf of the Committee.  I'm joined by my

18   partner Jerry Bracht.  We also have Jessie Yeltz [Ph.] of SRR,

19   the Committee's advisor in the courtroom.

20           THE COURT:  Thank you.  Anyone else making an

21   appearance?  Mr. Strochak?

22           And let's -- before we begin, I mean, I reviewed the

23   briefs.  I reviewed many, but not all the exhibits.  We'll go

24   forward with both motions simultaneously in terms of the

25   evidence.  If you want to make any preliminary remarks, keep

5

1  them brief.  I've read everything and I think I understand the

2  issues.  Just so everybody knows, I haven't decided anything;

3  but what I've reviewed, I really do think the issues about use

4  of cash collateral and exclusivity are linked together.

5  Mr. Strochak, one of the concerns that I have is that you've

6  submitted a new budget, a 13-week budget with respect to the

7  cash collateral, yet you propose to extend the use of cash

8  collateral to the end of the year.  The 13-week period shows a

9  decline in round numbers from about four million dollars in

10 cash to two million dollars in cash, so the Court has concerns

11 given the burn rate that's been evident so far as to how long

12 cash will be available.

13        Both sides, particularly the prepetition lenders and

14 the debtor, have proposed exhibits that look at in the case of

15 the lenders total enterprise value in the case of the debtor

16 value core assets.  Both premised, it appears to me, ongoing

17 concern value, no cash, no going concern.

18        So I just want you to know -- I'll let you proceed.

19 If you want to do -- if both sides want to do brief openings

20 that's fine or you can just get into the evidence, but I just

21 wanted to sort of based on what I reviewed so far I want to let

22 you know what the Court's concerns are.

23        Mr. Strochak?

24        MR. STROCHAK:  Thank you, Your Honor.  We certainly

25 will be addressing those issues with testimony.  Just to give

6

1   you a little preview by way of opening what we're going to

2   demonstrate, Your Honor, is that the cash projections are

3   directly related to the consolidation that's going to be going

4   on in the connector seals business and that there are a number

5   of different factors built into the cash projection.  That will

6   demonstrate to the Court that it is a reasonable and, in fact,

7   conservative projection, that we're going to demonstrate that

8   the debtor's history of its cash projections through the course

9   of the Chapter 11 cases has been very conservative.  They've

10  consistently done better than their cash forecast week after

11  week, month after month through the course of the Chapter 11

12  case, and that there are conservative factors built into that

13  forecast going forward and that as we get further through this

14  year as the evidence will show in the connector seals

15  consolidation that the cash position will stabilize toward the

16  middle of the year toward the end of the 13-week budget that

17  we've provided and, in fact, we think will pick up in the

18  second half of the year.

19          In addition, we'll present evidence that the debtors

20  believe that they have sufficient cash to continue operating

21  the business and certainly sufficient time to adjust if things

22  don't go as well as they have forecasted; although, as I've

23  indicated, they feel very confident in their abilities to

24  forecast their cash needs and, in fact, have consistently met

25  those forecasts going forward.

7

1          THE COURT:  Okay.

2          MR. STROCHAK:  I'm happy to turn the podium over to

3    others for openings, Your Honor.  That's really all I

4    particularly wanted to address on the opening because I know

5    Your Honor does have the briefs.

6          THE COURT:  All right.

7          MR. STROCHAK:  We could jump directly into the

8    evidence or --

9          THE COURT:  Mr. Tishler or Mr. Levine or Bracht, do

10   you want to make very brief opening?

11         MR. TISHLER:  Thank you, Your Honor.  John Tishler on

12   behalf of the lenders here.  With all due respect to

13   Mr. Strochak and the debtors, we believe the proof is going to

14   show an accelerating decline in this company's business in

15   revenues.  Over the last four months they have burned cash at a

16   rate of about a million dollars per month and that is a

17   disturbing trend for us.

18         Back to your point, Your Honor, with only four

19   million dollars of cash in the bank we think it's imprudent to

20   get out too far and not have a plan B in place and that is what

21   our proposal essentially is.  We have proposed tightening

22   covenants.  We don't have any opposition to a modest extension

23   to use of cash to the end of July, Your Honor, as we've said

24   repeatedly.  We also believe, however, that there should be

25   tightened covenants on what the cash usage and burn looks like,

8

1   the revenues disbursements and a test against the borrowing

2   base that could show that the company is eating it's A/R and

3   not replenishing it.

4           We do think a sale of a noncore and nonperforming

5   assets, we think there's about three to five million dollars of

6   that that ought to be carried out again to reduce the senior

7   lender's position here.  We do think the retention of a banker

8   to (1) locate potential exit financing source that may not have

9   been uncovered by the debtor's efforts and (2) to explore, not

10  to conduct but just to explore what a sale of a medical device

11  business might bring so that all the constituents can come back

12  to you about 45 days before the end of July and determine at

13  that point what is the best direction this case should be.

14  We've got a plan on the table.  The Committee may have a plan

15  on the table depending on the exclusivity termination that you

16  rule on today.  We also think there ought to be at least a look

17  at what a sale potentially brings to the business.

18          So that's our proposal on that.

19          THE COURT:  Thank you, Mr. Tishler.

20          Mr. Levine?

21          MR. LEVINE:  Good morning, Your Honor.  John Levine

22  of Andrew Kurth on behalf of the Committee.  It looks like

23  we're going to stick on the cash collateral topic for now so

24  I'll be brief.  The values regardless of whether you agree with

25  the debtors which you know the Committee doesn't on valuation

9

1   or Cap Source, which does seem to be in the range of

2   reasonableness, the fact is it seems the Cap Source is

3   adequately protected.  The conditions that Cap Source is

4   requesting amount to a *de facto* termination of exclusivity.

5   They're looking to do a liquidating plan of reorganization.  If

6   you look deep into the conditions by June if no financing is

7   obtained by the debtors, they're likely to want to sell the

8   assets and that's what the conditions say.

9           If you're going to terminate exclusivity with respect

10  to Cap Source by having a *de facto* liquidating plan, you should

11  also terminate exclusivity with respect to the Committee to

12  give us an opportunity to present their own plan.  We'll

13  address the exclusivity issues in connection with the evidence.

14          THE COURT:  Thank you.  Mr. Strochak?

15          MR. STROCHAK:  Thank you, Judge.  We call Michael

16  Lubin.

17          THE COURT:  Good morning.  Raise your right hand.

18          (Michael Lubin, witness for the debtors, sworn.)

19          MR. STROCHAK:  Please have a seat, Mr. Lubin.

20          THE WITNESS:  Thank you.

21          THE COURT:  Let me just -- I just want to remind

22  everybody it -- I don't know whether you've worked out

23  stipulations as to exhibits, but I'm going to rely on you when

24  you use an exhibit if you intend to offer it, you'd better

25  offer it and I'll rule on -- if there are objections, I'll rule

Michael Lubin - Direct                    10

1   on it then.  I don't want to -- the last time we had an

2   evidentiary hearing I was reminding everybody whether you were

3   offering exhibits it's really your responsibility to decide if

4   you're going to offer it or not.

5           Go ahead, Mr. Strochak.

6           MR. STROCHAK:  Thank you.

7                    DIRECT EXAMINATION

8   BY MR. STROCHAK:

9   Q.   Good morning, Mr. Lubin.  Let's talk directly with the

10  comments the Court just made.  You are the chairman of the

11  debtors, correct?

12  A.   Correct.

13  Q.   And have you done an assessment of whether the company has

14  significant -- sufficient cash to keep -- continue operating

15  through an extension of cash collateral?

16  A.   I have and we believe that the company will have

17  sufficient cash that, in fact, after the end of that 13-week

18  period if the cash gets as low as we have it forecasted, which

19  we don't believe will happen, that it will turn back up for a

20  number of reasons but that we will then be generating cash on a

21  continuing basis.

22  Q.   What are the circumstances that you've evaluated that lead

23  you to those conclusions?

24  A.   Well, the only real substantial cash burn here aside from

25  the expenses in these Chapter 11 cases is that our businesses

Michael Lubin - Direct                           11

1  that are really tied to the automotive OEM business have been

2  suffering terribly and rather than producing cash, they've been

3  eating cash.  As we've all spoken about before we develop a

4  plan that will enable us by we believe probably the end of May

5  to absolutely eliminate the cash burn with respect to our

6  automotive connector seal business and actually turn that into

7  a cash positive business almost regardless of what the volumes

8  are because that business will be moved to our other facilities

9  which are already operating at very high levels of

10 profitability, very high levels of cash flow, and don't require

11 any additional overhead to manage that business.  So if the

12 business we retain turns out to be all that business, which is

13 14 or 15 million dollars, we think that business would generate

14 probably four and a half to five million dollars a year cash

15 flow.  That's roughly $400,000.00 a month, whereas right now

16 we're burning about $100,000.00 a month because volumes are so

17 low and because we're running it in a dedicated facility where

18 we just can't get rid of the overhead.

19 Q.   When you say you're running $100,000.00 a month, that's in

20 the connector seals business?

21 A.   In just that business unit because volumes are so low.  We

22 have a dedicated facility with a -- with an overhead that we're

23 really required to have to operate the facility and we can't

24 get away from it as long as we run that facility.  Our plan is

25 to eliminate that facility, eliminate the overhead, and let

Michael Lubin - Direct                              12

1   that business be absorbed by our other facilities.  We already

2   have essentially all of the overhead costs and all the

3   functions that are required to be performed, so it will simply

4   be incremental profitability.  The business we have in that

5   plan generates an average between 33 and 35 percent

6   contribution to overhead so that if we -- as I said, if we

7   retain 15 million dollars' worth of business, 14, it will

8   generate roughly four and a half to five million.  If we retain

9   11 million the way the forecast was built, it will generate

10  between three and a half and four million dollars a year in

11  cash flow and we have a very high degree of confidence in that.

12  Q.   Is there any flex in the cash projection?  Are there any

13  particular areas of the cash projection where you believe that

14  there is flex for the debtors to actually perform better than

15  the forecast?

16  A.   Well, I'd say two things:  One is that we have from the

17  very beginning of these cases out performed the cash forecast

18  by dramatic numbers.  You know, our divisional people put those

19  numbers together.  We do not push them to change those numbers.

20  They have been apparently extremely conservative over and over

21  and over again and we believe they've done the same thing here.

22  In addition, we have -- while we believe that we will be able

23  to accomplish a very substantial reduction in the working

24  capital associated with that business during the wind-down

25  period because we've told our customers in order for this to

Michael Lubin - Direct                          13

1   work for them, which we believe is critical to them, they have

2   to help us by agreeing that they will give us the amount of

3   inventory they need to build in order to safely allow us to

4   move the molds from one plant to another and then they have to

5   authorize us to build that inventory and to ship it to them,

6   bill them, and pay it on a very, very short time frame.  And I

7   think -- it sounds like it's a very dramatic thing to ask the

8   customer, but really what you're doing is you're saying you

9   have a very good supplier, one who's critical to you.  In order

10  to make sure that that supplier is available to you in the

11  future to supply your needs you need to make a one-time

12  investment of roughly three months' worth of inventory.  It

13  will be burned off in three months and then you'll be back to

14  the -- to ordinary course of business.  So the short version

15  is, yes, we've actually built the cash forecast in a different

16  set of assumptions and we plan to go forward with it.  At the

17  end of May we actually are showing about two and a quarter

18  million dollars of incremental working capital that we don't

19  expect to be there at that time that's eating cash.  And we

20  think that we should be able to eliminate a substantial amount

21  of that and convert that to cash during this period so that

22  there will actually be little, if any, cash burn and the entire

23  cash burn will be associated with paying principal payments to

24  Capital Source and paying the administrative expenses as

25  Chapter 11.  But even if we can't accomplish that, even if we

Michael Lubin - Direct                          14

1   end up with a larger amount of working capital in the month of

2   June that's all going to reverse itself because we're going to

3   be done producing.  We will have already shipped the bulk of

4   the product.  The balance will be shipped in early June and we

5   expect to collect those receivables in the month of June or

6   early July, so we should turn two million dollars positive in

7   that month just by eliminating that working capital.

8   Q.   Let's turn, if we could, to the details of the connector

9   seals consolidation plan.  What are the operational elements of

10  that plan, Mr. Lubin?

11  A.   Well, we are going to be producing, as I said, enough

12  inventory to protect the customers while we make the move.

13  Customers need to go through qualification process of these

14  parts in a new location.  It seems kind of counter-intuitive

15  but even if you move the molding press, the mold, the process

16  system and the people running the parts they do require

17  qualification because it's in a new location.  We want to make

18  sure these things run the same way.  We've gone to the

19  customers.  I will say it's been awfully difficult to get the

20  customers to come up with their forecast because they're all

21  sort of reeling from what's going on in the automotive

22  business.  They don't know what the right numbers are, but they

23  finally --

24          THE COURT:  Who are the principal customers in the

25  connector seals business?

Michael Lubin - Direct                          15

1          THE WITNESS:  Your Honor, the principal customers are

2   Delphi Packard Electric.  I think they call it Delphi E right

3   now.  Tyco Electronics, FCI which used to be called Framatone

4   [Ph.] Connectors, and Molex [Ph.].  There are a number of other

5   customers.  Those are the four biggest that account for the

6   bulk of the dollars.  And they've all had serious problems

7   forecasting their own business.  We now have forecasts from two

8   of the three -- two of the four.  The third one, Tyco, has said

9   we're not going to give you a forecast, but if you work with

10  August volumes that should be safe so we're going to create the

11  forecast.  Delphi, I would say, is a little bit slower moving

12  as they are in everything.  They're a rather dysfunctional

13  company.  But at some point we're going to tell Delphi, you're

14  going to have to make a decision or these molds are going to

15  move and the plant is going to shut down and they will have to

16  make a decision.  They have asked us to start the process by

17  putting through supplier change requests on all the parts we

18  have.  That's about 230 part numbers, so it's quite a

19  voluminous effort.  We're almost done with that, but I don't

20  know if that's a stalling process because they just can't make

21  decisions, but we've gone to them.  We now have viable

22  forecasts from three of them and we are going back to --

23          THE COURT:  I thought you said you had viable

24  forecasts from two of them.

25          THE WITNESS:  I'm -- from two of them; the third one

Michael Lubin - Direct                              16

1  has basically said, we're not going to give you a forecast

2  because for some reason they think that's a commitment to

3  produce a certain number of units.  We don't see that, but

4  they've told us that if we use their August purchases of these

5  parts and we build that into a contract that they will be

6  satisfied with that.  So we've gone back and done that.  We've

7  sent them those volumes and we're waiting for them to come back

8  to us with contracts.

9        We produced contracts.  There is a contract we call a

10  transition letter which basically says, in order to assist us

11  in this transition period they agree that they will commit to

12  allow us to authorize to build the volume of inventory that is

13  on the schedule, which really is their ongoing requirements

14  plus the so-called inventory bank, that they authorize us to

15  make it as quickly as we can according to our requirements, to

16  ship it to them and bill them, and that they will pay us in 20

17  days.

18        THE COURT:  Who has agreed to pay you in 20 days?

19        THE WITNESS:  Molex and FCI.  I believe Tyco has as

20  well.  Delphi doesn't have 20-day terms anyway.  Delphi is on

21  five-day terms and that may go down.

22  BY MR. STROCHAK:

23  Q.  Mr. Lubin, let's go back to the qualification process for

24  a second.  How long do you anticipate it will take to requalify

25  the machines to make these parts when they're in their new

Michael Lubin – Direct                    17

1  locations?

2  A.   Well, it's really the molds, not the machines.  But we

3  built the original forecast on the assumptions the customers

4  would require six months' worth of inventory because of the so-

5  called PPAP process, production part approval process.  It's

6  extremely lengthy if they require a full PAP.  The three

7  customers who are moving forward promptly on this have told us

8  that they're intending to abbreviate that process.  They do not

9  want that much inventory, do not need that much inventory, and

10 in fact, right now the standard seems to be they want us to

11 qualify four cavities out of the mold.  I would say our molds

12 probably have an average of 300 cavities or more and typically

13 in a PPAP you'd be required to build parts and then measure

14 every one of those cavities, which is a rather time-consuming

15 process.  They've told us now that they only want to qualify

16 the four corners and the center cavity, which is five out of an

17 average of 100.  We think it's going to abbreviate that process

18 dramatically.  It's just practical.  And, of course, it

19 reflects the fact that they've been doing this with their own

20 businesses.  They've been consolidating their footprint.

21 They've been moving their business into smaller numbers of

22 facilities in order to enhance their profitability or eliminate

23 their losses and they are, you know, very attuned to what we're

24 doing.  I think that they're seeing lots of this going on in

25 the industry because very, very many automotive suppliers are

Michael Lubin - Direct                          18

1   in the same kind of position that our connector seals business

2   is right now where they just have to find another way to reduce

3   their costs in order to be able to survive.  In fact, I think

4   they view us as being in a better position than most of their

5   suppliers because most of their suppliers in our kind of

6   business are running one plant, the plant that's heavily

7   automotive oriented.  If automotive shuts down they could be

8   producing 25 to 30 percent of capacity in their plant.  We had

9   two plants.  They're running very efficiently right now making

10  very good cash flows and we have a place to move that business

11  where it just becomes plus business.  It's all just incremental

12  sales that produce incremental profit.

13  Q.   You mentioned the change in thinking from a six-month

14  requalification process to a shorter requalification process.

15  Did that have any effect on the company's projections of cash

16  flow?

17  A.   Yeah.  There were several things that were accelerated as

18  a result.  We built the fore -- what we call the financial

19  forecast.  It was delivered in mid-January on the assumption

20  that was the best we had at that time, that they would want six

21  months' worth of inventory, and that we'd be running --

22  Q.   Let me stop you there, Mr. Lubin.  Let's just work with

23  that for one second.  If you could pull out the debtor's

24  exhibit binder.  It should be one of the smaller binders.

25  A.   I think I have it.

Michael Lubin - Direct                                    19

1   Q.   You should see it.  If you open to the table of contents

2   it should say debtors' witness and exhibit list.

3   A.   Got it.

4   Q.   If you could turn to tabs 3, 4 and 5.

5           MR. STROCHAK:  Your Honor, I assume you have a copy.

6           THE COURT:  I do.

7   BY MR. STROCHAK:

8   Q.   And, Mr. Lubin, if you could just explain for the Court

9   what Exhibits 3, 4 and 5 are.

10  A.   Well, Exhibit 3 is the monthly P&Ls for last year that

11  include estimates.  Those were not yet final in November and

12  December.  It's a complete set of financial statements.  It's

13  P&L statements, percentage P&Ls, balance sheets, cash flows,

14  and then a look at all of the debt interest and changes in

15  debt.  Exhibit 4 is a similar set of numbers that's a forecast

16  for 2009.  I believe the same exhibits -- the same statements

17  in that.  And then Exhibit 5 is actually our consolidated P&L

18  by month and then it's the individual facility P&L forecast for

19  the month -- for each month.

20  Q.   Broken out by facility?

21  A.   Broken down by facility.

22          MR. STROCHAK:  Thank you.  Your Honor, we offer

23  Debtors' Exhibits 3, 4, and 5.

24          MR. BRACHT:  No objection, Your Honor.

25          THE COURT:  There being no objection, collective

Michael Lubin - Direct                    20

1   Exhibits 3, 4, and 5 are admitted into evidence.

2          (Debtors' Exhibits 3, 4 and 5 are admitted.)

3          MR. STROCHAK:   Thank you.   Okay.

4   BY MR. STROCHAK:

5   Q.   Mr. Lubin, with that framework now, you were starting to

6   talk about the relationship of the mid-January projections to

7   the cash forecast.

8   A.   Well, the mid-January projections reflected the best

9   information we had at that time, which was that the customers

10  would be looking for an extended PPAP process.   They would

11  require six months' worth of inventory.   In order to do that

12  instead of assumptions we thought was the safe set of

13  assumptions, we did not know how it would all play out, but we

14  made these assumptions for projection purposes.   The assumption

15  was that because the facility is tremendously under utilized

16  right now, we could build the customer requirements, plus the

17  six-month inventory bank in the six-month period -- actually, a

18  five-month period because we assumed we'd be starting in

19  February.   And you can see if you look at the fourth page under

20  tab 5 it shows the Warren, Ohio facility, which is the

21  connector seal facility today.

22          THE COURT:   Just give me a second.

23          THE WITNESS:   Yes, sir.

24              [Pause in the proceedings.]

25          THE COURT:   All right.

Michael Lubin - Direct                    21

1          THE WITNESS:  You can see if you look at that we are

2     building inventory or making sales at a very high rate during

3     this period and then that ceases totally in July.  The

4     assumption was we build that inventory, we would bill it, ship

5     it and bill it in the six-month period and then in July we

6     would commence the process of moving all the operations to the

7     new facilities.  The customer would not need production from

8     the new facility until January because they would have a six-

9     month inventory in their hands to work off.  And then, in

10    effect, we would start building new inventory and making new

11    sales on January 1 the following year.

12         THE COURT:  You're saying your customers have agreed

13    to pay for six months' inventory before they actually need to

14    used it?

15         THE WITNESS:  Well, I would say they have not because

16    they've come back and they've said they're going to do this in

17    a shorter time frame, Your Honor.

18         THE COURT:  They'll do what in a shorter time frame?

19         THE WITNESS:  Your Honor, this was a set of

20    assumptions we made in January before we had customer

21    conversations.

22         THE COURT:  Right.

23         THE WITNESS:  We made the assumption that based upon

24    the typical PPAP process and the number of parts we'd have to

25    qualify that they would want to -- they would need six months'

Michael Lubin - Direct                                      22

1   worth of inventory in order to be able to protect themselves

2   from customer shutdown on their end if we -- until we got the

3   new operations up and running.  We've since had detailed

4   conversations with the customers and each one of them has said,

5   we are not going to do this the same way you were thinking

6   about.  We're going to accelerate the qualification process.

7   It is after all the same mold, same molding press, same

8   supplier, same process.  We should be able to do this in an

9   abbreviated fashion and we're going to do this with a lesser

10  amount of inventory.

11          The inventories that they're looking at are between

12  six to eight weeks on the bottom and four months on the other

13  end and we've told the customers, your contribution to this

14  process is you have to pay for this inventory now, buy it and

15  pay for it now.  That's your protection.

16          THE COURT:  And who said they're willing to pay for

17  it now?

18          THE WITNESS:  Tyco and Mo -- I'm sorry.  Molex and

19  FCI have said they're prepared to pay for it.  Tyco, we

20  believe, is going to say that.  We're going to be sending them

21  contracts within the next couple of days and we believe that

22  this is -- when you look at what all these companies are doing

23  in order to avoid potential problems with their suppliers, what

24  volumes are doing to the automotive supply base, we think this

25  is a very, very modest investment on their part and we think

Michael Lubin - Direct                              23

1   it's extremely viable.  I think they do far more than that all

2   the time.  We're not asking them for price increases.  We're

3   not asking them for substantial loans.  We're saying, you're

4   going to up front now.  It becomes three months.  It will be

5   gone in three months.

6   BY MR. STROCHAK:

7   Q.   Mr. Lubin, what are the circumstances in your

8   understanding that are going on in the industry now that lead

9   you to believe that customers are going to be willing to pay

10  for inventory in advance?

11  A.   Well, obviously none of them wants to pay for more

12  inventory than they have to, but I think they're all looking at

13  potential disasters with their suppliers.  Their suppliers who

14  are highly automotive OEM oriented are dying.  They have

15  tremendous problems.  They're running their facilities, if

16  they're running at all, at very, very low levels of utilization

17  and leaves them in a position where their cash flows are

18  extremely negative.  So their big issue is they need to

19  guarantee that they have supply from reliable suppliers so they

20  will not have a shutdown on the other end.  They won't shut

21  down for GM, Chrysler, Toyota, Honda, any of those people.

22  That's an extremely expensive proposition.

23          THE COURT:  So when you do you believe you'll be able

24  to complete the switch-over from Warren to other facilities?

25          THE WITNESS:  Well, based upon the build we're

Michael Lubin - Direct                          24

1  talking about now, we believe that we will have contracts in

2  place with all these customers that will cover all of this by

3  the middle of next month, probably earlier.  We believe we can

4  build the inventory requirements between now and May.  We will

5  already be moving molding presses because we have more molding

6  presses than we need to set them up in new facilities and we're

7  going to begin -- as we complete the build-up of a particular

8  part, we're going to move the mold that's used to make that

9  part to the new facility and begin the qualification process.

10         But our plan, and we believe it's very viable, is to

11  complete the shutdown of the Warren facility and the entire

12  inventory building by May and to have the new facilities ready

13  to run in full by the end of June.

14         THE COURT:  Go ahead, Mr. Strochak.

15  BY MR. STROCHAK:

16  Q.   Mr. Lubin, what do you see as the execution risks in the

17  plan for consolidating the connector seals business?

18  A.    Well, I would say we have to assure that we're going to

19  have continuing reasonable levels of productivity and

20  reasonable levels of quality of the parts that are being made

21  in buying the facility.  We're dealing with that by providing

22  to the hourly people there a significant incentive.  The

23  ability to make 20 percent incrementally on top of their wages,

24  which would also probably include overtime in a situation where

25  they're looking at not great prospects of new jobs or a

Michael Lubin - Direct                                      25

1  difficult time finding new jobs going forward, so I think

2  they're going to be very interested in that.  Those incentives

3  are based upon their maintaining a level of quality that's

4  consistent with what we have been producing on a continuing

5  basis and producing at a productivity level that guarantees

6  we're going to be able to make some money while we do this and

7  that's being discussed with the union right now.  We have to go

8  through the union.  We don't think there'll be any kind of a

9  problem.  That's one risk.  The other risk is the ability to

10 run these parts in these facilities.  What we've done is we've

11 spoken to seven or eight people who we think are critical to

12 those parts being able to be produced effectively at the new

13 facilities.

14         THE COURT:  Where's the new facility?

15         THE WITNESS:  Well, we'd be moving the largest piece

16 of the production to the Rock Hill facility, which is the

17 medical facility.  We're actually talking, Your Honor, about

18 moving six people -- six salaried people of whom one is the

19 jointly the general manager of the Rock Hill facility and

20 Vienna facility.  And the other people are all going to be

21 replacements for the people who are doing the -- the equivalent

22 job in that facility.  We believe we're going to upgrade the

23 facility and also bring knowledge about these particular parts

24 and how they're run.  So we'll be adding essentially no

25 incremental people on a salary basis to that plant.  That's

Michael Lubin - Direct                              26

1   going to be the bulk of the dollars.  As we see it now, it's

2   going to include Tyco, FCI and Molex and American Izockie

3   [Ph.], who's our fifth largest customer, and a couple of

4   smaller customers.

5           The bulk of the balance, which is essentially the

6   Delphi business and business we have with Federal Mogul [Ph.]

7   and a few other companies would be moving to the Jasper

8   facility, which is the insulator plant.  And then there are

9   just a couple of part numbers that were previously produced in

10  the North Canton facility that would be moved back there and

11  the equipment to --

12          THE COURT:  Moved back where?  I'm sorry.

13          THE WITNESS:  To the North Canton, Ohio facility and

14  that would be -- we wouldn't have to move equipment because we

15  still have our -- we've done [ph.] equipment in the same place.

16  BY MR. STROCHAK:

17  Q.   Mr. Lubin, do you believe it's likely that your customers

18  will seek price concessions in exchange for purchasing, you

19  know, larger than normal inventories up front?

20  A.   We've heard nothing to that effect.  We've told the

21  customers that we're going to be holding prices.  That seems to

22  be their biggest issue.  I think that they're looking at lots

23  of situations now where custom -- suppliers are coming to them

24  and saying, in order to survive I need price increases because

25  the volumes are killing us.  So I think they're very happy with

Michael Lubin - Direct                    27

1   the idea that we're going to be able to do this and turn it

2   into a viable business and be a continuing supplier and hold

3   our prices.

4           THE COURT:  You're going to be building three months'

5   inventory instead of six months' inventory?

6           THE WITNESS:  Right, Your Honor.  So what's happening

7   is the whole thing has been accelerated.  We're going to be

8   producing less in Vienna.  The cash flow from Vienna will be

9   lower.  It will happen -- it will be completed a bit earlier

10  and because the customers want us up and running in the new

11  facilities a bit earlier.  We're spending the dollars that we

12  need to spend on transition; the movement costs are being spent

13  earlier.  We had them built into our forecast in the second

14  half of the year but now the customer said, we want you to

15  start producing in June/July, so we have to spend it before

16  June obviously and that's all built into the numbers.

17          THE COURT:  Well, you have a revised set of forecasts

18  because these forecasts are based on six-month inventory build

19  and the later transition and now you're saying that --

20          THE WITNESS:  We have --

21          THE COURT:  -- that plan has changed.

22          THE WITNESS:  We have not yet completed the financial

23  forecast.  Our financials have stretched a bit thin.  You can

24  imagine.  But the cash forecast reflects this new plan.  It

25  reflects the lower build in the short run; it reflects spending

Michael Lubin - Direct                              28

1   the dollars on the move earlier; and, in addition, it reflects

2   much more conservative assumptions on how we're going to be

3   paid for the inventory and how we're going to ship the

4   inventory, although we believe we're going to --

5          THE COURT:  What do you mean, "more conservative

6   assumptions"?

7          THE WITNESS:  Well, I believe that the cash forecast

8   as of the end of May reflects about a million and a quarter

9   dollars more receivables on the books than were built into this

10  financial forecast because the assumption -- when the

11  controller in that division made the forecast was that we're

12  going to collect it a bit later.  We don't intend to let that

13  happen.  We intend to do better, but he felt to be conservative

14  he wanted to do that.  It reflects that almost $900,000.00 of

15  incremental inventory on the books at the end of that period,

16  but we believe we're going to get that shipped out and billed

17  before the end of June.  So we think there's a fair cushion in

18  there because of these working capital assets that are implied

19  to be on the books and are sitting there and if -- using our

20  cash for a period of time, but we don't expect them to be there

21  or we expect them to be lower.

22         In any case, in the month of June they will be turned

23  into cash.

24  BY MR. STROCHAK:

25  Q.   Mr. Lubin, turn if you would in the debtors' exhibit book

Michael Lubin - Direct                    29

1  to Exhibit 1.   Is this the cash forecast you referenced?

2  A.   Yes, it is.

3          MR. STROCHAK:  Your Honor, we move Exhibit 1 into

4  evidence.

5          THE COURT:  Hearing no objection, Exhibit 1 is in

6  evidence.

7              (Debtors' Exhibit 1 is admitted.)

8  BY MR. STROCHAK:

9  Q.   Mr. Lubin, let me turn to a different topic.

10         THE COURT:  Let me just -- before you go on.

11         MR. STROCHAK:  Sure.

12         THE COURT:  Looking at Exhibit 1 this cash forecast

13  built on the assumption that you're billing out three months of

14  inventory or six months of inventory?

15         THE WITNESS:  Three months, Your Honor.

16         THE COURT:  Okay.  Go ahead.

17  BY MR. STROCHAK:

18  Q.   Mr. Lubin, let's turn to the suggestion that the

19  prepetition lenders have made regarding marketing or sale of

20  some or all of the debtors' businesses.  Has the company

21  evaluated the possibility of selling assets?

22  A.   Well, we believe that we have business units that are

23  extremely viable and are attractive sale candidates.

24  Absolutely.  We think they could be sold now.  They could be

25  sold later.  We don't think that they are diminishing in value.

Michael Lubin - Direct                                    30

1    We think that the -- even -- the core assets are holding their

2    own even in the market that's rather lousy.

3    Q.    Just to be perfectly clear, what do you consider the "core

4    assets"?

5    A.    We're talking about the Rock Hill facility which is

6    prim -- which is today the medical business and we're talking

7    about the Jasper, Georgia facility, which is the ignition wire

8    insulator business, and we believe those are extremely

9    attractive businesses.  We think they could be sold absolutely.

