```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3   ---------------------------------------X
                                            :
 4   In Re:                                 :   08-11153 (MG)
                                            :
 5       LEXINGTON PRECISION CORPORATION,   :   One Bowling Green
                                            :   New York, New York
 6                  Debtor.                 :
                                            :   February 24, 2009
 7   ---------------------------------------X

 8
                          TRANSCRIPT OF TRIAL
 9            BEFORE THE HONORABLE MARTIN GLENN
                 UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12   For the Debtors:          ADAM STROCHAK, ESQ.
                               ALEX LEVINE, ESQ.
13                             JOHN LUCAS, ESQ.
                               Weil, Gotshal & Manges LLP
14                             1300 I Street, N.W.
                               Washington, D.C.  20005
15

16   For the Ad Hoc           JONATHAN LEVINE, ESQ.
      Bondholders Committee:  GERALD BRACT, ESQ.
17                             Andrews Kurth LLP
                               450 Lexington Avenue
18                             New York, New York  10017

19   For Webster:             SCOTT A. ZUBER, ESQ.
                               Day Pitney, LLP
20                             200 Campus Drive
                               Florham Park, New Jersey  07932
21

22   For Secured Lenders:     JOHN C. TISHLER, ESQ.
                               Waller, Lansden, Dortch & Davis LLP
23                             Nashville City Center
                               511 Union Street
24                             Nashville, Tennessee  37219

25                             (Appearances continue on next page.)


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1

 2

 3   APPEARANCES (Continued):

 4   For the U.S. Trustee:     Office of the United States Trustee
                               BY:   PAUL SCWARTZBERG, ESQ.
 5                                   ANDREW D. VELEZ-RIVERA, ESQ.
                               Assistant United States Trustee
 6                             33 Whitehall Street
                               New York, New York  10004

 7

 8   For Capital Source:       AARON R. CAHN, ESQ.
                               Carter, Ledyard & Milburn LLP
 9                             2 Wall Street
                               New York, New York 10009

10

11   Court Transcriber:        RUTH ANN HAGER
                               TypeWrite Word Processing Service
12                             211 N. Milton Road
                               Saratoga Springs, New York  12866

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                                                        3

 2

 3                              INDEX

 4   Witness          Exam-Court  Direct   Cross    Redirect   Recross

 5   DEBTORS':

 6   Dean Vomero                           4 (Strochak)
                                          45 (Bracht)
 7                                                   49 (Tishler)

 8   Jessie Ultz                   56     76 (Strochak)

 9   Nick Walsh                    81     86 (Strochak) 92
                                          91 (Tishler)
10
     Closing Argument by Mr. Strochak, P. 99
11   Closing Argument by Mr. Tishler, P. 125
     Closing Argument by Mr. Bracht, P. 132
12

13                        E X H I B I T S

14                        Description                  ID.    EV.

15   COMMITTEE'S:

16   17    Income statement for Jasper,
           Georgia Plant                               36
17
     Q, R, S, T, U, V, W, X, Y, Z, AA, BB        --    55
18      CC, DD, EE, FF, GG, HH, II, JJ
        KK, LL    (All Deposition Exhibits)
19

20   PSLG Preliminary Summary of Net Sales        --    58

21   A    Changes in Projections                  --    72

22   B    Monthly Budget to Actual                --    58

23   D    Chart of Comparable Values              --    72

24   H    199-2007 Actual Sales                   --    72

25   K    Capital IQ Data                         --    74
```

4

1          THE COURT: We're still in the midst of Mr. Vomero's

2     cross-examination.

3          MR. STROCHAK:  That's correct, Your Honor.

4          THE COURT: Mr. Vomero, can you please come back to

5     the witness chair?  You're still under oath, Mr. Vomero.

6          Before we begin, with respect to scheduling, we can

7     go this morning until 12:15.  I'm going to be tied up from

8     12:30 to 3:30.  I know I said yesterday we would resume today.

9     We can actually resume, if necessary, this afternoon from 3:45

10    until 6:15.  Hopefully it won't be necessary but that's the

11    plan.

12         MR. STROCHAK: Thank you, Your Honor.

13                         CROSS-EXAMINATION

14    BY MR. STROCHAK:

15    Q.   Good morning, Mr. Vomero.  You have visited each of the

16    debtor's plants; correct?

17    A.   Correct.

18    Q.   You visited the medical plant in Rock Hill?

19    A.   Yes.

20    Q.   Just once?

21    A.   Yes.

22    Q.   The insulators plant in Jasper, Georgia just once?

23    A.   Correct.

24    Q.   Were your visits sufficient to familiarize yourself with

25    the operations of the plant and its functions?

Vomero - Cross                                    5

1   A.   At a moderate level or lower level.

2   Q.   On a lower level?

3   A.   I would say moderate level.

4   Q.   Now, you understand that the medical plant in Rock Hill is

5   a self-contained operation; correct?

6   A.   Can you be more specific?

7   Q.   Yes.  Are there any critical operations for the medical

8   business that are outside of the Rock Hill plant?

9   A.   I'm not certain.

10  Q.   You're not sure one way or the other?

11  A.   Correct.  I'm not certain if mixing is done there.

12  Q.   Have you looked into the administrative functions for the

13  medical division?  Do you understand where the administration

14  functions for the medical division are performed?

15  A.   It's certain administration functions are performed there.

16  Q.   Do you understand that they have local finance staff for

17  the medical division in South Carolina; correct?

18  A.   I think they have accounting and -- it's not clear to me

19  if they have finance stuff there.  They do have some

20  accounting.

21  Q.   Are you familiar with any functions for the medical

22  division that are performed outside of Rock Hill?

23  A.   I'm not certain if treasury or IT or general management

24  type items are at Rock Hill or not.  I do know some

25  administrative functions are performed there.  That's my

Vomero - Cross                                                    6

1   understanding right now.

2   Q.    Do you understand they have a -- the company has a

3   corporate office in New York; right?

4   A.    Correct.

5   Q.    And the company has a corporate CFO, Mr. Welhouse; right?

6   A.    Yes.

7   Q.    Apart from the functions that the corporate office in New

8   York and Mr. Welhouse as CFO may perform, are you aware of any

9   services necessary to support the Rock Hill medical business

10  other than those provided at the Rock Hill facility?

11  A.    Other than what I've discussed previously.

12  Q.    So the answer is no other than the treasury function and

13  perhaps the finance function that you mentioned?

14  A.    I'm not certain if information technology is done there or

15  it's centralized in another location.

16  Q.    Looking at the Rock Hill facility from the perspective of

17  a potential buyer, is it your understanding that a potential

18  buyer could operate that business as a stand-alone business?

19  A.    Depends.

20  Q.    It depends on the buyer?

21  A.    Correct.

22  Q.    So a buyer with corporate overhead, finance function, IT

23  function perhaps could simply acquire the medical business and

24  operate it; correct?

25  A.    It depends who the buyer is.

Vomero - Cross                                    7

1   Q.   If the buyer had -- assume for me for a second that the

2   buyer has a corporate overhead structure, a finance function,

3   an IT function, a treasury function.  That type of buyer, they

4   could simply acquire the medical business and operate it as a

5   standalone business; is that right?

6   A.   I believe they would.  Again, that's a difficult one to

7   answer because it depends who the buyer is.  They're going to

8   want additional management in there.  They're going to want --

9   have their own services that they want that are different than

10  what the facility is today.  It's a very difficult question to

11  answer and I'm not -- again, it's a very challenging question

12  to answer.

13  Q.   Well, have you done any analysis of the saleability of the

14  medical plant in Rock Hill on a standalone basis?

15  A.   Other than discussions with Campbell on the sale process

16  and management I haven't done -- and the valuation work we did.

17  Q.   You did the valuation work; correct?

18  A.   Correct.

19  Q.   In doing the valuation work, did you do any assessment of

20  what a perspective buyer would be looking at in terms of the

21  necessity of providing services for the medical business?

22  A.   An assessment of services that a potential buyer would

23  have to -- let me make sure I understand your question.

24       Is your question if a buyer were to come in what type of

25  services would that buyer have to provide above and beyond what

Vomero - Cross                                    8

1  is at Rock Hill.  Is that your question?

2  Q.    Yes, exactly.  Did you make any assessment of that issue?

3  A.    Assessment?

4  Q.    You seem to be struggling with the question.

5  A.    Yes, I really am.

6  Q.    So let me see if I can rephrase it for you.

7       You assessed in some way, shape or form the ability to

8  divest the medical business in Rock Hill; correct?

9  A.    No.  We valued the total enterprise on a fair market value

10 basis and what we did is tried to marry the cash streams for

11 each one of the different business units.  So we didn't -- we

12 assumed a willing buyer, a willing seller for the entire

13 corporate entity.  So that was the presumption I made when I

14 did the valuation work.  So stripping it out and selling

15 individual units perhaps could be done but the assumption we

16 made was that it was the entity intact.

17 Q.    So you're not sure whether or not the sale of individual

18 units could be accomplished.  Is that what you're saying?  You

19 haven't analyzed that issue?

20 A.    Based on the results of the sale process it's feasible.

21 Q.    Which sale process are you referring to, the prepetition?

22 A.    Correct.

23 Q.    And the prepetition sale process resulted in an offer of

24 $32 million subject to diligence, a conditional offer for $32

25 million for just the medical business; correct?

Vomero - Cross                                                    9

1   A.    That's my understanding.

2   Q.    That buyer Trummer Board [Ph.] was not proposing to

3   acquire any of the corporate assets, correct, the corporate

4   overhead, so to speak?

5   A.    Correct.

6   Q.    Now, apart from the prepetition sale process, in

7   connection with your work for this hearing in your report, have

8   you done any analysis of the types of buyers that would in fact

9   consider purchasing the medical business?

10  A.    No specific buyers for the med -- not -- I want to make

11  sure I understand the question.  Can you repeat it, please?

12  Q.    Yes.  I'm trying to get a sense.  You're telling us that

13  you think it's reasonable to market the medical business and my

14  question is have you done any analysis of the types of

15  potential acquirers who might actually be out there and might

16  be interested in purchasing it?

17  A.    We've looked at two of the interested parties.  Of course,

18  Trummer Board and I think Parker Hannifon [Ph.] was interested

19  in certain -- interested in the business generally.  We looked

20  at kind of their financial health and wherewithal generally,

21  but that's the extent of what we did.

22  Q.    Do you believe that any buyer for the medical business

23  would be looking to acquire the corporate overhead, the

24  corporate structure and the cost structure associated with the

25  corporate office?

Vomero - Cross                                    10

1          THE COURT: Mr. Bracht?

2          MR. BRACHT: Your Honor, I would just request that the

3     witness speak up a little bit.  I'm having a difficult time

4     hearing him.

5          THE COURT: Just pull the microone closer to you,

6     Mr. Vomero.

7     A.   Can you repeat the question?

8     Q.   Yes, sure. Let me rephrase it.

9          Have you identified any potential buyers for the medical

10    business who would be interested in acquiring the medical

11    business itself in Rock Hill and the corporate overhead that

12    goes along with it?

13    A.   We didn't do comprehensive analysis of who the potential

14    buyers would be.  What we did was printed limited.

15    Q.   Let me switch to the Jasper facility, the insulators

16    facility.

17         With respect to the insulators facility, have you made any

18    assessment of whether or not you could operate as a standalone

19    facility or needs additional services provided by the corporate

20    offices?

21    A.   My understanding is it's fairly similar to Rock Hill in

22    terms of the administrative functions.  So my answers would be

23    the same.

24    Q.   Have you done any analysis of the types of potential

25    buyers who might be interested in the insulator's business?

Vomero - Cross                                              11

1  A.    No.

2  Q.    If you could pick up the binder with the lender's exhibits

3  in it and your report, Exhibit A.

4  A.    I'm sorry. Which?

5  Q.    There should be a binder with the lender's exhibits in it.

6  I think it's the thin binder.  The first tab there I hope is

7  Exhibit A with your report.

8  A.    Okay.

9  Q.    Turn with me if you would to Page 45.

10  A.    I'm sorry, 45?

11  Q.    Yes.  Actually let me just start somewhere else.

12       Let's actually start on Page 9 of Exhibit A.  On Page 9,

13  sir, you've expressed your view that it's not an unreasonable

14  course of action for the debtors to consider divesting a

15  portion or all of their businesses and then you state several

16  reasons for that conclusion.  The first of those reasons is a

17  review of transactions from September 1, 2008 to February 10,

18  2009 in the automotive aftermarket OEM and medical sectors.

19       What I want to start with is it's your conclusion, sir,

20  that the evidence of eleven comparable transactions as you've

21  identified is a suggestion that there's a robust market for

22  deals in the current environment.  Is that correct?

23  A.    That coupled with the financial condition of the debtors.

24  We didn't think pursuing that option was unreasonable.

25  Q.    And the reason you didn't think pursing it was

Vomero - Cross                    12

1   unreasonable was because there are actually deals getting done

2   out in the marketplace; is that right?

3   A.    That's correct.

4   Q.    Even in the stressed environment; right?

5   A.    Correct.

6   Q.    Of the eleven, what you've categorized as comparable

7   transactions, how many of those were in the distressed

8   environment?

9   A.    I didn't classify them a comparable; I classified them as

10  reasonably similar.  In my mind there's a difference.

11  Q.    These are transactions where the seller was in a position

12  reasonably similar to those in the debtor's in these cases; is

13  that right?

14  A.    Based on the description of the target company it was

15  reasonably similar to one of the debtor's business units.

16  Q.    In what ways?  Were they reasonably similar with respect

17  to their financial condition or some other characteristic?

18  A.    It was basically their business, the types of product in

19  their business, their general business.

20  Q.    So it's industry as opposed -- industry and product as

21  opposed to financial condition?

22  A.    Correct.  So there wasn't financial information readily

23  available for most --

24  Q.    So you haven't provided any financial information for any

25  of these transactions; correct?

Vomero - Cross                                    13

1   A.   Based on our review it was pretty limited because most of

2   the transactions were private.

3   Q.   You're not able to make any assessment of the value that

4   the seller received in those transactions; correct?

5   A.   There might have been one or two but it was not -- my

6   recollection is very, very limited.

7   Q.   Your recollection is limited?

8   A.   No, no.  That the financial information with these

9   transactions was very limited if there was anything.

10  Q.   So you've not been able to determine whether these

11  companies in these transactions were able to achieve high

12  multiples, for example, of revenue or EBITDA in the prices that

13  they received; correct?

14  A.   Correct.

15  Q.   Now, you indicated that the most notable of these

16  transactions was Deli's sale of its global exhaust business and

17  that's notable because Deli was in a distressed situation; is

18  that correct?

19  A.   Correct.

20  Q.   What you're suggesting is that because Deli was able to

21  sell assets in a distressed situation that the debtors in this

22  case would also be able to sell assets in a distressed

23  situation.

24  A.   That was the assumption.

25  Q.   Ultimately your opinion is about saleability; right?

Vomero - Cross                          14

1  It's -- the question is could these assets be sold and you're

2  not offering any opinion as to the price in which they might be

3  able to obtain for them in a distressed situation; correct?

4  A.    When we did our valuation work we did it on a fair market

5  value basis for the whole entity.  So it's the best way I can

6  describe what we did.  I had to make the assumption there was a

7  willing buyer, a willing seller.

8  Q.    Well, this isn't evaluation; correct?  Your opinions with

9  respect to these transactions, those aren't evaluations;

10 correct?

11 A.    Correct.

12 Q.    What you're doing is you're offering an opinion that

13 there's a market out there and even companies in distress in

14 the automotive industry can sell assets in this market?

15 A.    That was -- correct.

16 Q.    Now, you don't have any indication or -- let me put it

17 this way.  You haven't done any analysis that suggests that the

18 market that you've identified is going to disappear at any

19 point in time; right?

20 A.    Our analysis was just over the last five months of

21 transactions.  So as current as the date of our report within a

22 week or so.

23 Q.    You can't offer any opinion that, for example, in July or

24 August or September of 2009 that there won't be willing buyers

25 out there to buy assets in the debtor's industries.  Is that

Vomero - Cross                                    15

1   correct?

2   A.   I think it's an interesting question because I think

3   there's always a willing buyer at the right price is one of the

4   assumptions I think.   In my view looking forward, I think is a

5   reasonable assumption.

6   Q.   Let me ask you about the second point on Page 9 of your

7   report where you indicate that your company bridge acted as

8   financial advisor for a distressed after-market parts

9   distributor and you were the financial advisor for that

10  transaction; correct?

11  A.   Chief restructuring officer.

12  Q.   You personally?

13  A.   Correct.

14  Q.   And you marketed that business?

15  A.   No.

16  Q.   How was it in sold, in what context?

17  A.   To a strategic buyer who the company has a relationship

18  with.   Not a relationship.   Who had discussed a transaction

19  about a year ago and it picked back up again in the summer.

20  Q.   That deal closed in December of last year?

21  A.   I think it was October when it closed.

22  Q.   Now, the reason you mentioned that transaction -- by the

23  way, what company is it?

24  A.   Parts Depot.

25  Q.   The reason that you mention that company is you believe

Vomero - Cross                              16

1  that that is an indicator that there is a robust market for

2  deals in the automotive parts after-market industry; correct?

3  A.   It's indicative of activity in the broad sector.

4  Q.   And that's the reason you included it in your report and

5  the basis for your opinion that it's not unreasonable or at

6  least one of the bases for your opinion that it's not

7  unreasonable for the data is to consider a sale of assets;

8  right?

9  A.   Correct.

10 Q.   I take it as chief restructuring officer for the company

11 that you concluded that you got a fair value for that business;

12 correct?

13 A.   Correct.

14 Q.   Mr. Vomero, I'd like to turn to the valuation work that

15 you did do.

16       THE COURT:  Did you consider that transaction as one

17 of the comparables for your analysis?

18       THE WITNESS:  No, it's not a comparable company but

19 in -- when we did our analysis we started broad with about --

20 broad searches and tried to narrow down to -- a broad

21 similarity, not a specific similarity like we did with the

22 comparable -- a comparable analysis.  So it's a much broader,

23 much broader in skill.

24       THE COURT:  So the fact that that company sold at 6.2

25 times EBITDA doesn't really bear on what any part of the

Vomero - Cross                                    17

1   Lexington business might be sold at?  Does it or not?  I mean

2   you put in your report that it was sold at 6.2 and it was an

3   after market, parts automotive after-market parts distributor.

4   Do you consider it similar or not similar?

5          THE WITNESS:  I would not consider it comparable for

6   valuation purposes.  The answer is I wouldn't use that

7   transaction multiple in the valuation.

8          THE COURT:  Go ahead, Mr. Strochak.

9          THE WITNESS:  I'm sorry.

10          THE COURT:  I'm saying Mr. Strochak should ask his

11  next question.

12          MR. STROCHAK:  Thank you.

13  BY MR. STROCHAK:

14  Q.   So we're on Appendix E on Page 42 of your report,

15  Exhibit A.  Are you with me?

16  A.   Yes.

17  Q.   Let me just start with an overview of the method that you

18  used here. Your methodology that you're using is comparable

19  public trading companies; correct?

20  A.   Correct.

21  Q.   In order to determine the multiples for your comparables

22  you compare their price, that is the market price for their

23  stock against their trailing EBITDA; correct?

24  A.   The equations that plus the market value of equity.  So I

25  think you just said stocks.  Stocks are a component of the

Vomero - Cross                                    18

1   enterprise value.  So other than that if you were to --

2   Q.    You derive a multiple for each of your comparables and

3   then either take it directly in the case -- we've only got one

4   comparable or aggregate in the case when you got more than one;

5   right?

6   A.    Yes.

7   Q.    And you've done that on three dates?  You've done that the

8   end of March '08, end of December '08 and February 10th;

9   correct?

10  A.    Correct.

11  Q.    Then you derive in the -- on the right-hand side of Page

12  42 in the table you show the trailing 12 months EBITDA for each

13  of -- for businesses of the debtors; right?

14  A.    Correct.

15  Q.    And you compare that in the first table against December

16  '08.  So you look at March '08, you look at December '08

17  trailing 12 months EBITDA; right?

18  A.    Correct.

19  Q.    Now, on the first line insulators, you show an improvement

20  in trailing months EBITDA goes from 5.9 to 6.3; correct?

21  A.    Correct.

22  Q.    That's an indication that that business is performing well

23  over that period; correct?  It's increased its trailing 12

24  months EBITDA over the period; right?

25  A.    Between those two periods it has.

Vomero - Cross                                    19

1  Q.   Now, again, dropping down to medical it goes from 2.2

2  million to 3.0 million trailing 12 months EBITDA and again that

3  indicates an increase in cash flow for that business; correct?

4  A.   Yes.

5  Q.   And that's also an indicator of strong performance for the

6  business; right?

7  A.   Correct.

8  Q.   In the next column, the valuation columns, you derive

9  those columns by multiplying the trailing twelve months EBITDA

10 by the applicable multiple; right?

11 A.   Yes.

12 Q.   And let's actually start with medical.  Medical you

13 show -- at 31 March '08 you show value of $21.3 million;

14 correct?

15 A.   Correct.

16 Q.   And you have that increasing to, is it 23.6 at the end of

17 December?

18 A.   Yes.

19 Q.   So you've got roughly a ten percent increase in value from

20 March to December 2008; correct?

21 A.   Correct.

22 Q.   And then you do it again with your February number and you

23 still come out just a little bit better than it started in

24 March; right?

25 A.   Yes.

Vomero - Cross                                    20

1  Q.   That indicates that the medical business in your analysis

2  has not lost any value over the course of the Chapter 11 cases;

3  correct?

4  A.   Correct.

5  Q.   Now, the 21.3 at the end of March, that is more or less

6  the same time period in which the company had an offer from

7  Trummer Board to buy the medical business for $32 million;

8  right?

9  A.   Yes.

10  Q.   Let's move up to insulators for a second, and the

11  valuation numbers that you get, 37.5 million in March, that's

12  derived by multiplying the March EBITDA by the applicable

13  multiple; right?

14  A.   Correct.

15  Q.   And you use the blended multiple there; right?  You

16  blended it to account for both OEM business and insulators and

17  aftermarket business and insulators; right?

18  A.   Correct.

19  Q.   Then the same thing applies for the December and February

20  valuations, correct, you just multiply the trailing twelve

21  months EBITDA times the applicable multiples; right?

22  A.   Yes.

23  Q.   Now, the insulator's cash flow has increased over the

24  March to December period and I take it for the February period

25  you didn't calculate any change in trailing 12 months EBITDA,

Vomero - Cross                                    21

1  did you?

2  A.    No.

3  Q.    So your indication of value declining from 37.5 million to

4  32.6 in December and 30.5 in February, that's due solely to the

5  changes in the multiples; right?

6  A.    Yes.

7  Q.    And the multiples are derived from the equity values as

8  you've indicated, right, so you see equity values going down

9  and that's what's driving the decline in your view in the value

10  of the insulators business; right?

11  A.    Yes.

12  Q.    Let's look at connector seals.  You've got the trailing 12

13  months EBITDA essentially disappearing going from 2.8 to

14  $200,000.00; correct?

15  A.    These were the company's numbers, but yes.

16  Q.    The valuation you've got $24.2 million at March.  That's

17  based on application of your multiples; correct?

18  A.    Correct.

19  Q.    Then you take it down to 4.8 in December.  That's no

20  longer a multiple derived valuation; correct?

21  A.    Correct.

22  Q.    You've taken it down to what you consider to be

23  liquidation value?

24  A.    It's an adjusted asset based method.

25  Q.    More or less equivalent to liquidation value?

Vomero - Cross                                22

1   A.    Similar methods.  You may get similar results but somewhat

2   different thinking but it's an adjusted asset base.

3   Q.    And you just carry that through to the February valuation;

4   right?

5   A.    Correct.  Because we didn't have the data.

6   Q.    And your methodology is exactly the same with respect to

7   metals.  You start with a multiple-derived value in March and

8   then take that down to, as you've indicated, fair market value

9   of the assets in December and February; right?

10  A.    That's not correct.

11  Q.    How do you derive those numbers?

12  A.    You used an asset based approach throughout for metals.

13  Q.    When you say an asset based value throughout --

14  A.    The same methodology as we've discussed.  The methodology

15  is consistent for metals.  It's an asset based -- an adjusted

16  asset based approach.

17  Q.    Consistent with connector seals?

18  A.    Yes.  We didn't use an EBITDA multiple for March.

19  Q.    Now, those values, the connector seal value of 4.8 and the

20  metals value of 6.6, you would not expect those to decline any

21  further; correct?

22  A.    As of the valuation date I think these values are fair.  A

23  large part of the values in this business is the real estate

24  and the machinery equipment.  So fair values change over time

25  and you re-go to revalue them at a later date the values could

Vomero - Cross                                        23

1   change.  So --

2   Q.  Let me ask it this way.  You would not expect to see

3   significant declines in those values given how close they are

4   to what would approximate a liquidation value for those two

5   businesses; correct?

6   A.   It depends on how the market value of real estate changes,

7   so I really can't answer that.  It's only because I can't

8   answer what the stock price of one of these companies is going

9   to be in the future.

10  Q.   Have you done any assessment of the values of the debtors'

11  real estate and equipment apart from the estimates that you

12  provided here?

13  A.   Over the course of the last couple of years I've ran

14  through some appraisals, that's the extent of the analysis, the

15  book values of the assets.

