WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEXINGTON PRECISION CORP., et al.,        :    08-11153 (MG)
                                          :
            Debtors.                      :    (Jointly Administered)
                                          :
-------------------------------------------------------------x
```

## NOTICE OF THE DEBTORS' MOTION FOR AUTHORIZATION, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 363(c), FOR CONTINUED USE OF CASH COLLATERAL

PLEASE TAKE NOTICE that Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (together, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, filed a motion, dated April 29, 2009 (the "Motion"), pursuant to sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the use of cash collateral, all as more fully described in the Motion.

PLEASE TAKE FURTHER NOTICE that objections or responses to the Motion, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court"); and (c) set forth the name of the objecting party, the basis for the objection, and specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be filed with the Bankruptcy Court no later than **May 13, 2009 at 12:00 p.m. (Prevailing Eastern Time)**.  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be served, so as to be received no later than **May 13, 2009, at 12:00 p.m. (Prevailing Eastern Time)**, upon:  (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Adam P. Strochak and John W. Lucas); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (d) attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn:  John C. Tishler); (e) attorneys for the statutory creditors' committee, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn:  Paul Silverstein); and (f) attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn:  Gerald Bender).

PLEASE TAKE FURTHER NOTICE that a hearing to consider the relief requested in the Motion shall be held before the Honorable Martin Glenn, United States Bankruptcy Judge, on **May 20, 2008 at 2:00 p.m**. (**Prevailing Eastern Time**), at the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 or as soon thereafter as counsel may be heard.

Dated: April 29, 2009
      New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                      :

**In re**                            :         **Chapter 11 Case No.**
                                        :

**LEXINGTON PRECISION CORP., et al.,**    :         **08-11153 (MG)**
                                        :

          **Debtors.**                :         **(Jointly Administered)**
                                        :
------------------------------------------------------------x

**DEBTORS' MOTION FOR AUTHORIZATION,**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND**
**363(c), FOR CONTINUED USE OF CASH COLLATERAL**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

**Summary of Relief Requested[1]**

        1.      By this motion, the Debtors request entry of an order (the "Cash Collateral

Order"), pursuant to sections 105, 361, 362, and 363 of chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"), authorizing the Debtors to use Cash Collateral (as defined

---

[1] Unless stated otherwise, all capitalized terms not defined in this summary shall have the meaning
ascribed to such term later in the proposed Cash Collateral Order annexed hereto.

below) in accordance with the terms set forth in the proposed Cash Collateral Order annexed

hereto as <u>Exhibit A</u>. In accordance with Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), the following is a summary of the terms of the proposed

use of Cash Collateral:[2]

> (i)    <u>Parties with Interest in Cash Collateral</u>. The parties with interest in Cash Collateral (collectively, the "<u>Prepetition Senior Lenders</u>") are (a) CapitalSource Finance LLC and Webster Business Credit Corporation, as agents and lenders under that certain Credit and Security Agreement, dated as of May 31, 2006, and any other lenders party thereto, and (b) CSE Mortgage LLC, as agent and lender, DMD Special Situations, LLC, as lender, and any other lenders under that certain Loan and Security Agreement, dated as of May 31, 2006. Motion, ¶¶ 7-11.

> (ii)    <u>Purposes for Use of Cash Collateral</u>. The Debtors shall use Cash Collateral for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors, and (c) the costs of administration of these chapter 11 cases, each in compliance with the Budget. Motion, ¶¶ 25-26; Cash Collateral Order, ¶4.

> (iii)    <u>Termination Date</u>. The Debtors' use of Cash Collateral will terminate (a) upon the closing or dismissal of the chapter 11 cases, (b) upon the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (c) upon the appointment of a chapter 11 trustee in these chapter 11 cases, (d) upon noncompliance with the terms of the Cash Collateral Order, (e) if cumulative expenditures exceed 110% of cumulative budgeted expenditures for any period, (f) if short-term investments and cash fall below agreed upon thresholds, (g) if net sales are less than 85% of the net sales reflected in the Budget, (h) upon entry of an order for the sale of more than $1,000,000 of the Debtors' assets that does not provide that the proceeds of such sale to be applied to the Prepetition Senior Secured Debt, (*i*) upon entry of an order authorizing the Debtors to obtain credit that is pari passu with or having priority over Prepetition Senior Secured Debt, (j) if the automatic stay is modified to permit foreclosure against Senior Lender Prepetition Collateral whose value exceeds $1 million, (k) if there is an uninsured loss with respect to the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens in an amount equal to or exceeding $1,000,000, or (*l*) on August 21, 2009. Cash Collateral Order ¶ 12.

---

[2] To the extent anything in this summary is inconsistent with the proposed Cash Collateral Order, annexed hereto, the proposed Cash Collateral Order shall control.

(iv)    Adequate Protection.  As previously provided by the "Second Cash Collateral Order," [3] the Debtors will continue to make adequate protection payments ("Adequate Protection Payments") in amounts equal to interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein, until the occurrence of a Termination Event.  Further, for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, the Prepetition Senior Lenders shall have, subject to the Carve-Out defined below and the conditions and limitations identical to those imposed by the Cash Collateral Order: (a) continued replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date and as provided by the Cash Collateral Order (b) first priority security interests in and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) liens (subject to prior liens, if any) on all encumbered assets that were not otherwise subject to the Prepetition Senior Lenders' liens as of the Commencement Date and as provided by the Second Cash Collateral Order (collectively, the "Adequate Protection Liens")  Motion ¶ 35; Cash Collateral Order, ¶ 9.

(v)    Carve-Out.  The Carve-Out, as provided under the Second Cash Collateral Order and as provided under the Cash Collateral Order, shall consist of payment of (a) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (b) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (c) upon the occurrence of the Termination Date or the Maturity Date (as defined in the First Cash Collateral Order) (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000; provided that the first $400,000 only shall be paid

---

[3] Order, dated March 4, 2009, Authorizing Debtors to Use Cash Collateral, Granting Adequate Protection to Prepetition Secured Lenders, and Authorizing Postpetition Financing [Docket No. 579].

from the assets subject to Senior Lender Prepetition Liens and the
Adequate Protection Liens (including Cash Collateral) and that would
otherwise be paid to the Prepetition Senior Lenders in respect of the
Adequate Protection Claim, and the balance between $500,000 and the
Prepetition Senior Lenders' Fee Carve-Out Amount shall be paid from
whatever assets would be distributed on account of the DIP Super-Priority
Claim; provided, further, that prior to the occurrence of the Termination
Date or the Maturity Date, the Debtors shall be permitted to pay from the
Cash Collateral and the DIP Loan (as defined in the First Cash Collateral
Order), as the same may be due and payable, all professional fees and
expenses pursuant to sections 330 and 331 of the Bankruptcy Code as
authorized by the Court that were rendered or incurred, as applicable, prior
to the occurrence of the Termination Date or the Maturity Date.  Cash
Collateral Order, ¶ 15.

## **Jurisdiction**

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Background**

3.      On April 1, 2008 (the "Commencement Date"), each of the Debtors

commenced with this Court a voluntary case under the Bankruptcy Code.  Sections 1107(a) and

1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and

manage their properties as debtors in possession.

4.      The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On

April 11, 2008, the United States Trustee for the Southern District of New York appointed the

statutory committee of creditors (the "Creditors' Committee").

5.      On February 2, 2009, the Debtors' filed their second motion for

authorization to continue use of Cash Collateral (the "Second Cash Collateral Motion").  On

February 24, 2009 the Court granted the Second Cash Collateral Motion  and on March 4, 2009

entered the Second Cash Collateral Order authorizing the use of Cash Collateral through May 22,

2009, subject to certain conditions set forth therein.

