WALLER LANSDEN DORTCH & DAVIS LLP
John C. Tishler (*Pro Hac Vice*)
Robert J. Welhoelter (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com
Email: Robert.Welhoelter@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for the Senior Prepetition Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | **08-11153 (MG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------------x

## LIMITED OBJECTION OF AGENTS FOR PREPETITION SENIOR LENDERS TO DEBTORS' THIRD MOTION FOR CONTINUED USE OF CASH COLLATERAL

By and through the undersigned attorneys, CapitalSource Finance LLC, as Revolver

Agent (defined below) to the Prepetition Revolver Lenders (defined below) and CSE Mortgage

LLC, as Term Loan Agent (defined below) to the Senior Term Loan Lenders (defined below,

and collectively with the Prepetition Revolver Lenders and the Agents, the "Prepetition Senior

Lenders"), hereby object to the *Debtors' Motion For Authorization, Pursuant To 11 U.S.C. §§ 105, 361, 362 and 363(c), For Continued Use of Cash Collateral* (the "Third Cash Collateral Motion") and state as follows:

**The Prepetition Senior Lenders continue to explore with the Debtors a consensual resolution for the extension of the Debtors' use of Cash Collateral, but in light of the timing for objections and the hearing on the Third Cash Collateral Motion, the Prepetition Senior Lenders file this limited objection out of an abundance of caution. The parties will keep the Court apprised of any developments regarding a consensual resolution.**

### Introduction

1.      The Debtors have enjoyed consensual use of Cash Collateral (defined below) during these bankruptcy cases for over thirteen (13) months. Despite having negotiated a consensual arrangement designed to expire if no reorganization plan was forthcoming before February 25, 2009, and subsequently obtaining a 13-week extension through May 22, 2009, in order to implement an operational restructuring of a portion of business, the Debtors now seek further non-consensual use of Cash Collateral on similar terms[1] to the Second Cash Collateral Order. However, the Debtors' grounds for any further extensions are becoming increasingly thin in light of the following:

- Debtors' failure to meet its stated objectives from the last dispute regarding Cash Collateral, including failure to meet the covenants for transition contracts and bank builds

- Significant cash deterioration. Under the current Budget, there is a net cash burn of almost $500,000 over the next 13 weeks, and given the uncertainties of various

---

[1] The proposed order to the Cash Collateral Motion has similar provisions to the Second Cash Collateral Order, but several material provisions of the Second Cash Collateral Order have been removed, including certain benchmarks in connection with the Connector Seals Consolidation. The proposed order is not acceptable to the Prepetition Senior Lenders.

automotive plan closures, could easily reach a critical level during the summer season

- Indefinite adjournment of its plan process and expiration of the exclusive plan filing period (with expiration of the solicitation period set for June 1, 2009)

- Debtors' failure to obtain exit financing despite testimony in February that at least one term sheet was forthcoming from a financing source

- Debtors' languid pursuit of mediation that was ordered by the Court

- Negotiations with the creditor constituencies being at an impasse, and

- Most importantly, a shrinking collateral base to provide recovery for the estates' constituents, or at a minimum, to protect the Prepetition Senior Lenders' secured position.

2.      Clearly, the Prepetition Senior Lenders prefer that the business remain a going concern, otherwise considerable value to all creditor constituencies would be lost. However, they object to the proposed terms and conditions in this third request for use of cash collateral, and ask that the duration of any usage be limited in duration and scope, and that financial covenants and benchmarks be implemented to protect the creditors' respective downside risk should the case posture deteriorate further.  Each of the foregoing "asks" by the Prepetition Senior Lenders provides incentive for these cases to progress and for the parties to develop realistic options for an ultimate conclusion.  Accordingly, the Prepetition Senior Lenders make this limited objection to the Cash Collateral Motion.

