WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
LEXINGTON PRECISION CORP., et al.,  :    08-11153 (MG)
                                    :
           Debtors.                 :    (Jointly Administered)
                                    :
-------------------------------------------------------------x
```

**NOTICE OF DEBTORS' MOTION, PURSUANT TO
SECTIONS 105(a), 362, AND 364(c)(2) OF THE BANKRUPTCY CODE, FOR
AUTHORIZATION TO INCUR SECURED DEBT FROM WESTFIELD BANK, FSB
FOR THE PURPOSE OF FINANCING THE DEBTORS' INSURANCE PREMIUMS
FOR WORKMEN'S COMPENSATION LIABILITY, EMPLOYMENT PRACTICES
LIABILITY, UMBRELLA LIABILITY, AND EXCESS UMBRELLA LIABILITY**

PLEASE TAKE NOTICE that Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (together, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases, filed a motion, dated July 10, 2009 (the "Motion"), pursuant to sections 105(a), 362, and 364(c)(2) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), authorizing the incurrence of secured debt for the purpose of financing certain insurance premiums of the Debtors, all as more fully described in the Motion.

PLEASE TAKE FURTHER NOTICE that any objections or responses to the Motion, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and (c) set forth the name of the objecting party, the basis for the objection, and specific grounds therefore.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be filed with the Bankruptcy Court no later than **July 23, 2009 at 4:00 p.m. (Pprevailing Eastern Time)**.  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

PLEASE TAKE FURTHER NOTICE that all objections and responses must be served, so as to be received no later than **July 23, 2009, at 4:00 p.m. (Prevailing Eastern Time)**, upon:  (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Adam P. Strochak and John W. Lucas); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (d) attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn:  John C. Tishler); (e) attorneys for the statutory creditors' committee, Andrews Kurth LLP, 450 Lexington Avenue,

New York, New York 10017 (Attn: Paul Silverstein); and (f) attorneys for Debtors' postpetition

lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New

York 10036 (Attn: Gerald Bender).

PLEASE TAKE FURTHER NOTICE that a hearing to consider the relief

requested in the Motion shall be held before the Honorable Martin Glenn, United States

Bankruptcy Judge, on **July 30, 2009 at 2:00 p.m**. **(Prevailing Eastern Time)**, at the United

States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York,

New York 10004 or as soon thereafter as counsel may be heard.

Dated: July 10, 2009
      New York, New York

                    /s/ Adam P. Strochak
                    Richard P. Krasnow
                    Adam P. Strochak

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone:    (212) 310-8000
                    Facsimile:    (212) 310-8007

                    Attorneys for Debtors
                    and Debtors in Possession

Hearing Date: July 30, 2009 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: July 23, 2009 at 4:00 p.m. (prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | **08-11153 (MG)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

**MOTION OF THE DEBTORS, PURSUANT TO SECTIONS 105(A), 362,**
**AND 364(c)(2) OF THE BANKRUPTCY CODE, FOR AUTHORIZATION**
**TO INCUR SECURED DEBT FROM WESTFIELD BANK, FSB FOR THE**
**PURPOSE OF FINANCING THE DEBTORS' INSURANCE PREMIUMS FOR**
**THEIR WORKMEN'S COMPENSATION LIABILITY, EMPLOYMENT PRACTICES**
**LIABILITY, UMBRELLA LIABILITY, AND EXCESS UMBRELLA LIABILITY**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), respectfully represent:

**Background**

        1.      On April 1, 2008 (the "Commencement Date"), each of the Debtors

commenced with this Court a voluntary case under the Bankruptcy Code.  Sections 1107(a) and

1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and

manage their properties as debtors in possession.

2.      The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On April 11, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of creditors (the "Creditors' Committee").

3.      Lexington is one of North America's leading manufacturers of rubber components for the automotive and medical device industries.  Lexington operates through two business divisions—the Rubber Group and the Metals Group.  Lexington's products are component parts and its primary customers are other manufacturers.

4.      The Rubber Group serves three principal markets.  Connector seal products are used in primary wire harnesses and sold mostly to companies which supply parts to original equipment manufacturers ("OEMs") in the automotive industry.  The connector seals business thus is sensitive to production levels in the North American automotive OEM industry.  Insulator products are used in ignition wire sets and the primary purchasers of these products are replacement parts suppliers to the automotive aftermarket segment, although Lexington also sells some insulators to the OEM segment.  The insulators business thus is less sensitive to OEM production levels.  The Rubber Group also manufactures and sells high-precision rubber components used in a variety of medical devices, including drug delivery systems, syringes, laparoscopic instruments, and catheters; these parts are sold to some of the world's largest medical device manufacturers.

5.      The Metals Group manufactures high-volume aluminum, brass, steel, and stainless steel components machined from bars, forgings, and cold-headed blanks primarily for manufacturers within the OEM automotive industry.  These components are used in many

applications, including heating and cooling systems, airbag systems, solenoids, switches, and valves.

