**AFFIDAVIT
OF
CAROLYN BELDEN
4538 Glade Street
Hubbard, Ohio 44425**

  My name is Carolyn Belden and I have worked for Lexington Precision Corporation since June, 1990. I quit my employment on or about April, 1999. My job and responsibilities with Lexington was Senior Layout Technician in charge of supervising the Layout Department. During that period of time I worked under the supervision of Lorraine Cerimele who was the supervisor in charge of Quality Control at Lexington. I reported directly to Lorraine Cerimele for the entire time that I worked for Lexington. My specific duties in working for Lexington was to disposition tools pursuant to customer specifications. I also supervised personnel and prepared tooling performance reports for Lexington. I also developed and maintained specific project lists that contained specific tool history. I also scheduled PPAP's for customers and scheduled the tool customer deadlines.

  While I was working at Lexington, Lorraine Cerimele's employment was terminated, however, I continued to work there for approximately four months longer. I also served under the direct supervision of Gloria Knight, the replacement for Lorraine Cerimele, for three months after which I then reported to Kathryn VanDyke who reported to Gloria Knight.

  On or about 1990 the President of Lexington was Jim Bergmann. Keith Blockinger was Production manager under Jim Bergmann and Lorraine Cerimele was Quality Control manager under Jim Bergmann. Both Blockinger and Cerimele were then in parallel positions of authority as to their respective departments. In approximately 1992 Keith Blockinger was designated as Plant Manager and Quality Control was placed under his supervision by the President Jim Bergmann. I believe, to the best of my knowledge, that Keith Blockinger was made President in 1995 and Jim Bergmann was transferred out of the plant to another location. In about 1993 it appeared that there were increasing pressures on Lexington which in turn transferred to the employees in Quality Control. These pressures had to do with customer deadlines and tooling costs. As a result, under Blockinger's direction, employees in Quality Control were required to knowingly falsify records and reports submitted to the customer to cover up

1



imperfections and substandard performance including tooling performance. Later the falsification of reports was encouraged by Lexington through Keith Blockinger for curing reductions. The curing reduction problem became even more significant in 1998.

Employees of Quality Control, including Lorraine Cerimele as supervisor, were pressured into approving materials that were out of specification which the customer was suppose to be notified about but was not aware of. Blockinger would constantly serveil the department without reason as much as 25 to 30 times a day and would eavesdrop on Lorraine Cerimele by standing outside of her office door, unbeknown to her, or would stand around corners from other manager's offices and listen to phone calls and conversations made by Lorraine Cerimele.

I participated in several meetings in which Keith Blockinger continued to pressure people in Quality Control, including Lorraine Cerimele, by asking them what they were going to do--which meant to do whatever it takes to bypass proper quality control. He on various occasions would state "I am not spending money to fix that tool"---"we are not going to miss this deadline, do what you have to do". Under such instructions there was only one thing that could be done, other than withhold shipment of the defective product, and that would be to falsify the records to the customer to meet the deadline. I worked on projects in which I reported the deficiencies and found that the products were delivered to the customer without informing the customer or delivering the proper product. I also heard Keith Blockinger on several occasions indicate in reference to a customer "I am not going to fix it--fuck them".

During Lorraine Cerimele's work tenure the Quality Control was very high in spite of the fact that Quality Control was constantly being pressured, including Lorraine Cerimele, to cover up inferior production. After Lorraine Cerimele left Lexington it is my opinion that the prestige of the company nose-dived and the company began to have more and more problems with customer complaints, returned parts or production, higher secondary costs due to the increase in 100% inspection. The new person taking over Lorraine Cerimele's duties constantly made derogatory remarks toward former supervision without mentioning Lorraine Cerimele's name. The new supervisor did not want to share our knowledge or our experience in the plant. The new supervisor has indicated on various occasions that she could

2

not understand what was going on in the plant and why they were now getting so many customer complaints and rejections. She said she had never seen the plant perform so badly, referring to the immediate situation. At the same time that Blockinger was pressuring Quality Control to pass inferior products Lorraine Cerimele was constantly attempting to raise and improve the standards of Quality Control in an attempt to turn out the best possible product under the circumstances. Continuous improvement was a high priority for Lorraine Cerimele's department. The various awards that were won by Lexington were achieved in large part by Lorraine Cerimele's leadership in the Quality Control Department and systems that she put in place.

AMP was considered one of Lexington's preferred customers with whom we were required to cover up the inferiority of the products and not report truthfully to the customer. In December, 1998 AMP representatives were given direct access to me by the president to discuss submission procedures that they wanted us to follow, which we were telling them for three years we were doing, when in fact we were not because of Blockinger's pressure to falsify reports and cut corners. As a direct result of the confrontation I was put under tremendous pressure to try to account for the inadequacies which the company told us to cover up. I was under so much intense pressure that I was required to go to the emergency room of the hospital because I broke out in hives with severe swelling of the face and other parts of the body. After various tests the doctor indicated that the condition was caused by severe mental stress. I was then put on a nerve calming medication and missed an entire week of work as a result of this stressful encounter.

The working conditions in Quality Control as a result of having to walk this tight-line were very stressful on a daily basis we realized what we were doing was wrong and you wanted to do what was right but realized that if we did not comply with the pressures of Blockinger's directions that we could lose our employment. As a result, within a week after my meeting with AMP representatives Lorraine Cerimele was terminated.

*Carolyn E Belden*
Carolyn Belden

STATE OF OHIO            )
                               ) ss.
TRUMBULL COUNTY    )

Before me a notary public in and for the above state and county this 13th day of August, 1999, personally appeared Carolyn Belden who on her oath did state that the foregoing affidavit is true as she verily believes.

[Notarial Seal: State of Ohio]

*Christina Parrish*
NOTARY PUBLIC

CHRISTINA PARRISH, Notary Public
State of Ohio
My Commission Expires 8/10/2000

4