# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  |  :  |  |
| In re: | : |  |
|  | : | **Chapter 11 Case No. 08-11153 (MG)** |
| **LEXINGTON PRECISION CORPORATION &** | : | **(Jointly Administered)** |
| **LEXINGTON RUBBER GROUP, INC.,** | : |  |
|  | : |  |
|  | : |  |
| **Debtors** | : |  |
---------------------------------------------------------------x

### <u>PROPOSED</u> COMBINED DISCLOSURE STATEMENT REGARDING PREPETITION SECURED LENDERS' CHAPTER 11 PLANS FOR LEXINGTON RUBBER GROUP, INC. AND LEXINGTON PRECISION CORPORATION

*The Bankruptcy Court <u>HAS NOT</u> approved this proposed disclosure statement as containing adequate information pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of acceptances or rejections of the chapter 11 plan described herein and attached hereto. Accordingly, the filing and dissemination of this disclosure statement are not intended to be, and should not in any way be construed as, a solicitation of votes on the plan, nor should the information contained in this disclosure statement be relied on for any purpose until a determination by the Bankruptcy Court that the proposed disclosure statement contains adequate information.*

*The Prepetition Secured Lenders reserve the right to amend or supplement this proposed disclosure statement at or before any hearing to consider this disclosure statement.*

WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
(615) 244-6380 TEL
(615) 244-6804 FAX

and

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Telephone: 212-732-3200
Fax: 212-732-3232

Dated: September 1, 2009

# TABLE OF CONTENTS

I.    Introduction ............................................................................................... 1

II.    Executive Summary .................................................................................. 5

    A.  Overview and Summary .................................................................... 5

    B.  Summary of Classification and Treatment of Claims
       and Interests Under the LRGI Plan ................................................. 6

    C.  Summary of Voting Procedures ....................................................... 8

    D.  Overview of Chapter 11 Process ..................................................... 9

III.   Overview of the Debtors' Operations and the Chapter 11 Cases ............ 10

    A.  Description of the Debtors' Operations ............................................ 10

       1.  LRGI: The Rubber Group ......................................................... 10

          a.  The Automotive Aftermarket ......................................... 11

          b.  The Automotive OEM Market ....................................... 11

          c.  The Medical Device Market ........................................... 12

          d.  LRGI's Competitive Strengths ...................................... 12

          e.  Facilities of the Rubber Group; Capacity for Growth ...... 13

          f.  Insulators for Automotive Ignition Systems .................. 14

          g.  Molded Rubber Components for Medical Devices ......... 16

          h.  Connector Seals for Automotive Wire Harnesses .......... 18

          i.  Financial Performance of LRGI ..................................... 20

       2.  LPC: The Metals Group ............................................................ 22

          a.  LPC's Competitive Strengths ........................................ 22

          b.  Financial Performance of LPC ....................................... 23

          c.  Strategic Alternatives .................................................... 23

       3.  Non-Operating Assets ............................................................. 23

          a.  Land in East Ellijay, Georgia (LRGI) ............................ 23

          b.  Land and Buildings in Lakewood, New York (LPC) ....... 24

          c.  Land and Buildings in Vienna, Ohio (LRGI) ................... 24

          d.  Net Operating Losses and Tax Attributes (LPC and/or LRGI) ... 24

       4.  Lexington's Employees ............................................................ 24

    B.  Significant Indebtedness .................................................................. 25

       1.  The Prepetition Credit Agreement ........................................... 25

       2.  The Prepetition Loan Agreement ............................................. 25

3.   Senior Subordinated Notes (LPC only) ............................................26

4.   Junior Subordinated Note (LPC only) ............................................27

C.   The Asbestos Cases Against LPC ............................................27

D.   Significant Events Leading to Commencement of the Chapter 11 Cases ............29

1.   Liquidity Crisis ............................................29

2.   Restructuring Efforts ............................................29

E.   The Chapter 11 Cases ............................................32

1.   Commencement of the Chapter 11 Cases and the "First Day" Orders ............32

   a.   Case Administration Orders ............................................32

   b.   Critical Obligations ............................................32

   c.   Customer and Employee Programs ............................................32

   d.   Financing Arrangements ............................................32

2.   Appointment of the Creditors' Committee ............................................33

3.   Use of Cash Collateral ............................................33

4.   Debtor-in-Possession Financing ............................................34

5.   The Debtors' Exclusive Periods ............................................35

6.   The Mediation Process ............................................35

7.   The Claims Reconciliation Process ............................................36

IV.   The LRGI Plan ............................................37

A.   Summary and Treatment of Unclassified Claims ............................................37

1.   Administrative Expense Claims ............................................37

2.   Professional Compensation and Reimbursement Claims ............................................38

3.   Priority Tax Claims ............................................38

4.   DIP Loan Claim ............................................39

B.   Classification and Treatment of Classified Claims Against and Interests in LRGI ............................................39

   a.   Class 1 – Other Priority Claims against LRGI (Unimpaired) ............39

   b.   Class 2(a) – CapitalSource Secured Claims against LRGI (Impaired) ............40

   c.   Class 2(b) – CSE Secured Claims against LRGI (Impaired) ............40

   d.   Class 3 – Secured Tax Claims against LRGI (Impaired) ............41

   e.   Class 4 – Other Secured Claims against LRGI (Impaired) ............41

   f.   Class 5 – General Unsecured Claims against LRGI (Impaired) ............42

   g.   Class 6 – Interests in LRGI (Impaired) ............................................42

C.   Distributions Pursuant to the LRGI Plan ............................................43

D.  Implementation of the LRGI Plan and Related Documents .............................43

1.  The LRGI Post-Confirmation Trust and LRGI Litigation Trust .................44

2.  The Sale Agent .............................................................................................44

3.  The Sale Process ..........................................................................................44

V.  The LPC Plan .......................................................................................................46

A.  Summary and Treatment of Unclassified Claims ...........................................46

1.  Administrative Expense Claims ..................................................................46

2.  Professional Compensation and Reimbursement Claims ...........................47

3.  Priority Tax Claims .....................................................................................47

4.  DIP Loan Claim ..........................................................................................48

B.  Classification and Treatment of Classified Claims Against and
Interests in LPC .............................................................................................48

a.  Class 1 – Other Priority Claims against LPC (Unimpaired) ............48

b.  Class 2(a) – CapitalSource Secured Claims against LPC (Impaired) ........49

c.  Class 2(b) – CSE Secured Claims against LPC (Impaired) .............49

d.  Class 3 – Secured Tax Claims against LPC (Impaired) ...................50

e.  Class 4 – Other Secured Claims against LPC (Impaired) ................50

f.  Class 5 – General Unsecured Claims against LPC, including
Senior Subordinated Note Claims (Impaired) .................................51

g.  Class 6 – Asbestos-Related Claims against LPC (Impaired) ...........52

h.  Class 7 – Junior Subordinated Note Claims against LPC (Impaired) ........53

i.  Class 8 – Series B Preferred Stock Interests in LPC (Impaired) ....53

j.  Class 9 – LPC Common Stock Interests (Impaired) ........................53

k.  Class 10 – Other Equity Interests in LPC (Impaired) .....................54

C.  Distributions Pursuant to the LPC Plan .........................................................54

1.  Disbursements .............................................................................................54

2.  Surrender or Transfer of the Senior Subordinated Notes and the
Junior Subordinated Note ...........................................................................55

3.  Indenture Trustee as Claim Holder .............................................................56

D.  Implementation of the LPC Plan and Related Documents .............................56

1.  The LPC Post-Confirmation Trust and LPC Litigation Trust ....................56

2.  The Sale Agent .............................................................................................57

3.  The Sale Process ..........................................................................................57

VI.  General Plan Provisions Applicable to Both the LRGI Plan and the LPC Plan ............58

A.  Cooperation from the Debtors ............................................................................ 58

B.  Provisions for the Treatment of Disputed Claims ............................................. 58

    1.  Objections to Claims and Prosecution of Disputed Claims ...................... 58

    2.  Resolution of Administrative Expense Claims and Other Claims ............. 58

    3.  Claim Estimation ....................................................................................... 58

    4.  Payment and Distribution on Disputed Claims ......................................... 59

C.  Prosecution of Claims Held by the Debtors ...................................................... 59

D.  Executory Contracts and Unexpired Leases ...................................................... 59

    1.  Rejection of Executory Contracts and Unexpired Leases ......................... 59

    2.  Cure of Defaults ........................................................................................ 59

    3.  Rejection Damage Claims .......................................................................... 60

    4.  Indemnification and Reimbursement of Directors and Officers ............... 60

    5.  Insurance Policies, Compensation and Benefit Programs, and Retiree
       Benefits ...................................................................................................... 60

E.  Setoffs ............................................................................................................... 61

F.  Reservation of "Cram-Down" Rights ................................................................ 61

G.  Conditions Precedent to the Effective Date of the Plan .................................... 61

H.  Effects of Confirmation ..................................................................................... 62

    1.  Discharge of Claims and Termination of Interests .................................... 62

    2.  Injunctions and Stays ................................................................................. 63

    3.  Exculpation ................................................................................................ 64

    4.  Releases ...................................................................................................... 64

    5.  Limits on Releases and Exculpation .......................................................... 65

I.  Dissolution of the Creditors' Committee ........................................................... 65

J.  Dissolution of the Debtors ................................................................................. 65

K.  Jurisdiction and Choice of Law ......................................................................... 65

    1.  Governing Law ........................................................................................... 65

    2.  Retention of Jurisdiction ............................................................................ 66

L.  Miscellaneous Provisions .................................................................................. 66

    1.  Payment of Statutory Fees ......................................................................... 66

    2.  Post-Confirmation Date Professional Fees and Expenses ......................... 66

    3.  Plan Supplement ........................................................................................ 66

    4.  Substantial Consummation ........................................................................ 66

    5.  Severability ................................................................................................ 66

6.  Binding Effect ................................................................................. 67

7.  Notices ............................................................................................ 67

8.  Time ................................................................................................ 67

9.  Section Headings ............................................................................. 67

M.  Modification, Revocation, or Withdrawal of the Plans ........................ 68

VII.  Financial Information and Analysis ............................................................ 69

VIII.  Certain Factors to be Considered .............................................................. 70

A.  Certain Risk Factors Relating to Confirmation of a Plan ..................... 70

1.  Risk of Non-Confirmation of a Plan ............................................. 70

2.  Non-Consensual Confirmation ...................................................... 70

3.  Risk of Non-Occurrence of the Effective Date ............................. 70

B.  Additional Factors to be Considered ................................................... 70

1.  The Prepetition Secured Lenders Have No Duty to Update ........... 70

2.  No Representations Outside this Disclosure Statement Are Authorized .... 70

3.  Projections and Other Forward Looking Statements Are Not Assured,
and Actual Results Will Vary ......................................................... 71

4.  This Disclosure Statement Is Not Legal or Tax Advice ................. 71

5.  No Admission Made ....................................................................... 71

6.  Business Factors and Competitive Conditions ............................... 71

a.  General Economic Conditions .............................................. 71

b.  Competitive Conditions ........................................................ 71

c.  Customers ............................................................................. 72

7.  Access to Financing and Trade Terms ........................................... 72

IX.  Certain Federal Income Tax Consequences of the Plans ............................ 73

A.  Introduction ........................................................................................ 73

B.  Material Tax Consequences to the Debtors .......................................... 74

C.  Material Tax Consequences to Holders of Claims Against or Interests in
LRGI or LPC ...................................................................................... 74

D.  Information Reporting and Backup Withholding .................................. 75

X.  Voting Procedures and Requirements ......................................................... 76

A.  Voting Deadline .................................................................................. 76

B.  Holders of Claims Entitled to Vote ...................................................... 77

C.  Vote Required for Acceptance by a Class ............................................ 77

D.  Voting Procedures ............................................................................... 78

|  | 1. | Voting Procedures | 78 |
|  | 2. | Withdrawal of Ballot | 78 |
| XI. | | Confirmation of a Plan | 79 |
| | A. | The Confirmation Hearing | 79 |
| | B. | Objections to Confirmation | 79 |
| | C. | General Requirements for Confirmation | 80 |
| | D. | Best Interests Test | 81 |
| | E. | No Unfair Discrimination/Fair and Equitable Test | 82 |
| | | 1. No Unfair Discrimination | 83 |
| | | 2. Fair and Equitable Test | 83 |
| | | a. Secured Claims | 83 |
| | | b. Unsecured Claims | 83 |
| | | c. Interests | 83 |
| | F. | Classification of Claims and Interests | 84 |
| | G. | Feasibility | 84 |
| XII. | | Conclusion | 85 |

## INDEX OF EXHIBITS

A.    LRGI Plan

B.    LPC Plan

C.    Disclosure Statement Order

D.    LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (without exhibits)

E.    LPC's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (without exhibits)

F.    Projected Financial Information

G.    Liquidation Analysis

# I. INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), CapitalSource Finance, LLC, as agent under the Prepetition Credit Agreement, and CSE Mortgage LLC, as agent under the Prepetition Loan Agreement (collectively, the "Agents"), jointly submit this disclosure statement (the "Disclosure Statement") to all holders of Claims against and Interests in Lexington Precision Corporation ("LPC") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("LRGI"), debtors and debtors in possession (together, the "Debtors" or "Lexington") in the above- captioned jointly-administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), in connection with (i) the Prepetition Secured Lenders' Chapter 11 Plan, dated September 1, 2009 in respect of LRGI (the "LRGI Plan") and (ii) the Prepetition Secured Lenders' Chapter 11 Plan, dated September 1, 2009 in respect of LPC (the "LPC Plan, and together with the LRGI Plan, the "Plans"), attached hereto as **Exhibit A** and **Exhibit B**, respectively. Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the appropriate Plan.  **Please note that to the extent any inconsistencies exist between the Disclosure Statement and either Plan, the terms of the applicable Plan shall govern.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Plans and alternatives to the Plans, (4) the rights of holders of Claims and Interests under the Plans, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Plans.

In light of the significant delays in the Debtors' development of a reasonable exit strategy from the Chapter 11 Cases, the Agents, in consultation with the Prepetition Revolver Lenders and the Prepetition Term Loan Lenders (collectively, the "Prepetition Secured Lenders") have developed the Plans in order to provide a rapid recovery of value through a sale process set forth in this Disclosure Statement.  The sale processes are to be conducted by a Post-Confirmation trustee (the "Post-Confirmation Trustee") in consultation with sale agent Gordian Group, LLC ("Gordian"), which has served as investment banker to the Prepetition Secured Lenders.  The lack of any acceptable alternative plan has become apparent during the seventeen (17) months of the Chapter 11 Cases, which have resulted in an aborted reorganization plan from the Debtors and no alternatives from any other party in interest.  Accordingly, the Prepetition Secured Lenders have been forced to present a reasonable avenue for the Debtors' exit from the Chapter 11 Cases, lest the Chapter 11 Cases continue to languish and both the value erode and the prospects for recovery dwindle.  Based upon a review of the market for a sale of the Debtors' businesses and conversations with potentially interested parties, it appears that a sale or sales of the Debtors' assets is the best option for recovery by the constituents in the Chapter 11 Cases.

Pursuant to the Plans, the respective Post-Confirmation Trustees and Gordian will market the Debtors' businesses for sale for a period of up to one hundred (100) days from entry of the Confirmation Order.  The Plan Proponents intend to move the Bankruptcy Court to allow Gordian to commence the marketing of the Debtor's businesses prior to the confirmation date.  The marketing process will pursue a sale of LRGI and/or LPC's businesses by whichever avenues appear to be most appropriate at the time: (a) as a whole, (b) by business segment on a going concern basis, or (c) on a liquidation basis, depending on the appropriate circumstances for the particular assets.

The Plan treats the LRGI estate and the LPC estate as separate bankruptcy estates, which reflects the corporate form employed by the Debtors during the operation of their businesses both prior to and during the Chapter 11 Cases.  PURSUANT TO THE PLANS, THERE WILL BE NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC ESTATES.  With respect to a sale of LRGI's business units and/or assets, and to the extent sufficient proceeds are available to satisfy all the Claims against LRGI, any excess proceeds would be distributed to LPC, which holds 100% of the equity Interests in LRGI, for distribution to holders of Claims against and Interests in LPC.  In addition, the Post-Confirmation Trustee will pursue sales of non-operating assets, as well as prosecution of avoidance actions and other litigation claims for the benefit of each bankruptcy estate.  Finally, to the extent such net operating losses are preserved, the Post-Confirmation Trustee may pursue liquidation of those through a merger transaction.

The Prepetition Secured Lenders recommend that all holders of Claims and Interests vote to accept the Plans because the Plans will enable creditors and shareholders to recover their Claims promptly.

**Please note that not all holders of Claims or Interests are entitled to vote.  If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement.  For more information as to which holders of Claims and Interests may vote, please refer to the following: Section IV.B "*Classification and Treatment of Classified Claims against and Interests in LRGI*" and Section V.B "*Classification and Treatment of Classified Claims Against and Interests in LPC*".  For voting procedures and important deadlines, please refer to Section X below, "*Voting Procedures and Requirements.*"**

On _____ ___, 2009, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Plans.  **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of either Plan or as to the accuracy or truth of the statements, information, and data contained in this Disclosure Statement.**

On _____ ___, 2009 at ___:__0 __.m. and, if necessary, _____ ___, 2009, the Bankruptcy Court shall hold a hearing to consider whether to approve and confirm the Plans (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time without notice.  For more information on the confirmation process, please refer to Section XI below, "Confirmation of the Plans."

For your reference, the following documents have also been attached to the Disclosure Statement:

(i)    The LRGI Plan (Exhibit A);

(ii)    The LPC Plan (Exhibit B);

(iii)    Order of the Bankruptcy Court, dated __, 2009 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain

procedures with respect to the solicitation and tabulation of votes to accept or reject the Plans (attached without exhibits) (Exhibit C);

(iv)    LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (attached without exhibits) (Exhibit D);

(v)    LPC's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (attached without exhibits as Exhibit E);

(vi)    Projected financial information for the period during which the sale processes will be pursued (the "Projected Financial Information") (Exhibit F); and

(vii)    The Prepetition Secured Lenders' Liquidation Analysis (Exhibit G).

**This Disclosure Statement does not replace a careful and detailed review and analysis of the Plans by each holder of a Claim or Interest. Please use this Disclosure Statement to aid and supplement that review. The description of the Plans contained herein is only a summary and is qualified in its entirety by reference to the full text of the applicable Plan; if any inconsistencies exist between the Plans and this Disclosure Statement, the applicable Plan shall govern. The Plan Proponents urge holders of Claims and Interests to review the Plans and any related attachments in order to obtain a full understanding of the Plans.**

**IRS Circular 230 Notice**: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Plan Proponents or the applicable Post-Confirmation Trustees of the **transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

Certain statements contained in this Disclosure Statement, including the Projected Financial Information, are forward-looking statements. Forward-looking statements usually can be identified by the use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "forecasts," "projects," or the negative thereof. They may be used in discussions of strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events. Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties include:

- Increases and decreases in business awarded to the Debtors by their customers;

- Unanticipated price reductions for the Debtors' products as a result of competition;

- Changes in the cost of raw materials;

- Strength or weakness in the North American automotive market;

- Changes in the competitive environment;

- Unanticipated operating results;

- Changes in economic conditions;

- Changes in interest rates;

- Financial difficulties encountered by customers or suppliers of the Debtors;

- Labor interruptions at the Debtors' facilities or at their customers' or suppliers' facilities;

- The Debtors' ability to develop adequate policies regarding and testing of internal control over financial reporting; and

- Other risks as disclosed in Section VII of this Disclosure Statement.

