# EXHIBIT D

# LEXINGTON PRECISION CORPORATION'S QUARTERLY REPORT ON FORM 10-Q FOR THE FISCAL QUARTER ENDED JUNE 30, 2009 (ATTACHED WITHOUT EXHIBITS)

# LEXINGTON PRECISION CORP

## FORM 10-Q
### (Quarterly Report)

## Filed 08/20/09 for the Period Ending 06/30/09

| | |
|---|---|
| Address | 767 THIRD AVE 29TH FL |
| | NEW YORK, NY 10017 |
| Telephone | 2123194657 |
| CIK | 0000012570 |
| Symbol | LEXPQ |
| SIC Code | 3060 - Fabricated Rubber Products, Not Elsewhere |
| Industry | Fabricated Plastic & Rubber |
| Sector | Basic Materials |
| Fiscal Year | 08/14 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

[X] Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the Period Ended June 30, 2009

**or**

[  ] Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

### Commission File Number 0-3252

# LEXINGTON PRECISION CORPORATION
### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-1830121** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **800 Third Avenue, New York, NY** | **10022** |
| (Address of principal executive office) | (Zip Code) |

### (212) 319-4657
#### (Registrant's telephone number, including area code)

### Not Applicable
#### (Former name, former address, and former fiscal year, if changed since last report date)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes X_ No _

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  __  No _

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.    (Check one):

|  |  |
|---|---|
| Large Accelerated Filer _ | Accelerated Filer _ |
| Non-Accelerated Filer _ | Smaller Reporting Company X |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes  __  No X

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.
       As of August 14, 2009, there were 5,021,767 shares of common stock of the Registrant outstanding.

**LEXINGTON PRECISION CORPORATION**

**Quarterly Report on Form 10-Q**

**Table of Contents**

**PART I.    FINANCIAL INFORMATION**

| | | |
|---|---|---|
| Item 1. | Financial Statements | 1 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 42 |
| Item 4T. | Controls and Procedures | 43 |

**PART II.    OTHER INFORMATION**

| | | |
|---|---|---|
| Item 3. | Defaults upon Senior Securities | 44 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 44 |
| Item 6. | Exhibits | 45 |

- i -

# PART I.  FINANCIAL INFORMATION

## Item 1. FINANCIAL STATEMENTS

### LEXINGTON PRECISION CORPORATION

**Consolidated Statements of Operations**
**(thousands of dollars, except per share data)**
**(unaudited)**

| | Three Months Ended June 30 | | Six Months Ended June 30 | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| Net sales | $ 15,377 | $ 20,000 | $ 29,542 | $ 41,352 |
| Cost of sales | 14,272 | 16,664 | 27,131 | 34,830 |
| Gross profit | 1,105 | 3,336 | 2,411 | 6,522 |
| Selling and administrative expenses | 1,486 | 1,454 | 2,830 | 3,303 |
| Income (loss) from operations | (381) | 1,882 | (419) | 3,219 |
| Interest expense | 1,881 | 1,966 | 3,741 | 4,740 |
| Reorganization items, net expense | 944 | 1,795 | 2,428 | 1,795 |
| Loss from continuing operations before income taxes | (3,206) | (1,879) | (6,588) | (3,316) |
| Income tax provision | 9 | 16 | 18 | 26 |
| Loss from continuing operations | (3,215) | (1,895) | (6,606) | (3,342) |
| Income (loss) from discontinued operations | 12 | (45) | (24) | (60) |
| Net loss | $ (3,203) | $ (1,940) | $ (6,630) | $ (3,402) |
| | | | | |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.65) | $ (0.38) | $ (1.33) | $ (0.68) |
| Discontinued operations | 0.01 | (0.01) | – | (0.01) |
| Net loss | $ (0.64) | $ (0.39) | $ (1.33) | $ (0.69) |

*See notes to consolidated financial statements.*

- 1 -

# LEXINGTON PRECISION CORPORATION

### Consolidated Balance Sheets
### (thousands of dollars, except share data)

| | | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|---|
| **Assets:** | | (unaudited) | | |
| Current assets: | | | | |
| Cash | $ | 3,579 | $ | 5,540 |
| Marketable securities | | 83 | | 38 |
| Accounts receivable, net of allowances of $837 and   $735, respectively | | 7,803 | | 6,794 |
| Inventories, net | | 8,072 | | 10,597 |
| Prepaid expenses and other current assets | | 1,385 | | 2,426 |
| Current assets of discontinued operations | | 31 | | 7 |
| Total current assets | | 20,953 | | 25,402 |
| Plant and equipment, net | | 17,102 | | 18,439 |
| Plant and equipment of discontinued operations, net | | 1,177 | | 1,231 |
| Goodwill, net | | 7,623 | | 7,623 |
| Other assets, net | | 512 | | 633 |
| | $ | 47,367 | $ | 53,328 |
| **Liabilities and stockholders' deficit:** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 2,240 | $ | 3,391 |
| Accrued expenses, excluding interest | | 3,932 | | 3,382 |
| Accrued interest expense | | 165 | | 199 |
| Debt in default | | 32,558 | | 34,175 |
| Debtor-in-possession loan | | 4,000 | | 4,000 |
| Current portion of long-term debt | | 16 | | 16 |
| Current liabilities of discontinued operations | | 151 | | 148 |
| Total current liabilities | | 43,062 | | 45,311 |
| Liabilities subject to compromise | | 56,812 | | 54,013 |
| Other long-term liabilities | | 468 | | 400 |
| Stockholders' deficit: | | | | |
| Common stock, $0.25 par value, 10,000,000 shares   authorized, 5,021,767 shares issued and outstanding   at June 30, 2009, and December 31, 2008 | | 1,245 | | 1,242 |
| Additional paid-in-capital | | 13,200 | | 13,197 |
| Accumulated deficit | | (67,289 ) | | (60,659 ) |
| Accumulated other comprehensive loss | | (131 ) | | (176 ) |
| Total stockholders' deficit | | (52,975 ) | | (46,396 ) |
| | $ | 47,367 | $ | 53,328 |

*See notes to consolidated financial statements.*

## LEXINGTON PRECISION CORPORATION

### Consolidated Statements of Cash Flows
### (thousands of dollars)
### (unaudited)

| | Six Months Ended June 30 | |
|---|---|---|
| | **2009** | **2008** |
| **Operating activities:** | | |
| Net loss $ | (6,630) $ | (3,402) |
| Adjustments to reconcile net loss to net cash provided (used) by continuing operations: | | |
| Loss from discontinued operations | 24 | 60 |
| Depreciation | 2,296 | 2,633 |
| Amortization included in operations | 73 | 124 |
| Amortization of deferred financing costs and fees | – | 251 |
| Increase in accrued reorganization expenses | 86 | 1,509 |
| Changes in operating assets and liabilities that provided (used) cash: | | |
| Accounts receivable, net | (1,009) | 644 |
| Inventories, net | 2,525 | (747) |
| Prepaid expenses and other current assets | 1,034 | (387) |
| Accounts payable | (806) | 548 |
| Accrued expenses, excluding interest | 119 | 347 |
| Accrued interest expense | 2,765 | 2,841 |
| Other long-term liabilities | 138 | – |
| Other | 16 | (6) |
| Net cash provided by continuing operations | 631 | 4,415 |
| Net cash provided by discontinued operations | 9 | 2 |
| Net cash provided by operating activities | 640 | 4,417 |
| **Investing activities:** | | |
| Purchases of plant and equipment | (1,077) | (1,663) |
| Proceeds from sales of assets | 126 | 42 |
| Expenditures for tooling owned by customers | (41) | (46) |
| Other | 8 | (77) |
| Net cash used by investing activities | (984) | (1,744) |
| **Financing activities:** | | |
| Issuance of debtor-in-possession note | – | 4,000 |
| Prepetition net borrowings under revolving line of credit | – | 3,587 |
| Prepetition repayment of debt in default and long-term debt | – | (837) |
| Postpetition repayment of debt in default and long-term debt | (1,617) | (826) |
| Payment of financing expenses | – | (214) |
| Net cash provided (used) by financing activities | (1,617) | 5,710 |
| | | |
| Net increase (decrease) in cash | (1,961) | 8,383 |
| Cash at beginning of year | 5,540 | 212 |
| Cash at end of period $ | 3,579 $ | 8,595 |

*See notes to consolidated financial statements.*

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1 — Basis of Presentation**

The unaudited interim consolidated financial statements include the accounts of Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"). The significant accounting policies followed by the Company are set forth in Note 1 to the consolidated financial statements in the Company's annual report on Form 10-K for the year ended December 31, 2008. In the opinion of management, the interim consolidated financial statements contain all adjustments, consisting only of adjustments of a normal, recurring nature, necessary to present fairly the Company's financial position at June 30, 2009, the Company's results of operations for the three-month and six-month periods ended June 30, 2009 and 2008, and the Company's cash flows for the six-month periods ended June 30, 2009 and 2008.

The preparation of the interim consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with any certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

The results of operations for the three-month period ended June 30, 2009, are not necessarily indicative of the results to be expected for any succeeding quarter or for the full year.

***Bankruptcy Filing***

On April 1, 2008, the Company filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-11153). The Company's exclusive right to file a plan of reorganization and solicit acceptances of such plan expired on April 30, 2009.

In connection with the chapter 11 filing, the Company obtained a financing package that consisted of (1) an arrangement with the Company's senior, secured lenders to freeze the loan under the Company's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through February 25, 2009, which has since been extended to September 25, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, unless otherwise extended. On June 30 and August 14, 2009, the Company's available cash on hand totaled $3,579,000 and $2,950,000, respectively. Although there can be no assurance, the Company currently believes that, based on its most recent financial projections, it has adequate liquidity to operate during the chapter 11 proceedings. For more information on the Company's senior, secured financing and the debtor-in-possession loan, please refer to Note 4, "Debt."

