Hearing Date and Time: October 6, 2009 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: October 1, 2009 at 4:00 p.m. (prevailing Eastern Time)

WALLER LANSDEN DORTCH & DAVIS
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804

and

CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Telephone: (212) 732-3200
Facsimile: (212) 732-3232

*Attorneys for Agents to the Prepetition Secured Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                          :
**In re:**                                :    **Chapter 11**
                                          :
**LEXINGTON PRECISION CORP., et al.,**    :    **Case No. 08-11153 (MG)**
                                          :
            **Debtors.**                  :    **(Jointly Administered)**
                                          :
-------------------------------------------------------------x

### MOTION BY AGENTS TO THE PREPETITION SECURED LENDERS TO SET ASIDE CERTAIN STANDSTILL AGREEMENTS, TO PERMIT GORDIAN GROUP TO SOLICIT INTEREST IN POTENTIAL SALES OF THE DEBTORS' BUSINESS UNITS AND/OR ASSETS, AND FOR RELATED RELIEF

By and through the undersigned attorneys, CapitalSource Finance LLC, as Revolver

Agent under the Prepetition Credit Agreement, and CSE Mortgage LLC, as Term Loan Agent

under the Prepetition Loan Agreement (collectively, the "Agents"), state the following as and for

their motion to set aside certain standstill agreements of the Debtors, to permit Gordian Group to

immediately begin acting as exclusive agent for the sale of the Debtors' business units and/or

assets, to permit the Agents, through Gordian Group, to disclose certain information in connection with the marketing of the Debtors' business units and/or assets, and for related relief (the "Motion"):

## INTRODUCTION

1.      The Agents, in consultation with the Prepetition Secured Lenders (defined below), have recently filed that certain *Proposed Combined Disclosure Statement Regarding Prepetition Secured Lenders' Chapter 11 Plans for Lexington Rubber Group, Inc. and Lexington Precision Corporation* (the "Disclosure Statement") and motion for approval of same (the "Disclosure Statement Motion").  To support the Prepetition Secured Lenders' efforts to pursue the Disclosure Statement and related reorganization plans for LRGI (the "LRGI Plan") and LPC (the "LPC Plan," and together with the LRGI Plan, the "Proposed Plans"), the Agents will require certain cooperation from the Debtors with respect to claims made against the Debtors, service lists, financial information, and other information that is currently only available to the Debtors or is otherwise currently protected by confidentiality provisions.  To the extent the Debtors refuse to cooperate, the Agents seek an order confirming the Debtors' obligations to do so.

2.      Because the Debtors and their financial advisor have taken steps to prohibit several dozen financial parties from discussing any transactions concerning the Debtors with parties other than the Debtors, the Debtors have created a *de facto* extension of the Debtors' exclusive periods by entering into non-ordinary course transactions without notice or a hearing. The Standstill Agreements (defined below) containing the offending provisions affect a significant portion of potential purchasers, and the Agents seek authority to explore sale transactions with such financial parties.  Opening up the process contemplated by the Disclosure Statement to such financial parties will increase the chances of an acceptable exit from these

chapter 11 cases and is in the best interests of all constituents of the Debtors' respective

bankruptcy estates. Moreover, the entry into each of the Standstill Agreements was a non-

ordinary course transaction that is not enforceable against the potential purchasers.

3.      In order for a streamlined process for pursuit of the only current plans even

potentially capable of confirmation (i.e. the Proposed Plans), the Agents seek the ability to

disseminate certain financial information to prospective parties. The Prepetition Credit

Agreement (defined below) and the Prepetition Loan Agreement (defined below) contain certain

confidentiality provisions limiting the dispersal of certain information beyond the Prepetition

Secured Lenders and hired professionals and consultants. The Agents seek relief from these

restrictions in order to pursue the Disclosure Statement and confirmation of the Proposed Plans.

The contemplated financial information to be included in the Disclosure Statement is not so

sensitive as to rise to commercially competitive sensitive information, but is simply an update of

the kind of information that was contained in the Debtors' previously proposed disclosure

statement filed December 17, 2008.

4.      Moreover, because a sale appears to be the avenue for a successful exit from these

cases, the Agents request that Gordian, who is contemplated to serve as "Sale Agent" under the

Proposed Plans, be appointed exclusive agent to explore the sale transactions contemplated by

the Proposed Plans. To date, the Debtors have failed to produce positive momentum toward a

resolution of these cases, instead simply obfuscating the process through the Standstill

Agreements and similar tactics. Allowing the proposed Sale Agent to begin exploration of

potential transactions will allow the exit process to finally begin in earnest.

