Hearing Date & Time: October 6, 2009 at 2:00 p.m.
Objection Deadline: October 1, 2009 at 4:00 p.m.

O'MELVENY & MYERS LLP
Gerald C. Bender, Esq.
Steven A. Rosenstein, Esq.
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Attorneys for DIP Lenders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------  x
```
**In re:**                                                   :   **Chapter 11**
                                                             :
**LEXINGTON PRECISION CORP., et al.,**                       :   **Case No. 08-11153 (MG)**
                                                             :
                                   **Debtors.**              :   **(Jointly Administered)**
                                                             :
```
------------------------------------------------------------------  x
```

### DIP LENDERS' OBJECTION TO PREPETITION LENDERS' PROPOSED COMBINED DISCLOSURE STATEMENT AND LIMITED OBJECTION TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' PROPOSED SECOND AMENDED DISCLOSURE STATEMENT

Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC, as

post-petition lenders (collectively, the "DIP Lenders") under that certain Amended and Restated

Super-Priority DIP Note issued by Lexington Rubber Group, Inc. ("LRGI") and Lexington

Precision Corporation ("LPC" and together with LRGI, the "Debtors") as of April 21, 2008 (the

"DIP Note"), by and through the undersigned counsel, hereby submit this (i) objection to the

Proposed Combined Disclosure Statement (the "Prepetition Lenders' Disclosure Statement")

Regarding Prepetition Secured Lenders' Chapter 11 Plans for Lexington Rubber Group, Inc. and

Lexington Precision Corporation (the "Prepetition Lenders' Plans," as further defined below), and

(ii) limited objection to the Proposed Second Amended Disclosure Statement for Official

Committee of Unsecured Creditors' Proposed Amended Joint Chapter 11 Plan (the "Committee Plan").  In support of this objection, the DIP Lenders respectfully represent as follows:

## I.   PRELIMINARY STATEMENT

1.   At the inception of these chapter 11 cases, the DIP Lenders loaned the Debtors $4 million (the "DIP Loan") to enable the Debtors to satisfy their working capital requirements.  The DIP Note was, and continues to be, the only source of postpetition financing for the Debtors.  In exchange for providing this critical lifeline, the DIP Lenders received superpriority for the DIP Note under section 364(c)(1) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Claims with section 364(c)(1) superpriority and administrative claims must be paid in full on the effective date of a confirmed plan of reorganization, unless the claim holder agrees to a different treatment.  Thus, any confirmable plans in these cases must provide for payment in full of the DIP Loan Claims (defined below) on the effective date unless the DIP Lenders agree to a different treatment.  Because the Prepetition Lenders' Plans do not pay the DIP Loan Claims in full at the effective date and the DIP Lenders have not agreed to the proposed treatment of the DIP Loan Claims, the Prepetition Lenders' Plans are unconfirmable and the Prepetition Lenders' Disclosure Statement should not be approved.

2.   Under the Prepetition Lenders' Plans, the assets of the Debtors would be placed in a trust for sale.  If and when a sale occurs, the DIP Loan Claims will be paid, but only after several classes of claims are paid first, making it possible that there will not be enough money to fully repay the DIP Loan Claims.  Such treatment of a Section 364(c)(1) superpriority claim is not permitted by the Bankruptcy Code absent clear consent by an affected party.  The DIP Lenders have not agreed and do not intend to agree to the treatment provided in the Prepetition Lenders' Plans.

3.       The Prepetition Lenders' Plans mistakenly assert that the DIP Lenders have waived their right to repayment upon the effective date of the plans by agreeing in the DIP Orders (defined below) to subordination of the DIP Note to the Prepetition Lenders' (defined below) claims.  The DIP Lenders agreed to subordinate their claims to the Prepetition Lenders' claims only to the extent that if there was not enough value in the estate to pay both the Prepetition Lenders' claims and the DIP Note Claims during the bankruptcy cases, then the Prepetition Lenders' Claims would be paid first, thereby protecting the value of their security interests.  If there is not enough value to pay both the claims of the DIP Lenders and the Prepetition Lenders upon the effective date or if the Prepetition Lenders agree to other treatment of their claims, no subordination should apply.  The agreement to subordinate does not, in any way, undermine the DIP Lenders' right to full payment at the effective date of a plan or upon the maturity of the DIP Note.  If a plan cannot pay all of the claims entitled to payment at confirmation and all necessary claimants do not agree to waive their rights to payment at the time, then such a plan is simply not confirmable.

