**Hearing Date and Time:  October 6, 2009 at 2:00 p.m.**
**Objection Deadline: October 1, 2009 at 4:00 p.m.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                               :

In re                       :       Chapter 11 Case No.
                                 :

**LEXINGTON PRECISION CORP., et al.,**   :       **08-11153 (MG)**
                                 :

        **Debtors.**           :       **(Jointly Administered)**
                                 :

------------------------------------------------------------x

**DEBTORS' OBJECTION TO THE PROPOSED AMENDED DISCLOSURE
STATEMENT FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
AMENDED JOINT CHAPTER 11 PLAN AND PROPOSED DISCLOSURE
STATEMENT FOR THE PREPETITION SECURED LENDERS' CHAPTER 11 PLANS**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

                Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington"

or the "Debtors"), as debtors and debtors in possession, for their objection to (i) the Proposed

Second Amended Disclosure Statement for Official Committee of Unsecured Creditors' Joint

Chapter 11 Plan [Docket No. 709], dated September 29, 2009 (the "Committee Disclosure

Statement"), filed in connection with the Official Committee Of Unsecured Creditors'

Proposed Amended Joint Chapter 11 Plan [Docket No. 708] (the "Committee Plan"), and

(ii) the Proposed Combined Disclosure Statement Regarding Prepetition Secured Lenders'

Chapter 11 Plans for Lexington Rubber Group, Inc. and Lexington Precision Corporation

[Docket No. 695], dated September 1, 2009 (the "Secured Lenders Disclosure Statement", and

together with the Committee Disclosure Statement, the "Disclosure Statements"), filed in

connection with the Prepetition Secured Lenders' Chapter 11 Plan [Docket No. 696] (the

"Secured Lenders LPC Plan"), and the Prepetition Secured Lenders' Chapter 11 Plan for

Lexington Rubber Group, Inc. [Docket No. 697] (the "Secured Lenders LRGI Plan," and

together with the Secured Lenders LPC Plan, the "Secured Lenders Plans," and together with

the Committee Plan, the "Plans") respectfully represent as follows:

**Preliminary Statement**

1.      The Debtors commenced these chapter 11 cases 18 months ago facing

three financial problems: an overleveraged balance sheet, a secured credit facility that was

maturing in the medium-term but in the meantime was being paid interest and principal, and an

organized group of hedge funds who had acquired a blocking vote in the Debtors' bonds and

wanted to dictate the terms of any restructuring.  Shortly after filing, the Debtors faced a fourth

problem – the Great Recession of 2008-09.

2.      Coinciding almost exactly with these chapter 11 cases, the financial

crisis felled companies with far greater financial resources than the Debtors.  Despite the

challenges of operating in chapter 11, a near-depression in the global economy, and the

collapse of the OEM auto market, the Debtors have performed remarkably well in chapter 11.

In 2008, one of the worst years for the global economy in recent memory, the Debtors

generated approximately $8.5 million in earnings before interest, taxes, depreciation and

amortization ("EBITDA").  Lexington also has generated positive cash flow from operations

throughout the chapter 11 cases, even while consolidating its connector seals business with

other operations in order to reduce costs and preserve value for all constituencies. With the restructuring now accomplished, in August 2009 the Debtors generated nearly $1 million in EBITDA before restructuring expenses.

3.    Throughout the chapter 11 cases, the Debtors have continued to make current interest and principal payments to their secured lenders (the "Secured Lenders"). Since the cases began, the Debtors have paid the Secured Lenders approximately $3 million in interest payments and reduced the principal balance of the loans by approximately another $4.8 million. The Debtors will begin October with approximately $3 million in cash, roughly the same amount they had when they entered chapter 11 in April 2008. The payment of interest and principal to the secured lenders, as well as the professionals fees and other expenses of the reorganization, was made possible by the Debtors' $4 million debtor-in-possession financing facility, which provided the liquidity necessary to maintain adequate levels of working capital.

4.    Although the chapter 11 process has not gone nearly as quickly as the Debtors had hoped, the cases are far from unsuccessful and in fact have achieved exactly what chapter 11 was intended to do. The protection of chapter 11 has enabled Lexington to preserve the jobs of almost 500 employees, continue supplying parts to customers, and maintain value for all creditors and holders of equity interests, all while *paying down* $4.8 million in secured debt.

