Hearing Date and Time: October 6, 2009 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: October 1, 2009 at 4:00 p.m. (prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
: 
In re                                                                  :    Chapter 11 Case No.
                                                                          :
**LEXINGTON PRECISION CORP., et al.,**          :    08-11153 (MG)
                                                                          :
            Debtors.                                             :    (Jointly Administered)
                                                                          :
----------------------------------------------------------x

**DEBTORS' OBJECTION TO THE MOTION BY AGENTS TO THE PREPETITION
SECURED LENDERS TO SET ASIDE CERTAIN STANDSTILL AGREEMENTS, TO
PERMIT GORDIAN GROUP TO SOLICIT INTEREST IN POTENTIAL SALES OF
THE DEBTORS' BUSINESS UNITS AND/OR ASSETS, AND FOR RELATED RELIEF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or the "Debtors"), as debtors and debtors in possession, for their objection to the motion (the "Motion") of CapitalSource LLC, as Revolver Agent under the Prepetition Credit Agreement, and CSE Mortgage Finance LLC, as Term Loan Agent under the Prepetition Loan Agreement (collectively, the "Agents") to set aside certain "Standstill Agreements," to permit Gordian Group, LLP ("Gordian") to solicit interest in potential sales of the Debtors' business units and/or assets, and for related relief [Docket No. 718], respectfully represent as follows:

**Preliminary Statement**

1. The Debtors commenced these chapter 11 cases 18 months ago facing three financial problems: an overleveraged balance sheet, a secured credit facility that was maturing in the medium-term but in the meantime was being paid interest and principal, and an organized group of hedge funds who had acquired a blocking vote in the Debtors' bonds and wanted to dictate the terms of any restructuring. Shortly after filing, the Debtors faced a fourth problem – the Great Recession of 2008-09.

2. Coinciding almost exactly with these chapter 11 cases, the financial crisis felled companies with far greater financial resources than the Debtors. Despite the challenges of operating in chapter 11, a near-depression in the global economy, and the collapse of the OEM auto market, the Debtors have performed remarkably well in chapter 11. In 2008, one of the worst years for the global economy in recent memory, the Debtors generated approximately $8.5 million in earnings before interest, taxes, depreciation and amortization ("EBITDA"). Lexington also has generated positive cash flow from operations throughout the chapter 11 cases, even while consolidating its connector seals business with other operations in order to reduce costs and preserve value for all constituencies. With the restructuring now accomplished, in August 2009 the Debtors generated nearly $1 million in EBITDA before restructuring expenses.

3. Throughout the chapter 11 cases, the Debtors have continued to make current interest and principal payments to their secured lenders (the "Secured Lenders"). Since the cases began, the Debtors have paid the Secured Lenders approximately $3 million in interest payments and reduced the principal balance of the loans by approximately another $4.8

million. The Debtors will begin October with approximately $3 million in cash, roughly the same amount they had when they entered chapter 11 in April 2008.

4.    Although the chapter 11 process has not gone nearly as quickly as the Debtors had hoped, the cases are far from unsuccessful and in fact have achieved exactly what chapter 11 was intended to do. The protection of chapter 11 has enabled the Debtors to preserve the jobs of almost 500 employees, continue supplying parts to customers, and maintain value for all creditors and holders of equity interests, all while *paying down* $4.8 million in secured debt.

5.    Yet, the Agents claim that there has been no positive momentum toward a resolution of the chapter 11 cases and instead propose through the guise of chapter 11 plans to liquidate the Debtors through what essentially amounts to be a de facto appointment of a chapter 11 trustee. In furtherance of their patently unconfirmable chapter 11 plans,[1] the Agents ask that the Court grant the following extraordinary relief:

- appointment of Gordian as an <u>exclusive</u> agent to market the Debtors' assets prior to confirmation of any chapter 11 plan;

- an order setting aside commonplace confidentiality agreements;

- relief from contractual confidentiality provisions that the Agents agreed to; and

- an order forcing the Debtors to cooperate with the Agents' competing chapter 11 plans.

---

[1] On September 1, 2009, the Agents filed chapter 11 plans (the "<u>Lender Plans</u>") for the Debtors and a proposed disclosure statement thereto (the "<u>Lender Disclosure Statement</u>"). Contemporaneously herewith, the Debtors filed an objection to the Lender Disclosure Statement ("<u>DS Objection</u>"). For the reasons set forth in the DS Objection, the Lender Plans are patently unconfirmable because, among other things, they contemplate a de facto appointment of an operating trustee without any showing of cause and fail to provide for the payment of administrative expense claims in full.

