**HEARING DATE:  October 6, 2009 at 2:00 p.m. (prevailing Eastern Time)**
**OBJECTION DEADLINE:  October 1, 2009 at 4:00 p.m. (prevailing Eastern Time)**

WALLER LANSDEN DORTCH & DAVIS LLP
John C. Tishler (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for the Senior Prepetition Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                     :
**In re**                                            :          **Chapter 11 Case No.**
                                                     :
**LEXINGTON PRECISION CORP., et al.,**               :          **08-11153 (MG)**
                                                     :
          **Debtors.**                               :          **(Jointly Administered)**
                                                     :
-------------------------------------------------------------x

### OBJECTION OF AGENTS FOR PREPETITION SECURED LENDERS TO COMMITTEE'S MOTION FOR APPROVAL OF DISCLOSURE STATEMENT, SOLICITATION PROCEDURES, AND CONFIRMATION PROCEDURES

By and through the undersigned attorneys, CapitalSource Finance LLC, as Revolver

Agent (defined below) to the Prepetition Revolver Lenders (defined below) and CSE Mortgage

LLC, as Term Loan Agent (defined below) to the Senior Term Loan Lenders (defined below),

hereby object to the *Official Committee Of Unsecured Creditors' Motion For Order (I)*

*Approving Proposed Disclosure Statement In Respect Of Committee's Joint Chapter 11 Plan For*

*The Debtors, (II) Approving Solicitation Procedures And (III) Setting A Hearing And Establishing Notice And Objection Procedures For Confirmation* (the "<u>Motion</u>") and state as follows:

The Prepetition Secured Lenders are committed to judicial economy and will seek to resolve disclosure-related issues regarding the Proposed Committee Disclosure Statement and their own Proposed Disclosure Statement through consensual adjustments to the relevant documents based on discussions with the parties in interest.  To the extent such discussions do not result in a consensual resolution, such outstanding issues can be resolved at the hearing on the Motion scheduled for October 6, 2009.  Also, to the extent that the Court is willing to entertain confirmation-related issues regarding the Proposed Committee Disclosure Statement and underlying Proposed Committee Plan at the October 6th hearing, the Prepetition Secured Lenders set forth such objections below, including grounds that such confirmation-related issues are ripe for determination at the disclosure statement stage.

## I.     <u>Summary of Objection</u>

1.     Because the Proposed Committee Plan (defined below) is patently unconfirmable, the accompanying disclosure statement should not be approved.  Chiefly, the Proposed Committee Plan provides that there will be no meaningful principal reduction of the Prepetition Secured Lenders' claims and their collateral position is impaired (they will receive only 75% of any collateral sales).  Even though the Credit Agreements upon which the Prepetition Secured Lenders' claims are founded matured on May 31, 2009, the Proposed Committee Plan intends to stretch payments to the Prepetition Secured Lenders over three years, to pay below market interest with only one percent amortization, to delete protective financial covenants and to possibly prime the Prepetition Secured Lenders' claims with an $8,000,000 working capital

facility.  The Prepetition Secured Lenders intend to vote against such treatment, and such treatment does not satisfy the requirements of 11 U.S.C. §1129(b) for confirmation over the Prepetition Secured Lenders' objections.  Accordingly, the Court should deny approval of the Proposed Committee Disclosure Statement because the Proposed Committee Plan, among other things, does not satisfy the cram-down provisions of the Bankruptcy Code.  Further, because the Debtors' cash flow on a trailing twelve months' basis shows that the Debtors cannot service the debt service payments the Committee (defined below) suggests the Prepetition Secured Lenders be given, the Plan is unfeasible and patently unconfirmable. Finally, because the Proposed Committee Plan depends upon a form of substantive consolidation which is simply not appropriate under these circumstances, the Proposed Committee Plan is legally flawed and should not be approved.

## II.    Background Facts

2.      The Debtors commenced these Chapter 11 cases on April 1, 2008 (the "Commencement Date").  No trustee or examiner has been appointed in these cases and the Debtors remain debtors in possession of their respective estates.

### A.  General Debt Structure of the Debtors

3.      Prior to the Commencement Date, the Prepetition Secured Lenders made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, forbearance agreements and discretionary funding letters executed by any Debtor and any Other Documents (as defined in each of the Prepetition Credit Agreement (defined below) and the Prepetition Loan Agreement (defined below)), the "Prepetition Secured Lender Loan Documents"):

a.      that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Prepetition Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent; and

b.      that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Prepetition Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent," and together with the Revolver Agent, the "Agents"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as lenders, the "Prepetition Term Loan Lenders," and together with the Prepetition Revolver Lenders, the "Prepetition Secured Lenders").

4.      Both of the Debtors are primary obligors on both the Prepetition Credit Agreement and the Prepetition Loan Agreement, with essentially all assets of both Debtors serving as the Collateral for the two loans.  Both loans were accelerated pre-petition.  Both loans also matured, by their terms, on May 31, 2009.

5.       Pursuant to an indenture, dated as of December 18, 2003, between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes which came due on August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes").  As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.  The Senior Subordinated Notes are general unsecured obligations of LPC.  LRGI is not liable for the Senior Subordinated Notes.

6.       According to LPC, approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates. Approximately 74.4% of the Senior Subordinated Notes are held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date.  Three members of the Ad Hoc Committee and the Indenture Trustee now serve as members of the statutory creditors' committee (the "Creditors' Committee" or the "Committee") in the Chapter 11 Cases.

7.       As described in the Disclosure Statement, LPC and LRGI are separate business units, with each debtor engaging in differentiated and distinct business pursuits and incurring trade debt with separate sets of trade creditors.

