WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                        :

In re                        :         **Chapter 11 Case No.**
                        :

**LEXINGTON PRECISION CORP., et al.,**   :         **08-11153 (BRL)**
                        :

        **Debtors.**         :         **(Jointly Administered)**
                        :

-------------------------------------------------------------x

**DEBTORS' SIXTH MOTION FOR AUTHORIZATION,**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND**
**363(c), FOR CONTINUED USE OF CASH COLLATERAL**

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

        Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber

Group, Inc. ("Lexington Rubber Group" and, together with Lexington Precision, "Lexington" or

the "Debtors"), as debtors and debtors in possession, respectfully represent:

**Summary of Relief Requested[1]**

        1.        By this motion, the Debtors request entry of an order (the "Cash Collateral

Order"), pursuant to sections 105, 361, 362, and 363 of chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code"), authorizing the Debtors to use Cash Collateral (as defined

---

[1] Unless stated otherwise, all capitalized terms not defined in this summary shall have the meaning
ascribed to such term later in the proposed Cash Collateral Order annexed hereto.

below) in accordance with the terms set forth in the proposed Cash Collateral Order annexed

hereto as <u>Exhibit A</u>.  This is the Debtors' sixth request for an extension of the use of Cash

Collateral.  During the course of these chapter 11 cases, the Debtors have received a series of

extensions of the use of Cash Collateral, the original period of which expired on February 25,

2009.  In the previous seven months, the Court has granted a series of short extensions based on

the progress of these chapter 11 cases.  Because the Debtors are nearing the end of their chapter

11 cases and there is still have a significant equity cushion, the Debtors seek a further extension

of their use of Cash Collateral.  Such an extension will preserve the Debtors' enterprise value

and will ensure a smoother chapter 11 plan process.

      2.      In accordance with Rule 4001 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>"), the following is a summary of the terms of the proposed

use of Cash Collateral:[2]

    (i)    <u>Parties with Interest in Cash Collateral</u>.  The parties with interest in Cash
Collateral (collectively, the "<u>Prepetition Secured Lenders</u>") are (a)
CapitalSource Finance LLC and Webster Business Credit Corporation, as
agents and lenders under that certain Credit and Security Agreement,
dated as of May 31, 2006, and any other lenders party thereto, and (b)
CSE Mortgage LLC, as agent and lender, DMD Special Situations, LLC,
as lender, and any other lenders under that certain Loan and Security
Agreement, dated as of May 31, 2006.  Cash Collateral Order, ¶ C.

    (ii)    <u>Purposes for Use of Cash Collateral</u>.  The Debtors shall use Cash
Collateral for (a) working capital and capital expenditures, (b) other
general corporate purposes of the Debtors, and (c) the costs of
administration of these chapter 11 cases, each in compliance with the
Budget.  Motion, ¶¶ 28-29; Cash Collateral Order, ¶4.

    (iii)    <u>Termination Date</u>.  The Debtors' use of Cash Collateral will terminate
(a) upon the closing or dismissal of the chapter 11 cases, (b) upon the
conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the
Bankruptcy Code, (c) upon the appointment of a chapter 11 trustee in

---

[2] To the extent anything in this summary is inconsistent with the proposed Cash Collateral Order, annexed
hereto, the proposed Cash Collateral Order shall control.

these chapter 11 cases, (d) upon noncompliance with the terms of the Cash Collateral Order, (e) if cumulative expenditures exceed 110% of cumulative budgeted expenditures for any period, (f) if short-term investments and cash fall below agreed upon thresholds, (g) if net sales are less than 82% of the net sales reflected in the Budget, (h) upon entry of an order for the sale of more than $1,000,000 of the Debtors' assets that does not provide that the proceeds of such sale to be applied to the Prepetition Senior Secured Debt, (*i*) upon entry of an order authorizing the Debtors to obtain credit that is pari passu with or having priority over Prepetition Senior Secured Debt, (j) if the automatic stay is modified to permit foreclosure against Senior Lender Prepetition Collateral whose value exceeds $1 million, (k) if there is an uninsured loss with respect to the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens in an amount equal to or exceeding $1,000,000, or (*l*) on December 31, 2009.  Cash Collateral Order ¶ 14.

(iv)     <u>Adequate Protection</u>.  As previously provided by the "Third Cash Collateral Order,"[3] the Debtors will continue to make adequate protection payments ("<u>Adequate Protection Payments</u>") in amounts equal to interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Secured Lender Loan Documents, according to the schedule of interest and principal payments contained therein, until the occurrence of a Termination Event.  Further, for any diminution in the value of the Prepetition Secured Lenders' interests in the Cash Collateral from and after the Commencement Date, the Prepetition Secured Lenders shall have, subject to the Carve-Out defined below and the conditions and limitations identical to those imposed by the Cash Collateral Order: (a) continued replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Secured Lenders, had liens on the Commencement Date and as provided by the Cash Collateral Order (b) first priority security interests in and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) liens (subject to prior liens, if any) on all encumbered assets that were not otherwise subject to the Prepetition Secured Lenders' liens as of the Commencement Date and as provided by the Second Cash Collateral Order (collectively, the "<u>Adequate Protection Liens</u>").  Cash Collateral Order, ¶ 11.

(v)      <u>Carve-Out</u>.  The Carve-Out, as provided in the Third Cash Collateral Order, shall consist of payment of (a) fees of the clerk of the Court, the clerk of any court to which an appeal may be taken, and the United States

---

[3] Third Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, and 363 (i) Authorizing Debtors to Use Cash Collateral and (ii) Granting Adequate Protection to Prepetition Secured Lenders, dated May 20, 2009 [Docket No. 634] (the "<u>Third Cash Collateral Order</u>").

Trustee pursuant to 28 U.S.C. § 1930(a) and (b); (b) pursuant to section 726(b) of the Bankruptcy Code, reasonable fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and (c) upon the occurrence of the Termination Date or the Maturity Date (as defined in the "First Cash Collateral Order")[4] (which occurrences shall be the trigger dates of this clause and not the measuring points with respect to any fees or expenses), the aggregate allowed unpaid professional fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for services rendered and expenses incurred, as well as fees and expenses payable to any trustee or examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the payment thereof, in an amount not to exceed $500,000; provided that the first $400,000 only shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition Secured Lenders in respect of the Adequate Protection Claim, and the balance between $500,000 and the Prepetition Secured Lenders' Fee Carve-Out Amount shall be paid from whatever assets would be distributed on account of the DIP Super-Priority Claim; provided, further, that prior to the occurrence of the Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash Collateral and the DIP Loan (as defined in the First Cash Collateral Order), as the same may be due and payable, all professional fees and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination Date or the Maturity Date.  Cash Collateral Order, ¶ 17.

### **Jurisdiction**

3.        This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4] Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (i) Authorizing Debtors to Use Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Lenders, and (iii) Authorizing Postpetition Financing, entered on April 17, 2008 [Docket No. 61] (the "First Cash Collateral Order").

**Background**

4.     On April 1, 2008 (the "Commencement Date"), each of the Debtors

commenced with this Court a voluntary case under the Bankruptcy Code.  Sections 1107(a) and

1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and

manage their properties as debtors in possession.

5.     The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On

April 11, 2008, the United States Trustee for the Southern District of New York appointed the

statutory committee of creditors (the "Creditors' Committee").

6.     On April 1, 2008, the Debtors filed their first motion for authorization to

use Cash Collateral and enter into a debtor-in-possession financing facility (the "DIP Loan") (the

"First Cash Collateral Motion").  On April 17, 2008, the Court granted the First Cash Collateral

Motion on a final basis and entered the First Cash Collateral Order authorizing the use of Cash

Collateral through February 25, 2009, subject to certain conditions set forth therein.  The Court

granted further extensions of the use of Cash Collateral on February 24, 2009 (the "Second Cash

Collateral Order"), May 20, 2009 (the "Third Cash Collateral Order"), August 17, 2009 (the

"Fourth Cash Collateral Order"), and September 25,  2009 (the "Fifth Cash Collateral Order").

The Debtors' current use of Cash Collateral expires on October 30, 2009.

