HEARING DATE: October 29, 2009 at 10:00 a.m. (prevailing Eastern Time)
OBJECTION DEADLINE: October 23, 2009 at 4:00 p.m. (prevailing Eastern Time)

WALLER LANSDEN DORTCH & DAVIS LLP
John C. Tishler (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@Wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for the Senior Prepetition Lenders*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
**In re**                                          :    **Chapter 11 Case No.**
                                                               :
**LEXINGTON PRECISION CORP., et al.,**   :    **08-11153 (MG)**
                                                               :
        Debtors.                                 :    **(Jointly Administered)**
                                                               :
---------------------------------------------------------------x

**RESPONSE AND LIMITED OBJECTION OF AGENTS FOR PREPETITION
SECURED LENDERS TO DEBTORS' SIXTH MOTION FOR
AUTHORIZATION, PURSUANT TO 11 U.S.C §§ 105, 361, 362, AND 363(c), FOR
CONTINUED USE OF CASH COLLATERAL**

By and through the undersigned attorneys, CapitalSource Finance LLC, as agent under

that certain prepetition Credit and Security Agreement (the "Prepetition Credit Agreement"), and

CSE Mortgage LLC, as agent under that certain prepetition Loan and Security Agreement (the

"Prepetition Loan Agreement"), (collectively, in such capacity as agents, the "Agents"), hereby

3154448.1

respond to and object, to a limited extent, to the *Debtors' Sixth Motion for Authorization, Pursuant to 11 U.S.C §§ 105, 361, 362, and 363(c), for Continued Use of Cash Collateral* (the "Motion") and state as follows:

### I.     Introduction

1.    The lenders under the Prepetition Credit Agreement and Prepetition Loan Agreement (collectively, the "Prepetition Secured Lenders") do not object to the Debtors use of cash collateral *per se*, and have in fact been actively negotiating with the Debtors' to consensually agree on terms for such use; however, the Prepetition Secured Lenders are compelled to object to certain factual claims and accusations made in the Motion that are inaccurate or misleading. The Debtors' posturing in this Motion is emblematic of the stagnation that plagues this case. Despite the need for the parties to work together in getting the competing plan process started, the Motion is divisive with its rhetoric and factual inaccuracies.

2.    The Prepetition Secured Lenders have been supportive of the Debtors and their attempts at exiting bankruptcy. To be sure, the Prepetition Secured Lenders have been forced to protect their interests but have not stood in the way of the Debtors' cases. The Debtors initially committed to exiting bankruptcy within 330 days of the filing date (*i.e.* February 25, 2009), and this deadline has long since passed. During the nearly nineteen (19) months of this case, the collateral position of the Prepetition Secured Lenders has steadily deteriorated. The Debtors' inability to formulate a feasible and confirmable plan and the worsening collateral position have forced the Prepetition Secured Lenders to propose their own plan. Only then have the official committee of unsecured creditors (the "Committee") and the Debtors been forced to take some sort of action in this case, as exhibited by their responsive plans and the divisive nature of the alleged "facts" in the Motion.

3. The Prepetition Secured Lenders have agreed in concept to a proposal made by the Debtors for an alteration in the method of measuring the Debtors' cash usage during the course of this two month period. The Prepetition Secured Lenders have agreed in concept to a proposal made by the Debtors for an alteration in the method of measuring the Debtors' cash usage during the course of this two month period. However, the final version of this change has not been circulated and the Prepetition Secured Lenders file this objection and response to reserve their right to object to the expression of the proposed change.

4.    II.    **Prepetition Secured Lender's Response**

5. The Prepetition Secured Lenders refute several specific assertions in the Debtors' Motion: (i) the inaccurate claims of strong financial performance, (ii) the claim, based on dated and inaccurate valuations, that the Prepetition Secured Lenders are overprotected due to an alleged "significant equity cushion"; (iii) the claim that the adequate protection payments being made to the Prepetition Secured Lenders constitute a significant drain on estate resources as opposed to the Debtors' performance, and (iv) the spurious claim that the *Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Debtors' Proposed Plan") would be in the best interest of all parties in this case.

**A. The Debtors' Claims of Strong Financial Performance has Little Support**

5. The Debtors make claims in the Motion regarding the positive financial results of the companies, but by their own admission these are half-truths based on limited information. While the Debtors make claims of positive cash flow, they themselves recognize that this is limited solely to the Lexington Rubber Group, Inc. portion of the business, and that a full half of the business tied to the automotive sector continues to be a laggard. (Motion, ¶ 12).

6. Further, the Debtors tout their EBITDAR results based on the past eight months. (Motion, ¶ 13). This claim fails, as their own EBITDAR calculation inaccurately portrays

reality, and the window of time to which they refer is limited.  The Debtors claim positive EBITDAR of $3.4 million through the first eight months of 2009.  (Motion, ¶ 13).

