**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **LEXINGTON PRECISION CORP., et al.,** | : | **Case No. 08-11153 (BRL)** |
| | : | |
| | : | |
| Debtors. | : | |

-------------------------------------------------------------------x

**[PROPOSED] DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, CAPITALSOURCE**
**FINANCE LLC AND CSE MORTGAGE LLC**

---

THE BANKRUPTCY COURT HAS NOT APPROVED THIS PROPOSED DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION PURSUANT TO SECTION 1125(B) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE JOINT CHAPTER 11 PLAN DESCRIBED HEREIN AND ATTACHED HERETO. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE UNTIL A DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.

THIS PROPOSED DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, INCLUDING AS TO VALUATION OF THE DEBTORS; BUT, RATHER, SHALL BE DEEMED AS A STATEMENT MADE IN AND FOR SETTLEMENT NEGOTIATIONS. THIS PROPOSED DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY LEGAL PROCEEDING NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS.

THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT.

---

ANDREWS KURTH LLP
450 Lexington Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

Counsel to the Official Committee
of Unsecured Creditors

WALLER LANSDEN DORTCH & DAVIS
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804

Counsel to CapitalSource Finance LLC
and CSE Mortgage LLC

Dated:  December 16, 2009

# TABLE OF CONTENTS

Page

I. Introduction ................................................................................................................. 1

II. Executive Summary ..................................................................................................... 4

    A.    Summary of Classification and Treatment of Claims and Interests Under the Plan........................................................................................................... 4

    B.    Summary of Voting Procedures.................................................................. 6

III. Overview of the Debtors' Operations and the Chapter 11 Cases ........................................... 8

    A.    Description of the Debtors' Operations ................................................................. 8

        1.    The Rubber Group ................................................................................ 8

            a.    The Automotive Aftermarket............................................. 9

            b.    The Automotive OEM Market........................................... 9

            c.    The Medical Device Market .............................................. 9

            d.    The Rubber Group's Competitive Strengths................................... 9

            e.    Facilities of the Rubber Group........................................... 9

            f.    Insulators for Automotive Ignition Systems ................................ 10

            g.    Molded Rubber Components for Medical Devices ..................... 11

            h.    Connector Seals for Automotive Wiring Harnesses ................... 12

        2.    The Metals Group ................................................................................ 12

            a.    Strategic Alternatives............................................................ 12

        3.    Non-Operating Assets ................................................................... 13

            a.    Land in East Ellijay, Georgia......................................... 13

            b.    Land and Buildings in Lakewood, New York ........................... 13

            c.    Land and Buildings in Vienna, Ohio ........................... 13

        4.    Lexington's Employees ...................................................... 13

    B.    Significant Indebtedness .................................................................... 14

        1.    The Prepetition Credit Agreement ........................................... 14

        2.    The Prepetition Loan Agreement........................................... 14

        3.    Senior Subordinated Notes ...................................................... 15

        4.    Junior Subordinated Note ...................................................... 15

    C.    The Asbestos Cases.................................................................... 16

    D.    Significant Events Leading to the Commencement of the Chapter 11 Cases...... 17

i

# TABLE OF CONTENTS
### (continued)

**Page**

|  |  |  |  |  |
|---|---|---|---|---|
|  | 1. | Liquidity Crisis | ........... | 18 |
|  | 2. | Restructuring Efforts | ........... | 18 |
| E. |  | The Chapter 11 Cases | ........... | 19 |
|  | 1. | Commencement of the Chapter 11 Cases and the "First-Day" Orders | ........... | 19 |
|  |  | a. | Case Administration Orders | 19 |
|  |  | b. | Critical Obligations | 19 |
|  |  | c. | Customer and Employee Programs | 20 |
|  |  | d. | Financing Arrangements | 20 |
|  | 2. | Appointment of the Committee | ........... | 20 |
|  | 3. | Use of Cash Collateral | ........... | 21 |
|  | 4. | Debtor-in-Possession Financing | ........... | 22 |
|  | 5. | The Debtors' Exclusive Periods | ........... | 23 |
|  | 6. | The Mediation Process | ........... | 24 |
|  | 7. | The Claims Reconciliation Process | ........... | 24 |
| IV. | The Plan | ........... | | 24 |
| A. |  | Summary and Treatment of Unclassified Claims | ........... | 25 |
|  | 1. | Administrative Expense Claims | ........... | 25 |
|  | 2. | Professional Compensation and Reimbursement Claims | ........... | 25 |
|  | 3. | Indenture Trustee Fee Claims | ........... | 25 |
|  | 4. | Debtor-in-Possession Loan Claims | ........... | 26 |
|  | 5. | Priority Tax Claims | ........... | 26 |
| B. |  | Classification and Treatment of Classified Claims and Interests | ........... | 26 |
|  | 1. | Claims against and Interests in LPC | ........... | 27 |
|  |  | a. | Class 1 – Other Priority Claims against LPC (Unimpaired) | 27 |
|  |  | b. | Class 2(a) – CapitalSource Secured Claims against LPC (Impaired) | 27 |
|  |  | c. | Class 2(b) – CSE Secured Claims against LPC (Impaired) | 27 |
|  |  | d. | Class 3 – Secured Tax Claims against LPC (Unimpaired) | 28 |
|  |  | e. | Class 4 – Other Secured Claims against LPC (Unimpaired) | 28 |

ii

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| f. | Class 5 – Senior Subordinated Note Claims (Impaired) | 29 |
| g. | Class 6 – Junior Subordinated Note Claims (Impaired) | 29 |
| h. | Class 7 – General Unsecured Claims against LPC (Impaired) | 29 |
| i. | Class 8 – Convenience Claims against LPC (Unimpaired) | 29 |
| j. | Class 9 – Asbestos-Related Claims (Impaired) | 30 |
| k. | Class 10 – Series B Preferred Stock Interests (Impaired) | 30 |
| l. | Class 11 – LPC Common Stock Interests (Impaired) | 30 |
| m. | Class 12 – Other Equity Interests in LPC (Impaired) | 31 |

2. Claims against and Interests in LRGI ............................................ 31

| | | |
|---|---|---|
| a. | Class 13 – Other Priority Claims against LRGI (Unimpaired) | 31 |
| b. | Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired) | 31 |
| c. | Class 14(b) – CSE Secured Claims against LRGI (Impaired) | 32 |
| d. | Class 15 – Secured Tax Claims against LRGI (Unimpaired) | 32 |
| e. | Class 16 – Other Secured Claims against LRGI (Unimpaired) | 32 |
| f. | Class 17 – General Unsecured Claims against LRGI (Impaired) | 33 |
| g. | Class 18 – Convenience Claims against LRGI (Unimpaired) | 33 |
| h. | Class 19 – Interests in LRGI (Unimpaired) | 34 |

C. Distributions Pursuant to the Plan ................................................. 34

1. Distributions ................................................................................. 34

2. Surrender or Transfer of the Senior Subordinated Notes ............. 35

D. Implementation of the Plan and Related Documents ........................ 35

1. New Priority Working Capital Facility ......................................... 35

2. The New Secured CapitalSource Credit Agreement ..................... 36

3. The New Secured CSE Loan Agreement ....................................... 36

NYC:203112.4

# TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| | 4. | The New Unsecured LPC Notes | 36 |
| | 5. | The New Unsecured LRGI Notes | 37 |
| | 6. | Cancellation of Documents, Agreements, and Debt Instruments | 37 |
| | 7. | Amended and Restated Charter and Amended and Restated By-Laws | 37 |
| | 8. | Corporate Action, Effectuating Documents, and Further Transactions. | 38 |
| E. | | Provisions for the Treatment of Disputed Claims | 38 |
| | 1. | Objections to Claims and Prosecution of Disputed Claims | 38 |
| | 2. | Resolution of Administrative Expense Claims and Other Claims | 39 |
| | 3. | Claim Estimation | 39 |
| | 4. | Payment and Distribution on Disputed Claims | 39 |
| F. | | Prosecution of Claims Held by the Debtors | 39 |
| G. | | Executory Contracts and Unexpired Leases | 39 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 39 |
| | 2. | Cure of Defaults | 40 |
| | 3. | Rejection Damage Claims | 40 |
| | 4. | Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits | 40 |
| H. | | Reservation of "Cram Down" Rights | 41 |
| I. | | Conditions Precedent to the Effective Date of the Plan | 41 |
| J. | | Effects of Confirmation | 42 |
| | 1. | Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests and all Other Equity Interests | 42 |
| | 2. | Discharge of Debtors | 43 |
| | 3. | Injunctions and Stays | 43 |
| | 4. | Exculpation | 44 |
| | 5. | Releases | 44 |
| K. | | Dissolution of the Committee | 45 |
| L. | | Management of the Reorganized Debtors | 45 |

iv

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| M. | | Jurisdiction and Choice of Law | 46 |
| | 1. | Governing Law | 46 |
| | 2. | Retention of Jurisdiction | 46 |
| N. | | Miscellaneous Provisions | 46 |
| | 1. | Payment of Statutory Fees | 46 |
| | 2. | Post-Confirmation Date Professional Fees and Expenses | 46 |
| | 3. | Indenture Trustee as Claim Holder | 46 |
| | 4. | Plan Supplement | 47 |
| | 5. | Substantial Consummation | 47 |
| | 6. | Severability | 47 |
| | 7. | Binding Effect | 47 |
| | 8. | Notices | 48 |
| | 9. | Time | 48 |
| | 10. | Section Headings | 48 |
| O. | | Modification, Revocation, or Withdrawal of the Plan | 48 |

V. Financial Information, Projections and Valuation Analysis ............ 49

| | | | |
|---|---|---|---|
| A. | | Selected Historical Financial Information | 49 |
| B. | | Valuation of the Reorganized Debtors | 49 |
| | 1. | Introduction | 49 |
| | 2. | Basis of Valuation | 49 |
| | 3. | Core Assets | 50 |
| | | a. The Rubber Group | 50 |
| | | b. The Corporate Offices | 50 |
| | | c. The Debtors' Tax Attributes | 50 |
| | 4. | Non-Core Assets | 51 |
| | | a. The Metals Group | 51 |
| | | b. Non-Operating Assets | 51 |
| | 5. | Enterprise Value of the Reorganized Debtors | 52 |

v

## TABLE OF CONTENTS
### (continued)

Page

VI. Certain Factors to be Considered ............................................................................. 52

    A.      Certain Risk Factors Relating to Confirmation of the Plan ............................. 52

          1.      Risk of Non-Confirmation of the Plan ........................................... 52

          2.      Non-Consensual Confirmation ....................................................... 52

          3.      Risk of Non-Occurrence of the Effective Date .............................. 53

    B.      Additional Factors to be Considered ............................................................. 53

          1.      The Plan Proponents Have No Duty to Update ............................... 53

          2.      No Representations Outside This Disclosure Statement Are Authorized ....................................................................................... 53

          3.      Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary ........................................... 53

          4.      This Disclosure Statement Is Not Legal or Tax Advice .................. 53

          5.      No Admission Made ........................................................................ 54

          6.      Access to Financing and Trade Terms ............................................ 54

          7.      Reorganized Debtor will be a Private Company .............................. 54

          8.      Significant Holders ......................................................................... 54

          9.      Illiquid Market ............................................................................... 54

          10.    Restrictions on Transfer ................................................................. 55

          11.    Dividend Policies ........................................................................... 55

VII. Certain Federal Income Tax Consequences of the Plan ........................................... 55

    A.      Consequences to the Debtors ......................................................................... 57

          1.      Net Operating Losses ...................................................................... 57

          2.      Cancellation of Debt ....................................................................... 57

    B.      Consequences to Holders of Certain Claims ................................................. 58

    1.      Holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, Allowed CSE Secured Claims against LRGI, and Allowed Senior Subordinated Note Claims ....................................................... 58

          *a.*      *Significant Modification* ....................................................... 58

          *b.*      *Determination Whether Existing or New Secured Debt or Senior Subordinated Notes are Securities* ........................ 59

NYC:203112.4

# TABLE OF CONTENTS
## (continued)

**Page**

   *i)*  *If the Senior Subordinated Notes are not Securities* ................... 59

   *ii)*  *If the Senior Subordinated Notes are Securities* ......................... 60

2. Holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, and Allowed CSE Secured Claims against LRGI ............. 60

3. Holders of Allowed General Unsecured Claims against LPC and Allowed General Unsecured Claims against LRGI .......................................... 60

4. Holders of Allowed Junior Subordinated Note Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in LPC ................................................................................................ 61

5. Character of Gain or Loss ...................................................................... 61

6. Original Issue Discount and Market Discount ...................................... 61

  *a.*  *Original Issue Discount* ........................................................... 61

  *b.*  *Market Discount* ...................................................................... 62

7. Distributions in Respect of Accrued Interest ....................................... 63

8. Ownership and Disposition of New LPC Common Stock ..................... 63

  *a.*  *Distributions* ............................................................................ 63

   *i)*  *Dividends to Non-Corporate Shareholders* ................................ 63

   *ii)*  *Dividends to Corporate Shareholders* ......................................... 64

  *b.*  *Sale or Other Disposition* ........................................................ 64

9. Disposition of New Secured Debt or New Unsecured Notes .............. 65

C. Information Reporting and Backup Withholding ................................. 65

VIII. SECURITIES LAW MATTERS .......................................................... 65

A. New LPC Common Stock and New LPC Warrants to be Issued to Holders of Claims Under the Plan ........................................................................ 65

B. New LPC Common Stock to be Distributed in Accordance with the Exit Financing Agreement ............................................................................ 66

C. Reorganized Debtor Will No Longer be a Public Company ................. 68

D. New Secured CapitalSource Debt and New Secured CSE Debt to be Issued to Holders of Claims Under the Plan ....................................... 69

E. Exit Financing Notes to be Distributed in Accordance with the Exit Financing Agreement ............................................................................ 70

NYC:203112.4

## TABLE OF CONTENTS
### (continued)

Page

F.    Stockholders' Agreement ............................................................................ 72

IX. Voting Procedures and Requirements ................................................................ 72

A.    Voting Deadline ........................................................................................ 72

B.    Holders of Claims Entitled to Vote .......................................................... 73

C.    Vote Required for Acceptance by a Class ................................................ 74

D.    Voting Procedures .................................................................................... 74

1.    Voting Procedures .............................................................................. 74

2.    Withdrawal of Ballot ......................................................................... 74

X. Confirmation of the Plan ................................................................................... 74

A.    The Confirmation Hearing ....................................................................... 74

B.    Objections to Confirmation ...................................................................... 75

C.    General Requirements for Confirmation .................................................. 75

D.    Best Interests Test .................................................................................... 77

E.    No Unfair Discrimination/Fair and Equitable Test .................................. 79

1.    No Unfair Discrimination ................................................................... 79

2.    Fair and Equitable Test ...................................................................... 79

a.    Secured Claims ........................................................................... 79

b.    Unsecured Claims ....................................................................... 79

c.    Interests ....................................................................................... 79

F.    Classification of Claims and Interests ...................................................... 80

G.    Feasibility ................................................................................................. 80

XI. Conclusion ......................................................................................................... 81

viii

# I.  INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), CapitalSource Finance LLC (in its capacity as agent under the Prepetition Credit Agreement (defined below), "<u>CapitalSource</u>"), CSE Mortgage LLC (in its capacity as agent under the Prepetition Loan Agreement (defined below), "<u>CSE Mortgage</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>" and together with CapitalSource and CSE Mortgage, the "<u>Plan Proponents</u>") of Lexington Precision Corporation ("<u>LPC</u>") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("<u>LRGI</u>"), as debtors and debtors in possession (together, the "<u>Debtors</u>" or "<u>Lexington</u>"), in jointly-administered cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>"), submit this disclosure statement (the "<u>Disclosure Statement</u>") to all holders of Claims against and Interests in the Debtors in connection with the Plan Proponents' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated December 16, 2009 (the "<u>Plan</u>"), attached hereto as **Exhibit A**.  Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the Plan.  **Please note that to the extent any inconsistencies exist between the Disclosure Statement and Plan, the Plan shall govern.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Plan and alternatives to the Plan, (4) the rights of holders of Claims and Interests under the Plan, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Plan.

The Plan Proponents developed the Plan in order to maximize recovery for the Debtors' creditors, while achieving a significant reduction in their consolidated indebtedness through a conversion of LPC's Senior Subordinated Notes into equity securities of LPC.

The Plan Proponents recommend that all holders of Claims vote to accept the Plan because the Plan will maximize such holders' recoveries.

**Please note that not all holders of Claims or Interests are entitled to vote.  If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement.  For more information as to which holders of Claims and Interests may vote, please refer to Section IV.B, "*Classification and Treatment of Classified Claims and Interests*" on page 26.  For voting procedures and important deadlines, please refer to Section IX, "*Voting Procedures and Requirements*" on page 72.**

On _____ __, 2010, the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Plan.  **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan or as to the accuracy or truth of the statements, information and data contained in this Disclosure Statement.**

On _____ __, 2010 at [ ____ ], the Bankruptcy Court shall hold a hearing to consider whether to approve and confirm the Plan (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time without notice. For more information on the confirmation process, please refer to Section X, "Confirmation of the Plan" on page 74.

