**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                            :
                                                 :    **Chapter 11 Case No.**
                                                 :
**LEXINGTON PRECISION CORP., et al.,**           :    **08-11153 (SCC)**
                                                 :
                            Debtors.             :    **(Jointly Administered)**
                                                 :
-----------------------------------------------------------x

## PROPOSED DISCLOSURE STATEMENT FOR
## DEBTORS' FOURTH AMENDED JOINT PLAN OF
## REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Bankruptcy Court has not approved this proposed disclosure statement as containing adequate information pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of acceptances or rejections of the chapter 11 plan described herein and attached hereto.  Accordingly, the filing and dissemination of this disclosure statement are not intended to be, and should not in any way be construed as, a solicitation of votes on the plan, nor should the information contained in this disclosure statement be relied on for any purpose until a determination by the Bankruptcy Court that the proposed disclosure statement contains adequate information.

The Debtors reserve the right to amend or supplement this proposed disclosure statement at or before the hearing to consider this disclosure statement.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000

Dated: April 19, 2010
         New York, New York

**TABLE OF CONTENTS**

I.    Introduction ............................................................................................................ 1

II.   Executive Summary ................................................................................................ 5

      A.    Summary of Classification and Treatment of Claims and Interests
            Under the Plan ............................................................................................. 5

      B.    Solicitation and Voting Procedures ............................................................. 7

            1.    The Record Date; Holders of Claims Entitled to Vote on
                  the Plan .............................................................................................. 8

            2.    Filing of the Plan Supplement ........................................................... 8

            3.    The Voting Deadline ........................................................................... 9

            4.    Voting Instructions ............................................................................. 9

      C.    Confirmation of the Plan .............................................................................. 9

            1.    The Confirmation Hearing .................................................................. 9

            2.    Objections to Confirmation ................................................................. 9

      D.    Overview of the Chapter 11 Process ............................................................ 10

III.  Overview of the Debtors' Operations and the Chapter 11 Cases ................................. 11

      A.    Description of the Debtors' Operations ......................................................... 11

            1.    The Rubber Group ............................................................................... 11

                  a.    The Automotive Aftermarket ................................................... 12

                  b.    The Automotive OEM Market .................................................. 12

                  c.    The Medical Device Market ...................................................... 12

                  d.    The Rubber Group's Competitive Strengths ............................. 13

                  e.    Facilities of the Rubber Group; Capacity for
                        Growth ..................................................................................... 15

                  f.    Insulators for Automotive Ignition Systems ............................. 15

                  g.    Molded Rubber Components for Medical Devices .................... 17

                  h.    Connector Seals for Automotive Wire Harnesses .................... 20

                  i.    Financial Performance of the Rubber Group ............................ 21

            2.    The Metals Group ............................................................................... 25

                  a.    The Metals Group's Competitive Strengths ............................. 26

                  b.    Financial Performance of the Metals Group ............................ 27

            3.    Non-Operating Assets ......................................................................... 28

|  |  | a. | Land in East Ellijay, Georgia | 28 |
|  |  | b. | Land and Buildings in Lakewood, New York | 29 |
|  |  | c. | Land and Buildings in Vienna, Ohio | 29 |
|  | 4. |  | The Debtors' Employees | 29 |
| B. | Significant Indebtedness |  |  | 29 |
|  | 1. |  | The Prepetition Credit Agreement | 29 |
|  | 2. |  | The Prepetition Loan Agreement | 30 |
|  | 3. |  | Senior Subordinated Notes | 31 |
|  | 4. |  | Junior Subordinated Note | 31 |
| C. | The Asbestos Cases |  |  | 32 |
| D. | Significant Events Leading to the Commencement of the Chapter 11 Cases |  |  | 34 |
|  | 1. |  | Liquidity Crisis | 34 |
|  | 2. |  | Restructuring Efforts | 34 |
| E. | The Chapter 11 Cases |  |  | 37 |
|  | 1. |  | Commencement of the Chapter 11 Cases and the "First-Day" Orders | 37 |
|  |  | a. | Case Administration Orders | 37 |
|  |  | b. | Critical Obligations | 37 |
|  |  | c. | Customer and Employee Programs | 37 |
|  |  | d. | Financing Arrangements | 37 |
|  | 2. |  | Appointment of the Creditors' Committee | 38 |
|  | 3. |  | Debtor in Possession Financing/Use of Cash Collateral | 38 |
|  | 4. |  | The Debtors' Exclusive Periods | 39 |
|  | 5. |  | The Mediation Process | 40 |
|  | 6. |  | The Claims Reconciliation Process | 40 |
| IV. | The Stock Purchase Agreement |  |  | 41 |
| A. | The Plan Investor |  |  | 41 |
| B. | The Stock Purchase Agreement |  |  | 42 |
| C. | Ancillary Agreements |  |  | 42 |
|  | 1. |  | The Shareholder Agreement | 42 |
|  | 2. |  | The Management Incentive Plan | 45 |

|     |     | 3.  | Employment Agreements ................................................................ 45 |
| V.  | The Plan .............................................................................................. 45 |
|     | A.  | Summary and Treatment of Unclassified Claims ............................. 45 |
|     |     | 1.  | Administrative Expense Claims ................................................ 46 |
|     |     | 2.  | Professional Compensation and Reimbursement Claims ..................... 47 |
|     |     | 3.  | Indenture Trustee Fee Claims .................................................. 47 |
|     |     | 4.  | Debtor in Possession Loan Claims .............................................. 47 |
|     |     | 5.  | Priority Tax Claims ............................................................. 47 |
|     |     | 6.  | Intercompany Claims .............................................................. 48 |
|     | B.  | Classification and Treatment of Classified Claims and Interests ........ 48 |
|     |     | 1.  | Claims against and Interests in LPC ........................................... 48 |
|     |     |     | a.  | Class 1 – Other Priority Claims against LPC (Unimpaired) ................................................................ 48 |
|     |     |     | b.  | Class 2(a) – CapitalSource Secured Claims against LPC (Impaired) .................................................... 48 |
|     |     |     | c.  | Class 2(b) – CSE Secured Claims against LPC (Impaired) ................................................................. 49 |
|     |     |     | d.  | Class 3 – Secured Tax Claims against LPC (Unimpaired) ............................................................ 50 |
|     |     |     | e.  | Class 4 – Other Secured Claims against LPC (Unimpaired) ............................................................ 50 |
|     |     |     | f.  | Class 5 – Senior Subordinated Note Claims (Impaired) ................................................................. 51 |
|     |     |     | g.  | Class 6 – Junior Subordinated Note Claims (Impaired) ................................................................. 51 |
|     |     |     | h.  | Class 7 – General Unsecured Claims against LPC (Impaired) ................................................................. 51 |
|     |     |     | i.  | Class 8 – Convenience Claims against LPC (Unimpaired) ............................................................ 52 |
|     |     |     | j.  | Class 9 – Asbestos-Related Claims (Impaired) ................... 52 |
|     |     |     | k.  | Class 10 – Series B Preferred Stock Interests (Impaired) ................................................................. 53 |
|     |     |     | l.  | Class 11 – LPC Common Stock Interests (Impaired) ............... 53 |
|     |     |     | m.  | Class 12 – Other Equity Interests in LPC (Impaired) ............... 53 |
|     |     | 2.  | Claims against and Interests in LRGI ......................................... 54 |

|   |   | a. | Class 13 – Other Priority Claims against LRGI (Unimpaired) | 54 |
|   |   | b. | Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired) | 54 |
|   |   | c. | Class 14(b) – CSE Secured Claims against LRGI (Impaired) | 55 |
|   |   | d. | Class 15 – Secured Tax Claims against LRGI (Unimpaired) | 55 |
|   |   | e. | Class 16 – Other Secured Claims against LRGI (Unimpaired) | 56 |
|   |   | f. | Class 17 – General Unsecured Claims against LRGI (Impaired) | 56 |
|   |   | g. | Class 18 – Convenience Claims against LRGI (Unimpaired) | 57 |
|   |   | h. | Class 19 – Interests in LRGI (Unimpaired) | 57 |
| C. |   |   | Distributions Pursuant to the Plan | 57 |
|   | 1. |   | Distributions | 57 |
|   | 2. |   | Surrender or Transfer of the Senior Subordinated Notes | 58 |
|   | 3. |   | Withholding and Reporting Requirements | 58 |
| D. |   |   | Implementation of the Plan and Related Documents | 59 |
|   | 1. |   | Restructuring Transactions | 59 |
|   | 2. |   | Cancellation of Documents, Agreements, and Debt Instruments | 59 |
|   | 3. |   | Charter Amendment | 59 |
|   | 4. |   | Stock Purchase Agreement | 60 |
|   | 5. |   | The Amended and Restated Secured CapitalSource Credit Agreement | 60 |
|   | 6. |   | The Amended and Restated Secured CSE Loan Agreement | 60 |
|   | 7. |   | Corporate Action, Effectuating Documents, and Further Transactions | 60 |
|   | 8. |   | Issuance of New LPC Common Stock | 61 |
|   | 9. |   | Exemption From Transfer Taxes | 62 |
| E. |   |   | Provisions for the Treatment of Disputed Claims | 62 |
|   | 1. |   | Objections to Claims and Prosecution of Disputed Claims | 62 |

|   | 2. | Resolution of Administrative Expense Claims and Other Claims | 62 |
|   | 3. | Claim Estimation | 63 |
|   | 4. | Payment and Distribution on Disputed Claims | 63 |
| F. |   | Prosecution of Claims Held by the Debtors | 63 |
| G. |   | Executory Contracts and Unexpired Leases | 63 |
|   | 1. | Assumption of Executory Contracts and Unexpired Leases | 63 |
|   | 2. | Cure of Defaults | 64 |
|   | 3. | Rejection Damage Claims | 64 |
|   | 4. | Indemnification and Reimbursement of Directors and Officers | 64 |
|   | 5. | Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits | 64 |
| H. |   | Reservation of "Cram Down" Rights | 65 |
| I. |   | Conditions Precedent to the Effective Date of the Plan | 65 |
| J. |   | Effects of Confirmation | 66 |
|   | 1. | Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests | 67 |
|   | 2. | Discharge of Debtors | 67 |
|   | 3. | Injunctions and Stays | 67 |
|   | 4. | Exculpation | 68 |
|   | 5. | Releases of Directors, Officers, and Employees | 68 |
|   | 6. | The Plan Investor Release | 69 |
|   | 7. | Other Releases | 69 |
|   | 8. | Limits on Releases and Exculpation | 70 |
| K. |   | Dissolution of the Creditors' Committee | 71 |
| L. |   | Management of the Reorganized Debtors | 71 |
| M. |   | Jurisdiction and Choice of Law | 72 |
|   | 1. | Governing Law | 72 |
|   | 2. | Retention of Jurisdiction | 72 |
| N. |   | The Plan Supplement | 72 |
| O. |   | Modification, Revocation, or Withdrawal of the Plan | 72 |

VI.   Financial Information, Projections and Valuation Analysis ........................... 73

    A.   Selected Historical and Projected Financial Information ................................. 73

    B.   Valuation of the Reorganized Debtors .............................................. 78

VII.  Certain Factors to be Considered ................................................ 79

    A.   Certain Risk Factors Relating to Confirmation of the Plan ............................. 79

        1.   Risk of Non-Confirmation of the Plan .................................... 79

        2.   Non-Consensual Confirmation ............................................ 79

        3.   Risk of Non-Occurrence of the Effective Date ......................... 79

        4.   Stock Purchase Agreement, Amended and Restated Secured CapitalSource Credit Agreement, and Amended and Restated Secured CSE Loan Agreement As Conditions Precedent to the Confirmation of the Plan ............................ 80

    B.   Additional Factors to be Considered ................................................ 80

        1.   The Debtors Have No Duty to Update .................................... 80

        2.   No Representations Outside This Disclosure Statement Are Authorized .......................................................... 80

        3.   Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary ......................... 80

        4.   This Disclosure Statement Is Not Legal or Tax Advice ........................ 81

        5.   No Admission Made ...................................................... 81

        6.   Business Factors and Competitive Conditions ............................ 81

            a.   Competitive Conditions .............................................. 81

            b.   Customers .......................................................... 81

        7.   Access to Financing and Trade Terms .................................... 81

        8.   Variances from the Projected Financial Statements ........................ 82

        9.   Significant Holders ...................................................... 82

        10.  Dilution of New LPC Common Stock .................................... 82

        11.  Illiquid Market .......................................................... 82

        12.  Restrictions on Transfer ................................................ 82

        13.  Indicative Value of the Debtors .......................................... 83

VIII. Certain Federal Income Tax Consequences of the Plan ........................... 83

    A.   Consequences to the Debtors ...................................................... 84

        1.   Cancellation of Debt .................................................... 85

2.    Limitations on NOL Carryforwards and Other Tax Attributes ............................................................. 86

a.    Built In Gains and Losses ......................................... 87

b.    Special Bankruptcy Exception .................................. 87

3.    Alternative Minimum Tax ..................................................... 88

B.    Consequences to Holders of Certain Claims ....................................... 88

1.    Holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and Allowed CapitalSource Secured Claims against LRGI (Class 14(a)) .................... 89

2.    Holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and Allowed CSE Secured Claims against LRGI (Class 14(b)) ................................................... 90

3.    Holders of Allowed Senior Subordinated Note Claims (Class 5) ....................................................................... 91

4.    Holders of General Unsecured Claims against LPC (Class 7) and General Unsecured Claims against LRGI (Class 17) ................................................................... 92

5.    Holders of Asbestos-Related Claims (Class 9) ...................... 94

6.    Character of Gain or Loss ..................................................... 94

7.    Distributions in Respect of Accrued Interest .......................... 95

8.    Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt .......... 95

a.    Stated Interest and Original Issue Discount ............... 95

b.    Sale, Exchange or Other Disposition of the Amended Secured Debt ............................................ 96

9.    Disposition of the New LPC Common Stock .......................... 96

C.    Information Reporting and Backup Withholding ............................... 97

IX.    Securities Law Matters ............................................................................. 97

A.    Issuance and Resale of the New LPC Common Stock under the Plan .................................................................................... 97

1.    Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim ............................ 97

2.    Issuance and Resale of New LPC Common Stock to be Issued to the Plan Investor .................................................. 98

|   | B. | Issuance and Resale of Amended Secured CapitalSource Debt, Amended Secured CSE Debt, GUC Payment Obligations, and any Other Deferred Cash Payment Obligations | 99 |
|---|----|----|----|
|   | C. | Listing | 99 |
|   | D. | Legends | 99 |
| X. | | Voting Procedures and Requirements | 99 |
|   | A. | Voting Deadline | 99 |
|   | B. | Holders of Claims Entitled to Vote | 101 |
|   | C. | Vote Required for Acceptance by a Class | 101 |
|   | D. | Voting Procedures | 101 |
|   |   | 1. Voting Procedures | 101 |
|   |   | 2. Withdrawal of Ballot | 102 |
| XI. | | Confirmation of the Plan | 102 |
|   | A. | The Confirmation Hearing | 102 |
|   | B. | General Requirements for Confirmation | 102 |
|   | C. | Best Interests Test | 104 |
|   | D. | No Unfair Discrimination/Fair and Equitable Test | 105 |
|   |   | 1. No Unfair Discrimination | 105 |
|   |   | 2. Fair and Equitable Test | 106 |
|   |   | a. Secured Claims | 106 |
|   |   | b. Unsecured Claims | 106 |
|   |   | c. Interests | 106 |
|   | E. | Classification of Claims and Interests | 106 |
|   | F. | Feasibility | 107 |
| XII. | | Conclusion | 108 |

# I.

## INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), Lexington Precision Corporation ("LPC") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("LRGI"), as debtors and debtors in possession (together, the "Debtors" or "Lexington"), in jointly-administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") to all holders of Claims against and Interests in the Debtors in connection with the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated April 19, 2010 (the "Plan" or the "Company's Plan"), attached hereto as **Exhibit A**. **Unless otherwise defined herein, capitalized terms used herein will have the meanings ascribed to such terms in the Plan. Please note that to the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan governs.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Plan and alternatives to the Plan, (4) the rights of holders of Claims and Interests under the Plan, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Plan.

The Debtors have developed the Plan in order to provide equitable treatment to all of their creditors, while also eliminating over $50,000,000 of their consolidated indebtedness, which will place the Debtors in a position to take advantage of significant growth opportunities. Pursuant to the Plan, each holder of Senior Subordinated Notes (i) will receive a cash payment in the amount of 51% of its Allowed Claim (the "Cash-Out Percentage") or (ii) may elect (the "Class 5 Stock Election") to receive a number of shares of New LPC Common Stock equal to the (x) product of its Allowed Claim and the Cash-Out Percentage, divided by (y) $10.00. The funds necessary to make payments to holders who do select the Class 5 Stock Election, plus additional funds needed for working capital, will be provided by Commercial Finance Services 407, LLC, or one of its affiliates (the "Plan Investor") pursuant to a Stock Purchase Agreement with the Debtors, under which the Plan Investor will purchase, at a price of $10.00 per share, shares of New LPC Common Stock for an aggregate investment of at least $22 million (including amounts spent to purchase Senior Subordinated Notes prior to the Effective Date).

The Debtors selected the Plan Investor after an extensive marketing effort led by their financial advisors, W.Y. Campbell & Company ("Campbell"), and have determined that the proposed investment, as represented by the Stock Purchase Agreement, represents the highest value achievable in the market at this time and under the current circumstances. These circumstances include:

- Continued disruption in credit markets and lack of availability of traditional sources of debt capital;

- The Debtors' inability, after more than a year of efforts, to obtain traditional debt financing sufficient to fund a plan of reorganization that would provide a meaningful recovery for creditors and leave the Reorganized Debtors with adequate working capital;

- Detrimental effects of extended Chapter 11 Cases on the Debtors' efforts to generate new business and maintain existing business;

- The costs to the estates in professionals fees and other reorganization expenses of continued Chapter 11 Cases;

- The expiration of the Debtors' exclusive period to file a plan of reorganization;

- Existence of a prior competing plan of reorganization proposed by creditor constituencies and providing for a recovery to holders of unsecured claims that is substantially inferior to the recovery provided to such holders under the Debtors' Plan.

The Debtors recommend that all holders of Claims vote to accept the Company's Plan because the Company's Plan will provide unsecured creditors the greatest recovery possible under the circumstances.

**Please note that not all holders of Claims or Interests are entitled to vote. If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement. For more information as to which holders of Claims and Interests may vote, please refer to Section V.B, "*Classification and Treatment of Classified Claims and Interests*" on page 48. For voting procedures and important deadlines, please refer to Section X, "*Voting Procedures and Requirements*" on page 99.**

On [_____], 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Plan. **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan or as to the accuracy or truth of the statements, information, and data contained in this Disclosure Statement.**

On [__], 2010, the Bankruptcy Court will hold a hearing to consider whether to approve and confirm the Plan (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time without notice. For more information on the confirmation process, please refer to Section XI, "*Confirmation of the Plan*" on page 96.

For your reference, the following documents are attached to the Disclosure Statement:

(i)    The Plan (**Exhibit A**);

(ii)     Order of the Bankruptcy Court, dated **[_____]**, 2010
(the "Disclosure Statement Order"), approving, among other things, this
Disclosure Statement and establishing certain procedures with respect to
the solicitation and tabulation of votes to accept or reject the Plan
(attached without exhibits) (**Exhibit B**);

(iii)    LPC's Annual Report on Form 10-K for the fiscal year ended
December 31, 2008 (attached without exhibits) (**Exhibit C**);

(iv)     LPC's Form 10-Qs for the quarter ended September 30, 2009 (attached
without exhibits) (**Exhibit D**);

(v)      LPC's Proxy Statement issued in connection with its Annual Meeting of
Stockholders held on May 28, 2009 (**Exhibit E**);

(vi)     The Debtors' Projected Consolidated Financial Statements (the "Projected
Financial Statements") for the period ending December 31, 2012
(**Exhibit F**);

(vii)    The Debtors' Liquidation Analysis (**Exhibit G**);

(viii)   Summary of Amended and Restated Secured CapitalSource Credit
Agreement (**Exhibit H**); and

(ix)     Summary of Amended and Restated Secured CSE Loan Agreement
(**Exhibit I**).

   **This Disclosure Statement does not replace a careful and detailed review and
analysis of the Plan by each holder of a Claim or Interest.  Please use this Disclosure
Statement to aid and supplement that review.  The description of the Plan contained herein
is only a summary and is qualified in its entirety by reference to the full text of the Plan; if
any inconsistencies exist between the Plan and this Disclosure Statement, the Plan governs.
The Debtors urge holders of Claims and Interests to review the Plan and any related
attachments in order to obtain a full understanding of the Plan.**

   **IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230,
holders of Claims and Interests are hereby notified that:  (i) any discussion of U.S. federal
tax issues contained or referred to in this Disclosure Statement is not intended or written to
be relied upon, and cannot be relied upon, by holders of Claims or Interests for the
purpose of avoiding penalties that may be imposed on them under the Tax Code; (ii) such
discussion is written in connection with the promotion or marketing by the Debtors of the
transactions or matters addressed herein (including the solicitation of votes accepting the
Plan); and (iii) holders of Claims and Interests should seek advice based on their particular
circumstances from an independent tax advisor.**

* * *

**The offers of securities contemplated by the Plan have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or similar state securities or "blue sky" laws.  The offers and issuances of such securities pursuant to the Plan are being done pursuant to exemptions available under section 1145 of the Bankruptcy Code and Section 4(2) of the Securities Act.  The securities to be issued pursuant to the Plan have not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan.**

**Certain statements contained in this Disclosure Statement, including the Projected Financial Statements, are forward-looking statements.  Forward-looking statements usually can be identified by the use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof.  They may be used in discussions of strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.  Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements.  Some of those risks and uncertainties include:**

- Increases and decreases in business awarded to the Debtors by their customers;

- Unanticipated price reductions for the Debtors' products as a result of competition;

- Changes in the cost of raw materials;

- Strength or weakness in the North American automotive market;

- Changes in the competitive environment;

- Unanticipated operating results;

- Changes in economic conditions;

- Changes in interest rates;

- Financial difficulties encountered by customers or suppliers of the Debtors;

- Labor interruptions at the Debtors' facilities or at their customers' or suppliers' facilities;

- The Debtors' ability to develop adequate policies regarding and testing of internal control over financial reporting; and

- Other risks as disclosed in Section VII of this Disclosure Statement.

**The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. There can be no assurance that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.**

## II.

## EXECUTIVE SUMMARY

### A.    Summary of Classification and Treatment of Claims and Interests Under the Plan

The following summarizes the classification of Claims and Interests under the Plan and the respective distributions and recoveries to each such Class. The following summary is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms of the Plan, please refer to Section V, "*The Plan*" on page 45.

The Plan provides for 19 classes of Claims and Interests. Classes 1 through 12 are comprised of Claims against or Interests in LPC, and Classes 13 through 19 are comprised of Claims against or Interests in LRGI. A Claim or Interest is impaired if the Plan modifies or changes the rights of the Claims or Interests included in the Class. Holders of Claims and Interests in Classes that are impaired may vote to accept or reject the Plan. If a Class of Claims or Interests is not impaired pursuant to the Plan, holders of the Claims or Interests in that Class are automatically deemed to accept the Plan.

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|-------|-------------|--------|-------------------|------------------------------|------------|
| | | | LPC Classes | | |
| Class 1 | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| Class 2(a) | CapitalSource Secured Claims against LPC | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CapitalSource Debt. | 100% |
| Class 2(b) | CSE Secured Claims against LPC | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CSE Debt. | 100% |
| Class 3 | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash or by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not later than 5 years from the date of assessment. | 100% |

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|-------|-------------|--------|-------------------|-----------------------------|------------|
| Class 4 | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| Class 5 | Senior Subordinated Note Claims | Impaired | Yes | Paid in Cash in an amount equal to 51% of the Allowed Claim, unless holder elects to receive a number shares of New LPC Common Stock equal to (x) the product of such holder's Allowed Claim and the Cash-Out Percentage (*i.e.*, 51.0%), <u>divided by</u>, (y) $10.00. | 51.0% |
| Class 6 | Junior Subordinated Note Claims | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| Class 7 | General Unsecured Claims against LPC | Impaired | Yes | Paid through an initial Cash payment of 8% of the Allowed Claim followed by nine (9) additional equal quarterly Cash payments, each in the amount of 8.6% of the Allowed Claim, unless the holder elects to receive a single Cash payment equal to 51% of the holder's Allowed Claim. | 80% |
| Class 8 | Convenience Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| Class 9 | Asbestos-Related Claims | Impaired | Yes | Paid in full by (i) insurance proceeds and (ii) to the extent insurance proceeds are insufficient to pay Allowed Claims, the deficiency will be paid as follows, (a) Allowed Claims exceeding available insurance proceeds by $2,000 or less will be paid upon Allowance and (b) Allowed Claims exceeding insurance proceeds in excess of $2,000 will receive an initial Cash payment of 8% of such amount upon Allowance followed by nine (9) additional semi-annual Cash payments, each in the amount of 8.6% of the Allowed Claim, unless the holder elects to receive a single Cash payment equal to 51.0% of the holder's Allowed Claim. | 100% of the Allowed Claim to the extent insurance proceeds are available, plus 80% of any remaining Allowed Claim |
| Class 10 | Series B Preferred Stock Interests | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| Class 11 | LPC Common Stock Interests | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| Class 12 | Other Equity Interests in LPC | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|-------|-------------|--------|-------------------|------------------------------|------------|
| | | | LRGI Classes | | |
| Class 13 | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| Class 14(a) | CapitalSource Secured Claims against LRGI | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CapitalSource Debt. | 100% |
| Class 14(b) | CSE Secured Claims against LRGI | Impaired | Yes | Satisfied in full by issuance of a Pro Rata share of the Amended Secured CSE Debt. | 100% |
| Class 15 | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash or by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more than 5 years from the date of assessment. | 100% |
| Class 16 | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| Class 17 | General Unsecured Claims against LRGI | Impaired | Yes | Paid through an initial Cash payment of 10% of the Allowed Claim (plus postpetition interest) followed by nine (9) additional equal quarterly payments, each in the amount of 10.75% of the Allowed Claim (plus postpetition interest), unless the holder elects to receive a single Cash payment equal to 51% of the holder's Allowed Claim. | 100% |
| Class 18 | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash with postpetition interest. | 100% |
| Class 19 | Interests in LRGI | Unimpaired | No (deemed to accept) | Interests are retained. | 100% |

## B.    Solicitation and Voting Procedures

If you are entitled to vote, you will receive a ballot with this Disclosure Statement.  On the ballot, you may elect either to accept or reject the Plan.  If you return a ballot that does not indicate either an acceptance or rejection of the Plan, your vote will be counted as a vote to accept the Plan.  If you return a ballot that indicates both an acceptance and rejection of the Plan, your vote will not be counted and will be disregarded.

The discussion of solicitation and voting procedures below is a summary of the solicitation and voting process.  Detailed voting instructions are provided with each ballot and are also set forth in greater detail in Section X, *Voting Procedures and Requirements,*" on page 99.  Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

1.      **The Record Date; Holders of Claims Entitled to Vote on the Plan**

The Bankruptcy Court has approved **[_____], 2010** as the record date (the "Record Date") to determine which holders of Claims or Interests may vote to accept or reject the Plan.  Class 2(a) – CapitalSource Secured Claims against LPC, Class 2(b) – CSE Secured Claims against LPC, Class 5 – Senior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims, Class 14(a) – CapitalSource Secured Claims against LRGI, Class 14(b) – CSE Secured Claims against LRGI, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim in any of these classes as of the Record Date may vote to accept or reject the Plan.

2.      **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement at least 10 days prior to the Confirmation Hearing (as defined below), and will serve all known holders of Claims, including all claimants scheduled on the Debtors' schedules, with a courtesy notice that will (i) inform parties that the Plan Supplement was filed, (ii) list the information contained in the Plan Supplement and (iii) explain where copies of the Plan Supplement may be obtained.  Parties may obtain a copy of the Plan Supplement by:  (i) calling the Debtors' restructuring hotline at **(646) 282-1800**; (ii) visiting the Debtors' restructuring website at: http://chapter11.epiqsystems.com/lexington; and/or (iii) writing to **Lexington Precision Ballot Tabulation, c/o Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, New York 10017**.

The Plan Supplement will include, without limitation, the following information:

•       the Charter Amendment;

•       the Securityholders Agreement;

•       the identity of the members of the new Board and the nature of any compensation for any member of the new Board who is an "insider" under the Bankruptcy Code;

•       the list of executory contracts and unexpired leases designated by the Debtors, with the consent of the Plan Investor, to be rejected on the Effective Date;

•       the Restructuring Transactions Notice, if any;

•       the form of the Stock Purchase Agreement;

•       the terms of the New LPC Common Stock; and

•       ancillary documents to the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.

3.      **The Voting Deadline**

**[___] [__], 2010 at 4:00 p.m. (prevailing Eastern Time)** has been approved by the Bankruptcy Court as the voting deadline (the "Voting Deadline").  The Voting Deadline is the date by which all ballots must be properly executed, completed and delivered to the Voting Agent in order to be counted as votes to accept or reject the Plan.

4.      **Voting Instructions**

Please send your ballot to:

**FINANCIAL BALLOTING GROUP LLC (the "Voting Agent")**
**ATTN: LEXINGTON PRECISION BALLOT TABULATION**
**757 THIRD AVENUE, 3RD FLOOR**
**NEW YORK, NEW YORK 10017**

**- OR -**

**tabulation@fbgllc.com**

**The Voting Agent must receive your ballot by (i) mail at the street address above or (ii) e-mail in PDF form, each before the Voting Deadline for your vote to be counted.**  The Voting Agent will not accept ballots sent by facsimile.  If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot.  If your ballot is damaged or lost, you should also contact the Voting Agent.

C.      **Confirmation of the Plan**

1.      **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for **[_____], 2010**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

2.      **Objections to Confirmation**

Objections or responses to confirmation of the Plan, if any, must:  (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (iii) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor.

All objections and responses to the confirmation of the Plan must be filed with the Bankruptcy Court no later than **[___ __], 2010 at 4:00 p.m. (prevailing Eastern Time)** (the "Plan Objection Deadline").  In accordance with General Order M-242, registered users of

the Bankruptcy Court's case filing system must electronically file their objections and responses. General Order M-242 may be found at www.nysb.uscourts.gov.  All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Shelley C. Chapman.

All objections and responses must be served, so as to be received no later than **[___  __], 2010 at 4:00 p.m. (prevailing Eastern Time)** upon:  (i) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn:  Michael A. Lubin), (ii) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn:  Richard P. Krasnow and Victoria Vron); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn:  Paul Schwartzberg); (iv) the attorneys for the Plan Investor, Jones Day, 222 E 41st St., New York, New York 10017 (Attn:  Lisa G. Laukitis and Jennifer J. O'Neil); (v) the attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn:  John C. Tishler) and Carter, Ledyard & Milburn LLP, 2 Wall Street, New York, New York 10005 (Attn: Aaron R. Cahn); (vi) the attorneys for the statutory committee of unsecured creditors, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn:  Paul Silverstein and Jonathan I. Levine); and (vii) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn:  Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

For more information on the confirmation of the Plan, please refer to Section V.J, "*Effects of Confirmation*," on page 66.  Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

## D.    Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all parties in interest.  In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the

bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor.  Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponent to conduct such solicitation pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III.

## OVERVIEW OF THE DEBTORS' OPERATIONS AND THE CHAPTER 11 CASES

### A.    Description of the Debtors' Operations

The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described below. The business of the Rubber Group is conducted by LRGI, and the assets utilized in that business are owned by LRGI, a Delaware corporation, and a wholly-owned subsidiary of LPC, which is also a Delaware corporation.  The business of the Metals Group is conducted by LPC, and the assets utilized in that business are owned by LPC.  The following table sets forth actual net sales for the Rubber Group and the Metals Group for 2007, 2008, and 2009 (dollar amounts in thousands):

|  | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Rubber Group | $ 74,587 | 84.4% | $ 62,278 | 85.3% | $ 51,261 | 83.3% |
| Metals Group | 13,821 | 15.6 | 10,751 | 14.7 | 10,306 | 16.7 |
| Total | $ 88,408 | 100.0% | $ 73,029 | 100.0% | $ 61,567 | 100.0% |

### 1.    The Rubber Group

The Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices.  The following table sets forth the Rubber Group's actual net sales to each of its principal markets for 2007, 2008, and 2009 (dollar amounts in thousands):

| | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Automotive Aftermarket | $ 22,034 | 29.5% | $ 26,569 | 42.7% | $ 26,564 | 51.8% |
| Automotive OEM | 35,799 | 48.0 | 18,006 | 28.9 | 10,078 | 19.7 |
| Medical Devices | 15,928 | 21.4 | 16,300 | 26.2 | 14,281 | 27.9 |
| Other Industries | 826 | 1.1 | 1,403 | 2.2 | 338 | 0.6 |
| Total | $ 74,587 | 100.0% | $ 62,278 | 100.0% | $ 51,261 | 100.0% |

The Rubber Group currently has two production facilities, each of which is a stand-alone business unit, with a complete management team.  The Jasper, Georgia facility specializes in insulators for automotive ignition systems and seals for automotive wire harnesses, and the Rock Hill, South Carolina facility specializes in components for medical devices and seals for automotive wire harnesses.  During the third quarter of 2009, the Debtors completed the closure of their automotive connector seal facility in Vienna, Ohio and the corresponding transfer of their automotive connector seal business to the Jasper, Georgia and Rock Hill, South Carolina facilities.  The Rubber Group has a significant presence as a supplier in the automotive aftermarket, the automotive OEM market and the medical device market.

### a.      The Automotive Aftermarket

In the automotive aftermarket, the Rubber Group supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors believe that the Rubber Group is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket, with an estimated North American market share of 50%.

### b.      The Automotive OEM Market

In the automotive OEM market, the Rubber Group has focused on two principal products, insulators for automotive ignition systems and seals for automotive wire harnesses. The Debtors believe that the Rubber Group is one of the two largest suppliers of connector seals in North America and the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market.  The Debtors believe that the Rubber Group's sales of insulators to the OEM market have been limited by customer concerns about the Debtors' financial condition; however, the Rubber Group has recently been awarded significant amounts of new business for insulators for automotive ignition systems in new vehicles and the Debtors believe that the Rubber Group's market share of ignition system insulators for the OEM segment will increase significantly in the immediate future.

### c.      The Medical Device Market

In the medical device market, the Rubber Group has chosen to avoid commodity products that are characterized by lower quality requirements and extreme price competition. Instead, the Rubber Group concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous medication delivery systems that are assembled using high-speed, automated

assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision. The Debtors believe that the Rubber Group has become a leading supplier of these types of components because of its capabilities in product design and materials development and because its molding technology offers excellent process repeatability and product quality.

### d.    The Rubber Group's Competitive Strengths

The Rubber Group's leading market positions, high profit margins, and prospects for growth once the Debtors' financial issues are behind them are a function of its ability to offer its customers a one-stop source for the development and delivery of complex molded-rubber components, with high quality and at competitive prices. The Rubber Group has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including materials development, mold-making, rubber mixing, molding, process automation, and process management.

(i)    Materials Development. Any new product development initiative begins with the selection of the appropriate compound to meet the product specification at a low cost. The Rubber Group has extensive experience in molding of numerous elastomers and works closely with its customers to choose the optimal material for any given application. The Rubber Group's in-house mixing operation in Jasper, Georgia, is equipped with a complete facility for materials development, including lab-style mixers, mills and molding presses, and analytical equipment for testing all critical performance characteristics. In addition, the Rubber Group's Rock Hill, South Carolina, facility contains an analytical laboratory that is utilized for detailed analysis of polymers, fillers, and contaminants.

(ii)    Mold-Making. The Rubber Group has invested over $14 million in a state-of-the-art mold-making operation within the Debtors' North Canton, Ohio facility (the "Engineering Center"). Through this investment, the Rubber Group controls 100% of its mold-making activities and has the capability to produce flashless molds, cut-in-plate molds, standard injection molds, and LSR injection molds. The mold-making operation permits the Rubber Group to significantly reduce turnaround times for prototype molds, production molds, modifications, and repairs. Moreover, the strong relationship between the Rubber Group's mold-making operation and its production-molding operations has enabled the Rubber Group to make numerous technological advances in both its mold-making and its molding processes.

Unlike most rubber molding businesses, the Rubber Group utilizes high-tolerance, "flashless" molds whenever possible. In a flashless mold, each cavity is comprised of a separate stack of precisely-machined, self-registering inserts that are assembled in multiple, hinged plates. The inserts have thousands of laser-cut vents that permit gases to escape from

the cavities during the molding process while limiting flash extension to nominal levels. As illustrated in the following table, flashless molds offer multiple benefits compared to conventional cut-in-plate molds.

| Attribute | Resulting Benefit |
|---|---|
| Produce tighter-tolerance components | Parts are easier to assemble and exhibit better end-use performance |
| Forces on mold surface are balanced | Parts remain concentric and symmetrical even after extensive mold usage |
| Cavities are vented | Trapped air issues are minimized, improving quality and reducing scrap |
| Most secondary operations, such as deflashing, trimming, and die-cutting, are eliminated | Lower risk of damaged parts and contamination; reduced costs |
| Part handling is reduced | Lower risk of contamination |
| Extended mold life | Lower mold cost over the life of the part; less deterioration in part quality over time |
| Individual cavities can be replaced. | Molds have full cavitation at all times, increasing productivity and reducing costs |

(iii)    Automation. The Rubber Group makes extensive use of automation throughout its operations to improve productivity, reduce labor costs, and improve the quality of its products. A substantial portion of the Rubber Group's automation equipment is designed and built at the Engineering Center. This gives the Rubber Group a competitive advantage because its automation equipment is less expensive than similar equipment that could be purchased from outside vendors and is designed specifically to optimize the Rubber Group's manufacturing processes.

(iv)    Proprietary Press Controls. The Rubber Group currently operates over 200 rubber molding presses, all of which are equipped with proprietary programmable logic controllers ("PLCs") designed and built at the Engineering Center. PLCs permit the Rubber Group to select the optimal processing parameters for each mold and ensure strict adherence to those parameters, in order to maximize quality and minimize costs. PLCs collect and store large amounts of data that can be used to determine the root cause of any molding problem.

(v)    Management Operating System. The Debtors have developed a management operating system that is used on a real-time basis to ensure the efficient operation of every area of each plant. The system increases management effectiveness, accountability, and communication. As a result, management is able to more closely control labor cost, productivity, and overall performance. The management operating system establishes performance expectations and enables management to hold every operator,

supervisor, and department accountable for meeting these expectations. Performance is measured and evaluated on a short-interval basis, usually every two hours, so that real-time adjustments can be made to bring performance into line with expectations.

### e.    Facilities of the Rubber Group; Capacity for Growth

The Rubber Group operates two modern production facilities encompassing 161,000 square feet of floor space. All of the operating facilities are owned by the Debtors.

All of the Rubber Group's facilities and equipment are well-maintained. Because of reductions in volume and increases in productivity, each of the Rubber Group's plants has substantial unused capacity in all functional areas at current volume levels. As a result, management believes that the Rubber Group can accommodate the sales growth reflected in the Projected Financial Statements (from $51.3 million in 2009 to $79.7 million in 2012) without the need for significant additional capital expenditures for plant and equipment.

The Rubber Group's production facilities are supported by a 42,000 square foot Engineering Center and a materials-development and rubber-mixing facility within the Jasper, Georgia facility. The Engineering Center and the materials development facility have helped the Rubber Group to differentiate itself from many other custom molders by offering its customers a number of proprietary services, including, materials development to determine the optimal material for the component, and automation to produce complete assemblies. When coupled with the Rubber Group's low-cost manufacturing operations and outstanding quality record, these services have made the Rubber Group a market leader in each of the markets it serves.

### f.    Insulators for Automotive Ignition Systems

Insulators for automotive ignition systems (aftermarket and OEM) represent the Rubber Group's largest product category, accounting for approximately 57.7% of the Rubber Group's net sales for all of 2009.

Insulators are molded rubber components that are used in ignition systems to seal and insulate the terminals on the spark plug and the distributor in a traditional ignition system, and the connection between the coil and the spark plug in a coil-on-plug style ignition system. Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers that assemble ignition-wire sets for the automotive OEMs and for retailers serving the automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

The Debtors believe that the Rubber Group is North America's largest manufacturer of insulators, with 2009 sales volume of 201 million units, representing net sales of approximately $30.1 million, and the leading supplier of insulators to companies, including General Cable and Standard Motor Products, that supply ignition-wire sets to automotive-parts retailers. During 2009, the Rubber Group's sales of insulators to the automotive aftermarket were $26.5 million, which represents an estimated North American market share in excess of 62%.

The Rubber Group is also a major supplier of insulators to companies that supply ignition-wire sets to the automotive original equipment manufacturers.  Through its customers, Prestolite Wire, Diamond Electric, and Ford, the Rubber Group is a major supplier of insulators used on new Ford and Chrysler vehicles produced in North America.  For 2009, the Rubber Group's sales of insulators for new vehicles were $3.1 million, which represents an estimated North American market share of approximately 27%.

The Rubber Group has become the leading supplier of insulators in North America, while continuing to achieve significant profit and cash flow margins, for the following reasons:

(i)      Product Knowledge. Because the Jasper facility is focused almost exclusively on the production and sale of insulators, the Rubber Group has developed vast knowledge of the product and its end-markets.  This knowledge enables the Rubber Group to provide invaluable assistance to its customers in designing insulators with superior performance characteristics, while minimizing cost.

(ii)     Cost Competitiveness. The same product focus has enabled the Rubber Group to develop cost-effective methods for delivering each type of insulator, including:

A.      High-cavitation tools for high-volume parts;

B.      Flashless tools for 180° parts;

C.      Unique, hybrid tools blending flashless and cut-in-plate technology, for certain difficult-to-mold insulators;

D.      Proprietary automation for molding, demolding, inspection, and assembly; and

E.      Offshore sourcing of lower-volume parts.

(iii)    Proprietary Materials. The Rubber Group has developed an extensive library of proprietary materials for the insulator market.  These materials enable the Rubber Group to meet demanding specifications (including engine temperatures as high as 600° F) at a competitive price.

(iv)     The Broadest Aftermarket Product Line. The Rubber Group has developed a very broad line of insulators for the automotive aftermarket by:

A.      Investing more than $7 million over the past ten years to build over one hundred high-cavitation tools for the aftermarket;

B.    Making further significant investments to acquire the right to use excess capacity on many of the high-cavitation tools owned by its OEM customers to supply the aftermarket; and

C.    Developing reliable, low-cost, off-shore sourcing for lower volume aftermarket parts.

Although the Rubber Group is already the leading supplier of insulators in North America, the Projected Financial Statements reflect a significant increase in sales of insulators once the Chapter 11 Cases are concluded. Management believes that this growth is achievable for the following reasons:

(i)    <u>New Programs Awarded or Considered Highly Likely</u>. The Rubber Group received orders to build production tooling from a number of suppliers to the Automotive OEMs, including Robert Bosch, Diamond Electric Manufacturing, Prestolite Wire and Remy, Inc., on programs with an annualized value of approximately $7.0 million at full volume and is quoting significant amounts of additional business for these customers. Based upon customer feedback, the management of the Rubber Group believes that its pricing is highly competitive and that it is highly likely that a meaningful portion of this additional business will be awarded to the Debtors.

(ii)    <u>Ford Potential</u>. Ford Motor Company has stated a desire to source additional insulators with the Debtors as soon as they are satisfied with the resolution of the Chapter 11 Cases.

(iii)    <u>Aftermarket Strength</u>. The Rubber Group is expected to continue to capture market share in the aftermarket due to:

A.    Its innovative product design;

B.    Its program of continuing to build high-cavitation molds for high-volume parts;

C.    Its off-shore sourcing of low-volume parts; and

D.    The inability of its competitors to match the Rubber Group's prices, quality, and service.

### g.    *Molded Rubber Components for Medical Devices*

Components for medical devices are the Rubber Group's second largest product line, accounting for 27.9% of the Rubber Group's net sales for 2009.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery

devices, and catheters.  The Rubber Group has chosen to avoid commodity-type components (like plunger tips for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that the Rubber Group is able to offer.  These types of products include seals for laparoscopic surgery devices, injection sites for intravenous medication delivery systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

The Rubber Group is rapidly becoming a leading supplier for these types of components because of its technical capabilities, including:

(i)     Product Design.  The Rubber Group uses proprietary computer simulation software to help its customers design components that function optimally in their required application and can be produced without significant problems.

(ii)    Materials Development.  The Rubber Group's extensive materials library and its experience with a broad range of elastomers enable it to develop the optimal material for each application at a competitive price.

(iii)   Tight-Tolerance, Flashless Molds.  The Rubber Group's state-of-the-art flashless molds allow it to:

A.     Maintain part concentricity, which is critical to the functioning of high-speed assembly equipment and to the delivery of precise dosages, even after extensive mold usage;

B.     Deliver consistently flash-free parts; and

C.     Hold extremely tight tolerances on even the most difficult features, including seals with very thin walls.

(iv)    Proprietary Press Controls.  The Rubber Group's proprietary press controls allow it to provide its customers with a high level of assurance regarding process repeatability and traceability.

(v)     In-House Automation Capability.  The Rubber Group's in-house automation design/build capability enables it to solve difficult assembly, inspection, and packaging issues for its customers.

The following is a description of the Rubber Group's principal products for the medical device industry, by application.

(i)     Medication Delivery Systems.  The Rubber Group supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and process repeatability.  Medication delivery products include injection sites for intravenous medication

delivery systems that are assembled using high-speed, automated assembly equipment, and plunger tips for syringes used in applications where dosages must be controlled with precision. Medical applications that utilize the Rubber Group's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology, cardiac care, and cosmetic surgery (Botox delivery). The Debtors believes growth opportunities in this product segment are strong because:

A.    Demand for the products should increase as the average age of the population increases;

B.    Device-makers will continue to move to higher-speed assembly, which should increase the need for suppliers with the ability to produce consistently symmetrical parts; and

C.    There is expected to be meaningful growth in applications where dosages must be tightly controlled.

(ii)    <u>Laparoscopic Surgery Devices</u>. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively small punctures rather than through a large incision. Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection. Since 2005, the Rubber Group has built significant relationships with three of the major manufacturers of laparoscopic surgery devices, and has received purchase orders for 21 different components for such devices. Many of these programs are in the early stages of their life-cycle and are expected to grow significantly in volume over the next several years.

The Debtors believe that the Rubber Group is in the early stages of a period of meaningful growth in its medical components business. A substantial portion of projected future growth is attributable to major programs that are currently ramping up with existing customers. The balance is attributable primarily to new projects currently in the development stage, both with existing customers and with new customers that have been attracted to the Rubber Group's capabilities.

Based upon discussions with a number of large customers, including, Ethicon Endo-Surgery, Inc., Smiths Medical, Delphi Corporation, and Ford Motor Corporation, the Debtors believe that substantial incremental business may be made available to them upon their emergence from chapter 11 with a reduced debt level. The Debtors are confident that they have in place the infrastructure and the equipment to take advantage of these new business opportunities profitably and without the need for significant additional investment in plant and equipment.

h.      *Connector Seals for Automotive Wire Harnesses*

Connector seals for automotive wire harnesses are the Rubber Group's third-largest product line, accounting for approximately 13.0% of the Rubber Group's estimated net sales for 2009.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.

There are three standard types of connector seals.  Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition.  Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

The Debtors believe that the Rubber Group is one of North America's two largest manufacturers of connector seals, with estimated 2009 sales volume of over 215 million units. During the third quarter of 2009, the Debtors completed the closure of their stand-alone connector seal facility in Vienna, Ohio and the transfer of their connection seal manufacturing business to their Jasper, Georgia, and Rock Hill, South Carolina facilities.  The Debtors undertook this consolidation because the reduction in the size of their connector seal business made it unlikely that this business could be returned to an adequate level of profitability as a stand-alone business unit.

The Rubber Group's sales of connector seals have declined significantly in recent years for the following reasons:

(i)      Customer in-sourcing of a number of commodity-type seals;

(ii)     Customer re-sourcing of some connector seals due to price increases implemented by the Rubber Group in 2005 and 2006;

(iii)    Customer concerns about sourcing new business with an already-dominant supplier viewed as having financial issues; and

(iv)     The industry-wide reduction in domestic car and truck production.

Despite these sales declines, the Rubber Group continues to be a leader in the manufacture of connector seals, while maintaining profit and cash flow margins above the norm for the automotive supply industry, for the following reasons:

(i)      Product Design. The Rubber Group's focus on connector seals, coupled with its proprietary computer simulation software, has made the Rubber Group uniquely capable of assisting its customers in designing the seals for their electrical connectors.

(ii)     Competitive Advantages in Multi-Hole Seals. The Rubber Group has developed very cost-effective technology for manufacturing large volumes of the highly-complex, multi-hole seals that have become the industry standard.  This technology encompasses:

A.     State-of-the-art, flashless tools that eliminate the need for most costly deflashing operations;

B.     Advanced wasteless molding technology, utilizing proprietary cold pots that minimize material waste;

C.     Proprietary "split-pin" technology that facilitates demolding without tears or flashed-over holes;

D.     High-cavitation tools that increase productivity and reduce cost; and

E.     Use of automated inspection equipment to meet stringent customer quality requirements.

### i.     *Financial Performance of the Rubber Group*

The following table sets forth the actual income from operations of the Rubber Group for 2007 and 2008 and its estimated income from operations for 2009 and the reconciliation of the Rubber Group's income from operations to its Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for those periods (dollar amounts in thousands).

Please refer to **Exhibit F**, attached hereto, for the reconciliation of the Debtors' consolidated loss from continuing operations for 2008 and their estimated consolidated loss from continuing operations for 2009 to their estimated consolidated Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP.  The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA.  Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)      EBITDA excludes interest expense.  Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)     EBITDA excludes provisions for taxes.  Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)    EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling.  Although depreciation and amortization are non-cash charges, they represent the consumption, over a projected period, of assets that produce revenue.  EBITDA also does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)    EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(v)     EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vi)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement, the Prepetition Loan Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP.  In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

The following table sets forth the actual operating results and EBITDA of the Rubber Group for 2007 and 2008 and its estimated operating results and EBITDA for 2009 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

| | 2007 Actual | | 2008 Actual | | 2009 Estimate[1] | |
|---|---|---|---|---|---|---|
| Net Sales | $74,587 | 100.0% | $62,278 | 100.0% | $51,261 | 100.0% |
| Cost of Sales | 63,039 | 84.5 | 52,173 | 83.8 | 44,664 | 87.1 |
| Gross Profit | 11,548 | 15.5 | 10,105 | 16.7 | 6,597 | 12.9 |
| Selling and Admin. Exp. | 3,573 | 4.8 | 2,409 | 5.5 | 2,446 | 4.8 |
| Income from Operations | 7,975 | 10.7 | 6,696 | 10.8 | 4,151 | 8.1 |
| Other Income (Loss): | | | | | | |
| Interest Income | | | | | | |
| Gain on involuntary conversion of real estate | | | | | 199 | 0.3 |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | 4,350 | 8.5 |
| Add Back: | | | | | | |
| Depreciation and Amortization | 5,727 | 7.7 | 4,746 | 7.6 | 4,196 | 8.2 |
| Interest Expense | | | | | | |
| Gain on involuntary conversion of real estate | | | | | (199) | 0.3 |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $13,702 | 18.4% | $11,442 | 18.4% | $ 8,347 | 16.3% |

The following table sets forth a reconciliation of the forecasted operating results and EBITDA of the Rubber Group for 2009 to its pro forma operating results and EBITDA for 2009 (dollar in thousands):

---

[1] During the last six months of 2008, the Rubber Group experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated operating results of the Rubber Group for 2009 include (i) $3,138,000 of net sales at the Vienna facility, (ii) $903,000 of costs incurred to restructure the connector seal business and (iii) $2,305,000 of operating losses incurred at the Vienna, Ohio, facility. EBITDA at the Vienna, Ohio, facility during 2009, including the relocation expenses, was negative $2,376,000. Excluding the results of the Vienna, Ohio, facility during 2009, the Rubber Group's estimated EBITDA for 2009 totaled $10,723,000, or 22.3%.

| | 2009 Estimate | | Pro Forma Adjustments | 2009 Pro Forma | |
|---|---|---|---|---|---|
| Net Sales | $ 51,261 | 100% | $    (407) | $50,854 | 100% |
| Cost of Sales | 44,664 | 87.1 | (5,848) | 38,816 | 76.3 |
| Gross Profit | 6,597 | 12.9 | 5,441 | 12,038 | 23.7 |
| Selling and Admin. Exp. | 2,446 | 4.8 | (215) | 2,231 | 4.4 |
| Income from Operations | 4,151 | 8.1 | 5,656 | 9,807 | 19.3 |
| Other Income (Loss): | | | | | |
| Interest Expense | | | | | |
| Gain on Involuntary Conversion of Real Estate | 199 | 0.3 | | | |
| Reorganization Expense | | | | | |
| Total Other Income | | | | | |
| Income Tax | | | | | |
| Income (Loss) from Continuing Operations | 4,350 | 8.5% | | | |
| Add Back: | | | | | |
| Depreciation and Amortization | 4,196 | 8.2 | (695) | 3,501 | 6.9 |
| Interest Expense | | | | | |
| Gain on Involuntary Conversion of Real Estate | (199) | 0.3 | | | |
| Reorganization Expense | | | | | |
| Income Tax | | | | | |
| EBITDA from Continuing Operations | $  8,347 | 16.3% | $  4,961 | $13,308 | 26.2% |

The following table sets forth the projected operating results and EBITDA of the Rubber Group for the years 2010 through 2012 (dollar amounts in thousands):

| | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Net Sales | $ 58,173 | 100.0% | $ 70,653 | 100.0% | $ 79,748 | 100.0% |
| Cost of Sales | 45,026 | 77.4 | 51,566 | 73.0 | 56,686 | 71.1 |
| Gross Profit | 13,147 | 22.6 | 19,087 | 27.0 | 23,062 | 28.9 |
| Selling and Admin. Exp. | 2,423 | 4.2 | 2,622 | 3.7 | 2,786 | 3.5 |
| Income from Operations | 10,724 | 18.4 | 16,465 | 23.3 | 20,276 | 25.4 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |

| | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 3,441 | 5.9 | 2,833 | 4.0 | 2,813 | 3.6 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 14,165 | 24.3% | $ 19,298 | 27.2% | $ 23,089 | 28.9% |

2.    **The Metals Group**

The Metals Group consists of the Debtors' machining business located in
Rochester, New York.  The Metals Group manufactures a variety of high-volume components
that are machined from aluminum, brass, steel, and stainless steel bars and blanks.  The Metals
Group primarily uses multiple spindle screw machines and specially-designed rotary transfer
machines that allow the Metals Group to perform multiple forming operations on a part at the
same time.  The components produced by the Metals Group include airbag inflator components,
solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering
components, and wiper-system components, primarily for use by the automotive OEMs.  The
Metals Group derives competitive advantage from its ability to design and build automated
inspection equipment that utilizes visual and mechanical sensing to verify the critical features of
complex components.

The following table sets forth the Metals Group's actual net sales to each of its principal markets for 2007, 2008, and 2009 (dollar amounts in thousands):

|  | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Automotive OEM | $ 11,597 | 83.9% | $ 8,764 | 81.5% | $ 8,867 | 86.0% |
| Other Industries | 2,224 | 16.1 | 1,987 | 18.5 | 1,439 | 14.0 |
| Total | $ 13,821 | 100.0% | $ 10,751 | 100.0% | $ 10,306 | 100.0% |

The Metals Group's automotive OEM customers have historically included such major domestic suppliers as BorgWarner, Cooper-Standard Automotive, Delphi, and Jiffy-Tite. Over the past twenty-four months, the Metals Group has been awarded substantial volumes of additional business by these customers as well as a number of new customers.

### a.    The Metals Group's Competitive Strengths

The Metals Group has a number of competitive advantages within the markets it serves, which have enabled it to build a solid base of customers.  These advantages include:

(i)    The ability to design and build specialized manufacturing equipment, which allows the Metals Group to offer its customers comparatively short lead times and low prices;

(ii)    The ability to design and build automation equipment for many of its processes, which allows the Metals Group to offer its customers excellent quality and low prices; and

(iii)    The ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

### b.    Financial Performance of the Metals Group

The following table sets forth the actual operating results and EBITDA of the Metals Group for 2007 and 2008 and its estimated operating results and EBITDA for 2009 (dollar amounts in thousands).

| | 2007 Actual | | 2008 Actual | | 2009 Estimated | |
|---|---|---|---|---|---|---|
| Net Sales | $ 13,821 | 100.0% | $ 10,751 | 100.0% | $ 10,306 | 100.0% |
| Cost of Sales | 13,490 | 97.6 | 10,934 | 101.7 | 10,674 | 103.6 |
| Gross Profit | 331 | 2.4 | (183) | (1.7) | (368) | (3.6) |
| Selling and Admin. Exp. | 523 | 3.8 | 558 | 5.2 | 359 | 3.5 |
| Income from Operations | (192) | (1.4) | (741) | (6.9) | (727) | (7.1) |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 682 | 4.9 | 536 | 5.0 | 452 | 4.4 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 490 | 3.5% | $ (205) | (1.9)% | $ (275) | (2.7)% |

The following table sets forth the projected operating results and EBITDA of the Metals Group for the years 2010 through 2012 (dollar amounts in thousands):

|  | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Net Sales | $ 15,103 | 100.0% | $21,632 | 100.0% | $ 24,350 | 100.0% |
| Cost of Sales | 13,573 | 89.9 | 18,630 | 86.1 | 20,939 | 86.0 |
| Gross Profit | 1,530 | 10.1 | 3,002 | 13.9 | 3,411 | 14.0 |
| Selling and Admin. Exp. | 420 | 2.8 | 566 | 2.6 | 634 | 2.6 |
| Income from Operations | 1,110 | 7.3 | 2,436 | 11.3 | 2,777 | 11.4 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 464 | 3.1 | 586 | 2.7 | 680 | 2.8 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 1,574 | 10.4% | $ 3,022 | 14.0% | $ 3,457 | 14.2% |

### 3.    Non-Operating Assets

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their ongoing business. The Debtors plan to dispose of such assets in an orderly fashion. The most significant of those assets are discussed below.

### a.    *Land in East Ellijay, Georgia*

The Debtors own a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site, however, the adjacent area has seen extensive commercial development. An independent appraisal of this property, dated June 10, 2008, indicates that the value of this property has increased significantly, making it uneconomical to consider building a manufacturing plant there. The Debtors have substantially

completed the grading work necessary to prepare the property for sale and expect to commence marketing of this parcel after the Chapter 11 Cases are concluded.

The Debtors also own six residential lots aggregating 6.6 acres abutting this commercial property.

### b.     Land and Buildings in Lakewood, New York

The Debtors own a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of the Debtors' former die casting business, under a lease that expires on December 31, 2010. The lessee pays the Debtors $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,000. The lease provides for a single, two-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

The Debtors also own a vacant 10,000-square-foot building on 2.5 acres adjacent to the leased property discussed above.

### c.     Land and Buildings in Vienna, Ohio

The Debtors also own a 52,540 square-foot industrial building on 24.95 acres of land in Vienna, Ohio that was formerly used in connection with the Debtors' connector seals business.  As set forth in further detail in Section III.A.1 herein, the connector seals business was consolidated into the Rock Hill, South Carolina, and Jasper, Georgia, facilities.

### 4.     The Debtors' Employees

As of December 31, 2009, the Debtors employed approximately 493 permanent employees, of which 101 were salaried employees and 362 were hourly employees, and 30 were temporary employees.  The Debtors believe that their relationship with their employees is good. The Debtors' operations at their Rock Hill, South Carolina facility are subject to a collective bargaining agreement with the United Steel Workers of America, AFL-CIO that expires in 2012. Because the Rock Hill facility is an "open-shop," only certain of its hourly employees are covered by the collective bargaining agreement.

### B.     Significant Indebtedness

The Debtors' significant prepetition indebtedness is described below.  In addition to this indebtedness for money borrowed, the Debtors have prepetition trade accounts payable and other general unsecured claims of approximately $6 million.

### 1.     The Prepetition Credit Agreement

The Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit

Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement"). The Credit Agreement provides for: (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and (ii) an equipment term loan in the original principal amount of $12.5 million.

Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of the Debtors' assets other than real estate and second priority liens on the Debtors' real estate.

The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements. As of the Commencement Date, approximately $22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

As described in greater detail in Section V.B.1.b, "*Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)*" on page 48, pursuant to the Plan, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims. On account of their Allowed Claims, holders of Class 2(a) Claims will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement.

## 2.    The Prepetition Loan Agreement

The Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"), as amended pursuant to the Default Waiver Agreement. The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

Pursuant to the Prepetition Loan Agreement, CSE, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the Debtors' real estate, and second priority liens on substantially all of the Debtors' other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements. As of the Commencement Date, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

As described in greater detail in Section V.B.1.c, "*Class 2(b) – CSE Secured Claims against LPC (Impaired)*" on page 49, pursuant to the Plan, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims. On account of their Allowed Claims, holders of Class 2(b) Claims will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement.

3.    **Senior Subordinated Notes**

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes").  Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

Approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates.  As of the Commencement Date, approximately 74.4% of the Senior Subordinated Notes were held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date.  Three members of the Ad Hoc Committee and the Indenture Trustee originally served as members of the Creditors' Committee in the Chapter 11 Cases.  On or about February 12, 2010, two of these members resigned from the Creditors' Committee after the Plan Investor purchased such members' Senior Subordinated Notes.

As described in greater detail in Section V.B.1.f, "*Class 5 – Senior Subordinated Note Claims (Impaired)*" on page 51, pursuant to the Plan, Claims arising from the Senior Subordinated Notes are classified as Class 5 Claims.  Each holder of a Class 5 Claim will receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, Cash in the amount equal to 51% (the "Cash-Out Percentage") of its Allowed Senior Subordinated Note Claim; provided, however, that in lieu of such distribution, such holder may elect to receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, a number of shares of New LPC Common Stock equal to (x) the product of its Allowed Senior Subordinated Note Claim and the Cash-Out Percentage (*i.e.*, 51.0%), divided by (y) $10.00.

4.    **Junior Subordinated Note**

LPC is indebted to Michael A. Lubin, Chairman of the Board of the Debtors, in respect of an unsecured Junior Subordinated Note due November 1, 2009 in the principal amount of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note").  Interest on the Junior Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of each year.  As of the Commencement Date, $75,000 of accrued interest was outstanding with respect to the Junior Subordinated Note.

As described in greater detail in Section V.B.1.g, "*Class 6 – Junior Subordinated Note Claims (Impaired)*" on page 51, pursuant to the Plan, Claims arising from the Junior Subordinated Note are classified as Class 6 Claims.  The holder of the Class 6 Claims has agreed not to, and will not, receive a distribution under the Plan.

C.    **The Asbestos Cases**

LPC is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos Actions").  In each case, the plaintiffs generally allege that LPC or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers.  Generally, none of the complaints allege any specific facts as to which products LPC allegedly produced that contained asbestos or the time of exposure.

LPC has denied and continues to deny any liability with respect to the Asbestos Actions.  To date, the Debtors have not been found liable on any asbestos-related Claims and approximately 1,000 cases have been dismissed.

To date, Liberty Mutual and Home Insurance Company, who insured the Debtors for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors' defense costs.  On June 13, 2003, Home Insurance Company became subject to a state insurance liquidation proceeding.  Since then, Liberty Mutual has continued to pay the Debtors' defense and other asbestos-related costs.

The Debtors believe the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
|--------|----------|
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and bodily injury, $1,000,000 per occurrence, $1,000,000 in aggregate coverage for products liability |

In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund.  The Debtors believe Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage.  The Debtors believe that the Fireman's Fund coverage is as follows:

| Period | Coverage |
|--------|----------|
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |
| 10/10/78-06/01/79 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |

| Period | Coverage |
|---|---|
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

It should be noted that there may be filed certain Asbestos Related Claims with respect to years for which there may not be any insurance coverage. As described below, and as provided for in the Plan, the lack of insurance coverage for a valid and enforceable Asbestos Related Claim will not preclude the holder of such claim from receiving a distribution under the Plan.

As described in greater detail in Section V.B.1.j, "*Class 9 – Asbestos-Related Claims (Impaired)*" on page 52, pursuant to the Plan, Asbestos-Related Claims are classified as Class 9 Claims. After the Effective Date, each Asbestos-Related Claim will be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; provided, however, that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, will as promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims will be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies). To the extent the proceeds of the Asbestos Insurance Policies do not cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors will pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim 80% of the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); provided, however, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim will receive (a)(i) Cash in the amount of eight percent (8%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (ii) an additional nine (9) semi-annual Cash payments, each in an amount equal to 8.6% of such Insurance Proceeds Deficiency, commencing three (3) months after the earlier of the Effective Date or the date such Claim is Allowed, or (b) in lieu of such distribution and in full satisfaction of its Claim, such holder may elect to receive a Cash payment in an amount equal to 51% of the Insurance Proceeds Deficiency on the later of (x) the Effective Date or (y) the date such Claim becomes Allowed.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

D.    **Significant Events Leading to the Commencement of the Chapter 11 Cases**

        Historically over 75% of the Debtors' business represented sales of rubber and metal components used by tier-one automotive suppliers, which provide automotive parts to domestic original OEMs.  Over the past decade, there has been a substantial decline in the market share of the Detroit-based OEMs.  Since 2005, but during 2008 and 2009 in particular, there has been a meaningful reduction in the aggregate number of vehicles produced annually in the U.S. by all manufacturers.  These factors have caused tier-one suppliers, particularly those focused on the Detroit-based OEMS, to experience declining sales and increased pricing pressures.  This challenging industry environment has been exacerbated by industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of component suppliers like the Debtors.

        The Debtors have responded to the reduction in OEM sales by restructuring their operations to reduce costs, which has enabled the Debtors to maintain superior operating and EBITDA margins despite declining sales and to increase their focus on their automotive aftermarket and medical device businesses.

      1.    **Liquidity Crisis**

        Notwithstanding operational restructuring and efforts to diversify the Debtors' business, the industry-wide reduction in automotive OEM orders began to affect the Debtors in a significant way in mid-2006.  Although the Debtors were able to maintain superior margins, the reduction in sales to the automotive OEMs had a significant impact on the Debtors' overall cash flow.  At the same time, the Debtors' Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort.  The combination of these factors caused a significant drain on the Debtors' cash.

        On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes.  As a result of the liquidity issues described above, the Debtors were not in a position to make the scheduled payment on the due date or within the thirty-day grace period.  The failure to make this interest payment within the grace period constituted a default under the Indenture, and by February 1, 2007, that default triggered a cross-default under the Prepetition Credit Agreement and the Prepetition Loan Agreement.  Shortly after November 1, 2006, certain holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee.

      2.    **Restructuring Efforts**

        From November 2006 through mid-March 2007, the Debtors held extensive discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues.  In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc

Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all stakeholders.  Upon entering into the standstill agreement, the Debtors engaged Campbell to assist them in seeking a refinancing or a sale of all or a portion of the Rubber Group.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers.  The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date.  In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code.  The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

Thereafter, the Debtors began their asset sale and refinancing efforts.  Despite an extremely difficult economic environment, the Debtors, assisted by Campbell, were able to obtain a number indications of interest for all or portions of LRGI.  Based upon those indications of interest and the advice of Campbell, the Debtors concluded that, notwithstanding the Debtors' negative book net worth calculated in accordance with GAAP, the value of the Debtors' assets far exceeded their liabilities.

Upon reviewing the various sale proposals, the Debtors' determined that the course of action that offered the best prospect of maximizing value was to proceed with a non-binding proposal, subject to due diligence, from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase LRGI's facility in Rock Hill, South Carolina, which produces molded rubber components primarily for use in medical devices, at a price of $32 million in cash, subject to a standard purchase price adjustment provision related to increases or decreases in working capital (the "Rock Hill Sale").  The Rock Hill Facility had $16 million in net sales for 2007, and the net book value of that facility was $5.3 million on December 31, 2007.  The sale would have generated a pre-tax gain of approximately $26 million for U.S. federal income tax purposes, all of which was anticipated to be sheltered by the Debtors' net operating loss carryforward (subject to possible alternative minimum taxes).

In conjunction with that sale process, the Debtors began to seek senior secured financing arrangements that would have enabled them, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, make substantial payments in respect of the Senior Subordinated Notes, and finance the operations and growth of the Debtors' remaining businesses.  The Debtors were able to obtain a non-binding proposal, subject to due diligence, from a prospective institutional lender (the "Potential New Secured Lender") for a $36.7 million senior secured credit facility that, had it closed, would have enabled the Debtors to (i) repay the Prepetition Secured Lenders, (ii) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (iii) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates

of the Debtors. The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a 5-year maturity and a cash-pay interest rate of 12%. The Junior Subordinated Note and the Senior Subordinated Notes held by the affiliated holders would have been converted to common stock, reducing the Debtors' remaining debt by an additional $8 million.

In mid-January 2008, the Debtors advised the Ad Hoc Committee that they believed that, in order to move forward with the Rock Hill Sale and the related financing, they required an extension of the standstill arrangement, which was due to expire on January 24, 2008, to April 30, 2008; the requested extension reflected the time periods requested by the Rock Hill Buyer and the Potential New Secured Lender in order to permit them to complete their respective due diligence investigations. The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that the Debtors and their advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale and a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion. The Debtors made extensive efforts to obtain the Ad Hoc Committee's agreement to the Rock Hill Sale and negotiate further extensions of the standstill agreement. After the Debtors and the Ad Hoc Committee were unable to come to agreement, the Debtors began preparations for chapter 11.

In a final effort to avoid the expense and disruption of a chapter 11 case, the Debtors made two additional restructuring proposals. The first proposal, which was made to the Ad Hoc Committee, included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process. The Ad Hoc Committee rejected the recapitalization proposal because it believed, based upon its valuation of the Debtors, that it would not have provided a full recovery to the holders of the Senior Subordinated Notes.

The second proposal was made to Jefferies High Yield Trading ("Jefferies"), the largest holder of the Senior Subordinated Notes with approximately 37.1% of the issue. That proposal provided for a full conversion of the Senior Subordinated Notes to equity. After negotiations between the Debtors and Jefferies, and a counterproposal by Jefferies, the Debtors and Jefferies were not able to reach an agreement.

In light of the foregoing, the Debtors determined that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code. The Debtors believed that the short-term standstill arrangements under which they had been operating for approximately a year prior to the Commencement Date were having a significant adverse effect on their business because of customer concerns about awarding additional business to a company with an uncertain future, and that further delay would only exacerbate the negative impact.

E.    **The Chapter 11 Cases**

1.    **Commencement of the Chapter 11 Cases and the "First-Day" Orders**

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases. Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

*a.    Case Administration Orders*

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases. These orders: (i) authorized the joint administration of the Chapter 11 Cases; (ii) established notice procedures; (iii) granted an extension of time to file the Debtors' schedules and statements; and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix. In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

*b.    Critical Obligations*

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations. The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to: (i) wages, compensation, and employee benefits; (ii) sales and use taxes; and (iii) claims of common carriers, equipment processors, and warehouses.

*c.    Customer and Employee Programs*

Further, the Bankruptcy Court granted authority to continue certain business operations. Among other things, the Bankruptcy Court authorized the Debtors to: (i) continue certain customer service programs; and (ii) continue certain workers compensation and all other insurance policies.

*d.    Financing Arrangements*

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to: (i) use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing; (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral; and (iii) maintain their existing bank accounts and forms.

### 2.      Appointment of the Creditors' Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the seven-member Creditors' Committee to represent the interests of all unsecured creditors in the Chapter 11 Cases.  The current Creditors' Committee consists of five members:

> Wilmington Trust Company;
>
> Valhalla Capital Partners, LLC;
>
> Momentive Performance Materials, Inc.;
>
> Wacker Chemical Corporation; and
>
> Environmental Products & Services of Vermont, Inc.

Jefferies High Yield Trading and Wilfrid Aubery, LLC once served on the Creditors' Committee, but have since resigned since selling their Senior Subordinated Notes to the Plan Investor, as described in Section IV.A of the Plan.  Valhalla Capital Partners, LLC, Jefferies High Yield Trading and  Wilfrid Aubery, LLC also served on the Ad Hoc Committee, as described in Section III.B.3, "*Senior Subordinated Notes*" on page 31.

### 3.      Debtor in Possession Financing/Use of Cash Collateral

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements.  The Debtors also obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008.  Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' Board of Directors and the Debtors' Co-Chief Executive Officer.  William B. Conner currently serves as a member of the Debtors' Board of Directors.  To the Debtors' knowledge, ORA Associates is not an insider of the Debtors.

On April 17, 2008, the Bankruptcy Court issued an order authorizing, on a final basis, the use of cash collateral and approved the DIP Note (the "DIP Financing Order").  On March 1, 2010, the Bankruptcy Court approved a third extension of the DIP Note to May 3, 2010 (Docket No. 843).  On March 9, 2010, the Bankruptcy Court approved the ninth extension of the use of cash collateral [Docket No. 851].  The Debtors' use of cash collateral currently expires on April 2, 2010.  The Prepetition Secured Lenders allege that the Debtors are in default under certain of the cash collateral orders and have reserved their rights regarding such defaults.

As described in Section V.A.4, "*Debtor in Possession* Loan Claims" on page 47, as consented to by the DIP Lenders, the DIP Loan Claims will be satisfied in full through (i) the issuance of 400,000 shares of New LPC Common Stock, and (ii) payment in Cash, on or as soon as reasonably practicable following the Effective Date, of all accrued and unpaid interest through the Effective Date.

4.        **The Debtors' Exclusive Periods**

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case.  In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case.  A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Creditors' Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit acceptances thereof.  The Debtors objected.  On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.  On July 17, 2008, the Creditors' Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend of the Debtors' exclusive periods for an additional 90 days.  On July 22, 2008, the Creditors' Committee filed that objection.  On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods.  Thereafter, by decision and order dated July 31, 2008, the Court granted the Debtors an extension of their exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

On October 7, 2008, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to January 26, 2009, and February 25, 2009, respectively.  The Creditors' Committee objected to the Debtors' motion.  On October 28, 2008, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors' motion.

On January 12, 2009, the Debtors filed a third motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof.  The Creditors' Committee and the Prepetition Secured Lenders objected to the Debtors' motion.  Upon the Debtors' request, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive periods pending a hearing on the Debtors' third extension motion.  After hearings on February 23 and 24, 2009, the Court extended the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof to April 30, 2009 and June 1, 2009 respectively.

Upon careful review of the circumstances, the Debtors decided not to seek any further extensions of the exclusive periods.  On September 1, 2009, the Prepetition Secured Lenders filed their own chapter 11 plans and a proposed combined disclosure statement with respect thereto.  On September 11, 2009, the Creditors' Committee also filed a chapter 11 plan and a proposed disclosure statement with respect thereto, each of which have been subsequently amended.  In connection with certain of the objections that were filed to the proposed disclosure statements of the Prepetition Secured Lenders and the Creditors' Committee, on October 5, 2009,

the Chapter 11 Cases were reassigned to the Honorable Burton R. Lifland.[2]  On December 16, 2009, the Senior Secured Lenders and the Creditors' Committee withdrew their previous individual chapter 11 plans and filed the joint Committee/Senior Secured Lenders Plan and a proposed disclosure statement therefor.  On **[___]**, 2010, the Committee and the Senior Secured Lenders withdrew their joint plan and announced their support for this Plan.

### 5.      The Mediation Process

At the hearing on February 24, 2009 in connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of cash collateral and the Debtors' third motion to extend the exclusive periods, the Debtors, the Creditors' Committee and the Prepetition Secured Lenders agreed to participate in a mediation to facilitate a resolution of disputed issues between the Debtors and the Creditors' Committee that could lead to an ultimate resolution of the Chapter 11 Cases, including valuation and structure of a potential consensual chapter 11 plan.  On March 17, 2009, the Bankruptcy Court entered an order appointing Seymour Preston, Jr. of Goldin Associates as the mediator.  Mr. Preston has conducted several mediation sessions with the Debtors and the Creditors' Committee after submission of valuation reports from Campbell and SRR.  To date, the mediation has not produced an agreement between the Debtors and the Creditors' Committee.

### 6.      The Claims Reconciliation Process

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline, or bar date, for any claimant other than (i) a counterparty to an executory contract rejected by the Debtors after July 16, 2008 or (ii) a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of Claim.  The claims-filing deadline for a counterparty to an executory contract rejected by the Debtors after July 16, 2008 is discussed under the caption "*Rejection Damage Claims*" on page 64.  The deadline for Government Units to file a proof of Claim was September 29, 2008.  In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of Claim form.  The notice included information as to how to file a proof of Claim and as to whether filing a proof of Claim is necessary.  On July 18, 2008, the Debtors also published the same notice in the national edition of <u>The Wall Street Journal</u>.

For more information on the bar dates and whether you need to file a proof of Claim, please refer to the bar date notice, which can be found at http://chapter11.epiqsystems.com/lexington.

---

[2] On March 4, 2010, the Chapter 11 Cases were reassigned to the Honorable Shelley C. Chapman.

The Bankruptcy Court has not yet set a deadline for filing requests for payment of Administrative Expense Claims.  The deadline for filing requests for payment of Administrative Expense Claims will be established under the Plan, as set forth in Section IV(A)(1) below.

## IV.

## THE STOCK PURCHASE AGREEMENT

Since May, 2009, the Debtors have engaged in extensive negotiations with a number of prospective investors with respect to a potential investment in the Debtors as part of their emergence from chapter 11.  Such negotiations culminated in the execution of the Stock Purchase Agreement, as filed with the Plan Supplement, as well as certain other ancillary agreements described herein.

### A.    The Plan Investor

Beginning in May, 2009, the Debtors and Campbell engaged in an extensive marketing process of the Debtors and their operations, seeking an investor to assist the Debtors in exiting their Chapter 11 Cases.  As part of the marketing process, Campbell contacted a total of 125 potential investors. Of this total, 69 signed non-disclosure agreements and were provided preliminary information on the Debtors and their operations.  After further discussions and review of the preliminary information packages, 20 potential investors attended management presentations at which they were provided additional information regarding the Debtors along with the opportunity to meet senior management. At the conclusion of these management presentations, nine parties expressed interest in visiting the Debtors' facilities located in Rock Hill, South Carolina, Jasper, Georgia and Rochester, New York.  In addition, these parties were provided access to an online data room that contained  financial, operational, environmental and other information necessary for potential investors to conduct confirmatory due diligence.

Despite the highly challenging economic environment, Campbell was able to generate strong interest in a transaction involving the Debtors and their operations.  Following the management presentations and facility tours, Campbell received proposals from eight parties.  Following additional rounds of negotiations with the bidding parties, the Debtors and Campbell determined that the final proposal submitted by the Plan Investor represented the highest and best value for the Debtors.

In January, 2010, the Plan Investor purchased the Senior Subordinated Notes from certain members of the Committee.  The purchase price paid by the Plan Investor for such notes equates to the distribution being paid to Senior Subordinated Notes under the Plan.

Based on such extensive marketing efforts, the Debtors believe that the Plan Investor and its plan investment, as represented by the Stock Purchase Agreement, constitute the highest and best option available to the Debtors, thereby allowing them to maximize the value of their estates and provide the best recovery to all parties in interest.

B.      **The Stock Purchase Agreement**

Pursuant to the Stock Purchase Agreement, the Plan Investor will invest at least $22 million (including amounts spent to purchase Senior Subordinated Notes prior to the Effective Date).  In exchange for its investment under the Stock Purchase Agreement, the Plan Investor will receive shares of New LPC Common Stock at a purchase price of $10.00.  The Debtors will use the proceeds of the investment to fund distributions under the Plan and to provide working capital to the Reorganized Debtors.

The Stock Purchase Agreement is subject to customary warranties and representations, covenants, and closing conditions.

C.      **Ancillary Agreements**

1.      **The Securityholders Agreement**

As part of the Stock Purchase Agreement, Mr. Lubin and Mr. Delano and their affiliates and family members who own 12% Senior Subordinated Notes, (together, the "Affiliated Bondholders"), and Lubin Partners LLC, Mr. William B. Connor, and ORA Associates, LLC (the "DIP Lenders," and, together with the Affiliated Bondholders, the "Management Members") and the Plan Investor will enter into a certain securityholders agreement (the "Securityholders Agreement").  The Securityholders Agreement will be filed as part of the Plan Supplement.

The material terms of the Securityholders Agreement are as follows:

(i)      Board of Directors.  Of the seven (7) member Board of Directors for Reorganized LPC, the Chief Executive Officer will be designated as one (1) board member, the Plan Investor will have the right to designate four (4) board members (provided, however, that one of the Plan Investor's designees will be an "Independent Director," as defined in the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement), and the Management Members will have the right to designate two (2) board members if they hold at least 12.5% of the New LPC Common Stock, one (1) board member if they hold at least 5% of the New LPC Common Stock or a board observer if they hold at least 2.5% of the New LPC Common Stock. The Management Members' board designations will each be subject to approval by the Plan Investor, with such approval to not be unreasonably withheld, conditioned or delayed.

(ii)      Actions Subject to Prior Consent.  So long as the Management Members have the right to designate a director as described above, Reorganized Debtors shall not take any of the following actions without the consent of a majority of the New LPC Common Stock held by the Management Members:  (a) increase the number of directors; (b) amend, alter or repeal any Reorganized Debtor's organizational documents if such amendment or

restatement would adversely affect the Management Members, in their capacity as equity holders, disproportionately as compared to the Plan Investor; (c) redeem, purchase, or acquire any stock of Reorganized LPC ("Reorganized LPC Stock") except pursuant to the Securityholders Agreement or on a proportionate basis; (d) generally, enter into any transaction outside the ordinary course of business with the Plan Investor or its affiliates that is on terms that, in the aggregate, are materially less favorable to the Reorganized Company than would be obtainable in a comparable arms-length transaction with a person that is not an affiliate of the Plan Investor; (e) designate certain purchasers of Reorganized LPC Stock as the same class of securityholder as the Management Members; and (f) grant registration rights on a basis that have priority over the registration rights granted to the Management Members and the Plan Investor, except with respect to rights granted based on the size of such investor's holdings.

(iii)    Transfer Restrictions.  The Management Members agree that prior to the occurrence of a public offering of the stock of Reorganized LPC resulting in a market float of greater than $50 million (a "Qualified IPO"), the Management Members generally may not transfer any securities except to certain permitted transferees (such as, among other things, certain estate planning transfers, transfers to family members or other members of the group of Management Members) or with the consent of the Plan Investor. Following a Qualified IPO, should one occur, the Management Members may transfer securities without the consent of the Plan Investor in a sale to the public pursuant to an effective registration statement of Reorganized LPC or pursuant to Rule 144, except that under certain specified circumstances such sales may be delayed due to pending or proposed corporate transactions, registrations for the sale of securities or sales of greater than five percent (5%) of the outstanding New LPC Common Stock by the Plan Investor.

(iv)    Tag-Along/Co-Sale Rights.  Subject to certain conditions, prior to a Qualified IPO, any stockholder will generally be entitled to participate pro rata in any sale by any other stockholder of New LPC Common Stock to a third party on a proportional basis on the same terms and conditions (including the price and form of consideration), except in the following circumstances:  (a) sales of shares of New LPC Common Stock to the public pursuant to a registration statement filed under the Securities Act of 1933, as amended, or pursuant to Rule 144 thereunder; (b) transfers to certain permitted transferees; (c) a transaction or series of transactions involving the transfer of less than one percent (1%) of the issued and outstanding shares of New LPC Common Stock; (d) a transaction or series of transactions involving the transfer of New LPC Common Stock by the Plan Investor or any of its affiliates that results in the Plan Investor or any of its affiliates retaining ownership of 51% or greater of the issued and

outstanding shares of New LPC Common Stock after giving effect to the sale; (e) shares of New LPC Common Stock purchased by Reorganized LPC or any other securityholder pursuant the right of first refusal described below; or (f) shares of New LPC Common Stock purchased in connection with a potential acquisition due to the drag-along rights described below.

(v)     Rights of First Refusal.  Prior to a Qualified IPO, the Plan Investor will have the right of first refusal on any sales of securities of Reorganized LPC by Management Members.  In the event the Plan Investor elects not to exercise such rights, Reorganized LPC will have a similar right of first refusal.  Such rights of first refusal will apply to certain proposed transfers of securities of Reorganized LPC as well as certain involuntary transfers of securities of Reorganized LPC (such as foreclosures, transfers in connection with a bankruptcy by the holder and similar matters).  The rights of first refusal shall not apply to: (a) transfers to any affiliate of the transferor, or to certain permitted transferees; (b) transfers to the Plan Investor or its affiliates; (c) transfers to Reorganized LPC; (d) any sale to the public pursuant to an effective registration statement under the Securities Act or Rule 144; (e) transfers pursuant to tag-along rights described above; or (f) transfers pursuant to drag-along rights described below.

(vi)    Drag-Along Rights.  Prior to a Qualified IPO, the Plan Investor will have the right to require all other holders to join in any sale by the Plan Investor of New LPC Common Stock to a third party in any transaction in which the Plan Investor is selling all of its New LPC Common Stock on the same terms and conditions and for the same consideration.  In the event that all or substantially all of the assets of Reorganized LPC are proposed to be sold, the holders of New LPC Common Stock other than the Plan Investor will agree to vote in favor of such a transaction.

(vii)   Preemptive Rights.  Each party to the Securityholders Agreement shall have the preemptive rights to purchase any additional Reorganized LPC Stock (or other securities convertible into Reorganized LPC Stock) proposed to be sold by Reorganized LPC from time to time ratably in accordance with such party's ownership of New LPC Common Stock. The preemptive rights shall not apply to: (a) New LPC Common Stock issued at the time of entry into the Securityholders Agreement; (b) securities offered to the public pursuant to a registration statement; (c) securities issued in certain corporate transactions approved by the board of directors of Reorganized LPC; (d) New LPC Common Stock issued as compensation to employees, officers, directors and consultants of the Reorganized Debtors; (e) securities issued in connection with stock splits, stock dividends and recapitalizations; and (f) up to $5 million of New LPC

Common Stock issued to affiliates of Plan Investor within sixty (60) days after entry into the Securityholders Agreement.

(viii)    Information Rights.  So long as the Management Members continue to hold at least 2.5% of the outstanding New LPC Common Stock, subject to certain conditions, each Management Member will have the right to receive monthly financial statements, annual financial statements and the annual consolidated budget and business plan of the Reorganized Debtors.

(ix)    Registration Rights.  At any time nine (9) months after a Qualified IPO, the Plan Investor will have the right to one (1) demand for public registration of its New LPC Common Stock.  After a Qualified IPO, the Plan Investor and the Management Members each receive customary piggyback registration rights.

**2.    The Management Incentive Plan**

After the Effective Date, the Reorganized Debtors will implement a certain management incentive plan (the "Management Incentive Plan") pursuant to which the Reorganized Debtors will issue warrants exercisable for 20% of the New LPC Common Stock after dilution (the "MIP Warrants").

**3.    Employment Agreements**

As one of the closing conditions to the Stock Purchase Agreement, among others, after the Effective Date, Mr. Lubin and Mr. Delano will enter into certain employment agreements with the Reorganized Debtors, which must be acceptable to the Plan Investor.  The Plan Supplement will include a disclosure of any compensation for any officer of the Reorganized Debtors or member of the new Boards who is an "insider" under the Bankruptcy Code.

**V.**

**THE PLAN**

This Section of the Disclosure Statement summarizes the Plan, which is attached hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the full text of the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and Plan, the Plan governs.

**A.    Summary and Treatment of Unclassified Claims**

The Plan does not classify all Claims and Interests.  In particular, Claims incurred during the course of the Chapter 11 Cases (i.e., Administrative Expense Claims) and Priority Tax Claims are unclassified.  A summary of these Claims is set forth below.

1.    **Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Commencement Date.  Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to the Debtors and Creditors' Committee that were incurred during the pendency of the Chapter 11 Cases.

(a)    Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than (i) a claim covered by Sections 2.2, 2.3 or 2.4 of the Plan, (ii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtors, as applicable, and the Office of the United States Trustee (the "U.S. Trustee"), notice of such Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date (i.e., 60 days after the Effective Date).  Such notice must include at a minimum (i) the name of the Debtor(s) that are purported to be liable for the Claim, (ii) the name of the holder of the Claim, (iii) the amount of the Claim, and (iv) the basis for the Claim.  **Failure to file and serve such notice timely and properly will result in the Administrative Expense Claim being forever barred and discharged.**

(b)    Allowance of Administrative Expense Claims.  An Administrative Expense Claim with respect to which notice has been properly filed and served pursuant to Section 2.1(a) of the Plan will become an Allowed Administrative Expense Claim if no objection is filed on or prior to the Administrative Expense Claims Objection Deadline.  If an objection is timely filed, the Administrative Expense Claim will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or as such Claim is settled, compromised, or otherwise resolved by the Debtors or Reorganized Debtors pursuant to Section 7.4 of the Plan.

(c)    Payment of Allowed Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a claim covered by Section 2.2, 2.3, or 2.4 of the Plan) agrees to a less favorable treatment, each Allowed Administrative Expense Claim (including any Allowed Claim asserted under section 503(b)(9) of the Bankruptcy Code) will be paid by the Reorganized Debtors in full, in Cash, in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as reasonably practicable following the later to occur of (i) the Effective Date or (ii) the date on which such Administrative Expense Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Expense Claims (other than a claim covered by Section 2.2, 2.3 or 2.4 of the Plan) against any of the Debtors representing liabilities incurred in the ordinary course of business by any of the Debtors, as Debtors in Possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as Debtors in Possession, whether or not incurred in the ordinary course of business, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and

subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

## 2.    Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court will fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date.  Each holder of such a Claim will be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (i) the Effective Date or (ii) the date which such Claim is Allowed.  The Debtors are authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

## 3.    Indenture Trustee Fee Claims

Indenture Trustee Fee Claims are Administrative Expense Claims of the Indenture Trustee for reimbursement of its reasonable accrued and unpaid fees and expenses under the Indenture.  The Indenture grants the Indenture Trustee a lien (the "Charging Lien") upon and priority in payment with respect to any distributions to holders of the Senior Subordinated Note Claims for payment of any Indenture Trustee Fees Claims arising prior to the Effective Date.

The holder of the Indenture Trustee Fee Claims will be paid in Cash on the Effective Date by Reorganized LPC without the need for Bankruptcy Court approval.  The Charging Lien will be discharged upon payment in full of the Indenture Trustee Fee Claims. Nothing in the Plan will impair, waive, or discharge the Charging Lien with respect to any fees or expenses not paid by Reorganized LPC.

## 4.    Debtor in Possession Loan Claims

DIP Loan Claims are all Claims arising under the DIP Note and the DIP Financing Order with respect to the DIP Note.  As consented to by the DIP Lenders, holders of the DIP Loan Claims will receive, in full satisfaction thereof, (i) 400,000 shares of New LPC Common Stock, and (ii) on or as soon as reasonably practicable following the Effective Date, payment in Cash of all accrued and unpaid interest through the Effective Date.

## 5.    Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim will receive, at the Debtors' or the Reorganized Debtors' option, (i) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (a) the Effective Date and (b) the date such Claim is Allowed; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (a) the Effective Date or (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

### 6.    Intercompany Claims

Notwithstanding anything to the contrary in the Plan, on the Effective Date, Intercompany Claims will be reinstated and treated in the ordinary course of business.

## B.    Classification and Treatment of Classified Claims and Interests

Pursuant to the Plan, there are a total of 19 Classes, with Classes 1 through 12 being Claims against or Interests in LPC and Classes 13 through 19 being Claims against or Interests in LRGI.

Unless indicated otherwise, all distributions will be in full satisfaction of each Allowed Claim or Interest and will be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed.  Further, claimholders can generally agree to receive less favorable treatment than the treatment provided for by the Plan.  Unless otherwise indicated, the Debtors have based the characteristics of the Claims or Interests on the Debtors' books and records.

### 1.    Claims against and Interests in LPC

#### a.    *Class 1 – Other Priority Claims against LPC (Unimpaired)*

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LPC will receive Cash in the amount of its Allowed Other Priority Claims against LPC.  Because Class 1 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

#### b.    *Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)*

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less

all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.   The Allowed CapitalSource Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Revolver Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CapitalSource Credit Agreement.  The CapitalSource Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LPC will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000.  An Amended and Restated Secured CapitalSource Credit Agreement is attached as **Exhibit 1.7** to the Plan and a summary thereof is attached as **Exhibit H** hereto. Because Class 2(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LPC are entitled to vote to accept or reject the Plan.

### c.    *Class 2(b) – CSE Secured Claims against LPC (Impaired)*

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Allowed CSE Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Term Loan Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CSE Loan Agreement.  The CSE Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CSE Secured Claim against LPC will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date,

or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders, $375,000. An Amended and Restated Secured CSE Loan Agreement is attached as **Exhibit 1.9** to the Plan and a summary thereof is attached as **Exhibit I** hereto. Because Class 2(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LPC are entitled to vote to accept or reject the Plan.

### d.    *Class 3 – Secured Tax Claims against LPC (Unimpaired)*

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC will receive, at the Debtors' election, either: (i) Cash in the amount of its Allowed Secured Tax Claim against LPC; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LPC, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LPC deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim against LPC. Because Class 3 Claims are not impaired pursuant to the Plan, holders of Secured Tax Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### e.    *Class 4 – Other Secured Claims against LPC (Unimpaired)*

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claims against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LPC or Reorganized LPC, the Debtors may (i) reinstate any Other Secured Claim against LPC or (ii) distribute to each holder of an Allowed Other Secured Claim against LPC (w) Cash in the amount of such Claim, (x) the sale or disposition of proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim will be deemed released. Because Class 4 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims

against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### f.        Class 5 – Senior Subordinated Note Claims (Impaired)

Class 5 Claims are all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as Indenture Trustee, and LPC, as issuer, which will include accrued and postpetition interest at 12% per annum.

As soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, each holder of an Allowed Senior Subordinated Note Claim will receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, Cash in the amount equal to the Cash-Out Percentage; provided, however, that in lieu of such distribution, such holder may instead elect to receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, a number of shares of New LPC Common Stock equal to (x) the product of the Allowed Senior Subordinated Note Claim and the Cash-Out Percentage (i.e., 51%), divided by (y) $10.00 (the "Class 5 Stock Election").  Because Class 5 Claims are impaired pursuant to the Plan, holders of Allowed Senior Subordinated Note Claims are entitled to vote to accept or reject the Plan.

### g.        Class 6 – Junior Subordinated Note Claims (Impaired)

Class 6 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which will include accrued and postpetition interest at 13% per annum.

As agreed to by the holder of the Junior Subordinated Note, the Junior Subordinated Note shall be cancelled.  The Holder of Junior Subordinated Note Claims will not receive a distribution under the Plan and, accordingly, is deemed to have voted to reject the Plan.

### h.        Class 7 – General Unsecured Claims against LPC (Impaired)

Class 7 Claims are all Unsecured Claims against LPC not classified in any other Class (i.e., Classes 5, 6, 8, or 9).

Each holder of an Allowed General Unsecured Claim against LPC will receive Cash payments in the aggregate amount of 85.4% of such claim as follows, (i) eight percent (8%) of its Allowed General Unsecured Claim against LPC will be paid in Cash as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed and (ii) an additional nine (9) equal quarterly Cash payments, each in an amount equal to eight and six-tenths percent (8.6%) of its Allowed General Unsecured Claim against LPC, commencing three (3) months after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in lieu of such distribution and in full satisfaction of its Claim, such holder may instead elect to receive a Cash payment in an amount equal to 51% of such Allowed Claim on the later of (x) the Effective Date or (y) the date such Claim becomes

Allowed.  Because Class 7 Claims are impaired pursuant to the Plan, holders of Allowed General Unsecured Claims against LPC are entitled to vote to accept or reject the Plan.

### i.    *Class 8 – Convenience Claims against LPC (Unimpaired)*

Class 8 Claims comprise all Unsecured Claims against LPC that are (i) Allowed in the amount of $2,000.00 or less, or (ii) Allowed in a larger amount but reduced to $2,000 by the holder of such Claim.

As described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Claim against LPC will receive Cash in the amount of its Allowed Convenience Claim against LPC and, accordingly, Class 8 is not impaired.  Because Class 8 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### j.    *Class 9 – Asbestos-Related Claims (Impaired)*

Class 9 Claims are any Asbestos-Related Claims, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.

After the Effective Date, each Asbestos-Related Claim will be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; provided, however, that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, will promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defenses.  To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims will be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies).

To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors will pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim 80% of the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); provided, however, that if the Insurance Proceeds Deficiency exceeds $2,000, the

holder of such Asbestos-Related Claim will receive (a)(i) Cash in the amount of eight percent (8%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (ii) an additional nine (9) equal quarterly Cash payments, each equal to eight and six-tenths percent (8.6%) of such Insurance Proceeds Deficiency, commencing three (3) months after the later of (x) the Effective Date and (y) the date such Claim is Allowed or (b) in lieu of such distribution and in full satisfaction of its Claim, such holder may elect to receive a Cash payment in an amount equal to 51% of the Insurance Proceeds Deficiency on the later of (x) the Effective Date or (y) the date such Claim becomes Allowed.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

### k.    Class 10 – Series B Preferred Stock Interests (Impaired)

Class 10 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

On the Effective Date, the Series B Preferred Stock Interests will be cancelled. Holders of Series B Preferred Stock Interests will not receive any distributions under the Plan and, accordingly, are deemed to have voted to reject the Plan.

### l.    Class 11 – LPC Common Stock Interests (Impaired)

Class 11 LPC Common Stock Interests are Interests of any holder of LPC Common Stock.

On the Effective Date, the LPC Common Stock will be cancelled.  Holders of LPC Common Stock Interests will not receive any distributions under the Plan and, accordingly, are deemed to have voted to reject the Plan.

### m.    Class 12 – Other Equity Interests in LPC (Impaired)

Class 12 Other Equity Interests are Interests of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests.

All Other Equity Interests will be cancelled.  Holders of Other Equity Interests will not receive any distributions on account of such Interests and, accordingly, are deemed to have voted to reject the Plan.

2.        **Claims against and Interests in LRGI**

a.        *Class 13 – Other Priority Claims against LRGI (Unimpaired)*

Class 13 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LRGI will receive Cash in the amount equal of its Allowed Other Priority Claim against LRGI. Because Class 13 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

b.        *Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired)*

Class 14(a) Claims are all Claims against LRGI arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Allowed CapitalSource Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Revolver Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CapitalSource Credit Agreement. The CapitalSource Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LRGI will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000. An Amended and Restated Secured CapitalSource Credit Agreement is attached as **Exhibit 1.7** to the Plan and a summary thereof is attached as **Exhibit H** hereto. Because Class 14(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### c.    *Class 14(b) – CSE Secured Claims against LRGI (Impaired)*

Class 14(b) Claims are all Claims against LRGI arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Allowed CSE Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Term Loan Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CSE Loan Agreement.  The CSE Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CSE Secured Claim against LRGI will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders, $375,000.  An Amended and Restated Secured CSE Loan Agreement is attached as **Exhibit 1.9** to the Plan and a summary thereof is attached as **Exhibit I** hereto.  Because Class 14(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### d.    *Class 15 – Secured Tax Claims against LRGI (Unimpaired)*

Class 15 Claims are Claims against LRGI that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI will receive, at the Debtors' election, either: (i) Cash in the amount of its Allowed Secured Tax Claim against LRGI; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LRGI with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LRGI deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Claim against LRGI.  Because Class 15 Claims are not impaired pursuant to the Plan,

holders of Secured Tax Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

  e.  ***Class 16 – Other Secured Claims against LRGI (Unimpaired)***

    Class 16 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

    At the option of LRGI or Reorganized LRGI, the Debtors may (i) reinstate any Other Secured Claim against LRGI or (ii) distribute to each holder of an Allowed Other Secured Claim against LRGI (w) Cash in the amount of such Claim, (x) the sale or disposition proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim will be deemed released. Because Class 16 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

  f.  ***Class 17 – General Unsecured Claims against LRGI (Impaired)***

    Class 17 Claims are all Unsecured Claims against LRGI not classified in Class 18.

    Each holder of an Allowed General Unsecured Claim against LRGI will receive Cash payments in the aggregate amount of 106.75% of such claim (including postpetition interest) as follows, (i) ten percent (10%) of the sum of (a) its Allowed General Unsecured Claim against LRGI and (b) interest on such Allowed General Unsecured Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate or such other rate as the Bankruptcy Court may determine, which will be paid in Cash as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed and (ii) an additional nine (9) equal quarterly Cash payments, each in an amount equal to ten and three quarters percent (10.75%) of the sum of (x) their Allowed General Unsecured Claim against LRGI and (y) interest on such Allowed General Unsecured Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate or such other rate as the Bankruptcy Court may determine, commencing three (3) months after the later of (a) the Effective Date or (b) the date such Claim is Allowed; provided, however, that in lieu of such distribution and in full satisfaction its claims, such holder may instead elect to receive Cash in an amount equal to 51.0% of its Allowed Claim on the later of (x) the Effective Date and (y) the date such Claim becomes Allowed.  Because Class 17 Claims are impaired pursuant to the Plan, holders of General Unsecured Claim against LRGI are entitled to vote to accept or reject the Plan.

### g.    *Class 18 – Convenience Claims against LRGI (Unimpaired)*

Class 18 Claims comprise all Unsecured Claims against LRGI that are (i) Allowed in the amount of $2,000.00 or less, or (ii) Allowed in a larger amount but reduced to $2,000.00 by the holder of such Claim.

As described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline.  Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Class Claim will receive Cash in the amount of its Allowed Convenience Claim against LRGI plus interest on such Allowed Convenience Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate or such other rate as the Bankruptcy Court may determine. Because Class 18 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### h.    *Class 19 – Interests in LRGI (Unimpaired)*

Class 19 Equity Interests are all Interests in LRGI, all of which are owned by LPC.  All the Interests in LRGI will be unaltered.  Because Class 19 Equity Interests are not impaired pursuant to the Plan, the holder of Interests in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

## C.    <u>Distributions Pursuant to the Plan</u>

### 1.    **Distributions**

A Disbursing Agent will make all distributions under the Plan.  For all distributions except those made with respect to Allowed Senior Subordinated Notes, Reorganized LPC or its designated agent will be the Disbursing Agent.  For distributions made with respect to Allowed Senior Subordinated Notes, the Indenture Trustee, or such other entity as designated by the Debtors, will be the Disbursing Agent.

With respect to Claims, the Disbursement Record Date is three (3) days after the Confirmation Date, at which time the claims registry will be closed.  The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the Debtors' schedules, books and records, or in any proofs of claim filed.  Any Cash distribution will be made by check or wire transfer or as otherwise provided by any applicable agreements.

No Cash distributions under $50 will be made unless the holder sends a written request to the Disbursing Agent.  No fractional shares of New LPC Common Stock will be distributed under the Plan.  If an Allowed Claim results in distribution of a number of shares that

is not a whole number, the number of share will be rounded up to the next whole number if the fraction is one-half (½) or greater and rounded down to the next lower whole number if the fraction is less than one-half (½).

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent will use reasonable efforts to locate the holder. If the distribution remains undeliverable one year after the Effective Date, the distribution will revert back to respective Reorganized Debtor.

The Debtors may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Debtors will not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement or the Final Cash Collateral Order.

## 2.    Surrender or Transfer of the Senior Subordinated Notes

Unless this requirement is waived by LPC or Reorganized LPC, in order to receive any distribution, holders of the Senior Subordinated Notes Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed. If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (i) submit a lost instrument affidavit and post an indemnity bond, and (ii) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the Plan, within one year of the Effective Date, such holder will be deemed to have no further Claim against the Debtors or their property and will not receive any distributions.

## 3.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, including any party described in Section 6.5 of the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any

governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**D.    Implementation of the Plan and Related Documents**

**1.    Restructuring Transactions**

On or after the Effective Date, the applicable Debtors and/or the Reorganized Debtors, with the prior written consent of the Plan Investor, may enter into the Restructuring Transactions set forth in the Restructuring Transactions Notice and may take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, or transfers as may be determined by the Debtors with the consent of the Plan Investor to be necessary or appropriate.

The form of each Restructuring Transaction will have to be acceptable to the Plan Investor. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each Reorganized Debtor under the Plan.

Implementation of the Restructuring Transactions, if any, will not affect distributions under the Plan. Moreover, the requirements of the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will apply to any Restructuring Transaction to be entered into by the Debtors or the Reorganized Debtors.

**2.    Cancellation of Documents, Agreements, and Debt Instruments**

As noted in Sections V.A and V.B of this Disclosure Statement, except with respect to Interests in LRGI, Cash payments or other consideration will be distributed pursuant to the Plan in satisfaction of all Claims and Interests and any document, agreement, or debt instrument evidencing any Claim or Interest will be automatically cancelled or superseded, as applicable, upon the Effective Date without any requirement for any further act or action. Affected documents include, but are not limited to, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture, the Senior Subordinated Notes, the Junior Subordinated Note, the Series B Preferred Stock Interests, and shares of LPC Common Stock.

**3.    Charter Amendment**

On the Effective Date or as soon as practicable thereafter, Reorganized LPC will file an amendment to LPC's certificate of incorporation (the "<u>Charter Amendment</u>") with the

Secretary of State of the State of Delaware.  The Charter Amendment will amend LPC's certificate of incorporation in order to, among other things, issue the New LPC Common Stock.

The Plan authorizes LPC to file the Charter Amendment without any further corporate action or any action by holders of Claims or Interests.

A copy of the Charter Amendment will be included in the Plan Supplement.  As described in Section V.N, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline.

**4.      Stock Purchase Agreement**

Pursuant to Section 5.5 of the Plan, Reorganized LPC will be authorized to enter into a Stock Purchase Agreement, substantially in the form of Exhibit 1.91 of the Plan, and to issue the shares of New LPC Common Stock contemplated thereunder without any further corporate action and without any further action by holders of Claims or Interests.  Each holder of an Allowed Claim or Interest shall be required to execute and be bound by the Securityholders Agreement as a condition precedent to receiving its allocation of New LPC Common Stock. From and after the Effective Date, the Plan Investor or its designee will be entitled to receive a management fee, customary for sponsored deals of this size and type, in exchange for agreed management services to be provided to Reorganized LPC.

**5.      The Amended and Restated Secured CapitalSource Credit Agreement**

On the Effective Date, the Debtors will be parties to a secured credit facility pursuant to the terms of the Amended and Restated Secured CapitalSource Credit Agreement attached as **Exhibit 1.7** to the Plan.  The obligations under the Amended and Restated Secured CapitalSource Credit Agreement will have the same security package and ranking as the loans under the Prepetition Credit Agreement.

**6.      The Amended and Restated Secured CSE Loan Agreement**

On the Effective Date, the Debtors will be parties to a secured credit facility pursuant to the terms of the Amended and Restated Secured CSE Loan Agreement attached as **Exhibit 1.9** to the Plan.  The obligations under the Amended and Restated Secured CSE Loan Agreement will have the same security package and ranking as the loans under the Prepetition Loan Agreement.

**7.      Corporate Action, Effectuating Documents, and Further Transactions**

Prior to, on or after the Effective Date, and pursuant to the Plan, the applicable Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors, which may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Plan Investor to be necessary or appropriate, which includes any Restructuring Transactions.

On the Effective Date, all matters provided for under the Plan that would otherwise require the approval of stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment; the authorization and issuance of the New LPC Common Stock; any change in the size of the Boards of Directors of the Reorganized Debtors; and any removal, election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) will be deemed to have been approved and such approval will be in effect from and after the Effective Date pursuant to the applicable General Corporation Law of the State of Delaware, without the necessity for any further acts by the stockholders or directors of the Debtors or the Reorganized Debtors.

Upon confirmation of the Plan, the Reorganized Debtors will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities to be issued pursuant to the Plan.

**8.      Issuance of New LPC Common Stock**

Pursuant to Section 5.6 of the Plan, Reorganized LPC will be authorized to issue the New LPC Common Stock on, or as soon as reasonably practicable after, the Effective Date without the need for any further corporate action and without any further action by holders of Claims or Interests.  Newly issued shares of New LPC Common Stock will be distributed to holders of Allowed Senior Subordinated Note Claims pursuant to Section 4.6 of the Plan, distributed to holders of the DIP Loan Claim pursuant to Section 2.4 of the Plan, and purchased by the Plan Investor pursuant to the Stock Purchase Agreement.

The shares of New LPC Common Stock to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim under the Plan will be issued pursuant to an exemption from registration provided by section 1145 of the Bankruptcy Code and the shares of New LPC Common Stock to be issued to the Plan Investor under the Plan will be issued pursuant to an exemption from registration provided by Section 4(2) of the Securities Act.  The shares to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim will generally be freely tradable, subject to (a) any applicable restrictions of the federal and state securities laws, (b) the Securityholders Agreement, and (c) any applicable restrictions of the federal and state securities laws and the restrictions imposed on "underwriters" by section 1145 of the Bankruptcy Code (discussed in greater detail in Section VII.B.11 herein, titled *Restrictions on Transfer*").  All of the shares of New LPC Common Stock to be issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

In connection with the distribution of New LPC Common Stock to current or former employees of the Debtors, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding

obligations, including withholding from distributions a portion of the New LPC Common Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

### 9.    Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, the occurrence of any intercompany or other Restructuring Transaction, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New LPC Common Stock, the Amended and Restated Secured CapitalSource Credit Agreement, the Amended and Restated Secured CSE Loan Agreement, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax.  All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax.

### E.    Provisions for the Treatment of Disputed Claims

### 1.    Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated will not receive a distribution as provided under the Plan unless and until such Claim, or any portion thereof, is Allowed.

Only the Debtors or the Reorganized Debtors, as applicable, may object to a Claim.  The Debtors may object to any Claim until the Effective Date and the Reorganized Debtors may object to any Claim from and after the Effective Date.  Any objections to Claims will be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court and (ii) a date to be fixed by the Bankruptcy Court.

### 2.    Resolution of Administrative Expense Claims and Other Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims, other than Professional Compensation and Reimbursement Claims, without further order of the Bankruptcy Court.

3.      **Claim Estimation**

The Debtors and the Reorganized Debtors may request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, regardless of whether the Claim is subject to an objection. If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      **Payment and Distribution on Disputed Claims**

When a Disputed Claim is Allowed, the holder of such Claim will receive the distribution provided by the Plan to the extent such Claim is Allowed.

F.      **Prosecution of Claims Held by the Debtors**

From and after the Effective Date, the Reorganized Debtors will, as representatives of the Debtors' estates, litigate any claims or causes of action that constituted assets of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or other actions instituted by the Debtors.

G.      **Executory Contracts and Unexpired Leases**

1.      **Assumption of Executory Contracts and Unexpired Leases**

As of the Effective Date, the Debtors will assume all executory contracts and unexpired leases to which the Debtors are a party, except for (i) any executory contract or lease that the Debtors previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order, (ii) any executory contract or lease, with respect to which the Debtors served and filed before the Confirmation Date a motion to assume, assume and assign, or reject, or (iii) any executory contract or lease listed on Schedule 8.1 of the Plan Supplement.

The Debtors may amend Schedule 8.1 of the Plan Supplement at any time before the Confirmation Date. If the Debtors add an executory contract or lease to Schedule 8.1, the Debtors will provide notice to all counterparties.

Unless otherwise specified, the inclusion of any executory contract or lease on Schedule 8.1 will include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease, even if Schedule 8.1 does not include such documents. The inclusion of any

executory contract or lease on Schedule 8.1 is not an admission that such document or any related documents is an executory contract or unexpired lease.

### 2.    Cure of Defaults

Prior to assuming any executory contract or unexpired lease, the Debtors must cure any monetary defaults and compensate counterparties for any non-monetary defaults.  At least twenty-one (21) days prior to the Confirmation Hearing, the Debtors will serve on all counterparties to executory contracts and unexpired leases a notice indicating a proposed cure amount for the respective contract or lease.  Counterparties will have twenty (20) days from the date of service to object to the proposed cure amount.  If any objection is filed, the Bankruptcy Court will hold a hearing to resolve such objection.

Notwithstanding Section 8.1 of the Plan and Section IV.F.1 of this Disclosure Statement, the Debtors reserve the right to reject any executory contract or lease if any objection is filed with respect to the cure amount.

### 3.    Rejection Damage Claims

If the Debtors reject an executory contract or lease, the counterparty must assert any Claim by filing a proof of claim with the Debtors' claim agents, Epiq Bankruptcy Solutions LLC, within 30 days following the later of (i) the date of service of the notice of the Effective Date, and (ii) the date of service of the notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such modification).  If the counterparty fails to file a proof of claim, the counterparty will be barred from asserting any Claim related to the rejection of the contract or lease in the future and will not receive any distribution under the Plan.

For more information regarding how to file a proof of claim, please refer to the bar date notice found at http://chapter11.epiqsystems.com/lexington.

### 4.    Indemnification and Reimbursement of Directors and Officers

All the Debtors' obligations to indemnify and reimburse directors, officers, and employees who served in such positions on or before the Confirmation Date will survive confirmation of the Plan and remain unaffected thereby.

### 5.    Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits

With the exception of any Insurance Policy, employee compensation program, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order or listed on Schedule 8.7 of the Plan, the Plan will treat all Insurance Policies and employee compensation and benefit programs as executory contracts and the Debtors will assume all such policies and programs.

To the extent the Insurance Policies are determined not to be executory contracts, they will remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory. The Plan will not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors will be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which will continue in full force and effect. Notwithstanding anything to the contrary contained in the Plan or the Disclosure Statement, to the extent that there is any inconsistency between the Insurance Policies and any provision of the Plan or Disclosure Statement, the terms of the Insurance Policies will control. No provision of the Plan will (i) expand or alter any insurance coverage under any of the Insurance Policies, or be deemed to create any insurance coverage that does not otherwise exist under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X thereof and anything supervening or preemptory, the Plan and Confirmation of the Plan will be without prejudice to any of the insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which the insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

The Reorganized Debtors will continue to pay all the Debtors' retiree benefits for the same duration for which the Debtors were obligated to provide such benefits.

## H.    Reservation of "Cram Down" Rights

Because Class 6 (Junior Subordinated Note Claims), Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Equity Interests in LPC) will not receive a distribution under the Plan and are deemed to have voted to reject the Plan, and in the event any other Class of Claims rejects the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. As described in Section VII.A.2, "*Non-Consensual Confirmation*" on page 79, the Debtors may confirm the Plan without the consent of all parties in interest.

## I.    Conditions Precedent to the Effective Date of the Plan

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions precedent are satisfied or waived: (i) a Confirmation Order, in form and substance acceptable to the Debtors, the Plan Investor, and the Agents will have been

entered and will not be subject to any stay or injunction; provided, however, that the approval of the Agents to the form and substance of the Confirmation Order cannot not be unreasonably withheld; (ii) all actions, documents, and agreements that are necessary to implement the Plan, in a form and substance acceptable to the Debtors, the Plan Investor, and the Agents, will have been completed and be effective; provided, however, that the approval of the Agents to the form and substance of such actions, documents, and agreements cannot not be unreasonably withheld; (iii) other than those conditions that by their nature can only be satisfied at the closing of the transactions contemplated by the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement, the conditions precedent to the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will have been satisfied or waived by the parties thereto and the Reorganized Debtors shall have access to the Cash contributed by the Plan Investor; and (iv) all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan, or that are required by law, regulation, or order, will have been received.

In their sole discretion, the Debtors may waive any of the aforementioned conditions precedent other than item (i) without Bankruptcy Court approval; provided, however, that the conditions set forth in (ii) and (iii) above that require approval of the Agents may only be waived by the Debtors with the consent of the applicable Agents, which consent shall not be unreasonably withheld. Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

If the conditions precedent are not satisfied on or prior to the ninetieth (90th) day after the Confirmation Order becomes a Final Order then, upon the Debtors' or the Agents' motion and after notice and a hearing, the Confirmation Order may be vacated, and, as a result, (i) no distributions under the Plan will be made, (ii) the Debtors and all holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iii) all of the Debtors' obligations with respect to the Claims and Interests will remain unchanged and nothing contained in the Plan will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## J.    **Effects of Confirmation**

Upon the Effective Date, all the Debtors' property will vest in the Reorganized Debtors free and clear of all liens, encumbrances, charges, and other interests, except as provided by the Plan, the Amended CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement. The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, as if no case was pending under any provision or chapter of the Bankruptcy Code.

1.      **Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests**

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in and all existing debts and Claims, including any interest accrued on such debts or Claims from and after the Commencement Date, against the Debtors or any of their assets or properties.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests, all LPC Common Stock Interests, all Other Equity Interests, and all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in the Debtors will be, and will be deemed to be, discharged and terminated, and all holders of Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests will be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim, Series B Preferred Stock Interest, LPC Common Stock Interests, or Other Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

2.      **Discharge of Debtors**

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Interest in the Debtors.

3.      **Injunctions and Stays**

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized

Debtors with respect to any such Claim against or Interest in the Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan.  Such injunction will extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.

Unless otherwise provided in the Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

4.      **Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, the DIP Lenders, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing will not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

5.      **Releases of Directors, Officers, and Employees**

**Subject to Section 10.11 of the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by the present and former directors, officers, and employees of the**

Debtors, the Debtors, the Reorganized Debtors, each holder of a Claim or Interest that
votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent
permissible under applicable law, as such law may be extended or integrated after the
Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan, will
release, unconditionally and forever, each present or former director, officer, and employee
from any and all claims or causes of action that exist as of the Effective Date and arise from
or relate to, in any manner, in whole or in part, the operation of the business of the
Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or
Interest of such holder, the business or contractual arrangements between any Debtor and
such holder, any restructuring of such claim or equity prior to the Commencement Date, or
any act, omission, occurrence, or event in any manner related to such subject matter,
transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited
to, the pursuit of confirmation of the Plan, the consummation thereof, the administration
thereof, or the property to be distributed thereunder; provided, however, that the
foregoing will not operate as a waiver of or release from any causes of action arising out of
the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized
misuse of confidential information that causes damages, or *ultra vires* acts of any such
person or entity.

6.   The Plan Investor Release

Notwithstanding anything contained in the Plan to the contrary, on the
Effective Date and effective as of the Effective Date, each holder of a Claim who receives a
distribution under the Plan shall provide a full discharge and release, and each Entity so
released shall be deemed released, to the Plan Investor and its affiliates and each of their
respective directors, officers, employees, members, attorneys, financial advisors,
accountants, investment bankers, investment advisors, actuaries, professionals, agents and
representatives, each in their representative capacities as such, and their respective
property from any and all causes of action, whether known or unknown, foreseen or
unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the
Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or
state securities laws or otherwise, arising from or related in any way to the Debtors,
including, without limitation, those in any way related to the Chapter 11 Cases, this
Disclosure Statement, or the Plan, provided, however, that the foregoing, the "Plan
Investor Release" shall not operate to waive or release any causes of action (i) arising from
any contractual obligations, (ii) expressly set forth in and preserved by the Plan, the Plan
Supplement or related documents, or (iii) arising from Claims for fraud or willful
misconduct.

7.   Other Releases

Subject to Section 10.11 of the Plan, effective as of the Confirmation Date,
but subject to the occurrence of the Effective Date, and in consideration of the services
provided to the Debtors by (i) the present and former affiliates, agents, financial advisors,
attorneys, and representatives of the Debtors who acted in such capacities after the
Commencement Date, (ii) the Plan Investor, (iii) the Creditors' Committee, (iv) the Agents,

**(v) the Prepetition Revolver Lenders, (vi) the Prepetition Term Loan Lenders, and (vii) the DIP Lenders, (a) the Debtors, (b) the Reorganized Debtors, (c) each holder of a Claim or Interest that votes to accept the Plan but does not elect to "opt-out," (d) each holder of a Claim or Interest that is deemed to accept the Plan, and (e) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan and that does not elect to "opt-out," will release, unconditionally and forever, each present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, the DIP Lenders, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; _provided, however_, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or _ultra vires_ acts of any such person or entity. For the avoidance of doubt, the claims and causes of actions released pursuant to Section 10.10 of the Plan include those claims and causes of action released under the Final Cash Collateral Order.**

It should be noted that under applicable non-bankruptcy law, the Debtors would either be vicariously liable for claims against the Debtors' directors, officers, and employees or required to indemnify such individuals from such claims given the Debtors' assumption of their indemnification obligations of their officers, directors, and employees under the Plan. When such claims indirectly affect a debtor's reorganization efforts, courts have found that releases of the type proposed in the Plan are justified. _In re Metromedia Fiber Network, Inc._, 416 F.3d 136, 142 (2d Cir. 2005); _Menard-Sanford v. Mabey_ (_In re A.H. Robbins Co._), 880 F.2d 694, 701 (4th Cir. 1989). Moreover, releases are justified if the plan of reorganization provides, as the Plan does, for full payment of claims or if creditors consent to such releases. _Metromedia_, 416 F3d at 142. All holders of Claims and Interest entitled to vote on the Plan may elect to opt out of the release provision of Section 10.10 of the Plan regardless of whether they choose to accept, reject, or not to vote on the Plan.

8. **Limits on Releases and Exculpation**

**Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, the releases set forth in Sections 10.8, 10.9 and 10.10 of the Plan will not effect a release of any claim against a non-Debtor by the United States Government or any of its**

**agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.   Nothing in Sections 10.8, 10.9 or 10.10 of the Plan nor the Confirmation Order will enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against a non-Debtor for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.   Other than as set forth in Section 10.7 of the Plan, nothing in the Plan or the Confirmation Order will exculpate any non-Debtor from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.**

**K.      Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents, if any, will terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

**L.      Management of the Reorganized Debtors**

On the Effective Date, the management, control, and operation of the Reorganized Debtors will become the responsibility of the Boards of Directors of the Reorganized Debtors.

The initial Board of Directors will consist of seven (7) members each.  The CEO, to be appointed by the Plan Investor, will be designated as one (1) board member, four (4) board members will be designated by the Plan Investor (provided, however, that one of the Plan Investor's designees shall be an "Independent Director," as defined in the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement), one (1) board member will be designated by the Affiliated Bondholders, and one (1) board member will be designated by the DIP Lenders.  The Affiliated Bondholders' and the DIP Lenders' designations will each be subject to approval by the Plan Investor, with such approval to not be unreasonably withheld.

Each member of the initial Board of Directors will serve in accordance with the applicable non-bankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors.

The Debtors anticipate that the officers of the Reorganized Debtors will be substantially the same as the Debtors' current officers.  The Debtors anticipate that Mr. Michael A. Lubin will continue as Chairman of the Board, Mr. Warren Delano will continue as President

and Mr. Dennis J. Welhouse will continue as Chief Financial Officer. No later than ten (10) days prior to the last day by which holders of impaired Claims and Interests may vote to accept or reject the Plan, the Debtors will identify in the Plan Supplement all officers and all members of the Boards of Directors of Reorganized LPC and Reorganized LRGI.

## M.    Jurisdiction and Choice of Law

### 1.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 2.    Retention of Jurisdiction

The Bankruptcy Court will retain and have exclusive jurisdiction over, in addition to other matters specified in the Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Plan.

## N.    The Plan Supplement

A draft of the form of each of the Plan Documents to be entered into as of the Effective Date, which will include, among other things, the Charter Amendment, the form of the Stock Purchase Agreement, the Securityholders Agreement, and any other relevant documents that are necessary to allow a holder of Claims to make an informed decision will be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which the holders of Impaired Claims may vote to accept or reject the Plan.

Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents included in the Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Plan must be received.

## O.    Modification, Revocation, or Withdrawal of the Plan

The Debtors reserve the rights to alter, amend, or modify the Plan at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors comply with section 1125 of the Bankruptcy Code.

After the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be

necessary to carry out the purposes and effects of the Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Plan.

A holder of a Claim or Interest that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder. Notwithstanding anything to the contrary herein or in the Plan, the Plan will not be modified or amended to affect the treatment or amount of the CapitalSource Secured Claim or the CSE Secured Claim without the prior written consent of the Agents.

The Debtors may revoke or withdraw the Plan any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan or the Plan does not otherwise become effective, the Plan will be deemed null and void. In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claims by the Debtors or to prejudice in any manner the Debtors' rights in any further proceedings involving the Debtors.

# VI.

# FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

## A.    Selected Historical and Projected Financial Information

The following historical financial information is attached to this Disclosure Statement as **Exhibit C** and **Exhibit D**, respectively:

-    LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (attached without exhibits) (**Exhibit C**); and

-    LPC's Reports on Form 10-Q for the quarter ended September 30, 2009 (attached without exhibits) (**Exhibit D**);

The Projected Financial Statements are set forth in their entirety in **Exhibit F** hereto.

The table set forth below in this Section V(A) sets forth the following data:

(i)    Actual results of continuing operations for 2008;

(ii)    Projected results of continuing operations for 2009, 2010, 2011, and 2012; and

(iii)    Pro forma projected operating results of continuing operations for 2009, adjusted as if the reorganization had been effective as of December 31, 2009.

In preparing the Projected Financial Statements, the Debtors assumed that (i) aggregate unit sales in the automotive aftermarket of replacement components that are critical

to the operation an performance of the vehicle will grow at the rate of one percent (1%) per annum; (ii) aggregate unit sales of medical devices will grow at the rate of two percent (2%) per annum; and (iii) the aggregate level of production of new automobiles in North America will be as follows:

-    2009 8.6 million units

-    2010 10.5 million units

-    2011 12.1 million units

-    2012 13.5 million units

The level of demand in the Debtors' end-markets is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.

EBITDA is not a measure of performance under GAAP and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(ii)    EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(iii)    EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iv)    EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the consumption, over a projected period, of assets that produce revenue. EBITDA also does not reflect the capital expenditures required for the replacement of these depreciated assets.

(v)    EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be

directly associated with the reorganization and restructuring of our business under chapter11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(vi)     EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vii)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement and the Prepetition Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**
**Consolidated Selected Financial Data – Continuing Operations Only**
**(in thousands of dollars)**

| | 2008 Actual | 2009 Estimate | 2009 Pro Forma | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | 73,029 | 61,567 | 61,160 | 73,276 | 92,285 | 104,098 |
| Income from operations | 3,237 | 1,058 | 7,335 | 9,841 | 16,909 | 21,001 |
| Other income (expense): | | | | | | |
| Interest expense | (8,726) | (7,649) | (7,649) | (2,450) | (2,283) | (1,689) |
| Interest income | 17 | 50 | 50 | 104 | 260 | 300 |
| Gain on sale of property and other | - | 199 | 199 | 181 | 2,308 | 260 |
| Reorganization expense | (4,657) | (4,338) | (4,338) | (5,312) | – | – |
| Cancellation of debt income | – | – | – | 31,168 | – | – |
| Total | (13,366) | (11,738) | (11,738) | 23,691 | 285 | (1,129) |
| Income (loss) before income taxes | (10,129) | (10,680) | (4,403) | 33,532 | 17,194 | 19,872 |
| Income taxes | 35 | 25 | 25 | 2,500 | 5,500 | 6,200 |
| Income (loss) from continuing operations | (10,164) | (10,705) | (4,428) | 31,032 | 11,694 | 13,672 |
| Add back (deduct): | | | | | | |
| Interest expense | 8,726 | 7,649 | 7,649 | 2,450 | 2,283 | 1,689 |
| Interest income | (17) | (50) | (50) | (104) | (260) | (300) |
| Income tax provision | 35 | 25 | 25 | 2,500 | 5,500 | 6,200 |
| Depreciation and amortization | 5,333 | 4,698 | 3,501 | 3,961 | 3,425 | 3,499 |
| Gain on sale of property | - | (199) | (199) | (181) | (2,308) | (260) |
| Reorganization expense | 4,657 | 4,338 | 4,338 | 5,312 | – | – |
| Cancellation of debt income | – | – | – | 31,168 | – | – |
| EBITDA | 8,570 | 5,756 | 10,836 | 13,802 | 20,334 | 24,500 |
| Capital expenditures | 2,695 | 1,774 | 1,774 | 3,370 | 3,710 | 3,210 |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Selected Financial Data – Continuing Operations Only
(in thousands of dollars)**

|  | 2008 Actual | 2009 Estimate | Projected | | |
|---|---|---|---|---|---|
|  |  |  | 2010 | 2011 | 2012 |
| Current assets | 25,402 | 21,860 | 26,324 | 31,228 | 40,261 |
| Current liabilities | 99,324 | 103,046 | 14,427 | 16,560 | 23,196 |
| Net working capital | (73,922) | (81,186) | 11,897 | 14,668 | 17,065 |
| Total assets | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |
| Senior debt | 34,175 | 30,942 | 26,724 | 17,919 | 11,954 |
| Total debt | 86,539 | 70,352 | 29,614 | 19,157 | 11,954 |
| EBITDA/ interest expense | 1.0X | 0.75X | 5.63X | 8.9X | 14.5X |
| Senior debt/EBITDA | 4.0X | 5.4X | 1.9X | 0.9X | 0.5X |
| Total debt/EBITDA | 10.1X | 12.2X | 2.1X | 0.9X | 0.5X |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Selected Financial Data – Continuing Operations Only
(in thousands of dollars)**

|  | 2008 Actual | 2009 Estimate | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|
| Net sales |  |  |  |  |  |
| Rubber Group | 62,278 | 51,261 | 58,173 | 70,653 | 79,748 |
| Metals Group | 10,751 | 10,306 | 15,103 | 21,632 | 24,350 |
| Total | 73,029 | 61,567 | 73,276 | 92,285 | 104,098 |
| Income (loss) from operations: |  |  |  |  |  |
| Rubber Group | 6,696 | 4,022 | 10,724 | 16,465 | 20,276 |
| Metals Group | (741) | (727) | 1,110 | 2,436 | 2,777 |
|  | 5,955 | 3,295 | 11,834 | 18,901 | 23,053 |
| Corporate office | (2,718) | (2,237) | (1,993) | (1,992) | (2,052) |
| Total | 3,237 | 1,058 | 9,841 | 16,909 | 21,001 |
| Depreciation and amortization: |  |  |  |  |  |
| Rubber Group | 4,746 | 4,195 | 3,441 | 2,833 | 2,813 |
| Metals Group | 536 | 452 | 464 | 586 | 680 |
|  | 5,282 | 4,647 | 3,905 | 3,419 | 3,493 |
| Corporate office | 51 | 51 | 56 | 6 | 6 |
| Total | 5,333 | 4,698 | 3,961 | 3,425 | 3,499 |
| EBITDA: |  |  |  |  |  |
| Rubber Group | 11,442 | 8,217 | 14,165 | 19,298 | 23,089 |
| Metals Group | (205) | (275) | 1,574 | 3,022 | 3,457 |
|  | 11,237 | 7,942 | 15,739 | 22,320 | 26,546 |
| Corporate office | (2,667) | (2,186) | (1,937) | (1,986) | (2,046) |
| Total | 8,570 | 5,576 | 13,802 | 20,334 | 24,500 |

## B.    Valuation of the Reorganized Debtors

During the course of the Chapter 11 Cases, the Debtors have been advised by Campbell, their financial advisor and investment banker, with respect to the estimated enterprise value of the Debtors. In preparing its estimates of the Debtors' enterprise value, Campbell utilized a number of well-established valuation methodologies, including discounted cash flow, comparable publicly-traded companies, comparable M&A transactions, and sum-of-the-parts, which resulted in enterprise values equal to or greater than the aggregate indebtedness of the Debtors. Notwithstanding these analytical valuations, the Plan is premised on a lower enterprise value that is based upon the proposed investment by the Plan Investor. The Debtors believe that a market-based valuation approach is appropriate under the circumstances because (a) in order to exit chapter 11, the Debtors required (and continue to require) additional capital because of the state of the economy and the conditions in the current credit markets, (b) the process through which the Plan Investor was identified, under the direction of Campbell, was open and exposed the Debtors' business to a substantial number of investors who were likely to consider such an investment, and (c) after the completion of that process, the transaction negotiated with the Plan Investor provided the highest and best value for the Debtors.

Pursuant to the Stock Purchase Agreement, the Plan Investor will purchase New LPC Common Stock at a purchase price of $10.00 per share (with the aggregate number of New LPC Common Stock purchased by the Plan Investor depending on the number of Claims that make the Class 5 Stock Election). Based upon the issuance of 3,591,500 of total shares of New LPC Common Stock under the Plan, the aggregate estimated total equity value of the Reorganized Debtors is $35.9 million. Based upon the anticipated net debt at the Effective Date of approximately $26.2 million, the Reorganized Debtors' enterprise value is $62.1 million.

## VII.

## CERTAIN FACTORS TO BE CONSIDERED

### A.    Certain Risk Factors Relating to Confirmation of the Plan

#### 1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

#### 2.    Non-Consensual Confirmation

Because Class 6 (Junior Subordinated Note Claims), Class 10 (Series B Preferred Security Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Security Interests) are deemed to reject the Plan, and in the event that any other impaired Class of Claims does not accept the Plan, the Debtors intend to seek confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code, whereby the Bankruptcy Court may confirm the Plan if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. The Debtors believe that the Plan satisfies these requirements. For more information on this topic, please refer to Section XI.B, *General Requirements for Confirmation*" on page 102.

#### 3.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. If each of the conditions precedent to the occurrence of the Effective Date has not been satisfied or duly waived on or before the 120th day after entry of the Confirmation Order, the Bankruptcy Court may, upon the Debtors' motion, vacate the Confirmation Order, in which event the Plan would be deemed null and void.

4.      **Stock Purchase Agreement, Amended and Restated Secured CapitalSource Credit Agreement, and Amended and Restated Secured CSE Loan Agreement As Conditions Precedent to the Confirmation of the Plan**

The Plan Investor has agreed to enter into the Stock Purchase Agreement and has agreed to invest at least $22 million through the purchase of Senior Subordinated Notes and New LPC Common Stock as provided therein.  However, the Stock Purchase Agreement is subject a number of conditions precedent that must be satisfied or waived by the parties thereto.

The Prepetition Secured Lenders have agreed to accept the treatment provided under the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement, as applicable, both of which contain a number of conditions precedent that must be satisfied or waived by the parties thereto.

If any of the closing conditions in the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement is not satisfied or waived, the Debtors will not be able to meet a condition precedent for confirmation of the Plan.  The Debtors can provide no assurance that the closing conditions in the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will be satisfied or, if not satisfied, waived by the parties thereto.

B.      **Additional Factors to be Considered**

1.      **The Debtors Have No Duty to Update**

Absent a Bankruptcy Court order to the contrary, the Debtors have no duty to update this Disclosure Statement or the attachments hereto.  Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of February 28, 2010. Delivery or receipt of this Disclosure Statement after February 28, 2010 does not imply that no changes have occurred in the information contained herein and in the attachments hereto since February 28, 2010.

2.      **No Representations Outside This Disclosure Statement Are Authorized**

The Bankruptcy Court has not authorized any representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan, other than representations made in this Disclosure Statement, the attachments hereto, and the other solicitation materials from the Debtors that are included with this Disclosure Statement.  In arriving at your decision to vote to accept or reject the Plan, you should not rely upon any representations that are not contained herein or included with this Disclosure Statement.

3.      **Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be

incorrect, and projections, which may differ materially from actual future events.  Because uncertainties exist with respect to any projection, assumption, or estimate, you should not consider any projection, assumption, or estimate to be an assurance or guarantee of actual results.

**4.    This Disclosure Statement Is Not Legal or Tax Advice**

This Disclosure Statement is <u>not</u> legal, business, or tax advice.  You should not construe the contents of this Disclosure Statement as such.  Please consult your own legal counsel or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

**5.    No Admission Made**

Nothing contained herein will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

**6.    Business Factors and Competitive Conditions**

***a.    Competitive Conditions***

In addition to uncertain economic and business conditions, as discussed in Section VI.A. above, the Reorganized Debtors will face competition for business from existing and possibly new competitors.  Such competition may affect the overall operating performance of the Reorganized Debtors.

***b.    Customers***

The Debtors believe that the majority of their customer relationships are strong, however, the loss of a significant customer could have a material adverse impact on operating performance.

**7.    Access to Financing and Trade Terms**

The Reorganized Debtors' operations will depend on, among other things, access to working capital through operating cash flow and the availability of customary trade terms from their supplies.  While the Debtors believe that projected operating cash flow and improved trade credit will provide adequate cash to finance the operations of the Reorganized Debtors, the Reorganized Debtors may nonetheless require greater funding.  No assurance can be given that additional financing will be available on terms favorable or acceptable to the Reorganized Debtors.  If the Reorganized Debtors meet their projected cash flows, the Debtors believe that their suppliers will continue to provide customary terms; however, no assurances can be given.

8.     **Variances from the Projected Financial Statements**

The fundamental premise of the Plan is the deleveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projected Financial Statements. The Projected Financial Statements reflect numerous assumptions concerning the Reorganized Debtors' anticipated future performance, some of which may not materialize. Such assumptions include assumptions concerning the general economy, business conditions in the industries in which the Debtors operate, and the ability of the Debtors to obtain additional business from existing and new customers. The Debtors believe that the assumptions underlying the Projected Financial Statements are reasonable; however, unanticipated events and circumstances that may occur subsequent to the preparation of the Projected Financial Statements may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projected Financial Statements are likely to vary from the projected results, and such variations may be material and adverse.

9.     **Significant Holders**

As a result of the Plan and the Stock Purchase Agreement, the Plan Investor and the Management Members will own a majority of the New LPC Common Stock.

10.     **Dilution of New LPC Common Stock**

It is anticipated that the Board of Directors of the Reorganized Debtors will adopt the Management Incentive Plan. If the Board distributes the MIP Warrants, and/or any equity interests, or options to acquire such equity interests, to management or employees, it is contemplated that such distributions will dilute the New LPC Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New LPC Common Stock distributed under the Plan.

11.     **Illiquid Market**

The New LPC Common Stock will not be listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell them in the future or as to the price at which any sale may occur. If a holder of such securities is able to sell them in the future, the price of the securities could be higher or lower than the value ascribed to them in this Disclosure Statement, depending upon many factors, including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Reorganized LPC.

12.     **Restrictions on Transfer**

The shares of New LPC Common Stock issued to the Plan Investor will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold without registration under the Securities Act unless resold pursuant to an exemption from registration.

Holders of the New LPC Common Stock issued to holders of Allowed Senior Subordinated Note Claims or holders of the DIP Loan Claim who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be unable to offer or sell such securities except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws. This would include persons who (a) purchase a Claim with a view to distribution of any security to be received in exchange for the Claim other than in ordinary trading transactions, (b) offer to sell securities issued under the Plan for holders of such securities, (c) offer to buy securities issued under the Plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with the Plan, the consummation of the Plan, or the offer or sale of securities under the Plan, or (d) are an issuer, a person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer.

13.    **Indicative Value of the Debtors**

The implied aggregate enterprise value of the Reorganized Debtors is $62.1 million based on the terms of the investment to be made by the Plan Investor. The Debtors have concluded that this represents the highest achievable value under current market conditions based on the results of an extensive marketing process conducted by Campbell.

**VIII.**

**CERTAIN FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Claims or Interests who are not voting because they are deemed to accept or reject the Plan.

The discussion of certain U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), current, temporary and proposed Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested and do not expect to request a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion under this heading does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership (or other entity taxed as a partnership) holds a Claim or Interest, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

This discussion also assumes that the CapitalSource Secured Claims, CSE Secured Claims, Senior Subordinated Notes, Amended Secured CapitalSource Debt, Amended Secured CSE Debt, and New LPC Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or Interests. Holders of Claims or Interests are urged to consult their own tax advisors regarding the federal, state, local and non-U.S. tax consequence of the Plan.**

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (ii) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein (including the solicitation of votes accepting the Plan); and (iii) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (the "Lexington Group"), of which LPC is the common parent, and file a single consolidated U.S. federal income tax return. The Lexington Group reported in the most recent Form 10-K filed by LPC and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $36 million as of the end of 2008. The Lexington Group incurred further operating losses during the taxable year ended

December 31, 2009.  The amount of the NOL carryforwards, including any such 2009 tax-year losses, remains subject to audit and adjustment by the IRS.  The Debtors expect to have taxable income for the current taxable year through the Effective Date.

As discussed below, in connection with the implementation of the Plan, the amount of the Lexington Group's consolidated NOL carryforwards and other tax attributes (including any 2009-tax year losses) may be reduced.  In addition, the subsequent utilization of any losses and NOL carryforwards remaining following the Effective Date, if any, may be restricted.

1.    **Cancellation of Debt**

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan.  The COD incurred is generally the amount by which the indebtedness discharged (reduced by any unamortized original issue discount) exceeds any consideration given in exchange therefor.  Certain statutory or judicial exceptions can generally apply to limit the amount of COD incurred for U.S. federal income tax purposes (such as where the payment of the cancelled debt would have given rise to a tax deduction).  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of excluded COD income generally does not occur until after the end of the taxable year in which the COD is incurred.  Alternatively, a debtor may elect to defer the inclusion of COD income resulting from its chapter 11 plan (thereby preserving the current use of its tax attributes, subject to applicable limitations), with the amount of COD income becoming includible in its income ratably over a five-taxable year period beginning in the fourth taxable year after the COD income arises, if the chapter 11 plan is consummated in 2010.

As a result of the discharge of Claims pursuant to the Plan, the Debtors will incur COD.  The extent of such COD and resulting tax attribute reduction will depend, in principal part, on the fair market value of the New LPC Common Stock distributed.  Based on the Enterprise Value of $62.1 million, as described in Section VI, "*Financial Information, Projections and Valuation Analysis,*" it is estimated that the Reorganized Debtors will incur approximately $31 million of COD (substantially all of which will be allocable to Reorganized LPC for U.S. federal income tax purposes).  Consequently, subject to any election to defer the inclusion of COD as described above, it is anticipated that the consolidated NOL carryforwards and any current year NOLs of the Lexington Group will be reduced in connection with the implementation of the Plan.

2.      **Limitations on NOL Carryforwards and Other Tax Attributes**

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs and built-in losses, if any) allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the changes in ownership of the Lexington Group as described below.  These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation.  A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose).  The Debtors anticipate that the issuance of the New LPC Common Stock pursuant to the Plan will cause an "ownership change" of the Lexington Group.

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.14% for ownership changes occurring in February 2010).  Based on the estimated total equity value of the Debtors of $35.9 million, as described in Section VI, "*Financial Information, Projections and Valuation Analysis*," the Debtors' annual limitation for an ownership change occurring in June  2010 would be approximately $1.4 million (before taking into account any adjustment for recognized built-in gain).  As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined *immediately after* (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below.  Generally, NOL carryforwards expire after 20 years.

Accordingly, the impact of an ownership change of the Lexington Group pursuant to the Plan depends upon, among other things, the amount of pre-change losses remaining, if any, after any reduction of attributes due to the COD, the value of both the stock and assets of the Debtors at or about the Effective Date, the continuation of their respective businesses, and the amount and timing of future taxable income.

### a.        *Built In Gains and Losses*

Among the pre-change losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

The presence of a net unrealized built-in gain or net unrealized built-in loss position for a corporation (or consolidated group) depends, among other things, on the value of the assets of the corporation (or consolidated group) at the time of the ownership change. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million and (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Whether the Lexington Group will benefit from adjustment for "built-in" gains or be subject to the limitation for "built-in" losses will depend upon the respective value of the Lexington Group's assets immediately before the Effective Date. Although not free from doubt, the Debtors currently expect to be in a net unrealized built-in gain position.

### b.        *Special Bankruptcy Exception*

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception,

which applies only if an ownership change occurs pursuant to a chapter 11 plan, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

Based upon the Plan, it is possible that the Debtors will not qualify for this exception. Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the change occurs.

For purposes of the Projected Financial Information, the Debtors have assumed that their use of pre-change losses will be limited to a range of approximately $2.1 million to $3.9 million (depending on the taxable year) on an annual basis under section 382 of the Tax Code after increasing the annual section 382 limitation for any expected recognized built-in gain.

### 3.    Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### B.    Consequences to Holders of Certain Claims

Pursuant to the Plan, and in satisfaction of their respective Claims: (i) holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and against LRGI (Class 14(a)) will receive payments as provided in the Amended and Restated Secured CapitalSource Credit Agreement; (ii) holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and against

LRGI (Class 14(b)) will receive payments as provided in the Amended and Restated Secured CSE Loan Agreement; (iii) holders of Allowed Senior Subordinated Note Claims (Class 5) will receive Cash or New LPC Common Stock; (iv) holders of Allowed Lexington Precision General Unsecured Claims (Class 7) and Allowed Lexington Rubber Group General Unsecured Claims (Class 17) will receive Cash payments over a twenty-seven month period or a single reduced Cash payment; and (v) holders of Asbestos Related Claims (Class 9) may receive Cash payments under the Asbestos Insurance Policies, and, to the extent the proceeds of the Asbestos Insurance Policies are not sufficient, cash payments, from the Reorganized Debtors or a single reduced cash payment.

The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim depends, in part, on whether the holder's Claim constitutes a "security" for U.S. federal income tax purposes and, if so, whether the consideration received in exchange therefor also constitutes a "security" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt instruments with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. The following discussion assumes that CapitalSource Secured Claims and CSE Secured Claims do not constitute securities for U.S. federal income tax purposes because their original maturity was three (3) years. ***Each holder of an Allowed CapitalSource Secured Claim, an Allowed CSE Secured Claim, an Allowed Senior Subordinated Note Claim or an Allowed General Unsecured Claim should consult its own tax advisor to determine whether its Allowed Claim or the consideration received in exchange therefor constitutes a security for U.S. federal income tax purposes***.

1.      **Holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and Allowed CapitalSource Secured Claims against LRGI (Class 14(a))**

Pursuant to the Plan, each holder of Allowed CapitalSource Secured Claims against LPC and Allowed CapitalSource Secured Claims against LRGI will receive on account of its Allowed Claim payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement plus a cash payment for certain fees, costs and expenses.

Whether changes to a debt instrument are regarded as a mere amendment for U.S. federal income tax purposes or instead, treated as, in substance, a new debt instrument received in satisfaction of the original debt obligation depends, in part, on whether the changed terms constitute a "significant modification" of the existing debt for U.S. federal income tax purposes, as determined under applicable Treasury regulations. The Amended Secured CapitalSource Debt has certain similarities and differences in terms as contrasted with the CapitalSource Secured

Claims, in particular, extension of the maturity date and a change of the interest rate. The following discussion assumes that the receipt of Amended Secured CapitalSource Debt by holders of Allowed CapitalSource Secured Claims should be treated as an "exchange" for U.S. federal income tax purposes.

Each holder of an Allowed CapitalSource Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the "issue price" (*see* Section VIII(B)(8) "*Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt*") of the Amended Secured CapitalSource Debt received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest or certain fees, costs and expenses). A holder of an Allowed CapitalSource Secured Claim generally should have ordinary income to the extent of the cash payment received for certain fees, costs, and expenses. Holders of an Allowed CapitalSource Secured Claim that receive a cash payment for certain fees, costs and expenses are urged to consult their own tax advisors as to the proper treatment of such payment in relation to their particular circumstances. In addition, a holder of an Allowed CapitalSource Secured Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income. *See* Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

A holder's tax basis in the Amended Secured CapitalSource Debt should equal the issue price of such debt on the Effective Date. A holder's holding period in such debt should begin the day following the Effective Date.

## 2.    Holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and Allowed CSE Secured Claims against LRGI (Class 14(b))

Pursuant to the Plan, each holder of Allowed CSE Secured Claims against LPC and Allowed CSE Secured Claims against LRGI will receive on account of its Allowed Claim payments over time as provided in the Amended and Restated Secured CSE Loan Agreement plus a cash payment for certain fees, costs and expenses.

Whether changes to a debt instrument are regarded as a mere amendment for U.S. federal income tax purposes or instead, treated as, in substance, a new debt instrument received in satisfaction of the original debt obligation depends, in part, on whether the changed terms constitute a "significant modification" of the existing debt for U.S. federal income tax purposes, as determined under applicable Treasury regulations. The Amended Secured CSE Debt has certain similarities and differences in terms as contrasted with the CSE Secured Claims, in particular, an extension of the maturity date and a change in the interest rate. The following discussion assumes that the receipt of Amended Secured CSE Debt by holders of Allowed CSE Secured Claims should be treated as an "exchange" for U.S. federal income tax purposes.

A holder of an Allowed CSE Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the "issue price" (*see* Section VIII(B)(8), "*Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt*") of the Amended Secured CSE Debt received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). A holder of an Allowed CSE Secured Claim generally should have ordinary income to the extent of the cash payment received for certain fees, costs, and expenses. Holders of an Allowed CSE Secured Claim that receive a cash payment for certain fees, costs and expenses are urged to consult their own tax advisors as to the proper treatment of such payment in relation to their particular circumstances. In addition, a holder of an Allowed CSE Secured Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income. *See* Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6) "*Character of Gain or Loss.*"

A holder's tax basis in the Amended Secured CSE Debt should equal the issue price of such debt on the Effective Date. A holder's holding period in such debt should begin the day following the Effective Date.

### 3.    Holders of Allowed Senior Subordinated Note Claims (Class 5)

The U.S. federal income tax consequences of the Plan to holders of Allowed Senior Subordinated Note Claims depend, among other things, on whether the holder elects to receive New LPC Common Stock in exchange for its Claim instead of Cash. A holder that elects to receive New LPC Common Stock must make such election for its entire Allowed Claim.

#### a.    *Receives Cash Distribution*

If a holder of an Allowed Senior Subordinated Note Claim receives only Cash in respect of its claims, such holder generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

#### b.    *Elects to Receive New LPC Common Stock*

As discussed above (at the beginning of the discussion in Section VIII(D), "*Consequences to Holders of Certain Claims*"), the U.S. federal income tax consequences of the Plan to holders of Allowed Senior Subordinated Note Claims that elect to receive only New LPC Common Stock depend, in part, on whether the holder's existing notes constitute "securities" for

U.S. federal income tax purposes.  It is not clear whether the Senior Subordinated Note Claims constitute securities.  Each holder is advised to consult its own tax advisors.

(i)    ***If Existing Note Does Not Constitute a Security***

If the Senior Subordinated Notes do not constitute securities, the holder of an Allowed Senior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any New LPC Common Stock, received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

A holder's tax basis in any New LPC Common Stock received should equal the fair market value of such stock on the Effective Date.  A holder's holding period in such stock should begin the day following the Effective Date.

(ii)    ***If Existing Note Constitutes a Security***

The receipt of stock of Reorganized LPC in exchange for an Allowed Senior Subordinated Note Claim that constitutes a security for U.S. federal income tax purposes will qualify as a "recapitalization" for U.S. federal income tax purposes.  The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder.  Accordingly, no gain or loss should be recognized by the holder of such Claim who receives only stock, but such holder may recognize income with respect to any amounts received in respect of accrued but unpaid interest.  As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*".

In a recapitalization exchange, a holder's aggregate tax basis in any stock received generally should equal the holder's aggregate adjusted tax basis in the existing notes exchanged therefor, increased by any interest or other income recognized in the exchange.  In general, a holder's holding period in any stock received will include the holder's holding period in the existing notes exchanged (other than any stock received in respect to any accrued but unpaid interest).

**4.    Holders of General Unsecured Claims against LPC (Class 7) and General Unsecured Claims against LRGI (Class 17)**

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim against LPC (Class 7) or against LRGI (Class 17) will receive Cash payable in ten (10) payments in respect of its Allowed Claim.  In the case of Class 7, the initial up front payment will be in the amount of 8% of the holder's Allowed Claim, and the remaining nine (9) equal quarterly Cash payments (hereafter, such later payment are collectively referred to as the "GUC Payment

Obligation") will each be in the amount of 8.6% of such Allowed Claim, unless such holder makes the Class 7 Cash Election to receive a single Cash payment equal to 51% of its Allowed Claim. In the case of Class 17, the initial up front payment will in the amount of 10% of the holder's Allowed Claim (plus postpetition interest through the Effective Date) and each payment under the GUC Payment Obligation will be in the amount of 10.75% of such Allowed Claim, unless the holder makes the Class 17 Cash Election to receive a single Cash Payment equal to 51% of such Allowed Claim (plus postpetition interest through the Effective Date).

### a.    *Receipt of Multiple Cash Payments*

In general, unless a holder makes a Class 7 Cash Election or a Class 17 Cash Election (as applicable), a holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of the initial Cash payment and the "issue price" (as discussed below) of the GUC Payment Obligation (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the character of any recognized gain or loss, and the treatment of amounts received in respect of any Claim for accrued but unpaid interest, see Section VIII(B)(6), "*Character of Gain or Loss*," and Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*."

The GUC Payment Obligation should be treated as a debt obligation for U.S. federal income tax purposes, and thus should be subject to the original issue discount ("OID") rules of the Tax Code. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the sum of the nine later payments) exceeds its "issue price," subject to a *de minimis* exception.

If, as expected, the GUC Payment Obligation is not considered traded on an "established market," the issue price of the GUC Payment Obligation should be the present value of all payments discounted at a rate based on the applicable federal rate for short-term instruments (which discount rate is currently in the range of 0.67% compounded semi-annually). Such rate will then be the yield to maturity in respect of the obligation. If the GUC Payment Obligation is traded on an "established market" during the 60 day period ending 30 days after the Effective Date, the issue price of the GUC Payment Obligation will be its fair market value (with the yield to maturity computed accordingly).

Each holder of an Allowed General Unsecured Claim generally will be required to accrue the OID in respect of the GUC Payment Obligation received and include such amount in gross income as interest over the term of such obligation based on the constant yield method. Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of Cash in respect of such income. A holder's tax basis in a GUC Payment Obligation will be increased by the amount of any OID included in income and reduced by any Cash received with respect to such GUC Payment Obligation.

A holder's initial tax basis in the GUC Payment Obligation received should equal the issue price of such obligation, and the holding period of such obligation should begin the day following the Effective Date.

      c.      ***Elects to Receive Single Cash Payment***

      In general, each holder of an Allowed General Unsecured Claim that elects to receive a single Cash payment should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the character of any recognized gain or loss, and the treatment of amounts received in respect of any Claim for accrued but unpaid interest, *see* Section VIII(B)(6), "*Character of Gain or Loss,*" and Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*"

### 5.      Holders of Asbestos-Related Claims (Class 9)

      Pursuant to the Plan, each Asbestos-Related Claim will be satisfied by Cash payments from the Asbestos Insurance Policies and, to the extent the proceeds of the Asbestos Insurance Policies are not sufficient, Cash payments (which may be made over time) from the Reorganized Debtors for a holder's Insurance Proceeds Deficiency (hereafter, such payments made over time are collectively referred to as the "IPD Payment Obligation") unless the holder of an Asbestos-Related Claim makes the Class 9 Cash Election to receive a single Cash Payment equal to 51% of the Insurance Proceeds Deficiency.

      The U.S. federal income tax treatment of a receipt of payments by a holder of an Asbestos-Related Claim generally will depend upon the nature of the Claim. Amounts received by a holder of a personal injury claim generally should not be taxable to such holder. Amounts received by a holder of a property damage claim may or may not be taxable to such holder depending on the nature and extent of the damage. Where cash payments are receivable over time, as under the IPD Payment Obligation, the existence of the payment obligation itself (rather than the later receipt of the cash payments represented by the obligation) may be treated as the consideration received in respect of the holder's Claim for U.S. federal income tax purposes.

      Because the tax treatment of any amounts received by a holder under the Plan will depend on facts peculiar to each holder, all holders of Asbestos-Related Claims are urged to consult their own tax advisors as to the proper tax treatment of such receipts, including the receipt and ownership of the IPD Payment Obligation in relation to their particular facts and circumstances. The Debtors currently intend to treat the IPD Payment Obligation in an equivalent manner to the GUC Payment Obligation, *see* Section VIII(B)(4), "*Holders of General Unsecured Claims Against LPC (Class 7) and General Unsecured Claims Against LRGI (Class 17).*"

### 6.      Character of Gain or Loss

      Where gain or loss is recognized by a holder in respect of the satisfaction its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and

whether and to what extent the holder previously had claimed a bad debt deduction.  Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

A holder that purchased its claim from a prior holder at a "market discount" (relative to the adjusted issue price of the claim at the time of acquisition) may be subject to the market discount rules of the Tax Code.  Under these rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such claim generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

7.      **Distributions in Respect of Accrued Interest**

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim (whether in cash, new debt or stock) is received in satisfaction of interest or OID that accrued during its holding period, such amount will be taxable to the holder as interest income (to the extent not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be viewed by the Internal Revenue Service as required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except to the extent otherwise provided therein, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim (as determined for U.S. federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder and attributable to principal under the Plan is properly allocable to interest.  Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

8.      **Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt**

a.      *Stated Interest and Original Issue Discount.*

A holder of Amended Secured CapitalSource Debt and Amended Secured CSE Debt (together, the "Amended Secured Debt") will be required to include the stated interest on

the debt in income in accordance with the holder's regular method of accounting. A debt instrument generally has OID if its "stated redemption price at maturity" (in this case, the principal amount of the Amended Secured Debt) exceeds its "issue price" by more than a de minimis amount. Due to the limited number of holders of Allowed CapitalSource Secured Claims and Allowed CSE Secured Claims, the Debtors expect, and the discussion herein assumes, that the "issue price" of the Amended Secured Debt will be equal to their stated principal amount in the Amended and Restated Secured CapitalSource Credit Agreement or the Amended and Restated CSE Loan Agreement, as applicable, and, thus, that the Amended Secured Debt will not be issued with OID. If the Amended Secured Debt is issued with OID, the holder would be required to recognize the OID over the term of the Amended Secured Debt in advance of the holder's receipt of the associated Cash.

### b.      Sale, Exchange or Other Disposition of the Amended Secured Debt.

Any gain or loss recognized by a holder on a sale, exchange or other disposition of the Amended Secured Debt generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the note immediately before the sale, exchange, redemption or other disposition. Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period in its note is more than one year at that time.

### 9.      Disposition of the New LPC Common Stock

Any gain recognized by a holder upon a subsequent taxable disposition of the New LPC Common Stock received in respect of its Claim (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deducted upon satisfaction of the Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, in the case of an exchange of the existing Senior Subordinated Notes that qualifies as a recapitalization for U.S. federal income tax purposes, the Tax Code indicates that any accrued market discount in respect of the Senior Subordinated Notes in excess of the gain recognized in the exchange should not be currently includible in income. However, such accrued market discount would carry over to any non-recognition property received in exchange therefor, such that any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

## C.    Information Reporting and Backup Withholding

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of new securities, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information or to make certain certifications. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, if any, provided that the required information is timely furnished to the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the exchanges contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above summary has been provided for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances. Accordingly, all holders of Claims and Interests receiving a distribution under the Plan are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the Plan.**

## IX.

## SECURITIES LAW MATTERS

### A.    Issuance and Resale of the New LPC Common Stock under the Plan

#### 1.    Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor

under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate.  In reliance upon this exemption, the New LPC Common Stock to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such shares of New LPC Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act unless the holder is an "underwriter" with respect to such securities as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such shares of New LPC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with a chapter 11 plan, with the consummation of the chapter 11 plan, or with an offer or sale of securities under the chapter 11 plan, or (d) is the issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

Recipients of securities under the Plan are advised to consult with their own legal advisors as to the availability of any exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

## 2.    Issuance and Resale of New LPC Common Stock to be Issued to the Plan Investor

The Debtors are relying on Section 4(2) of the Securities Act and, with respect to state securities or "blue sky" laws, Section 18 of the Securities Act, to exempt from the registration requirements of the Securities Act the offer and sale of the shares of New LPC Common Stock to be issued to the Plan Investor under the Plan.

The shares of New LPC Common Stock to be issued to the Plan Investor under the Plan will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold without registration under the Securities Act unless resold pursuant to an exemption from registration.  The Plan Investor will have the right to demand the public

registration of the New LPC Common Stock and will receive customary piggyback registration rights. See Section IV.C.1, "*The Securityholders Agreement*."

**B.**     **Issuance and Resale of Amended Secured CapitalSource Debt, Amended Secured CSE Debt, GUC Payment Obligations, and any Other Deferred Cash Payment Obligations**

The Amended Secured CapitalSource Debt, the Amended Secured CSE Debt, the GUC Payment Obligations, and any other deferred cash payment obligations, to the extent they constitute securities, will be issued pursuant to an exemption from registration provided by section 1145 of the Bankruptcy Code.

See Section IX.A.1, "*Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim*."

**C.**     **Listing**

None of the securities to be issued pursuant to the Plan are, and upon the consummation of the Plan, such securities will not be, listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

**D.**     **Legends**

Certificates evidencing shares of the New LPC Common Stock received by holders of at least 10% of the New LPC Common Stock will bear a legend substantially in the form below (except no legend will be required on certificates issued in "street name" or in the name of, or by a nominee, of the Depository Trust Company):

THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

**X.**

**VOTING PROCEDURES AND REQUIREMENTS**

**A.**     **Voting Deadline**

IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:

**Class 2(a) – CapitalSource Secured Claims against LPC**

**Class 2(b) – CSE Secured Claims against LPC**

**Class 5 – Senior Subordinated Note Claims**

**Class 7 – General Unsecured Claims against LPC**

**Class 9 – Asbestos-Related Claims**

**Class 14(a) – CapitalSource Secured Claims against LRGI**

**Class 14(b) – CSE Secured Claims against LRGI**

**Class 17 – General Unsecured Claims against LRGI**

All known holders of CapitalSource Secured Claims, CSE Secured Claims, Senior Subordinated Note Claims, General Unsecured Claims, and Asbestos-Related Claims as of the Record Date are entitled to vote on the Plan and have been sent a ballot together with this Disclosure Statement.  Such holders should read the ballot carefully and follow the instructions contained therein.  To vote, please use only the ballot that accompanies this Disclosure Statement.

The Debtors have engaged Financial Balloting Group LLC, as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE STREET ADDRESS OR E-MAIL ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 4:00 P.M., PREVAILING EASTERN TIME, ON [___ __], 2010.**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE TO EITHER ACCEPT OR REJECT THE PLAN.**

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

> **Financial Balloting Group LLC**
> **757 Third Avenue, 3rd Floor,**
> **New York, New York 10017**
> **Telephone:  (646) 282-1800**
>
> **- OR –**
>
> **tabulation@fbgllc.com**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

**B.    Holders of Claims Entitled to Vote**

Class 2(a) – CapitalSource Secured Claims against LPC, Class 2(b) – CSE Secured Claims against LPC, Class 5 – Senior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims, Class 14(a) – CapitalSource Secured Claims against LRGI, Class 14(b) – CSE Secured Claims against LRGI, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim in any of these classes as of [_____  __], 2010 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Plan.

**C.    Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that vote to accept or reject the plan.  Classes 2(a), 2(b), 5, 7, 9, 14(a), 14(b) and 17 will accept the Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.    Voting Procedures**

**1.    Voting Procedures**

Voting procedures will be as described in the Disclosure Statement Order.

2.        **Withdrawal of Ballot**

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (i) be signed by the party that signed the Ballot to be revoked and (ii) be received by the Voting Agent before the Voting Deadline.  The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline.  In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

**XI.**

**CONFIRMATION OF THE PLAN**

A.        **The Confirmation Hearing**

**The Confirmation Hearing will commence at [          ]  .m. prevailing Eastern Time on [            ], 2010.**

**The Plan Objection Deadline is 4:00 p.m. prevailing Eastern Time on [      ], 2010.**

All objections and responses to the confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

B.        **General Requirements for Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)        The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)       The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)      The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made or promised by the Debtors or by an Entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VII.A.2, *"Non-Consensual Confirmation"* on page 79, each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim, on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as will be determined by the Bankruptcy Court to provide to the holder of such

Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(x)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

(xi)    The Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## C.    Best Interests Test

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case.  The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for

attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Creditors' Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Debtors have determined that there would be no distribution under chapter 7 of the Bankruptcy Code to any Class of unsecured Claims or Interests and, consequently, confirmation of the Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Debtors' liquidation analysis estimates the proceeds generated from a hypothetical chapter 7 liquidation of the Debtors' assets. The Debtors base the analysis upon a number of significant assumptions which are described therein. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The Debtors' chapter 7 liquidation analysis and the assumptions utilized therein are set forth in **Exhibit G** to this Disclosure Statement.

### D.    No Unfair Discrimination/Fair and Equitable Test

As provided under the Bankruptcy Code, the Bankruptcy Court may confirm a chapter 11 plan over the rejection or deemed rejection of such plan by a class of claims or interests if the chapter 11 plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

### 1.    No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the chapter 11 plan. The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

2.      **Fair and Equitable Test**

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims or interests receive more than 100% of the allowed amount of the claims or interests in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

a.      *Secured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide each holder of an impaired secured claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such allowed secured claim with deferred cash payments equal in value to the amount of such allowed secured claim, as of the effective date, or (ii) the "indubitable equivalent" of such allowed secured claim.

b.      *Unsecured Claims*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an impaired unsecured claim will receive under the chapter 11 plan a distribution equal in value to the amount of the allowed unsecured claim or (ii) no distribution will be made under the Plan to any holder that is junior to the claims in the dissenting class.

c.      *Interests*

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an interest will receive under the chapter 11 plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of an interest that is junior to the dissenting class.

The Debtors believe that (i) the Plan satisfies the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) the Plan satisfies the "fair and equitable" requirement notwithstanding the rejection of the Plan by any Class of Claims, because either (x) each Class of Claims or Interests will receive under the Plan a distribution equal in value to the amount of such Claims or (y) no distribution will be made to under the Plan to any holder of a claim that is junior to the dissenting class.

E.      **Classification of Claims and Interests**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar."  The Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above.  Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

**F.** **Feasibility**

        The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  As part of this analysis, the Debtors have prepared the Projected Financial Statements set forth in **Exhibit F** to this Disclosure Statement.  Certain selected financial information from the Projected Financial Statements and certain key financial ratios are set forth in Section VI, "*Financial Information, Projections and Valuation Analysis,*" on page 73.  These projections are based upon the assumption that the Bankruptcy Court will confirm the Plan and, for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place within 90 days after entry of the Confirmation Order.  Based upon the Projected Financial Statements, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

# XII.

## CONCLUSION

The Debtors believe the Plan is in the best interests of all holders of Claims and Interests and urges the holders of impaired Claims in Classes 2(a), 2(b), 5, 7, 9, 14(a), 14(b) and 17 to vote to accept the Plan and to evidence acceptance by returning their ballots such that the Voting Agent will receive the ballots no later than [___ __], 2010.

Dated: April 19, 2010
     New York, New York

                      Respectfully submitted,

                      LEXINGTON PRECISION CORPORATION


                      By: /s/ Michael A. Lubin
                          Name:  Michael A. Lubin
                          Title:   Chairman of the Board

                      LEXINGTON RUBBER GROUP, INC.


                      By: /s/ Michael A. Lubin
                          Name:  Michael A. Lubin
                          Title:   Chairman of the Board

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Attorneys for the Debtors
and Debtors in Possession

## **Exhibit A**

**The Plan**

(Filed under separate cover)

**<u>Exhibit B</u>**

**Entered Disclosure Statement Order**

(To be provided)

<u>**Exhibit C**</u>

**LPC Annual Report on Form 10-K**
**for Fiscal Year Ended December 31, 2008**

10-K 1 d24736.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

[X]     Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for
the Year Ended December 31, 2008
or

[ ]     Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
Commission File Number: 0-3252

# LEXINGTON PRECISION CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-1830121** |
| (State or other jurisdiction of<br>incorporation or organization) | (I.R.S. Employer<br>Identification No.) |
| **800 Third Avenue, New York, NY** | **10022** |
| (Address of principal executive offices) | (Zip code) |

### Registrant's telephone number, including area code: (212) 319-4657

_____

### Securities registered pursuant to Section 12(b) of the Act: None

### Securities registered pursuant to Section 12(g) of the Act:
### Common Stock, $0.25 par value
#### (Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in rule 405 of the Securities Act.  Yes __ No X

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes __ No X

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No __

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of  "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.  (Check one):

| | |
|---|---|
| Large Accelerated Filer __ | Accelerated Filer __ |
| Non-Accelerated Filer __ | Smaller Reporting Company X |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes __ No X

The aggregate market value of the registrant's common stock, $0.25 par value per share, held by non-affiliates of the registrant, as of June 30, 2008, was approximately $1,105,000.

The number of shares of common stock outstanding as of April 13, 2009, was 5,021,767.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement to be issued in connection with its 2009 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III. Only those portions of the Proxy Statement which are specifically incorporated by reference are deemed filed as part of this report on Form 10-K.

**LEXINGTON PRECISION CORPORATION**
**Annual Report on Form 10-K**
**Table of Contents**

|         |                                                                                      | **Page** |
|---------|--------------------------------------------------------------------------------------|----------|
| **PART I** |                                                                                   |          |
| Item 1. | Business                                                                              | 1        |
| Item 1A. | Risk Factors                                                                         | 8        |
| Item 2. | Properties                                                                            | 13       |
| Item 3. | Legal Proceedings                                                                     | 13       |
| Item 4. | Submission of Matters to a Vote of Security Holders                                   | 14       |
| **PART II** |                                                                                  |          |
| Item 5. | Market for Our Common Stock and Other Stockholder Matters                             | 15       |
| Item 6. | Selected Financial Data                                                               | 16       |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19       |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk                           | 41       |
| Item 8. | Financial Statements and Supplementary Data                                           | 42       |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 76       |
| Item 9A(T). | Controls and Procedures                                                           | 76       |
| Item 9B. | Other Information                                                                    | 78       |
| **PART III** |                                                                                 |          |
| Item 10. | Directors, Executive Officers, and Corporate Governance of the Registrant            | 79       |

| Item 11. | Executive Compensation | 79 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 79 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 79 |
| Item 14. | Principal Accountant Fees and Services | 79 |

**PART IV**

| Item 15. | Exhibits and Financial Statement Schedules | 80 |

i

# PART I

## Item 1. BUSINESS

Our company was incorporated in Delaware in 1966. Substantially all of our business is conducted in the continental United States. Through our two operating segments, the Rubber Group and the Metals Group, we manufacture rubber and metal components that are sold to other manufacturers.

In 2008, net sales of the Rubber Group totaled $62,278,000, or 85.3% of our consolidated net sales. The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

In 2008, net sales of the Metals Group totaled $10,751,000, or 14.7% of our consolidated net sales. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

The following table summarizes net sales of the Rubber Group and the Metals Group during 2008, 2007, and 2006 by the type of product in which each segment's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| | 2008 | | 2007 | | 2006 | |
| --- | ---: | ---: | ---: | ---: | ---: | ---: |
| **Rubber Group:** | | | | | | |
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical devices | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |
| **Metals Group:** | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Automotive — OEM | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

Financial data for our operating segments can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, under the section titled "Results of Operations – Comparison of 2008, 2007, and 2006," and in Note 10, "Segments," in the notes to our consolidated financial statements in Part II, Item 8.

- 1 -

**Filing of Chapter 11**

During the second half of 2006, we experienced a significant decrease in sales of automotive components for new cars and trucks. We believe that this reduction was primarily a result of production cutbacks by the Detroit-based automakers and resultant production cutbacks and inventory adjustments by our customers who supply the automobile manufacturers. Although we reduced expenses in an effort to offset the impact of the lower sales, our operating profit and cash flow during the second half of 2006 were adversely affected, as was the availability under our revolving line of credit. As a result, we were unable to continue to make payments on our subordinated debt.

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At December 31, 2008, accrued interest on our Senior Subordinated Notes totaled $13,055,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a

number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own a majority of our Senior Subordinated Notes to advise them of the following:

1.    We had decided to pursue the proposal to purchase the Rock Hill facility;

- 2 -

2.    We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.    We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.    In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.    We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default of our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the

Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). In connection with this petition, we obtained a financing package that we believed provided us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The arrangement with the senior, secured lenders provided for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in

- 3 -

Vienna, OH. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We believe that the effectuation of this plan will significantly enhance our ability to obtain the financing we need to exit chapter 11. In order to allow us sufficient time in which to complete the operational restructuring of our connector-seal business, including the closing of the Vienna facility and the relocation of the connector-seal business to our other rubber molding facilities, on January 13, 2009, we filed a motion requesting that the Bankruptcy Court extend the time during which we have the exclusive right to file a plan of reorganization and our right to use cash collateral. Subsequent to a hearing held on our motion on February 23 and 24, 2009, the Bankruptcy Court extended our exclusive right to file a plan of reorganization until April 30, 2009, extended our exclusive right to solicit acceptances of such plan until June 1, 2009, and extended our right to use cash collateral to May 22, 2009. In addition, by mutual agreement, the maturity date of the debtor-in-possession loan was extended from April 1, 2009, to December 31, 2009. For more information on the restructuring of our connector-seal business, please refer to the discussion of the Rubber Group in the section titled "Results of Operations — Comparison of 2008, 2007, and 2006" in this Part II, Item 7.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

- 4 -

We cannot assure you that the Amended Plan will be confirmed. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**Major Customers**

Our largest customer is General Cable Corporation. During 2008, 2007, and 2006, net sales to General Cable totaled $10,897,000, $9,436,000, and $9,557,000, which represented 14.9%, 10.7%, and 10.9%, respectively, of our consolidated net sales and 17.5%, 12.7%, and 12.6%, respectively, of the Rubber Group's net sales. During 2008, 2007, and 2006, net sales to Delphi Corporation totaled $5,587,000, $8,505,000, and

$10,719,000, which represented 7.7%, 9.6%, and 12.2%, respectively, of our consolidated net sales. During 2008, 2007, and 2006, the Rubber Group's net sales to Delphi totaled $4,603,000, $7,381,000, and $10,719,000, which represented 7.4%, 9.9%, and 14.1%, respectively, of the Rubber Group's net sales. During 2008 and 2007, the Metals Group's net sales to Delphi totaled $984,000 and $1,124,000, respectively, which represented 9.2% and 8.1% respectively, of the Metals Group's net sales. The majority of the products we sell to Delphi are covered by a supply contract that expires on December 31, 2009. No other customer accounted for more than 10% of our consolidated net sales during 2008, 2007, or 2006. Generally, loss of a significant amount of business from any of our large customers could have a material adverse effect on our results of operations and financial condition if that business were not replaced by additional business from existing or new customers. We believe that our reserve for uncollectible accounts receivable is adequate; however, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay or fail to make payments for goods sold to them.

## Marketing and Sales

Our marketing and sales effort is carried out by management personnel and account managers.

## Raw Materials

Our principal raw materials are silicone and organic rubber compounds and aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. We generally have had access to adequate amounts of each of our principal raw materials from a number of suppliers. During 2008, 2007, and 2006 price increases and decreases for our principal raw materials did not have a significant effect on our operating results.

- 5 -

We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

We have not experienced any disruption in our production as a result of raw material shortages.

## Patents and Trademarks

We do not currently hold any patents, trademarks, or licenses that we consider to be material to the successful operation of our business.

## Seasonal Variations

Our business generally is not subject to significant seasonal variation; however, we generally experience decreased sales during the third calendar quarter of each year due to shutdowns of our customers' plants in July as a result of vacations and model-year changeovers and during the fourth calendar quarter of each year due to shutdowns of our customers' plants for vacations and holidays in December.

## Backlog

Sales of our products are made pursuant to a variety of arrangements and practices. Our customers regularly revise release schedules to correspond to their own production requirements. We believe that the aggregate value of scheduled releases outstanding on our books at any time cannot be considered firm backlog because those releases may be revised at any time. We also believe that increases or decreases in the aggregate value of scheduled releases are not necessarily indicative of any trend in our net sales.

## Competition

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

## Research and Development

During 2008, 2007, and 2006, we spent approximately $661,000, $915,000, and $1,093,000, respectively, on our research and development activities, which are primarily related to improving our manufacturing processes in order to reduce the cost and increase the quality of our products.

## Environmental Compliance

Our operations are subject to numerous laws and regulations controlling the discharge of materials into the environment or otherwise relating to the protection of the environment. Although we make expenditures relating to the protection of the environment, compliance with environmental laws and regulations has not had a significant impact on our capital spending requirements, earnings, or

- 6 -

competitive position. We cannot assure you that changes in environmental laws and regulations, or in the interpretation or enforcement of those laws and regulations, will not require material expenditures in the future.

## Employees

We believe that our employee relations are generally good. The following table shows the number of employees at December 31, 2008, 2007, and 2006.

|  | December 31 | | |
| --- | --- | --- | --- |
|  | 2008 | 2007 | 2006 |

| | | | |
|---|---|---|---|
| Rubber Group | 408 | 538 | 594 |
| Metals Group | 68 | 121 | 104 |
| Corporate Office | 6 | 7 | 8 |
| | 482 | 666 | 706 |

At December 31, 2008, 2007, and 2006, employees at the Rubber Group included 151, 224, and 277 hourly workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2009, and March 11, 2009. We have commenced the process of terminating all operations at the manufacturing facility subject to the agreement that expired on March 11, 2009, and we anticipate that we will complete the closing of this facility, which as of December 31, 2008, had 54 hourly workers, during the second quarter of 2009. For more information on the shutdown of this manufacturing facility please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 and to Note 16, "Subsequent Event," in the notes to our consolidated financial statements in Part II, Item 8.

**Discontinued Operations**

During 2005, we sold or liquidated all of the assets of our diecasting business except its land and buildings. In this Form 10-K, the diecasting business is reported as discontinued operations. For more information about the closing of the die casting business, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and to Note 14, "Discontinued Operations," in the notes to our consolidated financial statements in Part II, Item 8. Unless otherwise indicated, the data set forth in this Form 10-K relate solely to our continuing operations.

**Filings with the Securities and Exchange Commission**

We do not make available through a website our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, or any amendments to those reports. We will furnish free of charge, upon written request to our President at 800 Third Avenue, 15th Floor, New York, NY 10022, a paper copy of the reports that we file with the Securities and Exchange Commission. The reports have been filed electronically with the Commission and are accessible on the Commission's website at www.sec.gov.

- 7 -

**Item 1A. RISK FACTORS**

**We are subject to risks associated with bankruptcy proceedings.**

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result

in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. This would substantially dilute the ownership percentage of the holders of our currently outstanding common stock. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial condition.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to reorganize the Company is subject to risks and uncertainties. The consolidated financial statements do not

- 8 -

include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**We are dependent on a few major customers.**

In 2008, the three largest customers of the Rubber Group accounted for 36.9% of the Rubber Group's net sales, and the three largest customers of the Metals Group accounted for 48.3% of the Metals Group's net sales. Generally, loss of a significant amount of business from any of our large customers would have a material adverse effect on our results of operations and financial condition if such business were not substantially replaced by additional business from existing or new customers. Additionally, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay, or fail to make, payments for goods sold to them.

**We are dependent on the automotive original equipment industry.**

Net sales to customers that supply systems to manufacturers of new cars and trucks represented 36.7%, 48.5%, and 50.8% of our consolidated net sales in 2008, 2007, and 2006, respectively. Sales to these customers are in part tied to the rate of sales of new vehicles. The unexpected, sharp decline in the sales of new cars and trucks that started during the second half of 2008 and the first quarter of 2009 has adversely affected our results of operations and financial condition. To mitigate the impact of the sharp decline in new car and truck sales, during the first quarter of 2009, we decided to close our connector-seal manufacturing facility, in Vienna, Ohio, because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future. We are transferring the production of connector seals to our other rubber molding facilities. We currently anticipate that the restructuring of our connector-seal business will be substantially completed by June 30, 2009, and that the cost to restructure the connector-seal business will be approximately $1,082,000, which we expect to incur during the second and third quarters of 2009. Compared to 2008, we currently project that the restructuring of our connector-seal business will increase the EBITDA of our connector-seal business by approximately $2,500,000 in 2010.

**We encounter significant competition.**

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

**A lack of effective internal control over financial reporting may result in an inability to accurately report our financial results.**

In connection with management's evaluation of our internal control over financial reporting, management identified significant deficiencies that, in the aggregate, constitute a material weakness. Our management concluded that we have incomplete documentation of the internal control system, we lack a procedure for documenting certain internal control activities, interdivisional internal control duties are not completely segregated, and we have been unable to test the operational effectiveness of our internal control over financial reporting. A failure to implement and maintain effective internal control over financial reporting could result in a material misstatement of our financial statements or otherwise cause

- 9 -

us to fail to meet our financial reporting obligations. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**We may not be able to remediate the material weakness in our internal control over financial reporting.**

Although its is our intention to remediate the material weakness in our internal control over financial reporting, on April 1, 2008, we filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy filing and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate these weaknesses prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the weaknesses prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**Part of our labor force is unionized.**

At December 31, 2008, employees at the Rubber Group included 151 workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2009, and March 11, 2009. We have commenced the process of terminating all operations at the manufacturing facility subject to the agreement that expired on March 11, 2009, and we anticipate that we will complete the closing of this facility, which as of December 31, 2008, had 54 hourly workers, during the second quarter of 2009. For more information on the shutdown of this manufacturing facility please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 and to Note 16, "Subsequent Event," in the notes to our consolidated financial statements in Part II, Item 8. We cannot assure you that our remaining union contract will be successfully renegotiated when it expires. Negotiations have not commenced regarding the extension of this agreement. If we were to experience a strike or work slowdown, it could have a material adverse effect on our results of operations and financial condition.

**Our customers may be subject to labor interruptions.**

Many of our customers and the three Detroit-based automobile manufacturers have union contracts with various unions. Protracted strikes or work slowdowns at our customers or at any of the Detroit-based automobile manufacturers could have a material adverse effect on our results of operations and financial condition.

**We are vulnerable to fluctuations in the cost and supply of raw materials.**

We purchase raw materials from various suppliers. While all of our raw materials are available from a number of suppliers, commodity raw materials are subject to fluctuations in price. Because raw materials in the aggregate constitute approximately 37% of our cost of goods sold, upward movement of raw material prices could have a material adverse effect on our results of operations. We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

- 10 -

We have not experienced any disruption in our production as a result of raw material shortages, but, if any such shortage were to occur, it could have a material adverse effect on our results of operations and financial condition.

**We are subject to numerous environmental laws and regulations.**

Our past and present business operations and our ownership and operation of real property are subject to extensive and changing environmental laws and regulations pertaining to the discharge of materials into the environment, the handling and disposal of wastes, including hazardous wastes, and the protection of the environment. Some of our existing and former locations use and have used substances and generate or have generated or disposed of wastes that are or may be considered hazardous or otherwise are subject to applicable environmental requirements. In addition, we utilize storage tanks and bulk containers for petrochemicals and other substances at our facilities. Based on our experience to date, we do not expect environmental claims or the costs of compliance with federal, state, and local, environmental laws and regulations to have a material impact on our capital expenditures, operating results, or financial condition. We cannot assure you, however, that the discovery of presently unknown environmental conditions, changes in environmental laws and regulations or their interpretation, or other unanticipated events will not give rise to expenditures or liabilities that may have a material adverse effect on our results of operations and financial condition.

**We may be subject to product liability claims and litigation.**

Our business exposes us to potential product liability. Many of the components manufactured and sold by us are designed to be used for long periods of time. Component failures, manufacturing flaws, design defects, or inadequate disclosure of product-related risks with respect to our components or the products in which they are incorporated could result in product failure or an unsafe condition or injury to, or death of, consumers. The occurrence of such a problem could result in product liability claims or a recall of, or safety alert relating to, our components or the products in which they are incorporated. We cannot assure you that the product liability insurance maintained by us would be available or sufficient to satisfy all claims against us or that we will be able to obtain insurance in the future at satisfactory rates, in adequate amounts, or at all. Future product liability claims, regardless of their ultimate outcome, or product recalls could result in costly litigation and could have a material adverse effect on our results of operations and financial condition and could damage our reputation and limit our ability to attract and retain customers. Mitigating our risk is the fact that most of the components we manufacture are designed by our customers and are integrated into systems that were designed by our customers or their customers. For this reason we believe that the risk of a product liability claim against us is reduced.

**Self-insurance may subject us to possible liability that may be partially or completely uninsured.**

We maintain insurance coverage for many aspects of our business and operations. Based on our evaluation of the various risks to which we may be exposed, we retain all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although we cannot assure you that we will be successful in our efforts, we attempt to limit our liability through, among other things, the ongoing training and education of our employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of our workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of contracts with our customers. However, we cannot assure you that we will be successful in our efforts to limit our liability.

- 11 -

**We are subject to interest rate changes**.

At December 31, 2008, we had a total of $38,175,000 of outstanding floating-rate debt at interest rates tied to either the London Interbank Offered Rate ("LIBOR") or the prime rate. Currently, we do not purchase derivative financial instruments to hedge or reduce our interest rate risk. As a result, changes in either LIBOR or the prime rate affect the rates at which we borrow funds.

**A change of control could result in a limitation on the use of our net operating loss carryforward.**

At December 31, 2008, our unused federal net operating loss carryforward totaled approximately $36,306,000. Under Section 382 of the Internal Revenue Code of 1986, as amended, if we undergo an "ownership change" the amount of our pre-change operating losses that may be utilized to offset future taxable income will be subject to an annual limitation. An ownership change occurs if the percentage of stock of the Company that is owned by certain groups of less than 5% shareholders, all treated as a single shareholder for this purpose, increases by more than 50 percentage points over a three-year period. Based on the value of the Company's common stock being $4.46 per share, as described in the Disclosure Statement filed with Bankruptcy Court on December 8, 2008, we anticipate that the issuance of the Series C Preferred Stock and common stock pursuant to the plan of reorganization that we filed with the Bankruptcy Court on December 8, 2008, if not further amended, would constitute an "ownership change." Assuming that we are in chapter 11 on the day that an ownership change occurs, the limitation imposed by Section 382 is generally equal to the product of (i) the fair market value of our stock immediately after the ownership change multiplied by (ii) the federal "long-term tax-exempt rate" in effect on the date of the ownership change. The annual limitation may be increased in the event that we have overall "built-in" gains in our assets at the time of the ownership change.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 12 -

**Item 2. PROPERTIES**

The following table shows the locations and square footage of our manufacturing facilities at December 31, 2008:

| | Square Feet |
|---|---|

Rubber Group:

| | |
|---|---|
| Jasper, Georgia | 100,000 |
| North Canton, Ohio | 42,000 |
| Vienna, Ohio | 64,000 |
| Rock Hill, South Carolina | 61,000 |
| Total Rubber Group | 267,000 |
| | |
| Metals Group: | |
| Rochester, New York | 60,000 |
| Total Company | 327,000 |

All of our plants are general manufacturing facilities suitable for our operations. We believe that our facilities are adequate to meet our current operating needs. All of our manufacturing facilities are owned by us, and all are encumbered by mortgages.

We occupy, in the aggregate, 4,000 square feet of office space for corporate executive and administrative purposes. We lease an office in Cleveland, Ohio, and reimburse an affiliate for the cost of leasing an office in New York City.

The manufacturing facility that was utilized by our discontinued diecasting business is located in Lakewood, New York, has 93,000 square feet of space, and is available for sale. The facility is currently leased to a third party for $159,000 per annum. The lessee has an option to purchase the facility for $1,590,000. We also own a 10,000 square foot building in Lakewood, New York, that is vacant and available for sale.

We own approximately 18 acres of land bordering State Route 515 in Ellijay, Georgia. This land, which was acquired as a potential plant site, has recently been graded and is available for sale. The property has a book value of $1,309,000 as of December 31, 2008, and an appraised value of $4,550,000 as of June 10, 2008. Additionally, we own six abutting residential lots, comprising approximately 7 acres.

During the first quarter of 2009, we decided to close our connector-seal manufacturing facility in Vienna, Ohio, because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future. We are transferring the production of connector seals to our other rubber molding facilities. We anticipate ceasing operations in that facility by June 30, 2009.

## Item 3. LEGAL PROCEEDINGS

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). We continue to operate our businesses and manage our properties as debtors in

- 13 -

possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, we obtained a financing package that we believed provides us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently

extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, between us, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC, as lenders. Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company, is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The arrangement with the senior, secured lenders provides for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. The arrangements for the use of cash collateral and the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

In addition, we are subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of our business activities. It is our policy to record accruals for claims and legal proceedings when we consider a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although we cannot assure you as to the outcome of existing or potential litigation, we currently believe, based upon the information available to us, that the outcome of those actions will not have a material adverse effect upon our results of operations or financial condition.

## Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

We did not submit any matters to a vote of security holders during the fourth quarter of 2008.

- 14 -

## PART II

## Item 5. MARKET FOR OUR COMMON STOCK AND OTHER STOCKHOLDER MATTERS

Our common stock is traded in the over-the-counter market through the Pink Sheets. At March 17, 2009, there were approximately 570 holders of record of our common stock. Trading in shares of our common stock is limited. The following table sets forth prices at which transactions in our common stock were reported on the Pink sheets. Additional trading data can be found at the Pink OTC Markets, Inc. website, www.pinksheets.com.

| | Years Ended December 31 | | | |
| | 2008 | | 2007 | |
| | High | Low | High | Low |
|---|---|---|---|---|
| First quarter | $0.55 | $0.25 | $0.41 | $0.10 |
| Second quarter | $0.75 | $0.25 | $0.70 | $0.13 |
| Third quarter | $1.01 | $0.75 | $0.80 | $0.60 |
| Fourth quarter | $1.01 | $0.15 | $0.70 | $0.25 |

These prices reflect inter-dealer prices and may not necessarily represent actual transactions. We are not able to determine whether retail markups, markdowns, or commissions were included in the above prices. We believe that eight brokerage firms currently make a market in our common stock, although both bid and asked quotations may be limited.

We have not paid dividends on our common stock since 1979, and we have no current plans to reinstate the payment of dividends. In addition, agreements defining the rights of the holders of our debt currently restrict us from paying cash dividends on our common stock. At December 31, 2008, we were in arrears in the payment of nine quarterly dividends in the aggregate amount of $59,400 on our $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), and we are in arrears with respect to the redemption of all of the outstanding Series B Preferred Stock for an aggregate redemption price of $660,000, representing the scheduled redemptions for 2000 through 2007.

For information on "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters," please refer to Part III, Item 12.

## Equity Compensation Plan Information

The following table sets forth information about our equity compensation plans at December 31, 2008 (share amounts in thousands):

| | Shares of common stock to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Shares of common stock remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans: | | | |
| Approved by security holders | — | $    NA | 310 |
| Not approved by security holders | — | NA | — |
| Total | — | $    NA | 310 |

- 15 -

## Item 6. SELECTED FINANCIAL DATA

The following table sets forth selected consolidated financial data, including the reconciliation of income or loss from continuing operations to earnings from continuing operations before interest, taxes, depreciation, amortization, and other non-operating items of income or expense ("EBITDA") and the reconciliation of EBITDA to net cash provided by our operating activities, for each of the years in the five-year period ended December 31, 2008 (dollar amounts in thousands, except per share amounts). The term EBITDA, as used by us, does not include reorganization items, which are reflected as other expense in the consolidated statements of operations. The financial data has been derived from our consolidated financial statements, which have been audited by Malin, Bergquist & Company, LLP (2007 and 2008) and Ernst & Young LLP (2004 through 2006), independent registered public accounting firms. This information is not necessarily indicative of the results of future operations and should be read in conjunction with, and is qualified by, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and our consolidated financial statements in Part II, Item 8.

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| **Summary of operations:** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Net sales | $ 73,029 | $ 88,408 | $ 87,901 | $96,842 | $110,353 |
| Cost of sales | 63,107 | 76,529 | 77,159 | 87,369 | 98,304 |
| Gross profit | 9,922 | 11,879 | 10,742 | 9,473 | 12,049 |
| Selling and administrative expenses (1) | 6,685(2) | 7,204 | 6,658 | 6,747 | 7,383 |
| Gain on sale of assets held for sale | — | — | — | (1,671) | — |
| Income from operations | 3,237 | 4,675 | 4,084 | 4,397 | 4,666 |
| Other income (expense): | | | | | |
| Interest expense (3) | (8,726)(4) | (11,339)(5) | (10,943) | (9,200) | (8,662) |
| Reorganization items, net | (4,540) | — | — | — | — |
| Gain on repurchase of debt | — | — | — | 77 | 8,598 |
| Income (loss) from continuing operations before income tax | (10,029) | (6,664) | (6,859) | (4,726) | 4,602 |
| Income tax provision (benefit) | 35 | 6 | 18 | (299) | (196) |
| Income (loss) from continuing operations | (10,064) | (6,670) | (6,877) | (4,427) | 4,798 |
| Income (loss) from discontinued operations | (229) | (289) | (472) | 644 | (3,208) |
| Net income (loss) | $(10,293) | $ (6,959) | $ (7,349) | $(3,783) | $ 1,590 |
| Net income (loss) per diluted common share | $ (2.07) | $ (1.41) | $ (1.49) | $ (0.77) | $ 0.32 |

*(continued on next page)*

- 16 -

*(continued from prior page)*

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| **Other data (continuing operations):** | | | | | |
| Reconciliation of income (loss) from continuing operations to EBITDA from continuing Operations (6): | | | | | |
| Income (loss) from continuing operations | $(10,064) | $ (6,670) | $ (6,877) | $ (4,427) | $ 4,798 |
| Adjustments: | | | | | |
| Depreciation and amortization included in income from continuing operations | 5,333 | 6,437 | 7,295 | 8,374 | 8,444 |

| | | | | | |
|---|---|---|---|---|---|
| Gain on repurchase of debt | — | — | — | (77) | (8,598) |
| Interest expense | 8,726 | 11,339 | 10,943 | 9,200 | 8,662 |
| Reorganization items, net | 4,540 | — | — | — | — |
| Income tax provision (benefit) | 35 | 6 | 18 | (299) | (196) |
| EBITDA from continuing operations (6) | 8,570 | 11,112 | 11,379 | 12,771 | 13,110 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities (6): | | | | | |
| Interest expense | (8,726) | (11,339) | (10,943) | (9,200) | (8,662) |
| Reorganization items, net | (4,540) | — | — | — | — |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 1,249 | 3,078 | 1,315 | 1,098 |
| Income tax benefit (provision) | (35) | (6) | (18) | 299 | 196 |
| Gain on sale of assets held for sale | — | — | — | (1,671) | — |
| Net change in accrued reorganization items, net | 1,168 | | | | |
| Net change in operating assets and liabilities | 7,432 | 4,420 | (940) | 3,628 | 1,326 |
| Net cash provided by operating activities | $ 4,120 | $ 5,436 | $ 2,556 | $ 7,142 | $ 7,068 |
| Net cash provided (used) by investing activities | $ (2,847) | $ (2,741) | $ (2,628) | $ 683 | $(6,085) |
| Net cash provided (used) by financing activities | $ 4,093 | $ (2,333) | $ 621 | $(11,212) | $ (580) |
| Capital expenditures (7) | $ 2,695 | $ 2,664 | $ 2,661 | $ 3,330 | $ 6,057 |

| | December 31 | | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| **Financial position** (8): | | | | | |
| Current assets | $ 25,402 | $ 21,877 | $ 20,222 | $ 22,396 | $ 28,907 |
| Current liabilities and liabilities subject to compromise | 99,324 | 87,771 | 82,211 | 41,092 | 35,777 |
| Net working capital deficit | $(73,922) | $(65,894) | $(61,989) | $(18,696) | $ (6,870) |
| Total assets | $ 53,328 | $ 52,367 | $ 54,440 | $ 62,343 | $ 78,377 |
| Long-term debt, excluding current portion | $ — | $ 5 | $ 406 | $ 41,545 | $ 58,949 |
| Total stockholders' deficit | $(46,396) | $(35,941) | $(28,991) | $(21,656) | $(17,875) |

*(footnotes on next page)*

- 17 -

---

*(footnotes for the table on prior pages)*

(1)  Selling and administrative expenses for 2008 and 2007 included $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to refinance or restructure our indebtedness.

(2)  Selling and administrative expenses for 2008 included $488,000 of one-time fees and expenses related to the

services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

(3)  Included the amortization and write-off of deferred financing expenses of $251,000, $1,249,000, $3,078,000, $1,315,000, and $1,098,000, in 2008, 2007, 2006, 2005, and 2004, respectively.

(4)  Interest expense for 2008 included $172,000 of default interest premium on our senior, secured debt, $1,455,000 of interest on missed interest payments and forbearance interest premium on the Senior Subordinated Notes, $296,000 of interest on the debtor-in-possession loan, and $251,000 of amortization of financing costs.

(5)  Interest expense for 2007 included $698,000 of default interest premium on our senior, secured debt, $1,279,000 of forbearance interest expense on the Senior Subordinated Notes, and $390,000 of interest on the interest payments that we failed to make on the Senior Subordinated Notes in 2006 and 2007.

(6)  EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. For more information on the use of EBITDA as a financial measure, please refer to our discussion of EBITDA in "Results of Operations – Comparison of 2008, 2007, and 2006" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7.

(7)  Included $28,000 of equipment purchased under capital leases in 2007. Included $157,000 of equipment acquired with seller-provided financing in 2006.

(8)  Data includes assets and liabilities of discontinued operations.

- 18 -

Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
                OPERATIONS

**Overview**

Some of our statements in this Form 10-K are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approvals with respect to motions in the chapter 11 proceedings;

- our ability to obtain financing that will permit us to exit chapter 11;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- our ability to offset any increases in the cost of raw materials;

- increases and decreases in the production of cars and trucks in North America;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- decreased access to the credit markets by our customers or suppliers;

- chapter 11 filings by one or more of our customers or suppliers;

- a chapter 11 filing by any of the Detroit-based automobile manufacturers; and

- labor interruptions at our facilities or at our customers' or suppliers' facilities.

- 19 -

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part I, Item 1A.

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

Unless otherwise indicated, the data set forth below in this Part II, Item 7, relate solely to our continuing operations.

## Results of Operations — Comparison of 2008, 2007, and 2006

The following table sets forth (in thousands of dollars) our consolidated operating results for 2008, 2007, and 2006, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. The term EBITDA, as used by us, does not include reorganization items, which are reflected as "other expense" in the consolidated statements of operations. EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP"). We have presented EBITDA here and elsewhere in this Form 10-K for the following reasons:

1. Investors and lenders frequently look at EBITDA when evaluating a company's ability to satisfy interest and principal obligations with respect to its outstanding indebtedness;

2. Management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items; and

3. Certain financial covenants in our senior, secured credit agreements have been calculated using variations of EBITDA.

EBITDA has material limitations when used as a measurement of performance, including the following:

1. EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2. EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3. EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up,

- 20 -

over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

4. EBITDA does not reflect reorganization items, which, pursuant to American Institute of Certified

Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," ("SOP 90-7"), represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to us, either currently or in the future.

5.    EBITDA does not reflect cash provided or used as a result of changes in our working capital.

6.    Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements that governed our senior, secured credit facility prior to our filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code on April 1, 2008.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP when analyzing our financial performance. EBITDA should not be considered to be a substitute for the following GAAP measures: gross profit, income from operations, net income, or net cash provided from operating activities.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 21 -

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | | **2007** | | **2006** | |
| Net sales | $ 73,029 | 100.0% | $ 88,408 | 100.0% | $ 87,901 | 100.0% |
| Cost of sales | 63,107 | 86.4 | 76,529 | 86.6 | 77,159 | 87.8 |
| Gross profit | 9,922 | 13.6 | 11,879 | 13.4 | 10,742 | 12.2 |
| Selling and administrative expenses (1) (2) | 6,685 | 9.2 | 7,204 | 8.1 | 6,658 | 7.6 |
| Income from operations | 3,237 | 4.4 | 4,675 | 5.3 | 4,084 | 4.6 |
| Other expense: | | | | | | |
| Interest expense | (8,726) | (11.9) | (11,339) | (12.8) | (10,943) | (12.4) |
| Reorganization items, net | (4,540) | (6.2) | — | — | — | — |
| Loss before income taxes | (10,029) | (13.7) | (6,664) | (7.5) | (6,859) | (7.8) |
| Income tax provision | 35 | 0.1 | 6 | — | 18 | — |
| Loss from continuing operations | (10,064) | (13.8) | (6,670) | (7.5) | (6,877) | (7.8) |
| Add back: | | | | | | |
| Depreciation and amortization (3) | 5,333 | 7.3 | 6,437 | 7.3 | 7,295 | 8.3 |
| Interest expense | 8,726 | 11.9 | 11,339 | 12.8 | 10,943 | 12.4 |

FORM 10-K                      Page 25 of 90
08-11153-scc    Doc 870    Filed 04/19/10    Entered 04/19/10 23:35:13    Main Document
Pg 145 of 318

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Reorganization items, net | 4,540 | 6.2 | — | | — | |
| Income tax provision | 35 | 0.1 | 6 | — | 18 | — |
| EBITDA | 8,570 | 11.7 | 11,112 | 12.6 | 11,379 | 12.9 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities: | | | | | | |
| Interest expense | (8,726) | (11.9) | (11,339) | (12.8) | (10,943) | (12.4) |
| Reorganization items, net | (4,540) | (6.2) | — | | — | |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 0.3 | 1,249 | 1.4 | 3,078 | 3.5 |
| Income tax provision | (35) | (0.1) | (6) | — | (18) | — |
| Change in accrued reorganization items, net | 1,168 | 1.6 | — | | — | |
| Change in operating assets and liabilities | 7,432 | 10.2 | 4,420 | 5.0 | (940) | (1.1) |
| Net cash provided by operating activities | $ 4,120 | 5.6% | $ 5,436 | 6.2% | $ 2,556 | 2.9% |
| Net cash used by investing activities | $ (2,847) | (3.9)% | $ (2,741) | (3.1)% | $ (2,628) | 3.0% |
| Net cash provided (used) by financing activities | $ 4,093 | 5.6% | $ (2,333) | (2.6)% | $ 621 | 0.7% |

(1) During 2008, prior to our filing of chapter 11 on April 1, 2008, and during 2007, we incurred $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness.

- 22 -

(2) Selling and administrative expenses for 2008 includes $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

(3) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, in 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive — OEM | $26,770 | 36.7% | $42,850 | 48.5% | $44,626 | 50.8% |
| Automotive — aftermarket | 26,569 | 36.4 | 25,786 | 29.2 | 27,906 | 31.7 |
| Medical | 16,300 | 22.3 | 15,928 | 18.0 | 11,039 | 12.6 |
| Industrial and residential equipment and devices | 2,486 | 3.4 | 2,836 | 3.2 | 3,168 | 3.6 |

| Other | 904 | 1.2 | 1,008 | 1.1 | 1,162 | 1.3 |
| Total net sales | $73,029 | 100.0% | $88,408 | 100.0% | $87,901 | 100.0% |

Our net sales for 2008 declined by $15,379,000, or 17.4%, compared to 2007. The decrease in net sales was primarily the result of a 37.5% decrease in net sales of automotive components used by original equipment manufacturers (OEMs), primarily connector seals used in automotive wiring systems, offset, in part, by increased net sales of automotive aftermarket components and components for medical devices.

EBITDA for 2008 was $8,570,000, or 11.7% of net sales, compared to EBITDA of $11,112,000, or 12.6% of net sales, for 2007. The change in EBITDA reflected a $2,260,000 decrease in EBITDA at the Rubber Group, a $695,000 decrease in EBITDA at the Metals Group, and a $413,000 increase in EBITDA at the Corporate Office. Excluding the $508,000 of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness during 2008, prior to our filing of chapter 11, and the $488,000 of one-time fees incurred to upgrade operating systems at our manufacturing facility in Rock Hill, South Carolina, EBITDA was $9,566,000, or 13.1% of net sales. Excluding the $698,000 of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness during 2007, EBITDA was $11,810,000, or 13.4% of net sales.

Net cash provided by our operating activities during 2008 totaled $4,120,000, compared to net cash provided by operating activities of $5,436,000 for 2007.

Our net sales for 2007 increased by $507,000, or 0.6%, compared to 2006. The increase in net sales was principally a result of increased unit sales of metal components and of rubber components used in medical devices, offset, by a decrease in net sales of automotive components used by OEMs, primarily connector seals used in automotive wiring systems.

EBITDA for 2007 was $11,112,000, or 12.6% of net sales, compared to EBITDA of $11,379,000, or 12.9% of net sales, for 2006. The change in EBITDA reflected a $915,000 increase in EBITDA at the

- 23 -

Metals Group, a $395,000 decrease in EBITDA at the Rubber Group, and a $787,000 decrease in EBITDA at the Corporate Office.

Net cash provided by our operating activities during 2007 totaled $5,436,000, compared to net cash provided by operating activities of $2,556,000 for 2006. For more information about the net cash provided by our operating activities, please refer to the consolidated statements of cash flows in Part II, Item 8, and to the section titled "Operating Activities" in this Part II, Item 7.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for 2008, 2007, and 2006.

### *Rubber Group*

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

The following table sets forth the operating results of the Rubber Group for 2008, 2007, and 2006 and the

reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| Net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |
| Cost of sales | 52,173 | 83.8 | 63,039 | 84.5 | 64,772 | 85.1 |
| Gross profit | 10,105 | 16.2 | 11,548 | 15.5 | 11,318 | 14.9 |
| Selling and administrative expenses (1) | 3,409 | 5.5 | 3,573 | 4.8 | 3,676 | 4.9 |
| Income from operations | 6,696 | 10.8 | 7,975 | 10.7 | 7,642 | 10.0 |
| Add back: depreciation and amortization | 4,746 | 7.6 | 5,727 | 7.7 | 6,455 | 8.5 |
| EBITDA | $11,442 | 18.4% | $13,702 | 18.4% | $14,097 | 18.5% |

(1) Selling and administrative expenses for 2008 includes $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

- 24 -

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |

During 2008, net sales of the Rubber Group decreased by $12,309,000, or 16.5%, compared to 2007. During 2008, net sales of aftermarket automotive components increased by $783,000, or 3.0%, to $26,569,000, and net sales of components for use in medical devices increased by $372,000, or 2.3%, to $16,300,000. These increases were offset by a reduction in net sales of components for use in automotive OEM applications by $13,249,000, or 42.4%, to $18,006,000. This reduction was primarily caused by production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during 2008. The three largest customers of the Rubber Group accounted for 36.9%, 30.5%, and 36.5%, of the Rubber Group's net sales during 2008, 2007, and 2006, respectively.

Cost of sales as a percentage of net sales decreased to 83.8% of net sales during 2008, compared to 84.5% of net sales during 2007, primarily due to improved labor efficiencies, lower employee benefit expenses, improved product mix, and lower depreciation and amortization expenses offset, in part, by the underabsorption of fixed or partially fixed costs during a period of reduced sales volume.

Selling and administrative expenses of the Rubber Group decreased by $164,000, or 4.6% during 2008, compared to 2007. During 2008, we incurred $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices. We currently estimate that the annual savings resulting from the project will be approximately $1,250,000. Selling and administrative expenses expressed as a percentage of net sales increased to 5.5% of net sales during 2008, compared to 4.8% during 2007. Excluding the $488,000 of one-time fees and expenses in 2008, selling and administrative expenses expressed as a percentage of net sales was 4.7% of net sales.

During 2008, the Rubber Group's income from operations totaled $6,696,000, a decrease of $1,279,000, or 16.0%, compared to 2007. The Rubber Group's EBITDA for 2008 was $11,442,000, or 18.4% of net sales, compared to $13,702,000, or 18.4% of net sales, for 2007. Excluding the $488,000 of fees and expenses related to the services of the consulting firm that we retained for the project in Rock Hill during 2008, income from operations totaled $7,184,000, or 11.5% of net sales, and EBITDA was $11,930,000, or 19.2% of net sales. The decrease in EBITDA at our Rubber Group during 2008 compared to 2007, resulted from a reduction in net sales to automotive OEM customers.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in Vienna, Ohio. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We currently

- 25 -

anticipate that the shutdown of the Vienna facility will be substantially completed by June 30, 2009, and that the cost to restructure our connector-seal business will be approximately $1,082,000, which we expect to incur during the second and third quarters of 2009. This estimated cost consists of (1) $555,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $422,000 for moving and installation of manufacturing equipment, and (3) $105,000 for start-up expenses. Although we cannot assure you, we currently believe, based on appraised values, that we will sell the Vienna, Ohio, manufacturing facility and certain ancillary manufacturing equipment that we are not planning to move to our other rubber molding facilities, at an amount that, in the aggregate, is in excess of the carrying value of these assets. Compared to 2008, we currently project that the restructuring of the connector-seal business will increase the EBITDA of the connector-seal business by approximately $2,500,000 in 2010.

During 2007, total net sales of the Rubber Group decreased by $1,503,000, or 2.0%, compared to 2006. Net sales to OEM automotive customers decreased by $3,883,000, or 11.1%, to $31,255,000 net sales of aftermarket automotive products decreased by $2,120,000, or 7.6%, to $25,786,000, net sales to medical device manufacturers increased by $4,889,000, or 44.3%, to $15,928,000, and all other net sales decreased by $389,000, or 19.4%, to $1,618,000.

The increase in net sales of medical components was primarily due to the sale of components to a medical device manufacturer that began purchasing production parts from us in January of 2007.

The decrease in net sales to automotive customers was primarily due to decreased unit sales to original equipment manufacturers of connector seals for automotive wire harnesses, components for use in automotive computer control modules, and insulators for automotive ignition-wire sets, which we believe resulted primarily

from production cutbacks by Detroit-based automakers, and decreased unit sales of insulators to manufacturers of aftermarket automotive ignition-wire sets primarily due to the decision of a large customer to reduce their on-hand inventory.

Cost of sales as a percentage of net sales decreased to 84.5% of net sales during 2007, compared to 85.1% of net sales during 2006, primarily due to improved product mix, lower depreciation and amortization expense, and lower employee benefit expenses.

Selling and administrative expenses of the Rubber Group expressed as a percentage of net sales decreased to 4.8% of net sales during 2007, compared to 4.9% during 2006, primarily because of reduced employee wage and benefit expenses.

During 2007, income from operations totaled $7,975,000, an increase of $333,000, or 4.4%, compared to 2006. EBITDA for 2007 was $13,702,000, or 18.4% of net sales, compared to $14,097,000, or 18.5% of net sales, for 2006.

### Metals Group

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

- 26 -

The following table sets forth the operating results of the Metals Group for 2008, 2007, and 2006, and the reconciliation of the Metals Group's loss from operations to its EBITDA (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |
| Cost of sales | 10,934 | 101.7 | 13,490 | 97.6 | 12,387 | 104.9 |
| Gross profit (loss) | (183) | (1.7) | 331 | 2.4 | (576) | (4.9) |
| Selling and administrative expenses | 558 | 5.2 | 523 | 3.8 | 669 | 5.6 |
| Loss from operations | (741) | (6.9) | (192) | (1.4) | (1,245) | (10.5) |
| Add back: depreciation and amortization | 536 | 5.0 | 682 | 4.9 | 820 | 6.9 |
| EBITDA | $ (205) | (1.9)% | $ 490 | 3.5% | $ (425) | (3.6)% |

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive original equipment | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |

| | | | | | |
|---|---|---|---|---|---|
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

During 2008, net sales of the Metals Group decreased by $3,070,000, or 22.2%, compared to 2007, primarily as a result of reduced net sales of components to automotive OEMs, which was primarily a result of production cutbacks by the automobile manufacturers and inventory reductions throughout the supply chain during 2008. The three largest customers of the Metals Group accounted for 48.3%, 55.2%, and 51.2% of the Metals Group's net sales during 2008, 2007, and 2006, respectively.

Cost of sales as a percentage of net sales increased to 101.7% of net sales during 2008 from 97.6% of net sales during 2007, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

Selling and administrative expenses of the Metals Group increased by $35,000, or 6.7%, from 2007 to 2008. Selling and administrative expenses expressed as a percentage of net sales increased to 5.2% of net sales during 2008, compared to 3.8% during 2007, primarily because of the underabsorption of fixed or partially fixed expenses during a period of reduced sales volume.

- 27 -

For 2008, the Metals Group's loss from operations was $741,000, compared to a loss from operations of $192,000 for 2007. The Metals Group's EBITDA for 2008 was negative $205,000, compared to positive $490,000 for 2007.

During 2007, net sales of the Metals Group increased by $2,010,000, or 17%, compared to 2006, primarily as a result of sales to new customers.

Cost of sales as a percentage of net sales decreased to 97.6% during 2007 from 104.9% during 2006, primarily because of (1) improved production efficiencies, (2) improved absorption of fixed or partially fixed manufacturing overhead during a period of increasing net sales, (3) lower depreciation expense, and (4) reduced material costs as a percentage of net sales.

Selling and administrative expenses of the Metals Group decreased from $669,000 during 2006 to $523,000 during 2007, primarily because of a reduction in headcount.

During 2007, the loss from operations was $192,000, compared to a loss from operations of $1,245,000 during 2006. EBITDA for 2007 was positive $490,000, compared to negative $425,000 for 2006.

***Corporate Office***

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for 2008, 2007, and 2006 and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

**Years Ended December 31**

|                                         | 2008       | 2007       | 2006       |
|-----------------------------------------|------------|------------|------------|
| Loss from operations                    | $(2,718)   | $(3,108)   | $(2,313)   |
| Add back: depreciation and amortization (1) | 51     | 28         | 20         |
| EBITDA                                  | $(2,667)   | $(3,080)   | $(2,293)   |

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, in 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

During 2008, Corporate Office expenses decreased to $2,718,000 from $3,108,000 during 2007. During 2008, prior to our filing of chapter 11 on April 1, 2008, and during 2007, Corporate Office expenses included $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness. During the period from April 1, 2008, through December 31, 2008, we incurred $4,540,000 of net expenses in connection with our efforts to refinance, restructure, or repay our indebtedness, which, in accordance with SOP 90-7, were classified as reorganization items in our consolidated statements of operations. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

During 2007, Corporate Office expenses increased by $795,000, compared to 2006, primarily because we incurred expenses of $698,000 in connection with our efforts to refinance, restructure, or repay our senior, secured debt and Senior Subordinated Notes as more fully discussed in the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7. The balance of the increase in cost was primarily due to higher premiums for liability insurance.

### Interest Expense

A breakdown of interest expense for 2008, 2007, and 2006 is set forth below (dollar amounts in thousands):

|                                                             | Years Ended December 31 |          |          |
|-------------------------------------------------------------|-------------------------|----------|----------|
|                                                             | 2008                    | 2007     | 2006     |
| Interest expense at contractual interest rates:             |                         |          |          |
| Senior, secured loans                                       | $2,490                  | $ 3,698  | $ 3,334  |
| Debtor-in-possession loan                                   | 296                     | —        | —        |
| Senior Subordinated Notes                                   | 4,101                   | 4,101    | 4,101    |
| Junior Subordinated Note                                    | 45                      | 45       | 45       |
| All other                                                   | 84                      | 47       | 480      |
|    Subtotal                                  | 7,016                   | 7,891    | 7,960    |
| Interest expense resulting from incremental interest rates: |                         |          |          |
| Senior, secured loans — default or forbearance premium      | 172                     | 698      | 62       |
| Senior Subordinated Notes — forbearance premium             | 411                     | 1,279    | —        |
| Senior Subordinated Notes — interest on missed interest payments | 1,044              | 390      | 21       |
|    Subtotal                                  | 1,627                   | 2,367    | 83       |
| Financing costs and fees                                    | 251                     | 1,249    | 3,078    |
|     Total interest expense              | 8,894                   | 11,507   | 11,121   |

| | | | |
|---|---|---|---|
| Less: Interest expense allocated to discontinued operations | 168 | 168 | 178 |
| Interest expense related to continuing operations | $8,726 | $11,339 | $10,943 |

The average amount of debt outstanding during 2008, 2007, and 2006, including past due interest payments on which we are accruing interest, was $81,395,000, $77,195,000, and $70,585,000, respectively. In 2008, 2007, and 2006, cash interest payments were $3,175,000, $4,431,000, and $6,749,000, respectively. For more information about the status of our senior, secured debt and our Senior Subordinated Notes, please refer to the discussion under the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

On April 2 and 17, 2008, and on March 3, 2009, the Bankruptcy Court entered orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. We continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates because we believe that the company is solvent and our unsecured debt, including accrued interest thereon, will be paid in full. For more

- 29 -

information about the status of our debt, please refer to the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

### Reorganization Items

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the period from April 1, 2008, through December 31, 2008, are set forth below (dollar amounts in thousands):

| | |
|---|---|
| Professional fees and expenses incurred directly by us | $2,239 |
| Professional fees and expenses incurred by creditors | 2,072 |
| Other costs | 346 |
| Interest income | (117) |
| Reorganization items, net | $4,540 |

### Income Tax Provision

The income tax provisions recorded in 2008, 2007, and 2006, consisted of estimated state income taxes. For additional information concerning income taxes and related matters, see Note 9, "Income Taxes," in the notes to our consolidated financial statements in Part II, Item 8.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $168,000, $168,000, and $178,000, for 2008, 2007, and 2006, respectively. During 2007 and 2006, we increased our provision for environmental remediation at the manufacturing facility formerly housing the diecasting business by $87,000 and $255,000, respectively. In March 2007, the State of New

York Department of Environmental Conservation informed us that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

## Liquidity and Capital Resources

### Operating Activities

During 2008, operating activities of our continuing operations provided net cash of $4,120,000. Net accounts receivable decreased by $4,187,000, or 38.1%, during 2008, primarily because (1) our net product sales during November and December of 2008 were less than our net product sales during November and December 2007, (2) the amount of outstanding billings for sales of tools and automation equipment decreased by $307,000, or 44.6%, and (3) our reserve for bad debts increased by $259,000, or 54.4%, during 2008. Inventories increased by $1,267,000, or 13.6%, primarily because of (a) higher metals prices, (b) increased raw material inventory due to an abnormally low level of raw materials at December 31, 2007, (c) a change in the terms of sale to a large customer, which resulted in increased on-hand finished goods inventory (d) the building of components to satisfy the safety stock requirements of certain of our customers as a result of our chapter 11 filing, and (e) an unanticipated sharp decline in net sales during the third and fourth quarters of 2008 that did not allow sufficient time for us to adjust our

- 30 -

finished goods inventory levels to the levels required to support reduced net sales levels. Prepaid expenses and other current assets increased by $1,403,000, or 135.9%, during the year, because (i) we had a receivable from our property insurance carrier in the amount of $634,000 at December 31, 2008, for expenditures that we incurred as a result of a fire that took place at our facility in Rock Hill, South Carolina, in November 2008, and (ii) we had deposits totaling $464,000 with utilities and trade creditors securing delivery of certain services and products. As of the date of filing this Form 10-K, we have received $500,000 from our property insurance carrier and we do not anticipate any problems in recovering the balance of our expenditures in accordance with the terms of the property insurance policy. Accounts payable at December 31, 2008, included $1,168,000 of unpaid billings from attorneys, investment advisors, and other fees and expenses incurred in connection with our chapter 11 filing. Accrued expenses decreased by $550,000 at December 31, 2008, primarily because of a reduction in accruals for employee benefits. Accrued interest expense, including accrued interest expense classified as a liability subject to compromise, increased by $5,468,000, or 68.7%, primarily because of additional accruals of interest on our subordinated debt.

Net cash used by operating activities of our discontinued operations totaled $38,000.

### Investing Activities

During 2008, investing activities of our continuing operations used net cash of $2,847,000. Capital expenditures attributable to the Rubber Group, the Metals Group, and the Corporate Office totaled $2,343,000, $333,000, and $19,000, respectively, primarily for manufacturing equipment, tooling for our automotive aftermarket business, tooling for certain OEM automotive components, and improvements to 20 acres of commercial land in Ellijay, Georgia. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $2,086,000, $523,000, and $8,000, respectively, for 2009. At December 31, 2008, we had approximately $81,000 of unrecorded commitments outstanding to purchase equipment.

### Financing Activities

During 2008, our financing activities provided net cash of $4,093,000. In 2008, we received $4,000,000 of cash from the issuance of the debtor-in-possession note and we increased borrowings under our revolving line of credit by $3,587,000. We made principal payments on our term loans totaling $3,280,000.

### Liquidity and Filing of Chapter 11

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At December 31, 2008, accrued interest on our Senior Subordinated Notes totaled $13,055,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated

- 31 -

under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own a majority of our Senior Subordinated Notes to advise them of the following:

1. We had decided to pursue the proposal to purchase the Rock Hill facility;

2. We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.   We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.   In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.   We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the

- 32 -

forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default of our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). In connection with this petition, we obtained a financing package that we believed provided us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The arrangement with the senior, secured lenders provided for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%.

At March 31, 2008, prior to our chapter 11 filing, our senior, secured credit facility included a $17,500,000 revolving line of credit, with $12,875,000 of loans and $907,000 of letters of credit outstanding. At

April 1, 2008, there were $14,219,000 of loans and $907,000 of letters of credit outstanding under the revolving line of credit. The contractual interest rate on loans under the revolving credit is LIBOR plus 2.75% (3.19% at December 31, 2008).

Our equipment term loan had an outstanding principal balance of $8,542,000 at March 31, 2008, $8,333,000 at April 1, 2008, and $6,667,000 at December 31, 2008. The contractual interest rate on the equipment term loan is LIBOR plus 4.5% (4.94% at December 31, 2008).

Our real estate term loan had an outstanding principal balance of $13,839,000 at March 31, 2008, $13,778,000 at April 1, 2008, and $13,289,000 at December 31, 2008. The contractual interest rate on the real estate term loan is the prime rate plus 6% on $4,000,000 principal amount and LIBOR plus 4.5% on the balance (weighted average of 6.24% at December 31, 2008).

On April 1, 2008, the financial covenants under the senior, secured financing agreements were modified as follows:

1. <u>Minimum Cash</u>. Our aggregate cash was required to be greater than $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and was required to be greater than $500,000 on the last day of each four-week period following May 30.

2. <u>Maximum Expenditures</u>. Our cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from April 2, 2008, through April 18, 2008, and was required to be less than 110% of cumulative budgeted expenditures on the last day of each two-week period following April 18.

- 33 -

3. <u>Minimum Net Sales</u>. Our cumulative net sales were required to be greater than 90% of cumulative budgeted net sales from April 2, 2008, through May 2, 2008, and was required to be greater than 90% of cumulative budgeted net sales on the last day of each four-week period after May 2.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in Vienna, Ohio. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We believe that the effectuation of this plan will significantly enhance our ability to obtain the financing we need to exit chapter 11. In order to allow us sufficient time in which to complete the operational restructuring of our connector-seal business, including the closing of the Vienna facility and the relocation of the connector-seal business to our other rubber molding facilities, on January 13, 2009, we filed a motion requesting that the Bankruptcy Court extend the time during which we have the exclusive right to file a plan of reorganization and our right to use cash collateral. Subsequent to a hearing held on our motion on February 23 and 24, 2009, the Bankruptcy Court extended our exclusive right to file a plan of reorganization until April 30, 2009, extended our exclusive right to solicit acceptances of such plan until June 1, 2009, and extended our right to use cash collateral to May 22, 2009. In addition, by mutual agreement, the maturity date of the debtor-in-possession loan was extended from April 1, 2009, to December 31, 2009. For more information on the restructuring of our connector-seal business, please refer to the discussion of the Rubber Group in the section titled "Results of Operations — Comparison of 2008, 2007, and 2006" in this Part II, Item 7.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 34 -

By order of the Bankruptcy Court on March 4, 2009, our ability to use cash collateral was extended to May 22, 2009, and the financial covenants under the senior, secured financing agreements were further modified, effective February 27, 2009, as follows:

1.  Minimum Cash. Our aggregate cash was or is required to be not less than the following amounts on the specified measurement dates:

| | |
|---|---|
| February 27, 2009 | $2,958,000 |
| March 6, 2009 | $2,402,000 |
| March 13, 2009 | $1,946,000 |
| March 20, 2009 | $1,867,000 |
| March 27, 2009 | $1,622,000 |
| April 3, 2009 | $1,499,000 |
| April 10, 2009 | $1,638,000 |
| April 17, 2009 | $1,307,000 |
| April 24, 2009 | $1,384,000 |
| May 1, 2009 | $1,222,000 |
| May 8, 2009 | $1,415,000 |
| May 15, 2009 | $1,334,000 |
| May 22, 2009 | $1,396,000 |

On April 17, 2009, the latest measurement date prior to the issuance of this report, our aggregate cash was $3,117,000.

2.  Maximum Expenditures. Our cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from February 27, 2009, through March 13, 2009, and are required to be less than 110% of cumulative budgeted expenditures on the last day of each two-week period following March 13, 2009. At April 17, 2009, the latest measurement date prior to the issuance of this report, our cumulative expenditures were $5,439,000 less than 110% of cumulative budgeted expenditures.

3.  Minimum Net Sales. Our cumulative net sales are required to be greater than 85% of cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At April 3, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales exceeded 85% of cumulative budgeted net sales by $791,000.

4.  <u>Operational Restructuring of Connector-Seal Business</u>. In connection with the closing of our connector-seal facility located in Vienna, Ohio, and the relocation of production to other rubber molding facilities, we have agreed to the following, subject to any changes that the senior, secured lender may agree to:

   (a)  On or before March 31, 2009, we shall obtain transitional and long-term contracts with customers covering at least 60% of our projected sales for the connector-seal business for 2010;

   (b)  The transitional agreements shall provide aggregate revenues of not less than $900,000 on payment terms not to exceed net 30 days;

   (c)  At least 90% of the inventory banks for the connector-seal consolidation shall be completed by May 31, 2009; and

- 35 -

   (d)  The closure of the Vienna, Ohio, facility shall be substantially completed by June 30, 2009.

   Because we did not meet the condition set forth in clause (a) above, the senior, secured lender has notified us that a Termination Event (as defined in the Cash collateral Order) has occurred. The senior, secured lender has not taken any action with respect to this Termination Event and has not indicated any present intention to take action, but has reserved its rights under the Cash Collateral Order.

   The senior, secured credit facility, as amended by the Bankruptcy Court on March 4, 2009, will terminate upon the occurrence of the following events if we fail to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

   Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

   •  The senior, secured credit facility would be repaid in full in cash;

   •  Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three

months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

We cannot assure you that the Amended Plan will be confirmed. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

- 36 -

Our aggregate indebtedness at December 31, 2008, totaled $73,375,000 plus $13,164,000 of accrued interest on our subordinated debt, compared to $69,091,000 plus $7,564,000 of accrued interest on our subordinated debt at December 31, 2007.

Including liabilities classified as subject to compromise, we had a net working capital deficit of $73,922,000 at December 31, 2008, compared to a net working capital deficit of $65,894,000 at December 31, 2007.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**Off-Balance Sheet Arrangements**

We have no material off-balance sheet arrangements.

**Inflation**

We generally attempt to pass through to our customers fluctuations in raw material costs; however, many

of our customers will not accept price increases from us to compensate for increases in labor and overhead expenses that result from inflation. To offset inflationary increases in costs that we cannot pass through to our customers and to maintain or improve our operating margins, we attempt to improve our production efficiencies and manufacturing processes. We believe that, over time, prices are affected by many factors, but that the price we can charge our customers is governed by the competitive pricing set by the marketplace, rather than by increases or decreases in particular components of our cost.

**Environmental Matters**

We have been named from time to time as one of numerous potentially responsible parties or third-party defendants under applicable environmental laws for restoration costs at waste-disposal sites, and as a defendant or potential defendant in various other environmental law matters. It is our policy to record accruals for matters of these types when we deem a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although we cannot assure you as to the outcome of existing or potential environmental litigation we believe, based upon the information currently available to us, that the outcome thereof will not have a material adverse effect upon our results of operations or financial condition.

- 37 -

**Quarterly Financial Data**

For quarterly financial data please refer to Note 15, "Quarterly Financial Data," in the notes to our consolidated financial statements in Part II, Item 8.

**Critical Accounting Policies and Estimates**

Our accounting policies are more fully described in Note 1, "Summary of Significant Accounting Policies," in the notes to our consolidated financial statements in Part II, Item 8. The preparation of our consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses during each reporting period. Actual results could differ from those estimates. The significant estimates included in the preparation of our financial statements are related to valuation of accounts receivable, inventories, long-lived assets, and goodwill and estimates related to the determination of liabilities for environmental matters, litigation, product liability matters, income taxes, and other contingencies.

We believe that the most critical accounting policies inherent in the preparation of our consolidated financial statements are the following:

*Going Concern Basis*

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Valuation of Accounts Receivable and Provision for Credit Losses

We record accounts receivable due from our customers at the time a sale is recorded in accordance with our revenue recognition policy. The markets we serve are characterized by intense price competition and increasing customer requirements for quality and service. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of our accounts receivable from those customers. We attempt to mitigate this risk of loss through ongoing evaluations of market conditions, examinations of financial statements of our customers, and discussions with management of our customers, as deemed necessary. Provisions for credit losses are based upon historical experience and such ongoing evaluations. We generally do not require collateral from our customers to support the extension of trade credit.

### Valuation of Inventory

Inventory is valued at the lower of cost (first-in, first-out method) or market. We evaluate our inventory on a quarterly basis to ensure that it is properly valued. We record allowances against inventory where appropriate to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, we apply consistent practices, which include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with new generation components, and actual margins generated from the sales of our components.

- 38 -

### Valuation of Long-Lived Assets other than Goodwill

We evaluate for impairment our plant and equipment and other long-term, assets other than goodwill when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in our use of these assets may cause the original estimated useful lives of these assets to change and result in the impairment of these assets.

When performing this evaluation, we prepare a projection of the future cash flow we will derive from an asset or group of assets. If the projected cash flow is less than the carrying value of the asset or asset group, we recognize an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although we believe that our projections of future cash flows are reasonable, changes in unit sales, pricing, cost of goods sold, and other factors could significantly affect the accuracy of our cash flow projections.

### Valuation of Goodwill

At December 31, 2008 and 2007, our unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2008, the assets of the Rubber Group, including goodwill, totaled $38,527,000. In 2008, EBITDA of the Rubber Group was $11,442,000. In connection with our chapter 11 proceedings, W.Y. Campbell & Company has prepared several analyses of the value of the Rubber Group that concluded that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### Revenue Recognition

All of our revenues result from the sale of rubber and metal components and mixed rubber compounds. We recognize revenue from the sale of these items when title and risk of loss pass to our customers according to shipping schedules and terms of sale mutually agreed to by us and our customers. Shipping and handling costs are typically paid by the customer. If paid by us, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience; these accruals may be adjusted subsequent to the date of shipment as new information becomes available.

### *Other*

Other critical accounting policies include estimates used to determine liabilities related to environmental matters, litigation, product liability matters, self-insurance, income taxes, and other contingencies. The process of making estimates takes into account historical experience, specific facts and circumstances, present and projected economic and business conditions, projected unit volumes, projected operating efficiencies, and other relevant factors and assumptions. We reevaluate our estimates whenever factors relevant to the making of the estimates change.

## Recently Issued Accounting Standards

Listed below are recently issued accounting standards and a discussion of how they have affected or will affect our consolidated financial statements:

### *Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion"*

In May 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion" ("FSP APB 14-1"). FSP APB 14-1 requires issuers of convertible debt instruments to separately account for the liability and equity components of interest cost recognized in future periods on convertible debt instruments in a manner that will reflect the entity's nonconvertible debt borrowing rate on the date the instrument was issued. FSP APB 14-1 is effective for fiscal years after December 15, 2008, and interim periods within those fiscal years, and must be applied to all periods presented. Based on our current operations, we do not believe that the adoption of FSP APB 14-1 will have a significant impact on our results of operations or financial position.

### *Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133"*

On March 19, 2008, the FASB issued Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133" ("FAS 161"), which enhanced required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (1) an entity uses derivative instruments, (2) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," and (3) derivative instruments and related hedged items affect an entity's financial

position, financial performance, and cash flows. FAS 161 is effective for fiscal years and interim periods beginning on or after November 15, 2008. Based on our current operations, we do not believe that FAS 161 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51"

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51 ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. Among other things, FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements separate from the parent company's equity, and that the amount of net income attributable to the noncontrolling interest should be included in consolidated net income on the face of the income statement. FAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Based on our current operations, we do not believe that FAS 160 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable

- 40 -

users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Based on our current operations, we do not believe that FAS 141R will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value when using U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In February 2008, the FASB issued Staff Position FAS157-2, "Effective Date of FASB Statement No. 157"("FSP 157-2"), which defers the effective date of FAS 157 for one year for certain nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on an annual basis. In accordance with FSP 157-2, we have only adopted the provisions of FAS 157 with respect to our financial assets and financial liabilities that were measured at fair value in our financial statements since January 1, 2008. At December 31, 2008, these assets and liabilities consisted only of marketable securities. The provisions of FAS 157 have not been applied to non-financial assets and non-financial liabilities.

***Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"***

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. FAS 159 also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. We adopted FAS 159 on January 1, 2008, and have elected not to apply the fair value option to any of our financial instruments.

## Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant. At December 31, 2008, we had outstanding $38,175,000 of floating-rate debt at interest rates equal to either LIBOR plus 2.75%, LIBOR plus 4.5%, prime rate plus 6%, or LIBOR plus 7%, subject to a minimum interest rate of 10%. At December 31, 2008, we had outstanding $35,200,000 of fixed-rate debt with a weighted-average interest rate of 11.9%. We estimate that a one-percentage-point increase or decrease in both LIBOR and the prime rate would increase or decrease our monthly interest expense by approximately $32,000. For further information about our indebtedness, please refer to Note 5, "Debt," in the notes to our consolidated financial statements in Part II, Item 8.

- 41 -

## Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### Table of Contents

|  | Page |
|---|---|
| Report of Malin, Bergquist & Company, LLP, Independent Registered Public Accounting Firm (for 2008 and 2007) | 43 |
| Report of Ernst & Young LLP, Independent Registered Public Accounting Firm (for 2006) | 44 |
| Consolidated Statements of Operations for the Years Ended December 31, 2008, 2007, and 2006 | 45 |
| Consolidated Balance Sheets at December 31, 2008 and 2007 | 46 |
| Consolidated Statements of Stockholders' Deficit for the Years Ended December 31, 2008, 2007, and 2006 | 48 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2008, 2007, and 2006 | 49 |
| Notes to Consolidated Financial Statements | 50 |

- 42 -

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Lexington Precision Corporation and Subsidiary

We have audited the accompanying consolidated balance sheets of Lexington Precision Corporation and subsidiary as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholders' deficit, and cash flows for the years then ended. Our audit also included the financial statement schedule in Part IV, Item 15. Lexington Precision Corporation's management is responsible for these consolidated financial statements and schedule. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lexington Precision Corporation and subsidiary as of December 31, 2008 and 2007, and the consolidated results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that Lexington Precision Corporation and subsidiary will continue as a going concern. As more fully described in Notes 1 and 5, on April 1, 2008, Lexington Precision Corporation and Lexington Rubber Group, Inc. (collectively, the "Debtors") filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") and their continuation as a going concern is contingent upon, among other things, the Debtors ability (i) to comply with the terms and conditions of the debtors-in-possession financing arrangements; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to generate sufficient cash flow from operations to fund working capital, capital expenditures and debt service requirements, and; (iv) to obtain financing sources to meet future obligations. These matters raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that may result from the outcome of this uncertainty.

/s/ Malin, Bergquist & Company, LLP

Malin, Bergquist & Company, LLP
Pittsburgh, Pennsylvania
April 23, 2009

- 43 -

---

### REPORT OF ERNST & YOUNG LLP, INDEPENDENT REGISTERED
### PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Lexington Precision Corporation and Subsidiaries

We have audited the consolidated balance sheet of Lexington Precision Corporation and subsidiaries as of
December 31, 2006, and the related consolidated statements of operations, stockholders' deficit, and cash flows
for the year then ended. Our audit also included the data for 2006 appearing on the financial statement schedule
listed in the index at Item 15(a). These consolidated financial statements and schedule are the responsibility of the
Company's management. Our responsibility is to express an opinion on these consolidated financial statements
and schedule based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight
Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free of material misstatement. We were not engaged to perform an
audit of the Company's internal control over financial reporting. Our audit included consideration of internal
control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances,
but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over
financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles
used and significant estimates made by management, and evaluating the overall financial statement presentation.
We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material
respects, the consolidated financial position of Lexington Precision Corporation and subsidiaries at
December 31, 2006, and the consolidated results of their operations and their cash flows for the year then ended,
in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the data for 2006
appearing on the related financial statement schedule, when considered in relation to the basic financial
statements taken as a whole, presents fairly in all material respects the information set forth therein.

The consolidated financial statements for 2006 have been prepared assuming that Lexington Precision
Corporation and subsidiaries would continue as a going concern. As more fully described in Notes 1 and 5, the
Company failed to pay quarterly interest payments that were due on its Senior Subordinated Notes on November
1, 2006 and February 1, 2007, resulting in substantially all of the Company's debt to be in default as of
December 31, 2006. As of February 28, 2007, the Company failed to comply with a fixed charge coverage ratio
covenant that is contained in its secured borrowing arrangements. On April 5, 2007, the Company was notified
that the Company's ability to borrow under its revolving line of credit would be terminated after May 7, 2007. On
April 6, 2007, the Company received a notice of acceleration demanding immediate payment in full of a portion
of the obligations due under its real estate term loan. Further, the Company has a working capital deficiency and a

stockholders' deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Ernst & Young LLP

Cleveland, Ohio
April 12, 2007

- 44 -

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Operations
### (thousands of dollars, except per share data)

|  | Years Ended December 31 | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Net sales | $ 73,029 | $ 88,408 | $ 87,901 |
| Cost of sales | 63,107 | 76,529 | 77,159 |
| Gross profit | 9,922 | 11,879 | 10,742 |
| Selling and administrative expenses | 6,685 | 7,204 | 6,658 |
| Income from operations | 3,237 | 4,675 | 4,084 |
| Other expense: |  |  |  |
| Interest expense | (8,726) | (11,339) | (10,943) |
| Reorganization items, net | (4,540) | — | — |
| Loss from continuing operations before income taxes | (10,029) | (6,664) | (6,859) |
| Income tax provision | 35 | 6 | 18 |
| Loss from continuing operations | (10,064) | (6,670) | (6,877) |
| Loss from discontinued operations | (229) | (289) | (472) |
| Net loss | $(10,293) | $ (6,959) | $ (7,349) |
| Basic and diluted loss per share of common stock: |  |  |  |
| Continuing operations | $ (2.03) | $ (1.35) | $ (1.39) |
| Discontinued operations | (0.04) | (0.06) | (0.10) |
| Net loss | $ (2.07) | $ (1.41) | $ (1.49) |

*See notes to consolidated financial statements*

- 45 -

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Balance Sheets**
**(thousands of dollars, except share data)**

|  | December 31 | |
|---|---|---|
|  | **2008** | **2007** |
| **Assets:** | | |
| Current assets: | | |
| Cash | $ 5,540 | $ 212 |
| Marketable securities | 38 | 214 |
| Accounts receivable, net of allowances of $735 and $476, respectively | 6,794 | 10,981 |
| Inventories, net of allowances of $778 and $612, respectively | 10,597 | 9,330 |
| Prepaid expenses and other current assets | 2,426 | 1,032 |
| Deferred income taxes | — | 98 |
| Current assets of discontinued operations | 7 | 10 |
| Total current assets | 25,402 | 21,877 |
| Plant and equipment: | | |
| Land | 2,255 | 1,817 |
| Buildings | 13,378 | 13,370 |
| Equipment | 112,022 | 110,723 |
|  | 127,655 | 125,910 |
| Accumulated depreciation | 109,216 | 105,056 |
| Plant and equipment, net | 18,439 | 20,854 |
| Plant and equipment of discontinued operations, net | 1,231 | 1,338 |
| Goodwill, net | 7,623 | 7,623 |
| Other assets, net | 633 | 675 |
|  | $ 53,328 | $ 52,367 |

*See notes to consolidated financial statements*
  *(continued on next page)*

- 46 -

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Balance Sheets**
**(thousands of dollars, except share data)**

December 31

|  | 2008 | 2007 |
|---|---|---|
| **Liabilities and stockholders' deficit:** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,391 | $ 6,558 |
| Accrued expenses, excluding interest expense | 3,382 | 3,932 |
| Accrued interest expense | 199 | 7,954 |
| Debt in default | 34,175 | 68,345 |
| Debtor-in-possession loan | 4,000 | — |
| Current portion of long-term debt | 16 | 741 |
| Current liabilities of discontinued operations | 148 | 241 |
| Total current liabilities | 45,311 | 87,771 |
| Liabilities subject to compromise | 54,013 | — |
| Long-term debt, excluding current portion | — | 5 |
| Deferred income taxes | — | 98 |
| Other long-term liabilities | 400 | 434 |
| Stockholders' deficit: | | |
| Common stock, $0.25 par value, 10,000,000 shares authorized, 5,021,767 shares issued and outstanding at December 31, 2008 and 2007, respectively | 1,242 | 1,238 |
| Additional paid-in-capital | 13,197 | 13,187 |
| Accumulated deficit | (60,659) | (50,366) |
| Accumulated other comprehensive loss | (176) | — |
| Total stockholders' deficit | (46,396) | (35,941) |
|  | $ 53,328 | $ 52,367 |

*See notes to consolidated financial statements*

- 47 -

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Statements of Stockholders' Deficit
(thousands of dollars)**

| | Common Stock | Additional Paid-in-Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | S |
|---|---|---|---|---|---|
| Balance at January 1, 2006 | $1,233 | $ 13,169 | $(36,058) | $ — | $ |
| Net loss | — | — | (7,349) | — | |
| Vesting of restricted stock grants | 2 | 12 | — | — | — |
| Balance at December 31, 2006 | 1,235 | 13,181 | (43,407) | — | |
| Net loss | — | — | (6,959) | | |
| Vesting of restricted stock grants | 3 | 6 | — | — | — |
| Balance at December 31, 2007 | 1,238 | 13,187 | (50,366) | — | |
| Net loss | — | — | (10,293) | | |
| Vesting of restricted stock grants | 4 | 10 | — | — | |
| Loss on change of fair value of marketable securities | — | — | — | (176) | |
| Balance at December 31, 2008 | $1,242 | $ 13,197 | $(60,659) | $ (176) | $ |

*See notes to consolidated financial statements*

- 48 -

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Consolidated Statements of Cash Flows
(thousands of dollars)**

| | Years Ended December 31 | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| **Operating activities:** | | | |
| Net loss | $(10,293) | $(6,959) | $ (7,349) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities of continuing operations: | | | |
| Net loss from discontinued operations | 229 | 289 | 472 |
| Depreciation | 5,082 | 6,036 | 6,919 |
| Amortization included in cost of sales | 251 | 401 | 376 |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 1,249 | 3,078 |
| Increase in reorganization expenses | 1,168 | — | — |
| Changes in operating assets and liabilities that provided (used) cash: | | | |
| Accounts receivable, net | 4,187 | (1,256) | 2,849 |
| Inventories, net | (1,267) | (543) | (1,003) |
| Prepaid expenses and other assets | (1,403) | 108 | (457) |
| Accounts payable | 1,097 | 188 | (2,683) |
| Accrued expenses, excluding interest expense | (550) | 143 | (912) |
| Accrued interest expense | 5,468 | 5,824 | 1,281 |
| Other long term liabilities | (2) | (2) | 12 |
| Other | (98) | (42) | (27) |
| Net cash provided by continuing operations | 4,120 | 5,436 | 2,556 |
| Net cash used by discontinued operations | (38) | (158) | (514) |
| Net cash provided by operating activities | 4,082 | 5,278 | 2,042 |
| **Investing activities:** | | | |
| Purchases of plant and equipment | (2,695) | (2,636) | (2,504) |
| Proceeds from sales of assets | 94 | 118 | — |
| Expenditures for tooling owned by customers | (307) | (197) | (174) |
| Other | 61 | (26) | 50 |
| Net cash used by continuing operations | (2,847) | (2,741) | (2,628) |
| Net cash used by discontinued operations | — | (27) | (13) |
| Net cash used by investing activities | (2,847) | (2,768) | (2,641) |

**Financing activities:**

|  |  |  |  |
|---|---|---|---|
| Issuance of debtor-in-possession note | 4,000 | — | — |
| Prepetition net borrowings (payments) under revolving line of credit | 3,587 | 2,263 | (3,585) |
| Prepetition repayment of debt in default and long-term debt | (837) | (3,310) | (22,527) |
| Prepetition proceeds from issuance of debt | — | — | 28,500 |
| Postpetition repayment of debt in default and long-term debt | (2,443) | — | — |
| Payment of financing expenses | (214) | (1,286) | (1,767) |
| Net cash provided (used) by financing activities | 4,093 | (2,333) | 621 |
| Net increase in cash | 5,328 | 177 | 22 |
| Cash at beginning of year | 212 | 35 | 13 |
| Cash at end of year | $ 5,540 | $ 212 | $ 35 |

*See notes to consolidated financial statements*

- 49 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 1 — Summary of Significant Accounting Policies

#### The Company

Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"), have two operating segments, the Rubber Group and the Metals Group. The Rubber Group is engaged in the manufacture of insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Metals Group is engaged in the manufacture of machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks for sale to automotive and industrial customers.

#### Principles of Consolidation

The consolidated financial statements include the accounts of Lexington Precision Corporation and Lexington Rubber Group, Inc. All significant intercompany accounts and transactions have been eliminated. Unless otherwise indicated all disclosures and amounts relate solely to the continuing operations of the Company.

#### Basis of Presentation

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-11153). Currently, the Company has the exclusive right to file a plan of reorganization until April 30, 2009, and the exclusive right to solicit acceptances of such plan until June 1, 2009.

In connection with the chapter 11 filing, the Company obtained a financing package that consisted of (1) an arrangement with the Company's senior, secured lenders to freeze the loan under the Company's revolving line

of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) the Company's unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The Company believes that it has more than adequate liquidity to operate during the chapter 11 proceedings. At April 17, 2009, the Company had $3,117,000 of cash on hand. For more information on the Company's senior, secured financing and the debtor-in-possession loan, please refer to Note 5, "Debt."

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection was to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in its total indebtedness on a basis that would be fair and equitable to all of its creditors and stockholders.

- 50 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Proposed Plan of Reorganization*

On June 30, 2008, the Company filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, the Company filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although the Company currently plans to complete the consolidation of its connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of the Company's liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

There can be no assurance that the Amended Plan will be confirmed. The Amended Plan may be further

amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

### *American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code"*

The Company's consolidated financial statements have been prepared in accordance with American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"). SOP 90-7 provides guidance for financial reporting by entities that have filed petitions and expect to reorganize as going concerns under chapter 11 of title 11 of the United States Code. SOP 90-7 recommends that all such entities report the same way while reorganizing under chapter 11, with the objective of reflecting their financial evolution. To accomplish this objective, SOP 90-7 requires, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

- 51 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Reorganization Items*

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as "reorganization items" in the statements of operations. Reorganization items reflected in the Company's consolidated financial statements for the period from April 1 through December 31, 2008, are set forth below (dollar amounts in thousands):

| | |
|---|---|
| Professional fees and expenses incurred directly by the Company | $2,239 |
| Professional fees and expenses incurred by creditors | 2,072 |
| Other costs | 346 |
| Interest income | (117) |
| Reorganization items, net | $4,540 |

### *Liabilities Subject to Compromise*

SOP 90-7 requires that certain prepetition claims against the Company that are unsecured or under-secured be classified in the balance sheet as "liabilities subject to compromise." Additional claims that are subject to compromise may arise subsequent to the filing date as a result of the rejection of executory contracts or because claims are allowed as a result of the resolution of contingencies or disputes. On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008, as the bar date for the filing of all prepetition claims other than claims held by government units. The bar date for government units to file prepetition claims was September 29, 2008. The bar date was the date on which claims against the Company that arose prior to the filing date must have been filed in order for the claimant to receive any distribution in the chapter 11 case. On July 1, 2008, the Company mailed a notice of the bar date and the manner in which a proof of claim was to be filed to all known creditors, and, on July 16, 2008, through publication of an official notice in the *Wall Street Journal,* the Company gave notice to all unknown potential claimants informing them of the official bar date and the manner in which a proof of claim was to be filed. Although prepetition claims are generally stayed, on April 2 and April 22, 2008, the Company received approvals from the Bankruptcy Court to pay or otherwise honor, subject to

certain conditions, certain prepetition obligations critical to its continued operation, including employee wages and benefits, workers' compensation and product liability insurance programs, certain customer programs, and common carrier charges.

- 52 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company has been paying and intends to continue to pay all undisputed postpetition claims in the ordinary course of business. Liabilities subject to compromise at December 31, 2008, consisted of the following (dollar amounts in thousands):

| | |
|---|---:|
| Accounts payable — continuing operations | $ 5,432 |
| Accounts payable — discontinued operations | 174 |
| Senior Subordinated Notes | 34,177 |
| Accrued interest on Senior Subordinated Notes | 13,055 |
| Junior Subordinated Note | 347 |
| Accrued interest on Junior Subordinated Note | 109 |
| Series B Preferred Stock | 660 |
| Accrued dividends on Series B Preferred Stock | 59 |
| Total liabilities subject to compromise | $54,013 |

The foregoing amounts are based upon the Company's books and records and do not necessarily take into account all alleged liabilities asserted in proofs of claims filed with the Bankruptcy Court.

### Accounting for Interest Expense

On April 2, 2008, the Bankruptcy Court issued an order authorizing the Company to utilize the collections on its accounts receivable in the operation of its business. Pursuant to that order, the interest rates on the Company's senior, secured debt were reduced from the default rates to the contractual rates. In addition, because the management of the Company believes that the Company is solvent, the Company continues to accrue, and report in its consolidated financial statements, interest on all of its unsecured prepetition debt at the applicable contractual rates.

### Going Concern Basis

The Company's consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Use of Estimates

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with any certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

- 53 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Marketable Securities*

Marketable securities held by the Company are valued at their quoted market prices at the close of business on December 31, 2008 and 2007, in accordance with Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (level 1 inputs). Based on the classification of these marketable securities as available-for-sale, the Company recognized $176,000 of other comprehensive loss during 2008.

### *Valuation of Accounts Receivable and Provision for Credit Losses*

The Company records accounts receivable due from its customers at the time a sale is recorded in accordance with its revenue recognition policy. The markets served by the Company are characterized by intense price competition and increasing requirements for quality and service. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of financial statements of its customers, and discussions with management of its customers. Provisions for credit losses are based upon historical experience and such ongoing evaluations. The Company generally does not require collateral from its customers to support the extension of trade credit.

### *Valuation of Inventory*

Inventory is valued at the lower of cost (first-in, first-out method) or market. The Company evaluates its inventory on a quarterly basis to ensure that it is properly valued. The Company records allowances against inventory to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, the Company applies consistent practices that include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with a new generation of components, and actual margins generated from the sales of its components.

Inventory levels by principal classification are set forth below (dollar amounts in thousands):

|  | December 31 | |
| --- | --- | --- |
|  | **2008** | **2007** |
| Finished goods | $  6,370 | $5,201 |
| Work in process | 1,923 | 2,185 |
| Raw materials | 2,304 | 1,944 |
|  | $10,597 | $9,330 |

### *Plant and Equipment*

Plant and equipment are carried at cost less accumulated depreciation. Depreciation is calculated principally on the straight-line method over the estimated useful lives of the various assets (3 to 8 years for equipment and 15 to 31 years for buildings). When an asset is retired or otherwise disposed of, the

- 54 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

related cost and accumulated depreciation are removed from the Company's records. Maintenance and repair expenses are expensed as incurred, while major improvements that increase the useful life of plant and equipment are capitalized. Maintenance and repair expenses were $3,349,000, $4,067,000, and $4,265,000, for 2008, 2007, and 2006, respectively.

### *Valuation of Long-Lived Assets other than Goodwill*

The Company evaluates the value of its plant and equipment and other long-term assets other than goodwill when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in the Company's use of these assets may cause the estimated useful lives of these assets to change and result in the impairment of these assets.

When performing this evaluation, the Company prepares a projection of the future cash flow it will derive from an asset or group of assets. If the projected cash flow is less than the carrying value of the asset or asset group, the Company recognizes an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although the Company believes that its projections of future cash flows are reasonable, changes in unit sales, pricing, cost of goods sold, and other factors could significantly affect the accuracy of the Company's cash flow projections.

### *Valuation of Goodwill*

At December 31, 2008 and 2007, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2008, the assets of the Rubber Group, including goodwill, totaled $38,527,000. In 2008, EBITDA of the Rubber Group was $11,442,000. In connection with the Company's chapter 11 proceedings, W.Y. Campbell & Company has prepared several analyses of the value of the Rubber Group that concluded that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### *Deferred Financing Expenses*

Deferred financing expenses are typically amortized on a straight-line basis until the date that the debt is due and payable either because of a stated maturity date or because of an event of default. During the fourth quarter of 2006, the Company wrote off $1,829,000 of the unamortized deferred financing costs related to its Senior Subordinated Notes and its senior, secured debt, which was reclassified as debt in default in the Company's consolidated balance sheet at December 31, 2006.

### *Research and Development Expenses*

Research and development expenses are expensed as incurred. These expenses totaled $661,000, $915,000, and $1,093,000, in 2008, 2007, and 2006, respectively.

- 55 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Net Income or Loss per Common Share

Basic net income or loss per common share is computed using the weighted-average number of common shares outstanding. Diluted net income or loss per share is calculated after giving effect to all potential common shares that were dilutive, using the treasury stock method. Potentially dilutive common shares consist of convertible preferred stock, unvested restricted stock, and warrants to purchase common stock. See also Note 11, "Net Income or Loss per Common Share."

### Revenue Recognition

All of the Company's revenues result from the sale of rubber and metal components and mixed rubber compounds. The Company recognizes revenue from the sale of these items when title and risk of loss pass to its customers according to shipping schedules and terms of sale mutually agreed to by the Company and its customers. Shipping and handling costs are typically paid by the customer. If paid by the Company, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience. These accruals may be adjusted subsequent to the date of shipment as new information becomes available.

### Recently Issued Accounting Standards

Listed below are recently issued accounting standards and a discussion of how they have affected or will effect the Company's consolidated financial statements:

### Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash Upon Conversion"

In May 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion" ("FSP APB 14-1"). FSP APB 14-1 requires issuers of convertible debt instruments to separately account for the liability and equity components of interest cost recognized in future periods on convertible debt instruments in a manner that will reflect the entity's nonconvertible debt borrowing rate on the date the instrument was issued. FSP APB 14-1 is effective for fiscal years after December 15, 2008, and interim periods within those fiscal years, and must be applied to all periods presented. Based on the Company's current operations, it does not believe that the adoption of FSP APB 14-1 will have a significant impact on its results of operations or financial position.

### Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133"

On March 19, 2008, the FASB issued Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement

133" ("FAS 161"), which enhanced required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (1) an entity uses derivative instruments, (2) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," and (3) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. FAS 161 is effective for fiscal years and interim periods beginning on or after November 15, 2008. Based on the Company's current

- 56 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

operations, it does not believe that FAS 161 will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51"*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51" ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. Among other things, FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements separate from the parent company's equity, and that the amount of net income attributable to the noncontrolling interest should be included in consolidated net income on the face of the income statement. FAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Based on its current operations, the Company does not believe that FAS 160 will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Early adoption of FAS 141R is not permitted. Based on its current operations, the Company does not believe that FAS 141R will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"*

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value when using U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In February 2008, the FASB issued Staff Position FAS157-2, "Effective Date of FASB

Statement No. 157" ("FSP 157-2"), which defers the effective date of FAS 157 for one year for certain nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on an annual basis. In accordance with FSP 157-2, the Company has only adopted the provisions of FAS 157 with respect to the Company's financial assets and financial liabilities that were measured at fair value in financial statements since January 1, 2008. At December 31, 2008, these assets and liabilities consisted only of marketable securities. The provisions of FAS 157 have not been applied to non-financial assets and non-financial liabilities.

- 57 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. FAS 159 also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. The Company adopted FAS 159 on January 1, 2008, and have elected not to apply the fair value option to any of its financial instruments.

### Note 2 — Cash

Cash at December 31, 2008 and 2007, totaled $5,540,000 and $212,000, respectively. The cash on hand at December 31, 2008, resulted primarily from the Company's post-petition financing arrangements, which consist of (1) an arrangement with the Company's senior, secured lenders to freeze the loans under the Company's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through May 22, 2009, and (2) the debtor-in-possession loan in the amount of $4,000,000 that matures on December 31, 2009.

### Note 3 — Other Noncurrent Assets

The Company has paid a portion of the cost of certain tooling that was purchased by customers and is being used by the Company to produce components under long-term supply arrangements. The payments have been recorded as a noncurrent asset and are being amortized on a straight-line basis over three years or, if shorter, the period during which the tooling is expected to produce components. At December 31, 2008 and 2007, noncurrent assets included $487,000 and $449,000, respectively, of unamortized capitalized payments. During 2008, 2007, and 2006, the Company amortized $344,000, $497,000, and $459,000, respectively, of such capitalized payments.

### Note 4 — Accrued Expenses, excluding Interest Expense

Accrued expenses, excluding interest expense, at December 31, 2008 and 2007, are summarized below (dollar amounts in thousands):

| | December 31 | |
|---|---|---|
| | 2008 | 2007 |

| | | |
|---|---:|---:|
| Employee fringe benefits | $2,138 | $2,617 |
| Salaries and wages | 346 | 298 |
| Taxes | 182 | 148 |
| Other | 716 | 869 |
| | $3,382 | $3,932 |

- 58 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 5 — Debt

Debt at December 31, 2008, and December 31, 2007, is set forth below (dollar amounts in thousands):

| | December 31, 2008 | | | December 31, 2007 |
|---|---:|---:|---:|---:|
| | Not Subject to Compromise | Subject to Compromise | Total | |
| Debt in default: | | | | |
| Senior, secured credit facility: facility: | | | | |
| Revolving line of credit | $ 14,219 | $ — | $14,219 | $10,632 |
| Equipment term loan | 6,667 | — | 6,667 | 9,167 |
| Real estate term loan | 13,289 | — | 13,289 | 14,022 |
| Subtotal | 34,175 | — | 34,175 | 33,821 |
| Senior Subordinated Notes | — | 34,177 | 34,177 | 34,177 |
| Junior Subordinated Note | — | 347 | 347 | 347 |
| Total debt in default | 34,175 | 34,524 | 68,699 | 68,345 |
| Debtor-in-possession loan | 4,000 | — | 4,000 | — |
| Current portion of long-term debt | 16 | 660 | 676 | 741 |
| Long-term debt: | | | | |
| Series B Preferred Stock | — | 660 | 660 | 660 |
| Other | 16 | — | 16 | 86 |
| Subtotal | 16 | 660 | 676 | 746 |
| Less current portion | (16) | (660) | (676) | (741) |
| Total long-term debt | — | — | — | 5 |
| Total debt | $ 38,191 | $35,184 | $73,375 | $69,091 |

### *Senior, Secured Credit Facility*

In connection with the Company's filing under chapter 11 of the Bankruptcy Code on April 1, 2008, the Company and its senior, secured lender, with the approval of the Bankruptcy Court, modified the senior, secured credit facility in the following manner:

    1.    The default premium of 2% was eliminated and the interest rates on the various components of the senior, secured facility reverted to the following contractual rates: LIBOR plus 2.75% on

outstandings under the revolving line of credit (3.19% at December 31, 2008); LIBOR plus 4.5% for the equipment term loan (4.94% at December 31, 2008); and prime rate plus 6% on $4,000,000 of the real estate term loan and LIBOR plus 4.5% on the remaining balance of the real estate term loan (weighted average of 6.24% at December 31, 2008).

2.  The principal amount of the loan outstanding under the revolving line of credit was fixed at $14,219,000, and the Company was permitted to utilize, until February 25, 2009, collections on its accounts receivable in the operation of its business.

- 59 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

3.  The Company agreed to continue to make the scheduled monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

In addition, the financial covenants under the senior, secured financing agreements were modified as follows:

1.  <u>Minimum Cash</u>. The Company's aggregate cash was required to be greater than $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and was required to be greater than $500,000 on the last day of each four-week period following May 30.

2.  <u>Maximum Expenditures</u>. The Company's cumulative expenditures were required to be less than 110% of its cumulative budgeted expenditures for the period from April 2, 2008, through April 18, 2008, and was required to be less than 110% on the last day of each two-week period following April 18.

3.  <u>Minimum Net Sales</u>. The Company's cumulative net sales were required to be greater than 90% of cumulative budgeted net sales from April 2, 2008, through May 2, 2008, and was required to be greater than 90% of cumulative budgeted net sales on the last day of each four-week period after May 2.

By order of the Bankruptcy Court on March 4, 2009, the Company's ability to use cash collateral was extended to May 22, 2009, and the financial covenants under the senior, secured financing agreements were further modified, effective February 27, 2009, as follows:

1.  <u>Minimum Cash</u>. Aggregate cash was or is required to be not less than the following amounts on the specified measurement dates:

| | |
|---|---|
| February 27, 2009 | $2,958,000 |
| March 6, 2009 | $2,402,000 |
| March 13, 2009 | $1,946,000 |
| March 20, 2009 | $1,867,000 |
| March 27, 2009 | $1,622,000 |
| April 3, 2009 | $1,499,000 |
| April 10, 2009 | $1,638,000 |
| April 17, 2009 | $1,307,000 |

| | |
|---|---|
| April 24, 2009 | $1,384,000 |
| May 1, 2009 | $1,222,000 |
| May 8, 2009 | $1,415,000 |
| May 15, 2009 | $1,334,000 |
| May 22, 2009 | $1,396,000 |

On April 17, 2009, the latest measurement date prior to the issuance of this report, the Company's aggregate cash was $3,117,000.

2. <u>Maximum Expenditures</u>. The Company's cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from February 27, 2009, through March 13, 2009, and are required to be less than 110% of cumulative budgeted

- 60 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

expenditures on the last day of each two-week period following March 13, 2009. At April 17, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $5,439,000 less than 110% of cumulative budgeted expenditures.

3. <u>Minimum Net Sales</u>. The Company's cumulative net sales are required to be greater than 85% of cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At April 3, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales exceeded 85% of cumulative budgeted net sales by $791,000.

4. <u>Operational Restructuring of Connector-Seal Business</u>. In connection with the closing of the Company's connector-seal facility located in Vienna, Ohio, and the relocation of production to other rubber molding facilities, the Company has agreed to the following, subject to any changes that the senior, secured lender may agree to:

   (a) On or before March 31, 2009, the Company shall obtain transitional and long-term contracts with customers covering at least 60% of our projected sales for the connector-seal business for 2010;

   (b) The transitional agreements shall provide aggregate revenues of not less than $900,000 on payment terms not to exceed net 30 days;

   (c) At least 90% of the inventory banks for the connector-seal consolidation shall be completed by May 31, 2009; and

   (d) The closure of the Vienna, Ohio, facility shall be substantially completed by June 30, 2009.

Because the Company did not meet the condition set forth in clause (a) above, the senior, secured lender notified the Company that a Termination Event (as defined in the Cash collateral Order) has occurred. The senior, secured lender has not taken any action with respect to this Termination Event and has not indicated any present intention to take action, but has reserved its rights under the Cash Collateral order.

The senior, secured credit facility, as amended effective February 27, 2009, will terminate upon the occurrence of the following events if the Company fails to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants,

(b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

The Company believes that the loans outstanding under the senior, secured credit facility and the interest accrued thereon are fully collateralized and will not be impaired under any plan of reorganization. As a result, the Company has continued to accrue and pay the interest on these loans at the contractual rates of interest.

The commencement of proceedings under chapter 11 constituted an event of default under the terms of the agreement governing the senior, secured credit facility. In addition, prior to the filing date, a cross-default existed under the senior, secured credit facility because the Company did not make the

- 61 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

interest payment that was due on its Senior Subordinated Notes on November 1, 2006, and has not made any of the quarterly interest payments since that date. As a result, all of the loans under the senior, secured credit facility are classified as debt in default at December 31, 2008 and 2007. From February 1, 2007, through March 31, 2008, a default premium of 2% was charged on the outstanding loan balances.

The Company's loans and reimbursement obligations with respect to letters of credit under the senior, secured credit facility are secured by liens on substantially all of the Company's assets. The agreements governing the senior, secured credit facility placed certain restrictions on the Company's business and operations, including limitations on the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

### Debtor-in-Possession Loan

The debtor-in-possession loan in the amount of $4,000,000 was approved by the Bankruptcy Court on April 2 and 17, 2008. The debtor-in-possession loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. The debtor-in-possession loan was granted super-priority status by the Bankruptcy Court. The loan matures on the earliest of (1) December 31, 2009, (2) the effective date of a plan of reorganization, (3) the conversion of the bankruptcy proceedings from chapter 11 to chapter 7, (4) the appointment of a chapter 11 trustee, or (5) an event of default as described in the documents governing the debtor-in-possession loan.

### Senior Subordinated Notes

The Senior Subordinated Notes mature on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. Pursuant to a forbearance agreement between the Company and a group of six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes reverted to 12%. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of the Company's affiliates and members of their families. At December 31,

2008, accrued interest on the Senior Subordinated Notes totaled $13,055,000. The Senior Subordinated Notes and the accrued interest thereon through December 31, 2008, were classified as liabilities subject to compromise in the Company's consolidated financial statements at December 31, 2008. The Company continues to accrue interest on the Senior Subordinated Notes at the contractual rate of 12% because the management of the Company believes that the Company is solvent.

### Junior Subordinated Note

The Junior Subordinated Note matures on November 1, 2009, and is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and to the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. At December 31, 2008, accrued interest on the Junior Subordinated Note totaled $109,000. The Junior Subordinated Note and the accrued interest thereon through December 31, 2008,

- 62 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

were classified as liabilities subject to compromise in the Company's consolidated financial statements at December 31, 2008. The Company continues to accrue interest on the Junior Subordinated Note at the contractual rate of 13% because the management of the Company believes that the Company is solvent.

### Series B Preferred Stock

At December 31, 2008, there were outstanding 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), and (4) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. All of the shares of the Series B Preferred Stock are past their scheduled redemption date. In addition, at December 31, 2008, the Company was in arrears on scheduled dividend payments on the Series B Preferred Stock in the aggregate amount $59,400.

The Series B Preferred Stock is classified as debt in the Company's consolidated financial statements. At December 31, 2008, the Series B Preferred Stock and accrued dividends thereon were classified as liabilities subject to compromise in the Company's consolidated financial statements. The Company continues to accrue dividends on the Series B Preferred Stock at the contractual rate of 4% because the management of the Company believes that the Company is solvent.

### Fair Value of Financial Instruments

The Company believes that, at December 31, 2008, the fair value of the loans outstanding under the revolving line of credit, the equipment term loan, the real estate term loan, and the debtor-in-possession loan approximated the principal amounts of such loans. Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

*Cash Interest Paid*

Cash interest paid during 2008, 2007, and 2006, including amounts allocated to discontinued operations, totaled $3,175,000, $4,431,000 and $6,749,000, respectively.

- 63 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## Note 6 — Interest Expense

A breakdown of interest expense for 2008, 2007, and 2006 is set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2008 | 2007 | 2006 |
| --- | --- | --- | --- |
| Interest expense at contractual interest rates: | | | |
| Senior, secured loans | $2,490 | $ 3,698 | $ 3,334 |
| Debtor-in-possession loan | 296 | | |
| Senior Subordinated Notes | 4,101 | 4,101 | 4,101 |
| Junior Subordinated Note | 45 | 45 | 45 |
| All other | 84 | 47 | 480 |
| Subtotal | 7,016 | 7,891 | 7,960 |
| Interest expense resulting from incremental interest rates: | | | |
| Senior, secured loans — default or forbearance premium | 172 | 698 | 62 |
| Senior Subordinated Notes — forbearance premium | 411 | 1,279 | — |
| Senior Subordinated Notes — interest on missed interest payments | 1,044 | 390 | 21 |
| Subtotal | 1,627 | 2,367 | 83 |
| Financing costs and fees | 251 | 1,249 | 3,078 |
| Total interest expense | 8,894 | 11,507 | 11,121 |
| Less: Interest expense allocated to discontinued operations | 168 | 168 | 178 |
| Interest expense related to continuing operations | $8,726 | $11,339 | $10,943 |

## Note 7 — Common Stock, Warrants, and Other Equity Securities

*Common Stock, $.25 Par Value*

At December 31, 2008, there were 5,021,767 shares of the Company's common stock outstanding, 48,889 shares reserved for issuance on the conversion of the Series B Preferred Stock, and 310,000 shares reserved for issuance under the Company's 2005 Stock Award Plan.

*Warrants*

At each of December 31, 2008 and 2007, there were 345,237 warrants outstanding, each of which entitles the holder to purchase one share of the Company's common stock for $3.50 from August 1, 2005, through August 1, 2009. Because the exercise price of the warrants substantially exceeded the market price of the Company's common stock at the date of issuance, the Company did not record any expense related to the issuance.

### Other Authorized Preferred Stock

The Company's restated certificate of incorporation provides that the Company is authorized to issue 2,500 shares of 6% Cumulative Convertible Preferred Stock, Series A, par value $100 per share, and

- 64 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

2,500,000 shares of other preferred stock having a par value of $1 per share. No shares of either of these classes of preferred stock have been issued.

## Note 8 — Employee Benefit Plans

### Retirement and Savings Plan

The Company maintains a retirement and savings plan pursuant to Section 401 of the Internal Revenue Code (a "401(k) plan"). All employees of the Company are entitled to participate in the 401(k) plan after meeting the eligibility requirements. Employees may generally contribute up to 60% of their annual compensation but not more than prescribed dollar amounts established by the United States Secretary of the Treasury. Employee contributions, up to 6% of an employee's compensation, are matched 50% by the Company. During 2008, 2007, and 2006, matching contributions made by the Company totaled $364,000, $432,000, and $443,000, respectively. Company contributions to the 401(k) plan vest at a rate of 20% per year commencing after the participant's second year of service; the participant becomes fully vested after six years of service.

### Incentive Compensation Plan

The Company has an incentive compensation plan that provides for the payment of annual cash bonus awards to certain officers and key employees of the Company if specified targets are met. The Compensation Committee of the Company's Board of Directors, which consists of two directors who are not employees of the Company, oversees the administration of the incentive compensation plan and approves the cash bonus awards. Bonus awards for eligible employees at our operating divisions are typically based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization ("EBITDA") at each operating division. Bonus awards for corporate officers are typically based upon the attainment of predetermined consolidated EBITDA targets. The consolidated financial statements include provisions for bonuses totaling $270,000, $77,000, and $136,000 in 2008, 2007 and 2006, respectively.

### 2005 Stock Award Plan

The Company also has a plan that permits it to award incentive stock options, nonqualified stock options, stock appreciation rights, awards of restricted common stock, performance shares, and performance units to directors, employees, or consultants of the Company (the "2005 Stock Award Plan" or the "Plan"). Under the Plan, the maximum number of shares of common stock that may be granted or optioned to eligible participants is 400,000 and the maximum grant to any eligible participant in a fiscal year for each type of award is set forth

below:

> Stock options:  50,000 shares
> Stock appreciation rights:  50,000 shares
> Restricted stock:  50,000 shares
> Performance shares:  fair market value of 50,000 shares
> Performance units:  fair market value up to $100,000

On January 26, 2006, 50,000 shares of restricted common stock were awarded to a key employee of the Company and, on October 9, 2007, 10,000 shares of restricted common stock were awarded to each of the Company's four outside directors. The price per common share on the respective grant dates was $0.79 and $0.70, respectively. The Restricted Stock Award Agreement governing the shares granted on

- 65 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

January 26, 2006, specifies that 10,000 shares vest on March 31, 2006, and 10,000 shares on each March 31 thereafter until all of the shares granted are vested. The Restricted Stock Award Agreements governing the shares granted on October 9, 2007, specify that, for each grant, 2,000 shares will vest on each subsequent anniversary date of October 9 until all shares granted are vested. If a grantee leaves the Company prior to shares becoming fully vested, any unvested shares will be returned to the Company. Compensation expense equal to the market value of the shares on the date of grant will be charged to earnings over the respective vesting periods. During 2008, 2007, and 2006, the Company's restricted stock amortization expense totaled $14,000, $9,000, and $14,000, respectively.

### Note 9 — Income Taxes

Income taxes are accounted for in accordance with Financial Accounting Standards Board Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." Deferred tax assets are reduced by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

The components of the provisions for income taxes related to continuing operations in 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Current: |  |  |  |
| Federal | $— | $— | $— |
| State | 35 | 6 | 18 |
|  | 35 | 6 | 18 |
| Deferred: |  |  |  |
| Federal | — | — | — |
| Income tax provision | $35 | $ 6 | $18 |

The income tax provisions recorded during 2008, 2007, and 2006 consisted of state income taxes.

During 2007, the Company paid $28,000 in state income taxes. No other state or federal income taxes were paid in 2008, 2007, or 2006.

The difference between the Company's income tax provision for the Company's loss from continuing operations in 2008, 2007, and 2006 and the income taxes that would have been payable at the federal statutory rate for the Company's loss from continuing operations is reconciled as follows (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Federal statutory income tax provision | $(3,489) | $(2,364) | $(2,495) |
| Change in valuation allowance | 3,472 | 1,807 | 2,317 |
| Expiration of operating loss carryforwards | — | 360 | 163 |
| Adjustment of impairment of long-lived assets | — | 163 | — |
| State income taxes, net of federal benefit | 21 | 4 | 12 |
| Other | 31 | 36 | 21 |
| Income tax provision | $ 35 | $ 6 | $ 18 |

- 66 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table sets forth the Company's deferred tax assets and deferred tax liabilities at December 31, 2008 and 2007 (dollar amounts in thousands):

|  | December 31 | |
|  | 2008 | 2007 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating losses and tax credit carryforwards: | | |
| Federal net operating losses | $ 12,344 | $ 8,843 |
| State net operating losses | 2,104 | 2,056 |
| Federal alternative minimum taxes | 864 | 864 |
| Investment tax credit | 100 | 100 |
| Other tax credit | 81 | 81 |
| Total tax carryforwards | 15,493 | 11,944 |
| Deductible temporary differences: | | |
| Reorganization costs | 1,583 | — |
| Impairment of long-lived assets | 12 | 12 |
| Accounts receivable and inventory reserves | 604 | 418 |
| Tax inventory over book | 423 | 103 |
| Interest | — | 2,583 |
| Compensation accruals | 365 | 292 |
| Other accruals | 265 | 333 |
| Other | 139 | 141 |
| Total deferred tax assets | 18,884 | 15,826 |

| | | |
|---|---:|---:|
| Valuation allowance | (18,224) | (14,752) |
| Net deferred tax assets | 660 | 1,074 |
| Deferred tax liabilities: Tax over book depreciation | (660) | (1,074) |
| Net deferred taxes | $ — | $ — |

During 2008, the Company's valuation allowance increased by $3,472,000, primarily due to the net loss reported by the Company for 2008.

At December 31, 2008, the Company had (1) net operating loss carryforwards for federal income tax purposes of $36,306,000, which expire in the years 2011 through 2028, (2) alternative minimum tax net operating loss carryforwards of $36,128,000, which can be used to reduce future taxable income for purposes of calculating alternative minimum taxable income, if any, without any time limitation, and (3) alternative minimum tax credit carryforwards of $864,000, which can be used to offset future payments of regular federal income taxes, if any, without any time limitation. During 2008, no net operating loss carryforwards were utilized or expired. Subsequent to the filing of the Form 10-K for the year ended December 31, 2007, the Company concluded that the interest expense that had been deemed to be non-deductible as reflected in the above table as a temporary timing difference, was, in fact, currently deductible. Reflecting this change in the above table at December 31, 2007, would have increased the federal net operating loss classified as a deferred tax asset by $2,583,000.

- 67 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The expiration of the Company's federal net operating loss carryforwards by year of expiration is set forth in the table below (dollar amounts in thousands):

| | |
|---|---:|
| 2009 | $ — |
| 2010 | — |
| 2011 | 1,379 |
| 2012 | 1,371 |
| 2013 | 4,033 |
| After 2013 | 29,523 |
| Total federal net operating loss carryforwards | $36,306 |

## Note 10 — Segments

### Description of Segments and Products

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily, insulators used in aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Metals Group manufactures machined metal components from aluminum, brass, steel,

and stainless steel bars, forgings, and cold-headed blanks. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States. At December 31, 2008, 13.2% of the Rubber Group's employees were covered by a collective bargaining agreement that expired on March 11, 2009, and 23.8% of the Rubber Group's employees were subject to a collective bargaining agreement that expires on October 19, 2009. With respect to the agreement that expired on March 11, 2009, the Company has commenced the process of terminating all operations at this manufacturing facility and anticipates that it will complete the closing this facility by June 30, 2009.

The Corporate Office consists primarily of general administrative expenses that are not a result of any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, and certain prepaid expenses and other miscellaneous current assets.

### Measurement of Segment Profit or Loss

The Company evaluates its performance based upon several measures, including income from operations, earnings before income taxes, depreciation, and amortization, and asset utilization.

The accounting policies of the Company's operating segments are the same as those described in Note 1, "Summary of Significant Accounting Policies," except that debt, deferred financing expenses, interest expense, reorganization items expensed in accordance with SOP 90-7, and income tax expense are excluded from segment reporting. Also, expenses, including reorganization items expensed in accordance with SOP 90-7, that are not considered direct expenses of the Rubber Group or the Metals Group are not allocated to those segments.

- 68 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Factors Management Used to Identify Reportable Segments

Although all of the Company's production facilities are similar manufacturing operations, selling to similar customers, the Company presents financial data for the Rubber Group and the Metals Group because of the significant difference in financial performance between those businesses.

### Industry Concentration, Reliance on Large Customers, and Credit Risk

The following table summarizes net sales during 2008, 2007, and 2006 by the type of product in which the Company's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | **2008** | | **2007** | | **2006** | |
| Automotive — OEM | $26,770 | 36.7% | $42,850 | 48.5% | $44,626 | 50.8% |
| Automotive — aftermarket | 26,569 | 36.4 | 25,786 | 29.2 | 27,906 | 31.7 |
| Medical | 16,300 | 22.3 | 15,928 | 18.0 | 11,039 | 12.6 |
| Industrial and residential equipment and devices | 2,486 | 3.4 | 2,836 | 3.2 | 3,168 | 3.6 |
| Other | 904 | 1.2 | 1,008 | 1.1 | 1,162 | 1.3 |

| | | | | | |
|---|---|---|---|---|---|
| Total net sales | $73,029 | 100.0% | $88,408 | 100.0% | $87,901 | 100.0% |

The following table summarizes the Company's accounts receivable from each of the industries listed above at December 31, 2008 and 2007 (dollar amounts in thousands):

| | Years Ended December 31 | | | |
|---|---|---|---|---|
| | 2008 | | 2007 | |
| Automotive — OEM | $2,353 | 34.6% | $ 5,366 | 48.9% |
| Automotive — aftermarket | 2,369 | 34.9 | 2,887 | 26.3 |
| Medical | 1,590 | 23.4 | 2,348 | 21.4 |
| Industrial and residential equipment and devices | 305 | 4.5 | 231 | 2.1 |
| Other | 177 | 2.6 | 149 | 1.3 |
| Total | $6,794 | 100.0% | $10,981 | 100.0% |

The markets in which the Company operates have been characterized by price competition, increasing requirements for quality and service, and, with respect to the automotive OEM markets, substantially reduced volumes because of slowing sales of automobiles. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of customer financial statements, and discussions with customer management. Provisions for credit losses are based upon historical experience and such ongoing evaluations. The Company generally does not require collateral from its customers to support the extension of trade credit. At December 31, 2008 and 2007, the Company had reserves for credit losses of $735,000 and $476,000, respectively.

- 69 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company's largest customer is General Cable Corporation. During 2008, 2007, and 2006, net sales to General Cable totaled $10,897,000, $9,436,000, and $9,557,000, which represented 14.9%, 10.7%, and 10.9%, respectively, of the Company's consolidated net sales and 17.5%, 12.7%, and 12.6%, respectively, of the Rubber Group's net sales. During 2008, 2007, and 2006, net sales to Delphi Corporation totaled $5,587,000, $8,505,000, and $10,719,000, which represented 7.7%, 9.6%, and 12.2%, respectively, of the Company's consolidated net sales. During 2008, 2007, and 2006, the Rubber Group's net sales to Delphi totaled $4,603,000, $7,381,000, and $10,719,000, which represented 7.4%, 9.9%, and 14.1%, respectively, of the Rubber Group's net sales. During 2008 and 2007, the Metals Group's net sales to Delphi totaled $984,000 and $1,124,000, respectively, which represented 9.2% and 8.1% respectively, of the Metals Group's net sales. The majority of the products the Company sells to Delphi are covered by a supply contract that expires on December 31, 2009. No other customer accounted for more than 10% of the Company's consolidated net sales during 2008, 2007, or 2006. Generally, loss of a significant amount of business from any of the Company's large customers could have a material adverse effect on our results of operations and financial condition if that business were not replaced by additional business from existing or new customers. The Company believes that the Company's reserve for uncollectible accounts receivable is adequate; however, the Company's results of operations and financial condition could be materially adversely affected if any of the Company's large customers experienced financial difficulties that caused them to delay or fail to make payments for goods sold to them.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 70 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Segment Financial Data*

Information relating to the Company's operating segments and the Corporate Office for 2008, 2007, and 2006, and at December 31, 2008, 2007, and 2006, is summarized below (dollar amounts in thousands):

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| *Net sales:* | | | |
| Rubber Group | $62,278 | $74,587 | $76,090 |
| Metals Group | 10,751 | 13,821 | 11,811 |
| Total net sales | $73,029 | $88,408 | $87,901 |
| *Income (loss) from operations:* | | | |
| Rubber Group | $ 6,696 | $ 7,975 | $ 7,642 |
| Metals Group | (741) | (192) | (1,245) |
| Subtotal | 5,955 | 7,783 | 6,397 |
| Corporate Office | (2,718) | (3,108) | (2,313) |
| Total income from operations | $ 3,237 | $ 4,675 | $ 4,084 |
| *Depreciation and amortization (1):* | | | |
| Rubber Group | $ 4,746 | $ 5,727 | $ 6,455 |
| Metals Group | 536 | 682 | 820 |
| Subtotal | 5,282 | 6,409 | 7,275 |
| Corporate Office | 51 | 28 | 20 |
| Total depreciation and amortization | $ 5,333 | $ 6,437 | $ 7,295 |
| *Capital expenditures (2):* | | | |
| Rubber Group | $ 2,343 | $ 2,068 | $ 2,118 |
| Metals Group | 333 | 519 | 511 |
| Subtotal | 2,676 | 2,587 | 2,629 |
| Corporate Office | 19 | 77 | 32 |
| Total capital expenditures | $ 2,695 | $ 2,664 | $ 2,661 |
| | December 31 | | |
| | **2008** | **2007** | **2006** |

|                      |          |          |          |
|----------------------|---------:|---------:|---------:|
| *Assets:*            |          |          |          |
| Rubber Group         | $38,527  | $42,236  | $45,056  |
| Metals Group         | 7,680    | 7,963    | 7,381    |
| Subtotal             | 46,207   | 50,199   | 52,437   |
| Corporate Office     | 5,883    | 820      | 484      |
| Total assets (3)     | $52,090  | $51,019  | $52,921  |

(1)  Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, during 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

(2)  Capital expenditures for 2007 included $28,000 of equipment purchased under capitalized lease obligations. Capital expenditures for 2006 included $157,000 of equipment acquired with seller-provided financing.

- 71 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(3)  Excludes the assets of discontinued operations, which totaled $1,238,000, $1,348,000, and $1,519,000, at December 31, 2008, 2007, and 2006, respectively.

### Note 11 — Net Loss per Common Share

The calculations of basic and diluted net loss per common share for the 2008, 2007, and 2006, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock were not dilutive. In addition, non-vested shares of restricted common stock issued under the Company's 2005 Stock Award Plan (the "Plan") are not considered outstanding common shares for purposes of the calculation of basic net loss per share of common stock because the effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of net income or loss per common share set forth below does not reflect the assumed conversion of the Series B Preferred Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the Plan.

|                                                       | Years Ended December 31 | | |
|-------------------------------------------------------|-----------:|----------:|----------:|
|                                                       | **2008**   | **2007**  | **2006**  |
| Numerator — Net loss:                                 |            |           |           |
| Continuing operations                                 | $(10,064)  | $(6,670)  | $(6,877)  |
| Discontinued operations                               | (229)      | (289)     | (472)     |
| Net loss                                              | $(10,293)  | $(6,959)  | $(7,349)  |
| Denominator — Weighted average shares outstanding     | 4,961      | 4,949     | 4,939     |
| Basic and diluted loss per share of common stock:     |            |           |           |
| Continuing operations                                 | $  (2.03)  | $ (1.35)  | $ (1.39)  |
| Discontinued operations                               | (0.04)     | (0.06)    | (0.10)    |
| Net loss                                              | $  (2.07)  | $ (1.41)  | $ (1.49)  |

## Note 12 — Commitments and Contingencies

### *Purchase Commitments*

At December 31, 2008, the Company had $81,000 of unrecorded commitments outstanding to purchase equipment.

### *Leases*

The Company is lessee under various operating leases relating to warehouse and office space, temporary, on-site office units, and equipment. Total rent expense under operating leases aggregated $366,000, $326,000, and $395,000, for 2008, 2007, and 2006, respectively. At December 31, 2008, future minimum lease commitments under noncancelable operating leases totaled $53,000, for 2009. Commitments subsequent to 2009 are not significant.

- 72 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Legal Actions*

In addition to the Company's bankruptcy proceedings, the Company is subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of its business activities. It is the Company's policy to record accruals for such other matters when a loss is deemed probable and the amount of such loss can be reasonably estimated. The various other actions to which the Company is or may in the future be a party are at various stages of completion. Although there can be no assurance as to the outcome of existing or potential litigation, the Company currently believes, based upon the information currently available to it, that the outcome of those actions will not have a material adverse effect upon its results of operations or financial condition.

### *Other*

The Company maintains insurance coverage for certain aspects of its business and operations. Based on the Company's evaluation of the various risks to which it may be exposed, the Company retains all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although there can be no assurance that it will be successful in its efforts, the Company attempts to limit its liability through, among other things, the ongoing training and education of its employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of its workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of contracts with its customers.

## Note 13 — Related Parties

The Chairman of the Board and the President of the Company are the Company's two largest stockholders, with beneficial ownership of 33% and 27.9%, respectively, of the Company's common stock. They are also the holders of the Junior Subordinated Note and, together with affiliated entities that include family members, the holders of $7,772,000 principal amount of Senior Subordinated Notes and 69,449 warrants to purchase common stock.

In 2008, 2007, and 2006 the Chairman of the Board and the President of the Company, through an investment banking firm of which they are the only partners, were paid $700,000 to provide management and

investment banking services. Additionally, they may receive incentive compensation tied to the Company's operating performance and other compensation for specific transactions completed by the Company with their assistance, although no such compensation was paid in 2008, 2007, or 2006. The Company also reimburses their firm for certain out-of-pocket expenses. During 2008, 2007, and 2006, the Company reimbursed their firm for expenses of $139,000, $115,000, and $116,000, respectively.

For more information on the compensation of the Company's executive officers, refer to the Company's proxy statement that was issued and filed during April 2009 in connection with the Company's Annual Meeting of Stockholders.

## Note 14 — Discontinued Operations

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to the diecasting business totaled $168,000, $168,000, and $178,000 for 2008, 2007, and 2006, respectively. During 2007 and 2006, the Company increased its provision for

- 73 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

environmental remediation at the manufacturing facility formerly housing the diecasting business by $87,000 and $255,000, respectively. In March 2007, the State of New York Department of Environmental Conservation informed the Company that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

## Note 15 — Quarterly Financial Data (Unaudited)

Quarterly unaudited financial data for the four fiscal quarters of each of 2008 and 2007 is set forth below (dollar amounts in thousands, except per share amounts).

|  | Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| **2008** | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| Net sales | $21,352 | $20,000 | $17,871 | $13,806 |
| Gross profit | $ 3,186 | $ 3,336 | $ 2,138 | $ 1,262 |
| Loss from continuing operations | $(1,447) | $(1,895) | $(3,184) | $(3,538) |
| Loss from discontinued operations | (15) | (45) | (21) | (148) |
| Net loss | $(1,462) | $(1,940) | $(3,205) | $(3,686) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.30) | $ 0.38 | $ (0.65) | $ (0.70) |
| Discontinued operations | — | (0.01) | — | (0.03) |
| Net loss | $ (0.30) | $ (0.39) | $ (0.65) | $ (0.73) |

|  | Quarters Ended | | | |
| --- | --- | --- | --- | --- |
| **2007** | **March 31** | **June 30** | **Sept. 30** | **Dec. 31** |
| Net sales | $22,530 | $23,778 | $23,060 | $19,040 |
| Gross profit | $ 3,053 | $ 3,576 | $ 3,310 | $ 1,940 |

FORM 10-K                                                                    Page 76 of 90
    08-11153-scc   Doc 870   Filed 04/19/10   Entered 04/19/10 23:35:13   Main Document
                       Pg 196 of 318

| | | | | |
|---|---:|---:|---:|---:|
| Loss from continuing operations | $ (915) | $(1,305) | $(1,806) | $(2,644) |
| Loss from discontinued operations | (2) | (56) | (53) | (178) |
|     Net loss | $ (917) | $(1,361) | $(1,859) | $(2,822) |
| Basic and diluted loss per share of common stock: | | | | |
|    Continuing operations | $ (0.19) | $ (0.26) | $ (0.37) | $ (0.53) |
|    Discontinued operations | — | (0.01) | (0.01) | (0.04) |
|     Net loss | $ (0.19) | $ (0.27) | $ (0.38) | $ (0.57) |

Results of operations for the quarter ended March 31, 2008, included $508,000 of expenses incurred in connection with the Company's efforts to refinance, restructure, or repay the Company's indebtedness, $172,000 of default interest on the Company's senior, secured debt, $619,000 of interest on missed interest payments and default interest at the rate of 4% for the holders of the Company's unsecured debt, and $251,000 of amortization of the charges received from the holders of the Company's senior, secured debt for consulting costs and legal fees. Results for the quarters ended June 30, September 30, and December 31, 2008, included $1,770,000, 1,622,000, and $1,148,000, respectively, of

- 74 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

net reorganization expenses in accordance with SOP 90-7, and $334,000, $382,000, and $416,000, respectively, of interest expense that consisted of interest on missed interest payments for the holders of the Company's unsecured debt and interest for the holders of the Company's debtor-in-possession loan.

Results of operations for the quarters ended March 31, June 30, September 30, and December 31, 2007, included costs and expenses of $448,000, $1,191,000, $1,498,000, and $1,177,000, respectively, relating to the Company's efforts to refinance or restructure its indebtedness, including additional interest on its senior, secured debt and the Senior Subordinated Notes, and various financing fees, legal fees, and consulting fees charged to the Company by the holders of the Company's senior, secured debt and the Senior Subordinated Notes.

### Note 16 — Subsequent Event

During the second half of 2008, the Company experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at its connector-seal facility located in Vienna, Ohio. Because of these losses and because the Company does not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, the Company decided to close this facility and move the production to the Company's other rubber molding facilities. The Company currently anticipates that the shutdown of the Vienna facility will be substantially completed by June 30, 2009, and that the cost to restructure the connector-seal business will be approximately $1,082,000, which the Company expects to incur during the second and third quarters of 2009. This estimated cost consists of (1) $555,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $422,000 for moving and installation of manufacturing equipment, and (3) $105,000 for start-up expenses. Although there can be no assurance, the Company currently believes, based on appraised values, that it will sell the Vienna, Ohio, manufacturing facility and certain ancillary manufacturing equipment that the Company is not planning to move to its other rubber molding facilities, at an amount that, in the aggregate, will be in excess of the carrying value of these assets. Compared to 2008, the Company currently projects that the restructuring of the connector-seal business will increase the EBITDA of the connector-seal business by approximately $2,500,000 in 2010.

- 75 -

**Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**Item 9A(T).  CONTROLS AND PROCEDURES**

*Evaluation of Disclosure Controls and Procedures*

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of December 31, 2008, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  Based on that evaluation, our principal executive officers and our principal financial officer have concluded that, because of the deficiencies in our internal control over financial reporting described below, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of the significant deficiencies which, in the aggregate, constitute a material weakness, as described below. Notwithstanding management's assessment of a material weaknesses, we are not aware that the material weakness has resulted in the issuance of any material errors or omissions in our consolidated financial statements contained in our annual report on Form 10-K for 2008 or related disclosures, and we received audit reports from our independent registered public accounting firms on these consolidated financial statements that were unqualified, other than the "going concern" qualification.

*Management's Report on Internal Control over Financial Reporting*

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Due to inherent limitations, internal control over financial reporting, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives have been met. The design of an internal controls system must take into account the realities of limited resources, and the benefits derived from any system of internal control must be balanced against the cost of implementing and maintaining the system. Inherently, all internal control systems are limited by the realities of errors in human judgment and decision making, collusion, and management's ability to override the system of internal control. Also, as business conditions or requirements change in the future, internal control systems in place today may become obsolete.

With the participation of our principal executive officers and our principal financial officer, our management conducted an evaluation of effectiveness of our internal controls over financial reporting as of December 31, 2008, based on the framework and criteria established in "*Internal Control – Integrated Framework,*" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The evaluation included a review of, among other things, the documentation of controls, the overall design of the internal controls, and the documentation related to the performance of control activities.

A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the

- 76 -

Company's quarterly or annual financial statements will not be detected or prevented prior to issuance. During the course of our evaluation, we identified certain significant deficiencies as of December 31, 2008, that, in our opinion, only when considered in the aggregate, would constitute a "material weakness" in the Company's internal control over financial reporting as of December 31, 2008. The significant deficiencies noted during our evaluation are set forth below:

- *Incomplete documentation of the internal control system.* The Company maintains numerous internal financial controls. Certain controls and procedures are properly documented within the Company's "Authorization Guidelines and Policy Memoranda." Many controls are embedded within our third-party enterprise resource planning system software in use at all of the Company's manufacturing locations, the software of our third-party cash management system provider, and the software of our Company-wide third-party payroll provider, but are not documented in a methodical fashion outside of these software systems. Other controls, including higher level entity controls, such as the review of our pre-formatted monthly divisional financial reporting package by division controllers and our Chief Financial Officer, President, and Chairman of the Board are not formally documented.

- *We do not have a procedure for documenting the internal control activities performed within the internal control system by our employees.* We currently do not have a procedure in place for our employees to document the internal control activities they perform on a routine basis, such as the review of monthly divisional financial reporting packages, so we do not have evidence that such controls are being performed.

- *Incomplete segregation of duties.* At December 31, 2008, the Company consisted of five operating divisions and the Corporate Office. Generally, the five divisions function as independent businesses with their own management staffs and are required, on a monthly basis, to complete an extensive monthly financial reporting package. Because of the size of these facilities, complete segregation of accounting duties is not cost-effective. In its place, we believe that we have sufficient entity-level oversight controls to mitigate the lack of segregation of duties. However, because the completion of oversight controls is not documented, the Company cannot test these oversight controls to prove that the lack of segregation of duties is not an internal control deficiency.

- *The Company has not tested the operational effectiveness of its internal controls over financial reporting.* Because we have not adequately documented certain internal controls over financial reporting and lack a procedure for documenting the completion of certain control activities, we are unable to test and prove the effectiveness of those internal controls over financial reporting in accordance with COSO standards. Since we have not completely tested our controls, we cannot determine if our controls over financial reporting were effective.

Because of the material weakness described above, management has concluded that, based on the COSO framework for internal control, the Company did not have effective controls over financial reporting as of December 31, 2008.

This annual report does not include an attestation of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accountant firm because of the temporary rules of the Securities and Exchange Commission that permit us

to provide only management's report in this annual report.

- 77 -

---

### Remediation of Weaknesses

At December 31, 2008, the several significant deficiencies noted above may, in the aggregate, constitute a material weakness in our internal control over financial reporting. Although it is our intention to remediate these weaknesses, on April 1, 2008, we filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy proceedings and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate the deficiencies prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the deficiencies prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission.

If we have the ability to do so, we intend to take the following actions to address the deficiencies described above:

1. Establish a set of procedures for documentation of the performance of internal control processes by our employees.

2. Establish formal documentation for higher level entity controls that are currently undocumented.

3. Develop a plan for testing of our internal controls in accordance with COSO standards.

4. Dedicate additional personnel resources to the improvement, monitoring, and testing of our internal controls over financial reporting.

### Changes in Internal Controls over Financial Reporting

In reviewing our internal controls, we determined that there have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B. Other Information.

None.

- 78 -

# PART III

## Item 10.  DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE OF THE REGISTRANT

Information required by Item 10 is incorporated by reference to the sections entitled "Election of Directors" and "Executive Officers" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Securities and Exchange Commission (the Commission) not later than 120 days after December 31, 2008.

## Item 11.  EXECUTIVE COMPENSATION

Information required by Item 11 is incorporated by reference to the section entitled "Executive Compensation" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

## Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Information required by Item 12 is incorporated by reference to the sections entitled "Security Ownership" and "Equity Compensation Plan Information" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

## Item 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

Information required by Item 13 is incorporated by reference to the section entitled "Certain Relationships and Transactions" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

## Item 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

Information required by Item 14 is incorporated by reference to the section entitled "Ratification of Appointment of Independent Auditors" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

# PART IV

## Item 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

    (a)   1.   **Financial Statements**

The consolidated financial statements of Lexington Precision Corporation and its wholly owned subsidiary, Lexington Rubber Group, Inc., are included in Part II, Item 8.

2. **Financial Statement Schedule**

   Schedule II, "Valuation and Qualifying Accounts and Reserves," is included in this Part IV, Item 15, on page 81. All other schedules are omitted because the required information is not applicable, not material, or included in the consolidated financial statements or the notes thereto.

3. **Exhibits**

   The exhibits listed on the accompanying exhibit index are filed herewith or incorporated herein by reference.

- 80 -

## LEXINGTON PRECISION CORPORATION AND SUBSIDIARY

### Schedule II – Valuation and Qualifying Accounts and Reserves
### of Continuing Operations
### (thousands of dollars)

| | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions From Reserves | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for Doubtful Accounts** | | | | |
| Year ended December 31, 2008 | $    476 | $    283 | $    24 | $735 |
| Year ended December 31, 2007 | $    412 | $    210 | $    146 | $476 |
| Year ended December 31, 2006 | $    697 | $    55 | $    340 | $412 |
| **Inventory Reserve** | | | | |
| Year ended December 31, 2008 | $    612 | $    231 | $    65 | $778 |
| Year ended December 31, 2007 | $    417 | $    379 | $    184 | $612 |
| Year ended December 31, 2006 | $    435 | $    245 | $    263 | $417 |

- 81 -

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LEXINGTON PRECISION CORPORATION
(Registrant)


By: /s/Warren Delano
     Warren Delano, President


April 23, 2009

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on April 23, 2009:

**Principal Executive Officers and Directors:**

/s/Michael A. Lubin
Michael A. Lubin, Chairman of the Board

/s/Warren Delano
Warren Delano, President and Director

**Principal Financial and Accounting Officer:**

/s/Dennis J. Welhouse
Dennis J. Welhouse, Senior Vice President,
  Chief Financial Officer, and Secretary

**Directors:**

/s/William B. Conner
William B. Conner, Director

/s/Kenneth I. Greenstein
Kenneth I. Greenstein, Director

/s/Joseph A. Pardo
Joseph A. Pardo, Director

/s/ Elizabeth H. Ruml
Elizabeth H. Ruml, Director


- 82 -

<hr>

**EXHIBIT INDEX**

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 3 – 1 | Articles of Incorporation and Restatement thereof | Incorporated by reference from Exhibit 3-1 to Lexington Precision Corporation's (the "Company") Form 10-K for the year ended May 31, 1981, located under Securities and Exchange Commission File No. 0-3252 ("1981 10-K") |

| 3 – 2 | By-laws, as amended | Incorporated by reference from Exhibit 3-2 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 ("1998 10-K") |
| 3 – 3 | Certificate of Correction dated September 21, 1976 | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for the year ended May 31, 1983, located under Securities and Exchange Commission File No. 0-3252 ("1983 10-K") |
| 3 – 4 | Certificate of Ownership and Merger dated May 24, 1977 | Incorporated by reference from Exhibit 3-4 to 1983 10-K |
| 3 – 5 | Certificate of Ownership and Merger dated May 31, 1977 | Incorporated by reference from Exhibit 3-5 to 1983 10-K |
| 3 – 6 | Certificate of Reduction of Capital dated December 30, 1977 | Incorporated by reference from Exhibit 3-6 to 1983 10-K |
| 3 – 7 | Certificate of Retirement of Preferred Shares dated December 30, 1977 | Incorporated by reference from Exhibit 3-7 to 1983 10-K |
| 3 – 8 | Certificate of Reduction of Capital dated December 18, 1978 | Incorporated by reference from Exhibit 3-8 to 1983 10-K |
| 3 – 9 | Certificate of Retirement of Preferred Shares dated December 28, 1978 | Incorporated by reference from Exhibit 3-9 to 1983 10-K |
| 3 – 10 | Certificate of Reduction of Capital dated January 9, 1979 | Incorporated by reference from Exhibit 3-10 to 1983 10-K |
| 3 – 11 | Certificate of Reduction of Capital dated December 20, 1979 | Incorporated by reference from Exhibit 3-11 to 1983 10-K |
| 3 – 12 | Certificate of Retirement of Preferred Shares dated December 20, 1979 | Incorporated by reference from Exhibit 3-12 to 1983 10-K |
| 3 – 13 | Certificate of Reduction of Capital dated December 16, 1982 | Incorporated by reference from Exhibit 3-13 to 1983 10-K |
| 3 – 14 | Certificate of Reduction of Capital dated December 17, 1982 | Incorporated by reference from Exhibit 3-14 to 1983 10-K |
| 3 – 15 | Certificate of Amendment of Restated Certificate of Incorporation dated September 26, 1984 | Incorporated by reference from Exhibit 3-15 to the Company's Form 10-K for the year ended May 31, 1985, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 16 | Certificate of Retirement of Stock dated September 24, 1986 | Incorporated by reference from Exhibit 4-3 to the Company's Registration Statement in Form S-2 located under Securities and Exchange Commission File No. 33-9380 ("1933 Act Registration Statement") |
| 3 – 17 | Certificate of Amendment of | Incorporated by reference from Exhibit 3-17 to the |

|  | Restated Certificate of Incorporation dated November 21, 1986 | Company's Form 10-K for the year ended May 31, 1987, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 18 | Certificate of Retirement of Stock dated January 15, 1987 | Incorporated by reference from Exhibit 4-5 to Amendment No. 1 to 1933 Act Registration Statement |

- 83 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 3 – 19 | Certificate of Retirement of Stock dated February 22, 1988 | Incorporated by reference from Exhibit 3-19 to the Company's Form 10-K for the year ended May 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("May 31, 1989 10-K") |
| 3 – 20 | Certificate of Amendment of Restated Certificate of Incorporation dated January 6, 1989 | Incorporated by reference from Exhibit 3-20 to May 31, 1989 10-K |
| 3 – 21 | Certificate of Retirement of Stock dated August 17, 1989 | Incorporated by reference from Exhibit 3-21 to May 31, 1989 10-K |
| 3 – 22 | Certificate of Retirement of Stock dated January 9, 1990 | Incorporated by reference from Exhibit 3-22 to the Company's Form 10-K for the seven months ended December 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("December 31, 1989 10-K") |
| 3 – 23 | Certificate of the Designations, Preferences and Relative Participating, Optional and Other Special Rights of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, and the Qualifications, Limitations and Restrictions thereof dated January 10, 1990 | Incorporated by reference from Exhibit 3-1 to the Company's Form 10-Q for the quarter ended November 30, 1989, located under Securities and Exchange Commission File No. 0-3252 ("November 30, 1989 10-Q") |
| 3 – 24 | Certificate of Ownership and Merger dated April 25, 1990 | Incorporated by reference from Exhibit 3-24 to December 31, 1989 10-K |
| 3 – 25 | Certificate of Elimination of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, dated June 4, 1990 | Incorporated by reference from Exhibit 3-25 to the Company's Form 10-K for the year ended December 31, 1990, located under Securities and Exchange Commission File No. 0-3252 ("1990 10-K") |
| 3 – 26 | Certificate of Retirement of Stock dated March 6, 1991 | Incorporated by reference from Exhibit 3-26 to 1990 10-K |

| 3 – 27 | Certificate of Retirement of Stock dated April 29, 1994 | Incorporated by reference from Exhibit 3-28 to the Company's Form 10-K for year the ended December 31, 1994, located under Securities and Exchange Commission File No. 0-3252 ("1994 10-K") |
| 3 – 28 | Certificate of Retirement of Stock dated January 6, 1995 | Incorporated by reference from Exhibit 3-27 to 1994 10-K |
| 3 – 29 | Certificate of Retirement of Stock dated January 5, 1996 | Incorporated by reference from Exhibit 3-29 to the Company's Form 10-K for year the ended December 31, 1995, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 30 | Certificate of Retirement of Stock dated January 6, 1997 | Incorporated by reference from Exhibit 3-30 to the Company's Form 10-K for the year ended December 31, 1996, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 31 | Certificate of Retirement of Stock dated January 9, 1998 | Incorporated by reference from Exhibit 3-31 to the Company's Form 10-K for the year ended December 31, 1997, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 32 | Certificate of Retirement of Stock dated January 13, 1999 | Incorporated by reference from Exhibit 3-32 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 33 | Certificate of Retirement of Stock dated January 26, 2000 | Incorporated by reference from Exhibit 3-33 to the Company's Form 10-K for year the ended December 31, 1999, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 34 | Certificate of Designations, Preferences, Rights and Number of Shares of Redeemable Preferred Stock, Series B | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for year the ended December 31, 1981, located under Securities and Exchange Commission File No. 0-3252 |

- 84 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 4 – 1 | Purchase Agreement dated as of February 7, 1985, between the Company and L&D Precision Limited Partnership ("L&D Precision") and exhibits thereto | Incorporated by reference from Exhibit 4-1 to the Company's Form 8-K dated February 7, 1985, located under Securities and Exchange Commission File No. 0-3252 |
| 4 – 2 | Amendment Agreement dated as of April 27, 1990, between the Company and L&D Precision with | Incorporated by reference from Exhibit 10-2 to 1990 10-K |

|         | respect to Purchase Agreement dated as of February 7, 1985 | |
|---------|---------|---------|
| 4 – 3 | Recapitalization Agreement dated as of April 27, 1990, between the Company and L&D Woolens Limited Partnership and exhibits thereto | Incorporated by reference from Exhibit 4-10 to December 31, 1989 10-K |
| 4 – 4 | Indenture, dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 4-1 to Form 8-K filed December 18, 2003, located under Securities and Exchange Commission File No. 0-3252 ("December 18, 2003 8-K") |
| 4 – 5 | First Supplemental Indenture, dated May 25, 2007, by and between the Company and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 10-3 to the Company's Form 10-Q for the period ended March 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2006 10-Q") |
| 4 – 6 | Registration Rights Agreement, dated as of December 18, 2003, between the Company and Purchasers listed therein | Incorporated by reference from Exhibit 4-2 to December 18, 2003 8-K |
| 4 – 7 | Form of Unit | Incorporated by reference from Exhibit 4-3 to December 18, 2003 8-K |
| 4 – 8 | Form of Warrant | Incorporated by reference from Exhibit 4-4 to December 18, 2003 8-K |
| 4 – 9 | Form of 12% Senior Subordinated Note due August 1, 2009 | Incorporated by reference from Exhibit 4-5 to December 18, 2003 8-K |
| 4 – 10 | Form of 13% Junior Subordinated Note due November 1, 2009 | Incorporated by reference from Exhibit 4-6 to December 18, 2003 8-K |
| 10 – 1 | Lexington Precision Corporation Flexible Compensation Plan, as amended | Incorporated by reference from Exhibit 10-3 to the Company's Form 10-K for the year ended December 31, 1991, located under Securities and Exchange Commission File No. 0-3252 ("1991 10-K") |
| 10 – 2 | 1986 Restricted Stock Award Plan, as amended | Incorporated by reference from Exhibit 10-38 to December 31, 1989 10-K |
| 10 – 3 | Lexington Precision Corporation Retirement and Savings Plan, as amended | Incorporated by reference from Exhibit 10-5 to December 31, 1998 10-K |
| 10 – 4 | Description of 2008 Compensation Arrangements with Lubin, Delano & Company | Filed herewith |
| 10 – 5 | Corporate Office 2002 Management Cash Bonus Plan | Incorporated by reference from Exhibit 10-7 to the Company's Form 10-K for the year ended December 31, 2002, located under Securities and Exchange Commission File No. 0-3252 ("2002 10-K") |
| 10 – 6 | Exchange Agreement, dated as of | Incorporated by reference from Exhibit 10-1 to December |

|  |  |  |
|---|---|---|
|  | December 18, 2003, between the Company and each of Michael A. Lubin and Warren Delano | 18, 2003 8-K |
| 10 – 7 | Warrant Agent Agreement, Dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Warrant Agent | Incorporated by reference from Exhibit 10-2 to December 18, 2003 8-K |

- 85 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 10 – 8 | Delphi Corporation Lifetime Contract, dated as of November 22, 2004, by and between Delphi Automotive Systems LLC and Lexington Connector Seals | Incorporated by reference from Exhibit 10-1 to Form 8-K filed November 29, 2004, located under Securities and Exchange Commission File No. 0-3252 |
| 10 – 9 | Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit A to the Proxy Statement on Schedule 14A of Lexington Precision Corporation filed with the Securities and Exchange Commission on April 22, 2005 |
| 10 – 10 | Form of the Incentive Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-2 to Form 8-K filed May 19, 2005, located under Securities and Exchange Commission File No. 0-3252 ("May 19, 2005 8-K") |
| 10 – 11 | Form of the Non-Qualified Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-3 to May 19, 2005 8-K |
| 10 – 12 | Form of the Restricted Stock Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-4 to May 19, 2005 8-K |
| 10 – 13 | Credit and Security Agreement, dated as of May 31, 2006, by and among the Company and Lexington Rubber Group, Inc. ("LRG"), as borrowers, the lenders from time to time party thereto (the "Lenders"), CapitalSource Finance LLC, as collateral agent and administrative agent for the Lenders, and CapitalSource Finance LLC and Webster Business Credit Corporation, as co-documentation agents | Incorporated by reference from Exhibit 10-4 to the March 31, 2006 10-Q |
| 10 – 14 | Pledge Agreement, dated as of May 31, 2006, made by the Company in favor of CapitalSource Finance LLC, as agent | Incorporated by reference from Exhibit 10-5 to March 31, 2006 10-Q |

| 10 – 15 | Loan and Security Agreement, dated as of May 31, 2006, by and among the Company and LRG, as borrowers, the lenders from time to time party thereto (the "Term Lenders"), and CSE Mortgage LLC, as collateral agent and administrative agent for the Term Lenders | Incorporated by reference from Exhibit 10-6 to March 31, 2006 10-Q |
| 10 – 16 | Pledge Agreement, dated as of May 31, 2006, made by the Company in favor of CSE Mortgage LLC, as agent | Incorporated by reference from Exhibit 10-7 to March 31, 2006 10-Q |
| 10 – 17 | Intercreditor Agreement, dated as of May 31, 2006, by and between CapitalSource Finance LLC, as agent, and CSE Mortgage LLC, as agent, with the acknowledgment of the Company and LRG, as borrowers, and Webster Business Credit Corporation, CapitalSource Finance LLC, CSE Mortgage LLC, and DMD Special Situations, LLC, as lenders | Incorporated by reference from Exhibit 10-9 to March 31, 2006 10-Q |
| 10 – 18 | First Amendment and Default Waiver Agreement dated as of November 20, 2006, among the Company and LRG., as borrowers, and CapitalSource Finance LLC, as a lender, as Agent and as Co-Documentation Agent, Webster Business Credit Corporation, as a lender and as Co-Documentation Agent, CSE Mortgage LLC, as a lender and an Agent, and DMD Special Situations, LLC, as a lender | Incorporated by reference from Exhibit 10-31 to the Company's Form 10-K for the year ended December 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("2006 10-K") |
| 10 – 19 | Amendment Agreement dated as of January 31, 2006, between the Company and Michael A. Lubin with respect to the 13% Junior Subordinated Note | Incorporated by reference from Exhibit 10-31 to the 2006 10-K |

- 86 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 10 – 20 | Agreement, dated May 19, 2007, by and among the Company, LRG., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended March 31, 2007, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2007 10-Q") |
| 10 – 21 | Forbearance Agreement, dated May 25, 2007, by and among the Company and the holders of 12% | Incorporated by reference from Exhibit 10-2 to the March 31, 2007 10-Q |

| | | |
|---|---|---|
| | Senior Subordinated Notes due August 1, 2009, signatory thereto | |
| 10 – 22 | First Amendment, dated July 20, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among the Company, LRG, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended June 30, 2007, located under Securities and Exchange Commission File No. 0-3252 |
| 10 – 23 | Second Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among the Company, LRG, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended September 30, 2007, located under Securities and Exchange Commission File No. 0-3252 ("September 30, 2007 10-Q") |
| 10 – 24 | First Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 25, 2007, by and among the Company and the holders of the 12% Senior Subordinated Notes due August 1, 2009, signatory thereto | Incorporated by reference from Exhibit 10-2 to the September 30, 2007 10-Q |
| 10 – 25 | Super-Priority DIP Note, dated April 21, 2008, of the Company and LRG. Payable to the order of Lubin Partners LLC, William B. Connor, and ORA Associates LLC in the aggregate principal amount of $4,000,000 | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended June 30, 2008, located under Securities and Exchange Commission File No. 0-3252 ("June 30, 2008 10-Q") |
| 10 – 26 | Amendment dated April 21, 2008, to Super-Priority DIP Note between the Company and LRG. Payable to the order of Lubin Partners LLC, William B. Connor, and ORA Associates LLC in the aggregate principal amount of $4,000,000 | Filed herewith |
| 21 – 1 | Significant Subsidiary of Registrant | Filed herewith |
| 31 – 1 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 – 2 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 – 3 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant | Filed herewith |

| 32 – 1 | Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 – 2 | Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

- 87 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 32 – 3 | Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

- 88 -

**<u>Exhibit D</u>**

**LPC Form 10-Q for Quarter Ended September 30, 2009**

10-Q 1 lexington10qseptember.htm QUARTERLY REPORT FOR THE PERIOD ENDED SEPTEMBER 30, 2009

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

[X] **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
for the Period Ended September 30, 2009**

or

[ ] **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Commission File Number 0-3252**

# LEXINGTON PRECISION CORPORATION
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-1830121** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **800 Third Avenue, New York, NY** | **10022** |
| (Address of principal executive office) | (Zip Code) |

**(212) 319-4657**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name, former address, and former fiscal year, if changed since last report date)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes X  No _

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes _ No _

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.     (Check one):

| | |
|---|---|
| Large Accelerated Filer _ | Accelerated Filer _ |
| Non-Accelerated Filer _ | Smaller Reporting Company X |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes _ No X

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

As of November 10, 2009, there were 5,021,767 shares of common stock of the Registrant outstanding.

# LEXINGTON PRECISION CORPORATION

## Quarterly Report on Form 10-Q

## Table of Contents

**PART I.    FINANCIAL INFORMATION**

Item 1.      Financial Statements                                                                          1

Item 2.      Management's Discussion and Analysis of Financial Condition and Results of Operations         21

Item 3.      Quantitative and Qualitative Disclosures about Market Risk                                    46

Item 4T.     Controls and Procedures                                                                       46

**PART II.   OTHER INFORMATION**

Item 1a.     Risk Factors                                                                                  47

Item 3.      Defaults upon Senior Securities                                                               49

Item 6.      Exhibits                                                                                      49

- i -

## PART I.   FINANCIAL INFORMATION

### Item 1. FINANCIAL STATEMENTS

### LEXINGTON PRECISION CORPORATION

**Consolidated Statements of Operations**
**(thousands of dollars, except per share data)**
**(unaudited)**

| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | | |
| --- | ---: | --- | ---: | --- | ---: | --- | ---: | --- |
| | **2009** | | **2008** | | **2009** | | **2008** | |
| Net sales | $ | 16,648 | $ | 17,871 | $ | 46,190 | $ | 59,223 |
| Cost of sales | | 14,251 | | 15,733 | | 41,382 | | 50,563 |
| Gross profit | | 2,397 | | 2,138 | | 4,808 | | 8,660 |
| Selling and administrative expenses | | 1,283 | | 1,702 | | 4,113 | | 5,030 |
| Income from operations | | 1,114 | | 436 | | 695 | | 3,630 |
| Interest expense | | 1,907 | | 1,989 | | 5,648 | | 6,729 |
| Reorganization items, net expense | | 1,062 | | 1,622 | | 3,490 | | 3,392 |
| Loss from continuing operations before income taxes | | (1,855) | | (3,175) | | (8,443) | | (6,491) |
| Income tax provision | | 8 | | 9 | | 26 | | 35 |
| Loss from continuing operations | | (1,863) | | (3,184) | | (8,469) | | (6,526) |
| Loss from discontinued operations | | (61) | | (21) | | (85) | | (81) |
| Net loss | $ | (1,924) | $ | (3,205) | $ | (8,554) | $ | (6,607) |
| Basic and diluted loss per share of common stock: | | | | | | | | |
| Continuing operations | $ | (0.37) | $ | (0.65) | $ | (1.70) | $ | (1.32) |
| Discontinued operations | | (0.02) | | – | | (0.02) | | (0.01) |
| Net loss | $ | (0.39) | $ | (0.65) | $ | (1.72) | $ | (1.33) |

*See notes to consolidated financial statements.*

- 1 -

# LEXINGTON PRECISION CORPORATION

## Consolidated Balance Sheets
### (thousands of dollars, except share data)

|  | September 30, 2009 (unaudited) | December 31, 2008 |
|---|---|---|
| **Assets:** |  |  |
| Current assets: |  |  |
| Cash | $ 2,785 | $ 5,540 |
| Marketable securities | 112 | 38 |
| Accounts receivable, net of allowances of $748 and $735, respectively | 9,112 | 6,794 |
| Inventories, net | 7,968 | 10,597 |
| Prepaid expenses and other current assets | 2,830 | 2,426 |
| Current assets of discontinued operations | 32 | 7 |
| Total current assets | 22,839 | 25,402 |
| Plant and equipment, net | 16,273 | 18,439 |
| Plant and equipment of discontinued operations, net | 1,150 | 1,231 |
| Goodwill, net | 7,623 | 7,623 |
| Other assets, net | 489 | 633 |
|  | $ 48,374 | $ 53,328 |
| **Liabilities and stockholders' deficit:** |  |  |
| Current liabilities: |  |  |
| Accounts payable | $ 3,480 | $ 3,391 |
| Accrued expenses, excluding interest | 4,697 | 3,382 |
| Accrued interest expense | 160 | 199 |
| Debt in default | 31,749 | 34,175 |
| Debtor-in-possession loan | 4,000 | 4,000 |
| Short-term debt and current portion of long-term debt | 435 | 16 |
| Current liabilities of discontinued operations | 127 | 148 |
| Total current liabilities | 44,648 | 45,311 |
| Liabilities subject to compromise | 58,258 | 54,013 |
| Other long-term liabilities | 334 | 400 |
| Stockholders' deficit: |  |  |
| Common stock, $0.25 par value, 10,000,000 shares authorized, 5,021,767 shares issued and outstanding at September 30, 2009, and December 31, 2008 | 1,245 | 1,242 |
| Additional paid-in-capital | 13,204 | 13,197 |
| Accumulated deficit | (69,213) | (60,659) |
| Accumulated other comprehensive loss | (102) | (176) |
| Total stockholders' deficit | (54,866) | (46,396) |
|  | $ 48,374 | $ 53,328 |

*See notes to consolidated financial statemennts*

- 2 -

## LEXINGTON PRECISION CORPORATION

### Consolidated Statements of Cash Flows
### (thousands of dollars)
### (unaudited)

|  | Nine Months Ended September 30 | |
|---|---|---|
|  | 2009 | 2008 |
| **Operating activities:** | | |
| Net loss | $ (8,554) | $ (6,607) |
| Adjustments to reconcile net loss to net cash provided (used) by continuing operations: | | |
| Loss from discontinued operations | 85 | 81 |
| Depreciation | 3,419 | 3,844 |
| Amortization included in operations | 122 | 173 |
| Amortization of deferred financing costs and fees | – | 251 |
| Increase in accrued reorganization expenses | 601 | 1,774 |
| Changes in operating assets and liabilities that provided (used) cash: | | |
| Accounts receivable, net | (2,318) | 873 |
| Inventories, net | 2,629 | (1,550) |
| Prepaid expenses and other current assets | (423) | (580) |
| Accounts payable | 370 | 949 |
| Accrued expenses, excluding interest | 433 | 523 |
| Accrued interest expense | 4,206 | 4,157 |
| Other long-term liabilities | 30 | 17 |
| Other | 56 | (27) |
| Net cash provided by continuing operations | 656 | 3,878 |
| Net cash provided (used) by discontinued operations | (50) | 15 |
| Net cash provided by operating activities | 606 | 3,893 |
| **Investing activities:** | | |
| Purchases of plant and equipment | (1,399) | (2,207) |
| Proceeds from sales of assets | 126 | 49 |
| Expenditures for tooling owned by customers | (101) | (258) |
| Other | 20 | 29 |
| Net cash used by investing activities | (1,354) | (2,387) |
| **Financing activities:** | | |
| Issuance of debtor-in-possession note | – | 4,000 |
| Prepetition net borrowings under revolving line of credit | – | 3,587 |
| Prepetition repayment of debt in default and long-term debt | – | (837) |
| Postpetition repayment of debt in default and short and long-term debt | (2,631) | (1,658) |
| Short-term borrowings | 624 | – |
| Payment of financing expenses | – | (214) |
| Net cash provided (used) by financing activities | (2,007) | 4,878 |
| Net increase (decrease) in cash | (2,755) | 6,384 |
| Cash at beginning of year | 5,540 | 212 |
| Cash at end of period | $ 2,785 | $ 6,596 |

*See notes to consolidated financial statemennts*

- 3 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 1 — Basis of Presentation**

The unaudited interim consolidated financial statements include the accounts of Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"). The significant accounting policies followed by the Company are set forth in Note 1 to the consolidated financial statements in the Company's annual report on Form 10-K for the year ended December 31, 2008. In the opinion of management, the interim consolidated financial statements contain all adjustments, consisting only of adjustments of a normal, recurring nature, necessary to present fairly the Company's financial position at September 30, 2009, the Company's results of operations for the three-month and nine-month periods ended September 30, 2009 and 2008, and the Company's cash flows for the nine-month periods ended September 30, 2009 and 2008.

The preparation of the interim consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

The results of operations for the three-month period ended September 30, 2009, are not necessarily indicative of the results to be expected for any succeeding quarter or for the full year.

*Subsequent Events*

The company has evaluated subsequent events through November 20, 2009, the date these financial statements were issued.

*Bankruptcy Filing*

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-11153). The Company's exclusive right to file a plan of reorganization and solicit acceptances of such plan expired on April 30, 2009.

In connection with the chapter 11 filing, the Company obtained a financing package that consisted of (1) an arrangement with the Company's senior, secured lenders to freeze the loan under the Company's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through February 25, 2009, which has since been extended to December 31, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, unless otherwise extended. On September 30 and November 13, 2009, the Company's available cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, the Company currently believes, based on its most recent financial projections, that it has adequate liquidity to operate during the chapter 11 proceedings. For more information on the Company's senior, secured financing and the debtor-in-possession loan, please refer to Note 4, "Debt."

- 4 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection was to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in its total indebtedness on a basis that would be fair and equitable to all of its creditors and stockholders.

### Competing Plans of Reorganization

During September and October 2009, the Company's senior, secured lenders, the official committee of unsecured creditors of the Company in the chapter 11 proceedings (the "Official Creditors' Committee"), and the Company filed separate plans of reorganization. Each of these plans may be further amended, and if no such plan is confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

#### The Lenders' Plan

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan. For a detailed description of the Lenders' Plan, please refer to the plan document and the related disclosure statement at http://chapter11epiqsystem.com /lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

#### The Committee's Plan

The plan filed by the Official Creditors' Committee on September 29, 2009 (the "Committee's Plan"), provides, in summary, for the following:

- An extension of the Company's outstanding senior, secured debt without any immediate pay down;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

- The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

- The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

- Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10% (with a floor of 13½%), a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

- 5 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

For a detailed description of the Committee's Plan, please refer to the plan document and related disclosure statement with respect to the Committee's Plan at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

### The Company's Plan

The amended plan filed by the Company on October 6, 2009 (the "Company's Plan"), provides, in summary, for the following:

- The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the real estate term loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum; and

- Each holder of a Junior Subordinated Note claim or a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of the Company's liabilities would have been converted into equity securities. For a detailed description of the Company's Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the plan document and the related disclosure statement filed on October 6, 2009 at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

The Company requires additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that the Company will be able to obtain such financing.

- 6 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

### *Reporting by Entities in Reorganization under the Bankruptcy Code*

The Company's consolidated financial statements have been prepared in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") subtopic 852-10, "Reorganizations – Overall" ("ASC 852-10"), (formerly, American Institute of Certified Public Accountants, Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." ASC 852-10 provides guidance for financial reporting by entities that have filed petitions and expect to reorganize as going concerns under Chapter 11 of Title 11 of the United States Code. ASC 852-10 does not change the application of Generally Accepted Accounting Principles ("GAAP") with respect to the preparation of the Company's financial statements. However, ASC 852-10 requires, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

### *Reorganization Items*

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as "reorganization items" in the statements of operations. Reorganization items reflected in the Company's consolidated financial statements for the three-month and nine-month periods ended September 30, 2009 and 2008, respectively, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | Nine Months Ended September 30, | April 1, 2008 Through September 30, |
|---|---|---|---|---|
| | 2009 | 2008 | 2009 | 2008 |
| Professional fees and expenses incurred directly by the Company | $ 365 | $ 833 | $ 1,200 | $ 1,832 |
| Professional fees and expenses incurred by creditors | 659 | 691 | 2,119 | 1,316 |
| Other costs | 50 | 149 | 210 | 326 |
| Interest income | (12) | (51) | (39) | (82) |
| Reorganization items, net expense | $ 1,062 | $ 1,622 | $ 3,490 | $ 3,392 |

### *Liabilities Subject to Compromise*

ASC 852-10 requires that certain prepetition claims against the Company that are unsecured or under-secured be classified in the balance sheet as "liabilities subject to compromise." Additional claims that are subject to compromise may arise subsequent to the filing date as a result of the rejection of executory contracts or because claims are allowed as a result of the resolution of contingencies or disputes. On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008, as the bar date for the filing of all prepetition claims other than claims held by government units. The bar date for government units to file prepetition claims was September 29, 2008. The bar date was the date on which claims against the Company that arose prior to the filing date must have been filed in order for the claimant to receive any distribution in the chapter 11 case. The bar dates have passed and, absent relief

- 7 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

from the Bankruptcy Court, no additional claims may be filed against the Company. No claims or asserted claims were filed that were not already known to the Company as of April 1, 2008. Although prepetition claims are generally stayed, on April 2 and April 22, 2008, the Company received approvals from the Bankruptcy Court to pay or otherwise honor, subject to certain conditions, certain prepetition obligations critical to its continued operation, including employee wages and benefits, workers' compensation and product liability insurance programs, certain customer programs, and common carrier charges.

The Company has been paying and intends to continue to pay all undisputed postpetition claims in the ordinary course of business. Liabilities subject to compromise at September 30, 2009, and December 31, 2008, consisted of the following (dollar amounts in thousands):

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Prepetition accounts payable – continuing operations | $ 5,432 | $ 5,432 |
| Prepetition accounts payable – discontinued operations | 174 | 174 |
| Senior Subordinated Notes | 34,177 | 34,177 |
| Accrued interest on Senior Subordinated Notes | 17,246 | 13,055 |
| Junior Subordinated Note | 347 | 347 |
| Accrued interest on Junior Subordinated Note | 143 | 109 |
| Series B Preferred Stock | 660 | 660 |
| Accrued dividends on Series B Preferred Stock | 79 | 59 |
| Total liabilities subject to compromise | $ 58,258 | $ 54,013 |

The foregoing amounts are based upon the Company's books and records and do not necessarily take into account all alleged liabilities asserted in proofs of claims filed with the Bankruptcy Court.

### Accounting for Interest Expense

On April 2, 2008, the Bankruptcy Court issued an order authorizing the Company to utilize the collections on its accounts receivable in the operation of its business. Pursuant to that order, the interest rates on the Company's senior, secured debt were reduced from the default rates to the contractual rates. Because the Company categorizes the interest on its unsecured prepetition debt as an allowed claim under its proposed plan of reorganization, the Company continues to accrue, and report in its consolidated financial statements, interest on all of its unsecured prepetition debt at the applicable contractual rates.

### Going Concern Basis

The Company's consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. GAAP. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

- 8 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

*Goodwill Impairment*

At September 30, 2009, and December 31, 2008, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At September 30, 2009, the assets of the Rubber Group, including goodwill, totaled $37,431,000. During the Company's chapter 11 proceedings, the Company's financial advisor, W.Y. Campbell & Company, has prepared several analyses of the value of the Rubber Group, each of which indicated that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill using a fair value approach are performed during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

*Recently Issued Accounting Standards*

*FASB ASC 105, "Generally Accepted Accounting Principles"*

In June 2009, the FASB issued ASC Topic 105 "Generally Accepted Accounting Principles" ("ASC 105"), formerly Statement of Financial Accounting Standards No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162." The objective of ASC 105 is to establish the FASB Accounting Standards Codification™ as the source of authoritative principles and standards recognized by the FASB to be applied by nongovernmental units in the preparation of financial statements in conformity with GAAP. ASC 105 did not change current GAAP, but is intended to simplify user access to all authoritative GAAP by providing all the authoritative literature related to a particular topic in one place. ASC 105 supersedes all other accounting literature not included in the Codification and all other accounting literature not included in ASC 105 is deemed to be nonauthoritative. The adoption of ASC 105 did not have any impact on the Company's results of operations or financial position. Pursuant to the provisions of ASC 105, the Company has updated references to U.S. GAAP in these consolidated financial statements.

*FASB ASC 855, "Subsequent Events"*

In May 2009, the FASB issued ASC Topic 855, "Subsequent Events" ("ASC 855"). This guidance is effective for interim or annual periods ending after June 15, 2009, and established the principles and requirements for the evaluation and disclosure of subsequent events. The Company adopted this guidance on April 1, 2009, and has included the appropriate disclosure in these consolidated financial statements.

- 9 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**Note 2 — Inventories**

Inventories at September 30, 2009, and December 31, 2008, are set forth below (dollar amounts in thousands):

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Finished goods | $ 4,110 | $ 6,370 |
| Work in process | 1,660 | 1,923 |
| Raw material | 2,198 | 2,304 |
|  | $ 7,968 | $ 10,597 |

**Note 3 — Plant and Equipment**

Plant and equipment at September 30, 2009, and December 31, 2008, is set forth below (dollar amounts in thousands):

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Land | $ 2,295 | $ 2,255 |
| Buildings | 13,750 | 13,378 |
| Equipment | 109,329 | 112,022 |
|  | 125,374 | 127,655 |
| Less accumulated depreciation | 109,101 | 109,216 |
| Plant and equipment, net | $ 16,273 | $ 18,439 |

- 10 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**Note 4 — Debt**

Debt at September 30, 2009, and December 31, 2008 is set forth below (dollar amounts in thousands):

| | September 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Not Subject to Compromise | Subject to Compromise | Total | Not Subject to Compromise | Subject to Compromise | Total |
| **Debt in default:** | | | | | | |
| Senior, secured credit facility: | | | | | | |
| Revolving line of credit | $ 14,219 | $ – | $ 14,219 | $ 14,219 | $ – | $ 14,219 |
| Equipment term loan | 4,792 | – | 4,792 | 6,667 | – | 6,667 |
| Real estate term loan | 12,738 | – | 12,738 | 13,289 | – | 13,289 |
| Subtotal | 31,749 | – | 31,749 | 34,175 | – | 34,175 |
| Senior Subordinated Notes | – | 34,177 | 34,177 | – | 34,177 | 34,177 |
| Junior Subordinated Note | – | 347 | 347 | – | 347 | 347 |
| Total debt in default | 31,749 | 34,524 | 66,273 | 34,175 | 34,524 | 68,699 |
| Debtor-in-possession loan | 4,000 | – | 4,000 | 4,000 | – | 4,000 |
| Short-term borrowings | 419 | – | 419 | – | – | – |
| Current portion of long-term debt | 16 | 660 | 676 | 16 | 660 | 676 |
| **Long-term debt:** | | | | | | |
| Series B Preferred Stock | – | 660 | 660 | – | 660 | 660 |
| Other | 16 | – | 16 | 16 | – | 16 |
| Subtotal | 16 | 660 | 676 | 16 | 660 | 676 |
| Less current portion | (16) | (660) | (676) | (16) | (660) | (676) |
| Total long-term debt | – | – | – | – | – | – |
| Total debt | $ 36,184 | $ 35,184 | $ 71,368 | $ 38,191 | $ 35,184 | $ 73,375 |

*Senior, Secured Credit Facility*

In connection with the Company's chapter 11 filing on April 1, 2008, the Company and its senior, secured lender, with the approval of the Bankruptcy Court, modified the senior, secured credit facility in the following manner:

1.  A default premium of 2% was eliminated and the interest rates on the various components of the senior, secured facility reverted to the following contractual rates: LIBOR plus 2.75% (3.00% at September 30, 2009) on outstanding amounts under the revolving line of credit; LIBOR plus 4.5% (4.75% at September 30, 2009) for the equipment term loan; and the prime rate, plus 6%, subject to a minimum interest rate of 11% (in effect at September 30, 2009), on $4,000,000 of the real estate term loan and LIBOR plus 4.5% (4.75% at September 30, 2009) on the balance of the real estate term loan (weighted average rate for the entire real estate loan of 6.71% at September 30, 2009).

- 11 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

2. The principal amount of the loan outstanding under the revolving line of credit was fixed at $14,219,000, and the Company was permitted to utilize, until February 25, 2009 (since extended to December 31, 2009), collections on its accounts receivable in the operation of its business.

3. The Company agreed to continue to make the scheduled monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

The following financial covenants are presently in effect under the senior, secured financing agreements:

1. Minimum Cash. Aggregate cash may not be less than the following amounts on the specified measurement dates:

| | |
|---|---|
| November 6, 2009 | $2,643,000 |
| November 13, 2009 | $2,632,000 |
| November 20, 2009 | $2,836,000 |
| November 27, 2009 | $2,657,000 |
| December 4, 2009 | $2,613,000 |
| December 11, 2009 | $2,833,000 |
| December 18, 2009 | $2,798,000 |
| December 25, 2009 | $2,917,000 |
| January 1, 2010 | $2,917,000 |

On November 13, 2009, the Company's aggregate cash was $3,753,000.

2. Maximum Expenditures. The Company's cumulative expenditures may not exceed 110% of its cumulative budgeted expenditures for the two-week period ending on November 13, 2009, and on the last day of each two-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $247,000 less than 110% of cumulative budgeted expenditures.

3. Minimum Net Sales. The Company's cumulative net sales are required to be greater than 82% of its cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $6,928,000 greater than the minimum level of cumulative net sales and aggregated 87.7% of our cumulative budgeted net sales from April 2, 2008.

The Company's right to utilize cash collateral of the senior, secured lenders will terminate upon the occurrence of the following events if the Company fails to cure any of the events within five days after it receives written notice of the event from the senior, secured lenders: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

- 12 -

Lexington Precision Corporation - Form 10-Q                    http://www.sec.gov/Archives/edgar/data/12570/000117625609001075/le...

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

The Company believes that the loans outstanding under the senior, secured credit facility and the interest accrued thereon are fully collateralized and will not be impaired under any plan of reorganization. As a result, the Company has continued to accrue and pay the interest on these loans at the contractual rates.

The commencement of proceedings under chapter 11 constituted an event of default under the terms of the agreement governing the senior, secured credit facility. In addition, prior to the chapter 11 filing date, a cross-default existed under the senior, secured credit facility because the Company did not make the interest payment that was due on its Senior Subordinated Notes on November 1, 2006, and has not made any of the quarterly interest payments since that date. As a result, all of the loans under the senior, secured credit facility are classified as debt in default at September 30, 2009, and December 31, 2008.

The Company's loans and reimbursement obligations with respect to letters of credit under the senior, secured credit facility are secured by liens on substantially all of the Company's assets. The agreements governing the senior, secured credit facility placed certain restrictions on the Company's business and operations, including limitations on the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

### Debtor-in-Possession Loan

The debtor-in-possession loan in the amount of $4,000,000 was approved by the Bankruptcy Court on April 2 and 17, 2008. The debtor-in-possession loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% (in effect at September 30, 2009). The debtor-in-possession loan was granted super-priority administration expense status by the Bankruptcy Court. The loan matures on the earliest of (1) December 31, 2009, unless otherwise extended, (2) the effective date of a plan of reorganization, (3) the conversion of the bankruptcy proceedings from chapter 11 to chapter 7, (4) the appointment of a chapter 11 trustee, or (5) an event of default as described in the documents governing the debtor-in-possession loan.

### Senior Subordinated Notes

The Senior Subordinated Notes matured on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. In addition, the Company did not pay the principal amount of the Senior Subordinated Notes at maturity. Pursuant to a forbearance agreement between the Company and a group of six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes reverted to 12%. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of the Company's affiliates and members of their families. At September 30, 2009, accrued interest on the Senior Subordinated Notes totaled $17,246,000. The Senior Subordinated Notes and the accrued interest thereon through September 30, 2009, were classified as

- 13 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

liabilities subject to compromise in the Company's consolidated financial statements at September 30, 2009.

### Junior Subordinated Note

The Junior Subordinated Note, which matured on November 1, 2009, is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and to the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. In addition, the Company did not pay the principal amount of the Junior Subordinated Note at maturity. At September 30, 2009, accrued interest on the Junior Subordinated Note totaled $143,000. The Junior Subordinated Note and the accrued interest thereon through September 30, 2009, were classified as liabilities subject to compromise in the Company's consolidated financial statements at September 30, 2009.

### Series B Preferred Stock

At September 30, 2009, there were outstanding 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), (4) accruing dividends at a contractual rate of 4%, and (5) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. All of the shares of Series B Preferred Stock are past their scheduled redemption date. In addition, at September 30, 2009, the Company was in arrears on scheduled dividend payments on the Series B Preferred Stock in the aggregate amount of $79,000.

The Series B Preferred Stock is classified as debt in the Company's consolidated financial statements. At September 30, 2009, the Series B Preferred Stock and accrued dividends thereon were classified as liabilities subject to compromise in the Company's consolidated financial statements.

### Fair Value of Financial Instruments

The Company believes that, at September 30, 2009, the fair value of the loans outstanding under the revolving line of credit, the equipment term loan, the real estate term loan, and the debtor-in-possession loan approximated the principal amounts of such loans. Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

### Cash Interest Paid

Cash interest paid during the nine-month periods ended September 30, 2009 and 2008, including amounts allocated to discontinued operations, totaled $1,568,000 and $2,400,000, respectively.

- 14 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 5 — Interest Expense**

A breakdown of interest expense for the three-month and nine-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| Interest expense at contractual interest rates: | | | | |
| Senior, secured loans | $ 390 | $ 618 | $ 1,209 | $ 1,926 |
| Debtor-in-possession loan | 102 | 103 | 303 | 191 |
| Senior Subordinated Notes | 1,025 | 1,025 | 3,076 | 3,076 |
| Junior Subordinated Note | 11 | 11 | 34 | 34 |
| All other | 18 | (5) | 37 | 61 |
| Subtotal | 1,546 | 1,752 | 4,659 | 5,288 |
| Interest expense resulting from incremental interest rates: | | | | |
| Senior, secured loans – default or forbearance premium | – | – | – | 172 |
| Senior Subordinated Notes – forbearance premium | – | – | – | 411 |
| Senior Subordinated Notes – interest on missed interest payments | 403 | 279 | 1,115 | 733 |
| Subtotal | 403 | 279 | 1,115 | 1,316 |
| Financing costs and fees | – | – | – | 251 |
| Total interest expense | 1,949 | 2,031 | 5,774 | 6,855 |
| Less interest expense allocated to discontinued operations | 42 | 42 | 126 | 126 |
| Interest expense related to continuing operations | $ 1,907 | $ 1,989 | $ 5,648 | $ 6,729 |

**Note 6 — Income Taxes**

At September 30, 2009, and December 31, 2008, the Company's net deferred income tax assets were fully reserved by a valuation allowance. The income tax provisions recorded during the three-month and nine-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

**Note 7 — Net Loss per Common Share**

The calculations of basic and diluted net loss per common share for the three-month and nine-month periods ended September 30, 2009 and 2008, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock, all of which expired on August 1, 2009, were not dilutive. In addition, non-vested shares of restricted common stock issued under the Company's 2005 Stock Award Plan are not considered outstanding common shares for purposes of the calculation of basic net loss per share of common stock because their effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of basic and diluted loss per share of common stock set forth below does not include the assumed conversion of the Series B Preferred

- 15 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(unaudited)**

Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the 2005 Stock Award Plan.

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| Numerator – Loss: | | | | |
| Continuing operations | $ (1,863) | $ (3,184) | $ (8,469) | $ (6,526) |
| Discontinued operations | (61) | (21) | (85) | (81) |
| Net loss | $ (1,924) | $ (3,205) | $ (8,554) | $ (6,607) |
| Denominator – Weighted average shares outstanding | 4,980 | 4,962 | 4,977 | 4,958 |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.37) | $ (0.65) | $ (1.70) | $ (1.32) |
| Discontinued operations | (0.02) | – | (0.02) | (0.01) |
| Net loss | $ (0.39) | $ (0.65) | $ (1.72) | $ (1.33) |

- 16 -

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 8 — Segments**

*Description of Segments and Products*

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily insulators used in aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Rubber Group currently operates manufacturing facilities in Jasper, Georgia, North Canton, Ohio, and Rock Hill, South Carolina. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks at a manufacturing facility located in Rochester, New York. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States.

The Corporate Office oversees the operations of the Rubber Group and the Metals Group and performs certain general administrative functions that are not directly related to any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, and certain prepaid expenses and other current assets.

*Sales by Market*

The following table summarizes net sales for the three-month and nine-month periods ended September 30, 2009 and 2008, by the end-market in which the Company's components were utilized (dollar amounts in thousands):

| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2009 | | 2008 (1) | | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 7,876 | 47.3 % | $ 6,717 | 37.6 % | $ 21,046 | 45.6 % | $ 21,326 | 36.0 % |
| Automotive – original equipment | 5,083 | 30.5 | 6,179 | 34.6 | 12,473 | 27.0 | 22,725 | 38.4 |
| Medical | 3,358 | 20.2 | 4,305 | 24.1 | 11,124 | 24.1 | 12,566 | 21.2 |
| Other | 331 | 2.0 | 670 | 3.7 | 1,547 | 3.3 | 2,606 | 4.4 |
| Total net sales | $ 16,648 | 100.0 % | $ 17,871 | 100.0 % | $ 46,190 | 100.0 % | $ 59,223 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

- 17 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

### *Segment Financial Data*

Information relating to the Company's operating segments and the Corporate Office for the three-month and nine-month periods ended September 30, 2009 and 2008, is summarized below (dollar amounts in thousands):

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| --- | --- | --- | --- | --- |
| | **2009** | **2008** | **2009** | **2008** |
| **Net sales:** | | | | |
| Rubber Group | $ 13,862 | $ 15,327 | $ 39,187 | $ 50,643 |
| Metals Group | 2,786 | 2,544 | 7,003 | 8,580 |
| Total net sales | $ 16,648 | $ 17,871 | $ 46,190 | $ 59,223 |
| **Income (loss) from operations:** | | | | |
| Rubber Group | $ 1,743 | $ 1,341 | $ 3,269 | $ 6,186 |
| Metals Group | (64) | (333) | (840) | (353) |
| Subtotal | 1,679 | 1,008 | 2,429 | 5,833 |
| Corporate Office (1) | (565) | (572) | (1,734) | (2,203) |
| Total income from operations | $ 1,114 | $ 436 | $ 695 | $ 3,630 |
| **Depreciation and amortization (2):** | | | | |
| Rubber Group | $ 1,045 | $ 1,120 | $ 3,159 | $ 3,564 |
| Metals Group | 113 | 127 | 343 | 415 |
| Subtotal | 1,158 | 1,247 | 3,502 | 3,979 |
| Corporate Office | 14 | 13 | 39 | 38 |
| Total depreciation and amortization | $ 1,172 | $ 1,260 | $ 3,541 | $ 4,017 |
| **Capital expenditures:** | | | | |
| Rubber Group | $ 215 | $ 392 | $ 1,194 | $ 1,901 |
| Metals Group | 107 | 145 | 205 | 288 |
| Subtotal | 322 | 537 | 1,399 | 2,189 |
| Corporate Office | – | 7 | – | 18 |
| Total capital expenditures | $ 322 | $ 544 | $ 1,399 | $ 2,207 |

| | Sept. 30, 2009 | Dec. 31, 2008 |
| --- | --- | --- |
| **Assets:** | | |
| Rubber Group | $ 37,431 | $ 38,527 |
| Metals Group | 6,588 | 7,680 |
| Subtotal | 44,019 | 46,207 |
| Corporate Office | 3,173 | 5,883 |
| Total assets | $ 47,192 | $ 52,090 |

(1) During the nine-month period ended September 30, 2008, Corporate Office expenses included $508,000 of expenses incurred in connection with the Company's efforts to refinance, restructure, or repay its indebtedness prior to its chapter 11 filing on April 1, 2008.

- 18 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

(2) Excludes amortization and write-off of deferred financing expenses, which totaled $251,000 during the nine-month period ended September 30, 2008. Amortization and write-off of deferred financing expenses is included in interest expense in the consolidated financial statements.

## Note 9 — Accumulated Other Comprehensive Loss

The Company's marketable securities are valued at their quoted market prices at the close of business on September 30, 2009, in accordance with the guidance set forth in FASB ASC subtopic 820-10 (level 1 inputs). Based on the classification of these marketable securities as available-for-sale, the Company recognized other comprehensive income of $29,000 and $74,000 during the three-month and nine-month periods ended September 30, 2009, respectively, and other comprehensive losses of $30,000 and $98,000 during the three-month and nine-month periods ended September 30, 2008, respectively.

## Note 10 — Discontinued Operations

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements.

## Note 11 — Restructuring of Connector-Seal Business

During the last six months of 2008, the Company experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at its connector-seal facility in Vienna, Ohio. Because of these losses and because the Company did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, the Company decided to close this facility and move the production to the Company's other rubber molding facilities. The relocation of the connector-seal business to the Company's other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the Company's other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for the moving and installation of manufacturing equipment, and (4) $141,000 for building repairs and maintenance. During the three-month period ended September 30, 2009, the Company expensed $258,000 of restructuring costs, of which $238,000 was included in cost of sales and $20,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. During the nine-month period ended September 30, 2009, the Company expensed $738,000 of restructuring costs, of which $682,000 was included in cost of sales and $56,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. At September 30, 2009, the Company had accrued $27,000 on its consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, the Company currently believes, based on independent appraisals, that it should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that the Company is not planning to move to its other rubber molding facilities, at a value that will be in excess of the carrying value of these assets.

- 19 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**Note 12 — Warrants to Purchase Common Stock**

On August 1, 2009, all outstanding warrants to purchase the Company's common stock expired unexercised.

[This space intentionally left blank]

- 20 -

**Item 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Overview**

Some of our statements in this Form 10-Q are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approvals with respect to motions in our chapter 11 proceedings;

- our ability to obtain financing that will permit us to exit chapter 11;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- which currently proposed plan of reorganization, if any, will be approved by the Bankruptcy Court;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- our ability to offset any increases in the cost of raw materials;

- increases and decreases in the production of cars and trucks in North America;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- decreased access to the credit markets by our customers or suppliers;

- chapter 11 filings by one or more of our customers or suppliers; and

- labor interruptions at our facilities or at our customers' or suppliers' facilities.

- 21 -

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part II, Item 1A of our Form 10-Q for the three-month period ended March 31, 2009, and this Form 10-Q, and in Part I, Item 1A of our annual report on Form 10-K for the year ended December 31, 2008.

## Subsequent Events

Our Junior Subordinated Note matured on November 1, 2009. We did not pay the principal amount of the note at its maturity. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on the Junior Subordinated Note at the contractual rate of 13%.

## Results of Operations — Third Quarter of 2009 Versus Third Quarter of 2008

Unless otherwise indicated, the data set forth below in this Item 2 relate solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the three-month periods ended September 30, 2009 and 2008, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. The term EBITDA, as used by us, does not include reorganization items, which are classified as nonoperating expense in our consolidated statements of operations. EBITDA is not a measure of performance under GAAP. We have presented EBITDA here and elsewhere in this Form 10-Q for the following reasons:

1.  Investors and lenders frequently look at EBITDA when evaluating a company's ability to satisfy interest and principal obligations with respect to its outstanding indebtedness;

2.  Management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items; and

3.  Certain financial covenants in our senior, secured credit agreements have been calculated using variations of EBITDA.

- 22 -

EBITDA has material limitations when used as a measurement of performance, including the following:

1. EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2. EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3. EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

4. EBITDA does not reflect reorganization items, which primarily represent expenses and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to us, either currently or in the future.

5. EBITDA does not reflect cash provided or used as a result of changes in our working capital.

6. Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements that governed our senior, secured credit facility prior to our chapter 11 filing on April 1, 2008.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP when analyzing our financial performance. EBITDA should not be considered to be a substitute for the following GAAP measures: gross profit, income from operations, net income, or net cash provided from operating activities.

- 23 -

Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 | |
| --- | ---: | ---: | ---: | ---: |
| Net sales | $ 16,648 | 100.0 % | $ 17,871 | 100.0 % |
| Cost of sales | 14,251 | 85.6 | 15,733 | 88.0 |
| Gross profit | 2,397 | 14.4 | 2,138 | 12.0 |
| Selling and administrative expenses | 1,283 | 7.7 | 1,702 | 9.5 |
| Income from operations | 1,114 | 6.7 | 436 | 2.4 |
| Interest expense | 1,907 | 11.5 | 1,989 | 11.1 |
| Reorganization items, net expense | 1,062 | 6.4 | 1,622 | 9.1 |
| Loss before income taxes | (1,855) | (11.1) | (3,175) | (17.8) |
| Income tax provision | 8 | – | 9 | 0.1 |
| Loss from continuing operations | (1,863) | (11.2) | (3,184) | (17.8) |
| Add back: | | | | |
| Depreciation and amortization | 1,172 | 7.0 | 1,260 | 7.1 |
| Interest expense | 1,907 | 11.5 | 1,989 | 11.1 |
| Reorganization items, net expense | 1,062 | 6.4 | 1,622 | 9.1 |
| Income tax provision | 8 | – | 9 | 0.1 |
| EBITDA | 2,286 | 13.7 | 1,696 | 9.5 |
| Adjustments to reconcile EBITDA to net cash provided (used) by operating activities: | | | | |
| Interest expense | (1,907) | (11.5) | (1,989) | (11.1) |
| Reorganization items, net expense | (1,062) | (6.4) | (1,622) | (9.1) |
| Income tax provision | (8) | – | (9) | (0.1) |
| Net change in accrued reorganization expenses | 515 | 3.1 | 265 | 1.5 |
| Net change in operating assets and liabilities | 201 | 1.2 | 1,122 | 6.3 |
| Net cash provided (used) by operating activities | $ 25 | 0.2 % | $ (537) | (3.0) % |
| Net cash used by investing activities | $ (370) | (2.2) % | $ (643) | (3.6) % |
| Net cash used by financing activities | $ (390) | (2.3) % | $ (832) | (4.7) % |

- 24 -

08-11153-scc    Doc 870    Filed 04/19/10    Entered 04/19/10 23:35:13    Main Document
Pg 238 of 318

Net sales classified by the end-market in which our components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | | Three Months Ended September 30 | | | |
| | | 2009 | | 2008 (1) | |
|---|---|---|---|---|---|
| Automotive – aftermarket | $ | 7,876 | 47.3 % | $ 6,717 | 37.6 % |
| Automotive – original equipment | | 5,083 | 30.5 | 6,179 | 34.6 |
| Medical | | 3,358 | 20.2 | 4,305 | 24.1 |
| Other | | 331 | 2.0 | 670 | 3.7 |
| Total net sales | $ | 16,648 | 100.0 % | $ 17,871 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

Our net sales for the third quarter of 2009 declined by $1,223,000, or 6.8%, compared to the third quarter of 2008. The decrease in net sales was primarily the result of a $1,096,000, or 17.7%, decrease in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers, as a result of the significant reduction in automotive production levels, and a $947,000, or 22.0%, reduction in the sales of medical components, offset, in part, by a $1,159,000 increase, or 17.3%, in sales of automotive components for use in the automotive aftermarket.

EBITDA for the third quarter of 2009 was $2,286,000, or 13.7% of net sales, compared to EBITDA of $1,696,000, or 9.5% of net sales, for the third quarter of 2008. The change in EBITDA reflected a $327,000 increase in EBITDA at the Rubber Group, a $255,000 increase in EBITDA at the Metals Group, and a $8,000 increase in EBITDA at the Corporate Office.

Net cash provided by our operating activities during the third quarter of 2009 totaled $25,000, compared to net cash used by operating activities of $537,000 for the third quarter of 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the three-month periods ended September 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

- 25 -

The following table sets forth the operating results of the Rubber Group for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | |
| Net sales | $ 13,862 | 100.0 % | $ 15,327 | 100.0 % |
| Cost of sales | 11,506 | 83.0 | 12,990 | 84.8 |
| Gross profit | 2,356 | 17.0 | 2,337 | 15.2 |
| Selling and administrative expenses | 613 | 4.4 | 996 | 6.5 |
| Income from operations | 1,743 | 12.6 | 1,341 | 8.7 |
| Add back depreciation and amortization | 1,045 | 7.5 | 1,120 | 7.3 |
| EBITDA | $ 2,788 | 20.1 % | $ 2,461 | 16.1 % |

Net sales by the type of market in which the Rubber Group's components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 7,876 | 56.8 % | $ 6,717 | 43.8 % |
| Medical | 3,358 | 24.2 | 4,305 | 28.1 |
| Automotive – original equipment | 2,590 | 18.7 | 4,057 | 26.5 |
| Other | 38 | 0.3 | 248 | 1.6 |
| Total net sales | $ 13,862 | 100.0 % | $ 15,327 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

During the third quarter of 2009, net sales of the Rubber Group decreased by $1,465,000, or 9.6%, compared to the third quarter of 2008, primarily because of a $1,467,000, or 36.2%, reduction in net sales of components for use in automotive original equipment applications, primarily connector seals for automotive wiring systems. This reduction was caused by large production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the third quarter of 2009 in response to reduced consumer demand for automobiles and light trucks. In addition, sales of medical components decreased by $947,000, or 22.0%, primarily due to (1) the reduction of safety stocks in inventory built up by one of our larger customers during the second and third quarters of 2008, and (2) a reduction in sales of a high volume, low margin component that is dual-sourced by our customer. These decreases were offset, in part, by a $1,159,000 increase, or 17.3%, in sales of automotive components for use in the automotive aftermarket.

- 26 -

Cost of sales as a percentage of net sales decreased to 83.0% of net sales during the third quarter of 2009, compared to 84.8% of net sales during the third quarter of 2008. This reduction was a result of improved product mix.

Selling and administrative expenses of the Rubber Group decreased by $383,000, or 38.5%, during the third quarter of 2009, compared to the third quarter of 2008, primarily because (1) during the third quarter of 2008 we incurred $257,000 of one-time fees and expenses related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and procedures at our facility in Rock Hill, South Carolina, (2) we reduced our administrative expenses as a result of the closing of our facility located in Vienna, Ohio, and (3) we recovered certain accounts receivable previously written off as uncollectible. Selling and administrative expenses expressed as a percentage of net sales decreased to 4.4% of net sales during the third quarter of 2009, compared to 6.5% during the third quarter of 2008.

During the third quarter of 2009, the Rubber Group's income from operations totaled $1,743,000, an increase of 402,000, or 30.0%, compared to the third quarter of 2008. The Rubber Group's EBITDA for the third quarter of 2009 was $2,788,000, or 20.1% of net sales, compared to $2,461,000, or 16.1% of net sales, for the third quarter of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the our other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for moving and installation of manufacturing equipment and (4) $141,000 for building repairs and maintenance. During the three-month period ended September 30, 2009, we expensed $258,000 of restructuring expenses, of which $238,000 was included in cost of sales and $20,000 was included in selling and administrative expenses in our consolidated statements of operations. At September 30, 2009, we had accrued $27,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, for an aggregate amount in excess of the carrying value of those assets.

- 27 -

*Metals Group*

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive original equipment manufacturers.

The following table sets forth the operating results of the Metals Group for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
|---|---|---|---|---|
| | 2009 | | 2008 | |
| Net sales | $ 2,786 | 100.0 % | $ 2,544 | 100.0 % |
| Cost of sales | 2,745 | 98.5 | 2,743 | 107.8 |
| Gross profit (loss) | 41 | 1.5 | (199 ) | (7.8 ) |
| Selling and administrative expenses | 105 | 3.8 | 134 | 5.3 |
| Loss from operations | (64 ) | (2.3 ) | (333 ) | (13.1 ) |
| Add back depreciation and amortization | 113 | 4.1 | 127 | 5.0 |
| EBITDA | $ 49 | 1.8 % | $ (206 ) | (8.1 )% |

Net sales by the end-market in which the Metals Group's components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
|---|---|---|---|---|
| | 2009 | | 2008 | |
| Automotive − original equipment | $ 2,493 | 89.5 % | $ 2,122 | 83.4 % |
| Other | 293 | 10.5 | 422 | 16.6 |
| Total net sales | $ 2,786 | 100.0 % | $ 2,544 | 100.0 % |

During the third quarter of 2009, net sales of the Metals Group increased by $242,000, or 9.5%, compared to the third quarter of 2008, primarily as a result of increased net sales of existing and new automotive original equipment components to the Metals Group's largest customer.

Cost of sales as a percentage of net sales decreased to 98.5% of net sales during the third quarter of 2009 from 107.8% of net sales during the third quarter of 2008, primarily because of improved efficiencies and better product mix.

Selling and administrative expenses of the Metals Group decreased by $29,000, or 21.6%, from the third quarter of 2008 to the third quarter of 2009, primarily as a result of a reduction in selling expenses.

- 28 -

Selling and administrative expenses expressed as a percentage of net sales decreased to 3.8% of net sales during the third quarter of 2009, compared to 5.3% during the third quarter of 2008.

For the third quarter of 2009, the Metals Group's loss from operations was $64,000, compared to a loss from operations of $333,000 for the third quarter of 2008. The Metals Group's EBITDA for the third quarter of 2009 was positive $49,000, compared to negative $206,000 for 2008.

*Corporate Office*

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Three Months Ended September 30 | |
| --- | --- | --- |
|  | 2009 | 2008 |
| Loss from operations | $ (565) | $ (572) |
| Add back depreciation and amortization | 14 | 13 |
| EBITDA | $ (551) | $ (559) |

- 29 -

*Interest Expense*

A breakdown of interest expense for the three-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | |
|---|---|---|
| | **2009** | **2008** |
| Interest expense at contractual interest rates: | | |
|     Senior, secured loans | $ 391 | $ 618 |
|     Debtor-in-possession loan | 102 | 103 |
|     Senior Subordinated Notes | 1,025 | 1,025 |
|     Junior Subordinated Note | 11 | 11 |
|     All other | 18 | (5) |
|         Subtotal | 1,547 | 1,752 |
| Interest expense resulting from incremental interest rates: | | |
|     Senior Subordinated Notes – interest on missed interest payments | 402 | 279 |
|         Subtotal | 402 | 279 |
|         Total interest expense | 1,949 | 2,031 |
| Less interest expense allocated to discontinued operations | 42 | 42 |
|         Interest expense related to continuing operations | $ 1,907 | $ 1,989 |

The average amount of debt outstanding during the third quarters of 2009 and 2008, including past due interest payments on which we are accruing interest, was $85,234,000 and $83,990,000, respectively. In the third quarters of 2009 and 2008, cash interest payments were $508,000 and $715,000, respectively. This decrease relates primarily to reductions in LIBOR and the prime rate.

The Bankruptcy Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 30 -

### Reorganization Items

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

|  | Three Months Ended September 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Professional fees and expenses incurred directly by us | $ 365 | $ 833 |
| Professional fees and expenses incurred by creditors | 659 | 691 |
| Other costs | 50 | 149 |
| Interest income | (12) | (51) |
| Reorganization items, net expense | $ 1,062 | $ 1,622 |

### Income Tax Provision

The income tax provisions recorded during the three-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $42,000 in each of the third quarters of 2009 and 2008.

- 31 -

**Results of Operations — First Nine Months of 2009 Versus First Nine Months of 2008**

Unless otherwise indicated, the data set forth below in this Item 2 relate solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the nine-month periods ended September 30, 2009 and 2008, the reconciliation of the loss from continuing operations to EBITDA for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
|---|---|---|---|---|
| | 2009 | | 2008 | |
| Net sales | $ 46,190 | 100.0 % | $ 59,223 | 100.0 % |
| Cost of sales | 41,382 | 89.6 | 50,563 | 85.4 |
| Gross profit | 4,808 | 10.4 | 8,660 | 14.6 |
| Selling and administrative expenses (1) | 4,113 | 8.9 | 5,030 | 8.5 |
| Income from operations | 695 | 1.5 | 3,630 | 6.1 |
| Interest expense | 5,648 | 12.2 | 6,729 | 11.4 |
| Reorganization items, net expense | 3,490 | 7.5 | 3,392 | 5.7 |
| Loss before income taxes | (8,443) | (18.3) | (6,491) | (11.0) |
| Income tax provision | 26 | 0.1 | 35 | 0.1 |
| Loss from continuing operations | (8,469) | (18.3) | (6,526) | (11.0) |
| Add back: | | | | |
| Depreciation and amortization (2) | 3,541 | 7.7 | 4,017 | 6.8 |
| Interest expense | 5,648 | 12.2 | 6,729 | 11.4 |
| Reorganization items, net expense | 3,490 | 7.5 | 3,392 | 5.7 |
| Income tax provision | 26 | 0.1 | 35 | 0.1 |
| EBITDA | 4,236 | 9.2 | 7,647 | 12.9 |
| Adjustments to reconcile EBITDA to net cash provided (used) by operating activities: | | | | |
| Interest expense | (5,648) | (12.23) | (6,729) | (11.4) |
| Reorganization items, net expense | (3,490) | (7.5) | (3,392) | (5.7) |
| Amortization and write-off of deferred financing expenses included in interest expense | – | – | 251 | 0.4 |
| Income tax provision | (26) | (0.1) | (35) | (0.1) |
| Net change in accrued reorganization expenses | 601 | 1.3 | 1,774 | 3.0 |
| Net change in operating assets and liabilities | 4,983 | 10.8 | 4,362 | 7.4 |
| Net cash provided by operating activities | $ 656 | 1.4 % | $ 3,878 | 6.5 % |
| Net cash used by investing activities | $ (1,354) | (2.9)% | $ (2,387) | (4.0)% |
| Net cash provided (used) by financing activities | $ (2,007) | (4.3)% | $ 4,878 | 8.2 % |

- 32 -

(1) The nine-month period ended September 30, 2008, includes $508,000 of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness prior to our chapter 11 filing on April 1, 2008.

(2) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000 during the nine-month period ended September 30, 2008, and which is included in interest expense in the consolidated financial statements.

Net sales by the end-market in which our components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 21,046 | 45.6 % | $ 21,326 | 36.0 % |
| Automotive – original equipment | 12,473 | 27.0 | 22,725 | 38.4 |
| Medical | 11,124 | 24.1 | 12,566 | 21.2 |
| Other | 1,547 | 3.3 | 2,606 | 4.4 |
| Total net sales | $ 46,190 | 100.0 % | $ 59,223 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

Our net sales for the first nine months of 2009 declined by $13,033,000, or 22.0%, compared to the first nine months of 2008. The decrease in net sales was primarily the result of a decrease of $10,252,000, or 45.1% in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers, as a result of the significant reduction in automotive production levels, and a $1,442,000, or 11.4%, reduction in the sales of medical components.

EBITDA for the first nine months of 2009 was $4,236,000, or 9.2% of net sales, compared to EBITDA of $7,647,000, or 12.9% of net sales, for the first nine months of 2008. The change in EBITDA reflected a $3,322,000 decrease in EBITDA at the Rubber Group, a $559,000 decrease in EBITDA at the Metals Group, and a $470,000 increase in EBITDA at the Corporate Office.

Net cash provided by our operating activities during the first nine months of 2009 totaled $656,000, compared to net cash provided by operating activities of $3,878,000 for 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the nine-month periods ended September 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

- 33 -

The following table sets forth the operating results of the Rubber Group for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| | 2009 | | 2008 | |
|---|---|---|---|---|
| Net sales | $ 39,187 | 100.0 % | $ 50,643 | 100.0 % |
| Cost of sales | 33,808 | 86.3 | 42,040 | 83.0 |
| Gross profit | 5,379 | 13.7 | 8,603 | 17.0 |
| Selling and administrative expenses | 2,110 | 5.4 | 2,417 | 4.8 |
| Income from operations | 3,269 | 8.3 | 6,186 | 12.2 |
| Add back depreciation and amortization | 3,159 | 8.1 | 3,564 | 7.0 |
| EBITDA | $ 6,428 | 16.4 % | $ 9,750 | 19.3 % |

Net sales by the end-market in which the Rubber Group's components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| | 2009 | | 2008 (1) | |
|---|---|---|---|---|
| Automotive – aftermarket | $ 21,046 | 53.7 % | $ 21,326 | 42.1 % |
| Medical | 11,124 | 28.4 | 12,566 | 24.8 |
| Automotive – original equipment | 6,708 | 17.1 | 15,651 | 30.9 |
| Other | 309 | 0.8 | 1,100 | 2.2 |
| Total net sales | $ 39,187 | 100.0 % | $ 50,643 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

During the first nine months of 2009, net sales of the Rubber Group decreased by $11,456,000, or 22.6%, compared to the first nine months of 2008, primarily because of a $8,943,000, or 57.1%, reduction in net sales of components for use in automotive original equipment applications, primarily connector seals for automotive wiring systems. This reduction was caused by dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first nine months of 2009 in response to sharply declining consumer demand for automobiles and light trucks. In addition, sales of medical components decreased by $1,442,000, or 11.5%, primarily due to (1) the reduction in safety stocks in inventory built up by one of our larger customers during the second and third quarters of 2008, and (2) a reduction in sales of a high volume, low margin component that is dual-sourced by our customer.

Cost of sales as a percentage of net sales increased to 86.3% of net sales during the first nine months of 2009, compared to 83.0% of net sales during the first nine months of 2008, primarily because

- 34 -

our connector-seal manufacturing facility in Vienna, Ohio, reported an operating loss of $3,326,000 during the first nine months of 2009, compared to an operating loss of $727,000 during the first nine months of 2008, as a result of the underabsorption of fixed or partially fixed costs as a result of sharply reduced sales volume, and because the connector-seal facility expensed $738,000 of costs incurred in connection with closing the facility, moving the production of connector-seals to our other rubber molding facilities, and preparing the building for sale.

Selling and administrative expenses of the Rubber Group decreased by $307,000, or 12.7%, during the first nine months of 2009, compared to the first nine months of 2008 primarily because we incurred $282,000 of one-time fees and expenses during the first nine months of 2008 related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and procedures at our facility in Rock Hill, South Carolina. Selling and administrative expenses expressed as a percentage of net sales increased to 5.4% of net sales during the first nine months of 2009, compared to 4.8% during the first nine months of 2008.

During the first nine months of 2009, the Rubber Group's income from operations totaled $3,269,000, a decrease of $2,917,000, or 47.2%, compared to the first nine months of 2008. The Rubber Group's EBITDA for the first nine months of 2009 was $6,428,000, or 16.4% of net sales, compared to $9,750,000, or 19.3% of net sales, for the first nine months of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production to our other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for moving and installation of manufacturing equipment, and (4) $141,000 for building repairs and maintenance. During the first nine months of 2009, we incurred $738,000 of restructuring expenses, of which $682,000 was included in cost of sales and $56,000 was included in selling and administrative expenses in our consolidated statements of operations. At September 30, 2009, we had accrued $27,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, for an aggregate amount in excess of the carrying value of those assets.

### Metals Group

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive original equipment manufacturers.

- 35 -

The following table sets forth the operating results of the Metals Group for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| | 2009 | | 2008 | |
| --- | ---: | ---: | ---: | ---: |
| Net sales | $ 7,003 | 100.0 % | $ 8,580 | 100.0 % |
| Cost of sales | 7,574 | 108.2 | 8,523 | 99.3 |
| Gross profit (loss) | (571) | (8.2) | 57 | 0.7 |
| Selling and administrative expenses | 269 | 3.8 | 410 | 4.8 |
| Loss from operations | (840) | (12.0) | (353) | (4.1) |
| Add back depreciation and amortization | 343 | 4.9 | 415 | 4.8 |
| EBITDA | $ (497) | (7.1) % | $ 62 | 0.7 % |

Net sales by the end-market in which the Metals Group's components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September | | | |
| | 2009 | | 2008 | |
| --- | ---: | ---: | ---: | ---: |
| Automotive — original equipment | $ 5,765 | 82.3 % | $ 7,074 | 82.4 % |
| Other | 1,238 | 17.7 | 1,506 | 17.6 |
| Total net sales | $ 7,003 | 100.0 % | $ 8,580 | 100.0 % |

During the first nine months of 2009, net sales of the Metals Group decreased by $1,557,000, or 18.3%, compared to the first nine months of 2008, primarily as a result of reduced net sales of components to automotive original equipment manufacturers. This reduction was primarily a result of dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first half of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 108.2% of net sales during the first nine months of 2009 from 99.3% of net sales during the first nine months of 2008, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

Selling and administrative expenses of the Metals Group decreased by $141,000, or 34.4%, from the first nine months of 2008 to the first nine months of 2009, primarily as a result of a reduction in selling expenses. Selling and administrative expenses expressed as a percentage of net sales decreased to 3.8% of net sales during the first nine months of 2009, compared to 4.8% during the first nine months of 2008.

- 36 -

For the first nine months of 2009, the Metals Group's loss from operations was $840,000, compared to a loss from operations of $353,000 for the first nine months of 2008. The Metals Group's EBITDA for the first nine months of 2009 was negative $497,000, compared to positive $62,000 for 2008.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Nine Months Ended September 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Loss from operations | $ (1,734) | $ (2,203) |
| Add back depreciation and amortization (1) | 39 | 38 |
| EBITDA | $ (1,695) | $ (2,165) |

(1)   Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000 during the first nine months of 2008 and which is included in interest expense in the consolidated financial statements.

During the first nine months of 2009, Corporate Office expenses decreased to $1,734,000 from $2,203,000 during the first nine months of 2008. This decrease is primarily attributed to $508,000 of expenses incurred during the first quarter of 2008, prior to our chapter 11 filing on April 1, 2008, in connection with our efforts to refinance, restructure, or repay our indebtedness. Subsequent to our chapter 11 filing on April 1, 2008, expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness are being classified as reorganization items in our consolidated statements of operations, in accordance with ASC 852-10. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 37 -

*Interest Expense*

A breakdown of interest expense for the nine-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

|  | Nine Months Ended September 30 | |
| --- | --- | --- |
|  | 2009 | 2008 |
| Interest expense at contractual interest rates: | | |
|     Senior, secured loans | $ 1,210 | $ 1,926 |
|     Debtor-in-possession loan | 303 | 191 |
|     Senior Subordinated Notes | 3,076 | 3,076 |
|     Junior Subordinated Note | 34 | 34 |
|     All other | 37 | 61 |
|         Subtotal | 4,660 | 5,288 |
| | | |
| Interest expense resulting from incremental interest rates: | | |
|     Senior, secured loans – default or forbearance premium | – | 172 |
|     Senior Subordinated Notes – forbearance premium | – | 411 |
|     Senior Subordinated Notes – interest on missed interest payments | 1,114 | 733 |
|         Subtotal | 1,114 | 1,316 |
| | | |
| Financing costs and fees | – | 251 |
| | | |
|         Total interest expense | 5,774 | 6,855 |
| | | |
| Less interest expense allocated to discontinued operations | 126 | 126 |
| | | |
|         Interest expense related to continuing operations | $ 5,648 | $ 6,729 |

The average amount of debt outstanding during the first nine months of 2009 and 2008, including past due interest payments on which we are accruing interest, was $84,531,000 and $80,979,000, respectively. In the first nine months of 2009 and 2008, cash interest payments were $1,568,000 and $2,400,000, respectively. This decrease relates primarily to the modification of our senior, secured credit facility, including the elimination of a 2% premium charged on outstanding balances under such facility, and reductions in LIBOR and the prime rate.

The Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 38 -

*Reorganization Items*

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the nine-month periods ended September 30, 2009 and 2008 are set forth below (dollar amounts in thousands):

|  | Nine Months Ended September 30, 2009 | | April 1, 2008 Through September 30, 2008 | |
|---|---|---|---|---|
| Professional fees and expenses incurred directly by us | $ | 1,200 | $ | 1,832 |
| Professional fees and expenses incurred by creditors |  | 2,119 |  | 1,316 |
| Other costs |  | 210 |  | 326 |
| Interest income |  | (39) |  | (82) |
| Reorganization items, net expense | $ | 3,490 | $ | 3,392 |

*Income Tax Provision*

The income tax provisions recorded during the nine-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

*Discontinued Operation*

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $126,000 in each of the nine-month periods ended September 30, 2009 and 2008.

**Liquidity and Capital Resources**

*Operating Activities*

During the first nine months of 2009, operating activities of our continuing operations provided net cash of $656,000. Net accounts receivable increased by $2,318,000, or 34.1%, during the first nine months of 2009, primarily because our net product sales during August and September of 2009 were greater than our net product sales during November and December of 2008. Net inventories decreased by $2,629,000, or 24.9%, because we undertook an aggressive program to bring our inventory levels in line with our current levels of sales. Prepaid expenses and other current assets increased by $423,000, or 17.4%, primarily because of an increase in prepaid insurance premiums and an increase in tooling being manufactured for our customers, offset, in part, by the collection of a portion of our receivable for insurance reimbursement related to losses we incurred at our facility in Rock Hill, South Carolina, caused by fire in November of 2008. Accrued interest expense, including accrued interest expense classified as a liability subject to compromise, increased by $4,206,000, or 31.3%, primarily because of additional accruals of interest on our subordinated debt.

Net cash used by operating activities of our discontinued operations during the first nine months of 2009 totaled $50,000.

- 39 -

*Investing Activities*

During the first nine months of 2009, investing activities of our continuing operations used net cash of $1,354,000. Capital expenditures attributable to the Rubber Group, the Metals Group, and the Corporate Office totaled $1,194,000, $205,000, and $0, respectively, primarily for manufacturing equipment and tooling for our automotive aftermarket business. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $1,569,000, $232,000, and $0, respectively, for 2009.

*Financing Activities*

During the first nine months of 2009, our financing activities used net cash of $2,007,000, primarily reflecting $2,426,000 of principal payments on our senior, secured term loans.

*Liquidity and Chapter 11 Filing*

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006 nor have we repaid the principal amount of the Senior Subordinated Notes, which became due on August 1, 2009. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At September 30, 2009, accrued interest on the Senior Subordinated Notes totaled $17,246,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default, and (2) modified certain of our financial covenants. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness, and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which

- 40 -

specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own 74.4% of our Senior Subordinated Notes to advise them of the following:

1.   We had decided to pursue the proposal to purchase the Rock Hill facility;

2.   We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.   We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.   In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, with a cash interest rate of 12% per annum; and

5.   We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default under our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). At that time, we obtained a financing package consisting of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which date has since been extended to December 31, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, if not extended. On September 30 and November 13,

- 41 -

2009, our cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings. The arrangement with the senior, secured lenders provided for a continuation of the scheduled, monthly principal payments on our term loans, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. Since the chapter 11 filing, we have made principal payments on the term loans totaling $5,119,000. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% (in effect on September 30, 2009).

Our senior, secured credit facility includes a $17,500,000 revolving line of credit. At April 1, 2008, and September 30, 2009 there were $14,219,000 of loans outstanding under the revolving line of credit, and at April 1, 2008, and September 30, 2009, there were $907,000 and $733,000, respectively, of letters of credit outstanding under the revolving line of credit. The contractual interest rate on loans under the revolving line of credit is LIBOR plus 2.75% (3.0% at September 30, 2009).

Our equipment term loan had an outstanding principal balance $8,333,000 at April 1, 2008. At September 30, 2009, the principal balance of our equipment term loan had been reduced to $4,792,000. The contractual interest rate on the equipment term loan is LIBOR plus 4.5% (4.75% at September 30, 2009).

Our real estate term loan had an outstanding principal balance of $13,778,000 at April 1, 2008. At September 30, 2009, the principal balance of our real estate term loan had been reduced to $12,738,000. The contractual interest rates on the real estate term loan are the prime rate plus 6%, subject to a minimum interest rate of 11% (in effect on September 30, 2009), on $4,000,000 principal amount and LIBOR plus 4.5% (4.75% at September 30, 2009) on the balance of the real estate term loan (weighted average rate for the entire real estate loan of 6.71% at September 30, 2009).

Under the arrangements pursuant to which we are entitled to utilize cash collateral we are required to meet the following financial covenants:

1.  Minimum Cash. Aggregate cash may not be less than the following amounts on the specified measurement dates:

| | |
|---|---|
| November 6, 2009 | $2,643,000 |
| November 13, 2009 | $2,632,000 |
| November 20, 2009 | $2,836,000 |
| November 27, 2009 | $2,657,000 |
| December 4, 2009 | $2,613,000 |
| December 11, 2009 | $2,833,000 |
| December 18, 2009 | $2,798,000 |
| December 25, 2009 | $2,917,000 |
| January 1, 2010 | $2,917,000 |

On November 13, 2009, the Company's aggregate cash was $3,753,000.

2.  Maximum Expenditures. Our cumulative expenditures may not exceed 110% of our cumulative budgeted expenditures for the two-week period ended November 13, 2009, and on the last day of each two-week period following November 13, 2009. At November 13, 2009, the latest measurement date prior to the issuance of this report, the Company's

- 42 -

cumulative expenditures were $247,000 less than 110% of cumulative budgeted expenditures.

3. <u>Minimum Net Sales</u>. Our cumulative net sales may not be less than 82% of our cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $6,928,000 greater than the minimum level of cumulative net sales and aggregated 87.7% of our cumulative budgeted net sales since April 2, 2008.

Our right to utilize cash collateral will terminate upon the occurrence of the following events, if we fail to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) the occurrence of an event of default as described in the documents governing the use of cash collateral.

During September and October 2009, the Company's senior, secured lenders, the official committee of unsecured creditors of the Company in the chapter 11 proceedings (the "Official Creditors' Committee"), and the Company filed separate plans of reorganization. Each of these plans may be further amended, and if no such plan is confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

The Lenders' Plan

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan. For a detailed description of the Lenders' Plan, please refer to the plan document and the related disclosure statement at http://chapter11epiqsystem.com /lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

The Committee's Plan

The plan filed by the Official Creditors' Committee on September 29, 2009, (the "Committee's Plan"), provides, in summary, for the following:

· An extension of our outstanding senior, secured debt without any immediate pay down;

· Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

· The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

· The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

- 43 -

·    Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10% (with a floor of 13½%), a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

For a detailed description of the Committee's Plan, please refer to the plan document and the related disclosure statement at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

The Company's Plan

The amended plan filed by the Company on October 6, 2009 (the "Company's Plan"), provides, in summary, for the following:

·    The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the real estate term loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

·    Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

·    Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum; and

·    Each holder of a Junior Subordinated Note claim or a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of our liabilities would have been converted into equity securities. For a detailed description of the Company's Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the plan documents and the related disclosure statement filed on October 6, 2009 at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

We require additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that we will be able to obtain such financing.

- 44 -

None of these plans of reorganization may ultimately be approved. No party currently has exclusive rights to propose a plan of reorganization and solicit votes thereon, so any interested party may propose a competing plan of reorganization at any time. Further, the proponents of the filed plans of reorganization are free to amend their respective plans at any time. As a result, a plan of reorganization that is materially different from the three that have been filed may ultimately be approved. Under the ultimate plan of reorganization, the interests of the holders of Series B Preferred Stock and our common stock may be substantially diluted or cancelled.

Our aggregate indebtedness at September 30, 2009, totaled $88,757,000, including $17,389,000 of accrued interest on our subordinated debt, compared to $86,539,000, including $13,164,000 of accrued interest on our subordinated debt, at December 31, 2008.

Including liabilities classified as subject to compromise, we had a net working capital deficit of $80,067,000 at September 30, 2009, compared to a net working capital deficit of $73,922,000 at December 31, 2008.

On September 30 and November 13, 2009, our cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in GAAP. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Critical Accounting Policies

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant accounting policies are disclosed in Note 1 to the consolidated financial statements in our annual report on Form 10-K for the year ended December 31, 2008, as modified by Note 1 to the consolidated financial statements in our quarterly reports on Form 10-Q for the three-month periods ended March 31, June 30, and September 30, 2009. The most significant areas involving management judgments and estimates are described in Management's Discussion and Analysis of Financial Conditions and Results of Operations in our annual report on Form 10-K for the year ended December 31, 2008. There have been no material changes to such judgments and estimates. Actual results could differ from those estimates.

- 45 -

## Item 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant. At September 30, 2009, we had outstanding $35,749,000 of floating-rate debt at interest rates equal to either LIBOR plus 2.75%, LIBOR plus 4.5%, the prime rate plus 6%, subject to a minimum interest rate of 11%, or LIBOR plus 7%, subject to a minimum interest rate of 10%, with a weighted average interest rate of 5.34% at September 30, 2009. At September 30, 2009, we had outstanding $35,619,000 of fixed-rate debt with a weighted average interest rate of 11.8%. We estimate that a one-percentage-point increase or decrease in both LIBOR and the prime rate would increase or decrease our monthly interest expense by approximately $23,000. For further information about our indebtedness, please refer to Note 4, "Debt," in the notes to our consolidated financial statements in Part I, Item 1.

## Item 4T. CONTROLS AND PROCEDURES

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of September 30, 2009, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our principal executive officers and our principal financial officer concluded that, because of deficiencies in our internal control over financial reporting, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of certain deficiencies which, in the aggregate, constitute a material weakness. This material weakness remained unremediated through September 30, 2009. Notwithstanding the foregoing, we do not believe that such deficiencies have resulted in any material errors or omissions in the consolidated financial statements contained in our annual reports on Form 10-K for 2008 and 2007, our quarterly reports on Form 10-Q for the three-month periods ended March 31, June 30, and September 30, 2008, and March 31, June 30, and September 30, 2009, or in any related disclosures.

### Changes in Internal Controls over Financial Reporting

There have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation, that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

- 46 -

## PART II. OTHER INFORMATION

### Item 1A. RISK FACTORS

**We are subject to risks associated with bankruptcy proceedings.**

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

On October 6, 2009, we filed with the Bankruptcy Court an amended plan of reorganization (the "Company's Plan"). If the Company's Plan becomes effective without further amendment, the following distributions would be made:

·   The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the outstanding real estate term loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

·   Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of its claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

·   Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $2.90 per share; and

·   Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of our liabilities would have been converted into equity securities.

We require additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that we will be able to obtain such financing.

In addition, our senior, secured lenders and the official committee of unsecured creditors of the Company have each filed competing plans of reorganization for the Company.

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan.

- 47 -

The plan filed by the Official Creditors' Committee on September 29, 2009 (the "Committee's Plan"), provides, in summary, for the following:

· An extension of our outstanding senior, secured debt without any immediate pay down;

· Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

· The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

· The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

· Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10%, a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

For a detailed description of the Company's Plan, the Lenders' Plan, and the Committee's Plan, classification and treatment of claims and interests under each plan, and the proposed terms of the Series C Preferred Stock under the Company's Plan, please refer to the plan documents and related disclosure statements filed with the Bankruptcy Court on October 6, 2009, September 25, 2009, and September 29, 2009, respectively. The proposed disclosure statements along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com /lexington. These documents are not incorporated by reference into this Form 10-Q except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

None of these plans of reorganization may ultimately be approved. No party currently has exclusive rights to propose a plan of reorganization and solicit votes thereon, so any interested party may propose a competing plan of reorganization at any time. Further, the proponents of the filed plans of reorganization are free to amend their respective plans at any time. As a result, a plan of reorganization that is materially different from the three that have been filed may ultimately be approved. Under the ultimate plan of reorganization, the interests of the holders of Series B Preferred Stock and our common stock may be substantially diluted or cancelled.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial condition.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to reorganize the Company is subject to risks and uncertainties. The consolidated financial statements do

- 48 -

not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Item 3. DEFAULTS UPON SENIOR SECURITIES

We have failed to make all quarterly interest payments on our $34,177,000 aggregate principal amount of Senior Subordinated Notes since November 1, 2006. The past due interest payments total $14,780,000 as of the filing date of this Form 10-Q. In addition, we failed to repay the $34,177,000 aggregate principal amount of our Senior Subordinated Notes, which became due on August 1, 2009.

We have failed to make all quarterly interest payments on our $347,000 Junior Subordinated Note since November 1, 2006. The past due interest payments total $146,000 as of the filing date of this Form 10-Q. In addition, we failed to repay the $347,000 principal amount of our Junior Subordinated Note, which became due on November 1, 2009.

For an additional discussion about these notes and this default, please refer to "Note 4 – Debt" to our consolidated financial statements in Part I, Item 1.

### Item 6. EXHIBITS

The exhibits listed on the accompanying Exhibit Index are filed herewith or incorporated herein by reference.

- 49 -

LEXINGTON PRECISION CORPORATION
FORM 10-Q
September 30, 2009

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LEXINGTON PRECISION CORPORATION
(Registrant)

November 20, 2009                               By:_____

Date                                       Michael A. Lubin
                                                 Chairman of the Board

November 20, 2009                               By:_____

Date                                       Warren Delano
                                                 President

November 20, 2009                               By:_____

Date                                       Dennis J. Welhouse
                                                 Senior Vice President and
                                                 Chief Financial Officer

- 50 -

### <u>EXHIBIT INDEX</u>

31-1     Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant.

31-2     Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Warren Delano, President and Co- Principal Executive Officer of the registrant.

31-3     Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant.

32-1     Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-2     Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-3     Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

- 51 -

**<u>Exhibit E</u>**

**LPC Proxy Statement**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**
**(Rule 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENTS**
**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant ☒
Filed by a party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission only (as permitted by Rule 14a-6(e)(2))
☒ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to § 240.14a-12

_____

LEXINGTON PRECISION CORPORATION

(Name of Registrant as Specified in Its Charter)

_____

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1)  Title of each class of securities to which transaction applies:  N/A
(2)  Aggregate number of securities to which transaction applies:  N/A
(3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11:  N/A
(4)  Proposed maximum aggregate value of transaction: N/A
(5)  Total fee paid:  N/A

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-1l(a)(2) and identify the filing for which the offsetting fee was paid previously.  Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)   Amount Previously Paid:
(2)   Form, Schedule or Registration Statement No.:
(3)   Filing Party:
(4)   Date Filed:

# LEXINGTON PRECISION CORPORATION
**800 Third Avenue, 15th Floor**
**New York, New York 10022**

---

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD ON MAY 28, 2009

Notice is hereby given that the Annual Meeting of Stockholders of LEXINGTON PRECISION CORPORATION (the "Company") will be held at the offices of Nixon Peabody LLP, 437 Madison Avenue, 24th Floor, New York, New York, on Thursday, May 28, 2009, at 11:00 A.M., for the purpose of considering and acting upon the following matters:

1.      The election of six directors by the holders of Common Stock and $8 Cumulative Convertible Preferred Stock, Series B, as set forth in the accompanying Proxy Statement;

2.      The ratification of Malin, Bergquist & Company, LLP as independent auditors of the Company for the year ending December 31, 2009; and

3.      The transaction of such other business as may properly come before the meeting and any adjournments thereof.

The Board of Directors has fixed the close of business on April 13, 2009, as the record date for determining the stockholders of the Company entitled to receive notice of and to vote at the meeting and any adjournments thereof.

**PLEASE SIGN, DATE, AND MAIL THE ENCLOSED PROXY PROMPTLY.  A POSTAGE-PAID ENVELOPE IS ENCLOSED FOR YOUR CONVENIENCE.**

By Order of the Board of Directors,

Dennis J. Welhouse
*Secretary*

April 23, 2009
New York, New York

# LEXINGTON PRECISION CORPORATION
**800 Third Avenue, 15th Floor**
**New York, New York 10022**

---

**PROXY STATEMENT**

**ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON MAY 28, 2009**

This Proxy Statement is being mailed to stockholders on or about May 4, 2009, in connection with the solicitation by the Board of Directors of LEXINGTON PRECISION CORPORATION, a Delaware corporation (the "Company"), of proxies to be voted at the annual meeting of stockholders of the Company to be held on May 28, 2009 (the "Annual Meeting"). Accompanying this Proxy Statement are the Notice of Annual Meeting of Stockholders, a form of proxy for the meeting, and a copy of the Company's Annual Report for the year ended December 31, 2008, which contains financial statements and related data. In addition, the Notice of Annual Meeting and Proxy Statement are available at http://www.edocumentview.com/LEXP.

All proxies that are properly completed, signed, and returned to the Company in time will be voted in accordance with the instructions thereon. Proxies may be revoked prior to the exercise thereof by filing with the Secretary of the Company a written revocation or a duly executed proxy bearing a later date, or by voting in person at the Annual Meeting. The cost of preparing and mailing the accompanying form of proxy and related materials and the cost of soliciting proxies will be borne by the Company. The Company has requested brokers, custodians, and other like parties to distribute proxy materials to the beneficial owners of shares and to solicit their proxies and will reimburse such persons for their services in doing so. Without additional compensation, officers and regular employees of the Company may solicit proxies personally or by telephone. The cost of additional solicitation incurred other than by use of the mails is estimated not to exceed $3,000.

Only stockholders of record at the close of business on the record date, April 13, 2009, are entitled to notice of, and to vote at, the Annual Meeting and any adjournments thereof. As of the record date, there were outstanding 5,021,767 shares of the Company's common stock, $0.25 par value (the "Common Stock"), and 3,300 shares of its $8 Cumulative Convertible Preferred Stock, Series B, $100 par value (the "Series B Preferred Stock"), each entitling the holder thereof to one vote. The holders of a majority of the outstanding shares of Common Stock and Series B Preferred Stock present in person or represented by proxy, voting together, will constitute a quorum for all matters before the Annual Meeting. The affirmative vote of a plurality of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting, voting together, is required for the election of the six directors. All other matters require the affirmative vote of a majority of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting.

With regard to the election of directors, votes may be cast in favor or withheld. Votes withheld from the election of directors will be counted to determine the presence or absence of a quorum for the transaction of business at the Annual Meeting, but they have no legal effect under Delaware law and, consequently, will not affect the outcome of the voting on such proposal. With regard to other proposals, abstentions may be specified and will have the same effect as votes against the subject proposal at the

Annual Meeting. Broker nonvotes (that is, proxies from brokers or nominees indicating that such persons have not received instructions from the beneficial owners or other persons entitled to vote shares on a particular matter as to which the brokers or nominees do not have discretionary power) are counted for purposes of determining a quorum for the transaction of business at the Annual Meeting but are not considered as votes for purposes of determining the outcome of voting on a proposal.

## PROPOSAL 1 — ELECTION OF DIRECTORS

The bylaws of the Company provide for the election of directors for one-year terms. The holders of Common Stock and Series B Preferred Stock, voting together, will be asked to vote at the Annual Meeting for the election of six directors, each to serve until the annual meeting of stockholders to be held in 2010 and until his or her successor has been elected and qualified. Unless authority to vote for the election of a director is specifically withheld by appropriate designation on the face of the proxy, it is the intention of the persons named in the accompanying proxy to vote such proxy for the election of William B. Conner, Warren Delano, Kenneth I. Greenstein, Michael A. Lubin, Joseph A. Pardo, and Elizabeth H. Ruml as directors to be elected by the holders of Common Stock and Series B Preferred Stock, voting together, to serve until the annual meeting of stockholders to be held in 2010 and until their respective successors shall have been elected and qualified. Messrs. Conner, Delano, Greenstein, Lubin, and Pardo and Ms. Ruml are presently members of the Board of Directors. The proxies cannot be voted for a greater number of persons than six in respect of Proposal 1. Management has no reason to believe that the named nominees will be unable or unwilling to serve, if elected. However, in such case, it is intended that the individuals named in the accompanying proxy will vote for the election of such substituted nominees as the Board of Directors may recommend.

Certain information concerning the nominees for election pursuant to Proposal 1 is set forth in the following table. The Board of Directors recommends that shareholders vote **FOR** the election of the named nominees.

| Name | Age | Principal Occupation, Business Experience, and Directorships |
|---|---|---|
| William B. Conner | 76 | Private Investor. President and Director of Conner Holding Company, a holding company for aviation companies, and Chairman of the Board of the subsidiaries thereof for more than five years. Director of the Company since 1981. |
| Warren Delano | 58 | President of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Kenneth I. Greenstein | 79 | Secretary of the Company from September 1979 to April 2004. Consultant for more than five years. Prior to becoming a consultant, stockholder of a professional corporation that was a partner in Nixon, Hargrave, Devans & Doyle LLP (now known as Nixon Peabody LLP), a law firm for more than five years. Director of the Company since 1978. |

| Michael A. Lubin | 59 | Chairman of the Board of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Joseph A. Pardo | 75 | Consultant for more than five years. Chairman of Phoenix Advisors, LLC for more than five years. Served as a financial consultant to a number of public and private companies, including as trustee of various creditor trusts in connection with reorganizations under chapter 11 of the federal bankruptcy code during the past five years. Served as Chairman of the Board of Brothers Gourmet Coffee Co. from October 2000 through March 2004. Director of the Company since 2002. |
| Elizabeth H. Ruml | 56 | Retired for more than five years. Managing Director and Co-Head of the Group Market Risk Management function at Deutsche Bank from June 1999 through October 1999. Managing Director and Head of the Corporate Portfolio Management Group at Bankers Trust Company (now known as Deutsche Bank) from March 1998 through June 1999. Managing Director and Chief Credit Officer at Salomon Brothers from May 1993 through December 1997. Director of the Company since 2002. |

Each of the nominees for director is a current director of the Company, and Messrs. Delano, Lubin, and Conner each own, directly or indirectly, greater than 5% of the Company's common stock. On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors have continued to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, the Debtors obtained a financing package that consisted of (a) an arrangement with the Debtor's senior, secured lenders to freeze the loan under the Debtor's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Debtors to use the cash collections on its accounts receivable in the operation of the Debtor's business through February 25, 2009, which was subsequently extended to May 22, 2009,  in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession loan in the amount of $4,000,000, which matures on December 31, 2009, among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The collections on its accounts receivable and the proceeds from the debtor-in-possession loan are being used by the Debtors for working capital, capital expenditures, and other general corporate purposes and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of the collections on its accounts receivable and the Agreement governing the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

## BOARD OF DIRECTORS AND COMMITTEES OF THE BOARD

The Board of Directors met nine times during 2008. Each director attended at least 75% of the meetings held by the Board of Directors and all meetings held by the committees of the Board of Directors on which such person served.

The Board of Directors has a standing Audit Committee and a standing Compensation Committee. The members of those committees are as follows:

| Name of Committee | Chairman | Other Member(s) |
|---|---|---|
| Audit Committee | Joseph A. Pardo | Kenneth I. Greenstein<br>Elizabeth H. Ruml |
| Compensation Committee | William B. Conner | Kenneth I. Greenstein |

The Audit Committee, which is comprised of three non-employee members of the Board of Directors, met four times during 2008.  The primary purpose of the Audit Committee is to review the financial information provided to the Company's stockholders and others, to oversee the system of internal financial controls, and to monitor the independent audit process. Its functions include recommending the independent auditors for appointment by the Board of Directors, consulting periodically with the Company's independent auditors as to the nature, scope, and results of their audit of the accounts of the Company, reviewing the Company's internal accounting controls and procedures, and such other related matters as the Audit Committee deems advisable. The Audit Committee Charter was attached as appendix A to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The Board of Directors has determined that each member of the Audit Committee is independent, as defined by the NASDAQ Manual. In addition, the Board of Directors has determined that Joseph A. Pardo is qualified to serve as the "audit committee financial expert" of the Company as defined in Item 407(d) of Securities and Exchange Commission's Regulation S-K.

The Compensation Committee, which is comprised of two non-employee members of the Board of Directors, met two times during 2008. The meetings were held at regularly scheduled Board meetings where other members of the Board could participate. When appropriate, executive officers whose compensation was being discussed excused themselves from the meetings. The functions of the Compensation Committee include reviewing salaries and cash bonus awards for the Company's executive officers and existing or potential compensation plans for the executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. Additionally, the Compensation Committee administers the Company's 2005 Stock Award Plan. The Compensation Committee does not delegate its authority in this regard. The Compensation Committee Charter was attached as appendix B to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Compensation Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

The Board of Directors does not have a standing nominating committee, or formal policy regarding nominations by securityholders. The Board of Directors has determined that it is not necessary to have a nominating committee or nomination policy because of the relatively small size of the Company and the Board of Directors. The Board of Directors considers recommendations for director nominees

from directors and members of management. The Board of Directors is also willing to consider stockholder recommendations for director nominees that are properly received in accordance with all applicable rules and regulations although no such recommendations have ever been received. The Board of Directors evaluates each prospective nominee on the basis of his or her qualifications. Each member of the Board of Directors is independent, other than Messrs. Lubin and Delano.

In view of the small size of the Board of Directors, as well as the infrequency with which shareholder communications are received, the Company does not have a formal process in place for its stockholders to communicate with its Board of Directors but is receptive to communications from its stockholders, which may be made by writing to Michael A. Lubin, Chairman of the Board, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, at any time prior to December 1, 2009, for the 2010 annual meeting of stockholders.

For the past five years, all of the directors have attended each of the annual meetings of stockholders of the Company. The Company does not have a policy with regard to attendance by directors at annual meetings of stockholders of the Company.

Each member of the Board of Directors, and each nominee for election as director, other than Mr. Lubin and Mr. Delano, is independent, as defined in Rule 4200(a)(15) of the NASDAQ Manual.

Pursuant to the Company's bylaws, the Company has agreed to indemnify its directors and executive officers to the fullest extent permitted by law.

The following table sets forth, for 2008, the fees earned by Directors of the Company other than Messrs. Delano and Lubin, whose fees are set forth in the section titled Executive Compensation.

| Name | Fees Earned or Paid in Cash ($) | All Other Compensation | Total ($) |
|---|---|---|---|
| William B. Conner | 15,950 | – | 15,950 |
| Kenneth I. Greenstein | 20,600 | – | 20,600 |
| Joseph A. Pardo | 20,950 | – | 20,950 |
| Elizabeth H. Ruml | 21,300 | – | 21,300 |

Each member of the Board of Directors receives an annual fee of $12,000. Each member of the Audit Committee receives an annual fee of $2,000. Directors receive $1,500 for each Board or committee meeting attended in person as well as reasonable out-of-pocket expenses incurred in connection with attending such meetings. Directors receive $350 for each Board meeting attended by telephone and $750 for each committee meeting attended by telephone. On October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to Ms. Ruml and to Messrs. Conner, Greenstein, and Pardo. Each of the four Restricted Stock Award Agreements governing the grants specify that 2,000 shares of the restricted Common Stock will vest over the service life of each respective Director on each subsequent October 9 until all 10,000 shares are vested. During 2008, there were no fees, stock options, stock appreciation rights, restricted stock, performance shares, performance units, non-equity incentive plan compensation, pension or nonqualified compensation earnings or other compensation paid, awarded, or granted to or exercised by directors for services rendered as members of the Board.

## EXECUTIVE OFFICERS

The following table sets forth certain information concerning the executive officers of the Company.

| <u>Name</u> | <u>Position and Offices</u> | <u>Age</u> |
|---|---|---|
| Michael A. Lubin | Chairman of the Board | 59 |
| Warren Delano | President and Director | 58 |
| Dennis J. Welhouse | Senior Vice President, Chief Financial Officer, and Secretary | 60 |

Mr. Lubin has been Chairman of the Board of the Company since 1991, and a director of the Company since 1985. For more than five years, Mr. Lubin has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Delano has been President of the Company since 1988, and a director of the Company since 1985. For more than five years, Mr. Delano has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Welhouse has been Senior Vice President since 1992 and Chief Financial Officer of the Company since 1989. Since 2004, Mr. Welhouse has also served as Secretary of the Company. Prior to April 2004, for more than five years, Mr. Welhouse was Assistant Secretary of the Company.

Each of the Company's executive officers serves at the pleasure of the Board of Directors. The Chairman of the Board must be a director of the Company to be elected such.

**Code of Ethics**

The Company has adopted a Code of Ethics that applies to its co-principal executive officers and key financial and accounting personnel. A paper copy of the Code of Ethics may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

# SECURITY OWNERSHIP

The following table sets forth the beneficial ownership of the Company's Common Stock, as of April 10, 2009, by (1) each director and director nominee, (2) each executive officer, (3) all directors and executive officers as a group, and (4) each person known by the Company to be the beneficial owner of more than 5% of its outstanding Common Stock. The business address of each officer, director, or stockholder listed below is c/o Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The persons named in the table have sole voting and dispositive power with respect to all shares of the Common Stock shown as beneficially owned by them, subject to community property laws, where applicable, except as set forth in the notes to the table.

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned | Percent of Class Owned |
|---|---|---|
| Michael A. Lubin | 1,681,790 (1) | 33.0% |
| Warren Delano | 1,401,097 (2) | 27.9 |
| William B. Conner | 383,494 (3) | 7.6 |
| Dennis J. Welhouse | 108,000 | 2.2 |
| Joseph A. Pardo | 58,105 | 1.2 |
| Kenneth I. Greenstein | 37,636 (4) | * |
| Elizabeth H. Ruml | 2,000 | * |
| Directors and executive officers as a group (7 persons) | 3,575,450 (5) | 70.2% |

\*    Less than 1 percent.

(1)    Includes (a) 70,000 shares of Common Stock and 169 warrants to purchase Common Stock ("Warrants") owned by a limited liability corporation of which Mr. Lubin is the managing member, (b) 50,000 shares and 40,980 Warrants owned by individual retirement accounts of Mr. Lubin, (c) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Lubin and Mr. Delano are both beneficiaries, and (d) 11,510 Warrants owned jointly with Mr. Lubin's wife. Also includes an aggregate of 9,180 Warrants that are owned by members of Mr. Lubin's family, as to which Mr. Lubin shares dispositive power but has no voting power.

(2)    Includes (a) 110,750 shares owned by individual retirement accounts of Mr. Delano and (b) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Delano and Mr. Lubin are both beneficiaries.

(3)    Includes 238,194 shares owned by Conner Holding Company, a Nevada corporation, of which Mr. Conner is president, a director, and majority stockholder.

(4)    Includes 8,170 shares owned by a retirement benefit plan of which Mr. Greenstein is the sole beneficiary.

(5)    See footnotes 1 through 4, above. Total includes 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Messrs. Delano and Lubin are beneficiaries that are reported in the shares beneficially owned by both Mr. Delano and Mr. Lubin. For purposes of the calculation of "Percent of Class Owned" for the directors and

executive officers as a group, the 89,062 shares and 7,610 Warrants owned by the retirement benefit plan of which Messrs. Delano and Lubin are officers are included in the numerator and the denominator only once.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder require the Company's officers and directors and persons who own more than 10 percent of the Common Stock to file reports of ownership and changes in ownership with the Securities and Exchange Commission and to furnish to the Company copies of all such filings.

Based solely on its review of the copies of such reports and written representations from certain reporting persons that certain reports were not required to be filed by such persons, the Company believes that all of its directors, officers, and beneficial owners complied with all of the filing requirements applicable to them with respect to transactions during the year ended December 31, 2008.

EXECUTIVE COMPENSATION

The following table summarizes, for the Company's past three fiscal years, the compensation paid to each of the Company's co-principal executive officers and to each of the Company's other executive officers whose total annual salary and bonus exceeded $100,000.

SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Salary ($) | | All Other Compensation ($) | | Total ($) |
|---|---|---|---|---|---|---|
| Michael A. Lubin | 2008 | 350,000 | (1) | 16,300 | (2) | 366,300 |
| Chairman of the Board | 2007 | 350,000 | (1) | 18,600 | (2) | 368,600 |
| (co-principal executive officer) | 2006 | 350,000 | (1) | 18,700 | (2) | 368,700 |
| | | | | | | |
| Warren Delano | 2008 | 350,000 | (1) | 16,300 | (2) | 366,300 |
| President and Director | 2007 | 350,000 | (1) | 18,600 | (2) | 368,600 |
| (co-principal executive officer) | 2006 | 350,000 | (1) | 18,700 | (2) | 368,700 |
| | | | | | | |
| Dennis J. Welhouse | 2008 | 161,200 | | 6,357 | (3) | 167,557 |
| Senior Vice President, | 2007 | 161,200 | | 5,827 | (3) | 167,027 |
| Chief Financial Officer, and Secretary | 2006 | 159,867 | | 5,090 | (3) | 164,957 |

(1) Represents compensation, paid indirectly to Messrs. Lubin and Delano through Lubin, Delano & Company, during each of 2008, 2007, and 2006 for services rendered as an executive officer of the Company. Lubin, Delano & Company is an investment banking and consulting firm of which Messrs. Lubin and Delano are the only partners. See "Compensation Discussion and Analysis," "Compensation Committee Report on Executive Compensation," and "Certain Relationships and Transactions."

(2)   Represents fees paid indirectly to Messrs. Lubin and Mr. Delano through Lubin, Delano &
      Company during each of 2008, 2007, and 2006 for serving as directors on the Company's
      Board of Directors.

(3)   Includes (a) Company contributions of $4,836, $4,836, and $4,152 made to Mr. Welhouse's
      account under the Company's 401(k) Plan in 2008, 2007, and 2006, respectively, and
      (b) insurance premiums of $1,521, $991, and $938 paid by the Company in 2008, 2007, and
      2006, respectively, for term life insurance owned by Mr. Welhouse.

No bonuses, stock options, stock appreciation rights, restricted stock, performance shares,
performance units, non-equity incentive plan compensation, or pension or nonqualified compensation
earnings were paid, awarded, or granted to or exercised by any of the persons named in the summary
compensation table above during 2008, 2007, or 2006. For a narrative description of material factors
necessary to provide an understanding of the compensation disclosed in the summary compensation table
above, see the section entitled "Compensation Discussion and Analysis" below.

## COMPENSATION DISCUSSION AND ANALYSIS

### Compensation Objectives, Philosophy, and Policy

The Company's compensation program is designed to motivate and reward the Company's
executive officers for attaining financial, operational, and strategic objectives that will contribute to the
overall goal of enhancing stockholder value and promote the Company's success in attracting,
developing, and retaining key executives and management personnel critical to its long-term success. The
Company believes that executive compensation should be based on objective measures of performance at
the individual, divisional, and corporate levels, should be driven primarily by the long-term interests of
the Company and its stockholders, and should be linked to the enhancement of stockholder value.  In
addition to reviewing compensation of executive officers, the Compensation Committee also considers
recommendations from the co-principal executive officers regarding compensation for those employees
reporting directly to them. The principal elements of the compensation plan include base salary and cash
bonus awards.

### Components of Executive Compensation

The compensation program for executive officers consists of the following components:

**Base Salary**.  Base salary is paid by the Company to executive officers as a result of market
practices and competitive factors. In determining the base pay levels for executive officers of the
Company, the Compensation Committee considers the compensation paid by a group of industrial
companies that are generally similar to the Company with respect to type of business, sales volume, cash
flow, and market capitalization. The companies that make up the comparable group are subject to change
as companies merge with, or are acquired by, other companies or because companies cease publishing
compensation data for other reasons. Base pay levels, prior to taking into account other factors considered
by the Compensation Committee, are at the mid-range of base pay levels for such group of companies.
The base salaries of the Messrs. Delano and Lubin were last adjusted effective January 1, 2004. The
increase in the compensation payable to Messrs. Delano and Lubin was made in order to adjust their
compensation to a level that the Compensation Committee considered appropriate at that time and under
the prevailing circumstances. Messrs. Delano and Lubin had previously been paid a base salary of
$250,000 each since 1999. The base salary of Mr. Welhouse was last adjusted on June 1, 2006, to an
annual salary level of $161,200. The increase in Mr. Welhouse's compensation was also made to adjust

his compensation to a level that the Compensation Committee considered appropriate at that time and under the prevailing circumstances. Prior to June 1, 2006, Mr. Welhouse's annual base salary was $158,000. The Company's most direct competitors are private companies that do not publicly disclose information regarding executive compensation, financial condition, or operating performance. The Company believes that the companies with which it compares itself for the purpose of determining executive compensation are not necessarily included in the indices used to compare stockholder returns that are contained elsewhere in this Proxy Statement. In determining the salary component of compensation packages for executive officers, the Compensation Committee also takes into consideration the recent performance of the individual and the Company, the experience of the individual, and the scope and complexity of the position. The Compensation Committee does not assign weights to these factors and does not consider any one factor more important than another. The 2008, 2007, and 2006 salaries of the named executive officers are shown in the "Salary" column of the summary compensation table in the section entitled "Executive Compensation" above. Salaries for executive officers are reviewed on an annual basis, as well as at the time of a promotion or other change in responsibilities.  Increases in salary are based on subjective evaluation of such factors as the individual's level of responsibility and performance.

**Incentive Compensation Plan**. In response to market practices and competitive factors, the Company's executive officers can qualify for incentive compensation. To provide incentives to increase profitability, the Company has an incentive compensation plan that provides for the payment of cash bonus awards to executive officers and other eligible employees of the Company. Bonus awards for eligible divisional employees are usually based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization (EBITDA) at each respective division. Bonus awards for executive officers and other eligible corporate employees are based upon the attainment of a predetermined consolidated EBITDA target. No bonuses were paid to Messrs. Delano, Lubin, or Welhouse for 2008, 2007, or 2006. The Compensation Committee is responsible for the supervision of the incentive compensation plan.

**2005 Stock Award Plan**. The Company also has an incentive stock plan (the "2005 Stock Award Plan") that permits it to award nonqualified stock options, incentive stock options, stock appreciation rights, restricted stock, performance shares, or performance units to officers and key employees of the Company. These varying types of long-term incentives, each focusing on different elements of performance and retention, are intended to benefit shareholders by enabling the Company to better attract and retain talent in a marketplace where such incentives are prevalent. Stock options are intended to reward for increases in shareholder value. Restricted stock is intended to help to retain directors, executive officers, and other key employees in a challenging business environment and to reward for increases in stockholder value. Performance shares and performance units are intended to provide focus on transforming the Company and attaining growth in stockholder value over a multi-year period. In January 2006, the Company awarded 50,000 shares of restricted Common Stock to an employee of the Company, and, on October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to each of the Company's four outside directors. No awards under the 2005 Stock Award Plan were granted to, exercised by, or held by any of the persons named in the summary compensation table above during 2008, 2007, or 2006.

**Compensation of Messrs. Delano, Lubin, and Welhouse**. Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2008, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, totaled $700,000. The Company's

- 10 -

arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2008, 2007, or 2006 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2008, 2007, or 2006.

During 2008, the aggregate payments made to Mr. Welhouse for services provided by him as Senior Vice President, Chief Financial Officer, and Secretary totaled $161,200. Mr. Welhouse received no payments under the incentive compensation plan for 2008, 2007, or 2006.

The Company believes that the quality of executive leadership significantly affects long term performance and that it is in the best interest of the stockholders to compensate executive leadership fairly for achievements that meet or exceed the standards set by the Compensation Committee, so long as there is corresponding risk when performance falls short of such standards.

The compensation paid for the combined services of Messrs. Delano, Lubin, and Welhouse in their respective roles as executive officers of the Company was agreed to after considering the responsibilities of such positions and the competitive marketplace for executive talent. The Company believes that the compensation paid to Lubin, Delano & Company during 2008 for the combined services of Messrs. Delano and Lubin as executive officers of the Company and to Mr. Welhouse during 2008 comports with the Compensation Committee's subjective perception of the base compensation levels of executive officers in their respective positions employed by other industrial companies, both public and private.

**Role of the Compensation Committee**

The Compensation Committee is comprised of two non-employee members of the Board of Directors. The Compensation Committee is responsible for reviewing salaries, cash bonus awards, and existing or potential compensation plans for the Company's executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. The membership of the Compensation Committee is determined by the Board.

## COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION

The Compensation Committee is composed entirely of independent directors. The members of the Compensation Committee consist of William B. Conner and Kenneth I. Greenstein.

The committee met with management to review and discuss the Compensation Discussion and Analysis disclosures included in this proxy statement. Based on such review and discussion, the committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Proxy Statement and incorporated by reference in the Company's Form 10-K for its 2008 fiscal year, and the Board has approved that recommendation.

COMPENSATION COMMITTEE

William B. Conner, *Chairman*
Kenneth I. Greenstein, *Member*

## AUDIT COMMITTEE REPORT

The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors and performs the other duties and responsibilities set forth in the Audit Committee's charter. It is the responsibility of the Company's independent auditors to perform an independent audit of and express an opinion on the Company's financial statements. The Audit Committee's responsibility is one of review and oversight. In fulfilling its oversight responsibilities:

(1)     The Audit Committee has reviewed and discussed with the Company's management the audited financial statements.

(2)     The Audit Committee has discussed with Malin, Bergquist & Company LLP, the Company's independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61, "Codification of Statements on Auditing Standards, AU § 380."

(3)     The Audit Committee has received the written disclosures and the letter from its independent registered public accounting firm required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and has discussed with its independent registered public accounting firm the independence of that firm as the Company's auditors.

(4)     Based on the Audit Committee's review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008, for filing with the Securities and Exchange Commission.

In 2000, the Board of Directors adopted a written charter for the Audit Committee, which sets forth the operating practices and responsibilities of the Audit Committee.  A copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. Each member of the Audit Committee is independent, as defined in Rule 4200(a) of the listing standards of the National Association of Securities Dealers.

The members of the Audit Committee are not professionally engaged in the practice of auditing or accounting and, except insofar as Mr. Pardo has been designated as the "audit committee financial expert" of the Company, are not experts in the fields of accounting, auditing, or auditor independence. Members of the committee rely without independent verification on the information provided to them and on the representations made by management and the independent auditors.

AUDIT COMMITTEE

Joseph A. Pardo, *Chairman*
Kenneth I. Greenstein, *Member*
Elizabeth H. Ruml, *Member*

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Company's Compensation Committee are William B. Conner and Kenneth I. Greenstein. Neither Mr. Conner nor Mr. Greenstein has ever been an employee of the Company, and

Mr. Conner, who is the Chairman of the Compensation Committee, has never been an officer of the Company. Mr. Greenstein served as Secretary of the Company from September 1979 to April 2004 although he received no compensation for acting in such capacity. Neither Mr. Conner nor Mr. Greenstein is party to any interlock relationships as defined in applicable Securities and Exchange Commission rules.

## CERTAIN RELATIONSHIPS AND TRANSACTIONS

Warren Delano and Michael A. Lubin beneficially own 27.9% and 33.0%, respectively, of the Common Stock of the Company.

Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2008, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, were $700,000. The Company's arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2008 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2008.

In addition to his ownership of Common Stock, and Warrants, Mr. Lubin and his family members own $346,666.67 aggregate principal amount of the Company's 13% Junior Subordinated Note due November 1, 2009, and $7,011,000 aggregate principal amount of the Company's 12% Senior Subordinated Notes due August 1, 2009. The Lubin, Delano & Company Profit Sharing Plan & Trust, of which Messrs. Delano and Lubin are currently the sole beneficiaries, owns $761,000 principal amount of the 12% Senior Subordinated Notes due August 1, 2009. The Company is in default under its 13% Junior Subordinated Note due November 1, 2009, and its 12% Senior Subordinated Notes due August 1, 2009, although the Company believes that any efforts to enforce the payment obligations under the notes are stayed as a result of the Company's filing of a voluntary petition for bankruptcy, as described below under the heading "Bankruptcy Proceeding."

The Company's principal executive offices at 800 Third Avenue, 15th Floor, New York, New York are leased by Lubin, Delano & Company for aggregate annual base rent of $109,000. Messrs. Delano and Lubin have guaranteed the obligations of Lubin, Delano & Company under the lease. The Company reimburses Lubin, Delano & Company for rent, utilities and other expenses relating to the lease and will reimburse Messrs. Delano and Lubin if any payments are made by them under their guaranties. Substantially all of the business conducted at those offices is the business of the Company.

## Bankruptcy Proceeding

On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors have continued to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, the Debtors obtained a financing package that consisted of (a) an arrangement with the Debtor's senior, secured lenders to freeze the loan under the Debtor's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Debtors to use the cash collections on its accounts receivable in the operation of the Debtor's business through February 25, 2009, which was subsequently extended to May 22, 2009, in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession loan in the amount of $4,000,000, which matures on December 31, 2009, among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The collections on its accounts receivable and the proceeds from the debtor-in-possession loan are being used by the Debtors for working capital, capital expenditures, and other general corporate purposes and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of the collections on its accounts receivable and the Agreement governing the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

## PROPOSAL 2 — RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS

The Board of Directors, on the recommendation of the Audit Committee, has appointed the firm of Malin, Bergquist & Company, LLP, independent public accountants, to audit the accounts of the Company for the year ending December 31, 2009. Malin, Bergquist & Company, LLP has been employed by the Company as its independent auditor since the Company's fiscal year ended December 31, 2007. Prior to that time, the Company employed Ernst & Young LLP as its independent auditor. Set forth below is a breakdown of the aggregate fees billed to the Company by Malin, Bergquist & Company, LLP and Ernst & Young LLP for the twelve-month periods ended December 31, 2008 and 2007:

|  | **2008** | **2007** |
|---|---|---|
| Audit Fees (1) | $256,050 | 240,000 |
| Tax Fees (2) | 12,775 | 17,000 |
| All Other Fees (3) | 38,401 | 62,500 |
|  | $307,226 | 319,500 |

(1) Includes fees for the respective annual audit and review of the Company's financial statements included in Form 10-Qs.

(2) Assistance with the preparation of federal and state income tax returns.

(3) The fees for 2008 include fees for the audit of the Lexington Precision Corporation Retirement & Savings Plan, fees related to the change of accountants, and fees related to assistance with certain court filings required in connection with the Company's chapter 11 filing. The fees for 2007 include fees for the audit of the Lexington Precision Corporation Retirement & Savings Plan, fees for the audit of Lexington Rubber Group, Inc., a wholly-owned subsidiary of Lexington Precision Corporation, and fees incurred in connection with our response to a standard inquiry letter from the U. S. Securities and Exchange Commission.

## Changes in Accountants

At a meeting held on October 9, 2007, the Board of Directors of the Company authorized Joseph A. Pardo, the Chairman of its Audit Committee and an independent director of the Company, to engage Malin, Bergquist & Company, LLP as its independent registered public accounting firm for the year ended December 31, 2007, at such time and on such terms as may be determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. At the same meeting, the Board of Directors of the Company authorized and directed Mr. Pardo, in his capacity as Chairman of the Audit Committee, to accept the resignation of Ernst & Young LLP as the independent registered public accounting firm of the Company at such time as determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. The audit committee of the Board of Directors, through the action of Mr. Pardo in his capacity as Chairman of the Audit Committee, engaged Malin, Bergquist & Company, LLP as the Company's independent registered public accounting firm on January 12, 2008, and accepted the resignation of Ernst & Young LLP on January 14, 2008. The Company did not consult with Malin, Bergquist & Company, LLP prior to that date regarding the application of accounting principles or type of audit that might be rendered on the Company's financial statements or any matter that was either the subject of a disagreement or reportable event as defined in Item 304(a)(1)(iv) and (v) of Regulation S-K.

The reports of Ernst & Young LLP on the Company's financial statements for the years ended December 31, 2006, contained an uncertainty qualification for conditions that raised substantial doubt about the ability of the Company to continue as a going concern. Such financial statements did not contain an adverse opinion, a disclaimer of opinion and were not qualified or modified as to audit scope or accounting principles.

In connection with the audits of the Company's financial statements for the years ended December 31, 2006, and the subsequent interim period preceding their resignation, there were no disagreements with Ernst & Young LLP on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedures which, if not resolved to the satisfaction of Ernst & Young LLP would have caused Ernst & Young LLP to make reference to the matter in their report. The Company has provided Ernst & Young LLP with a copy of this disclosure, and Ernst & Young LLP has furnished the Company with a letter addressed to the Commission stating that it agrees with the above statements, as previously disclosed. A copy of that letter, dated January 25, 2008, is filed as Exhibit 16.1 to the Company's Form 8-K/A filed on January 30, 2008.

## Audit Committee Pre-Approval Policies and Procedures

The Audit Committee adopted a pre-approval policy in 2003 pursuant to which the Audit Committee pre-approves each non-audit engagement or service performed by the Company's independent auditor. Prior to pre-approving any such non-audit engagement or service, it is the committee's practice to first gather information regarding the engagement or requested service that explains the specific engagement or service and enables the committee to make a well-reasoned assessment of the impact of the engagement or service on the auditor's independence. In addition, the Audit Committee may authorize the executive officers of the Company to incur fees for non-audit services without the specific approval of the committee, provided that the fees for such services do not exceed $15,000. As required by the Sarbanes-Oxley Act of 2002, the Audit Committee pre-approved all non-audit engagements for services provided by our independent auditor after May 6, 2003.

The bylaws of the Company do not require that the stockholders ratify the appointment of Malin, Bergquist & Company, LLP as our independent auditor; however, we are seeking ratification because we believe it is a matter of good corporate governance practice. It is intended that, unless any proxy is

marked to the contrary, the shares represented by such proxy shall be voted for the ratification of such appointment. If the stockholders do not ratify the appointment, the Audit Committee will reconsider whether to retain Malin, Bergquist & Company, LLP, but may nevertheless retain Malin, Bergquist & Company, LLP as the Company's independent auditor. If the appointment is ratified, the Audit Committee in its discretion may change the appointment at any time during the year if it determines that a change would be in the best interests of the Company and its stockholders.

It is expected that a representative of Malin, Bergquist & Company, LLP will be present at the Annual Meeting to answer questions of stockholders and will have the opportunity, if desired, to make a statement.

The Board of Directors recommends that shareholders vote **FOR** such ratification.

## STOCKHOLDER PROPOSALS

Proposals by stockholders intended to be presented at the next annual meeting (to be held in 2010) must be received by the Secretary of the Company on or before December 1, 2009, in order to be included in the proxy statement and the proxy for that meeting. Proposals should be directed to the Secretary, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, and must comply with applicable requirements of the federal securities laws and the Company's bylaws.

## OTHER MATTERS

Management does not know of any other matters that are likely to be brought before the Annual Meeting; however, in the event that any other matters properly come before the Annual Meeting, the persons named in the enclosed proxy will vote in accordance with their judgment on such matters.

Accompanying this Proxy Statement is a copy of the Company's Annual Report, which includes financial statements and related data.

According to the rules of the Securities and Exchange Commission, the information presented in this Proxy Statement under the captions "Audit Committee Report" and  "Compensation Committee Report on Executive Compensation" will not be deemed to be "soliciting material" or filed with the Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, and nothing contained in any previous filings made by the Company under such Acts shall be interpreted as incorporating by reference the information presented under the specified captions.

By Order of the Board of Directors,

Dennis J. Welhouse
*Secretary*

Dated:  April 23, 2009
New York, New York

**<u>Exhibit F</u>**

**Debtors' Projected Consolidated Financial Statements
for Five Years ending December 31, 2012**

## Consolidated Statements of Operations
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 88,408 | 73,029 | 61,567 | 73,276 | 92,285 | 104,098 |
| Cost of sales | 76,529 | 63,107 | 55,468 | 58,599 | 70,196 | 77,625 |
| Gross profit | 11,879 | 9,922 | 6,099 | 14,677 | 22,089 | 26,473 |
| Selling & administrative expense | 6,506 | 6,177 | 5,041 | 4,836 | 5,180 | 5,472 |
| Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
| Other income (expense): | | | | | | |
|    Interest expense | (11,339) | (8,726) | (7,649) | (2,360) | (2,283) | (1,689) |
|    Interest income | – | 117 | 50 | 104 | 260 | 300 |
|    Gain on sale of property | – | – | 199 | 181 | 2,308 | – |
|    Discontinued operations | (289) | (229) | (127) | (51) | (90) | 862 |
|    Reorganization expense | (698) | (5,165) | (4,338) | (5,312) | – | – |
|    Cancellation of debt income | – | – | – | 31,168 | – | – |
|      Subtotal | (12,326) | (14,003) | (11,865) | 23,730 | 195 | (527) |
| Income (loss) before income taxes | (6,953) | (10,258) | (10,807) | 33,571 | 17,104 | 20,474 |
| Provision for income taxes | 6 | 35 | 25 | 2,500 | 5,500 | 6,200 |
| Net income (loss) | (6,959) | (10,293) | (10,832) | 31,071 | 11,604 | 14,274 |
| EBITDA (continuing operations, excluding reorganization expenses): | | | | | | |
|    Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
|    Depreciation | 6,036 | 5,082 | 4,521 | 3,765 | 3,369 | 3,469 |
|    Amortization (operating only) | 401 | 251 | 177 | 196 | 56 | 30 |
|     EBITDA | 11,810 | 9,078 | 5,756 | 13,802 | 20,334 | 24,500 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Operations
### (expressed as a percent of net sales)

| | Actual | | Estimate | Projected | | |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 86.6 | 86.4 | 90.1 | 80.0 | 76.1 | 74.6 |
| Gross profit | 13.4 | 13.6 | 9.9 | 20.0 | 23.9 | 25.4 |
| Selling & administrative expense | 7.4 | 8.5 | 8.2 | 6.6 | 5.6 | 5.3 |
| Income from operations | 6.1 | 5.1 | 1.7 | 13.4 | 18.3 | 20.2 |
| Other income (expense): | | | | | | |
|    Interest expense | (12.8) | (11.9) | (12.4) | (3.2) | (2.5) | (1.6) |
|    Interest income | 0.0 | 0.2 | 0.1 | 0.1 | 0.3 | 0.3 |
|    Gain on sale of property | 0.0 | 0.0 | 0.3 | 0.2 | 2.5 | 0.0 |
|    Discontinued operations | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | 0.8 |
|    Reorganization expense | (0.8) | (7.1) | (7.0) | (7.2) | 0.0 | 0.0 |
|    Cancellation of debt income | 0.0 | 0.0 | 0.0 | 42.5 | 0.0 | 0.0 |
|     Total | (13.9) | (19.2) | (19.3) | 32.4 | 0.2 | (0.5) |
| Income (loss) before income taxes | (7.9) | (14.0) | (17.6) | 45.8 | 18.5 | 19.7 |
| Income taxes | 0.0 | 0.0 | 0.0 | 3.4 | 6.0 | 6.0 |
| Net income (loss) | (7.9) % | (14.1) % | (17.6) % | 42.4 % | 12.6 % | 13.7 % |
| EBITDA: | | | | | | |
|    Income from operations | 6.1 % | 5.1 % | 1.7 % | 13.4 % | 18.3 % | 20.2 % |
|    Depreciation | 6.8 | 7.0 | 7.3 | 5.1 | 3.7 | 3.3 |
|    Amortization (operating only) | 0.5 | 0.3 | 0.3 | 0.3 | 0.1 | 0.0 |
|     EBITDA | 13.4 % | 12.4 % | 9.3 % | 18.8 % | 22.0 % | 23.5 % |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Cash Flow
### (in thousands of dollars)

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
| Depreciation | 6,036 | 5,082 | 4,521 | 3,765 | 3,369 | 3,469 |
| Amortization (operating only), net | 401 | 251 | 177 | 196 | 56 | 30 |
| EBITDA | 11,810 | 9,078 | 5,756 | 13,802 | 20,334 | 24,500 |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (1,256) | 4,187 | (232) | (1,531) | (2,451) | (1,479) |
| Inventories | (543) | (1,267) | 2,662 | (646) | (2,029) | (1,511) |
| Prepaid expenses | (287) | (145) | 97 | 383 | (260) | (106) |
| Other current assets | 328 | (1,249) | 407 | 766 | (173) | (72) |
| Accounts payable | 188 | 1,097 | 882 | 2,192 | 1,285 | 644 |
| Accrued expenses | 147 | (583) | (556) | 319 | 456 | 299 |
| Net change in operating working capital | (1,423) | 2,040 | 3,260 | 1,483 | (3,172) | (2,225) |
| | | | | | | |
| Capital expenditures | (2,664) | (2,695) | (1,744) | (3,370) | (3,710) | (3,210) |
| Sales of P & E, excl. gains or losses on sales | – | 28 | 277 | 630 | 3,213 | – |
| Other assets | (184) | (339) | (46) | 144 | 1,324 | (114) |
| Post-retirement liability, excl. current portion | (2) | (2) | (38) | (10) | (30) | (22) |
| Other long-term liabilities | 101 | 75 | 51 | 84 | 62 | 110 |
| Cash provided (used) by discontinued operations | (17) | 130 | 35 | 150 | 108 | 1,751 |
| | | | | | | |
| Net cash provided (used) | 7,621 | 8,315 | 7,551 | 12,913 | 18,129 | 20,790 |
| | | | | | | |
| Nonoperating profit (loss) incl. income tax expense | (12,211) | (13,977) | (11,853) | (10,350) | (7,613) | (7,679) |
| Amortization of deferred financing costs | 1,249 | 251 | – | – | – | – |
| Deferred financing charges | (1,286) | (214) | – | – | – | – |
| Income taxes payable, net | (4) | 33 | 14 | (4) | – | – |
| Accrued interest | 5,824 | 5,468 | 5,684 | 56 | (68) | (43) |
| Accrued reorganization expense | – | 1,168 | 708 | (1,876) | – | – |
| Cancellation of debt income | – | – | – | – | – | – |
| Proceeds from sale of common stock | – | – | – | 9,700 | – | – |
| Term loans | (3,279) | 697 | (3,023) | (6,968) | (10,457) | (7,203) |
| Revolving line of credit | 2,263 | 3,587 | – | – | – | – |
| | | | | | | |
| Net cash flow | 177 | 5,328 | (919) | 3,471 | (9) | 5,865 |
| | | | | | | |
| Add cash on hand at beginning of period | 35 | 212 | 5,540 | 4,621 | 8,092 | 8,083 |
| Cash on hand at end of period | 212 | 5,540 | 4,621 | 8,092 | 8,083 | 13,948 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Balance Sheets
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 212 | 5,540 | 4,621 | 8,092 | 8,083 | 13,948 |
| Marketable securities | 214 | 38 | 155 | 155 | 155 | 155 |
| Trade receivables, net | 10,981 | 6,794 | 7,026 | 8,557 | 11,008 | 12,487 |
| Inventories | 9,330 | 10,597 | 7,935 | 8,581 | 10,610 | 12,121 |
| Prepaid expenses | 926 | 1,071 | 974 | 591 | 851 | 957 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Other current assets | 106 | 1,355 | 1,114 | 348 | 521 | 593 |
| Current assets of discontinued operations | 10 | 7 | 35 | – | – | – |
| Total current assets | 21,877 | 25,402 | 21,860 | 26,324 | 31,228 | 40,261 |
| | | | | | | |
| Plant & equipment | | | | | | |
| Land | 1,817 | 2,255 | 2,168 | 2,216 | 856 | 856 |
| Buildings | 13,370 | 13,378 | 11,123 | 12,041 | 12,341 | 12,341 |
| Machinery & equipment | 110,723 | 112,022 | 103,461 | 99,188 | 102,598 | 105,808 |
| | 125,910 | 127,655 | 116,752 | 113,445 | 115,795 | 119,005 |
| Accumulated depreciation | 105,056 | 109,216 | 102,570 | 100,107 | 103,476 | 106,945 |
| Plant & equipment, net | 20,854 | 18,439 | 14,182 | 13,338 | 12,319 | 12,060 |
| | | | | | | |
| Reorganization value (to be allocated) | – | – | – | 27,388 | 27,388 | 27,388 |
| | | | | | | |
| Plant & equipment of discontinued operations | 1,338 | 1,231 | 1,143 | 907 | 799 | – |
| | | | | | | |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| | | | | | | |
| Deferred financing expenses | 37 | – | – | – | – | – |
| | | | | | | |
| Other assets | 638 | 633 | 1,440 | 1,047 | 68 | 90 |
| | | | | | | |
| | 52,367 | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Balance Sheets (cont.)**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 6,558 | 3,391 | 4,816 | 5,297 | 6,582 | 7,226 |
| Accrued income taxes | (43) | (10) | 4 | – | – | – |
| Accrued interest expense | 7,954 | 199 | 162 | 217 | 149 | 106 |
| Accrued expenses excl. interest | | | | | | |
| and income taxes | 3,975 | 3,392 | 3,001 | 3,155 | 3,611 | 3,910 |
| Short-term debt | 10,632 | 18,219 | 18,429 | – | – | – |
| Current portion of long-term debt | 58,454 | 19,972 | 16,739 | 5,758 | 6,218 | 11,954 |
| Current liabilities of discontinued operations | 241 | 148 | 160 | – | – | – |
| Total current liabilities | 87,771 | 45,311 | 43,311 | 14,427 | 16,560 | 23,196 |
| Liabilities subject to compromise | – | 54,013 | 59,735 | – | – | |
| Long-term debt, net of current portion | 5 | – | – | 23,856 | 12,939 | – |
| Long-term portion of post-retirement obligation | 258 | 256 | 218 | 208 | 178 | 156 |
| Other long-term liabilities | 176 | 144 | 82 | 94 | 102 | 150 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,242 | 1,247 | 35,915 | 35,915 | 35,915 |
| Additional paid-in-capital | 13,187 | 13,197 | 13,205 | – | – | – |
| Accumulated income (deficit) | (50,366) | (60,835) | (71,550) | 2,127 | 13,731 | 28,005 |
| Stockholders' equity (deficit) | (35,941) | (46,396) | (57,098) | 38,042 | 49,646 | 63,920 |
| | 52,367 | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Outstanding Debt**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revolving loans | 10,632 | 14,219 | 14,219 | – | – | – |
| Equipment term loan | 9,167 | 6,667 | 4,167 | – | – | – |
| New credit agreement | – | – | – | 15,052 | 11,854 | 7,954 |
| Real estate term loan A | 10,022 | 9,289 | 8,556 | – | – | – |
| Real estate term loan B | 4,000 | 4,000 | 4,000 | – | – | – |
| New loan agreement | – | – | – | 11,672 | 6,065 | 4,000 |
| Debtor-in-possession | – | 4,000 | 4,000 | – | – | – |
| Retirement obligations | 6 | – | – | – | – | – |
| General unsecured claims | – | – | – | 2,890 | 1,238 | – |
| 12% Senior Subordinated Notes due July 31, 2009 | 34,177 | 34,177 | 34,177 | – | – | – |
| 12% Senior Subordinated Notes due December 31, 2013 | – | – | – | – | – | – |
| 13% Junior Subordinated Note | 347 | 347 | 347 | – | – | – |
| Redeemable preferred stock | 660 | 660 | 660 | – | – | – |
| Other | 80 | 16 | 226 | – | – | – |
| Total debt | 69,091 | 73,375 | 70,352 | 29,614 | 19,157 | 11,954 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Rubber Group Statements of Operations**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 74,587 | 62,278 | 51,261 | 58,173 | 70,653 | 79,748 |
| Cost of sales | 63,039 | 52,173 | 44,794 | 45,026 | 51,566 | 56,686 |
| Gross profit | 11,548 | 10,105 | 6,467 | 13,147 | 19,087 | 23,062 |
| Selling & administrative expense | 3,573 | 2,921 | 2,445 | 2,423 | 2,622 | 2,786 |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| EBITDA: | | | | | | |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| Depreciation | 5,335 | 4,509 | 4,031 | 3,264 | 2,777 | 2,783 |
| Amortization (operating only) | 392 | 237 | 164 | 177 | 56 | 30 |
| EBITDA | 13,702 | 11,930 | 8,217 | 14,165 | 19,298 | 23,089 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Rubber Group Statements of Operations**
**(expressed as a percent of net sales)**

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 84.5 | 83.8 | 87.4 | 77.4 | 73.0 | 71.1 |
| Gross profit | 15.5 | 16.2 | 12.6 | 22.6 | 27.0 | 28.9 |
| Selling & administrative expense | 4.8 | 4.7 | 4.8 | 4.2 | 3.7 | 3.5 |
| Income from operations | 10.7 % | 11.5 % | 7.8 % | 18.4 % | 23.3 % | 25.4 % |
| EBITDA: |  |  |  |  |  |  |
| Income from operations | 10.7 % | 11.5 % | 7.8 % | 18.4 % | 23.3 % | 25.4 % |
| Depreciation | 7.2 | 7.2 | 7.9 | 5.6 | 3.9 | 3.5 |
| Amortization (operating only) | 0.5 | 0.4 | 0.3 | 0.3 | 0.1 | 0.0 |
| EBITDA | 18.4 % | 19.2 % | 16.0 % | 24.3 % | 27.3 % | 29.0 % |

### LEXINGTON PRECISION CORPORATION
### AND SUBSIDIARY

### Rubber Group Statements of Cash Flows
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| Depreciation | 5,335 | 4,509 | 4,031 | 3,264 | 2,777 | 2,783 |
| Amortization (operating only) | 392 | 237 | 164 | 177 | 56 | 30 |
| EBITDA | 13,702 | 11,930 | 8,217 | 14,165 | 19,298 | 23,089 |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (728) | 3,763 | (662) | (1,234) | (1,776) | (1,210) |
| Inventories | (288) | (826) | 1,925 | (517) | (1,185) | (1,167) |
| Prepaid expenses | (20) | (51) | 134 | 190 | (115) | (73) |
| Other current assets | 430 | (1,359) | 390 | 696 | (72) | (59) |
| Accounts payable | 177 | 1,213 | 628 | 1,749 | 793 | 446 |
| Accrued expenses | (91) | 203 | (396) | 142 | 225 | 187 |
| Net change in operating working capital | (520) | 2,943 | 2,019 | 1,026 | (2,130) | (1,876) |
| | | | | | | |
| Capital expenditures | (2,068) | (2,343) | (1,462) | (2,891) | (2,700) | (2,450) |
| Sales of P & E, excl. gains or losses on sales | – | 6 | 159 | 630 | 3,213 | – |
| Other assets | (337) | (358) | (97) | 144 | 1,324 | (114) |
| Post-retirement liability, excl. current portion | (12) | (9) | (27) | – | (12) | (12) |
| Other long-term liabilities | 101 | 75 | 51 | 84 | 62 | 110 |
| | | | | | | |
| Net cash provided (used) | 10,866 | 12,244 | 8,860 | 13,158 | 19,055 | 18,747 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Rubber Group Balance Sheets
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 51 | 27 | 26 | 26 | 26 | 26 |
| Trade receivables, net | 8,961 | 5,198 | 5,860 | 7,094 | 8,870 | 10,080 |
| Inventories | 7,268 | 8,094 | 6,169 | 6,686 | 7,871 | 9,038 |
| Prepaid expenses | 646 | 697 | 563 | 373 | 488 | 561 |
| Other current assets | (94) | 1,265 | 1,041 | 345 | 417 | 476 |
| Total current assets | 16,832 | 15,281 | 13,659 | 14,524 | 17,672 | 20,181 |
| | | | | | | |
| Plant & equipment | | | | | | |
| Land | 1,696 | 2,134 | 2,047 | 2,095 | 735 | 735 |
| Buildings | 11,012 | 11,012 | 8,739 | 9,641 | 9,941 | 9,941 |
| Machinery & equipment | 85,356 | 86,751 | 78,052 | 73,316 | 75,716 | 78,166 |
| | 98,064 | 99,897 | 88,838 | 85,052 | 86,392 | 88,842 |
| Accumulated depreciation | 80,780 | 84,785 | 77,657 | 74,693 | 77,470 | 80,253 |
| Plant & equipment, net | 17,284 | 15,112 | 11,181 | 10,359 | 8,922 | 8,589 |
| | | | | | | |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| | | | | | | |
| Other assets | 497 | 511 | 1,367 | 974 | (5) | 17 |
| | 42,236 | 38,527 | 33,830 | 33,480 | 34,212 | 36,410 |
| | | | | | | |
| **Liabilities & Invested Capital:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 4,353 | 1,452 | 2,080 | 3,829 | 4,622 | 5,068 |
| Accrued operating expenses | 2,138 | 2,341 | 1,945 | 2,087 | 2,312 | 2,499 |
| Total current liabilities | 6,491 | 3,793 | 4,025 | 5,916 | 6,934 | 7,567 |
| | | | | | | |
| Liabilities subject to compromise | – | 4,114 | 4,114 | – | – | – |
| | | | | | | |
| Long-term portion of post-retirement obligation | 170 | 161 | 134 | 134 | 122 | 110 |
| | | | | | | |
| Other long-term liabilities | 176 | 144 | 82 | 94 | 102 | 150 |
| | | | | | | |
| Invested capital | 35,399 | 30,315 | 25,475 | 27,402 | 27,054 | 28,583 |
| | 42,236 | 38,527 | 33,830 | 33,480 | 34,212 | 36,410 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Statements of Operations**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net product sales | 13,821 | 10,751 | 10,306 | 15,103 | 21,632 | 24,350 |
| Cost of product sales | 13,490 | 10,934 | 10,674 | 13,573 | 18,630 | 20,939 |
| Gross profit | 331 | (183) | (368) | 1,530 | 3,002 | 3,411 |
| Selling & administrative expense | 523 | 558 | 359 | 420 | 566 | 634 |
| Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
| EBITDA: | | | | | | |
| Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
| Depreciation | 682 | 536 | 452 | 464 | 586 | 680 |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | 490 | (205) | (275) | 1,574 | 3,022 | 3,457 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Statements of Operations**
**(expressed as a percent of net sales)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 97.6 | 101.7 | 103.6 | 89.9 | 86.1 | 86.0 |
| Gross profit | 2.4 | (1.7) | (3.6) | 10.1 | 13.9 | 14.0 |
| Selling & administrative expense | 3.8 | 5.2 | 3.5 | 2.8 | 2.6 | 2.6 |
| Income (loss) from operations | (1.4) % | (6.9) % | (7.1) % | 7.3 % | 11.3 % | 11.4 % |
| EBITDA: | | | | | | |
| Income (loss) from operations | (1.4) % | (6.9) % | (7.1) % | 7.3 % | 11.3 % | 11.4 % |
| Depreciation | 4.9 | 5.0 | 4.4 | 3.1 | 2.7 | 2.8 |
| Amortization (operating only) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBITDA | 3.5 % | (1.9) % | (2.7) % | 10.4 % | 14.0 % | 14.2 % |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Metals Group Statements of Cash Flows
(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
| Depreciation | 682 | 536 | 452 | 464 | 586 | 680 |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | 490 | (205) | (275) | 1,574 | 3,022 | 3,457 |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (401) | 424 | 430 | (297) | (675) | (269) |
| Inventories | (255) | (441) | 737 | (129) | (844) | (344) |
| Prepaid expenses | (67) | 132 | (2) | 33 | (83) | (33) |
| Other current assets | 38 | (84) | 21 | 60 | (101) | (13) |
| Accounts payable | 469 | (289) | 189 | 698 | 467 | 173 |
| Accrued expenses | 41 | (73) | 7 | 57 | 199 | 78 |
| Net change in operating working capital | (175) | (331) | 1,382 | 422 | (1,037) | (408) |
| Capital expenditures | (519) | (333) | (282) | (479) | (1,000) | (750) |
| Sales of P & E, excl. gains or losses on sales | – | 22 | 118 | – | – | – |
| Other assets | (61) | 28 | 33 | – | – | – |
| Post-retirement liability, excl. current portion | 10 | 7 | (11) | (10) | (18) | (10) |
| Net cash provided (used) | (255) | (812) | 965 | 1,507 | 967 | 2,289 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Balance Sheets**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 1 | 2 | 2 | 2 | 2 | 2 |
| Trade receivables, net | 2,020 | 1,596 | 1,166 | 1,463 | 2,138 | 2,407 |
| Inventories | 2,062 | 2,503 | 1,766 | 1,895 | 2,739 | 3,083 |
| Prepaid expenses | 343 | 211 | 213 | 180 | 263 | 296 |
| Other current assets | – | 84 | 63 | 3 | 104 | 117 |
| Total current assets | 4,426 | 4,396 | 3,210 | 3,543 | 5,246 | 5,905 |
| | | | | | | |
| Plant & equipment | | | | | | |
| Land | 121 | 121 | 121 | 121 | 121 | 121 |
| Buildings | 2,325 | 2,330 | 2,348 | 2,364 | 2,364 | 2,364 |
| Machinery & equipment | 25,280 | 25,170 | 25,308 | 25,771 | 26,771 | 27,521 |
| | 27,726 | 27,621 | 27,777 | 28,256 | 29,256 | 30,006 |
| Accumulated depreciation | 24,251 | 24,371 | 24,815 | 25,279 | 25,865 | 26,545 |
| Plant & equipment, net | 3,475 | 3,250 | 2,962 | 2,977 | 3,391 | 3,461 |
| | | | | | | |
| Other assets | 62 | 34 | 1 | 1 | 1 | 1 |
| | 7,963 | 7,680 | 6,173 | 6,521 | 8,638 | 9,367 |
| | | | | | | |
| **Liabilities & Invested Capital:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 1,538 | 21 | 210 | 908 | 1,375 | 1,548 |
| Accrued operating expenses | 433 | 360 | 367 | 424 | 623 | 701 |
| Total current liabilities | 1,971 | 381 | 577 | 1,332 | 1,998 | 2,249 |
| | | | | | | |
| Liabilities subject to compromise | – | 1,228 | 1,228 | – | – | – |
| | | | | | | |
| Long-term portion of post-retirement obligation | 88 | 95 | 94 | 74 | 56 | 46 |
| | | | | | | |
| Invested capital | 5,904 | 5,976 | 4,274 | 5,115 | 6,584 | 7,072 |
| | 7,963 | 7,680 | 6,173 | 6,521 | 8,638 | 9,367 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Statements of Operations**
**(in thousands of dollars)**

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | – | – | – | – | – | – |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2,410 | 2,210 | 2,237 | 1,993 | 1,992 | 2,052 |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| EBITDA: |  |  |  |  |  |  |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| Depreciation | 19 | 37 | 38 | 37 | 6 | 6 |
| Amortization (operating only) | 9 | 14 | 13 | 19 | – | – |
| EBITDA | (2,382) | (2,159) | (2,186) | (1,937) | (1,986) | (2,046) |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Statements of Operations**
**(expressed as a percent of net sales)**

|  | Actual | | Estimate | Projected | | |
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Net sales | – % | – % | – % | – % | – % | – % |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2.7 | 3.0 | 3.6 | 2.7 | 2.2 | 2.0 |
| Loss from operations | (2.7) % | (3.0) % | (3.6) % | (2.7) % | (2.2) % | (2.0) % |
| EBITDA: |  |  |  |  |  |  |
| Loss from operations | (2.7) % | (3.0) % | (3.6) % | (2.7) % | (2.2) % | (2.0) % |
| Depreciation | – | 0.1 | 0.1 | 0.1 | – | – |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | (2.7) % | (2.9) % | (3.5) % | (2.6) % | (2.2) % | (2.0) % |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Statements of Cash Flows**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| Depreciation | 19 | 37 | 38 | 37 | 6 | 6 |
| Amortization (operating only) | 9 | 14 | 13 | 19 | – | – |
| EBITDA | (2,382) | (2,159) | (2,186) | (1,937) | (1,986) | (2,046) |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (127) | – | – | – | – | – |
| Prepaid expenses | (200) | (226) | (35) | 160 | (62) | – |
| Other current assets | (140) | 194 | (4) | 10 | – | – |
| Accounts payable | (458) | 173 | 65 | (255) | 25 | 25 |
| Accrued expenses | 197 | (713) | (167) | 120 | 32 | 34 |
| Net change in operating working capital | (728) | (572) | (141) | 35 | (5) | 59 |
| | | | | | | |
| Capital expenditures | (77) | (19) | – | – | (10) | (10) |
| Other assets | 214 | (9) | 18 | – | – | – |
| Discontinued operations | (87) | – | – | – | – | – |
| | | | | | | |
| Net cash provided (used) | (3,060) | (2,759) | (2,309) | (1,902) | (2,001) | (1,997) |
| | | | | | | |
| Nonoperating loss incl. income tax expense | (12,211) | (14,465) | (12,052) | (10,350) | (7,613) | (7,679) |
| Amortization of deferred financing costs | 1,249 | 251 | – | – | – | – |
| Deferred financing charges | (1,286) | (214) | – | – | – | – |
| Income taxes payable, net | (4) | 33 | 14 | (4) | – | – |
| Accrued interest | 5,824 | 5,468 | 5,684 | 56 | (68) | (43) |
| Accrued reorganization expense | – | 1,168 | 708 | (1,876) | | |
| Proceeds from sale of common stock | – | – | – | 9,700 | – | – |
| Term loans | (3,279) | 697 | (3,023) | (6,968) | (10,457) | (7,203) |
| Revolving line of credit | 2,263 | 3,587 | – | – | – | – |
| | | | | | | |
| Net cash flow | (10,504) | (6,234) | (10,978) | (11,344) | (20,139) | (16,922) |
| | | | | | | |
| Add cash on hand at beginning of period | (17) | 160 | 5,511 | 4,593 | 8,064 | 8,055 |
| Less cash on hand at end of period | 160 | 5,511 | 4,593 | 8,064 | 8,055 | 13,920 |
| | | | | | | |
| Net cash transferred to (from) corporate | (10,681) | (11,585) | (10,060) | (14,815) | (20,130) | (22,787) |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Balance Sheets**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 160 | 5,511 | 4,593 | 8,064 | 8,055 | 13,920 |
| Marketable securities | 214 | 38 | 155 | 155 | 155 | 155 |
| Trade receivables, net | – | – | – | – | – | – |
| Inventories | – | – | – | – | – | – |
| Prepaid expenses | (63) | 163 | 198 | 38 | 100 | 100 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Other current assets | 200 | 6 | 10 | – | – | – |
| Total current assets | 609 | 5,718 | 4,956 | 8,257 | 8,310 | 14,175 |
| Plant & equipment | | | | | | |
| Land | – | – | – | – | – | – |
| Buildings | 33 | 36 | 36 | 36 | 36 | 36 |
| Machinery & equipment | 87 | 101 | 101 | 101 | 111 | 121 |
| | 120 | 137 | 137 | 137 | 147 | 157 |
| Accumulated depreciation | 25 | 60 | 98 | 135 | 141 | 147 |
| Plant & equipment, net | 95 | 77 | 39 | 2 | 6 | 10 |
| Reorganization value (to be allocated) | – | – | – | 27,388 | 27,388 | 27,388 |
| Deferred financing expenses | 37 | – | – | – | – | – |
| Other assets | 79 | 88 | 72 | 72 | 72 | 72 |
| | 820 | 5,883 | 5,067 | 35,719 | 35,776 | 41,645 |

**LEXINGTON PRECISION CORPORATION
AND SUBSIDIARY**

**Corporate Office Balance Sheets (cont.)
(in thousands of dollars)**

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 667 | 1,918 | 2,472 | 560 | 585 | 610 |
| Accrued income taxes | (43) | (10) | 4 | | – | – |
| Accrued interest expense | 7,954 | 199 | 161 | 217 | 149 | 106 |
| Accrued expenses excl. interest and income taxes | 1,404 | 691 | 837 | 644 | 676 | 710 |
| Short-term debt | 10,632 | 18,219 | 18,429 | – | – | – |
| Current portion of long-term debt | 58,454 | 19,972 | 16,739 | 5,758 | 7,203 | 11,954 |
| Total current liabilities | 79,068 | 40,989 | 38,642 | 7,179 | 8,613 | 13,380 |
| Liabilities subject to compromise | – | 48,497 | 54,219 | – | – | – |
| Long-term debt, net of current portion | 5 | – | – | 23,856 | 11,954 | – |
| Deferred income taxes | 98 | – | – | – | – | – |
| Intercompany | (42,410) | (37,207) | (30,775) | (33,358) | (34,437) | (35,655) |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,242 | 1,247 | 35,915 | 35,915 | 35,915 |
| Add'l paid-in-capital | 13,187 | 13,197 | 13,205 | | | |
| Accumulated deficit | (50,366) | (60,835) | (71,471) | 2,127 | 13,731 | 28,005 |
| Stockholders' equity (deficit) | (35,941) | (46,396) | (57,019) | 38,042 | 49,646 | 63,920 |
|  | 820 | 5,883 | 5,067 | 35,719 | 35,776 | 41,645 |

**<u>Exhibit G</u>**

**Debtors' Liquidation Analysis**

**LEXINGTON PRECISION CORPORATION**

**Liquidation Analysis as of February 28, 2010**
**(in thousands of dollars)**

|  | LRGI | LPC | Debtors |
|---|---|---|---|
| Net proceeds of liquidation before related fees | 30,546 | 9,054 | 39,601 |
| Trustee's commission (3%) | (916) | (272) | (1,188) |
| Legal fees | (600) | (600) | (1,200) |
| Net proceeds of liquidation | 29,030 | 8,183 | 37,213 |
| Secured debt |  |  | (30,515) |
| Interest on secured debt during liquidation period |  |  | (695) |
| Debtor-in-possession loan |  |  | (4,031) |
| Interest on debtor-in-possession loan during liquidation period |  |  | (200) |
| Net proceeds before payment of post-petition accounts payable and chapter 11 professional fees |  |  | 1,772 |
| Chapter 11 professional fees |  |  | (1,718) |
| Shortfall |  |  | 54 |
| Net proceeds of liquidation available for unsecured creditors |  |  | 54 |

## Exhibit H

**Summary of Amended and Restated
Secured CapitalSource Credit Agreement**

US_ACTIVE:\43178130\01\26690.0008

**Lexington Precision Corporation**

**Summary of Terms of Amended and Restated Credit and Security Agreement (the "Credit Agreement").** *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.*

| | |
|---|---|
| **Lenders** | CapitalSource Finance LLC ("<u>CS</u>") and Webster Business Credit Corporation ("<u>Webster</u>" and, together with CS, the "<u>Lenders</u>"). |
| **Debtors** | Lexington Precision Corporation ("<u>LPC</u>") and Lexington Rubber Group, Inc. ("<u>LRG</u>" and, together with LPC, the "<u>Borrowers</u>"). |
| **Agent** | CS, as administrative agent and collateral agent (the "Agent"). |
| **Equity Sponsor** | Aurora Resurgence Management Partners LLC or an affiliate thereof (the "<u>Equity Sponsor</u>"). |
| **Closing Date** | The date on which all of the conditions precedent of the Credit Agreement are fully satisfied. |
| **Governing Law** | New York |
| **Commitments** | <u>Equipment Term Loan</u>:    a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| | <u>Revolving Credit Commitments</u>:    a credit facility in the maximum aggregate principal amount of Revolving Credit Advances and Letters of Credit that may be outstanding at any one time, which as of the Closing Date equals $[733,000], less any L/C Disbursements and less any amounts that may expire and not be renewed under any Letters of Credit. |
| **Term / Maturity** | 3-year facility maturing on [_____], 2013. |
| **Priority Ranking** | First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on non-real estate collateral and second-lien on real estate collateral). |
| **Interest** | LIBOR <u>plus</u> the Applicable Margin. |
| | LIBOR floor of 2.5%. |
| | Applicable Margin of 5.5% for the first full year of the credit facility. Thereafter, the Applicable Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations: (i) if Leverage Ratio is greater than 2.5x, 6.5%; (ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, |

6.0%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 5.5%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 4.5%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 4.0%.

Default Interest Rate: 2.0% per annum plus the Applicable Rate.

**Fees**              Commitment Fee:   1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date.

Letter of Credit Fees:   5.5% per annum (increasing by 2.0% per annum from and after the occurrence of, and during the continuation of, any Event of Default) for each Letter of Credit, together with any and all other fees and expenses in connection therewith, payable quarterly in arrears.

Audit Fees:   Agent entitled to conduct as many Audit Fees as it wishes. However, provided no Default or Event of Default exists and is continuing and the Borrowers' Leverage Ratio as of the last day of each Fiscal Quarter of the applicable Fiscal Year is 2.0:1.0 or less, then Borrowers shall only reimburse Agent for the lesser of (i) $25,000 or (ii) the actual costs and expenses incurred by Agent in connection with such field audit.

**Amortization**      Amortization payments in the following amounts are payable: (i) $208,333.33 per month for the first full twenty-four (24) months following the Closing Date and (ii) $325,000 per month for each month thereafter until the end of the Term.

**Mandatory Prepayments**      Extraordinary Receipts:   mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement.

Dispositions/Sales:   mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of

business).

<u>Casualty Event Proceeds</u>:   Extraordinary Receipts consisting of proceeds from insurance policies covering Equipment or Real Property damage, destruction or casualty may be reinvested by the Borrowers to repair or replace such damaged Equipment or Real Property, provided, among other things, that no Default or Event of Default exist and be continuing and that the cost of the repairs or replacements do not exceed the Materiality Threshold ($250,000).

<u>Excess Cash Flow</u>:   mandatory prepayment of 50% of Excess Cash Flow payable quarterly (excepting therefrom any Excess Cash Flow, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Term Loan Agreement and subject thereto), unless Leverage Ratio for such quarter is less than 2.5:1.0.

<u>Equity Issuances / Debt Incurrence</u>:   mandatory prepayment of 100% of Net Cash Proceeds of any Equity Interest issuances or Indebtedness incurrence by any Borrower; <u>provided</u> that so long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or incur Indebtedness under the Junior Lien Facility in an aggregate principal amount not to exceed $5,000,000; <u>provided</u>, <u>further</u>, that any Indebtedness incurred under the Junior Lien Facility shall not exceed $3,000,000.

| | |
|---|---|
| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |
| **Negative Covenants** | Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others. |
| **Financial Covenants** | <u>Fixed Charge Coverage Ratio</u>:   not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date.<br><br><u>Capital Expenditures</u>:   maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year. |

Leverage Ratio:
- 4.0:1.0 for each calendar month beginning on the third full calendar
month following the Closing Date and prior to [_____], 2011;
- 3.5:1.0 for each calendar month ending after [_____], 2011 and prior to
[_____], 2012; and
- 3.0:1.0 for each calendar month ending after [_____], 2012 through the
expiration of the Term.

Minimum Liquidity:    not less than $2,000,000 at any time.

Minimum EBITDA:    not less than (i) $600,000 from the first day of the
first full calendar month following the Closing Date to the last day of
such calendar month; (ii) $1,333,333 from the first day of the second full
calendar month following the Closing Date to the last day of such
calendar month; (iii) $8,000,000 on an annualized basis (as measured
from the first full day of the first full calendar month following the
Closing Date) beginning on the last day of the third full calendar month
following the Closing Date through the last day of the calendar month
that is the first anniversary of the Closing Date and (iv) $9,000,000
thereafter.

| | |
|---|---|
| **Conditions Precedent** | Customary conditions precedent for a credit facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity in an amount of at least $3,000,000. |
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others. |
| **Equity Investment** | Equity Sponsor shall have made an Equity Investment in an amount not less than $[9,700,000] in the Borrowers as of the Closing Date. |

**Junior Lien Facility**   Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent.

**Board of Directors**   Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).   As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member).

**Board Observation**   A Lender Representative selected by the Agent may attend meetings of each Governing Body.   So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement.

**<u>Exhibit I</u>**

**Summary of Amended and Restated Secured CSE Loan Agreement**

**Lexington Precision Corporation**

**Summary of Terms of Amended and Restated Loan and Security Agreement (the "Loan Agreement").**    *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.*

| | |
|---|---|
| **Lenders** | CSE Mortgage LLC ("<u>CSE</u>") and DMD Special Situations, LLC ("<u>DMD</u>" and, together with CSE, the "<u>Lenders</u>"). |
| **Debtors** | Lexington Precision Corporation ("<u>LPC</u>") and Lexington Rubber Group, Inc. ("<u>LRG</u>" and, together with LPC, the "<u>Borrowers</u>"). |
| **Agent** | CSE, as administrative agent and collateral agent (the "Agent"). |
| **Equity Sponsor** | Aurora Resurgence Management Partners LLC or an affiliate thereof (the "<u>Equity Sponsor</u>"). |
| **Closing Date** | The date on which all of the conditions precedent of the Loan Agreement are fully satisfied. |
| **Governing Law** | New York |
| **Commitments** | <u>Term Loan A</u>:    a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| | <u>Term Loan B</u>:    a term loan, including Capitalized Expenses allocated pro rata between Term Loan B, Term Loan A and the Equipment Term Loan, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| **Term / Maturity** | 3-year facility maturing on [_____], 2013. |
| **Priority Ranking** | First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on real estate collateral and second-lien on non-real estate collateral). |
| | Payment subordination of Term Loan B (see "Amortization" below). |
| **Interest** | <u>Term Loan A</u>:    LIBOR <u>plus</u> Applicable Term A Margin.    LIBOR floor of 2.5%. |
| | <u>Applicable Term A Margin</u> of 7.0% for the first full year of the loan facility.    Thereafter, the Applicable Term A Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:<br>(i) if Leverage Ratio is greater than 2.5x, 8.0%; |

(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 7.5%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 7.0%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 6.0%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 5.5%.

Term Loan B:    Base Rate plus Applicable Term B Margin.   Base Rate floor of 5.0%

Applicable Term B Margin of 10.5% for the first full year of the loan facility.    Thereafter, the Applicable Term B Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:

(i) if Leverage Ratio is greater than 2.5x, 11.5%;

(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 11.0%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 10.5%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 9.5%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 9.0%.

Default Interest Rate: 2.0% per annum plus the Applicable Rate.

**Fees**

Commitment Fee:    1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date.

**Amortization; Repayment**

Amortization of Term Loan A

Payments in the following amounts are payable: (i) $61,111.11 per month for the first full twenty-four (24) months following the Closing Date and (ii) $90,000 per month for each month thereafter until the end of the Term.

Repayment of Term Loan B

Entire principal balance of the Term Loan B due and payable in full as of the expiration of the Term.    The Term Loan B facility may be voluntarily prepaid, provided that either (i) the Term Loan A and the Equipment Loan under the Amended and Restated Credit and Security Agreement are repaid in full in cash or (ii) the Borrowers have already prepaid an aggregate principal amount of not less than $3,000,000 of the Term Loan A and Borrowers otherwise comply with certain "Restricted Payment Conditions" (e.g., no Event of Default in existence or as a result thereof).

| | |
|---|---|
| **Mandatory Prepayments** | <u>Extraordinary Receipts</u>:   mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement. |

<u>Dispositions/Sales</u>:   mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of business).

<u>Casualty Event Proceeds</u> Extraordinary Receipts consisting of proceeds from insurance policies covering Equipment or Real Property damage, destruction or casualty may be reinvested by the Borrowers to repair or replace such damaged Equipment or Real Property, provided, among other things, that no Default or Event of Default exist and be continuing and that the cost of the repairs or replacements do not exceed the Materiality Threshold ($250,000).

<u>Excess Cash Flow</u>:   mandatory prepayment of 50% of Excess Cash Flow payable quarterly, unless Leverage Ratio for such quarter is less than 2.5:1.0.

<u>Equity Issuances / Debt Incurrence</u>:   mandatory prepayment of 100% of any Equity Interest issuances or Indebtedness incurrence by any Borrower (excepting therefrom any Net Cash Proceeds, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject thereto); <u>provided</u> that so long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or incur Indebtedness under the Junior Lien Facility in an aggregate principal amount not to exceed $5,000,000; <u>provided</u>, <u>further</u>, that any Indebtedness incurred under the Junior Lien Facility shall not exceed $3,000,000.

| | |
|---|---|
| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |

**Negative Covenants**      Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others.

**Financial Covenants**      Fixed Charge Coverage Ratio:    not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date.

Capital Expenditures:    maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year.

Leverage Ratio:
- 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to [____], 2011;
- 3.5:1.0 for each calendar month ending after [____], 2011 and prior to [____], 2012; and
- 3.0:1.0 for each calendar month ending after [____], 2012 through the expiration of the Term.
Minimum Liquidity:    not less than $2,000,000 at any time.

Minimum EBITDA:    not less than (i) $600,000 from the first day of the first full calendar month following the Closing Date to the last day of such calendar month; (ii) $1,333,333 from the first day of the second full calendar month following the Closing Date to the last day of such calendar month; (iii) $8,000,000 on an annualized basis (as measured from the first full day of the first full calendar month following the Closing Date) beginning on the last day of the third full calendar month following the Closing Date through the last day of the calendar month that is the first anniversary of the Closing Date and (iv) $9,000,000 thereafter.

**Conditions Precedent**      Customary conditions precedent for a loan facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity

Pg 318 of 318

in an amount of at least $3,000,000.

| | |
|---|---|
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others. |
| **Equity Investment** | Equity Sponsor shall have made an Equity Investment in an amount not less than $[9,700,000] in the Borrowers as of the Closing Date. |
| **Junior Lien Facility** | Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent. |
| **Board of Directors** | Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).   As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member). |
| **Board Observation** | A Lender Representative selected by the Agent may attend meetings of each Governing Body.   So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement. |