**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | |
|---|---|
| In re | : |
| | :   **Chapter 11 Case No.** |
| | : |
| **LEXINGTON PRECISION CORP., <u>et al.</u>,** | :   **08-11153 (SCC)** |
| | : |
| Debtors. | :   **(Jointly Administered)** |
| | : |

---------------------------------------------------------x

## DISCLOSURE STATEMENT FOR DEBTORS'
## FOURTH AMENDED JOINT PLAN OF REORGANIZATION
## <u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED</u>

The Bankruptcy Court has not approved this proposed disclosure statement as containing adequate information pursuant to section 1125(b) of the Bankruptcy Code for use in the solicitation of acceptances or rejections of the chapter 11 plan described herein and attached hereto. Accordingly, the filing and dissemination of this disclosure statement are not intended to be, and should not in any way be construed as, a solicitation of votes on the plan, nor should the information contained in this disclosure statement be relied on for any purpose until a determination by the Bankruptcy Court that the proposed disclosure statement contains adequate information.

The Debtors reserve the right to amend or supplement this proposed disclosure statement at or before the hearing to consider this disclosure statement.

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
Debtors in Possession
767 Fifth Avenue
New York, New York, 10153
(212) 310-8000

Dated: May 26, 2010
     New York, New York

I.      Introduction ................................................................................................................ 1

II.     Executive Summary .................................................................................................. 5

        A.      Summary of Classification and Treatment of Claims and Interests
                Under the Plan ............................................................................................... 5

        B.      Solicitation and Voting Procedures ............................................................... 7

                1.      The Record Date; Holders of Claims Entitled to Vote on
                        the Plan ................................................................................................ 8

                2.      Filing of the Plan Supplement ............................................................. 8

                3.      The Voting Deadline ............................................................................ 9

                4.      Voting Instructions .............................................................................. 9

        C.      Confirmation of the Plan ............................................................................... 9

                1.      The Confirmation Hearing ................................................................... 9

                2.      Objections to Confirmation ................................................................ 10

        D.      Overview of the Chapter 11 Process ........................................................... 10

III.    Overview of the Debtors' Operations and the Chapter 11 Cases ................................. 11

        A.      Description of the Debtors' Operations ........................................................ 11

                1.      The Rubber Group .............................................................................. 12

                        a.      The Automotive Aftermarket ................................................... 12

                        b.      The Automotive OEM Market ................................................. 12

                        c.      The Medical Device Market ..................................................... 13

                        d.      The Rubber Group's Competitive Strengths .............................. 13

                        e.      Facilities of the Rubber Group; Capacity for
                                Growth ...................................................................................... 15

                        f.      Insulators for Automotive Ignition Systems ............................. 15

                        g.      Molded Rubber Components for Medical Devices .................... 18

                        h.      Connector Seals for Automotive Wire Harnesses ..................... 20

                        i.      Financial Performance of the Rubber Group ............................. 21

                2.      The Metals Group ............................................................................... 25

                        a.      The Metals Group's Competitive Strengths .............................. 26

                        b.      Financial Performance of the Metals Group .............................. 27

                3.      Non-Operating Assets ......................................................................... 28

|  |  | a. | Land in East Ellijay, Georgia | 28 |
|  |  | b. | Land and Buildings in Lakewood, New York | 29 |
|  |  | c. | Land and Buildings in Vienna, Ohio | 29 |
|  | 4. | | The Debtors' Employees | 29 |
| B. | | | Significant Indebtedness | 29 |
|  | 1. | | The Prepetition Credit Agreement | 29 |
|  | 2. | | The Prepetition Loan Agreement | 30 |
|  | 3. | | Senior Subordinated Notes | 31 |
|  | 4. | | Junior Subordinated Note | 31 |
| C. | | | The Asbestos Cases | 32 |
| D. | | | Significant Events Leading to the Commencement of the Chapter 11 Cases | 34 |
|  | 1. | | Liquidity Crisis | 34 |
|  | 2. | | Restructuring Efforts | 34 |
| E. | | | The Chapter 11 Cases | 37 |
|  | 1. | | Commencement of the Chapter 11 Cases and the "First-Day" Orders | 37 |
|  |  | a. | Case Administration Orders | 37 |
|  |  | b. | Critical Obligations | 37 |
|  |  | c. | Customer and Employee Programs | 37 |
|  |  | d. | Financing Arrangements | 37 |
|  | 2. | | Appointment of the Creditors' Committee | 38 |
|  | 3. | | Debtor in Possession Financing/Use of Cash Collateral | 38 |
|  | 4. | | The Debtors' Exclusive Periods | 39 |
|  | 5. | | The Mediation Process | 40 |
|  | 6. | | The Claims Reconciliation Process | 40 |
| IV. | | | The Stock Purchase Agreement | 41 |
| A. | | | The Plan Investor | 41 |
| B. | | | The Stock Purchase Agreement | 42 |
| C. | | | Ancillary Agreements | 42 |
|  | 1. | | The Securityholders Agreement | 42 |
|  | 2. | | The Management Incentive Plan | 45 |

|  | 3. | Employment Agreements | 45 |

| V. | The Plan | | 45 |

| | A. | Summary and Treatment of Unclassified Claims | 46 |
| | | 1. Administrative Expense Claims | 46 |
| | | 2. Professional Compensation and Reimbursement Claims | 47 |
| | | 3. Indenture Trustee Fee Claims | 47 |
| | | 4. Debtor in Possession Loan Claims | 48 |
| | | 5. Priority Tax Claims | 48 |
| | | 6. Intercompany Claims | 48 |

| | B. | Classification and Treatment of Classified Claims and Interests | 48 |
| | | 1. Claims against and Interests in LPC | 49 |
| | | a. Class 1 – Other Priority Claims against LPC (Unimpaired) | 49 |
| | | b. Class 2(a) – CapitalSource Secured Claims against LPC (Impaired) | 49 |
| | | c. Class 2(b) – CSE Secured Claims against LPC (Impaired) | 49 |
| | | d. Class 3 – Secured Tax Claims against LPC (Unimpaired) | 50 |
| | | e. Class 4 – Other Secured Claims against LPC (Unimpaired) | 51 |
| | | f. Class 5 – Senior Subordinated Note Claims (Impaired) | 51 |
| | | g. Class 6 – Junior Subordinated Note Claims (Impaired) | 51 |
| | | h. Class 7 – General Unsecured Claims against LPC (Impaired) | 52 |
| | | i. Class 8 – Convenience Claims against LPC (Unimpaired) | 52 |
| | | j. Class 9 – Asbestos-Related Claims (Impaired) | 52 |
| | | k. Class 10 – Series B Preferred Stock Interests (Impaired) | 53 |
| | | l. Class 11 – LPC Common Stock Interests (Impaired) | 54 |
| | | m. Class 12 – Other Equity Interests in LPC (Impaired) | 54 |
| | | 2. Claims against and Interests in LRGI | 54 |

| | | | |
|---|---|---|---|
| | a. | Class 13 – Other Priority Claims against LRGI (Unimpaired) | 54 |
| | b. | Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired) | 54 |
| | c. | Class 14(b) – CSE Secured Claims against LRGI (Impaired) | 55 |
| | d. | Class 15 – Secured Tax Claims against LRGI (Unimpaired) | 56 |
| | e. | Class 16 – Other Secured Claims against LRGI (Unimpaired) | 56 |
| | f. | Class 17 – General Unsecured Claims against LRGI (Impaired) | 57 |
| | g. | Class 18 – Convenience Claims against LRGI (Unimpaired) | 57 |
| | h. | Class 19 – Interests in LRGI (Unimpaired) | 58 |
| C. | | Distributions Pursuant to the Plan | 58 |
| | 1. | Distributions | 58 |
| | 2. | Surrender or Transfer of the Senior Subordinated Notes | 59 |
| | 3. | Withholding and Reporting Requirements | 59 |
| D. | | Implementation of the Plan and Related Documents | 60 |
| | 1. | Restructuring Transactions | 60 |
| | 2. | Cancellation of Documents, Agreements, and Debt Instruments | 60 |
| | 3. | Charter Amendment | 60 |
| | 4. | Stock Purchase Agreement | 61 |
| | 5. | The Amended and Restated Secured CapitalSource Credit Agreement | 61 |
| | 6. | The Amended and Restated Secured CSE Loan Agreement | 61 |
| | 7. | Corporate Action, Effectuating Documents, and Further Transactions | 61 |
| | 8. | Issuance of New LPC Common Stock | 62 |
| | 9. | Exemption From Transfer Taxes | 63 |
| E. | | Provisions for the Treatment of Disputed Claims | 63 |
| | 1. | Objections to Claims and Prosecution of Disputed Claims | 63 |

|  | 2. | Resolution of Administrative Expense Claims and Other Claims | 63 |
|  | 3. | Claim Estimation | 63 |
|  | 4. | Payment and Distribution on Disputed Claims | 64 |
| F. | | Prosecution of Claims Held by the Debtors | 64 |
| G. | | Executory Contracts and Unexpired Leases | 64 |
|  | 1. | Assumption of Executory Contracts and Unexpired Leases | 64 |
|  | 2. | Cure of Defaults | 65 |
|  | 3. | Rejection Damage Claims | 65 |
|  | 4. | Indemnification and Reimbursement of Directors and Officers | 65 |
|  | 5. | Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits | 65 |
| H. | | Reservation of "Cram Down" Rights | 66 |
| I. | | Conditions Precedent to the Effective Date of the Plan | 66 |
| J. | | Effects of Confirmation | 67 |
|  | 1. | Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests | 68 |
|  | 2. | Discharge of Debtors | 68 |
|  | 3. | Injunctions and Stays | 68 |
|  | 4. | Exculpation | 69 |
|  | 5. | Releases of Directors, Officers, and Employees | 69 |
|  | 6. | The Plan Investor Release | 70 |
|  | 7. | Other Releases | 70 |
|  | 8. | Limits on Releases and Exculpation | 71 |
| K. | | Dissolution of the Creditors' Committee | 72 |
| L. | | Management of the Reorganized Debtors | 72 |
| M. | | Jurisdiction and Choice of Law | 73 |
|  | 1. | Governing Law | 73 |
|  | 2. | Retention of Jurisdiction | 73 |
| N. | | The Plan Supplement | 73 |
| O. | | Modification, Revocation, or Withdrawal of the Plan | 73 |

VI.    Financial Information, Projections and Valuation Analysis ............................ 74

    A.      Selected Historical and Projected Financial Information .................................. 74

    B.      Valuation of the Reorganized Debtors ................................................ 79

VII.   Certain Factors to be Considered ............................................................. 80

    A.      Certain Risk Factors Relating to Confirmation of the Plan .............................. 80

        1.      Risk of Non-Confirmation of the Plan ...................................... 80

        2.      Non-Consensual Confirmation ............................................. 80

        3.      Risk of Non-Occurrence of the Effective Date ......................... 81

        4.      Stock Purchase Agreement, Amended and Restated Secured CapitalSource Credit Agreement, and Amended and Restated Secured CSE Loan Agreement As Conditions Precedent to the Confirmation of the Plan ............................... 81

    B.      Additional Factors to be Considered ................................................. 81

        1.      The Debtors Have No Duty to Update ..................................... 81

        2.      No Representations Outside This Disclosure Statement Are Authorized ...................................................................... 82

        3.      Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary ............................... 82

        4.      This Disclosure Statement Is Not Legal or Tax Advice .............. 82

        5.      No Admission Made ........................................................... 82

        6.      Business Factors and Competitive Conditions .......................... 82

            a.     Competitive Conditions ............................................. 82

            b.     Customers ............................................................... 82

        7.      Access to Financing and Trade Terms ................................... 83

        8.      Variances from the Projected Financial Statements .................. 83

        9.      Significant Holders ........................................................... 83

        10.    Dilution of New LPC Common Stock ..................................... 83

        11.    Illiquid Market ................................................................. 83

        12.    Restrictions on Transfer ..................................................... 84

        13.    Indicative Value of the Debtors ............................................ 84

VIII.  Certain Federal Income Tax Consequences of the Plan ................................. 84

    A.      Consequences to the Debtors ......................................................... 86

        1.      Cancellation of Debt ......................................................... 86

| | | | |
|---|---|---|---|
| | 2. | Limitations on NOL Carryforwards and Other Tax Attributes................................................. | 87 |
| | | a. Built In Gains and Losses ......................... | 88 |
| | | b. Special Bankruptcy Exception.................... | 89 |
| | 3. | Alternative Minimum Tax ............................... | 89 |
| B. | | Consequences to Holders of Certain Claims ........................ | 90 |
| | 1. | Holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and Allowed CapitalSource Secured Claims against LRGI (Class 14(a))...................... | 90 |
| | 2. | Holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and Allowed CSE Secured Claims against LRGI (Class 14(b)) ......................... | 91 |
| | 3. | Holders of Allowed Senior Subordinated Note Claims (Class 5) ..................................... | 92 |
| | 4. | Holders of General Unsecured Claims against LPC (Class 7) and General Unsecured Claims against LRGI (Class 17) ..................................... | 94 |
| | 5. | Holders of Asbestos-Related Claims (Class 9)........................ | 95 |
| | 6. | Character of Gain or Loss ....................... | 96 |
| | 7. | Distributions in Respect of Accrued Interest........................ | 96 |
| | 8. | Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt.................... | 97 |
| | | a. Stated Interest and Original Issue Discount............... | 97 |
| | | b. Sale, Exchange or Other Disposition of the Amended Secured Debt ................... | 97 |
| | 9. | Disposition of the New LPC Common Stock ........................ | 97 |
| C. | | Information Reporting and Backup Withholding ................... | 98 |
| IX. | | Securities Law Matters ........................ | 99 |
| A. | | Issuance and Resale of the New LPC Common Stock under the Plan ........................ | 99 |
| | 1. | Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim.................... | 99 |
| | 2. | Issuance and Resale of New LPC Common Stock to be Issued to the Plan Investor ................... | 100 |

B.     Issuance and Resale of Amended Secured CapitalSource Debt,
Amended Secured CSE Debt, GUC Payment Obligations, and any
Other Deferred Cash Payment Obligations ........................................................ 100

C.     Listing ................................................................................................................. 100

D.     Legends ............................................................................................................... 100

X.     Voting Procedures and Requirements ........................................................................... 101

A.     Voting Deadline .................................................................................................. 101

B.     Holders of Claims Entitled to Vote .................................................................... 102

C.     Vote Required for Acceptance by a Class .......................................................... 102

D.     Voting Procedures .............................................................................................. 103

     1.     Voting Procedures ................................................................................. 103

     2.     Withdrawal of Ballot ............................................................................ 103

XI.     Confirmation of the Plan .............................................................................................. 103

A.     The Confirmation Hearing .................................................................................. 103

B.     General Requirements for Confirmation ............................................................ 103

C.     Best Interests Test .............................................................................................. 105

D.     No Unfair Discrimination/Fair and Equitable Test ............................................ 106

     1.     No Unfair Discrimination ..................................................................... 107

     2.     Fair and Equitable Test ......................................................................... 107

          a.     Secured Claims ......................................................................... 107

          b.     Unsecured Claims ..................................................................... 107

          c.     Interests .................................................................................... 107

E.     Classification of Claims and Interests ................................................................ 108

F.     Feasibility ........................................................................................................... 108

XII.     Conclusion .................................................................................................................... 109

# I.

## INTRODUCTION

Pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), Lexington Precision Corporation ("LPC") and its wholly-owned subsidiary Lexington Rubber Group, Inc. ("LRGI"), as debtors and debtors in possession (together, the "Debtors" or "Lexington"), in jointly-administered cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), submit this disclosure statement (the "Disclosure Statement") to all holders of Claims against and Interests in the Debtors in connection with the *Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated April 19, 2010, as modified May 24, 2010 (as may be further modified, the "Plan"), attached hereto as **Exhibit A**.  **Unless otherwise defined herein, capitalized terms used herein will have the meanings ascribed to such terms in the Plan.  Please note that to the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan governs.**

The purpose of this Disclosure Statement is to provide holders of Claims and Interests with adequate information about (1) the Debtors' history and businesses, (2) the Chapter 11 Cases, (3) the Plan and alternatives to the Plan, (4) the rights of holders of Claims and Interests under the Plan, and (5) other information necessary to enable holders of Claims and Interests to make an informed judgment as to whether to vote to accept or reject the Plan.

The Debtors have developed the Plan in order to provide equitable treatment to all of their creditors, while also eliminating over $50,000,000 of their consolidated indebtedness, which will place the Debtors in a position to take advantage of significant growth opportunities.  Pursuant to the Plan, each holder of Senior Subordinated Notes (i) will receive a cash payment in the amount of 51% of its Allowed Claim (the "Cash-Out Percentage") or (ii) may elect (the "Class 5 Stock Election") to receive a number of shares of New LPC Common Stock equal to the (x) the product of its Allowed Claim and the Cash-Out Percentage, divided by (y) $10.00.  The funds necessary to make payments to holders who do not select the Class 5 Stock Election, plus additional funds needed for working capital, will be provided by Commercial Finance Services 407, LLC, or one of its affiliates (the "Plan Investor") pursuant to a Stock Purchase Agreement with the Debtors, under which the Plan Investor will purchase, at a price of $10.00 per share, shares of New LPC Common Stock for an aggregate investment of at least $22 million (including amounts spent to purchase Senior Subordinated Notes prior to the Effective Date).

The Debtors selected the Plan Investor after an extensive marketing effort led by their financial advisors, W.Y. Campbell & Company ("Campbell"), and have determined that the proposed investment, as represented by the Stock Purchase Agreement, represents the highest value achievable in the market at this time and under the current circumstances.  These circumstances include:

- Continued disruption in credit markets and lack of availability of traditional sources of debt capital;

- The Debtors' inability, after more than a year of efforts, to obtain traditional debt financing sufficient to fund a plan of reorganization that would provide a meaningful recovery for creditors and leave the Reorganized Debtors with adequate working capital;

- Detrimental effects of extended Chapter 11 Cases on the Debtors' efforts to generate new business and maintain existing business;

- The costs to the estates in professionals fees and other reorganization expenses of continued Chapter 11 Cases;

- The expiration of the Debtors' exclusive period to file a plan of reorganization;

- Existence of a prior competing plan of reorganization proposed by creditor constituencies and providing for a recovery to holders of unsecured claims that is substantially inferior to the recovery provided to such holders under the Debtors' Plan.

The Debtors recommend that all holders of Claims vote to accept the Plan because the Plan will provide unsecured creditors the greatest recovery possible under the circumstances.

**Please note that not all holders of Claims or Interests are entitled to vote.  If you are entitled to vote, a ballot will be enclosed with this Disclosure Statement.  For more information as to which holders of Claims and Interests may vote, please refer to Section V.B, *"Classification and Treatment of Classified Claims and Interests"* on page 49. For voting procedures and important deadlines, please refer to Section X, *"Voting Procedures and Requirements"* on page 102.**

On May 26, 2010, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved this Disclosure Statement as providing adequate information to allow a holder of a Claim or an Interest to make an informed judgment as to whether to accept or reject the Plan.  **Please note that the Bankruptcy Court's approval of this Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan or as to the accuracy or truth of the statements, information, and data contained in this Disclosure Statement.**

On July 14, 2010, the Bankruptcy Court will hold a hearing to consider whether to approve and confirm the Plan (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time without notice.  For more information on the confirmation process, please refer to Section XI, *"Confirmation of the Plan"* on page 96.

For your reference, the following documents are attached to the Disclosure Statement:

(i)     The Plan (**Exhibit A**);

(ii)     Order of the Bankruptcy Court, dated May 26, 2010 (the "<u>Disclosure Statement Order</u>"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached without exhibits) (**<u>Exhibit B</u>**);

(iii)    LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (attached without exhibits) (**<u>Exhibit C</u>**);

(iv)    LPC's Form 10-Qs for the quarter ended September 30, 2009 (attached without exhibits) (**<u>Exhibit D</u>**);

(v)     LPC's Proxy Statement issued in connection with its Annual Meeting of Stockholders held on May 28, 2009 (**<u>Exhibit E</u>**);

(vi)    The Debtors' Projected Consolidated Financial Statements (the "<u>Projected Financial Statements</u>") for the period ending December 31, 2012 (**<u>Exhibit F</u>**);

(vii)   The Debtors' Liquidation Analysis (**<u>Exhibit G</u>**);

(viii)  Summary of Amended and Restated Secured CapitalSource Credit Agreement (**<u>Exhibit H</u>**);

(ix)    Summary of Amended and Restated Secured CSE Loan Agreement (**<u>Exhibit I</u>**);

(x)     Letter from the Debtors to holders of Claims in Class 17 (General Unsecured Claims against LRGI) (**<u>Exhibit J</u>**); and

(xi)    Letter from the Creditors' Committee to holders of Claims in Class 17 (General Unsecured Claims against LRGI (**<u>Exhibit K</u>**).

**This Disclosure Statement does not replace a careful and detailed review and analysis of the Plan by each holder of a Claim or Interest. Please use this Disclosure Statement to aid and supplement that review. The description of the Plan contained herein is only a summary and is qualified in its entirety by reference to the full text of the Plan; if any inconsistencies exist between the Plan and this Disclosure Statement, the Plan governs. The Debtors urge holders of Claims and Interests to review the Plan and any related attachments in order to obtain a full understanding of the Plan.**

**<u>IRS Circular 230 Notice</u>: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (ii) such discussion is written in connection with the promotion or marketing by the Debtors of the**

transactions or matters addressed herein (including the solicitation of votes accepting the Plan); and (iii) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

\* \* \*

The offers of securities contemplated by the Plan have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or similar state securities or "blue sky" laws. The offers and issuances of such securities pursuant to the Plan are being done pursuant to exemptions available under section 1145 of the Bankruptcy Code and Section 4(2) of the Securities Act. The securities to be issued pursuant to the Plan have not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan.

Certain statements contained in this Disclosure Statement, including the Projected Financial Statements, are forward-looking statements. Forward-looking statements usually can be identified by the use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used in discussions of strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events. Forward-looking statements are subject to a number of risks and uncertainties that could cause the Debtors' actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties include:

- Increases and decreases in business awarded to the Debtors by their customers;

- Unanticipated price reductions for the Debtors' products as a result of competition;

- Changes in the cost of raw materials;

- Strength or weakness in the North American automotive market;

- Changes in the competitive environment;

- Unanticipated operating results;

- Changes in economic conditions;

- Changes in interest rates;

-   Financial difficulties encountered by customers or suppliers of the Debtors;

-   Labor interruptions at the Debtors' facilities or at their customers' or suppliers' facilities;

-   The Debtors' ability to develop adequate policies regarding and testing of internal control over financial reporting; and

-   Other risks as disclosed in Section VII of this Disclosure Statement.

**The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. There can be no assurance that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.**

## II.

## EXECUTIVE SUMMARY

### A.    Summary of Classification and Treatment of Claims and Interests Under the Plan

The following summarizes the classification of Claims and Interests under the Plan and the respective distributions and recoveries to each such Class. The following summary is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms of the Plan, please refer to Section V, "*The Plan*" on page 46.

The Plan provides for 19 classes of Claims and Interests. Classes 1 through 12 are comprised of Claims against or Interests in LPC, and Classes 13 through 19 are comprised of Claims against or Interests in LRGI. A Claim or Interest is impaired if the Plan modifies or changes the rights of the Claims or Interests included in the Class. Holders of Claims and Interests in Classes that are impaired may vote to accept or reject the Plan. If a Class of Claims or Interests is not impaired pursuant to the Plan, holders of the Claims or Interests in that Class are automatically deemed to accept the Plan.

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|---|---|---|---|---|---|
| **LPC Classes** | | | | | |
| **Class 1** | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| **Class 2(a)** | CapitalSource Secured Claims against LPC | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CapitalSource Debt. | 100% |
| **Class 2(b)** | CSE Secured Claims against LPC | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CSE Debt. | 100% |

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|-------|-------------|--------|-------------------|------------------------------|------------|
| **Class 3** | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash or by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not later than 5 years from the date of assessment. | 100% |
| **Class 4** | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| **Class 5** | Senior Subordinated Note Claims | Impaired | Yes | Paid in Cash in an amount equal to 51% of the Allowed Claim (which shall exclude any interest accruing from and after the Commencement Date), unless holder elects to receive a number shares of New LPC Common Stock equal to (x) the product of such holder's Allowed Claim (which shall exclude any interest accruing from and after the Commencement Date) and the Cash-Out Percentage (*i.e.*, 51%), <u>divided by</u>, (y) $10.00. | 51% |
| **Class 6** | Junior Subordinated Note Claims | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| **Class 7** | General Unsecured Claims against LPC | Impaired | Yes | Paid through an initial Cash payment of 8% of the Allowed Claim followed by nine (9) additional equal quarterly Cash payments, each in the amount of 8.6% of the Allowed Claim, unless the holder elects to receive a single Cash payment equal to 51% of the holder's Allowed Claim. | Payments aggregating 85.4% of the Allowed Claim with a net present value (using a discount rate of 6% per annum) of 80% |
| **Class 8** | Convenience Claims against LPC | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|---|---|---|---|---|---|
| **Class 9** | Asbestos-Related Claims | Impaired | Yes | Paid in full by (i) insurance proceeds and (ii) to the extent insurance proceeds are insufficient to pay Allowed Claims, the deficiency will be paid as follows, (a) Allowed Claims exceeding available insurance proceeds by $2,000 or less will be paid upon Allowance and (b) Allowed Claims exceeding insurance proceeds in excess of $2,000 will receive an initial Cash payment of 8% of such amount upon Allowance followed by nine (9) additional semi-annual Cash payments, each in the amount of 8.6% of the Allowed Claim, unless the holder elects to receive a single Cash payment equal to 51% of the holder's Allowed Claim. | 100% of the Allowed Claim to the extent insurance proceeds are available, plus payments, aggregating 85.4% of any remaining Allowed Claim, with a net present value (using a discount rate of 6% per annum) of 80% |
| **Class 10** | Series B Preferred Stock Interests | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| **Class 11** | LPC Common Stock Interests | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| **Class 12** | Other Equity Interests in LPC | Impaired | No (deemed to reject) | Cancelled and will receive no distribution. | 0% |
| **LRGI Classes** | | | | | |
| **Class 13** | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| **Class 14(a)** | CapitalSource Secured Claims against LRGI | Impaired | Yes | Satisfied in full by the issuance of a Pro Rata share of the Amended Secured CapitalSource Debt. | 100% |
| **Class 14(b)** | CSE Secured Claims against LRGI | Impaired | Yes | Satisfied in full by issuance of a Pro Rata share of the Amended Secured CSE Debt. | 100% |
| **Class 15** | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash or by semi-annual Cash payments commencing on the Effective Date and continuing over 18 months but not more than 5 years from the date of assessment. | 100% |

| Class | Designation | Status | Entitled to Vote? | Distribution Under the Plan | % Recovery |
|---|---|---|---|---|---|
| **Class 16** | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash. | 100% |
| **Class 17**[1] | General Unsecured Claims against LRGI | Impaired | Yes | Paid in full through ten (10) quarterly payments with interest from the Commencement Date through the date of last payment, unless the holder elects to receive a single Cash payment equal to 51% of the sum of the holder's Allowed Claim and postpetition interest on such Allowed Claim. | Payments with a net present value (using a discount rate necessary to satisfy the Allowed Claim in full) of 100% |
| **Class 18** | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) | Paid in full in Cash with postpetition interest. | 100% |
| **Class 19** | Interests in LRGI | Unimpaired | No (deemed to accept) | Interests are retained. | 100% |

## B.    Solicitation and Voting Procedures

If you are entitled to vote, you will receive a ballot with this Disclosure Statement. On the ballot, you may elect either to accept or reject the Plan. If you return a ballot that does not indicate either an acceptance or rejection of the Plan, your vote will be counted as a vote to accept the Plan. If you return a ballot that indicates both an acceptance and rejection of the Plan, your vote will not be counted and will be disregarded.

**The discussion of solicitation and voting procedures below is a summary of the solicitation and voting process.** Detailed voting instructions are provided with each ballot and are also set forth in greater detail in Section X, "*Voting Procedures and Requirements,*" on page 102. Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

### 1.    The Record Date; Holders of Claims Entitled to Vote on the Plan

The Bankruptcy Court has approved **May 26, 2010** as the record date (the "Record Date") to determine which holders of Claims or Interests may vote to accept or reject the Plan. Class 2(a) – CapitalSource Secured Claims against LPC, Class 2(b) – CSE Secured Claims against LPC, Class 5 – Senior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims, Class 14(a) – CapitalSource Secured Claims against LRGI, Class 14(b) – CSE Secured Claims against LRGI, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Plan that are impaired

---

[1] Letters from the Debtors and the Creditors' Committee to holders of Claims in Class 17 are attached hereto as Exhibits J and K.

and entitled to vote to accept or reject the Plan.  Each holder of a Claim in any of these classes as of the Record Date may vote to accept or reject the Plan.

## 2. Filing of the Plan Supplement

The Debtors will file the Plan Supplement at least 10 days prior to the Confirmation Hearing (as defined below), and will serve all known holders of Claims, including all claimants scheduled on the Debtors' schedules, with a courtesy notice that will (i) inform parties that the Plan Supplement was filed, (ii) list the information contained in the Plan Supplement and (iii) explain where copies of the Plan Supplement may be obtained.  Parties may obtain a copy of the Plan Supplement by:  (i) calling the Debtors' restructuring hotline at **(646) 282-1800**; (ii) visiting the Debtors' restructuring website at: http://chapter11.epiqsystems.com/lexington; and/or (iii) writing to **Lexington Precision Ballot Tabulation, c/o Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, New York 10017**.

The Plan Supplement will include, without limitation, the following information:

- the Charter Amendment;

- the Securityholders Agreement;

- the identity of the members of the new Board and the nature of any compensation for any member of the new Board who is an "insider" under the Bankruptcy Code;

- the list of executory contracts and unexpired leases designated by the Debtors, with the consent of the Plan Investor, to be rejected on the Effective Date;

- the Restructuring Transactions Notice, if any;

- the form of the Stock Purchase Agreement;

- the terms of the New LPC Common Stock; and

- ancillary documents to the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.

## 3. The Voting Deadline

**Friday July 2, 2010 at 5:00 p.m. (Eastern Daylight Time)** has been approved by the Bankruptcy Court as the voting deadline (the "Voting Deadline").  The Voting Deadline is the date by which all ballots must be properly executed, completed and delivered to the Voting Agent in order to be counted as votes to accept or reject the Plan.

4. **Voting Instructions**

Please send your ballot to:

> **FINANCIAL BALLOTING GROUP LLC (the "Voting Agent")**
> **ATTN: LEXINGTON PRECISION BALLOT TABULATION**
> **757 THIRD AVENUE, 3RD FLOOR**
> **NEW YORK, NEW YORK 10017**
>
> **- OR -**
>
> **tabulation@fbgllc.com**

**The Voting Agent must receive your ballot by (i) mail at the street address above or (ii) e-mail in PDF form, each before the Voting Deadline for your vote to be counted.** The Voting Agent will not accept ballots sent by facsimile. If you are a holder of a Claim or an Interest entitled to vote but did not receive a ballot, please contact the Voting Agent to obtain a ballot. If your ballot is damaged or lost, you should also contact the Voting Agent.

C. **Confirmation of the Plan**

1. **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for **10:00 a.m. (Eastern Daylight Time) on Wednesday July 14, 2010.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

2. **Objections to Confirmation**

Objections or responses to confirmation of the Plan, if any, must: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; and (iii) set forth the name of the objecting party, the basis for the objection, and the specific grounds therefor.

All objections and responses to the confirmation of the Plan must be filed with the Bankruptcy Court no later than **Friday July 2, 2010 at 5:00 p.m. (Eastern Daylight Time)** (the "Plan Objection Deadline"). In accordance with General Order M-242, registered users of the Bankruptcy Court's case filing system must electronically file their objections and responses. General Order M-242 may be found at www.nysb.uscourts.gov. All other parties-in-interest must file their objections and responses on a 3.5 inch disk (preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format) and deliver a hard copy directly to the chambers of Judge Shelley C. Chapman.

All objections and responses must be served, so as to be received no later than **Friday July 2, 2010 at 5:00 p.m. (Eastern Daylight Time)** upon: (i) the Debtors, Lexington Precision Corporation, 800 Third Ave. 15th Floor, New York, New York 10023 (Attn: Michael A. Lubin), (ii) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow and Victoria Vron); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul Schwartzberg); (iv) the attorneys for the Plan Investor, Jones Day, 222 E 41st St., New York, New York 10017 (Attn: Lisa G. Laukitis and Jennifer J. O'Neil); (v) the attorneys for the Debtors' prepetition lenders, Waller, Landsden, Dortch & Davis LLP, 511 Union Street, Suite 2700, Nashville, Tennessee, 37219 (Attn: John C. Tishler) and Carter, Ledyard & Milburn LLP, 2 Wall Street, New York, New York 10005 (Attn: Aaron R. Cahn); (vi) the attorneys for the statutory committee of unsecured creditors, Andrews Kurth LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Paul Silverstein and Jonathan I. Levine); and (vii) the attorneys for Debtors' postpetition lenders, O'Melveny & Meyers, LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Gerald Bender).

Bankruptcy Rule 9014 governs all objections to confirmation of the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

For more information on the confirmation of the Plan, please refer to Section V.J, "*Effects of Confirmation*," on page 68. Before voting, please review and consider all information outlined in the Plan, this Disclosure Statement, and any documents attached thereto.

## D.     Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself and all parties in interest. In addition to permitting the rehabilitation of a debtor, chapter 11 promotes equality of treatment of similarly situated claims and similarly situated equity interests with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court having jurisdiction over a particular chapter 11 case makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of, or holder of an equity interest in, a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date

of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In order to solicit acceptances of a proposed plan, however, section 1126 of the Bankruptcy Code requires a debtor and any other plan proponent to conduct such solicitation pursuant to a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement in accordance with the Disclosure Statement Order and the requirements of section 1126 of the Bankruptcy Code.

## III.

## OVERVIEW OF THE DEBTORS' OPERATIONS AND THE CHAPTER 11 CASES

### A. Description of the Debtors' Operations

The Debtors' operations are conducted through two operating groups, the Rubber Group and the Metals Group, which are described below. The business of the Rubber Group is conducted by LRGI, and the assets utilized in that business are owned by LRGI, a Delaware corporation, and a wholly-owned subsidiary of LPC, which is also a Delaware corporation. The business of the Metals Group is conducted by LPC, and the assets utilized in that business are owned by LPC. The following table sets forth actual net sales for the Rubber Group and the Metals Group for 2007, 2008, and 2009 (dollar amounts in thousands):

|  | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Rubber Group | $ 74,587 | 84.4 % | $ 62,278 | 85.3 % | $ 51,261 | 83.3 % |
| Metals Group | 13,821 | 15.6 | 10,751 | 14.7 | 10,306 | 16.7 |
| Total | $ 88,408 | 100.0 % | $ 73,029 | 100.0 % | $ 61,567 | 100.0 % |

### 1. The Rubber Group

The Rubber Group is a leading manufacturer of tight-tolerance, molded rubber components that are sold to customers who supply the automotive aftermarket, to customers who supply the automotive original-equipment manufacturers ("OEMs"), and to manufacturers of medical devices. The following table sets forth the Rubber Group's actual net sales to each of its principal markets for 2007, 2008, and 2009 (dollar amounts in thousands):

| | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Automotive Aftermarket | $ 22,034 | 29.5 % | $ 26,569 | 42.7 % | $ 26,564 | 51.8 % |
| Automotive OEM | 35,799 | 48.0 | 18,006 | 28.9 | 10,078 | 19.7 |
| Medical Devices | 15,928 | 21.4 | 16,300 | 26.2 | 14,281 | 27.9 |
| Other Industries | 826 | 1.1 | 1,403 | 2.2 | 338 | 0.6 |
| Total | $ 74,587 | 100.0 % | $ 62,278 | 100.0 % | $ 51,261 | 100.0 % |

The Rubber Group currently has two production facilities, each of which is a stand-alone business unit, with a complete management team. The Jasper, Georgia facility specializes in insulators for automotive ignition systems and seals for automotive wire harnesses, and the Rock Hill, South Carolina facility specializes in components for medical devices and seals for automotive wire harnesses. During the third quarter of 2009, the Debtors completed the closure of their automotive connector seal facility in Vienna, Ohio and the corresponding transfer of their automotive connector seal business to the Jasper, Georgia and Rock Hill, South Carolina facilities. The Rubber Group has a significant presence as a supplier in the automotive aftermarket, the automotive OEM market and the medical device market.

### a. The Automotive Aftermarket

In the automotive aftermarket, the Rubber Group supplies insulators to manufacturers who produce ignition-wire sets for automotive-parts retailers. The Debtors believe that the Rubber Group is the leading supplier of insulators for automotive ignition systems to the automotive aftermarket, with an estimated North American market share of 50%.

### b. The Automotive OEM Market

In the automotive OEM market, the Rubber Group has focused on two principal products, insulators for automotive ignition systems and seals for automotive wire harnesses. The Debtors believe that the Rubber Group is one of the two largest suppliers of connector seals in North America and the second largest manufacturer of insulators for automotive ignition systems to the North American automotive OEM market. The Debtors believe that the Rubber Group's sales of insulators to the OEM market have been limited by customer concerns about the Debtors' financial condition; however, the Rubber Group has recently been awarded significant amounts of new business for insulators for automotive ignition systems in new vehicles and the Debtors believe that the Rubber Group's market share of ignition system insulators for the OEM segment will increase significantly in the immediate future.

### c. The Medical Device Market

In the medical device market, the Rubber Group has chosen to avoid commodity products that are characterized by lower quality requirements and extreme price competition. Instead, the Rubber Group concentrates on medical components that require high levels of quality and process repeatability, such as seals for laparoscopic surgery devices, injection sites for intravenous medication delivery systems that are assembled using high-speed, automated

assembly machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision. The Debtors believe that the Rubber Group has become a leading supplier of these types of components because of its capabilities in product design and materials development and because its molding technology offers excellent process repeatability and product quality.

### d. The Rubber Group's Competitive Strengths

The Rubber Group's leading market positions, high profit margins, and prospects for growth once the Debtors' financial issues are behind them are a function of its ability to offer its customers a one-stop source for the development and delivery of complex molded-rubber components, with high quality and at competitive prices. The Rubber Group has developed industry-leading capabilities in every step of the process from product-concept through delivery of a completed component or assembly, including materials development, mold-making, rubber mixing, molding, process automation, and process management.

(i)    Materials Development. Any new product development initiative begins with the selection of the appropriate compound to meet the product specification at a low cost. The Rubber Group has extensive experience in molding of numerous elastomers and works closely with its customers to choose the optimal material for any given application. The Rubber Group's in-house mixing operation in Jasper, Georgia, is equipped with a complete facility for materials development, including lab-style mixers, mills and molding presses, and analytical equipment for testing all critical performance characteristics. In addition, the Rubber Group's Rock Hill, South Carolina, facility contains an analytical laboratory that is utilized for detailed analysis of polymers, fillers, and contaminants.

(ii)    Mold-Making. The Rubber Group has invested over $14 million in a state-of-the-art mold-making operation within the Debtors' North Canton, Ohio facility (the "Engineering Center"). Through this investment, the Rubber Group controls 100% of its mold-making activities and has the capability to produce flashless molds, cut-in-plate molds, standard injection molds, and LSR injection molds. The mold-making operation permits the Rubber Group to significantly reduce turnaround times for prototype molds, production molds, modifications, and repairs. Moreover, the strong relationship between the Rubber Group's mold-making operation and its production-molding operations has enabled the Rubber Group to make numerous technological advances in both its mold-making and its molding processes.

Unlike most rubber molding businesses, the Rubber Group utilizes high-tolerance, "flashless" molds whenever possible. In a flashless mold, each cavity is comprised of a separate stack of precisely-machined, self-registering inserts that are assembled in multiple, hinged plates. The inserts have thousands of laser-cut vents that permit gases to escape from

the cavities during the molding process while limiting flash extension to nominal levels. As illustrated in the following table, flashless molds offer multiple benefits compared to conventional cut-in-plate molds.

| Attribute | Resulting Benefit |
|---|---|
| Produce tighter-tolerance components | Parts are easier to assemble and exhibit better end-use performance |
| Forces on mold surface are balanced | Parts remain concentric and symmetrical even after extensive mold usage |
| Cavities are vented | Trapped air issues are minimized, improving quality and reducing scrap |
| Most secondary operations, such as deflashing, trimming, and die-cutting, are eliminated | Lower risk of damaged parts and contamination; reduced costs |
| Part handling is reduced | Lower risk of contamination |
| Extended mold life | Lower mold cost over the life of the part; less deterioration in part quality over time |
| Individual cavities can be replaced. | Molds have full cavitation at all times, increasing productivity and reducing costs |

(iii)   Automation. The Rubber Group makes extensive use of automation throughout its operations to improve productivity, reduce labor costs, and improve the quality of its products. A substantial portion of the Rubber Group's automation equipment is designed and built at the Engineering Center. This gives the Rubber Group a competitive advantage because its automation equipment is less expensive than similar equipment that could be purchased from outside vendors and is designed specifically to optimize the Rubber Group's manufacturing processes.

(iv)   Proprietary Press Controls. The Rubber Group currently operates over 200 rubber molding presses, all of which are equipped with proprietary programmable logic controllers ("PLCs") designed and built at the Engineering Center. PLCs permit the Rubber Group to select the optimal processing parameters for each mold and ensure strict adherence to those parameters, in order to maximize quality and minimize costs. PLCs collect and store large amounts of data that can be used to determine the root cause of any molding problem.

(v)   Management Operating System. The Debtors have developed a management operating system that is used on a real-time basis to ensure the efficient operation of every area of each plant. The system increases management effectiveness, accountability, and communication. As a result, management is able to more closely control labor cost, productivity, and overall performance. The management operating system establishes performance expectations and enables management to hold every operator,

supervisor, and department accountable for meeting these expectations. Performance is measured and evaluated on a short-interval basis, usually every two hours, so that real-time adjustments can be made to bring performance into line with expectations.

### e. Facilities of the Rubber Group; Capacity for Growth

The Rubber Group operates two modern production facilities encompassing 161,000 square feet of floor space. All of the operating facilities are owned by the Debtors.

All of the Rubber Group's facilities and equipment are well-maintained. Because of reductions in volume and increases in productivity, each of the Rubber Group's plants has substantial unused capacity in all functional areas at current volume levels. As a result, management believes that the Rubber Group can accommodate the sales growth reflected in the Projected Financial Statements (from $51.3 million in 2009 to $79.7 million in 2012) without the need for significant additional capital expenditures for plant and equipment.

The Rubber Group's production facilities are supported by a 42,000 square foot Engineering Center and a materials-development and rubber-mixing facility within the Jasper, Georgia facility. The Engineering Center and the materials development facility have helped the Rubber Group to differentiate itself from many other custom molders by offering its customers a number of proprietary services, including, materials development to determine the optimal material for the component, and automation to produce complete assemblies. When coupled with the Rubber Group's low-cost manufacturing operations and outstanding quality record, these services have made the Rubber Group a market leader in each of the markets it serves.

### f. Insulators for Automotive Ignition Systems

Insulators for automotive ignition systems (aftermarket and OEM) represent the Rubber Group's largest product category, accounting for approximately 57.7% of the Rubber Group's net sales for all of 2009.

Insulators are molded rubber components that are used in ignition systems to seal and insulate the terminals on the spark plug and the distributor in a traditional ignition system, and the connection between the coil and the spark plug in a coil-on-plug style ignition system. Insulators, which are also called "boots" and "nipples," are sold to tier-one suppliers that assemble ignition-wire sets for the automotive OEMs and for retailers serving the automotive aftermarket, like AutoZone, Advance Auto Parts, NAPA, and O'Reilly.

The Debtors believe that the Rubber Group is North America's largest manufacturer of insulators, with 2009 sales volume of 201 million units, representing net sales of approximately $30.1 million, and the leading supplier of insulators to companies, including General Cable and Standard Motor Products, that supply ignition-wire sets to automotive-parts retailers. During 2009, the Rubber Group's sales of insulators to the automotive aftermarket were $26.5 million, which represents an estimated North American market share in excess of 62%.

The Rubber Group is also a major supplier of insulators to companies that supply ignition-wire sets to the automotive original equipment manufacturers. Through its customers, Prestolite Wire, Diamond Electric, and Ford, the Rubber Group is a major supplier of insulators used on new Ford and Chrysler vehicles produced in North America. For 2009, the Rubber Group's sales of insulators for new vehicles were $3.1 million, which represents an estimated North American market share of approximately 27%.

The Rubber Group has become the leading supplier of insulators in North America, while continuing to achieve significant profit and cash flow margins, for the following reasons:

(i)    <u>Product Knowledge</u>. Because the Jasper facility is focused almost exclusively on the production and sale of insulators, the Rubber Group has developed vast knowledge of the product and its end-markets. This knowledge enables the Rubber Group to provide invaluable assistance to its customers in designing insulators with superior performance characteristics, while minimizing cost.

(ii)    <u>Cost Competitiveness</u>. The same product focus has enabled the Rubber Group to develop cost-effective methods for delivering each type of insulator, including:

    A.    High-cavitation tools for high-volume parts;

    B.    Flashless tools for 180° parts;

    C.    Unique, hybrid tools blending flashless and cut-in-plate technology, for certain difficult-to-mold insulators;

    D.    Proprietary automation for molding, demolding, inspection, and assembly; and

    E.    Offshore sourcing of lower-volume parts.

(iii)    <u>Proprietary Materials</u>. The Rubber Group has developed an extensive library of proprietary materials for the insulator market. These materials enable the Rubber Group to meet demanding specifications (including engine temperatures as high as 600° F) at a competitive price.

(iv)    <u>The Broadest Aftermarket Product Line</u>. The Rubber Group has developed a very broad line of insulators for the automotive aftermarket by:

    A.    Investing more than $7 million over the past ten years to build over one hundred high-cavitation tools for the aftermarket;

B. Making further significant investments to acquire the right to use excess capacity on many of the high-cavitation tools owned by its OEM customers to supply the aftermarket; and

C. Developing reliable, low-cost, off-shore sourcing for lower volume aftermarket parts.

Although the Rubber Group is already the leading supplier of insulators in North America, the Projected Financial Statements reflect a significant increase in sales of insulators once the Chapter 11 Cases are concluded. Management believes that this growth is achievable for the following reasons:

(i) <u>New Programs Awarded or Considered Highly Likely</u>. The Rubber Group received orders to build production tooling from a number of suppliers to the Automotive OEMs, including Robert Bosch, Diamond Electric Manufacturing, Prestolite Wire and Remy, Inc., on programs with an annualized value of approximately $7.0 million at full volume and is quoting significant amounts of additional business for these customers. Based upon customer feedback, the management of the Rubber Group believes that its pricing is highly competitive and that it is highly likely that a meaningful portion of this additional business will be awarded to the Debtors.

(ii) <u>Ford Potential</u>. Ford Motor Company has stated a desire to source additional insulators with the Debtors as soon as they are satisfied with the resolution of the Chapter 11 Cases.

(iii) <u>Aftermarket Strength</u>. The Rubber Group is expected to continue to capture market share in the aftermarket due to:

A. Its innovative product design;

B. Its program of continuing to build high-cavitation molds for high-volume parts;

C. Its off-shore sourcing of low-volume parts; and

D. The inability of its competitors to match the Rubber Group's prices, quality, and service.

### g. *Molded Rubber Components for Medical Devices*

Components for medical devices are the Rubber Group's second largest product line, accounting for 27.9% of the Rubber Group's net sales for 2009.

Manufacturers of medical devices use molded rubber components in a wide variety of applications, including medication delivery systems, syringes, laparoscopic surgery

devices, and catheters. The Rubber Group has chosen to avoid commodity-type components (like plunger tips for inexpensive syringes) that are characterized by lower quality requirements and intense price competition and to focus its marketing efforts on components that require the high levels of quality and process repeatability that the Rubber Group is able to offer. These types of products include seals for laparoscopic surgery devices, injection sites for intravenous medication delivery systems that are assembled using high-speed automated machinery, and plunger tips for syringes used in applications where dosages must be controlled with precision.

The Rubber Group is rapidly becoming a leading supplier for these types of components because of its technical capabilities, including:

(i)    <u>Product Design</u>. The Rubber Group uses proprietary computer simulation software to help its customers design components that function optimally in their required application and can be produced without significant problems.

(ii)    <u>Materials Development</u>. The Rubber Group's extensive materials library and its experience with a broad range of elastomers enable it to develop the optimal material for each application at a competitive price.

(iii)    <u>Tight-Tolerance, Flashless Molds</u>. The Rubber Group's state-of-the-art flashless molds allow it to:

    A.    Maintain part concentricity, which is critical to the functioning of high-speed assembly equipment and to the delivery of precise dosages, even after extensive mold usage;

    B.    Deliver consistently flash-free parts; and

    C.    Hold extremely tight tolerances on even the most difficult features, including seals with very thin walls.

(iv)    <u>Proprietary Press Controls</u>. The Rubber Group's proprietary press controls allow it to provide its customers with a high level of assurance regarding process repeatability and traceability.

(v)    <u>In-House Automation Capability</u>. The Rubber Group's in-house automation design/build capability enables it to solve difficult assembly, inspection, and packaging issues for its customers.

The following is a description of the Rubber Group's principal products for the medical device industry, by application.

(i)    <u>Medication Delivery Systems</u>. The Rubber Group supplies a variety of molded rubber products used in medication delivery applications that require high levels of quality and process repeatability. Medication delivery products include injection sites for intravenous medication

delivery systems that are assembled using high-speed, automated assembly equipment, and plunger tips for syringes used in applications where dosages must be controlled with precision. Medical applications that utilize the Rubber Group's rubber components include renal dialysis, insulin delivery, anesthesia delivery, oncology, cardiac care, and cosmetic surgery (Botox delivery). The Debtors believes growth opportunities in this product segment are strong because:

A. Demand for the products should increase as the average age of the population increases;

B. Device-makers will continue to move to higher-speed assembly, which should increase the need for suppliers with the ability to produce consistently symmetrical parts; and

C. There is expected to be meaningful growth in applications where dosages must be tightly controlled.

(ii) <u>Laparoscopic Surgery Devices</u>. Laparoscopic surgery is a minimally-invasive surgical technique in which the surgeon enters the patient's body through a number of relatively small punctures rather than through a large incision. Laparoscopic surgery is growing at a rapid pace because it offers a number of benefits that reduce both the cost and the risk of surgical procedures, including significantly shorter operating and recovery times, significantly shorter overall hospital stays, and substantially reduced risk of infection. Since 2005, the Rubber Group has built significant relationships with three of the major manufacturers of laparoscopic surgery devices, and has received purchase orders for 21 different components for such devices. Many of these programs are in the early stages of their life-cycle and are expected to grow significantly in volume over the next several years.

The Debtors believe that the Rubber Group is in the early stages of a period of meaningful growth in its medical components business. A substantial portion of projected future growth is attributable to major programs that are currently ramping up with existing customers. The balance is attributable primarily to new projects currently in the development stage, both with existing customers and with new customers that have been attracted to the Rubber Group's capabilities.

Based upon discussions with a number of large customers, including, Ethicon Endo-Surgery, Inc., Smiths Medical, Delphi Corporation, and Ford Motor Corporation, the Debtors believe that substantial incremental business may be made available to them upon their emergence from chapter 11 with a reduced debt level. The Debtors are confident that they have in place the infrastructure and the equipment to take advantage of these new business opportunities profitably and without the need for significant additional investment in plant and equipment.

### h.     Connector Seals for Automotive Wire Harnesses

Connector seals for automotive wire harnesses are the Rubber Group's third-largest product line, accounting for approximately 13.0% of the Rubber Group's estimated net sales for 2009.

Connector seals are molded rubber components that are utilized in automotive wire harnesses to protect the electrical connections throughout the vehicle from the effects of harmful elements like oil, water, salt, and dust.

There are three standard types of connector seals. Single-wire seals, which seal individual wire connections, and perimeter seals, which seal the closures of plastic connector housings, are commodity products and are subject to significant price competition. Multi-hole seals, which seal up to 121 wire connections, are specialty items that require far more technical expertise and command higher margins.

The Debtors believe that the Rubber Group is one of North America's two largest manufacturers of connector seals, with estimated 2009 sales volume of over 215 million units. During the third quarter of 2009, the Debtors completed the closure of their stand-alone connector seal facility in Vienna, Ohio and the transfer of their connection seal manufacturing business to their Jasper, Georgia, and Rock Hill, South Carolina facilities. The Debtors undertook this consolidation because the reduction in the size of their connector seal business made it unlikely that this business could be returned to an adequate level of profitability as a stand-alone business unit.

The Rubber Group's sales of connector seals have declined significantly in recent years for the following reasons:

(i)      Customer in-sourcing of a number of commodity-type seals;

(ii)     Customer re-sourcing of some connector seals due to price increases implemented by the Rubber Group in 2005 and 2006;

(iii)    Customer concerns about sourcing new business with an already-dominant supplier viewed as having financial issues; and

(iv)     The industry-wide reduction in domestic car and truck production.

Despite these sales declines, the Rubber Group continues to be a leader in the manufacture of connector seals, while maintaining profit and cash flow margins above the norm for the automotive supply industry, for the following reasons:

(i)      Product Design. The Rubber Group's focus on connector seals, coupled with its proprietary computer simulation software, has made the Rubber Group uniquely capable of assisting its customers in designing the seals for their electrical connectors.

(ii)     Competitive Advantages in Multi-Hole Seals. The Rubber Group has developed very cost-effective technology for manufacturing large volumes of the highly-complex, multi-hole seals that have become the industry standard.  This technology encompasses:

A.     State-of-the-art, flashless tools that eliminate the need for most costly deflashing operations;

B.     Advanced wasteless molding technology, utilizing proprietary cold pots that minimize material waste;

C.     Proprietary "split-pin" technology that facilitates demolding without tears or flashed-over holes;

D.     High-cavitation tools that increase productivity and reduce cost; and

E.     Use of automated inspection equipment to meet stringent customer quality requirements.

### i.     *Financial Performance of the Rubber Group*

The following table sets forth the actual income from operations of the Rubber Group for 2007 and 2008 and its estimated income from operations for 2009 and the reconciliation of the Rubber Group's income from operations to its Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for those periods (dollar amounts in thousands).

Please refer to **Exhibit F**, attached hereto, for the reconciliation of the Debtors' consolidated loss from continuing operations for 2008 and their estimated consolidated loss from continuing operations for 2009 to their estimated consolidated Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP.  The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA.  Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(i)     EBITDA excludes interest expense.  Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(ii)    EBITDA excludes provisions for taxes.  Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iii)   EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling.  Although depreciation and amortization are non-cash charges, they represent the consumption, over a projected period, of assets that produce revenue.  EBITDA also does not reflect the capital expenditures required for the replacement of these depreciated assets.

(iv)    EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(v)     EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vi)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement, the Prepetition Loan Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP.  In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

The following table sets forth the actual operating results and EBITDA of the Rubber Group for 2007 and 2008 and its estimated operating results and EBITDA for 2009 (dollar amounts in thousands) and reconciles those numbers to GAAP numbers:

|  | 2007 Actual | | 2008 Actual | | 2009 Estimate[2] | |
|---|---|---|---|---|---|---|
| Net Sales | $74,587 | 100.0% | $62,278 | 100.0% | $51,261 | 100.0% |
| Cost of Sales | 63,039 | 84.5 | 52,173 | 83.8 | 44,664 | 87.1 |
| Gross Profit | 11,548 | 15.5 | 10,105 | 16.7 | 6,597 | 12.9 |
| Selling and Admin. Exp. | 3,573 | 4.8 | 2,409 | 5.5 | 2,446 | 4.8 |
| Income from Operations | 7,975 | 10.7 | 6,696 | 10.8 | 4,151 | 8.1 |
| Other Income (Loss): | | | | | | |
| Interest Income | | | | | | |
| Gain on involuntary conversion of real estate | | | | | 199 | 0.3 |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | 4,350 | 8.5 |
| Add Back: | | | | | | |
| Depreciation and Amortization | 5,727 | 7.7 | 4,746 | 7.6 | 4,196 | 8.2 |
| Interest Expense | | | | | | |
| Gain on involuntary conversion of real estate | | | | | (199) | 0.3 |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $13,702 | 18.4% | $11,442 | 18.4% | $ 8,347 | 16.3% |

The following table sets forth a reconciliation of the forecasted operating results and EBITDA of the Rubber Group for 2009 to its pro forma operating results and EBITDA for 2009 (dollar in thousands):

---

[2] During the last six months of 2008, the Rubber Group experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated operating results of the Rubber Group for 2009 include (i) $3,138,000 of net sales at the Vienna facility, (ii) $903,000 of costs incurred to restructure the connector seal business and (iii) $2,305,000 of operating losses incurred at the Vienna, Ohio, facility. EBITDA at the Vienna, Ohio, facility during 2009, including the relocation expenses, was negative $2,376,000. Excluding the results of the Vienna, Ohio, facility during 2009, the Rubber Group's estimated EBITDA for 2009 totaled $10,723,000, or 22.3%.

|  | 2009 Estimate | | Pro Forma Adjustments | 2009 Pro Forma | |
|---|---|---|---|---|---|
| Net Sales | $ 51,261 | 100% | $ (407) | $50,854 | 100% |
| Cost of Sales | 44,664 | 87.1 | (5,848) | 38,816 | 76.3 |
| Gross Profit | 6,597 | 12.9 | 5,441 | 12,038 | 23.7 |
| Selling and Admin. Exp. | 2,446 | 4.8 | (215) | 2,231 | 4.4 |
| Income from Operations | 4,151 | 8.1 | 5,656 | 9,807 | 19.3 |
| Other Income (Loss): | | | | | |
| Interest Expense | | | | | |
| Gain on Involuntary Conversion of Real Estate | 199 | 0.3 | | | |
| Reorganization Expense | | | | | |
| Total Other Income | | | | | |
| Income Tax | | | | | |
| Income (Loss) from Continuing Operations | 4,350 | 8.5% | | | |
| Add Back: | | | | | |
| Depreciation and Amortization | 4,196 | 8.2 | (695) | 3,501 | 6.9 |
| Interest Expense | | | | | |
| Gain on Involuntary Conversion of Real Estate | (199) | 0.3 | | | |
| Reorganization Expense | | | | | |
| Income Tax | | | | | |
| EBITDA from Continuing Operations | $ 8,347 | 16.3% | $ 4,961 | $13,308 | 26.2% |

The following table sets forth the projected operating results and EBITDA of the Rubber Group for the years 2010 through 2012 (dollar amounts in thousands):

|  | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Net Sales | $ 58,173 | 100.0% | $ 70,653 | 100.0% | $ 79,748 | 100.0% |
| Cost of Sales | 45,026 | 77.4 | 51,566 | 73.0 | 56,686 | 71.1 |
| Gross Profit | 13,147 | 22.6 | 19,087 | 27.0 | 23,062 | 28.9 |
| Selling and Admin. Exp. | 2,423 | 4.2 | 2,622 | 3.7 | 2,786 | 3.5 |
| Income from Operations | 10,724 | 18.4 | 16,465 | 23.3 | 20,276 | 25.4 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |

| | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 3,441 | 5.9 | 2,833 | 4.0 | 2,813 | 3.6 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 14,165 | 24.3 % | $ 19,298 | 27.2 % | $ 23,089 | 28.9 % |

2.      **The Metals Group**

The Metals Group consists of the Debtors' machining business located in Rochester, New York.  The Metals Group manufactures a variety of high-volume components that are machined from aluminum, brass, steel, and stainless steel bars and blanks.  The Metals Group primarily uses multiple spindle screw machines and specially-designed rotary transfer machines that allow the Metals Group to perform multiple forming operations on a part at the same time.  The components produced by the Metals Group include airbag inflator components, solenoids for transmissions, fluid handling couplings, hydraulic valve blocks, power steering components, and wiper-system components, primarily for use by the automotive OEMs.  The Metals Group derives competitive advantage from its ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

The following table sets forth the Metals Group's actual net sales to each of its principal markets for 2007, 2008, and 2009 (dollar amounts in thousands):

| | 2007 Actual | | 2008 Actual | | 2009 Estimate | |
|---|---|---|---|---|---|---|
| Automotive OEM | $ 11,597 | 83.9 % | $ 8,764 | 81.5 % | $ 8,867 | 86.0 % |
| Other Industries | 2,224 | 16.1 | 1,987 | 18.5 | 1,439 | 14.0 |
| Total | $ 13,821 | 100.0 % | $ 10,751 | 100.0 % | $ 10,306 | 100.0 % |

The Metals Group's automotive OEM customers have historically included such major domestic suppliers as BorgWarner, Cooper-Standard Automotive, Delphi, and Jiffy-Tite. Over the past twenty-four months, the Metals Group has been awarded substantial volumes of additional business by these customers as well as a number of new customers.

### a.    *The Metals Group's Competitive Strengths*

The Metals Group has a number of competitive advantages within the markets it serves, which have enabled it to build a solid base of customers.  These advantages include:

(i)    The ability to design and build specialized manufacturing equipment, which allows the Metals Group to offer its customers comparatively short lead times and low prices;

(ii)    The ability to design and build automation equipment for many of its processes, which allows the Metals Group to offer its customers excellent quality and low prices; and

(iii)    The ability to design and build automated inspection equipment that utilizes visual and mechanical sensing to verify the critical features of complex components.

### b.    Financial Performance of the Metals Group

The following table sets forth the actual operating results and EBITDA of the Metals Group for 2007 and 2008 and its estimated operating results and EBITDA for 2009 (dollar amounts in thousands).

|  | 2007 Actual | | 2008 Actual | | 2009 Estimated | |
|---|---|---|---|---|---|---|
| Net Sales | $ 13,821 | 100.0 % | $ 10,751 | 100.0 % | $ 10,306 | 100.0 % |
| Cost of Sales | 13,490 | 97.6 | 10,934 | 101.7 | 10,674 | 103.6 |
| Gross Profit | 331 | 2.4 | (183) | (1.7) | (368) | (3.6) |
| Selling and Admin. Exp. | 523 | 3.8 | 558 | 5.2 | 359 | 3.5 |
| Income from Operations | (192) | (1.4) | (741) | (6.9) | (727) | (7.1) |
| Other Income (Loss): | | | | | | |
|    Interest Expense | | | | | | |
|    Gain on Repurchase of Debt | | | | | | |
|    Reorganization Expense | | | | | | |
|    Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing     Operations | | | | | | |
| Add Back: | | | | | | |
|    Depreciation and Amortization | 682 | 4.9 | 536 | 5.0 | 452 | 4.4 |
|    Interest Expense | | | | | | |
|    Gain on Repurchase of Debt | | | | | | |
|    Reorganization Expense | | | | | | |
|    Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 490 | 3.5 % | $ (205) | (1.9) % | $ (275) | (2.7) % |

The following table sets forth the projected operating results and EBITDA of the Metals Group for the years 2010 through 2012 (dollar amounts in thousands):

| | 2010 Projected | | 2011 Projected | | 2012 Projected | |
|---|---|---|---|---|---|---|
| Net Sales | $ 15,103 | 100.0% | $21,632 | 100.0% | $ 24,350 | 100.0% |
| Cost of Sales | 13,573 | 89.9 | 18,630 | 86.1 | 20,939 | 86.0 |
| Gross Profit | 1,530 | 10.1 | 3,002 | 13.9 | 3,411 | 14.0 |
| Selling and Admin. Exp. | 420 | 2.8 | 566 | 2.6 | 634 | 2.6 |
| Income from Operations | 1,110 | 7.3 | 2,436 | 11.3 | 2,777 | 11.4 |
| Other Income (Loss): | | | | | | |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Total Other Income | | | | | | |
| Income Tax | | | | | | |
| Income (Loss) from Continuing Operations | | | | | | |
| Add Back: | | | | | | |
| Depreciation and Amortization | 464 | 3.1 | 586 | 2.7 | 680 | 2.8 |
| Interest Expense | | | | | | |
| Gain on Repurchase of Debt | | | | | | |
| Reorganization Expense | | | | | | |
| Income Tax | | | | | | |
| EBITDA from Continuing Operations | $ 1,574 | 10.4% | $ 3,022 | 14.0% | $ 3,457 | 14.2% |

3.    **Non-Operating Assets**

In addition to the Rubber Group and the Metals Group, the Debtors own certain assets that are unrelated to their ongoing business. The Debtors plan to dispose of such assets in an orderly fashion. The most significant of those assets are discussed below.

a.    *Land in East Ellijay, Georgia*

The Debtors own a parcel of commercial land consisting of approximately 20 acres with approximately 1,560 feet of frontage on State Highway 515 in East Ellijay, Georgia. The site was originally acquired for use as a potential plant site, however, the adjacent area has seen extensive commercial development. An independent appraisal of this property, dated June 10, 2008, indicates that the value of this property has increased significantly, making it uneconomical to consider building a manufacturing plant there. The Debtors have substantially

completed the grading work necessary to prepare the property for sale and expect to commence marketing of this parcel after the Chapter 11 Cases are concluded.

The Debtors also own six residential lots aggregating 6.6 acres abutting this commercial property.

### b.     Land and Buildings in Lakewood, New York

The Debtors own a 93,000-square-foot manufacturing building on 4.9 acres of land in Lakewood, New York that is occupied by the purchaser of the Debtors' former die casting business, under a lease that expires on December 31, 2010. The lessee pays the Debtors $159,000 per year, triple-net, and has an option to purchase the facility for $1,595,000. The lease provides for a single, two-year renewal option. If the renewal option is exercised, the lease rate and the purchase option will increase by a factor based upon the change in the Consumer Price Index.

The Debtors also own a vacant 10,000-square-foot building on 2.5 acres adjacent to the leased property discussed above.

### c.     Land and Buildings in Vienna, Ohio

The Debtors also own a 52,540 square-foot industrial building on 24.95 acres of land in Vienna, Ohio that was formerly used in connection with the Debtors' connector seals business.  As set forth in further detail in Section III.A.1 herein, the connector seals business was consolidated into the Rock Hill, South Carolina, and Jasper, Georgia, facilities.

### 4.     The Debtors' Employees

As of December 31, 2009, the Debtors employed approximately 493 permanent employees, of which 101 were salaried employees and 362 were hourly employees, and 30 were temporary employees.  The Debtors believe that their relationship with their employees is good. The Debtors' operations at their Rock Hill, South Carolina facility are subject to a collective bargaining agreement with the United Steel Workers of America, AFL-CIO that expires in 2012. Because the Rock Hill facility is an "open-shop," only certain of its hourly employees are covered by the collective bargaining agreement.

## B.     Significant Indebtedness

The Debtors' significant prepetition indebtedness is described below.  In addition to this indebtedness for money borrowed, the Debtors have prepetition trade accounts payable and other general unsecured claims of approximately $6 million.

### 1.     The Prepetition Credit Agreement

The Debtors are parties to that certain Credit and Security Agreement, dated as of May 31, 2006 (the "Prepetition Credit Agreement"), with CapitalSource Finance LLC ("CapitalSource"), as collateral agent, administrative agent, and lender, Webster Business Credit

Corporation, as lender and co-documentation agent, and any other lenders party thereto (collectively, the "Credit Agreement Lenders"), as amended pursuant to that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (the "Default Waiver Agreement").  The Credit Agreement provides for:  (i) a revolving credit facility in the maximum aggregate amount of $17.5 million, including letters of credit, and (ii) an equipment term loan in the original principal amount of $12.5 million.

Pursuant to the Prepetition Credit Agreement, CapitalSource, as agent for the Credit Agreement Lenders, holds first priority liens on, and security interests in, substantially all of the Debtors' assets other than real estate and second priority liens on the Debtors' real estate.

The Debtors used the amounts borrowed under the Prepetition Credit Agreement to fund general working capital requirements.  As of the Commencement Date, approximately $22.6 million, including outstanding letters of credit, was outstanding under the Prepetition Credit Agreement.

As described in greater detail in Section V.B.1.b, "*Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)*" on page 50, pursuant to the Plan, Claims arising from the Prepetition Credit Agreement are classified as Class 2(a) Claims.  On account of their Allowed Claims, holders of Class 2(a) Claims will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement.

## 2. The Prepetition Loan Agreement

The Debtors also are parties to that certain Loan and Security Agreement, dated as of May 31, 2006 (the "Prepetition Loan Agreement"), with CSE Mortgage LLC ("CSE"), as lender, collateral agent, and administrative agent, DMD Special Situations, LLC ("DMD"), as lender, and any other lenders party thereto (collectively, the "Loan Agreement Lenders," and together with the Credit Agreement Lenders, the "Prepetition Secured Lenders"), as amended pursuant to the Default Waiver Agreement.  The Loan and Security Agreement provides for two real estate term loans, Term Loan A and Term Loan B, in the original principal amounts of $11 million and $4 million, respectively.

Pursuant to the Prepetition Loan Agreement, CSE, as agent for the Loan Agreement Lenders, holds first priority liens on, and security interests in, the Debtors' real estate, and second priority liens on substantially all of the Debtors' other assets.

The Debtors used the amounts borrowed under the Prepetition Loan Agreement to fund general working capital requirements.  As of the Commencement Date, approximately $9.8 million principal amount was outstanding under Term Loan A, and $4 million principal amount was outstanding under Term Loan B.

As described in greater detail in Section V.B.1.c, "*Class 2(b) – CSE Secured Claims against LPC (Impaired)*" on page 51, pursuant to the Plan, Claims arising from the Prepetition Loan Agreement are classified as Class 2(b) Claims.  On account of their Allowed Claims, holders of Class 2(b) Claims will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement.

### 3. Senior Subordinated Notes

Pursuant to an indenture, dated as of December 18, 2003 (as supplemented thereafter, the "Indenture"), between Wilmington Trust Company, as indenture trustee (the "Indenture Trustee"), and LPC, there are issued and outstanding $34.18 million in principal amount of unsecured Senior Subordinated Notes due August 1, 2009, which bear interest at the rate of 12% per annum (the "Senior Subordinated Notes"). Interest on the Senior Subordinated Notes is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, approximately $9.1 million of accrued interest was outstanding with respect to the Senior Subordinated Notes.

Approximately 22.7% of the Senior Subordinated Notes are held by Michael A. Lubin and Warren Delano, the co-Chief Executive Officers of the Debtors, and their families and affiliates. As of the Commencement Date, approximately 74.4% of the Senior Subordinated Notes were held by a group of six hedge funds that formed an ad hoc committee (the "Ad Hoc Committee") to negotiate with the Debtors prior to the Commencement Date. Three members of the Ad Hoc Committee and the Indenture Trustee originally served as members of the Creditors' Committee in the Chapter 11 Cases. On or about February 12, 2010, two of these members resigned from the Creditors' Committee after the Plan Investor purchased such members' Senior Subordinated Notes.

As described in greater detail in Section V.B.1.f, "*Class 5 – Senior Subordinated Note Claims (Impaired)*" on page 52, pursuant to the Plan, Claims arising from the Senior Subordinated Notes are classified as Class 5 Claims. Each holder of a Class 5 Claim will receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, Cash in the amount equal to 51% (the "Cash-Out Percentage") of its Allowed Senior Subordinated Note Claim; provided, however, that in lieu of such distribution, such holder may elect to receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, a number of shares of New LPC Common Stock equal to (x) the product of its Allowed Senior Subordinated Note Claim and the Cash-Out Percentage (*i.e.*, 51%), divided by (y) $10.00.

### 4. Junior Subordinated Note

LPC is indebted to Michael A. Lubin, Chairman of the Board of the Debtors, in respect of an unsecured Junior Subordinated Note due November 1, 2009 in the principal amount of $347,000, which was originally issued on December 18, 2003, and bears interest at the rate of 13% per annum (as amended, the "Junior Subordinated Note"). Interest on the Junior Subordinated Note is payable quarterly on February 1, May 1, August 1, and November 1 of each year. As of the Commencement Date, $75,000 of accrued interest was outstanding with respect to the Junior Subordinated Note.

As described in greater detail in Section V.B.1.g, "*Class 6 – Junior Subordinated Note Claims (Impaired)*" on page 52, pursuant to the Plan, Claims arising from the Junior Subordinated Note are classified as Class 6 Claims. The holder of the Class 6 Claims has agreed not to, and will not, receive a distribution under the Plan.

## C.   The Asbestos Cases

LPC is one of many defendants named in approximately 3,500 pending asbestos-related actions before the Court of Common Pleas of Cuyahoga County, Ohio ("Asbestos Actions").  In each case, the plaintiffs generally allege that LPC or one of its predecessors produced a product containing asbestos, with which the plaintiffs came into contact during the course of their careers.  Generally, none of the complaints allege any specific facts as to which products LPC allegedly produced that contained asbestos or the time of exposure.

LPC has denied and continues to deny any liability with respect to the Asbestos Actions.  To date, the Debtors have not been found liable on any asbestos-related Claims and approximately 1,000 cases have been dismissed.

To date, Liberty Mutual and Home Insurance Company, who insured the Debtors for certain periods of time against asbestos-related injuries, have paid 100% of the Debtors' defense costs.  On June 13, 2003, Home Insurance Company became subject to a state insurance liquidation proceeding.  Since then, Liberty Mutual has continued to pay the Debtors' defense and other asbestos-related costs.

The Debtors believe the Liberty Mutual insurance policies provide the following coverage:

| Period | Coverage |
|---|---|
| 1985-86 | $500,000 in aggregate coverage and up to the same per occurrence |
| 1986-87 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1987-88 | $1,000,000 in aggregate coverage and up to the same per occurrence |
| 1988-89 | $2,000,000 in aggregate coverage for property damage and bodily injury, $1,000,000 per occurrence, $1,000,000 in aggregate coverage for products liability |

In addition to the Liberty Mutual and Home Insurance Company insurance, LPC is a beneficiary of certain excess liability coverage provided by Fireman's Fund.  The Debtors believe Fireman's Fund provides additional insurance coverage for Asbestos-Related Claims to the extent the Liberty Mutual or Home Insurance Company policies provide coverage.  The Debtors believe that the Fireman's Fund coverage is as follows:

| Period | Coverage |
|---|---|
| 3/15/77-6/1/78 | $5,000,000 in excess coverage |
| 6/1/78-10/10/78 | $5,000,000 in excess coverage |
| 10/10/78-06/01/79 | $1,000,000 in excess coverage |
| 6/1/79-6/1/80 | $5,000,000 in excess coverage |
| 6/1/80-6/1/81 | $5,000,000 in excess coverage |
| 6/1/81-6/1/82 | Unknown |

| Period | Coverage |
|---|---|
| 6/1/82-6/1/83 | $5,000,000 in excess coverage |

It should be noted that there may be filed certain Asbestos Related Claims with respect to years for which there may not be any insurance coverage. As described below, and as provided for in the Plan, the lack of insurance coverage for a valid and enforceable Asbestos Related Claim will not preclude the holder of such claim from receiving a distribution under the Plan.

As described in greater detail in Section V.B.1.j, "*Class 9 – Asbestos-Related Claims (Impaired)*" on page 53, pursuant to the Plan, Asbestos-Related Claims are classified as Class 9 Claims. After the Effective Date, each Asbestos-Related Claim will be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; provided, however, that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, will as promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims will be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies). To the extent the proceeds of the Asbestos Insurance Policies do not cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors will pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim 80% of the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); provided, however, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim will receive (a)(i) Cash in the amount of eight percent (8%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (ii) an additional nine (9) semi-annual Cash payments, each in an amount equal to 8.6% of such Insurance Proceeds Deficiency, commencing three (3) months after the earlier of the Effective Date or the date such Claim is Allowed, or (b) in lieu of such distribution and in full satisfaction of its Claim, such holder may elect to receive a Cash payment in an amount equal to 51% of the Insurance Proceeds Deficiency on the later of (x) the Effective Date or (y) the date such Claim becomes Allowed.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

## D. Significant Events Leading to the Commencement of the Chapter 11 Cases

Historically over 75% of the Debtors' business represented sales of rubber and metal components used by tier-one automotive suppliers, which provide automotive parts to domestic original OEMs. Over the past decade, there has been a substantial decline in the market share of the Detroit-based OEMs. Since 2005, but during 2008 and 2009 in particular, there has been a meaningful reduction in the aggregate number of vehicles produced annually in the U.S. by all manufacturers. These factors have caused tier-one suppliers, particularly those focused on the Detroit-based OEMS, to experience declining sales and increased pricing pressures. This challenging industry environment has been exacerbated by industry-wide efforts to reduce inventory levels throughout the automotive supply chain, which has caused the overall decline in retail sales of automobiles to have a magnified impact on sales of component suppliers like the Debtors.

The Debtors have responded to the reduction in OEM sales by restructuring their operations to reduce costs, which has enabled the Debtors to maintain superior operating and EBITDA margins despite declining sales and to increase their focus on their automotive aftermarket and medical device businesses.

### 1. Liquidity Crisis

Notwithstanding operational restructuring and efforts to diversify the Debtors' business, the industry-wide reduction in automotive OEM orders began to affect the Debtors in a significant way in mid-2006. Although the Debtors were able to maintain superior margins, the reduction in sales to the automotive OEMs had a significant impact on the Debtors' overall cash flow. At the same time, the Debtors' Rock Hill, South Carolina facility, which produces components for the medical device industry, was preparing to launch a major new program for one of the world's largest manufacturers of laparoscopic surgical devices and was incurring start-up expenses of approximately $150,000 per month in that effort. The combination of these factors caused a significant drain on the Debtors' cash.

On November 1, 2006, a regular, quarterly interest payment was due in respect of the Senior Subordinated Notes. As a result of the liquidity issues described above, the Debtors were not in a position to make the scheduled payment on the due date or within the thirty-day grace period. The failure to make this interest payment within the grace period constituted a default under the Indenture, and by February 1, 2007, that default triggered a cross-default under the Prepetition Credit Agreement and the Prepetition Loan Agreement. Shortly after November 1, 2006, certain holders of the Senior Subordinated Notes organized and formed the Ad Hoc Committee.

### 2. Restructuring Efforts

From November 2006 through mid-March 2007, the Debtors held extensive discussions with the Prepetition Secured Lenders and the Ad Hoc Committee in an effort to negotiate a financial restructuring that would resolve the Debtors' liquidity issues. In mid-March 2007, the Debtors reached agreements with the Prepetition Secured Lenders and the Ad Hoc

Committee on a standstill arrangement while the Debtors pursued potential asset sales and refinancing arrangements in order to stabilize their finances and maximize value for all stakeholders. Upon entering into the standstill agreement, the Debtors engaged Campbell to assist them in seeking a refinancing or a sale of all or a portion of the Rubber Group.

The Debtors obtained the standstill agreement with the Prepetition Secured Lenders by agreeing to pay interest at two points above the contract rates, and to pay financing fees, and fees and expenses of outside counsel, financial advisors, and appraisers. The incremental payments aggregated approximately $2.2 million between November 1, 2006 and the Commencement Date. In addition, in return for a standstill agreement with the Ad Hoc Committee, the Ad Hoc Committee required, as a condition to its forbearance, an increase in the rate of interest on the Senior Subordinated Notes from 12% to 16% until the Senior Subordinated Notes were paid in full or until LPC filed a petition for relief under the Bankruptcy Code. The incremental interest accrued on the Senior Subordinated Notes totaled approximately $2.3 million as of the Commencement Date.

Thereafter, the Debtors began their asset sale and refinancing efforts. Despite an extremely difficult economic environment, the Debtors, assisted by Campbell, were able to obtain a number indications of interest for all or portions of LRGI. Based upon those indications of interest and the advice of Campbell, the Debtors concluded that, notwithstanding the Debtors' negative book net worth calculated in accordance with GAAP, the value of the Debtors' assets far exceeded their liabilities.

Upon reviewing the various sale proposals, the Debtors' determined that the course of action that offered the best prospect of maximizing value was to proceed with a non-binding proposal, subject to due diligence, from a multi-national manufacturer of rubber products having annual sales of over $4 billion (the "Rock Hill Buyer") to purchase LRGI's facility in Rock Hill, South Carolina, which produces molded rubber components primarily for use in medical devices, at a price of $32 million in cash, subject to a standard purchase price adjustment provision related to increases or decreases in working capital (the "Rock Hill Sale"). The Rock Hill Facility had $16 million in net sales for 2007, and the net book value of that facility was $5.3 million on December 31, 2007. The sale would have generated a pre-tax gain of approximately $26 million for U.S. federal income tax purposes, all of which was anticipated to be sheltered by the Debtors' net operating loss carryforward (subject to possible alternative minimum taxes).

In conjunction with that sale process, the Debtors began to seek senior secured financing arrangements that would have enabled them, upon the closing of the Rock Hill Sale, to repay the Prepetition Secured Lenders, make substantial payments in respect of the Senior Subordinated Notes, and finance the operations and growth of the Debtors' remaining businesses. The Debtors were able to obtain a non-binding proposal, subject to due diligence, from a prospective institutional lender (the "Potential New Secured Lender") for a $36.7 million senior secured credit facility that, had it closed, would have enabled the Debtors to (i) repay the Prepetition Secured Lenders, (ii) pay all accrued interest (aggregating approximately $8.8 million at February 29, 2008) on the Senior Subordinated Notes, and (iii) pay approximately 50% of the outstanding principal amount of the Senior Subordinated Notes held by non-affiliates

of the Debtors. The balance of the Senior Subordinated Notes held by non-affiliated holders would have remained outstanding, with a 5-year maturity and a cash-pay interest rate of 12%. The Junior Subordinated Note and the Senior Subordinated Notes held by the affiliated holders would have been converted to common stock, reducing the Debtors' remaining debt by an additional $8 million.

In mid-January 2008, the Debtors advised the Ad Hoc Committee that they believed that, in order to move forward with the Rock Hill Sale and the related financing, they required an extension of the standstill arrangement, which was due to expire on January 24, 2008, to April 30, 2008; the requested extension reflected the time periods requested by the Rock Hill Buyer and the Potential New Secured Lender in order to permit them to complete their respective due diligence investigations. The Ad Hoc Committee responded by delivering a proposed form of extension agreement that contained certain provisions that the Debtors and their advisors considered untenable, including the Ad Hoc Committee's right to veto the Rock Hill Sale and a mere two-week extension of the standstill arrangement, subject to further extension at the Ad Hoc Committee's sole discretion. The Debtors made extensive efforts to obtain the Ad Hoc Committee's agreement to the Rock Hill Sale and negotiate further extensions of the standstill agreement. After the Debtors and the Ad Hoc Committee were unable to come to agreement, the Debtors began preparations for chapter 11.

In a final effort to avoid the expense and disruption of a chapter 11 case, the Debtors made two additional restructuring proposals. The first proposal, which was made to the Ad Hoc Committee, included a conversion of a portion of the Senior Subordinated Notes to common stock based upon the values reflected by the offers received during the abandoned sale process. The Ad Hoc Committee rejected the recapitalization proposal because it believed, based upon its valuation of the Debtors, that it would not have provided a full recovery to the holders of the Senior Subordinated Notes.

The second proposal was made to Jefferies High Yield Trading ("Jefferies"), the largest holder of the Senior Subordinated Notes with approximately 37.1% of the issue. That proposal provided for a full conversion of the Senior Subordinated Notes to equity. After negotiations between the Debtors and Jefferies, and a counterproposal by Jefferies, the Debtors and Jefferies were not able to reach an agreement.

In light of the foregoing, the Debtors determined that the only available method to protect the interests of all stakeholders was to seek protection under the Bankruptcy Code. The Debtors believed that the short-term standstill arrangements under which they had been operating for approximately a year prior to the Commencement Date were having a significant adverse effect on their business because of customer concerns about awarding additional business to a company with an uncertain future, and that further delay would only exacerbate the negative impact.

### E.    The Chapter 11 Cases

#### 1.    Commencement of the Chapter 11 Cases and the "First-Day" Orders

On April 1, 2008, the Debtors filed voluntary petitions commencing the Chapter 11 Cases.  Shortly thereafter, the Debtors obtained a series of orders from the Bankruptcy Court designed to minimize any disruption to the Debtors' business operations and to facilitate the Debtors' reorganization.

##### a.    Case Administration Orders

The Bankruptcy Court entered a number of procedural orders to streamline and simplify the administration of the Chapter 11 Cases.  These orders:  (i) authorized the joint administration of the Chapter 11 Cases; (ii) established notice procedures; (iii) granted an extension of time to file the Debtors' schedules and statements; and (iv) authorized the mailing of initial notices and all other mailings directly to parties in interest and the filing of a list of creditors without claim amounts in lieu of a matrix.  In addition, the Debtors obtained orders authorizing the engagement of Weil, Gotshal & Manges LLP and Campbell as legal and financial advisors, respectively.

##### b.    Critical Obligations

To allow the Debtors to maintain certain critical operations during the Chapter 11 Cases, the Bankruptcy Court authorized certain payments on prepetition obligations.  The Bankruptcy Court authorized the Debtors to satisfy certain outstanding obligations including those relating to:  (i) wages, compensation, and employee benefits; (ii) sales and use taxes; and (iii) claims of common carriers, equipment processors, and warehouses.

##### c.    Customer and Employee Programs

Further, the Bankruptcy Court granted authority to continue certain business operations.  Among other things, the Bankruptcy Court authorized the Debtors to:  (i) continue certain customer service programs; and (ii) continue certain workers compensation and all other insurance policies.

##### d.    Financing Arrangements

In order to assure that the Debtors had adequate financing to continue their operations throughout the term of the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to:  (i) use the Prepetition Secured Lenders' cash collateral and obtain $4 million in unsecured postpetition financing; (ii) continue their centralized cash management system as modified to reflect the authorization to use cash collateral; and (iii) maintain their existing bank accounts and forms.

## 2.    Appointment of the Creditors' Committee

Pursuant to section 1102(a) and (b) of the Bankruptcy Code, on April 11, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the seven-member Creditors' Committee to represent the interests of all unsecured creditors in the Chapter 11 Cases. The current Creditors' Committee consists of five members:

> Wilmington Trust Company;
>
> Valhalla Capital Partners, LLC;
>
> Momentive Performance Materials, Inc.;
>
> Sandler Capital Management; and
>
> Environmental Products & Services of Vermont, Inc.

Jefferies High Yield Trading and Wilfrid Aubery, LLC once served on the Creditors' Committee, but have since resigned since selling their Senior Subordinated Notes to the Plan Investor, as described in Section IV.A of the Plan. Valhalla Capital Partners, LLC, Jefferies High Yield Trading and  Wilfrid Aubery, LLC also served on the Ad Hoc Committee, as described in Section III.B.3, "*Senior Subordinated Notes*" on page 32.

## 3.    Debtor in Possession Financing/Use of Cash Collateral

To fund their continued operations during the term of the Chapter 11 Cases, the Debtors obtained authority to use the Prepetition Secured Lenders' cash collateral, which secures the Debtors' obligations under the Prepetition Credit and Loan Agreements. The Debtors also obtained $4 million in unsecured postpetition financing pursuant to the DIP Note, which was issued by the Debtors in favor of Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC on April 21, 2008. Lubin Partners, LLC is an affiliate of Michael A. Lubin, the Chairman of the Debtors' Board of Directors and the Debtors' Co-Chief Executive Officer. William B. Conner currently serves as a member of the Debtors' Board of Directors. To the Debtors' knowledge, ORA Associates is not an insider of the Debtors.

On April 17, 2008, the Bankruptcy Court issued an order authorizing, on a final basis, the use of cash collateral and approved the DIP Note (the "DIP Financing Order"). On March 1, 2010, the Bankruptcy Court approved a third extension of the DIP Note to May 3, 2010 (Docket No. 843). On March 9, 2010, the Bankruptcy Court approved the ninth extension of the use of cash collateral [Docket No. 851]. The Debtors' use of cash collateral currently expires on April 2, 2010. The Prepetition Secured Lenders allege that the Debtors are in default under certain of the cash collateral orders and have reserved their rights regarding such defaults.

As described in Section V.A.4, "*Debtor in Possession* Loan Claims" on page 49, as consented to by the DIP Lenders, the DIP Loan Claims will be satisfied in full through (i) the issuance of 400,000 shares of New LPC Common Stock, and (ii) payment in Cash, on or as soon as reasonably practicable following the Effective Date, of all accrued and unpaid interest through the Effective Date.

4.    **The Debtors' Exclusive Periods**

Section 1121 of the Bankruptcy Code grants a debtor the exclusive right to propose a plan of reorganization during the first 120 days after the commencement of a chapter 11 case. In addition, a debtor also has the exclusive right to solicit votes for the acceptance of any proposed plan during the first 180 days after the commencement of a chapter 11 case. A debtor's exclusive rights may be either terminated or extended for "cause."

On May 21, 2008, the Creditors' Committee filed a motion with the Bankruptcy Court seeking a termination of the Debtors' exclusive rights to propose a plan and solicit acceptances thereof. The Debtors objected. On June 11, 2008, the Bankruptcy Court held a hearing on the matter and reserved judgment.

On July 9, 2008, the Debtors filed a motion to extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively. On July 17, 2008, the Creditors' Committee withdrew its motion to terminate the Debtors' exclusive periods but indicated its intention to object to the Debtors' motion to extend of the Debtors' exclusive periods for an additional 90 days. On July 22, 2008, the Creditors' Committee filed that objection. On July 29, 2008, the Bankruptcy Court held a hearing on the Debtors' motion to extend the exclusive periods. Thereafter, by decision and order dated July 31, 2008, the Court granted the Debtors an extension of their exclusivity to propose a chapter 11 plan and solicit acceptances thereof to October 28, 2008 and December 27, 2008, respectively.

On October 7, 2008, the Debtors filed a motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof to January 26, 2009, and February 25, 2009, respectively. The Creditors' Committee objected to the Debtors' motion. On October 28, 2008, the Bankruptcy Court held a hearing on the Debtors' motion, following which the Bankruptcy Court granted the Debtors' motion.

On January 12, 2009, the Debtors filed a third motion to further extend their exclusive periods to file a chapter 11 plan and solicit acceptances thereof. The Creditors' Committee and the Prepetition Secured Lenders objected to the Debtors' motion. Upon the Debtors' request, the Bankruptcy Court entered a bridge order extending the Debtors' exclusive periods pending a hearing on the Debtors' third extension motion. After hearings on February 23 and 24, 2009, the Court extended the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereof to April 30, 2009 and June 1, 2009 respectively.

Upon careful review of the circumstances, the Debtors decided not to seek any further extensions of the exclusive periods. On September 1, 2009, the Prepetition Secured Lenders filed their own chapter 11 plans and a proposed combined disclosure statement with respect thereto. On September 11, 2009, the Creditors' Committee also filed a chapter 11 plan and a proposed disclosure statement with respect thereto, each of which have been subsequently amended. In connection with certain of the objections that were filed to the proposed disclosure statements of the Prepetition Secured Lenders and the Creditors' Committee, on October 5, 2009,

the Chapter 11 Cases were reassigned to the Honorable Burton R. Lifland.[3]  On December 16, 2009, the Senior Secured Lenders and the Creditors' Committee withdrew their previous individual chapter 11 plans and filed the joint Committee/Senior Secured Lenders Plan and a proposed disclosure statement therefor.  On May 26, 2010, the Committee and the Senior Secured Lenders withdrew their joint plan and announced their support for this Plan.

### 5. The Mediation Process

At the hearing on February 24, 2009 in connection with the Bankruptcy Court's ruling on the Debtors' first motion for extension of their use of cash collateral and the Debtors' third motion to extend the exclusive periods, the Debtors, the Creditors' Committee and the Prepetition Secured Lenders agreed to participate in a mediation to facilitate a resolution of disputed issues between the Debtors and the Creditors' Committee that could lead to an ultimate resolution of the Chapter 11 Cases, including valuation and structure of a potential consensual chapter 11 plan.  On March 17, 2009, the Bankruptcy Court entered an order appointing Seymour Preston, Jr. of Goldin Associates as the mediator.  Mr.  Preston has conducted several mediation sessions with the Debtors and the Creditors' Committee after submission of valuation reports from Campbell and SRR.  To date, the mediation has not produced an agreement between the Debtors and the Creditors' Committee.

### 6. The Claims Reconciliation Process

On June 13, 2008, the Debtors filed their schedules of assets and liabilities, which list all outstanding prepetition claims held against the Debtors as reflected in the Debtors' books and records.

On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008 as the deadline, or bar date, for any claimant other than (i) a counterparty to an executory contract rejected by the Debtors after July 16, 2008 or (ii) a Government Unit to assert a claim against the Debtors in the Chapter 11 Cases by filing a proof of Claim.  The claims-filing deadline for a counterparty to an executory contract rejected by the Debtors after July 16, 2008 is discussed under the caption "*Rejection Damage Claims*" on page 66.  The deadline for Government Units to file a proof of Claim was September 29, 2008.  In early July 2008, the Debtors sent all known holders of Claims, including all claimants scheduled on the Debtors' schedules, notice of the bar dates as well as a proof of Claim form.  The notice included information as to how to file a proof of Claim and as to whether filing a proof of Claim is necessary.  On July 18, 2008, the Debtors also published the same notice in the national edition of The Wall Street Journal.

For more information on the bar dates and whether you need to file a proof of Claim, please refer to the bar date notice, which can be found at http://chapter11.epiqsystems.com/lexington.

---

[3] On March 4, 2010, the Chapter 11 Cases were reassigned to the Honorable Shelley C. Chapman.

The Bankruptcy Court has not yet set a deadline for filing requests for payment of Administrative Expense Claims. The deadline for filing requests for payment of Administrative Expense Claims will be established under the Plan, as set forth in Section IV(A)(1) below.

<div align="center">

IV.

**THE STOCK PURCHASE AGREEMENT**

</div>

Since May, 2009, the Debtors have engaged in extensive negotiations with a number of prospective investors with respect to a potential investment in the Debtors as part of their emergence from chapter 11. Such negotiations culminated in the execution of the Stock Purchase Agreement, as filed with the Plan Supplement, as well as certain other ancillary agreements described herein.

A.      **The Plan Investor**

Beginning in May, 2009, the Debtors and Campbell engaged in an extensive marketing process of the Debtors and their operations, seeking an investor to assist the Debtors in exiting their Chapter 11 Cases. As part of the marketing process, Campbell contacted a total of 125 potential investors. Of this total, 69 signed non-disclosure agreements and were provided preliminary information on the Debtors and their operations. After further discussions and review of the preliminary information packages, 20 potential investors attended management presentations at which they were provided additional information regarding the Debtors along with the opportunity to meet senior management. At the conclusion of these management presentations, nine parties expressed interest in visiting the Debtors' facilities located in Rock Hill, South Carolina, Jasper, Georgia and Rochester, New York. In addition, these parties were provided access to an online data room that contained financial, operational, environmental and other information necessary for potential investors to conduct confirmatory due diligence.

Despite the highly challenging economic environment, Campbell was able to generate strong interest in a transaction involving the Debtors and their operations. Following the management presentations and facility tours, Campbell received proposals from eight parties. Following additional rounds of negotiations with the bidding parties, the Debtors and Campbell determined that the final proposal submitted by the Plan Investor represented the highest and best value for the Debtors.

In January 2010, the Plan Investor purchased all of the Senior Subordinated Notes held by Jefferies, and thereafter purchased additional Senior Subordinated Notes from certain other members of the Committee and other holders. All of such purchases were made at a price equal to 65% of the principal amount of the Senior Subordinated Notes, which approximated 51% of the Senior Subordinated Note Claims of such holders. The Plan Investor currently holds $24,085,000 principal amount of the Senior Subordinated Notes, which represents approximately 70.5% of the aggregate amount of Senior Subordinated Notes outstanding.

Based on such extensive marketing efforts, the Debtors believe that the Plan Investor and its plan investment, as represented by the Stock Purchase Agreement, constitute the

highest and best option available to the Debtors, thereby allowing them to maximize the value of their estates and provide the best recovery to all parties in interest.

**B.**     **The Stock Purchase Agreement**

Pursuant to the Stock Purchase Agreement, the Plan Investor will invest at least $22 million (including amounts spent to purchase Senior Subordinated Notes prior to the Effective Date). In exchange for its investment under the Stock Purchase Agreement, the Plan Investor will receive shares of New LPC Common Stock at a purchase price of $10.00. The Debtors will use the proceeds of the investment to fund distributions under the Plan and to provide working capital to the Reorganized Debtors.

The Stock Purchase Agreement is subject to customary warranties and representations, covenants, and closing conditions.

**C.**     **Ancillary Agreements**

**1.**     **The Securityholders Agreement**

As part of the Stock Purchase Agreement, Mr. Lubin and Mr. Delano and their affiliates and family members who own 12% Senior Subordinated Notes, (together, the "Affiliated Bondholders"), and Lubin Partners LLC, Mr. William B. Connor, and ORA Associates, LLC (the "DIP Lenders," and, together with the Affiliated Bondholders, the "Management Members") and the Plan Investor will enter into a certain securityholders agreement (the "Securityholders Agreement"). The Securityholders Agreement will be filed as part of the Plan Supplement.

The material terms of the Securityholders Agreement are as follows:

(i)     Board of Directors. Of the seven (7) member Board of Directors for Reorganized LPC, the Chief Executive Officer will be designated as one (1) board member, the Plan Investor will have the right to designate four (4) board members (provided, however, that one of the Plan Investor's designees will be an "Independent Director," as defined in the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement), and the Management Members will have the right to designate two (2) board members if they hold at least 12.5% of the New LPC Common Stock, one (1) board member if they hold at least 5% of the New LPC Common Stock or a board observer if they hold at least 2.5% of the New LPC Common Stock. The Management Members' board designations will each be subject to approval by the Plan Investor, with such approval to not be unreasonably withheld, conditioned or delayed.

(ii)     Actions Subject to Prior Consent. So long as the Management Members have the right to designate a director as described above, Reorganized Debtors shall not take any of the following actions without the consent of

a majority of the New LPC Common Stock held by the Management Members: (a) increase the number of directors; (b) amend, alter or repeal any Reorganized Debtor's organizational documents if such amendment or restatement would adversely affect the Management Members, in their capacity as equity holders, disproportionately as compared to the Plan Investor; (c) redeem, purchase, or acquire any stock of Reorganized LPC ("Reorganized LPC Stock") except pursuant to the Securityholders Agreement or on a proportionate basis; (d) generally, enter into any transaction outside the ordinary course of business with the Plan Investor or its affiliates that is on terms that, in the aggregate, are materially less favorable to the Reorganized Company than would be obtainable in a comparable arms-length transaction with a person that is not an affiliate of the Plan Investor; (e) designate certain purchasers of Reorganized LPC Stock as the same class of securityholder as the Management Members; and (f) grant registration rights on a basis that have priority over the registration rights granted to the Management Members and the Plan Investor, except with respect to rights granted based on the size of such investor's holdings.

(iii) Transfer Restrictions. The Management Members agree that prior to the occurrence of a public offering of the stock of Reorganized LPC resulting in a market float of greater than $50 million (a "Qualified IPO"), the Management Members generally may not transfer any securities except to certain permitted transferees (such as, among other things, certain estate planning transfers, transfers to family members or other members of the group of Management Members) or with the consent of the Plan Investor. Following a Qualified IPO, should one occur, the Management Members may transfer securities without the consent of the Plan Investor in a sale to the public pursuant to an effective registration statement of Reorganized LPC or pursuant to Rule 144, except that under certain specified circumstances such sales may be delayed due to pending or proposed corporate transactions, registrations for the sale of securities or sales of greater than five percent (5%) of the outstanding New LPC Common Stock by the Plan Investor.

(iv) Tag-Along/Co-Sale Rights. Subject to certain conditions, prior to a Qualified IPO, any stockholder will generally be entitled to participate pro rata in any sale by any other stockholder of New LPC Common Stock to a third party on a proportional basis on the same terms and conditions (including the price and form of consideration), except in the following circumstances: (a) sales of shares of New LPC Common Stock to the public pursuant to a registration statement filed under the Securities Act of 1933, as amended, or pursuant to Rule 144 thereunder; (b) transfers to certain permitted transferees; (c) a transaction or series of transactions involving the transfer of less than one percent (1%) of the issued and outstanding shares of New LPC Common Stock; (d) a transaction or series

of transactions involving the transfer of New LPC Common Stock by the Plan Investor or any of its affiliates that results in the Plan Investor or any of its affiliates retaining ownership of 51% or greater of the issued and outstanding shares of New LPC Common Stock after giving effect to the sale; (e) shares of New LPC Common Stock purchased by Reorganized LPC or any other securityholder pursuant the right of first refusal described below; or (f) shares of New LPC Common Stock purchased in connection with a potential acquisition due to the drag-along rights described below.

(v)     Rights of First Refusal.  Prior to a Qualified IPO, the Plan Investor will have the right of first refusal on any sales of securities of Reorganized LPC by Management Members.  In the event the Plan Investor elects not to exercise such rights, Reorganized LPC will have a similar right of first refusal.  Such rights of first refusal will apply to certain proposed transfers of securities of Reorganized LPC as well as certain involuntary transfers of securities of Reorganized LPC (such as foreclosures, transfers in connection with a bankruptcy by the holder and similar matters).  The rights of first refusal shall not apply to: (a) transfers to any affiliate of the transferor, or to certain permitted transferees; (b) transfers to the Plan Investor or its affiliates; (c) transfers to Reorganized LPC; (d) any sale to the public pursuant to an effective registration statement under the Securities Act or Rule 144; (e) transfers pursuant to tag-along rights described above; or (f) transfers pursuant to drag-along rights described below.

(vi)    Drag-Along Rights.  Prior to a Qualified IPO, the Plan Investor will have the right to require all other holders to join in any sale by the Plan Investor of New LPC Common Stock to a third party in any transaction in which the Plan Investor is selling all of its New LPC Common Stock on the same terms and conditions and for the same consideration.  In the event that all or substantially all of the assets of Reorganized LPC are proposed to be sold, the holders of New LPC Common Stock other than the Plan Investor will agree to vote in favor of such a transaction.

(vii)   Preemptive Rights.  Each party to the Securityholders Agreement shall have the preemptive rights to purchase any additional Reorganized LPC Stock (or other securities convertible into Reorganized LPC Stock) proposed to be sold by Reorganized LPC from time to time ratably in accordance with such party's ownership of New LPC Common Stock. The preemptive rights shall not apply to: (a) New LPC Common Stock issued at the time of entry into the Securityholders Agreement; (b) securities offered to the public pursuant to a registration statement; (c) securities issued in certain corporate transactions approved by the board of directors of Reorganized LPC; (d) New LPC Common Stock issued as compensation to employees, officers, directors and consultants of the

Reorganized Debtors; (e) securities issued in connection with stock splits, stock dividends and recapitalizations; and (f) up to $5 million of New LPC Common Stock issued to affiliates of Plan Investor within sixty (60) days after entry into the Securityholders Agreement.

(viii)  <u>Information Rights</u>.  So long as the Management Members continue to hold at least 2.5% of the outstanding New LPC Common Stock, subject to certain conditions, each Management Member will have the right to receive monthly financial statements, annual financial statements and the annual consolidated budget and business plan of the Reorganized Debtors.

(ix)  <u>Registration Rights</u>.  At any time nine (9) months after a Qualified IPO, the Plan Investor will have the right to one (1) demand for public registration of its New LPC Common Stock.  After a Qualified IPO, the Plan Investor and the Management Members each receive customary piggyback registration rights.

## 2.    The Management Incentive Plan

After the Effective Date, the Reorganized Debtors will implement a certain management incentive plan (the "<u>Management Incentive Plan</u>") pursuant to which the Reorganized Debtors will issue ten-year warrants or options to certain members of management exercisable for 20% of the New LPC Common Stock before dilution (the "<u>MIP Warrants</u>"). The MIP Warrants will be exercisable initially at a price equal to $10.00 per share, increasing at the rate of 20% per annum.  The final terms of the Management Incentive Plan are still under negotiation.

In addition to the MIP Warrants, the Reorganized Debtors may issue warrants or options to certain members of the Reorganized Debtors' board of directors who are not employees of the Plan Investor which may equal up to 3% of the New LPC Common Stock on a fully diluted basis.

## 3.    Employment Agreements

As one of the closing conditions to the Stock Purchase Agreement, among others, after the Effective Date, Mr. Lubin and Mr. Delano will enter into certain employment agreements with the Reorganized Debtors, which must be acceptable to the Plan Investor.  The Plan Supplement will include a disclosure of any compensation for any officer of the Reorganized Debtors or member of the new Boards who is an "insider" under the Bankruptcy Code.

## V.

## THE PLAN

This Section of the Disclosure Statement summarizes the Plan, which is attached hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the full text of the

Plan.  To the extent any inconsistencies exist between the Disclosure Statement and Plan, the Plan governs.

## A.     Summary and Treatment of Unclassified Claims

The Plan does not classify all Claims and Interests.  In particular, Claims incurred during the course of the Chapter 11 Cases (i.e., Administrative Expense Claims) and Priority Tax Claims are unclassified.  A summary of these Claims is set forth below.

### 1.     Administrative Expense Claims

Administrative Expense Claims are the actual and necessary costs and expenses of the Chapter 11 Cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  Such expenses include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases and tax obligations incurred after the Commencement Date.  Other Administrative Expense Claims include the actual, reasonable, and necessary professional fees and expenses of the advisors to the Debtors and Creditors' Committee that were incurred during the pendency of the Chapter 11 Cases.

(a)     Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than (i) a claim covered by Sections 2.2, 2.3 or 2.4 of the Plan, (ii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtors, as applicable, and the Office of the United States Trustee (the "U.S. Trustee"), notice of such Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date (i.e., 60 days after the Effective Date).  Such notice must include at a minimum (i) the name of the Debtor(s) that are purported to be liable for the Claim, (ii) the name of the holder of the Claim, (iii) the amount of the Claim, and (iv) the basis for the Claim.  **Failure to file and serve such notice timely and properly will result in the Administrative Expense Claim being forever barred and discharged.**

(b)     Allowance of Administrative Expense Claims.  An Administrative Expense Claim with respect to which notice has been properly filed and served pursuant to Section 2.1(a) of the Plan will become an Allowed Administrative Expense Claim if no objection is filed on or prior to the Administrative Expense Claims Objection Deadline.  If an objection is timely filed, the Administrative Expense Claim will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or as such Claim is settled, compromised, or otherwise resolved by the Debtors or Reorganized Debtors pursuant to Section 7.4 of the Plan.

(c)     Payment of Allowed Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a claim covered by Section 2.2, 2.3, or 2.4 of the Plan) agrees to a less favorable treatment, each Allowed Administrative Expense Claim (including any Allowed Claim asserted under section 503(b)(9) of the Bankruptcy Code) will be paid by the Reorganized Debtors in full, in Cash, in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as

reasonably practicable following the later to occur of (i) the Effective Date or (ii) the date on which such Administrative Expense Claim becomes an Allowed Claim; provided, however, that Allowed Administrative Expense Claims (other than a claim covered by Section 2.2, 2.3 or 2.4 of the Plan) against any of the Debtors representing liabilities incurred in the ordinary course of business by any of the Debtors, as Debtors in Possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as Debtors in Possession, whether or not incurred in the ordinary course of business, will be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

### 2. Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are Administrative Expense Claims of professionals seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328 and 330 of the Bankruptcy Code.

In the Confirmation Order, the Bankruptcy Court will fix a deadline to file, and set a hearing date to consider, all applications for allowance of Administrative Expense Claims for professional services rendered and expenses incurred through and including the Confirmation Date. Each holder of such a Claim will be paid in Cash in the amount of its Allowed Administrative Expense Claim as soon as practicable following the later of (i) the Effective Date or (ii) the date which such Claim is Allowed. The Debtors are authorized to pay professionals compensation for services rendered and reimburse expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

### 3. Indenture Trustee Fee Claims

Indenture Trustee Fee Claims are Administrative Expense Claims of the Indenture Trustee for reimbursement of its reasonable accrued and unpaid fees and expenses under the Indenture, including any reasonable fees and expenses of its legal counsel. The Indenture grants the Indenture Trustee a lien (the "Charging Lien") upon and priority in payment with respect to any distributions to holders of the Senior Subordinated Note Claims for payment of any Indenture Trustee Fees Claims arising prior to the Effective Date.

Notwithstanding any provision contained in the Plan to the contrary, unless otherwise agreed to by the Indenture Trustee and Reorganized LPC, all Indenture Trustee Fee Claims that are allowed by the Bankruptcy Court upon notice and a hearing will be paid in Cash on the Effective Date as Administrative Expense Claims; provided, however, that the Indenture Trustee must file a request for payment of Indenture Trustee Fee Claims, along with a detailed breakdown of all fees and expenses sought, at least seventeen (17) days prior to the Confirmation Hearing, any objection thereto shall be filed ten (10) days before the Confirmation Hearing, and such request will be determined by the Bankruptcy Court pursuant to the Indenture and applicable law at the Confirmation Hearing. Notwithstanding the foregoing, any fees of the

Indenture Trustee for services related to distributions pursuant to the Plan will be paid by the Reorganized LPC after the Effective Date in the ordinary course of business in Cash without the need for an application to, or approval of, any court. Nothing in the Plan is deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by Reorganized LPC and otherwise claimed by the Indenture Trustee. Nothing in the Plan prejudices any party's right regarding the jurisdiction of the Bankruptcy Court.

### 4. Debtor in Possession Loan Claims

DIP Loan Claims are all Claims arising under the DIP Note and the DIP Financing Order with respect to the DIP Note. As consented to by the DIP Lenders, holders of the DIP Loan Claims will receive, in full satisfaction thereof, (i) 400,000 shares of New LPC Common Stock, and (ii) on or as soon as reasonably practicable following the Effective Date, payment in Cash of all accrued and unpaid interest through the Effective Date.

### 5. Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Each holder of an Allowed Priority Tax Claim will receive, at the Debtors' or the Reorganized Debtors' option, (i) Cash in the amount of its Allowed Priority Tax Claim on or as soon as practicable following the later of (a) the Effective Date and (b) the date such Claim is Allowed; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Priority Tax Claim, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (a) the Effective Date or (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

### 6. Intercompany Claims

Notwithstanding anything to the contrary in the Plan, on the Effective Date, Intercompany Claims will be reinstated and treated in the ordinary course of business.

### B. Classification and Treatment of Classified Claims and Interests

Pursuant to the Plan, there are a total of 19 Classes, with Classes 1 through 12 being Claims against or Interests in LPC and Classes 13 through 19 being Claims against or Interests in LRGI.

Unless indicated otherwise, all distributions will be in full satisfaction of each Allowed Claim or Interest and will be made as soon as reasonably practicable after the later of (i) the Effective Date or (ii) in the case of a Claim, the date such Claim is Allowed. Further, claimholders can generally agree to receive less favorable treatment than the treatment provided

for by the Plan.  Unless otherwise indicated, the Debtors have based the characteristics of the Claims or Interests on the Debtors' books and records.

### 1. Claims against and Interests in LPC

#### a. Class 1 – Other Priority Claims against LPC (Unimpaired)

Class 1 Claims are Claims against LPC of a type identified in section 507(a) of the Bankruptcy Code as being entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LPC will receive Cash in the amount of its Allowed Other Priority Claims against LPC.  Because Class 1 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

#### b. Class 2(a) – CapitalSource Secured Claims against LPC (Impaired)

Class 2(a) Claims are all Claims against LPC arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.   The Allowed CapitalSource Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Revolver Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CapitalSource Credit Agreement.  The  CapitalSource Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LPC will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000.  An Amended and Restated Secured CapitalSource Credit Agreement is attached as **Exhibit 1.7** to the Plan and a summary thereof is attached as **Exhibit H** hereto. Because Class 2(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LPC are entitled to vote to accept or reject the Plan.

### c.    Class 2(b) – CSE Secured Claims against LPC (Impaired)

Class 2(b) Claims are all Claims against LPC arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Allowed CSE Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Term Loan Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CSE Loan Agreement.  The CSE Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CSE Secured Claim against LPC will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders, $375,000. An Amended and Restated Secured CSE Loan Agreement is attached as **Exhibit 1.9** to the Plan and a summary thereof is attached as **Exhibit I** hereto.  Because Class 2(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LPC are entitled to vote to accept or reject the Plan.

### d.    Class 3 – Secured Tax Claims against LPC (Unimpaired)

Class 3 Claims are Claims against LPC that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LPC will receive, at the Debtors' election, either:  (i) Cash in the amount of its Allowed Secured Tax Claim against LPC; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LPC, with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LPC deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim against LPC.  Because Class 3 Claims are not impaired pursuant to the Plan, holders

of Secured Tax Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### e.    *Class 4 – Other Secured Claims against LPC (Unimpaired)*

Class 4 Claims are all Secured Claims against LPC other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claims against LPC that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LPC or Reorganized LPC, the Debtors may (i) reinstate any Other Secured Claim against LPC or (ii) distribute to each holder of an Allowed Other Secured Claim against LPC (w) Cash in the amount of such Claim, (x) the sale or disposition of proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim will be deemed released. Because Class 4 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### f.    *Class 5 – Senior Subordinated Note Claims (Impaired)*

Class 5 Claims are all Claims against LPC arising under the Senior Subordinated Notes issued pursuant to that certain Indenture, dated December 18, 2003, between Wilmington Trust Company, as Indenture Trustee, and LPC, as issuer, for principal and accrued prepetition interest at a rate set forth in the Indenture.  For the avoidance of doubt, Senior Subordinated Note Claims exclude interest accruing from and after the Commencement Date.

As soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, each holder of an Allowed Senior Subordinated Note Claim will receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, Cash in the amount equal to the Cash-Out Percentage; provided, however, that in lieu of such distribution, such holder may instead elect to receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, a number of shares of New LPC Common Stock equal to (x) the product of the Allowed Senior Subordinated Note Claim and the Cash-Out Percentage (i.e., 51%), divided by (y) $10.00 (the "Class 5 Stock Election").  Because Class 5 Claims are impaired pursuant to the Plan, holders of Allowed Senior Subordinated Note Claims are entitled to vote to accept or reject the Plan.

### g.    *Class 6 – Junior Subordinated Note Claims (Impaired)*

Class 6 Claims are all Claims against LPC arising under the Junior Subordinated Note issued by LPC to Michael A. Lubin on December 13, 2003, which will include accrued and postpetition interest at 13% per annum.

As agreed to by the holder of the Junior Subordinated Note, the Junior Subordinated Note shall be cancelled. The Holder of Junior Subordinated Note Claims will not receive a distribution under the Plan and, accordingly, is deemed to have voted to reject the Plan.

### h. *Class 7 – General Unsecured Claims against LPC (Impaired)*

Class 7 Claims are all Unsecured Claims against LPC not classified in any other Class (i.e., Classes 5, 6, 8, or 9).

Each holder of an Allowed General Unsecured Claim against LPC will receive Cash payments in the aggregate amount of 85.4% of such claim as follows, (i) eight percent (8%) of its Allowed General Unsecured Claim against LPC will be paid in Cash as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed and (ii) an additional nine (9) equal quarterly Cash payments, each in an amount equal to eight and six-tenths percent (8.6%) of its Allowed General Unsecured Claim against LPC, commencing three (3) months after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in lieu of such distribution and in full satisfaction of its Claim, such holder may instead elect to receive a Cash payment in an amount equal to 51% of such Allowed Claim on the later of (x) the Effective Date or (y) the date such Claim becomes Allowed. This stream of payments has a net present value (using a discount rate of 6% per annum) of 80% of the Allowed Claims. Because Class 7 Claims are impaired pursuant to the Plan, holders of Allowed General Unsecured Claims against LPC are entitled to vote to accept or reject the Plan.

### i. *Class 8 – Convenience Claims against LPC (Unimpaired)*

Class 8 Claims comprise all Unsecured Claims against LPC that are (i) Allowed in the amount of $2,000.00 or less, or (ii) Allowed in a larger amount but reduced to $2,000 by the holder of such Claim.

As described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline. Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Claim against LPC will receive Cash in the amount of its Allowed Convenience Claim against LPC and, accordingly, Class 8 is not impaired. Because Class 8 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LPC are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### j. *Class 9 – Asbestos-Related Claims (Impaired)*

Class 9 Claims are any Asbestos-Related Claims, including Claims arising out of pending litigation against LPC before the Court of Common Pleas in Cuyahoga County, Ohio.

After the Effective Date, each Asbestos-Related Claim will be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; provided, however, that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, will promptly as possible after the Effective Date commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defenses. To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims will be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies).

To the extent the proceeds of the Asbestos Insurance Policies are not sufficient to cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors will pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim 80% of the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); provided, however, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim will receive (a) Cash in the amount of eight percent (8%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (b) an additional nine (9) equal quarterly Cash payments, each equal to eight and six-tenths percent (8.6%) of such Insurance Proceeds Deficiency, commencing three (3) months after the later of (i) the Effective Date and (ii) the date such Claim is Allowed. This stream of payments has a net present value (using a discount rate of 6% per annum) of 80% of such Insurance Proceeds Deficiency, as of the date such Claim becomes Allowed. In lieu of such stream of payments and in full satisfaction of its Claim, such holder may elect to receive a Cash payment in an amount equal to 51% of the Insurance Proceeds Deficiency on the later of (i) the Effective Date or (ii) the date such Claim becomes Allowed.

**Nothing in this Disclosure Statement or the Plan is an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or insurance coverage by Liberty Mutual or Fireman's Fund.**

### k.      Class 10 – Series B Preferred Stock Interests (Impaired)

Class 10 Interests are Interests in LPC arising from issued and outstanding shares of Lexington Precision $8 Cumulative Convertible Preferred Stock, Series B.

On the Effective Date, the Series B Preferred Stock Interests will be cancelled. Holders of Series B Preferred Stock Interests will not receive any distributions under the Plan and, accordingly, are deemed to have voted to reject the Plan.

### l.      Class 11 – LPC Common Stock Interests (Impaired)

Class 11 LPC Common Stock Interests are Interests of any holder of LPC Common Stock.

On the Effective Date, the LPC Common Stock will be cancelled.  Holders of LPC Common Stock Interests will not receive any distributions under the Plan and, accordingly, are deemed to have voted to reject the Plan.

### m.      Class 12 – Other Equity Interests in LPC (Impaired)

Class 12 Other Equity Interests are Interests of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests.

All Other Equity Interests will be cancelled.  Holders of Other Equity Interests will not receive any distributions on account of such Interests and, accordingly, are deemed to have voted to reject the Plan.

## 2.      Claims against and Interests in LRGI

### a.      Class 13 – Other Priority Claims against LRGI (Unimpaired)

Class 13 Claims are Claims against LRGI of a type identified in section 507(a) of the Bankruptcy Code as entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).

Each holder of an Allowed Other Priority Claim against LRGI will receive Cash in the amount equal to its Allowed Other Priority Claim against LRGI. Because Class 13 Claims are not impaired pursuant to the Plan, holders of Other Priority Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### b.      Class 14(a) – CapitalSource Secured Claims against LRGI (Impaired)

Class 14(a) Claims are all Claims against LRGI arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent under the Prepetition Credit Agreement and all lenders thereunder, for adequate protection arising under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order.  The Allowed CapitalSource Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition

Revolver Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CapitalSource Credit Agreement. The CapitalSource Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CapitalSource Secured Claim against LRGI will receive payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000. An Amended and Restated Secured CapitalSource Credit Agreement is attached as **Exhibit 1.7** to the Plan and a summary thereof is attached as **Exhibit H** hereto. Because Class 14(a) Claims are impaired pursuant to the Plan, holders of CapitalSource Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### c.      *Class 14(b) – CSE Secured Claims against LRGI (Impaired)*

Class 14(b) Claims are all Claims against LRGI arising under the Prepetition Loan Agreement and all Claims of CSE, as agent under the Prepetition Loan Agreement and all lenders thereunder, for adequate protection under the Final Cash Collateral Order less all payments made subsequent to the Commencement Date in respect of and Claims under the Final Cash Collateral Order. The Allowed CSE Secured Claim is comprised of outstanding principal amounts as well as the capitalization of certain Prepetition Term Loan Lender fees and expenses, including a success fee, which are described in more detail in the Amended and Restated Secured CSE Loan Agreement. The CSE Secured Claim will be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

Each holder of an Allowed CSE Secured Claim against LRGI will receive payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, will be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders,

$375,000.  An Amended and Restated Secured CSE Loan Agreement is attached as **Exhibit 1.9** to the Plan and a summary thereof is attached as **Exhibit I** hereto.  Because Class 14(b) Claims are impaired pursuant to the Plan, holders of CSE Secured Claims against LRGI are entitled to vote to accept or reject the Plan.

### d.    *Class 15 – Secured Tax Claims against LRGI (Unimpaired)*

Class 15 Claims are Claims against LRGI that, absent their status as Secured Claims, would be entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, and includes any interest on such Secured Tax Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Each holder of an Allowed Secured Tax Claim against LRGI will receive, at the Debtors' election, either: (i) Cash in the amount of its Allowed Secured Tax Claim against LRGI; (ii) equal semi-annual Cash payments in the aggregate amount of its Allowed Secured Tax Claim against LRGI with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (iii) such other treatment as will be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim against LRGI deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Claim against LRGI.  Because Class 15 Claims are not impaired pursuant to the Plan, holders of Secured Tax Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### e.    *Class 16 – Other Secured Claims against LRGI (Unimpaired)*

Class 16 Claims are all Secured Claims against LRGI other than CapitalSource Secured Claims, CSE Secured Claims, and Secured Tax Claims and includes any interest on such Other Secured Claim against LRGI that is required to be paid pursuant to section 506(b) of the Bankruptcy Code.

At the option of LRGI or Reorganized LRGI, the Debtors may (i) reinstate any Other Secured Claim against LRGI or (ii) distribute to each holder of an Allowed Other Secured Claim against LRGI (w) Cash in the amount of such Claim, (x) the sale or disposition proceeds of the Collateral securing such Claim, including any interest to be paid pursuant to section 506(b) of the Bankruptcy Code, up to the value of the holder's security interest, (y) the Collateral securing such Claim and any interest on such Claim to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event the Debtors elect to treat the Claim under clauses (w) or (x) of this Section, the Liens securing such Claim will be deemed released. Because Class 16 Claims are not impaired pursuant to the Plan, holders of Other Secured Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

### f.    Class 17 – General Unsecured Claims against LRGI (Impaired)

Class 17 Claims are all Unsecured Claims against LRGI not classified in Class 18.

If Class 17 accepts the Plan, each holder of an Allowed General Unsecured Claim against LRGI will receive Cash payments in the aggregate amount of 106.75% of such Claim (which includes interest from the Commencement Date through the date of last payment) as follows, (a) ten percent (10%) of the sum of (i) its Allowed General Unsecured Claim against LRGI and (ii) postpetition interest from the Commencement Date through and including the Effective Date, calculated at the federal judgment rate, in Cash as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed and (b) an additional nine (9) equal quarterly Cash payments, each in an amount equal to ten and three quarters percent (10.75%) of the sum of (i) its Allowed General Unsecured Claim, and (ii) postpetition interest from the Commencement Date through and including the Effective Date, calculated at the federal judgment rate, commencing three (3) months after the later of the Effective Date and the date such Claim is Allowed.  The Plan does not contain any protective covenants for the treatment of the Class 17 Claims.

If Class 17 does not accept the Plan, each holder of an Allowed General Unsecured Claim against LRGI will receive the following stream of Cash payments:  (a) an initial Cash payment, payable as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, equal to ten percent (10%) of the sum of (i) its Allowed General Unsecured Claim against LRGI and (ii) postpetition interest from the Commencement Date through and including the Effective Date at the rate determined by the Bankruptcy Court and (b) an additional nine (9) quarterly payments, each in an amount determined by the Bankruptcy Court to be adequate to satisfy in full Allowed General Unsecured Claims against LRGI.

Attached hereto as **Exhibits J** and **K** are letters from the Debtors and the Creditors' Committee to holders of Claims in Class 17.

In either case, each holder may instead elect to receive Cash in an amount equal to 51% of the sum of (i) its Allowed General Unsecured Claim and (ii) postpetition interest from the Commencement Date through and including the Effective Date at the federal judgment rate on the later of (x) the Effective Date and (y) the date such Claim becomes Allowed (the "Class 17 Cash Election").

Because Class 17 Claims are impaired pursuant to the Plan, holders of General Unsecured Claim against LRGI are entitled to vote to accept or reject the Plan.

### g.    Class 18 – Convenience Claims against LRGI (Unimpaired)

Class 18 Claims comprise all Unsecured Claims against LRGI that are (i) Allowed in the amount of $2,000.00 or less, or (ii) Allowed in a larger amount but reduced to $2,000.00 by the holder of such Claim.

As described in greater detail in the Disclosure Statement Order, any holder of an Unsecured Claim that elects to reduce the amount of such Claim to $2,000.00 or less must elect to reduce its Claim on its ballot and return the ballot to the Voting Agent before the Voting Deadline. Any holder of an Unsecured Claim electing to reduce its Claim does not need to vote to accept the Plan to exercise its election.

Each holder of an Allowed Convenience Class Claim will receive Cash in the amount of its Allowed Convenience Claim against LRGI plus interest on such Allowed Convenience Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate or such other rate as the Bankruptcy Court may determine. Because Class 18 Claims are not impaired pursuant to the Plan, holders of Convenience Claims against LRGI are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

**h.     Class 19 – Interests in LRGI (Unimpaired)**

Class 19 Equity Interests are all Interests in LRGI, all of which are owned by LPC. All the Interests in LRGI will be unaltered. Because Class 19 Equity Interests are not impaired pursuant to the Plan, the holder of Interests in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

**C.     Distributions Pursuant to the Plan**

**1.     Distributions**

A Disbursing Agent will make all distributions under the Plan. For all distributions except those made with respect to Allowed Senior Subordinated Notes, Reorganized LPC or its designated agent will be the Disbursing Agent. For distributions made with respect to Allowed Senior Subordinated Notes, the Indenture Trustee, or such other entity as designated by the Debtors, will be the Disbursing Agent.

With respect to Claims, the Disbursement Record Date is three (3) days after the Confirmation Date, at which time the claims registry will be closed. The Disbursing Agent will make distributions to all parties listed in the claims registry as of the Disbursement Record Date based upon the last known address of each party as reflected in the Debtors' schedules, books and records, or in any proofs of claim filed. Any Cash distribution will be made by check or wire transfer or as otherwise provided by any applicable agreements.

No Cash distributions under $50 will be made unless the holder sends a written request to the Disbursing Agent. No fractional shares of New LPC Common Stock will be distributed under the Plan. If an Allowed Claim results in distribution of a number of shares that is not a whole number, the number of share will be rounded up to the next whole number if the fraction is one-half (½) or greater and rounded down to the next lower whole number if the fraction is less than one-half (½).

In the event a distribution is returned or is otherwise undeliverable, the Disbursing Agent will use reasonable efforts to locate the holder. If the distribution remains undeliverable

one year after the Effective Date, the distribution will revert back to respective Reorganized Debtor.

The Debtors may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Debtors will not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement or the Final Cash Collateral Order.

## 2.     Surrender or Transfer of the Senior Subordinated Notes

Unless this requirement is waived by LPC or Reorganized LPC, in order to receive any distribution, holders of the Senior Subordinated Notes Claims must surrender or, if the notes are held in the name of, or by a nominee of, the Depository Trust Company, make a book-entry transfer of their Senior Subordinated Notes to the Indenture Trustee, unless the Indenture Trustee is reasonably satisfied that the note was lost, stolen, or otherwise destroyed.  If a note is lost, stolen, or otherwise destroyed, the Indenture Trustee may require the holder to (i) submit a lost instrument affidavit and post an indemnity bond, and (ii) hold the Debtors and the Indenture Trustee harmless with respect to any distributions made on any Claims arising from the lost, stolen, or otherwise destroyed note.

If a holder of a Senior Subordinated Note Claim fails to comply with these requirements, as outlined in the preceding paragraph and in Section 5.2(b) of the Plan, within one year of the Effective Date, such holder will be deemed to have no further Claim against the Debtors or their property and will not receive any distributions.

## 3.     Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, including any party described in Section 6.5 of the Plan, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

## D.    Implementation of the Plan and Related Documents

### 1.    Restructuring Transactions

On or after the Effective Date, the applicable Debtors and/or the Reorganized Debtors, with the prior written consent of the Plan Investor, may enter into the Restructuring Transactions set forth in the Restructuring Transactions Notice and may take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors.  The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, or transfers as may be determined by the Debtors with the consent of the Plan Investor to be necessary or appropriate.

The form of each Restructuring Transaction will have to be acceptable to the Plan Investor.  In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each Reorganized Debtor under the Plan.

Implementation of the Restructuring Transactions, if any, will not affect distributions under the Plan.  Moreover, the requirements of the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will apply to any Restructuring Transaction to be entered into by the Debtors or the Reorganized Debtors.

### 2.    Cancellation of Documents, Agreements, and Debt Instruments

As noted in Sections V.A and V.B of this Disclosure Statement, except with respect to Interests in LRGI, Cash payments or other consideration will be distributed pursuant to the Plan in satisfaction of all Claims and Interests and any document, agreement, or debt instrument evidencing any Claim or Interest will be automatically cancelled or superseded, as applicable, upon the Effective Date without any requirement for any further act or action. Affected documents include, but are not limited to, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture, the Senior Subordinated Notes, the Junior Subordinated Note, the Series B Preferred Stock Interests, and shares of LPC Common Stock.

### 3.    Charter Amendment

On the Effective Date or as soon as practicable thereafter, Reorganized LPC will file an amendment to LPC's certificate of incorporation (the "Charter Amendment") with the Secretary of State of the State of Delaware.  The Charter Amendment will amend LPC's certificate of incorporation in order to, among other things, issue the New LPC Common Stock.

The Plan authorizes LPC to file the Charter Amendment without any further corporate action or any action by holders of Claims or Interests.

A copy of the Charter Amendment will be included in the Plan Supplement. As described in Section V.N, the Plan Supplement will be filed at least ten (10) days prior to the Voting Deadline.

### 4. Stock Purchase Agreement

Pursuant to Section 5.5 of the Plan, Reorganized LPC will be authorized to enter into a Stock Purchase Agreement, substantially in the form of **Exhibit 1.91** of the Plan, and to issue the shares of New LPC Common Stock contemplated thereunder without any further corporate action and without any further action by holders of Claims or Interests. Each holder of an Allowed Claim or Interest shall be required to execute and be bound by the Securityholders Agreement as a condition precedent to receiving its allocation of New LPC Common Stock. From and after the Effective Date, the Plan Investor or its designee will be entitled to receive a management fee, customary for sponsored deals of this size and type, in exchange for agreed management services to be provided to Reorganized LPC.

### 5. The Amended and Restated Secured CapitalSource Credit Agreement

On the Effective Date, the Debtors will be parties to a secured credit facility pursuant to the terms of the Amended and Restated Secured CapitalSource Credit Agreement attached as **Exhibit 1.7** to the Plan. The obligations under the Amended and Restated Secured CapitalSource Credit Agreement will have the same security package and ranking as the loans under the Prepetition Credit Agreement.

### 6. The Amended and Restated Secured CSE Loan Agreement

On the Effective Date, the Debtors will be parties to a secured credit facility pursuant to the terms of the Amended and Restated Secured CSE Loan Agreement attached as **Exhibit 1.9** to the Plan. The obligations under the Amended and Restated Secured CSE Loan Agreement will have the same security package and ranking as the loans under the Prepetition Loan Agreement.

### 7. Corporate Action, Effectuating Documents, and Further Transactions

Prior to, on or after the Effective Date, and pursuant to the Plan, the applicable Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors, which may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Plan Investor to be necessary or appropriate, which includes any Restructuring Transactions.

On the Effective Date, all matters provided for under the Plan that would otherwise require the approval of stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment; the authorization and issuance of the New LPC Common Stock; any change in the size of the Boards of Directors of the Reorganized Debtors; and any removal, election or appointment, as the case may be, of directors and officers of the Reorganized Debtors) will be deemed to have been

approved and such approval will be in effect from and after the Effective Date pursuant to the applicable General Corporation Law of the State of Delaware, without the necessity for any further acts by the stockholders or directors of the Debtors or the Reorganized Debtors.

Upon confirmation of the Plan, the Reorganized Debtors will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities to be issued pursuant to the Plan.

## 8.     Issuance of New LPC Common Stock

Pursuant to Section 5.6 of the Plan, Reorganized LPC will be authorized to issue the New LPC Common Stock on, or as soon as reasonably practicable after, the Effective Date without the need for any further corporate action and without any further action by holders of Claims or Interests. Newly issued shares of New LPC Common Stock will be distributed to holders of Allowed Senior Subordinated Note Claims pursuant to Section 4.6 of the Plan, distributed to holders of the DIP Loan Claim pursuant to Section 2.4 of the Plan, and purchased by the Plan Investor pursuant to the Stock Purchase Agreement.

The shares of New LPC Common Stock to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim under the Plan will be issued pursuant to an exemption from registration provided by section 1145 of the Bankruptcy Code and the shares of New LPC Common Stock to be issued to the Plan Investor under the Plan will be issued pursuant to an exemption from registration provided by Section 4(2) of the Securities Act. The shares to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim will generally be freely tradable, subject to (a) any applicable restrictions of the federal and state securities laws, (b) the Securityholders Agreement, and (c) any applicable restrictions of the federal and state securities laws and the restrictions imposed on "underwriters" by section 1145 of the Bankruptcy Code (discussed in greater detail in Section VII.B.11 herein, titled "*Restrictions on Transfer*"). All of the shares of New LPC Common Stock to be issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable. Each distribution and issuance referred to in the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

In connection with the distribution of New LPC Common Stock to current or former employees of the Debtors, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New LPC Common Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

### 9. Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, the occurrence of any intercompany or other Restructuring Transaction, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New LPC Common Stock, the Amended and Restated Secured CapitalSource Credit Agreement, the Amended and Restated Secured CSE Loan Agreement, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax.

### E. Provisions for the Treatment of Disputed Claims

#### 1. Objections to Claims and Prosecution of Disputed Claims

Any Claim that is subject to an objection or is otherwise disputed, contingent, or unliquidated will not receive a distribution as provided under the Plan unless and until such Claim, or any portion thereof, is Allowed.

Only the Debtors or the Reorganized Debtors, as applicable, may object to a Claim. The Debtors may object to any Claim until the Effective Date and the Reorganized Debtors may object to any Claim from and after the Effective Date. Any objections to Claims will be served and filed with the Bankruptcy Court on or before the later of (i) the one-hundred twentieth (120th) day after the Effective Date, as such date may be extended by order of the Bankruptcy Court and (ii) a date to be fixed by the Bankruptcy Court.

#### 2. Resolution of Administrative Expense Claims and Other Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve, or withdraw any objections to any Claims, including any Administrative Expense Claims or Disputed Claims, other than Professional Compensation and Reimbursement Claims, without further order of the Bankruptcy Court.

#### 3. Claim Estimation

The Debtors and the Reorganized Debtors may request the Bankruptcy Court to estimate any Claim that is disputed, unliquidated, or contingent, regardless of whether the Claim

is subject to an objection. If the Bankruptcy Court estimates a Claim, the Bankruptcy Court may elect to estimate either the amount in which the Claim is Allowed or the amount of the Claim, in which case, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to disallow such Claim.

All the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4. Payment and Distribution on Disputed Claims

When a Disputed Claim is Allowed, the holder of such Claim will receive the distribution provided by the Plan to the extent such Claim is Allowed.

## F. Prosecution of Claims Held by the Debtors

From and after the Effective Date, the Reorganized Debtors will, as representatives of the Debtors' estates, litigate any claims or causes of action that constituted assets of the Debtors, including, without limitation, any avoidance or recovery actions under sections 541, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and any other causes of action, rights to payments of claims that may be pending on the Effective Date or other actions instituted by the Debtors.

## G. Executory Contracts and Unexpired Leases

### 1. Assumption of Executory Contracts and Unexpired Leases

As of the Effective Date, the Debtors will assume all executory contracts and unexpired leases to which the Debtors are a party, except for (i) any executory contract or lease that the Debtors previously assumed, assumed and assigned, or rejected pursuant to a Bankruptcy Court order, (ii) any executory contract or lease, with respect to which the Debtors served and filed before the Confirmation Date a motion to assume, assume and assign, or reject, or (iii) any executory contract or lease listed on Schedule 8.1 of the Plan Supplement.

The Debtors may amend Schedule 8.1 of the Plan Supplement at any time before the Confirmation Date. If the Debtors add an executory contract or lease to Schedule 8.1, the Debtors will provide notice to all counterparties.

Unless otherwise specified, the inclusion of any executory contract or lease on Schedule 8.1 will include any related documents such as amendments, restatements, modifications, supplements or any other document that may affect the underlying executory contract or lease, even if Schedule 8.1 does not include such documents. The inclusion of any executory contract or lease on Schedule 8.1 is not an admission that such document or any related documents is an executory contract or unexpired lease.

## 2.    Cure of Defaults

Prior to assuming any executory contract or unexpired lease, the Debtors must cure any monetary defaults and compensate counterparties for any non-monetary defaults.  At least twenty-one (21) days prior to the Confirmation Hearing, the Debtors will serve on all counterparties to executory contracts and unexpired leases a notice indicating a proposed cure amount for the respective contract or lease.  Counterparties will have twenty (20) days from the date of service to object to the proposed cure amount.  If any objection is filed, the Bankruptcy Court will hold a hearing to resolve such objection.

Notwithstanding Section 8.1 of the Plan and Section IV.F.1 of this Disclosure Statement, the Debtors reserve the right to reject any executory contract or lease if any objection is filed with respect to the cure amount.

## 3.    Rejection Damage Claims

If the Debtors reject an executory contract or lease, the counterparty must assert any Claim by filing a proof of claim with the Debtors' claim agents, Epiq Bankruptcy Solutions LLC, within 30 days following the later of (i) the date of service of the notice of the Effective Date, and (ii) the date of service of the notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such modification).  If the counterparty fails to file a proof of claim, the counterparty will be barred from asserting any Claim related to the rejection of the contract or lease in the future and will not receive any distribution under the Plan.

For more information regarding how to file a proof of claim, please refer to the bar date notice found at http://chapter 11.epiqsystems.com/lexington.

## 4.    Indemnification and Reimbursement of Directors and Officers

All the Debtors' obligations to indemnify and reimburse directors, officers, and employees who served in such positions on or before the Confirmation Date will survive confirmation of the Plan and remain unaffected thereby.

## 5.    Insurance Policies, Compensation and Benefit Programs, and Retiree Benefits

With the exception of any Insurance Policy, employee compensation program, or employee benefit program that is specifically rejected pursuant to a Bankruptcy Court order or listed on Schedule 8.7 of the Plan, the Plan will treat all Insurance Policies and employee compensation and benefit programs as executory contracts and the Debtors will assume all such policies and programs.

To the extent the Insurance Policies are determined not to be executory contracts, they will  remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for

purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory. The Plan will not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors will be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which will continue in full force and effect. Notwithstanding anything to the contrary contained in the Plan or the Disclosure Statement, to the extent that there is any inconsistency between the Insurance Policies and any provision of the Plan or Disclosure Statement, the terms of the Insurance Policies will control. No provision of the Plan will (i) expand or alter any insurance coverage under any of the Insurance Policies, or be deemed to create any insurance coverage that does not otherwise exist under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X thereof and anything supervening or preemptory, the Plan and Confirmation of the Plan will be without prejudice to any of the insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which the insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

The Reorganized Debtors will continue to pay all the Debtors' retiree benefits for the same duration for which the Debtors were obligated to provide such benefits.

## H.  Reservation of "Cram Down" Rights

Because Class 6 (Junior Subordinated Note Claims), Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Equity Interests in LPC) will not receive a distribution under the Plan and are deemed to have voted to reject the Plan, and in the event any other Class of Claims rejects the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. As described in Section VII.A.2, "*Non-Consensual Confirmation*" on page 81, the Debtors may confirm the Plan without the consent of all parties in interest.

## I.  Conditions Precedent to the Effective Date of the Plan

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions precedent are satisfied or waived: (i) a Confirmation Order, in form and substance acceptable to the Debtors, the Plan Investor, and the Agents will have been entered and will not be subject to any stay or injunction; provided, however, that the approval of the Agents to the form and substance of the Confirmation Order cannot not be unreasonably withheld; (ii) all actions, documents, and agreements that are necessary to implement the Plan, in

a form and substance acceptable to the Debtors, the Plan Investor, and the Agents, will have been completed and be effective; provided, however, that the approval of the Agents to the form and substance of such actions, documents, and agreements cannot not be unreasonably withheld; (iii) other than those conditions that by their nature can only be satisfied at the closing of the transactions contemplated by the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement, the conditions precedent to the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will have been satisfied or waived by the parties thereto and the Reorganized Debtors shall have access to the Cash contributed by the Plan Investor; and (iv) all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan, or that are required by law, regulation, or order, will have been received.

In their sole discretion, the Debtors may waive any of the aforementioned conditions precedent other than item (i) without Bankruptcy Court approval; provided, however, that the conditions set forth in (ii) and (iii) above that require approval of the Agents may only be waived by the Debtors with the consent of the applicable Agents, which consent shall not be unreasonably withheld. Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

If the conditions precedent are not satisfied on or prior to the ninetieth (90th) day after the Confirmation Order becomes a Final Order then, upon the Debtors' or the Agents' motion and after notice and a hearing, the Confirmation Order may be vacated, and, as a result, (i) no distributions under the Plan will be made, (ii) the Debtors and all holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iii) all of the Debtors' obligations with respect to the Claims and Interests will remain unchanged and nothing contained in the Plan will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

## J. **Effects of Confirmation**

Upon the Effective Date, all the Debtors' property will vest in the Reorganized Debtors free and clear of all liens, encumbrances, charges, and other interests, except as provided by the Plan, the Amended CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement. The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, as if no case was pending under any provision or chapter of the Bankruptcy Code.

1.      **Discharge of Claims and Termination of Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests**

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in and all existing debts and Claims, including any interest accrued on such debts or Claims from and after the Commencement Date, against the Debtors or any of their assets or properties.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Series B Preferred Stock Interests, all LPC Common Stock Interests, all Other Equity Interests, and all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests in the Debtors will be, and will be deemed to be, discharged and terminated, and all holders of Claims, Series B Preferred Stock Interests, LPC Common Stock Interests, and Other Equity Interests will be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim, Series B Preferred Stock Interest, LPC Common Stock Interests, or Other Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

2.      **Discharge of Debtors**

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim against or Interest in the Debtors.

3.      **Injunctions and Stays**

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized

Debtors with respect to any such Claim against or Interest in the Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim released pursuant to Article XII of the Plan. Such injunction will extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interests in properties.

Unless otherwise provided in the Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

4.      **Exculpation**

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, the DIP Lenders, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) will have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, this Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing will not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

5.      **Releases of Directors, Officers, and Employees**

**Subject to Section 10.11 of the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by the present and former directors, officers, and employees of the**

Debtors, the Debtors, the Reorganized Debtors, each holder of a Claim or Interest that votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan, will release, unconditionally and forever, each present or former director, officer, and employee from any and all claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such claim or equity prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; **provided**, **however**, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or entity.

6.    The Plan Investor Release

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, each holder of a Claim who receives a distribution under the Plan shall provide a full discharge and release, and each Entity so released shall be deemed released, to the Plan Investor and its affiliates and each of their respective directors, officers, employees, members, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents and representatives, each in their representative capacities as such, and their respective property from any and all causes of action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including, without limitation, those in any way related to the Chapter 11 Cases, this Disclosure Statement, or the Plan, **provided**, **however**, that the foregoing, the "**Plan Investor Release**" shall not operate to waive or release any causes of action (i) arising from any contractual obligations, (ii) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, or (iii) arising from Claims for fraud or willful misconduct.

7.    Other Releases

Subject to Section 10.11 of the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (i) the present and former affiliates, agents, financial advisors, attorneys, and representatives of the Debtors who acted in such capacities after the Commencement Date, (ii) the Plan Investor, (iii) the Creditors' Committee, (iv) the Agents,

**(v) the Prepetition Revolver Lenders, (vi) the Prepetition Term Loan Lenders, and (vii) the DIP Lenders, (a) the Debtors, (b) the Reorganized Debtors, (c) each holder of a Claim or Interest that votes to accept the Plan but does not elect to "opt-out," (d) each holder of a Claim or Interest that is deemed to accept the Plan, and (e) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan and that does not elect to "opt-out," will release, unconditionally and forever, each present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, the DIP Lenders, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, however, that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or _ultra vires_ acts of any such person or entity. For the avoidance of doubt, the claims and causes of actions released pursuant to Section 10.10 of the Plan include those claims and causes of action released under the Final Cash Collateral Order.**

It should be noted that under applicable non-bankruptcy law, the Debtors would either be vicariously liable for claims against the Debtors' directors, officers, and employees or required to indemnify such individuals from such claims given the Debtors' assumption of their indemnification obligations of their officers, directors, and employees under the Plan. When such claims indirectly affect a debtor's reorganization efforts, courts have found that releases of the type proposed in the Plan are justified. _In re Metromedia Fiber Network, Inc._, 416 F.3d 136, 142 (2d Cir. 2005); _Menard-Sanford v. Mabey_ (_In re A.H. Robbins Co._), 880 F.2d 694, 701 (4th Cir. 1989). Moreover, releases are justified if the plan of reorganization provides, as the Plan does, for full payment of claims or if creditors consent to such releases. _Metromedia_, 416 F3d at 142. All holders of Claims and Interest entitled to vote on the Plan may elect to opt out of the release provision of Section 10.10 of the Plan regardless of whether they choose to accept, reject, or not to vote on the Plan.

**8.      Limits on Releases and Exculpation**

**Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, the releases set forth in Sections 10.8, 10.9 and 10.10 of the Plan will not effect a release of any claim against a non-Debtor by the United States Government or any of its**

agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority. Nothing in Sections 10.8, 10.9 or 10.10 of the Plan nor the Confirmation Order will enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against a non-Debtor for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority. Other than as set forth in Section 10.7 of the Plan, nothing in the Plan or the Confirmation Order will exculpate any non-Debtor from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.**

**K.    Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released from and discharged of all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents, if any, will terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

**L.    Management of the Reorganized Debtors**

On the Effective Date, the management, control, and operation of the Reorganized Debtors will become the responsibility of the Boards of Directors of the Reorganized Debtors.

The initial Board of Directors will consist of seven (7) members each. The CEO, to be appointed by the Plan Investor, will be designated as one (1) board member, four (4) board members will be designated by the Plan Investor (provided, however, that one of the Plan Investor's designees shall be an "Independent Director," as defined in the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement), one (1) board member will be designated by the Affiliated Bondholders, and one (1) board member will be designated by the DIP Lenders. The Affiliated Bondholders' and the DIP Lenders' designations will each be subject to approval by the Plan Investor, with such approval to not be unreasonably withheld.

Each member of the initial Board of Directors will serve in accordance with the applicable non-bankruptcy law and the certificates of incorporation and by-laws of the Reorganized Debtors.

The Debtors anticipate that the officers of the Reorganized Debtors will be substantially the same as the Debtors' current officers. The Debtors anticipate that Mr. Michael A. Lubin will continue as Chairman of the Board, Mr. Warren Delano will continue as President

and Mr. Dennis J. Welhouse will continue as Chief Financial Officer. No later than ten (10) days prior to the last day by which holders of impaired Claims and Interests may vote to accept or reject the Plan, the Debtors will identify in the Plan Supplement all officers and all members of the Boards of Directors of Reorganized LPC and Reorganized LRGI.

## M.    Jurisdiction and Choice of Law

### 1.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 2.    Retention of Jurisdiction

The Bankruptcy Court will retain and have exclusive jurisdiction over, in addition to other matters specified in the Plan, any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Plan.

## N.    The Plan Supplement

A draft of the form of each of the Plan Documents to be entered into as of the Effective Date, which will include, among other things, the Charter Amendment, the form of the Stock Purchase Agreement, the Securityholders Agreement, and any other relevant documents that are necessary to allow a holder of Claims to make an informed decision will be contained in the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date on which the holders of Impaired Claims may vote to accept or reject the Plan.

Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents included in the Plan Supplement will be posted at http://chapter11.epiqsystems.com/lexington as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Plan must be received.

## O.    Modification, Revocation, or Withdrawal of the Plan

The Debtors reserve the rights to alter, amend, or modify the Plan at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors comply with section 1125 of the Bankruptcy Code.

After the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be

necessary to carry out the purposes and effects of the Plan so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Plan.

A holder of a Claim or Interest that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder. Notwithstanding anything to the contrary herein or in the Plan, the Plan will not be modified or amended to affect the treatment or amount of the CapitalSource Secured Claim or the CSE Secured Claim without the prior written consent of the Agents.

The Debtors may revoke or withdraw the Plan any time prior to the Effective Date. If the Debtors revoke or withdraw the Plan or the Plan does not otherwise become effective, the Plan will be deemed null and void. In such event, nothing contained herein will be deemed to constitute a waiver or release of any Claims by the Debtors or to prejudice in any manner the Debtors' rights in any further proceedings involving the Debtors.

## VI.

## FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

### A.      Selected Historical and Projected Financial Information

The following historical financial information is attached to this Disclosure Statement as **Exhibit C** and **Exhibit D**, respectively:

-      LPC's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 (attached without exhibits) (**Exhibit C**); and

-      LPC's Reports on Form 10-Q for the quarter ended September 30, 2009 (attached without exhibits) (**Exhibit D**);

The Projected Financial Statements are set forth in their entirety in **Exhibit F** hereto.

The table set forth below in this Section V(A) sets forth the following data:

(i)      Actual results of continuing operations for 2008;

(ii)      Projected results of continuing operations for 2009, 2010, 2011, and 2012; and

(iii)      Pro forma projected operating results of continuing operations for 2009, adjusted as if the reorganization had been effective as of December 31, 2009.

In preparing the Projected Financial Statements, the Debtors assumed that (i) aggregate unit sales in the automotive aftermarket of replacement components that are critical

to the operation an performance of the vehicle will grow at the rate of one percent (1%) per annum; (ii) aggregate unit sales of medical devices will grow at the rate of two percent (2%) per annum; and (iii) the aggregate level of production of new automobiles in North America will be as follows:

- 2009 8.6 million units

- 2010 10.5 million units

- 2011 12.1 million units

- 2012 13.5 million units

The level of demand in the Debtors' end-markets is subject to many factors outside the control of the Debtors, including interest rates, inflation rates, unemployment rates, consumer spending, war, and terrorism. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.

EBITDA is not a measure of performance under GAAP and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. The Debtors have presented EBITDA here and elsewhere in this Disclosure Statement because management uses EBITDA as a supplemental measure to evaluate the operating performance of the Debtors' business and believes that it provides a useful measure for comparing period to period performance among their business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items, and because certain financial covenants in the Debtors' senior, secured credit agreements have been and will, in the future, be calculated using variations of EBITDA. Nevertheless, EBITDA has material limitations when used as a measurement of performance, including the following:

(ii)     EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to the Debtors, and accruals for interest expense represent an obligation to pay cash interest in the future.

(iii)    EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to the Debtors, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

(iv)    EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the consumption, over a projected period, of assets that produce revenue. EBITDA also does not reflect the capital expenditures required for the replacement of these depreciated assets.

(v)     EBITDA does not reflect reorganization items, which represent revenues, expenses, realized gains and losses, and provisions for losses that can be

directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to the Debtors, either currently or in the future.

(vi)    EBITDA does not reflect cash provided or used as a result of changes in the Debtors' working capital.

(vii)    The Debtors' definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in the industries in which the Debtors operate.  As the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases.  The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements governing the Prepetition Credit Agreement and the Prepetition Loan Agreement.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP. In particular, the Debtors monitor income from operations, both in dollars and as a percentage of net sales.

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**
**Consolidated Selected Financial Data – Continuing Operations Only**
**(in thousands of dollars)**

| | 2008 Actual | 2009 Estimate | 2009 Pro Forma | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Net sales | 73,029 | 61,567 | 61,160 | 73,276 | 92,285 | 104,098 |
| Income from operations | 3,237 | 1,058 | 7,335 | 9,841 | 16,909 | 21,001 |
| Other income (expense): | | | | | | |
| Interest expense | (8,726) | (7,649) | (7,649) | (2,450) | (2,283) | (1,689) |
| Interest income | 17 | 50 | 50 | 104 | 260 | 300 |
| Gain on sale of property and other | - | 199 | 199 | 181 | 2,308 | 260 |
| Reorganization expense | (4,657) | (4,338) | (4,338) | (5,312) | – | – |
| Cancellation of debt income | – | – | – | 31,168 | – | – |
| Total | (13,366) | (11,738) | (11,738) | 23,691 | 285 | (1,129) |
| Income (loss) before income taxes | (10,129) | (10,680) | (4,403) | 33,532 | 17,194 | 19,872 |
| Income taxes | 35 | 25 | 25 | 2,500 | 5,500 | 6,200 |
| Income (loss) from continuing operations | (10,164) | (10,705) | (4,428) | 31,032 | 11,694 | 13,672 |
| Add back (deduct): | | | | | | |
| Interest expense | 8,726 | 7,649 | 7,649 | 2,450 | 2,283 | 1,689 |
| Interest income | (17) | (50) | (50) | (104) | (260) | (300) |
| Income tax provision | 35 | 25 | 25 | 2,500 | 5,500 | 6,200 |
| Depreciation and amortization | 5,333 | 4,698 | 3,501 | 3,961 | 3,425 | 3,499 |
| Gain on sale of property | - | (199) | (199) | (181) | (2,308) | (260) |
| Reorganization expense | 4,657 | 4,338 | 4,338 | 5,312 | – | – |
| Cancellation of debt income | – | – | – | 31,168 | – | – |
| EBITDA | 8,570 | 5,756 | 10,836 | 13,802 | 20,334 | 24,500 |
| Capital expenditures | 2,695 | 1,774 | 1,774 | 3,370 | 3,710 | 3,210 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

**Consolidated Selected Financial Data – Continuing Operations Only**
**(in thousands of dollars)**

|  | 2008 Actual | 2009 Estimate | Projected | | |
|  |  |  | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Current assets | 25,402 | 21,860 | 26,324 | 31,228 | 40,261 |
| Current liabilities | 99,324 | 103,046 | 14,427 | 16,560 | 23,196 |
| Net working capital | (73,922) | (81,186) | 11,897 | 14,668 | 17,065 |
| Total assets | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |
| Senior debt | 34,175 | 30,942 | 26,724 | 17,919 | 11,954 |
| Total debt | 86,539 | 70,352 | 29,614 | 19,157 | 11,954 |
| EBITDA/ interest expense | 1.0X | 0.75X | 5.63X | 8.9X | 14.5X |
| Senior debt/EBITDA | 4.0X | 5.4X | 1.9X | 0.9X | 0.5X |
| Total debt/EBITDA | 10.1X | 12.2X | 2.1X | 0.9X | 0.5X |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Selected Financial Data – Continuing Operations Only**
**(in thousands of dollars)**

| | 2008 Actual | 2009 Estimate | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| | | | Projected | | |
| Net sales | | | | | |
| Rubber Group | 62,278 | 51,261 | 58,173 | 70,653 | 79,748 |
| Metals Group | 10,751 | 10,306 | 15,103 | 21,632 | 24,350 |
| Total | 73,029 | 61,567 | 73,276 | 92,285 | 104,098 |
| | | | | | |
| Income (loss) from operations: | | | | | |
| Rubber Group | 6,696 | 4,022 | 10,724 | 16,465 | 20,276 |
| Metals Group | (741) | (727) | 1,110 | 2,436 | 2,777 |
| | 5,955 | 3,295 | 11,834 | 18,901 | 23,053 |
| Corporate office | (2,718) | (2,237) | (1,993) | (1,992) | (2,052) |
| Total | 3,237 | 1,058 | 9,841 | 16,909 | 21,001 |
| | | | | | |
| Depreciation and amortization: | | | | | |
| Rubber Group | 4,746 | 4,195 | 3,441 | 2,833 | 2,813 |
| Metals Group | 536 | 452 | 464 | 586 | 680 |
| | 5,282 | 4,647 | 3,905 | 3,419 | 3,493 |
| Corporate office | 51 | 51 | 56 | 6 | 6 |
| Total | 5,333 | 4,698 | 3,961 | 3,425 | 3,499 |
| | | | | | |
| EBITDA: | | | | | |
| Rubber Group | 11,442 | 8,217 | 14,165 | 19,298 | 23,089 |
| Metals Group | (205) | (275) | 1,574 | 3,022 | 3,457 |
| | 11,237 | 7,942 | 15,739 | 22,320 | 26,546 |
| Corporate office | (2,667) | (2,186) | (1,937) | (1,986) | (2,046) |
| Total | 8,570 | 5,576 | 13,802 | 20,334 | 24,500 |

## B.    Valuation of the Reorganized Debtors

During the course of the Chapter 11 Cases, the Debtors have been advised by Campbell, their financial advisor and investment banker, with respect to the estimated enterprise value of the Debtors.  In preparing its estimates of the Debtors' enterprise value, Campbell utilized a number of well-established valuation methodologies, including discounted cash flow, comparable publicly-traded companies, comparable M&A transactions, and sum-of-the-parts, which resulted in enterprise values equal to or greater than the aggregate indebtedness of the Debtors.  Notwithstanding these analytical valuations, the Plan is premised on a lower enterprise value that is based upon the proposed investment by the Plan Investor.  The Debtors believe that a market-based valuation approach is appropriate under the circumstances because (a) in order to exit chapter 11, the Debtors required (and continue to require) additional capital because of the state of the economy and the conditions in the current credit markets, (b) the process through which the Plan Investor was identified, under the direction of Campbell, was open and exposed the Debtors' business to a substantial number of investors who were likely to consider such an investment, and (c) after the completion of that process, the transaction negotiated with the Plan Investor provided the highest and best value for the Debtors.

Pursuant to the Stock Purchase Agreement, the Plan Investor will purchase New LPC Common Stock at a purchase price of $10.00 per share (with the aggregate number of New LPC Common Stock purchased by the Plan Investor depending on the number of Claims that make the Class 5 Stock Election).  The Debtors project, assuming that none of the holders of Allowed Claims in Classes 7 and 17 choose the respective cash elections, that immediately following the Effective Date, there will be outstanding approximately 3.591 million shares of New LPC Common Stock, valued at $10.00 per share, and $33.0 million of aggregate indebtedness for money borrowed, and the Debtors will hold approximately $6.8 million in cash. Based upon this projection, the Debtors' implied enterprise value is approximately $62.1 million, calculated as followed (in millions of dollars):

| | |
|---|---|
| New LPC Common Stock (3.59 million shares at $10.00 per share) | $35.9 |
| | |
| Indebtedness for money borrowed | 33.0 |
| Cash on hand | (6.8) |
| Net indebtedness | 26.2 |
| | |
| Implied enterprise value | $62.1 |


# VII.

# CERTAIN FACTORS TO BE CONSIDERED

## A.    Certain Risk Factors Relating to Confirmation of the Plan

### 1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2.    Non-Consensual Confirmation

Because Class 6 (Junior Subordinated Note Claims), Class 10 (Series B Preferred Security Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Security Interests) are deemed to reject the Plan, and in the event that any other impaired Class of Claims does not accept the Plan, the Debtors intend to seek confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code, whereby the Bankruptcy Court may confirm the Plan if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.

The Debtors believe that the Plan satisfies these requirements. For more information on this topic, please refer to Section XI.B, "*General Requirements for Confirmation*" on page 104.

### 3. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. If each of the conditions precedent to the occurrence of the Effective Date has not been satisfied or duly waived on or before the 120th day after entry of the Confirmation Order, the Bankruptcy Court may, upon the Debtors' motion, vacate the Confirmation Order, in which event the Plan would be deemed null and void.

### 4. Stock Purchase Agreement, Amended and Restated Secured CapitalSource Credit Agreement, and Amended and Restated Secured CSE Loan Agreement As Conditions Precedent to the Confirmation of the Plan

The Plan Investor has agreed to enter into the Stock Purchase Agreement and has agreed to invest at least $22 million through the purchase of Senior Subordinated Notes and New LPC Common Stock as provided therein. However, the Stock Purchase Agreement is subject to a number of conditions precedent that must be satisfied or waived by the parties thereto.

The Prepetition Secured Lenders have agreed to accept the treatment provided under the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement, as applicable, both of which contain a number of conditions precedent that must be satisfied or waived by the parties thereto.

If any of the closing conditions in the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement is not satisfied or waived, the Debtors will not be able to meet a condition precedent for confirmation of the Plan. The Debtors can provide no assurance that the closing conditions in the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement will be satisfied or, if not satisfied, waived by the parties thereto.

### B. Additional Factors to be Considered

### 1. The Debtors Have No Duty to Update

Absent a Bankruptcy Court order to the contrary, the Debtors have no duty to update this Disclosure Statement or the attachments hereto. Unless otherwise specified, all statements contained herein and in the attachments hereto are made as of February 28, 2010. Delivery or receipt of this Disclosure Statement after February 28, 2010 does not imply that no changes have occurred in the information contained herein and in the attachments hereto since February 28, 2010.

2. **No Representations Outside This Disclosure Statement Are Authorized**

The Bankruptcy Court has not authorized any representations concerning or related to the Debtors, these Chapter 11 Cases, or the Plan, other than representations made in this Disclosure Statement, the attachments hereto, and the other solicitation materials from the Debtors that are included with this Disclosure Statement. In arriving at your decision to vote to accept or reject the Plan, you should not rely upon any representations that are not contained herein or included with this Disclosure Statement.

3. **Projections and Other Forward Looking Statements Are Not Assured, and Actual Results Will Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may differ materially from actual future events. Because uncertainties exist with respect to any projection, assumption, or estimate, you should not consider any projection, assumption, or estimate to be an assurance or guarantee of actual results.

4. **This Disclosure Statement Is Not Legal or Tax Advice**

This Disclosure Statement is <u>not</u> legal, business, or tax advice. You should not construe the contents of this Disclosure Statement as such. Please consult your own legal counsel or accountant, as appropriate, as to any legal, tax and other matters concerning your Claim or Interest.

Please do not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Plan or whether to object to confirmation of the Plan.

5. **No Admission Made**

Nothing contained herein will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

6. **Business Factors and Competitive Conditions**

a. *Competitive Conditions*

In addition to uncertain economic and business conditions, as discussed in Section VI.A. above, the Reorganized Debtors will face competition for business from existing and possibly new competitors. Such competition may affect the overall operating performance of the Reorganized Debtors.

b. *Customers*

The Debtors believe that the majority of their customer relationships are strong, however, the loss of a significant customer could have a material adverse impact on operating performance.

### 7. Access to Financing and Trade Terms

The Reorganized Debtors' operations will depend on, among other things, access to working capital through operating cash flow and the availability of customary trade terms from their supplies. While the Debtors believe that projected operating cash flow and improved trade credit will provide adequate cash to finance the operations of the Reorganized Debtors, the Reorganized Debtors may nonetheless require greater funding. No assurance can be given that additional financing will be available on terms favorable or acceptable to the Reorganized Debtors. If the Reorganized Debtors meet their projected cash flows, the Debtors believe that their suppliers will continue to provide customary terms; however, no assurances can be given.

### 8. Variances from the Projected Financial Statements

The fundamental premise of the Plan is the deleveraging of the Debtors and the implementation and realization of the Debtors' business plan, as reflected in the Projected Financial Statements. The Projected Financial Statements reflect numerous assumptions concerning the Reorganized Debtors' anticipated future performance, some of which may not materialize. Such assumptions include assumptions concerning the general economy, business conditions in the industries in which the Debtors operate, and the ability of the Debtors to obtain additional business from existing and new customers. The Debtors believe that the assumptions underlying the Projected Financial Statements are reasonable; however, unanticipated events and circumstances that may occur subsequent to the preparation of the Projected Financial Statements may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projected Financial Statements are likely to vary from the projected results, and such variations may be material and adverse.

### 9. Significant Holders

As a result of the Plan and the Stock Purchase Agreement, the Plan Investor and the Management Members will own a majority of the New LPC Common Stock.

### 10. Dilution of New LPC Common Stock

It is anticipated that the Board of Directors of the Reorganized Debtors will adopt the Management Incentive Plan. If the Board distributes the MIP Warrants, and/or any equity interests, or options to acquire such equity interests, to management or employees, it is contemplated that such distributions will dilute the New LPC Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the New LPC Common Stock distributed under the Plan.

### 11. Illiquid Market

The New LPC Common Stock will not be listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell them in the future or as to the price at which any sale may occur. If a holder of such securities is able to sell them in the future, the price of the securities could be higher or lower than the value ascribed to them in this Disclosure Statement, depending upon many factors,

including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, Reorganized LPC.

### 12. Restrictions on Transfer

The shares of New LPC Common Stock issued to the Plan Investor will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold without registration under the Securities Act unless resold pursuant to an exemption from registration.

Holders of the New LPC Common Stock issued to holders of Allowed Senior Subordinated Note Claims or holders of the DIP Loan Claim who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be unable to offer or sell such securities except pursuant to an available exemption from registration under the Securities Act and under equivalent state securities or "blue sky" laws.  This would include persons who (a) purchase a Claim with a view to distribution of any security to be received in exchange for the Claim other than in ordinary trading transactions, (b) offer to sell securities issued under the Plan for holders of such securities, (c) offer to buy securities issued under the Plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with the Plan, the consummation of the Plan, or the offer or sale of securities under the Plan, or (d) are an issuer, a person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer.

### 13. Indicative Value of the Debtors

The implied aggregate enterprise value of the Reorganized Debtors is $62.1 million based on the terms of the investment to be made by the Plan Investor.  The Debtors have concluded that this represents the highest achievable value under current market conditions based on the results of an extensive marketing process conducted by Campbell.

### VIII.

### CERTAIN FEDERAL INCOME
### TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Claims or Interests who are not voting because they are deemed to accept or reject the Plan.

The discussion of certain U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), current, temporary and proposed Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested and do not expect to request a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion under this heading does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or Interests through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership (or other entity taxed as a partnership) holds a Claim or Interest, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

This discussion also assumes that the CapitalSource Secured Claims, CSE Secured Claims, Senior Subordinated Notes, Amended Secured CapitalSource Debt, Amended Secured CSE Debt, and New LPC Common Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or Interests. Holders of Claims or Interests are urged to consult their own tax advisors regarding the federal, state, local and non-U.S. tax consequence of the Plan.**

**IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that:  (i) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (ii) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein (including the solicitation of votes accepting the Plan); and (iii) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.**

## A.    Consequences to the Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (the "Lexington Group"), of which LPC is the common parent, and file a single consolidated U.S. federal income tax return.  The Lexington Group reported in the most recent Form 10-K filed by LPC and its subsidiaries consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes of approximately $36 million as of the end of 2008.  The Lexington Group incurred further operating losses during the taxable year ended December 31, 2009.  The amount of the NOL carryforwards, including any such 2009 tax-year losses, remains subject to audit and adjustment by the IRS.  The Debtors expect to have taxable income for the current taxable year through the Effective Date.

As discussed below, in connection with the implementation of the Plan, the amount of the Lexington Group's consolidated NOL carryforwards and other tax attributes (including any 2009-tax year losses) may be reduced.  In addition, the subsequent utilization of any losses and NOL carryforwards remaining following the Effective Date, if any, may be restricted.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred pursuant to a confirmed chapter 11 plan.  The COD incurred is generally the amount by which the indebtedness discharged (reduced by any unamortized original issue discount) exceeds any consideration given in exchange therefor.  Certain statutory or judicial exceptions can generally apply to limit the amount of COD incurred for U.S. federal income tax purposes (such as where the payment of the cancelled debt would have given rise to a tax deduction).  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  Any reduction in tax attributes in respect of excluded COD income generally does not occur until after the end of the taxable year in which the COD is incurred.  Alternatively, a debtor may elect to defer the inclusion of COD income resulting from its chapter 11 plan (thereby preserving the current use of its tax attributes, subject to applicable limitations), with the amount of COD income becoming includible in its income ratably over a five-taxable year period beginning in the fourth taxable year after the COD income arises, if the chapter 11 plan is consummated in 2010.

As a result of the discharge of Claims pursuant to the Plan, the Debtors will incur COD.  The extent of such COD and resulting tax attribute reduction will depend, in principal part, on the fair market value of the New LPC Common Stock distributed.  Based on the Enterprise Value of $62.1 million, as described in Section VI, "*Financial Information, Projections and Valuation Analysis*," it is estimated that the Reorganized Debtors will incur approximately $31 million of COD (substantially all of which will be allocable to Reorganized

LPC for U.S. federal income tax purposes). Consequently, subject to any election to defer the inclusion of COD as described above, it is anticipated that the consolidated NOL carryforwards and any current year NOLs of the Lexington Group will be reduced in connection with the implementation of the Plan.

### 2. Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs and built-in losses, if any) allocable to periods prior to the Effective Date (collectively, "<u>pre-change losses</u>") may be subject to limitation under section 382 of the Tax Code as a result of the changes in ownership of the Lexington Group as described below. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). The Debtors anticipate that the issuance of the New LPC Common Stock pursuant to the Plan will cause an "ownership change" of the Lexington Group.

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.14% for ownership changes occurring in February 2010). Based on the estimated total equity value of the Debtors of $35.9 million, as described in Section VI, "*Financial Information, Projections and Valuation Analysis*," the Debtors' annual limitation for an ownership change occurring in June 2010 would be approximately $1.4 million (before taking into account any adjustment for recognized built-in gain). As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined *immediately after* (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the

ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses, absent any increases due to recognized built-in gains discussed below. Generally, NOL carryforwards expire after 20 years.

Accordingly, the impact of an ownership change of the Lexington Group pursuant to the Plan depends upon, among other things, the amount of pre-change losses remaining, if any, after any reduction of attributes due to the COD, the value of both the stock and assets of the Debtors at or about the Effective Date, the continuation of their respective businesses, and the amount and timing of future taxable income.

### a.     Built In Gains and Losses

Among the pre-change losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.

Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

The presence of a net unrealized built-in gain or net unrealized built-in loss position for a corporation (or consolidated group) depends, among other things, on the value of the assets of the corporation (or consolidated group) at the time of the ownership change. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million and (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

Whether the Lexington Group will benefit from adjustment for "built-in" gains or be subject to the limitation for "built-in" losses will depend upon the respective value of the Lexington Group's assets immediately before the Effective Date. Although not free from doubt, the Debtors currently expect to be in a net unrealized built-in gain position.

### b. *Special Bankruptcy Exception*

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, which applies only if an ownership change occurs pursuant to a chapter 11 plan, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

Based upon the Plan, it is possible that the Debtors will not qualify for this exception. Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the change occurs.

For purposes of the Projected Financial Information, the Debtors have assumed that their use of pre-change losses will be limited to a range of approximately $2.1 million to $3.9 million (depending on the taxable year) on an annual basis under section 382 of the Tax Code after increasing the annual section 382 limitation for any expected recognized built-in gain.

### 3. Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

**B.      Consequences to Holders of Certain Claims**

Pursuant to the Plan, and in satisfaction of their respective Claims:  (i) holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and against LRGI (Class 14(a)) will receive payments as provided in the Amended and Restated Secured CapitalSource Credit Agreement; (ii) holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and against LRGI (Class 14(b)) will receive payments as provided in the Amended and Restated Secured CSE Loan Agreement; (iii) holders of Allowed Senior Subordinated Note Claims (Class 5) will receive Cash or New LPC Common Stock; (iv) holders of Allowed Lexington Precision General Unsecured Claims (Class 7) and Allowed Lexington Rubber Group General Unsecured Claims (Class 17) will receive Cash payments over a twenty-seven month period or a single reduced Cash payment; and (v) holders of Asbestos Related Claims (Class 9) may receive Cash payments under the Asbestos Insurance Policies, and, to the extent the proceeds of the Asbestos Insurance Policies are not sufficient, cash payments, from the Reorganized Debtors or a single reduced cash payment.

The U.S. federal income tax consequences of the implementation of the Plan to a holder of a Claim depends, in part, on whether the holder's Claim constitutes a "security" for U.S. federal income tax purposes and, if so, whether the consideration received in exchange therefor also constitutes a "security" for U.S. federal income tax purposes.  The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt.  One of the most significant factors considered in determining whether a particular debt is a security is its original term.  In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities.  Additionally, the IRS has ruled that new debt instruments with a term of less than five (5) years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.  The following discussion assumes that CapitalSource Secured Claims and CSE Secured Claims do not constitute securities for U.S. federal income tax purposes because their original maturity was three (3) years.  *Each holder of an Allowed CapitalSource Secured Claim, an Allowed CSE Secured Claim, an Allowed Senior Subordinated Note Claim or an Allowed General Unsecured Claim should consult its own tax advisor to determine whether its Allowed Claim or the consideration received in exchange therefor constitutes a security for U.S. federal income tax purposes*.

**1.      Holders of Allowed CapitalSource Secured Claims against LPC (Class 2(a)) and Allowed CapitalSource Secured Claims against LRGI (Class 14(a))**

Pursuant to the Plan, each holder of Allowed CapitalSource Secured Claims against LPC and Allowed CapitalSource Secured Claims against LRGI will receive on account of its Allowed Claim payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement plus a cash payment for certain fees, costs and expenses.

Whether changes to a debt instrument are regarded as a mere amendment for U.S. federal income tax purposes or instead, treated as, in substance, a new debt instrument received in satisfaction of the original debt obligation depends, in part, on whether the changed terms constitute a "significant modification" of the existing debt for U.S. federal income tax purposes, as determined under applicable Treasury regulations. The Amended Secured CapitalSource Debt has certain similarities and differences in terms as contrasted with the CapitalSource Secured Claims, in particular, extension of the maturity date and a change of the interest rate. The following discussion assumes that the receipt of Amended Secured CapitalSource Debt by holders of Allowed CapitalSource Secured Claims should be treated as an "exchange" for U.S. federal income tax purposes.

Each holder of an Allowed CapitalSource Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the "issue price" (see Section VIII(B)(8) "*Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt*") of the Amended Secured CapitalSource Debt received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest or certain fees, costs and expenses). A holder of an Allowed CapitalSource Secured Claim generally should have ordinary income to the extent of the cash payment received for certain fees, costs, and expenses. Holders of an Allowed CapitalSource Secured Claim that receive a cash payment for certain fees, costs and expenses are urged to consult their own tax advisors as to the proper treatment of such payment in relation to their particular circumstances. In addition, a holder of an Allowed CapitalSource Secured Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income. *See* Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

A holder's tax basis in the Amended Secured CapitalSource Debt should equal the issue price of such debt on the Effective Date. A holder's holding period in such debt should begin the day following the Effective Date.

### 2. Holders of Allowed CSE Secured Claims against LPC (Class 2(b)) and Allowed CSE Secured Claims against LRGI (Class 14(b))

Pursuant to the Plan, each holder of Allowed CSE Secured Claims against LPC and Allowed CSE Secured Claims against LRGI will receive on account of its Allowed Claim payments over time as provided in the Amended and Restated Secured CSE Loan Agreement plus a cash payment for certain fees, costs and expenses.

Whether changes to a debt instrument are regarded as a mere amendment for U.S. federal income tax purposes or instead, treated as, in substance, a new debt instrument received in satisfaction of the original debt obligation depends, in part, on whether the changed terms constitute a "significant modification" of the existing debt for U.S. federal income tax purposes, as determined under applicable Treasury regulations. The Amended Secured CSE Debt has

certain similarities and differences in terms as contrasted with the CSE Secured Claims, in particular, an extension of the maturity date and a change in the interest rate. The following discussion assumes that the receipt of Amended Secured CSE Debt by holders of Allowed CSE Secured Claims should be treated as an "exchange" for U.S. federal income tax purposes.

A holder of an Allowed CSE Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the "issue price" (*see* Section VIII(B)(8), "*Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt*") of the Amended Secured CSE Debt received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). A holder of an Allowed CSE Secured Claim generally should have ordinary income to the extent of the cash payment received for certain fees, costs, and expenses. Holders of an Allowed CSE Secured Claim that receive a cash payment for certain fees, costs and expenses are urged to consult their own tax advisors as to the proper treatment of such payment in relation to their particular circumstances. In addition, a holder of an Allowed CSE Secured Claim will have interest income to the extent of any amounts received in respect of accrued and unpaid interest not previously included in income. *See* Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6) "*Character of Gain or Loss.*"

A holder's tax basis in the Amended Secured CSE Debt should equal the issue price of such debt on the Effective Date. A holder's holding period in such debt should begin the day following the Effective Date.

### 3. Holders of Allowed Senior Subordinated Note Claims (Class 5)

The U.S. federal income tax consequences of the Plan to holders of Allowed Senior Subordinated Note Claims depend, among other things, on whether the holder elects to receive New LPC Common Stock in exchange for its Claim instead of Cash. A holder that elects to receive New LPC Common Stock must make such election for its entire Allowed Claim.

#### *a. Receives Cash Distribution*

If a holder of an Allowed Senior Subordinated Note Claim receives only Cash in respect of its claims, such holder generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

### b.     Elects to Receive New LPC Common Stock

As discussed above (at the beginning of the discussion in Section VIII(D), "*Consequences to Holders of Certain Claims*"), the U.S. federal income tax consequences of the Plan to holders of Allowed Senior Subordinated Note Claims that elect to receive only New LPC Common Stock depend, in part, on whether the holder's existing notes constitute "securities" for U.S. federal income tax purposes.  It is not clear whether the Senior Subordinated Note Claims constitute securities.  Each holder is advised to consult its own tax advisors.

### (i)     If Existing Note Does Not Constitute a Security

If the Senior Subordinated Notes do not constitute securities, the holder of an Allowed Senior Subordinated Note Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any New LPC Common Stock, received (other than in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest).  As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest.*"

For a discussion of the character of any recognized gain or loss, please refer to Section VIII(B)(6), "*Character of Gain or Loss.*"

A holder's tax basis in any New LPC Common Stock received should equal the fair market value of such stock on the Effective Date.  A holder's holding period in such stock should begin the day following the Effective Date.

### (ii)     If Existing Note Constitutes a Security

The receipt of stock of Reorganized LPC in exchange for an Allowed Senior Subordinated Note Claim that constitutes a security for U.S. federal income tax purposes will qualify as a "recapitalization" for U.S. federal income tax purposes.  The classification of an exchange as a recapitalization for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the holder.  Accordingly, no gain or loss should be recognized by the holder of such Claim who receives only stock, but such holder may recognize income with respect to any amounts received in respect of accrued but unpaid interest.  As relates to any claim for accrued but unpaid interest, please refer to Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*".

In a recapitalization exchange, a holder's aggregate tax basis in any stock received generally should equal the holder's aggregate adjusted tax basis in the existing notes exchanged therefor, increased by any interest or other income recognized in the exchange.  In general, a holder's holding period in any stock received will include the holder's holding period in the existing notes exchanged (other than any stock received in respect to any accrued but unpaid interest).

4. **Holders of General Unsecured Claims against LPC (Class 7) and General Unsecured Claims against LRGI (Class 17)**

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim against LPC (Class 7) or against LRGI (Class 17) will receive Cash payable in ten (10) payments in respect of its Allowed Claim. In the case of Class 7, the initial up front payment will be in the amount of 8% of the holder's Allowed Claim, and the remaining nine (9) equal quarterly Cash payments (hereafter, such later payment are collectively referred to as the "GUC Payment Obligation") will each be in the amount of 8.6% of such Allowed Claim, unless such holder makes the Class 7 Cash Election to receive a single Cash payment equal to 51% of its Allowed Claim. In the case of Class 17, the initial up front payment will in the amount of 10% of the holder's Allowed Claim (plus postpetition interest through the Effective Date) and each payment under the GUC Payment Obligation will be in the amount of 10.75% of such Allowed Claim, unless the holder makes the Class 17 Cash Election to receive a single Cash Payment equal to 51% of such Allowed Claim (plus postpetition interest through the Effective Date).

### a. *Receipt of Multiple Cash Payments*

In general, unless a holder makes a Class 7 Cash Election or a Class 17 Cash Election (as applicable), a holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of the initial Cash payment and the "issue price" (as discussed below) of the GUC Payment Obligation (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the character of any recognized gain or loss, and the treatment of amounts received in respect of any Claim for accrued but unpaid interest, see Section VIII(B)(6), "*Character of Gain or Loss*," and Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*."

The GUC Payment Obligation should be treated as a debt obligation for U.S. federal income tax purposes, and thus should be subject to the original issue discount ("OID") rules of the Tax Code. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the sum of the nine later payments) exceeds its "issue price," subject to a *de minimis* exception.

If, as expected, the GUC Payment Obligation is not considered traded on an "established market," the issue price of the GUC Payment Obligation should be the present value of all payments discounted at a rate based on the applicable federal rate for short-term instruments (which discount rate is currently in the range of 0.67% compounded semi-annually). Such rate will then be the yield to maturity in respect of the obligation. If the GUC Payment Obligation is traded on an "established market" during the 60 day period ending 30 days after the Effective Date, the issue price of the GUC Payment Obligation will be its fair market value (with the yield to maturity computed accordingly).

Each holder of an Allowed General Unsecured Claim generally will be required to accrue the OID in respect of the GUC Payment Obligation received and include such amount in gross income as interest over the term of such obligation based on the constant yield method.

Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of Cash in respect of such income. A holder's tax basis in a GUC Payment Obligation will be increased by the amount of any OID included in income and reduced by any Cash received with respect to such GUC Payment Obligation.

A holder's initial tax basis in the GUC Payment Obligation received should equal the issue price of such obligation, and the holding period of such obligation should begin the day following the Effective Date.

### c.  Elects to Receive Single Cash Payment

In general, each holder of an Allowed General Unsecured Claim that elects to receive a single Cash payment should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received (other than in respect of any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). For a discussion of the character of any recognized gain or loss, and the treatment of amounts received in respect of any Claim for accrued but unpaid interest, *see* Section VIII(B)(6), "*Character of Gain or Loss,*" and Section VIII(B)(7), "*Distributions in Respect of Accrued Interest*"

### 5.  Holders of Asbestos-Related Claims (Class 9)

Pursuant to the Plan, each Asbestos-Related Claim will be satisfied by Cash payments from the Asbestos Insurance Policies and, to the extent the proceeds of the Asbestos Insurance Policies are not sufficient, Cash payments (which may be made over time) from the Reorganized Debtors for a holder's Insurance Proceeds Deficiency (hereafter, such payments made over time are collectively referred to as the "IPD Payment Obligation") unless the holder of an Asbestos-Related Claim makes the Class 9 Cash Election to receive a single Cash Payment equal to 51% of the Insurance Proceeds Deficiency.

The U.S. federal income tax treatment of a receipt of payments by a holder of an Asbestos-Related Claim generally will depend upon the nature of the Claim. Amounts received by a holder of a personal injury claim generally should not be taxable to such holder. Amounts received by a holder of a property damage claim may or may not be taxable to such holder depending on the nature and extent of the damage. Where cash payments are receivable over time, as under the IPD Payment Obligation, the existence of the payment obligation itself (rather than the later receipt of the cash payments represented by the obligation) may be treated as the consideration received in respect of the holder's Claim for U.S. federal income tax purposes.

Because the tax treatment of any amounts received by a holder under the Plan will depend on facts peculiar to each holder, all holders of Asbestos-Related Claims are urged to consult their own tax advisors as to the proper tax treatment of such receipts, including the receipt and ownership of the IPD Payment Obligation in relation to their particular facts and circumstances. The Debtors currently intend to treat the IPD Payment Obligation in an equivalent manner to the GUC Payment Obligation, *see* Section VIII(B)(4), "*Holders of General*

*Unsecured Claims Against LPC (Class 7) and General Unsecured Claims Against LRGI (Class 17)."*

### 6.    Character of Gain or Loss

Where gain or loss is recognized by a holder in respect of the satisfaction its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.  Each holder of a Claim is urged to consult its tax advisor for a determination of the character of any gain or loss recognized in respect to the satisfaction of its Claim.

A holder that purchased its claim from a prior holder at a "market discount" (relative to the adjusted issue price of the claim at the time of acquisition) may be subject to the market discount rules of the Tax Code.  Under these rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such claim generally would be treated as ordinary income to the extent of the market discount accrued during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.

### 7.    Distributions in Respect of Accrued Interest

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim (whether in cash, new debt or stock) is received in satisfaction of interest or OID that accrued during its holding period, such amount will be taxable to the holder as interest income (to the extent not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security would be viewed by the Internal Revenue Service as required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except to the extent otherwise provided therein, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim (as determined for U.S. federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.  There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such holder and attributable to principal under the Plan is properly allocable to interest.  Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of distributions

under the Plan and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

8.      **Ownership and Disposition of Amended Secured CapitalSource Debt and Amended Secured CSE Debt**

a.      *Stated Interest and Original Issue Discount.*

A holder of Amended Secured CapitalSource Debt and Amended Secured CSE Debt (together, the "Amended Secured Debt") will be required to include the stated interest on the debt in income in accordance with the holder's regular method of accounting.  A debt instrument generally has OID if its "stated redemption price at maturity" (in this case, the principal amount of the Amended Secured Debt) exceeds its "issue price" by more than a de minimis amount.  Due to the limited number of holders of Allowed CapitalSource Secured Claims and Allowed CSE Secured Claims, the Debtors expect, and the discussion herein assumes, that the "issue price" of the Amended Secured Debt will be equal to their stated principal amount in the Amended and Restated Secured CapitalSource Credit Agreement or the Amended and Restated CSE Loan Agreement, as applicable, and, thus, that the Amended Secured Debt will not be issued with OID.  If the Amended Secured Debt is issued with OID, the holder would be required to recognize the OID over the term of the Amended Secured Debt in advance of the holder's receipt of the associated Cash.

b.      *Sale, Exchange or Other Disposition of the Amended Secured Debt.*

Any gain or loss recognized by a holder on a sale, exchange or other disposition of the Amended Secured Debt generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the holder and the holder's adjusted tax basis in the note immediately before the sale, exchange, redemption or other disposition.  Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period in its note is more than one year at that time.

9.      **Disposition of the New LPC Common Stock**

Any gain recognized by a holder upon a subsequent taxable disposition of the New LPC Common Stock received in respect of its Claim (or any stock or property received for such stock in a later tax-free exchange) would be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deducted upon satisfaction of the Claim, less any income (other than interest income) recognized by the holder upon satisfaction of the Claim, and (ii) with respect to a cash-basis holder, also any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, in the case of an exchange of the existing Senior Subordinated Notes that qualifies as a recapitalization for U.S. federal income tax purposes, the Tax Code indicates that any accrued market discount in respect of the Senior Subordinated Notes in excess of the gain recognized in the exchange should not be currently includible in income.  However, such

accrued market discount would carry over to any non-recognition property received in exchange therefor, such that any gain recognized by the holder upon a subsequent disposition of the stock should be treated as ordinary income to the extent of any carryover of accrued market discount not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.

## C.     Information Reporting and Backup Withholding

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of new securities, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information or to make certain certifications. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, if any, provided that the required information is timely furnished to the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the exchanges contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above summary has been provided for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances. Accordingly, all holders of Claims and Interests receiving a distribution under the Plan are urged to consult their tax advisors concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the Plan.**

# IX.

## SECURITIES LAW MATTERS

**A.**      **Issuance and Resale of the New LPC Common Stock under the Plan**

       **1.**      **Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim**

       Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate.  In reliance upon this exemption, the New LPC Common Stock to be issued to holders of Allowed Senior Subordinated Note Claims and holders of the DIP Loan Claim generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such shares of New LPC Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act unless the holder is an "underwriter" with respect to such securities as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such shares of New LPC Common Stock generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

       Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or under an agreement made in connection with a chapter 11 plan, with the consummation of the chapter 11 plan, or with an offer or sale of securities under the chapter 11 plan, or (d) is the issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

       Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

       Recipients of securities under the Plan are advised to consult with their own legal advisors as to the availability of any exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

2.    **Issuance and Resale of New LPC Common Stock to be Issued to the Plan Investor**

The Debtors are relying on Section 4(2) of the Securities Act and, with respect to state securities or "blue sky" laws, Section 18 of the Securities Act, to exempt from the registration requirements of the Securities Act the offer and sale of the shares of New LPC Common Stock to be issued to the Plan Investor under the Plan.

The shares of New LPC Common Stock to be issued to the Plan Investor under the Plan will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold without registration under the Securities Act unless resold pursuant to an exemption from registration.  The Plan Investor will have the right to demand the public registration of the New LPC Common Stock and will receive customary piggyback registration rights.  See Section IV.C.1, "*The Securityholders Agreement*."

**B.    Issuance and Resale of Amended Secured CapitalSource Debt, Amended Secured CSE Debt, GUC Payment Obligations, and any Other Deferred Cash Payment Obligations**

The Amended Secured CapitalSource Debt, the Amended Secured CSE Debt, the GUC Payment Obligations, and any other deferred cash payment obligations, to the extent they constitute securities, will be issued pursuant to an exemption from registration provided by section 1145 of the Bankruptcy Code.

See Section IX.A.1, "*Issuance and Resale of New LPC Common Stock to be Issued to Holders of Allowed Senior Subordinated Note Claims or Holders of the DIP Loan Claim*."

**C.    Listing**

None of the securities to be issued pursuant to the Plan are, and upon the consummation of the Plan, such securities will not be, listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

**D.    Legends**

Certificates evidencing shares of the New LPC Common Stock received by holders of at least 10% of the New LPC Common Stock will bear a legend substantially in the form below (except no legend will be required on certificates issued in "street name" or in the name of, or by a nominee, of the Depository Trust Company):

THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION OR UNLESS LEXINGTON PRECISION CORPORATION RECEIVES AN OPINION OF

COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## X.

### VOTING PROCEDURES AND REQUIREMENTS

**A.**    <u>**Voting Deadline**</u>

      **IT IS IMPORTANT THAT THE HOLDERS OF THE FOLLOWING CLASSES TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN:**

      **Class 2(a) – CapitalSource Secured Claims against LPC**

      **Class 2(b) – CSE Secured Claims against LPC**

      **Class 5 – Senior Subordinated Note Claims**

      **Class 7 – General Unsecured Claims against LPC**

      **Class 9 – Asbestos-Related Claims**

      **Class 14(a) – CapitalSource Secured Claims against LRGI**

      **Class 14(b) – CSE Secured Claims against LRGI**

      **Class 17 – General Unsecured Claims against LRGI**

      All known holders of CapitalSource Secured Claims, CSE Secured Claims, Senior Subordinated Note Claims, General Unsecured Claims, and Asbestos-Related Claims as of the Record Date are entitled to vote on the Plan and have been sent a ballot together with this Disclosure Statement. Such holders should read the ballot carefully and follow the instructions contained therein. To vote, please use only the ballot that accompanies this Disclosure Statement.

      The Debtors have engaged Financial Balloting Group LLC, as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

      **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE STREET ADDRESS OR E-MAIL ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 5:00 P.M., EASTERN DAYLIGHT TIME, ON FRIDAY JULY 2, 2010.**

      **IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE TO ACCEPT THE PLAN.**

**ANY PROPERLY EXECUTED, TIMELY RECEIVED BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED AS A VOTE TO EITHER ACCEPT OR REJECT THE PLAN.**

**FAXED COPIES OF BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

> **Financial Balloting Group LLC**
> **757 Third Avenue, 3rd Floor,**
> **New York, New York 10017**
> **Telephone:  (646) 282-1800**

**- OR –**

**tabulation@fbgllc.com**

Additional copies of this Disclosure Statement are available upon written request made to the Voting Agent, at the address set forth immediately above.

**B.**      **Holders of Claims Entitled to Vote**

Class 2(a) – CapitalSource Secured Claims against LPC, Class 2(b) – CSE Secured Claims against LPC, Class 5 – Senior Subordinated Note Claims, Class 7 – General Unsecured Claims against LPC, Class 9 – Asbestos-Related Claims, Class 14(a) – CapitalSource Secured Claims against LRGI, Class 14(b) – CSE Secured Claims against LRGI, and Class 17 – General Unsecured Claims against LRGI are the only Classes under the Plan that are impaired and entitled to vote to accept or reject the Plan.  Each holder of a Claim in any of these classes as of May 26, 2010 (the Record Date established in the Disclosure Statement Order for purposes of this solicitation) may vote to accept or reject the Plan.

**C.**      **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, a class of claims accepts a chapter 11 plan when it is accepted by the holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that vote to accept or reject the plan.  Classes 2(a), 2(b), 5, 7, 9, 14(a), 14(b) and 17 will accept the Plan if at least two-thirds in dollar amount and a majority in number of the holders of that class that cast their ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.** **Voting Procedures**

**1.** **Voting Procedures**

Voting procedures will be as described in the Disclosure Statement Order.

**2.** **Withdrawal of Ballot**

Any holder of a Claim or Interest that has delivered a valid ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (i) be signed by the party that signed the Ballot to be revoked and (ii) be received by the Voting Agent before the Voting Deadline. The Debtors may contest the validity of any withdrawal.

Any holder that has delivered a valid ballot may change its vote by delivering to the Voting Agent a properly completed subsequent ballot that is received by the Voting Agent before the Voting Deadline. In a case where more than one timely, properly completed ballot is received, only the ballot that bears the latest date will be counted.

## XI.

## CONFIRMATION OF THE PLAN

**A.** **The Confirmation Hearing**

**The Confirmation Hearing will commence at 10:00 a.m. Eastern Daylight Time on Wednesday July 14, 2010.**

**The Plan Objection Deadline is 5:00 p.m. Eastern Daylight Time on Friday July 2, 2010.**

All objections and responses to the confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.** **General Requirements for Confirmation**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(i)     The Plan complies with the applicable provisions of the Bankruptcy Code.

(ii)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

(iv)     Any payment made or promised by the Debtors or by an Entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of equity securities and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

(vi)     With respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(vii)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, as described in Section VII.A.2, "*Non-Consensual Confirmation*" on page 81, each Class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that each holder of a Priority Tax Claim will receive on account of such Claim (a) Cash equal to its Allowed Priority Tax Claim, on or as soon as practicable following the later of (i) the Effective Date or (ii) the date the such Claim is Allowed; (b) equal semi-annual Cash payments in the aggregate amount of its Allowed

Priority Tax Claim with interest at the applicable non-bankruptcy rate, commencing as soon as reasonably practicable after the later of the (i) the Effective Date or (ii) the date such Claim is Allowed and continuing over an eighteen (18) month period (but in no event exceeding five (5) years after the Commencement Date); or (c) such other treatment as will be determined by the Bankruptcy Court to provide to the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

(ix)    At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

(x)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(xi)    The Plan provides for the continuation after the Effective Date of the payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## C.    <u>Best Interests Test</u>

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and any additional Administrative Expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared

to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of the Creditors' Committee or any other statutorily appointed committee. Moreover, additional Claims could arise from the Debtors' breach or rejection of obligations incurred and executory contracts or leases entered into both prior to, and during the pendency of, the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors were paid in full, with interest, and no equity holder would receive any distribution until all creditors were paid in full, with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee in bankruptcy and any professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) increases in Claims that would be satisfied on a priority basis, the Debtors have determined that there would be no distribution under chapter 7 of the Bankruptcy Code to any Class of unsecured Claims or Interests and, consequently, confirmation of the Plan will provide each creditor and each holder of equity securities with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**The Debtors' liquidation analysis estimates the proceeds generated from a hypothetical chapter 7 liquidation of the Debtors' assets. The Debtors base the analysis upon a number of significant assumptions which are described therein. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

The Debtors' chapter 7 liquidation analysis and the assumptions utilized therein are set forth in **Exhibit G** to this Disclosure Statement.

## D.     No Unfair Discrimination/Fair and Equitable Test

As provided under the Bankruptcy Code, the Bankruptcy Court may confirm a chapter 11 plan over the rejection or deemed rejection of such plan by a class of claims or

interests if the chapter 11 plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class:

### 1. No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the chapter 11 plan. The test does not require that the treatment be the same or equivalent, but rather, that such treatment be "fair."

### 2. Fair and Equitable Test

This test applies to classes of different priority (*e.g.*, unsecured versus secured) and includes the general requirement that no class of claims or interests receive more than 100% of the allowed amount of the claims or interests in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

#### a. Secured Claims

The Bankruptcy Code requires that a chapter 11 plan must provide each holder of an impaired secured claim either (i) liens on the collateral or the proceeds of collateral equal in value to the amount of such allowed secured claim with deferred cash payments equal in value to the amount of such allowed secured claim, as of the effective date, or (ii) the "indubitable equivalent" of such allowed secured claim.

#### b. Unsecured Claims

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an impaired unsecured claim will receive under the chapter 11 plan a distribution equal in value to the amount of the allowed unsecured claim or (ii) no distribution will be made under the Plan to any holder that is junior to the claims in the dissenting class.

#### c. Interests

The Bankruptcy Code requires that a chapter 11 plan must provide that either (i) each holder of an interest will receive under the chapter 11 plan a distribution equal in value to the greater of (x) the fixed liquidation preference or redemption price, if any, of the stock that is the basis for such Interest or (y) the value of such stock, or (ii) no distribution will be made to any holder of an interest that is junior to the dissenting class.

The Debtors believe that (i) the Plan satisfies the "no unfair discrimination" requirement because there is a singular treatment for all holders of Claims and Interests in each Class and (ii) the Plan satisfies the "fair and equitable" requirement notwithstanding the rejection of the Plan by any Class of Claims, because either (x) each Class of Claims or Interests will receive under the Plan a distribution equal in value to the amount of such Claims or (y) no distribution will be made to under the Plan to any holder of a claim that is junior to the dissenting class.

**E.**     **Classification of Claims and Interests**

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which requires that a chapter 11 plan place each claim or equity interest into a class with other claims or equity interests that are "substantially similar."  The Plan establishes Classes of Claims and Interests as required by the Bankruptcy Code; these Classes are summarized above.  Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified.

**F.**     **Feasibility**

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  As part of this analysis, the Debtors have prepared the Projected Financial Statements set forth in **Exhibit F** to this Disclosure Statement.  Certain selected financial information from the Projected Financial Statements and certain key financial ratios are set forth in Section VI, "*Financial Information, Projections and Valuation Analysis,*" on page 75.  These projections are based upon the assumption that the Bankruptcy Court will confirm the Plan and, for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place within 90 days after entry of the Confirmation Order.  Based upon the Projected Financial Statements, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

## XII.

## CONCLUSION

The Debtors believe the Plan is in the best interests of all holders of Claims and Interests and urges the holders of impaired Claims in Classes 2(a), 2(b), 5, 7, 9, 14(a), 14(b) and 17 to vote to accept the Plan and to evidence acceptance by returning their ballots such that the Voting Agent will receive the ballots no later than **Friday July 2, 2010 at 5:00 p.m. (Eastern Daylight Time).**

Dated: May 26, 2010
New York, New York

Respectfully submitted,

LEXINGTON PRECISION CORPORATION

By: _____
Name: Michael A. Lubin
Title:   Chairman of the Board

LEXINGTON RUBBER GROUP, INC.

By: _____
Name: Michael A. Lubin
Title:   Chairman of the Board

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
(212) 310-8000

Attorneys for the Debtors
and Debtors in Possession

## Exhibit A

### The Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                :

In re                            :         Chapter 11 Case No.
                                :

LEXINGTON PRECISION CORP., <u>et al.</u>,    :        08-11153 (SCC)
                                :

             Debtors.          :         (Jointly Administered)
                                :
-----------------------------------------------------------------x

## DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
   Debtors in Possession

Dated: May 26, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I    DEFINITIONS AND INTERPRETATION ....................................................................1

    A.    Definitions ...................................................................................................................1

        1.1.    Adjudication Amount ...............................................................................1

        1.2.    Administrative Expense Claim Bar Date ..................................................1

        1.3.    Administrative Expense Claim Objection Deadline ..................................1

        1.4.    Administrative Expense Claim ..................................................................1

        1.5.    Agents .......................................................................................................2

        1.6.    Allowed ....................................................................................................2

        1.7.    Amended and Restated Secured CapitalSource Credit Agreement ...................2

        1.8.    Amended Secured CapitalSource Debt ....................................................2

        1.9.    Amended and Restated Secured CSE Loan Agreement ...................................2

        1.10.    amended Secured CSE debt ......................................................................2

        1.11.    Asbestos Insurance Policies .....................................................................2

        1.12.    Asbestos-Related Claim ...........................................................................2

        1.13.    Bankruptcy Code ......................................................................................3

        1.14.    Bankruptcy Court ......................................................................................3

        1.15.    Bankruptcy Rules ......................................................................................3

        1.16.    Business Day .............................................................................................3

        1.17.    CapitalSource ............................................................................................3

        1.18.    CapitalSource Secured Claim ...................................................................3

        1.19.    Cash ..........................................................................................................3

        1.20.    Cash-Out Percentage.................................................................................3

        1.21.    Chapter 11 Cases ......................................................................................3

        1.22.    Charging Lien ...........................................................................................3

        1.23.    Charter Amendment ..................................................................................3

        1.24.    Claim.........................................................................................................4

        1.25.    Class .........................................................................................................4

        1.26.    Class 5 Stock Election ..............................................................................4

        1.27.    Class 7 Cash Election ...............................................................................4

        1.28.    Class 9 Cash Election ...............................................................................4

        1.29.    Class 17 Cash Election .............................................................................4

| | | |
|---|---|---|
| 1.30. | Collateral | 4 |
| 1.31. | Commencement Date | 4 |
| 1.32. | Confirmation Date | 4 |
| 1.33. | Confirmation Hearing | 4 |
| 1.34. | Confirmation Order | 5 |
| 1.35. | Contingent Claim | 5 |
| 1.36. | Convenience Claim | 5 |
| 1.37. | Creditors' Committee | 5 |
| 1.38. | CSE Mortgage | 5 |
| 1.39. | CSE Secured Claim | 5 |
| 1.40. | Debtors | 5 |
| 1.41. | Debtors in Possession | 5 |
| 1.42. | DIP Lenders | 5 |
| 1.43. | DIP Loan Claims | 5 |
| 1.44. | DIP Note | 5 |
| 1.45. | Disallowed Claim | 5 |
| 1.46. | Disbursing Agent | 6 |
| 1.47. | Disclosure Statement | 6 |
| 1.48. | Disclosure Statement Order | 6 |
| 1.49. | Disputed Claim | 6 |
| 1.50. | Distribution Record Date | 6 |
| 1.51. | Effective Date | 6 |
| 1.52. | Entity | 6 |
| 1.53. | Final Cash Collateral Order | 6 |
| 1.54. | Final Order | 6 |
| 1.55. | General Unsecured Claim | 7 |
| 1.56. | Indenture | 7 |
| 1.57. | Indenture Trustee | 7 |
| 1.58. | Indenture Trustee Fee Claim | 7 |
| 1.59. | Insurance Policies | 7 |
| 1.60. | Insurance Proceeds Deficiency | 7 |

1.61.    Intercompany Claim ................................................................7

1.62.    Interest ....................................................................................7

1.63.    Junior Subordinated Note .......................................................7

1.64.    Junior Subordinated Note Claim .............................................7

1.65.    LPC .........................................................................................7

1.66.    LPC Common Stock ................................................................7

1.67.    LPC Common Stock Interests..................................................7

1.68.    LRGI .......................................................................................7

1.69.    Lien .........................................................................................7

1.70.    New LPC Common Stock .......................................................7

1.71.    Other Equity Interest ..............................................................8

1.72.    Other Priority Claim ...............................................................8

1.73.    Other Secured Claim ..............................................................8

1.74.    Plan Documents ......................................................................8

1.75.    Plan .........................................................................................8

1.76.    Plan Investor ...........................................................................8

1.77.    Plan Supplement .....................................................................8

1.78.    Prepetition Credit Agreement .................................................8

1.79.    Prepetition Loan Agreement ...................................................8

1.80.    Prepetition Revolver Lenders .................................................8

1.81.    Prepetition Term Loan Lenders ..............................................8

1.82.    Prepetition secured Lenders....................................................9

1.83.    Priority Tax Claim ..................................................................9

1.84.    Pro Rata ..................................................................................9

1.85.    Reorganized Debtors ...............................................................9

1.86.    Reorganized LPC ....................................................................9

1.87.    Reorganized LRGI ..................................................................9

1.88.    Restructuring Transactions ......................................................9

1.89.    Restructuring Transactions Notice..........................................9

1.90.    Schedules ................................................................................9

1.91.    Secured Claim .........................................................................9

1.92.    Secured Tax Claim ...................................................................................9

1.93.    Senior Subordinated Notes ......................................................................9

1.94.    Senior Subordinated Note Claim ............................................................9

1.95.    Series B Preferred Stock Interest .........................................................10

1.96.    Stock Purchase Agreement ....................................................................10

1.97.    Unliquidated Claim ...............................................................................10

1.98.    Unsecured Claim ...................................................................................10

B.       Interpretation; Application of Definitions and Rules of Construction ............................10

ARTICLE II     ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ...........10

2.1.     Administrative Expense Claims.............................................................10

2.2.     Professional Compensation and Reimbursement Claims ....................11

2.3.     Indenture Trustee Fee Claims ...............................................................11

2.4.     DIP Loan Claims ...................................................................................11

2.5.     Priority Tax Claims................................................................................12

2.6.     Intercompany Claims.............................................................................12

ARTICLE III    CLASSIFICATION OF CLAIMS AND INTERESTS ...................................12

ARTICLE IV     TREATMENT OF CLAIMS AND INTERESTS .........................................13

4.1.     Class 1:  Other Priority Claims against LPC .......................................13

4.2.     Class 2(a):  CapitalSource Secured Claims against LPC....................13

4.3.     Class 2(b):  CSE Secured Claims against LPC....................................14

4.4.     Class 3:  Secured Tax Claims against LPC..........................................14

4.5.     Class 4:  Other Secured Claims against LPC.......................................15

4.6.     Class 5:  Senior Subordinated Note Claims.........................................15

4.7.     Class 6:  Junior Subordinated Note Claims .........................................15

4.8.     Class 7:  General Unsecured Claims against LPC ...............................15

4.9.     Class 8: Convenience Claims against LPC...........................................16

4.10.    Class 9:  Asbestos-Related Claims ......................................................16

4.11.    Class 10:  Series B Preferred Stock Interests......................................17

4.12.    Class 11:  LPC Common Stock Interests.............................................17

4.13.    Class 12:  Other Equity Interests in LPC ............................................17

4.14.    Class 13:  Other Priority Claims against LRGI ...................................17

4.15. Class 14(a): CapitalSource Secured Claims against LRGI ................................17

4.16. Class 14(b): CSE Secured Claims against LRGI ...............................18

4.17. Class 15: Secured Tax Claims against LRGI....................................18

4.18. Class 16: Other Secured Claims against LRGI................................19

4.19. Class 17: General Unsecured Claims against LRGI .........................19

4.20. Class 18: Convenience Claims against LRGI...................................20

4.21. Class 19: Interests in LRGI............................................................20

ARTICLE V      MEANS FOR IMPLEMENTATION .................................................20

5.1. Restructuring Transactions .............................................................20

5.2. Cancellation and Surrender of Existing Securities and Agreements .................21

5.3. Charter Amendment.........................................................................21

5.4. Execution of documents commemorating indebtedness....................22

5.5. Stock Purchase Agreement ..............................................................22

5.6. Issuance of New LPC Common Stock..............................................22

5.7. Exemption from Securities Laws .....................................................22

ARTICLE VI      VOTING AND DISTRIBUTIONS ....................................................22

6.1. Voting of Claims..............................................................................22

6.2. Nonconsensual Confirmation ..........................................................22

6.3. Distribution Record Date .................................................................23

6.4. Date of Distributions........................................................................23

6.5. Disbursing Agent .............................................................................23

6.6. Rights and Powers of Disbursing Agent...........................................23

6.7. Expenses of the Disbursing Agent...................................................23

6.8. Delivery of Distributions .................................................................23

6.9. Unclaimed Distributions ..................................................................24

6.10. Manner of Payment..........................................................................24

6.11. Fractional Shares.............................................................................24

6.12. Minimum Cash Distributions...........................................................25

6.13. Setoffs .............................................................................................25

ARTICLE VII      PROCEDURES FOR DISPUTED CLAIMS ...................................25

7.1. Objections .......................................................................................25

7.2.    No Payment Pending Allowance ........................................................................25

7.3.    Distributions After Allowance.........................................................................25

7.4.    Resolution of Administrative Expense Claims and other Claims......................26

7.5.    Estimation of Claims .....................................................................................26

7.6.    Interest ..........................................................................................................26

7.7.    Allocation Of Plan Distributions Between Principal And Interest. ..................26

ARTICLE VIII EXECUTORY CONTRACTS AND UNEXPIRED LEASES.......................................27

8.1.    Assumption or Rejection of Executory Contracts and Unexpired Leases ..........27

8.2.    Approval of Assumption or Rejection of Executory Contracts and
        Unexpired Leases...........................................................................................27

8.3.    Inclusiveness..................................................................................................27

8.4.    Cure of Defaults.............................................................................................27

8.5.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
        Unexpired Leases Rejected Pursuant to the Plan................................................28

8.6.    Indemnification Obligations ...........................................................................28

8.7.    Insurance Policies ..........................................................................................28

8.8.    Compensation and Benefit Programs................................................................29

8.9.    Retiree Benefits..............................................................................................29

ARTICLE IX   CORPORATE GOVERNANCE AND MANAGEMENT OF THE
             REORGANIZED DEBTORS ..............................................................................30

9.1.    General...........................................................................................................30

9.2.    Directors and Officers of the Reorganized Debtors...........................................30

9.3.    Issuance of Non-Voting Securities ..................................................................30

ARTICLE X   EFFECT OF CONFIRMATION ..............................................................................30

10.1.   Vesting of Assets ...........................................................................................30

10.2.   Discharge of Claims and interests....................................................................31

10.3.   Discharge of Debtors ......................................................................................31

10.4.   Injunction or Stay............................................................................................31

10.5.   Term of Injunctions or Stays ...........................................................................31

10.6.   Injunction Against Interference With Plan ........................................................32

10.7.   Exculpation ....................................................................................................32

10.8.   Releases of Directors, Officers and Employees................................................32

| | | |
|---|---|---|
| 10.9. | Plan Investor Release | 33 |
| 10.10. | Other Releases | 33 |
| 10.11. | Limitation on Releases | 34 |
| 10.12. | Avoidance Actions | 34 |
| 10.13. | Retention of Causes of Action/Reservation of Rights | 34 |
| 10.14. | Limitations on Exculpation and Releases of Representatives | 35 |
| ARTICLE XI | CONDITIONS PRECEDENT to effective date | 35 |
| 11.1. | Conditions Precedent to Effectiveness | 35 |
| 11.2. | Waiver of Conditions | 35 |
| 11.3. | Effect Of Failure Of Conditions To Effective Date | 36 |
| ARTICLE XII | RETENTION OF JURISDICTION | 36 |
| ARTICLE XIII | MISCELLANEOUS PROVISIONS | 38 |
| 13.1. | Effectuating Documents and Further Transactions | 38 |
| 13.2. | Corporate Action | 38 |
| 13.3. | Exemption from Transfer Taxes | 38 |
| 13.4. | Expedited Tax Determination | 38 |
| 13.5. | Payment of Statutory Fees | 39 |
| 13.6. | Post-Confirmation Date Professional Fees and Expenses | 39 |
| 13.7. | Dissolution of Statutory Committees | 39 |
| 13.8. | Indenture Trustee as Claim Holder | 39 |
| 13.9. | Plan Supplement | 39 |
| 13.10. | Substantial Consummation | 39 |
| 13.11. | Amendments or Modifications of the Plan | 39 |
| 13.12. | Revocation or Withdrawal of the Plan | 40 |
| 13.13. | Severability | 40 |
| 13.14. | Governing Law | 40 |
| 13.15. | Binding Effect | 41 |
| 13.16. | Exhibits/Schedules | 41 |
| 13.17. | Notices | 41 |
| 13.18. | Time | 43 |
| 13.19. | Section Headings | 43 |

**<u>EXHIBITS and SCHEDULES</u>**

Exhibit 1.7  – Amended and Restated Secured CapitalSource Credit Agreement

Exhibit 1.9– Amended and Restated Secured CSE Loan Agreement

Exhibit 1.96 – Form of Stock Purchase Agreement

Schedule 8.1 – Executory contracts and unexpired leases to be rejected

Schedule 8.7 – Insurance policies and agreements to be rejected

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                             :

In re                               :        **Chapter 11 Case No.**
                                             :

**LEXINGTON PRECISION CORP., et al.,**     :        **08-11153 (BRL)**
                                           :

              **Debtors.**                  :        **(Jointly Administered)**
                                           :
----------------------------------------------------------------x

**DEBTORS' FOURTH AMENDED JOINT PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED**

          Lexington Precision Corporation and Lexington Rubber Group, Inc. propose the following fourth amended joint chapter 11 plan of reorganization, pursuant to section 1121(a) of title 11 of the United States Code:

**ARTICLE I**

**DEFINITIONS AND INTERPRETATION**

      A.    **Definitions**.

          The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

          1.1.    ***ADJUDICATION AMOUNT*** has the meaning set forth in Section 4.10(c) of this Plan.

          1.2.    ***ADMINISTRATIVE EXPENSE CLAIM BAR DATE*** means the deadline for filing proofs of or requests for payment of Administrative Expense Claims, which shall be 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.

          1.3.    ***ADMINISTRATIVE EXPENSE CLAIM OBJECTION DEADLINE*** means, as applicable, (a) the day that is the later of (i) the first Business Day that is at least 30 days after the Administrative Expense Claim Bar Date and (ii) as to Administrative Expense Claims filed after the Administrative Expense Claim Bar Date, the first Business Day that is at least 30 days after a Final Order is entered deeming the late filed claim to be treated as timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the Reorganized Debtors without further notice to parties-in-interest.

          1.4.    ***ADMINISTRATIVE EXPENSE CLAIM*** means any Claim constituting a cost or expense of administration of the Chapter 11 Cases allowed under sections 503(b) (including 503(b)(9)), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' business, any actual and necessary costs and expenses of the administration and implementation of the Plan, any indebtedness or obligations incurred or assumed by the Debtors, as Debtors in Possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or

lease of property or an interest in property or the rendition of services, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' estates under section 1930 of chapter 123 of title 28 of the United States Code.

1.5.     ***AGENTS*** means collectively, CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and CSE Mortgage, as collateral agent for itself and other lenders under the Prepetition Loan Agreement.

1.6.     ***ALLOWED*** means that, with respect to a Claim, (i) such Claim has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and no contrary proof of claim has been filed, (ii) a proof of claim with respect to such Claim has been timely filed and no objection thereto has been interposed within the time period set forth in Section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or an objection thereto has been interposed and such Claim has been allowed in whole or in part by a Final Order, (iii) such Claim has been expressly allowed by a Final Order or under the Plan, or (iv) such Claim has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under Sections 7.1, 7.4, or 7.5 of the Plan; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" under the Plan.

1.7.     ***AMENDED AND RESTATED SECURED CAPITALSOURCE CREDIT AGREEMENT*** means the agreement between CapitalSource, as agent, the Prepetition Revolver Lenders, and the Debtors in the form attached hereto as Exhibit 1.7.

1.8.     ***AMENDED SECURED CAPITALSOURCE DEBT*** means the indebtedness incurred by the Debtors pursuant to the terms set forth in the Amended and Restated Secured CapitalSource Credit Agreement.

1.9.     ***AMENDED AND RESTATED SECURED CSE LOAN AGREEMENT*** means the agreement between CSE, as agent, the Prepetition Term Lenders, and the Debtors in the form attached hereto as Exhibit 1.9.

1.10.     ***AMENDED SECURED CSE DEBT*** means the indebtedness incurred by the Debtors pursuant to the terms set forth in the Amended and Restated Secured CSE Loan Agreement.

1.11.     ***ASBESTOS INSURANCE POLICIES*** means any and all Insurance Policies issued to LPC or any predecessor in interest that insure LPC against losses that give rise to any Asbestos-Related Claim.

1.12.     ***ASBESTOS-RELATED CLAIM*** means any Claim, remedy or liability against any Debtor, whether or not such Claim, remedy or liability is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise (including piercing the corporate veil, alter ego and similar theories), for damages for property damage or for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent allegedly arising out of or based on, directly or indirectly, in whole or in part, the presence of or exposure to asbestos or asbestos-containing products or things that were installed, engineered, designed, manufactured, fabricated,

constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced or disposed of by any Debtor or an Entity for whose products or operations any Debtor allegedly has liability or for which any Debtor is otherwise allegedly liable, including any Claim, remedy or liability for compensatory damages (such as loss of consortium, lost wages or other opportunities, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) or punitive damages related thereto, and any Claim under any settlement of an Asbestos-Related Claim entered into by or on behalf of any Debtor prior to the Commencement Date.

1.13.    ***BANKRUPTCY CODE*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.14.    ***BANKRUPTCY COURT*** means the United States Bankruptcy Court for the Southern District of New York or such other court that exercises jurisdiction over the Chapter 11 Cases.

1.15.    ***BANKRUPTCY RULES*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases.

1.16.    ***BUSINESS DAY*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.17.    ***CAPITALSOURCE*** means CapitalSource Finance LLC.

1.18.    ***CAPITALSOURCE SECURED CLAIM*** means all Claims arising under the Prepetition Credit Agreement and all Claims of CapitalSource, as agent, and the Prepetition Revolver Lenders thereunder arising under the Final Cash Collateral Order (including accrued and unpaid interest and any reasonable fees, expenses, costs, and other charges payable under the Prepetition Credit Agreement and the Final Cash Collateral Order), less all payments made subsequent to the Commencement Date in respect of such Claims under the Final Cash Collateral Order; provided, however, the CapitalSource Secured Claim shall in no event be reduced by the amount of the Prepetition Senior Lenders' Fee Carve-Out Amount, as provided in paragraph 23 of the Final Cash Collateral Order.

1.19.    ***CASH*** means legal tender of the United States of America.

1.20.    ***CASH-OUT PERCENTAGE*** means fifty-one percent (51%).

1.21.    ***CHAPTER 11 CASES*** means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on April 1, 2008 in the United States Bankruptcy Court for the Southern District of New York and styled *In re Lexington Precision Corporation, et al.*, Chapter 11 Case No. 08-11153 (SCC) (Jointly Administered).

1.22.    ***CHARGING LIEN*** means any right of the Indenture Trustee to a Lien upon or other priority in payment with respect to distributions to be made to holders of Senior Subordinated Note Claims for payment of any Indenture Trustee Fee Claim arising prior to the Effective Date.

1.23.    ***CHARTER AMENDMENT*** means the amendment to the certificate of incorporation of LPC to be filed in accordance with Section 5.2 of the Plan, a form of which is to be included in the Plan Supplement.

1.24.    ***CLAIM*** shall have the meaning ascribed in section 101 of the Bankruptcy Code.

1.25.    ***CLASS*** means any group of Claims or Interests classified by the Plan as set forth in Article III of the Plan.

1.26.    ***CLASS 5 STOCK ELECTION*** means the election by a holder of an Allowed Claim in Class 5 to receive, in full satisfaction of all Allowed Senior Subordinated Note Claim held by such holder, shares of New LPC Common Stock equal to the product of (x) such holder's Allowed Senior Subordinated Note Claim and (y) the Cash-Out Percentage divided by $10.00.  A holder of Allowed Claims in Class 5 may not elect the Class 5 Stock Election for only a portion of its Claims and may only make such election for all Allowed Claims in Class 5 held by such holder or not at all.

1.27.    ***CLASS 7 CASH ELECTION*** means the election by a holder of an Allowed Claim in Class 7 to receive, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, a Cash payment in an amount equal to the Cash-Out Percentage of such Allowed Claim in full satisfaction thereof.  A holder of Allowed Claims in Class 7 cannot elect the Class 7 Cash Election for only a portion of its Claims and may only make such election for all Allowed Claims in Class 7 held by such holder or not at all.

1.28.    ***CLASS 9 CASH ELECTION*** means the election by a holder of an Allowed Claim in Class 9 to receive, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, a Cash payment in an amount equal to the Cash Out Percentage of such Allowed Claim in full satisfaction thereof.  A holder of Allowed Claims in Class 9 cannot elect the Class 9 Cash Election for only a portion of its Claims and may only make such election for all Allowed Claims in Class 9 held by such holder or not at all.

1.29.    ***CLASS 17 CASH ELECTION*** means the election by a holder of an Allowed Claim in Class 17 to receive, in full satisfaction of such Allowed Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, a Cash payment in an amount equal to the product of (x) the Cash-Out Percentage multiplied by (y) the sum of (I) such Allowed Claim and (II) interest on such Allowed Claim from the Commencement Date through and including the Effective Date at the federal judgment rate or such other rate as the Bankruptcy Court may determine.  A holder of Allowed Claims in Class 17 cannot elect the Class 17 Cash Election for only a portion of its Claims and may only make such election for all Allowed Claims in Class 17 held by such holder or not at all.

1.30.    ***COLLATERAL*** means any property or interest in property of the Debtors' estates subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

1.31.    ***COMMENCEMENT DATE*** means April 1, 2008, the date on which the Debtors commenced the Chapter 11 Cases.

1.32.    ***CONFIRMATION DATE*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases.

1.33.    ***CONFIRMATION HEARING*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.34. ***CONFIRMATION ORDER*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.35. ***CONTINGENT CLAIM*** means any Claim, the liability for which attaches or is dependent upon the occurrence of, or is triggered by, an event, which event has not yet occurred as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.36. ***CONVENIENCE CLAIM*** means any Unsecured Claim in the amount of $2,000.00 or less, and any other Unsecured Claim that is reduced to such amount by the holder of such Claim pursuant to the procedures set forth in the Disclosure Statement Order.

1.37. ***CREDITORS' COMMITTEE*** means the statutory creditors' committee appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Cases, as may be reconstituted from time to time.

1.38. ***CSE MORTGAGE*** means CSE Mortgage LLC.

1.39. ***CSE SECURED CLAIM*** means all Claims arising under the Prepetition Loan Agreement and all Claims of CSE Mortgage, as agent, and the Prepetition Term Loan Lenders thereunder arising under the Final Cash Collateral Order (including accrued and unpaid interest and any reasonable fees, expenses, costs, and other charges payable under the Prepetition Loan Agreement and the Final Cash Collateral Order), less all payments made subsequent to the Commencement Date in respect of such Claims under the Final Cash Collateral Order; provided, however, the CSE Secured Claim shall in no event be reduced by the amount of the Prepetition Senior Lenders' Fee Carve Out Amount, as provided in paragraph 23 of the Final Cash Collateral Order.

1.40. ***DEBTORS*** means LPC and LRGI.

1.41. ***DEBTORS IN POSSESSION*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.42. ***DIP LENDERS*** means Lubin Partners, LLC, William B. Connor, and ORA Associates, LLC, as the lenders under the DIP Note.

1.43. ***DIP LOAN CLAIMS*** means all Claims arising under the DIP Note, as authorized and approved by that certain Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Authorizing Postpetition Financing, entered by the Bankruptcy Court on April 17, 2008, in the Chapter 11 Cases, as may be amended or supplemented.

1.44. ***DIP NOTE*** means that certain Amended and Restated Super-Priority DIP Note issued by the Debtors in favor of the DIP Lenders on April 21, 2008, in the amount of $4 million (as may be further amended and restated).

1.45. ***DISALLOWED CLAIM*** means a Claim or a portion of a Claim that is disallowed by an order of the Bankruptcy Court or any other court of competent jurisdiction.

1.46.    ***DISBURSING AGENT*** means such Entity as is designated pursuant to Section 6.5 of the Plan to be a disbursing agent.

1.47.    ***DISCLOSURE STATEMENT*** means the disclosure statement with respect to the Plan filed with and approved by the Bankruptcy Court in accordance with section 1125 of the Bankruptcy Code, as such disclosure statement may be amended, modified or supplemented.

1.48.    ***DISCLOSURE STATEMENT ORDER*** means the order of the Bankruptcy Court approving the Disclosure Statement and establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.49.    ***DISPUTED CLAIM*** means any Claim (including any Administrative Expense Claim) against any Debtor, proof of which was timely and properly filed, that is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.

1.50.    ***DISTRIBUTION RECORD DATE*** means the date that is three (3) days after the Confirmation Date.

1.51.    ***EFFECTIVE DATE*** means a Business Day specified by the Debtors on or after the Confirmation Date, on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in Article 11 of the Plan have been satisfied or waived.

1.52.    ***ENTITY*** means a person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the Office of the United States Trustee.

1.53.    ***FINAL CASH COLLATERAL ORDER*** means that certain Final Order Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, and (III) Authorizing Postpetition Financing, entered by the Bankruptcy Court on April 17, 2008, in the Chapter 11 Cases, as may be amended or supplemented.

1.54.    ***FINAL ORDER*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, that has not been reversed, vacated, or stayed, and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order.

1.55.    **GENERAL UNSECURED CLAIM** means any Claim against any of the Debtors other than a Convenience Claim, an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, an Other Secured Claim, a CapitalSource Secured Claim, a CSE Secured Claim, a Senior Subordinated Note Claim, a Junior Subordinated Note Claim, or an Asbestos-Related Claim.

1.56.    **INDENTURE** means the Indenture, dated as of December 18, 2003, entered into by LPC, with Wilmington Trust Company, as trustee, under which the Senior Subordinated Notes were issued, as such Indenture is or has been amended, modified or supplemented from time to time.

1.57.    **INDENTURE TRUSTEE** means Wilmington Trust Company, in its capacity as the indenture trustee for the Senior Subordinated Notes, or any successor thereto.

1.58.    **INDENTURE TRUSTEE FEE CLAIM** means any Claim of the Indenture Trustee for the reimbursement of its accrued and unpaid fees and expenses under the applicable provisions of the Indenture or the Bankruptcy Code, including fees and expenses of its legal counsel.

1.59.    **INSURANCE POLICIES** means any and all insurance policies issued to LPC or LRGI, or any of their predecessors in interest.

1.60.    **INSURANCE PROCEEDS DEFICIENCY** has the meaning set forth in Section 4.10(c) of this Plan.

1.61.    **INTERCOMPANY CLAIM** means any Claim against any Debtor held by another Debtor.

1.62.    **INTEREST** means any LPC Common Stock Interest, Other Equity Interest or Series B Preferred Stock Interest.

1.63.    **JUNIOR SUBORDINATED NOTE** means that certain 13% Junior Subordinated Note due November 1, 2009, issued on December 18, 2003 by LPC to Michael A. Lubin.

1.64.    **JUNIOR SUBORDINATED NOTE CLAIM** means all Claims arising under the Junior Subordinated Note, which shall include interest from and after the Commencement Date at the rate of 13% per annum.

1.65.    **LPC**  means Lexington Precision Corporation, a Delaware corporation.

1.66.    **LPC COMMON STOCK** means the shares of common stock of LPC.

1.67.    **LPC COMMON STOCK INTERESTS** means the interest of any holder of LPC Common Stock.

1.68.    **LRGI**  means Lexington Rubber Group, Inc., a Delaware corporation.

1.69.    **LIEN** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

1.70.    **NEW LPC COMMON STOCK** means the shares of common stock to be issued by Reorganized LPC, having the material terms set forth in the Charter Amendment.

1.71.    ***OTHER EQUITY INTEREST*** means the interest of any holder of an equity security of any of the Debtors represented by any instrument evidencing an ownership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, excluding the LPC Common Stock Interests and the Series B Preferred Stock Interests.

1.72.    ***OTHER PRIORITY CLAIM*** means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim, a DIP Loan Claim, or a Priority Tax Claim.

1.73.    ***OTHER SECURED CLAIM*** means any Secured Claim other than a Secured Tax Claim, the CapitalSource Secured Claim and the CSE Secured Claim.

1.74.    ***PLAN DOCUMENTS*** means the documents to be executed, delivered, assumed, and/or performed in conjunction with the consummation of the Plan on the Effective Date, including but not limited to (i) the Charter Amendment, (ii) the list of executory contracts and unexpired leases listed on Schedule 8.1, (iii) the Amended and Restated Secured CapitalSource Credit Agreement and related loan documentation, and (iv) the Amended and Restated Secured CSE Loan Agreement and related loan documentation.  To the extent not previously filed with the Bankruptcy Court, each of the Plan Documents to be entered into as of the Effective Date will be included in draft form in the Plan Supplement.

1.75.    ***PLAN*** means this Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, including the Plan Documents, the Plan Supplement, and the exhibits and schedules hereto and thereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms of the Plan.

1.76.    ***PLAN INVESTOR*** means Commercial Finance Services 407, LLC or its affiliate.

1.77.    ***PLAN SUPPLEMENT*** means the document (as may be amended, modified or supplemented) containing the forms of documents specified in Section 13.9 of the Plan.

1.78.    ***PREPETITION CREDIT AGREEMENT*** means that certain Credit and Security Agreement, dated May 31, 2006 (as amended, restated or otherwise modified), between the Debtors, as borrowers, and CapitalSource, as a lender, as collateral agent and administrative agent for itself and each other lender, and as co-documentation agent, and Webster Business Credit Corporation as a lender and as co-documentation agent, together with all other relevant Prepetition Senior Lender Loan Documents (as defined in the Final Cash Collateral Order).

1.79.    ***PREPETITION LOAN AGREEMENT*** means that certain Loan and Security Agreement, dated May 31, 2006 (as amended, restated or otherwise modified), between the Debtors, as borrowers, and CSE Mortgage, as a lender and a collateral agent for itself and each other lender, and DMD Special Situations Funding LLC, as a lender, together with all other relevant Prepetition Senior Lender Loan Documents (as defined in the Final Cash Collateral Order).

1.80.    ***PREPETITION REVOLVER LENDERS*** means CapitalSource and Webster Business Credit Corporation, as lenders under the Prepetition Credit Agreement.

1.81.    ***PREPETITION TERM LOAN LENDERS*** means CSE Mortgage and DMD Special Situations Funding LLC, as lenders under the Prepetition Loan Agreement.

1.82.    **_PREPETITION SECURED LENDERS_** mean, collectively, the Prepetition Revolver Lenders and the Prepetition Term Loan Lenders.

1.83.    **_PRIORITY TAX CLAIM_** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.84.    **_PRO RATA_** means, with respect to Claims, at any time, the proportion that the Allowed amount of any Claim in a particular Class or Classes bears to the aggregate Allowed amounts of all Claims in such Class or Classes, unless the Plan provides otherwise.

1.85.    **_REORGANIZED DEBTORS_** means each of the Debtors, as reorganized as of the Effective Date in accordance with the Plan, and their successors.

1.86.    **_REORGANIZED LPC_** means LPC, as reorganized as of the Effective Date in accordance with the Plan.

1.87.    **_REORGANIZED LRGI_** means LRGI, as reorganized as of the Effective Date in accordance with the Plan.

1.88.    **_RESTRUCTURING TRANSACTIONS_** means a consolidation, merger, restructuring, conversion, dissolution, transfer, contribution of assets, or other transaction pursuant to which a Reorganized Debtor merges with or transfers substantially all of its assets and liabilities to another Debtor or newly formed entity on or after the Effective Date, as set forth in the Restructuring Transactions Notice and as provided for in Section 5.1 of the Plan.

1.89.    **_RESTRUCTURING TRANSACTIONS NOTICE_** means the notice, if any, contained in the Plan Supplement listing the relevant Restructuring Transactions, including the corporate structure of the Reorganized Debtors.

1.90.    **_SCHEDULES_** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements may be supplemented or amended on or prior to the Effective Date.

1.91.    **_SECURED CLAIM_** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.92.    **_SECURED TAX CLAIM_** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

1.93.    **_SENIOR SUBORDINATED NOTES_** means the 12% Senior Subordinated Notes due August 1, 2009, issued by LPC pursuant to the Indenture.

1.94.    **_SENIOR SUBORDINATED NOTE CLAIM_** means any Claim arising under the Senior Subordinated Notes for principal and accrued prepetition interest at the rate set forth in the Indenture.  For the avoidance of doubt, Senior Subordinated Note Claim shall exclude any interest accruing from and after the Commencement Date.

1.95. ***SERIES B PREFERRED STOCK INTEREST*** means the interest of any holder of issued and outstanding shares of LPC's $8 Cumulative Convertible Preferred Stock, Series B.

1.96. ***STOCK PURCHASE AGREEMENT*** means that certain agreement between the Plan Investor and LPC, substantially in the form attached hereto as Exhibit 1.96, pursuant to which the Plan Investor will agree to purchase certain amount of shares of New LPC Common Stock in connection with the consummation of this Plan.

1.97. ***UNLIQUIDATED CLAIM*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

1.98. ***UNSECURED CLAIM*** means any Claim that is not a Secured Claim, an Administrative Expense Claim, a Priority Tax Claim or Other Priority Claim.

**B.      Interpretation; Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning ascribed to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  In the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

<div align="center">

**ARTICLE II**

**ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

</div>

2.1. ***ADMINISTRATIVE EXPENSE CLAIMS***.

(a)   Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than (i) a claim covered by Sections 2.2, 2.3 or 2.4 hereof, (ii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtors, as applicable, and the Office of the United States Trustee, notice of such Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date.  Such notice must include at a minimum (A) the name of the Debtor(s) that are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis for the Claim.  **Failure to file and serve such notice timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.**

(b)   Allowance of Administrative Expense Claims.  An Administrative Expense Claim with respect to which notice has been properly filed and served pursuant to Section 2.1(a), (a) shall become an Allowed Administrative Expense Claim if no objection is filed on or prior to the Administrative Expense Claim Objection Deadline.  If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by

Final Order or as such Claim is settled, compromised, or otherwise resolved by the Debtors or Reorganized Debtors pursuant to section 7.4 of the Plan.

(c) Payment of Allowed Administrative Expense Claims. Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a claim covered by Sections 2.2, 2.3, or 2.4 hereof) agrees to a less favorable treatment, each Allowed Administrative Expense Claim (including any Allowed Claim asserted under section 503(b)(9) of the Bankruptcy Code) shall be paid by the Reorganized Debtors in full, in Cash, in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim on or as soon as reasonably practicable following the later to occur of (a) the Effective Date, or (b) the date on which such Administrative Expense Claim shall become an Allowed Claim; provided, however, that Allowed Administrative Expense Claims (other than a claim covered by Section 2.2, 2.3 or 2.4 hereof) against any of the Debtors representing liabilities incurred in the ordinary course of business by any of the Debtors, as Debtors in Possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as Debtors in Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

### 2.2. *PROFESSIONAL COMPENSATION AND REIMBURSEMENT CLAIMS*.

The Bankruptcy Court shall fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 328 and 330 of the Bankruptcy Code or applications for allowance of Administrative Expense Claims arising under section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. Unless otherwise agreed to by the claimant and the Debtors or the Reorganized Debtors, as applicable, the Allowed Administrative Expense Claims arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), and 503(b)(5) of the Bankruptcy Code shall be paid in full, in Cash, as soon as practicable following the later to occur of (a) the Effective Date and (b) the date upon which any such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. The Debtors and the Reorganized Debtors, as applicable, are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date and until the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

### 2.3. *INDENTURE TRUSTEE FEE CLAIMS*.

Notwithstanding any provision contained in this Plan to the contrary, unless otherwise agreed to by the Indenture Trustee and Reorganized LPC, all Indenture Trustee Fee Claims that are allowed by the Bankruptcy Court upon notice and a hearing shall be paid in Cash on the Effective Date as Administrative Expense Claims; *provided, however*, that the Indenture Trustee shall file a request for payment of Indenture Trustee Fee Claims, along with a detailed breakdown of all fees and expenses sought, at least **seventeen (17) days** prior to the Confirmation Hearing, any objection thereto shall be filed **ten (10) days** before the Confirmation Hearing, and such request shall be determined by the Bankruptcy Court pursuant to the Indenture and applicable law at the Confirmation Hearing. Notwithstanding the foregoing, any fees of the Indenture Trustee for services related to distributions pursuant to the Plan shall be paid by the Reorganized LPC after the Effective Date in the ordinary course of business in Cash without the need for an application to, or approval of, any court. Nothing herein shall be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by Reorganized LPC and otherwise claimed by the Indenture Trustee. Nothing herein shall prejudice any party's right regarding the jurisdiction of the Bankruptcy Court.

2.4. ***DIP LOAN CLAIMS***.

The holders of DIP Loan Claims shall receive, in full satisfaction thereof, (i) 400,000 shares of New LPC Common Stock, and (ii) payment, on or as soon as reasonably practicable following the Effective Date, in Cash of all accrued and unpaid interest through the Effective Date.

2.5. ***PRIORITY TAX CLAIMS***.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable following the later to occur of the Effective Date and the date on which such Administrative Priority Tax Claim shall become an Allowed Priority Tax Claim, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

2.6. ***INTERCOMPANY CLAIMS.***

Notwithstanding anything to the contrary herein, on the Effective Date, Intercompany Claims shall be reinstated and treated in the ordinary course of business.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|---|---|---|---|
| **LPC Classes** | | | |
| **Class 1** | Other Priority Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 2(a)** | CapitalSource Secured Claims against LPC | Impaired | Yes |
| **Class 2(b)** | CSE Secured Claims against LPC | Impaired | Yes |
| **Class 3** | Secured Tax Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 4** | Other Secured Claims against LPC | Unimpaired | No (deemed to accept) |
| **Class 5** | Senior Subordinated Note Claims | Impaired | Yes |
| **Class 6** | Junior Subordinated Note Claims | Impaired | No (deemed to reject) |
| **Class 7** | General Unsecured Claims against LPC | Impaired | Yes |

| CLASS | DESIGNATION | STATUS | ENTITLED TO VOTE? |
|---|---|---|---|
| Class 8 | Convenience Claims against LPC | Unimpaired | No (deemed to accept) |
| Class 9 | Asbestos-Related Claims | Impaired | Yes |
| Class 10 | Series B Preferred Stock Interests | Impaired | No (deemed to reject) |
| Class 11 | LPC Common Stock Interests | Impaired | No (deemed to reject) |
| Class 12 | Other Equity Interests in LPC | Impaired | No (deemed to reject) |
| **LRGI Classes** | | | |
| Class 13 | Other Priority Claims against LRGI | Unimpaired | No (deemed to accept) |
| Class 14(a) | CapitalSource Secured Claims against LRGI | Impaired | Yes |
| Class 14(b) | CSE Secured Claims against LRGI | Impaired | Yes |
| Class 15 | Secured Tax Claims against LRGI | Unimpaired | No (deemed to accept) |
| Class 16 | Other Secured Claims against LRGI | Unimpaired | No (deemed to accept) |
| Class 17 | General Unsecured Claims against LRGI | Impaired | Yes |
| Class 18 | Convenience Claims against LRGI | Unimpaired | No (deemed to accept) |
| Class 19 | Interests in LRGI | Unimpaired | No (deemed to accept) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

**LPC Claims and Interests**.

### 4.1. *CLASS 1: OTHER PRIORITY CLAIMS AGAINST LPC*.

(a) <u>Impairment and Voting</u>. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Except to the extent that a holder of an Allowed Other Priority Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed.

### 4.2. *CLASS 2(A): CAPITALSOURCE SECURED CLAIMS AGAINST LPC*.

(a) <u>Impairment and Voting</u>. Class 2(a) is impaired by the Plan. Each holder of an Allowed CapitalSource Secured Claim against LPC is entitled to vote to accept or reject the Plan.

(b) <u>Allowance of Claim</u>. The CapitalSource Secured Claim shall be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

(c) <u>Distributions</u>. Except to the extent that a holder of an Allowed CapitalSource Secured Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full

satisfaction of such Claim, payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, shall be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000.

### 4.3.    *CLASS 2(B):  CSE SECURED CLAIMS AGAINST LPC*.

(a)    <u>Impairment and Voting</u>.  Class 2(b) is impaired by the Plan.  Each holder of an Allowed CSE Secured Claim against LPC is entitled to vote to accept or reject the Plan.

(b)    <u>Allowance of Claim</u>.  The CSE Secured Claim shall be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

(c)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed CSE Secured Claim against LPC agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, shall be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders, $375,000.

### 4.4.    *CLASS 3:  SECURED TAX CLAIMS AGAINST LPC*.

(a)    <u>Impairment and Voting</u>.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a holder of an Allowed Secured Tax Claim against LPC agrees to a less favorable treatment, each holder shall receive, at the sole option of LPC or Reorganized LPC, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

### 4.5. *CLASS 4: OTHER SECURED CLAIMS AGAINST LPC*.

(a) <u>Impairment and Voting</u>. Class 4 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Except to the extent that a holder of an Allowed Other Secured Claim against LPC agrees to a less favorable treatment, at the sole option of LPC or Reorganized LPC, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Allowed Other Secured Claim, either (w) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of the holder's security interest in such Collateral, (y) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event LPC or Reorganized LPC elects to treat a Claim under clause (w) or (x) of this Section, the Liens securing such Secured Claim shall be deemed released.

### 4.6. *CLASS 5: SENIOR SUBORDINATED NOTE CLAIMS*.

(a) <u>Impairment and Voting</u>. Class 5 is impaired by the Plan. Each holder of an Allowed Senior Subordinated Note Claim is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Except to the extent that a holder of an Allowed Senior Subordinated Note Claim agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of its Allowed Senior Subordinated Note Claim, as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, Cash in an amount equal to the Cash-Out Percentage of its Allowed Senior Subordinated Note Claim; <u>provided</u>, <u>however</u>, that in lieu of such distribution, such holder may instead elect to make the Class 5 Stock Election.

### 4.7. *CLASS 6: JUNIOR SUBORDINATED NOTE CLAIMS*.

(a) <u>Impairment and Voting</u>. Class 6 is impaired by the Plan. Each holder of an Allowed Junior Subordinated Note Claim is deemed to have voted to reject the Plan.

(b) <u>Distributions</u>. Holders of Allowed Junior Subordinated Note Claims shall receive no distribution under this Plan.

### 4.8. *CLASS 7: GENERAL UNSECURED CLAIMS AGAINST LPC*.

(a) <u>Impairment and Voting</u>. Class 7 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim against LPC is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Each holder of an Allowed General Unsecured Claim against LPC shall receive, in full satisfaction of such Allowed General Unsecured Claim, (i) Cash in the amount of eight percent (8%) of such Allowed General Unsecured Claim as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such General Unsecured Claim becomes Allowed, and (ii) an additional nine (9) equal quarterly Cash payments, each in an amount equal to eight and six-tenths percent (8.6%) of such Allowed Claim commencing three (3) months after the later of (a) the Effective Date and (b) the date such claim becomes Allowed; provided, however, that in lieu of such distribution, such holder may instead elect to make the Class 7 Cash Election.

### 4.9.  *CLASS 8: CONVENIENCE CLAIMS AGAINST LPC*.

(a)  Impairment and Voting.  Class 8 is unimpaired by the Plan.  Each holder of an Allowed Convenience Claim in LPC is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  Distributions.  Each holder of an Allowed Convenience Claim against LPC shall receive, in full satisfaction of such Allowed Convenience Claim, Cash in an amount equal to 100% of such Allowed Convenience Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed.

### 4.10.  *CLASS 9:  ASBESTOS-RELATED CLAIMS*.

(a)  Impairment and Voting.  Class 9 is impaired by the Plan.  Each holder of an Asbestos-Related Claim is entitled to vote to accept or reject the Plan.

(b)  Treatment.  Each Asbestos-Related Claim shall be deemed a Disputed Claim without the need for the Debtors to file a separate formal objection thereto.

(c)  Distributions.  After the Effective Date, each Asbestos-Related Claim shall be adjudicated in the forum in which such Claim had been pending prior to the Commencement Date; *provided, however* that any claimant who has filed an Asbestos-Related Claim, but has not commenced a proceeding prior to the Commencement Date, shall, as promptly as possible after the Effective Date, commence a proceeding in a court of competent jurisdiction other than the Bankruptcy Court, subject to any and all defenses that any defendant may have thereto, including without limitation, statute of limitations, laches, and any other defense.  To the extent that the proceeds of the Asbestos Insurance Policies are sufficient to cover the recovery on any Asbestos-Related Claim covered thereby as determined by a final and non-appealable order or judgment of a court of competent jurisdiction (the "Adjudication Amount"), the holders of such Asbestos-Related Claims shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of, directly or indirectly, collecting, recovering, or receiving payment of, on, or with respect to any Asbestos-Related Claim against the Debtors or the Reorganized Debtors (other than against the Asbestos Insurance Policies).  To the extent the proceeds of the Asbestos Insurance Policies do not cover the entire Adjudication Amount for any specific Asbestos-Related Claim, the Reorganized Debtors shall pay in Cash as promptly as possible after the determination of the Adjudication Amount of such Asbestos-Related Claim 80% of the difference between such Adjudication Amount and the proceeds of the Asbestos Insurance Policies (the "Insurance Proceeds Deficiency"); provided, however, that if the Insurance Proceeds Deficiency exceeds $2,000, the holder of such Asbestos-Related Claim shall receive, in full satisfaction thereof, (i) Cash in the amount of eight percent (8%) of such Insurance Proceeds Deficiency as soon as reasonably practicable after the date of determination of the Adjudication Amount of such Asbestos-Related Claim, and (ii) an additional nine (9) equal quarterly Cash payments, each in an amount equal to eight and six-tenths percent (8.6%) of such Insurance Proceeds Deficiency commencing three (3) months after the later

of (x) the Effective Date and (y) the date such Claim becomes Allowed; provided, however, that in lieu of such distribution, such holder may instead elect to make the Class 9 Cash Election.

(d) **Nothing in this Plan or the Disclosure Statement is an admission of any liability by the Debtors or an admission of insurance coverage by Liberty Mutual or Fireman's Fund. Further, the treatment provided to holders of Asbestos-Related Claims is not an admission of any liability by the Debtors or an admission of insurance coverage by Liberty Mutual or Fireman's Fund.**

### 4.11. *CLASS 10: SERIES B PREFERRED STOCK INTERESTS*.

(a) Impairment and Voting. Class 10 is impaired by the Plan. Each holder of a Series B Preferred Stock Interest is deemed to have voted to reject the Plan.

(b) Distributions. On the Effective Date, the Series B Preferred Stock Interests shall be cancelled and shall receive no distributions on account of such Interests.

### 4.12. *CLASS 11: LPC COMMON STOCK INTERESTS*.

(a) Impairment and Voting. Class 11 is impaired by the Plan. Each holder of an LPC Common Stock Interest is deemed to have voted to reject the Plan.

(b) Distributions. LPC Common Stock Interests shall be cancelled on the Effective Date and shall receive no distributions on account of such Interests.

### 4.13. *CLASS 12: OTHER EQUITY INTERESTS IN LPC*.

(a) Impairment and Voting. Class 12 is impaired by the Plan. Each holder of an Other Equity Interest in LPC is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b) Distributions. All Other Equity Interests shall be cancelled on the Effective Date and shall receive no distributions on account of such Interests.

**LRGI Claims and Interests**

### 4.14. *CLASS 13: OTHER PRIORITY CLAIMS AGAINST LRGI*.

(a) Impairment and Voting. Class 13 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) Distributions. Except to the extent that a holder of an Allowed Other Priority Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, and (ii) the date such Claim becomes Allowed.

### 4.15. *CLASS 14(A): CAPITALSOURCE SECURED CLAIMS AGAINST LRGI*.

(a) Impairment and Voting. Class 14(a) is impaired by the Plan. Each holder of an Allowed CapitalSource Secured Claim against LRGI is entitled to vote to accept or reject the Plan.

(b) <u>Allowance of Claim</u>.  The  CapitalSource Secured Claim shall be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CapitalSource, as collateral agent and administrative agent for itself and other lenders under the Prepetition Credit Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

(c) <u>Distributions</u>.  Except to the extent that a holder of an Allowed CapitalSource Secured Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payments over time as provided in the Amended and Restated Secured CapitalSource Credit Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Revolver Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, shall be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Term Loan Lenders, $375,000.

4.16.    *CLASS 14(B):  CSE SECURED CLAIMS AGAINST LRGI*.

(a) <u>Impairment and Voting</u>.  Class 14(b) is impaired by the Plan.  Each holder of an Allowed CSE Secured Claim against LRGI is entitled to vote to accept or reject the Plan.

(b) <u>Allowance of Claim</u>.  The CSE Secured Claim shall be Allowed on the Effective Date in an amount stipulated by the Debtors, the Plan Investor and CSE, as collateral agent for itself and other lenders under the Prepetition Loan Agreement, and approved in a Final Order entered by the Bankruptcy Court prior to the date of the Confirmation Hearing.

(c) <u>Distributions</u>.  Except to the extent that a holder of an Allowed CSE Secured Claim against LRGI agrees to a less favorable treatment, each such holder shall receive, in full satisfaction of such Claim, payments over time as provided in the Amended and Restated Secured CSE Loan Agreement beginning on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed, except that all actual and reasonable fees, costs, and expenses of the Prepetition Term Loan Lenders (including, without limitation, any attorneys' fees and any financial advisors' fees) incurred during the Chapter 11 Cases that have not been paid in accordance with the terms of the Final Cash Collateral Order through the Effective Date, or that have been incurred in connection with the transactions contemplated under this Plan through the Effective Date, shall be paid in full in Cash on the Effective Date in an amount not to exceed, when combined with similar amounts owing to the Prepetition Revolver Lenders, $375,000.

4.17.    *CLASS 15:  SECURED TAX CLAIMS AGAINST LRGI*.

(a) <u>Impairment and Voting</u>.  Class 15 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>.  Except to the extent that a holder of an Allowed Secured Tax Claim against LRGI agrees to a less favorable treatment, each holder shall receive, at the sole option of LRGI or Reorganized LRGI, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments in an aggregate amount equal to such Allowed

Secured Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the Commencement Date), or (iii) such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed Senior Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Senior Tax Claim.

### 4.18.  *CLASS 16:  OTHER SECURED CLAIMS AGAINST LRGI*.

(a)  <u>Impairment and Voting</u>.  Class 16 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim against LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Except to the extent that a holder of an Allowed Other Secured Claim against LRGI agrees to a less favorable treatment, at the sole option of LRGI or Reorganized LRGI, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction of such Allowed Other Secured Claim, either (w) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the Collateral securing such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, to the extent of the value of the holder's security interest in such Collateral, (y) the Collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event LRGI or Reorganized LRGI elects to treat a Claim under clause (w) or (x) of this Section, the Liens securing such Secured Claim shall be deemed released.

### 4.19.  *CLASS 17:  GENERAL UNSECURED CLAIMS AGAINST LRGI*.

(a)  <u>Impairment and Voting</u>.  Class 17 is impaired by the Plan.  Each holder of an Allowed General Unsecured Claim against LRGI is entitled to vote to accept or reject the Plan

(b)  <u>Distributions</u>.

(i)  If Class 17 accepts the Plan, each holder of an Allowed General Unsecured Claim against LRGI will receive Cash payments in the aggregate amount of 106.75% of such Claim (which includes interest from the Commencement Date through the date of last payment) as follows, (a) ten percent (10%) of the sum of (i) its Allowed General Unsecured Claim against LRGI and (ii) postpetition interest from the Commencement Date through and including the Effective Date, calculated at the federal judgment rate, in Cash as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed and (b) an additional nine (9) equal quarterly Cash payments, each in an amount equal to ten and three quarters percent (10.75%) of the sum of (i) its Allowed General Unsecured Claim, and (ii) postpetition interest from the Commencement Date through and including the Effective Date, calculated at the federal judgment rate, commencing three (3) months after the later of the Effective Date and the date such Claim is Allowed.

(ii)     If Class 17 does not accept the Plan, each holder of an Allowed General Unsecured Claim against LRGI will receive the following stream of Cash payments:  (a) an initial Cash payment, payable as soon as practicable after the later of the Effective Date and the date such Claim becomes Allowed, equal to ten percent (10%) of the sum of (i) its Allowed General Unsecured Claim against LRGI and (ii) postpetition interest from the Commencement Date through and including the Effective Date at the rate determined by the Bankruptcy Court and (b) an additional nine (9) quarterly payments, each in an amount determined by the Bankruptcy Court to be adequate to satisfy in full Allowed General Unsecured Claims against LRGI.

(iii)     In either case, in lieu of the stream of payments referred to in (i) and (ii) above, each holder of an Allowed General Unsecured Claim may instead elect the Class 17 Cash Election.

4.20.     ***CLASS 18:  CONVENIENCE CLAIMS AGAINST LRGI***.

(a)  <u>Impairment and Voting</u>.  Class 18 is unimpaired by the Plan.  Each holder of an Allowed Convenience Claim in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Each holder of an Allowed Convenience Claim against LRGI shall receive, in full satisfaction of such Allowed Convenience Claim, Cash in an amount equal to 100% of the sum of (i) such Allowed Convenience Claim and (ii) interest on such Allowed Convenience Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate or such other rate as the Bankruptcy Court may determine, to be paid on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

4.21.     ***CLASS 19:  INTERESTS IN LRGI***.

(a)  <u>Impairment and Voting</u>.  Class 19 is unimpaired by the Plan.  Each holder of an Interest in LRGI is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  All Interests in LRGI shall be unaltered.

**ARTICLE V**

**MEANS FOR IMPLEMENTATION**

5.1.     ***RESTRUCTURING TRANSACTIONS***

On or after the Effective Date, the Debtors and/or the Reorganized Debtors may enter into the Restructuring Transactions set forth in the Restructuring Transactions Notice and may take any actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors.  The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, or transfers as may be determined by the Debtors, with consent of the Plan Investor, to be necessary or appropriate.  The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Transactions Notice and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate

instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and the Restructuring Transactions Notice and having other terms for which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions. The form of each Restructuring Transaction shall be acceptable to the Plan Investor. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor shall assume and perform the obligations of each Reorganized Debtor under this Plan. Implementation of any Restructuring Transaction shall not affect distributions under the Plan. Moreover, the requirements of the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement shall apply to any Restructuring Transaction to be entered into by the Debtors or the Reorganized Debtors.

To the extent that any such Restructuring Transactions result in the assumption and assignment of any Executory Contract or Unexpired Lease under the Plan to a party other than (i) the Debtors originally a party to such Executory Contract or Unexpired Lease (including such Debtor as Reorganized Debtor) or (b) the Reorganized Debtors, the Debtors shall comply with the procedures set forth in ARTICLE VIII of the Plan.

5.2. *CANCELLATION AND SURRENDER OF EXISTING SECURITIES AND AGREEMENTS*.

(a) Except (i) as otherwise expressly provided in the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (iii) for purposes of evidencing a right to distributions under the Plan, or (iv) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, any document, agreement, or debt instrument evidencing any Claim or Interest, including without limitation, the Prepetition Credit Agreement, the Prepetition Loan Agreement, the DIP Note, the Indenture and all notes issued thereunder, shall be deemed automatically cancelled, superseded, or amended and restated, as applicable, without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

(b) Unless waived by LPC or Reorganized LPC, each holder of the Senior Subordinated Notes shall surrender such note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, the Debtors shall follow the applicable procedures of the Depository Trust Company for book-entry transfer of the Senior Subordinated Notes to the Indenture Trustee. No distributions hereunder shall be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from Depository Trust Company shall be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to (i) submit a lost instrument affidavit and an indemnity bond and (ii) hold the Debtors and the Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this Section by a holder of any note, such holder shall, for all purposes under this Plan, be deemed to have surrendered such note. Any holder of Senior Subordinated Notes that fails to surrender such note or satisfactorily explain its non-availability to the applicable Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, or their property or against the Indenture Trustee in respect of such Claim and

shall not participate in any distribution hereunder, and the distribution that would have otherwise been made to such holder shall be returned to Reorganized LPC by the Indenture Trustee.

### 5.3. *CHARTER AMENDMENT*.

On the Effective Date or as soon as practicable thereafter, LPC shall file the Charter Amendment with the Secretary of State of the State of Delaware. The Charter Amendment will amend LPC's certificate of incorporation to authorize the issuance of the New LPC Common Stock. LPC is hereby authorized to file the Charter Amendment without the need for any further corporate action and without any further action by holders of Claims or Interests.

### 5.4. *EXECUTION OF DOCUMENTS COMMEMORATING INDEBTEDNESS*.

The Reorganized Debtors' entry into the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests.

### 5.5. *STOCK PURCHASE AGREEMENT*.

The entry by Reorganized LPC into the Stock Purchase Agreement and the issuance of shares of New LPC Common Stock thereunder are hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests.

### 5.6. *ISSUANCE OF NEW LPC COMMON STOCK*.

The issuance by Reorganized LPC of New LPC Common Stock on or as soon as reasonably practicable after the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Interests. Newly-issued shares of New LPC Common Stock shall be distributed to holders of Allowed Senior Subordinated Note Claims pursuant to Section 4.6 of the Plan, distributed to holders of the DIP Loan Claim pursuant to Section 2.4 of the Plan, and purchased by the Plan Investor pursuant to the Stock Purchase Agreement.

### 5.7. *EXEMPTION FROM SECURITIES LAWS*.

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the offer and issuance of securities under the Plan will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and under applicable state securities laws.

## ARTICLE VI

## VOTING AND DISTRIBUTIONS

### 6.1. *VOTING OF CLAIMS*.

Each holder of an Allowed Claim or Interest in an impaired Class of Claims or Interests that is entitled to vote on the Plan pursuant to Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in the Disclosure Statement Order, or any other order or orders of the Bankruptcy Court.

### 6.2. *NONCONSENSUAL CONFIRMATION*.

Because Class 6 (Junior Subordinated Note Claims), Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Equity Interests in LPC) are deemed to have voted to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to such Claims and Interests.

If any other impaired class of Claims or Interests entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, respectively, the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to such Claims and Interests.

### 6.3. *DISTRIBUTION RECORD DATE*.

On the Distribution Record Date the claims register shall be closed and any transfer of any Claim therein shall be prohibited. The Disbursing Agent shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the claims register or stock transfer ledger or similar ledger, as applicable, as of the close of business on the Distribution Record Date.

### 6.4. *DATE OF DISTRIBUTIONS*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Distributions to holders of Claims and Interests shall be made as provided in Article IV hereof.

### 6.5. *DISBURSING AGENT*.

All distributions under the Plan (other than with respect to the Allowed Senior Subordinated Note Claims) shall be made by Reorganized LPC as the Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent. The Indenture Trustee, or such other entity designated by the Debtors, shall be the Disbursing Agent for the Senior Subordinated Notes. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### 6.6. *RIGHTS AND POWERS OF DISBURSING AGENT*.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.7. *EXPENSES OF THE DISBURSING AGENT*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.8.    ***DELIVERY OF DISTRIBUTIONS***.

(a)    <u>General</u>.  Subject to Bankruptcy Rule 9010, all distributions to a holder of an Allowed Claim or Interest shall be made at the address of the holder thereof as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents or in a letter of transmittal unless the Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.

(b)    <u>Distributions to Holders of Allowed Senior Subordinated Note Claims</u>.  Reorganized LPC shall deliver all distributions in respect of Allowed Senior Subordinated Note Claims to the Indenture Trustee or such other entity designated by the Debtors as the Disbursing Agent under the Senior Subordinated Notes.  Upon delivery of the foregoing distributions to the Indenture Trustee or such designee, Reorganized LPC shall be released of all liability with respect to the delivery of such distributions.  The Indenture Trustee or such designee shall transmit the distributions to the holders of the Allowed Senior Subordinated Note Claims.  Reorganized LPC shall provide whatever reasonable assistance may be required by the Indenture Trustee or such designee with respect to such distributions.

(c)    <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan, including any party described in Section 6.5 above, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

6.9.    ***UNCLAIMED DISTRIBUTIONS***.

In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest from the original distribution date through the new distribution date; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interest in property (including any stock) shall revert to Reorganized LPC or Reorganized LRGI, as applicable, and the Claim of any other Entity to such property or interest in property shall be discharged and forever barred.

6.10.    ***MANNER OF PAYMENT***.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.11. ***FRACTIONAL SHARES***.

No fractional shares of New LPC Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New LPC Common Stock that is not a whole number, the actual distribution of shares of New LPC Common Stock shall be rounded as follows: (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment or other distribution therefor. The total number of authorized shares of New LPC Common Stock to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the rounding provided in this Section 6.11.

6.12. ***MINIMUM CASH DISTRIBUTIONS***.

Notwithstanding anything set forth herein to the contrary, no payment of Cash less than $50 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Disbursing Agent.

6.13. ***SETOFFS***.

The Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any Claims of any nature whatsoever that the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim the Debtors may have against the holder of such Claim; provided, however, that the Debtors shall not exercise setoff rights with respect to the respective Claims of the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders and/or the Agents under the Prepetition Credit Agreement and the Prepetition Loan Agreement.

## ARTICLE VII

## PROCEDURES FOR DISPUTED CLAIMS

7.1. ***OBJECTIONS***.

Objections to all Claims against the Debtors may be interposed and prosecuted only by the Debtors and the Reorganized Debtors. The Reorganized Debtors shall be entitled to object to any Claim through and after the Effective Date. Any objections to Claims shall be served and filed with the Bankruptcy Court on or before the later of (i) one hundred twenty (120) days after the Effective Date, as such time may be extended by order of the Bankruptcy Court and (ii) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.

7.2. ***NO PAYMENT PENDING ALLOWANCE***.

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, then no payment or distribution provided hereunder shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.3. ***DISTRIBUTIONS AFTER ALLOWANCE***.

To the extent that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim, the property distributable with respect to such Claim in accordance with Article IV of the Plan. Such distributions shall be made as soon as practicable after the later of (i) the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order, (ii) the date on which any objection to such Disputed Claim has been withdrawn, or (iii) the date on which such Disputed Claim has been settled, compromised or otherwise resolved. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed and any property withheld, if any, pending the resolution of such Claim shall revest in the applicable Reorganized Debtor.

### 7.4. ***RESOLUTION OF ADMINISTRATIVE EXPENSE CLAIMS AND OTHER CLAIMS***.

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expense Claims and any other Claims and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals.

### 7.5. ***ESTIMATION OF CLAIMS***.

Requests for estimation of all Claims against the Debtors may be interposed and prosecuted only by the Debtors and the Reorganized Debtors. The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.6. ***INTEREST***.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon from the Effective Date to the date such Claim becomes Allowed.

### 7.7. ***ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST***.

Except to the extent otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest. For the avoidance of doubt, the terms of this Section 7.7 shall not apply to the CapitalSource Secured Claims and the CSE Secured Claims.

## ARTICLE VIII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1. *ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES*.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment, or rejection has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.1, which Schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.1 to delete therefrom or add thereto any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either assumed or rejected as of the Effective Date. The Debtors shall provide notice of any amendments to Schedule 8.1 to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 8.1 shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

### 8.2. *APPROVAL OF ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES*.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date and subject to the Debtors' right pursuant to Section 8.4 of the Plan to reject any executory contract or unexpired lease that is subject to a dispute over a cure amount, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (ii) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject the executory contracts and unexpired leases specified in Section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such executory contracts and unexpired leases and (iii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

### 8.3. *INCLUSIVENESS*.

Unless otherwise specified on Schedule 8.1 of the Plan Supplement, each executory contract and unexpired lease listed or to be listed on Schedule 8.1 shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any

agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedule 8.1.

8.4. ***CURE OF DEFAULTS***.

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, at least 21 days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 8.1 of the Plan, a notice (the "Assumption Notice"), which shall list the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of the Assumption Notice to file and serve any objection to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

8.5. ***BAR DATE FOR FILING PROOFS OF CLAIM RELATING TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES REJECTED PURSUANT TO THE PLAN***.

In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors, or assigns, unless a proof of claim is filed with Epiq Bankruptcy Solutions, LLC and served upon the attorneys for the Debtors on or before the thirtieth (30th) day after the later of (i) the date of service of notice of the Effective Date, or (ii) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such modification).

8.6. ***INDEMNIFICATION OBLIGATIONS***.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are or were directors, officers or employees of the Debtors on or before the Confirmation Date, against any claims or causes of action, as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

8.7. ***INSURANCE POLICIES***.

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court or listed on Schedule 8.7 of the Plan, which will be filed as part of the Plan Supplement, all of the Debtors' Insurance Policies and any agreements, documents or instruments relating thereto, are treated as executory contracts under the Plan and will be assumed pursuant to the Plan, effective as of the Effective Date.  Nothing contained in this Section 8.7 shall

constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' Insurance Policies.

To the extent the Insurance Policies are determined not to be executory contracts, they will remain in full force and effect in accordance with their terms and will be treated as unimpaired (as defined in section 1124 of the Bankruptcy Code), including without limitation for purposes of payment of Claims for retrospective premiums, deductibles, and self-insurance retentions.

The Debtors and the Reorganized Debtors will perform the insureds' obligations under the Insurance Policies, whether they are treated as executory or non-executory. The Plan shall not, and is not intended to, modify any of the rights or obligations of insurers or the Debtors under any of the Insurance Policies. Notwithstanding any other provision of the Plan, including Article X and anything supervening or preemptory, the Debtors and Reorganized Debtors shall be, and intend to remain, bound by all of the terms, conditions, limitations and/or exclusions contained in the Insurance Policies, which shall continue in full force and effect. Notwithstanding anything contained in the Plan or the Disclosure Statement to the contrary, to the extent that there is an inconsistency between the Insurance Policies and any provision of the Plan or Disclosure Statement, the terms of the Insurance Policies shall control. No provision of the Plan shall (i) expand or alter any insurance coverage under any of the Insurance Policies, or shall be deemed to create any insurance coverage that does not otherwise exist, if at all, under the terms of the Insurance Policies, (ii) create any direct right of action against insurers that did not otherwise exist, and/or (iii) be construed as an acknowledgment either that the Insurance Policies cover or otherwise apply to any Claims or that any Claims are eligible for payment under any of the Insurance Policies.

Notwithstanding any provision of the Plan, including Article X and anything supervening or preemptory, the Plan and the Confirmation Order shall be without prejudice to any of insurers' rights, claims and/or defenses in any subsequent litigation in any appropriate forum in which coverage is at issue, including any litigation in which insurers seek a declaration regarding the nature and/or extent of any insurance coverage under the Insurance Policies.

8.8.    ***COMPENSATION AND BENEFIT PROGRAMS***.

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all employment and severance policies and workers' compensation programs, and all compensation and benefit plans, policies and programs of the Debtors applicable to their present and former employees, officers and directors, including, without express or implied limitation, all savings plans, retirement plans, health care plans, disability plans, and life, accidental death, and dismemberment insurance plans, shall be deemed to be, and shall be treated as though they are, executory contracts that are deemed assumed under the Plan, and the Debtors' obligations under such plans, policies, and programs shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, shall survive confirmation of the Plan, shall remain unaffected thereby, and shall not be discharged in accordance with section 1141 of the Bankruptcy Code. Any default existing under any of such plans, policies, or programs shall be cured promptly after it becomes known by the Reorganized Debtors.

8.9.    ***RETIREE BENEFITS***.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## ARTICLE IX

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF THE REORGANIZED DEBTORS

9.1. *GENERAL*.

On the Effective Date, the management, control, and operation of the Reorganized Debtors shall become the general responsibility of the boards of directors (the "Boards") of Reorganized LPC and Reorganized LRGI, respectively.

9.2. ***DIRECTORS AND OFFICERS OF THE REORGANIZED DEBTORS***.

(a)     Boards of Directors of the Reorganized Debtors.  The Boards of the Reorganized Debtors shall consist of seven (7) members each.  The CEO, to be appointed by the Plan Investor, will be designated as one (1) board member, four (4) board members will be designated by the Plan Investor (provided, however, that one of the Plan Investor's designees shall be an "Independent Director," as defined in the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement), one (1) board member will be designated by Mr. Lubin and Mr. Delano (together, the "Affiliated Bondholders"), and one (1) board member will be designated by the DIP Lenders.

(b)     Officers of the Reorganized Debtors.  The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date.  Such officers shall serve in accordance with applicable nonbankruptcy law, any employment agreement with the Reorganized Debtors, and the certificates of incorporation and by-laws of the Reorganized Debtors, as the same may be amended from time to time.

(c)     No later than ten (10) days prior to the last day by which holders of impaired Claims may vote to accept or reject the Plan, the Debtors (i) will identify in the Plan Supplement all the members of the Boards and all officers of Reorganized LPC and Reorganized LRGI, and (ii) will disclose any compensation for any officer of the Reorganized LPC and Reorganized LRGI or member of the new Boards who is an "insider" under the Bankruptcy Code.

9.3. ***ISSUANCE OF NON-VOTING SECURITIES***.

From and after the Effective Date, the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code so long as it is applicable.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.1. *VESTING OF ASSETS*.

Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors shall vest in each of the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan, the Amended CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose

of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code.

10.2. ***DISCHARGE OF CLAIMS AND INTERESTS***.

Except as provided in the Plan, the rights afforded in, and the payments and distributions to be made under, the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Interests and all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Commencement Date, against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims and Interests against the Debtors shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees, or any of their assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest, and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

10.3. ***DISCHARGE OF DEBTORS***.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any trustee or agent on behalf of any holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors.

10.4. ***INJUNCTION OR STAY***.

Except as otherwise expressly provided in the Plan, all persons or Entities who have held, hold or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against or Interest in the Debtors or the Reorganized Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or the Reorganized Debtors or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest, or (v) pursuing any Claim or Interest released pursuant to Article XII of the Plan. Such injunction shall extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interest in properties.

10.5. ***TERM OF INJUNCTIONS OR STAYS***.

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the

Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.6. *INJUNCTION AGAINST INTERFERENCE WITH PLAN*.

Upon the entry of the Confirmation Order, all holders of Claims or Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

10.7. *EXCULPATION*.

**Notwithstanding anything herein to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, and the Prepetition Term Loan Lenders, the DIP Lenders, and their respective directors, officers, employees, partners, members, agents, representatives, accountants, financial advisors, investment bankers, or attorneys (but solely in their capacities as such) shall have or incur any liability for any claim, cause of action or other assertion of liability for any act taken or omitted to be taken since the Commencement Date in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, consummation, or administration of this Plan, property to be distributed under this Plan, or any other act or omission in connection with the Chapter 11 Cases, this Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; provided, however, that the foregoing shall not affect the liability of any person that would otherwise result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* act.**

10.8. *RELEASES OF DIRECTORS, OFFICERS AND EMPLOYEES*.

**Subject to Section 10.11 of the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by the present and former directors, officers, and employees of the Debtors, the Debtors, the Reorganized Debtors, each holder of a Claim or Interest that votes to accept the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan, shall release, unconditionally and forever, each present or former director, officer, and employee from any and all Claims or causes of action that exist as of the Effective Date and arise from or relate to, in any manner, in whole or in part, the operation of the business of the Debtors, the subject matter of, or the transactions or events giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, however, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or Entity.**

10.9.  *PLAN INVESTOR RELEASE*

Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, each holder of a Claim who receives a distribution under the Plan shall provide a full discharge and release, and each Entity so released shall be deemed released, to the Plan Investor and its affiliates and each of their respective directors, officers, employees, members, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents and representatives, each in their representative capacities as such, and their respective property from any and all causes of action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including, without limitation, those in any way related to the Chapter 11 Cases, this Plan, or the Disclosure Statement, provided, however, that the foregoing, the "Plan Investor Release" shall not operate to waive or release any causes of action (i) arising from any contractual obligations; (ii) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; (iii) arising from Claims for fraud or willful misconduct.

10.10.  *OTHER RELEASES*.

Subject to Section 10.11 of the Plan, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and in consideration of the services provided to the Debtors by (i) the present and former affiliates, agents, financial advisors, attorneys, and representatives of the Debtors who acted in such capacities after the Commencement Date, (ii) the Plan Investor, (iii) the Creditors' Committee, (iv) the Agents, (v) the Prepetition Revolver Lenders, (vi) the Prepetition Term Loan Lenders, and (vii) the DIP Lenders, (1) the Debtors, (2) the Reorganized Debtors, (3) each holder of a Claim or Interest that votes to accept the Plan that does not elect to "opt-out" the releases as provided herein, (4) each holder of a Claim or Interest that is deemed to accept the Plan, and (5) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan and that does not elect to "opt-out" of the releases as provided herein, shall release, unconditionally and forever, each present or former affiliate, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors, the Plan Investor, the Creditors' Committee, the Agents, the Prepetition Revolver Lenders, the Prepetition Term Loan Lenders, the DIP Lenders, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims or causes of action that exist as of the Effective Date and arise from or relate, in any manner, in whole or in part, to the operation of the business of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim or Interest of such holder, the business or contractual arrangements between any Debtor and such holder, any restructuring of such Claim or Interest prior to the Commencement Date, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction or obligation, or arising out of the Chapter 11 Cases, including, but not limited to, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof, or the property to be distributed thereunder; provided, however, that the foregoing shall not operate as a waiver or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts of any such person or Entity.   For the avoidance of doubt, the claims and causes of actions released hereunder include those claims and causes of action released under the Final Cash Collateral Order.

10.11.  ***LIMITATION ON RELEASES***.

**Notwithstanding anything to the contrary in the Plan or in the Confirmation Order, the releases set forth in Sections 10.8, 10.9 and 10.10 of the Plan shall not effect a release of any claim against a non-Debtor by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation, any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority.  Nothing in Sections 10.8, 10.9 or 10.10 of the Plan nor the Confirmation Order shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceeding against a non-Debtor for any liability whatsoever, including, without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.  Other than as set forth in Section 10.7 of the Plan, nothing in the Plan or the Confirmation Order shall exculpate any non-Debtor from any liability to the United States Government or any of its agencies or any state or local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state or local authority.**

10.12.  ***AVOIDANCE ACTIONS***.

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the sole right to prosecute any and all avoidance actions, equitable subordination actions or recovery actions under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

10.13.  ***RETENTION OF CAUSES OF ACTION/RESERVATION OF RIGHTS***.

(a)     Except as provided in Sections 10.8, 10.9 and 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Entity, to the extent such Entity asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' estates.

(b)     Except as provided in Sections 10.8, 10.9 and 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Commencement Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.14. ***LIMITATIONS ON EXCULPATION AND RELEASES OF REPRESENTATIVES***.

Nothing in Sections 10.7, 10.8 or 10.9 of the Plan shall (i) be construed to release or exculpate any Entity from intentional fraud, malpractice, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts, or (ii) limit the liability of the professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

## ARTICLE XI

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

11.1. ***CONDITIONS PRECEDENT TO EFFECTIVENESS***.

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 11.2 of the Plan:

(a) The Confirmation Order, in form and substance acceptable to the Debtors, the Plan Investor, and the Agents, shall have been entered and shall not be subject to any stay or injunction; provided, however, that the approval of the Agents to the form and substance of the Confirmation Order shall not be unreasonably withheld;

(b) All actions, documents, and agreements necessary to implement the Plan, in a form and substance acceptable to the Debtors, the Plan Investor, and the Agents, shall have been effected or executed; provided, however, that the approval of the Agents to the form and substance of such actions, documents, and agreements shall not be unreasonably withheld;

(c) Other than those conditions that by their nature can only be satisfied at the closing of the transactions contemplated by the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement, the conditions precedent to the Stock Purchase Agreement, the Amended and Restated Secured CapitalSource Credit Agreement and the Amended and Restated Secured CSE Loan Agreement shall have been satisfied or waived by the parties thereto and the Reorganized Debtors shall have access to the Cash contributed by the Plan Investor; and

(d) The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are determined by the Debtors to be necessary to implement the Plan or that are required by law, regulation, or order.

11.2. ***WAIVER OF CONDITIONS***.

Except for the conditions set forth in Section 11.1(a), each of the conditions precedent in Section 11.1 hereof may be waived in whole or in part by the Debtors, in their sole discretion; provided, however, that the conditions set forth in Sections 11.1(b) and (c) that require approval of the Agents may only be waived by the Debtors with the written consent of the applicable Agents, which consent shall not be unreasonably withheld. Any such waiver may be effected at any time, without notice or leave or order of the Bankruptcy Court and without any formal action.

11.3.    *EFFECT OF FAILURE OF CONDITIONS TO EFFECTIVE DATE*.

In the event the conditions precedent specified in Section 11.1 hereof have not been satisfied or waived pursuant to Section 11.2 hereof on or prior to the 90th day after the Confirmation Order becomes a Final Order, then, upon the Debtors' or the Agents' motion and after notice and a hearing, the Confirmation Order may be vacated and, as a result, (i) no distributions under the Plan will be made, (ii) the Debtors and all holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iii) all of the Debtors' obligations with respect to the Claims and Interests will remain unchanged and nothing contained herein will be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceedings involving the Debtors.

# ARTICLE XII

# RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, arising under, and related to the Chapter 11 Cases and the Plan pursuant to, and for the purpose of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending motions for the assumption or rejection of executory contracts or unexpired leases, the allowance of Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to the facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To ensure that distributions to holders of Allowed Claims and Interests are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Interest, Administrative Expense Claim, or Disputed Claim;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is stayed, reversed, revoked, modified, or vacated for any reason;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to prevent interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)　　To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)　　To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby or thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)　　To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following the Effective Date;

(l)　　To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)　　To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(n)　　To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(o)　　To recover all assets of the Debtors and all property of the Debtors' estates, wherever located;

(p)　　To hear and determine any rights, claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code, any other federal or state statute, or any legal theory;

(q)　　To enter a final decree closing the Chapter 11 Cases;

(r)　　To determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order any of the Plan Documents, or any other contract, instrument, release or other agreement or document related to the Plan, the Disclosure Statement or the Plan Supplement; and

(s)　　To hear and determine any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1. ***EFFECTUATING DOCUMENTS AND FURTHER TRANSACTIONS***.

Subject to any specific conditions contained herein, the Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents (including, without limitation, the Charter Amendment) and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.2. ***CORPORATE ACTION***.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders or directors of one or more of the Debtors or the Reorganized Debtors (including, without limitation, the filing of the Charter Amendment, entry into the Stock Purchase Agreement, issuance of New LPC Common Stock, any change in the size of the Boards of the Reorganized Debtors, and any removal, election, or appointment, as the case may be, of directors and officers of the Reorganized Debtors) shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated, without any requirement for further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

13.3. ***EXEMPTION FROM TRANSFER TAXES***.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, the occurrence of any intercompany or other Restructuring Transaction, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the New LPC Common Stock, the Amended and Restated Secured CapitalSource Credit Agreement, the Amended and Restated Secured CSE Loan Agreement, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax.  All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including, without limitation, the transfers effectuated under the Plan, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, sales or use, or other similar tax.

13.4. ***EXPEDITED TAX DETERMINATION***.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any and all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through, and including, the Effective Date.

13.5.    *PAYMENT OF STATUTORY FEES*.

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.6.    *POST-CONFIRMATION DATE PROFESSIONAL FEES AND EXPENSES*.

From and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by Reorganized Debtors.

13.7.    *DISSOLUTION OF STATUTORY COMMITTEES*.

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's professionals, including without limitation, attorneys, financial advisors, accountants and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

13.8.    *INDENTURE TRUSTEE AS CLAIM HOLDER*.

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize proofs of Claim timely filed by any Indenture Trustee in respect of any Claims under the Indenture. Accordingly, any Claim, proof of which is filed by the registered or beneficial holder of a Claim, may be disallowed as duplicative of the Claim of the Indenture Trustee, without any further action of the Bankruptcy Court.

13.9.    *PLAN SUPPLEMENT*.

A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court no later than ten (10) days prior to the last date by which holders of impaired Claims and Interests may vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at a website identified in the Disclosure Statement as they become available, but no later than five (5) days prior to the last date by which votes to accept or reject the Plan must be received.

13.10.    *SUBSTANTIAL CONSUMMATION*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.11.    *AMENDMENTS OR MODIFICATIONS OF THE PLAN*.

Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  After the Confirmation Date, so long as

such action does not materially and adversely affect the treatment of holders of Claims or Interests under the Plan, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Interest of such holder. Notwithstanding anything to the contrary herein, the Plan shall not be modified or amended to affect the treatment or amount of the CapitalSource Secured Claim or the CSE Secured Claim without the prior written consent of the Agents.

### 13.12. *REVOCATION OR WITHDRAWAL OF THE PLAN*.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors take such action, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims against or Series B Preferred Stock Interests in the Debtors, any claims or rights of the Debtors against any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

### 13.13. *SEVERABILITY*.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors or the Agents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision as altered or interpreted shall then be applicable. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 13.14. *GOVERNING LAW*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule or document in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

13.15.  ***BINDING EFFECT***.

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

13.16.  ***EXHIBITS/SCHEDULES***.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.17.  ***NOTICES***.

In order to be effective, all notices, requests, and demands must be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

> Lexington Precision Corporation
> 800 Third Avenue, 15th Floor
> New York, New York 10022
> Attn:  Michael A. Lubin
> Title:  Chairman of the Board
> Telephone:  (212) 319-4655
> Facsimile:   (212) 319-4659

> - and -

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Richard P. Krasnow, Esq.
> Telephone:  (212) 310-8000
> Facsimile:   (212) 310-8007

If to the Plan Investor:

> Commercial Financial Services 407, LLC
> 10877 Wilshire Blvd., Suite 2250
> Los Angeles, CA 90024
> Attn: Steve Martinez
> Telephone: (310) 286-3500
> Facsimile: (310) 277-5591

> - and -

> Jones Day
> 222 East 41st Street
> New York, New York 10017
> Attn: Lisa Laukitis

Telephone: (212) 326-3939
Facsimile: (212) 755-7306

If to the Prepetition Secured Lenders:

If to CapitalSource Finance LLC:

CapitalSource Finance LLC
12th Floor
4445 Willard Avenue
Chevy Chase MD 20815
Attn: Mark Fidati
Telephone: (410) 814-2517
Facsimile:  (410) 814-2599

- and -

CapitalSource Finance LLC
12th Floor
4445 Willard Avenue
Chevy Chase MD 20815
Attn: Joanne M. Fungaroli
Telephone: (301) 841-2885
Facsimile:  (301) 841-2380

If to CSE Mortgage LLC:

CSE Mortgage LLC
c/o CapitalSource Finance LLC
12th Floor
4445 Willard Avenue
Chevy Chase MD 20815
Attn: Mark Fidati
Telephone: (410) 814-2517
Facsimile:  (410) 814-2599

- and -

CSE Mortgage LLC
CapitalSource Finance LLC
12th Floor
4445 Willard Avenue
Chevy Chase MD 20815
Attn: Joanne M. Fungaroli
Telephone: (301) 841-2885
Facsimile:  (301) 841-2380

- and -

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700

Nashville, Tennessee 37219
Attn: John C. Tishler
Telephone: (615) 244-6380
Facsimile: (615) 244-6804

- and -

Carter, Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
Attn: Aaron R. Cahn
Telephone: (212) 732-3200
Facsimile: (212) 732-3232

13.18. *TIME*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.19. *SECTION HEADINGS*.

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

Dated: May 26, 2010
New York, New York

Respectfully submitted,

LEXINGTON PRECISION CORPORATION

By: _____
Name: Michael A. Lubin
Title: Chairman of the Board

LEXINGTON RUBBER GROUP, INC.

By: _____
Name: Michael A. Lubin
Title: Chairman of the Board

**EXHIBIT 1.7**

**Amended and Restated Secured CapitalSource Credit Agreement**

**AMENDED AND RESTATED**

**CREDIT AND SECURITY AGREEMENT**

**Dated as of [_____], 2010**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**
**as Borrowers**

**and**

**CAPITALSOURCE FINANCE LLC,**
**as a Lender, as Co-Documentation Agent and as Agent,**

**WEBSTER BUSINESS CREDIT CORPORATION**
**as a Lender and as Co-Documentation Agent**

**and**

**ANY OTHER LENDERS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**TABLE OF CONTENTS**

Page

1.    DEFINITIONS. ...................................................................................................... 2

    1.1.    Accounting Terms ........................................................................... 2
    1.2.    General Terms ................................................................................. 2
    1.3.    Uniform Commercial Code Terms ................................................. 2

II.    ADVANCES, PAYMENTS. ................................................................................... 3

    2.1.    Revolving Credit Advances and Equipment Term Loan................. 3
    2.2.    Disbursement of Advance Proceeds ............................................. 4
    2.3.    Repayment of Advances. ............................................................... 4
    2.4.    Overadvances ................................................................................. 4
    2.5.    Statement of Account; Evidence of Loans. .................................... 4
    2.6.    Letters of Credit. ............................................................................ 5
    2.7.    Additional Payments ...................................................................... 8
    2.8.    Manner of Advancing Revolving Credit Advances and Payment.... 8
    2.9.    Mandatory Prepayments ................................................................ 9
    2.10.    Defaulting Lenders. ...................................................................... 11

III.    INTEREST AND FEES. ...................................................................................... 12

    3.1.    Interest .......................................................................................... 12
    3.2.    Intentionally Omitted ..................................................................... 12
    3.3.    Audit Fees ..................................................................................... 13
    3.4.    Letter of Credit Fees ..................................................................... 13
    3.5.    Computation of Interest and Fees ................................................. 14
    3.6.    Maximum Charges ......................................................................... 14
    3.7.    Increased Costs ............................................................................. 14
    3.8.    Capital Adequacy .......................................................................... 15

IV.    COLLATERAL; GENERAL TERMS. ................................................................. 15

    4.1.    Security Interest in the Collateral .................................................. 15
    4.2.    Perfection of Security Interest. ...................................................... 15
    4.3.    Disposition of Collateral ................................................................ 17
    4.4.    Preservation of Collateral .............................................................. 17
    4.5.    Ownership of Collateral ................................................................. 17
    4.6.    Defense of Agent's and Lenders' Interests ................................... 18
    4.7.    Books and Records ....................................................................... 18
    4.8.    Financial and Other Disclosure ..................................................... 18
    4.9.    Compliance with Laws .................................................................. 18
    4.10.    Inspection of Premises .................................................................. 19
    4.11.    Insurance ...................................................................................... 19
    4.12.    Payment of Taxes ......................................................................... 20
    4.13.    Payment of Leasehold Obligations ............................................... 21
    4.14.    Receivables. .................................................................................. 21
    4.15.    Inventory ....................................................................................... 23
    4.16.    Equipment and Real Property Covenants ..................................... 23
    4.17.    Exculpation ................................................................................... 23

| | | |
|---|---|---|
| 4.18. | Environmental Matters. | 23 |
| 4.19. | No Other Financing Statements | 25 |
| 4.20. | Additional Mortgages | 25 |
| 4.21. | Intellectual Property | 26 |
| 4.22. | Commercial Tort Claims | 26 |
| 4.23. | OFAC | 26 |
| 4.24. | Appraisals | 26 |

**V.      REPRESENTATIONS AND WARRANTIES. ........26**

| | | |
|---|---|---|
| 5.1. | Authority | 26 |
| 5.2. | Formation and Qualification | 26 |
| 5.3. | Tax Returns | 27 |
| 5.4. | Financial Statements | 27 |
| 5.5. | Name | 28 |
| 5.6. | OSHA and Environmental Compliance | 28 |
| 5.7. | Solvency | 28 |
| 5.8. | Litigation | 29 |
| 5.9. | No Indebtedness | 29 |
| 5.10. | Violations | 29 |
| 5.11. | Plans | 29 |
| 5.12. | Patents, Trademarks, Copyrights and Licenses | 28 |
| 5.13. | Licenses and Permits | 30 |
| 5.14. | No Default of Indebtedness | 30 |
| 5.15. | No Other Defaults | 31 |
| 5.16. | No Burdensome Restrictions | 31 |
| 5.17. | No Labor Disputes | 31 |
| 5.18. | Margin Regulations | 31 |
| 5.19. | Investment Company Act | 31 |
| 5.20. | Disclosure | 31 |
| 5.21. | No Conflicting Agreements or Orders | 31 |
| 5.22. | Application of Certain Laws and Regulations | 32 |
| 5.23. | Hedge Contracts | 32 |
| 5.24. | Real Property | 32 |
| 5.25. | Deposit Accounts | 32 |
| 5.26. | Brokers | 32 |
| 5.27. | OFAC | 32 |
| 5.28. | Accountants' Letter | 30 |
| 5.29. | Senior Debt | 32 |

**VI.      AFFIRMATIVE COVENANTS. ........32**

| | | |
|---|---|---|
| 6.1. | Payment of Fees | 32 |
| 6.2. | Conduct of Business and Maintenance of Existence and Assets | 33 |
| 6.3. | Violations | 33 |
| 6.4. | Government Receivables | 33 |
| 6.5. | Execution of Supplemental Instruments | 33 |
| 6.6. | Payment of Material Agreements | 33 |
| 6.7. | Standards of Financial Statements | 33 |
| 6.8. | Further Assurances; Post Closing | 34 |
| 6.9. | Board of Directors | 32 |
| 6.10. | Board Observation | 32 |

VII.    NEGATIVE COVENANTS. ...................................................................34

    7.1.    Sale of Assets, Consolidation, Merger, Dissolution, Etc.............................35
    7.2.    Encumbrances...............................................................................36
    7.3.    Indebtedness ................................................................................37
    7.4.    Loans, Investments, Etc ..................................................................39
    7.5.    Dividends and Redemptions ............................................................40
    7.6.    Nature of Business........................................................................41
    7.7.    Transactions with Affiliates .............................................................41
    7.8.    Subsidiaries................................................................................41
    7.9.    Fiscal Year and Accounting Changes ..................................................42
    7.10.    Pledge of Credit ..........................................................................42
    7.11.    Amendment of Material Agreements ..................................................42
    7.12.    Compliance with ERISA ................................................................42
    7.13.    Prepayment of Indebtedness.............................................................43
    7.14.    Payment of Subordinated Debt .........................................................43
    7.15.    Orgnaizational Changes..................................................................41
    7.16.    OFAC ......................................................................................41

    VIII.    FINANCIAL COVENANTS. ..........................................................43
    8.1.    Controlling Definitions...................................................................43
    8.2.    Fixed Charge Coverage Ratio ..........................................................46
    8.3.    Capital Expenditures .....................................................................46
    8.4.    Leverage Ratio ............................................................................46
    8.5.    Minimum Liquidity ......................................................................44
    8.6.    Minimum EBITDA .......................................................................44

IX.    CONDITIONS PRECEDENT. .....................................................................46
    9.1.    Conditions to Effectiveness ............................................................46

X.    INFORMATION AS TO BORROWERS. .....................................................51
    10.1.    Disclosure of Material Matters ........................................................51
    10.2.    Schedules ..................................................................................51
    10.3.    Environmental Compliance Certificate ...............................................51
    10.4.    Litigation ..................................................................................51
    10.5.    Material Occurrences .....................................................................52
    10.6.    Government Receivables .................................................................52
    10.7.    Annual Financial Statements ...........................................................52
    10.8.    Monthly Financial Statements .........................................................52
    10.9.    Projections .................................................................................53
    10.10.    Variances From Operating Budget ....................................................53
    10.11.    Notice of Adverse Events ...............................................................53
    10.12.    ERISA Notices and Requests ..........................................................53
    10.13.    Material Intellectual Property ..........................................................54
    10.14.    Public Reports ............................................................................54
    10.15.    Material Agreements .....................................................................54
    10.16.    Additional Information ...................................................................54
    10.17.    Additional Documents ...................................................................55

XI.    EVENTS OF DEFAULT. ...........................................................................55
    11.1.    Obligations ................................................................................55

| | | | |
|---|---|---|---|
| 11.2. | Misrepresentations | | 55 |
| 11.3. | Financial Information | | 55 |
| 11.4. | Liens | | 55 |
| 11.5. | Covenants | | 55 |
| 11.6. | Judgments | | 55 |
| 11.7. | Voluntary Bankruptcy | | 56 |
| 11.8. | Cessation of Business | | 56 |
| 11.9. | Involuntary Bankruptcy | | 56 |
| 11.10. | Material Adverse Change | | 56 |
| 11.11. | Agent's Liens | | 56 |
| 11.12. | Subordinated Debt | | 56 |
| 11.13. | Cross Default | | 56 |
| 11.14. | Guaranty | | 57 |
| 11.15. | Change of Control | | 57 |
| 11.16. | Change of Management | | 57 |
| 11.17. | Invalidity | | 57 |
| 11.18. | Takings | | 57 |
| 11.19. | Seizures | | 57 |
| 11.20. | Cessation of Operations | | 57 |
| 11.21. | Plans | | 58 |
| 11.22. | Criminal Charges | | 58 |

**XII. AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. .......... 58**

| | | | |
|---|---|---|---|
| 12.1. | Rights and Remedies | | 58 |
| 12.2. | Application of Proceeds | | 59 |
| 12.3. | Agent's Discretion | | 59 |
| 12.4. | Setoff | | 59 |
| 12.5. | Rights and Remedies not Exclusive | | 60 |

**XIII. WAIVERS AND JUDICIAL PROCEEDINGS. ........................................ 60**

| | | | |
|---|---|---|---|
| 13.1. | Waiver of Notice | | 60 |
| 13.2. | Delay | | 60 |
| 13.3. | Jury Waiver | | 60 |

**XIV. EFFECTIVE DATE AND TERMINATION. ............................................. 61**

| | | | |
|---|---|---|---|
| 14.1. | Term | | 61 |
| 14.2. | Termination | | 61 |

**XV. REGARDING AGENT. ........................................................................ 62**

| | | | |
|---|---|---|---|
| 15.1. | Appointment | | 62 |
| 15.2. | Nature of Duties | | 62 |
| 15.3. | Lack of Reliance on Agent and Resignation | | 62 |
| 15.4. | Certain Rights of Agent | | 63 |
| 15.5. | Reliance | | 63 |
| 15.6. | Notice of Default | | 63 |
| 15.7. | Indemnification | | 63 |
| 15.8. | Agent in its Individual Capacity | | 64 |
| 15.9. | Delivery of Documents | | 64 |
| 15.10. | Borrowers' Undertaking to Agent | | 64 |
| 15.11. | Documentation Agent, Etc | | 64 |

3604386.12

iv

     15.12.    Collateral Matters ........................................................................................ 64

**XVI.    BORROWING REPRESENTATIVE.** ....................................................... **65**
     16.1.    Borrowing Representative Provisions ........................................................ 65
     16.2.    Waiver of Subrogation ................................................................................ 66

**XVII.   MISCELLANEOUS.** ................................................................................. **66**
     17.1.    GOVERNING LAW ..................................................................................... 66
     17.2.    Entire Understanding .................................................................................. 67
     17.3.    Successors and Assigns; Participations: New Lenders ............................... 68
     17.4.    Application of Payments ............................................................................. 70
     17.5.    Indemnity .................................................................................................... 70
     17.6.    Notice ......................................................................................................... 71
     17.7.    Survival ...................................................................................................... 72
     17.8.    Severability ................................................................................................. 72
     17.9.    Expenses ..................................................................................................... 73
     17.10.   Injunctive Relief ........................................................................................ 73
     17.11.   Consequential Damages ............................................................................. 73
     17.12.   Captions ...................................................................................................... 73
     17.13.   Counterparts; Telecopied Signatures ......................................................... 74
     17.14.   Construction ............................................................................................... 74
     17.15.   Confidentiality ........................................................................................... 74
     17.16.   Publicity ..................................................................................................... 74
     17.17.   Survival of Representations and Warranties .............................................. 75
     17.18.   Destruction of Invoices .............................................................................. 75
     17.19.   Time ............................................................................................................ 75
     17.20.   Release ........................................................................................................ 75
     17.21.   Patriot Act .................................................................................................. 75
     17.22.   Amendment and Restatement ..................................................................... 71

# AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

PREAMBLE. This Amended and Restated Credit and Security Agreement (herein, together with all schedules and exhibits hereto, and as it may be amended, restated, supplemented or modified from time to time, called this "Agreement"), dated as of [____], 2010, is made among: (i) LEXINGTON PRECISION CORPORATION, a Delaware corporation ("LPC" or "Parent Company"), and LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("LRG"; LRG and LPC herein sometimes called individually, "Initial Borrower" and, collectively, if more than one, the "Initial Borrowers"; and together with each other Person which, on or subsequent to the Closing Date, agrees in writing to become a borrower hereunder, herein called, individually, a "Borrower" and, collectively, the "Borrowers," and pending the inclusion by written agreement of any other such Person, besides each Initial Borrower, as a "Borrower" hereunder, all references herein to "Borrowers," "each Borrower," the "applicable Borrower," "such Borrower" or any other, similar variations thereof (whether singular or plural) shall all mean and refer to each Initial Borrower, collectively); (ii) CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CapitalSource"), together with any and all other Persons that are now, or that hereafter become, party hereto, as lenders hereunder (collectively, the "Lenders" and, individually, a "Lender"); (iii) CapitalSource, as collateral agent and administrative agent for itself, each other such Lender and each other "Lender Party" (as hereinafter defined) (CapitalSource, when acting in such agency capacity, is herein called the "Agent") and (iv) CapitalSource and Webster Business Credit Corporation ("WBCC") as co-documentation agents (in such capacity, the "Co-Documentation Agents").

STATEMENT OF THE TRANSACTION. Capitalized terms used in this statement of the transaction shall have the meanings ascribed to such terms in Section 1.2. The Initial Borrowers and the Lender Parties have entered into that certain Credit and Security Agreement, dated as of May 31, 2006, as amended by that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (as further amended or modified to date, the "Existing Credit Agreement"), wherein the Lenders have provided the Initial Borrowers with an equipment term loan in the initial aggregate principal amount of $12,500,000.00 and a revolving loan in the maximum aggregate principal amount of $17,500,000.00 (collectively, the "Existing Equipment Loan Facility").

The Borrowers are debtors and debtors-in-possession in jointly-administered cases under Chapter 11 of the Bankruptcy Code, Case No. 08-11153 (the "Chapter 11 Cases"), and they have obtained from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a series of orders to minimize any disruption to the Borrowers' business operations and to facilitate the Borrowers' reorganization, including, the authority to use the Lenders' cash collateral.

The Borrowers have emerged from Chapter 11 bankruptcy pursuant to the **[Debtors' Plan of Reorganization]** Under Chapter 11 of the Bankruptcy Code (as amended, supplemented or otherwise modified from time to time, the "Reorganization Plan"). By operation of law all Defaults and/or Events of Default existing prior to the Closing Date have been cured or waived pursuant to a final non-appealable order (other than with respect to any material appeals reasonably consented to by the Lenders and Agent), dated as of the date hereof (the "Confirmation Order").

In order to finance in part the distributions to be made under the Reorganization Plan and to pay the fees and expenses associated therewith (including, without limitation, the Capitalized Expenses), the Borrowers have requested that simultaneously with the consummation of the Reorganization Plan, the Lenders shall amend and restate the Existing Equipment Loan Facility pursuant to the terms and conditions herein.

Borrowers, Agent and Lenders acknowledge and agree that, immediately prior to the closing of the transaction contemplated hereby, (a) the current amount of all outstanding Revolving Credit Advances, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $[_____], (b) Issuer has issued the Letters of Credit listed on <u>Schedule 2.6</u> attached hereto and such Letters of Credit remain outstanding, and (c) the current principal amount outstanding under the Equipment Term Loan, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $[_____].

Pursuant to the Reorganization Plan, the Existing Equipment Loan Facility shall be amended to, among other things, (a) extend the last day of the Term from May 15, 2009 to [_____], 2013, (b) convert all the following, which are outstanding as of the Closing Date, to Obligations due under the Equipment Term Loan, and accordingly, increase the amount of the Equipment Term Loan by the amount of such amounts so converted: (i) all Revolving Credit Advances, (ii) all accrued and unpaid interest related to the Existing Equipment Loan Facility, (iii) all L/C Disbursements and (iv) all Capitalized Expenses and (c) reduce the Maximum Revolving Credit Amount from $17,500,000 to $**[733,000]** (the aggregate principal amount of the existing and undrawn Letters of Credit), all in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and undertakings herein contained, each Borrower, the Lenders and Agent, each intending to be legally bound hereby, hereby covenant and agree as follows:

1. <u>DEFINITIONS</u>.

  1.1. <u>Accounting Terms</u>

. As used in this Agreement or any Other Document, accounting terms not defined or partly defined (to the extent not fully defined) in <u>Section 1.2</u> or elsewhere in this Agreement shall have the respective meanings given to them under GAAP; <u>provided</u>, <u>however</u>, whenever such accounting terms are used for the purposes of determining compliance with the Financial Covenants, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the Historical Financial Statements; <u>provided</u>, <u>further</u>, that in the event that any accounting change (an "<u>Accounting Change</u>") shall occur that results in a change in the method of calculation of the Financial Covenants, standards or terms of this Agreement, then the Borrowers and Agent agree to enter into negotiations in good faith in order to amend such affected provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such Accounting Changes had not been made and, until such time as an amendment regarding such affected provisions of this Agreement has been executed and delivered by the Borrowers, Agent and the Required Lenders, all Financial Covenants, standards and terms of this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. Certain other definitions, used in the determination of the Financial Covenants, are set forth in <u>Section 8.1</u>. When applied to Borrowers and their Subsidiaries or Borrowers on a consolidated basis, accounting terms shall mean Borrowers and their Subsidiaries on a consolidated basis determined in accordance with GAAP.

  1.2. <u>General Terms</u>. For purposes of this Agreement the following terms shall have the following meanings: See <u>Annex One</u> attached hereto and by this reference incorporated herein.

  1.3. <u>Uniform Commercial Code Terms</u>. All terms used herein and defined in the Uniform Commercial Code shall have the meaning given therein unless otherwise defined herein. Without limitation of the foregoing, the terms "accounts," "chattel paper," "instruments," "general intangibles,"

"payment intangibles," "support obligations," "securities," "investment property," "documents," "commercial tort claims," "deposit accounts," "payment intangibles," "software," "letter-of-credit rights," "inventory," "farm products," "equipment" and "fixtures," as and when used in the description of Collateral, shall have the meanings given to such terms in Articles 8 or 9 (as applicable) of the Uniform Commercial Code.

1.4.    <u>Certain Matters of Construction</u>. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and <u>vice versa</u>. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any documents, instruments or agreements to which Agent, any Lender or any Borrower is a party, including, without limitation, references to any of the Other Documents, shall mean and include each of such documents, instruments or agreements as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in a manner consistent with the terms of this Agreement and the Intercreditor Agreement. References herein or in any Other Documents to any actions being taken (or omitted to be taken) by any Lender Party after a Default or Event of Default has occurred shall mean that such action may be taken (or omitted to be taken) only during the continuation of such Default or Event of Default. The words "to Borrowers' knowledge" (or words to similar effect), shall mean the knowledge of Borrowers' officers or employees charged with responsibility for the matter in question, obtained (or which should reasonably have been expected to have been obtained) after due inquiry. Unless otherwise expressly provided herein or in any Other Documents, all references to time herein and in any Other Documents shall mean and refer to New York time.

II.    <u>ADVANCES, PAYMENTS</u>.

2.1.    <u>Revolving Credit Advances and Equipment Term Loan</u>.

(a)    Subject to the terms and conditions set forth in this Agreement, each Lender, severally and not jointly, will make Revolving Credit Advances, in aggregate amounts outstanding at any time equal to such Lender's respective Commitment Percentage of the Maximum Revolving Credit Amount; <u>provided</u>, <u>however</u>, that, at no time hereafter, shall the aggregate amount of all Working Capital Obligations exceed the Maximum Revolving Credit Amount. The Revolving Credit Commitment shall expire at the end of the Term (unless earlier terminated pursuant to the terms hereof). Revolving Credit Advances shall bear interest from the date of their disbursement until paid in full at the Applicable Rate, with accrued interest being payable as provided in <u>Section 3.1</u>. Notwithstanding anything herein to the contrary, Borrowers shall have no right to request from Agent or any Lender any Revolving Credit Advances, except for L/C Disbursements.

(b)    Subject to the terms and conditions of this Agreement, each Lender, severally and not jointly, has made available to Borrowers an Equipment Term Loan in a sum equal to such Lender's Equipment Term Loan Commitment. The principal amount of the Equipment Term Loan shall be repaid in monthly installments on the first day of each calendar month equal in amount to (i) Two Hundred Eight Thousand Three Hundred Thirty Three Dollars and 33/100 ($208,333.33) each, beginning on [_____], 2010, and continuing on the first day of each succeeding calendar month for twenty-four (24) months and (ii) Three Hundred Twenty Five Thousand Dollars and No/100 ($325,000.00) each, beginning on [_____], 2012, and continuing on the first day of each succeeding calendar month thereafter until the expiration of the Term. Upon the expiration of the Term (<u>subject</u>, <u>however</u>, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation), all of the Obligations,

including, without limitation, the entire remaining principal balance of the Loans, shall be due and payable in full.

2.2.    <u>Disbursement of Advance Proceeds</u>. All Advances have been or shall be, as applicable, disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to any Lender Party arising pursuant hereto, shall be charged to Borrowers' Account on Agent's books.

2.3.    <u>Repayment of Advances</u>.

(a)    All Advances shall be due and payable in full on the last day of the Term, subject to earlier prepayment, in whole or in part, as provided in this Agreement or in any Other Document.

(b)    All payments of principal, interest fees and other amounts payable hereunder or under any of the Other Documents shall be made to Agent at the Payment Office not later than 3:00 p.m. (Eastern) on the due date for payment thereof in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account.

(c)    Borrowers absolutely and unconditionally promise to pay principal, interest, fees and all other Obligations payable hereunder or under any Other Documents as and when due, without any deduction whatsoever, including, but not limited to, any deduction for any defense, setoff or counterclaim.

(d)    Any other Obligation for which a payment date is not expressly provided herein or in any Other Document shall be due and payable on demand or, if not sooner demanded, on the last of the Term.

2.4.    <u>Overadvances</u>. If, at any time hereafter, Working Capital Obligations then outstanding exceed the Maximum Revolving Credit Amount, the Borrowers shall be obligated, immediately and without the necessity of any demand, to cause the amount of such excess (such amount being herein called an "<u>Overadvance</u>") to be reduced to zero (0) by repaying the Revolving Credit Advances then outstanding (or, in lieu thereof, or in addition thereto, as the case may be, by posting cash Collateral with Agent in respect of the Letters of Credit then outstanding), by a like amount.

2.5.    <u>Statement of Account; Evidence of Loans</u>.

(a)    Agent shall maintain on its books, in accordance with its customary procedures, a loan account in the name of Borrowers ("<u>Borrowers' Account</u>") in which shall be recorded the date and amount of each Advance made by Lenders and the date and amount of each payment in respect thereof; <u>provided</u>, <u>however</u>, the failure by Agent to record the date and amount of any Advance or any error therein shall not adversely affect the rights of Agent or any Lender or Borrowers' obligations in regard thereto. Promptly after the end of each calendar month, Agent shall deliver to Borrowing Representative a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Lenders and Borrowers, during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within sixty (60) days after such statement is received by Borrowing Representative. The records of Agent with respect to the Borrowers' Account shall be conclusive evidence of the amounts of Advances, other charges and payments applicable thereto, absent manifest error. Any amounts charged to Borrowers' Account shall, until paid in full, bear interest at the Applicable

Rate (or, after an Event of Default has occurred while it is continuing, at the option of Agent or the direction of the Required Lenders, the Default Rate).

(b)     Each Borrower agrees that:

(i)     upon written notice by any Lender to the Borrowing Representative that a promissory note or other evidence of indebtedness is requested by such Lender to evidence the Advances and other Obligations owing or payable to, or to be made by, such Lender, the Borrowers shall promptly (and in any event within three (3) Business Days following the later of (x) any such request and (y) delivery by Agent of the form of promissory note pursuant to this Section 2.5(b)) execute and deliver to such Lender an appropriate promissory note or notes in form and substance reasonably acceptable to such Lender, payable to the order of such Lender in a principal amount equal to the amount of the Advances owing or payable to Lender;

(ii)     all references to Notes in this Agreement and the Other Documents shall mean the Notes, if any, to the extent issued (and not returned to the Borrowers for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

(iii)     upon any Lender's written request, and in any event within three (3) Business Days of any such request, Borrowers shall execute and deliver to such Lender new Notes and/or divide the Notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its sole and absolute discretion; provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such Notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new Notes and shall be returned to the Borrowers promptly upon such Lender's receipt of the replacement notes.

2.6.     Letters of Credit.

(a)     Subject to the terms and conditions of this Agreement, Agent agrees to cause the existing standby letters of credit listed on Schedule 2.6 hereof to remain in effect for the account of Borrowers (as same may be renewed, extended or amended, each, a "Letter of Credit"). If necessary, at the request of Borrowers, Agent shall arrange for the extension of the Letters of Credit (provided, however, that no extension shall extend later than thirty (30) days prior to the last day of the Term); provided, however, that the aggregate face amount of all Letters of Credit outstanding at any time shall not increase; provided, further, that Agent may cause the Issuer to issue one or more renewals or amendments to the Letters of Credit in an aggregate face amount to not exceed the Maximum Revolving Credit Amount. Each L/C Disbursement shall be deemed to be a Revolving Credit Advance and shall bear interest at the Applicable Rate for Revolving Credit Advances. The Letters of Credit that have not been drawn shall not bear interest.

(b)     Each Letter of Credit shall, among other things, (i) be in form and substance acceptable to the Issuer, including the requirement that the amounts payable thereunder must be payable in Dollars, (ii) provide for the payment of sight or time drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein, and (iii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than thirty (30) days prior to the last day of the Term. Each Letter of Credit shall be subject to the International Standby Practices (ISP98) issued by the Institute for International Banking Law and Practice, Inc., and any amendments or revisions thereof.

(c)     On demand, if an Event of Default has occurred and is continuing, Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash Collateral, in an amount equal to one hundred five percent (105%) of the undrawn face amount of any outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time. Agent will invest such cash Collateral (less applicable reserves) in such short-term money-market items as Agent and such Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash Collateral. No Borrower may withdraw amounts credited to any such account except upon payment and performance in full of all Obligations and termination of this Agreement.

(d)     Each Borrower shall indemnify, save and hold Agent, each Lender and each Issuer harmless from any loss, cost, expense or liability, including, without limitation, payments made by Agent, any Lender or any Issuer, and expenses and reasonable attorneys' fees incurred by Agent, any Lender or any Issuer arising out of, or in connection with, any Letter of Credit. Each Borrower shall be bound by the Agent's and the Issuer's regulations and reasonable good faith interpretations of any Letter of Credit, although this interpretation may be different from Borrower's own; and, neither Agent nor any Lender, any Issuer, nor any of its correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Letter of Credit, except for, and solely to the extent of, Agent's, any Lender's, such Issuer's or such correspondents' gross negligence or willful misconduct.

(e)     Each Borrower shall authorize and direct the Issuer to name such Borrower as the "Account Party" therein and to accept and rely upon the Issuer's instructions and agreements with respect to all matters arising in connection with the Letters of Credit.

(f)     Each Lender shall, to the extent of its Commitment Percentage of the aggregate amount of all disbursements made with respect to the Letters of Credit, be deemed to have irrevocably purchased an undivided participation in each L/C Disbursement and each Revolving Credit Advance made by Agent as a consequence of such L/C Disbursement. If at the time an L/C Disbursement is made the unpaid balance of Revolving Credit Advances exceeds or would exceed, with the making of such L/C Disbursement, the Maximum Revolving Credit Amount and if such L/C Disbursement is not reimbursed by Borrowers within one (1) Business Day, then Agent shall promptly notify each Lender, and upon Agent's demand each Lender shall pay to Agent such Lender's Commitment Percentage of such unreimbursed L/C Disbursement together with such Lender's Commitment Percentage of Agent's unreimbursed costs and expenses relating to such unreimbursed disbursement. Upon receipt by Agent of a repayment from any Borrower of any amount disbursed by Agent for which Agent had already been reimbursed by the Lenders, Agent shall deliver to each of the Lenders that Lender's Commitment Percentage of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) Issuer ceases to be obligated under the Letters of Credit hereunder; (ii) no Letter of Credit remains outstanding and uncancelled; or (iii) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or relating to all Letters of Credit.

(g)     The obligations of a Lender to make payments to Agent for the account of Agent or the Issuer with respect to a Letter of Credit shall be irrevocable, without any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the Other Documents;

(ii)     the existence of any claim, setoff, defense or other right that any Borrower may have at any time against a beneficiary named in such Letter of Credit or any transferee of such Letter of Credit (or any Person for which any such transferee may be acting), Agent, Issuer, any Lender, or any other person, whether in connection with this Agreement, such Letter of Credit, the transactions contemplated herein or any related transactions (including any underlying transactions between Borrower or any other party and the beneficiary named in such Letter of Credit);

(iii)     any draft, certificate or any other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of this Agreement or any of the Loan Documents;

(v)     any failure by Agent or the Issuer to provide any notices required pursuant to this Agreement relating to such Letter of Credit;

(vi)     any payment by the Issuer under any of the Letters of Credit against presentation of a draft or certificate that does not comply with the terms of such Letter of Credit (if, in the good faith opinion of the Issuer, such prepayment is deemed to be appropriate); or

(vii)     the occurrence and continuation of any Default or Event of Default;

provided, however, that after paying in full its reimbursement obligation hereunder, nothing herein shall adversely affect the right of any Borrower or any Lender, as the case may be, to commence any proceeding against such Issuer for any wrongful disbursement made by such Issuer under a Letter of Credit as a result of, and solely to the extent of, acts or omissions constituting gross negligence or willful misconduct on the part of such Issuer;

(h)     If by reason of (i) any change in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by any Issuer or Lender with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(ii)     there shall be imposed on any Issuer, Lender or Agent any other condition regarding any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to any Issuer, Lender or Agent of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by any Issuer, Lender or Agent, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay on demand such amounts as Agent may specify to be necessary to compensate Agent and Lenders for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the Applicable Rate for Revolving

Credit Advances. The determination by Agent of any amount due pursuant to this Section 2.6(h), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(i)      If any Letter of Credit remains outstanding on the last day of the Term or such earlier date as this Agreement may be terminated, Borrowers shall: (A) provide cash collateral therefor in an amount equal to one hundred five percent (105%) of the undrawn face amount of any outstanding Letters of Credit; or (B) cause all such Letters of Credit and guaranties thereof, if any, to be canceled and returned; or (C) deliver a stand-by letter (or letters) of credit in guarantee of such Letters of Credit, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus thirty (30) additional days) as, and in an amount equal to at least 105% of the aggregate maximum amount then available to be drawn under, such Letters of Credit and shall be issued by a Person, and shall be subject to such terms and conditions, as are satisfactory to Agent.

2.7.    Additional Payments

. Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document, may be charged to Borrowers' Account as a Revolving Credit Advance and added to the Obligations.

2.8.    Manner of Advancing Revolving Credit Advances and Payment.

(a)      Each Revolving Credit Advance shall be advanced according to the applicable Commitment Percentages of the Lenders.

(b)      Each payment (including each prepayment) by Borrowers on account of the principal of the Revolving Credit Advances shall be applied to the Revolving Credit Advances pro rata according to the applicable Commitment Percentages of the Lenders. Each payment (including each prepayment) by Borrowers on account of the principal of the Equipment Term Loan shall be applied to the Equipment Term Loan pro rata according to the applicable Commitment Percentages of the Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by Borrowers on account of principal, interest and fees shall be made to Agent at the Payment Office, in each case on or prior to 3:00 p.m. (Eastern), in Dollars and in immediately available funds.

(c)      Notwithstanding anything to the contrary contained in subsections (a) and (b) above, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Credit Advances shall be advanced by Agent and each payment by Borrower on account of Revolving Credit Advances shall be applied first to those Revolving Credit Advances advanced by Agent. On or before 3:00 p.m. (Eastern), on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (A) if the aggregate amount of new Revolving Credit Advances made by Agent during the preceding calendar month (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Credit Advances during such preceding calendar month, then each such Lender shall provide Agent with funds in an amount equal to its Commitment Percentage of the difference between (1) such Revolving Credit Advances and (2) such repayments and (B) if the aggregate amount of repayments applied to outstanding Revolving Credit Advances during such calendar month exceeds the aggregate amount of new Revolving Credit Advances made during such calendar month, then Agent shall provide each such Lender with funds in an amount equal to its Commitment Percentage of the difference between (1) such repayments and (2) such Revolving Credit Advances. Each Lender shall be entitled to earn interest at the Applicable Rate on outstanding Advances that it has funded. Promptly following each Settlement Date, Agent shall submit to

each Lender a certificate with respect to payments received and Revolving Credit Advances made during the calendar month immediately preceding such Settlement Date. Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)     Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make available to Agent the amount which would constitute its applicable Commitment Percentage of Revolving Credit Advances, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowers of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the Agent's daily cost of funds (computed on the basis of a year of 360 days) during such period as determined by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Credit Advances hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.9.     Mandatory Prepayments

. Notwithstanding the provisions of Section 2.3(a) hereof:

(a)     Extraordinary Receipts.  Subject to subsection (c) below, upon the receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts, which payments shall be applied to the Obligations in the manner specified in subsection (f) below.

(b)     Disposition Proceeds.  Upon the sale or disposition of any Collateral by any Borrower or any of its Subsidiaries as permitted in clauses (ii) and (vi) of Section 7.1(b) (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by any such Borrower or Subsidiary in connection therewith, which payments shall be applied to the Obligations in the manner specified in subsection (f) below.

(c)     Insurance Proceeds. Notwithstanding subsection (a) above, if any of the Equipment or Real Property is damaged or physically destroyed or otherwise suffers a casualty, upon the written request of Borrowing Representative, which shall be made not less than five (5) Business Days after such casualty occurs, Agent shall release to Borrowing Representative Extraordinary Receipts consisting of proceeds from insurance policies covering such damage, destruction or casualty that are received by Agent pursuant to Section 4.11 hereof or otherwise, to the extent a Borrower elects to apply

such Extraordinary Receipts to the repair, refurbishment or replacement of the Equipment or Real Property that has been damaged, destroyed or otherwise suffered a casualty, provided, however, that, all of the following conditions are satisfied: (i) no Default or Event of Default shall have occurred and be continuing, (ii) the amount of the insurance proceeds (together with any deductible to be satisfied by a Borrower) are sufficient, in Agent's good faith determination, to permit such repair, refurbishment or replacement to be made in a satisfactory manner, (iii) such proceeds shall be used solely to repair, refurbish or replace the Equipment or Real Property that has been damaged, destroyed or suffered casualty (free and clear of any security interests, Liens, claims or encumbrances), (iv) such repair, refurbishment or replacement shall be commenced by Borrowers as soon as is reasonably practicable after such damage, destruction or casualty has occurred and shall be diligently pursued by Borrowers to satisfactory completion, and (v) the repair, refurbishment or replacement to which such proceeds are applied shall cause the value of the Equipment or Real Property that is being repaired, refurbished or replaced to be not less than the value thereof prior to such damage, destruction or other casualty occurring; provided, further, however, that the amount of such Extraordinary Receipts that may be released to Borrowers in respect of any such damage, destruction or other casualty loss for the repair, refurbishment or replacement of Equipment or Real Property shall not exceed the Materiality Threshold. Pending any release of such Extraordinary Receipts to Borrowing Representative pursuant to this subsection (c), Agent shall hold such Extraordinary Receipts as cash Collateral. Any Extraordinary Receipts applied to repair, refurbish or replace Equipment or Real Property pursuant to and in accordance with this subsection (c) shall not be deemed Capital Expenditures for purposes of this Agreement.

(d)     Excess Cash Flow.  Upon delivery to Agent of the financial statements referred to in and required by Section 10.8 for each Fiscal Quarter of the Borrowers (commencing with the first Fiscal Quarter ending subsequent to the Closing Date) but in any event not later than, in the case of the first three (3) Fiscal Quarters in any Fiscal Year, fifty (50) days after the end of such Fiscal Quarter and, in the case of the Fiscal Quarter corresponding with the end of any Fiscal Year, one hundred (100) days after the end of each such Fiscal Quarter, Borrowers shall pay to Agent fifty percent (50%) of Excess Cash Flow for such Fiscal Quarter (excepting therefrom any Excess Cash Flow, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Term Loan Agreement and subject thereto), which payments shall be applied to the Obligations in the manner specified in subsection (f) below; provided, however, that if the Leverage Ratio is less than 2.5:1.0 for such Fiscal Quarter, Borrowers shall not be obligated to pay any Excess Cash Flow with respect to such Fiscal Quarter to Agent. In the event that the aforesaid financial statement is not so delivered, then a calculation based upon estimated amounts shall be made by Agent upon which calculation Borrowers shall make the prepayment required by this Section, subject to adjustment when the financial statement is delivered to Agent as required hereby. The calculation made by Agent shall not be deemed a waiver of any rights of Agent or any Lender or may have as a result of the failure by Borrowers to deliver such financial statement.

(e)     Issuance of Equity Interests or Indebtedness. Upon the issuance of any Equity Interests by any Borrower or the issuance or incurrence of any Indebtedness by any Borrower (other than any Indebtedness permitted by Section 7.3 hereof), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance or incurrence, which payments shall be applied to the Obligations in the manner specified in subsection (f) below; provided, however, that notwithstanding anything to the contrary set forth herein, as long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or Indebtedness under the Junior Lien Facility during the Term in an aggregate principal amount not to exceed $5,000,000 (provided, that Borrowers shall not issue Indebtedness under the Junior Lien Facility in an aggregate principal amount in excess of $3,000,000), and the proceeds of such amounts shall not be required to be applied to prepay any of the Obligations pursuant to this Section 2.9(e).

(f)     Application of Proceeds. Proceeds of mandatory prepayments made pursuant to this Section 2.9, shall be applied by Agent, when received: first, to pay any Obligations then due and owing, but unpaid; second, to repay the principal amount of the Equipment Term Loan, with such prepayment to be applied to the then remaining installments of the Equipment Term Loan in the reverse order of their respective maturities (beginning with the final payment); third, to pay Revolving Credit Advances then outstanding, until paid in full; fourth, to the Term Loan Agent for application to the Term Loan Debt to the extent required pursuant to the Term Loan Agreement and in the manner set forth therein; and, fifth, any remainder thereof shall be paid to the Borrowers or as the Borrowing Representative directs.

(g)     Consent. Nothing contained in this Section 2.9 shall be deemed to be a consent by Agent and Lenders to the sale or disposition of any Collateral, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case, except as expressly permitted in this Agreement.

(h)     Application of Proceeds During an Event of Default.  If an Event of Default has occurred and is continuing, at the option of Agent, or at the direction of the Required Lenders, any Extraordinary Receipts or Net Cash Proceeds from any sale or other disposition of any Equipment or Real Property, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case shall be applied, instead, as provided in Section 12.2.

2.10.    Defaulting Lenders.

(a)     Notwithstanding anything to the contrary contained herein, if any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Revolving Credit Advance, or Lender's participation in any Letter of Credit or (y) notifies either Agent or the Borrowing Representative that it does not intend to make available its portion of any Revolving Credit Advance or to purchase Lender's participation in any Letter of Credit pursuant to Section 2.6 (if, in each case, the actual refusal to do so then constitutes a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder and under the Other Documents of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section while such Lender Default remains in effect.

(b)     In such event, Revolving Credit Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") having Revolving Credit Commitments which are not Defaulting Lenders, based on their respective Commitment Percentages in regard thereto, and no Commitment Percentage of any Lender or any pro rata share of any Revolving Credit Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Revolving Credit Advances shall be applied to reduce the applicable Revolving Credit Advances of each Lender pro rata based on the aggregate of the outstanding Revolving Credit Advances of that type of all Lenders at the time of such application; provided, however, that, such amount shall not be applied to any Revolving Credit Advances of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Revolving Credit Advances then outstanding.

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents. All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of

"Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)     Other than as expressly set forth in this Section, the rights and obligations of a Defaulting Lender (including its obligation to indemnify Agent under certain conditions pursuant hereto) and the other parties hereto shall remain unchanged. Nothing in this Section shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     No Defaulting Lender shall be entitled to receive any increased costs recovery under Section 3.7 or any capital adequacy charges under Section 3.8 in respect or, and to the extent of, its defaulted obligations.

(f)     In the event a Defaulting Lender cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

III.     INTEREST AND FEES.

3.1.     Interest

.

(a)     Interest on the Advances shall be payable to Agent for the benefit of Lenders monthly in arrears on the first day of each month, commencing on [_____], 2010. Interest charges shall be computed on the actual principal amount of Advances outstanding during each interest assessment period described above at the Applicable Rate; provided, however, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Lenders, the Obligations shall bear interest, instead, at the Applicable Rate plus an additional two (2%) percent per annum (as applicable, the "Default Rate").

(b)     Notwithstanding any other provision hereof, if any applicable law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (b), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Loans that bear interest with respect to the LIBOR Rate) to make or maintain Loans that bear interest with respect to the LIBOR Rate, the obligation of all Lenders to make Loans that bear interest with reference to the LIBOR Rate shall be suspended, and Agent, in its reasonable discretion, shall select a comparable rate as a substitute therefor.

3.2.     Determination of Applicable Margin{  TC "3.5. LIBOR Indemnity" \f C \l "2" }.

(a)     Beginning on [_____] 1, 2011 and on the first day of each Fiscal Quarter thereafter (each, a "Determination Date"), the Applicable Margin shall be determined by Agent and, if appropriate, adjusted, in accordance with the terms and conditions herein. On each Determination Date, Agent shall determine the Applicable Margin based on the Leverage Ratio reported in the most recently delivered Compliance Certificate for the applicable Fiscal Month as required to be delivered to Agent in accordance with Section 10.8 hereof (e.g., for a Determination Date of October 1, Agent shall look to the Leverage Ratio reported in the Compliance Certificate timely delivered for the Fiscal Month ending

August 31). The Applicable Margin as so determined and, if appropriate, adjusted, shall be effective from such Determination Date until the next Determination Date.

(b)     If Borrowing Representative shall fail timely to provide the Compliance Certificate to Agent with respect to the applicable Fiscal Month in accordance with Section 10.8 hereof (without regards to any cure periods set forth herein), then the Applicable Margin shall be based on the highest rate set forth in its definitions herein until the next Determination Date.

(c)     Notwithstanding the foregoing, if the Applicable Margin, which had been determined on the basis of any Compliance Certificate delivered by Borrowing Representative to Agent that contained any incorrect or inaccurate financial data, is less than such Applicable Margin that would have been determined had such Compliance Certificate been based on financial data that was correct and accurate, then such Applicable Margin at the appropriate lower rate(s) shall be recalculated retroactively for all affected periods and (to the extent not therefore paid) all accrued and unpaid interest as so recalculated shall be charged to Borrowers' Account.

3.3.    Audit Fees

. Agent may conduct field audits and inspections with respect to Borrowers' inventory and/or receivables at such intervals as it deems appropriate. Borrowers shall pay to Agent, for its own account, audit fees in connection with each such field audit at Agent's customary per diem charges therefor plus the customary out-of-pocket expenses incurred by Agent for external auditors. Notwithstanding the foregoing, so long as no Default or Event of Default has occurred and is continuing (in which event Borrowers shall reimburse Agent for all actual costs and expenses incurred by Agent in connection with any field audit), (x) Borrowers shall not reimburse Agent for more than one (1) such field audit in any Fiscal Year provided that the Leverage Ratio as of the last day of each Fiscal Quarter of such Fiscal Year is less than or equal to 2.0:1.0 and (y) the amount Borrowers shall be required to reimburse Agent for each field audit shall not exceed the lesser of (i) $25,000 or (ii) the actual costs and expenses incurred by Agent in connection with each field audit.

3.4.    Letter of Credit Fees

. Borrowers shall pay (a) to Agent, for the benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, at a rate per annum equal to five and one-half of one percent (5.50%) (increasing by two percent (2.0%) per annum from and after the occurrence of, and during the continuation of, any Event of Default) and (b) to Agent for the benefit of the Issuer any and all fees and expenses as agreed upon by the Issuer and the Borrowing Representative in connection with any Letter of Credit, including, without limitation, in connection with the amendment or renewal of any such Letter of Credit and any acceptances created thereunder; and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "Letter of Credit Fees"). Such fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed and be payable quarterly in arrears on the first day of each calendar quarter (beginning with the first such date following the Closing Date) and on the last day of the Term. All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction. All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason.

3.5.    Computation of Interest and Fees

. Interest and per annum fees payable hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall continue to be payable at the Applicable Rate during such extension; provided, however, that the foregoing extension shall not be considered when determining Borrowers' ongoing compliance with Financial Covenants that concern or include scheduled principal payments within specified dates.

3.6.    Maximum Charges

. In no event shall interest and any other charges hereunder exceed the highest rate permissible under applicable law. In the event interest or any other charges hereunder would otherwise exceed the highest rate permitted under applicable law the provisions hereof shall be deemed amended to provide for interest or such other charges to be charged at the highest permissible rate; any excess amount shall be applied: first, to pay Revolving Credit Advances then outstanding, until paid in full; second, to repay the principal amount of the Equipment Term Loan, with such prepayment to be applied to the then remaining installments of the Equipment Term Loan in the reverse order of their respective maturities (beginning with the final payment); and, third, if there is any excess remaining, Agent shall promptly refund such excess to Borrowers.

3.7.    Increased Costs

. In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of the Advances with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of any Lender;

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of any Lender, including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to any Lender of making, renewing or maintaining its Advances hereunder by an amount that such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that such Lender deems to be material, then, each and any such case, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount as will compensate such Lender for such additional cost or such reduction, as the case may be. Such Lender

3604386.12

shall certify the amount of such additional cost or reduced amount, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

3.8.    Capital Adequacy. In the event that any Lender shall have determined that any applicable law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (for purposes of this Section, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of the Advances with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on any Lender's capital as a consequence of its obligations hereunder to a level below that which such Lender could have achieved but for such adoption, change or compliance (taking into consideration such Lender's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then, from time to time, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount or amounts as will compensate such Lender for such reduction. In determining such amount or amounts, such Lender may use any reasonable averaging or attribution method. The protection of this Section shall be available to each Lender regardless of any possible contention that the applicable law, regulation or condition is invalid or inapplicable. Such Lender shall certify the amount necessary to compensate such Lender with respect to this Section, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

IV.    COLLATERAL; GENERAL TERMS.

4.1.    Security Interest in the Collateral

. To secure the prompt payment and performance to each Lender Party of the Obligations, each Borrower hereby assigns, pledges and grants to Agent for the ratable benefit of the Lender Parties, a continuing security interest in and to all of the Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Notwithstanding the foregoing, the Mortgages on the Real Property Collateral located in New York State shall be subject to the limitations set forth in such Mortgages. Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest in the Collateral and shall cause its financial statements to reflect the existence of such security interest.

4.2.    Perfection of Security Interest.

(a)    Borrowers shall take all action that Agent may request from time to time so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens thereon other than Permitted Encumbrances, (ii) using reasonable efforts to obtain landlords', warehouse operators', bailees' or mortgagees' lien waivers or related agreements in respect of premises where any Equipment or Inventory is located, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all Securities, chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, Deposit Account Control Agreements and other custodial arrangements reasonably satisfactory to Agent, (v) executing (as appropriate) and delivering

authorizations for the recording of financing statements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest under the Uniform Commercial Code or other applicable law; (vi) using reasonable efforts to obtain acknowledgments, in form and substance satisfactory to Agent, from any bailee having possession of any Collateral at any time, stating that the bailee holds such Collateral on behalf of Agent, (vii) obtaining "control" of any investment property, deposit account, letter-of-credit right or electronic chattel paper (the term "control" as used in respect of the foregoing types of Collateral having the meaning set forth in Articles 8 and 9 of the UCC), with any agreements establishing such "control" to be in form and substance satisfactory to Agent, and (viii) if a Borrower at any time has or acquires a Commercial Tort Claim, such Borrower shall promptly notify Agent thereof, in writing, and grant a specific collateral assignment of such claim to Agent as additional Collateral. Notwithstanding the foregoing provisions of this subsection (a), Borrowers shall not be required to obtain or to use their reasonable efforts to obtain warehouse operators,' bailees' or landlords' agreements or acknowledgments or related agreements in respect of premises where Inventory and/or Equipment is located, to the extent that the Inventory and/or Equipment in the possession of a warehouse operator or bailee or located on leased premises has a fair market value that is less than the Materiality Threshold; unless, in either case, Borrowers are requested by Agent to do so after any Event of Default has occurred and during its continuation.

(b) Without limiting the generality of the foregoing, in the specific case of Inventory in-transit to a Borrower from outside the continental United States of America, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after the occurrence of an Event of Default and during its continuation, each Borrower shall (i) deliver (or cause to be delivered) to Agent copies of all invoices, manifests and documents of title pertaining to such Inventory promptly upon such Borrower's receipt thereof, but in any event not later than five (5) Business Days after receipt, (ii) cause all such documents of title to be issued in the Agent's name, or to its order (or, if negotiable in form, Borrower may, instead, cause such documents of title to be endorsed to Agent, or in "blank"); (iii) provide Agent with evidence of appropriate marine or like insurance in respect of the transit of such Inventory to Borrower, and (iv) as necessary, provide Agent with access or custodianship agreements from warehouse operators, consolidators, customs house operators, customs brokers and other third parties to facilitate Agent's control over, access to and/or repossession of, such in-transit Inventory, including, without limitation, if requested by Agent, a customs agent agreement in form and substance satisfactory to Agent.

(c) In addition thereto, but without limiting the generality of the foregoing, in the specific case of Inventory of a Borrower that is consigned to any Person, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after an Event of Default has occurred and during its continuation, such Borrower shall (i) file a UCC financing statement in respect of such inventory naming itself as "consignor" and such Person as "consignee" thereon, in the jurisdiction of such consignee's incorporation (or organization), and assign such financing statement to Agent, and (ii) cause such consignee (and, if requested by Agent, any secured lender to, or landlord (or mortgagee) of, such consignee to execute and deliver to Agent a bailee's letter in form and content satisfactory to Agent in respect of such inventory.

(d) Agent is hereby authorized to file financing statements in accordance with the applicable provisions of the UCC, including, without limitation financing statements that describe the Collateral covered thereby as "all personal property", "all assets" or words of similar effect, at any time or from time to time hereafter, in any jurisdiction; and Borrowers hereby ratify, approve and affirm the filing of any such financing statements heretofore filed by Agent in respect of any Borrower (including any

predecessor-in-interest thereof). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account.

(e)     Borrowers acknowledge that from time to time Agent may act as bailee (under the UCC) for the Term Loan Agent in respect of certain Collateral, and hereby authorize Agent to do so and to turn over to Term Loan Agent any such Collateral at its request subject to the provisions of the Intercreditor Agreement.

4.3.    Disposition of Collateral

. Each Borrower will safeguard and protect all Collateral for Agent's account and make no disposition thereof whether by sale, lease or otherwise except as expressly provided in clauses (i), (ii) and (vi) of Section 7.1(b) and, then, subject to Section 2.9 in respect of any Net Cash Proceeds derived therefrom.

4.4.    Preservation of Collateral

. Following any demand by Agent for payment of all Obligations due and owing pursuant to Section 12.1 hereof, subject to the provisions of the Intercreditor Agreement, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any Borrower's owned or leased property (subject to the terms of any leases) to obtain such Collateral. Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may reasonably require. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account.

4.5.    Ownership of Collateral

. With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (a) each Borrower shall be the sole owner, lessee or licensee (as applicable) of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent (subject to Permitted Encumbrances); (b) except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens; (c) each document and agreement constituting Collateral executed by each Borrower or delivered to any Lender Party in connection with this Agreement shall be true and correct in all material respects; (d) all signatures and endorsements of each Borrower that appear on any such documents or agreements constituting Collateral shall be genuine and each Borrower party thereto shall have full capacity to execute same; and (e) each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 or at such other locations within the United States of America as Agent may receive notice of from time to time pursuant to Section 10.16 (all such locations herein called, collectively, the "Collateral Locations" and, individually, a "Collateral Location"); and shall not be removed from such Collateral Locations without the prior written consent of Agent except in the case of (i) the sale of Inventory in the ordinary course of business, (ii) the sale of Equipment to the extent permitted in Section 4.3 hereof, (iii) the movement of Equipment from one Collateral Location to another Collateral Location, (iv) the movement of Equipment to the extent necessary for its repair or maintenance; and (v) the movement of motor vehicles in the ordinary course of Borrowers' business.

4.6. <u>Defense of Agent's and Lenders' Interests</u>

. Unless and until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's security interests in the Collateral shall continue in full force and effect without interruption. During such periods no Borrower shall pledge, sell, assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered any part of the Collateral in any way, except for Permitted Encumbrances or as otherwise expressly permitted in this Agreement. Each Borrower shall defend Agent's security interest in the Collateral against any and all Persons (subject to Permitted Encumbrances). At any time after an Event of Default has occurred and during its continuation, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it and make it available to Agent at one or more of the Collateral Locations, as Agent shall elect. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies provided herein and in the Other Documents, or under the Uniform Commercial Code or other applicable law. In addition to the foregoing, Agent may, at its option, instruct all suppliers, carriers, forwarders, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into a Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement. Taking any of the foregoing actions provided in this <u>Section 4.6</u> shall be subject, however, to the provisions of the Intercreditor Agreement.

4.7. <u>Books and Records</u>

. Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including, without limitation, by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied.

4.8. <u>Financial and Other Disclosure</u>

. Each Borrower hereby irrevocably authorizes and directs the Accountants and all other accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent copies of any of the Borrower's financial statements, trial balances or other accounting records of any sort in the possession of such Person and to disclose to Agent any information such Person may have concerning such Borrower's financial status and business operations. In respect of the foregoing, if the Accountants are changed by any Borrower subsequent to the Closing Date, then Borrowing Representative shall execute and deliver a letter directing the Accountants to act in the manner provided hereinabove when requested by Agent, such letter to be in form and substance reasonably satisfactory to Agent.

4.9. <u>Compliance with Laws</u>

. Each Borrower shall comply in all material respects with all acts, rules, regulations and orders of any Governmental Authority applicable to the Collateral or any part thereof or to the operation of such

Borrower's business the non-compliance with which, in each instance, could reasonably be expected to have a Material Adverse Effect. Each Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of any Governmental Authority in any reasonable manner, provided, that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on the Collateral.

4.10.    Inspection of Premises

. During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or an Event of Default has occurred and is then continuing), Agent and each Lender Party and their agents shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business. During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or Event of Default has occurred and is then continuing) Agent, each Lender Party and their agents may enter upon any Borrower's business premises from time to time for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business. Borrowers shall reimburse Agent for all reasonable costs incurred by them in respect of the foregoing. All of such costs shall be charged to Borrowers' Account, subject to Section 3.3 in respect of certain field audit fees and charges.

4.11.    Insurance

. Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. Each Borrower shall, at its own cost and expense, in amounts and with carriers acceptable to Agent (a) keep all its insurable properties and properties in which each Borrower has an interest insured against the hazards of fire, flood (under the circumstances described below), sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's including, without limitation, products liability insurance, insurance against theft, larceny, embezzlement and misappropriation of funds, and business interruption insurance; (b) maintain a bond or other surety in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; and (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business. Without limitation of the foregoing, if as of the Closing Date or at any time thereafter Agent determines that all or a portion of the improvements situated on any Real Property Collateral are located within a "Special Flood Hazard Area" (as designated by the applicable Governmental Authority), Borrowers shall ensure that flood insurance is obtained and maintained with respect to such Real Property Collateral for the Term at Borrowers' expense in a form, amount and from an issuing company reasonably acceptable to Agent. Each Borrower shall furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured in regard to liability insurance and loss payee as its interests may appear in regard to casualty or property coverage, to the extent affecting or relating to Collateral, and providing (A) that, subject to any overriding provisions of the Intercreditor Agreement, all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated

unless at least thirty (30) days' prior written notice is given to Agent. In the event of any loss thereunder, subject to the provisions of the Intercreditor Agreement, the carriers named therein are hereby directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. During the continuation of an Event of Default, Agent is hereby authorized, subject to the provisions of the Intercreditor Agreement, to adjust and compromise claims under insurance coverage referred to above. All loss recoveries received by Agent upon any such insurance shall, except as otherwise provided in the Intercreditor Agreement, either be paid over to Borrowers or applied by the Agent as follows: (i) if no Event of Default or Default has occurred and is then continuing, and the loss recovery so received by Agent is less than or equal to the Materiality Threshold, then, Agent shall remit such loss recovery to the Borrowers for use in the restoration of the loss in accordance with <u>Section 2.9</u>; (ii) if no Event of Default or Default has occurred and is then continuing, and the loss recovery received by Agent is more than the Materiality Threshold, then, Agent shall apply such loss recovery to the Obligations in accordance with <u>Section 2.9</u>, and (iii) if any Event of Default or Default has occurred and is then continuing, then, Agent shall receive and apply such loss recovery to the Obligations in such order as Agent, in its sole discretion, shall determine consistent with the terms of <u>Section 12.2</u> of this Agreement. Any surplus of such proceeds remaining after such application, shall, subject to the provisions of the Intercreditor Agreement, be paid by Agent to Borrowers or applied as may be otherwise required by law. If, however, after application of such proceeds to the Obligations any Overadvance exists, Borrowers shall comply with <u>Section 2.4</u> in respect of its elimination. Anything hereinabove to the contrary notwithstanding, Agent shall not be obligated to remit any insurance proceeds to Borrowers unless Borrowers shall have provided Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss in accordance with <u>Section 2.9</u>. The Collateral shall at all times be maintained in accordance with the requirements of all insurance carriers that provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect. If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance, pay the premium therefor, and charge Borrowers' Account for the amount thereof.

4.12.   <u>Payment of Taxes</u>

. Each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral, including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made that, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may, unless the Borrowers have done so within five (5) Business Days after the Borrowing Representative receives written demand from the Agent that they do so, pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent under this Section shall be charged to Borrowers' Account. Until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the

payment thereof has been made), Agent may hold any balance standing to Borrowers' credit and Agent shall retain its security interest in any and all Collateral held by Agent.

4.13. <u>Payment of Leasehold Obligations</u>

. Each Borrower shall at all times pay, when and as due (or within any applicable grace periods) its rental obligations under all leases material to its business operations under which it is a tenant, and shall otherwise comply, in all material respects, with all other material terms of such leases and keep them in full force and effect (unless terminated in accordance with the terms thereof) and, at Agent's request will provide evidence of having done so.

4.14. <u>Receivables</u>.

(a) Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower, and the same shall be due and owing in accordance with the applicable Borrower's standard terms of sale, in each case except where the failure of any such Receivables to satisfy the terms of this <u>Section 4.14(a)</u> could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b) Each Customer, to each Borrower's actual knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due except to the extent that such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover its Receivables from any Customer which is not solvent, except in each case where the failure of any such Customer to be solvent or otherwise be able to pay all Receivables on which it is so obligated could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Nothing in this <u>Section 4.14(b)</u> shall be construed to require any Borrower to obtain any information or take any other affirmative action to assess such Customer's solvency or its ability to pay all Receivables on which such Customer is obligated.

(c) Each Borrower's chief executive office is located at the address identified as such set forth on <u>Schedule 4.14(c)</u> hereto. Until written notice is given to Agent by Borrowing Representative of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d) No Borrower shall establish or maintain any Deposit Account with any financial institution (except for Excluded Deposit Accounts) unless, prior to the Closing Date or opening of such Depository Account, Agent, the applicable Borrower and such financial institution shall have entered into a Deposit Account Control Agreement with respect to such Depository Account. Each Borrower shall ensure that all collections of Receivables and all other payments received by such Borrower are remitted directly to a Deposit Account subject to a Deposit Account Control Agreement.

(e) At any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, subject to the provisions of the Intercreditor Agreement, so long as any such Event of Default is continuing, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both. Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telecopy, secretarial and

clerical expenses and the salaries of any collection personnel used for collection, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(f)     Agent shall have the continuing right, subject to the provisions of the Intercreditor Agreement, to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables or any other Collateral received by Agent for application to the Obligations in accordance herewith and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power at any time hereafter, subject to the provisions of the Intercreditor Agreement (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; and (iv) to sign such Borrower's name on any documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same, subject to the provisions of the Intercreditor Agreement. Following the occurrence of an Event of Default and during its continuation, each Borrower shall hereby constitute Agent or Agent's designee as such Borrower's attorney with additional power, subject to the provisions of the Intercreditor Agreement, (i) to demand payment of the Receivables; (ii) to enforce payment of the Receivables by legal proceedings or otherwise; (iii) to exercise all of Borrowers' rights and remedies with respect to the collection of the Receivables and any other Collateral; (iv) to settle, adjust, compromise, extend or renew the Receivables; and (v) to settle, adjust or compromise any legal proceedings brought to collect Receivables. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time after the occurrence of an Event of Default and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower to the extent pertaining to Receivables or other Collateral.

(g)     No Lender Party shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom, except for any such errors or omissions or delays of any kind determined by a court of competent jurisdiction in a final proceeding to have resulted from its gross (not mere) negligence or willful misconduct. After an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is further authorized and empowered at any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, to accept the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

(h)     No Borrower will, without Agent's consent, compromise or adjust any material amount of the Receivables, or extend the time for payment thereof by more than sixty (60) days) or accept

any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as heretofore have been customary in the business of such Borrower.

4.15.  Inventory

. With respect to Inventory, to the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.16.  Equipment and Real Property Covenants

. With respect to the Equipment and Real Property: (a) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (b) Borrowers shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of their insurance and in material conformity with all applicable laws; (c) the Equipment is and shall be used in the business operations of Borrowers and not for personal, family, household or farming use; (d) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (e) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; (f) each Borrower assumes all responsibility and liability arising from its use of the Equipment and Real Property; (g) except as disclosed on Schedule 4.16, as of the Closing Date no Equipment is Excluded Equipment; and (h) hereafter Borrowers will notify Agent promptly, but in any event within ten (10) Business Days after, Borrowers acquire any Equipment that is Excluded Equipment subsequent to the Closing Date.

4.17.  Exculpation

. Nothing herein contained shall be construed to constitute any Lender Party as any Borrower's agent for any purpose whatsoever; nor shall any Lender Party be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. No Lender Party, whether by anything herein or in any assignment or otherwise, assumes any Borrower's obligations under any contract or agreement assigned to such Lender Party, and no Lender Party shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.18.  Environmental Matters.

(a)  Borrowers shall ensure that the Real Property remains at all times in material compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except in compliance with applicable law or the appropriate Environmental Authority.

(b)  Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws, which system shall include periodic reviews of such compliance.

3604386.12

(c)     Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws. If the failure to do so could reasonably be expected to have a Material Adverse Effect, Borrowers shall use their best efforts. to obtain to the extent required by applicable Environment Laws or the appropriate Environmental Authority, certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity under any Environment Laws of any Hazardous Substances at any Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, any demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Governmental Authority responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any of the foregoing Persons referred to herein as an "Environmental Authority"), then, Borrowing Representative shall, within five (5) Business Days thereafter, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware with respect to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowers shall promptly forward to Agent copies of any request from any Environmental Authority for information, any notification by any Environmental Authority of potential liability or any demand letter from any Environmental Authority relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward to Agent copies of correspondence between any Borrower and any Environmental Authority regarding such claims until all claims are settled. Borrowers shall promptly forward to Agent copies of all material documents and reports concerning any Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in the Collateral.

(f)     Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all action required by applicable Environmental Laws to safeguard the health of any Person and to avoid subjecting the Collateral to any Lien. If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or comply with any of the requirements of any Environmental Laws within thirty (30) days after the Borrowing Representative receives written demand from the Agent that it do so, Agent may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral: (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deems reasonably necessary under applicable Environmental Laws to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or

proceedings, fines and penalties, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(g)     Promptly upon the written request of Agent, but in any event within five (5) Business Days after Borrowers' receipt of such request, which may be made following the discovery of any Hazardous Discharge until such Hazardous Discharge is remedied to the extent required by applicable Environmental Laws or the appropriate Environmental Authority or following the filing of any Environmental Complaint until such Environmental Complaint is resolved, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm reasonably acceptable to Agent with respect to such Hazardous Discharge or Environmental Complaint, and the potential costs of abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge acceptable to the appropriate Environmental Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed the Materiality Threshold, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)     Borrowers shall defend and indemnify each Lender Party and hold each Lender Party and their respective employees, agents, directors and officers harmless from and against all losses, liabilities, damages and expenses, claims, costs, fines and penalties, including reasonable attorney's fees, suffered or incurred by such Lender Party under or on account of any Environmental Laws, including, without limitation, the assertion of any Lien thereunder, with respect to any Hazardous Discharge, or the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage or expense, claim, cost, fine or penalty is attributable to any Hazardous Discharge resulting from actions on the part of such Lender Party. Borrowers' obligations under this subsection (h) shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened to take any action in connection with the presence of any Hazardous Substances. Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement. Borrowers' obligations of indemnity hereunder shall not extend to, or include, any loss, damage, cost or expense incurred by any Lender Party in respect of the foregoing caused by, or resulting form, its gross negligence or willful misconduct.

4.19.    No Other Financing Statements

. Except for the financing statements filed by Agent and financing statements giving notice of Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20.    Additional Mortgages

. Borrowers shall execute and deliver to Agent immediately upon the acquisition in fee simple by any Borrower of any Real Property subsequent to the Closing Date a Mortgage with respect to such additional Real Property (subject to any Permitted Encumbrances), together with such title insurance policies (mortgagee's form), certified surveys, appraisals, and local counsel opinions with respect thereto and such other agreements, documents and instruments as Agent deems reasonably necessary or desirable, in form and substance satisfactory to Agent.

4.21.    Intellectual Property

. Borrowers shall execute and deliver to Agent security agreements in form suitable for registration and otherwise reasonably acceptable to Agent (i) on the Closing Date, with respect to any Material Intellectual Property registered or for which an application for registration is pending with the U.S. Patent and Trademark Office or the U.S. Copyright Office as of the Closing Date, or (ii) immediately upon the creation or acquisition by Borrower of any Material Intellectual Property registered, or for which an application for registration is pending, with either such office subsequent to the Closing Date.

4.22.    Commercial Tort Claims

. Promptly upon the discovery of any Commercial Tort Claim in favor of a Borrower, Borrowers will notify Agent of the same and execute such documents as are requested by Agent in order to grant to Agent a security interest in such Commercial Tort Claim under the UCC.

4.23.    OFAC. Agent may, at its option, reject, refuse to accept or return any Collateral that any Lender Party determines is, or may be, owed by, or due from, or belongs to, a Sanctioned Person.

4.24.    Appraisals

. With respect to Equipment, upon Agent's request, which may be at such intervals as it deems appropriate, Borrowers shall, at their expense, deliver or cause to be delivered to Agent, Appraisals (or updates to Appraisals) addressed to Agent and upon which Agent is expressly permitted to rely; provided that notwithstanding anything else to the contrary in this Section 4.24, Borrowers shall not pay for more than one (1) such Appraisal in each Fiscal Year following the Closing Date if the Leverage Ratio as of the last day of each Fiscal Quarter in such Fiscal Year is less than or equal to 2.0:1.0 and no Event of Default has occurred and is continuing.

V.    REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

5.1.    Authority

. Upon entry of the Confirmation Order, each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is party and to perform all of its respective duties and obligations hereunder and thereunder. Upon entry of the Confirmation Order, the execution, delivery and performance of this Agreement and of any Other Documents to which such Borrower is party (a) are within such Borrower's corporate powers, have been duly authorized, are not in contravention of law or any material terms of such Borrower's Organic Documents or of any Material Agreement or undertaking to which such Borrower is a party or by which such Borrower or any of its property is bound, and (b) will not conflict with nor result in any breach of any material provisions of or constitute a default under or result in the creation of any Lien (except Permitted Encumbrances) upon any asset of such Borrower under the provisions of any Organic Document or other instrument to which such Borrower is a party or by which it or any of its property may be bound.

5.2.    Formation and Qualification.

(a)    Each Borrower is duly organized and in good standing under the laws of the State(s) or other jurisdiction(s) listed on Schedule 5.2 and is qualified to do business and is in good standing in the State(s) or other jurisdiction(s) listed on Schedule 5.2, which State(s) or other

jurisdiction(s) constitute all State(s) or other jurisdiction(s) in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Each Borrower has delivered to Agent true and complete copies of its Organic Documents and will promptly notify Agent of any amendment or change thereto.

(b)     Each Borrower's identification number (if any) assigned to it by the appropriate Govermental Authority of the state of its organization, if any, is set forth on Schedule 5.2.

(c)     The Subsidiaries (if any) of each Borrower as of the Closing Date are as set forth in Schedule 5.2.

(d)     The Equity Interests of each Borrower which are authorized, issued and outstanding on the Closing Date are set forth and described in Schedule 5.2.

(e)     This Agreement is, and each Other Document executed by a Borrower constitutes, the legal, valid and binding obligation of such Borrower, enforceable against it in accordance with its terms, except as such enforcement is subject to the effect of (i) any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(f)     The signatures of each officer of each Borrower that appear on this Agreement and each Other Document are genuine, and each such officer of such Borrower executing same on behalf of such Borrower has full capacity to execute same.

5.3.     Tax Returns

. Each Borrower's federal tax identification number is set forth on Schedule 5.3. Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable, other than, any such charges as are being contested by Borrowers in good faith by appropriate proceedings provided that Borrowers have established reserves on their books for any unpaid taxes in accordance with GAAP. The Provision for Taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current Fiscal Year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books or any ongoing audit of any of its tax returns, except as otherwise may be disclosed in Schedule 5.3.

5.4.     Financial Statements.

(a)     The audited financial statements of Borrowers and their Subsidiaries on a consolidated basis for their most recently completed Fiscal Year, and the related statements of income, changes in stockholder's equity and cash flow for the annual fiscal period ended on such date, all accompanied by reports thereon containing opinions by the Accountants, and the unaudited financial statements of Borrowers and their Subsidiaries on a consolidated basis for that portion of their current Fiscal Year ended with their most recently completed Fiscal Quarter and Fiscal Month for which financial statements have been reported and the related statements of income, changes in stockholder's equity and cash flow for the fiscal periods ended on such date, (collectively, the "Historical Financial Statements"), copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied (except for changes in application with which the Accountants have concurred) and present in all material respects the financial position of the Borrowers and their Subsidiaries on a consolidated basis at such dates and the results of their operations for such periods. Since the last day of

the Borrowers' most recently completed Fiscal Year, there has been no material adverse change (other than the Chapter 11 Cases) in the financial condition of the Borrowers on a consolidated basis from that shown on the consolidated balance sheet of Borrowers as of such date or in the aggregate value of the Equipment and Real Property owned by them.

(b)     The projected financial statements of the Borrowers and their Subsidiaries on a consolidated basis furnished to Agent on or prior to the Closing Date (the "Initial Projections"), were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Initial Projections are not to be viewed as facts and that actual results may differ from such Initial Projections.

5.5.    Name

. Neither of the Borrowers has been known by any other name in the five (5) years immediately preceding the Closing Date, and neither of the Borrowers sells Inventory under any other name except as set forth on Schedule 5.5; nor has either Borrower been the surviving organization of a merger or consolidation or acquired all or substantially all of the assets of any Person during the five (5) years immediately preceding the Closing Date.

5.6.    OSHA and Environmental Compliance

. Except as may be set forth on Schedule 5.6:

(a)     Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds and Equipment are in compliance with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws, except where the failure to comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds, Real Property or Equipment under any such laws, rules or regulations.

(b)     Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws, except where the failure to obtain any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)     (i) There are no visible signs, in any material amounts of releases, spills, discharges, leaks or disposals (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property owned by any Borrower or leased by any Borrower and used for manufacturing or the storage of Hazardous Substances which do not comply in all material respects with all applicable Environmental Laws in respect thereof; (ii) there are no underground storage tanks or polychlorinated biphenyls on any such Real Property; except in compliance with Environmental Laws; (iii) none of any such Real Property has ever been used as a treatment, storage or disposal facility for Hazardous Waste; and (iv) no material amounts of any Hazardous Substances are present on any such Real Property in violation of any applicable Environmental Law.

5.7.    Solvency.

(a)     The Initial Projections demonstrate that the Borrowers on a consolidated basis will have sufficient cash flow to enable them to pay their debts as they mature, subsequent to the Closing Date.

(b)     Immediately following the execution of this Agreement and the consummation of the transactions contemplated hereby on the Closing Date, including the issuance of any Loans, (i) the assets of the Borrowers, on a consolidated basis, at a fair valuation and at their present fair saleable value will be in excess of the total amount of liabilities of the Borrowers (including contingent and unmatured liabilities) on a consolidated basis, (ii) the Borrowers will be able to pay their Indebtedness as it becomes due, and (iii) the Borrowers on a consolidated basis will not have unreasonably small capital to carry on their respective businesses.

(c)     As of the Closing Date, there is no undisputed Indebtedness in excess of the Materiality Threshold owing by the Borrowers to any third parties that is past due (after giving effect to any applicable grace period for payment) except for trade accounts payable not in excess of Two Million Dollars ($2,000,000) in aggregate amount, which will be paid by the Borrowers within thirty (30) days following the Closing Date, or as may otherwise be disclosed in <u>Schedule 5.7</u>.

(d)     This Agreement is, and all Other Documents will be, executed and delivered by the Borrowers in good faith and in exchange for reasonably equivalent value and fair consideration.

5.8.     <u>Litigation</u>

. Except with respect to the Chapter 11 Cases or as may be otherwise disclosed in <u>Schedule 5.8</u>, as of the Closing Date no Borrower has (i) any pending or threatened litigation, arbitration, actions or proceedings that, if determined adversely to it, could be reasonably expected to have a Material Adverse Effect, or (ii) any Commercial Tort Claims.

5.9.     <u>No Indebtedness</u>

. Except in respect of the amounts owed Lenders and the Term Loan Lenders under the Existing Equipment Loan Facility and the Existing Term Loan Facility, respectively, and as may be disclosed on <u>Schedule 5.9</u>, no Borrower has any Indebtedness on the Closing Date; and none of such Indebtedness is secured by any Lien, except for Permitted Encumbrances.

5.10.     <u>Violations</u>

. No Borrower is in violation of any applicable statute, regulation or ordinance or any order of any court, Governmental Authority or arbitration board or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.11.     <u>Plans</u>

. No Borrower nor any member of the Controlled Group maintains or contributes to any Plan (or has assumed any liability in respect of any Plan) other than those (if any) listed on <u>Schedule 5.11</u> hereto. Except as set forth in Schedule 5.11, (i) no Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan, (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code, (iii) no Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid, (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence that would

cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan, (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and no Borrower nor any member of the Controlled Group knows of any facts or circumstances that would materially change the value of such assets and accrued benefits and other liabilities, (vi) no Borrower or any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan, (vii) no Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists that could give rise to any such liability, (viii) no Borrower, nor any member of the Controlled Group, nor any fiduciary of, nor any trustee for, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action that would constitute or result in a ERISA Event with respect to any such Plan that is subject to ERISA, (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan, (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period contained in 29 CFR §2615.3 has not been waived, (xi) no Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group, and (xii) no Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

5.12.    <u>Patents, Trademarks, Copyrights and Licenses</u>. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, trade names, assumed names, trade secrets and licenses owned or utilized by Borrowers as of the Closing Date that are material to the conduct of Borrowers' business operations (herein, "<u>Material Intellectual Property</u>") are set forth on <u>Schedule 5.12</u>. All such Material Intellectual Property is valid and, except as set forth on <u>Schedule 5.12</u>, has been duly registered or filed with the appropriate Governmental Authority; there is no objection to or pending challenge to the validity thereof, and neither Borrower is aware of any grounds for any challenge, except as may be set forth in <u>Schedule 5.12</u>. To each Borrower's knowledge, its Material Intellectual Property consists of original material or property developed by such Borrower or which was lawfully acquired by such Borrower from the proper and lawful owner thereof. Each Borrower has maintained its Material Intellectual Property as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all proprietary software developed and used by any Borrower, constituting Material Intellectual Property, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement.

5.13.    <u>Licenses and Permits</u>

. Each Borrower (a) is in material compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law or regulation for the operation of its business in each jurisdiction in which it is now conducting business if the failure to procure such licenses or permits and/or be in material compliance therewith could reasonably be expected to have a Material Adverse Effect.

5.14.    <u>No Default of Indebtedness</u>

. Except as set forth in <u>Schedule 5.14</u>, as of the Closing Date, no Borrower is in default (after giving effect to any applicable grace period for payment) in the payment of the principal of or interest on any Indebtedness and no event has occurred under the provisions of any instrument or agreement under which

any Indebtedness has been issued that without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.15.  No Other Defaults

. As of the Closing Date, no Borrower is in default in any material respect in the payment or performance of any of its material contractual obligations in respect of any Material Agreement.

5.16.  No Burdensome Restrictions

. No Borrower is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect. No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that is not a Permitted Encumbrance.

5.17.  No Labor Disputes

. No Borrower is involved in any material labor dispute; and, to Borrowers' knowledge, there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence. Except as set forth in Schedule 5.17, no labor contract in existence on the Closing Date is scheduled to expire during the Term.

5.18.  Margin Regulations

. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advances will be used for "purchasing" or "carrying" "margin stock," as those terms are defined in Regulation U of such Board of Governors.

5.19.  Investment Company Act

. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.20.  Disclosure

. No representation or warranty made by any Borrower in this Agreement, or in any financial statement, report, certificate or any Other Document furnished in connection herewith, including, without limitation, the Perfection Certificate, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not materially misleading. There is no fact known to Borrowers that Borrowers have not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement that could reasonably be expected to have a Material Adverse Effect.

5.21.  No Conflicting Agreements or Orders

. Except as disclosed on Schedule 5.21, no provision of any Material Agreement nor any judgment, decree or order binding on any Borrower or affecting any Collateral conflicts with, or requires any consent that has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.22. Application of Certain Laws and Regulations

. No Borrower is subject to any statute, rule or regulation that regulates the incurrence of any Indebtedness, including, without limitation, statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.23. Hedge Contracts

. As of the Closing Date, no Borrower is party to any Hedge Contract, except a Permitted Hedge Contract.

5.24. Real Property

. As of the Closing Date, Borrowers have no interest as owner or tenant in any Real Property, except as disclosed on Schedule 5.24.

5.25. Deposit Accounts

. As of the Closing Date, no Borrower has any Deposit Accounts, except as listed on Schedule 5.25.

5.26. Brokers

. No Borrower has retained the services of any broker to assist such Borrower in obtaining the benefits of this Agreement.

5.27. OFAC

. No Permitted Holder, no Borrower and no Subsidiary is a Sanctioned Person. No Portion of any Advance will be used to facilitate the operation of, to finance any investments in or any activities of, or to make any payments to, any Sanctioned Person or Sanctioned Country.

5.28 Accountants' Letter. Borrowing Representative has executed and delivered to the Accountants a letter directing the Accountants to act in the manner provided in Section 4.8 hereof when requested by Agent.

5.29. Senior Debt

. The principal amount of the Loans constitute "Senior Debt" as such term is defined in the Junior Lien Facility Documents and the holders of such Indebtedness are entitled to the rights and benefits of a holder of "Senior Debt" under Section [__] of the Junior Lien Facility Credit Agreement.

VI. AFFIRMATIVE COVENANTS.

Each Borrower shall, and shall cause its Subsidiaries to, do the following until payment in full of the Obligations and termination of this Agreement:

6.1. Payment of Fees

. Pay to Agent on demand all usual and customary fees and expenses that Agent incurs in connection with (a) the forwarding of the proceeds of any Advance and (b) the establishment and maintenance of any Deposit Account Control Agreement and the related Deposit Account(s). Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

3604386.12

6.2.  Conduct of Business and Maintenance of Existence and Assets

. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted), including, without limitation, all Material Intellectual Property, and take all actions necessary to enforce and protect the validity of Material Intellectual Property or other material rights included in the Collateral; (b) keep in full force and effect its existence and Material Agreements (in accordance with their terms); (c) comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect.

6.3.  Violations

. Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Authority, or of any agency thereof, applicable to any Borrower that could reasonably be expected to have a Material Adverse Effect.

6.4.  Government Receivables

. If requested by Agent to do so in respect of any Receivable, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act or other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them, subject to the provisions of the Intercreditor Agreement.

6.5.  Execution of Supplemental Instruments

. Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement and the Other Documents may be carried into effect.

6.6.  Payment of Material Agreements

. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, including any in respect of its Material Agreements, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or where the amount or validity thereof is currently being contested in good faith by appropriate proceedings; provided that Borrowers have established reserves on their books in accordance with GAAP in respect thereof; and subject at all times to any applicable Subordination Agreement.

6.7.  Standards of Financial Statements

. Cause all financial statements referred to herein to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence

of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by the Accountants or the reporting officer of a Borrower, as the case may be, and disclosed therein).

6.8.  Further Assurances; Post Closing

. At Borrowers' cost and expense, each Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Agent may reasonably request with respect to the purposes, terms and conditions of this Agreement and the Other Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of this Agreement or any Other Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule  6.8.

6.9  Board of Directors.  At all times, the Board of Directors (or other governing body) of each Borrower shall have at least one (1) Independent Director, which shall be appointed by the Equity Sponsor.

6.10.  Board Observation.  Each Borrower shall permit a representative designated by Agent (the "Lender Representative") to attend and participate in as a non-voting observer all meetings of the Board of Directors (or other governing body) of such Borrower and all meetings of any committee of any such Board of Directors (the "Governing Body"). Each Borrower agrees to give the relevant Lender Representative the same notice of all such meetings and copies of all materials distributed to members of any Governing Body at the same time as such notice and materials are given to the members of such Governing Body, and the relevant Lender Representative will be given the opportunity to participate in any telephonic meetings of such Governing Body.  Each Borrower shall cause its Board of Directors to meet not less frequently than once per Fiscal Year.  If it is proposed that any action be taken by written consent in lieu of a meeting of any Governing Body, the relevant Borrower shall give written notice thereof to the relevant Lender Representative as is required to be delivered to the members of such Governing Body describing in reasonable detail the nature and substance of such action. Agent may, without making demand, charge Borrowers' Account for all reasonable costs and expenses incurred by it in connection with Agent's rights pursuant to this Section 6.10. Notwithstanding anything to the contrary in this paragraph, (a) so long as no Default or Event of Default has occurred and is continuing (in which event Agent may attend in-person any meetings of any Governing Body as it shall deem appropriate), a Lender Representative shall not attend in-person more than three (3) meetings of a Governing Body of a Borrower per Fiscal Year and (b) a Lender Representative may be excused by the relevant Borrower's Governing Body from attending any portion of such Governing Body's meeting (i) to the extent that attendance by such Lender Representative would jeopardize such Borrower's ability to assert the attorney-client privilege with respect to matters of material importance to be discussed during a portion of any meeting as determined by such Governing Body in good faith, (ii) during which matters relating to the Loans are to be discussed or (iii) during any voting (or final deliberation related thereto) by the members of such Governing Body with regards to the sale or other disposition of any Property that is permitted by this Agreement.

VII.  NEGATIVE COVENANTS.

Each Borrower shall, and shall cause its Subsidiaries to, comply as follows until payment in full of all Obligations and termination of this Agreement:

7.1.    Sale of Assets, Consolidation, Merger, Dissolution, Etc

. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)    merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it, except that any wholly-owned Subsidiary of a Borrower may merge with and into or consolidate with a Borrower or any other wholly-owned Subsidiary of a Borrower, and any Borrower may merge with or into, or consolidate with any other Borrower; provided, however, that each of the following conditions is satisfied: (i) Agent shall have received not less than ten (10) Business Days' prior written notice of such intended merger or consolidation, which notice shall set forth in detail reasonably satisfactory to Agent the Persons that are merging or consolidating, which Person will be the surviving entity, the locations of the assets of the Persons that are merging or consolidating, and any Material Agreements and documents relating to such merger or consolidation, (ii) Agent shall have received such other information with respect to such merger or consolidation as Agent may reasonably request, (iii) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (iv) Agent shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Governmental Authority (with a copy as filed promptly after such filing), and (v) the surviving Person (if not already a Borrower) shall expressly confirm, ratify and assume the Obligations, this Agreement and all Other Documents to which the Borrowers are then party in writing, in a form and substance satisfactory to Agent, shall execute and deliver such other agreements, documents and instruments as Agent may reasonably request in connection therewith;

(b)    sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its other assets to any other Person without the prior written consent of Agent, except for

(i)    sales of Inventory in the ordinary course of business;

(ii)    Permitted PP&E Dispositions;

(iii)    the issuance and sale by Parent Company of Equity Interests after the Closing Date; provided, however, that, (a) the terms of such Equity Interests, and the terms and conditions of the purchase and sale thereof, shall not include any terms that contravene, or include any limitation on the right of any Borrower to amend or modify, any of the terms and conditions of this Agreement or any of the Other Documents, (b) after giving effect to such issuance and sale, no Change of Control shall have occurred, and (c) the Net Cash Proceeds derived therefrom shall be paid to Agent for application to the Obligations in accordance with Section 2.9(f) hereof;

(iv)    the issuance of Equity Interests of Parent Company pursuant to an employee stock warrant, stock option, management incentive program or grant or similar equity plan or 401(k) plan established for Borrowers' employees; provided, however, that no Change of Control shall result therefrom;

(v)    the issuance of Equity Interests in connection with the Equity Investment;

(vi)    the sale or other disposition of Collateral not otherwise permitted in clauses (i) and (ii) above, if: (a) such sales or other dispositions do not involve Collateral having an aggregate fair market value in excess of the Materiality Threshold for all such Collateral disposed of in

any Fiscal Year of Borrowers; (b) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and (c) all of the Net Cash Proceeds of the sale of such Collateral shall be paid to Agent for application to the Obligations in accordance with Section 2.9(f) of this Agreement;

(vii)　intercompany loans and dividend payments, among or between Borrowers, to the extent permitted by Sections 7.4(f), 7.5(b) and 7.7(b);

(c)　wind up, liquidate or dissolve, except pursuant to any merger or consolidation made in accordance with Section 7.1(a); or

(d)　agree to do any of the foregoing, except if such agreement is conditioned on approval by the Required Lenders.

7.2.　Encumbrances

. No Borrower shall, or shall permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, Lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or Lien with respect to any such assets or properties, except the following (herein called, collectively, "Permitted Encumbrances"):

(a)　the security interests and Liens in the Collateral in favor of Agent for the benefit of the Lender Parties granted pursuant to this Agreement and the Other Documents;

(b)　Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Subsidiary, as the case may be, and with respect to which reserves have been set aside on its books in accordance with GAAP;

(c)　non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of such Borrower's or Subsidiary's business to the extent: (1) such Liens secure Indebtedness that is not overdue or (2) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which reserves have been set aside on its books as required by GAAP;

(d)　zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property that do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property owned by any Borrower (or, to Borrowers' knowledge, in the case of Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, the value of the Borrowers' interest in such Leasehold Interests) that is subject thereto;

(e)　purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) acquired after the Closing Date and purchase money mortgages on Real Property acquired after the Closing Date to secure Indebtedness permitted under Section 7.3(b) hereof;

(f)     pledges and deposits of cash or issuances of letters of credit by any Borrower after the Closing Date in the ordinary course of its business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower as of the date hereof;

(g)     pledges and deposits of cash by any Borrower after the Closing Date to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower as of the date hereof;

(h)     Liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment, tooling or other materials that are not owned by any Borrower, but are located on the premises of such Borrower (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower and the precautionary UCC financing statement filings in respect thereof;

(i)     the security interests in and Liens upon the Collateral and mortgages and Liens upon the Real Property in favor of the Term Loan Agent to secure the Term Loan Debt, provided, however, that, the security interests in and Liens upon the Collateral in favor of Term Loan Agent are and shall at all times be subject to the terms of the Intercreditor Agreement;

(j)     judgment Liens and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued by Borrowers, (ii) adequate reserves have been made for the amounts thereof on the books of Borrowers in accordance with GAAP and (iii) a stay of enforcement of any such Liens is in effect;

(k)     any security interests and Liens of an Insurance Premium Finance Party on the Insurance Premium Collateral to secure the Indebtedness described in and to the extent permitted in Section 7.3(f) hereof;

(l)     security interests and Liens granted to the applicable Issuer under any Letter of Credit Documents;

(m)     those other security interests and Liens (if any) existing on the Closing Date and set forth on Schedule 7.2 hereof; and

(n)     any subordinated security interests and junior Liens granted to the Junior Lien Facility Lender in connection with the Junior Lien Facility.

7.3.     Indebtedness

. No Borrower shall, nor shall permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)     the Obligations;

(b)     purchase money Indebtedness (including Capitalized Leases) existing on or arising after the Closing Date, to the extent secured by purchase money security interests in Equipment

and the proceeds thereof (including Capitalized Leases) and purchase money Mortgages or Liens on Real Property; provided, however, that:

(i)     the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Two Million Dollars ($2,000,000) in any Fiscal Year; provided, that the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Four Million Dollars ($4,000,000);

(ii)     such security interests, Mortgages or Liens do not apply to any property of such Borrower or Subsidiary other than the Equipment or Real Property so acquired (and the proceeds thereof), unless such Indebtedness is owed to the Lenders or the Term Loan Lenders;

(iii)     the Indebtedness secured thereby does not exceed the cost of the Equipment or Real Property so acquired, as the case may be;

(iv)     such security interests, Mortgages and/or Liens are released promptly upon such Indebtedness being fully paid and satisfied;

(v)     Agent shall have received at least five (5) Business Days' prior written notice of the intention of Borrowers to incur such Indebtedness, if incurred subsequent to the Closing Date; and

(vi)     as of the date of incurrence of such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(c)     guarantees by any Borrower of the Obligations of any other Borrower in favor of Agent for the benefit of Lenders;

(d)     Indebtedness of Borrowers to the Term Loan Lenders evidenced by or arising under the Term Loan Agreement and the other Term Loan Lender Agreements; provided, however, that the principal amount of such Indebtedness shall not exceed the sum of (i) [_____] ($[_____]) plus (ii) any Indebtedness incurred as permitted by Section 7.3(b) that is owed to the Term Loan Lenders; in each case, less the aggregate amount of all principal repayments, whether optional or mandatory, in respect thereof;

(e)     Indebtedness of any Borrower evidenced by the Junior Lien Facility Subordinated Note as in effect (or in form reasonably satisfactory to Agent) on the Closing Date or as amended in compliance herewith, provided, however, that:

(i)     the aggregate principal amount of such Indebtedness shall not exceed Three Million Dollars ($3,000,000) less the aggregate amount of all permitted principal repayments, repurchases or redemptions, whether optional or mandatory, made after the Closing Date in respect thereof;

(ii)     the principal amount of the Loans are and shall at all times constitute "Senior Debt," as such term is defined in the Junior Lien Facility Documents; and the Lenders shall be entitled to all the rights and benefits of a holder of "Senior Debt" under Section [_] of the Junior Lien Subordinated Note; and

(iii)     such Indebtedness is and remains subject to a Subordination Agreement in form and substance satisfactory to Agent;

(f)        Indebtedness of Borrowers to an Insurance Premium Finance Party in connection with insurance policies maintained by Borrowers arising as a result of such Insurance Premium Finance Party entering into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided, however, that, such Indebtedness shall be unsecured except to the extent permitted under Section 7.2(k) hereof, and shall not exceed, in aggregate principal amount outstanding at any one time, Seven Hundred Fifty Thousand Dollars ($750,000);

(g)        other Indebtedness outstanding on the Closing Date that is listed on Schedule 7.3;

(h)        Indebtedness of Borrowers to the applicable Issuer arising under any Letter of Credit Documents;

(i)        Indebtedness of any Borrower to any other Borrower arising after the Closing Date pursuant to loans made by any Borrower permitted under Section 7.4(g) hereof; and

(j)        Subordinated Indebtedness.

7.4.    Loans, Investments, Etc

. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase any Equity Interests or Indebtedness or all or a substantial part of the assets or property of any Person, or form or acquire any Subsidiaries, or agree to do any of the foregoing (unless conditioned upon the consent of the Required Lenders), except:

(a)        the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)        investments in cash or Cash Equivalents, provided that at any time such investments in the aggregate exceed Ten Thousand Dollars ($10,000), (1) no Revolving Credit Advances are then outstanding and (2) the terms and conditions of Section 4.14(d) hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

(c)        the existing equity investments of each Borrower as of the Closing Date in its Subsidiaries, as listed on Schedule 7.4; provided, however, that, no Borrower shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries, except that a Borrower may make capital contributions to another Borrower in the form of dividend payments as permitted pursuant to Sections 7.5 and 7.7 hereof;

(d)        equity investments of a Borrower in another Borrower;

(e)        loans and advances by any Borrower to employees of such Borrower after the Closing Date in an aggregate principal amount not to exceed the Materiality Threshold at any time;

(f)        Equity Interests or debt securities issued to any Borrower by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the Indebtedness of such Person; provided, however, that, the original of

any stock certificate or other instrument evidencing such obligations shall, at Agent's request, be promptly delivered to Agent, but in any event within five (5) Business Days after Borrowers receive such request, together with such stock power, assignment or endorsement by such Borrower as Agent may request;

(g)     loans by a Borrower to another Borrower after the Closing Date, provided, however, that, (i) upon Agent's request, Borrowers shall provide to Agent a report in form and substance satisfactory to Agent of the outstanding amount of such loans as of the last day of the immediately preceding month and indicating any loans made and payments received during the immediately preceding month; and (ii) upon Agent's request, any such loan shall be evidenced by a promissory note or other instrument, the single original of which shall be promptly, but not later than five (5) Business Days after Agent's request, delivered to Agent to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require;

(h)     obligations of any Customer to any Borrower arising from Accounts that are past due and are evidenced by a promissory note by such Customer payable to such Borrower; provided, however, that, promptly upon the receipt by such Borrower of the original of any such promissory note, but in any event within five (5) Business Days thereafter, subject to the provisions of the Intercreditor Agreement, such promissory note shall be endorsed to the order of Agent by such Borrower and delivered to Agent;

(i)     those loans and advances (if any) existing on the Closing Date and set forth on Schedule 7.4; provided, however, that, as to such loans and advances, Borrowers shall not, directly or indirectly, amend, modify, alter or change the terms of such loans and advances or any agreement, document or instrument related thereto and Borrowers shall furnish to Agent all default notices or demands for payment in connection with such loans and advances received by any Borrower or on its behalf, promptly after the receipt thereof, or sent by any Borrower or on its behalf; concurrently with the sending thereof; as the case may be; and

(j)     the payment of dividends by Borrowers, and the redemption, retirement, defeasance, purchase or other acquisition of Equity Interests, to the extent permitted by Sections 7.5 and 7.7 hereof.

7.5.     Dividends and Redemptions

. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, declare or pay any dividends on account of any shares of any class of any Equity Interests of such Borrower now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, except that:

(a)     any Borrower may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests for consideration in the form of additional Equity Interests so long as no Default or Event of Default has occurred and is continuing or could reasonably be expected to occur after giving effect thereto; provided, however, that no Borrower shall issue Excluded Equity Interests;

(b)     Borrowers may pay dividends to the extent permitted in Section 7.7 below;

(c)        any Subsidiary of a Borrower may pay dividends to a Borrower; and

(d)        Borrowers may repurchase Equity Interests consisting of and limited to Equity Interests held by employees of a Borrower pursuant to any employee stock ownership plan thereof upon the termination, retirement or death of any such employee in accordance with the provisions of such plan, provided that, as to any such repurchase, each of the following conditions is satisfied: (i) as of the date of the payment for such repurchase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (ii) such repurchase shall be paid with funds legally available therefor, (iii) such repurchase shall not violate any law or regulation or the material terms of any indenture, agreement or undertaking to which such Borrower is a party or by which such Borrower or its property are bound, and (iv) the aggregate amount of all cash payments for such repurchases in any Fiscal Year shall not exceed the Materiality Threshold.

7.6.    <u>Nature of Business</u>

. No Borrower shall, or shall permit any Subsidiary to, substantially change the nature of the business in which it is engaged or, except as otherwise specifically permitted by this Agreement, purchase or invest, directly or indirectly, in any assets or property other than purchases of assets or property in the ordinary course of business that are to be used in its business as presently conducted.

7.7.    <u>Transactions with Affiliates</u>

. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)        purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliate of such Borrower (other than a Borrower or a Subsidiary thereof), except in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business (as the case may be) and upon fair and reasonable terms no less favorable to such Borrower than such Borrower would obtain in a comparable arm's length transaction with an unaffiliated person; or

(b)        make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower, except (i) reasonable compensation to, and reimbursement of reasonable expenses incurred by, officers, employees and directors for services rendered to such Borrower in the ordinary course of business, (ii) payments by any Borrower to any other Borrower for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services paid for by any Borrower on behalf of such other Borrower, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower and for the payment of taxes by or on behalf of such Borrower, (iii) the grant of stock options, restricted stock awards, stock appreciation rights or similar rights to employees, officers or directors pursuant to a plan approved by the Board of Directors of the applicable Borrower (so long as after giving effect thereto no Change of Control shall occur and no Default or Event of Default shall have occurred and be continuing), (iv) loans or other advances to employees permitted by <u>Section 7.4(e)</u> hereof, (v) the payment of reasonable fees to the directors of any Borrower and (vi) payments of management fees to the Equity Sponsor in an aggregate principal amount not to exceed $500,000 in any Fiscal Year (so long as (x) no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to occur because of the payment thereof and (y) the Equity Sponsor enters into, and delivers to Agent, a Subordination Agreement in form and substance satisfactory to Agent).

7.8.    <u>Subsidiaries</u>

3604386.12

. No Borrower shall, or shall permit any Subsidiary to, either: (a) create or acquire any Subsidiary; (b) enter into any partnership, joint venture or similar arrangement or (c) dispose of any Equity Interests in any Subsidiary, except in a transaction expressly permitted under <u>Section 7.1</u>. Without limitation of the foregoing, if and to the extent any Subsidiary is created or acquired hereafter with the prior written consent of the Agent, then, as a condition to such consent becoming effective, (i) each such Subsidiary must be joined as a Borrower hereunder, or must become a Guarantor hereof, (ii) each Subsidiary must grant a Lien on its assets to Agent as security for its obligations hereunder or under its Guaranty, and (iii) the Equity Interests of such Subsidiary must be pledged to Agent by amendment to the Pledge Agreement; each on terms satisfactory to Agent.

### 7.9. <u>Fiscal Year and Accounting Changes</u>

. No Borrower shall, or shall permit any Subsidiary to, change its Fiscal Year from that in use on the Closing Date or make any significant change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by applicable law.

### 7.10. <u>Pledge of Credit</u>

. No Borrower shall, or shall permit any Subsidiary to, pledge (or purport to pledge) Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of the Advances in or for any business other than such Borrower's business as conducted on the Closing Date.

### 7.11. <u>Amendment of Material Agreements</u>

. No Borrower shall, or shall permit any Subsidiary to, amend, modify, alter or otherwise change in any material respect any term or provision of any of its Material Agreements, unless such amendment, modification or waiver does not cause any contravention of, or conflict with, any material term or condition of this Agreement and would not otherwise reasonably be expected to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, Borrowers may, after giving prior written notice to Agent, amend, modify, alter or change the terms or provisions of any Material Agreement respecting Funded Indebtedness so as to extend the maturity thereof or defer the timing of any payments in respect thereof, or to forgive or cancel such Indebtedness (or a portion thereof) or to reduce the interest rate on or any fees associated therewith; and, <u>provided</u>, <u>further</u>, that Borrowers shall not amend, modify, alter or change any material terms or provisions of any of the Term Loan Lender Agreements (except as permitted in the first proviso hereof), except after giving Agent prior written notice thereof and, if requested by Agent, a corresponding amendment, modification, alteration or change is made hereto or to the Other Documents on the same, or substantially the same, terms simultaneously therewith.

### 7.12. <u>Compliance with ERISA</u>

. No Borrower shall, or shall permit any Subsidiary to, either: (i) maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans existing on the Closing Date and disclosed on <u>Schedule 5.11</u>, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any

obligation to contribute to any Multiemployer Plan, (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any ERISA Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

      7.13.   Prepayment of Indebtedness

. No Borrower shall, or shall permit any Subsidiary to, at any time, directly or indirectly, either: (a) prepay any Indebtedness, or (b) repurchase, redeem, retire, defease or otherwise acquire any Indebtedness of any Borrower, or set aside or otherwise deposit or invest any sums for such purpose; provided, however, that Borrowers may, from time to time, prepay, repurchase, redeem or retire, in whole or in part, (i) the Obligations, subject to the terms hereof, and (ii) the Term Loans, if, with respect to each such prepayment, repurchase, redemption or retirement of the Term Loans, Borrowers shall comply with (x) all Restricted Payment Conditions and (y) all terms and conditions set forth in the Term Loan Agreement.

      7.14.   Payment of Subordinated Debt

. No Borrower shall, or shall permit any Subsidiary to at any time, directly or indirectly pay the principal of, interest on or any other charge or fee in respect of any Subordinated Debt, except in accordance with the terms thereof as in effect on the Closing Date and as expressly permitted by the Subordination Agreement applicable thereto or the subordination provisions of the Junior Lien Facility Documents.

      7.15.   Organizational Changes.  No Borrower shall, or permit any of its Subsidiaries to, (a) modify or restate its name without thirty (30) days' prior notice to Agent, (b) reincorporate or reorganize under the laws of any jurisdiction, (c) amend its Organic Documents or (d) agree or commit to do any of the foregoing.

      7.16.   OFAC.  No Permitted Holder nor any Borrower shall, or permit any Borrower's Subsidiaries to, (a) be or become a Sanctioned Person, (ii) engage in any dealings or transactions prohibited by Section 2 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), or otherwise be associated with any such Sanctioned Person in any manner violative of Section 2 of such executive order, or (c) otherwise become a Sanctioned Person in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

VIII.   FINANCIAL COVENANTS.

      Borrowers shall, until payment in full of the Obligations and termination of this Agreement, comply with the Financial Covenants set forth below.

      8.1.   Controlling Definitions

. As used in this Article VIII:

      "Annualization Ratio" shall mean (a) 4/1 as of **[September 30]**, 2010, (b) 3/1 as of **[October 31]**, 2010, (c) 12/5 as of **[November 30]**, 2010, (d) 2/1 as of **[December 31]**, 2010, (e) 12/7 as of **[January 30]**, 2011, (f) 3/2 as of **[February 28]**, 2011, (g) 4/3 as of **[March 31]**, 2011, (h) 6/5 as of **[April 30]**, 2011 and, (i) 12/11 as of **[May 31]**, 2011.

3604386.12

"Capital Expenditures" shall mean, as applied to any Person, all expenditures for any fixed or capital assets (including, but not limited to, tooling) or improvements, or for replacements, substitutions or additions thereto, that have a useful life of more than one (1) year, including, but not limited to, the direct or indirect acquisition of such assets by way of offset items or otherwise and shall include the amount recorded on the balance sheet of such Person at the time of the acquisition of any such asset pursuant to a Capitalized Lease.

"Capitalized Lease" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which, in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

"Cash Income Taxes" shall mean, as to any Person, for any period, the Provision for Taxes less any portion thereof that represents deferred income taxes unless they become due and payable in the period, all determined in accordance with GAAP.

"Cash Interest Expense" shall mean, as to any Person, for any period, Interest Expense less (a) Interest Expense that represents the amortization of fees and expenses that were paid during prior periods and (b) Interest Expense on any Indebtedness payable in kind that was accrued during such period but is not paid in cash within thirty (30) days following the due date thereof ("Deferred Interest"), plus any Deferred Interest paid in cash during such period.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding any extraordinary or nonrecurring gains or losses), all as determined in accordance with GAAP; provided, however, that, without duplication, (a) the net income of any Person that is not a wholly-owned Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a wholly-owned Subsidiary of such Person; (b) the net income of any Person accrued prior to the date it becomes a wholly-owned Subsidiary of such Person or is merged into or consolidated with such Person or any of its wholly-owned Subsidiaries or the date that Person's assets are acquired by such Person or by any of its wholly-owned Subsidiaries shall be excluded; (c) the net income of any Person shall exclude interest accrued, but not paid, on indebtedness owing to a Subsidiary or parent corporation of such Person that is subordinated in right of payment to the payment in full of the Obligations, on terms and conditions acceptable to Agent; (d) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded; (e) the net income of any Person shall exclude any write-down or write-off of assets resulting from the application of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" or Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets"; (f) the net income of any Person shall exclude any items of income (or expense) that are required by GAAP to be classified as non-operating amounts in such Person's statement of income definition; and (g) the net income of any Person shall exclude any gain or loss (together with any related Provisions for Taxes) realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions) or of any Equity Interest of such Person or a Subsidiary of such Person and any net income or loss realized as a result of changes in GAAP or the application thereof to such Person.

3604386.12

"EBITDA" shall mean, as to any Person, with respect to any period, the Consolidated Net Income of such Person for such period plus the following items, to the extent deducted in computing Consolidated Net Income for such period: (a) depreciation and amortization expenses; (b) Interest Expense for such period, plus (c) the Provision for Taxes for such period, plus (d) any one-time severance costs and other costs incurred in connection with the termination, relocation and training of senior management of Borrowers in an aggregate principal amount not to exceed at any time $**[700,000]**, plus (e) to the extent not already included in clause (g) of the definition of "Consolidated Net Income" above, losses resulting from the sale or other disposition, as permitted herein, of Property and the machining business of Borrowers, plus (f) payments of management fees to the Equity Sponsor to the extent permitted under Section 7.7(b) hereof.

"Fixed Charge Coverage Ratio" shall mean for any Test Period, the ratio of (a) EBITDA, less Unfinanced Capital Expenditures to (b) Fixed Charges, for such Test Period determined for the Borrowers on a consolidated basis in accordance with GAAP.

"Fixed Charges" shall mean, as to any Person, for any period, the sum, without duplication, of (a) Cash Interest Expense, plus (b) all regularly scheduled (as determined at the beginning of such period) principal payments on Indebtedness (including the portion of any payments under Capitalized Leases that is classified as principal), plus (c) Cash Income Taxes, plus (d) all cash dividends and distributions on Equity Interests, together with all repurchases, redemptions and retirements of Equity Interests, to the extent not included in clauses (a) or (b) of this definition.

"Interest Expense" shall mean, for any period, as to any Person, as determined in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capitalized Leases for such period), including, without limitation, discounts in connection with the sale of any Accounts, but excluding interest paid in property other than cash and any other interest expense not payable in cash.

"Leverage Ratio" shall mean the ratio for the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as of the end of any calendar month, of (a) Net Senior Debt to (b) EBITDA for the Test Period, except that, as of the end of each calendar month immediately following the Closing Date until the first anniversary of the Closing Date, the Leverage Ratio shall mean the ratio of (x) Net Senior Debt to (y) the quotient of (A) EBITDA for the Test Period times (B) the Annualization Ratio.

"Liquidity" shall mean, as of any date of determination, the balance of cash on hand and Cash Equivalents of Borrowers not subject to any Lien or encumbrance other than in favor of Agent.

"Net Senior Debt" shall mean, as of any date, all Indebtedness outstanding (i) pursuant to this Agreement and the Other Documents and (ii) pursuant to the Term Loan Lender Agreements, less cash on hand and Cash Equivalents of the Borrowers as of such date.

"Test Period" shall mean the most recent period of twelve consecutive calendar months ended on or prior to any date of determination (taken as one accounting period), except that for each calendar month ending on or prior to the first anniversary of the Closing Date, "Test Period" shall mean the period commencing on the first day of the first calendar month following the Closing Date and ending on the date of determination.

"Unfinanced Capital Expenditures" shall mean any Capital Expenditures not financed with Indebtedness.

8.2.     Fixed Charge Coverage Ratio

. Borrowers shall maintain a Fixed Charge Coverage Ratio for any Test Period beginning on the last day of the third full calendar month following the Closing Date, measured on a monthly basis, of not less than 1.0:1.0.

8.3.     Capital Expenditures

. Borrowers and their Subsidiaries shall not make Capital Expenditures in any Fiscal Year, as measured monthly, in an aggregate amount in excess of $4,000,000 during such Fiscal Year; provided, however, that if Capital Expenditures in any Fiscal Year are less than $4,000,000, the amount of permitted Capital Expenditures in the immediately following Fiscal Year shall be increased by an amount equal to such unused amount of Capital Expenditures for such Fiscal Year up to a maximum of $1,000,000.

8.4.     Leverage Ratio

. Borrowers shall maintain a Leverage Ratio at the end of each calendar month beginning on the last day of the third full calendar month following the Closing Date of not more than: (i) 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to [_____], 2011; (ii) 3.5:1.0 for each calendar month ending after [_____], 2011 and prior to [_____], 2012; and (iii) 3.0:1.0 for each calendar month ending after [_____], 2012 through the expiration of the Term.

8.5.     Minimum Liquidity.   Borrowers shall not permit Borrowers' Liquidity at any time to be less than $2,000,000.

8.6.     Minimum EBITDA.   EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as measured every calendar month beginning on the third full calendar month following the Closing Date on a trailing twelve-month basis (provided, however, that for each calendar month ending on or prior to the first anniversary of the Closing Date, such measurement shall mean EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP for the period from the first day of the first full calendar month following the Closing Date, through such date of determination times the Annualization Ratio) shall not be less than (i) $8,000,000 through the first anniversary of the Closing Date or (ii) $9,000,000 thereafter. Notwithstanding the foregoing, the EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, (x) as measured on the last day of the first full calendar month following the Closing Date shall not be less than $600,000 in the period from the first day of the first full calendar month following the Closing Date to such date of determination or, (y) as measured on the last day of the second full calendar month following the Closing Date shall not be less than $1,333,333 in the period from the first day of the first full calendar month following the Closing Date to such date of determination.

IX.     CONDITIONS PRECEDENT.

9.1.     Conditions to Effectiveness

. The agreement of Lenders to make the Loans pursuant to this Agreement and the Other Documents is subject to the satisfaction, in the sole judgment of the Agent and Lenders, or waiver by Lenders, immediately prior to or concurrently with the making of the Loans hereunder, of the following conditions precedent:

(a)     Amended and Restated Notes. To the extent amended and restated Notes and/or alloges to Notes have been requested by any Lender, Agent shall have received such amended and restated Notes and/or alloges to Notes duly executed and delivered by a Designated Officer of each Borrower;

(b)     Amended and Restated Credit Agreement. Agent shall have received this Agreement, duly executed by all parties hereto, in form and substance satisfactory to Agent;

(c)     Filings, Registrations, Recordings and Searches. (i) Each document (including, without limitation, any Uniform Commercial Code financing statement) required by this Agreement, any Other Document, under applicable law or otherwise as reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral shall have been properly executed (if necessary) and delivered to the Agent or the title company for filing, registration or recordation in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received satisfactory evidence of the depositing for payment of any necessary fee, tax or expense relating thereto; (ii) the Agent shall also have received UCC, tax and judgment lien searches with respect to each Borrower in such jurisdictions as Agent shall require, and the results of such searches shall be satisfactory to Agent; and (iii) Agent shall have received from Borrowing Representative, for each Borrower, the Perfection Certificate;

(d)     Secretary's Certificates. Agent shall have received a certificate of the Secretary (or an acceptable substitute officer having similar duties and powers), of each Borrower, dated the Closing Date, in substantially the form of Exhibit 9.1(d), unless otherwise acceptable to or required by Agent, certifying as to (i) the incumbency and signature of the officers of each Borrower executing this Agreement and any Other Documents, and (ii) the resolutions of the Board of Directors of such Borrower authorizing such officers to enter into and carry out such transactions as are contemplated pursuant to this Agreement and the Other Documents; and including therewith copies of the Organic Documents of such Borrower as in effect on the Closing Date, each in form and substance satisfactory to Agent;

(e)     Good Standing Certificates. Agent shall have received good standing certificates for each Borrower dated not more than thirty (30) days prior to the Closing Date, issued by the secretary of state or other appropriate official of each Borrower's jurisdiction of organization and each jurisdiction where the conduct of each Borrower's business activities or the ownership of its properties necessitates qualification;

(f)     Legal Opinion. Agent shall have received an opinion of legal counsel to the Borrowers, in form and content satisfactory to Agent, which shall cover such matters incidental to the transactions contemplated by this Agreement, the Notes and all Other Documents as Agent may reasonably require;

(g)     No Litigation. Except with respect to the Chapter 11 Cases, (i) no litigation, investigation or proceeding before or by any arbitrator or Governmental Authority shall be continuing or threatened against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement or the Other Documents or any of the transactions contemplated hereby and thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the opinion of Agent, reasonably be expected to have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the transactions contemplated hereby shall have been issued by any Governmental Authority;

(h)　　Material Agreements. Agent shall have received and reviewed all Material Agreements existing on the Closing Date and be satisfied therewith;

(i)　　Collateral Examination. Agent shall have completed examinations of its primary Collateral, and be satisfied therewith;

(j)　　Commitment Fee. Agent shall have received in cash, on or prior to the Closing Date, a commitment fee, to be shared pro rata among the Lenders, equal to 1.00% of the aggregate principal amount of the Loans as of the Closing Date;

(k)　　Intentionally Omitted;

(l)　　Other Fees and Expenses.  Agent shall have received all fees and expenses payable to Agent and the Lenders on or prior to the Closing Date pursuant to this Agreement, any Other Document, the Reorganization Plan and the Cash Collateral Order, including, without limitation, reasonable attorneys' fees;

(m)　　Financial Statements. Agent shall have received copies of the Initial Projections and copies of the Historical Financial Statements, and be satisfied therewith;

(n)　　Insurance. Agent shall have received, in form and content satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(o)　　Deposit Account Control Agreements.  Agent shall have received all Deposit Account Control Agreements, duly executed by all parties thereto, required to be delivered as of the Closing Date pursuant to Section 4.14 hereof;

(p)　　Consents. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem reasonably necessary to effectuate the transactions contemplated by this Agreement and the Other Documents;

(q)　　No Adverse Material Effect. Except for the Chapter 11 Cases, since the end of Borrowers' most recently completed Fiscal Year for which audited financial statements have been reported, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect;

(r)　　Landlord's Agreements. Unless Agent otherwise has agreed to waive such requirement in one or more instances Agent shall have received landlord agreements in form and content reasonably satisfactory to Agent with respect to all premises leased by any Borrowers at which Equipment having a fair market value in excess of the Materiality Threshold is located;

(s)　　Intellectual Property. To the extent that any Material Intellectual Property (or applications therefor) is registered with the United States Patent and Trademark Office or, as appropriate, the United States Copyright Office as of the Closing Date, the Borrower owning such Material Intellectual Property shall have executed, as appropriate, a patent security agreement, a trademark security agreement, and/or a copyright security agreement in favor of Agent, each to be in form and content satisfactory to Agent;

3604386.12

(t)     Closing Certificate. Agent shall have received a closing certificate signed by a Designated Officer of each Borrower dated the Closing Date, in substantially the form of Exhibit 9.1(t), stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date, no Default or Event of Default has occurred or is continuing;

(u)     Junior Lien Facility Documents. Agent shall have received a copy duly executed by all parties thereto, certified by a Designated Officer of the Borrowing Representative as true and complete, of each of the Junior Lien Facility Documents, including schedules and exhibits thereto, along with a Subordination Agreement, all in form and substance satisfactory to Agent, with respect to the Junior Lien Facility. The term of the Junior Lien Facility shall expire at least six (6) months following the expiration of the Term, and the outstanding obligations thereunder shall be zero (0) as of the Closing Date;

(v)     Equity Investment Proceeds. Agent shall have received evidence satisfactory to it that no more than **[$2,200,000]** of the proceeds from the Equity Investment (such amount is subject to Agent's review of sources and uses and Initial Projections) was used to payoff certain of Borrowers' outstanding accounts payable;

(w)     Subordination Agreements. Agent shall have received a Subordination Agreement, in form and substance satisfactory to Agent, from (i) each holder of the Borrowers' Subordinated Debt that is outstanding as of the Closing Date and (ii) the Equity Sponsor pursuant to Section 7.7(b) hereof;

(x)     Mortgages. Agent shall have received from each Borrower amendments to each Mortgage with respect to all Real Property Collateral owned by such Borrower in fee simple as of the Closing Date, together with the following, each to be in form and substance satisfactory to Agent: a mortgagee's title insurance policy or title insurance endorsement (each a "Title Insurance Policy"), dated the Closing Date together with evidence that all premiums in respect of such Title Insurance Policy have been paid, which Title Insurance Policy shall: (i) be in an amount reasonably satisfactory to Agent; (ii) insure that the Mortgage insured thereunder creates a valid first Lien on the Real Property covered by such Mortgage free and clear of all Liens, defects and encumbrances (except those set forth in the Title Insurance Policy or otherwise reasonably acceptable to Lender); (iii) name Agent as the insured party thereunder; (iv) be in the form of ALTA Loan Policy 1970 (as amended) or other form approved by Agent, and (v) contain such endorsements and effective coverage as Agent may reasonably request;

(y)     Term Loans. Borrowers shall have consummated all transactions contemplated with the Term Loan Agent and the Term Loan Lenders substantially in accordance with the terms of the Term Loan Agreement as in effect on the Closing Date;

(z)     Equity Investment.  Agent shall have received evidence satisfactory to it that the Equity Investment has been consummated in accordance with terms and conditions satisfactory to Agent;

(aa)     Intercreditor Agreement. Agent and Term Loan Agent shall have executed and delivered an amendment to the Intercreditor Agreement, in form and substance satisfactory to Agent;

(bb)     Election of New Board of Directors.  The Permitted Holders of the Voting Equity Interests shall have elected a new Board of Directors of each Borrower, which shall be comprised of the following seven (7) members: (i) the Chief Executive Officer of the Parent Company, (ii) one (1) individual appointed by the Affiliated Bondholders (as defined in the Reorganization Plan), (iii) four (4)

individuals appointed by the Equity Sponsor (provided, however, that at least one (1) of such individuals shall be an Independent Director) and (iv) one (1) individual appointed by the DIP Lenders (as defined in the Reorganization Plan), provided that at least $**[3,500,000]** is to be rolled over to new Equity Interests as of the Closing Date (in such event that this condition is not satisfied, the seventh member shall be appointed by the Equity Sponsor);

(cc)     Minimum Liquidity. Agent shall have received evidence satisfactory to it that on the Closing Date, after giving effect to the transactions contemplated herein and taking into consideration all closing fees and expenses and the current obligations of the Borrowers, Borrowers shall have Liquidity in an amount of at least $3,000,000;

(dd)     Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order (together with all exhibits and other attachments thereto, as any of the foregoing shall be amended, modified or supplemented from time to time or any of the terms or conditions thereof waived (with the consent of the Lenders and Agent with respect to any amendment, modification, supplement or waiver that is adverse to the Lenders, as determined by the Lenders and Agent in their reasonable discretion), the "Plan Documents") in respect of the Chapter 11 Cases of the Borrowers in accordance with Section 1129 of the Bankruptcy Code, and Agent shall have received a copy thereof.  The Confirmation Order shall be in form and substance reasonably satisfactory to the Lenders and Agent, shall have been entered on the docket of the Bankruptcy Court, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in any manner (unless otherwise reasonably satisfactory to the Lenders and Agent) and Equity Sponsor and/or the Borrowers shall have made all cash payments contemplated thereunder;

(ee)     Plan Documents. The transactions contemplated by the Plan Documents shall have been consummated substantially contemporaneously with the consummation of the transactions hereunder (including, without limitation, all cash payments contemplated thereunder by Equity Sponsor and/or the Borrowers); and all conditions to the effectiveness of the Reorganization Plan shall have been satisfied or waived;

(ff)     Management Agreements. Agent shall have received from the Borrowers all management agreements and related documents and agreements duly executed by all parties thereto, in form and substance satisfactory to Agent;

(gg)     Pledge Reaffirmation.  Agent shall have received a pledge reaffirmation, in form and substance satisfactory to Agent, from each pledgor under the Pledge Agreement;

(hh)     USA Patriot Act/OFAC.  Agent and Lenders shall have received all documentation and other information required by applicable law and/or Governmental Authorities (including, without limitation, the USA Patriot Act and OFAC);

(ii)     IRS Form 8821. Each Borrower shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service;

(jj)     Environmental Reports. Agent shall have received environmental studies and reports prepared by independent environmental engineering firms experienced in such matters reasonably acceptable to Agent reflecting Borrowers' compliance with Section 5.6 hereof with respect to any Real Property that Borrowers own in fee simple as of the Closing Date; and

(kk)     Other Documents. Agent shall have received all Other Documents which Agent determines to be reasonably necessary to consummate the transactions contemplated to occur on or after

the Closing Date pursuant to this Agreement, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated herein shall be satisfactory in form and substance to each Lender Party and its legal counsel.

X.    INFORMATION AS TO BORROWERS.

Each Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.    Disclosure of Material Matters

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, report to Agent all matters materially and adversely affecting the value, or collectibility of any portion of the Collateral in excess of the Materiality Threshold or the enforceability of Agent's Lien thereon, including, without limitation, any Borrower's reclamation or repossession of, or the return to any Borrower of, any material amount of goods, or material amount of claims or disputes asserted by any Customer or other Obligor.

10.2.    Schedules

. Deliver to Agent on or before the tenth (10th) day of each Fiscal Month as and for the prior Fiscal Month (a) Receivables agings, (b) accounts payable agings and (c) Inventory reports. In addition, each Borrower will deliver to Agent at such intervals as Agent may request: (i) confirmatory assignment schedules, (ii) copies of Customer's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including, without limitation, trial balances and test verifications. Agent shall also have the right to confirm and verify all Receivables by any manner and through any medium it considers commercially advisable and do whatever it may deem commercially necessary to protect its interests hereunder. The items to be provided under this Section shall be in form satisfactory to Agent and executed by the Borrowing Representative and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

10.3.    Environmental Compliance Certificate

. At the request of Agent from time to time, furnish promptly, but in any event within five (5) Business Days after Borrowers' receipt of such request, a certificate signed by a Designated Officer of Borrowing Representative stating that, to the best of Borrowing Representative's knowledge, each Borrower is in compliance in all Environmental Laws and laws relating to occupational safety and health. To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action Borrower will implement in order to achieve full compliance.

10.4.    Litigation

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of: (i) any Commercial Tort Claim arising in a Borrower's favor subsequent to the Closing Date, or (ii) any litigation, suit or administrative proceeding affecting any Borrower, including, particularly, any Commercial Tort Claim, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

10.5.    Material Occurrences

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of: (a) any Event of Default or Default; (b) any event, development or circumstance as a result of which any financial statements or other reports furnished to Agent fail to present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition or operating results of the Borrowers as of the date of such statements; (c) any accumulated retirement Plan funding deficiency which, if such deficiency continued for two (2) Plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (d) default by any Borrower in respect of any Indebtedness that exceeds the Materiality Threshold and could reasonably be expected to result in the acceleration of the maturity of such Indebtedness, other than the Obligations, together with the names and addresses of the holders of such Indebtedness and the amount of such Indebtedness; (e) the termination (or receipt of notice of pending termination) of any Material Agreement; and (f) any other development in the business or affairs of the Borrowers which could reasonably be expected to have a Material Adverse Effect; in each case, describing the nature thereof and the action that Borrowers propose to take with respect thereto.

10.6.    Government Receivables

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, if the aggregate outstanding amount of any of its Receivables that arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them, exceeds the Materiality Threshold.

10.7.    Annual Financial Statements

. Furnish to Agent within one hundred (100) days after the end of each Fiscal Year of Borrowers financial statements of Borrowers on a consolidated basis, including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current Fiscal Year to the end of such Fiscal Year and a balance sheet as at the end of such Fiscal Year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by Malin, Bergquist & Company LLP or any other nationally recognized independent certified public accounting firm selected by Borrowers, but reasonably satisfactory to Agent (the "Accountants"). In addition, such financial statements shall be accompanied by a certificate of a Designated Officer of the Borrowing Representative, in substantially the form of Exhibit 10.7, that shall state that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants (herein, a "Compliance Certificate").

10.8.    Quarterly and Monthly Financial Statements{ TC "10.7.        Monthly Financial Statements" \f C \l "2" }. Furnish to Agent, (a) within fifty (50) days following the end of the first three (3) Fiscal Quarters of each Fiscal Year, and (b) within thirty (30) days following the end of each Fiscal Month, the following: (i) an unaudited balance sheet of Borrowers on a consolidated basis, and (ii) unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated basis reflecting results of operations from the beginning of the Fiscal Year to the end of such Fiscal Quarter or Fiscal Month, as applicable, and for such Fiscal Quarter or Fiscal Month, as applicable, all as prepared on a basis consistent with prior practices but in accordance with GAAP (together with a comparison to the reports for the corresponding period(s) in the prior Fiscal Year and to the Projections

for the current Fiscal Year required under <u>Section 10.9</u>). The reports shall be accompanied by a Compliance Certificate of Borrowers signed by a Designated Officer of Borrowing Representative stating that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants.

10.9.    <u>Projections</u>

. Furnish to Agent, prior to the first day of each Fiscal Year, commencing with its first Fiscal Year beginning after the Closing Date, month-by-month projected financial statements of Borrowers on a consolidated basis for such Fiscal Year, including balance sheets, income statements, statements of cash flow, and calculations of projected Financial Covenant compliance (including projected amounts of all financial components used in determining compliance) for such month (collectively, with the Initial Projections, the "<u>Projections</u>"), with the Projections to be accompanied by a certificate of the Borrowers signed by a Designated Officer of the Borrowing Representative to the effect that such Projections were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Projections are not to be viewed as facts and that actual results may differ from such Projections.

10.10.    <u>Variances From Operating Budget</u>

. Furnish to Agent, concurrently with the delivery of the financial statements referred to in <u>Section 10.8</u>, a summary of all material variances from the Projections submitted by Borrowers pursuant to <u>Section 10.9</u>.

10.11.    <u>Notice of Adverse Events</u>

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Authority or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Authority or any other Person to renew or extend any such Consent; (iii) copies of any periodic or special reports filed by any Borrower with any Governmental Authority, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower, taken as a whole, or if copies thereof are requested by any Lender Party.

10.12.    <u>ERISA Notices and Requests</u>

. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice in the event that (i) any Borrower or any member of the Controlled Group knows that an ERISA Event has occurred, together with a written statement describing such ERISA Event and the action, if any, that such Borrower or member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action that such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member

of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with a copy of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with a copy of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

### 10.13. Material Intellectual Property

. Notify Agent promptly after, but in any event within five (5) Business Days thereafter, if, subsequent to the Closing Date, any Borrower applies for, or acquires, any Material Intellectual Property registered (or registrable) under applicable federal law, and execute and deliver to Agent, upon request, such security agreements in respect thereof as Agent may request to evidence, confirm or perfect Agent's Lien on and security interest in such Collateral.

### 10.14. Public Reports

. Furnish to Agent, promptly after, but in any event within five (5) Business Days after, the same become publicly available, copies of all periodic and other reports, proxy statements and other materials (if any) filed by any Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to the owners of Borrowers' Equity Interests generally or to the holders of its Indebtedness (or any trustee, agent or to other representative therefor), as the case may be:

### 10.15. Material Agreements

. Furnish to Agent copies of: (i) all Material Agreements entered into subsequent to the Closing Date, promptly after, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (ii) all material amendments, modifications, alterations or other changes to any Material Agreements promptly upon, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (iii) any notices of default, termination, rescission or cancellation, or demands for payment made or received by any Borrower in respect of any Material Agreement, promptly after, but in any event within five (5) Business Days after, their receipt or delivery by such Borrower.

### 10.16. Additional Information

. Furnish to Agent such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without limitation and without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening or establishing of any new Collateral Location or any Borrower's closing of any existing Collateral Location, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts at

any of its plants or other facilities, or the expiration (other than in accordance with its terms) of any labor contract to which any Borrower is a party or by which any Borrower is bound.

### 10.17. Additional Documents

. Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

## XI. EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

### 11.1. Obligations

. (i) Failure by any Borrower to pay the principal amount of any Obligations when due, or (ii) failure by any Borrower to pay any Obligations consisting of interest and fees within two (2) Business Days after the date when due, or (iii) failure by Borrower to pay any other Obligations not described in clauses (i) or (ii) above within five (5) Business Days after the date when due; in each such case, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any Other Document or by notice of intention to prepay, or by required prepayment;

### 11.2. Misrepresentations

. Any representation or warranty of any material fact, circumstance or condition made or deemed made by any Borrower in this Agreement or any Other Document or in any certificate, document or financial or other written statement furnished by any Borrower at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

### 11.3. Financial Information

. Failure by any Borrower to (i) furnish financial information when due or when requested pursuant hereto that is unremedied for a period of five (5) Business Days, or (ii) permit the inspection of its books or records by any Lender Party, when requested pursuant to Section 4.10 hereof;

### 11.4. Liens

. Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's property having a collateral value, as determined by Agent, of more than the Materiality Threshold that is not stayed or vacated within thirty (30) days (but not later than its being executed, however);

### 11.5. Covenants

. Either (i) except as otherwise provided in Section 11.3(i) above or clause (ii) of this Section 11.5, failure of any Borrower to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document; or (ii) a failure of Borrowers to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.7 or 6.4 hereof that is not cured within twenty (20) days from the occurrence of such failure;

### 11.6. Judgments

. Any judgment is rendered or judgment Lien is filed against any Borrower for an amount in excess of the Materiality Threshold which is not either satisfied, stayed or discharged of record within thirty (30) days of such rendering or filing (but not later than its being executed, however);

### 11.7.   Voluntary Bankruptcy

. Any Borrower, any Subsidiary of any Borrower or any Guarantor shall (other than with respect to the Chapter 11 Cases) (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (vi) admit in writing its inability, or be generally unable, to pay its Indebtedness as it becomes due, (vii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (viii) take any action for the purpose of effecting any of the foregoing;

### 11.8.   Cessation of Business

. Any Borrower shall cease operation of its business or commence the liquidation of such business; or any Borrower shall give notice to Agent of its intent to undertake either of the foregoing measures;

### 11.9.   Involuntary Bankruptcy

. Any Borrower, any Subsidiary of a Borrower or any Guarantor shall acquiesce in, or fail to have dismissed within forty-five (45) days, any petition filed against it in any involuntary case under any state or federal bankruptcy law (as now or hereafter in effect), or take any action for the purpose of effecting any of the foregoing;

### 11.10.   Material Adverse Change

. Any change in any Borrower's condition or affairs (financial or otherwise) which in Agent's reasonable opinion has a Material Adverse Effect unless such Borrower remedies same to Agent's satisfaction within thirty (30) days after the Borrowing Representative receives written notice thereof from Agent;

### 11.11.   Agent's Liens

. Any Lien on any Collateral created hereunder or provided for hereby or under any Other Document ceases to be or is not a valid and perfected Lien having a first priority interest, except for any Permitted Encumbrance having Lien priority;

### 11.12.   Subordinated Debt

. An event of default shall occur under or in respect of any Subordinated Debt that causes the acceleration of, or entitles the holder thereof to cause the acceleration of, any Subordinated Debt, or any payment is made or received in respect of any Subordinated Debt in violation of the subordination provisions thereof, the terms hereof or the terms of any Subordination Agreement made with respect thereto.

### 11.13.   Cross Default

. Either: (i) any "Event of Default" (as defined herein) under the Term Loan Agreement shall occur and be continuing (unless waived in writing by the Term Loan Lenders); or (ii) any "Event of Default" (as defined therein) under the Junior Lien Facility Documents shall occur and be continuing (unless waived in writing by the holder of the Junior Lien Facility Subordinated Note); or (iii) a default of the obligations of any Borrower under any other Material Agreement which involves a monetary obligation in excess of the Materiality Threshold, whether individually or in the aggregate, shall occur, which default is not cured (or waived in writing) within any applicable grace period;

11.14.    Guaranty

. Termination (except by its express terms) or breach of any Guaranty or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate or challenges the validity of, or its liability under, any such Guaranty or similar agreement;

11.15.    Change of Control

. Any Change of Control shall occur;

11.16.    Change of Management

. Any Change of Management shall occur;

11.17.    Invalidity

. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower, or any Borrower shall so claim in writing to Agent;

11.18.    Takings

. (i) Any Governmental Authority shall revoke, terminate, suspend or adversely modify any license, permit, patent trademark or trade name of any Borrower, the continuation of which is material to the continuation of any Borrower's business; or (ii) any agreement that is necessary or material to the operation of any Borrower's business shall be suspended, revoked or terminated and not be reinstated or replaced by a substitute acceptable to Agent within thirty (30) days after the date of suspension, revocation or termination, and such suspension, revocation or termination without reinstatement or replacement would reasonably be expected to have a Material Adverse Effect;

11.19.    Seizures

. Any portion of the Collateral in excess of the Materiality Threshold shall be seized or taken by a Governmental Authority, or any Borrower or the title and rights of any Borrower shall have become the subject matter of litigation which could reasonably be expected, in the opinion of Agent, upon final determination, to result in material impairment or loss of such Collateral;

11.20.    Cessation of Operations

. Unless and except to the extent occurring in the ordinary course of Borrowers' business as conducted on the Closing Date, any material portion of the business operations of the Borrowers (considered as a whole) are interrupted at any time for more than ten (10) consecutive Business Days during any period of thirty (30) consecutive days, unless (i) such cessation of operations occurs in the ordinary course of Borrowers' business; e.g., an annual plant shutdown for re-tooling or maintenance or (ii) the Borrowers

shall (A) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to enable them to continue to operate their business in substantially the same manner as operated prior to such interruption and meet their obligations when due during such interruption and (B) receive the proceeds described in clause (A) preceding not later than thirty  (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (A) and (B) of this section, an Event of Default shall be deemed to have occurred if such interruption of operations continues for a period of more than one hundred eighty (180) consecutive days;

11.21.  Plans

. An event or condition specified in Section 7.12 or Section 10.12 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) that, in the judgment of Agent, could reasonably be expected to have a Material Adverse Effect; or

11.22.  Criminal Charges

. Any Borrower or any Designated Officer shall become the subject of a criminal indictment or investigation in respect of or pertaining to, the operation or conduct of a Borrower's business, its reporting of any financial data, its application for, or receipt of, any credit, its "laundering" of any funds or its non-payment (or underpayment) of any taxes or any other Charges, or shall admit its guilt or complicity in respect of any of the foregoing, or shall pay any fine or suffer any penalty in respect thereof (including as part of any plea bargain or similar arrangement).

XII.  AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

12.1.  Rights and Remedies

. Upon and after the occurrence of an Event of Default pursuant to Sections 11.7, 11.8, 11.9 or 11.20, all Obligations shall be immediately due and payable and this Agreement and all Commitments shall be deemed terminated. During the existence of any other Event of Default not specified in the preceding sentence, at the option of Required Lenders, all Obligations shall be immediately due and payable and Lenders shall have the right to terminate this Agreement and all Commitments, and cease making Advances. Upon the occurrence of any Event of Default and during its continuation, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or in equity generally, including, without limitation, the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral that is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowers at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the

purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Borrower. In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Borrower's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights that are used in connection with (a) Inventory for the purpose of disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of Inventory. Notwithstanding anything in this Agreement to the contrary, the exercise by any Lender Party of any rights or remedies in respect of any Collateral, and the application of any proceeds thereof, shall be subject in all respects to the provisions of the Intercreditor Agreement.

      12.2.   <u>Application of Proceeds</u>

.

The proceeds realized by Agent from the sale of any Collateral made pursuant to <u>Section 12.1</u> hereof, shall, subject to the provisions of the Intercreditor Agreement, be applied as follows: <u>first</u>, to the costs, expenses and attorneys' fees and expenses actually incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; <u>second</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document in respect of the Equipment Term Loan; <u>third</u>, to interest on the Equipment Term Loan then accrued, but unpaid; <u>fourth</u>, to the then outstanding principal amount of the Equipment Term Loan; <u>fifth</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document in respect of the Revolving Credit Advances; <u>sixth</u>, to interest on the Revolving Credit Advances then accrued, but unpaid; <u>seventh</u>, to the principal amount of any Revolving Credit Advances then outstanding; <u>eighth</u>, to furnish Agent cash Collateral in an amount not less than one hundred five percent (105%) of the aggregate undrawn amount of all Letters of Credit, such cash collateral arrangements to be in form and substance satisfactory to Agent; <u>lastly</u>, to all other Obligations then outstanding; <u>provided</u>, <u>however</u>, that Agent reserves the right to adjust the foregoing allocations as it sees fit from time to time, in its sole discretion, and apply (or re-apply, as the case may be) such proceeds to the Obligations in a different manner or order. If any deficiency shall arise, Borrowers shall remain liable to the Lender Parties therefor. If any surplus exists, such surplus shall be held by Agent as cash Collateral pending full payment and satisfaction of all Obligations and termination of this Agreement, after which any remainder shall be returned to the Borrowing Representative except as otherwise provided in the Intercreditor Agreement or is otherwise then required under applicable law.

      12.3.   <u>Agent's Discretion</u>

. After an Event of Default has occurred and while it is continuing, Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto, <u>provided</u> that such determination will not in any way modify or affect any Lender Party's rights hereunder.

      12.4.   <u>Setoff</u>.

          (a)     <u>Establishment of Right</u>. In addition to any other rights which any Lender Party may have under applicable law, upon the occurrence of an Event of Default and during its continuation, each Lender Party shall have a right of setoff as to, and may apply, any Borrower's property held by it (actually or constructively) to reduce the Obligations, subject to the provisions of the Intercreditor Agreement; <u>provided</u>, <u>however</u>, that no Lender Party shall have any such right of setoff, appropriation or application against any Payroll Account. Each Lender Party agrees to notify the Borrowing

Representative and the Agent after any such setoff and application is made by such Lender Party, provided that its failure to give such notice shall not affect the validity of such setoff and application.

(b) <u>Benefited Lender Parties</u>. If any Lender Party (a "<u>Benefited Party</u>") shall at any time receive any payment of all or part of its Advances, or interest thereon, or other Obligations owing under this Agreement or the Other Documents or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in <u>Section 11.7</u> or <u>Section 11.9</u> or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender Party, if any, in such Advances, or interest thereon, or other Obligations owing under this Agreement or the Other Documents, such Benefited Party shall purchase for cash from each affected Lender Party a participating interest in such portion of each such other Lender Party's Advances or other Obligations owing under this Agreement or Other Documents, or shall provide each Lender Party with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Parties to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lender Parties; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Party, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrowers agree that each Lender Party so purchasing a portion of another Lender Party's Advances or other Obligations owing under this Agreement or the Other Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of <u>clause (a)</u> of this <u>Section 12.4</u>, rights of setoff) with respect to such portion purchased as fully as if such Lender Party were the direct holder thereof.

12.5. <u>Rights and Remedies not Exclusive</u>

. The enumeration of the foregoing rights and remedies of the Lender Parties is not intended to be exhaustive, and the exercise of any right or remedy by the Lender Parties shall not preclude the exercise of any other right or remedy provided for herein or in any Other Document or otherwise provided by law from and after the occurrence of any Event of Default and during its continuation, all of which shall be cumulative and not alternative.

XIII. <u>WAIVERS AND JUDICIAL PROCEEDINGS</u>.

13.1. <u>Waiver of Notice</u>

. Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

13.2. <u>Delay</u>

. No delay or omission on any Lender Party's part in exercising any right, remedy or option hereunder or under any of the Other Documents shall operate as a waiver of such right, remedy or option or of any Default or Event of Default.

13.3. <u>Jury Waiver</u>

. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER

THIS AGREEMENT OR ANY OTHER DOCUMENT, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTIONS; IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIV.     EFFECTIVE DATE AND TERMINATION.

  14.1.     Term

. This Agreement, which shall inure to the benefit of, and shall be binding upon, the respective successors and permitted assigns of each Borrower and each Lender Party; shall become effective on the Closing Date, and shall continue in full force and effect until [_____], 2013 (the "Term") unless sooner terminated as herein provided. Borrowers may terminate this Agreement at any time, contingent upon payment in full of the Obligations.

  14.2.     Termination

. The termination of this Agreement shall not affect the rights of any Borrower or any Lender Party, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, all rights or interests created hereby, and all of the Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent for the benefit of the Lender Parties hereunder and the financing statements filed in respect thereof shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been paid or performed in full after the termination of this Agreement or each Borrower has furnished the Lender Parties with an indemnification satisfactory to such parties with respect thereto. Accordingly, each Borrower waives any rights that it may have under the applicable provisions of the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to deliver such termination statements to the Borrowers, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or performed in full. Notwithstanding any other provision of this Agreement or any Other Document, no termination of this Agreement shall affect Agent's or any Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of this Agreement and the Other Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Agent hereunder and under the Other Documents and the financing statements filed pursuant thereto and the rights and powers of Lender shall continue in full force and effect notwithstanding the fact that Borrowers' borrowings hereunder may from time to time be in a zero or credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash.

XV.     REGARDING AGENT.

15.1.    Appointment

. Each Lender Party hereby designates CapitalSource to act as Agent for such Lender Party under this Agreement and the Other Documents. Each Lender Party hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest and all fees, charges and collections received pursuant to this Agreement, for the ratable benefit of the Lender Parties, except the fees and other amounts payable to Agent as set forth in Section 9.1(k). Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including, without limitation, collection of the Obligations), Agent shall not be required to exercise any discretion or take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, which instructions shall be binding; provided, however, that Agent shall not be required to take any action that exposes Agent to liability or that is contrary to this Agreement or the Other Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto from the Lender Parties.

15.2.    Nature of Duties

. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent, nor any of its officers, directors, employees or agents, shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by any of them under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder or under any Other Documents. Agent shall not be under any obligation to any Lender Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower. The duties of Agent with respect to the Advances shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, express or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any Other Document, except as expressly set forth herein or therein.

15.3.    Lack of Reliance on Agent and Resignation

. Independently and without reliance upon Agent, each other Lender Party has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower in connection with the making and carrying of the Advances or any other Obligations and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender Party with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter except as shall be

provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender Party for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or for the financial condition of any Borrower, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default. Agent may resign on thirty (30) days' written notice to each of the Lenders and, upon such resignation, the Required Lenders will promptly designate a successor Agent. If no such successor Agent is appointed at the end of such thirty (30) day period, Agent may designate one of the existing Lenders as a successor Agent. Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "<u>Agent</u>" shall mean such successor Agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.     <u>Certain Rights of Agent</u>

. If Agent shall request instructions from Lenders with respect to any act or action (including any failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, <u>no Lender Party shall have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders</u>.

15.5.     <u>Reliance</u>

. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

15.6.     <u>Notice of Default</u>

. Agent shall not be deemed to have knowledge or notice of the occurrence, continuation or cessation of any Default or Event of Default unless Agent has received notice from a Lender Party or a Borrower referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default" (or a notice in respect of the continuation or cessation thereof). In the event that Agent receives such a notice, Agent shall give notice thereof to all other Lender Parties. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; <u>provided</u>, <u>however</u>, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders consistent with the terms of this Agreement and the Other Documents.

15.7.     <u>Indemnification</u>

. To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided, however, that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the indemnified party's gross (not mere) negligence or willful misconduct.

        15.8.    Agent in its Individual Capacity

. As to that portion of the Advances made by Agent as a Lender, Agent shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties of Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Borrower as if it were not performing the duties of Agent specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

        15.9.    Delivery of Documents

. To the extent Agent receives documents and information from any Borrower pursuant to Article X of this Agreement, Agent will promptly furnish such documents and information to the other Lender Parties.

        15.10.   Borrowers' Undertaking to Agent

. Without prejudice to their respective obligations to Lender Parties under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

        15.11.   Documentation Agent, Etc

. Agent shall have the continuing right, for purposes hereof, at any time from time to time to designate one or more Lender Parties (and/or its or their Affiliates) as "Co-Agent," "Collateral Agent," "Co-Documentation Agent," "Syndication Agent," "Arranger" or otherwise for purposes hereof, but such designations shall have no substantive effect, and the Lender Parties (or their Affiliates) so designated shall have no additional powers, duties or responsibilities as a result hereof. Further, no such Lender Party need be identified by such designation in any Other Document (including any amendment hereto or thereto) or execute this Agreement or any Other Document, using such designation.

        15.12.   Collateral Matters

. Agent is authorized on behalf of Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or this Agreement or any of the Other Documents that may be necessary or reasonably advisable to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to this Agreement of the Other Documents. Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion and without the necessity of any notice to or further consent from the Lenders, to release any Liens upon any

Collateral (a) upon the repayment in full of the Obligations and termination of this Agreement and the Other Documents or as otherwise contemplated in this Agreement, including, without limitation, with respect to any Permitted PP&E Disposition; (b) constituting property in which Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or (c) constituting property leased to Borrowers under a lease which has expired or been terminated in a transaction permitted under this Agreement. Upon request by Agent or Borrowers at any time, Lenders will confirm in writing Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this <u>Section 15.12</u>. Upon receipt by Agent of any authorization from Lenders of Agent's authority to release any Liens upon particular types or items of Collateral, and upon at least 5 Business Days' prior written request by Borrowers, Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of its Liens upon such Collateral; <u>provided</u>, <u>however</u>, that (i) Agent shall not be required to execute any such document on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon all interests retained by the Agent for the benefit of the Lenders, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

XVI.   <u>BORROWING REPRESENTATIVE</u>.

16.1.   <u>Borrowing Representative Provisions</u>

. If and to the extent that at any time or from time to time there are multiple Borrowers, then:

(a)   Each Borrower acknowledges that it together with each other Borrower make up a related organization of various entities constituting a single economic and business enterprise and sharing a substantial identity of interests such that, without limitation, Borrowers render services to or for the benefit of each other, purchase or sell and supply goods to or for the benefit of each other, make loans or advances and provide other financial accommodations to or for the benefit of each other (including the payment of creditors and guarantees of Indebtedness), provide administrative, marketing, payroll and management services to or for the benefit of each other; have centralized accounting, common officers and directors. Accordingly, and without limitation, any credit or other financial accommodation extended to any one Borrower pursuant hereto will result in direct and substantial economic benefit to each other Borrower, and each Borrower will likewise benefit from the economic benefit to each other Borrower, and consequently, the Borrowers, as a group, applying for credit and other financial accommodations pursuant hereto on a collective basis.

(b)   Each Borrower hereby irrevocably designates Borrowing Representative to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Representative.

(c)   The handling of this credit facility as a co-borrowing facility with a Borrowing Representative in the manner set forth in this Agreement is solely an accommodation to Borrowers and at their specific request. No Lender Party shall incur any liability to Borrowers as a result thereof. To induce each Lender Party to do so and in consideration thereof, each Borrower hereby indemnifies each Lender Party and holds each Lender Party harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against such Lender Party by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein,

3604386.12

reliance by Agent, any Lender or any other Lender Party on any request or instruction from Borrowing Representative or any other action taken by Agent, any Lender or any other Lender Party with respect to this Section except due to willful misconduct or gross (not mere) negligence by the indemnified party.

(d)     All Obligations shall be joint and several liabilities of Borrowers. Each Borrower cross-guarantees the full payment and performance hereunder and under the Other Documents by the other Borrower of its Obligations, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extension, renewal or forbearance granted by any Lender Party to any Borrower, the failure any Lender Party to give any Borrower any notice, any failure of any Lender Party to pursue or preserve its rights against any Borrower, the release by any Lender Party of any Borrower or any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by any Lender Party to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.

16.2.    Waiver of Subrogation

. Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim that such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property that is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVII.   MISCELLANEOUS.

17.1.    GOVERNING LAW

. THIS AGREEMENT AND, UNLESS OTHERWISE EXPRESSLY PROVIDED THEREIN, EACH OTHER DOCUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK. ANY JUDICIAL PROCEEDING BROUGHT BY OR AGAINST ANY BORROWER WITH RESPECT TO ANY OF THE OBLIGATIONS, THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTION MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE CITY AND STATE OF NEW YORK, UNITED STATES OF AMERICA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWING REPRESENTATIVE AT ITS ADDRESS SET FORTH IN SECTION 17.6 AND SERVICE SO MADE SHALL BE DEEMED COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAILS OF THE UNITED STATES OF AMERICA; PROVIDED, HOWEVER, IF BORROWING REPRESENTATIVE CEASES TO HAVE AN ADDRESS IN NEW YORK, NEW YORK AS ITS NOTICE ADDRESS PURSUANT TO SECTION 17.6, THEN, AT ANY LENDER PARTY'S OPTION, BY SERVICE UPON THE CORPORATION SERVICE COMPANY (OR ANY SUCCESSOR OR REPLACEMENT AGENT FOR SERVICE WITH AN OFFICE IN NEW

YORK, NEW YORK, SELECTED BY SUCH LENDER PARTY), WHICH EACH BORROWER HEREBY APPOINTS AS ITS AGENT FOR THE LIMITED PURPOSE OF ACCEPTING SERVICE IN THE STATE OF NEW YORK UNDER SUCH CIRCUMSTANCE. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR LIMIT THE RIGHT OF ANY LENDER PARTY TO BRING PROCEEDINGS AGAINST ANY BORROWER IN THE COURTS OF ANY OTHER JURISDICTION. EACH BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER AND SHALL NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON FORUM NON CONVENIENS. ANY JUDICIAL PROCEEDING BY ANY BORROWER AGAINST ANY LENDER PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT, SHALL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT LOCATED IN THE CITY OF NEW YORK, STATE OF NEW YORK OR IN THE COURTS OF ANY OTHER JURISDICTION IN WHICH ANY LENDER PARTY HAS BROUGHT A PROCEEDING AGAINST ANY BORROWER IN RESPECT HEREOF THAT IS THEN PENDING.

17.2.    Entire Understanding.

(a)     This Agreement and the Other Documents contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by the respective officers of the party making such promises, representations, warranties, or guarantees. Neither this Agreement nor any Other Document nor any portion or provisions hereof or thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and the Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement or any Other Document.

(b)     The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this subsection, from time to time enter into written supplemental agreements to this Agreement or the Other Documents for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent, or Borrowers hereunder or thereunder or the conditions, provisions or terms hereof or thereof, or waiving any Event of Default, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall, without the consent of all Lenders: (i) increase the Commitment or Commitment Percentage of any Lender; (ii) increase the Maximum Revolving Credit Amount; (iii) extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders pursuant to this Agreement; (iv) alter the definition of the term "Required Lenders" or alter, amend or modify this Section 17.2(b); or (v) release during any calendar year any Collateral (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of the Materiality Threshold. No supplemental agreement shall, without the consent of Agent, change the rights and duties of Agent. Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders and Agent and all future holders of the Obligations. In the case of any waiver of any Event of Default, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of

Default is the same as the Event of Default that was waived), or impair any right or remedy arising therefrom.

(c)     In the event that Agent requests the consent of a Lender pursuant to this Section and such consent is denied, then CapitalSource may, at its option, require such Lender to assign its interest in the Advances to CapitalSource or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to the then outstanding principal amount of that portion of the Advances owing to such Lender plus accrued and unpaid interest thereon and any fees then due such Lender, which interest and fees shall be paid when collected from Borrowers. In the event CapitalSource elects to require any Lender to assign its interest to CapitalSource or to the Designated Lender, CapitalSource will so notify such Lender in writing within forty-five (45) days following such Lender's denial, and such Lender will assign its interest to CapitalSource or the Designated Lender no later than five (5) Business Days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, CapitalSource or the Designated Lender, as appropriate, and Agent.

17.3.    Successors and Assigns; Participations: New Lenders.

(a)     This Agreement shall be binding upon and inure to the benefit of Borrowers, each Lender Party, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)     Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to one or more Participants. In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the Other Documents shall remain unchanged for all purposes, (b) the Borrowers and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and under the Other Documents, and (c) all amounts payable by Borrowers hereunder and under the Other Documents shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 17.2(b) expressly requiring the unanimous vote of all Lenders or, as applicable, all affected Lenders. Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement that such Lender enters into with any Participant. Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the same right of setoff pursuant to Section 12.4 hereof in respect to its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of setoff shall be subject to the provisions of Section 12.4 hereof and each Participant shall be obligated to share with the Lenders, and the Lenders agree to share with each Participant as provided in Section 12.4 hereof. Each Participant may exercise all rights of payment (including, without limitation, rights of set-off) with respect to the portion of the Advances in which a participation has been purchased by it as fully as if such Participant were the direct holder thereof, provided that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in the Advances to such Participant had such Lender retained such interest in the Advances, and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same portion of the Advances to both such Lender and such Participant.

(c)     Any Lender may sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to any Lender, any Affiliate of any Lender or an Approved Fund or, subject to subsection (d) below, with the consent (which shall not be unreasonably withheld, conditioned or delayed) of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers (reasonable grounds for withholding consent to include an assignee who would subject the Borrowers to the payment of materially greater costs of the types described in Sections 3.7 and 3.8 than Borrowers are otherwise then subject to paying) to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make or carry all or a portion of the Advances (each a "Purchasing Lender"), in minimum amounts of not less than Five Million Dollars ($5,000,000), pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Borrowers' consent (if required) to any such sale, assignment or transfer shall be presumed unless Borrowers object thereto in writing, with reasonable detail for such objection included therein, within three (3) Business Days after Borrowing Representative receives a written request for such consent. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a notation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers hereby consent to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing, including, if requested by any Lender, the execution and delivery of one or more promissory notes in replacement of one or more existing Notes. As used herein, "Approved Fund" shall mean any (i) investment company, hedge fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (i) and that, with respect to each of the preceding clauses (i) and (ii), is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

(d)     Nothing contained herein shall limit in any way the right of any Lender (without notice to, or consent of, the Agent or any Borrower) to assign all or a portion of the Loans owing to it from time to time to (i) any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System or any Operating Circular issued by such Federal Reserve Bank, or (ii) to any other Person to whom such Lender is indebted from time to time (including, but not limited to, under any warehousing, securitization or overnight repurchase facility), as collateral security in respect thereof (such Persons described in clauses (i) and (ii) above herein called "Lender Pledgees"), but, no such assignment shall release the assigning Lender from its obligations hereunder.

(e)     Agent shall maintain at its address set forth in Section 17.6 hereof a copy of each Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the

names and addresses of the owners of the Advances from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of that portion of the Advances recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of not less than Three Thousand Five Hundred Dollars ($3,500) payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment to such Purchasing Lender, unless waived in writing by Agent.

(f)        Borrowers authorize each Lender to disclose to any transferee or Purchasing Lender and any prospective transferee or Purchasing Lender any and all financial information in such Lender's possession concerning Borrowers which has been delivered to such Lender by or on behalf of Borrowers pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrowers.

(g)        If, pursuant to this Section, any interest in this Agreement or any portion of the Advances or any Note is transferred to any transferee that is organized under the laws of any jurisdiction other than the United States of America or any State thereof, the transferor Lender shall cause such transferee, concurrently with the effectiveness of such transfer, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Agent and the Borrowers) that, under applicable law and treaties, no taxes will be required to be withheld by the Agent, the Borrowers or the transferor Lender with respect to any payments to be made to such transferee in respect of the Advances or Notes transferred, (ii) to furnish to the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrowers) two duly completed and signed copies of either U.S. Internal Revenue Service Form W-8 BEN or U.S. Internal Revenue Service Form W-8 ECI, or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities (wherein such transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments hereunder), and (iii) to agree (for the benefit of the transferor Lender, the Agent and the Borrowers) to provide the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrower) new forms as contemplated hereby upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

17.4.    Application of Payments

. Subject to Section 2.9 and Section 12.2, Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause of action, then, to such extent, the Obligations or part thereof intended to be satisfied shall be reinstated and continue as if such payment or proceeds had not been received by Agent or such Lender.

17.5.    Indemnity

. Each Borrower jointly and severally shall indemnify Agent, each Lender, their respective Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "Indemnified Persons") from and against

any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house legal documentation, diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, the Existing Credit Agreement, this Agreement, any Other Document and/or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment). If any Indemnified Person uses in-house counsel to provide legal services for which any Borrower is responsible to pay or indemnify, each Borrower expressly agrees that its indemnification obligations include the allocable costs of such in-house counsel. Agent and each Lender agrees to give Borrowing Representative reasonable notice of any event of which Agent or such Lender becomes aware for which indemnification may be required under this Section 17.5, and Agent or such Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrowing Representative's consent, which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "Insured Event"), Agent and each Lender agrees not to exercise its right to select counsel to defend the event if that would cause any Borrower's insurer to deny coverage; provided, however, that Agent and each Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Borrower has paid to Lender pursuant to the indemnity set forth in this Section 17.5, then Agent or such Lender shall, promptly pay to such Borrower the amount of such recovery.

17.6.    Notice

. Any notice or request hereunder or under any of the Other Documents may be given to any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 17.6. Any notice or request hereunder shall be given by (a) hand delivery, (b) a nationally recognized overnight courier, (c) registered or certified mail, return receipt requested, or (d) telecopy to the number set forth below (or such other number as may hereafter be specified in a notice designated as a notice of change of address) with electronic confirmation of its receipt. Any notice or other communication required or permitted pursuant to this Agreement shall be deemed given (a) when personally delivered to any officer of the party to whom it is addressed, (b) on the earlier of actual receipt thereof or five (5) Business Days following posting thereof by certified or registered mail, postage prepaid, or (c) upon actual receipt thereof when sent by a recognized overnight delivery service or (d) upon actual receipt thereof when sent by telecopier to the number set forth below (or to such other number as has been furnished by a party to the others by like notice) or in any Commitment Transfer Supplement; with electronic confirmation of its receipt, in each case addressed to each party at its address set forth below (or at such other address as has been furnished in writing by a party to the others by like notice):

        (A)    If to Agent or to

            CapitalSource as Lender at:        CapitalSource Finance LLC

4445 Willard Avenue
12th Floor
Chevy Chase, Maryland 20815
Attention: Portfolio Manager/Business
Credit Services
Telecopier: (301) 841-2889
Email: mfidati@capitalsource.com

with a copy to:                     CapitalSource Finance LLC
                                    4445 Willard Avenue
                                    12th Floor
                                    Chevy Chase, Maryland 20815
                                    Attention: Joanne Fungaroli
                                    Telecopier: (301) 841-2889
                                    Email: jfungaroli@capitalsource.com

with a copy to:                     Waller Lansden Dortch & Davis, LLP
                                    511 Union Street, Suite 2700
                                    Nashville, Tennessee 37219-8966
                                    Attention:  Robert L. Harris, Esq.
                                    Telecopier: (615) 244-6804
                                    E-mail: robert.harris@wallerlaw.com

(B)      If to a Lender other than Agent or CapitalSource, as specified on the signature pages hereof.

(C)   If to Borrowing Representative
      or any Borrower, at:          Lexington Precision Corporation
                                    800 Third Avenue, 15th Floor
                                    New York, NY 10022
                                    Attention: Michael R. Lubin
                                    Telecopier: (212) 319-4659
                                    E-mail: mlubin@lexingtonprecision.com

with a copy to:                     [_____
                                    _____
                                    _____
                                    Attention: _____
                                    Telecopier: _____
                                    E-mail: _____]

17.7.   <u>Survival</u>

. The obligations of Borrowers under <u>Sections 2.6(d)</u>, <u>3.7</u>, <u>3.8</u>, <u>4.18(h)</u>, <u>17.5</u> and <u>17.9</u> shall survive any termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8.   <u>Severability</u>

. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

17.9.    Expenses

. All costs and expenses incurred by Agent and/or its Affiliates (and each Lender, with respect to expenses incurred at any time during which an Event of Default exists) including, without limitation, all costs and expenses, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), reasonable attorneys' fees and disbursements incurred by Agent (or any Lender with respect to expenses incurred at any time during which an Event of Default exists): (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, (c) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement, the Note or any Other Documents and/or any related agreement, document or instrument; or (d) arising in any way out of the administration of the Obligations or this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, or the taking or refraining from taking by Agent or any Lender of any action requested by any Borrower or (e) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (f) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's transactions with any Borrower, or (g) in connection with any advice given to Agent with respect to its rights and obligations under this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, may be charged to Borrowers' Account and shall be part of the Obligations. If Agent or any of its Affiliates uses in-house counsel to provide legal services under this Agreement or any Other Document for which Borrowers are responsible to pay or indemnify, each Borrower expressly agrees that its Obligations include the reasonable allocable costs of such in-house counsel.

17.10.    Injunctive Relief

. Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lenders; and, accordingly, Agent, if Agent so requests, shall, to the extent permitted by applicable law, be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11.    Consequential Damages

. No Lender Party, nor any agent or attorney for it, shall be liable to any Borrower, nor shall any Borrower, or any agent of attorney for it, be liable to any Lender Party, for consequential damages arising from any breach of contract, tort or other wrong relating to the execution, delivery or performance under this Agreement or any Other Document, the establishment, administration or collection of the Obligations or any related transaction.

17.12.    Captions

. The captions at various places in this Agreement and any Other Document are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement or any Other Document.

17.13.    Counterparts; Telecopied Signatures

. This Agreement and each Other Document may be executed in any number of separate counterparts and by different parties hereto in separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format shall be deemed to be an original signature hereto and each party agrees that it will be bound by its own facsimile signature or signature sent by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format and that it accepts the facsimile signature or signature by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format of each other party.

17.14.    Construction

. The parties acknowledge that each party and its counsel have reviewed this Agreement and each Other Document and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and each Other Document or any amendments, schedules or exhibits thereto.

17.15.    Confidentiality

. Each Lender Party shall hold all non-public information obtained by it pursuant to the requirements of this Agreement and each Other Document in accordance with such Lender Party's customary procedures for handling confidential information of this nature; provided, however, that each Lender Party may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel, rating agencies, collateral agents and other professional advisors, (b) to any Lender Party or to any prospective Lender Party, so long as such Lender Party or prospective Lender Party shall have been instructed in writing, and by acceptance of the information be deemed to have agreed, to treat such information as confidential in accordance with this Section 17.15, (c) to the Term Loan Agent and the Term Lenders subject to the terms of the Intercreditor Agreement, and (d) as required by any Governmental Authority or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by applicable law or court order, each Lender Party shall use its best efforts prior to disclosure thereof, to notify the Borrowing Representative of the applicable request for disclosure of such non-public information (A) by a Governmental Authority or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a transferee by such Governmental Authority) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender, or any other Lender Party be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of any Lender Party in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.

17.16.    Publicity

. Each Borrower hereby authorizes each Lender Party to make appropriate announcements of any financial arrangement entered into pursuant hereto, including, without limitation, announcements that are commonly known as "tombstones" in such publications and to such selected parties as such Lender Party shall deem appropriate, after consultation with Borrowing Representative. Without limiting the foregoing, Borrowers authorize each Lender Party to utilize any logo or other distinctive symbol associated with the Borrowers in connection with any such announcement or any other promotion, advertising or marketing

undertaken by it, after consultation with Borrowing Representative. In no event, however, shall any Borrower use the name of any Lender Party or any logo or distinctive symbol associated with any of them, unless, as appropriate, such Lender Party has given its prior written consent thereto.

17.17.  Survival of Representations and Warranties

. All representations and warranties of each Borrower contained in this Agreement and the Other Documents shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

17.18.  Destruction of Invoices

. Borrowing Representative hereby authorizes and directs Agent, each Lender and each other Lender Party in accordance with its standard document retention policies in such regard to destroy all invoices, financial statements and other data provided from time to time by Borrowers pursuant hereto.

17.19.  Time

. Time is of the essence in this Agreement and each Other Document.

17.20.  Release

. Notwithstanding any other provision of this Agreement or any Other Document, each Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "Releasing Parties"), hereby fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "Released Parties"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date. Each Borrower acknowledges that the foregoing release is a material inducement to Agent's and each Lender's decision to extend to Borrowers the financial accommodations hereunder and has been relied upon by Agent and each Lender in agreeing to make the Advances and entering into this Agreement.

17.21.  Patriot Act

. The USA Patriot Act presently requires each Lender Party to obtain, verify and record information that identifies each Person that opens an account or applies for a loan or lease. Borrowers agree to cooperate with each Lender Party in maintaining compliance with such law on an ongoing basis. In addition to the foregoing, each Lender Party that is not incorporated under the Laws of the United States of America or a State thereof (and is not exempted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or a foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) at such other times as are required under the USA Patriot Act.

17.22 <u>Amendment and Restatement.</u>{ TC "Section 11.21    Amendment and Restatement"\l2 }

(a)    On the Closing Date, the Existing Credit Agreement shall be amended and restated in its entirety by this Agreement, and the Existing Credit Agreement shall thereafter be of no further force and effect, except to evidence (i) the incurrence by the Borrower of the "Obligations" under and as defined in the Existing Credit Agreement (whether or not such "Obligations" are contingent as of the Closing Date), (ii) the representations and warranties made by the Borrower prior to the Closing Date and (iii) any action or omission performed or required to be performed pursuant to such Existing Credit Agreement prior to the Closing Date (including any failure, prior to the Closing Date, to comply with the covenants contained in such Existing Credit Agreement).  The amendments and restatements set forth herein shall not cure any breach thereof or any "Default" or "Event of Default" under and as defined in the Existing Credit Agreement existing prior to the Closing Date.  This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence payment of all or any portion of such obligations and liabilities.

(b)    The terms and conditions of this Agreement and the Agent's and the Lenders' rights and remedies under this Agreement and the other Other Documents shall apply to all of the "Obligations" incurred under and as defined in the Existing Credit Agreement.

(c)    On and after the Closing Date, (i) all references to the Existing Credit Agreement in the Other Documents (other than this Agreement) shall be deemed to refer to the Existing Credit Agreement, as amended and restated hereby, (ii) all references to any Article, Section or sub-clause of the Existing Credit Agreement in any Other Document (other than this Agreement) shall be deemed to be references to the corresponding provisions of this Agreement and (iii) except as the context otherwise provides, on or after the Closing Date, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be references to the Existing Credit Agreement, as amended and restated hereby.

(d)    This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar and, except as expressly provided herein or in any other Other Document, all terms and conditions of the Other Documents remain in full force and effect unless otherwise specifically amended hereby or any other Other Document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF each of the parties hereto has signed this Agreement as of the day and year first above written.

"BORROWERS"

LEXINGTON PRECISION CORPORATION

By: _____
Name: _____
Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____
Name: _____
Title: _____

**[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

CAPITALSOURCE FINANCE LLC, as Agent and a Lender:

By: _____
Name: _____
Title: _____

Commitment Amount:

Revolving Credit Commitment:              $[_____]
Equipment Term Loan Commitment:          $[_____]
Commitment Percentage:                   **[50%]**


WEBSTER BUSINESS CREDIT CORPORATION, as a Lender

By: _____
Name: _____
Title: _____

Commitment Amount:

Revolving Credit Commitment:              $[_____]
Equipment Term Loan Commitment:          $[_____]
Commitment Percentage:                   **[50%]**


**[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

## List of Annexes, Exhibits and Schedules

### Annexes

Annex One            Definitions

### Exhibits

Exhibit 9.1(d)       Secretary's Certificate
Exhibit 9.1(t)       Closing Certificate
Exhibit 10.7         Compliance Certificate
Exhibit 17.3         Commitment Transfer Supplement

### Schedules

Schedule 2.6         Letters of Credit
Schedule 4.5         Equipment and Inventory Locations
Schedule 4.14(c)     Location of Executive Offices
Schedule 4.16        Excluded Equipment
Schedule 5.2         Organizational Data and Numbers; Qualifications
Schedule 5.3         Tax Matters
Schedule 5.5         Prior Names
Schedule 5.6         OSHA and Environmental Compliance
Schedule 5.7         Disputed Indebtedness
Schedule 5.8         Litigation
Schedule 5.9         Indebtedness
Schedule 5.11        Plans
Schedule 5.12        Material Intellectual Property
Schedule 5.14        Defaulted Indebtedness
Schedule 5.17        Labor Contracts
Schedule 5.21        Conflicts
Schedule 5.24        Real Property
Schedule 5.25        Deposit Accounts
Schedule 6.8         Post-Closing Matters
Schedule 7.2         Permitted Encumbrances
Schedule 7.3         Other Indebtedness
Schedule 7.4         Loans and Investments

ANNEX ONE

DEFINITIONS

This Annex One is incorporated by reference into, and constitutes an integral part of, the Amended and Restated Credit and Security Agreement, dated as of [_____], 2010 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), made among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers; the Lenders identified therein as parties thereto; CAPITALSOURCE FINANCE LLC, as a Lender, Co-Documentation Agent and as Agent for all Lenders; and WEBSTER BUSINESS CREDIT CORPORATION, as a Lender and Co-Documentation Agent. The following terms shall have the following meanings as and when used in the Credit Agreement and the Other Documents. References in such defined terms to "this Agreement," "hereof," "hereto" or the like, shall mean and refer to the Credit Agreement.

"Annualization Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Accountants" shall have the meaning set forth in Section 10.7 hereof.

"Accounting Change" shall have the meaning set forth in Section 1.1 hereof.

"Advances" shall mean and include any loans, advances or other financial accommodations made under, pursuant to, or in connection with this Agreement or any Other Document, including, particularly the Equipment Term Loan, the Revolving Credit Advances, any Letters of Credit and any unpaid fees and expenses due and owing to Agent and/or Lenders.

"Affiliate," of any Person, shall mean (a) any Person that, directly or indirectly, is in Control of, is Controlled by, or is under common Control with such Person, or (b) any Person who is a shareholder, director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.

"Agent" shall have the meaning set forth in the preamble to this Agreement; and shall include the successors and assigns of any such Person.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Applicable Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 5.50%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)     if the Leverage Ratio is greater than 2.50x, then the Applicable Margin shall equal 6.50%;

(b)     if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Margin shall equal 6.00%;

(c)     if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Margin shall equal 5.50%;

(d)     if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Margin shall equal 4.50%; and

(e)     if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Margin shall equal 4.00%.

"Applicable Rate" shall mean the sum of LIBOR plus the Applicable Margin.

"Appraisal" shall mean an appraisal, conducted at Borrowers' expense, by an independent appraiser selected by, or acceptable to, Agent of the Borrowers' Equipment using a form, scope and methodology selected by, or acceptable to, Agent.

"Approved Fund" shall have the meaning given to such term in Section 17.3(c).

"Bank Product Obligations" shall mean, collectively, all amounts owed by Borrowers to any Lender Party in respect of (i) any cash management service, including through the use of a Deposit Account Control Agreement and the related Deposit Account(s), (ii) any Hedge Contract, (iii) any derivative product or (iv) any other bank product or service; in each case, provided by any Lender Party to any Borrower from time to time in connection with this Agreement or the transactions contemplated hereby.

"Bankruptcy Code" shall mean Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq).

"Bankruptcy Court" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Borrower" and "Borrowers" shall have the meanings set forth in the preamble to this Agreement; and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a consolidated basis" (or words of similar import) shall mean, as appropriate, the consolidation in accordance with GAAP of the accounts or other items of Borrowers and their respective Subsidiaries (if any).

"Borrowers' Account" shall have the meaning set forth in Section 2.5.

"Borrowing Representative" shall mean the Parent Company.

"Business Day" shall mean any day other than a day on which commercial banks in New York are authorized or required by law to close.

"Capital Expenditures" shall have the meaning set forth in Section 8.1.

"Capitalized Expenses" shall mean all fees, costs and expenses that have accrued and remain unpaid through the Closing Date, including, without limitation, the following: (i) pre-petition legal fees of the Lenders in an amount of $[TBD], (ii) prepayment fee under the Existing Equipment Loan Facility in an amount of $[TBD], (iii) the Lenders' financial advisor's fees, costs and expenses in the amount of $[TBD] and (iv) the Lenders' investment banker's success fee in an amount of $[TBD].

"Capitalized Leases" shall have the meaning set forth in Section 8.1.

"CapitalSource" shall have the meaning set forth in the Preamble to this Agreement.

"Cash Collateral Order" shall mean that certain Cash Collateral Order entered on April 17, 2008 by the Bankruptcy Court relating to the Chapter 11 Cases, as has been amended or extended from time to time.

"Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of ninety (90) days or less issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of ninety (90) days or less issued by any financial institution that is a member of the Federal Reserve System and has combined capital, surplus and undivided profits of not less than $250,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of ninety (90) days or less issued by a corporation (except an Affiliate of any Borrower) organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital, surplus and undivided profits of not less than $250,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date of acquisition if the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds that invest substantially all of their assets in securities of the types described in clauses (a) through (e) above.

"Cash Income Taxes" shall have the meaning set forth in Section 8.1.

"Cash Interest Expense" shall have the meaning set forth in Section 8.1.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in Section 7.1(a) hereof; (ii) the liquidation or dissolution of any Borrower or the adoption of a plan by the stockholders of any Borrower relating to the dissolution or liquidation of such Borrower, other than as permitted in Section 7.1(a) hereof; (iii) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Equity Interests of any Borrower; (iv) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of any Borrower (together with any new directors who have been appointed by, or whose nomination for election by the shareholders of such Borrower, as the case may be, was approved by, a vote of at least sixty-six and two-thirds percent (66 2/3%) of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of such Borrower; (v) the failure of Parent Company to own directly or indirectly one hundred percent (100%) of

the voting power of the total outstanding Voting Equity Interests of LRG; or (vi) the failure of the Equity Sponsor to own directly or indirectly more than fifty percent (50%) of the voting power of the total outstanding Voting Equity Interests of Parent Company.

"Change of Management" shall mean that neither of the Principals is actively involved in the day-to-day executive management of each Borrower, whether by death, disability, retirement, termination of employment or otherwise, unless, (i) within 30 days thereafter, Borrowers shall have in place an interim Chief Executive Officer or similarly-titled member of executive management and
(ii) within 120 days thereafter, Borrowers shall have retained successor executive management acceptable to the Required Lenders in their Credit Judgment in terms of qualifications, ability and experience (after which, their successor(s) in office shall be deemed "Principals" hereunder).

"Chapter 11 Cases" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, Equity Interests, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon any Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean the date on which all of the conditions precedent set forth in Section 9.1 hereof have been fully satisfied in the sole judgment of the Agent and Lenders (or otherwise waived by Lenders).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated thereunder.

"Collateral" shall mean and include all assets of each Borrower (subject only to the limitation on Subsidiary Stock of each Foreign Subsidiary, if any, set forth in subsection (f) below), including, without limitation, all of the following assets but shall exclude any Excluded Equipment as long as it is Excluded Equipment:

     (a)      all Receivables;

     (b)      all Equipment;

     (c)      all General Intangibles;

     (d)      all Inventory;

     (e)      all Contract Rights;

     (f)      all Equity Interests of each Domestic Subsidiary (if any), and sixty-five percent (65%) of the Equity Interests of each Foreign Subsidiary (if any);

     (g)      all Securities;

(h)     all Leasehold Interests;

(i)     all Commercial Tort Claims;

(j)     all of each Borrower's right, title and interest in and to (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) all other property, including warranty claims, relating to any goods securing this Agreement; (v) all of each Borrower's contract rights, rights of payment that have been earned under a contract right, instruments, investment property, documents, chattel paper, warehouse receipts, deposit accounts, money and securities; (vi) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (vii) all supporting obligations that secure payment or performance of any account, chattel paper, document, general intangible, instrument or investment property; (viii) all letter-of-credit rights; (ix) Extraordinary Receipts; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder or under the Other Documents, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(k)     all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to clauses (a) through (j) of this definition; and

(l)     all proceeds and products of the Collateral described in clauses (a) through (k) of this definition, in whatever form, including, but not limited to: cash, Deposit Accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and Commercial Tort Claim proceeds.

The term "Collateral" shall also extend to and include all Real Property Collateral.

"Collateral Locations" shall have the meaning assigned to such term in Section 4.5.

"Commercial Tort Claim" shall have the meaning given to such term in Article 9 of the UCC and shall include, without limitation, any claim of any Borrower arising in tort and specified on Schedule 5.8.

"Commitment" or "Commitments" shall mean, individually or collectively, the Revolving Credit Commitment(s) and Equipment Term Loan Commitments of each Lender, or all Lenders, as the case may be.

"Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Commitment bears to the total Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent, pursuant to which, among

other things, a Purchasing Lender shall purchase and assume all or a portion of the obligation of a Lender to make and carry Advances under this Agreement.

"<u>Confirmation Order</u>" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"<u>Consents</u>" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and other third parties, domestic or foreign, (i) necessary to carry on any Borrower's business, including, without limitation, any consents required under all applicable federal, state or other applicable law, and (ii) required to effectuate the transactions and agreements contemplated in this Agreement and the Other Documents.

"<u>Contract Rights</u>" shall mean all rights of each Borrower arising under or in connection with any contract, to the extent that such Borrower may grant a security interest in such rights under such contract, either by the terms of such contract or pursuant to the applicable provisions of Article 9 of the UCC, notwithstanding the terms of such contract, or otherwise. "<u>Contract Rights</u>" shall include, without limitation, all rights of each Borrower under all license agreements to which it is party as licensor or licensee and all letter-of-credit rights of each Borrower.

"<u>Control</u>" shall mean the power, whether direct or indirect, (i) to vote ten percent (10%) of more of the Voting Equity Interests of a Person, or (ii) to direct, or cause the direction of, the management and/or policies of a Person, whether by contract or otherwise.

"<u>Controlled Group</u>" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"<u>Credit Judgment</u>" shall mean the credit judgment of Agent, Required Lenders or all Lenders, as the case may be, exercised by it (or them) in good faith and in a commercially reasonable manner from the perspective of a senior secured lender making loans of similar type and size to similar borrowers.

"<u>Customer</u>" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"<u>Default</u>" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall have the meaning set forth in <u>Section 3.1(a)</u> hereof.

"<u>Defaulting Lender</u>" shall have the meaning set forth in <u>Section 2.10(a)</u> hereof.

"<u>Deferred Interest</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>Deposit Account</u>" shall mean any checking account, savings account, time deposit account, certificate of deposit, investment account or other account (howsoever denominated), in which from time to time any cash or Securities of any Borrower is or may be deposited.

"<u>Deposit Account Control Agreement</u>" shall mean an agreement, in form and substance satisfactory to Agent in its sole discretion, which provides Agent with "control" (within the meaning of

the UCC) over, and a first priority, perfected Lien on, each account of each Borrower and all assets of such Borrower from time to time on deposit or otherwise credited to such Deposit Account.

"Designated Officer" shall mean the chairman, president, chief executive officer, chief financial officer or chief operating officer of a Borrower (regardless of title), or such other officer, agent or representative of a Borrower that Agent may, at such Borrower's request, permit to be a "Designated Officer" from time to time.

"Determination Date" shall have the meaning set forth in Section 3.2(a).

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean a Subsidiary organized under the laws of the United States or any political subdivision thereof.

"EBITDA" shall have the meaning set forth in Section 8.1 hereof.

"Environmental Authority" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, motor vehicles, fittings, furniture, furnishings, fixtures, molds, discs, tools, stamps, parts, accessories and all replacements and substitutions therefor or accessions thereto, and all software embedded therein.

"Equipment Term Loan" shall mean the term loan, which includes the Capitalized Expenses, in the principal amount of [_____] ($[_____]) made to Borrowers by the Lenders pursuant to Section 2.1(b).

"Equipment Term Loan Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Equipment Term Loan Commitment" representing the commitment of such Lender to make its Commitment Percentage of the Equipment Term Loan available to Borrowers.

"Equipment Term Loan Commitments" shall mean the aggregate amount of each Lender's individual Equipment Term Loan Commitment, which aggregate amount shall equal [_____]($[_____]).

"Equity Interests" shall mean: (i) in the case of a corporation, all capital stock, including common and preferred stock, and warrants to acquire capital stock; (ii) in the case of a partnership, all partnership interests therein, including special, limited and general interests; (iii) in the case of a limited liability company, all membership interests therein; and (iv) in the case of any other entity, all interests evidencing equity ownership therein.

"Equity Investment" **[shall mean the cash contribution by the Equity Sponsor to one or more of the Borrowers made on the Closing Date in an amount not less than [$9,700,000], plus the amount of any cash fees paid to investors in connection with such transaction, in exchange for Equity Interests in one or more of the Borrowers, in each case upon the terms of the Reorganization Plan and for the purpose of partially funding the costs and expenses of the Borrowers' exit from bankruptcy.]**

"Equity Sponsor" shall mean Aurora Resurgence Management Partners LLC, a Delaware limited liability company, or an Affiliate thereof, including Commercial Financial Services 407, LLC, a Delaware limited liability company.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan for which the reporting requirements have not been waived in writing; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of its respective Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable; (f) a complete or partial withdrawal by any Borrower or any member of the Controlled Group from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan: (i) the imposition of any liability under Title IV of ERISA, other than Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any member of the Controlled Group in excess of the Materiality Threshold and (j) any other event of condition with respect to a Plan, including any Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate, that could reasonably be expected to result in liability of any Borrower in excess of the Materiality Threshold.

"Event of Default" shall mean the occurrence and continuance of any of the events set forth in Article XI hereof.

"Excess Cash Flow" shall mean, for any fiscal year, without duplication, an amount equal to the sum of (i) Consolidated Net Income (or loss) of Borrowers for such period, plus (ii) an amount equal to the amount of depreciation expenses, amortization expense (including the amortization of goodwill), accrued non-cash interest expense and all other non-cash charges deducted in arriving at such Consolidated Net Income (or loss), plus (iii) an amount equal to the aggregate net cash proceeds of the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent not required to be applied to mandatory prepayments or payments on the Loans or the Term Loans and not reinvested in new Equipment or Real Property pursuant to Section 2.9 hereof, plus (iv) an amount equal to the net loss on the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent deducted in arriving at such Consolidated Net Income (or loss), plus (v) an amount equal to

50% of the aggregate management fees paid to the Equity Sponsor during such period, plus (vi) without duplication of other items included in this definition an amount equal to any tax refunds or credits received by Borrowers during such period, less (vii) an amount equal to the permitted Capital Expenditures of Borrowers for such period, less (viii) an amount equal to the sum of all regularly scheduled payments of principal on Indebtedness for money borrowed of Borrower (other than with respect to payments of Revolving Credit Advances) actually made during such period to the extent permitted hereunder, less (ix) an amount equal to the net gain on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent included in arriving at such consolidated net income or loss.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Deposit Account" shall mean any Deposit Account of Borrowers that is (i) a Payroll Account or (ii) a Deposit Account (other than any in which proceeds of Collateral are at any time deposited) in which collected funds on deposit, determined on any date on a daily average basis over the immediately preceding thirty (30) days, is less than Ten Thousand Dollars ($10,000) or, when aggregated with all other such Deposit Accounts, Twenty-Five Thousand Dollars ($25,000).

"Excluded Equipment" shall mean any Equipment (or proceeds thereof) that is or becomes subject to a Lien (including pursuant to Capitalized Leases) permitted under subsections (e) or (m) of Section 7.2, if the valid grant of a Lien thereon to Agent is prohibited by the terms of the agreement between any Borrower and the holder of such Lien or under applicable law, and such prohibition has not been or is not waived, or the consent of the holder such other Lien has not been or is not otherwise obtained (it being understood that Borrowers shall have no obligation whatsoever to any Lender Party to obtain such consent), or under applicable law such prohibition cannot be waived and, notwithstanding anything to the contrary set forth in the definition of "Collateral", the types or items of Collateral described in such definition shall not include the Excluded Collateral, so long as the prohibition set forth in such agreement or applicable law remains effective. For example, but without limitation, if pursuant to any Capitalized Lease, the valid grant of a Lien thereon to Agent in the Equipment leased thereunder is prohibited, the Lien of Agent thereon shall be reinstated upon termination of such Capitalized Lease, and such Equipment shall no longer be considered Excluded Equipment.

"Excluded Equity Interests" shall mean any Equity Interests that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures or is required to be prepaid, repurchased, reacquired or defeased, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (b) is convertible into or exchangeable or exercisable for (i) debt securities or other Indebtedness or (ii) other Excluded Equity Interests, in each case at any time on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (c) contains any repurchase obligation that may come into effect prior to the indefeasibly payment in full in cash of all Obligations, in each case, unless the holders of such Equity Interests expressly enter into, and deliver to Agent, a Subordination Agreement in form and substance satisfactory to Agent, (d) requires any payment of cash dividends or any other distributions, in each case, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash or (e) is guaranteed by, or secured by any Property of, any Borrower or any of its Subsidiaries.

"Existing Credit Agreement" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Equipment Loan Facility" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Term Loan Facility" shall mean the term loan credit facility under that certain Loan and Security Agreement, dated as of May 31, 2006, as may have been amended, restated, supplemented or otherwise modified through the Closing Date, among the Borrowers, Term Loan Lenders and Term Loan Agent.

"Extraordinary Receipts" shall mean any cash received by a Borrower or any of its Subsidiaries not in the ordinary course of business from the following, (a) proceeds of insurance in respect of the Collateral, (b) condemnation awards (and payments in lieu thereof) in respect of the Collateral, (c) indemnity payments, (d) foreign, United States, state or local tax refunds, (e) pension plan reversions and (f) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action in respect of the Collateral.

"Financial Covenants" shall mean the financial covenants set forth in Article VIII.

["**First Merit Blocked Account Agreement**" shall mean the Deposit Account Control Agreement, dated as of May 31, 2006, among the Borrowers, First Merit Bank, N.A., and the Agent, as the same may be amended in accordance with its terms.]

"Fiscal Year" shall mean Borrowers' fiscal year as in effect on the Closing Date; and the terms "Fiscal Quarter" and "Fiscal Month" shall have correlative meanings.

"Fixed Charge Coverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Fixed Charges" shall have the meaning set forth in Section 8.1 hereof.

"Foreign Subsidiary" shall mean any Subsidiary of a Borrower which is not a Domestic Subsidiary.

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations for borrowed money, whether current or long-term (including, without limitation, the Obligations and the Subordinated Debt) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all purchase money Indebtedness;

(c)    the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(d)    the maximum amount available to be drawn under letters of credit (including, without limitation, standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)    all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(f)     all Indebtedness in respect of Capital Leases;

(g)     all preferred stock or other Equity Interests providing for mandatory redemptions, sinking fund or like payments prior to the end of the Term;

(h)     all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(i)     all guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied, except that, for purposes of the Financial Covenants, GAAP shall be determined on the basis of such principles used in the preparation of the most recent audited financial statements delivered to Agent prior to the Closing Date.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trade names, service marks, trade secrets, goodwill, copyrights, design rights, registrations, licenses, license fees, franchises, customer lists, tax refunds, tax refund claims, pension fund refunds, pension fund refund claims, overpayments, overpayment claims, reclamation rights, computer programs, software, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer, all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governing Body" shall have the meaning set forth in Section 6.10 hereof.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person (other than a Borrower) who may hereafter guarantee payment or performance of the whole or any part of the Obligations. "Guarantors" means, collectively, all such Persons. On the Closing Date, there are no Guarantors, except for each Borrower as to the other Borrower.

"Guaranty" shall mean any guaranty of the Obligations of Borrowers, in whole or in part, executed at any time by a Guarantor in favor of Agent for the ratable benefit of Lenders and the other Lender Parties, as applicable.

"Hazardous Discharge" shall have the meaning set forth in Section 4.18(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum

and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws relating to hazardous waste disposal now in force or hereafter enacted.

"Hedge Contract" shall mean any "hedge," "swap," "collar," "cap" or similar agreement between a Borrower and any other financial institution, including, but not limited to, any Lender Party or Affiliate of a Lender Party, intended to fix the relative amount of such Borrower's risk in respect of changes in interest rates, foreign currency exchange and commodity values.

"Historical Financial Statements" shall have the meaning set forth in Section 5.4(a) hereof.

"Indebtedness" shall mean, with respect to any Person (without duplication), any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments, including (for avoidance of doubt) Subordinated Debt; (b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person in connection with obtaining goods, materials or services that is not overdue by more than ninety (90) days, unless the trade payable is being contested in good faith); (c) all obligations as lessee under leases that have been, or should be in accordance with GAAP, recorded as Capitalized Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations in respect of any Equity Interests issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person that is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under any Hedge Contracts; (i) all obligations owed by such Person under license agreements with respect to non-refundable, advance or minimum guaranteed royalty payments; and (j) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

"Indemnified Persons" shall have the meaning given to such term in Section 17.5.

"Independent Director" shall mean a member of the Board of Directors of any Borrower who shall not have been at the time of such Person's appointment or at any time during the preceding five (5)

years, and shall not be as long as such Person is a director of any Borrower, a director, officer, employee, partner, member, manager, Affiliate or holder of any Equity Interests of any Independent Parties.

"Independent Parties" shall mean any of the following Persons: the Accountants or any other outside auditor, attorney or consultant of any Borrower, or any of their Subsidiaries or Affiliates, (ii) a supplier to any Borrower or any of the Independent Parties, (iii) a Person Controlling or under common Control with any partner, member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties, or (iv) a member of the immediate family of any director, officer, employee, partner, member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties.

"Initial Borrowers" shall have the meaning set forth in the preamble to this Agreement.

"Initial Projections" shall have the meaning given to such term in Section 5.4(b).

"Insurance Premium Collateral" shall mean, collectively, (a) any insurance policies of Borrowers for which an Insurance Premium Finance Party has entered into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum, and (b) any loss proceeds paid or payable to a Borrower pursuant to such insurance policies (to the extent of the amount owed to such Insurance Premium Finance Party), provided, however, that, (i) in no event shall the Insurance Premium Collateral include any amounts deposited in or received in any Deposit Account that is subject to a Deposit Account Control Agreement established by Borrowers in connection herewith or otherwise with respect to Borrowers' financing arrangements with Agent and Lenders for the handling of collections of Receivables or other assets and (ii) in no event shall the Insurance Premium Collateral of any Insurance Premium Finance Party secure any obligation to any other Insurance Premium Finance Party.

"Insurance Premium Finance Party" shall mean, in connection with insurance policies maintained by Borrowers, an insurance company or a third party that enters into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum.

"Insured Event" shall have the meaning set forth in Section 17.5 hereof.

"Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated of even date herewith, by and between Agent and Term Loan Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Expense" shall have the meaning set forth in Section 8.1.

"Inventory" shall mean and include, as to each Borrower, all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them. The term "Inventory," as used herein, shall further extend to and include, as applicable to any Borrower, any and all farm products.

"IP Security Agreement Supplement" shall mean a security agreement, to be in registrable form and otherwise to be in form and substance reasonably satisfactory to Lender pursuant to which Lender

may give notice of record of its Lien on Material Intellectual Property owned by a Borrower and registered with the United States government.

"IRS" shall mean the Internal Revenue Service of the United States Treasury, and any successor thereto.

"Issuer" shall mean any Person selected by the Agent who issued a Letter of Credit and/or accepted a draft pursuant to the terms thereof.

"Junior Lien Facility" shall mean the secured subordinated credit facility, subject to a Subordination Agreement, evidenced by the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related agreements, documents, instruments and certificates, which provides the borrowers thereunder with a loan in a maximum aggregate principal amount of up to $3,000,000.

"Junior Lien Facility Credit Agreement" shall mean that certain Credit Agreement, dated as of [____], 2010, between the Equity Sponsor and one or more of the Borrowers, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Documents" shall mean the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related documents, instruments, agreements and certificates, each as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Lender" shall mean the Equity Sponsor in its capacity as the holder of the Indebtedness evidenced by the Junior Lien Facility Subordinated Note.

"Junior Lien Facility Subordinated Note" shall mean the [__]% Junior Subordinated Note due [____], 201[_], issued by [____] in favor of the Junior Lien Facility Lender, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"L/C Disbursement" shall mean any payment by the Issuer pursuant to a Letter of Credit.

"Leasehold Interests" shall mean all of each Borrower's right, title and interest in and to any Real Property owned by a Person other than Borrower, whether as tenant, lessee, licensee, operator or otherwise.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person that becomes a transferee, successor or assignee of any Lender pursuant to Section 17.3(c).

"Lender Default" shall have the meaning set forth in Section 2.10(a) hereof.

"Lender Party" shall mean Agent, each Lender, any Issuer, any Purchasing Lender, any Participant and any Lender Pledgee, together with each other holder from time to time of any interest in any of the Obligations.

"Lender Pledgee" shall have the meaning set forth in Section 17.3(d) hereof.

"Lender Representative" shall have the meaning set forth in <u>Section 6.10</u> hereof.

"Letter(s) of Credit" shall have the meaning set forth in <u>Section 2.6</u> hereof.

"Letter of Credit Documents" means, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefore, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (i) the rights and obligations of the parties concerned or at risk or (ii) any collateral security for such obligations.

"Letter of Credit Fees" shall have the meaning set forth in <u>Section 3.4</u> hereof.

"Leverage Ratio" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"LIBOR Rate" shall mean the greater of (i) two and one-half percent (2.5%) per annum or (ii) a fluctuating rate of interest per annum determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the one-month London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR Rate" shall mean the greater of (a) two and one-half percent (2.5%) per annum or (b) the fluctuating rate of interest per annum calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen Page LIBO Page as the one-month London interbank offered rate for deposits in U.S Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; <u>provided</u>, <u>however</u>, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; <u>provided</u>, <u>however</u>, if such rate is not available, "LIBOR Rate" shall mean the greater of (x) two and one-half percent (2.5%) per annum or (y) a fluctuating rate of interest per annum from a comparable rate quotation designated by Agent as a substitute therefore. "<u>Telerate Page 3750</u>" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "<u>Business Day</u>" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Liquidity" shall have the meaning given to such term in <u>Section 8.1</u> hereof.

"Loan" means each Revolving Credit Advance and the Equipment Term Loan, as the case may be.

"Loan Documents" shall mean, collectively, this Agreement and the Other Documents.

"LPC" shall have the meaning given to such term in the initial recitals to this Agreement.

"LRG" shall have the meaning given to such term in the initial recitals to this Agreement.

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, business operations, assets or business prospects of the Borrowers, considered as a whole, (b) Borrowers' ability to pay the Obligations in accordance with the terms hereof and of the Other Documents, (c) the value of the Collateral, considered as a whole, or Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents, considered as a whole.

"Material Agreements" shall mean and include, in the case of each Borrower, the following: (i) any lease of Real Property material to the operation of a Borrower's business that involves annual payments by a Borrower in excess of the Materiality Threshold, (ii) any lease of personal property by a Borrower having aggregate annual rentals in excess of the Materiality Threshold, (iii) any license agreement for the use of any intellectual property material and necessary for the operation of its business, (iv) the Term Loan Agreement, the Term Loan Lender Agreements, the Junior Lien Facility Documents, any Subordination Agreement and any other document, instrument or agreement evidencing, pertaining to, subordinating or securing the payment of, any Indebtedness in excess of the Materiality Threshold, (v) any labor or union contract, (vi) any employment contracts (more than 12 months) with executive officers of Borrowers, (vii) any long-term purchase or supply contracts (more than 12 months) involving annual sales or purchases in excess of Two Million Dollars ($2,000,000), (viii) any Organic Document, and (ix) any other document, contract or agreement the termination of which (without its substantially contemporaneous replacement) could reasonably be expected to have a Material Adverse Effect.

"Material Intellectual Property" shall have the meaning given to such term in Section 5.12 hereof.

"Materiality Threshold" shall mean Two Hundred Fifty Thousand Dollars ($250,000).

"Maximum Revolving Credit Amount" shall mean the maximum amount of Revolving Credit Advances and Letters of Credit that may be outstanding at any one time, which as of the Closing Date equals **[Seven Hundred Thirty-Three Thousand And No/100 Dollars ($733,000.00)]**, less any L/C Disbursement and less any amounts that may expire and not be renewed under any Letters of Credit.

"Mortgage" shall mean each mortgage, deed of trust, security deed, assignment of leasehold interest or rents, or similar document pursuant to which a Borrower shall grant to or for the benefit of Agent a Lien on the Real Property Collateral, together with all modifications, supplements, replacements, restatements, and amendments thereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" shall mean, with respect to any sale or other disposition of any asset or the sale or issuance of any Indebtedness or Equity Interests, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person in connection with such transaction after deducting therefrom only (without duplication) (a) reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, accountant's fees, investment banking fees, finder's fees, other similar fees and commissions and reasonable out-of-pocket expenses, (b) the amount of taxes reasonably estimated by such Person to be actually and reasonably attributable to such transaction, (c) the amount of any Indebtedness secured by a security interest, lien or other encumbrance (other than a security interest or other Lien created hereunder or pursuant hereto) on such asset that, by the terms of such transaction, is required to be repaid upon such disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such

Person or any Affiliate of any Borrower and, in each case, are properly attributable to such transaction or to the asset that is the subject thereof.

"Net Senior Debt" shall have the meaning set forth in Section 8.1 hereof.

"Non-Defaulting Lenders" shall have the meaning set forth in Section 2.10(b) hereof.

"Note" shall mean each promissory note at any time evidencing any portion of the Obligations. "Notes" shall refer, collectively, thereto.

"Obligations" shall mean and include any and all of each Borrower's Indebtedness, obligations and/or liabilities to Agent, Lenders and each other Lender Party (or any corporation that directly or indirectly Controls or is Controlled by or is under common Control with Agent, any Lender or any other Lender Party) of every kind, nature and description, whether direct or indirect, secured or unsecured, joint, several, joint and several, absolute or contingent, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such Indebtedness, obligations or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and including, but not limited to, any and all of any Borrower's Indebtedness, obligations and/or liabilities under this Agreement, the Other Documents or under any other agreement between any Lender Party and any Borrower, all amounts charged to Borrowers' Account and all obligations of any Borrower to each Lender Party to perform acts or refrain from taking any action. Without limitation of the foregoing, the term "Obligations" extends to and includes all Advances, all accrued (but unpaid) interest thereon and all fees payable hereunder and under any Other Documents. For the avoidance of doubt, it is understood and agreed that the term "Obligations" shall not include any Borrower's Indebtedness, obligations and/or liabilities to any Lender Party or any other Person under any Permitted Hedge Contracts or with respect to any Bank Product Obligations.

"OFAC" shall mean the U.S. Department of the Treasury Office of Foreign Assets Control, and its successors.

"Organic Documents" shall mean: (i) for a corporation, its articles (or certificate) of incorporation and bylaws; (ii) for a partnership, its articles of organization (if any) and partnership agreement; and (ii) for a limited liability company, its articles (or certificate) of organization and any operating agreement; together with, for each such entity and any other entity not described above, such other, similar documents as are integral to its formation or the conduct of its business operations.

"Other Documents" shall mean the Notes, the Letter of Credit Documents, the Mortgages, any UCC financing statement, any Deposit Account Control Agreements (including, without limitation, **[the First Merit Blocked Account Agreement]**), the Pledge Agreement and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Borrower and delivered to Agent, any Lender or any other Lender Party in respect of the transactions contemplated by this Agreement.

"Overadvance" shall have the meaning set forth in Section 2.4 hereof.

"Parent Company" shall have the meaning given to such term in the initial recitals to this Agreement.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances in accordance with Section 17.3(b) hereof.

"Payment Office" shall mean, initially, the office of the Agent located at 4445 Willard Avenue, 12th Floor, Chevy Chase, Maryland 20815; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Representative and to each Lender to be the Payment Office.

"Payroll Account" shall mean any one or more deposit, custody or other accounts maintained by any Borrower with a bank or other institution if such account is used solely to deposit funds that are to be applied to the payment of wages and other compensation payable to employees of any Borrower and any withholding, social security, payroll, unemployment or other taxes relating thereto, imposed by any federal, state, county or local government or a subdivision or agency thereof, including any charges, fees, assessments, interest, penalties or additions payable in connection with any of the foregoing or which are to be applied, to the extent of amounts withheld or deducted from compensation payable to any employee of any Borrower, to the payment of health insurance or other benefits generally provided to employees of any Borrower.

"PBGC" shall mean the Pension Benefit Guaranty Corporation, and any successor thereto.

"Perfection Certificate" shall mean, collectively, the Perfection Certificate for each Borrower executed by such Borrower and delivered to Agent on the Closing Date.

"Permitted Encumbrances" shall have the meaning set forth in Section 7.2 hereof.

"Permitted Hedge Contracts" shall mean any Hedge Contracts entered into in the ordinary course of, and pursuant to the reasonable requirements of Agent, Borrowers' business, and not for speculative purposes.

"Permitted Holders" shall mean the following Persons and their respective Affiliates: the Equity Sponsor, William B. Conner, Michael A. Lubin, Warren Delano and William Shulvitz.

"Permitted PP&E Dispositions" shall mean: the sale or other disposition of Equipment no longer used or useful in the business of any Borrower, so long as (i) no Event of Default then exists, and none otherwise would be caused thereby, (ii) Agent shall have received at least one (1) Business Day advance notice thereof if the sale or other disposition exceeds Twenty-Five Thousand Dollars ($25,000) and (iii) such sales or other dispositions do not involve Equipment having an aggregate fair market value in excess of the Materiality Threshold for all such Equipment which is the subject of sales or other dispositions in any one Fiscal Year, except as the Required Lenders otherwise may agree.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of Borrowers or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreement" shall mean the Pledge Agreement dated as of May 31, 2006, by the undersigned thereto, in favor of Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Principals" shall mean Michael A. Lubin and Warren Delano or each of their permitted successors pursuant to the terms and conditions herein; each, individually.

"Projections" shall have the meaning set forth in Section 10.9 hereof.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Equity Interests.

"Provision for Taxes" shall mean with respect to any Person for any period, the provision of taxes on the net income of such Person, whether federal, state, provincial, county or local, foreign or domestic, that is required to be made on the income statement of such Person for such period in accordance with GAAP.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to its owned and leased premises, including, particularly, any real property identified on Schedule 5.24 hereto, but shall exclude the real property located at 202 Winchester Road, Lakewood, New York. The term "Real Property" specifically includes Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, in addition to Real Property owned by Borrowers, or a Borrower, in fee simple.

"Real Property Collateral" shall mean that portion of Borrowers' Real Property that at any time is owned by a Borrower in fee simple (if any).

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrowers by their respective Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances (including payment intangibles), and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Releases" shall have the meaning set forth in Section 5.6(c)(i) hereof.

"Released Parties" shall have the meaning set forth in Section 17.20 hereof.

"Releasing Parties" shall have the meaning set forth in Section 17.20 hereof.

"Reorganization Plan" shall have the meaning set forth in the "Statement of the Transaction" section hereto.

"Reportable Event" shall mean a reportable event described in Section 4043(b) of ERISA and/or in the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Commitments.

"Restricted Payment" shall mean and include any payment described in the proviso to Section 7.13.

"Restricted Payment Conditions," with respect to any Restricted Payment, shall mean the following conditions: (i) no Event of Default shall have occurred and be continuing as of the payment date, and none would be caused by or result from such payment being made; (ii) on a pro forma basis, after giving effect to such payment as if made in the last Fiscal Month for which Borrowers have reported financial statements pursuant to Section 10.8, Borrowers shall remain in compliance with all applicable Financial Covenants; and (iii) Agent shall have received at least three (3) Business Days' advance written notice of Borrowers' intent to make such payment, specifying the amount thereof, the payee (if known) and the purpose, and at such time a Designated Officer of the Borrowing Representative shall have certified in writing to Agent Borrowers' compliance with clauses (i) through (iii) above, showing appropriate computations.

"Revolving Credit Advances" shall mean Advances made pursuant hereto other than in connection with the (i) Equipment Term Loan or (ii) issued and undrawn Letters of Credit.

"Revolving Credit Commitment" shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement for each Lender as its "Revolving Credit Commitment" representing the commitment of such Lender to make Revolving Credit Advances and to fund outstanding Letters of Credit; as it may change from time to time in accordance with Section 17.3(c).

"Revolving Credit Commitments" shall mean the aggregate amount of each Lender's individual Revolving Credit Commitment, which aggregate amount shall equal the Maximum Revolving Credit Amount.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on any list thereof maintained by OFAC, as published from time to time.

"Sanctioned Person" shall mean any Person (i) named on any list of "Specifically Designated Nationals," "Blocked Persons," "Specifically Designated Terrorists," "Specially Designated Narcotics Traffickers" or "Foreign Terrorist Organizations" maintained by OFAC, as published from time to time; (ii) that is (A) an agent of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Securities" shall mean and include, as to each Borrower, all securities (whether certificated or uncertificated) and other investment property owned by such Borrower, whether now existing or hereafter created, including any held by any intermediary in any "street" name, pursuant to any custody arrangement or otherwise. The term "Securities" specifically includes all securities accounts, security entitlements, commodity contracts and commodity accounts.

"Settlement Date", in respect of settlements among Lenders, if WBCC is not the only Lender, shall mean the Closing Date and thereafter the first Business Day of each calendar month.

"Subordinated Debt" shall mean any Indebtedness of the Borrowers incurred after the Closing Date (including, without limitation, any Indebtedness related to the Junior Lien Facility), provided that (i)

such Indebtedness is made expressly subordinate and subject in right and time of payment to the all Obligations pursuant to a Subordination Agreement, in form and substance satisfactory to Agent; (ii) any Liens and rights of any kind such subordinated lender may have or thereafter acquire against any Borrower with respect to such Indebtedness shall not be asserted in any manner until ninety (90) days after all of the Obligations have been indefeasibly paid in full in cash; (iii) any interest accruing with respect to such subordinated Indebtedness shall be only payable-in-kind until all Obligations have been indefeasibly paid in full in cash; (iv) such subordinated Indebtedness shall have a final maturity occurring no sooner than, or a weighted average life less than, the date that is six (6) calendar months following the expiration of the Term; and (v) Agent provides prior written consent to such subordinated Indebtedness (provided, that no prior written consent of Agent shall be required for Indebtedness under the Junior Lien Facility as permitted in Section 7.3(e) hereof).

"Subordination Agreement" shall mean an agreement, satisfactory in form and substance to Agent, in its sole discretion, among (i) Agent, (ii) a creditor holding Indebtedness permitted to be incurred hereunder, and (iii) the Borrowers (whether directly or by consent), setting forth the terms by which such Indebtedness shall be subordinated, in right of payment and claim, to the rights and claims of the Lender Parties in respect of the Obligations and the Collateral.

"Subsidiary" shall mean, as to any Person, a corporation or other entity a majority of whose Voting Equity Interests are owned, directly or indirectly, by such Person. Unless otherwise expressly provided herein, references herein to a "Subsidiary" or the "Subsidiaries" shall mean and refer to Subsidiaries of the Borrowers, including any not in existence on the Closing Date in anticipation of their subsequent creation or acquisition in accordance with the terms hereof.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Term Loan" or "Term Loans" shall mean the term loans made by or on behalf of the Term Loan Lenders to each Borrower pursuant to the Term Loan Agreement in the initial aggregate principal amount of **[____]** ($**[___]**).

"Term Loan Agent" shall mean CSE Mortgage LLC and its successors and assigns.

"Term Loan Agreement" shall mean the Amended and Restated Loan and Security Agreement, dated of even date herewith, by and among Term Loan Agent, Term Loan Lenders and Borrowers, as amended or modified from time to time subject to the provisions of the Intercreditor Agreement.

"Term Loan Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Term Loan Agent or any Term Loan Lender, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Term Loan Lender Agreements.

"Term Loan Lender Agreements" shall mean, collectively, the following (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Term Loan Agreement; (b) all "Other Documents" (as defined therein) at any time executed and delivered by any Borrower with, to or in favor of Term Loan Agent or any Term Loan Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Term Loan Lender Agreement".

"Term Loan Lenders" shall mean, collectively, CSE Mortgage LLC in its individual capacity and the other lenders who are from time to time parties to the Term Loan Agreement as lenders, and their

respective successors and assigns, and the lenders with respect to any Refinancing Indebtedness; each sometimes being referred to herein individually as a "Term Loan Lender".

"Test Period" shall have the meaning set forth in Section 8.1 hereof.

"Title Insurance Policy" shall have the meaning set forth in Section 9.1(x) hereof.

"Toxic Substance" shall mean and include any material present on the Real Property that has been shown to have significant adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. The term "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Unfinanced Capital Expenditures" shall have the meaning set forth in Section 8.1 hereof.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code, as adopted in the State of New York, in effect from time to time.

"Voting Equity Interests" shall mean Equity Interests having ordinary voting power to elect members of the board of directors, partners, managers or comparable governing authority of a Person.

"WBCC" shall have the meaning set forth in the Recitals hereto.

"Working Capital Obligations" shall mean, any time, the aggregate amount of: (i) all then outstanding Revolving Credit Advances and (ii) all amounts then available for drawing under all then outstanding Letters of Credit.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

ACKNOWLEDGED AND AGREED:

LEXINGTON PRECISION CORPORATION

By: _____
      Name: _____
      Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____
      Name: _____
      Title: _____

**EXHIBIT 9.1(d)**
**SECRETARY'S CERTIFICATE**

The undersigned, being the Secretary of LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("Borrower"), hereby gives this certificate to CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CS") pursuant to the terms of that certain Amended and Restated Credit and Security Agreement, dated as of even date herewith (herein, as at any time amended, amended and restated, supplemented or otherwise modified, called the "Credit Agreement"), among Borrower, LEXINGTON PRECISION CORPORATION, CS, individually as a lender and as agent for itself and the other Lenders from time to time party thereto, and such other lenders. Capitalized terms used herein and not defined herein have the meanings assigned to them in the Credit Agreement.

The undersigned hereby certifies that:

1.      Attached hereto as <u>Exhibit "A"</u> is a true and correct copy of the Certificate of Incorporation of Borrower and all amendments thereto as in effect on the date hereof;

2.      Attached hereto as <u>Exhibit "B"</u> is a true and correct copy of the bylaws of Borrower as in effect on the date hereof;

3.      Pursuant to resolutions heretofore adopted by the Board of Directors of Borrower, a true, correct and complete copy of which is set forth on <u>Exhibit "C"</u> attached hereto, each officer of Borrower identified below is duly authorized to execute and/or attest the Credit Agreement and each Other Document to which the Borrower is a party for and on behalf of Borrower, and to bind Borrower accordingly thereby; and the specimen signature of each such officer or other representative inscribed below is his genuine signature:

| Name | Title | Signature |
|---|---|---|
| Michael A. Lubin | Chairman of the Board | _____ |
| Warren Delano | President | _____ |
| [_____] | [_____] | _____ |

IN WITNESS WHEREOF, the undersigned has executed this certificate in his aforesaid capacity as Secretary of Borrower, as of [___ __], 2010.

_____

Name: [_____]
Title:  Secretary

3604386.12

EXHIBIT "A"

[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "B"


[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "C"

[BORROWERS' COUNSEL TO PROVIDE]

**EXHIBIT 9.1(t)**

**CLOSING CERTIFICATE**

This certificate is delivered pursuant to <u>Section 9.1(t)</u> of that certain Amended and Restated Credit and Security Agreement, dated as of [_____ ___], 2010, among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers, the Lenders from time to time party thereto, and CAPITALSOURCE FINANCE LLC, as a Lender and as Agent for all such Lenders (as such agreement has been, or may be, amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

Borrowing Representative hereby certifies to Agent that as of the date hereof:

(a)      all representations and warranties set forth in the Credit Agreement and the Other Documents are true and correct;

(b)      Borrowers are in compliance with all terms and provisions set forth in the Credit Agreement and the Other Documents; and

(c)      no Default or Event of Default has occurred and is continuing.

LEXINGTON PRECISION CORPORATION,
as Borrowing Representative

By: _____

Name: _____

Title: _____

Date: [_____ ___], 2010

3604386.12

**Exhibit 10.7**

Form of Compliance Certificate

To:     CapitalSource Finance LLC
        4445 Willard Avenue, 12th Floor
        Chevy Chase, MD 20815
        Attention: Business Credit Services/Portfolio Manager

Re:     Lexington Precision Corporation
        Lexington Rubber Group, Inc.: Compliance Certificate dated [_____ __, 20__]

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Credit and Security Agreement, dated as of [____ ____], 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between LEXINGTON PRECISION CORPORATION, a Delaware corporation ("**LPC**"), LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("**LRG**", and together with LPC, collectively, the "**Borrowers**") and CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("**Lender**"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

Pursuant to Section [10.7] [10.8] of the Credit Agreement, the Designated Officer of Borrowing Representative hereby certifies that:

1.      The financial statements of Borrowers for the period ending [_____ __, 20__] attached hereto as Schedule 1 have been prepared in accordance with GAAP, applied on a basis consistent with prior practices.

2.      The Borrowing Representative has reviewed the terms of the Credit Agreement and the Other Documents and the condition of Borrowers, and based on such review, no Default or Event of Default has occurred or is continuing, except as set forth on Schedule 2 attached hereto, specifying the nature of such Default or Event of Default, when it occurred, and the steps that the Borrowers have taken, are taking, or propose to take with respect thereto.

3.      Attached hereto as Schedule 3 are the calculations that set forth the Borrowers' compliance with the Financial Covenants as of [_____ __, 20__].

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, 20__.

<div style="margin-left: 40%;">

**LEXINGTON PRECISION CORPORATION,**
as Borrowing Representative


By: _____
Name: _____
Title: _____

</div>

# COMMITMENT TRANSFER SUPPLEMENT

COMMITMENT TRANSFER SUPPLEMENT, dated as of _____, 20__, among _____ (the "Transferor Lender"), each Purchasing Lender executing this Commitment Transfer Supplement (each, a "Purchasing Lender"), and CAPITALSOURCE FINANCE LLC ("CS"), as agent for the Lenders (as defined below) under the Credit Agreement (as defined below)

## W I T N E S S E T H

WHEREAS, this Commitment Transfer Supplement is being executed and delivered in accordance with Section 17.3 of the Amended and Restated Credit and Security Agreement, dated as of [_____ __], 2010, (as from time to time amended, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "Credit Agreement") among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (therein and herein called "Borrowers"), and CS, the various financial institutions named therein or which hereafter become a party thereto, (together with CS, the "Lenders") and CS as agent for Lenders (in such capacity, "Agent"); and

WHEREAS, each Purchasing Lender wishes to become a Lender party to the Credit Agreement; and

WHEREAS, the Transferor Lender is selling and assigning to each Purchasing Lender rights, obligations and commitments under the Credit Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      All capitalized terms used herein which are not defined shall have the meanings given to them in the Credit Agreement.

2.      Upon receipt by the Agent of four counterparts of this Commitment Transfer Supplement, to each of which is attached a fully completed Schedule and each of which has been executed by the Transferor Lender and Purchasing Lender, Agent will transmit to Transferor Lender and each Purchasing Lender a transfer effective notice, substantially in the form of Schedule II to this Commitment Transfer Supplement (a "Transfer Effective Notice") Such Transfer Effective Notice shall set forth, inter alia, the date on which the transfer effected by this Commitment Transfer Supplement shall become effective (the "Transfer Effective Date"), which date shall not be earlier than the first Business Day following the date such Transfer Effective Notice is received. From and after the Transfer Effective Date, each Purchasing Lender shall be a Lender party to the Credit Agreement for all purposes thereof.

3.      At or before 12:00 Noon (New York City time) on the Transfer Effective Date each Purchasing Lender shall pay to Transferor Lender, in immediately available funds, an amount equal to the purchase price, as agreed between Transferor Lender and such Purchasing Lender (the "Purchase Price"), of the portion of the outstanding Advances being purchased by such Purchasing Lender (such Purchasing Lender's "Purchased Percentage") and other amounts owing to the Transferor Lender under the Credit Agreement with respect to that portion of the Advances being purchased by such Purchasing Lender. Effective upon receipt by Transferor Lender of the Purchase Price from a Purchasing Lender, Transferor Lender hereby irrevocably sells, assigns and transfers to such Purchasing Lender, without recourse, representation or warranty, and each Purchasing Lender hereby irrevocably purchases, takes and assumes from Transferor Lender, such Purchasing Lender's Purchased Percentage of the Advances and other amounts owing to the Transferor Lender under the Credit Agreement together with all instruments, documents and collateral security pertaining thereto.

4.      Transferor Lender has made arrangements with each Purchasing Lender with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by Transferor Lender to such Purchasing Lender of any fees heretofore received by Transferor Lender pursuant to the Credit Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by such Purchasing Lender to Transferor Lender of fees or interest received by such Purchasing Lender pursuant to the Credit Agreement from and after the Transfer Effective Date.

5.      (a)      All principal payments that would otherwise be payable from and after the Transfer Effective Date to or for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender pursuant to the Credit Agreement shall, instead, be payable to or for the account of Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement.

        (b)      All interest, fees and other amounts that would otherwise accrue for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender from and after the Transfer Effective Date pursuant to the Credit Agreement shall, instead, accrue for the account of, and be payable to, Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement. In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by any Purchasing Lender, Transferor Lender and each Purchasing Lender will make appropriate arrangements for payment by Transferor Lender to such Purchasing Lender of such amount upon receipt thereof from Borrower.

        (c)      Consistent with the terms of Section 17.3 of the Credit Agreement, (i) payments of principal, interest, fees, charges and collections owing to the Purchasing Lender hereafter pursuant to the Credit Agreement shall be made by the Agent without giving effect to any collection days, and (ii) Purchasing Lender shall not be entitled to receive any portion of any fees or charges payable to the Agent for its own account.

6.      Concurrently with the execution and delivery hereof, Transferor Lender will provide to each Purchasing Lender conformed copies of the Credit Agreement and all Other Documents delivered to Transferor lender.

7.      Each of the parties to this Commitment Transfer Supplement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Commitment Transfer Supplement.

8.      By executing and delivering this Commitment Transfer Supplement, Transferor Lender and each Purchasing Lender confirm to and agree with each other and Agent and Lenders as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, Transferor Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, the Other Documents or any other instrument or document furnished pursuant thereto; (ii) Transferor Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their Obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Lender confirms that it has received a copy of the Credit

Agreement, together with copies of such financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Transfer Supplement; (iv) each Purchasing Lender will, independently and without reliance upon Agent, Transferor Lender or any other Lenders and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (v) each Purchasing Lender appoints and authorizes Agent to take such action and to exercise such powers under the Credit Agreement as are delegated to the Agent by the terms thereof; (vi) each Purchasing Lender agrees that it will perform all of its respective obligations as set forth in the Credit Agreement to be performed by each as a Lender; and (vii) each Purchasing Lender represents and warrants to Transferor Lender, the other Lenders, Agent and Borrowers that it is either (x) entitled to the benefits of an income tax treaty with the United States of America that provides for an exemption from the United States withholding tax on interest and other payments made by Borrowers under the Credit Agreement and the Other Documents or (y) is engaged in trade or business within the United States of America.

9.      Schedule I hereto sets forth the revised Commitment Percentages of Transferor Lender and Purchasing Lender after giving effect to the transfer contemplated hereby as well as administrative information with respect to each Purchasing Lender.

10.     This Commitment Transfer Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Transfer Supplement to be executed by their respective duly authorized officers on the date set forth above.

_____
as Transferor Lender

By: _____
Name: _____
Title: _____


_____
as a Purchasing Lender

By: _____
Name: _____
Title: _____


CAPITALSOURCE FINANCE LLC, as Agent

By: _____
Name: _____
Title: _____

3604386.12

SCHEDULE I TO COMMITMENT TRANSFER SUPPLEMENT

<u>LIST OF OFFICE ADDRESSES FOR NOTICES AND COMMITMENT AMOUNTS</u>

[Transferor Lender]    Revised Revolving Credit Commitment Amount    $_____
Revised Term Loan Commitment Amount    $_____

Revised Commitment Percentage:    _____%

[Purchasing Lender]    Revolving Credit Commitment Amount    $_____
Term Loan Commitment Amount    $_____

Commitment Percentage:    _____%

Addresses for Notices

_____
_____
_____
Attention:
Telephone:
Telecopier:

<u>SCHEDULE II TO COMMITMENT TRANSFER SUPPLEMENT</u>

[Form of Transfer Effective Notice]

To: _____, as Transferor Lender and
_____, as Purchasing Lender:

The undersigned, as Agent under the Amended and Restated Credit and Security Agreement dated as of [_____ __], 2010 among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (collectively, "Borrowers"), and CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CS"), the various financial institutions named therein or which hereafter become a party thereto, (together with CS, the "Lenders") and CS as agent for Lenders (in such capacity, "Agent"), acknowledges receipt of four (4) executed counterparts of a completed Commitment Transfer Supplement in the form attached hereto. [Note: Attach copy of Commitment Transfer Supplement.] Terms defined in such Commitment Transfer Supplement are used herein as therein defined

Pursuant to such Commitment Transfer Supplement, you are advised that the Transfer Effective Date will be [Insert date of Transfer Effective Notice.]

CAPITALSOURCE FINANCE LLC,
as Agent

By: _____
Name: _____
Title: _____

ACCEPTED FOR RECORDATION
IN REGISTER:

<u>**SCHEDULES TO**</u>

**AMENDED AND RESTATED**

**CREDIT AND SECURITY AGREEMENT**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**

**and**

**CAPITALSOURCE FINANCE LLC,**
**as a Lender and as Agent**

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**Closing Date: [_____], 2010**

## Schedules

| | |
|---|---|
| Schedule 2.6 | Letters of Credit |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Disputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicts |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

**SCHEDULE 2.6**

**<u>LETTERS OF CREDIT</u>**

**SCHEDULE 4.5**

**<u>EQUIPMENT AND INVENTORY LOCATIONS</u>**

**SCHEDULE 4.14(c)**

**<u>LOCATION OF EXECUTIVE OFFICES</u>**

**SCHEDULE 4.16**

**<u>EXCLUDED EQUIPMENT</u>**

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA; QUALIFICATIONS**

**SCHEDULE 5.3**

**FEDERAL TAX IDENTIFICATION NUMBERS**

**SCHEDULE 5.5**

**<u>PRIOR NAMES</u>**

**SCHEDULE 5.6**

<u>**OSHA AND ENVIRONMENTAL COMPLIANCE EXCEPTIONS**</u>

**SCHEDULE 5.7**

**<u>DISPUTED INDEBTEDNESS</u>**

**SCHEDULE 5.8**

**<u>LITIGATION</u>**

**SCHEDULE 5.9**

**<u>INDEBTEDNESS</u>**

**SCHEDULE 5.11**

**<u>PLANS</u>**

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

**SCHEDULE 5.14**

**<u>DEFAULTS</u>**

**SCHEDULE 5.17**

**<u>LABOR CONTRACTS</u>**

**SCHEDULE 5.21**

**<u>CONFLICTS</u>**

**SCHEDULE 5.24**

**REAL PROPERTY**

**SCHEDULE 5.25**

**<u>DEPOSIT ACCOUNTS</u>**

**SCHEDULE 6.8**

**<u>POST-CLOSING MATTERS</u>**

**SCHEDULE 7.2**

**<u>PERMITTED ENCUMBRANCES</u>**

**SCHEDULE 7.3**

**<u>OTHER INDEBTEDNESS</u>**

**SCHEDULE 7.4**

**LOANS AND INVESTMENTS**

**EXHIBIT 1.9**

**Amended and Restated Secured CSE Loan Agreement**

**AMENDED AND RESTATED**

**LOAN AND SECURITY AGREEMENT**

**Dated as of [_____], 2010**


**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**


**and**


**CSE MORTGAGE LLC**

**as a Lender and as Agent**

**and**

**ANY OTHER LENDERS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

# TABLE OF CONTENTS

**Page**

I.      DEFINITIONS ................................................................................................................2
        1.1.    ACCOUNTING TERMS ..................................................................................2
        1.2.    GENERAL TERMS .........................................................................................3
        1.3.    UNIFORM COMMERCIAL CODE TERMS .....................................................3
        1.4.    CERTAIN MATTERS OF CONSTRUCTION .....................................................3

II.     TERM LOANS; PAYMENTS.........................................................................................3
        2.1.    TERM LOANS ..............................................................................................3
        2.2.    VOLUNTARY PREPAYMENTS .......................................................................4
        2.3.    MANDATORY PREPAYMENTS ......................................................................4
        2.4.    STATEMENT OF ACCOUNT; EVIDENCE OF LOANS.......................................6

III.    INTEREST AND FEES.................................................................................................8
        3.1.    INTEREST ....................................................................................................8
        3.2.    COMPUTATION OF INTEREST ......................................................................8
        3.3.    MAXIMUM CHARGES ..................................................................................8
        3.4.    [INTENTIONALLY OMITTED] ......................................................................8
        3.5.    INCREASED COSTS ......................................................................................9
        3.6.    CAPITAL ADEQUACY. .................................................................................9

IV.     COLLATERAL; GENERAL TERMS..............................................................................10
        4.1.    SECURITY INTEREST IN THE COLLATERAL ...............................................10
        4.2.    PERFECTION OF SECURITY INTEREST .......................................................11
        4.3.    DISPOSITION OF COLLATERAL .................................................................12
        4.4.    PRESERVATION OF COLLATERAL ..............................................................13
        4.5.    OWNERSHIP OF COLLATERAL ...................................................................13
        4.6.    DEFENSE OF AGENT'S AND LENDERS' INTERESTS ...................................13
        4.7.    BOOKS AND RECORDS ..............................................................................14
        4.8.    FINANCIAL AND OTHER DISCLOSURE .......................................................14
        4.9.    COMPLIANCE WITH LAWS ........................................................................14
        4.10.   INSPECTION OF PREMISES ........................................................................15
        4.11.   INSURANCE ...............................................................................................15
        4.12.   PAYMENT OF TAXES .................................................................................16
        4.13.   PAYMENT OF LEASEHOLD OBLIGATIONS ..................................................17
        4.14.   RECEIVABLES ...........................................................................................17
        4.15.   INVENTORY ...............................................................................................19
        4.16.   EQUIPMENT AND REAL PROPERTY COVENANTS ........................................19
        4.17.   EXCULPATION...........................................................................................20
        4.18.   ENVIRONMENTAL MATTERS ....................................................................20
        4.19.   NO OTHER FINANCING STATEMENTS ........................................................22
        4.20.   ADDITIONAL MORTGAGES .......................................................................22
        4.21.   INTELLECTUAL PROPERTY .......................................................................22
        4.22.   COMMERCIAL TORT CLAIMS ....................................................................22
        4.23.   OFAC.......................................................................................................23
        4.24.   APPRAISALS ..............................................................................................23

V.      REPRESENTATIONS AND WARRANTIES.....................................................................23
        5.1.    AUTHORITY ...............................................................................................23
        5.2.    FORMATION AND QUALIFICATION ...........................................................23
        5.3.    TAX RETURNS ...........................................................................................24
        5.4.    FINANCIAL STATEMENTS ..........................................................................24

| | | |
|---|---|---|
| 5.5. | Name | 25 |
| 5.6. | OSHA and Environmental Compliance | 25 |
| 5.7. | Solvency | 26 |
| 5.8. | Litigation | 26 |
| 5.9. | No Indebtedness | 26 |
| 5.10. | Violations | 26 |
| 5.11. | Plans | 26 |
| 5.12. | Patents, Trademarks, Copyrights and Licenses | 27 |
| 5.13. | Licenses and Permits | 28 |
| 5.14. | No Default of Indebtedness | 28 |
| 5.15. | No Other Defaults | 28 |
| 5.16. | No Burdensome Restrictions | 28 |
| 5.17. | No Labor Disputes | 28 |
| 5.18. | Margin Regulations | 28 |
| 5.19. | Investment Company Act | 28 |
| 5.20. | Disclosure | 28 |
| 5.21. | No Conflicting Agreements or Orders | 29 |
| 5.22. | Application of Certain Laws and Regulations | 29 |
| 5.23. | Hedge Contracts | 29 |
| 5.24. | Real Property | 29 |
| 5.25. | Deposit Accounts | 29 |
| 5.26. | Brokers | 29 |
| 5.27. | OFAC | 29 |
| 5.28. | Accountants' Letter | 29 |
| 5.29. | Senior Debt | 29 |

| | | |
|---|---|---|
| **VI.** | **AFFIRMATIVE COVENANTS** | **30** |
| 6.1. | Payment of Fees | 30 |
| 6.2. | Conduct of Business and Maintenance of Existence and Assets | 30 |
| 6.3. | Violations | 30 |
| 6.4. | Government Receivables | 30 |
| 6.5. | Execution of Supplemental Instruments | 30 |
| 6.6. | Payment of Material Agreements | 31 |
| 6.7. | Standards of Financial Statements | 31 |
| 6.8. | Further Assurances, Post Closing | 31 |
| 6.9. | Board of Directors | 30 |
| 6.10. | Board Observation | 31 |

| | | |
|---|---|---|
| **VII.** | **NEGATIVE COVENANTS** | **32** |
| 7.1. | Sale of Assets, Consolidation, Merger, Dissolution, Etc. | 32 |
| 7.2. | Encumbrances | 33 |
| 7.3. | Indebtedness | 35 |
| 7.4. | Loans, Investments, Etc. | 37 |
| 7.5. | Dividends and Redemptions | 38 |
| 7.6. | Nature of Business | 39 |
| 7.7. | Transactions with Affiliates | 39 |
| 7.8. | Subsidiaries | 40 |
| 7.9. | Fiscal Year and Accounting Changes | 40 |
| 7.10. | Pledge of Credit | 40 |
| 7.11. | Amendment of Material Agreements | 40 |
| 7.12. | Compliance with ERISA | 41 |
| 7.13. | Prepayment of Indebtedness | 41 |
| 7.14. | Payment of Subordinated Debt | 41 |
| 7.15. | Organizational Changes | 41 |

| | | |
|---|---|---|
| **VIII.** | **FINANCIAL COVENANTS** | **42** |

|       | 8.1.   | CONTROLLING DEFINITIONS | 42 |
|       | 8.2.   | FIXED CHARGE COVERAGE RATIO | 44 |
|       | 8.3.   | CAPITAL EXPENDITURES | 44 |
|       | 8.4.   | LEVERAGE RATIO | 45 |
|       | 8.5.   | MINIMUM LIQUIDITY | 444 |
|       | 8.6.   | MINIMUM EBITDA | 454 |

| **IX.** | **CONDITIONS PRECEDENT** | | **45** |
|       | 9.1.   | CONDITIONS TO EFFECTIVENESS | 45 |

| **X.** | **INFORMATION AS TO BORROWERS** | | **50** |
|       | 10.1.  | DISCLOSURE OF MATERIAL MATTERS | 50 |
|       | 10.2.  | ENVIRONMENTAL COMPLIANCE CERTIFICATE | 50 |
|       | 10.3.  | LITIGATION | 51 |
|       | 10.4.  | MATERIAL OCCURRENCES | 51 |
|       | 10.5.  | GOVERNMENT RECEIVABLES | 51 |
|       | 10.6.  | ANNUAL FINANCIAL STATEMENTS | 51 |
|       | 10.7.  | MONTHLY FINANCIAL STATEMENTS | 52 |
|       | 10.8.  | PROJECTIONS | 52 |
|       | 10.9.  | VARIANCES FROM OPERATING BUDGET | 52 |
|       | 10.10. | NOTICE OF ADVERSE EVENTS | 52 |
|       | 10.11. | ERISA NOTICES AND REQUESTS | 53 |
|       | 10.12. | MATERIAL INTELLECTUAL PROPERTY | 53 |
|       | 10.13. | PUBLIC REPORTS | 53 |
|       | 10.14. | MATERIAL AGREEMENTS | 54 |
|       | 10.15. | ADDITIONAL INFORMATION | 54 |
|       | 10.16. | ADDITIONAL DOCUMENTS | 54 |

| **XI.** | **EVENTS OF DEFAULT** | | **54** |
|       | 11.1.  | OBLIGATIONS | 54 |
|       | 11.2.  | MISREPRESENTATIONS | 54 |
|       | 11.3.  | FINANCIAL INFORMATION | 55 |
|       | 11.4.  | LIENS | 55 |
|       | 11.5.  | COVENANTS | 55 |
|       | 11.6.  | JUDGMENTS | 55 |
|       | 11.7.  | VOLUNTARY BANKRUPTCY | 55 |
|       | 11.8.  | CESSATION OF BUSINESS | 55 |
|       | 11.9.  | INVOLUNTARY BANKRUPTCY | 55 |
|       | 11.10. | MATERIAL ADVERSE CHANGE | 56 |
|       | 11.11. | AGENT'S LIENS | 56 |
|       | 11.12. | SUBORDINATED DEBT | 56 |
|       | 11.13. | CROSS DEFAULT | 56 |
|       | 11.14. | GUARANTY | 56 |
|       | 11.15. | CHANGE OF CONTROL | 56 |
|       | 11.16. | CHANGE OF MANAGEMENT | 56 |
|       | 11.17. | INVALIDITY | 56 |
|       | 11.18. | TAKINGS | 56 |
|       | 11.19. | SEIZURES | 57 |
|       | 11.20. | CESSATION OF OPERATIONS | 57 |
|       | 11.21. | PLANS | 57 |
|       | 11.22. | CRIMINAL CHARGES | 57 |

| **XII.** | **AGENT'S LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT** | | **57** |
|       | 12.1.  | RIGHTS AND REMEDIES | 57 |
|       | 12.2.  | APPLICATION OF PROCEEDS | 59 |
|       | 12.3.  | AGENT'S DISCRETION | 59 |

| | | |
|---|---|---|
| 12.4. | SETOFF | 59 |
| 12.5. | RIGHTS AND REMEDIES NOT EXCLUSIVE | 60 |

**XIII. WAIVERS AND JUDICIAL PROCEEDINGS** .......................................................**60**
| | | |
|---|---|---|
| 13.1. | WAIVER OF NOTICE | 60 |
| 13.2. | DELAY | 61 |
| 13.3. | JURY WAIVER | 61 |

**XIV. EFFECTIVE DATE AND TERMINATION** ..............................................................**61**
| | | |
|---|---|---|
| 14.1. | TERM | 61 |
| 14.2. | TERMINATION | 61 |

**XV. REGARDING AGENT** ..........................................................................................**62**
| | | |
|---|---|---|
| 15.1. | APPOINTMENT | 62 |
| 15.2. | NATURE OF DUTIES | 62 |
| 15.3. | LACK OF RELIANCE ON AGENT AND RESIGNATION | 63 |
| 15.4. | CERTAIN RIGHTS OF AGENT | 63 |
| 15.5. | RELIANCE | 63 |
| 15.6. | NOTICE OF DEFAULT | 64 |
| 15.7. | INDEMNIFICATION | 64 |
| 15.8. | AGENT IN ITS INDIVIDUAL CAPACITY | 64 |
| 15.9. | DELIVERY OF DOCUMENTS | 64 |
| 15.10. | BORROWERS' UNDERTAKING TO AGENT | 64 |
| 15.11. | DOCUMENTATION AGENT, ETC. | 65 |
| 15.12. | TERM B LENDERS PURCHASE OPTION. | 65 |
| 15.13. | COLLATERAL MATTERS. | 66 |

**XVI. BORROWING REPRESENTATIVE** .......................................................................**67**
| | | |
|---|---|---|
| 16.1. | BORROWING REPRESENTATIVE PROVISIONS | 67 |
| 16.2. | WAIVER OF SUBROGATION | 68 |

**XVII. MISCELLANEOUS** ..............................................................................................**68**
| | | |
|---|---|---|
| 17.1. | GOVERNING LAW | 68 |
| 17.2. | ENTIRE UNDERSTANDING; AMENDMENTS; WAIVERS; CONSENTS | 69 |
| 17.3. | SUCCESSORS AND ASSIGNS; PARTICIPATIONS; NEW LENDERS | 71 |
| 17.4. | APPLICATION OF PAYMENTS | 74 |
| 17.5. | INDEMNITY | 74 |
| 17.6. | NOTICE | 75 |
| 17.7. | SURVIVAL | 77 |
| 17.8. | SEVERABILITY | 77 |
| 17.9. | EXPENSES | 77 |
| 17.10. | INJUNCTIVE RELIEF | 77 |
| 17.11. | CONSEQUENTIAL DAMAGES | 78 |
| 17.12. | CAPTIONS | 78 |
| 17.13. | COUNTERPARTS; TELECOPIED SIGNATURES | 78 |
| 17.14. | CONSTRUCTION | 78 |
| 17.15. | CONFIDENTIALITY | 78 |
| 17.16. | PUBLICITY | 79 |
| 17.17. | SURVIVAL OF REPRESENTATIONS AND WARRANTIES | 79 |
| 17.18. | DESTRUCTION OF INVOICES | 79 |
| 17.19. | TIME | 79 |
| 17.20. | RELEASE | 79 |
| 17.21. | PATRIOT ACT | 80 |
| 17.22. | AMENDMENT AND RESTATEMENT | 80 |

# AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

PREAMBLE.  This Amended and Restated Loan and Security Agreement (herein, together with all schedules and exhibits hereto, and as it may be amended, restated, supplemented or modified from time to time, called this "Agreement"), dated as of [_____], 2010, is made among: (i) LEXINGTON PRECISION CORPORATION, a Delaware corporation ("LPC" or "Parent Company"), and LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("LRG"; LRG and LPC herein sometimes called individually, "Initial Borrower" and, collectively, if more than one, the "Initial Borrowers"; and together with each other Person which, on or subsequent to the Closing Date, agrees in writing to become a borrower hereunder, herein called, individually, a "Borrower" and, collectively, the "Borrowers," and pending the inclusion by written agreement of any other such Person, besides each Initial Borrower, as a "Borrower" hereunder, all references herein to "Borrowers," "each Borrower," the "applicable Borrower," "such Borrower" or any other, similar variations thereof (whether singular or plural) shall all mean and refer to each Initial Borrower, collectively); (ii) CSE MORTGAGE LLC, a Delaware limited liability company ("CSE"), together with any and all other Persons that are now, or that hereafter become, party hereto, as lenders hereunder (collectively, the "Lenders" and, individually, a "Lender"); and (iii) CSE, as collateral agent and administrative agent for itself, each other such Lender and each other "Lender Party" (as hereinafter defined) (CSE, when acting in such agency capacity, is herein called the "Agent").

STATEMENT OF THE TRANSACTION.  Capitalized terms used in this statement of the transaction shall have the meanings ascribed to such terms in Section 1.2.  The Initial Borrowers and the Lender Parties have entered into that certain Loan and Security Agreement, dated as of May 31, 2006, as amended by that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (as further amended or modified to date, the "Existing Loan Agreement", wherein the Lenders have provided the Initial Borrowers with certain term loans in the initial aggregate principal amount of $[_____] (collectively, the "Existing Term Loan Facility").

The Borrowers are debtors and debtors-in-possession in jointly-administered cases under Chapter 11 of the Bankruptcy Code, Case No. 08-11153 (the "Chapter 11 Cases"), and they have obtained from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a series of orders to minimize any disruption to the Borrowers' business operations and to facilitate the Borrowers' reorganization, including, the authority to use the Lenders' cash collateral.

The Borrowers have emerged from Chapter 11 bankruptcy pursuant to the [Debtors' Plan of Reorganization] Under Chapter 11 of the Bankruptcy Code (as amended, supplemented or otherwise modified from time to time, the "Reorganization Plan").  By operation of law all Defaults and/or Events of Default existing prior to the Closing Date have been cured or waived pursuant to a final non-appealable order (other than with respect to any material appeals reasonably consented to by the Lenders and Agent), dated as of the date hereof (the "Confirmation Order").

In order to finance in part the distributions to be made under the Reorganization Plan and to pay the fees and expenses associated therewith (including, without limitation, the Capitalized Expenses), the Borrowers have requested that simultaneously with the consummation of the Reorganization Plan, the Lenders shall amend and restate the Existing Term Loan Facility pursuant to the terms and conditions herein.

Borrowers, Agent and Lenders acknowledge and agree that, immediately prior to the closing of the transaction contemplated hereby, the current principal amount outstanding under the (a) Term Loan A, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $[_____] and (b) Term Loan B, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $[_____].

Pursuant to the Reorganization Plan, the Existing Term Loan Facility shall be amended to, among other things, (a) extend the last day of the Term from May 15, 2009 to [____], 2013 and (b) convert all the following, which are outstanding as of the Closing Date, to Obligations due under the Term Loans, and accordingly, increase the amount of each Term Loan by the amounts, respectively, of such amounts so converted: (i) all accrued and unpaid interest relating to each Term Loan and (ii) all Capitalized Expenses, all in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and undertakings herein contained, each Borrower, each Lender and Agent, each intending to be legally bound hereby, hereby covenant and agree as follows:

I. <u>DEFINITIONS</u>{ TC "I. DEFINITIONS" \f C \l "1" }.

1.1. <u>Accounting Terms</u>{ TC "1.1. Accounting Terms" \f C \l "2" }. As used in this Agreement or any Other Document, accounting terms not defined or partly defined (to the extent not fully defined) in <u>Section 1.2</u> or elsewhere in this Agreement shall have the respective meanings given to them under GAAP; <u>provided</u>, <u>however</u>, whenever such accounting terms are used for the purposes of determining compliance with the Financial Covenants, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the Historical Financial Statements; <u>provided</u>, <u>further</u>, that in the event that any accounting change (an "<u>Accounting Change</u>") shall occur that results in a change in the method of calculation of the Financial Covenants, standards or terms of this Agreement, then the Borrowers and Agent agree to enter into negotiations in good faith in order to amend such affected provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such Accounting Changes had not been made and, until such time as an amendment regarding such affected provisions of this Agreement has been executed and delivered by the Borrowers, Agent and the Required Lenders, all Financial Covenants, standards and terms of this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred. Certain other definitions, used in the determination of the Financial Covenants, are set forth in <u>Section 8.1</u>. When applied to Borrowers and their Subsidiaries or Borrowers on a consolidated basis, accounting terms shall mean Borrowers and their Subsidiaries on a consolidated basis determined in accordance with GAAP.

1.2.  <u>General Terms</u>{ TC "1.2.     General Terms" \f C \l "2" }.  For purposes of this Agreement the following terms shall have the following meanings:  See Annex One attached hereto and by this reference incorporated herein.

1.3.  Uniform Commercial Code Terms{ TC "1.3.        Uniform Commercial Code Terms" \f C \l "2" }.  All terms used herein and defined in the Uniform Commercial Code shall have the meaning given therein unless otherwise defined herein.  Without limitation of the foregoing, the terms "accounts," "chattel paper," "instruments," "general intangibles," "payment intangibles," "support obligations," "securities," "investment property," "documents," "commercial tort claims," "deposit accounts," "payment intangibles," "software," "letter-of-credit rights," "inventory," "farm products," "equipment" and "fixtures," as and when used in the description of Collateral, shall have the meanings given to such terms in Articles 8 or 9 (as applicable) of the Uniform Commercial Code.

1.4.  Certain Matters of Construction{ TC "1.4.  Certain Matters of Construction" \f C \l "2" }.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any documents, instruments or agreements to which Agent, any Lender or any Borrower is a party, including, without limitation, references to any of the Other Documents, shall mean and include each of such documents, instruments or agreements as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in a manner consistent with the terms of this Agreement and the Intercreditor Agreement.  References herein or in any Other Documents to any actions being taken (or omitted to be taken) by any Lender Party after a Default or Event of Default has occurred shall mean that such action may be taken (or omitted to be taken) only during the continuation of such Default or Event of Default.  The words "to Borrowers' knowledge" (or words to similar effect), shall mean the knowledge of Borrowers' officers or employees charged with responsibility for the matter in question, obtained (or which should reasonably have been expected to have been obtained) after due inquiry.  Unless otherwise expressly provided herein or in any Other Documents, all references to time herein and in any Other Documents shall mean and refer to New York time.

II.  TERM LOANS; PAYMENTS{ TC "II.     TERM LOAN; PAYMENTS" \f C \l "1" }

2.1.  Term Loans{ TC "2.1.        Term Loan" \f C \l "2" }.

(a)  Term Loan A.  Subject to the terms and conditions of this Agreement, each Term A Lender, severally and not jointly, has made available to Borrowers the Term Loan A in a sum equal to such Lender's Term Loan A Commitment.  The principal amount of the Term Loan A shall be repaid in monthly installments on the first day of each calendar month equal in amount to (i) Sixty-One Thousand One Hundred Eleven Dollars and 11/100 ($61,111.11) each, beginning on [_____] 1, 2010, and continuing on the first day of each succeeding calendar month for twenty-four (24) months and (ii) Ninety Thousand Dollars and No/100 ($90,000.00) each, beginning on [_____], 2012, and continuing on the first day of each

succeeding calendar month thereafter until the expiration of the Term (subject, however, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation as provided herein), at which time all of the Obligations, including without limitation, the entire remaining principal balance of all Term Loans, shall be due and payable in full.

(b)　　Term Loan B.  Subject to the terms and conditions of this Agreement, each Term B Lender, severally and not jointly, has made available to Borrowers the Term Loan B in a sum equal to such Lender's Term Loan B Commitment.  The entire principal balance of the Term Loan B shall be due and payable, in full, upon the expiration of the Term (subject, however, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation as provided herein), at which time all of the Obligations, including without limitation, the entire remaining principal balance of all Term Loans, shall be due and payable in full.

2.2.　　Voluntary Prepayments{ TC "2.2.　　Voluntary Prepayments" \f C \l "2" }.  The Term Loans may be voluntarily prepaid, in whole or in part, at any time or from time to time, provided, however, that: (i) any partial prepayments of the Term Loan A shall be applied to the principal installments of the Term Loan A then remaining to be repaid in the reverse order of their respective maturities (beginning with the final payment); (ii) any full prepayment of the principal balance of any Term Loan shall be accompanied by the payment of accrued interest thereon through the date of prepayment and (iii) the Borrowers may not voluntarily prepay the Term Loan B, unless (A) the Term Loan A and the  Equipment Term Loan (as defined in the Revolver Loan Agreement) have been repaid in full in cash or (B) (x) the Borrowers comply with the Restricted Payment Conditions with respect to any such prepayment and (y) prior to making any such prepayment, the Borrowers have made voluntary prepayments under this Section 2.2 and/or mandatory prepayments under Section 2.3, in each case, in respect of Term Loan A, in an aggregate amount equal to at least $3,000,000.

2.3.　　Mandatory Prepayments{ TC "2.3.　　Mandatory Prepayments" \f C \l "2" }.  Notwithstanding the provisions of Section 2.1 hereof:

(a)　　Extraordinary Receipts.  Subject to subsection (c) below, upon the receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts, which payments shall be applied to the Obligations in the manner specified in subsection (f) below;

(b)　　Dispositions. Upon the sale or disposition of any Collateral by any Borrower or any of its Subsidiaries as permitted in clauses (ii) and (vi) of Section 7.1(b) hereof (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver  Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject to the provisions of the Intercreditor Agreement in regard thereto), Borrowers shall pay to Agent an amount equal to one hundred

percent (100%) of the Net Cash Proceeds received by any such Borrower or Subsidiary in connection therewith, which payments shall be applied to the Obligations in the manner specified in underline subsection (f) below;

(c)    Insurance Proceeds.  Notwithstanding subsection (a) above, if any of the Equipment or Real Property is damaged or physically destroyed or otherwise suffers a casualty, upon the written request of Borrowing Representative, which shall be made not less than five (5) Business Days after such casualty occurs, Agent shall release to Borrowing Representative Extraordinary Receipts consisting of proceeds from insurance policies covering such damage, destruction or casualty that are received by Agent pursuant to Section 4.11 hereof or otherwise, to the extent a Borrower elects to apply such Extraordinary Receipts to the repair, refurbishment or replacement of the Equipment or Real Property that has been damaged, destroyed or otherwise suffered a casualty, provided, however, that, all of the following conditions are satisfied: (i) no Default or Event of Default shall have occurred and be continuing, (ii) the amount of the insurance proceeds (together with any deductible to be satisfied by a Borrower) are sufficient, in Agent's good faith determination, to permit such repair, refurbishment or replacement to be made in a satisfactory manner, (iii) such proceeds shall be used solely to repair, refurbish or replace the Equipment or Real Property that has been damaged, destroyed or suffered casualty (free and clear of any security interests, Liens, claims or encumbrances), (iv) such repair, refurbishment or replacement shall be commenced by Borrowers as soon as is reasonably practicable after such damage, destruction or casualty has occurred and shall be diligently pursued by Borrowers to satisfactory completion, and (v) the repair, refurbishment or replacement to which such proceeds are applied shall cause the value of the Equipment or Real Property that is being repaired, refurbished or replaced to be not less than the value thereof prior to such damage, destruction or other casualty occurring; provided, further, however, that the amount of such Extraordinary Receipts that may be released to Borrowers in respect of any such damage, destruction or other casualty loss for the repair, refurbishment or replacement of Equipment or Real Property shall not exceed the Materiality Threshold.  Pending any release of such Extraordinary Receipts to Borrowing Representative pursuant to this subsection (c), Agent shall hold such Extraordinary Receipts as cash Collateral.  Any Extraordinary Receipts applied to repair, refurbish or replace Equipment or Real Property pursuant to and in accordance with this subsection (c) shall not be deemed Capital Expenditures for purposes of this Agreement.

(d)    Excess Cash Flow.  Upon delivery to Agent of the financial statements referred to in and required by Section 10.7 for each Fiscal Quarter of the Borrowers (commencing with the first Fiscal Quarter ending subsequent to the Closing Date) but in any event not later than, in the case of the first three (3) Fiscal Quarters in any Fiscal Year, fifty (50) days after the end of such Fiscal Quarter and, in the case of the Fiscal Quarter corresponding with the end of any Fiscal Year, one hundred (100) days after the end of each such Fiscal Quarter, Borrowers shall pay to Agent fifty percent (50%) of Excess Cash Flow for such Fiscal Quarter, which payments shall be applied to the Obligations in the manner specified in subsection (f) below; provided, however, that if the Leverage Ratio is less than 2.5:1.0 for such Fiscal Quarter, Borrowers shall not be obligated to pay any Excess Cash Flow with respect to such Fiscal Quarter to Agent.  In the event that the aforesaid financial statement is not so delivered, then a calculation based upon estimated amounts shall be made by Agent upon which calculation Borrowers shall make the prepayment required by this Section, subject to adjustment when the financial statement is delivered to Agent as required hereby.  The calculation made by

Agent shall not be deemed a waiver of any rights of Agent or any Lender or may have as a result of the failure by Borrowers to deliver such financial statement.

(e)     <u>Issuance of Equity Interests or Indebtedness</u>.  Upon the issuance of any Equity Interests by any Borrower or the issuance or incurrence of any Indebtedness by any Borrower (other than any Indebtedness permitted by <u>Section 7.3</u> hereof), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance or incurrence (excepting therefrom any Net Cash Proceeds, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject thereto), which payments shall be applied to the Obligations in the manner specified in <u>subsection (f)</u> below; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary set forth herein, as long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or Indebtedness under the Junior Lien Facility during the Term in an aggregate principal amount not to exceed $5,000,000 (<u>provided</u>, that Borrowers shall not issue Indebtedness under the Junior Lien Facility in an aggregate principal amount in excess of $3,000,000), and the proceeds of such amounts shall not be required to be applied to prepay any of the Obligations pursuant to this <u>Section 2.3(e)</u>.

(f)     <u>Application of Proceeds</u>.  Proceeds of mandatory prepayments made pursuant to this <u>Section 2.3</u> shall be applied by Agent, when received:  <u>first</u>, to pay any Obligations then due and owing in respect of the Term Loan A (other than principal); <u>second</u>, to repay the principal amount of the Term Loan A, with such prepayment to be applied to the then remaining installments of the Term Loan A in the reverse order of their respective maturities (beginning with the final payment); <u>third</u>, to the Revolver Loan Agent for application to the Revolver Loan Debt to the extent required pursuant to the Revolver Loan Agreement and in the manner set forth therein; <u>fourth</u>, to pay any Obligations then due and owing in respect of the Term Loan B (other than principal); <u>fifth</u>, to repay the principal amount of the Term Loan B, and, <u>last</u>, any remainder thereof shall be paid to Borrowers or as Borrowing Representative directs.

(g)     <u>Consent</u>. Nothing contained in this <u>Section 2.3</u> shall be deemed to be a consent by Agent and Lenders to the sale or disposition of any Collateral, the issuance of any Equity Interests or the issuance of any Indebtedness, in each case, except as expressly permitted in this Agreement.

(h)     <u>Application of Proceeds During an Event of Default</u>. If an Event of Default has occurred and is continuing, at the option of Agent, or at the direction of the Required Lenders, any Extraordinary Receipts or Net Cash Proceeds from any sale or other disposition of any Equipment or Real Property, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case, shall be applied, instead, as provided in <u>Section 12.2</u>.

2.4.     <u>Statement of Account; Evidence of Loans</u>{ TC "2.4.     Statement of Account" \f C \l "2" }.

(a)     Agent shall maintain on its books, in accordance with its customary procedures, a loan account in the name of Borrowers ("<u>Borrowers' Account</u>") in which shall be

recorded each Lender's pro rata share of the Term Loans, the date and amount of each payment in respect of the Term Loans (whether of principal or accrued interest), any charges that may be made to Borrowers' Account pursuant hereto, and the payment of such charges; provided, however, the failure by Agent to record the date and amount of such sums shall not adversely affect the rights of Agent or any Lender, or Borrowers' obligations in regard thereto. Promptly after the end of each calendar month, Agent shall send to Borrowing Representative a statement showing the accounting for the Term Loans, any charges to Borrowers' Account made pursuant hereto, any payments made or credited in respect thereof and any other transactions occurring between or among Agent, Lenders and Borrowers pursuant to this Agreement or any Other Document during such month. Any charges made to Borrowers' Account and reflected on such statement shall be due and payable by Borrowers within ten (10) days after Borrowers' receipt of such statement and shall bear interest at the Applicable Rate until paid in full. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within sixty (60) days after such statement is received by Borrowing Representative. The records of Agent with respect to Borrowers' Account shall be conclusive evidence of the amounts of the Term Loans, any charges made to Borrowers' Account, any interest thereon, and any payments thereon, absent manifest error.

(b)     Each Borrower agrees that:

(i)     upon written notice by any Lender to the Borrowing Representative that a promissory note or other evidence of indebtedness is requested by such Lender to evidence any Term Loan and other Obligations owing or payable to, or to be made by, such Lender, the Borrowers shall promptly (and in any event within three (3) Business Days following the later of (x) any such request and (y) delivery by Agent of the form of promissory note pursuant to this Section 2.4(b)) execute and deliver to such Lender an appropriate promissory note or notes in form and substance reasonably acceptable to such Lender and Borrowers, payable to the order of such Lender in a principal amount equal to the portion of the applicable Term Loan owing or payable to Lender;

(ii)     all references to Notes in this Agreement and the Other Documents shall mean the Notes, if any, to the extent issued (and not returned to the Borrowers for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

(iii)     upon any Lender's written request, and in any event within three (3) Business Days of any such request, Borrowers shall execute and deliver to such Lender new Notes and/or divide the Notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its sole and absolute discretion; provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such Notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new Notes and shall be returned to the Borrowers promptly upon such Lender's receipt of the replacement notes.

III.    <u>INTEREST AND FEES</u>{ TC "III.   INTEREST AND FEES" \f C \l "1" }.

3.1.    <u>Interest</u>{ TC "3.1.    Interest" \f C \l "2" }.

(a)    Interest on the Term Loan A shall be payable to Agent for the benefit of Term A Lenders monthly in arrears on the first day of each month, commencing on [_____], 2010.  Interest charges shall be computed on the actual principal amount of the Term Loan A outstanding during each interest assessment period described above at the Applicable Term Loan A Rate; <u>provided</u>, <u>however</u>, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Term A Lenders, the Term Loan A shall bear interest, instead, at the Default Rate.

(b)    Interest on the Term Loan B shall be payable to Agent for the benefit of Term B Lenders monthly in arrears on the first day of each calendar month, commencing on [_____], 2010.  Interest charges shall be computed on the actual principal amount of the Term Loan B outstanding during each interest assessment period described above at the Applicable Term Loan B Rate; <u>provided</u>, <u>however</u>, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Term B Lenders, the Term Loan B shall bear interest, instead, at the Default Rate.

(c)    Notwithstanding any other provision hereof, if any applicable law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this <u>subsection (c)</u>, the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Term Loans that bear interest with respect to the LIBOR Rate) to make or maintain Term Loans that bear interest with respect to the LIBOR Rate, the obligation of all Lenders to make Term Loans that bear interest with reference to the LIBOR Rate shall be suspended and Agent, in its reasonable discretion, shall select a comparable rate as a substitute therefor.

3.2.    <u>Computation of Interest</u>{ TC "3.3.   Computation of Interest" \f C \l "2" }.  Interest payable hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall continue to be payable at the Applicable Rate during such extension; <u>provided</u>, <u>however</u>, that the foregoing extension shall not be considered when determining Borrowers' ongoing compliance with Financial Covenants that concern or include scheduled principal payments within specified dates.

3.3.    <u>Maximum Charges</u>{ TC "3.4.     Maximum Charges" \f C \l "2" }.  In no event shall interest and any other charges hereunder exceed the highest rate permissible under applicable law.  In the event interest or any other charges hereunder would otherwise exceed the highest rate permitted under applicable law the provisions hereof shall be deemed amended to provide for interest or such other charges to be charged at the highest permissible rate; any excess amount shall be applied to the principal balance of the applicable Term Loan, unless and until it is paid in full, with such prepayment to be applied to the then remaining installments of

such Term Loan in the reverse order of its maturity (beginning with the final payment); and, if there is any excess remaining, Agent shall promptly refund such excess to Borrowers.

      3.4. <u>Determination of Applicable Margins</u>{ TC "3.5.    LIBOR Indemnity" \f C \l "2" }.

      (a)    Beginning on [____] 1, 2011 and on the first day of each Fiscal Quarter thereafter (each, a "<u>Determination Date</u>"), the Applicable Margins shall be determined by Agent and, if appropriate, adjusted, in accordance with the terms and conditions herein. On each Determination Date, Agent shall determine the Applicable Margins based on the Leverage Ratio reported in the most recently delivered Compliance Certificate for the applicable Fiscal Month as required to be delivered to Agent in accordance with <u>Section 10.7</u> hereof (e.g., for a Determination Date of October 1, Agent shall look to the Leverage Ratio reported in the Compliance Certificate timely delivered for the Fiscal Month ending August 31). Any Applicable Margin as so determined and, if appropriate, adjusted, shall be effective from such Determination Date until the next Determination Date.

      (b)    If Borrowing Representative shall fail timely to provide the Compliance Certificate to Agent with respect to the applicable Fiscal Month in accordance with <u>Section 10.7</u> hereof (without regards to any cure periods set forth herein), then the Applicable Margins shall be based on the highest rate set forth in each of their respective definitions herein until the next Determination Date.

      (c)    Notwithstanding the foregoing, if either of the Applicable Margins, which had been determined on the basis of any Compliance Certificate delivered by Borrowing Representative to Agent that contained any incorrect or inaccurate financial data, is less than such Applicable Margin that would have been determined had such Compliance Certificate been based on financial data that was correct and accurate, then such Applicable Margin at the appropriate lower rate(s) shall be recalculated retroactively for all affected periods and (to the extent not therefore paid) all accrued and unpaid interest as so recalculated shall be charged to Borrowers' Account.

      3.5. <u>Increased Costs</u>. { TC "3.6. Increased Costs. " \f C \l "2" }In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this <u>Section 3.5</u>, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of the Term Loans with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

      (a)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of any Lender);

      (b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or

loans by, or other credit extended by, any office of any Lender, including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)     impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to any Lender of making, renewing or maintaining its pro rata share of any Term Loan by an amount that such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of its pro rata share of any Term Loan by an amount that such Lender deems to be material, then, each and any such case, Borrowers shall promptly pay such Lender, upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount as will compensate such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs that are already reflected in the calculation of the Applicable Rate.  Such Lender shall certify the amount of such additional cost or reduced amount, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

3.6.     Capital Adequacy{  TC "3.7. Capital Adequacy" \f C \l "2" }.  In the event that any Lender shall have determined that any applicable law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (for purposes of this Section, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of any Term Loan with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on any Lender's capital as a consequence of its obligations hereunder to a level below that which such Lender could have achieved but for such adoption, change or compliance (taking into consideration such Lender's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then, from time to time, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below) such additional amount or amounts as will compensate such Lender for such reduction.  In determining such amount or amounts, such Lender may use any reasonable averaging or attribution method.  The protection of this Section shall be available to each Lender regardless of any possible contention that the applicable law, regulation or condition is invalid or inapplicable.  Such Lender shall certify the amount necessary to compensate such Lender with respect to this Section, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

IV.     COLLATERAL; GENERAL TERMS{  TC "IV.     COLLATERAL; GENERAL TERMS" \f C \l "1" }.

4.1.     Security Interest in the Collateral{  TC "4.1. Security Interest in the Collateral" \f C \l "2" }.  To secure the prompt payment and performance to each Lender Party of the

Obligations, each Borrower hereby assigns, pledges and grants to Agent for the ratable benefit of the Lender Parties, a continuing security interest in and to all of the Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Notwithstanding the foregoing, the Mortgages on the Real Property Collateral located in New York State shall be subject to the limitations set forth in such Mortgages. Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest in the Collateral and shall cause its financial statements to reflect the existence of such security interest.

4.2. <u>Perfection of Security Interest</u>{ TC "4.2.   Perfection of Security Interest" \f C \l "2" }.

(a) Borrowers shall take all action that Agent may request from time to time so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens thereon other than Permitted Encumbrances, (ii) using reasonable efforts to obtain landlords', warehouse operators', bailees' or mortgagees' lien waivers or related agreements in respect of premises where any Equipment or Inventory is located, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all Securities, chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, Deposit Account Control Agreements and other custodial arrangements reasonably satisfactory to Agent, (v) executing (as appropriate) and delivering authorizations for the recording of financing statements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest under the Uniform Commercial Code or other applicable law; (vi) using reasonable efforts to obtain acknowledgments, in form and substance satisfactory to Agent, from any bailee having possession of any Collateral at any time, stating that the bailee holds such Collateral on behalf of Agent, (vii) obtaining "control" of any investment property, deposit account, letter-of-credit right or electronic chattel paper (the term "control" as used in respect of the foregoing types of Collateral having the meaning set forth in Articles 8 and 9 of the UCC), with any agreements establishing such "control" to be in form and substance satisfactory to Agent, and (viii) if a Borrower at any time has or acquires a Commercial Tort Claim, such Borrower shall promptly notify Agent thereof, in writing, and grant a specific collateral assignment of such claim to Agent as additional Collateral. Notwithstanding the foregoing provisions of this <u>subsection (a)</u>, Borrowers shall not be required to obtain or to use their reasonable efforts to obtain warehouse operators,' bailees' or landlords' agreements or acknowledgments or related agreements in respect of premises where Inventory and/or Equipment is located, to the extent that the Inventory and/or Equipment in the possession of a warehouse operator or bailee or located on leased premises has a fair market value that is less than the Materiality Threshold; unless, in either case, Borrowers are requested by Agent to do so after any Event of Default has occurred and during its continuation.

(b) Without limiting the generality of the foregoing, in the specific case of Inventory in-transit to a Borrower from outside the continental United States of America,

promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after the occurrence of an Event of Default and during its continuation, each Borrower shall (i) deliver (or cause to be delivered) to Agent copies of all invoices, manifests and documents of title pertaining to such Inventory promptly upon such Borrower's receipt thereof, but in any event not later than five (5) Business Days after receipt, (ii) cause all such documents of title to be issued in the Agent's name, or to its order (or, if negotiable in form, Borrower may, instead, cause such documents of title to be endorsed to Agent, or in "blank"); (iii) provide Agent with evidence of appropriate marine or like insurance in respect of the transit of such Inventory to Borrower, and (iv) as necessary, provide Agent with access or custodianship agreements from warehouse operators, consolidators, customs house operators, customs brokers and other third parties to facilitate Agent's control over, access to and/or repossession of, such in-transit Inventory, including, without limitation, if requested by Agent, a customs agent agreement in form and substance satisfactory to Agent; in each case except to the extent delivered, issued or otherwise provided to the Revolver Loan Agent subject to the Intercreditor Agreement.

(c)     In addition thereto, but without limiting the generality of the foregoing, in the specific case of Inventory of a Borrower that is consigned to any Person, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after an Event of Default has occurred and during its continuation, such Borrower shall (i) file a UCC financing statement in respect of such inventory naming itself as "consignor" and such Person as "consignee" thereon, in the jurisdiction of such consignee's incorporation (or organization), and assign such financing statement to Agent and (ii) cause such consignee (and, if requested by Agent, any secured lender to, or landlord (or mortgagee) of, such consignee to execute and deliver to Agent a bailee's letter in form and content satisfactory to Agent in respect of such inventory; in each case except to the extent assigned, delivered or otherwise provided to the Revolver Loan Agent subject to the Intercreditor Agreement.

(d)     Agent is hereby authorized to file financing statements in accordance with the applicable provisions of the UCC, including, without limitation financing statements that describe the Collateral covered thereby as "all personal property", "all assets" or words of similar effect, at any time or from time to time hereafter, in any jurisdiction; and Borrowers hereby ratify, approve and affirm the filing of any such financing statements heretofore filed by Agent in respect of any Borrower (including any predecessor-in-interest thereof). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account.

(e)     Borrowers acknowledge that from time to time Agent may act as bailee (under the UCC) for the Revolver Loan Agent in respect of certain Collateral, and hereby authorize Agent to do so and to turn over to Revolver Loan Agent any such Collateral at its request subject to the provisions of the Intercreditor Agreement.

4.3.     <u>Disposition of Collateral</u>{ TC "4.3.  Disposition of Collateral" \f C \l "2" }.  Each Borrower will safeguard and protect all Collateral for Agent's account and make no disposition thereof whether by sale, lease or otherwise except as expressly provided in <u>clauses (i)</u>, <u>(ii)</u> and <u>(vi)</u> of <u>Section 7.1(b)</u> and, then, subject to <u>Section 2.3</u> in respect of any Net Cash Proceeds derived therefrom.

4.4.    Preservation of Collateral{ TC "4.4. Preservation of Collateral" \f C \l "2" }.
Following any demand by Agent for payment of all Obligations due and owing pursuant to
Section 12.1(a) hereof, subject to the provisions of the Intercreditor Agreement, Agent: (a) may
at any time take such steps as Agent deems necessary to protect Agent's interest in and to
preserve the Collateral, including the hiring of such security guards or the placing of other
security protection measures as Agent may deem appropriate; (b) may employ and maintain at
any Borrower's premises a custodian who shall have full authority to do all acts necessary to
protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may
move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists,
trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall
have, and is hereby granted, a right of ingress and egress to the places where the Collateral is
located, and may proceed over and through any Borrower's owned or leased property (subject to
the terms of any leases) to obtain such Collateral.  Each Borrower shall cooperate fully with all
of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral
as Agent may reasonably require.  All of Agent's expenses of preserving the Collateral,
including any expenses relating to the bonding of a custodian, shall be charged to Borrowers'
Account.

4.5.    Ownership of Collateral{ TC "4.5.   Ownership of Collateral" \f C \l "2" }.  With
respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest:
(a) each Borrower shall be the sole owner, lessee or licensee (as applicable) of and fully
authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each
and every item of its respective Collateral to Agent (subject to Permitted Encumbrances); (b)
except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens; (c) each
document and agreement constituting Collateral executed by each Borrower or delivered to any
Lender Party in connection with this Agreement shall be true and correct in all material respects;
(d) all signatures and endorsements of each Borrower that appear on any such documents or
agreements constituting Collateral shall be genuine and each Borrower party thereto shall have
full capacity to execute same; and (e) each Borrower's Equipment and Inventory shall be located
as set forth on Schedule 4.5 or at such other locations within the United States of America as
Agent may receive notice of from time to time pursuant to Section 10.15 (all such locations
herein called, collectively, the "Collateral Locations" and, individually, a "Collateral Location");
and shall not be removed from such Collateral Locations without the prior written consent of
Agent except in the case of (i) the sale of Inventory in the ordinary course of business, (ii) the
sale of Equipment to the extent permitted in Section 4.3 hereof, (iii) the movement of Equipment
from one Collateral Location to another Collateral Location, (iv) the movement of Equipment to
the extent necessary for its repair or maintenance; and (v) the movement of motor vehicles in the
ordinary course of Borrowers' business.

4.6.    Defense of Agent's and Lenders' Interests{ TC "4.6.        Defense of Agent's
and Lenders' Interests" \f C \l "2" }.  Unless and until (a) payment and performance in full of all
of the Obligations and (b) termination of this Agreement, Agent's security interests in the
Collateral shall continue in full force and effect without interruption.  During such periods no
Borrower shall pledge, sell, assign, transfer, create or suffer to exist a Lien upon or encumber or
allow or suffer to be encumbered any part of the Collateral in any way, except for Permitted
Encumbrances or as otherwise expressly permitted in this Agreement.  Each Borrower shall
defend Agent's security interest in the Collateral against any and all Persons (subject to

Permitted Encumbrances).  At any time after an Event of Default has occurred and during its continuation, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including without limitation, labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it and make it available to Agent at one or more of the Collateral Locations, as Agent shall elect.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies provided herein and in the Other Documents, or under the Uniform Commercial Code or other applicable law.  In addition to the foregoing, Agent may, at its option, instruct all suppliers, carriers, forwarders, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into a Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.  Taking any of the foregoing actions provided in this <u>Section 4.6</u> shall be subject, however, to the provisions of the Intercreditor Agreement.

4.7.    <u>Books and Records</u>{ TC "4.7.        Books and Records" \f C \l "2" }.  Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including, without limitation, by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied.

4.8.    <u>Financial and Other Disclosure</u>{ TC "4.8.   Financial and Other Disclosure" \f C \l "2" }.  Each Borrower hereby irrevocably authorizes and directs the Accountants and all other accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent copies of any of the Borrower's financial statements, trial balances or other accounting records of any sort in the possession of such Person and to disclose to Agent any information such Person may have concerning such Borrower's financial status and business operations.  In respect of the foregoing, if the Accountants are changed by any Borrower subsequent to the Closing Date, then Borrowing Representative shall execute and deliver a letter directing the Accountants to act in the manner provided hereinabove when requested by Agent, such letter to be in form and substance reasonably satisfactory to Agent.

4.9.    <u>Compliance with Laws</u>{ TC "4.9.   Compliance with Laws" \f C \l "2" }.  Each Borrower shall comply in all material respects with all acts, rules, regulations and orders of any Governmental Authority applicable to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which, in each instance, could reasonably be expected to have a Material Adverse Effect.  Each Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of any Governmental Authority in any reasonable manner, <u>provided</u>, that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on the Collateral.

4.10.   <u>Inspection of Premises</u>{ TC "4.10.   Inspection of Premises" \f C \l "2" }.  During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or an Event of Default has occurred and is then continuing), Agent and each Lender Party and their agents shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business.  During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or Event of Default has occurred and is then continuing) Agent, each Lender Party and their agents may enter upon any Borrower's business premises from time to time for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business.  Borrowers shall reimburse Agent and each Lender Party for all reasonable costs incurred by them in respect of the foregoing.  All of such costs shall be charged to Borrowers' Account.

4.11.   <u>Insurance</u>{ TC "4.11.Insurance" \f C \l "2" }.  Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Each Borrower shall, at its own cost and expense, in amounts and with carriers acceptable to Agent (a) keep all its insurable properties and properties in which each Borrower has an interest insured against the hazards of fire, flood (under the circumstances described below), sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's including, without limitation, products liability insurance, insurance against theft, larceny, embezzlement and misappropriation of funds, and business interruption insurance; (b) maintain a bond or other surety in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; and (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business.  Without limitation of the foregoing, if as of the Closing Date or at any time thereafter Agent determines that all or a portion of the improvements situated on any Real Property Collateral are located within a "Special Flood Hazard Area" (as designated by the applicable Governmental Authority), Borrowers shall ensure that flood insurance is obtained and maintained with respect to such Real Property Collateral for the Term at Borrowers' expense in a form, amount and from an issuing company reasonably acceptable to Agent.  Each Borrower shall furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured in regard to liability insurance and loss payee as its interests may appear in regard to casualty or property coverage, to the extent affecting or relating to Collateral, and providing (A) that, subject to any overriding provisions of the Intercreditor Agreement, all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent.  In the event of any loss thereunder, subject to the provisions of the Intercreditor Agreement, the carriers named therein are hereby

directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly.  If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. During the continuation of an Event of Default, Agent is hereby authorized, subject to the provisions of the Intercreditor Agreement, to adjust and compromise claims under insurance coverage referred to above.  All loss recoveries received by Agent upon any such insurance shall, except as otherwise provided in the Intercreditor Agreement, either be paid over to Borrowers or applied by the Agent as follows:  (i) if no Event of Default or Default has occurred and is then continuing, and the loss recovery so received by Agent is less than or equal to the Materiality Threshold, then, Agent shall remit such loss recovery to the Borrowers for use in the restoration of the loss in accordance with Section 2.3(c); (ii) if no Event of Default or Default has occurred and is then continuing, and the loss recovery received by Agent is more than the Materiality Threshold, then, Agent shall apply such loss recovery to the Obligations in accordance with Section 2.3(a), and (iii) if any Event of Default or Default has occurred and is then continuing, then, Agent shall receive and apply such loss recovery to the Obligations in such order as Agent, in its sole discretion, shall determine consistent with the terms of Section 12.2 of this Agreement. Any surplus of such proceeds remaining after such application, shall, subject to the provisions of the Intercreditor Agreement, be paid by Agent to Borrowers or applied as may be otherwise required by law.  Anything hereinabove to the contrary notwithstanding, Agent shall not be obligated to remit any insurance proceeds to Borrowers unless Borrowers shall have provided Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss in accordance with Section 2.3(c).  The Collateral shall at all times be maintained in accordance with the requirements of all insurance carriers that provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.  If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance, pay the premium therefor and charge Borrowers' Account for the amount thereof.

      4.12.   Payment of Taxes{ TC "4.12.       Payment of Taxes" \f C \l "2" }.  Each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral, including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes.  If any tax by any governmental authority is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made that, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may, unless the Borrowers have done so within five (5) Business Days after the Borrowing Representative receives written demand from the Agent that they do so, pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof.  Agent will not pay any taxes, assessments or Charges to the extent that any Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the

Collateral. The amount of any payment by Agent under this Section shall be charged to Borrowers' Account. Until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold any balance standing to Borrowers' credit and Agent shall retain its security interest in any and all Collateral held by Agent.

4.13. <u>Payment of Leasehold Obligations</u>{ TC "4.13.     Payment of Leasehold Obligations" \f C \l "2" }. Each Borrower shall at all times pay, when and as due (or within any applicable grace periods) its rental obligations under all leases material to its business operations under which it is a tenant, and shall otherwise comply, in all material respects, with all other material terms of such leases and keep them in full force and effect (unless terminated in accordance with the terms thereof) and, at Agent's request will provide evidence of having done so.

4.14. <u>Receivables</u>{ TC "4.14.     Receivables" \f C \l "2" }.

(a)     Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower, and the same shall be due and owing in accordance with the applicable Borrower's standard terms of sale, in each case except where the failure of any such Receivables to satisfy the terms of this <u>Section 4.14(a)</u> could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Each Customer, to each Borrower's actual knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due except to the extent that such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover its Receivables from any Customer which is not solvent, except in each case where the failure of any such Customer to be solvent or otherwise be able to pay all Receivables on which it is so obligated could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Nothing in this <u>Section 4.14(b)</u> shall be construed to require any Borrower to obtain any information or take any other affirmative action to assess such Customer's solvency or its ability to pay all Receivables on which such Customer is obligated.

(c)     Each Borrower's chief executive office is located at the address identified as such set forth on <u>Schedule 4.14(c)</u> hereto. Until written notice is given to Agent by Borrowing Representative of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)     No Borrower shall establish or maintain any Deposit Account with any financial institution (except for Excluded Deposit Accounts) unless, prior to the Closing Date or opening of such Depository Account, Agent, the applicable Borrower and such financial institution shall have entered into a Deposit Account Control Agreement with respect to such Depository Account. Each Borrower shall ensure that all collections of Receivables and all other payments received by such Borrower are remitted directly to a Deposit Account subject to a Deposit Account Control Agreement.

(e)     At any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, subject to the provisions of the Intercreditor Agreement and the prior rights of the Revolver Loan Agent, so long as any such Event of Default is continuing, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both. Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telecopy, secretarial and clerical expenses and the salaries of any collection personnel used for collection, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(f)     Agent shall have the continuing right, subject to the provisions of the Intercreditor Agreement and the prior rights of the Revolver Loan Agent, to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables or any other Collateral received by Agent for application to the Obligations in accordance herewith and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power at any time hereafter, subject to the provisions of the Intercreditor Agreement, (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; and (iv) to sign such Borrower's name on any documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same, subject to the provisions of the Intercreditor Agreement. Following the occurrence of an Event of Default and during its continuation, each Borrower shall hereby constitute Agent or Agent's designee as such Borrower's attorney with additional power, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, (i) to demand payment of the Receivables; (ii) to enforce payment of the Receivables by legal proceedings or otherwise; (iii) to exercise all of Borrowers' rights and remedies with respect to the collection of the Receivables and any other Collateral; (iv) to settle, adjust, compromise, extend or renew the Receivables; and (v) to settle, adjust or compromise any legal proceedings brought to collect Receivables. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time after the occurrence of an Event of Default and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower to the extent pertaining to Receivables or other Collateral.

(g)     No Lender Party shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in

payment thereof, or for any damage resulting therefrom, except for any such errors or omissions or delays of any kind determined by a court of competent jurisdiction in a final proceeding to have resulted from its gross (not mere) negligence or willful misconduct.  After an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  Agent is further authorized and empowered at any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, to accept the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

(h)     No Borrower will, without Agent's consent, unless and except to the extent that Revolver Loan Agent otherwise has consented thereto, compromise or adjust any material amount of the Receivables, or extend the time for payment thereof by more than sixty (60) days) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as heretofore have been customary in the business of such Borrower.

4.15.    Inventory{  TC "4.15.Inventory" \f C \l "2" }.  To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.16.    Equipment and Real Property Covenants{  TC "4.16.      Equipment and Real Property Covenants" \f C \l "2" }.  With respect to the Equipment and Real Property:  (a) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (b) Borrowers shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of their insurance and in material conformity with all applicable laws; (c) the Equipment is and shall be used in the business operations of Borrowers and not for personal, family, household or farming use; (d) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (e) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; (f) each Borrower assumes all responsibility and liability arising from its use of the Equipment and Real Property; (g) except as disclosed on <u>Schedule 4.16,</u> as of the Closing Date no Equipment is Excluded Equipment; and (h) hereafter Borrowers will notify Agent promptly, but in any event within ten (10) Business Days after, Borrowers acquire any Equipment that is Excluded Equipment subsequent to the Closing Date.

4.17.  <u>Exculpation</u>{ TC "4.17.       Exculpation" \f C \l "2" }.  Nothing herein contained shall be construed to constitute any Lender Party as any Borrower's agent for any purpose whatsoever; nor shall any Lender Party be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  No Lender Party, whether by anything herein or in any assignment or otherwise, assumes any Borrower's obligations under any contract or agreement assigned to such Lender Party, and no Lender Party shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.18.  <u>Environmental Matters</u>{ TC "4.18.  Environmental Matters" \f C \l "2" }.

(a)     Borrowers shall ensure that the Real Property remains at all times in material compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except in compliance  with applicable law or the appropriate Environmental Authority.

(b)     Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws, which system shall include periodic reviews of such compliance.

(c)     Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws.  If the failure to do so could reasonably be expected to have a Material Adverse Effect, Borrowers shall use their best efforts to obtain to the extent required by applicable Environment Laws or the appropriate Environmental Authority, certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity under any Environment Laws of any Hazardous Substances at any Real Property (any such event being hereinafter referred to as a "<u>Hazardous Discharge</u>") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, any demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "<u>Environmental Complaint</u>") from any Person, including any Governmental Authority responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any of the foregoing Persons referred to herein as an "<u>Environmental Authority</u>"), then, Borrowing Representative shall, within five (5) Business Days thereafter, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware with respect to the Hazardous Discharge or Environmental Complaint.  Such information is to be provided to allow Agent to protect its security interest in the Collateral

and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowers shall promptly forward to Agent copies of any request from any Environmental Authority for information, any notification by any Environmental Authority of potential liability or any demand letter from any Environmental Authority relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward to Agent copies of correspondence between any Borrower and any Environmental Authority regarding such claims until all claims are settled.  Borrowers shall promptly forward to Agent copies of all material documents and reports concerning any Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in the Collateral.

(f)     Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all action required by applicable Environmental Laws to safeguard the health of any Person and to avoid subjecting the Collateral to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or comply with any of the requirements of any Environmental Laws within thirty (30) days after the Borrowing Representative receives written demand from the Agent that it do so, Agent may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deems reasonably necessary under applicable Environmental Laws to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint.  All reasonable costs and expenses incurred by Agent (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(g)     Promptly upon the written request of Agent, but in any event within five (5) Business Days after Borrowers' receipt of such request, which may be made following the discovery of any Hazardous Discharge until such Hazardous Discharge is remedied to the extent required by applicable Environmental Laws or the appropriate Environmental Authority or following the filing of any Environmental Complaint until such Environmental Complaint is resolved, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm reasonably acceptable to Agent with respect to such Hazardous Discharge or Environmental Complaint, and the potential costs of abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property.  Any report or investigation of such Hazardous Discharge acceptable to the appropriate Environmental Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent.  If such estimates, individually or in the aggregate, exceed the Materiality Threshold, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)    Borrowers shall defend and indemnify each Lender Party and hold each Lender Party and their respective employees, agents, directors and officers harmless from and against all losses, liabilities, damages and expenses, claims, costs, fines and penalties, including reasonable attorney's fees, suffered or incurred by such Lender Party under or on account of any Environmental Laws, including, without limitation, the assertion of any Lien thereunder, with respect to any Hazardous Discharge, or the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage or expense, claim, cost, fine or penalty is attributable to any Hazardous Discharge resulting from actions on the part of such Lender Party.  Borrowers' obligations under this <u>subsection (h)</u> shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened to take any action in connection with the presence of any Hazardous Substances.  Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.  Borrowers' obligations of indemnity hereunder shall not extend to, or include, any loss, damage, cost or expense incurred by any Lender Party in respect of the foregoing caused by, or resulting form, its gross negligence or willful misconduct.

4.19.   <u>No Other Financing Statements</u>{  TC "4.19. No Other Financing Statements" \f C \l "2" }.  Except for the financing statements filed by Agent and financing statements giving notice of Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20.   <u>Additional Mortgages</u>{  TC "4.20.   Additional Mortgages" \f C \l "2" }.  Borrowers shall execute and deliver to Agent immediately upon the acquisition in fee simple by any Borrower of any Real Property subsequent to the Closing Date a Mortgage with respect to such additional Real Property (subject to any Permitted Encumbrances), together with such title insurance policies (mortgagee's form), certified surveys, appraisals, and local counsel opinions with respect thereto and such other agreements, documents and instruments as Agent deems reasonably necessary or desirable, in form and substance satisfactory to Agent.

4.21.   <u>Intellectual Property</u>{  TC "4.21.   Intellectual Property" \f C \l "2" }.  Borrowers shall execute and deliver to Agent security agreements in form suitable for registration and otherwise reasonably acceptable to Agent (i) on the Closing Date, with respect to any Material Intellectual Property registered or for which an application for registration is pending with the U.S. Patent and Trademark Office or the U.S. Copyright Office as of the Closing Date, or (ii) immediately upon the creation or acquisition by Borrower of any Material Intellectual Property registered, or for which an application for registration is pending, with either such office subsequent to the Closing Date.

4.22.   <u>Commercial Tort Claims</u>{  TC "4.22.   Commercial Tort Claims" \f C \l "2" }.  Promptly upon the discovery of any Commercial Tort Claim in favor of a Borrower, Borrowers will notify Agent of the same and execute such documents as are requested by Agent in order to grant to Agent a security interest in such Commercial Tort Claim under the UCC.

4.23.   OFAC{ TC "4.23.   OFAC" \f C \l "2" }.  Agent may, at its option, reject, refuse to accept or return any Collateral that any Lender Party determines is, or may be, owed by, or due from, or belongs to, a Sanctioned Person.

4.24.   Appraisals. { TC "4.24.   Appraisals" \f C \l "2" } With respect to Real Property Collateral, upon Agent's request, which may be at such intervals as it deems appropriate, Borrowers shall, at their expense, deliver or cause to be delivered to Agent, Appraisals (or updates to Appraisals) as to the Real Property Collateral addressed to Agent and upon which Agent is expressly permitted to rely; provided, that notwithstanding anything else to the contrary in this Section 4.24, Borrowers shall not pay for more than one (1) such Appraisal in each Fiscal Year following the Closing Date if the Leverage Ratio as of the last day of each Fiscal Quarter in such Fiscal Year is less than or equal to 2.0:1.0 and no Event of Default has occurred and is continuing.

V.   REPRESENTATIONS AND WARRANTIES{ TC "V.   REPRESENTATIONS AND WARRANTIES" \f C \l "1" }.

Each Borrower represents and warrants as follows:

5.1.   Authority{ TC "5.1.  Authority" \f C \l "2" }.  Upon entry of the Confirmation Order, each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is party and to perform all of its respective duties and obligations hereunder and thereunder.  Upon entry of the Confirmation Order, the execution, delivery and performance of this Agreement and of any Other Documents to which such Borrower is party (a) are within such Borrower's corporate powers, have been duly authorized, are not in contravention of law or any material terms of such Borrower's Organic Documents or of any Material Agreement or undertaking to which such Borrower is a party or by which such Borrower or any of its property is bound, and (b) will not conflict with nor result in any breach of any material provisions of or constitute a default under or result in the creation of any Lien (except Permitted Encumbrances) upon any asset of such Borrower under the provisions of any Organic Document or other instrument to which such Borrower is a party or by which it or any of its property may be bound.

5.2.   Formation and Qualification{ TC "5.2.   Formation and Qualification" \f C \l "2" }.

(a)   Each Borrower is duly organized and in good standing under the laws of the State(s) or other jurisdiction(s) listed on Schedule 5.2 and is qualified to do business and is in good standing in the State(s) or other jurisdiction(s) listed on Schedule 5.2, which State(s) or other jurisdiction(s) constitute all State(s) or other jurisdiction(s) in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Each Borrower has delivered to Agent true and complete copies of its Organic Documents and will promptly notify Agent of any amendment or change thereto.

(b)    Each Borrower's identification number (if any) assigned to it by the appropriate Governmental Authority of the state of its organization, if any, is set forth on Schedule 5.2.

(c)    The Subsidiaries (if any) of each Borrower as of the Closing Date are as set forth in Schedule 5.2.

(d)    The Equity Interests of each Borrower which are authorized, issued and outstanding on the Closing Date are set forth and described in Schedule 5.2.

(e)    This Agreement is, and each Other Document executed by a Borrower constitutes, the legal, valid and binding obligation of such Borrower, enforceable against it in accordance with its terms, except as such enforcement is subject to the effect of (i) any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(f)    The signatures of each officer of each Borrower that appear on this Agreement and each Other Document are genuine, and each such officer of such Borrower executing same on behalf of such Borrower has full capacity to execute same.

5.3.    Tax Returns{    TC "5.3.        Tax Returns" \f C \l "2" }.  Each Borrower's federal tax identification number is set forth on Schedule 5.3.  Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable, other than, any such charges as are being contested by Borrowers in good faith by appropriate proceedings provided that Borrowers have established reserves on their books for any unpaid taxes in accordance with GAAP.  The Provision for Taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current Fiscal Year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books or any ongoing audit of any of its tax returns, except as otherwise may be disclosed in Schedule 5.3.

5.4.    Financial Statements{    TC "5.4.        Financial Statements" \f C \l "2" }.

(a)    The audited financial statements of Borrowers and their Subsidiaries on a consolidated basis for their most recently completed Fiscal Year, and the related statements of income, changes in stockholder's equity and cash flow for the annual fiscal period ended on such date, all accompanied by reports thereon containing opinions by the Accountants, and the unaudited financial statements of Borrowers and their Subsidiaries on a consolidated basis for that portion of their current Fiscal Year ended with their most recently completed Fiscal Quarter and Fiscal Month for which financial statements have been reported and the related statements of income, changes in stockholder's equity and cash flow for the fiscal periods ended on such date, (collectively, the "Historical Financial Statements"), copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied (except for changes in application with which the Accountants have concurred) and present in all material respects the financial position of the Borrowers and their Subsidiaries on a consolidated basis at such

dates and the results of their operations for such periods. Since the last day of the Borrowers' most recently completed Fiscal Year, there has been no material adverse change (other than the Chapter 11 Cases) in the financial condition of the Borrowers on a consolidated basis from that shown on the consolidated balance sheet of Borrowers as of such date or in the aggregate value of the Equipment and Real Property owned by them.

(b) The projected financial statements of the Borrowers and their Subsidiaries on a consolidated basis furnished to Agent on or prior to the Closing Date (the "Initial Projections"), were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Initial Projections are not to be viewed as facts and that actual results may differ from such Initial Projections.

5.5. Name{ TC "5.5.    Name" \f C \l "2" }.  Neither of the Borrowers has been known by any other name in the five (5) years immediately preceding the Closing Date, and neither of the Borrowers sells Inventory under any other name except as set forth on Schedule 5.5; nor has either Borrower been the surviving organization of a merger or consolidation or acquired all or substantially all of the assets of any Person during the five (5) years immediately preceding the Closing Date.

5.6. OSHA and Environmental Compliance{ TC "5.6.   OSHA and Environmental Compliance" \f C \l "2" }.  Except as may be set forth on Schedule 5.6:

(a) Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds and Equipment are in compliance with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws, except where the failure to comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds, Real Property or Equipment under any such laws, rules or regulations.

(b) Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws, except where the failure to obtain any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c) (i) There are no visible signs, in any material amounts of releases, spills, discharges, leaks or disposals (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property owned by any Borrower or leased by any Borrower and used for manufacturing or the storage of Hazardous Substances which do not comply in all material respects with all applicable Environmental Laws in respect thereof; (ii) there are no underground storage tanks or polychlorinated biphenyls on any such Real Property, except in compliance with Environmental Laws; (iii) none of any such Real Property has ever been used as a treatment, storage or disposal facility for Hazardous Waste; and (iv) no material amounts of any Hazardous Substances are present on any such Real Property in violation of any applicable Environmental Law.

5.7.    <u>Solvency</u>{  TC "5.7.   Solvency" \f C \l "2" }.

(a)    The Initial Projections demonstrate that the Borrowers on a consolidated basis will have sufficient cash flow to enable them to pay their debts as they mature, subsequent to the Closing Date.

(b)    Immediately following the execution of this Agreement and the consummation of the transactions contemplated hereby on the Closing Date, including the issuance of the Term Loans, (i) the assets of the Borrowers, on a consolidated basis, at a fair valuation and at their present fair saleable value will be in excess of the total amount of liabilities of the Borrowers (including contingent and unmatured liabilities) on a consolidated basis, (ii) the Borrowers will be able to pay their Indebtedness as it becomes due, and (iii) the Borrowers on a consolidated basis will not have unreasonably small capital to carry on their respective businesses.

(c)    As of the Closing Date, there is no undisputed Indebtedness in excess of the Materiality Threshold owing by the Borrowers to any third parties that is past due (after giving effect to any applicable grace period for payment) except for trade accounts payable not in excess of Two Million Dollars ($2,000,000) in aggregate amount, which will be paid by the Borrowers within thirty (30) days following the Closing Date, or as may otherwise be disclosed in <u>Schedule 5.7</u>.

(d)    This Agreement is, and all Other Documents will be, executed and delivered by the Borrowers in good faith and in exchange for reasonably equivalent value and fair consideration.

5.8.    <u>Litigation</u>{  TC "5.8. Litigation" \f C \l "2" }.  Except with respect to the Chapter 11 Cases or as may be otherwise disclosed in <u>Schedule 5.8</u>, as of the Closing Date no Borrower has (i) any pending or threatened litigation, arbitration, actions or proceedings that, if determined adversely to it, could be reasonably expected to have a Material Adverse Effect, or (ii) any Commercial Tort Claims.

5.9.    <u>No Indebtedness</u>{  TC "5.9.   No Indebtedness" \f C \l "2" }.  Except in respect of the amounts owed Lenders and the Revolver Loan Lenders under the Existing Term Loan Facility and the Existing Revolver Loan Facility respectively, and as may be disclosed on <u>Schedule 5.9</u>, no Borrower has any Indebtedness on the Closing Date; and none of such Indebtedness is secured by any Lien, except for Permitted Encumbrances.

5.10.    <u>Violations</u>{  TC "5.10.        Violations" \f C \l "2" }.  No Borrower is in violation of any applicable statute, regulation or ordinance or any order of any court, Governmental Authority or arbitration board or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.11.    <u>Plans</u>{  TC "5.11.     Plans" \f C \l "2" }.  No Borrower nor any member of the Controlled Group maintains or contributes to any Plan (or has assumed any liability in respect of any Plan) other than those (if any) listed on <u>Schedule 5.11</u> hereto.  Except as set forth in <u>Schedule 5.11</u>, (i) no Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each

Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan, (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code, (iii) no Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid, (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence that would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan, (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and no Borrower nor any member of the Controlled Group knows of any facts or circumstances that would materially change the value of such assets and accrued benefits and other liabilities, (vi) no Borrower or any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan, (vii) no Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists that could give rise to any such liability, (viii) no Borrower, nor any member of the Controlled Group, nor any fiduciary of, nor any trustee for, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action that would constitute or result in a ERISA Event with respect to any such Plan that is subject to ERISA, (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan, (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period contained in 29 CFR §2615.3 has not been waived, (xi) no Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group, and (xii) no Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

5.12. <u>Patents, Trademarks, Copyrights and Licenses</u>{ TC "5.12. Patents, Trademarks, Copyrights and Licenses" \f C \l "2" }. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, trade names, assumed names, trade secrets and licenses owned or utilized by Borrowers as of the Closing Date that are material to the conduct of Borrowers' business operations (herein, "<u>Material Intellectual Property</u>") are set forth on <u>Schedule 5.12</u>. All such Material Intellectual Property is valid and, except as set forth on <u>Schedule 5.12</u>, has been duly registered or filed with the appropriate Governmental Authority; there is no objection to or pending challenge to the validity thereof, and neither Borrower is aware of any grounds for any challenge, except as may be set forth in <u>Schedule 5.12</u>. To each Borrower's knowledge, its Material Intellectual Property consists of original material or property developed by such Borrower or which was lawfully acquired by such Borrower from the proper and lawful owner thereof. Each Borrower has maintained its Material Intellectual Property as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all proprietary software developed and used by any Borrower, constituting Material Intellectual Property, such Borrower is in possession of all

source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement.

5.13. <u>Licenses and Permits</u>{ TC "5.13.    Licenses and Permits" \f C \l "2" }. Each Borrower (a) is in material compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law or regulation for the operation of its business in each jurisdiction in which it is now conducting business if the failure to procure such licenses or permits and/or be in material compliance therewith could reasonably be expected to have a Material Adverse Effect.

5.14. <u>No Default of Indebtedness</u>{ TC "5.14.    No Default of Indebtedness" \f C \l "2" }. Except as set forth in <u>Schedule 5.14</u>, as of the Closing Date, no Borrower is in default (after giving effect to any applicable grace period for payment) in the payment of the principal of or interest on any Indebtedness and no event has occurred under the provisions of any instrument or agreement under which any Indebtedness has been issued that without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.15. <u>No Other Defaults</u>{ TC "5.15.    No Other Defaults" \f C \l "2" }. As of the Closing Date, no Borrower is in default in any material respect in the payment or performance of any of its material contractual obligations in respect of any Material Agreement.

5.16. <u>No Burdensome Restrictions</u>{ TC "5.16.    No Burdensome Restrictions" \f C \l "2" }. No Borrower is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect.  No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that is not a Permitted Encumbrance.

5.17. <u>No Labor Disputes</u>{ TC "5.17.    No Labor Disputes" \f C \l "2" }. No Borrower is involved in any material labor dispute; and, to Borrowers' knowledge, there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence.  Except as set forth in <u>Schedule 5.17</u>, no labor contract in existence on the Closing Date is scheduled to expire during the Term.

5.18. <u>Margin Regulations</u>{ TC "5.18.    Margin Regulations" \f C \l "2" }. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.  No part of the proceeds of the Term Loans will be used for "purchasing" or "carrying" "margin stock," as those terms are defined in Regulation U of such Board of Governors.

5.19. <u>Investment Company Act</u>{ TC "5.19.    Investment Company Act" \f C \l "2" }. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.20. <u>Disclosure</u>{ TC "5.20.    Disclosure" \f C \l "2" }. No representation or warranty made by any Borrower in this Agreement, or in any financial statement, report,

certificate or any Other Document furnished in connection herewith, including, without limitation, the Perfection Certificate, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not materially misleading.  There is no fact known to Borrowers that Borrowers have not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement that could reasonably be expected to have a Material Adverse Effect.

5.21.  <u>No Conflicting Agreements or Orders</u>{  TC "5.21.   No Conflicting Agreements or Orders" \f C \l "2" }.  Except as disclosed on <u>Schedule 5.21</u>, no provision of any Material Agreement nor any judgment, decree or order binding on any Borrower or affecting any Collateral conflicts with, or requires any consent that has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.22.  <u>Application of Certain Laws and Regulations</u>{  TC "5.22.   Application of Certain Laws and Regulations" \f C \l "2" }.  No Borrower is subject to any statute, rule or regulation that regulates the incurrence of any Indebtedness, including without limitation, statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.23.  <u>Hedge Contracts</u>{  TC "5.23. Hedge Contracts" \f C \l "2" }.  As of the Closing Date, no Borrower is party to any Hedge Contract, except a Permitted Hedge Contract.

5.24.  <u>Real Property</u>{  TC "5.24.    Real Property" \f C \l "2" }.  As of the Closing Date, Borrowers have no interest as owner or tenant in any Real Property, except as disclosed on <u>Schedule 5.24</u>.

5.25.  <u>Deposit Accounts</u>{  TC "5.25.      Deposit Accounts" \f C \l "2" }.  As of the Closing Date, no Borrower has any Deposit Accounts, except as listed on <u>Schedule 5.25</u>.

5.26.  <u>Brokers</u>{  TC "5.26.   Brokers" \f C \l "2" }.  No Borrower has retained the services of any broker to assist such Borrower in obtaining the benefits of this Agreement.

5.27.  <u>OFAC</u>{  TC "5.27.    OFAC" \f C \l "2" }.  No Permitted Holder, no Borrower and no Subsidiary is a Sanctioned Person.  No Portion of the Term Loans will be used to facilitate the operation of, to finance any investments in or any activities of, or to make any payments to, any Sanctioned Person or Sanctioned Country.

5.28.  <u>Accountants' Letter</u>.   Borrowing Representative has executed and delivered to the Accountants a letter directing the Accountants to act in the manner provided in <u>Section 4.8</u> hereof when requested by Agent.

5.29.  <u>Senior Debt</u>.{  TC "5.28.     Senior Debt" \f C \l "2" }  The principal amount of the Term Loans constitute "Senior Debt" as such term is defined in the Junior Lien Facility Documents and the holders of such Indebtedness are entitled to the rights and benefits of a holder of "Senior Debt" under Section [___] of the Junior Lien Facility Credit Agreement.

VI.  <u>AFFIRMATIVE COVENANTS</u>{  TC "VI.  AFFIRMATIVE COVENANTS" \f C \l "1" }.

Each Borrower shall, and shall cause its Subsidiaries to, do the following until payment in full of the Obligations and termination of this Agreement:

6.1.  <u>Payment of Fees</u>{  TC "6.1.  Payment of Fees" \f C \l "2" }.  Pay to Agent on demand all usual and customary fees and expenses that Agent incurs in connection with (a) the forwarding of the proceeds of the Term Loans and (b) the establishment and maintenance of any Deposit Account Control Agreement and the related Deposit Account(s).  Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

6.2.  <u>Conduct of Business and Maintenance of Existence and Assets</u>{  TC "6.2. Conduct of Business and Maintenance of Existence and Assets" \f C \l "2" }. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted), including, without limitation, all Material Intellectual Property, and take all actions necessary to enforce and protect the validity of Material Intellectual Property or other material rights included in the Collateral; (b) keep in full force and effect its existence and Material Agreements (in accordance with their terms); (c) comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect.

6.3.  <u>Violations</u>{  TC "6.3. Violations" \f C \l "2" }.  Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Authority, or of any agency thereof, applicable to any Borrower that could reasonably be expected to have a Material Adverse Effect.

6.4.  <u>Government Receivables</u>{  TC "6.4. Government Receivables" \f C \l "2" }.  If requested by Agent to do so in respect of any Receivable, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act or other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them, subject to the provisions of the Intercreditor Agreement.

6.5.  <u>Execution of Supplemental Instruments</u>{  TC "6.5.  Execution of Supplemental Instruments" \f C \l "2" }.  Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement and the Other Documents may be carried into effect.

6.6.    Payment of Material Agreements{  TC "6.6.	Payment of Material Agreements" \f C \l "2" }.  Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, including any in respect of its Material Agreements, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or where the amount or validity thereof is currently being contested in good faith by appropriate proceedings; provided that Borrowers have established reserves on their books in accordance with GAAP in respect thereof; and subject at all times to any applicable Subordination Agreement.

6.7.    Standards of Financial Statements{  TC "6.7.	Standards of Financial Statements" \f C \l "2" }.  Cause all financial statements referred to herein to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by the Accountants or the reporting officer of a Borrower, as the case may be, and disclosed therein).

6.8.    Further Assurances; Post Closing. {  TC "6.8.	Further Assurances, Post Closing" \f C \l "2" } At Borrowers' cost and expense, each Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Agent may reasonably request with respect to the purposes, terms and conditions of this Agreement and the Other Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of this Agreement or any Other Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule 6.8.

6.9.    Board of Directors.  At all times, the Board of Directors (or other governing body) of each Borrower shall have at least one (1) Independent Director, which shall be appointed by the Equity Sponsor.

6.10.    Board Observation.  Each Borrower shall permit a representative designated by Agent (the "Lender Representative") to attend and participate in as a non-voting observer all meetings of the Board of Directors (or other governing body) of such Borrower and all meetings of any committee of any such Board of Directors (the "Governing Body"). Each Borrower agrees to give the relevant Lender Representative the same notice of all such meetings and copies of all materials distributed to members of any Governing Body at the same time as such notice and materials are given to the members of such Governing Body, and the relevant Lender Representative will be given the opportunity to participate in any telephonic meetings of such Governing Body.  Each Borrower shall cause its Board of Directors to meet not less frequently than once per Fiscal Year.  If it is proposed that any action be taken by written consent in lieu of a meeting of any Governing Body, the relevant Borrower shall give written notice thereof to the relevant Lender Representative as is required to be delivered to the members of such Governing Body describing in reasonable detail the nature and substance of such action. Agent may, without making demand, charge Borrowers' Account for all reasonable costs and expenses incurred by it

in connection with Agent's rights pursuant to this <u>Section 6.10</u>. Notwithstanding anything to the contrary in this paragraph, (a) so long as no Default or Event of Default has occurred and is continuing (in which event Agent may attend in-person any meetings of any Governing Body as it shall deem appropriate), a Lender Representative shall not attend in-person more than three (3) meetings of a Governing Body of a Borrower per Fiscal Year and (b) a Lender Representative may be excused by the relevant Borrower's Governing Body from attending any portion of such Governing Body's meeting (i) to the extent that attendance by such Lender Representative would jeopardize such Borrower's ability to assert the attorney-client privilege with respect to matters of material importance to be discussed during a portion of any meeting as determined by such Governing Body in good faith, (ii) during which matters relating to the Term Loans are to be discussed or (iii) during any voting (or final deliberation related thereto) by the members of such Governing Body with regards to the sale or other disposition of any Property that is permitted by this Agreement.

VII.     <u>NEGATIVE COVENANTS</u>{  TC "VII.     NEGATIVE COVENANTS" \f C \l "1" }.

       Each Borrower shall, and shall cause its Subsidiaries to, comply as follows until payment in full of all Obligations and termination of this Agreement:

       7.1.    <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc.</u>{  TC "7.1.Sale of Assets, Consolidation, Merger, Dissolution, Etc." \f C \l "2" }  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

              (a)     merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it except that any wholly-owned Subsidiary of a Borrower may merge with and into or consolidate with a Borrower or any other wholly-owned Subsidiary of a Borrower, and any Borrower may merge with or into, or consolidate with any other Borrower; <u>provided</u>, <u>however</u>, that each of the following conditions is satisfied:  (i) Agent shall have received not less than ten (10) Business Days' prior written notice of such intended merger or consolidation, which notice shall set forth in detail reasonably satisfactory to Agent the Persons that are merging or consolidating, which Person will be the surviving entity, the locations of the assets of the Persons that are merging or consolidating, and any Material Agreements and documents relating to such merger or consolidation, (ii) Agent shall have received such other information with respect to such merger or consolidation as Agent may reasonably request, (iii) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (iv) Agent shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Governmental Authority (with a copy as filed promptly after such filing), and (v) the surviving Person (if not already a Borrower) shall expressly confirm, ratify and assume the Obligations, this Agreement and all Other Documents to which the Borrowers are then party in writing, in a form and substance satisfactory to Agent, shall execute and deliver such other agreements, documents and instruments as Agent may reasonably request in connection therewith;

(b)     sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its other assets to any other Person without the prior written consent of Agent, except for

(i)     sales of Inventory in the ordinary course of business;

(ii)     Permitted PP&E Dispositions;

(iii)     the issuance and sale by Parent Company of Equity Interests after the Closing Date; provided, however, that, (a) the terms of such Equity Interests, and the terms and conditions of the purchase and sale thereof, shall not include any terms that contravene, or include any limitation on the right of any Borrower to amend or modify, any of the terms and conditions of this Agreement or any of the Other Documents, (b) after giving effect to such issuance and sale, no Change of Control shall have occurred and (c) the Net Cash Proceeds derived therefrom shall be paid to Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the Revolver Loan Agreement;

(iv)     the issuance of Equity Interests of Parent Company pursuant to an employee stock warrant, stock option, management incentive program or grant or similar equity plan or 401(k) plan established for Borrowers' employees; provided, however, that no Change of Control shall result therefrom;

(v)     the issuance of Equity Interests in connection with the Equity Investment;

(vi)     the sale or other disposition of Collateral not otherwise permitted in clauses (i) and (ii) above, if: (a) such sales or other dispositions do not involve Collateral having an aggregate fair market value in excess of the Materiality Threshold for all such Collateral disposed of in any Fiscal Year of Borrowers; (b) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and (c) all of the Net Cash Proceeds of the sale of such Collateral shall be paid to Agent for application to the Obligations in accordance with Section 2.3(b) of this Agreement;

(vii)     intercompany loans and dividend payments, among or between Borrowers, to the extent permitted by Sections 7.3(d), 7.4(g), 7.5(c) and 7.7(b);

(c)     wind up, liquidate or dissolve, except pursuant to any merger or consolidation made in accordance with Section 7.1(a); or

(d)     agree to do any of the foregoing, except if such agreement is conditioned on approval by the Agent.

7.2.     Encumbrances{ TC "7.2.     Encumbrances" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, Lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or Lien with

respect to any such assets or properties, <u>except</u> the following (herein called, collectively, "<u>Permitted Encumbrances</u>"):

(a)     the security interests and Liens in the Collateral in favor of Agent for the benefit of the Lender Parties granted pursuant to this Agreement and the Other Documents;

(b)     Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Subsidiary, as the case may be, and with respect to which reserves have been set aside on its books in accordance with GAAP;

(c)     non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of such Borrower's or Subsidiary's business to the extent: (1) such Liens secure Indebtedness that is not overdue or (2) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which reserves have been set aside on its books as required by GAAP;

(d)     zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property that do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property owned by any Borrower (or, to Borrowers' knowledge, in the case of Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, the value of the Borrowers' interest in such Leasehold Interests) that is subject thereto;

(e)     purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) acquired after the Closing Date and purchase money mortgages on Real Property acquired after the Closing Date to secure Indebtedness permitted under <u>Section 7.3(b)</u> hereof;

(f)     pledges and deposits of cash or issuances of letters of credit by any Borrower after the Closing Date in the ordinary course of its business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower as of the date hereof;

(g)     pledges and deposits of cash by any Borrower after the Closing Date to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower as of the date hereof;

(h)     Liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment, tooling or other materials that are not owned by any Borrower, but are located on the premises of such Borrower (but not in

connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower and the precautionary UCC financing statement filings in respect thereof;

(i) the security interests in and Liens upon the Collateral and mortgages and Liens upon the Real Property in favor of the Revolver Loan Agent to secure the Revolver Loan Debt, <u>provided</u>, <u>however</u>, that, the security interests in and Liens upon the Collateral in favor of Revolver Loan Agent are and shall at all times be subject to the terms of the Intercreditor Agreement;

(j) judgment Liens and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default, <u>provided</u>, <u>that</u>, (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued by Borrowers, (ii) adequate reserves have been made for the amounts thereof on the books of Borrowers in accordance with GAAP and (iii) a stay of enforcement of any such Liens is in effect;

(k) any security interests and Liens of an Insurance Premium Finance Party on the Insurance Premium Collateral to secure the Indebtedness described in and to the extent permitted in <u>Section 7.3(h)</u> hereof;

(l) security interests and Liens granted to the "Issuer" under any "Letter of Credit Documents" (as each such term is defined in the Revolver Loan Agreement);

(m) those other security interests and Liens (if any) existing on the Closing Date and set forth on <u>Schedule 7.2</u> hereof; and

(n) any subordinated security interests and junior Liens granted to the Junior Lien Facility Lender in connection with the Junior Lien Facility.

7.3. <u>Indebtedness</u>{ TC "7.3. Indebtedness" \f C \l "2" }. No Borrower shall, nor shall permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, <u>except</u>:

(a) the Obligations;

(b) purchase money Indebtedness (including Capitalized Leases) existing on or arising after the Closing Date, to the extent secured by purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) and purchase money Mortgages or Liens on Real Property; <u>provided</u>, <u>however</u>, that:

(i) the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Two Million Dollars ($2,000,000) in any Fiscal Year; <u>provided</u>, that the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Four Million Dollars ($4,000,000);

(ii)    such security interests, Mortgages or Liens do not apply to any property of such Borrower or Subsidiary other than the Equipment or Real Property so acquired (and the proceeds thereof), unless such Indebtedness is owed to the Lenders or the Revolving Loan Lenders;

(iii)    the Indebtedness secured thereby does not exceed the cost of the Equipment or Real Property so acquired, as the case may be;

(iv)    such security interests, Mortgages and/or Liens are released promptly upon such Indebtedness being fully paid and satisfied;

(v)    Agent shall have received at least five (5) Business Days' prior written notice of the intention of Borrowers to incur such Indebtedness, if incurred subsequent to the Closing Date; and

(vi)    as of the date of incurrence of such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(c)    guarantees by any Borrower of the Obligations of any other Borrower in favor of Agent for the benefit of Lenders;

(d)    the Indebtedness of any Borrower to any other Borrower arising after the Closing Date pursuant to loans made by any Borrower permitted under Section 7.4(g) hereof;

(e)    Indebtedness of Borrowers to the Revolver Loan Lenders evidenced by or arising under the Revolver Loan Agreement and the other Revolver Loan Lender Agreements, provided, however, that the principal amount of such Indebtedness shall not exceed the sum of (i) [_____] Dollars ($_____) plus (ii) any Indebtedness incurred as permitted by Section 7.3(b) that is owed to the Revolver Loan Lenders; in each case less the aggregate principal amount of all repayments, whether optional or mandatory, in respect thereof that, in the case of any revolving facility result in a permanent reduction in the principal amount of the Revolver Loans available for borrowing thereunder;

(f)    Indebtedness of any Borrower evidenced by the Junior Lien Facility Subordinated Note as in effect (or in form reasonably satisfactory to Agent) on the Closing Date or as amended in compliance herewith; provided, however, that:

(i)    the aggregate principal amount of such Indebtedness shall not exceed Three Million Dollars ($3,000,000) less the aggregate amount of all permitted principal repayments, repurchases or redemptions, whether optional or mandatory, made after the Closing Date in respect thereof;

(ii)    the principal amount of the Term Loans are and shall at all times constitute "Senior Debt," as such term is defined in the Junior Lien Facility Documents; and the holders of the Term Loans shall be entitled to all the rights and benefits of a holder of "Senior Debt" under Section [__] of the Junior Lien Facility Subordinated Note; and

(iii)     such Indebtedness is and remains subject to a Subordination Agreement in form and substance satisfactory to Agent;

(g)     Indebtedness of Borrowers to an Insurance Premium Finance Party in connection with insurance policies maintained by Borrowers arising as a result of such Insurance Premium Finance Party entering into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided, however, that, such Indebtedness shall be unsecured except to the extent permitted under Section 7.2(k) hereof, and shall not exceed, in aggregate principal amount outstanding at any one time, Seven Hundred Fifty Thousand Dollars ($750,000);

(h)     other Indebtedness outstanding on the Closing Date that is listed on Schedule 7.3;

(i)     Indebtedness of Borrowers to any "Issuer" arising under any "Letter of Credit Documents" (as each such term is defined in the Revolver Loan Agreement); and

(j)     Subordinated Debt.

7.4.    Loans, Investments, Etc.{ TC "7.4.  Loans, Investments, Etc." \f C \l "2" } No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase any Equity Interests or Indebtedness or all or a substantial part of the assets or property of any Person, or form or acquire any Subsidiaries, or agree to do any of the foregoing (unless conditioned upon the consent of the Required Lenders), except:

(a)     the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)     investments in cash or Cash Equivalents, provided that at any time such investments in the aggregate exceed Ten Thousand Dollars ($10,000) (1) no Revolver Loan Debt is then outstanding and (2) the terms and conditions of Section 4.14(d) hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

(c)     the existing equity investments of each Borrower as of the Closing Date in its Subsidiaries, as listed on Schedule 7.4; provided, however, that, no Borrower shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries, except that a Borrower may make capital contributions to another Borrower in the form of dividend payments as permitted pursuant to Sections 7.5 and 7.7 hereof;

(d)     equity investments of a Borrower in another Borrower;

(e)     loans and advances by any Borrower to employees of such Borrower after the Closing Date in an aggregate principal amount not to exceed the Materiality Threshold at any time;

(f)     Equity Interests or debt securities issued to any Borrower by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the Indebtedness of such Person; provided, however, that, the original of any stock certificate or other instrument evidencing such obligations shall, at Agent's request, be promptly delivered to Agent, but in any event within five (5) Business Days after Borrowers receive such request, together with such stock power, assignment or endorsement by such Borrower as Agent may request, subject to the provisions of the Intercreditor Agreement;

(g)     loans by a Borrower to another Borrower after the Closing Date, provided, however, that, (i) upon Agent's request, Borrowers shall provide to Agent a report in form and substance satisfactory to Agent of the outstanding amount of such loans as of the last day of the immediately preceding month and indicating any loans made and payments received during the immediately preceding month; and (ii) upon Agent's request, any such loan shall be evidenced by a promissory note or other instrument, the single original of which shall be promptly, but not later than five (5) Business Days after Agent's request, delivered to Agent to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require, subject to the provisions of the Intercreditor Agreement;

(h)     obligations of any Customer to any Borrower arising from Accounts that are past due and are evidenced by a promissory note by such Customer payable to such Borrower; provided, however, that promptly upon the receipt by such Borrower of the original of any such promissory note, but in any event within five (5) Business Days thereafter, subject to the provisions of the Intercreditor Agreement, such promissory note shall be endorsed to the order of Agent by such Borrower and delivered to Agent;

(i)     those loans and advances (if any) existing on the Closing Date and set forth on Schedule 7.4; provided, however, that, as to such loans and advances, Borrowers shall not, directly or indirectly, amend, modify, alter or change the terms of such loans and advances or any agreement, document or instrument related thereto and Borrowers shall furnish to Agent all default notices or demands for payment in connection with such loans and advances received by any Borrower or on its behalf, promptly after the receipt thereof, or sent by any Borrower or on its behalf, concurrently with the sending thereof, as the case may be; and

(j)     the payment of dividends by Borrowers, and the redemption, retirement, defeasance, purchase or other acquisition of Equity Interests, to the extent permitted by Sections 7.5 and 7.7 hereof.

7.5.   Dividends and Redemptions{ TC "7.5.     Dividends and Redemptions" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, declare or pay any dividends on account of any shares of any class of any Equity Interests of such Borrower now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of

capital or otherwise) in respect of any such shares or agree to do any of the foregoing, <u>except that</u>:

        (a)     any Borrower may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests for consideration in the form of additional Equity Interests so long as no Default or Event of Default has occurred and is continuing or could reasonably be expected to occur after giving effect thereto; <u>provided</u>, <u>however</u>, that no Borrower shall issue Excluded Equity Interests;

        (b)     Borrowers may pay dividends to the extent permitted in <u>Section 7.7</u> below;

        (c)     any Subsidiary of a Borrower may pay dividends to a Borrower; and

        (d)     Borrowers may repurchase Equity Interests consisting of and limited to Equity Interests held by employees of a Borrower pursuant to any employee stock ownership plan thereof upon the termination, retirement or death of any such employee in accordance with the provisions of such plan, provided that, as to any such repurchase, each of the following conditions is satisfied: (i) as of the date of the payment for such repurchase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (ii) such repurchase shall be paid with funds legally available therefor, (iii) such repurchase shall not violate any law or regulation or the material terms of any indenture, agreement or undertaking to which such Borrower is a party or by which such Borrower or its property are bound, and (iv) the aggregate amount of all cash payments for such repurchases in any Fiscal Year shall not exceed the Materiality Threshold.

        7.6.   <u>Nature of Business</u>{  TC "7.6.      Nature of Business" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, substantially change the nature of the business in which it is engaged or, except as otherwise specifically permitted by this Agreement, purchase or invest, directly or indirectly, in any assets or property other than purchases of assets or property in the ordinary course of business that are to be used in its business as presently conducted.

        7.7.   <u>Transactions with Affiliates</u>{  TC "7.7.     Transactions with Affiliates" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

        (a)     purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliate of such Borrower (other than a Borrower or a Subsidiary thereof), except in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business (as the case may be) and upon fair and reasonable terms no less favorable to such Borrower than such Borrower would obtain in a comparable arm's length transaction with an unaffiliated person; or

        (b)     make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower, except (i) reasonable compensation to, and reimbursement of reasonable expenses incurred by, officers, employees and directors for services rendered to such Borrower in the ordinary course

of business, (ii) payments by any Borrower to any other Borrower for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services paid for by any Borrower on behalf of such other Borrower, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower and for the payment of taxes by or on behalf of such Borrower, (iii) the grant of stock options, restricted stock awards, stock appreciation rights or similar rights to employees, officers or directors pursuant to a plan approved by the Board of Directors of the applicable Borrower (so long as after giving effect thereto no Change of Control shall occur and no Default or Event of Default shall have occurred and be continuing), (iv) loans or other advances to employees permitted by Section 7.4(e) hereof, (v) the payment of reasonable fees to the directors of any Borrower and (vi) payments of management fees to the Equity Sponsor in an aggregate principal amount not to exceed Five Hundred Thousand Dollars ($500,000) in any Fiscal Year (so long as (x) no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to occur because of the payment thereof and (y) the Equity Sponsor enters into, and delivers to Agent, a Subordination Agreement in form and substance satisfactory to Agent).

7.8. <u>Subsidiaries</u>{ TC "7.8.      Subsidiaries" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, either: (a) create or acquire any Subsidiary; (b) enter into any partnership, joint venture or similar arrangement; or (c) dispose of any Equity Interests in any Subsidiary, except in a transaction expressly permitted under <u>Section 7.1</u>.  Without limitation of the foregoing, if and to the extent any Subsidiary is created or acquired hereafter with the prior written consent of the Agent, then, as a condition to such consent becoming effective, (i) each such Subsidiary must be joined as a Borrower hereunder, or must become a Guarantor hereof, (ii) each Subsidiary must grant a Lien on its assets to Agent as security for its obligations hereunder or under its Guaranty, and (iii) the Equity Interests of such Subsidiary must be pledged to Agent by amendment to the Pledge Agreement; each on terms satisfactory to Agent.

7.9. <u>Fiscal Year and Accounting Changes</u>{ TC "7.9.      Fiscal Year and Accounting Changes" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, change its Fiscal Year from that in use on the Closing Date or make any significant change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by applicable law.

7.10. <u>Pledge of Credit</u>{ TC "7.10. Pledge of Credit" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, pledge (or purport to pledge) Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of the Term Loans in or for any business other than such Borrower's business as conducted on the Closing Date.

7.11. <u>Amendment of Material Agreements</u>{ TC "7.11. Amendment of Material Agreements" \f C \l "2" }.  No Borrower shall, or shall permit any Subsidiary to, amend, modify, alter or otherwise change in any material respect any term or provision of any of its Material Agreements, unless such amendment, modification or waiver does not cause any contravention of, or conflict with, any material term or condition of this Agreement and would not otherwise reasonably be expected to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, Borrowers may, after giving prior written notice to Agent, amend, modify, alter or change the terms or provisions of any Material Agreement respecting Funded Indebtedness so as to extend the maturity thereof or defer the timing of any payments in respect

thereof, or to forgive or cancel such Indebtedness (or a portion thereof) or to reduce the interest rate on or any fees associated therewith; and, <u>provided</u>, <u>further</u>, that Borrowers shall not amend, modify, alter or change any material terms or provisions of any of the Revolver Loan Lender Agreements (except as permitted in the first proviso hereof), except after giving Agent prior written notice thereof and, if requested by Agent, a corresponding amendment, modification, alteration or change is made hereto or to the Other Documents on the same, or substantially the same, terms simultaneously therewith.

      7.12.   <u>Compliance with ERISA</u>{ TC "7.12.      Compliance with ERISA" \f C \l "2" }. No Borrower shall, or shall permit any Subsidiary to, either: (i) maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans existing on the Closing Date and disclosed on <u>Schedule 5.11</u>, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan, (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any ERISA Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

      7.13.   <u>Prepayment of Indebtedness</u>{ TC "7.13.     Prepayment of Indebtedness" \f C \l "2" }. No Borrower shall, or shall permit any Subsidiary to, at any time, directly or indirectly, either: (a) prepay any Indebtedness, or (b) repurchase, redeem, retire, defease or otherwise acquire any Indebtedness of any Borrower, or set aside or otherwise deposit or invest any sums for such purpose; <u>provided</u>, <u>however</u>, that Borrowers may, from time to time, prepay, repurchase, redeem or retire, in whole or in part, (i) the Obligations, subject to the terms hereof, including, without limitation, with respect to any voluntary prepayments of the Term Loan B, the satisfaction of the conditions set forth in <u>Section 2.2(iii)</u> hereof and (ii) the Revolver Loan Debt, subject to the terms of the Revolver Loan Agreement.

      7.14.   <u>Payment of Subordinated Debt</u>{ TC "7.14.  Payment of Subordinated Debt" \f C \l "2" }. No Borrower shall, or shall permit any Subsidiary to at any time, directly or indirectly pay the principal of, interest on or any other charge or fee in respect of any Subordinated Debt, except in accordance with the terms thereof as in effect on the Closing Date and as expressly permitted by the Subordination Agreement applicable thereto or the subordination provisions of the Junior Lien Facility Documents.

7.15.   <u>Organizational Changes</u>.  No Borrower shall, or permit any of its Subsidiaries to, (a) modify or restate its name within thirty (30) days' prior notice to Agent, (b) reincorporate or reorganize under the laws of any jurisdiction, (c) amend its Organic Documents or (d) agree or commit to do any of the foregoing.

7.16.   <u>OFAC</u>.  No Permitted Holder nor any Borrower shall, or permit any Borrower's Subsidiaries to, (a) be or become a Sanctioned Person, (ii) engage in any dealings or transactions prohibited by Section 2 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), or otherwise be associated with any such Sanctioned Person in any manner violative of Section 2 of such executive order, or (c) otherwise become a Sanctioned Person in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

VIII.   <u>FINANCIAL COVENANTS</u>{  TC "VIII.   FINANCIAL COVENANTS" \f C \l "1" }.

Borrowers shall, until payment in full of the Obligations and termination of this Agreement, comply with the Financial Covenants set forth below.

8.1.   <u>Controlling Definitions</u>{  TC "8.1.   Controlling Definitions" \f C \l "2" }.  As used in this <u>Article VIII</u>:

"<u>Annualization Ratio</u>" shall mean (a) 4/1 as of **[September 30]**, 2010, (b) 3/1 as of **[October 31]**, 2010, (c) 12/5 as of **[November 30]**, 2010, (d) 2/1 as of **[December 31]**, 2010, (e) 12/7 as of **[January 30]**, 2011, (f) 3/2 as of **[February 28]**, 2011, (g) 4/3 as of **[March 31]**, 2011, (h) 6/5 as of **[April 30]**, 2011 and, (i) 12/11 as of **[May 31]**, 2011.

"<u>Capital Expenditures</u>" shall mean, as applied to any Person, all expenditures for any fixed or capital assets (including, but not limited to, tooling) or improvements, or for replacements, substitutions or additions thereto, that have a useful life of more than one (1) year, including, but not limited to, the direct or indirect acquisition of such assets by way of offset items or otherwise and shall include the amount recorded on the balance sheet of such Person at the time of the acquisition of any such asset pursuant to a Capitalized Lease.

"<u>Capitalized Lease</u>" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which, in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

"<u>Cash Income Taxes</u>" shall mean, as to any Person, for any period, the Provision for Taxes <u>less</u> any portion thereof that represents deferred income taxes unless they become due and payable in the period, all determined in accordance with GAAP.

"<u>Cash Interest Expense</u>" shall mean, as to any Person, for any period, Interest Expense <u>less</u> (a) Interest Expense that represents the amortization of fees and expenses that were paid during prior periods and (b) Interest Expense on any Indebtedness payable in kind that was accrued during such period but is not paid in cash within thirty (30) days following the due date thereof ("<u>Deferred Interest</u>"), <u>plus</u> any Deferred Interest paid in cash during such period.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding any extraordinary or nonrecurring gains or losses), all as determined in accordance with GAAP; provided, however, that, without duplication, (a) the net income of any Person that is not a wholly-owned Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a wholly-owned Subsidiary of such Person; (b) the net income of any Person accrued prior to the date it becomes a wholly-owned Subsidiary of such Person or is merged into or consolidated with such Person or any of its wholly-owned Subsidiaries or the date that Person's assets are acquired by such Person or by any of its wholly-owned Subsidiaries shall be excluded; (c) the net income of any Person shall exclude interest accrued, but not paid, on indebtedness owing to a Subsidiary or parent corporation of such Person that is subordinated in right of payment to the payment in full of the Obligations, on terms and conditions acceptable to Agent; (d) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded; (e) the net income of any Person shall exclude any write-down or write-off of assets resulting from the application of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" or Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets"; (f) the net income of any Person shall exclude any items of income (or expense) that are required by GAAP to be classified as non-operating amounts in such Person's statement of income definition; and (g) the net income of any Person shall exclude any gain or loss (together with any related Provisions for Taxes) realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions) or of any Equity Interest of such Person or a Subsidiary of such Person and any net income or loss realized as a result of changes in GAAP or the application thereof to such Person.

"EBITDA" shall mean, as to any Person, with respect to any period, the Consolidated Net Income of such Person for such period plus the following items, to the extent deducted in computing Consolidated Net Income for such period: (a) depreciation and amortization expenses; (b) Interest Expense for such period, plus (c) the Provision for Taxes for such period, plus (d) any one-time severance costs and other costs incurred in connection with the termination, relocation and training of senior management of Borrowers in an aggregate principal amount not to exceed at any time $**[700,000]**, plus (e) to the extent not already included in clause (g) of the definition of "Consolidated Net Income" above, losses resulting from the sale or other disposition, as permitted herein, of Property and the machining business of Borrowers, plus (f) payments of management fees to the Equity Sponsor to the extent permitted under Section 7.7(b) hereof..

"Fixed Charge Coverage Ratio" shall mean for any Test Period, the ratio of (a) EBITDA, less Unfinanced Capital Expenditures to (b) Fixed Charges, for such Test Period determined for the Borrowers on a consolidated basis in accordance with GAAP.

"Fixed Charges" shall mean, as to any Person, for any period, the sum, without duplication, of (a) Cash Interest Expense, plus (b) all regularly scheduled (as determined at the beginning of such period) principal payments on Indebtedness (including the portion of any payments under Capitalized Leases that is classified as principal), plus (c) Cash Income Taxes, plus (d) all cash dividends and distributions on Equity Interests, together with all repurchases, redemptions and retirements of Equity Interests, to the extent not included in clauses (a) or (b) of this definition.

"Interest Expense" shall mean, for any period, as to any Person, as determined in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capitalized Leases for such period), including, without limitation, discounts in connection with the sale of any Accounts, but excluding interest paid in property other than cash and any other interest expense not payable in cash.

"Leverage Ratio" shall mean the ratio for the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as of the end of any calendar month, of (a) Net Senior Debt to (b) EBITDA for the Test Period, except that, as of the end of each calendar month immediately following the Closing Date until the first anniversary of the Closing Date, the Leverage Ratio shall mean the ratio of (x) Net Senior Debt to (y) the quotient of (A) EBITDA for the Test Period times (B) the Annualization Ratio.

"Liquidity" shall mean, as of any date of determination, the balance of cash on hand and Cash Equivalents of Borrowers not subject to any Lien or encumbrance other than in favor of Agent.

"Net Senior Debt" shall mean, as of any date, all Indebtedness outstanding (i) pursuant to this Agreement and the Other Documents and (ii) pursuant to the Revolver Loan Lender Agreements, less cash on hand and Cash Equivalents of the Borrowers as of such date.

"Test Period" shall mean the most recent period of twelve consecutive calendar months ended on or prior to any date of determination (taken as one accounting period), except that for each calendar month ending on or prior to the first anniversary of the Closing Date, "Test Period" shall mean the period commencing on the first day of the first calendar month following the Closing Date and ending on the date of determination.

"Unfinanced Capital Expenditures" shall mean any Capital Expenditures not financed with Indebtedness.

8.2.    Fixed Charge Coverage Ratio{ TC "8.2.    Fixed Charge Coverage Ratio" \f C \l "2" }.  Borrowers shall maintain a Fixed Charge Coverage Ratio for any Test Period beginning on the last day of the third full calendar month following the Closing Date, measured on a monthly basis, of not less than 1.0:1.0.

8.3.    Capital Expenditures{ TC "8.3.    Capital Expenditures" \f C \l "2" }.  Borrowers and their Subsidiaries shall not make Capital Expenditures in any Fiscal Year, as measured monthly, in an aggregate amount in excess of Four Million Dollars ($4,000,000) during such Fiscal Year; provided, however, that if Capital Expenditures in any Fiscal Year are

less than Four Million Dollars ($4,000,000), the amount of permitted Capital Expenditures in the immediately following Fiscal Year shall be increased by an amount equal to such unused amount of Capital Expenditures for such Fiscal Year up to a maximum amount of One Million Dollars ($1,000,000).

8.4.     <u>Leverage Ratio</u>{ TC "8.4.    Leverage Ratio" \f C \l "2" }.  Borrowers shall maintain a Leverage Ratio at the end of each calendar month beginning on the last day of the third full calendar month following the Closing Date of not more than: (i) 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to [____], 2011; (ii) 3.5:1.0 for each calendar month ending after [____], 2011 and prior to [____], 2012; and (iii) 3.0:1.0 for each calendar month ending after [____], 2012 through the expiration of the Term.

8.5.     <u>Minimum Liquidity</u>.  Borrowers shall not permit Borrowers' Liquidity at any time to be less than $2,000,000.

8.6.     <u>Minimum EBITDA</u>.  EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as measured every calendar month beginning on the third full calendar month following the Closing Date on a trailing twelve-month basis (<u>provided</u>, <u>however</u>, that for each calendar month ending on or prior to the first anniversary of the Closing Date, such measurement shall mean EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP for the period from the first day of the first full calendar month following the Closing Date, through such date of determination times the Annualization Ratio) shall not be less than (i) $8,000,000 through the first anniversary of the Closing Date or (ii) $9,000,000 thereafter. Notwithstanding the foregoing, the EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, (x) as measured on the last day of the first full calendar month following the Closing Date shall not be less than $600,000 in the period from the first day of the first full calendar month following the Closing Date to such date of determination or, (y) as measured on the last day of the second full calendar month following the Closing Date shall not be less than $1,333,333 in the period from the first day of the first full calendar month following the Closing Date to such date of determination

IX.     <u>CONDITIONS PRECEDENT</u>{ TC "IX.    CONDITIONS PRECEDENT" \f C \l "1" }.

9.1.     <u>Conditions to Effectiveness</u>{ TC "9.1.       Conditions to the Term Loan" \f C \l "2" }.  The agreement of Lenders to make the Term Loans pursuant to this Agreement and the Other Documents is subject to the satisfaction, in the sole judgment of the Agent and Lenders, or waiver by Lenders, immediately prior to or concurrently with the making of the Term Loans hereunder, of the following conditions precedent:

(a)     <u>Amended and Restated Notes</u>.  To the extent amended and restated Notes and/or alonges to Notes have been requested by any Lender, Agent shall have received such amended and restated Notes and/or alonges to Notes duly executed and delivered by a Designated Officer of each Borrower;

(b)      <u>Amended and Restated Loan Agreement</u>.  Agent shall have received this Agreement, duly executed by all parties hereto, in form and substance satisfactory to Agent;

(c)      <u>Filings, Registrations, Recordings and Searches</u>.  (i) Each document (including, without limitation, any Uniform Commercial Code financing statement) required by this Agreement, any Other Document, under applicable law or otherwise as reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral shall have been properly executed (if necessary) and delivered to the Agent or the title company for filing, registration or recordation in each jurisdiction in which the filing, registration or recordation thereof is so required  or requested, and Agent shall have received satisfactory evidence of the depositing for payment of any necessary fee, tax or expense relating thereto; (ii) the Agent shall also have received UCC, tax and judgment lien searches with respect to each Borrower in such jurisdictions as Agent shall require, and the results of such searches shall be satisfactory to Agent; and (iii) Agent shall have received from Borrowing Representative, for each Borrower, the Perfection Certificate;

(d)      <u>Secretary's Certificates</u>.  Agent shall have received a certificate of the Secretary (or an acceptable substitute officer having similar duties and powers), of each Borrower, dated the Closing Date, in substantially the form of <u>Exhibit 9.1(d)</u>, unless otherwise acceptable to or required by Agent, certifying as to (i) the incumbency and signature of the officers of each Borrower executing this Agreement and any Other Documents, and (ii) the resolutions of the Board of Directors of such Borrower authorizing such officers to enter into and carry out such transactions as are contemplated pursuant to this Agreement and the Other Documents; and including therewith copies of the Organic Documents of such Borrower as in effect on the Closing Date, each in form and substance satisfactory to Agent;

(e)      <u>Good Standing Certificates</u>.  Agent shall have received good standing certificates for each Borrower dated not more than thirty (30) days prior to the Closing Date, issued by the secretary of state or other appropriate official of each Borrower's jurisdiction of organization and each jurisdiction where the conduct of each Borrower's business activities or the ownership of its properties necessitates qualification;

(f)      <u>Legal Opinion</u>.  Agent shall have received an opinion of legal counsel to the Borrowers, in form and content satisfactory to Agent, which shall cover such matters incidental to the transactions contemplated by this Agreement, the Notes and all Other Documents as Agent may reasonably require;

(g)      <u>No Litigation</u>.  Except with respect to the Chapter 11 Cases, (i) no litigation, investigation or proceeding before or by any arbitrator or Governmental Authority shall be continuing or threatened against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement or the Other Documents or any of the transactions contemplated hereby and thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the opinion of Agent, reasonably be expected to have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the transactions contemplated hereby shall have been issued by any Governmental Authority;

(h)     Material Agreements.  Agent shall have received and reviewed all Material Agreements existing on the Closing Date and be satisfied therewith;

(i)     Collateral Examination.  Agent shall have completed examinations of its primary Collateral, and be satisfied therewith;

(j)     Commitment Fee.  Agent shall have received in cash, on or prior to the Closing Date, a commitment fee, to be shared pro rata among the Lenders, equal to 1.00% of the aggregate principal amount of the Term Loans as of the Closing Date;

(k)     Intentionally Omitted;

(l)     Other Fees and Expenses.  Agent shall have received all fees and expenses payable to Agent and the Lenders on or prior to the Closing Date pursuant to this Agreement, any Other Document, the Reorganization Plan and the Cash Collateral Order, including, without limitation, reasonable attorneys' fees;

(m)     Financial Statements.  Agent shall have received copies of the Initial Projections and copies of the Historical Financial Statements, and be satisfied therewith;

(n)     Insurance.  Agent shall have received, in form and content satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(o)     Deposit Account Control Agreements.  Agent shall have received all Deposit Account Control Agreements, duly executed by all parties thereto, required to be delivered as of the Closing Date pursuant to Section 4.14 hereof;

(p)     Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem reasonably necessary to effectuate the transactions contemplated by this Agreement and the Other Documents;

(q)     No Adverse Material Effect.  Except for the Chapter 11 Cases, since the end of Borrowers' most recently completed Fiscal Year for which audited financial statements have been reported, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect;

(r)     Landlord's Agreements.  Unless Agent otherwise has agreed to waive such requirement in one or more instances Agent shall have received landlord agreements in form and content reasonably satisfactory to Agent with respect to all premises leased by any Borrowers at which Equipment having a fair market value in excess of the Materiality Threshold is located;

(s)     Intellectual Property.  To the extent that any Material Intellectual Property (or applications therefor) is registered with the United States Patent and Trademark Office or, as appropriate, the United States Copyright Office as of the Closing Date, the Borrower owning such Material Intellectual Property shall have executed, as appropriate, a patent security agreement, a trademark security agreement, and/or a copyright security agreement in favor of Agent, each to be in form and content satisfactory to Agent;

(t)     Closing Certificate.  Agent shall have received a closing certificate signed by a Designated Officer of each Borrower dated the Closing Date, in substantially the form of Exhibit 9.1(t), stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date, no Default or Event of Default has occurred or is continuing;

(u)     Junior Lien Facility Documents. Agent shall have received a copy duly executed by all parties thereto, certified by a Designated Officer of the Borrowing Representative as true and complete, of each of the Junior Lien Facility Documents, including schedules and exhibits thereto, along with a Subordination Agreement, all in form and substance satisfactory to Agent, with respect to the Junior Lien Facility. The term of the Junior Lien Facility shall expire at least six (6) months following the expiration of the Term, and the outstanding obligations thereunder shall be zero (0) as of the Closing Date;

(v)     Equity Investment Proceeds. Agent shall have received evidence satisfactory to it that no more than **[$2,200,000]** of the proceeds from the Equity Investment (such amount is subject to Agent's review of sources and uses and Initial Projections) was used to payoff certain of Borrowers' outstanding accounts payable;

(w)     Subordination Agreements. Agent shall have received a Subordination Agreement, in form and substance satisfactory to Agent, from (i) each holder of the Borrowers' Subordinated Debt that is outstanding as of the Closing Date and (ii) the Equity Sponsor pursuant to Section 7.7(b) hereof;

(x)     Mortgages.  Agent shall have received from each Borrower amendments to each Mortgage with respect to all Real Property Collateral owned by such Borrower in fee simple as of the Closing Date, together with the following, each to be in form and substance satisfactory to Agent a mortgagee's title insurance policy or title insurance endorsement (each a "Title Insurance Policy"), dated the Closing Date together with evidence that all premiums in respect of such Title Insurance Policy have been paid, which Title Insurance Policy shall:  (i) be in an amount reasonably satisfactory to Agent; (ii) insure that the Mortgage insured thereunder creates a valid first Lien on the Real Property covered by such Mortgage free and clear of all Liens, defects and encumbrances (except those set forth in the Title Insurance Policy or otherwise reasonably acceptable to Lender); (iii) name Agent as the insured party thereunder; (iv) be in the form of ALTA Loan Policy 1970 (as amended) or other form approved by Agent, and (v) contain such endorsements and effective coverage as Agent may reasonably request;

(y)     Revolver Loans.  Borrowers shall have consummated all transactions contemplated with the Revolver Loan Agent and the Revolver Loan Lenders substantially in accordance with the terms of the Revolver Loan Agreement as in effect on the Closing Date;

(z)     Equity Investment.  Agent shall have received evidence satisfactory to it that the Equity Investment has been consummated in accordance with terms and conditions satisfactory to Agent;

(aa)     Intercreditor Agreement. Agent and Revolver Loan Agent shall have executed and delivered an amendment to the Intercreditor Agreement, in form and substance satisfactory to Agent;

(bb)     Election of New Board of Directors.  The Permitted Holders of the Voting Equity Interests shall have elected a new Board of Directors of each Borrower, which shall be comprised of the following seven (7) members: (i) the Chief Executive Officer of the Parent Company, (ii) one (1) individual appointed by the Affiliated Bondholders (as defined in the Reorganization Plan), (iii) four (4) individuals appointed by the Equity Sponsor (provided, however, that at least one (1) of such individuals shall be an Independent Director) and (iv) one (1) individual appointed by the DIP Lenders (as defined in the Reorganization Plan), provided that at least **$[3,500,000]** is to be rolled over to new Equity Interests as of the Closing Date (in such event that this condition is not satisfied, the seventh member shall be appointed by the Equity Sponsor);

(cc)     Minimum Liquidity. Agent shall have received evidence satisfactory to it that on the Closing Date, after giving effect to the transactions contemplated herein and taking into consideration all closing fees and expenses and the current obligations of the Borrowers, Borrowers shall have Liquidity in an amount of at least $3,000,000;

(dd)     Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order (together with all exhibits and other attachments thereto, as any of the foregoing shall be amended, modified or supplemented from time to time or any of the terms or conditions thereof waived (with the consent of the Lenders and Agent with respect to any amendment, modification, supplement or waiver that is adverse to the Lenders, as determined by the Lenders and Agent in their reasonable discretion), the "Plan Documents") in respect of the Chapter 11 Cases of the Borrowers in accordance with Section 1129 of the Bankruptcy Code, and Agent shall have received a copy thereof.  The Confirmation Order shall be in form and substance reasonably satisfactory to the Lenders and Agent, shall have been entered on the docket of the Bankruptcy Court, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in any manner (unless otherwise reasonably satisfactory to the Lenders and Agent) and Equity Sponsor and/or the Borrowers shall have made all cash payments contemplated thereunder;

(ee)     Plan Documents. The transactions contemplated by the Plan Documents shall have been consummated substantially contemporaneously with the consummation of the transactions hereunder (including, without limitation, all cash payments contemplated thereunder by Equity Sponsor and/or the Borrowers); and all conditions to the effectiveness of the Reorganization Plan shall have been satisfied or waived;

(ff)    Management Agreements. Agent shall have received from the Borrowers all management agreements and related documents and agreements duly executed by all parties thereto, in form and substance satisfactory to Agent;

(gg)    Pledge Reaffirmation.  Agent shall have received a pledge reaffirmation, in form and substance satisfactory to Agent, from each pledgor under the Pledge Agreement;

(hh)    USA Patriot Act/OFAC. Agent and Lenders shall have received all documentation and other information required by applicable law and/or Governmental Authorities (including, without limitation, the USA Patriot Act and OFAC);

(ii)    IRS Form 8821.  Each Borrower shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service;

(jj)    Environmental Reports. Agent shall have received environmental studies and reports prepared by independent environmental engineering firms experienced in such matters reasonably acceptable to Agent reflecting Borrowers' compliance with Section 5.6 hereof with respect to any Real Property that Borrowers own in fee simple as of the Closing Date; and

(kk)    Other Documents.  Agent shall have received all Other Documents which Agent determines to be reasonably necessary to consummate the transactions contemplated to occur on or after the Closing Date pursuant to this Agreement, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated herein shall be satisfactory in form and substance to each Lender Party and its legal counsel.

X.    INFORMATION AS TO BORROWERS{ TC "X. INFORMATION AS TO BORROWERS" \f C \l "1" }.

Each Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.    Disclosure of Material Matters{ TC "10.1.  Disclosure of Material Matters" \f C \l "2" }. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, report to Agent all matters materially and adversely affecting the value, or collectibility of any portion of the Collateral in excess of the Materiality Threshold or the enforceability of Agent's Lien thereon.

10.2.    Environmental Compliance Certificate{ TC "10.2.  Environmental Compliance Certificate" \f C \l "2" }.  At the request of Agent from time to time, furnish promptly, but in any event within five (5) Business Days after Borrowers' receipt of such request, a certificate signed by a Designated Officer of Borrowing Representative stating that, to the best of Borrowing Representative's knowledge, each Borrower is in compliance in all Environmental Laws and laws relating to occupational safety and health.  To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action Borrower will implement in order to achieve full compliance.

10.3. <u>Litigation</u>{ TC "10.3.　　　Litigation" \f C \l "2" }.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of:  (i) any Commercial Tort Claim arising in a Borrower's favor subsequent to the Closing Date, or (ii) any litigation, suit or administrative proceeding affecting any Borrower, including, particularly, any Commercial Tort Claim, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

10.4. <u>Material Occurrences</u>{ TC "10.4.　　Material Occurrences" \f C \l "2" }. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of:  (a) any Event of Default or Default; (b) any event, development or circumstance as a result of which any financial statements or other reports furnished to Agent fail to present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition or operating results of the Borrowers as of the date of such statements; (c) any accumulated retirement Plan funding deficiency which, if such deficiency continued for two (2) Plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (d) default by any Borrower in respect of any Indebtedness that exceeds the Materiality Threshold and  could reasonably be expected to result in the acceleration of the maturity of such Indebtedness, other than the Obligations, together with the names and addresses of the holders of such Indebtedness and the amount of such Indebtedness; (e) the termination (or receipt of notice of pending termination) of any Material Agreement; and (f) any other development in the business or affairs of the Borrowers which could reasonably be expected to have a Material Adverse Effect; in each case, describing the nature thereof and the action that Borrowers propose to take with respect thereto.

10.5. <u>Government Receivables</u>{ TC "10.5.　　　Government Receivables" \f C \l "2" }.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, if the aggregate outstanding amount of any of its Receivables that arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them, exceeds the Materiality Threshold.

10.6. <u>Annual Financial Statements</u>{ TC "10.6.　　　Annual Financial Statements" \f C \l "2" }.  Furnish to Agent within one hundred (100) days after the end of each Fiscal Year of Borrowers financial statements of Borrowers on a consolidated basis, including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current Fiscal Year to the end of such Fiscal Year and a balance sheet as at the end of such Fiscal Year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by Malin, Bergquist & Company LLP or any other nationally recognized independent certified public accounting firm selected by Borrowers, but reasonably satisfactory to Agent (the "<u>Accountants</u>").  In addition, such financial statements shall be accompanied by a certificate of a Designated Officer of the Borrowing Representative, in substantially the form of <u>Exhibit 10.6</u>, that shall state that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto

calculations that set forth Borrowers' compliance with the Financial Covenants (herein, a "Compliance Certificate").

10.7.    Quarterly and Monthly Financial Statements{  TC "10.7.    Monthly Financial Statements" \f C \l "2" }.  Furnish to Agent, (a) within fifty (50) days following the end of the first three (3) Fiscal Quarters of each Fiscal Year, and (b) within thirty (30) days following the end of each Fiscal Month, the following: (i) an unaudited balance sheet of Borrowers on a consolidated basis, and (ii) unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated basis reflecting results of operations from the beginning of the Fiscal Year to the end of such Fiscal Quarter or Fiscal Month, as applicable, and for such Fiscal Quarter or Fiscal Month, as applicable, all as prepared on a basis consistent with prior practices but in accordance with GAAP (together with a comparison to the reports for the corresponding period(s) in the prior Fiscal Year and to the Projections for the current Fiscal Year required under Section 10.8).  The reports shall be accompanied by a Compliance Certificate of Borrowers signed by a Designated Officer of Borrowing Representative stating that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants.

10.8.    Projections{  TC "10.8.       Projections" \f C \l "2" }.  Furnish to Agent prior to the first day of each Fiscal Year, commencing with its first Fiscal Year beginning after the Closing Date, month-by-month projected financial statements of Borrowers on a consolidated basis for such Fiscal Year, including balance sheets, income statements, statements of cash flow, and calculations of projected Financial Covenant compliance (including projected amounts of all financial components used in determining compliance) for such month (collectively, with the Initial Projections, the "Projections"), with the Projections to be accompanied by a certificate of the Borrowers signed by a Designated Officer of the Borrowing Representative to the effect that such Projections were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Projections are not to be viewed as facts and that actual results may differ from such Projections.

10.9.    Variances From Operating Budget{  TC "10.9.       Variances From Operating Budget" \f C \l "2" }.  Furnish to Agent, concurrently with the delivery of the financial statements referred to in Section 10.7, a summary of all material variances from the Projections submitted by Borrowers pursuant to Section 10.8.

10.10.   Notice of Adverse Events.{  TC "10.10.     Notice of Adverse Events." \f C \l "2" }  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Authority or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Authority or any other Person to renew or extend any such Consent; (iii) copies of any periodic or special reports filed by any Borrower with any Governmental Authority, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower, taken as a whole, or if copies thereof are requested by any Lender Party.

10.11. <u>ERISA Notices and Requests</u>{  TC "10.11.  ERISA Notices and Requests" \f C \l "2" }.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice in the event that (i) any Borrower or any member of the Controlled Group knows that an ERISA Event has occurred, together with a written statement describing such ERISA Event and the action, if any, that such Borrower or member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action that such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with a copy of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with a copy of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

10.12. <u>Material Intellectual Property</u>{  TC "10.12.  Material Intellectual Property" \f C \l "2" }.  Notify Agent promptly after, but in any event within five (5) Business Days thereafter, if, subsequent to the Closing Date, any Borrower applies for, or acquires, any Material Intellectual Property registered (or registrable) under applicable federal law, and execute and deliver to Agent, upon request, such security agreements in respect thereof as Agent may request to evidence, confirm or perfect Agent's Lien on and security interest in such Collateral.

10.13. <u>Public Reports</u>{  TC "10.13.  Public Reports" \f C \l "2" }.  Furnish to Agent, promptly after, but in any event within five (5) Business Days after, the same become publicly available, copies of all periodic and other reports, proxy statements and other materials (if any) filed by any Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to the owners of Borrowers' Equity Interests generally or to the holders of its Indebtedness (or any trustee, agent or to other representative therefor), as the case may be:

10.14.  Material Agreements{  TC "10.14.   Material Agreements" \f C \l "2" }.  Furnish to Agent copies of:  (i) all Material Agreements entered into subsequent to the Closing Date, promptly after, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (ii) all material amendments, modifications, alterations or other changes to any Material Agreements promptly upon, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (iii) any notices of default, termination, rescission or cancellation, or demands for payment made or received by any Borrower in respect of any Material Agreement, promptly after, but in any event within five (5) Business Days after, their receipt or delivery by such Borrower.

10.15.  Additional Information{  TC "10.15. Additional Information" \f C \l "2" }. Furnish to Agent such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without limitation and without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening or establishing of any new Collateral Location or any Borrower's closing of any existing Collateral Location, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts at any of its plants or other facilities, or the expiration (other than in accordance with its terms) of any labor contract to which any Borrower is a party or by which any Borrower is bound.

10.16.  Additional Documents{  TC "10.16. Additional Documents" \f C \l "2" }. Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

XI.  EVENTS OF DEFAULT{  TC "XI.  EVENTS OF DEFAULT" \f C \l "1" }.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

11.1.  Obligations{  TC "11.1.      Obligations" \f C \l "2" }.  (i) Failure by any Borrower to pay the principal amount of any Obligations when due, or (ii) failure by any Borrower to pay any Obligations consisting of interest and fees within two (2) Business Days after the date when due, or (iii) failure by Borrower to pay any other Obligations not described in clauses (i) or (ii) above within five (5) Business Days after the date when due; in each such case, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any Other Document or by notice of intention to prepay, or by required prepayment;

11.2.  Misrepresentations{  TC "11.2.      Misrepresentations" \f C \l "2" }.  Any representation or warranty of any material fact, circumstance or condition made or deemed made by any Borrower in this Agreement or any Other Document or in any certificate, document or financial or other written statement furnished by any Borrower at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

11.3.   <u>Financial Information</u>{  TC "11.3.    Financial Information" \f C \l "2" }.  Failure by any Borrower to (i) furnish financial information when due or when requested pursuant hereto that is unremedied for a period of five (5) Business Days, or (ii) permit the inspection of its books or records by any Lender Party, when requested pursuant to <u>Section 4.10</u> hereof;

11.4.   <u>Liens</u>{  TC "11.4.    Liens" \f C \l "2" }.  Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's property having a collateral value, as determined by Agent, of more than the Materiality Threshold that is not stayed or vacated within thirty (30) days (but not later than its being executed, however);

11.5.   <u>Covenants</u>{  TC "11.5.        Covenants" \f C \l "2" }.  Either (i) except as otherwise provided in <u>Section 11.3(i)</u> above or clause (ii) of this <u>Section 11.5</u>, failure of any Borrower to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document; or (ii) a failure of Borrowers to perform, keep or observe any term, provision, condition or covenant, contained in <u>Sections 4.7</u> or <u>6.4</u> hereof that is not cured within twenty (20) days from the occurrence of such failure;

11.6.   <u>Judgments</u>{  TC "11.6.        Judgments" \f C \l "2" }.  Any judgment is rendered or judgment Lien is filed against any Borrower for an amount in excess of the Materiality Threshold which is not either satisfied, stayed or discharged of record within thirty (30) days of such rendering or filing (but not later than its being executed, however);

11.7.   <u>Voluntary Bankruptcy</u>{  TC "11.7.    Voluntary Bankruptcy" \f C \l "2" }.  Any Borrower, any Subsidiary of any Borrower or any Guarantor shall (other than with respect to the Chapter 11 Cases) (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (vi) admit in writing its inability, or be generally unable, to pay its Indebtedness as it becomes due, (vii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (viii) take any action for the purpose of effecting any of the foregoing;

11.8.   <u>Cessation of Business</u>{  TC "11.8.    Cessation of Business" \f C \l "2" }.  Any Borrower shall cease operation of its business or commence the liquidation of such business; or any Borrower shall give notice to Agent of its intent to undertake either of the foregoing measures;

11.9.   <u>Involuntary Bankruptcy</u>{  TC "11.9. Involuntary Bankruptcy" \f C \l "2" }.  Any Borrower, any Subsidiary of a Borrower or any Guarantor shall acquiesce in, or fail to have dismissed within forty-five (45) days, any petition filed against it in any involuntary case under any state or federal bankruptcy law (as now or hereafter in effect), or take any action for the purpose of effecting any of the foregoing;

11.10. <u>Material Adverse Change</u>{ TC "11.10.      Material Adverse Change" \f C \l "2" }. Any change in any Borrower's condition or affairs (financial or otherwise) which in Agent's reasonable opinion has a Material Adverse Effect unless such Borrower remedies same to Agent's satisfaction within thirty (30) days after the Borrowing Representative receives written notice thereof from Agent;

11.11. <u>Agent's Liens</u>{ TC "11.11.   Agent's Liens" \f C \l "2" }. Any Lien on any Collateral created hereunder or provided for hereby or under any Other Document ceases to be or is not a valid and perfected Lien having a first priority interest, except for any Permitted Encumbrance having Lien priority;

11.12. <u>Subordinated Debt</u>{ TC "11.12.      Subordinated Debt" \f C \l "2" }. An event of default shall occur under or in respect of any Subordinated Debt that causes the acceleration of, or entitles the holder thereof to cause the acceleration of, any Subordinated Debt, or any payment is made or received in respect of any Subordinated Debt in violation of the subordination provisions thereof, the terms hereof or the terms of any Subordination Agreement made with respect thereto.

11.13. <u>Cross Default</u>{ TC "11.13.   Cross Default" \f C \l "2" }. Either:  (i) any "Event of Default" (as defined herein) under the Revolver Loan Agreement shall occur and be continuing (unless waived in writing by the Revolver Loan Lenders); or (ii) any "Event of Default" (as defined therein) under the Junior Lien Facility Documents shall occur and be continuing (unless waived in writing by the holder of the Junior Lien Facility Subordinated Note); or (iii) a default of the obligations of any Borrower under any other Material Agreement which involves a monetary obligation in excess of the Materiality Threshold, whether individually or in the aggregate, shall occur, which default is not cured (or waived in writing) within any applicable grace period;

11.14. <u>Guaranty</u>{ TC "11.14.      Guaranty" \f C \l "2" }. Termination (except by its express terms) or breach of any Guaranty or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate or challenges the validity of, or its liability under, any such Guaranty or similar agreement;

11.15. <u>Change of Control</u>{ TC "11.15.     Change of Control" \f C \l "2" }. Any Change of Control shall occur;

11.16. <u>Change of Management</u>{ TC "11.16.        Change of Management" \f C \l "2" }. Any Change of Management shall occur;

11.17. <u>Invalidity</u>{ TC "11.17.        Invalidity" \f C \l "2" }. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower, or any Borrower shall so claim in writing to Agent;

11.18. <u>Takings</u>{ TC "11.18. Takings" \f C \l "2" }. (i) Any Governmental Authority shall revoke, terminate, suspend or adversely modify any license, permit, patent trademark or trade name of any Borrower, the continuation of which is material to the continuation of any Borrower's business, or (ii) any agreement that is necessary or material to the operation of any Borrower's business shall be suspended, revoked or terminated and not be reinstated or replaced

by a substitute acceptable to Agent within thirty (30) days after the date of suspension, revocation or termination, and such suspension, revocation or termination without reinstatement or replacement would reasonably be expected to have a Material Adverse Effect;

11.19.  <u>Seizures</u>{  TC "11.19.Seizures" \f C \l "2" }.  Any portion of the Collateral in excess of the Materiality Threshold shall be seized or taken by a Governmental Authority, or any Borrower or the title and rights of any Borrower shall have become the subject matter of litigation which could reasonably be expected, in the opinion of Agent, upon final determination, to result in material impairment or loss of such Collateral;

11.20.  <u>Cessation of Operations</u>{  TC "11.20.          Cessation of Operations" \f C \l "2" }.  Unless and except to the extent occurring in the ordinary course of Borrowers' business as conducted on the Closing Date, any material portion of the business operations of the Borrowers (considered as a whole) are interrupted at any time for more than ten (10) consecutive Business Days during any period of thirty (30) consecutive days, unless (i) such cessation of operations occurs in the ordinary course of Borrowers' business; <u>e.g.</u>, an annual plant shutdown for re-tooling or maintenance or (ii) the Borrowers shall (A) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to enable them to continue to operate their business in substantially the same manner as operated prior to such interruption and meet their obligations when due during such interruption and (B) receive the proceeds described in <u>clause (A)</u> preceding not later than thirty (30) days following the initial date of any such interruption; <u>provided</u>, <u>however</u>, that notwithstanding the provisions of <u>clauses (A)</u> and <u>(B)</u> of this <u>Section</u>, an Event of Default shall be deemed to have occurred if such interruption of operations continues for a period of more than one hundred eighty (180) consecutive days;

11.21.  <u>Plans</u>{  TC "11.21.     Plans" \f C \l "2" }.  An event or condition specified in <u>Section 7.12</u> or <u>Section 10.11</u> hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) that, in the judgment of Agent, could reasonably be expected to have a Material Adverse Effect; or

11.22.  <u>Criminal Charges</u>{  TC "11.22.          Criminal Charges" \f C \l "2" }.  Any Borrower or any Designated Officer shall become the subject of a criminal indictment or investigation in respect of or pertaining to, the operation or conduct of a Borrower's business, its reporting of any financial data, its application for, or receipt of, any credit, its "laundering" of any funds or its non-payment (or underpayment) of any taxes or any other Charges, or shall admit its guilt or complicity in respect of any of the foregoing, or shall pay any fine or suffer any penalty in respect thereof (including as part of any plea bargain or similar arrangement).

XII.  <u>AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT</u>{  TC "XII.  AGENT'S LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT" \f C \l "1" }.

12.1.  <u>Rights and Remedies</u>{  TC "12.1.     Rights and Remedies" \f C \l "2" }.

(a)     Upon and after the occurrence of an Event of Default pursuant to Sections 11.7, 11.8, 11.9 or 11.20, all Obligations shall be immediately due and payable and this Agreement shall be deemed terminated.  During the existence of any other Event of Default not specified in the preceding sentence, at the option of the (x) Required Term A Lenders all Obligations in respect of the Term Loan A shall be immediately due and payable, or (y) Required Term B Lenders, subject to Section 12.1(b), all Obligations in respect of the Term Loan B shall be immediately due and payable and, in each case, Lenders shall have the right to terminate this Agreement.  Upon the occurrence of any Event of Default and during its continuation, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or in equity generally, including, without limitation, the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process.  Agent may enter any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place.  With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect.  Except as to that part of the Collateral that is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowers at least ten (10) days prior to such sale or sales is reasonable notification.  At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Borrower.  In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Borrower's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights that are used in connection with (a) Inventory for the purpose of disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of Inventory.  Notwithstanding anything in this Agreement to the contrary, the exercise by any Lender Party of any rights or remedies in respect of any Collateral, and the application of any proceeds thereof, shall be subject in all respects to the provisions of the Intercreditor Agreement.

(b)     Upon the occurrence of an Event of Default, the Term B Lenders shall be permitted to accelerate the Obligations in respect of the Term Loan B and institute a legal proceeding against the Borrowers solely with respect to the Borrowers' nonpayment of any Obligations then due and payable to the Term B Lenders hereunder, provided, however, that in no event shall the Term B Lenders have any ability to take any Lien Enforcement Action or otherwise exercise (or cause the Agent  to exercise) any remedies against the Collateral or any other remedies against the Borrowers until the earlier of (x) the payment in full in cash of all Obligations owed to the Term A Lenders and the Agent in respect of the Term Loan A or (y) the expiration of the Standstill Period.  For purposes of this Section 12.1, "Standstill Period" means the period of time terminating on the 180th day after the date written notice is given to the Agent

by the Required Term B Lenders that the Term B Lenders have accelerated the Obligations in respect of the Term Loan B, <u>provided</u> that the Standstill Period shall be extended so long as Agent is diligently pursuing in good faith the exercise of its enforcement rights or remedies against all or a material portion of the Collateral (including without limitation, any of the following: solicitation of bids from third parties to conduct the liquidation of all or a material portion of the Collateral, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, auctioneers or other third parties for the purpose of valuing, marketing, promoting or selling a material portion of the Collateral, notification of account debtors to make payments to Agent or its agents, any action to take possession of all or any material portion of the Collateral or commencement of any legal proceedings or actions against or with respect to all or any material portion of the Collateral) or diligently attempting to vacate any stay of enforcement of its Liens on all or a material portion of the Collateral.

12.2.  <u>Application of Proceeds</u>{  TC "12.2. Application of Proceeds" \f C \l "2" }.  The proceeds realized by Agent from the sale of any Collateral made pursuant to <u>Section 12.1(a)</u> hereof, shall, subject to the provisions of the Intercreditor Agreement, be applied as follows: <u>first</u>, to the costs, expenses and attorneys' fees and expenses actually incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; <u>second</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document; <u>third</u>, to interest on the Term Loan A then accrued, but unpaid; <u>fourth</u>, to the principal amount of the Term Loan A then outstanding; <u>fifth</u>, to interest on the Term Loan B then accrued, but unpaid; <u>sixth</u>, to the principal amount of the Term Loan B then outstanding; and, <u>lastly</u>, to all other Obligations then outstanding.  If any deficiency shall arise, Borrowers shall remain liable to the Lender Parties therefor.  If any surplus exists, such surplus shall be held by Agent as cash Collateral pending full payment and satisfaction of all Obligations and termination of this Agreement, after which any remainder shall be returned to the Borrowing Representative except as otherwise provided in the Intercreditor Agreement or is otherwise then required under applicable law.  Notwithstanding anything to the contrary contained herein, the Lien granted to the Agent for the benefit of the Term A Lenders shall be deemed to be separate and distinct from the Lien granted to the Agent for the benefit of the Term B Lenders, and to the extent that, under the foregoing provisions, the Term A Lenders are entitled to be paid from the proceeds of Collateral prior to the Term B Lenders, each of the parties hereto agrees that the priority provisions of this <u>Section 12.2</u> shall be enforceable under Section 510 of the Bankruptcy Code as effecting a subordination of the interests of the Term B Lenders to the Term A Lenders.

12.3.  <u>Agent's Discretion</u>{  TC "12.3.        Agent's Discretion" \f C \l "2" }.  After an Event of Default has occurred and while it is continuing, Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto; <u>provided</u> that such determination will not in any way modify or affect any Lender Party's rights hereunder, including, without limitation, with respect to the Term B Lenders after the expiration of the Standstill Period.

12.4.  <u>Setoff</u>{  TC "12.4.      Setoff" \f C \l "2" }.

(a)  <u>Establishment of Right</u>.  In addition to any other rights which any Lender Party may have under applicable law, upon the occurrence of an Event of Default and during its

continuation, each Lender Party shall have a right of setoff as to, and may apply, any Borrower's property held by it (actually or constructively) to reduce the Obligations, subject to the provisions of the Intercreditor Agreement; provided, however, that no Lender Party shall have any such right of setoff, appropriation or application against any Payroll Account. Each Lender Party agrees to notify the Borrowing Representative and the Agent after any such setoff and application is made by such Lender Party, provided that its failure to give such notice shall not affect the validity of such setoff and application.

(b)     Benefited Lender Parties. If any Lender Party (a "Benefited Party") shall at any time receive any payment of all or part of any Term Loan held by such Lender Party, or interest thereon, or other Obligations owing under this Agreement or the Other Documents or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 11.7 or Section 11.9 or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender Party, if any, in such Term Loan, or interest thereon, or other Obligations owing under this Agreement or the Other Documents, such Benefited Party shall purchase for cash from each affected Lender Party holding such Term Loan a participating interest in such portion of each such other Lender Party's Term Loan or other Obligations owing under this Agreement or Other Documents, or shall provide each such Lender Party with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Parties to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lender Parties; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Party, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrowers agree that each Lender Party so purchasing a portion of another Lender Party's Term Loan or other Obligations owing under this Agreement or the Other Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of clause (a) of this Section 12.4, rights of setoff) with respect to such portion purchased as fully as if such Lender Party were the direct holder thereof.

12.5.   Rights and Remedies not Exclusive{  TC "12.5.      Rights and Remedies not Exclusive" \f C \l "2" }.  The enumeration of the foregoing rights and remedies of the Lender Parties is not intended to be exhaustive, and the exercise of any right or remedy by the Lender Parties shall not preclude the exercise of any other right or remedy provided for herein or in any Other Document or otherwise provided by law from and after the occurrence of any Event of Default and during its continuation, all of which shall be cumulative and not alternative.

XIII.   WAIVERS AND JUDICIAL PROCEEDINGS{  TC "XIII. WAIVERS AND JUDICIAL PROCEEDINGS" \f C \l "1" }.

13.1.   Waiver of Notice{  TC "13.1.      Waiver of Notice" \f C \l "2" }.  Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

13.2.  <u>Delay</u>{  TC "13.2.    Delay" \f C \l "2" }.  No delay or omission on any Lender Party's part in exercising any right, remedy or option hereunder or under any of the Other Documents shall operate as a waiver of such right, remedy or option or of any Default or Event of Default.

13.3.  <u>Jury Waiver</u>{  TC "13.3.    Jury Waiver" \f C \l "2" }.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTIONS; IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIV.  <u>EFFECTIVE DATE AND TERMINATION</u>{  TC "XIV.   EFFECTIVE DATE AND TERMINATION" \f C \l "1" }.

14.1.  <u>Term</u>{  TC "14.1.    Term" \f C \l "2" }.  This Agreement, which shall inure to the benefit of, and shall be binding upon, the respective successors and permitted assigns of each Borrower and each Lender Party; shall become effective on the Closing Date, and shall continue in full force and effect until [_____], 2013 (the "<u>Term</u>") or any earlier date on which the Term Loans, together with all accrued interest thereon, and all other Obligations are fully paid and satisfied or this Agreement is otherwise terminated in accordance with its terms.

14.2.  <u>Termination</u>{  TC "14.2.    Termination" \f C \l "2" }.  The termination of this Agreement shall not affect the rights of any Borrower or any Lender Party, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, all rights or interests created hereby, and all of the Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Agent for the benefit of the Lender Parties hereunder and the financing statements filed in respect thereof shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been paid or performed in full after the termination of this Agreement or each Borrower has furnished the Lender Parties with an indemnification satisfactory to such parties with respect thereto.  Accordingly, each Borrower waives any rights that it may have under the applicable provisions of the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to deliver such termination statements to the Borrowers, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds.  All representations, warranties,

covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or performed in full. Notwithstanding any other provision of this Agreement or any Other Document, no termination of this Agreement shall affect Agent's or any Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of this Agreement and the Other Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Agent hereunder and under the Other Documents and the financing statements filed pursuant thereto and the rights and powers of Lender shall continue in full force and effect notwithstanding the fact that Borrowers' borrowings hereunder may from time to time be in a zero or credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash.

XV.     REGARDING AGENT{  TC "XV.   REGARDING AGENT" \f C \l "1" }.

        15.1.   Appointment{  TC "15.1.     Appointment" \f C \l "2" }.  Each Lender Party hereby designates CSE to act as Agent for such Lender Party under this Agreement and the Other Documents.  Each Lender Party hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest and all fees, charges and collections received pursuant to this Agreement, for the ratable benefit of the Lender Parties, except the fees and other amounts payable to Agent as set forth in Section 9.1(k). Agent may perform any of its duties hereunder by or through its agents or employees.  As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Obligations), but Agent may act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the requisite Lenders as provided in this Agreement, which instructions shall be binding; provided, however, that Agent shall not be required to take any action that exposes Agent to liability or that is contrary to this Agreement or the Other Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto from the Lender Parties.

        15.2.   Nature of Duties{  TC "15.2. Nature of Duties" \f C \l "2" }.  Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents.  Neither Agent, nor any of its officers, directors, employees or agents, shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by any of them under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder or under any Other Documents.  Agent shall not be under any obligation to any Lender Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower.  The duties of Agent with respect to the

Term Loans shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, express or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any Other Document, except as expressly set forth herein or therein.

15.3.    <u>Lack of Reliance on Agent and Resignation</u>{  TC "15.3.    Lack of Reliance on Agent and Resignation" \f C \l "2" }.  Independently and without reliance upon Agent, each other Lender Party has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower in connection with the making and carrying of the Term Loans or any other Obligations and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower.  Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender Party with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof.  Agent shall not be responsible to any Lender Party for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or for the financial condition of any Borrower, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.  Agent may resign on thirty (30) days' written notice to each of the Lenders and, upon such resignation, the Required Lenders will promptly designate a successor Agent.  If no such successor Agent is appointed at the end of such thirty (30) day period, Agent may designate one of the existing Lenders as a successor Agent.  Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "<u>Agent</u>" shall mean such successor Agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent.  After any Agent's resignation as Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.    <u>Certain Rights of Agent</u>{  TC "15.4. Certain Rights of Agent" \f C \l "2" }.  If Agent shall request instructions from Lenders with respect to any act or action (including any failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement); and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender Party shall have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement).

15.5.    <u>Reliance</u>{  TC "15.5. Reliance" \f C \l "2" }.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or

telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

15.6. Notice of Default{ TC "15.6.    Notice of Default" \f C \l "2" }. Agent shall not be deemed to have knowledge or notice of the occurrence, continuation or cessation of any Default or Event of Default unless Agent has received notice from a Lender Party or a Borrower referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default" (or a notice in respect of the continuation or cessation thereof). In the event that Agent receives such a notice, Agent shall give notice thereof to all other Lender Parties. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement); provided, however, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders consistent with the terms of this Agreement and the Other Documents.

15.7. Indemnification{ TC "15.7. Indemnification" \f C \l "2" }. To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Term Loans, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent  in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided, however, that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the indemnified party's gross (not mere) negligence or willful misconduct.

15.8. Agent in its Individual Capacity{ TC "15.8.Agent in its Individual Capacity" \f C \l "2" }. As to that portion of the Term Loans made by Agent as a Lender, Agent shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties of Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Borrower as if it were not performing the duties of Agent specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

15.9. Delivery of Documents{ TC "15.9. Delivery of Documents" \f C \l "2" }. To the extent Agent receives documents and information from any Borrower pursuant to Article X of this Agreement, Agent will promptly furnish such documents and information to the other Lender Parties.

15.10. Borrowers' Undertaking to Agent{ TC "15.10.    Borrowers' Undertaking to Agent" \f C \l "2" }. Without prejudice to their respective obligations to Lender Parties under the

other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall <u>pro tanto</u> satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

15.11. <u>Documentation Agent, Etc.</u>{ TC "15.11.    Documentation Agent, Etc." \f C \l "2" } Agent shall have the continuing right, for purposes hereof, at any time from time to time to designate one or more Lender Parties (and/or its or their Affiliates) as "Co-Agent," "Collateral Agent," "Documentation Agent," "Syndication Agent," "Arranger" or otherwise for purposes hereof, but such designations shall have no substantive effect, and the Lender Parties (or their Affiliates) so designated shall have no additional powers, duties or responsibilities as a result hereof. Further, no such Lender Party need be identified by such designation in any Other Document (including any amendment hereto or thereto) or execute this Agreement or any Other Document, using such designation.

15.12. <u>Term B Lenders Purchase Option</u>. { TC "15.12.    Term B Lenders Purchase Option." \f C \l "2" }

(i)    Upon the occurrence and during the continuance of (i) an acceleration of the Obligations or (ii) a Lien Enforcement Action on the part of the Agent on behalf of Term A Lenders, any or all of the Term B Lenders, acting as a single purchaser group, shall have the option at any time upon five (5) Business Days prior written notice (each such notice, a "<u>Term B Purchase Notice</u>") from the Term B Lenders to the Term A Lenders to purchase all of the Obligations in respect of the Term Loan A from the Term A Lenders. Such Term B Purchase Notice to Term A Lenders shall be irrevocable.

(ii)    On the date specified by Agent on behalf of Term B Lenders in such Term B Purchase Notice (which shall not be less than five (5) Business Days, nor more than ten (10) Business Days, after the receipt by Agent on behalf of Term A Lenders of the Term B Purchase Notice from Agent on behalf of Term B Lenders of the election by the Term B Lenders to exercise such option), Term A Lenders shall sell to Term B Lenders, and Term B Lenders shall purchase from Term A Lenders, the then outstanding principal amount of the Term Loan A <u>plus</u> accrued and unpaid interest thereon and any fees and expenses due the Agent or Term A Lenders (the "<u>Term Loan A Obligations</u>"). The Term A Lenders hereby represent and warrant that, as of the date hereof, no approval of any court or other regulatory or governmental authority is required for such sale.

(iii)    Upon the date of such purchase and sale, Term B Lenders shall (i) pay to Agent on behalf of Term A Lenders as the purchase price therefor (the "<u>Purchase Price</u>") the full amount of the Term Loan A Obligations then outstanding and unpaid (including principal, interest, fees and expenses, including reasonable attorneys' fees and legal expenses but excluding any early termination fee or prepayment fee), (ii) agree to pay to Term A Lenders any early termination fee or prepayment fee payable in connection with Term Loan A in accordance with this Agreement within three (3) Business Days of the receipt of same by the Term B Lenders or Agent on behalf of Term B Lenders, after the payment in full in cash to Term B

Lenders of the Obligations in respect of the Term Loan B and the Term Loan A Obligations purchased by Term B Lenders pursuant to this Section 15.12 (excluding any early termination or prepayment fee (whether owing with respect to Term Loan A or Term Loan B)), provided that (x) the notice of termination is received by the Term B Lenders or Agent on behalf of Term B Lenders or (y) the effective date of termination occurs, within one year after the effective date of the purchase of the Term Loan A Obligations by the Term B Lenders. Such purchase price shall be remitted by wire transfer in federal funds to such bank account of Agent on behalf of Term A Lenders, as Agent may designate in writing to the Term B Lenders or Agent on behalf of Term B Lenders for such purpose. Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by Term B Lenders to the bank account designated by Agent on behalf of Term A Lenders are received in such bank account no later than 3:00 p.m., New York City time, and interest shall be calculated to and including such Business Day if the amounts so paid to the bank account designated by Agent on behalf of Term A Lenders are received in such bank account later than 3:00 p.m., New York City time.

(iv)    Such purchase shall be made pursuant to a Commitment Transfer Supplement and shall be expressly made without representation or warranty of any kind by Term A Lenders as to the Term Loan A Obligations or otherwise and without recourse to Term A Lenders, except that Term A Lenders shall represent and warrant: (i) the amount of the Term Loan A Obligations being purchased, (ii) that Term A Lenders will transfer the Term Loan A Obligations to the Term B Lenders free and clear of any Liens or encumbrances, (iii) Term A Lenders have legal and equitable title to the Term Loan A Obligations and the related Other Documents being purchased and (iv) Term A Lenders have the right to assign the Term Loan A Obligations and the assignment is duly authorized.

15.13.  Collateral Matters. { TC "15.13.    Collateral Matters." \f C \l "2" } (a)  Agent is authorized on behalf of Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or this Agreement or any of the Other Documents that may be necessary or reasonably advisable to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to this Agreement and the Other Documents. Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion and without the necessity of any notice to or further consent from the Lenders, to release any Liens upon any Collateral (a) upon the repayment in full of the Obligations and termination of this Agreement and the Other Documents or as otherwise contemplated in this Agreement, including, without limitation, with respect to any Permitted PP&E Disposition; (b) constituting property in which Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or (c) constituting property leased to Borrowers under a lease which has expired or been terminated in a transaction permitted under this Agreement. Upon request by Agent or Borrowers at any time, Lenders will confirm in writing Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this Section 15.13. Upon receipt by Agent of any authorization from Lenders of Agent's authority to release any Liens upon particular types or items of Collateral, and upon at least 5 Business Days' prior written request by Borrowers, Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of its Liens upon such Collateral; provided, however, that (i) Agent shall not be required to execute any such document on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without

recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon all interests retained by the Agent for the benefit of the Lenders, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     Notwithstanding the foregoing sub-clause (a) of this <u>Section 15.13</u>, <u>Section 17.2</u> or any other provision to the contrary in this Agreement, after the occurrence of an Event of Default and prior to the expiration of the Standstill Period, Agent and Term A Lenders shall have the exclusive right to manage, perform and enforce the terms of this Agreement and the Other Documents with respect to the Collateral, to exercise and enforce all privileges and rights thereunder according to their discretion and the exercise of its business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral, to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral and to take all other Lien Enforcement Actions with respect thereto, in each case (i) so long as the proceeds thereof are applied in accordance with <u>Section 12.2</u> hereof and (ii) subject to the terms and conditions of the Intercreditor Agreement.

XVI.    <u>BORROWING REPRESENTATIVE{</u> TC "XVI.    BORROWING REPRESENTATIVE" \f C \l "1" }.

16.1.    <u>Borrowing Representative Provisions{</u> TC "16.1.    Borrowing Representative Provisions" \f C \l "2" }.  If and to the extent that at any time or from time to time there are multiple Borrowers, then:

(a)     Each Borrower acknowledges that it together with each other Borrower make up a related organization of various entities constituting a single economic and business enterprise and sharing a substantial identity of interests such that, without limitation, Borrowers render services to or for the benefit of each other, purchase or sell and supply goods to or for the benefit of each other, make loans or advances and provide other financial accommodations to or for the benefit of each other (including the payment of creditors and guarantees of Indebtedness), provide administrative, marketing, payroll and management services to or for the benefit of each other; have centralized accounting, common officers and directors.  Accordingly, and without limitation, any credit or other financial accommodation extended to any one Borrower pursuant hereto will result in direct and substantial economic benefit to each other Borrower, and each Borrower will likewise benefit from the economic benefit to each other Borrower, and consequently, the Borrowers, as a group, applying for credit and other financial accommodations pursuant hereto on a collective basis.

(b)     Each Borrower hereby irrevocably designates Borrowing Representative to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Representative.

(c)     The handling of this credit facility as a co-borrowing facility with a Borrowing Representative in the manner set forth in this Agreement is solely an accommodation to Borrowers and at their specific request.  No Lender Party shall incur any liability to Borrowers

as a result thereof. To induce each Lender Party to do so and in consideration thereof, each Borrower hereby indemnifies each Lender Party and holds each Lender Party harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against such Lender Party by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent, any Lender or any other Lender Party on any request or instruction from Borrowing Representative or any other action taken by Agent, any Lender or any other Lender Party with respect to this Section except due to willful misconduct or gross (not mere) negligence by the indemnified party.

(d)     All Obligations shall be joint and several liabilities of Borrowers. Each Borrower cross-guarantees the full payment and performance hereunder and under the Other Documents by the other Borrower of its Obligations, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extension, renewal or forbearance granted by any Lender Party to any Borrower, the failure any Lender Party to give any Borrower any notice, any failure of any Lender Party to pursue or preserve its rights against any Borrower, the release by any Lender Party of any Borrower or any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by any Lender Party to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.

16.2.     Waiver of Subrogation{ TC "16.2.   Waiver of Subrogation" \f C \l "2" }.  Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim that such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property that is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVII.   MISCELLANEOUS{ TC "XVII.    MISCELLANEOUS" \f C \l "1" }.

17.1.   GOVERNING LAW{ TC "17.1.    GOVERNING LAW" \f C \l "2" }.  THIS AGREEMENT AND, UNLESS OTHERWISE EXPRESSLY PROVIDED THEREIN, EACH OTHER DOCUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK.  ANY JUDICIAL PROCEEDING BROUGHT BY OR AGAINST ANY BORROWER WITH RESPECT TO ANY OF THE OBLIGATIONS, THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTION MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE CITY AND STATE OF NEW YORK, UNITED STATES OF AMERICA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR

ANY OTHER DOCUMENT.  EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWING REPRESENTATIVE AT ITS ADDRESS SET FORTH IN <u>SECTION 17.6</u> AND SERVICE SO MADE SHALL BE DEEMED COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAILS OF THE UNITED STATES OF AMERICA; <u>PROVIDED</u>, <u>HOWEVER</u>, IF BORROWING REPRESENTATIVE CEASES TO HAVE AN ADDRESS IN NEW YORK, NEW YORK AS ITS NOTICE ADDRESS PURSUANT TO <u>SECTION 17.6</u>, THEN, AT ANY LENDER PARTY'S OPTION, BY SERVICE UPON THE CORPORATION SERVICE COMPANY (OR ANY SUCCESSOR OR REPLACEMENT AGENT FOR SERVICE WITH AN OFFICE IN NEW YORK, NEW YORK, SELECTED BY SUCH LENDER PARTY), WHICH EACH BORROWER HEREBY APPOINTS AS ITS AGENT FOR THE LIMITED PURPOSE OF ACCEPTING SERVICE IN THE STATE OF NEW YORK UNDER SUCH CIRCUMSTANCE.  NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR LIMIT THE RIGHT OF ANY LENDER PARTY TO BRING PROCEEDINGS AGAINST ANY BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.  EACH BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER AND SHALL NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON <u>FORUM NON CONVENIENS</u>.  ANY JUDICIAL PROCEEDING BY ANY BORROWER AGAINST ANY LENDER PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT, SHALL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT LOCATED IN THE CITY OF NEW YORK, STATE OF NEW YORK OR IN THE COURTS OF ANY OTHER JURISDICTION IN WHICH ANY LENDER PARTY HAS BROUGHT A PROCEEDING AGAINST ANY BORROWER IN RESPECT HEREOF THAT IS THEN PENDING.

17.2.   Entire Understanding; Amendments; Waivers; Consents**{**  TC "17.2.      Entire Understanding; Amendments; Waivers; Consents" \f C \l "2" **}**.

(a)      This Agreement and the Other Documents contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by the respective officers of the party making such promises, representations, warranties, or guarantees.  Neither this Agreement nor any Other Document nor any portion or provisions hereof or thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and the Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement or any Other Document.

(b)     The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this underline subsection, from time to time enter into written supplemental agreements to this Agreement or the Other Documents for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent, or Borrowers  hereunder or thereunder or the conditions, provisions or terms hereof or thereof, or waiving any Event of Default, but only to the extent specified in such written agreements; provided that, until the repayment in full in cash Obligations in respect of the Term Loan A, only the consent of the Required Term A Lenders shall be required to waive any Event of Default (other than any Event of Default under Section 11.1) or forbear from taking any action with respect to same; provided further, however, that no such no such modification, amendment, waiver or supplemental agreement shall, without the consent of

(A) all Term A Lenders:  (i) increase the Term Loan A Commitment or Term Loan A Commitment Percentage of any Term A Lender; (ii) increase the Term Loan A; (iii) extend the maturity of Term Loan A or the due date for any amount payable with respect thereto, or decrease the rate of interest or reduce any fee payable by Borrowers to Term A Lenders pursuant to this Agreement; (iv) alter the definition of the terms "Required Term A Lenders" or "Required Lenders" or alter, amend or modify this Section 17.2(b); (v) make any change to the purchase option in Section 15.12 hereof; or (vi) cause any reduction in the principal, interest or fees payable in respect of the Term Loan A (except in connection with any waiver of the application of the Default Rate that applies to all of the Term Loans);

(B) all Term B Lenders: (i) increase the Term Loan B Commitment or Term Loan B Commitment Percentage of any Term B Lender; (ii) increase the Term Loan B; (iii) extend the maturity of Term Loan B or the due date for any amount payable with respect thereto, or decrease the rate of interest or reduce any fee payable by Borrowers to Term B Lenders pursuant to this Agreement; (iv) alter the definition of the terms "Required Term B Lenders" or "Required Lenders" or alter, amend or modify this Section 17.2(b); (v) make any change to the purchase option in Section 15.12 hereof; or (vi) cause any reduction in the principal, interest or fees payable in respect of the Term Loan B (except in connection with any waiver of the application of the Default Rate that applies to all of the Term Loans);

(C) all the Lenders, release during any calendar year any Collateral (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of the Materiality Threshold; or

(D) each Lender and Agent, change the rights and duties of Agent.

(c)     Any supplemental agreement entered into pursuant to this Section 17.2 shall apply equally to each Lender and shall be binding upon Borrowers, Lenders, and Agent and all future holders of the Obligations.  In the case of any waiver of any Event of Default, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the

subsequent Event of Default is the same as the Event of Default that was waived), or impair any right or remedy arising therefrom.

(d)     In the event that Agent requests the consent of a Lender pursuant to this Section and such consent is denied, then CSE may, at its option, require such Lender to assign its interest in the Term Loans to CSE or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to the then outstanding principal amount of that portion of the Term Loans owing to such Lender plus accrued and unpaid interest thereon and any fees then due such Lender, which interest and fees shall be paid when collected from Borrowers.  In the event CSE elects to require any Lender to assign its interest to CSE or to the Designated Lender, CSE will so notify such Lender in writing within forty-five (45) days following such Lender's denial, and such Lender will assign its interest to CSE or the Designated Lender no later than five (5) Business Days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, CSE or the Designated Lender, as appropriate, and Agent.

17.3.   Successors and Assigns; Participations; New Lenders{  TC "17.3.  Successors and Assigns; Participations; New Lenders" \f C \l "2" }.

(a)     This Agreement shall be binding upon and inure to the benefit of Borrowers, each Lender Party, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)     Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Term Loans to one or more Participants.  In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the Other Documents shall remain unchanged for all purposes, (b) the Borrowers and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and under the Other Documents, and (c) all amounts payable by Borrowers hereunder and under the Other Documents shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 17.2(b) expressly requiring the unanimous vote of all Lenders or, as applicable, all affected Lenders.  Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement that such Lender enters into with any Participant.  Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the same right of setoff pursuant to Section 12.4 hereof in respect to its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of setoff shall be subject to the provisions of Section 12.4 hereof and each Participant shall be obligated to share with the Lenders, and the Lenders agree to share with each Participant as provided in Section 12.4 hereof. Each Participant may exercise all rights of payment (including, without limitation, rights of set-off) with respect to the portion of the Term Loans in which a participation has been purchased by it as fully as if such Participant were the direct holder thereof, provided that Borrowers shall not

be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in such Term Loan to such Participant had such Lender retained such interest in such Term Loan, and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same portion of the Term Loans to both such Lender and such Participant.

(c)    Any Lender may sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to any Lender, any Affiliate of any Lender or an Approved Fund or, subject to subsection (d) below, with the consent (which shall not be unreasonably withheld, conditioned or delayed) of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers (reasonable grounds for withholding consent to include an assignee who would subject the Borrowers to the payment of materially greater costs of the types described in Sections 3.5 and 3.6 than Borrowers are otherwise then subject to paying) to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make or carry all or a portion of the Term Loans (each a "Purchasing Lender"), in minimum amounts of not less than Five Hundred Thousand Dollars ($500,000) (or, if such Lender's interest in the Term Loans is less than Five Hundred Thousand Dollars ($500,000), then such Lender may assign all of its interest), pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Borrowers' consent (if required) to any such sale, assignment or transfer shall be presumed unless Borrowers object thereto in writing, with reasonable detail for such objection included therein, within three (3) Business Days after Borrowing Representative receives a written request for such consent. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a notation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers hereby consent to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing, including, if requested by any Lender, the execution and delivery of one or more promissory notes in replacement of one or more existing Notes. As used herein, Approved Fund" shall mean any (i) investment company, hedge fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (i) and that, with respect to each of the preceding clauses (i) and (ii), is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) a Person (other than

a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.  Notwithstanding the foregoing, DMD may assign its interest in the Term Loan B to an Approved Fund or a Purchasing Lender without the consent of the Agent or Borrower, so long as DMD otherwise complies with this <u>Section 17.2(c)</u>.

(d)     Nothing contained herein shall limit in any way the right of any Lender (without notice to, or consent of, the Agent or any Borrower) to assign all or a portion of the Term Loans owing to it from time to time to (i) any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System or any Operating Circular issued by such Federal Reserve Bank, or (ii) to any other Person to whom such Lender is indebted from time to time (including, but not limited to, under any warehousing, securitization or overnight repurchase facility), as collateral security in respect thereof (such Persons described in <u>clauses (i)</u> and <u>(ii)</u> above herein called "<u>Lender Pledgees</u>"), but, no such assignment shall release the assigning Lender from its obligations hereunder.

(e)     Agent shall maintain at its address set forth in <u>Section 17.6</u> hereof a copy of each Commitment Transfer Supplement delivered to it and a register (the "<u>Register</u>") for the recordation of the names and addresses of the owners of the Term Loans from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of that portion of the Term Loans recorded therein for the purposes of this Agreement.  The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Agent shall receive a fee in the amount of not less than Three Thousand Five Hundred Dollars ($3,500) payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment to such Purchasing Lender, unless waived in writing by Agent.

(f)     Borrowers authorize each Lender to disclose to any transferee or Purchasing Lender and any prospective transferee or Purchasing Lender any and all financial information in such Lender's possession concerning Borrowers which has been delivered to such Lender by or on behalf of Borrowers pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrowers.

(g)     If, pursuant to this Section, any interest in this Agreement or any portion of the Term Loans or any Note is transferred to any transferee that is organized under the laws of any jurisdiction other than the United States of America or any State thereof, the transferor Lender shall cause such transferee, concurrently with the effectiveness of such transfer, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Agent and the Borrowers) that, under applicable law and treaties, no taxes will be required to be withheld by the Agent, the Borrowers or the transferor Lender with respect to any payments to be made to such transferee in respect of the Term Loans or Notes transferred, (ii) to furnish to the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrowers) two duly completed and signed copies of either U.S. Internal Revenue Service Form W-8 BEN or U.S. Internal Revenue Service Form W-8 ECI, or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities (wherein such transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments

hereunder), and (iii) to agree (for the benefit of the transferor Lender, the Agent and the Borrowers) to provide the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrower) new forms as contemplated hereby upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

17.4. <u>Application of Payments</u>{  TC "17.4.        Application of Payments" \f C \l "2" }.  Subject to <u>Section 2.3</u> and <u>Section 12.2</u>, Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause of action, then, to such extent, the Obligations or part thereof intended to be satisfied shall be reinstated and continue as if such payment or proceeds had not been received by Agent or such Lender.

17.5. <u>Indemnity</u>{  TC "17.5.        Indemnity" \f C \l "2" }.  Each Borrower jointly and severally shall indemnify Agent, each Lender, their respective Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "<u>Indemnified Persons</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house legal documentation, diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, the Existing Loan Agreement, this Agreement, any Other Document and/or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  If any Indemnified Person uses in-house counsel to provide legal services for which any Borrower is responsible to pay or indemnify, each Borrower expressly agrees that its indemnification obligations include the allocable costs of such in-house counsel.  Agent and each Lender agrees to give Borrowing Representative reasonable notice of any event of which Agent or such Lender becomes aware for which indemnification may be required under this <u>Section 17.5</u>, and Agent or such Lender may elect (but is not obligated) to direct the defense thereof, <u>provided</u> that the selection of counsel shall be subject to Borrowing Representative's consent, which consent shall not be unreasonably withheld or delayed.  Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.  Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "<u>Insured Event</u>"), Agent and each Lender agrees not to exercise its right to select

counsel to defend the event if that would cause any Borrower's insurer to deny coverage; provided, however, that Agent and each Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Borrower has paid to Lender pursuant to the indemnity set forth in this Section 17.5, then Agent or such Lender shall promptly pay to such Borrower the amount of such recovery.

17.6. Notice{ TC "17.6.    Notice" \f C \l "2" }. Any notice or request hereunder or under any of the Other Documents may be given to any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 17.6. Any notice or request hereunder shall be given by (a) hand delivery, (b) a nationally recognized overnight courier, (c) registered or certified mail, return receipt requested, or (d) telecopy to the number set forth below (or such other number as may hereafter be specified in a notice designated as a notice of change of address) with electronic confirmation of its receipt. Any notice or other communication required or permitted pursuant to this Agreement shall be deemed given (a) when personally delivered to any officer of the party to whom it is addressed, (b) on the earlier of actual receipt thereof or five (5) Business Days following posting thereof by certified or registered mail, postage prepaid, or (c) upon actual receipt thereof when sent by a recognized overnight delivery service or (d) upon actual receipt thereof when sent by telecopier to the number set forth below (or to such other number as has been furnished by a party to the others by like notice) or in any Commitment Transfer Supplement; with electronic confirmation of its receipt, in each case addressed to each party at its address set forth below (or at such other address as has been furnished in writing by a party to the others by like notice):

(A) If to Agent or to
CSE as Lender at:
        CapitalSource Finance LLC
4445 Willard Avenue
12th Floor
Chevy Chase, Maryland 20815
Attention:  Portfolio Manager/Business
Credit Services
Telecopier:     (301) 841-2889
E-mail:  mfidati@capitalsource.com

with a copy to:
        CapitalSource Finance LLC
4445 Willard Avenue
12th Floor
Chevy Chase, Maryland 20815
Attention: Joanne Fungaroli
Telecopier: (301) 841-2889
Email: jfungaroli@capitalsource.com

with a copy to:
        Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
Attention: Robert L. Harris, Esq.
Telecopier: (615) 244-6804
Email: robert.harris@wallerlaw.com

(B) If to a Lender other than Agent or CSE, as specified on the signature pages hereof

(C) If to Borrowing Representative
or any Borrower, at:
        Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Attention: Michael R. Lubin
Telecopier: (212) 319-4659
E-mail: mlubin@lexingtonprecision.com

with a copy to:
        [_____
_____
_____
Attention: _____
Telecopier: _____
E-mail: _____ ]

17.7.  <u>Survival</u>{ TC "17.7.  Survival" \f C \l "2" }.  The obligations of Borrowers under Sections 3.5, 3.6, 4.18(h), 17.5 and 17.9 shall survive any termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8.  Severability{ TC "17.8.        Severability" \f C \l "2" }.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

17.9.  Expenses{ TC "17.9. Expenses" \f C \l "2" }.  All costs and expenses incurred by Agent and/or its Affiliates (and each Lender, with respect to expenses incurred pursuant to clause (b) below or during any period that an Event of Default exists) including, without limitation, all costs and expenses, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), reasonable attorneys' fees and disbursements incurred by Agent (or any Lender with respect to expenses incurred pursuant to clause (b) below or during any period that an Event of Default exists): (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, (c) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement, the Notes or any Other Documents and/or any related agreement, document or instrument; or (d) arising in any way out of the administration of the Obligations or this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, or the taking or refraining from taking by Agent or any Lender of any action requested by any Borrower or (e) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (f) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's transactions with any Borrower, or (g) in connection with any advice given to Agent with respect to its rights and obligations under this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, may be charged to Borrowers' Account and shall be part of the Obligations.  If Agent or any of its Affiliates uses in-house counsel to provide legal services under this Agreement or any Other Document for which Borrowers are responsible to pay or indemnify, each Borrower expressly agrees that its Obligations include the reasonable allocable costs of such in-house counsel.

17.10.  Injunctive Relief{ TC "17.10.        Injunctive Relief" \f C \l "2" }.  Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lenders; and, accordingly, Agent, if Agent so requests, shall, to the extent permitted by applicable law, be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11.  <u>Consequential Damages</u>{  TC "17.11.          Consequential Damages" \f C \l "2" }.  No Lender Party, nor any agent or attorney for it, shall be liable to any Borrower, nor shall any Borrower, or any agent of attorney for it, be liable to any Lender Party, for consequential damages arising from any breach of contract, tort or other wrong relating to the execution, delivery or performance under this Agreement or any Other Document, the establishment, administration or collection of the Obligations or any related transaction.

17.12.  <u>Captions</u>{  TC "17.12.          Captions" \f C \l "2" }.  The captions at various places in this Agreement and any Other Document are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement or any Other Document.

17.13.  <u>Counterparts; Telecopied Signatures</u>{  TC "17.13.  Counterparts; Telecopied Signatures" \f C \l "2" }.  This Agreement and each Other Document may be executed in any number of separate counterparts and by different parties hereto in separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format shall be deemed to be an original signature hereto and each party agrees that it will be bound by its own facsimile signature or signature sent by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format and that it accepts the facsimile signature or signature by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format of each other party.

17.14.  <u>Construction</u>{  TC "17.14.     Construction" \f C \l "2" }.  The parties acknowledge that each party and its counsel have reviewed this Agreement and each Other Document and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and each Other Document or any amendments, schedules or exhibits thereto.

17.15.  <u>Confidentiality</u>{  TC "17.15. Confidentiality" \f C \l "2" }.  Each Lender Party shall hold all non-public information obtained by it pursuant to the requirements of this Agreement and each Other Document in accordance with such Lender Party's customary procedures for handling confidential information of this nature; <u>provided</u>, <u>however</u>, that each Lender Party may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel, rating agencies, collateral agents and other professional advisors, (b) to any Lender Party or to any prospective Lender Party, so long as such Lender Party or prospective Lender Party shall have been instructed in writing, and by acceptance of the information be deemed to have agreed, to treat such information as confidential in accordance with this <u>Section 17.15</u>, (c) to the Revolver Loan Agent and the Revolver Loan Lenders subject to the terms of the Intercreditor Agreement, and (d) as required by any Governmental Authority or representative thereof or pursuant to legal process; <u>provided</u>, <u>further</u> that (i) unless specifically prohibited by applicable law or court order, each Lender Party shall use its best efforts prior to disclosure thereof, to notify the Borrowing Representative of the applicable request for disclosure of such non-public information (A) by a Governmental Authority or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a transferee by such Governmental Authority) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender, or any other Lender Party be obligated to return any

materials furnished by any Borrower other than those documents and instruments in possession of any Lender Party in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.

17.16. <u>Publicity</u>{ TC "17.16.        Publicity" \f C \l "2" }.  Each Borrower hereby authorizes each Lender Party to make appropriate announcements of any financial arrangement entered into pursuant hereto, including, without limitation, announcements that are commonly known as "tombstones" in such publications and to such selected parties as such Lender Party shall deem appropriate, after consultation with Borrowing Representative.  Without limiting the foregoing, Borrowers authorize each Lender Party to utilize any logo or other distinctive symbol associated with the Borrowers in connection with any such announcement or any other promotion, advertising or marketing undertaken by it, after consultation with Borrowing Representative.  In no event, however, shall any Borrower use the name of any Lender Party or any logo or distinctive symbol associated with any of them, unless, as appropriate, such Lender Party has given its prior written consent thereto.

17.17. <u>Survival of Representations and Warranties</u>{ TC "17.17.   Survival of Representations and Warranties" \f C \l "2" }.  All representations and warranties of each Borrower contained in this Agreement and the Other Documents shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

17.18. <u>Destruction of Invoices</u>{ TC "17.18.Destruction of Invoices" \f C \l "2" }.  Borrowing Representative hereby authorizes and directs Agent, each Lender and each other Lender Party in accordance with its standard document retention policies in such regard to destroy all invoices, financial statements and other data provided from time to time by Borrowers pursuant hereto.

17.19. <u>Time</u>{ TC "17.19.    Time" \f C \l "2" }.  Time is of the essence in this Agreement and each Other Document.

17.20. <u>Release</u>. { TC "17.20.        Release" \f C \l "2" } Notwithstanding any other provision of this Agreement or any Other Document, each Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself,  its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "<u>Releasing Parties</u>"), hereby fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "<u>Released Parties</u>"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date.  Each Borrower acknowledges that the foregoing release is a material inducement to Agent's and each Lender's decision to extend to Borrowers the financial accommodations hereunder and has been relied upon by Agent and each Lender in agreeing to make the Term Loans and entering into this Agreement.

3631160.5

17.21.  Patriot Act{ TC "17.21.      Patriot Act" \f C \l "2" }.  The USA Patriot Act presently requires each Lender Party to obtain, verify and record information that identifies each Person that opens an account or applies for a loan or lease.  Borrowers agree to cooperate with each Lender Party in maintaining compliance with such law on an ongoing basis.  In addition to the foregoing, each Lender Party that is not incorporated under the Laws of the United States of America or a State thereof (and is not exempted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or a foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) at such other times as are required under the USA Patriot Act.

17.22.  Amendment and Restatement.

(a)      On the Closing Date, the Existing Loan Agreement shall be amended and restated in its entirety by this Agreement, and the Existing Loan Agreement shall thereafter be of no further force and effect, except to evidence (i) the incurrence by the Borrower of the "Obligations" under and as defined in the Existing Loan Agreement (whether or not such "Obligations" are contingent as of the Closing Date), (ii) the representations and warranties made by the Borrower prior to the Closing Date and (iii) any action or omission performed or required to be performed pursuant to such Existing Loan Agreement prior to the Closing Date (including any failure, prior to the Closing Date, to comply with the covenants contained in such Existing Loan Agreement).  The amendments and restatements set forth herein shall not cure any breach thereof or any "Default" or "Event of Default" under and as defined in the Existing Loan Agreement existing prior to the Closing Date.  This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Existing Loan Agreement or evidence payment of all or any portion of such obligations and liabilities.

(b)      The terms and conditions of this Agreement and the Agent's and the Lenders' rights and remedies under this Agreement and the Other Documents shall apply to all of the "Obligations" incurred under and as defined in the Existing Loan Agreement.

(c)      On and after the Closing Date, (i) all references to the Existing Loan Agreement in the Other Documents (other than this Agreement) shall be deemed to refer to the Existing Loan Agreement, as amended and restated hereby, (ii) all references to any Article, Section or sub-clause of the Existing Loan Agreement in any Other Document (other than this Agreement) shall be deemed to be references to the corresponding provisions of this Agreement and (iii) except as the context otherwise provides, on or after the Closing Date, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be references to the Existing Loan Agreement, as amended and restated hereby.

(d)      This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar and, except as expressly

provided herein or in any Other Document, all terms and conditions of the Other Documents remain in full force and effect unless otherwise specifically amended hereby or any other Other Document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF each of the parties hereto has signed this Agreement as of the day and year first above written.

"BORROWERS"

LEXINGTON PRECISION CORPORATION

By: _____
    Name: _____
    Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____
    Name: _____
    Title: _____

[SIGNATURE PAGE TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT]

"LENDER" and "AGENT"

CSE MORTGAGE LLC

By: _____
Name: _____
Title: _____

Term Loan A Commitment:            $[_____]

Term Loan A Commitment Percentage:      [100]%




"LENDER"

DMD SPECIAL SITUATIONS, LLC
By: CS Capital Advisors LLC, its manager

By: _____
Name: _____
Title: _____

Term Loan B Commitment:            $[_____]

Term Loan B Commitment Percentage:      [100]%




[SIGNATURE PAGE TO AMENDED AND RESTATED LOAN AND SECURITY
AGREEMENT]

List of Annexes, Exhibits and Schedules

**Annexes**

Annex One           Definitions

**Exhibits**

| | |
|---|---|
| Exhibit 9.1(d) | Secretary's Certificate |
| Exhibit 9.1(t) | Closing Certificate |
| Exhibit 10.6 | Compliance Certificate |
| Exhibit 17.3 | Commitment Transfer Supplement |

**Schedules**

| | |
|---|---|
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicting Agreements |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

DEFINITIONS

This Annex One is incorporated by reference into, and constitutes an integral part of, the Amended and Restated Loan and Security Agreement, dated as of [_____], 2010 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), made among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers; the Lenders identified therein as parties thereto; and CSE MORTGAGE LLC, as a Lender and as Agent for all Lenders.  The following terms shall have the following meanings as and when used in the Loan Agreement and the Other Documents.  References in such defined terms to "this Agreement," "hereof," "hereto" or the like, shall mean and refer to the Loan Agreement.

_____

"Annualization Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Accountants" shall have the meaning set forth in Section 10.6 hereof.

"Accounting Change" shall have the meaning set forth in Section 1.1 hereof.

"Affiliate," of any Person, shall mean (a) any Person that, directly or indirectly, is in Control of, is Controlled by, or is under common Control with such Person, or (b) any Person who is a shareholder, director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.

"Agent" shall have the meaning set forth in the preamble to this Agreement; and shall include the successors and assigns of any such Person.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Applicable Margins" shall mean, collectively, the Applicable Term A Margin and the Applicable Term B Margin.

"Applicable Term A Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 7.00%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)     if the Leverage Ratio is greater than 2.50x, then the Applicable Term A Margin shall equal 8.00%;

(b)     if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Term A Margin shall equal 7.50%;

(c)     if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Term A Margin shall equal 7.00%;

(d)     if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Term A Margin shall equal 6.00%; and

(e)     if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Term A Margin shall equal 5.50%.

"Applicable Term B Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 10.50%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)     if the Leverage Ratio is greater than 2.50x, then the Applicable Term B Margin shall equal 11.50%;

(b)     if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Term B Margin shall equal 11.00%;

(c)     if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Term B Margin shall equal 10.50%;

(d)     if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Term B Margin shall equal 9.50%; and

(e)     if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Term B Margin shall equal 9.00%.

"Applicable Rate" shall mean the Applicable Term Loan A Rate or the Applicable Term Loan B Rate, as applicable.

"Applicable Term Loan A Rate" shall mean, the sum of the LIBOR Rate plus the Applicable Term A Margin.

"Applicable Term Loan B Rate" shall mean, the sum of the Prime Rate plus the Applicable Term B Margin.

"Appraisal" shall mean an appraisal, conducted at Borrowers' expense, by an independent appraiser selected by, or acceptable to, Agent of the Borrowers' Real Property using a form, scope and methodology selected by, or acceptable to, Agent.

"Approved Fund" shall have the meaning given to such term in Section 17.3(c).

"Bankruptcy Code" shall mean Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq).

"Bankruptcy Court" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Benefited Party" shall have the meaning set forth in Section 12.4(b).

"Borrower" and "Borrowers" shall have the meanings set forth in the preamble to this Agreement; and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a consolidated basis" (or words of similar import) shall mean, as appropriate, the consolidation in accordance with GAAP of the accounts or other items of Borrowers and their respective Subsidiaries (if any).

"Borrowers' Account" shall have the meaning set forth in Section 2.4.

"Borrowing Representative" shall mean the Parent Company.

"Business Day" shall mean any day other than a day on which commercial banks in New York are authorized or required by law to close.

"Capital Expenditures" shall have the meaning set forth in Section 8.1.

"Capitalized Expenses" shall mean all fees, costs and expenses that have accrued and remain unpaid through the Closing Date, including, without limitation, the following: (i) pre-petition legal fees of the Lenders in an amount of $**[TBD]**, (ii) prepayment fee under the Existing Term Loan Facility in an amount of $**[TBD]**, (iii) the Lenders' financial advisor's fees, costs and expenses in the amount of $**[TBD]** and (iv) the Lenders' investment banker's success fee in an amount of $**[TBD]**.

"Capitalized Leases" shall have the meaning set forth in Section 8.1.

"Cash Collateral Order" shall mean that certain Cash Collateral Order entered on April 17, 2008 by the Bankruptcy Court relating to the Chapter 11 Cases, as has been amended or extended from time to time.

"Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of ninety (90) days or less issued, or directly and fully guaranteed or insured, by the United States of America or any agency or instrumentality thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of ninety (90) days or less issued by any financial institution that is a member of the Federal Reserve System and has combined capital, surplus and undivided profits of not less than $250,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of ninety (90) days or less issued by a corporation (except an Affiliate of any Borrower) organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital, surplus and undivided profits of not less than $250,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date of acquisition if the terms of such agreements comply with the guidelines set forth in the Federal

Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds that invest substantially all of their assets in securities of the types described in clauses (a) through (e) above.

"Cash Income Taxes" shall have the meaning set forth in Section 8.1.

"Cash Interest Expense" shall have the meaning set forth in Section 8.1.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in Section 7.1(a) hereof; (ii) the liquidation or dissolution of any Borrower or the adoption of a plan by the stockholders of any Borrower relating to the dissolution or liquidation of such Borrower, other than as permitted in Section 7.1(a) hereof; (iii) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Equity Interests of any Borrower; (iv) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of any Borrower (together with any new directors who have been appointed by, or whose nomination for election by the shareholders of such Borrower, as the case may be, was approved by, a vote of at least sixty-six and two-thirds percent (66 2/3%) of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of such Borrower; (v) the failure of Parent Company to own directly or indirectly one hundred percent (100%) of the voting power of the total outstanding Voting Equity Interests of LRG; or (vi) the failure of the Equity Sponsor to own directly or indirectly more than fifty percent (50%) of the voting power of the total outstanding Voting Equity Interests of Parent Company.

"Change of Management" shall mean that neither of the Principals is actively involved in the day-to-day executive management of each Borrower, whether by death, disability, retirement, termination of employment or otherwise, unless, (i) within 30 days thereafter, Borrowers shall have in place an interim Chief Executive Officer or similarly-titled member of executive management and (ii) within 120 days thereafter, Borrowers shall have retained successor executive management acceptable to the Required Lenders in their Credit Judgment in terms of qualifications, ability and experience (after which, their successor(s) in office shall be deemed "Principals" hereunder).

"Chapter 11 Cases" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales,

use, ad valorem, value added, transfer, franchise, profits, inventory, Equity Interests, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon any Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean the date on which all of the conditions precedent set forth in Section 9.1 hereof have been fully satisfied in the sole judgment of the Agent and Lenders (or otherwise waived by Lenders).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated thereunder.

"Collateral" shall mean and include all assets of each Borrower (subject only to the limitation on Equity Interests of each Foreign Subsidiary, if any, set forth in subsection (f) below), including, without limitation, all of the following assets, but shall exclude any Excluded Equipment as long as it is Excluded Equipment:

(a)     all Receivables;

(b)     all Equipment;

(c)     all General Intangibles;

(d)     all Inventory;

(e)     all Contract Rights;

(f)     all Equity Interests of each Domestic Subsidiary (if any), and sixty-five percent (65%) of the Equity Interests of each Foreign Subsidiary (if any);

(g)     all Securities;

(h)     all Leasehold Interests;

(i)     all Commercial Tort Claims;

(j)     all of each Borrower's right, title and interest in and to (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) all other property, including warranty claims, relating to any goods securing this Agreement; (v) all of each Borrower's contract rights, rights of payment that have been earned under a contract right, instruments, investment property, documents, chattel paper, warehouse receipts, deposit accounts, money and securities; (vi) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (vii) all supporting obligations that

secure payment or performance of any account, chattel paper, document, general intangible, instrument or investment property; (viii) all letter-of-credit rights; (ix) Extraordinary Receipts; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder or under the Other Documents, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(k)     all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to clauses (a) through (j) of this definition; and

(l)     all proceeds and products of the Collateral described in clauses (a) through (k) of this definition, in whatever form, including, but not limited to:  cash, Deposit Accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and Commercial Tort Claim proceeds.

The term "Collateral" shall also extend to and include all Real Property Collateral.

"Collateral Locations" shall have the meaning assigned to such term in Section 4.5.

"Commercial Tort Claim" shall have the meaning given to such term in Article 9 of the UCC and shall include, without limitation, any claim of any Borrower arising in tort and specified on Schedule 5.8.

"Commitment" or "Commitments" shall mean, individually or collectively, the Term Loan A Commitment(s) and Term Loan B Commitments of each Lender, or all Lenders, as the case may be.

"Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Commitment bears to the total Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent, pursuant to which, among other things, a Purchasing Lender shall purchase and assume all or a portion of the obligation of a Lender to make and carry the Term Loans under this Agreement.

"Confirmation Order" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and other third parties,

domestic or foreign, (i) necessary to carry on any Borrower's business, including, without limitation, any consents required under all applicable federal, state or other applicable law, and (ii) required to effectuate the transactions and agreements contemplated in this Agreement and the Other Documents.

"Consolidated Net Income" shall have the meaning given to such term in Section 8.1 hereof.

"Contract Rights" shall mean all rights of each Borrower arising under or in connection with any contract, to the extent that such Borrower may grant a security interest in such rights under such contract, either by the terms of such contract or pursuant to the applicable provisions of Article 9 of the UCC, notwithstanding the terms of such contract, or otherwise. "Contract Rights" shall include, without limitation, all rights of each Borrower under all license agreements to which it is party as licensor or licensee and all letter-of-credit rights of each Borrower.

"Control" shall mean the power, whether direct or indirect, (i) to vote ten percent (10%) of more of the Voting Equity Interests of a Person, or (ii) to direct, or cause the direction of, the management and/or policies of a Person, whether by contract or otherwise.

"Controlled Group" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Credit Judgment" shall mean the credit judgment of Agent, Required Lenders, Required Term A Lenders, Required Term B Lenders or all Lenders, as the case may be, exercised by it (or them) in good faith and in a commercially reasonable manner from the perspective of a senior secured lender making loans of similar type and size to similar borrowers.

"CSE" shall have the meaning given to such term in the initial recitals to this Agreement.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Default" shall mean an event which, with the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean two percent (2%) per annum over the otherwise Applicable Rate then and from time to time thereafter in effect.

"Deferred Interest" shall have the meaning set forth in Section 8.1 hereof.

"Deposit Account" shall mean any checking account, savings account, time deposit account, certificate of deposit, investment account or other account (howsoever

denominated), in which from time to time any cash or Securities of any Borrower is or may be deposited.

"<u>Deposit Account Control Agreement</u>" shall mean an agreement, in form and substance satisfactory to Agent in its sole discretion, which provides Agent with "control" (within the meaning of the UCC) over, and a first priority, perfected Lien on, each account of each Borrower and all assets of such Borrower from time to time on deposit or otherwise credited to such Deposit Account.

"<u>Designated Lender</u>" shall have the meaning set forth in <u>Section 17.2(d)</u> hereof.

"<u>Designated Officer</u>" shall mean the chairman, president, chief executive officer, chief financial officer or chief operating officer of a Borrower (regardless of title), or such other officer, agent or representative of a Borrower that Agent may, at such Borrower's request, permit to be a "Designated Officer" from time to time.

"<u>Determination Date</u>" shall have the mean set forth in <u>Section 3.4(a)</u> hereof.

"<u>DMD</u>" shall mean DMD Special Situations, LLC, a Delaware limited liability company.

"<u>Dollar</u>" and the sign "<u>$</u>" shall mean lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" shall mean a Subsidiary organized under the laws of the United States or any political subdivision thereof.

"<u>EBITDA</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>Environmental Authority</u>" shall have the meaning set forth in <u>Section 4.18(d)</u> hereof.

"<u>Environmental Complaint</u>" shall have the meaning set forth in <u>Section 4.18(d)</u> hereof.

"<u>Environmental Laws</u>" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"<u>Equipment</u>" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, motor vehicles, fittings, furniture, furnishings, fixtures, molds, discs, tools, stamps, parts, accessories and all replacements and substitutions therefor or accessions thereto, and all software embedded therein.

"Equity Interests" shall mean: (i) in the case of a corporation, all capital stock, including common and preferred stock and warrants to acquire capital stock; (ii) in the case of a partnership, all partnership interests therein, including special, limited and general interests; (iii) in the case of a limited liability company, all membership interests therein; and (iv) in the case of any other entity, all interests evidencing equity ownership therein.

"Equity Investment" **[shall mean the cash contribution by the Equity Sponsor to one or more of the Borrowers made on the Closing Date in an amount not less than [$9,700,000], plus the amount of any cash fees paid to investors in connection with such transaction, in exchange for Equity Interests in one or more of the Borrowers, in each case upon the terms of the Reorganization Plan and for the purpose of partially funding the costs and expenses of the Borrowers' exit from bankruptcy.]**

"Equity Sponsor" shall mean Aurora Resurgence Management Partners LLC, a Delaware limited liability company, or an Affiliate thereof, including Commercial Financial Services 407, LLC, a Delaware limited liability company.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan for which the reporting requirements have not been waived in writing; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of its respective Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable; (f) a complete or partial withdrawal by any Borrower or any member of the Controlled Group from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the imposition of any liability under Title IV of ERISA, other than Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any member of the Controlled Group in excess of the Materiality Threshold; and (j) any other event of condition with respect to a Plan, including any Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate, that could reasonably be expected to result in liability of any Borrower in excess of the Materiality Threshold.

"Event of Default" shall mean the occurrence and continuance of any of the events set forth in Article XI hereof.

"Excess Cash Flow" shall mean, for any fiscal year, without duplication, an amount equal to the sum of (i) Consolidated Net Income (or loss) of Borrowers for such period, plus (ii) an amount equal to the amount of depreciation expenses, amortization expense (including the amortization of goodwill), accrued non-cash interest expense and all other non-cash charges deducted in arriving at such Consolidated Net Income (or loss), plus (iii) an amount equal to the aggregate net cash proceeds of the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent not required to be applied to mandatory prepayments or payments on the Revolver Loans or the Term Loans and not reinvested in new Equipment or Real Property pursuant to Section 2.3 hereof, plus (iv) an amount equal to the net loss on the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent deducted in arriving at such Consolidated Net Income (or loss), plus (v) an amount equal to 50% of the aggregate management fees paid to the Equity Sponsor during such period, plus (vi) without duplication of other items included in this definition an amount equal to any tax refunds or credits received by Borrowers during such period, less (vii) an amount equal to the permitted Capital Expenditures of Borrowers for such period, less (viii) an amount equal to the sum of all regularly scheduled payments of principal on Indebtedness for money borrowed of Borrower (other than with respect to payments of the Term Loans) actually made during such period to the extent permitted hereunder, less (ix) an amount equal to the net gain on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent included in arriving at such consolidated net income or loss.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Deposit Account" shall mean any Deposit Account of Borrowers that is (i) a Payroll Account or (ii) a Deposit Account (other than any in which proceeds of Collateral are at any time deposited) in which collected funds on deposit, determined on any date on a daily average basis over the immediately preceding thirty (30) days, is less than Ten Thousand Dollars ($10,000) or, when aggregated with all other such Deposit Accounts, Twenty-Five Thousand Dollars ($25,000).

"Excluded Equipment" shall mean any Equipment (or proceeds thereof) that is or becomes subject to a Lien (including pursuant to Capitalized Leases) permitted under subsections (e) or (m) of Section 7.2, if the valid grant of a Lien thereon to Agent is prohibited by the terms of the agreement between any Borrower and the holder of such Lien or under applicable law, and such prohibition has not been or is not waived, or the consent of the holder such other Lien has not been or is not otherwise obtained (it being understood that Borrowers shall have no obligation whatsoever to any Lender Party to obtain such consent), or under applicable law such prohibition cannot be waived and, notwithstanding anything to the contrary set forth in the definition of "Collateral", the types or items of Collateral described in such definition shall not include Excluded Equipment, so long as the prohibition set forth in such agreement or applicable law remains effective. For example, but without limitation, if pursuant to any Capitalized Lease, the valid grant of a Lien thereon to Agent in the Equipment leased thereunder is prohibited, the Lien of Agent thereon shall be reinstated upon termination of such Capitalized Lease, and such Equipment shall no longer be considered Excluded Equipment.

"Excluded Equity Interests" shall mean any Equity Interests that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures or is required to be prepaid, repurchased, reacquired or defeased, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (b) is convertible into or exchangeable or exercisable for (i) debt securities or other Indebtedness or (ii) other Excluded Equity Interests, in each case at any time on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (c) contains any repurchase obligation that may come into effect prior to the indefeasibly payment in full in cash of all Obligations, in each case, unless the holders of such Equity Interests expressly enter into, and deliver to Agent, a Subordination Agreement in form and substance satisfactory to Agent, (d) requires any payment of cash dividends or any other distributions, in each case, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash or (e) is guaranteed by, or secured by any Property of, any Borrower or any of its Subsidiaries.

"Existing Loan Agreement" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Revolver Loan Facility" shall mean the term loan and revolving credit facility under that certain Credit and Security Agreement, dated as of May 31, 2006, as may have been amended, restated, supplemented or otherwise modified through the Closing Date, among the Borrowers, Revolver Loan Lenders and Revolver Loan Agent.

"Existing Term Loan Facility" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Extraordinary Receipts" shall mean any cash received by a Borrower or any of its Subsidiaries not in the ordinary course of business from the following, (a) proceeds of insurance in respect of the Collateral, (b) condemnation awards (and payments in lieu thereof) in respect of the Collateral, (c) indemnity payments, (d) foreign, United States, state or local tax refunds, (e) pension plan reversions and (f) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action in respect of the Collateral.

"Financial Covenants" shall mean the financial covenants set forth in Article VIII.

[**"First Merit Blocked Account Agreement"** shall mean the Deposit Account Control Agreement, dated the Closing Date, among the Borrowers, First Merit Bank, N.A., and the Agent, as the same may be amended in accordance with its terms.]

"Fiscal Year" shall mean Borrowers' fiscal year as in effect on the Closing Date; and the terms "Fiscal Quarter" and "Fiscal Month" shall have correlative meanings.

"Fixed Charge Coverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Fixed Charges" shall have the meaning set forth in Section 8.1 hereof.

"Foreign Subsidiary" shall mean any Subsidiary of a Borrower which is not a Domestic Subsidiary.

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations for borrowed money, whether current or long-term (including, without limitation, the Obligations and the Subordinated Debt) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all purchase money Indebtedness;

(c)     the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(d)     the maximum amount available to be drawn under letters of credit (including, without limitation, standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)     all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(f)     all Indebtedness in respect of Capital Leases;

(g)     all preferred stock or other Equity Interests providing for mandatory redemptions, sinking fund or like payments prior to the end of the Term;

(h)     all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(i)     all guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination consistently applied, except that, for purposes of the Financial Covenants, GAAP shall be determined on the basis of such principles used in the preparation of the most recent audited financial statements delivered to Agent prior to the Closing Date.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trade names, service marks, trade secrets, goodwill, copyrights, design rights, registrations, licenses, license fees, franchises, customer lists, tax refunds, tax refund claims, pension fund refunds, pension fund refund claims, overpayments, overpayment claims, reclamation rights, computer programs, software, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer, all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governing Body" shall have the meaning set forth in Section 6.10 hereof.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person (other than a Borrower) who may hereafter guarantee payment or performance of the whole or any part of the Obligations. "Guarantors" means, collectively, all such Persons. On the Closing Date, there are no Guarantors, except for each Borrower as to the other Borrower.

"Guaranty" shall mean any guaranty of the Obligations of Borrowers, in whole or in part, executed at any time by a Guarantor in favor of Agent for the ratable benefit of Lenders and the other Lender Parties, as applicable.

"Hazardous Discharge" shall have the meaning set forth in Section 4.18(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws relating to hazardous waste disposal now in force or hereafter enacted.

"Hedge Contract" shall mean any "hedge," "swap," "collar," "cap" or similar agreement between a Borrower and any other financial institution, including, but not limited to, any Lender Party or Affiliate of a Lender Party, intended to fix the relative amount of such Borrower's risk in respect of changes in interest rates, foreign currency exchange and commodity values.

"Historical Financial Statements" shall have the meaning set forth in Section 5.4(a) hereof.

"Indebtedness" shall mean, with respect to any Person (without duplication), any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments, including (for avoidance of doubt) Subordinated Debt; (b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person in connection with obtaining goods, materials or services that is not overdue by more than ninety (90) days, unless the trade payable is being contested in good faith); (c) all obligations as lessee under leases that have been, or should be in accordance with GAAP, recorded as Capitalized Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations in respect of any Equity Interests issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person that is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under any Hedge Contracts; (i) all obligations owed by such Person under license agreements with respect to non-refundable, advance or minimum guaranteed royalty payments; and (j) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

"Indemnified Persons" shall have the meaning given to such term in Section 17.5.

"Independent Director" shall mean a member of the Board of Directors of any Borrower who shall not have been at the time of such Person's appointment or at any time during the preceding five (5) years, and shall not be as long as such Person is a director of any Borrower, a director, officer, employee, partner, member, manager, Affiliate or holder of any Equity Interests of any Independent Parties.

"Independent Parties" shall mean any of the following Persons: the Accountants or any other outside auditor, attorney or consultant of any Borrower, or any of their Subsidiaries or Affiliates, (ii) a supplier to any Borrower or any of the Independent Parties, (iii) a Person Controlling or under common Control with any partner, member, manager, Affiliate, supplier or

holder of any Equity Interests of any Borrower or any of the Independent Parties, or (iv) a member of the immediate family of any director, officer, employee, partner, member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties.

"Initial Borrowers" shall have the meaning set forth in the preamble to this Agreement.

"Initial Projections" shall have the meaning given to such term in Section 5.4(b).

"Insurance Premium Collateral" shall mean, collectively, (a) any insurance policies of Borrowers for which an Insurance Premium Finance Party has entered into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum, and (b) any loss proceeds paid or payable to a Borrower pursuant to such insurance policies (to the extent of the amount owed to such Insurance Premium Finance Party), provided, however, that, (i) in no event shall the Insurance Premium Collateral include any amounts deposited in or received in any Deposit Account that is subject to a Deposit Account Control Agreement established by Borrowers in connection herewith or otherwise with respect to Borrowers' financing arrangements with Agent and Lenders for the handling of collections of Receivables or other assets and (ii) in no event shall the Insurance Premium Collateral of any Insurance Premium Finance Party secure any obligation to any other Insurance Premium Finance Party.

"Insurance Premium Finance Party" shall mean, in connection with insurance policies maintained by Borrowers, an insurance company or a third party that enters into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum.

"Insured Event" shall have the meaning set forth in Section 17.5 hereof.

"Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated of even date herewith, by and between Agent and Revolver Loan Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Expense" shall have the meaning set forth in Section 8.1.

"Inventory" shall mean and include, as to each Borrower, all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them. The term "Inventory," as used herein, shall further extend to and include, as applicable to any Borrower, any and all farm products.

"IRS" shall mean the Internal Revenue Service of the United States Treasury, and any successor thereto.

"Junior Lien Facility" shall mean the secured subordinated credit facility, subject to a Subordination Agreement, evidenced by the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related agreements, documents, instruments and certificates, which provides the borrowers thereunder with a loan in a maximum aggregate principal amount of up to $3,000,000.

"Junior Lien Facility Credit Agreement" shall mean that certain Credit Agreement, dated as of [_____], 2010, between the Equity Sponsor and one or more of the Borrowers, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Documents" shall mean the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related documents, instruments, agreements and certificates, each as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Lender" shall mean the Equity Sponsor in its capacity as the holder of the Indebtedness evidenced by the Junior Lien Facility Subordinated Note.

"Junior Lien Facility Subordinated Note" shall mean the [__]% Junior Subordinated Note due [_____], 201[_], issued by [_____] in favor of the Junior Lien Facility Lender, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Leasehold Interests" shall mean all of each Borrower's right, title and interest in and to any Real Property owned by a Person other than Borrower, whether as tenant, lessee, licensee, operator or otherwise.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person that becomes a transferee, successor or assignee of any Lender pursuant to Section 17.3(c).

"Lender Party" shall mean Agent, each Lender, any Purchasing Lender, any Participant and any Lender Pledgee, together with each other holder from time to time of any interest in any of the Obligations.

"Lender Pledgee" shall have the meaning set forth in Section 17.3(d) hereof.

"Lender Representative" shall have the meaning set forth in Section 6.10 hereof.

"Leverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"LIBOR Rate" shall mean the greater of (i) two and one-half percent (2.5%) per annum or (ii) a fluctuating rate of interest per annum determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the one-month London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day. If for any reason such rate is not available,

"LIBOR Rate" shall mean the greater of (a) two and one-half percent (2.5%) per annum or (b) the fluctuating rate of interest per annum calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen Page LIBO Page as the one-month London interbank offered rate for deposits in U.S Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR Rate" shall mean the greater of (x) two and one-half percent (2.5%) per annum or (y) a fluctuating rate of interest per annum from a comparable rate quotation designated by Agent as a substitute therefore. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Enforcement Action" means (a) the taking of any action to enforce or realize upon any Lien, (b) the exercise of any right or remedy provided to a secured creditor on account of a Lien under any of the Loan Documents or under applicable law, including the election to retain any Collateral in satisfaction of a Lien, (c) the taking of any action or the exercise of any right or remedy in respect of the collection on, set off against, marshaling of, or foreclosure on the Collateral (including, without limitation, the notification of account debtors), (d) the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale or any other means permissible under applicable law, (e) the exercise of any other right of a secured creditor under Part 6 of Article 9 of the UCC, and (f) the commencement of any legal proceedings against any Borrower or with respect to any Collateral for any relief described in clauses (a) through (e) above.  This definition shall not include (1) the filing of a lawsuit by any Lender solely to collect its debt (but does include any action or proceeding to enforce or realize upon a judgment Lien), (2) subject to Sections 12.1(b) and 15.12, the receipt of payments of principal or of interest or other obligations arising under the Loan Documents made in accordance with the terms of the Loan Documents, (3) the receipt of any payment or distribution under or pursuant to a plan of reorganization confirmed in a case under the Bankruptcy Code in accordance with the provisions of this Agreement, (4) except as otherwise expressly set forth in this Agreement, the exercise of any right or remedy available to a creditor or a secured creditor in any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code (including, without limitation, filing proofs of claims and defending any actions filed against such creditor in any such proceeding), or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, or proceedings seeking reorganization, arrangement, or other relief, or in any other dissolution or liquidation proceeding, (5) the acceleration of any loan, or

(6) the filing or participation in the filing of an involuntary bankruptcy petition against any Borrower.

"Liquidity" shall have the meaning given to such term in Section 8.1 hereof.

"Loan Documents" shall mean, collectively, this Agreement and the Other Documents.

"LPC" shall have the meaning given to such term in the initial recitals to this Agreement.

"LRG" shall have the meaning given to such term in the initial recitals to this Agreement.

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, business operations, assets or business prospects of the Borrowers, considered as a whole, (b) Borrowers' ability to pay the Obligations in accordance with the terms hereof and of the Other Documents, (c) the value of the Collateral, considered as a whole, or Agent's Liens on the Collateral, or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents, considered as a whole.

"Material Agreements" shall mean and include, in the case of each Borrower, the following: (i) any lease of Real Property material to the operation of a Borrower's business that involves annual payments by a Borrower in excess of the Materiality Threshold, (ii) any lease of personal property by a Borrower having aggregate annual rentals in excess of the Materiality Threshold, (iii) any license agreement for the use of any intellectual property material and necessary for the operation of its business, (iv) the Revolver Loan Agreement, the Revolver Loan Lender Agreements, the Junior Lien Facility Documents, any Subordination Agreement and any other document, instrument or agreement evidencing, pertaining to, subordinating or securing the payment of, any Indebtedness in excess of the Materiality Threshold, (v) any labor or union contract, (vi) any employment contracts (more than 12 months) with executive officers of Borrowers, (vii) any long-term purchase or supply contracts (more than 12 months) involving annual sales or purchases in excess of Two Million Dollars ($2,000,000), (viii) any Organic Document, and (ix) any other document, contract or agreement the termination of which (without its substantially contemporaneous replacement) could reasonably be expected to have a Material Adverse Effect.

"Material Intellectual Property" shall have the meaning given to such term in Section 5.12 hereof.

"Materiality Threshold" shall mean Two Hundred Fifty Thousand Dollars ($250,000).

"Mortgage" shall mean each mortgage, deed of trust, security deed, assignment of leasehold interest or rents, or similar document pursuant to which a Borrower shall grant to or for the benefit of Agent a Lien on the Real Property Collateral, together with all modifications, supplements, replacements, restatements, and amendments thereof.

"<u>Multiemployer Plan</u>" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>" shall mean, with respect to any sale or other disposition of any asset or the sale or issuance of any Indebtedness, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person in connection with such transaction after deducting therefrom only (without duplication) (a) reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, accountant's fees, investment banking fees, finder's fees, other similar fees and commissions and reasonable out-of-pocket expenses, (b) the amount of taxes reasonably estimated by such Person to be actually and reasonably attributable to such transaction, (c) the amount of any Indebtedness secured by a security interest, lien or other encumbrance (other than a security interest or other Lien created hereunder or pursuant hereto) on such asset that, by the terms of such transaction, is required to be repaid upon such disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any Affiliate of any Borrower and, in each case, are properly attributable to such transaction or to the asset that is the subject thereof.

"<u>Net Senior Debt</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>Non-Real Property Collateral</u>" shall mean all Collateral, other than the Real Property Collateral.

"<u>Note</u>" shall mean each promissory note (if any) at any time evidencing any other portion of the Obligations.  "<u>Notes</u>" shall refer, collectively, thereto.

"<u>Obligations</u>" shall mean and include any and all of each Borrower's Indebtedness, obligations and/or liabilities to Agent and each Lender Party (or any corporation that directly or indirectly Controls or is Controlled by or is under common Control with Agent or any Lender Party) of every kind, nature and description, whether direct or indirect, secured or unsecured, joint, several, joint and several, absolute or contingent, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such Indebtedness, obligations or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and including, but not limited to, any and all of any Borrower's Indebtedness, obligations and/or liabilities under this Agreement, the Other Documents, or under any other agreement between any Lender Party and any Borrower, all amounts charged to Borrowers' Account, and all obligations of any Borrower to each Lender Party to perform acts or refrain from taking any action.  Without limitation of the foregoing, the term "<u>Obligations</u>" extends to and includes the Term Loan A and the Term Loan B, all accrued (but unpaid) interest thereon and all fees payable hereunder and under any Other Documents.

"<u>OFAC</u>" shall mean the U.S. Department of the Treasury Office of Foreign Assets Control, and its successors.

"Organic Documents" shall mean: (i) for a corporation, its articles (or certificate) of incorporation and bylaws; (ii) for a partnership, its articles of organization (if any) and partnership agreement; and (ii) for a limited liability company, its articles (or certificate) of organization and any operating agreement; together with, for each such entity and any other entity not described above, such other, similar documents as are integral to its formation or the conduct of its business operations.

"Other Documents" shall mean the Notes, the Mortgages, any UCC financing statement, any Deposit Account Control Agreements (including, without limitation, the [First Merit Blocked Account Agreement]), the Pledge Agreement and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Borrower and delivered to Agent or any Lender Party in respect of the transactions contemplated by this Agreement.

"Parent Company" shall have the meaning given to such term in the initial recitals to this Agreement.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any Term Loan in accordance with Section 17.3(b) hereof.

"Payment Office" shall mean, initially, the office of the Agent located at 4445 Willard Avenue, 12th Floor, Chevy Chase, Maryland 20815; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Representative and to each Lender to be the Payment Office.

"Payroll Account" shall mean any one or more deposit, custody or other accounts maintained by any Borrower with a bank or other institution if such account is used solely to deposit funds that are to be applied to the payment of wages and other compensation payable to employees of any Borrower and any withholding, social security, payroll, unemployment or other taxes relating thereto, imposed by any federal, state, county or local government or a subdivision or agency thereof, including any charges, fees, assessments, interest, penalties or additions payable in connection with any of the foregoing or which are to be applied, to the extent of amounts withheld or deducted from compensation payable to any employee of any Borrower, to the payment of health insurance or other benefits generally provided to employees of any Borrower.

"PBGC" shall mean the Pension Benefit Guaranty Corporation, and any successor thereto.

"Perfection Certificate" shall mean, collectively, the Perfection Certificate for each Borrower executed by such Borrower and delivered to Agent on the Closing Date.

"Permitted Encumbrances" shall have the meaning set forth in Section 7.2 hereof.

"Permitted Hedge Contracts" shall mean any Hedge Contracts entered into in the ordinary course of, and pursuant to the reasonable requirements of Agent, Borrowers' business, and not for speculative purposes.

3631160.5

"Permitted Holders" shall mean the following Persons and their respective Affiliates: the Equity Sponsor, William B. Conner, Michael A. Lubin, Warren Delano and William Shulvitz.

"Permitted PP&E Dispositions" shall mean: the sale or other disposition of Equipment no longer used or useful in the business of any Borrower, so long as (i) no Event of Default then exists, and none otherwise would be caused thereby, (ii) Agent shall have received at least one (1) Business Day advance notice thereof if the sale or other disposition exceeds Twenty-Five Thousand Dollars ($25,000) and (iii) such sales or other dispositions do not involve Equipment having an aggregate fair market value in excess of the Materiality Threshold for all such Equipment which is the subject of sales or other dispositions in any one Fiscal Year, except as the Required Lenders otherwise may agree.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of Borrowers or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreement" shall mean the Pledge Agreement dated as of May 31, 2006, by the undersigned thereto, in favor of Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Prime Rate" shall mean the greater of (i) five percent (5.0%) per annum or (ii) a fluctuating per annum rate of interest equal at all times to the rate of interest announced publicly from time to time by Citibank, N.A. as its base rate; provided, that such rate is not necessarily the best rate offered to its customers and, should Agent be unable to determine such rate, such other indication of the prevailing prime rate of interest as reasonably may be chosen by Agent; provided, further, that each change in the fluctuating rate of interest shall take effect simultaneously with the corresponding change in the Prime Rate.

"Principals" shall mean Michael A. Lubin and Warren Delano or each of their permitted successors pursuant to the terms and conditions herein; each, individually.

"Projections" shall have the meaning set forth in Section 10.8 hereof.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Equity Interests.

"Provision for Taxes" shall mean with respect to any Person for any period, the provision of taxes on the net income of such Person, whether federal, state, provincial, county or local, foreign or domestic, that is required to be made on the income statement of such Person for such period in accordance with GAAP.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to its owned and leased premises, including, particularly, any real property identified on Schedule 5.24 hereto, but shall exclude the real property located at 202 Winchester Road, Lakewood, New York. The term "Real Property" specifically includes Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold in addition to Real Property owned by Borrowers, or a Borrower, in fee simple.

"Real Property Collateral" shall mean that portion of Borrowers' Real Property that at any time is owned by a Borrower in fee simple (if any).

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrowers by their respective Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances (including payment intangibles), and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Releases" shall have the meaning set forth in Section 5.6(c)(i) hereof.

"Released Parties" shall have the meaning set forth in Section 17.20 hereof.

"Releasing Parties" shall have the meaning set forth in Section 17.20 hereof.

"Reorganization Plan" shall have the meaning set forth in the "Statement of the Transaction" section hereto.

"Reportable Event" shall mean a reportable event described in Section 4043(b) of ERISA and/or in the regulations promulgated thereunder.

"Required Lenders" shall mean the Required Term A Lenders and the Required Term B Lenders, provided that after the repayment in full of either the Term Loan A or Term Loan B, "Required Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the then outstanding Term Loans.

"Required Term A Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Term Loan A.

"Required Term B Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Term Loan B.

"Restricted Payment" shall mean and include any payment described in the proviso to Section 7.13.

"Restricted Payment Conditions," with respect to any Restricted Payment, shall mean the following conditions: (i) no Event of Default shall have occurred and be continuing as of the payment date, and none would be caused by or result from such payment being made; (ii) on a pro forma basis, after giving effect to such payment as if made in the last Fiscal Month for which Borrowers have reported financial statements pursuant to Section 10.7, Borrowers shall remain in compliance with all applicable Financial Covenants; and (iii) Agent shall have received at least three (3) Business Days' advance written notice of Borrowers' intent to make such payment, specifying the amount thereof, the payee (if known) and the purpose, and at such time a Designated Officer of the Borrowing Representative shall have certified in writing to Agent Borrowers' compliance with clauses (i) through (ii) above, showing appropriate computations.

"Revolver Loan Agent" shall mean CapitalSource Finance LLC and its successors and assigns.

"Revolver Loan Agreement" shall mean the Amended and Restated Credit and Security Agreement, dated of even date herewith, by and among Revolver Loan Agent, Revolver Loan Lenders and Borrowers, as may be amended, amended and restated, supplemented or otherwise modified from time to time subject to the provisions of the Intercreditor Agreement.

"Revolver Loan Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Revolver Loan Agent or any Revolver Loan Lender, including, without limitation, principal, interest, charges, fees, premiums, indemnities, costs and expenses, however, evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolver Loan Lender Agreements.

"Revolver Loan Lender Agreements" shall mean, collectively, the following (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Revolver Loan Agreement; (b) all "Other Documents" (as defined therein) at any time executed and delivered by any Borrower with, to or in favor of Revolver Loan Agent or any Revolver Loan Lender pursuant to the Revolver Loan Agreement; sometimes being referred to herein individually as a "Revolver Loan Lender Agreement".

"Revolver Loan Lenders" shall mean, collectively, CapitalSource Finance LLC, in its individual capacity and any other lenders who are from time to time parties to the Revolver Loan Agreement as lenders, and their respective successors and assigns; each sometimes being referred to herein individually as a "Revolver Loan Lender".

"Revolver Loans" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Revolver Loan Agent or any Revolver Loan Lender (including, without limitation, the Equipment Term Loan, the Revolving Credit

Advances and any Letters of Credit, each as such term is defined in the Revolver Loan Agreement), including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolver Loan Lender Agreements.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on any list thereof maintained by OFAC, as published from time to time.

"Sanctioned Person" shall mean any Person (i) named on any list of "Specifically Designated Nationals," "Blocked Persons," "Specifically Designated Terrorists," "Specially Designated Narcotics Traffickers" or "Foreign Terrorist Organizations" maintained by OFAC, as published from time to time; (ii) that is (A) an agent of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Securities" shall mean and include, as to each Borrower, all securities (whether certificated or uncertificated) and other investment property owned by such Borrower, whether now existing or hereafter created, including any held by any intermediary in any "street" name, pursuant to any custody arrangement or otherwise. The term "Securities" specifically includes all securities accounts, security entitlements, commodity contracts and commodity accounts.

"Standstill Period" shall have the meaning set forth in Section 12.1(b).

"Subordinated Debt" shall mean any Indebtedness of the Borrowers incurred after the Closing Date (including, without limitation, any Indebtedness related to the Junior Lien Facility), provided that (i) such Indebtedness is made expressly subordinate and subject in right and time of payment to the all Obligations pursuant to a Subordination Agreement, in form and substance satisfactory to Agent; (ii) any Liens and rights of any kind such subordinated lender may have or thereafter acquire against any Borrower with respect to such Indebtedness shall not be asserted in any manner until ninety (90) days after all of the Obligations have been indefeasibly paid in full in cash; (iii) any interest accruing with respect to such subordinated Indebtedness shall be only payable-in-kind until all Obligations have been indefeasibly paid in full in cash; (iv) such subordinated Indebtedness shall have a final maturity occurring no sooner than, or a weighted average life less than, the date that is six (6) calendar months following the expiration of the Term; and (v) Agent provides prior written consent to such subordinated Indebtedness (provided, that no prior written consent of Agent shall be required for Indebtedness under the Junior Lien Facility as permitted in Section 7.3(e) hereof).

"Subordination Agreement" shall mean an agreement, satisfactory in form and substance to Agent, in its sole discretion, among (i) Agent, (ii) a creditor holding Indebtedness permitted to be incurred hereunder, and (iii) the Borrowers (whether directly or by consent), setting forth the terms by which such Indebtedness shall be subordinated, in right of payment and claim, to the rights and claims of the Lender Parties in respect of the Obligations and the Collateral.

"Subsidiary" shall mean, as to any Person, a corporation or other entity, a majority of whose Voting Equity Interests are owned, directly or indirectly, by such Person.

Unless otherwise expressly provided herein, references herein to a "Subsidiary" or the "Subsidiaries" shall mean and refer to Subsidiaries of the Borrowers, including any not in existence on the Closing Date in anticipation of their subsequent creation or acquisition in accordance with the terms hereof.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Term A Lender" shall mean each Lender with a Term Loan A Commitment or which holds a portion of the Term Loan A.

"Term B Lender" shall mean each Lender with a Term Loan B Commitment or which holds a portion of the Term Loan B.

"Term B Purchase Notice" shall have the meaning set forth in Section 15.12.

"Term Loan A" shall mean the term loan, which includes $[_____] of the Capitalized Expenses, in the principal amount of [_____] Dollars ($[_____]) made to Borrowers by the Lenders pursuant to Section 2.1(a).

"Term Loan A Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Term Loan A Commitment" representing the commitment of such Lender to make its Term Loan A Commitment Percentage of the Term Loan A available to Borrower.

"Term Loan A Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Term Loan A Commitment bears to the total Term Loan A Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Term Loan A Commitments" shall mean the aggregate amount of each Lender's individual Term Loan A Commitment, which aggregate amount shall equal [_____] Dollars ($[_____]).

"Term Loan A Obligations" shall have the meaning set forth in Section 15.12.

"Term Loan B" shall mean the term loan, which includes $[_____] of the Capitalized Expenses, in the principal amount of [_____] Dollars ($[_____]) made to Borrowers by the Lenders pursuant to Section 2.1(b).

"Term Loan B Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Term Loan B Commitment" representing the commitment of such Lender to make its Term Loan B Commitment Percentage of the Term Loan B available to Borrower.

"Term Loan B Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Term Loan B Commitment bears to the total Term Loan B Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Term Loan B Commitments" shall mean the aggregate amount of each Lender's individual Term Loan B Commitment, which aggregate amount shall equal [_____] Dollars ($[_____]).

"Term Loans" shall mean, collectively, the Term Loan A and the Term Loan B.

"Test Period" shall have the meaning set forth in Section 8.1 hereof.

"Title Insurance Policy" shall have the meaning set forth in Section 9.1(x) hereof.

"Toxic Substance" shall mean and include any material present on the Real Property that has been shown to have significant adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. The term "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Unfinanced Capital Expenditures" shall have the meaning set forth in Section 8.1 hereof.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code, as adopted in the State of New York, in effect from time to time.

"Voting Equity Interests" shall mean Equity Interests having ordinary voting power to elect members of the board of directors, partners, managers or comparable governing authority of a Person

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

ACKNOWLEDGED AND AGREED:

LEXINGTON PRECISION CORPORATION

By:_____
    Name:_____
    Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____
    Name:_____
    Title: _____

# EXHIBIT 9.1(d)
## SECRETARY'S CERTIFICATE

The undersigned, being the Secretary of LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("Borrower"), hereby gives this certificate to CSE MORTGAGE LLC, a Delaware limited liability company ("CSE") pursuant to the terms of that certain Amended and Restated Loan and Security Agreement, dated as of even date herewith (herein, as at any time amended, amended and restated, supplemented or otherwise modified, called the "Loan Agreement"), among Borrower, LEXINGTON PRECISION CORPORATION, CSE, individually as a lender and as agent for itself and the other Lenders from time to time party thereto, and such other lenders. Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.

The undersigned hereby certifies that:

1.      Attached hereto as Exhibit "A" is a true and correct copy of the Certificate of Incorporation of Borrower and all amendments thereto as in effect on the date hereof;

2.      Attached hereto as Exhibit "B" is a true and correct copy of the bylaws of Borrower as in effect on the date hereof;

3.      Pursuant to resolutions heretofore adopted by the Board of Directors of Borrower, a true, correct and complete copy of which is set forth on Exhibit "C" attached hereto, each officer of Borrower identified below is duly authorized to execute and/or attest the Loan Agreement and each Other Document to which the Borrower is a party for and on behalf of Borrower, and to bind Borrower accordingly thereby; and the specimen signature of each such officer or other representative inscribed below is his genuine signature:

| Name | Title | Signature |
|------|-------|-----------|
| Michael A. Lubin | Chairman of the Board | _____ |
| Warren Delano | President | _____ |
| [_____] | [_____] | _____ |

IN WITNESS WHEREOF, the undersigned has executed this certificate in his aforesaid capacity as Secretary of Borrower, as of [___ __], 2010.

_____

Name:  [_____]
Title:    Secretary

EXHIBIT "A"

[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "B"


[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "C"


[BORROWERS' COUNSEL TO PROVIDE]

**EXHIBIT 9.1(t)**

**CLOSING CERTIFICATE**

This certificate is delivered pursuant to <u>Section 9.1(t)</u> of that certain Amended and Restated Loan and Security Agreement, dated as of [_____ ____], 2010, among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers, the Lenders from time to time party thereto, and CSE MORTGAGE LLC, as a Lender and as Agent for all such Lenders (as such agreement has been, or may be, amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Loan Agreement.

Borrowing Representative hereby certifies to Agent that as of the date hereof:

(a)     all representations and warranties set forth in the Loan Agreement and the Other Documents are true and correct;

(b)     Borrowers are in compliance with all terms and provisions set forth in the Loan Agreement and the Other Documents; and

(c)     no Default or Event of Default has occurred and is continuing.


LEXINGTON PRECISION CORPORATION,
as Borrowing Representative


By: _____
Name: _____
Title: _____


Date: [_____ ____], 2010

**Exhibit 10.6**

Form of Compliance Certificate

To:     CapitalSource Finance LLC
        4445 Willard Avenue, 12th Floor
        Chevy Chase, MD 20815
        Attention: Business Credit Services/Portfolio Manager

Re:     Lexington Precision Corporation
        Lexington Rubber Group, Inc.: Compliance Certificate dated [_____ __, 20__]

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Loan and Security Agreement, dated as of **[____ ___]**, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between LEXINGTON PRECISION CORPORATION, a Delaware corporation ("**LPC**"), LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("**LRG**", and together with LPC, collectively, the "**Borrowers**") and CSE MORTGAGE LLC, a Delaware limited liability company ("**Lender**"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to Section [10.6] [10.7] of the Loan Agreement, the Designated Officer of Borrowing Representative hereby certifies that:

1.      The financial statements of Borrowers for the period ending [_____ __, 20__] attached hereto as Schedule 1 have been prepared in accordance with GAAP, applied on a basis consistent with prior practices.

2.      The Borrowing Representative has reviewed the terms of the Loan Agreement and the Other Documents and the condition of Borrowers, and based on such review, no Default or Event of Default has occurred or is continuing, except as set forth on Schedule 2 attached hereto, specifying the nature of such Default or Event of Default, when it occurred, and the steps that the Borrowers have taken, are taking, or propose to take with respect thereto.

3.      Attached hereto as Schedule 3 are the calculations that set forth the Borrowers' compliance with the Financial Covenants as of [_____ __, 20__].

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this ____ day of _____, 20__.

LEXINGTON PRECISION CORPORATION,
as Borrowing Representative

By: _____
Name: _____
Title: _____

## COMMITMENT TRANSFER SUPPLEMENT

COMMITMENT TRANSFER SUPPLEMENT, dated as of _____, 20__, among _____ (the "Transferor Lender"), each Purchasing Lender executing this Commitment Transfer Supplement (each, a "Purchasing Lender"), and CSE MORTGAGE LLC ("CSE"), as agent for the Lenders (as defined below) under the Loan Agreement (as defined below).

W I T N E S S E T H

WHEREAS, this Commitment Transfer Supplement is being executed and delivered in accordance with Section 17.3 of the Amended and Restated Loan and Security Agreement, dated as of [_____ __], 2010, (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Loan Agreement") among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (therein and herein called "Borrowers"), CSE and the various financial institutions named therein or which hereafter become a party thereto (together with CSE, the "Lenders") and CSE as agent for Lenders (in such capacity, "Agent"); and

WHEREAS, each Purchasing Lender wishes to become a Lender party to the Loan Agreement; and

WHEREAS, the Transferor Lender is selling and assigning to each Purchasing Lender rights, obligations and commitments under the Loan Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      All capitalized terms used herein which are not defined shall have the meanings given to them in the Loan Agreement.

2.      Upon receipt by the Agent of four counterparts of this Commitment Transfer Supplement, to each of which is attached a fully completed Schedule and each of which has been executed by the Transferor Lender and Purchasing Lender, Agent will transmit to Transferor Lender and each Purchasing Lender a transfer effective notice, substantially in the form of Schedule II to this Commitment Transfer Supplement (a "Transfer Effective Notice") Such Transfer Effective Notice shall set forth, inter alia, the date on which the transfer effected by this Commitment Transfer Supplement shall become effective (the "Transfer Effective  Date"), which date shall not be earlier than the first Business Day following the date such Transfer Effective Notice is received. From and after the Transfer Effective Date, each Purchasing Lender shall be a Lender party to the Loan Agreement for all purposes thereof.

3.      At or before 12:00 Noon (New York City time) on the Transfer Effective Date each Purchasing Lender shall pay to Transferor Lender, in immediately available funds, an amount equal to the purchase price, as agreed between Transferor Lender and such Purchasing Lender (the "Purchase Price"), of the portion of the outstanding Advances being purchased by such Purchasing Lender (such Purchasing Lender's "Purchased Percentage") and other amounts owing to the Transferor Lender under the Loan Agreement with respect to that portion of the Advances being purchased by such Purchasing Lender. Effective upon receipt by Transferor Lender of the Purchase Price from a Purchasing Lender, Transferor Lender hereby irrevocably sells, assigns and transfers to such Purchasing Lender, without recourse, representation or warranty, and each Purchasing Lender hereby irrevocably purchases, takes and assumes from Transferor Lender, such Purchasing Lender's Purchased Percentage of the Advances and other amounts owing to the Transferor Lender under the Loan Agreement together with all instruments, documents and collateral security pertaining thereto.

4.      Transferor Lender has made arrangements with each Purchasing Lender with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by Transferor Lender to such Purchasing Lender of any fees heretofore received by Transferor Lender pursuant to the Loan Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by such Purchasing Lender to Transferor Lender of fees or interest received by such Purchasing Lender pursuant to the Loan Agreement from and after the Transfer Effective Date.

5.      (a)      All principal payments that would otherwise be payable from and after the Transfer Effective Date to or for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender pursuant to the Loan Agreement shall, instead, be payable to or for the account of Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement.

        (b)      All interest, fees and other amounts that would otherwise accrue for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender from and after the Transfer Effective Date pursuant to the Loan Agreement shall, instead, accrue for the account of, and be payable to, Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement. In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by any Purchasing Lender, Transferor Lender and each Purchasing Lender will make appropriate arrangements for payment by Transferor Lender to such Purchasing Lender of such amount upon receipt thereof from Borrower.

        (c)      Consistent with the terms of Section 17.3 of the Loan Agreement, (i) payments of principal, interest, fees, charges and collections owing to the Purchasing Lender hereafter pursuant to the Loan Agreement shall be made by the Agent without giving effect to any collection days, and (ii) Purchasing Lender shall not be entitled to receive any portion of any fees or charges payable to the Agent for its own account.

6.      Concurrently with the execution and delivery hereof, Transferor Lender will provide to each Purchasing Lender conformed copies of the Loan Agreement and all Other Documents delivered to Transferor lender.

7.      Each of the parties to this Commitment Transfer Supplement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Commitment Transfer Supplement.

8.      By executing and delivering this Commitment Transfer Supplement, Transferor Lender and each Purchasing Lender confirm to and agree with each other and Agent and Lenders as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, Transferor Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement, the Other Documents or any other instrument or document furnished pursuant thereto; (ii) Transferor Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their Obligations under the Loan Agreement or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Lender confirms that it has received a copy of the Loan Agreement, together with copies of such financial statements and such other documents and information

3631160.5

as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Transfer Supplement; (iv) each Purchasing Lender will, independently and without reliance upon Agent, Transferor Lender or any other Lenders and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (v) each Purchasing Lender appoints and authorizes Agent to take such action and to exercise such powers under the Loan Agreement as are delegated to the Agent by the terms thereof; (vi) each Purchasing Lender agrees that it will perform all of its respective obligations as set forth in the Loan Agreement to be performed by each as a Lender; and (vii) each Purchasing Lender represents and warrants to Transferor Lender, the other Lenders, Agent and Borrowers that it is either (x) entitled to the benefits of an income tax treaty with the United States of America that provides for an exemption from the United States withholding tax on interest and other payments made by Borrowers under the Loan Agreement and the Other Documents or (y) is engaged in trade or business within the United States of America.

9.      Schedule I hereto sets forth the revised Commitment Percentages of Transferor Lender and Purchasing Lender after giving effect to the transfer contemplated hereby as well as administrative information with respect to each Purchasing Lender.

10.     This Commitment Transfer Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Transfer Supplement to be executed by their respective duly authorized officers on the date set forth above.

_____

as Transferor Lender

By: _____
Name: _____
Title: _____


_____

as a Purchasing Lender

By: _____
Name: _____
Title: _____


CSE MORTGAGE LLC, as Agent

By: _____
Name: _____
Title: _____

<u>LIST OF OFFICE ADDRESSES FOR NOTICES AND COMMITMENT AMOUNTS</u>

| [Transferor Lender] | Revised Revolving Credit Commitment Amount | $_____ |
| | Revised Term Loan Commitment Amount | $_____ |
| | | |
| | Revised Commitment Percentage: | _____% |
| | | |
| [Purchasing Lender] | Revolving Credit Commitment Amount | $_____ |
| | Term Loan Commitment Amount | $_____ |
| | | |
| | Commitment Percentage: | _____% |

Addresses for Notices

_____

_____

_____

Attention:
Telephone:
Telecopier:

<u>SCHEDULE II TO COMMITMENT TRANSFER SUPPLEMENT</u>

[Form of Transfer Effective Notice]

To: _____, as Transferor Lender and
_____, as Purchasing Lender:

The undersigned, as Agent under the Amended and Restated Loan and Security Agreement dated as of [_____ __], 2010 among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (collectively, "Borrowers"), and CSE MORTGAGE LLC, a Delaware limited liability company ("CSE"), the various financial institutions named therein or which hereafter become a party thereto, (together with CSE, the "Lenders") and CSE as agent for Lenders (in such capacity, "Agent"), acknowledges receipt of four (4) executed counterparts of a completed Commitment Transfer Supplement in the form attached hereto. [Note: Attach copy of Commitment Transfer Supplement.] Terms defined in such Commitment Transfer Supplement are used herein as therein defined

Pursuant to such Commitment Transfer Supplement, you are advised that the Transfer Effective Date will be [Insert date of Transfer Effective Notice.]

CSE MORTGAGE LLC,
as Agent


By: _____
Name: _____
Title: _____




ACCEPTED FOR RECORDATION
IN REGISTER:

**<u>SCHEDULES TO</u>**

**AMENDED AND RESTATED**

**LOAN AND SECURITY AGREEMENT**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**

**and**

**CSE MORTGAGE LLC,**
**as a Lender and as Agent**

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**Closing Date: [_____], 2010**

## Schedules

| | |
|---|---|
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Disputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicting Agreements |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

**SCHEDULE 4.5**

**<u>EQUIPMENT AND INVENTORY LOCATIONS</u>**

**SCHEDULE 4.14(c)**

**LOCATION OF EXECUTIVE OFFICES**

**SCHEDULE 4.16**

**EXCLUDED EQUIPMENT**

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA; QUALIFICATIONS**

**SCHEDULE 5.3**

**FEDERAL TAX IDENTIFICATION NUMBERS**

**SCHEDULE 5.5**

**PRIOR NAMES**

**SCHEDULE 5.6**

<u>**OSHA AND ENVIRONMENTAL COMPLIANCE EXCEPTIONS**</u>

**SCHEDULE 5.7**

**<u>DISPUTED INDEBTEDNESS</u>**

**SCHEDULE 5.8**

**LITIGATION**

A-1

**SCHEDULE 5.9**

**<u>INDEBTEDNESS</u>**

**SCHEDULE 5.11**

**<u>PLANS</u>**

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

**SCHEDULE 5.14**

**<u>DEFAULTS</u>**

**SCHEDULE 5.17**

**<u>LABOR CONTRACTS</u>**

**SCHEDULE 5.21**

**<u>CONFLICTING AGREEMENTS</u>**

**SCHEDULE 5.24**

**<u>REAL PROPERTY</u>**

**SCHEDULE 5.25**

**DEPOSIT ACCOUNTS**

**SCHEDULE 6.8**

**<u>POST-CLOSING MATTERS</u>**

**SCHEDULE 7.2**

**<u>PERMITTED ENCUMBRANCES</u>**

**SCHEDULE 7.3**

**<u>OTHER INDEBTEDNESS</u>**

**SCHEDULE 7.4**

**LOANS AND INVESTMENTS**

**EXHIBIT 1.91**

**Form of Stock Purchase Agreement**

**(To be filed with Plan Supplement)**

**SCHEDULE 8.1**

**Executory contracts and unexpired leases to be rejected**

**(To be filed with Plan Supplement)**

**SCHEDULE 8.7**

**Insurance policies and agreements to be rejected**

**(To be filed with Plan Supplement)**

## Exhibit B

## Entered Disclosure Statement Order

(To be provided)

**<u>Exhibit C</u>**

**LPC Annual Report on Form 10-K**
**for Fiscal Year Ended December 31, 2008**

10-K 1 d24736.htm

<hr>

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

[X]     Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for
        the Year Ended December 31, 2008
        **or**

[ ]     Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
        Commission File Number: 0-3252

# LEXINGTON PRECISION CORPORATION
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-1830121** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **800 Third Avenue, New York, NY** | **10022** |
| (Address of principal executive offices) | (Zip code) |

### Registrant's telephone number, including area code: (212) 319-4657

_____

### Securities registered pursuant to Section 12(b) of the Act: None

### Securities registered pursuant to Section 12(g) of the Act:
### Common Stock, $0.25 par value
#### (Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in rule 405 of the Securities Act.  Yes __ No X

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes __ No X

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No __

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  [X]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of  "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.  (Check one):
Large Accelerated Filer __                          Accelerated Filer __
Non-Accelerated Filer __                            Smaller Reporting Company X

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes __ No X

The aggregate market value of the registrant's common stock, $0.25 par value per share, held by non-affiliates of the registrant, as of June 30, 2008, was approximately $1,105,000.

The number of shares of common stock outstanding as of April 13, 2009, was 5,021,767.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's proxy statement to be issued in connection with its 2009 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated by reference into Part III. Only those portions of the Proxy Statement which are specifically incorporated by reference are deemed filed as part of this report on Form 10-K.

## LEXINGTON PRECISION CORPORATION
## Annual Report on Form 10-K
## Table of Contents

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 8 |
| Item 2. | Properties | 13 |
| Item 3. | Legal Proceedings | 13 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 14 |
| **PART II** | | |
| Item 5. | Market for Our Common Stock and Other Stockholder Matters | 15 |
| Item 6. | Selected Financial Data | 16 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 19 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 41 |
| Item 8. | Financial Statements and Supplementary Data | 42 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 76 |
| Item 9A(T). | Controls and Procedures | 76 |
| Item 9B. | Other Information | 78 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance of the Registrant | 79 |

| Item 11. | Executive Compensation | 79 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 79 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 79 |
| Item 14. | Principal Accountant Fees and Services | 79 |

**PART IV**

| Item 15. | Exhibits and Financial Statement Schedules | 80 |

i

---

## PART I

## Item 1. BUSINESS

Our company was incorporated in Delaware in 1966. Substantially all of our business is conducted in the continental United States. Through our two operating segments, the Rubber Group and the Metals Group, we manufacture rubber and metal components that are sold to other manufacturers.

In 2008, net sales of the Rubber Group totaled $62,278,000, or 85.3% of our consolidated net sales. The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

In 2008, net sales of the Metals Group totaled $10,751,000, or 14.7% of our consolidated net sales. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

The following table summarizes net sales of the Rubber Group and the Metals Group during 2008, 2007, and 2006 by the type of product in which each segment's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
| | 2008 | | 2007 | | 2006 | |
| Rubber Group: | | | | | | |
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical devices | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |

Metals Group:

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Automotive — OEM | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

Financial data for our operating segments can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, under the section titled "Results of Operations – Comparison of 2008, 2007, and 2006," and in Note 10, "Segments," in the notes to our consolidated financial statements in Part II, Item 8.

- 1 -

## Filing of Chapter 11

During the second half of 2006, we experienced a significant decrease in sales of automotive components for new cars and trucks. We believe that this reduction was primarily a result of production cutbacks by the Detroit-based automakers and resultant production cutbacks and inventory adjustments by our customers who supply the automobile manufacturers. Although we reduced expenses in an effort to offset the impact of the lower sales, our operating profit and cash flow during the second half of 2006 were adversely affected, as was the availability under our revolving line of credit. As a result, we were unable to continue to make payments on our subordinated debt.

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At December 31, 2008, accrued interest on our Senior Subordinated Notes totaled $13,055,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a

number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own a majority of our Senior Subordinated Notes to advise them of the following:

1.  We had decided to pursue the proposal to purchase the Rock Hill facility;

- 2 -

2.  We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.  We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.  In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.  We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default of our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the

Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). In connection with this petition, we obtained a financing package that we believed provided us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The arrangement with the senior, secured lenders provided for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in

- 3 -

Vienna, OH. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We believe that the effectuation of this plan will significantly enhance our ability to obtain the financing we need to exit chapter 11. In order to allow us sufficient time in which to complete the operational restructuring of our connector-seal business, including the closing of the Vienna facility and the relocation of the connector-seal business to our other rubber molding facilities, on January 13, 2009, we filed a motion requesting that the Bankruptcy Court extend the time during which we have the exclusive right to file a plan of reorganization and our right to use cash collateral. Subsequent to a hearing held on our motion on February 23 and 24, 2009, the Bankruptcy Court extended our exclusive right to file a plan of reorganization until April 30, 2009, extended our exclusive right to solicit acceptances of such plan until June 1, 2009, and extended our right to use cash collateral to May 22, 2009. In addition, by mutual agreement, the maturity date of the debtor-in-possession loan was extended from April 1, 2009, to December 31, 2009. For more information on the restructuring of our connector-seal business, please refer to the discussion of the Rubber Group in the section titled "Results of Operations — Comparison of 2008, 2007, and 2006" in this Part II, Item 7.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

- 4 -

We cannot assure you that the Amended Plan will be confirmed. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**Major Customers**

Our largest customer is General Cable Corporation. During 2008, 2007, and 2006, net sales to General Cable totaled $10,897,000, $9,436,000, and $9,557,000, which represented 14.9%, 10.7%, and 10.9%, respectively, of our consolidated net sales and 17.5%, 12.7%, and 12.6%, respectively, of the Rubber Group's net sales. During 2008, 2007, and 2006, net sales to Delphi Corporation totaled $5,587,000, $8,505,000, and

$10,719,000, which represented 7.7%, 9.6%, and 12.2%, respectively, of our consolidated net sales. During 2008, 2007, and 2006, the Rubber Group's net sales to Delphi totaled $4,603,000, $7,381,000, and $10,719,000, which represented 7.4%, 9.9%, and 14.1%, respectively, of the Rubber Group's net sales. During 2008 and 2007, the Metals Group's net sales to Delphi totaled $984,000 and $1,124,000, respectively, which represented 9.2% and 8.1% respectively, of the Metals Group's net sales. The majority of the products we sell to Delphi are covered by a supply contract that expires on December 31, 2009. No other customer accounted for more than 10% of our consolidated net sales during 2008, 2007, or 2006. Generally, loss of a significant amount of business from any of our large customers could have a material adverse effect on our results of operations and financial condition if that business were not replaced by additional business from existing or new customers. We believe that our reserve for uncollectible accounts receivable is adequate; however, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay or fail to make payments for goods sold to them.

**Marketing and Sales**

Our marketing and sales effort is carried out by management personnel and account managers.

**Raw Materials**

Our principal raw materials are silicone and organic rubber compounds and aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. We generally have had access to adequate amounts of each of our principal raw materials from a number of suppliers. During 2008, 2007, and 2006 price increases and decreases for our principal raw materials did not have a significant effect on our operating results.

- 5 -

We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

We have not experienced any disruption in our production as a result of raw material shortages.

**Patents and Trademarks**

We do not currently hold any patents, trademarks, or licenses that we consider to be material to the successful operation of our business.

**Seasonal Variations**

Our business generally is not subject to significant seasonal variation; however, we generally experience decreased sales during the third calendar quarter of each year due to shutdowns of our customers' plants in July as a result of vacations and model-year changeovers and during the fourth calendar quarter of each year due to shutdowns of our customers' plants for vacations and holidays in December.

## Backlog

Sales of our products are made pursuant to a variety of arrangements and practices. Our customers regularly revise release schedules to correspond to their own production requirements. We believe that the aggregate value of scheduled releases outstanding on our books at any time cannot be considered firm backlog because those releases may be revised at any time. We also believe that increases or decreases in the aggregate value of scheduled releases are not necessarily indicative of any trend in our net sales.

## Competition

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

## Research and Development

During 2008, 2007, and 2006, we spent approximately $661,000, $915,000, and $1,093,000, respectively, on our research and development activities, which are primarily related to improving our manufacturing processes in order to reduce the cost and increase the quality of our products.

## Environmental Compliance

Our operations are subject to numerous laws and regulations controlling the discharge of materials into the environment or otherwise relating to the protection of the environment. Although we make expenditures relating to the protection of the environment, compliance with environmental laws and regulations has not had a significant impact on our capital spending requirements, earnings, or

- 6 -

competitive position. We cannot assure you that changes in environmental laws and regulations, or in the interpretation or enforcement of those laws and regulations, will not require material expenditures in the future.

## Employees

We believe that our employee relations are generally good. The following table shows the number of employees at December 31, 2008, 2007, and 2006.

|  | December 31 | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |

| | | | |
|---|---|---|---|
| Rubber Group | 408 | 538 | 594 |
| Metals Group | 68 | 121 | 104 |
| Corporate Office | 6 | 7 | 8 |
| | 482 | 666 | 706 |

At December 31, 2008, 2007, and 2006, employees at the Rubber Group included 151, 224, and 277 hourly workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2009, and March 11, 2009. We have commenced the process of terminating all operations at the manufacturing facility subject to the agreement that expired on March 11, 2009, and we anticipate that we will complete the closing of this facility, which as of December 31, 2008, had 54 hourly workers, during the second quarter of 2009. For more information on the shutdown of this manufacturing facility please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 and to Note 16, "Subsequent Event," in the notes to our consolidated financial statements in Part II, Item 8.

**Discontinued Operations**

During 2005, we sold or liquidated all of the assets of our diecasting business except its land and buildings. In this Form 10-K, the diecasting business is reported as discontinued operations. For more information about the closing of the die casting business, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and to Note 14, "Discontinued Operations," in the notes to our consolidated financial statements in Part II, Item 8. Unless otherwise indicated, the data set forth in this Form 10-K relate solely to our continuing operations.

**Filings with the Securities and Exchange Commission**

We do not make available through a website our annual report on Form 10-K, our quarterly reports on Form 10-Q, our current reports on Form 8-K, or any amendments to those reports. We will furnish free of charge, upon written request to our President at 800 Third Avenue, 15th Floor, New York, NY 10022, a paper copy of the reports that we file with the Securities and Exchange Commission. The reports have been filed electronically with the Commission and are accessible on the Commission's website at www.sec.gov.

- 7 -

**Item 1A. RISK FACTORS**

**We are subject to risks associated with bankruptcy proceedings.**

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result

in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. This would substantially dilute the ownership percentage of the holders of our currently outstanding common stock. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial condition.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to reorganize the Company is subject to risks and uncertainties. The consolidated financial statements do not

- 8 -

include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**We are dependent on a few major customers.**

In 2008, the three largest customers of the Rubber Group accounted for 36.9% of the Rubber Group's net sales, and the three largest customers of the Metals Group accounted for 48.3% of the Metals Group's net sales. Generally, loss of a significant amount of business from any of our large customers would have a material adverse effect on our results of operations and financial condition if such business were not substantially replaced by additional business from existing or new customers. Additionally, our results of operations and financial condition could be materially adversely affected if any of our large customers experienced financial difficulties that caused them to delay, or fail to make, payments for goods sold to them.

**We are dependent on the automotive original equipment industry.**

Net sales to customers that supply systems to manufacturers of new cars and trucks represented 36.7%, 48.5%, and 50.8% of our consolidated net sales in 2008, 2007, and 2006, respectively. Sales to these customers are in part tied to the rate of sales of new vehicles. The unexpected, sharp decline in the sales of new cars and trucks that started during the second half of 2008 and the first quarter of 2009 has adversely affected our results of operations and financial condition. To mitigate the impact of the sharp decline in new car and truck sales, during the first quarter of 2009, we decided to close our connector-seal manufacturing facility, in Vienna, Ohio, because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future. We are transferring the production of connector seals to our other rubber molding facilities. We currently anticipate that the restructuring of our connector-seal business will be substantially completed by June 30, 2009, and that the cost to restructure the connector-seal business will be approximately $1,082,000, which we expect to incur during the second and third quarters of 2009. Compared to 2008, we currently project that the restructuring of our connector-seal business will increase the EBITDA of our connector-seal business by approximately $2,500,000 in 2010.

**We encounter significant competition.**

The markets in which we compete are characterized by intense price competition and increasing customer requirements for quality and service. We compete for business primarily on the basis of quality, service, engineering capability, and price. We encounter substantial competition from a large number of domestic and foreign-based manufacturing companies. Our competitors range from small and medium-sized specialized firms to large diversified companies, many of which have resources substantially greater than ours. Additionally, some of our customers have internal manufacturing operations that compete with us.

**A lack of effective internal control over financial reporting may result in an inability to accurately report our financial results.**

In connection with management's evaluation of our internal control over financial reporting, management identified significant deficiencies that, in the aggregate, constitute a material weakness. Our management concluded that we have incomplete documentation of the internal control system, we lack a procedure for documenting certain internal control activities, interdivisional internal control duties are not completely segregated, and we have been unable to test the operational effectiveness of our internal control over financial reporting. A failure to implement and maintain effective internal control over financial reporting could result in a material misstatement of our financial statements or otherwise cause

- 9 -

us to fail to meet our financial reporting obligations. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**We may not be able to remediate the material weakness in our internal control over financial reporting.**

Although its is our intention to remediate the material weakness in our internal control over financial reporting, on April 1, 2008, we filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy filing and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate these weaknesses prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the weaknesses prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission. For more information on our internal controls over financial reporting, please refer to "Controls and Procedures" in Part II, Item 9A(T).

**Part of our labor force is unionized.**

At December 31, 2008, employees at the Rubber Group included 151 workers at two plant locations that were subject to collective bargaining agreements, which expire on October 19, 2009, and March 11, 2009. We have commenced the process of terminating all operations at the manufacturing facility subject to the agreement that expired on March 11, 2009, and we anticipate that we will complete the closing of this facility, which as of December 31, 2008, had 54 hourly workers, during the second quarter of 2009. For more information on the shutdown of this manufacturing facility please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 and to Note 16, "Subsequent Event," in the notes to our consolidated financial statements in Part II, Item 8. We cannot assure you that our remaining union contract will be successfully renegotiated when it expires. Negotiations have not commenced regarding the extension of this agreement. If we were to experience a strike or work slowdown, it could have a material adverse effect on our results of operations and financial condition.

**Our customers may be subject to labor interruptions.**

Many of our customers and the three Detroit-based automobile manufacturers have union contracts with various unions. Protracted strikes or work slowdowns at our customers or at any of the Detroit-based automobile manufacturers could have a material adverse effect on our results of operations and financial condition.

**We are vulnerable to fluctuations in the cost and supply of raw materials.**

We purchase raw materials from various suppliers. While all of our raw materials are available from a number of suppliers, commodity raw materials are subject to fluctuations in price. Because raw materials in the aggregate constitute approximately 37% of our cost of goods sold, upward movement of raw material prices could have a material adverse effect on our results of operations. We have generally been successful in passing through to our customers increases in the prices of raw materials, although price increases to our customers have typically lagged behind the price increases from our suppliers. We attempt to minimize the effect of raw material price increases by seeking other sources of supply, substituting alternative materials, and reformulating compounds.

We have not experienced any disruption in our production as a result of raw material shortages, but, if any such shortage were to occur, it could have a material adverse effect on our results of operations and financial condition.

**We are subject to numerous environmental laws and regulations.**

Our past and present business operations and our ownership and operation of real property are subject to extensive and changing environmental laws and regulations pertaining to the discharge of materials into the environment, the handling and disposal of wastes, including hazardous wastes, and the protection of the environment. Some of our existing and former locations use and have used substances and generate or have generated or disposed of wastes that are or may be considered hazardous or otherwise are subject to applicable environmental requirements. In addition, we utilize storage tanks and bulk containers for petrochemicals and other substances at our facilities. Based on our experience to date, we do not expect environmental claims or the costs of compliance with federal, state, and local, environmental laws and regulations to have a material impact on our capital expenditures, operating results, or financial condition. We cannot assure you, however, that the discovery of presently unknown environmental conditions, changes in environmental laws and regulations or their interpretation, or other unanticipated events will not give rise to expenditures or liabilities that may have a material adverse effect on our results of operations and financial condition.

**We may be subject to product liability claims and litigation.**

Our business exposes us to potential product liability. Many of the components manufactured and sold by us are designed to be used for long periods of time. Component failures, manufacturing flaws, design defects, or inadequate disclosure of product-related risks with respect to our components or the products in which they are incorporated could result in product failure or an unsafe condition or injury to, or death of, consumers. The occurrence of such a problem could result in product liability claims or a recall of, or safety alert relating to, our components or the products in which they are incorporated. We cannot assure you that the product liability insurance maintained by us would be available or sufficient to satisfy all claims against us or that we will be able to obtain insurance in the future at satisfactory rates, in adequate amounts, or at all. Future product liability claims, regardless of their ultimate outcome, or product recalls could result in costly litigation and could have a material adverse effect on our results of operations and financial condition and could damage our reputation and limit our ability to attract and retain customers. Mitigating our risk is the fact that most of the components we manufacture are designed by our customers and are integrated into systems that were designed by our customers or their customers. For this reason we believe that the risk of a product liability claim against us is reduced.

**Self-insurance may subject us to possible liability that may be partially or completely uninsured.**

We maintain insurance coverage for many aspects of our business and operations. Based on our evaluation of the various risks to which we may be exposed, we retain all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although we cannot assure you that we will be successful in our efforts, we attempt to limit our liability through, among other things, the ongoing training and education of our employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of our workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of contracts with our customers. However, we cannot assure you that we will be successful in our efforts to limit our liability.

- 11 -

**We are subject to interest rate changes**.

At December 31, 2008, we had a total of $38,175,000 of outstanding floating-rate debt at interest rates tied to either the London Interbank Offered Rate ("LIBOR") or the prime rate. Currently, we do not purchase derivative financial instruments to hedge or reduce our interest rate risk. As a result, changes in either LIBOR or the prime rate affect the rates at which we borrow funds.

**A change of control could result in a limitation on the use of our net operating loss carryforward.**

At December 31, 2008, our unused federal net operating loss carryforward totaled approximately $36,306,000. Under Section 382 of the Internal Revenue Code of 1986, as amended, if we undergo an "ownership change" the amount of our pre-change operating losses that may be utilized to offset future taxable income will be subject to an annual limitation. An ownership change occurs if the percentage of stock of the Company that is owned by certain groups of less than 5% shareholders, all treated as a single shareholder for this purpose, increases by more than 50 percentage points over a three-year period.  Based on the value of the Company's common stock being $4.46 per share, as described in the Disclosure Statement filed with Bankruptcy Court on December 8, 2008, we anticipate that the issuance of the Series C Preferred Stock and common stock pursuant to the plan of reorganization that we filed with the Bankruptcy Court on December 8, 2008, if not further amended, would constitute an "ownership change." Assuming that we are in chapter 11 on the day that an ownership change occurs, the limitation imposed by Section 382 is generally equal to the product of (i) the fair market value of our stock immediately after the ownership change multiplied by (ii) the federal "long-term tax-exempt rate" in effect on the date of the ownership change. The annual limitation may be increased in the event that we have overall "built-in" gains in our assets at the time of the ownership change.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 12 -

**Item 2. PROPERTIES**

The following table shows the locations and square footage of our manufacturing facilities at December 31, 2008:

| | Square Feet |
| --- | --- |

Rubber Group:

| | |
|---|---:|
| Jasper, Georgia | 100,000 |
| North Canton, Ohio | 42,000 |
| Vienna, Ohio | 64,000 |
| Rock Hill, South Carolina | 61,000 |
| Total Rubber Group | 267,000 |
| | |
| Metals Group: | |
| Rochester, New York | 60,000 |
| Total Company | 327,000 |

All of our plants are general manufacturing facilities suitable for our operations. We believe that our facilities are adequate to meet our current operating needs. All of our manufacturing facilities are owned by us, and all are encumbered by mortgages.

We occupy, in the aggregate, 4,000 square feet of office space for corporate executive and administrative purposes. We lease an office in Cleveland, Ohio, and reimburse an affiliate for the cost of leasing an office in New York City.

The manufacturing facility that was utilized by our discontinued diecasting business is located in Lakewood, New York, has 93,000 square feet of space, and is available for sale. The facility is currently leased to a third party for $159,000 per annum. The lessee has an option to purchase the facility for $1,590,000. We also own a 10,000 square foot building in Lakewood, New York, that is vacant and available for sale.

We own approximately 18 acres of land bordering State Route 515 in Ellijay, Georgia. This land, which was acquired as a potential plant site, has recently been graded and is available for sale. The property has a book value of $1,309,000 as of December 31, 2008, and an appraised value of $4,550,000 as of June 10, 2008. Additionally, we own six abutting residential lots, comprising approximately 7 acres.

During the first quarter of 2009, we decided to close our connector-seal manufacturing facility in Vienna, Ohio, because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future. We are transferring the production of connector seals to our other rubber molding facilities. We anticipate ceasing operations in that facility by June 30, 2009.

## Item 3. LEGAL PROCEEDINGS

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). We continue to operate our businesses and manage our properties as debtors in

- 13 -

possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, we obtained a financing package that we believed provides us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently

extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, between us, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC, as lenders. Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company, is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The arrangement with the senior, secured lenders provides for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. The arrangements for the use of cash collateral and the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

In addition, we are subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of our business activities. It is our policy to record accruals for claims and legal proceedings when we consider a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although we cannot assure you as to the outcome of existing or potential litigation, we currently believe, based upon the information available to us, that the outcome of those actions will not have a material adverse effect upon our results of operations or financial condition.

## Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

We did not submit any matters to a vote of security holders during the fourth quarter of 2008.

- 14 -

## PART II

## Item 5. MARKET FOR OUR COMMON STOCK AND OTHER STOCKHOLDER MATTERS

Our common stock is traded in the over-the-counter market through the Pink Sheets. At March 17, 2009, there were approximately 570 holders of record of our common stock. Trading in shares of our common stock is limited. The following table sets forth prices at which transactions in our common stock were reported on the Pink sheets. Additional trading data can be found at the Pink OTC Markets, Inc. website, www.pinksheets.com.

| | Years Ended December 31 | | | |
|---|---|---|---|---|
| | 2008 | | 2007 | |
| | High | Low | High | Low |
| First quarter | $0.55 | $0.25 | $0.41 | $0.10 |
| Second quarter | $0.75 | $0.25 | $0.70 | $0.13 |
| Third quarter | $1.01 | $0.75 | $0.80 | $0.60 |
| Fourth quarter | $1.01 | $0.15 | $0.70 | $0.25 |

These prices reflect inter-dealer prices and may not necessarily represent actual transactions. We are not able to determine whether retail markups, markdowns, or commissions were included in the above prices. We believe that eight brokerage firms currently make a market in our common stock, although both bid and asked quotations may be limited.

We have not paid dividends on our common stock since 1979, and we have no current plans to reinstate the payment of dividends. In addition, agreements defining the rights of the holders of our debt currently restrict us from paying cash dividends on our common stock. At December 31, 2008, we were in arrears in the payment of nine quarterly dividends in the aggregate amount of $59,400 on our $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), and we are in arrears with respect to the redemption of all of the outstanding Series B Preferred Stock for an aggregate redemption price of $660,000, representing the scheduled redemptions for 2000 through 2007.

For information on "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters," please refer to Part III, Item 12.

## Equity Compensation Plan Information

The following table sets forth information about our equity compensation plans at December 31, 2008 (share amounts in thousands):

| | Shares of common stock to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Shares of common stock remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans: | | | |
|   Approved by security holders | — | $ NA | 310 |
|   Not approved by security holders | — | NA | — |
|     Total | — | $ NA | 310 |

- 15 -

## Item 6. SELECTED FINANCIAL DATA

The following table sets forth selected consolidated financial data, including the reconciliation of income or loss from continuing operations to earnings from continuing operations before interest, taxes, depreciation, amortization, and other non-operating items of income or expense ("EBITDA") and the reconciliation of EBITDA to net cash provided by our operating activities, for each of the years in the five-year period ended December 31, 2008 (dollar amounts in thousands, except per share amounts). The term EBITDA, as used by us, does not include reorganization items, which are reflected as other expense in the consolidated statements of operations. The financial data has been derived from our consolidated financial statements, which have been audited by Malin, Bergquist & Company, LLP (2007 and 2008) and Ernst & Young LLP (2004 through 2006), independent registered public accounting firms. This information is not necessarily indicative of the results of future operations and should be read in conjunction with, and is qualified by, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7, and our consolidated financial statements in Part II, Item 8.

| | Years Ended December 31 | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| **Summary of operations:** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Net sales | $ 73,029 | $ 88,408 | $ 87,901 | $96,842 | $110,353 |
| Cost of sales | 63,107 | 76,529 | 77,159 | 87,369 | 98,304 |
| Gross profit | 9,922 | 11,879 | 10,742 | 9,473 | 12,049 |
| Selling and administrative expenses (1) | 6,685(2) | 7,204 | 6,658 | 6,747 | 7,383 |
| Gain on sale of assets held for sale | — | — | — | (1,671) | — |
| Income from operations | 3,237 | 4,675 | 4,084 | 4,397 | 4,666 |
| Other income (expense): | | | | | |
| Interest expense (3) | (8,726)(4) | (11,339)(5) | (10,943) | (9,200) | (8,662) |
| Reorganization items, net | (4,540) | — | — | — | — |
| Gain on repurchase of debt | — | — | — | 77 | 8,598 |
| Income (loss) from continuing operations before income tax | (10,029) | (6,664) | (6,859) | (4,726) | 4,602 |
| Income tax provision (benefit) | 35 | 6 | 18 | (299) | (196) |
| Income (loss) from continuing operations | (10,064) | (6,670) | (6,877) | (4,427) | 4,798 |
| Income (loss) from discontinued operations | (229) | (289) | (472) | 644 | (3,208) |
| Net income (loss) | $(10,293) | $ (6,959) | $ (7,349) | $(3,783) | $ 1,590 |
| Net income (loss) per diluted common share | $ (2.07) | $ (1.41) | $ (1.49) | $ (0.77) | $ 0.32 |

*(continued on next page)*

- 16 -

*(continued from prior page)*

| | | Years Ended December 31 | | | |
|---|---|---|---|---|---|
| | **2008** | **2007** | **2006** | **2005** | **2004** |
| **Other data (continuing operations):** | | | | | |
| Reconciliation of income (loss) from continuing operations to EBITDA from continuing Operations (6): | | | | | |
| Income (loss) from continuing operations | $(10,064) | $ (6,670) | $ (6,877) | $ (4,427) | $ 4,798 |
| Adjustments: | | | | | |
| Depreciation and amortization included in income from continuing operations | 5,333 | 6,437 | 7,295 | 8,374 | 8,444 |

| | | | | | |
|---|---|---|---|---|---|
| Gain on repurchase of debt | — | — | — | (77) | (8,598) |
| Interest expense | 8,726 | 11,339 | 10,943 | 9,200 | 8,662 |
| Reorganization items, net | 4,540 | — | — | — | — |
| Income tax provision (benefit) | 35 | 6 | 18 | (299) | (196) |
| EBITDA from continuing operations (6) | 8,570 | 11,112 | 11,379 | 12,771 | 13,110 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities (6): | | | | | |
| Interest expense | (8,726) | (11,339) | (10,943) | (9,200) | (8,662) |
| Reorganization items, net | (4,540) | — | — | — | — |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 1,249 | 3,078 | 1,315 | 1,098 |
| Income tax benefit (provision) | (35) | (6) | (18) | 299 | 196 |
| Gain on sale of assets held for sale | — | — | — | (1,671) | — |
| Net change in accrued reorganization items, net | 1,168 | | | | |
| Net change in operating assets and liabilities | 7,432 | 4,420 | (940) | 3,628 | 1,326 |
| Net cash provided by operating activities | $ 4,120 | $ 5,436 | $ 2,556 | $ 7,142 | $ 7,068 |
| Net cash provided (used) by investing activities | $ (2,847) | $ (2,741) | $ (2,628) | $ 683 | $(6,085) |
| Net cash provided (used) by financing activities | $ 4,093 | $ (2,333) | $ 621 | $(11,212) | $ (580) |
| Capital expenditures (7) | $ 2,695 | $ 2,664 | $ 2,661 | $ 3,330 | $ 6,057 |

| | December 31 | | | | |
|---|---|---|---|---|---|
| | 2008 | 2007 | 2006 | 2005 | 2004 |
| **Financial position** (8): | | | | | |
| Current assets | $ 25,402 | $ 21,877 | $ 20,222 | $ 22,396 | $ 28,907 |
| Current liabilities and liabilities subject to compromise | 99,324 | 87,771 | 82,211 | 41,092 | 35,777 |
| Net working capital deficit | $(73,922) | $(65,894) | $(61,989) | $(18,696) | $ (6,870) |
| Total assets | $ 53,328 | $ 52,367 | $ 54,440 | $ 62,343 | $ 78,377 |
| Long-term debt, excluding current portion | $ — | $ 5 | $ 406 | $ 41,545 | $ 58,949 |
| Total stockholders' deficit | $(46,396) | $(35,941) | $(28,991) | $(21,656) | $(17,875) |

*(footnotes on next page)*

- 17 -

*(footnotes for the table on prior pages)*

(1) Selling and administrative expenses for 2008 and 2007 included $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to refinance or restructure our indebtedness.

(2) Selling and administrative expenses for 2008 included $488,000 of one-time fees and expenses related to the

services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

(3) Included the amortization and write-off of deferred financing expenses of $251,000, $1,249,000, $3,078,000, $1,315,000, and $1,098,000, in 2008, 2007, 2006, 2005, and 2004, respectively.

(4) Interest expense for 2008 included $172,000 of default interest premium on our senior, secured debt, $1,455,000 of interest on missed interest payments and forbearance interest premium on the Senior Subordinated Notes, $296,000 of interest on the debtor-in-possession loan, and $251,000 of amortization of financing costs.

(5) Interest expense for 2007 included $698,000 of default interest premium on our senior, secured debt, $1,279,000 of forbearance interest expense on the Senior Subordinated Notes, and $390,000 of interest on the interest payments that we failed to make on the Senior Subordinated Notes in 2006 and 2007.

(6) EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP") and should not be considered in isolation or used as a substitute for income from operations, net income, net cash provided by operating activities, or other operating or cash flow statement data prepared in accordance with GAAP. For more information on the use of EBITDA as a financial measure, please refer to our discussion of EBITDA in "Results of Operations – Comparison of 2008, 2007, and 2006" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7.

(7) Included $28,000 of equipment purchased under capital leases in 2007. Included $157,000 of equipment acquired with seller-provided financing in 2006.

(8) Data includes assets and liabilities of discontinued operations.

- 18 -

## Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

Some of our statements in this Form 10-K are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approvals with respect to motions in the chapter 11 proceedings;

- our ability to obtain financing that will permit us to exit chapter 11;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- our ability to offset any increases in the cost of raw materials;

- increases and decreases in the production of cars and trucks in North America;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- decreased access to the credit markets by our customers or suppliers;

- chapter 11 filings by one or more of our customers or suppliers;

- a chapter 11 filing by any of the Detroit-based automobile manufacturers; and

- labor interruptions at our facilities or at our customers' or suppliers' facilities.

- 19 -

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part I, Item 1A.

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

Unless otherwise indicated, the data set forth below in this Part II, Item 7, relate solely to our continuing operations.

## Results of Operations — Comparison of 2008, 2007, and 2006

The following table sets forth (in thousands of dollars) our consolidated operating results for 2008, 2007, and 2006, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. The term EBITDA, as used by us, does not include reorganization items, which are reflected as "other expense" in the consolidated statements of operations. EBITDA is not a measure of performance under U.S. generally accepted accounting principles ("GAAP"). We have presented EBITDA here and elsewhere in this Form 10-K for the following reasons:

1. Investors and lenders frequently look at EBITDA when evaluating a company's ability to satisfy interest and principal obligations with respect to its outstanding indebtedness;

2. Management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items; and

3. Certain financial covenants in our senior, secured credit agreements have been calculated using variations of EBITDA.

EBITDA has material limitations when used as a measurement of performance, including the following:

1. EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2. EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3. EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up,

- 20 -

over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

4. EBITDA does not reflect reorganization items, which, pursuant to American Institute of Certified

Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," ("SOP 90-7"), represent revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to us, either currently or in the future.

5. EBITDA does not reflect cash provided or used as a result of changes in our working capital.

6. Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements that governed our senior, secured credit facility prior to our filing of a voluntary petition for relief under chapter 11 of title 11 of the United States Code on April 1, 2008.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP when analyzing our financial performance. EBITDA should not be considered to be a substitute for the following GAAP measures: gross profit, income from operations, net income, or net cash provided from operating activities.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 21 -

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Net sales | $ 73,029 | 100.0% | $ 88,408 | 100.0% | $ 87,901 | 100.0% |
| Cost of sales | 63,107 | 86.4 | 76,529 | 86.6 | 77,159 | 87.8 |
| Gross profit | 9,922 | 13.6 | 11,879 | 13.4 | 10,742 | 12.2 |
| Selling and administrative expenses (1) (2) | 6,685 | 9.2 | 7,204 | 8.1 | 6,658 | 7.6 |
| Income from operations | 3,237 | 4.4 | 4,675 | 5.3 | 4,084 | 4.6 |
| Other expense: | | | | | | |
| Interest expense | (8,726) | (11.9) | (11,339) | (12.8) | (10,943) | (12.4) |
| Reorganization items, net | (4,540) | (6.2) | — | — | — | — |
| Loss before income taxes | (10,029) | (13.7) | (6,664) | (7.5) | (6,859) | (7.8) |
| Income tax provision | 35 | 0.1 | 6 | — | 18 | — |
| Loss from continuing operations | (10,064) | (13.8) | (6,670) | (7.5) | (6,877) | (7.8) |
| Add back: | | | | | | |
| Depreciation and amortization (3) | 5,333 | 7.3 | 6,437 | 7.3 | 7,295 | 8.3 |
| Interest expense | 8,726 | 11.9 | 11,339 | 12.8 | 10,943 | 12.4 |

| | 2008 | | 2007 | | 2006 | |
|---|---|---|---|---|---|---|
| Reorganization items, net | 4,540 | 6.2 | — | — | — | — |
| Income tax provision | 35 | 0.1 | 6 | — | 18 | — |
| EBITDA | 8,570 | 11.7 | 11,112 | 12.6 | 11,379 | 12.9 |
| Adjustments to reconcile EBITDA to net cash provided by operating activities: | | | | | | |
| Interest expense | (8,726) | (11.9) | (11,339) | (12.8) | (10,943) | (12.4) |
| Reorganization items, net | (4,540) | (6.2) | — | — | — | — |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 0.3 | 1,249 | 1.4 | 3,078 | 3.5 |
| Income tax provision | (35) | (0.1) | (6) | — | (18) | — |
| Change in accrued reorganization items, net | 1,168 | 1.6 | — | — | — | — |
| Change in operating assets and liabilities | 7,432 | 10.2 | 4,420 | 5.0 | (940) | (1.1) |
| Net cash provided by operating activities | $ 4,120 | 5.6% | $ 5,436 | 6.2% | $ 2,556 | 2.9% |
| Net cash used by investing activities | $ (2,847) | (3.9)% | $ (2,741) | (3.1)% | $ (2,628) | 3.0% |
| Net cash provided (used) by financing activities | $ 4,093 | 5.6% | $ (2,333) | (2.6)% | $ 621 | 0.7% |

(1) During 2008, prior to our filing of chapter 11 on April 1, 2008, and during 2007, we incurred $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness.

(2) Selling and administrative expenses for 2008 includes $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

(3) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, in 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive — OEM | $26,770 | 36.7% | $42,850 | 48.5% | $44,626 | 50.8% |
| Automotive — aftermarket | 26,569 | 36.4 | 25,786 | 29.2 | 27,906 | 31.7 |
| Medical | 16,300 | 22.3 | 15,928 | 18.0 | 11,039 | 12.6 |
| Industrial and residential equipment and devices | 2,486 | 3.4 | 2,836 | 3.2 | 3,168 | 3.6 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Other | 904 | 1.2 | 1,008 | 1.1 | 1,162 | 1.3 |
| Total net sales | $73,029 | 100.0% | $88,408 | 100.0% | $87,901 | 100.0% |

Our net sales for 2008 declined by $15,379,000, or 17.4%, compared to 2007. The decrease in net sales was primarily the result of a 37.5% decrease in net sales of automotive components used by original equipment manufacturers (OEMs), primarily connector seals used in automotive wiring systems, offset, in part, by increased net sales of automotive aftermarket components and components for medical devices.

EBITDA for 2008 was $8,570,000, or 11.7% of net sales, compared to EBITDA of $11,112,000, or 12.6% of net sales, for 2007. The change in EBITDA reflected a $2,260,000 decrease in EBITDA at the Rubber Group, a $695,000 decrease in EBITDA at the Metals Group, and a $413,000 increase in EBITDA at the Corporate Office. Excluding the $508,000 of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness during 2008, prior to our filing of chapter 11, and the $488,000 of one-time fees incurred to upgrade operating systems at our manufacturing facility in Rock Hill, South Carolina, EBITDA was $9,566,000, or 13.1% of net sales. Excluding the $698,000 of expenses incurred in connection with our efforts to restructure, refinance, or repay our indebtedness during 2007, EBITDA was $11,810,000, or 13.4% of net sales.

Net cash provided by our operating activities during 2008 totaled $4,120,000, compared to net cash provided by operating activities of $5,436,000 for 2007.

Our net sales for 2007 increased by $507,000, or 0.6%, compared to 2006. The increase in net sales was principally a result of increased unit sales of metal components and of rubber components used in medical devices, offset, by a decrease in net sales of automotive components used by OEMs, primarily connector seals used in automotive wiring systems.

EBITDA for 2007 was $11,112,000, or 12.6% of net sales, compared to EBITDA of $11,379,000, or 12.9% of net sales, for 2006. The change in EBITDA reflected a $915,000 increase in EBITDA at the

- 23 -

Metals Group, a $395,000 decrease in EBITDA at the Rubber Group, and a $787,000 decrease in EBITDA at the Corporate Office.

Net cash provided by our operating activities during 2007 totaled $5,436,000, compared to net cash provided by operating activities of $2,556,000 for 2006. For more information about the net cash provided by our operating activities, please refer to the consolidated statements of cash flows in Part II, Item 8, and to the section titled "Operating Activities" in this Part II, Item 7.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for 2008, 2007, and 2006.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

The following table sets forth the operating results of the Rubber Group for 2008, 2007, and 2006 and the

reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

|  | Years Ended December 31 | | | | | |
|  | 2008 | | 2007 | | 2006 | |
| Net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |
| Cost of sales | 52,173 | 83.8 | 63,039 | 84.5 | 64,772 | 85.1 |
| Gross profit | 10,105 | 16.2 | 11,548 | 15.5 | 11,318 | 14.9 |
| Selling and administrative expenses (1) | 3,409 | 5.5 | 3,573 | 4.8 | 3,676 | 4.9 |
| Income from operations | 6,696 | 10.8 | 7,975 | 10.7 | 7,642 | 10.0 |
| Add back: depreciation and amortization | 4,746 | 7.6 | 5,727 | 7.7 | 6,455 | 8.5 |
| EBITDA | $11,442 | 18.4% | $13,702 | 18.4% | $14,097 | 18.5% |

(1) Selling and administrative expenses for 2008 includes $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices.

- 24 -

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | | | | |
|  | 2008 | | 2007 | | 2006 | |
| Automotive — aftermarket | $26,569 | 42.7% | $25,786 | 34.6% | $27,906 | 36.7% |
| Automotive — OEM | 18,006 | 28.9 | 31,255 | 41.9 | 35,138 | 46.2 |
| Medical | 16,300 | 26.2 | 15,928 | 21.4 | 11,039 | 14.5 |
| Industrial | 851 | 1.4 | 971 | 1.3 | 1,176 | 1.5 |
| Other | 552 | 0.8 | 647 | 0.8 | 831 | 1.1 |
| Total net sales | $62,278 | 100.0% | $74,587 | 100.0% | $76,090 | 100.0% |

During 2008, net sales of the Rubber Group decreased by $12,309,000, or 16.5%, compared to 2007. During 2008, net sales of aftermarket automotive components increased by $783,000, or 3.0%, to $26,569,000, and net sales of components for use in medical devices increased by $372,000, or 2.3%, to $16,300,000. These increases were offset by a reduction in net sales of components for use in automotive OEM applications by $13,249,000, or 42.4%, to $18,006,000. This reduction was primarily caused by production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during 2008. The three largest customers of the Rubber Group accounted for 36.9%, 30.5%, and 36.5%, of the Rubber Group's net sales during 2008, 2007, and 2006, respectively.

Cost of sales as a percentage of net sales decreased to 83.8% of net sales during 2008, compared to 84.5% of net sales during 2007, primarily due to improved labor efficiencies, lower employee benefit expenses, improved product mix, and lower depreciation and amortization expenses offset, in part, by the underabsorption of fixed or partially fixed costs during a period of reduced sales volume.

Selling and administrative expenses of the Rubber Group decreased by $164,000, or 4.6% during 2008, compared to 2007. During 2008, we incurred $488,000 of one-time fees and expenses, related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and manufacturing procedures and controls at our facility in Rock Hill, South Carolina, where we manufacture rubber components used in medical devices. We currently estimate that the annual savings resulting from the project will be approximately $1,250,000. Selling and administrative expenses expressed as a percentage of net sales increased to 5.5% of net sales during 2008, compared to 4.8% during 2007. Excluding the $488,000 of one-time fees and expenses in 2008, selling and administrative expenses expressed as a percentage of net sales was 4.7% of net sales.

During 2008, the Rubber Group's income from operations totaled $6,696,000, a decrease of $1,279,000, or 16.0%, compared to 2007. The Rubber Group's EBITDA for 2008 was $11,442,000, or 18.4% of net sales, compared to $13,702,000, or 18.4% of net sales, for 2007. Excluding the $488,000 of fees and expenses related to the services of the consulting firm that we retained for the project in Rock Hill during 2008, income from operations totaled $7,184,000, or 11.5% of net sales, and EBITDA was $11,930,000, or 19.2% of net sales. The decrease in EBITDA at our Rubber Group during 2008 compared to 2007, resulted from a reduction in net sales to automotive OEM customers.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in Vienna, Ohio. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We currently

- 25 -

anticipate that the shutdown of the Vienna facility will be substantially completed by June 30, 2009, and that the cost to restructure our connector-seal business will be approximately $1,082,000, which we expect to incur during the second and third quarters of 2009. This estimated cost consists of (1) $555,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $422,000 for moving and installation of manufacturing equipment, and (3) $105,000 for start-up expenses. Although we cannot assure you, we currently believe, based on appraised values, that we will sell the Vienna, Ohio, manufacturing facility and certain ancillary manufacturing equipment that we are not planning to move to our other rubber molding facilities, at an amount that, in the aggregate, is in excess of the carrying value of these assets. Compared to 2008, we currently project that the restructuring of the connector-seal business will increase the EBITDA of the connector-seal business by approximately $2,500,000 in 2010.

During 2007, total net sales of the Rubber Group decreased by $1,503,000, or 2.0%, compared to 2006. Net sales to OEM automotive customers decreased by $3,883,000, or 11.1%, to $31,255,000 net sales of aftermarket automotive products decreased by $2,120,000, or 7.6%, to $25,786,000, net sales to medical device manufacturers increased by $4,889,000, or 44.3%, to $15,928,000, and all other net sales decreased by $389,000, or 19.4%, to $1,618,000.

The increase in net sales of medical components was primarily due to the sale of components to a medical device manufacturer that began purchasing production parts from us in January of 2007.

The decrease in net sales to automotive customers was primarily due to decreased unit sales to original equipment manufacturers of connector seals for automotive wire harnesses, components for use in automotive computer control modules, and insulators for automotive ignition-wire sets, which we believe resulted primarily

from production cutbacks by Detroit-based automakers, and decreased unit sales of insulators to manufacturers of aftermarket automotive ignition-wire sets primarily due to the decision of a large customer to reduce their on-hand inventory.

Cost of sales as a percentage of net sales decreased to 84.5% of net sales during 2007, compared to 85.1% of net sales during 2006, primarily due to improved product mix, lower depreciation and amortization expense, and lower employee benefit expenses.

Selling and administrative expenses of the Rubber Group expressed as a percentage of net sales decreased to 4.8% of net sales during 2007, compared to 4.9% during 2006, primarily because of reduced employee wage and benefit expenses.

During 2007, income from operations totaled $7,975,000, an increase of $333,000, or 4.4%, compared to 2006. EBITDA for 2007 was $13,702,000, or 18.4% of net sales, compared to $14,097,000, or 18.5% of net sales, for 2006.

### Metals Group

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive OEMs.

- 26 -

The following table sets forth the operating results of the Metals Group for 2008, 2007, and 2006, and the reconciliation of the Metals Group's loss from operations to its EBITDA (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |
| Cost of sales | 10,934 | 101.7 | 13,490 | 97.6 | 12,387 | 104.9 |
| Gross profit (loss) | (183) | (1.7) | 331 | 2.4 | (576) | (4.9) |
| Selling and administrative expenses | 558 | 5.2 | 523 | 3.8 | 669 | 5.6 |
| Loss from operations | (741) | (6.9) | (192) | (1.4) | (1,245) | (10.5) |
| Add back: depreciation and amortization | 536 | 5.0 | 682 | 4.9 | 820 | 6.9 |
| EBITDA | $ (205) | (1.9)% | $ 490 | 3.5% | $ (425) | (3.6)% |

Net sales by the type of product in which our components were utilized during 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive original equipment | $ 8,764 | 81.5% | $11,595 | 83.9% | $ 9,488 | 80.3% |
| Industrial and residential equipment and devices | 1,635 | 15.2 | 1,865 | 13.5 | 1,992 | 16.9 |
| Other | 352 | 3.3 | 361 | 2.6 | 331 | 2.8 |

| | | | | | | |
|---|---|---|---|---|---|
| Total net sales | $10,751 | 100.0% | $13,821 | 100.0% | $11,811 | 100.0% |

During 2008, net sales of the Metals Group decreased by $3,070,000, or 22.2%, compared to 2007, primarily as a result of reduced net sales of components to automotive OEMs, which was primarily a result of production cutbacks by the automobile manufacturers and inventory reductions throughout the supply chain during 2008. The three largest customers of the Metals Group accounted for 48.3%, 55.2%, and 51.2% of the Metals Group's net sales during 2008, 2007, and 2006, respectively.

Cost of sales as a percentage of net sales increased to 101.7% of net sales during 2008 from 97.6% of net sales during 2007, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

Selling and administrative expenses of the Metals Group increased by $35,000, or 6.7%, from 2007 to 2008. Selling and administrative expenses expressed as a percentage of net sales increased to 5.2% of net sales during 2008, compared to 3.8% during 2007, primarily because of the underabsorption of fixed or partially fixed expenses during a period of reduced sales volume.

- 27 -

For 2008, the Metals Group's loss from operations was $741,000, compared to a loss from operations of $192,000 for 2007. The Metals Group's EBITDA for 2008 was negative $205,000, compared to positive $490,000 for 2007.

During 2007, net sales of the Metals Group increased by $2,010,000, or 17%, compared to 2006, primarily as a result of sales to new customers.

Cost of sales as a percentage of net sales decreased to 97.6% during 2007 from 104.9% during 2006, primarily because of (1) improved production efficiencies, (2) improved absorption of fixed or partially fixed manufacturing overhead during a period of increasing net sales, (3) lower depreciation expense, and (4) reduced material costs as a percentage of net sales.

Selling and administrative expenses of the Metals Group decreased from $669,000 during 2006 to $523,000 during 2007, primarily because of a reduction in headcount.

During 2007, the loss from operations was $192,000, compared to a loss from operations of $1,245,000 during 2006. EBITDA for 2007 was positive $490,000, compared to negative $425,000 for 2006.

### *Corporate Office*

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for 2008, 2007, and 2006 and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

**Years Ended December 31**

|                                       | 2008      | 2007      | 2006      |
|---------------------------------------|-----------|-----------|-----------|
| Loss from operations                  | $(2,718)  | $(3,108)  | $(2,313)  |
| Add back: depreciation and amortization (1) | 51        | 28        | 20        |
| EBITDA                                | $(2,667)  | $(3,080)  | $(2,293)  |

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, in 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

During 2008, Corporate Office expenses decreased to $2,718,000 from $3,108,000 during 2007. During 2008, prior to our filing of chapter 11 on April 1, 2008, and during 2007, Corporate Office expenses included $508,000 and $698,000, respectively, of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness. During the period from April 1, 2008, through December 31, 2008, we incurred $4,540,000 of net expenses in connection with our efforts to refinance, restructure, or repay our indebtedness, which, in accordance with SOP 90-7, were classified as reorganization items in our consolidated statements of operations. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

- 28 -

During 2007, Corporate Office expenses increased by $795,000, compared to 2006, primarily because we incurred expenses of $698,000 in connection with our efforts to refinance, restructure, or repay our senior, secured debt and Senior Subordinated Notes as more fully discussed in the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7. The balance of the increase in cost was primarily due to higher premiums for liability insurance.

### *Interest Expense*

A breakdown of interest expense for 2008, 2007, and 2006 is set forth below (dollar amounts in thousands):

|                                       | Years Ended December 31 | | |
|---------------------------------------|----------|-----------|-----------|
|                                       | 2008     | 2007      | 2006      |
| Interest expense at contractual interest rates: |          |           |           |
| Senior, secured loans                 | $2,490   | $ 3,698   | $ 3,334   |
| Debtor-in-possession loan             | 296      | —         | —         |
| Senior Subordinated Notes             | 4,101    | 4,101     | 4,101     |
| Junior Subordinated Note              | 45       | 45        | 45        |
| All other                             | 84       | 47        | 480       |
| Subtotal                              | 7,016    | 7,891     | 7,960     |
| Interest expense resulting from incremental interest rates: |          |           |           |
| Senior, secured loans — default or forbearance premium | 172      | 698       | 62        |
| Senior Subordinated Notes — forbearance premium | 411      | 1,279     | —         |
| Senior Subordinated Notes — interest on missed interest payments | 1,044    | 390       | 21        |
| Subtotal                              | 1,627    | 2,367     | 83        |
| Financing costs and fees              | 251      | 1,249     | 3,078     |
| Total interest expense                | 8,894    | 11,507    | 11,121    |

| Less: Interest expense allocated to discontinued operations | 168 | 168 | 178 |
|---|---|---|---|
| Interest expense related to continuing operations | $8,726 | $11,339 | $10,943 |

The average amount of debt outstanding during 2008, 2007, and 2006, including past due interest payments on which we are accruing interest, was $81,395,000, $77,195,000, and $70,585,000, respectively. In 2008, 2007, and 2006, cash interest payments were $3,175,000, $4,431,000, and $6,749,000, respectively. For more information about the status of our senior, secured debt and our Senior Subordinated Notes, please refer to the discussion under the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

On April 2 and 17, 2008, and on March 3, 2009, the Bankruptcy Court entered orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. We continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates because we believe that the company is solvent and our unsecured debt, including accrued interest thereon, will be paid in full. For more

- 29 -

information about the status of our debt, please refer to the section titled "Liquidity and Filing of Chapter 11" in this Part II, Item 7.

### Reorganization Items

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the period from April 1, 2008, through December 31, 2008, are set forth below (dollar amounts in thousands):

| | |
|---|---|
| Professional fees and expenses incurred directly by us | $2,239 |
| Professional fees and expenses incurred by creditors | 2,072 |
| Other costs | 346 |
| Interest income | (117) |
| Reorganization items, net | $4,540 |

### Income Tax Provision

The income tax provisions recorded in 2008, 2007, and 2006, consisted of estimated state income taxes. For additional information concerning income taxes and related matters, see Note 9, "Income Taxes," in the notes to our consolidated financial statements in Part II, Item 8.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $168,000, $168,000, and $178,000, for 2008, 2007, and 2006, respectively. During 2007 and 2006, we increased our provision for environmental remediation at the manufacturing facility formerly housing the diecasting business by $87,000 and $255,000, respectively. In March 2007, the State of New

York Department of Environmental Conservation informed us that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

## Liquidity and Capital Resources

### Operating Activities

During 2008, operating activities of our continuing operations provided net cash of $4,120,000. Net accounts receivable decreased by $4,187,000, or 38.1%, during 2008, primarily because (1) our net product sales during November and December of 2008 were less than our net product sales during November and December 2007, (2) the amount of outstanding billings for sales of tools and automation equipment decreased by $307,000, or 44.6%, and (3) our reserve for bad debts increased by $259,000, or 54.4%, during 2008. Inventories increased by $1,267,000, or 13.6%, primarily because of (a) higher metals prices, (b) increased raw material inventory due to an abnormally low level of raw materials at December 31, 2007, (c) a change in the terms of sale to a large customer, which resulted in increased on-hand finished goods inventory (d) the building of components to satisfy the safety stock requirements of certain of our customers as a result of our chapter 11 filing, and (e) an unanticipated sharp decline in net sales during the third and fourth quarters of 2008 that did not allow sufficient time for us to adjust our

- 30 -

finished goods inventory levels to the levels required to support reduced net sales levels. Prepaid expenses and other current assets increased by $1,403,000, or 135.9%, during the year, because (i) we had a receivable from our property insurance carrier in the amount of $634,000 at December 31, 2008, for expenditures that we incurred as a result of a fire that took place at our facility in Rock Hill, South Carolina, in November 2008, and (ii) we had deposits totaling $464,000 with utilities and trade creditors securing delivery of certain services and products. As of the date of filing this Form 10-K, we have received $500,000 from our property insurance carrier and we do not anticipate any problems in recovering the balance of our expenditures in accordance with the terms of the property insurance policy. Accounts payable at December 31, 2008, included $1,168,000 of unpaid billings from attorneys, investment advisors, and other fees and expenses incurred in connection with our chapter 11 filing. Accrued expenses decreased by $550,000 at December 31, 2008, primarily because of a reduction in accruals for employee benefits. Accrued interest expense, including accrued interest expense classified as a liability subject to compromise, increased by $5,468,000, or 68.7%, primarily because of additional accruals of interest on our subordinated debt.

Net cash used by operating activities of our discontinued operations totaled $38,000.

### Investing Activities

During 2008, investing activities of our continuing operations used net cash of $2,847,000. Capital expenditures attributable to the Rubber Group, the Metals Group, and the Corporate Office totaled $2,343,000, $333,000, and $19,000, respectively, primarily for manufacturing equipment, tooling for our automotive aftermarket business, tooling for certain OEM automotive components, and improvements to 20 acres of commercial land in Ellijay, Georgia. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $2,086,000, $523,000, and $8,000, respectively, for 2009. At December 31, 2008, we had approximately $81,000 of unrecorded commitments outstanding to purchase equipment.

### Financing Activities

During 2008, our financing activities provided net cash of $4,093,000. In 2008, we received $4,000,000 of cash from the issuance of the debtor-in-possession note and we increased borrowings under our revolving line of credit by $3,587,000. We made principal payments on our term loans totaling $3,280,000.

### Liquidity and Filing of Chapter 11

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At December 31, 2008, accrued interest on our Senior Subordinated Notes totaled $13,055,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated

- 31 -

under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default and (2) modified certain of the financial covenants effective March 31, 2007. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own a majority of our Senior Subordinated Notes to advise them of the following:

1. We had decided to pursue the proposal to purchase the Rock Hill facility;

2. We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3.   We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4.   In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, and would receive cash interest at 12% per annum; and

5.   We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the

- 32 -

forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default of our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). In connection with this petition, we obtained a financing package that we believed provided us more than adequate liquidity to operate our business without interruption throughout the term of the chapter 11 proceedings. This financing package consisted of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The arrangement with the senior, secured lenders provided for a continuation of the scheduled monthly, term loan principal payments, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%.

At March 31, 2008, prior to our chapter 11 filing, our senior, secured credit facility included a $17,500,000 revolving line of credit, with $12,875,000 of loans and $907,000 of letters of credit outstanding. At

April 1, 2008, there were $14,219,000 of loans and $907,000 of letters of credit outstanding under the revolving line of credit. The contractual interest rate on loans under the revolving credit is LIBOR plus 2.75% (3.19% at December 31, 2008).

Our equipment term loan had an outstanding principal balance of $8,542,000 at March 31, 2008, $8,333,000 at April 1, 2008, and $6,667,000 at December 31, 2008. The contractual interest rate on the equipment term loan is LIBOR plus 4.5% (4.94% at December 31, 2008).

Our real estate term loan had an outstanding principal balance of $13,839,000 at March 31, 2008, $13,778,000 at April 1, 2008, and $13,289,000 at December 31, 2008. The contractual interest rate on the real estate term loan is the prime rate plus 6% on $4,000,000 principal amount and LIBOR plus 4.5% on the balance (weighted average of 6.24% at December 31, 2008).

On April 1, 2008, the financial covenants under the senior, secured financing agreements were modified as follows:

1. Minimum Cash. Our aggregate cash was required to be greater than $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and was required to be greater than $500,000 on the last day of each four-week period following May 30.

2. Maximum Expenditures. Our cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from April 2, 2008, through April 18, 2008, and was required to be less than 110% of cumulative budgeted expenditures on the last day of each two-week period following April 18.

- 33 -

3. Minimum Net Sales. Our cumulative net sales were required to be greater than 90% of cumulative budgeted net sales from April 2, 2008, through May 2, 2008, and was required to be greater than 90% of cumulative budgeted net sales on the last day of each four-week period after May 2.

During the second half of 2008, we experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at our connector-seal facility located in Vienna, Ohio. Because of these losses and because we do not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. We believe that the effectuation of this plan will significantly enhance our ability to obtain the financing we need to exit chapter 11. In order to allow us sufficient time in which to complete the operational restructuring of our connector-seal business, including the closing of the Vienna facility and the relocation of the connector-seal business to our other rubber molding facilities, on January 13, 2009, we filed a motion requesting that the Bankruptcy Court extend the time during which we have the exclusive right to file a plan of reorganization and our right to use cash collateral. Subsequent to a hearing held on our motion on February 23 and 24, 2009, the Bankruptcy Court extended our exclusive right to file a plan of reorganization until April 30, 2009, extended our exclusive right to solicit acceptances of such plan until June 1, 2009, and extended our right to use cash collateral to May 22, 2009. In addition, by mutual agreement, the maturity date of the debtor-in-possession loan was extended from April 1, 2009, to December 31, 2009. For more information on the restructuring of our connector-seal business, please refer to the discussion of the Rubber Group in the section titled "Results of Operations — Comparison of 2008, 2007, and 2006" in this Part II, Item 7.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 34 -

By order of the Bankruptcy Court on March 4, 2009, our ability to use cash collateral was extended to May 22, 2009, and the financial covenants under the senior, secured financing agreements were further modified, effective February 27, 2009, as follows:

1.  Minimum Cash. Our aggregate cash was or is required to be not less than the following amounts on the specified measurement dates:

| | |
|---|---|
| February 27, 2009 | $2,958,000 |
| March 6, 2009 | $2,402,000 |
| March 13, 2009 | $1,946,000 |
| March 20, 2009 | $1,867,000 |
| March 27, 2009 | $1,622,000 |
| April 3, 2009 | $1,499,000 |
| April 10, 2009 | $1,638,000 |
| April 17, 2009 | $1,307,000 |
| April 24, 2009 | $1,384,000 |
| May 1, 2009 | $1,222,000 |
| May 8, 2009 | $1,415,000 |
| May 15, 2009 | $1,334,000 |
| May 22, 2009 | $1,396,000 |

On April 17, 2009, the latest measurement date prior to the issuance of this report, our aggregate cash was $3,117,000.

2.  Maximum Expenditures. Our cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from February 27, 2009, through March 13, 2009, and are required to be less than 110% of cumulative budgeted expenditures on the last day of each two-week period following March 13, 2009. At April 17, 2009, the latest measurement date prior to the issuance of this report, our cumulative expenditures were $5,439,000 less than 110% of cumulative budgeted expenditures.

3.  Minimum Net Sales. Our cumulative net sales are required to be greater than 85% of cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At April 3, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales exceeded 85% of cumulative budgeted net sales by $791,000.

4. <u>Operational Restructuring of Connector-Seal Business</u>. In connection with the closing of our connector-seal facility located in Vienna, Ohio, and the relocation of production to other rubber molding facilities, we have agreed to the following, subject to any changes that the senior, secured lender may agree to:

(a) On or before March 31, 2009, we shall obtain transitional and long-term contracts with customers covering at least 60% of our projected sales for the connector-seal business for 2010;

(b) The transitional agreements shall provide aggregate revenues of not less than $900,000 on payment terms not to exceed net 30 days;

(c) At least 90% of the inventory banks for the connector-seal consolidation shall be completed by May 31, 2009; and

- 35 -

(d) The closure of the Vienna, Ohio, facility shall be substantially completed by June 30, 2009.

Because we did not meet the condition set forth in clause (a) above, the senior, secured lender has notified us that a Termination Event (as defined in the Cash collateral Order) has occurred. The senior, secured lender has not taken any action with respect to this Termination Event and has not indicated any present intention to take action, but has reserved its rights under the Cash Collateral Order.

The senior, secured credit facility, as amended by the Bankruptcy Court on March 4, 2009, will terminate upon the occurrence of the following events if we fail to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

Although we cannot assure you that we will be successful, our intent in filing for chapter 11 protection was to use the powers afforded us under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in our total indebtedness on a basis that would be fair and equitable to all of our creditors and stockholders. On June 30, 2008, we filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, we filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although we currently plan to complete the consolidation of the connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three

months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of our liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, the classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

We cannot assure you that the Amended Plan will be confirmed. The Amended Plan may be further amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

- 36 -

Our aggregate indebtedness at December 31, 2008, totaled $73,375,000 plus $13,164,000 of accrued interest on our subordinated debt, compared to $69,091,000 plus $7,564,000 of accrued interest on our subordinated debt at December 31, 2007.

Including liabilities classified as subject to compromise, we had a net working capital deficit of $73,922,000 at December 31, 2008, compared to a net working capital deficit of $65,894,000 at December 31, 2007.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

**Off-Balance Sheet Arrangements**

We have no material off-balance sheet arrangements.

**Inflation**

We generally attempt to pass through to our customers fluctuations in raw material costs; however, many

of our customers will not accept price increases from us to compensate for increases in labor and overhead expenses that result from inflation. To offset inflationary increases in costs that we cannot pass through to our customers and to maintain or improve our operating margins, we attempt to improve our production efficiencies and manufacturing processes. We believe that, over time, prices are affected by many factors, but that the price we can charge our customers is governed by the competitive pricing set by the marketplace, rather than by increases or decreases in particular components of our cost.

**Environmental Matters**

We have been named from time to time as one of numerous potentially responsible parties or third-party defendants under applicable environmental laws for restoration costs at waste-disposal sites, and as a defendant or potential defendant in various other environmental law matters. It is our policy to record accruals for matters of these types when we deem a loss to be probable and we can reasonably estimate the amount of that loss. The various actions to which we are or may in the future be a party are at various stages of completion. Although we cannot assure you as to the outcome of existing or potential environmental litigation we believe, based upon the information currently available to us, that the outcome thereof will not have a material adverse effect upon our results of operations or financial condition.

<center>- 37 -</center>

**Quarterly Financial Data**

For quarterly financial data please refer to Note 15, "Quarterly Financial Data," in the notes to our consolidated financial statements in Part II, Item 8.

**Critical Accounting Policies and Estimates**

Our accounting policies are more fully described in Note 1, "Summary of Significant Accounting Policies," in the notes to our consolidated financial statements in Part II, Item 8. The preparation of our consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses during each reporting period. Actual results could differ from those estimates. The significant estimates included in the preparation of our financial statements are related to valuation of accounts receivable, inventories, long-lived assets, and goodwill and estimates related to the determination of liabilities for environmental matters, litigation, product liability matters, income taxes, and other contingencies.

We believe that the most critical accounting policies inherent in the preparation of our consolidated financial statements are the following:

*Going Concern Basis*

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Valuation of Accounts Receivable and Provision for Credit Losses

We record accounts receivable due from our customers at the time a sale is recorded in accordance with our revenue recognition policy. The markets we serve are characterized by intense price competition and increasing customer requirements for quality and service. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of our accounts receivable from those customers. We attempt to mitigate this risk of loss through ongoing evaluations of market conditions, examinations of financial statements of our customers, and discussions with management of our customers, as deemed necessary. Provisions for credit losses are based upon historical experience and such ongoing evaluations. We generally do not require collateral from our customers to support the extension of trade credit.

### Valuation of Inventory

Inventory is valued at the lower of cost (first-in, first-out method) or market. We evaluate our inventory on a quarterly basis to ensure that it is properly valued. We record allowances against inventory where appropriate to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, we apply consistent practices, which include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with new generation components, and actual margins generated from the sales of our components.

- 38 -

### Valuation of Long-Lived Assets other than Goodwill

We evaluate for impairment our plant and equipment and other long-term, assets other than goodwill when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in our use of these assets may cause the original estimated useful lives of these assets to change and result in the impairment of these assets.

When performing this evaluation, we prepare a projection of the future cash flow we will derive from an asset or group of assets. If the projected cash flow is less than the carrying value of the asset or asset group, we recognize an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although we believe that our projections of future cash flows are reasonable, changes in unit sales, pricing, cost of goods sold, and other factors could significantly affect the accuracy of our cash flow projections.

### Valuation of Goodwill

At December 31, 2008 and 2007, our unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2008, the assets of the Rubber Group, including goodwill, totaled $38,527,000. In 2008, EBITDA of the Rubber Group was $11,442,000. In connection with our chapter 11 proceedings, W.Y. Campbell & Company has prepared several analyses of the value of the Rubber Group that concluded that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### Revenue Recognition

All of our revenues result from the sale of rubber and metal components and mixed rubber compounds. We recognize revenue from the sale of these items when title and risk of loss pass to our customers according to shipping schedules and terms of sale mutually agreed to by us and our customers. Shipping and handling costs are typically paid by the customer. If paid by us, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience; these accruals may be adjusted subsequent to the date of shipment as new information becomes available.

### Other

Other critical accounting policies include estimates used to determine liabilities related to environmental matters, litigation, product liability matters, self-insurance, income taxes, and other contingencies. The process of making estimates takes into account historical experience, specific facts and circumstances, present and projected economic and business conditions, projected unit volumes, projected operating efficiencies, and other relevant factors and assumptions. We reevaluate our estimates whenever factors relevant to the making of the estimates change.

## Recently Issued Accounting Standards

Listed below are recently issued accounting standards and a discussion of how they have affected or will affect our consolidated financial statements:

- 39 -

### Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion"

In May 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion" ("FSP APB 14-1"). FSP APB 14-1 requires issuers of convertible debt instruments to separately account for the liability and equity components of interest cost recognized in future periods on convertible debt instruments in a manner that will reflect the entity's nonconvertible debt borrowing rate on the date the instrument was issued. FSP APB 14-1 is effective for fiscal years after December 15, 2008, and interim periods within those fiscal years, and must be applied to all periods presented. Based on our current operations, we do not believe that the adoption of FSP APB 14-1 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133"

On March 19, 2008, the FASB issued Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133" ("FAS 161"), which enhanced required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (1) an entity uses derivative instruments, (2) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," and (3) derivative instruments and related hedged items affect an entity's financial

position, financial performance, and cash flows. FAS 161 is effective for fiscal years and interim periods beginning on or after November 15, 2008. Based on our current operations, we do not believe that FAS 161 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51"

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51 ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. Among other things, FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements separate from the parent company's equity, and that the amount of net income attributable to the noncontrolling interest should be included in consolidated net income on the face of the income statement. FAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Based on our current operations, we do not believe that FAS 160 will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable

- 40 -

users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Based on our current operations, we do not believe that FAS 141R will have a significant impact on our results of operations or financial position.

### Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value when using U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In February 2008, the FASB issued Staff Position FAS157-2, "Effective Date of FASB Statement No. 157"("FSP 157-2"), which defers the effective date of FAS 157 for one year for certain nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on an annual basis. In accordance with FSP 157-2, we have only adopted the provisions of FAS 157 with respect to our financial assets and financial liabilities that were measured at fair value in our financial statements since January 1, 2008. At December 31, 2008, these assets and liabilities consisted only of marketable securities. The provisions of FAS 157 have not been applied to non-financial assets and non-financial liabilities.

*Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"*

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. FAS 159 also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. We adopted FAS 159 on January 1, 2008, and have elected not to apply the fair value option to any of our financial instruments.

## Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant. At December 31, 2008, we had outstanding $38,175,000 of floating-rate debt at interest rates equal to either LIBOR plus 2.75%, LIBOR plus 4.5%, prime rate plus 6%, or LIBOR plus 7%, subject to a minimum interest rate of 10%. At December 31, 2008, we had outstanding $35,200,000 of fixed-rate debt with a weighted-average interest rate of 11.9%. We estimate that a one-percentage-point increase or decrease in both LIBOR and the prime rate would increase or decrease our monthly interest expense by approximately $32,000. For further information about our indebtedness, please refer to Note 5, "Debt," in the notes to our consolidated financial statements in Part II, Item 8.

- 41 -

## Item 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

### Table of Contents

|                                                                                                          | Page |
|----------------------------------------------------------------------------------------------------------|------|
| Report of Malin, Bergquist & Company, LLP, Independent Registered Public Accounting Firm (for 2008 and 2007) | 43   |
| Report of Ernst & Young LLP, Independent Registered Public Accounting Firm (for 2006)                    | 44   |
| Consolidated Statements of Operations for the Years Ended December 31, 2008, 2007, and 2006              | 45   |
| Consolidated Balance Sheets at December 31, 2008 and 2007                                                | 46   |
| Consolidated Statements of Stockholders' Deficit for the Years Ended December 31, 2008, 2007, and 2006   | 48   |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2008, 2007, and 2006              | 49   |
| Notes to Consolidated Financial Statements                                                               | 50   |

- 42 -

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Lexington Precision Corporation and Subsidiary

We have audited the accompanying consolidated balance sheets of Lexington Precision Corporation and subsidiary as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholders' deficit, and cash flows for the years then ended. Our audit also included the financial statement schedule in Part IV, Item 15. Lexington Precision Corporation's management is responsible for these consolidated financial statements and schedule. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audits.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lexington Precision Corporation and subsidiary as of December 31, 2008 and 2007, and the consolidated results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The accompanying consolidated financial statements have been prepared assuming that Lexington Precision Corporation and subsidiary will continue as a going concern. As more fully described in Notes 1 and 5, on April 1, 2008, Lexington Precision Corporation and Lexington Rubber Group, Inc. (collectively, the "Debtors") filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") and their continuation as a going concern is contingent upon, among other things, the Debtors ability (i) to comply with the terms and conditions of the debtors-in-possession financing arrangements; (ii) to obtain confirmation of a plan of reorganization under the Bankruptcy Code; (iii) to generate sufficient cash flow from operations to fund working capital, capital expenditures and debt service requirements, and; (iv) to obtain financing sources to meet future obligations. These matters raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that may result from the outcome of this uncertainty.

/s/ Malin, Bergquist & Company, LLP

Malin, Bergquist & Company, LLP
Pittsburgh, Pennsylvania
April 23, 2009

- 43 -

### REPORT OF ERNST & YOUNG LLP, INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Lexington Precision Corporation and Subsidiaries

We have audited the consolidated balance sheet of Lexington Precision Corporation and subsidiaries as of December 31, 2006, and the related consolidated statements of operations, stockholders' deficit, and cash flows for the year then ended. Our audit also included the data for 2006 appearing on the financial statement schedule listed in the index at Item 15(a). These consolidated financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and schedule based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Lexington Precision Corporation and subsidiaries at December 31, 2006, and the consolidated results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the data for 2006 appearing on the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

The consolidated financial statements for 2006 have been prepared assuming that Lexington Precision Corporation and subsidiaries would continue as a going concern. As more fully described in Notes 1 and 5, the Company failed to pay quarterly interest payments that were due on its Senior Subordinated Notes on November 1, 2006 and February 1, 2007, resulting in substantially all of the Company's debt to be in default as of December 31, 2006. As of February 28, 2007, the Company failed to comply with a fixed charge coverage ratio covenant that is contained in its secured borrowing arrangements. On April 5, 2007, the Company was notified that the Company's ability to borrow under its revolving line of credit would be terminated after May 7, 2007. On April 6, 2007, the Company received a notice of acceleration demanding immediate payment in full of a portion of the obligations due under its real estate term loan. Further, the Company has a working capital deficiency and a

stockholders' deficit. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Ernst & Young LLP

Cleveland, Ohio
April 12, 2007

- 44 -

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Operations
### (thousands of dollars, except per share data)

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| Net sales | $ 73,029 | $ 88,408 | $ 87,901 |
| Cost of sales | 63,107 | 76,529 | 77,159 |
| Gross profit | 9,922 | 11,879 | 10,742 |
| Selling and administrative expenses | 6,685 | 7,204 | 6,658 |
| Income from operations | 3,237 | 4,675 | 4,084 |
| Other expense: | | | |
| Interest expense | (8,726) | (11,339) | (10,943) |
| Reorganization items, net | (4,540) | — | — |
| Loss from continuing operations before income taxes | (10,029) | (6,664) | (6,859) |
| Income tax provision | 35 | 6 | 18 |
| Loss from continuing operations | (10,064) | (6,670) | (6,877) |
| Loss from discontinued operations | (229) | (289) | (472) |
| Net loss | $(10,293) | $ (6,959) | $ (7,349) |
| Basic and diluted loss per share of common stock: | | | |
| Continuing operations | $ (2.03) | $ (1.35) | $ (1.39) |
| Discontinued operations | (0.04) | (0.06) | (0.10) |
| Net loss | $ (2.07) | $ (1.41) | $ (1.49) |

*See notes to consolidated financial statements*

- 45 -

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Balance Sheets
### (thousands of dollars, except share data)

|  | December 31 | |
|---|---|---|
|  | **2008** | **2007** |
| **Assets:** | | |
| Current assets: | | |
| Cash | $ 5,540 | $ 212 |
| Marketable securities | 38 | 214 |
| Accounts receivable, net of allowances of $735 and $476, respectively | 6,794 | 10,981 |
| Inventories, net of allowances of $778 and $612, respectively | 10,597 | 9,330 |
| Prepaid expenses and other current assets | 2,426 | 1,032 |
| Deferred income taxes | — | 98 |
| Current assets of discontinued operations | 7 | 10 |
| Total current assets | 25,402 | 21,877 |
| Plant and equipment: | | |
| Land | 2,255 | 1,817 |
| Buildings | 13,378 | 13,370 |
| Equipment | 112,022 | 110,723 |
|  | 127,655 | 125,910 |
| Accumulated depreciation | 109,216 | 105,056 |
| Plant and equipment, net | 18,439 | 20,854 |
| Plant and equipment of discontinued operations, net | 1,231 | 1,338 |
| Goodwill, net | 7,623 | 7,623 |
| Other assets, net | 633 | 675 |
|  | $ 53,328 | $ 52,367 |

*See notes to consolidated financial statements
    (continued on next page)*

- 46 -

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Balance Sheets
### (thousands of dollars, except share data)

December 31

| | 2008 | 2007 |
|---|---|---|
| **Liabilities and stockholders' deficit:** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,391 | $ 6,558 |
| Accrued expenses, excluding interest expense | 3,382 | 3,932 |
| Accrued interest expense | 199 | 7,954 |
| Debt in default | 34,175 | 68,345 |
| Debtor-in-possession loan | 4,000 | — |
| Current portion of long-term debt | 16 | 741 |
| Current liabilities of discontinued operations | 148 | 241 |
| Total current liabilities | 45,311 | 87,771 |
| Liabilities subject to compromise | 54,013 | — |
| Long-term debt, excluding current portion | — | 5 |
| Deferred income taxes | — | 98 |
| Other long-term liabilities | 400 | 434 |
| Stockholders' deficit: | | |
| Common stock, $0.25 par value, 10,000,000 shares authorized, 5,021,767 shares issued and outstanding at December 31, 2008 and 2007, respectively | 1,242 | 1,238 |
| Additional paid-in-capital | 13,197 | 13,187 |
| Accumulated deficit | (60,659) | (50,366) |
| Accumulated other comprehensive loss | (176) | — |
| Total stockholders' deficit | (46,396) | (35,941) |
| | $ 53,328 | $ 52,367 |

*See notes to consolidated financial statements*

- 47 -

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Stockholders' Deficit
### (thousands of dollars)

| | Common Stock | Additional Paid-in-Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | S |
|---|---|---|---|---|---|
| Balance at January 1, 2006 | $1,233 | $ 13,169 | $(36,058) | $ — | |
| Net loss | — | — | (7,349) | — | |
| Vesting of restricted stock grants | 2 | 12 | — | — | |
| Balance at December 31, 2006 | 1,235 | 13,181 | (43,407) | — | |
| Net loss | — | — | (6,959) | — | |
| Vesting of restricted stock grants | 3 | 6 | — | — | |
| Balance at December 31, 2007 | 1,238 | 13,187 | (50,366) | — | |
| Net loss | — | — | (10,293) | — | |
| Vesting of restricted stock grants | 4 | 10 | — | — | |
| Loss on change of fair value of marketable securities | — | — | — | (176) | |
| Balance at December 31, 2008 | $1,242 | $ 13,197 | $(60,659) | $ (176) | |

*See notes to consolidated financial statements*

- 48 -

# LEXINGTON PRECISION CORPORATION
# AND SUBSIDIARY

## Consolidated Statements of Cash Flows
## (thousands of dollars)

| | Years Ended December 31 | | |
| --- | --- | --- | --- |
| | **2008** | **2007** | **2006** |
| **Operating activities:** | | | |
| Net loss | $(10,293) | $(6,959) | $ (7,349) |
| Adjustments to reconcile net loss to net cash provided (used) by operating activities of continuing operations: | | | |
| Net loss from discontinued operations | 229 | 289 | 472 |
| Depreciation | 5,082 | 6,036 | 6,919 |
| Amortization included in cost of sales | 251 | 401 | 376 |
| Amortization and write-off of deferred financing expenses included in interest expense | 251 | 1,249 | 3,078 |
| Increase in reorganization expenses | 1,168 | — | — |
| Changes in operating assets and liabilities that provided (used) cash: | | | |
| Accounts receivable, net | 4,187 | (1,256) | 2,849 |
| Inventories, net | (1,267) | (543) | (1,003) |
| Prepaid expenses and other assets | (1,403) | 108 | (457) |
| Accounts payable | 1,097 | 188 | (2,683) |
| Accrued expenses, excluding interest expense | (550) | 143 | (912) |
| Accrued interest expense | 5,468 | 5,824 | 1,281 |
| Other long term liabilities | (2) | (2) | 12 |
| Other | (98) | (42) | (27) |
| Net cash provided by continuing operations | 4,120 | 5,436 | 2,556 |
| Net cash used by discontinued operations | (38) | (158) | (514) |
| Net cash provided by operating activities | 4,082 | 5,278 | 2,042 |
| **Investing activities:** | | | |
| Purchases of plant and equipment | (2,695) | (2,636) | (2,504) |
| Proceeds from sales of assets | 94 | 118 | — |
| Expenditures for tooling owned by customers | (307) | (197) | (174) |
| Other | 61 | (26) | 50 |
| Net cash used by continuing operations | (2,847) | (2,741) | (2,628) |
| Net cash used by discontinued operations | — | (27) | (13) |
| Net cash used by investing activities | (2,847) | (2,768) | (2,641) |

**Financing activities:**

| | | | |
|---|---|---|---|
| Issuance of debtor-in-possession note | 4,000 | — | — |
| Prepetition net borrowings (payments) under revolving line of credit | 3,587 | 2,263 | (3,585) |
| Prepetition repayment of debt in default and long-term debt | (837) | (3,310) | (22,527) |
| Prepetition proceeds from issuance of debt | — | — | 28,500 |
| Postpetition repayment of debt in default and long-term debt | (2,443) | — | — |
| Payment of financing expenses | (214) | (1,286) | (1,767) |
| Net cash provided (used) by financing activities | 4,093 | (2,333) | 621 |
| Net increase in cash | 5,328 | 177 | 22 |
| Cash at beginning of year | 212 | 35 | 13 |
| Cash at end of year | $ 5,540 | $ 212 | $ 35 |

*See notes to consolidated financial statements*

- 49 -

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 — Summary of Significant Accounting Policies**

*The Company*

Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"), have two operating segments, the Rubber Group and the Metals Group. The Rubber Group is engaged in the manufacture of insulators used in both aftermarket and OEM automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Metals Group is engaged in the manufacture of machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks for sale to automotive and industrial customers.

*Principles of Consolidation*

The consolidated financial statements include the accounts of Lexington Precision Corporation and Lexington Rubber Group, Inc. All significant intercompany accounts and transactions have been eliminated. Unless otherwise indicated all disclosures and amounts relate solely to the continuing operations of the Company.

*Basis of Presentation*

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-11153). Currently, the Company has the exclusive right to file a plan of reorganization until April 30, 2009, and the exclusive right to solicit acceptances of such plan until June 1, 2009.

In connection with the chapter 11 filing, the Company obtained a financing package that consisted of (1) an arrangement with the Company's senior, secured lenders to freeze the loan under the Company's revolving line

of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through February 25, 2009, which was subsequently extended to May 22, 2009, and (2) the Company's unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009. The Company believes that it has more than adequate liquidity to operate during the chapter 11 proceedings. At April 17, 2009, the Company had $3,117,000 of cash on hand. For more information on the Company's senior, secured financing and the debtor-in-possession loan, please refer to Note 5, "Debt."

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection was to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in its total indebtedness on a basis that would be fair and equitable to all of its creditors and stockholders.

- 50 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Proposed Plan of Reorganization*

On June 30, 2008, the Company filed with the Bankruptcy Court a plan of reorganization. On August 8, 2008, the Company filed an amended plan of reorganization, which was further amended in December 2008 (the "Amended Plan"). On December 8, 2008, the Amended Plan and a proposed disclosure statement with respect to the Amended Plan were filed with the Bankruptcy Court. Although the Company currently plans to complete the consolidation of its connector-seal business prior to seeking approval of the Amended Plan, if the Amended Plan becomes effective without further amendment, the following distributions would be made:

- The senior, secured credit facility would be repaid in full in cash;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Amended Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $4.46 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Amended Plan had become effective on December 31, 2008, $48,407,000 of the Company's liabilities would have been converted into equity securities. For a detailed description of the Amended Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the proposed disclosure statement filed with the Bankruptcy Court on December 8, 2008. The proposed disclosure statement along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com/lexington.

There can be no assurance that the Amended Plan will be confirmed. The Amended Plan may be further

amended. If the Amended Plan is not confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

### *American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code"*

The Company's consolidated financial statements have been prepared in accordance with American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"). SOP 90-7 provides guidance for financial reporting by entities that have filed petitions and expect to reorganize as going concerns under chapter 11 of title 11 of the United States Code. SOP 90-7 recommends that all such entities report the same way while reorganizing under chapter 11, with the objective of reflecting their financial evolution. To accomplish this objective, SOP 90-7 requires, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

- 51 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### *Reorganization Items*

SOP 90-7 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as "reorganization items" in the statements of operations. Reorganization items reflected in the Company's consolidated financial statements for the period from April 1 through December 31, 2008, are set forth below (dollar amounts in thousands):

| | |
|---|---|
| Professional fees and expenses incurred directly by the Company | $2,239 |
| Professional fees and expenses incurred by creditors | 2,072 |
| Other costs | 346 |
| Interest income | (117) |
| Reorganization items, net | $4,540 |

### *Liabilities Subject to Compromise*

SOP 90-7 requires that certain prepetition claims against the Company that are unsecured or under-secured be classified in the balance sheet as "liabilities subject to compromise." Additional claims that are subject to compromise may arise subsequent to the filing date as a result of the rejection of executory contracts or because claims are allowed as a result of the resolution of contingencies or disputes. On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008, as the bar date for the filing of all prepetition claims other than claims held by government units. The bar date for government units to file prepetition claims was September 29, 2008. The bar date was the date on which claims against the Company that arose prior to the filing date must have been filed in order for the claimant to receive any distribution in the chapter 11 case. On July 1, 2008, the Company mailed a notice of the bar date and the manner in which a proof of claim was to be filed to all known creditors, and, on July 16, 2008, through publication of an official notice in the *Wall Street Journal,* the Company gave notice to all unknown potential claimants informing them of the official bar date and the manner in which a proof of claim was to be filed. Although prepetition claims are generally stayed, on April 2 and April 22, 2008, the Company received approvals from the Bankruptcy Court to pay or otherwise honor, subject to

certain conditions, certain prepetition obligations critical to its continued operation, including employee wages and benefits, workers' compensation and product liability insurance programs, certain customer programs, and common carrier charges.

- 52 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company has been paying and intends to continue to pay all undisputed postpetition claims in the ordinary course of business. Liabilities subject to compromise at December 31, 2008, consisted of the following (dollar amounts in thousands):

| | |
|---|---:|
| Accounts payable — continuing operations | $ 5,432 |
| Accounts payable — discontinued operations | 174 |
| Senior Subordinated Notes | 34,177 |
| Accrued interest on Senior Subordinated Notes | 13,055 |
| Junior Subordinated Note | 347 |
| Accrued interest on Junior Subordinated Note | 109 |
| Series B Preferred Stock | 660 |
| Accrued dividends on Series B Preferred Stock | 59 |
| Total liabilities subject to compromise | $54,013 |

The foregoing amounts are based upon the Company's books and records and do not necessarily take into account all alleged liabilities asserted in proofs of claims filed with the Bankruptcy Court.

### *Accounting for Interest Expense*

On April 2, 2008, the Bankruptcy Court issued an order authorizing the Company to utilize the collections on its accounts receivable in the operation of its business. Pursuant to that order, the interest rates on the Company's senior, secured debt were reduced from the default rates to the contractual rates. In addition, because the management of the Company believes that the Company is solvent, the Company continues to accrue, and report in its consolidated financial statements, interest on all of its unsecured prepetition debt at the applicable contractual rates.

### *Going Concern Basis*

The Company's consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### *Use of Estimates*

The preparation of the consolidated financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with any certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

- 53 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Marketable Securities

Marketable securities held by the Company are valued at their quoted market prices at the close of business on December 31, 2008 and 2007, in accordance with Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" (level 1 inputs). Based on the classification of these marketable securities as available-for-sale, the Company recognized $176,000 of other comprehensive loss during 2008.

### Valuation of Accounts Receivable and Provision for Credit Losses

The Company records accounts receivable due from its customers at the time a sale is recorded in accordance with its revenue recognition policy. The markets served by the Company are characterized by intense price competition and increasing requirements for quality and service. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of financial statements of its customers, and discussions with management of its customers. Provisions for credit losses are based upon historical experience and such ongoing evaluations. The Company generally does not require collateral from its customers to support the extension of trade credit.

### Valuation of Inventory

Inventory is valued at the lower of cost (first-in, first-out method) or market. The Company evaluates its inventory on a quarterly basis to ensure that it is properly valued. The Company records allowances against inventory to provide for losses due to obsolescence, lower of cost or market valuations, excess quantities on hand, and certain other factors. In doing so, the Company applies consistent practices that include the identification of potentially unmarketable inventory based on assumptions about future demand and historical usage rates, specific identification of components that are being replaced with a new generation of components, and actual margins generated from the sales of its components.

Inventory levels by principal classification are set forth below (dollar amounts in thousands):

|                  | December 31 | |
|------------------|------------:|------------:|
|                  | 2008 | 2007 |
| Finished goods   | $ 6,370 | $5,201 |
| Work in process  | 1,923 | 2,185 |
| Raw materials    | 2,304 | 1,944 |
|                  | $10,597 | $9,330 |

### Plant and Equipment

Plant and equipment are carried at cost less accumulated depreciation. Depreciation is calculated principally on the straight-line method over the estimated useful lives of the various assets (3 to 8 years for equipment and 15 to 31 years for buildings). When an asset is retired or otherwise disposed of, the

- 54 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

related cost and accumulated depreciation are removed from the Company's records. Maintenance and repair expenses are expensed as incurred, while major improvements that increase the useful life of plant and equipment are capitalized. Maintenance and repair expenses were $3,349,000, $4,067,000, and $4,265,000, for 2008, 2007, and 2006, respectively.

### Valuation of Long-Lived Assets other than Goodwill

The Company evaluates the value of its plant and equipment and other long-term assets other than goodwill when events or changes in circumstances indicate that the carrying value of the assets may not be fully recoverable. Changes in technology or in the Company's use of these assets may cause the estimated useful lives of these assets to change and result in the impairment of these assets.

When performing this evaluation, the Company prepares a projection of the future cash flow it will derive from an asset or group of assets. If the projected cash flow is less than the carrying value of the asset or asset group, the Company recognizes an impairment loss equal to the excess, if any, of the carrying value of the asset or asset group over its appraised fair value, net of estimated disposal costs. Although the Company believes that its projections of future cash flows are reasonable, changes in unit sales, pricing, cost of goods sold, and other factors could significantly affect the accuracy of the Company's cash flow projections.

### Valuation of Goodwill

At December 31, 2008 and 2007, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At December 31, 2008, the assets of the Rubber Group, including goodwill, totaled $38,527,000. In 2008, EBITDA of the Rubber Group was $11,442,000. In connection with the Company's chapter 11 proceedings, W.Y. Campbell & Company has prepared several analyses of the value of the Rubber Group that concluded that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill are performed using a fair value approach during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### Deferred Financing Expenses

Deferred financing expenses are typically amortized on a straight-line basis until the date that the debt is due and payable either because of a stated maturity date or because of an event of default. During the fourth quarter of 2006, the Company wrote off $1,829,000 of the unamortized deferred financing costs related to its Senior Subordinated Notes and its senior, secured debt, which was reclassified as debt in default in the Company's consolidated balance sheet at December 31, 2006.

### Research and Development Expenses

Research and development expenses are expensed as incurred. These expenses totaled $661,000, $915,000, and $1,093,000, in 2008, 2007, and 2006, respectively.

- 55 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Net Income or Loss per Common Share*

Basic net income or loss per common share is computed using the weighted-average number of common shares outstanding. Diluted net income or loss per share is calculated after giving effect to all potential common shares that were dilutive, using the treasury stock method. Potentially dilutive common shares consist of convertible preferred stock, unvested restricted stock, and warrants to purchase common stock. See also Note 11, "Net Income or Loss per Common Share."

*Revenue Recognition*

All of the Company's revenues result from the sale of rubber and metal components and mixed rubber compounds. The Company recognizes revenue from the sale of these items when title and risk of loss pass to its customers according to shipping schedules and terms of sale mutually agreed to by the Company and its customers. Shipping and handling costs are typically paid by the customer. If paid by the Company, shipping and handling costs are included in cost of sales. Accruals for sales returns and certain other sales allowances are recorded at the time of shipment based primarily on historical experience. These accruals may be adjusted subsequent to the date of shipment as new information becomes available.

*Recently Issued Accounting Standards*

Listed below are recently issued accounting standards and a discussion of how they have affected or will effect the Company's consolidated financial statements:

*Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash Upon Conversion"*

In May 2008, the Financial Accounting Standards Board ("FASB") issued Staff Position APB 14-1, "Accounting for Convertible Debt Instruments that May Be Settled in Cash upon Conversion" ("FSP APB 14-1"). FSP APB 14-1 requires issuers of convertible debt instruments to separately account for the liability and equity components of interest cost recognized in future periods on convertible debt instruments in a manner that will reflect the entity's nonconvertible debt borrowing rate on the date the instrument was issued. FSP APB 14-1 is effective for fiscal years after December 15, 2008, and interim periods within those fiscal years, and must be applied to all periods presented. Based on the Company's current operations, it does not believe that the adoption of FSP APB 14-1will have a significant impact on its results of operations or financial position.

*Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement 133"*

On March 19, 2008, the FASB issued Statement of Financial Accounting Standards No. 161, "Disclosures about Derivative Instruments and Hedging Activities – An Amendment of FASB Statement

133" ("FAS 161"), which enhanced required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (1) an entity uses derivative instruments, (2) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities," and (3) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. FAS 161 is effective for fiscal years and interim periods beginning on or after November 15, 2008. Based on the Company's current

- 56 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

operations, it does not believe that FAS 161 will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51"*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an Amendment of ARB No. 51" ("FAS 160"). FAS 160 amends ARB No. 51 to establish accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. Among other things, FAS 160 also clarifies that a noncontrolling interest in a subsidiary is an ownership interest in the consolidated entity that should be reported as equity in the consolidated financial statements separate from the parent company's equity, and that the amount of net income attributable to the noncontrolling interest should be included in consolidated net income on the face of the income statement. FAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Based on its current operations, the Company does not believe that FAS 160 will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 141 (Revised 2007), "Business Combinations"*

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (revised 2007), "Business Combinations" ("FAS 141R"). FAS 141R establishes the principles and requirements for how the acquirer of a business shall recognize and measure in its financial statements the identifiable assets acquired, the liabilities assumed, and any controlling interest in the acquiree. FAS 141R also sets forth guidance on how to recognize and measure goodwill acquired in a business combination or a gain from a bargain purchase and determines what information to disclose to enable users of financial statements to evaluate the nature and financial effects of the business combination. FAS 141R is effective for fiscal years beginning after December 15, 2008. Early adoption of FAS 141R is not permitted. Based on its current operations, the Company does not believe that FAS 141R will have a significant impact on its results of operations or financial position.

### *Statement of Financial Accounting Standards No. 157, "Fair Value Measurements"*

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"). FAS 157 defines fair value, establishes a framework for measuring fair value when using U.S. generally accepted accounting principles, and expands disclosures about fair value. FAS 157 also provides for increased consistency and comparability in fair value measurements. FAS 157 applies under other accounting pronouncements that require or permit fair value measurements and does not require new fair value measurements, and is effective for fiscal years beginning after November 15, 2007, and for interim periods within those fiscal years. In February 2008, the FASB issued Staff Position FAS157-2, "Effective Date of FASB

Statement No. 157" ("FSP 157-2"), which defers the effective date of FAS 157 for one year for certain nonfinancial assets and nonfinancial liabilities, except those that are recognized or disclosed at fair value in the financial statements on an annual basis. In accordance with FSP 157-2, the Company has only adopted the provisions of FAS 157 with respect to the Company's financial assets and financial liabilities that were measured at fair value in financial statements since January 1, 2008. At December 31, 2008, these assets and liabilities consisted only of marketable securities. The provisions of FAS 157 have not been applied to non-financial assets and non-financial liabilities.

- 57 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities"*

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities" ("FAS 159"). FAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value that are not currently required to be measured at fair value. FAS 159 also establishes presentation and disclosure requirements to facilitate comparisons between entities that choose different measurements for similar types of assets and liabilities. FAS 159 is effective for fiscal years beginning after November 15, 2007. The Company adopted FAS 159 on January 1, 2008, and have elected not to apply the fair value option to any of its financial instruments.

## Note 2 — Cash

Cash at December 31, 2008 and 2007, totaled $5,540,000 and $212,000, respectively. The cash on hand at December 31, 2008, resulted primarily from the Company's post-petition financing arrangements, which consist of (1) an arrangement with the Company's senior, secured lenders to freeze the loans under the Company's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through May 22, 2009, and (2) the debtor-in-possession loan in the amount of $4,000,000 that matures on December 31, 2009.

## Note 3 — Other Noncurrent Assets

The Company has paid a portion of the cost of certain tooling that was purchased by customers and is being used by the Company to produce components under long-term supply arrangements. The payments have been recorded as a noncurrent asset and are being amortized on a straight-line basis over three years or, if shorter, the period during which the tooling is expected to produce components. At December 31, 2008 and 2007, noncurrent assets included $487,000 and $449,000, respectively, of unamortized capitalized payments. During 2008, 2007, and 2006, the Company amortized $344,000, $497,000, and $459,000, respectively, of such capitalized payments.

## Note 4 — Accrued Expenses, excluding Interest Expense

Accrued expenses, excluding interest expense, at December 31, 2008 and 2007, are summarized below (dollar amounts in thousands):

| | December 31 | |
| --- | --- | --- |
| | 2008 | 2007 |

| | | |
|---|---:|---:|
| Employee fringe benefits | $2,138 | $2,617 |
| Salaries and wages | 346 | 298 |
| Taxes | 182 | 148 |
| Other | 716 | 869 |
| | $3,382 | $3,932 |

- 58 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 5 — Debt

Debt at December 31, 2008, and December 31, 2007, is set forth below (dollar amounts in thousands):

| | December 31, 2008 | | | December 31, 2007 |
|---|---|---|---|---|
| | Not Subject to Compromise | Subject to Compromise | Total | |
| Debt in default: | | | | |
| Senior, secured credit facility: facility: | | | | |
| Revolving line of credit | $ 14,219 | $ — | $14,219 | $10,632 |
| Equipment term loan | 6,667 | — | 6,667 | 9,167 |
| Real estate term loan | 13,289 | — | 13,289 | 14,022 |
| Subtotal | 34,175 | — | 34,175 | 33,821 |
| Senior Subordinated Notes | — | 34,177 | 34,177 | 34,177 |
| Junior Subordinated Note | — | 347 | 347 | 347 |
| Total debt in default | 34,175 | 34,524 | 68,699 | 68,345 |
| Debtor-in-possession loan | 4,000 | — | 4,000 | — |
| Current portion of long-term debt | 16 | 660 | 676 | 741 |
| Long-term debt: | | | | |
| Series B Preferred Stock | — | 660 | 660 | 660 |
| Other | 16 | — | 16 | 86 |
| Subtotal | 16 | 660 | 676 | 746 |
| Less current portion | (16) | (660) | (676) | (741) |
| Total long-term debt | — | — | — | 5 |
| Total debt | $ 38,191 | $35,184 | $73,375 | $69,091 |

### Senior, Secured Credit Facility

In connection with the Company's filing under chapter 11 of the Bankruptcy Code on April 1, 2008, the Company and its senior, secured lender, with the approval of the Bankruptcy Court, modified the senior, secured credit facility in the following manner:

1. The default premium of 2% was eliminated and the interest rates on the various components of the senior, secured facility reverted to the following contractual rates: LIBOR plus 2.75% on

outstandings under the revolving line of credit (3.19% at December 31, 2008); LIBOR plus 4.5% for the equipment term loan (4.94% at December 31, 2008); and prime rate plus 6% on $4,000,000 of the real estate term loan and LIBOR plus 4.5% on the remaining balance of the real estate term loan (weighted average of 6.24% at December 31, 2008).

2. The principal amount of the loan outstanding under the revolving line of credit was fixed at $14,219,000, and the Company was permitted to utilize, until February 25, 2009, collections on its accounts receivable in the operation of its business.

- 59 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

3. The Company agreed to continue to make the scheduled monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

In addition, the financial covenants under the senior, secured financing agreements were modified as follows:

1. Minimum Cash. The Company's aggregate cash was required to be greater than $1,000,000 on May 2, 2008, and $500,000 on May 30, 2008, and was required to be greater than $500,000 on the last day of each four-week period following May 30.

2. Maximum Expenditures. The Company's cumulative expenditures were required to be less than 110% of its cumulative budgeted expenditures for the period from April 2, 2008, through April 18, 2008, and was required to be less than 110% on the last day of each two-week period following April 18.

3. Minimum Net Sales. The Company's cumulative net sales were required to be greater than 90% of cumulative budgeted net sales from April 2, 2008, through May 2, 2008, and was required to be greater than 90% of cumulative budgeted net sales on the last day of each four-week period after May 2.

By order of the Bankruptcy Court on March 4, 2009, the Company's ability to use cash collateral was extended to May 22, 2009, and the financial covenants under the senior, secured financing agreements were further modified, effective February 27, 2009, as follows:

1. Minimum Cash. Aggregate cash was or is required to be not less than the following amounts on the specified measurement dates:

|                   |            |
|-------------------|------------|
| February 27, 2009 | $2,958,000 |
| March 6, 2009     | $2,402,000 |
| March 13, 2009    | $1,946,000 |
| March 20, 2009    | $1,867,000 |
| March 27, 2009    | $1,622,000 |
| April 3, 2009     | $1,499,000 |
| April 10, 2009    | $1,638,000 |
| April 17, 2009    | $1,307,000 |

| | |
|---|---|
| April 24, 2009 | $1,384,000 |
| May 1, 2009 | $1,222,000 |
| May 8, 2009 | $1,415,000 |
| May 15, 2009 | $1,334,000 |
| May 22, 2009 | $1,396,000 |

On April 17, 2009, the latest measurement date prior to the issuance of this report, the Company's aggregate cash was $3,117,000.

2. <u>Maximum Expenditures</u>. The Company's cumulative expenditures were required to be less than 110% of cumulative budgeted expenditures for the period from February 27, 2009, through March 13, 2009, and are required to be less than 110% of cumulative budgeted

- 60 -

---

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

expenditures on the last day of each two-week period following March 13, 2009. At April 17, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $5,439,000 less than 110% of cumulative budgeted expenditures.

3. <u>Minimum Net Sales</u>. The Company's cumulative net sales are required to be greater than 85% of cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At April 3, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales exceeded 85% of cumulative budgeted net sales by $791,000.

4. <u>Operational Restructuring of Connector-Seal Business</u>. In connection with the closing of the Company's connector-seal facility located in Vienna, Ohio, and the relocation of production to other rubber molding facilities, the Company has agreed to the following, subject to any changes that the senior, secured lender may agree to:

(a) On or before March 31, 2009, the Company shall obtain transitional and long-term contracts with customers covering at least 60% of our projected sales for the connector-seal business for 2010;

(b) The transitional agreements shall provide aggregate revenues of not less than $900,000 on payment terms not to exceed net 30 days;

(c) At least 90% of the inventory banks for the connector-seal consolidation shall be completed by May 31, 2009; and

(d) The closure of the Vienna, Ohio, facility shall be substantially completed by June 30, 2009.

Because the Company did not meet the condition set forth in clause (a) above, the senior, secured lender notified the Company that a Termination Event (as defined in the Cash collateral Order) has occurred. The senior, secured lender has not taken any action with respect to this Termination Event and has not indicated any present intention to take action, but has reserved its rights under the Cash Collateral order.

The senior, secured credit facility, as amended effective February 27, 2009, will terminate upon the occurrence of the following events if the Company fails to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants,

(b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

The Company believes that the loans outstanding under the senior, secured credit facility and the interest accrued thereon are fully collateralized and will not be impaired under any plan of reorganization. As a result, the Company has continued to accrue and pay the interest on these loans at the contractual rates of interest.

The commencement of proceedings under chapter 11 constituted an event of default under the terms of the agreement governing the senior, secured credit facility. In addition, prior to the filing date, a cross-default existed under the senior, secured credit facility because the Company did not make the

- 61 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

interest payment that was due on its Senior Subordinated Notes on November 1, 2006, and has not made any of the quarterly interest payments since that date. As a result, all of the loans under the senior, secured credit facility are classified as debt in default at December 31, 2008 and 2007. From February 1, 2007, through March 31, 2008, a default premium of 2% was charged on the outstanding loan balances.

The Company's loans and reimbursement obligations with respect to letters of credit under the senior, secured credit facility are secured by liens on substantially all of the Company's assets. The agreements governing the senior, secured credit facility placed certain restrictions on the Company's business and operations, including limitations on the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

### *Debtor-in-Possession Loan*

The debtor-in-possession loan in the amount of $4,000,000 was approved by the Bankruptcy Court on April 2 and 17, 2008. The debtor-in-possession loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10%. The debtor-in-possession loan was granted super-priority status by the Bankruptcy Court. The loan matures on the earliest of (1) December 31, 2009, (2) the effective date of a plan of reorganization, (3) the conversion of the bankruptcy proceedings from chapter 11 to chapter 7, (4) the appointment of a chapter 11 trustee, or (5) an event of default as described in the documents governing the debtor-in-possession loan.

### *Senior Subordinated Notes*

The Senior Subordinated Notes mature on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. Pursuant to a forbearance agreement between the Company and a group of six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes reverted to 12%. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of the Company's affiliates and members of their families. At December 31,

2008, accrued interest on the Senior Subordinated Notes totaled $13,055,000. The Senior Subordinated Notes and the accrued interest thereon through December 31, 2008, were classified as liabilities subject to compromise in the Company's consolidated financial statements at December 31, 2008. The Company continues to accrue interest on the Senior Subordinated Notes at the contractual rate of 12% because the management of the Company believes that the Company is solvent.

### Junior Subordinated Note

The Junior Subordinated Note matures on November 1, 2009, and is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and to the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. At December 31, 2008, accrued interest on the Junior Subordinated Note totaled $109,000. The Junior Subordinated Note and the accrued interest thereon through December 31, 2008,

- 62 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

were classified as liabilities subject to compromise in the Company's consolidated financial statements at December 31, 2008. The Company continues to accrue interest on the Junior Subordinated Note at the contractual rate of 13% because the management of the Company believes that the Company is solvent.

### Series B Preferred Stock

At December 31, 2008, there were outstanding 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), and (4) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. All of the shares of the Series B Preferred Stock are past their scheduled redemption date. In addition, at December 31, 2008, the Company was in arrears on scheduled dividend payments on the Series B Preferred Stock in the aggregate amount $59,400.

The Series B Preferred Stock is classified as debt in the Company's consolidated financial statements. At December 31, 2008, the Series B Preferred Stock and accrued dividends thereon were classified as liabilities subject to compromise in the Company's consolidated financial statements. The Company continues to accrue dividends on the Series B Preferred Stock at the contractual rate of 4% because the management of the Company believes that the Company is solvent.

### Fair Value of Financial Instruments

The Company believes that, at December 31, 2008, the fair value of the loans outstanding under the revolving line of credit, the equipment term loan, the real estate term loan, and the debtor-in-possession loan approximated the principal amounts of such loans. Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

### Cash Interest Paid

Cash interest paid during 2008, 2007, and 2006, including amounts allocated to discontinued operations, totaled $3,175,000, $4,431,000 and $6,749,000, respectively.

- 63 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## Note 6 — Interest Expense

A breakdown of interest expense for 2008, 2007, and 2006 is set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
| Interest expense at contractual interest rates: |  |  |  |
| Senior, secured loans | $2,490 | $ 3,698 | $ 3,334 |
| Debtor-in-possession loan | 296 |  |  |
| Senior Subordinated Notes | 4,101 | 4,101 | 4,101 |
| Junior Subordinated Note | 45 | 45 | 45 |
| All other | 84 | 47 | 480 |
| Subtotal | 7,016 | 7,891 | 7,960 |
| Interest expense resulting from incremental interest rates: |  |  |  |
| Senior, secured loans — default or forbearance premium | 172 | 698 | 62 |
| Senior Subordinated Notes — forbearance premium | 411 | 1,279 | — |
| Senior Subordinated Notes — interest on missed interest payments | 1,044 | 390 | 21 |
| Subtotal | 1,627 | 2,367 | 83 |
| Financing costs and fees | 251 | 1,249 | 3,078 |
| Total interest expense | 8,894 | 11,507 | 11,121 |
| Less: Interest expense allocated to discontinued operations | 168 | 168 | 178 |
| Interest expense related to continuing operations | $8,726 | $11,339 | $10,943 |

## Note 7 — Common Stock, Warrants, and Other Equity Securities

### Common Stock, $.25 Par Value

At December 31, 2008, there were 5,021,767 shares of the Company's common stock outstanding, 48,889 shares reserved for issuance on the conversion of the Series B Preferred Stock, and 310,000 shares reserved for issuance under the Company's 2005 Stock Award Plan.

### Warrants

At each of December 31, 2008 and 2007, there were 345,237 warrants outstanding, each of which entitles the holder to purchase one share of the Company's common stock for $3.50 from August 1, 2005, through August 1, 2009. Because the exercise price of the warrants substantially exceeded the market price of the Company's common stock at the date of issuance, the Company did not record any expense related to the issuance.

### Other Authorized Preferred Stock

The Company's restated certificate of incorporation provides that the Company is authorized to issue 2,500 shares of 6% Cumulative Convertible Preferred Stock, Series A, par value $100 per share, and

- 64 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

2,500,000 shares of other preferred stock having a par value of $1 per share. No shares of either of these classes of preferred stock have been issued.

### Note 8 — Employee Benefit Plans

#### Retirement and Savings Plan

The Company maintains a retirement and savings plan pursuant to Section 401 of the Internal Revenue Code (a "401(k) plan"). All employees of the Company are entitled to participate in the 401(k) plan after meeting the eligibility requirements. Employees may generally contribute up to 60% of their annual compensation but not more than prescribed dollar amounts established by the United States Secretary of the Treasury. Employee contributions, up to 6% of an employee's compensation, are matched 50% by the Company. During 2008, 2007, and 2006, matching contributions made by the Company totaled $364,000, $432,000, and $443,000, respectively. Company contributions to the 401(k) plan vest at a rate of 20% per year commencing after the participant's second year of service; the participant becomes fully vested after six years of service.

#### Incentive Compensation Plan

The Company has an incentive compensation plan that provides for the payment of annual cash bonus awards to certain officers and key employees of the Company if specified targets are met. The Compensation Committee of the Company's Board of Directors, which consists of two directors who are not employees of the Company, oversees the administration of the incentive compensation plan and approves the cash bonus awards. Bonus awards for eligible employees at our operating divisions are typically based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization ("EBITDA") at each operating division. Bonus awards for corporate officers are typically based upon the attainment of predetermined consolidated EBITDA targets. The consolidated financial statements include provisions for bonuses totaling $270,000, $77,000, and $136,000 in 2008, 2007 and 2006, respectively.

#### 2005 Stock Award Plan

The Company also has a plan that permits it to award incentive stock options, nonqualified stock options, stock appreciation rights, awards of restricted common stock, performance shares, and performance units to directors, employees, or consultants of the Company (the "2005 Stock Award Plan" or the "Plan"). Under the Plan, the maximum number of shares of common stock that may be granted or optioned to eligible participants is 400,000 and the maximum grant to any eligible participant in a fiscal year for each type of award is set forth

below:

        Stock options:  50,000 shares
        Stock appreciation rights:  50,000 shares
        Restricted stock:  50,000 shares
        Performance shares:  fair market value of 50,000 shares
        Performance units:  fair market value up to $100,000

On January 26, 2006, 50,000 shares of restricted common stock were awarded to a key employee of the Company and, on October 9, 2007, 10,000 shares of restricted common stock were awarded to each of the Company's four outside directors. The price per common share on the respective grant dates was $0.79 and $0.70, respectively. The Restricted Stock Award Agreement governing the shares granted on

- 65 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

January 26, 2006, specifies that 10,000 shares vest on March 31, 2006, and 10,000 shares on each March 31 thereafter until all of the shares granted are vested. The Restricted Stock Award Agreements governing the shares granted on October 9, 2007, specify that, for each grant, 2,000 shares will vest on each subsequent anniversary date of October 9 until all shares granted are vested. If a grantee leaves the Company prior to shares becoming fully vested, any unvested shares will be returned to the Company. Compensation expense equal to the market value of the shares on the date of grant will be charged to earnings over the respective vesting periods. During 2008, 2007, and 2006, the Company's restricted stock amortization expense totaled $14,000, $9,000, and $14,000, respectively.

### Note 9 — Income Taxes

Income taxes are accounted for in accordance with Financial Accounting Standards Board Statement of Financial Accounting Standards No. 109, "Accounting for Income Taxes." Deferred tax assets are reduced by a valuation allowance if, based upon the weight of available evidence, it is more likely than not that some portion or all of the deferred tax assets will not be realized.

The components of the provisions for income taxes related to continuing operations in 2008, 2007, and 2006, are set forth below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| Current: | | | |
| Federal | $— | $— | $— |
| State | 35 | 6 | 18 |
|  | 35 | 6 | 18 |
| Deferred: | | | |
| Federal | — | — | — |
| Income tax provision | $35 | $ 6 | $18 |

The income tax provisions recorded during 2008, 2007, and 2006 consisted of state income taxes.

During 2007, the Company paid $28,000 in state income taxes. No other state or federal income taxes were paid in 2008, 2007, or 2006.

The difference between the Company's income tax provision for the Company's loss from continuing operations in 2008, 2007, and 2006 and the income taxes that would have been payable at the federal statutory rate for the Company's loss from continuing operations is reconciled as follows (dollar amounts in thousands):

| | Years Ended December 31 | | |
| | 2008 | 2007 | 2006 |
|---|---|---|---|
| Federal statutory income tax provision | $(3,489) | $(2,364) | $(2,495) |
| Change in valuation allowance | 3,472 | 1,807 | 2,317 |
| Expiration of operating loss carryforwards | — | 360 | 163 |
| Adjustment of impairment of long-lived assets | — | 163 | — |
| State income taxes, net of federal benefit | 21 | 4 | 12 |
| Other | 31 | 36 | 21 |
| Income tax provision | $ 35 | $ 6 | $ 18 |

- 66 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table sets forth the Company's deferred tax assets and deferred tax liabilities at December 31, 2008 and 2007 (dollar amounts in thousands):

| | December 31 | |
| | 2008 | 2007 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating losses and tax credit carryforwards: | | |
| Federal net operating losses | $ 12,344 | $ 8,843 |
| State net operating losses | 2,104 | 2,056 |
| Federal alternative minimum taxes | 864 | 864 |
| Investment tax credit | 100 | 100 |
| Other tax credit | 81 | 81 |
| Total tax carryforwards | 15,493 | 11,944 |
| Deductible temporary differences: | | |
| Reorganization costs | 1,583 | — |
| Impairment of long-lived assets | 12 | 12 |
| Accounts receivable and inventory reserves | 604 | 418 |
| Tax inventory over book | 423 | 103 |
| Interest | — | 2,583 |
| Compensation accruals | 365 | 292 |
| Other accruals | 265 | 333 |
| Other | 139 | 141 |
| Total deferred tax assets | 18,884 | 15,826 |

| | | |
|---|---:|---:|
| Valuation allowance | (18,224) | (14,752) |
| Net deferred tax assets | 660 | 1,074 |
| Deferred tax liabilities: Tax over book depreciation | (660) | (1,074) |
| Net deferred taxes | $ — | $ — |

During 2008, the Company's valuation allowance increased by $3,472,000, primarily due to the net loss reported by the Company for 2008.

At December 31, 2008, the Company had (1) net operating loss carryforwards for federal income tax purposes of $36,306,000, which expire in the years 2011 through 2028, (2) alternative minimum tax net operating loss carryforwards of $36,128,000, which can be used to reduce future taxable income for purposes of calculating alternative minimum taxable income, if any, without any time limitation, and (3) alternative minimum tax credit carryforwards of $864,000, which can be used to offset future payments of regular federal income taxes, if any, without any time limitation. During 2008, no net operating loss carryforwards were utilized or expired. Subsequent to the filing of the Form 10-K for the year ended December 31, 2007, the Company concluded that the interest expense that had been deemed to be non-deductible as reflected in the above table as a temporary timing difference, was, in fact, currently deductible. Reflecting this change in the above table at December 31, 2007, would have increased the federal net operating loss classified as a deferred tax asset by $2,583,000.

- 67 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The expiration of the Company's federal net operating loss carryforwards by year of expiration is set forth in the table below (dollar amounts in thousands):

| | |
|---|---:|
| 2009 | $ — |
| 2010 | — |
| 2011 | 1,379 |
| 2012 | 1,371 |
| 2013 | 4,033 |
| After 2013 | 29,523 |
| Total federal net operating loss carryforwards | $36,306 |

**Note 10 — Segments**

*Description of Segments and Products*

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily, insulators used in aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Metals Group manufactures machined metal components from aluminum, brass, steel,

and stainless steel bars, forgings, and cold-headed blanks. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States. At December 31, 2008, 13.2% of the Rubber Group's employees were covered by a collective bargaining agreement that expired on March 11, 2009, and 23.8% of the Rubber Group's employees were subject to a collective bargaining agreement that expires on October 19, 2009. With respect to the agreement that expired on March 11, 2009, the Company has commenced the process of terminating all operations at this manufacturing facility and anticipates that it will complete the closing this facility by June 30, 2009.

The Corporate Office consists primarily of general administrative expenses that are not a result of any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, and certain prepaid expenses and other miscellaneous current assets.

### Measurement of Segment Profit or Loss

The Company evaluates its performance based upon several measures, including income from operations, earnings before income taxes, depreciation, and amortization, and asset utilization.

The accounting policies of the Company's operating segments are the same as those described in Note 1, "Summary of Significant Accounting Policies," except that debt, deferred financing expenses, interest expense, reorganization items expensed in accordance with SOP 90-7, and income tax expense are excluded from segment reporting. Also, expenses, including reorganization items expensed in accordance with SOP 90-7, that are not considered direct expenses of the Rubber Group or the Metals Group are not allocated to those segments.

- 68 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Factors Management Used to Identify Reportable Segments

Although all of the Company's production facilities are similar manufacturing operations, selling to similar customers, the Company presents financial data for the Rubber Group and the Metals Group because of the significant difference in financial performance between those businesses.

### Industry Concentration, Reliance on Large Customers, and Credit Risk

The following table summarizes net sales during 2008, 2007, and 2006 by the type of product in which the Company's components were utilized (dollar amounts in thousands):

| | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | 2006 | |
| Automotive — OEM | $26,770 | 36.7% | $42,850 | 48.5% | $44,626 | 50.8% |
| Automotive — aftermarket | 26,569 | 36.4 | 25,786 | 29.2 | 27,906 | 31.7 |
| Medical | 16,300 | 22.3 | 15,928 | 18.0 | 11,039 | 12.6 |
| Industrial and residential equipment and devices | 2,486 | 3.4 | 2,836 | 3.2 | 3,168 | 3.6 |
| Other | 904 | 1.2 | 1,008 | 1.1 | 1,162 | 1.3 |

| | | | | | |
|---|---|---|---|---|---|
| Total net sales | $73,029 | 100.0% | $88,408 | 100.0% | $87,901 | 100.0% |

The following table summarizes the Company's accounts receivable from each of the industries listed above at December 31, 2008 and 2007 (dollar amounts in thousands):

| | Years Ended December 31 | | | |
|---|---|---|---|---|
| | **2008** | | **2007** | |
| Automotive — OEM | $2,353 | 34.6% | $ 5,366 | 48.9% |
| Automotive — aftermarket | 2,369 | 34.9 | 2,887 | 26.3 |
| Medical | 1,590 | 23.4 | 2,348 | 21.4 |
| Industrial and residential equipment and devices | 305 | 4.5 | 231 | 2.1 |
| Other | 177 | 2.6 | 149 | 1.3 |
| Total | $6,794 | 100.0% | $10,981 | 100.0% |

The markets in which the Company operates have been characterized by price competition, increasing requirements for quality and service, and, with respect to the automotive OEM markets, substantially reduced volumes because of slowing sales of automobiles. These factors, among others, may have an adverse effect on the operating results and financial condition of specific customers, and, in turn, on the collectibility of the Company's accounts receivable from those customers. The Company attempts to mitigate this risk of loss through ongoing evaluations of automotive market conditions, examination of customer financial statements, and discussions with customer management. Provisions for credit losses are based upon historical experience and such ongoing evaluations. The Company generally does not require collateral from its customers to support the extension of trade credit. At December 31, 2008 and 2007, the Company had reserves for credit losses of $735,000 and $476,000, respectively.

- 69 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company's largest customer is General Cable Corporation. During 2008, 2007, and 2006, net sales to General Cable totaled $10,897,000, $9,436,000, and $9,557,000, which represented 14.9%, 10.7%, and 10.9%, respectively, of the Company's consolidated net sales and 17.5%, 12.7%, and 12.6%, respectively, of the Rubber Group's net sales. During 2008, 2007, and 2006, net sales to Delphi Corporation totaled $5,587,000, $8,505,000, and $10,719,000, which represented 7.7%, 9.6%, and 12.2%, respectively, of the Company's consolidated net sales. During 2008, 2007, and 2006, the Rubber Group's net sales to Delphi totaled $4,603,000, $7,381,000, and $10,719,000, which represented 7.4%, 9.9%, and 14.1%, respectively, of the Rubber Group's net sales. During 2008 and 2007, the Metals Group's net sales to Delphi totaled $984,000 and $1,124,000, respectively, which represented 9.2% and 8.1% respectively, of the Metals Group's net sales. The majority of the products the Company sells to Delphi are covered by a supply contract that expires on December 31, 2009. No other customer accounted for more than 10% of the Company's consolidated net sales during 2008, 2007, or 2006. Generally, loss of a significant amount of business from any of the Company's large customers could have a material adverse effect on our results of operations and financial condition if that business were not replaced by additional business from existing or new customers. The Company believes that the Company's reserve for uncollectible accounts receivable is adequate; however, the Company's results of operations and financial condition could be materially adversely affected if any of the Company's large customers experienced financial difficulties that caused them to delay or fail to make payments for goods sold to them.

(THIS SPACE INTENTIONALLY LEFT BLANK)

- 70 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Segment Financial Data

Information relating to the Company's operating segments and the Corporate Office for 2008, 2007, and 2006, and at December 31, 2008, 2007, and 2006, is summarized below (dollar amounts in thousands):

|  | Years Ended December 31 | | |
|  | 2008 | 2007 | 2006 |
|---|---|---|---|
| **Net sales:** | | | |
| Rubber Group | $62,278 | $74,587 | $76,090 |
| Metals Group | 10,751 | 13,821 | 11,811 |
| Total net sales | $73,029 | $88,408 | $87,901 |
| **Income (loss) from operations:** | | | |
| Rubber Group | $ 6,696 | $ 7,975 | $ 7,642 |
| Metals Group | (741) | (192) | (1,245) |
| Subtotal | 5,955 | 7,783 | 6,397 |
| Corporate Office | (2,718) | (3,108) | (2,313) |
| Total income from operations | $ 3,237 | $ 4,675 | $ 4,084 |
| **Depreciation and amortization (1):** | | | |
| Rubber Group | $ 4,746 | $ 5,727 | $ 6,455 |
| Metals Group | 536 | 682 | 820 |
| Subtotal | 5,282 | 6,409 | 7,275 |
| Corporate Office | 51 | 28 | 20 |
| Total depreciation and amortization | $ 5,333 | $ 6,437 | $ 7,295 |
| **Capital expenditures (2):** | | | |
| Rubber Group | $ 2,343 | $ 2,068 | $ 2,118 |
| Metals Group | 333 | 519 | 511 |
| Subtotal | 2,676 | 2,587 | 2,629 |
| Corporate Office | 19 | 77 | 32 |
| Total capital expenditures | $ 2,695 | $ 2,664 | $ 2,661 |
|  | December 31 | | |
|  | 2008 | 2007 | 2006 |

| Assets: | | | |
|---|---|---|---|
| Rubber Group | $38,527 | $42,236 | $45,056 |
| Metals Group | 7,680 | 7,963 | 7,381 |
| Subtotal | 46,207 | 50,199 | 52,437 |
| Corporate Office | 5,883 | 820 | 484 |
| Total assets (3) | $52,090 | $51,019 | $52,921 |

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000, $1,249,000, and $3,078,000, during 2008, 2007, and 2006, respectively, and which is included in interest expense in the consolidated financial statements.

(2) Capital expenditures for 2007 included $28,000 of equipment purchased under capitalized lease obligations. Capital expenditures for 2006 included $157,000 of equipment acquired with seller-provided financing.

- 71 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(3) Excludes the assets of discontinued operations, which totaled $1,238,000, $1,348,000, and $1,519,000, at December 31, 2008, 2007, and 2006, respectively.

### Note 11 — Net Loss per Common Share

The calculations of basic and diluted net loss per common share for the 2008, 2007, and 2006, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock were not dilutive. In addition, non-vested shares of restricted common stock issued under the Company's 2005 Stock Award Plan (the "Plan") are not considered outstanding common shares for purposes of the calculation of basic net loss per share of common stock because the effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of net income or loss per common share set forth below does not reflect the assumed conversion of the Series B Preferred Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the Plan.

| | Years Ended December 31 | | |
|---|---|---|---|
| | 2008 | 2007 | 2006 |
| Numerator — Net loss: | | | |
| Continuing operations | $(10,064) | $(6,670) | $(6,877) |
| Discontinued operations | (229) | (289) | (472) |
| Net loss | $(10,293) | $(6,959) | $(7,349) |
| Denominator — Weighted average shares outstanding | 4,961 | 4,949 | 4,939 |
| Basic and diluted loss per share of common stock: | | | |
| Continuing operations | $ (2.03) | $ (1.35) | $ (1.39) |
| Discontinued operations | (0.04) | (0.06) | (0.10) |
| Net loss | $ (2.07) | $ (1.41) | $ (1.49) |

## Note 12 — Commitments and Contingencies

### Purchase Commitments

At December 31, 2008, the Company had $81,000 of unrecorded commitments outstanding to purchase equipment.

### Leases

The Company is lessee under various operating leases relating to warehouse and office space, temporary, on-site office units, and equipment. Total rent expense under operating leases aggregated $366,000, $326,000, and $395,000, for 2008, 2007, and 2006, respectively. At December 31, 2008, future minimum lease commitments under noncancelable operating leases totaled $53,000, for 2009. Commitments subsequent to 2009 are not significant.

- 72 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Legal Actions

In addition to the Company's bankruptcy proceedings, the Company is subject to various claims and legal proceedings covering a wide range of matters that arise in the ordinary course of its business activities. It is the Company's policy to record accruals for such other matters when a loss is deemed probable and the amount of such loss can be reasonably estimated. The various other actions to which the Company is or may in the future be a party are at various stages of completion. Although there can be no assurance as to the outcome of existing or potential litigation, the Company currently believes, based upon the information currently available to it, that the outcome of those actions will not have a material adverse effect upon its results of operations or financial condition.

### Other

The Company maintains insurance coverage for certain aspects of its business and operations. Based on the Company's evaluation of the various risks to which it may be exposed, the Company retains all or a portion of the liability for potential losses because of various deductibles, coverage limits, and retentions. Although there can be no assurance that it will be successful in its efforts, the Company attempts to limit its liability through, among other things, the ongoing training and education of its employees, the implementation of safety programs, the ongoing testing and evaluation of the safety and suitability of its workplace environments, the development of sound business practices, and the exercise of care and judgment in the negotiation of contracts with its customers.

## Note 13 — Related Parties

The Chairman of the Board and the President of the Company are the Company's two largest stockholders, with beneficial ownership of 33% and 27.9%, respectively, of the Company's common stock. They are also the holders of the Junior Subordinated Note and, together with affiliated entities that include family members, the holders of $7,772,000 principal amount of Senior Subordinated Notes and 69,449 warrants to purchase common stock.

In 2008, 2007, and 2006 the Chairman of the Board and the President of the Company, through an investment banking firm of which they are the only partners, were paid $700,000 to provide management and

investment banking services. Additionally, they may receive incentive compensation tied to the Company's operating performance and other compensation for specific transactions completed by the Company with their assistance, although no such compensation was paid in 2008, 2007, or 2006. The Company also reimburses their firm for certain out-of-pocket expenses. During 2008, 2007, and 2006, the Company reimbursed their firm for expenses of $139,000, $115,000, and $116,000, respectively.

For more information on the compensation of the Company's executive officers, refer to the Company's proxy statement that was issued and filed during April 2009 in connection with the Company's Annual Meeting of Stockholders.

## Note 14 — Discontinued Operations

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to the diecasting business totaled $168,000, $168,000, and $178,000 for 2008, 2007, and 2006, respectively. During 2007 and 2006, the Company increased its provision for

- 73 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

environmental remediation at the manufacturing facility formerly housing the diecasting business by $87,000 and $255,000, respectively. In March 2007, the State of New York Department of Environmental Conservation informed the Company that it intended to commence the process to classify it as a Class 4 Site under the State of New York Environmental Conservation Law, which would mean that the site was properly closed and only required continued monitoring.

## Note 15 — Quarterly Financial Data (Unaudited)

Quarterly unaudited financial data for the four fiscal quarters of each of 2008 and 2007 is set forth below (dollar amounts in thousands, except per share amounts).

| | Quarters Ended | | | |
| 2008 | March 31 | June 30 | Sept. 30 | Dec. 31 |
|---|---|---|---|---|
| Net sales | $21,352 | $20,000 | $17,871 | $13,806 |
| Gross profit | $ 3,186 | $ 3,336 | $ 2,138 | $ 1,262 |
| Loss from continuing operations | $(1,447) | $(1,895) | $(3,184) | $(3,538) |
| Loss from discontinued operations | (15) | (45) | (21) | (148) |
| Net loss | $(1,462) | $(1,940) | $(3,205) | $(3,686) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.30) | $ (0.38) | $ (0.65) | $ (0.70) |
| Discontinued operations | — | (0.01) | — | (0.03) |
| Net loss | $ (0.30) | $ (0.39) | $ (0.65) | $ (0.73) |

| | Quarters Ended | | | |
| 2007 | March 31 | June 30 | Sept. 30 | Dec. 31 |
|---|---|---|---|---|
| Net sales | $22,530 | $23,778 | $23,060 | $19,040 |
| Gross profit | $ 3,053 | $ 3,576 | $ 3,310 | $ 1,940 |

| | | | | |
|---|---|---|---|---|
| Loss from continuing operations | $ (915) | $ (1,305) | $ (1,806) | $ (2,644) |
| Loss from discontinued operations | (2) | (56) | (53) | (178) |
| Net loss | $ (917) | $ (1,361) | $ (1,859) | $ (2,822) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.19) | $ (0.26) | $ (0.37) | $ (0.53) |
| Discontinued operations | — | (0.01) | (0.01) | (0.04) |
| Net loss | $ (0.19) | $ (0.27) | $ (0.38) | $ (0.57) |

Results of operations for the quarter ended March 31, 2008, included $508,000 of expenses incurred in connection with the Company's efforts to refinance, restructure, or repay the Company's indebtedness, $172,000 of default interest on the Company's senior, secured debt, $619,000 of interest on missed interest payments and default interest at the rate of 4% for the holders of the Company's unsecured debt, and $251,000 of amortization of the charges received from the holders of the Company's senior, secured debt for consulting costs and legal fees. Results for the quarters ended June 30, September 30, and December 31, 2008, included $1,770,000, 1,622,000, and $1,148,000, respectively, of

- 74 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

net reorganization expenses in accordance with SOP 90-7, and $334,000, $382,000, and $416,000, respectively, of interest expense that consisted of interest on missed interest payments for the holders of the Company's unsecured debt and interest for the holders of the Company's debtor-in-possession loan.

Results of operations for the quarters ended March 31, June 30, September 30, and December 31, 2007, included costs and expenses of $448,000, $1,191,000, $1,498,000, and $1,177,000, respectively, relating to the Company's efforts to refinance or restructure its indebtedness, including additional interest on its senior, secured debt and the Senior Subordinated Notes, and various financing fees, legal fees, and consulting fees charged to the Company by the holders of the Company's senior, secured debt and the Senior Subordinated Notes.

## Note 16 — Subsequent Event

During the second half of 2008, the Company experienced a dramatic downturn in automotive original equipment volume, which resulted in operating losses at its connector-seal facility located in Vienna, Ohio. Because of these losses and because the Company does not believe that it will be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, the Company decided to close this facility and move the production to the Company's other rubber molding facilities. The Company currently anticipates that the shutdown of the Vienna facility will be substantially completed by June 30, 2009, and that the cost to restructure the connector-seal business will be approximately $1,082,000, which the Company expects to incur during the second and third quarters of 2009. This estimated cost consists of (1) $555,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $422,000 for moving and installation of manufacturing equipment, and (3) $105,000 for start-up expenses. Although there can be no assurance, the Company currently believes, based on appraised values, that it will sell the Vienna, Ohio, manufacturing facility and certain ancillary manufacturing equipment that the Company is not planning to move to its other rubber molding facilities, at an amount that, in the aggregate, will be in excess of the carrying value of these assets. Compared to 2008, the Company currently projects that the restructuring of the connector-seal business will increase the EBITDA of the connector-seal business by approximately $2,500,000 in 2010.

- 75 -

## Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## Item 9A(T).  CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of December 31, 2008, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act").  Based on that evaluation, our principal executive officers and our principal financial officer have concluded that, because of the deficiencies in our internal control over financial reporting described below, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of the significant deficiencies which, in the aggregate, constitute a material weakness, as described below. Notwithstanding management's assessment of a material weaknesses, we are not aware that the material weakness has resulted in the issuance of any material errors or omissions in our consolidated financial statements contained in our annual report on Form 10-K for 2008 or related disclosures, and we received audit reports from our independent registered public accounting firms on these consolidated financial statements that were unqualified, other than the "going concern" qualification.

### *Management's Report on Internal Control over Financial Reporting*

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Due to inherent limitations, internal control over financial reporting, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives have been met. The design of an internal controls system must take into account the realities of limited resources, and the benefits derived from any system of internal control must be balanced against the cost of implementing and maintaining the system. Inherently, all internal control systems are limited by the realities of errors in human judgment and decision making, collusion, and management's ability to override the system of internal control. Also, as business conditions or requirements change in the future, internal control systems in place today may become obsolete.

With the participation of our principal executive officers and our principal financial officer, our management conducted an evaluation of effectiveness of our internal controls over financial reporting as of December 31, 2008, based on the framework and criteria established in "*Internal Control – Integrated Framework,*" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The evaluation included a review of, among other things, the documentation of controls, the overall design of the internal controls, and the documentation related to the performance of control activities.

A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the

- 76 -

Company's quarterly or annual financial statements will not be detected or prevented prior to issuance. During the course of our evaluation, we identified certain significant deficiencies as of December 31, 2008, that, in our opinion, only when considered in the aggregate, would constitute a "material weakness" in the Company's internal control over financial reporting as of December 31, 2008. The significant deficiencies noted during our evaluation are set forth below:

- *Incomplete documentation of the internal control system.* The Company maintains numerous internal financial controls. Certain controls and procedures are properly documented within the Company's "Authorization Guidelines and Policy Memoranda." Many controls are embedded within our third-party enterprise resource planning system software in use at all of the Company's manufacturing locations, the software of our third-party cash management system provider, and the software of our Company-wide third-party payroll provider, but are not documented in a methodical fashion outside of these software systems. Other controls, including higher level entity controls, such as the review of our pre-formatted monthly divisional financial reporting package by division controllers and our Chief Financial Officer, President, and Chairman of the Board are not formally documented.

- *We do not have a procedure for documenting the internal control activities performed within the internal control system by our employees.* We currently do not have a procedure in place for our employees to document the internal control activities they perform on a routine basis, such as the review of monthly divisional financial reporting packages, so we do not have evidence that such controls are being performed.

- *Incomplete segregation of duties.* At December 31, 2008, the Company consisted of five operating divisions and the Corporate Office. Generally, the five divisions function as independent businesses with their own management staffs and are required, on a monthly basis, to complete an extensive monthly financial reporting package. Because of the size of these facilities, complete segregation of accounting duties is not cost-effective. In its place, we believe that we have sufficient entity-level oversight controls to mitigate the lack of segregation of duties. However, because the completion of oversight controls is not documented, the Company cannot test these oversight controls to prove that the lack of segregation of duties is not an internal control deficiency.

- *The Company has not tested the operational effectiveness of its internal controls over financial reporting.* Because we have not adequately documented certain internal controls over financial reporting and lack a procedure for documenting the completion of certain control activities, we are unable to test and prove the effectiveness of those internal controls over financial reporting in accordance with COSO standards. Since we have not completely tested our controls, we cannot determine if our controls over financial reporting were effective.

Because of the material weakness described above, management has concluded that, based on the COSO framework for internal control, the Company did not have effective controls over financial reporting as of December 31, 2008.

This annual report does not include an attestation of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accountant firm because of the temporary rules of the Securities and Exchange Commission that permit us

to provide only management's report in this annual report.

- 77 -

### Remediation of Weaknesses

At December 31, 2008, the several significant deficiencies noted above may, in the aggregate, constitute a material weakness in our internal control over financial reporting. Although it is our intention to remediate these weaknesses, on April 1, 2008, we filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of chapter 11 of the United States Bankruptcy Code. Because of the additional demands placed on our limited number of accounting professionals due to the bankruptcy proceedings and the substantial financial resources required to remediate the deficiencies noted above, we may not be able to remediate the deficiencies prior to the initial audit of our internal control over financial reporting by a registered public accounting firm. If we are unable to remediate the deficiencies prior to this audit, we will encounter difficulties in the audit of our internal controls by our outside independent auditors, which may have an adverse effect on our ability to prepare financial statements in accordance with U.S. generally accepted accounting principles and to comply with the reporting requirements of the Securities and Exchange Commission.

If we have the ability to do so, we intend to take the following actions to address the deficiencies described above:

1. Establish a set of procedures for documentation of the performance of internal control processes by our employees.

2. Establish formal documentation for higher level entity controls that are currently undocumented.

3. Develop a plan for testing of our internal controls in accordance with COSO standards.

4. Dedicate additional personnel resources to the improvement, monitoring, and testing of our internal controls over financial reporting.

### Changes in Internal Controls over Financial Reporting

In reviewing our internal controls, we determined that there have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information.**

None.

- 78 -

## PART III

### Item 10.  DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE OF THE REGISTRANT

Information required by Item 10 is incorporated by reference to the sections entitled "Election of Directors" and "Executive Officers" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Securities and Exchange Commission (the Commission) not later than 120 days after December 31, 2008.

### Item 11.  EXECUTIVE COMPENSATION

Information required by Item 11 is incorporated by reference to the section entitled "Executive Compensation" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

### Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Information required by Item 12 is incorporated by reference to the sections entitled "Security Ownership" and "Equity Compensation Plan Information" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

### Item 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

Information required by Item 13 is incorporated by reference to the section entitled "Certain Relationships and Transactions" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

### Item 14.  PRINCIPAL ACCOUNTANT FEES AND SERVICES

Information required by Item 14 is incorporated by reference to the section entitled "Ratification of Appointment of Independent Auditors" in the Company's proxy statement issued in connection with its 2009 Annual Meeting of Stockholders and to be filed with the Commission not later than 120 days after December 31, 2008.

## PART IV

### Item 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a)   1.   **Financial Statements**

The consolidated financial statements of Lexington Precision Corporation and its wholly owned subsidiary, Lexington Rubber Group, Inc., are included in Part II, Item 8.

2. **Financial Statement Schedule**

Schedule II, "Valuation and Qualifying Accounts and Reserves," is included in this Part IV, Item 15, on page 81. All other schedules are omitted because the required information is not applicable, not material, or included in the consolidated financial statements or the notes thereto.

3. **Exhibits**

The exhibits listed on the accompanying exhibit index are filed herewith or incorporated herein by reference.

- 80 -

## LEXINGTON PRECISION CORPORATION AND SUBSIDIARY

### Schedule II – Valuation and Qualifying Accounts and Reserves
### of Continuing Operations
### (thousands of dollars)

|  | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions From Reserves | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for Doubtful Accounts** |  |  |  |  |
| Year ended December 31, 2008 | $ 476 | $ 283 | $ 24 | $735 |
| Year ended December 31, 2007 | $ 412 | $ 210 | $ 146 | $476 |
| Year ended December 31, 2006 | $ 697 | $ 55 | $ 340 | $412 |
| **Inventory Reserve** |  |  |  |  |
| Year ended December 31, 2008 | $ 612 | $ 231 | $ 65 | $778 |
| Year ended December 31, 2007 | $ 417 | $ 379 | $ 184 | $612 |
| Year ended December 31, 2006 | $ 435 | $ 245 | $ 263 | $417 |

- 81 -

## SIGNATURES

Pursuant to the requirements of Section 13 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

LEXINGTON PRECISION CORPORATION
(Registrant)

By: /s/Warren Delano
     Warren Delano, President

April 23, 2009

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on April 23, 2009:

**Principal Executive Officers and Directors:**

/s/Michael A. Lubin
Michael A. Lubin, Chairman of the Board

/s/Warren Delano
Warren Delano, President and Director

**Principal Financial and Accounting Officer:**

/s/Dennis J. Welhouse
Dennis J. Welhouse, Senior Vice President,
  Chief Financial Officer, and Secretary

**Directors:**

/s/William B. Conner
William B. Conner, Director

/s/Kenneth I. Greenstein
Kenneth I. Greenstein, Director

/s/Joseph A. Pardo
Joseph A. Pardo, Director

/s/ Elizabeth H. Ruml
Elizabeth H. Ruml, Director

- 82 -

**EXHIBIT INDEX**

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 3 – 1 | Articles of Incorporation and Restatement thereof | Incorporated by reference from Exhibit 3-1 to Lexington Precision Corporation's (the "Company") Form 10-K for the year ended May 31, 1981, located under Securities and Exchange Commission File No. 0-3252 ("1981 10-K") |

| | | |
|---|---|---|
| 3 – 2 | By-laws, as amended | Incorporated by reference from Exhibit 3-2 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 ("1998 10-K") |
| 3 – 3 | Certificate of Correction dated September 21, 1976 | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for the year ended May 31, 1983, located under Securities and Exchange Commission File No. 0-3252 ("1983 10-K") |
| 3 – 4 | Certificate of Ownership and Merger dated May 24, 1977 | Incorporated by reference from Exhibit 3-4 to 1983 10-K |
| 3 – 5 | Certificate of Ownership and Merger dated May 31, 1977 | Incorporated by reference from Exhibit 3-5 to 1983 10-K |
| 3 – 6 | Certificate of Reduction of Capital dated December 30, 1977 | Incorporated by reference from Exhibit 3-6 to 1983 10-K |
| 3 – 7 | Certificate of Retirement of Preferred Shares dated December 30, 1977 | Incorporated by reference from Exhibit 3-7 to 1983 10-K |
| 3 – 8 | Certificate of Reduction of Capital dated December 18, 1978 | Incorporated by reference from Exhibit 3-8 to 1983 10-K |
| 3 – 9 | Certificate of Retirement of Preferred Shares dated December 28, 1978 | Incorporated by reference from Exhibit 3-9 to 1983 10-K |
| 3 – 10 | Certificate of Reduction of Capital dated January 9, 1979 | Incorporated by reference from Exhibit 3-10 to 1983 10-K |
| 3 – 11 | Certificate of Reduction of Capital dated December 20, 1979 | Incorporated by reference from Exhibit 3-11 to 1983 10-K |
| 3 – 12 | Certificate of Retirement of Preferred Shares dated December 20, 1979 | Incorporated by reference from Exhibit 3-12 to 1983 10-K |
| 3 – 13 | Certificate of Reduction of Capital dated December 16, 1982 | Incorporated by reference from Exhibit 3-13 to 1983 10-K |
| 3 – 14 | Certificate of Reduction of Capital dated December 17, 1982 | Incorporated by reference from Exhibit 3-14 to 1983 10-K |
| 3 – 15 | Certificate of Amendment of Restated Certificate of Incorporation dated September 26, 1984 | Incorporated by reference from Exhibit 3-15 to the Company's Form 10-K for the year ended May 31, 1985, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 16 | Certificate of Retirement of Stock dated September 24, 1986 | Incorporated by reference from Exhibit 4-3 to the Company's Registration Statement in Form S-2 located under Securities and Exchange Commission File No. 33-9380 ("1933 Act Registration Statement") |
| 3 – 17 | Certificate of Amendment of | Incorporated by reference from Exhibit 3-17 to the |

|  | Restated Certificate of Incorporation dated November 21, 1986 | Company's Form 10-K for the year ended May 31, 1987, located under Securities and Exchange Commission File No. 0-3252 |
|---|---|---|
| 3 – 18 | Certificate of Retirement of Stock dated January 15, 1987 | Incorporated by reference from Exhibit 4-5 to Amendment No. 1 to 1933 Act Registration Statement |

- 83 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 3 – 19 | Certificate of Retirement of Stock dated February 22, 1988 | Incorporated by reference from Exhibit 3-19 to the Company's Form 10-K for the year ended May 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("May 31, 1989 10-K") |
| 3 – 20 | Certificate of Amendment of Restated Certificate of Incorporation dated January 6, 1989 | Incorporated by reference from Exhibit 3-20 to May 31, 1989 10-K |
| 3 – 21 | Certificate of Retirement of Stock dated August 17, 1989 | Incorporated by reference from Exhibit 3-21 to May 31, 1989 10-K |
| 3 – 22 | Certificate of Retirement of Stock dated January 9, 1990 | Incorporated by reference from Exhibit 3-22 to the Company's Form 10-K for the seven months ended December 31, 1989, located under Securities and Exchange Commission File No. 0-3252 ("December 31, 1989 10-K") |
| 3 – 23 | Certificate of the Designations, Preferences and Relative Participating, Optional and Other Special Rights of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, and the Qualifications, Limitations and Restrictions thereof dated January 10, 1990 | Incorporated by reference from Exhibit 3-1 to the Company's Form 10-Q for the quarter ended November 30, 1989, located under Securities and Exchange Commission File No. 0-3252 ("November 30, 1989 10-Q") |
| 3 – 24 | Certificate of Ownership and Merger dated April 25, 1990 | Incorporated by reference from Exhibit 3-24 to December 31, 1989 10-K |
| 3 – 25 | Certificate of Elimination of 12% Cumulative Convertible Exchangeable Preferred Stock, Series C, dated June 4, 1990 | Incorporated by reference from Exhibit 3-25 to the Company's Form 10-K for the year ended December 31, 1990, located under Securities and Exchange Commission File No. 0-3252 ("1990 10-K") |
| 3 – 26 | Certificate of Retirement of Stock dated March 6, 1991 | Incorporated by reference from Exhibit 3-26 to 1990 10-K |

| | | |
|---|---|---|
| 3 – 27 | Certificate of Retirement of Stock dated April 29, 1994 | Incorporated by reference from Exhibit 3-28 to the Company's Form 10-K for year the ended December 31, 1994, located under Securities and Exchange Commission File No. 0-3252 ("1994 10-K") |
| 3 – 28 | Certificate of Retirement of Stock dated January 6, 1995 | Incorporated by reference from Exhibit 3-27 to 1994 10-K |
| 3 – 29 | Certificate of Retirement of Stock dated January 5, 1996 | Incorporated by reference from Exhibit 3-29 to the Company's Form 10-K for year the ended December 31, 1995, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 30 | Certificate of Retirement of Stock dated January 6, 1997 | Incorporated by reference from Exhibit 3-30 to the Company's Form 10-K for the year ended December 31, 1996, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 31 | Certificate of Retirement of Stock dated January 9, 1998 | Incorporated by reference from Exhibit 3-31 to the Company's Form 10-K for the year ended December 31, 1997, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 32 | Certificate of Retirement of Stock dated January 13, 1999 | Incorporated by reference from Exhibit 3-32 to the Company's Form 10-K for the year ended December 31, 1998, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 33 | Certificate of Retirement of Stock dated January 26, 2000 | Incorporated by reference from Exhibit 3-33 to the Company's Form 10-K for year the ended December 31, 1999, located under Securities and Exchange Commission File No. 0-3252 |
| 3 – 34 | Certificate of Designations, Preferences, Rights and Number of Shares of Redeemable Preferred Stock, Series B | Incorporated by reference from Exhibit 3-3 to the Company's Form 10-K for year the ended December 31, 1981, located under Securities and Exchange Commission File No. 0-3252 |

- 84 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
|---|---|---|
| 4 – 1 | Purchase Agreement dated as of February 7, 1985, between the Company and L&D Precision Limited Partnership ("L&D Precision") and exhibits thereto | Incorporated by reference from Exhibit 4-1 to the Company's Form 8-K dated February 7, 1985, located under Securities and Exchange Commission File No. 0-3252 |
| 4 – 2 | Amendment Agreement dated as of April 27, 1990, between the Company and L&D Precision with | Incorporated by reference from Exhibit 10-2 to 1990 10-K |

|        |                                                                                                   |                                                                                                                                                                                               |
|--------|---------------------------------------------------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|        | respect to Purchase Agreement dated as of February 7, 1985                                        |                                                                                                                                                                                               |
| 4 – 3  | Recapitalization Agreement dated as of April 27, 1990, between the Company and L&D Woolens Limited Partnership and exhibits thereto | Incorporated by reference from Exhibit 4-10 to December 31, 1989 10-K                                                                                                          |
| 4 – 4  | Indenture, dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 4-1 to Form 8-K filed December 18, 2003, located under Securities and Exchange Commission File No. 0-3252 ("December 18, 2003 8-K")             |
| 4 – 5  | First Supplemental Indenture, dated May 25, 2007, by and between the Company and Wilmington Trust Company, as Trustee | Incorporated by reference from Exhibit 10-3 to the Company's Form 10-Q for the period ended March 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2006 10-Q") |
| 4 – 6  | Registration Rights Agreement, dated as of December 18, 2003, between the Company and Purchasers listed therein | Incorporated by reference from Exhibit 4-2 to December 18, 2003 8-K                                                                                            |
| 4 – 7  | Form of Unit                                                                                      | Incorporated by reference from Exhibit 4-3 to December 18, 2003 8-K                                                                                                                            |
| 4 – 8  | Form of Warrant                                                                                   | Incorporated by reference from Exhibit 4-4 to December 18, 2003 8-K                                                                                                                            |
| 4 – 9  | Form of 12% Senior Subordinated Note due August 1, 2009                                           | Incorporated by reference from Exhibit 4-5 to December 18, 2003 8-K                                                                                                                            |
| 4 – 10 | Form of 13% Junior Subordinated Note due November 1, 2009                                         | Incorporated by reference from Exhibit 4-6 to December 18, 2003 8-K                                                                                                                            |
| 10 – 1 | Lexington Precision Corporation Flexible Compensation Plan, as amended                            | Incorporated by reference from Exhibit 10-3 to the Company's Form 10-K for the year ended December 31, 1991, located under Securities and Exchange Commission File No. 0-3252 ("1991 10-K")      |
| 10 – 2 | 1986 Restricted Stock Award Plan, as amended                                                      | Incorporated by reference from Exhibit 10-38 to December 31, 1989 10-K                                                                                                                         |
| 10 – 3 | Lexington Precision Corporation Retirement and Savings Plan, as amended                           | Incorporated by reference from Exhibit 10-5 to December 31, 1998 10-K                                                                                                                          |
| 10 – 4 | Description of 2008 Compensation Arrangements with Lubin, Delano & Company                         | Filed herewith                                                                                                                                                                                |
| 10 – 5 | Corporate Office 2002 Management Cash Bonus Plan                                                   | Incorporated by reference from Exhibit 10-7 to the Company's Form 10-K for the year ended December 31, 2002, located under Securities and Exchange Commission File No. 0-3252 ("2002 10-K")      |
| 10 – 6 | Exchange Agreement, dated as of                                                                   | Incorporated by reference from Exhibit 10-1 to December                                                                                                                                        |

|  | December 18, 2003, between the Company and each of Michael A. Lubin and Warren Delano | 18, 2003 8-K |
| --- | --- | --- |
| 10 – 7 | Warrant Agent Agreement, Dated as of December 18, 2003, between the Company and Wilmington Trust Company, as Warrant Agent | Incorporated by reference from Exhibit 10-2 to December 18, 2003 8-K |

- 85 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 10 – 8 | Delphi Corporation Lifetime Contract, dated as of November 22, 2004, by and between Delphi Automotive Systems LLC and Lexington Connector Seals | Incorporated by reference from Exhibit 10-1 to Form 8-K filed November 29, 2004, located under Securities and Exchange Commission File No. 0-3252 |
| 10 – 9 | Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit A to the Proxy Statement on Schedule 14A of Lexington Precision Corporation filed with the Securities and Exchange Commission on April 22, 2005 |
| 10 – 10 | Form of the Incentive Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-2 to Form 8-K filed May 19, 2005, located under Securities and Exchange Commission File No. 0-3252 ("May 19, 2005 8-K") |
| 10 – 11 | Form of the Non-Qualified Stock Option Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-3 to May 19, 2005 8-K |
| 10 – 12 | Form of the Restricted Stock Award Agreement Pursuant to the Lexington Precision Corporation 2005 Stock Award Plan | Incorporated by reference from Exhibit 10-4 to May 19, 2005 8-K |
| 10 – 13 | Credit and Security Agreement, dated as of May 31, 2006, by and among the Company and Lexington Rubber Group, Inc. ("LRG"), as borrowers, the lenders from time to time party thereto (the "Lenders"), CapitalSource Finance LLC, as collateral agent and administrative agent for the Lenders, and CapitalSource Finance LLC and Webster Business Credit Corporation, as co-documentation agents | Incorporated by reference from Exhibit 10-4 to the March 31, 2006 10-Q |
| 10 – 14 | Pledge Agreement, dated as of May 31, 2006, made by the Company in favor of CapitalSource Finance LLC, as agent | Incorporated by reference from Exhibit 10-5 to March 31, 2006 10-Q |

| 10 – 15 | Loan and Security Agreement, dated as of May 31, 2006, by and among the Company and LRG, as borrowers, the lenders from time to time party thereto (the "Term Lenders"), and CSE Mortgage LLC, as collateral agent and administrative agent for the Term Lenders | Incorporated by reference from Exhibit 10-6 to March 31, 2006 10-Q |
| 10 – 16 | Pledge Agreement, dated as of May 31, 2006, made by the Company in favor of CSE Mortgage LLC, as agent | Incorporated by reference from Exhibit 10-7 to March 31, 2006 10-Q |
| 10 – 17 | Intercreditor Agreement, dated as of May 31, 2006, by and between CapitalSource Finance LLC, as agent, and CSE Mortgage LLC, as agent, with the acknowledgment of the Company and LRG, as borrowers, and Webster Business Credit Corporation, CapitalSource Finance LLC, CSE Mortgage LLC, and DMD Special Situations, LLC, as lenders | Incorporated by reference from Exhibit 10-9 to March 31, 2006 10-Q |
| 10 – 18 | First Amendment and Default Waiver Agreement dated as of November 20, 2006, among the Company and LRG., as borrowers, and CapitalSource Finance LLC, as a lender, as Agent and as Co-Documentation Agent, Webster Business Credit Corporation, as a lender and as Co-Documentation Agent, CSE Mortgage LLC, as a lender and an Agent, and DMD Special Situations, LLC, as a lender | Incorporated by reference from Exhibit 10-31 to the Company's Form 10-K for the year ended December 31, 2006, located under Securities and Exchange Commission File No. 0-3252 ("2006 10-K") |
| 10 – 19 | Amendment Agreement dated as of January 31, 2006, between the Company and Michael A. Lubin with respect to the 13% Junior Subordinated Note | Incorporated by reference from Exhibit 10-31 to the 2006 10-K |

- 86 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| --- | --- | --- |
| 10 – 20 | Agreement, dated May 19, 2007, by and among the Company, LRG., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended March 31, 2007, located under Securities and Exchange Commission File No. 0-3252 ("March 31, 2007 10-Q") |
| 10 – 21 | Forbearance Agreement, dated May 25, 2007, by and among the Company and the holders of 12% | Incorporated by reference from Exhibit 10-2 to the March 31, 2007 10-Q |

|  | Senior Subordinated Notes due August 1, 2009, signatory thereto | |
|---|---|---|
| 10 – 22 | First Amendment, dated July 20, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among the Company, LRG, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended June 30, 2007, located under Securities and Exchange Commission File No. 0-3252 |
| 10 – 23 | Second Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 18, 2007, by and among the Company, LRG, Inc., CapitalSource Finance LLC, Webster Business Credit Corporation, CSE Mortgage LLC, and DMD Special Situations Funding, LLC | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended September 30, 2007, located under Securities and Exchange Commission File No. 0-3252 ("September 30, 2007 10-Q") |
| 10 – 24 | First Amendment, dated September 24, 2007, to the Forbearance Agreement, dated as of May 25, 2007, by and among the Company and the holders of the 12% Senior Subordinated Notes due August 1, 2009, signatory thereto | Incorporated by reference from Exhibit 10-2 to the September 30, 2007 10-Q |
| 10 – 25 | Super-Priority DIP Note, dated April 21, 2008, of the Company and LRG. Payable to the order of Lubin Partners LLC, William B. Connor, and ORA Associates LLC in the aggregate principal amount of $4,000,000 | Incorporated by reference from Exhibit 10-1 to the Company's Form 10-Q for the period ended June 30, 2008, located under Securities and Exchange Commission File No. 0-3252 ("June 30, 2008 10-Q") |
| 10 – 26 | Amendment dated April 21, 2008, to Super-Priority DIP Note between the Company and LRG. Payable to the order of Lubin Partners LLC, William B. Connor, and ORA Associates LLC in the aggregate principal amount of $4,000,000 | Filed herewith |
| 21 – 1 | Significant Subsidiary of Registrant | Filed herewith |
| 31 – 1 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 – 2 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant | Filed herewith |
| 31 – 3 | Rule 13(a) — 14(a) / 15(d) — 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant | Filed herewith |

| 32 – 1 | Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |
| 32 – 2 | Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

- 87 -

| EXHIBIT NUMBER | EXHIBIT | LOCATION |
| 32 – 3 | Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith |

- 88 -

**Exhibit D**

**LPC Form 10-Q for Quarter Ended September 30, 2009**

10-Q 1 lexington10qseptember.htm QUARTERLY REPORT FOR THE PERIOD ENDED SEPTEMBER 30, 2009

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

**[X] Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
for the Period Ended September 30, 2009**

or

**[  ] Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

### Commission File Number 0-3252

# LEXINGTON PRECISION CORPORATION
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **22-1830121** |
| (State or other jurisdiction of<br>incorporation or organization) | (I.R.S. Employer<br>Identification No.) |
| **800 Third Avenue, New York, NY** | **10022** |
| (Address of principal executive office) | (Zip Code) |

**(212) 319-4657**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name, former address, and former fiscal year, if changed since last report date)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes X  No _

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  _  No _

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company.     (Check one):

| | |
|---|---|
| Large Accelerated Filer _ | Accelerated Filer _ |
| Non-Accelerated Filer _ | Smaller Reporting Company X |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes _ No X

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

As of November 10, 2009, there were 5,021,767 shares of common stock of the Registrant outstanding.

# LEXINGTON PRECISION CORPORATION

## Quarterly Report on Form 10-Q

### Table of Contents

**PART I.**    **FINANCIAL INFORMATION**

Item 1.      Financial Statements      1

Item 2.      Management's Discussion and Analysis of Financial Condition and Results of Operations      21

Item 3.      Quantitative and Qualitative Disclosures about Market Risk      46

Item 4T.      Controls and Procedures      46

**PART II.**    **OTHER INFORMATION**

Item 1a.      Risk Factors      47

Item 3.      Defaults upon Senior Securities      49

Item 6.      Exhibits      49

- i -

# PART I.   FINANCIAL INFORMATION

## Item 1. FINANCIAL STATEMENTS

### LEXINGTON PRECISION CORPORATION

**Consolidated Statements of Operations**
**(thousands of dollars, except per share data)**
**(unaudited)**

|  | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
|  | **2009** | **2008** | **2009** | **2008** |
| Net sales | $ 16,648 | $ 17,871 | $ 46,190 | $ 59,223 |
| Cost of sales | 14,251 | 15,733 | 41,382 | 50,563 |
| Gross profit | 2,397 | 2,138 | 4,808 | 8,660 |
| Selling and administrative expenses | 1,283 | 1,702 | 4,113 | 5,030 |
| Income from operations | 1,114 | 436 | 695 | 3,630 |
| Interest expense | 1,907 | 1,989 | 5,648 | 6,729 |
| Reorganization items, net expense | 1,062 | 1,622 | 3,490 | 3,392 |
| Loss from continuing operations before income taxes | (1,855) | (3,175) | (8,443) | (6,491) |
| Income tax provision | 8 | 9 | 26 | 35 |
| Loss from continuing operations | (1,863) | (3,184) | (8,469) | (6,526) |
| Loss from discontinued operations | (61) | (21) | (85) | (81) |
| Net loss | $ (1,924) | $ (3,205) | $ (8,554) | $ (6,607) |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.37) | $ (0.65) | $ (1.70) | $ (1.32) |
| Discontinued operations | (0.02) | – | (0.02) | (0.01) |
| Net loss | $ (0.39) | $ (0.65) | $ (1.72) | $ (1.33) |

*See notes to consolidated financial statements.*

- 1 -

# LEXINGTON PRECISION CORPORATION

## Consolidated Balance Sheets
### (thousands of dollars, except share data)

| | September 30, 2009 | December 31, 2008 |
|---|---|---|
| | (unaudited) | |
| **Assets:** | | |
| Current assets: | | |
|     Cash | $ 2,785 | $ 5,540 |
|     Marketable securities | 112 | 38 |
|     Accounts receivable, net of allowances of $748 and $735, respectively | 9,112 | 6,794 |
|     Inventories, net | 7,968 | 10,597 |
|     Prepaid expenses and other current assets | 2,830 | 2,426 |
|     Current assets of discontinued operations | 32 | 7 |
|         Total current assets | 22,839 | 25,402 |
| Plant and equipment, net | 16,273 | 18,439 |
| Plant and equipment of discontinued operations, net | 1,150 | 1,231 |
| Goodwill, net | 7,623 | 7,623 |
| Other assets, net | 489 | 633 |
| | $ 48,374 | $ 53,328 |
| **Liabilities and stockholders' deficit:** | | |
| Current liabilities: | | |
|     Accounts payable | $ 3,480 | $ 3,391 |
|     Accrued expenses, excluding interest | 4,697 | 3,382 |
|     Accrued interest expense | 160 | 199 |
|     Debt in default | 31,749 | 34,175 |
|     Debtor-in-possession loan | 4,000 | 4,000 |
|     Short-term debt and current portion of long-term debt | 435 | 16 |
|     Current liabilities of discontinued operations | 127 | 148 |
|         Total current liabilities | 44,648 | 45,311 |
| Liabilities subject to compromise | 58,258 | 54,013 |
| Other long-term liabilities | 334 | 400 |
| Stockholders' deficit: | | |
|     Common stock, $0.25 par value, 10,000,000 shares authorized, 5,021,767 shares issued and outstanding at September 30, 2009, and December 31, 2008 | 1,245 | 1,242 |
|     Additional paid-in-capital | 13,204 | 13,197 |
|     Accumulated deficit | (69,213) | (60,659) |
|     Accumulated other comprehensive loss | (102) | (176) |
|         Total stockholders' deficit | (54,866) | (46,396) |
| | $ 48,374 | $ 53,328 |

*See notes to consolidated financial statemennts*

- 2 -

# LEXINGTON PRECISION CORPORATION

## Consolidated Statements of Cash Flows
### (thousands of dollars)
### (unaudited)

| | Nine Months Ended September 30 | |
| --- | --- | --- |
| | 2009 | 2008 |
| **Operating activities:** | | |
| Net loss | $ (8,554) | $ (6,607) |
| Adjustments to reconcile net loss to net cash provided (used) by continuing operations: | | |
| Loss from discontinued operations | 85 | 81 |
| Depreciation | 3,419 | 3,844 |
| Amortization included in operations | 122 | 173 |
| Amortization of deferred financing costs and fees | – | 251 |
| Increase in accrued reorganization expenses | 601 | 1,774 |
| Changes in operating assets and liabilities that provided (used) cash: | | |
| Accounts receivable, net | (2,318) | 873 |
| Inventories, net | 2,629 | (1,550) |
| Prepaid expenses and other current assets | (423) | (580) |
| Accounts payable | 370 | 949 |
| Accrued expenses, excluding interest | 433 | 523 |
| Accrued interest expense | 4,206 | 4,157 |
| Other long-term liabilities | 30 | 17 |
| Other | 56 | (27) |
| Net cash provided by continuing operations | 656 | 3,878 |
| Net cash provided (used) by discontinued operations | (50) | 15 |
| Net cash provided by operating activities | 606 | 3,893 |
| **Investing activities:** | | |
| Purchases of plant and equipment | (1,399) | (2,207) |
| Proceeds from sales of assets | 126 | 49 |
| Expenditures for tooling owned by customers | (101) | (258) |
| Other | 20 | 29 |
| Net cash used by investing activities | (1,354) | (2,387) |
| **Financing activities:** | | |
| Issuance of debtor-in-possession note | – | 4,000 |
| Prepetition net borrowings under revolving line of credit | – | 3,587 |
| Prepetition repayment of debt in default and long-term debt | – | (837) |
| Postpetition repayment of debt in default and short and long-term debt | (2,631) | (1,658) |
| Short-term borrowings | 624 | – |
| Payment of financing expenses | – | (214) |
| Net cash provided (used) by financing activities | (2,007) | 4,878 |
| Net increase (decrease) in cash | (2,755) | 6,384 |
| Cash at beginning of year | 5,540 | 212 |
| Cash at end of period | $ 2,785 | $ 6,596 |

*See notes to consolidated financial statemennts*

- 3 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 1 — Basis of Presentation**

The unaudited interim consolidated financial statements include the accounts of Lexington Precision Corporation and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Company"). The significant accounting policies followed by the Company are set forth in Note 1 to the consolidated financial statements in the Company's annual report on Form 10-K for the year ended December 31, 2008. In the opinion of management, the interim consolidated financial statements contain all adjustments, consisting only of adjustments of a normal, recurring nature, necessary to present fairly the Company's financial position at September 30, 2009, the Company's results of operations for the three-month and nine-month periods ended September 30, 2009 and 2008, and the Company's cash flows for the nine-month periods ended September 30, 2009 and 2008.

The preparation of the interim consolidated financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenue and expenses during each reporting period. Future events and their impact on the Company's results of operations or financial position cannot be determined with certainty. Although the Company strives to use its best judgment in making estimates and assumptions, actual results could vary materially from anticipated results.

The results of operations for the three-month period ended September 30, 2009, are not necessarily indicative of the results to be expected for any succeeding quarter or for the full year.

### *Subsequent Events*

The company has evaluated subsequent events through November 20, 2009, the date these financial statements were issued.

### *Bankruptcy Filing*

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. 08-11153). The Company's exclusive right to file a plan of reorganization and solicit acceptances of such plan expired on April 30, 2009.

In connection with the chapter 11 filing, the Company obtained a financing package that consisted of (1) an arrangement with the Company's senior, secured lenders to freeze the loan under the Company's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Company to utilize the collections on its accounts receivable in the operation of its business through February 25, 2009, which has since been extended to December 31, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, unless otherwise extended. On September 30 and November 13, 2009, the Company's available cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, the Company currently believes, based on its most recent financial projections, that it has adequate liquidity to operate during the chapter 11 proceedings. For more information on the Company's senior, secured financing and the debtor-in-possession loan, please refer to Note 4, "Debt."

- 4 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

Although there can be no assurance that the Company will be successful, its intent in filing for chapter 11 protection was to use the powers afforded it under the Bankruptcy Code to effect a financial restructuring that would result in a significant reduction in its total indebtedness on a basis that would be fair and equitable to all of its creditors and stockholders.

### *Competing Plans of Reorganization*

During September and October 2009, the Company's senior, secured lenders, the official committee of unsecured creditors of the Company in the chapter 11 proceedings (the "Official Creditors' Committee"), and the Company filed separate plans of reorganization. Each of these plans may be further amended, and if no such plan is confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

#### The Lenders' Plan

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan. For a detailed description of the Lenders' Plan, please refer to the plan document and the related disclosure statement at http://chapter11epiqsystem.com /lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

#### The Committee's Plan

The plan filed by the Official Creditors' Committee on September 29, 2009 (the "Committee's Plan"), provides, in summary, for the following:

- An extension of the Company's outstanding senior, secured debt without any immediate pay down;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

- The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

- The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

- Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10% (with a floor of 13½%), a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

- 5 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

For a detailed description of the Committee's Plan, please refer to the plan document and related disclosure statement with respect to the Committee's Plan at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

The Company's Plan

The amended plan filed by the Company on October 6, 2009 (the "Company's Plan"), provides, in summary, for the following:

·   The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the real estate term loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

·   Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

·   Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum; and

·   Each holder of a Junior Subordinated Note claim or a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of the Company's liabilities would have been converted into equity securities. For a detailed description of the Company's Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the plan document and the related disclosure statement filed on October 6, 2009 at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

The Company requires additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that the Company will be able to obtain such financing.

- 6 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

### *Reporting by Entities in Reorganization under the Bankruptcy Code*

The Company's consolidated financial statements have been prepared in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") subtopic 852-10, "Reorganizations – Overall" ("ASC 852-10"), (formerly, American Institute of Certified Public Accountants, Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." ASC 852-10 provides guidance for financial reporting by entities that have filed petitions and expect to reorganize as going concerns under Chapter 11 of Title 11 of the United States Code. ASC 852-10 does not change the application of Generally Accepted Accounting Principles ("GAAP") with respect to the preparation of the Company's financial statements. However, ASC 852-10 requires, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.

### *Reorganization Items*

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as "reorganization items" in the statements of operations. Reorganization items reflected in the Company's consolidated financial statements for the three-month and nine-month periods ended September 30, 2009 and 2008, respectively, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | | Nine Months Ended September 30, | | April 1, 2008 Through September 30, |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2009 | | 2008 | | 2009 | | 2008 |
| Professional fees and expenses incurred directly by the Company | $ | 365 | $ | 833 | $ | 1,200 | $ | 1,832 |
| Professional fees and expenses incurred by creditors | | 659 | | 691 | | 2,119 | | 1,316 |
| Other costs | | 50 | | 149 | | 210 | | 326 |
| Interest income | | (12) | | (51) | | (39) | | (82) |
| Reorganization items, net expense | $ | 1,062 | $ | 1,622 | $ | 3,490 | $ | 3,392 |

### *Liabilities Subject to Compromise*

ASC 852-10 requires that certain prepetition claims against the Company that are unsecured or under-secured be classified in the balance sheet as "liabilities subject to compromise." Additional claims that are subject to compromise may arise subsequent to the filing date as a result of the rejection of executory contracts or because claims are allowed as a result of the resolution of contingencies or disputes. On June 30, 2008, the Bankruptcy Court entered an order establishing August 15, 2008, as the bar date for the filing of all prepetition claims other than claims held by government units. The bar date for government units to file prepetition claims was September 29, 2008. The bar date was the date on which claims against the Company that arose prior to the filing date must have been filed in order for the claimant to receive any distribution in the chapter 11 case. The bar dates have passed and, absent relief

- 7 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

from the Bankruptcy Court, no additional claims may be filed against the Company. No claims or asserted claims were filed that were not already known to the Company as of April 1, 2008. Although prepetition claims are generally stayed, on April 2 and April 22, 2008, the Company received approvals from the Bankruptcy Court to pay or otherwise honor, subject to certain conditions, certain prepetition obligations critical to its continued operation, including employee wages and benefits, workers' compensation and product liability insurance programs, certain customer programs, and common carrier charges.

The Company has been paying and intends to continue to pay all undisputed postpetition claims in the ordinary course of business.  Liabilities subject to compromise at September 30, 2009, and December 31, 2008, consisted of the following (dollar amounts in thousands):

|  | September 30, 2009 | | December 31, 2008 |
|---|---|---|---|
| Prepetition accounts payable – continuing operations | $ | 5,432 | $ | 5,432 |
| Prepetition accounts payable – discontinued operations |  | 174 |  | 174 |
| Senior Subordinated Notes |  | 34,177 |  | 34,177 |
| Accrued interest on Senior Subordinated Notes |  | 17,246 |  | 13,055 |
| Junior Subordinated Note |  | 347 |  | 347 |
| Accrued interest on Junior Subordinated Note |  | 143 |  | 109 |
| Series B Preferred Stock |  | 660 |  | 660 |
| Accrued dividends on Series B Preferred Stock |  | 79 |  | 59 |
| Total liabilities subject to compromise | $ | 58,258 | $ | 54,013 |

The foregoing amounts are based upon the Company's books and records and do not necessarily take into account all alleged liabilities asserted in proofs of claims filed with the Bankruptcy Court.

### *Accounting for Interest Expense*

On April 2, 2008, the Bankruptcy Court issued an order authorizing the Company to utilize the collections on its accounts receivable in the operation of its business. Pursuant to that order, the interest rates on the Company's senior, secured debt were reduced from the default rates to the contractual rates. Because the Company categorizes the interest on its unsecured prepetition debt as an allowed claim under its proposed plan of reorganization, the Company continues to accrue, and report in its consolidated financial statements, interest on all of its unsecured prepetition debt at the applicable contractual rates.

### *Going Concern Basis*

The Company's consolidated financial statements have been prepared on a "going concern basis," as such term is used in U.S. GAAP. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. The Company's ability to restructure, refinance, or repay its indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about the Company's ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

- 8 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

### *Goodwill Impairment*

At September 30, 2009, and December 31, 2008, the Company's unamortized goodwill totaled $7,623,000, which related entirely to the Rubber Group. At September 30, 2009, the assets of the Rubber Group, including goodwill, totaled $37,431,000. During the Company's chapter 11 proceedings, the Company's financial advisor, W.Y. Campbell & Company, has prepared several analyses of the value of the Rubber Group, each of which indicated that the fair value of the Rubber Group is in excess of its carrying value. Tests for impairment of goodwill using a fair value approach are performed during the fourth quarter of each year and at other times when events or changes in circumstances indicate possible impairment.

### *Recently Issued Accounting Standards*

### *FASB ASC 105, "Generally Accepted Accounting Principles"*

In June 2009, the FASB issued ASC Topic 105 "Generally Accepted Accounting Principles" ("ASC 105"), formerly Statement of Financial Accounting Standards No. 168, "The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162." The objective of ASC 105 is to establish the FASB Accounting Standards Codification™ as the source of authoritative principles and standards recognized by the FASB to be applied by nongovernmental units in the preparation of financial statements in conformity with GAAP. ASC 105 did not change current GAAP, but is intended to simplify user access to all authoritative GAAP by providing all the authoritative literature related to a particular topic in one place. ASC 105 supersedes all other accounting literature not included in the Codification and all other accounting literature not included in ASC 105 is deemed to be nonauthoritative. The adoption of ASC 105 did not have any impact on the Company's results of operations or financial position. Pursuant to the provisions of ASC 105, the Company has updated references to U.S. GAAP in these consolidated financial statements.

### *FASB ASC 855, "Subsequent Events"*

In May 2009, the FASB issued ASC Topic 855, "Subsequent Events" ("ASC 855"). This guidance is effective for interim or annual periods ending after June 15, 2009, and established the principles and requirements for the evaluation and disclosure of subsequent events. The Company adopted this guidance on April 1, 2009, and has included the appropriate disclosure in these consolidated financial statements.

- 9 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(unaudited)**

**Note 2 — Inventories**

Inventories at September 30, 2009, and December 31, 2008, are set forth below (dollar amounts in thousands):

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Finished goods | $ 4,110 | $ 6,370 |
| Work in process | 1,660 | 1,923 |
| Raw material | 2,198 | 2,304 |
|  | $ 7,968 | $ 10,597 |

**Note 3 — Plant and Equipment**

Plant and equipment at September 30, 2009, and December 31, 2008, is set forth below (dollar amounts in thousands):

|  | September 30, 2009 | December 31, 2008 |
|---|---|---|
| Land | $ 2,295 | $ 2,255 |
| Buildings | 13,750 | 13,378 |
| Equipment | 109,329 | 112,022 |
|  | 125,374 | 127,655 |
| Less accumulated depreciation | 109,101 | 109,216 |
| Plant and equipment, net | $ 16,273 | $ 18,439 |

- 10 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 4 — Debt**

Debt at September 30, 2009, and December 31, 2008 is set forth below (dollar amounts in thousands):

| | September 30, 2009 | | | December 31, 2008 | | |
|---|---|---|---|---|---|---|
| | Not Subject to Compromise | Subject to Compromise | Total | Not Subject to Compromise | Subject to Compromise | Total |
| Debt in default: | | | | | | |
| Senior, secured credit facility: | | | | | | |
|    Revolving line of credit | $ 14,219 | $ – | $ 14,219 | $ 14,219 | $ – | $ 14,219 |
|    Equipment term loan | 4,792 | – | 4,792 | 6,667 | – | 6,667 |
|    Real estate term loan | 12,738 | – | 12,738 | 13,289 | – | 13,289 |
|    Subtotal | 31,749 | – | 31,749 | 34,175 | – | 34,175 |
| Senior Subordinated Notes | – | 34,177 | 34,177 | – | 34,177 | 34,177 |
| Junior Subordinated Note | – | 347 | 347 | – | 347 | 347 |
|    Total debt in default | 31,749 | 34,524 | 66,273 | 34,175 | 34,524 | 68,699 |
| Debtor-in-possession loan | 4,000 | – | 4,000 | 4,000 | – | 4,000 |
| Short-term borrowings | 419 | – | 419 | – | – | – |
| Current portion of long-term debt | 16 | 660 | 676 | 16 | 660 | 676 |
| Long-term debt: | | | | | | |
|    Series B Preferred Stock | – | 660 | 660 | – | 660 | 660 |
|    Other | 16 | – | 16 | 16 | – | 16 |
|    Subtotal | 16 | 660 | 676 | 16 | 660 | 676 |
|    Less current portion | (16) | (660) | (676) | (16) | (660) | (676) |
|    Total long-term debt | – | – | – | – | – | – |
| Total debt | $ 36,184 | $ 35,184 | $ 71,368 | $ 38,191 | $ 35,184 | $ 73,375 |

*Senior, Secured Credit Facility*

In connection with the Company's chapter 11 filing on April 1, 2008, the Company and its senior, secured lender, with the approval of the Bankruptcy Court, modified the senior, secured credit facility in the following manner:

1. A default premium of 2% was eliminated and the interest rates on the various components of the senior, secured facility reverted to the following contractual rates: LIBOR plus 2.75% (3.00% at September 30, 2009) on outstanding amounts under the revolving line of credit; LIBOR plus 4.5% (4.75% at September 30, 2009) for the equipment term loan; and the prime rate, plus 6%, subject to a minimum interest rate of 11% (in effect at September 30, 2009), on $4,000,000 of the real estate term loan and LIBOR plus 4.5% (4.75% at September 30, 2009) on the balance of the real estate term loan (weighted average rate for the entire real estate loan of 6.71% at September 30, 2009).

- 11 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

2.  The principal amount of the loan outstanding under the revolving line of credit was fixed at $14,219,000, and the Company was permitted to utilize, until February 25, 2009 (since extended to December 31, 2009), collections on its accounts receivable in the operation of its business.

3.  The Company agreed to continue to make the scheduled monthly principal payments of $208,000 on the equipment term loan, which had an outstanding principal balance of $8,333,000 on the filing date, and $61,000 on the real estate term loan, which had an outstanding principal balance of $13,778,000 on the filing date.

The following financial covenants are presently in effect under the senior, secured financing agreements:

1.  Minimum Cash. Aggregate cash may not be less than the following amounts on the specified measurement dates:

| | |
|---|---|
| November 6, 2009 | $2,643,000 |
| November 13, 2009 | $2,632,000 |
| November 20, 2009 | $2,836,000 |
| November 27, 2009 | $2,657,000 |
| December 4, 2009 | $2,613,000 |
| December 11, 2009 | $2,833,000 |
| December 18, 2009 | $2,798,000 |
| December 25, 2009 | $2,917,000 |
| January 1, 2010 | $2,917,000 |

On November 13, 2009, the Company's aggregate cash was $3,753,000.

2.  Maximum Expenditures. The Company's cumulative expenditures may not exceed 110% of its cumulative budgeted expenditures for the two-week period ending on November 13, 2009, and on the last day of each two-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, the Company's cumulative expenditures were $247,000 less than 110% of cumulative budgeted expenditures.

3.  Minimum Net Sales. The Company's cumulative net sales are required to be greater than 82% of its cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $6,928,000 greater than the minimum level of cumulative net sales and aggregated 87.7% of our cumulative budgeted net sales from April 2, 2008.

The Company's right to utilize cash collateral of the senior, secured lenders will terminate upon the occurrence of the following events if the Company fails to cure any of the events within five days after it receives written notice of the event from the senior, secured lenders: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) occurrence of an event of default as described in the documents governing the use of cash collateral.

- 12 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

The Company believes that the loans outstanding under the senior, secured credit facility and the interest accrued thereon are fully collateralized and will not be impaired under any plan of reorganization. As a result, the Company has continued to accrue and pay the interest on these loans at the contractual rates.

The commencement of proceedings under chapter 11 constituted an event of default under the terms of the agreement governing the senior, secured credit facility. In addition, prior to the chapter 11 filing date, a cross-default existed under the senior, secured credit facility because the Company did not make the interest payment that was due on its Senior Subordinated Notes on November 1, 2006, and has not made any of the quarterly interest payments since that date. As a result, all of the loans under the senior, secured credit facility are classified as debt in default at September 30, 2009, and December 31, 2008.

The Company's loans and reimbursement obligations with respect to letters of credit under the senior, secured credit facility are secured by liens on substantially all of the Company's assets. The agreements governing the senior, secured credit facility placed certain restrictions on the Company's business and operations, including limitations on the sale of all or substantially all of its assets, the repurchase of common stock, the redemption of preferred stock, and the payment of cash dividends.

### Debtor-in-Possession Loan

The debtor-in-possession loan in the amount of $4,000,000 was approved by the Bankruptcy Court on April 2 and 17, 2008. The debtor-in-possession loan is unsecured, subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% (in effect at September 30, 2009). The debtor-in-possession loan was granted super-priority administration expense status by the Bankruptcy Court. The loan matures on the earliest of (1) December 31, 2009, unless otherwise extended, (2) the effective date of a plan of reorganization, (3) the conversion of the bankruptcy proceedings from chapter 11 to chapter 7, (4) the appointment of a chapter 11 trustee, or (5) an event of default as described in the documents governing the debtor-in-possession loan.

### Senior Subordinated Notes

The Senior Subordinated Notes matured on August 1, 2009, and are unsecured obligations, subordinated in right of payment to all of the Company's existing and future senior debt. The Senior Subordinated Notes bear interest at 12% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. In addition, the Company did not pay the principal amount of the Senior Subordinated Notes at maturity. Pursuant to a forbearance agreement between the Company and a group of six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding, the interest rate on the Senior Subordinated Notes was increased to 16% effective March 9, 2007. Upon the commencement of the chapter 11 proceedings, the interest rate on the Senior Subordinated Notes reverted to 12%. An additional $7,772,000 aggregate principal amount, or 22.7% of the Senior Subordinated Notes outstanding, is held by certain of the Company's affiliates and members of their families. At September 30, 2009, accrued interest on the Senior Subordinated Notes totaled $17,246,000. The Senior Subordinated Notes and the accrued interest thereon through September 30, 2009, were classified as

- 13 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

liabilities subject to compromise in the Company's consolidated financial statements at September 30, 2009.

### *Junior Subordinated Note*

The Junior Subordinated Note, which matured on November 1, 2009, is an unsecured obligation of the Company that is subordinated in right of payment to all of the Company's existing and future senior debt and to the Senior Subordinated Notes. The Junior Subordinated Note bears interest at 13% per annum, payable quarterly on February 1, May 1, August 1, and November 1. The Company did not make the interest payment that was due on November 1, 2006, and has not made any of the quarterly interest payments since that date. In addition, the Company did not pay the principal amount of the Junior Subordinated Note at maturity. At September 30, 2009, accrued interest on the Junior Subordinated Note totaled $143,000. The Junior Subordinated Note and the accrued interest thereon through September 30, 2009, were classified as liabilities subject to compromise in the Company's consolidated financial statements at September 30, 2009.

### *Series B Preferred Stock*

At September 30, 2009, there were outstanding 3,300 shares of the Company's $8 Cumulative Convertible Preferred Stock, Series B (the "Series B Preferred Stock"), par value $100 per share, with a carrying value of $660,000. Each share of Series B Preferred Stock is (1) entitled to one vote, (2) redeemable for $200 plus accumulated and unpaid dividends, (3) convertible into 14.8148 shares of common stock (subject to adjustment), (4) accruing dividends at a contractual rate of 4%, and (5) entitled, upon voluntary or involuntary liquidation and after payment of all liabilities of the Company, to a liquidation preference of $200 plus accumulated and unpaid dividends. All of the shares of Series B Preferred Stock are past their scheduled redemption date. In addition, at September 30, 2009, the Company was in arrears on scheduled dividend payments on the Series B Preferred Stock in the aggregate amount of $79,000.

The Series B Preferred Stock is classified as debt in the Company's consolidated financial statements. At September 30, 2009, the Series B Preferred Stock and accrued dividends thereon were classified as liabilities subject to compromise in the Company's consolidated financial statements.

### *Fair Value of Financial Instruments*

The Company believes that, at September 30, 2009, the fair value of the loans outstanding under the revolving line of credit, the equipment term loan, the real estate term loan, and the debtor-in-possession loan approximated the principal amounts of such loans. Because of the limited trading in the Company's various unsecured debt securities, the Company is unable to express an opinion as to the fair value of the Senior Subordinated Notes, the Junior Subordinated Note, or the Series B Preferred Stock.

### *Cash Interest Paid*

Cash interest paid during the nine-month periods ended September 30, 2009 and 2008, including amounts allocated to discontinued operations, totaled $1,568,000 and $2,400,000, respectively.

- 14 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 5 — Interest Expense**

A breakdown of interest expense for the three-month and nine-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

|  | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|  | **2009** | **2008** | **2009** | **2008** |
|---|---|---|---|---|
| Interest expense at contractual interest rates: |  |  |  |  |
|     Senior, secured loans | $ 390 | $ 618 | $ 1,209 | $ 1,926 |
|     Debtor-in-possession loan | 102 | 103 | 303 | 191 |
|     Senior Subordinated Notes | 1,025 | 1,025 | 3,076 | 3,076 |
|     Junior Subordinated Note | 11 | 11 | 34 | 34 |
|     All other | 18 | (5) | 37 | 61 |
|         Subtotal | 1,546 | 1,752 | 4,659 | 5,288 |
| Interest expense resulting from incremental interest rates: |  |  |  |  |
|     Senior, secured loans – default or forbearance premium | – | – | – | 172 |
|     Senior Subordinated Notes – forbearance premium | – | – | – | 411 |
|     Senior Subordinated Notes – interest on missed interest payments | 403 | 279 | 1,115 | 733 |
|         Subtotal | 403 | 279 | 1,115 | 1,316 |
| Financing costs and fees | – | – | – | 251 |
|         Total interest expense | 1,949 | 2,031 | 5,774 | 6,855 |
| Less interest expense allocated to discontinued operations | 42 | 42 | 126 | 126 |
|         Interest expense related to continuing operations | $ 1,907 | $ 1,989 | $ 5,648 | $ 6,729 |

**Note 6 — Income Taxes**

At September 30, 2009, and December 31, 2008, the Company's net deferred income tax assets were fully reserved by a valuation allowance. The income tax provisions recorded during the three-month and nine-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

**Note 7 — Net Loss per Common Share**

The calculations of basic and diluted net loss per common share for the three-month and nine-month periods ended September 30, 2009 and 2008, are set forth below (in thousands, except per share amounts). The assumed conversion of the Series B Preferred Stock and the assumed exercise of warrants to purchase the Company's common stock, all of which expired on August 1, 2009, were not dilutive. In addition, non-vested shares of restricted common stock issued under the Company's 2005 Stock Award Plan are not considered outstanding common shares for purposes of the calculation of basic net loss per share of common stock because their effect would not be dilutive. As a result, the weighted average number of common shares outstanding used in the calculation of basic and diluted loss per share of common stock set forth below does not include the assumed conversion of the Series B Preferred

- 15 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

Stock, the assumed exercise of the warrants, or the non-vested shares of restricted common stock issued under the 2005 Stock Award Plan.

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | **2009** | **2008** | **2009** | **2008** |
| Numerator – Loss: | | | | |
| Continuing operations | $ (1,863 ) | $ (3,184 ) | $ (8,469 ) | $ (6,526 ) |
| Discontinued operations | (61 ) | (21 ) | (85 ) | (81 ) |
| Net loss | $ (1,924 ) | $ (3,205 ) | $ (8,554 ) | $ (6,607 ) |
| Denominator – Weighted average shares outstanding | 4,980 | 4,962 | 4,977 | 4,958 |
| Basic and diluted loss per share of common stock: | | | | |
| Continuing operations | $ (0.37 ) | $ (0.65 ) | $ (1.70 ) | $ (1.32 ) |
| Discontinued operations | (0.02 ) | – | (0.02 ) | (0.01 ) |
| Net loss | $ (0.39 ) | $ (0.65 ) | $ (1.72 ) | $ (1.33 ) |

- 16 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 8 — Segments**

### *Description of Segments and Products*

The Company has two operating segments, the Rubber Group and the Metals Group. The Rubber Group manufactures tight-tolerance rubber components, primarily insulators used in aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment. The Rubber Group currently operates manufacturing facilities in Jasper, Georgia, North Canton, Ohio, and Rock Hill, South Carolina. The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks at a manufacturing facility located in Rochester, New York. The Rubber Group and the Metals Group conduct substantially all of their business in the continental United States.

The Corporate Office oversees the operations of the Rubber Group and the Metals Group and performs certain general administrative functions that are not directly related to any activity carried on by either the Rubber Group or the Metals Group. Corporate Office expenses include the compensation and benefits of the Company's executive officers and corporate staff, rent on the office space occupied by these individuals, general corporate legal fees, including fees related to financings, and certain insurance expenses. Assets of the Corporate Office are primarily cash, marketable securities, and certain prepaid expenses and other current assets.

### *Sales by Market*

The following table summarizes net sales for the three-month and nine-month periods ended September 30, 2009 and 2008, by the end-market in which the Company's components were utilized (dollar amounts in thousands):

| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | | |
|---|---|---|---|---|---|---|---|---|
| | **2009** | | **2008 (1)** | | **2009** | | **2008 (1)** | |
| Automotive – aftermarket | $ 7,876 | 47.3 % | $ 6,717 | 37.6 % | $ 21,046 | 45.6 % | $ 21,326 | 36.0 % |
| Automotive – original equipment | 5,083 | 30.5 | 6,179 | 34.6 | 12,473 | 27.0 | 22,725 | 38.4 |
| Medical | 3,358 | 20.2 | 4,305 | 24.1 | 11,124 | 24.1 | 12,566 | 21.2 |
| Other | 331 | 2.0 | 670 | 3.7 | 1,547 | 3.3 | 2,606 | 4.4 |
| Total net sales | $ 16,648 | 100.0 % | $ 17,871 | 100.0 % | $ 46,190 | 100.0 % | $ 59,223 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

- 17 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

*Segment Financial Data*

Information relating to the Company's operating segments and the Corporate Office for the three-month and nine-month periods ended September 30, 2009 and 2008, is summarized below (dollar amounts in thousands):

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| --- | --- | --- | --- | --- |
| | **2009** | **2008** | **2009** | **2008** |
| **Net sales:** | | | | |
| Rubber Group | $ 13,862 | $ 15,327 | $ 39,187 | $ 50,643 |
| Metals Group | 2,786 | 2,544 | 7,003 | 8,580 |
| Total net sales | $ 16,648 | $ 17,871 | $ 46,190 | $ 59,223 |
| **Income (loss) from operations:** | | | | |
| Rubber Group | $ 1,743 | $ 1,341 | $ 3,269 | $ 6,186 |
| Metals Group | (64) | (333) | (840) | (353) |
| Subtotal | 1,679 | 1,008 | 2,429 | 5,833 |
| Corporate Office (1) | (565) | (572) | (1,734) | (2,203) |
| Total income from operations | $ 1,114 | $ 436 | $ 695 | $ 3,630 |
| **Depreciation and amortization (2):** | | | | |
| Rubber Group | $ 1,045 | $ 1,120 | $ 3,159 | $ 3,564 |
| Metals Group | 113 | 127 | 343 | 415 |
| Subtotal | 1,158 | 1,247 | 3,502 | 3,979 |
| Corporate Office | 14 | 13 | 39 | 38 |
| Total depreciation and amortization | $ 1,172 | $ 1,260 | $ 3,541 | $ 4,017 |
| **Capital expenditures:** | | | | |
| Rubber Group | $ 215 | $ 392 | $ 1,194 | $ 1,901 |
| Metals Group | 107 | 145 | 205 | 288 |
| Subtotal | 322 | 537 | 1,399 | 2,189 |
| Corporate Office | – | 7 | – | 18 |
| Total capital expenditures | $ 322 | $ 544 | $ 1,399 | $ 2,207 |

| | Sept. 30, 2009 | Dec. 31, 2008 |
| --- | --- | --- |
| **Assets:** | | |
| Rubber Group | $ 37,431 | $ 38,527 |
| Metals Group | 6,588 | 7,680 |
| Subtotal | 44,019 | 46,207 |
| Corporate Office | 3,173 | 5,883 |
| Total assets | $ 47,192 | $ 52,090 |

(1) During the nine-month period ended September 30, 2008, Corporate Office expenses included $508,000 of expenses incurred in connection with the Company's efforts to refinance, restructure, or repay its indebtedness prior to its chapter 11 filing on April 1, 2008.

- 18 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

(2) Excludes amortization and write-off of deferred financing expenses, which totaled $251,000 during the nine-month period ended September 30, 2008. Amortization and write-off of deferred financing expenses is included in interest expense in the consolidated financial statements.

## Note 9 — Accumulated Other Comprehensive Loss

The Company's marketable securities are valued at their quoted market prices at the close of business on September 30, 2009, in accordance with the guidance set forth in FASB ASC subtopic 820-10 (level 1 inputs). Based on the classification of these marketable securities as available-for-sale, the Company recognized other comprehensive income of $29,000 and $74,000 during the three-month and nine-month periods ended September 30, 2009, respectively, and other comprehensive losses of $30,000 and $98,000 during the three-month and nine-month periods ended September 30, 2008, respectively.

## Note 10 — Discontinued Operations

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements.

## Note 11 — Restructuring of Connector-Seal Business

During the last six months of 2008, the Company experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at its connector-seal facility in Vienna, Ohio. Because of these losses and because the Company did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, the Company decided to close this facility and move the production to the Company's other rubber molding facilities. The relocation of the connector-seal business to the Company's other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the Company's other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for the moving and installation of manufacturing equipment, and (4) $141,000 for building repairs and maintenance. During the three-month period ended September 30, 2009, the Company expensed $258,000 of restructuring costs, of which $238,000 was included in cost of sales and $20,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. During the nine-month period ended September 30, 2009, the Company expensed $738,000 of restructuring costs, of which $682,000 was included in cost of sales and $56,000 was included in selling and administrative expenses in the Company's consolidated statements of operations. At September 30, 2009, the Company had accrued $27,000 on its consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, the Company currently believes, based on independent appraisals, that it should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that the Company is not planning to move to its other rubber molding facilities, at a value that will be in excess of the carrying value of these assets.

- 19 -

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (unaudited)

**Note 12 — Warrants to Purchase Common Stock**

On August 1, 2009, all outstanding warrants to purchase the Company's common stock expired unexercised.

[This space intentionally left blank]

- 20 -

## Item 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

Some of our statements in this Form 10-Q are "forward-looking statements." Forward-looking statements usually can be identified by our use of words like "believes," "expects," "may," "will," "should," "anticipates," "estimates," "projects," or the negative thereof. They may be used when we discuss strategy, which typically involves risk and uncertainty, and they generally are based upon projections and estimates rather than historical facts and events.

Forward-looking statements are subject to a number of risks and uncertainties that could cause our actual results or performance to be materially different from the future results or performance expressed in or implied by those statements. Some of those risks and uncertainties are:

- our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements;

- our ability to obtain court approvals with respect to motions in our chapter 11 proceedings;

- our ability to obtain financing that will permit us to exit chapter 11;

- our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings;

- which currently proposed plan of reorganization, if any, will be approved by the Bankruptcy Court;

- increases and decreases in business awarded to us by our customers;

- unanticipated price reductions for our products as a result of competition;

- our ability to offset any increases in the cost of raw materials;

- increases and decreases in the production of cars and trucks in North America;

- changes in the competitive environment;

- unanticipated operating results;

- changes in economic conditions;

- changes in interest rates;

- financial difficulties encountered by our customers or suppliers;

- decreased access to the credit markets by our customers or suppliers;

- chapter 11 filings by one or more of our customers or suppliers; and

- labor interruptions at our facilities or at our customers' or suppliers' facilities.

- 21 -

Our results of operations for any particular period are not necessarily indicative of the results to be expected for any succeeding period. The use of forward-looking statements should not be regarded as a representation that any of the projections or estimates expressed in or implied by those forward-looking statements will be realized, and actual results may vary materially. We cannot assure you that any of the forward-looking statements contained herein will prove to be accurate. All forward-looking statements are expressly qualified by the discussion above.

Because we have substantial borrowings for a company our size, any negative event may have a greater adverse effect upon us than it would have upon a company of the same size that has less debt.

For additional discussion about risks and uncertainties that may affect our business, please refer to "Risk Factors" in Part II, Item 1A of our Form 10-Q for the three-month period ended March 31, 2009, and this Form 10-Q, and in Part I, Item 1A of our annual report on Form 10-K for the year ended December 31, 2008.

**Subsequent Events**

Our Junior Subordinated Note matured on November 1, 2009. We did not pay the principal amount of the note at its maturity. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on the Junior Subordinated Note at the contractual rate of 13%.

**Results of Operations — Third Quarter of 2009 Versus Third Quarter of 2008**

Unless otherwise indicated, the data set forth below in this Item 2 relate solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the three-month periods ended September 30, 2009 and 2008, the reconciliation of the loss from continuing operations to earnings before interest, taxes, depreciation, and amortization ("EBITDA") for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. The term EBITDA, as used by us, does not include reorganization items, which are classified as nonoperating expense in our consolidated statements of operations. EBITDA is not a measure of performance under GAAP. We have presented EBITDA here and elsewhere in this Form 10-Q for the following reasons:

1. Investors and lenders frequently look at EBITDA when evaluating a company's ability to satisfy interest and principal obligations with respect to its outstanding indebtedness;

2. Management uses EBITDA as a supplemental measure to evaluate the operating performance of our business and believes that it provides a useful measure for comparing period to period performance among our business units because it does not include period to period fluctuations in taxes, interest costs, costs associated with capital investments, and certain non-operating items; and

3. Certain financial covenants in our senior, secured credit agreements have been calculated using variations of EBITDA.

- 22 -

EBITDA has material limitations when used as a measurement of performance, including the following:

1.  EBITDA excludes interest expense. Cash interest payments represent a reduction in cash available to us, and accruals for interest expense represent an obligation to pay cash interest in the future.

2.  EBITDA excludes provisions for taxes. Cash payments of taxes represent a reduction in cash available to us, and accruals for non-cash taxes represent an obligation to pay cash taxes in the future.

3.  EBITDA excludes depreciation and amortization related to buildings, equipment, and tooling. Although depreciation and amortization are non-cash charges, they represent the using up, over a projected period, of assets that produce revenue. EBITDA does not reflect the capital expenditures required for the replacement of these depreciated assets.

4.  EBITDA does not reflect reorganization items, which primarily represent expenses and provisions for losses that can be directly associated with the reorganization and restructuring of our business under chapter 11. Reorganization items that are expenses represent a reduction in cash available to us, either currently or in the future.

5.  EBITDA does not reflect cash provided or used as a result of changes in our working capital.

6.  Our definition of EBITDA may not be the same as the definition of EBITDA used by other companies, including companies in our industry; as the number of differences in the definition of EBITDA increases, the usefulness of EBITDA as a comparative measure decreases. The definition of EBITDA used here is different from the definition of EBITDA used to calculate compliance with the financial covenants in the loan agreements that governed our senior, secured credit facility prior to our chapter 11 filing on April 1, 2008.

To compensate for the shortcomings of EBITDA as a financial measure, it is important to use financial data derived under GAAP when analyzing our financial performance. EBITDA should not be considered to be a substitute for the following GAAP measures: gross profit, income from operations, net income, or net cash provided from operating activities.

- 23 -

---

Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 | |
|---|---:|---:|---:|---:|
| Net sales | $ 16,648 | 100.0 % | $ 17,871 | 100.0 % |
| Cost of sales | 14,251 | 85.6 | 15,733 | 88.0 |
| Gross profit | 2,397 | 14.4 | 2,138 | 12.0 |
| Selling and administrative expenses | 1,283 | 7.7 | 1,702 | 9.5 |
| Income from operations | 1,114 | 6.7 | 436 | 2.4 |
| Interest expense | 1,907 | 11.5 | 1,989 | 11.1 |
| Reorganization items, net expense | 1,062 | 6.4 | 1,622 | 9.1 |
| Loss before income taxes | (1,855) | (11.1) | (3,175) | (17.8) |
| Income tax provision | 8 | – | 9 | 0.1 |
| Loss from continuing operations | (1,863) | (11.2) | (3,184) | (17.8) |
| Add back: | | | | |
| Depreciation and amortization | 1,172 | 7.0 | 1,260 | 7.1 |
| Interest expense | 1,907 | 11.5 | 1,989 | 11.1 |
| Reorganization items, net expense | 1,062 | 6.4 | 1,622 | 9.1 |
| Income tax provision | 8 | – | 9 | 0.1 |
| EBITDA | 2,286 | 13.7 | 1,696 | 9.5 |
| Adjustments to reconcile EBITDA to net cash provided (used) by operating activities: | | | | |
| Interest expense | (1,907) | (11.5) | (1,989) | (11.1) |
| Reorganization items, net expense | (1,062) | (6.4) | (1,622) | (9.1) |
| Income tax provision | (8) | – | (9) | (0.1) |
| Net change in accrued reorganization expenses expenses | 515 | 3.1 | 265 | 1.5 |
| Net change in operating assets and liabilities | 201 | 1.2 | 1,122 | 6.3 |
| Net cash provided (used) by operating activities | $ 25 | 0.2 % | $ (537) | (3.0) % |
| Net cash used by investing activities | $ (370) | (2.2) % | $ (643) | (3.6) % |
| Net cash used by financing activities | $ (390) | (2.3) % | $ (832) | (4.7) % |

- 24 -

Net sales classified by the end-market in which our components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | | |
| | 2009 | | | 2008 (1) | |
|---|---|---|---|---|---|
| Automotive – aftermarket | $ | 7,876 | 47.3 % | $ 6,717 | 37.6 % |
| Automotive – original equipment | | 5,083 | 30.5 | 6,179 | 34.6 |
| Medical | | 3,358 | 20.2 | 4,305 | 24.1 |
| Other | | 331 | 2.0 | 670 | 3.7 |
| Total net sales | $ | 16,648 | 100.0 % | $ 17,871 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

Our net sales for the third quarter of 2009 declined by $1,223,000, or 6.8%, compared to the third quarter of 2008. The decrease in net sales was primarily the result of a $1,096,000, or 17.7%, decrease in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers, as a result of the significant reduction in automotive production levels, and a $947,000, or 22.0%, reduction in the sales of medical components, offset, in part, by a $1,159,000 increase, or 17.3%, in sales of automotive components for use in the automotive aftermarket.

EBITDA for the third quarter of 2009 was $2,286,000, or 13.7% of net sales, compared to EBITDA of $1,696,000, or 9.5% of net sales, for the third quarter of 2008. The change in EBITDA reflected a $327,000 increase in EBITDA at the Rubber Group, a $255,000 increase in EBITDA at the Metals Group, and a $8,000 increase in EBITDA at the Corporate Office.

Net cash provided by our operating activities during the third quarter of 2009 totaled $25,000, compared to net cash used by operating activities of $537,000 for the third quarter of 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the three-month periods ended September 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

- 25 -

The following table sets forth the operating results of the Rubber Group for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 | |
|---|---|---|---|---|
| Net sales | $ 13,862 | 100.0 % | $ 15,327 | 100.0 % |
| Cost of sales | 11,506 | 83.0 | 12,990 | 84.8 |
| Gross profit | 2,356 | 17.0 | 2,337 | 15.2 |
| Selling and administrative expenses | 613 | 4.4 | 996 | 6.5 |
| Income from operations | 1,743 | 12.6 | 1,341 | 8.7 |
| Add back depreciation and amortization | 1,045 | 7.5 | 1,120 | 7.3 |
| EBITDA | $ 2,788 | 20.1 % | $ 2,461 | 16.1 % |

Net sales by the type of market in which the Rubber Group's components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 (1) | |
|---|---|---|---|---|
| Automotive – aftermarket | $ 7,876 | 56.8 % | $ 6,717 | 43.8 % |
| Medical | 3,358 | 24.2 | 4,305 | 28.1 |
| Automotive – original equipment | 2,590 | 18.7 | 4,057 | 26.5 |
| Other | 38 | 0.3 | 248 | 1.6 |
| Total net sales | $ 13,862 | 100.0 % | $ 15,327 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

During the third quarter of 2009, net sales of the Rubber Group decreased by $1,465,000, or 9.6%, compared to the third quarter of 2008, primarily because of a $1,467,000, or 36.2%, reduction in net sales of components for use in automotive original equipment applications, primarily connector seals for automotive wiring systems. This reduction was caused by large production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the third quarter of 2009 in response to reduced consumer demand for automobiles and light trucks. In addition, sales of medical components decreased by $947,000, or 22.0%, primarily due to (1) the reduction of safety stocks in inventory built up by one of our larger customers during the second and third quarters of 2008, and (2) a reduction in sales of a high volume, low margin component that is dual-sourced by our customer. These decreases were offset, in part, by a $1,159,000 increase, or 17.3%, in sales of automotive components for use in the automotive aftermarket.

- 26 -

Cost of sales as a percentage of net sales decreased to 83.0% of net sales during the third quarter of 2009, compared to 84.8% of net sales during the third quarter of 2008. This reduction was a result of improved product mix.

Selling and administrative expenses of the Rubber Group decreased by $383,000, or 38.5%, during the third quarter of 2009, compared to the third quarter of 2008, primarily because (1) during the third quarter of 2008 we incurred $257,000 of one-time fees and expenses related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and procedures at our facility in Rock Hill, South Carolina, (2) we reduced our administrative expenses as a result of the closing of our facility located in Vienna, Ohio, and (3) we recovered certain accounts receivable previously written off as uncollectible. Selling and administrative expenses expressed as a percentage of net sales decreased to 4.4% of net sales during the third quarter of 2009, compared to 6.5% during the third quarter of 2008.

During the third quarter of 2009, the Rubber Group's income from operations totaled $1,743,000, an increase of 402,000, or 30.0%, compared to the third quarter of 2008. The Rubber Group's EBITDA for the third quarter of 2009 was $2,788,000, or 20.1% of net sales, compared to $2,461,000, or 16.1% of net sales, for the third quarter of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production at this facility to the our other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for moving and installation of manufacturing equipment and (4) $141,000 for building repairs and maintenance. During the three-month period ended September 30, 2009, we expensed $258,000 of restructuring expenses, of which $238,000 was included in cost of sales and $20,000 was included in selling and administrative expenses in our consolidated statements of operations. At September 30, 2009, we had accrued $27,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, for an aggregate amount in excess of the carrying value of those assets.

- 27 -

### Metals Group

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive original equipment manufacturers.

The following table sets forth the operating results of the Metals Group for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 | |
|---|---|---|---|---|
| Net sales | $ 2,786 | 100.0 % | $ 2,544 | 100.0 % |
| Cost of sales | 2,745 | 98.5 | 2,743 | 107.8 |
| Gross profit (loss) | 41 | 1.5 | (199 ) | (7.8 ) |
| Selling and administrative expenses | 105 | 3.8 | 134 | 5.3 |
| Loss from operations | (64 ) | (2.3 ) | (333 ) | (13.1 ) |
| Add back depreciation and amortization | 113 | 4.1 | 127 | 5.0 |
| EBITDA | $ 49 | 1.8 % | $ (206 ) | (8.1 )% |

Net sales by the end-market in which the Metals Group's components were utilized for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Three Months Ended September 30 | | | |
| | 2009 | | 2008 | |
|---|---|---|---|---|
| Automotive – original equipment | $ 2,493 | 89.5 % | $ 2,122 | 83.4 % |
| Other | 293 | 10.5 | 422 | 16.6 |
| Total net sales | $ 2,786 | 100.0 % | $ 2,544 | 100.0 % |

During the third quarter of 2009, net sales of the Metals Group increased by $242,000, or 9.5%, compared to the third quarter of 2008, primarily as a result of increased net sales of existing and new automotive original equipment components to the Metals Group's largest customer.

Cost of sales as a percentage of net sales decreased to 98.5% of net sales during the third quarter of 2009 from 107.8% of net sales during the third quarter of 2008, primarily because of improved efficiencies and better product mix.

Selling and administrative expenses of the Metals Group decreased by $29,000, or 21.6%, from the third quarter of 2008 to the third quarter of 2009, primarily as a result of a reduction in selling expenses.

- 28 -

Selling and administrative expenses expressed as a percentage of net sales decreased to 3.8% of net sales during the third quarter of 2009, compared to 5.3% during the third quarter of 2008.

For the third quarter of 2009, the Metals Group's loss from operations was $64,000, compared to a loss from operations of $333,000 for the third quarter of 2008. The Metals Group's EBITDA for the third quarter of 2009 was positive $49,000, compared to negative $206,000 for 2008.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the three-month periods ended September 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Three Months Ended September 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Loss from operations | $ (565) | $ (572) |
| Add back depreciation and amortization | 14 | 13 |
| EBITDA | $ (551) | $ (559) |

- 29 -

*Interest Expense*

A breakdown of interest expense for the three-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

|  | Three Months Ended September 30 | |
|---|---|---|
|  | **2009** | **2008** |
| Interest expense at contractual interest rates: | | |
|     Senior, secured loans | $ 391 | $ 618 |
|     Debtor-in-possession loan | 102 | 103 |
|     Senior Subordinated Notes | 1,025 | 1,025 |
|     Junior Subordinated Note | 11 | 11 |
|     All other | 18 | (5) |
|         Subtotal | 1,547 | 1,752 |
| | | |
| Interest expense resulting from incremental interest rates: | | |
|     Senior Subordinated Notes – interest on missed interest payments | 402 | 279 |
|         Subtotal | 402 | 279 |
| | | |
|         Total interest expense | 1,949 | 2,031 |
| | | |
| Less interest expense allocated to discontinued operations | 42 | 42 |
| | | |
|       Interest expense related to continuing operations | $ 1,907 | $ 1,989 |

The average amount of debt outstanding during the third quarters of 2009 and 2008, including past due interest payments on which we are accruing interest, was $85,234,000 and $83,990,000, respectively. In the third quarters of 2009 and 2008, cash interest payments were $508,000 and $715,000, respectively. This decrease relates primarily to reductions in LIBOR and the prime rate.

The Bankruptcy Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 30 -

### Reorganization Items

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the three-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

|  | Three Months Ended September 30 | |
|  | 2009 | 2008 |
| --- | --- | --- |
| Professional fees and expenses incurred directly by us | $ 365 | $ 833 |
| Professional fees and expenses incurred by creditors | 659 | 691 |
| Other costs | 50 | 149 |
| Interest income | (12) | (51) |
| Reorganization items, net expense | $ 1,062 | $ 1,622 |

### Income Tax Provision

The income tax provisions recorded during the three-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $42,000 in each of the third quarters of 2009 and 2008.

- 31 -

**Results of Operations — First Nine Months of 2009 Versus First Nine Months of 2008**

Unless otherwise indicated, the data set forth below in this Item 2 relate solely to our continuing operations.

The following table sets forth (in thousands of dollars) our consolidated operating results for the nine-month periods ended September 30, 2009 and 2008, the reconciliation of the loss from continuing operations to EBITDA for those periods, and the reconciliation of EBITDA to net cash provided or used by our operating activities for those periods. Also included in the table are the net cash flows provided or used by our investing activities and financing activities (dollar amounts in thousands):

| | | Nine Months Ended September 30 | | |
| | | 2009 | | 2008 | |
|---|---|---|---|---|---|
| Net sales | $ | 46,190 | 100.0 % | $ 59,223 | 100.0 % |
| Cost of sales | | 41,382 | 89.6 | 50,563 | 85.4 |
| Gross profit | | 4,808 | 10.4 | 8,660 | 14.6 |
| Selling and administrative expenses (1) | | 4,113 | 8.9 | 5,030 | 8.5 |
| Income from operations | | 695 | 1.5 | 3,630 | 6.1 |
| Interest expense | | 5,648 | 12.2 | 6,729 | 11.4 |
| Reorganization items, net expense | | 3,490 | 7.5 | 3,392 | 5.7 |
| Loss before income taxes | | (8,443) | (18.3) | (6,491) | (11.0) |
| Income tax provision | | 26 | 0.1 | 35 | 0.1 |
| Loss from continuing operations | | (8,469) | (18.3) | (6,526) | (11.0) |
| Add back: | | | | | |
|   Depreciation and amortization (2) | | 3,541 | 7.7 | 4,017 | 6.8 |
|   Interest expense | | 5,648 | 12.2 | 6,729 | 11.4 |
|   Reorganization items, net expense | | 3,490 | 7.5 | 3,392 | 5.7 |
|   Income tax provision | | 26 | 0.1 | 35 | 0.1 |
| EBITDA | | 4,236 | 9.2 | 7,647 | 12.9 |
| Adjustments to reconcile EBITDA to net cash provided (used) by operating activities: | | | | | |
|   Interest expense | | (5,648) | (12.23) | (6,729) | (11.4) |
|   Reorganization items, net expense | | (3,490) | (7.5) | (3,392) | (5.7) |
|   Amortization and write-off of deferred financing expenses included in interest expense | | – | – | 251 | 0.4 |
|   Income tax provision | | (26) | (0.1) | (35) | (0.1) |
|   Net change in accrued reorganization expenses | | 601 | 1.3 | 1,774 | 3.0 |
|   Net change in operating assets and liabilities | | 4,983 | 10.8 | 4,362 | 7.4 |
| Net cash provided by operating activities | $ | 656 | 1.4 % | $ 3,878 | 6.5 % |
| Net cash used by investing activities | $ | (1,354) | (2.9)% | $ (2,387) | (4.0)% |
| Net cash provided (used) by financing activities | $ | (2,007) | (4.3)% | $ 4,878 | 8.2 % |

- 32 -

(1) The nine-month period ended September 30, 2008, includes $508,000 of expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness prior to our chapter 11 filing on April 1, 2008.

(2) Does not include the amortization and write-off of deferred financing expenses, which totaled $251,000 during the nine-month period ended September 30, 2008, and which is included in interest expense in the consolidated financial statements.

Net sales by the end-market in which our components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| | 2009 | | 2008 (1) | |
|---|---|---|---|---|
| Automotive – aftermarket | $ 21,046 | 45.6 % | $ 21,326 | 36.0 % |
| Automotive – original equipment | 12,473 | 27.0 | 22,725 | 38.4 |
| Medical | 11,124 | 24.1 | 12,566 | 21.2 |
| Other | 1,547 | 3.3 | 2,606 | 4.4 |
| Total net sales | $ 46,190 | 100.0 % | $ 59,223 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

Our net sales for the first nine months of 2009 declined by $13,033,000, or 22.0%, compared to the first nine months of 2008. The decrease in net sales was primarily the result of a decrease of $10,252,000, or 45.1% in net sales of automotive components, primarily connector seals for automotive wiring systems, used by original equipment manufacturers, as a result of the significant reduction in automotive production levels, and a $1,442,000, or 11.4%, reduction in the sales of medical components.

EBITDA for the first nine months of 2009 was $4,236,000, or 9.2% of net sales, compared to EBITDA of $7,647,000, or 12.9% of net sales, for the first nine months of 2008. The change in EBITDA reflected a $3,322,000 decrease in EBITDA at the Rubber Group, a $559,000 decrease in EBITDA at the Metals Group, and a $470,000 increase in EBITDA at the Corporate Office.

Net cash provided by our operating activities during the first nine months of 2009 totaled $656,000, compared to net cash provided by operating activities of $3,878,000 for 2008.

The discussion that follows sets forth our analysis of the operating results of the Rubber Group, the Metals Group, and the Corporate Office for the nine-month periods ended September 30, 2009 and 2008.

### Rubber Group

The Rubber Group manufactures tight-tolerance rubber components. The Rubber Group's primary products are insulators used in both aftermarket and original equipment automotive ignition-wire sets, connector seals used in automotive wiring systems, and molded rubber components used in a variety of medical devices, such as intravenous medication-delivery systems, syringes, and laparoscopic surgical equipment.

- 33 -

The following table sets forth the operating results of the Rubber Group for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Rubber Group's income from operations to its EBITDA (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | |
| Net sales | $ 39,187 | 100.0 % | $ 50,643 | 100.0 % |
| Cost of sales | 33,808 | 86.3 | 42,040 | 83.0 |
| Gross profit | 5,379 | 13.7 | 8,603 | 17.0 |
| Selling and administrative expenses | 2,110 | 5.4 | 2,417 | 4.8 |
| Income from operations | 3,269 | 8.3 | 6,186 | 12.2 |
| Add back depreciation and amortization | 3,159 | 8.1 | 3,564 | 7.0 |
| EBITDA | $ 6,428 | 16.4 % | $ 9,750 | 19.3 % |

Net sales by the end-market in which the Rubber Group's components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 (1) | |
| Automotive – aftermarket | $ 21,046 | 53.7 % | $ 21,326 | 42.1 % |
| Medical | 11,124 | 28.4 | 12,566 | 24.8 |
| Automotive – original equipment | 6,708 | 17.1 | 15,651 | 30.9 |
| Other | 309 | 0.8 | 1,100 | 2.2 |
| Total net sales | $ 39,187 | 100.0 % | $ 50,643 | 100.0 % |

(1) In order to conform to the method of classification used in 2009, the amount of net sales shown for certain market classifications in 2008 have changed from amounts previously reported.

During the first nine months of 2009, net sales of the Rubber Group decreased by $11,456,000, or 22.6%, compared to the first nine months of 2008, primarily because of a $8,943,000, or 57.1%, reduction in net sales of components for use in automotive original equipment applications, primarily connector seals for automotive wiring systems. This reduction was caused by dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first nine months of 2009 in response to sharply declining consumer demand for automobiles and light trucks. In addition, sales of medical components decreased by $1,442,000, or 11.5%, primarily due to (1) the reduction in safety stocks in inventory built up by one of our larger customers during the second and third quarters of 2008, and (2) a reduction in sales of a high volume, low margin component that is dual-sourced by our customer.

Cost of sales as a percentage of net sales increased to 86.3% of net sales during the first nine months of 2009, compared to 83.0% of net sales during the first nine months of 2008, primarily because

- 34 -

our connector-seal manufacturing facility in Vienna, Ohio, reported an operating loss of $3,326,000 during the first nine months of 2009, compared to an operating loss of $727,000 during the first nine months of 2008, as a result of the underabsorption of fixed or partially fixed costs as a result of sharply reduced sales volume, and because the connector-seal facility expensed $738,000 of costs incurred in connection with closing the facility, moving the production of connector-seals to our other rubber molding facilities, and preparing the building for sale.

Selling and administrative expenses of the Rubber Group decreased by $307,000, or 12.7%, during the first nine months of 2009, compared to the first nine months of 2008 primarily because we incurred $282,000 of one-time fees and expenses during the first nine months of 2008 related to the services of a consulting firm that was retained to assist us with the upgrading of the operating systems and procedures at our facility in Rock Hill, South Carolina. Selling and administrative expenses expressed as a percentage of net sales increased to 5.4% of net sales during the first nine months of 2009, compared to 4.8% during the first nine months of 2008.

During the first nine months of 2009, the Rubber Group's income from operations totaled $3,269,000, a decrease of $2,917,000, or 47.2%, compared to the first nine months of 2008. The Rubber Group's EBITDA for the first nine months of 2009 was $6,428,000, or 16.4% of net sales, compared to $9,750,000, or 19.3% of net sales, for the first nine months of 2008.

During the last six months of 2008, we experienced a dramatic downturn in sales of components used in automotive original equipment, which resulted in operating losses at our connector-seal facility in Vienna, Ohio. Because of these losses and because we did not believe that it would be possible to return this facility to an adequate level of profitability in the foreseeable future, during the first quarter of 2009, we decided to close this facility and move the production to our other rubber molding facilities. The relocation of the connector-seal business to our other rubber molding facilities was completed during the third quarter of 2009. The estimated cost to restructure the connector-seal business, including the cost to move the production to our other rubber molding facilities and prepare the Vienna, Ohio, manufacturing building for sale, will total approximately $888,000, which consists of (1) $383,000 for employee related expenses, including, special incentive compensation, severance, and other costs, (2) $255,000 for start-up expenses at the new manufacturing locations, (3) $109,000 for moving and installation of manufacturing equipment, and (4) $141,000 for building repairs and maintenance. During the first nine months of 2009, we incurred $738,000 of restructuring expenses, of which $682,000 was included in cost of sales and $56,000 was included in selling and administrative expenses in our consolidated statements of operations. At September 30, 2009, we had accrued $27,000 on our consolidated balance sheet for severance awards and termination benefits granted to employees of the Vienna, Ohio, facility. These accrued benefits are scheduled to be paid out during the fourth quarter of 2009. Although there can be no assurance, we currently believe, based on independent appraisals, that we should be able to sell the Vienna, Ohio, manufacturing facility and certain manufacturing equipment that we are not planning to move to our other rubber molding facilities, for an aggregate amount in excess of the carrying value of those assets.

### Metals Group

The Metals Group manufactures machined metal components from aluminum, brass, steel, and stainless steel bars, forgings, and cold-headed blanks. The Metals Group's sales are primarily to automotive original equipment manufacturers.

- 35 -

The following table sets forth the operating results of the Metals Group for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Metals Group's income or loss from operations to its EBITDA (dollar amounts in thousands):

| | Nine Months Ended September 30 | | | | | |
| | 2009 | | | 2008 | | |
| Net sales | $ | 7,003 | 100.0 % | $ | 8,580 | 100.0 % |
| Cost of sales | | 7,574 | 108.2 | | 8,523 | 99.3 |
| Gross profit (loss) | | (571) | (8.2) | | 57 | 0.7 |
| Selling and administrative expenses | | 269 | 3.8 | | 410 | 4.8 |
| Loss from operations | | (840) | (12.0) | | (353) | (4.1) |
| Add back depreciation and amortization | | 343 | 4.9 | | 415 | 4.8 |
| EBITDA | $ | (497) | (7.1) % | $ | 62 | 0.7 % |

Net sales by the end-market in which the Metals Group's components were utilized for the nine-month periods ended September 30, 2009 and 2008, are set forth below (dollar amounts in thousands):

| | Nine Months Ended September | | | | | |
| | 2009 | | | 2008 | | |
| Automotive — original equipment | $ | 5,765 | 82.3 % | $ | 7,074 | 82.4 % |
| Other | | 1,238 | 17.7 | | 1,506 | 17.6 |
| Total net sales | $ | 7,003 | 100.0 % | $ | 8,580 | 100.0 % |

During the first nine months of 2009, net sales of the Metals Group decreased by $1,557,000, or 18.3%, compared to the first nine months of 2008, primarily as a result of reduced net sales of components to automotive original equipment manufacturers. This reduction was primarily a result of dramatic production cutbacks by North American automobile manufacturers and related inventory reductions throughout the supply chain during the first half of 2009 in response to sharply declining consumer demand for automobiles and light trucks.

Cost of sales as a percentage of net sales increased to 108.2% of net sales during the first nine months of 2009 from 99.3% of net sales during the first nine months of 2008, primarily because of the underabsorption of fixed or partially fixed manufacturing overhead during a period of reduced sales volume.

Selling and administrative expenses of the Metals Group decreased by $141,000, or 34.4%, from the first nine months of 2008 to the first nine months of 2009, primarily as a result of a reduction in selling expenses. Selling and administrative expenses expressed as a percentage of net sales decreased to 3.8% of net sales during the first nine months of 2009, compared to 4.8% during the first nine months of 2008.

- 36 -

For the first nine months of 2009, the Metals Group's loss from operations was $840,000, compared to a loss from operations of $353,000 for the first nine months of 2008. The Metals Group's EBITDA for the first nine months of 2009 was negative $497,000, compared to positive $62,000 for 2008.

### Corporate Office

Corporate Office expenses, which are not included in the operating results of the Rubber Group or the Metals Group, represent administrative expenses incurred primarily at our New York City and Cleveland offices. Corporate Office expenses are consolidated with the selling and administrative expenses of the Rubber Group and the Metals Group in our consolidated financial statements.

The following table sets forth the operating results of the Corporate Office for the nine-month periods ended September 30, 2009 and 2008, and the reconciliation of the Corporate Office's loss from operations to its EBITDA (dollar amounts in thousands):

|  | Nine Months Ended September 30 | |
|---|---|---|
|  | 2009 | 2008 |
| Loss from operations | $ (1,734) | $ (2,203) |
| Add back depreciation and amortization (1) | 39 | 38 |
| EBITDA | $ (1,695) | $ (2,165) |

(1) Excludes the amortization and write-off of deferred financing expenses, which totaled $251,000 during the first nine months of 2008 and which is included in interest expense in the consolidated financial statements.

During the first nine months of 2009, Corporate Office expenses decreased to $1,734,000 from $2,203,000 during the first nine months of 2008. This decrease is primarily attributed to $508,000 of expenses incurred during the first quarter of 2008, prior to our chapter 11 filing on April 1, 2008, in connection with our efforts to refinance, restructure, or repay our indebtedness. Subsequent to our chapter 11 filing on April 1, 2008, expenses incurred in connection with our efforts to refinance, restructure, or repay our indebtedness are being classified as reorganization items in our consolidated statements of operations, in accordance with ASC 852-10. For more information on our efforts to refinance, restructure, or repay our indebtedness, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 37 -

*Interest Expense*

A breakdown of interest expense for the nine-month periods ended September 30, 2009 and 2008, is set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30 | |
|---|---|---|
| | 2009 | 2008 |
| Interest expense at contractual interest rates: | | |
| Senior, secured loans | $ 1,210 | $ 1,926 |
| Debtor-in-possession loan | 303 | 191 |
| Senior Subordinated Notes | 3,076 | 3,076 |
| Junior Subordinated Note | 34 | 34 |
| All other | 37 | 61 |
| Subtotal | 4,660 | 5,288 |
| Interest expense resulting from incremental interest rates: | | |
| Senior, secured loans – default or forbearance premium | – | 172 |
| Senior Subordinated Notes – forbearance premium | – | 411 |
| Senior Subordinated Notes – interest on missed interest payments | 1,114 | 733 |
| Subtotal | 1,114 | 1,316 |
| Financing costs and fees | – | 251 |
| Total interest expense | 5,774 | 6,855 |
| Less interest expense allocated to discontinued operations | 126 | 126 |
| Interest expense related to continuing operations | $ 5,648 | $ 6,729 |

The average amount of debt outstanding during the first nine months of 2009 and 2008, including past due interest payments on which we are accruing interest, was $84,531,000 and $80,979,000, respectively. In the first nine months of 2009 and 2008, cash interest payments were $1,568,000 and $2,400,000, respectively. This decrease relates primarily to the modification of our senior, secured credit facility, including the elimination of a 2% premium charged on outstanding balances under such facility, and reductions in LIBOR and the prime rate.

The Court has entered a series of orders authorizing certain arrangements pursuant to which we are permitted to utilize the collections on our accounts receivable in the operation of our business. Under those arrangements, the interest rates on our senior, secured debt were reduced from the default rates to the contractual rates, and we agreed to continue to pay the scheduled monthly principal payments on the secured term loans. Because we categorize the interest on our unsecured prepetition debt as an allowed claim under our proposed plan of reorganization, we continue to accrue interest on our unsecured prepetition debt at the applicable contractual rates. For more information about the status of our debt, please refer to the section titled "Liquidity and Capital Resources – Liquidity and Chapter 11 Filing" in this Part I, Item 2.

- 38 -

### Reorganization Items

ASC 852-10 requires that revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of a business must be reported separately as reorganization items in the statements of operations. Reorganization items reflected in our consolidated financial statements for the nine-month periods ended September 30, 2009 and 2008 are set forth below (dollar amounts in thousands):

| | Nine Months Ended September 30, 2009 | April 1, 2008 Through September 30, 2008 |
|---|---|---|
| Professional fees and expenses incurred directly by us | $ 1,200 | $ 1,832 |
| Professional fees and expenses incurred by creditors | 2,119 | 1,316 |
| Other costs | 210 | 326 |
| Interest income | (39) | (82) |
| Reorganization items, net expense | $ 3,490 | $ 3,392 |

### Income Tax Provision

The income tax provisions recorded during the nine-month periods ended September 30, 2009 and 2008, consisted of estimated state income taxes.

### Discontinued Operation

The results of operations, assets, liabilities, and cash flows of the Company's former diecasting business have been classified as discontinued operations in the consolidated financial statements. Interest expense allocated to discontinued operations totaled $126,000 in each of the nine-month periods ended September 30, 2009 and 2008.

## Liquidity and Capital Resources

### Operating Activities

During the first nine months of 2009, operating activities of our continuing operations provided net cash of $656,000. Net accounts receivable increased by $2,318,000, or 34.1%, during the first nine months of 2009, primarily because our net product sales during August and September of 2009 were greater than our net product sales during November and December of 2008. Net inventories decreased by $2,629,000, or 24.9%, because we undertook an aggressive program to bring our inventory levels in line with our current levels of sales. Prepaid expenses and other current assets increased by $423,000, or 17.4%, primarily because of an increase in prepaid insurance premiums and an increase in tooling being manufactured for our customers, offset, in part, by the collection of a portion of our receivable for insurance reimbursement related to losses we incurred at our facility in Rock Hill, South Carolina, caused by fire in November of 2008. Accrued interest expense, including accrued interest expense classified as a liability subject to compromise, increased by $4,206,000, or 31.3%, primarily because of additional accruals of interest on our subordinated debt.

Net cash used by operating activities of our discontinued operations during the first nine months of 2009 totaled $50,000.

- 39 -

*Investing Activities*

During the first nine months of 2009, investing activities of our continuing operations used net cash of $1,354,000. Capital expenditures attributable to the Rubber Group, the Metals Group, and the Corporate Office totaled $1,194,000, $205,000, and $0, respectively, primarily for manufacturing equipment and tooling for our automotive aftermarket business. Capital expenditures for the Rubber Group, the Metals Group, and the Corporate Office are currently projected to total $1,569,000, $232,000, and $0, respectively, for 2009.

*Financing Activities*

During the first nine months of 2009, our financing activities used net cash of $2,007,000, primarily reflecting $2,426,000 of principal payments on our senior, secured term loans.

*Liquidity and Chapter 11 Filing*

We have not made the scheduled interest payments due on our Senior Subordinated Notes since November 1, 2006 nor have we repaid the principal amount of the Senior Subordinated Notes, which became due on August 1, 2009. From May 25, 2007, through January 24, 2008, we operated under a forbearance agreement with six hedge funds that hold $25,428,000 aggregate principal amount, or 74.4%, of the Senior Subordinated Notes outstanding. While the forbearance agreement was in effect, we were not required to make interest payments on the Senior Subordinated Notes, and the forbearing noteholders could not take any action to collect any past due interest payments. An additional $7,772,000 aggregate principal amount, or 22.7%, of the Senior Subordinated Notes outstanding is held by certain of our affiliates and members of their families. The interest rate on the Senior Subordinated Notes was increased from 12% to 16% for the period from March 9, 2007, through March 31, 2008. At September 30, 2009, accrued interest on the Senior Subordinated Notes totaled $17,246,000.

The failure to make the scheduled interest payments on the Senior Subordinated Notes caused a cross-default under the agreements governing our senior, secured debt. Additionally, we were not in compliance with certain financial covenants. From May 25, 2007, through January 24, 2008, we operated under a forbearance arrangement with the senior, secured lenders. The forbearance agreement (1) provided that the senior, secured lenders would take no action to accelerate or collect their loans as a result of any existing default or cross-default, and (2) modified certain of our financial covenants. During the forbearance period, we remained in compliance with all financial covenants, as modified, and we remained current on all principal and interest payments owed to the secured lenders.

Upon the commencement of the forbearance period, we engaged the investment banking firm of W.Y. Campbell & Company to assist in a review of the various strategic alternatives available to us to satisfy our outstanding indebtedness. As a consequence of this review, we determined to pursue a sale of the assets and business of the Rubber Group and, with the assistance of W.Y. Campbell, prepared an offering memorandum with respect to the proposed sale. During the summer and fall of 2007, we distributed the offering memorandum to a number of interested parties, including both financial and strategic purchasers.

During the fourth quarter of 2007, we received several offers to purchase all or portions of the assets of the Rubber Group. Based upon these offers and the advice of W.Y. Campbell, we concluded that (1) the value of the Rubber Group alone was significantly in excess of our total indebtedness, and (2) the proposal that would provide the maximum value for all of our constituencies was an offer from a major, multi-national, industrial company to purchase our facility in Rock Hill, South Carolina, which

- 40 -

specializes in manufacturing molded rubber components for use in medical devices. The proposed purchase price of $32,000,000 would have resulted in an after-tax gain of approximately $26,000,000.

During January 2008, we approached the six hedge funds that own 74.4% of our Senior Subordinated Notes to advise them of the following:

1. We had decided to pursue the proposal to purchase the Rock Hill facility;

2. We had received a proposal from a new senior, secured lender to provide us with a $36,700,000 senior, secured credit facility upon completion of the sale of the Rock Hill facility;

3. We believed that the proceeds of the sale and the new credit facility would permit us to pay all accrued interest on the Senior Subordinated Notes plus 50% of the principal amount of the Senior Subordinated Notes held by non-affiliates;

4. In order to facilitate the refinancing, the balance of the Senior Subordinated Notes held by non-affiliates would have to be extended to mature on August 31, 2013, with a cash interest rate of 12% per annum; and

5. We had agreed that the 22.7% of the Senior Subordinated Notes held by affiliates would be converted into shares of our common stock concurrently with the completion of the refinancing transactions described above.

At the same time, we requested an extension of the forbearance agreement to May 31, 2008, in order to provide the prospective purchaser and the new senior, secured lender the time they required to complete their due diligence and documentation.

In late January 2008, the six hedge funds responded with an alternative proposal for an extension of the forbearance arrangement. After reviewing this proposal with our counsel and W.Y. Campbell, we concluded that it would not be in the best interests of all of our creditors and equity holders to proceed with an extension on the terms proposed. Further discussions were unproductive and, as a result, the forbearance agreement expired on January 25, 2008. Because the forbearance agreement with the hedge funds was not extended, the forbearance agreement with the senior, secured lenders also expired on January 25, 2008, and we were in default under our senior, secured financing agreements.

Subsequent to the expiration of the forbearance agreements, we continued our discussions with the six hedge funds and proposed a number of transactions for the restructuring of our debt, but each of these proposals was rejected. Ultimately, we determined that the best available method to effect a restructuring of our debt on terms that would be fair to all of our creditors and stockholders was to utilize the provisions of chapter 11 of the Bankruptcy Code.

On April 1, 2008, we filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 08-11153). At that time, we obtained a financing package consisting of (1) an arrangement with our senior, secured lenders to freeze the loan under our revolving line of credit at the amount outstanding on April 1, 2008, and to permit us to utilize the collections on our accounts receivable in the operation of our business through February 25, 2009, which date has since been extended to December 31, 2009, and (2) an unsecured, super-priority debtor-in-possession loan in the amount of $4,000,000, which matures on December 31, 2009, if not extended. On September 30 and November 13,

- 41 -

2009, our cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings. The arrangement with the senior, secured lenders provided for a continuation of the scheduled, monthly principal payments on our term loans, which aggregate $269,000 per month, and the elimination of the default interest premium, so that our interest rates returned to the original contractual rates. Since the chapter 11 filing, we have made principal payments on the term loans totaling $5,119,000. The debtor-in-possession loan is subordinated to the senior, secured loans, and bears interest at LIBOR plus 7%, subject to a minimum interest rate of 10% (in effect on September 30, 2009).

Our senior, secured credit facility includes a $17,500,000 revolving line of credit. At April 1, 2008, and September 30, 2009 there were $14,219,000 of loans outstanding under the revolving line of credit, and at April 1, 2008, and September 30, 2009, there were $907,000 and $733,000, respectively, of letters of credit outstanding under the revolving line of credit. The contractual interest rate on loans under the revolving line of credit is LIBOR plus 2.75% (3.0% at September 30, 2009).

Our equipment term loan had an outstanding principal balance $8,333,000 at April 1, 2008. At September 30, 2009, the principal balance of our equipment term loan had been reduced to $4,792,000. The contractual interest rate on the equipment term loan is LIBOR plus 4.5% (4.75% at September 30, 2009).

Our real estate term loan had an outstanding principal balance of $13,778,000 at April 1, 2008. At September 30, 2009, the principal balance of our real estate term loan had been reduced to $12,738,000. The contractual interest rates on the real estate term loan are the prime rate plus 6%, subject to a minimum interest rate of 11% (in effect on September 30, 2009), on $4,000,000 principal amount and LIBOR plus 4.5% (4.75% at September 30, 2009) on the balance of the real estate term loan (weighted average rate for the entire real estate loan of 6.71% at September 30, 2009).

Under the arrangements pursuant to which we are entitled to utilize cash collateral we are required to meet the following financial covenants:

1. <u>Minimum Cash.</u> Aggregate cash may not be less than the following amounts on the specified measurement dates:

| | |
|---|---|
| November 6, 2009 | $2,643,000 |
| November 13, 2009 | $2,632,000 |
| November 20, 2009 | $2,836,000 |
| November 27, 2009 | $2,657,000 |
| December 4, 2009 | $2,613,000 |
| December 11, 2009 | $2,833,000 |
| December 18, 2009 | $2,798,000 |
| December 25, 2009 | $2,917,000 |
| January 1, 2010 | $2,917,000 |

On November 13, 2009, the Company's aggregate cash was $3,753,000.

2. <u>Maximum Expenditures.</u> Our cumulative expenditures may not exceed 110% of our cumulative budgeted expenditures for the two-week period ended November 13, 2009, and on the last day of each two-week period following November 13, 2009. At November 13, 2009, the latest measurement date prior to the issuance of this report, the Company's

- 42 -

cumulative expenditures were $247,000 less than 110% of cumulative budgeted expenditures.

3.  <u>Minimum Net Sales</u>. Our cumulative net sales may not be less than 82% of our cumulative budgeted net sales from April 2, 2008, through the end of every four-week period thereafter. At November 13, 2009, the latest measurement date prior to the issuance of this report, cumulative net sales were $6,928,000 greater than the minimum level of cumulative net sales and aggregated 87.7% of our cumulative budgeted net sales since April 2, 2008.

Our right to utilize cash collateral will terminate upon the occurrence of the following events, if we fail to cure any of the events within five days of receiving written notice of the event from the senior, secured lender: (a) failure to comply with the financial covenants, (b) dismissal of the chapter 11 case, (c) conversion of the chapter 11 case to a chapter 7 case, (d) appointment of a trustee to manage the financial affairs of the Company, or (e) the occurrence of an event of default as described in the documents governing the use of cash collateral.

During September and October 2009, the Company's senior, secured lenders, the official committee of unsecured creditors of the Company in the chapter 11 proceedings (the "Official Creditors' Committee"), and the Company filed separate plans of reorganization. Each of these plans may be further amended, and if no such plan is confirmed by the Bankruptcy Court, it is unclear what holders of claims or equity interests would ultimately receive with respect to their claims or interests.

The Lenders' Plan

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan. For a detailed description of the Lenders' Plan, please refer to the plan document and the related disclosure statement at http://chapter11epiqsystem.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

The Committee's Plan

The plan filed by the Official Creditors' Committee on September 29, 2009, (the "Committee's Plan"), provides, in summary, for the following:

·   An extension of our outstanding senior, secured debt without any immediate pay down;

·   Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

·   The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

·   The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

- 43 -

- Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10% (with a floor of 13½%), a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

For a detailed description of the Committee's Plan, please refer to the plan document and the related disclosure statement at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest.

The Company's Plan

The amended plan filed by the Company on October 6, 2009 (the "Company's Plan"), provides, in summary, for the following:

- The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the real estate loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of their claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum; and

- Each holder of a Junior Subordinated Note claim or a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of our liabilities would have been converted into equity securities. For a detailed description of the Company's Plan, classification and treatment of claims and interests, and the proposed terms of the Series C Preferred Stock, please refer to the plan documents and the related disclosure statement filed on October 6, 2009 at http://chapter11.epiqsystems.com/lexington. These documents are not incorporated by reference into this Form 10-Q, except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

We require additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that we will be able to obtain such financing.

- 44 -

None of these plans of reorganization may ultimately be approved. No party currently has exclusive rights to propose a plan of reorganization and solicit votes thereon, so any interested party may propose a competing plan of reorganization at any time. Further, the proponents of the filed plans of reorganization are free to amend their respective plans at any time. As a result, a plan of reorganization that is materially different from the three that have been filed may ultimately be approved. Under the ultimate plan of reorganization, the interests of the holders of Series B Preferred Stock and our common stock may be substantially diluted or cancelled.

Our aggregate indebtedness at September 30, 2009, totaled $88,757,000, including $17,389,000 of accrued interest on our subordinated debt, compared to $86,539,000, including $13,164,000 of accrued interest on our subordinated debt, at December 31, 2008.

Including liabilities classified as subject to compromise, we had a net working capital deficit of $80,067,000 at September 30, 2009, compared to a net working capital deficit of $73,922,000 at December 31, 2008.

On September 30 and November 13, 2009, our cash on hand totaled $2,785,000 and $3,753,000, respectively. Although there can be no assurance, we currently believe, based on our most recent financial projections, that we have adequate liquidity to operate during the chapter 11 proceedings.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial position.

Our consolidated financial statements have been prepared on a "going concern basis," as such term is used in GAAP. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to restructure, refinance, or repay our indebtedness is subject to risks and uncertainties. As a result, there is substantial doubt about our ability to continue to report on a going concern basis. The consolidated financial statements do not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Critical Accounting Policies

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant accounting policies are disclosed in Note 1 to the consolidated financial statements in our annual report on Form 10-K for the year ended December 31, 2008, as modified by Note 1 to the consolidated financial statements in our quarterly reports on Form 10-Q for the three-month periods ended March 31, June 30, and September 30, 2009. The most significant areas involving management judgments and estimates are described in Management's Discussion and Analysis of Financial Conditions and Results of Operations in our annual report on Form 10-K for the year ended December 31, 2008. There have been no material changes to such judgments and estimates. Actual results could differ from those estimates.

- 45 -

**Item 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We do not invest in or trade market risk sensitive instruments. We also do not have any foreign operations or any significant amount of foreign sales and, therefore, we believe that our exposure to foreign currency exchange rate risk is insignificant. At September 30, 2009, we had outstanding $35,749,000 of floating-rate debt at interest rates equal to either LIBOR plus 2.75%, LIBOR plus 4.5%, the prime rate plus 6%, subject to a minimum interest rate of 11%, or LIBOR plus 7%, subject to a minimum interest rate of 10%, with a weighted average interest rate of 5.34% at September 30, 2009. At September 30, 2009, we had outstanding $35,619,000 of fixed-rate debt with a weighted average interest rate of 11.8%. We estimate that a one-percentage-point increase or decrease in both LIBOR and the prime rate would increase or decrease our monthly interest expense by approximately $23,000. For further information about our indebtedness, please refer to Note 4, "Debt," in the notes to our consolidated financial statements in Part I, Item 1.

**Item 4T. CONTROLS AND PROCEDURES**

Our Chairman of the Board, President, and Chief Financial Officer, with the participation of members of management of our operating divisions, evaluated, as of September 30, 2009, the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based on that evaluation, our principal executive officers and our principal financial officer concluded that, because of deficiencies in our internal control over financial reporting, our disclosure controls and procedures as defined in Rule 13a-15(e) were not effective in ensuring that information required to be included in our periodic filings with the Securities and Exchange Commission is recorded, processed, summarized, and reported to management to allow timely decisions regarding required disclosures because of certain deficiencies which, in the aggregate, constitute a material weakness. This material weakness remained unremediated through September 30, 2009. Notwithstanding the foregoing, we do not believe that such deficiencies have resulted in any material errors or omissions in the consolidated financial statements contained in our annual reports on Form 10-K for 2008 and 2007, our quarterly reports on Form 10-Q for the three-month periods ended March 31, June 30, and September 30, 2008, and March 31, June 30, and September 30, 2009, or in any related disclosures.

### Changes in Internal Controls over Financial Reporting

There have been no changes in our internal controls over financial reporting, as defined in Rule 13a-15(f) or 15(d)-15(f), or in other factors identified in connection with our evaluation, that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

- 46 -

---

## PART II. OTHER INFORMATION

### Item 1A. RISK FACTORS

**We are subject to risks associated with bankruptcy proceedings.**

On April 1, 2008, the Company filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

On October 6, 2009, we filed with the Bankruptcy Court an amended plan of reorganization (the "Company's Plan"). If the Company's Plan becomes effective without further amendment, the following distributions would be made:

- The outstanding balance on the senior, secured credit facility would be extended for a period of five years following the effective date of the Company's Plan; the revolving line of credit, the equipment term loan, and all but $4,000,000 of the then outstanding real estate term loans would be converted into new term notes with interest payable at the rate of LIBOR plus 4.50% per annum and monthly principal payments of $269,000 commencing one month after the effective date of the Company's Plan; the remaining $4,000,000 of the outstanding real estate term loan would be converted into a new term note with interest payable at the rate of prime plus 6% and monthly principal payments of $17,000 commencing one month after the effective date of the Company's Plan;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an initial cash payment equal to 10% of its claim and nine additional cash payments, each equal to 10.75% of their claim, payable quarterly, commencing three months after the effective date of the Company's Plan;

- Each holder of a Senior Subordinated Note claim would receive shares of new Series C Preferred Stock with an aggregate liquidation preference equal to their claim, increasing at the rate of 6% per annum, and convertible into common stock at $2.90 per share; and

- Each holder of a Junior Subordinated Note claim and a Series B Preferred Stock interest would receive new shares of common stock with a value equal to their claim or interest.

If the Company's Plan had become effective on September 30, 2009, $52,652,000 of our liabilities would have been converted into equity securities.

We require additional financing in order to consummate the Company's Plan. There can be no assurance that the Company's Plan will be confirmed or that we will be able to obtain such financing.

In addition, our senior, secured lenders and the official committee of unsecured creditors of the Company have each filed competing plans of reorganization for the Company.

The plan filed by the senior, secured lenders on September 25, 2009 (the "Lenders' Plan"), provides, in summary, for the appointment of a trustee to manage the Company's business and assets and to supervise a prompt sale of the Company, in whole or in pieces, by the financial advisor to the senior, secured lenders, with the proceeds to be distributed in accordance with a priority schedule set forth in the Lenders' Plan.

- 47 -

The plan filed by the Official Creditors' Committee on September 29, 2009 (the "Committee's Plan"), provides, in summary, for the following:

- An extension of our outstanding senior, secured debt without any immediate pay down;

- Each holder of a general unsecured claim, other than holders of Senior Subordinated Notes and the Junior Subordinated Note, would receive an unsecured note of the Company, the terms of which have not been specified;

- The conversion of the Senior Subordinated Notes into 65% of the common stock of the reorganized company;

- The elimination of all classes of claims and interests junior to the Senior Subordinated Notes; and

- Additional liquidity to be provided through a $10,000,000 junior, secured loan to be provided or arranged by certain holders of the Senior Subordinated Notes; the providers of this loan would receive interest at the rate of LIBOR + 10%, a $1,500,000 financing fee, and 35% of the common stock of the reorganized company.

For a detailed description of the Company's Plan, the Lenders' Plan, and the Committee's Plan, classification and treatment of claims and interests under each plan, and the proposed terms of the Series C Preferred Stock under the Company's Plan, please refer to the plan documents and related disclosure statements filed with the Bankruptcy Court on October 6, 2009, September 25, 2009, and September 29, 2009, respectively. The proposed disclosure statements along with other documents related to the chapter 11 proceedings can be found at http://chapter11.epiqsystems.com /lexington. These documents are not incorporated by reference into this Form 10-Q except to the extent that they identify the proposed classification and treatment of claims and interest and the proposed terms of the Series C Preferred Stock.

None of these plans of reorganization may ultimately be approved. No party currently has exclusive rights to propose a plan of reorganization and solicit votes thereon, so any interested party may propose a competing plan of reorganization at any time. Further, the proponents of the filed plans of reorganization are free to amend their respective plans at any time. As a result, a plan of reorganization that is materially different from the three that have been filed may ultimately be approved. Under the ultimate plan of reorganization, the interests of the holders of Series B Preferred Stock and our common stock may be substantially diluted or cancelled.

The risks and uncertainties associated with the chapter 11 proceedings, including our ability to operate pursuant to the terms of our debtor-in-possession credit arrangements, our ability to obtain court approvals with respect to motions in the chapter 11 proceedings, our ability to obtain financing that will permit us to exit chapter 11, and our ability to develop, confirm, and consummate a plan of reorganization with respect to the chapter 11 proceedings, may have a material adverse effect on our results of operations and financial condition.

Our consolidated financial statements have been presented on a "going concern basis," as such term is used in U.S. generally accepted accounting principles. A going concern basis contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Our ability to reorganize the Company is subject to risks and uncertainties. The consolidated financial statements do

- 48 -

not include any adjustments to the amounts or classification of assets or liabilities to reflect these risks and uncertainties.

### Item 3. DEFAULTS UPON SENIOR SECURITIES

We have failed to make all quarterly interest payments on our $34,177,000 aggregate principal amount of Senior Subordinated Notes since November 1, 2006. The past due interest payments total $14,780,000 as of the filing date of this Form 10-Q. In addition, we failed to repay the $34,177,000 aggregate principal amount of our Senior Subordinated Notes, which became due on August 1, 2009.

We have failed to make all quarterly interest payments on our $347,000 Junior Subordinated Note since November 1, 2006. The past due interest payments total $146,000 as of the filing date of this Form 10-Q. In addition, we failed to repay the $347,000 principal amount of our Junior Subordinated Note, which became due on November 1, 2009.

For an additional discussion about these notes and this default, please refer to "Note 4 – Debt" to our consolidated financial statements in Part I, Item 1.

### Item 6. EXHIBITS

The exhibits listed on the accompanying Exhibit Index are filed herewith or incorporated herein by reference.

- 49 -

# LEXINGTON PRECISION CORPORATION
## FORM 10-Q
### September 30, 2009

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="right">

LEXINGTON PRECISION CORPORATION

(Registrant)

</div>

| | |
|---|---|
| November 20, 2009 | By:_____ |
| Date | Michael A. Lubin |
| | Chairman of the Board |

| | |
|---|---|
| November 20, 2009 | By:_____ |
| Date | Warren Delano |
| | President |

| | |
|---|---|
| November 20, 2009 | By:_____ |
| Date | Dennis J. Welhouse |
| | Senior Vice President and |
| | Chief Financial Officer |

<div align="center">

- 50 -

</div>

## EXHIBIT INDEX

31-1   Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant.

31-2   Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Warren Delano, President and Co- Principal Executive Officer of the registrant.

31-3   Rule 13(a) – 14(a) / 15(d) – 14(a) Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant.

32-1   Certification of Michael A. Lubin, Chairman of the Board and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-2   Certification of Warren Delano, President and Co-Principal Executive Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32-3   Certification of Dennis J. Welhouse, Chief Financial Officer and Principal Financial Officer of the registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

- 51 -

**<u>Exhibit E</u>**

**LPC Proxy Statement**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**
**(Rule 14a-101)**

**INFORMATION REQUIRED IN PROXY STATEMENTS**
**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement
☐ Confidential, for Use of the Commission only (as permitted by Rule 14a-6(e)(2))
☒ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to § 240.14a-12

_____

**LEXINGTON PRECISION CORPORATION**

(Name of Registrant as Specified in Its Charter)

_____

Payment of Filing Fee (Check the appropriate box):

☒ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)   Title of each class of securities to which transaction applies:  N/A
    (2)   Aggregate number of securities to which transaction applies:  N/A
    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11:  N/A
    (4)   Proposed maximum aggregate value of transaction: N/A
    (5)   Total fee paid:  N/A

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-1l(a)(2) and identify the filing for which the offsetting fee was paid previously.  Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)   Amount Previously Paid:
    (2)   Form, Schedule or Registration Statement No.:
    (3)   Filing Party:
    (4)   Date Filed:

# LEXINGTON PRECISION CORPORATION
### 800 Third Avenue, 15th Floor
### New York, New York 10022

_____

## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
## TO BE HELD ON MAY 28, 2009

Notice is hereby given that the Annual Meeting of Stockholders of LEXINGTON PRECISION CORPORATION (the "Company") will be held at the offices of Nixon Peabody LLP, 437 Madison Avenue, 24th Floor, New York, New York, on Thursday, May 28, 2009, at 11:00 A.M., for the purpose of considering and acting upon the following matters:

1.      The election of six directors by the holders of Common Stock and $8 Cumulative Convertible Preferred Stock, Series B, as set forth in the accompanying Proxy Statement;

2.      The ratification of Malin, Bergquist & Company, LLP as independent auditors of the Company for the year ending December 31, 2009; and

3.      The transaction of such other business as may properly come before the meeting and any adjournments thereof.

The Board of Directors has fixed the close of business on April 13, 2009, as the record date for determining the stockholders of the Company entitled to receive notice of and to vote at the meeting and any adjournments thereof.

**PLEASE SIGN, DATE, AND MAIL THE ENCLOSED PROXY PROMPTLY.  A POSTAGE-PAID ENVELOPE IS ENCLOSED FOR YOUR CONVENIENCE.**

By Order of the Board of Directors,

Dennis J. Welhouse
*Secretary*

April 23, 2009
New York, New York

# LEXINGTON PRECISION CORPORATION
### 800 Third Avenue, 15th Floor
### New York, New York 10022

---

### PROXY STATEMENT

### ANNUAL MEETING OF STOCKHOLDERS
### TO BE HELD ON MAY 28, 2009

This Proxy Statement is being mailed to stockholders on or about May 4, 2009, in connection with the solicitation by the Board of Directors of LEXINGTON PRECISION CORPORATION, a Delaware corporation (the "Company"), of proxies to be voted at the annual meeting of stockholders of the Company to be held on May 28, 2009 (the "Annual Meeting"). Accompanying this Proxy Statement are the Notice of Annual Meeting of Stockholders, a form of proxy for the meeting, and a copy of the Company's Annual Report for the year ended December 31, 2008, which contains financial statements and related data. In addition, the Notice of Annual Meeting and Proxy Statement are available at http://www.edocumentview.com/LEXP.

All proxies that are properly completed, signed, and returned to the Company in time will be voted in accordance with the instructions thereon. Proxies may be revoked prior to the exercise thereof by filing with the Secretary of the Company a written revocation or a duly executed proxy bearing a later date, or by voting in person at the Annual Meeting. The cost of preparing and mailing the accompanying form of proxy and related materials and the cost of soliciting proxies will be borne by the Company. The Company has requested brokers, custodians, and other like parties to distribute proxy materials to the beneficial owners of shares and to solicit their proxies and will reimburse such persons for their services in doing so. Without additional compensation, officers and regular employees of the Company may solicit proxies personally or by telephone. The cost of additional solicitation incurred other than by use of the mails is estimated not to exceed $3,000.

Only stockholders of record at the close of business on the record date, April 13, 2009, are entitled to notice of, and to vote at, the Annual Meeting and any adjournments thereof. As of the record date, there were outstanding 5,021,767 shares of the Company's common stock, $0.25 par value (the "Common Stock"), and 3,300 shares of its $8 Cumulative Convertible Preferred Stock, Series B, $100 par value (the "Series B Preferred Stock"), each entitling the holder thereof to one vote. The holders of a majority of the outstanding shares of Common Stock and Series B Preferred Stock present in person or represented by proxy, voting together, will constitute a quorum for all matters before the Annual Meeting. The affirmative vote of a plurality of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting, voting together, is required for the election of the six directors. All other matters require the affirmative vote of a majority of the shares of Common Stock and Series B Preferred Stock present in person or represented by proxy and entitled to vote at the Annual Meeting.

With regard to the election of directors, votes may be cast in favor or withheld. Votes withheld from the election of directors will be counted to determine the presence or absence of a quorum for the transaction of business at the Annual Meeting, but they have no legal effect under Delaware law and, consequently, will not affect the outcome of the voting on such proposal. With regard to other proposals, abstentions may be specified and will have the same effect as votes against the subject proposal at the

Annual Meeting. Broker nonvotes (that is, proxies from brokers or nominees indicating that such persons have not received instructions from the beneficial owners or other persons entitled to vote shares on a particular matter as to which the brokers or nominees do not have discretionary power) are counted for purposes of determining a quorum for the transaction of business at the Annual Meeting but are not considered as votes for purposes of determining the outcome of voting on a proposal.

## PROPOSAL 1 — ELECTION OF DIRECTORS

The bylaws of the Company provide for the election of directors for one-year terms. The holders of Common Stock and Series B Preferred Stock, voting together, will be asked to vote at the Annual Meeting for the election of six directors, each to serve until the annual meeting of stockholders to be held in 2010 and until his or her successor has been elected and qualified. Unless authority to vote for the election of a director is specifically withheld by appropriate designation on the face of the proxy, it is the intention of the persons named in the accompanying proxy to vote such proxy for the election of William B. Conner, Warren Delano, Kenneth I. Greenstein, Michael A. Lubin, Joseph A. Pardo, and Elizabeth H. Ruml as directors to be elected by the holders of Common Stock and Series B Preferred Stock, voting together, to serve until the annual meeting of stockholders to be held in 2010 and until their respective successors shall have been elected and qualified. Messrs. Conner, Delano, Greenstein, Lubin, and Pardo and Ms. Ruml are presently members of the Board of Directors. The proxies cannot be voted for a greater number of persons than six in respect of Proposal 1. Management has no reason to believe that the named nominees will be unable or unwilling to serve, if elected. However, in such case, it is intended that the individuals named in the accompanying proxy will vote for the election of such substituted nominees as the Board of Directors may recommend.

Certain information concerning the nominees for election pursuant to Proposal 1 is set forth in the following table. The Board of Directors recommends that shareholders vote **FOR** the election of the named nominees.

| Name | Age | Principal Occupation, Business Experience, and Directorships |
|------|-----|-------------------------------------------------------------|
| William B. Conner | 76 | Private Investor. President and Director of Conner Holding Company, a holding company for aviation companies, and Chairman of the Board of the subsidiaries thereof for more than five years. Director of the Company since 1981. |
| Warren Delano | 58 | President of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Kenneth I. Greenstein | 79 | Secretary of the Company from September 1979 to April 2004. Consultant for more than five years. Prior to becoming a consultant, stockholder of a professional corporation that was a partner in Nixon, Hargrave, Devans & Doyle LLP (now known as Nixon Peabody LLP), a law firm for more than five years. Director of the Company since 1978. |

| | | |
|---|---|---|
| Michael A. Lubin | 59 | Chairman of the Board of the Company for more than five years. Partner of Lubin, Delano & Company, an investment banking and consulting firm, for more than five years. Director of the Company since 1985. |
| Joseph A. Pardo | 75 | Consultant for more than five years. Chairman of Phoenix Advisors, LLC for more than five years. Served as a financial consultant to a number of public and private companies, including as trustee of various creditor trusts in connection with reorganizations under chapter 11 of the federal bankruptcy code during the past five years. Served as Chairman of the Board of Brothers Gourmet Coffee Co. from October 2000 through March 2004. Director of the Company since 2002. |
| Elizabeth H. Ruml | 56 | Retired for more than five years. Managing Director and Co-Head of the Group Market Risk Management function at Deutsche Bank from June 1999 through October 1999. Managing Director and Head of the Corporate Portfolio Management Group at Bankers Trust Company (now known as Deutsche Bank) from March 1998 through June 1999. Managing Director and Chief Credit Officer at Salomon Brothers from May 1993 through December 1997. Director of the Company since 2002. |

Each of the nominees for director is a current director of the Company, and Messrs. Delano, Lubin, and Conner each own, directly or indirectly, greater than 5% of the Company's common stock. On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors have continued to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, the Debtors obtained a financing package that consisted of (a) an arrangement with the Debtor's senior, secured lenders to freeze the loan under the Debtor's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Debtors to use the cash collections on its accounts receivable in the operation of the Debtor's business through February 25, 2009, which was subsequently extended to May 22, 2009, in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession loan in the amount of $4,000,000, which matures on December 31, 2009, among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The collections on its accounts receivable and the proceeds from the debtor-in-possession loan are being used by the Debtors for working capital, capital expenditures, and other general corporate purposes and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of the collections on its accounts receivable and the Agreement governing the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

## BOARD OF DIRECTORS AND COMMITTEES OF THE BOARD

The Board of Directors met nine times during 2008. Each director attended at least 75% of the meetings held by the Board of Directors and all meetings held by the committees of the Board of Directors on which such person served.

The Board of Directors has a standing Audit Committee and a standing Compensation Committee. The members of those committees are as follows:

| Name of Committee | Chairman | Other Member(s) |
|---|---|---|
| Audit Committee | Joseph A. Pardo | Kenneth I. Greenstein<br>Elizabeth H. Ruml |
| Compensation Committee | William B. Conner | Kenneth I. Greenstein |

The Audit Committee, which is comprised of three non-employee members of the Board of Directors, met four times during 2008. The primary purpose of the Audit Committee is to review the financial information provided to the Company's stockholders and others, to oversee the system of internal financial controls, and to monitor the independent audit process. Its functions include recommending the independent auditors for appointment by the Board of Directors, consulting periodically with the Company's independent auditors as to the nature, scope, and results of their audit of the accounts of the Company, reviewing the Company's internal accounting controls and procedures, and such other related matters as the Audit Committee deems advisable. The Audit Committee Charter was attached as appendix A to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The Board of Directors has determined that each member of the Audit Committee is independent, as defined by the NASDAQ Manual. In addition, the Board of Directors has determined that Joseph A. Pardo is qualified to serve as the "audit committee financial expert" of the Company as defined in Item 407(d) of Securities and Exchange Commission's Regulation S-K.

The Compensation Committee, which is comprised of two non-employee members of the Board of Directors, met two times during 2008. The meetings were held at regularly scheduled Board meetings where other members of the Board could participate. When appropriate, executive officers whose compensation was being discussed excused themselves from the meetings. The functions of the Compensation Committee include reviewing salaries and cash bonus awards for the Company's executive officers and existing or potential compensation plans for the executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. Additionally, the Compensation Committee administers the Company's 2005 Stock Award Plan. The Compensation Committee does not delegate its authority in this regard. The Compensation Committee Charter was attached as appendix B to the Proxy statement issued in connection with the 2007 Annual Meeting. A paper copy of the Compensation Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

The Board of Directors does not have a standing nominating committee, or formal policy regarding nominations by securityholders. The Board of Directors has determined that it is not necessary to have a nominating committee or nomination policy because of the relatively small size of the Company and the Board of Directors. The Board of Directors considers recommendations for director nominees

from directors and members of management. The Board of Directors is also willing to consider stockholder recommendations for director nominees that are properly received in accordance with all applicable rules and regulations although no such recommendations have ever been received. The Board of Directors evaluates each prospective nominee on the basis of his or her qualifications. Each member of the Board of Directors is independent, other than Messrs. Lubin and Delano.

In view of the small size of the Board of Directors, as well as the infrequency with which shareholder communications are received, the Company does not have a formal process in place for its stockholders to communicate with its Board of Directors but is receptive to communications from its stockholders, which may be made by writing to Michael A. Lubin, Chairman of the Board, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, at any time prior to December 1, 2009, for the 2010 annual meeting of stockholders.

For the past five years, all of the directors have attended each of the annual meetings of stockholders of the Company. The Company does not have a policy with regard to attendance by directors at annual meetings of stockholders of the Company.

Each member of the Board of Directors, and each nominee for election as director, other than Mr. Lubin and Mr. Delano, is independent, as defined in Rule 4200(a)(15) of the NASDAQ Manual.

Pursuant to the Company's bylaws, the Company has agreed to indemnify its directors and executive officers to the fullest extent permitted by law.

The following table sets forth, for 2008, the fees earned by Directors of the Company other than Messrs. Delano and Lubin, whose fees are set forth in the section titled Executive Compensation.

| Name | Fees Earned or Paid in Cash ($) | All Other Compensation | Total ($) |
|---|---|---|---|
| William B. Conner | 15,950 | – | 15,950 |
| Kenneth I. Greenstein | 20,600 | – | 20,600 |
| Joseph A. Pardo | 20,950 | – | 20,950 |
| Elizabeth H. Ruml | 21,300 | – | 21,300 |

Each member of the Board of Directors receives an annual fee of $12,000. Each member of the Audit Committee receives an annual fee of $2,000. Directors receive $1,500 for each Board or committee meeting attended in person as well as reasonable out-of-pocket expenses incurred in connection with attending such meetings. Directors receive $350 for each Board meeting attended by telephone and $750 for each committee meeting attended by telephone. On October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to Ms. Ruml and to Messrs. Conner, Greenstein, and Pardo. Each of the four Restricted Stock Award Agreements governing the grants specify that 2,000 shares of the restricted Common Stock will vest over the service life of each respective Director on each subsequent October 9 until all 10,000 shares are vested. During 2008, there were no fees, stock options, stock appreciation rights, restricted stock, performance shares, performance units, non-equity incentive plan compensation, pension or nonqualified compensation earnings or other compensation paid, awarded, or granted to or exercised by directors for services rendered as members of the Board.

# EXECUTIVE OFFICERS

The following table sets forth certain information concerning the executive officers of the Company.

| Name | Position and Offices | Age |
|------|----------------------|-----|
| Michael A. Lubin | Chairman of the Board | 59 |
| Warren Delano | President and Director | 58 |
| Dennis J. Welhouse | Senior Vice President, Chief Financial Officer, and Secretary | 60 |

Mr. Lubin has been Chairman of the Board of the Company since 1991, and a director of the Company since 1985. For more than five years, Mr. Lubin has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Delano has been President of the Company since 1988, and a director of the Company since 1985. For more than five years, Mr. Delano has been a partner of Lubin, Delano & Company, an investment banking and consulting firm.

Mr. Welhouse has been Senior Vice President since 1992 and Chief Financial Officer of the Company since 1989. Since 2004, Mr. Welhouse has also served as Secretary of the Company. Prior to April 2004, for more than five years, Mr. Welhouse was Assistant Secretary of the Company.

Each of the Company's executive officers serves at the pleasure of the Board of Directors. The Chairman of the Board must be a director of the Company to be elected such.

**Code of Ethics**

The Company has adopted a Code of Ethics that applies to its co-principal executive officers and key financial and accounting personnel. A paper copy of the Code of Ethics may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022.

# SECURITY OWNERSHIP

The following table sets forth the beneficial ownership of the Company's Common Stock, as of April 10, 2009, by (1) each director and director nominee, (2) each executive officer, (3) all directors and executive officers as a group, and (4) each person known by the Company to be the beneficial owner of more than 5% of its outstanding Common Stock. The business address of each officer, director, or stockholder listed below is c/o Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. The persons named in the table have sole voting and dispositive power with respect to all shares of the Common Stock shown as beneficially owned by them, subject to community property laws, where applicable, except as set forth in the notes to the table.

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned | Percent of Class Owned |
|---|---|---|
| Michael A. Lubin | 1,681,790 (1) | 33.0% |
| Warren Delano | 1,401,097 (2) | 27.9 |
| William B. Conner | 383,494 (3) | 7.6 |
| Dennis J. Welhouse | 108,000 | 2.2 |
| Joseph A. Pardo | 58,105 | 1.2 |
| Kenneth I. Greenstein | 37,636 (4) | * |
| Elizabeth H. Ruml | 2,000 | * |
| Directors and executive officers as a group (7 persons) | 3,575,450 (5) | 70.2% |

\*   Less than 1 percent.

(1) Includes (a) 70,000 shares of Common Stock and 169 warrants to purchase Common Stock ("Warrants") owned by a limited liability corporation of which Mr. Lubin is the managing member, (b) 50,000 shares and 40,980 Warrants owned by individual retirement accounts of Mr. Lubin, (c) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Lubin and Mr. Delano are both beneficiaries, and (d) 11,510 Warrants owned jointly with Mr. Lubin's wife. Also includes an aggregate of 9,180 Warrants that are owned by members of Mr. Lubin's family, as to which Mr. Lubin shares dispositive power but has no voting power.

(2) Includes (a) 110,750 shares owned by individual retirement accounts of Mr. Delano and (b) 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Mr. Delano and Mr. Lubin are both beneficiaries.

(3) Includes 238,194 shares owned by Conner Holding Company, a Nevada corporation, of which Mr. Conner is president, a director, and majority stockholder.

(4) Includes 8,170 shares owned by a retirement benefit plan of which Mr. Greenstein is the sole beneficiary.

(5) See footnotes 1 through 4, above. Total includes 89,062 shares and 7,610 Warrants owned by Lubin, Delano & Company Profit Sharing Plan & Trust of which Messrs. Delano and Lubin are beneficiaries that are reported in the shares beneficially owned by both Mr. Delano and Mr. Lubin. For purposes of the calculation of "Percent of Class Owned" for the directors and

executive officers as a group, the 89,062 shares and 7,610 Warrants owned by the retirement benefit plan of which Messrs. Delano and Lubin are officers are included in the numerator and the denominator only once.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder require the Company's officers and directors and persons who own more than 10 percent of the Common Stock to file reports of ownership and changes in ownership with the Securities and Exchange Commission and to furnish to the Company copies of all such filings.

Based solely on its review of the copies of such reports and written representations from certain reporting persons that certain reports were not required to be filed by such persons, the Company believes that all of its directors, officers, and beneficial owners complied with all of the filing requirements applicable to them with respect to transactions during the year ended December 31, 2008.

<div align="center">

**EXECUTIVE COMPENSATION**

</div>

The following table summarizes, for the Company's past three fiscal years, the compensation paid to each of the Company's co-principal executive officers and to each of the Company's other executive officers whose total annual salary and bonus exceeded $100,000.

<div align="center">

**SUMMARY COMPENSATION TABLE**

</div>

| Name and Principal Position | Year | Salary ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Michael A. Lubin | 2008 | 350,000 (1) | 16,300 (2) | 366,300 |
| Chairman of the Board | 2007 | 350,000 (1) | 18,600 (2) | 368,600 |
| (co-principal executive officer) | 2006 | 350,000 (1) | 18,700 (2) | 368,700 |
| Warren Delano | 2008 | 350,000 (1) | 16,300 (2) | 366,300 |
| President and Director | 2007 | 350,000 (1) | 18,600 (2) | 368,600 |
| (co-principal executive officer) | 2006 | 350,000 (1) | 18,700 (2) | 368,700 |
| Dennis J. Welhouse | 2008 | 161,200 | 6,357 (3) | 167,557 |
| Senior Vice President, | 2007 | 161,200 | 5,827 (3) | 167,027 |
| Chief Financial Officer, and Secretary | 2006 | 159,867 | 5,090 (3) | 164,957 |

(1) Represents compensation, paid indirectly to Messrs. Lubin and Delano through Lubin, Delano & Company, during each of 2008, 2007, and 2006 for services rendered as an executive officer of the Company. Lubin, Delano & Company is an investment banking and consulting firm of which Messrs. Lubin and Delano are the only partners. See "Compensation Discussion and Analysis," "Compensation Committee Report on Executive Compensation," and "Certain Relationships and Transactions."

(2) Represents fees paid indirectly to Messrs. Lubin and Mr. Delano through Lubin, Delano & Company during each of 2008, 2007, and 2006 for serving as directors on the Company's Board of Directors.

(3) Includes (a) Company contributions of $4,836, $4,836, and $4,152 made to Mr. Welhouse's account under the Company's 401(k) Plan in 2008, 2007, and 2006, respectively, and (b) insurance premiums of $1,521, $991, and $938 paid by the Company in 2008, 2007, and 2006, respectively, for term life insurance owned by Mr. Welhouse.

No bonuses, stock options, stock appreciation rights, restricted stock, performance shares, performance units, non-equity incentive plan compensation, or pension or nonqualified compensation earnings were paid, awarded, or granted to or exercised by any of the persons named in the summary compensation table above during 2008, 2007, or 2006. For a narrative description of material factors necessary to provide an understanding of the compensation disclosed in the summary compensation table above, see the section entitled "Compensation Discussion and Analysis" below.

## COMPENSATION DISCUSSION AND ANALYSIS

### Compensation Objectives, Philosophy, and Policy

The Company's compensation program is designed to motivate and reward the Company's executive officers for attaining financial, operational, and strategic objectives that will contribute to the overall goal of enhancing stockholder value and promote the Company's success in attracting, developing, and retaining key executives and management personnel critical to its long-term success. The Company believes that executive compensation should be based on objective measures of performance at the individual, divisional, and corporate levels, should be driven primarily by the long-term interests of the Company and its stockholders, and should be linked to the enhancement of stockholder value. In addition to reviewing compensation of the executive officers, the Compensation Committee also considers recommendations from the co-principal executive officers regarding compensation for those employees reporting directly to them. The principal elements of the compensation plan include base salary and cash bonus awards.

### Components of Executive Compensation

The compensation program for executive officers consists of the following components:

**Base Salary**. Base salary is paid by the Company to executive officers as a result of market practices and competitive factors. In determining the base pay levels for executive officers of the Company, the Compensation Committee considers the compensation paid by a group of industrial companies that are generally similar to the Company with respect to type of business, sales volume, cash flow, and market capitalization. The companies that make up the comparable group are subject to change as companies merge with, or are acquired by, other companies or because companies cease publishing compensation data for other reasons. Base pay levels, prior to taking into account other factors considered by the Compensation Committee, are at the mid-range of base pay levels for such group of companies. The base salaries of the Messrs. Delano and Lubin were last adjusted effective January 1, 2004. The increase in the compensation payable to Messrs. Delano and Lubin was made in order to adjust their compensation to a level that the Compensation Committee considered appropriate at that time and under the prevailing circumstances. Messrs. Delano and Lubin had previously been paid a base salary of $250,000 each since 1999. The base salary of Mr. Welhouse was last adjusted on June 1, 2006, to an annual salary level of $161,200. The increase in Mr. Welhouse's compensation was also made to adjust

his compensation to a level that the Compensation Committee considered appropriate at that time and under the prevailing circumstances. Prior to June 1, 2006, Mr. Welhouse's annual base salary was $158,000. The Company's most direct competitors are private companies that do not publicly disclose information regarding executive compensation, financial condition, or operating performance. The Company believes that the companies with which it compares itself for the purpose of determining executive compensation are not necessarily included in the indices used to compare stockholder returns that are contained elsewhere in this Proxy Statement. In determining the salary component of compensation packages for executive officers, the Compensation Committee also takes into consideration the recent performance of the individual and the Company, the experience of the individual, and the scope and complexity of the position. The Compensation Committee does not assign weights to these factors and does not consider any one factor more important than another. The 2008, 2007, and 2006 salaries of the named executive officers are shown in the "Salary" column of the summary compensation table in the section entitled "Executive Compensation" above. Salaries for executive officers are reviewed on an annual basis, as well as at the time of a promotion or other change in responsibilities. Increases in salary are based on subjective evaluation of such factors as the individual's level of responsibility and performance.

**Incentive Compensation Plan**. In response to market practices and competitive factors, the Company's executive officers can qualify for incentive compensation. To provide incentives to increase profitability, the Company has an incentive compensation plan that provides for the payment of cash bonus awards to executive officers and other eligible employees of the Company. Bonus awards for eligible divisional employees are usually based upon the attainment of predetermined targets for earnings before interest, taxes, depreciation, and amortization (EBITDA) at each respective division. Bonus awards for executive officers and other eligible corporate employees are based upon the attainment of a predetermined consolidated EBITDA target. No bonuses were paid to Messrs. Delano, Lubin, or Welhouse for 2008, 2007, or 2006. The Compensation Committee is responsible for the supervision of the incentive compensation plan.

**2005 Stock Award Plan**. The Company also has an incentive stock plan (the "2005 Stock Award Plan") that permits it to award nonqualified stock options, incentive stock options, stock appreciation rights, restricted stock, performance shares, or performance units to officers and key employees of the Company. These varying types of long-term incentives, each focusing on different elements of performance and retention, are intended to benefit shareholders by enabling the Company to better attract and retain talent in a marketplace where such incentives are prevalent. Stock options are intended to reward for increases in shareholder value. Restricted stock is intended to help to retain directors, executive officers, and other key employees in a challenging business environment and to reward for increases in stockholder value. Performance shares and performance units are intended to provide focus on transforming the Company and attaining growth in stockholder value over a multi-year period. In January 2006, the Company awarded 50,000 shares of restricted Common Stock to an employee of the Company, and, on October 9, 2007, the Company awarded 10,000 shares of restricted Common Stock to each of the Company's four outside directors. No awards under the 2005 Stock Award Plan were granted to, exercised by, or held by any of the persons named in the summary compensation table above during 2008, 2007, or 2006.

**Compensation of Messrs. Delano, Lubin, and Welhouse**. Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2008, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, totaled $700,000. The Company's

arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2008, 2007, or 2006 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2008, 2007, or 2006.

During 2008, the aggregate payments made to Mr. Welhouse for services provided by him as Senior Vice President, Chief Financial Officer, and Secretary totaled $161,200. Mr. Welhouse received no payments under the incentive compensation plan for 2008, 2007, or 2006.

The Company believes that the quality of executive leadership significantly affects long term performance and that it is in the best interest of the stockholders to compensate executive leadership fairly for achievements that meet or exceed the standards set by the Compensation Committee, so long as there is corresponding risk when performance falls short of such standards.

The compensation paid for the combined services of Messrs. Delano, Lubin, and Welhouse in their respective roles as executive officers of the Company was agreed to after considering the responsibilities of such positions and the competitive marketplace for executive talent. The Company believes that the compensation paid to Lubin, Delano & Company during 2008 for the combined services of Messrs. Delano and Lubin as executive officers of the Company and to Mr. Welhouse during 2008 comports with the Compensation Committee's subjective perception of the base compensation levels of executive officers in their respective positions employed by other industrial companies, both public and private.

**Role of the Compensation Committee**

The Compensation Committee is comprised of two non-employee members of the Board of Directors. The Compensation Committee is responsible for reviewing salaries, cash bonus awards, and existing or potential compensation plans for the Company's executive officers and other eligible employees and making recommendations to the Board of Directors regarding such salaries, cash bonus awards, and compensation plans. The membership of the Compensation Committee is determined by the Board.

## COMPENSATION COMMITTEE REPORT ON EXECUTIVE COMPENSATION

The Compensation Committee is composed entirely of independent directors. The members of the Compensation Committee consist of William B. Conner and Kenneth I. Greenstein.

The committee met with management to review and discuss the Compensation Discussion and Analysis disclosures included in this proxy statement. Based on such review and discussion, the committee recommended to the Board of Directors that the Compensation Discussion and Analysis be included in this Proxy Statement and incorporated by reference in the Company's Form 10-K for its 2008 fiscal year, and the Board has approved that recommendation.

COMPENSATION COMMITTEE

William B. Conner, *Chairman*
Kenneth I. Greenstein, *Member*

# AUDIT COMMITTEE REPORT

The Audit Committee oversees the Company's financial reporting process on behalf of the Board of Directors and performs the other duties and responsibilities set forth in the Audit Committee's charter. It is the responsibility of the Company's independent auditors to perform an independent audit of and express an opinion on the Company's financial statements. The Audit Committee's responsibility is one of review and oversight. In fulfilling its oversight responsibilities:

(1)     The Audit Committee has reviewed and discussed with the Company's management the audited financial statements.

(2)     The Audit Committee has discussed with Malin, Bergquist & Company LLP, the Company's independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61, "Codification of Statements on Auditing Standards, AU § 380."

(3)     The Audit Committee has received the written disclosures and the letter from its independent registered public accounting firm required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and has discussed with its independent registered public accounting firm the independence of that firm as the Company's auditors.

(4)     Based on the Audit Committee's review and discussions referred to above, the Audit Committee recommended to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2008, for filing with the Securities and Exchange Commission.

In 2000, the Board of Directors adopted a written charter for the Audit Committee, which sets forth the operating practices and responsibilities of the Audit Committee.  A copy of the Audit Committee's charter may be obtained by written request to the President, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022. Each member of the Audit Committee is independent, as defined in Rule 4200(a) of the listing standards of the National Association of Securities Dealers.

The members of the Audit Committee are not professionally engaged in the practice of auditing or accounting and, except insofar as Mr. Pardo has been designated as the "audit committee financial expert" of the Company, are not experts in the fields of accounting, auditing, or auditor independence. Members of the committee rely without independent verification on the information provided to them and on the representations made by management and the independent auditors.

<div align="center">

AUDIT COMMITTEE

Joseph A. Pardo, *Chairman*
Kenneth I. Greenstein, *Member*
Elizabeth H. Ruml, *Member*

</div>

# COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Company's Compensation Committee are William B. Conner and Kenneth I. Greenstein. Neither Mr. Conner nor Mr. Greenstein has ever been an employee of the Company, and

Mr. Conner, who is the Chairman of the Compensation Committee, has never been an officer of the Company. Mr. Greenstein served as Secretary of the Company from September 1979 to April 2004 although he received no compensation for acting in such capacity. Neither Mr. Conner nor Mr. Greenstein is party to any interlock relationships as defined in applicable Securities and Exchange Commission rules.

## CERTAIN RELATIONSHIPS AND TRANSACTIONS

Warren Delano and Michael A. Lubin beneficially own 27.9% and 33.0%, respectively, of the Common Stock of the Company.

Messrs. Delano and Lubin are compensated indirectly by the Company through payments made to Lubin, Delano & Company, an investment banking and consulting firm of which they are the only partners. During 2008, the aggregate payments made to Lubin, Delano & Company for services provided by Messrs. Delano and Lubin in their capacities as President and Chairman of the Board, respectively, were $700,000. The Company's arrangements with Lubin, Delano & Company also provide for an incentive fee based upon the attainment of predetermined consolidated EBITDA targets and additional compensation, as mutually agreed upon, for services provided by Lubin, Delano & Company in connection with acquisitions, divestitures, financings, or other similar transactions involving the Company. Messrs. Delano and Lubin received no payments under the incentive compensation plan for 2008 and no additional compensation for services provided in connection with acquisitions, divestitures, financings, or similar transactions during 2008.

In addition to his ownership of Common Stock, and Warrants, Mr. Lubin and his family members own $346,666.67 aggregate principal amount of the Company's 13% Junior Subordinated Note due November 1, 2009, and $7,011,000 aggregate principal amount of the Company's 12% Senior Subordinated Notes due August 1, 2009. The Lubin, Delano & Company Profit Sharing Plan & Trust, of which Messrs. Delano and Lubin are currently the sole beneficiaries, owns $761,000 principal amount of the 12% Senior Subordinated Notes due August 1, 2009. The Company is in default under its 13% Junior Subordinated Note due November 1, 2009, and its 12% Senior Subordinated Notes due August 1, 2009, although the Company believes that any efforts to enforce the payment obligations under the notes are stayed as a result of the Company's filing of a voluntary petition for bankruptcy, as described below under the heading "Bankruptcy Proceeding."

The Company's principal executive offices at 800 Third Avenue, 15th Floor, New York, New York are leased by Lubin, Delano & Company for aggregate annual base rent of $109,000. Messrs. Delano and Lubin have guaranteed the obligations of Lubin, Delano & Company under the lease. The Company reimburses Lubin, Delano & Company for rent, utilities and other expenses relating to the lease and will reimburse Messrs. Delano and Lubin if any payments are made by them under their guaranties. Substantially all of the business conducted at those offices is the business of the Company.

## Bankruptcy Proceeding

On April 1, 2008, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc. (collectively, the "Debtors"), filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 cases are being jointly administered under the caption In re Lexington Precision Corp, et al., Case No. 08-11153 (the "Chapter 11 Cases"). The Debtors have continued to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

In connection with this petition, the Debtors obtained a financing package that consisted of (a) an arrangement with the Debtor's senior, secured lenders to freeze the loan under the Debtor's revolving line of credit at the amount outstanding on April 1, 2008, and to permit the Debtors to use the cash collections on its accounts receivable in the operation of the Debtor's business through February 25, 2009, which was subsequently extended to May 22, 2009, in return for certain adequate protection, and (b) an unsecured super-priority, debtor in possession loan in the amount of $4,000,000, which matures on December 31, 2009, among the Debtors, as borrowers, and Lubin Partners LLC, William B. Conner, and ORA Associates LLC as the lenders, (the "Lenders"). Michael A. Lubin, the Chairman of the Board, co-principal executive officer, and nominee for director of the Company is the managing member of Lubin Partners LLC. Mr. Conner is a director and nominee for director of the Company. Mr. Lubin is a creditor and stockholder of the Company and Mr. Conner is a stockholder of the Company. The collections on its accounts receivable and the proceeds from the debtor-in-possession loan are being used by the Debtors for working capital, capital expenditures, and other general corporate purposes and for the costs of administration of the Chapter 11 Cases. The arrangement for the use of the collections on its accounts receivable and the Agreement governing the debtor-in-possession loan contain certain financial and other covenants and certain events of default.

## PROPOSAL 2 — RATIFICATION OF APPOINTMENT OF INDEPENDENT AUDITORS

The Board of Directors, on the recommendation of the Audit Committee, has appointed the firm of Malin, Bergquist & Company, LLP, independent public accountants, to audit the accounts of the Company for the year ending December 31, 2009. Malin, Bergquist & Company, LLP has been employed by the Company as its independent auditor since the Company's fiscal year ended December 31, 2007. Prior to that time, the Company employed Ernst & Young LLP as its independent auditor. Set forth below is a breakdown of the aggregate fees billed to the Company by Malin, Bergquist & Company, LLP and Ernst & Young LLP for the twelve-month periods ended December 31, 2008 and 2007:

|  | **2008** | **2007** |
|---|---|---|
| Audit Fees (1) | $256,050 | 240,000 |
| Tax Fees (2) | 12,775 | 17,000 |
| All Other Fees (3) | 38,401 | 62,500 |
|  | $307,226 | 319,500 |

(1) Includes fees for the respective annual audit and review of the Company's financial statements included in Form 10-Qs.

(2) Assistance with the preparation of federal and state income tax returns.

(3) The fees for 2008 include fees for the audit of the Lexington Precision Corporation Retirement & Savings Plan, fees related to the change of accountants, and fees related to assistance with certain court filings required in connection with the Company's chapter 11 filing. The fees for 2007 include fees for the audit of the Lexington Precision Corporation Retirement & Savings Plan, fees for the audit of Lexington Rubber Group, Inc., a wholly-owned subsidiary of Lexington Precision Corporation, and fees incurred in connection with our response to a standard inquiry letter from the U. S. Securities and Exchange Commission.

## Changes in Accountants

At a meeting held on October 9, 2007, the Board of Directors of the Company authorized Joseph A. Pardo, the Chairman of its Audit Committee and an independent director of the Company, to engage Malin, Bergquist & Company, LLP as its independent registered public accounting firm for the year ended December 31, 2007, at such time and on such terms as may be determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. At the same meeting, the Board of Directors of the Company authorized and directed Mr. Pardo, in his capacity as Chairman of the Audit Committee, to accept the resignation of Ernst & Young LLP as the independent registered public accounting firm of the Company at such time as determined appropriate by Mr. Pardo, in his capacity as Chairman of the Audit Committee. The audit committee of the Board of Directors, through the action of Mr. Pardo in his capacity as Chairman of the Audit Committee, engaged Malin, Bergquist & Company, LLP as the Company's independent registered public accounting firm on January 12, 2008, and accepted the resignation of Ernst & Young LLP on January 14, 2008. The Company did not consult with Malin, Bergquist & Company, LLP prior to that date regarding the application of accounting principles or type of audit that might be rendered on the Company's financial statements or any matter that was either the subject of a disagreement or reportable event as defined in Item 304(a)(1)(iv) and (v) of Regulation S-K.

The reports of Ernst & Young LLP on the Company's financial statements for the years ended December 31, 2006, contained an uncertainty qualification for conditions that raised substantial doubt about the ability of the Company to continue as a going concern. Such financial statements did not contain an adverse opinion, a disclaimer of opinion and were not qualified or modified as to audit scope or accounting principles.

In connection with the audits of the Company's financial statements for the years ended December 31, 2006, and the subsequent interim period preceding their resignation, there were no disagreements with Ernst & Young LLP on any matters of accounting principles or practices, financial statement disclosure, or auditing scope and procedures which, if not resolved to the satisfaction of Ernst & Young LLP would have caused Ernst & Young LLP to make reference to the matter in their report. The Company has provided Ernst & Young LLP with a copy of this disclosure, and Ernst & Young LLP has furnished the Company with a letter addressed to the Commission stating that it agrees with the above statements, as previously disclosed. A copy of that letter, dated January 25, 2008, is filed as Exhibit 16.1 to the Company's Form 8-K/A filed on January 30, 2008.

## Audit Committee Pre-Approval Policies and Procedures

The Audit Committee adopted a pre-approval policy in 2003 pursuant to which the Audit Committee pre-approves each non-audit engagement or service performed by the Company's independent auditor. Prior to pre-approving any such non-audit engagement or service, it is the committee's practice to first gather information regarding the engagement or requested service that explains the specific engagement or service and enables the committee to make a well-reasoned assessment of the impact of the engagement or service on the auditor's independence. In addition, the Audit Committee may authorize the executive officers of the Company to incur fees for non-audit services without the specific approval of the committee, provided that the fees for such services do not exceed $15,000. As required by the Sarbanes-Oxley Act of 2002, the Audit Committee pre-approved all non-audit engagements for services provided by our independent auditor after May 6, 2003.

The bylaws of the Company do not require that the stockholders ratify the appointment of Malin, Bergquist & Company, LLP as our independent auditor; however, we are seeking ratification because we believe it is a matter of good corporate governance practice. It is intended that, unless any proxy is

marked to the contrary, the shares represented by such proxy shall be voted for the ratification of such appointment. If the stockholders do not ratify the appointment, the Audit Committee will reconsider whether to retain Malin, Bergquist & Company, LLP, but may nevertheless retain Malin, Bergquist & Company, LLP as the Company's independent auditor. If the appointment is ratified, the Audit Committee in its discretion may change the appointment at any time during the year if it determines that a change would be in the best interests of the Company and its stockholders.

It is expected that a representative of Malin, Bergquist & Company, LLP will be present at the Annual Meeting to answer questions of stockholders and will have the opportunity, if desired, to make a statement.

The Board of Directors recommends that shareholders vote **FOR** such ratification.

## STOCKHOLDER PROPOSALS

Proposals by stockholders intended to be presented at the next annual meeting (to be held in 2010) must be received by the Secretary of the Company on or before December 1, 2009, in order to be included in the proxy statement and the proxy for that meeting. Proposals should be directed to the Secretary, Lexington Precision Corporation, 800 Third Avenue, 15th Floor, New York, NY 10022, and must comply with applicable requirements of the federal securities laws and the Company's bylaws.

## OTHER MATTERS

Management does not know of any other matters that are likely to be brought before the Annual Meeting; however, in the event that any other matters properly come before the Annual Meeting, the persons named in the enclosed proxy will vote in accordance with their judgment on such matters.

Accompanying this Proxy Statement is a copy of the Company's Annual Report, which includes financial statements and related data.

According to the rules of the Securities and Exchange Commission, the information presented in this Proxy Statement under the captions "Audit Committee Report" and "Compensation Committee Report on Executive Compensation" will not be deemed to be "soliciting material" or filed with the Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, and nothing contained in any previous filings made by the Company under such Acts shall be interpreted as incorporating by reference the information presented under the specified captions.

By Order of the Board of Directors,

Dennis J. Welhouse
*Secretary*

Dated:  April 23, 2009
        New York, New York

## Exhibit F

**Debtors' Projected Consolidated Financial Statements
for Five Years ending December 31, 2012**

## Consolidated Statements of Operations
### (in thousands of dollars)

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 88,408 | 73,029 | 61,567 | 73,276 | 92,285 | 104,098 |
| Cost of sales | 76,529 | 63,107 | 55,468 | 58,599 | 70,196 | 77,625 |
| Gross profit | 11,879 | 9,922 | 6,099 | 14,677 | 22,089 | 26,473 |
| Selling & administrative expense | 6,506 | 6,177 | 5,041 | 4,836 | 5,180 | 5,472 |
| Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
| Other income (expense): | | | | | | |
|   Interest expense | (11,339) | (8,726) | (7,649) | (2,360) | (2,283) | (1,689) |
|   Interest income | – | 117 | 50 | 104 | 260 | 300 |
|   Gain on sale of property | – | – | 199 | 181 | 2,308 | – |
|   Discontinued operations | (289) | (229) | (127) | (51) | (90) | 862 |
|   Reorganization expense | (698) | (5,165) | (4,338) | (5,312) | – | – |
|   Cancellation of debt income | – | – | – | 31,168 | – | – |
|     Subtotal | (12,326) | (14,003) | (11,865) | 23,730 | 195 | (527) |
| Income (loss) before income taxes | (6,953) | (10,258) | (10,807) | 33,571 | 17,104 | 20,474 |
| Provision for income taxes | 6 | 35 | 25 | 2,500 | 5,500 | 6,200 |
| Net income (loss) | (6,959) | (10,293) | (10,832) | 31,071 | 11,604 | 14,274 |
| EBITDA (continuing operations, excluding reorganization expenses): | | | | | | |
|   Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
|   Depreciation | 6,036 | 5,082 | 4,521 | 3,765 | 3,369 | 3,469 |
|   Amortization (operating only) | 401 | 251 | 177 | 196 | 56 | 30 |
|   EBITDA | 11,810 | 9,078 | 5,756 | 13,802 | 20,334 | 24,500 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Operations
### (expressed as a percent of net sales)

|  | Actual | | Estimate | Projected | | |
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 86.6 | 86.4 | 90.1 | 80.0 | 76.1 | 74.6 |
| Gross profit | 13.4 | 13.6 | 9.9 | 20.0 | 23.9 | 25.4 |
| Selling & administrative expense | 7.4 | 8.5 | 8.2 | 6.6 | 5.6 | 5.3 |
| Income from operations | 6.1 | 5.1 | 1.7 | 13.4 | 18.3 | 20.2 |
| Other income (expense): |  |  |  |  |  |  |
|    Interest expense | (12.8) | (11.9) | (12.4) | (3.2) | (2.5) | (1.6) |
|    Interest income | 0.0 | 0.2 | 0.1 | 0.1 | 0.3 | 0.3 |
|    Gain on sale of property | 0.0 | 0.0 | 0.3 | 0.2 | 2.5 | 0.0 |
|    Discontinued operations | (0.3) | (0.3) | (0.2) | (0.1) | (0.1) | 0.8 |
|    Reorganization expense | (0.8) | (7.1) | (7.0) | (7.2) | 0.0 | 0.0 |
|    Cancellation of debt income | 0.0 | 0.0 | 0.0 | 42.5 | 0.0 | 0.0 |
|      Total | (13.9) | (19.2) | (19.3) | 32.4 | 0.2 | (0.5) |
| Income (loss) before income taxes | (7.9) | (14.0) | (17.6) | 45.8 | 18.5 | 19.7 |
| Income taxes | 0.0 | 0.0 | 0.0 | 3.4 | 6.0 | 6.0 |
| Net income (loss) | (7.9) % | (14.1) % | (17.6) % | 42.4 % | 12.6 % | 13.7 % |
| EBITDA: |  |  |  |  |  |  |
|    Income from operations | 6.1 % | 5.1 % | 1.7 % | 13.4 % | 18.3 % | 20.2 % |
|    Depreciation | 6.8 | 7.0 | 7.3 | 5.1 | 3.7 | 3.3 |
|    Amortization (operating only) | 0.5 | 0.3 | 0.3 | 0.3 | 0.1 | 0.0 |
|      EBITDA | 13.4 % | 12.4 % | 9.3 % | 18.8 % | 22.0 % | 23.5 % |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Statements of Cash Flow
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income from operations | 5,373 | 3,745 | 1,058 | 9,841 | 16,909 | 21,001 |
| Depreciation | 6,036 | 5,082 | 4,521 | 3,765 | 3,369 | 3,469 |
| Amortization (operating only), net | 401 | 251 | 177 | 196 | 56 | 30 |
| EBITDA | 11,810 | 9,078 | 5,756 | 13,802 | 20,334 | 24,500 |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (1,256) | 4,187 | (232) | (1,531) | (2,451) | (1,479) |
| Inventories | (543) | (1,267) | 2,662 | (646) | (2,029) | (1,511) |
| Prepaid expenses | (287) | (145) | 97 | 383 | (260) | (106) |
| Other current assets | 328 | (1,249) | 407 | 766 | (173) | (72) |
| Accounts payable | 188 | 1,097 | 882 | 2,192 | 1,285 | 644 |
| Accrued expenses | 147 | (583) | (556) | 319 | 456 | 299 |
| Net change in operating working capital | (1,423) | 2,040 | 3,260 | 1,483 | (3,172) | (2,225) |
| | | | | | | |
| Capital expenditures | (2,664) | (2,695) | (1,744) | (3,370) | (3,710) | (3,210) |
| Sales of P & E, excl. gains or losses on sales | – | 28 | 277 | 630 | 3,213 | – |
| Other assets | (184) | (339) | (46) | 144 | 1,324 | (114) |
| Post-retirement liability, excl. current portion | (2) | (2) | (38) | (10) | (30) | (22) |
| Other long-term liabilities | 101 | 75 | 51 | 84 | 62 | 110 |
| Cash provided (used) by discontinued operations | (17) | 130 | 35 | 150 | 108 | 1,751 |
| | | | | | | |
| Net cash provided (used) | 7,621 | 8,315 | 7,551 | 12,913 | 18,129 | 20,790 |
| | | | | | | |
| Nonoperating profit (loss) incl. income tax expense | (12,211) | (13,977) | (11,853) | (10,350) | (7,613) | (7,679) |
| Amortization of deferred financing costs | 1,249 | 251 | – | – | – | – |
| Deferred financing charges | (1,286) | (214) | – | – | – | – |
| Income taxes payable, net | (4) | 33 | 14 | (4) | – | – |
| Accrued interest | 5,824 | 5,468 | 5,684 | 56 | (68) | (43) |
| Accrued reorganization expense | – | 1,168 | 708 | (1,876) | | |
| Cancellation of debt income | – | – | – | – | – | – |
| Proceeds from sale of common stock | – | – | – | 9,700 | – | – |
| Term loans | (3,279) | 697 | (3,023) | (6,968) | (10,457) | (7,203) |
| Revolving line of credit | 2,263 | 3,587 | – | – | – | – |
| | | | | | | |
| Net cash flow | 177 | 5,328 | (919) | 3,471 | (9) | 5,865 |
| | | | | | | |
| Add cash on hand at beginning of period | 35 | 212 | 5,540 | 4,621 | 8,092 | 8,083 |
| Cash on hand at end of period | 212 | 5,540 | 4,621 | 8,092 | 8,083 | 13,948 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Balance Sheets
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 212 | 5,540 | 4,621 | 8,092 | 8,083 | 13,948 |
| Marketable securities | 214 | 38 | 155 | 155 | 155 | 155 |
| Trade receivables, net | 10,981 | 6,794 | 7,026 | 8,557 | 11,008 | 12,487 |
| Inventories | 9,330 | 10,597 | 7,935 | 8,581 | 10,610 | 12,121 |
| Prepaid expenses | 926 | 1,071 | 974 | 591 | 851 | 957 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Other current assets | 106 | 1,355 | 1,114 | 348 | 521 | 593 |
| Current assets of discontinued operations | 10 | 7 | 35 | – | – | – |
| Total current assets | 21,877 | 25,402 | 21,860 | 26,324 | 31,228 | 40,261 |
| Plant & equipment | | | | | | |
| Land | 1,817 | 2,255 | 2,168 | 2,216 | 856 | 856 |
| Buildings | 13,370 | 13,378 | 11,123 | 12,041 | 12,341 | 12,341 |
| Machinery & equipment | 110,723 | 112,022 | 103,461 | 99,188 | 102,598 | 105,808 |
| | 125,910 | 127,655 | 116,752 | 113,445 | 115,795 | 119,005 |
| Accumulated depreciation | 105,056 | 109,216 | 102,570 | 100,107 | 103,476 | 106,945 |
| Plant & equipment, net | 20,854 | 18,439 | 14,182 | 13,338 | 12,319 | 12,060 |
| Reorganization value (to be allocated) | – | – | – | 27,388 | 27,388 | 27,388 |
| Plant & equipment of discontinued operations | 1,338 | 1,231 | 1,143 | 907 | 799 | – |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| Deferred financing expenses | 37 | – | – | – | – | – |
| Other assets | 638 | 633 | 1,440 | 1,047 | 68 | 90 |
| | 52,367 | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Consolidated Balance Sheets (cont.)**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 6,558 | 3,391 | 4,816 | 5,297 | 6,582 | 7,226 |
| Accrued income taxes | (43) | (10) | 4 | – | – | – |
| Accrued interest expense | 7,954 | 199 | 162 | 217 | 149 | 106 |
| Accrued expenses excl. interest | | | | | | |
| and income taxes | 3,975 | 3,392 | 3,001 | 3,155 | 3,611 | 3,910 |
| Short-term debt | 10,632 | 18,219 | 18,429 | – | – | – |
| Current portion of long-term debt | 58,454 | 19,972 | 16,739 | 5,758 | 6,218 | 11,954 |
| Current liabilities of discontinued operations | 241 | 148 | 160 | – | – | – |
| Total current liabilities | 87,771 | 45,311 | 43,311 | 14,427 | 16,560 | 23,196 |
| Liabilities subject to compromise | – | 54,013 | 59,735 | – | – | |
| Long-term debt, net of current portion | 5 | – | – | 23,856 | 12,939 | – |
| Long-term portion of post-retirement obligation | 258 | 256 | 218 | 208 | 178 | 156 |
| Other long-term liabilities | 176 | 144 | 82 | 94 | 102 | 150 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,242 | 1,247 | 35,915 | 35,915 | 35,915 |
| Additional paid-in-capital | 13,187 | 13,197 | 13,205 | – | – | – |
| Accumulated income (deficit) | (50,366) | (60,835) | (71,550) | 2,127 | 13,731 | 28,005 |
| Stockholders' equity (deficit) | (35,941) | (46,396) | (57,098) | 38,042 | 49,646 | 63,920 |
| | 52,367 | 53,328 | 46,248 | 76,627 | 79,425 | 87,422 |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Consolidated Outstanding Debt
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revolving loans | 10,632 | 14,219 | 14,219 | – | – | – |
| Equipment term loan | 9,167 | 6,667 | 4,167 | – | – | – |
| New credit agreement | – | – | – | 15,052 | 11,854 | 7,954 |
| Real estate term loan A | 10,022 | 9,289 | 8,556 | – | – | – |
| Real estate term loan B | 4,000 | 4,000 | 4,000 | – | – | – |
| New loan agreement | – | – | – | 11,672 | 6,065 | 4,000 |
| Debtor-in-possession | – | 4,000 | 4,000 | – | – | – |
| Retirement obligations | 6 | – | – | – | – | – |
| General unsecured claims | – | – | – | 2,890 | 1,238 | – |
| 12% Senior Subordinated Notes due July 31, 2009 | 34,177 | 34,177 | 34,177 | – | – | – |
| 12% Senior Subordinated Notes due December 31, 2013 | – | – | – | – | – | – |
| 13% Junior Subordinated Note | 347 | 347 | 347 | – | – | – |
| Redeemable preferred stock | 660 | 660 | 660 | – | – | – |
| Other | 80 | 16 | 226 | – | – | – |
| Total debt | 69,091 | 73,375 | 70,352 | 29,614 | 19,157 | 11,954 |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Rubber Group Statements of Operations
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | 74,587 | 62,278 | 51,261 | 58,173 | 70,653 | 79,748 |
| Cost of sales | 63,039 | 52,173 | 44,794 | 45,026 | 51,566 | 56,686 |
| Gross profit | 11,548 | 10,105 | 6,467 | 13,147 | 19,087 | 23,062 |
| Selling & administrative expense | 3,573 | 2,921 | 2,445 | 2,423 | 2,622 | 2,786 |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| EBITDA: | | | | | | |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| Depreciation | 5,335 | 4,509 | 4,031 | 3,264 | 2,777 | 2,783 |
| Amortization (operating only) | 392 | 237 | 164 | 177 | 56 | 30 |
| EBITDA | 13,702 | 11,930 | 8,217 | 14,165 | 19,298 | 23,089 |

**Rubber Group Statements of Operations
(expressed as a percent of net sales)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 84.5 | 83.8 | 87.4 | 77.4 | 73.0 | 71.1 |
| Gross profit | 15.5 | 16.2 | 12.6 | 22.6 | 27.0 | 28.9 |
| Selling & administrative expense | 4.8 | 4.7 | 4.8 | 4.2 | 3.7 | 3.5 |
| Income from operations | 10.7 % | 11.5 % | 7.8 % | 18.4 % | 23.3 % | 25.4 % |
| EBITDA: | | | | | | |
|   Income from operations | 10.7 % | 11.5 % | 7.8 % | 18.4 % | 23.3 % | 25.4 % |
|   Depreciation | 7.2 | 7.2 | 7.9 | 5.6 | 3.9 | 3.5 |
|   Amortization (operating only) | 0.5 | 0.4 | 0.3 | 0.3 | 0.1 | 0.0 |
|     EBITDA | 18.4 % | 19.2 % | 16.0 % | 24.3 % | 27.3 % | 29.0 % |

# LEXINGTON PRECISION CORPORATION
# AND SUBSIDIARY

## Rubber Group Statements of Cash Flows
### (in thousands of dollars)

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income from operations | 7,975 | 7,184 | 4,022 | 10,724 | 16,465 | 20,276 |
| Depreciation | 5,335 | 4,509 | 4,031 | 3,264 | 2,777 | 2,783 |
| Amortization (operating only) | 392 | 237 | 164 | 177 | 56 | 30 |
| EBITDA | 13,702 | 11,930 | 8,217 | 14,165 | 19,298 | 23,089 |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (728) | 3,763 | (662) | (1,234) | (1,776) | (1,210) |
| Inventories | (288) | (826) | 1,925 | (517) | (1,185) | (1,167) |
| Prepaid expenses | (20) | (51) | 134 | 190 | (115) | (73) |
| Other current assets | 430 | (1,359) | 390 | 696 | (72) | (59) |
| Accounts payable | 177 | 1,213 | 628 | 1,749 | 793 | 446 |
| Accrued expenses | (91) | 203 | (396) | 142 | 225 | 187 |
| Net change in operating working capital | (520) | 2,943 | 2,019 | 1,026 | (2,130) | (1,876) |
| Capital expenditures | (2,068) | (2,343) | (1,462) | (2,891) | (2,700) | (2,450) |
| Sales of P & E, excl. gains or losses on sales | – | 6 | 159 | 630 | 3,213 | – |
| Other assets | (337) | (358) | (97) | 144 | 1,324 | (114) |
| Post-retirement liability, excl. current portion | (12) | (9) | (27) | – | (12) | (12) |
| Other long-term liabilities | 101 | 75 | 51 | 84 | 62 | 110 |
| Net cash provided (used) | 10,866 | 12,244 | 8,860 | 13,158 | 19,055 | 18,747 |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Rubber Group Balance Sheets
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 51 | 27 | 26 | 26 | 26 | 26 |
| Trade receivables, net | 8,961 | 5,198 | 5,860 | 7,094 | 8,870 | 10,080 |
| Inventories | 7,268 | 8,094 | 6,169 | 6,686 | 7,871 | 9,038 |
| Prepaid expenses | 646 | 697 | 563 | 373 | 488 | 561 |
| Other current assets | (94) | 1,265 | 1,041 | 345 | 417 | 476 |
| Total current assets | 16,832 | 15,281 | 13,659 | 14,524 | 17,672 | 20,181 |
| Plant & equipment | | | | | | |
| Land | 1,696 | 2,134 | 2,047 | 2,095 | 735 | 735 |
| Buildings | 11,012 | 11,012 | 8,739 | 9,641 | 9,941 | 9,941 |
| Machinery & equipment | 85,356 | 86,751 | 78,052 | 73,316 | 75,716 | 78,166 |
| | 98,064 | 99,897 | 88,838 | 85,052 | 86,392 | 88,842 |
| Accumulated depreciation | 80,780 | 84,785 | 77,657 | 74,693 | 77,470 | 80,253 |
| Plant & equipment, net | 17,284 | 15,112 | 11,181 | 10,359 | 8,922 | 8,589 |
| Goodwill | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 | 7,623 |
| Other assets | 497 | 511 | 1,367 | 974 | (5) | 17 |
| | 42,236 | 38,527 | 33,830 | 33,480 | 34,212 | 36,410 |
| **Liabilities & Invested Capital:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 4,353 | 1,452 | 2,080 | 3,829 | 4,622 | 5,068 |
| Accrued operating expenses | 2,138 | 2,341 | 1,945 | 2,087 | 2,312 | 2,499 |
| Total current liabilities | 6,491 | 3,793 | 4,025 | 5,916 | 6,934 | 7,567 |
| Liabilities subject to compromise | – | 4,114 | 4,114 | – | – | – |
| Long-term portion of post-retirement obligation | 170 | 161 | 134 | 134 | 122 | 110 |
| Other long-term liabilities | 176 | 144 | 82 | 94 | 102 | 150 |
| Invested capital | 35,399 | 30,315 | 25,475 | 27,402 | 27,054 | 28,583 |
| | 42,236 | 38,527 | 33,830 | 33,480 | 34,212 | 36,410 |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Metals Group Statements of Operations
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net product sales | 13,821 | 10,751 | 10,306 | 15,103 | 21,632 | 24,350 |
| Cost of product sales | 13,490 | 10,934 | 10,674 | 13,573 | 18,630 | 20,939 |
| Gross profit | 331 | (183) | (368) | 1,530 | 3,002 | 3,411 |
| Selling & administrative expense | 523 | 558 | 359 | 420 | 566 | 634 |
| Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
| EBITDA: | | | | | | |
|    Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
|    Depreciation | 682 | 536 | 452 | 464 | 586 | 680 |
|    Amortization (operating only) | – | – | – | – | – | – |
|     EBITDA | 490 | (205) | (275) | 1,574 | 3,022 | 3,457 |

## LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Metals Group Statements of Operations
### (expressed as a percent of net sales)

|  | Actual | | Estimate | Projected | | |
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| Net sales | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 100.0 % |
| Cost of sales | 97.6 | 101.7 | 103.6 | 89.9 | 86.1 | 86.0 |
| Gross profit | 2.4 | (1.7) | (3.6) | 10.1 | 13.9 | 14.0 |
| Selling & administrative expense | 3.8 | 5.2 | 3.5 | 2.8 | 2.6 | 2.6 |
| Income (loss) from operations | (1.4) % | (6.9) % | (7.1) % | 7.3 % | 11.3 % | 11.4 % |
| EBITDA: | | | | | | |
| Income (loss) from operations | (1.4) % | (6.9) % | (7.1) % | 7.3 % | 11.3 % | 11.4 % |
| Depreciation | 4.9 | 5.0 | 4.4 | 3.1 | 2.7 | 2.8 |
| Amortization (operating only) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| EBITDA | 3.5 % | (1.9) % | (2.7) % | 10.4 % | 14.0 % | 14.2 % |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Metals Group Statements of Cash Flows
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Income (loss) from operations | (192) | (741) | (727) | 1,110 | 2,436 | 2,777 |
| Depreciation | 682 | 536 | 452 | 464 | 586 | 680 |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | 490 | (205) | (275) | 1,574 | 3,022 | 3,457 |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (401) | 424 | 430 | (297) | (675) | (269) |
| Inventories | (255) | (441) | 737 | (129) | (844) | (344) |
| Prepaid expenses | (67) | 132 | (2) | 33 | (83) | (33) |
| Other current assets | 38 | (84) | 21 | 60 | (101) | (13) |
| Accounts payable | 469 | (289) | 189 | 698 | 467 | 173 |
| Accrued expenses | 41 | (73) | 7 | 57 | 199 | 78 |
| Net change in operating working capital | (175) | (331) | 1,382 | 422 | (1,037) | (408) |
| Capital expenditures | (519) | (333) | (282) | (479) | (1,000) | (750) |
| Sales of P & E, excl. gains or losses on sales | – | 22 | 118 | – | – | – |
| Other assets | (61) | 28 | 33 | – | – | – |
| Post-retirement liability, excl. current portion | 10 | 7 | (11) | (10) | (18) | (10) |
| Net cash provided (used) | (255) | (812) | 965 | 1,507 | 967 | 2,289 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Metals Group Balance Sheets**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 1 | 2 | 2 | 2 | 2 | 2 |
| Trade receivables, net | 2,020 | 1,596 | 1,166 | 1,463 | 2,138 | 2,407 |
| Inventories | 2,062 | 2,503 | 1,766 | 1,895 | 2,739 | 3,083 |
| Prepaid expenses | 343 | 211 | 213 | 180 | 263 | 296 |
| Other current assets | – | 84 | 63 | 3 | 104 | 117 |
| Total current assets | 4,426 | 4,396 | 3,210 | 3,543 | 5,246 | 5,905 |
| Plant & equipment | | | | | | |
| Land | 121 | 121 | 121 | 121 | 121 | 121 |
| Buildings | 2,325 | 2,330 | 2,348 | 2,364 | 2,364 | 2,364 |
| Machinery & equipment | 25,280 | 25,170 | 25,308 | 25,771 | 26,771 | 27,521 |
| | 27,726 | 27,621 | 27,777 | 28,256 | 29,256 | 30,006 |
| Accumulated depreciation | 24,251 | 24,371 | 24,815 | 25,279 | 25,865 | 26,545 |
| Plant & equipment, net | 3,475 | 3,250 | 2,962 | 2,977 | 3,391 | 3,461 |
| Other assets | 62 | 34 | 1 | 1 | 1 | 1 |
| | 7,963 | 7,680 | 6,173 | 6,521 | 8,638 | 9,367 |
| **Liabilities & Invested Capital:** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 1,538 | 21 | 210 | 908 | 1,375 | 1,548 |
| Accrued operating expenses | 433 | 360 | 367 | 424 | 623 | 701 |
| Total current liabilities | 1,971 | 381 | 577 | 1,332 | 1,998 | 2,249 |
| Liabilities subject to compromise | – | 1,228 | 1,228 | – | – | – |
| Long-term portion of post-retirement obligation | 88 | 95 | 94 | 74 | 56 | 46 |
| Invested capital | 5,904 | 5,976 | 4,274 | 5,115 | 6,584 | 7,072 |
| | 7,963 | 7,680 | 6,173 | 6,521 | 8,638 | 9,367 |

# LEXINGTON PRECISION CORPORATION
# AND SUBSIDIARY

## Corporate Office Statements of Operations
## (in thousands of dollars)

|  | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | – | – | – | – | – | – |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2,410 | 2,210 | 2,237 | 1,993 | 1,992 | 2,052 |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| EBITDA: | | | | | | |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| Depreciation | 19 | 37 | 38 | 37 | 6 | 6 |
| Amortization (operating only) | 9 | 14 | 13 | 19 | – | – |
| EBITDA | (2,382) | (2,159) | (2,186) | (1,937) | (1,986) | (2,046) |

# LEXINGTON PRECISION CORPORATION
# AND SUBSIDIARY

## Corporate Office Statements of Operations
## (expressed as a percent of net sales)

| | Actual | | Estimate | Projected | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Net sales | – % | – % | – % | – % | – % | – % |
| Cost of sales | – | – | – | – | – | – |
| Gross profit from operations | – | – | – | – | – | – |
| Selling & administrative expense | 2.7 | 3.0 | 3.6 | 2.7 | 2.2 | 2.0 |
| Loss from operations | (2.7) % | (3.0) % | (3.6) % | (2.7) % | (2.2) % | (2.0) % |
| EBITDA: | | | | | | |
| Loss from operations | (2.7) % | (3.0) % | (3.6) % | (2.7) % | (2.2) % | (2.0) % |
| Depreciation | – | 0.1 | 0.1 | 0.1 | – | – |
| Amortization (operating only) | – | – | – | – | – | – |
| EBITDA | (2.7) % | (2.9) % | (3.5) % | (2.6) % | (2.2) % | (2.0) % |

# LEXINGTON PRECISION CORPORATION
# AND SUBSIDIARY

### Corporate Office Statements of Cash Flows
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Loss from operations | (2,410) | (2,210) | (2,237) | (1,993) | (1,992) | (2,052) |
| Depreciation | 19 | 37 | 38 | 37 | 6 | 6 |
| Amortization (operating only) | 9 | 14 | 13 | 19 | – | – |
| EBITDA | (2,382) | (2,159) | (2,186) | (1,937) | (1,986) | (2,046) |
| | | | | | | |
| Changes in operating working capital accounts: | | | | | | |
| Accounts receivable, net | (127) | – | – | – | – | – |
| Prepaid expenses | (200) | (226) | (35) | 160 | (62) | – |
| Other current assets | (140) | 194 | (4) | 10 | – | – |
| Accounts payable | (458) | 173 | 65 | (255) | 25 | 25 |
| Accrued expenses | 197 | (713) | (167) | 120 | 32 | 34 |
| Net change in operating working capital | (728) | (572) | (141) | 35 | (5) | 59 |
| | | | | | | |
| Capital expenditures | (77) | (19) | – | – | (10) | (10) |
| Other assets | 214 | (9) | 18 | – | – | – |
| Discontinued operations | (87) | – | – | – | – | – |
| | | | | | | |
| Net cash provided (used) | (3,060) | (2,759) | (2,309) | (1,902) | (2,001) | (1,997) |
| | | | | | | |
| Nonoperating loss incl. income tax expense | (12,211) | (14,465) | (12,052) | (10,350) | (7,613) | (7,679) |
| Amortization of deferred financing costs | 1,249 | 251 | – | – | – | – |
| Deferred financing charges | (1,286) | (214) | – | – | – | – |
| Income taxes payable, net | (4) | 33 | 14 | (4) | – | – |
| Accrued interest | 5,824 | 5,468 | 5,684 | 56 | (68) | (43) |
| Accrued reorganization expense | – | 1,168 | 708 | (1,876) | | |
| Proceeds from sale of common stock | – | – | – | 9,700 | – | – |
| Term loans | (3,279) | 697 | (3,023) | (6,968) | (10,457) | (7,203) |
| Revolving line of credit | 2,263 | 3,587 | – | – | – | – |
| | | | | | | |
| Net cash flow | (10,504) | (6,234) | (10,978) | (11,344) | (20,139) | (16,922) |
| | | | | | | |
| Add cash on hand at beginning of period | (17) | 160 | 5,511 | 4,593 | 8,064 | 8,055 |
| Less cash on hand at end of period | 160 | 5,511 | 4,593 | 8,064 | 8,055 | 13,920 |
| | | | | | | |
| Net cash transferred to (from) corporate | (10,681) | (11,585) | (10,060) | (14,815) | (20,130) | (22,787) |

# LEXINGTON PRECISION CORPORATION
## AND SUBSIDIARY

### Corporate Office Balance Sheets
### (in thousands of dollars)

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| **Assets:** | | | | | | |
| Current assets: | | | | | | |
| Cash | 160 | 5,511 | 4,593 | 8,064 | 8,055 | 13,920 |
| Marketable securities | 214 | 38 | 155 | 155 | 155 | 155 |
| Trade receivables, net | – | – | – | – | – | – |
| Inventories | – | – | – | – | – | – |
| Prepaid expenses | (63) | 163 | 198 | 38 | 100 | 100 |
| Deferred income taxes | 98 | – | – | – | – | – |
| Other current assets | 200 | 6 | 10 | – | – | – |
| Total current assets | 609 | 5,718 | 4,956 | 8,257 | 8,310 | 14,175 |
| Plant & equipment | | | | | | |
| Land | – | – | – | – | – | – |
| Buildings | 33 | 36 | 36 | 36 | 36 | 36 |
| Machinery & equipment | 87 | 101 | 101 | 101 | 111 | 121 |
| | 120 | 137 | 137 | 137 | 147 | 157 |
| Accumulated depreciation | 25 | 60 | 98 | 135 | 141 | 147 |
| Plant & equipment, net | 95 | 77 | 39 | 2 | 6 | 10 |
| Reorganization value (to be allocated) | – | – | – | 27,388 | 27,388 | 27,388 |
| Deferred financing expenses | 37 | – | – | – | – | – |
| Other assets | 79 | 88 | 72 | 72 | 72 | 72 |
| | 820 | 5,883 | 5,067 | 35,719 | 35,776 | 41,645 |

**LEXINGTON PRECISION CORPORATION**
**AND SUBSIDIARY**

**Corporate Office Balance Sheets (cont.)**
**(in thousands of dollars)**

| | Actual | | Estimate | Projected | | |
|---|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
| **Liabilities & Stockholders' Equity (Deficit):** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | 667 | 1,918 | 2,472 | 560 | 585 | 610 |
| Accrued income taxes | (43) | (10) | 4 | | – | – |
| Accrued interest expense | 7,954 | 199 | 161 | 217 | 149 | 106 |
| Accrued expenses excl. interest and income taxes | 1,404 | 691 | 837 | 644 | 676 | 710 |
| Short-term debt | 10,632 | 18,219 | 18,429 | | | |
| Current portion of long-term debt | 58,454 | 19,972 | 16,739 | 5,758 | 7,203 | 11,954 |
| Total current liabilities | 79,068 | 40,989 | 38,642 | 7,179 | 8,613 | 13,380 |
| Liabilities subject to compromise | – | 48,497 | 54,219 | – | – | – |
| Long-term debt, net of current portion | 5 | – | – | 23,856 | 11,954 | – |
| Deferred income taxes | 98 | – | – | – | – | – |
| Intercompany | (42,410) | (37,207) | (30,775) | (33,358) | (34,437) | (35,655) |
| Stockholders' equity (deficit): | | | | | | |
| Common stock | 1,238 | 1,242 | 1,247 | 35,915 | 35,915 | 35,915 |
| Add'l paid-in-capital | 13,187 | 13,197 | 13,205 | | | |
| Accumulated deficit | (50,366) | (60,835) | (71,471) | 2,127 | 13,731 | 28,005 |
| Stockholders' equity (deficit) | (35,941) | (46,396) | (57,019) | 38,042 | 49,646 | 63,920 |
| | 820 | 5,883 | 5,067 | 35,719 | 35,776 | 41,645 |

<u>**Exhibit G**</u>

**Debtors' Liquidation Analysis**

**LEXINGTON PRECISION CORPORATION**

**Liquidation Analysis as of February 28, 2010**
**(in thousands of dollars)**

|  | LRGI | LPC | Debtors |
|---|---|---|---|
| Net proceeds of liquidation before related fees | 30,546 | 9,054 | 39,601 |
| Trustee's commission (3%) | (916) | (272) | (1,188) |
| Legal fees | (600) | (600) | (1,200) |
| Net proceeds of liquidation | 29,030 | 8,183 | 37,213 |
| Secured debt |  |  | (30,515) |
| Interest on secured debt during liquidation period |  |  | (695) |
| Debtor-in-possession loan |  |  | (4,031) |
| Interest on debtor-in-possession loan during liquidation period |  |  | (200) |
| Net proceeds before payment of post-petition accounts payable and chapter 11 professional fees |  |  | 1,772 |
| Chapter 11 professional fees |  |  | (1,718) |
| Shortfall |  |  | 54 |
| Net proceeds of liquidation available for unsecured creditors |  |  | 54 |

## <u>Exhibit H</u>

**Summary of Amended and Restated
Secured CapitalSource Credit Agreement**

# Lexington Precision Corporation

**Summary of Terms of Amended and Restated Credit and Security Agreement (the "Credit Agreement").** *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.*

| | |
|---|---|
| **Lenders** | CapitalSource Finance LLC ("CS") and Webster Business Credit Corporation ("Webster" and, together with CS, the "Lenders"). |
| **Debtors** | Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG" and, together with LPC, the "Borrowers"). |
| **Agent** | CS, as administrative agent and collateral agent (the "Agent"). |
| **Equity Sponsor** | Aurora Resurgence Management Partners LLC or an affiliate thereof (the "Equity Sponsor"). |
| **Closing Date** | The date on which all of the conditions precedent of the Credit Agreement are fully satisfied. |
| **Governing Law** | New York |
| **Commitments** | <u>Equipment Term Loan</u>:   a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| | <u>Revolving Credit Commitments</u>:   a credit facility in the maximum aggregate principal amount of Revolving Credit Advances and Letters of Credit that may be outstanding at any one time, which as of the Closing Date equals $[733,000], less any L/C Disbursements and less any amounts that may expire and not be renewed under any Letters of Credit. |
| **Term / Maturity** | 3-year facility maturing on [_____], 2013. |
| **Priority Ranking** | First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on non-real estate collateral and second-lien on real estate collateral). |
| **Interest** | LIBOR <u>plus</u> the Applicable Margin. |
| | LIBOR floor of 2.5%. |
| | Applicable Margin of 5.5% for the first full year of the credit facility. Thereafter, the Applicable Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:<br>(i) if Leverage Ratio is greater than 2.5x, 6.5%;<br>(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, |

6.0%;
(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 5.5%;
(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 4.5%; and
(v) if Leverage Ratio is less than or equal to 1.75x, 4.0%.

<u>Default Interest Rate:</u> 2.0% per annum plus the Applicable Rate.

**Fees**

<u>Commitment Fee:</u>   1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date.

<u>Letter of Credit Fees:</u>   5.5% per annum (increasing by 2.0% per annum from and after the occurrence of, and during the continuation of, any Event of Default) for each Letter of Credit, together with any and all other fees and expenses in connection therewith, payable quarterly in arrears.

<u>Audit Fees:</u>   Agent entitled to conduct as many Audit Fees as it wishes. However, provided no Default or Event of Default exists and is continuing and the Borrowers' Leverage Ratio as of the last day of each Fiscal Quarter of the applicable Fiscal Year is 2.0:1.0 or less, then Borrowers shall only reimburse Agent for the lesser of (i) $25,000 or (ii) the actual costs and expenses incurred by Agent in connection with such field audit.

**Amortization**

Amortization payments in the following amounts are payable: (i) $208,333.33 per month for the first full twenty-four (24) months following the Closing Date and (ii) $325,000 per month for each month thereafter until the end of the Term.

**Mandatory Prepayments**

<u>Extraordinary Receipts:</u>   mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement.

<u>Dispositions/Sales:</u>   mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of

business).

Casualty Event Proceeds:    Extraordinary Receipts consisting of proceeds from insurance policies covering Equipment or Real Property damage, destruction or casualty may be reinvested by the Borrowers to repair or replace such damaged Equipment or Real Property, provided, among other things, that no Default or Event of Default exist and be continuing and that the cost of the repairs or replacements do not exceed the Materiality Threshold ($250,000).

Excess Cash Flow:    mandatory prepayment of 50% of Excess Cash Flow payable quarterly (excepting therefrom any Excess Cash Flow, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Term Loan Agreement and subject thereto), unless Leverage Ratio for such quarter is less than 2.5:1.0.

Equity Issuances / Debt Incurrence:    mandatory prepayment of 100% of Net Cash Proceeds of any Equity Interest issuances or Indebtedness incurrence by any Borrower; provided that so long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or incur Indebtedness under the Junior Lien Facility in an aggregate principal amount not to exceed $5,000,000; provided, further, that any Indebtedness incurred under the Junior Lien Facility shall not exceed $3,000,000.

| | |
|---|---|
| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |
| **Negative Covenants** | Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others. |
| **Financial Covenants** | Fixed Charge Coverage Ratio:    not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date.<br><br>Capital Expenditures:    maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year. |

Leverage Ratio:
- 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to [_____], 2011;
- 3.5:1.0 for each calendar month ending after [_____], 2011 and prior to [_____], 2012; and
- 3.0:1.0 for each calendar month ending after [_____], 2012 through the expiration of the Term.

Minimum Liquidity:   not less than $2,000,000 at any time.

Minimum EBITDA:   not less than (i) $600,000 from the first day of the first full calendar month following the Closing Date to the last day of such calendar month; (ii) $1,333,333 from the first day of the second full calendar month following the Closing Date to the last day of such calendar month; (iii) $8,000,000 on an annualized basis (as measured from the first full day of the first full calendar month following the Closing Date) beginning on the last day of the third full calendar month following the Closing Date through the last day of the calendar month that is the first anniversary of the Closing Date and (iv) $9,000,000 thereafter.

| | |
|---|---|
| **Conditions Precedent** | Customary conditions precedent for a credit facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity in an amount of at least $3,000,000. |
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others. |
| **Equity Investment** | Equity Sponsor shall have made an Equity Investment in an amount not less than $[9,700,000] in the Borrowers as of the Closing Date. |

**Junior Lien Facility**    Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent.

**Board of Directors**    Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).    As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member).

**Board Observation**    A Lender Representative selected by the Agent may attend meetings of each Governing Body.    So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement.

## Exhibit I

**Summary of Amended and Restated Secured CSE Loan Agreement**

**Lexington Precision Corporation**

**Summary of Terms of Amended and Restated Loan and Security Agreement (the "Loan Agreement").** *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.*

| | |
|---|---|
| **Lenders** | CSE Mortgage LLC ("CSE") and DMD Special Situations, LLC ("DMD" and, together with CSE, the "Lenders"). |
| **Debtors** | Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG" and, together with LPC, the "Borrowers"). |
| **Agent** | CSE, as administrative agent and collateral agent (the "Agent"). |
| **Equity Sponsor** | Aurora Resurgence Management Partners LLC or an affiliate thereof (the "Equity Sponsor"). |
| **Closing Date** | The date on which all of the conditions precedent of the Loan Agreement are fully satisfied. |
| **Governing Law** | New York |
| **Commitments** | Term Loan A:  a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| | Term Loan B:  a term loan, including Capitalized Expenses allocated pro rata between Term Loan B, Term Loan A and the Equipment Term Loan, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[_____]. |
| **Term / Maturity** | 3-year facility maturing on [_____], 2013. |
| **Priority Ranking** | First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on real estate collateral and second-lien on non-real estate collateral). |
| | Payment subordination of Term Loan B (see "Amortization" below). |
| **Interest** | Term Loan A:  LIBOR plus Applicable Term A Margin.  LIBOR floor of 2.5%. |
| | Applicable Term A Margin of 7.0% for the first full year of the loan facility.  Thereafter, the Applicable Term A Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:<br>(i) if Leverage Ratio is greater than 2.5x, 8.0%; |

(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 7.5%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 7.0%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 6.0%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 5.5%.

Term Loan B:   Base Rate plus Applicable Term B Margin.   Base Rate floor of 5.0%

Applicable Term B Margin of 10.5% for the first full year of the loan facility.   Thereafter, the Applicable Term B Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:

(i) if Leverage Ratio is greater than 2.5x, 11.5%;

(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 11.0%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 10.5%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 9.5%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 9.0%.

Default Interest Rate: 2.0% per annum plus the Applicable Rate.

| | |
|---|---|
| **Fees** | Commitment Fee:   1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date. |
| **Amortization; Repayment** | Amortization of Term Loan A<br>Payments in the following amounts are payable: (i) $61,111.11 per month for the first full twenty-four (24) months following the Closing Date and (ii) $90,000 per month for each month thereafter until the end of the Term.<br><br>Repayment of Term Loan B<br>Entire principal balance of the Term Loan B due and payable in full as of the expiration of the Term.   The Term Loan B facility may be voluntarily prepaid, provided that either (i) the Term Loan A and the Equipment Loan under the Amended and Restated Credit and Security Agreement are repaid in full in cash or (ii) the Borrowers have already prepaid an aggregate principal amount of not less than $3,000,000 of the Term Loan A and Borrowers otherwise comply with certain "Restricted Payment Conditions" (e.g., no Event of Default in existence or as a result thereof). |

| **Mandatory Prepayments** | <u>Extraordinary Receipts</u>:   mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement. |
|---|---|

<u>Dispositions/Sales</u>:   mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of business).

<u>Casualty Event Proceeds</u> Extraordinary Receipts consisting of proceeds from insurance policies covering Equipment or Real Property damage, destruction or casualty may be reinvested by the Borrowers to repair or replace such damaged Equipment or Real Property, provided, among other things, that no Default or Event of Default exist and be continuing and that the cost of the repairs or replacements do not exceed the Materiality Threshold ($250,000).

<u>Excess Cash Flow</u>:   mandatory prepayment of 50% of Excess Cash Flow payable quarterly, unless Leverage Ratio for such quarter is less than 2.5:1.0.

<u>Equity Issuances / Debt Incurrence</u>:   mandatory prepayment of 100% of any Equity Interest issuances or Indebtedness incurrence by any Borrower (excepting therefrom any Net Cash Proceeds, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject thereto); <u>provided</u> that so long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or incur Indebtedness under the Junior Lien Facility in an aggregate principal amount not to exceed $5,000,000; <u>provided</u>, <u>further</u>, that any Indebtedness incurred under the Junior Lien Facility shall not exceed $3,000,000.

| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |
|---|---|

**Negative Covenants**    Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others.

**Financial Covenants**    <u>Fixed Charge Coverage Ratio</u>:   not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date.

<u>Capital Expenditures</u>:   maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year.

<u>Leverage Ratio</u>:
- 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to [____], 2011;
- 3.5:1.0 for each calendar month ending after [____], 2011 and prior to [____], 2012; and
- 3.0:1.0 for each calendar month ending after [____], 2012 through the expiration of the Term.
<u>Minimum Liquidity</u>:   not less than $2,000,000 at any time.

<u>Minimum EBITDA</u>:   not less than (i) $600,000 from the first day of the first full calendar month following the Closing Date to the last day of such calendar month; (ii) $1,333,333 from the first day of the second full calendar month following the Closing Date to the last day of such calendar month; (iii) $8,000,000 on an annualized basis (as measured from the first full day of the first full calendar month following the Closing Date) beginning on the last day of the third full calendar month following the Closing Date through the last day of the calendar month that is the first anniversary of the Closing Date and (iv) $9,000,000 thereafter.

**Conditions Precedent**    Customary conditions precedent for a loan facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity

in an amount of at least $3,000,000.

| | |
|---|---|
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others. |
| **Equity Investment** | Equity Sponsor shall have made an Equity Investment in an amount not less than $[9,700,000] in the Borrowers as of the Closing Date. |
| **Junior Lien Facility** | Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent. |
| **Board of Directors** | Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).   As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member). |
| **Board Observation** | A Lender Representative selected by the Agent may attend meetings of each Governing Body.   So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement. |

<u>**Exhibit J**</u>

**Letter from the Debtors to Holders of Claims in Class 17**

May 26, 2010

To:   Holders of General Unsecured Claims
      against Lexington Rubber Group, Inc. (Class 17)

Enclosed you will find our proposed Plan of Reorganization, a disclosure statement describing the Plan in detail, and a ballot for voting.

We are pleased to be able to present a plan of reorganization that offers you the option to receive, over a 27-month period, payment of 100% of your claim plus interest at an effective rate of interest of 6%. These payments will be completed nine months before the maturity of our restructured secured debt. Our Plan also offers you the option of receiving, as an alternative to the quarterly payments, an immediate cash payment equal to 51% of your claim.

The Plan, and the recovery for Class 17, is being made possible by a substantial infusion of cash from an affiliate of Aurora Capital Group, who will become the majority shareholder of Lexington Precision Corporation upon its emergence from Chapter 11. Existing management will stay in place. The restructuring of our balance sheet and operations in Chapter 11 has enabled us to strengthen the Company, and we look forward to substantial growth in our business, which should offer an opportunity for increased business for our suppliers.

In a separate letter, counsel to the Official Committee of Unsecured Creditors Committee recommends that Class 17 creditors vote to reject the Plan. We strongly disagree with their assertions.

Our Plan is the only viable plan of reorganization available to the Company at this time. To delay its implementation will only delay payments to you.

We again urge you to vote in favor of the Plan and look forward to commencing payments to holders of allowed claims as soon as the Plan is approved by the Bankruptcy Court.

Sincerely,


Michael A. Lubin
Chairman of the Board


Warren Delano
President

<u>**Exhibit K**</u>

**Letter from the Creditors' Committee to Holders of Claims in Class 17**

The Official Committee of Unsecured Creditors
of Lexington Precision Corp., <u>et al</u>.
c/o Andrews Kurth LLP
450 Lexington Avenue
New York, New York 10017

May 26, 2010

TO:     HOLDERS OF GENERAL UNSECURED
        CLAIMS AGAINST LEXINGTON RUBBER
        GROUP, INC. ("<u>Lexington Rubber</u>") (CLASS 17)

RE:     <u>Lexington Precision Corporation, et al., (the "Debtors") Case No. 08-11153 (SCC)</u>

        The Official Committee of Unsecured Creditors (the "<u>Committee</u>") has been appointed as

your representative in the Debtors' Chapter 11 cases.   The Debtors are seeking to obtain

confirmation of their Fourth Amended Joint Plan of Reorganization, dated April 19, 2010

[Docket No. 869] (the "<u>Proposed Plan</u>").  The Debtors seek votes on the Proposed Plan from all

holders of Class 17 claims (the "<u>Class 17 Claim Holders</u>") against Lexington Rubber.

     **THE COMMITTEE RECOMMENDS THAT CLASS 17 VOTE <u>AGAINST</u> THE**

**PROPOSED PLAN.**

        Under the Proposed Plan, Class 17 Claim Holders would be entitled to receive either: (i)

a cash payment equal to 51% of their Allowed Claims, or (ii) an initial payment equal to 10% of

their Allowed Claims, followed by 9 equal quarterly payments of 10.75% of Allowed Claims

(the "<u>Proposed Recovery</u>").  Lexington Rubber is a solvent estate and unsecured claims against

Lexington Rubber are structurally senior to unsecured claims at Lexington Precision

Corporation. **THE COMMITTEE BELIEVES THAT UNDER THE PROPOSED PLAN,**

**THE PROPOSED RECOVERY FOR CLASS 17 CLAIM HOLDERS IS INADEQUATE**

**BECAUSE BOTH: (I) THE POST PETITION AND PRE EFFECTIVE DATE INTEREST AND (II) THE INTEREST RATE ON DEFERRED POST EFFECTIVE DATE PAYMENTS TO CLASS 17 ARE INADEQUATE.**

The deadline for receipt of the ballots on the Proposed Plan is July 2, 2010 at 5:00 PM (Eastern Daylight Time). The Committee urges you to vote **AGAINST** the Proposed Plan and submit your ballot so that it is received before July 2, 2010 at 5:00 PM (Eastern Daylight Time).

Should you have any questions about this case, the Proposed Plan or the voting process, please call either Paul N. Silverstein or Jonathan I. Levine at (212) 850-2800, counsel to the Committee at your convenience.

NYC:212892.7