10   They'd be sold for good value.  We don't believe these are the

11   kind of businesses which should be sold in the distress

12   context.  You're talking --

13          THE COURT:  Of course, you're going to move the

14   connector seal business into Rock Hill, it's no longer a stand-

15   alone medical facility, right?

16          THE WITNESS:  I would totally agree, Your Honor, but

17   we believe that because of the type of business that we would

18   have moved and the fact that we would have long-term contracts

19   with respect to that business, we think that any prospective

20   buyer would be very interested in having that business

21   incrementally.  It's very profitable.  It involves proprietary

22   technology that really no one else in the world has to make

23   these kind of parts and it's extremely sophisticated.

24   BY MR. STROCHAK:

25   Q.    Mr. Lubin, is there any reason not to test the market

Michael Lubin - Direct                    31

1   value of the insulators in the medical businesses?

2   A.   We don't think you can test the value.  We think that

3   you -- in order to effectively market a business you have to go

4   out with a clear intention of selling; if you don't and if it's

5   know that, well, this is just testing the waters, a few things

6   are going to happen:  One is that a lot of people will not even

7   bother because why should they, it's just an exercise; number

8   two, if guys do get involved we don't think they're going to

9   give it their best shot because why should they.  They

10  should -- in our minds what they're going to do is say, if I

11  can steal it I'll steal it.  If I can't we'll worry about it

12  later.  I think we're -- we've been in that situation before.

13  I mean, we already looked a bit ridiculous because we had a

14  deal.  We were prepared to accept to sell a medical business

15  and we weren't able to go forward with it.  People -- when

16  people work on a project, people work on an acquisition, they

17  want to know at the end of the day you're selling it.  That's

18  what you're trying to see how rich you are at that time.

19  Q.   The deal you referenced for medical, when did that occur?

20  A.   We had an offer in January of last year and we had to

21  basically walk away from it in late January, early February.

22  Q.   Well --

23  A.   If I -- let me finish.  I started to say before, I think

24  these are not the kinds of businesses you want to sell in

25  distress scenario.  You know, people refer to things like the

Michael Lubin - Direct                    32

1  Delphi exhaust business, a 290 million-dollar business that

2  sold for 17 million dollars.  I don't know the specifics of

3  that, but I would have to guess it's a 290 million-dollar

4  business probably losing a lot of cash flow probably with a

5  sizable balance sheet.  This is a company -- the Rock Hill

6  facility is essentially a five million-dollar balance sheet

7  that has a projectable cash flow of five million dollars plus.

8  You're not looking to get the balance sheet out of that.

9  You're looking to get the maximum value out of the cash flow

10  generation capability of that business and I think that the

11  Chapter 11 context is not the way to do that.

12  Q.   Would a process to either sell the medical business or

13  test the market for it have any implications for the company's

14  ability to continue to grow that business?

15  A.   Well, I'm not going to say customers are going to walk

16  away from the business.  I think what we do is unique enough

17  and difficult enough to do that customers are not going to have

18  the option to move to other suppliers with existing business,

19  but we are working the pipeline.  We have projects in the

20  pipeline that are very significant and I think that's what's

21  going to really hurt.  But people are paying you for your

22  ability to generate profit and your ability to grow that profit

23  by growing sales and I think those pipeline projects are

24  extremely likely to be pulled back because people want to know

25  who's going to own the business, how is it going to be run,

Michael Lubin - Direct                    33

1  when they're putting in important projects with the supplier.

2  Q.   If in several months the company is not able to realize

3  the benefits of the connector seals consolidation do you

4  believe there would beany obstacles at that point to a sale

5  process for medical business or any other piece of the

6  business?

7  A.   Oh, I would say we would still think that a Chapter 11

8  context is not the way to sell those kind of businesses, but I

9  don't see there'd be any issue with selling those.  If there

10  were a few million dollars of connector seal business in one of

11  those plants it certainly wouldn't detract from the value of

12  the medical business if it had a few million dollars of OEM

13  automotive business making a profit.  It can only be an

14  enhancement, but even if it isn't you can always close it down,

15  I suppose, or move it to a -- you can rent a building and move

16  it to another facility if it makes sense.  You can get some

17  knock-out bid on the medical business.  I don't think you'd be

18  precluded from doing that.  I think it would only be a plus to

19  have made this transfer.

20  Q.   Putting aside the core businesses are there any other

21  surplus or extraneous assets that the debtors could sell?

22  A.   Well, we have, I guess, three.  One is a building that is

23  under a lease with an option to buy.  I think the practicality

24  of selling that business because it's under a lease with an

25  option to buy is not very high.  We get paid on the lease.  The

Michael Lubin - Direct                                    34

1   lease return is adequate but I don't think it's practical to

2   sell that.  You have the machining business in Rochester that

3   frankly has been suffering the same way that the connector

4   seals business has because it has a very, very high

5   concentration of automotive OEM.  We've made the same kind of

6   assessment of that business we made with connector seals, but

7   the difference is we have an enormous amount of committed

8   business from customers that should be starting up over this

9   year and next that we think are going to allow that business to

10  grow from under 11 million last year to probably 25 million

11  dollars plus in 2011 and that's going to change that business

12  dramatically.

13       THE COURT:  What's the basis for your optimism?  I

14  mean, that is -- I have to say that I've looked at your

15  projections and based on historical trends I'm wondering how is

16  this possible.

17       THE WITNESS:  Your Honor, we have contracts from a

18  number of customers for these parts.  Why is that happening?  I

19  think honestly we've had promises from customers in the past.

20  We've quoted a lot of business from people who said they wanted

21  to move business from existing suppliers and we've been told

22  we're competitive and they come back to us and they say, oh,

23  we're going to leave them where they are.  And our assumption

24  is that what's happened is existing suppliers have said, well,

25  I don't really like meeting that price but incrementally that

Michael Lubin - Direct                                    35

1   business is something that if I lose it it's going to cost me

2   even more, so I'm going to for the time being continue that

3   volume.  I'll just meet the price.  And what happens at the end

4   of that period is you have all your business price

5   incrementally where you say, well, it's at least contributing a

6   couple dollars to the bottom line.  But when you get done, you

7   still have the overhead of running the facility and you don't

8   make any money, you're losing money.  And you say, why am I

9   doing this.

10          That's changed.  Now we have customers who come to us

11  saying, we need you to do this and we've been given contracts

12  on a number of these parts.  Not 100 percent of the growth, but

13  contracts in which they commit to buy their requirements of a

14  particular part from us and from, I'd say, real customers.  Not

15  people that are fly-by-night and a lot of companies that we

16  think will be long-term survivors.

17          THE COURT:  What's the monthly overhead you

18  anticipate eliminating by consolidating Warren, Ohio with Rock

19  Hill and to some extent Jasper?

20          THE WITNESS:  I don't have a firm number, Your Honor,

21  but I believe it's around $300,000.00.

22          THE COURT:  A month?

23          THE WITNESS:  A month.

24          THE COURT:  And what -- do you own the Warren

25  facility?

Michael Lubin - Direct                         36

1            THE WITNESS:  We do.

2            THE COURT:  And what's your plan?  What are you going

3    to do with it?

4            THE WITNESS:  We are when we get done with it going

5    to put it up for sale.

6            THE COURT:  Go ahead, Mr. Strochak.

7    BY MR. STROCHAK:

8    Q.   Mr. Lubin, let's stick with the topic of forecasting for

9    just a second.  Could you explain how the debtors billed their

10   individual forecasts on a facility-by-facility level?

11   A.   Are we talking cash forecasts or operating P&L fore --

12   Q.   The operating forecast.

13   A.   They're billed facility by facility.  They are based upon

14   detailed projections by part number.  To the extent that

15   customers have input, we rely on customer input, if it makes

16   sense.  We -- to the extent that we're looking at automotive

17   industry forecasts, automotive OEM business, we do two things.

18   One is in our insulator business, we have detailed forecasts of

19   the projected engine builds.  We get a forecast of the entire

20   projected automotive build from a well recognized service.  CSM

21   Worldwide I think is the name of the company.  I think they're

22   considered one of the two top forecasting services.  We used to

23   use JD Power [Ph.] and I think they're the other one and I

24   think they're both in the same class.  We found CSM to be

25   better but we get a forecasted to total auto build.  We then go

Michael Lubin - Direct                              37

1   back to CSM and say because our insulators are related to

2   engines rather than platforms, you may have an engine that goes

3   across several platforms.  We need a forecast of the build by

4   engine type because that -- that engine is what determines

5   which spark plugs, which wiring sys -- which ignition wiring

6   systems and which boots they require.  So we build our forecast

7   based upon that and it's done part number by part number.  To

8   the extent that we don't have that sort of visibility, our

9   connector seals business, for example, the parts are generic.

10  They go across many, many platform types.  You can't tie them

11  to a platform.  Our own customers can't do that because we've

12  asked them to do that, so we do the best we can which is to use

13  the overall build levels and we extrapolate the build levels

14  that are built into the CSM forecast.  With respect to the

15  medical business, we -- to our very best ability we go back to

16  the customers and ask them to detail forecast by part.  In some

17  cases you get very good forecasts or detailed forecasts.  In

18  some cases you don't get anything and all you can do is work

19  with history, but we intend to do it -- to build sales part

20  number by part number based upon the best available information

21  as to what the demand for those parts is going to be.  It's not

22  perfect but we do the best we can.  We think we have a

23  reasonable amount of backup behind that and we think it makes

24  sense.  We then build the expense structure based upon those

25  sales.  We -- our individual operating units determine the

Michael Lubin - Direct                                    38

1  number of people that are required in each department who are

2  going to make the parts necessary to fulfill those sales

3  requirements.   They determine the overhead structure that's

4  necessary and they build the expenses that way based upon the

5  volumes.

6  Q.    Looking at the company as a whole on a consolidated basis

7  over the last three years has the company met its EBITDA

8  forecast?

9  A.    We have not.   We've missed it in some cases by substantial

10 amounts.

11 Q.    What are the circumstances that have resulted in missing

12 the forecasts?

13 A.    Well, I think there have been two major factors.   One is

14 that the automobile decline started in 2006 and I would say

15 it's accelerated beyond anybody -- anybody's projection or

16 expectation.   The forecasting services themselves have reduced

17 their forecast time after time after time sometimes from one

18 month to the next.

19 Q.    Let me stop you right there if I could for just one second

20 and turn, if you would, to Exhibit 9 -- Debtors' Exhibit 9 in

21 the binder.

22 A.    I'm there.

23 Q.    Could you tell me what Exhibit 9 is?

24 A.    I believe this is a history of the forecast that CSM

25 Worldwide produced for the world, not for Lexington but for the

Michael Lubin - Direct                              39

1   world, over the period of time from January '05 through today.

2   And as you can see, they have consistently pulled their numbers

3   down in some cases by dramatic numbers within just short

4   periods of time.  I'm not blaming them but this is the reality

5   of people trying to forecast the automotive OEM business in

6   this world.

7   Q.   The debtors subscribe to the CSM service?

8   A.   We do.

9   Q.   And this is data that CSM provided to the debtors

10  summarized?

11  A.   Yes, it is.

12          MR. STROCHAK:   Thank you.  Your Honor, we offer

13  Exhibit 9.

14          MR. BRACHT:   No objection, Your Honor.  Jerry Bracht.

15          THE COURT:   All right.  Exhibit 9 is admitted in

16  evidence.

17             (Debtors Exhibit 9 is admitted.)

18  BY MR. STROCHAK:

19  Q.   Mr. Lubin, you started to talk about two reasons for

20  missing the forecast.  The first was the auto-build.  What's

21  the second?

22  A.   The second reason I believe is that we have had this

23  continuing overhang of excessive debt, defaults, near defaults,

24  forbearance agreements and I would say we did not know how to

25  make an assessment of the impact of that situation on our

Michael Lubin - Direct                    40

1   customers business they might remove because they are

2   concerned.  We have business units where we are -- we have been

3   at one time well over 50 percent of the market for, let's say,

4   connector seals for automotive wire harnesses and we have

5   customers who are extremely nervous relying on a company that

6   is under forbearance agreement items.  So we've had a lot of

7   situations where we have been promised business but people have

8   ultimately decided not to give it to us.

9          THE COURT:  Do you track your market share?

10         THE WITNESS:  We try, Your Honor.  I don't think we

11  have -- we have a very good handle on where we stand in the

12  insulator business, particularly in the after market.  We don't

13  have that good a handle on the OEM connector seals market

14  because it's right out --

15         THE COURT:  What's happened to your percentage of

16  your -- of the market over the last three years for your

17  products because I understand your point about CSM forecast is

18  the whole industry has declined dramatically and how has

19  your -- how, if at all, has your market share changed over that

20  period?

21         THE WITNESS:  If you look in the automotive segment

22  at all, we believe our market share and after market has gone

23  up by quite a bit through additional product we offer and the

24  fact that customers have tried other suppliers who've offered

25  them bargain prices in some cases and they found out that what

Michael Lubin - Direct                                  41

1  they're getting is bargained parts, parts that don't meet their

2  requirements.

3          THE COURT:  Right.  But what about with respect to

4  the OEM market?

5          THE WITNESS:  In OEM we believe that in the insulator

6  business we pretty much held our share and in the connector

7  seal business we've lost some share, but we don't know exactly

8  how much.

9          THE COURT:  Okay.

10 BY MR. STROCHAK:

11 Q.   Mr. Lubin, what steps have the debtors taken during the

12 course of the Chapter 11 cases to adjust with -- to adjust for,

13 you know, the continuing decline in EBITDA and the company's

14 results and the continuing changes in the -- particularly in

15 the OEM market?

16 A.   I'd say we've made we think very aggressive efforts to

17 bring our costs and our expenditures back in line with our

18 sales levels.  Sales have certainly dropped by more than we

19 anticipated they would.  We believe it's almost 100 percent

20 related to automotive OEM, some that's afflicting everyone, but

21 we've made we think rather substantial efforts to match those

22 with reductions in spending and we believe we've been pretty

23 successful doing that.  We are, for example, running our

24 machining facility essentially 32 hours a week right now.  Our

25 people in that facility are -- our salary people are taking 80

Michael Lubin - Direct                    42

1   percent of their salary.  Our hourly people are working only

2   four days and in some cases three days.  We're making every

3   effort to bring that expense in line.  Our connector seals

4   business we have -- the machine part -- what products is

5   that with respect to?

6         THE WITNESS:  They make parts for -- turn machine

7   parts for primarily the automotive OEM.  They have some

8   industrial business but the bulk of the business right now is

9   automotive OEM, lot for HVAC systems and connections in

10  those --

11        THE COURT:  In what percentage of your overall

12  business is the machine parts?

13        THE WITNESS:  It's probably under 15 percent.

14  BY MR. STROCHAK:

15  Q.   Mr. Lubin, what's been going on particularly in the OEM

16  market in December and January -- December of 2008, January

17  2009?

18  A.   I would say people are not building cars and customers to

19  a very large degree except where they're out of balance are not

20  buying.  They're using their existing inventories.

21        THE COURT:  I know the manufacturers have this

22  lengthy shutdown every holiday.  Did you shut down as well?

23        THE WITNESS:  We shut down -- all but the medical

24  facility was shut down for at least half the month of December.

25  The connector seals business and, as I said, I guess responsive

Michael Lubin - Direct                           43

1    to Mr. Strochak's earlier question that was shut down for three

2    weeks of January and first couple of weeks of February.  We're

3    running a skeleton crew right now and once we get these

4    contracts in place, we're going to run it quite aggressively to

5    build the inventories, but we've taken extended shutdowns.  The

6    insulator business which has suffered to a much lesser extent

7    from some OEM turndown or downturn has also taken aggressive

8    action to reduce costs because their OEM business is right now

9    essentially nonexistent.  It's under five percent of their

10   volume.

11          THE COURT:  And you talked about this before, but

12   when do you anticipate having new contracts in place with

13   respect the connector seals business so you can move forward

14   with consolidation?

15          THE WITNESS:  We believe we'll have them in place by

16   the middle of March.

17          THE COURT:  Thank you.

18   BY MR. STROCHAK:

19   Q.   Let me switch gears a little bit here, Mr. Lubin.  You

20   know, in early January the company made a decision to put off a

21   hearing on the disclosure statement and push off the plan

22   process.  What were the reasons for that?

23   A.   Well, we had reached the point based upon what we were

24   told by Capital One, which is the lender we were working with

25   principally that we concluded the likelihood of having the

Michael Lubin - Direct                    44

1   financing to exit Chapter 11 in the time frame it would be

2   necessary in order to have a viable plan to confirm at the end

3   of February was very, very low and we felt it was unwise to

4   move forward at that point in time.  We believed at that time

5   and we continue to believe that completing this consolidation

6   will have such a significant impact on the ongoing cash flows

7   of the company that it will change the dynamic getting that

8   financing done.  We believe we're going to take a business

9   right now, which as I said is burning $100,000.00 a month in

10  cash and we can move that same business into other facilities

11  and make it into three and a half to five million dollars in

12  cash flow.  It's a very significant swing.

13  Q.   Let me just back up one step and ask you to describe for

14  the Court the history of your dealings with Capital One as a

15  potential exit lender to the company.

16  A.   Well, we started talking to Capital One before we were

17  thinking about even going into Chapter 11.  They made a

18  financing proposal in connection with the sale of --

19  prospective sale of the medical business that we think would

20  have been viable financial proposal.  They made a subsequent

21  financing proposal and we were not in the position of moving

22  forward with the medical sale to finance the business in total

23  assuming we worked out a restructuring of the subordinated debt

24  that we think would have been a viable proposal.  When finally

25  we couldn't come to any agreement on any one of those things we

Michael Lubin - Direct                                45

1  filed Chapter 11 and began to speak to them shortly afterwards

2  and they made us a proposal or perhaps more than one -- I can't

3  keep track at this point -- to finance the business on an

4  ongoing basis as an exit lender.

5  Q.   Did the debtors ever execute any of those proposals?

6  A.   We did not.

7  Q.   What's your understanding of what the proposal means?   Is

8  that something that's a commitment, I guess is my question.

9  A.   It's very far from a commitment.   It's a basis, I think,

10 for the lender to move forward to earn a fee or potentially

11 earn a fee for moving forward with a transaction.   All you're

12 doing by executing the proposal is getting the lender to move

13 forward.   We did not like the idea of committing to pay a fee

14 for a commitment if it came into -- that might ultimately not

15 be the right commitment to fund the plan or reorganization we

16 were going to be working forward on.   But we were able to get

17 them to move forward with their due diligence notwithstanding

18 not signing the letter by agreeing to pay their fees.   And so

19 they -- in my mind, they did everything they would have done if

20 we had executed a proposal letter with our becoming committed

21 to pay them a fee.

22 Q.   When you say you did pay their fees are they referring to

23 out-of-pocket fees or something beyond that?

24 A.   We pay -- they're out-of-pocket expenses.   I'm sorry.   I

25 probably misspoke.   We agreed to pay their out-of-pocket

Michael Lubin - Direct                              46

1  expense of doing the due diligence.  Appraisals, environmental

2  work, current asset audits that are typical for a secured

3  lender.

4  Q.   And did Capital One, in fact, continue to explore the

5  possibility of financing with you?

6  A.   They did and they performed all these due diligence tasks

7  and they have, to my knowledge, gotten pretty far along on that

8  process.

9  Q.   Now, what happened at the end of December to make you

10 reconsider moving forward with the plan process?   In other

11 words, what happened with respect to the exit financing?

12 A.   Well, late December they came to us and told us that they

13 were at this point very unlikely to finance the real estate

14 portion of the company's assets given what's going on in the

15 real estate market generally and they felt that we should go

16 find a real estate lender or some other methodology for

17 financing of real estate.  We felt that was a significant

18 enough portion of the financing that until we had something

19 locked down on that it didn't make any sense to really move

20 forward.

21 Q.   Now, have you had negotiations with any other prospective

22 institutional lenders for an exit facility?

23 A.   We have had negotiations with several others.  We're

24 talking right now with -- I guess they're called Wells Fargo

25 notes.  We always think of as Congress Financial [Ph.], because

Michael Lubin - Direct                                    47

1   they were our lender for many years, but they were acquired by

2   Wachovia which was acquired by Wells and they know a great deal

3   about our company.  We believe we'll be receiving a proposal

4   letter from them within this week.

5   Q.   And what's that belief based on?

6   A.   They've told us that they're preparing a proposal letter.

7            THE COURT:  With or without real estate?

8            THE WITNESS:  Without real estate, no.  We believe

9   they're going to be finance -- interested in financing the

10  current assets and the equipment.

11  BY MR. STROCHAK:

12  Q.   Let me just turn you, if I could, to Exhibit 2 in the

13  debtors binder.  And if you could just tell me what Exhibit 2

14  is.

15  A.   Exhibit 2 is just -- I'm sorry.  I'm in 3.  Exhibit 2 is

16  an email I believe I sent to a lady named Deirdre Martini

17  [Ph.], who is a managing director at Wachovia for the set of

18  financial projections to her and indicating the purpose of

19  this -- I'm sorry.  The format for this was that we were

20  assuming that we would consummate a -- we arranged the real

21  estate portion of the financing based upon the assumption of

22  the sale lease back of four of the properties for their fair

23  market value of 7.4 million dollars.

24  Q.   And Ms. Martini is a representative of Wells Fargo or

25  Wachovia?

                    Michael Lubin - Direct                          48

1   A.   She's the director at Wells Fargo, who is a new business

2   person of Wells Fargo.

3            THE COURT:  She is obviously well known to the Court

4   and most bankruptcy counsel I think in her prior life.

5            MR. STROCHAK:  She is, Your Honor.  Your Honor, we

6   offer Exhibit 2.

7            MR. BRACHT:  No objection.

8            THE COURT:  All right.  Exhibit 2 is in evidence.

9                  (Debtors Exhibit 2 is admitted.)

10  BY MR. STROCHAK:

11  Q.   Mr. Lubin, would you explain?  Are there any other options

12  for financing meeting some or all of the company's needs for

13  financing that you're exploring?

14  A.   Well, I would say we're exploring several alternatives.

15  One is that we are speaking with a company called Icon Capital

16  [Ph.], which does term loans exclusively.  They will lend

17  against complete facilities and they're interested in doing a

18  combination of the real estate and the equipment on the theory

19  that when you have good business and the business produces a

20  lot of cash flow if you ultimately have to sell it the buyer

21  has to pay the loans secured by the facilities because he can't

22  get the business otherwise.  And they're looking at the

23  possibility of doing a combination of real estate and equipment

24  loans.  We are talking to a firm in Chicago called -- I believe

25  it's AIC Ventures -- about the possibility of a sale lease back

Michael Lubin - Direct                                    49

1  along the lines we built in here.  We also have begun

2  conversations with two of our largest customers and our largest

3  supplier about their -- the possibility of their participating

4  with us in what we call the investor loan in our disclosure

5  documents.

6  Q.   Now, what's the investor loan, if you could flesh that out

7  for us.

8  A.   It's right now a rollover of the DIP facility of four

9  million dollars into a second lien facility that would sit

10 underneath the new secured lender but we're looking at the

11 possibility that given the marketplace we will very likely have

12 to raise that amount by some number.  We don't know how much

13 that will turn out to be, but we've begun to speak to people

14 who we think would have an interest in participating in this.

15 I would say no one has said, oh, yes, we're sending you a

16 check, but every one of them have said, yes, we can consider

17 that.  We'd like to know more.

18 Q.   Mr. Lubin, based on the reactions you've had from, you

19 know, all the people you've talken -- spoken with about

20 potentially financing the business do you believe that the

21 debtor's businesses are financable?

22 A.   We do.

23 Q.   Do you believe that they're financable in an amount that

24 will be sufficient to fund the plan of reorganization?

25 A.   Well, we think they are but I guess we don't know.  It's a

                    Michael Lubin - Direct                    50

 1  very unusual market.  It's very, very difficult out there.

 2  What's nice right now is we're speaking to people who are not

 3  banks that have taken TARP money who are trying to find ways to

 4  reduce their portfolios and need some real reason to lend.

 5  They're talking to people, customers and suppliers to whom we

 6  mean something a little bit different because we're critical to

 7  them.  The fact that they're willing to even think about this,

 8  which is a bit unusual, we think is indication that it's in

 9  fact -- we sit in that position relative to them.

10  Q.   Let me turn now to negotiations with the Committee over

11  the restructuring process.  Could you just give us a summary of

12  the latest back and forth with the Committee in terms of trying

13  to negotiate a consensual plan of reorganization?  I think in

14  terms of a time frame probably to update the Court since we

15  were last here in October and the last exclusivity motion.

16  A.   I'd say we've had one or two meetings with the Committee.

17  We've made some proposals to them.  They've made some proposals

18  to us.  Obviously, this is all protected, but I guess we --

19  Q.   Yeah, just to be clear, I'm not asking you to describe the

20  specific proposal, just the process.

21  A.   We -- frankly, we don't believe the proposals we've gotten

22  from the Committee pass the straight face test.  We just don't

23  think that they are in any way advancing the ball.  They're

24  setting the ball further back.  Because we continue to have

25  this enormous difference in valuation, we have requested the

Michael Lubin - Direct                    51

1  Committee to arrange a meeting of both principals and financial

2  advisors to sit down, talk about valuation, look at our

3  valuation which we've given fairly detailed information on to

4  the Committee and we said we'd like to see the equivalent

5  information from your advisors.  We have been told right now

6  they're not prepared to share that and they have declined a

7  meeting.

8  Q.   Let's turn to Exhibit 10, Debtors Exhibit 10, if I could.

9  Mr. Lubin, what is Exhibit 10?

10 A.   This is an email from Mr. Altineau [Ph.] to Bob Welch,

11 who's the chairman of the Committee, and Nick Walsh who I think

12 is the second largest or third largest after ourselves holder

13 of the notes following up a telephone conversation they had the

14 previous day.  And it's another request for a meeting between

15 principals and financial advisors to talk about valuation in

16 the hopes of trying to move the reorganization process forward

17 on a consensual basis.

18         MR. STROCHAK:  Your Honor, we offer Exhibit 10.

19         MR. BRACHT:  No objection, Your Honor.

20         THE COURT:  Exhibit 10 is admitted in evidence.

21             (Debtors Exhibit 10 is admitted.)

22         MR. STROCHAK:  Your Honor, if I could just ask the

23 Court's indulgence for just one minute as I look over my notes.

24         THE COURT:  Sure.

25             [Pause in the proceedings.]

                    Michael Lubin - Cross                          52

1              MR. STROCHAK:  I think I'm through, Your Honor.  I'll

2    pass the witness.

3              THE COURT:  Thank you.  Mr. Bracht, you're going to

4    go next?

5              MR. BRACHT:  Thank you.

6                         CROSS-EXAMINATION

7    BY MR. BRACHT:

8    Q.   Well, Mr. Lubin, we kind of left off talking about the

9    exit financing issue so let me follow-up with that little bit

10   and then we'll go back to some of the other issues.  Recently

11   you had a communication from Cap One regarding their

12   willingness to go forward with respect to consideration of exit

13   financing.  Is that true?

14   A.   You're referring to a letter we received from them that

15   indicated that if we weren't ready to go by March 15, I

16   believe, that they would not be interested in pursuing it?

17   Q.   Yes.

18   A.   Yes, we have.

19   Q.   Okay.

20             MR. BRACHT:  Your Honor, I believe that -- Your

21   Honor, that is Exhibit PP and we would offer Exhibit PP at this

22   time.

23             MR. STROCHAK:  No objection, Your Honor.

24             THE COURT:  Just give me a second.

25             MR. BRACHT:  You're not going to be finished with

Michael Lubin - Cross                                53

1   your --

2           THE COURT:  Just -- I didn't rule yet.  I was getting

3   my papers in order.

4           MR. BRACHT:  I'm sorry, Your Honor.

5           THE COURT:  All right.  Hearing no objection, Exhibit

6   PP is in evidence.

7                   (Committee Exhibit PP is admitted.)

8           THE COURT:  Go ahead, Mr. Bracht.

9   BY MR. BRACHT:

10  Q.   You're not going to be finished with your consolidation

11  effort by March, are you, Mr. Lubin?

12  A.   We are not.

13  Q.   You consider Capital One to be a viable source of exit

14  financing at this point?

15  A.   Well, I would say they are still a possibility based on

16  the conversations we've had with them but I wouldn't say we're

17  counting on them.

18  Q.   You've gotten anything in writing from Cap One that would

19  modify or otherwise --

20  A.   We have not.

21  Q.   -- deflect from Exhibit PP?

22  A.   We have not.

23  Q.   With respect to --

24          THE COURT:  Let me ask.  Did you have discussions

25  with Cap One?  Do they understand your timetable for the

Michael Lubin - Cross                            54

 1 | consolidation?  Do you --

 2 |           THE WITNESS:  They do.

 3 |           THE COURT:  Okay.

 4 |           THE WITNESS:  One could ask what was the purpose of

 5 | that letter when they have no commitment to do anything.

 6 |           THE COURT:  I'll leave that with Mr. Bracht to deal

 7 | with.  I just --

 8 | BY MR. BRACHT:

 9 | Q.   With respect to --

10 |           THE COURT:  Did you understand it as a goodbye

11 | handshake, the letter?

12 |           THE WITNESS:  Well, I would say we weren't pleased to

13 | receive it.  We thought it was sort of remarkable, but I've had

14 | conversations with Mr. Altineau --

15 |           THE COURT:  Well, I'll leave it to Mr. Bracht if he

16 | wants to get into it or not.

17 |           MR. BRACHT:  Thank you, Your Honor.

18 | BY MR. BRACHT:

19 | Q.   Mr. Lubin, let's talk a little bit about your

20 | conversations or your negotiations with Wells Fargo.  As I

21 | understand it, you started talking with Wells Fargo in late

22 | December of 2008.  Is that true, sir?

23 | A.   I think it was probably early December.

24 | Q.   Okay.  You've not received anything of substance in

25 | writing from Wells other than emails, arranging for meetings

Michael Lubin – Cross                                55

1  and discussions.  Is that true?

2  A.   We have not received a proposal from them or commitment

3  from them.

4  Q.   Nothing in writing and nothing concrete?

5  A.   Correct.

6  Q.   You have no meetings scheduled with Wells.  Is that true?

7  A.   We have no meetings scheduled because the next step is

8  that they've indicated to us they're going to be providing us

9  with a proposal letter.

10 Q.   And is that a proposal letter like the one you got from

11 Cap One back in July of 29th of 2008?

12 A.   I don't know what it's going to be.  It won't be a

13 commitment letter, but I don't know what it's going to say.

14 Q.   And you believed you were going to get a proposal letter

15 in the next week or two, correct?

16 A.   Oh, I think we were going to get a proposal letter this

17 week.

18 Q.   This week?

19 A.   This week.

20 Q.   Okay.  So when I took your deposition last week it was "in

21 the next week or two," right?

22 A.   Well, they've spoken to us since then.

23 Q.   Okay.  With respect to AIC Ventures that's our -- yeah.

24 AIC Ventures, is that right?  That's Mr. Dalfitt [Ph.]?

25 A.   Yes.

Michael Lubin - Cross                                        56

1    Q.    And that involves a potential sale lease back on a portion

2    of your assets.  Is that true?

3    A.    That's correct.

4    Q.    You haven't spoken with Mr. Dalfitt in two weeks, have

5    you, sir?

6    A.    That's correct.

7    Q.    You have no proposals or commitments from Mr. Dalfitt?

8    A.    We do not.

9    Q.    And you expect to hear from him within the next one or two

10   weeks, correct?

11   A.    I believe so.

12   Q.    When --

13          THE COURT:  Why do you believe that?

14          THE WITNESS:  Because he's indicated to us that he

15   will be getting back to us with a determination whether they

16   want to go forward or not.

17   BY MR. BRACHT:

18   Q.    With respect to Icon Capital you've had a couple of

19   meetings with Icon Capital, correct?