16  Q.   You're not a real estate appraiser; correct?

17  A.   Correct.

18  Q.   And you're not an equipment appraiser in any sense; right?

19  A.   Correct.

20  Q.   So your opinions with respect to any potential decline or

21  further decline of those values is limited to your sense that

22  market values might change, they might not change; right?

23  A.   Correct.

24  Q.   Now, your valuation -- you have not done any precedent

25  transaction analysis for your valuation; correct?

Vomero - Cross                                    24

1   A.   We considered it but it's -- we considered precedent

2   transactions but didn't feel it was reasonable.

3   Q.   You couldn't reach a conclusion on value based on

4   precedent transactions; right?

5   A.   Based on our research we didn't find any transactions that

6   were close enough to our valuation date and close enough to the

7   debtors' business to include it in the analysis.

8   Q.   You haven't provided discounted cash flow valuation;

9   correct?

10  A.   In this -- no, I haven't provided it.

11         THE COURT: Did you do a DCF analysis?  I know it's

12  not in your report but I'd like to know whether you did a DCF

13  analysis.

14         THE WITNESS:  I did not do a DCF analysis.

15         THE COURT:  Why not?

16         THE WITNESS:  Two primary reasons.  The first is the

17  unpredictability of the cash flow and having the poor forecast

18  made it very challenging to project out the cash flow.  The

19  second reason is we were measuring.  We wanted to measure

20  changes in value.  The DCF, the main parameters in the DCF

21  primarily terminal value and then the beta that drives the cost

22  and capital are based on market comps anyways.  So as we

23  measured the changes in those comps we felt, I believe, that

24  we've captured the changes in value.  So those are the two

25  reasons.

Vomero - Cross                                    25

1   Q.   Now, you've indicated that the unpredictability of the

2   cash flow is a factor in your decision not to do a DCF.  But,

3   in fact, the medical business has had relatively stable cash

4   flow; correct?

5   A.   Correct.

6   Q.   And it's performing reasonably close to projections;

7   correct?

8   A.   Over what time period?

9   Q.   Well, let's just say the last year.

10  A.   To what budget?  My understanding is they missed the --

11  EBITDA by 20 percent.  So I wouldn't agree with that statement

12  at all.

13  Q.   You think a twenty percent miss on EBITDA is sufficient --

14  is such a variation that you couldn't do a discounted cash flow

15  on that value?

16  A.   I think given my history with the forecast inaccuracy I'd

17  say yes, I just couldn't get comfortable with the numbers that

18  I was given.

19  Q.   The insulators business is also performing reasonably

20  well; correct?

21  A.   Not currently.  Not currently.  I wouldn't agree with

22  that.

23  Q.   By currently you mean --

24  A.   The last five months -- four, the last four months.

25  Q.   January and February -- excuse me, January, December,

Vomero - Cross                                           26

1   November, October?

2   A.    Yes.

3   Q.    That conclusion is notwithstanding your own data showing

4   an increase of $400,000.00 in trailing twelve months EBITDA for

5   the insulator's business?

6   A.    That's correct.

7   Q.    For purposes of your valuation, Mr. Vomero, you have not

8   assumed that any of the debtors' businesses would be sold

9   separately; right?  You've assumed sale of the entire

10  enterprise?

11  A.    That's correct.

12  Q.    Are you familiar, sir, with the concept of a controlled

13  premium in valuation work?

14  A.    Yes.

15  Q.    You understand as a general sense a publicly-traded

16  comparable value derives a value to acquire a minority interest

17  in a company; right?

18  A.    Correct.  And it also has a liquidity premium.

19  Q.    You understand to acquire all the shares of a company or

20  all the equity of a company that it would be typical for a

21  buyer to pay a premium for that; right?

22  A.    Depends on the situation.

23  Q.    It's certainly not uncommon for a buyer to have to pay a

24  premium to acquire a controlling interest in a company.  Is

25  that right, sir?

Vomero - Cross                              27

1   A.    It happens.

2   Q.    In fact, if you went out and tried to buy all the stock of

3   a publicly-traded company in all likelihood you would have to

4   pay more than the share price for buying one share or a hundred

5   shares in the market today; right?

6   A.    Generally speaking, yes.

7   Q.    The range of that premium could be 25 to 30 percent;

8   correct?

9   A.    I don't know.  I really don't.

10  Q.    You haven't done any assessment?

11  A.    No, I have not.

12  Q.    And you've not analyzed control premiums in the auto

13  market -- excuse me, the auto parts market; right?

14  A.    Correct.

15  Q.    What you're suggesting with respect to the medical

16  business, with respect to a prospective sale of the medical

17  business, is that the debtor should sell that business into a

18  market where multiples are falling; is that right?

19  A.    Multiples have fallen.

20  Q.    What does your latest data indicate?  It indicates that

21  multiples are continuing to fall, right, and that's illustrated

22  by your February value; right?

23  A.    Correct.

24  Q.    Let me focus on your trailing twelve month EBITDA numbers.

25  Let's start with insulators.  You've got -- at December '08

Vomero - Cross                                        28

1   you've got trailing 12 month EBITDA at $6.3 million for that

2   purpose.  Let me ask you if I could to pull up the debtors'

3   exhibit binder and turn with me to Debtors Exhibit 13 in

4   evidence.

5   A.    13?

6   Q.    Yes.

7   A.    I don't think I have the debtors'.

8   Q.    It should be the other smallish binder.  Have you got it?

9   A.    Okay.

10  Q.    Are you with me?

11  A.    Yes.

12  Q.    Debtors' Exhibit 13 in evidence, the middle column 2008

13  actual numbers.  For the insulators business it shows $7.9

14  million of EBITDA and you've got 6.3 in your analysis for

15  December; correct?

16  A.    Yes.

17  Q.    What accounts for the difference between 6.3 and 7.9?

18  A.    It's the allocation of corporate overhead.

19  Q.    So you've allocated roughly $1.6 million of overhead to

20  the insulator's business?

21  A.    Roughly.

22  Q.    Mr. Vomero, do you believe that a buyer of the insulator's

23  business would acquire the negative cash flow associated with

24  the corporate overhead?

25  A.    I can't answer that question but what I can say is that

                        Vomero - Cross                          29

1    the insulator business is, in essence, subsidizing corporate

2    costs.  So it's a definite expense on their books that's just

3    not recorded in the end to reflect that cost.  So in order to

4    deal with that it's about $2 million annually.  We assigned it

5    to the core assets based on their EBITDA contribution.

6              THE COURT:  How did you allocate overhead, on the

7    basis of percentage of total EBITDA?

8              THE WITNESS:  Correct.  The assumption is the --

9    they're the ones that have the financial wherewithal to -

10             THE COURT:  I'm just trying to understand.  I just

11   want to know what methodology --

12             THE WITNESS:  That's what I used, yes.  And I would

13   add that in the comparables they have that segment of corporate

14   overhead in their EBITDAs.

15   BY MR. STROCHAK:

16   Q.   Let's do the same comparison with respect to medical.

17   Your December '08 trailing 12 months EBITDA for medical is 3.0

18   and if you look at Debtor's Exhibit 13, the debtors have 3.9.

19   A.   Okay.

20   Q.   The difference between your 3.0 and the debtors' 3.9 again

21   is the corporate overhead?

22   A.   That's part of it.  We added some items back to their

23   EBITDA on a pro forma so that that's in our numbers as well.

24   We had a positive add back.

25   Q.   You mean roughly the $600,000.00 add back; right?

Vomero - Cross                              30

1   A.   It's six or seven, yes.  Correct.

2   Q.   And that's already in your three, correct, your 3.0?

3   A.   Correct.

4   Q.   If you look at the bottom of Exhibit 13 you'll see the

5   footnote.  In fact, the debtors have added that into their 3.9

6   number for medical adjustments of $488,000.00 and $190,000.00;

7   correct?

8   A.   Correct.

9   Q.   Those correspond to the same adjustments that you've made;

10  right?

11  A.   Yes.  The insurance estimate we were given was 150 and

12  this has 190.

13  Q.   So you have allocated another $900,000.00 or so to the

14  corporate overhead to the medical EBITDA number; right?

15  A.   Correct.

16  Q.   So you've got 1.6 in insulators and $900,000.00 in

17  medical.  So roughly $2.5 million of overhead; right?

18  A.   Correct.

19  Q.   Now, you've made zero allocation or close to zero

20  allocation of the corporate overhead to the connector seals in

21  the metals businesses; right?

22  A.   Correct.

23  Q.   So, in effect, sir, isn't what you have done -- isn't it

24  correct that what you've done is you have allocated the

25  corporate overhead to the two businesses, insulators and

Vomero - Cross                              31

1   medical, that have higher multiples in your valuation analysis;

2   right?

3   A.   They had higher cash value and the concept was they're the

4   only ones that could have the financial wherewithal to pay for

5   those costs.  So that was the basis.  It wasn't -- did I answer

6   your question correctly?

7   Q.   You did answer my question.  The answer is yes, you put it

8   in insulators and medical.

9   A.   Right.

10  Q.   But you have the higher multiples; correct?

11  A.   Hold on.

12                      [Pause in proceedings.]

13  A.   That wasn't the case in March where connector seals had a

14  higher multiple than the aftermarket -- than insulators.  So

15  it's -- right.  So we're consistent through the period.

16  Q.   You used your 7.2 multiple for connector seals in March.

17  A.   Yes.  The multiple had nothing to do with how we did it.

18  Q.   Let me turn to your sensitivity analysis which is in

19  Appendix E, Page 43 of Exhibit A.

20  A.   Okay.

21  Q.   Let me start again and make sure I understand what you've

22  done here.  Is it correct, sir, that what you've done is you

23  analyzed January '09 sales data in order to get a sense as to

24  what's going on with the business currently and its potential

25  effect on value; is that right?

Vomero - Cross                                    32

1   A.    That's fair.

2   Q.    Now, you did not have -- at the time you did your

3   sensitivity analysis you did not have EBITDA value for January;

4   right?

5   A.    Correct.

6   Q.    But you did have sales numbers; right?

7   A.    Yes.

8   Q.    So looking at your analysis in the table on Page 43 of

9   Exhibit A, working across the first line for the medical you've

10  got fiscal year '08 revenue EBITDA and EBITDA margin figures;

11  right?

12  A.    Correct.

13  Q.    That's 16.2 million in medical revenue; 3.7 million in

14  medical EBITDA resulting in an almost 23 percent margin; right?

15  A.    Yes.

16  Q.    Let me just as you that.  That's a fairly robust margin in

17  this industry; correct?

18  A.    In the industry -- can you define the industry?

19  Q.    Yes.  Medical parts.  Medical parts for the medical

20  industry.

21  A.    It's a reasonable margin.  I don't know if it would say

22  it's high.  It's reasonable.

23  Q.    You haven't done any particular analysis of margins in

24  that industry, in the medical parts industry, have you?

25  A.    No, I have not.

Vomero - Cross                              33

1   Q.   Now, you -- the next line down is January '09 growth and

2   you've got ten percent in there.  That represents the revenue

3   growth for January '09 over last year; right?

4   A.   I think it was eight percent but I used ten for the

5   analysis.

6   Q.   Round numbers, okay.  And that results in an incremental

7   change of revenue of 1.6 million; right?

8   A.   Correct.

9   Q.   Then you calculate that -- that results in an increase in

10  EBITDA of $800,000.00; right?

11  A.   It's that plus an increase in the gross margin rate to 25

12  percent.  So there's two components to that change.

13  Q.   The bottom line though is that what you're seeing is an

14  increase of -- an increase of EBITDA by $800,000.00; right?

15  A.   It's what this sensitivity analysis was done, on an annual

16  basis.

17  Q.   That's on an annual basis.

18  A.   Under these assumptions.

19  Q.   Now, then you then calculate -- you use your pure multiple

20  of 7.1 times and what you calculate then is incremental value

21  of $5.4 million; right?

22  A.   Correct.

23  Q.   So what your sensitivity actually shows is that based on

24  January revenue performance for the medical business you

25  actually think that it's increased by $5.4 million in value;

Vomero - Cross                                    34

1  right?

2  A.   The results of this analysis if they were to hold true.  I

3  would want to see a couple more months of demonstrated

4  performance but in essence that's what this sensitivity was

5  trying to capture.

6  Q.   Well, we all would like to see better performance but you

7  can't predict the future.

8  A.   Right.  But I want to use current data and said what if

9  today, what if in January if that held true did the analysis.

10 Q.   Now, you did the same analysis for insulators; correct?

11 Again, working across your chart you've got '08 revenue of

12 $32.3 million; right?

13 A.   Correct.

14 Q.   And EBITDA of $7.8 million; right?

15 A.   Correct.

16 Q.   Again, a margin of 21 percent again.  I'm correct, am I

17 not, that 21 percent is a fairly robust margin for a company in

18 the automotive parts business; right?

19 A.   In the automotive parts business as in -- well, this is

20 without corporate overhead in it.  So you kind of don't get a

21 good comparison when you look at the comps.  It's kind of not a

22 fair comparison without the corporate overhead.  So as it

23 stands it's a good margin I would say, yes.  It's a good

24 margin, sure.

25 Q.   Now, you show January '09 growth at -- off 20 percent;

Vomero - Cross                                    35

1   right?

2   A.    Yes.

3   Q.    That reflects declining revenues as a result of the

4   distress in primarily the OEM market; right?

5   A.    Correct.

6   Q.    So what you're showing there is incremental change to

7   annual revenue of $6.5 million; is that right?

8   A.    Correct.

9   Q.    Then you've calculated incremental change to EBITDA of

10  negative 1.4 million; right?

11  A.    Correct.

12  Q.    That's on an annual basis; right?

13  A.    Correct.

14  Q.    So we're talking a little bit -- maybe $125,000.00 per

15  month if we divide it by 12 roughly $125,000.00 or so,

16  $120,000.00 maybe?

17  A.    Roughly.  On a monthly basis.

18  Q.    Now, you would agree with me, sir, that if actual EBITDA

19  for January was much greater, it increased that that would in

20  fact show increased value under your sensitivity analysis;

21  right?

22  A.    Correct.

23  Q.    So you just extrapolated from the actual revenue data that

24  you have to what you think the EBITDA could be based on that

25  revenue?

Vomero - Cross                                    36

1  A.    Correct.

2  Q.    Again, if actual EBITDA is different, for example if the

3  actual EBITDA increased you would reflect increased value;

4  right?

5  A.    Correct.

6        MR. STROCHAK: Your Honor, I have one further exhibit

7  that's not in the binder.  I can hand it up.

8                    [Pause in proceedings.]

9        THE COURT: I'll mark this as Exhibit 17?

10       MR. STROCHAK: Yes.

11                 (Debtors Exhibit 17, Marked.)

12 Q.    Mr. Vomero, I've given you Debtor's Exhibit 17 which I

13 will represent to you is an income statement for the Jasper,

14 Georgia plant for January 2009.  We were able to get this

15 overnight.  So I don't think you've seen it before but I will

16 represent to you that that's what it is.

17     If you look with me on the gross cash flow line, it's

18 about two-thirds of the way down the page under the bold

19 heading cash flow data it shows actual cash flow of $642,000.00

20 for January '09 as compared to prior year -

21       THE COURT: Could you put it on the screen?  I don't

22 see it.  Why don't you put it on the screen?

23                    [Pause in proceedings.]

24 Q.    I was just saying it shows actual gross cash flow of

25 $642,000.00 for January '09 and its comparison to the prior

Vomero - Cross                                        37

1    year and the same line and table shows $668,000.00.  Are you

2    with me?

3    A.    Yes.

4    Q.    You would agree, sir, that the gross cash flow line is

5    equivalent to what we've been talking about as EBITDA; correct?

6    A.    Correct.

7    Q.    So assuming that these results are correct, and I realize

8    you just got this and you haven't had a chance to review it,

9    but assuming that these are correct numbers for what the

10   company actually did in January it does not suggest a twenty

11   percent decline in EBITDA, does it, sir?

12   A.    No, it does not.

13   Q.    It suggests the decline in EBITDA of only about 25 or

14   $26,000.00; right?

15   A.    Correct.

16   Q.    Now, if the monthly decline in EBITDA is only about

17   $25,000.00 as opposed to the 20 percent decline that you have

18   in your sensitivity analysis, what does that do to the

19   incremental value calculation?

20   A.    The negative would basically go away.

21   Q.    It would show positive value based on January performance;

22   correct?

23   A.    That's correct.

24            THE COURT: Why did you do your sensitivity analysis?

25            THE WITNESS: Because I did -- I used the trailing 12

Vomero - Cross                              38

1   months.  I wanted to -- and I had January data.  I wanted to

2   see how that would influence the trailing 12 to see what the --

3   because there was growth in medical. There was a decline in

4   insulators and I wanted to see what the effect of that would

5   have and whether an adjustment would have been warranted.  Even

6   in the insulators when I got the EBITDA numbers I had mapped

7   the change in sales to change in EBITDA.  So that's kind of how

8   I got comfortable doing that.

9           The results came out negative so I didn't make an

10  adjustment.

11          THE COURT: You didn't make the adjustment?

12          THE WITNESS: Yes, right.  But with this data I would

13  -- but the results for change I would have done the same

14  analysis had I had the data and it would have come out positive

15  I thought, yes.

16  BY MR. STROCHAK:

17  Q.   Now, just going back to something you said earlier,

18  Mr. Vomero.  You indicated that you thought medical had missed

19  its forecast by approximately twenty percent.

20  A.   In 2008.

21  Q.   So comparing -- how did you arrive at that calculation?

22  A.   The year budget, I think the budget we got in January.

23          THE COURT: January of what year?

24          THE WITNESS: January -- I'm sorry.  January of 2008.

25  It was the annual budget versus the July budget.

Vomero - Cross                                    39

1  BY MR. STROCHAK:

2  Q.    But you haven't included that analysis in your report;

3  correct?

4  A.    No, I -- well, yes.  It was a subset of the -- our overall

5  assessment of the forecast.

6  Q.    Point me if you could to where in your report it

7  demonstrates a twenty percent decline in -- excuse me, a 20

8  percent miss in the EBITDA -- excuse me.  Let me just start

9  again.

10      Is there a place in your report where you detail your

11  assessment that medical missed its forecast by 20 percent in

12  2008?

13  A.    I don't believe there is one in the report but I -- look,

14  I considered it.

15  Q.    Assume for me that it was not twenty percent off, that it

16  was more in the range of five, six, seven percent off, does

17  that change your conclusion at all about the wisdom of using a

18  DCF, a discounted cash flow analysis for valuation purposes for

19  that business?

20  A.    No, it doesn't.  I'm comfortable with the analysis in as

21  it came out because we've used good current data and good

22  market comps.  So I'm fairly comfortable with the approach

23  we've taken.

24  Q.    You're comfortable with the one method you've chosen

25  without testing it against any other methods; is that right?

Vomero - Cross                                    40

1  A.    Correct.

2  Q.    Let me turn to the connective seals consolidation.   You

3  indicated yesterday I believe that you thought it was a good

4  idea and you thought the company should go ahead and do it;

5  right?

6  A.    Correct.

7  Q.    Now, you haven't reached out and spoken directly to any of

8  the debtor's customers involved in the connector seals

9  business; correct?

10  A.    Correct.

11  Q.    You haven't done any analysis of the specific molds that

12  are used to make these products that the debtors are

13  considering moving to other facilities; right?

14  A.    Correct.

15  Q.    You haven't done any analysis of what other companies in

16  the industry might be able to produce products by using those

17  molds; right?

18  A.    Correct.

19  Q.    Now, we discussed yesterday I believe the PPAP's process,

20  the pre-production approval process and that's I think -- to

21  summarize that's the certification process that you have to go

22  through in order to get a part approved for production; right?

23  A.    Correct.

24  Q.    You don't know how long it would actually take to do PPAPs

25  for any of the particular parts that the debtors are

Vomero - Cross                                    41

1  considering moving; right?

2  A.    Not specifically.

3  Q.    You have a general sense but not a specific sense; right?

4  A.    That's correct.

5  Q.    And you haven't done any particular analysis of PPAP

6  timing issues; right? You haven't studied how long it's taking

7  parts manufacturers to get PPAPs done in the current

8  environment or anything like that; right?

9  A.    Correct.

10  Q.    Now, you have indicated in your report that if customers

11  resourced these products to a different company that, in fact,

12  that would take quite some significant time in order to get

13  them certified again; right?

14  A.    I think my understanding is the process is the same.  I

15  mean if they're recertifying they would recertify the -- oh.  I

16  understand what you're saying.

17        Can you repeat the question?

18  Q.    Yeah, sure.  Let me rephrase it actually.  You've

19  indicated in your report on Page 17 that the PPAP approval

20  process can take a significant amount of time, right?

21  A.    Correct.

22  Q.    And that would be true if our customers decided to

23  resource products away from the debtors, right?

24  A.    Correct.

25  Q.    And, in fact, isn't it correct that it would likely take

                        Vomero - Cross                          42

 1  longer to get through the PPAP process if a customer was going

 2  to move a part to an entirely new company, as opposed to moving

 3  an existing mold operated by Lexington to a different Lexington

 4  plant?

 5  A.    I think it's customer-by-customer specific.  Generally the

 6  way, you know, seen automotive parts move and generally, you

 7  know, a three-month bank is sufficient to move it whether

 8  you're doing an internal change or an external change; that's

 9  my experience.

10          THE COURT:  Mr. Vomero, who owns the molds?  Is it is

11  the customer or is it the -- Lexington?

12          THE WITNESS:  It's the customer's except in the after

13  market where Lexington will develop a mold to replicate a part.

14  That's my understanding, yes.

15  BY MR. STROCHAK:

16  Q.    Now, if a customer decided to resource its part rather

17  than move it with Lexington to the different plant they would

18  still need that inventory, correct, in order to get them

19  through the PPAP process at the new plant.

20  A.    If they didn't have it already on hand, so I don't -- you

21  know, it's a difficult question to answer.

22  Q.    But they still would need some inventory, right?  Assuming

23  they're still using the product, using the part, supplying the

24  part to their own customers, they are going to need that part,

25  right?

Vomero - Cross                                    43

1  A.   That part?  Well, of course they're going to need the

2  part.

3  Q.   So either they have it in their current inventory or

4  they're going to have to buy it from Lexington in order to

5  prepare for the three months or so PPAP process in order to get

6  a new supplier certifier, right?

7  A.   Correct.

8  Q.   And you haven't done any analysis of the debtors'

9  customers to figure out how much inventory they actually have

10 of any particular parts, right?

11 A.   Correct.

12 Q.   Now, what's been going on in the market generally isn't it

13 correct, sir, that as a general matter auto parts suppliers

14 have been taking their inventories down, right?

15 A.   I don't -- I haven't analyzed it specifically.  With

16 respect to Lexington the inventory is relatively high because

17 the demand has fallen off so quickly in a historical sense so I

18 haven't analyzed it specifically, but I don't -- wouldn't

19 necessarily hold that to be true.  I don't have a specific

20 answer for you.

21 Q.   I think I understand you.

22 A.   But I don't think that's necessarily a fair question.

23 Q.   Sir, your answer is you don't have any general sense as to

24 what's going on in the industry, correct?

25 A.   I have a general sense, but not a specific sense.  Yes.

Vomero - Cross                                    44

1  Q.   And the general sense, correct, is that suppliers are

2  taking inventories down, right?

3  A.   No, my general sense is they're trying to but the demand

4  has fallen off so quickly that there is fairly significant

5  amounts.  But they're -- they're always trying.  It's a just-

6  in-time system through our -- yes, so --

7  Q.   And then turning to the specific you haven't done any

8  particular analysis of inventories of any of the specific parts

9  that the debtors might make for their customers in the

10 connector seals business, right?

11 A.   Correct.

12 Q.   Mr. Vomero, you don't believe that the auto build numbers

13 that we've seen in December and January, that is, the very low

14 numbers are going to continue indefinitely, right?

15 A.   Indefinitely?  In -- I think there'll be -- at some point

16 in the future there'll be a rebound.

17 Q.   At some point someone is going to build an automobile in

18 the United States, right?

19 A.   Let's hope.

20 Q.   So production levels -- isn't it correct, sir, that

21 production levels are going to go up from what we're seeing in

22 December and January at some point?

23 A.   At some point it's probable.

24        MR. STROCHAK:  Your Honor, could I ask the Court's

25 indulgence for just a minute or two to look up some notes?

Vomero - Cross                                    45

1          THE COURT:  Sure.

2                  [Pause in the proceedings.]

3          MR. STROCHAK:  Thank you, Your Honor.  I appreciate

4  the Court's indulgence.  I have no further questions.

5          THE COURT:  Thanks very much.

6          MR. BRACHT:  Your Honor, I have a few.

7          THE COURT:  Go ahead, Mr. Bracht.  Do you need any

8  water, Mr. Vomero?

9          THE WITNESS:  No.  No, thank you.

10                     CROSS-EXAMINATION

11  BY MR. BRACHT:

12  Q.   Good morning, Mr. Vomero.  My name is Jerry Bracht.  I

13  represent the Committee.  Mr. Vomero, did you have some input

14  into the plan, so to speak, that's proposed in Cap Source's

15  objection with respect to cash collateral?

16          THE COURT:  I don't understand your question.

17  BY MR. BRACHT:

18  Q.   There's a -- there are some suggestions in the cash

19  collateral objection that the agents filed that set forth

20  various provisions concerning what the Cap Source feels like

21  would be an appropriate way to proceed.  Did you have any input

22  into those?