6.    On February 20, 2009, the Debtors filed a motion for authorization to

extend the termination date of their debtor-in-possession financing facility (the "DIP Loan")

[Docket No. 567].  The lenders of the DIP Loan consented to an extension of the termination

date and on March 23, 2009 the Court (J. Gonzalez) entered an order extending the termination

date of the DIP Loan [Docket No. 594].[4]

**The Prepetition Senior Lenders Have
Unreasonably Refused To Consent To Use Of Cash Collateral**

7.    The Debtors and the Prepetition Senior Lenders are parties to certain

"Prepetition Credit Agreements," which are described in more detail in the Debtors' Second

Cash Collateral Motion.  In short, as of April 1, 2009, the Debtors were obligated to the

Prepetition Senior Lenders in the approximate aggregate principal amount of $33.1 million, plus

accrued and unpaid interest in the amount of approximately $5,000.  As discussed in more detail

below, the value of the assets (the "Collateral") encumbered by the Prepetition Senior Lenders'

liens significantly exceeds the aggregate amount of the obligations owed under the Prepetition

Credit Agreements.  The Prepetition Senior Lenders have received current payments of interest

and principal during the chapter 11 cases.

---

[4] The maturity date of the DIP Loan has been extended to earliest of (i) December 31, 2009, (ii) the date
upon which the Debtors' use of Cash Collateral (as defined in the Second Cash Collateral Motion)
terminates, (iii) the effective date of a confirmed chapter 11 plan of reorganization in these chapter 11
cases, (iv) the conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy
Code, (v) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of
an examiner with expanded powers to operate or manage the financial affairs, the business or the
reorganization of any Debtor, and (vi) the date of acceleration by the DIP Lenders pursuant to section 7
(Events of Default) of the Note.

8.      Prior to filing this Motion, the Debtors inquired whether the Prepetition Senior Lender would consent to an extension of the use of Cash Collateral in accordance with a budget.  The Prepetition Senior Lenders rejected this request notwithstanding the fact they are abundantly oversecured and continue to receive regular principal and interest payments that further reduce the amount of their claims.

9.      The only alternative to continued use of Cash Collateral is a sale of one or both of the Debtors' core businesses.  A sale, however, will only benefit the Prepetition Senior Lenders at the expense of all other economic stakeholders in these cases, as well as the Debtors' customers and employees.  The value of the Debtors as a going concern is far greater than the value in a liquidation or a section 363 sale.  The marketing of any business segment of the Debtors, especially the medical business, will only frustrate the Debtors' ability to enhance value for all constituencies because customers likely will be unwilling to commit new business to the Debtors in the face of additional uncertainty about whether the company will be able to reorganize or will be sold off in pieces.

10.     The Prepetition Senior Lenders, are oversecured, adequately protected, and unable to demonstrate that the value of the Collateral is declining.  Since the Commencement Date, the Prepetition Senior Lenders have remained oversecured by a substantial equity cushion in the Collateral securing their claims.  During the chapter 11 cases, the Debtors have made <u>all</u> regular principal payments aggregating $3,233,333.28, made the contractual non-default interest payments aggregating $2,231,329.62, and paid attorneys' and financial advisor fees of the Prepetition Senior Lenders aggregating $609,911.22.  The Prepetition Senior Lenders thus have what amounts to a fully performing loan.

11.     If a company whose only flaw is the inability to obtain exit financing is given no choice but to put itself up for sale, then few, if any, companies will emerge intact from chapter 11 in the current credit markets.  The purpose of chapter 11 is to give a troubled company the time necessary to reorganize, not to force a sale that will benefit only an oversecured lender whose claims are being paid current interest and being reduced monthly through regular principal payments.

## Events During the Chapter 11 Case and the Debtors' Financial Performance

12.     Notwithstanding extraordinarily challenging economic conditions and the collapse of sales in the North American automobile OEM sector, the Debtors have continued to generate positive cash flow through the performance of their business lines that are not heavily dependent on the OEM sector.

13.     For example, for the period ending December 31, 2008 the insulators business, which primarily serves the automotive aftermarket, generated net sales of $32.3 million and earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $8.0 million, or 24.8% of net sales.  The medical business generated net sales of $16.3 million and pro forma EBITDA of $5.2 million, or 31.9% of net sales.  The connector seals business, serving primarily the OEM market generated sales of $13.7 million and EBITDA of under $300,000 for 2008.  Overall, the Debtors' EBITDA for 2008 was $8.6 million, before deducting reorganization expenses.  For the period ending March 31, 2009, the insulators business generated net sales of $7.2 million and EBITDA of $1.8 million, or 25% of net sales, the medical business generated net sales of $3.9 million and EBITDA of $1.0, or 25.6% of net sales, and the connector seals business generated net sales of $1.2 million and EBITDA of ($737,000).

14.    Despite the challenges posed by economic conditions and continued uncertainty regarding the ultimate outcome of these chapter 11 cases, the insulators and medical businesses are poised for growth and increased profitability in 2009 and beyond.  The aftermarket portion of the insulators business continues to experience widely-recognized counter-cyclical growth as consumers defer purchases of new automobiles and increase spending on maintenance of older vehicles, resulting in greater demand for replacement parts, particularly consumable parts such as ignition wire sets.[5]

15.    Since the last hearing, the Debtors have continued to obtain additional aftermarket business and have now received firm purchase orders for molds for a number of significant OEM insulator programs, despite the fact that they are still operating in chapter 11. The Debtors' forecast that their revenues from OEM insulators will increase by approximately $9.8 million through 2012; the molds for which the Debtors have already received orders are projected to generate approximately 60% of that additional volume.

16.    In addition, the medical business is seeing increased volumes for existing parts and orders for new parts, based largely on customer satisfaction with the Debtors' performance in quality, service, and price.  For 2009, the Debtors forecast that the insulators business will generate net sales of $32.5 million and EBITDA of $7.7 million, or 23.7% of net sales, and the medical business will generate net sales of $17.9 million and EBITDA of $5.2 million, or 31.6% of net sales, and the connector seals business net sales of $6.0 million and EBITDA of under $100,000 as the Debtors close their connector seals facility in Vienna, Ohio and move the connector seals production to their other rubber molding facilities.

---

[5] *See* Jonathan Welsh, "The Hot New Car Is Your Old Car," The Wall Street Journal, January 14, 2009, at p, D1 (discussing increasing sales trends in the automobile parts and service sector).

17.     As discussed in the Second Cash Collateral Motion, the Debtors have commenced an operational restructuring (the "Connector Seals Consolidation") to adjust for reduced sales volume in the connector seals business.  During the past month, the Debtors have secured transition agreements and long-term contracts with three of their four largest connector seals customers and expect the consolidation to be complete in approximately 30-45 days.  Once complete, the Connectors Seals Consolidation will help reduce overhead expenses, increase cash flow, and aid the Debtors in their efforts to obtain exit financing.  The Connector Seals Consolidation will also help insulate the Debtors from the effects of any further deterioration in the automotive OEM sector.

18.     The Debtors have not obtained an extension of their existing, long-term connector seals contract with Delphi Corporation ("Delphi") but have decided to transfer the production of the Delphi parts to the Debtors' Jasper, Georgia facility anyway, to permit the timely closure of the Vienna, Ohio facility and the reorganization of the connector seals business. The transferred Delphi parts are projected to produce over $400,000 of incremental profit for the Jasper facility from the date of transfer through year-end and the Debtors believe they have a strong likelihood of retaining this business beyond 2009.

**Anticipated Path to Conclusion of the Chapter 11 Cases**

19.     The Debtors see two paths to emergence from chapter 11.  The first is obtaining adequate exit financing that would satisfy the claims of the Prepetition Senior Lenders and fund distributions under a plan.  The second is to "cram down" the claims of the Prepetition Senior Lenders over their objection under section 1129(b) of the Bankruptcy Code.  The credit markets have been in turmoil for almost a year and it has proven to be difficult for the Debtors to secure a commitment from an exit lender on satisfactory terms despite their well-diversified business that continues to have positive cash flow.  Despite these obstacles, the Debtors believe

that the interests of all constituencies are best served by continuing on the first path rather than

proceeding immediately with a cramdown plan that will entail significant litigation, at great cost.

The Prepetition Senior Lenders remain adequately protected and continuation of use of Cash

Collateral will further their own interests by allowing additional time for the Debtors to seek

financing to take out the Prepetition Senior Lenders.