### Background Facts

3.      Prior to the Commencement Date, the Prepetition Senior Lenders made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, forbearance agreements and discretionary funding letters executed by any Debtor and any Other Documents (as defined

in each of the Credit Agreement (defined below) and the Loan Agreement (defined below), the "Prepetition Senior Lender Loan Documents"):

      (a)    that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent; and

      (b)    that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as lenders, the "Prepetition Term Lenders").

    4.    The Revolver Agent and Term Loan Agent are referred to collectively herein as the "Agents."  Any capitalized terms not defined herein shall have the meanings ascribed to them in the Prepetition Senior Lender Loan Documents or the Cash Collateral Order (as defined below), as applicable.

5.      On April 17, 2008, this Court entered that certain *Final Order Pursuant To Bankruptcy Code Sections 105, 361, 362, 363, & 364 (i) Authorizing Debtors To Use Cash Collateral, (ii) Granting Adequate Protection To Prepetition Secured Lenders, and (iii) Authorizing Postpetition Financing* (the "<u>First Cash Collateral Order</u>"), whereby the Prepetition Senior Lenders consented to the use of their Cash Collateral (as defined in the First Cash Collateral Order) subject to certain conditions.  Chief among those conditions is that the Debtors' confirm and consummate a plan of reorganization that provides for the indefeasible payment in full of the obligations to the Prepetition Senior Lenders within three hundred thirty (330) days of the Commencement Date, i.e. February 25, 2009 (the "<u>Cash Collateral Deadline</u>"). (Cash Collateral Order, ¶ 11(viii).)

6.      To date, the Debtors have developed their proposed plan (the "<u>Proposed Plan</u>"), and the accompanying disclosure statement (the "<u>Proposed Disclosure Statement</u>"). Unfortunately, such progress has come to a grinding halt, as the Debtors were unable to obtain exit financing.  As a result, the hearing (the "<u>Disclosure Statement Hearing</u>") regarding the adequacy of the Proposed Disclosure Statement has been adjourned numerous times to allow the Debtors to, among other things, make progress with respect to obtaining exit financing. Ultimately, the Debtors have not produced exit financing and the Disclosure Statement Hearing has been adjourned indefinitely.

7.      In addition, certain financial covenants were included in the First Cash Collateral Order, including the requirement to meet net sales of at least 90% of the forecasted amounts in the applicable budgets, measured from the beginning of the case through the relevant measuring date (the "<u>Original Net Sales Threshold</u>").[2]  For the period from April 2, 2008 through February

---

[2] Section 11(vii) of the Cash Collateral Order provides, in relevant part:

6, 2009, cumulative net sales were below the Original Net Sales Threshold (10.6% below the budgeted forecast).  Accordingly, a Termination Event occurred, the Debtors are in default of the First Cash Collateral Order (the "Original Net Sales Default"), and the Prepetition Senior Lenders, by letter dated February 12, 2009, provided notice of same and reserved any and all rights stemming from such default.

### The Second Cash Collateral Motion and Order

8.      Previously on February 2, 2009, the Debtors filed their *Debtors' Motion For Authorization, Pursuant To 11 U.S.C. §§ 105, 361, 362 and 363(c), For Continued Use of Cash Collateral* ( the "Second Cash Collateral Motion"), whereby they sought continued use of Cash Collateral through December 31, 2009, or an extension of three hundred ten (310) days from the previous agreed-upon Cash Collateral Deadline.  The Prepetition Senior Lenders did not oppose use of Cash Collateral outright but sought to impose a shorter extension on tighter restrictions, as well as explore all possible exit scenarios from bankruptcy, including sale of non-core assets and business lines, as well as a marketing process for the medical division.