6.    Lexington is headquartered in New York, New York, and maintains manufacturing plants in New York, Georgia, Ohio, and South Carolina.  As of March 31, 2009, Lexington had approximately 480 employees, of which 114 are salaried employees and 366 are hourly employees.

## Jurisdiction

7.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.    The Debtor are seeking authorization, pursuant to sections 105(a), 362, and 364(c)(2) of the Bankruptcy Code, to incur secured debt from Westfield Bank, FSB ("Westfield") for the purpose of financing the Debtors' premiums for their workmen's compensation liability, employment practices, fiduciary, crime and kidnap & ransom liability, umbrella liability, and excess umbrella liability policies.

## The Policies

9.    The Court authorized the Debtors to maintain and continue their insurance coverage and any and all necessary renewals and replacements thereof, in the ordinary course of business by order dated April 22, 2008 [Docket No. 80] (the "Insurance Order").

10.    In accordance with the Insurance Order, the Debtors purchased one-year insurance policies for workmen's compensation liability, employment practices, fiduciary, crime and kidnap & ransom liability, umbrella liability, and excess umbrella liability insurance (the "Policies") from AIG Casualty Company, Chubb Group of Insurance Companies, Fireman's

Fund Insurance Company of Ohio, and Chubb Group of Insurance Companies, respectively (collectively, the "Insurers").

11.    The Debtors' insurance program expired on July 1, 2009 and in anticipation of the expiration, the Debtors negotiated renewal terms with the Insurers.  The insurance premiums for the renewal of the Policies are in the aggregate approximately $830,000 (the "Insurance Premiums"), which the Debtors are authorized to pay pursuant to the Insurance Order.  The Insurance Premiums consist of:  (i) workmen's compensation liability insurance for an annual premium of $709,412, (ii) employment practices, fiduciary, crime and kidnap & ransom liability insurance for an annual premium of $55,000, (iii) umbrella liability insurance for an annual premium of $38,609, and (iv) excess umbrella liability insurance for an annual premium of $28,785.

12.    The Policies have been renewed and are in place subject to the down payment that will be made on or before July 30, 2009 and the first premium finance installment upon approval of this Motion.

**Financing of the Policies**

13.    In the exercise of their business judgment, the Debtors determined that it would be prudent to conserve liquidity and, as is typical in this and other industries, and consistent with the Debtors' past practices, to finance the payment of the Insurance Premiums. Indeed, the Debtors entered into a similar agreement for renewal of prior insurance policies in 2006 and 2007.  Accordingly, this Motion seeks authorization to enter into a standard premium financing agreement, secured by liens on the policies and their proceeds, to finance $623,854.50, or approximately seventy-five percent (75%) of the total premium.

14.      Subject to the Court's approval, the Debtors are permitted to incur secured debt for the purpose of financing their insurance premiums pursuant to (a) the Third Order Pursuant To Bankruptcy Code Sections 105(a), 361, 362, and 363 (I) Authorizing Debtors To Use Cash Collateral and (II) Granting Adequate Protection To Prepetition Secured Lenders, date May 20, 2009 [Docket No. 634] (the "Cash Collateral Order") and (b) sections 4.11 and 7.3(h) of the Credit Agreement (as defined under the Cash Collateral Order) and Loan Agreement (as defined under the Cash Collateral Order).

15.      Paragraph 11(ii)(x) of the Cash Collateral Order provides that the liens granted to the Prepetition Secured Lenders under the Cash Collateral Order do not include any property granted as security to an Insurance Premium Finance Party (as defined in the Cash Collateral Order).  The Cash Collateral Order also provides that a security interest granted for insurance premium financing must not prime or impair any of the liens held by the Debtors' Prepetition Secured Lenders and must not exceed $800,000 at any one time.  Here, the Security Interests will not prime or impair the Prepetition Secured Lender's liens and the indebtedness is less than $800,000.

16.      It is not possible to obtain insurance premium financing on an unsecured basis.  Accordingly, the Debtors have engaged in discussions with Westfield to negotiate the terms of the financing of the Insurance Premiums on a secured basis.  The Debtors and Westfield expect to enter into a commercial premium finance agreement (the "Financing Agreement") pursuant to which Westfield will finance the aggregate amount of Insurance Premiums payable by the Debtors pursuant to the Policies on a secured basis.  A copy of the Financing Agreement is annexed hereto as Exhibit A.

17.     Pursuant to the terms of the Financing Agreement, the Debtors propose to finance the Insurance Premiums as follows: (i) the Debtors will make a cash down payment of $207,951.50 on or before July 30, 2009 and (ii) an aggregate financed amount of $623,854.50 (the "Financed Amount"), which includes a finance charge equal to an annual percentage rate of interest of 4.999%, will be payable in nine (9) equal monthly installment payments, each in the approximate amount of $70,774, with the initial monthly payment due upon approval of this motion.