The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially.  There can be no assurance that any of the forward-looking statements contained herein will prove to be accurate.  All forward-looking statements are expressly qualified by the discussion above.

## II. EXECUTIVE SUMMARY

### A. <u>Overview and Summary</u>

The Plans proposed by the Agents contemplate a marketing and sale of the business units or assets of the Debtors, and, to the extent there are proceeds from such sales, a distribution of the proceeds of such sale or sales to the respective creditors of the Debtors according to the priorities set forth in the Plans. In other words, creditors of LRGI will recover from the sales of LRGI business units or assets and creditors of LPC will recover from the sales of LPC business units or assets. PURSUANT TO THE PLANS, THERE WILL BE NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC ESTATES.

Following confirmation of the Plans, separate and distinct post-confirmation operating trusts will be established and the assets of the respective Debtors will be placed into the trusts. All businesses of the Debtors shall continue to operate post-confirmation with the oversight of a post-confirmation trustee. It is the intention of the Plan Proponents to avoid interruption of the businesses of the Debtors as much as possible, and to retain and incent current operating management of each business segment (other than the senior-most corporate level management of the Debtors, who will be displaced by the Post-Confirmation Trustees); the Prepetition Secured Lenders want to encourage operating management to continue to drive results and improve operations.

The Plans will be implemented, following the entry of a Confirmation Order, by having a marketing and sales process commenced by which highest and best bids for the businesses of the Debtors will be obtained. It is the preference of the Plan Proponents that the businesses be sold as going concern operations. If that is not possible, then sales of lots of assets will be conducted. Sales will be conducted in accordance with Section 363 of the Bankruptcy Code once the sale agent and/or the applicable Post-Confirmation Trustee chooses a stalking horse bidder or bidders. The marketing process will last up to one hundred (100) days in duration, by which one or more deadline stalking horse bidders shall have been obtained, with such deadline subject to extension by agreement between the Plan Proponents and the applicable Post-Confirmation Trustee in consultation with the Sale Agent. The Plan Proponents intend to move the Bankruptcy Court to allow Gordian to commence the marketing of the Debtor's businesses prior to the confirmation date. To the extent the marketing process yields a Stalking Horse Bidder prior to the 100th day after the Confirmation Date, the marketing process may be shorter than 100 days in the applicable Post-Confirmation Trustee's discretion and in consultation with the Plan Proponents and the Sale Agent.

The Prepetition Secured Lenders contemplate that they may be the initial stalking horse bidders for the assets and, if they so decide, then they will credit bid in some amount only in an effort to set a floor for bidders for the businesses. – and hence, in such circumstances, would not bid beyond their initial bid. Upon completion of some or all of the sales, the Plan will be deemed Effective and, after a sale of all of the assets of the Debtors, these cases will be closed.

The Agents believe that this approach, and that each Plan provides for the greatest

possible recovery for all creditors and urges each impaired creditor to vote in favor of these
Plans.

**B. Summary of Classification and Treatment of Claims and Interests Under the LRGI
Plan**

The following summarizes the classification of Claims and Interests under the
LRGI Plan and the respective distributions and recoveries to each such class. The following
summary is qualified in its entirety by reference to the full text of the LRGI Plan. For a more
detailed description of the terms of the Plan, please refer to Section IV below "*The LRGI Plan*",
Section V below "*The LPC Plan*" and Section VI below "*General Plan Provisions Applicable to
Both the LRGI Plan and the LPC Plan*".

The Plans provide for 16 classes of Claims and Interests. The LRGI Plan consists of
6 Classes, while the LPC Plan has 10 Classes. PURSUANT TO THE PLANS, THERE WILL BE
NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC ESTATES. A Claim or
Interest is impaired if the applicable Plan modifies or changes the rights of the Claims or Interests
included in the Class. Holders of Claims and Interests in classes that are impaired may vote to accept
or reject the applicable Plan. If a Class of Claims or Interests is not impaired pursuant to the
applicable Plan, holders of the Claims or Interests in that Class are automatically deemed to accept
the applicable Plan.

| LRGI CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? | DISTRIBUTION |
|---|---|---|---|---|
| 1 | *OTHER PRIORITY CLAIMS AGAINST LRGI* | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| 2(a) | *CAPITALSOURCE SECURED CLAIMS AGAINST LRGI* | Impaired | Yes | First priority beneficial interest in LRGI Post-Confirmation Trust and a limited first priority beneficial interest in LRGI Litigation Trust[*] |
| 2(b) | *CSE SECURED CLAIMS AGAINST LRGI* | Impaired | Yes | First priority beneficial interest in LRGI Post-Confirmation Trust and a limited first priority beneficial interest in LRGI Litigation Trust[*] |
| 3 | *SECURED TAX CLAIMS AGAINST LRGI* | Impaired | Yes | Second priority beneficial interest in LRGI Post-Confirmation Trust |
| 4 | *OTHER SECURED CLAIMS AGAINST LRGI* | Impaired | Yes | Third priority beneficial interest in LRGI Post-Confirmation Trust |

---

[*] Classes 2(a) and 2(b) may also be entitled to a distribution from the LRGI Litigation Trust on account of certain
replacement liens on unencumbered assets and avoidance actions under the Final Cash Collateral Order.

| 5 | *GENERAL UNSECURED CLAIMS AGAINST LRGI* | Impaired | Yes | Fourth priority beneficial interest in LRGI Post-Confirmation Trust and first priority beneficial interest in LRGI Litigation Trust (subject to rights of Classes 2(a) and 2(b)[*]) |
| 6 | *INTERESTS IN LRGI* | Impaired | Yes | Fifth priority residual beneficial interest in LRGI Post-Confirmation Trust and second priority residual beneficial interest in LRGI Litigation Trust (subject to rights of Classes 2(a) and 2(b)[*]) |

| LPC CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? | DISTRIBUTION |
|---|---|---|---|---|
| 1 | *OTHER PRIORITY CLAIMS AGAINST LPC* | Unimpaired | No (deemed to accept) | Paid in full. In Cash on the Effective Date |
| 2(a) | *CAPITALSOURCE SECURED CLAIMS AGAINST LPC* | Impaired | Yes | First priority beneficial interest in LPC Post-Confirmation Trust and a limited first priority beneficial interest in LPC Litigation Trust[#] |
| 2(b) | *CSE SECURED CLAIMS AGAINST LPC* | Impaired | Yes | First priority beneficial interest in LPC Post-Confirmation Trust and a limited first priority beneficial interest in LPC Litigation Trust[#] |
| 3 | *SECURED TAX CLAIMS AGAINST LPC* | Impaired | Yes | Second priority beneficial interest in LPC Post-Confirmation Trust |
| 4 | *OTHER SECURED CLAIMS AGAINST LPC* | Impaired | Yes | Third Priority beneficial interest in LPC Post-Confirmation Trust |
| 5 | *GENERAL UNSECURED CLAIMS AGAINST LPC (INCLUDING SENIOR SUBORDINATED NOTE CLAIMS)* | Impaired | Yes | Fourth priority beneficial interest in LPC Post-Confirmation Trust and first priority beneficial interest in LPC Litigation Trust (subject to rights of Classes 2(a) and 2(b)[#]) |
| 6 | *ASBESTOS-RELATED CLAIMS AGAINST LPC* | Impaired | Yes | Insurance proceeds, and to the extent such proceeds are insufficient, a fourth priority beneficial interest in LPC Post-Confirmation Trust and first priority beneficial interest in LPC |

[#] Classes 2(a) and 2(b) may also be entitled to a distribution from the LRGI Litigation Trust on account of certain replacement liens on unencumbered assets and avoidance actions under the Final Cash Collateral Order.

| | | | | Litigation Trust (subject to rights of Classes 2(a) and 2(b)[#]) |
|---|---|---|---|---|
| 7 | *JUNIOR SUBORDINATED NOTE CLAIMS AGAINST LPC* | Impaired | Yes | Fifth priority beneficial interest in LPC Post-Confirmation Trust and second priority beneficial interest in LPC Litigation Trust (subject to rights of Classes 2(a) and 2(b)[#]) |
| 8 | *SERIES B PREFERRED STOCK INTERESTS IN LPC* | Impaired | Yes | Sixth priority beneficial interest in LPC Post-Confirmation Trust and third priority beneficial interest in LPC Litigation Trust (subject to rights of Classes 2(a) and 2(b)[#]) |
| 9 | *LPC COMMON STOCK INTERESTS* | Impaired | Yes | Seventh priority residual beneficial interest in LPC Post-Confirmation Trust and fourth priority residual beneficial interest in LPC Litigation Trust (subject to rights of Classes 2(a) and 2(b)[#]) |
| 10 | *OTHER EQUITY INTERESTS IN LPC* | Impaired | No (deemed to reject) | No distribution - cancelled and extinguished. |

## C. Summary of Voting Procedures

       If you are entitled to vote on a Plan, you will receive a ballot with this Disclosure Statement. On the ballot, you may elect either to accept or reject the applicable Plan. If you return a ballot that does not indicate either an acceptance or rejection of the applicable Plan, your vote shall be counted as a vote to accept the applicable Plan. If you return a ballot that indicates both an acceptance and rejection of the applicable Plan, your vote shall not be counted as either an acceptance or rejection.

       _____ __, **2009**, is the record date (the "Voting Record Date") to determine which holders of Claims or Interests may vote to accept or reject the Plans.

       _____ __, **2009 4:00 p.m. (Eastern Standard Time)** is the last day to vote (the "Voting Deadline").

Please send your ballot to:

       **FINANCIAL BALLOTING GROUP LLC (the "Voting Agent")**
       **ATTN: [LRGI/LPC] BALLOT TABULATION**
       **757 THIRD AVENUE, 3RD FLOOR**
       **NEW YORK, NEW YORK 10017**

       **- OR**

       **tabulation@fbgllc.com**

**The Voting Agent must receive your ballot by (i) mail at street address above or (ii) e-mail in PDF form, each before the Voting Deadline for your vote to be counted.** The Voting Agent will not accept ballots sent by facsimile. If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot. If your ballot is damaged or lost, you should also contact the Voting Agent.

For more information on voting procedures, please refer to Section X below, "*Voting Procedures and Requirements*". Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

**D. <u>Overview of the Chapter 11 Process</u>**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest. In addition, creditors and parties in interest may propose reorganization plans under certain circumstances. In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a particular debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a particular debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Absent unusual circumstances, separate estates are created for each entity that files for bankruptcy protection.

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor. Subject to certain limited exceptions, the confirmation order typically discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor or any other plan proponent to conduct such solicitation pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponents are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III. OVERVIEW OF THE DEBTORS' OPERATIONS AND THE CHAPTER 11 CASES

### A. <u>Description of the Debtors' Operations</u>

The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described in detail below. The business of the Rubber Group is conducted by LRGI, and the assets utilized in that business are owned by LRGI, a Delaware corporation and wholly-owned subsidiary of LPC, which is also a Delaware corporation. The business of the Metals Group is conducted by LPC, and the assets utilized in that business are owned by LPC. The following table sets forth actual net sales for the Rubber Group and the Metals Group for 2006 through 2008 (dollar amounts in thousands):

| | *Years Ended December 31* | | | | | |
| | *2008* | | *2007* | | *2006* | |
|---|---|---|---|---|---|---|
| **Rubber Group:** | | | | | | |
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical devices | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |
| **Metals Group:** | | | | | | |
| Automotive — OEM | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

LRGI's actual (through _____) and forecasted net sales for 2009 are as follows (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

### 1. LRGI: The Rubber Group

LRGI is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices.

The following table sets forth LRGI's actual net sales to each of its principal markets for 2006 through 2008 (dollar amounts in thousands):

|  | *Years Ended December 31* | | | | | |
|  | *2008* | | *2007* | | *2006* | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: |
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |

LRGI's actual (through _____) and forecasted net sales to each of its principal markets for 2009 is as follows (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

LRGI currently has two production facilities, each of which is virtually a stand-alone business unit, with a complete management team, primarily focused on a single product line. The Jasper, Georgia facility primarily specializes in insulators for automotive ignition systems and the Rock Hill, South Carolina facility primarily specializes in components for medical devices. Formerly, the Vienna, Ohio facility specialized in automotive connector seals and transmission seals. In view of the dramatic downturn in volume in the automotive original equipment market, the Debtors implemented a migration of assets from the Vienna, Ohio facility to the Rock Hill, South Carolina facility and the Jasper, Georgia facility. That consolidation of the connector seals business is discussed in more detail in Section III.A.1(h) below, "*Connector Seals for Automotive Wiring Harnesses*".

### a. The Automotive Aftermarket

In the automotive aftermarket, LRGI supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors have indicated that LRGI is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket, with an estimated North American market share of 50%. Such market position could make this business segment an attractive sale option for strategic and financial buyers.

### b. The Automotive OEM Market

In the automotive OEM market, LRGI has focused on two principal products, insulators for automotive ignition systems and connector seals for automotive wiring harnesses. LRGI has previously indicated that it is one of the two largest suppliers of connector seals in North America and the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market. LRGI has further indicated that its sales of insulators to the OEM market have been limited by customer concerns about the LRGI's financial condition.

Despite the depressed condition of the automotive OEM market, strategic buyers could be interested in purchasing this business segment either as a whole or on an asset by asset basis.

### c. The Medical Device Market

In the medical device market, LRGI concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision. LRGI has indicated that it has become a leading supplier of these types of components because of its capabilities in product design and materials development and because LRGI's molding technology offers excellent process repeatability and product quality. For these reasons, this business segment is potentially an attractive acquisition target for both strategic and financial buyers.

### d. LRGI's Competitive Strengths

According to LRGI, its leading market positions and high profit margins are a function of its ability to offer its customers a one-stop source for the development and delivery of complex molded-rubber components, with high quality and at competitive prices. LRGI has indicated that it has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including materials development, computer simulation, mold-making, rubber mixing, molding, process automation, and process management. Specifically, LRGI has indicated the following competitive strengths of LRGI, which will make it attractive to potential purchasers:[1]

(i)    Materials Development. Any new product development initiative begins with the selection of the appropriate compound to meet the product specification at a low cost. LRGI has extensive experience in molding of numerous elastomers and works closely with its customers to choose the optimal material for any given application. LRGI's in-house mixing operation in Jasper, Georgia, is equipped with a complete facility for materials development, including lab-style mixers, mills and molding presses, and analytical equipment for testing all critical performance characteristics. In addition, LRGI's Rock Hill, South Carolina facility contains an analytical laboratory that is utilized for detailed analysis of polymers, fillers, and contaminants.

(ii)    Computer Simulation. LRGI's computer simulation capability is a critical component of its offering to customers. LRGI uses proprietary computer simulation software for both product design and mold design. By incorporating computer simulation into the product development process, LRGI is often able to design a component that meets the customer's application without the time and expense required to create a physical prototype. LRGI also uses computer simulation to design both its molds and its molding process in order to maximize the probability of success in the production environment.

(iii)    Mold-Making. LRGI has invested over $14 million in a state-of-the-art mold-making operation within the Debtors' North Canton, Ohio facility (the "Engineering

---

[1] This description of competitive strengths is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

Center"). Through this investment, LRGI controls 100% of its mold-making activities and has the capability to produce flashless molds, cut-in-plate molds, standard injection molds, and LSR injection molds. The mold-making operation permits LRGI to significantly reduce turnaround times for prototype molds, production molds, modifications, and repairs. Moreover, the strong relationship between LRGI's mold-making operation and its production-molding operations has enabled LRGI to make numerous technological advances in both its mold-making and its molding processes.

Unlike most rubber molding businesses, LRGI utilizes high-tolerance, "flashless" molds whenever possible. In a flashless mold, each cavity is comprised of a separate stack of precisely-machined, self-registering inserts. These inserts, which are assembled in multiple, hinged plates, have thousands of laser-cut vents that permit gases to escape from the cavities during the molding process while limiting flash extension to nominal levels. Flashless molds offer multiple benefits compared to conventional cut-in-plate molds.

(iv)    Automation. LRGI makes extensive use of automation throughout its operations to improve productivity, reduce labor costs, and improve the quality of its products. A substantial portion of LRGI's automation equipment is designed and built at the Engineering Center. This gives LRGI a competitive advantage because its automation equipment is less expensive than similar equipment that could be purchased from outside vendors and is designed specifically to optimize LRGI's manufacturing processes.

(v)    Proprietary Press Controls. LRGI currently operates over 200 rubber molding presses, all of which are equipped with proprietary programmable logic controllers ("PLCs") designed and built at the Engineering Center. PLCs permit LRGI to select the optimal processing parameters for each mold and ensure strict adherence to those parameters, in order to maximize quality and minimize costs. PLCs collect and store large amounts of data that can be used to determine the root cause of any molding problem.

(vi)    Management Operating System. LRGI has developed a management operating system that is used on a real-time basis to ensure the efficient operation of every area of each plant. The system increases management effectiveness, accountability, and communication. As a result, management is able to more closely control labor cost, productivity, and overall performance. The management operating system establishes performance expectations and enables management to hold every operator, supervisor, and department accountable for meeting these expectations. Performance is measured and evaluated on a short-interval basis, usually every two hours, so that real-time adjustments can be made to bring performance into line with expectations.

*e. Facilities of the Rubber Group; Capacity for Growth*

LRGI operates two modern manufacturing facilities and one state-of-the-art design and mold production facility, all of which encompass 203,000 square feet of floor space with surrounding land. All of the operating facilities are owned by LRGI, including certain real property located in Jasper, Georgia, North Canton, Ohio, and Rock Hill, South Carolina. In

addition, LRGI owns certain non-operating assets, including its former manufacturing facility and surrounding land in Vienna, Ohio, as well as vacant land in East Ellijay, Georgia.

LRGI has previously indicated that all of its facilities and equipment are well-maintained. Because of reductions in volume and increases in productivity, each of LRGI's plants has unused capacity in all functional areas at the current volume levels. As a result, a strategic buyer may find synergy and a financial buyer may be able to exploit growth opportunities without the need for significant additional capital expenditures for plant and equipment.

LRGI's's production facilities are supported by the Engineering Center in North Canton, Ohio, and a materials-development and rubber-mixing facility within the Jasper, Georgia facility, as well as additional testing and mixing facilities in the Rock Hill, South Carolina facility. The Engineering Center and the materials development facility have bolstered LRGI 's status as custom molders by offering its customers various proprietary services, including computer simulation to optimize the design of a component, materials development to determine the optimal material for a component, and automation to produce complete assemblies. When coupled with LRGI's low-cost manufacturing operations and quality record, these services have, according to the LRGI, made it a market leader in each of the markets it serves.

Note that in November 2008, LRGI experienced a fire at its Rock Hill, South Carolina facility. The extent to which the November fire has affected the LRGI's (or LPC's) operations, if at all, has not been disclosed. In addition, the Debtors had a receivable from its property insurance carrier in the amount of $634,000 at December 31, 2008, for expenditures relating to the fire. As of the filing date of LPC's Form 10-K for the fiscal year ending December 31, 2008, the Debtors had received $500,000 of the $634,000 and did not anticipate any problems in recovering the balance.

### f. Insulators for Automotive Ignition Systems

Insulators for automotive ignition systems (aftermarket and OEM) represent LRGI's largest product category, accounting for more than fifty percent (50%) of LRGI's net sales for the first six months of 2009, and more than fifty percent (50%) of LRGI's forecasted net sales for all of 2009.