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection was to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in its total indebtedness on a basis that would be fair and equitable to all of its creditors and stockholders.

- 4 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

### Proposed Plan of Reorganization

In December 2008, the Company filed an amended plan of reorganization (the "Amended Plan") that, if confirmed, would provide for the following distributions:

— The senior, secured credit facility would be repaid in full in cash;

— Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

— Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

— Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on June 30, 2009, $51,206,000 of the Company's liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington . These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

The Company requires financing in order to consummate the Amended Plan. There can be no assurance that the Amended Plan will be confirmed or that the Company will be able to obtain such financing. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

### American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code"

The Company's consolidated financial statements have been prepared in accordance with American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"). SOP 90-7 provides guidance for financial reporting by entities that have filed petitions and expect to reorganize as going concerns under Chapter 11 of Title 11 of the United States Code. SOP 90-7 recommends that all such entities report the same way while reorganizing under chapter 11, with the objective of reflecting their financial evolution. To accomplish this objective, SOP 90-7 requires, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

- 5 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

*Reorganization Items*

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as "reorganization items" in the statements of operations. Reorganization items reflected in the Company's consolidated financial statements for the three-month and six-month periods ended June 30, 2009 and 2008, respectively, are set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | Six Months Ended June 30 | |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Professional fees and expenses incurred directly by the Company | $ 322 | $ 1,024 | $ 835 | $ 1,024 |
| Professional fees and expenses incurred by creditors | 509 | 625 | 1,460 | 625 |
| Other costs | 123 | 177 | 160 | 177 |
| Interest income | (10) | (31) | (27) | (31) |
| Reorganization items, net expense | $ 944 | $ 1,795 | $ 2,428 | $ 1,795 |

*Liabilities Subject to Compromise*

SOP 90-7 requires that certain prepetition claims against the Company that are unsecured or under-secured be classified in the balance sheet as "liabilities subject to compromise." Additional claims that are subject to compromise may arise subsequent to the filing date as a result of the rejection of executory contracts or because claims are allowed as a result of the resolution of contingencies or disputes. On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008, as the bar date for the filing of all prepetition claims other than claims held by government units. The bar date for government units to file prepetition claims was September 29, 2008. The bar date was the date on which claims against the Company that arose prior to the filing date must have been filed in order for the claimant to receive any distribution in the chapter 11 case. The bar dates have passed and, absent relief from the Bankruptcy Court, no additional claims may be filed against the Company. No claims or asserted claims were filed that were not already known to the Company as of April 1, 2008. Although prepetition claims are generally stayed, on April 2 and April 22, 2008, the Company received approvals from the Bankruptcy Court to pay or otherwise honor, subject to certain conditions, certain prepetition obligations critical to its continued operation, including employee wages and benefits, workers' compensation and product liability insurance programs, certain customer programs, and common carrier charges.

- 6 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

The Company has been paying and intends to continue to pay all undisputed postpetition claims in the ordinary course of business. Liabilities subject to compromise at June 30, 2009, and December 31, 2008, consisted of the following (dollar amounts in thousands):

|  | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Accounts payable – continuing operations | $ 5,432 | $ 5,432 |
| Accounts payable – discontinued operations | 174 | 174 |
| Senior Subordinated Notes | 34,177 | 34,177 |
| Accrued interest on Senior Subordinated Notes | 15,818 | 13,055 |
| Junior Subordinated Note | 347 | 347 |
| Accrued interest on Junior Subordinated Note | 131 | 109 |
| Series B Preferred Stock | 660 | 660 |
| Accrued dividends on Series B Preferred Stock | 73 | 59 |
| Total liabilities subject to compromise | $ 56,812 | $ 54,013 |

The foregoing amounts are based upon the Company's books and records and do not necessarily take into account all alleged liabilities asserted in proofs of claims filed with the Bankruptcy Court.

### Accounting for Interest Expense

On April 2, 2008, the Bankruptcy Court issued an order authorizing the Company to utilize the collections on its accounts receivable in the operation of its business. Pursuant to that order, the interest rates on the Company's senior, secured debt were reduced from the default rates to the contractual rates. In addition, because the management of the Company believes that the Company is solvent, the Company continues to accrue, and report in its consolidated financial statements, interest on all of its unsecured prepetition debt at the applicable contractual rates.

### Going Concern Basis

The Company's consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles ("GAAP"). A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Goodwill Impairment

At June 30, 2009, and December 31, 2008, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At June 30, 2009, the assets of the Rubber Group, including goodwill, totaled $36,152,000. In connection with the Company's chapter 11 proceedings, the Company's financial advisor, W.Y. Campbell & Company, has prepared several analyses of the value of the Rubber Group, each of which indicated that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill are performed using a fair

- 7 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### *Recently Issued Accounting Standards*

### *Statement of Financial Accounting Standards No. 165, "Subsequent Events"*

In May 2009, the Financial Accounting Standards Board (the "FASB") issued Statement No. 165, "Subsequent Events" ("SFAS 165"). SFAS 165 was issued to establish general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued. SFAS 165 does not result in significant changes in current recognition or disclosure standards, but requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for that date. SFAS 165 also clarifies the circumstances under which an entity should recognize events or transactions occurring after the balance sheet date in its financial statements. SFAS 165 is effective for interim and annual periods ending after June 15, 2009. The adoption of SFAS 165 did not have a material impact on the Company's financial statements for the periods ended June 30, 2009. For purposes of this accounting standard, the Company has evaluated subsequent events through August 20, 2009, the date these financial statements were issued.

### *Statement of Financial Accounting Standards No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles—a replacement of FASB Statement No. 162"*

In June 2009, the FASB approved the FASB Accounting Standards Codification ("Codification") as the single source of GAAP. The Codification does not change current GAAP, but is intended to simplify user access to all authoritative GAAP by providing all the authoritative literature related to a particular topic in one place. All existing accounting standard documents will be superseded and all other accounting literature not included in the Codification will be considered nonauthoritative. The Codification is effective for interim and annual periods ending after September 15, 2009. The Codification is effective for the Company during its interim period ending September 30, 2009, and is not expected to have any impact on the Company's financial statements.

## Note 2 — Inventories

Inventories at June 30, 2009, and December 31, 2008, are set forth below (dollar amounts in thousands):

|  | June 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Finished goods | $ | 4,554 | $ | 6,370 |
| Raw material | | 2,033 | | 1,923 |
| Work in process | | 1,485 | | 2,304 |
| | $ | 8,072 | $ | 10,597 |

- 8 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(Unaudited)**

## Note 3 — Plant and Equipment

Plant and equipment at June 30, 2009, and December 31, 2008, is set forth below (dollar amounts in thousands):

|  | June 30, 2009 | December 31, 2008 |
|---|---|---|
| Land | $ 2,287 | $ 2,255 |
| Buildings | 13,406 | 13,378 |
| Equipment | 110,697 | 112,022 |
|  | 126,390 | 127,655 |
| Less accumulated depreciation | 109,288 | 109,216 |
| Plant and equipment, net | $ 17,102 | $ 18,439 |

## Note 4 — Debt

Debt at June 30, 2009, and December 31, 2008 is set forth below (dollar amounts in thousands):

|  | June 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
|  | Not Subject to Compromise | Subject to Compromise | Total | Not Subject to Compromise | Subject to Compromise | Total |
| **Debt in default:** |  |  |  |  |  |  |
| Senior, secured credit facility: |  |  |  |  |  |  |
| Revolving line of credit | $ 14,219 | $ – | $ 14,219 | $ 14,219 | $ – | $ 14,219 |
| Equipment term loan | 5,417 | – | 5,417 | 6,667 | – | 6,667 |
| Real estate term loan | 12,922 | – | 12,922 | 13,289 | – | 13,289 |
| Subtotal | 32,558 | – | 32,558 | 34,175 | – | 34,175 |
| Senior Subordinated Notes | – | 34,177 | 34,177 | – | 34,177 | 34,177 |
| Junior Subordinated Note | – | 347 | 347 | – | 347 | 347 |
| Total debt in default | 32,558 | 34,524 | 67,082 | 34,175 | 34,524 | 68,699 |
| Debtor-in-possession loan | 4,000 | – | 4,000 | 4,000 | – | 4,000 |
| Current portion of long-term debt | 16 | 660 | 676 | 16 | 660 | 676 |
| Long-term debt: |  |  |  |  |  |  |
| Series B Preferred Stock | – | 660 | 660 | – | 660 | 660 |
| Other | 16 | – | 16 | 16 | – | 16 |
| Subtotal | 16 | 660 | 676 | 16 | 660 | 676 |
| Less current portion | (16) | (660) | (676) | (16) | (660) | (676) |
| Total long-term debt | – | – | – | – | – | – |
| Total debt | $ 36,574 | $ 35,184 | $ 71,758 | $ 38,191 | $ 35,184 | $ 73,375 |

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

*Senior, Secured Credit Facility*

In connection with the Company's filing under chapter 11 of the Bankruptcy Code on April 1, 2008, the Company and its senior, secured lender, with the approval of the Bankruptcy Court, modified the senior, secured credit facility in the following manner:

1.  A default premium of 2% was eliminated and the interest rates on the various components of the senior, secured facility reverted to the following contractual rates: LIBOR plus 2.75% (3.07% at June 30, 2009) on outstanding amounts under the revolving line of credit; LIBOR plus 4.5% (4.82% at June 30, 2009) for the equipment term loan; and the prime rate, plus 6%, subject to a minimum interest rate of 11% (in effect at June 30, 2009), on $4,000,000 of the real estate term loan and LIBOR plus 4.5% (4.82% at June 30, 2009) on the remaining balance of the real estate term loan (weighted average rate for the entire real estate loan of 6.73% at June 30, 2009).