5.      The Agents have requested cooperation with respect to the relief requested herein

as to obviate the need for this Motion, but to date, the Debtors have not responded to such

requests. Immediate resolution of the Motion is warranted because the Debtors and their

financial advisor's actions are chilling the chapter 11 process and are working as a *de facto*

extension of the Debtors' exclusive periods. To the extent the Court desires an evidentiary

hearing to resolve the Motion, the Agents request, pursuant to Local Bankruptcy Rule 9014-2,

that such evidentiary hearing be conducted at the date and time indicated above.

## BACKGROUND FACTS

6.      The Debtors commenced these chapter 11 cases on April 1, 2008 (the

"Commencement Date"). No trustee or examiner has been appointed in these cases and the

Debtors remain debtors in possession of their respective estates.

## I.    Debt Structure of the Debtors

7.      Prior to the Commencement Date, the Prepetition Secured Lenders made certain

loans and other financial accommodations available to the Debtors pursuant to, among other

things, the following documents (collectively, with any and all other agreements, instruments,

and related documents, including without limitation, guaranties, pledges, forbearance agreements

and discretionary funding letters executed by any Debtor and any Other Documents (as defined

in each of the Prepetition Credit Agreement (defined below) and the Prepetition Loan Agreement

(defined below)), the "Prepetition Senior Lender Loan Documents"):

      a.      that certain Credit and Security Agreement, dated May 31, 2006 (as

amended to date and as may be amended, restated or otherwise modified from time to

time, the "Prepetition Credit Agreement"), between the Debtors, as borrowers, and

CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and

administrative agent for itself and other lenders under the Credit Agreement

(CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and

as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent; and

b.      that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Prepetition Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as lenders, the "Prepetition Term Loan Lenders").

8.      Both of the Debtors are primary obligors on both the Prepetition Credit Agreement and the Prepetition Loan Agreement, with essentially all assets of both Debtors' serving as the Collateral for the two loans.

9.      Pursuant to an indenture, dated as of December 18, 2003, between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes"). As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes. The Senior Subordinated Notes are general unsecured obligations of LPC. LRGI is not liable for the Senior Subordinated Notes.

10.      According to LPC, approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors,

and their families and affiliates. Approximately 74.4% of the Senior Subordinated Notes are held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date. Three members of the Ad Hoc Committee and the Indenture Trustee now serve as members of the statutory creditors' committee (the "Creditors' Committee") in the Chapter 11 Cases.

11.     Michael A. Lubin, Chairman of the Board of the Debtors, holds an unsecured Junior Subordinated Note made by LPC and due November 1, 2009 in the principal amount of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note"). As of the Commencement Date, $75,000 of accrued interest was outstanding with respect to the Junior Subordinated Note. The right to payment on the Junior Subordinated Note is expressly subordinated to the Senior Subordinated Notes and is a general unsecured obligation of LPC. LRGI is not liable for the Junior Subordinated Note.

## II.    Cash Collateral Usage and Defaults

12.     By order dated April 17, 2008 (the "First Cash Collateral Order"), this Court approved and the Prepetition Secured Lenders consented to the use of their Cash Collateral subject to certain conditions. Chief among those conditions is that the Debtors' confirm and consummate a plan of reorganization that provides for the indefeasible payment in full of the obligations to the Prepetition Secured Lenders within three hundred thirty (330) days of the Commencement Date, i.e. February 25, 2009 (the "Cash Collateral Deadline"). (Cash Collateral Order, ¶ 11(viii).) The Debtors failed to meet such conditions of the First Cash Collateral Order.

13.     In addition, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through February 6, 2009, net sales of at least 90% of the net sales reflected

in the cash collateral budget, which failure constituted a Termination Event and put them in default under the First Cash Collateral Order. The Prepetition Secured Lenders have reserved rights with respect to such default.

14.     Near the expiration of the original Cash Collateral Deadline, the Debtors filed a motion for non-consensual use of the Prepetition Secured Lenders' cash collateral through December 31, 2009. The Prepetition Secured Lenders objected to the motion. At the hearings on the Debtors' motion on February 23 and 24, 2009, the Bankruptcy Court declined to approve the representative from Campbell as an expert because, among other things, Campbell provided its valuation report without independently verifying the Debtor's financial data and expressly disclaiming any responsibility for the accuracy of such data. In explaining its ruling on the Debtors' motion, the Bankruptcy Court indicated that the only competent valuation testimony was that of Bridge Associates, LLC, who has served as Financial Advisor to the Prepetition Secured Lenders prior to and during the Chapter 11 Cases.