4.       In the Prepetition Lenders' Plans, the Prepetition Lenders are choosing not to provide for the payment in full of their claims at the effective date and are receiving beneficial interests in the post-confirmation trusts that pay distributions if and when a sale occurs.  But, the Prepetition Lenders cannot drag the DIP Lenders along and bind the DIP Lenders to their decision to forego payment in full at the effective date.  The DIP Lenders' right to get paid at the effective date of a plan, or upon maturity, is paramount.  Because the Prepetition Lenders' Plans do not provide for the full payment of the DIP Loan Claims, they are unconfirmable.

5.       The Prepetition Lenders' Plans are unconfirmable for two additional reasons.  First, confirmation of the Prepetition Lenders' Plans will result in the occurrence of the

maturity date and various events of default under the DIP Note, but they do not propose to pay the DIP Note at such time, in contravention of the DIP Note and the DIP Orders.  As a debt instrument, the DIP Note must be paid pursuant to its terms.  Second, the Prepetition Lenders' Plans—which are essentially liquidating plans—are not feasible because they propose a sale process that is too uncertain and unclear to pass muster and that lacks reasonable assurance of success.

6.     Additionally, the Prepetition Lenders' Disclosure Statement may not be approved because it does not contain "adequate information" regarding the Prepetition Lenders' Plans' flawed treatment of the DIP Loan Claims necessary for creditors to make an informed decision regarding the Prepetition Lenders' Plans.

7.     Lastly, to the extent that the Committee Plan does not pay the DIP Loan Claims in full in cash at the effective date, such plan would be unconfirmable and may not be approved by a bankruptcy court.

## II.     BACKGROUND

8.     On April 1, 2008 (the "Commencement Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors-in-possession.

9.     The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On April 11, 2008, the United States Trustee for the Southern District of New York appointed the statutory committee of creditors (the "Creditors' Committee").

10.     Lacking unencumbered funds to operate their businesses on an ongoing basis due to the liens of lenders (the "Prepetition Lenders") under the Debtors' prepetition secured credit facilities, as part of the first day motions, on the Commencement Date, the Debtors filed a

motion (the "First Cash Collateral and DIP Motion") to use the Prepetition Lenders' Cash Collateral (as defined in the First Cash Collateral and DIP Motion) and to approve the DIP Loan. (Docket No. 11.)  On April 2, 2008, the Court held a hearing and entered an order granting the relief requested in the First Cash Collateral and DIP Motion on an interim basis.  (Docket No. 18.)  On April 17, 2008, the Court entered an order (the "First Cash Collateral and DIP Order") granting the relief requested in the First Cash Collateral and DIP Motion on a final basis.  (Docket No. 61.)  The First Cash Collateral and DIP Order authorized the Debtors to (i) use Cash Collateral[1] and (ii) obtain postpetition financing in the amount of $4 million.

11.     Because the Court found that the Debtors were unable to obtain the funds being provided pursuant to the DIP Loan on more favorable terms than those of the proposed DIP Note and could not obtain the funds as unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code or as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, the DIP Lenders were granted a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code.  (First Cash Collateral and DIP Order ¶¶ G, 20.)  The DIP Note was ordered to be:

> payable from any prepetition and postpetition property of the Debtors and all proceeds thereof and senior to any and all other unsecured claims, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, provided, however, that notwithstanding the foregoing, the DIP Super-Priority Claim shall be junior, subordinate, and subject to the Adequate Protection Claim, the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, the Carve-Out (as defined below), and the Adequate

---

[1] The Court approved further extensions of the Debtors' use of the Prepetition Senior Lenders' Cash Collateral by orders dated March 4, 2009 (the "Second Cash Collateral Order," Docket No. 579), May 20, 2009 (the "Third Cash Collateral Order," Docket No. 634), August 17, 2009 (the "Fourth Cash Collateral Order," Docket No. 690) and September 25, 2009 (the "Fifth Cash Collateral Order," Docket No. 725, and as amended from time to time, the "Cash Collateral Order").

Protection Liens.

(DIP Extension Order ¶ F; First Cash Collateral and DIP Order ¶ 20.)

12.     On April 21, 2008, pursuant to the First Cash Collateral and DIP Order, the Debtors issued to the DIP Lenders a Super-Priority DIP Note in the amount of $4 million.  The entire amount of the DIP Loan was fully borrowed shortly after entry of the First Cash Collateral and DIP Order.  On March 23, 2009, the Court entered an order authorizing the extension of the DIP Loan maturity date (the "DIP Extension Order" and together with the First Cash Collateral and DIP Order, the "DIP Orders").  (Docket No. 594.)  The Debtors executed an Amended and Restated Super-Priority DIP Note pursuant to the DIP Extension Order.

13.     The DIP Note matures as follows:

> The principal amount of this Note shall be paid on the earliest of (i) December 31, 2009, (ii) the date upon which the Debtors' use of Cash Collateral . . . terminates, (iii) the effective date of a confirmed plan of reorganization in the Chapter 11 Cases, (iv) the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (v) the appointment of a chapter 11 trustee in any of the Chapter 11 Cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor and (vi) the date of acceleration by the [DIP Lenders upon an Event of Default].