5.    The Secured Lenders Plans should not be sent out for consideration by creditors or shareholders because they are patently unconfirmable; sending them out would only add to the administrative expenses of the chapter 11 cases and drain the Debtors' liquidity. The Secured Lenders Plans do not seek to reorganize the Debtors at all. Instead, they propose to divest the Debtors from control of their businesses by appointing a "Post-Confirmation

Trustee" (the "Trustee") to liquidate the Debtors' assets prior to the effective date (the

"Effective Date") of the Secured Lenders Plans.  The Trustee presumably would be selected by

the Secured Lenders themselves, and thus probably have little interest in realizing any value to

the estates beyond that owed to the Secured Lenders.  Even worse, this Court would have no

oversight over the actions of the Trustee, even prior to the Effective Date.  Not only is there is

no basis for appointment of the Trustee, but the Secured Lenders Plans completely contravene

the provisions of the Bankruptcy Code, and are thus unconfirmable under section 1129(a)(1) of

the Bankruptcy Code.  The Secured Lenders Plans also cannot be confirmed because they

propose to pay off the Debtors' postpetition financing loan (the "DIP Loan") and other

administrative expenses only *after* the Trustee completes the sale(s) of the Debtors' assets, and

only if the Secured Lenders succeed in obtaining value beyond their own claims, in direct

contravention of the statutory requirement that administrative expenses must be paid in full, in

cash, on the effective date of a plan.  11 U.S.C. § 1129(a)(9).

      6.     The Secured Lenders Plans are unlikely to find support from *any* creditor

or shareholder constituency.  They propose a fire sale under circumstances that are certain to

minimize rather than maximize value.  Indeed, the Secured Lenders Disclosure Statement is so

deficient it does not even estimate the likely recovery for creditors or shareholders, a defect that

cannot be cured because under the plan structure proposed no one will know the value to be

distributed until *after* the Secured Lenders Plan is voted upon, confirmed, and consummated by

a sale of the Debtors' assets.  Only by artificially impairing their own claims – purportedly

waiving claims to default interest and prepayment premiums to which they are not entitled in

the first place – can the Secured Lenders create the illusion that the Secured Lenders Plans

could garner support from any impaired class of creditors and thus satisfy the requirements of section 1129(a)(10).

7.      In February, the Secured Lenders' former financial advisor testified that the Debtors' going concern value was $63 million – about *twice* the amount owed to the Secured Lenders.  The Secured Lenders' strategy is to extract their value at any cost, either through confirmation of a plan that sacrifices value for speed or by forcing the Debtors to spend so much opposing it that their remaining liquidity is depleted and they have no choice but to put themselves up for sale.

8.      The Committee Plan, proposed in reaction to the Secured Lenders' attempt to liquidate the Debtors, also suffers from fatal flaws that make confirmation impossible.  After moving to terminate exclusivity and opposing reasonable extensions, ostensibly because it wanted the right to propose its own plan, the official committee of unsecured creditors (the "Committee") has finally done so.  The Committee Plan reveals that the Committee has no outside financing and no commitments yet for any other financing.  To provide the capital necessary to finance a plan, the Committee proposes a $10 million exit facility (the "Committee Exit Facility") purportedly to be provided by its own noteholder members for which they will earn a "fee" of 35% of the equity of the reorganized Debtors plus a note for $1.5 million – an outrageous, self-dealing give-away of value to the Committee's own constituents that not only violates the requirement in section 1123(a)(4) that a plan must provide the same treatment for each claim in a class, but also its fiduciary duties to its broader constituency – the general unsecured creditors.  The 35% equity stake could be worth as much as $10 million based even on the Committee's valuation of total enterprise value.  The "fee" to be received by the purported lenders of the Committee Exit Facility would thus constitute as

much as 115% of the $10 million to be provided to the reorganized Debtors under the facility,

and that does not include the minimum rate of 13.5% interest to be earned on the $10 million

note that the purported lenders would also receive for the use of their money.[1]  Like the

Secured Lenders Plan, the Committee Plan is a clear grab by its proponents aimed to take as

much value away from the estates as possible at the expense of other creditors and

shareholders.