3

6.  Each of the Agents' requests is unwarranted and should not be granted by the Court.

**Objection**

A.  **Appointment of Gordian as an Exclusive Agent to Market the Debtors' Assets is Inappropriate**

7.  As discussed in more detail in the DS Objection, the Lender Plans are patently unconfirmable because, among other things, they contemplate transferring control of the Debtors' assets to a liquidating trustee during the chapter 11 cases – a move that is akin to appointment of a chapter 11 trustee or conversion to chapter 7, but without a showing of cause as required under sections 1104 and 1112 of the Bankruptcy Code, respectively. The Agents' request to appoint Gordian as exclusive agent to market the Debtors' assets is in furtherance of these patently unconfirmable plans. Because the Lender Plans are patently unconfirmable, the Court should not authorize any actions in furtherance thereof.

8.  Even if the Court were to approve the Lender Disclosure Statement, authorizing Gordian to start marketing the Debtors' assets prior to approval of the Lender Plans would be premature. Until a chapter 11 plan is confirmed that divests control of the Debtors' assets from the Debtors, it is inappropriate to authorize a third party to market the Debtors' assets without the Debtors' consent.[2] It is especially inappropriate to appoint that third party as an <u>exclusive</u> agent to market the Debtors' assets. By appointing Gordian as an exclusive agent to market the Debtors' assets, the Court would effectively be divesting control of the assets from the Debtors because the Debtors would no longer be able to market or sell the assets

---

[2] It is for this reason that the Lender Plans are additionally unconfirmable. The Lender Plans are premised on quick sales of assets between confirmation of the Lender Plans and emergence from chapter 11. To prevent fire sales of assets, the Agent seek to market the assets prior to confirmation. However, as this relief is inappropriate, the Lender Plans will result in fire sales of assets to the detriment of the Debtors' creditors and other parties in interest.

4

themselves – their key right as fiduciaries of the estates. The Agents cite no case law or precedent for their extraordinary request. That is because the relief they are seeking can only be done in the context of a motion to appoint a chapter 11 trustee or to convert the cases to chapter 7 – a motion that the Agents have not made as they surely know that there is no "cause" for such relief under sections 1104 or 1112 of the Bankruptcy Code.

**B.    "Standstill Agreements" Are Enforceable and Should Not Be Set Aside**

9.    During these chapter 11 cases, in connection with exploring various alternatives for emergence from chapter 11, the Debtors entered into numerous confidentiality agreements with financial parties (the "<u>Confidentiality Agreements</u>"). Contrary to the Agents' suggestion that there were nefarious reasons for these agreements, the Confidentiality Agreements were entered into to protect the confidential information that the Debtors provided to each signatory of those agreements. Although these Confidentiality Agreements do contain a provision prohibiting the signatories from taking certain actions for a period of two years, those provisions were intended to prevent the signatories from using the Debtors' confidential information to the detriment of the Debtors' estates, by for example, buying up controlling positions in the Debtors' securities in order to block the Debtors' proposed reorganization – and not to prevent some other third party from proposing a chapter 11 plan. These types of provisions are commonplace in the industry, as the Agents admit. *See* Motion, ¶ 46.

10.    The Agents' contention that the Confidentiality Agreements have created a de facto extension of the Debtors' exclusive periods is misplaced. The Agents appear to misunderstand the concept of exclusivity. In the Motion, the Agents allege that

> A central tenet of the Bankruptcy Code is the concept of "debtor in possession," whereby the Debtors remain in control of the reorganization process for the duration of the exclusive periods set forth in Section 1124 of the Bankruptcy Code.

5

Motion, ¶ 53.  The Agents appear to believe that the Bankruptcy Code somehow prevents a debtor from being a "debtor in possession" once its exclusivity periods expire.  Nothing in section 1107 of the Bankruptcy Code, however, or in section 1121 of the Bankruptcy Code, links the concept of "debtor in possession" with exclusivity.  The expiration of the Debtors' exclusive periods does not divest the Debtors of control over the chapter 11 cases.  The loss of exclusivity under section 1121 just means that parties in interest, <u>in addition</u> to the Debtors, may propose a chapter 11 plan.  It does not mean that the Debtors no longer have an ability to propose their own chapter 11 plans or that the Debtors have to do everything possible to make it easier for parties in interest to confirm their plans.  Even if the Confidentiality Agreements are making it more difficult for the Agents to find potential purchasers now, as the Agents contend, this is irrelevant.  The Lenders Plans have not been (and likely will not be) confirmed; so it is inappropriate for the Agents to be soliciting offers for assets they have not right to sell.  If and when the Lender Plans are confirmed, the Debtors do not object to the relevant provisions of the Confidentiality Agreements being set aside so that the Agents can implement the Lenders Plans.   Until the plans are confirmed, however, it is appropriate for the signatories to the Confidentiality Agreements to continue to abide by all provisions of such agreements.