**B.   Cash Collateral Usage and Defaults; Exclusivity**

8.       All told, the Debtors have had use of the Prepetition Secured Lenders' cash collateral for a year and a half (or 548 days) and counting.  Through the five cash collateral orders having been entered thus far in the Chapter 11 Cases (collectively, the "Cash Collateral

Orders" and each a "Cash Collateral Order"), the Debtors have failed to live up to three conditions expressly negotiated and agreed to by the Debtors.

9.      Such failures include, without limitation:

    a.      Pursuant to Section 11(viii) of the first Cash Collateral Order dated April 17, 2008, the Debtors' failure to confirm and consummate a plan of reorganization that provides for the indefeasible payment in full of the obligations to the Prepetition Secured Lenders within three hundred thirty (330) days of the Commencement Date, i.e. February 25, 2009.

    b.      Pursuant to Section 11(vii) of the first Cash Collateral Order dated April 17, 2008, the Debtors' failure to maintain on a cumulative basis, for the period from April 2, 2008 through February 6, 2009, net sales of at least 90% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under such first Cash Collateral Order.  The Prepetition Secured Lenders have reserved rights with respect to such default.

    c.      Pursuant to Section 13(vii) of the second Cash Collateral Order dated March 4, 2009, the Debtors' failure to maintain on a cumulative basis, for the period from April 2, 2008 through May 1, 2009, net sales of at least 85% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under such second Cash Collateral Order.  The Prepetition Secured Lenders have reserved their rights regarding such default.

10.      Recently, as reflected by the fifth Cash Collateral Order, dated September 22, 2009, the Debtors and the Prepetition Lenders agreed to a further short-term extension for the Debtors' use of the Prepetition Secured Lenders' cash collateral through October 30, 2009, on

substantially the same terms as the third and fourth Cash Collateral Orders, dated May 20, 2009, and August 17, 2009, respectively. The Prepetition Secured Lenders are not obligated and have not agreed to any further extension of the Debtors' use of their cash collateral.

11.    The Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances expired on April 30, 2009 and June 1, 2009, and have not been extended. Despite the expiration of the exclusive periods, the Debtors, together with their financial advisor, have taken affirmative steps to maintain de facto exclusivity with respect to a significant portion of potential exit avenues through their execution of certain Standstill Agreements (as defined and as described in greater detail below).

**C.    The Mediation Process**

12.    In connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of the Prepetition Secured Lenders' cash collateral and the Debtors' third motion to extend the exclusive periods, the Bankruptcy Court ordered that the Debtors, the Creditors' Committee, and the Prepetition Secured Lenders attend mediation sessions regarding valuation, structure of potential consensual plans of reorganization, and the ultimate resolution of these chapter 11 cases.

13.    Nearly a month after entry of the order directing the parties to choose a mediator, the parties agreed upon the appointment of Seymour Preston, Jr., of Goldin Associates as mediator, who conducted several mediation sessions with the Debtors and the Creditors' Committee after submission of valuation reports from their respective financial advisors. The Prepetition Secured Creditors were neither invited to be nor were they involved in the mediation, as the principal disputes described in Section III.D of the Prepetition Secured Lenders' Disclosure Statement between the Debtors and the Creditors' Committee have continued to

persist in the chapter 11 cases.  As a result, the mediation has not produced an agreement between the Debtors and the Creditors' Committee to date.

**D.  The Debtors' Abandoned Plan**

14.     Prior to the original Cash Collateral Deadline, the Debtors developed and pursued their own plan of reorganization (the "Debtors' Proposed Plan"), but because of their inability to obtain a firm commitment for exit financing, the Debtors delayed the Bankruptcy Court's consideration of their disclosure statement (the "Debtors' Proposed Disclosure Statement") multiple times and eventually abandoned their plan as it is currently formulated.

15.     A puzzling feature of the Debtors' Proposed Plan included the use of LRGI estate assets to satisfy claims of creditors of the LPC estate despite the Senior Subordinated Notes and the Junior Subordinated Note being obligations of only LPC.  To date, no consolidation motion has been filed by the Debtors and the Debtors have maintained separate books and financial statements for LRGI and LPC.  The Prepetition Senior Lender Loan Documents treat both LRGI and LPC as primary obligors (in contrast to the documents relating to the Senior Subordinated Notes and the Junior Subordinated Note, which only refer to LPC as an obligor and without any obligation of LRGI).

16.     Since the expiration of the Debtors' Exclusive Periods, the Debtors and their financial advisor have taken steps to explore potential investments from financial parties in order to pursue some modified form of the Debtors' Proposed Plan.  The Debtors' efforts have yielded little results since the eight (8) months from the last-scheduled date for the Debtors' Disclosure Statement Hearing on February 9, 2009.

17.     As set forth more fully in that certain *Motion by Agents to the Prepetition Secured Lenders to Set Aside Certain Standstill Agreements to Permit Gordian Group to Solicit Interest*

*in Potential Sales of the Debtors' Business Units and/or Assets, and for Related Relief* (Docket No. 718, the "Standstill Motion"), the Debtors have taken affirmative steps to chill the reorganization process for parties other than the Debtor, including locking up certain financial parties through "Standstill Agreements" and preventing such parties from discussing alternative exit strategies with the Prepetition Secured Lenders or the Creditors' Committee.  Predictably, the Debtors have refused to waive the lock-up feature to allow for other exit options to be pursued or even explored.