7.     On February 20, 2009, the Debtors filed a motion for authorization to

extend the termination date of the DIP Loan.  The lenders of the DIP Loan consented to an

extension of the termination date and on March 23, 2009 the Court (J. Gonzalez) entered an

order extending the termination date of the DIP Loan.[5]

---

[5] The maturity date of the DIP Loan was extended to earliest of (i) December 31, 2009, (ii) the date upon
which the Debtors' use of Cash Collateral (as defined in the Second Cash Collateral Motion) terminates,

## Anticipated Path to Conclusion of the Chapter 11 Cases

8.      The Debtors hope to emerge from chapter 11 as early as the end of 2009.

On October 6, 2009, the Debtors filed their third amended joint plan of reorganization under

chapter 11 of the Bankruptcy Code (as may be further amended, the "Proposed Plan")[6] and a

revised proposed disclosure statement with respect thereto (as may be further amended, the

"Proposed Disclosure Statement").[7]  Agents for the Prepetition Secured Lenders and the

Creditors' Committee also filed their own chapter 11 plans (the "Third Party Plans") and

proposed disclosure statements with respect thereto (the "Third Party Disclosure Statements").[8]

A hearing on the Proposed Disclosure Statement and the Third Party Disclosure Statements is

expected to be scheduled later this month.

9.      The Proposed Plan is premised on obtaining $10 million in exit financing,

$4 million of which will be provided by the existing postpetition lenders under the DIP Loan.

Like many other companies currently in chapter 11 trying to raise exit financing, the Debtors'

efforts in this regard have been hampered by the current credit crisis and the Debtors have not

---

(iii) the effective date of a confirmed chapter 11 plan of reorganization in these chapter 11 cases, (iv) the conversion of any of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (v) the appointment of a chapter 11 trustee in any of these chapter 11 cases or the appointment of an examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Debtor, and (vi) the date of acceleration by the DIP Lenders pursuant to section 7 (Events of Default) of the Note.

[6] Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated October 6, 2009.

[7] Proposed Disclosure Statement for Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, filed October 6, 2009.

[8] *See* Proposed Combined Disclosure Statement Regarding Prepetition Secured Lenders' Chapter 11 Plans for Lexington Rubber Group, Inc. and Lexington Precision Corporation, filed September 1,2 009 [Docket No. 695] (the "Secured Lenders DS"), filed in connection with the Prepetition Secured Lenders' Chapter 11 Plan [Docket No. 696], and the Prepetition Secured Lenders' Chapter 11 Plan for Lexington Rubber Group, Inc. [Docket No.697]; and Proposed Second Amended Disclosure Statement for Official Committee of Unsecured Creditors' Joint Chapter 11 Plan, filed September 29, 2009 [Docket No. 728], filed in connection with the Official Committee Of Unsecured Creditors' Proposed Amended Joint Chapter 11 Plan [Docket No. 708].

yet been able to secure the additional financing on satisfactory terms. The Debtors, however, are currently in discussions with a number of potential financing sources, including certain customers and potential investors, regarding exit financing and expect that these discussions will result in a commitment to provide the required financing. The Debtors submit that their Proposed Plan is confirmable and is in the best interests of creditors and equity holders.

10.     The process of approving the Proposed Disclosure Statement and confirming the Proposed Plan will take at a minimum another couple of months. To complete a successful restructuring, the Debtors require the use of Cash Collateral during the plan process. Under any of the Third Party Plans, even the chapter 11 plans filed by the Prepetition Secured Lenders, the continued use of Cash Collateral would be required.

11.     Accordingly, the Debtors believe that the interests of all constituencies would be best served by allowing the Debtors to continue using Cash Collateral while the Debtors, the Prepetition Secured Lenders and the Creditors' Committee undergo the process of getting the Proposed Disclosure Statement and the Third Party Disclosure Statements approved, and their respective chapter 11 plans confirmed, rather than taking the drastic actions that would be necessary if the Debtors were no longer able to use Cash Collateral. To provide sufficient time for the plan and disclosure statement processes to run their course, the Debtors are seeking a two-month extension of the use of Cash Collateral. As discussed below, the Prepetition Secured Lenders will remain adequately protected during this extension. Moreover, continuation of the use of Cash Collateral will further the interests of all constituencies by making sure that the Debtors operate as a going concern during the prosecution of their own chapter 11 plans, should the Court allow the disclosure statement with respect thereto to go out to creditors and equity holders for voting.

## The Debtors' Financial Performance and Equity Cushion

12.      Notwithstanding extraordinarily challenging economic conditions and the collapse of sales in the North American automobile OEM sector, the Debtors have continued to generate positive cash flow through the performance of their business lines that are not heavily dependent on the OEM sector and continue to maintain a significant equity cushion.

13.      For example, in the first eight months of 2009, the Debtors have generated net sales of approximately $40.5 million and earnings before interest, taxes, depreciation, amortization, and reorganization expenses ("EBITDAR") of approximately $3.4 million, after deducting negative EBITDAR of $2.2 million at their Vienna, Ohio facility, which was closed in the summer of 2009.   The Debtors forecast that for the fiscal year 2009, they will generate net sales of approximately $60.7 million and EBITDAR of approximately $8.1 million, after deducting the negative EBTIDAR at the Vienna, Ohio facility.  In addition, the Debtors had approximately $3 million in cash on hand at the beginning of October 2009, which is the same amount of cash that the Debtors had on hand when they started these chapter 11 cases in April 2008.

14.      The only drain on estate resources have been the outsized reorganization expenses and the adequate protection payments that the Debtors have been making to the Prepetition Secured Lenders under the cash collateral orders.  During the chapter 11 cases, the Debtors have paid the Prepetition Secured Lenders regular principal payments aggregating approximately $4.6 million and contractual non-default interest payments aggregating approximately $2.9 million, and have paid attorneys' and financial advisor fees of the Prepetition Secured Lenders aggregating approximately $1.2 million.  In addition, the Debtors have paid other professional fees aggregating approximately $5.1 million.

15.     The Debtors also continue to maintain a significant equity cushion.  The Debtors and the Prepetition Secured Lenders are parties to certain "Prepetition Credit Agreements," which are described in more detail in the proposed Cash Collateral Order, attached hereto as Exhibit A.  As of October 1, 2009, the Debtors were obligated to the Prepetition Secured Lenders in the approximate aggregate principal amount of $31.5 million, plus accrued and unpaid interest in the amount of approximately $5,000.  The value of the assets (the "Collateral") encumbered by the Prepetition Secured Lenders' liens significantly exceeds the aggregate amount of the obligations owed under the Prepetition Credit Agreements.  As set forth in the Proposed Disclosure Statement, the Debtors' financial advisor, W.Y. Campbell & Company, has determined that the enterprise value of the reorganized Debtors is $104.9 million, more than three times the outstanding debt owed to the Prepetition Secured Lenders.  Even the Creditors' Committee's financial advisor estimates the total enterprise value at more than twice the outstanding debt owed to the Prepetition Secured Lenders.  Although the Prepetition Secured Lenders did not include a valuation analysis in their proposed disclosure statement, by the assessment of the Prepetition Secured Lenders' own financial advisor, Dean Vomero of Bridge Associates, presented at the February 23-24, 2009 hearing, the Collateral, which comprises virtually all of the Debtors' assets, is worth $67.6 million, which is more than twice the amount of the Prepetition Secured Lenders' claims.  Consequently, the Prepetition Secured Lenders enjoy a substantial equity cushion.

### The Prepetition Secured Lenders Have Not Yet Consented to Extension of Use of Cash Collateral

16.     Prior to filing this Motion, the Debtors inquired as to whether the Prepetition Secured Lenders would consent to an extension of the use of Cash Collateral on the same terms as apply to the current use of Cash Collateral.  The Prepetition Secured Lenders have

not yet responded to the Debtors' request.  The Debtors hope that they will be able to reach a

consensual resolution of this Motion in light of the fact the Prepetition Secured Lenders are

abundantly oversecured and continue to receive regular principal and interest payments that

further reduce the amount of their claims.

17.    At this point, the only alternative to continued use of Cash Collateral is a

sale of a portion of the Debtors' core business.  A sale, however, will only benefit the Prepetition

Secured Lenders at the expense of all other economic stakeholders in these cases, as well as the

Debtors' customers and employees.  The value of the Debtors as a going concern is far greater

than the value in a liquidation or a section 363 sale.  The marketing of any business segment of

the Debtors, especially the medical business, will only frustrate the Debtors' ability to enhance

value for all constituencies because customers likely will be unwilling to commit new business to

the Debtors in the face of additional uncertainty about whether the company will be sold off in

pieces.