7.     An EBITDAR calculation does not give a complete view of the performance of these companies.  EBITDAR expressly excludes interest payments, which are a contractual obligation of the companies to both the Prepetition Secured Lenders and the holders of certain Senior Subordinated Notes.  Including both of these factors eliminates the positive earnings of the companies.  If restructuring expenses are included, the Company's year-to-date EBITDA would barely be positive, at approximately $400,000 before deduction for financing or interest expenses.  After deducting interest expense for the same eight (8) month period of more than $5 million, the Company's pre-tax earnings (before or after giving effect to restructuring charges) are solidly negative.  If this analysis is expanded to the last twelve months (or including an additional four months of results), EBITDA and pre-tax earnings are even lower.  It should be noted that wholesale exclusion of reorganization expenses fails to account for the additional interest and other expenses associated with any new financing coming out of bankruptcy (for instance, the $10 million junior debt facility proposed under the current formulation of the Debtors' Proposed Plan).

8.     The Debtors also posit that they will earn $8.1 million in EBITDAR for fiscal year 2009, but such statement does not clearly indicate the extent of inclusion or exclusion of the Vienna, Ohio facility and the unprofitable connector seals business.  *Id*.  This claim of positive performance goes against the performance trends and history of the companies with no explanations of the reasoning for the expected sudden turnaround.  Over the first eight (8) months of 2009, the Debtors claim the companies' EBITDAR totaled approximately $3.4 million.  Therefore, in order to achieve their recent projection for full-year EBITDAR of

approximately $8.1 million for 2009, the Debtors will need to achieve EBITDAR of approximately $4.7 million over the last four (4) months of the year, or approximately $1.175 million in EBITDAR per month.

9.  Historical performance and recent trends indicate that it will be very difficult for the Debtors to achieve these profitability levels and meet such projections. In August 2009, a relatively good month according to the Debtors compared to recent performance, the companies' EBITDAR was approximately $1 million, or about fifteen percent (15%) below the $1.175 million implied monthly level needed to achieve the full-year projections. In fact, the last time the companies' monthly EBITDAR was higher than $1.175 million in any single month was in April 2008, and EBITDAR for any single month has only exceeded the targeted $1.175 million on four occasions since January 2007.

**B.  The Prepetition Secured Lenders Do Not Have a Significant Equity Cushion**

10.  The Debtors have claimed overly optimistic valuations for the companies, and have used these valuations to assert that there is a significant equity cushion. (Motion, ¶ 15). Such valuations, given the current posture of the case, are inappropriate to use as a grounds for claiming that an equity cushion exists.

11.  The Debtors further misconstrue the valuation of Bridge Associates (the "Bridge Valuation") that they referenced in the Motion. *Id.* The Bridge Valuation was conducted for use at a February 2009 hearing regarding cash collateral usage, and was not actually presented as a valuation *per se*, as its function was to show a relative decline in total enterprise valuation since the filing of these cases on April 1, 2008 (the "Commencement Date"). The Bridge Valuation also assumed *arguendo* that total enterprise valuation was the appropriate measure of value at that point in the case, but did not accept such method as the appropriate measure.

12.     While the Prepetition Secured Lenders believe the Bridge Valuation was accurate at the time eight (8) months ago, the Prepetition Secured Lenders cannot be certain that such valuation continues to be accurate, as much of the information used as the basis for that valuation is now in excess of a year old.  In this time period, the economy has continued to deteriorate and the auto industry, a significant client of LPC, remains in turmoil.  The continued depressed economic conditions, combined with the companies' weak financial performance, are unlikely to have improved the valuation of the companies.

13.     The recent improvement in operational performance noted by the Debtors has not translated into an improvement in the Debtors' valuation.  Indeed, note that according to the Debtors' own valuation estimates, enterprise value has declined from $120.1 million as of their disclosure statement filed in December 2008 (the "December DS") to $104.9 million as of their recently filed disclosure statement (the "Current DS").  The Prepetition Secured Lenders dispute the Debtors' valuations, but note that even the Debtors' valuations show nearly a thirteen percent (12.7%) decline in enterprise value in ten (10) months.

14.     The Prepetition Secured Lenders do not concede that enterprise valuation is the proper measure of value.  Liquidation value, assuming it is calculated properly and conservatively, may also be considered the proper indicator of collateral value.  Similar to the admitted decline in enterprise value, the Debtors' own estimate of their net liquidation value was $42.268 million as of the December DS, but has since declined by $4.402 million in the past ten (10) months to $37.866 million as of the Current DS, an amount only slightly in excess of the claims by the Prepetition Secured Lenders and the DIP Lenders.  Accordingly, the Debtors admit to a decline in liquidation value over the past ten (10) months of more than ten percent (10%),

with such value rapidly approaching the outstanding principal amount of the Prepetition Secured Lenders' debt and the postpetition financing.