For your reference, the following documents have also been attached to the Disclosure Statement:

(i)     The Plan (Exhibit A);

(ii)    Order of the Bankruptcy Court, dated __, 2010 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached without exhibits) (Exhibit B);

(iii)   LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (attached without exhibits as Exhibit C);

(iv)    LPC's Form 10-Q for the quarter ended September 30, 2009 (attached without exhibits as Exhibit D);

(v)     Historical Consolidated Income Statement of the Debtors (Exhibit E)

(vi)    Adjustments to Consolidated Income Statements of the Debtors (Exhibit F)

(vii)   Adjusted Income Statements of the Debtors (Exhibit G)

(viii)  Historical Consolidated Balance Sheets of the Debtors (Exhibit H)

(ix)    Liquidation Analysis (Exhibit I)

(x)     Projected Consolidated Income Statements of the Reorganized Debtors for the Four Years ending December 31, 2013 (Exhibit J); and

(xi)    Schedule of Uses of Funds (Exhibit K).

**This Disclosure Statement does not replace a careful and detailed review and analysis of the Plan by each holder of a Claim or Interest. Please use this Disclosure Statement to aid and supplement that review. The description of the Plan contained herein is only a summary and is qualified in its entirety by reference to the full text of the Plan; if any inconsistencies exist between the Plan and this Disclosure Statement, the Plan shall govern. The Plan Proponents urge holders of Claims and Interests to review the Plan and any related attachments in order to obtain a full understanding of the Plan.**

2

**IRS Circular 230 Notice**: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Plan Proponents of the transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

\* \* \*

The offer of LPC Common Stock (the "New LPC Common Stock") and New LPC Warrants (as defined on page 34) in exchange for certain existing Claims and outstanding securities of Lexington Precision Corporation has not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or similar state securities or "blue sky" laws. The issuance of such securities pursuant to the Plan is being done pursuant to the exemption available under section 1145 of the Bankruptcy Code. The New LPC Common Stock and New LPC Warrants to be issued pursuant to the Plan has not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan.

Certain statements contained in this Disclosure Statement, including the Projected Financial Information, are forward-looking statements. Forward-looking statements usually can be identified by the use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "forecasts," "projects," or the negative thereof. They may be used in discussions of strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events. Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties include:

- Increases and decreases in business awarded to the Debtors by their customers;

- Unanticipated price reductions for the Debtors' products as a result of competition;

- Changes in the cost of raw materials;

- Strength or weakness in the North American automotive market;

- Changes in the competitive environment;

3

- ▪ **Unanticipated operating results;**

- ▪ **Changes in economic conditions;**

- ▪ **Changes in interest rates;**

- ▪ **Financial difficulties encountered by customers or suppliers of the Debtors;**

- ▪ **Labor interruptions at the Debtors' facilities or at their customers' or suppliers' facilities;**

- ▪ **The Debtors' ability to develop adequate policies regarding and testing of internal control over financial reporting; and**

- ▪ **Other risks as disclosed in Section VI of this Disclosure Statement.**

**The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. There can be no assurance that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.**

The Agents present this Disclosure Statement as a negotiated settlement of certain issues with the Committee and have agreed to certain consolidated treatment of the LPC and LRGI estates; however, the Agents reserve the Prepetition Secured Lenders' respective rights to object to any proposed plan or disclosure statement that proposes to consolidate the LPC and LRGI estates.

## II.  EXECUTIVE SUMMARY

### A.    Summary of Classification and Treatment of Claims and Interests Under the Plan

The following summarizes the classification of Claims and Interests under the Plan and the respective distributions and recoveries to each such class. The following summary is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms of the Plan, please refer to Section IV, " *The Plan*" on page 24.

The Plan provides for 19 classes of Claims and Interests. Classes 1 through 12 are comprised of Claims against or Interests in LPC, and Classes 13 through 19 are comprised of Claims against or Interests in LRGI. A Claim or Interest is impaired if the Plan modifies or changes the rights of the Claims or Interests included in the Class. Holders of Claims and Interests in classes that are impaired: (i) may vote to accept or reject the Plan or (ii) may be deemed to reject the Plan. If a Class of Claims or Interests is not impaired pursuant to the Plan, holders of the Claims or Interests in that Class are automatically deemed to accept the Plan.

4

| LPC CLASS | Designation | STATUS | ENTITLED TO VOTE? | DISTRIBUTION UNDER PLAN |
|---|---|---|---|---|
| Class 1 | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| Class 2(a) | CapitalSource Secured Claims against LPC | Impaired | Yes | Satisfied by issuance of New Secured CapitalSource Debt and New LPC Warrants on the Effective Date |
| Class 2(b) | CSE Secured Claims against LPC | Impaired | Yes | Satisfied by issuance of New Secured CSE Debt and New LPC Warrants on the Effective Date |
| Class 3 | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full (i) on the Effective Date or (i) by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more than 5 years from the date of assessment. |
| Class 4 | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| Class 5 | Senior Subordinated Note Claims | Impaired | Yes | Paid in full on the Effective Date by issuance of pro rata share of 65% of New LPC Common Stock. |
| Class 6 | Junior Subordinated Note Claims | Impaired | No (deemed to reject) | No distribution or retention of property under the Plan. |
| Class 7 | General Unsecured Claims against LPC | Impaired | Yes | Paid in full, by issuance of New Unsecured LPC Notes on the Effective Date |
| Class 8 | Convenience Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| Class 9 | Asbestos-Related Claims | Impaired | No (deemed to reject) | Distributions limited to insurance proceeds |
| Class 10 | Series B Preferred Stock Interests | Impaired | No (deemed to reject) | No distribution or retention of property under the Plan. |
| Class 11 | LPC Common Stock Interests | Impaired | No (deemed to reject) | No distribution or retention of property under the Plan. |
| Class 12 | Other Equity Interests in LPC | Impaired | No (deemed to reject) | No distribution or retention of property under the Plan. |

| LRGI CLASS | Designation | STATUS | ENTITLED TO VOTE? | |
|---|---|---|---|---|
| Class 13 | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| Class 14(a) | CapitalSource Secured Claims against LRGI | Impaired | Yes | Satisfied by issuance of New Secured CapitalSource Debt and New LPC Warrants on the Effective Date |
| Class 14(b) | CSE Secured Claims against LRGI | Impaired | Yes | Satisfied by issuance of New Secured CSE Debt and New LPC Warrants on the Effective Date |
| Class 15 | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full (i) on the Effective Date or (i) by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more |

| LPC CLASS | Designation | STATUS | ENTITLED TO VOTE? | DISTRIBUTION UNDER PLAN |
|---|---|---|---|---|
| | | | | than 5 years from the date of assessment. |
| **Class 16** | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 17** | General Unsecured Claims against LRGI | Impaired | Yes | Paid in full, by issuance of New Unsecured LRGI Notes on the Effective Date |
| **Class 18** | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full, in Cash on the Effective Date |
| **Class 19** | Interests in LRGI | Unimpaired | No (deemed to accept) | Interests are left unaltered. |

### B.    <u>Summary of Voting Procedures</u>

If you are entitled to vote on the Plan, you will receive a ballot with this Disclosure Statement.  On the ballot, you may elect either to accept or reject the Plan.  If you return a ballot that does not indicate either an acceptance or rejection of the Plan, your vote shall not be counted.

**[___  __], 2010**, is the record date (the "<u>Voting Record Date</u>") to determine which holders of Claims or Interests may vote to accept or reject the Plan.

**[___  __], 2010  4:00 p.m. (Eastern Standard Time)** is the last day to vote (the "<u>Voting Deadline</u>").

NYC:203112.4

Ballots should be directed to the following address:

> **BMC Group**
> **Attn:  Lexington Precision Balloting**
> **PO Box 3020**
> **Chanhassen, MN 55317-3020**

Ballots submitted by overnight and hand delivery should be directed to the following address:

> **BMC Group**
> **Attn:  Lexington Precision Balloting**
> **18750 Lake Drive East**
> **Chanhassen, MN 55317**

Ballots submitted by electronic mail should be directed to the following address:

> Info@bmcgroup.com

**The Voting Agent must receive your ballot by (i) mail at street address above or (ii) e-mail in PDF form, each before the Voting Deadline for your vote to be counted.** The Voting Agent will not accept ballots sent by facsimile.  If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot.  If your ballot is damaged or lost, you should also contact the Voting Agent.

For more information on voting procedures, please refer to Section IX, " *Voting Procedures and* Requirements" on page 72.  Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

**C.**     **Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all economic parties in interest.  In addition, creditors and parties in interest may propose reorganization plans under certain circumstances.  In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying

7

claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor. Subject to certain limited exceptions, the confirmation order typically discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor or any other plan proponent to conduct such solicitation pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Plan Proponents are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III. OVERVIEW OF THE DEBTORS' OPERATIONS AND THE CHAPTER 11 CASES

### A.    Description of the Debtors' Operations

The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described in detail below. The business of the Rubber Group is conducted by LRGI, and the assets utilized in that business are owned by LRGI, a Delaware corporation, and a wholly-owned subsidiary of LPC, which is also a Delaware corporation. The business of the Metals Group is conducted by LPC, and the assets utilized in that business are owned by LPC.

#### 1.    The Rubber Group

According to the Debtors, the Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices.

The Rubber Group currently has two production facilities, each of which is virtually a stand-alone business unit, with a complete management team, primarily focused on a single product line. The Jasper, Georgia facility primarily specializes in insulators for automotive ignition systems and the Rock Hill, South Carolina facility primarily specializes in components for medical devices. Formerly, the Vienna, Ohio facility specialized in automotive connector seals and transmission seals. In view of the dramatic downturn in volume in the automotive original equipment market, the Debtors implemented a migration of assets from the Vienna, Ohio facility to the Rock Hill, South Carolina facility and the Jasper, Georgia facility. That consolidation of the connector seals business is discussed in more detail under the heading **"Connector Seals for Automotive Wiring Harnesses"** starting on page 12.

NYC:203112.4

### a.    The Automotive Aftermarket

In the automotive aftermarket, the Rubber Group supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors have indicated that the Rubber Group is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket.

### b.    The Automotive OEM Market

In the automotive OEM market, the Rubber Group has focused on two principal products, insulators for automotive ignition systems and connector seals for automotive wiring harnesses.   The Debtors have previously indicated that the Rubber Group is one of the two largest suppliers of connector seals in North America and the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market.   The Debtors have further indicated that the Rubber Group's sales of insulators to the OEM market have been limited by customer concerns about the Debtors' financial condition and that the Rubber Group's market share of insulators for automotive ignition systems in new vehicles will increase significantly following the conclusion of the Chapter 11 Cases.

### c.    The Medical Device Market

In the medical device market, the Rubber Group concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

### d.    The Rubber Group's Competitive Strengths

According to the Debtors, the Rubber Group's leading market positions, high profit margins, and prospects for growth once the Debtors' financial issues are behind them are a function of its ability to offer its customers a one-stop source for the development and delivery of complex molded-rubber components, with high quality and at competitive prices.   The Debtors have indicated that the Rubber Group has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including materials development, computer simulation, mold-making, rubber mixing, molding, process automation, and process management.[1]

### e.    Facilities of the Rubber Group

The Rubber Group operates two modern manufacturing facilities and one state-of-the-art design and mold production facility, all of which encompass 203,000 square feet of floor space with surrounding land. All of the operating facilities are owned by the Rubber Group, including certain real property located in Jasper, Georgia, North Canton, Ohio, and Rock Hill,

---

[1] This description of competitive strengths is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

South Carolina. In addition, the Rubber Group owns certain non-operating assets, including its former manufacturing facility and surrounding land in Vienna, Ohio, as well as vacant land in East Ellijay, Georgia.

The Debtors have previously indicated that the Rubber Group's facilities and equipment are well-maintained.  Because of reductions in volume and increases in productivity, each of the Rubber Group's plants has unused capacity in all functional areas at current volume levels.

The Rubber Group's production facilities are supported by the Engineering Center in North Canton, Ohio, and a materials-development and rubber-mixing facility within the Jasper, Georgia facility, as well as additional testing and mixing facilities in the Rock Hill, South Carolina facility. The Engineering Center and the materials development facility have bolstered the Rubber Group's status as custom molders by offering its customers various proprietary services, including computer simulation to optimize the design of a component, materials development to determine the optimal material for a component, and automation to produce complete assemblies. When coupled with the Rubber Group's low-cost manufacturing operations and quality record, these services have, according to the Debtors, made it a market leader in each of the markets the Rubber Group serves.

Note that in November 2008, the Rubber Group experienced a fire at its Rock Hill, South Carolina facility. The extent to which the November fire has affected the Debtors' operations, if at all, has not been disclosed. In addition, the Debtors had a receivable from their property insurance carrier in the amount of $634,000 at December 31, 2008, for expenditures relating to the fire. As of the filing date of LPC's Form 10-K for the fiscal year ending December 31, 2008, the Debtors had received $500,000 of the $634,000 and did not anticipate any problems in recovering the balance.

### f.    *Insulators for Automotive Ignition Systems*

According to the Debtors, insulators for automotive ignition systems (aftermarket and OEM) represent the Rubber Group's largest product category, accounting for more than fifty percent (50%) of the Rubber Group's net sales for the first seven months of 2009.

Insulators are molded rubber components that are used in ignition systems to seal and insulate the terminals on the spark plug and the distributor in a traditional ignition system, and the connection between the coil and the spark plug in a coil-on-plug ("COP") style ignition system.  Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers that assemble ignition-wire sets for the automotive OEMs and for retailers serving the automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

The Rubber Group is also a major supplier of insulators to companies that supply ignition-wire sets to the automobile manufacturers.  Through the Rubber Group's customers, Prestolite Wire, Diamond Electric, Weastec, and Ford, the Debtors have indicated that the Rubber Group is the largest supplier of insulators used on new Ford and Chrysler vehicles produced in North America.

10

g.    *Molded Rubber Components for Medical Devices*

According to the Debtors, components for medical devices are the Rubber Group's second largest product line, accounting for approximately one third (1/3) of the Rubber Group's net sales for the first seven months of 2009.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery devices, and catheters.   According to the Debtors, the Rubber Group has chosen to avoid commodity-type components (like plunger tips for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that the Rubber Group is able to offer.  These types of products include seals for laparoscopic surgery devices, injection sites for intravenous feeding systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

The following is a description of the Rubber Group's principal products for the medical device industry, grouped by application.[2]

(i)    Medication Delivery Systems. The Rubber Group supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and process repeatability.   Medication delivery products include injection sites for intravenous feeding systems that are assembled using high-speed, automated assembly equipment and plunger tips for syringes used in applications where dosages must be controlled with precision.  Medical applications that utilize the Rubber Group's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology applications, cardiac applications, and cosmetic surgery (Botox delivery).

(ii)    Laparoscopic Surgery Devices. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively-small punctures rather than through a large incision. Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection.

---

[2] This description of LRGI's medical products is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

NYC:203112.4

*h.*    ***Connector Seals for Automotive Wiring Harnesses***

According to the Debtors, connector seals for automotive wiring harnesses are the Rubber Group's third-largest product line, accounting for approximately one tenth (1/10) of the Rubber Group's net sales for the first seven months of 2009.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.

There are three standard types of connector seals. Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition. Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

The Rubber Group currently manufactures connector seals using both high-consistency silicone rubber ("HCR") and liquid silicone rubber ("LSR") at its facilities in Jasper, Georgia, and Rock Hill, South Carolina. The Rubber Group formerly conducted its connector seals operations in Vienna, Ohio (approximately equidistant between Cleveland and Pittsburgh). The Debtors have indicated that the migration of the connector seals operations was designed to reduce overhead costs and create an incremental EBITDA contribution from the connector seals business.

**2.    The Metals Group**

The Metals Group consists of the Debtors' machining business located in Rochester, New York. The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks. The Metals Group primarily uses multi-spindle screw machines and specially-designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time. The components produced by the Metals Group are primarily for use by automotive OEMs and include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components, primarily for use by the automotive OEMs.

The Metals Group's automotive OEM customers have historically included such major domestic suppliers as Borg Warner, Cooper--Standard Automotive, Delphi, and Jiffy-Tite.

*a.*    ***Strategic Alternatives***

According to the Debtors, the Metals Group has made significant progress in strengthening its operations and building its sales base but has not been able to generate adequate cash flow to justify continuing investment. The Debtors have further indicated previously that the net present value of the proceeds from a wind-down of the Metals Group's assets would be approximately $7.6 million, including liquidation of the ownership in certain real property located in Rochester, New York, and Lakewood, New York.

12

### 3.    Non-Operating Assets

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their on-going business.  The most significant of those assets are the following:

#### a.    *Land in East Ellijay, Georgia*

LRGI owns a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site, however, according to the Debtors, the adjacent area has seen extensive commercial development. According to the Debtors, LRGI has substantially completed the grading work necessary to prepare the property for sale.

The Debtors also own six residential lots aggregating 6.6 acres abutting this commercial property.

#### b.    *Land and Buildings in Lakewood, New York*

LPC owns a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of LPC's former die casting business, under a lease that expires on December 31, 2009.  The lessee pays LPC $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,000. The lease provides for a single, three-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

#### c.    *Land and Buildings in Vienna, Ohio*

The Debtors own a 52,540-square foot industrial building on 24.95 acres of land in Vienna, Ohio that was formerly used in connection with LRGI's connector seals business. As set forth in further detail in Section III.1(h) herein, "*Connector Seals for Automotive Wiring Harnesses*", the connectors seals business was consolidated into the Rock Hill, South Carolina, and Jasper, Georgia, facilities.