20   A.    We have.

21   Q.    You've received no proposals or no commitments from Icon

22   Capital?

23   A.    We received a proposal quite some time back, but basically

24   because Capital One indicated an interest in doing the entire

25   facility we sort of dropped it so we've gone back to Icon and

Michael Lubin - Cross                                    57

1   they're reviewing it and we believe we'll hear from them this

2   week as well.

3   Q.   No current proposal --

4   A.   No, sir.

5   Q.   -- regarding the sale of the lease back proposal?  The one

6   you're we're talking about --

7   A.   It would be a sale --

8   Q.   -- was something that was back in the June/July time

9   frame?

10  A.   That's correct.

11  Q.   Okay.  You've got nothing scheduled, no meetings scheduled

12  with Icon Capital.  Is that true?

13  A.   We're expecting to hear from them this week.

14  Q.   Do you have any meetings scheduled with them --

15  A.   No, sir.

16  Q.   -- currently?

17  A.   No, sir.

18  Q.   You've not received anything in writing from them?

19  A.   Correct.

20  Q.   And you think you're going to hear from them within the

21  next week or two, correct?

22  A.   Within this week.

23  Q.   Okay.  Now, you told us that you learned from Cap One in

24  late December that Cap One was no longer interested in lending

25  on the real estate, correct?

Michael Lubin - Cross                                    58

1  A.    That's correct.

2  Q.    You also learned from Cap One on October 22nd of 2008 that

3  Cap One was unwilling to fully underwrite the entire debt

4  facility.  Is that true, sir?

5  A.    I don't remember the date but there was a point in time in

6  there that we did do that.

7  Q.    Okay.  Let's look at my -- look at Exhibit BB.

8  A.    Which book am I in?  Committee's?  Okay.  BB.  Yeah, wrong

9  book.

10  Q.    Mr. Lubin, this is an internal email from Michael Burns --

11  or to Mr. Altineau at Cap One regarding some contacts that you

12  had with Mr. Altineau on October the 22nd or thereabouts.  Is

13  that true?

14  A.    Yeah, I'm not sure that I received this or when I received

15  this.  This an internal email at Capital One.  I'm not sure we

16  ever got this email.  I know we requested at one point in time

17  to authorize them to begin to speak to syndication partners

18  which we had no problem with but I don't know that they ever

19  said to us at this point in time that they would not fully

20  underwrite the facility.

21  Q.    Remember when we talked about this in your deposition?

22  A.    I remember talking about it, but I don't recall the --

23  Q.    Okay.  And at the point in time of the deposition it was

24  Exhibit 19 to the deposition of Mr. Altineau and let me -- I'm

25  going to show you and direct your attention --

                    Michael Lubin - Cross                        59

1              THE COURT:  Go ahead.

2              MR. BRACHT:  You need a copy -- original --

3              THE COURT:  Well, go ahead and let me --

4              THE WITNESS:  I'm not [unintelligible], Your Honor.

5              MR. BRACHT:  Excuse me?

6              THE WITNESS:  I'm not [unintelligible].

7              MR. BRACHT:  Okay.

8   BY MR. BRACHT:

9   Q.   Let me -- you can see here starting on --

10             THE COURT:  Just reference page and line numbers.

11             MR. BRACHT:  Yes, sir.

12  BY MR. BRACHT:

13  Q.   Starting on Page 107, we're talking about Exhibit 19 and

14  we're talking about the conversation that you had with Mr.

15  Altineau that's reflected in Exhibit 19 indicating that you

16  would have no problem with Capital One syndicating the loan,

17  right?

18  A.   Absolutely.

19  Q.   Okay.  And then we go on to talk about Exhibit 19 and I

20  ask you on Page 108, Line 20, I ask you "You see in the next

21  paragraph where Mr. Altineau says the current financing climate

22  is such that if we obtain credit approval on Lexington we would

23  be unwilling to fully underwrite the entire debt facility for

24  Lexington."  And your answer was, "Yeah, you are right.  Then

25  that would be it.  I was only focused on the first paragraph as

Michael Lubin - Cross                    60

1  you asked, but that does not say that.  I would say this is the

2  first time, October 22nd of 2008.  Um-hum."  And I said, "Okay,

3  is that a yes" and you said, "Yes."  Is that -- did I read that

4  correctly, Your Honor -- I mean, Mr. Lubin?

5  A.   Your -- you read very well.  I agree with that but I guess

6  when I look at this email trail, I don't know that we ever

7  received this email.  That's what this email says but this is

8  apparently a letter that Altineau had drafted that he passed

9  around inside Capital One.  When he speaks about "Mike's note

10  below" that's Mike Burns.  That's not Mike Lubin and I'm not

11  sure that we ever got this email.  I know we were requested to

12  give him authorization to begin syndication partners, but I

13  don't think that's the same thing as telling us that they would

14  not underwrite the entire facility.

15        THE COURT:  The email says that "Please review the

16  letter I have drafted below to Mike Lubin."  Did you receive a

17  letter from Mr. Altineau that sets out --

18        THE WITNESS:  Your Honor, I don't remember getting

19  one.  I remember having a conversation in which he asked that

20  we'd authorized him to begin to talk to syndication partners

21  and we said, "Why not?  We have no problem with that.  Why

22  should we make their risk greater?" but I may have received

23  such a letter.  I don't remember getting it but this is all

24  internal.  I guess I got a little confused in deposition.

25        MR. BRACHT:  Your Honor, this is covered in

Michael Lubin - Cross                          61

1  Mr. Altineau's deposition designations to which we have made --

2              THE COURT:  I read it.

3              MR. BRACHT:  And in which he confirmed that there was

4  a conversation not only about syndication but also about the

5  fact that he told Mr. Lubin that they were unwilling to finance

6  100 percent of the debt.  And, Your Honor, in context of our

7  offer with respect to Mr. Altineau's deposition, this is one of

8  the exhibits that we've offered and we would move admission of

9  Exhibit BB at this time.

10             MR. STROCHAK:  Relevance, Your Honor.  It's an

11 internal email.

12             THE COURT:  Did Mr. Altineau communicate to you that

13 Cap One would be unwilling to fully underwrite the entire debt

14 facility for Lexington?

15             THE WITNESS:  Your Honor, it's very possible but I

16 don't recall.  I recall the conversation about authorizing them

17 to speak to syndication partners.  Didn't consider that to be

18 any kind of an issue.

19             THE COURT:  I'm going to sustain the objection for

20 now.  When you offer Mr. Altineau's deposition testimony you

21 will -- do offer it again.

22             MR. BRACHT:  I will.

23 BY MR. BRACHT:

24 Q.   That conversation -- do you agree that that conversation

25 was somewhere around October 22nd of 2008?

Michael Lubin - Cross                                        62

1   A.   I couldn't place it in time.

2   Q.   Okay.  Do you remember that the sec --

3   A.   I wouldn't be surprised at that.

4        THE COURT:  One at a time.  One at a time.

5   Q.   Do you remember that the second exclusivity hearing was on

6   October the 29th of 2008?

7   A.   I don't remember that but I'll take your word for it.

8   Q.   At the second exclusivity hearing you didn't say anything

9   about Capital One's willingness to underwrite the entire amount

10  of the debt, did you?

11  A.   I don't recall.

12  Q.   Okay.  Do you recall what you did tell us --

13  A.   I don't --

14  Q.   -- about exit financing with Capital One during that

15  hearing?

16  A.   I don't recall that, no.

17       MR. BRACHT:  Your Honor, I have Page 80 of the

18  transcript of the October 29th hearing.

19       THE COURT:  You can either use it to refresh his

20  recollection or you can do what you -- are you offering the

21  testimony?  What -- tell me what you're doing.

22       MR. BRACHT:  I want to refresh his recollection.

23       THE COURT:  Go ahead.

24       MR. BRACHT:  But I thought I put it on the --

25       THE COURT:  I put it on the screen.

Michael Lubin - Cross                                    63

1          MR. BRACHT:  -- the screen.

2          THE COURT:  Let me switch over.  Did -- is your

3    monitor turned on?

4          THE WITNESS:  No.

5          THE COURT:  It needs to face you.

6    BY MR. BRACHT:

7    Q.   Okay.  Do you see it there, Mr. Lubin?  Can you see the

8    page?

9    A.   I can see part of it, yeah.

10   Q.   At the very --

11         THE COURT:  Just tell me what page that is again.

12         MR. BRACHT:  Excuse me.

13         THE COURT:  What page is that?

14         MR. BRACHT:  Page 80, Line -- starting at Line 1,

15   Your Honor.

16         THE COURT:  Thank you.

17   BY MR. BRACHT:

18   Q.   And at the very top of the page, Mr. Lubin, I asked you --

19   you had previously testified about an inventory issue

20   concerning the Cap One financing and I asked you just a couple

21   of questions about this inventory issue.  I mean, you're not

22   suggesting that you're million dollars apart with Capital One

23   and that if you bridge that gap that you're going to get your

24   exit financing and your answer was "We believe we will."  Did I

25   read that correct?

Michael Lubin - Cross                                   64

1   A.    That's correct.

2   Q.    So at the time of the hearing it was your belief that you

3   were a million dollars apart with Capital One.  Is that true?

4   A.    That's correct.

5   Q.    Did you ever learn subsequent to October 29th just how

6   much Capital One was willing to fund with respect to exit

7   financing?

8   A.    With respect to?

9   Q.    The exit financing.

10  A.    Not from Capital One.

11  Q.    Well, did you -- how did you learn?

12  A.    Someone showed me an exhibit of a -- of some internal work

13  that Capital One had prepared but I don't recall specifically

14  getting an indication from them how much they would lend and

15  not lend.

16  Q.    Your testimony is is that they never told you that you --

17  that they were not willing to lend you 100 percent of the

18  amount of the exit finance that you had -- that you needed?

19  A.    Well, they told us -- in late December they told us they

20  would not do the real estate portion.

21  Q.    Okay.  Other than the July 29th proposal that you did not

22  sign you never got another proposal with respect to exit

23  financing that was signed by Mr. Altineau, did you?

24  A.    I don't recall, but that's very possible.

25  Q.    Let's turn to your consolidation plan.  Let's talk about

Michael Lubin - Cross                                    65

1  that for a minute.  I just want to make sure that we -- I want

2  to talk about the facts.  Okay.  I don't want to talk about

3  what you believe or what you think.  I want you to tell me

4  factually where you are with respect to your consolidation

5  plan.  As I understand it, there are several contingencies, one

6  of which is you have to have contracts, written contracts with

7  your customers, right?

8  A.   That's our requirement.

9  Q.   Right.  That's your requirement.  And if you don't get

10 those written requirements -- written contracts you're not

11 going to do this, are you?

12 A.   That's correct.

13 Q.   Okay.  And you actually need two contracts from your

14 customers, don't you?

15 A.   That's correct.

16 Q.   Both in writing, one for this inventory build-up that you

17 described and their commitment to purchase that inventory --

18 A.   That's correct.

19 Q.   -- ahead of time.

20 A.   That's correct.

21 Q.   You're not going to start building the inventory up until

22 they agree to purchase it and pay for it, right?

23 A.   That's correct.

24 Q.   The second contract that you need is a long-term contract

25 with these customers, right?

Michael Lubin - Cross                                    66

1    A.    Correct.

2    Q.    And you're looking for a long-term contract in writing

3    that goes through 2012, correct?

4    A.    That's right.

5    Q.    And if you don't get those long-term contracts from your

6    customers you're not going to do their part, correct?

7    A.    That's correct.

8    Q.    Because you're not going to incur the expense and the

9    problems of moving these molds and moving this equipment until

10   you have a long-term commitment from your customers for

11   connector seals that runs through 2012.

12   A.    That's correct.

13   Q.    With respect to the inventory build-up you've said that

14   you're expecting a three-month build-up of inventory for your

15   larger customers, correct?

16   A.    For the larger parts for our larger customers.

17   Q.    Okay.

18   A.    That's correct.

19   Q.    And the forecast that you have given that's in January as

20   we have seen that forecast was based on a six-month build-up,

21   was it not?

22   A.    That's correct.

23   Q.    A six-month build-up of customers with signed contracts

24   paying for all of that inventory up front?

25   A.    That's correct.

Michael Lubin - Cross                              67

1            THE COURT:  I thought the cash forecast was based on

2    three months, not six months.

3            THE WITNESS:  It was, Your Honor.  I think he's

4    referring to the financial forecast.

5            THE COURT:  All right.

6    BY MR. BRACHT:

7    Q.   And you talked about the larger customers but with respect

8    to the smaller customers that you have, which are customers

9    below a certain level of volume, you're requiring those

10   customers to commit to a 12-month inventory build-up, correct?

11   A.   That's not correct.

12   Q.   Excuse me?

13   A.   That's not correct.

14   Q.   Is it not correct?

15   A.   No.  We made an assumption that we would only keep a

16   portion of the business and that the smaller customers want

17   more inventory.  We made an assumption that they would want 12

18   months, but we'll build what they need.  We made the assumption

19   they would move parts to other suppliers, which would require a

20   much, much more lengthy and detailed qualification process.

21   Q.   Well, clarify for me, Mr. Lubin.  Are you going to request

22   a 12-month inventory build-up for your smaller customers?

23   A.   No.

24           THE COURT:  What percentage of your connector seal

25   business is from your four large -- you'd say the four large

Michael Lubin - Cross                                    68

1   customers?

2           THE WITNESS:  I would say, Your Honor, it's over 80

3   percent of the business.

4           THE COURT:  And those are the customers that you want

5   the long-term contracts with?

6           THE WITNESS:  I would say any parts that we're going

7   to move to the new facility we're going to require contracts.

8   There's no point in spending the money to move these other --

9   go through the qualification process, move the molds, move the

10  presses, and then have the customer say, oh, I've decided to

11  resource it.  I think on the flip side the customers always

12  want some continuity.  They're very nervous people in the

13  automotive industry because they're afraid their entire supply

14  base could fall apart.

15  BY MR. BRACHT:

16  Q.  Are you going to be asking your small volume customers for

17  any commitment whatsoever with respect to inventory build-up?

18  A.  We're going to ask them to commit to whatever they think

19  they need to cushion them in the interim.  We'd assume they'll

20  be looking for the same kind of volume.

21  Q.  You've assumed for purposes of planning that that would be

22  a 12-month commitment, correct?

23  A.  No.  Smaller customers -- I believe we -- well, actually

24  I'm not sure we've assumed -- we've assumed for the financial

25  forecast that those customers would not move.  That's not the

Michael Lubin - Cross                                    69

1    way it appears now based on conver --

2              THE COURT:  What do you mean, "would not move"?

3              THE WITNESS:  That -- that's a bit confusing.  I

4    agree.  We've assumed that the smaller customers would not move

5    the parts to our other facilities.  They would resource them.

6    What we're getting back from those customers is exactly the

7    opposite that they want to seem to stay with us.  So we're

8    going to ask them to do the same thing.  You may be getting a

9    little confused between low volume parts and low volume

10   customers.  Mr. Bracht, I'm not trying to be obtuse here, but

11   we've told the customers that because of the number of PPAPs

12   that are going to be required or the number of qualifications

13   and we have over 500 part numbers, which probably encompasses

14   something like 600 molds, we've told them that the practicality

15   is that we -- we can take the higher volume parts, which we're

16   measuring at $15,000.00 a year or more in volume, and that

17   we'll build whatever they see as a necessary bank to get them

18   through the qualification process on the assumption that we

19   will qualify those molds as quickly as we can.

20             What they're telling us now is between six to eight

21   weeks is the low end and four months on the high end and we're

22   estimating that to roughly be three months.  We've also told

23   them that on the smaller volume parts we do not intend to begin

24   qualification until later.  These don't amount to a huge amount

25   of dollars but the practicality of getting this much paperwork

Michael Lubin - Cross                                    70

1   done in, let's say, the three-month period is very, very low.

2   So we've told them they have to buy a longer period of time if

3   they want to have supply.  If they want to move the parts to

4   another supplier they can do that but if they want to be

5   supplied by us, we've suggested to them they have to buy a

6   year's worth of inventory on those smaller volume parts.  It

7   doesn't amount to a lot of dollars but this may be what you're

8   getting confused in.

9           MR. BRACHT:  All right.  Well, thank you for

10  correcting me.

11  BY MR. BRACHT:

12  Q.   So it's with respect to the lower volume parts that you're

13  requesting a 12-month inventory build-up?

14  A.   Right.  And the financial forecast actually assumes that

15  those parts would never go back into production in our plants

16  again.  Again, that's not the way it's looking.

17  Q.   And just --

18          THE COURT:  There's a cost to you in moving those

19  low-volume parts production to the other facilities?

20          THE WITNESS:  There is, Your Honor.  It's not an

21  enormous cost but there is a cost.  And again, we would re --

22  if they wanted us to continue to make the parts we'd require

23  them to sign a contract for them because why do it?  Again, the

24  financial forecast was built on the assumption that we would

25  not be continuing to make those parts, but I think we have

Michael Lubin - Cross                              71

1   roughly 80 percent of the business staying with us and 20

2   percent of it going away.  A bit chunk of that is the smaller

3   volume parts.  It doesn't appear that way.  It appears they're

4   going to want us to keep all of those parts and move them to

5   new facilities.

6   BY MR. BRACHT:

7   Q.   Just to be clear, Mr. Lubin, isn't it true that as we

8   speak that none of your customers have committed to anything?

9   A.   That is correct.

10  Q.   And isn't it further true that as we speak the customers

11  have not seen the contracts that you are proposing that they

12  agree to?

13  A.   Two of them have actually seen the contracts and are

14  reviewing them.  The others have not but I would say the others

15  are looking at -- with the exception of the transition

16  agreement, which we've described to them in our initial

17  conversations the long-term contracts are an exact duplicate of

18  the existing contracts they have and the pricing is an exact

19  duplicate of the existing contracts they have.  The Delphi

20  contract is simply an extension of the existing Delphi contract

21  on fundamentally the same terms.  The Tyco contract is an

22  extension of a contract -- actually, it's a renewal of a

23  contract that we had in place before.

24         MR. BRACHT:  Your Honor, I've been patient.  I want

25  to object to the last part of this question as nonresponsive.

Michael Lubin - Cross                               72

1          THE COURT:  Just ask another question.  I thought it

2   was responsive.  Go ahead.

3          MR. BRACHT:  My question was, Your Honor, that the

4   customers have not seen the contracts.

5          THE COURT:  He said two of them have.

6          MR. BRACHT:  Two of them had and then he went on to

7   explain all this other stuff about --

8          THE COURT:  Ask your next question.

9          MR. BRACHT:  -- what he thinks and what he believes.

10         THE COURT:  Ask your next question, Mr. Bracht.

11  BY MR. BRACHT:

12  Q.   You indicated that two of your customers have actually

13  seen the contracts, correct?

14  A.   That's correct.

15         THE COURT:  And we'll move faster if you confine

16  yourself to Mr. Bracht's questions.  Mr. Strochak has more

17  questions after.  He'll --

18         THE WITNESS:  I'll do my best, Your Honor.

19         THE COURT:  Go ahead, Mr. Bracht.

20  BY MR. BRACHT:

21  Q.   And I assume then that those customers got those contracts

22  sometime within the last week after I took your deposition?

23  A.   Correct.

24  Q.   Another contingency with respect to this consolidation is

25  that you need to prepare the facilities for receiving the

Michael Lubin - Cross                                73

1   equipment and the molds, right?

2   A.   Correct.

3   Q.   Now, you indicated earlier that your moving parts took

4   three facilities:  Rock Hill, that's in South Carolina, right?

5   A.   Correct.

6   Q.   That's going to take about 60 percent of the Vienna

7   production?

8   A.   I believe that's right.

9   Q.   And then 30 percent is going to Jasper and that's in

10   Georgia, correct?

11   A.   Correct.

12   Q.   And then there's 10 percent that's going back to North

13   Canton, right?

14   A.   Correct.

15   Q.   And that's the liquid silicon rubber business, right?

16   A.   Correct.

17   Q.   And that's the same business that you moved from North

18   Canton to Vienna within the last year or so in order to

19   eliminate overhead at North Canton, correct?

20   A.   That is correct.

21   Q.   So you're moving it right back within a year?

22   A.   That's correct.

23   Q.   Okay.  You have not moved equipment from Vienna to Rock

24   Hill as we speak, have you, sir?

25   A.   We've actually moved quite a lot of equipment to Rock

Michael Lubin - Cross                    74

1   Hill, but it's equipment that's being used in the medical

2   business right now.

3   Q.   All right.  So let's talk about the equipment that's going

4   to be used for this consolidation of the connector seals.

5   You've not moved any of that equipment to Rock Hill as we

6   speak, right?

7   A.   We have not.

8   Q.   And you do not anticipate moving that equipment until

9   April at the earliest.  Is that correct?

10  A.   We expect to start moving in April.

11  Q.   All right.  And that's because the space where you're

12  going to be putting the connector seals production is being

13  used by medical because of the fire that you had in the other

14  facility?

15  A.   That is correct.

16  Q.   And --

17  A.   But actually what that means is the facility was

18  substantially prepared.  Moving the equipment is a very modest

19  undertaking, not difficult to do.  The bigger issue is you have

20  to have the utilities and the other key hookups to have the

21  equipment function.  A lot of that work was already done

22  because that building was prepared to move presses in to run

23  the medical parts while the clean room and the other building

24  was being reconstructed.

25          MR. BRACHT:  Objection.  Nonresponsive, Your Honor.

Michael Lubin - Cross                                   75

1          THE COURT:  Overruled.

2    BY MR. BRACHT:

3    Q.    And isn't it true that the work at the Jasper facility

4    has not started yet?

5    A.    That's correct.  It's been quoted; not started yet.

6    Q.    You need to convince key people at Vienna to move,

7    correct?

8    A.    That's correct.

9    Q.    You need to convince those people to move from Ohio to

10   Georgia or to South Carolina, correct?

11   A.    Two people to Georgia and I believe it's six people to

12   South Carolina.

13   Q.    Have you included any incentive package with respect to

14   those people?

15   A.    We have not.

16   Q.    All right.  Now, you are proposing an incentive plan for

17   the people remaining behind at Vienna, correct?

18   A.    Well, everybody who is working on the Vienna wind-down

19   will have an incentive package both the hourly and the

20   salaried.

21   Q.    Right.  And that --

22   A.    So there is that incentive program for the people who

23   would be moving while they're working on that transition.

24   Q.    And that's so you can ensure you need that plan because

25   you need to make sure that those people are going to hang on

Michael Lubin - Cross                          76

1   and you're not going to have an interruption in production.   Is

2   that true?

3   A.    Correct.

4   Q.    And that incentive plan needs to be approved by the union,

5   correct?

6   A.    That's correct.

7   Q.    And that's not happened yet, has it?

8   A.    Not happened yet.

9   Q.    You mentioned earlier in your testimony, and I wrote it

10  down I think, you talked about the continual overhang of

11  defaults, near defaults and forbearance agreements that have

12  been a part of this company, correct?

13  A.    Correct.

14  Q.    And that has not been of recent origin, has it?

15  A.    It's gone back quite a ways.

16  Q.    It's gone on for at least back into the late '80s?

17  A.    I don't think that's correct.

18  Q.    Early '90s?

19  A.    I think around 2000.

20  Q.    Okay.  Well, let's talk about that.  Do you recall that

21  the sub debt, as you put it, is a residue of a 50 to 60 million

22  dollar junk bond issue that you had Blasius Industries [Ph.]

23  issue back in the '87 time period?

24  A.    I do.

25  Q.    And Blasius Industries was a -- was the predecessor name

Michael Lubin - Cross                                    77

1   of Lexington Precision?

2   A.   Correct.

3   Q.   And do you recall that after that issue of junk bonds that

4   the company had problems with making payments on those junk

5   bonds?

6   A.   I'm certainly recalling late 2000 those bonds matured and

7   we thought they were going to be refinanced but the market

8   collapsed on us and we didn't do that, didn't complete that

9   refinancing.

10  Q.   My question, sir, is do you recall that you had problems

11  making payments on those junk bonds?

12  A.   I recall at that time, yeah.

13  Q.   And do you recall that you missed a payment on a

14  subsequent reissue of the sub debt as well?

15  A.   I don't have recollection of that.

16  Q.   Okay.  Do you recall that the sub debt was initially

17  refinanced in the mid-'90s?

18  A.   I do recall that, yes.

19  Q.    Okay.

20  A.   I think that's right.

21  Q.   And then in 1999 you were prepared and preparing to

22  refinance all of your debt at that point in time, correct?

23  A.   That's correct.

24  Q.   And it took you four years to get that done, correct?

25  A.   That's correct.

Michael Lubin - Cross                                    78

1  Q.   And during that period of time you were paying lenders to

2  extend due dates on the loans that were outstanding.  Were you

3  not, sir?

4  A.   I don't believe we were.

5  Q.   Let's look at Exhibit QQ.  Do you recognize Exhibit QQ?

6  A.   Looks like a set of board minutes from 2005.

7  Q.   I'm sorry.  I got you in the wrong spot.  I want you to

8  look at Exhibit -- it's the 10,000 -- it's the 2003 10K.

9  Exhibit L.

10 A.   Okay.

11 Q.   Do you recognize Exhibit L?

12 A.   Looks like our 10K from 2003.

13          MR. BRACHT:  Your Honor, I would move admission of

14 Exhibit L.

15          THE COURT:  Exhibit L is in evidence.

16               (Committee Exhibit L is admitted.)

17 BY MR. BRACHT:

18 Q.   If you look at Page 18 of Exhibit L, Mr. Lubin, up at the

19 top where it says, "Interest Expense," the last part of that

20 last sentence refers to "Fees being paid during 2003 to lenders

21 providing loans under our revolving line of credit to extend

22 the expiration date of the revolving line of credit beyond its

23 scheduled due dates."  Do you recall that, sir?

24          MR. STROCHAK:  Your Honor, objection.  Relevance

25 grounds.

Michael Lubin - Cross                                79

1          THE COURT:  Overruled.  Overruled.

2          THE WITNESS:  I think I do.  I don't recall it

3    specifically, but --

4    BY MR. BRACHT:

5    Q.   And that was --

6    A.   -- it makes sense to me.

7    Q.   That was to prevent a default, wasn't it?

8    A.   No, that was to prevent having no revolving line of credit

9    because the revolving line of credit by its terms expired on

10   that date and like any other lender in order to extend a new

11   line of credit, the lender asked for a fee.

12   Q.   The restructure in 2003 that you did with respect to all

13   your debt included the sub debt that we're talking about today,

14   is that right?

15   A.   That's correct.

16   Q.   In 2004 it's my understanding that Lexington borrowed an

17   additional seven million dollars with an increasing rate note

18   for additional liquidity.  Is that true, sir?

19   A.   I don't recall the amount, but I recall a loan of that

20   type.

21   Q.   Okay.  And it was for additional liquidity, was it not?

22   A.   I think so.

23   Q.   And isn't it true that as early as 2005 that your auditors

24   expressed substantial doubt about the company's ability to

25   continue as a going concern?

Michael Lubin - Cross                                      80

1  A.   I think perhaps earlier than that as long as you have

2  defaults or anything of that type hanging over you.  That's

3  generally the position the order to take.

4  Q.   And carrying forward to kind of where we are today, you

5  refinanced your secured debt in 2006.  Is that correct?

6  A.   That's correct.

7  Q.   You missed a payment on the sub debt in November of 2006

8  and that puts you in default on both the secured debt and the

9  sub debt and here we are today.

10 A.   That's correct.

11 Q.   In addition to the financial issues that you've been

12 dealing with for at least until or from the year 2000 you've

13 also been dealing with operational issues with respect to this

14 company for a long time.  Haven't you, sir?

15 A.   We've had some.

16 Q.   From 1999 at least to the present your EBITDA numbers and

17 your sales numbers have consistently gone down almost every

18 year, year over year, correct?

19 A.   I don't know that's the case.  I think certainly we would

20 want to take a look at the pieces because there's some pieces

21 of this business that contributed very negative numbers --

22           THE COURT:  Mr. Lubin, we'll speed this along --

23           THE WITNESS:  Okay.

24           THE COURT:  -- if you just try and answer

25 Mr. Bracht's questions.

Michael Lubin - Cross                                    81

1              THE WITNESS:  I --

2              THE COURT:  If Mr. Strochak wants to elicit more t

3    testimony, he'll be able to do it but you listen carefully to

4    Mr. Bracht's questions and just answer --

5              THE WITNESS:  I don't --

6              THE COURT:  If you can't answer it, you'll just say

7    you can't answer it.

8              THE WITNESS:  I -- it's possible, Your Honor.  I

9    don't recall the specifics.

10             THE COURT:  Ask your next question, Mr. Bracht.

11             MR. BRACHT:  Well, Your Honor, excuse me.

12   BY MR. BRACHT:

13   Q.   Mr. Lubin, we talked about this in your deposition, didn't

14   we?  Do you recall that, sir?

15   A.   I recall that you talked about it, yes.

16   Q.   And you recall me showing your 10K numbers from 1999

17   through 2007, correct?

18   A.   I -- yes, I recall that.  I don't remember --

19   Q.   And do you recall that --

20   A.   -- the specific numbers, but --

21   Q.   -- in every --

22             THE COURT:  One at a time.  One at a time.

23   Q.   Do you recall that in every year that those numbers went

24   down maybe with the exception of one?

25   A.   That's possible.  I don't remember the specifics.

Michael Lubin - Cross                                      82

1              MR. BRACHT:  Well --

2              THE COURT:  I guess you're going to have to do it the

3     hard way.

4              MR. BRACHT:  I'm sorry?

5              THE COURT:  I guess you're going to have to do it the

6     hard way.

7              MR. BRACHT:  I'm afraid so, Your Honor.

8              THE COURT:  Let's go back to --

9              MR. STROCHAK:  I would say the proper way, Your

10    Honor.

11             THE COURT:  What I think he was doing was proper.  He

12    got an answer from the witness.  If he wants to explore it

13    further, go ahead and explore it further.

14             THE WITNESS:  Well --

15             THE COURT:  You want to just show him his testimony

16    and maybe short circuit this or --

17             MR. BRACHT:  Okay.

18             THE COURT:  If you've got -- you know, I'll let you

19    do it any way you want, Mr. Bracht, but if you want to show

20    them -- if you did --

21             MR. BRACHT:  What I want and what --

22             THE COURT:  -- this in his deposition and you got the

23    answers you wanted do that.

24             MR. BRACHT:  All right.

25             THE COURT:  But if you want to go through each of the

Michael Lubin - Cross                                        83

1   reports, do that.

2          MR. BRACHT:  I did want to in this context introduce

3   Exhibit P, which is the 2007 10K because it contains the

4   numbers from like 2003 forward.

5          THE COURT:  Any objection to Exhibit P, Mr. Strochak?

6          MR. STROCHAK:  No, Your Honor.

7          THE COURT:  All right.  Exhibit P is in evidence.

8              (Committee Exhibit P is admitted.)

9          MR. BRACHT:  All right.

10         THE COURT:  All right.  Before you go on let me just

11  say this testimony is certainly proceeding more slowly than I

12  anticipate.  That's not intended as a reflection on the part of

13  counsel.  We're going to go until 12:30.  We're going to take a

14  relatively short lunch break till 1:30.  We can resume at 1:30.

15  I need to stop today at 5:00.  We'll resume.  We'll see where

16  we are at 5:00.  We may resume earlier tomorrow morning at

17  10:00.  We'll see where we are in the evidence, but for now

18  Exhibit P is in evidence.

19         THE WITNESS:  Your Honor, maybe I can save some time.

20  I certainly remember the questioning.  I certainly remember

21  that by and large the [unintelligible] EBITDA declined over

22  this period of time.  I don't remember the specifics and maybe

23  that's good enough or maybe not.