23  A.   General.  General input.

24  Q.   Okay.

25  A.   Not specific.

Vomero - Cross                                    46

1   Q.   Part of that plan, as I understand it, includes an

2   immediate, for lack of a better word, sale of what is referred

3   to as the noncore assets.  Is that true?

4   A.   Yes.

5   Q.   And that would include the metals business?

6   A.   Yes.

7   Q.   And I know we've talked a lot about it.  I haven't gotten

8   it clear in my mind as far as you are concerned.  Do you have

9   an opinion sitting here today what would likely -- what the

10  proceeds would likely be of a sale of a noncore assets

11  including metals?

12  A.   Not in aggregate.  Don't have a sense for what the land in

13  Georgia and -- would be worth.

14  Q.   Okay.

15  A.   That's one piece.  Metals we did an adjusted asset-based

16  approach which we can look up the number.  It was in the six --

17  five to seven million-dollar range.  It was a reasonable range.

18  Q.   Well, I understand you did an asset-based approach, but --

19  A.   Yeah.

20  Q.   -- is it in your opinion that in a sale process in this

21  environment that that amount of money is likely to be received

22  in a sales process of those assets?

23  A.   I think that's the value of those assets.  It can be

24  realized.  Yeah, I think that those assets over time could be

25  realized at that amount.

Vomero - Cross                              47

1   Q.   That is your opinion?

2   A.   Yeah, that would be my -- yes.

3   Q.   Okay.  But in terms of an aggregate value you don't have

4   an opinion with respect to an aggregate value for all of those

5   assets?

6   A.   Correct.

7   Q.   Okay.  Same question.  The plan as I understand it

8   includes a -- in essence, a deadline for the debtors to obtain

9   exit financing.  If it's not done by June then the plan would

10  be to proceed with the sale of the medical business.  Is that

11  your understanding?

12  A.   Generally.

13  Q.   Okay.  And same question with respect to the medical

14  business.  Do you have an opinion sitting here today as to what

15  the proceeds of a sale of the medical decision would be

16  pursuant to the plan proposed by Cap Source?

17  A.   We have our valuation, you know.  It's established a value

18  for it so I think that's a reasonable value.

19          THE COURT:  Did you establish a value for the medical

20  business sold as a separate --

21          THE WITNESS:  Oh, I'm sorry.

22          THE COURT:  Anyhow, I thought you said you didn't --

23          THE WITNESS:  No, I didn't.  That's correct.  That's

24  correct.  I did not.  I did not do that.  It's as a base line

25  to the base line value but, no, I did not value it separately.

                    Vomero - Cross                        48

1            THE COURT:  Now, you can all handle --

2            THE WITNESS:  Yes, so --

3            THE COURT:  -- your case the way you want but I don't

4    read this report as giving his opinion of value of any of the

5    components of the business.

6            Mr. Strochak, if you want to let him go on with this,

7    I'll fine but I'll just tell you how I read this thing.

8            MR. STROCHAK:  And that's accurate, but I was --

9            THE COURT:  I'm not crediting his testimony with

10   respect to value of components in this.

11           MR. BRACHT:  Okay.  I just wanted to -- you know,

12   whatever the answer is I just wanted to get clear in my mind.

13   BY MR. BRACHT:

14   Q.   If the plan as proposed by Cap Source were to proceed

15   according to plan -- pardon me -- what would be left?

16   A.   Insulators.  I'm sorry.  Yes, the insulator business.

17   Q.   Just the insulator business?

18   A.   And some assets, the residual Vienna facility if the --

19   Q.   Do you have any opinion sitting here today whether or not

20   the sale of the assets as proposed by Cap Source would satisfy

21   the amount of debt that Cap Source is owed?

22   A.   I haven't done that specific analysis.

23   Q.   Do you have any opinion as to whether or not the proceeds

24   of the sale of those assets as proposed by Cap Source would

25   give any value to the sub debt to the Committee?

Vomero - Cross/Redirect                          49

1  A.   I haven't done that analysis.

2           THE COURT:  All right.  Mr. Tishler?

3                    REDIRECT EXAMINATION

4  BY MR. TISHLER:

5  Q.   Mr. Vomero, isn't it your understanding that the reason

6  we're asking to do a market test as part of our request in the

7  cash collateral is to determine to some extent what a sale of

8  the medical device business would bring?

9  A.   That's correct.

10          MR. TISHLER:  Thank you.

11          THE COURT:  Anybody else have any further questions?

12          MR. STROCHAK:  Nothing further, Your Honor.

13          THE COURT:  All right.  Mr. Vomero, you're excused.

14          THE WITNESS:  Thank you.

15          THE COURT:  All right.  It's 10:22.  We're going to

16 take a ten-minute recess.  And who's -- do you have another

17 witness, Mr. Tishler?

18          MR. TISHLER:  No, Your Honor.  I just have one.  I

19 wanted to go ahead and put into evidence the --

20          THE COURT:  All right.  Let's do that now.

21          MR. TISHLER:  Those numbers.  Yeah.

22          THE COURT:  Why don't you -- what did you want to put

23 in evidence?

24          MR. TISHLER:  What we looked at yesterday that shows

25 the EBITDA at the end of last year.

50

1          THE COURT:  Did you clear the confidentiality issue

2    with --

3          MR. TISHLER:  It was fine with the debtors.  We've

4    got an exhibit.

5          THE COURT:  Okay.

6          MR. STROCHAK:  No objection, Your Honor.

7          MR. TISHLER:  And I also wanted to move into evidence

8    Mr. Altineau's deposition designations in our record.

9          THE COURT:  Let's do it when we come back from break.

10         MR. TISHLER:  Okay.

11         THE COURT:  Okay.  We'll treat those exhibits.  I

12   want to be sure that I have -- you know, I have -- with the

13   Altineau deposition I've got the Committee's designations.  I

14   don't have a single document that has everybody's designations,

15   counter designations.  And so what I'm going to ask is -- did

16   you have designations in that?

17         MR. STROCHAK:  Your Honor, our suggestion was to put

18   the whole transcript in.

19         THE COURT:  I don't allow that.  I really don't allow

20   that.  I'm not reading -- I read everything that's in evidence.

21   I do not read transcripts front to back.  Unless -- you know,

22   if that's what people have designated I don't -- I just don't

23   do it.  I make it clear I don't allow people to dump deposition

24   transcripts into the record.

25              I read all of the Committee's designations.  It was

51

1   easy to follow.  They were highlighted in yellow.  They were in

2   a separate binder.  If people have counter designations or

3   objections, you know, what I'd like to have and I didn't ask

4   the people to do that is to have a single mark, use different

5   highlighters, and -- but I just don't -- I don't permit people

6   to dump depositions in.

7           Ten-minute recess.

8           (Off the record.)

9           THE COURT:  Please be seated.  All right.

10  Mr. Tishler, you wanted to introduce some exhibits.

11          MR. TISHLER:  Yes, Your Honor, thanks.  Your Honor,

12  this is from yesterday's testimony and this is the preliminary

13  summary of net sales offering profits and margins that was

14  provided to Capital Source by Lexington Precision from which we

15  calculated our end of 2008 EBITDA number.  So I'd like to offer

16  that as the lender's next exhibit.

17          THE COURT:  Been marked as PSLG.

18          MR. TISHLER:  Yes.  Yes, Your Honor.

19          THE COURT:  Any objections?

20          MR. STROCHAK:  No objection, Judge.

21          THE COURT:  All right.  Exhibit PSLG is in evidence.

22          (Committee Exhibit PSLG is admitted.)

23          MR. TISHLER:  And then, Your Honor, we are

24  highlighting our excerpts from the Capital One deposition and

25  we will hand that up as soon as we get that done.  And we would

52

1   move the admission of those deposition excerpts into evidence.

2         THE COURT:  Have you shown what you're offering to --

3         MR. TISHLER:  It was attached to our -- it's just --

4   we're just highlighting now --

5         THE COURT:  All right.

6         MR. TISHLER:  We had already designated it in our

7   witness exhibit list.

8         MR. STROCHAK:  We don't have any objection to the

9   deposition, Your Honor.

10         THE COURT:  All right.  You know, what would be more

11   helpful, Mr. Tishler, and I -- do you have designations as

12   well, Mr. Strochak?

13         MR. STROCHAK:  Let me just address that, Your Honor.

14   We were going to counter designate substantially the whole

15   deposition.  You know, I don't mean to cause any additional

16   work for the Court.  I understand that Your Honor would prefer

17   a counter designation specifically and we're trying to get that

18   done right now and we can get it to you as soon as we can.  So,

19   you know, at the Court's convenience I can either counter

20   designate the whole thing or we can mark it to delete the

21   handful of things that are unnecessary for the Court to read.

22         THE COURT:  Maybe you didn't get the message.  Go

23   ahead and counter designate everything.  If I look through it

24   and I find stuff that the Court concludes shouldn't have been

25   designated I will take appropriate action.  I don't know what

53

1  it is yet, but the one thing I don't tolerate is people dumping

2  transcripts.  This isn't the biggest transcript in the world,

3  but I don't permit it done.

4         You go ahead and do it and you'll bear the

5  consequences, okay?  Anything you designate that's appropriate,

6  that's fine but don't tell me you're going to, you know --

7  there's plenty of stuff in here that --

8         MR. STROCHAK:  My only point, Your Honor, is that I

9  just don't have a marked copy right now.  So if I could ask the

10  Court's indulgence to submit that subsequently we will go

11  through and we will ensure Your Honor that there's nothing

12  extraneous in there and I would ask the Court's indulgence to

13  be able to do that.

14         THE COURT:  Okay.  Here's what I would like done.

15  Mr. Bracht, did you give marked copies to everybody else?

16         MR. BRACHT:  I did, Your Honor.

17         THE COURT:  Okay.  Take the Committee's marked copy.

18  Take a different colored highlighter and that goes for the

19  prepetition lenders as well.  I'd like to have one transcript.

20  Just tell me they used yellow.  Each of you use a different

21  color so I know what was each side's and each party's

22  designations and then I'll go through.

23         I've already read because it was so easy to do.  I

24  just went through it and I read what the Committee designated.

25  It was all highlighted in yellow.  It was simple.  That way

54

1    I'll go back and I'll read again whatever anybody else wants to

2    designate.

3              MR. STROCHAK:  We'll do that, Your Honor.

4              THE COURT:  Okay.

5              MR. STROCHAK:  And I apologize for any inconvenience.

6              THE COURT:  All right.  Have you given the other

7    parties what your designations are or --

8              MR. STROCHAK:  Your Honor, what I told the other

9    parties is that we would just suggest putting the whole

10   transcript in.  I know Your Honor doesn't want to proceed that

11   way.  I didn't -- no one had any objection to proceeding that

12   way, so I am assuming there are no objections to anything we

13   would designate within the document.

14             THE COURT:  Is that correct, counsel -- Mr. Bracht?

15             MR. BRACHT:  Yes, Your Honor, I --

16             THE COURT:  Or Mr. Tishler?

17             MR. BRACHT:  -- will have no -- we will have no

18   objections to any other designations.

19             THE COURT:  Subject to seeing what gets marked, the

20   designations and counter designations of the parties to the

21   Altineau deposition as admitted into evidence.

22             MR. BRACHT:  Okay.  Your Honor, just to complete the

23   housecleaning with respect to that issue there are a number of

24   exhibits that are referenced in the designations that the

25   Committee has made in Mr. Altineau's deposition.  They are

55

1   listed on our exhibit list.  I'd like to -- I don't believe

2   there are any objections to those exhibits.  I have a list of

3   them.  I can read it into the record or I can give you the

4   list.

5            THE COURT:  Well, why don't you read them off?  I've

6   got your --

7            MR. BRACHT:  Okay.

8            THE COURT:  I kept a copy of everybody's exhibit list

9   separate.

10           MR. BRACHT:  Okay.

11           THE COURT:  I've been marking off when they're

12   admitted into evidence.

13           MR. BRACHT:  I -- the deposition exhibits from

14   Mr. Altineau's deposition that are referenced and identified in

15   the Committee's designations are listed on the Committee's

16   exhibit list as Exhibits Q, R, S, T, U, V, W, X, Y, Z, AA, BB,

17   CC, DD, EE, FF, GG, HH, II, JJ, KK, and LL.

18           THE COURT:  And you're offering those?

19           MR. BRACHT:  I'm offering those at this time, Your

20   Honor.

21           THE COURT:  Okay.  Any objections?

22           MR. STROCHAK:  No objection, Your Honor.

23           MR. TISHLER:  No, Your Honor.

24           THE COURT:  All right.  Exhibits Q, R, S, T, U, V, W,

25   X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, LL are all

Jessie Ultz - Direct                                          56

1  admitted into evidence.

2              (Committee Exhibits Q, R, S, T, U, V,

3              W, X, Y, Z, AA, BB, CC, DD, EE, FF,

4              GG, HH, II, JJ, KK, LL are admitted.)

5       THE COURT:  Mr. Bracht, do you want to call a

6  witness?

7       MR. BRACHT:  Yes.  Jessie Ultz of SRR.

8       THE COURT:  If you'd raise your right hand.

9       (Jessie Ultz, witness for the Committee, sworn.)

10      THE COURT:  Please have a seat.

11                   DIRECT EXAMINATION

12  BY MR. BRACHT:

13  Q.   Mr. Ultz, will you state your name, please, for the

14  record?

15  A.   Jessie Ultz with Scott Regis Ross [Ph.].

16  Q.   How are you employed with Scott Regis Ross?

17  A.   I'm a manager in the valuation and financial opinions

18  group.

19  Q.   And that's a company that we all refer to as SRR?

20  A.   Correct.

21  Q.   And is SRR the Committee's advisor -- financial advisor

22  with respect to this matter?

23  A.   We are.

24  Q.   And have you been engaged as a part of that team since the

25  beginning of the bankruptcy and maybe even prior?

                        Jessie Ultz - Direct                     57

1   A.    Yes.

2   Q.    And are you familiar with various events and meetings and

3   so on and so forth that have occurred through the case with

4   respect to the debtor and other interested parties?

5   A.    Yes.

6   Q.    I'd like you to go over a few things with me very quickly,

7   if we can, concerning various financial performance by the

8   debtors.  Have -- you received, I'm sure, over the course of

9   this engagement a number of different forecasts and financial

10  information documents from the debtors, have you not?

11  A.    Yeah, we've received a lot of information.

12  Q.    Okay.  And have you been really primarily the one at SRR

13  that's been responsible for kind of vetting that information

14  and reviewing it and dealing with it?

15  A.    Yeah, I would say I'm the point person on information

16  collection and follow-up questions and kind of cataloguing and

17  understanding what we have.

18  Q.    In connection with that job have you -- have you become

19  familiar with the monthly forecasts of Lexington, of the debtor

20  and how those fore -- the forecasts themselves compare to

21  actual results?

22  A.    I have.  We prepare that monthly.

23  Q.    Okay.  And let me show you what's been marked as Exhibit

24  B.  Why don't you check in the binder there.  Do you have

25  Exhibit B?

Jessie Ultz - Direct                                    58

1  A.    I do.

2  Q.    Okay.  And what is Exhibit B, Mr. Ultz?

3  A.    Exhibit B looks at the monthly budget to actual for

4  Lexington both on a consolidated basis and by division for each

5  of the months since they basically came out with their five-

6  year plan after filing.

7  Q.    Okay.  And this is for 2008?

8  A.    Correct.

9  Q.    And the information that is contained on Exhibit B is

10 that -- comes from information and documents that have been

11 supplied to you by the debtors?

12 A.    Yes, these come directly from their financial statements.

13         THE COURT:  You put them in a spreadsheet, is that --

14         THE WITNESS:  Right.  We just put them into Excel to

15 make it easier to look at so you don't have to pull out each

16 monthly report.

17         MR. BRACHT:  Okay.  Your Honor, we would offer

18 Exhibit B at this time.

19         THE COURT:  Hearing no objection, Exhibit B is in

20 evidence.

21         MR. STROCHAK:  No objection.

22             (Committee Exhibit B is admitted.)

23 BY MR. BRACHT:

24 Q.    Mr. Ultz, I'm not going to go over each line item with you

25 with respect to this exhibit, but what is -- what -- in

Jessie Ultz - Direct                          59

1  general, what is this exhibit demonstrate?

2  A.   I really shows that the company as a whole and really by

3  each division has declined in every month since June relative

4  to their budget, so each month the results have gotten

5  progressively worse and the variances increased.  As you can

6  see in the first box on a consolidated basis the variance in

7  June, which actually was a month that had been completed so

8  that really was an actual -- was very close and then each

9  subsequent month has effectively gotten worse.

10 Q.   Okay.  And when you say on a consolidated basis just for

11 the record and make sure that everybody is on the same page is

12 this the line that you're talking about up here, the bottom

13 line in the first -- the top box?

14 A.   That's correct.  That would be the entire rubber group as

15 well as metals and corporate.

16 Q.   Okay.  Now, the other projections that you have here are

17 broken down into various the rubber group as a whole, then

18 connector seals separately, insulators separately, medical

19 separately and so on.

20 A.   Um-hum.

21 Q.   I notice that there's no information that is contained in

22 here for December with respect to the individual units.  Why is

23 that?

24 A.   We requested the December financials several times and

25 haven't received those.  All we have is the monthly operating

Jessie Ultz - Direct                                  60

1   report which only presents consolidated results, so we don't

2   have any information by division for December at this point

3   level in January.

4   Q.   Okay.  And to -- specifically just we've heard a lot of

5   talk about, you know, the after market and medical -- the

6   insulator box does that include the after-market component of

7   Lexington's business?

8   A.   That would be all of their after-market business, as well

9   as a small portion of their OEM business.

10  Q.   Okay.  Do you have any feel just generally for the mix

11  between after market and OEM that's contained within the

12  numbers for the insulators division?

13  A.    My recollection is that the OEM business is about eight

14  million a year in sales versus 32 million total for the

15  division, so about a quarter of sales I think less of EBITDA.

16  Q.   Okay.  So about a quarter of the sales would be the OEM

17  portion and the rest would be after market?

18  A.   That's correct.  And even within the OEM portion Lexington

19  believes that a portion of that is really after market, so I

20  guess it's even more after market than the initial answer that

21  I gave, but that's the breakdown the way they actually present

22  it in their financial statements.

23  Q.   And based on your calculations and the information

24  supplied to you by the debtors are the results actual forecast

25  of the insulators business also going down?

Jessie Ultz - Direct                              61

1   A.   Yeah, the trend appears to be downward.   Like I said, we

2   don't have December yet, but the last three months have been

3   pretty substantial misses.

4   Q.   Okay.  And really the same questions with respect to the

5   medical division which at the top of the second page of the

6   exhibit.

7   A.   The medical division is the same trend.  I will note -- I

8   think it's been discussed that there was a fire in November and

9   the adjustment to that fire is in this number so this is an

10  adjusted result, not the straight number that would appear on

11  their financial statements.

12          THE COURT:  Where is the adjustment?

13          THE WITNESS:  It's in the actual EBITDA, the 329.

14  That includes the $150,000.00 adjustment that they had in their

15  financials.

16          THE COURT:  I heard some testimony before one of the

17  exhibits Mr. Strochak put in evidence showed $190,000.00

18  adjustment versus 150.

19          THE WITNESS:  Right.  We haven't seen 190.  The

20  director's packet we received said 150.

21          THE COURT:  Go ahead, Mr. Bracht.

22          MR. BRACHT:  Okay.

23  BY MR. BRACHT:

24  Q.   So what is your take-away from Exhibit B?  What -- that --

25  go ahead.

Jessie Ultz - Direct                                    62

1  A.   I think at the end of the day everyone is on the same

2  page, that the OEM business is struggling for everyone so

3  connector seals and metals have been major drains on the

4  business over the last six months.  But insulators and medical

5  aren't moving in the right direction at the end of the day.

6  They're both missing their budget by a wider margin each month.

7  Q.   Let's move to Exhibit A.  Do you have Exhibit A in front

8  of you, Mr. Ultz?

9  A.   I do.

10 Q.   And what is Exhibit A?

11 A.   Exhibit A is trying to show the changes in projections

12 over the last six months.  So in July the company came out with

13 their original five-year plan and shortly thereafter received

14 the divisional backup.  So the July 21st line is really the

15 first round of projections we were given from Lexington.

16         THE COURT:  July 22.

17         THE WITNESS:  Yes.  The 22nd at the top and 23rd at

18 the bottom.  But those are essentially -- the original five-

19 year plan I think the base level was dated July 15th and that

20 was the detail we received by division.  And since then we've

21 received a couple different rounds of revisions and as you can

22 see at the top there's a lot of numbers on the page but the

23 first section is the insulator's business in aggregate.  Within

24 insulators the company breaks out its work by after market and

25 OEM and this was the comment I made before where total sales

Jessie Ultz - Direct                                     63

1    were around 32 million and the OEM business is around eight

2    million.  So we get more detail based on the OEM side of the

3    business because that salesman prepares a more detailed

4    forecast, so we've gotten a couple of rounds of information and

5    revisions for that.

6          We haven't received any revisions on the original

7    after-market business although the numbers don't add up.  If

8    you take the revisions, there obviously has been some changes

9    there and I guess the trend is that each time the company

10   projects, the projections are revised downward, so you can see

11   that in aggregate on the insulator's business.  It's not just a

12   2008 or 2009 phenomenon.  It really goes throughout the entire

13   projection period.

14         THE COURT:  The 2008 was -- EBITDA was projected to

15   go up for like October from July, right?  8/4 up to 8/5

16   through --

17         THE WITNESS:  That's correct.  And then when the

18   actuals got closer it was revised down to 7/7 in December.  So

19   what this shows, and there's actually more detail in the OEM

20   segment on the next page because we've got more detail there

21   but it really just looks at the change and if you see the

22   change from October to December, which is the boxed item at the

23   top of the insulators division, it shows that over the course

24   of that two-month period the company's long-term prospects

25   declined by six to ten percent, so it wasn't just a revision in

Jessie Ultz - Direct                                    64

1   '08 or even '09 but across the board throughout the next five

2   years the expectation was that business was going to be worse

3   and based on what they knew in December versus what they knew

4   in October.

5   BY MR. BRACHT:

6   Q.   And there's a second page that contains the same type of

7   information with respect to other portions of the business,

8   correct?

9   A.   Right.   And this is really a subset of the OEM business on

10  that first page.   As I mentioned, the OEM business is run by

11  one salesman but within the OEM business the company feels that

12  a portion of that business actually goes to OEMs for new cars

13  and another portion goes to what's called OES or original

14  equipment service parts.   So they're still selling to OEMs or

15  tier-one suppliers, but maybe it goes to a dealership and they

16  put it on as a repair part versus as on a new vehicle.   The

17  customer is the same, so the salesperson that tracks it is the

18  same but the end result is that it ends up on a used car versus

19  a new car.   So what this shows really is of that eight and a

20  half million, approximately three and a half million in 2008 is

21  more OES business which is closer to the after market than to

22  the OEM market.   And you can see that the after-market business

23  is projected to be basically flat so there's no real growth

24  prospects in that business as it's a fairly consistent

25  business.   It kind of tracks with GDP.   It doesn't have a lot

Jessie Ultz - Direct                                65

1   of growth typically and so all the growth in the insulators, as

2   you can see on the last line of the first box, is projected new

3   business in the OEM market.  So you can see the OEM total is

4   going from five million in 2008 to 18 million in 2012.  So all

5   the -- effectively all the growth in the insulator's business

6   comes from OEM projections and not after market.  So over time

7   this business really becomes more of an OEM business than an

8   after-market business.

9   Q.   And do you also have the same kind of information down at

10  the bottom of the first page for medical --

11  A.   Right.

12  Q.   -- and what is -- what are the projections and received --

13  projections and revisions of the projections, what do they show

14  with respect to medical?

15  A.   As you can see with medical there's not much of a change

16  over time.  I guess a lot changed in the middle as far as we

17  have line-by-line projections in the medical division and those

18  change which customers are going to have which parts, which

19  customers they lost parts with or volumes had been reduced or

20  new customers they got provided were increased.  At the end of

21  the day, the dollar amount never changed in aggregate, so over

22  the course between July and December customers were pulled out.

23  New customers were put in into their detailed plan but

24  effectively the EBITDA number never changed.

25  Q.   Now, as an overall conclusion you talked about the growth

Jessie Ultz - Direct                                    66

1  prospects with respect to the after-market business at least as

2  reflected in these projections.  Does this demonstrate that at

3  least insofar as the debtors are concerned with making the

4  projections that the after-market business is also being

5  negatively impacted by the economy.

6           MR. STROCHAK:  Objection, Your Honor.  Leading.

7           THE COURT:  Sustained.

8  BY MR. BRACHT:

9  Q.   What does it show, Mr. Ultz, concerning whether or not the

10 after-market business is being negatively impacted by the

11 economy?

12 A.   If we could go back to the second page of this exhibit,

13 there was a revision in the projections on the OEM side between

14 September and December and the box at the bottom shows the

15 percentage change.  And so what you can see is that the after-

16 market business between September and December the projections

17 2008 actually have an increase.  They're up 10 percent.  But

18 beyond 2008 the projection was that the after-market business

19 was going to be worse off than they had originally expected.