        20.     The Debtors have determined not to seek a further extension of their

exclusive periods to file a plan and solicit acceptances thereof.  Instead, the Debtors have

determined that their resources would be better served by focusing on completing the Connector

Seals Consolidation, proceeding with the mediation, advancing the process of securing additional

business from current and prospective customers, and seeking an exit financing commitment.  To

this end, the Debtors are seeking a thirteen (13) week extension of use of Cash Collateral.  The

Debtors acknowledge that there is no guarantee that exit financing will be available in the very

near term.  However, the Connector Seals Consolidation process is well underway, which upon

completion will increase their available cash flow and provide one of the necessary components

that prospective exit lenders are requiring.

**The Value of the Collateral Exceeds**
**The Claims of the Prepetition Senior Lenders**

        21.     Since the hearing on the Second Cash Collateral Motion, there has been no

reduction in the value of the Collateral securing the interests of the Prepetition Secured Lenders.

The Prepetition Senior Lenders' claims continue to be oversecured and they continue to receive

current-pay interest, as well as regular principal payments, further reducing their claims.  There

is, therefore, virtually no risk that the value of that Collateral will diminish below the value of

their claims.  Even in an absolute worst-case scenario – conversion of these cases to a chapter 7

liquidation – the value likely to be recovered substantially exceeds the claims under the Prepetition Credit Agreements.

22.     By the assessment of the Prepetition Senior Lenders' own financial advisor, Dean Vomero of Bridge Associates, presented at the February 23-24, 2009 hearing, the Collateral is worth $67.6 million, which is twice the amount of the Prepetition Senior Lenders' claims. Consequently, the Prepetition Senior Lenders enjoy a substantial equity cushion, which more than adequately protects them against any risk of diminution in the value of their collateral.

23.     The Debtors continue to have adequate cash to operate their businesses. They have substantially exceeded the cash forecast in their current budget and, as of April 17, 2009, had in excess of $3.1 million in cash, which was $1.25 million above the cash balance reflected for that date in the budget submitted to the Court at the hearing on the Second Cash Collateral Motion. Although the budget for the next thirteen (13) week period is not yet complete, the Debtors' projections reflect that they will have sufficient cash to operate the businesses.

<u>**Argument**</u>

**A.     Extraordinary Provision Under General Order No. M-274**

24.     The following term of the proposed use of Cash Collateral is considered an "<u>Extraordinary Provision</u>" under the General Order M-274 of the United States Bankruptcy Court for the Southern District of New York:

- <u>Liens on Chapter 5 Causes of Action</u>.  Subject to entry of the Cash Collateral Order, as adequate protection for the use of the Prepetition Senior Lenders' Cash Collateral, Prepetition Senior Lenders shall continue to hold a first priority security interests and liens upon causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date.

B.    **Necessity for Use of Cash Collateral**

25.    Without the use of Cash Collateral, the Debtors lack sufficient

unencumbered funds with which to operate their businesses on an ongoing basis.  The Debtors,

therefore, have an urgent and immediate need to continue their use of Cash Collateral for, among

other uses, (i) working capital and capital expenditures, including the completion of the

Connector Seals Consolidation, (ii) operating costs and expenses, and (iii) restructuring costs,

including professional fees and expenses.

26.    Absent authorization from the Court to continue the use of the Cash

Collateral, the Debtors and all economic stakeholders in these cases will be immediately and

irreparably harmed.  The Debtors' ability to maintain business relationships with their customers

and suppliers and to meet payroll and other operating expenses is essential to the Debtors'

continued viability and the value of their businesses as going concerns, the maintenance of which

inures to the benefit of all stakeholders in these cases.  Without the continued use of Cash

Collateral, the Debtors would be forced to cease business operations, terminate substantially all

of their employees, and, in all likelihood, seek conversion of these cases to chapter 7.  That

outcome likely would result in no recovery for unsecured creditors and equity holders.

C.    **Legal Standard For Use of Cash Collateral And Adequate Protection**

27.    Section 363 of the Bankruptcy Code governs a debtor's use of cash

collateral.  Under section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity

that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing,

authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. §

363(c)(2).  Section 363(a) defines "cash collateral" as follows:

> [C]ash, negotiable instruments, documents of title, securities,
> deposit accounts, or other cash equivalents whenever acquired in

> which the estate and an entity other than the estate have an interest
> and includes the proceeds, products, offspring, rents, or profits of
> property and the fees, charges, accounts or other payments for the
> use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as
> provided in section 552(b) of this title, whether existing before or
> after the commencement of a case under this title.

11 U.S.C. § 363(c)(2).

28.    It is universally acknowledged that a debtor's cash "is the life blood of the

business" and the bankruptcy court must assure that such "is available for use even if to a limited

extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a

debtor to use cash collateral to continue its operations so long as the interests asserted by affected

creditors in such cash are adequately protected.

29.    If a secured creditor objects to the debtor's proposed use of cash collateral,

the court must ensure that the creditor's interests are adequately protected. *Id.* at § 363(e) (" . . .

[O]n request of an entity that has an interest in property used . . . the court, with or without a

hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of

such interest"). Thus, courts are required to balance the protection offered to a secured creditor

against the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home*

*Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In determining whether a creditor

is adequately protected, courts "will generally permit the business operation to continue, at least

to the point of plan formulation, if the debtors make a solid evidentiary showing to support their

projections . . . ." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

30.    Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection'

is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate

protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of

adequate protection, including a cash payment or periodic cash payments, additional liens,

replacement liens, and the "indubitable equivalent of such entity's interest in such property." 11

U.S.C. § 361.

       31.     The determination of adequate protection is a "fact-specific inquiry." *In

re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The focus of the adequate protection

requirement is to preserve a secured creditor's position at the time of the bankruptcy filing and

protect the secured creditor from diminution in the value of its collateral during the

reorganization process. *Id.* at 288 (citation omitted); *Beker*, 58 B.R. at 736; *see In re WorldCom,

Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of

the Bankruptcy Code, which sets forth how adequate protection may be provided under section

363, makes clear that the purpose is to insure that the secured creditor receives the value for

which the creditor bargained for prior to the debtor's bankruptcy."). "However, neither the

legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what

was bargained for by the parties." *Id.* at 619; *see Beker*, 58 B.R. at 741 ("*Adequate* protection,

not *absolute* protection, is the statutory standard.") (emphasis added).

       32.     Notably, the Bankruptcy Code does not require a debtor to provide a

secured lender with "absolute protection" but only "adequate protection." *Becker*, 58 B.R. at 741.

An equity cushion is "the value of the property, above the amount owed to the creditor with a

secured claim, that will shield that interest from loss due to any decrease in the value of the

property during the time the automatic stay remains in effect." *In re New Era Co.*, 125 B.R. 725,

728-29 (S.D.N.Y. 1991); *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection.").

33.    Courts routinely hold that an equity cushion of twenty percent or more provides sufficient adequate protection. *See*, *e.g.*, *In re Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (recognizing that courts routinely find that a twenty percent equity provides sufficient adequate protection); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1090 (4th Cir. 1986) (same); *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (twenty percent equity cushion sufficient to constitute adequate protection); *In re Wilson*, 378 B.R. 862, 890 (Bankr. D. Mont. 2007) (thirty-nine percent equity cushion sufficient to constitute adequate protection).

D.    **The Use Of Cash Collateral And
Proposed Adequate Protection Should Be Approved**

34.    The Debtors propose to continue their use of the cash in compliance with a thirteen (13) week budget (the "Budget") through and including August 21, 2009, which will be filed with the Court prior to the hearing on this Motion.  The extension of the use of Cash Collateral will allow sufficient time to (i) complete the Connector Seals Consolidation and demonstrate the profitability of that business post-consolidation, (ii) move forward with the mediation, and (iii) continue efforts to obtain a commitment from an exit lender that will enable the Debtors to pay in full the claims of the Prepetition Senior Lenders.  Because the Prepetition Senior Lenders are oversecured and more than adequately protected, the Court should authorize continued use of Cash Collateral and allow the Debtors to continue with the current reorganization process, which has the highest probability of achieving a consensual plan of reorganization and repayment of the Prepetition Senior Lenders' claims in full.