9.      At the combined hearings on the Second Cash Collateral Motion and the Debtor's motion for extension of exclusivity (the "February Hearings"), management for the Debtors testified (i) regarding exit financing prospects, that a term sheet was due to be received from a prospective exit lender within the first week of March; and (ii) regarding the operational restructuring of the connector seals business, that the Debtors could deliver transition agreements and long-term contract commitments from the bulk of its customers by the middle of March,

---

With respect to the use of Cash Collateral hereunder, each of the following shall constitute a "Termination Event":

…

(vii) if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four-week period thereafter, net sales are less than 90% of the net sales reflected in the Budget or any New Budget…

2009. No such exit financing prospects have been tendered to the Prepetition Senior Lenders or even been discussed by the Debtors since the February Hearings.

10.     At the conclusion of the February Hearings, the Court approved use of Cash Collateral for 13 weeks through May 22, 2009, instructed the parties to negotiate a form of order to include certain benchmarks and covenants for such usage, and instructed the parties to attend mediation. Regarding the connector seals restructuring, the Debtors' negotiated for a deadline of March 31, 2009 (instead of the mid-March timing it indicated to the Court) to deliver the transition and long-term contracts. On March 4, 2009, the Court entered that certain *Order Pursuant To Bankruptcy Code Sections 105(A), 361, 362, And 363 (I) Authorizing Debtors To Use Cash Collateral And (Ii) Granting Adequate Protection To Prepetition Secured Lenders* (the "Second Cash Collateral Order"), whereby the Debtors agreed to, among other things, meet certain benchmarks in connection with the Connector Seals Consolidation (as defined in the Second Cash Collateral Order), maintain certain cash levels, and meet certain net sales thresholds.

11.     For instance, Section 9 of the Second Cash Collateral Order[3] required a certain

---

[3] Section 9 of the Second Cash Collateral Order provides:

The Debtors operational restructuring of their connector seals business (the "Connector Seals Consolidation") is subject to the following benchmarks, with written evidence of compliance to be provided to the Agents within two (2) business days of the listed dates for each benchmark, subject to any variances to which the Debtors, Revolver Agent, and Term Loan Agent may agree:

(i)     On or before March 31, 2009, the Debtors shall obtain transitional and long term contracts (2 years or longer) with customers covering at least sixty percent (60%) of the Debtors' projected sales for the connector seals business for 2010;

(ii)     the transitional agreements shall provide aggregate revenues of not less than $900,000 on payment terms not to exceed net thirty (30) days;

(iii)     at least 90% of the "inventory banks" for the Connector Seals Consolidation shall be completed by May 31, 2009; and

volume of transition and long-term contracts from connector seals customers to be obtained by March 31, 2009.  The Debtors failed to meet such benchmark, eventually providing evidence of such contracts with three customers making up approximately fifty-one percent (51%) of the threshold amount (rather than 60%).  In addition, the Agents have calculated the revenue level from such transition agreements to be less than half of the required amount, or approximately three hundred eighty five thousand ($385,000) rather than $900,000.  Accordingly, a Termination Event occurred, the Debtors are in default of the Second Cash Collateral Order (the "Connector Seals Defaults"), and the Prepetition Senior Lenders provided notice of same and reserved, by letter dated April 3, 2009, any and all rights stemming from such defaults.

12.    In addition, Section 13(vii) of the Second Cash Collateral Order relaxed the Original Net Sales Threshold to eighty-five percent (85%) (the "Relaxed Net Sales Threshold") rather than ninety percent (90%).  As indicated on the Debtors' most recent Compliance Certificate, dated May 6, 2009 (a true and correct copy of which is annexed hereto as Exhibit A), cumulative net sales for the period from April 2, 2008 through May 1, 2009 were below the Relaxed Net Sales Threshold (15.7% below the budgeted forecast).  Accordingly, a Termination Event occurred, the Debtors are in default of the Second Cash Collateral Order (the "Second Net Sales Default"), and the Prepetition Senior Lenders provided notice of same and reserved, by letter dated May 14, 2009, any and all rights stemming from such default.

13.    It should also be noted that the Debtors' exclusive period to file a plan expired on April 30, 2009, and its exclusive solicitation period is currently scheduled to expire on June 1, 2009.