18.     The Debtors understand that, as a condition to the financing of the Policies, the Debtors will be required to grant Westfield a security interest in the Policies (the "Security Interest").  The Security Interest will extend to all unearned Insurance Premiums which may become payable under the Policies and loss payments which reduce the unearned Insurance Premiums subject to any mortgagee or loss payee interests (collectively, the "Collateral").

19.     The Debtors have been advised that Westfield's willingness to finance the Insurance Premiums will be expressly conditioned upon entry of an order of the Court that: (i) approves the Debtors' entry into, and payment of all sums due under, the Financing Agreement and approves the grant of the Security Interest; (ii) provides for prospective relief from the automatic stay imposed pursuant to section 362 of the Bankruptcy Code with respect to the Collateral in the event that the Debtors default on a payment due under the Financing Agreement; and (iii) permits Westfield to cancel the Policies financed in the event of such default (after giving notice required by applicable state law) and apply any unearned premiums due under the Policies to any amount owed by the Debtors to Westfield without further application to the Court.

20.    Westfield is insisting on the inclusion of these provisions in an order entered by the Court because the value of its collateral, *i.e.*, the unearned insurance premiums, will decrease each day that the Policies are in effect.  Consequently, upon default under a financing agreement, Westfield is likely to assert it must be able to cancel the Policies without further court action.

**Cause Exists to Allow the Debtors to Enter Into A Financing Agreement and
Authorize the Debtors to Grant a Security Interest Outside the Ordinary Course**

21.    Pursuant to section 364(c)(2) of the Bankruptcy Code, the Debtors are required to obtain Court approval to obtain credit "secured by a lien on property of the estate that is not otherwise subject to a lien."  11 U.S.C. § 364(c)(2).

22.    It is common and accepted business practice for insurance premium finance companies, such as Westfield, to require the borrower to grant a security interest in the insurance policies financed in exchange for the financing provided.  In light of the importance of both maintaining insurance coverage with respect to business activities and preserving the Debtors' cash flow, the Debtors believe that it is in their best interests, and in the best interests of their creditors and all parties in interest, for the Court to approve the financing of the Insurance Premiums by allowing the Debtors to enter into a financing agreement with Westfield consistent with the terms of Westfield's financing proposal, as described herein.

23.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## <u>Notice</u>

24.     No trustee or examiner has been appointed in these chapter 11 cases.

Notice of this motion has been provided to (i) the United States Trustee for the Southern District

of New York, (ii) the attorneys for the agents for the Debtors' Prepetition Lenders, (iii) the

attorneys for the Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee,

and (v) all other parties that have requested notice in these chapter 11 cases.  The Debtors submit

that no other or further notice need be provided.

WHEREFORE the Debtors respectfully request entry of an order (i) authorizing

the Debtors, pursuant to section 364(c)(2) of the Bankruptcy Code to (a) incur secured debt from

Westfield for the purpose of financing the Insurance Premiums, and (b) take such actions as may

be reasonably necessary to enter into, implement and effectuate the terms and conditions of any

financing agreement with Westfield containing terms substantially similar to those discussed

herein, and (ii) granting to the Debtors such other and further relief as the Court may deem just

and appropriate.

Dated:  July 10, 2009
        New York, New York

                                    /s/ Adam P. Strochak
                                    Richard P. Krasnow
                                    Adam P. Strochak

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone:    (212) 310-8000
                                    Facsimile:     (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

# EXHIBIT A

**(Financing Agreement)**

Pg 13 of 22

## COMMERCIAL INSURANCE PREMIUM NOTE AND SECURITY AGREEMENT

**Repayment Terms:** For value received, the undersigned ("Insured"), promises to pay to the order of **WESTFIELD BANK, FSB,** Two Park Circle, Westfield Center, OH 44251 ("Bank"), the principal sum of $ _____ 623,854.50 _____ plus interest at the rate of _4.999_ % on the principal sum outstanding from time to time, commencing on _7/30/2009_ , and continuing on the same day of each month thereafter until paid in full. The total payments to be paid to Bank include a processing fee of $50.

**Security for Payment:** The Insured assigns to Bank, as security for payment of amounts due hereunder, all sums payable to the Insured relating to the policies listed on page three (3) (the "Policies"), including, among other things, any payment on account of loss or any return premiums and gross unearned premiums. In addition, Insured grants a security interest in all deposit accounts maintained with Bank and Bank's affiliates.

| Agency | | Insured (Legal Name) (Trade Name) | |
|---|---|---|---|
| Name: | Leonard Insurance Services Agency, Inc. | Name: | Lexington Precision Corporation |
| Address: | 4244 Mt. Pleasant Street, Nw | Address: | 30195 Chagrin Blvd., Suite 208W |
| P.O. Box: | | P.O. Box: | |
| City, State, Zip: | North Canton   OH   44720 | City, State, Zip: | Cleveland   OH   44124 |
| Phone: | (330) 266-1904 | Phone: | (216) 591-1070 |
| Fax: | (330) 498-9952 | Fax: | |
| Bank Agency Code: A00032 | | Federal Tax ID Number: | |

Payments:                                                                                                          **Quote Number:103887**

A Cash Down Payment of _____ 207,951.50 shall be paid according to the terms within. Payments of $ _70,774.54_ shall be made Monthly.