Insulators are molded rubber components that are used in ignition systems to seal and insulate the terminals on the spark plug and the distributor in a traditional ignition system, and the connection between the coil and the spark plug in a coil-on-plug ("COP") style ignition system. Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers that assemble ignition-wire sets for the automotive OEMs and for retailers serving the automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

LRGI has previously indicated that it is North America's largest manufacturer of insulators, with [forecasted 2009 sales volume of _____ units, representing net sales of approximately $_____], and the leading supplier of insulators to companies, including General Cable, Standard Motor Products, and Federal Mogul, that supply ignition-wire sets to automotive-parts retailers. The forecasted 2009 sales volume represents an estimated North American market share of approximately [___%].

LRGI is also a major supplier of insulators to companies that supply ignition-wire sets to the automobile manufacturers. Through its customers, Prestolite Wire, Diamond Electric, Weastec, and Ford, LRGI has indicated that it is the largest supplier of insulators used on new Ford and Chrysler vehicles produced in North America. For 2009, LRGI's sales of insulators for new vehicles are forecasted to be $[____], which represents an estimated North American market share of approximately [____].

LRGI has previously indicated that it has become the leading supplier of insulators in North America, while continuing to achieve significant profit and cash flow margins, for the following reasons, which makes LRGI's insulators business attractive to potential buyers:[2]

(i)     Product Knowledge. Because the Jasper, Georgia facility is focused almost exclusively on the production and sale of insulators, LRGI has developed knowledge of the product and its end-markets. This knowledge, coupled with LRGI's proprietary computer simulation software, enable LRGI to provide invaluable assistance to its customers in designing insulators with superior performance characteristics, while minimizing cost.

(ii)    Cost Competitiveness. The same product focus has enabled LRGI to develop cost-effective methods for delivering each type of insulator, including:

- High-cavitation tools for high-volume parts;

- Flashless tools for 180° parts;

- Unique, hybrid tools blending flashless and cut-in-plate technology, for certain difficult-to-mold insulators;

- Proprietary automation for molding, demolding, inspection, and assembly; and

- Offshore sourcing of lower-volume parts.

(iii)   Proprietary Materials. LRGI has developed an extensive library of proprietary materials for the insulator market. These materials enable LRGI to meet demanding specifications (including engine temperatures as high as 600° F) at a competitive price.

(iv)    The Broadest Aftermarket Product Line. LRGI has developed a very broad line of insulators for the automotive aftermarket by:

- Investing more than $7 million over the past ten years to build over one hundred high-cavitation tools for the aftermarket;

- Making further significant investments to acquire the right to use excess capacity on many of the high-cavitation tools owned by its OEM customers to supply the aftermarket; and

---

[2] This description of reasons for profit and cash flow margins is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

- Developing reliable, low-cost, off-shore sourcing for lower volume aftermarket parts.

(v)     Aftermarket Growth. According to LRGI, its aftermarket business may grow and will not be adversely affected by any decline in the automotive OEM industry.

LRGI has indicated that potential growth of the insulators business, including aftermarket and the OEM market segments, could result from the following factors:[3]

(i)     New Programs. LRGI has indicated that it has been working closely with a number of suppliers to the Automotive OEMs, including Robert Bosch, Diamond Electric Manufacturing, Mitsubishi Electric, and Remy, Inc., on certain programs.

(ii)     General Motors Potential. Prior to July 2008, General Cable, which assembles the ignition-wire sets for most new GM vehicles pursuant to an agreement with Delphi Corporation ("Delphi"), had been prohibited by Delphi from purchasing insulators for those sets from LRGI.  In late July 2008, Delphi authorized General Cable to purchase insulators from LRGI and LRGI received its first purchase order for insulators to be used on Delphi ignition-wire sets.

(iii)     Ford Potential. LRGI has previously indicated that Ford Motor Company has indicated a desire to source additional insulators with LRGI as soon as they are satisfied with the resolution of the Chapter 11 Cases.

(iv)     Returning Business. Certain OEM customers that had re-sourced products away from LRGI to other suppliers (both domestic and international) have experienced price increases and/or quality issues with their new suppliers and according to the Debtors, are shifting portions of this business back to LRGI. LRGI has previously indicated that Prestolite Wire, LRGI's largest OEM Insulator customer, has returned to LRGI to source four parts with annual sales value of approximately $435,000 and has asked LRGI to requote an additional ten parts with annual sales value of approximately $2 million.

(v)     Aftermarket Strength. LRGI could capture additional market share in the aftermarket segment due to: innovative product design, ability to build high-cavitation molds for high volume parts, off-shore sourcing of low-volume parts, and inability of competitors to match LRGI's prices, quality, and service.

### g. Molded Rubber Components for Medical Devices

Components for medical devices are LRGI's second largest product line, accounting for approximately one third (1/3) of LRGI's net sales for the first six months of 2009, and approximately one third (1/3) of LRGI's forecasted net sales for all of 2009.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery devices, and catheters. According to LRGI, it has chosen to avoid commodity-type components (like plunger tips

---

[3] This description of potential growth factors is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that LRGI is able to offer. These types of products include seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

According to LRGI, it is rapidly becoming a leading supplier for these types of components because of the following technical capabilities, which are attractive to a potential purchase of LRGI's businesses:[4]

(i)    Product Design. LRGI uses proprietary computer simulation software to help its customers design components that function optimally in their required application and can be produced without significant problems.

(ii)    Materials Development. LRGI's extensive materials library and its experience with a broad range of elastomers enable it to develop the optimal material for each application at a competitive price.

(iii)    Tight-Tolerance, Flashless Molds. LRGI's state-of-the-art flashless molds allow it to: (a) maintain part concentricity, which is critical to the functioning of high-speed assembly equipment and to the delivery of precise dosages, even after extensive mold usage; (b) deliver consistently flash-free parts; and (c) hold tight tolerances on difficult features, including seals with very thin walls.

(iv)    Proprietary Press Controls. LRGI's proprietary press controls allow it to provide its customers with a high level of assurance regarding process repeatability and traceability.

(v)    In-House Automation Capability. LRGI's in-house automation design/build capability enables it to solve difficult assembly, inspection, and packaging issues for its customers.

LRGI has previously indicated that its medical components business is poised for growth through programs that may ramp up with existing customers and potential new projects both with existing and new customers. Despite these claims, the Debtors have been unable to obtain exit financing or some other recapitalization with respect to its operations as a collective whole. LRGI's medical device business is likely to be the primary source of value in the LRGI Plan, through a sale to either a strategic or financial buyer.

The following is a description of LRGI's principal products for the medical device industry, grouped by application, which are likely to attract the most interest from potential purchasers:[5]

(i)    Medication Delivery Systems. LRGI supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and

---

[4] This description of LRGI's technical capabilities is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.
[5] This description of LRGI's medical products is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

process repeatability.  Medication delivery products include injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly equipment and plunger tips for syringes used in applications where dosages must be controlled with precision.  Medical applications that utilize LRGI's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology applications, cardiac applications, and cosmetic surgery (Botox delivery).  LRGI has indicated that growth opportunities in this product segment could be strong because:[6]

- Demand for the products could increase as the average age of the population increases;

- Device-makers are likely to continue to move to higher-speed assembly, which could increase the demand for the ability to produce consistently symmetrical parts; and

- Possibility of meaningful growth in applications where dosages must be tightly controlled.

(ii)    <u>Laparoscopic Surgery Devices</u>. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively-small punctures rather than through a large incision. Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection.  LRGI has previously indicated that since 2005, LRGI has built significant relationships with three of the major manufacturers of laparoscopic surgery devices, and has received purchase orders for 21 different components for laparoscopic surgery devices.  According to LRGI, these programs are in the early stages of their life-cycle and could grow in volume over the next several years.

### h. Connector Seals for Automotive Wiring Harnesses

Connector seals for automotive wiring harnesses are LRGI's third-largest product line, accounting for approximately one tenth (1/10) of LRGI's net sales for the first six months of 2009 and approximately one tenth (1/10) of LRGI's forecasted net sales for all of 2009.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.  There are three standard types of connector seals. Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition.  Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

LRGI has previously indicated that it is one of North America's two largest manufacturers of connector seals, with a forecasted 2009 sales volume of over [____] units.  LRGI

---

[6] This description of LRGI's growth opportunities is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

currently manufactures connector seals using both high-consistency silicone rubber ("HCR") and liquid silicone rubber ("LSR") at its facilities in Jasper, Georgia, and Rock Hill, South Carolina. LRGI formerly conducted its connector seals operations in Vienna, Ohio (approximately equidistant between Cleveland and Pittsburgh). The migration of the connector seals operations was designed to reduce overhead costs and create an incremental EBITDA contribution from the connector seals business. LRGI has indicated that the migration is now substantially completed, although the net results are not yet clear.

According to LRGI, its sales of connector seals have declined significantly in recent years for the following reasons:[7]

(i)    Customer in-sourcing of a number of commodity-type seals;

(ii)    Customer re-sourcing of some connector seals due to price increases implemented by LRGI in 2005 and 2006;

(iii)    Customer concerns about sourcing new business with an already-dominant supplier viewed as having financial issues; and

(iv)    The industry-wide reduction in domestic car and truck production.

LRGI has previously indicated that despite these sales declines, LRGI continues to be a leader in the manufacture of connector seals, while maintaining profit and cash flow margins claimed to be above the norm for the automotive supply industry, for the following reasons:[8]

(i)    Product Design. LRGI's focus on connector seals, coupled with its proprietary computer simulation software, has made LRGI capable of assisting its customers in designing the seals for their electrical connectors.

(ii)    Competitive Advantages in Multi-Hole Seals. LRGI has developed cost-effective technology for manufacturing large volumes of the complex, multi-hole seals that have become the industry standard. This technology encompasses:

- State-of-the-art, flashless tools that eliminate the need for costly deflashing operations;

- Advanced wasteless molding technology, utilizing proprietary cold pots that minimize material waste;

- Proprietary "split-pin" technology that facilitates demolding without tears or flashed-over holes;

- High-cavitation tools that increase productivity and reduce cost; and

- Use of automated inspection equipment to meet stringent customer quality

---

[7] This description of LRGI's decline in net sales for its connector seals business is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.
[8] This description of LRGI's competitive strengths in the connector seals market is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

requirements

(iii)    Process Flexibility. LRGI has the capability to produce connector seals using both HCR and LSR and, as a result, can offer its customers a cost-effective method to manufacture each part.

### i. Financial Performance of LRGI

The following table sets forth the actual income from operations of LRGI for 2006 through 2008 and the reconciliation of LRGI's income from operations to its Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for those periods (dollar amounts in thousands).

| | *Years Ended December 31* | | | | | |
|---|---|---|---|---|---|---|
| | *2008* | | *2007* | | *2006* | |
| Net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |
| Cost of sales | 52,173 | 83.8 | 63,039 | 84.5 | 64,772 | 85.1 |
| Gross profit | 10,105 | 16.2 | 11,548 | 15.5 | 11,318 | 14.9 |
| Selling and administrative expenses (1) | 3,409 | 5.5 | 3,573 | 4.8 | 3,676 | 4.9 |
| Income from operations | 6,696 | 10.8 | 7,975 | 10.7 | 7,642 | 10.0 |
| Add back: depreciation and amortization | 4,746 | 7.6 | 5,727 | 7.7 | 6,455 | 8.5 |
| EBITDA | $11,442 | 18.4% | $13,702 | 18.4% | $14,097 | 18.5% |

(1) Selling and administrative expenses for 2008 includes $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist LRGI with the upgrading of the operating systems and manufacturing procedures and controls at LRGI's facility in Rock Hill, South Carolina, where LRGI manufactures rubber components used in medical devices.

LRGI's actual income (through _____) and forecasted income for 2009 and the reconciliation of LRGI's income from operations to its EBITDA for 2009 are as follows (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. The Prepetition Secured Lenders have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and in the future will likely be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations

when used as a measurement of performance, including the following:

(i)     EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)     EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)     EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are noncash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)     EBITDA, as used by the Debtors, does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the Debtors' business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(v)     EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vi)     The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement and the Prepetition Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP.  In particular, it appears that the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

The following table sets forth the actual operating results and EBITDA of LRGI for 2006 through 2008 and its forecasted operating results and EBITDA for 2009 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

The following table sets forth a reconciliation of the forecasted operating results and EBITDA of LRGI for 2009 to its pro forma operating results and EBITDA for 2009 (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

Recently, industry forecasts of automotive production levels have been reduced several times.

## 2. LPC: The Metals Group

The Metals Group is operated through the assets of LPC and consists of LPC's machining business located in Rochester, New York. LPC manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks. LPC primarily uses multi-spindle screw machines and specially-designed rotary transfer machines that allow LPC to perform multiple forming operations on a part simultaneously. The components produced by LPC are primarily for use by automotive OEMs and include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components.

The following table sets forth LPC's actual net sales to each of its principal markets for 2006 through 2008 (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive original equipment | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

The following table sets forth LPC's actual (through _____) and projected net sales to each of its principal markets for 2009 (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

LPC's automotive OEM customers have historically included such major domestic suppliers as BorgWarner, Cooper-Standard Automotive, Delphi, and Jiffy-Tite. The Debtors have previously indicated that LPC has been awarded additional business by these customers as well as a by new customers.

### a. LPC's Competitive Strengths

According to LPC, it has a number of competitive advantages within the markets it serves, which have enabled LPC to build its customer base. These advantages include:[9]

(i)    The ability to design and build specialized manufacturing equipment, which allows LPC to offer its customers comparatively short lead times and low prices;

(ii)    The ability to design and build automation equipment for many of its processes, which allows LPC to offer its customers excellent quality components and low prices; and

---

[9] This description of LPC's competitive strengths is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

(iii)    The ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

### b. Financial Performance of LPC

The following table sets forth the actual operating results and EBITDA of LPC for 2006 through 2008 (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| Net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |
| Cost of sales | 10,934 | 101.7 | 13,490 | 97.6 | 12,387 | 104.9 |
| Gross profit (loss) | (183) | (1.7) | 331 | 2.4 | (576) | (4.9) |
| Selling and administrative expenses | 558 | 5.2 | 523 | 3.8 | 669 | 5.6 |
| Loss from operations | (741) | (6.9) | (192) | (1.4) | (1,245) | (10.5) |
| Add back: depreciation and amortization | 536 | 5.0 | 682 | 4.9 | 820 | 6.9 |
| EBITDA | $ (205) | (1.9)% | $ 490 | 3.5% | $ (425) | (3.6)% |

The following table sets forth the actual (through _____) and projected operating results and EBITDA of LPC for 2009 (dollar amounts in thousands):

[if available, table to be included upon Bankruptcy Court Order allowing disclosure]

Over the past two years, industry forecasts of automotive production levels have been reduced several times.

### c. Strategic Alternatives

According to LPC, it has made significant progress in strengthening its operations and building its sales base but has not been able to generate adequate cash flow to justify continuing investment. LPC has further indicated previously that the net present value of the proceeds from a wind-down of LPC's assets would be approximately $7.6 million, including liquidation of the ownership in certain real property located in Rochester, New York, and Lakewood, New York.

### 3. Non-Operating Assets

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their on-going business. The Plans provides that the applicable Post-Confirmation Trustee shall dispose of such assets in an orderly fashion. The most significant of those assets are the following:

### a. Land in East Ellijay, Georgia (LRGI)

LRGI owns a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site, however, the adjacent area has seen extensive commercial development. LRGI has substantially completed the grading work necessary to

prepare the property for sale, which the Post-Confirmation Trustee will pursue.

The Debtors also own six residential lots aggregating 6.6 acres abutting this commercial property.

### b. Land and Buildings in Lakewood, New York (LPC)

LPC owns a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of LPC's former die casting business, under a lease that expires on December 31, 2009. The lessee pays LPC $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,000. The lease provides for a single, three-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

### c. Land and Buildings in Vienna, Ohio (LRGI)

LRGI owns a 52,540-square foot industrial building on 24.95 acres of land in Vienna, Ohio that was formerly used in connection with LRGI's connector seals business.  As set forth in further detail in Section III.1(h) herein, *"Connector Seals for Automotive Wiring Harnesses"*, the connectors seals business was consolidated into the Rock Hill, South Carolina, and Jasper, Georgia, facilities.

### d. Net Operating Losses and Tax Attributes (LPC and/or LRGI)

The Debtors estimated that Lexington had, for federal income tax purposes, approximately $36.7 million of consolidated net operating loss ("NOL") carryforwards (of which approximately $5.3 million is usable only upon the sale or liquidation of the Debtors' businesses) and $0.9 million of consolidated tax credit carryforwards (collectively, the "Tax Attributes"), according to the Proposed Disclosure Statement dated December 17, 2008.  To the extent any such Tax Attributes are an asset of either LRGI or LPC, the Post-Confirmation Trustees will take reasonable steps to preserve the Tax Attributes and to the extent net value to the respective bankruptcy estates can be realized from same, will pursue liquidation of the Tax Attributes.

### 4. Lexington's Employees

As of December 31, 2008, the Debtors employed approximately 482 permanent employees, including 408 LRGI employees, 68 LPC employees, and 6 corporate employees.  The Debtors have indicated that their relationship with their employees is good.  The Debtors' operations are subject to collective bargaining agreements at two facilities.  Because the Debtors' Rock Hill, South Carolina manufacturing facility is an "open-shop," only certain of its hourly employees are covered by a collective bargaining agreement with the United Steel Workers of America, AFL-CIO, which expires on October 18, 2009.  All of the hourly employees at the Vienna, Ohio manufacturing facility are covered by a collective bargaining agreement with the IUE-CWA, which was recently extended to March 11, 2009, pending discussions about the future of the facility. An analysis of the collective bargaining agreement and the impact of the migration away from the Vienna, Ohio facility will be conducted and appropriate action, if necessary, will be taken prior to the Effective Date by the applicable Post-Confirmation Trustee.

## B. Significant Indebtedness

The significant prepetition indebtedness of LRGI and LPC is described below. In addition to this indebtedness for money borrowed, LRGI and LPC have prepetition and postpetition trade accounts payable and other general unsecured claims of approximately $7.7 million, including approximately $1.2 million at Corporate, approximately $1.4 million for LPC, and approximately $5.1 million for LRGI.

### 1. The Prepetition Credit Agreement

Both Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement"). The Credit Agreement provides for: (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and (ii) an equipment term loan facility in the original principal amount of $12.5 million.

Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of LRGI's and LPC's assets other than real estate and second priority liens on the Debtors' real estate.

The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements. As of the Commencement Date, approximately $22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

As of _____ and after application of the Adequate Protection Payments made by the Debtors pursuant to the Final Cash Collateral Order, the Credit Agreement Lenders' claim is $_____, which amount consists of $_____ in principal, $_____ in accrued but unpaid interest at the non-default rate, $_____ in professional fees, and $_____ in other fees and charges under the Prepetition Credit Agreement.

As described in greater detail in Section IV.B and V.B below, pursuant to the Plans, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims against LRGI under the LRGI Plan and Class 2(a) Claims against LPC under the LPC Plan. Such claims are impaired because, among other things, the Credit Agreement Lenders will not receive default interest or any prepayment premiums that are provided for under the Prepetition Credit Agreement.

### 2. The Prepetition Loan Agreement

Both Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders,"), as amended pursuant to the Default Waiver Agreement. The Prepetition Loan Agreement provides for two real estate term

loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

Pursuant to the Prepetition Loan Agreement, CSE, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the both LRGI's and LPC's real estate, and second priority liens on substantially all of both LRGI's and LPC's other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements. As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B. As of _____ and after application of the Adequate Protection Payments made by the Debtors pursuant to the Final Cash Collateral Order, the Loan Agreement Lenders' claim (a) on account of Term Loan A is $_____, which amount consists of $_____ in principal, $_____ in accrued but unpaid interest at the non-default rate, $_____ in professional fees, and $_____ in other fees and charges under the Prepetition Loan Agreement; and (b) on account of Term Loan B is $_____, which amount consists of $_____ in principal, $_____ in accrued but unpaid interest at the non-default rate, $_____ in professional fees, and $_____ in other fees and charges under the Prepetition Loan Agreement.