2.  The principal amount of the loan outstanding under the revolving line of credit was fixed at $14,219,000, and the Company was permitted to utilize, until February 25, 2009 (since extended to September 25, 2009), collections on its accounts receivable in the operation of its business.

3.  The Company agreed to continue to make the scheduled monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

The following financial covenants are presently in effect under the senior, secured financing agreements:

1.  <u>Minimum Cash</u>. Aggregate cash may not be less than $1,342,000 on August 21, 2009, nor less than $2,000,000 on the last day of each week thereafter. At August 14, 2009, the Company's aggregate cash was $2,950,000.

2.  <u>Maximum Expenditures</u>. The Company's cumulative expenditures may not exceed 110% of its cumulative budgeted expenditures for the two-week period ending on June 12, 2009, and on the last day of each two-week period following June 12, 2009. At August 7, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $2,297,000 less than 110% of cumulative budgeted expenditures.

3.  <u>Minimum Net Sales</u>. The Company's cumulative net sales are required to be greater than 82% of its cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At July 24, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $2,592,000 greater than the minimum level of cumulative net sales and aggregated 84.6% of our cumulative budgeted net sales from April 2, 2008.

The Company's right to utilize cash collateral of the senior, secured lenders will terminate upon the occurrence of the following events if the Company fails to cure any of the events within five days after it receives written notice of the event from the senior, secured lender: (a) failure to comply with the

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

The Company believes that the loans outstanding under the senior, secured credit facility and the interest accrued thereon are fully collateralized and will not be impaired under any plan of reorganization. As a result, the Company has continued to accrue and pay the interest on these loans at the contractual rates.

The commencement of proceedings under chapter 11 constituted an event of default under the terms of the agreement governing the senior, secured credit facility. In addition, prior to the chapter 11 filing date, a cross-default existed under the senior, secured credit facility because the Company did not make the interest payment that was due on its Senior Subordinated Notes on November 1, 2006, and has not made any of the quarterly interest payments since that date. As a result, all of the loans under the senior, secured credit facility are classified as debt in default at June 30, 2009, and December 31, 2008.

The Company's loans and reimbursement obligations with respect to letters of credit under the senior, secured credit facility are secured by liens on substantially all of the Company's assets. The agreements governing the senior, secured credit facility placed certain restrictions on the Company's business and operations, including limitations on the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

### Debtor-in-Possession Loan

The debtor-in-possession loan in the amount of $4,000,000 was approved by the Bankruptcy Court on April 2 and 17, 2008. The debtor-in-possession loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% (in effect at June 30, 2009). The debtor-in-possession loan was granted super-priority administration expense status by the Bankruptcy Court. The loan matures on the earliest of (1) December 31, 2009, unless otherwise extended, (2) the effective date of a plan of reorganization, (3) the conversion of the bankruptcy proceedings from chapter 11 to chapter 7, (4) the appointment of a chapter 11 trustee, or (5) an event of default as described in the documents governing the debtor-in-possession loan.

### Senior Subordinated Notes

The Senior Subordinated Notes matured on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. In addition, the Company did not pay the principal amount of the Senior Subordinated Notes on their maturity. Pursuant to a forbearance agreement between the Company and a group of six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes reverted to 12%. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of the Company's affiliates and members of their families. At June 30,

- 11 -

# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## (Unaudited)

2009, accrued interest on the Senior Subordinated Notes totaled $15,818,000. The Senior Subordinated Notes and the accrued interest thereon through June 30, 2009, were classified as liabilities subject to compromise in the Company's consolidated financial statements at June 30, 2009. The Company continues to accrue interest on the Senior Subordinated Notes at the contractual rate of 12% because the management of the Company believes that the Company is solvent.

### Junior Subordinated Note

The Junior Subordinated Note matures on November 1, 2009, and is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and to the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. At June 30, 2009, accrued interest on the Junior Subordinated Note totaled $131,000. The Junior Subordinated Note and the accrued interest thereon through June 30, 2009, were classified as liabilities subject to compromise in the Company's consolidated financial statements at June 30, 2009. The Company continues to accrue interest on the Junior Subordinated Note at the contractual rate of 13% because the management of the Company believes that the Company is solvent.

### Series B Preferred Stock

At June 30, 2009, there were outstanding 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), and (4) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. All of the shares of Series B Preferred Stock are past their scheduled redemption date. In addition, at June 30, 2009, the Company was in arrears on scheduled dividend payments on the Series B Preferred Stock in the aggregate amount of $73,000.

The Series B Preferred Stock is classified as debt in the Company's consolidated financial statements. At June 30, 2009, the Series B Preferred Stock and accrued dividends thereon were classified as liabilities subject to compromise in the Company's consolidated financial statements. The Company continues to accrue dividends on the Series B Preferred Stock at the contractual rate of 4% because the management of the Company believes that the Company is solvent.

### Fair Value of Financial Instruments

The Company believes that, at June 30, 2009, the fair value of the loans outstanding under the revolving line of credit, the equipment term loan, the real estate term loan, and the debtor-in-possession loan approximated the principal amounts of such loans. Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

- 12 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

*Cash Interest Paid*

Cash interest paid during the six-month periods ended June 30, 2009 and 2008, including amounts allocated to discontinued operations, totaled $1,060,000 and $1,684,000, respectively.

## Note 5 — Interest Expense

A breakdown of interest expense for the three-month and six-month periods ended June 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | Six Months Ended June 30 | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| Interest expense at contractual interest rates: | | | | |
| Senior, secured loans | $ 404 | $ 627 | $ 819 | $ 1,308 |
| Debtor-in-possession loan | 101 | 88 | 201 | 88 |
| Senior Subordinated Notes | 1,026 | 1,026 | 2,051 | 2,051 |
| Junior Subordinated Note | 12 | 12 | 23 | 23 |
| All other | 9 | 9 | 19 | 66 |
| Subtotal | 1,552 | 1,762 | 3,113 | 3,536 |
| | | | | |
| Interest expense resulting from incremental interest rates: | | | | |
| Senior, secured loans – default or forbearance premium | – | – | – | 172 |
| Senior Subordinated Notes – forbearance premium | – | – | – | 411 |
| Senior Subordinated Notes – interest on missed interest payments | 371 | 246 | 712 | 454 |
| Subtotal | 371 | 246 | 712 | 1,037 |
| | | | | |
| Financing costs and fees | – | – | – | 251 |
| | | | | |
| Total interest expense | 1,923 | 2,008 | 3,825 | 4,824 |
| | | | | |
| Less interest expense allocated to discontinued operations | 42 | 42 | 84 | 84 |
| | | | | |
| Interest expense related to continuing operations | $ 1,881 | $ 1,966 | $ 3,741 | $ 4,740 |

## Note 6 — Income Taxes

At June 30, 2009, and December 31, 2008, the Company's net deferred income tax assets were fully reserved by a valuation allowance. The income tax provisions recorded during the three-month and six-month periods ended June 30, 2009 and 2008, consisted of estimated state income taxes.

## Note 7 — Net Loss per Common Share

The calculations of basic and diluted net loss per common share for the three-month and six-month periods ended June 30, 2009 and 2008, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock were not dilutive. In addition, non-vested shares of restricted

- 13 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

common stock issued under the Company's 2005 Stock Award Plan (the "Plan") are not considered outstanding common shares for purposes of the calculation of basic net loss per share of common stock because the effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of basic and diluted loss per share of common stock set forth below does not include the assumed conversion of the Series B Preferred Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the Plan.

| | Three Months Ended June 30 | | | | Six Months Ended June 30 | | | |
|---|---|---|---|---|---|---|---|---|
| | **2009** | | **2008** | | **2009** | | **2008** | |
| Numerator – Loss: | | | | | | | | |
| Continuing operations | $ | (3,215) | $ | (1,895) | $ | (6,606) | $ | (3,342) |
| Discontinued operations | | 12 | | (45) | | (24) | | (60) |
| Net loss | $ | (3,203) | $ | (1,940) | $ | (6,630) | $ | (3,402) |
| Denominator – Weighted average shares outstanding | | 4,980 | | 4,962 | | 4,975 | | 4,957 |
| Basic and diluted loss per share of common stock: | | | | | | | | |
| Continuing operations | $ | (0.65) | $ | (0.38) | | (1.33) | $ | (0.68) |
| Discontinued operations | | 0.01 | | (0.01) | | – | | (0.01) |
| Net loss | $ | (0.64) | $ | (0.39) | $ | (1.33) | $ | (0.69) |

## Note 8 — Segments

### *Description of Segments and Products*

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily insulators used in aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Rubber Group currently operates manufacturing facilities in Jasper, Georgia, North Canton, Ohio, and Rock Hill, South Carolina. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks at a manufacturing facility located in Rochester, New York. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States.

The Corporate Office consists primarily of general administrative expenses that are not a result of any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to

- 14 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, and certain prepaid expenses and other miscellaneous current assets.