15.     After the hearings on the Debtors' motion for non-consensual cash collateral usage, the Court, by entry of a "Second Cash Collateral Order" extended the Debtors' use of cash collateral for 13 weeks to May 22, 2009, on terms substantially similar to those of the First Cash Collateral Order. The Debtors and Prepetition Secured Lenders negotiated a form of order, which included additional covenants regarding minimum cash balances and certain other performance metrics, as well as certain increased reporting requirements, all designed to protect against a rapid decline in value of the Prepetition Secured Lenders' collateral. In addition, the Prepetition Secured Lenders agreed to relax the net sales covenant from 90% to 85% of projected net sales; however, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through May 1, 2009, net sales of at least 85% of the net sales reflected in the cash

collateral budget, which failure constituted a Termination Event and put them in default under the Second Cash Collateral Order. The Prepetition Secured Lenders have reserved their rights regarding such default. ·

16.     On April 29, the Debtors filed a second motion to extend use of the Prepetition Secured Lenders' Cash Collateral for an additional 13 weeks. Prior to the hearing on the Debtors' second non-consensual motion, the Debtors and the Prepetition Secured Lenders negotiated an additional 13-week extension for the Debtors' further use of the Prepetition Secured Lenders' cash collateral through August 21, 2009 on substantially the same terms as the First Cash Collateral Order and the Second Cash Collateral Order, which is reflected by the "Third Cash Collateral Order" entered in the Chapter 11 Cases on May 20, 2009. In addition, the Prepetition Secured Lenders agreed to further relax the net sales covenants from 85% to 82% of projected net sales.

17.     On August 5, 2009, the Debtors filed a third motion to extend the Debtors' use of the Prepetition Secured Lenders' cash collateral by another 13 weeks. Prior to the hearing on the third motion, the Debtors and the Prepetition Secured Lenders agreed to a short-term extension for the Debtors' use of the Prepetition Secured Lenders' cash collateral from August 21, 2009 to September 25, 2009, on substantially the same terms as the Third Cash Collateral Order, which is reflected by a stipulation, agreement and order entered in the Chapter 11 Cases on August 17, 2009 (the "Fourth Cash Collateral Order"). The Prepetition Secured Lenders have not agreed to any further extension and are under no obligation to agree to any extension.

**III.   Exclusivity Issues**

18.     By order entered July 31, 2008 (the "First Exclusivity Order"), the Court granted the Debtors' first request for an extension of the exclusive periods through October 28, 2008 for

plan filing and December 27, 2008 for solicitation of votes.  Among the factors cited for such

extension were: (i) the Debtors' active steps to move the reorganization process along; (ii) the

length of time the case has been pending (4 months at that time); and (iii) the Debtors' ability to

propose a viable plan.  (First Exclusivity Order, pp. 5-6).

19.    By order entered October 31, 2008 (the "Second Exclusivity Order"), the Court

granted the Debtors' second request for an extension of the exclusive periods through January

26, 2009 for plan filing and February 25, 2009 for solicitation of votes.  Among the factors cited

for such extension were: (i) the Debtors' reasonable prospects of obtaining exit financing, as

established by uncontroverted testimony from the Debtors; (ii) dispute over the effects of the

diminution in the Debtors' business over the past few months and the overall deterioration of the

general automotive market; (iii) Committee's unwillingness to negotiate until receipt of all

requested information; (iv) delays in the Debtors' presentation of the valuation report; and

(v) sufficient progress in negotiations.  (Second Exclusivity Order, pp. 6-9).

20.    On January 12, 2009, the Debtors filed a third motion to further extend their

exclusive periods to file a chapter 11 plan and solicit acceptances.  The Creditors Committee and

the Prepetition Secured Lenders objected to the Debtors' motion.  The Debtors also filed a

motion for a bridge order extending the Debtors exclusive periods pending a hearing on the

Debtors' third extension motion.  After hearings on February 23 and 24, 2009, the Court

extended the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof to

April 30, 2009 and June 1, 2009, respectively.

21.    The Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances

expired on April 30, 2009 and June 1, 2009, and have not been extended.  Accordingly, the

Prepetition Secured Lenders have filed and are pursuing confirmation of their own Proposed

Plans, which they feel compelled to undertake in light of the lack of any reasonable prospects for an exit strategy other than a sale process prescribed in the Proposed Plans.

22.    Despite the expiration of the exclusive periods, the Debtors, together with their financial advisor, have taken affirmative steps to maintain *de facto* exclusivity with respect to a significant portion of potential exit avenues through their execution of certain Standstill Agreements (as defined and as described in greater detail below).