(DIP Note § 1.)  Events of default occur under the DIP note upon, *inter alia*, (i) the failure to pay any principal or interest on the DIP Note when due, (ii) the appointment of an interim or permanent trustee in any of the chapter 11 cases or the appointment of an examiner in any of the chapter 11 cases with expanded powers to operate or manage the financial affairs, the businesses or any reorganization of any Debtor, (iii) the dismissal of any of the chapter 11 cases or the conversion of any of the chapter 11 cases to a chapter 7 case, and (iv) the entry of an order amending, supplementing, staying, vacating or otherwise modifying any of the DIP Orders, the Second Cash Collateral Order or the DIP Note or approving any claim or administrative expense

claim (other than the Carve-Out and the Adequate Protection Claim (each as defined in the DIP

Orders)) having any priority over, or being pari passu to the superpriority administrative expense

claim of the DIP Note.  (*Id.* § 7.)

14.    The DIP Loan has provided significant benefits to the Debtors.  It has

enabled the Debtors to preserve and maintain the going-concern value of the Debtors during the

chapter 11 cases and provided assurance to the Debtors' customers, vendors and employees of the

Debtors' abilities to meet their near term obligations.

15.    On June 30, 2008, the Debtors filed a Joint Plan of Reorganization.  (Docket

No. 196.)  On August 8, 2008, the Debtors filed an Amended Joint Plan of Reorganization and a

proposed disclosure statement.  (Docket No. 306.)  The Debtors subsequently filed a Second

Amended Joint Plan of Reorganization and a revised disclosure statement on December 17, 2008.

(Docket Nos. 488, 490.)

16.    The Debtors' exclusive right to file a plan of reorganization and solicit

acceptances of such plan expired, respectively, on April 30, 2009 and June 1, 2009.  (*See* Docket

No. 571.)

17.    On September 1, 2009, CapitalSource Finance LLC ("CapitalSource"), as

agent under Debtors' prepetition Credit and Security Agreement, dated May 31, 2006, as

amended, and CSE Mortgage LLC ("CSE Mortgage") as agent under Debtors' Loan and Security

Agreement, dated May 31, 2006, as amended, filed the Prepetition Lenders' Disclosure Statement,

the Prepetition Secured Lenders' Chapter 11 Plan for Lexington Rubber Group, Inc. (the "LRGPI

Plan") and the Prepetition Secured Lenders' Chapter 11 Plan for Lexington Precision Corporation.

(the "LPC Plan," and together with the LRGPI Plan, the "Prepetition Lenders' Plans").  (Docket

Nos. 695, 696, 697.)

18.    The Prepetition Lenders' Plans are substantially identical.  Each creates a
Post-Confirmation Litigation Trust and a Post-Confirmation Trust to hold, market for sale, and
operate the assets of the Debtors (with a Post-Confirmation Trustee to be appointed by the
Prepetition Lenders to serve as the trustee for both trusts as of the confirmation date).  The
Post-Confirmation Trustee will also continue to operate the Debtors' businesses and conduct a sale
process, thereby displacing the senior-most corporate-level management of the Debtors.
(Prepetition Lenders' Disclosure Statement at 5.)  In addition, Gordian Group, LLC will be
appointed as sole and exclusive "Sale Agent" in order to conduct a marketing process of the LRGI
businesses and the LPC businesses during the 100-day period following the confirmation date.
(Prepetition Lenders' Disclosure Statement at 5.)

19.    The timing and amount (if any) of payment under the Prepetition Lenders'
Plans are uncertain.  The Prepetition Lenders' Plans contemplate that distributions to claimants be
in cash or through the issuance of "interests" in the Post-Confirmation Trusts and the
Post-Confirmation Litigation Trusts.  If the conditions precedent to the effectiveness of the
Prepetition Lenders' Plans are not timely satisfied, upon a motion by CapitalSource, CSE
Mortgage or the Post-Confirmation Trustee, no distributions under the applicable plan will be
made.  (Prepetition Lenders' Plans § 11.1(e).)  In that event, the Post-Confirmation Trustee (in
consultation only with CapitalSource, CSE Mortgage and the Sale Agent) may take whatever steps
it determines, in its discretion, will maximize value for the creditors of the Debtors' estates,
including dismissal of the applicable chapter 11 case, liquidation or other appropriate action.