    9.    The Disclosure Statements also fail to provide adequate information as

required by section 1125 of the Bankruptcy Code.  Among numerous failures described further

below is the complete absence of any estimate of recoveries for creditors in the Secured

Lenders Disclosure Statement, as well as the lack of any valuation information – the most basic

information that any investor in the Debtors would want to assess in determining whether the

Secured Lenders Plans to liquidate the Debtors would benefit any creditor other than the

Secured Lenders themselves.

    10.    The Debtors are cognizant of the need to bring these chapter 11 cases to

a timely conclusion.  To that end they have been working diligently on multiple paths to

emergence, including negotiations with potential investors on a transaction that would facilitate

reorganization and discussions with sources of financing for the Debtors own plan if no

transaction materializes.  Although these negotiations are ongoing, the Debtors anticipate filing

within the next week their third amended plan of reorganization (the "Debtors Plan") and a

proposed disclosure statement with respect thereto (the "Debtors Disclosure Statement").  The

---

[1] In contrast, the DIP Loan had a 2% fee and earned interest at LIBOR (with a floor of 3% per annum) plus 7% per annum.  *See* Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (i) Authorizing Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Authorizing Postpetition Financing, dated April 17, 2008, Exhibit A [Docket No. 61].

Debtors Plan will avoid the disastrous liquidation proposed by the Secured Lenders and will be financed on commercial terms by an exit facility, whose participants would be the lenders under the DIP Loan (the "DIP Lenders") and most likely certain customers of the Debtors. If the Court is inclined to approve any of the Disclosure Statements, it should in the interests of fairness and efficiency require that solicitation of such Disclosure Statements await the hearing on the Debtors Disclosure Statement so that all the chapter 11 plans may be sent out for voting simultaneously. Seriatim solicitation will only confuse creditors and add expense, impairing the value of the Debtors' businesses.

### The Proposed Plans are Patently Unconfirmable

11.     Where a plan on its face does not comply with the basic requirements of the Bankruptcy Code, courts have refused to approve the corresponding disclosure statement rather than engage in the futile exercise of pursuing that plan. *See In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied . . . ."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate . . . .") (citations omitted); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) (citation omitted). The Secured Lenders Plans and the Committee Plan fail to meet the requirements of section 1129(a)(1) of the Bankruptcy Code and are thus unconfirmable.

_The Secured Lenders Plans Are Patently Unconfirmable_

12.    The Secured Lenders Plans are patently unconfirmable because (i) they contemplate a de facto appointment of an operating trustee without any showing of cause; (ii) would likely result in a default under the Debtors' postpetition loans (the "DIP Loans"); (iii) fail to assure that all administrative expense claims will be paid in full in cash on the effective date (the "Effective Date") of the Secured Lenders Plans; and (v) artificially impair the Secured Lenders Claims in order to create an illusion that there is an impaired class that would accept a plan that is in the best interests of, at most, one constituency, the Secured Lenders themselves.

(a)    The Secured Lenders Plans contemplate a de facto appointment of an operating trustee, without any showing of cause

13.    The Secured Lenders Plans contemplate that upon confirmation of such plans, the Debtors' assets will be transferred to two liquidating trusts, to be exclusively managed and controlled by post-confirmation trustees (the "Trustees"), who will be authorized to dispose of the assets prior to the Effective Date, with proceeds of such sales to be distributed to pay the Secured Lenders. _See_ Secured Lenders Plans, § 5.3. As such, the Secured Lenders Plan are patently unconfirmable. The divestiture of management's control of the Debtors' assets during the chapter 11 cases that is contemplated by the Secured Lenders Plans is akin to either appointment of a chapter 11 trustee pursuant to section 1104 of the Bankruptcy Code or conversion of the chapter 11 cases to chapter 7 pursuant to section 1112 of the Bankruptcy Code. The Secured Lenders Plans, however, do not comply with either section 1104 or section 1112. Approval of the Secured Lenders Plans would thus be in complete contravention of the Bankruptcy Code.

14.    It is black letter law that a chapter 11 debtor has the right to operate its

own business and manage its own assets as a debtor in possession.  11 U.S.C. § 1107(a) and

1108.  The only way to divest control of the estates from a debtor is by seeking a motion to

appoint a chapter 11 trustee pursuant to section 1104 of the Bankruptcy Code or to convert the

chapter 11 case to a case under chapter 7 pursuant to section 1112 of the Bankruptcy Code.