11.    Nor does the Agents' argument that the Confidentiality Agreements should be set aside as invalid under section 363 of the Bankruptcy Code have any merit.  The Agents fail to cite a single case where a court has ruled that the Bankruptcy Code requires approval of confidentiality agreements, nor could the Debtors find any.

12.    First, entering into the Confidentiality Agreement is within the ordinary course of business, under either the "vertical dimension" or the "horizontal dimension" tests. *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re*

6

*Coordinated Apparel, Inc.,* 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).  Under the horizontal dimension test, the court makes an industry-wide comparative analysis of the debtor's business to other similar businesses and considers whether such other businesses would engage in the proposed transaction.  *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, *17 (Bankr. S.D.N.Y. Mar. 21, 2003) (citing *In re Lavigne*, 114 F.3d at 385).  As the Agents admit, confidentiality agreements and standstill agreements are common in negotiations over equity infusions.  Motion, ¶ 52.  Companies in the Debtors' industry, including the Debtors, engage in negotiations over potential equity or capital infusions all the time.  Chapter 11 debtors engage in negotiations over exit financing routinely as well and enter into confidentiality agreements at the initial stages of any negotiations without court approval.  The Debtors satisfy the vertical dimension test as well.  Under the vertical dimension test, a court analyzes the transaction "from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those [it] accepted" when it initially contracted with the debtor.  *In re Lavigne*, 114 F.3d at 385.  A hypothetical creditor is not in greater economic risk from a confidentiality agreement.  A hypothetical creditor does not expect that once a debtor's exclusive periods expire, the debtor will lose control over the reorganizion process – for the reasons set forth above, that is simply not the case under the Bankruptcy Code; the Secured Lenders' mistaken understanding of the Bankruptcy Code should not be imputed to a hypothetical creditor.

    13.  Even if the Confidentiality Agreements were not entered into in the ordinary course of business, section 363(c) would not be applicable.  The relevant section to look at would be section 363(b) of the Bankruptcy Code, which provides which contracts must be approved by the court if they are entered into outside the ordinary course of business.

7

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, . . .". 11 U.S.C. § 363(b)(1). The Confidentiality Agreements do not provide for the use, sale or lease of property of the estates; accordingly, no prior court approval of such agreements was necessary. Accordingly, the Confidentiality Agreements are enforceable and should not be set aside by the Court.

**C.    Agents Should Abide by the Confidentiality Provisions They Agreed to**

14.    In the Prepetition Credit Agreement and the Prepetition Loan Agreement, the Agents agreed to hold non-public information that they received from the Debtors confidential, but carved out the ability to disclose such information to a limited group of parties. *See* Prepetition Credit Agreement, § 17.15; Prepetition Loan Agreement, § 17.15. The Agents now ask the Court to relieve them from their obligations to comply with the provisions that they, as sophisticated financial institutions, contractually agreed to. Their request is two-fold: (i) authority to use confidential information in the Lender Disclosure Statement, and (ii) to provide such information to potential purchasers, subject to any confidentiality agreements the Agents deem necessary. Although the Debtors do not object to the Agents including in the Lender Disclosure Statement any financial information that is already publicly available or that the Debtors have used in connection with their chapter 11 plans, the Debtors do not believe it is appropriate for the Court to modify contractual provisions between sophisticated parties, absent extenuating circumstances, to allow the Agents to disclose the Debtors' confidential information to potential purchasers without the Debtors' consent.

8

08-11153-scc    Doc 736    Filed 10/01/09    Entered 10/01/09 15:41:00    Main Document
Pg 9 of 10


**D.    Debtors Should Not be Forced to Help Formulate the Lender Plans**

15.    Not only do the Agents ask this Court to effectively displace the Debtors from control over their assets, but they are asking the Court to order the Debtors to help the Agents to do so.  Again, the Agents misunderstand the consequences of loss of exclusivity.  As discussed above, the loss of the Debtors' exclusive periods merely allows other parties in interest to propose their own chapter 11 plans; it does not require the Debtors to assist such parties in interest to make their chapter 11 plans feasible or confirmable.  To the extent the Lender Disclosure Statement is approved and the Agents require service lists for solicitation of the Lender Disclosure Statement, the Debtors have no problems providing the Agents with the relevant service lists.  However, to the extent the Agents seek the Debtors' assistance with respect to claims against the Debtors and other information that is necessary in connection with implementation of the Lender Plans, the Debtors, who will be displaced by a liquidating trustee, should not be required to assist the Agents – that will be the job of the liquidating trustee.

16.    Accordingly, the relief the Agents seek in the Motion is totally inappropriate and should not be approved by this Court.  The Agents should not be allowed to subvert the chapter 11 process by getting relief they would not otherwise be entitled to.

WHEREAS the Debtors request that the Court deny the Motion and grant such other relief as each just.

Dated: October 1, 2009
    New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue

        New York, New York 10153
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtors and
        Debtors in Possession

10