### E.   The Prepetition Secured Lenders' Plans

18.    In connection with the Prepetition Secured Lenders' objections to the Debtors' first motion for non-consensual usage of Cash Collateral and the Debtors' third exclusivity motion, the Prepetition Secured Lenders suggested that a sale process be explored as a potential alternative exit strategy to these Chapter 11 Cases.  The passage of time has revealed that a sale plan is the only exit strategy with a reasonable likelihood of success.

19.    Certainly the additional time with the Debtors at the helm of these cases has brought us no closer to closure.  The expiration of the Debtors' exclusive periods, typically a catalyst to a negotiated resolution or a contested and/or competing plan process, has been met with tepid response.  Virtually no progress has been made with respect to negotiations among the primary parties in interest in these cases.  The mediation process has been unsuccessful, and the Debtors are taking active steps, as represented by the Standstill Agreements, to prevent other parties from mounting a successful plan process.  Such inertia supports the Prepetition Secured Lenders' view that the only exit plan with a reasonable chance at success is a sale plan.[1]

---

[1] During the mediation process, the Debtors and Committee apparently worked on a Plan with the mediator whereby the Debtors would solicit an investment sufficient to pay a significant sum to the bondholders, while stretching the Prepetition Secured Lenders. The chief flaw in this approach, the Prepetition Secured Lenders believe, is that the

20.    In light of the significant delays in the Debtors' development of a reasonable exit strategy from the Chapter 11 Cases, the Agents, in consultation with the Prepetition Revolver Lenders and the Prepetition Term Loan Lenders, have developed the Prepetition Secured Lenders' Plans in order to provide a rapid recovery of value through a sale process set forth in the Prepetition Secured Lenders' Disclosure Statement.  The sale processes are to be conducted by a Post-Confirmation trustee (the "Post-Confirmation Trustee") in consultation with sale agent Gordian Group, LLC ("Gordian"), which currently serves as investment banker to the Prepetition Secured Lenders.

21.    The lack of any acceptable alternative plan has become apparent during the eighteen (18) months of the Chapter 11 Cases, which have resulted in an abandoned reorganization plan from the Debtors and only once the Prepetiton Secured Lenders filed their plans, a reactionary plan from the Committee.  Accordingly, the Prepetition Secured Lenders have been forced to present a reasonable avenue for the Debtors' exit from the Chapter 11 Cases, lest the Chapter 11 Cases continue to languish and both the value erode and the prospects for recovery dwindle.   Based upon a review of the market for a sale of the Debtors' businesses and conversations with potentially interested parties, it appears that a sale or sales of the Debtors' assets is the best option for recovery by the constituents in the Chapter 11 Cases.

22.    As set forth more fully in the Standstill Motion, the Prepetition Secured Lenders have developed the Proposed Plans in an effort to fully market the Debtors' businesses and/or assets for recovery to the benefit of the estates.  Such factors include a fulsome marketing process and treatment of the LRGI estate and the LPC estate as separate bankruptcy estates (reflecting the corporate form employed by the Debtors during the operation of their businesses

---

bond debt is only the obligation of one of the two debtors (the holding company). It would be inappropriate to take value from a non-obligor (LRGI) to pay a creditor of LPC.

both prior to and during the Chapter 11 Cases and providing recovery in line with the bargains struck by the creditors of each debtor).

### F.   The Committee's Reactionary Plan

23.     In response to the Prepetition Secured Lenders' Proposed Plans, the Committee quickly followed suit by filing its *Proposed Disclosure Statement For Official Committee Of Unsecured Creditors' Joint Chapter 11 Plan* (the "Proposed Committee Disclosure Statement") in respect of its proposed joint plan of reorganization (the "Proposed Committee Plan").

24.     The Proposed Committee Plan is a classic "paper plan," with most impaired classes of creditors receiving some sort of note payable or other instrument in satisfaction of their claim as opposed to an actual payout.  Specifically, the Committee suggests the following treatment for the Prepetition Secured Lenders:  a thirty-six (36) month refinancing of the Prepetition Secured Lenders' claims without any immediate paydown, with an eighteen (18) month moratorium on financial covenants and with only nominal amortization (1%) over such term.  Finally, sales of the Prepetition Secured Lenders' collateral will net the Prepetition Secured Lenders only seventy-five percent (75%) of such sales proceeds.  In sum, such conditions are materially worse than the original credit reflected in the Prepetition Secured Lender Loan Documents, both qualitatively and quantitatively.

25.     In addition, the amendment of the Proposed Committee Plan provides for an $8,000,000 asset based working capital facility, the source, terms, and security position of which are not disclosed.  Moreover, the Committee now proposes a moratorium of the financial covenants that exist in the Prepetition Credit Agreement.  These provisions reject the Committee's clear recognition of the Debtor's impending liquidity crisis shortly after the Effective Date

26.     Finally, the Proposed Committee Plan provides for the issuance of notes to each Debtors' unsecured creditors, the payment terms of which is not clear from the Proposed Committee Disclosure Statement.[2]

27.     Much like the Debtors' abandoned plan, the Proposed Committee Plan provides for certain "deemed consolidation" of the Debtors' estates for voting and distribution purposes:

> "In settlement and compromise of certain existing and potential disputes regarding intercompany claims and related matters, pursuant to Sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Debtors as comprising a single estate solely for the purposes of voting on the Plan, confirmation of the Plan and making Plan distributions in respect of Claims against the equity interests in the Debtors under the Plan. Such settlement and compromise shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities. This settlement and compromise (and the treatment derived therefrom) serves only as a mechanism to effect a fair distribution of value to the Debtors' constituencies. Intercompany claims between the Debtors shall, solely for the purposes of receiving Plan distributions, be deemed resolved and therefore not entitled to any Plan distribution and shall not be entitled to vote on the Plan."