## **Argument**

**A.    Extraordinary Provision Under General Order No. M-274**

18.    The following term of the proposed use of Cash Collateral is considered

an "Extraordinary Provision" under the General Order M-274 of the United States Bankruptcy

Court for the Southern District of New York:

- Liens on Chapter 5 Causes of Action.  Subject to entry of the Cash Collateral
  Order, as adequate protection for the use of the Prepetition Secured Lenders' Cash
  Collateral, Prepetition Secured Lenders shall continue to hold a first priority
  security interests and liens upon causes of action under sections 542, 543, 544,
  545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code for any diminution
  in the value of the Prepetition Secured Lenders' interests in the Cash Collateral
  from and after the Commencement Date.

**B.     Necessity for Use of Cash Collateral**

19.     Without the use of Cash Collateral, the Debtors lack sufficient

unencumbered funds with which to operate their businesses on an ongoing basis.  The Debtors,

therefore, have an urgent and immediate need to continue their use of Cash Collateral for, among

other purposes, (i) working capital and capital expenditures, (ii) operating costs and expenses,

and (iii) restructuring costs, including professional fees and expenses.

20.     Absent authorization from the Court to continue the use of the Cash

Collateral, the Debtors and all economic stakeholders in these cases will be immediately and

irreparably harmed.  The Debtors' ability to maintain business relationships with their customers

and suppliers and to meet payroll and other operating expenses is essential to the Debtors'

continued viability and the value of their businesses as going concerns, the maintenance of which

inures to the benefit of all stakeholders in these cases.  Without the continued use of Cash

Collateral, the Debtors would be forced to cease business operations, terminate substantially all

of their employees, and, in all likelihood, seek conversion of these cases to chapter 7.  That

outcome likely would result in no recovery for unsecured creditors and equity holders.

**C.     Legal Standard For Use of Cash Collateral And Adequate Protection**

21.     Section 363 of the Bankruptcy Code governs a debtor's use of cash

collateral.  Under section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity

that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing,

authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. §

363(c)(2).  Section 363(a) defines "cash collateral" as follows:

> [C]ash, negotiable instruments, documents of title, securities,
> deposit accounts, or other cash equivalents whenever acquired in
> which the estate and an entity other than the estate have an interest
> and includes the proceeds, products, offspring, rents, or profits of

> property and the fees, charges, accounts or other payments for the
> use or occupancy of rooms and other public facilities in hotels,
> motels, or other lodging properties subject to a security interest as
> provided in section 552(b) of this title, whether existing before or
> after the commencement of a case under this title.

11 U.S.C. § 363(c)(2).

22.     It is universally acknowledged that a debtor's cash "is the life blood of the

business" and the bankruptcy court must assure that such "is available for use even if to a limited

extent." *In re Mickler*, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts typically authorize a

debtor to use cash collateral to continue its operations so long as the interests asserted by affected

creditors in such cash are adequately protected.

23.     If a secured creditor objects to the debtor's proposed use of cash collateral,

the court must ensure that the creditor's interests are adequately protected. *Id.* at § 363(e) (" . . .

[O]n request of an entity that has an interest in property used . . . the court, with or without a

hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of

such interest"). Thus, courts are required to balance the protection offered to a secured creditor

against the debtor's need to use cash in its reorganization effort. *Stein v. U.S. Farmers Home*

*Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982). In determining whether a creditor

is adequately protected, courts "will generally permit the business operation to continue, at least

to the point of plan formulation, if the debtors make a solid evidentiary showing to support their

projections . . . ." *In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993).

24.     Section 363(e) of the Bankruptcy Code provides that, "on request of an

entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e). "The concept of 'adequate protection'

is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate

protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of

adequate protection, including a cash payment or periodic cash payments, additional liens,

replacement liens, and the "indubitable equivalent of such entity's interest in such property."  11

U.S.C. § 361.

        25.     The determination of adequate protection is a "fact-specific inquiry."  *In*

*re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).  The focus of the adequate protection

requirement is to preserve a secured creditor's position at the time of the bankruptcy filing and

protect the secured creditor from diminution in the value of its collateral during the

reorganization process.  *Id.* at 288 (citation omitted); *Beker*, 58 B.R. at 736; *see In re WorldCom,*

*Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of

the Bankruptcy Code, which sets forth how adequate protection may be provided under section

363, makes clear that the purpose is to insure that the secured creditor receives the value for

which the creditor bargained for prior to the debtor's bankruptcy.").  "However, neither the

legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what

was bargained for by the parties."  *Id.* at 619; *see Beker*, 58 B.R. at 741 ("*Adequate* protection,

not *absolute* protection, is the statutory standard.") (emphasis added).

        26.     Notably, the Bankruptcy Code does not require a debtor to provide a

secured lender with "absolute protection" but only "adequate protection." *Beker*, 58 B.R. at 741.

An equity cushion is "the value of the property, above the amount owed to the creditor with a

secured claim, that will shield that interest from loss due to any decrease in the value of the

property during the time the automatic stay remains in effect."  *In re New Era Co.*, 125 B.R. 725,

728-29 (S.D.N.Y. 1991); *In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("It

is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of

adequate protection.").

27.    Courts routinely hold that an equity cushion of twenty percent or more

provides sufficient adequate protection.  *See*, *e.g.*, *In re Mendoza*, 111 F.3d 1264, 1272 (5th Cir.

1997) (recognizing that courts routinely find that a twenty percent equity provides sufficient

adequate protection); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1090 (4th Cir. 1986) (same); *In

re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984) (twenty percent equity cushion sufficient to

constitute adequate protection); *In re Wilson*, 378 B.R. 862, 890 (Bankr. D. Mont. 2007) (thirty-

nine percent equity cushion sufficient to constitute adequate protection).

### D.    The Use Of Cash Collateral And Proposed Adequate Protection Should Be Approved

28.    The Debtors propose to continue their use of the cash in compliance with a

budget (the "Budget") through and including December 31, 2009, a copy of which is attached as

Exhibit 1 to the proposed Cash Collateral Order.  The extension of the use of Cash Collateral will

allow sufficient time to (i) continue Debtors' efforts to obtain a commitment for exit financing,

and (ii) permit the plan process to proceed with respect to the Proposed Plan and the Third Party

Plans.  Because the Prepetition Secured Lenders are oversecured and more than adequately

protected, the Court should authorize continued use of Cash Collateral and allow the parties to

proceed with the plan process.

29.    The Prepetition Secured Lenders have never disputed that they are

oversecured.  As discussed above, under  the Debtors' or even the Creditors' Committee's

valuation of total enterprise value, the Prepetition Secured Lenders are oversecured by at least a

100% equity cushion.  In addition, the Debtors will continue to perform in accordance with

substantially all of the economic terms under the Fifth Cash Collateral Order, including making

regular principal and interest payments to further reduce the claims of and protect the Prepetition

Secured Lenders' interest in the Cash Collateral from any diminution in value (together with the

equity cushion, the "Proposed Adequate Protection").

30.    Because the Debtors' businesses remain stable and there is still a

significant equity cushion, the Proposed Adequate Protection is more than sufficient to allow the

Debtors to utilize the cash necessary for the operation of their businesses while the chapter 11

plan process moves forward.  Extending the use of Cash Collateral a mere two months subjects

the Prepetition Secured Lenders to very little, if any, risk of losing the substantial equity cushion

they enjoy.

### Conclusion

31.    In the circumstances of these chapter 11 cases, the Debtors' ability to

maintain business relationships with their customers and vendors, and meet payroll and other

critical operating expenses is essential to the Debtors' continued viability and the value of their

businesses as a going concern.  Indeed, absent continued use of the cash collateral, the Debtors'

businesses will be brought to an immediate halt, with disastrous consequences for the Debtors,

their estates, and their creditors.  Continued use of Cash Collateral is therefore of the utmost

importance to the preservation and maintenance of the value of the Debtors and essential to the

plan process, in which the Prepetition Secured Lenders themselves are participating, the efforts

that the Debtors have undertaken to secure exit financing, and the successful consummation of a

chapter 11 plan.

32.    The Prepetition Secured Lenders are significantly oversecured.  They are

adequately protected by a substantial equity cushion and have virtually no risk that they will not

be able to realize the value of their claims in full, even in an absolute worst-case scenario of

conversion to a chapter 7 liquidation.  The equity cushion alone is sufficient to adequately protect the interests of the Prepetition Secured Lenders, but on top of that the Debtors propose to continue cash payments to reduce the principal of the outstanding secured debt, and to pay interest at the contractual non-default rates.  For the reasons discussed herein, the Court should authorize the Debtors to continue their use of Cash Collateral.