15.     As noted above, the total value of the Debtors has decreased, but the cash collateral position has also decreased significantly, despite claims to the contrary by the Debtors. (Motion, ¶ 13). The Debtors' cash and equivalents have declined from $8.3 million (including the DIP proceeds) to $3.2 million since the Commencement Date (a 62% decline since April 2008). Finally, cash collateral has continued to decline from July 2009 to August 2009, with the August cash and equivalents balance of $3.155 million being the second lowest figure since the Commencement Date. The Debtors' claims of strong recent performance have not translated into a more buoyant cash position; in fact, while monthly EBITDA increased in August 2009, the companies' cash balance fell.

### C. The Adequate Protection Payments Are Not the Significant Drain on Estate Resources

16.     The Debtors state in the Motion that "the only drain on estate resources have been the outsized reorganization expenses and the adequate protection payments that the Debtors have been making to the Prepetition Secured Lenders under the cash collateral orders." (Motion, ¶ 14). This claim is inaccurate as the companies' own financial performance, as noted above, has been a significant drain on estate assets. In particular, both the connector seals business and the metals business are unprofitable and have drained substantial resources from the companies and have contributed to the erosion of cash and other collateral. According to the companies' financials, EBITDA for the last eight (8) month period (year-to-date) ending August 31, 2009 was (i) approximately ($0.576) million for the metals business and (ii) approximately ($2.246) million for the connector seals business. The implication is that these two businesses have caused more than $2.5 million of EBITDA to vanish over the past eight (8) months, and for the

enterprise value to decline by a multiple of this decreased EBITDA. Even after adding back approximately $672,000 in non-recurring expenses, these two businesses combined for negative EBITDAR of approximately $2 million in less than a year.

17. Additionally, the Debtors are claiming that debt payments being made to the Prepetition Secured Lenders, at less than the contractual amounts, are a "drain." These are obligations incurred by the companies used to finance both their expansion and day-to-day operations. This is a fundamental cost of their business and not some arbitrary drain. Further, the Debtors are not even making their full required payments under the loan documents with the Prepetition Secured Lenders. The Debtors have been in default of the obligations to the Prepetition Secured Lenders since months prior to the Commencement Date; however, the Debtors continue to pay the lower non-default interest rate. It is a red herring that the Debtors characterize the senior debt that they previously incurred, and are currently not fully servicing, as a drain on estate resources.

**D. Claim of Superiority of the Debtors' Proposed Plan**

18. The Debtors mistakenly claim that their Proposed Plan is in the best interests of the creditors and equity holders. (Motion, ¶ 9). As set forth above and while this case has continued to languish in bankruptcy court for over one and a half years, the collateral position of the Senior Secure Lenders has steadily deteriorated. Such deterioration belies the claim that their Proposed Plan is in all parties' best interest. The Prepetition Secured Lenders dispute the substantive consolidation under the Debtors' Proposed Plan, and question how creditors of Lexington Precision Corporation are permitted to capture virtually all of the value of these estates that resides exclusively in the estate of Lexington Rubber Group, Inc.

19. The Debtors fail to note that the inability to develop a feasible and confirmable plan in this case has forced the Prepetition Secured Lenders to propose their own plan in this case.  In fact, the recent filing of proposed plans by the Committee and the Prepetition Secured Lenders is a clear indication that two of the three primary parties in this case don't share the Debtors' view about the parties' best interests.

### III.     Conclusion

20.     The Prepetition Secured Lenders do not object to the Debtors' use of cash collateral on reasonable terms that are continuing to be discussed, but as set forth above, the Prepetition Secured Lenders are compelled to respond to the factual inaccuracies and misleading allegations of the Motion. In the event the parties are able to reach final agreement on all terms, the Court will be notified.

Respectfully submitted:

WALLER LANSDEN DORTCH & DAVIS LLP


*/s/ John C. Tishler*_____
John C. Tishler (*Pro Hac Vice*)
511 Union Street, Suite 2700
Nashville, Tennessee  37219-8966
TEL: (615) 244-6380
FAX: (615) 244-6804
Email: John.Tishler@wallerlaw.com

and

CARTER LEDYARD & MILBURN LLP


*/s/ Aaron R. Cahn*_____
Aaron R. Cahn
2 Wall Street
New York, New York 10005
TEL: (212) 238-8629
FAX: (212) 732-3232
Email: cahn@clm.com

*Counsel to Agents for Senior Prepetition Lenders*

**Certificate of Service**

        I hereby certify that on this the 23rd day of October, 2009, a true and correct copy of the foregoing pleading was served upon the following parties in accordance with the notice of hearing filed by the Debtors in connection with the Motion.

(a)     counsel to the Committee, Andrews Kurth LLP, 450 Lexington Avenue, 15th Floor, New York, New York 10017 (Attn: Paul Silverstein and Jonathan Levine);

(b)     the Debtors, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, New York 10023 (Attn: Michael A. Lubin);

(c)     counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Victoria Vron);

(d)     the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); and

(e)     counsel to the Debtors' postpetition agents, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

                                                                         */s/ Aaron R. Cahn*_____
                                                                         Aaron R. Cahn