### 4.    Lexington's Employees

As of December 31, 2008, the Debtors employed approximately 482 permanent employees, including 408 LRGI employees, 68 LPC employees, and 6 corporate employees. The Debtors have indicated that their relationship with their employees is good. The Debtors' operations are subject to collective bargaining agreements at two facilities. Because the Debtors' Rock Hill, South Carolina manufacturing facility is an "open-shop," only certain of its hourly employees were covered by a collective bargaining agreement with the United Steel Workers of America, AFL-CIO, which expires on October 18, 2009. All of the hourly employees at the Vienna, Ohio manufacturing facility are covered by a collective bargaining agreement with the IUE-CWA, which was recently extended to March 11, 2009, pending discussions about the future of the facility.

13

B.    **Significant Indebtedness**

        The Debtors' significant prepetition indebtedness is described below.  In addition to this indebtedness for money borrowed, the Debtors have prepetition and postpetition trade accounts payable and other general unsecured claims of approximately $7.7 million.

      1.      **The Prepetition Credit Agreement**

        The Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource, as collateral agent, administrative agent, and lender, Webster Business Credit Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement").  The Credit Agreement provides for:  (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and (ii) an equipment term loan facility in the original principal amount of $12.5 million.

        Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of the Debtors' assets other than real estate and second priority liens on the Debtors' real estate.

        The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements.  As of the Commencement Date, approximately $22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

        As described in greater detail in Section IV.B.1.b, "*Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)*" on page 27, pursuant to the Plan, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims.  Holders of Class 2(a) Claims shall receive their pro rata share of New Secured CapitalSource Debt in full satisfaction of their Allowed Claims.

      2.      **The Prepetition Loan Agreement**

        The Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage, as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"), as amended pursuant to the Default Waiver Agreement.  The Prepetition Loan Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

        Pursuant to the Prepetition Loan Agreement, CSE Mortgage, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the Debtors' real estate, and second priority liens on substantially all of the Debtors' other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements.  As of March 31, 2008, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

As described in greater detail in Section IV.B.1.c, "*Class 2(b) – CSE Secured Claims against LPC (Impaired)*" on page 27, pursuant to the Plan, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims.  Holders of Class 2(b) Claims shall receive their pro rata share of New Secured CSE Debt in full satisfaction of their Allowed Claims.

### 3.    Senior Subordinated Notes

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes").  Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

According to the Debtors, approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates.  Approximately 59% of the Senior Subordinated Notes are held by members of the Committee.

As described in greater detail in Section IV.B.1.f, "*Class 5 – Senior Subordinated Note Claims (Impaired)*" on page 29, pursuant to the Plan, Claims arising from the Senior Subordinated Notes are classified as Class 5 Claims.  Each holder of a Class 5 Claim shall receive its pro rata share of New LPC Common Stock.

### 4.    Junior Subordinated Note

Michael A. Lubin, Chairman of the Board of the Debtors, holds an unsecured Junior Subordinated Note made by LPC and due November 1, 2009 in the principal amount of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note").  Interest on the Junior Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, $75,000 of accrued interest was outstanding with respect to the Junior Subordinated Note.

As described in greater detail in Section IV.B.1.g, "*Class 6 – Junior Subordinated Note Claims (Impaired)*" on page 29, pursuant to the Plan, Claims arising from the Junior Subordinated Note are classified as Class 6 Claims.  The Holder of the Class 6 Claims shall not receive or retain any property under the Plan on account of such Claims.

NYC:203112.4

C.    **The Asbestos Cases**[3]

      The Debtors have previously indicated that LPC is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos Actions").  In each case, the plaintiffs generally allege that LPC or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers.  Generally, none of the complaints allege any specific facts as to which products LPC allegedly produced that contained asbestos or the time of exposure.

      LPC has denied and continues to deny any liability with respect to the Asbestos Actions.  To date, the Debtors have never been found liable on any asbestos-related Claims and approximately 1,000 cases were dismissed.

      To date, Liberty Mutual and Home Insurance Company, who insured the Debtors for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors' defense costs.  On June 13, 2003, Home Insurance Company became subject to a state insurance liquidation proceeding.  As of December 17, 2008, Liberty Mutual continued to pay the Debtors' defense and other asbestos-related costs.

      The Debtors have indicated that they believe the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
| --- | --- |
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and bodily injury, $1,000,000 per occurrence, $1,000,000 in aggregate coverage for products liability |

      In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund.  The Debtors have indicated that Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage. The Debtors have further indicated that the Fireman's Fund coverage is as follows:

| Period | Coverage |
| --- | --- |
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |

---

[3] This description of the Asbestos Actions and claims arising therefrom is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

| Period | Coverage |
|---|---|
| 10/10/78-06/01/79 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

It should be noted that there may be filed certain Asbestos Related Claims with respect to years for which there may not be any insurance coverage. As described below, and as provided for in the Plan, the lack of insurance coverage for a valid and enforceable Asbestos Related Claim will not preclude a holder of such claim from receiving a distribution under the Plan.

As described in greater detail in Section IV.B.1.j, "Class 9 – Asbestos-Related Claims (Impaired)" on page 47, pursuant to the Plan, Asbestos-Related Claims are classified as Class 9 Claims. Each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date. Any claimant who has filed an Asbestos Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible commence a proceeding after the Effective Date in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.

Any recovery on any Asbestos-Related Claim shall be limited to the proceeds of the Insurance Policies and holders of Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than the Insurance Policies).

Because all Class 9 Claims are disputed and impaired pursuant to the Plan, holders of Asbestos-Related Claims are deemed to reject the Plan.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or any other party, including the Plan Proponents, or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or any other party, including the Plan Proponents, or insurance coverage by Liberty Mutual or Fireman's Fund.**

## D.   Significant Events Leading to the Commencement of the Chapter 11 Cases

According to the Debtors, historically over 75% of the Debtors' business represented sales of rubber and metal components used by tier-one automotive part manufacturers, which supply automotive parts to domestic OEMs. Over the past decade, there has been a substantial decline in the market share of the Detroit-based OEMs. Since 2005, but during 2008 in particular, there has been a meaningful reduction in the aggregate number of

17

vehicles produced annually in the U.S. by all manufacturers. These factors have caused tier-one suppliers, particularly those focused on the Detroit-based OEMs, to experience declining sales and increased pricing pressures. This challenging industry environment has been exacerbated by industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of component suppliers like the Debtors. Additionally, the Debtors' aftermarket business has declined over the past-five years although not as significantly as the OEM business.

According to the Debtors, they have responded to the reduction in OEM sales by restructuring their operations to reduce costs, which has enabled them to maintain significant operating and EBITDA margins despite declining sales and to increase their focus on their automotive aftermarket and medical device businesses.

### 1.    Liquidity Crisis[4]

Notwithstanding the operational restructuring and their efforts to diversify their business, the industry-wide reduction in automotive OEM orders began to affect the Debtors in a significant way in mid-2006. According to the Debtors, although they were able to maintain superior margins, the reduction in sales to the automotive OEMs had a significant impact on the Debtors' overall cash flow. At the same time, the Debtors' Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort. According to the Debtors, the combination of these factors caused a significant drain on the Debtors' cash.

On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes. The Debtors did not make the scheduled payment on the due date or within the thirty-day grace period, which constituted a default under the Indenture, and by February 1, 2007, that default created a cross-default under the Prepetition Credit Agreement and the Prepetition Loan Agreement. Shortly thereafter, certain holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee of Senior Subordinated Noteholders (the "Ad Hoc Committee").

### 2.    Restructuring Efforts[5]

From November 2006 through mid-March 2007, the Debtors engaged in discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues. In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all

---

[4] This description of the Debtors' liquidity crisis is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

[5] This description of the Debtors' restructuring efforts is based upon the Debtors' Disclosure Statement filed in these Chapter 11 Cases on December 17, 2008.

NYC:203112.4

stakeholders.  Upon entering into the standstill agreement, the Debtors engaged Campbell to assist them in seeking a refinancing or a sale of all or a portion of the Rubber Group.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers.  The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date.  In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code.  The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

The Debtors, assisted by Campbell, were able to obtain a number indications of interest for all or portions of LRGI.  Despite the indications of interest and the receipt of a non-binding proposal, subject to due diligence, from a multi-national manufacturer of rubber products to purchase LRGI's facility in Rock Hill, South Carolina, the Ad Hoc Committee and the Debtors were unable to reach agreement on the Rock Hill Sale or to achieve an extension of the standstill agreement. Consequently, the Debtors began preparations for chapter 11, finally determining that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code.

E.    **The Chapter 11 Cases**

1.    **Commencement of the Chapter 11 Cases and the "First-Day" Orders**

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases.  Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

a.    *Case Administration Orders*

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases.  These orders: (i) authorized the joint administration of the Chapter 11 Cases, (ii) established notice procedures, (iii) granted an extension of time to file the Debtors' schedules and statements, and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix.  In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

b.    *Critical Obligations*

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations.  The

NYC:203112.4

Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits, (ii) sales and use taxes, and (iii) claims of common carriers, equipment processors, and warehouses.

### c.    Customer and Employee Programs

Further, the Bankruptcy Court granted authority to continue certain business operations.  Among other things, the Bankruptcy Court authorized the Debtors to: (i) continue certain customer service programs and (ii) continue certain workers compensation and all other insurance policies.

### d.    Financing Arrangements

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to (i) use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing, (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral, and (iii) maintain their existing bank accounts and forms.

### 2.    Appointment of the Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee to represent the interests of all unsecured creditors in the Chapter 11 Cases.  The original members of the Committee were:

Wilmington Trust Company;

Jefferies High Yield Trading, LLC;

Wilfrid Aubrey, LLC;

Valhalla Capital Partners, LLC;

Momentive Performance Materials, Inc.;

Wacker Chemical Corporation; and

Environmental Products & Services of Vermont, Inc.

Representatives of Jefferies High Yield Trading, LLC, Wilfrid Aubrey, LLC, and Valhalla Capital Partners, LLC also served on the Ad Hoc Committee, as described in Section III.D.1, "*Liquidity Crisis*" on page 17.

Wacker Chemical Corporation resigned from the Committee on August 20, 2008.

On November 16, 2009, the U.S. Trustee appointed Sandler Capital Management to the Committee.

The Committee retained Andrews Kurth LLP as counsel to the Committee, and Stout Risius Ross, Inc. ("SRR") as financial advisor to the Committee.

### 3.    Use of Cash Collateral

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained by agreement the authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements.

The Debtors' use of the Prepetition Secured Lenders' cash collateral was subject to various conditions, including without limitation that a plan of reorganization be confirmed and consummated within three hundred thirty (330) days of the Commencement Date, or on or before February 25, 2009, and such plan was required to pay the Prepetition Secured Lenders' Claims indefeasibly in full on the effective date of any such plan.  On the condition that such a plan was timely consummated, the Prepetition Secured Lenders agreed to waive any incremental default interest from the Commencement Date through consummation of such plan.  The condition requiring consummation of a "take-out" plan was not met; thus the incremental default interest has not been waived by the Prepetition Secured Lenders.  The Debtors disagree with this analysis.

Near the expiration of the consensual term on February 2, 2009, the Debtors filed a motion for non-consensual use of the Prepetition Secured Lenders' cash collateral through December 31, 2009. Prior to the hearings on the Debtors' motion, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through February 6, 2009, net sales of at least 90% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under the cash collateral order entered on April 17, 2008 (the "Original Cash Collateral Order"). The Prepetition Secured Lenders have reserved their rights regarding such default.

At the hearings on the Debtors' motion on February 23 and 24, 2009, the Bankruptcy Court declined to approve the representative from Campbell as an expert because, among other things, Campbell provided its valuation report without independently verifying the Debtor's financial data and expressly disclaiming any responsibility for the accuracy of such data.

After the hearings on the Debtors' motion, the Court, by entry of a "Second Cash Collateral Order" extended the Debtors use of cash collateral for thirteen (13) weeks to May 22, 2009, on terms substantially similar to those of the Original Cash Collateral Order. The Debtors and Prepetition Secured Lenders negotiated a form of order, which included additional covenants regarding minimum cash balances and certain other performance metrics, as well as certain increased reporting requirements, all designed to protect against a rapid decline in value of the Prepetition Secured Lenders' collateral. In addition, the Prepetition Secured Lenders agreed to relax the net sales covenant from 90% to 85% of projected net sales; however, the Debtors failed to maintain on a cumulative basis, for the period from April 2, 2008 through May 1, 2009, net

21

sales of at least 85% of the net sales reflected in the cash collateral budget, which failure constituted a Termination Event and put them in default under the Second Cash Collateral Order. The Prepetition Secured Lenders have reserved their rights regarding such default.

On April 29, the Debtors filed a second motion to extend use of the Prepetition Secured Lenders' cash collateral for an additional thirteen weeks. Prior to the hearing on the Debtors' second motion, the Debtors and the Prepetition Secured Lenders negotiated an additional 13-week extension for the Debtors' further use of the Prepetition Secured Lenders' cash collateral through August 21, 2009 on substantially the same terms as the Original Cash Collateral Order and the Second Cash Collateral Order, which is reflected by the "Third Cash Collateral Order" entered in the Chapter 11 Cases on May 4, 2009. In addition, the Prepetition Secured Lenders agreed to further relax the net sales covenants from 85% to 82% of projected net sales.

On August 5, 2009, the Debtors filed a third motion to extend the Debtors' use of the Prepetition Secured Lenders' cash collateral by another 13 weeks. Prior to the hearing on the third motion, the Debtors and the Prepetition Secured Lenders agreed to a short-term extension for the Debtors' use of the Prepetition Secured Lenders' cash collateral from August 21, 2009 to September 25, 2009, on substantially the same terms as the Third Cash Collateral Order, which is reflected by a stipulation, agreement and order entered in the Chapter 11 Cases on August 17, 2009 (the "Fourth Cash Collateral Order").

On September 22, 2009, the Debtors and the Prepetition Secured Lenders agreed to a further short-term extension and filed an agreed order and stipulation for the Debtors' use of the Prepetition Secured Lenders' cash collateral from September 25, 2009, through October 30, 2009, on substantially the same terms as the Fourth Cash Collateral Order, and the court entered such order on September 25, 2009 (the "Fifth Cash Collateral Order").

On October 14, 2009, the Debtors filed another motion to extend the Debtors' use of the Prepetition Secured Lenders' cash collateral. Prior to the hearing on this additional motion, the Debtors and the Prepetition Secured Lenders agreed to an extension through December 31, 2009, on substantially the same terms as the Fifth Cash Collateral Order and prior cash collateral orders, which is reflected by a stipulation, agreement and order entered in the Chapter 11 Cases on October 28, 2009 (the "Sixth Cash Collateral Order"). The Prepetition Secured Lenders have not agreed to any further extension.

4.      **Debtor-in-Possession Financing**

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements. The Debtors also obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008. Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' board of directors and the Debtors' Co-Chief Executive Officer. William B. Connor currently serves as a director on the Debtors' board of directors. The Debtors have alleged that ORA Associates is not an insider of the Debtors.

The Bankruptcy Court authorized, on a final basis, the use of cash collateral and approved the DIP Note on April 17, 2008. The original maturity date of the DIP Note was April 1, 2009, which maturity date was extended upon motion by the Debtors to December 31, 2009. No additional fees were paid to the DIP Lenders in exchange for the extension. Under the terms and conditions of the Final Cash Collateral Order, repayment of the DIP Note was made expressly subordinate to, among other things, the Claims of the Prepetition Secured Lenders' Claims. The Debtors, DIP Lenders, and the Prepetition Secured Lenders disagree regarding the extent of the subordination, which issue is very likely to be litigated.

As described in Section IV.A.4, "*Debtor-in-Possession Loan Claims*" on page 26, Claims arising from the DIP Note shall, if authorized by the Bankruptcy Court, be paid in full in cash on the Effective Date.

## 5.    The Debtors' Exclusive Periods

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case. In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case. A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit acceptances thereof. The Debtors objected. On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive period to file a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively. On July 17, 2008, the Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend the Debtors' exclusive periods for an additional 90 days. On July 22, 2008, the Committee filed that objection. On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods. Thereafter, by decision and order dated July 31, 2008, the Court granted the Debtors an extension of the Debtors' exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

On October 7, 2008, the Debtors filed a second motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to January 26, 2009, and February 25, 2009, respectively. The Committee objected to the Debtors' motion. On October 28, 2008, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors' motion.

On January 12, 2009, the Debtors filed a third motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances. The Committee and the Prepetition Secured Lenders objected to the Debtors' motion. The Debtors also filed a motion for a bridge order extending the Debtors exclusive periods pending a hearing on the Debtors' third

23

extension motion. After hearings on February 23 and 24, 2009, the Court extended the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof to April 30, 2009 and June 1, 2009, respectively.

The Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances expired on April 30, 2009 and June 1, 2009, and have not been extended.

### 6.    The Mediation Process

In connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of cash collateral and the Debtors' third motion to extend the exclusive periods, the Bankruptcy Court ordered that the Debtors, the Committee, and the Prepetition Secured Lenders to attend mediation sessions regarding valuation, structure of potential consensual plans of reorganization, and the ultimate resolution of these Chapter 11 Cases. The parties agreed upon the appointment of Seymour Preston, Jr., of Goldin Associates, who conducted several mediation sessions with the Debtors and the Committee after submission of valuation reports from Campbell and SRR.

To date, the mediation has not produced an agreement between the Debtors and the Committee.

### 7.    The Claims Reconciliation Process

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline for any claimant other than (i) a counterparty to an executory contract rejected by the Debtors after July 16, 2008 or (ii) a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of claim. The deadline for a counterparty to an executory contract rejected by the Debtors after July 16, 2008 is discussed under the caption **"Rejection Damage Claims,"** on page 40. The deadline for Government Units to file a proof of claim was September 29, 2008. In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of claim form. The notice included information as to how to file a proof of claim and whether filing a proof of claim is necessary. On July 18, 2008, the Debtors also published the same notice in the national edition of <u>The Wall Street Journal</u>.