24         MR. BRACHT:  Well, let's just put a bow on it.  Let

25  me show you Page 71 of your deposition --

Michael Lubin - Cross                                    84

1              THE COURT:  Why don't you put it up on the screen?

2              MR. BRACHT:  Okay.

3              THE COURT:  That way we'll all be able to look at

4     it --

5              MR. BRACHT:  All right.  I --

6              THE COURT:  -- at the same time.  Okay?  That's why

7     we turned on the projector today.

8              MR. BRACHT:  I just never can seem to get it

9     straight.

10             THE COURT:  Just have it facing you.

11             MR. BRACHT:  All right.

12             THE COURT:  And if it all doesn't show on there,

13    just there's a button on the side to zoom.  You want to -- if

14    you need to you can zoom or you can -- there you go.  And

15    there's a focus button if you have -- just --

16             MR. BRACHT:  Okay.

17    BY MR. BRACHT:

18    Q.   I think we can get it, Mr. Lubin.  And you can see on Page

19    71 that I asked you about how net sales and EBITDA has

20    decreased basically every year since 1999 forward.  And you're

21    looking at the 2003 10K, which is Exhibit L, and you say, "I'm

22    looking at 1999 through 2003 and our sale of that period, sales

23    in total decreased in EBITDA."  Read that correctly, sir?

24    A.   You did.

25    Q.   Then we go to Exhibit 32 of your deposition, which is a

                    Michael Lubin - Cross                          85

1   2007 10K which is Exhibit P for this hearing and I ask you to

2   look at the EBITDA numbers and sales numbers from 2003 through

3   2007 and ask you the same question and you say, "Yes.  The

4   EBITDA declined each year and sales declined each year."  And

5   then you correct yourself and you say, "Each year but 2000

6   [unintelligible] -- 2000 to 2007 [unintelligible] plat of" --

7   A.   Yeah, that's not shown on the screen, but --

8           THE COURT:  You just need to move there.  Okay.  Does

9   that refresh your recollection, Mr. Lubin?

10          THE WITNESS:  It does.

11          THE COURT:  Okay.

12  BY MR. BRACHT:

13  Q.   Now, I want to talk with you about this in kind of a

14  bigger picture with respect to this consolidation issue.

15  Lexington has been shutting down and consolidating its

16  businesses since at least 2002.  Is that true, sir?

17  A.   Certain of them, yes.

18  Q.   2002 you closed your Arizona plant, which was part of the

19  metals business and you moved that certain business and

20  equipment from Arizona to your Rochester, New York facility.

21  Is that true, sir?

22  A.   We moved the equipment.  We moved very little business but

23  we moved the bulk of the equipment.

24  Q.   And do you recall that the transfer of that business and

25  the consolidation of that equipment with Rochester caused

Michael Lubin – Cross                                    86

1  excess costs and production?

2  A.    Excess costs and production where?  I don't --

3  Q.    At Rochester.

4  A.    I don't recall it causing excess costs in Rochester.

5  Q.    Let's look at the 2003 10K again, which is Exhibit 11.

6  A.    Exhibit L?

7           THE COURT:  L.

8           THE WITNESS:  L.

9           THE COURT:  It's Exhibit L, Mr. Bracht.

10          MR. BRACHT:  Exhibit L.  Excuse me.

11 BY MR. BRACHT:

12 Q.    Are you there, Mr. Lubin?

13 A.    I am.

14 Q.    And if you look --

15 A.    But I don't know where, though.

16 Q.    -- at Page 16 you'll see down at the bottom that there is

17 an explanation of the increase in the costs of sales as a

18 percentage of net sales.  Do you see that, sir?

19 A.    Yes.

20 Q.    And part of that was caused, according to your 10K, "by

21 excess costs and production inefficiencies caused by the

22 transfer of certain business and equipment from Arizona to the

23 Rochester, New York facility."

24 A.    Yeah, I don't know that that speaks to --

25 Q.    Did I read that correctly?

                    Michael Lubin - Cross                        87

1  A.    I -- you did.  I don't know that that speaks to --

2              THE COURT:  I think you've answered his question.

3              THE WITNESS:  -- the Rochester facility.

4              THE COURT:  I think you answered his question.  Go

5  ahead, Mr. Bracht.

6  BY MR. BRACHT:

7  Q.    So that was a consolidation that at least according to

8  your 10K caused you some increased costs and inefficiencies.

9  Now, it's true, is it not, that a year later or your -- a

10 couple years later in 2004 that Lexington decided to

11 discontinue its die casting business?

12 A.    That's correct.

13 Q.    And that was accomplished in 2005?

14 A.    That's correct.

15 Q.    And then also in 2004 Lexington started to restructure its

16 connector seals business, correct?

17 A.    That's correct.

18 Q.    And part of that restructuring included closing the

19 LaGrange, Georgia facility, right?

20 A.    That's correct.

21 Q.    And the LaGrange, Georgia facility was a facility that was

22 dedicated to the production of connector seals, was it not?

23 A.    Primarily.

24 Q.    And the tooling and equipment that was in LaGrange,

25 Georgia, was transferred and consolidated in Vienna, was it

Michael Lubin - Cross                    88

1  not?

2  A.   The portion of that business that was continuing, yes.

3  Q.   And isn't it true that the LaGrange consolidation led to

4  increased expenses and production and efficiencies?

5  A.   It's possible but the question is where.

6  Q.   Well, let's look at Exhibit N, which is the 2005 10K.

7        MR. BRACHT:  And if you would, Your Honor, I would

8  offer Exhibit N.

9        MR. STROCHAK:  No objection subject to the relevance

10  tie-up.

11        THE COURT:  Exhibit N is admitted in evidence.

12           (Committee Exhibit N is admitted.)

13        THE COURT:  I don't know what your subject to the

14  tie-up is.  I've admitted the exhibit as in evidence.  If

15  you've got an objection, you'd better be more specific about

16  it.

17  BY MR. BRACHT:

18  Q.   And if you turn, Mr. Lubin, to Page 15 of Exhibit N and

19  the second paragraph from the bottom and, again, you have:

20        "The 10K explains how your cost of sales as a percentage

21        of net sales has increased to 88 percent during 2005 and

22        one of those reasons listed were expenses and production

23        inefficiencies resulting from the closing of the LaGrange,

24        Georgia facility in the relocation of tooling and

25        equipment from the LaGrange facility to our connector

Michael Lubin - Cross                          89

1   seals facility in Vienna."

2  Did I read that correctly?

3  A.   You did.

4  Q.   And we talked already about the fact that also as a part

5  of this restructuring that the LSR business, which is a part of

6  the connector seals, right, that was moved from North Canton to

7  Vienna as well.  Right?

8  A.   That's like part of the same restructuring but, yes, it

9  was moved.

10  Q.   You have often in your testimony referred to the success

11  of the after-market business part of your business, haven't

12  you, sir?

13  A.   Yes.

14  Q.   And you've indicated that I believe earlier in your

15  testimony that you think this automotive ill occurred or

16  started in, what, 2006.  Is that a fair statement?

17  A.   Oh, at the latest.  Probably earlier, but I think I spoke

18  to 2006 before.

19  Q.   Isn't it true, sir, that during 2006 that one of the

20  reasons for a decrease in your net sales for that year to

21  automotive customers was reduced unit sales of insulators to

22  after-market customers?

23  A.   That -- that may be true.

24  Q.   And was it that further true in 2007 as well?

25  A.   I don't recall.

Michael Lubin - Cross                                    90

1  Q.   Well, let's look at -- very quickly, let's look at Exhibit

2  P, which is the 2007 10K.

3           MR. BRACHT:  Your Honor, I'm not sure I've offered

4  Exhibit P but I'll offer it now.  It's the 2007 10K.

5           THE COURT:  I already have it marked in evidence.

6           MR. BRACHT:  Excuse me?

7           THE COURT:  I have it marked in evidence.

8           MR. BRACHT:  Thank you, Your Honor.

9           THE COURT:  On the 10Ks I have Exhibits L, N and P

10 shown admitted in evidence.

11 BY MR. BRACHT:

12 Q.   If you'll turn to page 23 of Exhibit P, Mr. Lubin.

13 A.   Yes.

14 Q.   The second paragraph from the bottom it is a description

15 of your -- of the decrease in net sales to automotive customers

16 and it gives various reasons for that.  And down at the bottom

17 of that paragraph it says:

18      "Decreased unit sales of insulators to manufacturers of

19      after-market automotive ignition wire sets primarily due

20      to the decision of a large customer to reduce their on-

21      hand inventory."

22 A.   That's correct.

23           MR. BRACHT:  Let me check.  I'll pass the witness,

24 Your Honor.

25           THE COURT:  Thank you, Mr. Bracht.

Michael Lubin - Cross                          91

1          Mr. Tishler, are you going to present or Mr. Cahn?

2          MR. TISHLER:  Mr. Cahn.  I'm sorry, Your Honor.

3          THE COURT:  All right.

4          MR. TISHLER:  Mr. Cahn is going to handle it for us.

5          THE COURT:  All right.  Mr. Cahn?

6          MR. CAHN:  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8    BY MR. CAHN:

9    Q.   Mr. Lubin, the lenders love fees, don't they?  You've

10   testified -- you've testified on a couple of occasions where

11   you've either had to pay a fee or were requested to pay a fee

12   to lenders for one purpose or another.  The proposal that you

13   expect to get within the next week from Wells Fargo do you

14   think they'll request a fee?

15   A.   I don't know what they're going to request.

16   Q.   Are you prepared to pay a fee if they request one?

17   A.   I think it depends what the proposal says.

18   Q.   All right.  How much was the fee that Capital One

19   requested?

20   A.   I don't recall the number.  I think they were looking

21   for -- I believe it was half of one percent.  Eventually they

22   changed that to asking for a deposit of $225,000.00 with the

23   proviso that if they made us any commitment letter that they

24   could keep any unused portion of that, but I'm not sure.

25   Q.   All right.  But you didn't sign the proposal letter,

Michael Lubin - Cross                                    92

1  right?

2  A.   No.

3  Q.   Because you didn't want to pay the fee?

4  A.   We thought we could get them to move forward with their

5  activities in furtherance of refinancing without signing the

6  proposal letter and that's exactly what they did.

7  Q.   Do you think that your tactic that you employed in order

8  to save the fee had any effect on Capital One's evaluation of

9  what doing business with Lexington would be like going forward?

10 A.   I would assume not because they said, yes, we're willing

11 to go forward on this business.

12 Q.   But now they're not willing to go forward?

13 A.   That's correct.

14 Q.   All right.

15          THE COURT:  We're not at March 15th yet, Mr. Cahn.

16          THE WITNESS:  To be fair, Your Honor, I think we'll

17 be there soon enough.

18          MR. CAHN:  Yes, I was reflecting Mr. Lubin's prior

19 testimony, Your Honor, that he didn't regard March 15th as an

20 achievable date to meet Capital One's conditions.

21 BY MR. CAHN:

22 Q.   You've also testified that you're in the process of

23 submitting contracts to your customers for the connector seals

24 business and Mr. Bracht has cross-examined you on some of the

25 details of those contracts.  Are you -- would you be willing as

Michael Lubin - Cross                                93

1   a condition to the continued use of cash collateral to

2   condition that use on the receipt of signed contracts from the

3   customers that you've identified?

4   A.   I think we can work something like that out.  I don't

5   think that'd be a problem.

6   Q.   All right.  You identified the four major customers for

7   the connector seals business as Delphi, Tyco, FCI and Molex.

8   Am I correct?

9   A.   That's correct.

10  Q.   Have in the past six months to a year have you lost

11  business from any of those customers?

12  A.   I think Molex may have moved a couple of parts to the far

13  east, which have been there overall emphasis of the last few

14  years.  Beyond that, I don't think so.

15  Q.   Have you lost any business from Tyco?

16       THE COURT:  By "lost business" you mean moving the

17  supply to someone else --

18       MR. CAHN:  Yes, Your Honor.

19       THE COURT:  -- as opposed to declining volumes

20  because nobody's making parts?

21       MR. CAHN:  That's correct, Your Honor.  Thank you.

22       THE WITNESS:  I think we had one part that was bought

23  by several customers.  Tyco, Uzaki [Ph.] North America, and I

24  think another company called Mayfair Plastics, which was a

25  transmission seal that the -- they're ultimate customer

Michael Lubin - Cross                                    94

1  redesigned the part to be made from a different material so,

2  yeah, we lost that business.

3  BY MR. CAHN:

4  Q.   Can you tell us what the decrease in revenue of sales was

5  for loss of that business?

6  A.   I don't recall the number but it was quite a substantial

7  part.  It was between a million and a half and two million

8  dollars, I would think.

9  Q.   Mr. Lubin, referring to Exhibit 5, which has been

10 introduced into evidence, looking at the page which you've

11 already testified to referring to the [unintelligible] in Ohio

12 facility.  That is the -- that's the connector sales facility.

13 Am I right?

14 A.   That's correct.

15 Q.   And we also call it the Vienna facility?

16 A.   We did.

17 Q.   Okay.

18         THE COURT:  Just give me a chance, Mr. Cahn.

19         MR. CAHN:  Well, I'm sorry, Your Honor.

20         THE COURT:  That's all right.  I think that I

21 would --

22         THE WITNESS:  I think it's the fourth page under.

23         MR. CAHN:  Yeah.

24         THE WITNESS:  Exhibit 5, Your Honor.

25         MR. CAHN:  It is the fourth page.

Michael Lubin - Cross                                    95

1          THE COURT:  Okay.  I got it.

2    BY MR. CAHN:

3    Q.   Mr. Lubin, these -- there's the date on the series of

4    projections which is January 23rd of 2009.

5    A.   That's correct.

6    Q.   All right.  And looking at the fourth page that I've just

7    referred to, the forecast January sales -- gross sales at

8    $511,000.00.

9    A.   That's correct.

10   Q.   And what was the actual sales number for that month?

11   A.   I think that it was under $300,000.00.

12   Q.   And, in fact, at your deposition last week you testified

13   it was 273 -- $273,000.00.  Am I correct?

14   A.   Sounds right to me.

15   Q.   All right.

16          THE COURT:  That's January?

17          MR. CAHN:  January of 2009.  Yes, Your Honor.

18          THE COURT:  Okay.

19          MR. CAHN:  Last month.

20          THE COURT:  Yes.

21   BY MR. CAHN:

22   Q.   You also testified on direct examination that once you

23   complete the consolidation of the connector seals business to

24   Rock Hill and Jasper, you plan on selling the Vienna facility.

25   Have you -- pardon me if I use a phrase which is becoming

Michael Lubin - Cross                                    96

1  current -- tested the market for the sale of that building?

2  A.   We have not.

3  Q.   So you have no idea as you sit here today what you could

4  get for that facility or when you could sell it?

5  A.   All we have is an appraisal that was done over the summer.

6  It's the only basis we have right now.

7  Q.   Over last summer that was done?

8  A.   On behalf of the lenders.

9  Q.   I beg your pardon?

10  A.   Done on behalf of the prospective lender.

11         THE COURT:  With respect to the January sales

12  projected at $511,000.00, the projection was prepared on

13  January 23rd.  What happened in the last week of the month?

14         THE WITNESS:  Your Honor, it may have been prepared

15  earlier.  I couldn't tell you when precisely these numbers were

16  created.  They were built into this forecast, but I don't think

17  it was significant impact on the bottom line.  We had the

18  facility pretty much mothballed for the month.

19         THE COURT:  We're at February 23rd.  Do you know the

20  actual sales have been through February?

21         THE WITNESS:  I do not but there -- clearly, we're

22  not -- we're not building the inventories yet, so there's not

23  going to be anything like this.  They're probably similar to

24  what January has been.

25         THE COURT:  When you prepared the projection when did

Michael Lubin - Cross/Redirect                    97

1  you expect to be building inventories?

2          THE WITNESS:  Well, we built the original plan and

3  this may be the -- we built the original plan in December.  We

4  thought we would have worked that contracts by early February

5  and, in fact, it's just taken longer to get people to focus

6  on –

7          THE COURT:  So you don't expect to have contracts in

8  the middle of March; then January, February and March all need

9  to change in this projection.

10          THE WITNESS:  I would say that's what's pretty much

11  reflected in the cash forecast, Your Honor.

12          MR. CAHN:  Your Honor, I have nothing further at this

13  time.

14          THE COURT:  Okay.  Anybody else cross-examine?

15  Mr. Strochak?

16          MR. STROCHAK:  Adam Strochak for the debtors, Your

17  Honor.

18                     REDIRECT EXAMINATION

19  BY MR. STROCHAK:

20  Q.   Mr. Lubin, did you have a conversation with Mr. Altineau

21  from Capital One regarding the February 5th letter that he

22  sent?

23  A.   I did.

24  Q.   What did he say to you and what did you say to him?

25          MR. BRACHT:  Objection.  Hearsay, Your Honor.

Michael Lubin - Redirect                    98

1        THE COURT:  Overruled.  You've opened this topic.  Go

2   ahead.

3        THE WITNESS:  Well, he said two things.  One is that

4   in his opinion -- and I would stress that his opinion I don't

5   think he necessarily is in the position to speak to the powers

6   of that organization, but in his opinion if we get this

7   transaction -- if we get the preconditions put together after

8   March 15th there's no reason they would not want to entertain

9   looking at this proposal or this exit financing within their

10  parameters.

11       I also asked him what promoted the letter and his

12  reaction was that he thought a fair chunk of that was related

13  to the fact that they do not like being pulled into litigation.

14  If they're in the lender, they're in the business of making

15  loans, they're not interested in being involved in the fight

16  and spending hours and hours in depositions when all they've

17  done is make proposals.

18  BY MR. STROCHAK:

19  Q.   Mr. Bracht asked you some questions about the company's

20  historical performance over time year over year declines and

21  EBITDA and sales going back to 1999.  Could you tell us in

22  general what are some of the circumstances that have led to

23  declining sales volumes and declining EBITDA at the company

24  over that long period of time?

25  A.   Well, I think there has been for certain a trend in which

Michael Lubin - Redirect                              99

 1   our business has been affected by the fact that customers are

 2   concerned that such a large supplier of a particular

 3   commodity -- and they're worried about our financial

 4   condition -- that's has a long-term effect.  One of the major

 5   factors that affected it was that Delphi in its infinite wisdom

 6   made a decision to in source I would say the great bulk of

 7   their high volume of connector seals, not just with us but with

 8   all their principal suppliers of these commodities.  To make

 9   them in a facility in Mississippi I think are ill-conceived.  I

10   think they did not work well.  It's been a tragedy for them

11   like a lot of other things they've done, but basically they in

12   source probably two-thirds of the volume of their business from

13   both us and the other suppliers.  We being the largest had the

14   greatest impact and it's what actually drove us to close the

15   LaGrange facility because we could then fit the remaining

16   business into the Vienna facility.  I would say it's just been

17   this ongoing issue of you have too much debt.  You're in

18   default, you're in forbearance arrangements, and as a result of

19   that we're just nervous about giving you business, even if you

20   were the guy who should have the business.

21   Q.   Apart from Delphi moving or in sourcing a portion of its

22   business were there any other structural changes to the company

23   that, you know, resulted in lower sales volumes over time?

24   A.   Well, we closed the -- we closed one of our two machining

25   operations because a customer that was the principal customer

Michael Lubin – Redirect                              100

1  of the Arizona facility moved its business and, I would say,

2  rather abruptly without any notice.  Actually, left us hanging

3  with some inventory.  So we closed that.  That had a fairly

4  significant impact probably in the range of ten million dollars

5  and then we determined that our die casting business just

6  didn't make sense and we determined to close that as well.

7  Q.   Let me focus for a second on the closure of the metals

8  plant.  Were there any particular inefficiencies associated

9  with the closure of that plant and moving remaining business

10 back east?

11 A.   Well, it was very little remaining business.  The customer

12 who moved that business moved it to another supplier because

13 they had a contractual arrangement with that supplier to give

14 them a certain amount of volume and when they weren't meeting

15 the volume requirements they were threatened with a lawsuit.

16 They allowed the customer to pick another book of business that

17 would make up the difference.  Because it all happened so

18 abruptly it was an expensive proposition to close that plan

19 because it was not planned and they sort of snuck up on us.

20 But beyond that, I think we just had the typical inefficiency

21 of running the plant as you complete your production

22 requirements with relatively low volume in that plant.

23 Q.   Let me direct you, if I could, to Exhibit P in the

24 Committee's large volume.

25 A.   Is that P or T?

Michael Lubin - Redirect                                101

1  Q.    P as in Paul.  It's the 2007 Form 10K and on Page 23 in

2  particular.

3  A.    Yes, I'm there.

4  Q.    There's a reference in that second-to-last paragraph on

5  the page that I think Mr. Bracht directed you to regarding

6  decreased unit sales of insulators to manufacturers of after-

7  market automotive ignition wire sets.  What were the

8  circumstances of that?

9  A.    I-- the customer is Federal Mogul.  I think Federal Mogul

10 went through its own Chapter 11 reorganization.  I can't place

11 this in time relative to when they came out, but they were

12 under new control and someone took a look at their inventory

13 levels, said this is too high, and determined they were going

14 to reduce that amount and in order to reduce that you either

15 have to sell more or you have to buy less.  Since their sales

16 are limited to what their customers want, they had to buy less.

17 They're back to doing ordinary course business, but I think

18 they reduced their inventory by between three quarters of a

19 million to a million dollars.  I think that was the entire

20 reduction that year.

21 Q.    To your knowledge did that -- did those circumstances have

22 anything to do with what was going on overall in the after

23 market automotive supply business at the time?

24 A.    I don't believe so.  I think that that was a discrete

25 decision by Federal Mogul management to reduce their inventory

Michael Lubin – Redirect                    102

1  levels.

2  Q.    We touched very briefly on the fire at the Rock Hill

3  facility.   Could you just provide a, you know, short synopsis

4  of the circumstances of that fire, what happened, and what the

5  company has done to address it?

6  A.    The fire started, I believe, in a piece of ventilating

7  equipment that was in the roof.   Some insulation got caught in

8  there and caught fire and it actually destroyed one entire

9  clean room, which is where we produce the parts.   It's actually

10  larger.   The two clean rooms.   We sent a team of people from

11  all our other facilities to that facility to assist in the

12  recovery.   We brought the insurance company in very early.

13  They have been funding as we go the reconstruction.   They have

14  paid for, for example, moving presses from one building to the

15  other.   They paid to prepare the other building, the one that

16  the connector seal business was moved in ultimately, to prepare

17  that to allow us to put the medical molding presses in there

18  because they wanted to reduce their exposure on business

19  interruption coverage.   The result of that, I think, was that

20  we didn't have a single customer who had a supply or production

21  disruption.   I think they were very pleased with the results.

22  I think it got us an awful lot of PR with the customers because

23  they were able to look at us in a crisis type situation and

24  realized we could support them.   We still don't have our full

25  production up yet.   We're still missing four large molding

Michael Lubin - Redirect                              103

1   presses because we don't have the capacity to take them.  The

2   new building did not have the electrical hookups to support

3   those presses but that is being put in I think by the end -- by

4   the end of next month that will be in, but they're

5   restructuring the clean room in the other building now and we

6   would hope by sometime in April we will have that clean room

7   back.  I think overall it's hurt us.  It's hurt the P&L.  We do

8   expect to make claims for business interruption and they're

9   quite substantial.  We haven't sorted how much they're going to

10  be but we have lost a fair amount of production.  It hasn't

11  hurt the customer because the customer has an alternative

12  supplier, but obviously it's an expensive proposition to lose

13  half of your production on the very high volume part.

14  Q.   Did you say when the fire occurred?  I'm sorry.

15  A.   I believe it's November 19th.

16  Q.   2008?

17  A.   That's correct.

18        MR. STROCHAK:  Yeah.  Thank you, Your Honor.  No

19  further questions.

20        THE COURT:  I have some questions.  Looking at this

21  Exhibit P at page 23, the table EBITDA is that just for the

22  rubber group or is that the consolidated?

23        THE WITNESS:  That's for the rubber group, Your

24  Honor.

25        THE COURT:  So if you turn back -- I guess it's Page

104

1   20 -- it's the page following Page 20 -- there is about two-

2   thirds of the way down there's a line of EBITDA.  Is that for

3   the consolidated enterprise?

4            THE WITNESS:  I don't know.  That looks like it's a

5   table for the entire company.

6            THE COURT:  Because what I'm -- and if you would look

7   at Exhibit 3, which was in the thin binder that your counsel

8   have -- leave that open there.  Keep it open and look at

9   Exhibit 3, which is the 2008 summary.  Now, the -- it's actual

10  through October and then forecast for November and December

11  2008.

12           THE WITNESS:  That's correct, Your Honor.

13           THE COURT:  All right.  Do you know what your -- what

14  was the forecast before the start of the year for EBITDA for

15  calendar year 2008?

16           THE WITNESS:  I do not remember, Your Honor.

17           THE COURT:  Do I have any exhibits, Mr. Strochak,

18  that show what -- I mean, what are -- I'll tell you.  One of

19  the big issues that is of concern to me is how much cash is

20  being burned over what period of time and, you know, certainly

21  the exhibits that I've reviewed they haven't been introduced

22  yet suggests that the company's forecasts have been way off the

23  mark.

24           Mr. Lubin's testimony, on the other hand not

25  supported by any exhibits, is that their cash forecasts have

105

1  been very accurate.  I'm trying to see; do I have some exhibits

2  here that reflect -- that back up the conclusion that their

3  forecasts have been accurate.  So I'm looking at Exhibit 3 and

4  excluding the discontinued operations the last two months being

5  forecast, everything else being actual, it showing EBITDA

6  $9,641,000.00.  In Exhibit P for 2007 I'm seeing EBITDA of 11

7  point -- $11,112,000.00.  For 2006 it was roughly the same,

8  $11,379,000.00.  I'm very interested in knowing what has been

9  happening, how accurate have their forecasts and projections

10  been.  Mr. Lubin's testimony of cash forecasts have been very

11  accurate.

12        On the other hand, Mr. Bracht used the deposition --

13  Mr. Lubin's deposition to show that from 2003 to 2007 sales in

14  EBITDA declined substantially.

15        THE WITNESS:  Your Honor, your --

16        THE COURT:  I'm at a loss.

17        THE WITNESS:  You're the last person with whom I want

18  to argue with, I assure you, but I think my testimony was not

19  that the cash forecast have been accurate.  They were very

20  conservative and we've beaten them by large amounts.

21        THE COURT:  That would make them accurate.  Well, it

22  would -- at least the numbers would be at least --

23        THE WITNESS:  No worse than accurate.

24        THE COURT:  They would be no worse than accurate.

25        MR. STROCHAK:  Well, I think I can --

106

1          THE COURT:  I'm trying to reconcile all this.

2          MR. STROCHAK:  Yeah.  I think I can respond to some

3    of your questions, Your Honor.

4          THE COURT:  Do it with testimony because I'd like to

5    hear -- I want to hear what the witness has to say about -- the

6    first question, which I guess you didn't have an answer to, was

7    what was the forecast EBITDA for 2008.  Do I have anything that

8    shows that?

9          THE WITNESS:  The forecast for 2008?

10         THE COURT:  8.  Yes.  I'm looking at Exhibit 3 which

11   is ten months actual, two months forecast shows the EBITDA for

12   the year of $9,641,000.00 and my question is, you know, I

13   assume that preparing these -- they start preparing forecasts

14   in 2007 for 2008 and I want to know what was the forecast

15   EBITDA for 2008 when it was prepared.

16         MR. STROCHAK:  I'm going to have to back and see if I

17   can answer your question as to the --

18         THE COURT:  Well, I want a witness answer.

19         MR. STROCHAK:  -- 2007 forecast.  Yes, Your Honor.  I

20   just want to point you -- as a preview, Mr. Welhouse is coming.

21   He's the company's CFO so we anticipated doing some of this

22   through him.

23         THE COURT:  All right.  Well, we can wait so you know

24   what I'd like to hear about.

25         MR. STROCHAK:  I do and I can give you a preview by

107

1   just kind of showing what we've given you in terms of exhibits

2   if --

3          THE COURT:  We'll wait for Mr. Welhouse, then.  Okay.

4          MR. STROCHAK:  Okay.

5          THE COURT:  Any other redirect?

6          MR. STROCHAK:  No, that's it, Your Honor.

7          THE COURT:  All right.  The witness is excused.

8   Thank you, Mr. Lubin.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  All right.  We're in recess until 1:30.

11          (Off the record.)

12          THE COURT:  Please be seated.  Mr. Strochak?

13          MR. STROCHAK:  I don't see the lender's counsel here.

14   I can check the hall.

15          THE COURT:  Pardon?

16          MALE SPEAKER:  They may be stuck in the elevator.

17   [Inaudible]

18          MR. STROCHAK:  There was quite a line getting in.

19          THE COURT:  Okay.

20          MR. STROCHAK:  I can check the hall, Your Honor.

21                  [Pause in proceedings.]

22          THE COURT:  Okay.  Mr. Strochak, why don't you call

23   your next witness?

24          MR. BRACHT:  Excuse me, Your Honor.  I did have

25   another question or two for Mr. Lubin.

Lubin - Cross                              108

1          THE COURT:  Okay.  Mr. Lubin, can you come back up?

2    You're still under oath.

3    BY MR. BRACHT:

4    Q.   Mr. Lubin, do you recall in your deposition that I asked

5    you about the Capital One letter that I asked you what prompted

6    that letter, the one from Capital One that was dated February

7    the 5th?  Remember we talked about that?

8    A.   I do.

9    Q.   I asked you what prompted that letter and your first

10   answer was, "I would be speculating."  Do you recall that?

11          THE COURT:  What page are you?

12          MR. BRACHT:  This is page --

13          MR. LUBIN:  I recall.

14          THE COURT:  No, I'd like to know what page.

15          MR. LUBIN:  Oh, I'm sorry.

16          MR. BRACHT:  Page 150.  Actually, it starts at Page

17   149, Line 25 and it goes on to 150.  Let me just put it up on

18   the screen.

19   Q.   I asked you what prompted the letter and you said, "I

20   would be speculating."  I invited you to speculate and said,

21   "It might not be admissible but tell me what you think."  You

22   said, "My speculation is that in general lenders and

23   prospective lenders like to lend and consider lending, they

24   don't want to be involved in the litigation.  I don't think

25   they were the least bit happy to be called in for a lengthy

Lubin - Cross                                     109

1   deposition.  You can see from the remarkable response their

2   lawyer submitted to the subpoena that someone at Capital One

3   was very unhappy about this.  They didn't even bother to

4   consult with the account officer who was working on it when

5   they submitted their motion to quash.  So I don't think they

6   were very happy about that and I think they don't want to be

7   caught in the middle.

8        Then I asked you, "Were you told that by Capital One?"

9   Your answer was, "No, but that's my speculation as I said."

10  A.   That's correct.

11  Q.   Did I read that correctly, sir?

12            MR. BRACHT:  That's all I have.

13            THE COURT:  Thank you, Mr. Bracht.  Okay.  Mr. Lubin

14  -- unless Mr. Strochak, do you have any additional questions?

15            MR. STROCHAK:  Nothing further.

16            THE COURT:  Okay.  You can step down.  Thank you.

17  Your next witness, Mr. Strochak?

18            MR. STROCHAK:  Thank you, Judge.  The debtors call

19  Dennis Welhouse.

20            THE COURT:  Raise your right hand, Mr. Welhouse.

21            (Dennis Welhouse, Debtor's Witness, Sworn.)

22            THE COURT:  Have a seat.

23            MR. WELHOUSE:  Thank you.

24                         DIRECT EXAMINATION

25  BY MR. STROCHAK:

Welhouse - Direct                          110

1  Q.   Mr. Welhouse, let's just see if we can get you oriented.

2  There should be a binder up there with a copy of the debtor's

3  exhibits in it.