20 So if you compare the September 8th OES after-market sales of

21 3/5 up to 3/6 are essentially flat.  And then you go to the

22 December projection they actually now project their after-

23 market sales to decline through 2012.  Again, it's not a one-

24 year issue.  This is over the next five years.  They now expect

25 less business in the after-market side than they had

Jessie Ultz - Direct                                    67

1   previously.  The percentage there, there's about an 18 percent

2   decline over the course of those -- what is it -- four months,

3   three months between those projections.  The long-term prospect

4   for the business are now about 18 percent lower.  And I guess

5   the other "no" is that when they do their projections

6   everything is classified as booked business or in-production

7   business, highly-likely business, and medium-likely business.

8   And all the after market was classified as in production or

9   booked business.  There was no speculative business in there.

10  And yet, the projections declined by 18 percent.

11  Q.   So what we have seen in Exhibit B is that the --

12           THE COURT:  Z now?  We're looking at --

13           MR. BRACHT:  I'm going back to --

14           THE COURT:  You're going to B.

15           MR. BRACHT:  I'm sorry.

16  BY MR. BRACHT:

17  Q.   What we first saw with Exhibit B is that debtor's actual

18  results are continuing to decline.

19           MR. STROCHAK:  Objection, Your Honor.  Leading.

20           MR. BRACHT:  And --

21           THE COURT:  Overruled.

22  BY MR. BRACHT:

23  Q.   And with respect to Exhibit A what does that show with

24  respect to the Lexington's projections?

25  A.   Well, we have raised -- these show that they're continuing

Jessie Ultz - Direct                                      68

1   to miss their budget by a wider margin and Exhibit A shows that

2   they're continuing to lower their budgets and that is going

3   over the next five years and not just the current period.

4   Q.   Now, if you would please, sir, turn to Exhibit K.  Now,

5   what is Exhibit K?

6   A.   Exhibit K is data pulled from Capital IQ, which is a

7   pretty recognized information service, and it looks at the

8   change in multiples, the comparable companies chosen by WI

9   Campbell at each stage of this process.  Going back to the 2007

10  time period when Campbell was trying to sell the company

11  through the filing date annexed to the first disclosure

12  statement and then September was when WI Campbell issued their

13  report.  And then December was the final disclosure statement

14  that's been issued and then the 18th was the last day prior to

15  submitting these documents.  And so what it shows is now

16  although we don't agree with all of the comparable companies

17  that Campbell chose even if you assume they're correct the

18  multiples have declined tremendously over the last year and

19  even specifically since they issued their report and the

20  disclosure statement came out in August and September.  So on

21  the automotive side whether it be after market or OEM, the

22  multiples are down 30 percent and on the medical side multiples

23  are down about 20 percent.

24  Q.   Okay.  And with performance -- actual performance compared

25  to budget going down with the debtors' own projections over

Jessie Ultz - Direct                                    69

1   time going down with multiples in the industry going down what

2   would you expect the change, if any, would be with respect to

3   the debtors' views of value or enterprise value of this

4   company?

5   A.    It seems like with all three of those factors pointing

6   downward you would have to assume the value wo0uld decline in

7   their mind over that period of time.

8   Q.    Okay.  Turn to Exhibit D if you could, please.  Do you

9   have it?

10  A.    I do.

11  Q.    What is Exhibit D?

12  A.    Exhibit D is a chart trying to show a comparative levels

13  of value across each of the times we've received an indication

14  from the company.  Every time they've issued a disclosure

15  statement or a report, they classify things differently so it's

16  hard to look at them side by side.  So what we've done here is

17  just shown the value that they allocate to the rubber group,

18  the metals group, the nonoperating assets and the cases where

19  it was relevant the cash and the working capital that Campbell

20  valued the company at.

21  Q.    All right.  So we've got the earliest date -- the

22  [unintelligible] in 2007 was something that was done --

23  A.    That was done --

24  Q.    -- pre-bankruptcy.

25  A.    That was pre-bankruptcy when Campbell was trying to

Jessie Ultz - Direct                              70

1  actually sell the company.  This is what they told the company

2  to expect from a value.

3  Q.    Okay.  And then we move to the August -- the earliest

4  date.  That's the first disclosure statement, right?

5  A.    That's correct.

6  Q.    And this enterprise value is something that's contained in

7  the disclosure statement?

8  A.    That's what the disclosure statement lays out.

9  Q.    It's not anything that we -- that you agree with or that

10 SRR agrees with, correct?

11 A.    We don't agree.  We're just taking it directly from their

12 documents.

13 Q.    Fine.  And then the next document or the next number is

14 September of 2008 and that's the effective date of the draft

15 WIC valuation report?

16 A.    Right.  That's their official report.

17 Q.    All right.  And then the disclosure statement in December

18 that was the second disclosure statement that was filed

19 sometime in the middle of December just prior to the

20 anticipated confirmation hearing that we were hopefully going

21 to have in February?

22 A.    That's correct.

23 Q.    Now, obviously we can see the numbers.  There has been a

24 drop in enterprise value from August to December, but it is --

25 it's dropped and it's comparable to the drop that's occurred

Jessie Ultz - Direct                                    71

1    with respect to the other parameters that we've looked at.

2              THE COURT:  I don't understand your question.

3    BY MR. BRACHT:

4    Q.   Is it a drop that would be comparable to the drop that

5    we've seen in their actual versus budgeted performance in their

6    own downward revisions of their projections and the downward

7    trend of the multiples in the industries?

8              MR. STROCHAK:  Objection, Your Honor.  I think this

9    calls for expert testimony.  We haven't received a report.  I

10   think once you start getting into comparing multiples and

11   EBITDA and everything else that's valuation and the Committee

12   has not provided a valuation report for us.

13             MR. BRACHT:  I'll withdraw the question, Your Honor.

14   BY MR. BRACHT:

15   Q.   Finally, just move to Exhibit H and I know that we had

16   talked a lot about this in various ways.  Could you just tell

17   us what Exhibit H is?

18   A.   Exhibit H for 1999 through 2007 is the actual sales in

19   EBITDA pulled from the company's 10K.  For 2008 that's the

20   number inn the most recent set of financials we've received.  I

21   guess at this point it's a projection from the company since we

22   don't have December results but that's the most recent number

23   that we had seen that would show up in their 10K.

24   Q.   Okay.  And the number of 3.7 on the EBITDA line for the

25   2008 estimated tax number that doesn't include adjustment?

Jessie Ultz - Direct                           72

1   A.   It doesn't include adjustment for reorganization expenses

2   which obviously we're including in everything else, but that's

3   the number that would show up in their 10K if it were filed

4   because that's the actual unadjusted number.

5            MR. BRACHT:  Your Honor, I would offer Exhibit H, D,

6   K and E at this -- excuse me, K and A.

7            MR. STROCHAK:  Let me start, Your Honor.  No

8   objection to H.

9            THE COURT:  All right.  Exhibit H is in evidence.

10              (Committee Exhibit H is admitted.)

11           MR. STROCHAK:  I'm sorry.  Did you say E, Mr. Bracht?

12           MR. BRACHT:  No, I didn't.  I didn't say E.  I did

13   say E.  I misspoke.  I meant A and D.

14           MR. STROCHAK:  No objection to A.

15           THE COURT:  All right.  Exhibit A is in evidence.

16              (Committee Exhibit A is admitted.)

17           MR. STROCHAK:  B is the next one?

18           THE COURT:  No, D.

19           MR. STROCHAK:  D as in David.

20           THE COURT:  B is in evidence already.  D as in David.

21           MR. STROCHAK:  No objection to D as in David.

22           THE COURT:  All right.  Exhibit D is in evidence.

23              (Committee Exhibit D is admitted.)

24           THE COURT:  K is next.

25           MR. STROCHAK:  K, I believe, is properly the subject

Jessie Ultz - Direct                                    73

1  of expert testimony and, again, for the same reason, we haven't

2  received a report.  We object to that one.

3              THE COURT:  You want to be heard on this, Mr. Bracht?

4              MR. BRACHT:  Well, Your Honor, it's simply a -- it's

5  right out of the -- what did you call it?

6              THE WITNESS:  Capital IQ.

7              MR. BRACHT:  This is the same source that's been used

8  by everybody in the courtroom.  It's simply a recitation taken

9  from the page of what's contained in that source.  It's not a

10  matter of opinion.  It's a matter of fact.

11             THE COURT:  Lay a better foundation for it.

12  BY MR. BRACHT:

13  Q.   Mr. Ultz, where did you get the information that's

14  contained on Exhibit K?

15  A.   Exhibit K comes from the data source Capital IQ.  We

16  strictly ask for the trailing 12-month EBITDA of each of the

17  comparable companies.  This is an Excel spreadsheet.

18             THE COURT:  The companies that are listed here and

19  the ones that WY Campbell --

20             THE WITNESS:  It's ones that they chose, not our --

21  they're not the counsel we would choose.

22             THE COURT:  All right.  So all this data comes

23  from --

24             THE WITNESS:  Capital --

25             THE COURT:  Campbell IQ?

Jessie Ultz - Direct                      74

1           THE WITNESS:  Capital IQ.

2           THE COURT:  Capital IQ?

3           THE WITNESS:  Yes.

4           THE COURT:  Objection is overruled.  Exhibit K is in

5  evidence.

6                (Committee Exhibit K is admitted.)

7           MR. BRACHT:  Okay.  And I believe, Your Honor, that

8  we already got Exhibit B in and I think I offered it earlier.

9           THE COURT:  I show it as in evidence.

10          MR. BRACHT:  Okay.

11  BY MR. BRACHT:

12  Q.   Mr. Ultz, just a few more questions.  During the course of

13  this bankruptcy as SRR participated in discussions with the

14  debtors regarding enterprise value?

15  A.   Yes.

16  Q.   Has SRR shared its views of enterprise value with the

17  debtors and its advisors?

18  A.   We did, yes.

19  Q.   And was that done at both orally and in writing?

20  A.   Yes.

21  Q.   And during the course of those meetings and those

22  discussions was SRR able to explain its methodology that it has

23  used in terms of its use regarding value?

24  A.   Yes.  We discussed the comparable companies that we chose

25  and the multiples and the levels of EBITDA we were applying it

Jessie Ultz - Direct                          75

1   to and have the chance to answer questions on those.

2            MR. BRACHT:  I'll pass the witness, Your Honor.

3            THE COURT:  Did you prepare -- have you prepared a

4   valuation report, Mr. Ultz?

5            THE WITNESS:  We haven't finalized one.  We are

6   prepared --

7            THE COURT:  Prepared a draft?

8            THE WITNESS:  We prepared it at the beginning of

9   January.  I believe we were supposed to exchange reports on

10  January 16th so we were in the first of January ready to

11  finalize and then obviously it was delayed and there is the

12  whole reorganizing of the connector seals business which

13  changes things pretty dramatically.

14           So as of December 31st we had prepared one.  It

15  hadn't been finalized.  It hadn't gone through all the quality

16  control and the review but there was the first draft of our

17  report.

18           THE COURT:  There was testimony during the debtors'

19  direct case that the debtor has asked for a meeting with the

20  Committee and its advisors to discuss value.  Are you aware of

21  that?

22           THE WITNESS:  They told me that they had requested

23  that.  I haven't been requested to be in a meeting.

24           THE COURT:  Go ahead, Mr. Bracht.

25           MR. BRACHT:  That's all I have, Your Honor.  Pass the

Ultz - Cross                                      76

1   witness.

2            THE COURT:  Cross-examination.

3                         CROSS-EXAMINATION

4   BY MR. STROCHAK:

5   Q.   Good morning, Mr. Ultz.  Adam Strochak,  Weil Gotshal for

6   the debtors.  Let's start with your Exhibit B, Committee

7   Exhibit B, please.  Now, your -- let me point you to the first

8   page of Exhibit B, the insulators business, the box at the

9   bottom of the page.

10  A.   Yes.

11  Q.   You've got cumulative forecast sales and actual sales of

12  the insulators business at 16.9 for forecast and 16.2 for

13  cumulative.  Is that correct?

14  A.   Correct.

15  Q.   And are those final numbers or are those only through

16  November?

17  A.   Those are through November.  We don't have December

18  results.

19  Q.   So through November we had just a -- just under five

20  percent off against the forecast on sales, right?

21  A.   Correct.

22  Q.   And you've got the forecast EBITDA and actual, again, just

23  dropping a little further down on the page, Exhibit B, and

24  again that shows just a little bit more than three percent, 3.4

25  percent off of forecast, correct?

Ultz - Cross                                                    77

1   A.    Correct.

2   Q.    Now, let me direct you, if I could, to Exhibit 13 in the

3   debtors' volume.  It's a separate binder.  You should have it

4   there.  It may be to your left.

5   A.    Thirteen is the comparison of '08 actual versus July

6   forecast?

7   Q.    Right.

8   A.    Okay.

9   Q.    Now, for the insulators business you see the column for

10  2008 actual and you were in court yesterday when Mr. Welhouse

11  testified about this, correct?

12  A.    Yes.

13  Q.    Now, you were -- you didn't call up overnight and ask for

14  the missing information for December that you didn't have yet,

15  did you?

16  A.    No, we requested it two or three times over the last week

17  or two and asked to have it provided to us as soon as it was

18  available.

19  Q.    And when you still didn't have it, you still didn't call

20  up yesterday or say anything in court yesterday, did you, sir?

21  A.    No.  That's a standing request.

22  Q.    You do have data for January through June, right?

23  A.    We have annual results.  I don't think they gave us

24  monthly for January through June.  We could back into it

25  obviously from the actuals we have.

Ultz - Cross                                    78

1  Q.   Well, again, you saw it yesterday in court that the

2  debtors did present the data for all of 2008, correct?

3  A.   Correct.

4  Q.   And let's just look at -- let's focus on insulators on the

5  EBITDA number.

6  A.   Um-hum.

7  Q.   The final EBITDA number is 7.9 for 2008 preliminary

8  results against forecast of 8.4, correct?

9  A.   Correct.

10  Q.   And again, that's only 5.4 percent off of the forecast,

11  right?

12  A.   With six months of actual, yes.

13  Q.   Have you done any assessment of whether the first year --

14  first part of the year was strong in performance?

15  A.   Strong relative to what?

16  Q.   Well, let me ask it this way.  Have you done any analysis

17  of first half of the year performance at all in the insulators

18  business?

19  A.   We've looked at the year in aggregate.  I guess what we've

20  been looking at now is relative to budget because we weren't

21  provided a budget for the full year.  Apparently, Cap Source

22  had one from early but we were told there was no budget for the

23  full year '08 because of the process they were going through at

24  that point.  So the only budget that we have came out in July.

25  We obviously had older budgets.  We have, I think, '04 through

Ultz - Cross                                     79

1  '07 annual budgets but we never got a budget for the first six

2  months, so I guess strong relative to what is what I would ask

3  given that we don't know what they were expecting.

4  Q.   Turn with me, if you would, to Exhibit A.

5  A.   In the Committee's?

6  Q.   Yes.

7  A.   Okay.

8  Q.   Now, the OES sector you've indicated that that is

9  essentially parts that are sold into the original equipment

10 market, but on the service side of the business as opposed to

11 the new car build, right?

12 A.   Right.  My understanding is it's sold to the same

13 customers as the OEM business, but they have it for a different

14 purpose where it would go on a repair part versus a new

15 vehicle.

16 Q.   So, for example, these might be parts that would be

17 supplied to a Ford or a Chrysler or a General Motors dealer who

18 might then replace spark plugs wires in vehicles that are

19 brought in for service, correct?

20 A.   Correct.

21 Q.   And you would agree that the -- you would agree with me,

22 sir, that the OES segment is only a small segment of the

23 debtors' insulators business, correct?

24 A.   Correct.

25 Q.   Now, you've indicated that OES -- the projection for OES

Ultz - Cross                                    80

1   sales is going down, right?

2   A.    Right.

3   Q.    But, in fact, the projections for after-market sales --

4   true after-market sales out of the OES sector are not going

5   down, correct?

6   A.    My recollection is over the next five years the

7   projections were in the zero to three percent growth range for

8   pure after market to like Auto Zones and retailers and those

9   type of stuff -- those types of companies.

10  Q.    Now, there's no analysis here -- withdrawn.

11                    [Pause in the proceedings.]

12            MR. STROCHAK:  That is all the questions I have.

13  Thank you, Your Honor.

14            THE COURT:  Thank you, Mr. Strochak.

15            Any further examination from anyone?

16            MR. TISHLER:  No, Your Honor.

17            THE COURT:  Thank you, Mr. Tishler.

18            Mr. Bracht?

19            MR. BRACHT:  Nothing further, Your Honor.

20            THE COURT:  All right.  You can be excused.

21            THE WITNESS:  Thank you.

22            THE COURT:  Mr. Bracht, your next witness?

23            MR. BRACHT:  The Committee calls Nick Walsh.

24            THE COURT:  If you would raise your right hand,

25  Mr. Walsh.

Walsh - Direct                                      81

1           (Nick Walsh, witness for the Committee, sworn.)

2           THE COURT:  Please have a seat.

3           MR. BRACHT:  Speak into the mike, Mr. Walsh.

4                        DIRECT EXAMINATION

5    BY MR. BRACHT:

6    Q.    Would you state your name, please, for the record?

7    A.    Nicholas Walsh.

8    Q.    Mr. Walsh, how are you employed?

9    A.    I am employed with Wilford Aubrey [Ph.].  We're an

10   investment management company.

11   Q.    Okay.  And is your employer a member of the Creditors'

12   Committee in this case?

13   A.    It is.

14   Q.    And are you the representative of Wilford Aubrey which

15   respect to the Committee?

16   A.    I am.

17   Q.    And have you been on the Committee the entire time?

18   A.    I have.

19   Q.    Have you had occasion to meet with and deal with the

20   debtors and its advisors over a period of time?

21   A.    I have with the debtors.

22   Q.    Okay.

23   A.    Several times.

24   Q.    All right.  And what is -- how does Wilford Aubrey rank in

25   terms of the outstanding notes with respect to the sub debt?

Walsh - Direct                                    82

1   Are you the second --

2   A.   Based on --

3   Q.   -- biggest holder?

4   A.   Based on my understanding we're the third largest.

5   Q.   Third largest.  Okay.  Post-bankruptcy, Mr. Walsh, has the

6   Committee met with the debtors in attempts to negotiate a

7   consensual plan?

8   A.   It has several times.

9   Q.   Both in person and over the phone?

10  A.   Yes.

11  Q.   Do you have an estimate as to how many times?

12  A.   I would say at least a half a dozen times if you count the

13  times that the full committee met with the debtor and subsets

14  of the Committee met also with the debtor.

15  Q.   Okay.  What in those meetings has been the single biggest

16  sticking point with respect to differences between the

17  Committee and the debtors?

18  A.   Well, I would say in my opinion that the biggest sticking

19  point has been basically that any negotiation with management

20  the sine qua non, the prerequisite, if you will, for any

21  reorganization value around which we would be organized had to

22  include a material recovery for the old equity.

23  Q.   And by "old equity" you're referring to the current

24  management?

25  A.   I believe they and their affiliates own approximately two-

Walsh - Direct                                    83

1   thirds of the old equity.

2   Q.    Okay.  What is it about the debtors' views with respect to

3   value as expressed to you and the Committee that is frustrating

4   to you?

5   A.    Well, I would say that reasonable people can disagree on

6   appropriate comparables, appropriate multiples, but basically

7   when faced with what's been going on the macro climate to have

8   virtually no movement on the value of the company over that

9   time to have exit financing deteriorate, to have basically the

10  need for new money to come in further diluting the senior notes

11  and still to have basically no movement on the value of the

12  company in management's mind I think has been wholly

13  unrealistic.

14  Q.    As a result of that kind of unyielding position on the

15  part of management are you at an impasse?  Is the Committee at

16  an impasse with management at this point?

17  A.    I would say so.  Yes.

18  Q.    You mentioned exit financing.  Have you had the Committee

19  and you individually have discussions with the debtors

20  concerning the availability of exit financing and how they've

21  been doing with respect to exit financing.

22  A.    I would say the most recent discussion was, I believe,

23  immediately prior to the last civi [ph.] hearing where we had a

24  meeting and management made it appear that exit financing was

25  imminent and they were minor appraisal-type issues to get over.

Walsh - Direct                                    84

1  As my memory serves correctly, it was related to the inventory

2  appraisals that Capital One was doing, but this was just a

3  detail to be worked out and that exit financing was imminent.

4  Q.    And did that subsequently turn out to be the case?

5  A.    No.

6  Q.    What attempts, if any, has the Committee made to obtain

7  exit financing in connection with this bankruptcy?

8  A.    We haven't gone out explicitly looking for new lenders.

9  We feel that in the current environment investors are looking

10 to become involved in a situation where there's really relative

11 little assurance that a deal would get done.  By that, I mean,

12 exclusivity is still with management, so we don't really have

13 the wherewithal to do due diligence.  So we just determined

14 basically as a committee that the pursuit of such exit

15 financing would not be a good use of time.

16 Q.    And because of the exclusivity situation?

17 A.    Yes.

18 Q.    What, in your mind, prospects are available to the

19 Committee if exclusivity is terminated?

20 A.    If it were to be terminated I'm hopeful that in relatively

21 short order the Committee could propose a plan of

22 reorganization which at its core would involve 100 percent

23 conversion of the unsecured claims into equity.  Could possibly

24 involve some other noteholders investing on a secured basis

25 could involve some of the sales of the noncore assets and could

Walsh - Direct                                    85

1   come to some agreement with Capital Source to couch their

2   stated aim, which is to reduce their exposure to the company.

3   Q.   I'm sorry.  I didn't hear that last --

4   A.   Which is to reduce their exposure to the company.

5   Q.   All right.  Did -- and from the Committee's perspective as

6   we speak, what -- from -- is the Committee's views concerning

7   the best course of action at this time?

8   A.   Well, it's my belief that the Committee would support such

9   a plan.  We haven't really gone over it fully and fleshed out

10  the details but in concept we think that they would support

11  that.

12  Q.   And that claim would be -- include the sale of noncore

13  assets, correct?

14  A.   I believe that the Committee would support marketing the

15  noncore assets subject to a reserve level to be agreed upon.

16          THE COURT:  What do you consider the "noncore

17  assets"?

18          THE WITNESS:  Basically, everything but medical and

19  insulator/connectors.

20  BY MR. BRACHT:

21  Q.   From your perspective, your experience, Mr. Walsh, does

22  the sale of the medical business at this point in time make any

23  sense to you?

24  A.   Well, I think it's a very distressed environment right now

25  and I think some stability in the markets would be beneficial

Walsh - Cross                                    86

1  to a sale process.  I think market participants would see right

2  through a market test in that information gleaned would be of

3  relatively little value because the true buyers would not want

4  to have basically help someone do price discovery through no

5  benefit of their own so -- and in terms of an actual sale

6  process I think that doing it immediately or relatively soon

7  would not be in the best interests of all creditors.

8          MR. BRACHT:  Thank you, Mr. Walsh.

9          THE COURT:  I'll pass the witness, Your Honor.

10         THE COURT:  Thank you, Mr. Bracht.  Cross-

11 examination?

12                  CROSS-EXAMINATION

13 BY MR. STROCHAK:

14 Q.   Good morning, Mr. Walsh.

15 A.   Good morning.

16 Q.   Adam Strochak, Weil Gotshal for the debtors.  The

17 Committee has not made any proposal to the debtors that meets

18 the debtors' requests or the debtors' position that there

19 should be a substantial recovery for equity in this case,

20 correct?

21 A.   Well, we have exchanged -- what would be the right term --

22 term sheets, proposal letters which involved an optionality

23 scenario where there would be some warrant recovery for

24 existing equity holders should value ultimately recover to the

25 point where equity would be -- to the point where those

                        Walsh - Cross                          87

1   warrants would become valuable.

2   Q.   And isn't it true, sir, that that proposal did not provide

3   a substantial recovery for equity, correct?

4            MR. BRACHT:  Your Honor, I have some -- an objection.

5   I think that these discussions were done explicitly pursuant to

6   Rule 408.  Part of the settlement discussions [unintelligible]

7   debtors and Committee and, therefore, I would object.

8            THE COURT:  Response, Mr. Strochak?

9            MR. STROCHAK:  Your Honor, I don't think it's fair

10  for Mr. Walsh to be able to testify that the debtors have come

11  in and taken unreasonable positions without unpacking to some

12  degree what the parties' positions were.

13           Now, I don't think any of this evidence should be

14  considered in the context of Rule 408 issues, but if we're

15  talking about in the negotiation process and if the Committee

16  has taken the position that we've somehow been unreasonable in

17  negotiations, I don't know how to respond to that, other than

18  ask him about the substance of the proposals and --

19           THE COURT:  The objection is overruled.  You opened

20  the door, Mr. Bracht.

21  BY MR. STROCHAK:

22  Q.   Now, Mr. Walsh, the proposal that you made to the debtors

23  had the substantial option value going to the bond holders,

24  correct?

25  A.   I -- it had -- the bulk of the equity going to the

                        Walsh - Cross                              88

1   bondholders.  It had the bulk of the optional recovery going to

2   the junior subordinated notes, the preferred stock, and the

3   equity.

4   Q.   And it's the equity, sir, that would receive most of the

5   upside value in the event the debtor performed well post-

6   petition, correct?