35.    The Prepetition Senior Lenders have never disputed that they are oversecured.  The evidence adduced at the hearing on the approval of the Second Cash Collateral Motion demonstrated they are oversecured by at least a 100% equity cushion and since that time there has been no decline in the Debtors' businesses.  In fact, there has been an improvement as cash availability has exceeded the forecast, the Connector Seals Consolidation has progressed and the Debtors have booked substantial new business in their insulators division.  In addition, the Debtors will continue to perform in accordance with substantially all of the economic terms under the Second Cash Collateral Order, including making regular principal and interest payments to further reduce the claims of and protect the Prepetition Senior Lenders' interest in the Cash Collateral from any diminution in value (the "Proposed Adequate Protection").

36.    Because, the Debtors' businesses remain stable and there has been no decline in value of the Collateral securing the Prepetition Senior Lenders claims, the Proposed Adequate Protection is more than sufficient to allow the Debtors to utilize cash for the necessary operation of their businesses while they continue to explore options to secure a satisfactory exit financing commitment.  Extending the use of Cash Collateral a mere 13 weeks subjects the Prepetition Senior Lenders to very little, if any, risk of losing the substantial equity cushion they enjoy.

37.    The Budget will also show that the Debtors will have adequate cash to meet their operating requirements.  At the hearing on the Second Cash Collateral Motion, the Debtors' 13-week budget reflected that their cash balance for the period ending April 17, 2009 would be $1.86 million.  On that date, the Debtors' actual cash position was in excess of $3.1 million, $1.25 million *above* the budgeted amount for that period.  *See* the Budget Comparison at Exhibit B.  In addition, now that the implementation of the Connector Seals

Consolidation is nearing completion, the Debtors' project that their cash balance should increase moderately throughout the year, despite the continued drain of administration expenses of these highly contentious cases.

### Conclusion

38.    In the circumstances of these chapter 11 cases, the Debtors' ability to complete the Connector Seals Consolidation, maintain business relationships with their customers and vendors, and meet payroll and other critical operating expenses is essential to the Debtors' continued viability and the value of their businesses as a going concern.  Indeed, absent continued use of the cash collateral, the Debtors' businesses will be brought to an immediate halt, with disastrous consequences for the Debtors, their estates, and their creditors.  Continued use of Cash Collateral is therefore of the utmost importance to the preservation and maintenance of the value of the Debtors and essential to the completion of the Connector Seals Consolidation, the mediation process, and the successful consummation of a chapter 11 plan.

39.    The Prepetition Senior Lenders are significantly oversecured.  They are adequately protected by a substantial equity cushion and have virtually no risk that they will not be able to realize the value of their claims in full, even in an absolute worst-case scenario of conversion to a chapter 7 liquidation.  The equity cushion alone is sufficient to adequately protect the interests of the Prepetition Secured Lenders, but on top of that the Debtors propose to continue cash payments to reduce the principal of the outstanding secured debt, and to pay interest at the contractual non-default rates.  For the reasons discussed herein, the Court should authorize the Debtors to continue use of Cash Collateral.

**Notice**

40.     No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this motion has been provided to (i) the United States Trustee for the Southern District

of New York, (ii) the attorneys for the agents for the Debtors' Prepetition Lenders, (iii) the

attorneys for the Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee,

and (v) all other parties that have requested notice in these chapter 11 cases.  The Debtors submit

that no other or further notice need be provided.

41.     Other than the relief provided under the First Cash Collateral Order and

the Second Cash Collateral Order, no previous request for the relief sought herein has been made

to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:  April 29, 2009
        New York, New York

                                    /s/ Adam P. Strochak
                                    Richard P. Krasnow
                                    Adam P. Strochak

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone:    (212) 310-8000
                                    Facsimile:    (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

# **EXHIBIT A**

**(Cash Collateral Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                              :

In re                        :          Chapter 11 Case No.
                              :

LEXINGTON PRECISION CORP., et al.,    :          08-11153 (MG)
                              :

        Debtors.               :          (Jointly Administered)
                              :
------------------------------------------------------------x

### ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 361, 362, AND 363 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS

Upon the Motion, dated April 29, 2009 (the "Motion") of Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber" and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, for an order pursuant to sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing them to (i) use Cash Collateral (as defined below) and (ii) grant adequate protection to the Debtors' Prepetition Senior Lenders (as defined below), all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) the attorneys for the agents for the Debtors' Prepetition Senior Lenders (as defined below), (iii) the attorneys for the

Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee (as defined below), and (v) all other parties that have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion; and based on the evidence adduced at a hearing on February 23, 2009 and February 24, 2009 (the "Hearing") in support of the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS:**

A.    On April 1, 2008 (the "Commencement Date"), Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

B.    Debtors have retained possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On April 11, 2008, a statutory committee of unsecured creditors (the "Creditors' Committee") was appointed in these chapter 11 cases.  No trustee, examiner, or any other committee has yet been appointed in these chapter 11 cases.

C.    Prior to the Commencement Date, the Prepetition Senior Lenders (as defined below) made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, and discretionary funding letters executed by any Debtor and any Other Documents (as

defined in each of the Credit Agreement (defined below) and the Loan Agreement (defined below)), the "Prepetition Senior Lender Loan Documents"):

(i)     that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent;

(ii)     that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent") (Revolver Agent and Term Loan Agent, collectively, the "Agents"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as the Term Loan Agent and a lender under the Loan Agreement, along with the Revolver Agent and the Prepetition Revolver Lenders, collectively, the "Prepetition Senior Lenders");

(iii)    that certain First Amendment and Default Waiver Agreement between

Debtors and CapitalSource, Webster, CSE and DMD in their various capacities dated as

of November 20, 2006; and

(iv)    that certain Agreement dated as of May 18, 2007 by and among the

Debtors, Agents (in their capacities as agents and lenders) and the other Prepetition

Senior Lenders, as amended by that certain First Amendment to Forbearance Agreement,

dated as of July 20, 2007, as further amended by that certain Second Amendment to

Forbearance Agreement effective as of September 24, 2007, and as further amended by

that certain Third Amendment to Forbearance Agreement executed December 11, 2007

and deemed effective as of November 26, 2007 (collectively, the "Forbearance

Agreement").

D.    The Court (J. Gonzalez) approved the use of Cash Collateral by order

dated April 17, 2008 [Docket No. 61] (the "First Cash Collateral Order") and this Court

approved a further extension by order dated March 4, 2009 [Docket No. 579] (the "Second Cash

Collateral Order").

E.    As used herein, "Prepetition Senior Secured Debt," means all Obligations,

as defined in the Prepetition Senior Lender Loan Documents, including, without limitation, costs,

fees (including without limitation allowed prepayment or termination fees) and expenses that

were outstanding under the Prepetition Senior Lender Loan Documents as of the Commencement

Date.  Without limiting the foregoing and in addition to any other amounts included in the

Prepetition Senior Secured Debt, (i) the Debtors (a) acknowledge that section 14.1 of the Credit

Agreement and section 3.8 of the Loan Agreement refer to the payment of prepayment premiums

and/or termination fees (the "Prepayment Fees") and (b) refers to said sections as to the terms

and provisions thereof, and (ii) the Prepetition Senior Lenders (a) reserve their rights to assert

that the Debtors have an obligation to pay such Prepayment Fees and (b) acknowledge that the

Debtors and all other parties in interest shall have the right to challenge or otherwise object to the

payment of such Prepayment Fees.