---

(iv)    the closure of the Vienna, Ohio facility shall be substantially completed by June 30, 2009.

## Prepetition Senior Lender's Limited Objection

14.     Section 363(c)(2)(A) requires consent by the Prepetition Senior Lenders in order

for the Debtors to use Cash Collateral.  Non-consensual use may be granted so long as the

Debtors provide the Prepetition Senior Lenders with adequate protection of their interests in the

Cash Collateral.  11 U.S.C. § 363(c)(2)(B) & 363(e).  It is axiomatic that adequate protection is

determined on a case by case basis.

15.     At the outset, the Prepetition Senior Lenders stress that they do not oppose an

extension of the use of Cash Collateral per se, but object to several significant features of the

current request, including without limitation: the duration of the current request and the lack of

adequate controls to monitor the Debtors' precarious financial situation.  Based on the facts and

circumstances of this case, the Prepetition Senior Lenders propose the following terms and

conditions be placed on the Debtors for any further use of Cash Collateral beyond May 22, 2009:

(a)     the duration of any extension should be limited to eight (8) weeks at the

most, to allow completion of the mediation process and the Connector Seals

Consolidation (subject to reasonable benchmarks being implemented and reasonable

required results of the consolidation), pursuit of exit financing or some other exit strategy

for the Proposed Plan (the Debtors have recently indicated that they are pursuing a capital

infusion from a third-party);

(b)     additional financial covenants and benchmarks should be implemented

that protect against the further decline of the creditors' position in these cases, including,

for example, instant visibility into the pursuit for exit financing and/or an exit transaction

involving an infusion of capital, including without limitation detailed weekly written

updates of the status of the process (including potential bids, offers, names of interested

parties, expressions of offers, etc.), and financial covenants consistent in scope to those in

the Second Cash Collateral Order and pegged to the Debtors' proposed budget; and

(c)        payment of the Prepetition Senior Lenders' fees and expenses, including

without limitation certain fees and expenses incurred in connection with the February

Hearings.

16.        The need for such limited duration, exploration of all available options, and

tightened controls are supported by five grounds:  (i) deterioration of the collateral base of the

estate, the liquidation value of which is quickly reaching a critical point; (ii) the Debtors'

precipitous percentage decline in total enterprise value[4] since the commencement of these cases;

(iii) the Debtors' deteriorating financial performance, as reflected in the Original Net Sales

Default and the Second Net Sales Default and the Debtors' declining cash levels since the

commencement of these cases, (iv) the Debtors' demonstrated historical inability to meet

benchmarks, promised outcomes, and other milestones in these cases, including a languid pursuit

of the mediation process; and (v) lack of any current prospects for an exit facility, as evidenced

by the recent indication from the Debtors that they are now pursuing a capital infusion as

opposed to an exit loan arrangement.

17        In support of this objection, the Prepetition Senior Lenders anticipate that they

will rely on the expert report and testimony of Dean R. Vomero, of Bridge Associates LLC.  Mr.

Vomero is familiar with the Debtors' business operations and financial condition, as he has

served as consultant to the Agents with respect to the Debtors both before and after the

---

[4] The Prepetition Senior Lenders do not assert that total enterprise value is the proper or only measure for
determining adequate protection of their interest, and are simply using such measure to illustrate the percentage
decline of total enterprise value and associated trends.  Moreover, the Prepetition Senior Lenders expressly reserve
any and all rights to argue that other methodologies are the proper measure for any adequate protection
determination, confirmation, or any other issue in these cases.

commencement of these cases. In addition, Mr. Vomero has analyzed certain financial and other relevant information in connection with the Second Cash Collateral Motion and this Third Cash Collateral Motion.