Number of Payments: _9_   First Payment Due: _7/30/2009_ . Subsequent Payments are due on the same day of each succeeding month.

☐ If this box is checked, all payments shall be automatically debited from the Insured's depository account _____ ,routing _____ on the payment due date.

Security Interest:   Insured is granting a security interest in the Policies to Bank.

Late Charge:  Upon default in payment of any installment ten days or more, Insured will pay a late charge of 5% of the delinquent installment or $50.00, whichever amount is greater, except that such charge shall be limited to the largest amount allowable under applicable law.

Prepayment:  If Insured prepays the full amount due hereunder, Insured shall pay a prepayment fee equal to 5% of the total outstanding note balance.

Assumption:  The obligation under this loan cannot be assumed without written permission of Bank.

### TERMS AND CONDITIONS

1. In consideration of the payment by Bank of the Amount Financed, Insured agrees to pay the Cash Down Payment to the insurance agency listed above ("Agency") and to pay Bank the Payments in accordance with the terms of this Commercial Insurance Premium Note and Security Agreement. Insured hereby authorizes Bank to disburse the loan proceeds to the Agency, to a general agent or broker, or directly to the Insurance Company(ies) listed on the schedule of Policies, as determenied by the bank.
2. An Event of Default occurs when: (i) the Insured does not pay any installment according to the terms of this Agreement or does not otherwise comply with the terms of this Agreement; (ii) any of the Policies is cancelled for any reason; or (iii) a proceeding in bankruptcy, receivership, or insolvency is instituted by or against Insured. When an Event of Default occurs and Bank provides any notice required by applicable law, all amounts due hereunder become immediately due and payable. Bank may also pursue the following remedies and any other remedy permitted it under applicable law:
   a. After providing 15 days notice to Insured, or as otherwise required by law, Bank may cancel the Policies and collect any gross unearned premiums or other amounts payable under the Policies.
   b. Bank may take all necessary actions to enforce payment of this debt. To the extent not limited by law, Bank is entitled to all collection costs and expenses incurred to enforce its rights hereunder and to reasonable attorneys' fees.
   c. After cancellation, Insured shall pay interest at the rate of 21% on the entire unpaid note balance as of the scheduled due date of the first delinquent payment leading to cancellation.
3. Insured hereby appoints Bank, upon the occurrence of an Event of Default, its irrevocable attorney in fact, with full power of substitution, which attorney in fact shall be coupled with an interest, with full authority, after notice has been mailed as required by law, to cancel the Policies and to receive any unearned premium or other amounts with respect to the Policies and to sign any check or draft issued therefor in Insured's name and to direct the insurance companies to make said check or draft payable to Bank.
4. Insured agrees not to assign the Policies except for the interests of mortgagees or loss payees without the prior written consent of Bank. Bank may assign or negotiate this Agreement without Insured's consent, and all Bank's rights hereunder shall inure to Bank's successors and assigns.
5. The Agency is not an agent of Bank and cannot bind Bank. Bank is not the agent of any insurer and is not liable for any insurer's act or omission. Insured's obligations under this Agreement shall not be relieved or diminished by any such act or omission.
6. Insured warrants that the proceeds of the loan contemplated herein will be used to purchase insurance for other than personal, family, agricultural or household purposes and that all information provided Bank or Agency in connection with this loan is true, correct, complete and not misleading.
7. Insured agrees to cooperate fully with Bank in executing additional instruments, documents, financing statements, and the like as may be deemed necessary or advisable by Bank in order to maintain and continue the security interest created by this Agreement. If automatic debit of payments has been selected by [checking the relevant box on page 1,] Insured hereby specifically authorizes Bank to automatically debit payments due hereunder as described in the Payment Schedule above and also agrees to execute any document Bank deems necessary in order for Bank to be authorized to automatically debit such payments.
8. Insured agrees to pay promptly any additional premiums assessed on the Policies by any insurer. Insured agrees to pay Bank a cancellation charge of $10.00 in the event Bank cancels any one or more of the Policies. Insured also agrees to pay a fee of $10.00 in the event any request by Bank to automatically debit Insured's account listed above is denied or any check Bank may accept from Insured is dishonored.

9. Insured agrees that any payments made and accepted after Policy cancellation shall not constitute reinstatement or obligate Bank to request reinstatement of the Policies, and Insured acknowledges that Bank has no authority to reinstate coverage, and that such payments may be applied to Insured's indebtedness hereunder.