As described in greater detail in Section IV.B and V.B below, pursuant to the Plans, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims against LRGI under the LRGI Plan and Class 2(b) Claims against LPC under the LPC Plan. Such claims are impaired because, among other things, the Loan Agreement Lenders will not receive default interest or any prepayment premiums that are provided for under the Prepetition Loan Agreement.

### 3. Senior Subordinated Notes (LPC only)

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes"). Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

According to LPC, approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates. Approximately 74.4% of the Senior Subordinated Notes are held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date. Three members of the Ad Hoc Committee and the Indenture Trustee now serve as members of the statutory creditors' committee (the "Creditors' Committee") in the Chapter 11 Cases.

As described in greater detail in Section V.B below, pursuant to the LPC Plan, Claims arising from the Senior Subordinated Notes are classified under the LPC Plan as Class 5 Claims against LPC. The Senior Subordinated Notes are general unsecured obligations of LPC.

LRGI is not liable for the Senior Subordinated Notes.

### 4. Junior Subordinated Note (LPC only)

Michael A. Lubin, Chairman of the Board of the Debtors, holds an unsecured Junior Subordinated Note made by LPC and due November 1, 2009 in the principal amount of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note"). Interest on the Junior Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, $75,000 of accrued interest was outstanding with respect to the Junior Subordinated Note. As described in greater detail in Section V.B below, pursuant to the LPC Plan, Claims arising from the Junior Subordinated Note are classified under the LPC Plan as Class 7 Claims against LPC. The right to payment on the Junior Subordinated Note is expressly subordinated to the Senior Subordinated Notes and is a general unsecured obligation of LPC. LRGI is not liable for the Junior Subordinated Note.

## C. The Asbestos Cases Against LPC[10]

LPC has previously indicated that it is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos Actions"). LRGI is not a defendant. In each case, the plaintiffs generally allege that LPC or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers. Generally, none of the complaints allege any specific facts as to which products LPC allegedly produced that contained asbestos or the time of exposure.

LPC has denied and continues to deny any liability with respect to the Asbestos Actions. To date, the Debtors have never been found liable on any asbestos-related Claims and approximately 1,000 cases were dismissed.

To date, Liberty Mutual and Home Insurance Company, who insured the Debtors for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors' defense costs. On June 13, 2003, Home Insurance Company became subject to a state insurance liquidation proceeding. As of December 17, 2008, Liberty Mutual continued to pay the Debtors' defense and other asbestos-related costs.

LPC believes the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
|---|---|
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and aggregate coverage for products liability bodily injury, $1,000,000 per occurrence |

---

[10] This description of the Asbestos Actions and claims arising therefrom is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund. LPC believes Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage. LPC believes that the Fireman's Fund coverage is as follows:

| Period | Coverage |
|---|---|
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |
| 6/1/79-6/1/80 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

It should be noted that there may be filed certain Asbestos Related Claims with respect to years for which there may not be any insurance coverage. As described below, and as provided for in the Plan, the lack of insurance coverage for a valid and enforceable Asbestos Related Claim will not preclude a holder of such claim from receiving a distribution under the Plan.

As described in greater detail in Section V.B below, pursuant to the LPC Plan, Asbestos-Related Claims are classified under the LPC Plan as Class 6 Claims against LPC. Following sixty (60) days after the appointment of the LPC Post-Confirmation Trustee, each Asbestos-Related Claim shall be commenced to be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; *provided, however,* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall as promptly as possible after sixty (60) days from the appointment of the LPC Post-Confirmation Trustee commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, and laches. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors, the LPC Post-Confirmation Trust or the LPC Litigation Trust (other than against the Asbestos Insurance Policies). To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the holder of the Allowed Asbestos-Related Claim shall receive, to the extent funds are available, distributions from the LPC Post-Confirmation Trust and/or the LPC Litigation Trust, in the LPC Post-Confirmation Trustee's discretion and in an amount equal to the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by LPC or any other party, including the LPC Post-Confirmation Trustee or the Plan**

**Proponents, or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the
treatment provided to holders of Asbestos-Related Claims is not an admission of any liability
by LPC or any other party, including the LPC Post-Confirmation Trustee or the Plan
Proponents, or of insurance coverage by Liberty Mutual or Fireman's Fund.**

### D. Significant Events Leading to the Commencement of the Chapter 11 Cases

According to the Debtors, historically over 75% of the Debtors' business
represented sales of rubber and metal components used by tier-one automotive part
manufacturers, which supply automotive parts to domestic original OEMs. Over the past decade,
there has been a substantial decline in the market share of the Detroit-based OEMs. Since 2005,
but during 2008 in particular, there has been a meaningful reduction in the aggregate number of
vehicles produced annually in the U.S. by all manufacturers. These factors have caused tier-one
suppliers, particularly those focused on the Detroit-based OEMs, to experience declining sales
and increased pricing pressures. This challenging industry environment has been exacerbated by
industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which
has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of
component suppliers like Lexington. In response, LRGI and LPC have taken steps to reduce costs
and to increase their focus on their automotive aftermarket and medical device businesses.

#### 1. Liquidity Crisis[11]

Notwithstanding the operational restructuring and their efforts to diversify their
business, the industry-wide reduction in automotive OEM orders began to affect Lexington in a
significant way in mid-2006. Although Lexington was able to maintain superior margins, the
reduction in sales to the automotive OEMs had a significant impact on Lexington's overall cash flow.
At the same time, LRGI's Rock Hill, South Carolina facility, which produces components for the
medical device industry, was preparing to launch a major new program for one of the world's largest
manufacturers of laparoscopic surgical devices and was incurring startup expenses of approximately
$150,000 per month in that effort. The combination of these factors caused a significant drain on the
Debtors' cash.

On November 1, 2006, a regular, quarterly interest payment was due in respect of
the Senior Subordinated Notes. The Debtors did not make the scheduled payment on the due date or
within the thirty-day grace period, which constituted a default under the Indenture, and by February
1, 2007, that default created a cross-default under the Prepetition Credit Agreement and the
Prepetition Loan Agreement. Shortly thereafter, certain holders of the Senior Subordinated Notes
organized and formed the Ad Hoc Committee.

#### 2. Restructuring Efforts[12]

From November 2006 through mid-March 2007, the Debtors held extensive

---

[11] This description of the Debtors' liquidity crisis is based upon the Debtors' Disclosure Statement filed in these
Chapter 11 Cases on December 17, 2008.
[12] This description of the Debtors' restructuring efforts is based upon the Debtors' Disclosure Statement filed in
these Chapter 11 Cases on December 17, 2008.

discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues. In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all stakeholders. Upon entering into the standstill agreement, the Debtors engaged Campbell to assist them in seeking a refinancing or a sale of all or a portion of LRGI.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers. The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date. In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code. The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

Thereafter, the Debtors began their asset sale and refinancing efforts. The Debtors were able to obtain several indications of interest for all or portions of LRGI. Based upon those indications of interest and the advice of Campbell, the Debtors concluded that, notwithstanding the Debtors' negative book net worth calculated in accordance with GAAP, the value of the Debtors' assets exceeded their liabilities.

Upon reviewing the various sale proposals, the Debtors determined to proceed with a non-binding proposal, subject to due diligence, from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase LRGI's facility in Rock Hill, South Carolina, which produces molded rubber components for use in medical devices, at a price of $32 million in cash subject to a standard purchase price adjustment provision related to increases or decreases in working capital (the "Rock Hill Sale"). The Rock Hill facility had $16 million in net sales for 2007, and the net book value of that facility was $5.3 million on December 31, 2007. The sale would have generated a pre-tax gain of approximately $26 million for U.S. federal income tax purposes, all of which was anticipated to be sheltered by the Debtors' net operating loss carry-forward (subject to a possible alternative minimum tax).

In conjunction with that sale process, the Debtors began to seek senior secured financing arrangements that would have enabled them, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, to make substantial payments in respect of the Senior Subordinated Notes, and to finance the operations and growth of the Debtors' remaining businesses. The Debtors were able to obtain a non-binding proposal, subject to due diligence, from a prospective institutional lender (the "Potential New Secured Lender") for a $36.7 million senior secured credit facility that, had it closed, would have enabled Lexington to (a) repay the Prepetition Secured Lenders, (b) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (c) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates of the Debtors. The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a

5-year maturity and a cash-pay interest rate of 12%. The Junior Subordinated Note and the Senior Subordinated Notes held by the affiliated holders would have been converted to common stock, reducing the Debtors' remaining book debt by an additional $8 million.

In mid-January 2008, the Debtors advised the Ad Hoc Committee that they believed that, in order to move forward with the Rock Hill Sale and the related financing, they required an extension of the current standstill arrangement (which was due to expire on January 24, 2008) to April 30, 2008. The requested extension reflected the time periods requested by the Rock Hill Buyer and the Potential New Secured Lender in order to permit them to complete their respective due-diligence investigations. The Ad Hoc Committee and the Debtors were unable to reach agreement on the Rock Hill Sale or to achieve an extension of the standstill agreement, and the Debtors began preparations for chapter 11.

In a final effort to avoid the expense and disruption of two chapter 11 cases, Lexington made two additional restructuring proposals. The first proposal, which was made to the Ad Hoc Committee, included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process. In support of this recapitalization, Lexington was able to obtain from the Potential New Secured Lender a modified, non-binding financing proposal that would have provided for a $43.3 million senior, secured credit facility, conditioned upon due diligence and the completion of the recapitalization. The Debtors believe that this facility would have been adequate to finance their entire business without the Rock Hill Sale. The proposed recapitalization would have enabled the Debtors to repay the Prepetition Secured Lenders in full, and in the Debtors' view, would have provided a full recovery to the holders of the Senior Subordinated Notes. The Ad Hoc Committee rejected the recapitalization proposal because it believed, based upon its valuation of the Debtors, that it would not have provided a full recovery to the holders of the Senior Subordinated Notes.

The second proposal was made to Jefferies High Yield Trading ("Jefferies"), the largest holder of the Senior Subordinated Notes with approximately 37.1% of the issue. To the knowledge of the Debtors, the second proposal was not shared with the other members of the Ad Hoc Committee. That proposal provided for a full conversion of the Senior Subordinated Notes to equity and would likely have given a majority of the voting power in the Debtors to non-affiliated holders of the Senior Subordinated Notes, conditioned upon reaching agreement on the following: (a) a continuing interest for existing stockholders consistent with the values reflected in the sale offers the Debtors had received; (b) shared control of the Board of Directors for at least two years following the restructuring; (c) continuation of current management of the Debtors for at least two years following the restructuring; and (d) a one-time right to purchase the shares issued to Jefferies if the shared control arrangements were terminated after two years, at a 40% premium to the amount owed to Jefferies at the time of conversion. After negotiations between the Debtors and Jefferies, and a counterproposal by Jefferies, the Debtors and Jefferies were not able to reach an agreement.

In light of the foregoing, the Debtors determined that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code. The Debtors believed that the short-term standstill arrangements under which they had been operating for approximately a year prior to the Commencement Date were having a significant adverse effect on their business because of customer concerns about awarding additional business to a company with an uncertain future, and that further delay would only exacerbate any negative impact.

### E. The Chapter 11 Cases

#### 1. Commencement of the Chapter 11 Cases and the "First-Day" Orders

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases. Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' respective reorganizations.

##### a. Case Administration Orders

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases. These orders: (i) authorized the joint administration (but not consolidation) of the Chapter 11 Cases, (ii) established notice procedures, (iii) granted an extension of time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix. In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

##### b. Critical Obligations

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations. The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits, (ii) sales and use taxes, and (iii) claims of common carriers, equipment processors, and warehouses.

##### c. Customer and Employee Programs

Further, the Bankruptcy Court granted authority to continue certain business operations. Among other things, the Bankruptcy Court authorized the Debtors to: (i) continue certain customer service programs and (ii) continue certain workers compensation and all other insurance policies.

##### d. Financing Arrangements

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to (i) consensually use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing, (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral, and (iii) maintain their existing bank accounts and forms. More detailed descriptions of the cash collateral and postpetition financing terms are included in Sections III.E.3 and III.E.4 below, respectively.

### 2. Appointment of the Creditors' Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the seven-member Creditors' Committee to represent the interests of all unsecured creditors in both Chapter 11 Cases. The original members of the Creditors' Committee were: Wilmington Trust Company, Jefferies High Yield Trading, Wilfrid Aubrey, LLC, Valhalla Capital Partners, LLC, Momentive Performance Materials, Inc., Wacker Chemical Corporation and Environmental Products & Services of Vermont, Inc.

Wacker Chemical Corporation resigned from the Creditors' Committee on August 20, 2008. It should be noted that representatives of Jefferies High Yield Trading, Wilfrid Aubery, LLC, and Valhalla Capital Partners, LLC also served on the Ad Hoc Committee. The Creditors' Committee retained Andrews Kurth LLP as counsel to the Creditors' Committee, and SRR as financial advisor to the Creditors' Committee.

### 3. Use of Cash Collateral

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained by agreement the authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements.

The Debtors' use of the Prepetition Secured Lenders' cash collateral was subject to various conditions, including without limitation that a plan of reorganization be confirmed and consummated within three hundred thirty (330) days of the Commencement Date, or on or before February 25, 2009, and such plan was required to pay the Prepetition Secured Lenders' Claims indefeasibly in full on the effective date of any such plan.

Near the expiration of the consensual term on February 2, 2009, the Debtors filed a motion for non-consensual use of the Prepetition Secured Lenders' cash collateral through December 31, 2009. The Prepetition Secured Lenders objected to the motion. Prior to the hearings on the Debtors' motion, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through February 6, 2009, net sales of at least 90% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under the cash collateral order entered on April 17, 2008 (the "Original Cash Collateral Order"). The Prepetition Secured Lenders have reserved their rights regarding such default.

At the hearings on the Debtors' motion on February 23 and 24, 2009, the Bankruptcy Court declined to approve the representative from Campbell as an expert because, among other things, Campbell provided its valuation report without independently verifying the Debtor's financial data and expressly disclaiming any responsibility for the accuracy of such data. In explaining its ruling on the Debtors' motion, the Bankruptcy Court indicated that the only competent valuation testimony was that of Bridge Associates, LLC, who has served as Financial Advisor to the Prepetition Secured Lenders prior to and during the Chapter 11 Cases.

After the hearings on the Debtors' motion, the Court, by entry of a "Second Cash Collateral Order" extended the Debtors use of cash collateral for thirteen (13) weeks to May 22, 2009, on terms substantially similar to those of the Original Cash Collateral Order. The Debtors and

Prepetition Secured Lenders negotiated a form or order, which included additional covenants regarding minimum cash balances and certain other performance metrics, as well as certain increased reporting requirements, all designed to protect against a rapid decline in value of the Prepetition Secured Lenders' collateral.  In addition, the Prepetition Secured Lenders agreed to relax the net sales covenant from 90% to 85% of projected net sales; however, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through May 1, 2009, net sales of at least 85% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under the Second Cash Collateral Order.  The Prepetition Secured Lenders have reserved their rights regarding such default.

On April 29, the Debtors filed a second motion to extend use of the Prepetition Secured Lenders' cash collateral for an additional thirteen weeks.  Prior to the hearing on the Debtors' second motion, the Debtors and the Prepetition Secured Lenders negotiated an additional 13-week extension for the Debtors' further use of the Prepetition Secured Lenders' cash collateral through August 21, 2009 on substantially the same terms as the Original Cash Collateral Order and the Second Cash Collateral Order, which is reflected by the "Third Cash Collateral Order" entered in the Chapter 11 Cases on May 4, 2009.  In addition, the Prepetition Secured Lenders agreed to further relax the net sales covenants from 85% to 82% of projected net sales.

On August 5, 2009, the Debtors filed a third motion to extend the Debtors' use of the Prepetition Secured Lenders' cash collateral by another 13 weeks.  Prior to the hearing on the third motion, the Debtors and the Prepetition Secured Lenders agreed to a short-term extension for the Debtors' use of the Prepetition Secured Lenders' cash collateral from August 21, 2009 to September 25, 2009, on substantially the same terms as the Third Cash Collateral Order, which is reflected by a stipulation, agreement and order entered in the Chapter 11 Cases on August 17, 2009.  The Prepetition Secured Lenders have not agreed to any further extension and are under no obligation to agree to any extension.

### 4. Debtor-in-Possession Financing

In order to comfort creditors and customers regarding the liquidity position of the Debtors, the Debtors obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008.  Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' board of directors and the Debtors' Co-Chief Executive Officer.  William B. Connor currently serves as a director on the Debtors' board of directors.  The Debtors have alleged that ORA Associates is not an insider of the Debtors.

The Bankruptcy Court approved the DIP Note on April 17, 2008. The original maturity date of the DIP Note was April 1, 2009, which maturity date was extended upon motion by the Debtors to December 31, 2009.  No additional fees were paid to the DIP Lenders in exchange for the extension. Under the terms and conditions of the Final Cash Collateral Order, repayment of the DIP Note was made expressly subordinate to the Claims of the Prepetition Secured Lenders' Claims.  Claims arising from the DIP Note shall be paid after payment in full of the Prepetition Secured Lenders' Claims in both the LRGI and the LPC case and as otherwise set forth in the applicable Plans.

### 5. The Debtors' Exclusive Periods

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case. In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case. A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Creditors' Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit acceptances thereof. The Debtors objected. On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively. On July 17, 2008, the Creditors' Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend the Debtors' exclusive periods for an additional 90 days. On July 22, 2008, the Creditors' Committee filed that objection. On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods. Thereafter, by decision and order dated July 31, 2008, the Court granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

On October 7, 2008, the Debtors filed a second motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to January 26, 2009, and February 25, 2009, respectively. The Creditors' Committee objected to the Debtors' motion. On October 28, 2008, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors' motion.

On January 12, 2009, the Debtors filed a third motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances. The Creditors Committee and the Prepetition Secured Lenders objected to the Debtors' motion. The Debtors also filed a motion for a bridge order extending the Debtors exclusive periods pending a hearing on the Debtors' third extension motion. After hearings on February 23 and 24, 2009, the Court extended the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof to April 30, 2009 and June 1, 2009, respectively.

The Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances expired on April 30, 2009 and June 1, 2009, and have not been extended. Accordingly, the Prepetition Secured Lenders are permitted to file and pursue confirmation of the Plans, which pursuit they feel compelled to undertake in light of the lack of any reasonable prospects for an exit strategy other than a sale process.

### 6. The Mediation Process

In connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of the Prepetition Secured Lenders' cash collateral and the Debtors' third

motion to extend the exclusive periods, the Bankruptcy Court ordered that the Debtors, the Creditors' Committee, and the Prepetition Secured Lenders to attend mediation sessions regarding valuation, structure of potential consensual plans of reorganization, and the ultimate resolution of these Chapter 11 Cases. The parties agreed upon the appointment of Seymour Preston, Jr., of Goldin Associates, who conducted several mediation sessions with the Debtors and the Creditors' Committee after submission of valuation reports from Campbell and SRR.

The Prepetition Secured Creditors have not been involved in the mediation, as the principal disputes described in Section III.D above between the Debtors and the Creditors' Committee have continued to persist in the Chapter 11 Cases. As a result, the mediation has not produced an agreement between the Debtors and the Creditors' Committee to date.