### Sales by Market

The following table summarizes net sales for the three-month and six-month periods ended June 30, 2009 and 2008, by the type of market in which the Company's components were utilized (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | Six Months Ended June 30 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2009 | | 2008 (1) | | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 6,840 | 44.5 % | $ 7,584 | 37.9 % | $ 13,170 | 44.6 % | $ 14,609 | 35.3 % |
| Medical | 3,834 | 24.9 | 4,250 | 21.3 | 7,766 | 26.3 | 8,261 | 20.0 |
| Automotive – OEM | 4,124 | 26.8 | 7,160 | 35.8 | 7,390 | 25.0 | 16,546 | 40.0 |
| Other | 579 | 3.8 | 1,006 | 5.0 | 1,216 | 4.1 | 1,936 | 4.7 |
| Total net sales | $ 15,377 | 100.0 % | $ 20,000 | 100.0 % | $ 29,542 | 100.0 % | $ 41,352 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for each market classification in 2008 may have changed from amounts previously reported.

- 15 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

*Segment Financial Data*

Information relating to the Company's operating segments and the Corporate Office for the three-month and six-month periods ended June 30, 2009 and 2008, is summarized below (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | Six Months Ended June 30 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2009 | | 2008 | | 2009 | | 2008 |
| Net sales: | | | | | | | | |
| Rubber Group | $ | 13,090 | $ | 17,230 | $ | 25,325 | $ | 35,316 |
| Metals Group | | 2,287 | | 2,770 | | 4,217 | | 6,036 |
| Total net sales | $ | 15,377 | $ | 20,000 | $ | 29,542 | $ | 41,352 |
| | | | | | | | | |
| Income (loss) from operations: | | | | | | | | |
| Rubber Group | $ | 588 | $ | 2,532 | $ | 1,526 | $ | 4,870 |
| Metals Group | | (362) | | (74) | | (776) | | (20) |
| Subtotal | | 226 | | 2,458 | | 750 | | 4,850 |
| Corporate Office (1) | | (607) | | (576) | | (1,169) | | (1,631) |
| Total income (loss) from operations | $ | (381) | $ | 1,882 | $ | (419) | $ | 3,219 |
| | | | | | | | | |
| Depreciation and amortization (2): | | | | | | | | |
| Rubber Group | $ | 1,055 | $ | 1,189 | $ | 2,114 | $ | 2,444 |
| Metals Group | | 113 | | 140 | | 230 | | 288 |
| Subtotal | | 1,168 | | 1,329 | | 2,344 | | 2,732 |
| Corporate Office | | 12 | | 13 | | 25 | | 25 |
| Total depreciation and amortization | $ | 1,180 | $ | 1,342 | $ | 2,369 | $ | 2,757 |
| | | | | | | | | |
| Capital expenditures : | | | | | | | | |
| Rubber Group | $ | 476 | $ | 840 | $ | 979 | $ | 1,509 |
| Metals Group | | 28 | | 96 | | 98 | | 143 |
| Subtotal | | 504 | | 936 | | 1,077 | | 1,652 |
| Corporate Office | | – | | 2 | | – | | 11 |
| Total capital expenditures | $ | 504 | $ | 938 | $ | 1,077 | $ | 1,663 |

| | | June 30, 2009 | | Dec. 31, 2008 |
| --- | --- | --- | --- | --- |
| Assets: | | | | |
| Rubber Group | $ | 36,152 | $ | 38,527 |
| Metals Group | | 6,147 | | 7,680 |
| Subtotal | | 42,299 | | 46,207 |
| Corporate Office | | 3,860 | | 5,883 |
| Total assets | $ | 46,159 | $ | 52,090 |

(1) During the six-month period ended June 30, 2008, Corporate Office expenses included $508,000 of expenses incurred in connection with the Company's efforts to refinance, restructure, or repay its indebtedness prior to its filing of chapter 11 on April 1, 2008.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

(2) Excludes amortization and write-off of deferred financing expenses, which totaled $251,000 during the six-month period ended June 30, 2008. Amortization and write-off of deferred financing expenses is included in interest expense in the consolidated financial statements.

## Note 9 — Accumulated Other Comprehensive Loss

The Company's marketable securities are valued at their quoted market prices at the close of business on June 30, 2008, in accordance with the guidance set forth in FAS 157 (level 1 inputs). Based on the classification of these marketable securities as available-for-sale, the Company recognized other comprehensive income of $24,000 and $45,000 during the three-month and six-month periods ended June 30, 2009, respectively, and other comprehensive losses of $31,000 and $68,000 during the three-month and six-month periods ended June 30, 2008, respectively.

## Note 10 — Discontinued Operations

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. During the three-month periods ended June 30, 2009 and 2008, the income (loss) from discontinued operations totaled $12,000 and $(45,000), respectively, which included allocated interest expense of $42,000 in each of the three-month periods. During the six-month periods ended June 30, 2009 and 2008, the loss from discontinued operations totaled $24,000 and $60,000, respectively, which included allocated interest expense of $84,000 in each of the six-month periods. At June 30, 2009 and 2008, assets of discontinued operations totaled $1,208,000 and $1,290,000, respectively, which consisted primarily of land and buildings.

## Note 11 — Restructuring of Connector-Seal Business

During the last six months of 2008, the Company experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at its connector-seal facility in Vienna, Ohio. Because of these losses and because the Company did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, the Company decided to close this facility and move the production to the Company's other rubber molding facilities. The shutdown of the Vienna facility was substantially completed on July 31, 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the Company's other rubber molding facilities, will total approximately $636,000, which consists of (1) $392,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $159,000 for start-up expenses at the new manufacturing locations, and (3) $85,000 for moving and installation of manufacturing equipment. During the three-month period ended June 30, 2009, the Company expensed $356,000 of restructuring costs, of which $333,000 was included in cost of sales and $23,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. During the six-month period ended June 30, 2009, the Company expensed $480,000 of restructuring costs, of which $444,000 was included in cost of sales and $36,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. At June 30, 2009, the Company had accrued $80,000 on its consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the third quarter of 2009. Although there can be no assurance, the Company currently believes, based on independent

- 17 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

appraisals, that it should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that the Company is not planning to move to its other rubber molding facilities, at a value that will be in excess of the carrying value of these assets.

[This space intentionally left blank]

- 18 -

**Item 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

Some of our statements in this Form 10-Q are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approvals with respect to motions in the chapter 11 proceedings;

- our ability to obtain financing that will permit us to exit chapter 11;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- our ability to offset any increases in the cost of raw materials;

- increases and decreases in the production of cars and trucks in North America;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- decreased access to the credit markets by our customers or suppliers;

- chapter 11 filings by one or more of our customers or suppliers; and

- labor interruptions at our facilities or at our customers' or suppliers' facilities.

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as

- 19 -

a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part II, Item 1A, and in our annual report on Form 10-K for the year ended December 31, 2008.

**Subsequent Events**

Our Senior Subordinated Notes matured on August 1, 2009. The Company did not pay the principal amount of the Senior Subordinated Notes at their maturity. The Company continues to accrue interest on the Senior Subordinated Notes at the contractual rate of 12% because the management of the Company believes that the Company is solvent.

**Results of Operations — Second Quarter of 2009 Versus Second Quarter of 2008**

Unless otherwise indicated, the data set forth below in this Item 2 relates solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the three-month periods ended June 30, 2009 and 2008, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. The term EBITDA, as used by us, does not include reorganization items, which are classified as nonoperating expense in our consolidated statements of operations. EBITDA is not a measure of performance under GAAP. We have presented EBITDA here and elsewhere in this Form 10-Q for the following reasons:

1. Investors and lenders frequently look at EBITDA when evaluating a company's ability to satisfy interest and principal obligations with respect to its outstanding indebtedness;

2. Management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items; and

3. Certain financial covenants in our senior, secured credit agreements have been calculated using variations of EBITDA.

EBITDA has material limitations when used as a measurement of performance, including the following:

1. EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2. EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3. EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

4. EBITDA does not reflect reorganization items, which primarily represent expenses and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to us, either currently or in the future.

5. EBITDA does not reflect cash provided or used as a result of changes in our working capital.

6. Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements that governed our senior, secured credit facility prior to our filing of a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on April 1, 2008.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP when analyzing our financial performance. EBITDA should not be considered to be a substitute for the following GAAP measures: gross profit, income from operations, net income, or net cash provided from operating activities.

- 21 -

Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
| | 2009 | | | 2008 | |
|---|---|---|---|---|---|
| Net sales | $ 15,377 | 100.0 % | $ | 20,000 | 100.0 % |
| Cost of sales | 14,272 | 92.8 | | 16,664 | 83.3 |
| Gross profit | 1,105 | 7.2 | | 3,336 | 16.7 |
| Selling and administrative expenses (1) | 1,486 | 9.7 | | 1,454 | 7.3 |
| Income (loss) from operations | (381) | (2.5) | | 1,882 | 9.4 |
| Interest expense | 1,881 | 12.2 | | 1,966 | 9.8 |
| Reorganization items, net expense | 944 | 6.1 | | 1,795 | 9.0 |
| Loss before income taxes | (3,206) | (20.8) | | (1,879) | (9.4) |
| Income tax provision | 9 | 0.1 | | 16 | 0.1 |
| Loss from continuing operations | (3,215) | (20.9) | | (1,895) | (9.5) |
| Add back: | | | | | |
|     Depreciation and amortization (2) | 1,180 | 7.7 | | 1,342 | 6.7 |
|     Interest expense | 1,881 | 12.2 | | 1,966 | 9.8 |
|     Reorganization items, net expense | 944 | 6.1 | | 1,795 | 9.0 |
|     Income tax provision | 9 | 0.1 | | 16 | 0.1 |
| EBITDA | 799 | 5.2 | | 3,224 | 16.1 |
| | | | | | |
| Adjustments to reconcile EBITDA to net cash used by operating activities: | | | | | |
|     Interest expense | (1,881) | (12.2) | | (1,966) | (9.8) |
|     Reorganization items, net expense | (944) | (6.1) | | (1,795) | (9.0) |
|     Income tax provision | (9) | (0.1) | | (16) | (0.1) |
|     Net change in accrued reorganization expenses | (689) | (4.5) | | 1,509 | 7.5 |
|     Net change in operating assets and liabilities | 3,834 | 24.9 | | 3,738 | 18.7 |
| Net cash provided by operating activities | $ 1,110 | 7.2 % | $ | 4,694 | 23.5 % |
| Net cash used by investing activities | $ (407) | (2.6) % | $ | (993) | (5.0) % |
| Net cash provided (used) by financing activities | $ (808) | (5.3) % | $ | 4,518 | 22.6 % |

(1) The three-month period ended June 30, 2008, includes $508,000 of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness prior to our filing of chapter 11 on April 1, 2008.