## IV.    The Mediation Process

23.    In connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of the Prepetition Secured Lenders' cash collateral and the Debtors' third motion to extend the exclusive periods, the Bankruptcy Court ordered that the Debtors, the Creditors' Committee, and the Prepetition Secured Lenders attend mediation sessions regarding valuation, structure of potential consensual plans of reorganization, and the ultimate resolution of these chapter 11 cases.

24.    Nearly a month after entry of the order directing the parties to choose a mediator, the parties agreed upon the appointment of Seymour Preston, Jr., of Goldin Associates as mediator, who conducted several mediation sessions with the Debtors and the Creditors' Committee after submission of valuation reports from their respective financial advisors.

25.    The Prepetition Secured Creditors were neither invited to be nor were they involved in the mediation, as the principal disputes described in Section III.D of the Disclosure Statement between the Debtors and the Creditors' Committee have continued to persist in the chapter 11 cases.  As a result, the mediation has not produced an agreement between the Debtors and the Creditors' Committee to date.

## V.    The Debtors' Aborted Plan

26.    Prior to the original Cash Collateral Deadline, the Debtors developed and
pursued their own plan of reorganization (the "Debtors' Proposed Plan"), but because of their
inability to obtain a firm commitment for exit financing, the Debtors delayed the Bankruptcy
Court's consideration of their disclosure statement (the "Debtors' Proposed Disclosure
Statement") multiple times and eventually aborted their plan as it is currently formulated.

27.    A puzzling feature of the Debtors' Proposed Plan included the use of LRGI estate
assets to satisfy claims of creditors of the LPC estate despite the Senior Subordinated Notes and
the Junior Subordinated Note being obligations of only LPC.  To date, no consolidation motion
has been filed by the Debtors and the Debtors have maintained separate books and financial
statements for LRGI and LPC.  The Prepetition Senior Lender Loan Documents treat both LRGI
and LPC as primary obligors (in contrast to the documents relating to the Senior Subordinated
Notes and the Junior Subordinated Note, which only refer to LPC as an obligor and without any
obligation by LRGI).

28.    As revealed by the deposition of the representative from Capital One Leverage
Finance Corporation ("Capital One") on January 29, 2009 (the "Deposition"), the Debtors
received several different proposals from Capital One, the first one in Spring 2008, the second in
July, 2008, and a final one in Fall 2008.  *See* Deposition,[1] pp. 7, 11, 36, 38, 50-51, & 94
(excerpts of the transcript of the Deposition are annexed to Docket Entry No. 551 as Exhibit B).
The Debtors never signed and returned any of the proposal letters to Capital One despite Capital
One's ability and willingness to underwrite the exit facility.  Id. at pp. 55, 66.

---

[1] Reference to page numbers are references to the transcript pages, the pagination of which does not correspond
exactly with the printed pages of Exhibit B to Docket Entry No. 551.

29.    Unfortunately, as the economy deteriorated, so did Capital One's desire and ability to provide the exit facility. Id. at 61, 94-95, 98-99. From the original proposal, which represented a fully underwritten loan, each subsequent proposal was adjusted negatively, ultimately resulting in a proposed exit facility with multiple contingencies and modified terms that have precluded obtaining exit financing for the Debtors' Proposed Plan. Id. at 60-61, 94-95, 98-99, 100-01, 119-20, 135-36. Specifically, the adjustments include, but are not limited to, the following negative features: (i) requirement that there be around a $15 million mezzanine financing to be provided by the debtors' management or some other participating entity (id. at 41, 140-41); (ii) that a commitment from a separate real property lender be obtained (id. at 140-41, 143-44, 147; (iii) that a significant percentage of the participants in the loan subscribe to such participation in advance of the loan being funded (id. at 100-01); and (iv) that the connector seals operational restructuring be completed before the loan is processed (id. at 120-21, 123, 124-25).

30.    The window of opportunity has closed, as Capital One indicated by letter dated February 5, 2009 (a copy of which is annexed to Docket Entry No. 551 as Exhibit C), that discussions for a financing arrangement would only continue with the Debtors through March 15, 2009. As a result, the hearing (the "Debtors' Disclosure Statement Hearing") regarding the adequacy of the Debtors' Proposed Disclosure Statement has been adjourned numerous times to allow the Debtors to, among other things, make progress with respect to obtaining exit financing. Ultimately, because the prospects of exit financing have proven to be remote, the Debtors' Disclosure Statement Hearing has been adjourned indefinitely.