(Prepetition Lenders' Disclosure Statement at 5; Prepetition Lenders' Plans § 11.3.)  Dismissal of
either chapter 11 case is subject only to the consent of CapitalSource and CSE Mortgage (and only
if the Prepetition Lenders' claims have not been fully paid).  (*Id.)*

20.     The Prepetition Lenders' Plans do not propose to pay the DIP Lenders upon the effective date of the plan.  Instead, the DIP Lenders would be paid for their DIP Loan Claims from the trusts if cash is available, and only after payment in full of the creditors holding the following classes of claims in the Debtors' cases: (i) the Prepetition Lenders' Claims, (ii) the Secured Tax Claims, and (iii) the Other Secured Claims.  (Prepetition Lenders' Plans § 2.4.)

21.     On September 11, 2009, the Creditors' Committee filed a Proposed Joint Chapter 11 Plan, along with a Proposed Disclosure Statement.  (Docket Nos. 708, 709.)  On September 25, 2009, the Creditors' Committee filed the Committee Plan and an Amended Proposed Disclosure Statement.  (Docket Nos. 724, 726.)  On September 29, 2009, the Creditors' Committee filed a Proposed Second Amended Disclosure Statement (the "Committee Disclosure Statement").  (Docket No. 730.)

22.     As to the treatment of the DIP Loan, the Committee Disclosure Statement explains:

> Each holder of a DIP Loan Claim shall receive on the Effective Date, cash in the total amount of their DIP Loan Claims, in full satisfaction of the DIP Loan Claims; provided, however, if the Bankruptcy Court determines that the Final Cash Collateral Order does not allow payment of the DIP Loan Claims in full in cash on the Effective Date, the DIP Loan Claims shall be paid as directed by the Bankruptcy Court under the Confirmation Order.

(Committee Disclosure Statement at 25; *see also* Committee Plan § 2.4.)

## III.    ARGUMENT

### A.    The Prepetition Lenders' Disclosure Statement Should Not Be Approved Because the Prepetition Lenders' Plans Cannot Be Confirmed.

23.     The Court should not approve the Prepetition Lenders' Disclosure Statement because the Prepetition Lenders' Plans are unconfirmable.  Courts will not allow the dissemination of an unconfirmable plan "because undertaking the burden and expense of plan

distribution and vote solicitation is unwise and inappropriate if the proposed plan could never be legally confirmed." *In re Phoenix Petroleum*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *see also In re Quigley Co.,* 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) (denying approval of disclosure statement because plan contained patent legal defects); *In re Copy Crafters Quickprint, Inc*., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1989) (holding approval of disclosure statement should be withheld if it is apparent that the plan will not comply with Section 1129(a)); *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988) (denying approval of disclosure statement describing unconfirmable plan "to avoid . . . a wasteful and fruitless exercise" that would "further delay a debtor's attempts to reorganize").

24.      Accordingly, courts may consider substantive plan issues at the disclosure statement hearing and deny approval to disclosure statements predicated upon facially unconfirmable plans. *See, e.g., In re Felicity Assocs., Inc*., 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face."); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement."); *In re Dakota Rail, Inc*., 104 B.R. 138, 145 (Bankr. D. Minn. 1989) (denying approval of "facially defective disclosure statement" describing infeasible plan); *In re S.E.T. Income Props., III*, 83 B.R. 791, 794 (Bankr. N.D. Okla. 1988) (denying approval of

disclosure statement because "the disclosure statement . . . demonstrates that the debtor's proposed plan of reorganization is not feasible").

> ### i. The Prepetition Lenders' Plans Cannot be Confirmed Because They Do Not Provide for the DIP Loan Claims to be Paid in Accordance with their Section 364(c)(1) Superpriority.

25.     Because the Prepetition Lenders' Plans do not provide for payment of the DIP Loan Claims in line with their Section 364(c)(1) superpriority, they cannot be confirmed.  The DIP Note must be repaid in cash at the effective date of a plan or at maturity.  In contrast, the Prepetition Lenders' Plans only call for potential, contingent payment long after the effective date and well after other lower-priority claims such as other administrative claims are first paid.

26.     It is black-letter law that in order for a plan of reorganization to be confirmable by the court, it must comply with the applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1). Section 1129(a)(9)(A) provides that a plan may only be confirmed if "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that with respect to a[n administrative] claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim."

27.     Section 364(c)(1) of the Bankruptcy Code permits a debtor-in-possession to incur debt with "priority over any or all administrative expenses," 11 U.S.C. § 364(c)(1), and the absolute priority rule demands that claims be paid in accordance with the priority of creditors' legal rights, *see* 11 U.S.C. § 1129(b)(2)(B).  Thus, in order for a plan to be confirmable, claims with Section 364(c)(1) superpriority must be paid in full at the effective date of a plan, unless the holder of the claim specifically agrees to a different treatment of such claim.