Both sections 1104 and 1112, however, require specific findings to be made by the court, such

as the finding of cause, before appointing a chapter 11 trustee or converting a chapter 11 case to

a case under chapter 7.  *See* 11 U.S.C. §§ 1104(a) and 1112(b)(1).

15.    The Secured Lenders have not made any motion pursuant to sections

1104 or 1112 of the Bankruptcy Code, nor have they even attempted to demonstrate "cause" for

the extraordinary relief that they seek.  The fact is, there is simply no cause for divesting

control of the assets from the Debtors.   In their efforts to reorganize, the Debtors have fully

complied with this Court's orders and the provisions of the Bankruptcy Code.  Moreover, the

Debtors' business has performed well under difficult circumstances, and has generated positive

cash flow throughout the chapter 11 process.  The Debtors have also cooperated with their

creditors and other parties in interest throughout these chapter 11 cases, and disclosed all

material information as required.  Although the Debtors have been unsuccessful to date in

obtaining adequate exit financing to confirm their proposed chapter 11 plans, the Debtors'

efforts were hampered by the collapse of the capital markets in the last year and the downturn

in the economy, as evidenced by the collapse of major financial institutions such as Lehman

Brothers and Washington Mutual and the bankruptcy filings of two of the "Big Three" auto

makers, Chrysler and General Motors.  The outlook for the economy and the capital markets,

however, is starting to pickup and the Debtors are fervently working on alternatives to exit

chapter 11 and expect to file an amended chapter 11 plan within the next week.

16.    Moreover, not only do the Secured Lenders Plans impermissibly attempt

to bypass the requirements imposed by sections 1104 and 1112(b), they are also fail to comply

with other provisions of the Bankruptcy Code.  The Secured Lenders Plans, for example,

provide that immediately upon confirmation, the Trustees will be authorized to

> continue ongoing operations of the Debtor's businesses while
> pursuing one or more sales of the assets, either on a going
> concern or a liquidation basis . . . [and] shall be vested with any
> and all authority to operate the businesses of [the Debtor],
> including without limitation the hiring and/or firing of corporate
> officers, entry into contracts, termination of contracts, and the
> determination of compensation levels (including "stay bonuses"
> to incent quick resolution of the Plan and sales hereunder), all
> without the need for further Court authority.

Secured Lenders Plans, § 5.3..  Thus, the Secured Lenders Plans not only contemplate

appointment of an operating trustee without establishing cause as required by the Bankruptcy

Code, but also propose to strip the Court of its authority over the Debtors' assets prior to the

Effective Date.  Without the Court's supervision, the Trustees will have *carte blanche* authority

to dispose of assets and manage operations in a manner that may not be in the best interest of

unsecured creditors, shareholders, or other parties in interest.  *In re Beyond.com Corp.*, 289

B.R. 138, 143-44 (Bankr. N.D. Cal. 2003), is squarely on point.  There, the court rejected a

disclosure statement because the proponent's chapter 11 plan failed to satisfy the requirements

of section 1129(a)(1) by, *inter alia*, authorizing a liquidating trustee to dispose of the debtor's

assets without further court approval.  The *Beyond.com* court held that a plan that "affords the

[plan proponent] the prerogative to comply selectively with the provisions of the Bankruptcy

Code and Rules without judicial supervision . . . fails to satisfy the requirements of

§ 1129(a)(1)." *Beyond.com*, at 144. As in *Beyond.com*, the Secured Lenders Plans do not meet

the requirements of Section 1129(a)(1) and are thus patently unconfirmable.

> (b)    Confirmation of the Secured Lenders Plans
> <u>will likely result in a default under the DIP Loans</u>

17.    The DIP Loan provides that it shall be an "Event of Default" if "an

interim or permanent trustee in any of the Chapter 11 Cases" is appointed. Final DIP Order,

Exhibit A, ¶ 7(b). Upon this Event of Default, and without further application or motion to the

Court, the DIP Lenders may declare all obligations to be immediately due and payable. *Id.* at

¶ 7. Accordingly, if the Secured Lenders Plans are confirmed and the Trustees are appointed

upon confirmation to take control of the Debtors' assets, the DIP Lenders would likely be

entitled to declare $4 million in obligations to be immediately due and payable, leaving the

Secured Lenders Trustees with no liquidity to continue operating the business. The Secured

Lenders Disclosure Statement does not disclose this risk, nor do they explain how the Trustees

will be able to satisfy these the DIP Loan upon confirmation of the Secured Lenders Plans.