Proposed Committee Plan, at § 5.1.  As described more fully below, such consolidation could work to vest an impaired accepting class of LPC with the power to bind non-accepting impaired classes of LRGI with respect to the fate of LRGI.  Aside from voting rights, there is not much more "substance" that could be involved with a consolidation of classes.

**G.  Procedural Posture**

28.     The Prepetition Secured Lenders filed their Disclosure Statement and Proposed Plans on September 3, 2009, together with their motion for approval and a notice of hearing.

---

[2] The Committee's Plan also does not identify how the Prepetition Secured Lenders' claims for pre-payment penalties or default interest will be treated. It further does not identify the full extent of the liens to be granted to the Prepetition Secured Lenders. For instance, there is nothing in the Committee Plan regarding the Prepetition Secured Lenders' liens against the equity of the Debtors.

Such items were served on September 4, 2009, or twenty-seven (27) days prior to the objection deadline of October 1, 2009.  A corrected notice of hearing (reflecting the correct hearing time) was filed and served on September 9, 2009, or twenty-seven (27) days prior to the hearing scheduled for October 6, 2009.

29.     The Committee filed the Motion on September 11, 2009, together with a notice of hearing, setting the objection deadline for October 1, 2009, or twenty (20) days from the mailing of the notice.  The hearing on the Motion is twenty-five (25) days from the mailing of the notice. The Committee has made no motion for the shortening of the applicable time periods under Rule 2002(b) of the Federal Rules of Bankruptcy Procedure.

### III.      Prepetition Secured Lender's Objection

30.     The Prepetition Secured Lenders' objection has three grounds:  the Proposed Committee Disclosure Statement cannot be approved because (i) the Committee has not given the requisite notice for parties in interest to formulate objections to the Proposed Committee Disclosure Statement, and (ii) the Proposed Committee Disclosure Statement does not contain adequate information, and (iii) the underlying Proposed Committee Plan is patently unconfirmable and approval is not in the parties' economic best interest for the following three reasons: (a) the plan does not meet confirmation requirements for approval over the Prepetition Secured Lenders' objection through cram-down, (b) fixing the confirmation flaws in the preceding subsection (a) renders the plan inescapably infeasible, and (c) the proposed substantive consolidation of the Debtors' estates grants creditor classes of LPC an impermissible ability to bind creditor classes of LRGI.

### A.    Inadequate Notice of Objection Deadline

31.    Rule 2002(b) of the Federal Rules of Bankruptcy Procedure requires that twenty-

five (25) days notice be provided to all creditors of the objection deadline with respect to a

disclosure statement (in relevant part):

> **Twenty-five-day Notices to Parties in Interest.**  Except as provided in
> subdivision (l) of this rule, the clerk, or some other person as the court may direct,
> shall give the debtor, the trustee, all creditors and indenture trustees not less than
> 25 days notice by mail of the time fixed … for filing objections and the hearing to
> consider approval of a disclosure statement…"

Fed. R. Bankr. P. 2002(b) (2008).

32.    As indicated above, the Committee provided only twenty (20) days notice

to creditors of the objection deadline to the Proposed Committee Disclosure Statement

and have made no motion to the Court for a shortening of such timing with respect to the

objection deadline.

### B.    The Proposed Committee Disclosure Statement Does Not Contain Adequate Information

33.    To approve the Disclosure Statement, the Court must find that it contains

adequate information to enable a reasonable creditor typical of the Debtors' claim holders to

make an informed judgment about the plan.  11 U.S.C. § 1125(a).  Adequate information is

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the

nature and history of the debtor and the condition of the debtor's books and records, that would

enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant

class to make an informed judgment about the plan.  11 U.S.C. § 1125(a)(1); Momentum Mfg.

Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d.

Cir. 1994).

34.    Section 1125 of the Bankruptcy Code places a heavy burden on the debtor to provide information, and the disclosure statement hearing is to be the "heart" of the bankruptcy case. *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 408 (1977) (Section 1125 "is the heart of the consolidation of the various reorganization chapters found in current law."). The importance of full disclosure is emphasized because of the reliance placed on the disclosure statement by the creditors and the court. The principle of disclosure is "of prime importance" in the reorganization process, <u>Momentum Mfg.</u>, 25 F.3d at 1136, and is the "pivotal concept of Chapter 11 reorganization," <u>Kuniea v. St. Jean Fin. Inc.</u>, 233 B.R. 46, 54 (S.D.N.Y. 1999).

35.    A disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution," <u>Ferretti</u>, 128 B.R. at 19; *see also* <u>In re Stanley Hotel, Inc.</u>, 13 B.R. 926, 929-30 (Bankr. D. Colo. 1981) ("…the information to be provided should be comprised of all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan").

36.    The Proposed Committee Disclosure Statement provides little or no disclosure as to the single most important aspect of the Proposed Committee Plan: the exit financing. The Proposed Committee Disclosure Statement simply mentions that $10 million in exit financing will be provided with a financing agreement to follow via the Plan Supplement (Proposed Committee Disclosure Statement, Section IV.D.1). Nowhere are the terms of the financing provided, a disclosure of whether there are conditions to funding, or even who the exit financier is. This is further seen in Exhibit M of the Proposed Committee Disclosure Statement which purports to be a schedule of sources and uses, but only provides the uses of the exit financing. As this financing is key to the Committee's Proposed Plan, and the Proposed Committee

Disclosure Statement fails to address the fact that the Proposed Committee Plan is contingent on this financing, of which limited information is provided, the Proposed Committee Disclosure Statement should not be approved.