## Notice

33.     No trustee or examiner has been appointed in these chapter 11 cases. Notice of this motion has been provided to (i) the United States Trustee for the Southern District of New York, (ii) the attorneys for the agents for the Prepetition Secured Lenders, (iii) the attorneys for the Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee, and (v) all other parties that have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

34.     Other than the relief provided under the First Cash Collateral Order, the Second Cash Collateral Order, the Third Cash Collateral Order, the Fourth Cash Collateral Order, and the Fifth Cash Collateral Order, no previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: October 14, 2009
      New York, New York

                        /s/ Adam P. Strochak
                        Richard P. Krasnow
                        Adam P. Strochak

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone:     (212) 310-8000

Facsimile:        (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

**(Cash Collateral Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
In re                                         :         **Chapter 11 Case No.**
                                              :
**LEXINGTON PRECISION CORP., et al.,**        :         **08-11153 (BRL)**
                                              :
        **Debtors.**                          :         **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

### SIXTH ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 361, 362, AND 363 (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS

Upon the Motion, dated October 14, 2009 (the "Motion") of Lexington Precision Corporation ("Lexington Precision") and Lexington Rubber Group, Inc. ("Lexington Rubber" and, together with Lexington Precision, the "Debtors"), as debtors and debtors in possession, for an order pursuant to sections 105(a), 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing them to (i) use Cash Collateral (as defined below) and (ii) grant adequate protection to the Debtors' Prepetition secured Lenders (as defined below), all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) the attorneys for the agents for the Debtors' Prepetition Secured Lenders (as defined below), (iii) the attorneys for the

Debtors' postpetition lenders, (iv) the attorneys for the Creditors' Committee (as defined below), and (v) all other parties that have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion; and based on the evidence adduced and the representations of counsel at the hearings on February 23, 2009, February 24, 2009, and October __, 2009 (the "Hearing") in support of the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS:**

      A.      On April 1, 2008 (the "Commencement Date"), Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

      B.      Debtors have retained possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On April 11, 2008, a statutory committee of unsecured creditors (the "Creditors' Committee") was appointed in these chapter 11 cases. No trustee, examiner, or any other committee has yet been appointed in these chapter 11 cases.

      C.      Prior to the Commencement Date, the Prepetition Secured Lenders (as defined below) made certain loans and other financial accommodations available to the Debtors pursuant to, among other things, the following documents (collectively, with any and all other agreements, instruments, and related documents, including without limitation, guaranties, pledges, and discretionary funding letters executed by any Debtor and any Other Documents (as

defined in each of the Credit Agreement (defined below) and the Loan Agreement (defined below)), the "Prepetition Secured Lender Loan Documents"):

(i) that certain Credit and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Credit Agreement"), between the Debtors, as borrowers, and CapitalSource Finance LLC ("CapitalSource"), as a lender, as collateral agent and administrative agent for itself and other lenders under the Credit Agreement (CapitalSource, when acting in such capacity, is herein called the "Revolver Agent"), and as Co-Documentation Agent, and Webster Business Credit Corporation ("Webster") as a lender (CapitalSource and Webster, as lenders, collectively the "Prepetition Revolver Lenders") and as Co-Documentation Agent;

(ii) that certain Loan and Security Agreement, dated May 31, 2006 (as amended to date and as may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), between the Debtors, as borrowers, and CSE Mortgage LLC ("CSE"), as a lender and as collateral agent for itself and each other lender under the Loan Agreement (CSE, when acting in such capacity, is herein called the "Term Loan Agent") (Revolver Agent and Term Loan Agent, collectively, the "Agents"), and DMD Special Situations Funding LLC, ("DMD"), as a lender under the Loan Agreement (DMD and CSE, as the Term Loan Agent and a lender under the Loan Agreement, along with the Revolver Agent and the Prepetition Revolver Lenders, collectively, the "Prepetition Secured Lenders");

4

(iii) that certain First Amendment and Default Waiver Agreement between Debtors and CapitalSource, Webster, CSE and DMD in their various capacities dated as of November 20, 2006; and

(iv) that certain Agreement dated as of May 18, 2007 by and among the Debtors, Agents (in their capacities as agents and lenders) and the other Prepetition Secured Lenders, as amended by that certain First Amendment to Forbearance Agreement, dated as of July 20, 2007, as further amended by that certain Second Amendment to Forbearance Agreement effective as of September 24, 2007, and as further amended by that certain Third Amendment to Forbearance Agreement executed December 11, 2007 and deemed effective as of November 26, 2007 (collectively, the "Forbearance Agreement").

D.    The Court (J. Gonzalez) approved the use of Cash Collateral by order dated April 17, 2008 [Docket No. 61] (the "First Cash Collateral Order") and this Court approved further extensions by orders dated March 4, 2009 [Docket No. 579] (the "Second Cash Collateral Order"), May 20, 2009 [Docket No. 634] (the "Third Cash Collateral Order"), August 17, 2009 [Docket No. 690] (the "Fourth Cash Collateral Order"), and September 25, 2009 [Docket No. 725] (the "Fifth Cash Collateral Order").

E.    As used herein, "Prepetition Senior Secured Debt," means all Obligations, as defined in the Prepetition Senior Lender Loan Documents, including, without limitation, costs, fees (including without limitation allowed prepayment or termination fees) and expenses that were outstanding under the Prepetition Secured Lender Loan Documents as of the Commencement Date. Without limiting the foregoing and in addition to any other amounts included in the Prepetition Senior Secured Debt, (i) the Debtors (a) acknowledge that section

5

14.1 of the Credit Agreement and section 3.8 of the Loan Agreement refer to the payment of prepayment premiums and/or termination fees (the "Prepayment Fees") and (b) refers to said sections as to the terms and provisions thereof, and (ii) the Prepetition Secured Lenders (a) reserve their rights to assert that the Debtors have an obligation to pay such Prepayment Fees and (b) acknowledge that the Debtors and all other parties in interest shall have the right to challenge or otherwise object to the payment of such Prepayment Fees.

F.    The Debtors represent, stipulate, acknowledge, and agree that:

(i) the Prepetition Senior Secured Debt is (a) legal, valid, binding, and enforceable against each Debtor; and (b) not subject to any contest, objection, recoupment, defense, counterclaim, offset, claim of subordination, claim of recharacterization, claim of avoidance of any nature, attack or challenge under the Bankruptcy Code, other applicable non-bankruptcy law, or otherwise;

(ii) all the Prepetition Senior Secured Debt is secured by the security interests in the Collateral (as defined below) previously granted under the Prepetition Secured Lender Loan Documents to the Prepetition Secured Lenders, that the Agents have, and will continue to have after entry of this Order, a legal, valid, enforceable, non-avoidable and continuing duly-perfected first priority security interest (and junior security interest, as applicable, subject to the terms of that certain Intercreditor Agreement dated as of May 31, 2006 between Revolver Agent, as agent and lender, Revolver Lenders, Term Loan Agent, as agent and lender, and Term Loan Lenders (the "Intercreditor Agreement")) in and lien on the Collateral, as more fully described and defined in the Prepetition Secured Lender Loan Documents (all such "Collateral", as the same existed on or at any time prior to the Commencement Date, together with all cash and non-cash proceeds thereof,

shall be hereinafter referred to as "Senior Lender Prepetition Collateral" and such liens

thereon shall be referred to as the "Senior Lender Prepetition Liens"), subject to no liens

or security interests other than the liens expressly permitted under the Prepetition Secured

Lender Loan Documents;

(iii) nothing contained herein in any way impairs the Prepetition Secured Lenders'

first and junior (as applicable in accordance with the terms of the Intercreditor

Agreement) priority lien status in the Senior Lender Prepetition Collateral;

(iv) as of the Commencement Date, and without giving effect to this Order, the

Debtors are not aware of any liens or security interests having priority over the Senior

Lender Prepetition Liens, except certain "Permitted Encumbrances" (as defined in the

applicable Prepetition Secured Lender Loan Documents);

(v) the Senior Lender Prepetition Liens in the Senior Lender Prepetition Collateral

were granted to the Prepetition Secured Lenders for fair consideration and reasonably

equivalent value, and were granted contemporaneously with the making of the loans

secured thereby; and

(vi) all cash of the Debtors wherever located on the Commencement Date (other

than the funds in the DIP Account (as defined in the First Cash Collateral Order))

represents either proceeds of loans under the Prepetition Secured Lender Loan

Documents or proceeds of the Senior Lender Prepetition Collateral; and pursuant to the

Prepetition Secured Lender Loan Documents and section 552(b) of the Bankruptcy Code,

the Prepetition Secured Lenders have a valid, duly perfected, first-priority lien upon and

security interest in and to all of the cash of the Debtors (other than the cash in the DIP

Account), and these funds, along with the proceeds of the Senior Lender Prepetition

Collateral, constitute "cash collateral" within the meaning of section 363(a) of the

Bankruptcy Code (the "Cash Collateral").