## IV. THE PLAN

This Section of the Disclosure Statement summarizes the Plan, which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the full text of the Plan. To the extent any inconsistencies exist between the Disclosure Statement and Plan, the Plan shall govern.

## A.    Summary and Treatment of Unclassified Claims

The Plan does not classify all Claims and Interests.  In particular, Claims incurred during the course of the Chapter 11 Cases (*i.e.*, Administrative Expense Claims) and Priority Tax Claims are unclassified.  A summary of these Claims is set forth below.

### 1.    Administrative Expense Claims

Administrative Expense Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Commencement Date.  Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to the Debtors and Committee that are incurred during the pendency of the Chapter 11 Cases.

Pursuant to Section 2.1 of the Plan, each holder of an Allowed Administrative Expense Claim shall receive Cash in the amount of its Allowed Administrative Expense Claim on or soon as reasonably practicable following the later of (a) the Effective Date or (b) the date on such Claim is Allowed, except that (i) any Allowed Administrative Expense Claim incurred in the ordinary course of business shall be paid in the ordinary course of business, consistent with past practice and (ii) any Allowed Administrative Expense Claims arising from liabilities incurred under loans, advances, or other obligations shall be paid in accordance with the terms and subject to the conditions of the documents governing such obligations.  Holders of Allowed Administrative Expense Claims may also elect to receive less favorable treatment.

### 2.    Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court shall fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date.  Each holder of such a Claim shall be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (a) the Effective Date or (b) the date which such Claim is Allowed.  The Debtors are authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

### 3.    Indenture Trustee Fee Claims

Indenture Trustee Fee Claims are Administrative Expense Claims of the Indenture Trustee for reimbursement of its reasonable accrued and unpaid fees and expenses under the

Indenture.  The Indenture grants the Indenture Trustee a lien (the "Charging Lien") upon and priority in payment with respect to any distributions to holders of the Senior Subordinated Note Claims for payment of any Indenture Trustee Fees Claims arising prior to the Effective Date.

The holder of the Indenture Trustee Fee Claims shall be paid in Cash on the Effective Date by Reorganized LPC without the need for Bankruptcy Court approval.  The Charging Lien shall be discharged upon payment in full of the Indenture Trustee Fee Claims. Nothing in the Plan shall impair, waive, or discharge the Charging Lien with respect to any fees or expenses not paid by Reorganized LPC.

### 4.        Debtor-in-Possession Loan Claims

DIP Loan Claims are all Claims arising under the DIP Note and the Final Cash Collateral Order with respect to the DIP Note.  Each holder of a DIP Loan Claim shall receive on the Effective Date, cash in the total amount of their DIP Loan Claims, in full satisfaction of said DIP Loan Claims; provided, however, if the Bankruptcy Court determines that the Final Cash Collateral Order does not allow payment of the DIP Loan Claims in full in cash on the Effective Date, the DIP Loan Claims shall be paid as directed by the Bankruptcy Court under the Confirmation Order.

### 5.        Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim shall receive, at the the Reorganized Debtors' option, (a) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date and (ii) the date such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

### B.        Classification and Treatment of Classified Claims and Interests

Pursuant to the Plan, there are a total of 19 Classes, with Classes 1 through 12 being Claims against or Interests in LPC and Classes 13 through 19 being Claims against or Interests in LRGI.

Unless indicated otherwise, all distributions shall be in full satisfaction of each Allowed Claim or Interest and shall be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed.  Further, claimholders can generally agree to receive less favorable treatment than the treatment provided

for by the Plan. Unless otherwise indicated, the Debtors have based the characteristics and amounts of the Claims or Interests on the Debtors' books and records.

1.      **Claims against and Interests in LPC**

a.      ***Class 1 – Other Priority Claims against LPC (Unimpaired)***

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LPC shall receive Cash in the amount of its Allowed Other Priority Claims against LPC. Because Class 1 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

b.      ***Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)***

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Allowed Amount of the CapitalSource Secured Claims against LPC shall include default interest, fees, expenses, costs, and other charges under the Prepetition Credit Agreement (including without limitation full reimbursement of financial advisor and legal fees incurred in connection with the Chapter 11 Cases) and will be set forth in a stipulation between the Committee and the Prepetition Secured Lenders, which stipulation will be presented at or before the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LPC shall receive, as soon as reasonably practicable after the the Effective Date, its pro rata share of the New Secured CapitalSource Debt and the New LPC Warrants. Because Class 2(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LPC are entitled to vote to accept or reject the Plan.

c.      ***Class 2(b) – CSE Secured Claims against LPC (Impaired)***

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE Mortgage, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Allowed Amount of the CSE Secured Claims against LPC shall include default interest, fees, expenses, costs, and other charges under the Prepetition Loan Agreement (including without limitation full reimbursement of financial advisor and legal fees incurred in connection with the Chapter 11 Cases) and will be set forth in a stipulation between the Committee and the Prepetition Secured Lenders, which stipulation will be presented at or before the Confirmation Hearing.

27

Each holder of an Allowed CSE Secured Claim against LPC shall receive, as soon as reasonably practicable after the the Effective Date, its pro rata share of the New Secured CSE Debt and the New LPC Warrants. Because Class 2(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LPC are entitled to vote to accept or reject the Plan.

**d.      Class 3 – Secured Tax Claims against LPC (Unimpaired)**

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC shall receive, at the Reorganized Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against LPC; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LPC, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LPC deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim against LPC. Because Class 3 Claims are not impaired pursuant to the Plan, holders of Secured Tax Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**e.      Class 4 – Other Secured Claims against LPC (Unimpaired)**

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claims against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of Reorganized LPC, the Reorganized Debtors may (i) reinstate any Other Secured Claim against LPC or (ii) distribute to holders of an Allowed Other Secured Claim against LPC (w) Cash in the amount of such Claim, (x) the sale or disposition of proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event the Reorganized Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released. Because Class 4 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

NYC:203112.4

      *f.*      ***Class 5 – Senior Subordinated Note Claims (Impaired)***

      Class 5 Claims are all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as Indenture Trustee, and LPC, as issuer, which shall include interest at 12% per annum through the Commencement Date.

      Each holder of an Allowed Senior Subordinated Note Claim shall receive, as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed, its pro rata share of 65% of the New LPC Common Stock.  Because Class 5 Claims are impaired pursuant to the Plan, holders of Allowed Senior Subordinated Note Claims are entitled to vote to accept or reject the Plan.

      *g.*      ***Class 6 – Junior Subordinated Note Claims (Impaired)***

      Class 6 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which shall include interest at 13% per annum.

      The holder of the Allowed Junior Subordinated Note Claims shall not receive or retain any property under the Plan on account of such Claims.  The holder of the Allowed Junior Subordinated Note Claims is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

      *h.*      ***Class 7 – General Unsecured Claims against LPC (Impaired)***

      Class 7 Claims are all Unsecured Claims against LPC not classified in any other Class (*e.g.*, Classes 5, 6, 8, or 9).

      Each holder of an Allowed General Unsecured Claim against LPC shall receive, as soon as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed, its pro rata share of the New Unsecured LPC Notes. Because Class 7 Claims are impaired pursuant to the Plan, holders of Allowed General Unsecured Claims against LPC are entitled to vote to accept or reject the Plan.

      *i.*      ***Class 8 – Convenience Claims against LPC (Unimpaired)***

      Class 8 Claims comprise all Unsecured Claims against LPC that are Allowed in the amount of $2,000.00 or less or (ii) Allowed in a larger amount but reduced to $2,000 by the holder of such Claim.

      As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Claim against LPC shall receive Cash in the amount of its Allowed Convenience Claim against LPC. Because Class 8 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### j.    Class 9 – Asbestos-Related Claims (Impaired)

Class 9 Claims are any Asbestos-Related Claims, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.

Each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date. Any claimant who has filed an Asbestos Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall promptly as possible commence a proceeding after the Effective Date in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.

Any recovery on any Asbestos-Related Claim shall be limited to the proceeds of the Insurance Policies and holders of Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than the Insurance Policies).

Because Class 9 Claims are disputed and impaired pursuant to the Plan, holders of Asbestos-Related Claims are not entitled to vote to accept or reject the Plan.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

### k.    Class 10 – Series B Preferred Stock Interests (Impaired)

Class 10 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

On the Effective Date, the Series B Preferred Stock Interests shall be cancelled and holders of Series B Preferred Stock shall not receive or retain any property under the Plan on account of such Interests. Holders of Series B Preferred Stock Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### l.    Class 11 – LPC Common Stock Interests (Impaired)

Class 11 LPC Common Stock Interests are Interests of any holder of LPC Common Stock.

On the Effective Date, the LPC Common Stock Interests shall be cancelled and holders of LPC Common Stock shall not receive or retain any property under the Plan on account of such Interests.  Holders of LPC Common Stock are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**m.      Class 12 – Other Equity Interests in LPC (Impaired)**

Class 12 Other Equity Interests are Interests of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including the LPC Warrants, but excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests.

On the Effective Date, all Other Equity Interests shall be cancelled and holders of Other Equity Interests shall not receive or retain any property under the Plan on account of such Interests.  Holders of Other Equity Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**2.      Claims against and Interests in LRGI**

**a.      Class 13 – Other Priority Claims against LRGI (Unimpaired)**

Class 13 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LRGI shall receive Cash in the amount equal of its Allowed Other Priority Claim against LRGI.  Because Class 13 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**b.      Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired)**

Class 14(a) Claims are all Claims against LRGI arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Allowed Amount of the CapitalSource Secured Claims against LRGI shall include default interest, fees, expenses, costs, and other charges under the Prepetition Loan Agreement (including without limitation full reimbursement of financial advisor and legal fees incurred in connection with the Chapter 11 Cases) and will be set forth in a stipulation between the Committee and the Prepetition Secured Lenders, which stipulation will be presented at or before the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LRGI shall receive, as soon as reasonably practicable after the Effective Date, its pro rata share of the New

31

Secured CapitalSource Debt and the New LPC Warrants. Because Class 14(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### c.    Class 14(b) – CSE Secured Claims against LRGI (Impaired)

Class 14(b) Claims are all Claims against LRGI arising under the Prepetition Loan Agreement and all Claims of CSE Mortgage, as agent for the Prepetition Lenders and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Allowed Amount of the CSE Secured Claims against LRGI shall include default interest, fees, expenses, costs, and other charges under the Prepetition Loan Agreement (including without limitation full reimbursement of financial advisor and legal fees incurred in connection with the Chapter 11 Cases) and will be set forth in a stipulation between the Committee and the Prepetition Secured Lenders, which stipulation will be presented at or before the Confirmation Hearing.

Each holder of an Allowed CSE Secured Claim against LRGI shall receive, as soon as reasonably practicable after the Effective Date, its pro rata share of the New Secured CSE Debt and the New LPC Warrants. Because Class 14(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### d.    Class 15 – Secured Tax Claims against LRGI (Unimpaired)

Class 15 Claims are Claims against LRGI that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI shall receive, at the Reorganized Debtors' election, either: (a) Cash in the amount of its Allowed Secured Tax Claim against LRGI; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LRGI with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LRGI deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Claim against LRGI. Because Class 15 Claims are not impaired pursuant to the Plan, holders of Secured Tax Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### e.    Class 16 – Other Secured Claims against LRGI (Unimpaired)

Class 16 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such

Other Secured Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of Reorganized LRGI, the Reorganized Debtors may (i) reinstate any Other Secured Claim against LRGI or (ii) distribute to holders of an Allowed Other Secured Claim against LRGI  (w) Cash in the amount of such Claim, (x) the sale or disposition proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral, which secures Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Reorganized Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim shall be deemed released.  Because Class 15 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### f.        Class 17 – General Unsecured Claims against LRGI (Impaired)

Class 17 Claims are all Unsecured Claims against LRGI not classified in any other class.

Each holder of an Allowed General Unsecured Claim against LRGI shall receive, as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Claim is Allowed, its pro rata share of the New Unsecured LRGI Notes. Because Class 17 Claims are impaired pursuant to the Plan, holders of General Unsecured Claim against LRGI are entitled to vote to accept or reject the Plan.

### g.        Class 18 – Convenience Claims against LRGI (Unimpaired)

Class 18 Claims comprise all Unsecured Claims against LRGI that are (i) Allowed in the amount of $2,000.00 or less or (ii) Allowed in a larger amount but reduced to $2,000.00 by the holder of such Claim.

As to be described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Class Claim shall receive Cash in the amount of its Allowed Convenience Claim against LRGI.  Because Class 18 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

h.    *Class 19 – Interests in LRGI (Unimpaired)*

Class 19 Equity Interests are all Interests in LRGI, all of which are owned by LPC.  All the Interests in LRGI shall be unaltered.  Because Class 19 Equity Interests are not impaired pursuant to the Plan, the holder of Interests in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

C.    **Distributions Pursuant to the Plan**

1.    **Distributions**

A Disbursing Agent shall make all distributions under the Plan.  For all distributions except those made with respect to Allowed Senior Subordinated Notes, Reorganized LPC shall be the Disbursing Agent.  For distributions made with respect to Allowed Senior Subordinated Notes, the Indenture Trustee, or such other entity as designated by the Reorganized Debtors, shall be the Disbursing Agent.

The Disbursement Record Date is three (3) days after the Confirmation Date, at which time the claims registry shall be closed.  The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the Debtors' schedules, books and records, or in any proofs of claim filed.  Any Cash distribution shall be made by check or wire transfer or as otherwise provided by any applicable agreements.

No Cash distributions under $50 shall be made unless the holder sends a written request to the Disbursing Agent.  No fractional shares of New LPC Common Stock shall be distributed under the Plan.  If an Allowed Claim results in distribution of a number of shares that is not a whole number, the number of share shall be rounded up to the next whole number if the fraction is one-half (½) or greater and rounded down to the next lower whole number if the fraction is less than one-half (½).

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent shall use reasonable efforts to locate the holder.  If the distribution remains undeliverable one year after the Effective Date, the distribution shall revert back to the respective Reorganized Debtor.

The Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim the Debtors or the Reorganized Debtors may have against the holder of such Claim; provided, however, that neither the Debtors nor the Reorganized Debtors shall exercise setoff rights with respect to the respective Claims of the Holders of the Senior Subordinated Notes, the Exit Financing Parties, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement.

34

## 2.    Surrender or Transfer of the Senior Subordinated Notes

Unless this requirement is waived by LPC or Reorganized LPC, in order to receive any distribution, holders of the Senior Subordinated Notes Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (a) submit a lost instrument affidavit and post an indemnity bond and (b) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the Plan, within one year of the Effective Date, such holder shall be deemed to have no further Claim against the Debtors or their property and shall not receive any distributions.

## D.    **Implementation of the Plan and Related Documents**

## 1.    **The Exit Financing Agreement**

To fund the distributions under the Plan (including those used to satisfy the DIP Note) and the continued operations of the Reorganized Debtors, the Reorganized Debtors shall enter into an exit financing arrangement with principal terms as set forth on Exhibit 1.43 of the Plan (the "Exit Financing Agreement") with certain holders of Allowed Senior Subordinated Note Claims (the "Exit Financing Parties"), pursuant to which the Reorganized Debtors will issue unsecured, subordinated  notes (the "Exit Financing Notes") in an amount equal to $9.5 million. Under the Exit Financing Agreement, the Reorganized Debtors will also issue 35% of New LPC Common Stock and a note in the amount of $1.5 million (the "Exit Financing Fee Notes") to the Exit Financing Parties. The Exit Financing Notes and Exit Financing Fee Notes shall be unsecured and fully subordinated to the New Secured CapitalSource Debt, the New Secured CSE Debt, and the New Priority Working Capital Facility (as defined below), such that there shall be no payment on account of the Exit Financing Notes and the Exit Financing Fee Note unless and until all obligations under the New Secured CapitalSource Credit Agreement, the New Secured CSE Loan Agreement and the New Priority Working Capital Facility are paid indefeasibly in full.  The Exit Financing Agreement shall be approved concurrently with confirmation of the Plan.

A copy of the Exit Financing Agreement will be included in the Plan Supplement. As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

Attached as Exhibit K to this Disclosure Statement is a schedule reflecting the anticipated sources and uses of funds to be received by the Reorganized Debtors pursuant to the issuance of the Exit Financing Notes under the Exit Financing Agreement.

2.      **The New Secured CapitalSource Credit Agreement**

On the Effective Date, pursuant to a secured credit facility with principal terms as set forth in Exhibit 1.70 of the Plan (the "New Secured CapitalSource Credit Agreement"), the principal amounts outstanding under the Prepetition Credit Agreement will be reinvested in the Reorganized Debtors in the form of new debt obligations  (the "New Secured CapitalSource Debt") that will rank senior to the Exit Financing Notes and have the same security package and ranking as the loans under the Prepetition Credit Agreement.  The Holders of Allowed Class 2(a) and Class 14(a) Claims shall also receive, along with the Holders of Allowed Class 2(b) and Class 14(b) Claims, their pro rata share of warrants (the "New LPC Warrants") exercisable for an aggregate of 100,000 shares of the New LPC Common Stock (on a fully-diluted basis). The New LPC Warrants shall be exercisable upon a liquidity event of Reorganized LPC and shall expire upon full payment and satisfaction of the New Secured CapitalSource Debt and the New Secured CSE Debt.  The New LPC Warrants shall include exercise price terms and put option rights such that the Holders of Allowed Class 2(a), Class 2(b), Class 14(a) and Class 14(b) Claims shall receive their pro rata portion of the net proceeds generated in a liquidity event of Reorganized LPC following satisfaction of the New Secured CapitalSource Debt, the New Secured CSE Debt, the Exit Financing Notes and recoveries to the Holders of Senior Subordinated Notes equal to seventy percent (70%) of the pre-petition principal amount outstanding of Senior Subordinated Notes (approximately $23.9 million).