4  A.   Okay.

5  Q.   Got it?

6  A.   Yes.

7  Q.   Okay.  Turn with me if you would to Debtor's Exhibit 1

8  which is in evidence.  Exhibit 1 is the debtor's cash forecast;

9  correct?

10 A.   Yes, correct.

11 Q.   Well, would you describe for us the process by which the

12 debtors prepared the cash forecast?

13 A.   Basically the cash forecast is prepared from the divisions

14 of each divisional controller, or a responsible person at those

15 locations prepares a form that's very similar to this.  Those

16 numbers are rolled together in the corporate office.  We

17 infrequently change the numbers that come from the divisions.

18 We do do some reasonableness tests but we often do not change

19 their numbers.

20 Q.   Every time that you do a cash forecast do you base that on

21 a fresh financial forecast?

22 A.   Essentially the cash forecast is based on the facts and

23 circumstances I think that are in existence at that time at

24 each division.

25 Q.   So did you --

Welhouse - Direct                          111

1          THE COURT:  I don't think that answered the question,

2    Mr. Welhouse.

3    Q.   Mr. Welhouse, now turn with me if you would to --

4          THE COURT:  Could you -- I'm interested in this.  I

5    don't think he answered the question.

6          MR. STROCHAK:  Oh, I'm sorry, Your Honor.  I thought

7    you said I thought it did answer the question.

8          THE COURT:  No, I don't think it answered the

9    question.

10         MR. STROCHAK:  That was my impression too but if Your

11   Honor was satisfied.

12         THE COURT:  Okay.  No, I'm interested in it but it

13   didn't answer the question.

14         MR. STROCHAK:  I agree with you, Your Honor.

15   Q.   Mr. Welhouse, let me direct you back to --

16   A.   Okay.  Like I could tell you that, you know, a new

17   financial projection, you know, for each month of the year for

18   three or four years is not prepared to do a 13 week cash

19   forecast.  So you know, though we have to do these every 13

20   weeks for the secured lender.

21   Q.   How often do you prepare new financial forecasts as

22   opposed to cash forecasts?

23   A.   Well, the financial forecasts have been updated several

24   times in connection with the disclosure statement we first

25   filed in I believe it was August, July or August. We prepared

Welhouse - Direct                    112

1  financial forecasts there which was the initial forecast for

2  the proceedings here.  Subsequent to that I think it's been

3  updated two or three times primarily because we received new

4  information from CSN.  The CSN data showed that the production

5  of new cars and trucks and like trucks in the United States was

6  continuing to decline.  So we were continually sort of updating

7  our projections to reflect those declines in the projections.

8  Q.   Let me turn you, if I could, to Exhibit 4, excuse me, 4,

9  Debtor's Exhibit 4 in evidence.  On the fourth page of Debtor's

10 Exhibit 4 is a consolidated monthly statement of cash flow for

11 2009.

12 A.   Yes.

13 Q.   Just for point of reference let's look at the May number

14 where the forecast for cash on hand at the end of the period

15 was $7.45 million.  Are you with me?

16 A.   Yes.

17 Q.   Let's compare that, if you would, with the cash forecast

18 at Exhibit 1.

19 A.   Okay.

20 Q.   Which shows net cash available at 22 May of $1.99 --

21 A.   994, correct.

22 Q.   -- million, just a hair under $2 million.

23 A.   Correct.

24 Q.   Could you explain how to bridge the difference between the

25 $7.5 million or so in the financial forecast and the $2.0

Welhouse – Direct                                    113

1   million on May 22 in the cash budget?

2   A.   Well, there's a couple of things there.  On a cash budget,

3   there's a footnote on the bottom that does say at the end of

4   this period we should have a receivable from the insurance

5   company of approximately $412,000.00.

6             THE COURT:  Which document are you looking at?

7             MR. WELHOUSE:  The 13 week cash flow, Your Honor.

8             THE COURT:  Yes.

9   A.   In addition, we have not reflected in the cash flow any

10  potential recoveries as a result of our business interruption

11  claim which we should be making with the insurance company

12  within the next month or two.  But the really big change in the

13  13 week cash flow versus a financial forecast are the change in

14  assumptions that were made regarding the consolidation of the

15  connector seal facility from Vienna, Ohio to Rock Hill, South

16  Carolina and Jasper, Georgia.

17  Q.   Explain for me if you could the specific differences as a

18  result of that consolidation, the difference to the cash flow.

19  A.   There are three or four large items in there.  As you know

20  from Mr. Lubin's testimony we were going to bill six months of

21  inventory, now we're billing like three months of inventory, so

22  the sales number declined considerably.  In addition to that,

23  we pulled from the second half of 2009 into the first half

24  $568,000.00 of cash relocation expenses.  In addition to that,

25  we made a decision in part because we think we'll be done with

Welhouse - Direct                          114

1  this in like May instead of June, some of the cash bonuses of

2  payments will actually get made in the first half of the year

3  versus the second half of the year which is where they were

4  scheduled in what I guess we would call the financial forecast.

5  So I can't remember specifically but I know the cash flow

6  affected the change in sales plus the pull-in of the

7  $568,000.00 of expenses and that totaled I believe around $1.7

8  or $1.8 change in cash flow --

9          THE COURT:  Can you show me in Exhibit 1 where those

10 expenses that have been moved to the first half of the year

11 where they show up in Exhibit 1?

12         MR. WELHOUSE:  Yes.  They're buried in all other

13 excluding KFX, and I can provide you with the detail on those,

14 Your Honor, if you would like later.

15 Q.   Let me see if I can help a little bit here.  If I could

16 direct your attention, Mr. Welhouse, to Exhibit 15 --

17         MR. STROCHAK:  Your Honor, we brought a couple of

18 exhibits this morning.

19         THE COURT:  Oh, okay.  I have [inaudible].

20         MR. WELHOUSE:  This is a schedule we did to help

21 everyone get from the financial forecast to the 13 week cash

22 flow forecast.  You can see at the top there we're showing the

23 sales drop by $2,480,000.00.  The next line there that says

24 EBITDA, the EBITDA affected the sales change and the relocation

25 expenses, and let's ignore the hourly, et cetera for now.  That

Welhouse - Direct                               115

1   showed up at the bottom and there's a little typo in here.  But

2   the effect of the sales change on the relocation expenses we've

3   calculated to be a $1,506,000.00 reduction in cash flow from

4   the financial forecast to this 13 week cash flow forecast.

5          THE COURT:  That's essentially because you moved it

6   up from the second half of the year to the first half of the

7   year?

8          MR. WELHOUSE:  In the first half and the sales have

9   been cut back considerably as well.  So there's less --

10         THE COURT:  Because it's three months of inventory as

11  opposed to six?

12         MR. WELHOUSE:  Yes, yes.  In addition, the

13  assumptions on the accounts receivable were changed in the

14  financial forecast.  If I recall correctly, we assumed we were

15  going to get almost immediate payment.  We eliminated that

16  assumption.  Payments were going to come in I would say from

17  zero to 15 days.  The financial forecast at the Vienna site the

18  receivables are calculated on a net collection of 25 days or

19  so.  That's basically assuming zero to five for Delphi which is

20  about 30% of the sales and roughly 30 days for everyone else

21  which we thought was reasonable in the circumstances.  But in

22  the financial forecast it was 15 or less.  So there's a

23  dramatic difference in the receivables.  So the cash flow

24  effect of that is in the 13 week forecast it reduces the

25  collections by $1,197,000.00.  Those receivables will collect

Welhouse - Direct                    116

1   out subsequent to May 22nd which is the last week covered in

2   the 13 week cash flow.  They're not collected out during that

3   13 weeks covered by the 13 week cash flow but they will collect

4   out shortly thereafter.

5           There was also a change in the inventory assumption.

6   The initial inventory assumption, the one built in the

7   financial forecast was they would take all the inventory right

8   away and pay for it.  That assumption was changed.  What's

9   built into the 13 week forecast is basically at the end of May

10  or on May 22nd or the end of May, half of the product that will

11  be built in June we believe will be on the balance sheet.  So

12  the inventory from the financial forecast to the 13 week

13  forecast increases by $866,000.00 and that directly reduces the

14  cash in the 13 week cash flow statement.

15          The last item here is just the acceleration of one of

16  the incentive bonus payments, the actual cash payment, and that

17  will reduce the cash in the 13 week cash flow by $179,000.00.

18  So these four or five items here, $3.78 million are the lion's

19  share of the difference between what we say is a cash on the

20  balance sheet and the financial forecast and the cash we

21  believe we'll have May 22nd, end of May.

22          MR. STROCHAK:  Your Honor, I move Exhibit 15 into

23  evidence.

24          MR. BRACHT:  No objection, Your Honor.

25          THE COURT:  All right.  Exhibit 15 is in evidence.

Welhouse - Direct                              117

(Schedule, Debtor's Exhibit 15, Received.)

Q.   Mr. Welhouse, what accounts for the rest of the delta

between the cash forecasts in Exhibit 1 and the financial

forecast in Exhibit 4?

A.   To be frank, I didn't have time to do that complete

analysis but I suspect that it's just a conservative nature of

the divisions.

Q.   Let me turn you, if I could, to Exhibit 16, Debtor's

Exhibit 16.  If you could explain for the Court what Exhibit 16

is?  Thank you.

A.   Your Honor, this appears to be all of the 13 week cash

flows that we've prepared and submitted to the secured lender

since the inception of the bankruptcy proceedings.

Q.   Looking at the first page of Exhibit 16, the top line of

the spreadsheet is actual cash; am I correct?  That is the

amount of cash that the debtors actually had at the end of that

weekly period?

A.   Yes.

Q.   The 13 week forecasted cash, what does that represent?

A.   That would be what we showed to be the forecasted level of

cash when we prepared this particular 13 week cash flow.

Q.   And are those forecasts, those forecasted numbers, were

they created at the beginning of the forecast period?

A.   Yes.

Q.   Then finally the last line in the table is the difference

Welhouse – Direct                                  118

1   between actual and forecast; is that correct?

2   A.    That is correct.

3   Q.    Now, has there been a month during the Chapter 11 cases

4   when the debtor's actual cash was less than the amount

5   forecasted during that period?

6   A.    No.

7   Q.    Let me just direct your attention to again the first page

8   of Exhibit 16 and the April 4 column, the first column on the

9   left.  Actual cash was $3.7 million at the end of that week.

10  Just as a frame of reference, what was the debtor's cash

11  position prior to April 4, prior to the commencement of the

12  Chapter 11 case?

13  A.    I do recall that.  March 31st I believe we had

14  approximately $370,000.00 of cash.

15  Q.    Now, let me just direct your attention across the actual

16  cash line on Page 1 of Exhibit 16 and actual cash goes from 3.7

17  the week of April 4 to a high of it looks like 8.4, almost $8.5

18  million for the week of June 20th.  What circumstances explain

19  the increase in actual cash of a little less than $5 million

20  over that period?

21  A.    Several items, but the two large items would be I believe

22  the receipt of the remainder of the DIP funds.  I believe on

23  the 4th of April we had $2 million of the $4 million if I

24  remember correctly.  Subsequent to that we received $2 million

25  more.

Welhouse - Direct                               119

1    The other large item I believe would be the fact that -- I

2    don't think -- maybe with the exception of Capital's

3    [inaudible] because they directly charge our account, I don't

4    think we paid any reorganization expenses at all during this

5    period of time because we didn't have the monies and frankly

6    because the bills just didn't come in.  You'll see one of the

7    reasons [inaudible] --

8         THE COURT:  A [inaudible] is a cash basis, the

9    operating statements --

10        MR. WELHOUSE:  Right.

11        THE COURT:  -- are accrued?

12        MR. WELHOUSE:  That's correct.  That's correct, sir.

13   So we did a lot of catch up in terms of payments.  I don't have

14   the exact numbers but I know it was probably I would say in

15   August, September, October time frame.  We probably paid out

16   close to $2 million in reorganization expenses to catch up back

17   to April 2nd.

18   Q.   Now, let me --

19        THE COURT:  How did you draw the DIP if you didn't

20   [inaudible]?

21        MR. WELHOUSE:  Well, Your Honor, the concept behind

22   the DIP loan I think initially from my perspective was to show

23   the trade, trade suppliers and our customers that we had more

24   than adequate financing in the 11.  The DIP funds were

25   deposited in Capital One Bank right here in the city and we

Welhouse - Direct                              120

1    didn't like draw them in the sense that we actually used them.

2              THE COURT:   What was your net cost on that?

3              MR. WELHOUSE:   The documents will show that the

4    interest rate on the DIP funds basically is 10%.   There's some

5    lighter issue in there, but basically 10% and Capital One was

6    paying us 3.1%.

7              THE COURT:   Expensive effort to show the trade you

8    had the money.

9              MR. WELHOUSE:   True, but I think it was somewhat

10   successful.

11   Q.   Mr. Welhouse, let me turn you back to Debtor's Exhibit 1.

12   It's the cash forecast.   In the cash disbursement section on

13   the column for 6 March there is a projected disbursement of

14   principal to Capital Source in the amount of $269,000.00.   What

15   does that represent?

16   A.   The principal, the principal payment on the Capital Source

17   equipment and real estate term loans.

18   Q.   Have the debtors been paying that through the course of

19   the Chapter 11 case?

20   A.   Yes, we've paid that right along.   I believe since April

21   1st I believe we've paid about $3 million in principal to

22   Capital Source.

23   Q.   The next [inaudible] in the spreadsheet, interest 165 at 6

24   March, is it correct that that represents interest payments to

25   Capital Source and has the debtor been paying notice to the

Welhouse - Direct                          121

1  course of the Chapter 11 case?

2  A.   Yes.

3  Q.   What's the approximate total of interest payments made

4  during the Chapter 11 case if you know?

5  A.   Be a bit of an estimate.  I would probably say around $2

6  million.  These loans are tied to Liber [Ph.] and as you all

7  know there's been some fairly wide swings at Liber.

8  Q.   Let me ask you about the other reorganization expenses in

9  the case.  Professional fees, what's been the debtor's general

10 prime rate on professional fees through the course of the

11 Chapter 11 case?

12 A.   Throughout the course of the Chapter 11 case, the first

13 nine months we probably averaged about $450,000.00 a month in

14 the first nine months of the year.

15 Q.   Is that on a pay basis or an accrued basis?

16 A.   That would be an accrued basis.

17 Q.   Do you have a rough sense of how much has actually been

18 paid over the course of the case?

19 A.   It would be a bit of a guess.  I would say around $3.5

20 million.  We do have a schedule on that in my office but it's

21 not in my computer.  I could check quickly for you.

22 Q.   Let me direct your attention down to the net cash

23 available line on Exhibit 1.  As the forecast runs out over the

24 13 week period through the end of May, the 22nd of May, do you

25 believe that the projected net cash available is sufficient to

Welhouse - Direct                                122

1  fund the debtor's operations during that period?

2  A.    I do.

3  Q.    Now, going out I realize the forecast only goes to May

4  22nd but knowing what you know about the forecast and the

5  financial projection and the current circumstances of the

6  company, what do you foresee happening to cash as the year

7  progresses, as we get out past the end of May?

8  A.    You can see from the chart that in the 3 April -- 10 April

9  area the cash balance tends to level off.  Going on past May

10 22nd we'll receive the $412,000.00 and some amount on the

11 business center option coverage.  But I believe the cash beyond

12 that should build because what I'm thinking is that we'll have

13 the connector seal facility closed and that substantial cash

14 drain on the company will end.   What we'll then have are two

15 facilities, our facility in Rock Hill, South Carolina that's

16 been a very consistent high cash flow generator as well as our

17 insulator facility at Jasper, Georgia which generated $8

18 million EBITDA last year, and we have that projected to be

19 slightly higher this year.  Those I think consistent cash

20 performers in addition to the cash that will be generated from

21 their production of the connector seal production should

22 provide way more than sufficient cash to operate the

23 corporation.

24        THE COURT:  What's the status of your insurance claim

25 under business interruption insurance?

Welhouse - Direct                    123

1              MR. WELHOUSE:  The business interruption claim, the

2    insurance company affiliated, Factory Mutual, has had auditors

3    in and out of our plant examining sales before November, the

4    month the fire took place, and sales subsequent to November.

5    And what they're trying to figure out is what sales, if any, we

6    lost because of the fire which would be the genesis for the

7    business interruption claim.  They've told us that they're not

8    going to be finished with that until the end of February.  So I

9    suspect that in March we'll sit down.  We have made an

10   estimate, Your Honor, with respect to November.  We believe

11   that because of the fire we lost $190,000.00 of cash flow and

12   we have a worksheet to show that number which I'd be happy to

13   send to the Court.  Whether or not the insurance company will

14   agree that's the business interruption claim remains to be

15   seen.  We haven't yet looked at December and January.  There

16   may be some business interruption claims in those months as

17   well because some of the presses that were destroyed couldn't

18   come on line fast enough to produce certain parts.  For

19   example, we make a very large high volume --

20              THE COURT:  You submitted proof of loss to the

21   insurance company?

22              MR. WELHOUSE:  We haven't submitted proof of loss to

23   them yet on the business interruption claim.  We have on the

24   property damage claim.

25              THE COURT:  The same insurer on property and

Welhouse – Direct                           124

1  business; right?

2          MR. WELHOUSE:  Yes, yes.  We haven't submitted proof

3  of loss on the business interruption claim.

4          THE COURT:  What's the status on the property damage

5  claim?

6          MR. WELHOUSE:  The property damage is sort of

7  ongoing.  Just permit me a little history.  The adjuster from

8  Affiliated FM was there like -- I'm not sure while the fire was

9  still raging, but shortly thereafter, and has basically been

10  approving every large expenditure from the beginning.  I would

11  say right now we've probably run up cash expenses somewhere in

12  the neighborhood of $600,000.00.

13          THE COURT:  They've been paying on an interim basis -

14  -

15          MR. WELHOUSE:  Yes.

16          THE COURT:  -- on the property --

17          MR. WELHOUSE:  Received in advance $500,000.00.

18          THE COURT:  Do they have a specified percentage hold

19  back or what do they -- how do they do it?

20          MR. WELHOUSE:  I can't say they have a specified

21  percentage hold back but I believe that they are holding back a

22  percentage because we've had the $600,000.00 of cash out the

23  door plus we lost $140,000.00 of inventory.

24          THE COURT:  Okay.

25          MR. WELHOUSE:  So that's $740,000.00.

Welhouse - Direct                                    125

1          THE COURT:  When do you plan to submit a proof of

2    loss with respect to the business interruption claim?

3          MR. WELHOUSE:  Quite frankly, I would like to hear

4    from them first and see what they propose.

5          THE COURT:  Okay.  Go ahead, Mr. Strochak.

6          MR. STROCHAK:  Thank you, Your Honor.  Before I

7    forget, Your Honor, the debtors move admission of Exhibit 16.

8          MR. BRACHT:  No objection, Your Honor.

9          THE COURT:  Exhibit 16 is in evidence.

10         (Cash Flows, Debtor's Exhibit 16, Received.)

11   Q.   Mr. Welhouse, turn with me if you would to Exhibit 13.

12   A.   Okay.

13   Q.   Could you describe for us what Exhibit 13 is?

14   A.   Exhibit 13 compares the preliminary actual results for

15   2008 broken down sort of by product lines within our business

16   and it compares that to the forecast that was used in the

17   initial disclosure statement.

18   Q.   And that's for the July 2008 forecast?

19   A.   Yes.

20   Q.   Let's start at the top of Exhibit 13 on the net sales

21   line.  What happened to the insulator business when compared to

22   forecast?

23   A.   Okay.  Just going from the top under core businesses, we

24   have our insulator business which is in Jasper, Georgia.  The

25   forecast from July 2008 had net sales of $34,201,000.00.  The

Welhouse – Direct                          126

1   actual preliminary for the year is $32,313,000.00.  We missed

2   the July forecast by $1,888,000.00, 5.5%.  That would be,

3   excuse me, Your Honor, that miss there would relate to the

4   small amount of OEM business that's within the insulator

5   business in that facility.

6       The medical business, you can see the forecast was

7   $16,536,000.00 for the year.  We're at $16,299,000.00.  We're

8   short by $237,000.00 or 1.4%.  So from our perspective our core

9   businesses were $2,125,000.00 off the July forecast or 4.2%.

10      The other businesses which you all know are primarily OEM

11  automotive businesses, you can see connector seals

12  $17,314,000.00.  The figure is $13,890,000.00.  They missed by

13  $3.4 million or 20%.  The machine which is also primarily an

14  OEM, $11,815,000.00 versus $10,751,000.00 missed by $1.1, only

15  9%.  So the other businesses missed by $4.5 million or 15%.

16  What this chart is designed to show is that the core businesses

17  we feel are essentially on the forecast and we don't contest

18  the fact that the OEM businesses did not get their forecast.

19  We don't know of anyone who has hit their OEM forecast.

20      Now, the bottom of the page, the other key number is the

21  EBITDA number and for our insulator business we had a forecast

22  of $8.4 million.  We came in at $7.9 million.  We missed by

23  $453,000.00 or 5.4%.

24      The medical business, $4,230,000.00.  The preliminary

25  unaudited results are $3,937,000.00 for a difference of

Welhouse - Direct                    127

1  $293,000.00.

2     Now, I did make two adjustments to the medical number.  We

3  added back to that the $488,000.00 of fees we paid to DeWolff

4  Boberg.  Those were initially included in the corporate office

5  budget but through discussions with our outside external

6  auditors and by reference to SAB 90-7 which is the

7  authoritative language that controls accounting for debtors in

8  bankruptcy, they felt that that was really a charge that should

9  go to the divisions.  But I did add it back for this purpose.

10  I also added back the $190,000.00 of cash flow profit and cash

11  flow we felt we lost because of the fire in November.  I did

12  not include any estimate for December.

13     So anyway, in summary, we believe the core businesses were

14  forecasted to come in at 12.6.  They came in at 11.9 or short

15  $700,000.00 or 5.8%.

16     On the OEM businesses, the auto OEM focused businesses,

17  connector seals forecast at $2 million, unaudited results

18  $200,000.00, $1.8 million short, 90%.

19     The machine business a forecast of 556, a negative cash

20  flow of 253, a shortfall there of $809,000.00.  So the other

21  businesses, the OEM focused businesses had a forecast of 2.6,

22  essentially a negative $52,000.00 of cash flow for a miss of

23  $2.6 million.  The corporate office numbers are there.  It's

24  basically a flush.

25     So again, our point of this is to show we believe the core

Welhouse - Direct                                128

1  businesses are very stable, very predictable and have not

2  exactly met their forecast but have been reasonably close to

3  their forecast.  Again, we do not dispute that the OEM

4  businesses, the automotive OEM businesses have missed their

5  forecasts by a fairly wide margin.

6          THE COURT:  I know you explained it already but just

7  tell me what the add backs you're putting on medical are?

8          MR. WELHOUSE:  Yes.  There's two add backs.  One is

9  for $488,000.00 and those are the fees we paid consultants.

10          THE COURT:  And have now been charged to

11  reorganization expenses and you put it back in over here?

12          MR. WELHOUSE:  Yeah, we added it back to the EBITDA

13  number.

14          THE COURT:  Okay.

15          MR. WELHOUSE:  Okay.  But on a gap basis --

16          THE COURT:  Right.

17          MR. WELHOUSE:  -- it's going to be deducted from the

18  medicals numbers.

19          THE COURT:  Okay.

20          MR. WELHOUSE:  Okay?  And the other number I added

21  back was the --

22          THE COURT:  190.

23          MR. WELHOUSE:  -- profit we thought we lost as a

24  result of the fire.

25          THE COURT:  Okay.  All right.  I understand.  Thank

Welhouse – Direct                                129

1  you.

2          MR. WELHOUSE:  Okay.

3  Q.   Mr. Welhouse, apart from the two adjustments that you

4  described in the medical EBITDA, are there any other

5  adjustments that have been made to the actual reported data

6  here for 2008?

7  A.   Any other adjustments?  I don't recall.

8          MR. STROCHAK:  Thank you.  Your Honor, we move

9  Exhibit 13.

10          MR. BRACHT:  No objection, Your Honor.

11          THE COURT:  All right.  Exhibit 13 is in evidence.

12          (Chart, Debtor's Exhibit 13, Received.)

13  Q.   Let me just stick with this for one second, Mr. Welhouse.

14  Now, the company also did the forecast prior to July 2008;

15  correct?

16  A.   That's correct.

17  Q.   Now, I know we don't have the data here in front of us but

18  just could you give the Court the general sense as to how the

19  company has performed relative to the earlier forecast that was

20  done for 2008?

21  A.   Sure, but I have to preface it by saying my focus has

22  clearly been on this July forecast and on the disclosure

23  statement and the forecast, the revisions we did because of the

24  change in the CSM data subsequent to July.  But I believe if I

25  could pull the forecast numbers from the beginning of the year

Welhouse - Direct                         130

1  from the papers in my office the schedule would look very

2  similar or essentially the core businesses would have performed

3  pretty much on the budget and the OEM businesses would probably

4  have missed by a wide margin.

5  Q.   Mr. Welhouse, the question I asked Mr. Lubin at the end of

6  the morning was on Exhibit 3 which is the 2008 actual 10 month

7  forecast for two months which showed EBITDA for the year of

8  $9,641,000.00 and the question I had for him was how does that

9  figure compare to what you forecast at the end of 2007 for

10 2008?

11 A.   I don't have those numbers but I suspect it would be

12 considerably lower.  I would relate that to the OEM businesses,

13 the connector seal businesses and the machine businesses.  My

14 sense is those were probably projected to show reasonably good

15 sales and EBITDA margins.  But again, I don't have to belabor

16 what's happened to the OEM automotive markets.  I can supply, I

17 will supply those numbers to the Court.

18        THE COURT:  No, I just -- the order of magnitude what

19 you believe you had forecast for the year versus what it -- we

20 don't have the actual, but the last two months forecast, what

21 compares to the $9,641,000.00, your best estimate of what you

22 had projected for the year.

23        MR. WELHOUSE:  It would be a guess, Your Honor.

24        THE COURT:  All right.  Go ahead Mr. Strochak.

25 Q.   Mr. Welhouse, let's turn if you would to Exhibit 14.   If

Welhouse - Direct                           131

1  you could explain for us what Exhibit 14 is?

2  A.   Okay.   Exhibit 14 is similar to the exhibit we just

3  examined except that it shows the forecast for the first --

4  it's comparing the forecast for the first six months of 2009 to

5  the actual results for the first six months of 2008.  Some of

6  the documents submitted by some of the agents for Capital

7  Source there was a suggestion that the forecast for the first

8  six months of 2009 was not accurate.  What we're showing here --

9  --

10       THE COURT:  Was it just a suggestion?  Go ahead.

11 A.   What we're showing here again is on the core businesses

12 the actual for our insulator facility at Jasper, Georgia six

13 months, 6/30/2008, $17,940,000.00.  Their forecast for the

14 first six months of '09 is $18,193,000.00, an increase of

15 $253,000.00.  At the medical plant on the first six months of

16 last year we did $8,261,000.00.  We're now saying

17 $9,378,000.00, an increase of $1,117,000.00 or 13.5%.  So we

18 don't see a big swing in those numbers from 2008 from the

19 actual numbers in 2008.

20      On the other businesses, the auto OEM focus business we're

21 showing an increase in connector seals --

22          THE COURT:  That's because you're loading all the

23 inventory in the first part of the year?

24          MR. WELHOUSE:  Right, right.  And this

25 $13,750,000.00, Your Honor, is based on six months of extra

Welhouse – Direct                              132

1    inventory production.

2           THE COURT:  Now you're talking about three months

3    instead of six?

4           MR. WELHOUSE:  Now we're talking about a smaller

5    number, yes.  And at the machine facility --

6           THE COURT:  Whatever you move up in the first half of

7    the year you just take out of the second half?

8           MR. WELHOUSE:  That's right.  That's correct, that's

9    correct.  The connector seals that will not get produced in

10   Vienna, Ohio will be produced in the second half of 2009 at our

11   plant at Rock Hill, South Carolina and the other facility in

12   Jasper, Georgia.

13          THE COURT:  Do you have a projection for total

14   connector seal production for the year?

15          MR. WELHOUSE:  I believe it's $10.5 million.

16          THE COURT:  How can it be $10.5 million if you're

17   projecting $13,750,000.00 for the first half?

18          MR. WELHOUSE:  Well, this was billed for the entire

19   year.

20          THE COURT:  The $13,750,000.00 is billed for the

21   entire year?

22          MR. WELHOUSE:  Yeah.  That's what we're going to

23   produce through June.

24          THE COURT:  You think it's actually going to be $10

25   million?

Welhouse - Direct                    133

1          MR. WELHOUSE:  $10.5 to $11 million, yes.  But that

2    number includes losing about 20% of the business which I guess

3    maybe we're not going to lose 20% of the business as Mr. Lubin

4    mentioned.

5          THE COURT:  The smaller volume.

6          MR. WELHOUSE:  Yes.

7          THE COURT:  All right.

8          MR. WELHOUSE:  Yes.  The EBITDA numbers under the

9    core businesses we did the $4.4 million with insulators in the

10   first six months of '08, we're now projecting $4.2 million, a

11   slight decrease in the first half of $355,000.00.  The medical

12   business, $1,896,000.00 versus 2.661 in the second half, an

13   increase of 765, 40% related primarily to the high volume

14   manufacture for Ethicon which is a subsidiary of Johnson &

15   Johnson.  Then the OEM businesses, the first half of last year

16   856 for connector seals.  We were projecting $2,783,000.00

17   assuming we build six months of inventory in the first six

18   months of the year which is like running the plant full

19   throttle for six months.  That's changed of course.  The

20   machine division we did 268 in the first half last year and we

21   projected 180 this year.  So with the exception of the

22   connector seals there will be no other numbers that have now

23   changed.  We think the forecast for the first six months of

24   2009 compared to the first half of 2008 is not unreasonable.

25         THE COURT:  Just tell me again in EBITDA what's the

Welhouse - Direct                              134

1  technologies?

2         MR. WELHOUSE:  Technologies is our mold making and

3  automation facility.  It's in North Canton, Ohio.  The tooling

4  facility in Jasper -- facilities in Jasper, Georgia; Rock Hill,

5  South Carolina and to date Vienna, Ohio would purchase all of

6  their tooling through Lexington Technologies and also purchase

7  specialized automation equipment that's manufactured in this

8  facility at North Canton, Ohio.

9         THE COURT:  What's the basis for -- I realize it's

10 not a large piece of the total, why the substantial increase in

11 EBITDA for the first half of this year versus last year?

12        MR. WELHOUSE:  From 38 to 122?

13        THE COURT:  Yes.

14        MR. WELHOUSE:  What's happening there is just sort of

15 a mathematical thing.  Basically the way the division operates

16 is it bills out its tools and automation equipment at cost.  So

17 in theory, they're supposed to break even on the gross profit

18 line.  So it's just some items I guess that just didn't zero

19 out in all the calculations.  There's no real answer for it.

20        THE COURT:  Go ahead, Mr. Strochak.

21        MR. STROCHAK:  I just ask the Court's indulgence for

22 one minute.

23        THE COURT:  Sure.

24        MR. STROCHAK:  I think I'm fairly close to done.  I

25 just want to go over my notes.  I don't think I moved Exhibit

Welhouse – Direct                      135

1  14.

2          THE COURT:  You didn't.  Hearing no objection, 14 is

3  in evidence.

4          MR. STROCHAK:  That's all I have, Your Honor.  I'll

5  pass the witness.

6          THE COURT:  Thank you.  Cross examine?

7          MR. STROCHAK:  Thank you for the Court's indulgence.

8          THE COURT:  Cross examination?  Do you need any

9  water, Mr. Welhouse?

10          MR. WELHOUSE:  Yes, please.  Thanks.

11                      CROSS EXAMINATION

12  BY MR. BRACHT:

13  Q.   Hi, Mr. Welhouse.  I just have a few questions.  They

14  mainly center around Exhibit 13.  Could we turn to Exhibit 13,

15  please?  Exhibit 13 contains a forecast for 2008 that was made

16  in July of 2008; correct?