7   A.   Well, it's quite possible that the debtors -- well, let me

8   rephrase that.  The equity -- existing equity would receive --

9   I'm sorry.  The new equity for which the bonds would be

10  exchanged it was our intention to have them receive up side --

11  to receive recovery until the full amount of their claim had

12  been recovered and it was our intention to have old equity

13  participate after that point essentially.

14  Q.   So are you telling us that your proposal topped out the

15  noteholders recovery at 100 percent of their claims or did

16  they -- or isn't it true, sir, that they actually got value --

17           THE COURT:  Mr. Strochak, we're not going to get into

18  the details of negotiating.  Mr. Bracht opened the door a

19  little, but I'm not going to -- I don't want to hear about the

20  back and forth.  I wish you would sit down together and do more

21  negotiating and deal with value and address to the Committee,

22  provide a copy of your financial advisors report.  I'll save

23  the rest of my comments for later.

24           Go ahead, Mr. Strochak, but let's stay off of the

25  negotiating positions.

Walsh - Cross                                        89

1          MR. STROCHAK:   Thank you, Your Honor.

2    BY MR. STROCHAK:

3    Q.    Have the debtors in any way precluded the Committee from

4    having any prospective exit lender do due diligence?

5    A.    No.

6    Q.    Now, it's correct that the Committee has no proposal in

7    hand for exit financing, correct?

8    A.    Correct.

9    Q.    Now, you've indicated the possibility that some of the

10   noteholders could come in as secured lenders on an exit

11   facility.  Do you have a proposal from any of the existing

12   noteholders for such a facility?

13   A.    We do not.

14   Q.    So no one has committed to such financing, correct?

15   A.    Correct.

16   Q.    Isn't it correct, sir, that during the course of these

17   cases the Committee has not once come to the debtors and

18   suggested a sale of noncore assets?

19   A.    Well, on this if it's all right I'll speak for myself.

20   And the time line may be a little blurry because I've been

21   involved in talking to the debtors and the 16-odd months of

22   prepetition negotiations and one of the things that I

23   personally suggested several times was, hey, if you're having

24   trouble making these coupon payments why not sell some of these

25   excess assets to prevent the filing.

Walsh - Cross                                    90

1  Q.   So that's prepetition.

2  A.   If I -- I may have mentioned it again post-petition.  I

3  don't know.  I don't recall exactly the time -- the time that I

4  actually recommended that.

5  Q.   Let me just ask the question again.  As you sit here today

6  are you aware of any particular circumstances where you or any

7  other member of the Committee after the petition date came to

8  the debtors and said, we think it's time to sell some of the

9  noncore assets?

10         MR. BRACHT:  Asked and answered, Your Honor.

11         THE COURT:  Sustained.

12 BY MR. STROCHAK:

13 Q.   Sir, isn't it correct that no lender or prospective

14 lender, more appropriately, has told you that they would not

15 consider a proposal for financing unless the exclusivity was

16 ended in this case?

17 A.   That's true.

18 Q.   Now, it is correct, sir, that the -- well, never mind.

19 Withdrawn.

20         MR. STROCHAK:  That's all the questions I have, Your

21 Honor.

22         THE COURT:  Thank you, Mr. Strochak.

23         Mr. Tishler?

24                     CROSS-EXAMINATION

25 BY MR. TISHLER:

                        Walsh - Cross                          91

1   Q.   Good morning, Mr. Walsh.  John Tishler for the senior

2   lenders.  How much is the claim of the noteholders in the

3   aggregate in this case?

4   A.   The face amount of the notes on my recollection was

5   approximately 34.2 million.  We have --

6            THE COURT:  I'm sorry.  Just give me the figure

7   again.

8            THE WITNESS:  34.2 million.

9            THE COURT:  Thank you.

10            THE WITNESS:  We have an accrued interest claim as

11   well which, of course, is increasing.

12            MR. TISHLER:  Sure.

13   BY MR. TISHLER:

14   Q.   And you're aware there's a junior DIP for about four

15   million?

16   A.   Correct.

17   Q.   And then the senior lenders claim is about 34, 35 million?

18   A.   That's my understanding, yes.

19   Q.   If Mr. Vomero's valuation is correct, then the equity is

20   what we call out of the money in this case now, wouldn't you

21   say?

22   A.   Yes.

23   Q.   Do you believe having an I banker seek additional sources

24   of exit financing might turn up additional sources of exit

25   financing in addition to what the debtors have done at this

                    Walsh - Cross/Redirect                        92

1   point?

2   A.    I do.

3           MR. STROCHAK:  Objection, Your Honor.  Beyond on the

4   scope of the direct.

5           THE COURT:  Overruled.

6   BY MR. TISHLER:

7   Q.    Have you or the Committee marketed or tested the market on

8   the medical device business?

9   A.    No.

10  Q.    If this company had less debt on its balance sheet do you

11  believe it would have a better chance to exit this bankruptcy?

12  A.    I do.

13  Q.    Is it better to sell assets at a time -- or is it better

14  to sell assets when there is a long marketing period or is it

15  better to sell assets in a rushed fire sale-type procedure?

16          MR. STROCHAK:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MR. TISHLER:  Thank you.  Thank you.

19          THE COURT:  Mr. Bracht?

20          MR. BRACHT:  Just one follow-up, Your Honor.

21                      REDIRECT EXAMINATION

22  BY MR. BRACHT:

23  Q.    Mr. Walsh, in the answers to the questions from

24  Mr. Strochak concerning exit financing, that's what I'm focused

25  on, has the existence of exclusivity hand strong [ph.]

                        Walsh - Redirect                        93

1   discouraged the members of the Committee to take steps to

2   obtain exit financing?

3   A.   Yes, it has.

4              MR. BRACHT:  That's all I have.

5              THE COURT:  Thank you, Mr. Bracht.

6              MR. STROCHAK:  Nothing further, Your Honor.

7              THE COURT:  All right.  You're excused.  Thank you,

8   Mr. Walsh.  Any further witnesses, Mr. Bracht?

9              MR. BRACHT:  No.  We rest, Your Honor.

10             THE COURT:  All right.  Mr. Tishler, you rested as

11  well?

12             MR. TISHLER:  Yes, Your Honor.

13             THE COURT:  All right.  Mr. Strochak, any rebuttal?

14             MR. STROCHAK:  Your Honor, I do want to talk with my

15  client about brief rebuttal.  In terms of timing I don't know

16  if we could get through closings before your 12:15 time line.

17             THE COURT:  I know but I'd like to get through.  If

18  you've got brief rebuttal let's get it on now and I'd like to

19  have the closings at 3:45, so call your witness if you have a

20  witness.

21             MR. STROCHAK:  Thank you, Your Honor.  Could I just

22  have two minutes, Your Honor?

23             THE COURT:  Yes.

24                     [Pause in the proceedings.]

25             MR. STROCHAK:  Thank you, Judge.  We're not going to

94

1   call any rebuttal case.

2           THE COURT:  All right.  You rest?

3           MR. STROCHAK:  We rest.

4           THE COURT:  All right.  All sides have rested.  It's

5   11:45.  We're going to be in recess.  We'll have argument at

6   3:45 p.m.  Thank you very much.

7           (Off the record.)

8           THE COURT:  -- what my ruling is going to be but --

9   and I'm not sure the issues that bothered me at the start are

10  any different now than they were then and I tried to tell you

11  initially.  While the prepetition lenders have opposed use of

12  cash collateral, it's an overstatement to say they oppose it.

13  They obviously -- they don't want to pull the plug.  There's

14  differences of opinion with debtors about for what period of

15  time cash collateral should be used.

16          The lenders have indicated that additional conditions

17  should be imposed by at least in terms of financial covenants

18  they haven't been specific about what financial covenants they

19  had in mind.  During some of the witness examination the

20  question was asked through a witness, "Well, would you be

21  prepared -- of management would you be prepared to condition

22  continued use of cash collateral on signing contracts in

23  connection with the consolidation?"  Everybody seemed

24  surprised.  The witness said, "Sure."

25          So, I mean, given that no one has argued the case --

95

1    that the debtor should to be permitted to use cash collateral

2    the issues are for what period of time and under what

3    conditions.  And I don't know whether you've endeavored,

4    Mr. Tishler, to talk -- you and your clients to talk with the

5    debtors to see whether you can come to some understanding or

6    agreement both as to the period and as to the conditions.

7            Just so you know why I'm not ruling on it, depending

8    on the outcome -- put it this way.  If I extend exclusivity for

9    some period of time -- and I don't know that I will -- but if I

10   were to do that, I would be very disinclined to impose any

11   condition on the debtors if they retain investment bankers,

12   detest the market on medical business or any other business.

13   If exclusivity is extended, the debtor should be running its

14   business and deciding how it wants to proceed.  So I -- I'll

15   have an open mind and listen, but I just wanted to let you know

16   now that that's certainly not a direction that I'm leaning at

17   this point.  In terms of financial covenants, that's one thing;

18   the period of continued use of cash collateral is another.

19   Whether exclusivity is lifted or not and you oppose the

20   extension of exclusivity as did the Committee and you certainly

21   in indicating a willingness to allow continued use of cash

22   collateral it wasn't tied directly to exclusivity.

23           So, you know, it seems to me that all the relevant

24   constituents should try and talk and figure out whether there

25   are -- what, if any, covenants or conditions and what the

96

1 period is.  I'd ask you to keep in mind in terms of the period

2 the 13-week budget, cash forecast which I think is

3 uncontroverted that it is -- these are not findings of fact,

4 but I mean, what -- what -- I mean, I think it seemed to be

5 acknowledged the debtor was conservative preparing its cash

6 forecast.

7        Mr. Vomero, I thought, was -- everyone was sort of

8 complimentary.  Mr. Welhouse in his efforts in forecasting cash

9 in these 13-week cash budgets so I'd expressed at the outset my

10 concern, you know, the budgets show about four million now and

11 then at the end of the week of May 22nd down to two million and

12 I still have questions about it.  So you ought to keep in mind

13 in terms of discussions about whether use of cash collateral

14 should be extended.

15        I certainly doubt that I would ever extend it to the

16 end of December and even the debtor seemed to, you know, at the

17 very end of their reply briefs said, well, if you don't do it

18 till the end of December maybe the end of May, their obvious

19 fall-back position.

20        You know, I'm not anxious to have additional cash

21 collateral hearings, but it does seem to me that the testimony

22 established that there didn't seem to be real disagreement with

23 the debtor moving forward with consolidation of the connector

24 seal business.  Mr. Vomero agreed that that was a good

25 strategy.  It had to be followed now.  So no one has really

97

1   contested that that should be done.  There seemed to be

2   questions about whether the debtor can do this in three months

3   or six months and whether it can sign up contracts as it says

4   it expects to be able to do by the middle of March, so you

5   ought to -- you know, I would encourage you to talk about

6   whether -- you know, there shouldn't be some date for continued

7   use of cash collateral that will give the prepetition lenders a

8   chance to come back if things aren't going the way the budget

9   shows and we'll sort of test is the debtor really successfully

10  executing on its consolidation of the connector seal business.

11  Those are not rulings.  Those are just some obvious thoughts

12  from what I've heard.

13         With respect to exclusivity, I'll listen to everybody

14  about it but I'm not real happy with either the debtor or the

15  Committee.  I have real questions whether the debtor -- the

16  debtors and the Committee have proceeded in good faith in

17  negotiations.  I have to express real skepticism and the debtor

18  was unsuccessful in getting the Campbell valuation if one would

19  reach pretty far to call out a valuation report into evidence

20  but, you know, Mr. Walsh's testimony at the end when I've been

21  listening to all counsel and witnesses at various points, the

22  market is fallen apart and yet the value of this company,

23  according to the debtor, doesn't seem to change.  So I'm a real

24  skeptic, but this isn't the time.  They didn't get their expert

25  report into evidence and if we ever get to a hearing and

98

1    valuation I assume they'll have a real expert report.  If not,

2    they're going to be in real trouble.

3           Those might -- you might want to shape your arguments

4    accordingly and I -- you know, and I'll ask both Mr. Bracht and

5    Mr. Strochak.  At this stage I'm not sure what the catastrophe

6    is if exclusivity is lifted.  I mean, you in your brief,

7    Mr. Strochak, say, oh, the Committee hasn't come forward with

8    exit financing.  They don't have anybody who says that they're

9    willing to convert a DIP into notes.  Mr. Walsh has said, well,

10   you know, we'll clean up the balance sheet of debt, convert

11   everything to equity.  I understand if there is any equity

12   value, equity doesn't like it because it dilutes them down

13   substantially, but in -- those aren't issues for today but, you

14   know, if the debtor gets any extension of exclusivity it's

15   going to be really short and I'm -- for one thing, the Court is

16   absolutely determined about is your brief, Mr. Strochak,

17   suggested that, oh, extend exclusivity, you know, the Committee

18   can have three months at the end.  You absolutely lose

19   exclusivity the end of September, I think it is.  And you said,

20   oh, well, the Committee would have -- if you extend use of cash

21   collateral till the end of December, well, the Committee would

22   have three months to do something, it isn't going to happen.

23   It isn't going to happen.  So I'm not sure whether -- what the

24   calamity is if exclusivity were ended right now and I'm not

25   sure the Committee is going to do any better than the debtors

99

1 have in coming up with a plan and we're probably going to wind

2 up with evaluation trial no matter what.   But think about that.

3 I'll see you all at 3:45.

4           MR. STROCHAK:   Thank you, Judge.

5           (Off the record.)

6           THE COURT:   Please be seated.   All right.

7 Mr. Strochak?

8                     CLOSING ARGUMENT

9           MR. STROCHAK:   Thank you, Your Honor.   Adam Strochek

10 for the debtors.   Let me start by addressing some of the points

11 raised in Your Honor's comments before we broke in terms of the

12 timing of our requests, that is, the length of the extensions

13 that we're seeking and conditions to those requests.

14           Our original cash collateral motion starting with

15 that asked for extensions in December 31st, as the Court knows.

16 In our papers we did indicate to the Court that if the Court

17 was not comfortable with an extension of that duration that we

18 thought July 31 was an appropriate date.   That will give us

19 enough time to get through the consolidation of the connector

20 seals business, to continue to explore the market for exist

21 financing.   Hopefully, once the consolidation is either

22 substantially done or substantially underway, that will ease

23 the way to exit financing.   We can't be sure of that, of

24 course, but it's certainly our hope that that will fall into

25 place.   And July 31 seems an appropriate date as long as it's

100

1  without prejudice to a further extension and likewise without

2  prejudice to anyone else coming into court and seeking to end

3  use of cash collateral if circumstances change between now and

4  then.

5           So we think that's an appropriate date if the Court

6  is uncomfortable going further given the state of the markets,

7  the state of the business, the cash projections or anything

8  else that the Court has heard.

9           With respect to exclusivity we had originally asked

10 for --

11          THE COURT:  Just before you do that --

12          MR. STROCHAK:  Sure.

13          THE COURT:  -- you said you were going to address

14 length of extension.  You've done that.  Also, conditions.

15          MR. STROCHAK:  I'm happy to deal with cash collateral

16 conditions now rather than circling back.

17          THE COURT:  Yeah, why don't you do that?

18          MR. STROCHAK:  Here's our thinking on conditions,

19 Your Honor.  There is 110 percent accedence rate built into our

20 order.  I do want to call attention; there's a typo in the

21 order.  We wrote "ten percent" instead of "110 percent," so if

22 you look at the order that we filed with our motion papers it

23 basically says on a cumulative basis we won't use more than 110

24 percent of the cash that we said we were going to use in the

25 budget.  So that's in there already.

101

1       We have --

2       THE COURT:  Your prepetition letter said you exceeded

3  by .6 percent or something.

4       MR. STROCHAK:  That was a sales figure.  In the

5  original cash collateral order there was a sales figure and

6  we're required to report to them and we missed that by that

7  small amount.

8       With respect to the cash budget going forward, we're

9  comfortable saying that we won't go more than a million dollars

10  below our forecast.  We've hit that forecast very consistently

11  with the cash budget, very consistently.  Obviously, with

12  something like cash you could be tripped up by, you know, a

13  check not coming in from a customer or something like that.  We

14  wouldn't want to inadvertently trip a covenant and not be able

15  to continue to run this business.

16       THE COURT:  Let me just stop you there because

17  Exhibit 1, which is the cash budget, the testimony that you

18  proffered, you know, you were about 300,000 -- you actually had

19  about $300,000.00 more in cash than was budgeted, I think, at

20  this February 27th date looking at it.  Slightly wrong -- there

21  was some issue about beginning of the week, end of the week,

22  but so the actual cash exceeded what was in the budget.

23       MR. STROCHAK:  That's right.  Quite possible that it

24  did.  I think -- I can't recall the exact number, $175,000.00,

25  $200,000.00.

102

1          THE COURT:  Okay.

2          MR. STROCHAK:  Your recollection is 300.

3          THE COURT:  Let me -- you know, if you get to May

4  22nd and you're a million below -- a million in cash this

5  budget showed it going from approximately four million down to

6  approximately two million.  I'll hear from Mr. Tishler, but I

7  suspect they're going to be much more uncomfortable with a

8  million than they are with two million, so saying you won't go

9  more than a million below what's in the budget you may -- well,

10 I may hear more about that from Mr. Tishler.

11         MR. STROCHAK:  Well --

12         THE COURT:  And I have to express my own discomfort

13 with that.  I mean, I expressed my views before the start and

14 one of my concerns was, okay, I saw a 13-week budget going from

15 four million to two million.  And I never heard a figure on

16 what cause you need to continue operating what is the minimum

17 cash balance the debtor requires in order to fund its day-to-

18 day operations.

19         The values that I heard, the total enterprise value,

20 all that was on a going-concern basis.  This debtor runs out of

21 cash you may as well throw out going-concern basis unless

22 somebody is going to start pumping money into it.

23         MR. STROCHAK:  Well, what I'm saying, Your Honor, is

24 that the use of -- continued use of cash would be conditioned

25 on us being not more than a million dollars below our net

1   available forecast so that would be --

2          THE COURT:  And the question I had --

3          MR. STROCHAK:  -- of course --

4          THE COURT:  -- if you get to -- we'd get to May and

5   instead of two million you have one million.  I'll guess I'll

6   hear from Mr. Tishler about it, but is that -- I mean, I didn't

7   hear any evidence about what the minimum cash that's required

8   to fund ongoing business operations.  I just express I get

9   nervous when that cash balance over 13 weeks goes from four

10  million to two million.  Now I heard Mr. Lubin and Mr. Welhouse

11  say, well, they expect that, you know, if the consolidation

12  plan goes as they hoped that the number will increase.  If it

13  doesn't, that's the concern I have so --

14          MR. STROCHAK:  Yeah.

15          THE COURT:  -- I'll hear from Mr. Tishler about it,

16  so --

17          MR. STROCHAK:  Yeah.

18          THE COURT:  -- your proposal is that we have this

19  cushion of a million below.

20          MR. STROCHAK:  Yeah.

21          THE COURT:  Even though I've heard how conservative

22  these projections are you're usually well above.

23          MR. STROCHAK:  Yeah.  I guess, I understand Your

24  Honor's point about there not being any evidence on this point

25  but from purposes of representation I can tell you that the

104

1   debtors are comfortable operating down to the level that I've

2   described.  If we got to the point -- or the low point in our

3   budget is 1.7 million, I believe, in the cash.  And what we're

4   comfortable saying is that if we get down to $700,000.00, that

5   is a million below that we still feel that we can operate and

6   we're perfectly comfortable telling the Court that we don't

7   think we're going to get there, so we're willing to say as a

8   condition to use some cash that we won't get there.

9           THE COURT:  Other conditions you want to talk about?

10          MR. STROCHAK:  We're very comfortable, Your Honor,

11  having some milestones in connection with the connector seals

12  consolidation and we've sketched out what those could look

13  like.  We think we can have half the business, half the

14  connector seals business that we're going to move under

15  contract by March 31st.

16          THE COURT:  What -- let me ask this.  I -- and maybe

17  there was testimony and you can remind me about it if there

18  was.  I definitely recall the testimony that going forward with

19  the consolidation the debtor had established that it was

20  contingent upon signing contracts with some number and I never

21  heard and I didn't ask about it.  I thought about it then.  I

22  didn't ask anyone else about what happens if two of your four

23  big customers sign, are you going to go forward with

24  consolidation or not.  There's no evidence as to what you're

25  going to do.

1          All I heard was there was -- the debtor had

2     established as a condition going forward with -- a contingency

3     to go forward with consolidation that it signed contracts but,

4     you know, in the real world you've got two who you've said

5     sound like they're on board.  They're willing to agree to

6     quicker payment terms.  They're willing to give you -- to have

7     to sign on a piece of paper yet.  You -- at least the testimony

8     as to two of the customers was much firmer than as to the other

9     two.  So what happens if there are only two?  I don't know.  I

10    didn't hear any evidence on this.

11          MR. STROCHAK:  Yeah.  I don't think it's a binary

12    decision, Your Honor.  I don't think the decision is we need to

13    have, you know, X amount of customers or Y amount of volume in

14    order to make this work.  I think it's much more of an

15    incremental-type thing.  You have customers who might want to

16    move certain parts but not others, so it's certainly not

17    necessary that a customer move 100 percent of its business.

18    You could take certain parts.  I think it would be kind of a

19    case-by-case calculation for the combination of parts that

20    we're getting to decide if it makes sense to move those or not.

21          THE COURT:  So your proposal was a half under

22    contract by when?

23          MR. STROCHAK:  By March 31st.

24          THE COURT:  And now is the half by dollar volume?  Is

25    it -- what is the half of what?

106

1          MR. STROCHAK:  The --

2          THE COURT:  The two of four?  I don't know what it

3     is.  I don't know what you're proposing.

4          MR. STROCHAK:  Yeah, I think, Your Honor --

5          THE COURT:  Lubin is -- talk to your lawyer.

6          MR. VOMERO:  I don't know if it -- if you want

7     testimony from me under oath or do you want no more testimony?

8          THE COURT:  No, I -- we'll -- I'll take it as a

9     representation now and we'll see what others have to say about

10    it.

11         MR. VOMERO:  Well, like I said, the -- as

12    Mr. Strochak said, it's not a binary decision.  It isn't a --

13    if we don't get the following it makes no sense.  We're going

14    to be moving -- let's -- we plan that we've got about seven

15    million dollars a year, maybe as much as eight and a half

16    million dollars a year business into the Rock Hill plant,

17    but -- and if we get that only a contribution [unintelligible]

18    probably two and a half to three million dollars.  If the

19    cust -- if only two of the customers were going to move there,

20    only two of the ones who -- they're -- the two we talked about

21    as much more firm right now are two of the ones that moved

22    there, that might be four million dollars' worth of business

23    and it might wholly contribute a million two but that's a much

24    better contribution than we have now.

25         So our point of view is we [unintelligible] any of it

107

1   as long as having the operation makes sense in terms of total

2   size.  We said the 50 percent is sort of the floor on the

3   theory that in order to really enhance our ability to get the

4   financing we had to have a significant incremental cash flow

5   and we thought the 50 would be a good starting point to that.

6   That would be probably seven and a half million dollars' worth

7   of business and probably two and a half million dollars of

8   incremental cash flow.

9          THE COURT:  Thank you.  Go ahead, Mr. Strochak.

10         MR. STROCHAK:  So to continue with those conditions

11  we think that we can complete production of the inventory bill,

12  the building the banks of inventory.  We think we can complete

13  90 percent of that by May 31st.  And then by June 30th we would

14  substantially close the Vienna plant.  And the reason I say

15  "substantially" is I guess we can't foreclose the possibility

16  that somebody has to go in and do something in there, but for

17  the most part operations substantially concluded at that plant

18  and the overhead of that plant labor overhead eliminated as a

19  cost.  So those are the milestones that we've come up with on

20  the connector seals consolidation.

21         Turning to the timing of the extension of

22  exclusivity, our original papers asked for the end of April.

23  As this matter proceeded, as we joined the hearing on continued

24  exclusivity with the cash collateral motion, we realized that

25  end of April was going to buy us filing papers in a month or so

108

1   if the Court granted the extension filing papers in a month or

2   so for a further extension if we had leave to do so.  So we

3   amended the motion and sought to extend exclusivity until July

4   31st.

5           Really, our thinking on that, Your Honor, was that a

6   substantial cause of the cash drain on the case has been the

7   expenses of administration and the reorganization expenses and

8   this is now the third time we've had contested exclusivity

9   motions.  Obviously, everyone has some responsibility for the

10  costs of the reorganization process but we thought teeing up

11  another one in April didn't make a whole lot of sense in light

12  of where we are and how much it's cost to get here.

13          THE COURT:  Well, it's a substantial cash drain but

14  you keep adding back into your -- in doing your forecasts and

15  projections your projections on EBITDA you had back all the

16  reorganization expenses, so I under -- in terms of looking at

17  the cash budget it certainly has its impact, but --

18          MR. STROCHAK:  That's my point, Your Honor.

19          THE COURT:  -- in terms of your operating performance

20  you've washed it out.

21          MR. STROCHAK:  No, it doesn't have anything to do

22  with the operating performance and that's not our thinking

23  on -- that wasn't our thinking on the extension is that it

24  would have any affect on operational performance of the

25  business.

1              You know, Your Honor has made it very clear that your

2     thinking is if there's going to be an extension it's going to

3     be a short one.  We're okay with that.  You know, I guess we

4     would suggest the end of May is appropriate.  The reason why we

5     think an extension is important is it will give us time to get

6     the consolidation done, to get our customers into the contracts

7     that we need, to get the consolidation done which will benefit

8     anybody.  There's nobody in this room who disagrees that this

9     needs to be done, that this is a good thing for the business to

10    do.