F.    The Debtors represent, stipulate, acknowledge, and agree that:

(i)    the Prepetition Senior Secured Debt is (i) legal, valid, binding, and

enforceable against each Debtor; and (ii) not subject to any contest, objection,

recoupment, defense, counterclaim, offset, claim of subordination, claim of re-

characterization, claim of avoidance of any nature, attack or challenge under the

Bankruptcy Code, other applicable non-bankruptcy law, or otherwise;

(ii)    all the Prepetition Senior Secured Debt is secured by the security interests

in the Collateral (as defined below) previously granted under the Prepetition Senior

Lender Loan Documents to the Prepetition Senior Lenders, that the Agents have, and will

continue to have after entry of this Order, a legal, valid, enforceable, non-avoidable and

continuing duly-perfected first priority security interest (and junior security interest, as

applicable, subject to the terms of that certain Intercreditor Agreement dated as of May

31, 2006 between Revolver Agent, as agent and lender, Revolver Lenders, Term Loan

Agent, as agent and lender, and Term Loan Lenders (the "Intercreditor Agreement")) in

and lien on the Collateral, as more fully described and defined in the Prepetition Senior

Lender Loan Documents (all such "Collateral", as the same existed on or at any time

prior to the Commencement Date, together with all cash and non-cash proceeds thereof,

shall be hereinafter referred to as "Senior Lender Prepetition Collateral" and such liens

thereon shall be referred to as the "Senior Lender Prepetition Liens"), subject to no liens

or security interests other than the liens expressly permitted under the Prepetition Senior

Lender Loan Documents;

(iii)    nothing contained herein in any way impairs the Prepetition Senior

Lenders' first and junior (as applicable in accordance with the terms of the Intercreditor

Agreement) priority lien status in the Senior Lender Prepetition Collateral;

(iv)    as of the Commencement Date, and without giving effect to this Order, the

Debtors are not aware of any liens or security interests having priority over the Senior

Lender Prepetition Liens, except certain "Permitted Encumbrances" (as defined in the

applicable Prepetition Senior Lender Loan Documents);

(v)    the Senior Lender Prepetition Liens in the Senior Lender Prepetition

Collateral were granted to the Prepetition Senior Lenders for fair consideration and

reasonably equivalent value, and were granted contemporaneously with the making of the

loans secured thereby; and

(vi)    all cash of the Debtors wherever located on the Commencement Date

(other than the funds in the DIP Account (as defined below)) represents either proceeds

of loans under the Prepetition Senior Lender Loan Documents or proceeds of the Senior

Lender Prepetition Collateral; and pursuant to the Prepetition Senior Lender Loan

Documents and section 552(b) of the Bankruptcy Code, the Prepetition Senior Lenders

have a valid, duly perfected, first-priority lien upon and security interest in and to all of

the cash of the Debtors (other than the cash in the DIP Account), and these funds, along

with the proceeds of the Senior Lender Prepetition Collateral, constitute "cash collateral"

within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

G.      The Debtors have an immediate need to use Cash Collateral and obtain funds in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to meet payroll, to make capital expenditures and to satisfy other working capital and operational needs including the consummation of the connector seals consolidation.  Good cause has been shown for the entry of this Order.  Use of Cash Collateral and the obtaining of funds is vital to avoid immediate and irreparable harm to Debtors' estates.

H.      The Debtors have requested that the Prepetition Senior Lenders consent to the use of their Cash Collateral.  The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors using such Cash Collateral.  The Prepetition Senior Lenders have not consented to the Debtors' use of Cash Collateral.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code, Bankruptcy Rules 4001 and 6003 and Local Bankruptcy Rule 4001-3 and serve to adequately protect the Prepetition Senior Lenders' interest in the Collateral securing their claims under the Prepetition Credit Agreements.

I.      The relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, and is in the best interests of the Debtors, their estates, and creditors.  Use of Cash Collateral under the terms and conditions set forth herein is necessary to avoid immediate and irreparable harm.  Accordingly, good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein.

J.      Based on the record before the Court, the terms of the use of the

Prepetition Senior Lenders' Cash Collateral as provided in this Order are in the best interests of

the Debtors, their estates, and creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      The Motion is hereby granted as modified herein, with the foregoing

findings incorporated herein by reference.

**Authorization to Use Cash Collateral**

2.      Subject to the terms and conditions set forth in this Order, the Debtors are

authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use Cash Collateral

through the earlier of either August 21, 2009, or until the occurrence of a Termination Event (as

defined below).

3.      Pursuant to the First Cash Collateral Order and the order approving the

Debtors' centralized cash management system [Docket No. 25] (the "Cash Management Order"),

FirstMerit Bank N.A., Akron, Ohio ("FirstMerit") shall, subject to the terms of the Cash

Management Order (including the reservation of Debtors' rights to modify their cash

management system to comply with section 345(b) of the Bankruptcy Code), maintain the

Debtors' cash management system by which First Merit transferred all available funds in or

received in the Debtors' lockbox accounts and the consolidation account at FirstMerit into the

Debtors' master operating account at FirstMerit (the "Master Operating Account"), without the

necessity to comply with any lockbox or blocked account agreement or any preexisting transfer

arrangement concerning such accounts; provided, however, that the Master Operating Account,

along with all other bank accounts, deposit accounts and securities accounts established or in

existence on or after the Commencement Date, shall be subject to any and all security interests

and liens granted hereunder and this Order shall be deemed the only action necessary to perfect

such liens in favor of the Revolver Agent for the benefit of the Senior Prepetition Lenders.

4.      The Debtors shall use Cash Collateral only for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors (including, without limitation, the making of Adequate Protection Payments (as defined below)), (c) the costs of administration of these chapter 11 cases, and (d) the consummation of the connector seals consolidation, with each of the foregoing in compliance with the thirteen (13) week budget (the "Budget"), which is annexed hereto as Exhibit A and incorporated herein by reference, subject to the permitted variances as provided for in this Order.

5.      Debtors may, with the prior written consent of the Revolver Agent and Term Loan Agent, use Cash Collateral in excess of the limits set forth in the Budget, as applicable; provided, however, that such consent shall not be necessary for variances that do not exceed, in the aggregate, 110% of the cumulative expenditures set forth in the Budget, as measured from February 27, 2009 through the Date of Determination (as defined below), with bi-weekly reports due to the Revolver Agent and Term Loan Agent by 5:00 p.m. on Wednesday following the end of the second week being reported, showing comparisons and percentage variance by line item as well as on a cumulative basis; provided further that the Debtors shall be allowed to make advance cash payments or deposits of cash (collectively, "Advances") in the amount of goods and services to be provided, if required by vendors, so long as all projected Advances are included as expenditures in the Budget, and all actual Advances are included in the reconciliation referred to in paragraph 12(v).  The "Date of Determination" shall initially be June 12, 2009 and subsequently shall be every other Friday thereafter.

6.      In no event shall any costs or expenses of administration be imposed upon the Prepetition Senior Lenders or any of the Senior Lender Prepetition Collateral pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, except as set forth in paragraphs 8, 9, and 15.

7.      The Debtors shall (i) maintain their cash balance at the levels set forth in paragraph 12(vi) hereof, and (ii) provide the Revolver Agent and Term Loan Agent, prior to 5:00 p.m. on the Wednesday following the week being reported, a weekly reconciliation of net cash

available to the Debtors compared to actual cash available through their Master Operating

Account, DIP Account, and any other accounts.  For the avoidance of doubt, the reconciliation

will be a reconciliation of "book cash" to "bank cash."