18.    As will be supported by the Prepetition Senior Lenders' proposed expert, (i) the value of the Prepetition Senior Lenders' Collateral has declined to a critical point; and (ii) as illustrated at the February Hearings, the Debtors' total enterprise value has declined precipitously since the beginning of these cases, and such trend has not changed since the February Hearings. Thus, the Prepetition Senior Lenders seek adequate financial covenants and benchmarks in any order extending use of Cash Collateral to protect against a further rapid decline in collateral value below the Prepetition Senior Lenders' claim amounts. Against the backdrop of extended shut-downs at General Motors and Chrysler, as well as the continued uncertainty in the auto sector, an upward trend in values does not appear to be imminent.

19.    The Debtors' cash position in the proposed budget remains at similar levels to the previous budget, however, the Prepetition Senior Lender's Collateral base has shrunk and will continue to shrink with the Connector Seals Consolidation, increasing the risk levels associated with such cash levels. In addition, there are significant reorganization expenses incurred in connection with the February Hearings that need to be explored with respect to their impact on the overall cash position of the Debtors. For instance, the Debtor's characterization of their cash position as of April 30, 2009 does not appear to account for such expenses and the Debtors should explain whether this revised budget reflects such payments.

20.    In connection with the Second Cash Collateral Motion, the Debtors promised but failed to deliver :

- the required volume of transition and long-term contracts (both in terms of projected future sales as well as short term revenue benefits in connection with the Connector Seals Consolidation), resulting in the Connector Seals Defaults

- the required level of cumulative net sales despite having negotiated the Relaxed Net Sales Threshold, resulting in the Second Net Sales Default.

The Debtors also indicated at the February Hearings that a term sheet from a prospective lender was forthcoming (indicated to be delivered within a week or two after the February Hearings). Such term sheet was never delivered to the Agents.

21.    In addition, the Debtors appear to be backing away from commitments with respect to the Connector Seals Consolidation, as certain timing commitments agreed to in the Second Cash Collateral Order are not present in the proposed order for the Third Cash Collateral Motion.  In fact, the proposed order does not include the requirement of completion of inventory banks by May 31 (Section 9(iii) of the Second Cash Collateral Order) and the closure of the Vienna facility by June 30, 2009 (Section 9(iv) of the Second Cash Collateral Order).

22.    Furthermore, the Debtors have not taken the Court's concerns regarding the need for quick mediation, as the mediator was not chosen until three weeks following the February Hearings, the first substantive meeting with the mediator did not take place until April 13, 2009, and the second follow-up meeting did not take place until April 29, 2009.  It is unclear where the mediation stands, but it has not progressed in accord with the Court's desire for an accelerated process.  To date, the mediation has not involved the Prepetition Senior Lenders at all (except for having identified the agreed-upon mediator), as the initial stages of the mediation have not produced any resolution between the committee and the Debtors that warrants exploration with the Prepetition Senior Lenders.

23.    In light of the Debtors' lack of prospects for exit financing or some other exit transaction, further time and expense in chapter 11 is a risk that the Prepetition Senior Lenders

and other constituents of the Debtors' estates cannot tolerate without timely and clear visibility, as well as tight controls on the use of Cash Collateral.  As the Collateral base shrinks, the potential for a successful exit from chapter 11 becomes less and less likely.  It is that unfortunate scenario against which the Prepetition Lenders are compelled to protect, and accordingly object to the Third Cash Collateral Motion as set forth herein.  In the meantime, the Prepetition Senior Lenders will continue to explore their options for resolution of these cases.

**Response to Specific Allegations in the Third Cash Collateral Motion**

24.    Finally, some of the Debtors' characterizations of the Prepetition Senior Lenders and the Debtors' financial condition in the Third Cash Collateral Motion are misleading or simply untrue.

25.    The Debtors claim that the Prepetition Senior Lenders "rejected [a] request" for a consensual extension of the Cash Collateral Deadline.  (Third Cash Collateral Motion, ¶ 8.) However, as the Debtor describe, the Debtors "inquired whether the Prepetition Senior Lenders would consent to an extension"  (Third Cash Collateral Motion, ¶ 8), but did not deliver any concrete proposals, budget, or other items that could form the basis of an analysis in light of the Debtor's burden to obtain further use of cash.  Only after the Court's chambers conference on the Third Cash Collateral Motion did the Debtors even produce the Budget.