**10. Neither Bank nor its assignee shall be liable for any loss or damage to the Insured by reason of failure of any insurance company to issue or maintain in force any of the Policies or by reason of the exercise by Bank or its assignee of the rights conferred herein. In no event will Bank be responsible to Insured or Agency for lost profits or for any special, indirect, incidental or consequential damages which Insured, Agency or any third party may incur arising out of or related to this Agreement, even if Bank has been advised of the possibility of such damages.**

11. Insured represents and warrants that the execution and performance of this Agreement are within its respective corporate or organizational powers, have been duly authorized by all necessary requisite actions, do not contravene any governmental or contractual restrictions binding upon such party, and that this Agreement is valid, binding and legally enforceable in accordance with its terms. Insured's signatory, by signing below, represents that he/she is duly authorized and has full authority to sign for Insured.

12. Insured represents and warrants that no proceeding in bankruptcy, receivership or insolvency has been or will be instituted by or against Insured, or, if Insured is the subject of such a proceeding, it is noted on this Agreement in the space in which Insured's name and address is placed.

13. This Agreement shall have no force or effect until accepted by Bank. The Bank shall be deemed to accept this Agreement only upon complete funding of the Amount Financed. All rights and remedies in this Agreement are cumulative and not exclusive. If any part of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement shall continue to be in full force and effect. This Agreement constitutes the entire Agreement between Bank and Insured and may not be modified except as agreed upon in writing. Bank's acceptance of late or partial payments shall not be deemed a waiver by Bank of any provisions of this Agreement, and Bank is entitled to require Insured to strictly comply with the terms hereof. This Agreement is governed by the law of the State of Ohio. If any amount contracted for or received by Bank is determined to violate any law or regulation, Bank may return such amount without any further liability therefor.

14. Any disputes between the parties with respect to any matter arising out of this Agreement which cannot be settled amicably by the parties thereto will be settled by arbitration in Medina County, Ohio, or in such other location as the parties shall mutually agree, in accordance with the rules of arbitration of the American Arbitration Association.

15. In the event any Policy endorsement is changed or any other material change in coverage under the Policies occurs, whether or not by action of the Insured, then Insured agrees to submit a new application to Bank and reapply under whatever application procedure Bank then requires or deems advisable. Should Bank approve Insured's application under this section, Insured agrees that Insured will execute a new note and security agreement and take all other actions Bank deems, in its sole discretion, necessary or advisable, including but not limited to, paying a cash down payment of at least 25% of the total increased premium. Bank shall be under no obligation whatsoever to approve any extension of additional credit under this section.

16. Insured represents and warrants that none of the Policies requires advance notice of cancellation to any party or is subject to any audit or reporting form requirements, except as provided herein or as provided in a writing signed by insured and Bank. No loan proceeds need be disbursed by Bank until Bank has received any filing and audit information which Bank, in its sole discretion, deems necessary.

By signing below, the Insured agrees to make all payments required by this Agreement and to be bound by all provisions of this Agreement. The Insured is not required to enter into an insurance premium financing arrangement as a condition to the purchase of any insurance policy. The undersigned certifies that all statements provided by Insured to any person in connection with Insured's loan application, whether orally or in writing, are true and complete.

**Insured represents that it is a (check only one box)**

☐ **corporation, limited liability company or partnership**
☐ **sole proprietorship**

The Insured certifies that this loan is being obtained for other than personal, family or household purposes.

| | | | |
|---|---|---|---|
| **Insured Name** | **By** | **Title** | **Date** |

| | | |
|---|---|---|
| **Witness** | **Print Name** | **Date** |

The agency signing below has read and agrees to all terms of the Commercial Insurance Premium Referral Master Agreement.