### 7. The Claims Reconciliation Process

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline for any claimant other than (i) a counterparty to an executory contract rejected by the Debtors after July 16, 2008 or (ii) a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of claim. The deadline for a counterparty to an executory contract rejected by the Debtors after July 16, 2008 is discussed in Section VIII below. The deadline for Government Units to file a proof of claim was September 29, 2008. In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of claim form. The notice included information as to how to file a proof of claim and whether filing a proof of claim is necessary. On July 18, 2008, the Debtors also published the same notice in the national edition of The Wall Street Journal.

## IV. THE LRGI PLAN

This Section of the Disclosure Statement summarizes the LRGI Plan, which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the full text of the LRGI Plan. To the extent any inconsistencies exist between the Disclosure Statement and the LRGI Plan, the LRGI Plan shall govern. PURSUANT TO THE LRGI PLAN, THERE WILL BE NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC ESTATES.

### A. Summary and Treatment of Unclassified Claims

The LRGI Plan does not classify all Claims and Interests. In particular, Claims incurred during the course of the Chapter 11 Cases (*i.e.*, Administrative Expense Claims) and Priority Tax Claims are unclassified. A summary of these Claims is set forth below.

### 1. Administrative Expense Claims

Administrative Expense Claims are the actual and necessary costs and expenses of the LRGI Chapter 11 Case that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to LRGI during the Chapter 11 Cases and tax obligations incurred after the Commencement Date. Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to LRGI and the Creditors' Committee that are incurred during the pendency of the LRGI Chapter 11 Case.

In running LRGI's businesses and conducting the sales contemplated by the Plan, the Post-Confirmation Trustee will pay Administrative Expense Claims incurred in the ordinary course of business and consistent with past practice or arising under loans or advances to LRGI after the Commencement Date, whether or not incurred in the ordinary course of business, in accordance with the terms and conditions of the particular transaction and any related agreements and instruments. The Post-Confirmation Trustee will pay all other Administrative Expense Claims, in full, in cash, on the Effective Date or as soon thereafter as is practicable, or on such other terms to which the Post-Confirmation Trustee and the holder of such Administrative Expense Claim agree. The Post-Confirmation Trustee will have the sole and exclusive authority to liquidate and pay any Administrative Expense Claims accruing after the Confirmation Date or any Administrative Expense Claim that remains unpaid as of the Confirmation Date.

The Post-Confirmation Trustee may file a motion to set a bar date for filing of proofs of Administrative Expense Claims through a date certain. Pursuant to Section 2.1 of the LRGI Plan, each holder of an Allowed Administrative Expense Claim shall receive Cash in the amount of its Allowed Administrative Expense Claim on or soon as reasonably practicable following the later of (a) the Effective Date or (b) the date on such Claim is Allowed, except that (i) any Allowed Administrative Expense Claim incurred in the ordinary course of business shall be paid in the ordinary course of business, consistent with past practice and (ii) any Allowed Administrative Expense Claims arising from liabilities incurred under loans, advances, or other obligations shall be paid in accordance with the terms and subject to the conditions of the documents governing such obligations. Holders of Allowed Administrative Expense Claims may also elect to receive less favorable treatment.

Because of the overlap of liability for some Administrative Expense Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Administrative Expense Claim may also be recoverable from the LPC bankruptcy estate in addition to the LRGI estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Administrative Expense Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 2. Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court shall fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date. Each holder of such a Claim shall be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (a) the Effective Date or (b) the date which such Claim is Allowed. In running LRGI's businesses and conducting the sales contemplated by the LRGI Plan, the Post-Confirmation Trustee is authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

Because of the overlap of liability for some Professional Compensation and Reimbursement Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Professional Compensation and Reimbursement Claim may also be recoverable from the LPC bankruptcy estate in addition to the LRGI estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Professional Compensation and Reimbursement Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 3. Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive, at the sole discretion of the Post-Confirmation Trustee, (a) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date and (ii) the date such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of

the Effective Date, equal to such Allowed Priority Tax Claim.

Because of the overlap of liability for some Priority Tax Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Priority Tax Claim may also be recoverable from the LPC bankruptcy estate in addition to the LRGI estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Priority Tax Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 4. DIP Loan Claim

Unless otherwise agreed to by the holders of the DIP Loan Claim, each holder of an Allowed DIP Loan Claim against LRGI shall receive, in full satisfaction of such claim, distributions from the LRGI Post-Confirmation Trust and the LRGI Litigation Trust, in the form of Cash, in an amount equal to such Allowed DIP Loan Claim to the extent such funds are available. Because the DIP Lenders agreed to subordinate their right to repayment of the DIP Note as set forth in the Final Cash Collateral Order, payment of such Allowed DIP Loan Claim shall be made only after payment in full of the Prepetition Secured Lenders' Claims in both the LRGI case and the LPC case, as well as the Secured Tax Claims and Other Secured Claims in both the LRGI and the LPC case. Payments of the DIP Loan Claim from the LRGI Post-Confirmation Trust, the LRGI Liquidation Trust, the LPC Post-Confirmation Trust, and the LPC Litigation Trust shall not, in the aggregate, exceed the total amount due under the DIP Note, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### B. Classification and Treatment of Classified Claims Against and Interests In LRGI

The LRGI Plan provides for 6 classes of Claims and Interests. Unless indicated otherwise, all distributions shall be in full satisfaction of each Allowed Claim or Interest and shall be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed. Further, claimholders can generally agree to receive less favorable treatment than the treatment provided for by the Plan. Unless otherwise indicated and to the extent such information is available to them, the Prepetition Secured Lenders have based the characteristics and amounts of the Claims or Interests on LRGI's books and records.

#### a. Class 1 – Other Priority Claims against LRGI (Unimpaired)

Class 1 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims). Each holder of an Allowed Other Priority Claim against LRGI shall receive Cash in the amount of its Allowed Other Priority Claims against LRGI. Because Class 1 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### b. Class 2(a) – CapitalSource Secured Claims against LRGI (Impaired)

Class 2(a) Claims are all Claims against LRGI arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order, less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Class 2(a) Claims shall be Allowed as filed, plus, to the extent there are sufficient assets in the estates to pay such amounts, any supplemental fees, interest and charges that have accrued since the Commencement Date through the Effective Date, but such Claims shall not include interest at the default rate or any prepayment premium.

Each holder of an Allowed CapitalSource Secured Claim against LRGI (or its designee) shall receive beneficial first priority interest in the LRGI Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim, on or as soon as reasonably practicable after the entry of the Confirmation Order, on account of which interest such holder will receive distributions from the LRGI Post-Confirmation Trust as soon as reasonably practicable after any sale is consummated.  In no event shall the combination of distributions on account of Class 2(a) under the LRGI Plan and Class 2(a) Claims under the LPC Plan exceed the Allowed Amount of the Class 2(a) Claims under the LRGI Plan.  Subject to the occurrence of the Effective Date, any and all Liens on LRGI's assets in favor of CapitalSource shall be deemed released, with such liens attaching and becoming automatically perfected in first position on the corpus (including all income on and increases thereto) of the LRGI Post-Confirmation Trust (with relative priority versus the CSE Secured Claims against LRGI being subject to the terms and conditions of the Intercreditor Agreement).  Holders of Allowed CapitalSource Secured Claims may also be entitled to a distribution from the LRGI Litigation Trust on account of certain replacement liens on avoidance actions under the Final Cash Collateral Order.

Because Class 2(a) Claims are impaired by the LRGI Plan, holders of CapitalSource Secured Claims against LRGI are entitled to vote to accept or reject the LRGI Plan.

### c. Class 2(b) – CSE Secured Claims against LRGI (Impaired)

Class 2(b) Claims are all Claims against LRGI arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Class 2(b) Claims shall be Allowed as filed, plus, to the extent there are sufficient assets in the estates to pay such amounts, any supplemental fees, interest and charges that have accrued since the Commencement Date through the Effective Date, but such Claims shall not include interest at the default rate or any prepayment premium.

Each holder of an Allowed CSE Secured Claim against LRGI (or its designee) shall receive beneficial first priority interest in the LRGI Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim, on or as soon as reasonably practicable after the entry of the Confirmation Order, on account of which interest such holder will receive distributions from the LRGI Post-Confirmation Trust as soon as reasonably practicable after any sale is consummated.  In no event shall the combination of distributions on account of Class 2(b) under the LRGI Plan and Class 2(b) Claims under the LPC Plan exceed the Allowed Amount of the Class 2(b) Claims under

the LRGI Plan. Subject to the occurrence of the Effective Date, any and all Liens on LRGI's assets in favor of CSE shall be deemed released, with such liens attaching and becoming automatically perfected in first position on the corpus (including all income on and increases thereto) of the LRGI Post-Confirmation Trust (with relative priority versus the CapitalSource Secured Claims against LRGI being subject to the terms and conditions of the Intercreditor Agreement). Holders of Allowed CSE Secured Claims may also be entitled to a distribution from the LPC Litigation Trust on account of certain replacement liens on avoidance actions under the Final Cash Collateral Order.

Because Class 2(b) Claims are impaired by the Plan, holders of CSE Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### d. Class 3 – Secured Tax Claims against LRGI (Impaired)

Class 3 Claims are Claims against LRGI that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI shall receive a second priority beneficial interest in the LRGI Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of the Confirmation Order. Subject to the occurrence of the Effective Date, any and all Liens on LRGI's assets in favor of a holder of a Secured Tax Claim against LRGI shall be deemed released, with such liens attaching and becoming automatically perfected in second position on the corpus (including all income on and increases thereto) of the LRGI Post-Confirmation Trust. On account of such interest, but only after the Allowed Class 2(a) and Class 2(b) Claims are paid in full, each holder shall receive, at the sole option of the LRGI Post-Confirmation Trustee, distributions from the LRGI Post-Confirmation Trust in the form of (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Senior Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Senior Tax Claim.

Because Class 3 Claims are impaired by the Plan, holders of Secured Tax Claims against LRGI are entitled to vote to accept or reject the LRGI Plan.

### e. Class 4 – Other Secured Claims against LRGI (Impaired)

Class 4 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such

Other Secured Claims against LRGI that is required to be paid pursuant to section 506(b) of the
Bankruptcy Code.

Each holder of an Allowed Other Secured Claim against LRGI shall receive a third
priority beneficial interest in the LRGI Post-Confirmation Trust in an amount equal to the Allowed
Amount of such Claim on or as soon as reasonably practicable after entry of the Confirmation Order.
Subject to the occurrence of the Effective Date, any and all Liens on LRGI's assets in favor of a
holder of an Other Secured Claim against LRGI shall be deemed released, with such liens attaching
and becoming automatically perfected in third position on the corpus (including all income and
increases thereto) of the LRGI Post-Confirmation Trust. On account of such interest, but only after
the Allowed Class 2(a), Class 2(b) and Class 3 Claims are paid in full, each holder shall receive, at
the sole option of the LRGI Post-Confirmation Trustee, distributions from the LRGI Post-
Confirmation Trust in the form of (i) Cash in an amount equal to such Allowed Other Secured Claim,
including any interest on such Allowed Other Secured Claim required to be paid pursuant to section
506(b) of the Bankruptcy Code, (ii) the proceeds of the sale or disposition of the Collateral securing
such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim
required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of
the holder's security interest in such Collateral, or (iii) the Collateral securing such Allowed Other
Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant
to section 506(b) of the Bankruptcy Code.

Because Class 4 Claims are impaired by the Plan, holders of Other Secured Claims
against LRGI are entitled to vote to accept or reject the LRGI Plan.

### f. Class 5 – General Unsecured Claims against LRGI (Impaired)

Class 5 Claims are all General Unsecured Claims against LRGI that are not an
Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax
Claim, an Other Secured Claim, a CapitalSource Secured Claim, or a CSE Secured Claim.

Each holder of an Allowed General Unsecured Claim against LRGI shall receive
both (i) a fourth priority beneficial interest in the LRGI Post-Confirmation Trust in an amount
equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of
the Confirmation Order, and (ii) a beneficial interest in the LRGI Litigation Trust in an amount
equal to the Allowed Amount of such claim.  On account of such beneficial interests, at the sole
option of the LRGI Post-Confirmation Trustee, each holder shall receive a combination of the
following in the form of Cash in an amount equal to the Allowed amount of the General Unsecured
Claim: (a) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, and the Allowed DIP Loan
Claim are paid in full, distributions from the LRGI Post-Confirmation Trust; and (b) only after the
Allowed Class 2(a) and 2(b) Claims and the Allowed DIP Loan Claim are paid in full, distributions
from the LRGI Litigation Trust.

Because Class 5 Claims are impaired by the Plan, holders of General Unsecured
Claims against LRGI are entitled to vote to accept or reject the LRGI Plan.

### g. Class 6 – Interests in LRGI (Impaired)

Class 6 Equity Interests are all Interests in LRGI, all of which are owned by LPC.
Each holder of an Allowed Interest in LRGI shall receive a residual interest in the LRGI Post-

Confirmation Trust and a residual interest in the LRGI Litigation Trust, and on account of such interests, shall receive distributions of the remaining corpus (including any income on and increases thereto) of each trust after payment in full of all other beneficial interests in each trust. Because Class 6 is impaired by the Plan, holders of Interests in LRGI are entitled to vote to accept or reject the LRGI Plan.

## C. Distributions Pursuant to the LRGI Plan

The Post-Confirmation Trustee shall serve as Disbursing Agent for all distributions under the LRGI Plan. The Disbursement Record Date will be three (3) days after the Confirmation Date, at which time the claims registry shall be closed. The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the LRGI's schedules, books and records, or in any proofs of claim filed. Any Cash distribution shall be made by check or wire transfer or as otherwise provided by any applicable agreements. No Cash distributions under $50 shall be made unless the holder sends a written request to the Disbursing Agent.

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent shall use reasonable efforts to locate the holder. If the distribution remains undeliverable one year after the Effective Date, the distribution shall revert back to the estate of the respective Debtor and made available for distribution to the next priority interests in the applicable Post-Confirmation Trust.

The Post-Confirmation Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the respective Debtor or their respective estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Post-Confirmation Trustee shall not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement.

## D. Implementation of the LRGI Plan and Related Documents

To fund the distributions under the LRGI Plan and the continued operations of LRGI pending the asset sales contemplated by the LRGI Plan, the Post-Confirmation Trustee shall be entitled to use the Prepetition Secured Lenders' cash collateral on terms and conditions acceptable to the Prepetition Secured Lenders. In addition, the Post-Confirmation Trustee will pursue sales of non-operating assets, as well as prosecution of avoidance actions and other litigation claims. Finally, to the extent net operating losses and carry-forwards, if any, are preserved for the benefit of the LRGI estate, the Post-Confirmation Trustee may pursue liquidation of those through a merger transaction. The Post-Confirmation Trustee shall pursue, in its discretion, any and all sale scenarios and will maximize the collective recovery for the constituents of the LRGI bankruptcy estate.

### 1. The LRGI Post-Confirmation Trust and LRGI Litigation Trust

On the Confirmation Date, all assets of LRGI (except as set forth in section 5.3(b) of the LRGI Plan) shall be deemed to be transferred from the Debtors to the LRGI Post-Confirmation Trust, and the LRGI Post-Confirmation Trustee shall continue ongoing operations of the Debtors' businesses while pursuing one or more sales of the assets, either on a going concern or a liquidation basis as circumstances may warrant. The LRGI Post-Confirmation Trustee shall be vested with any and all authority to operate the businesses of LRGI, including without limitation the hiring and/or firing of corporate officers, entry into contracts, termination of contracts and the determination of compensation levels (including "stay bonuses" to incent quick resolution of the Plan and sales hereunder), all without the need for the Court authority. Except as consented to by the LRGI Post-Confirmation Trustee, the current management shall refrain from management, and in all cases shall not interfere with the LRGI Post-Confirmation Trustee's operation of the business. The terms and conditions of the LRGI Post-Confirmation Trust will be governed by that certain LRGI Post-Confirmation Trust Agreement, the form of which shall be included in the Plan Supplement.

Also on the Confirmation Date, all avoidance actions under chapter 5 of the Bankruptcy Code, the ability to object to any Claims or Interests, and all litigation claims of whatever nature or amount shall be vested in the LRGI Litigation Trust. The LRGI Post-Confirmation Trustee shall have the power to commence, prosecute, pursue, settle, dismiss or otherwise control all aspects of any such claims. The terms and conditions of the LRGI Litigation Trust will be governed by that certain LRGI Litigation Trust Agreement, the form of which shall be included in the applicable Plan Supplement.

The LRGI Post-Confirmation Trustee will be designated in the Plan Supplement.

### 2. The Sale Agent

On the Confirmation Date, Gordian Group, LLC shall be appointed the sole and exclusive "Sale Agent" of the LRGI Post-Confirmation Trustee in order to commence and explore sale possibilities of the assets of the LRGI Post-Confirmation Trust either as a whole (either together with the assets of the LPC Post-Confirmation Trust or separate) or in separate lots. The marketing process shall last up to one hundred (100) days from the Confirmation Date. To the extent the marketing process yields a Stalking Horse Bidder prior to the 100th day after the Confirmation Date, the marketing process may be shorter than 100 days in the applicable Post-Confirmation Trustee's discretion in consultation with the Plan Proponents and the Sale Agent. The Plan Proponents intend to move the Bankruptcy Court to allow Gordian to commence the marketing of the LRGI businesses prior to the confirmation date. Such sales shall be conducted in accordance with Section 363 of the Bankruptcy Code by motion by the LRGI Post-Confirmation Trustee and in consultation with the Sale Agent and the Prepetition Secured Lenders.

### 3. The Sale Process

Once the Sale Agent has obtained a party or parties interested in serving as the highest and best bidder for some or all of the assets (hereinafter the "Stalking Horse Bidder"),

the LRGI Post-Confirmation Trustee shall file a motion with the Bankruptcy Court seeking a process by which to sell the business unit or assets to the highest and best bidder.  The Prepetition Secured Lenders may serve as the Stalking Horse Bidder on account of a credit bid of their Claims, as allocated by the Bankruptcy Court with respect to the business unit or assets being sold.  The form and substance of such sale procedures motion shall be in conformity with the terms of the LRGI Plan but shall otherwise be in the sole discretion of the Post-Confirmation Trustee.  Once the Bankruptcy Court has approved a buyer for the assets or business unit, the Post-Confirmation Trustee shall proceed forthwith to consummate such sale.  Upon consummation of any such sale, the Post-Confirmation Trustee shall make distribution of the proceeds of such sale in the manner contemplated by the LRGI Plan.  The LRGI Post-Confirmation Trustee, subject to approval of the Plan Proponents, may move the Bankruptcy Court to withdraw, replace, or substitute the Sale Agent should the situation warrant such action.

# V. THE LPC PLAN

This Section of the Disclosure Statement summarizes the LPC Plan, which is attached hereto as **Exhibit B**. This summary is qualified in its entirety by reference to the full text of the LPC Plan. To the extent any inconsistencies exist between the Disclosure Statement and the LPC Plan, the LPC Plan shall govern. PURSUANT TO THE LPC PLAN, THERE WILL BE NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC ESTATES.

## A. Summary and Treatment of Unclassified Claims

The LPC Plan does not classify all Claims and Interests. In particular, Claims incurred during the course of the Chapter 11 Cases (*i.e.*, Administrative Expense Claims) and Priority Tax Claims are unclassified. A summary of these Claims is set forth below.

### 1. Administrative Expense Claims

Administrative Expense Claims are the actual and necessary costs and expenses of the LPC Chapter 11 Case that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to LPC during the Chapter 11 Cases and tax obligations incurred after the Commencement Date. Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to LPC and the Creditors' Committee that are incurred during the pendency of the LPC Chapter 11 Case.