(2) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000 during the six-month period ended June 30, 2008, and which is included in interest expense in the consolidated financial statements.

Net sales by the type of market in which our components were utilized for the three-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
| | 2009 | | | 2008 (1) | |
|---|---|---|---|---|---|
| Automotive – aftermarket | $ | 6,840 | 44.5 % | $ 7,584 | 37.9 % |
| Automotive – OEM | | 4,124 | 26.8 | 7,160 | 35.8 |
| Medical | | 3,834 | 24.9 | 4,250 | 21.3 |
| Other | | 579 | 3.8 | 1,006 | 5.0 |
| Total net sales | $ | 15,377 | 100.0 % | $ 20,000 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for each market classification in 2008 may have changed from amounts previously reported.

Our net sales for the second quarter of 2009 declined by $4,623,000, or 23.1%, compared to the second quarter of 2008. The decrease in net sales was primarily the result of a 42.4% decrease in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers (OEMs), as a result of the significant reduction in automotive production levels.

EBITDA for the second quarter of 2009 was $799,000, or 5.2% of net sales, compared to EBITDA of $3,224,000, or 16.1% of net sales, for the second quarter of 2008. The change in EBITDA reflected a $2,078,000 decrease in EBITDA at the Rubber Group, a $315,000 decrease in EBITDA at the Metals Group, and a $32,000 decrease in EBITDA at the Corporate Office.

Net cash provided by our operating activities during the second quarter of 2009 totaled $1,110,000, compared to net cash provided by operating activities of $4,694,000 for 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the three-month periods ended June 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

The following table sets forth the operating results of the Rubber Group for the three-month periods ended June 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2009 | | | 2008 |
| Net sales | $ | 13,090 | 100.0 % | $ | 17,230 | 100.0 % |
| Cost of sales | | 11,699 | 89.4 | | 13,957 | 81.0 |
| Gross profit | | 1,391 | 10.6 | | 3,273 | 19.0 |
| Selling and administrative expenses | | 803 | 6.1 | | 741 | 4.3 |
| Income from operations | | 588 | 4.5 | | 2,532 | 14.7 |
| Add back depreciation and amortization | | 1,055 | 8.1 | | 1,189 | 6.9 |
| EBITDA | $ | 1,643 | 12.6 % | $ | 3,721 | 21.6 % |

Net sales by the type of market in which the Rubber Group's components were utilized for the three-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2009 | | | 2008 (1) |
| Automotive – aftermarket | $ | 6,840 | 52.3 % | $ | 7,584 | 44.0 % |
| Medical | | 3,834 | 29.3 | | 4,250 | 24.7 |
| Automotive – OEM | | 2,302 | 17.6 | | 4,882 | 28.3 |
| Other | | 114 | 0.8 | | 514 | 3.0 |
| | | | | | | |
| Total net sales | $ | 13,090 | 100.0 % | $ | 17,230 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for each market classification in 2008 may have changed from amounts previously reported.

During the second quarter of 2009, net sales of the Rubber Group decreased by $4,140,000, or 24.0%, compared to the second quarter of 2008, primarily because of a $2,580,000, or 52.8%, reduction in net sales of components for use in automotive OEM applications, primarily connector seals for automotive wiring systems. This reduction was caused by dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the second quarter of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 89.4% of net sales during the second quarter of 2009, compared to 81.0% of net sales during the second quarter of 2008, primarily because our connector-seal manufacturing facility in Vienna, Ohio, reported an operating loss of $1,442,000 during the second quarter of 2009, due to the underabsorption of fixed or partially fixed costs as a result of sharply reduced sales volume, and because the connector-seal facility expensed $363,000 of costs

- 24 -

incurred in connection with closing the facility and moving the production of connector seals to our other rubber molding facilities.

Selling and administrative expenses of the Rubber Group increased by $62,000, or 8.4%, during the second quarter of 2009, compared to the second quarter of 2008, primarily because of increased reserves for bad debts and the addition of two sales professionals. Selling and administrative expenses expressed as a percentage of net sales increased to 6.1% of net sales during the second quarter of 2009, compared to 4.3% during the second quarter of 2008.

During the second quarter of 2009, the Rubber Group's income from operations totaled $588,000, a decrease of $1,944,000, or 76.8%, compared to the second quarter of 2008. The Rubber Group's EBITDA for the second quarter of 2009 was $1,643,000, or 12.6% of net sales, compared to $3,721,000, or 21.6% of net sales, for the second quarter of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The shutdown of the Vienna facility was substantially completed on July 31, 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the our other rubber molding facilities, will total approximately $636,000, which consists of (1) $392,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $159,000 for start-up expenses at the new manufacturing locations, and (3) $85,000 for moving and installation of manufacturing equipment. During the three-month period ended June 30, 2009, we expensed $363,000 of restructuring expenses, of which $338,000 was included in cost of sales and $25,000 was included in selling and administrative expenses in our consolidated statements of operations. At June 30, 2009, we had accrued $80,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the third quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, at an amount that will be in excess of the carrying value of these assets.

- 25 -

*Metals Group*

T he Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

The following table sets forth the operating results of the Metals Group for the three-month periods ended June 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
|---|---|---|---|---|---|
| | | 2009 | | 2008 | |
| Net sales | $ | 2,287 | 100.0 % | $ 2,770 | 100.0 % |
| Cost of sales | | 2,573 | 112.5 | 2,707 | 97.7 |
| Gross profit (loss) | | (286) | (12.5) | 63 | 2.3 |
| Selling and administrative expenses | | 76 | 3.3 | 137 | 4.9 |
| Loss from operations | | (362) | (15.8) | (74) | (2.7) |
| Add back depreciation and amortization | | 113 | 4.9 | 140 | 5.1 |
| EBITDA | $ | (249) | (10.9)% | $ 66 | 2.4 % |

Net sales by the type of market in which the Metals Group's components were utilized for the three-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | | | |
|---|---|---|---|---|---|
| | | 2009 | | 2008 | |
| Automotive original equipment | $ | 1,822 | 79.7 % | $ 2,278 | 82.2 % |
| Other | | 465 | 20.3 | 492 | 17.8 |
| Total net sales | $ | 2,287 | 100.0 % | $ 2,770 | 100.0 % |

During the second quarter of 2009, net sales of the Metals Group decreased by $483,000, or 17.4%, compared to the second quarter of 2008, primarily as a result of reduced net sales of components to automotive OEMs. This reduction was primarily a result of dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the second quarter of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 112.5% of net sales during the second quarter of 2009 from 97.7% of net sales during the second quarter of 2008, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

Selling and administrative expenses of the Metals Group decreased by $61,000, or 44.5%, from the second quarter of 2008 to the second quarter of 2009, primarily as a result of a reduction in the number of sales people. Selling and administrative expenses expressed as a percentage of net sales decreased to 3.3% of net sales during the second quarter of 2009, compared to 4.9% during the second quarter of 2008.

For the second quarter of 2009, the Metals Group's loss from operations was $362,000, compared to a loss from operations of $74,000 for the second quarter of 2008. The Metals Group's EBITDA for the second quarter of 2009 was negative $249,000, compared to positive $66,000 for 2008.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the three-month periods ended June 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Three Months Ended June 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Loss from operations | $ (607) | $ (576) |
| Add back depreciation and amortization | 12 | 13 |
| EBITDA | $ (595) | $ (563) |

During the second quarter of 2009, Corporate Office expenses increased to $607,000 from $576,000 during the second quarter of 2008. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Filing of Chapter 11" in this Part I, Item 2.

*Interest Expense*

A breakdown of interest expense for the three-month periods ended June 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | |
| --- | --- | --- |
| | 2009 | 2008 |
| Interest expense at contractual interest rates: | | |
| Senior, secured loans | $       404 | $       627 |
| Debtor-in-possession loan | 101 | 88 |
| Senior Subordinated Notes | 1,026 | 1,026 |
| Junior Subordinated Note | 12 | 12 |
| All other | 9 | 9 |
| Subtotal | 1,552 | 1,762 |
| | | |
| Interest expense resulting from incremental interest rates: | | |
| Senior Subordinated Notes – interest on missed interest payments | 371 | 246 |
| Subtotal | 371 | 246 |
| | | |
| Total interest expense | 1,923 | 2,008 |
| | | |
| Less interest expense allocated to discontinued operations | 42 | 42 |
| | | |
| Interest expense related to continuing operations | $    1,881 | $    1,966 |

The average amount of debt outstanding during the second quarters of 2009 and 2008, including past due interest payments on which we are accruing interest, was $84,379,000 and $82,091,000, respectively. In the second quarters of 2009 and 2008, cash interest payments were $523,000 and $714,000, respectively. This decrease relates primarily to reductions in LIBOR and the prime rate.