31.    Since the expiration of the Debtors' Exclusive Periods, the Debtors and their financial advisor have taken steps to explore potential investments from financial parties in order to pursue some modified form of the Debtors' Proposed Plan. The Debtors' efforts have yielded

little results since the 7 months from the last-scheduled date for the Debtors' Disclosure
Statement Hearing on February 9, 2009.

32.    As set forth more fully below, the Debtors' activities have included locking up
certain financial parties through Standstill Agreements and preventing such parties from
discussing alternative exit strategies with the Prepetition Secured Lenders or the Creditors'
Committee.  Predictably, the Debtors have refused to waive the lock-up feature to allow for other
exit options to be pursued or even explored.

## VI.    The Prepetition Secured Lenders' Plans

33.    In connection with the Prepetition Secured Lenders' objections to the Debtors'
first motion for non-consensual usage of Cash Collateral and the Debtors' third exclusivity
motion, the Prepetition Secured Lenders suggested that a sale process be explored as a potential
alternative exit strategy to these chapter 11 cases.  The passage of time has revealed that a sale
plan is likely to be the only exit strategy with a reasonable likelihood of success.

34.    Certainly the additional time with the Debtors at the helm of these cases has
brought us no closer to closure.  The expiration of the Debtors' exclusive periods, typically a
catalyst to a negotiated resolution or a contested and/or competing plan process, has been met
with tepid response.  Such inertia supports the Prepetition Secured Lenders' view that the only
exit plan with a reasonable chance at success is a sale plan.

35.    In light of the significant delays in the Debtors' development of a reasonable exit
strategy from the Chapter 11 Cases, the Agents, in consultation with the Prepetition Revolver
Lenders and the Prepetition Term Loan Lenders (collectively, the "Prepetition Secured Lenders")
have developed the Plans in order to provide a rapid recovery of value through a sale process set
forth in the Disclosure Statement.  The sale processes are to be conducted by a Post-

Confirmation trustee (the "Post-Confirmation Trustee") in consultation with sale agent Gordian

Group, LLC ("Gordian"), which currently serves as investment banker to the Prepetition Secured

Lenders.

36.     The lack of any acceptable alternative plan has become apparent during the 17

months of the Chapter 11 Cases, which have resulted in an aborted reorganization plan from the

Debtors and, prior to the submission of the Proposed Plans, no alternatives from any other party

in interest.  Accordingly, the Prepetition Secured Lenders have been forced to present a

reasonable avenue for the Debtors' exit from the Chapter 11 Cases, lest the Chapter 11 Cases

continue to languish and both the value erode and the prospects for recovery dwindle.   Based

upon a review of the market for a sale of the Debtors' businesses and conversations with

potentially interested parties, it appears that a sale or sales of the Debtors' assets is the best

option for recovery by the constituents in the Chapter 11 Cases.

37.     Far from the dreaded "fire sale," the marketing process will pursue a sale of LRGI

and/or LPC's businesses by whichever avenues appear to be most appropriate at the time: (a) as a

whole, (b) by business segment on a going concern basis, or (c) on a liquidation basis, depending

on the appropriate circumstances for the particular assets.  More importantly, by allowing

Gordian time to commence contacting interested parties now, the "fire sale" concerns will be

eliminated.

38.     Key to the Proposed Plans is that the LRGI estate and the LPC estate are treated

as separate bankruptcy estates, which reflects the corporate form employed by the Debtors

during the operation of their businesses both prior to and during the Chapter 11 Cases.  This

respect for the corporate form of the Debtors is in stark contrast to both the Debtors' Proposed

Plan and the proposed plan filed by the Official Committee of Unsecured Creditors' in response

to the Prepetition Secured Lenders' Plan, which is essentially a "re-tread" of the Debtors'
Proposed Plan but with a different allocation of value..

39.     With respect to a sale of LRGI's business units and/or assets, and to the extent
sufficient proceeds are available to satisfy all the Claims against LRGI, any excess proceeds
would be distributed to LPC, which holds 100% of the equity Interests in LRGI, for distribution
to holders of Claims against and Interests in LPC.

40.     In addition, the Post-Confirmation Trustee of each estate will pursue sales of non-
operating assets, as well as prosecution of avoidance actions and other litigation claims for the
benefit of each bankruptcy estate.  Finally, to the extent such net operating losses are preserved,
the appropriate Post-Confirmation Trustee may pursue liquidation of those through a merger
transaction.

41.     Because of certain confidentiality provisions in the Prepetition Credit Agreement
and the Prepetition Loan Agreement, the Agents have taken a very conservative approach with
respect to certain projected financial information or other information that has not been publicly
divulged through either the public reporting requirements under the Securities and Exchange
Commission or the chapter 11 process.  Accordingly, there is some bracketed information in the
Disclosure Statement, which primarily relates to certain projected information for this fiscal year
that the Debtors have not made publicly available.  Out of an abundance of caution, the Agents
have not included such information at this stage.