28.     This court has already recognized that "by virtue of the Code's mandate that allowed administrative priority expenses be paid in full at confirmation of a plan, . . . fees not

payable during the pendency of the case . . . nonetheless must be fully satisfied if the plan is to be

confirmed." *In re Boco Enter., Inc.*, No. 93 B 42331 (JLG), 1994 Bankr. LEXIS 1710, at *11

(S.D.N.Y. 1994); *see also* 11 U.S.C. § 1129(a)(9)(A). Section "1129(a)(9)(A) brings to an end all

of the pre-confirmation super-priorities that the secured parties may have obtained. If the secured

parties desire confirmation, the administration claims must be paid in full in cash at confirmation."

*In re Emons Indus., Inc.*, 76 B.R. 59, 60 (S.D.N.Y. 1987). Indeed, the superpriority of a Section

364(c)(1) claim may result in a situation in which no assets are available to satisfy the rights of

other administrative claims. *See In re Am. Res. Mgmt. Corp.*, 51 B.R. 713, 721 (Bankr. D. Utah

1985) ("Section 364(c)(1) superpriority may affect the rights of administrative claimants to full

payment in the event sufficient funds are unavailable by subjecting them to reduction and

proration.").

      29.    The DIP Loan Claims have Section 364(c)(1) superpriority and are payable

from any prepetition and postpetition property of the Debtors and all proceeds thereof senior to

such claims. (DIP Extension Order ¶ F, First Cash Collateral and DIP Order ¶ 20.) Therefore, in

order for any plan in these cases to be confirmable, basic bankruptcy principles require that the

DIP Loan Claims be paid in cash on the effective date of the plan, unless the DIP Lenders agree to

a different treatment.

      30.    The Prepetition Lenders' Plans, however, do not propose to pay the DIP

Loan Claims in cash in full on the effective date of their plans. Instead, they propose to provide

holders of DIP Loan Claims cash distributions from certain post-confirmation trusts only to the

extent funds are available. (Prepetition Lenders' Disclosure Statement at 46; Prepetition Lenders'

Plans § 2.4.) Both the timing and amount of payment for the DIP Loan Claims are contingent and

uncertain. (Prepetition Lenders' Plans §§ 2.1, 2.4.) In other words, if and when the DIP Loan

Claims will be repaid will not be known until weeks or months after confirmation of the
Prepetition Lenders' Plans.

31.    In contrast, allowed administrative claims would be paid in full in cash at
the effective date (Prepetition Lenders' Plans § 2.1), even though Section 364(c)(1) superpriority
claims enjoy higher priority and are required to be paid first.  Further, the Prepetition Lenders'
Plans also provide that payment of the DIP Loan Claim will be made only after payment in full of
the Prepetition Lenders' Claims, the Secured Tax Claims, and the Other Secured Claims.
(Prepetition Lenders' Plans §2.4.)[2]

32.    Thus, the Prepetition Lenders' Plans do not provide payment in cash of the
DIP Loan Claims on the effective date of the plan as required, and compound that mistreatment by
paying lower-priority claims before the DIP Loan Claims are to be paid.  The Prepetition Lenders
justify their re-priority scheme with the assertion that the DIP Lenders agreed to subordinate their
right to repayment of the DIP Note under a chapter 11 plan.  (*See* Prepetition Lenders' Disclosure
Statement ¶ 4.8.)  That assertion is wrong.

33.    The DIP Lenders agreed to subordinate payment of their claims to the
claims of the Prepetition Lenders while the bankruptcy case was pending so that the Prepetition
Lenders' security interests would not be infringed and the Prepetition Lenders' Cash Collateral
would be protected.  That agreement meant, for example, that during the bankruptcy case, the
Debtors could not repay or refinance the DIP Note before paying off the specified prepetition
claims.

---

[2] Indeed, by including the Secured Tax Claims and the Other Tax Claims, the list of claims that would be paid
before the DIP Loan Claims is broader than provided in the DIP Orders.  *See* DIP Extension Order ¶ F and First Cash
Collateral and DIP Order ¶ 20.

34.     But the DIP Lenders did not agree to any treatment in a chapter 11 plan other than that provided by the Bankruptcy Code—*i.e.,* full payment at the effective date.  Indeed, the entire benefit of Section 364(c)(1) superpriority is the guarantee of payment at the effective date of a confirmed plan.  Nothing in the DIP Orders or DIP Note indicates that the DIP Lenders had agreed to any different treatment or rights as to a chapter 11 plan.  Rather, the First Cash Collateral and DIP Order explicitly provides that "it shall not in any way constitute agreement, consent or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of [the] Order."  (First Cash Collateral and DIP Order ¶ 27.)