> (c)    The Secured Lenders Plans do not ensure that all administrative
> <u>expense claims will be paid in cash in full</u>

18.    The Secured Lenders Plans are structured to maximize the speed of the

recovery for the Secured Lenders at the expense of a likely diminution, or total elimination, of

value available for the Debtors' other creditors and equity holders. Specifically, the Secured

Lenders Plans provide that proceeds of sales of the Debtors' assets between confirmation and

the Effective Date will be used first to pay off the claims of the Secured Lenders (the "<u>Secured</u>

<u>Lenders Claims</u>") prior to the Effective Date. Yet, administrative expense claims will not be

paid until the later to occur of (i) the Effective Date and (ii) the date on which an administrative

expense becomes an allowed claim, or as soon as reasonably practicable thereafter. *See, e.g.*,

Secured Lenders LPC Plan at Section 2.1.  Thus, the Secured Lenders Claims can arguably be

paid off before it is known whether sufficient proceeds remain to pay administrative expense

claims in full in cash (or as otherwise agreed with the holders of such claims).

19.     This treatment of administrative expense claims is impermissible under

section 1129(a) of the Bankruptcy Code, thus making the Secured Lenders Plans patently

unconfirmable.  Section 1129(a)(9) requires that holders of administrative expense claims

receive payment in full in cash upon the effective date of a plan (unless otherwise agreed).  11

U.S.C. § 1129(a)(9).  By authorizing the payment of the Secured Lenders Claims prior to the

Effective Date, the Secured Lenders Plans do not ensure that sufficient funds are left over in the

estates to pay in full in cash all administrative expense claims.  Moreover, the fact that the

Trustees would have authority under the Secured Lenders Plans to dispose of the Debtors'

property without court supervision accelerates the problem, as there will be no court oversight

to ensure that the assets are sold for the highest possible price.  The possibility that there will be

insufficient funds to pay administrative expense claims is even implied in the Secured Lenders

Plans because the plans contemplate that it is possible that the Effective Date will never occur

if the proceeds of the sales are not sufficient to fund distributions.  *See* Secured Lenders Plans,

§ 11.1.  The Secured Lenders Plans are silent as to what happens to the proceeds that were used

to pay off the Secured Lenders Claims in the event the Effective Date does not occur;

presumably, the Secured Lenders will keep such proceeds to the detriment of all other parties in

interest.  Such complete disregard for the requirements of section 1129(a)(9) should not be

countenanced and the Disclosure Statements should not be approved.

12

(d)     The Secured Lenders Plans artificially impair the Secured Lenders Claims

20.     The Secured Lenders Plans artificially impair the Secured Lenders

Claims by claiming to not pay the Secured Lenders certain interest and premiums to which they

are not even entitled; all in the apparent attempt to create an accepting impaired creditor class

in the high likelihood that no other impaired creditor class accepts the Secured Lenders Plans.

21.     Section 1129(a) of the Bankruptcy Code provides that certain

requirements must be met to confirm a plan, including that:

> If a class of claims is impaired under the plan, at least one class of claims
> that is impaired under the plan has accepted the plan, determined without
> including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10).

22.     Section 1124(1) of the Bankruptcy Code provides that a class of claims

is impaired unless a chapter 11 plan "leaves unaltered the legal, equitable, and contractual

rights to which such claim or interest entitles the holder of such claim or interest. . . ." 11

U.S.C. § 1124.   For purposes of section 1129(a)(10), a chapter 11 plan must demonstrate that

"the proposed impairment . . . is necessary for economical or other justifiable reasons and not

just to achieve a cram down." *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr.

S.D.N.Y. 1995).   Put differently, "for purposes of 11 U.S.C. § 1129(a)(10), a claim is not

impaired if the alteration of rights in question arises solely from the [plan proponent's] exercise

of discretion." *In re Gramercy Twins Assocs.*, 187 B.R. 112, 118 (Bankr. S.D.N.Y. 1995)

(citing *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993)).