37.    The Proposed Committee Plan contains the requirement of a intercreditor agreement being successfully negotiated between the Prepetition Secured Lenders and the providers of the exit financing.  The Proposed Committee Disclosure Statement does not delineate what the terms of this interecreditor agreement would be, or what would happen if an intercreditor agreement is not successfully negotiated between the parties.

38.    The Proposed Committee Plan further fails to disclose many of the terms of the New CapitalSource Credit Agreement.  Amongst these are whether the current loan structure will remain.  Currently, Prepetition Secured Lenders have a revolving credit facility as well as an equipment term facility outstanding to the Debtors.  The terms, as delineated in the Proposed Committee Disclosure Statement and Proposed Committee Plan, do not discuss these different facilities and whether both are subject to the terms as described in Exhibit 1.68 to the Proposed Committee Plan.  Other terms of the New Secured CapitalSource Credit Agreement not disclosed include a maturity date for the facility, an interest rate, an amortization schedule, or the amount of proceeds that will be allocated from the sale of assets to the paydown of the Prepetition Secured Lenders' facility.  Finally, the Proposed Committee Disclosure Statement states that the New CapitalSource Credit Agreement will include customary protections and covenants, but does not disclose what those protections and covenants are and whether they will be at least equivalent to the terms and conditions of the Prepetition Credit Agreement.

39.    The Proposed Committee Disclosure Statement does not address certain key aspects of the Prepetition Secured Lenders' claim, including but not limited to, whether accrued

but unpaid interest under the default interest rate, fees and charges will be included as a part of this claim. The Proposed Committee Disclosure Statement does not address among other things, whether the Prepetition Secured Lenders would retain their dominion and control over the Reorganized Debtors' cash position, or whether the Prepetition Secured Lenders would retain the senior lien on the stock of the LRGI.

40.      Exhibit 1.68 to the Proposed Committee Plan includes an option for the Reorganized Debtor to incur up to $8 million in a working capital facility. This facility is not addressed anywhere else in the Proposed Committee Disclosure Statement. The terms of this facility are not mentioned, and the collateral to secure this facility is not discussed. The relative priority of any liens also remains unclear. As this financial obligation is not only necessary to the restructuring, but also provides an additional drain on the cash flow of the Reorganized Debtors, it is information imperative to the decision making process and the Proposed Committee Disclosure Statement should not be approved without it. Moreover, the financial projections do not include underlying assumptions and do not appear to address the effects of such working capital facility.

41.      Class 5 of the Proposed Committee Plan, the Senior Subordinated Note Claims, are given 65% of the New LPC Common Stock to pay the claim in full. The Disclosure Statement does not address whether there will be dividend restrictions placed on this stock limiting the ability of these noteholders to be paid their claim prior to the Prepetition Secured Lenders. It is unclear from the Proposed Committee Disclosure Statement what the basis is for the allocation of 65% of the New LPC Common Stock. Relatedly, the allocation of 35% of the New LPC Common Stock to the exit financiers is unsupported by the Proposed Committee

Disclosure Statement.  More clarity of these issues is necessary before the Proposed Committee Disclosure Statement can be approved.

42.     While the Proposed Committee Plan includes a proposal to substantively consolidate the estates of LRGI and LPC, nowhere in the Proposed Committee Disclosure Statement is there a discussion of why this treatment is applicable to the case at hand.  The issue of substantive consolidation is discussed in greater depth below.

43.     The Proposed Committee Plan includes payment of the DIP Note as an administrative expense prior to payments to the Prepetition Secured Lenders (Proposed Committee Disclosure Statement, Section IV.A.4).  This fails to recognize that the DIP Note was contractually subordinated to the Prepetition Secured Lenders pursuant to Section 20 of the first Cash Collateral Order, dated April 17, 2008.  In the Proposed Committee Disclosure Statement, there is no discussion of this contractual subordination or why this contractual obligation should not be upheld.

44.     Section 10.8 of the Proposed Committee Plan provides the Reorganized Debtors the right to prosecute avoidance actions with any proceeds received from such prosecution to be used by the Reorganized Debtors.  Neither the Proposed Committee Plan nor the Proposed Committee Disclosure Statement address the fact that the Cash Collateral Orders  provide that the Prepetition Secured Lenders have received a replacement lien on such proceeds.

45.     Section 10.9 of the Proposed Committee Plan and the Proposed Committee Disclosure Statement fail to make mention of the release specifically granted to the Prepetition Secured Lenders in the Cash Collateral Orders.

46.     As the Proposed Committee Disclosure Statement described above, fails to
provide necessary information for the creditors of the Debtors' estates to make an informed
decision, the Disclosure Statement should not be approved.

## C.   The Underlying Plan is Unconfirmable

47.     In order for a bankruptcy court to confirm a plan, the plan must comply with the
applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).

48.     If a plan is unable to be confirmed under the applicable provisions of the
Bankruptcy Code, the accompanying disclosure statement should not be approved.  *See, e.g.*, In
re Main Street AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted
that a court may disapprove of a disclosure statement, even if it provides adequate information
about a proposed plan, if the plan could not possibly be confirmed"); In re Curtis Center LP, 195
B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("a disclosure statement should be disapproved where the
plan it describes is patently unconfirmable"); In re 266 Washington Assocs., 141 B.R. 275, 288
(Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where…it describes a
plan which is fatally flawed and thus incapable of confirmation); In re Copy Crafters Quickprint,
Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1989) (approval of disclosure statement should be
withheld if it is apparent plan will not comply with section 1129(a)).