G.     The Debtors have an immediate need to use Cash Collateral and obtain

funds in order to permit, among other things, the orderly continuation of the operation of their

businesses, to maintain business relationships with vendors, suppliers and customers, to meet

payroll, to make capital expenditures and to satisfy other working capital and operational needs.

Good cause has been shown for the entry of this Order. Use of Cash Collateral and the obtaining

of funds is vital to avoid immediate and irreparable harm to Debtors' estates.

H.     The Debtors have requested that the Prepetition Secured Lenders consent

to the use of their Cash Collateral. The ability of the Debtors to continue their businesses and

reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors using such Cash

Collateral. The Prepetition Secured Lenders have not consented to the Debtors' use of Cash

Collateral. The adequate protection provided herein and other benefits and privileges contained

herein are consistent with and authorized by the Bankruptcy Code, Bankruptcy Rules 4001 and

6003 and Local Bankruptcy Rule 4001-3 and serve to adequately protect the Prepetition Secured

Lenders' interest in the Collateral securing their claims under the Prepetition Credit Agreements.

I.     The relief requested in the Motion is necessary, essential and appropriate

for the continued operation of the Debtors' businesses, the management and preservation of their

assets and properties, and is in the best interests of the Debtors, their estates, and creditors. Use

of Cash Collateral under the terms and conditions set forth herein is necessary to avoid

immediate and irreparable harm. Accordingly, good, adequate and sufficient cause has been

shown to justify the granting of the relief requested herein.

J.      Based on the record before the Court, the terms of the use of the

Prepetition Secured Lenders' Cash Collateral as provided in this Order have been negotiated at

arms' length and in "good faith," as that term is used in section 364(e) of the Bankruptcy Code,

and are in the best interests of the Debtors, their estates and creditors.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      The Motion is hereby granted as modified herein, with the foregoing

findings incorporated herein by reference.

<u>**Authorization to Use Cash Collateral**</u>

2.      Subject to the terms and conditions set forth in this Order, the Debtors are

authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use Cash Collateral

through the earlier of either December 31, 2009, or until the occurrence of a Termination Event

(as defined below).

3.      Pursuant to the First Cash Collateral Order and the order approving the

Debtors' centralized cash management system [Docket No. 25] (the "Cash Management Order"),

FirstMerit Bank N.A., Akron, Ohio ("FirstMerit") shall, subject to the terms of the Cash

Management Order (including the reservation of Debtors' rights to modify their cash

management system to comply with section 345(b) of the Bankruptcy Code), maintain the

Debtors' cash management system by which First Merit transferred all available funds in or

received in the Debtors' lockbox accounts and the consolidation account at FirstMerit into the

Debtors' master operating account at FirstMerit (the "Master Operating Account"), without the

necessity to comply with any lockbox or blocked account agreement or any preexisting transfer

arrangement concerning such accounts; provided, however, that the Master Operating Account,

along with all other bank accounts, deposit accounts and securities accounts established or in

existence on or after the Commencement Date, shall be subject to any and all security interests and liens granted hereunder and this Order shall be deemed the only action necessary to perfect such liens in favor of the Revolver Agent for the benefit of the Senior Prepetition Lenders.

4.    The Debtors shall use Cash Collateral only for (a) working capital and capital expenditures, (b) other general corporate purposes of the Debtors (including, without limitation, the making of Adequate Protection Payments (as defined below)), and (c) the costs of administration of these chapter 11 cases, with each of the foregoing in compliance with the budget (the "Budget"), which is annexed hereto as Exhibit 1 and incorporated herein by reference, subject to the permitted variances as provided for in this Order.

5.    Debtors may, with the prior written consent of the Revolver Agent and Term Loan Agent, use Cash Collateral in excess of the limits set forth in the Budget, as applicable; provided, however, that such consent shall not be necessary for variances that do not exceed, in the aggregate, 110% of the cumulative expenditures set forth in the Budget, as measured from October 30, 2009 through the Date of Determination (as defined below), with bi-weekly reports due to the Revolver Agent and Term Loan Agent by 5:00 p.m. on Wednesday following the end of the second week being reported, showing comparisons and percentage variance by line item as well as on a cumulative basis; provided further that the Debtors shall be allowed to make advance cash payments or deposits of cash (collectively, "Advances") in the amount of goods and services to be provided, if required by vendors, so long as all projected Advances are included as expenditures in the Budget, and all actual Advances are included in the reconciliation referred to in paragraph 14(v). The "Date of Determination" shall initially be November 13, 2009 and subsequently shall be every other Friday thereafter.

10

6.      In no event shall any costs or expenses of administration be imposed upon the Prepetition Secured Lenders or any of the Senior Lender Prepetition Collateral pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, except as set forth in paragraphs 8, 11, and 17.

7.      The Debtors shall (i) maintain their cash balance at the levels set forth in paragraph 14(vi) hereof, and (ii) provide the Revolver Agent and Term Loan Agent, prior to 5:00 p.m. on the Tuesday following the week being reported, a weekly reconciliation of net cash available to the Debtors compared to actual cash available through their Master Operating Account, DIP Account, and any other accounts. For the avoidance of doubt, the reconciliation will be a reconciliation of "book cash" to "bank cash."

8.      Notwithstanding anything herein to the contrary, no Cash Collateral (including without limitation the amounts held in the Master Operating Account) may be used by any of the Debtors (or any subsequent trustee), the Creditors' Committee, any other statutory committee or any other person or entity (i) to object to or contest in any manner, or raise any defense or contest to, the validity, perfection, priority or enforceability of the Prepetition Senior Secured Debt, the Senior Lender Prepetition Liens, and the Prepetition Secured Lender Loan Documents or under this Order, or to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims (whether under chapter 5 of the Bankruptcy Code or otherwise) or any other claims or causes of action against the Prepetition Secured Lenders, including without limitation for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, or 550 of the Bankruptcy Code (collectively, the "Claims and Defenses"); (ii) subject to paragraph 14(viii) below, to sell any portion of the Senior Lender Prepetition Collateral (other than sales of inventory in the ordinary course of business, sales to customers of tooling and

11

equipment that will be used by the Debtors to produce inventory for sale to such customers in the

ordinary course of business, and sales of surplus or obsolete equipment, provided that the fair

market value of the surplus or obsolete equipment to be sold after the Commencement Date shall

not exceed $50,000 in the case of any single transaction or $200,000 in the aggregate) without

either providing for the indefeasible payment of the Prepetition Senior Secured Debt (subject to

the provisions of paragraphs 11(i) and 18 hereof), any outstanding Adequate Protection

Payments, and any other allowed obligations accruing on or after the Commencement Date with

respect to the Prepetition Senior Secured Debt pursuant to the Prepetition Secured Lender Loan

Documents, section 506(b) of the Bankruptcy Code, or otherwise (the "Postpetition

Obligations") in full in cash on the sale closing date or obtaining prior written consent to such

sale from the Agents (subject to the Intercreditor Agreement); (iii) to incur any new indebtedness

that would be *pari passu* with or have priority over the Prepetition Senior Secured Debt and that

would not provide for the indefeasible payment of the Prepetition Senior Secured Debt (subject

to the provisions of paragraphs 11(i) and 18 hereof), any outstanding Adequate Protection

Payments, and the Postpetition Obligations, in full in cash on the closing date of such financing;

or (iv) to modify the rights of the Prepetition Secured Lenders under this Order.

        9.      [Omitted].

**<u>Exit Transaction Reporting</u>**

        10.     The Debtors shall continue providing the Agents with detailed bi-weekly

written reports by 5:00 p.m. every other Tuesday regarding their efforts with respect to an exit

transaction in whatever form (including without limitation exit financing or some other capital

infusion and any offering memorandum with respect to the foregoing), with such reports to

include information (by way of example and without limitation) regarding potential and actual

bids, including interested party names and amounts, expressions of interest, and any other information regarding the progress of the Debtors' pursuit of an exit.