A copy of the New Secured CapitalSource Credit Agreement will be included in the Plan Supplement.  As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

3.      **The New Secured CSE Loan Agreement**

On the Effective Date, pursuant to a secured credit facility with principal terms as set forth in Exhibit 1.73 of the Plan (the "New Secured CSE Loan Agreement"), the principal amounts outstanding under the Prepetition Loan Agreement will be reinvested in the Reorganized Debtors in the form of new debt obligations (the "New Secured CSE Debt") that will rank senior to the Exit Financing Notes and have the same security package and ranking as the loans under the Prepetition Loan Agreement.  The Holders of Allowed Class 2(b) and 14(b) Claims shall also receive, along with the Holders of Allowed Class 2(a) and Class 14(a) Claims, their pro rata share of the New LPC Warrants.

A copy of the New Secured CSE Loan Agreement will be included in the Plan Supplement.   As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

4.      **The New Priority Working Capital Facility**

To fund the continuing operations of the Reorganized Debtors, on the Effective Date, the Reorganized Debtors shall enter into a new first priority working capital facility with principal terms as set forth on Exhibit 1.68 of the Plan (the "New Priority Working Capital Facility") with CapitalSource and Webster Business Credit Corporation, as lenders under the

New Priority Working Capital Facility pursuant to which the Reorganized Debtors may incur up to $4 million of principal amount of indebtedness. The amounts outstanding under the New Priority Working Capital Facility shall be secured by a first-priority lien (subject to the terms of that certain Intercreditor Agreement, dated as of May 31, 2006, by and among CapitalSource Finance LLC as agent under the Prepetition Credit Agreement, and CSE Mortgage LLC, as agent under the Prepetition Loan Agreement, regarding the Prepetition Credit Agreement and Prepetition Loan Agreement, as such intercreditor agreement as may have been and may be further amended) on the assets of the Reorganized Debtors.

5.    **The New Unsecured LPC Notes**

On the Effective Date, the holders of Allowed General Unsecured Claims against LPC shall receive notes (the "New Unsecured LPC Notes") in the full amount of their Class 7 Claims.

A copy of the New Unsecured LPC Note will be included in the Plan Supplement. As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

6.    **The New Unsecured LRGI Notes**

On the Effective Date, the holders of Allowed General Unsecured Claims against LRGI shall receive notes (the "New Unsecured LRGI Notes") in the full amount of their Class 17 Claims.

A copy of the New Unsecured LRGI Note will be included in the Plan Supplement. As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

7.    **Cancellation of Documents, Agreements, and Debt Instruments**

As noted in Sections IV.A and IV.B of this Disclosure Statement, Cash payments or other consideration will be distributed pursuant to the Plan in satisfaction of all Claims and Interests and any document, agreement, or debt instrument evidencing any Claim or Interest shall be automatically cancelled upon the Effective Date without any requirement for any further act or action. Affected documents include, but are not limited to, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture, the Senior Subordinated Notes, the Junior Subordinated Note, shares of the Series B Preferred Stock, and shares of the LPC Common Stock.

8.    **Amended and Restated Charter and Amended and Restated By-Laws**

On the Effective Date or as soon as practicable thereafter, Reorganized LPC shall file an amended and restated certificate of incorporation (the "Amended and Restated Charter") with the Secretary of State of the State of Delaware and adopt amended and restated by-laws (the "Amended and Restated By-Laws"). The Amended and Restated Charter will amend and restate LPC's certificate of incorporation in its entirety in order to, among other things, (i) change the

number of authorized shares of LPC Common Stock to 1,000,000 and (ii) cancel the shares of Series B Preferred Stock. The Amended and Restated By-Laws will amend and restate LPC's by-laws in their entirety.

The Plan authorizes Reorganized LPC to file the Amended and Restated Charter and adopt the Amended and Restated By-Laws without any further corporate action or any action by holders of Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, or Other Equity Interests.

A copy of the Amended and Restated Charter and the Amended and Restated By-Laws will be included in the Plan Supplement. As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.

### 9. Corporate Action, Effectuating Documents, and Further Transactions.

On the Effective Date, all matters provided for under the Plan that would otherwise require the approval of stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment; the issuance of the shares of the New LPC Common Stock and the New LPC Warrants; the increase in the size of the Boards of Directors of the Reorganized Debtors; and the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) shall be deemed to have been approved and such approval shall be in effect from and after the Effective Date pursuant to the applicable General Corporation Law of the State of Delaware, without the necessity for any further acts by the stockholders or directors of the Debtors or the Reorganized Debtors.

Upon confirmation of the Plan, the Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities to be issued pursuant to the Plan.

### E. Provisions for the Treatment of Disputed Claims

### 1. Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated shall not receive a distribution as provided under the Plan unless and until such Claim is Allowed.

Only the Plan Proponents or the Reorganized Debtors may object to a Claim. The Plan Proponents may object to any Claim until the Effective Date and the Reorganized Debtors may object to any Claim from and after the Effective Date. Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court or (ii) a date to be fixed by the Bankruptcy Court.

**2.      Resolution of Administrative Expense Claims and Other Claims**

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims, other than Professional Compensation and Reimbursement Claims, without further order of the Bankruptcy Court.

**3.      Claim Estimation**

A party may at any time request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, regardless of whether the Claim is subject to an objection.  If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, a party may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**4.      Payment and Distribution on Disputed Claims**

When a Disputed Claim is Allowed, the holder of such Claim shall receive the distribution provided by the Plan to the extent such Claim is Allowed.

**F.      Prosecution of Claims Held by the Debtors**

From and after the Effective Date, the Reorganized Debtors shall, as representatives of the Debtors' estates, litigate any claims or causes of action that constituted assets of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or other actions instituted by the Debtors.

**G.      Executory Contracts and Unexpired Leases**

**1.      Assumption of Executory Contracts and Unexpired Leases**

As of the Effective Date, the Debtors shall assume all executory contracts and unexpired leases to which the Debtors are a party, except for (i) any executory contract or lease that the Debtors previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order; (ii) any executory contract or lease, with respect to which the Debtors served and filed before the Confirmation Date a motion to assume, assume and assign, or reject, or (iii) any executory contract or lease listed on Schedule 8.1 of the Plan Supplement.

The Plan Proponents may amend Schedule 8.1 of the Plan Supplement at any time before the Confirmation Date. If the Plan Proponents add an executory contract or lease to Schedule 8.1, the Plan Proponents shall provide notice to all counterparties.

Unless otherwise specified, the inclusion of any executory contract or lease on Schedule 8.1 shall include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease, even if Schedule 8.1 does not include such documents. The inclusion of any executory contract or lease on Schedule 8.1 is not an admission that such document or any related documents is an executory contract or unexpired lease.

## 2.    Cure of Defaults

Prior to assuming any executory contract or unexpired lease, the Debtors must cure any monetary defaults and compensate counterparties for any non-monetary defaults. At least twenty (20) days prior to the Confirmation Hearing, the Plan Proponents shall serve on all counterparties to executory contracts and unexpired leases a notice indicating a proposed cure amount for the respective contract or lease. Counterparties shall have twenty (20) days from the date of service to object to the proposed cure amount. If any objection is filed, the Bankruptcy Court shall hold a hearing to resolve such objection.

Notwithstanding Section 8.1 of the Plan and Section IV.F.1 of this Disclosure Statement, the Plan Proponents reserve the right to reject any executory contract or lease if any objection is filed with respect to the cure amount.

## 3.    Rejection Damage Claims

If an executory contract or lease is rejected, the counterparty must assert any Claim by filing a proof of claim with the claim agents for the Chapter 11 Case, Epiq Bankruptcy Solutions LLC, within thirty (30) days following the earlier of (i) the date of service of the notice of the Effective Date, or (ii) entry of an order rejecting such executory contract or unexpired lease (solely with respect to the party directly affected by such rejection). If the counterparty fails to file a proof of claim, the counterparty shall be barred from asserting any Claim related to the rejection of the contract or lease in the future and shall not receive any distribution under the Plan.

The Plan Proponents reserve the right to have potential rejection damage claims estimated for voting purposes, with any such estimated claim participating in the applicable class of unsecured creditors.

## 4.    Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits

With the exception of any Insurance Policy, employee compensation program, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order, the Plan shall treat all Insurance Policies and employee compensation and benefit programs as executory contracts and the Debtors shall assume all such policies and programs.

40

To the extent the Insurance Policies are determined not to be executory contracts, they will remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory. The Plan shall not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors shall be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which shall continue in full force and effect. Notwithstanding anything to the contrary contained in the Plan or the Disclosure Statement, to the extent that there is any inconsistency between the Insurance Policies and any provision of the Plan or Disclosure Statement, the terms of the Insurance Policies shall control. No provision of the Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or be deemed to create any insurance coverage that does not otherwise exist under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X thereof and anything supervening or preemptory, the Plan and Confirmation of the Plan shall be without prejudice to any of the insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which the insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

The Reorganized Debtors shall continue to pay all the Debtors' retiree benefits for the same duration for which the Debtors were obligated to provide such benefits.

## H.   Reservation of "Cram Down" Rights

In the event that any impaired Class of Claims or Equity Interests shall fail to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Plan Proponents reserve the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (b) amend the Plan. As described in Section VI.A.2, "*Non-Consensual Confirmation*" on page 52, the Plan Proponents may confirm the Plan without the consent of all parties in interest.

## I.   Conditions Precedent to the Effective Date of the Plan

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions precedent are satisfied or waived: (a) a Confirmation Order, in form and substance acceptable to the Plan Proponents, shall have been entered and shall not be

subject to any stay or injunction; (b) all actions, documents, and agreements that are necessary to implement the Plan shall have been completed and be effective; (c) all conditions precedent to the completion of the New Secured CapitalSource Credit Agreement, the New Secured CSE Loan Agreement and the Exit Financing Agreement shall have been satisfied or waived and the Reorganized Debtors shall have access to the funding thereunder; and (d) all authorizations, consents, regulatory approvals, and other authorizations necessary to the implementation of the Plan, as is required by law, regulation, or order shall have been received.

In their sole discretion, the Plan Proponents may waive any of the aforementioned conditions precedent  other than item (a) without Bankruptcy Court approval; provided that such waiver is by the party in whose favor such conditions precedent run, with such waiving party being only either the Committee or the Agents, as applicable.  Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

If the conditions precedent are not satisfied on or prior to the 120th (one hundred twentieth) day after the Confirmation Order becomes a Final Order and upon motion by any of the Plan Proponents, then (i) the Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Interests shall be restored to their *status quo ante* as of the day immediately proceeding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) all of the Debtors' obligations shall remain unchanged.

## J.    **Effects of Confirmation**

Upon the Effective Date, all the Debtors' property shall vest in the Reorganized Debtors free and clear of all liens, encumbrances, charges, and other interests, except as provided by the Plan.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, as if no case was pending under any provision or chapter of the Bankruptcy Code.

### 1.    **Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests and all Other Equity Interests**

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests, LPC Common Stock Interests and Other Equity Interests in and all existing debts and Claims, including any interest accrued on such debts or Claims from and after the Commencement Date, against the Debtors or any of their assets or properties.

Except as provided in the Plan, upon the Effective Date, all existing Claims and all Series B Preferred Stock Interests, LPC Common Stock Interests and Other Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Series B Preferred Stock Interests, LPC Common Stock Interests and Other Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or

42

assigns, or any of their assets or properties, any other or further Claim or Series B Preferred Stock Interest, LPC Common Stock Interest or Other Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Series B Preferred Stock Interest, LPC Common Stock Interest or Other Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 2.     Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Series B Preferred Stock Interests, LPC Common Stock Interests and Other Equity Interests and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Series B Preferred Stock Interest, LPC Common Stock Interest or Other Equity Interest in the Debtors.

### 3.     Injunctions and Stays

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors with respect to any such Claim against or Interest in the Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan or under any Cash Collateral Order.  Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.

Unless otherwise provided in the Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  Without limiting the foregoing, any releases in favor of the Committee, the Agents and the Prepetition Secured Lenders shall survive the Effective Date and remain in place into perpetuity.

NYC:203112.4

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

4.    **Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Plan Proponents, the Prepetition Revolver Lenders or the Prepetition Term Loan Lenders and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act. Without limiting the foregoing, any and all releases of the Committee, the Prepetition Secured Lenders and the Agents contained in the Final Cash Collateral Order shall not be limited by this provision in any way and any and all parties shall be bound by such releases on the terms contained in the Final Cash Collateral Order.**

5.    **Releases**

**Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (a) the Agents, (b) the Prepetition Revolver Lenders, (c) the Prepetition Term Loan Lenders and (d) the Committee, (1) the Debtors, (2) each holder of a Claim or Interest that votes to accept a Plan but does not elect to "opt-out," (3) each holder of a Claim or Interest that is deemed to accept a Plan, and (4) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept a Plan and that does not elect to "opt-out," shall release, unconditionally and forever, each future, present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Agents, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, and the Committee, and each of their respective present and future members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual**

44

arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or ultra vires acts of any such person or entity.

All holders of Claims and Interests entitled to vote on the Plan may elect to opt out of the release provision of the Plan whether they choose to accept, reject, or not to vote on the Plan.

### K.    Dissolution of the Committee

On the Effective Date, the Committee shall be dissolved and the members thereof shall be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Committee's attorneys, accountants, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

### L.    Management of the Reorganized Debtors

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the responsibility of the Boards of Directors of the Reorganized Debtors.

As of the Effective Date, the Boards of Directors of the Reorganized Debtors will consist of 5 members each, with one such director of each of the Reorganized Debtors being an independent director, subject to the approval of CapitalSource and CSE Mortgage, which approval shall not be unreasonably withheld. The initial directors of the Reorganized Debtors shall consist of the directors elected by the Holders of the New LPC Common Stock. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Plan Proponents shall file with the Court the identity and biographical information (including any information required to be disclosed by LPC under Item 5.02(d) of Form 8-K under the Securities Exchange Act of 1934) of the initial directors no later than three (3) days prior to the Confirmation Hearing. Each of the members of such initial Boards of Directors shall serve in accordance with applicable nonbankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors, as the same may be amended from time to time.

The voluntary filing of any insolvency action (including an assignment for the benefit of creditors, receivership, bankruptcy, or similar action) shall require unanimous consent of the Board of Directors of Reorganized LPC or Reorganized LRGI, as applicable.

Representatives of CapitalSource and CSE Mortgage shall have the right to be non-voting observers of any meeting of the Boards of Director of each of Reorganized LPC and Reorganized CRG, I.

At or prior to the Confirmation Hearing, the Plan Proponents will identify all officers and members of the Boards of Directors of Reorganized LPC and Reorganized LRGI.

**M.    Jurisdiction and Choice of Law**

**1.    Governing Law**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

**2.    Retention of Jurisdiction**

The Bankruptcy Court shall retain and have exclusive jurisdiction over, in addition to other matters specified in the Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Plan.

**N.    Miscellaneous Provisions**

**1.    Payment of Statutory Fees**

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**2.    Post-Confirmation Date Professional Fees and Expenses**

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Debtors.

**3.    Indenture Trustee as Claim Holder**

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of claim timely filed by the Indenture Trustee in respect of any Claims under the Indenture.  Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

4.       **Plan Supplement**

A draft of the form of each of the Plan Documents to be entered into as of the Effective Date, which shall include, among other things, the Charter Amendment, and any other relevant documents that are necessary to allow a holder of Claims or Interests to make an informed decision shall be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which holders of impaired Claims may vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Plan must be received.

5.       **Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

6.       **Severability**

Prior to the entry of the Confirmation Order, if the Bankruptcy Court determines any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret such term or provision so as to render the term or provision valid and enforceable to the maximum extent practicable and consistent with the original purpose of such term or provision.

Notwithstanding any such determination, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such determination, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

7.       **Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

NYC:203112.4

**8.      Notices**

In order to be effective, all notices, requests, and demands to or upon the Plan Proponents must be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

ANDREWS KURTH LLP
450 Lexington Avenue, 15th Floor
New York, New York 10017
Attn: Paul Silverstein and Jonathan Levine
Telephone: (212) 850-2800
Facsimile: (212) 850-2929

- and -

WALLER LANSDEN DORTCH & DAVIS LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Attn: John C. Tishler and Christopher Siderys
Telephone: (615) 244-6380
Facsimile: (615) 244-6804

**9.      Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**10.      Section Headings**

The section headings contained in the Plan and this Disclosure Statement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

**O.      Modification, Revocation, or Withdrawal of the Plan**

The Plan Proponents reserve the rights to alter, amend, or modify the Plan at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents comply with section 1125 of the Bankruptcy Code.

After the Confirmation Date, the Plan Proponents may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Plan.

NYC:203112.4

A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.

The Plan Proponents may revoke or withdraw the Plan any time prior to the Effective Date.  If the Plan Proponents revoke or withdraw the Plan or the Plan does not otherwise become effective, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by the Plan Proponents or to prejudice in any manner the Plan Proponents' rights in any further proceedings involving the Debtors.