17  A.   I would say it was probably made at the end of May, June

18  time frame.

19  Q.   Okay.

20  A.   Mid to late June.

21  Q.   Okay.  At that point in time you had actual data through

22  the first six months of the year; correct?

23  A.   If I recall correctly, I may be in error, I think that

24  forecast may have included actuals for the first five months.

25  Someone has --

Welhouse - Cross                          136

1   Q.   Well, we're going to look at the numbers here and if I've

2   done my math right, which I probably haven't, but we can figure

3   it out.   But my point is is that when you're comparing this

4   July 2008 forecast to actual, you've got at least five months,

5   maybe six months in there that you know what the results are;

6   right?

7   A.   That's correct.

8   Q.   Okay.   So what we then -- is it safe then to conclude that

9   the miss on the forecast that are shown here, for example,

10  let's just look at the EBITDA number for your core businesses

11  of negative 734, that would indicate that the forecast for the

12  last five to six months in 2008 were responsible -- was missed

13  by that number.   So the operations in the last six months of

14  2008 were responsible for that miss; right?

15  A.   The last six or seven months.

16  Q.   Okay.

17  A.   Correct.

18  Q.   But all that misforecast occurred in that last half of

19  2008 roughly?

20  A.   Six or seven months; right.

21  Q.   And I think that if you do the math, because you've got on

22  Exhibit 14, you got your actual numbers through June of 2008;

23  right?

24  A.   Yes.

25  Q.   And you look at your core business EBITDA for actual

Welhouse - Cross                                    137

1    through June 30, 2008 and that comes to 6.4; right?

2              THE COURT:  Are you on Exhibit 14?

3              MR. BRACHT:  Yes.

4    A.    Right.

5    Q.    Okay.

6    A.    6.458.

7    Q.    If you compare that to what you had forecasted for 2008 on

8    Exhibit 13 you come to a difference of about sixty-one seventy-

9    five.  And then if you --

10             THE COURT:  You've lost me --

11             MR. BRACHT:  Okay.

12             THE COURT:  -- Mr. Bracht.

13   Q.    Let me just ask you this.

14             THE COURT:  I apologize for that.

15             MR. BRACHT:  I apologize, Your Honor.

16             THE COURT:  No, I'm very interested --

17             MR. BRACHT:  I was over on the side trying to do it

18   myself and --

19             THE COURT:  I'm just asking you to go over it one

20   more time.

21             MR. BRACHT:  Okay.  All right.  All right.  If I had

22   a pen I could maybe do it.  But let me just put up my notes.

23   Q.    In my scribbling over here on the side, Mr. Welhouse, if

24   you look on the screen you see my calculations there?  All

25   right.  Let's see if I can get this right.  What we're doing is

Welhouse - Cross                     138

1   we're comparing what's on Exhibit 13 and what's on Exhibit 14.

2   Okay?

3   A.   Yes.

4   Q.   So the first thing I did is I took what -- we're just

5   dealing with EBITDA, the core businesses, the subtotal.  All

6   right?  So the first calculation is you take the forecast on

7   Exhibit 13, 12 thousand --

8           THE COURT:  It's actually $12,633,000.00.

9           MR. BRACHT:  I'm sorry.

10          THE COURT:  That's okay.

11          MR. BRACHT:  It's $12 million.  I understand.

12  Q.   $12,633,000.00.  All right.  And then you flip over to

13  Exhibit 14 and you subtract what you actually did for June

14  compared to the forecast which leaves $6,175,000.00 that needs

15  to be accomplished in the second half of 2008 in order to meet

16  your forecast; right?

17  A.   Mm hm.

18  Q.   Do you agree with me so far?

19  A.   Yes, yes.

20  Q.   Okay.  Then you take the 2008 actual number on Exhibit 13.

21  That's $11,899,000.00.  See that?

22  A.   Yes.

23  Q.   Okay.  And you subtract from that what you actually did

24  and you get $5,441,000.00 and that represents what you actually

25  did in the last six months of 2008; correct?

Welhouse – Cross                        139

1   A.    Subtract.

2          THE COURT:  That one you lost me on because you're

3   subtracting the 6 --

4          MR. WELHOUSE:  Same number.

5          THE COURT:  -- 458 which is a first half of the year,

6   not a second half of the year.

7          MR. BRACHT:  That's the actual, right, Your Honor.  I

8   misspoke.  That's the actual and so if you subtract that from

9   the actual of $11,899,000.00, that leaves what they had to get,

10  or what they did get in the last half of 2008 $5,441,000.00.

11         THE COURT:  What they were short -- that's what you

12  were short for the first half of the year from your forecast?

13         MR. BRACHT:  That actually, Your Honor, that's a

14  comparison of actual to actual.  So if you're adding back in

15  the $5,441,000.00 which is what they actually did in the last

16  six months -- and the point is is if you compare that number --

17         THE COURT:  Okay.

18         MR. BRACHT:  -- with what they should have done in

19  the last six months of $6,175,000.00 you get a difference of

20  734 which is exactly the variance from budget on Page 13, on

21  Exhibit 13.

22         MR. WELHOUSE:  Correct.

23  Q.    You see that?

24  A.    Yes.

25  Q.    So doesn't that indicate that in the last six months of

Welhouse – Cross                          140

1  the year that you missed your budget by $734,000.00?

2  A.    Or 11.5%.

3  Q.    About 11.5% over the last six months as compared to the

4  total of 5.8% which was of course skewed because you had actual

5  results and by definition you couldn't miss your projections

6  for those six months; correct?

7  A.    That's correct but I think the actuals were five months,

8  not six.  But I don't disagree with that generally.

9  Q.    Okay.  You know, I'm not going to go through it with

10 respect to some of the other numbers in terms of net sales but

11 the same analysis applies; you would agree?

12 A.    I think I would agree.  I would like to add that I think

13 an awful lot of it relates to the OEM insulator business that's

14 within our insulator facility in Jasper, Georgia.

15 Q.    I understand, but my point, sir, is that on the six months

16 that you were able to forecast you missed your EBITDA number on

17 your core businesses by somewhere between 11 and 12%; correct?

18 A.    The last six or seven months.

19 Q.    Right.

20 A.    Yes.

21 Q.    Okay.  Now, I'm not going to take up a whole lot of more

22 time but the cash, the 13 week cash forecast versus the

23 forecast, what I'm going to call the financial forecast, are

24 you saying that the 13 week cash forecasts are more accurate

25 than the financial forecasts?

Welhouse - Cross                           141

1   A.   Well, I think they're more conservative.

2   Q.   More conservative.  Well, more conservative because you

3   actually included expenses that you incurred during that period

4   of time?

5   A.   I'm not sure I follow your question.

6   Q.   Well, isn't that what the actual cash forecast for 13

7   weeks is supposed to try to estimate what your expenses are for

8   that period of time?

9   A.   Yes.

10  Q.   They're more conservative simply because they're smaller

11  than what you forecasted in your financial forecast?

12  A.   Well, there's -- I explained earlier there's a

13  conservative bias at the division level.  If you look at the

14  history of our 13 week cash flow projections you can see we've

15  always done considerably better than our 13 week cash flow

16  projections.

17       THE COURT:  Do you prepare monthly variance reports?

18       MR. WELHOUSE:  Against the 13 week cash flow

19  projection?

20       THE COURT:  Well, do you prepare -- well, I'll find

21  out what it's against.  Do you prepare variance reports?

22       MR. WELHOUSE:  We do track our performance on the 13

23  week cash flow projection, our cash receipts and disbursements.

24  We do track that.

25  Q.   My question is really simple.  Which forecast of your cash

Welhouse – Cross                        142

1   should we be relying on?  Which is more accurate?  Can you tell

2   me that?

3   A.   Well, the forecast that's out there now has connector

4   seals with a six month build in it.  Okay.  So that should be

5   revised to reflect the three month build.  I think in my mind,

6   again, the 13 week cash flow forecast that's out there is

7   somewhat conservative and I don't see our available cash going

8   below any of the numbers in the 13 week cash flow forecast.

9   Q.   Okay.  Now, the flip side of your 13 week forecast being

10  conservative is that your financial forecasts are maybe a bit

11  optimistic; isn't that true, sir?

12  A.   I can't say they're a bit optimistic because when I think

13  back of how they were prepared -- will they turn out to be

14  exactly as forecast?  I don't know.  They could be high, they

15  could be low.  But we used the best available data, the best

16  and most recent CM data to do the forecast.

17  Q.   There's a big -- in every instance the 13 week cash

18  forecast is lower by a large margin than the financial

19  forecast; correct?

20  A.   Well, I believe that's correct but the actual cash has

21  turned out to be considerably higher than the 13 week cash flow

22  forecast as well.

23  Q.   And that actual cash is what you set forth in which

24  exhibit?

25  A.   I think it's in --

Welhouse - Cross                              143

1    Q.    That's in 16?

2    A.    If you go to -- and remember, this is reset at the

3    beginning of every 13 month period so --

4              THE COURT:  13 week period?

5              MR. WELHOUSE:  13 week period.  So we start out with

6    like zero difference.  But right now for February 27th --

7              THE COURT:  You're looking at Exhibit 1?

8              MR. WELHOUSE:  Exhibit 16.

9              THE COURT:  16?  Okay.

10             MR. WELHOUSE:  The week ending February 27th we had

11   projected $2,285,000.00.  The actual number is $4,036,000.00

12             THE COURT:  I'm sorry, just --

13             MR. WELHOUSE:  The last page.  The last page, Your

14   Honor.

15             MR. BRACHT:  Are you looking --

16             THE COURT:  I'm with you.  Go ahead.

17   Q.    Are you looking at what, February 20th?

18   A.    16, 16.  I'm looking at the latest available data that

19   exists and that's 27 February where we projected $2,285,000.00

20   and the actual number is $4,036,000.00.

21   Q.    Okay.  I just -- the reason why I'm confused is because my

22   copy of the exhibit does not contain that $4 million.

23   A.    It's not in here.

24   Q.    Oh, okay.  All right.

25   A.    I just got it from my office.  I didn't mean to hold you

Welhouse - Cross                          144

1    at a disadvantage.

2            THE COURT:  All right.  I want to be clear.  The $4

3    million plus figure is what you believe the February 27th

4    figure in Exhibit 1 will be?

5            MR. WELHOUSE:  I know that's what it is,

6    $4,036,000.00 February 27th.

7            THE COURT:  That's in -- that replaces the

8    $3,708,000.00?

9            MR. WELHOUSE:  On the last page of Tab 16?

10           THE COURT:  No, I was going back to Exhibit 1.  I was

11   trying --

12           MR. WELHOUSE:  Okay.  I was on Tab 16, the last page

13   of the 13 week cash flow projection that's in effect today, the

14   27 February.

15           THE COURT:  Yes, $2,285,000.00.

16           MR. WELHOUSE:  Yes.  The number that'll fill in above

17   that is $4,036,000.00

18           THE COURT:  Okay.  Why is the number on Exhibit 1

19   through February 27 $3,708,000.00?

20           MR. WELHOUSE:  This was a new forecast that was done

21   I would say the last week of January specifically for submittal

22   to the Courts for purposes of extending our use of the cash

23   collateral.

24           THE COURT:  Exhibit 1, that's what Exhibit 1 is?

25           MR. WELHOUSE:  Yes, yes.  Ordinarily under our

Welhouse - Cross                                    145

1  arrangements with Capital Source we would not have had to

2  update our 13 week cash flow until just prior to March 20th.

3  We went ahead and we updated the cash flow for that purpose.

4  But technically the cash flow that's in effect is the one under

5  Exhibit 16, the last --

6              THE COURT:  $2,285,000.00?

7              MR. WELHOUSE:  Yes.

8              THE COURT:  All I know is I'm looking at different

9  numbers for everything.  I'm having trouble.  Your counsel

10 submitted Exhibit 1 as the 13 week cash flow starting with

11 February 27th.

12             MR. WELHOUSE:  Okay.

13             THE COURT:  So you're saying the $3,708,000.00,

14 that's changed.  It's $4,036,000.00 which is also different

15 than the February 27th number, the $2,285,000.00.  The

16 $2,285,000.00 was from an older 13 week --

17             MR. WELHOUSE:  That's correct.  That is correct.  The

18 one that would be in effect had we not updated this one just

19 for purposes of the hearing and discussions with Capital

20 Source.

21             THE COURT:  Go ahead, Mr. Bracht.

22 BY MR. BRACHT:

23 Q.   Just one other point for clarification, Mr. Welhouse.  The

24 11 to 12% shortfall that we discussed, that's with respect to

25 the core businesses; correct?

Welhouse – Cross                                    146

1    A.    Yes.

2              MR. BRACHT:   I have no further questions, Your Honor.

3                        CROSS EXAMINATION

4    BY MR. CAHN:

5    Q.    Mr. Welhouse, you testified about the process by which

6    these projections are prepared and I believe you testified that

7    there is basically the same form that we see here in the

8    projections that are submitted to the various divisional heads.

9    A.    Very similar, yes.

10   Q.    They fill that out and they send it back to you?  Is that

11   how it works?

12   A.    Pretty much, yes.

13   Q.    Okay.  Is there any direction that is given to the people

14   who actually fill out this form as to how they are to go about

15   gathering the information that they use to make their

16   projections?

17   A.    There are instructions given.  The instructions are

18   essentially for like the management team to get together,

19   review their sales projections, look at their history, and just

20   to project the cash flow as accurately as they can.

21   Q.    Okay.  Do you have any personal knowledge how they

22   actually go about developing their numbers?

23   A.    Some of the numbers are developed using historical

24   relationships related to like future sales projections.

25   Q.    Are you ever called upon by people in the field at the

Welhouse – Cross                          147

1  various facilities to provide guidance on a particular number

2  or a particular figure?

3  A.    I can't say that I haven't been asked to do that.  I can't

4  recall any specific instances.  The people in the field I would

5  say are relatively experienced people who have done this

6  before.

7  Q.    Okay.  But you can't tell us -- and I'm characterizing

8  here so please tell me if I'm wrong.  What I'm getting from

9  this is you're not able to tell us with a great deal of

10 certainty as to the precise standards that these people out in

11 the field might use in developing the numbers.  What I'm

12 hearing from you is they basically use their experience and

13 some gut feelings and kind of their sense of what's out there

14 is the way they develop these numbers?

15 A.    No.  I mentioned they use some historical relationships,

16 material cost as a percent of sales, [unintelligible] percent

17 of sales and those numbers are converted into cash flow and put

18 into the statements.  I think that would be a general

19 description of how they do it.  Plus any intimate knowledge

20 they might have of the operation.

21 Q.    Your role in this procedure is precisely what?

22 A.    To oversee it and review their numbers.

23 Q.    In what respects do you review the numbers?

24 A.    We have some historical data that we compare it to.  We

25 take a look at their sales projections versus the sales

Welhouse - Cross                                   148

1   projections we've been given previously to see if we think they

2   generally line up.  We look at their disbursements to see if

3   they generally line up or basically reasonable.

4   Q.   If you feel that adjustments are called for, do you

5   consult with the people in the field before making those

6   adjustments?

7   A.   Absolutely.

8   Q.   Are you able to tell us the extent to which the figures

9   that have been presented as part of the forecasts that are

10  already in evidence represent any adjustments suggested by you

11  or mandated by you?

12  A.   I can't think of any adjustments suggested or mandated by

13  me.

14  Q.   Okay.  Mr. Welhouse, let me show you what we submitted to

15  the Court as our exhibit, as Capital Source's Exhibit B.  I ask

16  you if you recognize it?

17  A.   I do.

18       THE COURT:  Just give me a second.  What is that

19  exhibit, sir?

20       MR. CAHN:  [Inaudible].

21       THE COURT:  Just give me a second.  All right, I have

22  it.

23  Q.   You're familiar with that certificate, Mr. Welhouse?

24  A.   Yes.

25  Q.   That's your signature at the bottom?

Welhouse - Cross                                    149

1   A.   Yes.

2   Q.   Can you tell me, if you know the answer to this, do the

3   figures that are provided in that certificate deviate in any

4   way from the figures or from the percentages mandated in the

5   cash collateral order?  I'm specifically referring to the net

6   sales line.

7   A.   Yeah, the net sales are 10.6% below the budgeted net

8   sales.

9   Q.   The order does call for a 90% --

10  A.   That's correct.

11  Q.   -- [unintelligible]?

12  A.   That's correct.  If I may, could I make a comment?

13  Q.   Sure.

14  A.   The covenant is 90%.  I don't deny that.  I would like to

15  add that we've also managed to reduce our expenditures by more

16  than the shortfall in sales.  If you will look up a few lines

17  on that form, which I don't have anymore -- I didn't mean that

18  in a negative way.

19       THE COURT:  There should be a binder there.  You're

20  talking about the certification; right?

21       MR. WELHOUSE:  Yes.  About not quite the middle of

22  the page there's a figure there, total cash disbursed against

23  the budget.  I think this goes to the management of the

24  divisions or then the corporate officers.  In the last column

25  it says actual versus budget.  You see we are below budget in

Welhouse - Cross                                    150

 1   expenditures by $7,911,000.00?

 2            THE COURT:  Yes, I see that.

 3            MR. WELHOUSE:  Okay.  The sales shortfall is

 4   $6,875,000.00.

 5            THE COURT:  Thank you.

 6            MR. CAHN:  Your Honor, may I offer this Exhibit B

 7   into evidence?

 8            THE COURT:  Yes.

 9            MR. STROCHAK:  No objection, Your Honor.

10            THE COURT:  All right.  Cap Source Exhibit B is

11   admitted in evidence.

12            MR. CAHN:  Thank you, Your Honor.  That's all I have.

13            THE COURT:  I want to come back -- look at Exhibit 1

14   again if you would.  Just give me one second to do a little

15   housekeeping and I'll be right with you; okay?  We're only

16   looking at the February 27th column, the first column on

17   Exhibit 1.

18            MR. WELHOUSE:  Okay.

19            THE COURT:  It showed net available cash of

20   $3,703,000.00.

21            MR. WELHOUSE:  Looking at the -- I'm sorry, Your

22   Honor, that would be at the end of the week.

23            THE COURT:  Yes.  You say the figure is

24   $4,036,000.00?

25            MR. WELHOUSE:  The figure I gave you, the

                          Welhouse - Cross                    151

1  $4,036,000.00 is at the beginning of the week.  To get the

2  number at the beginning of the week you would need to take the

3  thirty-seven O-eight and add that to cash of 153.

4        THE COURT:  Can you tell me -- what I'm trying to --

5  what I want to ask you about is what line items changed that

6  reflect the increased cash?  I mean I just saw this forecast

7  for the first time last week and I'm trying to understand

8  what's changed that's increased cash by $300,000.00.

9        MR. WELHOUSE:  Okay.  Well, it's not quite

10 $300,000.00 because the beginning of the week cash figure is

11 thirty-seven O-eight plus what we -- and that's the number at

12 the end of the week, plus what we used during the week, the

13 153.  So the beginning cash number from like yesterday would be

14 $3,861,000.00.

15       THE COURT:  Yes.  Okay.

16       MR. WELHOUSE:  Compared to what the number actually

17 was, the $4,036,000.00.

18       THE COURT:  All right.

19       MR. WELHOUSE:  I can't tell you specifically what

20 that is.  I can when I get back to my office.  But this was

21 done like the last week in January and it was rolled forward

22 the first, second, and third, and the fourth to get to the

23 23rd, to get to the hearing date, today.  We had to start doing

24 this on January 1st.  So I'm not exactly sure which items are

25 over.  I'm sure there's some overs and unders all the way down

Welhouse – Cross                              152

1  the line.

2          THE COURT:  I guess the major question I have is I

3  just -- to put it bluntly, have you just not paid some bills so

4  that you wind up with a higher cash amount?

5          MR. WELHOUSE:  I would have to say no to that because

6  of the terms that are imposed on us by the trade.  Our biggest

7  supplier, Wacker Silicones, we have 45 day terms with them.  We

8  wire them money religiously on the 45th day because we believe

9  those are fantastic terms and we don't want to like do anything

10  to jeopardize those terms.  There's a number of other suppliers

11  like that.  So I can't say it's -- and I don't know -- there's

12  a lot of -- we have a lot of suppliers so, you know, it's

13  possible it's going on out there.  I don't believe any

14  suppliers at all are being pushed.

15          THE COURT:  Is it your testimony that you continue to

16  pay your suppliers in accordance with the historical practices

17  you've been following since you went into Chapter -- filed

18  Chapter 11?  I mean I'm just --

19          MR. WELHOUSE:  I would say yes.

20          THE COURT:  I'm just looking at the cash number --

21          MR. WELHOUSE:  I would say yes.

22          THE COURT:  I see cash numbers that go up but --

23          MR. WELHOUSE:  I would say yes.

24          THE COURT:  I need to know whether, you know, why

25  such good fortune?

Welhouse – Cross                           153

1            MR. WELHOUSE:  I would say yes other than we have in

2    the 11 been able to get some extended terms from some of our

3    suppliers like [unintelligible] Wacker.  I believe with Dow

4    Corning we're at 15 days.  Other customers, they've allowed us

5    30 days.  So we pay religiously that on the 30th day because we

6    do not want to lose those terms.

7            THE COURT:  Right.

8            MR. WELHOUSE:  We want to build a base to get even

9    more extended terms if possible.

10           THE COURT:  Okay.  Any other direct or cross?

11           MR. STROCHAK:  No further direct, Your Honor.

12           MR. BRACHT:  Nothing further, Your Honor.

13           THE COURT:  All right.  Mr. Welhouse, you're excused.

14   Thank you very much.

15           MR. WELHOUSE:  Thank you.

16           MR. STROCHAK:  Adam Strochak for the debtors.  We

17   call Andre Ougier.

18           THE COURT:  All right.  Before Mr. Ougier comes up,

19   let's just take a very short recess.  We'll take a ten minute

20   recess now.  I should alert you all that a large class of

21   Columbia Law School students are coming.  Oh, Fordham, excuse

22   me.  Fordham Law School students will be descending on the

23   courtroom at some point in a while just observing.  As a

24   result, we're probably going to stop the testimony at 4:45

25   rather than 5:00.  We're going to meet the students.  Okay?

Welhouse - Cross                               154

1            MR. STROCHAK:  Just for planning purposes, Your

2     Honor, Mr. Augier is our last witness.

3            THE COURT:  Okay.  All right.  So we'll just take a

4     short break.

5                     [Off the record.]

6            THE COURT:  All right.  Mr. Strochak, call your next

7     witness.

8            MR. STROCHAK:  Thank you, Your Honor.  We call Mr.

9     Augier.

10           (Andre Augier, Debtor's Witness, Sworn.)

11           THE COURT:  Please have a seat.  Could you spell your

12    last name?

13           THE WITNESS:  Yes.  It's spelled A-U-G-I-E-R.

14

15           THE COURT:  Thank you.

16           MR. STROCHAK:  Good afternoon, Mr. Augier.

17           Just to orient you if you could locate the debtor's

18    exhibit binder and if you'd turn to Tab 12, you'll find a copy

19    of your report.

20           THE WITNESS:  I have it.

21           MR. STROCHAK:  Thank you.

22                     DIRECT EXAMINATION

23    BY MR. STROCHAK:

24    Q.   Mr. Augier, I know you're with W.Y. Campbell, the debtor's

25    financial advisors.  Would you tell us what position you hold

Welhouse - Cross                                    155

1  with Campbell?

2  A.    I'm a managing director with Campbell & Company.

3  Q.    What are your responsibilities as managing director?

4  A.    They're severalfold; I am responsible for leading certain

5  transactions, I am a principal, one of the original founders in

6  the firm so I have some oversight for the firm as a whole and

7  an oversight for more or less day-to-day operations.

8  Q.    Would you explain for the Court -- does W.Y. Campbell have

9  any particular specialty?

10 A.    W.Y. Campbell & Company specializes in what we'll refer to

11 middle market investment banking; we focus on advising clients

12 that are in the process of contemplating a transaction

13 somewhere in between -- call it 25 and 350/400 million.

14 Q.    Are there any particular industries on which W.Y. Campbell

15 focuses?

16 A.    The preponderance of our work -- eighty percent of the

17 transactions and situations that we work on are with industrial

18 customers.   We have -- because of our location in Detroit --

19 grown to be the largest M&A adviser within the automotive

20 sector, again, within the middle market.

21 Q.    What's your personal educational and professional

22 background?

23 A.    I have an undergraduate degree from Michigan State

24 University in finance and I have a masters of science and

25 finance from Moss College.

Welhouse - Cross                                    156

1   Q.    Have you done valuation work in the past?

2   A.    Extensively.

3   Q.    About how many valuations have you performed just in terms

4   of a rough estimate?

5   A.    I've done hundreds of M&A transactions in my career.

6   Every M&A transaction involves one or several valuations

7   throughout its course so many, many.

8   Q.    Have you previously testified about valuation issues?

9   A.    I have.

10  Q.    Could you explain for us the services that W.Y. Campbell

11  has provided to the debtors both pre-petition and post-

12  petition?

13  A.    On a pre-petition basis we were retained by the debtor to

14  in essence sell all or parts of the rubber group.  On a post-

15  petition basis we've assisted the debtor on numerous fronts,

16  primarily valuation of all and pieces of the business.

17  Q.    How long have you been working with the company overall?

18  A.    Two years.

19  Q.    Have you done anything to familiarize yourself with the

20  debtor's operations?

21  A.    We have spent extensive time at each and every location,

22  have spent a significant amount of time with management

23  including Mr. Welhouse and Mr. Lubin and Mr. Delano, feel we've

24  got a very good handle on the business itself and how it's

25  positioned in each of its industries.

Welhouse – Cross                          157

1   Q.   Let me ask you about the report that's Exhibit 12.   What

2   was Campbell asked to do in preparing Exhibit 12?

3   A.   With respect to this specific report we were asked to

4   provide value in the context of cash collateral and decided

5   that what was most appropo was to look at the core businesses

6   and in essence focus on those and their value.

7   Q.   Is this the first time that you performed a valuation of

8   the debtors?

9   A.   It is not.

10  Q.   What was the first time?

11  A.   The first time, I'd say, four or five months ago we valued

12  the entire company.

13  Q.   I'm sorry, four or five months ago?

14  A.   We valuated the entire company.

15  Q.   That was in connection with the preparation of the

16  disclosure statement initially last summer?

17  A.   Exactly.   Correct.

18  Q.   Are you prepared today to offer an opinion on the value of

19  the debtors?

20  A.   I am.

21       MR. STROCHAK:   Your Honor, we move that Mr. Augier be

22  qualified as an expert witness under Rule 702 on valuation.

23       MR. BRACHT:   Your Honor, I have an objection.   I'd

24  appreciate taking the witness on voir dire for a few minutes?

25       THE COURT:   Go ahead, Mr. Bracht.

Welhouse – Cross                                    158

1          MR. BRACHT:   Jerry Bracht for the committee.

2                      VOIR DIRE EXAMINATION

3    BY MR. BRACHT:

4    Q.   Mr. Augier, was this report -- Exhibit 12 -- was it

5    prepared pursuant to the Uniform Standards of Professional

6    Appraisal Practice?

7    A.   I don't know the answer to that.

8    Q.   Are you familiar with the Uniform Standards of

9    Professional Appraisal Practice?

10   A.   I am, not to the letter, but I am familiar with its

11   content.

12   Q.   Are you a member of the American Society of Appraisers?

13   A.   I am not.

14   Q.   Are you an accredited senior appraiser?

15   A.   I am not.

16   Q.   Are you a member of the Institute of Business Appraisers?

17   A.   I am not.

18   Q.   Are you a CPA?

19   A.   I am not.

20   Q.   Have you been accredited in business valuation?

21   A.   I have not.

22   Q.   Have not?

23   A.   No.

24   Q.   How many opinions on enterprise value have you given in

25   contested proceedings like this one?

Welhouse - Cross                159

1    A.    Throughout my career, I don't recall but --

2    Q.    I'm talking about in court under oath.

3    A.    Yes.  Two or three.

4    Q.    Are those listed in the report under your qualifications?

5    A.    They are not.

6    Q.    Why aren't they?

7    A.    Because this was over a certain period of time.

8    Q.    I see.  The only two you listed were the one where I took

9    your video deposition early, early in the case --

10   A.    Correct.

11   Q.    -- and then also apparently an arbitration in which W.Y.

12   Campbell was a party?

13   A.    Correct.

14   Q.    The methodology that you've used in the report you have

15   not calculated value on a comparable company basis.  Is that

16   true?

17   A.    That's correct.

18   Q.    You have not used the discounted cash flow basis with

19   respect to your report -- Exhibit 12?

20   A.    Correct.  Intentionally.

21   Q.    You've calculated value based on a comparable

22   transactional basis based on transactions that are no earlier

23   than some time in 2006.  Is that correct?

24   A.    We used all the data that was readily available; correct.

25   Q.    But no transaction earlier than 2006 with respect to the

Welhouse - Cross                                        160

1   insulator business?

2   A.    Specifically, with respect to insulator I think you're

3   correct.

4   Q.    Did you write the report -- Exhibit 12?

5   A.    Parts of it.

6   Q.    In terms of the data that's contained in the report you

7   did not independently verify or express any opinion with

8   respect to management's projections or the reasonableness of

9   management's assumptions in connection with estimating the

10  enterprise value; correct?

11  A.    I think your question did we --

12        THE COURT:  You want the question again?

13        THE WITNESS:  Yes.  Did we review management's

14  projections or did we --

15        THE COURT:  Go ahead, Mr. Bracht.

16  BY MR. BRACHT:

17  Q.    No.  My question is it is true, isn't it, sir, that

18  Campbell did not independently verify or express any opinion

19  with respect to management's projections or the reasonableness

20  of management's assumptions in connection with estimating the

21  enterprise value?

22  A.    That's correct.

23  Q.    Isn't it true, Mr. Augier, that Campbell relied upon and

24  assumed without independent verification the accuracy and

25  completeness of the financial and other information provided to

161

1   or discussed with it by Lexington or attained by it from public

2   sources?

3   Q.    Correct.

4           MR. BRACHT:  Your Honor, I object to Mr. Augier as an

5   expert.  I don't believe he's qualified.  His testimony is not

6   relevant because he's not qualified.  It's also not reliable

7   given the fact that he hasn't tested the underlying data and I

8   think under the Daubert standards he's not qualified as an

9   expert witness.

10          THE COURT:  Mr. Strochak, do you want to be heard?

11          MR. STROCHAK:  Thank you, Your Honor.  We submit Mr.

12  Augier is well qualified.  He's an investment banker, he has

13  worked on hundreds of M&A transactions, rendered valuations in

14  those contexts.  He has the necessary skill and expertise to

15  render an opinion on valuation.  The other points that Mr.

16  Bracht makes go to the weight of any valuation testimony.  If

17  Mr. Bracht believes that he left out a methodology we're

18  perfectly prepared and will be explaining exactly what Mr.

19  Augier did and why he did it but anything else goes to weight.

20          THE COURT:  The objection is sustained.  The

21  testimony is excluded.

22          When I read the report it was quite clear to me that

23  Mr. Augier and W.Y. Campbell did not review or express an

24  opinion about management's projections that are essential to

25  the valuation report.  You can take any numbers, plug them into

162

1   a formula -- he essentially determined comparables which Mr.

2   Bracht contests whether they're comparable but he essentially

3   determined a multiple based on prior transactions and took the

4   debtor's projections for EBITDA without verifying or testing

5   the numbers.  That is not an opinion as to value.  The

6   objection is sustained.

7           MR. STROCHAK:  Your Honor, respectfully --

8           THE COURT:  I don't want to hear any argument, Mr.

9   Strochak.  The objection is sustained.

10          MR. STROCHAK:  Well, could I make a proffer, Your

11  Honor, as to what we believe the testimony would show?

12          THE COURT:  You can make your proffer.  I assume that

13  the proffer is what's in the report?