11             THE COURT:  I don't know whether that's true or not.

12    No one testified that they disagreed with it.  Let's just put

13    it that way.

14             MR. STROCHAK:  Well, so no one has told us that we

15    shouldn't do this.  No one has questioned the business judgment

16    in doing this to save these costs and, you know, we can

17    disagree as to how successful it might be in generating

18    additional cash flow but nobody says, don't do it.  So that's

19    our thinking on timing, Your Honor.

20             Let me turn to the cash collateral motion and see if

21    I can sum up where we are.  The touchstone, of course, is

22    adequate protection and we think that the evidence demonstrates

23    that we have not been overly aggressive in this case.  We have,

24    in fact, been generous with the adequate protection that we've

25    provided to the senior lenders in this case.  We've paid them

110

1    principal payments throughout the case.  We paid them interest

2    payments throughout the case.  We're proposing to continue to

3    do so.

4            They are protected by a very substantial equity

5    cushion in the business.  Their own valuation evidence, Your

6    Honor, Mr. Vomero suggests that they've got, you know, nearly

7    twice the protection of the value of their claim so a very

8    substantial equity cushion on top of them.

9            Let me focus on Mr. Vomero's valuation for a minute.

10   We don't agree with it, Your Honor.  We think it's low and we

11   think the evidence suggests that there are a lot of things that

12   he did in that valuation that with a couple of changes of

13   assumptions, changes in calculations you end up with a much

14   more substantial valuation.  The comparables are thin.  There

15   is no control premium for the publicly traded comp values.  I

16   think that would appropriately be added in.  He's included the

17   corporate overhead in the EBITDA numbers for the medical --

18           THE COURT:  Yeah, but what he did was --

19           MR. STROCHAK:  -- and the insulators business.

20           THE COURT:  -- he used a methodology that computed

21   total enterprise value.  Then over it has to go somewhere so I

22   had always thought it sort of standard that you have to find an

23   allocation method.  You at one point seemed to disagree with

24   the allocation method he did.  He did it based on the

25   percentage of EBITDA in that segment so the result was, of

111

1    course, that connector seals got almost no overhead because it

2    had almost no -- it had negative EBITDA.  But you -- what do

3    you do?  You want to ignore overhead in determining total

4    enterprise value?  It wasn't -- you know, Mr. Vomero wasn't

5    putting a value on the medical business, for example.  He was

6    putting it on the entire enterprise and so you'd have to do

7    something with overhead.  You have to allocate it out and I

8    didn't hear any -- other than your raising questions with him

9    about what methodology he did use, there certainly wasn't any

10   testimony on your side as to -- that there was a better or more

11   appropriate method for allocating it.

12          What do you do with the overhead?  Do you want to

13   ignore it?

14          MR. STROCHAK:  Well, Your Honor, this is my point.

15   My point is the valuation method he chose bears no resemblance

16   to what's actually going on in this case.  That is, no one here

17   is suggesting that the debtor should put the entire business up

18   for sale and that that would be anything close to the way to

19   maximize value.

20          THE COURT:  No.  But the law is that in determining

21   adequate protection that I have to look at, what's the pot of

22   assets that's securing their indebtedness, it's basically all

23   the assets.  So you look at -- you know, the cases I've read

24   said that's what you ought to do so you value the entire

25   enterprise.  Okay.  That's what he did.  And in doing that he

112

1   had to do something with overhead -- with corporate overhead.

2   It's not -- it's not a revenue generator.  It's the cost of

3   doing business.  It's got to be allocated out.

4         If these were stand-alone businesses they'd have

5   their own overhead but they don't.  There was corporate, so I

6   don't understand your criticism of what he did with respect to

7   allocating overhead.  It had to be allocated.  You raised the

8   question as to whether it was appropriate to allocate it based

9   on the percentage of EBITDA from that line of business but

10  didn't suggest what -- that there was some different method he

11  should have used.  You raised in your questions that, well, the

12  result was that because medical had higher EBITDA, more of the

13  overhead got charged to it.  That's true.  I understand that.

14        And you say, well, you know, there's a different

15  multiple so it might have affected total value.  Okay.  I

16  understand your point.  I don't agree with it but I understand

17  your point.

18        MR. STROCHAK:  Thank you, Your Honor.  The key here

19  is ultimately valuation is about modelling.  You're modelling

20  values for this business.  And my point, Your Honor, is that we

21  think he modeled it the wrong way.  We think he modeled it as a

22  publicly-traded comparable value on an enterprise-wide basis.

23  He did do the whole thing but he basically just took one

24  valuation method and didn't use any other valuation method,

25  which is erroneous in this case when what the lenders here are

113

1    asking for is for a sale of the medical business.  They're

2    saying you should go out separately and sell medical.

3          THE COURT:  Let me ease your mind right now.  The one

4    part of Mr. Vomero's testimony that I don't credit is his

5    recommendation that they test the market for sale of the

6    medical business now.  He didn't opine about the value of the

7    medical business.  I -- you know, Mr. Tishler can argue to the

8    contrary, but I found unpersuasive the testimony or the

9    arguments for going out and doing, you know, a banker's book

10   and going out and testing the market when at least the debtor

11   is not serious about selling now.

12         If exclusivity gets lifted, different ball game, you

13   know, somebody can put in a plan that proposes selling noncore

14   assets, proposes selling the medical business fair game.

15   That's going to hinge on exclusivity.  Okay.  I understand the

16   debtors' position.  The debtors' position is they don't want to

17   market the medical business now.  They think the market, you

18   know -- the whole market is distressed, period.  They think

19   it's good business.  They think it's a growing business.  They

20   want to keep it.  They want to -- if they want to sell it, they

21   want to sell it when things improve.  They get a higher value.

22   I understand your arguments about it.

23         So I just -- your time is better spent arguing about

24   something other than -- and I thought I made this clear

25   earlier -- that one of the conditions -- if I permit use of

114

1   cash collateral, one of the conditions is not likely to be

2   that, you know, they put specific assets on the block right

3   now.  Exclusivity gets lifted, you know.  The Committee -- if

4   the Committee is going to propose a plan or someone else is

5   going to propose a plan and they think that things are so dire

6   you'd better sell some assets while you can, I don't know

7   what -- nobody testified about what this -- how lengthy the

8   sales process is likely to be.  If cash were really running

9   out, you know, I might feel differently about whether the Court

10  should impose a condition.

11          MR. STROCHAK:  That's understood, Your Honor, and we

12  certainly have no problem with anyone coming back to work if

13  circumstances change.  You know, we recognize we need cash to

14  operate, too, so there's certainly no desire to drive this

15  business into the ground like a dart.  We want to do what

16  maximizes value for all constituents in the case and that's the

17  idea.  So there's no suggestion that if things need to be

18  revisited they shouldn't be revisited in our part, Your Honor.

19          Let me talk a little bit about the testimony and the

20  argument -- or the testimony that's come in regarding the

21  debtors' projections and their performance over time.  You

22  know, the fundamental complaint we've heard is that the debtors

23  haven't done a great job forecasting.  They haven't done a

24  great job predicting how much business they're going to get and

25  how much cash flow they're going to generate.

115

1          Your Honor, we really don't disagree with that.  We

2    haven't done the greatest job.  We've missed a lot.  We've

3    missed a lot because it's in many respects like trying to catch

4    a falling knife with what's been going on in the automobile

5    industry particularly recently and over time as well.  But what

6    that doesn't mean is that the two businesses, insulators and

7    medical, that are performing very well aren't in fact

8    performing very well.  The evidence has shown that they've got

9    increasing EBITDA over the trailing 12-month period.  That's

10   straight from Mr. Vomero's analysis and they've held up well in

11   extraordinarily difficult times.

12          THE COURT:  But not sufficiently well to support the

13   debt load that the company has.  Consequently, you haven't been

14   able to find an exit lender who's willing to put up enough

15   money that would pay off all the prepetition secured lenders.

16   They -- you know, if they were stand-alone businesses without a

17   big debt load, that might all be well and good what you're

18   saying.  I don't fault the debtor for the difficulty in coming

19   up with accurate projections in the current market.  I mean,

20   it's a nightmare.  But the reality is that given the debt load

21   that this company has and it -- with the plan that the debtor

22   proposed for exiting bankruptcy you haven't been able to find a

23   lender or lenders willing to come up with the money top

24   accomplish it.

25          MR. STROCHAK:  And that's why we're --

116

1          THE COURT:  Again, it's not -- I don't fault

2    management for that.  It's the circumstances, you know, that

3    there -- they like hit the perfect storm.

4          MR. STROCHAK:  That's why we're here, Your Honor.

5    What we're asking for is the additional time that we need in

6    order to fix the drain on cash that is the connector seals

7    business so that we can try and get this company out of

8    bankruptcy and keep it together, preserve value which is firmly

9    our view that the way to do that is to keep this business

10   together at this time, and while the lenders have sought a sale

11   the Committee has, as far as I can tell, agreed with us that

12   selling these businesses now is not the right thing to do so

13   that's our view --

14         THE COURT:  Well, unless --

15         MR. STROCHAK:  -- like --

16         THE COURT:  -- they're the ones who decide to do it.

17   Unless they decide they're going to propose a plan and they

18   feel that they need to do it, so I -- you know, they're -- they

19   certainly didn't put on evidence in favor of selling the

20   medical business now but they also didn't say it may be

21   necessary to sell noncore assets if they can be sold.

22         MR. STROCHAK:  Yeah, I heard that too, Your Honor,

23   but the key for us is that, you know, keeping these core

24   businesses together is in our view the way to maximize value

25   and that's what we're here trying to --

117

 1          THE COURT:  Well, you're defining medical as core?

 2          MR. STROCHAK:  Medical insulators and --

 3          THE COURT:  Medical is in a stand-alone facility

 4  right now.  Do you want to combine connector seals into their

 5  plant?  Why do you define it as "core"?

 6          MR. STROCHAK:  Well, by "core" I mean the business

 7  that's doing well.

 8          THE COURT:  Different?

 9          MR. STROCHAK:  Yeah.  And it's core in the sense

10  that, you know, it's a fundamental aspect of this business.

11  It's the business that this company wants to reorganize around

12  going forward.  The medical business and the insulators

13  business are going to be the core businesses around, which we

14  reorganize and the connector seals business provides, you know,

15  we hope once the business is fixed some incremental cash flow

16  to that.

17          THE COURT:  Okay.

18          MR. STROCHAK:  With respect to the extension of

19  exclusivity, we do think it's important, Your Honor, to have

20  exclusivity extended so we can accomplish the connector seals

21  consolidation.  It's --

22          THE COURT:  Even if exclusivity is lifted, what

23  prevents you from accomplishing the connector seal

24  consolidation?

25          MR. STROCHAK:  Well, there's nothing objective that

118

1   stops the process.  We think it makes it harder.  We think a

2   competing process where -- first of all, there's a distraction

3   issue if we're going to have a competing plan and have to move

4   forward and litigate a competing plan at the same time that

5   we're trying to do this consolidation because that makes it

6   very difficult to get customers to sign up.  They say, you

7   know, why should I sign into a litigation, why should I sign

8   into a company with a long-term contract where I have

9   absolutely no idea if, you know, you're going to survive next

10  month's litigation, much less long term so it becomes very

11  difficult to convince people that this is the right thing to

12  do.

13          The other factor, Your Honor, is frankly the cash

14  burn.  If exclusivity is lifted and we move into a competing

15  plan process, the cash burn is going to get not better but

16  worse because the reorganization expenses are going to go up,

17  so that is a substantial factor in our mind and obviously

18  you've heard a lot from both the prepetition lenders and the

19  Committee on the cash issues.  It's a concern for us.  It's a

20  concern for everyone and we think it gets substantially worse

21  if we move now into a competing plan process so we'd like the

22  time to get the connector seals consolidation done.

23          We may have to have a competing plan process.  We may

24  have to have a valuation litigation.  We may have valuation

25  litigation with three parties contesting it rather than two,

119

 1   and we may someday be there but we don't think we should be

 2   there over the next three, four months.  We think that that

 3   fight, those issues are best put off until we have the

 4   consolidation done.

 5        THE COURT:  The testimony would say there's been zero

 6   movement with respect to valuation, which I was told on day one

 7   was the central issue in this case.  Zero movement.  Why --

 8   excuse me -- what is there to suggest that three months from

 9   now that would be different?  The connector seal business is

10   not at the center of the valuation dispute from the testimony

11   I've heard.  At most, the debtor hopes to get some incremental

12   revenue from consolidating connector seal business.

13        MR. STROCHAK:  Well, incremental cash flow, Your

14   Honor.

15        THE COURT:  Yeah.  Incremental cash flow.  Reducing

16   it to overhead by shutting the Vienna facility and bringing

17   some, you know, moving some of the business in.  But it's not

18   core.  You've already said that's not part of the core business

19   around what you're trying to reorganize and there has been

20   zero -- the evidence shows zero progress in trying to negotiate

21   a plan or come into agreement on value or, you know, you each

22   cross -- you each point fingers at each other.  You say they

23   don't want to meet.  They say they've told you what their views

24   of value and what their methodology is so, you know, it's just

25   stuck in place.

120

1          MR. STROCHAK:  Well --

2          THE COURT:  At which point, you know, the Court's

3   attitude would be, okay, let's just lift exclusivity.  Let them

4   put the competing plans in and we'll go forward and we'll

5   have -- you know, have to have a valuation trial, fine.  But

6   this is only a recipe for draining -- you're going to get to

7   the end when the Court can't extend exclusivity.  That, you

8   know, and I sort of read your papers to say, yeah, that's what

9   we want to do.  We want to get to the end and we want to leave

10  them three months and we've had, you know, 18 months and we'll

11  leave them three months.  Good luck.  It isn't going to work

12  that way.

13         MR. STROCHAK:  Well, Your Honor, I don't disagree

14  with you that there's been no progress.  I don't disagree with

15  you that, you know, I can't stand here and tell you that within

16  three months we're going to be able to get to a deal.  All I

17  can say is that what we've heard from the Committee has been

18  the same refrain over and over again.

19         THE COURT:  Well, they say the same thing about you,

20  you know.  They say the same.  "You," meaning the debtors.

21  Okay.  This is the first hearing where we have the prepetition

22  lenders, you know, finally -- they've been sort of sitting

23  below the surface.  Mr. Cahn has showed up at hearings from

24  time to time.  Mr. Tishler has been on the phone a few times,

25  but the prepetition lenders have sort of stayed under the radar

121

1  screen, for the most part, but now they've surfaced opposing --

2  sort of opposing the use of cash collateral, opposing extension

3  of exclusivity and saying, you know, the debtor has been

4  immovable in trying to negotiate out these issues.  Okay.  So

5  this case is at loggerheads.

6         MR. STROCHAK:  You know, I don't disagree with you on

7  that, Your Honor.  I'm not sure that it's unfixable.  I'm not

8  sure that if we couldn't get together with a mediator that we

9  might be able to get --

10        THE COURT:  How did you know what I was thinking?

11        MR. STROCHAK:  -- movement.  Well, you told us what

12  you were thinking, Your Honor.

13        THE COURT:  Because I have the mediation order open

14  in front of me here about you're making sure that I have the

15  power to order the parties to mediation whether they like it or

16  not.  Okay.  It's right on the screen right in front of me

17  right now.

18        MR. STROCHAK:  From our perspective, Your Honor --

19        THE COURT:  General order --

20        MR. STROCHAK:  -- we're --

21        THE COURT:  --M-143.

22        MR. STROCHAK:  We're more than willing to try it.

23  You don't have to order us to participate.  You know, we're at

24  a loss as to how to make progress.

25        THE COURT:  You all need to put your cards on the

122

1  table with each other and stop.  This is just -- you know, from

2  the Court's standpoint I'm just watching all of you turn a lot

3  of paper and get nowhere.

4        MR. STROCHAK:  Well, all I can say from the debtors'

5  perspective, Your Honor, is not for lack of trying.  We really

6  have tried.  We provided them with our valuation.

7        THE COURT:  Well, I'm not going to get into it.  Each

8  of you point the fingers at each other about who's trying,

9  who's not trying, who's cooperating, who's not cooperating.  I

10 expressed my view earlier.  I mean, for the longest time the

11 expert report that didn't get into evidence finally -- well,

12 actually it wasn't total enterprise value.  It was just core

13 assets so I don't know what value you -- you didn't put a value

14 on the noncore assets but it was mystifying to me in light of

15 what's happening in the market and the decline in business and

16 missing projections that the debtor could take the position

17 from day one value of this company hasn't changed at all.

18        You know, the last time I heard any valuation sort of

19 testimony from your witnesses, oh, we're just going to put that

20 part of the business at liquidation, but the other parts the

21 value has gone up.  You know, it all stays the same.

22        MR. STROCHAK:  Well --

23        THE COURT:  I'm skeptical.

24        MR. STROCHAK:  Respectfully, Your Honor, if you go

25 back and compare the complete valuation report that we did in

123

1   April -- excuse me, in August with the valuation of core assets

2   you'll see that those values did go down.  They haven't gone

3   down as much as the Committee says they should have gone down,

4   but in part that's due to improvement in the business.  The

5   businesses have done better and that's an objective fact.  We

6   think that --

7           THE COURT:  But you disagree that multiples --

8           MR. STROCHAK:   -- that's demonstrated.

9           THE COURT:   -- in the marketplace have -- you think

10  they've stayed the same, they haven't gone down?

11          MR. STROCHAK:  No, I think some of the multiples

12  probably have gone down, Your Honor, and I think --

13          THE COURT:  So the business may have improved but if

14  multiples go down you may not, you know -- things may be worse

15  off or you may be standing still or you may have declined a

16  little bit, but not as much as they say.  And, you know, I

17  recognize Your Honor has some skepticism about that but, you

18  know, we're not standing here saying as a matter of argument or

19  as a matter of fact that there's been no decline in value.  I

20  think that if you compare the two values, the one done in

21  August, and the one updated most recently for this hearing --

22          THE COURT:  Well, the only evidence in this hearing

23  is from Bridge Associates that puts a total enterprise value

24  below the secure and unsecured debt.  It would have the equity

25  out of the money by a lot.  Okay.  This is not the valuation

124

1  here.  Okay.  This was for cash collateral purposes they put it

2  in.  You were unsuccessful in getting your report in but, you

3  know, the only competent evidence I have before me right now

4  shows the debtors underwater.  There's no value for equity.

5          MR. STROCHAK:  I appreciate that, Your Honor, and I

6  understand where we stand for purposes of this hearing.  Your

7  Honor, unless you have any questions I think that I've probably

8  said --

9          THE COURT:  Let me hear from --

10         MR. STROCHAK:  -- what I need to say at this point.

11 Thank you.

12         THE COURT:  Mr. Tishler, you want to --

13         MR. TISHLER:  Your Honor, I don't want to get up here

14 and make a lot of excuses, but I do want to tell you we heard

15 you loud and clear in terms of the -- in fact, I didn't hear it

16 just from you.  I've heard it from the debtors and the

17 Committee how everybody hates the market testing theory and so

18 you'll be happy to know that we're not going to push it

19 anymore.

20         I did want you to understand it was our way of

21 attempting to do sort of a compromise here that's obviously

22 blown up completely in our faces.  We saw --

23         THE COURT:  That overstates it, but --

24         MR. TISHLER:  Yeah, but we saw the cash burn and we

25 saw the declining of the business.  We knew -- we know we're

125

1  over secured.  We couldn't come in here, I didn't feel like,

2  with a straight face and demand and pound the table that you

3  sell medical, but the reason for it, as you know, was when you

4  see a decline like this even if it's just cash you run out of

5  cash, as you said, and there is no more enterprise value.  We

6  want to avoid that situation and that's all we're here today

7  basically putting in front of you again.

8         THE COURT:  So tell me the length and the conditions.

9         MR. TISHLER:  We don't want to go any further out

10  than the budget has given us visibility on, which puts them at

11  two million dollars.  I also, Your Honor, have a sheet that

12  I -- that we've talked to the debtors about that lays out the

13  conditions if you'd be interested in just having that in front

14  of you, so --

15         THE COURT:  You've shared -- everybody has a copy

16  Just hand it -- I do have it.

17         MR. TISHLER:  You all have it?  Okay.  We recognize

18  that we need to have cash usage.  The debtors need to have cash

19  usage through some period of time.  We recommend just out to

20  the budget period, which would end May 22nd.  We would ask that

21  there be tightened conditions because if things go horribly

22  wrong I think we need to have some break on the process much

23  before they use up all the cash.

24         So 1(a) would be maintaining minimum levels of EBITDA

25  that -- for each month during the term of the extension.  It's

126

1   measured monthly against the financial statement forecast that

2   we anticipate.  They usually give us one and they can give us

3   one again and that it supports the budget that they've already

4   submitted with their cash collateral motion.

5          The second one is one that's currently in there,

6   which is maintaining cash balance and cash receipts for at

7   least 90 percent against budget.  That's in the current order.

8   Limiting cash disbursements to at most 110 percent of weekly

9   amounts set forth in the budget measured weekly, that is also

10  in the budget.  Providing a weekly reconciliation of net cash

11  available to the debtors' bank account balance including

12  without limitation the operating account, the DIP account.

13  That is a new request.  And maintaining current borrowing base

14  availability no worse than the most recently submitted

15  certificate.  That insures against a drain of the A/R which is

16  also our collateral.

17         With respect to the connector seal consolidation,

18  we'd like them to meet those benchmarks that we have there,

19  which is transitional agreements and long-term at least three-

20  year contracts executed by customers.  We suggested 60 percent

21  of the projected sales of connectors business for '09.  We

22  understood Mr. Lubin to testify he could do that by mid-March

23  but they said March 31st that's --

24         THE COURT:  I heard the mid-March as well, but you

25  don't have a problem with March 31?

127

1          MR. TISHLER:  No, Your Honor, I don't.  And then the

2    transitional agreements in part 2(a) much generate minimum

3    aggregate revenue, $900,000.00 and contain payment terms no

4    longer than net 20 days.  They were explained to us that that

5    was one of the advantages of it.  We just wanted to make sure

6    that the company got them.

7          THE COURT:  Just -- I heard the evidence.  You know,

8    I'm --

9          MR. TISHLER:  Right.

10         THE COURT:  -- skeptical in the current market that

11   people are really -- customers are really going to be willing

12   to shorten their payment terms but --

13         MR. TISHLER:  We're just --

14         THE COURT:  -- that's the evidence I heard.

15         MR. TISHLER:  -- basically put your money where your

16   mouth is is what this is.

17         Finally, we think there may be some value in

18   retaining investment banker to search for exit financing during

19   the extension.  That's what we would recommend.  We would take

20   the existing cash flow --

21         THE COURT:  There's no shortage of investment bankers

22   in this case already.  I mean, I -- the notion of paying

23   somebody else to do what -- you know, if you all got together

24   and you all have your financial advisors.  If you actually

25   would sit down in a room together and figure out what other

128

 1  possible avenues for exit financing there are, I can't see what

 2  another -- still another investment banker with another fee is

 3  going to bring to the table, but --

 4         MR. TISHLER:  Our view is a fresh look because

 5  apparently nobody has been able to get it done at this point.

 6  Maybe that's telling us something but anyway --

 7         THE COURT:  Well, I thought we were going to hear

 8  from Wells Fargo next week.

 9         MR. TISHLER:  Those would be -- and what we would do

10  is we would recommend just adding these to the existing order.

11  The order that the debtor submitted to you has additional

12  changes to it which we can't agree to, so we would just add

13  these to the existing order.  It's simpler.  We can turn to you

14  probably by tonight if that would suit you.

15         With respect to the other half of the issue because

16  our market testing got no trans -- traction and frankly, Your

17  Honor, you described this well.  We've been sitting on the side

18  lines patiently for about a year waiting for something to

19  happen here.  We're as frustrated, if not more frustrated than

20  anybody else because, to use your analogy, we've shown our

21  cards because we're all in in this deal.  Our monies are even

22  spent.  It's in the deal and we have really struggled with this

23  frankly about the exclusivity extension, but we've come down to

24  the point where we think the only option really is to terminate

25  exclusivity.  It will foster -- it will force a negotiation

129

 1  here.

 2          THE COURT:  Well, what about Mr. Strochak's point

 3  that the debtor needs to maintain exclusivity in order to

 4  effectively complete the consolidation of the connector seal

 5  business?

 6          MR. TISHLER:  I -- my understanding is that's to be

 7  done by the end of May.  What's going to happen is if you

 8  terminate exclusivity -- we're almost to March now.  It's going

 9  to take time for people to formulate plans, put them on file.

10  There will be a disclosure that -- you're going to have a

11  disclosure statement hearing.  Nothing is going to happen with

12  respect to those plans.  It's going to disrupt this business

13  that -- the lenders are certainly -- Mr. Vonero testified

14  correctly.  We are in favor of them consolidating connector

15  seals.

16          THE COURT:  Oh, I know.  I heard that.  I understand.

17          MR. TISHLER:  So we don't see that that has to be

18  disrupted at all.  We understand that it will cause --

19          THE COURT:  Well, Mr. Strochak argued.  I didn't hear

20  evidence.  Maybe I did.  I mean, I -- Mr. Strochak just argued

21  that it will be more difficult to get customers to sign up

22  long-term contracts if exclusivity is lifted because there's

23  more uncertainty about who's going to be running this company.