   8.  Notwithstanding anything herein to the contrary, no Cash Collateral

(including without limitation the amounts held in the Master Operating Account) may be used by

any of the Debtors (or any subsequent trustee), the Creditors' Committee, any other statutory

committee or any other person or entity (i) to object to or contest in any manner, or raise any

defense or contest to, the validity, perfection, priority or enforceability of the Prepetition Senior

Secured Debt, the Senior Lender Prepetition Liens, and the Prepetition Senior Lender Loan

Documents or under this Order, or to assert or prosecute any action for preferences, fraudulent

conveyances, other avoidance power claims (whether under chapter 5 of the Bankruptcy Code or

otherwise) or any other claims or causes of action against the Prepetition Senior Lenders,

including without limitation for lender liability or pursuant to sections 105, 510, 544, 547, 548,

549, or 550 of the Bankruptcy Code (collectively, the "Claims and Defenses"); (ii) subject to

paragraph 12(viii) below, to sell any portion of the Senior Lender Prepetition Collateral (other

than sales of inventory in the ordinary course of business, sales to customers of tooling and

equipment that will be used by the Debtors to produce inventory for sale to such customers in the

ordinary course of business, and sales of surplus or obsolete equipment, provided that the fair

market value of the surplus or obsolete equipment to be sold after the Commencement Date shall

not exceed $50,000 in the case of any single transaction or $200,000 in the aggregate) without

either providing for the indefeasible payment of the Prepetition Senior Secured Debt (subject to

the provisions of paragraphs 9(i) and 16 hereof), any outstanding Adequate Protection Payments,

and any other allowed obligations accruing on or after the Commencement Date with respect to

the Prepetition Senior Secured Debt pursuant to the Prepetition Senior Lender Loan Documents,

section 506(b) of the Bankruptcy Code, or otherwise (the "Postpetition Obligations") in full in

cash on the sale closing date or obtaining prior written consent to such sale from the Agents

(subject to the Intercreditor Agreement); (iii) to incur any new indebtedness that would be *pari*

*passu* with or have priority over the Prepetition Senior Secured Debt and that would not provide for the indefeasible payment of the Prepetition Senior Secured Debt (subject to the provisions of paragraphs 9(i) and 16 hereof), any outstanding Adequate Protection Payments, and the Postpetition Obligations, in full in cash on the closing date of such financing; or (iv) to modify the rights of the Prepetition Senior Lenders under this Order.

**Adequate Protection**

9.      As adequate protection for the use of Cash Collateral, the Prepetition Senior Lenders shall receive:

(i)      adequate protection payments ("Adequate Protection Payments") in amounts equal to the following amounts, provided, only in the event that it is determined that the claims of the Agents and the Prepetition Senior Lenders are not fully secured, the Adequate Protection Payments shall be subject to reallocation, recharacterization, or disgorgement, after notice and a hearing before the Court:

(a)      interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Senior Lender Loan Documents, according to the schedule of interest and principal payments contained therein; provided that in consideration for the receipt of principal payments, Prepetition Senior Lenders shall forever waive any and all claims for the difference between the contractual non-default rate and the contractual default rate (the "Default Rate Differential") from the May 22, 2009, until the occurrence of a Termination Event; provided, further that (i) the Debtors (x) acknowledge that sections 3.1 of each of the Credit Agreement and the Loan Agreement refer to the payment of default interest and (y) refer to said sections as to the terms and provisions thereof, and (ii) the Prepetition Senior Lenders reserve their rights to assert that

the Debtors have an obligation to pay the Default Rate Differential on or after the

occurrence of a Termination Event and the Debtors and all other parties-in-

interest shall have the right to challenge or otherwise object to the payment of

such Default Rate Differential.  For the avoidance of doubt, in the event

Prepetition Senior Secured Debt is, and the amounts due to the Prepetition Senior

Lenders hereunder are, indefeasibly paid in full in cash prior to the occurrence of

or in connection with a Termination Event (subject to the provisions of paragraph

16 hereof), Prepetition Senior Lenders shall automatically be deemed to forever

waive their claims to the Default Rate Differential with respect to the period

between February 27, 2009 and the date of such payment; provided, further,

however, notwithstanding anything to the contrary contained herein, that both the

Debtors and the Prepetition Senior Lenders' respective rights are preserved with

respect to the Default Rate Differential under the First Cash Collateral Order and

that certain Termination Event reflected by that certain Compliance Certificate by

the Debtors, dated February 11, 2009; and

> (b)    payment of reasonable fees and expenses of (1) two legal

counsel (i.e., two law firms) for the Agents, one of which shall be local counsel,

(2) a single financial advisor (one financial advisor firm) for the Agents, provided

that, until a Termination Event shall have occurred, the fees and expenses of such

financial advisor shall not exceed $20,000 per month in the aggregate (the

"Financial Advisor Monthly Cap") on a rolling basis, such that any overages may

be carried over and recovered from any subsequent month's amounts to the extent

such subsequent month's amount is less than the Financial Advisor Monthly Cap;

(3) other legal counsel retained by any of the Prepetition Senior Lenders, <u>provided</u> that, until a Termination Event shall have occurred, the fees and expenses of each such counsel shall not exceed $7,500 per month in the aggregate with respect to each Prepetition Senior Lender (the "<u>Participant Monthly Cap</u>") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Participant Monthly Cap; <u>provided</u>, <u>however</u>, that nothing in this paragraph 9(i) shall prejudice the rights of (x) any Prepetition Senior Lender under section 506(b) of the Bankruptcy Code to seek its reasonable fees and expenses pursuant to the Prepetition Senior Lender Loan Documents and (y) the Debtors to challenge or otherwise object to any such request;

(ii)      for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, (a) replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Senior Lenders, had liens on the Commencement Date (including, without limitation, cash and receivables and the proceeds thereof, whether existing or hereafter acquired after the Commencement Date and whether or not deposited in the Master Operating Account), (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all encumbered assets which were not otherwise subject to the Prepetition Secured Lenders' liens as of the Commencement Date (collectively, the "<u>Adequate Protection Liens</u>");

provided, however, that the Adequate Protection Liens shall (w) be subject to the Carve-

Out (as defined below), (x) exclude any insurance policy (but not exclude the Debtors'

entitlement, if any, to payments thereunder (subject to the Senior Lender Prepetition

Liens and the Adequate Protection Liens) net of any amounts that may be due to an

Insurance Premium Finance Party (as such term is defined in the Prepetition Senior

Lender Loan Documents) with respect to such policy) where, subject to authorization of

the Court, security interests and liens are granted to an Insurance Premium Finance Party

on the Insurance Premium Collateral (as such term is defined in the Prepetition Senior

Lender Loan Documents, provided that in no instance will the Insurance Premium

Finance Party be granted a security interest in or lien on the DIP Account or the Master

Operating Account) to secure the indebtedness of the Debtors to an Insurance Premium

Finance Party in connection with insurance policies maintained by the Debtors arising as

a result of such Insurance Premium Finance Party entering into arrangements to allow the

Debtors to pay all or a portion of the applicable insurance premiums on such insurance

policies in installments rather than in one lump sum annual payment; provided that the

Debtors shall continue to abide by the requirements under sections 4.11 of each of the

Credit Agreement and the Loan Agreement, provided, however, that notwithstanding

anything contained in said sections to the contrary, amounts payable to Agents as loss

payees under a casualty or property insurance coverage shall be reduced by amounts

owed, if any, to the Insurance Premium Finance Parties with respect to such policies; and

provided further that such indebtedness of the Debtors to all Insurance Premium Finance

Parties shall not exceed the aggregate principal amount outstanding of $800,000 at any

one time ("Insurance Premium Financing"); and (y) neither prime nor impair any

perfected liens or perfected security interests in the same collateral that are senior in rank and priority to the Senior Lender Prepetition Liens or the Adequate Protection Liens under applicable nonbankruptcy law as of the Commencement Date, such as statutory liens, if any, that are senior in priority as a result of being perfected under applicable state law prior to the granting of the Adequate Protection Liens; and provided further, however, except as expressly set forth in this Order, the Adequate Protection Liens granted herein shall not be subject to any liens that are avoided and preserved for the benefit of any of the Debtors' estates under section 551 of the Bankruptcy Code, and shall not be subordinated to or made *pari passu* with any other lien under section 364(d) or any other section of the Bankruptcy Code or otherwise; and

(iii)     for any diminution in the value of the Prepetition Senior Lenders' interests in the Cash Collateral from and after the Commencement Date, an administrative expense claim pursuant section 507(b) of the Bankruptcy Code (the "Adequate Protection Claim"), which shall be senior to any and all other claims (including the DIP Super-Priority Claim, as defined below), but subject to the Carve-Out (as defined below).