26.    The Debtors assert that "the lenders are oversecured, adequately protected, and unable to demonstrate that the value of the collateral is declining." (Third Cash Collateral Motion, ¶ 10.)  The Prepetition Senior Lenders can clearly demonstrate that such value has declined substantially, as the Debtors most recent borrowing base certificate, dated May 1, 2009, shows that the Debtor is now out of formula (i.e. "overadvanced") by $6.7 million against

accounts receivable and inventory, a negative condition which did not exist at the commencement of these proceedings.

27.     At the end of paragraph 10, the Debtors somehow claim that because the Debtors have made all regular payments… "The lenders thus have what amounts to a fully performing loan." No statement could be further from the truth. Even though the principal balance of the loans has amortized by $3.2 million during the cases, the value of the Collateral has declined by a substantially greater amount. As stated above, the $6.7 million out-of-formula condition of the current assets under the Credit Agreement suggests the value of the Collateral has declined substantially. The Debtors are not in compliance with the terms of the Cash Collateral Order or the Second Cash Collateral Order, and are not generating operating cash flow sufficient to cover its fixed charges (principal, interest and capital expenditures) on a trailing 12-month basis. All these conditions severely undercut the Debtors's contention that the Prepetition Senior Lenders have a fully performing loan.

28.     Moreover, the Debtors contend that they "…continue to generate positive cash flow through the performance of their business lines that are not heavily dependent on the OEM sector." (Third Cash Collateral Motion, ¶ 12.) By the Agents' calculations, this assertion is specious. For the last 12 months ended March 31, 2009, the Debtors have generated Adjusted EBITDA of $6.7 million (before reported restructuring expenses), versus principal, interest and capital expenditures totaling $8.0 million, resulting in **negative** cash flow of -$1.3 million.

## Reservation of Rights

29.     The Prepetition Senior Lenders reserve the right to amend, supplement, or withdraw this objection prior to or at the hearing on the Third Cash Collateral Motion, and

reserve the right to oppose the Third Cash Collateral Motion at the hearing on any grounds

whatsoever, whether or not contained in this objection or any amendment or supplement hereto.

Based on the foregoing, the Agents object to the Third Cash Collateral Motion and urge

the Court to deny further use of Cash Collateral except on the grounds set forth herein, and not to

enter the proposed order.

Respectfully submitted:

WALLER LANSDEN DORTCH & DAVIS LLP

*/s/Robert J. Welhoelter*
John C. Tishler (*Pro Hac Vice*)
Robert J. Welhoelter (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com
Email: Robert.Welhoelter@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP

*/s/Aaron R. Cahn*
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for Senior Prepetition Lenders*

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing pleading was served by email and/or hand delivery, upon the following parties in accordance with that certain *Notice of the Debtors' Motion for Authorization, Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363(c), For Continued Use of Cash Collateral* on this the 15th day of May, 2009.

Lexington Precision Corporation
(Attn: Michael A. Lubin)
800 Third Avenue, 15th Floor
New York, New York 10023

Weil, Gotshal & Manges, LLP
(Attn: Adam Strochak)
767 Fifth Avenue
New York, New York 10153

Office of the United States Trustee for the Southern District of New York
(Attn: Paul Schwartzberg)
33 Whitehall Street
New York, New York 10004

Andrews Kurth LLP
(Attn: Paul Silverstein)
450 Lexington Avenue
New York, New York 10017

O'Melveny & Meyers, LLP
(Attn: Gerald Bender)
Times Square Tower
7 Times Square
New York, New York 10036

I hereby further certify that a hard copy of same was delivered by hand delivery to Judge Glenn's chambers.

*/s/Aaron R. Cahn*
Aaron R. Cahn