| | | | |
|---|---|---|---|
| **Agency's Name** | **By** | **Title** | **Date** |

Q# 103887, PRN: 062609, CFG: Bank, RT: Platinum, DD: N/A, BM: Coupon, P/F: 0.00 Qtd For: A00032 Original

Initial_____

| Schedule of Policies Covered By This Agreement ("Policies") | | | | | | |
|---|---|---|---|---|---|---|
| Policy Number | Full Names and Addresses of Insurance Co. to Whom the Amount Financed is Paid | Type of Insurance | Term in Months | Effective Date | Minimum Earned ($) | Policy Premium |
| TBD | C00403-AIG Casualty Company<br>[SR] | W/C | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 679,935.00<br>29,477.00<br>0.00 |
| TBD | C00010-Chubb Group Of Insurance Companies<br>[SR] | EPLI | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 6/30/2009 | 0.00 | 55,000.00<br>0.00<br>0.00 |
| TBD | C00457-Firemans Fund Insurance Company of Ohio<br>[SR] | UMB | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 38,609.00<br>0.00<br>0.00 |
| TBD | C00010-Chubb Group Of Insurance Companies<br>[SR] | UMB | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 28,785.00<br>0.00<br>0.00 |

**PAYMENT DISCLOSURE (the amount and cost of your loan):**     **Cash Price (Total Premiums): $        831,806.00**

Initial_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
                        :

In re                         :        **Chapter 11 Case No.**
                         :

**LEXINGTON PRECISION CORP., et al.,**  :        **08-11153 (MG)**
                         :

        **Debtors.**           :        **(Jointly Administered)**
                         :
---------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a), 362, AND 364(c)(2) OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO INCUR SECURED DEBT FROM WESTFIELD BANK, FSB FOR THE PURPOSE OF FINANCING THE DEBTORS' INSURANCE PREMIUMS FOR THEIR WORKMEN'S COMPENSATION LIABILITY, DIRECTOR'S AND OFFICER'S LIABILITY, UMBRELLA LIABILITY, AND EXCESS UMBRELLA LIABILITY

Upon the Motion, dated July 10, 2009 (the "Motion") of Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber" and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, seeking authority, pursuant to sections 105(a), 362, and 364(c)(2) of title 11 of the United States Code (the "Bankruptcy Code") to incur secured debt from Westfield Bank, FSB ("Westfield") for the purpose of financing the insurance premiums of the Debtors' workmen's compensation liability, employment practices, fiduciary, crime and kidnap & ransom liability, umbrella liability, and excess umbrella liability policies (the "Insurance Premiums"), all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to (i) the United States Trustee for the Southern District of

New York, (ii) the attorneys for the agents for the Debtors' prepetition lenders, (iii) the attorneys

for the Debtors' postpetition lenders, (iv) the attorneys for the statutory creditors' committee (the

"Committee"), (v) Westfield, and (vi) all other parties entitled to notice in these chapter 11 cases,

and it appearing that no other or further notice need be provided; and a hearing having been held

to consider the relief requested in the Motion (the "Hearing"); and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to section 364(c)(2) of the Bankruptcy Code, the

Debtors are authorized to (i) enter into, and pay all sums due under, a financing agreement with

Westfield (the "Financing Agreement"), a copy of which is annexed hereto as Exhibit A, and

(ii) grant Westfield a security interest in all unearned Insurance Premiums which may become

payable under the Policies and loss payments which reduce the unearned Insurance Premiums

subject to any mortgagee or loss payee interests; and it is further

ORDERED that, in the event that the Debtors default upon the terms of the

Financing Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code

(the "Automatic Stay") shall be modified solely to the extent necessary to permit Westfield to

exercise any rights solely under the Financing Agreement as it may otherwise have under

applicable state law but for the pendency of these cases (without prejudice to the Debtors' rights

under such state law) and without the necessity of further application to this Court, to cancel the

Policies financed pursuant to this Order, after giving any notice required by applicable state law. Except as provided in the preceding sentence, the provisions of the Automatic Stay shall remain in full force and effect; and it is further

ORDERED that, in the event of a default by the Debtors under the Financing Agreement, Westfield may receive and apply all unearned premiums due to the Debtors upon cancellation of the Policies to any amount owing by the Debtors to Westfield, without further application of this Court; and it is further

ORDERED that the full rights of Westfield under the Financing Agreement and applicable law shall be fully preserved and protected and shall not be impaired by this bankruptcy proceeding, the appointment of a trustee, the conversion of this proceeding to one under chapter 7 of the Bankruptcy Code, or any other provisions of the Bankruptcy Code.

Dated: July __ 2009
       New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**(Finance Agreement)**

## COMMERCIAL INSURANCE PREMIUM NOTE AND SECURITY AGREEMENT

**Repayment Terms:** For value received, the undersigned ("Insured"), promises to pay to the order of WESTFIELD BANK, FSB, Two Park Circle, Westfield Center, OH 44251 ("Bank"), the principal sum of $ ___623,854.50___ plus interest at the rate of _4.999_ % on the principal sum outstanding from time to time, commencing on _7/30/2009_ , and continuing on the same day of each month thereafter until paid in full. The total payments to be paid to Bank include a processing fee of $50.

**Security for Payment:** The Insured assigns to Bank, as security for payment of amounts due hereunder, all sums payable to the Insured relating to the policies listed on page three (3) (the "Policies"), including, among other things, any payment on account of loss or any return premiums and gross unearned premiums. In addition, Insured grants a security interest in all deposit accounts maintained with Bank and Bank's affiliates.

| Agency | | Insured (Legal Name) (Trade Name) | |
|---|---|---|---|
| Name: | Leonard Insurance Services Agency, Inc. | Name: | Lexington Precision Corporation |
| Address: | 4244 Mt. Pleasant Street, Nw | Address: | 30195 Chagrin Blvd., Suite 208W |
| P.O. Box: | | P.O. Box: | |
| City, State, Zip: | North Canton   OH   44720 | City, State, Zip: | Cleveland   OH   44124 |
| Phone: | (330) 266-1904 | Phone: | (216) 591-1070 |
| Fax: | (330) 498-9952 | Fax: | |
| Bank Agency Code: A00032 | | Federal Tax ID Number: | |

Quote Number:103887

**Payments:**

A Cash Down Payment of ___207,951.50___ shall be paid according to the terms within. Payments $ ___70,774.54___ shall be made _Monthly._

Number of Payments: _9_    First Payment Due: _7/30/2009_ . Subsequent Payments are due on the same day of each succeeding month.