In running LPC's businesses and conducting the sales contemplated by the Plan, the Post-Confirmation Trustee will pay Administrative Expense Claims incurred in the ordinary course of business and consistent with past practice or arising under loans or advances to LPC after the Commencement Date, whether or not incurred in the ordinary course of business, in accordance with the terms and conditions of the particular transaction and any related agreements and instruments. The Post-Confirmation Trustee will pay all other Administrative Expense Claims, in full, in cash, on the Effective Date or as soon thereafter as is practicable, or on such other terms to which the Post-Confirmation Trustee and the holder of such Administrative Expense Claim agree. The Post-Confirmation Trustee will have the sole and exclusive authority to liquidate and pay any Administrative Expense Claims accruing after the Confirmation Date or any Administrative Expense Claim that remains unpaid as of the Confirmation Date.

The Post-Confirmation Trustee may file a motion to set a bar date for filing of proofs of Administrative Expense Claims through a date certain. Pursuant to Section 2.1 of the LPC Plan, each holder of an Allowed Administrative Expense Claim shall receive Cash in the amount of its Allowed Administrative Expense Claim on or soon as reasonably practicable following the later of (a) the Effective Date or (b) the date on such Claim is Allowed, except that (i) any Allowed Administrative Expense Claim incurred in the ordinary course of business shall be paid in the ordinary course of business, consistent with past practice and (ii) any Allowed Administrative Expense Claims arising from liabilities incurred under loans, advances, or other obligations shall be paid in accordance with the terms and subject to the conditions of the documents governing such obligations. Holders of Allowed Administrative Expense Claims may also elect to receive less favorable treatment.

Because of the overlap of liability for some Administrative Expense Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Administrative Expense Claim may also be recoverable from the LRGI bankruptcy estate in addition to the LPC estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Administrative Expense Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 2. Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court shall fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date. Each holder of such a Claim shall be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (a) the Effective Date or (b) the date which such Claim is Allowed. In running LPC's businesses and conducting the sales contemplated by the LPC Plan, the Post-Confirmation Trustee is authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

Because of the overlap of liability for some Professional Compensation and Reimbursement Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Professional Compensation and Reimbursement Claim may also be recoverable from the LRGI bankruptcy estate in addition to the LPC estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Professional Compensation and Reimbursement Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 3. Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive, at the sole discretion of the Post-Confirmation Trustee, (a) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date and (ii) the date such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of

the Effective Date, equal to such Allowed Priority Tax Claim.

Because of the overlap of liability for some Priority Tax Claims across the LRGI and LPC bankruptcy estates, the following limitation shall apply: to the extent that an Allowed Priority Tax Claim may also be recoverable from the LRGI bankruptcy estate in addition to the LPC estate, no recovery on account of such Claim shall exceed the Allowed Amount of such Priority Tax Claim, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### 4. DIP Loan Claim

Unless otherwise agreed to by the holders of the DIP Loan Claim, each holder of an Allowed DIP Loan Claim against LPC shall receive, in full satisfaction of such claim, distributions from the LPC Post-Confirmation Trust and the LPC Litigation Trust, in the form of Cash, in an amount equal to such Allowed DIP Loan Claim to the extent such funds are available. Because the DIP Lenders agreed to subordinate their right to repayment of the DIP Note as set forth in the Final Cash Collateral Order, payment of such Allowed DIP Loan Claim shall be made only after payment in full of the Prepetition Secured Lenders' Claims in both the LRGI case and the LPC case, as well as the Secured Tax Claims and Other Secured Claims in both the LRGI and the LPC case. Payments of the DIP Loan Claim from the LRGI Post-Confirmation Trust, the LRGI Liquidation Trust, the LPC Post-Confirmation Trust, and the LPC Litigation Trust shall not, in the aggregate, exceed the total amount due under the DIP Note, with the allocable share for each estate to be determined by either (a) agreement between the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee or (b) the Bankruptcy Court.

### B. Classification and Treatment of Classified Claims Against and Interests In LPC

The LPC Plan provides for 10 classes of Claims and Interests. Unless indicated otherwise, all distributions shall be in full satisfaction of each Allowed Claim or Interest and shall be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed. Further, claimholders can generally agree to receive less favorable treatment than the treatment provided for by the Plan. Unless otherwise indicated and to the extent such information is available to them, the Prepetition Secured Lenders have based the characteristics and amounts of the Claims or Interests on LPC's books and records.

#### a. Class 1– Other Priority Claims against LPC (Unimpaired)

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims). Each holder of an Allowed Other Priority Claim against LPC shall receive Cash in the amount of its Allowed Other Priority Claims against LPC. Because Class 1 Claims are not impaired pursuant to the LPC Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the LPC Plan and are not entitled to vote to accept or reject the LPC Plan.

### b. Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order, less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Class 2(a) Claims shall be Allowed as filed, plus, to the extent there are sufficient assets in the estates to pay such amounts, any supplemental fees, interest and charges that have accrued since the Commencement Date through the Effective Date, but such Claims shall not include interest at the default rate or any prepayment premium.

Each holder of an Allowed CapitalSource Secured Claim against LPC (or its designee) shall receive beneficial first priority interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim, on or as soon as reasonably practicable after the entry of the Confirmation Order, on account of which interest such holder will receive distributions from the LPC Post-Confirmation Trust as soon as reasonably practicable after any sale is consummated. In no event shall the combination of distributions on account of Class 2(a) Claims under the LPC Plan and Class 2(a) Claims under the LRGI Plan exceed the Allowed Amount of the Class 2(a) Claims under the LPC Plan. Subject to the occurrence of the Effective Date, any and all Liens on LPC's assets in favor of CapitalSource shall be deemed released, with such liens attaching and becoming automatically perfected in first position on the corpus (including all income on and increases thereto) of the LPC Post-Confirmation Trust (with relative priority versus the CSE Secured Claims against LPC being subject to the terms and conditions of the Intercreditor Agreement). Holders of Allowed CapitalSource Secured Claims may also be entitled to a distribution from the LPC Litigation Trust on account of certain replacement liens on avoidance actions under the Final Cash Collateral Order.

Because Class 2(a) Claims are impaired by the LPC Plan, holders of CapitalSource Secured Claims against LPC are entitled to vote to accept or reject the LPC Plan.

### c. Class 2(b) – CSE Secured Claims against LPC (Impaired)

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Class 2(b) Claims shall be Allowed as filed, plus, to the extent there are sufficient assets in the estates to pay such amounts, any supplemental fees, interest and charges that have accrued since the Commencement Date through the Effective Date, but such Claims shall not include interest at the default rate or any prepayment premium.

Each holder of an Allowed CSE Secured Claim against LPC (or its designee) shall receive beneficial first priority interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim, on or as soon as reasonably practicable after the entry of the Confirmation Order, on account of which interest such holder will receive distributions from the LPC Post-Confirmation Trust as soon as reasonably practicable after any sale is consummated. In no event shall the combination of distributions on account of Class 2(b) Claims under the LPC Plan and Class 2(b) Claims under the LRGI Plan exceed the Allowed Amount of the Class 2(b) Claims under

the LPC Plan. Subject to the occurrence of the Effective Date, any and all Liens on LPC's assets in favor of CSE shall be deemed released, with such liens attaching and becoming automatically perfected in first position on the corpus (including all income on and increases thereto) of the LPC Post-Confirmation Trust (with relative priority versus the CapitalSource Secured Claims against LPC being subject to the terms and conditions of the Intercreditor Agreement). Holders of Allowed CSE Secured Claims may also be entitled to a distribution from the LPC Litigation Trust on account of certain replacement liens on avoidance actions under the Final Cash Collateral Order.

Because Class 2(b) Claims are impaired by the LPC Plan, holders of CSE Secured Claims against LPC are entitled to vote to accept or reject the LPC Plan.

### d. Class 3 – Secured Tax Claims against LPC (Impaired)

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC shall receive a second priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of the Confirmation Order. Subject to the occurrence of the Effective Date, any and all Liens on LPC's assets in favor of a holder of a Secured Tax Claim against LPC shall be deemed released, with such liens attaching and becoming perfected in second position on the corpus of the LPC Post-Confirmation Trust. On account of such interest, but only after the Allowed Class 2(a) and Class 2(b) Claims are paid in full, each holder shall receive, at the sole option of the LPC Post-Confirmation Trustee, distributions from the LPC Post-Confirmation Trust in the form of (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Senior Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Senior Tax Claim.

Because Class 3 Claims are impaired by the LPC Plan, holders of Secured Tax Claims against LPC are entitled to vote to accept or reject the LPC Plan.

### e. Class 4 – Other Secured Claims against LPC (Impaired)

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claims against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Other Secured Claim against LPC shall receive a third priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such Claim on or as soon as reasonably practicable after entry of the Confirmation Order. Subject to the occurrence of the Effective Date, any and all Liens on LPC's assets in favor of a holder of an Other Secured Claim against LPC shall be deemed released, with such liens attaching and becoming perfected in third position on the corpus of the LPC Post-Confirmation Trust. On account of such interest, but only after the Allowed Class 2(a), Class 2(b) and Class 3 Claims are paid in full, each holder shall receive, at the sole option of the LPC Post-Confirmation Trustee, distributions from the LPC Post-Confirmation Trust in the form of (i) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (ii) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of the holder's security interest in such Collateral, or (iii) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Because Class 4 Claims are impaired by the LPC Plan, holders of Other Secured Claims against LPC are entitled to vote to accept or reject the LPC Plan.

### f. Class 5 – General Unsecured Claims Against LPC, including Senior Subordinated Note Claims (Impaired)

Class 5 Claims are (i) all General Unsecured Claims against LPC that are not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, an Other Secured Claim, a CapitalSource Secured Claim, a CSE Secured Claim, or a Junior Subordinated Note Claim; and (ii) all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as Indenture Trustee, and LPC, as issuer, which Senior Subordinated Note Claim includes interest until the Commencement Date.

Each holder of an Allowed General Unsecured Claim or a Senior Subordinated Note Claim against LPC shall receive both (i) a fourth priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of the Confirmation Order, and (ii) a first priority beneficial interest in the LPC Litigation Trust in an amount equal to the Allowed Amount of such claim.   On account of such beneficial interests, at the sole option of the LPC Post-Confirmation Trustee, each holder shall receive a combination of the following in the form of Cash in an amount equal to the Allowed amount of the Class 5 Claim: (a) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, and the Allowed DIP Loan Claim are paid in full, distributions from the LPC Post-Confirmation Trust; and (b) only after the Allowed Class 2(a) and 2(b) Claims and the Allowed DIP Loan Claim are paid in full, distributions from the LPC Litigation Trust.

Because Class 5 Claims are impaired by the LPC Plan, holders of General Unsecured Claims against LPC or Senior Subordinated Note Claims against LPC are entitled to vote to accept or reject the LPC Plan.

### g. Class 6 – Asbestos-Related Claims Against LPC (Impaired)

Class 6 Claims are any Asbestos-Related Claims against LPC, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.  Each Asbestos-Related Claim shall be deemed a Disputed Claim without the need for a separate formal objection to be filed thereto.

Following sixty (60) days after the appointment of the LPC Post-Confirmation Trustee, each Asbestos-Related Claim shall be commenced to be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; *provided, however* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible after sixty (60) days from the appointment of the LPC Post-Confirmation Trustee commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.

To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors, the LPC Post-Confirmation Trust or the LPC Litigation Trust (other than against the Asbestos Insurance Policies as herein provided).

To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, each holder of such a claim shall receive both (i) a fourth priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of the Confirmation Order, and (ii) a first priority beneficial interest in the LPC Litigation Trust in an amount equal to the Allowed Amount of such claim.   On account of such beneficial interests, at the sole option of the LPC Post-Confirmation Trustee, each holder shall receive, as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim, a combination of the following in Cash, equal to the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies: (a) only after the Allowed Class 2(a), 2(b), 3, 4, and 5 Claims, and the Allowed DIP Loan Claim are paid in full, distributions from the LPC Post-Confirmation Trust; and (b) only after the Allowed Class 2(a) and 2(b) Claims and the Allowed DIP Loan Claim are paid in full, distributions from the LPC Litigation Trust.

**Nothing in this Plan or the Disclosure Statement is an admission of any liability by LPC or any other party, including the Post-Confirmation Trustee or the Plan Proponents or an admission of insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by LPC or any other party, including the Post-Confirmation Trustee or the Plan Proponents or an admission of insurance coverage by Liberty Mutual or Fireman's Fund**.

Because Class 6 Claims are impaired by the LPC Plan, holders of Asbestos-Related

Claims Against LPC are entitled to vote to accept or reject the LPC Plan.

### h. Class 7 – Junior Subordinated Note Claims Against LPC (Impaired)

Class 7 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which includes interest until the Commencement Date. Such Junior Subordinated Note Claims were made expressly subordinate to General Unsecured Claims (including the Senior Subordinated Note Claims) against LPC.

Each holder of a Class 7 Claim shall recieve both (i) a fifth priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such claim on or as soon as reasonably practicable after entry of the Confirmation Order, and (ii) a second priority beneficial interest in the LPC Litigation Trust in an amount equal to the Allowed Amount of such claim.   On account of such beneficial interests, at the sole option of the LPC Post-Confirmation Trustee, each holder shall receive a combination of the following in the form of Cash in an amount equal to the Allowed amount of the Class 7 Claim: (a) only after the Allowed Class 2(a), 2(b), 3, and 4 Claims, the Allowed DIP Loan Claim, and the Allowed Class 5 and 6 Claims are paid in full, distributions from the LPC Post-Confirmation Trust; and (b) only after Allowed Class 2(a), 2(b), 3, and 4 Claims, the Allowed DIP Loan Claim, and Class 5 and 6 Claims are paid in full, distributions from the LPC Litigation Trust.

Because Class 7 Claims are impaired by the LPC Plan, holders of Junior Subordinated Note Claims are entitled to vote to accept or reject the LPC Plan.

### j. Class 8 – Series B Preferred Stock Interests in LPC (Impaired)

Class 8 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

Each holder of a Class 8 Interest will receive both (i) a sixth priority beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such interest on or as soon as reasonably practicable after entry of the Confirmation Order, and (ii) a second priority beneficial interest in the LPC Litigation Trust in an amount equal to the Allowed Amount of such interest.  On account of such beneficial interests, at the sole option of the LPC Post-Confirmation Trustee, (a) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, the Allowed DIP Loan Claim, and Allowed Class 5, 6 and 7 Claims are paid in full, distributions from the LPC Post-Confirmation Trust; and (b) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, the Allowed DIP Loan Claim, and Allowed Class 5, 6 and 7 Claims are paid in full, distributions from the LPC Litigation Trust.

Because Class 8 Interests are impaired by the LPC Plan, holders of Series B Preferred Stock Interests are entitled to vote to accept or reject the LPC Plan.

### k. Class 9 – LPC Common Stock Interests (Impaired)

Class 9 Interests are Interests arising from issued and outstanding shares of LPC Common Stock.

Each holder of a Class 9 Interest will receive both (i) a pro-rated seventh priority residual beneficial interest in the LPC Post-Confirmation Trust in an amount equal to the Allowed Amount of such interest on or as soon as reasonably practicable after entry of the Confirmation Order, and (ii) a pro-rated third priority residual beneficial interest in the LPC Litigation Trust in an amount equal to the Allowed Amount of such interest. On account of such beneficial interests, at the sole option of the LPC Post-Confirmation Trustee, (a) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, the Allowed DIP Loan Claim, and Allowed Class 5, 6 and 7 Claims are paid in full, and Allowed Class 8 Interests are paid in full, distributions from the LPC Post-Confirmation Trust; and (b) only after the Allowed Class 2(a), 2(b), 3 and 4 Claims, the Allowed DIP Loan Claim, and Allowed Class 5, 6 and 7 Claims are paid in full, and the Class 8 Interests are paid in full, distributions from the LPC Litigation Trust.

Because Class 9 Interests are impaired by the LPC Plan, holders of LPC Common Stock Interests are entitled to vote to accept or reject the LPC Plan.

### l. Class 10 – Other Equity Interests in LPC (Impaired)

Class 10 Other Equity Interests are Interests of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, but excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests. All Other Equity Interests in LPC will be cancelled and will receive no distribution under the LPC Plan. Because Class 10 is fully impaired under the LPC Plan, each holder of a Class 10 Other Equity Interest is deemed to reject the LPC Plan and is not entitled to vote to accept or reject the LPC Plan.

## C. Distributions Pursuant to the LPC Plan

### 1. Disbursements

A Disbursing Agent shall make all distributions under the Plan. For all distributions except those made with respect to Allowed Senior Subordinated Note Claims, the Post-Confirmation Trustee or its designated agent shall be the Disbursing Agent. For distributions made with respect to Allowed Senior Subordinated Note Claims, the Indenture Trustee, or such other entity as designated by the Debtors, shall be the Disbursing Agent. To the extent the Indenture Trustee has incurred during the Bankruptcy Case or shall incur any costs or expenses (including legal fees or expenses), such costs or expenses shall be paid from any and all distributions made under the LPC Plan on account of the Senior Subordinated Note Claims Against LPC or the Junior Subordinated Note Claims Against LPC.

The Disbursement Record Date will be three (3) days after the Confirmation Date, at which time the claims registry shall be closed. The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in LPC's schedules, books and records, or in any proofs of claim filed. Any Cash distribution shall be made by check or wire transfer or as otherwise provided by any applicable agreements. No Cash distributions under $50 shall be made unless the holder sends a written request to the Disbursing Agent.

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent shall use reasonable efforts to locate the holder.  If the distribution remains undeliverable one year after the Effective Date, the distribution shall revert back to the estate of the respective Debtor and made available for distribution to the next priority interests in the applicable Post-Confirmation Trust.

The Post-Confirmation Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the respective Debtor or their respective estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Post-Confirmation Trustee shall not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement.

## 2. Surrender or Transfer of the Senior Subordinated Notes and the Junior Subordinated Note

Unless this requirement is waived by the Post-Confirmation Trustee, in order to receive any distribution, holders of the Senior Subordinated Note Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the LPC Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

Unless this requirement is waived by the Post-Confirmation Trustee, to be able to participate in any distribution, the holder of the Junior Subordinated Note Claim shall surrender the Junior Subordinated Note to the Post-Confirmation Trustee, unless the Post-Confirmation Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If the note is lost, stolen, or otherwise destroyed, the Post-Confirmation Trustee may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) to hold the Post-Confirmation Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen or otherwise destroyed note.

If a holder of a Junior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(c) of the LPC Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

### 3. Indenture Trustee as Claim Holder

Consistent with Bankruptcy Rule 3003(c), the Post-Confirmation Trustee shall recognize proofs of claim timely filed by the Indenture Trustee in respect of any Claims under the Indenture. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

## D. Implementation of the LPC Plan and Related Documents

To fund the distributions under the LPC Plan and the continued operations of LPC pending the asset sales contemplated by the LPC Plan, the Post-Confirmation Trustee shall be entitled to use the Prepetition Secured Lenders' cash collateral on terms and conditions acceptable to the Prepetition Secured Lenders. In addition, the Post-Confirmation Trustee will pursue sales of non-operating assets, as well as prosecution of avoidance actions and other litigation claims. Finally, to the extent net operating losses and carry-forwards, if any, are preserved for the benefit of the LPC estate, the Post-Confirmation Trustee may pursue liquidation of those through a merger transaction. The Post-Confirmation Trustee shall pursue, in its discretion, any and all sale scenarios and will maximize the collective recovery for the constituents of the LPC bankruptcy estate.