The Bankruptcy Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. We continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates because we believe that the Company is solvent. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Filing of Chapter 11" in this Part I, Item 2.

*Reorganization Items*

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our

- 28 -

consolidated financial statements for the three-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended June 30 | | |
|---|---|---|---|
| | 2009 | | 2008 |
| Professional fees and expenses incurred directly by us | $ 322 | $ | 1,024 |
| Professional fees and expenses incurred by creditors | 509 | | 625 |
| Other costs | 123 | | 177 |
| Interest income | (10) | | (31) |
| Reorganization items, net expense | $ 944 | $ | 1,795 |

### *Income Tax Provision*

The income tax provisions recorded during the three-month periods ended June 30, 2009 and 2008, consisted of estimated state income taxes.

### *Discontinued Operation*

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $42,000 in each of the second quarters of 2009 and 2008.

## Results of Operations — First Six Months of 2009 Versus First Six Months of 2008

Unless otherwise indicated, the data set forth below in this Item 2 relates solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the six-month periods ended June 30, 2009 and 2008, the reconciliation of the loss from continuing operations to EBITDA for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods.

Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | | Six Months Ended June 30 | | | |
|---|---|---|---|---|---|
| | | 2009 | | 2008 | |
| Net sales | $ | 29,542 | 100.0 % | $ 41,352 | 100.0 % |
| Cost of sales | | 27,131 | 91.8 | 34,830 | 84.2 |
| Gross profit | | 2,411 | 8.2 | 6,522 | 15.8 |
| Selling and administrative expenses (1) | | 2,830 | 9.6 | 3,303 | 8.0 |
| Income (loss) from operations | | (419) | (1.4) | 3,219 | 7.8 |
| Interest expense | | 3,741 | 12.7 | 4,740 | 11.5 |
| Reorganization items, net expense | | 2,428 | 8.2 | 1,795 | 4.3 |
| Loss before income taxes | | (6,588) | (22.3) | (3,316) | (8.0) |
| Income tax provision | | 18 | 0.1 | 26 | 0.1 |
| Loss from continuing operations | | (6,606) | (22.4) | (3,342) | (8.1) |
| Add back: | | | | | |
| Depreciation and amortization (2) | | 2,369 | 8.0 | 2,757 | 6.7 |
| Interest expense | | 3,741 | 12.7 | 4,740 | 11.5 |
| Reorganization items, net expense | | 2,428 | 8.2 | 1,795 | 4.3 |
| Income tax provision | | 18 | 0.1 | 26 | 0.1 |
| EBITDA | | 1,950 | 6.6 | 5,976 | 14.5 |
| Adjustments to reconcile EBITDA to net cash used by operating activities: | | | | | |
| Interest expense | | (3,741) | (12.7) | (4,740) | (11.5) |
| Reorganization items, net expense | | (2,428) | (8.2) | (1,795) | (4.3) |
| Amortization and write-off of deferred financing expenses included in interest expense | | – | – | 251 | 0.6 |
| Income tax provision | | (18) | (0.1) | (26) | (0.1) |
| Net change in accrued reorganization expenses | | 86 | 0.3 | 1,509 | 3.6 |
| Net change in operating assets and liabilities | | 4,782 | 16.2 | 3,240 | 7.8 |
| Net cash provided by operating activities | $ | 631 | 2.1 % | $ 4,415 | 10.7 % |
| Net cash used by investing activities | $ | (984) | (3.3)% | $ (1,744) | (4.2)% |
| Net cash provided (used) by financing activities | $ | (1,617) | (5.5)% | $ 5,710 | 13.8 % |

(1) The six-month period ended June 30, 2008, includes $508,000 of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness prior to our filing of chapter 11 on April 1, 2008.

(2) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000 during the six-month period ended June 30, 2008, and which is included in interest expense in the consolidated financial statements.

Net sales by the type of market in which our components were utilized for the six-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Six Months Ended June 30 | | | |
|---|---|---|---|---|
| | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 13,170 | 44.6 % | $ 14,609 | 35.3 % |
| Medical | 7,766 | 26.3 | 8,261 | 20.0 |
| Automotive – OEM | 7,390 | 25.0 | 16,546 | 40.0 |
| Other | 1,216 | 4.1 | 1,936 | 4.7 |
| Total net sales | $ 29,542 | 100.0 % | $ 41,352 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for each market classification in 2008 may have changed from amounts previously reported.

Our net sales for the first six months of 2009 declined by $11,810,000, or 28.6%, compared to the first six months of 2008. The decrease in net sales was primarily the result of a 55.3% decrease in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers (OEMs), as a result of the significant reduction in automotive production levels.

EBITDA for the first six months of 2009 was $1,950,000, or 6.6% of net sales, compared to EBITDA of $5,976,000, or 14.5% of net sales, for the first six months of 2008. The change in EBITDA reflected a $3,674,000 decrease in EBITDA at the Rubber Group, a $814,000 decrease in EBITDA at the Metals Group, and a $462,000 increase in EBITDA at the Corporate Office. Excluding the $508,000 of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness during the first quarter of 2008, prior to the chapter 11 filing on April 1, 2008, EBITDA was $6,484,000, or 15.7% of net sales.

Net cash provided by our operating activities during the first six months of 2009 totaled $631,000, compared to net cash provided by operating activities of $4,415,000 for 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the six-month periods ended June 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

The following table sets forth the operating results of the Rubber Group for the six-month periods ended June 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Six Months Ended June 30 | | | | |
| | 2009 | | | 2008 | |
|---|---|---|---|---|---|
| Net sales | $ 25,325 | 100.0 % | $ | 35,316 | 100.0 % |
| Cost of sales | 22,302 | 88.1 | | 29,050 | 82.3 |
| Gross profit | 3,023 | 11.9 | | 6,266 | 17.7 |
| Selling and administrative expenses | 1,497 | 5.9 | | 1,396 | 4.0 |
| Income from operations | 1,526 | 6.0 | | 4,870 | 13.8 |
| Add back depreciation and amortization | 2,114 | 8.3 | | 2,444 | 6.9 |
| EBITDA | $ 3,640 | 14.4 % | $ | 7,314 | 20.7 % |

Net sales by the type of market in which the Rubber Group's components were utilized for the six-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Six Months Ended June 30 | | | | |
| | 2009 | | | 2008 (1) | |
|---|---|---|---|---|---|
| Automotive – aftermarket | $ 13,170 | 52.0 % | $ | 14,609 | 41.4 % |
| Medical | 7,766 | 30.7 | | 8,261 | 23.4 |
| Automotive – OEM | 4,118 | 16.3 | | 11,594 | 32.8 |
| Other | 271 | 1.0 | | 852 | 2.4 |
| Total net sales | $ 25,325 | 100.0 % | $ | 35,316 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for each market classification in 2008 may have changed from amounts previously reported.

During the first six months of 2009, net sales of the Rubber Group decreased by $9,991,000, or 28.3%, compared to the first six months of 2008, primarily because of a $7,476,000, or 64.5%, reduction in net sales of components for use in automotive OEM applications, primarily connector seals for automotive wiring systems. This reduction was caused by dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first six months of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 88.1% of net sales during the first six months of 2009, compared to 82.3% of net sales during the first six months of 2008, primarily because our connector-seal manufacturing facility in Vienna, Ohio, reported an operating loss of $2,488,000 during the first six months of 2009, as a result of the underabsorption of fixed or partially fixed costs as a result of sharply reduced sales volume, and because the connector-seal facility expensed $480,000 of

costs incurred in connection with closing the facility and moving the production of connector-seals to our other rubber molding facilities.

Selling and administrative expenses of the Rubber Group increased by $101,000, or 7.2%, during the first six months of 2009, compared to the first six months of 2008 primarily because of increased reserves for bad debts. Selling and administrative expenses expressed as a percentage of net sales increased to 5.9% of net sales during the first six months of 2009, compared to 4.0% during the first six months of 2008.

During the first six months of 2009, the Rubber Group's income from operations totaled $1,526,000, a decrease of $3,344,000, or 68.7%, compared to the first six months of 2008. The Rubber Group's EBITDA for the first six months of 2009 was $3,640,000, or 14.4% of net sales, compared to $7,314,000, or 20.7% of net sales, for the first six months of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The shutdown of the Vienna facility was substantially completed on July 31, 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production to our other rubber molding facilities, will total approximately $636,000, which consists of (1) $392,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $159,000 for start-up expenses at the new manufacturing locations, and (3) $85,000 for moving and installation of manufacturing equipment. During the first six months of 2009, we incurred $480,000 of restructuring expenses, of which $444,000 was included in cost of sales and $36,000 was included in selling and administrative expenses in our consolidated statements of operations. At June 30, 2009, we had accrued $80,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the third quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, at an amount that will be in excess of the carrying value of these assets.