## VII.    The Standstill Agreements

42.     After the Debtors abandoned pursuit of the Debtors' Proposed Plan and the
Debtors' Proposed Disclosure Statement and after the expiration of their exclusive periods, the
Debtors, together with their financial advisor, have taken affirmative steps to chill the

reorganization process for parties other than the Debtors. By executing non-disclosure agreements that contain certain "stand-still" provisions (the "Standstill Agreements") with financial parties, such counterparties to the stand-stills are forbidden from being able to explore potential transactions with either the Prepetition Secured Lenders or the Creditors' Committee.

43.    During the preliminary stages of development of the Proposed Plans, it came to the Prepetition Secured Lenders' attention that certain potential bidders for the assets of the LRGI estate and the LPC estate had engaged in discussions with the Debtors for transactions along the lines of infusions of equity capital and/or subordinated debt. More than one party approached the Agents seeking to explore potential transactions with the Prepetition Secured Lenders directly or through a purchase of the Prepetition Secured Lenders' positions.

44.    However, the Agents declined to engage in such discussions in light of the confidentiality provisions of the Prepetition Credit Agreement and the Prepetition Loan Agreement, which permits disclosure of confidential information under limited circumstances. In addition, at least one party indicated that the non-disclosure agreement with the Debtors included a "stand-still" provision, whereby use of any information received from the Debtors is forbidden to be used in connection with exploration or negotiation of any transaction with any party other than the Debtors.

45.    In response to the Agents' request for a roster of parties who had executed non-disclosure agreements with the Debtors, the Debtors indicated that over fifty financial parties have executed such agreements as of June 22, 2009.

46.    Such "stand-still" provisions are not in the ordinary course of the Debtors' businesses. Moreover, they are an affront to the Bankruptcy Code and work as a *de facto* exclusive period for the Debtors with respect to the locked-up counter-parties, as potential

transactions other than those acceptable to the Debtors are unable to be explored fruitfully, let alone consummated. Although such provisions may even be commonplace outside of the chapter 11 context, such limitations have no place in a chapter 11 case where the Debtors' exclusive periods have expired and other parties are being forced to incur expense and take an active role in forging a successful exit from bankruptcy. After 17 months in bankruptcy, all exit possibilities must be explored.

## RELIEF REQUESTED

47.     The Agents requested consensual resolution of these issues from the Debtors, but to date, the Debtors have not responded to such requests. Thus, the Agents are forced to file this Motion.

48.     By this motion, the Prepetition Secured Lenders seek (i) to set aside the Standstill Agreements of the Debtors and allow the Prepetition Secured Lenders to explore potential transaction terms with such financial parties; (ii) to permit Gordian Group to immediately begin acting as exclusive agent for the sale of the Debtors' business units and/or assets, so that the only reasonably likely avenue for exit from these chapter 11 cases does not lose momentum; (iii) to permit the Agents, through Gordian, to disclose information of the nature typically used in a disclosure statement in the Prepetition Secured Lenders' Disclosure Statement in connection with the pursuit of its Proposed Plans; (iv) to permit the Agents, though Gordian, to disclose information of the nature typically used in marketing an entity's business units and/or assets for sale, subject to potential bidders being required to sign a non-disclosure agreement that limits such usage to exploration of potential transactions in these chapter 11 cases; (v) to obtain cooperation from the Debtors regarding access to information required by the Prepetition

Secured Lenders to pursue the Disclosure Statement and the Proposed Plans; and (vi) for any related, further or other relief to which the Prepetition Secured Lenders may be entitled.

## ARGUMENTS AND AUTHORITIES

### I.    Set Aside Standstill Agreements

49.    The Standstill Agreements do not reflect ordinary course transactions, and therefore, are invalid pursuant to Section 363 of the Bankruptcy Code and should not be enforceable against the counterparties to the Standstill Agreements.

50.    Section 363(c)(1) of the Bankruptcy Code permits a debtor in possession to enter into transactions in the ordinary course of the debtor's business without first seeking court approval. 11 U.S.C. § 363(c)(1). Where the transaction is outside the ordinary course of the debtor's business, on the other hand, the Bankruptcy Code prohibits the debtor from using property of the estate until the creditors and other parties in interest are given notice of the proposed transaction and the opportunity for a hearing if they object to the proposal. 11 U.S.C. § 363(b)(1). If an objection is interposed, then the dispute requires judicial resolution. Id.; In re the Leslie Fay Cos., 168 B.R. 294, 301 (Bankr. S.D.N.Y. 1994). These provisions were "designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." Leslie Fay, 168 B.R. at 301-02 (citations omitted). In other words, the "apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) and § 1108." Id. at 302.