35.     The Prepetition Lenders' error is in mistakenly equating the DIP Lenders' agreement that the DIP Note would not be repaid before certain claims of the Prepetition Lenders as an agreement to waive Section 364(c)(1) superpriority payment rights in a reorganization plan. The DIP Lenders never waived their right to repayment as part of a reorganization plan—if they had done so, receiving Section 364(c)(1) status would have been virtually meaningless.  Thus, in order for the Prepetition Lenders' Plans to be confirmable, the DIP Loan Claims must be paid in full at the effective date because the DIP Lenders have not and do not intend to waive their rights to repayment as part of a confirmable plan by the Prepetition Lenders.

36.     Furthermore, the Prepetition Lenders propose plans that provide for payment of Prepetition Lenders' Claims through distributions from trusts, if and when a sale occurs rather than seeking such repayment at the effective date.  (Prepetition Lenders' Plans §§ 4.2-4.3.)  But the Prepetition Lenders cannot bind the DIP Lenders to consent to a plan where their priority as a holder of a Section 364(c)(1) claim has been wrongfully impaired simply because the Prepetition Lenders have consented to treatment of their claims under a plan in a manner that does not ensure repayment at the effective date.  If the DIP Loan Claims cannot be

paid until the Prepetition Lenders are paid as the DIP Orders provide, then both must be paid at the effective date. That is what the DIP Lenders agreed to and this is their right. Moreover, if the Prepetition Lenders agree not to get paid at the effective date, that should not affect the rights of the DIP Lenders to get paid. Under the Prepetition Lenders' theory, if they chose not to be paid for 100 years, then the DIP Lenders would also be bound to wait at least 100 years for payment. On the contrary, the DIP Lenders retain their separate right not to consent to any plan that does not pay the DIP Loan Claims in full on the plan's effective date.

37.    Because the Prepetition Lenders' Plans do not provide for the DIP Loan Claims to be paid on a senior basis and prior to the Debtors' administrative claims, the Prepetition Lenders' Plans do not comply with the Bankruptcy Code and are therefore unconfirmable. *See e.g., In re Mayco Plastics, Inc*., 379 B.R. 691, 706 (Bankr. E.D. Mich. 2008) (holding that plan proponent "bears the burden of demonstrating how its plan can be confirmed absent payment in full of this § 364(c)(1) so-called 'super priority' claim and absent the consent of the holders of the claim"). For that reason, the Court should not approve the Prepetition Lenders' Disclosure Statement for their unconfirmable plans.

ii.    **The Prepetition Lenders' Plans Cannot be Confirmed Because They Violate the Terms of the DIP Note and the Court's Orders.**

38.    The Prepetition Lenders' Plans would trigger the maturity date of the DIP Note at both the confirmation date and the effective date of the plans, but do not provide for payment of the DIP Note at either such time. As a debt instrument, the DIP Note must be paid when it is due in according with its terms. The Prepetition Lenders' Plans cannot unilaterally rewrite the terms of the DIP Note or treat it in a manner other than a debt instrument that must be repaid in accordance with its terms.

39.    In addition, the Prepetition Lenders' Plans would create at least three

Events of Defaults under the DIP Note thereby permitting the DIP Lenders to accelerate the

maturity of the DIP Loans:

- The DIP Note requires payment upon, among other things, the effective date of a plan of reorganization.  As discussed above (*see supra* at ¶¶ 25-32), the Prepetition Lenders' Plans would not pay the DIP Note at the effective date, but instead only later (if at all).  (DIP Note §§ 1, 7.)  The failure to pay the DIP Note at maturity, triggered by the effective date of a plan of reorganization, would constitute an Event of Default under the DIP Note.

- The Prepetition Lenders' Plans call for the payment of administrative expenses on the plans' effective date.  Under the DIP Note, an order approving any administrative expense claim (other than the Carve-Out and the Adequate Protection Claim) having any priority over, or being pari passu to the superpriority administrative expense claim of the DIP Note constitutes an Event of Default.  (DIP Note § 7.)  The confirmation of the Prepetition Lenders' Plans would permit administrative expense claims to be paid prior to the DIP Loan Claims and would constitute an Event of Default under the DIP Note.

- The Prepetition Lenders' Plans effectively provide for the appointment of a chapter 11 trustee or a conversion of the chapter 11 cases to a chapter 7, as further described in the Debtors' Objection to the Prepetition Lenders' Disclosure Statement (the "Debtors' Objection"), which the DIP Lenders join in and reiterate.[3]  At confirmation, the Prepetition Lenders' Plans would vest the "Post-Confirmation Trustee" with the management, control, and operation of the Debtors' respective business units and/or assets.  (*See* Prepetition Lenders' Plans Art. IX.)  Both the conversion to a chapter 7 case and the appointment of a trustee "with expanded powers to operate or manage the financial affairs, the business, or the reorganization" of the Debtors are immediate Events of Default under the DIP Note and trigger the maturity date. (DIP Note §§ 1, 7.)  Accordingly, the DIP Note will become due and payable and an immediate Event of Default will occur on the confirmation date of the Prepetition Lenders' Plans.