23.     The Secured Lenders Plans do not alter the rights of the Secured

Lenders.   The Secured Lenders claim that the Secured Lenders Claims are impaired because the

Secured Lenders Plans do not pay the Secured Lenders default interest or prepayment

premiums.   Not only have the Secured Lenders failed to show that such treatment is

economically necessary, but they fail to show that the Secured Lenders are even entitled to such interest and premiums.

24.     In the Final DIP Order, the Secured Lenders waived the right to receive default interest from the commencement of these chapter 11 cases to the termination of the use of their cash collateral. *See* Final DIP Order at Paragraph 8(i)(a).  Moreover, in the Final DIP Order, the Debtors reserved the right to challenge the default interest for the post-termination date period. *Id.*  The use of cash collateral has not yet expired.  Accordingly, the Secured Lenders do not yet have claims to any default interest and, consequently, their legal rights are not affected by nonpayment.  To the extent the Secured Lenders will argue that they are waiving their right to receive the default interest after termination of the use of cash collateral, the claims to such interests are at best, contingent, and at worst, speculative, as termination of use of cash collateral under the Secured Lenders Plans would not be in the best interests of even the Secured Lenders.

25.     Moreover, the Debtors do not believe that the Secured Lenders are entitled to any prepayment premiums because there has been no prepayment of the Senior Debt (other than the payments authorized under the Final DIP Order).  Nor have the Secured Lenders disclosed what prepayment premiums they are entitled to receive.  Accordingly, the Secured Lenders are artificially trying to create an impaired accepting class to satisfy section 1129(a)(10) of the Bankruptcy Code.  It is a near-certainty that the Secured Lenders Plans will not be accepted by any other impaired creditor class, thus making the Secured Lenders Plans uconfirmable under section 1129(a) of the Bankruptcy Code.

## The Committee Plan Is Patently Unconfirmable

26.      Likewise, the Committee Plan cannot be confirmed because it too fails to satisfy all of the provisions of section 1129(a) of the Bankruptcy Code.  Specifically, the Committee Plan provides a disparate treatment to creditors within Class 5 (Senior Subordinated Note Claims), which violates section 1123(a)(4) of the Bankruptcy Code.  Moreover, the Committee's proposed Exit Facility, commitments for which are yet to surface, conveys so much value to certain members of the Committee at the expense of all other creditors, that it appears unconfirmable on its face for failure to meet the good faith requirement of section 1129(a)(3).

27.      Section 1123(a)(4) of the Bankruptcy Code requires that any chapter 11 plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  The failure to satisfy section 1123(a)(4) makes a chapter 11 plan unconfirmable under section 1129(a)(1) of the Bankruptcy Code.

28.      The Committee Plan does not provide the same treatment to each claim in Class 5 (Senior Subordinated Note Claims).  Class 5 is comprised of  74.4% of claims held by an ad hoc group of hedge funds (the "Ad Hoc Committee") that acquired a blocking position in the senior subordinated notes prior to these chapter 11 cases in order to dictate the terms of any restructuring, and 22.7% of claims held by Michael A. Lubin, Warren Delano and their affiliates (the "Minority Holders").  During the chapter 11 cases, the Ad Hoc Committee was essentially reconstituted into the Committee and the purported lenders of the Committee Exit Facility will apparently be members of the Ad Hoc Committee (the "Purported Lenders"), although the identity of these lenders is not disclosed in the Committee's Disclosure Statement.

15

As described above, the Committee Exit Facility contemplates that the Purported Lenders will provide a $10 million loan in exchange for (i) a $10 million five year term note at an interest rate of at least 13.5%, (ii) 35% of the equity in the reorganized Debtors, and (iii) a $1.5 million fee in a form an additional note, the terms of which have yet to be disclosed. *See* Committee Plan at Exhibit 1.43.  Based on even the lower range of the Committee's valuation of total enterprise value of $60 million, *see* Committee Disclosure Statement at Section 5, the Debtors estimate that the 35% equity interest in the reorganized Debtors would amount to approximately $5 million, thus making the total consideration that the Purported Lenders would receive for their $10 million loan be a $6.5 million up front distribution plus an over time payment of a $10 million note at an annual interest rate of at least 13.5% – that is a stunning 65% fee for a loan that already carries a hefty interest rate.  The Debtors are not aware of any chapter 11 case where such an extravagant compensation structure has been approved for any loan or equity investment, nor has the Committee cited any. But for the size of the loan, this compensation structure would constitute criminal usury under New York law.  *See* N.Y. Penal Code § 190.40.  It is patently inconsistent with the Committee's responsibilities as a fiduciary for all unsecured creditors.