49.     The reason is simple:  to avoid needless expense and effort.  *See* In re Allied
Gaming Mgmt., Inc., 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("…the estate should not be
burdened (both in terms of time and expense) with going through the printing, mailing, noticing,
balloting, and other exercises in the confirmation process where inability to attain confirmation is
a *fait accompli*").  In re Valrico Square Ltd. P'ship, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990)
("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time

of the Court and the parties"); In re S.E.T. Income Properties, III, 83 B.R. 791, 792 (Bankr. N.D.

Okla. 1988) ("A clear showing that the plan is not confirmable justifies denial of the sufficiency

of the disclosure statement to avoid the cost and delay of a fruitless venture").

50.      Moreover, at least one court, In re One Canandaigua Properties, Inc., 140 B.R.

616 (Bankr. W.D.N.Y. 1992), has recognized that "…there are factors which might lead a

bankruptcy court to exercise its discretion to rule on 'confirmability' issues prior to a hearing on

confirmation, and thereby achieve economy of resources and time." 140 B.R. at 618 (collecting

cases).  One basis proposed by the Canandaigua court is "where the issue requiring resolution

will have to be resolved sooner or later, and a sooner resolution is in the economic best interest

of all parties." Id.

51.      In the case at hand, there are three distinct failures of the Proposed Committee

Plan with respect to confirmation, which render sending such plan out for voting a fruitless

venture:  (1) the Proposed Committee Plan cannot meet the confirmation requirements for cram-

down over the Prepetition Secured Lenders' objection pursuant to Section 1129(b) of the

Bankruptcy Code; (2) adjusting the Proposed Committee Plan to address the confirmation issues

in the preceding section (1) simply renders the Proposed Committee Plan infeasible; and (3) the

proposed substantive consolidation of the Debtors' estates under the Proposed Committee Plan is

not warranted and grants impaired creditor classes of LPC an impermissible ability to bind

impaired creditor classes of LRGI.  In light of these significant fatal confirmation issues, no

economic interest is served by incurring the significant expense of soliciting votes on the

Proposed Committee Plan.

1.     **The Proposed Committee Plan Does Not Meet Cram-Down Requirements**

52.    Pursuant to Section 1129(b)(1) of the Bankruptcy Code, a requirement for approval of a chapter 11 plan without acceptance by a class of impaired secured claims requires that such plan be "fair and equitable" with respect to such non-accepting class.

53.    The concept of "fair and equitable" with respect to an impaired non-accepting class of secured claims includes, but is not limited to, the following results under the proposed plan: (a) the holders of such claims must retain their liens and "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property" (11 U.S.C. §§ 1129(b)(2)(A)(i)); or (b) where a plan provides such class "realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii). Neither standard is met in this case.

54.    The term sheet proposed for the notes to be distributed to the Prepetition Secured Lenders, as Exhibit 1.68 to the Proposed Committee Plan, shows that the Proposed Committee Plan is attempting to satisfy the lien retention and the deferred cash payment tests of 1129(b)(2)(A)(i). Under these tests, as noted above, the lenders must retain their liens in their collateral and receive payments which, when discounted to present value as of the plan effective date, at least equals the amount of the secured claim.

55.    The Proposed Committee Plan calls for seventy five percent (75%) of the proceeds received from the sale of assets, on which the Prepetition Secured Lenders have first priority liens, to be used to pay down the New Secured CapitalSource Notes. The failure to pay twenty five percent (25%) of the proceeds from such assets sales fails the lien retention requirement. Moreover, the proposed priority of liens securing the $8,000,000 working capital

facility is unclear, and any *pari passu* treatment or subordination of the Prepetition Secured Lenders' liens would run afoul of the lien retention requirement.

56.     In making the deferred cash payment calculation, the key factor is whether the interest is at a market rate.  The crucial numbers for making this calculation are clearly not final, since they are set forth in brackets in Proposed Committee Plan's Exhibit 1.68, but, assuming *arguendo* that they represent the actual proposal being put forth, they provide for three-year notes at an interest rate of LIBOR plus 6%. Three month LIBOR, the most commonly-used benchmark in commercial transactions, is currently around .30%, which would result in an interest rate of 6.3%. The committee's submission provides no evidence that 6.3% is anything close to a market rate of interest, and indeed, anecdotal evidence from the commercial marketplace indicates that 6.3% is well below market for a non-coerced commercial loan, particularly when the inherent risk factors for a company which has been in bankruptcy for a year and a half are factored in.  Moreover, this proposed interest rate does not take into account the fact that the Debtors' available cash flow will not be sufficient to sustain their continuing operations.

57.     Nor can the proposed treatment pass the indubitable equivalent test of 1129(b)(2)(A)(iii). One factor weighing heavily against the indubitable equivalent test is that the prepetition loans have matured by their terms. While there do not appear to be reported cases which state unequivocally that deferred cash payments cannot as a matter of law be the indubitable equivalent of full payment on the effective date, the fact that the loans have matured by their terms necessarily makes this standard a difficult one to meet.

58.     In In re Edgewater Motel, Inc., 85 B.R. 989 (Bankr. E.D. Tenn 1988), the court denied confirmation of a plan which proposed to pay a secured lender whose loan had

matured by its terms interest only for ten years, finding that the plan did not satisfy either the deferred cash payments test or the indubitable equivalent test. Here, even though the proposed payout is three years, the same analysis should apply.

59.    The Prepetition Secured Lenders intend to present proof by representatives from Gordian Group with respect to the proposed treatment of the Prepetition Secured Lenders under the Proposed Committee Plan in order to demonstrate the failure to meet the confirmation requirements of Section 1129(b)(2)(A) of the Bankruptcy Code. In summary, however, the trailing twelve month performance of these Debtors indicates that these Debtors have insufficient cash flow to service the Prepetition Secured Lenders' debt at the interest rate proposed by the Committee in its Plan, much less service at the higher market interest rate or  any interest associated with a prospective revolving credit facility or unsecured creditor notes. Merely hoping that there will be cash to pay the paper generated by the Proposed Committee  Plan is insufficient and makes the Proposed Committee Plan patently unconfirmable.

### 2.    <u>The Proposed Committee Plan is Not Feasible</u>

60.    Pursuant to Section 1129(a)(11) of the Bankruptcy Code, a requirement for confirmation of a plan is that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(10).

61.    Indeed, feasibility of the plan is often properly considered at the disclosure statement stage, not just confirmation. *See, e.g.*, <u>In re Ferretti</u>, 128 B.R. 16, 21 (Bankr. D.N.H. 1991) (denying approval of disclosure statement where plan contains inadequate basis for feasibility); <u>Copy Crafters</u>, 92 B.R. at 981 (denying approval of disclosure statement where plan

premised on shaky valuation and speculative sale);  In re Olive St. Invs., Inc., 117 B.R. 488, 490-

01 (Bankr. E.D. Mo. 1990) (denying approval of disclosure statement based partly on lack of

disclosure regarding feasibility of plan, including disclosure regarding factors affecting

availability of financing and debtor's inability to obtain commitment for financing); S.E.T., 83

B.R. at 794 (denying approval of disclosure statement because of plan's lack of feasibility).

62.    The Prepetition Secured Lenders intend to present proof by representatives from

Gordian Group with respect to the feasibility of the Proposed Committee Plan, once adjustments

have been made to conform with the confirmation requirements of Section 1129(b)(2)(A) of the

Bankruptcy Code.  Again, in summary, given the inability of the Debtors to generate cash flow

sufficient to satisfy the paper generated by the Proposed Committee Plan, the Proposed

Committee Plan is unfeasible and is patently unconfirmable.

### 3.    The Proposed Committee Plan Disenfranchises Creditors of LRGI

63.    As set forth above, the Proposed Committee Plan contains a substantive

consolidation provision in Section 5.1, which is innocuously titled "Intercompany Claims."  The

breadth of the section, however, should not be underestimated given its seemingly harmless title,

as the result is substantive consolidation of the Debtors' estates for voting and distribution

purposes.  Absent extraordinary circumstances, which are not present in this case, substantive

consolidation is inappropriate and renders the Proposed Committee Plan unconfirmable as

currently formulated.

64.    Substantive Consolidation is an extraordinary remedy, and has recently gotten

attention from the Third Circuit in a case involving a plan that is remarkably similar to the

construct of the Proposed Committee Plan:  In re Owens Corning, 419 F. 3d 195 (3d Cir. 2007),

which bases much of its reason on In re Augie-Restivo Baking Co., 860 F. 2d 515 (2d Cir. 1988),

a Second Circuit case which remains good law.  The structure of the Owens Corning case and the

case at hand are very similar, if not functionally identical:

**Owens Corning Structure**



65.     The relationship among the lenders and Owens Corning, the parent Delaware

corporation ("OCD") and its subsidiaries (the "OC Subsidiaries"), was established by a credit

agreement in 1997.  The OC Subsidiaries guaranteed the obligations under the credit agreement.

The credit agreement contained various provisions regarding corporate separation and

restrictions on certain transactions involving any of the OC subsidiaries, which provisions were

designed to protect the value of the guaranties.  Note that OCD was a publicly traded company,

so the loan agreement was public information.

66.     The relationship between the bondholders and OCD was established following a

1998 marketing effort.  The marketing effort involved a prospectus that mentioned the structural

subordination of the bonds to the lender loans (but also contained an apparently inaccurate

statement regarding the relative priority of the loans and the bonds).  There is some mention of

the indenture governing the bonds, which appears to post-date the prospectus.  Asbestos

claimants do not rely on any corporate form (unity or separateness) when they become claimants.

Trade claim reliance was not discussed in the opinion.

67.     The consolidation provision of the <u>Owens Corning</u> plan is also very similar to the

case at hand:  "All assets and liabilities of each Subsidiary Debtor…will be treated as though

they were merged into and with the assets and liabilities of OCD…"  <u>Owens Corning</u>, 419 F.3d

at 202, n7.  The court described such consolidation as a "deemed consolidation, under which a consolidation is deemed to exist for purposes of valuing and satisfying creditor claims, for voting for or against the Plan, and making distributions for allowed claims under it." Id. at 202.

68.    After lengthy discussion of the equitable nature of substantive consolidation and the doctrine's history through the past century, the Owens Corning court identified five principles for guidance when applying the equitable remedy of substantive consolidation:

(a)    Limiting the cross-creep of liability by respecting entity separateness…

(b)    The harms substantive consolidation addresses are nearly always those caused by debtors (and entities they control) who disregard separateness.

(c)    Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(d)    Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies…

(e)    While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

Id. at 211 (footnotes, citations, and certain internal quotations omitted).

69.    Ultimately, the Third Circuit adopted the Augie-Restivo factors and applied them as follows:

Absent consent, the following showing is required concerning the entities for which substantive consolidation is sought:

Either: (1) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity; or

(2) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

Id. at 211 (footnotes omitted).

70.    Applying this test to a fact pattern strikingly similar to these Chapter 11 Cases, the Owens Corning court denied the deemed substantive consolidation, as the harm of eliminating guaranty obligations against the subsidiaries (which were structurally superior to the Bondholder claims, asbestos claims, and trade claims against the parent OCD entity) far outweighed any benefit to the estates, which were not hopelessly entangled.

71.    Analysis of the Proposed Committee Plan in the context of LPC's and LRGI's structure reveals the same facts as Owens Corning:

**Lexington Structure**



The bondholders' and asbestos claimants' respective claims are against LPC, while the loan obligations are primary obligations of both LPC and LRGI.  This structure is actually more egregious than the simple structural superiority in Owens Corning, as the LRGI obligations to the Prepetition Secured Lenders are secured by the assets of LRGI.

72.    At first glance, the Committee's proposed consolidation may appear to be more difficult to evaluate than the Owens Corning consolidation, as the separateness of LPC and LRGI

is being preserved after distributions under the Proposed Committee Plan.  However, the impaired classes of creditors of LRGI, including the Prepetition Secured Lenders and the trade claimants, are being disenfranchised with respect to their respective right to vote (and perhaps control) the ultimate reorganization of LRGI.  Neither the bondholders nor the asbestos claimants are creditors of LRGI, but their likely acceptance of the Proposed Committee Plan is primed to satisfy the impaired accepting class requirement of Section 1129(b)(1) of the Bankruptcy Code as a result of the deemed "single estate" theory for voting purposes.

73.     Moreover, the consolidation of the LPC and LRGI estates with respect to distributions on account of equity interests in the Debtors is also a substantive consolidation.

74.     In order for the bankruptcy court to bless the substantive consolidation proposed under the Proposed Committee Plan over the objection of the Prepetition Secured Lenders and any unsecured creditors of LRGI only, the Committee will need to show the two prongs of the Owens Corning test, which stems from the "two critical factors" adopted by the Augie-Restivo court:

> (1)     Whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or

> (2)     Whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.

Augie Restivo, 860 F.2d at 518; see also In re Source Enters., Inc., 392 B.R. 541 (S.D.N.Y. 2008) (upholding Owens Corning and Augie-Restivo in *dicta*); In re Worldcom, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) (granting substantive consolidation based upon hopeless entanglement and benefit to all creditors); but see In re Munford, Inc., 115 B.R. 390, 395 n1 (Bankr. N.D. Ga. 1990) (interpreting the Augie-Restivo Court's factors as something less than "concrete barriers" or "iron-clad rules" when considering a motion to dismiss).

75.    In the case at hand, neither factor is supported.  First, in executing the Prepetition Secured Lender Loan Documents, the Prepetition Secured Lenders relied on the separate status of the Debtors and the expectation that the creditors of LPC would not be able to recover from LRGI's assets.  Evidence of such reliance includes the Prepetition Secured Lender Loan Documents' express references to certain permitted upstream distributions and the conditions regarding same.  Moreover, the Indenture, the Senior Subordinated Notes, and the Junior Subordinated Note all reflect the existence of LRGI as a subsidiary of LPC, but only LPC is the obligor on such instruments.  Second, the Debtors have maintained separate reporting obligations and financial records with respect to LPC and LRGI.

76.    In addition, none of the five policies undergirding the <u>Owens Corning</u> analysis is likely to pass muster in the case at hand.  Instead, the Committee is using substantive consolidation as a sword to disenfranchise the creditors of LRGI.  For example, to the extent the Senior Subordinated Note class, the Junior Subordinated Note class, or the Asbestos Claimant class accept the Proposed Committee Plan, it is conceivable that no class of creditors of LRGI voted to accept the Proposed Committee Plan yet the Proposed Committee Plan may be foisted upon them if the proposed consolidation is upheld.  Moreover, the construction of the various unsecured creditor classes does not appear to be supported by any rationale other than generating an accepted impaired class for the purposes of the Proposed Committee Plan.

## IV.    <u>Joinder and Reservation of Rights</u>

77.    The Prepetition Secured Lenders hereby join any objections to the Motion to the extent such objection is not inconsistent with this objection, and further reserve the right to amend, supplement, or withdraw this objection prior to or at the hearing on the Motion, and

reserve the right to oppose the Motion at the hearing on any grounds whatsoever, whether or not contained in this objection or any amendment or supplement hereto.

Based on the foregoing, the Agents object to the Motion and urge the Court to deny approval of the Proposed Committee Disclosure Statement, and not to enter the proposed order.

Respectfully submitted:

WALLER LANSDEN DORTCH & DAVIS LLP

*/s/ John C. Tishler*_____
John C. Tishler (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP

*/s/ Aaron R. Cahn*_____
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for Senior Prepetition Lenders*

## Certificate of Service

I hereby certify that on this the 1st day of October, 2009, a true and correct copy of the foregoing pleading was served upon the following parties in accordance with the notice of hearing filed by the Committee in connection with the Motion.

(a)     counsel to the Committee, Andrews Kurth LLP, 450 Lexington Avenue, 15th Floor, New York, New York 10017 (Attn: Paul Silverstein and Jonathan Levine);

(b)     the Debtors, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, New York 10023 (Attn: Michael A. Lubin);

(c)     counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Victoria Vron);

(d)     the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); and

(e)     counsel to the Debtors' postpetition agents, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

*/s/ Aaron R. Cahn*_____
Aaron R. Cahn