**Adequate Protection**

11.      As adequate protection for the use of Cash Collateral, the Prepetition Secured Lenders shall receive:

(i) adequate protection payments ("Adequate Protection Payments") in amounts equal to the following amounts, provided, only in the event that it is determined that the claims of the Agents and the Prepetition Secured Lenders are not fully secured, the Adequate Protection Payments shall be subject to reallocation, recharacterization, or disgorgement, after notice and a hearing before the Court:

(a) interest payments (at the contractual non-default rate) and principal payments due under the Prepetition Secured Lender Loan Documents, according to the schedule of interest and principal payments contained therein; provided that in consideration for the receipt of principal payments, Prepetition Secured Lenders shall forever waive any and all claims for the difference between the contractual non-default rate and the contractual default rate (the "Default Rate Differential") from October 30, 2009, until the occurrence of a Termination Event; provided, further that (i) the Debtors (x) acknowledge that sections 3.1 of each of the Credit Agreement and the Loan Agreement refer to the payment of default interest and (y) refer to said sections as to the terms and provisions thereof, and (ii) the Prepetition Secured Lenders reserve their rights to assert that the Debtors have an obligation to pay the Default Rate Differential on or after the occurrence of a Termination Event and the Debtors and all other parties-in-

13

interest shall have the right to challenge or otherwise object to the payment of

such Default Rate Differential. For the avoidance of doubt, in the event

Prepetition Senior Secured Debt is, and the amounts due to the Prepetition

Secured Lenders hereunder are, indefeasibly paid in full in cash prior to the

occurrence of or in connection with a Termination Event (subject to the

provisions of paragraph 18 hereof), Prepetition Secured Lenders shall

automatically be deemed to forever waive their claims to the Default Rate

Differential with respect to the period between October 30, 2009 and the date of

such payment; provided, further, however, notwithstanding anything to the

contrary contained herein, that both the Debtors and the Prepetition Secured

Lenders' respective rights are preserved with respect to the Default Rate

Differential under the First Cash Collateral Order, the Second Cash Collateral

Order, the Third Cash Collateral Order, the Fourth Cash Collateral Order, the

Fifth Cash Collateral Order and those certain Termination Events (A) under

paragraphs 9(i) and 9(ii) of the Second Cash Collateral Order, (B) reflected by

that certain Compliance Certificate by the Debtors, dated February 11, 2009, and

(C) reflected by that certain Compliance Certificate by the Debtors, dated May 6,

2009.

      (b) payment of reasonable fees and expenses of (1) two legal counsel (i.e.,

two law firms) for the Agents, one of which shall be local counsel, (2) a single

financial advisor (one financial advisor firm) for the Agents, provided that, until a

Termination Event shall have occurred, the fees and expenses of such financial

advisor shall not exceed $20,000 per month in the aggregate (the "Financial

Advisor Monthly Cap") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Financial Advisor Monthly Cap; (3) other legal counsel retained by any of the Prepetition Secured Lenders, provided that, until a Termination Event shall have occurred, the fees and expenses of each such counsel shall not exceed $7,500 per month in the aggregate with respect to each Prepetition Secured Lender (the "Participant Monthly Cap") on a rolling basis, such that any overages may be carried over and recovered from any subsequent month's amounts to the extent such subsequent month's amount is less than the Participant Monthly Cap; provided, however, that nothing in this paragraph 11(i) shall prejudice the rights of (x) any Prepetition Secured Lender under section 506(b) of the Bankruptcy Code to seek its reasonable fees and expenses pursuant to the Prepetition Secured Lender Loan Documents and (y) the Debtors to challenge or otherwise object to any such request;

(ii) for any diminution in the value of the Prepetition Secured Lenders' interests in the Cash Collateral from and after the Commencement Date, (a) replacement security interests in and liens upon all of the Debtors' assets in which the Agents, for the benefit of the Prepetition Secured Lenders, had liens on the Commencement Date (including, without limitation, cash and receivables and the proceeds thereof, whether existing or hereafter acquired after the Commencement Date and whether or not deposited in the Master Operating Account), (b) first priority security interests and liens upon any and all unencumbered assets of the Debtors, including without limitation the Master Operating Account, the DIP Account, and causes of action under sections 542, 543, 544, 545, 547,

15

548, 549, 550, 551, or 553 of the Bankruptcy Code, and (c) junior liens on all

encumbered assets which were not otherwise subject to the Prepetition Secured Lenders'

liens as of the Commencement Date (collectively, the "Adequate Protection Liens");

provided, however, that the Adequate Protection Liens shall (w) be subject to the Carve-

Out (as defined below), (x) exclude any insurance policy (but not exclude the Debtors'

entitlement, if any, to payments thereunder (subject to the Senior Lender Prepetition

Liens and the Adequate Protection Liens) net of any amounts that may be due to an

Insurance Premium Finance Party (as such term is defined in the Prepetition Secured

Lender Loan Documents) with respect to such policy) where, subject to authorization of

the Court, security interests and liens are granted to an Insurance Premium Finance Party

on the Insurance Premium Collateral (as such term is defined in the Prepetition Secured

Lender Loan Documents, provided that in no instance will the Insurance Premium

Finance Party be granted a security interest in or lien on the DIP Account or the Master

Operating Account) to secure the indebtedness of the Debtors to an Insurance Premium

Finance Party in connection with insurance policies maintained by the Debtors arising as

a result of such Insurance Premium Finance Party entering into arrangements to allow the

Debtors to pay all or a portion of the applicable insurance premiums on such insurance

policies in installments rather than in one lump sum annual payment; provided that the

Debtors shall continue to abide by the requirements under sections 4.11 of each of the

Credit Agreement and the Loan Agreement, provided, however, that notwithstanding

anything contained in said sections to the contrary, amounts payable to Agents as loss

payees under a casualty or property insurance coverage shall be reduced by amounts

owed, if any, to the Insurance Premium Finance Parties with respect to such policies; and

provided further that such indebtedness of the Debtors to all Insurance Premium Finance

Parties shall not exceed the aggregate principal amount outstanding of $800,000 at any

one time ("Insurance Premium Financing"); and (y) neither prime nor impair any

perfected liens or perfected security interests in the same collateral that are senior in rank

and priority to the Senior Lender Prepetition Liens or the Adequate Protection Liens

under applicable nonbankruptcy law as of the Commencement Date, such as statutory

liens, if any, that are senior in priority as a result of being perfected under applicable state

law prior to the granting of the Adequate Protection Liens; and provided further,

however, except as expressly set forth in this Order, the Adequate Protection Liens

granted herein shall not be subject to any liens that are avoided and preserved for the

benefit of any of the Debtors' estates under section 551 of the Bankruptcy Code, and

shall not be subordinated to or made *pari passu* with any other lien under section 364(d)

or any other section of the Bankruptcy Code or otherwise; and

(iii) for any diminution in the value of the Prepetition Secured Lenders' interests

in the Cash Collateral from and after the Commencement Date, an administrative expense

claim pursuant section 507(b) of the Bankruptcy Code (the "Adequate Protection

Claim"), which shall be senior to any and all other claims (including the DIP Super-

Priority Claim, as defined below), but subject to the Carve-Out (as defined below).

12.    The Adequate Protection Liens on property of the Debtors' estates granted

herein, including without limitation the security interests and liens in postpetition cash and

receivables, the Master Operating Account, the DIP Account and proceeds of each of the

foregoing, are valid, binding, effective, enforceable, and fully perfected, and no filing or

recordation or other act in accordance with any applicable local, state, for federal law, rule, or

regulation, is necessary to create or perfect such Adequate Protection Liens. The above provision

notwithstanding, Debtors shall cooperate with Prepetition Secured Lenders to execute such

documents and instruments, and do such other things as Prepetition Secured Lenders may

reasonably request, to evidence and perfect such Adequate Protection Liens for the convenience

and information of third parties, and to evidence the obligations undertaken by the Debtors

hereunder.

13.    None of the Prepetition Secured Lenders shall be deemed to be in control

of the Debtors or their operations or to be acting as a "responsible person," "managing agent," or

"owner or  operator" with respect to the operation or management of the Debtors.

14.    With respect to the use of Cash Collateral hereunder, each of the following

shall constitute a "Termination Event":

(i) the closing or dismissal of the chapter 11 cases;

(ii) the conversion of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code;

(iii) the appointment in these chapter 11 cases of a chapter 11 trustee or an

examiner with expanded powers to operate or manage the financial affairs, the businesses

or the reorganization of any Debtor;

(iv) non-compliance by any Debtor with any of the terms or provisions of this

Order;

(v) the Debtors' cumulative expenditures from October 30, 2009 through the Date

of Determination are more than 110% of the cumulative expenditures for such periods, as

set forth in the Budget;

(vi) the aggregate total of the Debtors' short-term investments and the cash available in their Master Operating Account and the DIP Account shall not fall below two million dollars ($2,000,000.00) at the end of any of the weeks ending November 6, November 13, November 20, November 27, December 4, December 11, December 18, December 25, and January 1.

(vii) if on a cumulative basis, measured every four weeks from the Commencement Date through the last day of every four week period thereafter, net sales are less than eighty-two percent (82%) of the net sales reflected in the Budget; provided, that the Debtors shall report such net sales in writing certified by the Debtors' CFO within five (5) days of the end of each four week period and provide comparison to the amounts reflected in the Budget, with a narrative explaining the reasons for any deviations, provided, however, that "net sales" shall not include any sales of tooling or equipment or other sales of the Debtors' assets;

(viii) entry of an order providing for the sale of more than $1,000,000 (to be measured in aggregate purchase price and/or book value, whichever is greater for each asset sold) of the Debtors' assets that does not provide that the proceeds of such sale (less all costs, expenses and fees related thereto) shall be applied to the Prepetition Senior Secured Debt in accordance with the terms set forth in the Prepetition Secured Lender Loan Documents (subject to the Intercreditor Agreement) on the sale closing date, or for which sale the Prepetition Secured Lenders have not provided prior written consent (subject to the Intercreditor Agreement); provided, however, that in no case shall the aggregate of any sales permitted hereunder exceed $5,000,000;

(ix)  [omitted]

(x) entry of any order pursuant to section 364 of the Bankruptcy Code authorizing Debtors to obtain credit that is *pari passu* with or has priority over the Prepetition Senior Secured Debt and does not provide for the indefeasible payment in full in cash of the Prepetition Senior Secured Debt (subject to the provisions of paragraphs 11(i) and 18 hereof) and any outstanding Adequate Protection Payments and allowed Postpetition Obligations on the closing date of such financing;

(xi) the automatic stay is lifted as to any party in order to take possession or to permit foreclosure on any portion of the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens, the value of which, as measured by fair market value or book value, whichever is greater, exceeds $1,000,000 in the aggregate;

(xii) any uninsured loss with respect to the Senior Lender Prepetition Collateral or any other collateral subject to the Adequate Protection Liens in an amount equal to or exceeding $1,000,000; or

(xiii) December 31, 2009.

15.     Following the occurrence of a Termination Event, other than a Termination Event under paragraph 14(xiii), the Debtors shall have five (5) business days after receipt of written notice from Revolver Agent and Term Loan Agent, on behalf of themselves, and the Prepetition Secured Lenders to cure such Termination Event, if it is capable of cure (the "Cure Period"). The Revolver Agent and the Term Loan Agent shall serve notice of the Termination Event on the Debtors, the U.S. Trustee, the Committee.

16.     On the earlier to occur of either (a) December 31, 2009, or (b) if upon the expiration of the Cure Period, the Debtors have not cured the Termination Event (assuming such

20

Termination Event is curable) and any required notice referred to in paragraph 15 has not been withdrawn (herein referred to as the "Termination Date"), then (1) the Debtors shall cease all use of Cash Collateral and any authority of Debtors under this Order to use Cash Collateral shall terminate; and (2) the Prepetition Secured Lenders shall be granted, without further action of the Prepetition Secured Lenders or the Court, immediate and automatic relief from the automatic stay under section 362 of the Bankruptcy Code, which shall be automatically terminated as it relates to the Senior Lender Prepetition Collateral and all other collateral in which Adequate Protection Liens have been granted without further action of the Prepetition Secured Lenders or this Court. Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the Prepetition Secured Lenders under this Order shall survive the Termination Date. In addition, upon the occurrence of the Termination Date, if instructed by the Revolver Agent and the Term Loan Agent, FirstMerit or any other bank or financial institution with which the Debtors establish an account, shall transfer all of the available funds on deposit in such account as directed by the Revolver Agent and the Term Loan Agent; provided, however, that if it is subsequently determined that the Prepetition Secured Lenders did not have Senior Lender Prepetition Liens or Adequate Protection Liens on such accounts, the Prepetition Secured Lenders shall disgorge and repay to the Debtors' estates such portion of the funds as to which they did not have Senior Lender Prepetition Liens or Adequate Protection Liens; provided, further, however, that notwithstanding the foregoing, (i) any existing deposit account control agreements shall continue in full force and effect subject to the terms of this Order, and (ii) within 45 days of the establishment of a new bank account, deposit account, securities account or other account, the Debtors, the Revolver Agent (for the benefit of the Prepetition Secured Lenders, subject to the Intercreditor Agreement)

and each bank or financial institution with which the Debtors establish such deposit account shall

enter into a deposit account control agreement or similar applicable agreement, which shall be in

form and substance reasonably satisfactory to the Revolver Agent; provided, further, that the

Debtors shall notify the Revolver Agent in writing within five (5) business days thereof of the

establishment of any new bank account, deposit account, securities account, or other account.

### Carve-Out

17.    The Senior Lender Prepetition Liens, the Adequate Protection Claim, the

Adequate Protection Liens, and the DIP Super-Priority Claim shall be subject to the payment of

the following items (collectively, the "Carve-Out"): (i) fees of the clerk of the Bankruptcy Court,

the clerk of any court to which an appeal may be taken, and the United States Trustee pursuant to

28 U.S.C. § 1930(a) and (b); (ii) pursuant to section 726(b) of the Bankruptcy Code, reasonable

fees and expenses of a trustee that are incurred after the conversion of these chapter 11 cases to a

case under chapter 7 of the Bankruptcy Code, in an amount not to exceed $100,000; and

(iii) upon the occurrence of the Termination Date or the Maturity Date (which occurrences shall

be the trigger dates of this clause and not the measuring points with respect to any fees or

expenses), the aggregate allowed unpaid professional fees and expenses payable under sections

330 and 331 of the Bankruptcy Code to professionals retained pursuant to an order of the Court

by the Debtors and any statutory committee(s) appointed in the Debtors' chapter 11 cases for

services rendered and expenses incurred, as well as fees and expenses payable to any trustee or

examiner appointed or elected in these chapter 11 cases, to the extent this Court allows the

payment thereof, in an amount not to exceed $500,000, provided that the first $400,000 only

shall be paid from the assets subject to Senior Lender Prepetition Liens and the Adequate

Protection Liens (including Cash Collateral) and that would otherwise be paid to the Prepetition

22

Secured Lenders in respect of the Adequate Protection Claim (the "Prepetition Secured Lenders'

Fee Carve-Out Amount"), and the balance between $500,000 and the Prepetition Secured

Lenders' Fee Carve-Out Amount shall be paid from whatever assets would be distributed on

account of the DIP Super-Priority Claim; provided, however, that prior to the occurrence of the

Termination Date or the Maturity Date, the Debtors shall be permitted to pay from the Cash

Collateral and the Interim DIP Loan, as the same may be due and payable, all professional fees

and expenses pursuant to sections 330 and 331 of the Bankruptcy Code as authorized by the

Court that were rendered or incurred, as applicable, prior to the occurrence of the Termination

Date or the Maturity Date. For the avoidance of doubt, with respect to the Prepetition Secured

Lenders, the Carve-Out for clauses (ii) and (iii) of the preceding sentence shall not exceed

$500,000 in the aggregate.

### Protection of Prepetition Secured Lenders

18.     With respect to any issued and outstanding letters of credit (collectively,

the "Outstanding Letters of Credit"), the Debtors shall comply with the terms of section 2.7(k) of

the Credit Agreement, provided that in any event, such Outstanding Letters of Credit shall be

released and returned to the holder thereof within ninety (90) days of indefeasible payment in

full of the Senior Lender Prepetition Debt (subject to the provisions of paragraph 11(i) hereof).

19.     The provisions of this Order are binding upon all the parties in interest in

these chapter 11 cases, including without limitation the Prepetition Secured Lenders, the DIP

Lenders and the Debtors, the Creditors' Committee, and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estates of the

Debtors or an examiner appointed pursuant to section 1104 of the Bankruptcy Code), and inure

to the benefit of the Prepetition Secured Lenders and the Debtors and, except with respect to any

trustee hereafter appointed or elected for the estates of the Debtors, their respective successors and assigns; provided, however, that this Order shall not limit or affect the rights of the Debtors in their prosecution of a chapter 11 plan or the rights and defenses thereto of the Prepetition Secured Lenders, the DIP Lenders, and the Creditors' Committee. In addition, neither the terms of this Order, nor the filing of these bankruptcy cases generally, shall be deemed to modify or affect the respective rights and obligations among the Prepetition Secured Lenders under the Intercreditor Agreement.

20.    Notwithstanding anything herein to the contrary, this Order is without prejudice to, and does not constitute a waiver (other than the waiver set forth in paragraph 11(i) regarding the Default Rate Differential), expressly or implicitly, of the rights of the Prepetition Secured Lenders to seek additional adequate protection should circumstances warrant.

21.    Entry of this Order shall not in any way (i) constitute agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this Order; or (ii) prevent the Prepetition Secured Lenders from objecting, for any reason, to any requests, motions or applications made in this Court (other than this Order), including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

### Reporting

22.    Existing reporting requirements shall continue, including without limitation full financial reports required under the Prepetition Secured Lender Loan Documents, which shall be provided on a monthly basis within thirty (30) days of the end of each month and on a quarterly and yearly basis pursuant to and in the form prescribed by the Prepetition Secured

Lender Loan Documents (or on such other schedule or in such other form as the parties may

agree).  In addition, and without limiting the foregoing or any other reporting requirement

contained hereunder, the Debtors shall prepare and submit (a) the reports referred to in

paragraphs 5, 7, 10 and 14(vii) hereof prior to the deadlines set forth therein, (b) reports

indicating any and all information that is required by the borrowing base certificates under the

Prepetition Secured Lender Loan Documents for the previous week prior to 5:00 p.m. on

Tuesday following the week being reported (or by such other date and time as the parties may

agree); and (c) any other and further reports reasonably requested by the Prepetition Secured

Lenders.  The Prepetition Secured Lenders and the Debtors shall have a bi-weekly phone

conference (the "Status Call"), on such dates, at such times, and on such other schedule as the

parties may agree, to update the Prepetition Secured Lenders on the Debtors' financial and

operational status, including updates as to relations with customers, vendors and suppliers.

## Releases

23.    In consideration of Debtors' use of Cash Collateral, the Debtors (on behalf

of themselves and any successor to the Debtors, including any chapter 11 trustee or chapter 7

trustee) voluntarily and knowingly release and forever discharge the Prepetition Secured Lenders

in all their respective capacities, their predecessors, agents, attorneys, financial advisors, direct

and indirect parents, subsidiaries and affiliates, members, managers, servicers, directors, officers,

employees, successors and assigns from all possible claims, counterclaims, demands, actions,

causes of action, damages, costs, expenses and liabilities whatsoever, known or unknown,

anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole

or in part on or before the date hereof, which the Debtors may now know or hereafter come to

know they have against Prepetition Secured Lenders in all of their respective capacities, their

25

predecessors, agents, attorneys, direct and indirect parents, subsidiaries and affiliates, members,

managers, servicers, directors, officers, employees, successors and assigns, if any, and

irrespective of whether any such claims arise out of contract, tort, violation of law or regulations,

or otherwise.

24.     The Debtors shall also provide the Prepetition Secured Lenders copies of

all reports made for or documents given to the United States Trustee in these chapter 11 cases.

25.     Debtors shall permit representatives, agents, and/or employees of the

Prepetition Secured Lenders, including professionals retained by the Prepetition Secured

Lenders' legal professionals, to have reasonable access to its premises and records during normal

business hours (without unreasonable interference with the proper operation of Debtors'

businesses) and shall cooperate, consult with, and provide to such persons all such non-

privileged information as they may reasonably request.

Dated: October  __, 2009
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

**(Budget)**

**LEXINGTON PRECISION CORPORATION**                                                              **REVISED 9/25/09**

**FORECAST OF CASH RECEIPTS, CASH DISBURSEMENTS, AND NET SALES FROM SEPTEMBER 28 THROUGH DECEMBER 25, 2009**
**(in thousands of dollars)**

| | | | | | | Week Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2-Oct | 9-Oct | 16-Oct | 23-Oct | 30-Oct | 6-Nov | 13-Nov | 20-Nov | 27-Nov | 4-Dec | 11-Dec | 18-Dec | 25-Dec |
| **Cash receipts** | 1,715 | 1,494 | 1,395 | 1,284 | 1,618 | 1,261 | 1,199 | 1,228 | 1,077 | 1,488 | 1,148 | 1,146 | 989 |
| **Cash disbursements:** | | | | | | | | | | | | | |
| Debt service: | | | | | | | | | | | | | |
| CapitalSource principal | 269 | - | - | - | - | 269 | - | - | - | 269 | - | - | - |
| CapitalSource interest | 134 | - | - | - | - | 134 | - | - | - | 134 | - | - | - |
| CapitalSource miscellaneous fees | 7 | - | - | - | - | 7 | - | - | - | 7 | - | - | - |
| DIP interest and fees | 33 | - | - | - | - | 34 | - | - | - | 33 | - | - | - |
| Westfield Bank | - | - | - | - | 70 | - | - | - | 70 | - | - | - | - |
| Lubin, Delano & Co. | 203 | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll and payroll taxes | 479 | 244 | 474 | 247 | 476 | 242 | 466 | 237 | 420 | 278 | 232 | 461 | 227 |
| Retirement & Savings Plan 401(k) | 38 | 14 | 38 | 14 | 38 | 14 | 38 | 14 | 38 | 14 | 38 | 14 | 38 |
| Group Medical Care Plan administrative fees | - | - | 13 | - | - | - | - | 13 | - | - | - | 13 | - |
| Reorganization professional fees and expenses | 160 | 61 | 104 | 61 | 108 | 174 | 122 | 122 | 122 | 103 | 83 | 83 | 82 |
| DIP legal counsel | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ordinary course professionals | - | - | 8 | 42 | - | 20 | 8 | - | 32 | 20 | - | 25 | 9 |
| Vendors: | | | | | | | | | | | | | |
| Dow Corning | 15 | 15 | 14 | 14 | 14 | 14 | 14 | 15 | 13 | 15 | 14 | 15 | 15 |
| Wacker Silicones | 109 | 167 | 122 | 99 | 101 | 100 | 80 | 84 | 77 | 79 | 82 | 94 | 93 |
| All other | 564 | 534 | 457 | 580 | 475 | 462 | 411 | 394 | 468 | 470 | 447 | 434 | 313 |
| State of Ohio BWC and UMR health disbursements | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 111 | 40 | 40 | 40 |
| Commercial Traffic | 15 | 17 | 14 | 17 | 13 | 14 | 12 | 13 | 13 | 13 | 13 | 14 | 13 |
| Disbursements (receipts) related to the Rock Hill fire | 24 | 23 | 24 | 23 | (192) | 24 | 23 | 24 | 23 | - | (94) | - | - |
| Total cash disbursed | 2,090 | 1,115 | 1,308 | 1,137 | 1,143 | 1,548 | 1,214 | 956 | 1,316 | 1,546 | 855 | 1,193 | 830 |
| **Net cash received (used)** | (375) | 379 | 87 | 147 | 475 | (287) | (15) | 272 | (239) | (58) | 293 | (47) | 159 |
| **Cumulative net cash received (used)** | (375) | 4 | 91 | 238 | 713 | 426 | 411 | 683 | 444 | 386 | 679 | 632 | 791 |
| **Ending cash balance from prior period** | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 | 3,098 |
| **Net cash available** | 2,723 | 3,102 | 3,189 | 3,336 | 3,811 | 3,524 | 3,509 | 3,781 | 3,542 | 3,484 | 3,777 | 3,730 | 3,889 |
| **Net sales (based on date shipped)** | 1,209 | 1,136 | 1,161 | 1,278 | 1,275 | 1,361 | 1,365 | 1,456 | 959 | 1,220 | 1,158 | 1,238 | 762 |
| **Net cumulative sales** | 1,209 | 2,345 | 3,506 | 4,784 | 6,059 | 7,420 | 8,785 | 10,241 | 11,200 | 12,420 | 13,578 | 14,816 | 15,578 |