## V.  FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

### A.    Selected Historical Financial Information

Selected historical financial information of the Debtors is set forth in their entirety in Exhibits E through H attached to this Disclosure Statement, as follows.

- Historical Consolidated Income Statement of the Debtors (Exhibit E)

- Adjustments to Consolidated Income Statements of the Debtors (Exhibit F)

- Adjusted Income Statements of the Debtors (Exhibit G)

- Historical Consolidated Balance Sheets of the Debtors (Exhibit H)

### B.    Valuation of the Reorganized Debtors

#### 1.    Introduction

The Plan Proponents' have been advised by SRR with respect to the aggregate enterprise value of the Reorganized Debtors. In preparing their analysis, SRR has assumed the Plan will be confirmed on or around February 28, 2009 and that that the Effective Date will be March 31, 2009.

#### 2.    Basis of Valuation

In preparing their estimate of enterprise value of the Reorganized Debtors, SRR determined that the Debtors' assets should be classified into two categories:  Core Assets and Non-Core Assets.  For valuation purposes, the Core Assets have been treated as an on-going business and valued on a going-concern basis, and the Non-Core Assets have been treated as assets held for sale and have been valued at estimated orderly liquidation value.  A summary of the Core Assets and Non-Core Assets, and the reasons for classifying them as such, is set forth below.

3.      **Core Assets**

SRR classified the following assets of the Debtors as Core Assets:

a.      *The Rubber Group*

The Rubber Group is a manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to manufacturers of medical devices, and to customers who supply the automotive OEMs. The Rubber Group currently has two production facilities, each of which is a stand-alone business unit, with a complete management team, focused on a single product line.  The Jasper, Georgia facility specializes in insulators for automotive ignition systems and the Rock Hill, South Carolina facility specializes in components for medical devices.  As a result of the recent dramatic downturn in demand by the automotive OEMs, the Debtors determined that the Vienna, Ohio facility was not viable as a stand-alone operation and transferred a majority of the business to the Rubber Group's other facilities.  Those facilities now produce the Debtors' automotive connector seals for OEMs. As discussed below under the caption "Non-Core Assets," SRR's valuation of the Rubber Group assumes the remaining fixed assets (i.e., real estate and machinery) of the Connector Seals Business will be sold.

b.      *The Corporate Offices*

The Debtors operate two corporate offices, in New York City and Cleveland, Ohio.  In preparing its estimate of the enterprise value of the Reorganized Debtors, SRR determined that the expenses of the corporate offices should be treated as part of the Core Assets of the Debtors and assumed to continue as long as the Debtors retain the operations of the Rubber Group.

c.      *The Debtors' Tax Attributes*

LPC maintained a net operating loss ("NOL") carryforward as of the end of 2008 due to losses sustained over the prior years. NOL carryforwards could be used in future periods by LPC to offset taxable income, which serve to effectively reduce its future tax burden. Based on the Company's existing NOL carryforwards and the restrictions placed on the utilization of NOL carryforwards, SRR estimated the present value of the tax benefit associated with the Debtors' NOL carryforwards to be zero. The primary reason that the NOL carryforwards have no value is that the amount of debt that will be cancelled based on the indicated value of equity is greater than the NOL carryforwards balance, implying that the NOL carryforwards will be eliminated on emergence.

SRR determined that the Core Assets should be valued on a going-concern basis and applied well-recognized valuation methodologies, including (a) discounted cash flow and (b) guideline public company.

SRR considered the results of each of these valuation methodologies in its analysis.

50

4. **Non-Core Assets**

SRR classified the following assets of the Debtors as Non-Core Assets:

a. *The Metals Group*

The Metals Group is the Debtors' metal-machining operation located in Rochester, New York. The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks. The Metals Group primarily uses multi-spindle screw machines and specially designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time. The components produced by the Metals Group include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components that are primarily sold to tier-one suppliers to automotive OEMs.

The Debtors have made substantial investments to enhance the operational capabilities of the Metals Group, but have not been able to improve its operating results over the past two years.

SRR ultimately determined that, in light of its weak historical operating performance, the Metals Group should, at this time, be treated as an asset held for sale and that the best indicator of value for the Metals Group would be its orderly liquidation value.

b. *Non-Operating Assets*

The Debtors own certain assets of value that are superfluous to their ongoing operations. The most significant of these assets are the following:

(i)     Real and personal property located in Vienna, Ohio that was previously utilized by the Connector Seals division;

(ii)    Commercial and residential land located in East Ellijay, Georgia;

(iii)   Industrial land and buildings located in Lakewood, New York;

(iv)    Common stock of Federal-Mogul Corporation; and

(v)     Filed claims in the chapter 11 cases of Delphi Corporation.

SRR determined that the Non-Operating Assets should be treated as assets held for sale and that the most accurate method of valuing these Non-Operating Assets would be to assume that they were liquidated in an orderly manner.

5.      **Enterprise Value of the Reorganized Debtors**

SRR has determined that the enterprise value of the Reorganized Debtors is $60-70 million, representing the sum of the value of the Core Assets and the value of the Non-Core Assets.  The adjusted enterprise value also includes the following:

(i)      the projected cash available immediately prior to the Effective Date; and

(ii)     the projected benefit of the normalized credit terms the Reorganized Debtors expect to obtain from suppliers to the Rubber Group subsequent to the Effective Date (i.e., surplus working capital).

**THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS AS OF AN ASSUMED CONFIRMATION DATE ON OR ABOUT FEBRUARY 28, 2009 AND AN ASSUMED EFFECTIVE DATE OF MARCH 31, 2009, REFLECT WORK PERFORMED BY SRR ON THE BASIS OF INFORMATION WITH RESPECT TO THE BUSINESS AND ASSETS OF THE DEBTORS THAT WAS AVAILABLE TO SRR AS OF DECEMBER 1, 2009. SRR'S CONCLUSIONS ARE BASED ON THE INFORMATION RECEIVED TO DATE.  SRR RESERVES THE RIGHT TO CHANGE THOSE CONCLUSIONS BASED UPON UPDATED INFORMATION IT GATHERS FROM THE DEBTORS DURING THESE PROCEEDINGS.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT SRR'S CONCLUSIONS, SRR DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.**

## VI.  CERTAIN FACTORS TO BE CONSIDERED

A.      **Certain Risk Factors Relating to Confirmation of the Plan**

1.      **Risk of Non-Confirmation of the Plan**

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.      **Non-Consensual Confirmation**

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Plan Proponents believe that the Plan satisfies these requirements.  For more information on this topic, please refer to Section X.C, "*General Requirements for Confirmation*" on page 75.

3. **Risk of Non-Occurrence of the Effective Date**

Although the Plan Proponents believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. If each of the conditions to the occurrence of the Effective Date has not been satisfied or duly waived on or before the 120th day after entry of the Confirmation Order, the Bankruptcy Court may, upon the Plan Proponents' motion, vacate the Confirmation Order, in which event the Plan would be deemed null and void.

B. **Additional Factors to be Considered**

1. **The Plan Proponents Have No Duty to Update**

Absent a Bankruptcy Court order to the contrary, the Plan Proponents have no duty to update this Disclosure Statement or the attachments hereto. Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of December 16, 2009. Delivery or receipt of this Disclosure Statement after December 16, 2009 does not imply that no changes have occurred in the information contained herein and in the attachments hereto since December 16, 2009.

2. **No Representations Outside This Disclosure Statement Are Authorized**

The Bankruptcy Court has not authorized any representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan, other than representations made in this Disclosure Statement, the attachments hereto, and the other solicitation materials from the Debtors and the Plan Proponents that are included with this Disclosure Statement. In arriving at your decision to vote to accept or reject the Plan, you should not rely upon any representations that are not contained herein or included with this Disclosure Statement.

3. **Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may differ materially from actual future events. Because uncertainties exist with respect to any projection, assumption, or estimate, you should not consider any projection, assumption, or estimate to be an assurance or guarantee of actual results.

4. **This Disclosure Statement Is Not Legal or Tax Advice**

This Disclosure Statement is <u>not</u> legal, business, or tax advice. You should not construe the contents of this Disclosure Statement as such. Please consult your own legal counsel or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

**5.    No Admission Made**

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

**6.    Access to Financing and Trade Terms**

The Reorganized Debtors' operations will depend on, among other things, access to working capital through the Exit Financing Agreement, and the availability of customary trade terms from their supplies.   While the Plan Proponents believe that (i) projected operating cash flow, (ii) the Exit Financing Agreement, (iii) the New Priority Working Capital Facility, and (iv) improved trade credit will provide adequate cash to consummate the Plan and provide for sufficient ongoing working capital, the Reorganized Debtors may nonetheless require greater working capital.  No assurance can be given that additional financing will be available on terms favorable or acceptable to the Reorganized Debtors.  If the Reorganized Debtors meet their projected cash flows, the Plan Proponents believe that their suppliers will continue to provide customary terms; however, no assurances can be given.

**7.    Reorganized Debtor will be a Private Company**

The New LPC Common Stock issued to holders of certain Claims under the Plan and sold to the Exit Financing Parties under the Exit Financing Agreement for Cash under the Plan will be issued to fewer than 300 holders of record.  As a result, Reorganized LPC will deregister and will no longer be required to file periodic reports (such as annual reports on Form 10-K and quarterly reports on Form 10-Q) with the SEC.

**8.    Significant Holders**

Under the Plan, certain holders of Allowed Claims may receive, or obtain the right to receive equity securities in Reorganized LPC representing in excess of five (5%) percent of the outstanding LPC Common Stock.  If holders of a significant number of shares of Reorganized LPC were to act as a group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

Further, the possibility that one or more large holders of equity securities may determine to sell all or a large portion of their shares in a short period of time may adversely affect the price of the shares.

**9.    Illiquid Market**

Reorganized LPC will not be a public reporting company, and so will not file periodic reports, such as annual reports on Form 10-K and quarterly reports on Form 10-Q, with the SEC, nor will it otherwise make any similar information publicly available.  A substantial portion of the shares of New LPC Common Stock of Reorganized LPC issued pursuant to the Plan will be restricted securities and therefore will not be freely tradable under applicable securities laws.  The shares of New LPC Common Stock, including restricted securities as well as those shares that are freely tradable, will not be listed on any stock exchange or electronic

stock market, and so it is unlikely that any market for the New LPC Common Stock will develop.  If any market for such shares does develop, since Reorganized LPC will not provide any financial or other business information about itself to the public, such market will be uninformed and likely will not accurately reflect the value of the New LPC Common Stock.  As a result, the shares of New LPC Common Stock of Reorganized LPC will be a highly illiquid investment.

### 10.    Restrictions on Transfer

Holders of the New LPC Common Stock who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code will be unable to offer or sell securities of Reorganized LPC received pursuant to the Plan, except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws.  This would include persons who (a) purchase a Claim with a view to distribution of any security to be received in exchange for the Claim other than in ordinary trading transactions, (b) offer to sell securities issued under the Plan for holders of such securities, (c) offer to buy securities issued under the Plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with the Plan, the consummation of the Plan, or the offer or sale of securities under the Plan, or (d) are an issuer, a person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer.

**The Exit Financing Parties under the Exit Financing Agreement will be unable to offer or sell securities of Reorganized LPC acquired pursuant to the Exit Financing Agreement in accordance with the Plan, except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws.**

### 11.    Dividend Policies

The Plan Proponents do not anticipate that Reorganized LPC will be paying any dividends on the New LPC Common Stock in the foreseeable future.  In addition, the covenants in any future financing facility to which Reorganized LPC may be a party may limit the ability of Reorganized LPC to pay dividends.  Certain institutional investors may only invest in dividend-paying equity securities or may operate under other restrictions which may prohibit or limit their ability to invest in the New LPC Common Stock.

## VII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims or Interests. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Asbestos-Related Claims.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial

authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel with respect to any of the tax aspects of the contemplated transactions and the discussion below is not binding on the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities will not assert, or that a court would not sustain, a different position than those discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership (or other entity taxed as partnership) holds a Claim or Interest, the tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to persons that acquire the exchange consideration in the secondary market.

This discussion also assumes that the Claims against and Interests in LPC and LRGI are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances of each holder of Claims or Interests.**

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (A) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (B) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (C) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

A.    **Consequences to the Debtors**

1.    **Net Operating Losses**

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (the "Lexington Group"), of which LPC is the common parent, and file a consolidated U.S. federal income tax return. In the most recent Form 10-K filed by LPC and its subsidiaries, the Lexington Group reported consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $36 million as of the end of 2008. *See* Lexington Precision Corporation 2008 Form 10-K, at Note 9 (Income Taxes). The Lexington Group expects to incur further net operating losses during the taxable year ending December 31, 2009. These NOL carryforwards and current year losses are subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, the Lexington Group's NOL carryforwards and other tax attributes (including current year losses) are expected to be eliminated by cancellation of debt, as described below, that will occur pursuant to the Plan. In addition, the subsequent utilization of any NOL carryforwards that remained would be restricted following the Effective Date.

2.    **Cancellation of Debt**

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes - such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credit carryforwards, and tax basis in assets - by the amount of cancellation of debt ("COD") resulting from a confirmed chapter 11 plan. The COD amount is generally the amount by which the indebtedness discharged (reduced by any unamortized original issue discount) exceeds the consideration given to creditors in respect of the debt. Certain statutory or judicial exceptions may limit the amount of COD for U.S. federal income tax purposes (such as where payment of the cancelled debt would have given rise to a tax deduction). The borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the borrower joins in the filing of a consolidated U.S. federal income tax return, Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced. The reduction in tax attributes due to COD is not made until after the taxable year in which the COD occurs.

The amount of COD and consequent attribute reduction in connection with the implementation of the Plan will depend on the fair market value of the New LPC Common Stock. Based on the Plan value of the LPC Common Stock at $[__] a share, as described in Section V, "*Financial Information, Projections and Valuation Analysis*" on page 45, the Debtors anticipate that the COD will eliminate all or nearly all of the Debtors' NOL carryforwards.

**B.**      **Consequences to Holders of Certain Claims**

Pursuant to the Plan, and in satisfaction of their respective Claims: (i) holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and Allowed CapitalSource Secured Claims against LRGI (Class 14(a)) under the Prepetition Credit Agreement will receive New Secured CapitalSource Debt; (ii) holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and Allowed CSE Secured Claims against LRGI (Class 14(b)) under the Prepetition Loan Agreement will receive New Secured CSE Debt; (iii) holders of Allowed Senior Subordinated Note Claims (Class 5) will receive New LPC Common Stock; (iv) holders of Allowed General Unsecured Claims against LPC (Class 7) will receive New Unsecured LPC Notes; and (v) holders of Allowed General Unsecured Claims against LRGI (Class 17) will receive New Unsecured LRGI Notes.   The aggregate obligations of the Debtors' under the Prepetition Credit Agreement and the Prepetition Loan Agreement are referred to below collectively as the "Existing Secured Debt."   The New Secured CapitalSource Debt and New Secured CSE Debt are referred to below collectively as the "New Secured Debt."   The New Unsecured LPC Notes and New Unsecured LRGI Notes are referred to below collectively as the "New Unsecured Notes."   The New Secured Debt and the New Unsecured Notes are referred to below as the "New Notes."

Pursuant to the Plan, holders of Allowed Junior Subordinated Note Claims (Class 6), holders of Series B Preferred Stock Interests (Class 10), holders of LPC Common Stock Interests (Class 11), and holders of Other Equity Interests in LPC (Class 12) will not receive or retain any Claims, Interests or other property.

1.      **Holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, Allowed CSE Secured Claims against LRGI, and Allowed Senior Subordinated Note Claims**

*a.*      *Significant Modification*

The exchange of the Existing Secured Debt for New Secured Debt will be treated for U.S. federal income tax purposes as a sale or exchange if the New Secured Debt are materially different in kind and extent from the Existing Secured Debt to an extent sufficient to constitute a "significant modification" for U.S. federal income tax purposes. In general, a modification is a "significant modification" if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant. Under the Treasury Regulations, a modification that adds, deletes or alters customary accounting or financial covenants is, without more, not a significant modification.

Treasury regulations provide that a change in the yield of a debt instrument is a significant modification if the yield on the modified instrument varies from the annual yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of 25 basis points or five percent of the annual yield of the unmodified instrument. Also, a modification that changes the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments. Due to the change in

yield, the exchange of the Existing Secured Debt for New Secured Debt constitutes a "significant modification" and thus results in a sale or exchange of the Existing Secured Debt for U.S. federal income tax purposes.

### b.    Determination Whether Existing or New Secured Debt or Senior Subordinated Notes are Securities

The U.S. federal income tax consequences of the Plan to holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, and Allowed CSE Secured Claims against LRGI, depend, in part, on whether the Existing Secured Debt and the New Secured Debt constitute "securities" for U.S. federal income tax purposes. The U.S. federal income tax consequences of the Plan to holders of Allowed Senior Subordinated Note Claims, depend, in part, on whether the Senior Subordinated Notes constitute "securities" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. The Existing Secured Debt had and the New Secured Debt will have a weighted average maturity at issuance of less than five years and thus likely do not constitute securities for U.S. federal income tax purposes. The remainder of this discussion assumes that the Existing Secured Debt and New Secured Debt are not securities for U.S. federal income tax purposes and that the exchange of the Existing Secured Debt for New Secured Debt is therefore taxable. It is uncertain whether the Senior Subordinated Notes, which had a weighted average maturity at issuance of more than five years and less than ten (10) years, constitute securities for U.S. federal income tax purposes. Holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, Allowed CSE Secured Claims against LRGI, and Allowed Senior Subordinated Note Claims are urged to consult their tax advisors regarding whether their Existing Secured Debt and New Secured Debt are securities or whether the Senior Subordinated Notes are securities, for U.S. federal income tax purposes.

### i)    If the Senior Subordinated Notes are not Securities

If the Senior Subordinated Notes do not constitute securities for U.S. federal income tax purposes, a holder of Allowed Senior Subordinated Note Claims would recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any New LPC Common Stock they receive (other than New LPC Common Stock received in respect of Claims for accrued but unpaid interest) and (ii) their adjusted tax basis in their Claims (other than any tax basis attributable to Claims for accrued but unpaid interest). For a discussion of the character of any recognized gain or loss, please refer to Section VII.B.5, *Character of Gain or Loss*" on page 57.

Additionally, holders of Allowed Senior Subordinated Note Claims would have interest income to the extent they receive New LPC Common Stock in respect of accrued and unpaid interest not previously included in income. See Section VII.B.7, "*Distributions in Respect of Accrued Interest*" on page 59.

A holder's tax basis in New LPC Common Stock received in a taxable exchange will be equal to its fair market value on the Effective Date and the holder's holding period will begin on the day following the Effective Date.

*ii)        If the Senior Subordinated Notes are Securities*

If the Senior Subordinated Notes constitute securities for U.S. federal income tax purposes, a holder of Allowed Senior Subordinated Note Claims generally would not recognize gain or loss on the receipt of New LPC Common Stock for the Senior Subordinated Notes (except with respect to New LPC Common Stock received in respect of Claims for accrued but unpaid interest not previously included in income, see Section VII.B.7, "*Distributions in Respect of Accrued Interest*" on page 59).

A holder's tax basis in New LPC Common Stock received in a tax-free recapitalization would be equal to the holder's adjusted tax basis in the Senior Subordinated Notes, increased by any gain and interest income recognized in the exchange. In general, a holder's holding period in such New LPC Common Stock would include the holder's holding period in the Senior Subordinated Notes exchanged therefor, except that the holding period of New LPC Common Stock received in respect of Claims for accrued but unpaid interest will begin on the day following the exchange.

## 2.    Holders of Allowed CapitalSource Secured Claims against LPC, Allowed CapitalSource Secured Claims against LRGI, Allowed CSE Secured Claims against LPC, and Allowed CSE Secured Claims against LRGI

Holders of Allowed CapitalSource Secured Claims against LPC or LRGI, and holders of Allowed CSE Secured Claims against LPC or LRGI generally should recognize gain or loss in an amount equal to the difference, if any, between the issue price of the New Secured Debt they receive (other than New Secured Debt received in respect of Claims for accrued but unpaid interest) and their adjusted tax basis in their Claims (other than tax basis attributable to Claims for accrued but unpaid interest). A holder's tax basis in the New Secured Debt received in a taxable exchange will be equal to their issue price and the holder's holding period will begin on the day following the Effective Date.

## 3.    Holders of Allowed General Unsecured Claims against LPC and Allowed General Unsecured Claims against LRGI

Holders of Allowed Unsecured Claims against LPC or LRGI generally should recognize gain or loss in an amount equal to the difference, if any, between the issue price of the New Unsecured Notes they receive (other than New Unsecured Notes received in respect of Claims for accrued but unpaid interest) and their adjusted tax basis in their Claims (other than tax basis attributable to Claims for accrued but unpaid interest). A holder's tax basis in the New

Unsecured Notes received in a taxable exchange will be equal to their issue price and the holder's holding period will begin on the day following the Effective Date.

**4.      Holders of Allowed Junior Subordinated Note Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in LPC**

A holder of Allowed Junior Subordinated Note Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, or Other Equity Interests may be entitled to a worthless stock deduction. Section 165(g) of the Tax Code allows a worthless stock deduction if stock held as a capital asset becomes wholly worthless during the taxable year. In such case, the stockholder is entitled to a capital loss from the deemed sale or exchange of the stock on the last day of such taxable year. The amount deductible is limited to the holder's basis in the worthless security.

**5.      Character of Gain or Loss**

The character of gain or loss recognized by a holder as ordinary or capital and as long-term or short-term depends upon, inter alia, the tax status of the holder, whether the Claim is a capital asset in the hands of the holder, how long the Claim was held, whether the Claim was acquired at a market discount, and the extent to which the holder previously claimed a bad debt deduction in respect of the Claim.  Each holder of a Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to its Claim.

Holders of Claims who recognize capital loss are subject to limits on the use of such capital losses. For noncorporate holders, capital losses may be offset against capital gains (without regard to holding period) and then may offset up to $3,000 ($1,500 for married individuals filing separate returns) of ordinary income.  Noncorporate holders may not carry back capital losses, but may carry forward unused capital losses indefinitely.  Corporate holders may offset capital losses only against capital gains.  Corporate holders may carry unused capital losses back three years and forward five years.  Holders that purchased Existing Secured Debt or Senior Subordinated Notes from a prior holder at a "market discount" (relative to the adjusted issue price of the Existing Secured Debt or Senior Subordinated Notes at the time of purchase) are subject to the market discount rules, discussed below (see Section VII.B.6.b. "Market Discount" on page 57).

**6.      Original Issue Discount and Market Discount**

**a.      *Original Issue Discount***

A holder of New Notes may be subject to original issue discount ("OID") rules that would require the holder to include OID in income prior to receiving payments on the New Notes. The amount of OID would be equal to the excess, if any, of the "stated redemption price at maturity" of the New Notes over their "issue price."  The issue price of the New Notes would be equal to their stated redemption price at maturity and, accordingly, the New Notes would not have OID if the New Notes were not considered to be traded on an established securities market (and, in the case of the New Secured Debt, if the Existing Secured Debt also were not considered to be traded on an established securities market) within the meaning of the Tax Code.  Pursuant

61

to Treasury Regulations, an "established securities market" need not be a national securities exchange. It is sufficient if the Existing Secured Debt or New Notes appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, or price quotations are readily available from brokers, dealers or traders. If the New Secured Debt or the New Unsecured Notes are considered to be traded on an established securities market under these rules, the issue price of the New Secured Debt or New Unsecured Notes would be their fair market value. If the New Secured Debt were not considered to be traded on an established securities market, but the Existing Secured Debt were considered to be so traded, the issue price of the New Secured Debt would be the fair market value of the Existing Secured Debt. Fair market value means the trading price of the New Secured Debt, New Unsecured Notes or Existing Secured Debt, as the case may be, on the date on which a substantial amount of the New Notes were issued. There would be OID if the issue price, so determined, is less than the "stated redemption price at maturity" of the New Notes. The stated redemption price at maturity is the sum of all payments due under the New Notes (other than payments of "qualified stated interest"). "Qualified stated interest" means any stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually throughout the term of the debt instrument. The interest payments on the New Notes should be qualified stated interest. If so, the stated redemption price at maturity will be equal to the principal amount of the New Notes.

If the New Secured Debt or New Unsecured Notes have OID, holders will be required to include the OID in income over the term of the debt at a constant yield, regardless of whether the holder is a cash or accrual method taxpayer and regardless of whether the holder receives any cash. Any OID that a holder includes in income will increase the holder's tax basis in the New Notes. A holder will not be separately taxed on cash payments of interest that have already been included in income under the OID rules, but such payments will reduce the holder's tax basis in the New Notes. Holders of New Notes are urged to consult their tax advisors concerning the application of the OID rules to them.

### b.    *Market Discount*

Market discount is defined, in general, as the excess, if any, of the stated redemption price at maturity of a debt over the holder's adjusted tax basis in the debt immediately after its acquisition (other than an acquisition at original issuance). In the case of a debt instrument having OID, the stated redemption price at maturity is the revised issue price of the debt instrument. A debt instrument's revised issue price is generally its issue price *plus* the OID previously includible in income by prior holders of the debt instrument. Under a de minimis exception, market discount is treated as zero if it is less than 0.25% per year (for each full year from acquisition to maturity) of the stated redemption price at maturity of the debt instrument. If Existing Secured Debt or Senior Subordinated Notes were acquired by a holder at a market discount, then, unless the holder elected to include the market discount in income as it accrued, the amount of market discount that would be treated as accrued at the time the Existing Secured Debt are exchanged for New Secured Debt or the Senior Subordinated Notes are exchanged for New LPC Common Stock would be calculated by multiplying the market discount by a factor, the numerator of which is the number of days the Existing Secured Debt or Senior Subordinated Notes were held by the holder and the denominator of which is the number of days from the

holder's acquisition of the Existing Secured Debt or Senior Subordinated Notes to the maturity date of such Notes.  The amount so calculated must be treated as ordinary income to the extent gain is recognized on the exchange of such Existing Secured Debt for New Secured Debt or Senior Subordinated Notes for New LPC Common Stock, unless the holder elected to include the market discount in income as it accrued.  For a discussion of the character of any recognized gain or loss, please refer to Section VII.B.5, "*Character of Gain or Loss*" on page 57.

If the exchange of Senior Subordinated Notes for New LPC Common Stock is a tax-free recapitalization, accrued market discount would not be currently includible in income. Instead, the accrued market discount would carry over to the New LPC Common Stock and would be treated as ordinary income upon a subsequent taxable disposition of the New LPC Common Stock to the extent the market discount was not previously included in income.

### 7.    Distributions in Respect of Accrued Interest

Consideration (whether in New Notes or New LPC Common Stock) received in respect of accrued unpaid interest or OID that accrued during the period that the holder held its Claims is taxable to the holder as interest income (if not previously included in income by the holder). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID that was previously included in income is not paid in full. However, the IRS has privately ruled that the holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to unpaid OID.  Accordingly, it is unclear whether, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

### 8.    Ownership and Disposition of New LPC Common Stock

#### *a.    Distributions*

Distributions with respect to New LPC Common Stock will be taxable as dividend income to the extent of LPC's current and accumulated earnings and profits as determined for U.S. federal income tax purposes. To the extent the amount distributed exceeds LPC's earnings and profits, the excess reduces the holder's adjusted tax basis in the New LPC Common Stock, but not below zero.  Any remaining excess is treated as gain or loss from the sale or exchange of the New LPC Common Stock, with the consequences discussed below in "—Sale or Other Disposition."

##### *i)    Dividends to Non-Corporate Shareholders*

Dividends are generally taxed as ordinary income.  However, dividends received by a non-corporate holder in taxable years beginning on or before December 31, 2010, may qualify to be taxed at lower long-term capital gain rates, provided certain holding period requirements are satisfied. Non-corporate holders should consult their own tax advisor regarding the applicability of such lower rates to their particular facts and circumstances.

### ii)    Dividends to Corporate Shareholders

Dividend distributions to a corporate shareholder will qualify for the 70% dividends received deduction (80% for corporate shareholders owning more than 20% of the voting power or value of the stock of the distributing corporation).   A distribution will be treated as a dividend only to the extent of LPC's earnings and profits as computed for U.S. federal income tax purposes.   However, there is no assurance that LPC will have earnings and profits at the distributions are made to shareholders.   Dividend income that is not subject to regular U.S. federal income tax as a consequence of the dividends received deduction may be subject to U.S. federal alternative minimum tax.

The dividends received deduction is available only if certain holding periods and taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent a corporation incurs debt that is directly attributable to an investment in stock on which dividends are paid, all or a portion of the dividends received deduction may be disallowed with respect to dividends on such stock. Finally, the tax consequences of a dividend to a corporate shareholder may be different if the dividend is treated as an "extraordinary dividend" under applicable rules.   An extraordinary dividend means, with respect to a cash dividend or other distribution on common stock, a dividend or other distribution which exceeds a prescribed threshold percentage of the underlying stock basis (10 percent of the underlying stock basis for common stock), unless the stock was held for more than two years before the dividend announcement date or satisfies certain other conditions. Corporate holders should consult their own tax advisor about whether a distribution constitutes an extraordinary dividend and the consequences of such a distribution.

### b.    Sale or Other Disposition

Except as described below, gain or loss recognized on a sale, exchange, or other disposition of New LPC Common Stock by a holder of an Allowed Senior Subordinated Note Claim generally will be capital gain or loss.   The amount of such capital gain or loss generally will be equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the New LPC Common Stock and will be long-term capital gain or loss if the holder has held the stock for more than a year. The use of capital losses is subject to limitations. See Section VII.B.5, "*Character of Gain or Loss*" on page 57.

Gain recognized on the sale, exchange, or other disposition of New LPC Common Stock that was received in exchange for Allowed Senior Subordinated Note Claims (or the sale, exchange, or other disposition of any stock or property received for New LPC Common Stock in a later tax-free exchange) would be treated as ordinary income to the extent of (i) any bad debt deduction (or addition to a bad debt reserve) taken with respect to the Allowed Senior Subordinated Note Claims or ordinary loss deduction taken upon satisfaction of the Allowed Senior Subordinated Note Claims, less any income (other than interest income) recognized by the holder upon satisfaction of the Allowed Senior Subordinated Note Claims, and (ii) with respect to a cash-basis holder, any amounts which would have been included in the holder's

64

gross income if the holder's Allowed Senior Subordinated Note Claims had been satisfied in full, but were not included in the holder's income by reason of the cash method of accounting.

### 9.    Disposition of New Secured Debt or New Unsecured Notes

Gain or loss recognized on a sale, exchange, or other disposition of New Notes generally will be capital gain or loss.  The amount of such capital gain or loss will be equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the New Notes and will be long-term capital gain or loss if the holder has held the New Notes for more than a year. The use of capital losses is subject to limitations. See Section VII.B.4, "*Character of Gain or Loss*" on page 57.

## C.    Information Reporting and Backup Withholding

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of New Secured Debt, New Unsecured Notes and New LPC Common Stock may be subject to information reporting to the recipient and the IRS and may be subject to "backup withholding" (currently at a rate of 28%) if the recipient of those payments fails to furnish certain identifying information or to make certain certifications to the payor.  Backup withholding is not an additional tax. Any amounts deducted and withheld under backup withholding generally are allowed as a credit against the recipient's U.S. federal income tax, if any, provided the appropriate filings are made as and when required by the Tax Code and applicable regulations.  Furthermore, certain penalties may be imposed on a recipient of payments that is required to supply information, but does not do so in the proper manner. Backup withholding generally would not apply with respect to payments to certain exempt recipients, such as corporations and financial institutions.  Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including transactions that result in the taxpayer claiming a loss in excess of certain thresholds. Holders are urged to consult their tax advisor regarding the applicability of these reporting requirements to them in connection with the exchanges contemplated by the Plan.

**The foregoing summary has been provided for informational purposes only. Holders of Claims and Interests are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences of the Plan to them.**

## VIII. SECURITIES LAW MATTERS

## A.    New LPC Common Stock and New LPC Warrants to be Issued to Holders of Claims Under the Plan

In reliance upon an exemption from the registration requirements of the Securities Act of 1933, and state securities and "blue sky" laws afforded by section 1145 of the Bankruptcy

Code, the New LPC Common Stock to be issued on the Effective Date to holders of Class 5 Claims and the New LPC Warrants to be issued to Holders of Class 2(a), 2(b), 14(a) and 14(b) Claims pursuant to the Plan will not need to be registered under the Securities Act or any state securities or "blue sky" laws.  Accordingly, shares of New LPC Common Stock and the New LPC Warrants issued pursuant to the Plan may be resold by any holder without registration under the Securities Act or other Federal securities laws pursuant to the exemption provided by section 4(l) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code (a "<u>Statutory Underwriter</u>").  In addition, such securities generally may be resold by the recipients thereof without registration on the state level pursuant to various exemptions provided by the respective laws of the several states.  Recipients of securities issued to holders of Allowed Claims under the Plan, however, are advised to consult with their own counsel as to the availability of any such exemption from registration under Federal or state law in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b) of the Bankruptcy Code defines a Statutory Underwriter for purposes of the 1933 Securities Act as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities or (iv) is a controlling person of the issuer of the securities, in this case, Reorganized LPC.

Pursuant to the Plan, certificates evidencing shares of New LPC Common Stock and the New LPC Warrants received by holders who may be "affiliates" or "underwriters" under the Securities Act (as determined in the reasonable discretion of the Board of Directors of Reorganized LPC) will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**B.**     <u>**New LPC Common Stock to be Distributed in Accordance with the Exit Financing Agreement**</u>

**An aggregate of 35% of the New LPC Common Stock will be issued to the Exit Financing Parties under the Exit Financing Agreement on the Effective Date pursuant to Section 5.6 of the Plan. Unlike the New LPC Common Stock to be issued to holders of**

66

Claims under the Plan, these shares of New LPC Common Stock being issued to the Exit Financing Parties under the Exit Financing Agreement are not subject to the exemption under section 1145 of the Bankruptcy Code.  The offer and sale of these shares of New LPC Common Stock will not be registered under the Securities Act or under any state securities laws.

THE OFFER AND ISSUANCE OF THE NEW LPC COMMON STOCK IS BEING MADE IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS.  THE NEW LPC COMMON STOCK IS BEING OFFERED ONLY TO "ACCREDITED INVESTORS" WHO HAVE THE QUALIFICATIONS NECESSARY TO PERMIT THE NEW LPC COMMON STOCK TO BE OFFERED AND SOLD IN RELIANCE UPON SUCH EXEMPTIONS AND WHO MEET THE SUITABILITY STANDARDS SET FORTH IN THE PLAN.

THIS OFFERING OF NEW LPC COMMON STOCK SHALL NOT CONSTITUTE AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM ANYONE IN ANY STATE OR OTHER JURISDICTIONS IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.

AN INVESTMENT IN THE NEW LPC COMMON STOCK IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK.  SEE SECTION VI, "CERTAIN RISK FACTORS TO BE CONSIDERED."  INVESTORS MUST BE PREPARED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT.

NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED THE SECURITIES OFFERED HEREBY OR THE TERMS OF THIS OFFERING, PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR ENDORSED THE MERITS OF THE OFFERING.

The Plan Proponents have made and will make available to the Exit Financing Parties under the Exit Financing Agreement purchasing the shares of New LPC Common Stock, prior to any closing of the sale of the New LPC Common Stock, the opportunity to ask questions of and to receive answers from representatives of the Plan Proponents concerning the Plan Proponents and the Debtor and the terms and conditions of the offering and to obtain any additional relevant information to the extent the Plan Proponents possess such information or can obtain it without unreasonable effort or expense.

THE EXIT FINANCING PARTIES UNDER THE EXIT FINANCING AGREEMENT MUST BE AWARE OF THE POTENTIALLY LONG-TERM NATURE OF THEIR INVESTMENT IN THE NEW LPC COMMON STOCK. THE EXIT

NYC:203112.4

**FINANCING PARTIES UNDER THE EXIT FINANCING AGREEMENT WILL NOT BE ABLE TO TRANSFER THEIR NEW LPC COMMON STOCK (I) UNLESS SUCH EXIT FINANCING PARTY COMPLIES WITH THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR (II) SUCH EXIT FINANCING PARTY CAN DEMONSTRATE THAT THERE IS AN EXEMPTION AVAILABLE FROM SUCH REGISTRATION REQUIREMENTS. IN CONNECTION WITH ANY TRANSFER OF THE NEW LPC COMMON STOCK, REORGANIZED LPC MAY REQUIRE THAT AN EXIT FINANCING PARTY PROVIDE IT WITH A LEGAL OPINION STATING THAT THE TRANSFER COMPLIES WITH APPLICABLE SECURITIES LAWS. REORGANIZED LPC MAY REQUIRE AN EXIT FINANCING PARTY TO PAY ANY COSTS THEY INCUR AS A RESULT OF A TRANSFER AS A CONDITION TO SUCH TRANSFER. THERE IS NO PUBLIC TRADING MARKET FOR THE NEW LPC COMMON STOCK AND IT IS UNLIKELY THAT A TRADING MARKET WILL DEVELOP IN THE FUTURE. REORGANIZED LPC IS UNDER NO OBLIGATION TO FACILITATE ANY TRANSFER OF THE NEW LPC COMMON STOCK. THEREFORE, AN EXIT FINANCING PARTY MAY BE REQUIRED TO BEAR THE ECONOMIC RISKS OF ITS INVESTMENT IN THE NEW LPC COMMON STOCK FOR AN INDEFINITE PERIOD OF TIME.**

**Pursuant to the Plan, certificates evidencing the New LPC Common Stock issued to Exit Financing Parties under the Exit Financing Agreement for cash will bear a legend substantially in the form below:**

> **THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.**

**C.    Reorganized Debtor Will No Longer be a Public Company**

The New LPC Common Stock issued to holders of certain Claims under the Plan and sold to Exit Financing Parties under the Exit Financing Agreements for cash under the Plan will be issued to fewer than 300 holders of record. As a result, Reorganized LPC will deregister and will no longer be required to file periodic reports (such as annual reports on Form 10-K and quarterly reports on Form 10-Q) with the SEC.

68

D.      **New Secured CapitalSource Debt and New Secured CSE Debt to be Issued to Holders of Claims Under the Plan**

In reliance upon an exemption from the registration requirements of the Securities Act, and state securities and "blue sky" laws afforded by section 1145 of the Bankruptcy Code, the New Secured Capital Source Debt and the New Secured CSE Debt to be issued on the Effective Date to holders of Allowed Class 2(a) and Class 14(a) Claims and holders of Allowed Class 2(b) and 14(b) Claims, respectively, pursuant to the Plan, will not need to be registered under the Securities Act or any state securities or "blue sky" laws. Accordingly, such Notes may be resold by any holder without registration under the Securities Act or other Federal securities laws pursuant to the exemption provided by Section 4(l) of the Securities Act, unless the holder is a Statutory Underwriter with respect to such securities. In addition, such securities generally may be resold by the recipients thereof without registration on the state level pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued to holders of Allowed Claims under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under Federal or state law in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b) of the Bankruptcy Code defines a Statutory Underwriter for purposes of the Securities Act as one who (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities or (iv) is a controlling person of the issuer of the securities, in this case, Reorganized LPC.

Entities deemed to be Statutory Underwriters may be able to sell securities without registration pursuant to the provisions of Rule 144 under the Securities Act which, in effect, permits the public sale of securities received pursuant to the Plan by Statutory Underwriters subject to the availability of public information concerning Reorganized LPC's volume limitations, holding periods and certain other conditions. Entities who believe they may be Statutory Underwriters under the definition contained in Section 1145 of the Bankruptcy Code are advised to consult their own counsel with respect to the availability of the exemption provided by such Rule.

Pursuant to the Plan, certificates evidencing New Secured CapitalSource Debt and New Secured CSE Debt received by holders who may be "affiliates" or "underwriters" under the Securities Act (as determined in the reasonable discretion of the Board of Directors of Reorganized LPC) will bear a legend substantially in the form below:

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND

69

APPLICABLE STATE SECURITIES LAWS OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**E.**     **Exit Financing Notes to be Distributed in Accordance with the Exit Financing Agreement**

An aggregate of $9.5 million principal amount of Exit Financing Notes and $1.5 million of Exit Financing Fee Notes will be issued to the Exit Financing Parties under the Exit Financing Agreement on the Effective Date pursuant to Section 5.6 of the Plan. Unlike the Notes to be issued to holders of Claims under the Plan, these Exit Financing Notes and Exit Financing Fee Notes being issued to the Exit Financing Parties under the Exit Financing Agreement are not subject to the exemption under section 1145 of the Bankruptcy Code. The offer and sale of these Exit Financing Notes and Exit Financing Fee Notes will not be registered under the Securities Act or under any state securities laws.

THE OFFER AND ISSUANCE OF THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES IS BEING MADE IN RELIANCE UPON EXEMPTIONS FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER AND SIMILAR EXEMPTIONS FROM REGISTRATION PROVIDED BY CERTAIN STATE SECURITIES LAWS. THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES ARE BEING OFFERED ONLY TO "ACCREDITED INVESTORS" WHO HAVE THE QUALIFICATIONS NECESSARY TO PERMIT THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES TO BE OFFERED AND SOLD IN RELIANCE UPON SUCH EXEMPTIONS AND WHO MEET THE SUITABILITY STANDARDS SET FORTH IN THE PLAN.

THIS OFFERING OF EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES SHALL NOT CONSTITUTE AN OFFER TO SELL TO OR A SOLICITATION OF AN OFFER TO BUY FROM ANYONE IN ANY STATE OR OTHER JURISDICTIONS IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION.

AN INVESTMENT IN THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. SEE SECTION VI, "CERTAIN RISK FACTORS TO BE CONSIDERED." INVESTORS MUST BE PREPARED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND BE ABLE TO WITHSTAND A TOTAL LOSS OF THEIR INVESTMENT.

NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS APPROVED THE SECURITIES OFFERED HEREBY OR THE TERMS OF THIS OFFERING, PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR ENDORSED THE MERITS OF THE OFFERING.

The Plan Proponents have made and will make available to the Exit Financing Parties under the Exit Financing Agreement purchasing the Exit Financing Notes and Exit Financing Fee Notes, prior to any closing of the sale of the Exit Financing Notes and Exit Financing Fee Notes, the opportunity to ask questions of and to receive answers from representatives of the Plan Proponents concerning the Plan Proponents and the Debtor and the terms and conditions of the offering and to obtain any additional relevant information to the extent the Plan Proponents possesses such information or can obtain it without unreasonable effort or expense.

THE EXIT FINANCING PARTIES UNDER THE EXIT FINANCING AGREEMENT MUST BE AWARE OF THE POTENTIALLY LONG-TERM NATURE OF THEIR INVESTMENT IN THE EXIT FINANCING NOTES AND THE EXIT FINANCING FEE NOTES. THE EXIT FINANCING PARTIES UNDER THE EXIT FINANCING AGREEMENT WILL NOT BE ABLE TO TRANSFER THEIR EXIT FINANCING NOTES OR EXIT FINANCING FEE NOTES (I) UNLESS SUCH EXIT FINANCING PARTY COMPLIES WITH THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR (II) SUCH EXIT FINANCING PARTY CAN DEMONSTRATE THAT THERE IS AN EXEMPTION AVAILABLE FROM SUCH REGISTRATION REQUIREMENTS. IN CONNECTION WITH ANY TRANSFER OF THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES, REORGANIZED LPC MAY REQUIRE THAT AN EXIT FINANCING PARTY PROVIDE IT WITH A LEGAL OPINION STATING THAT THE TRANSFER COMPLIES WITH APPLICABLE SECURITIES LAWS.  REORGANIZED LPC MAY REQUIRE AN EXIT FINANCING PARTY TO PAY ANY COSTS THEY INCUR AS A RESULT OF A TRANSFER AS A CONDITION TO SUCH TRANSFER.  THERE IS NO PUBLIC TRADING MARKET FOR THE EXIT FINANCING NOTES AND EXIT FINANCING FEE NOTES AND IT IS UNLIKELY THAT A TRADING MARKET WILL DEVELOP IN THE FUTURE. REORGANIZED LPC IS UNDER NO OBLIGATION TO FACILITATE ANY TRANSFER OF THE EXIT FINANCING NOTES OR THE EXIT FINANCING FEE NOTES. THEREFORE, AN EXIT FINANCING PARTY MAY BE REQUIRED TO BEAR THE ECONOMIC RISKS OF ITS INVESTMENT IN THE EXIT FINANCING NOTES AND THE EXIT FINANCING FEE NOTES FOR AN INDEFINITE PERIOD OF TIME.

Pursuant to the Plan, certificates evidencing the Exit Financing Notes and the Exit Financing Fee Notes issued to Exit Financing Parties under the Exit Financing Agreement for cash will bear a legend substantially in the form below:

THE NOTES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL

71

REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**F.**    **Stockholders' Agreement**

The Exit Financing Parties under the Exit Financing Agreement and certain of their affiliates and Reorganized LPC will enter into a Stockholders' Agreement with respect to the shares of New LPC Common Stock of Reorganized LPC acquired by or otherwise issued to the Exit Financing Parties under the Exit Financing Agreement and certain of their affiliates pursuant to the Plan.

**A copy of the Stockholders' Agreement will be included in the Plan Supplement.  As described in Section IV.N.4, "*Plan Supplement*" on page 47, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline, [___ __], 2010.**

## IX. VOTING PROCEDURES AND REQUIREMENTS

**A.**    **Voting Deadline**

**IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:**

> **Class 2(a) – CapitalSource Secured Claims against LPC**
>
> **Class 2(b) – CSE Secured Claims against LPC**
>
> **Class 5 – Senior Subordinated Note Claims**
>
> **Class 7 – General Unsecured Claims against LPC**
>
> **Class 14(a) – CapitalSource Secured Claims against LRGI**
>
> **Class 14(b) – CSE Secured Claims against LRGI**
>
> **Class 17 – General Unsecured Claims against LRGI**

All known holders of CapitalSource Secured Claims against LPC, CSE Secured Claims against LPC, Senior Subordinated Note Claims, General Unsecured Claims against LPC, CapitalSource Secured Claims against LRGI, CSE Secured Claims against LRGI and General Unsecured Claims against LRGI as of the Record Date are entitled to vote on the Plan and have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein.  To vote, please use only the ballot that accompanies this Disclosure Statement.

The Plan Proponents have engaged BMC Group as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

72

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE STREET ADDRESS OR E-MAIL ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., EASTERN TIME, ON [___ __].

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.

ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.

FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

> **BMC Group**
> **Attn:  Lexington Precision Balloting**
> **PO Box 3020**
> **Chanhassen, MN 55317-3020**
>
> **OR**
>
> **(888) 909-0100**
>
> **OR**
>
> **Info@bmcgroup.com**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

## B.    <u>Holders of Claims Entitled to Vote</u>

Class 2(a) -- CapitalSource Secured Claims against LPC, Class 2(b) -- CSE Secured Claims against LPC, Class 5 – Senior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 14(a) -- CapitalSource Secured Claims against LRGI, Class 14(b) -- CSE Secured Claims against LRGI, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim in any of these classes as of [____ __], 2010 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Plan.

NYC:203112.4

**C.**    **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that vote to accept or reject the plan.  A class of interests accept a chapter 11 plan when it is accepted by at least two-thirds in amount of the interest of that class that vote to accept or reject the plan.  Thus, Classes 2(a), 2(b), 5, 7, 14(a), 14(b) and 17 will accept the Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.**    **Voting Procedures**

**1.**    **Voting Procedures**

Voting procedures shall be as described in the Disclosure Statement Order.

**2.**    **Withdrawal of Ballot**

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) be signed by the party that signed the Ballot to be revoked and (b) be received by the Voting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline.  In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## X.CONFIRMATION OF THE PLAN

**A.**    **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for [ _____ ].  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B.**      **Objections to Confirmation**

Objections or responses to confirmation of the Plan, if any, must (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefore.

All objections and responses to the confirmation of the Plan must be filed with the Bankruptcy Court no later than **[___ __] at [4:00] p.m. (prevailing Eastern Time)**.  In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses.  General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Burton R. Lifland.

All objections and responses must be served, so as to be received no later than **[___ __], at [4:00] p.m. (prevailing Eastern Time)**, upon:  (a) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (b) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Adam Strochak); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (d) the attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn: John C. Tishler); (e) the attorneys for the Committee, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Paul Silverstein and Jonathan Levine); and (f) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn:  Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**      **General Requirements for Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)      The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)      The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made or promised by the Plan Proponents or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Plan Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Plan Proponents have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VI.A.2, "*Non-Consensual Confirmation*" on page 52, each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as shall be determined by the Bankruptcy Court to provide to the holder of such

76

Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(x)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

(xi)    The Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## D.    **Best Interests Test**

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for

attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Plan Proponents have determined that there would be no distribution under chapter 7 of the Bankruptcy Code to any Class of unsecured Claims or Interests and, consequently, confirmation of the Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

THE PLAN PROPONENTS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT LEGAL, ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE PLAN PROPONENTS' OR THEIR ADVISORS. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THE LIQUIDATION ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.

The Plan Proponents' chapter 7 liquidation analysis of the Debtors and the assumptions utilized therein are set forth in Exhibit I to this Disclosure Statement.

E.      **No Unfair Discrimination/Fair and Equitable Test**

As provided under the Bankruptcy Code, the Bankruptcy Court may confirm a chapter 11 plan over the rejection or deemed rejection of such plan by a class of claims or interests if the chapter 11 plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

1.      **No Unfair Discrimination**

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the chapter 11 plan.  The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

2.      **Fair and Equitable Test**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims or interests receive more than 100% of the allowed amount of the claims or interests in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

   a.      *Secured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide each holder of an impaired secured claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such allowed secured claim with deferred cash payments equal in value to the amount of such allowed secured claim, as of the effective date, or (ii) the "indubitable equivalent" of such allowed secured claim.

   b.      *Unsecured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an impaired unsecured claim will receive under the chapter 11 plan a distribution equal in value to the amount of the allowed unsecured claim or (ii) no distribution will be made under the Plan to any holder that is junior to the claims in the dissenting class.

   c.      *Interests*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an Interest will receive under the chapter 11 plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of an interest that is junior to the dissenting class.

The Plan Proponents believe that (i) the Plan satisfies the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) the Plan satisfies the "fair and equitable" requirement notwithstanding the rejection of the Plan by any Class of Claims or Interests, because each Class

of Claims or Interests will receive under the Plan a distribution equal in value to (x), with respect to any Class of Claims, the amount of such Claims and (y), with respect to any Class of Interests, the greater of the fixed liquidation value, the redemption price, or the value of the stock that is the basis for such Interests.

## F.    Classification of Claims and Interests

The Plan Proponents believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar."   The Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above.    Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

## G.    Feasibility

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization.   For purposes of determining whether the Plan meets this requirement, the Plan Proponents have analyzed the Debtors' ability to meet their financial obligations as contemplated thereunder.   In connection therewith, certain selected historical financial information of the Debtors is set forth in Exhibits E through H attached hereto.   The Plan Proponents believe that the Debtors will be able to make all payments required to be made pursuant to the Plan.

80

## XI.  CONCLUSION

The Plan Proponents believe the Plan is in the best interests of all holders of Claims and Interests and urges the holders of impaired Claims and Interests in Classes 2(a), 2(b), 5, 7, 14(a), 14(b) and 17 to vote to accept the Plan and to evidence acceptance by returning their ballots such that the Voting Agent will receive the ballots no later than [ _____ ].

Dated: New York, New York
        December 16, 2009

Respectfully submitted,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: _____
    Name:
    Title:  Authorized Signatory

CAPSOURCE FINANCE LLC,

*As Agent for the Prepetition Revolver Lenders*

By: _____
    Name:
    Title:  Authorized Signatory

CSE MORTGAGE LLC,

*As Agent for the Prepetition Term Loan Lenders*

By: _____
    Name:
    Title:  Authorized Signatory

NYC:203112.4