14          MR. STROCHAK:  It is, Your Honor, and I just feel the

15  need to clarify.

16          Mr. Augier's testimony would relate to trailing

17  EBITDA numbers as opposed to projections, therefore, it's not

18  necessary that he analyze the debtor's projections on a going

19  forward basis.  The idea is that he looked at, historically,

20  what the debtors had actually done and worked from the actual

21  numbers with certain adjustments that, of course, we're

22  prepared to explain but that is the fundamental basis of the

23  valuation work that he did, it's based on trailing numbers as

24  opposed to forward-looking numbers.

25          THE COURT:  Mr. Bracht, do you want to be heard

163

1   further?

2         MR. BRACHT:  Your Honor, just a point that I think is

3   pretty well-established that multiples are determined based on

4   numbers going forward and not backwards.  So he could not have

5   arrived at a multiple without relying at least in some respect

6   on the projections going forward if that's the point.

7         THE COURT:  The pre-petition lenders report has

8   figures for total enterprise value based on trailing twelve

9   month figures as well so I mean that's nothing unusual about

10  that methodology.

11        MR. BRACHT:  No, I understand that, Your Honor, but

12  the multiple that you apply to that number is a multiple that

13  has got to be based on what's going on in the market at a

14  particular point in time or which is influenced by the

15  projections and how those projections are coming to fruition.

16        THE COURT:  The objection is sustained.  I reviewed

17  the report carefully and I believe the report makes clear that

18  it is not competent evidence of the value.

19        Do you have any questions for this witness that don't

20  call for his expert opinion?

21        MR. STROCHAK:  Only about the report, Your Honor, and

22  I can lay a foundation --

23        THE COURT:  If you want to lay a foundation -- I'll

24  permit you a proffer or to lay a further foundation but based

25  on the voir dire of Mr. Bracht and based on my review of the

 1   report in preparing for the hearing this report is not

 2   competent evidence of value.

 3          MR. STROCHAK:  Well, if permitted I would like to lay

 4   that foundation, Your Honor.

 5          THE COURT:  Why don't you just make a proffer of what

 6   it is that you would endeavor to show.

 7          MR. STROCHAK:  Your Honor -- and I can direct your

 8   attention to Page 19 of Exhibit 12 and there's a summary at the

 9   top of the page.  It says, "In calculating the value of the

10   core assets using the precedent M&A transaction valuation

11   methodology Campbell derived an enterprise value to EBITDA

12   ratio to be applied to the core assets pro forma 2008 results

13   by starting with the valuation multiples presented above" and

14   it goes on.  I think that synthesizes the methodology with

15   respect to the precedent M&A transaction valuation method, that

16   it is a derivation of a multiple based on comparable

17   transactions and then comparing that multiple with the multiple

18   on precedent transactions is derivative of trailing EBITDA and

19   then once that multiple is derived, then applying that to the

20   debtor's trailing 2008 EBITDA which as the Court has heard

21   today in testimony are actual numbers.

22          Now, obviously, there are certain adjustments that

23   Mr. Augier could testify to with respect to certain of the

24   businesses but that is the fundamental methodology as to apply

25   that multiple to trailing EBITDA.

165

1           With respect to the second valuation methodology that

2  Mr. Augier used, what he calls the sum of the parts valuation

3  methodology, that's on Page 21 of Exhibit 12.  Again, reading

4  from the middle of the page it says, "In calculating the

5  enterprise value of the core assets using the sum of the parts

6  valuation methodology Campbell derived a value for each of the

7  operating facilities on the assumption that each facility was

8  sold to a separate buyer on the following basis" and then Point

9  1 is the 2008 pro forma EBITDA of each facility was adjusted.

10 So it goes through the adjustments and makes it clear that the

11 methodology used is to derive a trailing EBITDA number for the

12 sum of the parts valuation and then apply that to the debtor's

13 trailing EBITDA.

14           THE COURT:  Just to make clear the basis for the

15 Court's ruling in addition to the objections raised by Mr.

16 Bracht, the Court refers to Page 4 of Exhibit 12.  I won't read

17 specifically the first two paragraphs on Page 4 where Mr.

18 Augier and W.Y. Campbell make clear that they've "relied upon

19 and assumed without independent verification the accuracy and

20 completeness of the financial and other information provided"

21 and it goes on from there in the next sentence, "with respect

22 to the projected financial statements Campbell has relied upon

23 the assurances of senior management of Lexington and the

24 projected financial statements were reasonably prepared" and it

25 goes on.

166

1          I have never either as a practicing lawyer, Mr.

2    Strochak, or since I've been on the bench -- as a practicing

3    lawyer not tendered an expert witness in valuation who hasn't

4    independently reviewed and stated his opinion as to the basis

5    for reliance on the company's financial statements and there's

6    none of that.

7          The objection of Mr. Bracht is sustained.

8          This is the same problem -- when I heard W.Y.

9    Campbell months ago testify you're putting up people to take

10   numbers given to them by management and you're asking just

11   assume those to be true, make no effort to verify it, don't do

12   anything but use those numbers and you tell me what you think

13   this company is worth.  That's not what a valuation expert

14   does.  It doesn't satisfy the Professional Standards for

15   valuation testimony.  The objection is sustained.

16         Do you have another witness?

17         MR. STROCHAK:  That's our final witness, Your Honor.

18         THE COURT:  All right.  Do you rest?

19         MR. STROCHAK:  We have a couple of exhibits to move,

20   Your Honor.

21         THE COURT:  You can step down.

22         MR. STROCHAK:  Debtor's Exhibits 6, 7 and 8, Your

23   Honor, are monthly operating reports in the docket.  We'd ask

24   the Court to take judicial notice of those.

25         THE COURT:  Any objections?

167

1          MR. BRACHT:  We have no objection, Your Honor, to 6,

2   7 and 8.

3          (Debtor's Exhibit Nos. 6, 7 and 8, Received.)

4          THE COURT:  All right.  Exhibits 6, 7 and 8 are

5   admitted into evidence.

6          MR. STROCHAK:  Exhibit 11 is the debtor's liquidation

7   analysis from the disclosure statement, again, a matter of

8   record and filed with the disclosure statement.  We offer that.

9          MR. BRACHT:  We don't agree with it, Your Honor, but

10  we don't have any objection to the admission.

11          (Debtor's Exhibit No. 11, Received.)

12          THE COURT:  Hearing no objection, Exhibit 11 is in

13  evidence.

14          MR. STROCHAK:  Your Honor, in light of the Court's

15  ruling on valuation would the Court permit us to take a five or

16  ten minute recess?  I'd like to speak with my client and just

17  take stock of where things stand and see if we have anything

18  else to put on.

19          THE COURT:  All right.  It's 3:21.  We'll resume at

20  3:30.

21          MR. STROCHAK:  Thank you, Your Honor.

22                    [Recess.]

23          THE COURT:  Please be seated.

24          Mr. Strochak, any further witnesses?

25          MR. STROCHAK:  Thank you, Judge.  Yes.  I appreciate

168

1    the Court's indulgence.

2            We do want to call Mr. Augier to testify on matters

3    on which he does not need to be qualified as an expert witness

4    as the debtor's financial advisor.

5            THE COURT:  All right.  Go ahead.

6                    DIRECT EXAMINATION CONTINUED

7    BY MR. STROCHAK:

8    Q.   Mr. Augier, were you involved in the debtor's efforts to

9    settle its medical business prior to the Chapter 11 case?

10   A.   I was.  I led that process.

11   Q.   Could you describe for the Court what was the result of

12   that process?

13   A.   The result of that process was we ended up with two offers

14   that were worthy of consideration and the board spent

15   significant time analyzing and discussing it.

16   Q.   Were there any specific dollar value offers made for the

17   business?

18   A.   We received an offer for $32 million for medical.

19   Q.   From whom?

20   A.   Trellerborg.

21   Q.   What's Trellerborg?

22   A.   Trellerborg is a Swedish-based conglomerate with extensive

23   --

24           THE COURT:  Could you spell that?

25           THE WITNESS:  T-R-E-L-L-E-R-B-O-R-G.

1                THE COURT:  I'm sorry.  I interrupted.  I apologize.

2                THE WITNESS:  Not at all.

3    BY MR. STROCHAK:

4    Q.   Yes.  I wasn't sure if your answer was finished.

5    A.   They're a sizeable Swedish conglomerate with extensive

6    investments in sophisticated rubber molding in a variety of

7    industries.

8    Q.   Mr. Augier, have you become familiar with the debtor's

9    rubber business during the course of your work?

10   A.   Very much so.

11   Q.   Are there any particular characteristics of the debtor's

12   business that distinguish it in any way from other companies in

13   the industry?

14   A.   I feel, personally -- we feel as a firm that the debtor's

15   rubber business is extremely unique both in the medical front

16   and in the automotive front.

17   Q.   How is it unique in the medical area?

18   A.   It's unique from the standpoint that its product are

19   extremely proprietary, garner significant margins because of

20   their proprietary nature and in essence their manufacturing

21   capabilities through their flashless molding are virtually

22   impossible to duplicate.

23   Q.   And with respect to the other lines of business?

24   A.   Clearly, the metals group and the connector seals group,

25   although connector seals possesses the similar capabilities and

170

1   significant pressures from OE builds it had impact to the

2   values of those businesses.

3   Q.   What about the particular technologies they used in those

4   lines?  Is there anything unique about them?

5   A.   Connector seals utilizes the same flashless molding

6   technology which is, again, extremely hard to duplicate.  The

7   metals group is a machine group and although the metals

8   machines parts to some fairly close tolerances there are a

9   number of other participants in the industry that have similar

10  capabilities.

11  Q.   With respect to your overall assessment of what's going on

12  in the marketplace for rubber industry transactions do you

13  believe that there would be significant interest in the

14  debtor's business on a going forward basis looking out over the

15  next six months to a year?

16  A.   I do.  I think the company's entities are, again,

17  extremely unique and hard to duplicate.

18  Q.   What's the basis for your conclusions?  What are you

19  seeing going on in the rubber industry that leads you to those

20  conclusions?

21  A.   Well, I've got a long resume in the rubber industry and

22  currently there is a gravitation towards quality, highly

23  engineered type products and, clearly, everything that

24  Lexington does reflects that

25  Q.   As an investment banker in this industry do you believe

171

1  that a market test of the value of the assets is a wise thing

2  to do in terms of maximizing the value in any sale transaction?

3  A.   It's my opinion that every time you go out into the street

4  under a "market test" you risk doing the business harm from a

5  customer standpoint, from an employee standpoint and an overall

6  management focus as well, I think, under proceedings such as

7  these you're leaving a record that that's exactly what you're

8  going to do is test the marketplace and buyers will not be as

9  serious as they otherwise might be.

10 Q.   Do you believe that the best way to maximize the value of

11 the debtor's medical business is to put it up for sale at this

12 time in the context of a Chapter 11 case?

13 A.   I do not.  I do not believe that it would maximize value.

14 Q.   Why?

15 A.   Having marketed this business and others in what we'll

16 call a distressed environment, buyers are very reluctant to put

17 their best foot forward, are eager to get their pound of flesh

18 and as a result typically do not maximize value in that

19 scenario.

20       MR. STROCHAK:  Thank you, Your Honor.  No further

21 questions.

22       THE COURT:  Cross-examination?

23       MR. BRACHT:  I have no questions, Your Honor.

24       THE COURT:  Thank you, Mr. Bracht.

25       Mr. Tishler?

Augier – Cross                                172

1          MR. TISHLER:  Mr. Augier, my name is John Tishler.  I

2    represent the senior lenders, Capital Source, in this matter.

3    I've got a couple of questions to ask you.

4                          CROSS EXAMINATION

5    BY MR. TISHLER:

6    Q.   Can you describe a little bit more about your sales

7    process pre-petition as to medical?  What did you do to develop

8    your sources and the two buyers that you mentioned earlier?

9    A.   Pre-petition we put together an offering memorandum

10   describing the entire rubber group and in a very detailed,

11   narrative sense allowed buyers to gain a clear understanding of

12   each of the divisions.  We distributed that offering memorandum

13   to parties who had signed the confidentiality agreement.  That

14   particular list, we derived from our own internal data bases

15   and parties that we've spoken to in prior transactions having

16   to do with rubber molding and in outside data bases to flesh

17   out the group.

18   Q.   So you came up with two buyers did you say?

19   A.   That's correct.

20   Q.   One was Trellerborg for around $32 million but who was the

21   second?  I guess I didn't catch that.

22   A.   Could I ask Mr. Strochak if I'm --

23   Q.   If you don't know you just say "I don't know."

24   A.   I do know I just don't know whether --

25          THE COURT:  Is there an issue about confidentiality,

Augier - Cross                                    173

1   Mr. Strochak?

2           MR. STROCHAK:  I just don't know at this point.

3

4   BY MR. TISHLER:

5   Q.   How about if we leave the name out and just give me the

6   price they're willing to pay and if there was anything

7   distinguishing about them from Trellerborg?

8   A.   I don't specifically remember the price.  We spent a lot

9   of time fleshing out the Trellerborg offer but it was --

10          THE COURT:  Was it lower than the Trellerborg offer?

11          THE WITNESS:  I don't recall at this stage.  Again,

12  we focused significantly on Trellerborg after a period of time.

13  BY MR. TISHLER:

14  Q.   Mr. Augier, let me ask you, hypothetically, if this

15  company very suddenly or very precipitously had a continuation

16  of a downturn of its business and it lost its cash cushion

17  would your recommendation be at that point to sell some aspects

18  of the business?

19  A.   Would it be my recommendation if the entire company --

20  could you rephrase your question, please?

21  Q.   Sure.  If the company, let's just say it got to zero and

22  had no money in the bank what would its options be at this

23  point?

24  A.   Its options would clearly be to divest of certain

25  operating entities.

Augier - Cross                                    174

1   Q.   So would one of those entities be the medical device

2   business?

3   A.   Potentially.

4   Q.   How would you recommend to all the creditor constituencies

5   that process be run?

6   A.   How would I recommend that the process be run?

7   Q.   Yes.

8   A.   To contact a select number of medical industry

9   participants and what I mean by that is not a small number but

10  a meaningful enough number to create a competitive process.

11  Q.   Have you already reached out to any of those bidders or

12  interested parties in the medical device business to check on

13  their interest in buying the medical device business?

14  A.   I have not.

15  Q.   Is it your sense that the $32 million, would that as a

16  potential number to sell that business would that be roughly

17  what it would bring in today or would it be higher or lower?

18  A.   I think that number would be significantly exceeded.

19  Q.   Be significantly what?

20  A.   Exceeded.

21  Q.   So it would be larger than $32 million?

22  A.   Yes, sir.

23          MR. TISHLER:  That's all I have.

24          THE COURT:  Thank you, Mr. Tishler.  Anyone else?

25  Mr. Strochak?

Vomero – Direct                                    175

1          MR. STROCHAK:  No redirect, Your Honor.

2          MR. BRACHT:  Nothing, Your Honor.

3          THE COURT:  All right.  You're excused, Mr. Augier.

4          Any other witnesses, Mr. Strochak?

5          MR. STROCHAK:  That's all, Your Honor.  The debtors

6   rest.

7          THE COURT:  All right.  Is Cap Source or the

8   committee going?

9          MR. TISHLER:  We are, Your Honor.

10         Your Honor, Capital Source will call only one witness

11  and that is Dean Vomero of Bridge.

12         As Mr. Vomero is walking up here, I'm not sure that

13  the Court received some of the demonstrative exhibits we sent

14  around to all the parties.  I have copies of that if you will

15  indulge me.

16         THE COURT:  Sure.

17            (Dean Vomero, PSL's Witness, Sworn.)

18         MR. TISHLER:  Your Honor, these demonstrative

19  exhibits essentially summarize Mr. Vomero's report and I

20  thought it might expedite getting through the report.

21                     DIRECT EXAMINATION

22  BY MR. TISHLER:

23  Q.   Mr. Vomero, would you state the company that you work

24  with?

25  A.   Bridge Associates.

Vomero – Direct                    176

1  Q.   Can you tell us about your involvement in this particular

2  case?

3  A.    In the fall of 2006 I was engaged by Waller to perform an

4  assessment of the debtor's business which I delivered in

5  January of 2007 and since then I've monitored -- well, as part

6  of that assessment I spent an extensive amount of time with

7  management and reviewed a significant amount of financial and

8  forecast information, visited all the facilities, wrote a

9  report and I've followed Lexington on a monthly basis ever

10 since that point.

11 Q.   Have you also visited the facilities at some point?

12 A.    Yes, during that process I have and I've been to a few

13 other facilities in the interim.

14 Q.   Can you give the Court a little background as to your own

15 personal background in the auto industry?

16 A.    Sure.  My last auto assignment I was chief restructuring

17 officer of Parts Depot which was a fairly large auto parts

18 distributor.  Prior to that I wrote an expert report in the

19 Collins & Aikman bankruptcy on solvency.  I was an expert

20 witness in the Telrod Automotive case on financial and

21 operational restructuring.  I was vice president of strategy

22 and development for Tier 1, a metal fabrication type company.

23 I also did a number of strategy and operation works in the

24 automotive industry prior to that.

25 Q.   Your other qualifications are attached to your expert

Vomero - Direct                                         177

1  report, I believe.  Is that correct?

2  A.    That's correct.

3          MR. TISHLER:  Your Honor, previously before the

4  hearing the debtors and Capital Source stipulated that Mr.

5  Vomero would be treated as an expert so we're going to proffer

6  him at this time as an expert.

7          THE COURT:  Hearing no objection --

8          MR. STROCHAK:  Just a second, Your Honor, I'm sorry.

9  I'd like a proffer as to what topics he's going to be qualified

10 as an expert.  Is it a valuation issue?

11         MR. TISHLER:  Yes.  We're going to take him through

12 the enterprise value methodology that he used in his expert

13 report and also he will testify as to the debtor's financial

14 ability to project and so forth.

15         MR. STROCHAK:  Your Honor, with respect to the basis

16 on your ruling with respect to Mr. Augier, we think that,

17 respectfully, there are the same problems with Mr. Vomero.

18         Now, I have to say, Your Honor, I disagree with your

19 conclusion as you know and I'm not trying to reargue that.

20         THE COURT:  Then don't.

21         MR. STROCHAK:  But I think the point is that unless

22 there's the same foundation then --

23         THE COURT:  Do you want to take the witness on voir

24 dire?

25         I read this report cover-to-cover, I read the other

Vomero - Direct                                      178

1   report cover-to-cover, they're not in the same ball park but if

2   you want to take the witness on voir dire, please, go ahead and

3   do it.

4            MR. STROCHAK:  Your Honor, actually, I'm going to

5   withdraw the objection.  We'll stipulate to the qualification,

6   Your Honor.

7            THE COURT:  All right.  The Court will permit Mr.

8   Vomero to testify as an expert.

9            MR. TISHLER:  Thank you, Your Honor.

10  BY MR. TISHLER:

11  Q.   Mr. Vomero, do you get data from the company that has

12  helped you put together your expert witness report?

13  A.   Yes, I have.  I have gotten financial projections and a

14  fair amount of detail and I've also received monthly financial

15  reports, director reports every month for the last couple of

16  years.

17  Q.   In addition to taking their data what other efforts did

18  you undertake the verify the accuracy of their data?

19  A.   In terms of their financial information?

20  Q.   Yes.

21  A.   We did a significant amount of analytical work in terms of

22  looking at your changes in the business, looking at budget to

23  actual.  We did a correlation analysis to the debtor's earnings

24  relative to GDP changes.  We also have looked at some of the

25  big three -- Merth/American/Autobuild data -- in reaching our

Vomero - Direct                                                    179

1  conclusions.  That's over the years the work I've done.

2  Q.   Mr. Vomero, there should be over there a list of our

3  witness and exhibit list.  It's not the bound volume, it should

4  be the one with the big clip on it?

5          MR. TISHLER:  Your Honor, we're referring to from

6  here on out PSLA which is the expert report.

7          THE COURT:  Yes, I have it open in front of me.

8  BY MR. TISHLER:

9  Q.   Mr. Vomero, would you mind just giving the Court a high

10 level summary of what your expert report concluded?

11 A.   I'll start with the engagement.  We were engaged to do

12 three things; we were engaged to assess the current financial

13 position of the debtor -- performance, we were engaged to look

14 at the collateral position and then we were engaged to

15 determine what the changes in the debtor's TEV since the

16 beginning of this case.

17         THE COURT:  I'm sorry changes in what?

18         THE WITNESS:  I'm sorry, Total Enterprise Value, TEV.

19         THE COURT:  Thank you.

20 BY MR. TISHLER:

21 A.   So that's in general the engagement and our conclusion is

22 there's been a substantial deterioration in the cash position

23 in particular in 2009.  We've seen a pretty stark decrease.

24 There's also been a deterioration in the overall business

25 financially and we've also seen a deterioration in TEV.  We

Vomero - Direct                         180

1  looked at this and said if you look at the current trend today

2  -- right where we are today and what's been happening over the

3  last three or four months it seems to make sense to put a

4  natural hedge in this business to protect the risk because the

5  business could be out of      cash this summer or at some point

6  in the future and given the amount of cushion we have it just

7  makes sense to at least start a process and do something versus

8  doing nothing later.

9  Q.   By "start a process" you mean explore the sale of some

10  assets --

11  A.   Yes, exploration of a sale and to begin that process

12  sooner rather than later.

13  Q.   Mr. Vomero, there are a couple of clarification points

14  that you wanted us to point out.  I believe in your report you

15  refer to the financial information that you had received.  It

16  was dated 1/16 and it should be 1/23?

17  A.   Well, that's when I received it.  There's just a little

18  discrepancy, I think, in projections.  The debtors were using

19  what we analyzed but they weren't material.

20       THE COURT:  If you're changing something in the

21  report can you point out to me what it is you wanted --

22       THE WITNESS:  No, we're not going to change anything.

23  I think the financial projections that were admitted were a

24  little bit different than what we worked with.  So just some

25  minor versions.

Vomero - Direct                                    181

 1           THE COURT:  All right.

 2   BY MR. TISHLER:

 3   Q.   This might not be material but the trailing EBITDA, I

 4   think you had in there it was down 26 percent but it should be

 5   25 percent?

 6   A.   No, it was the total enterprise value and there was a

 7   slight change, I think, from 28 or 26 to 25.

 8   Q.   All right.  When we get to it in the slides we'll talk

 9   about that.

10   A.   Yes.  As we QC'd the work we found the mistake.

11   Q.   If you'll take a look at the slides, we'll walk through

12   those for a second.  If you could, Mr. Vomero, take a look at

13   the first one and then describe to the Court --

14           THE COURT:  Mr. Tishler, are you going to mark the

15   slides as exhibits?

16           MR. TISHLER:  I will, Your Honor, I think that's a

17   great idea.

18           THE COURT:  Why don't you just mark it for

19   identification now.  Are you going to mark them separately or

20   as one --

21           MR. TISHLER:  We can just add it on as PSL-F if that

22   works?

23           THE COURT:  All right.  I've been handed six pages of

24   slides; the first is headed "At the current cash burn rate of

25   approximately $1 million --

Vomero - Direct                                          182

1          THE WITNESS:  Your Honor, I have an extra copy.

2                      (PSL Exhibit F, Marked.)

3          THE COURT:  No, I have a copy.  I just want to make

4   sure I'm identifying for the record what's been marked as PSL

5   Exhibit F.  We're all in sync, Mr. Tishler?

6          MR. TISHLER:  That's it, Your Honor.  Thank you.

7          THE COURT:  Go ahead.

8   BY MR. TISHLER:

9   Q.   Mr. Vomero, you want to walk us through what the first

10  slide is showing us?

11  A.   Sure.  All we did in this slide is took the actual cash

12  balance at various points in time and the important point from

13  this slide is since December 31st of this year the debtor had

14  $5.5 million in cash, right now they have $4 million and that's

15  a burn rate of roughly $1 million a month.  The forecast -- and

16  this is the B13 forecast -- is right now at $2 million and

17  although Dennis has clearly been conservative on his estimates

18  of that number but, directionally, the cash is moving in the

19  wrong direction and especially since the beginning of the year

20  and as a result, again, we think we need a natural hedge in

21  this business or some efforts to begin a marketing process.

22  Q.   Mr. Vomero, when you talk about Mr. Welhouse's projections

23  on cash you do agree with the debtors that he has typically

24  been on target or even below target, I guess, in a good way.

25  He's obviously been to the good side.  He's usually projected

Vomero - Direct                                      183

1   less cash and the company has outperformed that projection?

2   A.   That's correct and I think he's about $1.2 million above

3   his projection currently and that's been a decent estimate over

4   time.

5   Q.   But included in those amounts that are shown in cash is $4

6   million from the subordinate DIP.  Is that correct?

7   A.   That's correct.

8   Q.   So at this point because they're roughly at $4 million in

9   cash, what's in their bank account is the DIP.  Is that

10  correct?

11  A.   That's correct.

12  Q.   Is there any other liquidity this company has other than

13  that DIP?

14  A.   None that I'm aware of.

15  Q.   Of course, unless there are --

16  A.   Right.  I don't know of any other source.

17  Q.   Other than the DIP that's the only source of liquidity

18  that they have other than their own cash flow?

19  A.   That's the only source I'm aware of.

20  Q.   Since, you say, June 30, 2008 through February 13, 2009

21  they've burned cash at a rate of $600,000.00 per month.  Is

22  that correct?

23  A.   That's correct.

24  Q.   So if the Court was to extend the use of cash collateral

25  for five more months based on that cash burn if they were

Vomero - Direct                              184

1   unable to turn it around they'd only have about $1 million of

2   cash in the bank at the end of July.  Is that about right?

3   A.    That's about right.

4   Q.    Is there anything else you wanted to go over on that first

5   slide?

6   A.    No, that's fine.

7        MR. TISHLER:  You'll turn to the second page, Your

8   Honor.

9   BY MR. TISHLER:

10  A.    With this slide, when we looked at the current cash burn -

11  -  you look out thirteen weeks, there's been clearly over-

12  conservatism in the thirteen week cash flow.  What happens

13  after that point has been a real issue in terms of estimating

14  what is going on with the debtors.  What we did is we looked at

15  -- and we've been tracking their historical forecast accuracy

16  and this adds an element of significant risk to the

17  projections.  I mean you think it's a good analogy if companies

18  miss their earnings estimates of stocks and in many instances

19  get hurt by it because people don't know how to react to what's

20  going to happen and there's an element of distrust in the

21  numbers you're given.  If we just look at January 2009 forecast

22  which we were given -- well, I think it was put together in

23  December -- net sales is down fifteen percent right now so we

24  started 2009 behind the eight ball on the budget.  During 2008

25  the debtors provided to us four forecasts, each with

Vomero - Direct                          185

 1  consecutive lower level of EBITDA.  The first version was the

 2  annual budget for 2008.  EBITDA was projected to be $17.2

 3  million.  That was subsequently revised in May -- which, I

 4  think, this is the July budget that a lot of people worked from

 5  of $12.9 million.  We received another version in September, it

 6  was revised down to $11.1 million.  We received a fourth

 7  version in November that was revised down to $9.7 million and I

 8  think the debtor ended up with EBITDA at around $8.7 million.

 9          THE COURT:  Where do you get that $8.7 million from?

10          THE WITNESS:  It's in their papers.  That's non-pro

11  forma, the $8.7 million.  So if you add back pro formas you get

12  to rethink the number -- a low number to have been working with

13  [sic].

14          THE COURT:  I asked the witness -- do you have the

15  debtor's exhibits?  Exhibit 3?  It had actuals for ten months

16  and forecasts for November and December and it showed EBITDA of

17  $9,641,000.00 for the year?

18          THE WITNESS:  Right.  We've actually plugged in

19  actual November and December.

20          THE COURT:  You have.  So you're saying it actually

21  brings it down to another million dollars?

22          THE WITNESS:  Yes.  That's my understanding.

23          THE COURT:  When did you get the actual for November

24  and December?

25          THE WITNESS:  We got December about two weeks ago and

Vomero - Direct                         186

1   November we received three weeks ago or so and I know that I

2   believe that number to be true because I think in our report we

3   have EBITDA of 93 to 94 and we did like 600,000 of pro forma,

4   so yes, the 87 is before pro forma adjustments.

5   BY MR. TISHLER:

6   Q.   At 8.7, Mr. Vomero, it's about a fifty percent inaccuracy.

7   Is that correct from where they started in January?  They

8   started in January?

9   A.   Yes, that's right.  That's correct.

10  Q.   What is the value to creditors to an EBITDA analysis as

11  opposed to just a cash analysis?

12  A.   An EBITDA analysis is a measure of the operating cash flow

13  of the business.  It's what is the business before you take

14  into account changes in working capital which are receivables

15  or your payables, any payments for capital expenditures, any

16  payments for principal and interest or financing.  So it's a

17  kind of standard run rate cash that's a fairly significant

18  measurement in most industries.

19  Q.   Was there anything else on this slide that you wanted to

20  go over?

21  A.   Yes, I wanted to -- I think what we did is we looked in

22  aggregate since May 2006 when Cap Source got into the credit,

23  since that point the EBITDA variance is 35 percent.  The last

24  six months the EBITDA variance was 55 percent and this was

25  based on the measure to the July forecast and the cumulative

Vomero - Direct                                    187

1   variance is $14.9 million if were to look back since May.

2            THE COURT:  Tell me, that cumulative variance is over

3   what period?

4            THE WITNESS:  May 2006 through December 31st.

5            THE COURT:  All right.

6            THE WITNESS:  We would change the -- we had three

7   different forecasts in that analysis that we used and we would

8   change.

9            MR. TISHLER:  Your Honor, I think I can now back up

10  that 8.7 number if you will indulge me.

11  BY MR. TISHLER:

12  Q.   Can you see that, Mr. Vomero?

13  A.   I can't see the descriptions but I can see the figures.

14                     [Pause in proceedings.]

15  BY MR. TISHLER:

16  Q.   Mr. Vomero, are you familiar with what this document is?

17  A.   Yes.

18  Q.   You want to tell the Court?

19  A.   It's a summary of the year-to-date financial results

20  through December 31st.

21  Q.   And who is this provided to you by?

22  A.   Lexington management.

23  Q.   If you walk through -- they ended up with a total actual

24  EBITDA of their rubbers, metals and corporate of 3.548.  Do you

25  see that?

Vomero - Direct                                    188

1   A.    Correct.

2   Q.    Then if you add back to that the 4.679 in Footnote No. 2?

3   A.    Correct.

4   Q.    And the $508,000.00 in reorganization expenses?

5   A.    Correct.  That gets you to 8.7.  Yes.

6             THE COURT:  When did Lexington provide you with

7   what's been shown on the screen?

8             THE WITNESS:  Two or three weeks -- within a two to

9   four week period.

10            THE COURT:  Mr. Tishler, do you have a copy we can

11  mark as an exhibit?

12            MR. TISHLER:  It's confidential and I'll have to ask

13  the debtors if they'd like to have it submitted as an exhibit.

14            THE COURT:  I want an explanation for why the numbers

15  that have been given to Cap Source are different than the

16  numbers you put in evidence.

17            MR. STROCHAK:  We're happy to offer that explanation,

18  Your Honor, if you're looking to me to provide it.

19            THE COURT:  Well, you put on testimony about what the

20  EBITDA -- you put in evidence -- Exhibit 3 -- that showed

21  EBITDA for the year with the last two months projected at 9.641

22  million.  I had a lot of questions about it and now I'm

23  suddenly hearing that you've given them a document that shows

24  it was only 8.7 million.  That doesn't make me happy.

25            MR. STROCHAK:  Well, the explanation is, I believe,

Vomero - Direct                                    189

1   in our Exhibit 13 which we put in evidence.

2          THE COURT:  All right.  You can deal with it on

3   cross-examination.  Go ahead, Mr. Tishler.

4          MR. TISHLER:  Your Honor, I'm going to go ahead and

5   mark and if the Court will indulge because it is marked

6   "confidential" I did want to respect the confidentiality of it

7   that we could file it under seal but it does have the date it

8   was issued which was your question.  That was the reason I was

9   going to mark this document.

10         THE COURT:  What's the date it was issued?

11         MR. TISHLER:  February 4, 2009.

12         THE COURT:  Well, at a break I'll see whether you can

13  work out the issue of confidentiality with Mr. Strochak.

14         MR. TISHLER:  Okay.

15         THE COURT:  I wouldn't ordinarily don't -- the

16  standard for sealing is under Section 107 of the Bankruptcy

17  Code and I'm pretty strict about what gets sealed and what's

18  public.

19         MR. TISHLER:  Okay.

20  BY MR. TISHLER:

21  Q.   Mr. Vomero, is there anything else on that page that you

22  wanted to highlight for us?

23  A.   No, that's it.  On Page 3, again, over the past 32 months,

24  that figure as to 97 percent of the time there's been over

25  optimism and that's based on 31 out of 32 months and that

Vomero - Direct                                    190

1   excludes restructuring related charges pre-petition.  If you

2   were to add that it would be 100 percent.

3        Some of the observations -- the way I've always looked at

4   this business especially in a distress situation, what's really

5   important is the year over change/your change in the business

6   and what's that trend?  What's the current trend on the year

7   over year basis and what type of statistics can you apply to

8   that variance and what's the average variance and what are some

9   of the deviations and is that going to be representative of

10  what's going to happen going forward.  I haven't seen that

11  resident in the information I've received.

12       Another tool that should be used, I think, going forward

13  is one of the things we do is we'll track the budget to actual

14  variance and try to triangulate to kind of the first analysis

15  to try to figure out what's going to happen with this business

16  and I haven't seen any evidence of that.

17       I think one of the other problems with the budgets over

18  time is the company has -- and during this period there's one

19  business and there's added business but there's been in the

20  projections business that they don't have contracts for,

21  they're likely to get and the probability weighing of that

22  versus lost business.  I think that process could be improved

23  and, again, I'm not trying to criticize management, I'm just

24  offering some of my observations over the years.

25  Q.   So just to sort of put a finer point on it are you saying

Vomero - Direct                                    191

1   that sometimes they don't necessarily fully appreciate the

2   risks attendant with the loss of a contract, for instance, or

3   something like that --

4   A.    Or the success of acquiring one.

5   Q.    When they do their projections?

6   A.    Correct.

7   Q.    Go on to the next slide, Mr. Vomero, and describe to the

8   Court what that says.

9   A.    Well, we looked back eight years through public filing

10  information as provided by Capital I.Q. which is the data

11  source for it and only once had they had a positive EBITDA year

12  over year growth and that was between 2000 and 2001 and it was

13  one percent growth.  Other than that the year over year change

14  in EBITDA has been negative and one of the issues we have is

15  given the inaccuracy of the forecast we have to turn to what's

16  happened historically and place significantly more weight on

17  that as we look forward.

18  Q.    Let's move on now to the more recent time period.  Your

19  next slide gets to that.  Could you talk about the

20  deterioration of the business, the most recent months?

21  A.    Given the economic conditions -- and it was pretty clear

22  that in automotive in the third and fourth quarter it collapsed

23  and right now we're in a collapsing situation, there's just no

24  doubt about it and nobody could have forecasted what has

25  happened over the last four or five months, but in our view at

Vomero - Direct                                    192

1    least over the next six to twelve months I think we need to

2    rely on what's going on in the business today, right now, and

3    we looked at revenue and I'll start on the quarterly results;

4    Q407 and Q408, we did a comparison on revenue and if you look

5    at it just in the fourth quarter all the business units were

6    down and the total variance in the fourth quarter was 27

7    percent.  There's a 27 percent decline in revenue year over

8    year.  I mean this isn't budget this is just year over year,

9    here's what's happened.  We had January budget -- and then we

10   did the same results for January.  Management had given us

11   sales figures and with the exception of medical which was up

12   eight percent, all of the business units were down including

13   insulators, which is down 20 percent.

14            THE COURT:  So this is a year over year comparison?

15            THE WITNESS:  Yes, it's just year over year.  Yes.

16   The total variance is a negative 35 percent on a year over year

17   basis and then the total four month variance is 29 percent and

18   the fourth quarter has resonated through the EBITDA performance

19   which is down 34 percent including the insulator group which

20   during the fourth quarter was down 25 percent on a year over

21   year basis.

22            What we're facing right now is if you looked at the

23   January -- the big three right now have record inventories,

24   they haven't seen these levels in years and that suggests that

25   demand over the next few months is going to be very soft.  In

Vomero - Direct                                         193

1   addition, according to Global Insight, which is a very

2   reputable forecasting firm, we're looking at GDP going from

3   positive growth in 2008 to negative growth in 2009 for the

4   first half of the year and I think even last week the Federal

5   Reserve reduced their forecast for the GDP.

6           So this is the environment we're in and this is what

7   we're doing today.

8   BY MR. TISHLER:

9   Q.   Is there a seasonal or other unusual reason that could

10  explain the sharp decline over the last four months in this

11  business?

12  A.   We've done year over year changes and we did add the

13  insurance proceeds back -- management's estimate for the

14  medical fire -- so whether or not that's a good number but

15  that's what we did.

16  Q.   Can connector seals' consolidation alone reverse this

17  trend?

18  A.   No, I don't believe it can and the reason for it is if you

19  looked at December connector seals sales it was only

20  $272,000.00.  There's just not going to be enough EBITDA

21  generated from that volume over the next six months or even

22  beyond six months -- the visibility is very murky.

23          THE COURT:  What about the reduction in overhead from

24  closing the Vienna plant?

25          THE WITNESS:  Well, if you looked at 2007 --

Vomero - Direct                                      194

1          THE COURT:  Because they estimated $300,000.00 a

2    month in the reduction in overhead.

3          THE WITNESS:  Part of that is they're moving the LSR

4    group out of Vienna back to North Canton.  If you looked at

5    2007, in 2007 they had a negative -- when they ran it there it

6    was negative EBITDA at 600,000 so I think the real issue we're

7    facing now is substantial volume declines right now and that's

8    the way I viewed it.

9          I think with connector seals the other issue is as

10   volume declines, the bank requirement declines which decreases

11   the amount of cash that they're going to get from the inventory

12   build and even after that when the consolidation is finished

13   they're going to have to ramp up inventory so there's going to

14   be a need for cash in that requirement.  Having said that I

15   think it's a good project and it should be done and it's going

16   to help but it's not going to bridge the gap.

17   BY MR. TISHLER:

18   Q.   The variance revenue drivers of this company, what

19   historically have been the two largest revenue producers of

20   their divisions?

21   A.   It's been the OE automotive that's been the biggest and

22   the after market automotive is No. 2 historically.

23   Q.   That is the connector seals and insulators?

24   A.   Correct.

25   Q.   Is that how they're identified on here?

Vomero - Direct                                    195

1  A.    Yes.

2  Q.    So the connector seals business is declining but you've

3  also got on here that insulators is also declining, I believe,

4  isn't it?

5  A.    Well, it's the Jasper facility because they've commingled

6  OE and after market.  The facility produces both and so what's

7  happening is the decline in OE is in essence cannibalizing

8  after market on an EBITDA basis at least over the last few

9  months.

10 Q.    It had a decline of 24 percent, I believe?

11 A.    That's correct.

12 Q.    That would be year over year?

13 A.    Correct.

14 Q.    What is the business reason -- we've talked about some of

15 them but why don't you go ahead and say as many as you can

16 think of -- what are the business reasons behind the

17 consolidation of the connector seals business?

18 A.    I mean the business is evaporating.  I mean it did

19 $300,000.00 of revenue in January.  They've got to do something

20 and I think it is the right thing to do and I want to see it

21 succeed.  I think everybody does.  I think the issue with the

22 connector seals is there's so much uncertainty in terms of the

23 economic benefits of that consolidation because you've got

24 revenue changing and you've got customer commitments changing,

25 you have execution risk involved the transition and these are

Vomero – Direct                                    196

1   not easy things to do.  Yes, I think management can get it done

2   but when we look at the benefits they're very difficult to

3   project.  They're very difficult.

4   Q.   Do you have an opinion as to whether they can get it done

5   on this suddenly shortened time frame?  Get it done by the end

6   of May?

7   A.   I haven't studied it, I think, deeply enough to see if

8   they can get it done by the end of May but it would be quite an

9   accomplishment if in fact they could do that.

10  Q.   What's the last four month's trends in sales for this

11  company?

12  A.   The last four, it's down 29 percent on a year over year

13  basis.

14          THE COURT:  What's the four months that we're talking

15  about?  Is it December, January, February, March?

16          THE WITNESS:  It would be from January.

17          THE COURT:  January?

18          THE WITNESS:  Yes.

19  BY MR. TISHLER:

20  Q.   If you would go on to the next slide, Mr. Vomero.  There's

21  also, I believe, you were testifying that there's been a

22  decline in enterprise value?

23  A.   That's correct.  Since the filing date we've seen a

24  decline in TEV from at least through December 31st of 25

25  percent and then an additional five percent through February

Vomero - Direct                                    197

1   10th of bar measurement points.

2   Q.    TEV is total enterprise value?

3   A.    That's correct.  What we've seen is both a decline in peer

4   group multiples as well as the trailing twelve month EBITDA so

5   we've seen a decline in both of those items.

6          THE COURT:  How do you select your peer group versus

7   how W.Y. Campbell selected its peer group?

8          THE WITNESS:  Well, if you go back they did

9   transactions that were dated.  If you go back to their August

10  14th or mid-August report -- all of our comps are on their comp

11  list but the difference is we scaled out super large companies

12  like Bridgestone which are just not comparable.  There were a

13  few other -- if I had in front of me I think Vistion was on

14  there as well.  It's just not a good comp.  Then, also, we

15  scaled back from size because in valuation there are size

16  premiums so the smaller a company the riskier it is and there's

17  been a fair amount of research and it's a highly recognized

18  concept.

19         THE COURT:  Did you ever meet with anyone from W.Y.

20  Campbell and discuss comparables and peer groups?

21         THE WITNESS:  No.  Our discussions have been mostly

22  about the sale process.  But our logic was let's get the peer

23  group -- let's narrow in sizes, No. 1.  No. 2 is geography

24  matters when you're comparing companies because international

25  markets are different and in some instances are growing faster

Vomero - Direct                           198

1   than domestic.  So Lexington's business is a domestic business

2   so we scaled and looked at the international diversity and

3   tried to get companies that were primarily North American --

4   and when I say "domestic" I mean north America.  The next

5   criteria we did is there are kind of two different types of

6   companies, there are companies who develop products and have

7   patents for products, branded products, research and

8   development their product companies and some of them may

9   manufacture or some of them may outsource the manufacturing.

10  Lexington doesn't develop products, they do it with their

11  customers but the customers own the rights to those products so

12  we wanted to get contract-type manufacturers that are similar

13  that compete on having really good process technology like

14  Lexington.  The only exception to that is in the after market

15  where they actually will make like knock-off molds; they

16  actually own the product but they will replicate a product or

17  develop something to make a product that goes on to an existing

18  vehicle.

19          THE COURT:  Thank you.

20          THE WITNESS:  So that was our criteria and when we

21  looked at the peer group, the peer group was larger.  The peer

22  group -- four of the six paid dividends, Lex doesn't.  Then the

23  peer group is generally less levered than Lex' even when you

24  eliminate the subordinated debt or what's subordinated to

25  Capital Source.  So you could arguably justify a discount on

Vomero - Direct                        199

1   that basis but on a quantitative basis we just wanted to stick

2   with the current market data as best we could.

3              THE COURT:  You only have one comparable for medical

4   supplies?

5              THE WITNESS:  Yes.  The reason for that is there are

6   a couple of companies that were reasonably similar but they're

7   product-based companies; they actually have patent protection,

8   they're branded products and even Wess -- but if you look at

9   Wess, Wess is actually much stronger, it's the market leader.

10  So, arguably, it's trending at a higher multiple than Lex was

11  but, yes, I only had one.

12  BY MR. TISHLER:

13  Q.   Why is there a diminution in the total enterprise value?

14  A.   It's based on the decline in the market and market

15  multiples and then also the debtor's EBITDA performance.

16  Q.   So what has the decline been from March of last year to

17  roughly this time frame based on your report?

18  A.   What has declined?

19  Q.   What is the diminution of the total enterprise value?

20  What was the amount on March 2008?

21  A.   $90.2 million.

22  Q.   Where is it today?

23  A.   Well, February 10th, it's at $63.4 million.  So that's a

24  thirty percent diminution in value.

25  Q.   What's the effect of a lower total enterprise value on a

Vomero - Direct                                        200

1   cash burn?

2   A.   We had to make the assumption when we did this that the

3   debtor would have sufficient cash flow to realize the value.

4   If we get to a point during this process where there isn't

5   enough cash flow or it's unreasonably low, then you may not

6   recognize or realize that value but we had to make the

7   assumption that they were going to have cash flow and if it

8   gets unreasonably low you would convert your analysis to an

9   asset-based approach, more likely, because you have to run

10  through an expedited process.

11  Q.   So in other words if they run out of money the process

12  turns into kind of a fire sale approach to selling assets?

13  A.   It would be expedited.  It would be an expedited sale.  At

14  least now as we sit here we have the luxury of some cash and

15  some time.  We don't know what we're going to have in three

16  months or six months.

17  Q.   Have you done a liquidation analysis of this business in

18  connection with your report?

19  A.   No, not of the whole company.  No.

20  Q.   Is it fair to say, though, a liquidation value would be

21  less than a total enterprise value?

22  A.   Yes.

23       THE COURT:  Have you had any discussions with anyone

24  from the company about what the minimum cash required is to

25  operate the business?

Vomero - Direct                    201

1        THE WITNESS:  No, I have not.  What makes it a

2   challenge is the amount of the professional fees.  They've been

3   so difficult.  So from an operational perspective, I think that

4   the company can provide some pretty good numbers but when you

5   throw in the costs of all this I think it becomes a real

6   challenge to see what's going to happen to cash over the next

7   three to six months.

8        THE COURT:  Maybe if everybody would come together

9   and come to an agreement we wouldn't have had so many contested

10  --

11       THE WITNESS:  I mean that's just my view.  I'm sure

12  Dennis has a different view.  That's the way I would

13  characterize it.

14       THE COURT:  Is it fair to say that you think Mr.

15  Welhouse has done a good job in terms of estimating the cash

16  flow in the business?

17       THE WITNESS:  Yes, the thirteen week cash flow.  Yes,

18  I think Dennis has done a fine job with that.

19  BY MR. TISHLER:

20  Q.   Mr. Vomero, what are the reasons for the enterprise

21  decline in your report?

22  A.   The decline in?

23  Q.   Enterprise value.

24  A.   The decline in the enterprise is the decline in the market

25  multiples and a decline in the debtor's financial performance

Vomero - Direct                                    202

1   as measured by EBITDA.

2   Q.    What do the next three to six months look like for Tier 2

3   and 3 suppliers like Lexington?

4   A.    It's going to be a real challenge.  I mean we're facing

5   declining GDP or at least the last report I had which is a

6   couple of weeks old.  You've got the big three with record

7   inventories suggesting very slow production over the next few

8   months so it's going to be a real challenge.

9   Q.    What about for the medical device business?

10  A.    It ended January with good, solid sales.  I think it's got

11  a good book.  It's got good prospects.

12  Q.    Why do you think would be a good time to explore a sale of

13  the medical device business?

14  A.    Because I think everybody suffers if we start the process

15  and it's too late and I think you've seen such a marked decline

16  on a year over year basis in the business that it doesn't seem

17  to me that it's worth the risk right now because if we wake up

18  one day -- again, it's very difficult to predict what's going

19  to happen over the next three months given the declines that

20  we've seen, we don't want to wake up and find out that we're

21  dangerously low on cash and we're not going to have enough time

22  to run a sale process.

23  Q.    Is it your sense -- you haven't tested the market for

24  buyers for medical devices or anything like that, have you?

25  A.    No, I have not.

Vomero - Direct                                203

1  Q.   But is it your sense that the medical business -- there

2  may be more buyers out there than auto supplier buyers?

3  A.   Yes.  I mean one of the things we did is we looked at

4  transactions over the past -- since the fourth quarter through

5  mid-February.  In aggregate we found that there were 74

6  transactions and those are both automotive and medical.  I

7  think it was roughly an equal split in terms of the numbers but

8  there were a lot of transactions that were being done out there

9  but I think it would be easier to realize value for medical

10 than the errant piece [sic].

11 Q.   This company dramatically reduced its secured debt.  Do

12 you believe it could more easily obtain exit financing?

13 A.   Yes.  I mean [inaudible] the balance sheet would be a very

14 good thing.

15 Q.   What was the impact on the business -- I believe you were

16 assisting Capital Source at the time they went out to market

17 with medical device before back in 2007, is that right, the end

18 of 2007?

19 A.   Well, the process started is my recollection -- and I

20 might be off on dates here -- is late spring/early summer of

21 2007 is when it began.  It was part of a forbearance that had

22 milestones to march down a sale process.

23 Q.   In connection with that process what harm came to the

24 debtor's medical device business that you're aware of?

25 A.   I'm not aware of any.

Vomero - Direct                                        204

1   Q.   What do you think would be worse to customers and vendors

2   of this medical device company?  Exploring a sale or just an

3   indefinite stay in bankruptcy?

4   A.    In exploring the sales.  In my view exploring a sale is a

5   better option compared to if we do have to run a fire sale.  I

6   think it puts the customers in more jeopardy.  It may not be

7   the most perfect alternative we have available but given what's

8   a possible outcome.

9   Q.    Mr. Vomero, would you turn to Page 17 of your expert

10  report?  I don't want you to read this because the Judge has

11  already read it, but I just want you to testify as to some of

12  the risks associated with the consolidation of the connector

13  seals business that you see?

14  A.    When we did this we were given the -- I don't want to get

15  into all of the different forecasts -- but what we looked at is

16  the economic benefits associated with the connector seals

17  consolidation and these are risky.  They're very difficult to

18  predict in terms of timing, in terms of quantities, in terms of

19  customer consent.  One of the things that heightened our risk

20  level was we were notified of this in early December.  It's

21  three months later, we don't have any contracts and it would be

22  great to gather them.  We want to gather them and get going but

23  until we do we have a level of uncertainty that makes it

24  difficult to project what's going to happen.

25  Q.    I believe those contracts require customers to commit to a

Vomero - Direct                                        205

1   long period of time to buy from --

2   A.   Well, that's what the proposal is right now.  I don't

3   think we have any final, signed contracts.

4   Q.   What would be next?  Anything?

5   A.   I mean we went through -- there's risks in resourcing,

6   there's risks in pricing as well, a number of the variables can

7   change.

8   Q.   What was the initial cost savings projected by doing the

9   connector seals consolidation?

10  A.   Well, the initial liquidity over the next six months was -

11  - I think it was a $2 million to $3 million pick up.  The cash

12  went from like $5.5 million to almost eightish, roughly.  I

13  can't remember the exact number but in that order of magnitude.

14  Q.   Did they initially project a higher number than they are

15  now projecting?

16  A.   That's correct.

17  Q.   Do you remember what those numbers are?

18  A.   Well, I think $2 million is what the current projection is

19  but that's from the thirteen week forecast.  So it's changed

20  fairly dramatically.

21  Q.   What's been the historical value of the machining

22  business?

23  A.   Well, if you look back four years on machining it's had

24  over the last four years negative EBITDA on all years except

25  for one which was 2007.  I think it did a half million EBITDA

Vomero - Direct                                    206

1   at that point.  From time to time I've done liquidation

2   analysis on machining when we've had KER [sic] appraisals.

3   Those analyses were between $6 million to $7 million so even if

4   that business turned $1 million of EBITDA, I think the OE

5   automotive business is trading now at 3 and you're looking at

6   $3 million versus $6 million to $7 million potentially

7   available so there's enough data there to suggest that it's

8   better being liquidated because it's not earning it's cost of

9   capital and it certainly hasn't over the last four years.

10  Q.   Mr. Lubin testified that there's been a real upsurge, I

11  think, in potential customers for that business.  Were you

12  aware of that?

13  A.   Yes, I was aware of that.  Yes, again, this business has

14  one customer.  It's machining as one business historically but

15  there's always been a compensating factor whether it's demand,

16  whether it's lost customers, changing quantities, etc.  So when

17  you look at Lexington I've always viewed it as a portfolio;

18  you're going to gain customers, you're going to gain wins but

19  there's also downside risks and that's what at least I've

20  observed over the last couple of years.

21  Q.   Is the machine business especially susceptible to the OEM

22  business?

23  A.   Yes, there's a high concentration in OE automotive.

24  Q.   What's your opinion as to how this case should proceed

25  from this point?

Vomero - Direct                                    207

1  A.   I think we need to explore all options at this point.   I

2  think to manage the risk of this case it's in everybody's best

3  interest to add a level of security in the event things

4  deteriorate further.

5  Q.   What would you recommend then?

6  A.   I would recommend we explore a sale process or get

7  ourselves in a position to do that in some form.   There's a lot

8  of effort to put together in OE and get things going but that's

9  my view right now.

10      MR. TISHLER:  Your Honor, I'd like to move the

11 admission of Mr. Vomer's expert report into evidence and I'd

12 also like to move the slides into evidence as summaries of his

13 expert report.

14      MR. STROCHAK:  No objection, Judge.

15           (PSL Exhibits A and F, Received.)

16      THE COURT:  All right.  PSL-A which is the expert

17 report is admitted into evidence and the slides which have been

18 marked today as PSL-F are in evidence.

19      MR. TISHLER:  That's all I have for now, Your Honor.

20      THE COURT:  Let's see if Mr. Bracht wants to cross-

21 examine before you do, Mr. Strochak.

22      MR. BRACHT:  Your Honor, I think I want to hear what

23 Mr. Strochak has to say.  I don't have anything.

24      THE COURT:  Go ahead, Mr. Strochak.  You can get

25 started at least this afternoon.

Vomero – Direct                                    208

1          MR. STROCHAK:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3     BY MR. STROCHAK:

4     Q.   Mr. Vomero, let's start if we could with debtor's Exhibit

5     3 which you should have a binder up there with the debtor's

6     exhibits in them.  If you could turn to Tab 3?

7     A.   Okay.

8     Q.   Now, the first page of debtor's Exhibit 3 is the

9     consolidated summary of the results for 2008 through October --

10    actual results -- and then projected results for November and

11    December; correct?

12    A.   Correct.

13    Q.   And we were looking at the EBITDA figure in the forecast

14    year column of $9.6 million; correct?

15    A.   Correct.

16    Q.   I think you indicated that you had some subsequent

17    information that indicated lower EBITDA results for 2008.  Is

18    that correct?

19    A.   Yes.  We were just doing a comparison to these two

20    documents.  Right.

21    Q.   You came up with a number around 8.7?  Is that correct?

22    A.   That's correct.

23    Q.   So what accounts in your mind for the delta between the

24    9.6 in the projected results for 2008 and the 8.7 that you're

25    working off of?

Vomero - Cross                                209

1  A.    I didn't to a reconciliation.  We started with this and we

2  plugged in the actual numbers when they became available so I

3  didn't do a reconciliation.

4  Q.    Did you look at all at any of the adjustments that had

5  been made to any of the numbers, particularly the 9.6 on

6  Exhibit 3?

7  A.    No, we just used the actuals.

8  Q.    When you say you "just used the actuals," you didn't try

9  and reconcile the 8.7 that you were using as an actual to the

10 9.6?

11 A.    No, I didn't recognize this spread sheet to what we used.

12 Q.    What you used is unadjusted with no adjustments at all?

13 A.    Well, no, we made adjustments.

14 Q.    So your 8.7 was adjusted?

15 A.    No, we used --

16      THE COURT:  It was off the sheet that your client

17 gave you.

18      THE WITNESS:  Yes, we added .6 of pro forma

19 adjustments to ours to come up with like 9.4 or something like

20 that.

21 BY MR. STROCHAK:

22 Q.    But you didn't reconcile the 8.7 that you read with the

23 9.6 in the earlier data?

24 A.    No, I didn't.  I may have or one of my principals may have

25 done it but I didn't, I thought we were pretty comparable and

Vomero - Cross                    210

1   we were able to tie out to what was filed in the papers and the

2   order of magnitude, I think, we were in the ball park.

3   Q.   Turn with me if you could to debtor's Exhibit 13?

4   A.   Yes.

5   Q.   Looking at the 2008 actual column -- again, these are

6   preliminary results, not audited, but actual results for 2008.

7   The total at the bottom for the EBITDA number is $9.58 million

8   or roughly $9.6 million; correct?

9   A.   Correct.

10  Q.   That as indicated in the footnote has been adjusted for

11  $488,000.00 in consulting fees; correct?

12  A.   Correct.

13  Q.   And $190,000.00 impact from the fire; right?

14  A.   Correct.

15  Q.   So when we back out those adjustments my math shows

16  roughly $8.9 million of actual EBITDA for 2008; correct?

17  A.   Yes, that would be correct.  So we probably got different

18  versions -- there's probably version issues between what we

19  received and what this shows.

20  Q.   In other words, it more or less squares with the 8.7?

21  A.   Yes, I think we're in the ball park.  I mean it's not an

22  issue for me which is pretty common.

23  Q.   Turn with me if you would to the summary slides that you

24  prepared, Exhibit F in evidence?

25  A.   Yes.

Vomero - Cross                           211

1   Q.   The chart -- the historical and projected cash on hand

2   chart in the middle of the page begins on June 30, 2008.  What

3   did you being it on June 30, 2008, the high point for the cash

4   and not the beginning of the Chapter 11 cases in April when

5   cash was significantly lower?

6   A.   Because we had seen a dramatic downturn in the business in

7   the second half of the year.  If you look at the year over year

8   changes, the first half versus the second half, it's been

9   incredibly dramatic.  So that was our starting point.  I think

10  a probably better comparison to be with good history is what's

11  happened since 12/31 moving forward is a better comparison.

12           THE COURT:  12/31?

13           THE WITNESS:  Of 2008 to where we are today is

14  probably the right comparison.

15  BY MR. STROCHAK:

16  Q.   You've indicated that going back to the high point of the

17  debtor's cash after the DIP loans were in and reflecting as Mr.

18  Welhouse testified, the deferral of certain reorganizational

19  expenses, you've indicated that the cash burn is roughly

20  $600,000.00 a month.  Is that right?

21  A.   From June 30th?

22  Q.   Yes.

23  A.   Yes, that's what would be indicated in that report but,

24  again, I think the better measure is what was cash at that

25  point before the deferral.  I'm sorry, I think the better

Vomero - Cross                          212

1   measure is what was cash at 12/31 compared to where we are at

2   today so the effects of the deferral aren't included in the

3   numbers.

4            THE COURT:  So you want to compare the $5.5 million

5   to --

6            THE WITNESS:  $4.0 million so that washes out.

7   BY MR. STROCHAK:

8   Q.   So that's roughly $1.5 million in roughly a month and a

9   half?

10  A.   I think that's correct.

11  Q.   Now, isn't it correct, sir, that December and January were

12  really perfectly awful months in the OEM sector; correct?

13  A.   Yes.

14  Q.   So a substantial portion of the debtor's revenues took a

15  tremendous hit due to what was going on in the OEM sector.  Is

16  that right?

17  A.   That's correct but we had seen this deterioration as well

18  -- there was deterioration in the third quarter relative to

19  what's happened as well.  So it's been an erosion with a

20  significant drop in the fourth quarter is the way I would

21  characterize it.

22  Q.   Let me turn if I could to the valuation exercise that you

23  did and if you look at your report on Page 42?

24  A.   Yes.

25            MR. STROCHAK:  For the record, that's Exhibit A in

Vomero - Cross                                  213

1  evidence.

2  BY MR. STROCHAK:

3  Q.   With respect to your OEM comparable companies you've only

4  identified three, is that the only three companies that you

5  could find that were in your view somewhat comparable in some

6  way to the debtors?

7  A.   Yes, based on the criteria we discussed, that's what I

8  feel is comparable.

9  Q.   With respect to medical you've only identified one, I

10 believe, as the Court pointed out.  Is that right?

11 A.   That's correct.

12 Q.   Again, you found no other companies in the marketplace

13 that were comparable in any way to the debtors for inclusion in

14 this analysis?

15 A.   Not in my view.

16 Q.   Is it typical in performing a valuation to rely on a

17 single comparable for a publicly traded comparables analysis?

18 A.   I've done it before, yes.

19        THE COURT:  That wasn't the question.

20 BY MR. STROCHAK:

21 Q.   The question was is it typical to do so?

22 A.   It's not uncommon but the majority of cases would use

23 multiple comps.

24 Q.   Is there something particularly unique about the medical

25 history that suggests justification for reliance on only a

Vomero - Cross                                          214

1  single comparable company?

2  A.   I was only able to find one contract manufacturer in

3  medical that was public.  The other ones that we had seen were

4  private so that was the basis.

5  Q.   In the automotive after market you've only used two

6  comparables.  Again, you were not able to identify any other

7  companies in the automobile after market parts business that

8  were comparable to the debtors?

9  A.   Most were significantly larger or had significant

10 international operations so we're in completely different

11 markets and competitive positions.

12 Q.   What's going on in the international markets that's

13 dramatically different than what's going on in North America?

14 A.   In what segment?

15 Q.   In automobiles?

16 A.   In automobiles?  China has had significant growth.  In

17 fact, China -- I think in January there were more sales of

18 autos in China than there were here so the market there is

19 growing tremendously, has better growth prospects.  India, the

20 same.  Europe, in the OE business I can't comment, I haven't

21 spent much focus there on Europe but anyway having

22 international presence in China in particular is promising.

23 It's definitely promising.  There's no doubt about it.

24 Q.   Which after market companies did you consider and then

25 eliminate because you found they had international exposure?

215

1  A.   Oh, that's right, you were talking about OE.   On the

2  international side you mentioned, though -- my response was to

3  OE automotive, not after market.   Sorry for the confusion.

4  Q.   Let's go on the same page.   Let's talk about after market

5  and with respect to after market you only identified two

6  comparables to the debtors.   Why were you able to locate only

7  two comparables in automotive after market?

8  A.   A lot of the comps we looked at -- we have this documented

9  and I don't have it with me but a number of them were larger or

10 they were distributors or, again, failed the criteria of the

11 screen that we established here.   So I've looked at some and

12 those were the general characteristics for exclusion.   I can't

13 recall the specifics at this time but I could give it to you in

14 a couple of days.

15          THE COURT:   All right.   We're going to pick up with

16 the cross-examination in the morning.

17          Let me ask how many more witnesses are we going to

18 have tomorrow?   Mr. Strochak, you've already -- I don't know

19 whether you're going to have any rebuttal witnesses?

20          MR. STROCHAK:   We may have rebuttal.   I was just

21 going to mention that, Your Honor.

22          THE COURT:   Mr. Tishler?

23          MR. TISHLER:   Mr. Vomero is my only witness.

24          MR. BRACHT:   We're planning on calling two or we were

25 planning on calling two and I think we probably still will but

216

1   I think I'll probably, hopefully, bring it down some.  I don't

2   think it's going to take that long.  They're not long

3   examinations.

4          THE COURT:  Just so you all know, tomorrow we can

5   only go from -- we're going to start at 9:00 again and we have

6   stop by 12:15 because I'm on a panel all afternoon and so plan

7   accordingly.

8          So we'll start at 9:00.  See you all in the morning.

9                    *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

217

1                              * * * * *

2       I certify that the foregoing is a court transcript from an

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6                        _____

7                                    Ruth Ann Hager

8   Dated:   February 26, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25