24  Why is anybody going to want to sign a three-year contract,

25  which is something that you've put in here as a contingency

130

1    condition?

2            MR. TISHLER:  You know, I understand that, Your

3    Honor.  At the same time my sense about this case is we're

4    fiddling while Rome's burning and --

5            THE COURT:  I agree with that part.

6            MR. TISHLER:  You know, I'm sorry.  It may put a

7    burden on folks but frankly it's been my experience when people

8    will not voluntarily come to the table, when you put a little

9    poker to their back side it tends to do something here, and if

10   all of that is going to force that issue then we would welcome

11   it.

12           At this point, our plan would be to put everything up

13   for sale.  You know, we understand.  There may be enterprise

14   value and all that good stuff, but the reality of it is when

15   you look at what's happened to our equity cushion, you can

16   disagree with Mr. Vomero by a million or so.  We are the only

17   constituent who has put up a valuation in this case and that

18   valuation was 68 million when it was approximately 90 million

19   about a year ago and so it has lost substantial value.  That's

20   enterprise value.  That's assuming a willing buyer and seller.

21   And in this market we all know the reality of that.

22           THE COURT:  Well, Mr. Strochak would say that the

23   debtor can try and cram down a plan on you and restructure your

24   debt because forcing a sale of the company now is not an option

25   that will maximize estate value, that you acknowledge there is

131

1   value for creditors other than the secured creditors.

2          MR. TISHLER:  We haven't done a liquidation analysis.

3   We certainly hope there is.  And by the way, they want to do

4   the cram down.  Let's get the market testing done under

5   LaSalle, right?  I mean, you can't have it both ways.  You

6   can't stiff-arm the lenders the whole case.

7          THE COURT:  And the one thing -- I mean, you were

8   under the radar for awhile but now the debtor finds itself with

9   all of its creditor constituencies opposing what it wants to

10  do, opposing extension of exclusivity.  It's got no creditor

11  support.

12         MR. TISHLER:  No.

13         THE COURT:  Which is certainly a factor in deciding

14  whether to extend exclusivity.

15         MR. TISHLER:  Right.  And we would not be opposed to

16  mediation either, Your Honor, but we're not sure what role we

17  would even play in that.  I mean, we're happy to facilitate --

18  that's been our role.  We've tried to talk to both sides.

19  We've talked to each other, but I'm not even re -- you know the

20  situation.  You've read it correctly, at least from my

21  perspective and I agree with everybody.  It's at an impasse.

22         THE COURT:  Don't go over -- I -- your condition 1(a)

23  maintaining minimum levels of EBITDA for each month during the

24  term of the extension measured monthly against financial

25  forecast.  Well, the forecasts have been unfortunate other than

132

1   everybody seems to agree the cash forecasts have been pretty

2   good, but the operating forecasts have not.

3           MR. TISHLER:  Right.

4           THE COURT:  Okay.  I don't know what forecasts you're

5   talking about.

6           MR. TISHLER:  They would have --

7           THE COURT:  What you really care about -- well, I

8   mean, maybe you do care about EBITDA as well.

9           MR. TISHLER:  Yeah.  I mean, because they've already

10  put a budget.  They can build from the budget a financial

11  forecast.  They've submitted a 13-week budget, the core.  I

12  mean, we've got to measure it.  I mean, back to your point.

13  How much cash does it take to operate this business.  There's

14  an immoral liquidity.  They're into this junior DIP.

15          THE COURT:  Right.

16          MR. TISHLER:  We've got to be sure there are

17  sufficient breaks on this process.

18          THE COURT:  All right.  Let me hear from the

19  Committee.  I don't know who's going to argue.  Mr. Bracht or

20  Mr. Levine.

21          MR. BRACHT:  Well, Your Honor, I'm not sure

22  exactly --

23          THE COURT:  Well, you agree that the debtor should be

24  able to use cash collateral.

25          MR. BRACHT:  Yes.  We do.  And --

133

1          THE COURT:  And what do you think about --

2          MR. BRACHT:  And in terms -- and as far as the terms

3  and the conditions are concerned, we're much more comfortable

4  with what the debtors have proposed with respect to cash

5  collateral than the terms that have been proposed by

6  Mr. Tishler.  We think -- I think that May 22nd period is

7  understanding -- based on what we've heard in the evidence,

8  which is what I want to talk about, is probably unrealistic

9  given what they need to do in order to get this

10 consolidation --

11         THE COURT:  Well, the only evidence of a budget is

12 the 13-week budget.  I heard some testimony that they thought

13 that cash would increase after that period but I'm not taking

14 that to the bank.  I mean, I just --

15         MR. BRACHT:  I just -- our feeling is that given what

16 they have described with respect to the contingencies in the

17 program with respect to this consolidation, that they're -- you

18 know, that they're going to be pushed to get it done or make

19 significant progress by the 22nd of May so we think that's too

20 short.

21         THE COURT:  Well, but if the debtor is right that

22 after May 22nd the cash balances will be rising and actually

23 the budget shows that the cash forecast, Exhibit 1, shows it's

24 reaching its low point at May 1st, $1,746,000.00 and then going

25 up in fits and starts, but the testimony is going to go up

134

1  aft -- you know, would go up after that.

2           I could be wrong but I would suspect that if, in

3  fact, when they get to the end of this 13-week budget if the

4  number is increasing, I think Mr. Tishler would be making a

5  mistake not to just agree to extend use of cash collateral

6  beyond that.  If the -- you know, if the numbers are improving

7  I suspect that the prepetition lenders will be more willing to

8  extend it.

9           I understand your point, Mr. Bracht, and I wish I had

10 some more concrete evidence than we think the cash will go up

11 after that.  We think we can accomplish the consolidation by

12 the end of May and by then they would have, you know, built --

13 if they've actually signed some long-term contracts, they would

14 have built the inventory.  They would have been able to either

15 close or come close to closing Vienna and save the overhead.

16 There were a substantial part of the overhead, which was --

17 testimony was about $300,000.00 a month.  You know, $300,000.00

18 a month would make a big difference in this cash forecast.

19          I'm not anxious to do this again May 22nd, but I'm

20 also -- I think the prepetition lenders are on pretty solid

21 ground in not -- you know, in taking a pretty hard and fast

22 position, well, this should not go out beyond the May 22nd.  If

23 a new 13-week budget is done 13 weeks into this and has a basis

24 in reality to show the numbers are going up, it may be that

25 this will get resolved by the cash -- the cash collateral part

135

1  will get resolved by a stipulation, which would make a lot of

2  sense coming down to the last day of the period doesn't make a

3  lot of sense to me, but I understand your point.  He doesn't --

4  it's not a lot of time and I understand there's a lot they want

5  to accomplish in that period.

6        MR. BRACHT:  And, Your Honor, I -- you know, if I

7  find myself in a little bit of a difficult position because in

8  terms of consistency because while I think the period is too

9  short -- we think the period is too short we also, as the

10 evidence indicates -- we have some doubt as to whether or not

11 the debtors are going to be able to accomplish what all they

12 want to accomplish with respect to this consolidation.

13        THE COURT:  Yeah, I didn't hear what happens if, you

14 know, the customers don't sign up the contracts.  I mean, I

15 heard it was the contin --

16        MR. BRACHT:  And that goes --

17        THE COURT:  Condition.

18        MR. BRACHT:  You know, we're definitely and very

19 concerned about exclusivity.  We don't think it's appropriate

20 at all.  And one of the factors and I want to talk about the

21 evidence with respect to exclusivity, one of the factors is the

22 viability of the reorganization plan.  And near as I can tell,

23 although I don't really think there's been a whole lot of

24 evidence presented by the debtors with respect to the factors

25 on exclusivity, but given then the benefit of the doubt, as

136

1  near as I can tell that part of their viable plan is this idea

2  that this consolidation is going to work.  And we heard a lot

3  of evidence about what the contingencies were with respect to

4  that.  We heard evidence about what has happened in the past

5  with respect to consolidations, that they attempted and

6  accomplished in the past with respect to increased expenses and

7  inefficiencies and that type of thing.

8         THE COURT:  Well, you know, the market is turned

9  upside down.

10        MR. BRACHT:  Excuse me?

11        THE COURT:  I said, the market is turned upside down.

12  It's just --

13        MR. BRACHT:  Well, this was -- I mean, these were in

14  situations in the past and as we saw in the 10Ks when we

15  weren't the throws of the market that we're here today and they

16  had, you know, kind of touted the idea that they can do these

17  consolidations and do them effectively, but at the same time

18  their track record is that they have done it in the past and

19  they have produced increased costs and production

20  inefficiencies, which is different than what they're saying

21  today.

22        So to the extent there's been any evidence of a

23  viable plan, I don't think that they carry their burden in that

24  regard.  And that's another thing that I think we need to keep

25  in mind.  I was -- I recall --

137

1          THE COURT:  The issue, though, is -- and I think the

2  cases say the issue isn't whether the plan they have on file

3  can be confirmed because --

4          MR. BRACHT:  Well, you know, I'm not sure --

5          THE COURT:  -- they could change that.

6          MR. BRACHT:  -- that the plan that they have on file

7  at this point is a plan that's filed at all given what's

8  happened since.  We weren't even able to go forward on that

9  plan as we have originally scheduled because of the changes

10 that took place with respect to connector seals, so I fully

11 expect that there will be another plan filed at some point in

12 time.

13         THE COURT:  I do, too.

14         MR. BRACHT:  So I don't think that plan is viable at

15 all.

16         The other issue, I think -- and, you know, I want --

17 I'm -- I was -- I read your opinion in the last exclusivity

18 hearing and I realized that you had correctly determined that

19 we made a lot of arguments in that case in that hearing, but we

20 didn't produce a lot of evidence.  And what I wanted to make

21 sure of in this hearing is that we came forward with evidence

22 that went to the factors with respect to exclusivity and I

23 think we have and I'm prepared to discuss those.

24         THE COURT:  Go ahead.

25         MR. BRACHT:  But what I want to say is before we

138

1  start is that the burden is on the debtors.

2            THE COURT:  Correct.

3            MR. BRACHT:  And I find that in terms of this record

4  that there has been very little evidence, if any, showing good

5  cause under the factors of <u>Adelphia</u> for extending exclusivity.

6  I mean, the idea -- excuse me -- Judge, I heard you.  I think

7  you pointed it out earlier with respect to one of the two, but

8  this idea that it will give us some more time to fix the

9  connector seals consolidation, well, there's not -- you know,

10 if you don't it's going to somehow hurt that process.  There's

11 been absolutely no evidence presented on that issue other than

12 what Mr. Strochak has represented to the Court and that's not

13 evidence.  There has been --

14            THE COURT:  I thought Mr. Lubin testified about --

15 not specifically about the consolidation but about what --

16 there was testimony that -- critique it if you want, but there

17 was evidence that support the debtors' view that any

18 exclusivity would hurt their business.

19            MR. BRACHT:  Ending exclusivity but not with respect

20 to the connector seals consolidation and losing customers, but

21 just kind of a general kind of discussion about what impression

22 it may leave in the market in his belief.

23            THE COURT:  Well, doesn't that -- doesn't it follow?

24 I mean, why would a customer want to sign a three-year

25 contract -- requirements contract for connector seals if they

139

1   see this case falling apart, exclusivity lifted, the

2   prepetition lenders wanting to sell off pieces of the company,

3   the Committee -- who knows what it wants to do.

4            MR. BRACHT:  Well, Your Honor, I can speculate all

5   day long about why they would or why they wouldn't but the

6   point is is there's been no evidence of what a customer would

7   do.  There's been simply no direct admissible evidence from any

8   customer concerning what the customer's attitude is going to be

9   with respect to various contingencies that may occur and that's

10  really the point.

11           We're not talking about necessarily what Mr. Strochak

12  thinks may be the best way of going and, you know, kind of give

13  us a break but we're supposed to be talking about evidence.

14  And I can go with the factors and I'll go -- I'm not going to

15  go over all of them, but I'll go over some of them.  I mean,

16  the first one that I want to talk about very briefly is, well,

17  is this case big and is it complex and I don't think that

18  anybody believes that the case is big and the debtors' position

19  has been from day one that this is simply a matter of balance

20  sheet restructuring.

21           THE COURT:  That was day one, but things did

22  change --

23           MR. BRACHT:  Well --

24           THE COURT:  -- in the market.  But I -- Mister --

25           MR. BRACHT:  If it's gotten --

140

1          THE COURT:  Mr. Bracht, it's not big or complicated.

2          MR. BRACHT:  Okay.  I didn't think it was.  The other

3   thing -- another thing that I'll briefly touch on is we --

4   obviously they've had sufficient time including two extensions

5   of exclusivity and during this time I think the Judge has

6   recognized that the evidence shows that there has been no

7   progress not just with respect to the Committee, but with

8   respect to other issues that go to whether or not they're going

9   to get a viable plan.

10         THE COURT:  Well, this has been an extremely

11  conten -- I've said this before.  It's been an extremely

12  contentious case from day one.  Your partner, Mr. Silverstein,

13  at first day hearings went into -- launched into a litany about

14  all he wanted to talk about was the prepetition period and

15  negotiations and unsuccessful and so terminate exclusivity now

16  and let's get on with it.  So it's been an extremely

17  contentious and with all due respect, Mr. Bracht, the Committee

18  and its professionals -- let me say, the Committee and its

19  counsel have not convinced the Court that they have been going

20  that extra mile to make this work to get the case through.  I

21  think there's more than enough blame to go around.

22         MR. BRACHT:  Yes, I -- Your Honor, I can understand

23  your sentiment in that regard.

24         THE COURT:  For awhile -- and I did say this on the

25  record --

141

1          MR. BRACHT:  The burd --

2          THE COURT:  -- the Committee opposed everything.  We

3    filed a brief in opposition to the simplest little motion.  You

4    filed it -- not you, but Mr. Silverstein filed an objection to

5    extending the debtors' time to file its schedules.  I couldn't

6    believe it.  I mean, the Committee has opposed -- I -- this is

7    the first time, Mr. Bracht, with you -- you're in support of

8    the debtor on one issue, continued use of cash collateral.  I

9    think it's the first time you've ever agreed with the debtor on

10   anything.

11         MR. BRACHT:  Could be, Your Honor.  It could be.

12         THE COURT:  And I don't mean personally you

13   because --

14         MR. BRACHT:  No, you're not at all, Your Honor.  I

15   take what you say at face value.  I think it's unfortunate.

16         THE COURT:  Okay.  Why don't you go through the other

17   factors?

18         MR. BRACHT:  All right.  The progress or the lack of

19   progress is not just with respect to negotiations with the

20   Committee, which I think we all agree are at a standstill, but

21   if you look at the issues with respect to exit financing, and

22   you read what went on with Cap One through Mr. Altineau, and

23   what the true state of affairs was with respect to exit

24   financing from really -- from July 29th when the first proposal

25   letter and the only proposal letter that was ever executed by

142

 1   Cap One and going forward and that was presented, if you

 2   recall, Your Honor, at the time of the first exclusivity period

 3   and from that point forward, it's completely deteriorated.  The

 4   amount that Cap One is willing to lend or was willing to lend

 5   continually got lower as the months go by.  We believe --

 6           THE COURT:  Well, it's share -- originally it

 7   discussed underwriting the full amount and then there came a

 8   time when it said, no, we have to syndicate.  I don't know that

 9   that's attributable to the debtor and its financial condition

10   as to the financial markets.

11           MR. BRACHT:  Well, but this was the only -- at least

12   at that time, this was the only financial source that the

13   debtors were dealing with and we believe the evidence shows

14   that as early as October the 22nd -- and I'm not talking about

15   the real estate portion of it.  I'm talking about the idea that

16   as early as October 22nd Cap One had advised Mr. Lubin that

17   they were not going to do 100 percent of this deal, that they

18   were going to have to go out and get partners and they were not

19   going to take 100 percent of the risk.

20           That was not something that was told to us.  That was

21   not something frankly that was ever told to us until I took

22   Mr. Altineau's deposition.

23           THE COURT:  And I read that.  There may be some

24   issue -- not much of an issue as to -- because it was all

25   within a few days whether Mr. Lubin -- you showed him the

143

1   email.  He said he hasn't seen it before.  The email referred

2   to Mr. Altineau having sent a letter.  The letter is not in

3   evidence.  I think you have the better side of this issue.

4          MR. BRACHT:  Well, and the point that didn't come up

5   in the discussion or the examination with Mr. Lubin was

6   regardless of the timing.  Mr. Lubin on October the 29th in

7   this courtroom told you and told us that it was the million

8   dollars part on this inventory appraisal issue and that was the

9   only thing standing in the way of them getting exit financing.

10  And if you read Mr. Altineau's deposition I asked him directly.

11  I said, "It was your decision not to fund 100 percent of this

12  exit facility.  Was it based in any way on the inventory

13  issue?" and he said, "Absolutely not" --

14          THE COURT:  I read it.  I read it.

15          MR. BRACHT:  If you -- and I guess that indicates a

16  lot of things to me.  First of all, is there a viable

17  possibility of exit financing.  You've heard the testimony from

18  Mr. Lubin as to what the status is with rese3pct to the other

19  three potential lenders.

20          THE COURT:  Well, there might well be viable prospect

21  for exit lending if a plan that was proposed converted all or

22  most of the debt -- unsecured debt into equity because it would

23  substantially reduce what the company -- what its future debt

24  load would be and so far certainly the plan that's filed, the

25  amended plan that's filed wouldn't do that.

144

1          MR. BRACHT:  The amended plan that's filed, Your

2    Honor, wouldn't do that and it doesn't even recognize the

3    possibility that it could be appropriate.  I mean, if you look

4    at Mr. Lerno's -- I'm sorry.  I'm getting his name wrong -- his

5    valuation and it's already been said and I think I -- you took

6    the words right out of my notes for my closing is that we're

7    underwater and there's no value to hold equity here.

8          THE COURT:  That's what his --

9          MR. BRACHT:  That's what his value says.

10          THE COURT:  It's not critiquing and you made the

11   point --

12          THE COURT:  There were some fair points that

13   Mr. Strochak made.  I had questions in my own mind about how

14   there's only one comparable for medical.  I'm skeptical about

15   that, but that's what the evidence is.  I thought Mr. Strochak

16   had some fair points to make about the -- not just that one

17   comparable but maybe on some of the others whether there were

18   some more.

19          I'm not -- you know, when I was in practice I did a

20   fair amount of work on valuation and experts with valuation.  I

21   don't remember somebody putting forward a report that relied on

22   one comparable as a basis for a value, a significant piece of

23   the business.  So I have my own reservations about -- but

24   that's what the evidence on the record is.  That report.

25          MR. BRACHT:  That's what we've got that's in the

145

1   records.

2            THE COURT:  That's right.

3            MR. BRACHT:  The only thing that I can really talk

4   about and it was admitted.  It was stipulated to by the debtors

5   so I assume that there was some belief that it at least had

6   some legitimate --

7            THE COURT:  It goes to the weight, though.  I mean,

8   I --

9            MR. BRACHT:  I understand.  I agree with you, Your

10  Honor.  The -- but the possibility of a plan that was discussed

11  with Mr. Walsh it's not something that's going to happen unless

12  exclusivity is denied and we can set about trying to do

13  something in a creative way using our time and using our

14  efforts and using our talents to try to figure out a way out of

15  this kind of deteriorating situation.

16           But it's not going to happen if exclusivity is

17  extended.  The extension of exclusivity is not going to change

18  anything.  The denying exclusivity is going to give the

19  Committee and the creditors, talented business people the

20  opportunity to try to figure out a way to get something done

21  here.

22           At this point, we have not had that ability.  We have

23  not had that opportunity.  The debtors have had 11 months in

24  bankruptcy, 15 months or so -- I might be wrong -- off on that

25  a little bit prior to bankruptcy to try to work something out

146

1  and I just don't -- I don't see any progress.  I see things

2  getting worse and not better and further --

3          THE COURT:  And what's your position about mediation?

4          MR. BRACHT:  Your Honor, we would be perfectly

5  willing to participate in the issue.  We've never -- I

6  really -- I know we don't want to get into, you know, an

7  argument about this, but I really do think that the -- this

8  issue of, well, you didn't give us a report and --

9          THE COURT:  There's no reason -- I don't want to get

10  into that now either.  I mean, I think I'm not going to decide

11  this on the basis of the finger pointing, because there's

12  plenty of it to go on.

13          MR. BRACHT:  Well --

14          THE COURT:  But what's clear to me is that this case

15  is just sort of stuck and nothing is moving.

16          MR. BRACHT:  Well, Your Honor, I have -- you know,

17  one of the factors is a good -- is a prog -- good-faith

18  progress in the negotiations and I think we've demonstrated --

19          THE COURT:  There's two sides to that.

20          MR. BRACHT:  I think that I -- we've put in

21  evidence --

22          THE COURT:  There's two sides.

23          MR. BRACHT:  -- concerning the good faith or the lack

24  thereof of the debtors with respect to a couple of issues and I

25  think that one is a third one, but you don't want to go there,

147

 1   then that's fine.

 2          But this issue with respect to value that hasn't

 3   changed it's not only hasn't changed in bankruptcy, Your Honor,

 4   it hasn't changed since the first time that the default came

 5   about.  We've been dealing with what has, in essence, been a

 6   discredited expert with respect to valuation.  The valuation

 7   draft report that's on file with the Court it suffers from the

 8   same problems.  It's got the same disclaimers.  It's got the

 9   same statements concerning reliance on the debtors'

10   representations and not checking the reliability of those.

11   We've been dealing with what any reasonable --

12          THE COURT:  The debtor is going to say if we get to a

13   valuation trial and a debtor is going to stand on that report

14   it's probably going to wind up with the same result it had

15   here, so that's its problem.

16          MR. BRACHT:  But the frustration is is that we've

17   been dealing with a report that when it first came out, when

18   the first disclosure statement was filed and if you go back and

19   look at the first disclosure statement the same language is in

20   the disclosure statement.

21          The WI Campbell was running from this valuation and

22   from the valuation stated in that disclosure statement from day

23   one.  They will clearly did not believe it.  They clearly --

24          THE COURT:  Well, I don't know whether they believed

25   it or not.  I think I -- why don't you go on to your next

148

1   point?  I have this point clearly in mind.

2            MR. BRACHT:  Okay.  And my --

3            THE COURT:  You won on your motion to --

4            MR. BRACHT:  I understand.

5            THE COURT:  Your objection to the --

6            MR. BRACHT:  But the reason why it's important is

7   because when we looked at it and according to Mr. Walsh and

8   what he's testified to any reasonable person would understand

9   that it was not reasonable, it was not valid, it was not

10  something that we could really deal with.

11           THE COURT:  So why are you -- why is the Committee

12  playing its card so close to the vest that it doesn't want to

13  part with its valuation report?

14           MR. BRACHT:  That we go kind of full circle on that

15  because here -- I guess --

16           THE COURT:  I mean, it's time for all of you to put

17  your cards on the table.

18           MR. BRACHT:  It's been -- we've had a lot of

19  discussion about this and I guess part of the reason is is that

20  we feel like we'd be bidding against ourselves.  And the first

21  reason is is that we've not had -- we -- we're -- there's not

22  been really no reason for us to finalize a report.  We have

23  not -- under no obligation to do so and the value of the

24  company has been a moving target since we started.

25           THE COURT:  You know, Mr. Bracht, I --

149

| 1 | MR. BRACHT:  Your Honor, we --

| 2 | THE COURT:  Wait, wait, wait, just let me finish

| 3 | this.

| 4 | MR. BRACHT:  We were --

| 5 | THE COURT:  Wait, wait.  Stop.  I believe

| 6 | Mr. Silverstein told me earlier in the case that the Committee

| 7 | was not prepared to sit down with the debtor and negotiate till

| 8 | it got more information from the debtor.  And there were issues

| 9 | about how rapidly that information was provided.  I can't

| 10 | remember which hearing it was where Mr. Silverstein's arguments

| 11 | were not backed up by your own professional who thought, yes,

| 12 | it's taking time to get stuff, but his requests were being

| 13 | responded to, was getting -- initially I was told, he didn't

| 14 | have all the information.  So things got protracted.  One of my

| 15 | opinions I think on exclusivity talked about when the

| 16 | negotiations were likely to start.  They were delayed a little

| 17 | longer because the Committee -- I thought it was a respectable

| 18 | position.  It wanted the information before it sat down.

| 19 | Okay.  I -- you know, I find it hard -- it was when I

| 20 | read the briefs for this that, again, without saying where the

| 21 | fault lies on it that was the first I'd heard that the

| 22 | Committee still hadn't shared a report with the debtor and its

| 23 | professionals.

| 24 | MR. BRACHT:  Your Honor --

| 25 | THE COURT:  I mean, I asked you about this long -- if

150

 1  I had known that what wasn't being done I probably would have

 2  entered an order about it a long time ago.  We wouldn't be here

 3  today.

 4         MR. BRACHT:  I think we need to go back and get the

 5  chronology and kind of -- we were in position and we were

 6  prepared.  In fact, we had an order in place by Your Honor

 7  concerning the confirmation hearing that we were going to be

 8  producing our report pursuant to court order sometime in early

 9  January in contemplation of the confirmation hearing.  That

10  confirmation hearing was put off and it was put off because of

11  a blow-up in the business of the debtor.  I mean, they -- I

12  don't know what WI Campbell thinks and I might add their report

13  is a moving target as well.

14         THE COURT:  Oh, that I would agree with.

15         MR. BRACHT:  And their report would not be considered

16  regardless of all the other problems it might have as really a

17  valid report today given the changes in the debtors' business.

18  So what happened?  What did we say?  Okay.  Why give them a

19  report that's based on old information.  Don't we have to do a

20  report that's based on current information?  And how do we

21  assess the probability of this consolidation plan with respect

22  to the connector seals as being a good one or a bad one, a

23  successful one or not successful?

24         All we had at the time, Your Honor, we don't have --

25  you know, I forgot to ask Mr. Lubin this in his examination.

151

1   There's no written plan for this consolidation.  The most

2   information that we've learned about this consolidation is when

3   I took Mr. Lubin's deposition a week ago.  We had nothing about

4   what this consolidation plan was going to be about.  We didn't

5   know how they were going to do it.  We didn't know when they

6   were going to do it.  We didn't know how much of it they were

7   going to do it and we made the decision that we weren't going

8   to produce a report based on old information and that's where

9   we are today.

10          THE COURT:  All right.

11          MR. BRACHT:  That -- you may disagree with that

12  decision, but I think it was a valid decision at the time.  We

13  are prepared --

14          THE COURT:  You know, if you all decide you're going

15  to wait until you get that final piece of information before

16  you -- look, it's one thing if the report is for use in the

17  confirmation hearing and evaluation trial.  It's another thing.

18  Draft reports get used in negotiations.  They're subject to

19  change.  Okay.  I've got -- you could work out a

20  confidentiality agreement or agree that neither side will

21  introduce the report in evidence and, you know, that happens a

22  lot.

23          Do we have a problem?

24          MR. BRACHT:  We don't have a problem, Your Honor.

25  Like I said, Your Honor, we -- if we're going to mediate this

152

1  case we're going to be prepared to mediate.  I don't know what

2  your order is going to contain, but I suspect after this

3  conversation that it might contain something like that.  I

4  mean, that's the Judge's -- if that's your wish, if that's your

5  order, we will abide by your order.

6          THE COURT:  Well, what's your suggestion, Mr. Bracht?

7  I know you want exclus -- let's assume that I don't extend --

8          MR. BRACHT:  You know, my suggestion --

9          THE COURT:  That I do -- well, hold on.  Let's assume

10  that I, you know, grant some very limited extension of

11  exclusivity, order all of you to mediation very promptly.  What

12  else should the order contain?

13          MR. BRACHT:  I don't -- I don't really have any

14  additions to that.  I think it would be fine.  Your Honor, we

15  can -- we have talked -- we have met and talked with them.  I

16  mean, it is an absolute red herring, I think.  I mean, what do

17  they -- we have told them what we think.  We have made

18  proposals.  We've been -- explained our comps.  We have told

19  them how we got to our methodology.  We have disagreed with

20  them about their comps.  We've had discussions with them and

21  we've presented them paper that they can look at what we're

22  doing.  What -- I mean, this concept of a report that contains

23  qualifications and, you know, description of the business and

24  all that kind of stuff, where is that going to get us?

25          Look, I don't -- my view is is that let's get a

153

1    report out here and let's get it done, but my point is I don't

2    think it makes any difference.  If we're going to be where we

3    are now and there's not going to be any movement between either

4    party then it's going to be a waste of time, but that's what

5    mediations are for.  I've been through a bunch of them and I

6    think that I -- I agree with the Court that at this stage that

7    it's probably the thing to do because we can't seem to get off

8    of first base.

9            But, you know, I can promise you, Your Honor, is if

10   we're going to deal from a situation where we're looking at an

11   enterprise value of 120 million dollars and old equity

12   retaining all the control of the company and we're getting, you

13   know, preferred stock with no control in the company or

14   something like that, which is what the last plan was proposed,

15   then that's not going to work.  We need people to be realistic

16   about what the value of this company is and whether or not old

17   equity is in the money.

18           THE COURT:  All right.

19           MR. BRACHT:  And until somebody wakes up and smells

20   the coffee it's not going to do any good but we're trying --

21   we're not against trying to work out a deal.  You heard

22   Mr. Walsh.  We're willing to work out to propose a plan that

23   converts us 100 percent into equity.  I don't know what else we

24   could do.

25           Anyway, Your Honor, I -- I don't think that the

154

1   evidence shows given their burden on any of the factors that

2   give rise to the extension of exclusivity which is a serious

3   matter, that they've met that burden.  I think we've presented

4   evidence of a lack of good faith.  I think we've presented

5   evidence of lack of a viable plan or a reasonable probability

6   of a viable plan, and I think every factor that we've talked

7   about with respect to exclusivity is in our favor and that the

8   evidence shows that exclusivity should not be extended.

9          THE COURT:  Thank you, Mr. Bracht.

10         MR. BRACHT:  You bet.

11         THE COURT:  Mr. Strochak?  So is the story and the

12  debtors going to stick with it?  The plan is the plan is the

13  plan and preferred stock to the noteholders and that's it and

14  you're not -- you know, You're not willing to budge off it?

15         MR. STROCHAK:  No, Your Honor.  That's never been the

16  story.

17         THE COURT:  Okay.

18         MR. STROCHAK:  You know, we have a plan.  We've tried

19  to --

20         THE COURT:  That plan is not feasible.  You can't --

21  you don't have any exit financing.  You haven't been able to

22  get exit financing.  The plan you filed is not viable.  You

23  couldn't go -- if you went forward with a confirmation --

24  disclosure confirmation hearing, you couldn't have confirmed

25  that plan.

155

1          MR. STROCHAK:  Because of the lack of exit financing?

2          THE COURT:  Yes.

3          MR. STROCHAK:  We agree, Your Honor.  That's why we

4   pulled it off the table and deferred the plan process.  It's

5   the unresolved contingency.  That's what we have on the exit

6   financing.  And, you know, we're doing our best to get it.

7   It's not for lack of effort but we're not there yet.  We're in

8   terrible, terrible credit markets.  We've proposed a plan that

9   converts the debt to equity.  You know, we haven't proposed a

10  cram-down at this point.  We've been trying to do what the

11  senior lenders wanted us to do and we told them what we would

12  try to do and so we can't make it happen and we haven't come to

13  the conclusion that we can't possibly make it happen.

14         If we have to propose a plan that crams them down and

15  says no other financing available, we may end up there but, you

16  know, we told them we wanted to take them out and we're still

17  trying to take them out.  That's how we started this case and

18  that's where we still are.  That's been their insistence so

19  far.  I mean, they haven't moved off that position either, so

20  there's been a lot of advantages going all around.

21         Your Honor, I suspect at this point you don't want to

22  hear me argue about the communications between us --

23         THE COURT:  No.  What I want to hear you actually

24  talk about for a few minutes is the sheet that Mr. Tishler gave

25  me with the lender's proposed terms for extension of cash

1  collateral.

2        MR. STROCHAK:  That's exactly where I was going to

3  head, Your Honor.  You know, the existing order was a

4  negotiated order.  It has a lot of conditions and things build

5  into it.  The ones that Mr. Tishler wants to put in in addition

6  are, you know, troubling in many respects.  I think, you know,

7  the EBITDA covenant, it's hard for us, you know, because we

8  come up with a forecast that we're sure we're going to meet.  I

9  suspect we probably could at some point.  I don't know how

10 useful that is to anybody but --

11       THE COURT:  I'm concerned.  I'm concerned about, you

12 know, EBITDA can fluctuate from month to month particularly

13 when there's a consolidation plan going on and if you miss it

14 one month, what happens then?  It doesn't -- the evidence would

15 seem to show there's sufficient equity cushion -- sufficient

16 cushion that protects the secured lenders that I'm not sure

17 that looking at one-month figures would be appropriate to blow

18 this whole thing up.

19       MR. STROCHAK:  That's exactly our position on that

20 one, Your Honor.  Ninety percent of the weekly cash amounts

21 point 1(b) that's a very small margin of error.  If we're

22 talking about, you know --

23       THE COURT:  Not if you have such a conservative cash

24 forecast, that's what -- which is what I heard that, you know,

25 that was it and I think I asked the question of Mr. Lubin about

1  it.   Maybe it was Mr. Welhouse but I specifically asked the

2  question.   I said, "Was this" -- I don't remember the terms I

3  used, but I was corrected to, no, it's a conservative cash

4  forecast.   This is not just a reasonable cash forecast.   This

5  is very conservative so --

6         MR. STROCHAK:  Would you think it's conservative,

7  Your Honor, but still the idea of essentially ending use of

8  cash collateral shutting down the case if we have a 10 percent

9  variation off the budget.   You know, we're talking about a cash

10  budget of, you know, 1.7 million at the low point; you know,

11  call it two million at the end of the period, $200,000.00.   You

12  know, that's one check from a customer that gets shifted from a

13  Friday to a Monday, right?   We're talking about weekly cash

14  budget here.

15         THE COURT:  Well, I don't think I would allow it to

16  blow up but it might trigger the lenders coming back in here.

17         MR. STROCHAK:  Well, to be clear, we don't have any

18  problem with them coming back here at any point.   I mean, you

19  know, if --

20         THE COURT:  What -- Mr. Lubin seems to want --

21  Mr. Strochak, why don't you --

22         MR. LUBIN:  Your Honor, if you don't mind, I do want

23  to say a number of these conditions where [unintelligible] is

24  already deemed in the cash collateral order, but I think that's

25  not quite accurate.   Some of these things are in there in

158

1    cumulative form so if we're ahead one week, let's say, we were

2    able to -- we had a disbursement that happened a little bit

3    later, the receipt came a little bit earlier, we could be off

4    the following week.  The cumulative [unintelligible] be in

5    compliance and we could leave well enough because that one week

6    was the problem.  There are a number of these things that are

7    in there that say on a cumulative basis the company will do X,

8    Y and Z.

9           THE COURT:  Mr. Tishler, what's the -- that does seem

10   a reasonable proposition.

11          MR. TISHLER:  Yes.  Yes, Your Honor.

12          THE COURT:  It's my concern about --

13          MR. TISHLER:  The issue is blowing up the case.  I

14   think as it is drafted now it has a five-day grace period or,

15   you know, gives them the right to come in here, which I think

16   that's where the burden should lie is that they have some basis

17   for having blown the covenant because, again, we've heard the

18   testimony.  The cash is going down.  This is all liquidity that

19   they have so, I mean, I think some version of this needs to be

20   in the order.  This is the very heart of what we're talking

21   about.

22          Now, whether we -- you know, I have to talk to my

23   clients about, you know, what period of time.  We could talk

24   about a two-week test or something like that.  What -- if

25   you've got a second my client is -- if I can --

159

1          THE COURT:  Go ahead.  Go ahead.

2               [Pause in the proceedings.]

3          MR. TISHLER:  Your Honor, I've been corrected.  The

4   cash receipts and disbursements is recorded and tested on a

5   cumulative value and that we're -- that's the current process.

6   We're happy with that.

7          However, on the cash on hand where they've already

8   testified that it's a conservative plan and we're giving them a

9   10 percent cushion on top of that, we think that is absolutely

10  got to be the way it is.

11         THE COURT:  I'm just thinking about loud.  You know,

12  it would seem to me that, for example, if the point were cash

13  got down to around two million dollars, I could understand

14  heightened sensitivity about the cash balance versus budget

15  when it's four million or three million.  I'm not sure that

16  missing the cash balance by 10 percent in one week ought to

17  result in everybody running in here for another hearing.  I

18  don't know whether I'm -- my biggest concern, Mr. Tishler, I

19  said it day one right at the beginning of the hearing was I'm

20  just fearful that if the cash burn rate stays what it is now or

21  increases and it ran out of money and then there's no going

22  concern -- let me tell you what I -- well, I'll wait until you

23  speak to your client -- clients, plural.

24         MR. STROCHAK:  I'm sorry, Your Honor.  Your question?

25         THE COURT:  No, I -- Mr. Tishler is talking to his

160

1  client as you were --

2          MR. TISHLER:  Your Honor, that's sort of echoing your

3  concept.  We could live with not below a million and a half and

4  then if it dips below a million and a half go to the 90

5  percent.

6          THE COURT:  Let me stop you.  Let me tell you what

7  I'm going to do with respect to cash collateral.  Okay.

8  Because the order expires tomorrow I'm going to permit the

9  debtor to continue to use cash collateral on pending a new

10 order being entered on the same terms as existed until now.

11 But I want you to try and work out with the debtor a new order,

12 new covenants.  I understand what your objections are, but I

13 want you to try and endeavor to resolve this issue of

14 additional covenants.  If you can't resolve it submit counter

15 orders and I'll resolve it.  Okay.  It does seem to me that

16 with this -- and, you know, I'm trying not -- I'm not

17 negotiating.  Ultimately I've got to enter an order.  It's

18 going to be -- you're all going to be a lot better off if you

19 can agree on the terms of this only till May 22nd.

20          So the length of the time I agree with the

21 prepetition lenders that I may well extend it beyond that but

22 not without seeing a new budget and what the situation then.

23 Hopefully, you'll -- if things have improved you'll just work

24 out a new stipulated order.  It does seem to me that from your

25 client's standpoint the week-to-week variations -- yeah, it's

161

1  of interest and importance to them, but less critical until the

2  cash balance comes down for -- I think it's a concept you ought

3  to try it and work out with the debtor.

4          As I say, we'll talk about it as soon as we finish.

5  How much time do you want to submit either try and work out an

6  agreed order consistent with my ruling or submit counter orders

7  and I'll decide.  Okay.  I don't want to be writing covenants.

8  I'm not a bank lawyer.  I don't want to be writing covenants

9  that don't make sense for the debtor or for the prepetition

10 lenders.

11         Mr. Strochak, let's talk about paragraph number 2(a).

12 Mr. Tishler agreed to switch the date to March 31.  Is the

13 proposal with that -- changed to March 31 acceptable to the

14 debtors?

15         MR. STROCHAK:  That will be okay, Your Honor.  The

16 only caveat I have is that, you know, there's a requirement

17 that the contracts be at least three years.  We'd like the

18 flexibility on that.  You know, if we have a customer comes

19 back and says, I can't do three but I can do two, you know,

20 we'd like to have the flexibility to work that through.

21         THE COURT:  Mr. Tishler?

22         MR. TISHLER:  Yeah, that's fine, Your Honor.

23         THE COURT:  All right.  Two years.  I think you're

24 going to be able to work most of this stuff out, okay.  I don't

25 know about 2(b).  Look, I'm going to leave this to you to try

162

1    and work this out.  Let's not negotiate it now.  See if you can

2    work it out.  If you can't work it out submit your counter

3    proposals.  If we have to have a hearing, Mr. Tishler will do

4    it by phone.  I know you're not in town.

5              MR. TISHLER:  All right.

6              THE COURT:  Okay.  Please work it out.

7              MR. STROCHAK:  I will.

8              THE COURT:  Paragraph 3 I reject.  Just got more

9    investment bankers than we know what to do with already.  If

10   you just all sit down together maybe you'll come up with some

11   more ideas.  If the debtor decides it wants to do it, fine, but

12   I'm not going to compel him to hire more.  Find an independent

13   professional.  Okay.  All right.

14             Exclusivity.  I'm ordering an extension of

15   exclusivity until April 30th and I'm also ordering -- well,

16   everyone has agreed under M-143 the amended general order I

17   could compel mediation even if the parties haven't agreed, but

18   the parties have agreed.

19                       [Pause in the proceedings.]

20             THE COURT:  I expect the parties to agree on a

21   mediator by noon Friday, March 6th and if you've been unable to

22   agree on a mediator I will appoint one.  I heard you all agree

23   on a mediator and it seems to me that given the issues that

24   separate the parties, you may well want to select someone who's

25   not a lawyer.

163

1          So I'm going to request that the debtors submit an

2   order requiring mediation by noon on March 6th.  If you can't

3   agree on the form of an order, submit counter orders and I'll

4   resolve the issue without a hearing -- without a further

5   hearing.  Mediation should include issues of proposed

6   reorganization plan and also valuation.  I want the proposed

7   mediation order to include provisions which you all ought to

8   try and agree upon for exchanging valuation reports.  If you

9   want to put caveats in there or that it's without prejudice to

10  the parties' ability at a confirmation hearing offer different

11  evidence that's fine, but this stuff has got to stop.  I want

12  lay -- everybody to lay their cards on the table.

13         You know, if the Court has an approved mediation

14  panel you don't need to use it.  I mean, if you can agree on

15  somebody you can just agree on somebody else.  You're all

16  sophisticated counsel and I'm sure you and your clients will

17  have suggestions for who would be the best type -- what's the

18  best type of person and maybe the person.  I'm going to leave

19  it to -- if you can't resolve who the mediator is, I will

20  appoint a mediator.  I believe under a general order I have the

21  ability to do that.

22         If you can't agree -- all can't agree on this by the

23  6th at noon you can all submit letters.  You can spear me as

24  well, but you can all submit letters stating your positions.

25  And, you know, the mediation schedule is going to depend more

164

1  on who the mediator is and what their time is but, you know, I

2  expect you all to be moving on it.

3          I want written status reports not with the detail.  I

4  don't want to know what goes on in the mediation other than the

5  mediation is take -- has the mediation move forward, you know,

6  meetings taking place.  I leave it to the mediator to decide

7  what information the mediator is -- beyond my requiring that

8  you exchange your valuation reports, I leave it to the mediator

9  to decide what other information he or she may want exchanged,

10 but I want written status reports by March 31 at 5:00 p.m.

11 Obviously, without revealing the confidences or negotiating

12 positions.

13         Mr. Strochak, I'm certainly not ruling now but I'll

14 tell you, you're going to have a giant fight on your hands to

15 get exclusivity extended beyond April 30th, okay, so you want

16 to be aware of that right now.  I'm not ruling.  I'll hear --

17 if you have a new motion to extend exclusivity I'll hear it,

18 but you're going to have a giant hill to climb unless

19 there's -- you know, if you can show there's real progress

20 being made and more times needed, that's one thing.  But if the

21 mediation has gotten nowhere, you can file your motion and I'll

22 hear it and any evidence, but I just want you to know right

23 now.

24         MR. TISHLER:  Your Honor, just one --

25         THE COURT:  Go ahead, Mr. Tishler.

165

1          MR. TISHLER:  On the cash collateral order, as I

2  understand it, we're to negotiate over these covenants, but

3  we're going to use the existing cash collateral --

4          THE COURT:  Yes.

5          MR. TISHLER:  -- order otherwise --

6          THE COURT:  Yes.

7          MR. TISHLER:  I think we can get that done by the end

8  of the week.  Wouldn't you think, Adam?

9          MR. STROCHAK:  I was going to suggest two days.  I'd

10  really like to keep a short time frame --

11          THE COURT:  I agree.

12          MR. STROCHAK:  -- because it will fill whatever time

13  we give it.

14          THE COURT:  I agree.

15          MR. STROCHAK:  So end of the day Thursday.  Is that

16  okay, Your Honor?

17          THE COURT:  That would be fine.  Mr. Levine?

18          MR. LEVINE:  Your Honor, if I make some --

19          THE COURT:  Sure.

20          MR. LEVINE:  I want to make sure for mediation

21  purposes we're comparing apples to apples.  I think we have to

22  agree upon a date that we're going to value the company as of

23  because obviously they're going to take a post organizational

24  restructuring date whereas we think that's, you know,

25  speculative of that right now, so I don't want to have to argue

166

1   about that issue.  I think Your Honor should.

2           THE COURT:  And what do you believe the date should

3   be?

4           MR. LEVINE:  I think it should be -- I don't know, as

5   of the end of this month.  The operation restructuring is

6   speculative at best.

7           THE COURT:  Mr. Strochak?

8           MR. STROCHAK:  I really don't think it's appropriate

9   to agree on that, Your Honor.  I mean, in some ways we're

10  trying to anticipate when the company is going to merge from

11  bankruptcy and, you know --

12          THE COURT:  I mean, you have to be comparing apples

13  to apples for purposes -- the mediation to have any chance of

14  success you can't be comparing apples and oranges.

15          MR. STROCHAK:  Well, in the spirit of compromise,

16  Your Honor, if anyone else thinks it's important then we're

17  willing to agree on a date.  That's fine.

18          THE COURT:  All right.

19          MR. STROCHAK:  Shall we just say --

20          THE COURT:  Okay.

21          MR. STROCHAK:  -- March 31st?

22          THE COURT:  Agree -- you two agree on a date, okay?

23  I don't need to know right now.  I just want you to agree on

24  the date as to what you're doing, okay?  Because I want

25  everybody comparing apples to apples.

167

1          MR. LEVINE:  March 3st is fine with the Committee,

2   Your Honor.

3          THE COURT:  All right.  Mr. Strochak?

4          MR. STROCHAK:  Yes.

5          THE COURT:  All right.  Mr. Bracht?

6          MR. BRACHT:  Yes, Your Honor.  I'm not familiar with

7   the rule.  I am familiar with more or less the rules that we

8   follow in Texas with respect to mediation and I just want to --

9   I want to know what the rules are, but I -- my anticipation is

10  that the mediation is confidential, that what --

11         THE COURT:  It is.

12         MR. BRACHT:  -- goes on in the mediation does not get

13  reported to you other than --

14         THE COURT:  The only thing that should be reported is

15  whether --

16         MR. BRACHT:  Yes, sir.

17         THE COURT:  -- it's been an impasse and has been

18  terminated.

19         MR. BRACHT:  Right.

20         THE COURT:  And that's the only thing I want to know.

21         MR. BRACHT:  Okay.

22         THE COURT:  Okay.  That's the rules.  I served as a

23  mediator before I went on the bench and those were the rules

24  that I always applied.

25         MR. STROCHAK:  Your Honor, I have a housekeeping

168

1    question.

2            THE COURT:  Yes.

3            MR. STROCHAK:  On cash collateral the existing order

4    expires.  Obviously, if you want to just so order the record

5    or --

6            THE COURT:  Yes, I'm so ordering the record that the

7    cash collateral order shall continue in effect pending

8    submission of hopefully an agreed order or, if not, general

9    orders that I will resolve remaining issues.

10           MR. STROCHAK:  Thank you, Judge.

11           THE COURT:  Okay.  All right.  So that the record is

12   clear, the debtors' motion to continue use of cash collateral

13   is granted on the terms described by the Court subject to the

14   parties submitting an order with regard to the additional

15   covenants or restrictions.  The debtors' motion to extend

16   exclusivity is granted to the extent that exclusivity is

17   extended to April 30, 2009 subject to the condition that the

18   parties promptly proceed to mediation as earlier described by

19   the Court.

20           Any other housekeeping details?  Mr. Lucas, you look

21   like you're --

22           MR. LEVINE:  Yeah, the solicitation is that --

23           THE COURT:  Why don't you do this, Mr. Strochak?  Why

24   don't you see if you can work out because you've got to put in

25   the two dates -- why don't you see if you can within the

169

1  parameters of what I rule we've got to have an order on --

2  filed on ECF so why don't you see if you can come up with an

3  agreed order that is consistent with the Court's ruling?

4  Obviously, you need new dates for -- I guess need two dates and

5  then the extension of exclusivity.

6          MR. STROCHAK:  We'll do that.

7          THE COURT:  Okay.  You understand, Mr. Levine?

8  You're looking --

9          MR. LEVINE:  So what is the April 30th date?  If it's

10  a justifiable plan that seems to be meaningless to me.  Pretty

11  complex.

12          THE COURT:  No, because I -- it -- what did the

13  existing order provide?  It provided you with how many days?

14  Existing order -- let me see if I can find it.

15          MR. STROCHAK:  How many days between plan exclusivity

16  and solicitation exclusivity?

17          THE COURT:  Yeah.

18          MR. STROCHAK:  I think it's 60, Your Honor.

19          THE COURT:  Okay.  I want to do it on essentially the

20  same -- I want to keep essentially the same schedule as we have

21  now.

22          MR. LEVINE:  Okay.

23          THE COURT:  Okay.

24          MR. LEVINE:  They essentially have until April 30th

25  to file a plan?

170

1          THE COURT:  Yes, and let me -- hold on.

2                    [Pause in the proceedings.]

3          THE COURT:  Okay.  You have 30 days.

4          MR. STROCHAK:  Thirty?

5          THE COURT:  Yeah, so your deadline for filing a plan

6   is April 30th and your deadline for soliciting acceptances

7   is --

8          MR. LEVINE:  I believe the prior one is 40 days, Your

9   Honor.

10          MALE SPEAKER:  Prior was 40-day period?

11          THE COURT:  No, it actually was 30.

12          MALE SPEAKER:  Thirty days.

13          THE COURT:  May 29th.  Actually, let's go over to

14   June 1.  Monday, June 1.  Deadline for soliciting acceptances

15   is June 1.  Yeah, June 1 because of the holiday.  Deadline for

16   soliciting acceptances is June 1.

17          MR. STROCHAK:  Thank you, Judge.

18          THE COURT:  All right.  Anything else that we need to

19   cover?

20          MR. STROCHAK:  I believe that's it.

21          THE COURT:  All right.  Thank you very much.

22          MR. STROCHAK:  Thank you, Judge.

23                    *  *  *  *  *  *

24

25

171

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6                                    _____

7                                         Ruth Ann Hager

8     February 26, 2009

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25