10.     The Adequate Protection Liens on property of the Debtors' estates granted herein, including without limitation the security interests and liens in postpetition cash and receivables, the Master Operating Account, the DIP Account and proceeds of each of the foregoing, are valid, binding, effective, enforceable, and fully perfected, and no filing or recordation or other act in accordance with any applicable local, state, for federal law, rule, or regulation, is necessary to create or perfect such Adequate Protection Liens.  The above provision notwithstanding, Debtors shall cooperate with Prepetition Senior Lenders to execute such documents and instruments, and do such other things as Prepetition Senior Lenders may

reasonably request, to evidence and perfect such Adequate Protection Liens for the convenience and information of third parties, and to evidence the obligations undertaken by the Debtors hereunder.

11.     None of the Prepetition Senior Lenders shall be deemed to be in control of the Debtors or their operations or to be acting as a "responsible person," "managing agent," or "owner or operator" with respect to the operation or management of the Debtors.

12.     With respect to the use of Cash Collateral hereunder, each of the following shall constitute a "Termination Event":

(i)     the closing or dismissal of the chapter 11 cases;

(ii)     the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code;

(iii)     the appointment in these chapter 11 cases of a chapter 11 trustee or an examiner with expanded powers to operate or manage the financial affairs, the businesses or the reorganization of any Debtor;

(iv)     non-compliance by any Debtor with any of the terms or provisions of this Order;

(v)     the Debtors' cumulative expenditures from May 22, 2009 through the Date of Determination are more than 110% of the cumulative expenditures for such periods, as set forth in the Budget;

(vi)    the aggregate total of the Debtors' short-term investments and the cash available in their Master Operating Account and the DIP Account shall not fall below the amounts corresponding to the dates forth below:

| Week Ending | Minimum Available Cash |
|---|---|
| (1)   29-May | $[] |
| (2)   5-June | $[] |
| (3)   12-June | $[] |
| (4)   19-June | $[] |
| (5)   26-June | $[] |
| (6)   3-July | $[] |
| (7)   10-July | $[] |
| (8)   17-July | $[] |
| (9)   24-July | $[] |
| (10) 31-July | $[] |
| (11) 7-Aug | $[] |
| (12) 14-Aug | $[] |
| (13) 21-Aug | $[]; |

(vii)    if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four week period thereafter, net sales are less than 85% of the net sales reflected in the Budget; provided, that the Debtors shall report such net sales in writing certified by the Debtors' CFO within five (5) days of the end of each four week period and proved comparison to the amounts reflected in the Budget, with a narrative explaining the reasons for any deviations, provided, however, that "net sales" shall not include any sales of tooling or equipment or other sales of the Debtors' assets;

(viii)    entry of an order providing for the sale of more than $1,000,000 (to be measured in aggregate purchase price and/or book value, whichever is greater for each asset sold) of the Debtors' assets that does not provide that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be applied to the Prepetition Senior Secured Debt in accordance with the terms set forth in the Prepetition Senior Lender

Loan Documents (subject to the Intercreditor Agreement) on the sale closing date, or for which sale the Prepetition Senior Lenders have not provided prior written consent (subject to the Intercreditor Agreement); provided, however, that in no case shall the aggregate of any sales permitted hereunder exceed $5,000,000;

(x)     entry of any order pursuant to section 364 of the Bankruptcy Code authorizing Debtors to obtain credit that is *pari passu* with or has priority over the Prepetition Senior Secured Debt and does not provide for the indefeasible payment in full in cash of the Prepetition Senior Secured Debt (subject to the provisions of paragraphs 9(i) and 16 hereof) and any outstanding Adequate Protection Payments and allowed Postpetition Obligations on the closing date of such financing;

(xi)     the automatic stay is lifted as to any party in order to take possession or to permit foreclosure on any portion of the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens, the value of which, as measured by fair market value or book value, whichever is greater, exceeds $1,000,000 in the aggregate;

(xii)     any uninsured loss with respect to the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens in an amount equal to or exceeding $1,000,000; or

(xiii)   August 21, 2009.

13.     Following the occurrence of a Termination Event, other than a Termination Event under paragraph 12(xiii), the Debtors shall have five (5) business days after receipt of written notice from Revolver Agent and Term Loan Agent, on behalf of themselves, and the Prepetition Senior Lenders to cure such Termination Event, if it is capable of cure (the

"Cure Period").  The Revolver Agent and the Term Loan Agent shall serve notice of the

Termination Event on the Debtors, the U.S. Trustee, the Committee.

14.    On the earlier to occur of either (a) August 21, 2009, or (b) if upon the

expiration of the Cure Period, the Debtors have not cured the Termination Event (assuming such

Termination Event is curable) and any required notice referred to in paragraph 14 has not been

withdrawn (herein referred to as the "Termination Date"), then (1) the Debtors shall cease all use

of Cash Collateral and any authority of Debtors under this Order to use Cash Collateral shall

terminate; and (2) the Prepetition Senior Lenders shall be granted, without further action of the

Prepetition Senior Lenders or the Court, immediate and automatic relief from the automatic stay

under section 362 of the Bankruptcy Code, which shall be automatically terminated as it relates

to the Senior Lender Prepetition Collateral and all other collateral in which Adequate Protection

Liens have been granted without further action of the Prepetition Senior Lenders or this Court.

Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of

the rights, remedies, benefits, and protections provided to the Prepetition Senior Lenders under

this Order shall survive the Termination Date.  In addition, upon the occurrence of the

Termination Date, if instructed by the Revolver Agent and the Term Loan Agent, FirstMerit or

any other bank or financial institution with which the Debtors establish an account, shall transfer

all of the available funds on deposit in such account as directed by the Revolver Agent and the

Term Loan Agent; provided, however, that if it is subsequently determined that the Prepetition

Senior Lenders did not have Senior Lender Prepetition Liens or Adequate Protection Liens on

such accounts, the Prepetition Secured Lenders shall disgorge and repay to the Debtors' estates

such portion of the funds as to which they did not have Senior Lender Prepetition Liens or

Adequate Protection Liens; provided, further, however, that notwithstanding the foregoing,

(i) any existing deposit account control agreements shall continue in full force and effect subject

to the terms of this Order, and (ii) within 45 days of the establishment of a new bank account,

deposit account, securities account or other account, the Debtors, the Revolver Agent (for the

benefit of the Prepetition Senior Lenders, subject to the Intercreditor Agreement) and each bank

or financial institution with which the Debtors establish such deposit account shall enter into a

deposit account control agreement or similar applicable agreement, which shall be in form and

substance reasonably satisfactory to the Revolver Agent; provided, further, that the Debtors shall

notify the Revolver Agent in writing within five (5) business days thereof of the establishment of

any new bank account, deposit account, securities account, or other account.

**Carve-Out**

          15.     The Senior Lender Prepetition Liens, the Adequate Protection Claim, the

Adequate Protection Liens, and the DIP Super-Priority Claim shall be subject to the payment of

the following items (collectively, the "Carve-Out"): (i) fees of the clerk of the Bankruptcy Court,

the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to

28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable

fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a

case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and

(iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall

be the trigger dates of this clause and not the measuring points with respect to any fees or

expenses), the aggregate allowed unpaid professional fees and expenses payable under sections

330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court

by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for

services rendered and expenses incurred, as well as fees and expenses payable to any trustee or

examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the

payment thereof, in an amount not to exceed $500,000, underlined provided that the first $400,000 only

shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate

Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition

Senior Lenders in respect of the Adequate Protection Claim (the "Prepetition Senior Lenders'

Fee Carve-Out Amount"), and the balance between $500,000 and the Prepetition Senior Lenders'

Fee Carve-Out Amount shall be paid from whatever assets would be distributed on account of

the DIP Super-Priority Claim; provided, however, that prior to the occurrence of the Termination

Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the

Interim DIP Loan, as the same may be due and payable, all professional fees and expenses

pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were

rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the

Maturity Date.  For the avoidance of doubt, with respect to the Prepetition Senior Lenders, the

Carve-Out for clauses (ii) and (iii) of the preceding sentence shall not exceed $500,000 in the

aggregate.

**Protection of Prepetition Senior Lenders**

16.    With respect to any issued and outstanding letters of credit  (collectively,

the "Outstanding Letters of Credit"), the Debtors shall comply with the terms of section 2.7(k) of

the Credit Agreement, provided that in any event, such Outstanding Letters of Credit shall be

released and returned to the holder thereof within ninety (90) days of indefeasible payment in

full of the Senior Lender Prepetition Debt (subject to the provisions of paragraph 9(i) hereof).

17.    The provisions of this Order are binding upon all the parties in interest in

these chapter 11 cases, including without limitation the Prepetition Senior Lenders, the DIP

Lenders and the Debtors, the Creditors' Committee, and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estates of the

Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code), and inure

to the benefit of the Prepetition Senior Lenders and the Debtors and, except with respect to any

trustee hereafter appointed or elected for the estates of the Debtors, their respective successors

and assigns; provided, however, that this Order shall not limit or affect the rights of the Debtors

in their prosecution of a chapter 11 plan or the rights and defenses thereto of the Prepetition

Senior Lenders, the DIP Lenders, and the Creditors' Committee.  In addition, neither the terms of

this Order, nor the filing of these bankruptcy cases generally, shall be deemed to modify or affect

the respective rights and obligations among the Prepetition Senior Lenders under the

Intercreditor Agreement.

       18.     Notwithstanding anything herein to the contrary, this Order is without

prejudice to, and does not constitute a waiver (other than the waiver set forth in paragraph 9(i)

regarding the Default Rate Differential), expressly or implicitly, of the rights of the Prepetition

Senior Lenders to seek additional adequate protection should circumstances warrant.

       19.     Entry of this Order shall not in any way (i) constitute agreement, consent,

or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of

this Order; or (ii) prevent the Prepetition Senior Lenders from objecting, for any reason, to any

requests, motions or applications made in this Court (other than this Order), including any

applications for interim or final allowances of compensation for services rendered or

reimbursement of expenses incurred under sections 105(a), 330 or 331 of the Bankruptcy Code,

by any party in interest.

**Reporting**

20.     Existing reporting requirements shall continue, including without limitation full financial reports required under the Prepetition Senior Lender Loan Documents, which shall be provided on a monthly basis within thirty (30) days of the end of each month and on a quarterly and yearly basis pursuant to and in the form prescribed by the Prepetition Senior Lender Loan Documents (or on such other schedule or in such other form as the parties may agree); provided that the Debtors shall have an extra fifteen (15) days to deliver their report on Form 10-K for the year ended December 31, 2008, and their report on Form 10-Q for the three-month period ending March 31, 2009.  In addition, and without limiting the foregoing or any other reporting requirement contained hereunder, the Debtors shall prepare and submit (a) the reports referred to in paragraphs 5 and 7 and 12(vii) hereof prior to the deadlines set forth therein, (b) reports indicating any and all information that is required by the borrowing base certificates under the Prepetition Senior Lender Loan Documents for the previous week prior to 5:00 p.m. on Tuesday following the week being reported (or by such other date and time as the parties may agree); and (c) any other and further reports reasonably requested by the Prepetition Senior Lenders. Commencing on May 29, 2009, the Prepetition Senior Lenders and the Debtors shall have a bi-weekly phone conference (the "Status Call"), on such dates, at such times, and on such other schedule as the parties may agree, to update the Prepetition Senior Lenders on the Debtors' financial and operational status, including updates as to relations with customers, vendors and suppliers.

**Releases**

21.     In consideration of Debtors' use of Cash Collateral, the Debtors (on behalf of themselves and any successor to the Debtors, including any chapter 11 trustee or chapter 7

trustee) voluntarily and knowingly release and forever discharge the Prepetition Senior Lenders

in all their respective capacities, their predecessors, agents, attorneys, financial advisors, direct

and indirect parents, subsidiaries and affiliates, members, managers, servicers, directors, officers,

employees, successors and assigns from all possible claims, counterclaims, demands, actions,

causes of action, damages, costs, expenses and liabilities whatsoever, known or unknown,

anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole

or in part on or before the date hereof, which the Debtors may now know or hereafter come to

know they have against Prepetition Senior Lenders in all of their respective capacities, their

predecessors, agents, attorneys, direct and indirect parents, subsidiaries and affiliates, members,

managers, servicers, directors, officers, employees, successors and assigns, if any, and

irrespective of whether any such claims arise out of contract, tort, violation of law or regulations,

or otherwise.

   22. The Debtors shall also provide the Prepetition Senior Lenders copies of all

reports made for or documents given to the United States Trustee in these chapter 11 cases.

   23. Debtors shall permit representatives, agents, and/or employees of the

Prepetition Senior Lenders, including professionals retained by the Prepetition Senior Lenders'

legal professionals, to have reasonable access to its premises and records during normal business

hours (without unreasonable interference with the proper operation of Debtors' businesses) and

shall cooperate, consult with, and provide to such persons all such non-privileged information as

they may reasonably request.

**Modifications/Amendments**

   24. Any material and substantive modifications to the terms of this Order, the

require the prior written consent of the Prepetition Senior Lenders or authorization of the Court.

Dated: May __, 2009
   New York, New York


         _____
         UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT B**

**(April 17 Budget Comparison)**

**LEXINGTON PRECISION CORPORATION**

**BUDGET COMPARISON FOR FEBRUARY 23, 2009 THROUGH APRIL 17, 2009**
  (in thousands of dollars)

| | | Actual | Budget | Actual vs. Budget |
|---|---|---:|---:|---:|
| Beginning cash balance per books on February 23, 2009 | | 4,036 | 3,861 | 175 |
| **Cash receipts** | | 8,654 | 11,841 | (3,187) |
| **Cash disbursements:** | | | | |
| Debt service: | | | | |
|   CapitalSource principal  (1) | | 538 | 538 | - |
|   CapitalSource interest | | 273 | 315 | (42) |
|   CapitalSource fees (LOC & unused line) | | 15 | 16 | (1) |
|   DIP Interest and fees | | 65 | 70 | (5) |
| L&D | | 232 | 203 | 29 |
| Payroll and payroll taxes | | 2,829 | 4,177 | (1,348) |
| Retirement & Savings Plan 401(k) | | 214 | 210 | 4 |
| Group Medical Care Plan Administrative Fees | | 13 | 26 | (13) |
| Prescription drug plan | | - | - | - |
| StopLoss | | 28 | 30 | (2) |
| Reorganization professional fees and expenses | | 513 | 1,139 | (626) |
| DeWolff, Boberg and Associates | | - | - | - |
| DIP legal counsel | | - | - | - |
| Ordinary course professionals | | - | 100 | (100) |
| Vendors - check disbursements (excluding Dow & Wacker): | | | | |
|   Dow Corning | | 148 | 487 | (339) |
|   Wacker | | 862 | 755 | 107 |
|   All other excluding capex | | 3,552 | 4,968 | (1,416) |
|   Capex | | - | 180 | (180) |
|   Ohio BWC and UMR Health Disbursements | | 407 | 508 | (101) |
|   Commercial Traffic | | 91 | 113 | (22) |
|   Utilities | | - | - | - |
|     Total cash disbursed | | 9,780 | 13,835 | (4,055) |
| **Miscellaneous cash receipts:** | | | | |
| Interest on DIP funds | | 8 | - | 8 |
| Other: | | 199 | - | 199 |
| **Net cash received (used)** | | (919) | (1,994) | 1,075 |
| **Ending cash balance per books** | (A) | 3,117 | 1,867 | 1,250 |
| Cash in banks: | | | | |
| FirstMerit operating account | | 620 | | |
| Capital One account 1311 | | 20 | | |
| Capital One account 1346 | | 2,477 | | |
| Capital One account 1583 | | - | | |
| Total cash in banks | (A) | 3,117 | | |
| **Net sales (based on date shipped)** | | 69,118 | 81,304 | (12,186) |