☐ If this box is checked, all payments shall be automatically debited from the Insured's depository account _____ ,routing _____ on the payment due date.

**Security Interest:**  Insured is granting a security interest in the Policies to Bank.

**Late Charge:**  Upon default in payment of any installment ten days or more, Insured will pay a late charge of 5% of the delinquent installment or $50.00, whichever amount is greater, except that such charge shall be limited to the largest amount allowable under applicable law.

**Prepayment:**  If Insured prepays the full amount due hereunder, Insured shall pay a prepayment fee equal to 5% of the total outstanding note balance.

**Assumption:**  The obligation under this loan cannot be assumed without written permission of Bank.

### TERMS AND CONDITIONS

1. In consideration of the payment by Bank of the Amount Financed, Insured agrees to pay the Cash Down Payment to the insurance agency listed above ("Agency") and to pay Bank the Payments in accordance with the terms of this Commercial Insurance Premium Note and Security Agreement. Insured hereby authorizes Bank to disburse the loan proceeds to the Agency, to a general agent or broker, or directly to the Insurance Company(ies) listed on the schedule of Policies, as determenied by the bank.

2. An Event of Default occurs when: (i) the Insured does not pay any installment according to the terms of this Agreement or does not otherwise comply with the terms of this Agreement; (ii) any of the Policies is cancelled for any reason; or (iii) a proceeding in bankruptcy, receivership, or insolvency is instituted by or against Insured. When an Event of Default occurs and Bank provides any notice required by applicable law, all amounts due hereunder become immediately due and payable. Bank may also pursue the following remedies and any other remedy permitted it under applicable law:

   a. After providing 15 days notice to Insured, or as otherwise required by law, Bank may cancel the Policies and collect any gross unearned premiums or other amounts payable under the Policies.

   b. Bank may take all necessary actions to enforce payment of this debt. To the extent not limited by law, Bank is entitled to all collection costs and expenses incurred to enforce its rights hereunder and to reasonable attorneys' fees.

   c. After cancellation, Insured shall pay interest at the rate of 21% on the entire unpaid note balance as of the scheduled due date of the first delinquent payment leading to cancellation.

3. Insured hereby appoints Bank, upon the occurrence of an Event of Default, its irrevocable attorney in fact, with full power of substitution, which attorney in fact shall be coupled with an interest, with full authority, after notice has been mailed as required by law, to cancel the Policies and to receive any unearned premium or other amounts with respect to the Policies and to sign any check or draft issued therefor in Insured's name and to direct the insurance companies to make said check or draft payable to Bank.

4. Insured agrees not to assign the Policies except for the interests of mortgagees or loss payees without the prior written consent of Bank. Bank may assign or negotiate this Agreement without Insured's consent, and all Bank's rights hereunder shall inure to Bank's successors and assigns.

5. The Agency is not an agent of Bank and cannot bind Bank. Bank is not the agent of any insurer and is not liable for any insurer's act or omission. Insured's obligations under this Agreement shall not be relieved or diminished by any such act or omission.

6. Insured warrants that the proceeds of the loan contemplated herein will be used to purchase insurance for other than personal, family, agricultural or household purposes and that all information provided Bank or Agency in connection with this loan is true, correct, complete and not misleading.

7. Insured agrees to cooperate fully with Bank in executing additional instruments, documents, financing statements, and the like as may be deemed necessary or advisable by Bank in order to maintain and continue the security interest created by this Agreement. If automatic debit of payments has been selected by [checking the relevant box on page 1,] Insured hereby specifically authorizes Bank to automatically debit payments due hereunder as described in the Payment Schedule above and also agrees to execute any document Bank deems necessary in order for Bank to be authorized to automatically debit such payments.

8. Insured agrees to pay promptly any additional premiums assessed on the Policies by any insurer. Insured agrees to pay Bank a cancellation charge of $10.00 in the event Bank cancels any one or more of the Policies. Insured also agrees to pay a fee of $10.00 in the event any request by Bank to automatically debit Insured's account listed above is denied or any check Bank may accept from Insured is dishonored.

Initial_____

Page 21 of 22

9. Insured agrees that any payments made and accepted after Policy cancellation shall not constitute reinstatement or obligate Bank to request reinstatement of the Policies, and Insured acknowledges that Bank has no authority to reinstate coverage, and that such payments may be applied to Insured's indebtedness hereunder.

10. Neither Bank nor its assignee shall be liable for any loss or damage to the Insured by reason of failure of any insurance company to issue or maintain in force any of the Policies or by reason of the exercise by Bank or its assignee of the rights conferred herein. In no event will Bank be responsible to Insured or Agency for lost profits or for any special, indirect, incidental or consequential damages which Insured, Agency or any third party may incur arising out of or related to this Agreement, even if Bank has been advised of the possibility of such damages.

11. Insured represents and warrants that the execution and performance of this Agreement are within its respective corporate or organizational powers, have been duly authorized by all necessary requisite actions, do not contravene any governmental or contractual restrictions binding upon such party, and that this Agreement is valid, binding and legally enforceable in accordance with its terms. Insured's signatory, by signing below, represents that he/she is duly authorized and has full authority to sign for Insured.

12. Insured represents and warrants that no proceeding in bankruptcy, receivership or insolvency has been or will be instituted by or against Insured, or, if Insured is the subject of such a proceeding, it is noted on this Agreement in the space in which Insured's name and address is placed.

13. This Agreement shall have no force or effect until accepted by Bank. The Bank shall be deemed to accept this Agreement only upon complete funding of the Amount Financed. All rights and remedies in this Agreement are cumulative and not exclusive. If any part of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement shall continue to be in full force and effect. This Agreement constitutes the entire Agreement between Bank and Insured and may not be modified except as agreed upon in writing. Bank's acceptance of late or partial payments shall not be deemed a waiver by Bank of any provisions of this Agreement, and Bank is entitled to require Insured to strictly comply with the terms hereof. This Agreement is governed by the law of the State of Ohio. If any amount contracted for or received by Bank is determined to violate any law or regulation, Bank may return such amount without any further liability therefor.

14. Any disputes between the parties with respect to any matter arising out of this Agreement which cannot be settled amicably by the parties thereto will be settled by arbitration in Medina County, Ohio, or in such other location as the parties shall mutually agree, in accordance with the rules of arbitration of the American Arbitration Association.

15. In the event any Policy endorsement is changed or any other material change in coverage under the Policies occurs, whether or not by action of the Insured, then Insured agrees to submit a new application to Bank and reapply under whatever application procedure Bank then requires or deems advisable. Should Bank approve Insured's application under this section, Insured agrees that Insured will execute a new note and security agreement and take all other actions Bank deems, in its sole discretion, necessary or advisable, including but not limited to, paying a cash down payment of at least 25% of the total increased premium. Bank shall be under no obligation whatsoever to approve any extension of additional credit under this section.

16. Insured represents and warrants that none of the Policies requires advance notice of cancellation to any party or is subject to any audit or reporting form requirements, except as provided herein or as provided in a writing signed by insured and Bank. No loan proceeds need be disbursed by Bank until Bank has received any filing and audit information which Bank, in its sole discretion, deems necessary.

By signing below, the Insured agrees to make all payments required by this Agreement and to be bound by all provisions of this Agreement. The Insured is not required to enter into an insurance premium financing arrangement as a condition to the purchase of any insurance policy. The undersigned certifies that all statements provided by Insured to any person in connection with Insured's loan application, whether orally or in writing, are true and complete.

Insured represents that it is a (check only one box)

☐ corporation, limited liability company or partnership
☐ sole proprietorship

The Insured certifies that this loan is being obtained for other than personal, family or household purposes.

_____          _____          _____          _____
Insured Name                     By                               Title                            Date

_____          _____          _____
Witness                          Print Name                       Date

The agency signing below has read and agrees to all terms of the Commercial Insurance Premium Referral Master Agreement.

_____          _____          _____          _____
Agency's Name                    By                               Title                            Date

Q# 103887, PRN: 062609, CFG: Bank, RT: Platinum, DD: N/A, BM: Coupon, P/F: 0.00 Qtd For: A00032 Original

| Policy Number | Full Names and Addresses of Insurance Co. to Whom the Amount Financed is Paid | Type of Insurance | Term in Months | Effective Date | Minimum Earned ($) | Policy Premium |
|---|---|---|---|---|---|---|
| | Schedule of Policies Covered By This Agreement ("Policies") | | | | | |
| TBD | C00403-AIG Casualty Company<br>[SR] | W/C | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 679,935.00<br>29,477.00<br>0.00 |
| TBD | C00010-Chubb Group Of Insurance Companies<br>[SR] | EPLI | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 6/30/2009 | 0.00 | 55,000.00<br>0.00<br>0.00 |
| TBD | C00457-Firemans Fund Insurance Company of Ohio<br>[SR] | UMB | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 38,609.00<br>0.00<br>0.00 |
| TBD | C00010-Chubb Group Of Insurance Companies<br>[SR] | UMB | 12<br>FIN TXS/FEES<br>ERN TXS/FEES | 7/1/2009 | 0.00 | 28,785.00<br>0.00<br>0.00 |

PAYMENT DISCLOSURE (the amount and cost of your loan):          Cash Price (Total Premiums): $          831,806.00

WFBZZ1(091407)                                                                                    Initial_____