### 1. The LPC Post-Confirmation Trust and LPC Litigation Trust

On the Confirmation Date, all assets of LPC (except as set forth in section 5.3(b) of the Plan) shall be deemed to be transferred from the Debtors to the LPC Post-Confirmation Trust, and the LPC Post-Confirmation Trustee shall continue ongoing operations of the Debtors' businesses while pursuing one or more sales of the assets, either on a going concern or a liquidation basis as circumstances may warrant. The LPC Post-Confirmation Trustee shall be vested with any and all authority to operate the businesses of LPC, including without limitation the hiring and/or firing of corporate officers, entry into contracts, termination of contracts and the determination of compensation levels (including "stay bonuses" to incent quick resolution of the LPC Plan and sales hereunder), all without the need for the Court authority. Except as consented to by the LPC Post-Confirmation Trustee, the current management shall refrain from management, and in all cases shall not interfere with the LPC Post-Confirmation Trustee's operation of the business. The terms and conditions of the LPC Post-Confirmation Trust will be governed by that certain LPC Post-Confirmation Trust Agreement, the form of which shall be included in the Plan Supplement.

Also on the Confirmation Date, all avoidance actions under chapter 5 of the Bankruptcy Code, the ability to object to any Claims or Interests, and all litigation claims of whatever nature or amount shall be vested in the LPC Litigation Trust. The LPC Post-Confirmation Trustee shall have the power to commence, prosecute, pursue, settle, dismiss or otherwise control all aspects of any such claims. The terms and conditions of the LPC Litigation Trust will be governed by that certain LPC Litigation Trust Agreement, the form of which shall be included in the Plan Supplement.

The LPC Post-Confirmation Trustee will be designated in the Plan Supplement.

## 2. The Sale Agent

On the Confirmation Date, Gordian Group, LLC shall be appointed the sole and exclusive "Sale Agent" of the LPC Post-Confirmation Trustee in order to commence and explore sale possibilities of the assets of the LPC Post-Confirmation Trust either as a whole (either together with the assets of the LRGI Post-Confirmation Trust or separate) or in separate lots. The marketing process shall last up to one hundred (100) days from the Confirmation Date. To the extent the marketing process yields a Stalking Horse Bidder prior to the 100th day after the Confirmation Date, the marketing process may be shorter than 100 days in the applicable Post-Confirmation Trustee's discretion in consultation with the Plan Proponents and the Sale Agent. The Plan Proponents intend to move the Bankruptcy Court to allow Gordian to commence the marketing of the LPC businesses prior to the confirmation date Such sales shall be conducted in accordance with Section 363 of the Bankruptcy Code by motion by the LPC Post-Confirmation Trustee and in consultation with the Sale Agent and the Prepetition Secured Lenders.

## 3. The Sale Process

Once the Sale Agent has obtained a party or parties interested in serving as the highest and best bidder for some or all of the assets (hereinafter the "Stalking Horse Bidder"), the LPC Post-Confirmation Trustee shall file a motion with the Bankruptcy Court seeking a process by which to sell the business unit or assets to the highest and best bidder. As per the Disclosure Statement, the Prepetition Secured Lenders may serve as the Stalking Horse Bidder on account of a credit bid of their Claims, as allocated by the Bankruptcy Court with respect to the business unit or assets being sold. The form and substance of such sale procedures motion shall be in conformity with the terms of the LPC Plan but shall otherwise be in the sole discretion of the Post-Confirmation Trustee. Once the Bankruptcy Court has approved a buyer for the assets or business unit, the Post-Confirmation Trustee shall proceed forthwith to consummate such sale. Upon consummation of any such sale, the Post-Confirmation Trustee shall make distribution of the proceeds of such sale in the manner contemplated by the LPC Plan. The LPC Post-Confirmation Trustee, subject to approval of the Plan Proponents, may move the Bankruptcy Court to withdraw, replace, or substitute the Sale Agent should the situation warrant such action.

## VI. GENERAL PLAN PROVISIONS APPLICABLE
## TO BOTH THE LRGI PLAN AND THE LPC PLAN

### A. Cooperation from the Debtors

The applicable Debtors, together with any present or former employees, managers, attorneys, consultants, directors, officers, independent contractors, financial advisors, or any affiliates of the foregoing, shall cooperate upon reasonable request of the applicable Post-Confirmation Trustee and/or the Sale Agent to carry out the provisions and purposes of the applicable Plan, with any disputes regarding same to be brought before the Bankruptcy Court by the Post-Confirmation Trustee through an expedited order to show cause or other appropriate relief.

### B. Provisions for the Treatment of Disputed Claims

#### 1. Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated shall not receive a distribution as provided under a Plan unless and until such Claim is Allowed.

Only the applicable Post-Confirmation Trustee may object to a Claim. The Post-Confirmation Trustee may object to any Claim at any time before or after the applicable Effective Date, except that any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court or (ii) a date to be fixed by the Bankruptcy Court; provided, however, the applicable Post-Confirmation Trustee shall not commence any claim objections until after one hundred twenty (120) days after the Confirmation Date unless consented to by the Plan Proponents.

#### 2. Resolution of Administrative Expense Claims and Other Claims

On and after the Confirmation Date, the Post-Confirmation Trustee shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims, other than Professional Compensation and Reimbursement Claims, without further order of the Bankruptcy Court.

#### 3. Claim Estimation

The Plan Proponents (up until the Confirmation Date) or the Post-Confirmation Trustee (after the Confirmation Date) may request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, including without limitation any potential rejection damages claims, regardless of whether the Claim is subject to an objection. If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, the Post-Confirmation Trustee may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and

subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Payment and Distribution on Disputed Claims

When a Disputed Claim is Allowed, the holder of such Claim shall receive the distribution provided by the applicable Plan to the extent such Claim is Allowed.

## C. Prosecution of Claims Held by the Debtors

Beginning one hundred twenty (120) days after the Confirmation Date, the applicable Post-Confirmation Trustee shall, as representatives of the applicable estate, litigate any claims or causes of action that constituted assets of one of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Confirmation Date or other actions instituted by the Debtors. For clarity, the Debtors shall not have any authority after the Confirmation Date to prosecute such claims, but shall cooperate with the applicable Post-Confirmation Trustee to pursue any such claims and causes of action, and any such pending claims and causes of action (together with any applicable statutes of limitation, statutes of repose, or similar provisions) shall be stayed for the one hundred twenty (120) day period indicated above, with any applicable deadline extended to the date one hundred fifty (150) days from the Confirmation Date.

## D. Executory Contracts and Unexpired Leases

Unless otherwise specified, any executory contract or lease shall include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease.

### 1. Rejection of Executory Contracts and Unexpired Leases

As of the applicable Effective Date, all executory contracts and unexpired leases that exist between the applicable Debtor (and the applicable Post-Confirmation Trustee) and any person or entity shall be deemed rejected, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, including without limitation any such contracts or leases assumed and assigned in connection with any asset sales, or (ii) as to which a motion for approval of the assumption, assumption and assignment, or rejection has been filed and served prior to the Effective Date. The Post-Confirmation Trustee shall have the exclusive authority to make the assumption/rejection decision in its sole discretion.

### 2. Cure of Defaults

Prior to assuming any executory contract or unexpired lease, the Post-Confirmation Trustee must cure any monetary defaults and compensate counterparties for any non-monetary defaults. At least thirty (30) days prior to any proposed effective date of assumption, the applicable Post-Confirmation Trustee shall serve on counterparties to the relevant executory contracts or unexpired lease a notice indicating a proposed cure amount for the respective contract or lease.

Counterparties shall have twenty (20) days from the date of service to object to the proposed cure amount. If any objection is filed, the Bankruptcy Court shall hold a hearing to resolve such objection. If no objection is filed within the twenty (20) day period, the cure amount identified by the Post-Confirmation Trustee shall be deemed the amount of the cure without further notice of hearing.

### 3. Rejection Damage Claims

If an executory contract or lease is rejected, the counterparty must assert any Claim by filing a proof of claim with the claim agents for the Chapter 11 Case, Epiq Bankruptcy Solutions LLC, within thirty (30) days following the earlier of (i) the date of service of the notice of the Effective Date, or (ii) entry of an order rejecting such executory contract or unexpired lease (solely with respect to the party directly affected by such rejection). If the counterparty fails to file a proof of claim, the counterparty shall be barred from asserting any Claim related to the rejection of the contract or lease in the future and shall not receive any distribution under the Plan.

The Prepetition Secured Lenders reserve the right to have potential rejection damage claims estimated for voting purposes, with any such estimated claim participating in the applicable class of unsecured creditors.

### 4. Indemnification and Reimbursement of Directors and Officers

All the Debtors' obligations to indemnify and reimburse directors, officers, and employees who served in such positions on or before the Confirmation Date shall not survive confirmation of the Plan and are discharged as of the Confirmation Date.

### 5. Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits

With the exception of any Insurance Policy, employee compensation program, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order, all Insurance Policies and employee compensation and benefit programs will be treated as executory contracts and the Post-Confirmation Trustee shall continue performance thereunder until rejection. The Post-Confirmation Trustee shall have the exclusive authority to move the Bankruptcy Court for rejection of any employee compensation program, any employee benefit program, or any Insurance Policy in its sole discretion.

To the extent the Insurance Policies are determined not to be executory contracts, they will remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

Unless rejected, the Post-Confirmation Trustee will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory. Except as by motion by the Post-Confirmation Trustee, the Plans shall not, and are not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding anything to the contrary contained in either Plan or the Disclosure Statement, to the

extent that there is any inconsistency between the Insurance Policies and any provision of either Plan or the Disclosure Statement, the terms of the Insurance Policies shall control.  No provision of either Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or be deemed to create any insurance coverage that does not otherwise exist under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of either Plan, neither Plan nor Confirmation of either Plan shall be without prejudice to any of the applicable Post-Confirmation Trustee's or insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which the insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

Until such underlying collective bargaining agreement is rejected, the Post-Confirmation Trustee shall continue to pay all of the respective Debtor's retiree benefits for the same duration for which the applicable Debtor was obligated to provide such benefits.

**E. Setoffs**

The applicable Post-Confirmation Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the Debtor or the Post-Confirmation Trustee may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Post-Confirmation Trustee of any such Claim the Debtor may have against the holder of such Claim; provided, however, that the Post-Confirmation Trustee shall not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement, all such claims having been released under the Final Cash Collateral Order.

**F. Reservation of "Cram Down" Rights**

In the event that any impaired Class of Claims or Equity Interests shall fail to accept the applicable Plan in accordance with section 1129(a) of the Bankruptcy Code, the Prepetition Secured Lenders reserve the right to (a) request that the Bankruptcy Court confirm such Plan in accordance with section 1129(b) of the Bankruptcy Code or (b) amend such Plan. As described in Section VIII.A.2, *"Non-Consensual Confirmation"* below, the Prepetition Secured Lenders may confirm such Plan without the consent of all parties in interest.  The Plan Proponents intend to proceed under section 1129(b) of the Bankruptcy Code if they cannot proceed under section 1129(a) of the Bankruptcy Code.

**G. Conditions Precedent to the Effective Date of the Plan**

The Effective Date shall not occur and a Plan shall not become effective unless and until the following conditions precedent are satisfied or waived:  (a) a Confirmation Order, in form and substance acceptable to the Prepetition Secured Lenders, shall have been entered and shall not be subject to any stay or injunction; (b) all actions, documents, and agreements that are necessary to

implement a Plan shall have been completed and be effective; (c) all conditions precedent to the the applicable Post-Confirmation Trust Agreement or the applicable Litigation Trust Agreement shall have been satisfied or waived by the Prepetition Secured Lenders or the Post-Confirmation Trustee, as applicable; (d) in the Post-Confirmation Trustee's sole discretion, funds sufficient to pay Allowed Administrative Claims in full will have been generated from sales of the applicable Debtor's business units and/or assets; and (e) the marketing and sale process of a Debtor's assets shall have generated a Stalking Horse Bidder for all or a portion of such Debtor's assets on or before the one hundredth (100th) day after the applicable Confirmation Date, subject to extension by agreement between the Plan Proponents and the applicable Post-Confirmation Trustee in consultation with the Sale Agent.

In their sole discretion, the Plan Proponents may waive any of the aforementioned conditions precedent with respect to either Plan without Bankruptcy Court approval. Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action. Upon such satisfaction or final waiver with respect to a Plan, the applicable Post-Confirmation Trustee shall provide notice of the occurrence of the Effective Date to the parties in interest with respect to the applicable Debtor.

If the conditions precedent are not satisfied within the time periods described above (as may be extended pursuant to the applicable Plan), then upon motion by either the Plan Proponents or the Post-Confirmation Trustee, no distributions under the applicable Plan shall be made and the Post-Confirmation Trustee, in consultation with the Plan Proponents and the Sale Agent) shall take whatever steps in its discretion will maximize the value for the creditors of the bankruptcy estates, which may include dismissal of the applicable Chapter 11 Case, liquidation of the Debtors' respective assets for distribution in accordance with the Bankruptcy Code, or some other appropriate action; provided, however, dismissal of either Chapter 11 Case shall be subject to the consent of the Plan Proponents so long as the Claims of the Prepetition Secured Lenders have not been satisfied in full.

## H. Effects of Confirmation

Upon the Confirmation Date, the applicable Post-Confirmation Trustee shall have the sole authority to operate the applicable Debtors' businesses, including without limitation, authority to (a) amend the Plans or any Plan Documents (subject to the Plan Proponents' authority to also amend the Plans or any Plan Documents); (b) negotiate and enter into agreements for the use of the Agents' Cash Collateral pending the auction sales of the business units and/or assets of the applicable Debtor; (c) negotiate and and enter into contracts, as well as the exercise of contractual rights held by the applicable Debtor; (d) prosecute objections to Claims (subject to the Plan Proponents' consent rights and authority also to object to Claims); (e) amend the applicable charter documents to provide for the replacement of the board of directors by the Post-Confirmation Trustee and eliminate all shareholder rights other than those provided in the Plans; and (f) any other tasks, responsibilities or authorities provided in the applicable Plan or any Plan Documents.. PURSUANT TO THE PLANS, THERE SHALL BE NO SUBSTANTIVE CONSOLIDATION OF THE LRGI AND LPC BANKRUPTCY ESTATES.

### 1. Discharge of Claims and Termination of Interests

Except as provided in a Plan, the rights afforded in and the payments and

distributions to be made under a Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Interests in and all existing debts and Claims, including any interest accrued on such debts or Claims from and after the Commencement Date, against the Debtors or any of their assets or properties.

Except as provided in a Plan, upon the Effective Date, all existing Claims and all Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Debtors, the applicable Post-Confirmation Trustee, their successors or assigns, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

## 2. Injunctions and Stays

Except as otherwise expressly provided in a Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders with respect to any such Claim against or Interest in the Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders, or against the property or interests in property of the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders or against the property or interests in property of the Debtors, the Post-Confirmation Trustee or the Prepetition Secured Lenders, with respect to any such Claim or Interest, or (v) pursuing any Claim released under a cash collateral order (including, without limitation, the Final Cash Collateral Order) or a Plan.  Such injunction shall extend to any successors of the Debtors and their respective properties and interests in properties.

Unless otherwise provided in a Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of a Plan.

### 3. Exculpation

Notwithstanding anything in a Plan, the Confirmation Order, or this Disclosure Statement to the contrary, as of the Effective Date, none of the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, and their respective present and future affiliates, directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plans, property to be distributed under the Plans, or any other act or omission in connection with the Chapter 11 Cases, the Plans, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.

### 4. Releases

Subject to Section 10.8 of a Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the Agents, (b) the Prepetition Revolver Lenders, and (c) the Prepetition Term Loan Lenders, (1) the Debtors, (2) each holder of a Claim or Interest that votes to accept a Plan but does not elect to "opt-out," (3) each holder of a Claim or Interest that is deemed to accept a Plan, and (4) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept a Plan and that does not elect to "opt-out," shall release, unconditionally and forever, each future, present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, and each of their respective present and future members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of a Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.

All holders of Claims and Interest entitled to vote on a Plan may elect to opt out of the release provision of section 10.7 of the applicable Plan whether they choose to accept, reject, or not to vote on the Plan.

### 5. Limits on Releases and Exculpation

**Notwithstanding anything to the contrary in a Plan the Confirmation Order or this Disclosure Statement, the releases set forth in Sections 10.7 of the Plan shall not effect a release of any claim against a non-Debtor by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority. Nothing in Section 10.8 of the Plan nor the Confirmation Order shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against a non-Debtor for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.  Other than as set forth in Section 10.7 of the Plan, nothing in a Plan or the Confirmation Order shall exculpate any non-Debtor from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.**

### I. Dissolution of the Creditors' Committee

On the later of the two Effective Dates of the two Plans, the Creditors' Committee shall be dissolved and the members thereof shall be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

### J. Dissolution of the Debtors

As soon as reasonably practicable after the Effective Date, the management, control, and operation of the applicable Debtor's businesses shall cease.

### K. Jurisdiction and Choice of Law

#### 1. Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under a Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 2. Retention of Jurisdiction

The Bankruptcy Court shall retain and have exclusive jurisdiction over, in addition to other matters specified in a Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or a Plan.

## L. Miscellaneous Provisions

### 1. Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Post-Confirmation Trustee shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

### 2. Post-Confirmation Date Professional Fees and Expenses

From and after the Confirmation Date, the Post-Confirmation Trustee shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Post-Confirmation Trustee, in accordance with any Cash Collateral budgets approved by the Agents.

### 3. Plan Supplement

A draft of the form of each of the applicable Plan Documents to be entered into as of the Effective Date, which shall include certain relevant documents that are necessary to allow a holder of Claims or Interests to make an informed decision shall be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which holders of impaired Claims may vote to accept or reject a Plan. Upon its filing with the Bankruptcy Court, a Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in a Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject a Plan must be received.

### 4. Substantial Consummation

On the Effective Date, a Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 5. Severability

Prior to the entry of the Confirmation Order, if the Bankruptcy Court determines any term or provision of a Plan to be invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret such term or provision so as to render the term or provision valid and enforceable to the maximum extent practicable and consistent with the original purpose of such term or provision.

Notwithstanding any such determination, alteration, or interpretation, the remainder

of the terms and provisions of a Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such determination, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of a Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

### 6. Binding Effect

A Plan shall be binding upon and inure to the benefit of the applicable Debtor, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Post-Confirmation Trustee and any purchasers of assets or stock pursuant to the Plan.

### 7. Notices

In order to be effective, all notices, requests, and demands to or upon the Prepetition Secured Lenders and the Post-Confirmation Trustee must be in writing (including by facsimile transmission) and, unless expressly provided herein, shall be deemed to have been duly given when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Waller, Lansden, Dortch & Davis LLP
> Attn: John C. Tishler
> 511 Union Street
> Suite 2700
> Nashville, TN 37219
> Fax: 615-244-6804
>
> and
>
> CapitalSource Finance, LLC
> Attn: Lisa J. Lenderman
> 4445 Willard Avenue
> 12th Floor
> Chevy Chase, MD 30815
> Fax: ___-___-____

### 8. Time

In computing any period of time prescribed or allowed by a Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 9. Section Headings

The section headings contained in a Plan and this Disclosure Statement are for reference purposes only and shall not affect in any way the meaning or interpretation of a Plan.

## M. <u>Modification, Revocation, or Withdrawal of the Plans</u>

The Plan Proponents reserve the rights to alter, amend, or modify both of the Plans at any time prior to the Effective Date, provided that such Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Prepetition Secured Lenders complies with section 1125 of the Bankruptcy Code.   The Post-Confirmation Trustee may also motion the Bankruptcy Court for alteration, amendment or modification to a Plan.

After the Confirmation Date, the Plan Proponents or the Post-Confirmation Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in a Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of a Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under a Plan.

A holder of a Claim or Interest that has accepted a Plan shall be deemed to have accepted such Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

The Plan Proponents may revoke or withdraw a Plan any time prior to the Effective Date. If the Plan Proponents revoke or withdraw a Plan or a Plan does not otherwise become effective, such Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by the Prepetition Secured Lenders or to prejudice in any manner the Debtors' rights in any further proceedings involving the Debtors, except with respect to any releases in favor of the Prepetition Secured Lenders.

## VII. FINANCIAL INFORMATION AND ANALYSIS

**A. <u>Selected Historical and Projected Financial Information</u>**

In order to facilitate the decision of a holder of a Claim or Interest in either of the Debtors to accept or reject the applicable Plan, the Prepetition Lenders have included the following financial documents as Exhibits to this Disclosure Statement:

(i)     LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (without exhibits), which is attached as Exhibit D;

(ii)    LPC's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (without exhibits, which is attached as Exhibit E;

(iii)   Projected Financial Information, which is attached as Exhibit F; and

(iv)    Liquidation Analysis, which is attached as Exhibit G.

# VIII. CERTAIN FACTORS TO BE CONSIDERED

## A. Certain Risk Factors Relating to Confirmation of a Plan

### 1. Risk of Non-Confirmation of a Plan

Although the Prepetition Secured Lenders believe that each Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to a Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2. Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept a Plan, the Bankruptcy Court may nevertheless confirm such Plan at the Plan Proponents' request if at least one impaired Class of Claims has accepted such Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted such Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Prepetition Secured Lenders believe that the Plan satisfies these requirements. For more information on this topic, please refer to Section XI.C below, "*General Requirements for Confirmation*".

### 3. Risk of Non-Occurrence of the Effective Date

Although the Prepetition Secured Lenders believe that the respective Effective Dates will occur soon after each Plan's Confirmation Date, there can be no assurance as to such timing. If each of the conditions to the occurrence of an Effective Date has not been satisfied or duly waived on or before the 100th day after entry of the applicable Confirmation Order, the Bankruptcy Court may, (a) upon the Plan Proponents' motion, vacate the Confirmation Order, or (b) upon the Post-Confirmation Trustee's motion (subject to consent of the Plan Proponents) should any Claims of the Prepetition Secured Claims remain outstanding), dismiss the applicable Bankruptcy Case, and in either event such Plan would be deemed null and void.

## B. Additional Factors to be Considered

### 1. The Prepetition Secured Lenders Have No Duty to Update

Absent a Bankruptcy Court order to the contrary, the Prepetition Secured Lenders have no duty to update this Disclosure Statement or the attachments hereto. Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of _____.  Delivery or receipt of this Disclosure Statement after _____ does not imply that no changes have occurred in the information contained herein and in the attachments hereto since such date.

### 2. No Representations Outside This Disclosure Statement Are Authorized

The Bankruptcy Court has not authorized any representations concerning or related to

the Debtors, these Chapter 11 Cases, or either Plan, other than representations made in this
Disclosure Statement, the attachments hereto, and the other solicitation materials from the Prepetition
Secured Lenders that are included with this Disclosure Statement.  In arriving at your decision to
vote to accept or reject the applicable Plan, you should not rely upon any representations that are not
contained herein or included with this Disclosure Statement.

### 3. Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary

Certain of the information contained in this Disclosure Statement is, by nature,
forward-looking, and contains estimates and assumptions, which might ultimately prove to be
incorrect, and projections, which may differ materially from actual future events.  Because
uncertainties exist with respect to any projection, assumption, or estimate, you should not consider
any projection, assumption, or estimate to be an assurance or guarantee of actual results.

### 4. This Disclosure Statement Is Not Legal or Tax Advice

This Disclosure Statement is not legal, business, or tax advice.  You should not
construe the contents of this Disclosure Statement as such.  Please consult your own legal counsel
or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or
Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to
determine how to vote on the applicable Plan or whether to object to confirmation of the applicable
Plan.

### 5. No Admission Made

Nothing contained herein shall constitute an admission of, or be deemed evidence of,
the tax or other legal effects of either Plan on the Prepetition Secured Lenders or on holders of
Claims or Interests.

### 6. Business Factors and Competitive Conditions

#### a. General Economic Conditions

The level of demand in the Debtor's respective end-markets is subject to many
factors outside the control of the Prepetition Secured Lenders and the Post-Confirmation Trustee,
including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism.
Any one of these or other economic factors could have a significant impact on the operating
performance and ultimate sale of the Debtors' businesses.  There can be no guarantee that economic
conditions or automotive industry conditions will not deteriorate further.

#### b. Competitive Conditions

In addition to uncertain economic and business conditions, the Debtors'
businesses will face competition for business from existing and possibly new competitors.  Such

competition may affect the overall operating performance and ultimate sale of the Debtors' businesses.

### c. Customers

The Debtors have previously indicated that they believe that the majority of their customer relationships are strong, however, the loss of a significant customer could have a material adverse impact on operating performance or the ultimate sale of the Debtors' businesses.

### 7. Access to Financing and Trade Terms

Operating of the Debtors' businesses will depend on, among other things, access to working capital through the Prepetition Secured Lenders' cash collateral, operating cash flow, and the availability of customary trade terms from their supplies.   While the Prepetition Secured Lenders believe that (i) projected operating cash flow, (ii) the use of cash collateral, and (iii) improved trade credit will provide adequate cash to consummate each Plan and provide for sufficient ongoing working capital, the Post-Confirmation Trustee may nonetheless require greater working capital. No assurance can be given that additional financing will be available on terms favorable or acceptable to the Post-Confirmation Trustee or that suppliers will continue to provide customary terms.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLANS

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or Interests. All holders of Claims or Interests are urged to consult their own tax advisors in determining the U.S. Federal, state, local and other tax consequences to them under the Plans.**

**IRS Circular 230 Notice**: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to **be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

### A. Introduction

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plans to the Debtors and holders of Claims and Interests. This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury regulations, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement. Changes in those rules, or new interpretations of those rules, may have retroactive effect and could significantly affect the federal income tax consequences described below. The Plan Proponents are not obligated to and have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of either Plan. There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership (or other entity taxed as a partnership) holds a Claim or Interest, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

## B. Material Tax Consequences to the Debtors

Generally, under the terms of the Plans, all Claims will be released except to the extent that the LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee have cash available to satisfy all or a portion of such respective Debtor's Claims. Any income resulting from the satisfaction of any Claim at a discount will not constitute taxable income to the applicable Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (the "Lexington Group"), of which LPC is the common parent, and file a single consolidated U.S. federal income tax return. The Lexington Group reported in the most recent Form 10-K filed by LPC and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $36 million as of the end of 2008. *See* Lexington Precision Corporation 2008 Form 10-K, at Note 9 (Income Taxes). The Lexington Group expects to incur further operating losses during the taxable year ending December 31, 2009. The amount of the NOL carryforwards and any such current year losses remains subject to audit and adjustment by the IRS. The LRGI Post-Confirmation Trustee and the LPC Post-Confirmation Trustee will take reasonable steps to preserve the NOLs and any other tax attributes so that they can be liquidated for the benefit of the LRGI and LPC bankruptcy estates, but such preservation may not happen despite such reasonable efforts of the applicable Post-Confirmation Trustee.

In connection with the implementation of the Plans, the amount of the Lexington Group's NOL carryforwards and other tax attributes (including current year losses) may be reduced. In addition, the subsequent utilization of any losses and NOL carryforwards remaining following the Effective Date of either Plan may be restricted. Based upon a preliminary review, the Plan Proponents do not expect the liquidation of the NOLs and other tax attributes to be a significant generator of value in connection with the sales under the Plans, but the Plans do require the applicable Post-Confirmation Trustee to take reasonable steps to preserve the value of the NOLs and other tax attributes for the benefit of the LRGI and LPC bankruptcy estates. The applicable Post-Confirmation Trustee will have the discretion to seek recovery on account of the NOLs and other tax attributes should such recovery efforts prove likely to be cost- effective.

## C. Material Tax Consequences to Holders of Claims Against or Interests in LRGI or LPC

Generally, the federal income tax consequences of the implementation of the Plans to a holder of a Claim or Interest in either of the Debtors will depend, among other things, on (a) whether the holder of a Claim or Interest in either LRGI or LPC party receives consideration in more than one tax year, (b) whether such recipient is a resident of the United States, (c) whether all of such consideration received is deemed to be received by such recipient as part of an integrated transaction, (d) whether such recipient reports income using the accrual or cash method of accounting, and (e) whether such recipient has previously taken a bad debt deduction or worthless security deduction with respect to the Claim or Interest.

A holder of a Claim or Interest will generally realize a gain or loss on the exchange under the Plans of its Claim or Interest for cash in an amount equal to the difference

between (i) the cash received by the recipient (other than any cash attributable to accrued but unpaid interest on the Claim or Interest), and (ii) the recipient's adjusted basis in the Claim or Interest exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain or loss recognized will be a capital gain or loss if the Claim or Interest was a capital asset in the hand of the holder, and such gain or loss will be a long-term capital gain or loss if the holder's holding period for the Claim or Interest surrendered exceeds one (1) year at the time of the exchange.

With respect to payments attributable to interest, a holder not previously required to include in its taxable income any accrued but unpaid interest on a Claim or Interest may be treated as receiving taxable interest, to the extent the cash it receives pursuant to a Plan is allocable to such accrued but unpaid interest. A holder previously required to include in its taxable income any accrued but unpaid interest on a Claim or Interest may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the holder is less than the amount of interest taken into income by the holder.

## D.  Information Reporting and Backup Withholding

Under the backup withholding rules of the Internal Revenue Code, holders may be subject to backup withholding at the rate of twenty-eight percent (28%) with respect to payments made pursuant to the Plans unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests receiving a distribution under the Plans are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the applicable Plan.**

## X. VOTING PROCEDURES AND REQUIREMENTS

### A. <u>Voting Deadline</u>

IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:

#### LRGI CLASSES

| | |
|---|---|
| Class 2(a) | *CapitalSource Secured Claims against LRGI* |
| Class 2(b) | *CSE Secured Claims against LRGI* |
| Class 3 | *Secured Tax Claims against LRGI* |
| Class 4 | *Other Secured Claims against LRGI* |
| Class 5 | *General Unsecured Claims against LRGI* |
| Class 6 | *Interests in LRGI* |

#### LPC CLASSES

| | |
|---|---|
| Class 2(a) | *CapitalSource Secured Claims against LPC* |
| Class 2(b) | *CSE Secured Claims against LPC* |
| Class 3 | *Secured Tax Claims against LPC* |
| Class 4 | *Other Secured Claims against LPC* |
| Class 5 | *General Unsecured Claims Against LPC (including Senior Subordinated Note Claims)* |
| Class 6 | *Asbestos-Related Claims Against LPC* |
| Class 7 | *Junior Subordinated Note Claims Against LPC* |
| Class 8 | *Series B Preferred Stock Interests In LPC* |
| Class 9 | *LPC Common Stock Interests* |

All known holders of Claims in the classes listed above as of the Record Date are entitled to vote on the applicable Plan and have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein. To vote, please use only the ballot that accompanies this Disclosure Statement.

The Prepetition Secured Lenders intend to use Financial Balloting Group LLC, who was retained by the Debtors in connection with their aborted plan, as the Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plans.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE STREET ADDRESS OR E-MAIL ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON [___  __], 2009.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE TO EITHER ACCEPT OR REJECT THE PLAN.**

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

> **Financial Balloting Group LLC**
> **757 Third Avenue, 3rd Floor,**
> **New York, New York 10017**
> **Telephone: (646) 282-1800**

> **-OR –**

> **tabulation@fbgllc.com**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

## B. Holders of Claims Entitled to Vote

Under the LRGI Plan, Classes 2(a), 2(b), 3, 4, 5 and 6 are the only Classes that are impaired and entitled to vote to accept or reject the LRGI Plan. Under the LPC Plan, Classes 2(a), 2(b), 3, 4, 5, 6, 7, 8, and 9 are the only Classes that are impaired and entitled to vote to accept or reject the LPC Plan. Each holder of a Claim in any of these classes as of [_____ __], 2009 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Plan.

## C. Vote Required for Acceptance by a Class

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that vote to accept or reject the plan. A class of interests accepts a chapter 11 plan when it is accepted by at least two-thirds in amount of the interest of that class that vote to accept or reject the plan. Thus, (i) Classes 2(a), 2(b), 3 and 5 of the LRGI Plan will accept the LRGI Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance and Class 6 will accept the LRGI Plan if at least two-thirds in amount of that Class cast their ballots in favor of acceptance; and (ii) Classes 2(a), 2(b), 3, 4, 5, 6 and 7 of the LPC Plan will accept the LPC Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance

and Classes 8 and 9 will accept the LPC Plan if at least two-thirds in amount of that Class cast their ballots in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## D. Voting Procedures

### 1. Voting Procedures

Voting procedures shall be as described in the Disclosure Statement Order.

### 2. Withdrawal of Ballot

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline.  The Plan Proponents may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline.  In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

# XI. CONFIRMATION OF A PLAN

## A. The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing on [both Plans] for _____ and, if needed, _____.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B. Objections to Confirmation

Objections or responses to confirmation of either Plan, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor.

All objections and responses to the confirmation of a Plan must be filed with the Bankruptcy Court no later than [___  __], 2009 at 4:00 p.m. (prevailing Eastern Time).  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Martin Glenn.

All objections and responses must be served, so as to be received no later than [___  __], 2009, at 4:00 p.m. (prevailing Eastern Time), upon:  (a) the Prepetition Secured Lenders, [_____]), (b) the attorneys for the Agents to the Prepetition Secured Lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn: John C. Tishler); (c) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow); (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); (e) the attorneys for the statutory committee of unsecured creditors, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn:  Paul Silverstein and Jonathon Levine); and (f) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C. General Requirements for Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)      The applicable Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)     The Prepetition Secured Lenders have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The applicable Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made under the applicable Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with such Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of such Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Prepetition Secured Lenders have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the applicable Plan, as a director, officer or responsible party of the Debtors, an affiliate of the Debtors participating in such Plan with the Debtors, or a successor to the Debtors under such Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Prepetition Secured Lenders have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the applicable Plan or will receive or retain under such Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "*Best Interests Test*" below.

(vii)    Except to the extent the applicable Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VIII.A.2, "*Non-Consensual Confirmation*" above, each Class of Claims or Interests has either accepted such Plan or is not impaired under such Plan.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the applicable Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b)

equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide to the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the applicable Plan, determined without including any acceptance of such Plan by any insider holding a Claim in such Class.

(x)    Confirmation of the applicable Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under such Plan, unless such liquidation or reorganization is proposed in such Plan. See discussion of "Feasibility" below.

(xi)    Absent rejection of the underlying collective bargaining agreement or other Final Order of the Bankruptcy Court, the applicable Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of such Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## D. Best Interests Test

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accepts the applicable Plan or (b) receives or retains under such Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The liquidation analysis is done separately for each Debtor, but they are presented together in Exhibit G for ease of reference.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the applicable Plan on the Effective Date.

The costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Creditors' Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Prepetition Secured Lenders have determined that there would be no distribution under chapter 7 of the Bankruptcy Code to any Class of unsecured Claims or Interests and, consequently, confirmation of the Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Prepetition Secured Lenders' liquidation analysis estimates the proceeds generated from a hypothetical chapter 7 liquidation of the Debtors' assets. The Prepetition Secured Lenders base the analysis upon a number of significant assumptions which are described therein. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The Plan Proponents' chapter 7 liquidation analysis of both LRGI and LPC (as well as the assumptions utilized therein) are set forth in Exhibit G to this Disclosure Statement.

## E. No Unfair Discrimination/Fair and Equitable Test

As provided under the Bankruptcy Code, the Bankruptcy Court may confirm a chapter 11 plan over the rejection or deemed rejection of such plan by a class of claims or interests if the chapter 11 plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

**1. No Unfair Discrimination**

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the chapter 11 plan. The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

**2. Fair and Equitable Test**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims or interests receive more than 100% of the allowed amount of the claims or interests in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

*a. Secured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide each holder of an impaired secured claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such allowed secured claim with deferred cash payments equal in value to the amount of such allowed secured claim, as of the effective date, or (ii) the "indubitable equivalent" of such allowed secured claim.

*b. Unsecured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an impaired unsecured claim will receive under the chapter 11 plan a distribution equal in value to the amount of the allowed unsecured claim or (ii) no distribution will be made under the plan to any holder that is junior to the claims in the dissenting class.

*c. Interests*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an Interest will receive under the chapter 11 plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of an interest that is junior to the dissenting class.

The Prepetition Secured Lenders believe that (i) both Plans satisfy the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) both Plans satisfy the "fair and equitable" requirement notwithstanding the rejection of either Plan by any respective Class of Claims or Interests, because each Class of Claims or Interests will receive under the applicable Plan a distribution equal in value to (x), with respect to any Class of Claims, the amount of such Claims and (y), with respect to any Class of Interests, the greater of the fixed liquidation value, the redemption price, or the value of the stock that is the basis for such Interests.

**F. Classification of Claims and Interests**

The Prepetition Secured Lenders believe that both Plans meet the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar." Each Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above. Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims of the respective estates are not classified.

**G. Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Prepetition Secured Lenders have analyzed the Debtors' ability to meet their financial obligations as contemplated to consummate the Plan. As part of this analysis, the Prepetition Secured Lenders have prepared the Projeted Financial Information set forth in Exhibit F to this Disclosure Statement. Certain selected financial information from the Projeted Financial Information and certain key financial ratios are set forth in Section VII above, "*Financial Information and Analysis*". These projections are based upon the assumption that the Bankruptcy Court will confirm each Plan and, for projection purposes, that the Effective Date of each Plan and its substantial consummation will take place within 180 days after entry of the applicable Confirmation Order. Based upon the Projeted Financial Information, the Prepetition Secured Lenders believe the applicable Post-Confirmation Trustee will be able to make all payments required to be made pursuant to the applicable Plan.

## XII. CONCLUSION

The Prepetition Secured Lenders believe the LRGI Plan is in the best interests of all holders of Claims and Interests with respect to LRGI and urges the holders of impaired Claims and Interests in Classes 2(a), 2(b), 3, 4, 5 and 6 to vote to accept the LRGI Plan and to evidence acceptance by returning their ballots such that the Voting Agent will received the ballots no later than the Voting Deadline at _____ on _____, 2009.

Similarly, the Prepetition Secured Lenders believe the LPC Plan is in the best interests of all holders of Claims and Interests with respect to LPC and urges the holders of impaired Claims and Interests in Classes 2(a), 2(b), 3, 4, 5,6 ,7 ,8 and 9 to vote to accept the LPC Plan and to evidence acceptance by returning their ballots such that the Voting Agent will have received the ballots no later than the Voting Deadline at _____ on _____, 2009.

Dated: Nashville, Tennessee
     September 1, 2009

                    Respectfully Submitted:

                    WALLER LANSDEN DORTCH & DAVIS, LLP
                    511 Union Street, Suite 2700
                    Nashville, Tennessee 37219
                    (615) 244-6380 TEL
                    (615) 244-6804 FAX

                    and

                    CARTER LEDYARD & MILBURN LLP
                    2 Wall Street
                    New York, NY 10005
                    Telephone: 212-732-3200
                    Fax: 212-732-3232

**<u>EXHIBIT A</u>**

The LRGI Plan

## EXHIBIT B

The LPC Plan

**<u>EXHIBIT C</u>**


Disclosure Statement Order


[to be provided]

## **EXHIBIT D**


LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (without exhibits)

## EXHIBIT E

LPC's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 (without exhibits)

**<u>EXHIBIT</u>** F


Projected Financial Information


[to be provided]

**EXHIBIT G**

Liquidation Analysis

[to be provided]