- 33 -

*Metals Group*

T he Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

The following table sets forth the operating results of the Metals Group for the six-month periods ended June 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Six Months Ended June 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | |
| Net sales | $ 4,217 | 100.0 % | $ 6,036 | 100.0 % |
| Cost of sales | 4,829 | 114.5 | 5,780 | 95.8 |
| Gross profit (loss) | (612) | (14.5) | 256 | 4.2 |
| Selling and administrative expenses | 164 | 3.9 | 276 | 4.6 |
| Loss from operations | (776) | (18.4) | (20) | (0.3) |
| Add back depreciation and amortization | 230 | 5.5 | 288 | 4.8 |
| EBITDA | $ (546) | (12.9)% | $ 268 | 4.4 % |

Net sales by the type of market in which the Metals Group's components were utilized for the six-month periods ended June 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Six Months Ended June 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | |
| Automotive original equipment | $ 3,272 | 77.6 % | $ 4,952 | 82.0 % |
| Other | 945 | 22.4 | 1,084 | 18.0 |
| | | | | |
| Total net sales | $ 4,217 | 100.0 % | $ 6,036 | 100.0 % |

During the first six months of 2009, net sales of the Metals Group decreased by $1,819,000, or 30.1%, compared to the first six months of 2008, primarily as a result of reduced net sales of components to automotive OEMs. This reduction was primarily a result of dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first six months of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 114.5% of net sales during the first six months of 2009 from 95.8% of net sales during the first six months of 2008, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

- 34 -

Selling and administrative expenses of the Metals Group decreased by $112,000, or 40.6%, from the first six months of 2008 to the first six months of 2009, primarily as a result of a reduction in the number of sales people. Selling and administrative expenses expressed as a percentage of net sales decreased to 3.9% of net sales during the first six months of 2009, compared to 4.6% during the first six months of 2008.

For the first six months of 2009, the Metals Group's loss from operations was $776,000, compared to a loss from operations of $20,000 for the first six months of 2008. The Metals Group's EBITDA for the first six months of 2009 was negative $546,000, compared to positive $268,000 for 2008.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the six-month periods ended June 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Six Months Ended June 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Loss from operations | $ (1,169 ) | $ (1,631 ) |
| Add back depreciation and amortization (1) | 25 | 25 |
| EBITDA | $ (1,144 ) | $ (1,606 ) |

(1)    Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000 during the first six months of 2008 and which is included in interest expense in the consolidated financial statements.

During the first six months of 2009, Corporate Office expenses decreased to $1,169,000 from $1,631,000 during the first six months of 2008. This decrease is primarily attributed to $508,000 of expenses incurred during the first quarter of 2008, prior to our chapter 11 filing on April 1, 2008, in connection with our efforts to refinance, restructure, or repay our indebtedness. Subsequent to our filing of chapter 11 on April 1, 2008, expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness were classified as reorganization items in our consolidated statements of operations, in accordance with SOP 90-7. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Filing of Chapter 11" in this Part I, Item 2.

- 35 -

*Interest Expense*

A breakdown of interest expense for the six-month periods ended June 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

|  | Six Months Ended June 30 | |
|---|---|---|
|  | **2009** | **2008** |
| Interest expense at contractual interest rates: | | |
| Senior, secured loans | $ 819 | $ 1,308 |
| Debtor-in-possession loan | 201 | 88 |
| Senior Subordinated Notes | 2,051 | 2,051 |
| Junior Subordinated Note | 23 | 23 |
| All other | 19 | 66 |
| Subtotal | 3,113 | 3,536 |
| Interest expense resulting from incremental interest rates: | | |
| Senior, secured loans – default or forbearance premium | – | 172 |
| Senior Subordinated Notes – forbearance premium | – | 411 |
| Senior Subordinated Notes – interest on missed interest payments | 712 | 454 |
| Subtotal | 712 | 1,037 |
| Financing costs and fees | – | 251 |
| Total interest expense | 3,825 | 4,824 |
| Less interest expense allocated to discontinued operations | 84 | 84 |
| Interest expense related to continuing operations | $ 3,741 | $ 4,740 |

The average amount of debt outstanding during the first six months of 2009 and 2008, including past due interest payments on which we are accruing interest, was $84,270,000 and $79,265,000, respectively. In the first six months of 2009 and 2008, cash interest payments were $1,060,000 and $1,684,000, respectively. This decrease relates primarily to the modification of our senior, secured credit facility, including the elimination of a 2% premium charged on outstanding balances under such facility, and reductions in LIBOR and the prime rate.

The Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. We continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates because we believe that the Company is solvent. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Filing of Chapter 11" in this Part I, Item 2.

### *Reorganization Items*

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the six-month periods ended June 30, 2009 and 2008 are set forth below (dollar amounts in thousands):

|  | Six Months Ended June 30 | |
|---|---|---|
|  | **2009** | **2008** |
| Professional fees and expenses incurred directly by us | $ 835 | $ 1,024 |
| Professional fees and expenses incurred by creditors | 1,460 | 625 |
| Other costs | 160 | 177 |
| Interest income | (27) | (31) |
| Reorganization items, net expense | $ 2,428 | $ 1,795 |

### *Income Tax Provision*

The income tax provisions recorded during the six-month periods ended June 30, 2009 and 2008, consisted of estimated state income taxes.

### *Discontinued Operation*

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $84,000 in each of the first six months of 2009 and 2008.

## Liquidity and Capital Resources

### *Operating Activities*

During the first six months of 2009, operating activities of our continuing operations provided net cash of $631,000. Net accounts receivable increased by $1,009,000, or 14.9%, during the first six months of 2009, primarily because our net product sales during May and June of 2009 were greater than our net product sales during November and December of 2008. Net inventories decreased by $2,525,000, or 23.8%, because we undertook an aggressive program to bring our inventory levels in line with our current levels of production. Prepaid expenses and other current assets decreased by 1,034,000, or 42.6%, primarily because of (1) collection of a portion of our receivable for insurance reimbursement related to losses we incurred at our facility in Rock Hill, South Carolina, caused by fire in November of 2008, and (2) the amortization of insurance premiums. Accrued interest expense, including accrued interest expense classified as a liability subject to compromise, increased by $2,765,000, or 20.6%, primarily because of additional accruals of interest on our subordinated debt.

Net cash provided by operating activities of our discontinued operations during the first six months of 2009 totaled $9,000.

### Investing Activities

During the first six months of 2009, investing activities of our continuing operations used net cash of $984,000. Capital expenditures attributable to the Rubber Group, the Metals Group, and the Corporate Office totaled $979,000, $98,000, and $0, respectively, primarily for manufacturing equipment and tooling for our automotive aftermarket business. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $1,865,000, $176,000, and $0, respectively, for 2009.

### Financing Activities

During the first six months of 2009, our financing activities used net cash of $1,617,000 for principal payments on our senior, secured term loans.

### Liquidity and Filing of Chapter 11

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006 nor have we repaid the principal amount of the Senior Subordinated Notes, which became due on August 1, 2009. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At June 30, 2009, accrued interest on the Senior Subordinated Notes totaled $15,818,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default, and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness, and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a

- 38 -

major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own 74.6% of our Senior Subordinated Notes to advise them of the following:

1.  We had decided to pursue the proposal to purchase the Rock Hill facility;

2.  We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.  We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.  In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, with a cash interest rate of 12% per annum; and

5.  We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default under our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which date has since been extended to September 25, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on

- 39 -

December 31, 2009, if not extended. On June 30 and August 14, 2009, our cash on hand totaled $3,579.000 and $2,950,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings. The arrangement with the senior, secured lenders provided for a continuation of the scheduled, monthly principal payments on our term loans, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. From April 1, 2008, the date on which we filed our voluntary petition for relief under chapter 11, through August 3, 2009, we have made principal payments on the term loans totaling $4,581,000. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% in effect on June 30, 2009.

Our senior, secured credit facility includes a $17,500,000 revolving line of credit. At April 1, 2008, and June 30, 2009 there were $14,219,000 of loans outstanding under the revolving line of credit, and at April 1, 2008, and June 30, 2009, there were $907,000 and $733,000, respectively, of letters of credit outstanding under the revolving line of credit. The contractual interest rate on loans under the revolving line of credit is LIBOR plus 2.75% (3.07% at June 30, 2009).

Our equipment term loan had an outstanding principal balance $8,333,000 at April 1, 2008. At June 30, 2009, our equipment term loan had an outstanding principal balance of $5,417,000. The contractual interest rate on the equipment term loan is LIBOR plus 4.5% (4.82% at June 30, 2009).

Our real estate term loan had an outstanding principal balance of $13,778,000 at April 1, 2008. At June 30, 2009, our real estate term loan had an outstanding principal balance of $12,922,000. The contractual interest rate on the real estate term loan is the prime rate plus 6%, subject to a minimum interest rate of 11% (in effect on June 30, 2009), on $4,000,000 principal amount and LIBOR plus 4.5% (14.82% at June 30, 2009) on the balance (weighted average rate for the entire real estate loan of 6.73% at June 30, 2009).

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. For more information on the restructuring of our connector-seal business, please refer to the discussion of the Rubber Group in the section titled "Results of Operations – Second Quarter of 2009 versus Second Quarter of 2008" in this Part I, Item 2.

Under the arrangements pursuant to which we are entitled to utilize cash collateral we are required to meet the following financial covenants:

1. Minimum Cash . Our aggregate cash may not be less than $1,348,000 on August 21, 2009, nor less than $2,000,000 at the end of any week thereafter. At August 14, 2009, our aggregate cash was $2,950,000.

2. Maximum Expenditures . Our cumulative expenditures may not exceed 110% of our cumulative budgeted expenditures for the two-week period ended June 12, 2009, and on the last day of each two-week period following June 12, 2009. At August 7, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $2,297,000 less than 110% of cumulative budgeted expenditures.

3. <u>Minimum Net Sales</u> . Our cumulative net sales may not be less than 82% of our cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At July 24, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $2,592,000 greater than the minimum level of cumulative net sales and aggregated 84.6% of our cumulative budgeted net sales from April 2, 2008.

Our right to utilize cash collateral will terminate upon the occurrence of the following events if we fail to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. In December 2008, we filed an amended plan of reorganization (the "Amended Plan") that, if confirmed, would provide for the following distributions:

— The senior, secured credit facility would be repaid in full in cash;

— Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

— Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

— Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on June 30, 2009, $51,206,000 of our liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington . These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

We require financing in order to consummate the Amended Plan. We cannot assure you that the Amended Plan will be confirmed or that we will be able to obtain such financing. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests

- 41 -

Our aggregate indebtedness at June 30, 2009, totaled $71,758,000, which includes $15,949,000 of accrued interest on our subordinated debt, compared to $73,375,000, which included $13,164,000 of accrued interest on our subordinated debt at December 31, 2008.

Including liabilities classified as subject to compromise, we had a net working capital deficit of $78,921,000 at June 30, 2009, compared to a net working capital deficit of $73,922,000 at December 31, 2008.

On June 30 and August 14, 2009, our cash on hand totaled $3,579,000 and $2,950,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in GAAP. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### *Critical Accounting Policies*

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant accounting policies are disclosed in Note 1 to the consolidated financial statements in our annual report on Form 10-K for the year ended December 31, 2008, as modified by Note 1 to the consolidated financial statements in our quarterly reports on Form 10-Q for the three-month periods ended March 31 and June 30, 2009. The most significant areas involving management judgments and estimates are described in Management's Discussion and Analysis of Financial Conditions and Results of Operations in our annual report on Form 10-K for the year ended December 31, 2008. There have been no material changes to such judgments and estimates. Actual results could differ from those estimates.

## Item 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant. At June 30, 2009, we had outstanding $36,558,000 of floating-rate debt at interest rates equal to either LIBOR plus 2.75%, LIBOR plus 4.5%, the prime rate plus 6%, subject to a minimum interest rate of 11%, or LIBOR plus 7%, subject to a minimum interest rate of 10%, with a weighted average interest rate of 5.4%. At June 30, 2009, we had outstanding $35,200,000 of fixed-rate debt with a weighted average interest rate of 11.9%. We estimate that a one-percentage-point increase or decrease in both LIBOR and the prime rate would increase or decrease our

monthly interest expense by approximately $30,000. For further information about our indebtedness, please refer to Note 4, "Debt," in the notes to our consolidated financial statements in Part I, Item 1.

## Item 4T. CONTROLS AND PROCEDURES

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of June 30, 2009, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our principal executive officers and our principal financial officer concluded that, because of deficiencies in our internal control over financial reporting, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of certain deficiencies which, in the aggregate, constitute a material weakness. This material weakness remained unremediated through June 30, 2009.
 Notwithstanding the foregoing, we do not believe that such deficiencies have resulted in any material errors or omissions in the consolidated financial statements contained in our annual reports on Form 10-K for 2008 and 2007, our quarterly reports on Form 10-Q for the three-month periods ended March 31, June 30, and September 30, 2008, and March 31 and June 30, 2009, or in any related disclosures.

### *Changes in Internal Controls over Financial Reporting*

There have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation, that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

## PART II. OTHER INFORMATION

## Item 3. DEFAULTS UPON SENIOR SECURITIES

On November 1, 2006, and February 1, May 1, August 1, and November 1, 2007, and February 1, May 1, August 1, and November 1, 2008, and February 1, May 1, and August 1, 2009, we failed to pay the quarterly interest payments then due on our $34,177,000 aggregate principal amount of Senior Subordinated Notes. The past due interest payments total $13,754,000 as of the filing date of this Form 10-Q. In addition, we failed to repay the $34,177,000 aggregate principal amount of our Senior Subordinated Notes, which became due on August 1, 2009. For an additional discussion about these notes and this default, please refer to "Note 4 – Debt" to our consolidated Financial statements in Part I, Item 1.

## Item 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

The Annual Meeting of our Stockholders was held on May 28, 2009.

The matters voted upon at the Annual Meeting and the results of the voting on each matter are set forth below:

1.   The following number of votes were cast for and withheld on a proposal to elect six directors (Messrs. William B. Conner, Warren Delano, Kenneth I. Greenstein, Michael A. Lubin, and Joseph A. Pardo and Ms. Elizabeth Ruml).

| | |
|---|---|
| Mr. Conner: | |
| Votes for Mr. Conner | 4,267,374 |
| Votes withheld from Mr. Conner | 97,714 |
| | |
| Mr. Delano: | |
| Votes for Mr. Delano | 4,244,462 |
| Votes withheld from Mr. Delano | 120,625 |
| | |
| Mr. Greenstein: | |
| Votes for Mr. Greenstein | 4,246,893 |
| Votes withheld from Mr. Greenstein | 118,195 |
| | |
| Mr. Lubin: | |
| Votes for Mr. Lubin | 4,244,553 |
| Votes withheld from Mr. Lubin | 120,535 |
| | |
| Mr. Pardo: | |
| Votes for Mr. Pardo | 4,247,430 |
| Votes withheld from Mr. Pardo | 117,658 |
| Ms. Ruml: | |
| Votes for Ms. Ruml | 4,246,446 |
| Votes withheld from Ms. Ruml | 118,642 |

2.  Ratification of Malin, Bergquist & Company, LLP as our independent auditors for the year ending December 31, 2009.

| | |
|---|---:|
| Votes for ratification | 4,247,377 |
| Votes against ratification | 92,708 |
| Abstentions | 25,003 |

There were no broker non-votes in respect of the foregoing matters.

**Item 6.  EXHIBITS**

The exhibits listed on the accompanying Exhibit Index are filed herewith or incorporated herein by reference.

- 45 -

**LEXINGTON PRECISION CORPORATION**
**FORM 10-Q**
**June 30, 2009**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LEXINGTON PRECISION CORPORATION
(Registrant)

August 20, 2009                         By:   /s/  Michael A. Lubin
   Date                                                   Michael A. Lubin
                                                          Chairman of the Board


August 20, 2009                         By:   /s/  Warren Delano
   Date                                                   Warren Delano
                                                          President


August 20, 2009                         By:   /s/  Dennis J. Welhouse
   Date                                                   Dennis J. Welhouse
                                                          Senior Vice President and
                                                          Chief Financial Officer


- 46 -

## EXHIBIT INDEX

31-1    Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant.

31-2    Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant.

31-3    Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant.

32-1    Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-2    Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-3    Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

- 47 -

## CERTIFICATION

I, Michael A. Lubin, certify that:

1.    I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    August 20, 2009

                        / s / Michael A. Lubin
                        Michael A. Lubin
                        Chairman of the Board
                        (Co-Principal Executive Officer)

## CERTIFICATION

I, Warren Delano, certify that:

1.   I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   August 20, 2009

/ s / Warren Delano
Warren Delano
President and Director
(Co-Principal Executive Officer)

# CERTIFICATION

I, Dennis J. Welhouse, certify that:

1.    I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  August 20, 2009

/s/ Dennis J. Welhouse
Dennis J. Welhouse
Senior Vice President,
 Chief Financial Officer, and Secretary
(Principal Financial Officer)

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the Chairman of the Board, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)    the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/*  Michael A. Lubin
Michael A. Lubin
Chairman of the Board
(Co-Principal Executive Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the President, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)    the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Warren Delano
Warren Delano
President
(Co-Principal Executive Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the Chief Financial Officer, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)     the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Dennis J. Welhouse
Dennis J. Welhouse
Senior Vice President,
 Chief Financial Officer, and
 Secretary
(Principal Financial Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

Exhibit 31-1

## CERTIFICATION

I, Michael A. Lubin, certify that:

1.  I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  August 20, 2009

                        / s / Michael A. Lubin
                        Michael A. Lubin
                        Chairman of the Board
                        (Co-Principal Executive Officer)

Exhibit 31-2

## <u>CERTIFICATION</u>

I, Warren Delano, certify that:

1.    I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   <u>August 20, 2009</u>

<u>/ s / </u>Warren Delano
Warren Delano
President and Director
(Co-Principal Executive Officer)

Exhibit 31-3

# CERTIFICATION

I, Dennis J. Welhouse, certify that:

1.    I have reviewed this Form 10-Q of Lexington Precision Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and
   (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   August 20, 2009

/s/ Dennis J. Welhouse
Dennis J. Welhouse
Senior Vice President,
 Chief Financial Officer, and Secretary
(Principal Financial Officer)

Exhibit 32-1

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the Chairman of the Board, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)      the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Michael A. Lubin
Michael A. Lubin
Chairman of the Board
(Co-Principal Executive Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

Exhibit 32.2

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the President, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)     the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Warren Delano
Warren Delano
President
(Co-Principal Executive Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.

Exhibit 32.3

Certification Pursuant to 18 U.S.C. Section 1350,
As Adopted Pursuant to Section 906 of the
Sarbanes - Oxley Act of 2002

In connection with the Quarterly Report of Lexington Precision Corporation, a Delaware corporation (the "Company"), on Form 10-Q for the period ended June 30, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, the Chief Financial Officer, hereby certifies pursuant to 18 U.S.C. §1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that, to the undersigned's knowledge:

(1)      the Report of the Company filed today pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), fully complies with the requirements of Section 13(a) of the Exchange Act; and

(2)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  Dennis J. Welhouse
Dennis J. Welhouse
Senior Vice President,
 Chief Financial Officer, and
 Secretary
(Principal Financial Officer)
August 20, 2009

A signed original of this written statement required by Section 906 has been provided to the registrant and will be retained by the registrant and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Company's Quarterly Report on Form 10-Q pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by such Act, be deemed filed by the Company for purposes of Section 18 of the Exchange Act. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act, except to the extent that the Company specifically incorporates it by reference.