51.     "Ordinary course" is not defined under the Bankruptcy Code and legislative history provides no further insight. Id. at 304.  Courts have developed two tests concerning whether a transaction is in the ordinary course of a debtor's business: the "horizontal" test (or industry wide test) and the "vertical" test (or the creditor's expectation test). Id.  In the case at hand, the Standstill Agreements fail both tests.

52.     The horizontal test focuses on whether "the transaction is the sort commonly undertaken by companies in that industry." Id.  In the case at hand, the Debtors, including a publicly-traded manufacturing company (LPC) and an operating subsidiary (LRGI) have engaged in negotiations with potential equity sponsors regarding the ability to discuss potential transactions with other parties in interest in these Bankruptcy Cases.  While such provisions as the Standstill Agreements may be common when negotiations are undertaken, the discussion of equity infusions is a far cry from conducting ordinary manufacturing operations.

53.     Under the vertical test, the inquiry is "whether the transaction in question subjects a hypothetical creditor to economic risks of a nature different from those he accepted when he decided to extend credit." Id.  In the case at hand, the extension of credit under the Prepetition Senior Lender Loan Documents was subject to the rights of the Debtors should they file for Bankruptcy Protection.  A central tenet of the Bankruptcy Code is the concept of "debtor in possession," whereby the Debtors remain in control of the reorganization process for the duration of the exclusive periods set forth in Section 1124 of the Bankruptcy Code.  However, upon expiration of such exclusive periods, the Standstill Agreements are an obstacle to the resolution of these Bankruptcy Cases.  Expiration of the Debtors' exclusive periods opens up the plan process to all parties in interest.  Because the Debtors' failed to make use of the exclusive periods to present and confirm their own plan of reorganization, they should not be permitted to

close off potential sources of funding for the plan of another party in interest.  Such restrictions

on the Prepetition Secured Lenders and the Creditors' Committee were not an expected result of

the expiration of the Debtors' exclusive periods.

54.    Because the Standstill Agreements are not ordinary course transactions, the

Debtors were not permitted to enter into them under Section 363(c)(1) of the Bankruptcy Code.

As a result, the Standstill Agreements are not valid and are not enforceable by the Debtors

against the counterparties.

55.    In addition, the Standstill Agreements are impacting the Prepetition Secured

Lenders' ability to include certain information in the Disclosure Statement.  To the extent that

the Agents and Gordian are able to discuss potential sales with interested parties, the Prepetition

Secured Lenders will be in a better position to provide more information regarding the potential

consummation of the exit strategy reflected by the Proposed Plans.

**II.    Permit Gordian to be Exclusive Sale Agent**

56.    Pursuant to Section 105(a) of the Bankruptcy Code, the Prepetition Secured

Lenders seek appointment of Gordian as the exclusive Sale Agent with respect to the business

units and/or assets of LRGI and LPC.

57.    Such appointment would not interfere with the Debtors' efforts to seek equity

infusions or the Creditors' Committee's efforts for its reorganization plan.  To the extent that a

potential purchaser sought to purchase the assets, however, Gordian would be the exclusive party

to negotiate on behalf of the estates.

58.    Approval of Gordian as the Sale Agent would allow these Bankruptcy Cases to

move toward resolution on a pace that has eluded the Debtors to this point.  In light of the lack of

any reasonable alternative to a sale, time is of the essence to protect against further deterioration

of the going-concern value of the Debtors, as well as potential erosion of the values of the underlying assets. In addition, allowing Gordian time prior to confirmation allows for better sale processes with a better outcome for all parties in interest, as opposed to a hasty "fire sale" once things have eroded too far.

### III.    Permit Disclosure of Information In Proposed Plans

59.    The Debtors are beneficiaries of certain confidentiality protections of financial and other information pursuant to the Prepetition Senior Lender Loan Documents (Prepetition Credit Agreement at 17.15 and Prepetition Loan Agreement at 17.15). Pursuant to the Prepetition Senior Lender Loan Documents, the Prepetition Secured Lenders are required to hold all non-public information in accordance with their customary procedures for such confidential information, but may disclose confidential information to their respective examiners, affiliates, outside auditors, counsel, rating agencies, collateral agents and other professional advisors. In addition, the Prepetition Secured Lenders may also disclose such confidential information to prospective Lender Parties (as defined in the applicable Prepetition Senior Lender Loan Document) so long as such party agrees to be bound by the confidentiality provisions of either the Prepetition Credit Agreement or the Prepetition Loan Agreement, as applicable.

60.    Out of an abundance of caution, the Prepetition Secured Lenders have inserted placeholders in the Disclosure Statement relating to certain financial information for fiscal year 2009. Specifically, the Prepetition Secured Lenders have omitted (for the time being) certain projected financial performance of the Debtors for this fiscal year. The Prepetition Secured Lenders seek to release such information in connection with the pursuit of approval of the Disclosure Statement and confirmation of the Proposed Plans.

61.     Inclusion of this information in the Disclosure Statement is consistent with Section 1125 of the Bankruptcy Code, which requires that adequate information be provided to allow holders of claims and interests to make an informed decision with respect to voting on a plan. By seeking to include this information the Prepetition Secured Lenders are making every effort to provide the required adequate information with respect to the Proposed Plans.

62.     Disclosure of this information is not controversial, as the Debtors' included similar information in the prior Debtors' Proposed Disclosure Statement, and the Prepetition Secured Lenders only seek to update such information for fiscal year 2009. To the extent that the Debtors seek to update such information, the Prepetition Secured Lenders would welcome such input, so long as strict timelines are maintained to keep the Disclosure Statement and Proposed Plans on track in terms of timing.

## IV.    Permit Disclosure of Information to Potential Purchasers

63.     As described above, the Prepetition Secured Lenders are required to protect confidential information pursuant to the terms of the Prepetition Credit Agreement and the Prepetition Loan Agreement. The Prepetition Secured Lenders seek the ability to disburse such confidential information, through Gordian, to potential purchasers of the Debtors' respective business units and/or assets. Such distribution would be done under confidentiality, with each potential purchaser being required to execute a confidentiality agreement limiting the use of such information, as would be customary in a sale transaction outside of bankruptcy.

64.     In light of the expiration of the Debtors' exclusive periods, allowing distribution of the confidential information will facilitate resolution of these Bankruptcy Cases by providing visibility into the value of the Debtors' respective business units and assets. Such visibility will allow a competitive bidding process to commence, and will maximize the return to the Debtors'

constituents on a reasonable time frame. Because the Prepetition Secured Lenders seek to

distribute the information only under suitable confidentiality, the Debtors' needs for discretion

are balanced together with the need for information to spur an exit from these Chapter 11 Cases.

65.    In addition, the Agents' ability to share this information would enhance the

Prepetition Secured Lenders' ability to include certain information in the Disclosure Statement.

To the extent that the Agents and Gordian are able to discuss potential sales with interested

parties, the Prepetition Secured Lenders will be in a better position to provide more information

regarding the potential consummation of the exit strategy reflected by the Proposed Plans.

**V.    Cooperation from the Debtors**

66.    In order to implement the relief requested by this Motion, the Prepetition Secured

Lenders seek cooperation from the Debtors, and to the extent that the Debtors refuse to cooperate

with the reasonable requests of the Prepetition Secured Lenders, procedures for expedited

resolution of any disputes regarding such refusal.

67.    By failing to implement the Debtors' Proposed Plan during the exclusivity

periods, the Debtors allowed the reorganization process to be opened up to additional parties in

interest. Accordingly, the Debtors should be required to provide access and information to such

additional parties to facilitate the plan process. Requiring formal discovery through Rule 2004

or some other avenue will add further delay to these already languishing Chapter 11 Cases.

68.    If the Debtors fail to comply with a reasonable request of the Prepetition Secured

Lenders in connection with prosecution of the Disclosure Statement and the Proposed Plans, the

Agents shall be permitted to file a notice of non-cooperation and a form of "show cause" order.

The notice of non-cooperation shall briefly describe the circumstances of the Debtors' (or any

affiliate's, employee's or management's) refusal to cooperate with the Prepetition Secured

Lenders' request. Upon entry of the show cause order by the Bankruptcy Court, a hearing shall take place not sooner than 5 days after entry of the order, at which the Debtors and any non-cooperating party shall be required to demonstrate why they should not be held in contempt of any order granting this Motion.

69.    The Prepetition Secured Lenders also seek any related, other or further relief to which they may be entitled or which the Bankruptcy Court determines to be just and proper.

Based on the foregoing, the Agents pray for the relief set forth above, and such further and other relief as the Court deems proper.

Respectfully submitted:

WALLER LANSDEN DORTCH & DAVIS LLP

____John C. Tishler_____
John C. Tishler (*Pro hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP

____/s/ Aaron R. Cahn_____
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for the Prepetition Secured Lenders*