40.    Because the DIP Lenders have not waived and do not intend to waive their

right to be paid in full at the Stated Maturity Date of the DIP Note in connection with the

Prepetition Lenders' Plans, the Prepetition Lenders' Plans will necessarily constitute an Event of

---

[3] In fact, the appointment of the chapter 11 trustee would be without any cause, thereby violating Section 1104 of the Bankruptcy Code.

Default under the DIP Note at the confirmation date and contravene the DIP Orders.  Because the

DIP Note was approved in a Court Order, a plan that causes an event of default under the DIP Note

would not comply with the orders of the Court, and a plan that does not comply with the orders of

the Court cannot be confirmed.  *See* 11 U.S.C. § 1129(a)(2); *In re Midwestern Co., Inc.*, 55 B.R.

856, 863 (W.D. Mo. 1985), *rev'd on other grounds, In re Titan Energy, Inc.*, 837 F 2d. 325 (8th

Cir. 1988).

> **ii.    The Prepetition Lenders' Plans Cannot be Confirmed Because They
> Are Not Feasible.**

40.    Under § 1129(a)(11), a plan must be feasible in order to be confirmable.  A

plan meets the feasibility standard if the plan proponent has shown there is a "reasonable assurance

of success."  *Kane v. Johns-Manville (In re Johns-Manville)*, 843 F.2d 636, 649 (2d Cir. 1988).  As

the Prepetition Lenders' Plans fail to identify a concrete path from plan confirmation to

effectiveness, the plans do not demonstrate a reasonable assurance of success and are

unconfirmable.

41.    The Prepetition Lenders' Plans are essentially liquidating plans that purport

to seek to ensure a "rapid recovery of value through a sale process" controlled by the Prepetition

Lenders "by whichever avenues appear to be most appropriate at the time."  (Prepetition Lenders'

Disclosure Statement at 1.)  Indeed, the Prepetition Lenders have given themselves broad

discretion following confirmation to abandon the plan and instead seek dismissal of the chapter 11

cases or liquidation upon failure of any of the conditions precedent to confirmation.  (*See supra* at

¶ 19.)  At bottom, the Prepetition Lenders' Plans are not really plans at all, but instead possible,

contingent paths that may be pursued depending on how things turn out, while the Prepetition

Lenders and Post-Confirmation Trustee get a blank check to proceed with unfettered discretion.

42.     One of the more significant conditions precedent to effectiveness of the Prepetition Lenders' Plan is the procurement of a stalking horse bidder within 100 days of the confirmation date.  (Prepetition Lenders' Plans § 11.1(e).)  As an example of the broad discretion the Prepetition Lenders' have afforded themselves, the Prepetition Lenders' Disclosure Statement notes that the Prepetition Lenders' contemplate that they may be an initial stalking horse bidder for the limited purpose of setting a floor for other bidders.  But the Prepetition Lenders' do not even agree to make that limited commitment, thereby exposing the plans to a material contingency. (*See* Prepetition Lenders' Disclosure Statement at 1.)

43.     In sum, the Prepetition Lenders' Plans are not feasible and cannot be confirmed, and the Prepetition Lenders' Disclosure Statement describing unconfirmable plans should not be approved.

### B.     The Prepetition Lenders' Disclosure Statement Should Not Be Approved Because It Does Not Contain Adequate Information.

44.     Under section 1125(b) of the Bankruptcy Code, a disclosure statement must contain "adequate information" before acceptances of a plan of reorganization may be solicited. 11 U.S.C. §1125(b).  Adequate information is defined as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan. . .

11 U.S.C. § 1125(a)(1).

45.     Disclosure statements must list "all 'adequate information' which would enable holders of claims to take an informed position on a proposed reorganization plan." *Sure-Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir. 1991); *see also In re Duratech Indus.,* 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999)

(disclosure statement must give creditors enough information to be able to decide whether to accept or reject the plan); *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988) (noting disclosure statement should provide creditors with meaningful information regarding "the consequences of the proposed plan on their claims and the possible Code alternatives so that they can intelligently accept or reject the Plan").  A disclosure statement should also contain "[a]ll factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan."  *In re Microwave Prods. of Am., Inc.,* 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989) (internal quotations omitted).  A disclosure statement that is inaccurate or deficient may not be approved.  *See* U.S.C. § 1125(b); *see also, e.g., Kunica v. St. Jean Fin. Inc.,* 233 B.R. 46, 54 (Bankr. S.D.N.Y. 1999), *amended on other grounds,* 63 F. Supp. 2d 342 (S.D.N.Y. 1999) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'" (internal citations omitted)); *In re Feldman,* 53 B.R. 355, 358 (Bankr. S.D.N.Y. 1985) (declining to approve disclosure statement because of inadequate information).

46.    The Prepetition Lenders' Disclosure Statement fails to satisfy the requirements of Section 1125 because it fails to provide adequate information regarding the treatment of the DIP Loan Claims to permit creditors to make an informed judgment about the Prepetition Lenders' Plans.  Among other things, it fails to disclose that:

- The Prepetition Lenders' Plans' treatment of the DIP Loan Claims is improper under the Bankruptcy Code because administrative claims are being paid in full in cash, while DIP Loan Claims will only be paid to the extent there are funds available.

- The DIP Lenders have not consented to the Prepetition Lenders' Plans or the treatment of the DIP Loan thereunder.

- The Prepetition Lenders' Disclosure Statement wrongly states that the DIP Lenders have agreed to subordinate the DIP Loan Claims in the Prepetition Lenders' Plan.

- The Cash Collateral Order and DIP Order specifically reserve the rights of the DIP Lenders to oppose the Prepetition Lenders' Disclosure Statement and Prepetition Lenders' Plans

- Confirmation of the Prepetition Lenders' Plan would immediately cause an Event of Default and result in the occurrence of the Stated Maturity Date under the DIP Note. But the DIP Lenders have not waived and do not intend to waive their right to be paid in full at the Stated Maturity Date nor waive any Event of Default under the DIP Note.

47.    In addition, the Prepetition Lenders' Disclosure Statement is lacking information regarding the terms of the Post-Confirmation Trusts and the identity of the Post-Confirmation Trustee. Absent information regarding the terms and conditions of the Post-Confirmation Trusts, creditors are unable to evaluate the treatment of their claims, the timing of distributions and likely success or failure of the Prepetition Lenders' Plans.

48.    This missing information clearly bears on the likely success or failure of the Prepetition Lenders' Plans. Because the Prepetition Lenders' Disclosure Statement does not have adequate information, it may not be approved. *See* 11 U.S.C. § 1125(b).

### C.    The Committee Disclosure Statement Should Not Be Approved if the DIP Loan Claims Will Not Be Paid in Full in Cash on the Effective Date.

49.    The Committee Plan is unclear as to whether it intends to insure that the DIP Loan Claims will be paid in full in cash. The Disclosure Statement explains that that the DIP Loan Claims will receive cash on the effective date, unless the Court determines that the DIP Orders do not allow payment of the DIP Loan Claims in full in cash on the effective date, in which case the DIP Loan Claims shall be paid as directed by the Court under the confirmation order. (*See supra* ¶ 22.)

50.    As discussed above (*see supra* ¶¶ 25-37), in order for a plan to be confirmable, the DIP Loan Claims must be paid in full in cash due to their Section 364(c)(1) superpriority claim status. The Committee Plan and Committee Disclosure Statement appear to

provide for such treatment, while reserving the ability to afford the DIP Loan Claims different treatment if the Court determines that the DIP Orders do not allow payment in full in cash on the effective date.  To the extent that the Committee Plan does not pay the DIP Loan Claims in full in cash at the effective date, such plan would be unconfirmable and may not be approved by a bankruptcy court.

51.    It is unclear as to what the Committee intends as to the unusual and confusing language concerning the DIP Loan Claims in its plan and disclosure statement.  The DIP Lenders therefore submit it should be stricken, and the Committee Plan should propose simply to pay the DIP Loan Claims in cash in full on the effective date.

## IV.    RESERVATION OF RIGHTS

52.    The DIP Lenders reserve their rights upon notice of the Plan confirmation hearing to object to other provisions of the Prepetition Lenders' Plans or the Committee Plan which render any such plan unconfirmable under the Bankruptcy Code.  In addition, the DIP Lenders reserve their rights under the DIP Note and the DIP Orders and applicable law.

## V.    CONCLUSION

53.    WHEREFORE, for the reasons set forth herein, the DIP Lenders respectfully request that this Court (i) deny approval of the Prepetition Lenders' Disclosure Statement, and (ii) deny approval of the Committee Disclosure Statement, unless and until it is clarified to provide only for the payment of the DIP Loan Claims in full on the Committee Plan's effective date.

Dated: October 1, 2009
      New York, New York

Respectfully submitted,

/s/ Gerald C. Bender
O'MELVENY & MYERS LLP
Gerald C. Bender, Esq.
gbender@omm.com
Steven A. Rosenstein, Esq.
srosenstein@omm.com
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061

Attorneys for DIP Lenders