29.    Because it cannot reasonably be considered market, the compensation to be provided the Purported Lenders under the Committee Exit Facility should be considered a gift to be provided to the Purported Lenders on account of their Class 5 Claims, thus providing a significantly greater distribution to certain members of Class 5, but not others, such as the Minority Holders.  Such disparate treatment within the same class is not allowed under section 1123(a)(4), thus making the Committee Plan patently unconfirmable under section 1129(a)(1).

## The Disclosure Statements Lack Adequate Information

30.      In the event the Court finds that any of the Plans are not patently unconfirmable, the Court should require that certain changes be made to the relevant Disclosure Statements before it they are sent out for solicitation.  Section 1125(a)(1) provides that before a plan proponent may solicit votes on a plan, it must provide holders of claims or interests a disclosure statement approved by the court as containing adequate information to enable "a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).  Therefore, a disclosure statement should contain "'all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan.'"  *In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (quoting *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981)).

31.      The Disclosure Statements lack important information and disclosures necessary for creditors and equity holders to evaluate the Committee Plan and the Secured Lenders Plans.   Neither Disclosure Statement adequately informs parties in interest of the significant risks with the implementation of their plans.   The Secured Lenders Disclosure Statement, for example, fails to disclose the risk that the DIP Loans will likely become due and payable at confirmation as a result of the appointment of the Trustees and the risk that the Trustee may not have the funds to continue operation of the business and sell it as a going concern.  The Secured Lenders provide no valuation information at all in their Disclosure Statement, giving creditors and shareholders no basis to assess the Secured Lenders liquidating plan.  It also fails to provides estimates of potential recoveries for each creditor class, thus making it impossible for creditors and shareholders to make an informed decision as to what recoveries they may receive under the Secured Lenders Plans.

32.     As for the Committee Disclosure Statement, it fails to disclose who will
operate the reorganized Debtors after emergence from chapter 11, and does not contemplate
disclosing who will comprise the initial officers of the reorganized Debtors until after the
voting deadline.  Based on information and belief, the Debtors expect that the boards of
directors and management of the reorganized Debtors will differ under the Committee Plan
from the existing boards of directors and management.  In such circumstance, to make an
informed decision, creditors and shareholders must know whether the Committee even has
anyone in mind yet to operate the reorganized Debtors – it is not clear from the Committee
Disclosure Statement that they do.

33.     The unconfirmable defects in the Committee Plan and the Secured
Lenders Plans, together with the deficiencies in each plan's respective Disclosure Statement,
are fundamental.  It is clear that both sets of chapter 11 plans were developed with one thought
in mind:  how to best benefit the proponents of the plans without regard to the best interests of
other creditors and the Debtors' estates.  Because of the patent deficiencies in the Secured
Lenders Plans and the Committee Plan, it would be a waste of the estate resources to send these
plans out for solicitation.

**Alternative Relief**

34.     If the Court is inclined to approve any of the Disclosure Statements, the
Debtors request that the Court require that the proponent of such Disclosure Statement hold off
commencing solicitation of its chapter 11 plan until the Court has had an opportunity to
consider the Debtors' Disclosure Statement.  Seriatim solicitation would only confuse voters
and add a significant amount of additional expenses for these estates.  Simultaneous solicitation
would not only be economically efficient, but it would result in the least amount of confusion

for creditors and shareholders and have fewer chances of causing material disruption to the

Debtors' businesses.  A short delay in the solicitation process will not prejudice the proponents

of the Disclosure Statements.

WHEREAS the Debtors request that the Court deny approval of the Disclosure

Statements and grant such other relief as each just.

Dated: October 1, 2009
       New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession