WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **LEXINGTON PRECISION CORP., <u>et al.</u>,** | **Case No. 08-11153 (SCC)** |
| Debtors. | **(Jointly Administered)** |

**PLAN SUPPLEMENT FOR THE DEBTORS'**
**FOURTH AMENDED JOINT PLAN OF REORGANIZATION**
**<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED</u>**

In accordance with Section 13.9 of that certain proposed plan of reorganization,

dated May 26, 2010 (as it may further amended, modified, or supplemented, the "**<u>Plan</u>**"),[1] of

Lexington Precision Corporation and its debtor subsidiary, Lexington Rubber Group, Inc.,

attached hereto are the following documents:

| Tab | Document | Plan Exhibit or Schedule No. (if applicable) |
|---|---|---|
| A | Charter Amendment (including Terms of New LPC Common Stock) | |
| B | Securityholders Agreement | |
| C | List of Directors and Officers | |
| D | List of Executory Contracts to Be Rejected | Schedule 8.1 |

---

[1] *Debtors' Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, as Modified*, dated May 26, 2010 [Docket No. 894].  Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

| Tab | Document | Plan Exhibit or Schedule No. (if applicable) |
|---|---|---|
| E | List of Insurance Policies and Agreements to Be Rejected | Schedule 8.7 |
| F | Restructuring Transactions | |
| G | Stock Purchase Agreement | Exhibit 1.96 |
| H-1 | Revised Summary of Amended and Restated Secured CSE Loan Agreement | |
| H-2 | Revised Summary of Amended and Restated Secured CapitalSource Credit Agreement | |
| I-1 | Revised Amended and Restated Secured CSE Loan Agreement and | Exhibit 1.9 |
| I-2 | Revised Amended and Restated Secured CapitalSource Credit Agreement | Exhibit 1.7 |
| J-1 | Ancillary Documents Related to Amended and Restated Secured CSE Loan Agreement | |
| J-2 | Ancillary Documents Related to Amended and Restated Secured CapitalSource Credit Agreement | |
| K | Management Incentive Plan | |

Dated: June 22, 2010
New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Tab A**

**Charter Amendment**

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**LEXINGTON PRECISION CORPORATION**

The undersigned, for the purpose of amending and restating the Certificate of Incorporation of **Lexington Precision Corporation**, a Delaware corporation (the "**Corporation**"), does hereby certify that:

1.    The date of filing of the Corporation's original Certificate of Incorporation with the Secretary of State of the State of Delaware was April 25, 1966.

2.    This Amended and Restated Certificate of Incorporation has been duly adopted pursuant to Sections 242 and 245 of the Delaware General Corporation Law.

3.    The Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety as follows:

## ARTICLE I

### NAME OF CORPORATION

The name of this Corporation is:

**Lexington Precision Corporation**

## ARTICLE II

### REGISTERED OFFICE

The address of the registered office of the Corporation in the State of Delaware is 160 Greentree Drive, Suite 101, Dover, Delaware, 19904, Kent County, and the name of its registered agent at that address is National Registered Agents, Inc.

## ARTICLE III

### PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law (the "**DGCL**").

# ARTICLE IV

# AUTHORIZED CAPITAL STOCK

**SECTION A.** Authorized Shares.  The Corporation shall be authorized to issue two classes of shares of stock to be designated, respectively, "Preferred Stock" and "Common Stock."  The total number of shares that the Corporation shall have authority to issue is five million (5,000,000).

1.      Common Stock. The total number of shares of common stock the Corporation shall have authority to issue shall be four million nine hundred thousand (4,900,000), and each such share shall have a par value of one cent ($.01) per share (the "**Common Stock**").

2.      Preferred Stock.  The total number of shares of Preferred Stock that the Corporation shall have authority to issue shall be one hundred thousand (100,000) and all such shares shall have a par value of one cent ($.01) per share (the "**Preferred Stock**"). Preferred Stock may be issued from time to time in one or more series.

3.      The shares of Preferred Stock may be issued from time to time in one or more series.  Other than with respect to the specific series of Preferred Stock referenced above, the Board of Directors of the Corporation (the "**Board**") is hereby vested with authority to fix by resolution or resolutions prior to the issuance thereof, the designations and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including, without limitation, the dividend rate, conversion or exchange rights, redemption price and liquidation preference, of any series of shares of Preferred Stock, and to fix the number of shares constituting any such series, and to increase or decrease the number of shares of any such series (but not below the number of shares thereof then outstanding).  In case the number of shares of any such series shall be so decreased, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution or resolutions originally fixing the number of shares of such series.

4.      The shares of stock of the Corporation are subject to that certain Securityholders Agreement dated as of [_____ ____], 2010 among the Corporation and certain of its stockholders and optionholders, as the same may be supplemented, amended or otherwise modified from time to time (the "Securityholders Agreement").

5.      The Board shall not have the power to create a non-voting class of stock.  All classes of stock authorized and issued by the Corporation shall have some form of voting rights.

**SECTION B.** Common Stock.   The Common Stock shall have the powers, preferences, rights and restrictions as provided for under the DGCL and as provided herein:

1.      Voting Rights.  Except as otherwise required by law, at every annual or special meeting of stockholders of the Corporation, every holder of Common Stock

shall be entitled to one vote, in person or by proxy, for each share of Common Stock standing in his name on the books of the Corporation.

2.    <u>Liquidation, Dissolution or Winding-Up</u>.    In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment in full of the liquidation preference on any series of preferred stock designated by the Board, if any, the remaining assets and funds of the Corporation shall be divided among and paid to the holders of shares of Common Stock.

# ARTICLE V

## ANNUAL MEETINGS OF STOCKHOLDERS

The annual meeting of stockholders shall be held at such time, on such date and at such place (within or without the State of Delaware) as provided in the Bylaws of the Corporation.  Subject to any requirement of applicable law, the books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws of the Corporation.

# ARTICLE VI

## CALL OF SPECIAL MEETINGS OF STOCKHOLDERS

Special meetings of stockholders of the Corporation for any purpose or purposes may be called at any time (i) by a majority of the members of the Board or (ii) by a committee of the Board that has been duly designated by the Board and whose power and authority, as provided in a resolution by the Board or in the Bylaws of the Corporation, includes the power to call such meetings, but such special meetings of stockholders of the Corporation may not be called by any other person or persons or in any other manner; <u>provided</u>, <u>however</u>, that if and to the extent that any special meeting of stockholders may be called by any other person or persons specified in any certificate of designations filed under Section 151(g) of the Delaware General Corporation Law (or its successor statute as in effect from time to time), then such special meeting may also be called by the person or persons, in the manner, at the times and for the purposes so specified.

# ARTICLE VII

## STOCKHOLDER ACTION BY WRITTEN CONSENT

Any election of directors or other action by the stockholders of the Corporation that can be effected at an annual or special meeting of stockholders can be effected by written consent without a meeting so long as such written consent is signed by the holders of at least the number of shares required to approve such action at a duly held annual or special stockholders meeting.

## ARTICLE VIII

## ELECTION OF DIRECTORS

**SECTION A.** Ballot.  Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**SECTION B.** Stockholder Nominees.  Nominations by stockholders of persons for election to the Board shall be made only in accordance with the procedures set forth in the Bylaws of the Corporation.

**SECTION C.** Removal.  Subject to Article 7 of the Securityholders Agreement, any director, or the entire Board, may be removed from office with or without cause, at any time, and only by the affirmative vote of the holders of a majority of the shares of voting stock then outstanding.

**SECTION D.** Election.  The right of the stockholders to elect directors is subject to the Securityholders Agreement.

## ARTICLE IX

## LIABILITY OF DIRECTORS

**SECTION A.** No Personal Liability.  To the fullest extent permitted by the DGCL as the same exists or as may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages resulting from any action taken in such individual's capacity as a director, whether due to a breach of fiduciary duty or otherwise.

**SECTION B.** Amendment or Repeal.  Any amendment, alteration or repeal of this Article IX that adversely affects any right of a director shall be prospective only and shall not limit or eliminate any such right with respect to any proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed, signed and acknowledged by [_____] as of the [_____] day of [_____], 2010.

**LEXINGTON PRECISION CORPORATION**

By: _____

**Tab B**

**Securityholders Agreement**

# SECURITYHOLDERS AGREEMENT

# AMONG

# LEXINGTON PRECISION CORPORATION

# AND

# CERTAIN OF ITS STOCKHOLDERS,

# OPTIONHOLDERS

# AND

# WARRANTHOLDERS

**[_____] [__], 2010**

# TABLE OF CONTENTS

**Page(s)**

1.    Definitions..................................................................................................................... 1

    1.1    Certain Defined Terms......................................................................................... 1
    1.2    Index of Other Defined Terms.......................................................................... 8

2.    Compliance with Securities Laws.............................................................................. 9

    2.1    Restrictions on Transfer...................................................................................... 9
    2.2    Cooperation of Company.................................................................................... 9
    2.3    Rule 144 Acknowledgment.............................................................................. 10
    2.4    Restrictions on Transfer for Benefit of Securityholders............................. 10

3.    Further Restrictions.................................................................................................... 10

    3.1    Prohibition on Transfer Prior to Qualified IPO Date ................................. 10
    3.2    Restriction on Transfer Subsequent to Qualified IPO Date......................... 10

4.    First Refusal Rights..................................................................................................... 11

    4.1    Restrictions Cumulative.................................................................................... 11
    4.2    Bona Fide Offers ................................................................................................ 11
    4.3    Involuntary Transfers........................................................................................ 13
    4.4    Application of First Refusal Rights.................................................................. 14
    4.5    Termination of First Refusal Rights................................................................ 15

5.    Third-Party Offer for All Outstanding Securities.................................................. 15

    5.1    Drag-Along Obligations.................................................................................... 15
    5.2    Termination of Drag-Along Obligations ........................................................ 16
    5.3    Restrictions Cumulative.................................................................................... 16

6.    "Tag-Along" Rights/Co-Sale Rights......................................................................... 16

    6.1    Tag-Along Sales/Co-Sales................................................................................ 16
    6.2    Notice of Tag-Along Opportunity................................................................... 16
    6.3    Notice and Terms of Acceptance of Tag-Along Opportunity...................... 17
    6.4    Application of Tag-Along Provisions.............................................................. 18
    6.5    Termination of Tag-Along Rights.................................................................... 18
    6.6    Restrictions Cumulative.................................................................................... 18

7.    Board of Directors and Governance.......................................................................... 18

    7.1    Board of Directors.............................................................................................. 18
    7.2    Board Observer Rights...................................................................................... 20

Securityholders Agreement

      7.3    Governance Provisions ................................................................ 21

8.    Intentionally Omitted ................................................................ 22

9.    Registration Rights ................................................................ 22

10.    Right of First Offer ................................................................ 22

      10.1    Right of First Offer ................................................................ 22
      10.2    Definition of New Securities ................................................... 22
      10.3    Notice of Right ................................................................ 23
      10.4    Exercise of Right ................................................................ 23
      10.5    Lapse and Reinstatement of Right ......................................... 24
      10.6    Termination of Right ................................................................ 24

11.    Termination ................................................................ 24

12.    Information Rights ................................................................ 25

      12.1    Information Rights ................................................................ 25

13.    Miscellaneous ................................................................ 25

      13.1    Governing Law ................................................................ 25
      13.2    Entire Agreement; Amendments ........................................... 26
      13.3    Legend on Stock Certificates, Warrants and Option Agreements .............. 26
      13.4    Specific Performance ................................................................ 27
      13.5    Waiver ................................................................ 27
      13.6    Successors and Assigns ................................................................ 27
      13.7    Severability ................................................................ 27
      13.8    Headings ................................................................ 28
      13.9    Further Assurances ................................................................ 28
      13.10    Gender ................................................................ 28
      13.11    Notices ................................................................ 28
      13.12    Counterparts ................................................................ 28
      13.13    Arbitration ................................................................ 28
      13.14    Effective Date ................................................................ 29

EXHIBIT A      Class A Securityholders

EXHIBIT B      Class B Securityholders

EXHIBIT C      Registration Rights

EXHIBIT D      Management Services Agreement

## SECURITYHOLDERS AGREEMENT

This Securityholders Agreement (the "Agreement") is made and entered into as of [_____] [__], 2010, by and among (a) Lexington Precision Corporation, a Delaware corporation (together with its permitted successors, the "Company"), (b) each of the stockholders and optionholders of the Company whose names and addresses are listed on Exhibit A hereto, as the same may be supplemented or amended from time to time (collectively, the "Class A Securityholders," which term shall include any Permitted Transferees thereof), and (c) each of the stockholders of the Company whose names and addresses are listed on Exhibit B hereto, as the same may be supplemented or amended from time to time (collectively, the "Class B Securityholders," which term shall include any Permitted Transferees thereof). The Class A Securityholders and the Class B Securityholders are referred to herein collectively as the "Securityholders."

## RECITALS

WHEREAS, the Company is authorized to issue an aggregate of 5,000,000 shares of capital stock, including 4,900,000 shares of common stock, par value $0.01 per share; and

WHEREAS, the Securityholders desire to enter into an agreement with each other and the Company concerning, *inter alia*, the transfer or other disposition of securities of the Company;

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Definitions.**

1.1    Certain Defined Terms. The following terms, as used herein or in the Exhibits hereto, have the following meanings:

"Act" means the Securities Act of 1933, as amended, or any applicable similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Affiliate," when used with reference to any Person, means any other Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with such first Person and, when used with reference to (i) the Aurora Entity, shall also include, but shall not be limited to, all of the limited liability company's members and their respective Affiliates and (ii) any natural person, shall also include such person's spouse, parents and descendants (whether by blood or adoption, and including stepchildren) and the spouses of such persons. "Affiliated with" shall have a correlative meaning to the term "Affiliate."

"Affiliate Transaction" means (a) any sale, lease, transfer or other disposition by the Company or any of its Subsidiaries of any of their respective properties or assets to, (b) any

purchase of property or assets by the Company or any of its Subsidiaries from, (c) any investment by the Company or any of its Subsidiaries directly or indirectly (including by way of a purchase of capital stock of any person from another person) in, (d) any agreement by the Company or any of its Subsidiaries with or for the benefit of, or (e) any other transaction between the Company or any of its Subsidiaries, and an Affiliate that Controls the Company or any Associate or Affiliate of any such Affiliate that Controls the Company; *provided, however,* that "Affiliate Transaction" shall not include any sale of New Securities at Fair Market Value subject to the right of first offer contained in Section 10 of this Agreement.

"ARF" means Aurora Resurgence Fund L.P., a Delaware limited partnership.

"ARF(C)" means Aurora Resurgence Fund (C) L.P., a Delaware limited partnership.

"ARF(NB)" means Aurora Resurgence Fund (NB) L.P., a Delaware limited partnership.

"Associate" means, when used to indicate a relationship with any Person, (a) any other Person of which such Person is an officer, director or partner or is, directly or indirectly, the Beneficial Owner of ten percent (10%) or more of any class of equity securities issued by such other Person, (b) any trust or estate in which such Person has a substantial beneficial interest or as to which such Person serves as a trustee or in a similar fiduciary capacity, and (c) any spouse of such Person, or any relative of such Person who has the same home as such Person or who is a director or officer of such Person.

"Aurora Entity" means Commercial Finance Services 407, LLC, a Delaware limited liability company.

"Aurora Resurgence Funds" means, collectively, ARF(C), ARF and ARF(NB).  ARF(C), ARF and ARF(NB) are each, individually, an "Aurora Resurgence Fund."

"Beneficial Owner" has the meaning attributed to it in Rules 13d-3 and 13d-5 under the Exchange Act (as in effect on the Initial Date), whether or not applicable, except that a "person" shall not be deemed to have "beneficial ownership" of any shares that any such person has the right to acquire, whether or not such right is exercisable immediately or within sixty (60) days after the date as of which such determination is being made.  "Beneficially Owned" shall have a correlative meaning to the term "Beneficial Owner."

"Board" means the Board of Directors of the Company.

"Business Day" means Monday through Friday of each week, except that no legal holiday recognized as such by the government of the United States, the State of California or the State of New York shall be regarded as a Business Day; *provided*, that for purposes of clauses (a) or (b) of the definition of Fair Market Value, "Business Day" shall mean any day on which the principal domestic securities exchange on which the applicable class of Securities are listed is open for trading.

"Capital Stock" means, with respect to any corporation, any and all shares, interests, rights to purchase (other than convertible or exchangeable indebtedness), warrants, options,

participations or other equivalents of or interests (however designated) in stock issued by that corporation.

"Commission" means the Securities and Exchange Commission or any governmental body successor thereto.

"Common Stock" means the Company's common stock, par value $0.01 per share, and all other stock of any class or classes (however designated) of the Company the holders of which have the right, without limitation as to amount, either to all or to a share of the balance of current dividends and liquidating dividends after the payment of dividends and distributions on any shares entitled to preference; *provided*, that no shares of the Company's stock entitled to preference shall be Common Stock for the purposes of this Agreement, even if such stock is entitled to share in the balance of current dividends and liquidating dividends after the payment of such preference.

"Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.

"Fair Market Value" of any Securities as of a particular date means the average value of the Securities of such class for the ten (10) Business Day period immediately preceding such date.  Such average value shall be (a) the average of the last reported sales price of the Securities of such class on the principal domestic securities exchange on which such class of Securities are listed for each of such ten (10) Business Days, or, if not reported on such exchange, on the composite tape, or, (b) in case no such reported sales take place for each of such ten (10) Business Days, the average of the reported closing bid and asked quotations on such principal domestic securities exchange for each of such ten (10) Business Days, or (c) if not listed on any domestic securities exchange, the last reported sales prices for such ten (10) Business Days in the over-the-counter market as reported by the National Quotation Bureau, Incorporated or similar organization, or (d) if none of such sale prices are available for each Business Day in such ten (10) Business Day period, the average of the high bid and low asked quotations in the over-the-counter market as so reported for such ten (10) Business Days, (e) if no such quotations are available, the fair market value per share as determined in good faith by the Board, whose determination shall be conclusive.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Initial Date" means [_____ ___, 2010].

"Involuntary Transfer" means any transfer, proceeding or action (other than to a Permitted Transferee) by or in which a Securityholder shall be deprived or divested of any right, title or interest in or to any Securities, including, without limitation, (i) any seizure under levy of attachment or execution, (ii) any foreclosure upon a pledge of such Securities, (iii) any transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the Federal Bankruptcy Code of 1978, or any modifications or revisions thereto or any similar state laws) or other court proceeding to a debtor in possession, trustee in bankruptcy or receiver or other officer or agency, or (iv) any transfer to a state or to a public officer or agency pursuant to any statute pertaining to escheat or abandoned property. "Involuntary Transferee" shall have a correlative meaning to "Involuntary Transfer."

"Liens" means any and all liens, claims, options, charges, encumbrances, voting trusts, irrevocable proxies or other rights of any kind or nature.

"Options" means any stock option now or hereafter granted or issued by the Company entitling the holder thereof to purchase shares of Common Stock.

"Permitted Transferee" means:

(a)    as to any Securityholder who is a natural person, (i) the successors in interest to such Securityholder, in the case of a Transfer upon the death of such Securityholder, *provided* that such successors in interest would be a Permitted Transferee under clauses (a)(ii) or (a)(iv) of this definition, (ii) such Securityholder's spouse, parents and descendants (whether by blood or adoption, and including stepchildren) and the spouses of such persons (whether directly or indirectly through a custodian or trustee under the Uniform Gifts to Minors Act or any similar law), or such Securityholder's spouse or former spouse as a result of the termination of the marital relationship of the Securityholder and the Securityholder's spouse or former spouse, (iii) such Securityholder, with respect to the disposition of the community property interest of such Securityholder's spouse in all or any part of the Securities upon the death of such spouse, and any Transfer occasioned by the incompetence of such Securityholder and (iv) in the case of a Transfer during such Securityholder's lifetime, any Person in which no Person has any interest (directly or indirectly) except for any of such Securityholder, such Securityholder's spouse, parents and descendants (whether by blood or adoption, and including stepchildren) and the spouses of such persons; *provided*, *however*, that in respect of any Transfer by any Securityholder during such Securityholder's lifetime pursuant to clause (ii) or (iv), such Securityholder shall retain voting power over all of the outstanding Securities being Transferred; and *provided*, *further*, that, in the case of a Transfer to a Person (such as a partnership or a trust) as to which a governing instrument exists, (x) such Securityholder shall furnish a copy of such governing instrument to the Company in advance, (y) the terms of such governing instrument shall not be inconsistent with the terms of this Agreement and (z) during the period that such Securities are held by such Person, the relevant Securityholder and all other relevant parties shall agree in writing that the terms of such governing instrument shall not be amended in any manner that results in such governing instrument being inconsistent with the terms of this Agreement without the prior written consent of the Company;

(b)    as to any Securityholder that is a trust, all the beneficiaries of which are natural persons, such beneficiaries or the grantor of the trust; *provided*, *however*, that if such trust is a

Permitted Transferee under clause (a)(i) or (a)(iv) of this definition, each such beneficiary or grantor of such trust is a Person who would be permitted to have an interest in such trust under such clause (a)(i) or (a)(iv);

(c)     as to any Securityholder that is a limited partnership or limited liability company, (i) any limited or general partner, member, officer, employee or Affiliate of such Securityholder, or (ii) any Affiliate of any limited or general partner or member of such Securityholder; *provided, however*, that if such limited partnership or limited liability company is a Permitted Transferee under clause (a)(i) or (a)(iv) of this definition, each such limited or general partner, member, officer, employer or Affiliate is a Person who would be permitted to have an interest in such partnership or limited liability company under such clause (a)(i) or (a)(iv);

(d)     as to any Securityholder, a bank, other financial institution or other lender to which Securities are Transferred by way of pledge or the creation of any Lien or security interest or to which Securities are Transferred upon the foreclosure thereof; *provided, however*, that as to any Securityholder, any such pledge, lien or security interest must be approved in advance in writing by a majority of the disinterested directors of the Board;

(e)     as to any Securityholder that is a corporation, all Affiliates of such Securityholder; *provided, however*, that if such corporation is a Permitted Transferee under clause (a)(i) or (a)(iv) of this definition, each such Affiliate is a Person who would be permitted to have an interest in such corporation under such clause (a)(i) or (a)(iv);

(f)     any successor to any Person that is (i) an employee benefit plan under the ERISA, or any successor statute, or (ii) whose assets are deemed to be "plan assets" under ERISA, or (iii) is subject to the fiduciary responsibility provisions of Part 4 of Title I of ERISA, or (iv) is a government plan or church plan within the meaning of Section 3(32) and Section 3(33), respectively, of ERISA; and

(g)     as to any Class A Securityholder, any other Class A Securityholder;

*provided*, in each such case, that prior written notice of any such Transfer is given to the Company by such Securityholder and that the Permitted Transferee shall agree in advance of such Transfer to be designated as a Securityholder and to be bound by the terms of this Agreement pursuant to a written agreement reasonably satisfactory to the Company and the Aurora Entity; *provided, further*, that in the case of a Transfer by operation of law to any Person set forth in clauses (a) or (b) above, prior to such Transfer being effected on the books of the Company, written notice of such Transfer is given to the Company and the Permitted Transferee agrees to be designated as a Securityholder and to be bound by the terms of this Agreement pursuant to a written agreement reasonably satisfactory to the Company and the Aurora Entity.

"Person" means a company, a corporation, an association, a partnership, a limited liability company, an organization, a joint venture, a trust or other legal entity, an individual, a government or political subdivision thereof or a governmental agency.

"Qualified IPO" means an underwritten public offering of Common Stock (or equity securities of a successor entity to the Company) pursuant to a registration statement filed with the Commission where, after giving effect to the offering, the fair market value of all outstanding

capital stock of the Company (which, with respect to Common Stock shall be the sales price per share times the number of shares of Common Stock issued and outstanding, and with respect to other capital stock shall be the Fair Market Value per share of such capital stock times the number of shares of such class of capital stock issued and outstanding)is not less than Fifty Million ($50,000,000).

"Qualified IPO Date" means the closing date of the sale of shares pursuant to the registration statement for the Qualified IPO.

"Qualifying Class A Securityholder" means, as of any date, any Class A Securityholder that, as of the applicable date, together with its Affiliates and Associates, continues to Beneficially Own at least fifty percent (50%) of the shares of Common Stock Beneficially Owned by such Class A Securityholder on the Initial Date (excluding for such purpose the effects of any redemptions of shares of Common Stock or a reorganization, recapitalization, merger, consolidation, reverse stock split or similar event).

"Registrable Securities" means:

(a)    any shares of Common Stock issued and outstanding on the date hereof or issuable upon exercise of options or warrants issued and outstanding on the date hereof sold to the Securityholders (or any options or warrants issued after the date hereof upon transfer or exchange of such options or warrants pursuant to the terms thereof);

(b)    any shares of Common Stock issued after the date hereof or issuable upon exercise of options or warrants issued after the date hereof that, in any such case, are designated by the Company as Registrable Securities for purposes of this Agreement to Persons who are or become Securityholders;

(c)    any shares of Common Stock issued pursuant to Section 10 of this Agreement; and

(d)    any securities issued or issuable with respect to any Common Stock referred to in clauses (a), (b) or (c) of this definition by way of stock dividend or stock split or in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization or otherwise.

As to any particular Registrable Securities, once issued such Securities shall cease to be Registrable Securities when:

(x)    a registration statement with respect to the sale of such Securities shall have become effective under the Act and such Securities shall have been disposed of in a transfer or transfers made pursuant to such registration statement;

(y)    all of such Securities held by any Person and his, her or its Affiliates may be distributed to the public pursuant to Rule 144 (or any successor provision) under the Act, as modified by Section 3.2 below, in any three (3) month period unless the aggregate Fair Market Value of such Securities at the start of such three (3) month period is greater than Twenty-Five Million ($25,000,000); or

(z)        such Securities shall have ceased to be outstanding.

Except as set forth in the preceding sentence, no Transfer of Registrable Securities shall cause such Registrable Securities to lose such status.

"Registration Expenses" means all expenses incident to the Company's performance of or compliance with Section 9 and Exhibit C hereto, including, without limitation, all registration, filing and FINRA fees, all fees and expenses of complying with securities or blue sky laws, all word processing, duplicating and printing expenses, messenger and delivery expenses, the fees and expenses of counsel for the Company and of its independent public accountants, including the expenses of any special audits or "cold comfort" letters required by or incident to such performance and compliance, the reasonable fees and expenses of a single counsel retained by the holders of a majority of the Registrable Securities being registered and any fees and disbursements of underwriters customarily paid by issuers or sellers of securities, but excluding underwriting discounts and commissions and transfer taxes, if any.

"Securities" means the shares of Common Stock, Options and Warrants now or hereafter issued to or otherwise acquired by the Securityholders (including acquisitions of such securities concurrent with the execution of this Agreement and acquisitions of any such securities of the Company after the date hereof whether or not pursuant to the terms hereof and including issuances of any such securities pursuant to any Option existing on the date hereof or issued subsequent to the date hereof) and all shares of Capital Stock or other securities (including convertible securities and the securities into which such convertible securities convert) of the Company or any successor of the Company issued or issuable in respect thereof as a result of any stock dividend on, or stock split or reclassification or conversion of, or in exchange for, any such Common Stock or issued or issuable with respect to such Common Stock, Options or Warrants in connection with any merger or reorganization or similar transaction involving the Company.

"Shelf Registration" means a "shelf" registration statement on an appropriate form pursuant to Rule 415 under the Act and/or any similar rule that may be adopted by the Commission.

"Subsidiary" with respect to any Person means (i) a corporation a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by such Person and one or more direct or indirect Subsidiaries of such Person or by one or more direct or indirect Subsidiaries of such Person, or (ii) any other Person (other than a corporation) in which such Person, one or more direct or indirect Subsidiaries of such Person, or such Person and one or more direct or indirect Subsidiaries of such Person, directly or indirectly, at the date of determination thereof has at least majority ownership interest.

"Transfer" means any direct or indirect disposition of an interest whether by sale, exchange, merger, consolidation, transfer, assignment, conveyance, distribution, pledge, inheritance, gift, mortgage, the creation of any security interest in, or lien or encumbrance upon, any other disposition of any kind and in any manner, by operation of law or otherwise, or any other transfer or agreement which would result in a change in the percentage of the Company's Securities Beneficially Owned by a Securityholder or a Beneficial Owner.

"Warrants" means any warrant for the purchase of Common Stock now or hereafter granted or issued by the Company entitling the holder thereof to purchase shares of Common Stock.

    1.2   Index of Other Defined Terms.  In addition to those terms defined in Section 1.1, the following terms shall have the respective meanings given thereto in the sections or paragraphs indicated below:

| Defined Term | Section |
|---|---|
| Acquisition Notice | 5.1 |
| Acquisition Proposal | 5.1 |
| Adverse Disclosure | Exh. C, ¶ 10 |
| Agreement | Preamble |
| ARMP | 7.3 |
| Aurora Director | 7.1 |
| Bona Fide Offer | 4.2 |
| Claims | Exh. C, ¶ 7(a) |
| Class A Securityholder | Preamble |
| Class A Directors | 7.1 |
| Class B Securityholder | Preamble |
| Company | Preamble |
| Counter-Notice | 4.2 |
| Demand Holder | Exh. C., ¶ 2(a) |
| Demand Registration | Exh. C., ¶ 2(a) |
| Directors | 7.1 |
| Drag-Along Securityholder | 5.1 |
| Election Notice | 10.3 |
| Financing Notice | 10.3 |
| Initial Class A Securityholders | 12.1 |
| Involuntary Transfer Notice | 4.3 |
| Late Purchasers | 10.2 |
| Lockup Notice | 3.2 |
| Maximum Number | Exh. C, ¶ 2(c) |
| New Securities | 10.2 |
| New Security Offeree | 10.1 |
| Notice Date | 6.2 |
| Observer | 7.2 |
| Option Notice | 4.2 |
| Other Securityholder | 6.1 |
| Other Sellers | Exh. C, ¶ 2(c) |
| Outside Party | 4.2 |
| Pro Rata Portion | 10.1 |
| Proposed Transferor | 6.1 |
| Proposed Transferor Notice | 6.2 |
| Registration Demand Securities | Exh. C, ¶ 2(a) |
| Registration Documents | Exh. C, ¶ 7(a) |

| | |
|---|---|
| Resumption Notice | 3.2 |
| Right of First Offer | 10.1 |
| Rule 144 | 2.3 |
| Securityholder | Preamble |
| Tag-Along Notice | 6.3 |
| Tag-Along Sale | 6.1 |
| Third-Party Offeror | 5.1 |
| Transferred Securities | 4.3 |

## 2.    Compliance with Securities Laws.

2.1    Restrictions on Transfer.  Notwithstanding anything herein to the contrary and in addition to, and not in lieu of, the terms of Sections 3, 4, 5 and 6 of this Agreement, each Securityholder agrees that, prior to making any Transfer of any Securities, other than a Transfer to the Company or to another Securityholder as required or permitted by this Agreement, and other than a transfer in a sale to the public pursuant to an effective registration statement of the Company, and other than a transfer as permitted without the consent of the Aurora Entity pursuant to Section 3.2, such Securityholder will give written notice to the Company describing the manner and terms of such proposed Transfer, the identity of the proposed transferee and such other information as the Company may reasonably request.  Each such Securityholder further agrees that such proposed Transfer will not be effected until:

(a)    the Company has notified such Securityholder that either:

(i)    in the opinion of Company counsel, no registration of such Securities under the Act is required in connection with such proposed Transfer; or

(ii)    a registration statement under the Act covering such proposed disposition has been filed by the Company with the Commission and has become effective under the Act; and

(b)    the Company has notified such Securityholder that either:

(i)    in the opinion of Company counsel, no registration or qualification under the securities or "blue sky" laws of any state is required in connection with such proposed disposition; or

(ii)    compliance with applicable state securities or "blue sky" laws has been effected.

The Company will use commercially reasonable efforts to respond to any such notice from a Securityholder within fifteen (15) days of its receipt of such notice.

2.2    Cooperation of Company.  In the case of any proposed Transfer under this Section 2, the Company will use commercially reasonable efforts to comply with any such applicable state securities or "blue sky" laws, but shall in no event be required, in connection therewith, to qualify to do business in any state where it is not then qualified or to take any action that would subject it to tax or to the general service of process in any state where it is not then

subject, unless the Company was otherwise required to do so prior to the proposed Transfer. The restrictions on Transfer contained in Section 2.1 shall be in addition to, and not by way of limitation of, any other restrictions on Transfer contained in any other section of this Agreement.

2.3    Rule 144 Acknowledgment.    Each Securityholder acknowledges that such Person is familiar with Rule 144 of the rules and regulations of the Commission, as amended, promulgated pursuant to the Act ("Rule 144"), and that such Person has been advised that Rule 144 permits, only under certain circumstances, the resale of restricted securities such as the Securities being purchased on the date hereof or that may become subject hereto after the date hereof, but that Rule 144 is not currently, and might not in the future become, available to permit resales by such Person of any Securities. Each Securityholder understands that, to the extent that Rule 144 (or any successor provision) is not available, such Person will be unable to sell any Securities without either registration under the Act or the existence of another exemption from such registration requirement, and that the Company has no obligation whatsoever to any Securityholder to register any Securities, except as set forth herein.

2.4    Restrictions on Transfer for Benefit of Securityholders.    Each Securityholder agrees that such Securityholder will not Transfer any Securities (or any direct or indirect interest therein) or any stock certificate, warrant or option agreement representing the same, now or hereafter at any time owned by such Securityholder, except (i) to the Company, (ii) to a Permitted Transferee, and, in each such case, as required or permitted by the provisions of Sections 2, 3, 4, 5 and 6 of this Agreement; *provided* that after the Qualified IPO Date, such Securityholder may Transfer Securities (or any direct or indirect interest therein) or any stock certificate, warrant or option agreement representing the same to any person as permitted by the provisions of Section 2 or 3 of this Agreement.

3.    **Further Restrictions.**

3.1    Prohibition on Transfer Prior to Qualified IPO Date.    Each Class A Securityholder agrees that, prior to the occurrence of the Qualified IPO Date, such Class A Securityholder will not Transfer any Securities now or hereafter owned by such Class A Securityholder except to a Permitted Transferee or with the consent of the Aurora Entity (which may be given or withheld in its sole and absolute discretion with or without any reason or liability therefor except as hereinafter provided in this Section 3). The foregoing restriction shall be in addition to, and not in lieu of, the terms of Sections 2, 4, 5 and 6 of this Agreement.

3.2    Restriction on Transfer Subsequent to Qualified IPO Date.    After the occurrence of the Qualified IPO Date, any Class A Securityholder may Transfer Securities without the consent of the Aurora Entity in a sale to the public pursuant to an effective registration statement of the Company or pursuant to Rule 144, except as otherwise provided in this Section 3.2. If (a) the Board determines that it intends to file a registration statement (other than by registration on Form S-4 or S-8 or any successor or similar forms) or make a public offering of Common Stock, (b) any Demand Holder (as defined in Exhibit C) provides notice to the Company that it is exercising its right to Demand Registration (as defined in Exhibit C), or (c) the Aurora Entity provides notice to the Company that it is negotiating an agreement for the sale of greater than five percent (5%) of the outstanding Common Stock, then in each case the Company shall promptly deliver to each Class A Securityholder written notice that such

Securityholder may not Transfer any Securities, other than a Permitted Transfer, without the consent of the Aurora Entity (the "Lockup Notice"); provided, that the Company shall not deliver in any twelve (12) month period more than one Lockup Notice to the Class A Securityholders due to an event described in clause (c) above.  If following the delivery of a Lockup Notice the Board determines that it no longer intends to file a registration statement or make an public offering of Common Stock, or if the Demand Holder has withdrawn its notice of exercise of Demand Registration, or ninety (90) days following the receipt by the Company of notice that the Aurora Entity is negotiating a sale of Common Stock, then the Company shall promptly deliver to each Class A Securityholder written notice that such Securityholder may resume Transfers of Securities without the consent of the Aurora Entity (the "Resumption Notice").  Each Class A Securityholder covenants and agrees not to Transfer any Securities, other than a Permitted Transfer, without the consent of the Aurora Entity, after such Class A Securityholder's receipt of the Lockup Notice and until the earlier of (i) in the case of a registration statement other than pursuant to a Demand Registration, the effectiveness of the registration statement, (ii) in the case of a registration statement pursuant to a Demand Registration, ninety (90) days after the effectiveness of the registration or (iii) delivery by the Company of the Resumption Notice.

4.    **First Refusal Rights.**

4.1    Restrictions Cumulative.    Each Securityholder agrees that such Securityholder will not Transfer any Securities (or any direct or indirect interest therein) or any stock certificate, warrant or option agreement representing the same, now or hereafter at any time owned by him, except to a Permitted Transferee or as required or permitted by the provisions of Sections 2, 3, 4, 5 and 6 of this Agreement.  The restrictions on transfer imposed by this Section 4 on any Securityholder shall be in addition to, and not in lieu of, the restrictions on transfer imposed by Sections 2, 3, 5 and 6 of this Agreement to the extent the same are otherwise applicable to such Securityholder.

4.2    Bona Fide Offers.    (a) If any Securityholder (other than a Class B Securityholder) desires to Transfer any Securities and such Securityholder shall have received a bona fide arms'-length written offer (a "Bona Fide Offer") from a Person other than an Affiliate or Associate of such Securityholder or a Permitted Transferee (the "Outside Party") for the Transfer of such Securities, such Securityholder shall give written notice (the "Option Notice") to the Aurora Entity and the Company setting forth such desire, which notice shall set forth at least the name and address of the Outside Party and the price and terms of the Bona Fide Offer and shall be accompanied by a copy of the Bona Fide Offer and evidence demonstrating, to the reasonable satisfaction of the Aurora Entity and the Company, the Outside Party's ability to consummate such offer.  Upon the giving of such Option Notice, the Aurora Entity or any of its Affiliates (other than the Company) shall have the option to purchase, on a pro rata basis in accordance with their respective outstanding Common Stock ownership, at the price offered by the Outside Party in the Bona Fide Offer, all (but not less than all) of the Securities specified in the Option Notice, said option to be exercised within ten (10) Business Days following the giving of such Option Notice, by giving a counter-notice (a "Counter-Notice") to the selling Securityholder (with a copy of such Counter-Notice to the Company).  In the event that a determination must be made (as described below) as to the fair market value of non-cash consideration, the ten (10) Business Day period referred to in the immediately preceding

sentence shall be extended to such greater period of time, not to exceed twenty (20) Business Days after said Option Notice, specified in good faith by a disinterested majority of the Board. In the event that the Bona Fide Offer provides, in whole or in part, for non-cash consideration, the "price" offered by the Outside Party shall be deemed to be the amount of cash, if any, provided in the Bona Fide Offer plus the fair market value of the non-cash consideration as determined in good faith by a disinterested majority of the Board. Notwithstanding the foregoing, no Aurora Entity shall be permitted to purchase any Securities pursuant to this Section 4 from any Securityholder that is subject to ERISA (or any successor statute) if such purchase would constitute a non-exempt prohibited transaction under ERISA (or any successor statute).

(b)    Subject to paragraph (d) of this Section 4.2, if the Aurora Entity or any of its Affiliates elect to purchase such Securities, each such electing entity shall be obligated to purchase, and such Securityholder shall be obligated to sell, such Securities at a closing to be held on the fifteenth (15th) Business Day after the giving of the Counter-Notice at the principal executive offices of the Company, or at such other time and place as may be mutually acceptable to each purchasing entity and such selling Securityholder. The closing of any such purchase by the Aurora Entity or any of its Affiliates may, at the election of the purchasing entity, be delayed up to thirty (30) Business Days in order to permit such acquisition of such Securities to be made in conformity with applicable laws, including the HSR Act.

(c)    Subject to paragraph (d) of this Section 4.2, if the Aurora Entity or any of its Affiliates do not elect to purchase all of such Securities proposed to be sold by such Securityholder within the time limits specified in paragraph (a) of this Section 4.2, then the Company shall have the option, exercisable by the delivery of a counter-notice to such Securityholder no later than fifteen (15) Business Days following the date of the Option Notice, to purchase, at the price offered by the Outside Party in the Bona Fide Offer, all (but not less than all) of the Securities specified in the Option Notice and not purchased by the Aurora Entity or any of its Affiliates. In the event that the Company elects to purchase Securities pursuant to this Section 4.2(c), the Company will be obligated to purchase, and such Securityholder shall be obligated to sell, such Securities at a closing to be held on the fifteenth (15th) Business Day after the delivery of the Company's counter-notice to such Securityholder at the principal executive offices of the Company, or at such other time and place as may be mutually acceptable to the Aurora Entity, the Company and such selling Securityholder. The closing of any such purchase by the Company may, at the election of the Company, be delayed up to thirty (30) Business Days in order to permit such acquisition of such Securities to be made in conformity with applicable laws, including the HSR Act. Notwithstanding the foregoing, the Company shall not be permitted to purchase any Securities pursuant to this Section 4 from any Securityholder that is subject to ERISA if such purchase would constitute a non-exempt prohibited transaction under ERISA.

(d)    If the Aurora Entity or any of its Affiliates and the Company elect not to purchase all of the Securities subject to the Bona Fide Offer within the time limits specified above, then the offer to sell any of the Securities to the Aurora Entity or any of its Affiliates and/or the Company shall be deemed revoked and the selling Securityholder, at any time within a period of three (3) months from the giving of said Option Notice, may Transfer all (but not less than all) of the remainder of such Securities to the Outside Party at the price and on

the terms contained in the Bona Fide Offer; *provided*, *however*, that in the event such selling Securityholder has not so Transferred said Securities to the Outside Party within said three month period, then said Securities thereafter shall once again become subject to all of the restrictions contained in this Agreement as though no Option Notice had ever been given.

(e)    At the closing of any purchase of Securities pursuant to this Section 4.2, the selling Securityholder shall deliver certificates representing such Securities duly endorsed for transfer and accompanied by all requisite stock transfer taxes.  Any Securities purchased pursuant to this Section 4.2 shall be transferred free and clear of any and all Liens (other than those arising under this Agreement or securities laws) and at the Closing of the purchase the selling Securityholder shall represent and warrant to such effect and to the effect that such selling Securityholder is the Beneficial Owner of such Securities.  Each Person making such purchase shall deliver at such closing, by immediately available funds, payment in full for the Securities being purchased by such Person.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise reasonably necessary, consistent with the terms hereof.

(f)    If, in any instance, the Aurora Entity or any of its Affiliates or the Company elects not to exercise its rights hereunder or elects to waive such rights, such election shall not constitute a waiver of such Person's rights to receive an Option Notice in the case of any Transfer subsequently proposed by such or any other Securityholder.

4.3    <u>Involuntary Transfers</u>.  (a) Each Securityholder shall notify the Company and the Aurora Entity promptly upon the occurrence of an Involuntary Transfer of any Securities (including Involuntary Transfers of any beneficial interest by a Beneficial Owner) (an "<u>Involuntary Transfer Notice</u>").  If an Involuntary Transfer of any of the Securities owned by any Securityholder shall occur, to the extent permitted by applicable law, such Securities shall remain subject to all the terms of this Agreement and the Aurora Entity, any of its Affiliates and the Company shall have the same rights of first refusal under Section 4.2 above with respect thereto (the "<u>Transferred Securities</u>") as if the Involuntary Transfer had been a proposed voluntary Transfer by such Securityholder, except that:

(i)    the periods within which such rights must be exercised shall run from the date the Involuntary Transfer Notice is received from the Securityholder or its legal representatives with respect to which such Involuntary Transfer has occurred;

(ii)    such rights shall be exercised by notice to the Involuntary Transferee rather than to the Securityholder with respect to which such Involuntary Transfer has occurred; and

(iii)    with respect to Options or Warrants that are exercisable for a purchase price greater than the Fair Market Value of the underlying Common Stock such options and warrants, there shall be no such rights of first refusal, subject to the following paragraph.

If such Transferred Securities were shares of Common Stock, the purchase price thereof shall be the lesser of the Fair Market Value of such Securities on the date of such Involuntary Transfer or on the date of the relevant Involuntary Transfer Notice from the Securityholder from whom such Involuntary Transfer took place (or from such Involuntary Transferee).  If such Transferred Securities are Options or Warrants that are then exercisable for a purchase price less than the Fair Market Value of the underlying Common Stock, the purchase price thereof shall be equal to (i) the lesser of (y) the aggregate Fair Market Value on the date of such Involuntary Transfer of the number of shares of Common Stock which the holder of such Options is entitled to receive upon exercise of such Transferred Securities or (z) the aggregate Fair Market Value of such number of shares on the date of the relevant Involuntary Transfer Notice from the Securityholder from whom such Involuntary Transfer took place (or from such Involuntary Transferee), less (ii) the aggregate exercise price of such Transferred Securities, but not less than zero.  If such Involuntary Transfer Securities are Options or Warrants that are not then exercisable or that have a purchase price greater than the Fair Market Value of the underlying Common Stock, then the Company may call such Options or Warrants for redemption for no further consideration, upon provision by the Company of notice to the Involuntary Transferee, and upon such redemption such Options or Warrants shall be canceled by the Company.

(b)    At the closing of any purchase of Transferred Securities, the Involuntary Transferee shall deliver certificates representing the Transferred Securities being purchased by the Aurora Entity, any of its Affiliates or the Company, as the case may be, duly endorsed for transfer and accompanied by all requisite stock transfer taxes, and such Securities shall be free and clear of any and all Liens arising through the action or inaction of the Involuntary Transferee (other than those arising under this Agreement) and the Involuntary Transferee shall represent and warrant to such effect and to the effect that such Involuntary Transferee is the Beneficial Owner of such Securities.  At the closing of any such purchase, the Securityholder that was the transferor in respect of the Involuntary Transfer shall represent and warrant to the purchaser or purchasers that such Securityholder had conveyed to the Involuntary Transferee good and valid title to the Transferred Securities, subject to customary qualifications.  The Person making such purchase shall deliver at closing, by immediately available funds, payment in full of the purchase price for the Securities being purchased by such Person.  At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary or appropriate, consistent with the terms hereof.

(c)    In the event that the provisions of this Section 4.3 shall be held to be unenforceable with respect to any particular Involuntary Transfer of Securities, to the extent permitted by applicable law, such Securities shall remain subject to all the terms of this Agreement and the Aurora Entity, any of its Affiliates and the Company shall have a right of first refusal as set forth in Section 4.2 hereof if the Involuntary Transferee subsequently obtains a Bona Fide Offer for and desires to Transfer such Transferred Securities.

4.4    <u>Application of First Refusal Rights</u>.  The first refusal rights provided in Sections 4.2 and 4.3 shall not apply to any Transfer of Securities:

(a)    to the Company, to the Aurora Entity or any of its Affiliates, or to a Permitted Transferee of the relevant Securityholder;

(b)      pursuant to an effective registration statement under the Act or pursuant to Rule 144 (or any successor provision);

(c)      to an Other Securityholder (as defined in Section 6.1) pursuant to Section 6 below; or

(d)      by a Drag-Along Securityholder (as defined in Section 5.1) pursuant to Section 5 below.

4.5      <u>Termination of First Refusal Rights</u>.  Notwithstanding anything herein to the contrary, the rights of first refusal provided in this Section 4 shall terminate, with respect to all Securities held by each Securityholder, upon the occurrence of the Qualified IPO Date.

**5.      Third-Party Offer for All Outstanding Securities.**

5.1      "<u>Drag-Along</u>" <u>Obligations</u>.  If the Aurora Entity shall receive an offer in writing from a third party which is not an Affiliate or an Associate of the Aurora Entity (a "<u>Third-Party Offeror</u>") to purchase all of the issued and outstanding Securities held by the Aurora Entity for purposes of effecting a business combination of the Company with such Person or an Affiliate thereof or to purchase all or substantially all of the assets of the Company (each an "<u>Acquisition Proposal</u>"), and the Aurora Entity desires to accept or cause the Company to accept such Acquisition Proposal, the Aurora Entity shall deliver a notice (an "<u>Acquisition Notice</u>") to the Company (which shall deliver a copy of such Acquisition Notice to each of the other Securityholders within three (3) Business Days of its receipt thereof).  Such Acquisition Notice shall contain a copy of such Acquisition Proposal, including the name and address of the Third-Party Offeror and the terms of the Acquisition Proposal.  If any other Securityholder receives any Acquisition Proposal (which, for this purpose, includes an offer to purchase all of the issued and outstanding Common Stock and any other securities exercisable for or convertible into Common Stock but not an offer to purchase only such other Securityholder's Common Stock and any other securities exercisable for or convertible into Common Stock), such Securityholder shall promptly transmit such Acquisition Proposal to the Company and the Aurora Entity (which the Aurora Entity may elect not to pursue without any liability or obligation to any Securityholder or the Company).  The other Securityholders (other than the Aurora Entity) (the "<u>Drag-Along Securityholders</u>") severally agree that, upon receipt of such Acquisition Notice, they shall be obligated to sell, at the same time the Aurora Entity sells, its Securities to the Third-Party Offeror in the same proportion as the Aurora Entity upon the terms and conditions set forth in the Acquisition Proposal, or, as the case may be, to vote their Securities in favor of the merger or sale of all or substantially all of the assets of the Company as described in the Acquisition Proposal, and otherwise to take all actions reasonably necessary or appropriate to cause the Company to consummate the proposed transaction, if applicable.  In any such transaction, all of such shares of Common Stock shall be purchased at, or be converted into the right to receive, the same price per share of Common Stock as received by the Aurora Entity.  Notwithstanding the foregoing, no Securityholder shall be obligated to sell any Securities to any Third Party Offeror pursuant to this Section 5 if such sale would constitute a non-exempt prohibited transaction under ERISA or any successor statute or if such sale would otherwise not be permitted by law. In that regard, the Aurora Entity may, in its sole discretion and at its own expense, seek an

administrative exemption from the U.S. Department of Labor (or other appropriate governmental agency) to allow such sale.

> 5.2    <u>Termination of Drag-Along Obligations</u>.  Notwithstanding anything herein to the contrary, the rights and obligations provided for in this Section 5 shall terminate, with respect to all Securities held by any Securityholder, upon the occurrence of the Qualified IPO Date.

> 5.3    <u>Restrictions Cumulative</u>.  The restrictions on transfer imposed by this Section 5 on any Securityholder shall be in addition to, and not in lieu of, the restrictions on transfer imposed by Sections 2, 3, 4 and 6 of this Agreement to the extent the same are otherwise applicable to such Securityholder.

> **6.    "Tag-Along" Rights/Co-Sale Rights.**

> 6.1    <u>"Tag-Along" Sales/Co-Sales</u>.  If any Securityholder (for purposes of this Section 6, the "<u>Proposed Transferor</u>"), at any time or from time to time, in one transaction or in a series of related transactions, desires to enter into an agreement (whether oral or written) to Transfer (for purposes of this Section 6, a "<u>Tag-Along Sale</u>") shares of Common Stock to any Person, then each of the other Securityholders  (for purposes of this Section 6, collectively, the "<u>Other Securityholders</u>") shall have the right, but not the obligation, to elect that the Proposed Transferor be obligated to require, as a condition to such Tag-Along Sale, that the proposed purchaser purchase from each such electing Other Securityholder up to the number of shares of Common Stock derived by multiplying the total number of shares of Common Stock owned by such electing Other Securityholder by a fraction, the numerator of which is equal to the number of shares of Common Stock then owned by the Proposed Transferor that are to be purchased by the proposed purchaser (without giving effect to any reduction in such number of shares by reason of any Other Securityholder's election to exercise the "tag-along" rights provided in this Section 6 in connection with such transaction) and the denominator of which is the total number of shares of Common Stock owned by the Proposed Transferor prior to such sale; *provided, however*, that if any Other Securityholder chooses not to sell any or all Securities which such Other Securityholder may be entitled to sell under this Section 6.1, the Proposed Transferor may sell, in the same transaction, additional shares of Common Stock equal to the difference between the number of shares of Common Stock which such Other Securityholder is entitled to sell and the number of shares of Common Stock such Other Securityholder chooses to sell, if any.  Any such sales by any Other Securityholder shall be on the same terms and conditions as the proposed Tag-Along Sale by the Proposed Transferor.  Each Other Securityholder whose Securities are sold in a Tag-Along Sale shall be required to bear a proportionate share of the expenses of the transaction, including, without limitation, legal, accounting and investment banking fees and expenses.

> 6.2    <u>Notice of Tag-Along Opportunity</u>.  The Proposed Transferor participating in a Tag-Along Sale shall promptly (and in no event less than twenty (20) Business Days prior to the consummation thereof) provide the Company with notice (for purposes of this Section 6, the "<u>Proposed Transferor Notice</u>") of the proposed Tag-Along Sale (which the Company shall transmit to each Other Securityholder within three (3) Business Days after its receipt thereof) containing the following:

(a)    the name and address of the proposed transferee in the Tag-Along Sale and a summary of the terms and conditions of such Tag-Along Sale;

(b)    the number of shares of Common Stock proposed to be Transferred by the Proposed Transferor in the event none of the Other Securityholders elects to participate;

(c)    the proposed amount and form of consideration to be paid for such Securities and the terms and conditions of payment offered by the proposed transferee;

(d)    the aggregate number of shares of Common Stock held of record by the Proposed Transferor as of the date of the notice (for purposes of this Section 6, the "Notice Date") from the Proposed Transferor to the Company;

(e)    the aggregate number of shares of Common Stock held of record as of the Notice Date by all Other Securityholders as a group (which number the Company shall provide to such Proposed Transferor upon request);

(f)    the maximum number of shares of Common Stock each such Other Securityholder is entitled to include in the Tag-Along Sale (as computed in accordance with the equations set forth in Section 6.1); and

(g)    that the proposed transferee has been informed of the "tag-along" rights provided for in Section 6.1.

6.3    Notice and Terms of Acceptance of Tag-Along Opportunity.

(a)    If an Other Securityholder desires to participate in such Tag-Along Sale, such Other Securityholder shall provide written notice (the "Tag-Along Notice") to such Proposed Transferor not later than ten (10) Business Days after the Notice Date setting forth the number of shares of Common Stock such Other Securityholder elects to include in the Tag-Along Sale.

(b)    Any Other Securityholder who at the time of a Proposed Transferor Notice then owns Common Stock may elect to include Common Stock in a Tag-Along Sale only in the same proportion as the shares of Common Stock to be sold by the Proposed Transferor as set forth in the Proposed Transferor Notice.

(c)    The Tag-Along Notice given by any Other Securityholder shall constitute such Other Securityholder's binding agreement to sell such Securities as are included therein on the terms and conditions applicable to such sale (including the requirements of this Section 6). In the event that the proposed transferee does not purchase the Securities of the Proposed Transferor, then the proposed Tag-Along Sale by the Other Securityholders to such proposed transferee shall not take place. If the Tag-Along Notice from any Other Securityholder is not received by the Proposed Transferor within the ten (10) Business Day period specified above in this Section 6.3, the Proposed Transferor shall have the right to consummate the Tag-Along Sale with the proposed transferee without any participation by such Other Securityholder, but only on the terms

and conditions stated in the notice to such Other Securityholders or on terms and conditions no more favorable to the Proposed Transferor and only if a definitive and binding agreement to consummate such Tag-Along Sale is entered into not later than thirty (30) days after the end of such ten (10) Business Day period specified above in this Section 6.3.

6.4    <u>Application of Tag-Along Provisions</u>.    The provisions of this Section 6 shall not apply to:

(a)    any transaction in which shares of Common Stock are proposed to be sold publicly pursuant to a registration statement filed under the Act or pursuant to Rule 144 (or any successor provision);

(b)    any Transfer to a Permitted Transferee;

(c)    any one transaction or series of related transactions involving the Transfer (other than to a Permitted Transferee) by the Proposed Transferor of less than one percent (1%) of the issued and outstanding shares of Common Stock;

(d)    any one transaction or series of related transactions involving the Transfer (other than to a Permitted Transferee) by the Aurora Entity or any of its Affiliates that results in the Aurora Entity and its Permitted Transferees retaining ownership of 51% or greater of the issued and outstanding shares of Common Stock after giving effect to the Tag-Along Sale;

(e)    any shares of Common Stock proposed to be Transferred by the Proposed Transferor which are purchased by the Company or any Other Securityholder pursuant to Section 4; or

(f)    any Transfer of shares of Common Stock in connection with an Acquisition Proposal subject to the provisions of Section 5 hereof.

6.5    <u>Termination of Tag-Along Rights</u>.    Notwithstanding anything herein to the contrary, the rights and obligations provided for in this Section 6 shall terminate, with respect to all Securities held by each Other Securityholder, upon the occurrence of the Qualified IPO Date.

6.6    <u>Restrictions Cumulative</u>.    The restrictions on transfer imposed by this Section 6 on any Securityholder shall be in addition to, and not in lieu of, the restrictions on transfer imposed by Sections 2, 3, 4 and 5 of this Agreement to the extent the same are otherwise applicable to such Securityholder.

**7.    Board of Directors and Governance.**

7.1    <u>Board of Directors</u>.

(a)    Subject to reduction pursuant to Section 7.1(d), the Board will consist of seven (7) members.  Each Securityholder shall vote or cause to be voted all shares of Common Stock owned or controlled by him, her or it at any meeting of the stockholders of the Company

called for the purpose of electing directors, or by written consent of the holders of Common Stock without a meeting, or otherwise, to nominate and elect to the Board, and to take all requisite actions within his, her or its control to (a) cause the nomination and election of (i) four (4) directors (the "Aurora Directors") designated by the Aurora Entity; *provided*, *however*, that one (1) of the Aurora Directors shall be designated in compliance with certain director independence standards for so long as, and to the extent, required by the Company's credit facility with CapitalSource; (ii) subject to the provisions of Sections 7.1(b) and 7.1(c) below, two (2) directors (the "Class A Directors") designated by the Class A Securityholders; *provided*, *further*, that the individuals designated as Class A Directors, shall be subject to the reasonable approval of the Aurora Entity, such approval not to be unreasonably withheld, conditioned or delayed; and (iii) the Chief Executive Officer of the Company (collectively with the Aurora Directors and the Class A Directors, if any, the "Directors") and (b) cause any successor Chief Executive Officer of the Company to be elected in the event of the death, disability, removal or resignation of the then current Chief Executive Officer of the Company. No Director elected pursuant to this Section 7.1 may be removed from office unless such removal is directed or approved by the written consent of the Persons entitled under this Section 7.1 to designate that Director.  The Chief Executive Officer may not be removed as director unless such individual is also removed as Chief Executive Officer of the Company, subject to the terms and conditions of such Chief Executive Officer's employment agreement, if any.  Any vacancies created by the resignation, removal or death of a director elected pursuant to this Section 7.1 shall be filled pursuant to the provisions of this Section 7.1.  Notwithstanding anything herein to the contrary, the rights and obligations provided for in this Section 7.1 shall terminate upon the occurrence of the Qualified IPO Date.

(b)     The right of the Class A Securityholders to designate two (2) Directors as provided in Section 7.1(a) above is conditioned upon the Class A Securityholders continuing to hold at least twelve and a half percent (12.5%) of the issued and outstanding shares of Common Stock.  If the Class A Securityholders hold less than twelve and a half percent (12.5%) of the issued and outstanding shares of Common Stock for any period of thirty (30) consecutive days, but at least five percent (5%) of the issued and outstanding shares of Common Stock at any time during such thirty- (30-) day period, then the Class A Securityholders shall be entitled to designate one (1) Director (who for purposes of this Agreement shall be designated as a Class A Director), and each Securityholder shall vote or cause to be voted all shares of Common Stock owned or controlled by him, her or it at any meeting of the stockholders of the Company called for the purpose of electing directors, or by written consent of the holders of Common Stock without a meeting, or otherwise, to nominate and elect to the Board, and to take all requisite actions within his, her or its control to cause the nomination and election of such Class A Director.

(c)     The right of the Class A Securityholders to designate one (1) Director as provided in Section 7.1(b) above is conditioned upon the Class A Securityholders continuing to hold at least five percent (5%) of the issued and outstanding shares of Common Stock.  If the Class A Securityholders hold less than five percent (5%) of the issued and outstanding shares of Common Stock for any period of thirty (30) consecutive days, such Class A Securityholders shall no longer have the right to designate any Directors.

(d)     Upon the loss of the right to designate Directors as set forth in Sections 7.1(b) and 7.1(c) above, the Class A Director(s) appointed thereunder shall promptly resign as a Director and at the request of the Aurora Entity, the Class A Securityholders shall vote all Securities held by such Class A Securityholders in favor of any designee appointed by the Aurora Entity to replace such Class A Director(s) or in favor of decreasing the number of directors serving on the Company's Board, as applicable.

(e)     So long as the Class A Securityholders shall have the right to designate a Director, any committee of the Board shall include at least one Class A Director; *provided, however,* that, in the case of the audit committee, the compensation committee or any other committee on which an officer or employee of the Company is not permitted to serve by reason of law, such Class A Director serving as a committee member shall not be an officer or employee of the Company; *provided, further*, that if there is no Class A Director that is not an officer or employee of the Company, then, in the case of the audit committee, the compensation committee or any other committee on which an officer or employee of the Company is not permitted to serve by reason of law, the Class A Securityholders shall have the right to send one non-voting representative to the meetings of such committee on their behalf, solely in a non-voting observer capacity; *provided, further*, that the Class A Securityholders shall not be entitled to include any Class A Director or any non-voting observer on any committee of the Board formed for the purpose of (i) considering any transaction between the Company, on the one hand, and a Class A Securityholder, on the other hand or (ii) considering the terms of employment of any Class A Securityholder.

7.2     <u>Board Observer Rights</u>.  If the Class A Securityholders lose the right to designate Directors as set forth in Section 7.1(c) above, but continue to hold at least two and a half percent (2.5%) of the issued and outstanding shares of Common Stock, the Class A Securityholders shall have the right to send one non-voting representative on their behalf (an "<u>Observer</u>") to attend all meetings of the Board, including all committees thereof, solely in a non-voting observer capacity; *provided*, *however*, that such Observer shall be reasonably acceptable to a majority of the members of the Board elected by the holders of the Common Stock.  The Company will furnish to the Observer copies of all notices, minutes, consents, board package materials and other materials that it generally makes available to its directors as and when such materials are provided to its directors.  The Observer may participate in discussions of matters under consideration by the Board and any matters brought before any committee thereof but will not be entitled to vote on any matter presented to the Board; *provided*, *however*, that a majority of the Board shall have the right, after deliberation in a closed session in which they can exclude the Observer, to exclude the Observer from portions of meetings of the Board or any committee thereof or omit to provide the Observer with certain information to the extent that a majority of the members of the Board believe in good faith after consultation with counsel that such exclusion or omission is necessary in order to preserve any attorney-client privilege, attorney-work product privilege or other similar legal privileges or such attendance or distribution of materials is otherwise prohibited by applicable law; *provided*, *further*, *however*, that the Observer shall agree in writing pursuant to a confidentiality and nondisclosure agreement, prior to attending any such meetings or to being furnished any such written materials, to hold in confidence and trust and not use or disclose any confidential information provided to or learned by him or her in connection with his or her rights under this Agreement during the time the Observer has observation rights and thereafter.  Class A Securityholders will have the

right to remove and replace their Observer in their sole discretion and to designate a substitute representative if such Observer is unable or unwilling to attend any of the Board's meetings, including any committees thereof. The Company shall reimburse the reasonable expenses of the Observer incurred in connection with attending meetings of the Board or any committee thereof or otherwise in the performance of its duties as an Observer pursuant to this Section 7.2. If the Class A Securityholders hold less than two and a half percent (2.5%) of the issued and outstanding shares of Common Stock at any time, such Class A Securityholders shall no longer have the right to designate any Observer.

       7.3    <u>Governance Provisions</u>.

       (a)       Each of the Securityholders agrees that the affirmative vote of the holders of a majority in interest of the issued and outstanding shares of Common Stock, each such share being entitled to one vote per share, held by the Class A Securityholders shall be required for the Company or any of its Subsidiaries to:

       (i)       amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries (including by recapitalization, merger or otherwise) in a manner that adversely affects Class A Securityholders disproportionately as compared to the Class B Securityholders;

       (ii)       redeem, repurchase or acquire any Capital Stock of the Company, other than pursuant to this Agreement or on a proportional basis among all Securityholders;

       (iii)       enter into or engage in an Affiliate Transaction outside the ordinary course of business, with the Aurora Entity or any of its Associates or Affiliates, with terms materially less favorable than a comparable arms'-length transaction with a non-affiliate, other than (x) pursuant to this Agreement or (y) pursuant to that certain management services agreement between the Company and ARMP in the form attached hereto as <u>Exhibit D</u>; *provided*, that in no event shall any Securityholder have any claim with respect to any Affiliate Transaction that has been approved pursuant to this Section 7.3(a) or is expressly exempt from such approval as provided in clauses (x) or (y) above;

       (iv)       increase the number of members of the Board;

       (v)       designate the purchaser of any Securities newly issued after the date hereof as a Class A Securityholder, unless such purchaser is already a Class A Securityholder (or the transferee of a Class A Securityholder in accordance with this Agreement);

       (vi)       grant any registration rights to any Person on a basis that has priority over the registration rights granted to the Securityholders party to this Agreement; *provided* that for purposes of this Agreement, rights granted to any Person due to amount of their holdings are deemed not to be a priority for purposes of this Agreement; or

(vii)   authorize, approve, commit to, or obligate itself (or any of its Subsidiaries) with respect to any of the foregoing.

Notwithstanding anything herein to the contrary, the rights and obligations provided for in this Section 7.3(a) shall terminate upon the earlier to occur of (i) the Qualified IPO Date or (ii) such time as the Class A Securityholders no longer have the right to designate any Director.

(b)   For avoidance of doubt, Class A Securityholders shall not have the right to approve, authorize, vote upon or consent to the issuance or incurrence of indebtedness, now or hereinafter incurred, or  any refinancing or restructuring thereof.

## 8.   __Intentionally Omitted.__

## 9.   __Registration Rights.__

The Company agrees to afford to each Securityholder the registration rights set forth in __Exhibit C__ hereto and each party hereby agrees to be bound by the terms and conditions included in __Exhibit C__ hereto as if such terms and conditions were included in the body of this Agreement. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to the registration rights set forth in __Exhibit C__ as in effect immediately before such transaction.

## 10.   __Right of First Offer.__

10.1   __Right of First Offer.__  Subject to the terms and conditions contained in this Section 10, the Company grants to each Class B Securityholder and each Qualifying Class A Securityholder (each a "__New Securities Offeree__" and, collectively, the "__New Security Offerees__") the right of first offer to purchase such New Security Offeree's Pro-Rata Portion (as defined below) of any New Securities (as defined below), that the Company or any of its Subsidiaries may, from time to time, propose to sell and issue (the "__Right of First Offer__").  With respect to each New Security Offeree, its "__Pro Rata Portion__" in respect of any New Securities shall be the ratio that (x) the sum of the number of shares of Common Stock then held by such New Security Offeree such New Security Offeree bears to (y) the sum of the aggregate number of shares of Common Stock then outstanding.   Subject to the terms and conditions contained in this Section 10, any portion of the New Securities not purchased pursuant to the Right of First Offer may be sold to any other Person.

10.2   __Definition of New Securities.__  Except as set forth below, "__New Securities__" shall mean any shares of Capital Stock of the Company or any of its Subsidiaries, including Common Stock or preferred stock, whether authorized or not, and rights, options or warrants to purchase shares of Capital Stock of the Company or any of its Subsidiaries, and securities of any type whatsoever that are, or may become, convertible into said shares of Capital Stock of the Company or any of its Subsidiaries, issued after the date hereof.  Notwithstanding the foregoing, "__New Securities__" does not include (i) shares of Common Stock to be issued by the Company concurrently with the execution of this Agreement; (ii) securities offered to the public generally pursuant to a registration statement under the Securities Act; (iii) securities issued in connection

with the acquisition of another corporation by the Company by merger, purchase of all or substantially all of the assets or shares or other reorganization whereby the Company or its stockholders own not less than a majority of the voting power of the surviving or successor corporation, *provided* such transaction is approved by the Board in accordance with the Certificate of Incorporation of the Company as then in effect; (iv) any shares of Common Stock or common stock of the Subsidiaries of the Company or related options convertible into or exercisable for such Common Stock or common stock issued to employees, officers and directors of, and consultants to, the Company or any of its Subsidiaries, pursuant to any of the Company's or any of its Subsidiaries' option plan or plans, *provided* that such shares of common stock shall not exceed the number of shares allocated or reserved for issuance under the Company's or any of its Subsidiaries' option plan or plans (subject to appropriate adjustment for stock splits, stock dividends, combinations, recapitalizations and the like); (v) securities issued in connection with any stock split, stock dividend or recapitalization by the Company or any of its Subsidiaries; and (vi) shares of Common Stock to be issued by the Company to any limited partner of any Aurora Resurgence Fund or any Affiliate of such limited partner or to the Aurora Entity or any of its affiliates or any of their respective directors, officers, employees or consultants (collectively, the "Late Purchasers"), from time to time but by no later than sixty (60) days after the date of this Agreement, directly or indirectly, on substantially the same terms and conditions as the shares of Common Stock and to be issued by the Company concurrently with the execution of this Agreement, to the Aurora Entity or any of its Affiliates; *provided* that in the case of (vi) above, the Aurora Entity shall provide to the Class A Securityholders, as promptly as practicable, with the names such Late Purchasers and the number of shares of Common Stock proposed to be sold to the Late Purchasers within the sixty (60) days after the date of this Agreement; *provided, further*, that any Late Purchasers shall not be designated as Class A Securityholders; *provided, further*, that the purchase price of shares of Common Stock by Late Purchasers shall not exceed Five Million ($5,000,000).

10.3    Notice of Right.    In the event the Company proposes to undertake an issuance of New Securities, it shall give to each New Security Offeree written notice of its intention, describing the type of New Securities and the price and terms upon which the Company proposes to issue the same and, if available, the definitive documents for such a financing (a "Financing Notice"). Each New Security Offeree shall have ten (10) Business Days from the date of receipt of any such Financing Notice to agree to purchase all or a portion of its Pro Rata Portion of such New Securities for the price and upon the terms specified in the notice, by giving written notice to the Company and stating therein the quantity of New Securities to be purchased (the "Election Notice").

10.4    Exercise of Right.    If any New Security Offeree exercises its Right of First Offer hereunder, the closing of the purchase of the New Securities with respect to which such right has been exercised shall take place within fifteen (15) Business Days after such New Security Offeree gives notice of such exercise, which period of time may be delayed up to thirty (30) Business Days in order to permit such acquisition of such New Securities to be made in conformity with applicable laws, including the HSR Act.  Upon exercise of such Right of First Offer, the Company and such New Security Offerees that exercises their Right of First Offer shall be legally obligated to consummate the purchase contemplated thereby and shall use commercially reasonable efforts to secure any approvals required in connection therewith.

10.5    <u>Lapse and Reinstatement of Right</u>.  In the event any New Security Offeree fails to exercise the Right of First Offer provided in this Section 10 within said ten (10) Business Day period, then any other New Security Offeree that elects to purchase all of its Pro Rata Portion of the New Securities in said ten (10) Business Day period shall have the option to purchase such unsubscribed shares of New Securities on the same terms and conditions set forth in this Section 10 within ten (10) Business Days after such New Security Offeree receives notice from the Company of such unsubscribed shares, which period of time may be delayed up to thirty (30) Business Days in order to permit such acquisition of such New Securities to be made in conformity with applicable laws, including the HSR Act.  In the event any New Security Offeree fails to exercise the Right of First Offer provided in this Section 10 to purchase all of the New Securities set forth in the Financing Notice within said ten (10) Business Day period, the Company shall have a period of three (3) months thereafter to sell or enter into a definitive agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within thirty (30) Business Days from the date of said agreement) to sell the New Securities not elected to be purchased by such New Security Offeree at the price and upon terms no less favorable to the Company than those contained in the Financing Notice.  In the event the Company has not sold the New Securities or entered into an agreement to sell the New Securities within said three (3) month period (or sold and issued New Securities in accordance with the foregoing within thirty (30) Business Days from the date of said agreement), the Company shall not thereafter issue or sell any New Securities without first offering such securities to each New Security Offeree as provided in Section 10.1 above.

10.6    <u>Termination of Right</u>.  Notwithstanding anything herein to the contrary, the rights and obligations provided in this Section 10 shall terminate upon the occurrence of a Qualified IPO.

## 11.    <u>Termination.</u>

Except for the provisions of Sections 9, 12 and 13, which shall survive the expiration or other termination of this Agreement, this Agreement shall terminate on the earliest to occur of (a) [_____ ___, 2020][*ten year term*], (b) a change in Control of the Company unless the holders of a majority in voting interest of the issued and outstanding shares of Common Stock, each such share being entitled to one vote per share, determine otherwise prior to such change in Control and (c) upon the written approval of (i) the Company and (ii) the holders of a majority in voting interest of the issued and outstanding shares of Common Stock, each such share being entitled to one vote per share, held by all the Securityholders; *provided* that any termination that would adversely affect the rights of any Securityholder (other than any termination that would adversely affect the rights of all Securityholders in the same manner) under this Agreement must be consented to by such Securityholder before such termination may be deemed effective against such Securityholder; *provided, further,* that to the extent that Class A Securityholders retain exercisable rights to appoint a director or board observer under Sections 7.1 and 7.2, the elimination of such rights would be deemed to be material and adverse with respect to the Class A Securityholders within the meaning of the foregoing sentence.  A Securityholder shall cease to be deemed a Securityholder hereunder, and shall no longer be a party to this Agreement, at such time as such Securityholder ceases to own any Securities.

## 12.    Information Rights.

12.1    Information Rights.

(a)    Subject to the terms and conditions set forth herein, each Qualifying Class A Securityholder will have rights to receive (i) as soon as available, but in any event within forty-five (45) days after the end of each month, monthly financial statements substantially equivalent to that which is provided to the Company's directors and (ii) as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Company, copies of the consolidated balance sheets of the Company  and its subsidiaries as at the end of such year, and consolidated statements of income, stockholders' equity and cash flows of the Company  and its subsidiaries for such year, in each case prepared in accordance with GAAP applicable to periodic financial statements generally, and accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the Persons being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP and (iii) the annual consolidated budget and business plan of the Company and its Subsidiaries; *provided, however,* that the right to receive the information described in clauses (i) and (ii) above shall not apply during any period in which the Company or the Company  is required to file, or voluntarily files, with the Commission periodic and other reports required by the Exchange Act.

(b)    Each Qualifying Class A Securityholder's rights under this Section 12.1 are conditioned upon and subject to such Qualifying Class A Securityholder agreeing in writing pursuant to a confidentiality and nondisclosure agreement, in form and substance reasonably acceptable to the Company and its counsel, and the terms of which are customary and reasonable in nature, prior to being furnished any information pursuant to this Section 12.1, to hold in confidence and trust and not use or disclose any confidential information provided to or learned by it in connection with its rights under this Agreement during the time such Qualifying Class A Securityholder has the information rights set forth in this Section 12.1 and thereafter.

(c)    Notwithstanding anything to the contrary in this Section 12.1, so long as (i) the Class A Securityholders set forth in Exhibit A (the "Initial Class A Securityholders") continue to hold at least two and a half percent (2.5%) of the issued and outstanding shares of Common Stock, and (ii) each of the Initial Class A Securityholders continues to hold issued and outstanding shares of Common Stock, for purposes of this Section 12.1 only, each of the Initial Class A Securityholders will have rights to receive information as a Qualifying Class A Securityholder as set forth in this Section 12.1.

## 13.    Miscellaneous.

13.1    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware without regard to principles of conflicts of law.

13.2    <u>Entire Agreement; Amendments</u>.  This Agreement (including the exhibits hereto) constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified or amended except by a written agreement signed by (a) the Company, (b) the holders of a majority in interest of the issued and outstanding shares of Common Stock, each such share being entitled to one vote per share, held by the Securityholders and (c) the holders of a majority in interest of the issued and outstanding shares of Common Stock, each such share being entitled to one vote per share, held by the Class B Securityholders; *provided* that any amendment that would adversely affect the rights of any Securityholder (other than any amendment that would adversely affect the rights of all Securityholders in the same manner) under this Agreement must be consented to by such Securityholder before such amendment may be deemed effective against such Securityholder; *provided, further,* that to the extent that Class A Securityholders retain exercisable rights to appoint a director or board observer under Sections 7.1 and 7.2, the elimination of such rights would be deemed to be material and adverse with respect to the Class A Securityholders within the meaning of the foregoing sentence. Notwithstanding the foregoing, subject to any limitations set forth in its Amended and Restated Certificate of Incorporation, Bylaws or in this Agreement, the Company shall have the right, from and after the date hereof, in the sole discretion of the Board, to issue shares of Common Stock, preferred stock or Options to purchase securities convertible into such shares, to any Person (whether or not such Person is already party to this Agreement) and to cause such securities and such Persons (to the extent not already subject to this Agreement) to become subject to this Agreement (including, at the option of the Company, the designation of any of such securities as Registrable Securities) and as a Securityholder of whatever class, so long as such Securityholder is not a Class A Securityholder, as the Company may determine, respectively.

13.3    <u>Legend on Stock Certificates, Warrants and Option Agreements</u>.  Each certificate representing Securities which are subject to this Agreement shall be endorsed with a legend substantially to the following effect (in addition to any legend required by applicable state securities or "blue sky" laws):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR LEXINGTON PRECISION CORPORATION (THE "COMPANY") SHALL HAVE RECEIVED AN OPINION OF ITS COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THAT ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.  THE SALE, TRANSFER OR OTHER DISPOSITION OF THE SECURITIES IS ALSO SUBJECT TO COMPLIANCE WITH THE TERMS AND CONDITIONS OF THAT CERTAIN SECURITYHOLDERS AGREEMENT, DATED AS OF [_____ ___, 2010], AS SUPPLEMENTED, MODIFIED AND AMENDED FROM TIME TO TIME, AMONG THE COMPANY AND THE STOCKHOLDERS AND OPTIONHOLDERS SIGNATORY

THERETO, A COPY OF WHICH AGREEMENT IS AVAILABLE FOR INSPECTION DURING REGULAR BUSINESS HOURS AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY.

Any stock certificate, warrant or option agreement issued at any time in exchange or substitution for any certificate or agreement bearing such legend (except a new certificate or agreement issued upon the completion of a public distribution of securities of the Company represented thereby) shall also bear such legend, unless the restrictions contained in Sections 3, 4, 5, 6, 7 and 9 of this Agreement are no longer in effect and, in the opinion of counsel for the Company, the Securities represented thereby need no longer be subject to the restrictions contained in Section 2 of this Agreement. The provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the Securityholders and all subsequent holders of Securities who acquired the same directly or indirectly from a Securityholder in a transaction or series of transactions not involving any public offering. The Company agrees that it will not transfer on its books any certificate representing Securities in violation of the provisions of this Agreement.

13.4    <u>Specific Performance</u>. Due to the fact that the securities of the Company cannot be readily purchased or sold in the open market, and for other reasons, the parties will be irreparably damaged in the event that this Agreement is not specifically enforced. In the event of a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any of the parties hereto, the other parties shall, in addition to all other remedies, be entitled (without any bond or other security being required) to a temporary and/or permanent injunction, without showing any actual damage or that monetary damages would not provide an adequate remedy, and/or a decree for specific performance, in accordance with the provisions hereof.

13.5    <u>Waiver</u>. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature. Anything in this Agreement to the contrary notwithstanding, any waiver, consent or other instrument under or pursuant to this Agreement signed by, or binding upon, a Securityholder shall be valid and binding upon any and all persons or entities (other than the Company) who may, at any time, have or claim any rights under or pursuant to this Agreement in respect of the Securities originally acquired by such Securityholder.

13.6    <u>Successors and Assigns</u>. Except as otherwise expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Company, its successors and assigns, and the Securityholders and their respective heirs, personal representatives, successors and permitted assigns.

13.7    <u>Severability</u>. If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or unenforceable any other severable provision of this Agreement, and this Agreement shall be carried out as if any such invalid or unenforceable provision were not contained herein.

13.8    Headings.  The section headings contained herein are for the purposes of convenience of reference only and are not intended to define or limit the contents of said sections.

13.9    Further Assurances.  Each party hereto shall cooperate and shall take such further action and shall execute and deliver such further documents as may be reasonably requested by any other party in order to carry out the provisions and purposes of this Agreement.

13.10    Gender.  Whenever the pronouns "he" or "his" are used herein they shall also be deemed to mean "she" or "hers" or "it" or "its" whenever applicable.  Words in the singular shall be read and construed as though in the plural and words in the plural shall be construed as though in the singular in all cases where they would so apply.

13.11    Notices.  Any notice or other communication to be given hereunder by any party to any other party shall be in writing and delivered in person or by courier or by facsimile transmission or by mail, postage prepaid, as follows:

(a)    if to the Company, to Lexington Precision Corporation, c/o Aurora Capital Group, 10877 Wilshire Boulevard, Los Angeles, California 90024, Attention: Timothy J. Hart, Telecopier No. (310) 277-5591 (with a copy to Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071, Attention: Bruce D. Meyer, Esq., Telecopier No.:  (213) 229-6979)), or at such other place as the Company shall have designated by notice as herein provided to each of the Securityholders; and

(b)    if to a Securityholder, to the address of such Securityholder as it appears on Exhibit A or Exhibit B hereto, or at such other place as such Securityholder shall have designated by notice as herein provided to the Company.

13.12    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original for all purposes, but all of which shall constitute but one and the same instrument.

13.13    Arbitration.

(a)    Any disputes or differences between the parties arising out of this Agreement which the parties are unable to resolve themselves shall be submitted to and resolved by arbitration as herein provided.  Within ten (10) Business Days after commencement of arbitration in accordance with the rules then obtaining of the American Arbitration Association, any of the parties hereto in dispute may request the American Arbitration Association to designate one arbitrator, who shall be a retired or former judge of any court of chancery or appellate court of the State of Delaware, any United States appellate court or the United States District Court for the District of Delaware who is, in any such case, not affiliated with any party in interest to such arbitration and who has substantial professional experience with regard to corporate legal matters.

(b)    The arbitrator shall consider the dispute at issue at New Castle County, Delaware at a mutually agreed upon time within thirty (30) days (or such longer period as may

be acceptable to the parties hereto in dispute) of the designation of the arbitrator.  The arbitration proceeding shall be held in accordance with the rules for commercial arbitration of the American Arbitration Association in effect on the date of commencement of such arbitration and shall include an opportunity for the parties to conduct discovery in advance of the proceeding. Notwithstanding the foregoing, the parties hereto agree that they will attempt, and they intend that they and the arbitrator should use commercially reasonable efforts in that attempt, to conclude the arbitration proceeding and have a final decision from the arbitrator within ninety (90) days from the date of selection of the arbitrator; *provided, however*, that the arbitrator shall be entitled to extend such ninety (90) day period one or more times to the extent necessary for such arbitrator to place a dollar value on any claim that may be unliquidated.  The arbitrator shall promptly deliver a decision with respect to the dispute to each of the parties, who shall promptly act in accordance therewith.  Each party to such arbitration agrees that any decision of the arbitrator shall be final, conclusive and binding and that they will not contest any action by any other party thereto in accordance with a decision of the arbitrator.  It is specifically understood and agreed that any party may enforce any award rendered pursuant to the arbitration provisions of this Section 13.13 by bringing suit in any court of competent jurisdiction.  The parties hereto agree that the arbitrator shall have authority to grant injunctive or other forms of equitable relief to any party that prevails in any such arbitration.

(c)    All costs and expenses attributable to the arbitrator shall be allocated among the parties to the arbitration in such manner as the arbitrator shall determine to be appropriate under the circumstances.

13.14    Effective Date.  The effective date of this Agreement shall be the Initial Date, and each reference herein to the date of this Agreement shall be deemed to be a reference to the Initial Date.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**THE COMPANY:**

**LEXINGTON PRECISION CORPORATION**

By:_____

**THE CLASS A SECURITYHOLDERS:**

By: _____
Name: William B. Conner

ORA ASSOCIATES, LLC


By: _____

Name: _____

Title: _____

SIGNATURE PAGE TO SECURITYHOLDERS AGREEMENT

[ADDITIONAL BOND HOLDERS]

By: _____

Name: _____

Title: _____

**[OPTIONHOLDERS]**

**THE CLASS B SECURITYHOLDERS:**


**COMMERCIAL FINANCE SERVICES 407, LLC**


By: _____
Name: Timothy J. Hart
Title: Vice President, Secretary and General
Counsel

SIGNATURE PAGE TO SECURITYHOLDERS AGREEMENT

**EXHIBIT A**

**Class A Securityholders**
**as of [_____]**

| Name and Address of<br>Class A Securityholder | Number of Shares of Common Stock<br>Owned |
| --- | --- |
| **William B. Conner**<br>c/o Conner Holding Company<br>1030 State Street<br>Erie, PA 16501-1804 | |
| **ORA Associates, LLC,**<br> c/o William Shulevitz<br>155 West 70th Street, Apt.3A,<br>New York, NY 10023 | |

# EXHIBIT B

## Class B Securityholders

## as of [_____]

| Name and Address of Class B Securityholder | Number of Shares of Common Stock Owned |
|---|---|
| **Commercial Finance Services 407, LLC** c/o Aurora Capital Group 10877 Wilshire Boulevard, Suite 2100 Los Angeles, CA 90024 Attn: Timothy J. Hart | |

Telephone No.:      (310) 551-0101
Telecopy No.:      (310) 277-5591
thart@auroracap.com

With copies of any notice to:

    Gibson, Dunn & Crutcher LLP
    333 S. Grand Avenue
    Los Angeles, CA 90071
    Attn:  Bruce D. Meyer, Esq.

Telephone No.:      (213) 229-7979
Telecopy No.:      (213) 229-7520

## EXHIBIT C

## Registration Rights

1.    "Piggy-Back" Registration.

(a)    Right to Include Registrable Securities.  If the Company at any time following a Qualified IPO, proposes to register any of its equity securities under the Act (other than by a registration on Form S-4 or Form S-8 or any successor or similar forms), whether or not for sale for its own account, in a manner which would permit registration of Registrable Securities for sale to the public under the Act, then the Company will each such time give prompt written notice (which shall be at least thirty (30) days prior to filing) to all Securityholders of Registrable Securities of its intention to do so, of such Securityholders' rights under this Paragraph 1 and, to the extent such information is available, of the type and number of equity securities to be registered, the distribution arrangements and, if the offering is underwritten, the proposed price and identity of the lead underwriter(s).  Upon the written request of any such Securityholder made within twenty (20) days after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Securityholder and the intended method of disposition thereof), the Company will use commercially reasonable efforts to effect the registration under the Act of all Registrable Securities which the Company has been so requested to register by the holders thereof, to the extent requisite to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Securities so to be registered, by inclusion of such Registrable Securities in the registration statement which covers the securities which the Company proposes to register or in a separate registration statement concurrently filed and on terms substantially the same as those being offered to the Company; *provided, however*, that if, at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such securities, subject to Paragraph 10 if applicable, the Company may, at its election, give written notice of such determination to each Securityholder of Registrable Securities and, thereupon:

(i)    in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the Registration Expenses in connection therewith), and

(ii)    in the case of a delay in registering, shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other securities.

(b)    Priority in "Piggy-Back" Registrations.  If a registration pursuant to this Paragraph 1 involves an underwritten offering and the managing underwriter advises the Company in writing that, in its opinion, the number of securities requested to be included in such registration exceeds the number which can be sold in such offering without adversely affecting

the offering, the Company will include in such registration to the extent of the number which the Company is so advised can be sold in such offering without adversely affecting the offering, securities determined as follows:

> (i)    first, the securities proposed by the Company to be sold for its own account,

> (ii)    second, any Registrable Securities requested to be included in such registration pro rata among the holders thereof requesting such registration on the basis of the number of shares of such securities requested to be included by such holders, and

> (iii)    third, any other securities of the Company proposed to be included in such registration statement in accordance with the priorities, if any, then existing among the holders of such securities.

2.    Demand Registration Right of Certain Securityholders.

(a)    Right to Require Registration.    Subject to the provisions of this Paragraph 2, at any time after the date nine (9) months following a Qualified IPO, any Class B Securityholder of 10% or more of the outstanding Common Stock (a "Demand Holder") shall have the right to require the Company to file a registration statement under the Securities Act for a public offering of all or any portion of the Registrable Securities held by such Demand Holder when such right is exercised (the shares subject to the demand, the "Registration Demand Securities"), provided that any request for a Demand Registration (as defined below) shall not be otherwise deemed to be effective unless such request is with respect to Registrable Securities constituting at least five percent (5%) of the outstanding shares of the class of Registrable Securities.  The demand registration rights granted to the Demand Holders in this Paragraph 2 are subject to the following limitations:  (i) each Demand Holder may make a demand under this Paragraph 2 only one (1) time (a "Demand Registration"), provided, however, that if after a Demand Holder executes a Demand Registration, such Demand Holder continues to hold 10% or more of the outstanding Common Stock, such Demand Holder shall have the right to execute one additional Demand Registration; (ii) the Company shall not be obligated to cause any registration statement filed under this Paragraph 2 to be declared effective less than six months after the effective date of the most recent registration statement filed by the Company on its own behalf; (iii) the managing underwriter of any such offering shall be a nationally recognized investment banking firm selected by the Company and approved by the Demand Holder making the Demand Registration (which approval shall not be unreasonably withheld); (iv) notwithstanding the giving of notice by a Demand Holder of the exercise of its right to require registration under this Paragraph 2, the Company may elect to convert such registration into a registration of shares for sale by the Company pursuant to Paragraph 1 hereof by providing notice to the Securityholders in accordance with Paragraph 1, and in such event the provisions of Paragraph 1 shall apply to such registration rather than the provisions of this Paragraph 2 and such registration shall not count as a Demand Registration; (v) during any two-year period, the Company may make a one-time election to postpone the filing or the effectiveness of a registration statement for a Demand Registration for up to six months if the Board determines, in its good faith judgment, that (x) such Demand Registration would reasonably be expected to have an adverse effect on,

interfere with or delay any proposal or plan by the Company or any of its subsidiaries to engage in any acquisition of assets (other than in the ordinary course of business) or any merger, consolidation, tender offer or similar transaction, (y) the filing of a registration statement or a sale of Registrable Securities pursuant thereto would require disclosure of material information that the Company has a bona fide business purpose for preserving as confidential or (z) the Company is unable to comply with the registration requirements of the Commission; *provided*, that, in such event, the holders of Registrable Securities initially requesting such Demand Registration will be entitled to withdraw such request and, if such request is withdrawn, such request for Demand Registration will not count as a request for Demand Registration hereunder and the Company will pay all Registration Expenses in connection with such withdrawn registration request; and (vi) any demand under this Paragraph 2 shall be for a firm commitment underwritten offering, with respect to which the Company shall be required to maintain an effective registration statement for a maximum of thirty (30) days.

(b)     Notice of Exercise of Demand Registration Right; Participation Rights. Any Demand Holder shall provide written notice to the Company of the Demand Registration (which notice shall state the number of shares of Registrable Securities the Demand Holder desires the Company to register and the intended method of disposition of such securities), and the Company promptly shall provide written notice of such Demand Registration to all of the other Securityholders and all of the Securityholders then will have the opportunity to include in the offering shares of Registrable Securities then owned by such Securityholders, but in each case only to the extent permitted by Paragraph 2(c) below. In addition, subject to Paragraph 2(c) below, the Company may elect to include in any registration statement and offering pursuant to this Paragraph 2 newly issued shares of Registrable Securities.     Solely for purposes of Paragraphs 3 through 9 below, any securities registered pursuant to this Paragraph 2 shall be deemed to be Registrable Securities.

(c)     Priority. Notwithstanding the foregoing, if the registration pursuant to this Paragraph 2 involves an underwritten offering and the managing underwriter advises the Company in writing that the number of shares of Registrable Securities desired to be offered by the Company or Securityholders other than the Demand Holder together with the Registration Demand Securities of the Demand Holder exceeds the maximum number of such shares which the managing underwriter considers, in good faith, to be appropriate based on market conditions and other relevant factors (including, without limitation, pricing) (the "Maximum Number"), then the securities proposed to be included by Securityholders other than the Demand Holder (the "Other Sellers") shall be excluded from such registration before any such securities of the Demand Holder or the Company shall be excluded. If, and to the extent that, after the exclusion of the securities proposed to be included by the Other Sellers, the number of securities proposed to be included by the Demand Holder and the Company exceeds the Maximum Number, such securities to be included on behalf of the Company shall be excluded. Each of the Demand Holder, the Other Sellers and the Company (in the event that any securities are to be offered by the Company) may withdraw from any demand registration pursuant to this Paragraph 2 by giving written notice to the Company prior to the filing date of such registration statement and, in the event of a withdrawal by the Demand Holder, such withdrawn Demand Registration shall not be deemed to be a Demand Registration counting against the maximum of one Demand Registrations set forth in Paragraph 2(a) if the Demand Holder pays or promptly reimburses the

Company for all Registration Expenses incurred by the Company in connection with such withdrawn Demand Registration.

      3.    <u>Registration Procedures</u>.  If and whenever the Company is required to register or use commercially reasonable efforts to effect the registration of any Registrable Securities under the Act as provided in Paragraph 1 or 2, the Company will, subject to the terms and conditions of Paragraph 1 or 2:

      (a)    prepare and file with the Commission as expeditiously as possible (and, in any event, within ninety (90) days), the requisite registration statement to effect such registration and use commercially reasonable efforts to cause such registration statement to become effective; *provided, however,* that as provided in Paragraphs 1 and 2 hereof, the Company may discontinue any registration of its securities at any time prior to the effective date of the registration statement relating thereto;

      (b)    prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Act with respect to the disposition of all securities covered by such registration statement until the earlier of such time as all of such securities have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement or the expiration of ninety (90) days after such registration statement becomes effective; *provided*, *however*, that if less than all the Registrable Securities are withdrawn from registration after the expiration of such period, the shares so withdrawn shall be allocated <u>pro rata</u> among the holders thereof on the basis of the respective numbers of Registrable Securities held by them included in such registration;

      (c)    promptly furnish to each seller of Registrable Securities covered by such registration statement such number of conformed copies of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits), such number of copies of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Act, in conformity with the requirements of the Act, and such other documents as such seller may reasonably request;

      (d)    use commercially reasonable efforts to register or qualify, prior to the effective date of such registration, all Registrable Securities and other securities covered by such registration statement under such securities or blue sky laws of such jurisdictions as each seller thereof shall reasonably request, to keep such registration or qualification in effect for so long as such registration statement remains in effect, and take any other action which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such seller, except that the Company shall not for any such purpose be required to:

      (i)    qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this Paragraph 2(d) be obligated to be so qualified,

        (ii)     subject itself to taxation in any such jurisdiction, or

        (iii)    consent to general service of process in any such jurisdiction;

        (e)     use commercially reasonable efforts to cause, prior to the effective date of such registration statement, all Registrable Securities covered by such registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof to consummate the disposition of such Registrable Securities;

        (f)     furnish to each seller of Registrable Securities covered by such registration statement a signed counterpart, addressed to such seller (and the underwriters, if any), of:

        (i)     an opinion of counsel for the Company, dated the effective date of such registration statement (or, if such registration includes an underwritten public offering, an opinion of counsel for the Company dated the date of the closing under the underwriting agreement), reasonably satisfactory in form and substance to such seller, and

        (ii)    a "comfort" letter, dated the effective date of such registration statement (and, if such registration includes an underwritten public offering, a "comfort" letter dated the date of the closing under the underwriting agreement), signed by the independent public accountants who have certified the Company's financial statements included in such registration statement,

covering substantially the same matters with respect to such registration statement (and the prospectus included therein) and, in the case of the accountants' letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' letters delivered to the underwriters in underwritten public offerings of securities and, in the case of the accountants' letter, such other financial matters as such seller or such holder (or the underwriters, if any) may reasonably request;

        (g)    immediately notify each holder of Registrable Securities covered by such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Act, of the happening of any event or the existence of any condition as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made, or if in the opinion of counsel for the Company it is necessary to supplement or amend such prospectus to comply with law and, subject to Paragraph 10, at the request of any such holder promptly prepare and furnish to such holder a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances under which they were made or such prospectus, as supplemented or amended, shall comply with law;

(h)    otherwise use commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first full calendar month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Act and the rules and regulations of the Commission thereunder, and not file any amendment or supplement to such registration statement or prospectus to which any such seller of Registrable Securities covered by such registration statement shall have reasonably objected on the grounds that such amendment or supplement does not comply in all material respects with the requirements of the Act or of the rules or regulations thereunder, having been furnished with a copy thereof at least five (5) Business Days prior to the filing thereof;

(i)    provide a transfer agent and registrar for all Registrable Securities covered by such registration statement not later than the effective date of such registration statement;

(j)    use its commercially reasonable to list, not later than the effective date of such registration statement, all Registrable Securities covered by such registration statement on any securities exchange on which any of the Registrable Securities are then listed or any other trading market on which any of the Registrable Securities are then admitted for trading; and

(k)    pay all Registration Expenses relating to any such registration.

The Company may require each seller of Registrable Securities as to which any registration is being effected to furnish the Company with such information and undertakings as it may reasonably request regarding such seller and the distribution of such securities as the Company may from time to time reasonably request in writing.

Each holder of Registrable Securities agrees by acquisition of such Registrable Securities as follows:

(A)    that upon receipt of any notice from the Company of the happening of any event of the kind described in Paragraph 3(g), such holder will forthwith discontinue such holder's disposition of Registrable Securities pursuant to the registration statement relating to such Registrable Securities until such holder's receipt of the copies of the supplemented or amended prospectus contemplated by Paragraph 3(g) and, if so directed by the Company, will deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such holder's possession of the prospectus relating to such Registrable Securities current at the time of receipt of such notice, and

(B)    that it will immediately notify the Company, at any time when a prospectus relating to the registration of such Registrable Securities is required to be delivered under the Act, of the happening of any event as a result of which information previously furnished by such holder to the Company in writing for inclusion in such prospectus contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made.

In the event the Company or any such holder shall give any such notice, the period referred to in Paragraph 3(h) shall be extended by a number of days equal to the number of days during the period from and including the giving of notice pursuant to Paragraph 3(g) to and including the date when each seller of any Registrable Securities covered by such registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Paragraph 3(h).

4.    <u>Underwritten Offerings</u>.

(a)    <u>Underwriting Agreement</u>.  If the Company at any time proposes to register any of its securities under the Act as contemplated by Paragraph 1 or 2 and such securities are to be distributed by or through one or more underwriters, the Company will, subject to the provisions of Paragraph 1(b) or 2(c), use commercially reasonable efforts to arrange for such underwriters to include the Registrable Securities to be offered and sold by a holder who elects to exercise its rights pursuant to Paragraph 1(a) or 2(a) or (b) among the securities to be distributed by such underwriters for and on the same price, terms, and conditions offered to the Company, and each holder of Registrable Securities agrees, by acquisition of such Registrable Securities, that all Registrable Securities of such holder to be included in such registration shall be distributed and sold through such underwriters.  The holders of Registrable Securities to be distributed by such underwriters shall be parties to the underwriting agreement between the Company and such underwriters and may, at their option, require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such holders of Registrable Securities and that any or all of the conditions precedent to the obligations of such underwriters shall also be made to and for the benefit of such holders of Registrable Securities. The Company will use commercially reasonable efforts to ensure that no underwriter shall require any holder of Registrable Securities to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such holder and such holder's intended method of distribution and any other representation required by law, and, despite the Company's commercially reasonable efforts, if an underwriter requires any holder of Registrable Securities to make additional representation or warranties to or agreements with such underwriter, such holder may elect not to participate in such underwritten offering (but shall not have any claims against the Company as a result of such election).

(b)    <u>Selection of Underwriters</u>.    The selection of the underwriter or underwriters for the public offering to be made pursuant to a registration statement filed under Paragraph 1 above shall be made by the Company, in its sole discretion, from amongst underwriting firms of national reputation.

(c)    <u>Holdback Agreements</u>.

(i)    Whether or not a holder of Registrable Securities participates in a registration pursuant to Paragraph 1, such holder agrees by acquisition of its Registrable Securities, if so requested by the Company or required by the managing underwriter, not to effect any public sale or distribution of such securities or sales of such securities pursuant to Rule 144 or otherwise, during the

ninety (90) days prior to and the ninety (90) days after any firm commitment underwritten registration pursuant to Paragraph 1 has become effective; *provided*, *however*, that either the Company or such managing underwriter shall be entitled, in its discretion, to extend the period during which the sale or distribution of Registrable Securities is restricted pursuant to this paragraph by up to an additional one hundred and twenty (120) days following the effective date of any such registration; *provided, further,* that this paragraph (i) shall not apply to any holder unless all executive officers and directors and greater than five percent (5%) stockholders of the Company enter into similar agreements.

(ii)    The Company agrees:

(A)    not to effect any public sale or distribution of its equity securities or securities convertible into or exchangeable or exercisable for any of such securities during the seven (7) days prior to and the ninety (90) days after any firm commitment underwritten registration pursuant to Paragraph 1 or 2 has become effective, except as part of such underwritten registration and except pursuant to registrations on Form S-4 or Form S-8 or any successor or similar forms thereto, and

(B)    to use commercially reasonable efforts to cause each holder of its equity securities or any securities convertible into or exchangeable or exercisable for any of such securities, in each case purchased from the Company at any time after the date hereof (other than in a public offering) to agree not to effect any such public sale or distribution of such securities, during such period or, in either case, if the managing underwriter advises the Company in writing that in its opinion, no such public sale or distribution should be effected for a specified period longer than ninety (90) days after such underwritten registration in order to complete the sale and distribution of securities included in such registration, during a reasonably longer period after such underwritten registration, except as part of such underwritten registration.

5.    <u>Preparation; Reasonable Investigation</u>.  In connection with the preparation and filing of each registration statement under the Act, the Company will give the holders of Registrable Securities registered under such registration statement, their underwriters, if any, and their respective counsel and accountants, the opportunity to participate in the preparation of such registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, and will give each of them such access to its books and records and such opportunities to discuss the business, finances and accounts of the Company and its subsidiaries with its officers, directors and the independent public accountants who have certified its financial statements as shall be necessary, in the opinion of such holders' and such underwriters' respective counsel, to conduct a reasonable investigation within the meaning of the Act.

6.    <u>Certain Rights of Holders</u>.  The Company will not file any registration statement under the Act which refers to any holder of Registrable Securities by name or otherwise without the prior written approval of such holder, which may not be unreasonably withheld.

7.    Indemnification.

(a)    Indemnification by the Company.  In the event of any registration of any securities of the Company under the Act, the Company will, and hereby does, indemnify and hold harmless the seller of any Registrable Securities covered by any registration statement filed pursuant to Paragraph 1 or 2, its directors, officers, members, employees, agents and investment advisors, each other Person who participates as an underwriter in the offering or sale of such securities and each other Person, if any, who controls such seller or any such underwriter within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act, from and against any losses, claims, damages or liabilities, joint or several (or actions or proceedings, whether commenced or threatened, in respect thereof) including without limitation, reasonable attorneys' fees, costs of investigation and costs of enforcing their rights for indemnification (collectively, "Claims"), to which such seller or any such director or officer or employee or agent or investment advisor or underwriter or controlling person may become subject under either Section 15 of the Act or Section 20 of the Exchange Act or otherwise, insofar as such Claims arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such securities were registered under the Act, any preliminary prospectus, final prospectus or summary prospectus contained therein, or any amendment or supplement thereto (if used during the period the Company is required to keep the registration statement current) (collectively, "Registration Documents"), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances in which made, or any violation by the Company of the Act or any state securities law, or any rule or regulation promulgated under the Act or any state securities law, or any other law applicable to the Company relating to any such registration or qualification, and the Company will reimburse such seller and each such director, officer, employee, agent, investment advisor, underwriter and controlling person for any legal or any other expenses reasonably incurred by them in connection with investigating or defending any such Claim; provided, however, that the Company shall not be liable in any such case to the extent that any such Claim or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any such Registration Document in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such seller stating that it is for use in the preparation thereof; provided, further, that the Company shall not be liable to any Person who participates as an underwriter in the offering or sale of Registrable Securities or any other Person, if any, who controls such underwriter within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act (or the selling holder of Registrable Securities, if the sale is not made through an underwriter) in any such case to the extent that any such Claim or expense arises out of such Person's failure to send or give a copy of the final prospectus to the Person claiming an untrue statement or alleged untrue statement or omission or alleged omission at or prior to the written confirmation of the sale of Registrable Securities to such Person if such statement or omission was corrected in such final prospectus.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such seller or any such director, officer, employee, agent, investment advisor, member, underwriter or controlling person and shall survive the transfer of such securities by such seller.

(b)    Indemnification by the Sellers.  The Company may require, as a condition to including any Registrable Securities in any registration statement filed pursuant to Paragraph 1

or 2, that the Company shall have received an undertaking satisfactory to it from each prospective seller of securities, to indemnify and hold harmless (in the same manner and to the same extent as set forth in this Paragraph 7(b)) the Company, each director of the Company, each officer of the Company and each other person, if any, who controls the Company within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act and each underwriter participating in any distribution being made pursuant to such registration statement, with respect to any statement or alleged statement or omission or alleged omission from such Registration Document, if such statement or alleged statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such seller specifically stating that it is for use in the preparation of such Registration Document.   Notwithstanding the foregoing, in no event shall any selling stockholder or any director, officer, employee, agent, investment advisor or controlling person thereof be liable to indemnify the Company pursuant to this Paragraph 7(b) in an amount in excess of the amount of the net proceeds of the Registrable Securities sold by him, her or it in any such offering.   Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Company of any such director, officer or controlling person and shall survive the transfer of such securities by such seller.   The Company shall use commercially reasonable efforts to ensure that no underwriter shall require any holder of Registrable Securities to provide any indemnification other than that provided hereinabove in this Paragraph 7(b), and, if, despite the Company's commercially reasonable efforts, an underwriter requires any holder of Registrable Securities to provide additional indemnification, such holder may elect not to participate in such underwritten offering (but shall not have any claim against the Company as a result of such election).

(c)      Notices of Claims, etc.   Promptly after receipt by an indemnified party of notice of the commencement of any action or proceeding involving a Claim referred to in the preceding subdivisions of this Paragraph 7, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the commencement of such action; *provided*, *however*, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subdivisions of this Paragraph 7, except to the extent that the indemnifying party is actually prejudiced by such failure to give notice.   In case any such action is brought against an indemnified party, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such claim, the indemnifying party shall be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation.   No indemnifying party shall consent to entry of any judgment or enter into any settlement of any pending or threatened proceeding in respect of which an indemnified party is or could have been a party and indemnity could have been sought under Paragraph 7(a) without the consent of the indemnified party which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

(d)    Other Indemnification.    Indemnification similar to that specified in the preceding subdivisions of this Paragraph 7 (with appropriate modifications) shall be given by the Company and each seller of Registrable Securities with respect to any required registration or other qualification of securities under any Federal or state law or regulation of any governmental authority, other than the Act.  If the indemnification provided for in Paragraphs 7(a), (b) or (c) is unavailable to an indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party or parties on the one hand and the indemnified party or parties on the other hand from the offering of the securities or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the indemnified party or parties on the other hand in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations; *provided*, *however*, that in no event shall any contribution by the selling stockholder or any director, officer, employee, agent, investment advisor or controlling person thereof pursuant to this Paragraph 7(d) exceed the amount of the net proceeds of the Registrable Securities sold by him, her or it in any such offering.

(e)    Indemnification Payments.    The indemnification required by this Paragraph 7 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred.

8.    Adjustment Affecting Registrable Securities.  The Company will not effect or permit to occur any combination or subdivision of shares which would adversely affect the ability of the holders of Registrable Securities to effect the registration of such securities in the manner contemplated by these registration rights provisions.

9.    Covenants Relating to Rule 144.  At all times after the effective date of the registration statement under the Act of the initial underwritten public offering of Common Stock, and until such time as all of the Registrable Securities cease to be Registrable Securities, the Company will file reports in compliance with the Exchange Act and will, at its expense, forthwith upon the request of any holder of "restricted securities" (as defined in Rule 144 (or any successor provision under the Act)), deliver to such holder a certificate, signed by the Company's principal financial officer, stating:

(a)    the Company's name, address and telephone number (including area code);

(b)    the Company's Internal Revenue Service identification number;

(c)    the Company's Commission file number;

(d)    the number of shares of Common Stock of the Company outstanding as shown by the most recent report or statement published by the Company; and

(e)    whether the Company has filed the reports required to be filed under the Exchange Act for a period of at least ninety (90) days prior to the date of such certificate and in addition has filed the most recent annual report required to be filed thereunder.

10.    <u>Delay in Filing; Suspension of Registration</u>.

(a)    Notwithstanding the provisions of Paragraphs 1, 2, 3 and 4 of this Exhibit C, in addition to the Company's rights pursuant to clause (v) of Paragraph 2(a), if the filing, initial effectiveness or continued use of any registration statement hereunder at any time would require the Company to make an Adverse Disclosure, then the Company, upon giving prompt notice of such action to the Securityholders participating in such registration, may delay the filing or initial effectiveness of such registration statement or suspend the use thereof for a reasonable period of time as determined in good faith by the Board of Directors of the Company. The Company shall have no obligation to inform the Securityholders of the reason for such delay or suspension other than to inform such Securityholders that such action is being taken pursuant to this Paragraph 10, and except as required by law, the Securityholders and their Affiliates and Associates shall not make any public disclosure regarding, and shall treat as confidential, any such delay, suspension or notice.

(b)    In the case of a delay, the Company shall promptly notify the participating Securityholders upon termination of such delay, and Company shall use commercially reasonable efforts to file such registration statement with the Commission or have the registration statement declared effective as soon as reasonably practicable following the termination of such delay.

(c)    In the case of a suspension, the Securityholders agree to suspend use of the prospectus related to the suspended registration statement in connection with any sale or purchase of or offer to sell or purchase Registrable Securities upon receipt of the notice of suspension.  The Company shall promptly notify the participating Securityholders upon the termination of any such suspension, promptly amend or supplement the registration statement following the termination of such suspension, if necessary, so that it does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein in order to make the statements therein not misleading.

(d)    "<u>Adverse Disclosure</u>" means the public disclosure of material, non-public information, which disclosure, in the reasonable, good faith judgment of the Board of Directors of the Company, after consultation with counsel, (i) would be required to be made in any registration statement or filed with the Commission by the Company so that such registration statement would not be materially misleading or so that such Registration Statement would otherwise comply with the Securities Act or applicable law, (ii) would not be required to be made at such time but for the filing of such registration statement, and (iii) the Company has a bona fide business purpose for not making such disclosure publicly.

**Tab C**

**List of Directors and Officers for Each Lexington
Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRGI")**[*]

| Directors of LPC and LRGI |
| --- |
| Michael A. Lubin* |
| Steve Martinez |
| Ryan McCarthy |
| John Kennedy |
| Michael Chupa |
| Warren Delano* |
| Bill Shulevitz |

| Officers of LPC and LRGI | | |
| --- | --- | --- |
| **Name** | **Title** | **Compensation**[†] |
| Michael A. Lubin* | Chief Executive Officer | $350,000/year plus performance-based cash incentives |
| Warren Delano* | President | $350,000/year plus performance-based cash incentives |
| Dennis J. Welhouse* | Senior Vice President, Chief Financial Officer, and Secretary | $161,200/year plus performance-based cash incentives |
| Charles R. Jenkins* | Assistant Treasurer | $95,000/year plus performance-based cash incentives |

---

[*] indicates that the individual is an insider.

[†] In addition, certain individuals will be eligible to participate in the Management Incentive Plan included under Tab K of the Plan Supplement.

**Tab D**

| List of Executory Contracts to Be Rejected |
| :---: |
| **None.** |

**<u>Tab E</u>**

| **List of Insurance Policies and Agreements to Be Rejected** |
|---|
| **None.** |

**Tab F**

| **Restructuring Transactions** |
|:---:|
| **None.** |

## **Tab G**

### **Stock Purchase Agreement**

**JD Comments: June 22, 2010**

## STOCK PURCHASE AGREEMENT

STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of [_____ __], 2010, between Commercial Finance Services 407, LLC, a Delaware limited liability company ("Purchaser"), and Lexington Precision Corporation, a Delaware corporation (the "Company").

WHEREAS, the Company and its wholly-owned subsidiary, Lexington Rubber Group, Inc., a Delaware Corporation ("LRGI" and, together with the Company, the "Debtors"), have filed for voluntary relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the case commenced by the Debtors is being jointly administered as Case No. 08-11153 (SCC) (the "Chapter 11 Cases");

WHEREAS, the Debtors operate their respective businesses as debtors-in-possession and have filed with the Bankruptcy Court the chapter 11 plan of reorganization substantially in the form and substance attached hereto as Exhibit A (the "Plan"); and

WHEREAS, on the Effective Date (as defined in the Plan), Reorganized LPC (as defined in the Plan) (referred hereto as the "Reorganized Company") will issue and sell to Purchaser, and Purchaser will purchase from the Reorganized Company, shares of New LPC Common Stock (as defined in the Plan), par value $0.01 per share, in accordance with and pursuant to the Plan and this Agreement (the "New Common Stock").

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

I.    DEFINITIONS

1.1    Definitions.  As used herein, the terms below will have the following respective meanings:

(a)    "Action" has the meaning designated in Section 9.11(a);

(b)    An "Affiliate" of any Person means another Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person; and, for the purposes of this definition only, "control" (including the terms "controlling", "controlled by" and "under common control with") means the direct or indirect possession of the power to direct or cause the direction of the management, policies or activities of a Person whether through the ownership of securities, by contract or agency or otherwise; provided that as such term is used in this Agreement, Purchaser shall not be considered an Affiliate of the Company;

(c)    "Agreement" has the meaning designated in the Recitals;

(d)    "Bankruptcy Code" has the meaning designated in the Recitals;

(e)    "Bankruptcy Court" has the meaning designated in the Recitals;

(f)    "Business Day" means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order;

(g)    "Chapter 11 Cases" has the meaning designated in the Recitals;

(h)    "Closing" has the meaning designated in Section 2.3;

(i)    "Closing Date" has the meaning designated in Section 2.3;

(j)    "Company" has the meaning designated in the Recitals;

(k)    "Company Disclosure Letter" has the meaning designated in Article III;

(l)    "Competing Proposal" has the meaning designated in Section 5.4;

(m)    "Confidentiality Agreement" means any Confidentiality Agreement between the Company and Purchaser;

(n)    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan;

(o)    "Debtors" has the meaning designated in the Recitals;

(p)    "Governmental Entity" means any governmental or regulatory authority, domestic or foreign, including without limitation any quasi-governmental, supranational or statutory entity and any stock exchange, court or arbitral body;

(q)    "Lexington Company" means any of the Company, LRGI or their Subsidiaries or its and their respective successors and assigns, including the Reorganized Company and its Subsidiaries;

(r)    "Law" means any domestic or foreign statute, rule, regulation or other legal requirement;

(s)    "LRGI" has the meaning designated in the Recitals;

(t)    "New Common Stock" has the meaning designated in the Recitals;

(u)    "Order" means any order, ruling, judgment, injunction or decree;

(v)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity;

(w)    "Plan" has the meaning designated in the Recitals;

(x)    "Plan Supplement" means the forms of documents specified in section 13.9 of the Plan;

(y)    "Pre-Closing Period" has the meaning designated in Section 5.1;

(z)    "Purchase Price" has the meaning designated in Section 2.1;

(aa)    "Purchaser" has the meaning designated in the Recitals;

(bb)    "Reorganized Company" has the meaning designated in the Recitals;

(cc)    "Securityholders Agreement" has the meaning designated in Section 2.4(ii);

(dd)    "Senior Subordinated Notes" means those certain 12% senior subordinated notes due August 1, 2009 and issued pursuant to an indenture, dated as of December 18, 2003, between Wilmington Trust Company, as indenture trustee, and the Company.

(ee)    "Shares" has the meaning designated in Section 2.1; and

(ff)    "Transaction Documents" has the meaning designated in Section 3.1.

1.2    Certain Interpretative Matters.  When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference will be to an Article or Section of, or an Annex or Schedule to, this Agreement unless otherwise indicated.  Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder"

and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms used herein with initial capital letters have the meanings ascribed to them herein and all terms defined in this Agreement will have such defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

## II.    SHARE PURCHASE

2.1    Share Purchase. On the terms and subject to the conditions hereinafter set forth, at the Closing, the Reorganized Company will issue and sell to Purchaser, and Purchaser will purchase from the Reorganized Company, for an aggregate price equal to [$_____] (the "Purchase Price"), [_____] shares of the New Common Stock at a purchase price of $10.00 per share, which shares represent [__%] of the New Common Stock issued and outstanding as of immediately after the Effective Date (after giving effect to the issuance of New Common Stock pursuant to this Agreement and otherwise pursuant to the Plan) (such shares issued to Purchaser, the "Shares").[1]

2.2    Purchase Price. The Purchase Price will be payable on the Closing Date in Cash by bank wire transfer of immediately available funds to an account or accounts designated by the Company in writing prior to the Closing.

2.3    Closing. The closing of the purchase and sale of the Shares (the "Closing") will take place at the offices of Jones Day, 222 E. 41st Street, New York, New York as soon as practicable after all of the conditions (other than the conditions to be satisfied concurrently with the Closing) set forth in Article VI hereof have been satisfied or waived. The date on which the Closing occurs is the "Closing Date."

2.4    Closing Deliveries. (a) At or prior to the Closing, Purchaser will deliver to the Reorganized Company:

(i)    the Purchase Price payable in accordance with Section 2.2 hereof;

(ii)    the Securityholders Agreement of the Reorganized Company in the form attached hereto as Exhibit B (the "Securityholders Agreement"), duly executed by Purchaser; and

---

[1]    Amounts and percentage to be completed at signing.

4

          (iii)   the officer's certificate required to be delivered by Purchaser pursuant to Section 6.1(e) hereof.

    (b)   At or prior to the Closing, the Reorganized Company will deliver to Purchaser:

          (i)   evidence, satisfactory to the Purchaser, of the filing with the Secretary of Sate of the State of Delaware, of the Amended and Restated Certificate of Incorporation of the Reorganized Company in the form attached hereto as <u>Exhibit C</u>;

          (ii)   Evidence, satisfactory to the Purchaser, of the proper adoption of the Amended and Restated Bylaws of the Reorganized Company in the form attached hereto as <u>Exhibit D</u>;

          (iii)   validly issued stock certificate or certificates evidencing the Shares;

          (iv)   the Securityholders Agreement, duly executed by the Reorganized Company and each other party thereto other than Purchaser; and

          (v)   the officer's certificate required to be delivered by the Reorganized Company pursuant to Section 6.1(e) hereof.

    III.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

       The Company hereby represents and warrants to Purchaser, except as set forth in the letter, dated of even date herewith, from the Company to Purchaser specifically referencing this Agreement and delivered prior to the execution of this Agreement (the "<u>Company Disclosure Letter</u>"), as follows:

       3.1   <u>Existence; Authorization, Validity and Effect of Agreement</u>.  As of the date hereof, the Company is a corporation duly incorporated, validly existing and in good standing under the Laws of Delaware.  As of the Effective Date, the Reorganized Company will be a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  The Company has the requisite corporate power and authority to execute and deliver this Agreement and, subject to the entry of the Confirmation Order and the occurrence of the Effective Date, the Reorganized Company will have the requisite corporate power and authority to execute and deliver the Securityholders Agreement (collectively with this Agreement, the "<u>Transaction Documents</u>").   The Transaction Documents and the consummation by the Company and, subject to the entry of the Confirmation Order and the occurrence of the Effective Date, the Reorganized Company of the transactions contemplated thereby have been or, in the case of the Reorganized Company, will be duly authorized by all requisite corporate action.  This Agreement has been duly and validly executed and delivered by the Company and constitutes, and the Securityholders Agreement, when executed and delivered by the Reorganized Company, will constitute, the valid and binding obligations of the Company or the Reorganized Company, as applicable, enforceable against the Company or the Reorganized Company, as applicable, in accordance with their respective terms (in each case, assuming the due and valid authorization, execution and delivery thereof by each other party thereto), except

that (i) such enforceability may be subject to applicable bankruptcy, insolvency or other similar Laws now or hereinafter in effect affecting creditors' rights generally, (ii) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought, and (iii) rights to indemnification may be limited by public policy considerations.

3.2    Capitalization.  Immediately following the Effective Date and upon issuance of the Shares (and all other distributions of New Common Stock pursuant to the Plan), the Shares will represent [___%][2] of the issued and outstanding shares of New Common Stock, and the New Common Stock will constitute the only issued and outstanding class of capital stock of the Reorganized Company.

3.3    Validity of Shares, Etc.  Each of the Shares, when issued to Purchaser in accordance with the Plan and this Agreement and after payment of the Purchase Price hereunder, will be duly authorized, validly issued, fully paid, non-assessable and will not have been issued in violation of any preemptive rights.  At the Closing, after payment of the Purchase Price hereunder, Purchaser will acquire good and valid title to the Shares, free and clear of any and all liens, claims, security interests, encumbrances, restrictions on voting or alienation or otherwise, or adverse interests, except as may be created by Purchaser, the Transaction Documents or by applicable securities Laws.

3.4    Schedule 3.4 sets forth a true and complete list of the Subsidiaries of the Company as of the date hereof.  Each Subsidiary of the Company is duly organized, validly existing and in good standing in the jurisdiction in which it was formed.  All of the outstanding capital stock of LRGI is owned by the Company.

3.5    No Conflict; Required Filings and Consents.  (a)  The execution, delivery and performance of this Agreement and the other Transaction Documents by the Company or the Reorganized Company, as the case may be, do not, and the consummation by the Company and the Reorganized Company of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the articles of incorporation or bylaws or equivalent organizational documents of any Lexington Company (as the same may be amended or adopted pursuant to the Plan) or (ii) subject to the entry of the Confirmation Order and the occurrence of the Effective Date, conflict with or violate any Law or Order applicable to any Lexington Company or by which any property or asset of any Lexington Company is, bound.

(b)    The execution and delivery of this Agreement and the other Transaction Documents by the Company or the Reorganized Company, as applicable, does not, and the performance of this Agreement and the other Transaction Documents and the consummation by the Company and the Reorganized Company of the transactions contemplated hereby and thereby will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity, except for the entry of the Confirmation Order.

---

[2]  To be completed at signing.

IV.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows:

4.1    Existence; Authorization, Validity and Effect of Agreement.  Purchaser is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware.  Purchaser is in compliance with its articles of incorporation and bylaws or equivalent organizational documents and all Laws applicable to it.  Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed by it (including without limitation the Transaction Documents).  The Transaction Documents and the consummation by Purchaser of the transactions contemplated thereby have been duly and validly authorized by all requisite corporate action.  This Agreement has been duly and validly executed and delivered by Purchaser and constitutes, and the Securityholders Agreement, when executed and delivered by Purchaser, will constitute, the valid and binding obligations of Purchaser, enforceable against it in accordance with their respective terms (in each case, assuming the due and valid authorization, execution and delivery thereof by each other party thereto), except that (i) the enforceability hereof and thereof may be subject to applicable bankruptcy, insolvency or other similar Laws now or hereinafter in effect affecting creditors' rights generally, (ii) the availability of the remedy of specific performance or injunctive or other forms of equitable relief may be subject to equitable defenses and would be subject to the discretion of the court before which any proceeding therefor may be brought, and (iii) rights to indemnification may be limited by public policy considerations.

4.2    No Conflict; Required Filings and Consents.  (a)  The execution, delivery and performance of this Agreement and the other Transaction Documents by Purchaser do not, and the consummation by Purchaser of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the articles of incorporation or bylaws or equivalent organizational documents of Purchaser or any of its Subsidiaries, (ii) conflict with or violate any Law or Order applicable to Purchaser or any of its Subsidiaries or by which any property or asset of Purchaser or any of its Subsidiaries is bound.

(b)    The execution and delivery of this Agreement and the other Transaction Documents by Purchaser does not, and the performance of this Agreement and the consummation of the transactions contemplated hereby and thereby by it will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Entity.

4.3    Investment Intent.  Purchaser is purchasing the Shares to be purchased by it for its own account and for investment purposes, and does not intend to redistribute the Shares (except in a transaction or transactions exempt from registration under the federal and state securities Laws or pursuant to an effective registration statement under such Laws).  Purchaser acknowledges that the Shares have not been registered under the Securities Act of 1933, as amended, or any state blue sky or securities Laws, that the transfer of the Shares is subject to compliance with such Laws (in addition to the restrictions set forth in the Securityholders Agreement), and that the certificate or certificates evidencing the Shares shall bear a legend reflecting the foregoing.

4.4     Investor Sophistication; Etc.  Purchaser is a sophisticated investor and has such knowledge and experience in financial, business and investment matters as to be capable of evaluating the merits and risks of an investment in the Shares.  Purchaser was not organized for the specific purpose of acquiring the Shares.  Purchaser is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

4.5     Senior Subordinated Notes. As of the date hereof, Purchaser holds Senior Subordinated Notes having an aggregate principal amount of $ 24,085,000.

4.6     Available Funds.  At the Closing, Purchaser shall have funds sufficient to purchase the Shares in accordance with the terms hereof.

## V.     COVENANTS

5.1     Access.  (a)  During the period from the date of this Agreement through the earlier of the Closing and the termination of this Agreement in accordance with Sections 8.1 or 8.2 hereof (the "Pre-Closing Period"), the Company will (i) allow all designated officers, attorneys, accountants and other representatives of Purchaser reasonable access at reasonable times to all designated officers, key employees, accountants and other representatives of the Lexington Companies and the books and records of the Lexington Companies and (ii) furnish to Purchaser and its counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request.

(b)     During the Pre-Closing Period, Purchaser shall provide the Company with such documentation as the Company may reasonably request to permit the Company to conduct a reasonable due diligence investigation concerning the financial capability, resources and creditworthiness of Purchaser, and Purchaser agrees to provide such assurances as to financial capability, resources and creditworthiness as may be reasonably requested by any third Person whose consent or approval is sought in connection with the transactions contemplated hereby.

5.2     Confidentiality.  (a)  Information obtained by Purchaser pursuant to Section 5.1(a) hereof shall be subject to the Confidentiality Agreement.

(b)     The Confidentiality Agreement shall remain in effect during the term of this Agreement and following its termination; provided, however, that such agreement will automatically terminate as of the Closing.

5.3     Publicity.  Until the Closing, the Company (or the Reorganized Company, as applicable) and Purchaser will, subject to their respective legal obligations (including requirements of stock exchanges and other similar regulatory bodies), consult with each other, and use reasonable efforts to agree upon the text of any press release, before issuing any such press release or otherwise making public statements with respect to the transactions contemplated hereby and in making any filings with any Governmental Entity or with any national securities exchange with respect thereto.

5.4     No Solicitations.  (a)  During the Pre-Closing Period, the Company agrees that it will not, and that it will cause its Subsidiaries and their respective officers, agents, representatives, Affiliates, stockholders and any other Person acting on its or their behalf not to,

directly or indirectly, solicit offers, inquiries or proposals for any transaction which would render impossible or impracticable the transactions between Purchaser and the Company contemplated herein on the terms herein (any such offer, inquiry or proposal, a "Competing Proposal").

(b)     If, during the Pre-Closing Period, the Company receives from any Person any Competing Proposal the Company will promptly advise Purchaser of such Competing Proposal and thereafter keep Purchaser informed in reasonable detail of all material communication related thereto.

(c)     Without limiting the generality or effect of the Confidentiality Agreement, during the Pre-Closing Period, Purchaser agrees that it will not, and that it will cause its officers, agents, representatives, Affiliates, stockholders and any other Person acting on its behalf not to, directly or indirectly, solicit or make any Competing Proposal, or accept or agree to, or otherwise cooperate in any way with any offer, inquiry or proposal relating to a Competing Proposal.

5.5     Best Efforts to Close.  The parties agree to use their best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including without limitation using their best efforts to cause the conditions to Closing to be satisfied as promptly as practicable.  Nothing set forth in this Section 5.5 will limit or affect actions permitted to be taken elsewhere in this Agreement.

5.6     Approvals.  Each of Purchaser and the Company agrees that it shall comply with the Laws that are applicable to any of the transactions contemplated by this Agreement and pursuant to which government notification or approval of such transactions is necessary or advisable.  Each of Purchaser and the Company shall consult and provide reasonable assistance to the other with respect to the compliance with such Laws and the obtaining of all such approvals and approvals of any third party necessary or advisable to the consummation of such transactions.  Each party shall keep the other reasonably apprised of the status of any material matters relating to completion of the transactions contemplated herein and shall use all reasonable efforts to resolve any objections as may be asserted by an Governmental Entity or third party the approval of which is necessary or advisable with respect to the transactions contemplated hereby.

5.7     Notification of Certain Matters.  The Company will give prompt notice to Purchaser, and Purchaser will give prompt notice to the Company, of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement and (ii) any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby.

5.8     Further Action.  From and after the Closing Date, each of the parties hereto will use all commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things reasonably necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and the other documents contemplated hereby

(including without limitation the Transaction Documents) and make effective the transactions contemplated hereby and thereby.

5.9    Conduct of Business.  During the Pre-Closing Period, except as otherwise contemplated by this Agreement (including the Company Disclosure Letter) or as required by the Bankruptcy Court or as otherwise required by Law, the Company will, in the context of the Chapter 11 Cases, cause the Lexington Companies' businesses to be conducted in the ordinary course and consistent with the present conduct of such businesses.

## VI.    CONDITIONS TO CLOSING

6.1    Conditions to Each Party's Obligations. The respective obligations of each party to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)  all conditions precedent to the effectiveness of the Plan shall have been satisfied or waived pursuant to the provisions therein;

(b)  no Order or Law enacted, entered, promulgated, enforced or issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement shall be in effect;

(c)  all representations and warranties of the other party hereto shall be true and correct in all material respects on the Closing Date;

(d)  all material covenants required to be performed by the other party hereto shall have been complied with in all material respects; and

(e)  each party shall have received from the other party a certificate of an executive officer of such other party certifying to the satisfaction of the condition set forth in (d) above.

6.2    Conditions to Obligations of the Reorganized Company.  The obligations of the Reorganized Company to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing of the following conditions:

(a)  that all items set forth in Section 2.4(a) hereof shall have been delivered to the Reorganized Company; and

(b)  the Plan (including without limitation the Plan Supplement) confirmed pursuant to the Confirmation Order shall be in the form attached as Exhibit A hereto or as otherwise approved by the Reorganized Company, and all the conditions precedent to the Plan shall have been satisfied in full or waived in accordance with Section 11.2 of the Plan.

6.3    Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing of the following conditions:

18

(a) all items set forth in Section 2.4(b) hereof shall have been delivered to Purchaser; and

(b) the Plan (including without limitation the Plan Supplement) confirmed pursuant to the Confirmation Order shall be in the form attached as Exhibit A hereto or as otherwise approved by Purchaser, and all the conditions precedent to the Plan shall have been satisfied in full or waived in accordance with Section 11.2 of the Plan.

## VII.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES

7.1    Survival of Representations and Warranties.  The representations and warranties set forth herein shall survive the Closing indefinitely.

## VIII.    TERMINATION AND WAIVER

8.1    Termination by Mutual Consent.  This Agreement may be terminated at any time prior to the Closing Date by the mutual consent of Purchaser and the Company.

8.2    Termination by Either Purchaser or Company.  This Agreement may be terminated:

(a) by either Purchaser or the Company if the Closing shall not have occurred on or before [_____ __, 2010][3], provided, however, that no party may terminate this Agreement pursuant to this Section 8.2(a) if such party's failure to fulfill any of its obligations under this Agreement shall have been the reason that the Closing shall not have occurred on or before said date;

(b) by either Purchaser or the Company if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the consummation of the purchase of Shares by Purchaser or any of the other transactions contemplated by this Agreement and such Order or other action shall have become final and nonappealable;

(c) by Purchaser if the Chapter 11 Cases of the Company is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a Chapter 11 trustee is appointed;

(d) by Purchaser if the Bankruptcy Court approves the consummation of the transactions contemplated by any Competing Proposal; or

(e) by either Purchaser or the Company, as the case may be, if there shall have been a default or breach by the other party of such other party's representations and warranties, covenants or agreements set forth in this Agreement, or in connection with the transactions contemplated hereby, which default or breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 10 calendar days following receipt by the defaulting or breaching party from the other party hereto of written notice of such default or

---

[3] This date will be 30 calendar days after the execution of this Agreement.

breach (specifying in reasonable detail the claimed default or breach and demand of its cure or satisfaction), and which default or breach would result in a failure of the condition set forth in Section 6.1(c) or 6.1(d) hereof, as applicable; provided that no party may terminate this Agreement pursuant to this Section 8.2(e) if such party is in material breach of this Agreement.

8.3    Effect of Termination.  In the event of the termination of this Agreement pursuant to Sections 8.1 or 8.2 hereof by Purchaser, on the one hand, or the Company, on the other hand, written notice thereof shall promptly be given to the other party specifying the provision hereof pursuant to which such termination is made, and this Agreement shall become void and have no effect, and there shall be no liability hereunder on the part of Purchaser or the Company or the Reorganized Company, provided, however, that Sections 5.2(a) and (b) hereof shall survive any such termination for so long as the Confidentiality Agreement shall remain in effect and provided further, however, that nothing in this Section 8.3 shall relieve any party of liability for any breach of this Agreement.

IX.    GENERAL PROVISIONS

9.1    Notices.  Any notice or other communication required to be given hereunder shall be in writing, and sent by reputable courier service (with proof of service), by hand delivery or by facsimile (followed on the next Business Day by delivery by courier service (with proof of delivery) or by hand delivery), addressed as follows:

If to Purchaser:

    Commercial Financial Services 407, LLC
    10877 Wilshire Blvd., Suite 2250
    Los Angeles, CA 90024
    Attn: Steve Martinez
    Telephone: (310) 286-3500
    Facsimile: (310) 277-5591

With copies to:

    Jones Day
    222 E. 41st St.
    New York, New York  10017
    Attn:  Lisa Laukitis
    Telephone: (212) 326-3939
    Facsimile:  (212) 755-7306

And:

    Jennifer J. O'Neil
    Jones Day
    222 East 41st Street
    New York, NY 10017
    Phone: 212.326.3742
    E-mail: jjoneil@jonesday.com

> If to the Company or the Reorganized Company:
>
>> Lexington Precision Corporation
>> 800 Third Avenue, 15th Floor
>> New York, New York 10022
>> Attn: Michael Lubin
>> Telephone: (212) 319-4655
>> Facsimile: (212) 319-4659
>
> With copies to:
>
>> Weil, Gotshal & Manges LLP
>> 767 Fifth Avenue
>> New York, New York 10153
>> Attn: [_____]
>> Telephone: (212) 310-8000
>> Facsimile:  (212) 310-8007
>
> And:
>
>> Nixon Peabody LLP
>> 437 Madison Avenue
>> New York, New York 10022
>> Attn: Richard F. Langan, Jr.
>> Telephone: (212) 940-3000
>> Facsimile: (212) 940-3111

or to such other address as any party specifies by written notice so given, and such notice will be deemed to have been received on the date of delivery or facsimile transmission, as the case may be, to the recipient thereof if delivered or transmitted, as applicable, prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice or other communication will be deemed not to have been received until the next succeeding Business Day in the place of receipt following the date of delivery or transmission. Rejection, any refusal to accept or the inability to deliver because of a changed address of which no notice was given will be ineffective.

   9.2    Assignment; Binding Effect.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any party hereto (whether by operation of Law or otherwise) without the prior written consent of the other party, except that (a) Purchaser will have the right to assign to any Affiliate of Purchaser any and all rights and obligations of Purchaser under this Agreement, provided, that any such assignment will not relieve Purchaser from any of its obligations hereunder, and (b) effective as of the Effective Date, all of the rights and obligations of the Company under this Agreement will be deemed assigned to the Reorganized Company pursuant to the Plan.  Any assignment not granted in accordance with the foregoing shall be null and void.  Subject to the first and last sentence of this Section 9.2, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Notwithstanding anything contained in this

Agreement to the contrary, (A) the Company's and the Reorganized Company's obligations hereunder are subject to approval by the Bankruptcy Court of the transactions contemplated hereby and under the other Transaction Documents and (B) nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto or their respective heirs, successors, executors, administrators and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

       9.3    <u>Entire Agreement</u>.  This Agreement, the Company Disclosure Letter, and any documents delivered by the parties in connection herewith or therewith, including the Transaction Documents and the Confidentiality Agreement, constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the parties with respect thereto, including, without limitation, any draft letter of intent or term sheet with respect to the transactions contemplated herein.

       9.4    <u>Amendment</u>.  Subject to applicable Law, including but not limited to the requirements of the Bankruptcy Code and the orders of the Bankruptcy Court, this Agreement may only be amended by an instrument in writing signed on behalf of each of the parties hereto.

       9.5    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the Laws of the State of New York, without regard to its conflict of laws principles.

       9.6    <u>Counterparts</u>.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered will be an original, but all such counterparts will together constitute one and the same instrument.  Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  A facsimile copy of a signature page shall be deemed to be an original signature page.

       9.7    <u>Headings</u>.  Headings of the Articles and Sections of this Agreement are for the convenience of the parties only, and will be given no substantive or interpretive effect whatsoever.

       9.8    <u>Waivers</u>.  The waiver by any party hereto of a breach of any provision hereunder will not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provision hereunder.  At any time prior to the Closing Date, any party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby.

       9.9    <u>Severability</u>.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so

broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

9.10    Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

9.11    Jurisdiction; Consent to Service of Process.  (a)  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and any appellate court from any such court, in any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby ("Action"), or for recognition or enforcement of any judgment resulting from any such Action, and each party hereby irrevocably and unconditionally agrees that all claims in respect of any such Action may be heard and determined in the Bankruptcy Court.

(b)    It will be a condition precedent to each party's right to bring any such Action that such Action, in the first instance, be brought in the Bankruptcy Court, and if each such court refuses to accept jurisdiction with respect thereto, such Action may be brought in any United States District Court located in New York County, New York so long as such court shall have subject matter jurisdiction over such Action, or alternatively in any New York State Court located in New York County, New York if the aforesaid United States District Courts do not have subject matter jurisdiction, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of New York, and each of the parties hereby irrevocably consents to the jurisdiction of such court, and of the appropriate appellate courts therefrom, in any such Action and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Action in any such court or that any such Action which is brought in such court has been brought in an inconvenient forum.

(c)    No party may move to (i) transfer any such Action from the Bankruptcy Court to another jurisdiction, (ii) consolidate any such Action brought in the Bankruptcy Court with a suit, action or proceeding in another jurisdiction, or (iii) dismiss any such Action brought in the Bankruptcy Court for the purpose of bringing the same in another jurisdiction.

(d)    Each party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any Action in the Bankruptcy Court, (ii) the defense of an inconvenient forum to the maintenance of such Action in any such court, and (iii) the right to object, with respect to such Action, that such court does not have jurisdiction over such party.  Each party irrevocably consents to service of process in any manner permitted by Law.

9.12    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.13    <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

9.14    <u>Enforcement of Agreement</u>.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement was not performed in accordance with its specific terms or was otherwise breached.  It is accordingly agreed that the parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled at law or in equity.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have executed this Agreement and caused the same to be duly delivered on their behalf on the day and year first written above.


Lexington Precision Corporation


By:_____
    Name:
    Title:


Commercial Finance Services 407, LLC


By:_____
    Name:
    Title:

JD Comments: June 22, 2010

Exhibit A

The Plan

Exhibit B

The Securityholders Agreement

Exhibit C

The Amended and Restated Certificate of Incorporation of the Reorganized Company

Exhibit D

The Amended and Restated Bylaws of the Reorganized Company

Schedule 3.4

Subsidiaries

**<u>Tab H-1</u>**

**Revised Summary of Amended and Restated Secured CSE Loan Agreement**

WLDD Draft
June 22, 2010

**II.    Summary of Terms of Amended and Restated Loan and Security Agreement (the "Loan Agreement").**    *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.*

| | |
|---|---|
| **Lenders** | CSE Mortgage LLC ("CSE") and DMD Special Situations, LLC ("DMD" and, together with CSE, the "Lenders"). |
| **Debtors** | Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG" and, together with LPC, the "Borrowers"). |
| **Agent** | CSE, as administrative agent and collateral agent (the "Agent"). |
| **Equity Sponsor** | Aurora Resurgence Management Partners LLC or an affiliate thereof (the "Equity Sponsor"). |
| **Closing Date** | The date on which all of the conditions precedent of the Loan Agreement are fully satisfied. |
| **Governing Law** | New York |
| **Commitments** | Term Loan A:    a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of [$8,575,036.22]. |
| | Term Loan B:    a term loan, including Capitalized Expenses allocated pro rata between Term Loan B, Term Loan A and the Equipment Term Loan, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of [$4,233,772.33]. |
| **Term / Maturity** | 3-year facility maturing on July 19, 2013. |
| **Priority Ranking** | First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on real estate collateral and second-lien on non-real estate collateral). |
| | Payment subordination of Term Loan B (see "Amortization" below). |
| **Interest** | Term Loan A:    LIBOR plus Applicable Term A Margin.    LIBOR floor of 2.5%. |
| | Applicable Term A Margin of 7.0% for the first full year of the loan facility.    Thereafter, the Applicable Term A Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:<br>(i) if Leverage Ratio is greater than 2.5x, 8.0%;<br>(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 7.5%;<br>(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, |

7.0%;
(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 6.0%; and
(v) if Leverage Ratio is less than or equal to 1.75x, 5.5%.

Term Loan B:    Base Rate plus Applicable Term B Margin.   Base Rate floor of 5.0%

Applicable Term B Margin of 10.5% for the first full year of the loan facility.    Thereafter, the Applicable Term B Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:
(i) if Leverage Ratio is greater than 2.5x, 11.5%;
(ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 11.0%;
(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 10.5%;
(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 9.5%; and
(v) if Leverage Ratio is less than or equal to 1.75x, 9.0%.

Default Interest Rate: 2.0% per annum plus the Applicable Rate.

| | |
|---|---|
| **Fees** | Commitment Fee:    1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date. |
| **Amortization; Repayment** | Amortization of Term Loan A<br>Payments in the following amounts are payable: (i) $61,111.11 per month for the first full twenty-four (24) months following the Closing Date and (ii) $90,000 per month for each month thereafter until the end of the Term.<br><br>Repayment of Term Loan B<br>Entire principal balance of the Term Loan B due and payable in full as of the expiration of the Term.   The Term Loan B facility may be voluntarily prepaid, provided that either (i) the Term Loan A and the Equipment Loan under the Amended and Restated Credit and Security Agreement are repaid in full in cash or (ii) the Borrowers have already prepaid an aggregate principal amount of not less than $3,000,000 of the Term Loan A and Borrowers otherwise comply with certain "Restricted Payment Conditions" (e.g., no Event of Default in existence or as a result thereof). |
| **Mandatory Prepayments** | Extraordinary Receipts:    mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of |

the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement.

<u>Dispositions/Sales</u>:    mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of business).

<u>Casualty Event Proceeds</u> Extraordinary Receipts consisting of proceeds from insurance policies covering Equipment or Real Property damage, destruction or casualty may be reinvested by the Borrowers to repair or replace such damaged Equipment or Real Property, provided, among other things, that no Default or Event of Default exist and be continuing and that the cost of the repairs or replacements do not exceed the Materiality Threshold ($250,000).

<u>Excess Cash Flow</u>:    mandatory prepayment of 50% of Excess Cash Flow payable quarterly, unless Leverage Ratio for such quarter is less than 2.5:1.0.

<u>Equity Issuances / Debt Incurrence</u>:    mandatory prepayment of 100% of any Equity Interest issuances or Indebtedness incurrence by any Borrower (excepting therefrom any Net Cash Proceeds, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject thereto); <u>provided</u> that so long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or incur Indebtedness under the Junior Lien Facility in an aggregate principal amount not to exceed $5,000,000; <u>provided</u>, <u>further</u>, that any Indebtedness incurred under the Junior Lien Facility shall not exceed $3,000,000.

| | |
|---|---|
| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |
| **Negative Covenants** | Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others. |

| | |
|---|---|
| **Financial Covenants** | <u>Fixed Charge Coverage Ratio</u>:   not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date. |
| | <u>Capital Expenditures</u>:   maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year. |
| | <u>Leverage Ratio</u>:<br>- 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to July 1, 2011;<br>- 3.5:1.0 for each calendar month ending after July 1, 2011 and prior to July 1, 2012; and<br>- 3.0:1.0 for each calendar month ending after July 1, 2012 through the expiration of the Term.<br><u>Minimum Liquidity</u>:   not less than $2,000,000 at any time. |
| | <u>Minimum EBITDA</u>:   not less than (i) $600,000 from the first day of the first full calendar month following the Closing Date to the last day of such calendar month; (ii) $1,333,333 from the first day of the second full calendar month following the Closing Date to the last day of such calendar month; (iii) $8,000,000 on an annualized basis (as measured from the first full day of the first full calendar month following the Closing Date) beginning on the last day of the third full calendar month following the Closing Date through the last day of the calendar month that is the first anniversary of the Closing Date and (iv) $9,000,000 thereafter. |
| **Conditions Precedent** | Customary conditions precedent for a loan facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity in an amount of at least $3,000,000. |
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or |

interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others.

**Equity Investment**    Equity Sponsor shall have made an Equity Investment in an amount not less than $[8,000,000] in the Borrowers as of the Closing Date.

**Junior Lien Facility**    Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent.

**Board of Directors**    Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).    As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member).

**Board Observation**    A Lender Representative selected by the Agent may attend meetings of each Governing Body.    So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement.

**Tab H-2**

**Revised Summary of Amended and Restated Secured CapitalSource Credit Agreement**

WLDD Draft
June 22, 2010

## Lexington Precision Corporation

**I.    Summary of Terms of Amended and Restated Credit and Security Agreement (the "Credit Agreement").** *Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.*

**Lenders**            CapitalSource Finance LLC ("CS") and Webster Business Credit Corporation ("Webster" and, together with CS, the "Lenders").

**Debtors**            Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG" and, together with LPC, the "Borrowers").

**Agent**              CS, as administrative agent and collateral agent (the "Agent").

**Equity Sponsor**     Aurora Resurgence Management Partners LLC or an affiliate thereof (the "Equity Sponsor").

**Closing Date**       The date on which all of the conditions precedent of the Credit Agreement are fully satisfied.

**Governing Law**      New York

**Commitments**        Equipment Term Loan:    a term loan, including its allocable share of Capitalized Expenses, made by the Lenders to the Borrowers on the Closing Date in the aggregate principal amount of $[17,657,219.07].

                       Revolving Credit Commitments:    a credit facility in the maximum aggregate principal amount of Revolving Credit Advances and Letters of Credit that may be outstanding at any one time, which as of the Closing Date equals $[733,000], less any L/C Disbursements and less any amounts that may expire and not be renewed under any Letters of Credit.

**Term / Maturity**    3-year facility maturing on July 19, 2013.

**Priority Ranking**   First-priority perfected security interest in the Collateral, subject to the terms of an Intercreditor Agreement (first-lien on non-real estate collateral and second-lien on real estate collateral).

**Interest**           LIBOR plus the Applicable Margin.

                       LIBOR floor of 2.5%.

                       Applicable Margin of 5.5% for the first full year of the credit facility. Thereafter, the Applicable Margin adjusts on each Determination Date pursuant to the following Leverage Ratio calculations:
                       (i) if Leverage Ratio is greater than 2.5x, 6.5%;
                       (ii) if Leverage Ratio is greater than 2.25x but less than or equal to 2.5x, 6.0%;

(iii) if Leverage Ratio is greater than 2.0x but less than or equal to 2.25x, 5.5%;

(iv) if Leverage Ratio is greater than 1.75x but less than or equal to 2.0x, 4.5%; and

(v) if Leverage Ratio is less than or equal to 1.75x, 4.0%.

<u>Default Interest Rate:</u> 2.0% per annum plus the Applicable Rate.

**Fees**     <u>Commitment Fee:</u>    1.0% commitment fee shared pro rata among the Lenders and paid in full on the Closing Date.

<u>Letter of Credit Fees:</u>    5.5% per annum (increasing by 2.0% per annum from and after the occurrence of, and during the continuation of, any Event of Default) for each Letter of Credit, together with any and all other fees and expenses in connection therewith, payable quarterly in arrears.

<u>Audit Fees:</u>    Agent entitled to conduct as many Audit Fees as it wishes. However, provided no Default or Event of Default exists and is continuing and the Borrowers' Leverage Ratio as of the last day of each Fiscal Quarter of the applicable Fiscal Year is 2.0:1.0 or less, then Borrowers shall only reimburse Agent for the lesser of (i) $25,000 or (ii) the actual costs and expenses incurred by Agent in connection with such field audit.

**Amortization**     Amortization payments in the following amounts are payable: (i) $208,333.33 per month for the first full twenty-four (24) months following the Closing Date and (ii) $325,000 per month for each month thereafter until the end of the Term.

**Mandatory Prepayments**     <u>Extraordinary Receipts:</u>    mandatory prepayment of 100% net proceeds thereof (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) unless resulting from casualty proceeds which are reinvested as permitted under the Credit Agreement.

<u>Dispositions/Sales:</u>    mandatory prepayment of 100% of Net Cash Proceeds (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto) of any Permitted PP&E Disposition and/or any other sale or disposition of Collateral (other than the sale of Inventory in the ordinary course of business).

Casualty Event Proceeds:    Extraordinary Receipts consisting of
proceeds from insurance policies covering Equipment or Real Property
damage, destruction or casualty may be reinvested by the Borrowers to
repair or replace such damaged Equipment or Real Property, provided,
among other things, that no Default or Event of Default exist and be
continuing and that the cost of the repairs or replacements do not exceed
the Materiality Threshold ($250,000).

Excess Cash Flow:    mandatory prepayment of 50% of Excess Cash
Flow payable quarterly (excepting therefrom any Excess Cash Flow, to
the extent payable and paid to the Term Loan Agent for application to the
Term Loan Debt in accordance with the terms of the Term Loan
Agreement and subject thereto), unless Leverage Ratio for such quarter is
less than 2.5:1.0.

Equity Issuances / Debt Incurrence:    mandatory prepayment of 100% of
Net Cash Proceeds of any Equity Interest issuances or Indebtedness
incurrence by any Borrower; provided that so long as no Event of Default
has occurred and is continuing, Borrowers may issue Equity Interests
and/or incur Indebtedness under the Junior Lien Facility in an aggregate
principal amount not to exceed $5,000,000; provided, further, that any
Indebtedness incurred under the Junior Lien Facility shall not exceed
$3,000,000.

| | |
|---|---|
| **Representations and Warranties** | Customary representations and warranties for a credit facility of this size and nature. |
| **Negative Covenants** | Customary negative covenants for a credit facility of this size and nature, restricting Borrowers' ability to sell assets, grant Liens on the Collateral, incur Indebtedness, make loans or investments, pay dividends or make redemptions, change the nature of its business, transact business with Affiliates, prepay certain Indebtedness and pay Subordinated Debt, among others. |
| **Financial Covenants** | Fixed Charge Coverage Ratio:    not less than 1.0:1.0, measured on a monthly basis, for any Test Period (annualized for the first twelve (12) months and on a rolling 12-month basis thereafter) beginning on the last day of the third full calendar month following the Closing Date.

Capital Expenditures:    maximum aggregate principal amount of $4,000,000 in any Fiscal Year, subject to increase of no more than $1,000,000 for unused amounts of Capital Expenditures for an immediately preceding Fiscal Year. |

Leverage Ratio:
- 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to July 1, 2011;
- 3.5:1.0 for each calendar month ending after July 1, 2011 and prior to July 1, 2012; and
- 3.0:1.0 for each calendar month ending after July 1, 2012 through the expiration of the Term.

Minimum Liquidity:    not less than $2,000,000 at any time.

Minimum EBITDA:    not less than (i) $600,000 from the first day of the first full calendar month following the Closing Date to the last day of such calendar month; (ii) $1,333,333 from the first day of the second full calendar month following the Closing Date to the last day of such calendar month; (iii) $8,000,000 on an annualized basis (as measured from the first full day of the first full calendar month following the Closing Date) beginning on the last day of the third full calendar month following the Closing Date through the last day of the calendar month that is the first anniversary of the Closing Date and (iv) $9,000,000 thereafter.

| | |
|---|---|
| **Conditions Precedent** | Customary conditions precedent for a credit facility of this size and nature, including, among others, corporate authorization certificates, executed documents, payment of fees, delivery of legal opinions, evidence of Equity Investment, delivery of Subordination Agreements, election of new Boards of Directors for each borrower (each a "Board"), entry of Confirmation Order and consummation of Plan Document transactions, and Agent's receipt of satisfactory evidence that on the Closing Date, after giving effect to the transactions and payments contemplated in the Credit Agreement and Loan Agreement, Borrowers shall have Liquidity in an amount of at least $3,000,000. |
| **Periodic Deliverables** | Annual Financial Statements; Monthly and Quarterly Financial Statements; Projections; Compliance Certificates; and others. |
| **Events of Default** | Customary Events of Default, including failures to pay principal or interest, misrepresentations, failure to furnish financial information (5-day cure period), issuance of impermissible Liens (30-day cure period), judgments exceeding the Materiality Threshold (30-day cure period), voluntary or involuntary bankruptcy filings; Material Adverse Change (30-day cure period); Cross-Default or acceleration on Subordinated Debt, Change of Control and Change of Management, among others. |
| **Equity Investment** | Equity Sponsor shall have made an Equity Investment in an amount not less than $[8,000,000] in the Borrowers as of the Closing Date. |

**Junior Lien Facility**     Equity Sponsor shall have the right to enter into a secured subordinated credit facility with one or more of the Borrowers in an aggregate principal amount not to exceed $3,000,000 and subject to a Subordination Agreement with the Agent.

**Board of Directors**      Each Board must have at least one (1) Independent Director (appointed by Equity Sponsor).    As of the Closing Date, one (1) Board member shall be the CEO of LPC; one (1) Board member shall be appointed by the Affiliated Bondholders (as defined in the Reorganization Plan); four (4) Board members shall be appointed by the Equity Sponsor; and one (1) Board member shall be appointed by the DIP Lenders (as defined in the Reorganization Plan) (provided that if at least $[3,500,000] is not rolled over to new Equity Interests as of the Closing Date, Equity Sponsor shall appoint such seventh Board member).

**Board Observation**      A Lender Representative selected by the Agent may attend meetings of each Governing Body.    So long as no Default or Event of Default has occurred and is continuing, such Lender Representative may not attend more than three (3) such Governing Body meetings **in any Fiscal Year** and may be excused from such meeting (i) to the extent its attendance would jeopardize a Borrower's ability to assert its attorney-client privilege, (ii) during which matters relating to the Loans are discussed or (iii) during any vote or final deliberation relating thereto regarding the sale or other disposition of any Collateral permitted by the Credit Agreement.

**<u>Tab I-1</u>**

**Revised Amended and Restated Secured CSE Loan Agreement**

**AMENDED AND RESTATED**

**LOAN AND SECURITY AGREEMENT**

**Dated as of [July 19], 2010**


**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**


**and**


**CSE MORTGAGE LLC**

**as a Lender and as Agent**

**and**

**ANY OTHER LENDERS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

# TABLE OF CONTENTS

**Page**

I.    DEFINITIONS ...................................................................................................................2
  1.1.    ACCOUNTING TERMS ...................................................................................2
  1.2.    GENERAL TERMS ..........................................................................................3
  1.3.    UNIFORM COMMERCIAL CODE TERMS ........................................................3
  1.4.    CERTAIN MATTERS OF CONSTRUCTION .......................................................3

II.   TERM LOANS; PAYMENTS ...........................................................................................3
  2.1.    TERM LOANS ................................................................................................3
  2.2.    VOLUNTARY PREPAYMENTS .........................................................................4
  2.3.    MANDATORY PREPAYMENTS ........................................................................4
  2.4.    STATEMENT OF ACCOUNT; EVIDENCE OF LOANS .........................................6

III.  INTEREST AND FEES .....................................................................................................7
  3.1.    INTEREST ......................................................................................................7
  3.2.    COMPUTATION OF INTEREST ........................................................................8
  3.3.    MAXIMUM CHARGES ....................................................................................8
  3.4.    [INTENTIONALLY OMITTED] .........................................................................8
  3.5.    INCREASED COSTS ........................................................................................8
  3.6.    CAPITAL ADEQUACY .....................................................................................9

IV.   COLLATERAL; GENERAL TERMS .............................................................................10
  4.1.    SECURITY INTEREST IN THE COLLATERAL ...................................................10
  4.2.    PERFECTION OF SECURITY INTEREST ..........................................................11
  4.3.    DISPOSITION OF COLLATERAL .....................................................................12
  4.4.    PRESERVATION OF COLLATERAL ..................................................................12
  4.5.    OWNERSHIP OF COLLATERAL .......................................................................13
  4.6.    DEFENSE OF AGENT'S AND LENDERS' INTERESTS ........................................13
  4.7.    BOOKS AND RECORDS ...................................................................................14
  4.8.    FINANCIAL AND OTHER DISCLOSURE ...........................................................14
  4.9.    COMPLIANCE WITH LAWS .............................................................................14
  4.10.   INSPECTION OF PREMISES .............................................................................14
  4.11.   INSURANCE ...................................................................................................15
  4.12.   PAYMENT OF TAXES .....................................................................................16
  4.13.   PAYMENT OF LEASEHOLD OBLIGATIONS .....................................................16
  4.14.   RECEIVABLES ...............................................................................................16
  4.15.   INVENTORY ..................................................................................................19
  4.16.   EQUIPMENT AND REAL PROPERTY COVENANTS ..........................................19
  4.17.   EXCULPATION ...............................................................................................19
  4.18.   ENVIRONMENTAL MATTERS .........................................................................19
  4.19.   NO OTHER FINANCING STATEMENTS ............................................................22
  4.20.   ADDITIONAL MORTGAGES ...........................................................................22
  4.21.   INTELLECTUAL PROPERTY ...........................................................................22
  4.22.   COMMERCIAL TORT CLAIMS ........................................................................22
  4.23.   OFAC ..........................................................................................................22
  4.24.   APPRAISALS ..................................................................................................22

V.    REPRESENTATIONS AND WARRANTIES ....................................................................22
  5.1.    AUTHORITY ..................................................................................................22
  5.2.    FORMATION AND QUALIFICATION ...............................................................23
  5.3.    TAX RETURNS ..............................................................................................23
  5.4.    FINANCIAL STATEMENTS .............................................................................24

|       |                                                                                  |    |
|-------|----------------------------------------------------------------------------------|----|
| 5.5.  | Name                                                                             | 24 |
| 5.6.  | OSHA and Environmental Compliance                                                | 24 |
| 5.7.  | Solvency                                                                         | 25 |
| 5.8.  | Litigation                                                                       | 25 |
| 5.9.  | No Indebtedness                                                                  | 26 |
| 5.10. | Violations                                                                       | 26 |
| 5.11. | Plans                                                                            | 26 |
| 5.12. | Patents, Trademarks, Copyrights and Licenses                                     | 27 |
| 5.13. | Licenses and Permits                                                             | 27 |
| 5.14. | No Default of Indebtedness                                                       | 27 |
| 5.15. | No Other Defaults                                                                | 27 |
| 5.16. | No Burdensome Restrictions                                                       | 27 |
| 5.17. | No Labor Disputes                                                                | 27 |
| 5.18. | Margin Regulations                                                               | 28 |
| 5.19. | Investment Company Act                                                           | 28 |
| 5.20. | Disclosure                                                                       | 28 |
| 5.21. | No Conflicting Agreements or Orders                                              | 28 |
| 5.22. | Application of Certain Laws and Regulations                                      | 28 |
| 5.23. | Hedge Contracts                                                                  | 28 |
| 5.24. | Real Property                                                                    | 28 |
| 5.25. | Deposit Accounts                                                                 | 28 |
| 5.26. | Brokers                                                                          | 28 |
| 5.27. | OFAC                                                                             | 28 |
| 5.28. | Accountants' Letter                                                              | 29 |
| 5.29. | Senior Debt                                                                      | 29 |

**VI.    AFFIRMATIVE COVENANTS ............................................................29**

| 6.1.  | Payment of Fees                                                                  | 29 |
| 6.2.  | Conduct of Business and Maintenance of Existence and Assets                      | 29 |
| 6.3.  | Violations                                                                       | 29 |
| 6.4.  | Government Receivables                                                            | 29 |
| 6.5.  | Execution of Supplemental Instruments                                            | 29 |
| 6.6.  | Payment of Material Agreements                                                    | 30 |
| 6.7.  | Standards of Financial Statements                                                | 30 |
| 6.8.  | Further Assurances, Post Closing                                                 | 30 |
| 6.9.  | Board of Directors                                                               | 30 |
| 6.10. | Board Observation                                                                | 30 |

**VII.   NEGATIVE COVENANTS ..................................................................31**

| 7.1.  | Sale of Assets, Consolidation, Merger, Dissolution, Etc.                         | 31 |
| 7.2.  | Encumbrances                                                                     | 32 |
| 7.3.  | Indebtedness                                                                     | 34 |
| 7.4.  | Loans, Investments, Etc.                                                         | 36 |
| 7.5.  | Dividends and Redemptions                                                        | 37 |
| 7.6.  | Nature of Business                                                               | 38 |
| 7.7.  | Transactions with Affiliates                                                     | 38 |
| 7.8.  | Subsidiaries                                                                     | 39 |
| 7.9.  | Fiscal Year and Accounting Changes                                               | 39 |
| 7.10. | Pledge of Credit                                                                 | 39 |
| 7.11. | Amendment of Material Agreements                                                 | 39 |
| 7.12. | Compliance with ERISA                                                            | 40 |
| 7.13. | Prepayment of Indebtedness                                                       | 40 |
| 7.14. | Payment of Subordinated Debt                                                     | 40 |
| 7.15. | Organizational Changes                                                           | 40 |

**VIII.  FINANCIAL COVENANTS ................................................................41**

|       | 8.1.  | CONTROLLING DEFINITIONS | 41 |
|       | 8.2.  | FIXED CHARGE COVERAGE RATIO | 43 |
|       | 8.3.  | CAPITAL EXPENDITURES | 43 |
|       | 8.4.  | LEVERAGE RATIO | 43 |
|       | 8.5.  | MINIMUM LIQUIDITY | 434 |
|       | 8.6.  | MINIMUM EBITDA | 434 |
| **IX.** | **CONDITIONS PRECEDENT** | | **44** |
|       | 9.1.  | CONDITIONS TO EFFECTIVENESS | 44 |
| **X.** | **INFORMATION AS TO BORROWERS** | | **49** |
|       | 10.1. | DISCLOSURE OF MATERIAL MATTERS | 49 |
|       | 10.2. | ENVIRONMENTAL COMPLIANCE CERTIFICATE | 49 |
|       | 10.3. | LITIGATION | 49 |
|       | 10.4. | MATERIAL OCCURRENCES | 49 |
|       | 10.5. | GOVERNMENT RECEIVABLES | 49 |
|       | 10.6. | ANNUAL FINANCIAL STATEMENTS | 50 |
|       | 10.7. | MONTHLY FINANCIAL STATEMENTS | 50 |
|       | 10.8. | PROJECTIONS | 50 |
|       | 10.9. | VARIANCES FROM OPERATING BUDGET | 51 |
|       | 10.10. | NOTICE OF ADVERSE EVENTS | 51 |
|       | 10.11. | ERISA NOTICES AND REQUESTS | 51 |
|       | 10.12. | MATERIAL INTELLECTUAL PROPERTY | 51 |
|       | 10.13. | PUBLIC REPORTS | 52 |
|       | 10.14. | MATERIAL AGREEMENTS | 52 |
|       | 10.15. | ADDITIONAL INFORMATION | 52 |
|       | 10.16. | ADDITIONAL DOCUMENTS | 52 |
| **XI.** | **EVENTS OF DEFAULT** | | **52** |
|       | 11.1. | OBLIGATIONS | 52 |
|       | 11.2. | MISREPRESENTATIONS | 53 |
|       | 11.3. | FINANCIAL INFORMATION | 53 |
|       | 11.4. | LIENS | 53 |
|       | 11.5. | COVENANTS | 53 |
|       | 11.6. | JUDGMENTS | 53 |
|       | 11.7. | VOLUNTARY BANKRUPTCY | 53 |
|       | 11.8. | CESSATION OF BUSINESS | 53 |
|       | 11.9. | INVOLUNTARY BANKRUPTCY | 54 |
|       | 11.10. | MATERIAL ADVERSE CHANGE | 54 |
|       | 11.11. | AGENT'S LIENS | 54 |
|       | 11.12. | SUBORDINATED DEBT | 54 |
|       | 11.13. | CROSS DEFAULT | 54 |
|       | 11.14. | GUARANTY | 54 |
|       | 11.15. | CHANGE OF CONTROL | 54 |
|       | 11.16. | CHANGE OF MANAGEMENT | 54 |
|       | 11.17. | INVALIDITY | 54 |
|       | 11.18. | TAKINGS | 54 |
|       | 11.19. | SEIZURES | 55 |
|       | 11.20. | CESSATION OF OPERATIONS | 55 |
|       | 11.21. | PLANS | 55 |
|       | 11.22. | CRIMINAL CHARGES | 55 |
| **XII.** | **AGENT'S LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT** | | **55** |
|       | 12.1. | RIGHTS AND REMEDIES | 55 |
|       | 12.2. | APPLICATION OF PROCEEDS | 57 |
|       | 12.3. | AGENT'S DISCRETION | 57 |

|  | 12.4. | SETOFF | 57 |
|  | 12.5. | RIGHTS AND REMEDIES NOT EXCLUSIVE | 58 |

**XIII.  WAIVERS AND JUDICIAL PROCEEDINGS** ........................................................ **58**

|  | 13.1. | WAIVER OF NOTICE | 58 |
|  | 13.2. | DELAY | 58 |
|  | 13.3. | JURY WAIVER | 58 |

**XIV.  EFFECTIVE DATE AND TERMINATION** ............................................................... **59**

|  | 14.1. | TERM | 59 |
|  | 14.2. | TERMINATION | 59 |

**XV.  REGARDING AGENT** ................................................................................................... **60**

|  | 15.1. | APPOINTMENT | 60 |
|  | 15.2. | NATURE OF DUTIES | 60 |
|  | 15.3. | LACK OF RELIANCE ON AGENT AND RESIGNATION | 60 |
|  | 15.4. | CERTAIN RIGHTS OF AGENT | 61 |
|  | 15.5. | RELIANCE | 61 |
|  | 15.6. | NOTICE OF DEFAULT | 61 |
|  | 15.7. | INDEMNIFICATION | 62 |
|  | 15.8. | AGENT IN ITS INDIVIDUAL CAPACITY | 62 |
|  | 15.9. | DELIVERY OF DOCUMENTS | 62 |
|  | 15.10. | BORROWERS' UNDERTAKING TO AGENT | 62 |
|  | 15.11. | DOCUMENTATION AGENT, ETC. | 62 |
|  | 15.12. | TERM B LENDERS PURCHASE OPTION. | 63 |
|  | 15.13. | COLLATERAL MATTERS. | 64 |

**XVI.  BORROWING REPRESENTATIVE** ........................................................................... **65**

|  | 16.1. | BORROWING REPRESENTATIVE PROVISIONS | 65 |
|  | 16.2. | WAIVER OF SUBROGATION | 66 |

**XVII.  MISCELLANEOUS.** ..................................................................................................... **66**

|  | 17.1. | GOVERNING LAW | 66 |
|  | 17.2. | ENTIRE UNDERSTANDING; AMENDMENTS; WAIVERS; CONSENTS | 67 |
|  | 17.3. | SUCCESSORS AND ASSIGNS; PARTICIPATIONS; NEW LENDERS | 68 |
|  | 17.4. | APPLICATION OF PAYMENTS | 71 |
|  | 17.5. | INDEMNITY | 71 |
|  | 17.6. | NOTICE | 72 |
|  | 17.7. | SURVIVAL | 74 |
|  | 17.8. | SEVERABILITY | 74 |
|  | 17.9. | EXPENSES | 74 |
|  | 17.10. | INJUNCTIVE RELIEF | 74 |
|  | 17.11. | CONSEQUENTIAL DAMAGES | 75 |
|  | 17.12. | CAPTIONS | 75 |
|  | 17.13. | COUNTERPARTS; TELECOPIED SIGNATURES | 75 |
|  | 17.14. | CONSTRUCTION | 75 |
|  | 17.15. | CONFIDENTIALITY | 75 |
|  | 17.16. | PUBLICITY | 76 |
|  | 17.17. | SURVIVAL OF REPRESENTATIONS AND WARRANTIES | 76 |
|  | 17.18. | DESTRUCTION OF INVOICES | 76 |
|  | 17.19. | TIME | 76 |
|  | 17.20. | RELEASE | 76 |
|  | 17.21. | PATRIOT ACT | 76 |
|  | 17.22. | AMENDMENT AND RESTATEMENT | 76 |

## AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

PREAMBLE.  This Amended and Restated Loan and Security Agreement (herein, together with all schedules and exhibits hereto, and as it may be amended, restated, supplemented or modified from time to time, called this "Agreement"), dated as of **[July 19]**, 2010, is made among: (i) LEXINGTON PRECISION CORPORATION, a Delaware corporation ("LPC" or "Parent Company"), and LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("LRG"; LRG and LPC herein sometimes called individually, "Initial Borrower" and, collectively, if more than one, the "Initial Borrowers"; and together with each other Person which, on or subsequent to the Closing Date, agrees in writing to become a borrower hereunder, herein called, individually, a "Borrower" and, collectively, the "Borrowers," and pending the inclusion by written agreement of any other such Person, besides each Initial Borrower, as a "Borrower" hereunder, all references herein to "Borrowers," "each Borrower," the "applicable Borrower," "such Borrower" or any other, similar variations thereof (whether singular or plural) shall all mean and refer to each Initial Borrower, collectively); (ii) CSE MORTGAGE LLC, a Delaware limited liability company ("CSE"), together with any and all other Persons that are now, or that hereafter become, party hereto, as lenders hereunder (collectively, the "Lenders" and, individually, a "Lender"); and (iii) CSE, as collateral agent and administrative agent for itself, each other such Lender and each other "Lender Party" (as hereinafter defined) (CSE, when acting in such agency capacity, is herein called the "Agent").

STATEMENT OF THE TRANSACTION.  Capitalized terms used in this statement of the transaction shall have the meanings ascribed to such terms in Section 1.2.  The Initial Borrowers and the Lender Parties have entered into that certain Loan and Security Agreement, dated as of May 31, 2006, as amended by that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (as further amended or modified to date, the "Existing Loan Agreement", wherein the Lenders have provided the Initial Borrowers with certain term loans in the initial aggregate principal amount of $**[15,000,000]** (collectively, the "Existing Term Loan Facility").

The Borrowers are debtors and debtors-in-possession in jointly-administered cases under Chapter 11 of the Bankruptcy Code, Case No. 08-11153 (the "Chapter 11 Cases"), and they have obtained from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a series of orders to minimize any disruption to the Borrowers' business operations and to facilitate the Borrowers' reorganization, including, the authority to use the Lenders' cash collateral.

The Borrowers have emerged from Chapter 11 bankruptcy pursuant to the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as amended, supplemented or otherwise modified from time to time, the "Reorganization Plan"). By operation of law all Defaults and/or Events of Default existing prior to the Closing Date have been cured or waived pursuant to a final non-appealable order (other than with respect to any material appeals reasonably consented to by the Lenders and Agent), dated as of the date hereof (the "Confirmation Order").

In order to finance in part the distributions to be made under the Reorganization Plan and to pay the fees and expenses associated therewith (including, without limitation, the Capitalized Expenses), the Borrowers have requested that simultaneously with the consummation of the Reorganization Plan, the Lenders shall amend and restate the Existing Term Loan Facility pursuant to the terms and conditions herein.

Borrowers, Agent and Lenders acknowledge and agree that, immediately prior to the closing of the transaction contemplated hereby, the current principal amount outstanding under the (a) Term Loan A, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $**[8,148,582.68]** and (b) Term Loan B, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $**[4,023,222.22]**.

Pursuant to the Reorganization Plan, the Existing Term Loan Facility shall be amended to, among other things, (a) extend the last day of the Term from May 15, 2009 to **[July 19]**, 2013 and (b) convert all the following, which are outstanding as of the Closing Date, to Obligations due under the Term Loans, and accordingly, increase the amount of each Term Loan by the amounts, respectively, of such amounts so converted: (i) all accrued and unpaid interest relating to each Term Loan and (ii) $**[637,003.65]** of the Capitalized Expenses, all in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and undertakings herein contained, each Borrower, each Lender and Agent, each intending to be legally bound hereby, hereby covenant and agree as follows:

I.    DEFINITIONS.

1.1.    Accounting Terms.  As used in this Agreement or any Other Document, accounting terms not defined or partly defined (to the extent not fully defined) in Section 1.2 or elsewhere in this Agreement shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with the Financial Covenants, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the Historical Financial Statements; provided, further, that in the event that any accounting change (an "Accounting Change") shall occur that results in a change in the method of calculation of the Financial Covenants, standards or terms of this Agreement, then the Borrowers and Agent agree to enter into negotiations in good faith in order to amend such affected provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such Accounting Changes had not been made and, until such time as an amendment regarding such affected provisions of this Agreement has been executed and delivered by the Borrowers, Agent and the Required Lenders, all Financial Covenants, standards and terms of this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  Certain other definitions, used in the determination of the Financial Covenants, are set forth in Section 8.1.  When applied to Borrowers and their Subsidiaries or Borrowers on a consolidated basis, accounting terms shall mean Borrowers and their Subsidiaries on a consolidated basis determined in accordance with GAAP.

1.2.    General Terms.  For purposes of this Agreement the following terms shall have the following meanings:  See Annex One attached hereto and by this reference incorporated herein.

1.3.    Uniform Commercial Code Terms.  All terms used herein and defined in the Uniform Commercial Code shall have the meaning given therein unless otherwise defined herein.  Without limitation of the foregoing, the terms "accounts," "chattel paper," "instruments," "general intangibles," "payment intangibles," "support obligations," "securities," "investment property," "documents," "commercial tort claims," "deposit accounts," "payment intangibles," "software," "letter-of-credit rights," "inventory," "farm products," "equipment" and "fixtures," as and when used in the description of Collateral, shall have the meanings given to such terms in Articles 8 or 9 (as applicable) of the Uniform Commercial Code.

1.4.    Certain Matters of Construction.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa.  All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.  Unless otherwise provided, all references to any documents, instruments or agreements to which Agent, any Lender or any Borrower is a party, including, without limitation, references to any of the Other Documents, shall mean and include each of such documents, instruments or agreements as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in a manner consistent with the terms of this Agreement and the Intercreditor Agreement.  References herein or in any Other Documents to any actions being taken (or omitted to be taken) by any Lender Party after a Default or Event of Default has occurred shall mean that such action may be taken (or omitted to be taken) only during the continuation of such Default or Event of Default. The words "to Borrowers' knowledge" (or words to similar effect), shall mean the knowledge of Borrowers' officers or employees charged with responsibility for the matter in question, obtained (or which should reasonably have been expected to have been obtained) after due inquiry. Unless otherwise expressly provided herein or in any Other Documents, all references to time herein and in any Other Documents shall mean and refer to New York time.

II.    TERM LOANS; PAYMENTS

2.1.    Term Loans.

(a)    Term Loan A.  Subject to the terms and conditions of this Agreement, each Term A Lender, severally and not jointly, has made available to Borrowers the Term Loan A in a sum equal to such Lender's Term Loan A Commitment.  The principal amount of the Term Loan A shall be repaid in monthly installments on the first day of each calendar month equal in amount to (i) Sixty-One Thousand One Hundred Eleven Dollars and 11/100 ($61,111.11) each, beginning on **[August 1]**, 2010, and continuing on the first day of each succeeding calendar month for twenty-four (24) months and (ii) Ninety Thousand Dollars and No/100 ($90,000.00) each, beginning on **[August 1]**, 2012, and continuing on the first day of each succeeding calendar month thereafter until the expiration of the Term (subject, however, to acceleration upon (or following) the occurrence of an Event of Default and during its

continuation as provided herein), at which time all of the Obligations, including without limitation, the entire remaining principal balance of all Term Loans, shall be due and payable in full.

(b)    Term Loan B.  Subject to the terms and conditions of this Agreement, each Term B Lender, severally and not jointly, has made available to Borrowers the Term Loan B in a sum equal to such Lender's Term Loan B Commitment.  The entire principal balance of the Term Loan B shall be due and payable, in full, upon the expiration of the Term (subject, however, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation as provided herein), at which time all of the Obligations, including without limitation, the entire remaining principal balance of all Term Loans, shall be due and payable in full.

2.2.    Voluntary Prepayments.  The Term Loans may be voluntarily prepaid, in whole or in part, at any time or from time to time, provided, however, that: (i) any partial prepayments of the Term Loan A shall be applied to the principal installments of the Term Loan A then remaining to be repaid in the reverse order of their respective maturities (beginning with the final payment); (ii) any full prepayment of the principal balance of any Term Loan shall be accompanied by the payment of accrued interest thereon through the date of prepayment and (iii) the Borrowers may not voluntarily prepay the Term Loan B, unless (A) the Term Loan A and the Equipment Term Loan (as defined in the Revolver Loan Agreement) have been repaid in full in cash or (B) (x) the Borrowers comply with the Restricted Payment Conditions with respect to any such prepayment and (y) prior to making any such prepayment, the Borrowers have made voluntary prepayments under this Section 2.2 and/or mandatory prepayments under Section 2.3, in each case, in respect of Term Loan A, in an aggregate amount equal to at least $3,000,000.

2.3.    Mandatory Prepayments.  Notwithstanding the provisions of Section 2.1 hereof:

(a)    Extraordinary Receipts.  Subject to subsection (c) below, upon the receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts, which payments shall be applied to the Obligations in the manner specified in subsection (f) below;

(b)    Dispositions.  Upon the sale or disposition of any Collateral by any Borrower or any of its Subsidiaries as permitted in clauses (ii) and (vi) of Section 7.1(b) hereof (excepting therefrom any proceeds of Non-Real Property Collateral, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject to the provisions of the Intercreditor Agreement in regard thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by any such Borrower or Subsidiary in connection therewith, which payments shall be applied to the Obligations in the manner specified in subsection (f) below;

(c)    <u>Insurance Proceeds</u>.  Notwithstanding <u>subsection (a)</u> above, if any of the Equipment or Real Property is damaged or physically destroyed or otherwise suffers a casualty, upon the written request of Borrowing Representative, which shall be made not less than five (5) Business Days after such casualty occurs, Agent shall release to Borrowing Representative Extraordinary Receipts consisting of proceeds from insurance policies covering such damage, destruction or casualty that are received by Agent pursuant to <u>Section 4.11</u> hereof or otherwise, to the extent a Borrower elects to apply such Extraordinary Receipts to the repair, refurbishment or replacement of the Equipment or Real Property that has been damaged, destroyed or otherwise suffered a casualty, <u>provided</u>, <u>however</u>, that, all of the following conditions are satisfied: (i) no Default or Event of Default shall have occurred and be continuing, (ii) the amount of the insurance proceeds (together with any deductible to be satisfied by a Borrower) are sufficient, in Agent's good faith determination, to permit such repair, refurbishment or replacement to be made in a satisfactory manner, (iii) such proceeds shall be used solely to repair, refurbish or replace the Equipment or Real Property that has been damaged, destroyed or suffered casualty (free and clear of any security interests, Liens, claims or encumbrances), (iv) such repair, refurbishment or replacement shall be commenced by Borrowers as soon as is reasonably practicable after such damage, destruction or casualty has occurred and shall be diligently pursued by Borrowers to satisfactory completion, and (v) the repair, refurbishment or replacement to which such proceeds are applied shall cause the value of the Equipment or Real Property that is being repaired, refurbished or replaced to be not less than the value thereof prior to such damage, destruction or other casualty occurring; <u>provided</u>, <u>further</u>, <u>however</u>, that the amount of such Extraordinary Receipts that may be released to Borrowers in respect of any such damage, destruction or other casualty loss for the repair, refurbishment or replacement of Equipment or Real Property shall not exceed the Materiality Threshold.  Pending any release of such Extraordinary Receipts to Borrowing Representative pursuant to this <u>subsection (c)</u>, Agent shall hold such Extraordinary Receipts as cash Collateral.  Any Extraordinary Receipts applied to repair, refurbish or replace Equipment or Real Property pursuant to and in accordance with this <u>subsection (c)</u> shall not be deemed Capital Expenditures for purposes of this Agreement.

(d)    <u>Excess Cash Flow</u>.  Upon delivery to Agent of the financial statements referred to in and required by <u>Section 10.7</u> for each Fiscal Quarter of the Borrowers (commencing with the first Fiscal Quarter ending subsequent to the Closing Date) but in any event not later than, in the case of the first three (3) Fiscal Quarters in any Fiscal Year, fifty (50) days after the end of such Fiscal Quarter and, in the case of the Fiscal Quarter corresponding with the end of any Fiscal Year, one hundred (100) days after the end of each such Fiscal Quarter, Borrowers shall pay to Agent fifty percent (50%) of Excess Cash Flow for such Fiscal Quarter, which payments shall be applied to the Obligations in the manner specified in <u>subsection (f)</u> below; <u>provided</u>, <u>however</u>, that if the Leverage Ratio is less than 2.5:1.0 for such Fiscal Quarter, Borrowers shall not be obligated to pay any Excess Cash Flow with respect to such Fiscal Quarter to Agent.  In the event that the aforesaid financial statement is not so delivered, then a calculation based upon estimated amounts shall be made by Agent upon which calculation Borrowers shall make the prepayment required by this Section, subject to adjustment when the financial statement is delivered to Agent as required hereby.  The calculation made by Agent shall not be deemed a waiver of any rights of Agent or any Lender or may have as a result of the failure by Borrowers to deliver such financial statement.

3631160.8

(e)    <u>Issuance of Equity Interests or Indebtedness</u>.  Upon the issuance of any Equity Interests by any Borrower or the issuance or incurrence of any Indebtedness by any Borrower (other than any Indebtedness permitted by <u>Section 7.3</u> hereof), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance or incurrence (excepting therefrom any Net Cash Proceeds, to the extent payable and paid to the Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the terms of the Revolver Loan Agreement and subject thereto), which payments shall be applied to the Obligations in the manner specified in <u>subsection (f)</u> below; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary set forth herein, as long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or Indebtedness under the Junior Lien Facility during the Term in an aggregate principal amount not to exceed $5,000,000 (<u>provided</u>, that Borrowers shall not issue Indebtedness under the Junior Lien Facility in an aggregate principal amount in excess of $3,000,000), and the proceeds of such amounts shall not be required to be applied to prepay any of the Obligations pursuant to this <u>Section 2.3(e)</u>.

(f)    <u>Application of Proceeds</u>.  Proceeds of mandatory prepayments made pursuant to this <u>Section 2.3</u> shall be applied by Agent, when received:  <u>first</u>, to pay any Obligations then due and owing in respect of the Term Loan A (other than principal); <u>second</u>, to repay the principal amount of the Term Loan A, with such prepayment to be applied to the then remaining installments of the Term Loan A in the reverse order of their respective maturities (beginning with the final payment); <u>third</u>, to the Revolver Loan Agent for application to the Revolver Loan Debt to the extent required pursuant to the Revolver Loan Agreement and in the manner set forth therein; <u>fourth</u>, to pay any Obligations then due and owing in respect of the Term Loan B (other than principal); <u>fifth</u>, to repay the principal amount of the Term Loan B, and, <u>last</u>, any remainder thereof shall be paid to Borrowers or as Borrowing Representative directs.

(g)    <u>Consent</u>. Nothing contained in this <u>Section 2.3</u> shall be deemed to be a consent by Agent and Lenders to the sale or disposition of any Collateral, the issuance of any Equity Interests or the issuance of any Indebtedness, in each case, except as expressly permitted in this Agreement.

(h)    <u>Application of Proceeds During an Event of Default</u>. If an Event of Default has occurred and is continuing, at the option of Agent, or at the direction of the Required Lenders, any Extraordinary Receipts or Net Cash Proceeds from any sale or other disposition of any Equipment or Real Property, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case, shall be applied, instead, as provided in <u>Section 12.2</u>.

2.4.    <u>Statement of Account; Evidence of Loans</u>.

(a)    Agent shall maintain on its books, in accordance with its customary procedures, a loan account in the name of Borrowers ("<u>Borrowers' Account</u>") in which shall be recorded each Lender's pro rata share of the Term Loans, the date and amount of each payment in respect of the Term Loans (whether of principal or accrued interest), any charges that may be made to Borrowers' Account pursuant hereto, and the payment of such charges; <u>provided</u>, <u>however</u>, the failure by Agent to record the date and amount of such sums shall not adversely

affect the rights of Agent or any Lender, or Borrowers' obligations in regard thereto. Promptly after the end of each calendar month, Agent shall send to Borrowing Representative a statement showing the accounting for the Term Loans, any charges to Borrowers' Account made pursuant hereto, any payments made or credited in respect thereof and any other transactions occurring between or among Agent, Lenders and Borrowers pursuant to this Agreement or any Other Document during such month. Any charges made to Borrowers' Account and reflected on such statement shall be due and payable by Borrowers within ten (10) days after Borrowers' receipt of such statement and shall bear interest at the Applicable Rate until paid in full. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within sixty (60) days after such statement is received by Borrowing Representative. The records of Agent with respect to Borrowers' Account shall be conclusive evidence of the amounts of the Term Loans, any charges made to Borrowers' Account, any interest thereon, and any payments thereon, absent manifest error.

        (b)      Each Borrower agrees that:

        (i)      upon written notice by any Lender to the Borrowing Representative that a promissory note or other evidence of indebtedness is requested by such Lender to evidence any Term Loan and other Obligations owing or payable to, or to be made by, such Lender, the Borrowers shall promptly (and in any event within three (3) Business Days following the later of (x) any such request and (y) delivery by Agent of the form of promissory note pursuant to this <u>Section 2.4(b)</u>) execute and deliver to such Lender an appropriate promissory note or notes in form and substance reasonably acceptable to such Lender and Borrowers, payable to the order of such Lender in a principal amount equal to the portion of the applicable Term Loan owing or payable to Lender;

        (ii)      all references to Notes in this Agreement and the Other Documents shall mean the Notes, if any, to the extent issued (and not returned to the Borrowers for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

        (iii)      upon any Lender's written request, and in any event within three (3) Business Days of any such request, Borrowers shall execute and deliver to such Lender new Notes and/or divide the Notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its sole and absolute discretion; <u>provided</u>, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and <u>provided</u>, <u>further</u>, that such Notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new Notes and shall be returned to the Borrowers promptly upon such Lender's receipt of the replacement notes.

III.    <u>INTEREST AND FEES.</u>

    3.1.    <u>Interest</u>.

3631160.8

(a)      Interest on the Term Loan A shall be payable to Agent for the benefit of Term A Lenders monthly in arrears on the first day of each month, commencing on **[August 1]**, 2010.  Interest charges shall be computed on the actual principal amount of the Term Loan A outstanding during each interest assessment period described above at the Applicable Term Loan A Rate; provided, however, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Term A Lenders, the Term Loan A shall bear interest, instead, at the Default Rate.

(b)      Interest on the Term Loan B shall be payable to Agent for the benefit of Term B Lenders monthly in arrears on the first day of each calendar month, commencing on **[August 1]**, 2010.  Interest charges shall be computed on the actual principal amount of the Term Loan B outstanding during each interest assessment period described above at the Applicable Term Loan B Rate; provided, however, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Term B Lenders, the Term Loan B shall bear interest, instead, at the Default Rate.

(c)      Notwithstanding any other provision hereof, if any applicable law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (c), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Term Loans that bear interest with respect to the LIBOR Rate) to make or maintain Term Loans that bear interest with respect to the LIBOR Rate, the obligation of all Lenders to make Term Loans that bear interest with reference to the LIBOR Rate shall be suspended and Agent, in its reasonable discretion, shall select a comparable rate as a substitute therefor.

3.2.    Computation of Interest.  Interest payable hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall continue to be payable at the Applicable Rate during such extension; provided, however, that the foregoing extension shall not be considered when determining Borrowers' ongoing compliance with Financial Covenants that concern or include scheduled principal payments within specified dates.

3.3.    Maximum Charges.  In no event shall interest and any other charges hereunder exceed the highest rate permissible under applicable law.  In the event interest or any other charges hereunder would otherwise exceed the highest rate permitted under applicable law the provisions hereof shall be deemed amended to provide for interest or such other charges to be charged at the highest permissible rate; any excess amount shall be applied to the principal balance of the applicable Term Loan, unless and until it is paid in full, with such prepayment to be applied to the then remaining installments of such Term Loan in the reverse order of its maturity (beginning with the final payment); and, if there is any excess remaining, Agent shall promptly refund such excess to Borrowers.

3.4.    Determination of Applicable Margins.

(a)    Beginning on **[July]** 1, 2011 and on the first day of each Fiscal Quarter thereafter (each, a "Determination Date"), the Applicable Margins shall be determined by Agent and, if appropriate, adjusted, in accordance with the terms and conditions herein. On each Determination Date, Agent shall determine the Applicable Margins based on the Leverage Ratio reported in the most recently delivered Compliance Certificate for the applicable Fiscal Month as required to be delivered to Agent in accordance with Section 10.7 hereof (e.g., for a Determination Date of October 1, Agent shall look to the Leverage Ratio reported in the Compliance Certificate timely delivered for the Fiscal Month ending August 31). Any Applicable Margin as so determined and, if appropriate, adjusted, shall be effective from such Determination Date until the next Determination Date.

(b)    If Borrowing Representative shall fail timely to provide the Compliance Certificate to Agent with respect to the applicable Fiscal Month in accordance with Section 10.7 hereof (without regards to any cure periods set forth herein), then the Applicable Margins shall be based on the highest rate set forth in each of their respective definitions herein until the next Determination Date.

(c)    Notwithstanding the foregoing, if either of the Applicable Margins, which had been determined on the basis of any Compliance Certificate delivered by Borrowing Representative to Agent that contained any incorrect or inaccurate financial data, is less than such Applicable Margin that would have been determined had such Compliance Certificate been based on financial data that was correct and accurate, then such Applicable Margin at the appropriate lower rate(s) shall be recalculated retroactively for all affected periods and (to the extent not therefore paid) all accrued and unpaid interest as so recalculated shall be charged to Borrowers' Account.

3.5.    Increased Costs.  In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this Section 3.5, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of the Term Loans with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of any Lender);

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of any Lender, including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to any Lender of making, renewing or maintaining its pro rata share of any Term Loan by an amount that such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of its pro rata share of any Term Loan by an amount that such Lender deems to be material, then, each and any such case, Borrowers shall promptly pay such Lender, upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount as will compensate such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs that are already reflected in the calculation of the Applicable Rate.  Such Lender shall certify the amount of such additional cost or reduced amount, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

   3.6. <u>Capital Adequacy</u>.  In the event that any Lender shall have determined that any applicable law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (for purposes of this Section, the term "Lender" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its pro rata share of any Term Loan with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on any Lender's capital as a consequence of its obligations hereunder to a level below that which such Lender could have achieved but for such adoption, change or compliance (taking into consideration such Lender's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then, from time to time, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below) such additional amount or amounts as will compensate such Lender for such reduction.  In determining such amount or amounts, such Lender may use any reasonable averaging or attribution method.  The protection of this Section shall be available to each Lender regardless of any possible contention that the applicable law, regulation or condition is invalid or inapplicable.  Such Lender shall certify the amount necessary to compensate such Lender with respect to this Section, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

IV. <u>COLLATERAL; GENERAL TERMS</u>.

   4.1. <u>Security Interest in the Collateral</u>.  To secure the prompt payment and performance to each Lender Party of the Obligations, each Borrower hereby assigns, pledges and grants to Agent for the ratable benefit of the Lender Parties, a continuing security interest in and to all of the Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Notwithstanding the foregoing, the Mortgages on the Real Property Collateral located in New York State shall be subject to the limitations set forth in such Mortgages.  Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest in the Collateral and shall cause its financial statements to reflect the existence of such security interest.

3631160.8

4.2.    <u>Perfection of Security Interest</u>.

(a)    Borrowers shall take all action that Agent may request from time to time so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens thereon other than Permitted Encumbrances, (ii) using reasonable efforts to obtain landlords', warehouse operators', bailees' or mortgagees' lien waivers or related agreements in respect of premises where any Equipment or Inventory is located, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all Securities, chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, Deposit Account Control Agreements and other custodial arrangements reasonably satisfactory to Agent, (v) executing (as appropriate) and delivering authorizations for the recording of financing statements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest under the Uniform Commercial Code or other applicable law; (vi)  using reasonable efforts to obtain acknowledgments, in form and substance satisfactory to Agent, from any bailee having possession of any Collateral at any time, stating that the bailee holds such Collateral on behalf of Agent, (vii) obtaining "control" of any investment property, deposit account, letter-of-credit right or electronic chattel paper (the term "control" as used in respect of the foregoing types of Collateral having the meaning set forth in Articles 8 and 9 of the UCC), with any agreements establishing such "control" to be in form and substance satisfactory to Agent, and (viii) if a Borrower at any time has or acquires a Commercial Tort Claim, such Borrower shall promptly notify Agent thereof, in writing, and grant a specific collateral assignment of such claim to Agent as additional Collateral.  Notwithstanding the foregoing provisions of this <u>subsection (a)</u>, Borrowers shall not be required to obtain or to use their reasonable efforts to obtain warehouse operators,' bailees' or landlords' agreements or acknowledgments or related agreements in respect of premises where Inventory and/or Equipment is located, to the extent that the Inventory and/or Equipment in the possession of a warehouse operator or bailee or located on leased premises has a fair market value that is less than the Materiality Threshold; unless, in either case, Borrowers are requested by Agent to do so after any Event of Default has occurred and during its continuation.

(b)    Without limiting the generality of the foregoing, in the specific case of Inventory in-transit to a Borrower from outside the continental United States of America, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after the occurrence of an Event of Default and during its continuation, each Borrower shall (i) deliver (or cause to be delivered) to Agent copies of all invoices, manifests and documents of title pertaining to such Inventory promptly upon such Borrower's receipt thereof, but in any event not later than five (5) Business Days after receipt, (ii) cause all such documents of title to be issued in the Agent's name, or to its order (or, if negotiable in form, Borrower may, instead, cause such documents of title to be endorsed to Agent, or in "blank"); (iii) provide Agent with evidence of appropriate marine or like insurance in respect of the transit of such Inventory to Borrower, and (iv) as necessary, provide Agent with access or custodianship agreements from warehouse operators, consolidators, customs house operators, customs brokers

and other third parties to facilitate Agent's control over, access to and/or repossession of, such in-transit Inventory, including, without limitation, if requested by Agent, a customs agent agreement in form and substance satisfactory to Agent; in each case except to the extent delivered, issued or otherwise provided to the Revolver Loan Agent subject to the Intercreditor Agreement.

(c)    In addition thereto, but without limiting the generality of the foregoing, in the specific case of Inventory of a Borrower that is consigned to any Person, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after an Event of Default has occurred and during its continuation, such Borrower shall (i) file a UCC financing statement in respect of such inventory naming itself as "consignor" and such Person as "consignee" thereon, in the jurisdiction of such consignee's incorporation (or organization), and assign such financing statement to Agent and (ii) cause such consignee (and, if requested by Agent, any secured lender to, or landlord (or mortgagee) of, such consignee to execute and deliver to Agent a bailee's letter in form and content satisfactory to Agent in respect of such inventory; in each case except to the extent assigned, delivered or otherwise provided to the Revolver Loan Agent subject to the Intercreditor Agreement.

(d)    Agent is hereby authorized to file financing statements in accordance with the applicable provisions of the UCC, including, without limitation financing statements that describe the Collateral covered thereby as "all personal property", "all assets" or words of similar effect, at any time or from time to time hereafter, in any jurisdiction; and Borrowers hereby ratify, approve and affirm the filing of any such financing statements heretofore filed by Agent in respect of any Borrower (including any predecessor-in-interest thereof).  All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account.

(e)    Borrowers acknowledge that from time to time Agent may act as bailee (under the UCC) for the Revolver Loan Agent in respect of certain Collateral, and hereby authorize Agent to do so and to turn over to Revolver Loan Agent any such Collateral at its request subject to the provisions of the Intercreditor Agreement.

4.3.    Disposition of Collateral.  Each Borrower will safeguard and protect all Collateral for Agent's account and make no disposition thereof whether by sale, lease or otherwise except as expressly provided in clauses (i), (ii) and (vi) of Section 7.1(b) and, then, subject to Section 2.3 in respect of any Net Cash Proceeds derived therefrom.

4.4.    Preservation of Collateral.  Following any demand by Agent for payment of all Obligations due and owing pursuant to Section 12.1(a) hereof, subject to the provisions of the Intercreditor Agreement, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to

3631160.8

12

the places where the Collateral is located, and may proceed over and through any Borrower's owned or leased property (subject to the terms of any leases) to obtain such Collateral.  Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may reasonably require.  All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account.

4.5.    <u>Ownership of Collateral</u>.  With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest:  (a) each Borrower shall be the sole owner, lessee or licensee (as applicable) of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent (subject to Permitted Encumbrances); (b) except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens; (c) each document and agreement constituting Collateral executed by each Borrower or delivered to any Lender Party in connection with this Agreement shall be true and correct in all material respects; (d) all signatures and endorsements of each Borrower that appear on any such documents or agreements constituting Collateral shall be genuine and each Borrower party thereto shall have full capacity to execute same; and (e) each Borrower's Equipment and Inventory shall be located as set forth on <u>Schedule 4.5</u> or at such other locations within the United States of America as Agent may receive notice of from time to time pursuant to <u>Section 10.15</u> (all such locations herein called, collectively, the "<u>Collateral Locations</u>" and, individually, a "<u>Collateral Location</u>"); and shall not be removed from such Collateral Locations without the prior written consent of Agent except in the case of (i) the sale of Inventory in the ordinary course of business, (ii) the sale of Equipment to the extent permitted in <u>Section 4.3</u> hereof, (iii) the movement of Equipment from one Collateral Location to another Collateral Location, (iv) the movement of Equipment to the extent necessary for its repair or maintenance; and (v) the movement of motor vehicles in the ordinary course of Borrowers' business.

4.6.    <u>Defense of Agent's and Lenders' Interests</u>.  Unless and until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's security interests in the Collateral shall continue in full force and effect without interruption. During such periods no Borrower shall pledge, sell, assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered any part of the Collateral in any way, except for Permitted Encumbrances or as otherwise expressly permitted in this Agreement. Each Borrower shall defend Agent's security interest in the Collateral against any and all Persons (subject to Permitted Encumbrances).  At any time after an Event of Default has occurred and during its continuation, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including without limitation, labels, stationery, documents, instruments and advertising materials.  If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it and make it available to Agent at one or more of the Collateral Locations, as Agent shall elect.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies provided herein and in the Other Documents, or under the Uniform Commercial Code or other applicable law.  In addition to the foregoing, Agent may, at its option, instruct all suppliers, carriers, forwarders, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into a Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will

immediately deliver them to Agent in their original form together with any necessary endorsement.  Taking any of the foregoing actions provided in this <u>Section 4.6</u> shall be subject, however, to the provisions of the Intercreditor Agreement.

      4.7.   <u>Books and Records</u>.  Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including, without limitation, by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied.

      4.8.   <u>Financial and Other Disclosure</u>.  Each Borrower hereby irrevocably authorizes and directs the Accountants and all other accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent copies of any of the Borrower's financial statements, trial balances or other accounting records of any sort in the possession of such Person and to disclose to Agent any information such Person may have concerning such Borrower's financial status and business operations.  In respect of the foregoing, if the Accountants are changed by any Borrower subsequent to the Closing Date, then Borrowing Representative shall execute and deliver a letter directing the Accountants to act in the manner provided hereinabove when requested by Agent, such letter to be in form and substance reasonably satisfactory to Agent.

      4.9.   <u>Compliance with Laws</u>.  Each Borrower shall comply in all material respects with all acts, rules, regulations and orders of any Governmental Authority applicable to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which, in each instance, could reasonably be expected to have a Material Adverse Effect.  Each Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of any Governmental Authority in any reasonable manner, <u>provided</u>, that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on the Collateral.

      4.10.   <u>Inspection of Premises</u>.  During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or an Event of Default has occurred and is then continuing), Agent and each Lender Party and their agents shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business.  During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or Event of Default has occurred and is then continuing) Agent, each Lender Party and their agents may enter upon any Borrower's business premises from time to time for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business.  Borrowers shall reimburse Agent and each Lender Party for all reasonable costs incurred by them in respect of the foregoing.  All of such costs shall be charged to Borrowers' Account.

3631160.8

4.11.   Insurance.  Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Each Borrower shall, at its own cost and expense, in amounts and with carriers acceptable to Agent (a) keep all its insurable properties and properties in which each Borrower has an interest insured against the hazards of fire, flood (under the circumstances described below), sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's including, without limitation, products liability insurance, insurance against theft, larceny, embezzlement and misappropriation of funds, and business interruption insurance; (b) maintain a bond or other surety in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; and (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business.  Without limitation of the foregoing, if as of the Closing Date or at any time thereafter Agent determines that all or a portion of the improvements situated on any Real Property Collateral are located within a "Special Flood Hazard Area" (as designated by the applicable Governmental Authority), Borrowers shall ensure that flood insurance is obtained and maintained with respect to such Real Property Collateral for the Term at Borrowers' expense in a form, amount and from an issuing company reasonably acceptable to Agent.  Each Borrower shall furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured in regard to liability insurance and loss payee as its interests may appear in regard to casualty or property coverage, to the extent affecting or relating to Collateral, and providing (A) that, subject to any overriding provisions of the Intercreditor Agreement, all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent.  In the event of any loss thereunder, subject to the provisions of the Intercreditor Agreement, the carriers named therein are hereby directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly.  If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.  During the continuation of an Event of Default, Agent is hereby authorized, subject to the provisions of the Intercreditor Agreement, to adjust and compromise claims under insurance coverage referred to above.  All loss recoveries received by Agent upon any such insurance shall, except as otherwise provided in the Intercreditor Agreement, either be paid over to Borrowers or applied by the Agent as follows:  (i) if no Event of Default or Default has occurred and is then continuing, and the loss recovery so received by Agent is less than or equal to the Materiality Threshold, then, Agent shall remit such loss recovery to the Borrowers for use in the restoration of the loss in accordance with Section 2.3(c); (ii) if no Event of Default or Default has occurred and is then continuing, and the loss recovery

received by Agent is more than the Materiality Threshold, then, Agent shall apply such loss recovery to the Obligations in accordance with <u>Section 2.3(a)</u>, and (iii) if any Event of Default or Default has occurred and is then continuing, then, Agent shall receive and apply such loss recovery to the Obligations in such order as Agent, in its sole discretion, shall determine consistent with the terms of <u>Section 12.2</u> of this Agreement.  Any surplus of such proceeds remaining after such application, shall, subject to the provisions of the Intercreditor Agreement, be paid by Agent to Borrowers or applied as may be otherwise required by law.  Anything hereinabove to the contrary notwithstanding, Agent shall not be obligated to remit any insurance proceeds to Borrowers unless Borrowers shall have provided Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss in accordance with <u>Section 2.3(c)</u>.  The Collateral shall at all times be maintained in accordance with the requirements of all insurance carriers that provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.  If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance, pay the premium therefor and charge Borrowers' Account for the amount thereof.

4.12.   <u>Payment of Taxes</u>.  Each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral, including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes.  If any tax by any governmental authority is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made that, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may, unless the Borrowers have done so within five (5) Business Days after the Borrowing Representative receives written demand from the Agent that they do so, pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof.  Agent will not pay any taxes, assessments or Charges to the extent that any Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral.  The amount of any payment by Agent under this Section shall be charged to Borrowers' Account.  Until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold any balance standing to Borrowers' credit and Agent shall retain its security interest in any and all Collateral held by Agent.

4.13.   <u>Payment of Leasehold Obligations</u>.  Each Borrower shall at all times pay, when and as due (or within any applicable grace periods) its rental obligations under all leases material to its business operations under which it is a tenant, and shall otherwise comply, in all material respects, with all other material terms of such leases and keep them in full force and effect (unless terminated in accordance with the terms thereof) and, at Agent's request will provide evidence of having done so.

4.14.   <u>Receivables</u>.

3631160.8

16

(a)    Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower, and the same shall be due and owing in accordance with the applicable Borrower's standard terms of sale, in each case except where the failure of any such Receivables to satisfy the terms of this Section 4.14(a) could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each Customer, to each Borrower's actual knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due except to the extent that such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover its Receivables from any Customer which is not solvent, except in each case where the failure of any such Customer to be solvent or otherwise be able to pay all Receivables on which it is so obligated could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Nothing in this Section 4.14(b) shall be construed to require any Borrower to obtain any information or take any other affirmative action to assess such Customer's solvency or its ability to pay all Receivables on which such Customer is obligated.

(c)    Each Borrower's chief executive office is located at the address identified as such set forth on Schedule 4.14(c) hereto.  Until written notice is given to Agent by Borrowing Representative of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)    No Borrower shall establish or maintain any Deposit Account with any financial institution (except for Excluded Deposit Accounts) unless, prior to the Closing Date or opening of such Depository Account, Agent, the applicable Borrower and such financial institution shall have entered into a Deposit Account Control Agreement with respect to such Depository Account.  Each Borrower shall ensure that all collections of Receivables and all other payments received by such Borrower are remitted directly to a Deposit Account subject to a Deposit Account Control Agreement.

(e)    At any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, subject to the provisions of the Intercreditor Agreement and the prior rights of the Revolver Loan Agent, so long as any such Event of Default is continuing, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telecopy, secretarial and clerical expenses and the salaries of any collection personnel used for collection, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(f)    Agent shall have the continuing right, subject to the provisions of the Intercreditor Agreement and the prior rights of the Revolver Loan Agent, to receive, endorse, assign  and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables or any other Collateral

received by Agent for application to the Obligations in accordance herewith and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power at any time hereafter, subject to the provisions of the Intercreditor Agreement, (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; and (iv) to sign such Borrower's name on any documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same, subject to the provisions of the Intercreditor Agreement.  Following the occurrence of an Event of Default and during its continuation, each Borrower shall hereby constitute Agent or Agent's designee as such Borrower's attorney with additional power, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, (i) to demand payment of the Receivables; (ii) to enforce payment of the Receivables by legal proceedings or otherwise; (iii) to exercise all of Borrowers' rights and remedies with respect to the collection of the Receivables and any other Collateral; (iv) to settle, adjust, compromise, extend or renew the Receivables; and (v) to settle, adjust or compromise any legal proceedings brought to collect Receivables.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  Agent shall have the right at any time after the occurrence of an Event of Default and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower to the extent pertaining to Receivables or other Collateral.

(g)     No Lender Party shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom, except for any such errors or omissions or delays of any kind determined by a court of competent jurisdiction in a final proceeding to have resulted from its gross (not mere) negligence or willful misconduct.  After an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  Agent is further authorized and empowered at any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Revolver Loan Agent pursuant to the Revolver Loan Agreement, to accept the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

3631160.8

(h)     No Borrower will, without Agent's consent, unless and except to the extent that Revolver Loan Agent otherwise has consented thereto, compromise or adjust any material amount of the Receivables, or extend the time for payment thereof by more than sixty (60) days) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as heretofore have been customary in the business of such Borrower.

4.15.   Inventory.  To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.16.   Equipment and Real Property Covenants.  With respect to the Equipment and Real Property:  (a) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (b) Borrowers shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of their insurance and in material conformity with all applicable laws; (c) the Equipment is and shall be used in the business operations of Borrowers and not for personal, family, household or farming use; (d) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (e) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; (f) each Borrower assumes all responsibility and liability arising from its use of the Equipment and Real Property; (g) except as disclosed on Schedule 4.16, as of the Closing Date no Equipment is Excluded Equipment; and (h) hereafter Borrowers will notify Agent promptly, but in any event within ten (10) Business Days after, Borrowers acquire any Equipment that is Excluded Equipment subsequent to the Closing Date.

4.17.   Exculpation.  Nothing herein contained shall be construed to constitute any Lender Party as any Borrower's agent for any purpose whatsoever; nor shall any Lender Party be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof.  No Lender Party, whether by anything herein or in any assignment or otherwise, assumes any Borrower's obligations under any contract or agreement assigned to such Lender Party, and no Lender Party shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.18.   Environmental Matters.

(a)     Borrowers shall ensure that the Real Property remains at all times in material compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except in compliance  with applicable law or the appropriate Environmental Authority.

3631160.8

19

(b)      Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws, which system shall include periodic reviews of such compliance.

(c)      Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws.  If the failure to do so could reasonably be expected to have a Material Adverse Effect, Borrowers shall use their best efforts to obtain to the extent required by applicable Environment Laws or the appropriate Environmental Authority, certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)      In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity under any Environment Laws of any Hazardous Substances at any Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, any demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any Governmental Authority responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any of the foregoing Persons referred to herein as an "Environmental Authority"), then, Borrowing Representative shall, within five (5) Business Days thereafter, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware with respect to the Hazardous Discharge or Environmental Complaint.  Such information is to be provided to allow Agent to protect its security interest in the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)      Borrowers shall promptly forward to Agent copies of any request from any Environmental Authority for information, any notification by any Environmental Authority of potential liability or any demand letter from any Environmental Authority relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward to Agent copies of correspondence between any Borrower and any Environmental Authority regarding such claims until all claims are settled.  Borrowers shall promptly forward to Agent copies of all material documents and reports concerning any Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in the Collateral.

(f)      Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all action required by applicable Environmental Laws to

safeguard the health of any Person and to avoid subjecting the Collateral to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or comply with any of the requirements of any Environmental Laws within thirty (30) days after the Borrowing Representative receives written demand from the Agent that it do so, Agent may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deems reasonably necessary under applicable Environmental Laws to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint.  All reasonable costs and expenses incurred by Agent (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(g)     Promptly upon the written request of Agent, but in any event within five (5) Business Days after Borrowers' receipt of such request, which may be made following the discovery of any Hazardous Discharge until such Hazardous Discharge is remedied to the extent required by applicable Environmental Laws or the appropriate Environmental Authority or following the filing of any Environmental Complaint until such Environmental Complaint is resolved, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm reasonably acceptable to Agent with respect to such Hazardous Discharge or Environmental Complaint, and the potential costs of abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property.  Any report or investigation of such Hazardous Discharge acceptable to the appropriate Environmental Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent.  If such estimates, individually or in the aggregate, exceed the Materiality Threshold, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)     Borrowers shall defend and indemnify each Lender Party and hold each Lender Party and their respective employees, agents, directors and officers harmless from and against all losses, liabilities, damages and expenses, claims, costs, fines and penalties, including reasonable attorney's fees, suffered or incurred by such Lender Party under or on account of any Environmental Laws, including, without limitation, the assertion of any Lien thereunder, with respect to any Hazardous Discharge, or the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage or expense, claim, cost, fine or penalty is attributable to any Hazardous Discharge resulting from actions on the part of such Lender Party.  Borrowers' obligations under this subsection (h) shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened to take any action in connection with the presence of any Hazardous Substances.  Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.  Borrowers' obligations of indemnity hereunder shall not extend to, or include, any loss, damage, cost or expense incurred by any

Lender Party in respect of the foregoing caused by, or resulting form, its gross negligence or willful misconduct.

4.19.    <u>No Other Financing Statements</u>.  Except for the financing statements filed by Agent and financing statements giving notice of Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

4.20.    <u>Additional Mortgages</u>.  Borrowers shall execute and deliver to Agent immediately upon the acquisition in fee simple by any Borrower of any Real Property subsequent to the Closing Date a Mortgage with respect to such additional Real Property (subject to any Permitted Encumbrances), together with such title insurance policies (mortgagee's form), certified surveys, appraisals, and local counsel opinions with respect thereto and such other agreements, documents and instruments as Agent deems reasonably necessary or desirable, in form and substance satisfactory to Agent.

4.21.    <u>Intellectual Property</u>.  Borrowers shall execute and deliver to Agent security agreements in form suitable for registration and otherwise reasonably acceptable to Agent (i) on the Closing Date, with respect to any Material Intellectual Property registered or for which an application for registration is pending with the U.S. Patent and Trademark Office or the U.S. Copyright Office as of the Closing Date, or (ii) immediately upon the creation or acquisition by Borrower of any Material Intellectual Property registered, or for which an application for registration is pending, with either such office subsequent to the Closing Date.

4.22.    <u>Commercial Tort Claims</u>.  Promptly upon the discovery of any Commercial Tort Claim in favor of a Borrower, Borrowers will notify Agent of the same and execute such documents as are requested by Agent in order to grant to Agent a security interest in such Commercial Tort Claim under the UCC.

4.23.    <u>OFAC</u>.  Agent may, at its option, reject, refuse to accept or return any Collateral that any Lender Party determines is, or may be, owed by, or due from, or belongs to, a Sanctioned Person.

4.24.    <u>Appraisals</u>.  With respect to Real Property Collateral, upon Agent's request, which may be at such intervals as it deems appropriate, Borrowers shall, at their expense, deliver or cause to be delivered to Agent, Appraisals (or updates to Appraisals) as to the Real Property Collateral addressed to Agent and upon which Agent is expressly permitted to rely; <u>provided</u>, that notwithstanding anything else to the contrary in this <u>Section 4.24</u>, Borrowers shall not pay for more than one (1) such Appraisal in each Fiscal Year following the Closing Date if the Leverage Ratio as of the last day of each Fiscal Quarter in such Fiscal Year is less than or equal to 2.0:1.0 and no Event of Default has occurred and is continuing.

V.     <u>REPRESENTATIONS AND WARRANTIES</u>.

Each Borrower represents and warrants as follows:

5.1.    <u>Authority</u>.  Upon entry of the Confirmation Order, each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is party and to perform all of its respective duties and obligations hereunder and thereunder.  Upon

3631160.8
22

entry of the Confirmation Order, the execution, delivery and performance of this Agreement and of any Other Documents to which such Borrower is party (a) are within such Borrower's corporate powers, have been duly authorized, are not in contravention of law or any material terms of such Borrower's Organic Documents or of any Material Agreement or undertaking to which such Borrower is a party or by which such Borrower or any of its property is bound, and (b) will not conflict with nor result in any breach of any material provisions of or constitute a default under or result in the creation of any Lien (except Permitted Encumbrances) upon any asset of such Borrower under the provisions of any Organic Document or other instrument to which such Borrower is a party or by which it or any of its property may be bound.

    5.2.   <u>Formation and Qualification</u>.

    (a)   Each Borrower is duly organized and in good standing under the laws of the State(s) or other jurisdiction(s) listed on <u>Schedule 5.2</u> and is qualified to do business and is in good standing in the State(s) or other jurisdiction(s) listed on <u>Schedule 5.2</u>, which State(s) or other jurisdiction(s) constitute all State(s) or other jurisdiction(s) in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Each Borrower has delivered to Agent true and complete copies of its Organic Documents and will promptly notify Agent of any amendment or change thereto.

    (b)   Each Borrower's identification number (if any) assigned to it by the appropriate Governmental Authority of the state of its organization, if any, is set forth on <u>Schedule 5.2</u>.

    (c)   The Subsidiaries (if any) of each Borrower as of the Closing Date are as set forth in <u>Schedule 5.2</u>.

    (d)   The Equity Interests of each Borrower which are authorized, issued and outstanding on the Closing Date are set forth and described in <u>Schedule 5.2</u>.

    (e)   This Agreement is, and each Other Document executed by a Borrower constitutes, the legal, valid and binding obligation of such Borrower, enforceable against it in accordance with its terms, except as such enforcement is subject to the effect of (i) any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

    (f)   The signatures of each officer of each Borrower that appear on this Agreement and each Other Document are genuine, and each such officer of such Borrower executing same on behalf of such Borrower has full capacity to execute same.

    5.3.   <u>Tax Returns</u>.  Each Borrower's federal tax identification number is set forth on <u>Schedule 5.3</u>.  Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable, other than, any such charges as are being contested by Borrowers in good faith by appropriate proceedings provided that Borrowers have established reserves on their books for any unpaid taxes in accordance with GAAP.  The Provision for Taxes

3631160.8

on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current Fiscal Year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books or any ongoing audit of any of its tax returns, except as otherwise may be disclosed in <u>Schedule 5.3</u>.

     5.4.   <u>Financial Statements</u>.

     (a)   The audited financial statements of Borrowers and their Subsidiaries on a consolidated basis for their most recently completed Fiscal Year, and the related statements of income, changes in stockholder's equity and cash flow for the annual fiscal period ended on such date, all accompanied by reports thereon containing opinions by the Accountants, and the unaudited financial statements of Borrowers and their Subsidiaries on a consolidated basis for that portion of their current Fiscal Year ended with their most recently completed Fiscal Quarter and Fiscal Month for which financial statements have been reported and the related statements of income, changes in stockholder's equity and cash flow for the fiscal periods ended on such date, (collectively, the "<u>Historical Financial Statements</u>"), copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied (except for changes in application with which the Accountants have concurred) and present in all material respects the financial position of the Borrowers and their Subsidiaries on a consolidated basis at such dates and the results of their operations for such periods.  Since the last day of the Borrowers' most recently completed Fiscal Year, there has been no material adverse change (other than the Chapter 11 Cases) in the financial condition of the Borrowers on a consolidated basis from that shown on the consolidated balance sheet of Borrowers as of such date or in the aggregate value of the Equipment and Real Property owned by them.

     (b)   The projected financial statements of the Borrowers and their Subsidiaries on a consolidated basis furnished to Agent on or prior to the Closing Date (the "<u>Initial Projections</u>"), were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Initial Projections are not to be viewed as facts and that actual results may differ from such Initial Projections.

     5.5.   <u>Name</u>.  Neither of the Borrowers has been known by any other name in the five (5) years immediately preceding the Closing Date, and neither of the Borrowers sells Inventory under any other name except as set forth on <u>Schedule 5.5;</u> nor has either Borrower been the surviving organization of a merger or consolidation or acquired all or substantially all of the assets of any Person during the five (5) years immediately preceding the Closing Date.

     5.6.   <u>OSHA and Environmental Compliance</u>.  Except as may be set forth on <u>Schedule 5.6</u>:

     (a)   Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds and Equipment are in compliance with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws, except where the failure to comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business,

assets, property, leaseholds, Real Property or Equipment under any such laws, rules or regulations.

(b)    Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws, except where the failure to obtain any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)    (i) There are no visible signs, in any material amounts of releases, spills, discharges, leaks or disposals (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property owned by any Borrower or leased by any Borrower and used for manufacturing or the storage of Hazardous Substances which do not comply in all material respects with all applicable Environmental Laws in respect thereof; (ii) there are no underground storage tanks or polychlorinated biphenyls on any such Real Property, except in compliance with Environmental Laws; (iii) none of any such Real Property has ever been used as a treatment, storage or disposal facility for Hazardous Waste; and (iv) no material amounts of any Hazardous Substances are present on any such Real Property in violation of any applicable Environmental Law.

5.7.    Solvency.

(a)    The Initial Projections demonstrate that the Borrowers on a consolidated basis will have sufficient cash flow to enable them to pay their debts as they mature, subsequent to the Closing Date.

(b)    Immediately following the execution of this Agreement and the consummation of the transactions contemplated hereby on the Closing Date, including the issuance of the Term Loans, (i) the assets of the Borrowers, on a consolidated basis, at a fair valuation and at their present fair saleable value will be in excess of the total amount of liabilities of the Borrowers (including contingent and unmatured liabilities) on a consolidated basis, (ii) the Borrowers will be able to pay their Indebtedness as it becomes due, and (iii) the Borrowers on a consolidated basis will not have unreasonably small capital to carry on their respective businesses.

(c)    As of the Closing Date, there is no undisputed Indebtedness in excess of the Materiality Threshold owing by the Borrowers to any third parties that is past due (after giving effect to any applicable grace period for payment) except for trade accounts payable not in excess of Two Million Dollars ($2,000,000) in aggregate amount, which will be paid by the Borrowers within thirty (30) days following the Closing Date, or as may otherwise be disclosed in Schedule 5.7.

(d)    This Agreement is, and all Other Documents will be, executed and delivered by the Borrowers in good faith and in exchange for reasonably equivalent value and fair consideration.

5.8.    Litigation.  Except with respect to the Chapter 11 Cases or as may be otherwise disclosed in Schedule 5.8, as of the Closing Date no Borrower has (i) any pending or threatened

3631160.8

25

litigation, arbitration, actions or proceedings that, if determined adversely to it, could be reasonably expected to have a Material Adverse Effect, or (ii) any Commercial Tort Claims.

5.9.    No Indebtedness.  Except in respect of the amounts owed Lenders and the Revolver Loan Lenders under the Existing Term Loan Facility and the Existing Revolver Loan Facility respectively, and as may be disclosed on Schedule 5.9, no Borrower has any Indebtedness on the Closing Date; and none of such Indebtedness is secured by any Lien, except for Permitted Encumbrances.

5.10.    Violations.  No Borrower is in violation of any applicable statute, regulation or ordinance or any order of any court, Governmental Authority or arbitration board or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.11.    Plans.  No Borrower nor any member of the Controlled Group maintains or contributes to any Plan (or has assumed any liability in respect of any Plan) other than those (if any) listed on Schedule 5.11 hereto.  Except as set forth in Schedule 5.11, (i) no Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan, (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code, (iii) no Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid, (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence that would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan, (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and no Borrower nor any member of the Controlled Group knows of any facts or circumstances that would materially change the value of such assets and accrued benefits and other liabilities, (vi) no Borrower or any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan, (vii) no Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists that could give rise to any such liability, (viii) no Borrower, nor any member of the Controlled Group, nor any fiduciary of, nor any trustee for, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action that would constitute or result in a ERISA Event with respect to any such Plan that is subject to ERISA, (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan, (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period contained in 29 CFR §2615.3 has not been waived, (xi) no Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group, and (xii) no Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

5.12.   <u>Patents, Trademarks, Copyrights and Licenses</u>.  All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, trade names, assumed names, trade secrets and licenses owned or utilized by Borrowers as of the Closing Date that are material to the conduct of Borrowers' business operations (herein, "<u>Material Intellectual Property</u>") are set forth on <u>Schedule 5.12</u>.  All such Material Intellectual Property is valid and, except as set forth on <u>Schedule 5.12</u>, has been duly registered or filed with the appropriate Governmental Authority; there is no objection to or pending challenge to the validity thereof, and neither Borrower is aware of any grounds for any challenge, except as may be set forth in <u>Schedule 5.12</u>.  To each Borrower's knowledge, its Material Intellectual Property consists of original material or property developed by such Borrower or which was lawfully acquired by such Borrower from the proper and lawful owner thereof.  Each Borrower has maintained its Material Intellectual Property as to preserve the value thereof from the date of creation or acquisition thereof.  With respect to all proprietary software developed and used by any Borrower, constituting Material Intellectual Property, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement.

5.13.   <u>Licenses and Permits</u>.  Each Borrower (a) is in material compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law or regulation for the operation of its business in each jurisdiction in which it is now conducting business if the failure to procure such licenses or permits and/or be in material compliance therewith could reasonably be expected to have a Material Adverse Effect.

5.14.   <u>No Default of Indebtedness</u>.  Except as set forth in <u>Schedule 5.14</u>, as of the Closing Date, no Borrower is in default (after giving effect to any applicable grace period for payment) in the payment of the principal of or interest on any Indebtedness and no event has occurred under the provisions of any instrument or agreement under which any Indebtedness has been issued that without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.15.   <u>No Other Defaults</u>.  As of the Closing Date, no Borrower is in default in any material respect in the payment or performance of any of its material contractual obligations in respect of any Material Agreement.

5.16.   <u>No Burdensome Restrictions</u>.  No Borrower is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect.  No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that is not a Permitted Encumbrance.

5.17.   <u>No Labor Disputes</u>.  No Borrower is involved in any material labor dispute; and, to Borrowers' knowledge, there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence.  Except as set forth in <u>Schedule 5.17</u>, no labor contract in existence on the Closing Date is scheduled to expire during the Term.

5.18.    <u>Margin Regulations</u>.  No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.  No part of the proceeds of the Term Loans will be used for "purchasing" or "carrying" "margin stock," as those terms are defined in Regulation U of such Board of Governors.

5.19.    <u>Investment Company Act</u>.  No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.20.    <u>Disclosure</u>.  No representation or warranty made by any Borrower in this Agreement, or in any financial statement, report, certificate or any Other Document furnished in connection herewith, including, without limitation, the Perfection Certificate, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not materially misleading.  There is no fact known to Borrowers that Borrowers have not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement that could reasonably be expected to have a Material Adverse Effect.

5.21.    <u>No Conflicting Agreements or Orders</u>.  Except as disclosed on <u>Schedule 5.21</u>, no provision of any Material Agreement nor any judgment, decree or order binding on any Borrower or affecting any Collateral conflicts with, or requires any consent that has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.22.    <u>Application of Certain Laws and Regulations</u>.  No Borrower is subject to any statute, rule or regulation that regulates the incurrence of any Indebtedness, including without limitation, statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.23.    <u>Hedge Contracts</u>.  As of the Closing Date, no Borrower is party to any Hedge Contract, except a Permitted Hedge Contract.

5.24.    <u>Real Property</u>.  As of the Closing Date, Borrowers have no interest as owner or tenant in any Real Property, except as disclosed on <u>Schedule 5.24</u>.

5.25.    <u>Deposit Accounts</u>.  As of the Closing Date, no Borrower has any Deposit Accounts, except as listed on <u>Schedule 5.25</u>.

5.26.    <u>Brokers</u>.  No Borrower has retained the services of any broker to assist such Borrower in obtaining the benefits of this Agreement.

5.27.    <u>OFAC</u>.  No Permitted Holder, no Borrower and no Subsidiary is a Sanctioned Person.  No Portion of the Term Loans will be used to facilitate the operation of, to finance any investments in or any activities of, or to make any payments to, any Sanctioned Person or Sanctioned Country.

3631160.8

5.28.   <u>Accountants' Letter</u>.   Borrowing Representative has executed and delivered to the Accountants a letter directing the Accountants to act in the manner provided in <u>Section 4.8</u> hereof when requested by Agent.

5.29.   <u>Senior Debt</u>.   The principal amount of the Term Loans shall constitute "Senior Debt" as such term shall be defined in the Junior Lien Facility Documents and the holders of such Indebtedness shall be entitled to the rights and benefits of a holder of "Senior Debt" under the Junior Lien Facility Credit Agreement.

VI.   <u>AFFIRMATIVE COVENANTS</u>.

Each Borrower shall, and shall cause its Subsidiaries to, do the following until payment in full of the Obligations and termination of this Agreement:

6.1.   <u>Payment of Fees</u>.   Pay to Agent on demand all usual and customary fees and expenses that Agent incurs in connection with (a) the forwarding of the proceeds of the Term Loans and (b) the establishment and maintenance of any Deposit Account Control Agreement and the related Deposit Account(s).   Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

6.2.   <u>Conduct of Business and Maintenance of Existence and Assets</u>.   (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted), including, without limitation, all Material Intellectual Property, and take all actions necessary to enforce and protect the validity of Material Intellectual Property or other material rights included in the Collateral; (b) keep in full force and effect its existence and Material Agreements (in accordance with their terms); (c) comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect.

6.3.   <u>Violations</u>.   Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Authority, or of any agency thereof, applicable to any Borrower that could reasonably be expected to have a Material Adverse Effect.

6.4.   <u>Government Receivables</u>.   If requested by Agent to do so in respect of any Receivable, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act or other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them, subject to the provisions of the Intercreditor Agreement.

6.5.   <u>Execution of Supplemental Instruments</u>.   Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or

instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement and the Other Documents may be carried into effect.

6.6.    Payment of Material Agreements.  Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, including any in respect of its Material Agreements, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or where the amount or validity thereof is currently being contested in good faith by appropriate proceedings; provided that Borrowers have established reserves on their books in accordance with GAAP in respect thereof; and subject at all times to any applicable Subordination Agreement.

6.7.    Standards of Financial Statements.  Cause all financial statements referred to herein to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by the Accountants or the reporting officer of a Borrower, as the case may be, and disclosed therein).

6.8.    Further Assurances; Post Closing.   At Borrowers' cost and expense, each Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Agent may reasonably request with respect to the purposes, terms and conditions of this Agreement and the Other Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of this Agreement or any Other Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule 6.8.

6.9.    Board of Directors.  At all times, the Board of Directors (or other governing body) of each Borrower shall have at least one (1) Independent Director, which shall be appointed by the Equity Sponsor.

6.10.    Board Observation.  Each Borrower shall permit a representative designated by Agent (the "Lender Representative") to attend and participate in as a non-voting observer all meetings of the Board of Directors (or other governing body) of such Borrower and all meetings of any committee of any such Board of Directors (the "Governing Body"). Each Borrower agrees to give the relevant Lender Representative the same notice of all such meetings and copies of all materials distributed to members of any Governing Body at the same time as such notice and materials are given to the members of such Governing Body, and the relevant Lender Representative will be given the opportunity to participate in any telephonic meetings of such Governing Body.  Each Borrower shall cause its Board of Directors to meet not less frequently than once per Fiscal Year.  If it is proposed that any action be taken by written consent in lieu of a meeting of any Governing Body, the relevant Borrower shall give written notice thereof to the relevant Lender Representative as is required to be delivered to the members of such Governing Body describing in reasonable detail the nature and substance of such action. Agent may, without

making demand, charge Borrowers' Account for all reasonable costs and expenses incurred by it in connection with Agent's rights pursuant to this <u>Section 6.10</u>. Notwithstanding anything to the contrary in this paragraph, (a) so long as no Default or Event of Default has occurred and is continuing (in which event Agent may attend in-person any meetings of any Governing Body as it shall deem appropriate), a Lender Representative shall not attend in-person more than three (3) meetings of a Governing Body of a Borrower per Fiscal Year and (b) a Lender Representative may be excused by the relevant Borrower's Governing Body from attending any portion of such Governing Body's meeting (i) to the extent that attendance by such Lender Representative would jeopardize such Borrower's ability to assert the attorney-client privilege with respect to matters of material importance to be discussed during a portion of any meeting as determined by such Governing Body in good faith, (ii) during which matters relating to the Term Loans are to be discussed or (iii) during any voting (or final deliberation related thereto) by the members of such Governing Body with regards to the sale or other disposition of any Property that is permitted by this Agreement.

VII.    <u>NEGATIVE COVENANTS</u>.

Each Borrower shall, and shall cause its Subsidiaries to, comply as follows until payment in full of all Obligations and termination of this Agreement:

7.1.    <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc.</u>  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)    merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it except that any wholly-owned Subsidiary of a Borrower may merge with and into or consolidate with a Borrower or any other wholly-owned Subsidiary of a Borrower, and any Borrower may merge with or into, or consolidate with any other Borrower; <u>provided</u>, <u>however</u>, that each of the following conditions is satisfied:  (i) Agent shall have received not less than ten (10) Business Days' prior written notice of such intended merger or consolidation, which notice shall set forth in detail reasonably satisfactory to Agent the Persons that are merging or consolidating, which Person will be the surviving entity, the locations of the assets of the Persons that are merging or consolidating, and any Material Agreements and documents relating to such merger or consolidation, (ii) Agent shall have received such other information with respect to such merger or consolidation as Agent may reasonably request, (iii) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (iv) Agent shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Governmental Authority (with a copy as filed promptly after such filing), and (v) the surviving Person (if not already a Borrower) shall expressly confirm, ratify and assume the Obligations, this Agreement and all Other Documents to which the Borrowers are then party in writing, in a form and substance satisfactory to Agent, shall execute and deliver such other agreements, documents and instruments as Agent may reasonably request in connection therewith;

3631160.8

31

(b)    sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its other assets to any other Person without the prior written consent of Agent, except for

(i)    sales of Inventory in the ordinary course of business;

(ii)    Permitted PP&E Dispositions;

(iii)    the issuance and sale by Parent Company of Equity Interests after the Closing Date; provided, however, that, (a) the terms of such Equity Interests, and the terms and conditions of the purchase and sale thereof, shall not include any terms that contravene, or include any limitation on the right of any Borrower to amend or modify, any of the terms and conditions of this Agreement or any of the Other Documents, (b) after giving effect to such issuance and sale, no Change of Control shall have occurred and (c) the Net Cash Proceeds derived therefrom shall be paid to Revolver Loan Agent for application to the Revolver Loan Debt in accordance with the Revolver Loan Agreement;

(iv)    the issuance of Equity Interests of Parent Company pursuant to an employee stock warrant, stock option, management incentive program or grant or similar equity plan or 401(k) plan established for Borrowers' employees; provided, however, that no Change of Control shall result therefrom;

(v)    the issuance of Equity Interests in connection with the Equity Investment;

(vi)    the sale or other disposition of Collateral not otherwise permitted in clauses (i) and (ii) above, if: (a) such sales or other dispositions do not involve Collateral having an aggregate fair market value in excess of the Materiality Threshold for all such Collateral disposed of in any Fiscal Year of Borrowers; (b) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and (c) all of the Net Cash Proceeds of the sale of such Collateral shall be paid to Agent for application to the Obligations in accordance with Section 2.3(b) of this Agreement;

(vii)    intercompany loans and dividend payments, among or between Borrowers, to the extent permitted by Sections 7.3(d), 7.4(g), 7.5(c) and 7.7(b);

(c)    wind up, liquidate or dissolve, except pursuant to any merger or consolidation made in accordance with Section 7.1(a); or

(d)    agree to do any of the foregoing, except if such agreement is conditioned on approval by the Agent.

7.2.    Encumbrances.  No Borrower shall, or shall permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, Lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other

similar notice of any security interest or Lien with respect to any such assets or properties, <u>except</u> the following (herein called, collectively, "<u>Permitted Encumbrances</u>"):

(a)    the security interests and Liens in the Collateral in favor of Agent for the benefit of the Lender Parties granted pursuant to this Agreement and the Other Documents;

(b)    Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Subsidiary, as the case may be, and with respect to which reserves have been set aside on its books in accordance with GAAP;

(c)    non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of such Borrower's or Subsidiary's business to the extent: (1) such Liens secure Indebtedness that is not overdue or (2) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which reserves have been set aside on its books as required by GAAP;

(d)    zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property that do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property owned by any Borrower (or, to Borrowers' knowledge, in the case of Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, the value of the Borrowers' interest in such Leasehold Interests) that is subject thereto;

(e)    purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) acquired after the Closing Date and purchase money mortgages on Real Property acquired after the Closing Date to secure Indebtedness permitted under <u>Section 7.3(b)</u> hereof;

(f)    pledges and deposits of cash or issuances of letters of credit by any Borrower after the Closing Date in the ordinary course of its business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower as of the date hereof;

(g)    pledges and deposits of cash by any Borrower after the Closing Date to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower as of the date hereof;

(h)    Liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment, tooling or other materials that are not owned by any Borrower, but are located on the premises of such Borrower (but not in

3631160.8

33

connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower and the precautionary UCC financing statement filings in respect thereof;

(i)     the security interests in and Liens upon the Collateral and mortgages and Liens upon the Real Property in favor of the Revolver Loan Agent to secure the Revolver Loan Debt, provided, however, that, the security interests in and Liens upon the Collateral in favor of Revolver Loan Agent are and shall at all times be subject to the terms of the Intercreditor Agreement;

(j)     judgment Liens and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued by Borrowers, (ii) adequate reserves have been made for the amounts thereof on the books of Borrowers in accordance with GAAP and (iii) a stay of enforcement of any such Liens is in effect;

(k)     any security interests and Liens of an Insurance Premium Finance Party on the Insurance Premium Collateral to secure the Indebtedness described in and to the extent permitted in Section 7.3(h) hereof;

(l)     security interests and Liens granted to the "Issuer" under any "Letter of Credit Documents" (as each such term is defined in the Revolver Loan Agreement);

(m)     those other security interests and Liens (if any) existing on the Closing Date and set forth on Schedule 7.2 hereof; and

(n)     any subordinated security interests and junior Liens granted to the Junior Lien Facility Lender in connection with the Junior Lien Facility.

7.3.    Indebtedness.  No Borrower shall, nor shall permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)     the Obligations;

(b)     purchase money Indebtedness (including Capitalized Leases) existing on or arising after the Closing Date, to the extent secured by purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) and purchase money Mortgages or Liens on Real Property; provided, however, that:

(i)     the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Two Million Dollars ($2,000,000) in any Fiscal Year; provided, that the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Four Million Dollars ($4,000,000);

(ii)     such security interests, Mortgages or Liens do not apply to any property of such Borrower or Subsidiary other than the Equipment or Real Property so acquired

(and the proceeds thereof), unless such Indebtedness is owed to the Lenders or the Revolving Loan Lenders;

        (iii)     the Indebtedness secured thereby does not exceed the cost of the Equipment or Real Property so acquired, as the case may be;

        (iv)     such security interests, Mortgages and/or Liens are released promptly upon such Indebtedness being fully paid and satisfied;

        (v)     Agent shall have received at least five (5) Business Days' prior written notice of the intention of Borrowers to incur such Indebtedness, if incurred subsequent to the Closing Date; and

        (vi)     as of the date of incurrence of such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

        (c)     guarantees by any Borrower of the Obligations of any other Borrower in favor of Agent for the benefit of Lenders;

        (d)     the Indebtedness of any Borrower to any other Borrower arising after the Closing Date pursuant to loans made by any Borrower permitted under Section 7.4(g) hereof;

        (e)     Indebtedness of Borrowers to the Revolver Loan Lenders evidenced by or arising under the Revolver Loan Agreement and the other Revolver Loan Lender Agreements, provided, however, that the principal amount of such Indebtedness shall not exceed the original sum of (i) [**Eighteen Million Three Hundred Ninety Thousand Two Hundred Nineteen and 07/100**] Dollars ($[**18,390,219.07**]) plus (ii) any Indebtedness incurred as permitted by Section 7.3(b) that is owed to the Revolver Loan Lenders; in each case less the aggregate principal amount of all repayments, whether optional or mandatory, in respect thereof that, in the case of any revolving facility result in a permanent reduction in the principal amount of the Revolver Loans available for borrowing thereunder;

        (f)     Indebtedness of any Borrower evidenced by the Junior Lien Facility Subordinated Note; provided, however, that:

        (i)     the aggregate principal amount of such Indebtedness shall not exceed Three Million Dollars ($3,000,000) less the aggregate amount of all permitted principal repayments, repurchases or redemptions, whether optional or mandatory, made after the Closing Date in respect thereof;

        (ii)     the principal amount of the Term Loans shall at all times constitute "Senior Debt," as such term is defined in the Junior Lien Facility Documents; and the holders of the Term Loans shall be entitled to all the rights and benefits of a holder of "Senior Debt" under the Junior Lien Facility Subordinated Note; and

        (iii)     such Indebtedness is and remains subject to a Subordination Agreement in form and substance satisfactory to Agent;

(g)    Indebtedness of Borrowers to an Insurance Premium Finance Party in connection with insurance policies maintained by Borrowers arising as a result of such Insurance Premium Finance Party entering into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided, however, that, such Indebtedness shall be unsecured except to the extent permitted under Section 7.2(k) hereof, and shall not exceed, in aggregate principal amount outstanding at any one time, Seven Hundred Fifty Thousand Dollars ($750,000);

(h)    other Indebtedness outstanding on the Closing Date that is listed on Schedule 7.3;

(i)    Indebtedness of Borrowers to any "Issuer" arising under any "Letter of Credit Documents" (as each such term is defined in the Revolver Loan Agreement); and

(j)    Subordinated Debt.

7.4.    Loans, Investments, Etc.  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase any Equity Interests or Indebtedness or all or a substantial part of the assets or property of any Person, or form or acquire any Subsidiaries, or agree to do any of the foregoing (unless conditioned upon the consent of the Required Lenders), except:

(a)    the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)    investments in cash or Cash Equivalents, provided that at any time such investments in the aggregate exceed Ten Thousand Dollars ($10,000) (1) no Revolver Loan Debt is then outstanding and (2) the terms and conditions of Section 4.14(d) hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

(c)    the existing equity investments of each Borrower as of the Closing Date in its Subsidiaries, as listed on Schedule 7.4; provided, however, that, no Borrower shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries, except that a Borrower may make capital contributions to another Borrower in the form of dividend payments as permitted pursuant to Sections 7.5 and 7.7 hereof;

(d)    equity investments of a Borrower in another Borrower;

(e)    loans and advances by any Borrower to employees of such Borrower after the Closing Date in an aggregate principal amount not to exceed the Materiality Threshold at any time;

(f)    Equity Interests or debt securities issued to any Borrower by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower in connection with the insolvency, bankruptcy, receivership or reorganization of such

Person or a composition or readjustment of the Indebtedness of such Person; <u>provided</u>, <u>however</u>, that, the original of any stock certificate or other instrument evidencing such obligations shall, at Agent's request, be promptly delivered to Agent, but in any event within five (5) Business Days after Borrowers receive such request, together with such stock power, assignment or endorsement by such Borrower as Agent may request, subject to the provisions of the Intercreditor Agreement;

(g)      loans by a Borrower to another Borrower after the Closing Date, <u>provided</u>, <u>however</u>, that, (i) upon Agent's request, Borrowers shall provide to Agent a report in form and substance satisfactory to Agent of the outstanding amount of such loans as of the last day of the immediately preceding month and indicating any loans made and payments received during the immediately preceding month; and (ii) upon Agent's request, any such loan shall be evidenced by a promissory note or other instrument, the single original of which shall be promptly, but not later than five (5) Business Days after Agent's request, delivered to Agent to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require, subject to the provisions of the Intercreditor Agreement;

(h)      obligations of any Customer to any Borrower arising from Accounts that are past due and are evidenced by a promissory note by such Customer payable to such Borrower; <u>provided</u>, <u>however</u>, that promptly upon the receipt by such Borrower of the original of any such promissory note, but in any event within five (5) Business Days thereafter, subject to the provisions of the Intercreditor Agreement, such promissory note shall be endorsed to the order of Agent by such Borrower and delivered to Agent;

(i)      those loans and advances (if any) existing on the Closing Date and set forth on <u>Schedule 7.4</u>; <u>provided</u>, <u>however</u>, that, as to such loans and advances, Borrowers shall not, directly or indirectly, amend, modify, alter or change the terms of such loans and advances or any agreement, document or instrument related thereto and Borrowers shall furnish to Agent all default notices or demands for payment in connection with such loans and advances received by any Borrower or on its behalf, promptly after the receipt thereof, or sent by any Borrower or on its behalf, concurrently with the sending thereof, as the case may be; and

(j)      the payment of dividends by Borrowers, and the redemption, retirement, defeasance, purchase or other acquisition of Equity Interests, to the extent permitted by <u>Sections 7.5</u> and <u>7.7</u> hereof.

7.5.    <u>Dividends and Redemptions</u>.  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, declare or pay any dividends on account of any shares of any class of any Equity Interests of such Borrower now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, <u>except that</u>:

(a)      any Borrower may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests for

3631160.8

consideration in the form of additional Equity Interests so long as no Default or Event of Default has occurred and is continuing or could reasonably be expected to occur after giving effect thereto; provided, however, that no Borrower shall issue Excluded Equity Interests;

(b)    Borrowers may pay dividends to the extent permitted in Section 7.7 below;

(c)    any Subsidiary of a Borrower may pay dividends to a Borrower; and

(d)    Borrowers may repurchase Equity Interests consisting of and limited to Equity Interests held by employees of a Borrower pursuant to any employee stock ownership plan thereof upon the termination, retirement or death of any such employee in accordance with the provisions of such plan, provided that, as to any such repurchase, each of the following conditions is satisfied: (i) as of the date of the payment for such repurchase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (ii) such repurchase shall be paid with funds legally available therefor, (iii) such repurchase shall not violate any law or regulation or the material terms of any indenture, agreement or undertaking to which such Borrower is a party or by which such Borrower or its property are bound, and (iv) the aggregate amount of all cash payments for such repurchases in any Fiscal Year shall not exceed the Materiality Threshold.

7.6.    Nature of Business.  No Borrower shall, or shall permit any Subsidiary to, substantially change the nature of the business in which it is engaged or, except as otherwise specifically permitted by this Agreement, purchase or invest, directly or indirectly, in any assets or property other than purchases of assets or property in the ordinary course of business that are to be used in its business as presently conducted.

7.7.    Transactions with Affiliates.  No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)    purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliate of such Borrower (other than a Borrower or a Subsidiary thereof), except in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business (as the case may be) and upon fair and reasonable terms no less favorable to such Borrower than such Borrower would obtain in a comparable arm's length transaction with an unaffiliated person; or

(b)    make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower, except (i) reasonable compensation to, and reimbursement of reasonable expenses incurred by, officers, employees and directors for services rendered to such Borrower in the ordinary course of business, (ii) payments by any Borrower to any other Borrower for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services paid for by any Borrower on behalf of such other Borrower, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower and for the payment of taxes by or on behalf of such Borrower, (iii) the grant of stock options, restricted

3631160.8

38

stock awards, stock appreciation rights or similar rights to employees, officers or directors pursuant to a plan approved by the Board of Directors of the applicable Borrower (so long as after giving effect thereto no Change of Control shall occur and no Default or Event of Default shall have occurred and be continuing), (iv) loans or other advances to employees permitted by Section 7.4(e) hereof, (v) the payment of reasonable fees to the directors of any Borrower and (vi) payments of management fees to the Equity Sponsor in an aggregate principal amount not to exceed Five Hundred Thousand Dollars ($500,000) in any Fiscal Year (so long as (x) no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to occur because of the payment thereof and (y) the Equity Sponsor enters into, and delivers to Agent, a Subordination Agreement in form and substance satisfactory to Agent).

7.8.    Subsidiaries.  No Borrower shall, or shall permit any Subsidiary to, either: (a) create or acquire any Subsidiary; (b) enter into any partnership, joint venture or similar arrangement; or (c) dispose of any Equity Interests in any Subsidiary, except in a transaction expressly permitted under Section 7.1.  Without limitation of the foregoing, if and to the extent any Subsidiary is created or acquired hereafter with the prior written consent of the Agent, then, as a condition to such consent becoming effective, (i) each such Subsidiary must be joined as a Borrower hereunder, or must become a Guarantor hereof, (ii) each Subsidiary must grant a Lien on its assets to Agent as security for its obligations hereunder or under its Guaranty, and (iii) the Equity Interests of such Subsidiary must be pledged to Agent by amendment to the Pledge Agreement; each on terms satisfactory to Agent.

7.9.    Fiscal Year and Accounting Changes.  No Borrower shall, or shall permit any Subsidiary to, change its Fiscal Year from that in use on the Closing Date or make any significant change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by applicable law.

7.10.   Pledge of Credit.  No Borrower shall, or shall permit any Subsidiary to, pledge (or purport to pledge) Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of the Term Loans in or for any business other than such Borrower's business as conducted on the Closing Date.

7.11.   Amendment of Material Agreements.  No Borrower shall, or shall permit any Subsidiary to, amend, modify, alter or otherwise change in any material respect any term or provision of any of its Material Agreements, unless such amendment, modification or waiver does not cause any contravention of, or conflict with, any material term or condition of this Agreement and would not otherwise reasonably be expected to have a Material Adverse Effect; provided, however, that, for avoidance of doubt, Borrowers may, after giving prior written notice to Agent, amend, modify, alter or change the terms or provisions of any Material Agreement respecting Funded Indebtedness so as to extend the maturity thereof or defer the timing of any payments in respect thereof, or to forgive or cancel such Indebtedness (or a portion thereof) or to reduce the interest rate on or any fees associated therewith; and, provided, further, that Borrowers shall not amend, modify, alter or change any material terms or provisions of any of the Revolver Loan Lender Agreements (except as permitted in the first proviso hereof), except after giving Agent prior written notice thereof and, if requested by Agent, a corresponding amendment, modification, alteration or change is made hereto or to the Other Documents on the same, or substantially the same, terms simultaneously therewith.

3631160.8

39

7.12.    Compliance with ERISA.  No Borrower shall, or shall permit any Subsidiary to, either:  (i) maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans existing on the Closing Date and disclosed on Schedule 5.11, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan, (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any ERISA Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

7.13.    Prepayment of Indebtedness.  No Borrower shall, or shall permit any Subsidiary to, at any time, directly or indirectly, either: (a) prepay any Indebtedness, or (b) repurchase, redeem, retire, defease or otherwise acquire any Indebtedness of any Borrower, or set aside or otherwise deposit or invest any sums for such purpose; provided, however, that Borrowers may, from time to time, prepay, repurchase, redeem or retire, in whole or in part, (i) the Obligations, subject to the terms hereof, including, without limitation, with respect to any voluntary prepayments of the Term Loan B, the satisfaction of the conditions set forth in Section 2.2(iii) hereof and (ii) the Revolver Loan Debt, subject to the terms of the Revolver Loan Agreement.

7.14.    Payment of Subordinated Debt. No Borrower shall, or shall permit any Subsidiary to at any time, directly or indirectly pay the principal of, interest on or any other charge or fee in respect of any Subordinated Debt, except in accordance with the terms thereof as in effect on the Closing Date and as expressly permitted by the Subordination Agreement applicable thereto or the subordination provisions of the Junior Lien Facility Documents.

7.15.    Organizational Changes.  No Borrower shall, or permit any of its Subsidiaries to, (a) modify or restate its name without thirty (30) days' prior notice to Agent, (b) reincorporate or reorganize under the laws of any jurisdiction, (c) amend its Organic Documents or (d) agree or commit to do any of the foregoing.

7.16.    OFAC.  No Permitted Holder nor any Borrower shall, or permit any Borrower's Subsidiaries to, (a) be or become a Sanctioned Person, (ii) engage in any dealings or transactions prohibited by Section 2 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), or otherwise be associated with any such Sanctioned Person in any

manner violative of Section 2 of such executive order, or (c) otherwise become a Sanctioned Person in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

VIII.    FINANCIAL COVENANTS.

Borrowers shall, until payment in full of the Obligations and termination of this Agreement, comply with the Financial Covenants set forth below.

8.1.    Controlling Definitions.  As used in this Article VIII:

"Annualization Ratio" shall mean (a) 4/1 as of **[September 30]**, 2010, (b) 3/1 as of **[October 31]**, 2010, (c) 12/5 as of **[November 30]**, 2010, (d) 2/1 as of **[December 31]**, 2010, (e) 12/7 as of **[January 30]**, 2011, (f) 3/2 as of **[February 28]**, 2011, (g) 4/3 as of **[March 31]**, 2011, (h) 6/5 as of **[April 30]**, 2011 and, (i) 12/11 as of **[May 31]**, 2011.

"Capital Expenditures" shall mean, as applied to any Person, all expenditures for any fixed or capital assets (including, but not limited to, tooling) or improvements, or for replacements, substitutions or additions thereto, that have a useful life of more than one (1) year, including, but not limited to, the direct or indirect acquisition of such assets by way of offset items or otherwise and shall include the amount recorded on the balance sheet of such Person at the time of the acquisition of any such asset pursuant to a Capitalized Lease.

"Capitalized Lease" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which, in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

"Cash Income Taxes" shall mean, as to any Person, for any period, the Provision for Taxes less any portion thereof that represents deferred income taxes unless they become due and payable in the period, all determined in accordance with GAAP.

"Cash Interest Expense" shall mean, as to any Person, for any period, Interest Expense less (a) Interest Expense that represents the amortization of fees and expenses that were paid during prior periods and (b) Interest Expense on any Indebtedness payable in kind that was accrued during such period but is not paid in cash within thirty (30) days following the due date thereof ("Deferred Interest"), plus any Deferred Interest paid in cash during such period.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding any extraordinary or nonrecurring gains or losses), all as determined in accordance with GAAP; provided, however, that, without duplication, (a) the net income of any Person that is not a wholly-owned Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a wholly-owned Subsidiary of such Person; (b) the net income of any Person accrued prior to the date it becomes a wholly-owned Subsidiary of such Person or is merged into or consolidated with such Person or any of its wholly-owned Subsidiaries or the date that Person's assets are acquired by such Person or by any of its wholly-owned Subsidiaries

3631160.8

shall be excluded; (c) the net income of any Person shall exclude interest accrued, but not paid, on indebtedness owing to a Subsidiary or parent corporation of such Person that is subordinated in right of payment to the payment in full of the Obligations, on terms and conditions acceptable to Agent; (d) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded; (e) the net income of any Person shall exclude any write-down or write-off of assets resulting from the application of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" or Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets"; (f) the net income of any Person shall exclude any items of income (or expense) that are required by GAAP to be classified as non-operating amounts in such Person's statement of income definition; and (g) the net income of any Person shall exclude any gain or loss (together with any related Provisions for Taxes) realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions) or of any Equity Interest of such Person or a Subsidiary of such Person and any net income or loss realized as a result of changes in GAAP or the application thereof to such Person.

"EBITDA" shall mean, as to any Person, with respect to any period, the Consolidated Net Income of such Person for such period plus the following items, to the extent deducted in computing Consolidated Net Income for such period: (a) depreciation and amortization expenses; (b) Interest Expense for such period, plus (c) the Provision for Taxes for such period, plus (d) any one-time severance costs and other costs incurred in connection with the termination, relocation and training of senior management of Borrowers in an aggregate principal amount not to exceed at any time $700,000, plus (e) to the extent not already included in clause (g) of the definition of "Consolidated Net Income" above, losses resulting from the sale or other disposition, as permitted herein, of Property and the machining business of Borrowers, plus (f) payments of management fees to the Equity Sponsor to the extent permitted under Section 7.7(b) hereof..

"Fixed Charge Coverage Ratio" shall mean for any Test Period, the ratio of (a) EBITDA, less Unfinanced Capital Expenditures to (b) Fixed Charges, for such Test Period determined for the Borrowers on a consolidated basis in accordance with GAAP.

"Fixed Charges" shall mean, as to any Person, for any period, the sum, without duplication, of (a) Cash Interest Expense, plus (b) all regularly scheduled (as determined at the beginning of such period) principal payments on Indebtedness (including the portion of any payments under Capitalized Leases that is classified as principal), plus (c) Cash Income Taxes, plus (d) all cash dividends and distributions on Equity Interests, together with all repurchases, redemptions and retirements of Equity Interests, to the extent not included in clauses (a) or (b) of this definition.

"Interest Expense" shall mean, for any period, as to any Person, as determined in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capitalized Leases for such period),

including, without limitation, discounts in connection with the sale of any Accounts, but excluding interest paid in property other than cash and any other interest expense not payable in cash.

"Leverage Ratio" shall mean the ratio for the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as of the end of any calendar month, of (a) Net Senior Debt to (b) EBITDA for the Test Period, except that, as of the end of each calendar month immediately following the Closing Date until the first anniversary of the Closing Date, the Leverage Ratio shall mean the ratio of (x) Net Senior Debt to (y) the quotient of (A) EBITDA for the Test Period times (B) the Annualization Ratio.

"Liquidity" shall mean, as of any date of determination, the balance of cash on hand and Cash Equivalents of Borrowers not subject to any Lien or encumbrance other than in favor of Agent.

"Net Senior Debt" shall mean, as of any date, all Indebtedness outstanding (i) pursuant to this Agreement and the Other Documents and (ii) pursuant to the Revolver Loan Lender Agreements, less cash on hand and Cash Equivalents of the Borrowers as of such date.

"Test Period" shall mean the most recent period of twelve consecutive calendar months ended on or prior to any date of determination (taken as one accounting period), except that for each calendar month ending on or prior to the first anniversary of the Closing Date, "Test Period" shall mean the period commencing on the first day of the first calendar month following the Closing Date and ending on the date of determination.

"Unfinanced Capital Expenditures" shall mean any Capital Expenditures not financed with Indebtedness.

8.2.    Fixed Charge Coverage Ratio.  Borrowers shall maintain a Fixed Charge Coverage Ratio for any Test Period beginning on the last day of the third full calendar month following the Closing Date, measured on a monthly basis, of not less than 1.0:1.0.

8.3.    Capital Expenditures.  Borrowers and their Subsidiaries shall not make Capital Expenditures in any Fiscal Year, as measured monthly, in an aggregate amount in excess of Four Million Dollars ($4,000,000) during such Fiscal Year; provided, however, that if Capital Expenditures in any Fiscal Year are less than Four Million Dollars ($4,000,000), the amount of permitted Capital Expenditures in the immediately following Fiscal Year shall be increased by an amount equal to such amount unused amount of Capital Expenditures for such Fiscal Year up to a maximum amount of One Million Dollars ($1,000,000).

8.4.    Leverage Ratio.  Borrowers shall maintain a Leverage Ratio at the end of each calendar month beginning on the last day of the third full calendar month following the Closing Date of not more than: (i) 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to **[July 1]**, 2011; (ii) 3.5:1.0 for each calendar month ending after **[July 1]**, 2011 and prior to **[July 1]**, 2012; and (iii) 3.0:1.0 for each calendar month ending after **[July 1]**, 2012 through the expiration of the Term.

3631160.8

43

8.5.   <u>Minimum Liquidity</u>.  Borrowers shall not permit Borrowers' Liquidity at any time to be less than $2,000,000.

8.6.   <u>Minimum EBITDA</u>.  EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as measured every calendar month beginning on the third full calendar month following the Closing Date on a trailing twelve-month basis (<u>provided</u>, <u>however</u>, that for each calendar month ending on or prior to the first anniversary of the Closing Date, such measurement shall mean EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP for the period from the first day of the first full calendar month following the Closing Date, through such date of determination times the Annualization Ratio) shall not be less than (i) $8,000,000 through the first anniversary of the Closing Date or (ii) $9,000,000 thereafter. Notwithstanding the foregoing, the EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, (x) as measured on the last day of the first full calendar month following the Closing Date shall not be less than $600,000 in the period from the first day of the first full calendar month following the Closing Date to such date of determination or, (y) as measured on the last day of the second full calendar month following the Closing Date shall not be less than $1,333,333 in the period from the first day of the first full calendar month following the Closing Date to such date of determination

IX.   <u>CONDITIONS PRECEDENT</u>.

9.1.   <u>Conditions to Effectiveness</u>.  The agreement of Lenders to make the Term Loans pursuant to this Agreement and the Other Documents is subject to the satisfaction, in the sole judgment of the Agent and Lenders, or waiver by Lenders, immediately prior to or concurrently with the making of the Term Loans hereunder, of the following conditions precedent:

(a)   <u>Amended and Restated Notes</u>.  To the extent amended and restated Notes and/or allonges to Notes have been requested by any Lender, Agent shall have received such amended and restated Notes and/or allonges to Notes duly executed and delivered by a Designated Officer of each Borrower;

(b)   <u>Amended and Restated Loan Agreement</u>.  Agent shall have received this Agreement, duly executed by all parties hereto, in form and substance satisfactory to Agent;

(c)   <u>Filings, Registrations, Recordings and Searches</u>.  (i) Each document (including, without limitation, any Uniform Commercial Code financing statement) required by this Agreement, any Other Document, under applicable law or otherwise as reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral shall have been properly executed (if necessary) and delivered to the Agent or the title company for filing, registration or recordation in each jurisdiction in which the filing, registration or recordation thereof is so required  or requested, and Agent shall have received satisfactory evidence of the depositing for payment of any necessary fee, tax or expense relating thereto; (ii) the Agent shall also have received UCC, tax and judgment lien searches with respect to each Borrower in such jurisdictions as Agent shall require, and the results of such searches shall be satisfactory to Agent; and (iii) Agent shall have received from Borrowing Representative, for each Borrower, the Perfection Certificate;

(d)    Secretary's Certificates.  Agent shall have received a certificate of the Secretary (or an acceptable substitute officer having similar duties and powers), of each Borrower, dated the Closing Date, in substantially the form of Exhibit 9.1(d), unless otherwise acceptable to or required by Agent, certifying as to (i) the incumbency and signature of the officers of each Borrower executing this Agreement and any Other Documents, and (ii) the resolutions of the Board of Directors of such Borrower authorizing such officers to enter into and carry out such transactions as are contemplated pursuant to this Agreement and the Other Documents; and including therewith copies of the Organic Documents of such Borrower as in effect on the Closing Date, each in form and substance satisfactory to Agent;

(e)    Good Standing Certificates.  Agent shall have received good standing certificates for each Borrower dated not more than thirty (30) days prior to the Closing Date, issued by the secretary of state or other appropriate official of each Borrower's jurisdiction of organization and each jurisdiction where the conduct of each Borrower's business activities or the ownership of its properties necessitates qualification;

(f)    Legal Opinion.  Agent shall have received an opinion of legal counsel to the Borrowers, in form and content satisfactory to Agent, which shall cover such matters incidental to the transactions contemplated by this Agreement, the Notes and all Other Documents as Agent may reasonably require;

(g)    No Litigation.  Except with respect to the Chapter 11 Cases, (i) no litigation, investigation or proceeding before or by any arbitrator or Governmental Authority shall be continuing or threatened against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement or the Other Documents or any of the transactions contemplated hereby and thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the opinion of Agent, reasonably be expected to have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the transactions contemplated hereby shall have been issued by any Governmental Authority;

(h)    Material Agreements.  Agent shall have received and reviewed all Material Agreements existing on the Closing Date and be satisfied therewith;

(i)    Collateral Examination.  Agent shall have completed examinations of its primary Collateral, and be satisfied therewith;

(j)    Commitment Fee.  Agent shall have received in cash, on or prior to the Closing Date, a commitment fee, to be shared pro rata among the Lenders, equal to 1.00% of the aggregate principal amount of the Term Loans as of the Closing Date;

(k)    Intentionally Omitted;

(l)    Other Fees and Expenses.  Agent shall have received all fees and expenses payable to Agent and the Lenders on or prior to the Closing Date pursuant to this Agreement, any Other Document, the Reorganization Plan and the Cash Collateral Order, including, without limitation, reasonable attorneys' fees;

3631160.8

(m)    <u>Financial Statements</u>.  Agent shall have received copies of the Initial Projections and copies of the Historical Financial Statements, and be satisfied therewith;

(n)    <u>Insurance</u>.  Agent shall have received, in form and content satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(o)    <u>Deposit Account Control Agreements</u>.  Agent shall have received all Deposit Account Control Agreements, duly executed by all parties thereto, required to be delivered as of the Closing Date pursuant to <u>Section 4.14</u> hereof;

(p)    <u>Consents</u>.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem reasonably necessary to effectuate the transactions contemplated by this Agreement and the Other Documents;

(q)    <u>No Adverse Material Effect</u>.  Except for the Chapter 11 Cases, since the end of Borrowers' most recently completed Fiscal Year for which audited financial statements have been reported, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect;

(r)    <u>Landlord's Agreements</u>.  Unless Agent otherwise has agreed to waive such requirement in one or more instances Agent shall have received landlord agreements in form and content reasonably satisfactory to Agent with respect to all premises leased by any Borrowers at which Equipment having a fair market value in excess of the Materiality Threshold is located;

(s)    <u>Intellectual Property</u>.  To the extent that any Material Intellectual Property (or applications therefor) is registered with the United States Patent and Trademark Office or, as appropriate, the United States Copyright Office as of the Closing Date, the Borrower owning such Material Intellectual Property shall have executed, as appropriate, a patent security agreement, a trademark security agreement, and/or a copyright security agreement in favor of Agent, each to be in form and content satisfactory to Agent;

(t)    <u>Closing Certificate</u>.  Agent shall have received a closing certificate signed by a Designated Officer of each Borrower dated the Closing Date, in substantially the form of <u>Exhibit 9.1(t)</u>, stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date, no Default or Event of Default has occurred or is continuing;

(u)    <u>Equity Investment Proceeds</u>. Agent shall have received evidence satisfactory to it that no more than $2,200,000 of the proceeds from the Equity Investment (such amount is subject to Agent's review of sources and uses and Initial Projections) was used to payoff certain of Borrowers' outstanding accounts payable;

3631160.8

(v)    Subordination Agreements. Agent shall have received a Subordination Agreement, in form and substance satisfactory to Agent, from (i) each holder of the Borrowers' Subordinated Debt that is outstanding as of the Closing Date and (ii) the Equity Sponsor pursuant to Section 7.7(b) hereof;

(w)    Mortgages.  Agent shall have received from each Borrower amendments to each Mortgage with respect to all Real Property Collateral owned by such Borrower in fee simple as of the Closing Date, together with the following, each to be in form and substance satisfactory to Agent a mortgagee's title insurance policy or title insurance endorsement (each a "Title Insurance Policy"), dated the Closing Date together with evidence that all premiums in respect of such Title Insurance Policy have been paid, which Title Insurance Policy shall:  (i) be in an amount reasonably satisfactory to Agent; (ii) insure that the Mortgage insured thereunder creates a valid first Lien on the Real Property covered by such Mortgage free and clear of all Liens, defects and encumbrances (except those set forth in the Title Insurance Policy or otherwise reasonably acceptable to Lender); (iii) name Agent as the insured party thereunder; (iv) be in the form of ALTA Loan Policy 1970 (as amended) or other form approved by Agent, and (v) contain such endorsements and effective coverage as Agent may reasonably request;

(x)    Revolver Loans.  Borrowers shall have consummated all transactions contemplated with the Revolver Loan Agent and the Revolver Loan Lenders substantially in accordance with the terms of the Revolver Loan Agreement as in effect on the Closing Date;

(y)    Equity Investment.  Agent shall have received evidence satisfactory to it that the Equity Investment has been consummated in accordance with terms and conditions satisfactory to Agent;

(z)    Intercreditor Agreement. Agent and Revolver Loan Agent shall have executed and delivered an amendment to the Intercreditor Agreement, in form and substance satisfactory to Agent;

(aa)    Election of New Board of Directors.  The Permitted Holders of the Voting Equity Interests shall have elected a new Board of Directors of each Borrower, which shall be comprised of the following seven (7) members: (i) the Chief Executive Officer of the Parent Company, (ii) one (1) individual appointed by the Affiliated Bondholders (as defined in the Reorganization Plan), (iii) four (4) individuals appointed by the Equity Sponsor (provided, however, that at least one (1) of such individuals shall be an Independent Director) and (iv) one (1) individual appointed by the DIP Lenders (as defined in the Reorganization Plan), provided that at least $4,000,000 is to be rolled over to new Equity Interests as of the Closing Date (in such event that this condition is not satisfied, the seventh member shall be appointed by the Equity Sponsor);

(bb)    Minimum Liquidity. Agent shall have received evidence satisfactory to it that on the Closing Date, after giving effect to the transactions contemplated herein and taking into consideration all closing fees and expenses and the current obligations of the Borrowers, Borrowers shall have Liquidity in an amount of at least $3,000,000;

3631160.8

(cc)    Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order (together with all exhibits and other attachments thereto, as any of the foregoing shall be amended, modified or supplemented from time to time or any of the terms or conditions thereof waived (with the consent of the Lenders and Agent with respect to any amendment, modification, supplement or waiver that is adverse to the Lenders, as determined by the Lenders and Agent in their reasonable discretion), the "Plan Documents") in respect of the Chapter 11 Cases of the Borrowers in accordance with Section 1129 of the Bankruptcy Code, and Agent shall have received a copy thereof.  The Confirmation Order shall be in form and substance reasonably satisfactory to the Lenders and Agent, shall have been entered on the docket of the Bankruptcy Court, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in any manner (unless otherwise reasonably satisfactory to the Lenders and Agent) and Equity Sponsor and/or the Borrowers shall have made all cash payments contemplated thereunder;

(dd)    Plan Documents. The transactions contemplated by the Plan Documents shall have been consummated substantially contemporaneously with the consummation of the transactions hereunder (including, without limitation, all cash payments contemplated thereunder by Equity Sponsor and/or the Borrowers); and all conditions to the effectiveness of the Reorganization Plan shall have been satisfied or waived;

(ee)    Management Agreements. Agent shall have received from the Borrowers all management agreements and related documents and agreements duly executed by all parties thereto, in form and substance satisfactory to Agent;

(ff)    Pledge Reaffirmation.  Agent shall have received a pledge reaffirmation, in form and substance satisfactory to Agent, from each pledgor under the Pledge Agreement;

(gg)    USA Patriot Act/OFAC. Agent and Lenders shall have received all documentation and other information required by applicable law and/or Governmental Authorities (including, without limitation, the USA Patriot Act and OFAC);

(hh)    IRS Form 8821.  Each Borrower shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service;

(ii)    Environmental Reports. Agent shall have received environmental studies and reports prepared by independent environmental engineering firms experienced in such matters reasonably acceptable to Agent reflecting Borrowers' compliance with Section 5.6 hereof with respect to any Real Property that Borrowers own in fee simple as of the Closing Date; and

(jj)    Other Documents.  Agent shall have received all Other Documents which Agent determines to be reasonably necessary to consummate the transactions contemplated to occur on or after the Closing Date pursuant to this Agreement, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated herein shall be satisfactory in form and substance to each Lender Party and its legal counsel.

3631160.8

48

X.    <u>INFORMATION AS TO BORROWERS</u>.

Each Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.    <u>Disclosure of Material Matters</u>.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, report to Agent all matters materially and adversely affecting the value, or collectibility of any portion of the Collateral in excess of the Materiality Threshold or the enforceability of Agent's Lien thereon.

10.2.    <u>Environmental Compliance Certificate</u>.  At the request of Agent from time to time, furnish promptly, but in any event within five (5) Business Days after Borrowers' receipt of such request, a certificate signed by a Designated Officer of Borrowing Representative stating that, to the best of Borrowing Representative's knowledge, each Borrower is in compliance in all Environmental Laws and laws relating to occupational safety and health.  To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action Borrower will implement in order to achieve full compliance.

10.3.    <u>Litigation</u>.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of:  (i) any Commercial Tort Claim arising in a Borrower's favor subsequent to the Closing Date, or (ii) any litigation, suit or administrative proceeding affecting any Borrower, including, particularly, any Commercial Tort Claim, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

10.4.    <u>Material Occurrences</u>.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of:  (a) any Event of Default or Default; (b) any event, development or circumstance as a result of which any financial statements or other reports furnished to Agent fail to present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition or operating results of the Borrowers as of the date of such statements; (c) any accumulated retirement Plan funding deficiency which, if such deficiency continued for two (2) Plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (d) default by any Borrower in respect of any Indebtedness that exceeds the Materiality Threshold and  could reasonably be expected to result in the acceleration of the maturity of such Indebtedness, other than the Obligations, together with the names and addresses of the holders of such Indebtedness and the amount of such Indebtedness; (e) the termination (or receipt of notice of pending termination) of any Material Agreement; and (f) any other development in the business or affairs of the Borrowers which could reasonably be expected to have a Material Adverse Effect; in each case, describing the nature thereof and the action that Borrowers propose to take with respect thereto.

10.5.    <u>Government Receivables</u>.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, if the aggregate outstanding amount of any of its Receivables that arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them, exceeds the Materiality Threshold.

3631160.8

49

10.6.    <u>Annual Financial Statements</u>.  Furnish to Agent within one hundred (100) days after the end of each Fiscal Year of Borrowers financial statements of Borrowers on a consolidated basis, including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current Fiscal Year to the end of such Fiscal Year and a balance sheet as at the end of such Fiscal Year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by Malin, Bergquist & Company LLP or any other nationally recognized independent certified public accounting firm selected by Borrowers, but reasonably satisfactory to Agent (the "<u>Accountants</u>").  In addition, such financial statements shall be accompanied by a certificate of a Designated Officer of the Borrowing Representative, in substantially the form of <u>Exhibit 10.6</u>, that shall state that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants (herein, a "<u>Compliance Certificate</u>").

10.7.    <u>Quarterly and Monthly Financial Statements</u>.  Furnish to Agent, (a) within fifty (50) days following the end of the first three (3) Fiscal Quarters of each Fiscal Year, and (b) within thirty (30) days following the end of each Fiscal Month, the following: (i) an unaudited balance sheet of Borrowers on a consolidated basis, and (ii) unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated basis reflecting results of operations from the beginning of the Fiscal Year to the end of such Fiscal Quarter or Fiscal Month, as applicable, and for such Fiscal Quarter or Fiscal Month, as applicable, all as prepared on a basis consistent with prior practices but in accordance with GAAP (together with a comparison to the reports for the corresponding period(s) in the prior Fiscal Year and to the Projections for the current Fiscal Year required under <u>Section 10.8</u>).  The reports shall be accompanied by a Compliance Certificate of Borrowers signed by a Designated Officer of Borrowing Representative stating that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants.

10.8.    <u>Projections</u>.  Furnish to Agent prior to the first day of each Fiscal Year, commencing with its first Fiscal Year beginning after the Closing Date, month-by-month projected financial statements of Borrowers on a consolidated basis for such Fiscal Year, including balance sheets, income statements, statements of cash flow, and calculations of projected Financial Covenant compliance (including projected amounts of all financial components used in determining compliance) for such month (collectively, with the Initial Projections, the "<u>Projections</u>"), with the Projections to be accompanied by a certificate of the Borrowers signed by a Designated Officer of the Borrowing Representative to the effect that such Projections were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Projections are not to be viewed as facts and that actual results may differ from such Projections.

3631160.8

10.9.   Variances From Operating Budget.  Furnish to Agent, concurrently with the delivery of the financial statements referred to in Section 10.7, a summary of all material variances from the Projections submitted by Borrowers pursuant to Section 10.8.

10.10.  Notice of Adverse Events.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Authority or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Authority or any other Person to renew or extend any such Consent; (iii) copies of any periodic or special reports filed by any Borrower with any Governmental Authority, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower, taken as a whole, or if copies thereof are requested by any Lender Party.

10.11.  ERISA Notices and Requests.  Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice in the event that (i) any Borrower or any member of the Controlled Group knows that an ERISA Event has occurred, together with a written statement describing such ERISA Event and the action, if any, that such Borrower or member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action that such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with a copy of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with a copy of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

10.12.  Material Intellectual Property.  Notify Agent promptly after, but in any event within five (5) Business Days thereafter, if, subsequent to the Closing Date, any Borrower applies for, or acquires, any Material Intellectual Property registered (or registrable) under applicable federal law, and execute and deliver to Agent, upon request, such security agreements

3631160.8

in respect thereof as Agent may request to evidence, confirm or perfect Agent's Lien on and security interest in such Collateral.

10.13.  <u>Public Reports</u>.  Furnish to Agent, promptly after, but in any event within five (5) Business Days after, the same become publicly available, copies of all periodic and other reports, proxy statements and other materials (if any) filed by any Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to the owners of Borrowers' Equity Interests generally or to the holders of its Indebtedness (or any trustee, agent or to other representative therefor), as the case may be:

10.14.  <u>Material Agreements</u>.  Furnish to Agent copies of:  (i) all Material Agreements entered into subsequent to the Closing Date, promptly after, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (ii) all material amendments, modifications, alterations or other changes to any Material Agreements promptly upon, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (iii) any notices of default, termination, rescission or cancellation, or demands for payment made or received by any Borrower in respect of any Material Agreement, promptly after, but in any event within five (5) Business Days after, their receipt or delivery by such Borrower.

10.15.  <u>Additional Information</u>.  Furnish to Agent such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without limitation and without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening or establishing of any new Collateral Location or any Borrower's closing of any existing Collateral Location, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts at any of its plants or other facilities, or the expiration (other than in accordance with its terms) of any labor contract to which any Borrower is a party or by which any Borrower is bound.

10.16.  <u>Additional Documents</u>.  Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

XI.    <u>EVENTS OF DEFAULT</u>.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

11.1.    <u>Obligations</u>.  (i) Failure by any Borrower to pay the principal amount of any Obligations when due, or (ii) failure by any Borrower to pay any Obligations consisting of interest and fees within two (2) Business Days after the date when due, or (iii) failure by Borrower to pay any other Obligations not described in clauses (i) or (ii) above within five (5) Business Days after the date when due; in each such case, whether at maturity or by reason of

acceleration pursuant to the terms of this Agreement or any Other Document or by notice of intention to prepay, or by required prepayment;

11.2.    Misrepresentations.  Any representation or warranty of any material fact, circumstance or condition made or deemed made by any Borrower in this Agreement or any Other Document or in any certificate, document or financial or other written statement furnished by any Borrower at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

11.3.    Financial Information.  Failure by any Borrower to (i) furnish financial information when due or when requested pursuant hereto that is unremedied for a period of five (5) Business Days, or (ii) permit the inspection of its books or records by any Lender Party, when requested pursuant to Section 4.10 hereof;

11.4.    Liens.  Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's property having a collateral value, as determined by Agent, of more than the Materiality Threshold that is not stayed or vacated within thirty (30) days (but not later than its being executed, however);

11.5.    Covenants.  Either (i) except as otherwise provided in Section 11.3(i) above or clause (ii) of this Section 11.5, failure of any Borrower to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document; or (ii) a failure of Borrowers to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.7 or 6.4 hereof that is not cured within twenty (20) days from the occurrence of such failure;

11.6.    Judgments.  Any judgment is rendered or judgment Lien is filed against any Borrower for an amount in excess of the Materiality Threshold which is not either satisfied, stayed or discharged of record within thirty (30) days of such rendering or filing (but not later than its being executed, however);

11.7.    Voluntary Bankruptcy.  Any Borrower, any Subsidiary of any Borrower or any Guarantor shall (other than with respect to the Chapter 11 Cases) (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (vi) admit in writing its inability, or be generally unable, to pay its Indebtedness as it becomes due, (vii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (viii) take any action for the purpose of effecting any of the foregoing;

11.8.    Cessation of Business.  Any Borrower shall cease operation of its business or commence the liquidation of such business; or any Borrower shall give notice to Agent of its intent to undertake either of the foregoing measures;

3631160.8

11.9.  <u>Involuntary Bankruptcy</u>.  Any Borrower, any Subsidiary of a Borrower or any Guarantor shall acquiesce in, or fail to have dismissed within forty-five (45) days, any petition filed against it in any involuntary case under any state or federal bankruptcy law (as now or hereafter in effect), or take any action for the purpose of effecting any of the foregoing;

11.10.  <u>Material Adverse Change</u>.  Any change in any Borrower's condition or affairs (financial or otherwise) which in Agent's reasonable opinion has a Material Adverse Effect unless such Borrower remedies same to Agent's satisfaction within thirty (30) days after the Borrowing Representative receives written notice thereof from Agent;

11.11.  <u>Agent's Liens</u>.  Any Lien on any Collateral created hereunder or provided for hereby or under any Other Document ceases to be or is not a valid and perfected Lien having a first priority interest, except for any Permitted Encumbrance having Lien priority;

11.12.  <u>Subordinated Debt</u>.  An event of default shall occur under or in respect of any Subordinated Debt that causes the acceleration of, or entitles the holder thereof to cause the acceleration of, any Subordinated Debt, or any payment is made or received in respect of any Subordinated Debt in violation of the subordination provisions thereof, the terms hereof or the terms of any Subordination Agreement made with respect thereto.

11.13.  <u>Cross Default</u>.  Either:  (i) any "Event of Default" (as defined herein) under the Revolver Loan Agreement shall occur and be continuing (unless waived in writing by the Revolver Loan Lenders); or (ii) any "Event of Default" (as defined therein) under the Junior Lien Facility Documents shall occur and be continuing (unless waived in writing by the holder of the Junior Lien Facility Subordinated Note); or (iii) a default of the obligations of any Borrower under any other Material Agreement which involves a monetary obligation in excess of the Materiality Threshold, whether individually or in the aggregate, shall occur, which default is not cured (or waived in writing) within any applicable grace period;

11.14.  <u>Guaranty</u>.  Termination (except by its express terms) or breach of any Guaranty or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate or challenges the validity of, or its liability under, any such Guaranty or similar agreement;

11.15.  <u>Change of Control</u>.  Any Change of Control shall occur;

11.16.  <u>Change of Management</u>.  Any Change of Management shall occur;

11.17.  <u>Invalidity</u>.  Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower, or any Borrower shall so claim in writing to Agent;

11.18.  <u>Takings</u>.  (i) Any Governmental Authority shall revoke, terminate, suspend or adversely modify any license, permit, patent trademark or trade name of any Borrower, the continuation of which is material to the continuation of any Borrower's business, or (ii) any agreement that is necessary or material to the operation of any Borrower's business shall be suspended, revoked or terminated and not be reinstated or replaced by a substitute acceptable to Agent within thirty (30) days after the date of suspension, revocation or termination, and such

suspension, revocation or termination without reinstatement or replacement would reasonably be expected to have a Material Adverse Effect;

11.19.  <u>Seizures</u>.  Any portion of the Collateral in excess of the Materiality Threshold shall be seized or taken by a Governmental Authority, or any Borrower or the title and rights of any Borrower shall have become the subject matter of litigation which could reasonably be expected, in the opinion of Agent, upon final determination, to result in material impairment or loss of such Collateral;

11.20.  <u>Cessation of Operations</u>.  Unless and except to the extent occurring in the ordinary course of Borrowers' business as conducted on the Closing Date, any material portion of the business operations of the Borrowers (considered as a whole) are interrupted at any time for more than ten (10) consecutive Business Days during any period of thirty (30) consecutive days, unless (i) such cessation of operations occurs in the ordinary course of Borrowers' business; <u>e.g.</u>, an annual plant shutdown for re-tooling or maintenance or (ii) the Borrowers shall (A) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to enable them to continue to operate their business in substantially the same manner as operated prior to such interruption and meet their obligations when due during such interruption and (B) receive the proceeds described in <u>clause (A)</u> preceding not later than thirty (30) days following the initial date of any such interruption; <u>provided</u>, <u>however</u>, that notwithstanding the provisions of <u>clauses (A)</u> and <u>(B)</u> of this <u>Section</u>, an Event of Default shall be deemed to have occurred if such interruption of operations continues for a period of more than one hundred eighty (180) consecutive days;

11.21.  <u>Plans</u>.  An event or condition specified in <u>Section 7.12</u> or <u>Section 10.11</u> hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) that, in the judgment of Agent, could reasonably be expected to have a Material Adverse Effect; or

11.22.  <u>Criminal Charges</u>.  Any Borrower or any Designated Officer shall become the subject of a criminal indictment or investigation in respect of or pertaining to, the operation or conduct of a Borrower's business, its reporting of any financial data, its application for, or receipt of, any credit, its "laundering" of any funds or its non-payment (or underpayment) of any taxes or any other Charges, or shall admit its guilt or complicity in respect of any of the foregoing, or shall pay any fine or suffer any penalty in respect thereof (including as part of any plea bargain or similar arrangement).

## XII.  AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

12.1.  <u>Rights and Remedies</u>.

(a)    Upon and after the occurrence of an Event of Default pursuant to <u>Sections 11.7, 11.8, 11.9</u> or <u>11.20</u>, all Obligations shall be immediately due and payable and this Agreement shall be deemed terminated.  During the existence of any other Event of Default not specified in the preceding sentence, at the option of the (x) Required Term A Lenders all

Obligations in respect of the Term Loan A shall be immediately due and payable, or (y) Required Term B Lenders, subject to Section 12.1(b), all Obligations in respect of the Term Loan B shall be immediately due and payable and, in each case, Lenders shall have the right to terminate this Agreement.  Upon the occurrence of any Event of Default and during its continuation, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or in equity generally, including, without limitation, the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process.  Agent may enter any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place.  With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect.  Except as to that part of the Collateral that is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowers at least ten (10) days prior to such sale or sales is reasonable notification.  At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Borrower.  In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Borrower's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights that are used in connection with (a) Inventory for the purpose of disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of Inventory.  Notwithstanding anything in this Agreement to the contrary, the exercise by any Lender Party of any rights or remedies in respect of any Collateral, and the application of any proceeds thereof, shall be subject in all respects to the provisions of the Intercreditor Agreement.

            (b)       Upon the occurrence of an Event of Default, the Term B Lenders shall be permitted to accelerate the Obligations in respect of the Term Loan B and institute a legal proceeding against the Borrowers solely with respect to the Borrowers' nonpayment of any Obligations then due and payable to the Term B Lenders hereunder, provided, however, that in no event shall the Term B Lenders have any ability to take any Lien Enforcement Action or otherwise exercise (or cause the Agent  to exercise) any remedies against the Collateral or any other remedies against the Borrowers until the earlier of (x) the payment in full in cash of all Obligations owed to the Term A Lenders and the Agent in respect of the Term Loan A or (y) the expiration of the Standstill Period.  For purposes of this Section 12.1, "Standstill Period" means the period of time terminating on the 180th day after the date written notice is given to the Agent by the Required Term B Lenders that the Term B Lenders have accelerated the Obligations in respect of the Term Loan B, provided that the Standstill Period shall be extended so long as Agent is diligently pursuing in good faith the exercise of its enforcement rights or remedies against all or a material portion of the Collateral (including without limitation, any of the

3631160.8

56

following: solicitation of bids from third parties to conduct the liquidation of all or a material portion of the Collateral, the engagement or retention of sales brokers, marketing agents, investment bankers, accountants, auctioneers or other third parties for the purpose of valuing, marketing, promoting or selling a material portion of the Collateral, notification of account debtors to make payments to Agent or its agents, any action to take possession of all or any material portion of the Collateral or commencement of any legal proceedings or actions against or with respect to all or any material portion of the Collateral) or diligently attempting to vacate any stay of enforcement of its Liens on all or a material portion of the Collateral.

12.2.    <u>Application of Proceeds</u>.  The proceeds realized by Agent from the sale of any Collateral made pursuant to <u>Section 12.1(a)</u> hereof, shall, subject to the provisions of the Intercreditor Agreement, be applied as follows: <u>first</u>, to the costs, expenses and attorneys' fees and expenses actually incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; <u>second</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document; <u>third</u>, to interest on the Term Loan A then accrued, but unpaid; <u>fourth</u>, to the principal amount of the Term Loan A then outstanding; <u>fifth</u>, to interest on the Term Loan B then accrued, but unpaid; <u>sixth</u>, to the principal amount of the Term Loan B then outstanding; and, <u>lastly</u>, to all other Obligations then outstanding.  If any deficiency shall arise, Borrowers shall remain liable to the Lender Parties therefor.  If any surplus exists, such surplus shall be held by Agent as cash Collateral pending full payment and satisfaction of all Obligations and termination of this Agreement, after which any remainder shall be returned to the Borrowing Representative except as otherwise provided in the Intercreditor Agreement or is otherwise then required under applicable law.  Notwithstanding anything to the contrary contained herein, the Lien granted to the Agent for the benefit of the Term A Lenders shall be deemed to be separate and distinct from the Lien granted to the Agent for the benefit of the Term B Lenders, and to the extent that, under the foregoing provisions, the Term A Lenders are entitled to be paid from the proceeds of Collateral prior to the Term B Lenders, each of the parties hereto agrees that the priority provisions of this <u>Section 12.2</u> shall be enforceable under Section 510 of the Bankruptcy Code as effecting a subordination of the interests of the Term B Lenders to the Term A Lenders.

12.3.    <u>Agent's Discretion</u>.  After an Event of Default has occurred and while it is continuing, Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto; <u>provided</u> that such determination will not in any way modify or affect any Lender Party's rights hereunder, including, without limitation, with respect to the Term B Lenders after the expiration of the Standstill Period.

12.4.    <u>Setoff</u>.

(a)    <u>Establishment of Right</u>.  In addition to any other rights which any Lender Party may have under applicable law, upon the occurrence of an Event of Default and during its continuation, each Lender Party shall have a right of setoff as to, and may apply, any Borrower's property held by it (actually or constructively) to reduce the Obligations, subject to the provisions of the Intercreditor Agreement; <u>provided</u>, <u>however</u>, that no Lender Party shall have any such right of setoff, appropriation or application against any Payroll Account.  Each Lender Party agrees to notify the Borrowing Representative and the Agent after any such setoff and

application is made by such Lender Party, <u>provided</u> that its failure to give such notice shall not affect the validity of such setoff and application.

(b)    <u>Benefited Lender Parties</u>.  If any Lender Party (a "<u>Benefited Party</u>") shall at any time receive any payment of all or part of any Term Loan held by such Lender Party, or interest thereon, or other Obligations owing under this Agreement or the Other Documents or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in <u>Section 11.7</u> or <u>Section 11.9</u> or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender Party, if any, in such Term Loan, or interest thereon, or other Obligations owing under this Agreement or the Other Documents, such Benefited Party shall purchase for cash from each affected Lender Party holding such Term Loan a participating interest in such portion of each such other Lender Party's Term Loan or other Obligations owing under this Agreement or Other Documents, or shall provide each such Lender Party with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Parties to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lender Parties; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Party, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.  The Borrowers agree that each Lender Party so purchasing a portion of another Lender Party's Term Loan or other Obligations owing under this Agreement or the Other Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of <u>clause (a)</u> of this <u>Section 12.4</u>, rights of setoff) with respect to such portion purchased as fully as if such Lender Party were the direct holder thereof.

12.5.    <u>Rights and Remedies not Exclusive</u>.  The enumeration of the foregoing rights and remedies of the Lender Parties is not intended to be exhaustive, and the exercise of any right or remedy by the Lender Parties shall not preclude the exercise of any other right or remedy provided for herein or in any Other Document or otherwise provided by law from and after the occurrence of any Event of Default and during its continuation, all of which shall be cumulative and not alternative.

## XIII.    <u>WAIVERS AND JUDICIAL PROCEEDINGS</u>.

13.1.    <u>Waiver of Notice</u>.  Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

13.2.    <u>Delay</u>.  No delay or omission on any Lender Party's part in exercising any right, remedy or option hereunder or under any of the Other Documents shall operate as a waiver of such right, remedy or option or of any Default or Event of Default.

13.3.    <u>Jury Waiver</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER

DOCUMENT, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR
INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH
RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED
TRANSACTIONS; IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER
ARISING, AND WHETHER IN CONTRACT OR TORT OR OTHERWISE, AND EACH
PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR
CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND
THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART
OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE
CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL
BY JURY.

XIV.   EFFECTIVE DATE AND TERMINATION.

14.1.   Term.  This Agreement, which shall inure to the benefit of, and shall be binding
upon, the respective successors and permitted assigns of each Borrower and each Lender Party;
shall become effective on the Closing Date, and shall continue in full force and effect until **[July
19]**, 2013 (the "Term") or any earlier date on which the Term Loans, together with all accrued
interest thereon, and all other Obligations are fully paid and satisfied or this Agreement is
otherwise terminated in accordance with its terms.

14.2.   Termination.  The termination of this Agreement shall not affect the rights of any
Borrower or any Lender Party, or any of the Obligations having their inception prior to the
effective date of such termination, and the provisions hereof shall continue to be fully operative
until all transactions entered into, all rights or interests created hereby, and all of the Obligations
have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights
granted to Agent for the benefit of the Lender Parties hereunder and the financing statements
filed in respect thereof shall continue in full force and effect, notwithstanding the termination of
this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a
zero or credit position, until all of the Obligations of each Borrower have been paid or performed
in full after the termination of this Agreement or each Borrower has furnished the Lender Parties
with an indemnification satisfactory to such parties with respect thereto.  Accordingly, each
Borrower waives any rights that it may have under the applicable provisions of the Uniform
Commercial Code to demand the filing of termination statements with respect to the Collateral,
and Agent shall not be required to deliver such termination statements to the Borrowers, or to file
them with any filing office, unless and until this Agreement shall have been terminated in
accordance with its terms and all Obligations paid in full in immediately available funds.  All
representations, warranties, covenants, waivers and agreements contained herein shall survive
termination hereof until all Obligations are paid or performed in full.  Notwithstanding any other
provision of this Agreement or any Other Document, no termination of this Agreement shall
affect Agent's or any Lender's rights or any of the Obligations existing as of the effective date of
such termination, and the provisions of this Agreement and the Other Documents shall continue
to be fully operative until the Obligations have been fully performed and indefeasibly paid in
cash in full.  The Liens granted to Agent hereunder and under the Other Documents and the
financing statements filed pursuant thereto and the rights and powers of Lender shall continue in
full force and effect notwithstanding the fact that Borrowers' borrowings hereunder may from

time to time be in a zero or credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash.

XV.    REGARDING AGENT.

15.1.    Appointment.  Each Lender Party hereby designates CSE to act as Agent for such Lender Party under this Agreement and the Other Documents.  Each Lender Party hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest and all fees, charges and collections received pursuant to this Agreement, for the ratable benefit of the Lender Parties, except the fees and other amounts payable to Agent as set forth in Section 9.1(k).  Agent may perform any of its duties hereunder by or through its agents or employees.  As to any matters not expressly provided for by this Agreement (including without limitation, collection of the Obligations), but Agent may act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the requisite Lenders as provided in this Agreement, which instructions shall be binding; provided, however, that Agent shall not be required to take any action that exposes Agent to liability or that is contrary to this Agreement or the Other Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto from the Lender Parties.

15.2.    Nature of Duties.  Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents.  Neither Agent, nor any of its officers, directors, employees or agents, shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by any of them under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder or under any Other Documents.  Agent shall not be under any obligation to any Lender Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower.  The duties of Agent with respect to the Term Loans shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, express or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any Other Document, except as expressly set forth herein or therein.

15.3.    Lack of Reliance on Agent and Resignation.  Independently and without reliance upon Agent, each other Lender Party has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower in connection with the making and carrying of the Term Loans or any other Obligations and the taking or not

3631160.8

60

taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower.  Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender Party with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof.  Agent shall not be responsible to any Lender Party for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or for the financial condition of any Borrower, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.  Agent may resign on thirty (30) days' written notice to each of the Lenders and, upon such resignation, the Required Lenders will promptly designate a successor Agent.  If no such successor Agent is appointed at the end of such thirty (30) day period, Agent may designate one of the existing Lenders as a successor Agent.  Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor Agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent.  After any Agent's resignation as Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.  Certain Rights of Agent.  If Agent shall request instructions from Lenders with respect to any act or action (including any failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement); and Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender Party shall have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement).

15.5.  Reliance.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it.  Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

15.6.  Notice of Default.  Agent shall not be deemed to have knowledge or notice of the occurrence, continuation or cessation of any Default or Event of Default unless Agent has received notice from a Lender Party or a Borrower referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default" (or a notice in respect of the continuation or cessation thereof).  In the event that

Agent receives such a notice, Agent shall give notice thereof to all other Lender Parties. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or the requisite Lenders as otherwise provided in this Agreement); provided, however, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders consistent with the terms of this Agreement and the Other Documents.

15.7.   Indemnification.  To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Term Loans, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent  in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided, however, that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the indemnified party's gross (not mere) negligence or willful misconduct.

15.8.   Agent in its Individual Capacity.  As to that portion of the Term Loans made by Agent as a Lender, Agent shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties of Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with any Borrower as if it were not performing the duties of Agent specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

15.9.   Delivery of Documents.  To the extent Agent receives documents and information from any Borrower pursuant to Article X of this Agreement, Agent will promptly furnish such documents and information to the other Lender Parties.

15.10.   Borrowers' Undertaking to Agent.  Without prejudice to their respective obligations to Lender Parties under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

15.11.   Documentation Agent, Etc.  Agent shall have the continuing right, for purposes hereof, at any time from time to time to designate one or more Lender Parties (and/or its or their Affiliates) as "Co-Agent," "Collateral Agent," "Documentation Agent," "Syndication Agent," "Arranger" or otherwise for purposes hereof, but such designations shall have no substantive effect, and the Lender Parties (or their Affiliates) so designated shall have no additional powers, duties or responsibilities as a result hereof.  Further, no such Lender Party need be identified by

such designation in any Other Document (including any amendment hereto or thereto) or execute this Agreement or any Other Document, using such designation.

    15.12. <u>Term B Lenders Purchase Option</u>.

    (i)    Upon the occurrence and during the continuance of (i) an acceleration of the Obligations or (ii) a Lien Enforcement Action on the part of the Agent on behalf of Term A Lenders, any or all of the Term B Lenders, acting as a single purchaser group, shall have the option at any time upon five (5) Business Days prior written notice (each such notice, a "<u>Term B Purchase Notice</u>") from the Term B Lenders to the Term A Lenders to purchase all of the Obligations in respect of the Term Loan A from the Term A Lenders.  Such Term B Purchase Notice to Term A Lenders shall be irrevocable.

    (ii)    On the date specified by Agent on behalf of Term B Lenders in such Term B Purchase Notice (which shall not be less than five (5) Business Days, nor more than ten (10) Business Days, after the receipt by Agent on behalf of Term A Lenders of the Term B Purchase Notice from Agent on behalf of Term B Lenders of the election by the Term B Lenders to exercise such option), Term A Lenders shall sell to Term B Lenders, and Term B Lenders shall purchase from Term A Lenders, the then outstanding principal amount of the Term Loan A <u>plus</u> accrued and unpaid interest thereon and any fees and expenses due the Agent or Term A Lenders (the "<u>Term Loan A Obligations</u>").  The Term A Lenders hereby represent and warrant that, as of the date hereof, no approval of any court or other regulatory or governmental authority is required for such sale.

    (iii)    Upon the date of such purchase and sale, Term B Lenders shall (i) pay to Agent on behalf of Term A Lenders as the purchase price therefor (the "<u>Purchase Price</u>") the full amount of the Term Loan A Obligations then outstanding and unpaid (including principal, interest, fees and expenses, including reasonable attorneys' fees and legal expenses but excluding any early termination fee or prepayment fee), (ii)  agree to pay to Term A Lenders any early termination fee or prepayment fee payable in connection with Term Loan A in accordance with this Agreement within three (3) Business Days of the receipt of same by the Term B Lenders or Agent on behalf of Term B Lenders, after the payment in full in cash to Term B Lenders of the Obligations in respect of the Term Loan B and the Term Loan A Obligations purchased by Term B Lenders pursuant to this <u>Section 15.12</u> (excluding any early termination or prepayment fee (whether owing with respect to Term Loan A or Term Loan B)), <u>provided</u> that (x) the notice of termination is received by the Term B Lenders or Agent on behalf of Term B Lenders or (y) the effective date of termination occurs, within one year after the effective date of the purchase of the Term Loan A Obligations by the Term B Lenders.  Such purchase price shall be remitted by wire transfer in federal funds to such bank account of Agent on behalf of Term A Lenders, as Agent may designate in writing to the Term B Lenders or Agent on behalf of Term B Lenders for such purpose.  Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by Term B Lenders to the bank account designated by Agent on behalf of Term A Lenders are received in such bank account no later than 3:00 p.m., New York City time, and interest shall be calculated to and including such Business Day if the amounts so paid to the bank account designated by Agent on behalf of Term A Lenders are received in such bank account later than 3:00 p.m., New York City time.

(iv)    Such purchase shall be made pursuant to a Commitment Transfer Supplement and shall be expressly made without representation or warranty of any kind by Term A Lenders as to the Term Loan A Obligations or otherwise and without recourse to Term A Lenders, except that Term A Lenders shall represent and warrant: (i) the amount of the Term Loan A Obligations being purchased, (ii) that Term A Lenders will transfer the Term Loan A Obligations to the Term B Lenders free and clear of any Liens or encumbrances, (iii) Term A Lenders have legal and equitable title to the Term Loan A Obligations and the related Other Documents being purchased and (iv) Term A Lenders have the right to assign the Term Loan A Obligations and the assignment is duly authorized.

15.13.  <u>Collateral Matters</u>.  (a)  Agent is authorized on behalf of Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or this Agreement or any of the Other Documents that may be necessary or reasonably advisable to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to this Agreement of the Other Documents. Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion and without the necessity of any notice to or further consent from the Lenders, to release any Liens upon any Collateral (a) upon the repayment in full of the Obligations and termination of this Agreement and the Other Documents or as otherwise contemplated in this Agreement, including, without limitation, with respect to any Permitted PP&E Disposition; (b) constituting property in which Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or (c) constituting property leased to Borrowers under a lease which has expired or been terminated in a transaction permitted under this Agreement.  Upon request by Agent or Borrowers at any time, Lenders will confirm in writing Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this <u>Section 15.13</u>.  Upon receipt by Agent of any authorization from Lenders of Agent's authority to release any Liens upon particular types or items of Collateral, and upon at least 5 Business Days' prior written request by Borrowers, Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of its Liens upon such Collateral; <u>provided</u>, <u>however</u>, that (i) Agent shall not be required to execute any such document on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon all interests retained by the Agent for the benefit of the Lenders, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)    Notwithstanding the foregoing sub-clause (a) of this <u>Section 15.13</u>, <u>Section 17.2</u> or any other provision to the contrary in this Agreement, after the occurrence of an Event of Default and prior to the expiration of the Standstill Period, Agent and Term A Lenders shall have the exclusive right to manage, perform and enforce the terms of this Agreement and the Other Documents with respect to the Collateral, to exercise and enforce all privileges and rights thereunder according to their discretion and the exercise of its business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral, to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral and to take all other Lien Enforcement Actions with respect thereto, in each case (i) so long as the proceeds thereof are applied in accordance with <u>Section 12.2</u> hereof and (ii) subject to the terms and conditions of the Intercreditor Agreement.

3631160.8

64

## XVI.   BORROWING REPRESENTATIVE.

16.1.   <u>Borrowing Representative Provisions</u>.  If and to the extent that at any time or from time to time there are multiple Borrowers, then:

(a)   Each Borrower acknowledges that it together with each other Borrower make up a related organization of various entities constituting a single economic and business enterprise and sharing a substantial identity of interests such that, without limitation, Borrowers render services to or for the benefit of each other, purchase or sell and supply goods to or for the benefit of each other, make loans or advances and provide other financial accommodations to or for the benefit of each other (including the payment of creditors and guarantees of Indebtedness), provide administrative, marketing, payroll and management services to or for the benefit of each other; have centralized accounting, common officers and directors.  Accordingly, and without limitation, any credit or other financial accommodation extended to any one Borrower pursuant hereto will result in direct and substantial economic benefit to each other Borrower, and each Borrower will likewise benefit from the economic benefit to each other Borrower, and consequently, the Borrowers, as a group, applying for credit and other financial accommodations pursuant hereto on a collective basis.

(b)   Each Borrower hereby irrevocably designates Borrowing Representative to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Representative.

(c)   The handling of this credit facility as a co-borrowing facility with a Borrowing Representative in the manner set forth in this Agreement is solely an accommodation to Borrowers and at their specific request.  No Lender Party shall incur any liability to Borrowers as a result thereof.  To induce each Lender Party to do so and in consideration thereof, each Borrower hereby indemnifies each Lender Party and holds each Lender Party harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against such Lender Party by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent, any Lender or any other Lender Party on any request or instruction from Borrowing Representative or any other action taken by Agent, any Lender or any other Lender Party with respect to this Section except due to willful misconduct or gross (not mere) negligence by the indemnified party.

(d)   All Obligations shall be joint and several liabilities of Borrowers.  Each Borrower cross-guarantees the full payment and performance hereunder and under the Other Documents by the other Borrower of its Obligations, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extension, renewal or forbearance granted by any Lender Party to any Borrower, the failure any Lender Party to give any Borrower any notice, any failure of any Lender Party to pursue or preserve its rights against any Borrower, the release by any Lender Party of any Borrower or any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by any Lender

Party to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.

16.2.   <u>Waiver of Subrogation</u>.  Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim that such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property that is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVII.   <u>MISCELLANEOUS</u>.

17.1.   <u>GOVERNING LAW</u>.  THIS AGREEMENT AND, UNLESS OTHERWISE EXPRESSLY PROVIDED THEREIN, EACH OTHER DOCUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK.  ANY JUDICIAL PROCEEDING BROUGHT BY OR AGAINST ANY BORROWER WITH RESPECT TO ANY OF THE OBLIGATIONS, THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTION MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE CITY AND STATE OF NEW YORK, UNITED STATES OF AMERICA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT.  EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWING REPRESENTATIVE AT ITS ADDRESS SET FORTH IN <u>SECTION 17.6</u> AND SERVICE SO MADE SHALL BE DEEMED COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAILS OF THE UNITED STATES OF AMERICA; <u>PROVIDED</u>, <u>HOWEVER</u>, IF BORROWING REPRESENTATIVE CEASES TO HAVE AN ADDRESS IN NEW YORK, NEW YORK AS ITS NOTICE ADDRESS PURSUANT TO <u>SECTION 17.6</u>, THEN, AT ANY LENDER PARTY'S OPTION, BY SERVICE UPON THE CORPORATION SERVICE COMPANY (OR ANY SUCCESSOR OR REPLACEMENT AGENT FOR SERVICE WITH AN OFFICE IN NEW YORK, NEW YORK, SELECTED BY SUCH LENDER PARTY), WHICH EACH BORROWER HEREBY APPOINTS AS ITS AGENT FOR THE LIMITED PURPOSE OF ACCEPTING SERVICE IN THE STATE OF NEW YORK UNDER SUCH CIRCUMSTANCE.  NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR LIMIT THE RIGHT OF ANY LENDER PARTY TO BRING PROCEEDINGS AGAINST ANY BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.  EACH BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER AND SHALL NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON <u>FORUM NON CONVENIENS</u>.

3631160.8

ANY JUDICIAL PROCEEDING BY ANY BORROWER AGAINST ANY LENDER PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT, SHALL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT LOCATED IN THE CITY OF NEW YORK, STATE OF NEW YORK OR IN THE COURTS OF ANY OTHER JURISDICTION IN WHICH ANY LENDER PARTY HAS BROUGHT A PROCEEDING AGAINST ANY BORROWER IN RESPECT HEREOF THAT IS THEN PENDING.

      17.2.    Entire Understanding; Amendments; Waivers; Consents.

      (a)    This Agreement and the Other Documents contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof.  Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by the respective officers of the party making such promises, representations, warranties, or guarantees.  Neither this Agreement nor any Other Document nor any portion or provisions hereof or thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.  Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and the Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement or any Other Document.

      (b)    The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this <u>subsection</u>, from time to time enter into written supplemental agreements to this Agreement or the Other Documents for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent, or Borrowers  hereunder or thereunder or the conditions, provisions or terms hereof or thereof, or waiving any Event of Default, but only to the extent specified in such written agreements; <u>provided</u> that, until the repayment in full in cash Obligations in respect of the Term Loan A, only the consent of the Required Term A Lenders shall be required to waive any Event of Default (other than any Event of Default under <u>Section 11.1</u>) or forbear from taking any action with respect to same; <u>provided</u> <u>further</u>, <u>however</u>, that no such no such modification, amendment, waiver or supplemental agreement shall, without the consent of

      (A) all Term A Lenders:  (i) increase the Term Loan A Commitment or Term Loan A Commitment Percentage of any Term A Lender; (ii) increase the Term Loan A; (iii) extend the maturity of Term Loan A or the due date for any amount payable with respect thereto, or decrease the rate of interest or reduce any fee payable by Borrowers to Term A Lenders pursuant to this Agreement; (iv) alter the definition of the terms "Required Term A Lenders" or "Required Lenders" or alter, amend or modify this <u>Section 17.2(b)</u>; (v) make any change to the purchase option in <u>Section 15.12</u> hereof; or (vi) cause any reduction in the principal, interest or fees payable in respect of the Term Loan A (except in connection with any waiver of the application of the Default Rate that applies to all of the Term Loans);

3631160.8

(B) all Term B Lenders: (i) increase the Term Loan B Commitment or Term Loan B Commitment Percentage of any Term B Lender; (ii) increase the Term Loan B; (iii) extend the maturity of Term Loan B or the due date for any amount payable with respect thereto, or decrease the rate of interest or reduce any fee payable by Borrowers to Term B Lenders pursuant to this Agreement; (iv) alter the definition of the terms "Required Term B Lenders" or "Required Lenders" or alter, amend or modify Section 17.2(b); (v) make any change to the purchase option in Section 15.12 hereof; or (vi) cause any reduction in the principal, interest or fees payable in respect of the Term Loan B (except in connection with any waiver of the application of the Default Rate that applies to all of the Term Loans);

(C) all the Lenders, release during any calendar year any Collateral (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of the Materiality Threshold; or

(D) each Lender and Agent, change the rights and duties of Agent.

(c)        Any supplemental agreement entered into pursuant to this Section 17.2 shall apply equally to each Lender and shall be binding upon Borrowers, Lenders, and Agent and all future holders of the Obligations.  In the case of any waiver of any Event of Default, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default that was waived), or impair any right or remedy arising therefrom.

(d)        In the event that Agent requests the consent of a Lender pursuant to this Section and such consent is denied, then CSE may, at its option, require such Lender to assign its interest in the Term Loans to CSE or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to the then outstanding principal amount of that portion of the Term Loans owing to such Lender plus accrued and unpaid interest thereon and any fees then due such Lender, which interest and fees shall be paid when collected from Borrowers.  In the event CSE elects to require any Lender to assign its interest to CSE or to the Designated Lender, CSE will so notify such Lender in writing within forty-five (45) days following such Lender's denial, and such Lender will assign its interest to CSE or the Designated Lender no later than five (5) Business Days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, CSE or the Designated Lender, as appropriate, and Agent.

17.3.    Successors and Assigns; Participations; New Lenders.

(a)        This Agreement shall be binding upon and inure to the benefit of Borrowers, each Lender Party, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)    Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Term Loans to one or more Participants.  In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the Other Documents shall remain unchanged for all purposes, (b) the Borrowers and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and under the Other Documents, and (c) all amounts payable by Borrowers hereunder and under the Other Documents shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in Section 17.2(b) expressly requiring the unanimous vote of all Lenders or, as applicable, all affected Lenders.  Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement that such Lender enters into with any Participant.  Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the same right of setoff pursuant to Section 12.4 hereof in respect to its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of setoff shall be subject to the provisions of Section 12.4 hereof and each Participant shall be obligated to share with the Lenders, and the Lenders agree to share with each Participant as provided in Section 12.4 hereof.  Each Participant may exercise all rights of payment (including, without limitation, rights of set-off) with respect to the portion of the Term Loans in which a participation has been purchased by it as fully as if such Participant were the direct holder thereof, provided that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in such Term Loan to such Participant had such Lender retained such interest in such Term Loan, and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same portion of the Term Loans to both such Lender and such Participant.

(c)    Any Lender may sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to any Lender, any Affiliate of any Lender or an Approved Fund or, subject to subsection (d) below, with the consent (which shall not be unreasonably withheld, conditioned or delayed) of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers (reasonable grounds for withholding consent to include an assignee who would subject the Borrowers to the payment of materially greater costs of the types described in Sections 3.5 and 3.6 than Borrowers are otherwise then subject to paying) to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make or carry all or a portion of the Term Loans (each a "Purchasing Lender"), in minimum amounts of not less than Five Hundred Thousand Dollars ($500,000) (or, if such Lender's interest in the Term Loans is less than Five Hundred Thousand Dollars ($500,000), then such Lender may assign all of its interest), pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording.  Borrowers' consent (if required) to any such sale, assignment or transfer shall be presumed unless Borrowers object thereto in writing, with reasonable detail for such objection included therein, within three (3) Business Days after Borrowing Representative receives a written request for such consent.  Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined

pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a notation for that purpose.  Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Borrowers hereby consent to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents.  Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing, including, if requested by any Lender, the execution and delivery of one or more promissory notes in replacement of one or more existing Notes.  As used herein, Approved Fund" shall mean any (i) investment company, hedge fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (i) and that, with respect to each of the preceding clauses (i) and (ii), is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.  Notwithstanding the foregoing, DMD may assign its interest in the Term Loan B to an Approved Fund or a Purchasing Lender without the consent of the Agent or Borrower, so long as DMD otherwise complies with this Section 17.2(c).

(d)    Nothing contained herein shall limit in any way the right of any Lender (without notice to, or consent of, the Agent or any Borrower) to assign all or a portion of the Term Loans owing to it from time to time to (i) any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System or any Operating Circular issued by such Federal Reserve Bank, or (ii) to any other Person to whom such Lender is indebted from time to time (including, but not limited to, under any warehousing, securitization or overnight repurchase facility), as collateral security in respect thereof (such Persons described in clauses (i) and (ii) above herein called "Lender Pledgees"), but, no such assignment shall release the assigning Lender from its obligations hereunder.

(e)    Agent shall maintain at its address set forth in Section 17.6 hereof a copy of each Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of the owners of the Term Loans from time to time.  The entries in the Register shall be conclusive, in the absence of manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of that portion of the Term Loans recorded therein for the purposes of this Agreement.  The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Agent shall receive a fee in the amount of not

3631160.8

70

less than Three Thousand Five Hundred Dollars ($3,500) payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment to such Purchasing Lender, unless waived in writing by Agent.

(f)    Borrowers authorize each Lender to disclose to any transferee or Purchasing Lender and any prospective transferee or Purchasing Lender any and all financial information in such Lender's possession concerning Borrowers which has been delivered to such Lender by or on behalf of Borrowers pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrowers.

(g)    If, pursuant to this Section, any interest in this Agreement or any portion of the Term Loans or any Note is transferred to any transferee that is organized under the laws of any jurisdiction other than the United States of America or any State thereof, the transferor Lender shall cause such transferee, concurrently with the effectiveness of such transfer, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Agent and the Borrowers) that, under applicable law and treaties, no taxes will be required to be withheld by the Agent, the Borrowers or the transferor Lender with respect to any payments to be made to such transferee in respect of the Term Loans or Notes transferred, (ii) to furnish to the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrowers) two duly completed and signed copies of either U.S. Internal Revenue Service Form W-8 BEN or U.S. Internal Revenue Service Form W-8 ECI, or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities (wherein such transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments hereunder), and (iii) to agree (for the benefit of the transferor Lender, the Agent and the Borrowers) to provide the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrower) new forms as contemplated hereby upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

17.4.    <u>Application of Payments</u>.  Subject to <u>Section 2.3</u> and <u>Section 12.2</u>, Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Borrower makes a payment to Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause of action, then, to such extent, the Obligations or part thereof intended to be satisfied shall be reinstated and continue as if such payment or proceeds had not been received by Agent or such Lender.

17.5.    <u>Indemnity</u>.  Each Borrower jointly and severally shall indemnify Agent, each Lender, their respective Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "<u>Indemnified Persons</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any

3631160.8

kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house legal documentation, diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, the Existing Loan Agreement, this Agreement, any Other Document and/or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  If any Indemnified Person uses in-house counsel to provide legal services for which any Borrower is responsible to pay or indemnify, each Borrower expressly agrees that its indemnification obligations include the allocable costs of such in-house counsel.  Agent and each Lender agrees to give Borrowing Representative reasonable notice of any event of which Agent or such Lender becomes aware for which indemnification may be required under this Section 17.5, and Agent or such Lender may elect (but is not obligated) to direct the defense thereof, provided that the selection of counsel shall be subject to Borrowing Representative's consent, which consent shall not be unreasonably withheld or delayed.  Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral.  Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "Insured Event"), Agent and each Lender agrees not to exercise its right to select counsel to defend the event if that would cause any Borrower's insurer to deny coverage; provided, however, that Agent and each Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense.  To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Borrower has paid to Lender pursuant to the indemnity set forth in this Section 17.5, then Agent or such Lender shall promptly pay to such Borrower the amount of such recovery.

17.6.    Notice.  Any notice or request hereunder or under any of the Other Documents may be given to any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 17.6.  Any notice or request hereunder shall be given by (a) hand delivery, (b) a nationally recognized overnight courier, (c) registered or certified mail, return receipt requested, or (d) telecopy to the number set forth below (or such other number as may hereafter be specified in a notice designated as a notice of change of address) with electronic confirmation of its receipt.  Any notice or other communication required or permitted pursuant to this Agreement shall be deemed given (a) when personally delivered to any officer of the party to whom it is addressed, (b) on the earlier of actual receipt thereof or five (5) Business Days following posting thereof by certified or registered mail, postage prepaid, or (c) upon actual receipt thereof when sent by a recognized overnight delivery service or (d) upon actual receipt thereof when sent by telecopier to the number set forth below (or to such other number as has been furnished by a party to the others by like notice) or in any Commitment Transfer Supplement; with electronic confirmation of its receipt, in each case addressed to each party at its address set forth below (or at such other address as has been furnished in writing by a party to the others by like notice):

3631160.8

(A)    If to Agent or to
CSE as Lender at:

CapitalSource Finance LLC
4445 Willard Avenue
12th Floor
Chevy Chase, Maryland 20815
Attention:  Portfolio Manager/Business
Credit Services
Telecopier:    (301) 841-2889
E-mail:  mfidati@capitalsource.com

with a copy to:

CapitalSource Finance LLC
4445 Willard Avenue
12th Floor
Chevy Chase, Maryland 20815
Attention: Joanne Fungaroli
Telecopier: (301) 841-2889
Email: jfungaroli@capitalsource.com

with a copy to:

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
Attention: Robert L. Harris, Esq.
Telecopier: (615) 244-6804
Email: robert.harris@wallerlaw.com

(B)    If to a Lender other than Agent or CSE, as specified on the signature pages
hereof.

(C)    If to Borrowing Representative
or any Borrower, at:

Lexington Precision Corporation
800 Third Avenue, 15th Floor
New York, NY 10022
Attention: Michael R. Lubin
Telecopier: (212) 319-4659
E-mail: mlubin@lexingtonprecision.com

with a copy to:

Aurora Resurgence Management Partners
LLC
10877 Wilshire Blvd.
21st Floor
Los Angeles, California 90024
Attention: Steve Martinez
Telecopier: (310) 277-5591
E-mail: smartinez@aurorares.com

3631160.8

17.7.    Survival.  The obligations of Borrowers under Sections 3.5, 3.6, 4.18(h), 17.5 and 17.9 shall survive any termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8.    Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

17.9.    Expenses.  All costs and expenses incurred by Agent and/or its Affiliates (and each Lender, with respect to expenses incurred pursuant to clause (b) below or during any period that an Event of Default exists) including, without limitation, all costs and expenses, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), reasonable attorneys' fees and disbursements incurred by Agent (or any Lender with respect to expenses incurred pursuant to clause (b) below or during any period that an Event of Default exists): (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, (c) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement, the Notes or any Other Documents and/or any related agreement, document or instrument; or (d) arising in any way out of the administration of the Obligations or this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, or the taking or refraining from taking by Agent or any Lender of any action requested by any Borrower or (e) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (f) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's transactions with any Borrower, or (g) in connection with any advice given to Agent with respect to its rights and obligations under this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, may be charged to Borrowers' Account and shall be part of the Obligations.  If Agent or any of its Affiliates uses in-house counsel to provide legal services under this Agreement or any Other Document for which Borrowers are responsible to pay or indemnify, each Borrower expressly agrees that its Obligations include the reasonable allocable costs of such in-house counsel.

17.10.    Injunctive Relief.  Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lenders; and, accordingly, Agent, if Agent so requests, shall, to the extent permitted by applicable law, be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11.  <u>Consequential Damages</u>.  No Lender Party, nor any agent or attorney for it, shall be liable to any Borrower, nor shall any Borrower, or any agent of attorney for it, be liable to any Lender Party, for consequential damages arising from any breach of contract, tort or other wrong relating to the execution, delivery or performance under this Agreement or any Other Document, the establishment, administration or collection of the Obligations or any related transaction.

17.12.  <u>Captions</u>.  The captions at various places in this Agreement and any Other Document are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement or any Other Document.

17.13.  <u>Counterparts; Telecopied Signatures</u>.  This Agreement and each Other Document may be executed in any number of separate counterparts and by different parties hereto in separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format shall be deemed to be an original signature hereto and each party agrees that it will be bound by its own facsimile signature or signature sent by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format and that it accepts the facsimile signature or signature by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format of each other party.

17.14.  <u>Construction</u>.  The parties acknowledge that each party and its counsel have reviewed this Agreement and each Other Document and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and each Other Document or any amendments, schedules or exhibits thereto.

17.15.  <u>Confidentiality</u>.  Each Lender Party shall hold all non-public information obtained by it pursuant to the requirements of this Agreement and each Other Document in accordance with such Lender Party's customary procedures for handling confidential information of this nature; <u>provided</u>, <u>however</u>, that each Lender Party may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel, rating agencies, collateral agents and other professional advisors, (b) to any Lender Party or to any prospective Lender Party, so long as such Lender Party or prospective Lender Party shall have been instructed in writing, and by acceptance of the information be deemed to have agreed, to treat such information as confidential in accordance with this <u>Section 17.15</u>, (c) to the Revolver Loan Agent and the Revolver Loan Lenders subject to the terms of the Intercreditor Agreement, and (d) as required by any Governmental Authority or representative thereof or pursuant to legal process; <u>provided</u>, <u>further</u> that (i) unless specifically prohibited by applicable law or court order, each Lender Party shall use its best efforts prior to disclosure thereof, to notify the Borrowing Representative of the applicable request for disclosure of such non-public information (A) by a Governmental Authority or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a transferee by such Governmental Authority) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender, or any other Lender Party be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of any Lender Party in order to perfect its Lien

on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.

17.16.  Publicity.  Each Borrower hereby authorizes each Lender Party to make appropriate announcements of any financial arrangement entered into pursuant hereto, including, without limitation, announcements that are commonly known as "tombstones" in such publications and to such selected parties as such Lender Party shall deem appropriate, after consultation with Borrowing Representative.  Without limiting the foregoing, Borrowers authorize each Lender Party to utilize any logo or other distinctive symbol associated with the Borrowers in connection with any such announcement or any other promotion, advertising or marketing undertaken by it, after consultation with Borrowing Representative.  In no event, however, shall any Borrower use the name of any Lender Party or any logo or distinctive symbol associated with any of them, unless, as appropriate, such Lender Party has given its prior written consent thereto.

17.17.  Survival of Representations and Warranties.  All representations and warranties of each Borrower contained in this Agreement and the Other Documents shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

17.18.  Destruction of Invoices.  Borrowing Representative hereby authorizes and directs Agent, each Lender and each other Lender Party in accordance with its standard document retention policies in such regard to destroy all invoices, financial statements and other data provided from time to time by Borrowers pursuant hereto.

17.19.  Time.  Time is of the essence in this Agreement and each Other Document.

17.20.  Release.   Notwithstanding any other provision of this Agreement or any Other Document, each Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself,  its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "Releasing Parties"), hereby fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "Released Parties"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date.  Each Borrower acknowledges that the foregoing release is a material inducement to Agent's and each Lender's decision to extend to Borrowers the financial accommodations hereunder and has been relied upon by Agent and each Lender in agreeing to make the Term Loans and entering into this Agreement.

17.21.  Patriot Act.  The USA Patriot Act presently requires each Lender Party to obtain, verify and record information that identifies each Person that opens an account or applies for a loan or lease. Borrowers agree to cooperate with each Lender Party in maintaining compliance with such law on an ongoing basis.  In addition to the foregoing, each Lender Party that is not

3631160.8

incorporated under the Laws of the United States of America or a State thereof (and is not exempted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or a foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) at such other times as are required under the USA Patriot Act.

17.22. <u>Amendment and Restatement</u>.

(a)    On the Closing Date, the Existing Loan Agreement shall be amended and restated in its entirety by this Agreement, and the Existing Loan Agreement shall thereafter be of no further force and effect, except to evidence (i) the incurrence by the Borrower of the "Obligations" under and as defined in the Existing Loan Agreement (whether or not such "Obligations" are contingent as of the Closing Date), (ii) the representations and warranties made by the Borrower prior to the Closing Date and (iii) any action or omission performed or required to be performed pursuant to such Existing Loan Agreement prior to the Closing Date (including any failure, prior to the Closing Date, to comply with the covenants contained in such Existing Loan Agreement). The amendments and restatements set forth herein shall not cure any breach thereof or any "Default" or "Event of Default" under and as defined in the Existing Loan Agreement existing prior to the Closing Date. This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Existing Loan Agreement or evidence payment of all or any portion of such obligations and liabilities.

(b)    The terms and conditions of this Agreement and the Agent's and the Lenders' rights and remedies under this Agreement and the Other Documents shall apply to all of the "Obligations" incurred under and as defined in the Existing Loan Agreement.

(c)    On and after the Closing Date, (i) all references to the Existing Loan Agreement in the Other Documents (other than this Agreement) shall be deemed to refer to the Existing Loan Agreement, as amended and restated hereby, (ii) all references to any Article, Section or sub-clause of the Existing Loan Agreement in any Other Document (other than this Agreement) shall be deemed to be references to the corresponding provisions of this Agreement and (iii) except as the context otherwise provides, on or after the Closing Date, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be references to the Existing Loan Agreement, as amended and restated hereby.

(d)    <u>REAFFIRMATION</u>. This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar and, except as expressly provided herein or in any Other Document, all terms and conditions of the Other Documents are hereby ratified and confirmed and remain in full force and effect unless otherwise specifically amended hereby or any other Other Document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF each of the parties hereto has signed this Agreement as of the day and year first above written.

"BORROWERS"

LEXINGTON PRECISION CORPORATION

By: _____
    Name: _____
    Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____
    Name: _____
    Title: _____

**[SIGNATURE PAGE TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT]**

"LENDER" and "AGENT"

CSE MORTGAGE LLC

By: _____

Name: _____

Title: _____

Term Loan A Commitment:
$[**8,575,036.22**]

Term Loan A Commitment Percentage:      100%

"LENDER"

DMD SPECIAL SITUATIONS, LLC
By: CS Capital Advisors LLC, its manager

By: _____

Name: _____

Title: _____

Term Loan B Commitment:
$[**4,233,772.33**]

Term Loan B Commitment Percentage:      100%

**[SIGNATURE PAGE TO AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT]**

3631160.8

List of Annexes, Exhibits and Schedules

Annexes

Annex One            Definitions

Exhibits

Exhibit 9.1(d)       Secretary's Certificate
Exhibit 9.1(t)       Closing Certificate
Exhibit 10.6         Compliance Certificate
Exhibit 17.3         Commitment Transfer Supplement


Schedules

Schedule 4.5         Equipment and Inventory Locations
Schedule 4.14(c)     Location of Executive Offices
Schedule 4.16        Excluded Equipment
Schedule 5.2         Organizational Data and Numbers; Qualifications
Schedule 5.3         Tax Matters
Schedule 5.5         Prior Names
Schedule 5.6         OSHA and Environmental Compliance
Schedule 5.7         Undisputed Indebtedness
Schedule 5.8         Litigation
Schedule 5.9         Indebtedness
Schedule 5.11        Plans
Schedule 5.12        Material Intellectual Property
Schedule 5.14        Defaulted Indebtedness
Schedule 5.17        Labor Contracts
Schedule 5.21        Conflicting Agreements
Schedule 5.24        Real Property
Schedule 5.25        Deposit Accounts
Schedule 6.8         Post Closing Matters
Schedule 7.2         Permitted Encumbrances
Schedule 7.3         Other Indebtedness
Schedule 7.4         Loans and Investments

ANNEX ONE

DEFINITIONS

This Annex One is incorporated by reference into, and constitutes an integral part of, the Amended and Restated Loan and Security Agreement, dated as of **[July 19]**, 2010 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), made among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers; the Lenders identified therein as parties thereto; and CSE MORTGAGE LLC, as a Lender and as Agent for all Lenders.  The following terms shall have the following meanings as and when used in the Loan Agreement and the Other Documents.  References in such defined terms to "this Agreement," "hereof," "hereto" or the like, shall mean and refer to the Loan Agreement.

---

"Annualization Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Accountants" shall have the meaning set forth in Section 10.6 hereof.

"Accounting Change" shall have the meaning set forth in Section 1.1 hereof.

"Affiliate," of any Person, shall mean (a) any Person that, directly or indirectly, is in Control of, is Controlled by, or is under common Control with such Person, or (b) any Person who is a shareholder, director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.

"Agent" shall have the meaning set forth in the preamble to this Agreement; and shall include the successors and assigns of any such Person.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Applicable Margins" shall mean, collectively, the Applicable Term A Margin and the Applicable Term B Margin.

"Applicable Term A Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 7.00%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)    if the Leverage Ratio is greater than 2.50x, then the Applicable Term A Margin shall equal 8.00%;

(b)    if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Term A Margin shall equal 7.50%;

(c)    if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Term A Margin shall equal 7.00%;

3631160.8

1

(d)     if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Term A Margin shall equal 6.00%; and

(e)     if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Term A Margin shall equal 5.50%.

"Applicable Term B Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 10.50%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)     if the Leverage Ratio is greater than 2.50x, then the Applicable Term B Margin shall equal 11.50%;

(b)     if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Term B Margin shall equal 11.00%;

(c)     if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Term B Margin shall equal 10.50%;

(d)     if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Term B Margin shall equal 9.50%; and

(e)     if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Term B Margin shall equal 9.00%.

"Applicable Rate" shall mean the Applicable Term Loan A Rate or the Applicable Term Loan B Rate, as applicable.

"Applicable Term Loan A Rate" shall mean, the sum of the LIBOR Rate plus the Applicable Term A Margin.

"Applicable Term Loan B Rate" shall mean, the sum of the Prime Rate plus the Applicable Term B Margin.

"Appraisal" shall mean an appraisal, conducted at Borrowers' expense, by an independent appraiser selected by, or acceptable to, Agent of the Borrowers' Real Property using a form, scope and methodology selected by, or acceptable to, Agent.

"Approved Fund" shall have the meaning given to such term in Section 17.3(c).

"Bankruptcy Code" shall mean Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq).

"Bankruptcy Court" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Benefited Party" shall have the meaning set forth in Section 12.4(b).

"Borrower" and "Borrowers" shall have the meanings set forth in the preamble to this Agreement; and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a consolidated basis" (or words of similar import) shall mean, as appropriate, the consolidation in accordance with GAAP of the accounts or other items of Borrowers and their respective Subsidiaries (if any).

"Borrowers' Account" shall have the meaning set forth in Section 2.4.

"Borrowing Representative" shall mean the Parent Company.

"Business Day" shall mean any day other than a day on which commercial banks in New York are authorized or required by law to close.

"Capital Expenditures" shall have the meaning set forth in Section 8.1.

"Capitalized Expenses" shall mean all fees, costs and expenses that have accrued and remain unpaid through the Closing Date, including, without limitation, the following: (i) pre-petition legal fees of the Lenders in an amount of $**[17,795.83]**, (ii) prepayment fee under the Existing Term Loan Facility in an amount of $**[138,340.52]** (which such amount shall be solely allocated to the Term Loans), (iii) the Lenders' financial advisor's fees, costs and expenses in the amount of $**[175,749.30]** and (iv) the Lenders' investment banker's success fee in an amount of $**[1,000,000.00]**.

"Capitalized Leases" shall have the meaning set forth in Section 8.1.

"Cash Collateral Order" shall mean that certain Cash Collateral Order entered on April 17, 2008 by the Bankruptcy Court relating to the Chapter 11 Cases, as has been amended or extended from time to time.

"Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of ninety (90) days or less issued, or directly and fully guaranteed or insured, by the United States of America or any agency or instrumentality thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of ninety (90) days or less issued by any financial institution that is a member of the Federal Reserve System and has combined capital, surplus and undivided profits of not less than $250,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of ninety (90) days or less issued by a corporation (except an Affiliate of any Borrower) organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital, surplus and undivided profits of not less than $250,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date

3631160.8

3

of acquisition if the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds that invest substantially all of their assets in securities of the types described in <u>clauses (a)</u> through <u>(e)</u> above.

"<u>Cash Income Taxes</u>" shall have the meaning set forth in <u>Section 8.1</u>.

"<u>Cash Interest Expense</u>" shall have the meaning set forth in <u>Section 8.1</u>.

"<u>CERCLA</u>" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 <u>et</u> <u>seq</u>.

"<u>Change of Control</u>" shall mean: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in <u>Section 7.1(a)</u> hereof; (ii) the liquidation or dissolution of any Borrower or the adoption of a plan by the stockholders of any Borrower relating to the dissolution or liquidation of such Borrower, other than as permitted in <u>Section 7.1(a)</u> hereof; (iii) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Equity Interests of any Borrower; (iv) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of any Borrower (together with any new directors who have been appointed by, or whose nomination for election by the shareholders of such Borrower, as the case may be, was approved by, a vote of at least sixty-six and two-thirds percent (66 2/3%) of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of such Borrower; (v) the failure of Parent Company to own directly or indirectly one hundred percent (100%) of the voting power of the total outstanding Voting Equity Interests of LRG; or (vi) the failure of the Equity Sponsor to own directly or indirectly more than fifty percent (50%) of the voting power of the total outstanding Voting Equity Interests of Parent Company.

"<u>Change of Management</u>" shall mean that neither of the Principals is actively involved in the day-to-day executive management of each Borrower, whether by death, disability, retirement, termination of employment or otherwise, unless, (i) within 30 days thereafter, Borrowers shall have in place an interim Chief Executive Officer or similarly-titled member of executive management and (ii) within 120 days thereafter, Borrowers shall have retained successor executive management acceptable to the Required Lenders in their Credit Judgment in terms of qualifications, ability and experience (after which, their successor(s) in office shall be deemed "Principals" hereunder).

"<u>Chapter 11 Cases</u>" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

3631160.8

4

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, Equity Interests, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon any Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean the date on which all of the conditions precedent set forth in Section 9.1 hereof have been fully satisfied in the sole judgment of the Agent and Lenders (or otherwise waived by Lenders).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated thereunder.

"Collateral" shall mean and include all assets of each Borrower (subject only to the limitation on Equity Interests of each Foreign Subsidiary, if any, set forth in subsection (f) below), including, without limitation, all of the following assets, but shall exclude any Excluded Equipment as long as it is Excluded Equipment:

(a)     all Receivables;

(b)     all Equipment;

(c)     all General Intangibles;

(d)     all Inventory;

(e)     all Contract Rights;

(f)     all Equity Interests of each Domestic Subsidiary (if any), and sixty-five percent (65%) of the Equity Interests of each Foreign Subsidiary (if any);

(g)     all Securities;

(h)     all Leasehold Interests;

(i)     all Commercial Tort Claims;

(j)     all of each Borrower's right, title and interest in and to (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) all other property, including warranty claims, relating to any goods securing this Agreement; (v) all of each Borrower's contract rights, rights of payment that have been earned under a contract right, instruments, investment property, documents, chattel paper, warehouse receipts, deposit accounts, money and securities; (vi) if and when obtained by any Borrower, all real and personal

3631160.8

5

property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (vii) all supporting obligations that secure payment or performance of any account, chattel paper, document, general intangible, instrument or investment property; (viii) all letter-of-credit rights; (ix) Extraordinary Receipts; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder or under the Other Documents, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(k)      all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to clauses (a) through (j) of this definition; and

(l)      all proceeds and products of the Collateral described in clauses (a) through (k) of this definition, in whatever form, including, but not limited to:  cash, Deposit Accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and Commercial Tort Claim proceeds.

The term "Collateral" shall also extend to and include all Real Property Collateral.

"Collateral Locations" shall have the meaning assigned to such term in Section 4.5.

"Commercial Tort Claim" shall have the meaning given to such term in Article 9 of the UCC and shall include, without limitation, any claim of any Borrower arising in tort and specified on Schedule 5.8.

"Commitment" or "Commitments" shall mean, individually or collectively, the Term Loan A Commitment(s) and Term Loan B Commitments of each Lender, or all Lenders, as the case may be.

"Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Commitment bears to the total Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent, pursuant to which, among other things, a Purchasing Lender shall purchase and assume all or a portion of the obligation of a Lender to make and carry the Term Loans under this Agreement.

"Confirmation Order" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

3631160.8

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and other third parties, domestic or foreign, (i) necessary to carry on any Borrower's business, including, without limitation, any consents required under all applicable federal, state or other applicable law, and (ii) required to effectuate the transactions and agreements contemplated in this Agreement and the Other Documents.

"Consolidated Net Income" shall have the meaning given to such term in Section 8.1 hereof.

"Contract Rights" shall mean all rights of each Borrower arising under or in connection with any contract, to the extent that such Borrower may grant a security interest in such rights under such contract, either by the terms of such contract or pursuant to the applicable provisions of Article 9 of the UCC, notwithstanding the terms of such contract, or otherwise. "Contract Rights" shall include, without limitation, all rights of each Borrower under all license agreements to which it is party as licensor or licensee and all letter-of-credit rights of each Borrower.

"Control" shall mean the power, whether direct or indirect, (i) to vote ten percent (10%) of more of the Voting Equity Interests of a Person, or (ii) to direct, or cause the direction of, the management and/or policies of a Person, whether by contract or otherwise.

"Controlled Group" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Credit Judgment" shall mean the credit judgment of Agent, Required Lenders, Required Term A Lenders, Required Term B Lenders or all Lenders, as the case may be, exercised by it (or them) in good faith and in a commercially reasonable manner from the perspective of a senior secured lender making loans of similar type and size to similar borrowers.

"CSE" shall have the meaning given to such term in the initial recitals to this Agreement.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Default" shall mean an event which, with the giving of notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean two percent (2%) per annum over the otherwise Applicable Rate then and from time to time thereafter in effect.

"Deferred Interest" shall have the meaning set forth in Section 8.1 hereof.

3631160.8

7

"Deposit Account" shall mean any checking account, savings account, time deposit account, certificate of deposit, investment account or other account (howsoever denominated), in which from time to time any cash or Securities of any Borrower is or may be deposited.

"Deposit Account Control Agreement" shall mean an agreement, in form and substance satisfactory to Agent in its sole discretion, which provides Agent with "control" (within the meaning of the UCC) over, and a first priority, perfected Lien on, each account of each Borrower and all assets of such Borrower from time to time on deposit or otherwise credited to such Deposit Account.

"Designated Lender" shall have the meaning set forth in Section 17.2(d) hereof.

"Designated Officer" shall mean the chairman, president, chief executive officer, chief financial officer or chief operating officer of a Borrower (regardless of title), or such other officer, agent or representative of a Borrower that Agent may, at such Borrower's request, permit to be a "Designated Officer" from time to time.

"Determination Date" shall have the mean set forth in Section 3.4(a) hereof.

"DMD" shall mean DMD Special Situations, LLC, a Delaware limited liability company.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean a Subsidiary organized under the laws of the United States or any political subdivision thereof.

"EBITDA" shall have the meaning set forth in Section 8.1 hereof.

"Environmental Authority" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, motor vehicles, fittings, furniture,

furnishings, fixtures, molds, discs, tools, stamps, parts, accessories and all replacements and substitutions therefor or accessions thereto, and all software embedded therein.

"Equity Interests" shall mean: (i) in the case of a corporation, all capital stock, including common and preferred stock and warrants to acquire capital stock; (ii) in the case of a partnership, all partnership interests therein, including special, limited and general interests; (iii) in the case of a limited liability company, all membership interests therein; and (iv) in the case of any other entity, all interests evidencing equity ownership therein.

"Equity Investment" shall mean the cash contribution by the Equity Sponsor to one or more of the Borrowers made on the Closing Date in an amount not less than **[$8,000,000]**, plus the amount of any cash fees paid to investors in connection with such transaction, in exchange for Equity Interests in one or more of the Borrowers, in each case upon the terms of the Reorganization Plan and for the purpose of partially funding the costs and expenses of the Borrowers' exit from bankruptcy.

"Equity Sponsor" shall mean Aurora Resurgence Management Partners LLC, a Delaware limited liability company, or an Affiliate thereof, including Commercial Finance Services 407, LLC, a Delaware limited liability company.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan for which the reporting requirements have not been waived in writing; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of its respective Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable; (f) a complete or partial withdrawal by any Borrower or any member of the Controlled Group from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the imposition of any liability under Title IV of ERISA, other than Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any member of the Controlled Group in excess of the Materiality Threshold; and (j) any other event of condition with respect to a Plan, including any Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate, that could

3631160.8

reasonably be expected to result in liability of any Borrower in excess of the Materiality Threshold.

"Event of Default" shall mean the occurrence and continuance of any of the events set forth in Article XI hereof.

"Excess Cash Flow" shall mean, for any fiscal year, without duplication, an amount equal to the sum of (i) Consolidated Net Income (or loss) of Borrowers for such period, plus (ii) an amount equal to the amount of depreciation expenses, amortization expense (including the amortization of goodwill), accrued non-cash interest expense and all other non-cash charges deducted in arriving at such Consolidated Net Income (or loss), plus (iii) an amount equal to the aggregate net cash proceeds of the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent not required to be applied to mandatory prepayments or payments on the Revolver Loans or the Term Loans and not reinvested in new Equipment or Real Property pursuant to Section 2.3 hereof, plus (iv) an amount equal to the net loss on the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent deducted in arriving at such Consolidated Net Income (or loss), plus (v) an amount equal to 50% of the aggregate management fees paid to the Equity Sponsor during such period, plus (vi) without duplication of other items included in this definition an amount equal to any tax refunds or credits received by Borrowers during such period, less (vii) an amount equal to the permitted Capital Expenditures of Borrowers for such period, less (viii) an amount equal to the sum of all regularly scheduled payments of principal on Indebtedness for money borrowed of Borrower (other than with respect to payments of the Term Loans) actually made during such period to the extent permitted hereunder, less (ix) an amount equal to the net gain on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent included in arriving at such consolidated net income or loss.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Deposit Account" shall mean any Deposit Account of Borrowers that is (i) a Payroll Account or (ii) a Deposit Account (other than any in which proceeds of Collateral are at any time deposited) in which collected funds on deposit, determined on any date on a daily average basis over the immediately preceding thirty (30) days, is less than Ten Thousand Dollars ($10,000) or, when aggregated with all other such Deposit Accounts, Twenty-Five Thousand Dollars ($25,000).

"Excluded Equipment" shall mean any Equipment (or proceeds thereof) that is or becomes subject to a Lien (including pursuant to Capitalized Leases) permitted under subsections (e) or (m) of Section 7.2, if the valid grant of a Lien thereon to Agent is prohibited by the terms of the agreement between any Borrower and the holder of such Lien or under applicable law, and such prohibition has not been or is not waived, or the consent of the holder such other Lien has not been or is not otherwise obtained (it being understood that Borrowers shall have no obligation whatsoever to any Lender Party to obtain such consent), or under applicable law such prohibition cannot be waived and, notwithstanding anything to the contrary set forth in the definition of "Collateral", the types or items of Collateral described in such definition shall not include Excluded Equipment, so long as the prohibition set forth in such agreement or applicable law remains effective.  For example, but without limitation, if pursuant

3631160.8

10

to any Capitalized Lease, the valid grant of a Lien thereon to Agent in the Equipment leased thereunder is prohibited, the Lien of Agent thereon shall be reinstated upon termination of such Capitalized Lease, and such Equipment shall no longer be considered Excluded Equipment.

"Excluded Equity Interests" shall mean any Equity Interests that, by its terms (or by the terms of any security to which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures or is required to be prepaid, repurchased, reacquired or defeased, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (b) is convertible into or exchangeable or exercisable for (i) debt securities or other Indebtedness or (ii) other Excluded Equity Interests, in each case at any time on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (c) contains any repurchase obligation that may come into effect prior to the indefeasibly payment in full in cash of all Obligations, in each case, unless the holders of such Equity Interests expressly enter into, and deliver to Agent, a Subordination Agreement in form and substance satisfactory to Agent, (d) requires any payment of cash dividends or any other distributions, in each case, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash or (e) is guaranteed by, or secured by any Property of, any Borrower or any of its Subsidiaries.

"Existing Loan Agreement" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Revolver Loan Facility" shall mean the term loan and revolving credit facility under that certain Credit and Security Agreement, dated as of May 31, 2006, as may have been amended, restated, supplemented or otherwise modified through the Closing Date, among the Borrowers, Revolver Loan Lenders and Revolver Loan Agent.

"Existing Term Loan Facility" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Extraordinary Receipts" shall mean any cash received by a Borrower or any of its Subsidiaries not in the ordinary course of business from the following, (a) proceeds of insurance in respect of the Collateral, (b) condemnation awards (and payments in lieu thereof) in respect of the Collateral, (c) indemnity payments, (d) foreign, United States, state or local tax refunds, (e) pension plan reversions and (f) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action in respect of the Collateral.

"Financial Covenants" shall mean the financial covenants set forth in Article VIII.

"First Merit Blocked Account Agreement" shall mean the Deposit Account Control Agreement, dated the Closing Date, among the Borrowers, First Merit Bank, N.A., and the Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, **[including, without limitation, by that certain Amendment to Deposit Account Control Agreement dated as of [July 19], 2010, among the Borrowers, First Merit Bank, N.A., and the Agent].**

"Fiscal Year" shall mean Borrowers' fiscal year as in effect on the Closing Date; and the terms "Fiscal Quarter" and "Fiscal Month" shall have correlative meanings.

"Fixed Charge Coverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Fixed Charges" shall have the meaning set forth in Section 8.1 hereof.

"Foreign Subsidiary" shall mean any Subsidiary of a Borrower which is not a Domestic Subsidiary.

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations for borrowed money, whether current or long-term (including, without limitation, the Obligations and the Subordinated Debt) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all purchase money Indebtedness;

(c)    the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(d)    the maximum amount available to be drawn under letters of credit (including, without limitation, standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)    all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(f)    all Indebtedness in respect of Capital Leases;

(g)    all preferred stock or other Equity Interests providing for mandatory redemptions, sinking fund or like payments prior to the end of the Term;

(h)    all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(i)    all guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person.

3631160.8

12

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board that are applicable to the circumstances as of the date of determination consistently applied, except that, for purposes of the Financial Covenants, GAAP shall be determined on the basis of such principles used in the preparation of the most recent audited financial statements delivered to Agent prior to the Closing Date.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trade names, service marks, trade secrets, goodwill, copyrights, design rights, registrations, licenses, license fees, franchises, customer lists, tax refunds, tax refund claims, pension fund refunds, pension fund refund claims, overpayments, overpayment claims, reclamation rights, computer programs, software, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer, all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governing Body" shall have the meaning set forth in Section 6.10 hereof.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person (other than a Borrower) who may hereafter guarantee payment or performance of the whole or any part of the Obligations. "Guarantors" means, collectively, all such Persons. On the Closing Date, there are no Guarantors, except for each Borrower as to the other Borrower.

"Guaranty" shall mean any guaranty of the Obligations of Borrowers, in whole or in part, executed at any time by a Guarantor in favor of Agent for the ratable benefit of Lenders and the other Lender Parties, as applicable.

"Hazardous Discharge" shall have the meaning set forth in Section 4.18(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws relating to hazardous waste disposal now in force or hereafter enacted.

"Hedge Contract" shall mean any "hedge," "swap," "collar," "cap" or similar agreement between a Borrower and any other financial institution, including, but not limited to, any Lender Party or Affiliate of a Lender Party, intended to fix the relative amount of such Borrower's risk in respect of changes in interest rates, foreign currency exchange and commodity values.

"Historical Financial Statements" shall have the meaning set forth in Section 5.4(a) hereof.

"Indebtedness" shall mean, with respect to any Person (without duplication), any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments, including (for avoidance of doubt) Subordinated Debt; (b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person in connection with obtaining goods, materials or services that is not overdue by more than ninety (90) days, unless the trade payable is being contested in good faith); (c) all obligations as lessee under leases that have been, or should be in accordance with GAAP, recorded as Capitalized Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations in respect of any Equity Interests issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person that is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under any Hedge Contracts; (i) all obligations owed by such Person under license agreements with respect to non-refundable, advance or minimum guaranteed royalty payments; and (j) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

"Indemnified Persons" shall have the meaning given to such term in Section 17.5.

"Independent Director" shall mean a member of the Board of Directors of any Borrower who shall not have been at the time of such Person's appointment or at any time during the preceding five (5) years, and shall not be as long as such Person is a director of any Borrower, a director, officer, employee, partner, member, manager, Affiliate or holder of any Equity Interests of any Independent Parties.

"Independent Parties" shall mean any of the following Persons: the Accountants or any other outside auditor, attorney or consultant of any Borrower, or any of their Subsidiaries or Affiliates, (ii) a supplier to any Borrower or any of the Independent Parties, (iii) a Person Controlling or under common Control with any partner, member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties, or (iv) a member of the immediate family of any director, officer, employee, partner, member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties.

"Initial Borrowers" shall have the meaning set forth in the preamble to this Agreement.

"Initial Projections" shall have the meaning given to such term in Section 5.4(b).

"Insurance Premium Collateral" shall mean, collectively, (a) any insurance policies of Borrowers for which an Insurance Premium Finance Party has entered into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum, and (b) any loss proceeds paid or payable to a Borrower pursuant to such insurance policies (to the extent of the amount owed to such Insurance Premium Finance Party), provided, however, that, (i) in no event shall the Insurance Premium Collateral include any amounts deposited in or received in any Deposit Account that is subject to a Deposit Account Control Agreement established by Borrowers in connection herewith or otherwise with respect to Borrowers' financing arrangements with Agent and Lenders for the handling of collections of Receivables or other assets and (ii) in no event shall the Insurance Premium Collateral of any Insurance Premium Finance Party secure any obligation to any other Insurance Premium Finance Party.

"Insurance Premium Finance Party" shall mean, in connection with insurance policies maintained by Borrowers, an insurance company or a third party that enters into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum.

"Insured Event" shall have the meaning set forth in Section 17.5 hereof.

"Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated of even date herewith, by and between Agent and Revolver Loan Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Expense" shall have the meaning set forth in Section 8.1.

"Inventory" shall mean and include, as to each Borrower, all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever

3631160.8

located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description that are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them. The term "Inventory," as used herein, shall further extend to and include, as applicable to any Borrower, any and all farm products.

"IRS" shall mean the Internal Revenue Service of the United States Treasury, and any successor thereto.

"Junior Lien Facility" shall mean the secured subordinated credit facility, subject to a Subordination Agreement, evidenced by the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related agreements, documents, instruments and certificates, which, pursuant to the terms and conditions herein, the Equity Sponsor may enter into to provide the borrowers thereunder with a loan in a maximum aggregate principal amount of up to $3,000,000.

"Junior Lien Facility Credit Agreement" shall mean the credit agreement (in form and substance satisfactory to the Agent) as may be entered into between the Equity Sponsor and one or more of the Borrowers evidencing the Junior Lien Facility, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Documents" shall mean the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related documents, instruments, agreements and certificates (each in form and substance satisfactory to the Agent), each as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Lender" shall mean the Equity Sponsor in its capacity as the holder of the Indebtedness evidenced by the Junior Lien Facility Subordinated Note.

"Junior Lien Facility Subordinated Note" shall mean the Junior Subordinated Note (in form and substance satisfactory to the Agent) issued by one or more of the Borrowers in favor of the Junior Lien Facility Lender as may be entered into in connection with the Junior Lien Facility, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Leasehold Interests" shall mean all of each Borrower's right, title and interest in and to any Real Property owned by a Person other than Borrower, whether as tenant, lessee, licensee, operator or otherwise.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person that becomes a transferee, successor or assignee of any Lender pursuant to Section 17.3(c).

3631160.8

16

"Lender Party" shall mean Agent, each Lender, any Purchasing Lender, any Participant and any Lender Pledgee, together with each other holder from time to time of any interest in any of the Obligations.

"Lender Pledgee" shall have the meaning set forth in Section 17.3(d) hereof.

"Lender Representative" shall have the meaning set forth in Section 6.10 hereof.

"Leverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"LIBOR Rate" shall mean the greater of (i) two and one-half percent (2.5%) per annum or (ii) a fluctuating rate of interest per annum determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the one-month London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day. If for any reason such rate is not available, "LIBOR Rate" shall mean the greater of (a) two and one-half percent (2.5%) per annum or (b) the fluctuating rate of interest per annum calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen Page LIBO Page as the one-month London interbank offered rate for deposits in U.S Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; provided, however, if such rate is not available, "LIBOR Rate" shall mean the greater of (x) two and one-half percent (2.5%) per annum or (y) a fluctuating rate of interest per annum from a comparable rate quotation designated by Agent as a substitute therefore. "Telerate Page 3750" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "Business Day" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Enforcement Action" means (a) the taking of any action to enforce or realize upon any Lien, (b) the exercise of any right or remedy provided to a secured creditor on account of a Lien under any of the Loan Documents or under applicable law, including the election to retain any Collateral in satisfaction of a Lien, (c) the taking of any action or the exercise of any right or remedy in respect of the collection on, set off against, marshaling of, or foreclosure on the Collateral (including, without limitation, the notification of account debtors), (d) the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale or any other means permissible under applicable law, (e) the exercise of any other right of a secured creditor under Part 6 of Article 9 of the UCC, and (f) the commencement of any legal proceedings against any Borrower or with respect to any Collateral for any relief

described in clauses (a) through (e) above.  This definition shall not include (1) the filing of a lawsuit by any Lender solely to collect its debt (but does include any action or proceeding to enforce or realize upon a judgment Lien), (2) subject to <u>Sections 12.1(b)</u> and <u>15.12</u>, the receipt of payments of principal or of interest or other obligations arising under the Loan Documents made in accordance with the terms of the Loan Documents, (3) the receipt of any payment or distribution under or pursuant to a plan of reorganization confirmed in a case under the Bankruptcy Code in accordance with the provisions of this Agreement, (4) except as otherwise expressly set forth in this Agreement, the exercise of any right or remedy available to a creditor or a secured creditor in any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code (including, without limitation, filing proofs of claims and defending any actions filed against such creditor in any such proceeding), or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, or proceedings seeking reorganization, arrangement, or other relief, or in any other dissolution or liquidation proceeding, (5) the acceleration of any loan, or (6) the filing or participation in the filing of an involuntary bankruptcy petition against any Borrower.

"<u>Liquidity</u>" shall have the meaning given to such term in <u>Section 8.1</u> hereof.

"<u>Loan Documents</u>" shall mean, collectively, this Agreement and the Other Documents.

"<u>LPC</u>" shall have the meaning given to such term in the initial recitals to this Agreement.

"<u>LRG</u>" shall have the meaning given to such term in the initial recitals to this Agreement.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the financial condition, business operations, assets or business prospects of the Borrowers, considered as a whole, (b) Borrowers' ability to pay the Obligations in accordance with the terms hereof and of the Other Documents, (c) the value of the Collateral, considered as a whole, or Agent's Liens on the Collateral, or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents, considered as a whole.

"<u>Material Agreements</u>" shall mean and include, in the case of each Borrower, the following:  (i) any lease of Real Property material to the operation of a Borrower's business that involves annual payments by a Borrower in excess of the Materiality Threshold, (ii) any lease of personal property by a Borrower having aggregate annual rentals in excess of the Materiality Threshold, (iii) any license agreement for the use of any intellectual property material and necessary for the operation of its business, (iv) the Revolver Loan Agreement, the Revolver Loan Lender Agreements, the Junior Lien Facility Documents, any Subordination Agreement and any other document, instrument or agreement evidencing, pertaining to, subordinating or securing the payment of, any Indebtedness in excess of the Materiality Threshold, (v) any labor or union contract, (vi) any employment contracts (more than 12 months) with executive officers of Borrowers, (vii) any long-term purchase or supply contracts (more than 12 months) involving

annual sales or purchases in excess of Two Million Dollars ($2,000,000), (viii) any Organic Document, and (ix) any other document, contract or agreement the termination of which (without its substantially contemporaneous replacement) could reasonably be expected to have a Material Adverse Effect.

"Material Intellectual Property" shall have the meaning given to such term in Section 5.12 hereof.

"Materiality Threshold" shall mean Two Hundred Fifty Thousand Dollars ($250,000).

"Mortgage" shall mean each mortgage, deed of trust, security deed, assignment of leasehold interest or rents, or similar document pursuant to which a Borrower shall grant to or for the benefit of Agent a Lien on the Real Property Collateral, together with all modifications, supplements, replacements, restatements, and amendments thereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" shall mean, with respect to any sale or other disposition of any asset or the sale or issuance of any Indebtedness, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person in connection with such transaction after deducting therefrom only (without duplication) (a) reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, accountant's fees, investment banking fees, finder's fees, other similar fees and commissions and reasonable out-of-pocket expenses, (b) the amount of taxes reasonably estimated by such Person to be actually and reasonably attributable to such transaction, (c) the amount of any Indebtedness secured by a security interest, lien or other encumbrance (other than a security interest or other Lien created hereunder or pursuant hereto) on such asset that, by the terms of such transaction, is required to be repaid upon such disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any Affiliate of any Borrower and, in each case, are properly attributable to such transaction or to the asset that is the subject thereof.

"Net Senior Debt" shall have the meaning set forth in Section 8.1 hereof.

"Non-Real Property Collateral" shall mean all Collateral, other than the Real Property Collateral.

"Note" shall mean each promissory note (if any) at any time evidencing any other portion of the Obligations.  "Notes" shall refer, collectively, thereto.

"Obligations" shall mean and include any and all of each Borrower's Indebtedness, obligations and/or liabilities to Agent and each Lender Party (or any corporation that directly or indirectly Controls or is Controlled by or is under common Control with Agent or any Lender Party) of every kind, nature and description, whether direct or indirect, secured or unsecured, joint, several, joint and several, absolute or contingent, due or to become due, now

3631160.8

19

existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such Indebtedness, obligations or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and including, but not limited to, any and all of any Borrower's Indebtedness, obligations and/or liabilities under this Agreement, the Other Documents, or under any other agreement between any Lender Party and any Borrower, all amounts charged to Borrowers' Account, and all obligations of any Borrower to each Lender Party to perform acts or refrain from taking any action.  Without limitation of the foregoing, the term "Obligations" extends to and includes the Term Loan A and the Term Loan B, all accrued (but unpaid) interest thereon and all fees payable hereunder and under any Other Documents.

"OFAC" shall mean the U.S. Department of the Treasury Office of Foreign Assets Control, and its successors.

"Organic Documents" shall mean:  (i) for a corporation, its articles (or certificate) of incorporation and bylaws; (ii) for a partnership, its articles of organization (if any) and partnership agreement; and (ii) for a limited liability company, its articles (or certificate) of organization and any operating agreement; together with, for each such entity and any other entity not described above, such other, similar documents as are integral to its formation or the conduct of its business operations.

"Other Documents" shall mean the Notes, the Mortgages, any UCC financing statement, any Deposit Account Control Agreements (including, without limitation, the First Merit Blocked Account Agreement), the Pledge Agreement and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Borrower and delivered to Agent or any Lender Party in respect of the transactions contemplated by this Agreement.

"Parent Company" shall have the meaning given to such term in the initial recitals to this Agreement.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any Term Loan in accordance with Section 17.3(b) hereof.

"Payment Office" shall mean, initially, the office of the Agent located at 4445 Willard Avenue, 12th Floor, Chevy Chase, Maryland 20815; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Representative and to each Lender to be the Payment Office.

"Payroll Account" shall mean any one or more deposit, custody or other accounts maintained by any Borrower with a bank or other institution if such account is used solely to deposit funds that are to be applied to the payment of wages and other compensation payable to employees of any Borrower and any withholding, social security, payroll, unemployment or other taxes relating thereto, imposed by any federal, state, county or local government or a subdivision or agency thereof, including any charges, fees, assessments, interest, penalties or additions payable in connection with any of the foregoing or which are to be applied, to the

3631160.8

extent of amounts withheld or deducted from compensation payable to any employee of any Borrower, to the payment of health insurance or other benefits generally provided to employees of any Borrower.

"PBGC" shall mean the Pension Benefit Guaranty Corporation, and any successor thereto.

"Perfection Certificate" shall mean, collectively, the Perfection Certificate for each Borrower executed by such Borrower and delivered to Agent on the Closing Date.

"Permitted Encumbrances" shall have the meaning set forth in Section 7.2 hereof.

"Permitted Hedge Contracts" shall mean any Hedge Contracts entered into in the ordinary course of, and pursuant to the reasonable requirements of Agent, Borrowers' business, and not for speculative purposes.

"Permitted Holders" shall mean the following Persons and their respective Affiliates: the Equity Sponsor, William B. Conner, Michael A. Lubin, Warren Delano and William Shulvitz.

"Permitted PP&E Dispositions" shall mean: the sale or other disposition of Equipment no longer used or useful in the business of any Borrower, so long as (i) no Event of Default then exists, and none otherwise would be caused thereby, (ii) Agent shall have received at least one (1) Business Day advance notice thereof if the sale or other disposition exceeds Twenty-Five Thousand Dollars ($25,000) and (iii) such sales or other dispositions do not involve Equipment having an aggregate fair market value in excess of the Materiality Threshold for all such Equipment which is the subject of sales or other dispositions in any one Fiscal Year, except as the Required Lenders otherwise may agree.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of Borrowers or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreement" shall mean the Pledge Agreement dated as of May 31, 2006, by the undersigned thereto, in favor of Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Prime Rate" shall mean the greater of (i) five percent (5.0%) per annum or (ii) a fluctuating per annum rate of interest equal at all times to the rate of interest announced publicly from time to time by Citibank, N.A. as its base rate; provided, that such rate is not necessarily the best rate offered to its customers and, should Agent be unable to determine such rate, such other

3631160.8

21

indication of the prevailing prime rate of interest as reasonably may be chosen by Agent; provided, further, that each change in the fluctuating rate of interest shall take effect simultaneously with the corresponding change in the Prime Rate.

"Principals" shall mean Michael A. Lubin and Warren Delano or each of their permitted successors pursuant to the terms and conditions herein; each, individually.

"Projections" shall have the meaning set forth in Section 10.8 hereof.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Equity Interests.

"Provision for Taxes" shall mean with respect to any Person for any period, the provision of taxes on the net income of such Person, whether federal, state, provincial, county or local, foreign or domestic, that is required to be made on the income statement of such Person for such period in accordance with GAAP.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to its owned and leased premises, including, particularly, any real property identified on Schedule 5.24 hereto, but shall exclude the real property located at 202 Winchester Road, Lakewood, New York. The term "Real Property" specifically includes Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold in addition to Real Property owned by Borrowers, or a Borrower, in fee simple.

"Real Property Collateral" shall mean that portion of Borrowers' Real Property that at any time is owned by a Borrower in fee simple (if any).

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrowers by their respective Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances (including payment intangibles), and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Releases" shall have the meaning set forth in Section 5.6(c)(i) hereof.

"Released Parties" shall have the meaning set forth in Section 17.20 hereof.

3631160.8

"Releasing Parties" shall have the meaning set forth in Section 17.20 hereof.

"Reorganization Plan" shall have the meaning set forth in the "Statement of the Transaction" section hereto.

"Reportable Event" shall mean a reportable event described in Section 4043(b) of ERISA and/or in the regulations promulgated thereunder.

"Required Lenders" shall mean the Required Term A Lenders and the Required Term B Lenders, provided that after the repayment in full of either the Term Loan A or Term Loan B, "Required Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the then outstanding Term Loans.

"Required Term A Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Term Loan A.

"Required Term B Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Term Loan B.

"Restricted Payment" shall mean and include any payment described in the proviso to Section 7.13.

"Restricted Payment Conditions." with respect to any Restricted Payment, shall mean the following conditions:  (i) no Event of Default shall have occurred and be continuing as of the payment date, and none would be caused by or result from such payment being made; (ii) on a pro forma basis, after giving effect to such payment as if made in the last Fiscal Month for which Borrowers have reported financial statements pursuant to Section 10.7, Borrowers shall remain in compliance with all applicable Financial Covenants; and (iii) Agent shall have received at least three (3) Business Days' advance written notice of Borrowers' intent to make such payment, specifying the amount thereof, the payee (if known) and the purpose, and at such time a Designated Officer of the Borrowing Representative shall have certified in writing to Agent Borrowers' compliance with clauses (i) through (ii) above, showing appropriate computations.

"Revolver Loan Agent" shall mean CapitalSource Finance LLC and its successors and assigns.

"Revolver Loan Agreement" shall mean the Amended and Restated Credit and Security Agreement, dated of even date herewith, by and among Revolver Loan Agent, Revolver Loan Lenders and Borrowers, as may be amended, amended and restated, supplemented or otherwise modified from time to time subject to the provisions of the Intercreditor Agreement.

"Revolver Loan Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Revolver Loan Agent or any Revolver Loan Lender, including, without limitation, principal, interest, charges, fees, premiums, indemnities, costs and expenses, however, evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolver Loan Lender Agreements.

3631160.8

23

"Revolver Loan Lender Agreements" shall mean, collectively, the following (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Revolver Loan Agreement; (b) all "Other Documents" (as defined therein) at any time executed and delivered by any Borrower with, to or in favor of Revolver Loan Agent or any Revolver Loan Lender pursuant to the Revolver Loan Agreement; sometimes being referred to herein individually as a "Revolver Loan Lender Agreement".

"Revolver Loan Lenders" shall mean, collectively, CapitalSource Finance LLC, in its individual capacity and any other lenders who are from time to time parties to the Revolver Loan Agreement as lenders, and their respective successors and assigns; each sometimes being referred to herein individually as a "Revolver Loan Lender".

"Revolver Loans" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Revolver Loan Agent or any Revolver Loan Lender (including, without limitation, the Equipment Term Loan, the Revolving Credit Advances and any Letters of Credit, each as such term is defined in the Revolver Loan Agreement), including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolver Loan Lender Agreements.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on any list thereof maintained by OFAC, as published from time to time.

"Sanctioned Person" shall mean any Person (i) named on any list of "Specifically Designated Nationals," "Blocked Persons," "Specifically Designated Terrorists," "Specially Designated Narcotics Traffickers" or "Foreign Terrorist Organizations" maintained by OFAC, as published from time to time; (ii) that is (A) an agent of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Securities" shall mean and include, as to each Borrower, all securities (whether certificated or uncertificated) and other investment property owned by such Borrower, whether now existing or hereafter created, including any held by any intermediary in any "street" name, pursuant to any custody arrangement or otherwise. The term "Securities" specifically includes all securities accounts, security entitlements, commodity contracts and commodity accounts.

"Standstill Period" shall have the meaning set forth in Section 12.1(b).

"Subordinated Debt" shall mean any Indebtedness of the Borrowers incurred after the Closing Date (including, without limitation, any Indebtedness related to the Junior Lien Facility), provided that (i) such Indebtedness is made expressly subordinate and subject in right and time of payment to the all Obligations pursuant to a Subordination Agreement, in form and substance satisfactory to Agent; (ii) any Liens and rights of any kind such subordinated lender may have or thereafter acquire against any Borrower with respect to such Indebtedness shall not be asserted in any manner until ninety (90) days after all of the Obligations have been indefeasibly paid in full in cash; (iii) any interest accruing with respect to such subordinated Indebtedness shall be only payable-in-kind until all Obligations have been indefeasibly paid in

3631160.8

full in cash; (iv) such subordinated Indebtedness shall have a final maturity occurring no sooner than, or a weighted average life less than, the date that is six (6) calendar months following the expiration of the Term; and (v) Agent provides prior written consent to such subordinated Indebtedness (provided, that no prior written consent of Agent shall be required for Indebtedness under the Junior Lien Facility as permitted in Section 7.3(e) hereof).

"Subordination Agreement" shall mean an agreement, satisfactory in form and substance to Agent, in its sole discretion, among (i) Agent, (ii) a creditor holding Indebtedness permitted to be incurred hereunder, and (iii) the Borrowers (whether directly or by consent), setting forth the terms by which such Indebtedness shall be subordinated, in right of payment and claim, to the rights and claims of the Lender Parties in respect of the Obligations and the Collateral.

"Subsidiary" shall mean, as to any Person, a corporation or other entity, a majority of whose Voting Equity Interests are owned, directly or indirectly, by such Person. Unless otherwise expressly provided herein, references herein to a "Subsidiary" or the "Subsidiaries" shall mean and refer to Subsidiaries of the Borrowers, including any not in existence on the Closing Date in anticipation of their subsequent creation or acquisition in accordance with the terms hereof.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Term A Lender" shall mean each Lender with a Term Loan A Commitment or which holds a portion of the Term Loan A.

"Term B Lender" shall mean each Lender with a Term Loan B Commitment or which holds a portion of the Term Loan B.

"Term B Purchase Notice" shall have the meaning set forth in Section 15.12.

"Term Loan A" shall mean the term loan, which includes $**[426,453.54]** of the Capitalized Expenses, in the principal amount of **[Eight Million Five Hundred Seventy-Five Thousand Thirty-Six and 22/100]** Dollars ($**[8,575,036.22]**) made to Borrowers by the Lenders pursuant to Section 2.1(a).

"Term Loan  A Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Term Loan A Commitment" representing the commitment of such Lender to make its Term Loan A Commitment Percentage of the Term Loan A available to Borrower.

"Term Loan A Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Term Loan A Commitment bears to the total Term Loan A Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Term Loan A Commitments" shall mean the aggregate amount of each Lender's individual Term Loan A Commitment, which aggregate amount shall equal **[Eight Million Five Hundred Seventy-Five Thousand Thirty-Six and 22/100]** Dollars ($**[8,575,036.22]**).

3631160.8

"Term Loan A Obligations" shall have the meaning set forth in Section 15.12.

"Term Loan B" shall mean the term loan, which includes $[**210,550.11**] of the Capitalized Expenses, in the principal amount of [**Four Million Two Hundred Thirty-Three Thousand Seven Hundred Seventy-Two and 33/100**] Dollars ($[**4,233,772.33**]) made to Borrowers by the Lenders pursuant to Section 2.1(b).

"Term Loan  B Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Term Loan B Commitment" representing the commitment of such Lender to make its Term Loan B Commitment Percentage of the Term Loan B available to Borrower.

"Term Loan B Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Term Loan B Commitment bears to the total Term Loan B Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Term Loan B Commitments" shall mean the aggregate amount of each Lender's individual Term Loan B Commitment, which aggregate amount shall equal [**Four Million Two Hundred Thirty-Three Thousand Seven Hundred Seventy-Two and 33/100**] Dollars ($[**4,233,772.33**]).

"Term Loans" shall mean, collectively, the Term Loan A and the Term Loan B.

"Test Period" shall have the meaning set forth in Section 8.1 hereof.

"Title Insurance Policy" shall have the meaning set forth in Section 9.1(x) hereof.

"Toxic Substance" shall mean and include any material present on the Real Property that has been shown to have significant adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances.  The term "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Unfinanced Capital Expenditures" shall have the meaning set forth in Section 8.1 hereof.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code, as adopted in the State of New York, in effect from time to time.

"Voting Equity Interests" shall mean Equity Interests having ordinary voting power to elect members of the board of directors, partners, managers or comparable governing authority of a Person

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3631160.8

ACKNOWLEDGED AND AGREED:


LEXINGTON PRECISION CORPORATION


By:_____
    Name:_____
    Title: _____



LEXINGTON RUBBER GROUP, INC.


By: _____
    Name:_____
    Title: _____

## EXHIBIT 9.1(d)
## SECRETARY'S CERTIFICATE

The undersigned, being the Secretary of LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("Borrower"), hereby gives this certificate to CSE MORTGAGE LLC, a Delaware limited liability company ("CSE") pursuant to the terms of that certain Amended and Restated Loan and Security Agreement, dated as of even date herewith (herein, as at any time amended, amended and restated, supplemented or otherwise modified, called the "Loan Agreement"), among Borrower, LEXINGTON PRECISION CORPORATION, CSE, individually as a lender and as agent for itself and the other Lenders from time to time party thereto, and such other lenders. Capitalized terms used herein and not defined herein have the meanings assigned to them in the Loan Agreement.

The undersigned hereby certifies that:

1.      Attached hereto as Exhibit "A" is a true and correct copy of the Certificate of Incorporation of Borrower and all amendments thereto as in effect on the date hereof;

2.      Attached hereto as Exhibit "B" is a true and correct copy of the bylaws of Borrower as in effect on the date hereof;

3.      Pursuant to resolutions heretofore adopted by the Board of Directors of Borrower, a true, correct and complete copy of which is set forth on Exhibit "C" attached hereto, each officer of Borrower identified below is duly authorized to execute and/or attest the Loan Agreement and each Other Document to which the Borrower is a party for and on behalf of Borrower, and to bind Borrower accordingly thereby; and the specimen signature of each such officer or other representative inscribed below is his genuine signature:

| Name | Title | Signature |
|---|---|---|
| Michael A. Lubin | Chairman of the Board | _____ |
| Warren Delano | President | _____ |
| [_____] | [_____] | _____ |

3631160.8

28

IN WITNESS WHEREOF, the undersigned has executed this certificate in his aforesaid capacity as Secretary of Borrower, as of [____ __], 2010.

_____

Name:  [_____]
Title:    Secretary

EXHIBIT "A"

[BORROWERS' COUNSEL TO PROVIDE]

3631160.8

EXHIBIT "B"


[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "C"


[BORROWERS' COUNSEL TO PROVIDE]

**EXHIBIT 9.1(t)**

**CLOSING CERTIFICATE**

This certificate is delivered pursuant to <u>Section 9.1(t)</u> of that certain Amended and Restated Loan and Security Agreement, dated as of [_____ ___], 2010, among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers, the Lenders from time to time party thereto, and CSE MORTGAGE LLC, as a Lender and as Agent for all such Lenders (as such agreement has been, or may be, amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Loan Agreement.

Borrowing Representative hereby certifies to Agent that as of the date hereof:

(a)      all representations and warranties set forth in the Loan Agreement and the Other Documents are true and correct;

(b)      Borrowers are in compliance with all terms and provisions set forth in the Loan Agreement and the Other Documents; and

(c)      no Default or Event of Default has occurred and is continuing.

LEXINGTON PRECISION CORPORATION,
as Borrowing Representative

By: _____
Name: _____
Title: _____

Date: [_____ ___], 2010

3631160.8

33

**Exhibit 10.6**

Form of Compliance Certificate

To:     CapitalSource Finance LLC
        4445 Willard Avenue, 12th Floor
        Chevy Chase, MD 20815
        Attention: Business Credit Services/Portfolio Manager

Re:     Lexington Precision Corporation
        Lexington Rubber Group, Inc.: Compliance Certificate dated [_____ __, 20__]

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Loan and Security Agreement, dated as of [____ ___], 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), between LEXINGTON PRECISION CORPORATION, a Delaware corporation ("**LPC**"), LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("**LRG**", and together with LPC, collectively, the "**Borrowers**") and CSE MORTGAGE LLC, a Delaware limited liability company ("**Lender**"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to Section [10.6] [10.7] of the Loan Agreement, the Designated Officer of Borrowing Representative hereby certifies that:

1.      The financial statements of Borrowers for the period ending [_____ __, 20__] attached hereto as Schedule 1 have been prepared in accordance with GAAP, applied on a basis consistent with prior practices.

2.      The Borrowing Representative has reviewed the terms of the Loan Agreement and the Other Documents and the condition of Borrowers, and based on such review, no Default or Event of Default has occurred or is continuing, except as set forth on Schedule 2 attached hereto, specifying the nature of such Default or Event of Default, when it occurred, and the steps that the Borrowers have taken, are taking, or propose to take with respect thereto.

3.      Attached hereto as Schedule 3 are the calculations that set forth the Borrowers' compliance with the Financial Covenants as of [_____ __, 20__].

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

3631160.8

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, 20__.

**LEXINGTON PRECISION CORPORATION,**
as Borrowing Representative

By:     _____

Name:  _____

Title:   _____

## COMMITMENT TRANSFER SUPPLEMENT

COMMITMENT TRANSFER SUPPLEMENT, dated as of _____, 20__, among _____ (the "Transferor Lender"), each Purchasing Lender executing this Commitment Transfer Supplement (each, a "Purchasing Lender"), and CSE MORTGAGE LLC ("CSE"), as agent for the Lenders (as defined below) under the Loan Agreement (as defined below).

### W I T N E S S E T H

WHEREAS, this Commitment Transfer Supplement is being executed and delivered in accordance with Section 17.3 of the Amended and Restated Loan and Security Agreement, dated as of [_____ __], 2010, (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Loan Agreement") among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (therein and herein called "Borrowers"), CSE and the various financial institutions named therein or which hereafter become a party thereto (together with CSE, the "Lenders") and CSE as agent for Lenders (in such capacity, "Agent"); and

WHEREAS, each Purchasing Lender wishes to become a Lender party to the Loan Agreement; and

WHEREAS, the Transferor Lender is selling and assigning to each Purchasing Lender rights, obligations and commitments under the Loan Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.    All capitalized terms used herein which are not defined shall have the meanings given to them in the Loan Agreement.

2.    Upon receipt by the Agent of four counterparts of this Commitment Transfer Supplement, to each of which is attached a fully completed Schedule and each of which has been executed by the Transferor Lender and Purchasing Lender, Agent will transmit to Transferor Lender and each Purchasing Lender a transfer effective notice, substantially in the form of Schedule II to this Commitment Transfer Supplement (a "Transfer Effective Notice") Such Transfer Effective Notice shall set forth, inter alia, the date on which the transfer effected by this Commitment Transfer Supplement shall become effective (the "Transfer Effective Date"), which date shall not be earlier than the first Business Day following the date such Transfer Effective Notice is received. From and after the Transfer Effective Date, each Purchasing Lender shall be a Lender party to the Loan Agreement for all purposes thereof.

3.    At or before 12:00 Noon (New York City time) on the Transfer Effective Date each Purchasing Lender shall pay to Transferor Lender, in immediately available funds, an amount equal to the purchase price, as agreed between Transferor Lender and such Purchasing Lender (the "Purchase Price"), of the portion of the outstanding Advances being purchased by such Purchasing Lender (such Purchasing Lender's "Purchased Percentage") and other amounts owing to the Transferor Lender under the Loan Agreement with respect to that portion of the Advances being purchased by such Purchasing Lender. Effective upon receipt by Transferor Lender of the Purchase Price from a Purchasing Lender, Transferor Lender hereby irrevocably sells, assigns and transfers to such Purchasing Lender, without recourse, representation or warranty, and each Purchasing Lender hereby irrevocably purchases, takes and assumes from Transferor Lender, such Purchasing Lender's Purchased Percentage of the Advances and other amounts owing to the Transferor Lender under the Loan Agreement together with all instruments, documents and collateral security pertaining thereto.

3631160.8

4.    Transferor Lender has made arrangements with each Purchasing Lender with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by Transferor Lender to such Purchasing Lender of any fees heretofore received by Transferor Lender pursuant to the Loan Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by such Purchasing Lender to Transferor Lender of fees or interest received by such Purchasing Lender pursuant to the Loan Agreement from and after the Transfer Effective Date.

5.    (a)    All principal payments that would otherwise be payable from and after the Transfer Effective Date to or for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender pursuant to the Loan Agreement shall, instead, be payable to or for the account of Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement.

       (b)    All interest, fees and other amounts that would otherwise accrue for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender from and after the Transfer Effective Date pursuant to the Loan Agreement shall, instead, accrue for the account of, and be payable to, Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement. In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by any Purchasing Lender, Transferor Lender and each Purchasing Lender will make appropriate arrangements for payment by Transferor Lender to such Purchasing Lender of such amount upon receipt thereof from Borrower.

       (c)    Consistent with the terms of Section 17.3 of the Loan Agreement, (i) payments of principal, interest, fees, charges and collections owing to the Purchasing Lender hereafter pursuant to the Loan Agreement shall be made by the Agent without giving effect to any collection days, and (ii) Purchasing Lender shall not be entitled to receive any portion of any fees or charges payable to the Agent for its own account.

6.    Concurrently with the execution and delivery hereof, Transferor Lender will provide to each Purchasing Lender conformed copies of the Loan Agreement and all Other Documents delivered to Transferor lender.

7.    Each of the parties to this Commitment Transfer Supplement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Commitment Transfer Supplement.

8.    By executing and delivering this Commitment Transfer Supplement, Transferor Lender and each Purchasing Lender confirm to and agree with each other and Agent and Lenders as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, Transferor Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement, the Other Documents or any other instrument or document furnished pursuant thereto; (ii) Transferor Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their Obligations under the Loan Agreement or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Lender confirms that it has received a copy of the Loan Agreement, together with copies of such financial statements and such other documents and information

as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Transfer Supplement; (iv) each Purchasing Lender will, independently and without reliance upon Agent, Transferor Lender or any other Lenders and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement; (v) each Purchasing Lender appoints and authorizes Agent to take such action and to exercise such powers under the Loan Agreement as are delegated to the Agent by the terms thereof; (vi) each Purchasing Lender agrees that it will perform all of its respective obligations as set forth in the Loan Agreement to be performed by each as a Lender; and (vii) each Purchasing Lender represents and warrants to Transferor Lender, the other Lenders, Agent and Borrowers that it is either (x) entitled to the benefits of an income tax treaty with the United States of America that provides for an exemption from the United States withholding tax on interest and other payments made by Borrowers under the Loan Agreement and the Other Documents or (y) is engaged in trade or business within the United States of America.

9.      Schedule I hereto sets forth the revised Commitment Percentages of Transferor Lender and Purchasing Lender after giving effect to the transfer contemplated hereby as well as administrative information with respect to each Purchasing Lender.

10.     This Commitment Transfer Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

3631160.8

38

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Transfer Supplement to be executed by their respective duly authorized officers on the date set forth above.

_____
as Transferor Lender


By:     _____
Name:   _____
Title:  _____




_____
as a Purchasing Lender


By:     _____
Name:   _____
Title:  _____



CSE MORTGAGE LLC, as Agent


By:     _____
Name:   _____
Title:  _____

3631160.8

SCHEDULE I TO COMMITMENT TRANSFER SUPPLEMENT

LIST OF OFFICE ADDRESSES FOR NOTICES AND COMMITMENT AMOUNTS

| | | |
|---|---|---|
| [Transferor Lender] | Revised Revolving Credit Commitment Amount | $_____ |
| | Revised Term Loan Commitment Amount | $_____ |
| | Revised Commitment Percentage: | _____% |
| [Purchasing Lender] | Revolving Credit Commitment Amount | $_____ |
| | Term Loan Commitment Amount | $_____ |
| | Commitment Percentage: | _____% |

Addresses for Notices

_____

_____

_____

Attention:
Telephone:
Telecopier:

SCHEDULE II TO COMMITMENT TRANSFER SUPPLEMENT

[Form of Transfer Effective Notice]

To: _____, as Transferor Lender and
    _____, as Purchasing Lender:

The undersigned, as Agent under the Amended and Restated Loan and Security Agreement dated as of [_____ __], 2010 among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (collectively, "Borrowers"), and CSE MORTGAGE LLC, a Delaware limited liability company ("CSE"), the various financial institutions named therein or which hereafter become a party thereto, (together with CSE, the "Lenders") and CSE as agent for Lenders (in such capacity, "Agent"), acknowledges receipt of four (4) executed counterparts of a completed Commitment Transfer Supplement in the form attached hereto. [Note: Attach copy of Commitment Transfer Supplement.] Terms defined in such Commitment Transfer Supplement are used herein as therein defined

Pursuant to such Commitment Transfer Supplement, you are advised that the Transfer Effective Date will be [Insert date of Transfer Effective Notice.]

CSE MORTGAGE LLC,
as Agent


By: _____
Name: _____
Title: _____




ACCEPTED FOR RECORDATION
IN REGISTER:

3631160.8

**<u>SCHEDULES TO</u>**

**AMENDED AND RESTATED**

**LOAN AND SECURITY AGREEMENT**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**

**and**

**CSE MORTGAGE LLC,**
**as a Lender and as Agent**

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**Closing Date: [July 19], 2010**

3631160.8

**Schedules**

| | |
|---|---|
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Undisputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicting Agreements |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

**SCHEDULE 4.5**

**EQUIPMENT AND INVENTORY LOCATIONS**

**SCHEDULE 4.14(c)**

**LOCATION OF EXECUTIVE OFFICES**

**SCHEDULE 4.16**

**<u>EXCLUDED EQUIPMENT</u>**

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA; QUALIFICATIONS**

**SCHEDULE 5.3**

**FEDERAL TAX IDENTIFICATION NUMBERS**

**SCHEDULE 5.5**

**PRIOR NAMES**

**SCHEDULE 5.6**

**OSHA AND ENVIRONMENTAL COMPLIANCE EXCEPTIONS**

**SCHEDULE 5.7**

**<u>UNDISPUTED INDEBTEDNESS</u>**

3631160.8

**SCHEDULE 5.8**

**<u>LITIGATION</u>**

**SCHEDULE 5.9**

**<u>INDEBTEDNESS</u>**

**SCHEDULE 5.11**

**PLANS**

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

**SCHEDULE 5.14**

**<u>DEFAULTS</u>**

**SCHEDULE 5.17**

**LABOR CONTRACTS**

**SCHEDULE 5.21**

**CONFLICTING AGREEMENTS**

**SCHEDULE 5.24**

**REAL PROPERTY**

**SCHEDULE 5.25**

**DEPOSIT ACCOUNTS**

**SCHEDULE 6.8**

**POST-CLOSING MATTERS**

**SCHEDULE 7.2**

**PERMITTED ENCUMBRANCES**

**SCHEDULE 7.3**

**<u>OTHER INDEBTEDNESS</u>**

**SCHEDULE 7.4**

**LOANS AND INVESTMENTS**

**Tab I-2**

**Revised Amended and Restated Secured CapitalSource Credit Agreement**

**AMENDED AND RESTATED**

**CREDIT AND SECURITY AGREEMENT**

**Dated as of [July 19], 2010**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**
**as Borrowers**

**and**

**CAPITALSOURCE FINANCE LLC,**
**as a Lender, as Co-Documentation Agent and as Agent,**

**WEBSTER BUSINESS CREDIT CORPORATION**
**as a Lender and as Co-Documentation Agent**

**and**

**ANY OTHER LENDERS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

# TABLE OF CONTENTS

Page

1. **DEFINITIONS.** .................................................................................................. 2
   1.1.   Accounting Terms ..................................................................................... 2
   1.2.   General Terms .......................................................................................... 2
   1.3.   Uniform Commercial Code Terms .......................................................... 2

II. **ADVANCES, PAYMENTS** ............................................................................... 3
   2.1.   Revolving Credit Advances and Equipment Term Loan .......................... 3
   2.2.   Disbursement of Advance Proceeds ......................................................... 4
   2.3.   Repayment of Advances ........................................................................... 4
   2.4.   Overadvances ........................................................................................... 4
   2.5.   Statement of Account; Evidence of Loans. .............................................. 4
   2.6.   Letters of Credit. ...................................................................................... 5
   2.7.   Additional Payments ............................................................................... 8
   2.8.   Manner of Advancing Revolving Credit Advances and Payment. ............ 8
   2.9.   Mandatory Prepayments .......................................................................... 9
   2.10.  Defaulting Lenders ................................................................................. 11

III. **INTEREST AND FEES** ................................................................................... 12
   3.1.   Interest ................................................................................................... 12
   3.2.   Intentionally Omitted ............................................................................ 12
   3.3.   Audit Fees .............................................................................................. 13
   3.4.   Letter of Credit Fees .............................................................................. 13
   3.5.   Computation of Interest and Fees .......................................................... 13
   3.6.   Maximum Charges ................................................................................. 14
   3.7.   Increased Costs ...................................................................................... 14
   3.8.   Capital Adequacy .................................................................................. 14

IV. **COLLATERAL; GENERAL TERMS.** ............................................................ 15
   4.1.   Security Interest in the Collateral .......................................................... 15
   4.2.   Perfection of Security Interest. ............................................................... 15
   4.3.   Disposition of Collateral ........................................................................ 16
   4.4.   Preservation of Collateral ...................................................................... 16
   4.5.   Ownership of Collateral ......................................................................... 17
   4.6.   Defense of Agent's and Lenders' Interests ............................................. 17
   4.7.   Books and Records ................................................................................. 18
   4.8.   Financial and Other Disclosure ............................................................. 18
   4.9.   Compliance with Laws .......................................................................... 18
   4.10.  Inspection of Premises .......................................................................... 18
   4.11.  Insurance ............................................................................................... 18
   4.12.  Payment of Taxes .................................................................................. 20
   4.13.  Payment of Leasehold Obligations ....................................................... 20
   4.14.  Receivables ............................................................................................ 20
   4.15.  Inventory ............................................................................................... 22
   4.16.  Equipment and Real Property Covenants .............................................. 22

3604386.15

|  |  |  |  |
|---|---|---|---|
| 4.17. | Exculpation | | 22 |
| 4.18. | Environmental Matters. | | 23 |
| 4.19. | No Other Financing Statements | | 24 |
| 4.20. | Additional Mortgages | | 25 |
| 4.21. | Intellectual Property | | 25 |
| 4.22. | Commercial Tort Claims | | 25 |
| 4.23. | OFAC | | 25 |
| 4.24. | Appraisals | | 25 |

**V.    REPRESENTATIONS AND WARRANTIES. ......................................................25**

| 5.1. | Authority | 25 |
|---|---|---|
| 5.2. | Formation and Qualification. | 26 |
| 5.3. | Tax Returns | 26 |
| 5.4. | Financial Statements. | 26 |
| 5.5. | Name | 27 |
| 5.6. | OSHA and Environmental Compliance | 27 |
| 5.7. | Solvency | 27 |
| 5.8. | Litigation | 28 |
| 5.9. | No Indebtedness | 28 |
| 5.10. | Violations | 28 |
| 5.11. | Plans | 28 |
| 5.12. | Patents, Trademarks, Copyrights and Licenses | 28 |
| 5.13. | Licenses and Permits | 29 |
| 5.14. | No Default of Indebtedness | 29 |
| 5.15. | No Other Defaults | 29 |
| 5.16. | No Burdensome Restrictions | 29 |
| 5.17. | No Labor Disputes | 30 |
| 5.18. | Margin Regulations | 30 |
| 5.19. | Investment Company Act | 30 |
| 5.20. | Disclosure | 30 |
| 5.21. | No Conflicting Agreements or Orders | 30 |
| 5.22. | Application of Certain Laws and Regulations | 30 |
| 5.23. | Hedge Contracts | 30 |
| 5.24. | Real Property | 30 |
| 5.25. | Deposit Accounts | 30 |
| 5.26. | Brokers | 30 |
| 5.27. | OFAC | 30 |
| 5.28. | Accountants' Letter | 30 |
| 5.29. | Senior Debt | 31 |

**VI.    AFFIRMATIVE COVENANTS. ......................................................................31**

| 6.1. | Payment of Fees | 31 |
|---|---|---|
| 6.2. | Conduct of Business and Maintenance of Existence and Assets | 31 |
| 6.3. | Violations | 31 |
| 6.4. | Government Receivables | 31 |
| 6.5. | Execution of Supplemental Instruments | 31 |
| 6.6. | Payment of Material Agreements | 31 |
| 6.7. | Standards of Financial Statements | 32 |
| 6.8. | Further Assurances; Post Closing | 32 |
| 6.9. | Board of Directors | 32 |

     6.10.    Board Observation ................................................................................. 32

**VII.**    **NEGATIVE COVENANTS.** ............................................................**33**
     7.1.    Sale of Assets, Consolidation, Merger, Dissolution, Etc. ............................ 33
     7.2.    Encumbrances ........................................................................................ 34
     7.3.    Indebtedness ......................................................................................... 35
     7.4.    Loans, Investments, Etc. ......................................................................... 37
     7.5.    Dividends and Redemptions ................................................................... 38
     7.6.    Nature of Business ................................................................................ 39
     7.7.    Transactions with Affiliates ................................................................... 39
     7.8.    Subsidiaries .......................................................................................... 39
     7.9.    Fiscal Year and Accounting Changes ..................................................... 40
     7.10.    Pledge of Credit ................................................................................... 40
     7.11.    Amendment of Material Agreements ..................................................... 40
     7.12.    Compliance with ERISA ....................................................................... 40
     7.13.    Prepayment of Indebtedness ................................................................. 41
     7.14.    Payment of Subordinated Debt ............................................................. 41
     7.15.    Orgnaizational Changes ........................................................................ 41
     7.16.    OFAC .................................................................................................... 41

     **VIII.**    FINANCIAL COVENANTS. ................................................................. 41
     8.1.    Controlling Definitions ......................................................................... 41
     8.2.    Fixed Charge Coverage Ratio ............................................................... 43
     8.3.    Capital Expenditures ............................................................................ 43
     8.4.    Leverage Ratio ..................................................................................... 44
     8.5.    Minimum Liquidity ............................................................................... 44
     8.6.    Minimum EBITDA ................................................................................ 44

**IX.**    **CONDITIONS PRECEDENT.** .........................................................**44**
     9.1.    Conditions to Effectiveness ................................................................... 44

**X.**    **INFORMATION AS TO BORROWERS.** ..........................................**48**
     10.1.    Disclosure of Material Matters .............................................................. 48
     10.2.    Schedules .............................................................................................. 48
     10.3.    Environmental Compliance Certificate .................................................. 49
     10.4.    Litigation .............................................................................................. 49
     10.5.    Material Occurrences ............................................................................ 49
     10.6.    Government Receivables ....................................................................... 49
     10.7.    Annual Financial Statements ................................................................. 49
     10.8.    Monthly Financial Statements ............................................................... 50
     10.9.    Projections ............................................................................................ 50
     10.10.    Variances From Operating Budget ....................................................... 50
     10.11.    Notice of Adverse Events ..................................................................... 50
     10.12.    ERISA Notices and Requests ................................................................ 50
     10.13.    Material Intellectual Property ............................................................... 51
     10.14.    Public Reports ...................................................................................... 51
     10.15.    Material Agreements ............................................................................. 51
     10.16.    Additional Information ......................................................................... 51
     10.17.    Additional Documents .......................................................................... 52

XI.      EVENTS OF DEFAULT ....................................................................................52
      11.1.    Obligations .......................................................................... 52
      11.2.    Misrepresentations ............................................................ 52
      11.3.    Financial Information ........................................................ 52
      11.4.    Liens .................................................................................. 52
      11.5.    Covenants .......................................................................... 52
      11.6.    Judgments .......................................................................... 52
      11.7.    Voluntary Bankruptcy ....................................................... 53
      11.8.    Cessation of Business ........................................................ 53
      11.9.    Involuntary Bankruptcy ..................................................... 53
      11.10.   Material Adverse Change ................................................... 53
      11.11.   Agent's Liens .................................................................... 53
      11.12.   Subordinated Debt ............................................................. 53
      11.13.   Cross Default ..................................................................... 53
      11.14.   Guaranty ............................................................................ 53
      11.15.   Change of Control ............................................................. 53
      11.16.   Change of Management...................................................... 53
      11.17.   Invalidity ........................................................................... 54
      11.18.   Takings .............................................................................. 54
      11.19.   Seizures ............................................................................. 54
      11.20.   Cessation of Operations..................................................... 54
      11.21.   Plans .................................................................................. 54
      11.22.   Criminal Charges .............................................................. 54

XII.     AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. .........54
      12.1.    Rights and Remedies ......................................................... 54
      12.2.    Application of Proceeds ..................................................... 55
      12.3.    Agent's Discretion ............................................................ 56
      12.4.    Setoff. ................................................................................ 56
      12.5.    Rights and Remedies not Exclusive .................................. 56

XIII.    WAIVERS AND JUDICIAL PROCEEDINGS. .....................................................56
      13.1.    Waiver of Notice ............................................................... 56
      13.2.    Delay ................................................................................. 57
      13.3.    Jury Waiver ....................................................................... 57

XIV.    EFFECTIVE DATE AND TERMINATION. ........................................................57
      14.1.    Term .................................................................................. 57
      14.2.    Termination ....................................................................... 57

XV.     REGARDING AGENT ......................................................................................58
      15.1.    Appointment ...................................................................... 58
      15.2.    Nature of Duties ................................................................ 58
      15.3.    Lack of Reliance on Agent and Resignation .................... 58
      15.4.    Certain Rights of Agent ..................................................... 59
      15.5.    Reliance ............................................................................. 59
      15.6.    Notice of Default ............................................................... 59
      15.7.    Indemnification ................................................................. 59
      15.8.    Agent in its Individual Capacity ....................................... 60
      15.9.    Delivery of Documents ..................................................... 60

3604386.15

|        |        |                                                                      |     |
|--------|--------|----------------------------------------------------------------------|-----|
| 15.10. |        | Borrowers' Undertaking to Agent                                      | 60  |
| 15.11. |        | Documentation Agent, Etc                                             | 60  |
| 15.12. |        | Collateral Matters                                                   | 60  |
| **XVI.** | **BORROWING REPRESENTATIVE.**                                      |     | **61** |
| 16.1.  |        | Borrowing Representative Provisions                                  | 61  |
| 16.2.  |        | Waiver of Subrogation                                                | 62  |
| **XVII.** | **MISCELLANEOUS.**                                                |     | **62** |
| 17.1.  |        | GOVERNING LAW                                                        | 62  |
| 17.2.  |        | Entire Understanding.                                                | 63  |
| 17.3.  |        | Successors and Assigns; Participations: New Lenders.                 | 64  |
| 17.4.  |        | Application of Payments                                              | 66  |
| 17.5.  |        | Indemnity                                                            | 66  |
| 17.6.  |        | Notice                                                               | 67  |
| 17.7.  |        | Survival                                                             | 68  |
| 17.8.  |        | Severability                                                         | 68  |
| 17.9.  |        | Expenses                                                             | 68  |
| 17.10. |        | Injunctive Relief                                                    | 69  |
| 17.11. |        | Consequential Damages                                                | 69  |
| 17.12. |        | Captions                                                             | 69  |
| 17.13. |        | Counterparts; Telecopied Signatures                                  | 69  |
| 17.14. |        | Construction                                                         | 69  |
| 17.15. |        | Confidentiality                                                      | 69  |
| 17.16. |        | Publicity                                                            | 70  |
| 17.17. |        | Survival of Representations and Warranties                           | 70  |
| 17.18. |        | Destruction of Invoices                                              | 70  |
| 17.19. |        | Time                                                                 | 70  |
| 17.20. |        | Release                                                              | 70  |
| 17.21. |        | Patriot Act.                                                         | 71  |
| 17.22. |        | Amendment and Restatement                                            | 71  |

## AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT

PREAMBLE. This Amended and Restated Credit and Security Agreement (herein, together with all schedules and exhibits hereto, and as it may be amended, restated, supplemented or modified from time to time, called this "Agreement"), dated as of **[July 19]**, 2010, is made among: (i) LEXINGTON PRECISION CORPORATION, a Delaware corporation ("LPC" or "Parent Company"), and LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("LRG"; LRG and LPC herein sometimes called individually, "Initial Borrower" and, collectively, if more than one, the "Initial Borrowers"; and together with each other Person which, on or subsequent to the Closing Date, agrees in writing to become a borrower hereunder, herein called, individually, a "Borrower" and, collectively, the "Borrowers," and pending the inclusion by written agreement of any other such Person, besides each Initial Borrower, as a "Borrower" hereunder, all references herein to "Borrowers," "each Borrower," the "applicable Borrower," "such Borrower" or any other, similar variations thereof (whether singular or plural) shall all mean and refer to each Initial Borrower, collectively); (ii) CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CapitalSource"), together with any and all other Persons that are now, or that hereafter become, party hereto, as lenders hereunder (collectively, the "Lenders" and, individually, a "Lender"); (iii) CapitalSource, as collateral agent and administrative agent for itself, each other such Lender and each other "Lender Party" (as hereinafter defined) (CapitalSource, when acting in such agency capacity, is herein called the "Agent") and (iv) CapitalSource and Webster Business Credit Corporation ("WBCC") as co-documentation agents (in such capacity, the "Co-Documentation Agents").

STATEMENT OF THE TRANSACTION. Capitalized terms used in this statement of the transaction shall have the meanings ascribed to such terms in Section 1.2. The Initial Borrowers and the Lender Parties have entered into that certain Credit and Security Agreement, dated as of May 31, 2006, as amended by that certain First Amendment and Default Waiver Agreement, dated as of November 20, 2006 (as further amended or modified to date, the "Existing Credit Agreement"), wherein the Lenders have provided the Initial Borrowers with an equipment term loan in the initial aggregate principal amount of $12,500,000.00 and a revolving loan in the maximum aggregate principal amount of $17,500,000.00 (collectively, the "Existing Equipment Loan Facility").

The Borrowers are debtors and debtors-in-possession in jointly-administered cases under Chapter 11 of the Bankruptcy Code, Case No. 08-11153 (the "Chapter 11 Cases"), and they have obtained from the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a series of orders to minimize any disruption to the Borrowers' business operations and to facilitate the Borrowers' reorganization, including, the authority to use the Lenders' cash collateral.

The Borrowers have emerged from Chapter 11 bankruptcy pursuant to the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as amended, supplemented or otherwise modified from time to time, the "Reorganization Plan"). By operation of law all Defaults and/or Events of Default existing prior to the Closing Date have been cured or waived pursuant to a final non-appealable order (other than with respect to any material appeals reasonably consented to by the Lenders and Agent), dated as of the date hereof (the "Confirmation Order").

In order to finance in part the distributions to be made under the Reorganization Plan and to pay the fees and expenses associated therewith (including, without limitation, the Capitalized Expenses), the Borrowers have requested that simultaneously with the consummation of the Reorganization Plan, the Lenders shall amend and restate the Existing Equipment Loan Facility pursuant to the terms and conditions herein.

3604386.15

Borrowers, Agent and Lenders acknowledge and agree that, immediately prior to the closing of the transaction contemplated hereby, (a) the current amount of all outstanding Revolving Credit Advances, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $**[14,247,071.05]**, (b) Issuer has issued the Letters of Credit listed on <u>Schedule 2.6</u> attached hereto and such Letters of Credit remain outstanding, and (c) the current principal amount outstanding under the Equipment Term Loan, together with all accrued and unpaid interest, fees, costs and expenses related thereto, is $**[2,715,266.07]**.

Pursuant to the Reorganization Plan, the Existing Equipment Loan Facility shall be amended to, among other things, (a) extend the last day of the Term from May 15, 2009 to **[July 19]**, 2013, (b) convert all the following, which are outstanding as of the Closing Date, to Obligations due under the Equipment Term Loan, and accordingly, increase the amount of the Equipment Term Loan by the amount of such amounts so converted: (i) all Revolving Credit Advances, (ii) all accrued and unpaid interest related to the Existing Equipment Loan Facility, (iii) all L/C Disbursements and (iv) $**[694,881.95]** of the Capitalized Expenses and (c) reduce the Maximum Revolving Credit Amount from $17,500,000 to $**[733,000]** (the aggregate principal amount of the existing and undrawn Letters of Credit), all in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and undertakings herein contained, each Borrower, the Lenders and Agent, each intending to be legally bound hereby, hereby covenant and agree as follows:

1.    <u>DEFINITIONS</u>.

    1.1.    <u>Accounting Terms</u>. As used in this Agreement or any Other Document, accounting terms not defined or partly defined (to the extent not fully defined) in <u>Section 1.2</u> or elsewhere in this Agreement shall have the respective meanings given to them under GAAP; <u>provided</u>, <u>however</u>, whenever such accounting terms are used for the purposes of determining compliance with the Financial Covenants, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the Historical Financial Statements; <u>provided</u>, <u>further</u>, that in the event that any accounting change (an "<u>Accounting Change</u>") shall occur that results in a change in the method of calculation of the Financial Covenants, standards or terms of this Agreement, then the Borrowers and Agent agree to enter into negotiations in good faith in order to amend such affected provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such Accounting Changes had not been made and, until such time as an amendment regarding such affected provisions of this Agreement  has been executed and delivered by the Borrowers, Agent and the Required Lenders, all Financial Covenants, standards and terms of this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. Certain other definitions, used in the determination of the Financial Covenants, are set forth in <u>Section 8.1</u>. When applied to Borrowers and their Subsidiaries or Borrowers on a consolidated basis, accounting terms shall mean Borrowers and their Subsidiaries on a consolidated basis determined in accordance with GAAP.

    1.2.    <u>General Terms</u>. For purposes of this Agreement the following terms shall have the following meanings: See <u>Annex One</u> attached hereto and by this reference incorporated herein.

    1.3.    <u>Uniform Commercial Code Terms</u>. All terms used herein and defined in the Uniform Commercial Code shall have the meaning given therein unless otherwise defined herein. Without limitation of the foregoing, the terms "accounts," "chattel paper," "instruments," "general intangibles," "payment intangibles," "support obligations," "securities," "investment property," "documents,"

3604386.15

"commercial tort claims," "deposit accounts," "payment intangibles," "software," "letter-of-credit rights," "inventory," "farm products," "equipment" and "fixtures," as and when used in the description of Collateral, shall have the meanings given to such terms in Articles 8 or 9 (as applicable) of the Uniform Commercial Code.

      1.4.   <u>Certain Matters of Construction</u>. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and <u>vice versa</u>. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any documents, instruments or agreements to which Agent, any Lender or any Borrower is a party, including, without limitation, references to any of the Other Documents, shall mean and include each of such documents, instruments or agreements as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced in a manner consistent with the terms of this Agreement and the Intercreditor Agreement. References herein or in any Other Documents to any actions being taken (or omitted to be taken) by any Lender Party after a Default or Event of Default has occurred shall mean that such action may be taken (or omitted to be taken) only during the continuation of such Default or Event of Default. The words "to Borrowers' knowledge" (or words to similar effect), shall mean the knowledge of Borrowers' officers or employees charged with responsibility for the matter in question, obtained (or which should reasonably have been expected to have been obtained) after due inquiry. Unless otherwise expressly provided herein or in any Other Documents, all references to time herein and in any Other Documents shall mean and refer to New York time.

II.    <u>ADVANCES, PAYMENTS</u>.

      2.1.   <u>Revolving Credit Advances and Equipment Term Loan</u>.

      (a)   Subject to the terms and conditions set forth in this Agreement, each Lender, severally and not jointly, will make Revolving Credit Advances, in aggregate amounts outstanding at any time equal to such Lender's respective Commitment Percentage of the Maximum Revolving Credit Amount; <u>provided, however,</u> that, at no time hereafter, shall the aggregate amount of all Working Capital Obligations exceed the Maximum Revolving Credit Amount. The Revolving Credit Commitment shall expire at the end of the Term (unless earlier terminated pursuant to the terms hereof). Revolving Credit Advances shall bear interest from the date of their disbursement until paid in full at the Applicable Rate, with accrued interest being payable as provided in <u>Section 3.1</u>. Notwithstanding anything herein to the contrary, Borrowers shall have no right to request from Agent or any Lender any Revolving Credit Advances, except for L/C Disbursements.

      (b)   Subject to the terms and conditions of this Agreement, each Lender, severally and not jointly, has made available to Borrowers an Equipment Term Loan in a sum equal to such Lender's Equipment Term Loan Commitment. The principal amount of the Equipment Term Loan shall be repaid in monthly installments on the first day of each calendar month equal in amount to (i) Two Hundred Eight Thousand Three Hundred Thirty Three Dollars and 33/100 ($208,333.33) each, beginning on **[August 1]**, 2010, and continuing on the first day of each succeeding calendar month for twenty-four (24) months and (ii) Three Hundred Twenty Five Thousand Dollars and No/100 ($325,000.00) each, beginning on **[August 1]**, 2012, and continuing on the first day of each succeeding calendar month thereafter until the expiration of the Term. Upon the expiration of the Term (subject, <u>however</u>, to acceleration upon (or following) the occurrence of an Event of Default and during its continuation), all of

the Obligations, including, without limitation, the entire remaining principal balance of the Loans, shall be due and payable in full.

2.2.    <u>Disbursement of Advance Proceeds</u>. All Advances have been or shall be, as applicable, disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to any Lender Party arising pursuant hereto, shall be charged to Borrowers' Account on Agent's books.

2.3.    <u>Repayment of Advances</u>.

(a)    All Advances shall be due and payable in full on the last day of the Term, subject to earlier prepayment, in whole or in part, as provided in this Agreement or in any Other Document.

(b)    All payments of principal, interest fees and other amounts payable hereunder or under any of the Other Documents shall be made to Agent at the Payment Office not later than 3:00 p.m. (Eastern) on the due date for payment thereof in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account.

(c)    Borrowers absolutely and unconditionally promise to pay principal, interest, fees and all other Obligations payable hereunder or under any Other Documents as and when due, without any deduction whatsoever, including, but not limited to, any deduction for any defense, setoff or counterclaim.

(d)    Any other Obligation for which a payment date is not expressly provided herein or in any Other Document shall be due and payable on demand or, if not sooner demanded, on the last of the Term.

2.4.    <u>Overadvances</u>. If, at any time hereafter, Working Capital Obligations then outstanding exceed the Maximum Revolving Credit Amount, the Borrowers shall be obligated, immediately and without the necessity of any demand, to cause the amount of such excess (such amount being herein called an "<u>Overadvance</u>") to be reduced to zero (0) by repaying the Revolving Credit Advances then outstanding (or, in lieu thereof, or in addition thereto, as the case may be, by posting cash Collateral with Agent in respect of the Letters of Credit then outstanding), by a like amount.

2.5.    <u>Statement of Account; Evidence of Loans</u>.

(a)    Agent shall maintain on its books, in accordance with its customary procedures, a loan account in the name of Borrowers ("<u>Borrowers' Account</u>") in which shall be recorded the date and amount of each Advance made by Lenders and the date and amount of each payment in respect thereof; <u>provided</u>, <u>however</u>, the failure by Agent to record the date and amount of any Advance or any error therein shall not adversely affect the rights of Agent or any Lender or Borrowers' obligations in regard thereto. Promptly after the end of each calendar month, Agent shall deliver to Borrowing Representative a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Lenders and Borrowers, during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within sixty (60) days after such statement is received by Borrowing Representative. The records of Agent with respect to the Borrowers' Account shall be conclusive evidence of the amounts of Advances, other charges and payments applicable thereto, absent manifest error. Any amounts charged to Borrowers' Account shall, until paid in full, bear interest at the Applicable

3604386.15

Rate (or, after an Event of Default has occurred while it is continuing, at the option of Agent or the direction of the Required Lenders, the Default Rate).

        (b)      Each Borrower agrees that:

        (i)      upon written notice by any Lender to the Borrowing Representative that a promissory note or other evidence of indebtedness is requested by such Lender to evidence the Advances and other Obligations owing or payable to, or to be made by, such Lender, the Borrowers shall promptly (and in any event within three (3) Business Days following the later of (x) any such request and (y) delivery by Agent of the form of promissory note pursuant to this Section 2.5(b)) execute and deliver to such Lender an appropriate promissory note or notes in form and substance reasonably acceptable to such Lender, payable to the order of such Lender in a principal amount equal to the amount of the Advances owing or payable to Lender;

        (ii)      all references to Notes in this Agreement and the Other Documents shall mean the Notes, if any, to the extent issued (and not returned to the Borrowers for cancellation) hereunder, as the same may be amended, modified, divided, supplemented and/or restated from time to time; and

        (iii)      upon any Lender's written request, and in any event within three (3) Business Days of any such request, Borrowers shall execute and deliver to such Lender new Notes and/or divide the Notes in exchange for then existing notes in such smaller amounts or denominations as such Lender shall specify in its sole and absolute discretion; provided, that the aggregate principal amount of such new Notes shall not exceed the aggregate principal amount of the Notes outstanding at the time such request is made; and provided, further, that such Notes that are to be replaced shall then be deemed no longer outstanding hereunder and replaced by such new Notes and shall be returned to the Borrowers promptly upon such Lender's receipt of the replacement notes.

    2.6.   Letters of Credit.

        (a)      Subject to the terms and conditions of this Agreement, Agent agrees to cause the existing standby letters of credit listed on Schedule 2.6 hereof to remain in effect for the account of Borrowers (as same may be renewed, extended or amended, each, a "Letter of Credit"). If necessary, at the request of Borrowers, Agent shall arrange for the extension of the Letters of Credit (provided, however, that no extension shall extend later than thirty (30) days prior to the last day of the Term); provided, however, that the aggregate face amount of all Letters of Credit outstanding at any time shall not increase; provided, further, that Agent may cause the Issuer to issue one or more renewals or amendments to the Letters of Credit in an aggregate face amount to not exceed the Maximum Revolving Credit Amount. Each L/C Disbursement shall be deemed to be a Revolving Credit Advance and shall bear interest at the Applicable Rate for Revolving Credit Advances. The Letters of Credit that have not been drawn shall not bear interest.

        (b)      Each Letter of Credit shall, among other things, (i) be in form and substance acceptable to the Issuer, including the requirement that the amounts payable thereunder must be payable in Dollars, (ii) provide for the payment of sight or time drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein, and (iii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than thirty (30) days prior to the last day of the Term. Each Letter of Credit shall be subject to the International Standby Practices (ISP98) issued by the Institute for International Banking Law and Practice, Inc., and any amendments or revisions thereof.

3604386.15

(c)      On demand, if an Event of Default has occurred and is continuing, Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash Collateral, in an amount equal to one hundred five percent (105%) of the undrawn face amount of any outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time. Agent will invest such cash Collateral (less applicable reserves) in such short-term money-market items as Agent and such Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash Collateral. No Borrower may withdraw amounts credited to any such account except upon payment and performance in full of all Obligations and termination of this Agreement.

(d)      Each Borrower shall indemnify, save and hold Agent, each Lender and each Issuer harmless from any loss, cost, expense or liability, including, without limitation, payments made by Agent, any Lender or any Issuer, and expenses and reasonable attorneys' fees incurred by Agent, any Lender or any Issuer arising out of, or in connection with, any Letter of Credit. Each Borrower shall be bound by the Agent's and the Issuer's regulations and reasonable good faith interpretations of any Letter of Credit, although this interpretation may be different from Borrower's own; and, neither Agent nor any Lender, any Issuer, nor any of its correspondents shall be liable for any error, negligence, or mistakes, whether of omission or commission, in following any Borrower's instructions or those contained in any Letter of Credit or of any modifications, amendments or supplements thereto or in issuing or paying any Letter of Credit, except for, and solely to the extent of, Agent's, any Lender's, such Issuer's or such correspondents' gross negligence or willful misconduct.

(e)      Each Borrower shall authorize and direct the Issuer to name such Borrower as the "Account Party" therein and to accept and rely upon the Issuer's instructions and agreements with respect to all matters arising in connection with the Letters of Credit.

(f)      Each Lender shall, to the extent of its Commitment Percentage of the aggregate amount of all disbursements made with respect to the Letters of Credit, be deemed to have irrevocably purchased an undivided participation in each L/C Disbursement and each Revolving Credit Advance made by Agent as a consequence of such L/C Disbursement. If at the time an L/C Disbursement is made the unpaid balance of Revolving Credit Advances exceeds or would exceed, with the making of such L/C Disbursement, the Maximum Revolving Credit Amount and if such L/C Disbursement is not reimbursed by Borrowers within one (1) Business Day, then Agent shall promptly notify each Lender, and upon Agent's demand each Lender shall pay to Agent such Lender's Commitment Percentage of such unreimbursed L/C Disbursement together with such Lender's Commitment Percentage of Agent's unreimbursed costs and expenses relating to such unreimbursed disbursement. Upon receipt by Agent of a repayment from any Borrower of any amount disbursed by Agent for which Agent had already been reimbursed by the Lenders, Agent shall deliver to each of the Lenders that Lender's Commitment Percentage of such repayment. Each Lender's participation commitment shall continue until the last to occur of any of the following events: (i) Issuer ceases to be obligated under the Letters of Credit hereunder; (ii) no Letter of Credit remains outstanding and uncancelled; or (iii) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or relating to all Letters of Credit.

(g)      The obligations of a Lender to make payments to Agent for the account of Agent or the Issuer with respect to a Letter of Credit shall be irrevocable, without any qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including, without limitation, any of the following circumstances:

3604386.15

6

(i)        any lack of validity or enforceability of this Agreement or any of the Other Documents;

(ii)        the existence of any claim, setoff, defense or other right that any Borrower may have at any time against a beneficiary named in such Letter of Credit or any transferee of such Letter of Credit (or any Person for which any such transferee may be acting), Agent, Issuer, any Lender, or any other person, whether in connection with this Agreement, such Letter of Credit, the transactions contemplated herein or any related transactions (including any underlying transactions between Borrower or any other party and the beneficiary named in such Letter of Credit);

(iii)        any draft, certificate or any other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)        the surrender or impairment of any security for the performance or observance of any of the terms of this Agreement or any of the Loan Documents;

(v)        any failure by Agent or the Issuer to provide any notices required pursuant to this Agreement relating to such Letter of Credit;

(vi)        any payment by the Issuer under any of the Letters of Credit against presentation of a draft or certificate that does not comply with the terms of such Letter of Credit (if, in the good faith opinion of the Issuer, such prepayment is deemed to be appropriate); or

(vii)        the occurrence and continuation of any Default or Event of Default;

provided, however, that after paying in full its reimbursement obligation hereunder, nothing herein shall adversely affect the right of any Borrower or any Lender, as the case may be, to commence any proceeding against such Issuer for any wrongful disbursement made by such Issuer under a Letter of Credit as a result of, and solely to the extent of, acts or omissions constituting gross negligence or willful misconduct on the part of such Issuer;

(h)        If by reason of (i) any change in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by any Issuer or Lender with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(i)        any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(ii)        there shall be imposed on any Issuer, Lender or Agent any other condition regarding any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to any Issuer, Lender or Agent of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by any Issuer, Lender or Agent, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay on demand such amounts as Agent may specify to be necessary to compensate Agent and Lenders for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the Applicable Rate for Revolving

Credit Advances. The determination by Agent of any amount due pursuant to this Section 2.6(h), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(i)        If any Letter of Credit remains outstanding on the last day of the Term or such earlier date as this Agreement may be terminated, Borrowers shall: (A) provide cash collateral therefor in an amount equal to one hundred five percent (105%) of the undrawn face amount of any outstanding Letters of Credit; or (B) cause all such Letters of Credit and guaranties thereof, if any, to be canceled and returned; or (C) deliver a stand-by letter (or letters) of credit in guarantee of such Letters of Credit, which stand-by letter (or letters) of credit shall be of like tenor and duration (plus thirty (30) additional days) as, and in an amount equal to at least 105% of the aggregate maximum amount then available to be drawn under, such Letters of Credit and shall be issued by a Person, and shall be subject to such terms and conditions, as are satisfactory to Agent.

2.7.    Additional Payments. Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document, may be charged to Borrowers' Account as a Revolving Credit Advance and added to the Obligations.

2.8.    Manner of Advancing Revolving Credit Advances and Payment.

(a)        Each Revolving Credit Advance shall be advanced according to the applicable Commitment Percentages of the Lenders.

(b)        Each payment (including each prepayment) by Borrowers on account of the principal of the Revolving Credit Advances shall be applied to the Revolving Credit Advances pro rata according to the applicable Commitment Percentages of the Lenders. Each payment (including each prepayment) by Borrowers on account of the principal of the Equipment Term Loan shall be applied to the Equipment Term Loan pro rata according to the applicable Commitment Percentages of the Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by Borrowers on account of principal, interest and fees shall be made to Agent at the Payment Office, in each case on or prior to 3:00 p.m. (Eastern), in Dollars and in immediately available funds.

(c)        Notwithstanding anything to the contrary contained in subsections (a) and (b) above, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Credit Advances shall be advanced by Agent and each payment by Borrower on account of Revolving Credit Advances shall be applied first to those Revolving Credit Advances advanced by Agent. On or before 3:00 p.m. (Eastern), on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (A) if the aggregate amount of new Revolving Credit Advances made by Agent during the preceding calendar month (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Credit Advances during such preceding calendar month, then each such Lender shall provide Agent with funds in an amount equal to its Commitment Percentage of the difference between (1) such Revolving Credit Advances and (2) such repayments and (B) if the aggregate amount of repayments applied to outstanding Revolving Credit Advances during such calendar month exceeds the aggregate amount of new Revolving Credit Advances made during such calendar month, then Agent shall provide each such Lender with funds in an amount equal to its Commitment Percentage of the difference between (1) such repayments and (2) such Revolving Credit Advances. Each Lender shall be entitled to earn interest at the Applicable Rate on outstanding Advances that it has funded. Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Revolving Credit Advances made during

the calendar month immediately preceding such Settlement Date. Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)      Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make available to Agent the amount which would constitute its applicable Commitment Percentage of Revolving Credit Advances, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowers of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the Agent's daily cost of funds (computed on the basis of a year of 360 days) during such period as determined by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Credit Advances hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.9.    Mandatory Prepayments. Notwithstanding the provisions of Section 2.3(a) hereof:

(a)      Extraordinary Receipts.  Subject to subsection (c) below, upon the receipt by any Borrower or any of its Subsidiaries of any Extraordinary Receipts (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts, which payments shall be applied to the Obligations in the manner specified in subsection (f) below.

(b)      Disposition Proceeds.  Upon the sale or disposition of any Collateral by any Borrower or any of its Subsidiaries as permitted in clauses (ii) and (vi) of Section 7.1(b) (excepting therefrom any proceeds of Collateral consisting of Real Property Collateral, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Intercreditor Agreement and subject thereto), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by any such Borrower or Subsidiary in connection therewith, which payments shall be applied to the Obligations in the manner specified in subsection (f) below.

(c)      Insurance Proceeds.  Notwithstanding subsection (a) above, if any of the Equipment or Real Property is damaged or physically destroyed or otherwise suffers a casualty, upon the written request of Borrowing Representative, which shall be made not less than five (5) Business Days after such casualty occurs, Agent shall release to Borrowing Representative Extraordinary Receipts consisting of proceeds from insurance policies covering such damage, destruction or casualty that are received by Agent pursuant to Section 4.11 hereof or otherwise, to the extent a Borrower elects to apply such Extraordinary Receipts to the repair, refurbishment or replacement of the Equipment or Real Property that has been damaged, destroyed or otherwise suffered a casualty, provided, however, that, all of the following conditions are satisfied: (i) no Default or Event of Default shall have occurred and be

continuing, (ii) the amount of the insurance proceeds (together with any deductible to be satisfied by a Borrower) are sufficient, in Agent's good faith determination, to permit such repair, refurbishment or replacement to be made in a satisfactory manner, (iii) such proceeds shall be used solely to repair, refurbish or replace the Equipment or Real Property that has been damaged, destroyed or suffered casualty (free and clear of any security interests, Liens, claims or encumbrances), (iv) such repair, refurbishment or replacement shall be commenced by Borrowers as soon as is reasonably practicable after such damage, destruction or casualty has occurred and shall be diligently pursued by Borrowers to satisfactory completion, and (v) the repair, refurbishment or replacement to which such proceeds are applied shall cause the value of the Equipment or Real Property that is being repaired, refurbished or replaced to be not less than the value thereof prior to such damage, destruction or other casualty occurring; provided, further, however, that the amount of such Extraordinary Receipts that may be released to Borrowers in respect of any such damage, destruction or other casualty loss for the repair, refurbishment or replacement of Equipment or Real Property shall not exceed the Materiality Threshold. Pending any release of such Extraordinary Receipts to Borrowing Representative pursuant to this subsection (c), Agent shall hold such Extraordinary Receipts as cash Collateral. Any Extraordinary Receipts applied to repair, refurbish or replace Equipment or Real Property pursuant to and in accordance with this subsection (c) shall not be deemed Capital Expenditures for purposes of this Agreement.

(d)     Excess Cash Flow.  Upon delivery to Agent of the financial statements referred to in and required by Section 10.8 for each Fiscal Quarter of the Borrowers (commencing with the first Fiscal Quarter ending subsequent to the Closing Date) but in any event not later than, in the case of the first three (3) Fiscal Quarters in any Fiscal Year, fifty (50) days after the end of such Fiscal Quarter and, in the case of the Fiscal Quarter corresponding with the end of any Fiscal Year, one hundred (100) days after the end of each such Fiscal Quarter, Borrowers shall pay to Agent fifty percent (50%) of Excess Cash Flow for such Fiscal Quarter (excepting therefrom any Excess Cash Flow, to the extent payable and paid to the Term Loan Agent for application to the Term Loan Debt in accordance with the terms of the Term Loan Agreement and subject thereto), which payments shall be applied to the Obligations in the manner specified in subsection (f) below; provided, however, that if the Leverage Ratio is less than 2.5:1.0 for such Fiscal Quarter, Borrowers shall not be obligated to pay any Excess Cash Flow with respect to such Fiscal Quarter to Agent. In the event that the aforesaid financial statement is not so delivered, then a calculation based upon estimated amounts shall be made by Agent upon which calculation Borrowers shall make the prepayment required by this Section, subject to adjustment when the financial statement is delivered to Agent as required hereby. The calculation made by Agent shall not be deemed a waiver of any rights of Agent or any Lender or may have as a result of the failure by Borrowers to deliver such financial statement.

(e)     Issuance of Equity Interests or Indebtedness. Upon the issuance of any Equity Interests by any Borrower or the issuance or incurrence of any Indebtedness by any Borrower (other than any Indebtedness permitted by Section 7.3 hereof), Borrowers shall pay to Agent an amount equal to one hundred percent (100%) of the Net Cash Proceeds of such issuance or incurrence, which payments shall be applied to the Obligations in the manner specified in subsection (f) below; provided, however, that notwithstanding anything to the contrary set forth herein, as long as no Event of Default has occurred and is continuing, Borrowers may issue Equity Interests and/or Indebtedness under the Junior Lien Facility during the Term in an aggregate principal amount not to exceed $5,000,000 (provided, that Borrowers shall not issue Indebtedness under the Junior Lien Facility in an aggregate principal amount in excess of $3,000,000), and the proceeds of such amounts shall not be required to be applied to prepay any of the Obligations pursuant to this Section 2.9(e).

(f)     Application of Proceeds. Proceeds of mandatory prepayments made pursuant to this Section 2.9, shall be applied by Agent, when received: first, to pay any Obligations then due and

owing, but unpaid; second, to repay the principal amount of the Equipment Term Loan, with such prepayment to be applied to the then remaining installments of the Equipment Term Loan in the reverse order of their respective maturities (beginning with the final payment); third, to pay Revolving Credit Advances then outstanding, until paid in full; fourth, to the Term Loan Agent for application to the Term Loan Debt to the extent required pursuant to the Term Loan Agreement and in the manner set forth therein; and, fifth, any remainder thereof shall be paid to the Borrowers or as the Borrowing Representative directs.

(g)     Consent. Nothing contained in this Section 2.9 shall be deemed to be a consent by Agent and Lenders to the sale or disposition of any Collateral, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case, except as expressly permitted in this Agreement.

(h)     Application of Proceeds During an Event of Default.  If an Event of Default has occurred and is continuing, at the option of Agent, or at the direction of the Required Lenders, any Extraordinary Receipts or Net Cash Proceeds from any sale or other disposition of any Equipment or Real Property, the issuance of any Equity Interests or the issuance or incurrence of any Indebtedness, in each case shall be applied, instead, as provided in Section 12.2.

2.10.    Defaulting Lenders.

(a)     Notwithstanding anything to the contrary contained herein, if any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Revolving Credit Advance, or Lender's participation in any Letter of Credit or (y) notifies either Agent or the Borrowing Representative that it does not intend to make available its portion of any Revolving Credit Advance or to purchase Lender's participation in any Letter of Credit pursuant to Section 2.6 (if, in each case, the actual refusal to do so then constitutes a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder and under the Other Documents of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section while such Lender Default remains in effect.

(b)     In such event, Revolving Credit Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") having Revolving Credit Commitments which are not Defaulting Lenders, based on their respective Commitment Percentages in regard thereto, and no Commitment Percentage of any Lender or any pro rata share of any Revolving Credit Advances required to be advanced by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Revolving Credit Advances shall be applied to reduce the applicable Revolving Credit Advances of each Lender pro rata based on the aggregate of the outstanding Revolving Credit Advances of that type of all Lenders at the time of such application; provided, however, that, such amount shall not be applied to any Revolving Credit Advances of a Defaulting Lender at any time when, and to the extent that, the aggregate amount of Advances of any Non-Defaulting Lender exceeds such Non-Defaulting Lender's Commitment Percentage of all Revolving Credit Advances then outstanding.

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents. All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

3604386.15

(d)      Other than as expressly set forth in this Section, the rights and obligations of a Defaulting Lender (including its obligation to indemnify Agent under certain conditions pursuant hereto) and the other parties hereto shall remain unchanged. Nothing in this Section shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)      No Defaulting Lender shall be entitled to receive any increased costs recovery under Section 3.7 or any capital adequacy charges under Section 3.8 in respect or, and to the extent of, its defaulted obligations.

(f)      In the event a Defaulting Lender cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

III.      INTEREST AND FEES.

3.1.      Interest.

(a)      Interest on the Advances shall be payable to Agent for the benefit of Lenders monthly in arrears on the first day of each month, commencing on **[August 1]**, 2010. Interest charges shall be computed on the actual principal amount of Advances outstanding during each interest assessment period described above at the Applicable Rate; provided, however, that after the occurrence of an Event of Default and during the continuation thereof, at the option of Agent or at the direction of the Required Lenders, the Obligations shall bear interest, instead, at the Applicable Rate plus an additional two (2%) percent per annum (as applicable, the "Default Rate").

(b)      Notwithstanding any other provision hereof, if any applicable law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (b), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Loans that bear interest with respect to the LIBOR Rate) to make or maintain Loans that bear interest with respect to the LIBOR Rate, the obligation of all Lenders to make Loans that bear interest with reference to the LIBOR Rate shall be suspended, and Agent, in its reasonable discretion, shall select a comparable rate as a substitute therefor.

3.2.      Determination of Applicable Margin.

(a)      Beginning on **[July]** 1, 2011 and on the first day of each Fiscal Quarter thereafter (each, a "Determination Date"), the Applicable Margin shall be determined by Agent and, if appropriate, adjusted, in accordance with the terms and conditions herein. On each Determination Date, Agent shall determine the Applicable Margin based on the Leverage Ratio reported in the most recently delivered Compliance Certificate for the applicable Fiscal Month as required to be delivered to Agent in accordance with Section 10.8 hereof (e.g., for a Determination Date of October 1, Agent shall look to the Leverage Ratio reported in the Compliance Certificate timely delivered for the Fiscal Month ending August 31). The Applicable Margin as so determined and, if appropriate, adjusted, shall be effective from such Determination Date until the next Determination Date.

(b)      If Borrowing Representative shall fail timely to provide the Compliance Certificate to Agent with respect to the applicable Fiscal Month in accordance with Section 10.8 hereof

3604386.15

(without regards to any cure periods set forth herein), then the Applicable Margin shall be based on the highest rate set forth in its definitions herein until the next Determination Date.

        (c)      Notwithstanding the foregoing, if the Applicable Margin, which had been determined on the basis of any Compliance Certificate delivered by Borrowing Representative to Agent that contained any incorrect or inaccurate financial data, is less than such Applicable Margin that would have been determined had such Compliance Certificate been based on financial data that was correct and accurate, then such Applicable Margin at the appropriate lower rate(s) shall be recalculated retroactively for all affected periods and (to the extent not therefore paid) all accrued and unpaid interest as so recalculated shall be charged to Borrowers' Account.

        3.3.    <u>Audit Fees</u>. Agent may conduct field audits and inspections with respect to Borrowers' inventory and/or receivables at such intervals as it deems appropriate. Borrowers shall pay to Agent, for its own account, audit fees in connection with each such field audit at Agent's customary per diem charges therefor plus the customary out-of-pocket expenses incurred by Agent for external auditors. Notwithstanding the foregoing, so long as no Default or Event of Default has occurred and is continuing (in which event Borrowers shall reimburse Agent for all actual costs and expenses incurred by Agent in connection with any field audit), (x) Borrowers shall not reimburse Agent for more than one (1) such field audit in any Fiscal Year <u>provided</u> that the Leverage Ratio as of the last day of each Fiscal Quarter of such Fiscal Year is less than or equal to 2.0:1.0 and (y) the amount Borrowers shall be required to reimburse Agent for each field audit shall not exceed the lesser of (i) $25,000 or (ii) the actual costs and expenses incurred by Agent in connection with each field audit.

        3.4.    <u>Letter of Credit Fees</u>. Borrowers shall pay (a) to Agent, for the benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, at a rate per annum equal to five and one-half of one percent (5.50%) (increasing by two percent (2.0%) per annum from and after the occurrence of, and during the continuation of, any Event of Default) and (b) to Agent for the benefit of the Issuer any and all fees and expenses as agreed upon by the Issuer and the Borrowing Representative in connection with any Letter of Credit, including, without limitation, in connection with the amendment or renewal of any such Letter of Credit and any acceptances created thereunder; and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "<u>Letter of Credit Fees</u>"). Such fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed and be payable quarterly in arrears on the first day of each calendar quarter (beginning with the first such date following the Closing Date) and on the last day of the Term. All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction. All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or proration upon the termination of this Agreement for any reason.

        3.5.    <u>Computation of Interest and Fees</u>. Interest and per annum fees payable hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall continue to be payable at the Applicable Rate during such extension; <u>provided</u>, <u>however</u>, that the foregoing extension shall not be considered when determining Borrowers' ongoing compliance with Financial Covenants that concern or include scheduled principal payments within specified dates.

3604386.15

3.6.    <u>Maximum Charges</u>. In no event shall interest and any other charges hereunder exceed the highest rate permissible under applicable law. In the event interest or any other charges hereunder would otherwise exceed the highest rate permitted under applicable law the provisions hereof shall be deemed amended to provide for interest or such other charges to be charged at the highest permissible rate; any excess amount shall be applied: <u>first</u>, to pay Revolving Credit Advances then outstanding, until paid in full; <u>second</u>, to repay the principal amount of the Equipment Term Loan, with such prepayment to be applied to the then remaining installments of the Equipment Term Loan in the reverse order of their respective maturities (beginning with the final payment); and, <u>third</u>, if there is any excess remaining, Agent shall promptly refund such excess to Borrowers.

3.7.    <u>Increased Costs</u>. In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this <u>Section 3.7</u>, the term "<u>Lender</u>" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its <u>pro rata</u> share of the Advances with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of any Lender;

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of any Lender, including, without limitation, pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to any Lender of making, renewing or maintaining its Advances hereunder by an amount that such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that such Lender deems to be material, then, each and any such case, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount as will compensate such Lender for such additional cost or such reduction, as the case may be. Such Lender shall certify the amount of such additional cost or reduced amount, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

3.8.    <u>Capital Adequacy</u>. In the event that any Lender shall have determined that any applicable law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (for purposes of this Section, the term "<u>Lender</u>" shall include any corporation or bank controlling any Lender) and the office or branch where any Lender (as so defined) makes or maintains its <u>pro rata</u> share of the Advances with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on any Lender's capital as a consequence of its obligations hereunder to a level below that which such Lender could have achieved but for such adoption, change or compliance (taking into

3604386.15

consideration such Lender's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then, from time to time, Borrowers shall promptly pay such Lender upon its demand (but not more than ten (10) days after Borrowers' receipt of such demand and the certificate of such Lender in regard thereto described below), such additional amount or amounts as will compensate such Lender for such reduction. In determining such amount or amounts, such Lender may use any reasonable averaging or attribution method. The protection of this Section shall be available to each Lender regardless of any possible contention that the applicable law, regulation or condition is invalid or inapplicable. Such Lender shall certify the amount necessary to compensate such Lender with respect to this Section, and the basis for such calculations, to Borrowers, and such certification shall be conclusive absent manifest error.

IV.    COLLATERAL; GENERAL TERMS.

4.1.    Security Interest in the Collateral. To secure the prompt payment and performance to each Lender Party of the Obligations, each Borrower hereby assigns, pledges and grants to Agent for the ratable benefit of the Lender Parties, a continuing security interest in and to all of the Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Notwithstanding the foregoing, the Mortgages on the Real Property Collateral located in New York State shall be subject to the limitations set forth in such Mortgages. Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest in the Collateral and shall cause its financial statements to reflect the existence of such security interest.

4.2.    Perfection of Security Interest.

(a)    Borrowers shall take all action that Agent may request from time to time so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens thereon other than Permitted Encumbrances, (ii) using reasonable efforts to obtain landlords', warehouse operators', bailees' or mortgagees' lien waivers or related agreements in respect of premises where any Equipment or Inventory is located, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all Securities, chattel paper, instruments, letters of credit and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, Deposit Account Control Agreements and other custodial arrangements reasonably satisfactory to Agent, (v) executing (as appropriate) and delivering authorizations for the recording of financing statements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest under the Uniform Commercial Code or other applicable law; (vi) using reasonable efforts to obtain acknowledgments, in form and substance satisfactory to Agent, from any bailee having possession of any Collateral at any time, stating that the bailee holds such Collateral on behalf of Agent, (vii) obtaining "control" of any investment property, deposit account, letter-of-credit right or electronic chattel paper (the term "control" as used in respect of the foregoing types of Collateral having the meaning set forth in Articles 8 and 9 of the UCC), with any agreements establishing such "control" to be in form and substance satisfactory to Agent, and (viii) if a Borrower at any time has or acquires a Commercial Tort Claim, such Borrower shall promptly notify Agent thereof, in writing, and grant a specific collateral assignment of such claim to Agent as additional Collateral. Notwithstanding the foregoing provisions of this subsection (a), Borrowers shall not be required to obtain or to use their reasonable efforts to obtain warehouse operators,' bailees' or landlords' agreements or acknowledgments or related agreements in respect of premises where Inventory and/or Equipment is located, to the extent that the Inventory and/or Equipment in the possession of a warehouse

operator or bailee or located on leased premises has a fair market value that is less than the Materiality Threshold; unless, in either case, Borrowers are requested by Agent to do so after any Event of Default has occurred and during its continuation.

(b)    Without limiting the generality of the foregoing, in the specific case of Inventory in-transit to a Borrower from outside the continental United States of America, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after the occurrence of an Event of Default and during its continuation, each Borrower shall (i) deliver (or cause to be delivered) to Agent copies of all invoices, manifests and documents of title pertaining to such Inventory promptly upon such Borrower's receipt thereof, but in any event not later than five (5) Business Days after receipt, (ii) cause all such documents of title to be issued in the Agent's name, or to its order (or, if negotiable in form, Borrower may, instead, cause such documents of title to be endorsed to Agent, or in "blank"); (iii) provide Agent with evidence of appropriate marine or like insurance in respect of the transit of such Inventory to Borrower, and (iv) as necessary, provide Agent with access or custodianship agreements from warehouse operators, consolidators, customs house operators, customs brokers and other third parties to facilitate Agent's control over, access to and/or repossession of, such in-transit Inventory, including, without limitation, if requested by Agent, a customs agent agreement in form and substance satisfactory to Agent.

(c)    In addition thereto, but without limiting the generality of the foregoing, in the specific case of Inventory of a Borrower that is consigned to any Person, promptly after, but in any event within five (5) Business Days after, Agent's request, which may be made at any time after an Event of Default has occurred and during its continuation, such Borrower shall (i) file a UCC financing statement in respect of such inventory naming itself as "consignor" and such Person as "consignee" thereon, in the jurisdiction of such consignee's incorporation (or organization), and assign such financing statement to Agent, and (ii) cause such consignee (and, if requested by Agent, any secured lender to, or landlord (or mortgagee) of, such consignee to execute and deliver to Agent a bailee's letter in form and content satisfactory to Agent in respect of such inventory.

(d)    Agent is hereby authorized to file financing statements in accordance with the applicable provisions of the UCC, including, without limitation financing statements that describe the Collateral covered thereby as "all personal property", "all assets" or words of similar effect, at any time or from time to time hereafter, in any jurisdiction; and Borrowers hereby ratify, approve and affirm the filing of any such financing statements heretofore filed by Agent in respect of any Borrower (including any predecessor-in-interest thereof). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account.

(e)    Borrowers acknowledge that from time to time Agent may act as bailee (under the UCC) for the Term Loan Agent in respect of certain Collateral, and hereby authorize Agent to do so and to turn over to Term Loan Agent any such Collateral at its request subject to the provisions of the Intercreditor Agreement.

4.3.    Disposition of Collateral. Each Borrower will safeguard and protect all Collateral for Agent's account and make no disposition thereof whether by sale, lease or otherwise except as expressly provided in clauses (i), (ii) and (vi) of Section 7.1(b) and, then, subject to Section 2.9 in respect of any Net Cash Proceeds derived therefrom.

4.4.    Preservation of Collateral. Following any demand by Agent for payment of all Obligations due and owing pursuant to Section 12.1 hereof, subject to the provisions of the Intercreditor Agreement, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's

3604386.15

16

interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any Borrower's owned or leased property (subject to the terms of any leases) to obtain such Collateral. Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may reasonably require. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account.

4.5.    Ownership of Collateral. With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (a) each Borrower shall be the sole owner, lessee or licensee (as applicable) of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent (subject to Permitted Encumbrances); (b) except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens; (c) each document and agreement constituting Collateral executed by each Borrower or delivered to any Lender Party in connection with this Agreement shall be true and correct in all material respects; (d) all signatures and endorsements of each Borrower that appear on any such documents or agreements constituting Collateral shall be genuine and each Borrower party thereto shall have full capacity to execute same; and (e) each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 or at such other locations within the United States of America as Agent may receive notice of from time to time pursuant to Section 10.16 (all such locations herein called, collectively, the "Collateral Locations" and, individually, a "Collateral Location"); and shall not be removed from such Collateral Locations without the prior written consent of Agent except in the case of (i) the sale of Inventory in the ordinary course of business, (ii) the sale of Equipment to the extent permitted in Section 4.3 hereof, (iii) the movement of Equipment from one Collateral Location to another Collateral Location, (iv) the movement of Equipment to the extent necessary for its repair or maintenance; and (v) the movement of motor vehicles in the ordinary course of Borrowers' business.

4.6.    Defense of Agent's and Lenders' Interests. Unless and until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's security interests in the Collateral shall continue in full force and effect without interruption. During such periods no Borrower shall pledge, sell, assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered any part of the Collateral in any way, except for Permitted Encumbrances or as otherwise expressly permitted in this Agreement. Each Borrower shall defend Agent's security interest in the Collateral against any and all Persons (subject to Permitted Encumbrances). At any time after an Event of Default has occurred and during its continuation, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it and make it available to Agent at one or more of the Collateral Locations, as Agent shall elect. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies provided herein and in the Other Documents, or under the Uniform Commercial Code or other applicable law. In addition to the foregoing, Agent may, at its option, instruct all suppliers, carriers, forwarders, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into a Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee,

and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement. Taking any of the foregoing actions provided in this <u>Section 4.6</u> shall be subject, however, to the provisions of the Intercreditor Agreement.

4.7.    <u>Books and Records</u>. Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including, without limitation, by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied.

4.8.    <u>Financial and Other Disclosure</u>. Each Borrower hereby irrevocably authorizes and directs the Accountants and all other accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent copies of any of the Borrower's financial statements, trial balances or other accounting records of any sort in the possession of such Person and to disclose to Agent any information such Person may have concerning such Borrower's financial status and business operations. In respect of the foregoing, if the Accountants are changed by any Borrower subsequent to the Closing Date, then Borrowing Representative shall execute and deliver a letter directing the Accountants to act in the manner provided hereinabove when requested by Agent, such letter to be in form and substance reasonably satisfactory to Agent.

4.9.    <u>Compliance with Laws</u>. Each Borrower shall comply in all material respects with all acts, rules, regulations and orders of any Governmental Authority applicable to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which, in each instance, could reasonably be expected to have a Material Adverse Effect. Each Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of any Governmental Authority in any reasonable manner, <u>provided</u>, that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on the Collateral.

4.10.    <u>Inspection of Premises</u>. During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or an Event of Default has occurred and is then continuing), Agent and each Lender Party and their agents shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business. During normal business hours and upon at least one (1) Business Day's prior notice (unless a Default or Event of Default has occurred and is then continuing) Agent, each Lender Party and their agents may enter upon any Borrower's business premises from time to time for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business. Borrowers shall reimburse Agent for all reasonable costs incurred by them in respect of the foregoing. All of such costs shall be charged to Borrowers' Account, subject to <u>Section 3.3</u> in respect of certain field audit fees and charges.

4.11.    <u>Insurance</u>. Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. Each Borrower shall, at its own cost and expense, in amounts and with carriers acceptable to Agent (a) keep all its insurable properties and properties in which each Borrower has an interest insured against the hazards of fire, flood (under the circumstances described below), sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's

including, without limitation, products liability insurance, insurance against theft, larceny, embezzlement and misappropriation of funds, and business interruption insurance; (b) maintain a bond or other surety in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; and (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business. Without limitation of the foregoing, if as of the Closing Date or at any time thereafter Agent determines that all or a portion of the improvements situated on any Real Property Collateral are located within a "Special Flood Hazard Area" (as designated by the applicable Governmental Authority), Borrowers shall ensure that flood insurance is obtained and maintained with respect to such Real Property Collateral for the Term at Borrowers' expense in a form, amount and from an issuing company reasonably acceptable to Agent. Each Borrower shall furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured in regard to liability insurance and loss payee as its interests may appear in regard to casualty or property coverage, to the extent affecting or relating to Collateral, and providing (A) that, subject to any overriding provisions of the Intercreditor Agreement, all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. In the event of any loss thereunder, subject to the provisions of the Intercreditor Agreement, the carriers named therein are hereby directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. During the continuation of an Event of Default, Agent is hereby authorized, subject to the provisions of the Intercreditor Agreement, to adjust and compromise claims under insurance coverage referred to above. All loss recoveries received by Agent upon any such insurance shall, except as otherwise provided in the Intercreditor Agreement, either be paid over to Borrowers or applied by the Agent as follows: (i) if no Event of Default or Default has occurred and is then continuing, and the loss recovery so received by Agent is less than or equal to the Materiality Threshold, then, Agent shall remit such loss recovery to the Borrowers for use in the restoration of the loss in accordance with Section 2.9; (ii) if no Event of Default or Default has occurred and is then continuing, and the loss recovery received by Agent is more than the Materiality Threshold, then, Agent shall apply such loss recovery to the Obligations in accordance with Section 2.9, and (iii) if any Event of Default or Default has occurred and is then continuing, then, Agent shall receive and apply such loss recovery to the Obligations in such order as Agent, in its sole discretion, shall determine consistent with the terms of Section 12.2 of this Agreement. Any surplus of such proceeds remaining after such application, shall, subject to the provisions of the Intercreditor Agreement, be paid by Agent to Borrowers or applied as may be otherwise required by law. If, however, after application of such proceeds to the Obligations any Overadvance exists, Borrowers shall comply with Section 2.4 in respect of its elimination. Anything hereinabove to the contrary notwithstanding, Agent shall not be obligated to remit any insurance proceeds to Borrowers unless Borrowers shall have provided Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss in accordance with Section 2.9. The Collateral shall at all times be maintained in accordance with the requirements of all insurance carriers that provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect. If any Borrower fails

3604386.15

to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance, pay the premium therefor, and charge Borrowers' Account for the amount thereof.

4.12.    Payment of Taxes. Each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral, including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made that, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may, unless the Borrowers have done so within five (5) Business Days after the Borrowing Representative receives written demand from the Agent that they do so, pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any payment by Agent under this Section shall be charged to Borrowers' Account. Until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold any balance standing to Borrowers' credit and Agent shall retain its security interest in any and all Collateral held by Agent.

4.13.    Payment of Leasehold Obligations. Each Borrower shall at all times pay, when and as due (or within any applicable grace periods) its rental obligations under all leases material to its business operations under which it is a tenant, and shall otherwise comply, in all material respects, with all other material terms of such leases and keep them in full force and effect (unless terminated in accordance with the terms thereof) and, at Agent's request will provide evidence of having done so.

4.14.    Receivables.

(a)    Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower, and the same shall be due and owing in accordance with the applicable Borrower's standard terms of sale, in each case except where the failure of any such Receivables to satisfy the terms of this Section 4.14(a) could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each Customer, to each Borrower's actual knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due except to the extent that such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover its Receivables from any Customer which is not solvent, except in each case where the failure of any such Customer to be solvent or otherwise be able to pay all Receivables on which it is so obligated could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Nothing in this Section 4.14(b) shall be construed to require any Borrower to obtain any information or take any other affirmative action to assess such Customer's solvency or its ability to pay all Receivables on which such Customer is obligated.

3604386.15

20

(c)     Each Borrower's chief executive office is located at the address identified as such set forth on Schedule 4.14(c) hereto. Until written notice is given to Agent by Borrowing Representative of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)     No Borrower shall establish or maintain any Deposit Account with any financial institution (except for Excluded Deposit Accounts) unless, prior to the Closing Date or opening of such Depository Account, Agent, the applicable Borrower and such financial institution shall have entered into a Deposit Account Control Agreement with respect to such Depository Account. Each Borrower shall ensure that all collections of Receivables and all other payments received by such Borrower are remitted directly to a Deposit Account subject to a Deposit Account Control Agreement.

(e)     At any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement, Agent shall have the right to send notice of the assignment of, and Agent's security interest in, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, subject to the provisions of the Intercreditor Agreement, so long as any such Event of Default is continuing, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both. Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telecopy, secretarial and clerical expenses and the salaries of any collection personnel used for collection, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(f)     Agent shall have the continuing right, subject to the provisions of the Intercreditor Agreement, to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables or any other Collateral received by Agent for application to the Obligations in accordance herewith and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power at any time hereafter, subject to the provisions of the Intercreditor Agreement (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; and (iv) to sign such Borrower's name on any documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same, subject to the provisions of the Intercreditor Agreement. Following the occurrence of an Event of Default and during its continuation, each Borrower shall hereby constitute Agent or Agent's designee as such Borrower's attorney with additional power, subject to the provisions of the Intercreditor Agreement, (i) to demand payment of the Receivables; (ii) to enforce payment of the Receivables by legal proceedings or otherwise; (iii) to exercise all of Borrowers' rights and remedies with respect to the collection of the Receivables and any other Collateral; (iv) to settle, adjust, compromise, extend or renew the Receivables; and (v) to settle, adjust or compromise any legal proceedings brought to collect Receivables. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time after the occurrence of an Event of Default and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower to the extent pertaining to Receivables or other Collateral.

(g)    No Lender Party shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom, except for any such errors or omissions or delays of any kind determined by a court of competent jurisdiction in a final proceeding to have resulted from its gross (not mere) negligence or willful misconduct. After an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is further authorized and empowered at any time after an Event of Default has occurred and during its continuation, subject to the provisions of the Intercreditor Agreement and the rights of the Term Loan Agent pursuant to the Term Loan Agreement, to accept the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

(h)    No Borrower will, without Agent's consent, compromise or adjust any material amount of the Receivables, or extend the time for payment thereof by more than sixty (60) days) or accept any material returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as heretofore have been customary in the business of such Borrower.

4.15.    Inventory. With respect to Inventory, to the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.16.    Equipment and Real Property Covenants. With respect to the Equipment and Real Property: (a) Borrowers shall keep the Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted); (b) Borrowers shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of their insurance and in material conformity with all applicable laws; (c) the Equipment is and shall be used in the business operations of Borrowers and not for personal, family, household or farming use; (d) Borrowers shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of motor vehicles used by or for the benefit of Borrowers in the ordinary course of business; (e) the Equipment is now and shall remain personal property and Borrowers shall not permit any of the Equipment to be or become a part of or affixed to real property; (f) each Borrower assumes all responsibility and liability arising from its use of the Equipment and Real Property; (g) except as disclosed on Schedule 4.16, as of the Closing Date no Equipment is Excluded Equipment; and (h) hereafter Borrowers will notify Agent promptly, but in any event within ten (10) Business Days after, Borrowers acquire any Equipment that is Excluded Equipment subsequent to the Closing Date.

4.17.    Exculpation. Nothing herein contained shall be construed to constitute any Lender Party as any Borrower's agent for any purpose whatsoever; nor shall any Lender Party be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. No Lender Party, whether by anything herein or in any assignment or otherwise, assumes any Borrower's obligations under any contract or agreement

assigned to such Lender Party, and no Lender Party shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.18.  <u>Environmental Matters</u>.

(a)  Borrowers shall ensure that the Real Property remains at all times in material compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except in compliance with applicable law or the appropriate Environmental Authority.

(b)  Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws, which system shall include periodic reviews of such compliance.

(c)  Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws. If the failure to do so could reasonably be expected to have a Material Adverse Effect, Borrowers shall use their best efforts. to obtain to the extent required by applicable Environment Laws or the appropriate Environmental Authority, certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)  In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity under any Environment Laws of any Hazardous Substances at any Real Property (any such event being hereinafter referred to as a "<u>Hazardous Discharge</u>") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, any demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "<u>Environmental Complaint</u>") from any Person, including any Governmental Authority responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any of the foregoing Persons referred to herein as an "<u>Environmental Authority</u>"), then, Borrowing Representative shall, within five (5) Business Days thereafter, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware with respect to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)  Borrowers shall promptly forward to Agent copies of any request from any Environmental Authority for information, any notification by any Environmental Authority of potential liability or any demand letter from any Environmental Authority relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward to Agent copies of correspondence between any Borrower and any Environmental Authority regarding such claims until all claims are settled. Borrowers shall promptly forward to Agent copies of all material documents and reports concerning any Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in the Collateral.

3604386.15

(f)      Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all action required by applicable Environmental Laws to safeguard the health of any Person and to avoid subjecting the Collateral to any Lien. If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or comply with any of the requirements of any Environmental Laws within thirty (30) days after the Borrowing Representative receives written demand from the Agent that it do so, Agent may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral: (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deems reasonably necessary under applicable Environmental Laws to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, shall be paid by Borrowers on demand, and may be charged to Borrowers' Account.

(g)      Promptly upon the written request of Agent, but in any event within five (5) Business Days after Borrowers' receipt of such request, which may be made following the discovery of any Hazardous Discharge until such Hazardous Discharge is remedied to the extent required by applicable Environmental Laws or the appropriate Environmental Authority or following the filing of any Environmental Complaint until such Environmental Complaint is resolved, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm reasonably acceptable to Agent with respect to such Hazardous Discharge or Environmental Complaint, and the potential costs of abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge acceptable to the appropriate Environmental Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed the Materiality Threshold, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)      Borrowers shall defend and indemnify each Lender Party and hold each Lender Party and their respective employees, agents, directors and officers harmless from and against all losses, liabilities, damages and expenses, claims, costs, fines and penalties, including reasonable attorney's fees, suffered or incurred by such Lender Party under or on account of any Environmental Laws, including, without limitation, the assertion of any Lien thereunder, with respect to any Hazardous Discharge, or the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage or expense, claim, cost, fine or penalty is attributable to any Hazardous Discharge resulting from actions on the part of such Lender Party. Borrowers' obligations under this <u>subsection (h)</u> shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened to take any action in connection with the presence of any Hazardous Substances. Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement. Borrowers' obligations of indemnity hereunder shall not extend to, or include, any loss, damage, cost or expense incurred by any Lender Party in respect of the foregoing caused by, or resulting form, its gross negligence or willful misconduct.

4.19.    No Other Financing Statements. Except for the financing statements filed by Agent and financing statements giving notice of Permitted Encumbrances, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

3604386.15

24

4.20.    Additional Mortgages. Borrowers shall execute and deliver to Agent immediately upon the acquisition in fee simple by any Borrower of any Real Property subsequent to the Closing Date a Mortgage with respect to such additional Real Property (subject to any Permitted Encumbrances), together with such title insurance policies (mortgagee's form), certified surveys, appraisals, and local counsel opinions with respect thereto and such other agreements, documents and instruments as Agent deems reasonably necessary or desirable, in form and substance satisfactory to Agent.

4.21.    Intellectual Property. Borrowers shall execute and deliver to Agent security agreements in form suitable for registration and otherwise reasonably acceptable to Agent (i) on the Closing Date, with respect to any Material Intellectual Property registered or for which an application for registration is pending with the U.S. Patent and Trademark Office or the U.S. Copyright Office as of the Closing Date, or (ii) immediately upon the creation or acquisition by Borrower of any Material Intellectual Property registered, or for which an application for registration is pending, with either such office subsequent to the Closing Date.

4.22.    Commercial Tort Claims. Promptly upon the discovery of any Commercial Tort Claim in favor of a Borrower, Borrowers will notify Agent of the same and execute such documents as are requested by Agent in order to grant to Agent a security interest in such Commercial Tort Claim under the UCC.

4.23.    OFAC. Agent may, at its option, reject, refuse to accept or return any Collateral that any Lender Party determines is, or may be, owed by, or due from, or belongs to, a Sanctioned Person.

4.24.    Appraisals. With respect to Equipment, upon Agent's request, which may be at such intervals as it deems appropriate, Borrowers shall, at their expense, deliver or cause to be delivered to Agent, Appraisals (or updates to Appraisals) addressed to Agent and upon which Agent is expressly permitted to rely; provided that notwithstanding anything else to the contrary in this Section 4.24, Borrowers shall not pay for more than one (1) such Appraisal in each Fiscal Year following the Closing Date if the Leverage Ratio as of the last day of each Fiscal Quarter in such Fiscal Year is less than or equal to 2.0:1.0 and no Event of Default has occurred and is continuing.

V.    REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

5.1.    Authority. Upon entry of the Confirmation Order, each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is party and to perform all of its respective duties and obligations hereunder and thereunder. Upon entry of the Confirmation Order, the execution, delivery and performance of this Agreement and of any Other Documents to which such Borrower is party (a) are within such Borrower's corporate powers, have been duly authorized, are not in contravention of law or any material terms of such Borrower's Organic Documents or of any Material Agreement or undertaking to which such Borrower is a party or by which such Borrower or any of its property is bound, and (b) will not conflict with nor result in any breach of any material provisions of or constitute a default under or result in the creation of any Lien (except Permitted Encumbrances) upon any asset of such Borrower under the provisions of any Organic Document or other instrument to which such Borrower is a party or by which it or any of its property may be bound.

3604386.15

5.2.    <u>Formation and Qualification</u>.

(a)    Each Borrower is duly organized and in good standing under the laws of the State(s) or other jurisdiction(s) listed on <u>Schedule 5.2</u> and is qualified to do business and is in good standing in the State(s) or other jurisdiction(s) listed on <u>Schedule 5.2</u>, which State(s) or other jurisdiction(s) constitute all State(s) or other jurisdiction(s) in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Each Borrower has delivered to Agent true and complete copies of its Organic Documents and will promptly notify Agent of any amendment or change thereto.

(b)    Each Borrower's identification number (if any) assigned to it by the appropriate Govermental Authority of the state of its organization, if any, is set forth on <u>Schedule 5.2</u>.

(c)    The Subsidiaries (if any) of each Borrower as of the Closing Date are as set forth in <u>Schedule 5.2</u>.

(d)    The Equity Interests of each Borrower which are authorized, issued and outstanding on the Closing Date are set forth and described in <u>Schedule 5.2</u>.

(e)    This Agreement is, and each Other Document executed by a Borrower constitutes, the legal, valid and binding obligation of such Borrower, enforceable against it in accordance with its terms, except as such enforcement is subject to the effect of (i) any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

(f)    The signatures of each officer of each Borrower that appear on this Agreement and each Other Document are genuine, and each such officer of such Borrower executing same on behalf of such Borrower has full capacity to execute same.

5.3.    <u>Tax Returns</u>. Each Borrower's federal tax identification number is set forth on <u>Schedule 5.3</u>. Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable, other than, any such charges as are being contested by Borrowers in good faith by appropriate proceedings provided that Borrowers have established reserves on their books for any unpaid taxes in accordance with GAAP. The Provision for Taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current Fiscal Year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books or any ongoing audit of any of its tax returns, except as otherwise may be disclosed in <u>Schedule 5.3</u>.

5.4.    <u>Financial Statements</u>.

(a)    The audited financial statements of Borrowers and their Subsidiaries on a consolidated basis for their most recently completed Fiscal Year, and the related statements of income, changes in stockholder's equity and cash flow for the annual fiscal period ended on such date, all accompanied by reports thereon containing opinions by the Accountants, and the unaudited financial statements of Borrowers and their Subsidiaries on a consolidated basis for that portion of their current Fiscal Year ended with their most recently completed Fiscal Quarter and Fiscal Month for which financial statements have been reported and the related statements of income, changes in stockholder's equity and cash flow for the fiscal periods ended on such date, (collectively, the "<u>Historical Financial Statements</u>"), copies of which have been delivered to Agent, have been prepared in accordance with GAAP,

3604386.15

consistently applied (except for changes in application with which the Accountants have concurred) and present in all material respects the financial position of the Borrowers and their Subsidiaries on a consolidated basis at such dates and the results of their operations for such periods. Since the last day of the Borrowers' most recently completed Fiscal Year, there has been no material adverse change (other than the Chapter 11 Cases) in the financial condition of the Borrowers on a consolidated basis from that shown on the consolidated balance sheet of Borrowers as of such date or in the aggregate value of the Equipment and Real Property owned by them.

(b)    The projected financial statements of the Borrowers and their Subsidiaries on a consolidated basis furnished to Agent on or prior to the Closing Date (the "Initial Projections"), were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Initial Projections are not to be viewed as facts and that actual results may differ from such Initial Projections.

5.5.    Name. Neither of the Borrowers has been known by any other name in the five (5) years immediately preceding the Closing Date, and neither of the Borrowers sells Inventory under any other name except as set forth on Schedule 5.5; nor has either Borrower been the surviving organization of a merger or consolidation or acquired all or substantially all of the assets of any Person during the five (5) years immediately preceding the Closing Date.

5.6.    OSHA and Environmental Compliance. Except as may be set forth on Schedule 5.6:

(a)    Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds and Equipment are in compliance with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws, except where the failure to comply with any of the foregoing could not reasonably be expected to have a Material Adverse Effect; there have been no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds, Real Property or Equipment under any such laws, rules or regulations.

(b)    Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws, except where the failure to obtain any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(c)    (i) There are no visible signs, in any material amounts of releases, spills, discharges, leaks or disposals (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property owned by any Borrower or leased by any Borrower and used for manufacturing or the storage of Hazardous Substances which do not comply in all material respects with all applicable Environmental Laws in respect thereof; (ii) there are no underground storage tanks or polychlorinated biphenyls on any such Real Property; except in compliance with Environmental Laws; (iii) none of any such Real Property has ever been used as a treatment, storage or disposal facility for Hazardous Waste; and (iv) no material amounts of any Hazardous Substances are present on any such Real Property in violation of any applicable Environmental Law.

5.7.    Solvency.

(a)    The Initial Projections demonstrate that the Borrowers on a consolidated basis will have sufficient cash flow to enable them to pay their debts as they mature, subsequent to the Closing Date.

3604386.15

27

(b)    Immediately following the execution of this Agreement and the consummation of the transactions contemplated hereby on the Closing Date, including the issuance of any Loans, (i) the assets of the Borrowers, on a consolidated basis, at a fair valuation and at their present fair saleable value will be in excess of the total amount of liabilities of the Borrowers (including contingent and unmatured liabilities) on a consolidated basis, (ii) the Borrowers will be able to pay their Indebtedness as it becomes due, and (iii) the Borrowers on a consolidated basis will not have unreasonably small capital to carry on their respective businesses.

(c)    As of the Closing Date, there is no undisputed Indebtedness in excess of the Materiality Threshold owing by the Borrowers to any third parties that is past due (after giving effect to any applicable grace period for payment) except for trade accounts payable not in excess of Two Million Dollars ($2,000,000) in aggregate amount, which will be paid by the Borrowers within thirty (30) days following the Closing Date, or as may otherwise be disclosed in <u>Schedule 5.7</u>.

(d)    This Agreement is, and all Other Documents will be, executed and delivered by the Borrowers in good faith and in exchange for reasonably equivalent value and fair consideration.

5.8.    <u>Litigation</u>. Except with respect to the Chapter 11 Cases or as may be otherwise disclosed in <u>Schedule 5.8</u>, as of the Closing Date no Borrower has (i) any pending or threatened litigation, arbitration, actions or proceedings that, if determined adversely to it, could be reasonably expected to have a Material Adverse Effect, or (ii) any Commercial Tort Claims.

5.9.    <u>No Indebtedness</u>. Except in respect of the amounts owed Lenders and the Term Loan Lenders under the Existing Equipment Loan Facility and the Existing Term Loan Facility, respectively, and as may be disclosed on <u>Schedule 5.9</u>, no Borrower has any Indebtedness on the Closing Date; and none of such Indebtedness is secured by any Lien, except for Permitted Encumbrances.

5.10.    <u>Violations</u>. No Borrower is in violation of any applicable statute, regulation or ordinance or any order of any court, Governmental Authority or arbitration board or tribunal that could reasonably be expected to have a Material Adverse Effect.

5.11.    <u>Plans</u>. No Borrower nor any member of the Controlled Group maintains or contributes to any Plan (or has assumed any liability in respect of any Plan) other than those (if any) listed on <u>Schedule 5.11</u> hereto. Except as set forth in Schedule 5.11, (i) no Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan, (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code, (iii) no Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid, (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence that would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan, (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and no Borrower nor any member of the Controlled Group knows of any facts or circumstances that would materially change the value of such assets and accrued benefits and other liabilities, (vi) no Borrower or any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan, (vii) no Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section

4972 or 4980B of the Code, and no fact exists that could give rise to any such liability, (viii) no Borrower, nor any member of the Controlled Group, nor any fiduciary of, nor any trustee for, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action that would constitute or result in a ERISA Event with respect to any such Plan that is subject to ERISA, (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan, (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period contained in 29 CFR §2615.3 has not been waived, (xi) no Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group, and (xii) no Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

5.12.    <u>Patents, Trademarks, Copyrights and Licenses</u>. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, trade names, assumed names, trade secrets and licenses owned or utilized by Borrowers as of the Closing Date that are material to the conduct of Borrowers' business operations (herein, "<u>Material Intellectual Property</u>") are set forth on <u>Schedule 5.12</u>. All such Material Intellectual Property is valid and, except as set forth on <u>Schedule 5.12</u>, has been duly registered or filed with the appropriate Governmental Authority; there is no objection to or pending challenge to the validity thereof, and neither Borrower is aware of any grounds for any challenge, except as may be set forth in <u>Schedule 5.12</u>. To each Borrower's knowledge, its Material Intellectual Property consists of original material or property developed by such Borrower or which was lawfully acquired by such Borrower from the proper and lawful owner thereof. Each Borrower has maintained its Material Intellectual Property as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all proprietary software developed and used by any Borrower, constituting Material Intellectual Property, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement.

5.13.    <u>Licenses and Permits</u>. Each Borrower (a) is in material compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law or regulation for the operation of its business in each jurisdiction in which it is now conducting business if the failure to procure such licenses or permits and/or be in material compliance therewith could reasonably be expected to have a Material Adverse Effect.

5.14.    <u>No Default of Indebtedness</u>. Except as set forth in <u>Schedule 5.14</u>, as of the Closing Date, no Borrower is in default (after giving effect to any applicable grace period for payment) in the payment of the principal of or interest on any Indebtedness and no event has occurred under the provisions of any instrument or agreement under which any Indebtedness has been issued that without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.15.    <u>No Other Defaults</u>. As of the Closing Date, no Borrower is in default in any material respect in the payment or performance of any of its material contractual obligations in respect of any Material Agreement.

5.16.    <u>No Burdensome Restrictions</u>. No Borrower is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect. No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien that is not a Permitted Encumbrance.

3604386.15

5.17.    No Labor Disputes. No Borrower is involved in any material labor dispute; and, to Borrowers' knowledge, there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence. Except as set forth in Schedule 5.17, no labor contract in existence on the Closing Date is scheduled to expire during the Term.

5.18.    Margin Regulations. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advances will be used for "purchasing" or "carrying" "margin stock," as those terms are defined in Regulation U of such Board of Governors.

5.19.    Investment Company Act. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.20.    Disclosure. No representation or warranty made by any Borrower in this Agreement, or in any financial statement, report, certificate or any Other Document furnished in connection herewith, including, without limitation, the Perfection Certificate, contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not materially misleading. There is no fact known to Borrowers that Borrowers have not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement that could reasonably be expected to have a Material Adverse Effect.

5.21.    No Conflicting Agreements or Orders. Except as disclosed on Schedule 5.21, no provision of any Material Agreement nor any judgment, decree or order binding on any Borrower or affecting any Collateral conflicts with, or requires any consent that has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.22.    Application of Certain Laws and Regulations. No Borrower is subject to any statute, rule or regulation that regulates the incurrence of any Indebtedness, including, without limitation, statutes or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.23.    Hedge Contracts. As of the Closing Date, no Borrower is party to any Hedge Contract, except a Permitted Hedge Contract.

5.24.    Real Property. As of the Closing Date, Borrowers have no interest as owner or tenant in any Real Property, except as disclosed on Schedule 5.24.

5.25.    Deposit Accounts. As of the Closing Date, no Borrower has any Deposit Accounts, except as listed on Schedule 5.25.

5.26.    Brokers. No Borrower has retained the services of any broker to assist such Borrower in obtaining the benefits of this Agreement.

5.27.    OFAC. No Permitted Holder, no Borrower and no Subsidiary is a Sanctioned Person. No Portion of any Advance will be used to facilitate the operation of, to finance any investments in or any activities of, or to make any payments to, any Sanctioned Person or Sanctioned Country.

3604386.15

5.28    Accountants' Letter.  Borrowing Representative has executed and delivered to the Accountants a letter directing the Accountants to act in the manner provided in Section 4.8 hereof when requested by Agent.

5.29.    Senior Debt. The principal amount of the Loans shall constitute "Senior Debt" as such term shall be defined in the Junior Lien Facility Documents and the holders of such Indebtedness shall be entitled to the rights and benefits of a holder of "Senior Debt" under the Junior Lien Facility Credit Agreement.

VI.    AFFIRMATIVE COVENANTS.

Each Borrower shall, and shall cause its Subsidiaries to, do the following until payment in full of the Obligations and termination of this Agreement:

6.1.    Payment of Fees.  Pay to Agent on demand all usual and customary fees and expenses that Agent incurs in connection with (a) the forwarding of the proceeds of any Advance and (b) the establishment and maintenance of any Deposit Account Control Agreement and the related Deposit Account(s). Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

6.2.    Conduct of Business and Maintenance of Existence and Assets. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted), including, without limitation, all Material Intellectual Property, and take all actions necessary to enforce and protect the validity of Material Intellectual Property or other material rights included in the Collateral; (b) keep in full force and effect its existence and Material Agreements (in accordance with their terms); (c) comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (d) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so could reasonably be expected to have a Material Adverse Effect.

6.3.    Violations. Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Authority, or of any agency thereof, applicable to any Borrower that could reasonably be expected to have a Material Adverse Effect.

6.4.    Government Receivables. If requested by Agent to do so in respect of any Receivable, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act or other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them, subject to the provisions of the Intercreditor Agreement.

6.5.    Execution of Supplemental Instruments. Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may reasonably request, in order that the full intent of this Agreement and the Other Documents may be carried into effect.

6.6.    Payment of Material Agreements. Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to

3604386.15

normal payment practices) all its obligations and liabilities of whatever nature, including any in respect of its Material Agreements, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect or where the amount or validity thereof is currently being contested in good faith by appropriate proceedings; provided that Borrowers have established reserves on their books in accordance with GAAP in respect thereof; and subject at all times to any applicable Subordination Agreement.

6.7.    Standards of Financial Statements. Cause all financial statements referred to herein to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments and the absence of footnotes) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by the Accountants or the reporting officer of a Borrower, as the case may be, and disclosed therein).

6.8.    Further Assurances; Post Closing. At Borrowers' cost and expense, each Borrower shall (i) take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as Agent may reasonably request with respect to the purposes, terms and conditions of this Agreement and the Other Documents and the consummation of the transactions contemplated thereby, and (ii) without limiting and notwithstanding any other provision of this Agreement or any Other Document, execute and deliver, or cause to be executed and delivered, such agreements and documents, and take or cause to be taken such actions, and otherwise perform, observe and comply with such obligations, as are set forth on Schedule 6.8.

6.9    Board of Directors.  At all times, the Board of Directors (or other governing body) of each Borrower shall have at least one (1) Independent Director, which shall be appointed by the Equity Sponsor.

6.10.    Board Observation.  Each Borrower shall permit a representative designated by Agent (the "Lender Representative") to attend and participate in as a non-voting observer all meetings of the Board of Directors (or other governing body) of such Borrower and all meetings of any committee of any such Board of Directors (the "Governing Body"). Each Borrower agrees to give the relevant Lender Representative the same notice of all such meetings and copies of all materials distributed to members of any Governing Body at the same time as such notice and materials are given to the members of such Governing Body, and the relevant Lender Representative will be given the opportunity to participate in any telephonic meetings of such Governing Body.  Each Borrower shall cause its Board of Directors to meet not less frequently than once per Fiscal Year.  If it is proposed that any action be taken by written consent in lieu of a meeting of any Governing Body, the relevant Borrower shall give written notice thereof to the relevant Lender Representative as is required to be delivered to the members of such Governing Body describing in reasonable detail the nature and substance of such action. Agent may, without making demand, charge Borrowers' Account for all reasonable costs and expenses incurred by it in connection with Agent's rights pursuant to this Section 6.10. Notwithstanding anything to the contrary in this paragraph, (a) so long as no Default or Event of Default has occurred and is continuing (in which event Agent may attend in-person any meetings of any Governing Body as it shall deem appropriate), a Lender Representative shall not attend in-person more than three (3) meetings of a Governing Body of a Borrower per Fiscal Year and (b) a Lender Representative may be excused by the relevant Borrower's Governing Body from attending any portion of such Governing Body's meeting (i) to the extent that attendance by such Lender Representative would jeopardize such Borrower's ability to assert the attorney-client privilege with respect to matters of material importance to be discussed during a portion of any meeting as determined by such Governing Body in good faith, (ii) during which matters relating to the Loans are to be discussed or (iii) during any voting (or final deliberation related thereto) by the

members of such Governing Body with regards to the sale or other disposition of any Property that is permitted by this Agreement.

VII.    <u>NEGATIVE COVENANTS</u>.

Each Borrower shall, and shall cause its Subsidiaries to, comply as follows until payment in full of all Obligations and termination of this Agreement:

7.1.    <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc</u>. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)    merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it, except that any wholly-owned Subsidiary of a Borrower may merge with and into or consolidate with a Borrower or any other wholly-owned Subsidiary of a Borrower, and any Borrower may merge with or into, or consolidate with any other Borrower; provided, <u>however</u>, that each of the following conditions is satisfied: (i) Agent shall have received not less than ten (10) Business Days' prior written notice of such intended merger or consolidation, which notice shall set forth in detail reasonably satisfactory to Agent the Persons that are merging or consolidating, which Person will be the surviving entity, the locations of the assets of the Persons that are merging or consolidating, and any Material Agreements and documents relating to such merger or consolidation, (ii) Agent shall have received such other information with respect to such merger or consolidation as Agent may reasonably request, (iii) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (iv) Agent shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Governmental Authority (with a copy as filed promptly after such filing), and (v) the surviving Person (if not already a Borrower) shall expressly confirm, ratify and assume the Obligations, this Agreement and all Other Documents to which the Borrowers are then party in writing, in a form and substance satisfactory to Agent, shall execute and deliver such other agreements, documents and instruments as Agent may reasonably request in connection therewith;

(b)    sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests or any of its other assets to any other Person without the prior written consent of Agent, <u>except</u> <u>for</u>

(i)    sales of Inventory in the ordinary course of business;

(ii)    Permitted PP&E Dispositions;

(iii)    the issuance and sale by Parent Company of Equity Interests after the Closing Date; provided, <u>however</u>, that, (a) the terms of such Equity Interests, and the terms and conditions of the purchase and sale thereof, shall not include any terms that contravene, or include any limitation on the right of any Borrower to amend or modify, any of the terms and conditions of this Agreement or any of the Other Documents, (b) after giving effect to such issuance and sale, no Change of Control shall have occurred, and (c) the Net Cash Proceeds derived therefrom shall be paid to Agent for application to the Obligations in accordance with <u>Section 2.9(f)</u> hereof;

(iv)    the issuance of Equity Interests of Parent Company pursuant to an employee stock warrant, stock option, management incentive program or grant or similar equity plan or 401(k) plan established for Borrowers' employees; provided, <u>however</u>, that no Change of Control shall result therefrom;

3604386.15

(v)    the issuance of Equity Interests in connection with the Equity Investment;

(vi)    the sale or other disposition of Collateral not otherwise permitted in clauses (i) and (ii) above, if: (a) such sales or other dispositions do not involve Collateral having an aggregate fair market value in excess of the Materiality Threshold for all such Collateral disposed of in any Fiscal Year of Borrowers; (b) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing; and (c) all of the Net Cash Proceeds of the sale of such Collateral shall be paid to Agent for application to the Obligations in accordance with Section 2.9(f) of this Agreement;

(vii)    intercompany loans and dividend payments, among or between Borrowers, to the extent permitted by Sections 7.4(f), 7.5(b) and 7.7(b);

(c)    wind up, liquidate or dissolve, except pursuant to any merger or consolidation made in accordance with Section 7.1(a); or

(d)    agree to do any of the foregoing, except if such agreement is conditioned on approval by the Required Lenders.

7.2.    Encumbrances. No Borrower shall, or shall permit any Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, Lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or Lien with respect to any such assets or properties, except the following (herein called, collectively, "Permitted Encumbrances"):

(a)    the security interests and Liens in the Collateral in favor of Agent for the benefit of the Lender Parties granted pursuant to this Agreement and the Other Documents;

(b)    Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Subsidiary, as the case may be, and with respect to which reserves have been set aside on its books in accordance with GAAP;

(c)    non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of such Borrower's or Subsidiary's business to the extent: (1) such Liens secure Indebtedness that is not overdue or (2) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which reserves have been set aside on its books as required by GAAP;

(d)    zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property that do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property owned by any Borrower (or, to Borrowers' knowledge, in the case of Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, the value of the Borrowers' interest in such Leasehold Interests) that is subject thereto;

3604386.15

(e)     purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) acquired after the Closing Date and purchase money mortgages on Real Property acquired after the Closing Date to secure Indebtedness permitted under Section 7.3(b) hereof;

(f)     pledges and deposits of cash or issuances of letters of credit by any Borrower after the Closing Date in the ordinary course of its business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower as of the date hereof;

(g)     pledges and deposits of cash by any Borrower after the Closing Date to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower as of the date hereof;

(h)     Liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment, tooling or other materials that are not owned by any Borrower, but are located on the premises of such Borrower (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower and the precautionary UCC financing statement filings in respect thereof;

(i)     the security interests in and Liens upon the Collateral and mortgages and Liens upon the Real Property in favor of the Term Loan Agent to secure the Term Loan Debt, provided, however, that, the security interests in and Liens upon the Collateral in favor of Term Loan Agent are and shall at all times be subject to the terms of the Intercreditor Agreement;

(j)     judgment Liens and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued by Borrowers, (ii) adequate reserves have been made for the amounts thereof on the books of Borrowers in accordance with GAAP and (iii) a stay of enforcement of any such Liens is in effect;

(k)     any security interests and Liens of an Insurance Premium Finance Party on the Insurance Premium Collateral to secure the Indebtedness described in and to the extent permitted in Section 7.3(f) hereof;

(l)     security interests and Liens granted to the applicable Issuer under any Letter of Credit Documents;

(m)     those other security interests and Liens (if any) existing on the Closing Date and set forth on Schedule 7.2 hereof; and

(n)     any subordinated security interests and junior Liens granted to the Junior Lien Facility Lender in connection with the Junior Lien Facility.

7.3.    Indebtedness. No Borrower shall, nor shall permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)     the Obligations;

(b)    purchase money Indebtedness (including Capitalized Leases) existing on or arising after the Closing Date, to the extent secured by purchase money security interests in Equipment and the proceeds thereof (including Capitalized Leases) and purchase money Mortgages or Liens on Real Property; provided, however, that:

(i)    the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Two Million Dollars ($2,000,000) in any Fiscal Year; provided, that the aggregate principal amount of such Indebtedness at any time outstanding shall not exceed Four Million Dollars ($4,000,000);

(ii)    such security interests, Mortgages or Liens do not apply to any property of such Borrower or Subsidiary other than the Equipment or Real Property so acquired (and the proceeds thereof), unless such Indebtedness is owed to the Lenders or the Term Loan Lenders;

(iii)    the Indebtedness secured thereby does not exceed the cost of the Equipment or Real Property so acquired, as the case may be;

(iv)    such security interests, Mortgages and/or Liens are released promptly upon such Indebtedness being fully paid and satisfied;

(v)    Agent shall have received at least five (5) Business Days' prior written notice of the intention of Borrowers to incur such Indebtedness, if incurred subsequent to the Closing Date; and

(vi)    as of the date of incurrence of such Indebtedness and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(c)    guarantees by any Borrower of the Obligations of any other Borrower in favor of Agent for the benefit of Lenders;

(d)    Indebtedness of Borrowers to the Term Loan Lenders evidenced by or arising under the Term Loan Agreement and the other Term Loan Lender Agreements; provided, however, that the original principal amount of such Indebtedness shall not exceed the sum of (i) **[Twelve Million Eight Hundred Eight Thousand Eight Hundred Eight and 55/100 Dollars]** ($[12,808,808.55]) plus (ii) any Indebtedness incurred as permitted by Section 7.3(b) that is owed to the Term Loan Lenders; in each case, less the aggregate amount of all principal repayments, whether optional or mandatory, in respect thereof;

(e)    Indebtedness of any Borrower evidenced by the Junior Lien Facility Subordinated Note; provided, however, that:

(i)    the aggregate principal amount of such Indebtedness shall not exceed Three Million Dollars ($3,000,000) less the aggregate amount of all permitted principal repayments, repurchases or redemptions, whether optional or mandatory, made after the Closing Date in respect thereof;

(ii)    the principal amount of the Loans shall at all times constitute "Senior Debt," as such term is defined in the Junior Lien Facility Documents; and the Lenders shall be entitled to all the rights and benefits of a holder of "Senior Debt" under the Junior Lien Subordinated Note; and

(iii)    such Indebtedness is and remains subject to a Subordination Agreement in form and substance satisfactory to Agent;

3604386.15

(f)      Indebtedness of Borrowers to an Insurance Premium Finance Party in connection with insurance policies maintained by Borrowers arising as a result of such Insurance Premium Finance Party entering into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in one lump sum annual payment; provided, however,  that, such Indebtedness shall be unsecured except to the extent permitted under Section 7.2(k) hereof, and shall not exceed, in aggregate principal amount outstanding at any one time, Seven Hundred Fifty Thousand Dollars ($750,000);

(g)      other Indebtedness outstanding on the Closing Date that is listed on Schedule 7.3;

(h)      Indebtedness of Borrowers to the applicable Issuer arising under any Letter of Credit Documents;

(i)      Indebtedness of any Borrower to any other Borrower arising after the Closing Date pursuant to loans made by any Borrower permitted under Section 7.4(g) hereof; and

(j)      Subordinated Indebtedness.

7.4.    Loans, Investments, Etc. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase any Equity Interests or Indebtedness or all or a substantial part of the assets or property of any Person, or form or acquire any Subsidiaries, or agree to do any of the foregoing (unless conditioned upon the consent of the Required Lenders), except:

(a)      the endorsement of instruments for collection or deposit in the ordinary course of business;

(b)      investments in cash or Cash Equivalents, provided that at any time such investments in the aggregate exceed Ten Thousand Dollars ($10,000), (1) no Revolving Credit Advances are then outstanding and (2) the terms and conditions of Section 4.14(d) hereof shall have been satisfied with respect to the Deposit Account, investment account or other account in which such cash or Cash Equivalents are held;

(c)      the existing equity investments of each Borrower as of the Closing Date in its Subsidiaries, as listed on Schedule 7.4; provided, however, that, no Borrower shall have any further obligations or liabilities to make any capital contributions or other additional investments or other payments to or in or for the benefit of any of such Subsidiaries, except that a Borrower may make capital contributions to another Borrower in the form of dividend payments as permitted pursuant to Sections 7.5 and 7.7 hereof;

(d)      equity investments of a Borrower in another Borrower;

(e)      loans and advances by any Borrower to employees of such Borrower after the Closing Date in an aggregate principal amount not to exceed the Materiality Threshold at any time;

(f)      Equity Interests or debt securities issued to any Borrower by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the Indebtedness of such Person; provided, however, that, the original of any stock certificate or other instrument evidencing such obligations shall, at Agent's request, be promptly delivered to Agent, but in any event within five (5) Business Days after Borrowers receive such

request, together with such stock power, assignment or endorsement by such Borrower as Agent may request;

(g)    loans by a Borrower to another Borrower after the Closing Date, provided, however, that, (i) upon Agent's request, Borrowers shall provide to Agent a report in form and substance satisfactory to Agent of the outstanding amount of such loans as of the last day of the immediately preceding month and indicating any loans made and payments received during the immediately preceding month; and (ii) upon Agent's request, any such loan shall be evidenced by a promissory note or other instrument, the single original of which shall be promptly, but not later than five (5) Business Days after Agent's request, delivered to Agent to hold as part of the Collateral, with such endorsement and/or assignment by the payee of such note or other instrument as Agent may require;

(h)    obligations of any Customer to any Borrower arising from Accounts that are past due and are evidenced by a promissory note by such Customer payable to such Borrower; provided, however, that, promptly upon the receipt by such Borrower of the original of any such promissory note, but in any event within five (5) Business Days thereafter, subject to the provisions of the Intercreditor Agreement, such promissory note shall be endorsed to the order of Agent by such Borrower and delivered to Agent;

(i)    those loans and advances (if any) existing on the Closing Date and set forth on Schedule 7.4; provided, however, that, as to such loans and advances, Borrowers shall not, directly or indirectly, amend, modify, alter or change the terms of such loans and advances or any agreement, document or instrument related thereto and Borrowers shall furnish to Agent all default notices or demands for payment in connection with such loans and advances received by any Borrower or on its behalf, promptly after the receipt thereof, or sent by any Borrower or on its behalf; concurrently with the sending thereof; as the case may be; and

(j)    the payment of dividends by Borrowers, and the redemption, retirement, defeasance, purchase or other acquisition of Equity Interests, to the extent permitted by Sections 7.5 and 7.7 hereof.

7.5.    Dividends and Redemptions. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly, declare or pay any dividends on account of any shares of any class of any Equity Interests of such Borrower now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, except that:

(a)    any Borrower may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Equity Interests for consideration in the form of additional Equity Interests so long as no Default or Event of Default has occurred and is continuing or could reasonably be expected to occur after giving effect thereto; provided, however, that no Borrower shall issue Excluded Equity Interests;

(b)    Borrowers may pay dividends to the extent permitted in Section 7.7 below;

(c)    any Subsidiary of a Borrower may pay dividends to a Borrower; and

(d)    Borrowers may repurchase Equity Interests consisting of and limited to Equity Interests held by employees of a Borrower pursuant to any employee stock ownership plan thereof upon

3604386.15

38

the termination, retirement or death of any such employee in accordance with the provisions of such plan, provided that, as to any such repurchase, each of the following conditions is satisfied: (i) as of the date of the payment for such repurchase and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (ii) such repurchase shall be paid with funds legally available therefor, (iii) such repurchase shall not violate any law or regulation or the material terms of any indenture, agreement or undertaking to which such Borrower is a party or by which such Borrower or its property are bound, and (iv) the aggregate amount of all cash payments for such repurchases in any Fiscal Year shall not exceed the Materiality Threshold.

7.6.    Nature of Business. No Borrower shall, or shall permit any Subsidiary to, substantially change the nature of the business in which it is engaged or, except as otherwise specifically permitted by this Agreement, purchase or invest, directly or indirectly, in any assets or property other than purchases of assets or property in the ordinary course of business that are to be used in its business as presently conducted.

7.7.    Transactions with Affiliates. No Borrower shall, or shall permit any Subsidiary to, directly or indirectly:

(a)    purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliate of such Borrower (other than a Borrower or a Subsidiary thereof), except in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business (as the case may be) and upon fair and reasonable terms no less favorable to such Borrower than such Borrower would obtain in a comparable arm's length transaction with an unaffiliated person; or

(b)    make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower, except (i) reasonable compensation to, and reimbursement of reasonable expenses incurred by, officers, employees and directors for services rendered to such Borrower in the ordinary course of business, (ii) payments by any Borrower to any other Borrower for actual and necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services paid for by any Borrower on behalf of such other Borrower, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower and for the payment of taxes by or on behalf of such Borrower, (iii) the grant of stock options, restricted stock awards, stock appreciation rights or similar rights to employees, officers or directors pursuant to a plan approved by the Board of Directors of the applicable Borrower (so long as after giving effect thereto no Change of Control shall occur and no Default or Event of Default shall have occurred and be continuing), (iv) loans or other advances to employees permitted by Section 7.4(e) hereof, (v) the payment of reasonable fees to the directors of any Borrower and (vi) payments of management fees to the Equity Sponsor in an aggregate principal amount not to exceed $500,000 in any Fiscal Year (so long as (x) no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to occur because of the payment thereof and (y) the Equity Sponsor enters into, and delivers to Agent, a Subordination Agreement in form and substance satisfactory to Agent).

7.8.    Subsidiaries. No Borrower shall, or shall permit any Subsidiary to, either: (a) create or acquire any Subsidiary; (b) enter into any partnership, joint venture or similar arrangement or (c) dispose of any Equity Interests in any Subsidiary, except in a transaction expressly permitted under Section 7.1. Without limitation of the foregoing, if and to the extent any Subsidiary is created or acquired hereafter with the prior written consent of the Agent, then, as a condition to such consent becoming effective, (i) each such Subsidiary must be joined as a Borrower hereunder, or must become a Guarantor hereof, (ii)

each Subsidiary must grant a Lien on its assets to Agent as security for its obligations hereunder or under its Guaranty, and (iii) the Equity Interests of such Subsidiary must be pledged to Agent by amendment to the Pledge Agreement; each on terms satisfactory to Agent.

7.9.    <u>Fiscal Year and Accounting Changes</u>. No Borrower shall, or shall permit any Subsidiary to, change its Fiscal Year from that in use on the Closing Date or make any significant change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by applicable law.

7.10.    <u>Pledge of Credit</u>. No Borrower shall, or shall permit any Subsidiary to, pledge (or purport to pledge) Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of the Advances in or for any business other than such Borrower's business as conducted on the Closing Date.

7.11.    <u>Amendment of Material Agreements</u>. No Borrower shall, or shall permit any Subsidiary to, amend, modify, alter or otherwise change in any material respect any term or provision of any of its Material Agreements, unless such amendment, modification or waiver does not cause any contravention of, or conflict with, any material term or condition of this Agreement and would not otherwise reasonably be expected to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, Borrowers may, after giving prior written notice to Agent, amend, modify, alter or change the terms or provisions of any Material Agreement respecting Funded Indebtedness so as to extend the maturity thereof or defer the timing of any payments in respect thereof, or to forgive or cancel such Indebtedness (or a portion thereof) or to reduce the interest rate on or any fees associated therewith; and, <u>provided</u>, <u>further</u>, that Borrowers shall not amend, modify, alter or change any material terms or provisions of any of the Term Loan Lender Agreements (except as permitted in the first proviso hereof), except after giving Agent prior written notice thereof and, if requested by Agent, a corresponding amendment, modification, alteration or change is made hereto or to the Other Documents on the same, or substantially the same, terms simultaneously therewith.

7.12.    <u>Compliance with ERISA</u>. No Borrower shall, or shall permit any Subsidiary to, either: (i) maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans existing on the Closing Date and disclosed on <u>Schedule 5.11</u>, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan, (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any ERISA Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

3604386.15

7.13.    Prepayment of Indebtedness. No Borrower shall, or shall permit any Subsidiary to, at any time, directly or indirectly, either: (a) prepay any Indebtedness, or (b) repurchase, redeem, retire, defease or otherwise acquire any Indebtedness of any Borrower, or set aside or otherwise deposit or invest any sums for such purpose; provided, however, that Borrowers may, from time to time, prepay, repurchase, redeem or retire, in whole or in part, (i) the Obligations, subject to the terms hereof, and (ii) the Term Loans, if, with respect to each such prepayment, repurchase, redemption or retirement of the Term Loans, Borrowers shall comply with (x) all Restricted Payment Conditions and (y) all terms and conditions set forth in the Term Loan Agreement.

7.14.    Payment of Subordinated Debt. No Borrower shall, or shall permit any Subsidiary to at any time, directly or indirectly pay the principal of, interest on or any other charge or fee in respect of any Subordinated Debt, except in accordance with the terms thereof as in effect on the Closing Date and as expressly permitted by the Subordination Agreement applicable thereto or the subordination provisions of the Junior Lien Facility Documents.

7.15.    Organizational Changes.   No Borrower shall, or permit any of its Subsidiaries to, (a) modify or restate its name without thirty (30) days' prior notice to Agent, (b) reincorporate or reorganize under the laws of any jurisdiction, (c) amend its Organic Documents or (d) agree or commit to do any of the foregoing.

7.16.    OFAC.   No Permitted Holder nor any Borrower shall, or permit any Borrower's Subsidiaries to, (a) be or become a Sanctioned Person, (ii) engage in any dealings or transactions prohibited by Section 2 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079(2001)), or otherwise be associated with any such Sanctioned Person in any manner violative of Section 2 of such executive order, or (c) otherwise become a Sanctioned Person in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

VIII.    FINANCIAL COVENANTS.

Borrowers shall, until payment in full of the Obligations and termination of this Agreement, comply with the Financial Covenants set forth below.

8.1.    Controlling Definitions. As used in this Article VIII:

"Annualization Ratio" shall mean (a) 4/1 as of **[September 30]**, 2010, (b) 3/1 as of **[October 31]**, 2010, (c) 12/5 as of **[November 30]**, 2010, (d) 2/1 as of **[December 31]**, 2010, (e) 12/7 as of **[January 30]**, 2011, (f) 3/2 as of **[February 28]**, 2011, (g) 4/3 as of **[March 31]**, 2011, (h) 6/5 as of **[April 30]**, 2011 and, (i) 12/11 as of **[May 31]**, 2011.

"Capital Expenditures" shall mean, as applied to any Person, all expenditures for any fixed or capital assets (including, but not limited to, tooling) or improvements, or for replacements, substitutions or additions thereto, that have a useful life of more than one (1) year, including, but not limited to, the direct or indirect acquisition of such assets by way of offset items or otherwise and shall include the amount recorded on the balance sheet of such Person at the time of the acquisition of any such asset pursuant to a Capitalized Lease.

"Capitalized Lease" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which, in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

3604386.15

"Cash Income Taxes" shall mean, as to any Person, for any period, the Provision for Taxes less any portion thereof that represents deferred income taxes unless they become due and payable in the period, all determined in accordance with GAAP.

"Cash Interest Expense" shall mean, as to any Person, for any period, Interest Expense less (a) Interest Expense that represents the amortization of fees and expenses that were paid during prior periods and (b) Interest Expense on any Indebtedness payable in kind that was accrued during such period but is not paid in cash within thirty (30) days following the due date thereof ("Deferred Interest"), plus any Deferred Interest paid in cash during such period.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding any extraordinary or nonrecurring gains or losses), all as determined in accordance with GAAP; provided, however, that, without duplication, (a) the net income of any Person that is not a wholly-owned Subsidiary or that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a wholly-owned Subsidiary of such Person; (b) the net income of any Person accrued prior to the date it becomes a wholly-owned Subsidiary of such Person or is merged into or consolidated with such Person or any of its wholly-owned Subsidiaries or the date that Person's assets are acquired by such Person or by any of its wholly-owned Subsidiaries shall be excluded; (c) the net income of any Person shall exclude interest accrued, but not paid, on indebtedness owing to a Subsidiary or parent corporation of such Person that is subordinated in right of payment to the payment in full of the Obligations, on terms and conditions acceptable to Agent; (d) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded; (e) the net income of any Person shall exclude any write-down or write-off of assets resulting from the application of Statement of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets" or Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets"; (f) the net income of any Person shall exclude any items of income (or expense) that are required by GAAP to be classified as non-operating amounts in such Person's statement of income definition; and (g) the net income of any Person shall exclude any gain or loss (together with any related Provisions for Taxes) realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions) or of any Equity Interest of such Person or a Subsidiary of such Person and any net income or loss realized as a result of changes in GAAP or the application thereof to such Person.

"EBITDA" shall mean, as to any Person, with respect to any period, the Consolidated Net Income of such Person for such period plus the following items, to the extent deducted in computing Consolidated Net Income for such period: (a) depreciation and amortization expenses; (b) Interest Expense for such period, plus (c) the Provision for Taxes for such period, plus (d) any one-time severance costs and other costs incurred in connection with the termination, relocation and training of senior management of Borrowers in an aggregate principal amount not to exceed at any time $700,000, plus (e) to the extent not already included in clause (g) of the definition of "Consolidated Net Income" above, losses resulting from the sale or other disposition, as permitted herein, of Property and the machining business of Borrowers, plus (f) payments of management fees to the Equity Sponsor to the extent permitted under Section 7.7(b) hereof.

"Fixed Charge Coverage Ratio" shall mean for any Test Period, the ratio of (a) EBITDA, less Unfinanced Capital Expenditures to (b) Fixed Charges, for such Test Period determined for the Borrowers on a consolidated basis in accordance with GAAP.

"Fixed Charges" shall mean, as to any Person, for any period, the sum, without duplication, of (a) Cash Interest Expense, plus (b) all regularly scheduled (as determined at the beginning of such period) principal payments on Indebtedness (including the portion of any payments under Capitalized Leases that is classified as principal), plus (c) Cash Income Taxes, plus (d) all cash dividends and distributions on Equity Interests, together with all repurchases, redemptions and retirements of Equity Interests, to the extent not included in clauses (a) or (b) of this definition.

"Interest Expense" shall mean, for any period, as to any Person, as determined in accordance with GAAP, the total interest expense of such Person, whether paid or accrued during such period (including the interest component of Capitalized Leases for such period), including, without limitation, discounts in connection with the sale of any Accounts, but excluding interest paid in property other than cash and any other interest expense not payable in cash.

"Leverage Ratio" shall mean the ratio for the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as of the end of any calendar month, of (a) Net Senior Debt to (b) EBITDA for the Test Period, except that, as of the end of each calendar month immediately following the Closing Date until the first anniversary of the Closing Date, the Leverage Ratio shall mean the ratio of (x) Net Senior Debt to (y) the quotient of (A) EBITDA for the Test Period times (B) the Annualization Ratio.

"Liquidity" shall mean, as of any date of determination, the balance of cash on hand and Cash Equivalents of Borrowers not subject to any Lien or encumbrance other than in favor of Agent.

"Net Senior Debt" shall mean, as of any date, all Indebtedness outstanding (i) pursuant to this Agreement and the Other Documents and (ii) pursuant to the Term Loan Lender Agreements, less cash on hand and Cash Equivalents of the Borrowers as of such date.

"Test Period" shall mean the most recent period of twelve consecutive calendar months ended on or prior to any date of determination (taken as one accounting period), except that for each calendar month ending on or prior to the first anniversary of the Closing Date, "Test Period" shall mean the period commencing on the first day of the first calendar month following the Closing Date and ending on the date of determination.

"Unfinanced Capital Expenditures" shall mean any Capital Expenditures not financed with Indebtedness.

8.2.    Fixed Charge Coverage Ratio. Borrowers shall maintain a Fixed Charge Coverage Ratio for any Test Period beginning on the last day of the third full calendar month following the Closing Date, measured on a monthly basis, of not less than 1.0:1.0.

8.3.    Capital Expenditures. Borrowers and their Subsidiaries shall not make Capital Expenditures in any Fiscal Year, as measured monthly, in an aggregate amount in excess of $4,000,000 during such Fiscal Year; provided, however, that if Capital Expenditures in any Fiscal Year are less than $4,000,000, the amount of permitted Capital Expenditures in the immediately following Fiscal Year shall be increased by an amount equal to such unused amount of Capital Expenditures for such Fiscal Year up to a maximum of $1,000,000.

3604386.15

8.4.    <u>Leverage Ratio</u>.  Borrowers shall maintain a Leverage Ratio at the end of each calendar month beginning on the last day of the third full calendar month following the Closing Date of not more than: (i) 4.0:1.0 for each calendar month beginning on the third full calendar month following the Closing Date and prior to **[July 1]**, 2011; (ii) 3.5:1.0 for each calendar month ending after **[July 1]**, 2011 and prior to **[July 1]**, 2012; and (iii) 3.0:1.0 for each calendar month ending after **[July 1]**, 2012 through the expiration of the Term.

8.5.    <u>Minimum Liquidity</u>.  Borrowers shall not permit Borrowers' Liquidity at any time to be less than $2,000,000.

8.6.    <u>Minimum EBITDA</u>.  EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, as measured every calendar month beginning on the third full calendar month following the Closing Date on a trailing twelve-month basis (<u>provided</u>, <u>however</u>, that for each calendar month ending on or prior to the first anniversary of the Closing Date, such measurement shall mean EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP for the period from the first day of the first full calendar month following the Closing Date, through such date of determination <u>times</u> the Annualization Ratio) shall not be less than (i) $8,000,000 through the first anniversary of the Closing Date or (ii) $9,000,000 thereafter. Notwithstanding the foregoing, the EBITDA of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP, (x) as measured on the last day of the first full calendar month following the Closing Date shall not be less than $600,000 in the period from the first day of the first full calendar month following the Closing Date to such date of determination or, (y) as measured on the last day of the second full calendar month following the Closing Date shall not be less than $1,333,333 in the period from the first day of the first full calendar month following the Closing Date to such date of determination.

IX.    <u>CONDITIONS PRECEDENT</u>.

9.1.    <u>Conditions to Effectiveness</u>. The agreement of Lenders to make the Loans pursuant to this Agreement and the Other Documents is subject to the satisfaction, in the sole judgment of the Agent and Lenders, or waiver by Lenders, immediately prior to or concurrently with the making of the Loans hereunder, of the following conditions precedent:

(a)    <u>Amended and Restated Notes</u>. To the extent amended and restated Notes and/or allonges to Notes have been requested by any Lender, Agent shall have received such amended and restated Notes and/or allonges to Notes duly executed and delivered by a Designated Officer of each Borrower;

(b)    <u>Amended and Restated Credit Agreement</u>. Agent shall have received this Agreement, duly executed by all parties hereto, in form and substance satisfactory to Agent;

(c)    <u>Filings, Registrations, Recordings and Searches</u>. (i) Each document (including, without limitation, any Uniform Commercial Code financing statement) required by this Agreement, any Other Document, under applicable law or otherwise as reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or Lien upon the Collateral shall have been properly executed (if necessary) and delivered to the Agent or the title company for filing, registration or recordation in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received satisfactory evidence of the depositing for payment of any necessary fee, tax or expense relating thereto; (ii) the Agent shall also have received UCC, tax and judgment lien searches with respect to each Borrower in such jurisdictions as

Agent shall require, and the results of such searches shall be satisfactory to Agent; and (iii) Agent shall have received from Borrowing Representative, for each Borrower, the Perfection Certificate;

(d)     Secretary's Certificates. Agent shall have received a certificate of the Secretary (or an acceptable substitute officer having similar duties and powers), of each Borrower, dated the Closing Date, in substantially the form of Exhibit 9.1(d), unless otherwise acceptable to or required by Agent, certifying as to (i) the incumbency and signature of the officers of each Borrower executing this Agreement and any Other Documents, and (ii) the resolutions of the Board of Directors of such Borrower authorizing such officers to enter into and carry out such transactions as are contemplated pursuant to this Agreement and the Other Documents; and including therewith copies of the Organic Documents of such Borrower as in effect on the Closing Date, each in form and substance satisfactory to Agent;

(e)     Good Standing Certificates. Agent shall have received good standing certificates for each Borrower dated not more than thirty (30) days prior to the Closing Date, issued by the secretary of state or other appropriate official of each Borrower's jurisdiction of organization and each jurisdiction where the conduct of each Borrower's business activities or the ownership of its properties necessitates qualification;

(f)     Legal Opinion. Agent shall have received an opinion of legal counsel to the Borrowers, in form and content satisfactory to Agent, which shall cover such matters incidental to the transactions contemplated by this Agreement, the Notes and all Other Documents as Agent may reasonably require;

(g)     No Litigation. Except with respect to the Chapter 11 Cases, (i) no litigation, investigation or proceeding before or by any arbitrator or Governmental Authority shall be continuing or threatened against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement or the Other Documents or any of the transactions contemplated hereby and thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the opinion of Agent, reasonably be expected to have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the transactions contemplated hereby shall have been issued by any Governmental Authority;

(h)     Material Agreements. Agent shall have received and reviewed all Material Agreements existing on the Closing Date and be satisfied therewith;

(i)     Collateral Examination. Agent shall have completed examinations of its primary Collateral, and be satisfied therewith;

(j)     Commitment Fee. Agent shall have received in cash, on or prior to the Closing Date, a commitment fee, to be shared pro rata among the Lenders, equal to 1.00% of the aggregate principal amount of the Loans as of the Closing Date;

(k)     Intentionally Omitted;

(l)     Other Fees and Expenses.  Agent shall have received all fees and expenses payable to Agent and the Lenders on or prior to the Closing Date pursuant to this Agreement, any Other Document, the Reorganization Plan and the Cash Collateral Order, including, without limitation, reasonable attorneys' fees;

(m)    <u>Financial Statements</u>. Agent shall have received copies of the Initial Projections and copies of the Historical Financial Statements, and be satisfied therewith;

(n)    <u>Insurance</u>. Agent shall have received, in form and content satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(o)    <u>Deposit Account Control Agreements</u>.  Agent shall have received all Deposit Account Control Agreements, duly executed by all parties thereto, required to be delivered as of the Closing Date pursuant to <u>Section 4.14</u> hereof;

(p)    <u>Consents</u>. Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem reasonably necessary to effectuate the transactions contemplated by this Agreement and the Other Documents;

(q)    <u>No Adverse Material Effect</u>. Except for the Chapter 11 Cases, since the end of Borrowers' most recently completed Fiscal Year for which audited financial statements have been reported, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect;

(r)    <u>Landlord's Agreements</u>. Unless Agent otherwise has agreed to waive such requirement in one or more instances Agent shall have received landlord agreements in form and content reasonably satisfactory to Agent with respect to all premises leased by any Borrowers at which Equipment having a fair market value in excess of the Materiality Threshold is located;

(s)    <u>Intellectual Property</u>. To the extent that any Material Intellectual Property (or applications therefor) is registered with the United States Patent and Trademark Office or, as appropriate, the United States Copyright Office as of the Closing Date, the Borrower owning such Material Intellectual Property shall have executed, as appropriate, a patent security agreement, a trademark security agreement, and/or a copyright security agreement in favor of Agent, each to be in form and content satisfactory to Agent;

(t)    <u>Closing Certificate</u>. Agent shall have received a closing certificate signed by a Designated Officer of each Borrower dated the Closing Date, in substantially the form of <u>Exhibit 9.1(t)</u>, stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents and (iii) on such date, no Default or Event of Default has occurred or is continuing;

(u)    <u>Equity Investment Proceeds</u>. Agent shall have received evidence satisfactory to it that no more than $2,200,000 of the proceeds from the Equity Investment (such amount is subject to Agent's review of sources and uses and Initial Projections) was used to payoff certain of Borrowers' outstanding accounts payable;

(v)    <u>Subordination Agreements</u>. Agent shall have received a Subordination Agreement, in form and substance satisfactory to Agent, from (i) each holder of the Borrowers' Subordinated Debt that is outstanding as of the Closing Date and (ii) the Equity Sponsor pursuant to <u>Section 7.7(b)</u> hereof;

3604386.15

46

(w)    <u>Mortgages</u>. Agent shall have received from each Borrower amendments to each Mortgage with respect to all Real Property Collateral owned by such Borrower in fee simple as of the Closing Date, together with the following, each to be in form and substance satisfactory to Agent: a mortgagee's title insurance policy or title insurance endorsement (each a "<u>Title Insurance Policy</u>"), dated the Closing Date together with evidence that all premiums in respect of such Title Insurance Policy have been paid, which Title Insurance Policy shall: (i) be in an amount reasonably satisfactory to Agent; (ii) insure that the Mortgage insured thereunder creates a valid first Lien on the Real Property covered by such Mortgage free and clear of all Liens, defects and encumbrances (except those set forth in the Title Insurance Policy or otherwise reasonably acceptable to Lender); (iii) name Agent as the insured party thereunder; (iv) be in the form of ALTA Loan Policy 1970 (as amended) or other form approved by Agent, and (v) contain such endorsements and effective coverage as Agent may reasonably request;

(x)    <u>Term Loans</u>. Borrowers shall have consummated all transactions contemplated with the Term Loan Agent and the Term Loan Lenders substantially in accordance with the terms of the Term Loan Agreement as in effect on the Closing Date;

(y)    <u>Equity Investment</u>.  Agent shall have received evidence satisfactory to it that the Equity Investment has been consummated in accordance with terms and conditions satisfactory to Agent;

(z)    <u>Intercreditor Agreement</u>. Agent and Term Loan Agent shall have executed and delivered an amendment to the Intercreditor Agreement, in form and substance satisfactory to Agent;

(aa)    <u>Election of New Board of Directors</u>.  The Permitted Holders of the Voting Equity Interests shall have elected a new Board of Directors of each Borrower, which shall be comprised of the following seven (7) members: (i) the Chief Executive Officer of the Parent Company, (ii) one (1) individual appointed by the Affiliated Bondholders (as defined in the Reorganization Plan), (iii) four (4) individuals appointed by the Equity Sponsor (<u>provided</u>, <u>however</u>, that at least one (1) of such individuals shall be an Independent Director) and (iv) one (1) individual appointed by the DIP Lenders (as defined in the Reorganization Plan), <u>provided</u> that at least $4,000,000 is to be rolled over to new Equity Interests as of the Closing Date (in such event that this condition is not satisfied, the seventh member shall be appointed by the Equity Sponsor);

(bb)    <u>Minimum Liquidity</u>. Agent shall have received evidence satisfactory to it that on the Closing Date, after giving effect to the transactions contemplated herein and taking into consideration all closing fees and expenses and the current obligations of the Borrowers, Borrowers shall have Liquidity in an amount of at least $3,000,000;

(cc)    <u>Confirmation Order</u>. The Bankruptcy Court shall have entered the Confirmation Order (together with all exhibits and other attachments thereto, as any of the foregoing shall be amended, modified or supplemented from time to time or any of the terms or conditions thereof waived (with the consent of the Lenders and Agent with respect to any amendment, modification, supplement or waiver that is adverse to the Lenders, as determined by the Lenders and Agent in their reasonable discretion), the "<u>Plan Documents</u>") in respect of the Chapter 11 Cases of the Borrowers in accordance with Section 1129 of the Bankruptcy Code, and Agent shall have received a copy thereof.  The Confirmation Order shall be in form and substance reasonably satisfactory to the Lenders and Agent, shall have been entered on the docket of the Bankruptcy Court, shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in any manner (unless otherwise reasonably satisfactory to the Lenders and Agent) and Equity Sponsor and/or the Borrowers shall have made all cash payments contemplated thereunder;

3604386.15

(dd)    <u>Plan Documents</u>. The transactions contemplated by the Plan Documents shall have been consummated substantially contemporaneously with the consummation of the transactions hereunder (including, without limitation, all cash payments contemplated thereunder by Equity Sponsor and/or the Borrowers); and all conditions to the effectiveness of the Reorganization Plan shall have been satisfied or waived;

(ee)    <u>Management Agreements</u>. Agent shall have received from the Borrowers all management agreements and related documents and agreements duly executed by all parties thereto, in form and substance satisfactory to Agent;

(ff)    <u>Pledge Reaffirmation</u>.  Agent shall have received a pledge reaffirmation, in form and substance satisfactory to Agent, from each pledgor under the Pledge Agreement;

(gg)    <u>USA Patriot Act/OFAC</u>.  Agent and Lenders shall have received all documentation and other information required by applicable law and/or Governmental Authorities (including, without limitation, the USA Patriot Act and OFAC);

(hh)    <u>IRS Form 8821</u>. Each Borrower shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service;

(ii)    <u>Environmental Reports</u>. Agent shall have received environmental studies and reports prepared by independent environmental engineering firms experienced in such matters reasonably acceptable to Agent reflecting Borrowers' compliance with <u>Section 5.6</u> hereof with respect to any Real Property that Borrowers own in fee simple as of the Closing Date; and

(jj)    <u>Other Documents</u>. Agent shall have received all Other Documents which Agent determines to be reasonably necessary to consummate the transactions contemplated to occur on or after the Closing Date pursuant to this Agreement, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated herein shall be satisfactory in form and substance to each Lender Party and its legal counsel.

X.    <u>INFORMATION AS TO BORROWERS</u>.

Each Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.    <u>Disclosure of Material Matters</u>. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, report to Agent all matters materially and adversely affecting the value, or collectibility of any portion of the Collateral in excess of the Materiality Threshold or the enforceability of Agent's Lien thereon, including, without limitation, any Borrower's reclamation or repossession of, or the return to any Borrower of, any material amount of goods, or material amount of claims or disputes asserted by any Customer or other Obligor.

10.2.    <u>Schedules</u>. Deliver to Agent on or before the tenth (10th) day of each Fiscal Month as and for the prior Fiscal Month (a) Receivables agings, (b) accounts payable agings and (c) Inventory reports. In addition, each Borrower will deliver to Agent at such intervals as Agent may request: (i) confirmatory assignment schedules, (ii) copies of Customer's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including, without limitation, trial balances and test verifications. Agent shall also have the right to confirm and verify all Receivables by any manner and through any medium it considers commercially advisable and do whatever it may deem commercially necessary to protect its interests

hereunder. The items to be provided under this Section shall be in form satisfactory to Agent and executed by the Borrowing Representative and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

10.3.    _Environmental Compliance Certificate_. At the request of Agent from time to time, furnish promptly, but in any event within five (5) Business Days after Borrowers' receipt of such request, a certificate signed by a Designated Officer of Borrowing Representative stating that, to the best of Borrowing Representative's knowledge, each Borrower is in compliance in all Environmental Laws and laws relating to occupational safety and health. To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action Borrower will implement in order to achieve full compliance.

10.4.    _Litigation_. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of: (i) any Commercial Tort Claim arising in a Borrower's favor subsequent to the Closing Date, or (ii) any litigation, suit or administrative proceeding affecting any Borrower, including, particularly, any Commercial Tort Claim, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

10.5.    _Material Occurrences_. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, notify Agent in writing of: (a) any Event of Default or Default; (b) any event, development or circumstance as a result of which any financial statements or other reports furnished to Agent fail to present fairly in all material respects, in accordance with GAAP consistently applied, the consolidated financial condition or operating results of the Borrowers as of the date of such statements; (c) any accumulated retirement Plan funding deficiency which, if such deficiency continued for two (2) Plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (d) default by any Borrower in respect of any Indebtedness that exceeds the Materiality Threshold and could reasonably be expected to result in the acceleration of the maturity of such Indebtedness, other than the Obligations, together with the names and addresses of the holders of such Indebtedness and the amount of such Indebtedness; (e) the termination (or receipt of notice of pending termination) of any Material Agreement; and (f) any other development in the business or affairs of the Borrowers which could reasonably be expected to have a Material Adverse Effect; in each case, describing the nature thereof and the action that Borrowers propose to take with respect thereto.

10.6.    _Government Receivables_. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, if the aggregate outstanding amount of any of its Receivables that arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them, exceeds the Materiality Threshold.

10.7.    _Annual Financial Statements_. Furnish to Agent within one hundred (100) days after the end of each Fiscal Year of Borrowers financial statements of Borrowers on a consolidated basis, including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current Fiscal Year to the end of such Fiscal Year and a balance sheet as at the end of such Fiscal Year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by Malin, Bergquist & Company LLP or any other nationally recognized independent certified public accounting firm selected by Borrowers, but reasonably satisfactory to Agent (the "_Accountants_"). In addition, such financial statements shall be accompanied by a certificate of a Designated Officer of the Borrowing Representative,

in substantially the form of Exhibit 10.7, that shall state that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants (herein, a "Compliance Certificate").

10.8.   Quarterly and Monthly Financial Statements.  Furnish to Agent, (a) within fifty (50) days following the end of the first three (3) Fiscal Quarters of each Fiscal Year, and (b) within thirty (30) days following the end of each Fiscal Month, the following: (i) an unaudited balance sheet of Borrowers on a consolidated basis, and (ii) unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated basis reflecting results of operations from the beginning of the Fiscal Year to the end of such Fiscal Quarter or Fiscal Month, as applicable, and for such Fiscal Quarter or Fiscal Month, as applicable, all as prepared on a basis consistent with prior practices but in accordance with GAAP (together with a comparison to the reports for the corresponding period(s) in the prior Fiscal Year and to the Projections for the current Fiscal Year required under Section 10.9).  The reports shall be accompanied by a Compliance Certificate of Borrowers signed by a Designated Officer of Borrowing Representative stating that, based on an examination sufficient to permit Borrowing Representative to make an informed statement, no Default or Event of Default has occurred and is continuing, or, if such is not the case, specifying the nature of such Default or Event of Default, when it occurred, and the steps being taken by Borrowers with respect to such event, and such certificate shall have appended thereto calculations that set forth Borrowers' compliance with the Financial Covenants.

10.9.   Projections. Furnish to Agent, prior to the first day of each Fiscal Year, commencing with its first Fiscal Year beginning after the Closing Date, month-by-month projected financial statements of Borrowers on a consolidated basis for such Fiscal Year, including balance sheets, income statements, statements of cash flow, and calculations of projected Financial Covenant compliance (including projected amounts of all financial components used in determining compliance) for such month (collectively, with the Initial Projections, the "Projections"), with the Projections to be accompanied by a certificate of the Borrowers signed by a Designated Officer of the Borrowing Representative to the effect that such Projections were prepared by Borrowers in good faith based on assumptions believed by Borrowers to be reasonable at the time being made, it being understood that such Projections are not to be viewed as facts and that actual results may differ from such Projections.

10.10.   Variances From Operating Budget. Furnish to Agent, concurrently with the delivery of the financial statements referred to in Section 10.8, a summary of all material variances from the Projections submitted by Borrowers pursuant to Section 10.9.

10.11.   Notice of Adverse Events. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Authority or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Authority or any other Person to renew or extend any such Consent; (iii) copies of any periodic or special reports filed by any Borrower with any Governmental Authority, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower, taken as a whole, or if copies thereof are requested by any Lender Party.

10.12.   ERISA Notices and Requests. Promptly upon learning thereof, but in any event within five (5) Business Days thereafter, furnish to Agent written notice in the event that (i) any Borrower or any member of the Controlled Group knows that an ERISA Event has occurred, together with a written

statement describing such ERISA Event and the action, if any, that such Borrower or member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action that such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with a copy of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with a copy of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

10.13.  <u>Material Intellectual Property</u>. Notify Agent promptly after, but in any event within five (5) Business Days thereafter, if, subsequent to the Closing Date, any Borrower applies for, or acquires, any Material Intellectual Property registered (or registrable) under applicable federal law, and execute and deliver to Agent, upon request, such security agreements in respect thereof as Agent may request to evidence, confirm or perfect Agent's Lien on and security interest in such Collateral.

10.14.  <u>Public Reports</u>. Furnish to Agent, promptly after, but in any event within five (5) Business Days after, the same become publicly available, copies of all periodic and other reports, proxy statements and other materials (if any) filed by any Borrower with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to the owners of Borrowers' Equity Interests generally or to the holders of its Indebtedness (or any trustee, agent or to other representative therefor), as the case may be:

10.15.  <u>Material Agreements</u>. Furnish to Agent copies of: (i) all Material Agreements entered into subsequent to the Closing Date, promptly after, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (ii) all material amendments, modifications, alterations or other changes to any Material Agreements promptly upon, but in any event within five (5) Business Days after, the same become effective (or as otherwise provided herein); (iii) any notices of default, termination, rescission or cancellation, or demands for payment made or received by any Borrower in respect of any Material Agreement, promptly after, but in any event within five (5) Business Days after, their receipt or delivery by such Borrower.

10.16.  <u>Additional Information</u>. Furnish to Agent such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and

conditions of this Agreement and the Notes have been complied with by Borrowers including, without limitation and without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening or establishing of any new Collateral Location or any Borrower's closing of any existing Collateral Location, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts at any of its plants or other facilities, or the expiration (other than in accordance with its terms) of any labor contract to which any Borrower is a party or by which any Borrower is bound.

      10.17.  <u>Additional Documents</u>. Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

XI.   <u>EVENTS OF DEFAULT</u>.

      The occurrence of any one or more of the following events shall constitute an "Event of Default":

      11.1.  <u>Obligations</u>. (i) Failure by any Borrower to pay the principal amount of any Obligations when due, or (ii) failure by any Borrower to pay any Obligations consisting of interest and fees within two (2) Business Days after the date when due, or (iii) failure by Borrower to pay any other Obligations not described in clauses (i) or (ii) above within five (5) Business Days after the date when due; in each such case, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or any Other Document or by notice of intention to prepay, or by required prepayment;

      11.2.  <u>Misrepresentations</u>. Any representation or warranty of any material fact, circumstance or condition made or deemed made by any Borrower in this Agreement or any Other Document or in any certificate, document or financial or other written statement furnished by any Borrower at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

      11.3.  <u>Financial Information</u>. Failure by any Borrower to (i) furnish financial information when due or when requested pursuant hereto that is unremedied for a period of five (5) Business Days, or (ii) permit the inspection of its books or records by any Lender Party, when requested pursuant to <u>Section 4.10</u> hereof;

      11.4.  <u>Liens</u>. Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's property having a collateral value, as determined by Agent, of more than the Materiality Threshold that is not stayed or vacated within thirty (30) days (but not later than its being executed, however);

      11.5.  <u>Covenants</u>. Either (i) except as otherwise provided in <u>Section 11.3(i)</u> above or <u>clause (ii)</u> of this <u>Section 11.5</u>, failure of any Borrower to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document; or (ii) a failure of Borrowers to perform, keep or observe any term, provision, condition or covenant, contained in <u>Sections 4.7</u> or <u>6.4</u> hereof that is not cured within twenty (20) days from the occurrence of such failure;

      11.6.  <u>Judgments</u>. Any judgment is rendered or judgment Lien is filed against any Borrower for an amount in excess of the Materiality Threshold which is not either satisfied, stayed or discharged of record within thirty (30) days of such rendering or filing (but not later than its being executed, however);

11.7.    Voluntary Bankruptcy. Any Borrower, any Subsidiary of any Borrower or any Guarantor shall (other than with respect to the Chapter 11 Cases) (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (vi) admit in writing its inability, or be generally unable, to pay its Indebtedness as it becomes due, (vii) file a petition seeking to take advantage of any other law providing for the relief of debtors, or (viii) take any action for the purpose of effecting any of the foregoing;

11.8.    Cessation of Business. Any Borrower shall cease operation of its business or commence the liquidation of such business; or any Borrower shall give notice to Agent of its intent to undertake either of the foregoing measures;

11.9.    Involuntary Bankruptcy. Any Borrower, any Subsidiary of a Borrower or any Guarantor shall acquiesce in, or fail to have dismissed within forty-five (45) days, any petition filed against it in any involuntary case under any state or federal bankruptcy law (as now or hereafter in effect), or take any action for the purpose of effecting any of the foregoing;

11.10.    Material Adverse Change. Any change in any Borrower's condition or affairs (financial or otherwise) which in Agent's reasonable opinion has a Material Adverse Effect unless such Borrower remedies same to Agent's satisfaction within thirty (30) days after the Borrowing Representative receives written notice thereof from Agent;

11.11.    Agent's Liens. Any Lien on any Collateral created hereunder or provided for hereby or under any Other Document ceases to be or is not a valid and perfected Lien having a first priority interest, except for any Permitted Encumbrance having Lien priority;

11.12.    Subordinated Debt. An event of default shall occur under or in respect of any Subordinated Debt that causes the acceleration of, or entitles the holder thereof to cause the acceleration of, any Subordinated Debt, or any payment is made or received in respect of any Subordinated Debt in violation of the subordination provisions thereof, the terms hereof or the terms of any Subordination Agreement made with respect thereto.

11.13.    Cross Default. Either: (i) any "Event of Default" (as defined herein) under the Term Loan Agreement shall occur and be continuing (unless waived in writing by the Term Loan Lenders); or (ii) any "Event of Default" (as defined therein) under the Junior Lien Facility Documents shall occur and be continuing (unless waived in writing by the holder of the Junior Lien Facility Subordinated Note); or (iii) a default of the obligations of any Borrower under any other Material Agreement which involves a monetary obligation in excess of the Materiality Threshold, whether individually or in the aggregate, shall occur, which default is not cured (or waived in writing) within any applicable grace period;

11.14.    Guaranty. Termination (except by its express terms) or breach of any Guaranty or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor attempts to terminate or challenges the validity of, or its liability under, any such Guaranty or similar agreement;

11.15.    Change of Control. Any Change of Control shall occur;

11.16.    Change of Management. Any Change of Management shall occur;

3604386.15

53

11.17.    Invalidity. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower, or any Borrower shall so claim in writing to Agent;

11.18.    Takings. (i) Any Governmental Authority shall revoke, terminate, suspend or adversely modify any license, permit, patent trademark or trade name of any Borrower, the continuation of which is material to the continuation of any Borrower's business; or (ii) any agreement that is necessary or material to the operation of any Borrower's business shall be suspended, revoked or terminated and not be reinstated or replaced by a substitute acceptable to Agent within thirty (30) days after the date of suspension, revocation or termination, and such suspension, revocation or termination without reinstatement or replacement would reasonably be expected to have a Material Adverse Effect;

11.19.    Seizures. Any portion of the Collateral in excess of the Materiality Threshold shall be seized or taken by a Governmental Authority, or any Borrower or the title and rights of any Borrower shall have become the subject matter of litigation which could reasonably be expected, in the opinion of Agent, upon final determination, to result in material impairment or loss of such Collateral;

11.20.    Cessation of Operations. Unless and except to the extent occurring in the ordinary course of Borrowers' business as conducted on the Closing Date, any material portion of the business operations of the Borrowers (considered as a whole) are interrupted at any time for more than ten (10) consecutive Business Days during any period of thirty (30) consecutive days, unless (i) such cessation of operations occurs in the ordinary course of Borrowers' business; e.g., an annual plant shutdown for re-tooling or maintenance or (ii) the Borrowers shall (A) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to enable them to continue to operate their business in substantially the same manner as operated prior to such interruption and meet their obligations when due during such interruption and (B) receive the proceeds described in clause (A) preceding not later than thirty  (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (A) and (B) of this section, an Event of Default shall be deemed to have occurred if such interruption of operations continues for a period of more than one hundred eighty (180) consecutive days;

11.21.    Plans. An event or condition specified in Section 7.12 or Section 10.12 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) that, in the judgment of Agent, could reasonably be expected to have a Material Adverse Effect; or

11.22.    Criminal Charges. Any Borrower or any Designated Officer shall become the subject of a criminal indictment or investigation in respect of or pertaining to, the operation or conduct of a Borrower's business, its reporting of any financial data, its application for, or receipt of, any credit, its "laundering" of any funds or its non-payment (or underpayment) of any taxes or any other Charges, or shall admit its guilt or complicity in respect of any of the foregoing, or shall pay any fine or suffer any penalty in respect thereof (including as part of any plea bargain or similar arrangement).

XII.    AGENT'S AND LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

12.1.    Rights and Remedies. Upon and after the occurrence of an Event of Default pursuant to Sections 11.7, 11.8, 11.9 or 11.20, all Obligations shall be immediately due and payable and this Agreement and all Commitments shall be deemed terminated. During the existence of any other Event of Default not specified in the preceding sentence, at the option of Required Lenders, all Obligations shall be

immediately due and payable and Lenders shall have the right to terminate this Agreement and all Commitments, and cease making Advances. Upon the occurrence of any Event of Default and during its continuation, Agent shall have the right to exercise any and all other rights and remedies provided for herein, under the Uniform Commercial Code and at law or in equity generally, including, without limitation, the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral that is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowers at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and such right and equity are hereby expressly waived and released by each Borrower. In connection with the exercise of the foregoing remedies, Agent is granted permission to use all of each Borrower's trademarks, trade styles, trade names, patents, patent applications, licenses, franchises and other proprietary rights that are used in connection with (a) Inventory for the purpose of disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of Inventory. Notwithstanding anything in this Agreement to the contrary, the exercise by any Lender Party of any rights or remedies in respect of any Collateral, and the application of any proceeds thereof, shall be subject in all respects to the provisions of the Intercreditor Agreement.

      12.2.   <u>Application of Proceeds</u>. The proceeds realized by Agent from the sale of any Collateral made pursuant to <u>Section 12.1</u> hereof, shall, subject to the provisions of the Intercreditor Agreement, be applied as follows: <u>first</u>, to the costs, expenses and attorneys' fees and expenses actually incurred by Agent for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; <u>second</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document in respect of the Equipment Term Loan; <u>third</u>, to interest on the Equipment Term Loan then accrued, but unpaid; <u>fourth</u>, to the then outstanding principal amount of the Equipment Term Loan; <u>fifth</u>, to any fees then due to any Lender Party pursuant hereto or under any Other Document in respect of the Revolving Credit Advances; <u>sixth</u>, to interest on the Revolving Credit Advances then accrued, but unpaid; <u>seventh</u>, to the principal amount of any Revolving Credit Advances then outstanding; <u>eighth</u>, to furnish Agent cash Collateral in an amount not less than one hundred five percent (105%) of the aggregate undrawn amount of all Letters of Credit, such cash collateral arrangements to be in form and substance satisfactory to Agent; <u>lastly</u>, to all other Obligations then outstanding; <u>provided</u>, <u>however</u>, that Agent reserves the right to adjust the foregoing allocations as it sees fit from time to time, in its sole discretion, and apply (or re-apply, as the case may be) such proceeds to the Obligations in a different manner or order. If any deficiency shall arise, Borrowers shall remain liable to the Lender Parties therefor. If any surplus exists, such surplus shall be held by Agent as cash Collateral pending full payment and satisfaction of all Obligations and termination of this Agreement, after which any remainder shall be returned to the Borrowing Representative except as otherwise provided in the Intercreditor Agreement or is otherwise then required under applicable law.

3604386.15

12.3.    <u>Agent's Discretion</u>. After an Event of Default has occurred and while it is continuing, Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto, <u>provided</u> that such determination will not in any way modify or affect any Lender Party's rights hereunder.

12.4.    <u>Setoff</u>.

(a)    <u>Establishment of Right</u>. In addition to any other rights which any Lender Party may have under applicable law, upon the occurrence of an Event of Default and during its continuation, each Lender Party shall have a right of setoff as to, and may apply, any Borrower's property held by it (actually or constructively) to reduce the Obligations, subject to the provisions of the Intercreditor Agreement; <u>provided</u>, <u>however</u>, that no Lender Party shall have any such right of setoff, appropriation or application against any Payroll Account. Each Lender Party agrees to notify the Borrowing Representative and the Agent after any such setoff and application is made by such Lender Party, <u>provided</u> that its failure to give such notice shall not affect the validity of such setoff and application.

(b)    <u>Benefited Lender Parties</u>. If any Lender Party (a "<u>Benefited Party</u>") shall at any time receive any payment of all or part of its Advances, or interest thereon, or other Obligations owing under this Agreement or the Other Documents or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in <u>Section 11.7</u> or <u>Section 11.9</u> or otherwise), in a greater proportion than any such payment to or Collateral received by any other Lender Party, if any, in such Advances, or interest thereon, or other Obligations owing under this Agreement or the Other Documents, such Benefited Party shall purchase for cash from each affected Lender Party a participating interest in such portion of each such other Lender Party's Advances or other Obligations owing under this Agreement or Other Documents, or shall provide each Lender Party with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Parties to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lender Parties; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Party, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrowers agree that each Lender Party so purchasing a portion of another Lender Party's Advances or other Obligations owing under this Agreement or the Other Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of <u>clause (a)</u> of this <u>Section 12.4</u>, rights of setoff) with respect to such portion purchased as fully as if such Lender Party were the direct holder thereof.

12.5.    <u>Rights and Remedies not Exclusive</u>. The enumeration of the foregoing rights and remedies of the Lender Parties is not intended to be exhaustive, and the exercise of any right or remedy by the Lender Parties shall not preclude the exercise of any other right or remedy provided for herein or in any Other Document or otherwise provided by law from and after the occurrence of any Event of Default and during its continuation, all of which shall be cumulative and not alternative.

XIII.    <u>WAIVERS AND JUDICIAL PROCEEDINGS</u>.

13.1.    <u>Waiver of Notice</u>. Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

3604386.15

13.2.   Delay. No delay or omission on any Lender Party's part in exercising any right, remedy or option hereunder or under any of the Other Documents shall operate as a waiver of such right, remedy or option or of any Default or Event of Default.

13.3.   Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTIONS; IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIV.   EFFECTIVE DATE AND TERMINATION.

14.1.   Term. This Agreement, which shall inure to the benefit of, and shall be binding upon, the respective successors and permitted assigns of each Borrower and each Lender Party; shall become effective on the Closing Date, and shall continue in full force and effect until **[July 19]**, 2013 (the "Term") unless sooner terminated as herein provided. Borrowers may terminate this Agreement at any time, contingent upon payment in full of the Obligations.

14.2.   Termination. The termination of this Agreement shall not affect the rights of any Borrower or any Lender Party, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, all rights or interests created hereby, and all of the Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent for the benefit of the Lender Parties hereunder and the financing statements filed in respect thereof shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been paid or performed in full after the termination of this Agreement or each Borrower has furnished the Lender Parties with an indemnification satisfactory to such parties with respect thereto. Accordingly, each Borrower waives any rights that it may have under the applicable provisions of the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to deliver such termination statements to the Borrowers, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or performed in full. Notwithstanding any other provision of this Agreement or any Other Document, no termination of this Agreement shall affect Agent's or any Lender's rights or any of the Obligations existing as of the effective date of such termination, and the provisions of this Agreement and the Other Documents shall continue to be fully operative until the Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to Agent hereunder and under the Other Documents and the financing statements filed pursuant thereto and the rights and powers of Lender shall continue in full force and effect notwithstanding the fact that Borrowers' borrowings hereunder may from time to time be in a zero or credit position until all of the Obligations have been fully performed and indefeasibly paid in full in cash.

3604386.15

XV.     REGARDING AGENT.

15.1.    Appointment. Each Lender Party hereby designates CapitalSource to act as Agent for such Lender Party under this Agreement and the Other Documents. Each Lender Party hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest and all fees, charges and collections received pursuant to this Agreement, for the ratable benefit of the Lender Parties, except the fees and other amounts payable to Agent as set forth in Section 9.1(k). Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including, without limitation, collection of the Obligations), Agent shall not be required to exercise any discretion or take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, which instructions shall be binding; provided, however, that Agent shall not be required to take any action that exposes Agent to liability or that is contrary to this Agreement or the Other Documents or applicable law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto from the Lender Parties.

15.2.    Nature of Duties. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent, nor any of its officers, directors, employees or agents, shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by any of them under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder or under any Other Documents. Agent shall not be under any obligation to any Lender Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower. The duties of Agent with respect to the Advances shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, express or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any Other Document, except as expressly set forth herein or therein.

15.3.    Lack of Reliance on Agent and Resignation. Independently and without reliance upon Agent, each other Lender Party has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower in connection with the making and carrying of the Advances or any other Obligations and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender Party with any credit or other information with respect thereto, whether coming into its possession before the making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender Party for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or for the financial condition of any Borrower, or be required to

3604386.15

make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Notes, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default. Agent may resign on thirty (30) days' written notice to each of the Lenders and, upon such resignation, the Required Lenders will promptly designate a successor Agent. If no such successor Agent is appointed at the end of such thirty (30) day period, Agent may designate one of the existing Lenders as a successor Agent. Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "<u>Agent</u>" shall mean such successor Agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.    <u>Certain Rights of Agent</u>. If Agent shall request instructions from Lenders with respect to any act or action (including any failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, <u>no Lender Party shall have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders</u>.

15.5.    <u>Reliance</u>. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

15.6.    <u>Notice of Default</u>. Agent shall not be deemed to have knowledge or notice of the occurrence, continuation or cessation of any Default or Event of Default unless Agent has received notice from a Lender Party or a Borrower referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default" (or a notice in respect of the continuation or cessation thereof). In the event that Agent receives such a notice, Agent shall give notice thereof to all other Lender Parties. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; <u>provided</u>, <u>however</u>, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders consistent with the terms of this Agreement and the Other Documents.

15.7.    <u>Indemnification</u>. To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; <u>provided</u>, <u>however</u>, that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the indemnified party's gross (not mere) negligence or willful misconduct.

3604386.15

15.8.    <u>Agent in its Individual Capacity</u>. As to that portion of the Advances made by Agent as a Lender, Agent shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties of Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Borrower as if it were not performing the duties of Agent specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

15.9.    <u>Delivery of Documents</u>. To the extent Agent receives documents and information from any Borrower pursuant to <u>Article X</u> of this Agreement, Agent will promptly furnish such documents and information to the other Lender Parties.

15.10.    <u>Borrowers' Undertaking to Agent</u>. Without prejudice to their respective obligations to Lender Parties under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall <u>pro</u> <u>tanto</u> satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

15.11.    <u>Documentation Agent, Etc</u>. Agent shall have the continuing right, for purposes hereof, at any time from time to time to designate one or more Lender Parties (and/or its or their Affiliates) as "Co-Agent," "Collateral Agent," "Co-Documentation Agent," "Syndication Agent," "Arranger" or otherwise for purposes hereof, but such designations shall have no substantive effect, and the Lender Parties (or their Affiliates) so designated shall have no additional powers, duties or responsibilities as a result hereof. Further, no such Lender Party need be identified by such designation in any Other Document (including any amendment hereto or thereto) or execute this Agreement or any Other Document, using such designation.

15.12.    <u>Collateral Matters</u>. Agent is authorized on behalf of Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or this Agreement or any of the Other Documents that may be necessary or reasonably advisable to perfect and maintain perfected the security interest in and Liens upon the Collateral granted pursuant to this Agreement of the Other Documents. Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion and without the necessity of any notice to or further consent from the Lenders, to release any Liens upon any Collateral (a) upon the repayment in full of the Obligations and termination of this Agreement and the Other Documents or as otherwise contemplated in this Agreement, including, without limitation, with respect to any Permitted PP&E Disposition; (b) constituting property in which Borrowers owned no interest at the time the Lien was granted or at any time thereafter; or (c) constituting property leased to Borrowers under a lease which has expired or been terminated in a transaction permitted under this Agreement. Upon request by Agent or Borrowers at any time, Lenders will confirm in writing Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this <u>Section 15.12</u>. Upon receipt by Agent of any authorization from Lenders of Agent's authority to release any Liens upon particular types or items of Collateral, and upon at least 5 Business Days' prior written request by Borrowers, Agent shall (and is hereby irrevocably authorized by Lenders to) execute such documents as may be necessary to evidence the release of its Liens upon such Collateral; <u>provided</u>, <u>however</u>, that (i) Agent shall not be required to execute any such document on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon

3604386.15

all interests retained by the Agent for the benefit of the Lenders, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

XVI.    BORROWING REPRESENTATIVE.

16.1.    Borrowing Representative Provisions. If and to the extent that at any time or from time to time there are multiple Borrowers, then:

(a)    Each Borrower acknowledges that it together with each other Borrower make up a related organization of various entities constituting a single economic and business enterprise and sharing a substantial identity of interests such that, without limitation, Borrowers render services to or for the benefit of each other, purchase or sell and supply goods to or for the benefit of each other, make loans or advances and provide other financial accommodations to or for the benefit of each other (including the payment of creditors and guarantees of Indebtedness), provide administrative, marketing, payroll and management services to or for the benefit of each other; have centralized accounting, common officers and directors. Accordingly, and without limitation, any credit or other financial accommodation extended to any one Borrower pursuant hereto will result in direct and substantial economic benefit to each other Borrower, and each Borrower will likewise benefit from the economic benefit to each other Borrower, and consequently, the Borrowers, as a group, applying for credit and other financial accommodations pursuant hereto on a collective basis.

(b)    Each Borrower hereby irrevocably designates Borrowing Representative to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Representative.

(c)    The handling of this credit facility as a co-borrowing facility with a Borrowing Representative in the manner set forth in this Agreement is solely an accommodation to Borrowers and at their specific request. No Lender Party shall incur any liability to Borrowers as a result thereof. To induce each Lender Party to do so and in consideration thereof, each Borrower hereby indemnifies each Lender Party and holds each Lender Party harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against such Lender Party by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent, any Lender or any other Lender Party on any request or instruction from Borrowing Representative or any other action taken by Agent, any Lender or any other Lender Party with respect to this Section except due to willful misconduct or gross (not mere) negligence by the indemnified party.

(d)    All Obligations shall be joint and several liabilities of Borrowers. Each Borrower cross-guarantees the full payment and performance hereunder and under the Other Documents by the other Borrower of its Obligations, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extension, renewal or forbearance granted by any Lender Party to any Borrower, the failure any Lender Party to give any Borrower any notice, any failure of any Lender Party to pursue or preserve its rights against any Borrower, the release by any Lender Party of any Borrower or any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by any Lender Party to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof.

16.2.  <u>Waiver of Subrogation</u>. Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim that such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property that is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVII.  <u>MISCELLANEOUS</u>.

17.1.  <u>GOVERNING LAW</u>. THIS AGREEMENT AND, UNLESS OTHERWISE EXPRESSLY PROVIDED THEREIN, EACH OTHER DOCUMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLIED TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN THE STATE OF NEW YORK. ANY JUDICIAL PROCEEDING BROUGHT BY OR AGAINST ANY BORROWER WITH RESPECT TO ANY OF THE OBLIGATIONS, THIS AGREEMENT OR ANY OTHER DOCUMENT OR ANY RELATED TRANSACTION MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE CITY AND STATE OF NEW YORK, UNITED STATES OF AMERICA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT. EACH BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO BORROWING REPRESENTATIVE AT ITS ADDRESS SET FORTH IN <u>SECTION 17.6</u> AND SERVICE SO MADE SHALL BE DEEMED COMPLETED FIVE (5) BUSINESS DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAILS OF THE UNITED STATES OF AMERICA; PROVIDED, HOWEVER, IF BORROWING REPRESENTATIVE CEASES TO HAVE AN ADDRESS IN NEW YORK, NEW YORK AS ITS NOTICE ADDRESS PURSUANT TO <u>SECTION 17.6</u>, THEN, AT ANY LENDER PARTY'S OPTION, BY SERVICE UPON THE CORPORATION SERVICE COMPANY (OR ANY SUCCESSOR OR REPLACEMENT AGENT FOR SERVICE WITH AN OFFICE IN NEW YORK, NEW YORK, SELECTED BY SUCH LENDER PARTY), WHICH EACH BORROWER HEREBY APPOINTS AS ITS AGENT FOR THE LIMITED PURPOSE OF ACCEPTING SERVICE IN THE STATE OF NEW YORK UNDER SUCH CIRCUMSTANCE. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR LIMIT THE RIGHT OF ANY LENDER PARTY TO BRING PROCEEDINGS AGAINST ANY BORROWER IN THE COURTS OF ANY OTHER JURISDICTION. EACH BORROWER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER AND SHALL NOT ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE OR BASED UPON <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u>. ANY JUDICIAL PROCEEDING BY ANY BORROWER AGAINST ANY LENDER PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OR CLAIM IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR ANY OTHER DOCUMENT, SHALL BE BROUGHT ONLY IN A FEDERAL OR STATE COURT LOCATED IN THE CITY OF NEW YORK, STATE OF NEW YORK OR IN THE COURTS OF ANY OTHER JURISDICTION IN WHICH ANY LENDER PARTY HAS BROUGHT A PROCEEDING AGAINST ANY BORROWER IN RESPECT HEREOF THAT IS THEN PENDING.

3604386.15

17.2.    <u>Entire Understanding</u>.

(a)    This Agreement and the Other Documents contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by the respective officers of the party making such promises, representations, warranties, or guarantees. Neither this Agreement nor any Other Document nor any portion or provisions hereof or thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and the Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement or any Other Document.

(b)    The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this <u>subsection</u>, from time to time enter into written supplemental agreements to this Agreement or the Other Documents for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent, or Borrowers hereunder or thereunder or the conditions, provisions or terms hereof or thereof, or waiving any Event of Default, but only to the extent specified in such written agreements; <u>provided</u>, <u>however</u>, that no such supplemental agreement shall, without the consent of all Lenders: (i) increase the Commitment or Commitment Percentage of any Lender; (ii) increase the Maximum Revolving Credit Amount; (iii) extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders pursuant to this Agreement; (iv) alter the definition of the term "Required Lenders" or alter, amend or modify this <u>Section 17.2(b)</u>; or (v) release during any calendar year any Collateral (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of the Materiality Threshold. No supplemental agreement shall, without the consent of Agent, change the rights and duties of Agent. Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders and Agent and all future holders of the Obligations. In the case of any waiver of any Event of Default, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default that was waived), or impair any right or remedy arising therefrom.

(c)    In the event that Agent requests the consent of a Lender pursuant to this Section and such consent is denied, then CapitalSource may, at its option, require such Lender to assign its interest in the Advances to CapitalSource or to another Lender or to any other Person designated by the Agent (the "<u>Designated Lender</u>"), for a price equal to the then outstanding principal amount of that portion of the Advances owing to such Lender plus accrued and unpaid interest thereon and any fees then due such Lender, which interest and fees shall be paid when collected from Borrowers. In the event CapitalSource elects to require any Lender to assign its interest to CapitalSource or to the Designated Lender, CapitalSource will so notify such Lender in writing within forty-five (45) days following such Lender's denial, and such Lender will assign its interest to CapitalSource or the Designated Lender no later than five (5) Business Days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, CapitalSource or the Designated Lender, as appropriate, and Agent.

3604386.15

17.3.    <u>Successors and Assigns; Participations: New Lenders</u>.

(a)    This Agreement shall be binding upon and inure to the benefit of Borrowers, each Lender Party, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)    Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to one or more Participants. In the event of a sale by a Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the Other Documents shall remain unchanged for all purposes, (b) the Borrowers and the Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and under the Other Documents, and (c) all amounts payable by Borrowers hereunder and under the Other Documents shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. No Participant shall have any direct or indirect voting rights hereunder except with respect to any event described in <u>Section 17.2(b)</u> expressly requiring the unanimous vote of all Lenders or, as applicable, all affected Lenders. Each Lender agrees to incorporate the requirements of the preceding sentence into each participation agreement that such Lender enters into with any Participant. Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the same right of setoff pursuant to <u>Section 12.4</u> hereof in respect to its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; <u>provided</u>, <u>however</u>, that such right of setoff shall be subject to the provisions of <u>Section 12.4</u> hereof and each Participant shall be obligated to share with the Lenders, and the Lenders agree to share with each Participant as provided in <u>Section 12.4</u> hereof. Each Participant may exercise all rights of payment (including, without limitation, rights of set-off) with respect to the portion of the Advances in which a participation has been purchased by it as fully as if such Participant were the direct holder thereof, <u>provided</u> that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in the Advances to such Participant had such Lender retained such interest in the Advances, and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same portion of the Advances to both such Lender and such Participant.

(c)    Any Lender may sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to any Lender, any Affiliate of any Lender or an Approved Fund or, subject to <u>subsection (d)</u> below, with the consent (which shall not be unreasonably withheld, conditioned or delayed) of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers (reasonable grounds for withholding consent to include an assignee who would subject the Borrowers to the payment of materially greater costs of the types described in <u>Sections 3.7</u> and <u>3.8</u> than Borrowers are otherwise then subject to paying) to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make or carry all or a portion of the Advances (each a "<u>Purchasing Lender</u>"), in minimum amounts of not less than Five Million Dollars ($5,000,000), pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Borrowers' consent (if required) to any such sale, assignment or transfer shall be presumed unless Borrowers object thereto in writing, with reasonable detail for such objection included therein, within three (3) Business Days after Borrowing Representative receives a written request for such consent. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the

extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a notation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers hereby consent to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing, including, if requested by any Lender, the execution and delivery of one or more promissory notes in replacement of one or more existing Notes. As used herein, "Approved Fund" shall mean any (i) investment company, hedge fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business or (ii) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (i) and that, with respect to each of the preceding clauses (i) and (ii), is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

(d)     Nothing contained herein shall limit in any way the right of any Lender (without notice to, or consent of, the Agent or any Borrower) to assign all or a portion of the Loans owing to it from time to time to (i) any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System or any Operating Circular issued by such Federal Reserve Bank, or (ii) to any other Person to whom such Lender is indebted from time to time (including, but not limited to, under any warehousing, securitization or overnight repurchase facility), as collateral security in respect thereof (such Persons described in clauses (i) and (ii) above herein called "Lender Pledgees"), but, no such assignment shall release the assigning Lender from its obligations hereunder.

(e)     Agent shall maintain at its address set forth in Section 17.6 hereof a copy of each Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of the owners of the Advances from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of that portion of the Advances recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of not less than Three Thousand Five Hundred Dollars ($3,500) payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment to such Purchasing Lender, unless waived in writing by Agent.

(f)     Borrowers authorize each Lender to disclose to any transferee or Purchasing Lender and any prospective transferee or Purchasing Lender any and all financial information in such Lender's possession concerning Borrowers which has been delivered to such Lender by or on behalf of Borrowers pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrowers.

3604386.15

(g)    If, pursuant to this Section, any interest in this Agreement or any portion of the Advances or any Note is transferred to any transferee that is organized under the laws of any jurisdiction other than the United States of America or any State thereof, the transferor Lender shall cause such transferee, concurrently with the effectiveness of such transfer, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Agent and the Borrowers) that, under applicable law and treaties, no taxes will be required to be withheld by the Agent, the Borrowers or the transferor Lender with respect to any payments to be made to such transferee in respect of the Advances or Notes transferred, (ii) to furnish to the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrowers) two duly completed and signed copies of either U.S. Internal Revenue Service Form W-8 BEN or U.S. Internal Revenue Service Form W-8 ECI, or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities (wherein such transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments hereunder), and (iii) to agree (for the benefit of the transferor Lender, the Agent and the Borrowers) to provide the transferor Lender (and, in the case of any Purchasing Lender, the Agent and the Borrower) new forms as contemplated hereby upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption.

17.4.    <u>Application of Payments</u>. Subject to <u>Section 2.9</u> and <u>Section 12.2</u>, Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause of action, then, to such extent, the Obligations or part thereof intended to be satisfied shall be reinstated and continue as if such payment or proceeds had not been received by Agent or such Lender.

17.5.    <u>Indemnity</u>. Each Borrower jointly and severally shall indemnify Agent, each Lender, their respective Affiliates and its and their respective managers, members, officers, employees, Affiliates, agents, representatives, successors, assigns, accountants and attorneys (collectively, the "<u>Indemnified Persons</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel and in-house legal documentation, diligence fees and expenses) which may be imposed on, incurred by or asserted against any Indemnified Person with respect to or arising out of, or in any litigation, proceeding or investigation instituted or conducted by any Person with respect to any aspect of, or any transaction contemplated by or referred to in, or any matter related to, the Existing Credit Agreement, this Agreement, any Other Document and/or any agreement, document or transaction contemplated thereby, whether or not such Indemnified Person is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment). If any Indemnified Person uses in-house counsel to provide legal services for which any Borrower is responsible to pay or indemnify, each Borrower expressly agrees that its indemnification obligations include the allocable costs of such in-house counsel. Agent and each Lender agrees to give Borrowing Representative reasonable notice of any event of which Agent or such Lender becomes aware for which indemnification may be required under this <u>Section 17.5</u>, and Agent or such Lender may elect (but is not obligated) to direct the defense thereof, <u>provided</u> that the selection of counsel shall be subject to Borrowing Representative's consent, which consent shall not be unreasonably withheld or delayed. Any Indemnified Person may, in its reasonable discretion, take such actions as it deems necessary and

appropriate to investigate, defend or settle any event or take other remedial or corrective actions with respect thereto as may be necessary for the protection of such Indemnified Person or the Collateral. Notwithstanding the foregoing, if any insurer agrees to undertake the defense of an event (an "Insured Event"), Agent and each Lender agrees not to exercise its right to select counsel to defend the event if that would cause any Borrower's insurer to deny coverage; provided, however, that Agent and each Lender reserves the right to retain counsel to represent any Indemnified Person with respect to an Insured Event at its sole cost and expense. To the extent that Agent or any Lender obtains recovery from a third party other than an Indemnified Person of any of the amounts that any Borrower has paid to Lender pursuant to the indemnity set forth in this Section 17.5, then Agent or such Lender shall, promptly pay to such Borrower the amount of such recovery.

17.6.    Notice. Any notice or request hereunder or under any of the Other Documents may be given to any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 17.6. Any notice or request hereunder shall be given by (a) hand delivery, (b) a nationally recognized overnight courier, (c) registered or certified mail, return receipt requested, or (d) telecopy to the number set forth below (or such other number as may hereafter be specified in a notice designated as a notice of change of address) with electronic confirmation of its receipt. Any notice or other communication required or permitted pursuant to this Agreement shall be deemed given (a) when personally delivered to any officer of the party to whom it is addressed, (b) on the earlier of actual receipt thereof or five (5) Business Days following posting thereof by certified or registered mail, postage prepaid, or (c) upon actual receipt thereof when sent by a recognized overnight delivery service or (d) upon actual receipt thereof when sent by telecopier to the number set forth below (or to such other number as has been furnished by a party to the others by like notice) or in any Commitment Transfer Supplement; with electronic confirmation of its receipt, in each case addressed to each party at its address set forth below (or at such other address as has been furnished in writing by a party to the others by like notice):

(A)    If to Agent or to

CapitalSource as Lender at:          CapitalSource Finance LLC
                                     4445 Willard Avenue
                                     12th Floor
                                     Chevy Chase, Maryland 20815
                                     Attention: Portfolio Manager/Business
                                     Credit Services
                                     Telecopier: (301) 841-2889
                                     Email: mfidati@capitalsource.com

with a copy to:                      CapitalSource Finance LLC
                                     4445 Willard Avenue
                                     12th Floor
                                     Chevy Chase, Maryland 20815
                                     Attention: Joanne Fungaroli
                                     Telecopier: (301) 841-2889
                                     Email: jfungaroli@capitalsource.com

with a copy to:                      Waller Lansden Dortch & Davis, LLP
                                     511 Union Street, Suite 2700

3604386.15

> Nashville, Tennessee 37219-8966
> Attention:  Robert L. Harris, Esq.
> Telecopier: (615) 244-6804
> E-mail: robert.harris@wallerlaw.com

(B)      If to a Lender other than Agent or CapitalSource, as specified on the signature pages hereof.

(C)   If to Borrowing Representative
      or any Borrower, at:

> Lexington Precision Corporation
> 800 Third Avenue, 15th Floor
> New York, NY 10022
> Attention: Michael R. Lubin
> Telecopier: (212) 319-4659
> E-mail: mlubin@lexingtonprecision.com

with a copy to:

> Aurora Resurgence Management Partners LLC
> 10877 Wilshire Blvd.
> 21st Floor
> Los Angeles, California 90024
> Attention: Steve Martinez
> Telecopier: (310) 277-5591
> E-mail: smartinez@aurorares.com

17.7.   Survival. The obligations of Borrowers under Sections 2.6(d), 3.7, 3.8, 4.18(h), 17.5 and 17.9 shall survive any termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8.   Severability. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

17.9.   Expenses. All costs and expenses incurred by Agent and/or its Affiliates (and each Lender, with respect to expenses incurred at any time during which an Event of Default exists) including, without limitation, all costs and expenses, documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including, without limitation, UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches and wire transfer fees and audit expenses), reasonable attorneys' fees and disbursements incurred by Agent (or any Lender with respect to expenses incurred at any time during which an Event of Default exists): (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, (c) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement, the Note or any Other Documents and/or any related agreement, document or instrument; or (d) arising in any way out of the administration of the Obligations or this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, or the taking or refraining from taking by Agent or any Lender of any action requested by any Borrower or (e) in instituting, maintaining, preserving, enforcing

and foreclosing on Agent's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (f) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's transactions with any Borrower, or (g) in connection with any advice given to Agent with respect to its rights and obligations under this Agreement, the Notes or any Other Documents and/or any related agreements, documents or instruments, may be charged to Borrowers' Account and shall be part of the Obligations. If Agent or any of its Affiliates uses in-house counsel to provide legal services under this Agreement or any Other Document for which Borrowers are responsible to pay or indemnify, each Borrower expressly agrees that its Obligations include the reasonable allocable costs of such in-house counsel.

17.10.   Injunctive Relief. Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lenders; and, accordingly, Agent, if Agent so requests, shall, to the extent permitted by applicable law, be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11.   Consequential Damages. No Lender Party, nor any agent or attorney for it, shall be liable to any Borrower, nor shall any Borrower, or any agent of attorney for it, be liable to any Lender Party, for consequential damages arising from any breach of contract, tort or other wrong relating to the execution, delivery or performance under this Agreement or any Other Document, the establishment, administration or collection of the Obligations or any related transaction.

17.12.   Captions. The captions at various places in this Agreement and any Other Document are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement or any Other Document.

17.13.   Counterparts; Telecopied Signatures. This Agreement and each Other Document may be executed in any number of separate counterparts and by different parties hereto in separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format shall be deemed to be an original signature hereto and each party agrees that it will be bound by its own facsimile signature or signature sent by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format and that it accepts the facsimile signature or signature by e-mail transmission of an adobe file format document (also known as a PDF file) or similar file format of each other party.

17.14.   Construction. The parties acknowledge that each party and its counsel have reviewed this Agreement and each Other Document and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and each Other Document or any amendments, schedules or exhibits thereto.

17.15.   Confidentiality. Each Lender Party shall hold all non-public information obtained by it pursuant to the requirements of this Agreement and each Other Document in accordance with such Lender Party's customary procedures for handling confidential information of this nature; provided, however, that each Lender Party may disclose such confidential information (a) to its examiners, affiliates, outside auditors, counsel, rating agencies, collateral agents and other professional advisors, (b) to any Lender Party or to any prospective Lender Party, so long as such Lender Party or prospective Lender Party shall have been instructed in writing, and by acceptance of the information be deemed to have agreed, to treat such information as confidential in accordance with this Section 17.15, (c) to the Term Loan Agent and the Term Lenders subject to the terms of the Intercreditor Agreement, and (d) as

required by any Governmental Authority or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by applicable law or court order, each Lender Party shall use its best efforts prior to disclosure thereof, to notify the Borrowing Representative of the applicable request for disclosure of such non-public information (A) by a Governmental Authority or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a transferee by such Governmental Authority) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender, or any other Lender Party be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of any Lender Party in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.

17.16.  Publicity. Each Borrower hereby authorizes each Lender Party to make appropriate announcements of any financial arrangement entered into pursuant hereto, including, without limitation, announcements that are commonly known as "tombstones" in such publications and to such selected parties as such Lender Party shall deem appropriate, after consultation with Borrowing Representative. Without limiting the foregoing, Borrowers authorize each Lender Party to utilize any logo or other distinctive symbol associated with the Borrowers in connection with any such announcement or any other promotion, advertising or marketing undertaken by it, after consultation with Borrowing Representative. In no event, however, shall any Borrower use the name of any Lender Party or any logo or distinctive symbol associated with any of them, unless, as appropriate, such Lender Party has given its prior written consent thereto.

17.17.  Survival of Representations and Warranties. All representations and warranties of each Borrower contained in this Agreement and the Other Documents shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

17.18.  Destruction of Invoices. Borrowing Representative hereby authorizes and directs Agent, each Lender and each other Lender Party in accordance with its standard document retention policies in such regard to destroy all invoices, financial statements and other data provided from time to time by Borrowers pursuant hereto.

17.19.  Time. Time is of the essence in this Agreement and each Other Document.

17.20.  Release. Notwithstanding any other provision of this Agreement or any Other Document, each Borrower voluntarily, knowingly, unconditionally and irrevocably, with specific and express intent, for and on behalf of itself, its managers, members, directors, officers, employees, stockholders, Affiliates, agents, representatives, accountants, attorneys, successors and assigns and their respective Affiliates (collectively, the "Releasing Parties"), hereby fully and completely releases and forever discharges the Indemnified Persons and any other Person or Insurer which may be responsible or liable for the acts or omissions of any of the Indemnified Persons, or who may be liable for the injury or damage resulting therefrom (collectively, with the Indemnified Persons, the "Released Parties"), of and from any and all actions, causes of action, damages, claims, obligations, liabilities, costs, expenses and demands of any kind whatsoever, at law or in equity, matured or unmatured, vested or contingent, that any of the Releasing Parties has against any of the Released Parties as of the Closing Date. Each Borrower acknowledges that the foregoing release is a material inducement to Agent's and each Lender's decision to extend to Borrowers the financial accommodations hereunder and has been relied upon by Agent and each Lender in agreeing to make the Advances and entering into this Agreement.

17.21.    Patriot Act. The USA Patriot Act presently requires each Lender Party to obtain, verify and record information that identifies each Person that opens an account or applies for a loan or lease. Borrowers agree to cooperate with each Lender Party in maintaining compliance with such law on an ongoing basis. In addition to the foregoing, each Lender Party that is not incorporated under the Laws of the United States of America or a State thereof (and is not exempted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or a foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) at such other times as are required under the USA Patriot Act.

17.22    Amendment and Restatement.

(a)    On the Closing Date, the Existing Credit Agreement shall be amended and restated in its entirety by this Agreement, and the Existing Credit Agreement shall thereafter be of no further force and effect, except to evidence (i) the incurrence by the Borrower of the "Obligations" under and as defined in the Existing Credit Agreement (whether or not such "Obligations" are contingent as of the Closing Date), (ii) the representations and warranties made by the Borrower prior to the Closing Date and (iii) any action or omission performed or required to be performed pursuant to such Existing Credit Agreement prior to the Closing Date (including any failure, prior to the Closing Date, to comply with the covenants contained in such Existing Credit Agreement).   The amendments and restatements set forth herein shall not cure any breach thereof or any "Default" or "Event of Default" under and as defined in the Existing Credit Agreement existing prior to the Closing Date.   This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence payment of all or any portion of such obligations and liabilities.

(b)    The terms and conditions of this Agreement and the Agent's and the Lenders' rights and remedies under this Agreement and the other Other Documents shall apply to all of the "Obligations" incurred under and as defined in the Existing Credit Agreement.

(c)    On and after the Closing Date, (i) all references to the Existing Credit Agreement in the Other Documents (other than this Agreement) shall be deemed to refer to the Existing Credit Agreement, as amended and restated hereby, (ii) all references to any Article, Section or sub-clause of the Existing Credit Agreement in any Other Document (other than this Agreement) shall be deemed to be references to the corresponding provisions of this Agreement and (iii) except as the context otherwise provides, on or after the Closing Date, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be references to the Existing Credit Agreement, as amended and restated hereby.

(d)    REAFFIRMATION. This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar and, except as expressly provided herein or in any other Other Document, all terms and conditions of the Other Documents are hereby ratified and confirmed and remain in full force and effect unless otherwise specifically amended hereby or any other Other Document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3604386.15

IN WITNESS WHEREOF each of the parties hereto has signed this Agreement as of the day and year first above written.

"BORROWERS"

LEXINGTON PRECISION CORPORATION

By: _____

Name: _____

Title: _____

LEXINGTON RUBBER GROUP, INC.

By: _____

Name: _____

Title: _____

**[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT]**

3604386.15

CAPITALSOURCE  FINANCE LLC, as Agent and a
Lender:


By:      _____
Name:    _____
Title:   _____

Commitment Amount:

Revolving Credit Commitment:              $[366,500]
Equipment Term Loan Commitment:      $[8,828,609.54]
Commitment Percentage:                          50%


WEBSTER BUSINESS CREDIT CORPORATION, as a
Lender


By:      _____
Name:    _____
Title:   _____

Commitment Amount:

Revolving Credit Commitment:              $[366,500]
Equipment Term Loan Commitment:      $[8,828,609.54]
Commitment Percentage:                          50%


**[SIGNATURE PAGE TO AMENDED AND RESTATED CREDIT AND SECURITY
AGREEMENT]**

3604386.15

List of Annexes, Exhibits and Schedules

Annexes

Annex One            Definitions

Exhibits

Exhibit 9.1(d)       Secretary's Certificate
Exhibit 9.1(t)       Closing Certificate
Exhibit 10.7         Compliance Certificate
Exhibit 17.3         Commitment Transfer Supplement

Schedules

Schedule 2.6         Letters of Credit
Schedule 4.5         Equipment and Inventory Locations
Schedule 4.14(c)     Location of Executive Offices
Schedule 4.16        Excluded Equipment
Schedule 5.2         Organizational Data and Numbers; Qualifications
Schedule 5.3         Tax Matters
Schedule 5.5         Prior Names
Schedule 5.6         OSHA and Environmental Compliance
Schedule 5.7         Undisputed Indebtedness
Schedule 5.8         Litigation
Schedule 5.9         Indebtedness
Schedule 5.11        Plans
Schedule 5.12        Material Intellectual Property
Schedule 5.14        Defaulted Indebtedness
Schedule 5.17        Labor Contracts
Schedule 5.21        Conflicts
Schedule 5.24        Real Property
Schedule 5.25        Deposit Accounts
Schedule 6.8         Post-Closing Matters
Schedule 7.2         Permitted Encumbrances
Schedule 7.3         Other Indebtedness
Schedule 7.4         Loans and Investments

3604386.15

ANNEX ONE

DEFINITIONS

This Annex One is incorporated by reference into, and constitutes an integral part of, the Amended and Restated Credit and Security Agreement, dated as of **[July 19]**, 2010 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), made among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers; the Lenders identified therein as parties thereto; CAPITALSOURCE FINANCE LLC, as a Lender, Co-Documentation Agent and as Agent for all Lenders; and WEBSTER BUSINESS CREDIT CORPORATION, as a Lender and Co-Documentation Agent. The following terms shall have the following meanings as and when used in the Credit Agreement and the Other Documents. References in such defined terms to "this Agreement," "hereof," "hereto" or the like, shall mean and refer to the Credit Agreement.

"Annualization Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Accountants" shall have the meaning set forth in Section 10.7 hereof.

"Accounting Change" shall have the meaning set forth in Section 1.1 hereof.

"Advances" shall mean and include any loans, advances or other financial accommodations made under, pursuant to, or in connection with this Agreement or any Other Document, including, particularly the Equipment Term Loan, the Revolving Credit Advances, any Letters of Credit and any unpaid fees and expenses due and owing to Agent and/or Lenders.

"Affiliate," of any Person, shall mean (a) any Person that, directly or indirectly, is in Control of, is Controlled by, or is under common Control with such Person, or (b) any Person who is a shareholder, director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.

"Agent" shall have the meaning set forth in the preamble to this Agreement; and shall include the successors and assigns of any such Person.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

"Applicable Margin" shall mean (i) from the Closing Date until the first anniversary of the Closing Date, a percentage, per annum, equal to 5.50%, and (ii) thereafter, a percentage, per annum, adjusted on the Determination Date as follows:

(a)    if the Leverage Ratio is greater than 2.50x, then the Applicable Margin shall equal 6.50%;

(b)    if the Leverage Ratio is greater than 2.25x, but less than or equal to 2.50x, then the Applicable Margin shall equal 6.00%;

(c)    if the Leverage Ratio is greater than 2.00x, but less than or equal to 2.25x, the Applicable Margin shall equal 5.50%;

(d)      if the Leverage Ratio is greater than 1.75x, but less than or equal to 2.00x, then the Applicable Margin shall equal 4.50%; and

(e)      if the Leverage Ratio is less than or equal to 1.75x, then the Applicable Margin shall equal 4.00%.

"Applicable Rate" shall mean the sum of LIBOR plus the Applicable Margin.

"Appraisal" shall mean an appraisal, conducted at Borrowers' expense, by an independent appraiser selected by, or acceptable to, Agent of the Borrowers' Equipment using a form, scope and methodology selected by, or acceptable to, Agent.

"Approved Fund" shall have the meaning given to such term in Section 17.3(c).

"Bank Product Obligations" shall mean, collectively, all amounts owed by Borrowers to any Lender Party in respect of (i) any cash management service, including through the use of a Deposit Account Control Agreement and the related Deposit Account(s), (ii) any Hedge Contract, (iii) any derivative product or (iv) any other bank product or service; in each case, provided by any Lender Party to any Borrower from time to time in connection with this Agreement or the transactions contemplated hereby.

"Bankruptcy Code" shall mean Chapter 11 of the U.S. Bankruptcy Code (11 U.S.C. §§ 101 et seq).

"Bankruptcy Court" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Borrower" and "Borrowers" shall have the meanings set forth in the preamble to this Agreement; and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a consolidated basis" (or words of similar import) shall mean, as appropriate, the consolidation in accordance with GAAP of the accounts or other items of Borrowers and their respective Subsidiaries (if any).

"Borrowers' Account" shall have the meaning set forth in Section 2.5.

"Borrowing Representative" shall mean the Parent Company.

"Business Day" shall mean any day other than a day on which commercial banks in New York are authorized or required by law to close.

"Capital Expenditures" shall have the meaning set forth in Section 8.1.

"Capitalized Expenses" shall mean all fees, costs and expenses that have accrued and remain unpaid through the Closing Date, including, without limitation, the following: (i) pre-petition legal fees of the Lenders in an amount of $[17,795.83], (ii) prepayment fee under the Existing Term Loan Facility in an amount of $[138,340.52] (which such amount shall be solely allocated to the Term Loans), (iii) the Lenders' financial advisor's fees, costs and expenses in the amount of $[175,749.30] and (iv) the Lenders' investment banker's success fee in an amount of $[1,000,000.00].

"Capitalized Leases" shall have the meaning set forth in Section 8.1.

3604386.15

"CapitalSource" shall have the meaning set forth in the Preamble to this Agreement.

"Cash Collateral Order" shall mean that certain Cash Collateral Order entered on April 17, 2008 by the Bankruptcy Court relating to the Chapter 11 Cases, as has been amended or extended from time to time.

"Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of ninety (90) days or less issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of ninety (90) days or less issued by any financial institution that is a member of the Federal Reserve System and has combined capital, surplus and undivided profits of not less than $250,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of ninety (90) days or less issued by a corporation (except an Affiliate of any Borrower) organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital, surplus and undivided profits of not less than $250,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date of acquisition if the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds that invest substantially all of their assets in securities of the types described in clauses (a) through (e) above.

"Cash Income Taxes" shall have the meaning set forth in Section 8.1.

"Cash Interest Expense" shall have the meaning set forth in Section 8.1.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in Section 7.1(a) hereof; (ii) the liquidation or dissolution of any Borrower or the adoption of a plan by the stockholders of any Borrower relating to the dissolution or liquidation of such Borrower, other than as permitted in Section 7.1(a) hereof; (iii) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Equity Interests of any Borrower; (iv) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of any Borrower (together with any new directors who have been appointed by, or whose nomination for election by the shareholders of such Borrower, as the case may be, was approved by, a vote of at least sixty-six and two-thirds percent (66 2/3%) of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of such Borrower; (v) the failure of Parent Company to own directly or indirectly one hundred percent (100%) of

3604386.15

6

the voting power of the total outstanding Voting Equity Interests of LRG; or (vi) the failure of the Equity Sponsor to own directly or indirectly more than fifty percent (50%) of the voting power of the total outstanding Voting Equity Interests of Parent Company.

"Change of Management" shall mean that neither of the Principals is actively involved in the day-to-day executive management of each Borrower, whether by death, disability, retirement, termination of employment or otherwise, unless, (i) within 30 days thereafter, Borrowers shall have in place an interim Chief Executive Officer or similarly-titled member of executive management and
(ii) within 120 days thereafter, Borrowers shall have retained successor executive management acceptable to the Required Lenders in their Credit Judgment in terms of qualifications, ability and experience (after which, their successor(s) in office shall be deemed "Principals" hereunder).

"Chapter 11 Cases" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, Equity Interests, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon any Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean the date on which all of the conditions precedent set forth in Section 9.1 hereof have been fully satisfied in the sole judgment of the Agent and Lenders (or otherwise waived by Lenders).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time and the regulations promulgated thereunder.

"Collateral" shall mean and include all assets of each Borrower (subject only to the limitation on Subsidiary Stock of each Foreign Subsidiary, if any, set forth in subsection (f) below), including, without limitation, all of the following assets but shall exclude any Excluded Equipment as long as it is Excluded Equipment:

     (a)      all Receivables;

     (b)      all Equipment;

     (c)      all General Intangibles;

     (d)      all Inventory;

     (e)      all Contract Rights;

     (f)      all Equity Interests of each Domestic Subsidiary (if any), and sixty-five percent (65%) of the Equity Interests of each Foreign Subsidiary (if any);

     (g)      all Securities;

(h)      all Leasehold Interests;

(i)      all Commercial Tort Claims;

(j)      all of each Borrower's right, title and interest in and to (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) all other property, including warranty claims, relating to any goods securing this Agreement; (v) all of each Borrower's contract rights, rights of payment that have been earned under a contract right, instruments, investment property, documents, chattel paper, warehouse receipts, deposit accounts, money and securities; (vi) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (vii) all supporting obligations that secure payment or performance of any account, chattel paper, document, general intangible, instrument or investment property; (viii) all letter-of-credit rights; (ix) Extraordinary Receipts; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder or under the Other Documents, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(k)      all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to clauses (a) through (j) of this definition; and

(l)      all proceeds and products of the Collateral described in clauses (a) through (k) of this definition, in whatever form, including, but not limited to: cash, Deposit Accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and Commercial Tort Claim proceeds.

The term "Collateral" shall also extend to and include all Real Property Collateral.

"Collateral Locations" shall have the meaning assigned to such term in Section 4.5.

"Commercial Tort Claim" shall have the meaning given to such term in Article 9 of the UCC and shall include, without limitation, any claim of any Borrower arising in tort and specified on Schedule 5.8.

"Commitment" or "Commitments" shall mean, individually or collectively, the Revolving Credit Commitment(s) and Equipment Term Loan Commitments of each Lender, or all Lenders, as the case may be.

"Commitment Percentage" of any Lender, shall mean the percentage that such Lender's Commitment bears to the total Commitments, as the same may be adjusted upon any assignment by a Lender to a Purchasing Lender pursuant to Section 17.3(c) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 17.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent, pursuant to which, among

3604386.15

other things, a Purchasing Lender shall purchase and assume all or a portion of the obligation of a Lender to make and carry Advances under this Agreement.

"Confirmation Order" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and other third parties, domestic or foreign, (i) necessary to carry on any Borrower's business, including, without limitation, any consents required under all applicable federal, state or other applicable law, and (ii) required to effectuate the transactions and agreements contemplated in this Agreement and the Other Documents.

"Contract Rights" shall mean all rights of each Borrower arising under or in connection with any contract, to the extent that such Borrower may grant a security interest in such rights under such contract, either by the terms of such contract or pursuant to the applicable provisions of Article 9 of the UCC, notwithstanding the terms of such contract, or otherwise. "Contract Rights" shall include, without limitation, all rights of each Borrower under all license agreements to which it is party as licensor or licensee and all letter-of-credit rights of each Borrower.

"Control" shall mean the power, whether direct or indirect, (i) to vote ten percent (10%) of more of the Voting Equity Interests of a Person, or (ii) to direct, or cause the direction of, the management and/or policies of a Person, whether by contract or otherwise.

"Controlled Group" shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Credit Judgment" shall mean the credit judgment of Agent, Required Lenders or all Lenders, as the case may be, exercised by it (or them) in good faith and in a commercially reasonable manner from the perspective of a senior secured lender making loans of similar type and size to similar borrowers.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1(a) hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.10(a) hereof.

"Deferred Interest" shall have the meaning set forth in Section 8.1 hereof.

"Deposit Account" shall mean any checking account, savings account, time deposit account, certificate of deposit, investment account or other account (howsoever denominated), in which from time to time any cash or Securities of any Borrower is or may be deposited.

"Deposit Account Control Agreement" shall mean an agreement, in form and substance satisfactory to Agent in its sole discretion, which provides Agent with "control" (within the meaning of

3604386.15

9

the UCC) over, and a first priority, perfected Lien on, each account of each Borrower and all assets of such Borrower from time to time on deposit or otherwise credited to such Deposit Account.

"Designated Officer" shall mean the chairman, president, chief executive officer, chief financial officer or chief operating officer of a Borrower (regardless of title), or such other officer, agent or representative of a Borrower that Agent may, at such Borrower's request, permit to be a "Designated Officer" from time to time.

"Determination Date" shall have the meaning set forth in Section 3.2(a).

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean a Subsidiary organized under the laws of the United States or any political subdivision thereof.

"EBITDA" shall have the meaning set forth in Section 8.1 hereof.

"Environmental Authority" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Complaint" shall have the meaning set forth in Section 4.18(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, motor vehicles, fittings, furniture, furnishings, fixtures, molds, discs, tools, stamps, parts, accessories and all replacements and substitutions therefor or accessions thereto, and all software embedded therein.

"Equipment Term Loan" shall mean the term loan, which includes $[694,881.95] of the Capitalized Expenses, in the principal amount of [Seventeen Million Seven Hundred Fifty-Seven Thousand Two Hundred Nineteen and 07/100 Dollars] ($[17,657,219.07]) made to Borrowers by the Lenders pursuant to Section 2.1(b).

"Equipment Term Loan Commitment," for each Lender, shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement as its "Equipment Term Loan Commitment" representing the commitment of such Lender to make its Commitment Percentage of the Equipment Term Loan available to Borrowers.

"Equipment Term Loan Commitments" shall mean the aggregate amount of each Lender's individual Equipment Term Loan Commitment, which aggregate amount shall equal [Seventeen Million Seven Hundred Fifty-Seven Thousand Two Hundred Nineteen and 07/100 Dollars] ($[17,657,219.07]).

"Equity Interests" shall mean: (i) in the case of a corporation, all capital stock, including common and preferred stock, and warrants to acquire capital stock; (ii) in the case of a partnership, all partnership

interests therein, including special, limited and general interests; (iii) in the case of a limited liability company, all membership interests therein; and (iv) in the case of any other entity, all interests evidencing equity ownership therein.

"Equity Investment" shall mean the cash contribution by the Equity Sponsor to one or more of the Borrowers made on the Closing Date in an amount not less than **[$8,000,000]**, plus the amount of any cash fees paid to investors in connection with such transaction, in exchange for Equity Interests in one or more of the Borrowers, in each case upon the terms of the Reorganization Plan and for the purpose of partially funding the costs and expenses of the Borrowers' exit from bankruptcy.

"Equity Sponsor" shall mean Aurora Resurgence Management Partners LLC, a Delaware limited liability company, or an Affiliate thereof, including Commercial Finance Services 407, LLC, a Delaware limited liability company.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Plan for which the reporting requirements have not been waived in writing; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412 of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of its respective Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any of its Subsidiaries could otherwise be liable; (f) a complete or partial withdrawal by any Borrower or any member of the Controlled Group from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (g) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Plan; (h) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan: (i) the imposition of any liability under Title IV of ERISA, other than Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any member of the Controlled Group in excess of the Materiality Threshold and (j) any other event of condition with respect to a Plan, including any Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate, that could reasonably be expected to result in liability of any Borrower in excess of the Materiality Threshold.

"Event of Default" shall mean the occurrence and continuance of any of the events set forth in Article XI hereof.

"Excess Cash Flow" shall mean, for any fiscal year, without duplication, an amount equal to the sum of (i) Consolidated Net Income (or loss) of Borrowers for such period, plus (ii) an amount equal to the amount of depreciation expenses, amortization expense (including the amortization of goodwill), accrued non-cash interest expense and all other non-cash charges deducted in arriving at such Consolidated Net Income (or loss), plus (iii) an amount equal to the aggregate net cash proceeds of the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent not required to be applied to mandatory prepayments or payments on the Loans or the Term Loans and not

3604386.15

11

reinvested in new Equipment or Real Property pursuant to Section 2.9 hereof, plus (iv) an amount equal to the net loss on the sale, lease, transfer or other disposition of assets by Borrowers during such period to the extent deducted in arriving at such Consolidated Net Income (or loss), plus (v) an amount equal to 50% of the aggregate management fees paid to the Equity Sponsor during such period, plus (vi) without duplication of other items included in this definition an amount equal to any tax refunds or credits received by Borrowers during such period, less (vii) an amount equal to the permitted Capital Expenditures of Borrowers for such period, less (viii) an amount equal to the sum of all regularly scheduled payments of principal on Indebtedness for money borrowed of Borrower (other than with respect to payments of Revolving Credit Advances) actually made during such period to the extent permitted hereunder, less (ix) an amount equal to the net gain on the sale, lease, transfer or other disposition of assets by Borrower during such period to the extent included in arriving at such consolidated net income or loss.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Deposit Account" shall mean any Deposit Account of Borrowers that is (i) a Payroll Account or (ii) a Deposit Account (other than any in which proceeds of Collateral are at any time deposited) in which collected funds on deposit, determined on any date on a daily average basis over the immediately preceding thirty (30) days, is less than Ten Thousand Dollars ($10,000) or, when aggregated with all other such Deposit Accounts, Twenty-Five Thousand Dollars ($25,000).

"Excluded Equipment" shall mean any Equipment (or proceeds thereof) that is or becomes subject to a Lien (including pursuant to Capitalized Leases) permitted under subsections (e) or (m) of Section 7.2, if the valid grant of a Lien thereon to Agent is prohibited by the terms of the agreement between any Borrower and the holder of such Lien or under applicable law, and such prohibition has not been or is not waived, or the consent of the holder such other Lien has not been or is not otherwise obtained (it being understood that Borrowers shall have no obligation whatsoever to any Lender Party to obtain such consent), or under applicable law such prohibition cannot be waived and, notwithstanding anything to the contrary set forth in the definition of "Collateral", the types or items of Collateral described in such definition shall not include the Excluded Collateral, so long as the prohibition set forth in such agreement or applicable law remains effective. For example, but without limitation, if pursuant to any Capitalized Lease, the valid grant of a Lien thereon to Agent in the Equipment leased thereunder is prohibited, the Lien of Agent thereon shall be reinstated upon termination of such Capitalized Lease, and such Equipment shall no longer be considered Excluded Equipment.

"Excluded Equity Interests" shall mean any Equity Interests that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event, (a) matures or is required to be prepaid, repurchased, reacquired or defeased, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (b) is convertible into or exchangeable or exercisable for (i) debt securities or other Indebtedness or (ii) other Excluded Equity Interests, in each case at any time on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash, (c) contains any repurchase obligation that may come into effect prior to the indefeasibly payment in full in cash of all Obligations, in each case, unless the holders of such Equity Interests expressly enter into, and deliver to Agent, a Subordination Agreement in form and substance satisfactory to Agent, (d) requires any payment of cash dividends or any other distributions, in each case, on or prior to the date that is six (6) months after the Obligations have been indefeasibly paid in full in cash or (e) is guaranteed by, or secured by any Property of, any Borrower or any of its Subsidiaries.

3604386.15

12

"Existing Credit Agreement" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Equipment Loan Facility" shall have the meaning set forth in the "Statement of the Transaction" section hereof.

"Existing Term Loan Facility" shall mean the term loan credit facility under that certain Loan and Security Agreement, dated as of May 31, 2006, as may have been amended, restated, supplemented or otherwise modified through the Closing Date, among the Borrowers, Term Loan Lenders and Term Loan Agent.

"Extraordinary Receipts" shall mean any cash received by a Borrower or any of its Subsidiaries not in the ordinary course of business from the following, (a) proceeds of insurance in respect of the Collateral, (b) condemnation awards (and payments in lieu thereof) in respect of the Collateral, (c) indemnity payments, (d) foreign, United States, state or local tax refunds, (e) pension plan reversions and (f) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action in respect of the Collateral.

"Financial Covenants" shall mean the financial covenants set forth in Article VIII.

"First Merit Blocked Account Agreement" shall mean the Deposit Account Control Agreement, dated as of May 31, 2006, among the Borrowers, First Merit Bank, N.A., and the Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, **[including, without limitation, by that certain Amendment to Deposit Account Control Agreement dated as of [July 19], 2010, among the Borrowers, First Merit Bank, N.A., and the Agent]**.

"Fiscal Year" shall mean Borrowers' fiscal year as in effect on the Closing Date; and the terms "Fiscal Quarter" and "Fiscal Month" shall have correlative meanings.

"Fixed Charge Coverage Ratio" shall have the meaning set forth in Section 8.1 hereof.

"Fixed Charges" shall have the meaning set forth in Section 8.1 hereof.

"Foreign Subsidiary" shall mean any Subsidiary of a Borrower which is not a Domestic Subsidiary.

"Funded Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations for borrowed money, whether current or long-term (including, without limitation, the Obligations and the Subordinated Debt) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all purchase money Indebtedness;

(c)     the principal portion of all obligations under conditional sale or other title retention agreements relating to Property purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

3604386.15

13

(d)    the maximum amount available to be drawn under letters of credit (including, without limitation, standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)    all obligations in respect of the deferred purchase price of Property or services (other than trade accounts payable in the ordinary course of business);

(f)    all Indebtedness in respect of Capital Leases;

(g)    all preferred stock or other Equity Interests providing for mandatory redemptions, sinking fund or like payments prior to the end of the Term;

(h)    all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, Property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; and

(i)    all guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied, except that, for purposes of the Financial Covenants, GAAP shall be determined on the basis of such principles used in the preparation of the most recent audited financial statements delivered to Agent prior to the Closing Date.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, trade names, service marks, trade secrets, goodwill, copyrights, design rights, registrations, licenses, license fees, franchises, customer lists, tax refunds, tax refund claims, pension fund refunds, pension fund refund claims, overpayments, overpayment claims, reclamation rights, computer programs, software, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer, all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governing Body" shall have the meaning set forth in Section 6.10 hereof.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person (other than a Borrower) who may hereafter guarantee payment or performance of the whole or any part of the Obligations. "Guarantors" means, collectively, all such Persons. On the Closing Date, there are no Guarantors, except for each Borrower as to the other Borrower.

3604386.15

"Guaranty" shall mean any guaranty of the Obligations of Borrowers, in whole or in part, executed at any time by a Guarantor in favor of Agent for the ratable benefit of Lenders and the other Lender Parties, as applicable.

"Hazardous Discharge" shall have the meaning set forth in Section 4.18(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws relating to hazardous waste disposal now in force or hereafter enacted.

"Hedge Contract" shall mean any "hedge," "swap," "collar," "cap" or similar agreement between a Borrower and any other financial institution, including, but not limited to, any Lender Party or Affiliate of a Lender Party, intended to fix the relative amount of such Borrower's risk in respect of changes in interest rates, foreign currency exchange and commodity values.

"Historical Financial Statements" shall have the meaning set forth in Section 5.4(a) hereof.

"Indebtedness" shall mean, with respect to any Person (without duplication), any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments, including (for avoidance of doubt) Subordinated Debt; (b) representing the balance deferred and unpaid of the purchase price of any property or services (except any such balance that constitutes an account payable to a trade creditor (whether or not an Affiliate) created, incurred, assumed or guaranteed by such Person in the ordinary course of business of such Person in connection with obtaining goods, materials or services that is not overdue by more than ninety (90) days, unless the trade payable is being contested in good faith); (c) all obligations as lessee under leases that have been, or should be in accordance with GAAP, recorded as Capitalized Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations in respect of any Equity Interests issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person that is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under any Hedge Contracts; (i) all obligations owed by such Person under license agreements with respect to non-refundable, advance or minimum guaranteed royalty

payments; and (j) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

"Indemnified Persons" shall have the meaning given to such term in Section 17.5.

"Independent Director" shall mean a member of the Board of Directors of any Borrower who shall not have been at the time of such Person's appointment or at any time during the preceding five (5) years, and shall not be as long as such Person is a director of any Borrower, a director, officer, employee, partner, member, manager, Affiliate or holder of any Equity Interests of any Independent Parties.

"Independent Parties" shall mean any of the following Persons: the Accountants or any other outside auditor, attorney or consultant of any Borrower, or any of their Subsidiaries or Affiliates, (ii) a supplier to any Borrower or any of the Independent Parties, (iii) a Person Controlling or under common Control with any partner,  member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties, or (iv) a member of the immediate family of any director, officer, employee, partner,  member, manager, Affiliate, supplier or holder of any Equity Interests of any Borrower or any of the Independent Parties.

"Initial Borrowers" shall have the meaning set forth in the preamble to this Agreement.

"Initial Projections" shall have the meaning given to such term in Section 5.4(b).

"Insurance Premium Collateral" shall mean, collectively, (a) any insurance policies of Borrowers for which an Insurance Premium Finance Party has entered into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum, and (b) any loss proceeds paid or payable to a Borrower pursuant to such insurance policies (to the extent of the amount owed to such Insurance Premium Finance Party), provided, however, that, (i) in no event shall the Insurance Premium Collateral include any amounts deposited in or received in any Deposit Account that is subject to a Deposit Account Control Agreement established by Borrowers in connection herewith or otherwise with respect to Borrowers' financing arrangements with Agent and Lenders for the handling of collections of Receivables or other assets and (ii) in no event shall the Insurance Premium Collateral of any Insurance Premium Finance Party secure any obligation to any other Insurance Premium Finance Party.

"Insurance Premium Finance Party" shall mean, in connection with insurance policies maintained by Borrowers, an insurance company or a third party that enters into arrangements to allow Borrowers to pay all or a portion of the applicable insurance premiums on such insurance policies in installments rather than in a lump sum.

"Insured Event" shall have the meaning set forth in Section 17.5 hereof.

"Intercreditor Agreement" shall mean the Amended and Restated Intercreditor Agreement, dated of even date herewith, by and between Agent and Term Loan Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Expense" shall have the meaning set forth in Section 8.1.

"Inventory" shall mean and include, as to each Borrower, all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any contract of service or held for sale or lease, all raw materials, work in process, finished goods

3604386.15

16

and materials and supplies of any kind, nature or description that are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them. The term "Inventory," as used herein, shall further extend to and include, as applicable to any Borrower, any and all farm products.

"IP Security Agreement Supplement" shall mean a security agreement, to be in registrable form and otherwise to be in form and substance reasonably satisfactory to Lender pursuant to which Lender may give notice of record of its Lien on Material Intellectual Property owned by a Borrower and registered with the United States government.

"IRS" shall mean the Internal Revenue Service of the United States Treasury, and any successor thereto.

"Issuer" shall mean any Person selected by the Agent who issued a Letter of Credit and/or accepted a draft pursuant to the terms thereof.

"Junior Lien Facility" shall mean the secured subordinated credit facility, subject to a Subordination Agreement, evidenced by the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related agreements, documents, instruments and certificates, which, pursuant to the terms and conditions herein, the Equity Sponsor may enter into to provide the borrowers thereunder with a loan in a maximum aggregate principal amount of up to $3,000,000.

"Junior Lien Facility Credit Agreement" shall mean the credit agreement (in form and substance satisfactory to the Agent) as may be entered into between the Equity Sponsor and one or more of the Borrowers evidencing the Junior Lien Facility, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Documents" shall mean the Junior Lien Facility Subordinated Note, the Junior Lien Facility Credit Agreement and all related documents, instruments, agreements and certificates (each in form and substance satisfactory to the Agent), each as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"Junior Lien Facility Lender" shall mean the Equity Sponsor in its capacity as the holder of the Indebtedness evidenced by the Junior Lien Facility Subordinated Note.

"Junior Lien Facility Subordinated Note" shall mean the Junior Subordinated Note (in form and substance satisfactory to the Agent) issued by one or more of the Borrowers in favor of the Junior Lien Facility Lender as may be entered into in connection with the Junior Lien Facility, as may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms and conditions of a Subordination Agreement.

"L/C Disbursement" shall mean any payment by the Issuer pursuant to a Letter of Credit.

"Leasehold Interests" shall mean all of each Borrower's right, title and interest in and to any Real Property owned by a Person other than Borrower, whether as tenant, lessee, licensee, operator or otherwise.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person that becomes a transferee, successor or assignee of any Lender pursuant to Section 17.3(c).

3604386.15

17

"<u>Lender Default</u>" shall have the meaning set forth in <u>Section 2.10(a)</u> hereof.

"<u>Lender Party</u>" shall mean Agent, each Lender, any Issuer, any Purchasing Lender, any Participant and any Lender Pledgee, together with each other holder from time to time of any interest in any of the Obligations.

"<u>Lender Pledgee</u>" shall have the meaning set forth in <u>Section 17.3(d)</u> hereof.

"<u>Lender Representative</u>" shall have the meaning set forth in <u>Section 6.10</u> hereof.

"<u>Letter(s) of Credit</u>" shall have the meaning set forth in <u>Section 2.6</u> hereof.

"<u>Letter of Credit Documents</u>" means, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefore, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (i) the rights and obligations of the parties concerned or at risk or (ii) any collateral security for such obligations.

"<u>Letter of Credit Fees</u>" shall have the meaning set forth in <u>Section 3.4</u> hereof.

"<u>Leverage Ratio</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>LIBOR Rate</u>" shall mean the greater of (i) two and one-half percent (2.5%) per annum or (ii) a fluctuating rate of interest per annum determined on a daily basis equal to the one-month rate of interest appearing on Telerate Page 3750 (or any successor page) as the one-month London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day. If for any reason such rate is not available, "<u>LIBOR Rate</u>" shall mean the greater of (a) two and one-half percent (2.5%) per annum or (b) the fluctuating rate of interest per annum calculated on a daily basis equal to the one-month rate of interest appearing on Reuters Screen Page LIBO Page as the one-month London interbank offered rate for deposits in U.S Dollars at approximately 11:00 a.m. (London time) on the second preceding Business Day; <u>provided</u>, <u>however</u>, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates; <u>provided</u>, <u>however</u>, if such rate is not available, "<u>LIBOR Rate</u>" shall mean the greater of (x) two and one-half percent (2.5%) per annum or (y) a fluctuating rate of interest per annum from a comparable rate quotation designated by Agent as a substitute therefore. "<u>Telerate Page 3750</u>" means the British Bankers Association Libor Rates (determined as of 11:00 a.m. London time) that are published by Moneyline Telerate (or any successor thereto). As used in this definition, the term "<u>Business Day</u>" means a day on which commercial banks are open for international business (including dealings in U.S. Dollar deposits in London, England).

"<u>Lien</u>" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"<u>Liquidity</u>" shall have the meaning given to such term in <u>Section 8.1</u> hereof.

"<u>Loan</u>" means each Revolving Credit Advance and the Equipment Term Loan, as the case may be.

3604386.15

18

"Loan Documents" shall mean, collectively, this Agreement and the Other Documents.

"LPC" shall have the meaning given to such term in the initial recitals to this Agreement.

"LRG" shall have the meaning given to such term in the initial recitals to this Agreement.

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, business operations, assets or business prospects of the Borrowers, considered as a whole, (b) Borrowers' ability to pay the Obligations in accordance with the terms hereof and of the Other Documents, (c) the value of the Collateral, considered as a whole, or Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents, considered as a whole.

"Material Agreements" shall mean and include, in the case of each Borrower, the following: (i) any lease of Real Property material to the operation of a Borrower's business that involves annual payments by a Borrower in excess of the Materiality Threshold, (ii) any lease of personal property by a Borrower having aggregate annual rentals in excess of the Materiality Threshold, (iii) any license agreement for the use of any intellectual property material and necessary for the operation of its business, (iv) the Term Loan Agreement, the Term Loan Lender Agreements, the Junior Lien Facility Documents, any Subordination Agreement and any other document, instrument or agreement evidencing, pertaining to, subordinating or securing the payment of, any Indebtedness in excess of the Materiality Threshold, (v) any labor or union contract, (vi) any employment contracts (more than 12 months) with executive officers of Borrowers, (vii) any long-term purchase or supply contracts (more than 12 months) involving annual sales or purchases in excess of Two Million Dollars ($2,000,000), (viii) any Organic Document, and (ix) any other document, contract or agreement the termination of which (without its substantially contemporaneous replacement) could reasonably be expected to have a Material Adverse Effect.

"Material Intellectual Property" shall have the meaning given to such term in Section 5.12 hereof.

"Materiality Threshold" shall mean Two Hundred Fifty Thousand Dollars ($250,000).

"Maximum Revolving Credit Amount" shall mean the maximum amount of Revolving Credit Advances and Letters of Credit that may be outstanding at any one time, which as of the Closing Date equals **[Seven Hundred Thirty-Three Thousand And No/100 Dollars ($733,000.00)]**, less any L/C Disbursement and less any amounts that may expire and not be renewed under any Letters of Credit.

"Mortgage" shall mean each mortgage, deed of trust, security deed, assignment of leasehold interest or rents, or similar document pursuant to which a Borrower shall grant to or for the benefit of Agent a Lien on the Real Property Collateral, together with all modifications, supplements, replacements, restatements, and amendments thereof.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Net Cash Proceeds" shall mean, with respect to any sale or other disposition of any asset or the sale or issuance of any Indebtedness or Equity Interests, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person in connection with such transaction after deducting therefrom only (without duplication) (a) reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, accountant's fees, investment banking fees, finder's fees, other similar fees and commissions and reasonable out-of-pocket expenses, (b) the amount of taxes reasonably estimated by such Person to be

actually and reasonably attributable to such transaction, (c) the amount of any Indebtedness secured by a security interest, lien or other encumbrance (other than a security interest or other Lien created hereunder or pursuant hereto) on such asset that, by the terms of such transaction, is required to be repaid upon such disposition, in each case to the extent, but only to the extent, that the amounts so deducted are actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any Affiliate of any Borrower and, in each case, are properly attributable to such transaction or to the asset that is the subject thereof.

"<u>Net Senior Debt</u>" shall have the meaning set forth in <u>Section 8.1</u> hereof.

"<u>Non-Defaulting Lenders</u>" shall have the meaning set forth in <u>Section 2.10(b)</u> hereof.

"<u>Note</u>" shall mean each promissory note at any time evidencing any portion of the Obligations. "<u>Notes</u>" shall refer, collectively, thereto.

"<u>Obligations</u>" shall mean and include any and all of each Borrower's Indebtedness, obligations and/or liabilities to Agent, Lenders and each other Lender Party (or any corporation that directly or indirectly Controls or is Controlled by or is under common Control with Agent, any Lender or any other Lender Party) of every kind, nature and description, whether direct or indirect, secured or unsecured, joint, several, joint and several, absolute or contingent, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such Indebtedness, obligations or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and including, but not limited to, any and all of any Borrower's Indebtedness, obligations and/or liabilities under this Agreement, the Other Documents or under any other agreement between any Lender Party and any Borrower, all amounts charged to Borrowers' Account and all obligations of any Borrower to each Lender Party to perform acts or refrain from taking any action. Without limitation of the foregoing, the term "Obligations" extends to and includes all Advances, all accrued (but unpaid) interest thereon and all fees payable hereunder and under any Other Documents. For the avoidance of doubt, it is understood and agreed that the term "Obligations" shall not include any Borrower's Indebtedness, obligations and/or liabilities to any Lender Party or any other Person under any Permitted Hedge Contracts or with respect to any Bank Product Obligations.

"<u>OFAC</u>" shall mean the U.S. Department of the Treasury Office of Foreign Assets Control, and its successors.

"<u>Organic Documents</u>" shall mean: (i) for a corporation, its articles (or certificate) of incorporation and bylaws; (ii) for a partnership, its articles of organization (if any) and partnership agreement; and (ii) for a limited liability company, its articles (or certificate) of organization and any operating agreement; together with, for each such entity and any other entity not described above, such other, similar documents as are integral to its formation or the conduct of its business operations.

"<u>Other Documents</u>" shall mean the Notes, the Letter of Credit Documents, the Mortgages, any UCC financing statement, any Deposit Account Control Agreements (including, without limitation, the First Merit Blocked Account Agreement), the Pledge Agreement and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by any Borrower and delivered to Agent, any Lender or any other Lender Party in respect of the transactions contemplated by this Agreement.

"<u>Overadvance</u>" shall have the meaning set forth in <u>Section 2.4</u> hereof.

3604386.15

"<u>Parent Company</u>" shall have the meaning given to such term in the initial recitals to this Agreement.

"<u>Participant</u>" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances in accordance with <u>Section 17.3(b)</u> hereof.

"<u>Payment Office</u>" shall mean, initially, the office of the Agent located at 4445 Willard Avenue, 12th Floor, Chevy Chase, Maryland 20815; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Representative and to each Lender to be the Payment Office.

"<u>Payroll Account</u>" shall mean any one or more deposit, custody or other accounts maintained by any Borrower with a bank or other institution if such account is used solely to deposit funds that are to be applied to the payment of wages and other compensation payable to employees of any Borrower and any withholding, social security, payroll, unemployment or other taxes relating thereto, imposed by any federal, state, county or local government or a subdivision or agency thereof, including any charges, fees, assessments, interest, penalties or additions payable in connection with any of the foregoing or which are to be applied, to the extent of amounts withheld or deducted from compensation payable to any employee of any Borrower, to the payment of health insurance or other benefits generally provided to employees of any Borrower.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation, and any successor thereto.

"<u>Perfection Certificate</u>" shall mean, collectively, the Perfection Certificate for each Borrower executed by such Borrower and delivered to Agent on the Closing Date.

"<u>Permitted Encumbrances</u>" shall have the meaning set forth in <u>Section 7.2</u> hereof.

"<u>Permitted Hedge Contracts</u>" shall mean any Hedge Contracts entered into in the ordinary course of, and pursuant to the reasonable requirements of Agent, Borrowers' business, and not for speculative purposes.

"<u>Permitted Holders</u>" shall mean the following Persons and their respective Affiliates: the Equity Sponsor, William B. Conner, Michael A. Lubin, Warren Delano and William Shulvitz.

"<u>Permitted PP&E Dispositions</u>" shall mean: the sale or other disposition of Equipment no longer used or useful in the business of any Borrower, so long as (i) no Event of Default then exists, and none otherwise would be caused thereby, (ii) Agent shall have received at least one (1) Business Day advance notice thereof if the sale or other disposition exceeds Twenty-Five Thousand Dollars ($25,000) and (iii) such sales or other dispositions do not involve Equipment having an aggregate fair market value in excess of the Materiality Threshold for all such Equipment which is the subject of sales or other dispositions in any one Fiscal Year, except as the Required Lenders otherwise may agree.

"<u>Person</u>" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Plan</u>" shall mean any employee benefit plan within the meaning of <u>Section 3(3)</u> of ERISA, maintained for employees of Borrowers or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

3604386.15

21

"Pledge Agreement" shall mean the Pledge Agreement dated as of May 31, 2006, by the undersigned thereto, in favor of Agent, as may be amended, restated, supplemented or otherwise modified from time to time.

"Principals" shall mean Michael A. Lubin and Warren Delano or each of their permitted successors pursuant to the terms and conditions herein; each, individually.

"Projections" shall have the meaning set forth in Section 10.9 hereof.

"Property" means any interest of any kind in any property or asset, whether real, personal or mixed, or tangible or intangible, including Equity Interests.

"Provision for Taxes" shall mean with respect to any Person for any period, the provision of taxes on the net income of such Person, whether federal, state, provincial, county or local, foreign or domestic, that is required to be made on the income statement of such Person for such period in accordance with GAAP.

"Purchasing Lender" shall have the meaning set forth in Section 17.3(c) hereof.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to its owned and leased premises, including, particularly, any real property identified on Schedule 5.24 hereto, but shall exclude the real property located at 202 Winchester Road, Lakewood, New York. The term "Real Property" specifically includes Leasehold Interests that are material to the operation of the Borrowers' business and involve annual payments in excess of the Materiality Threshold, in addition to Real Property owned by Borrowers, or a Borrower, in fee simple.

"Real Property Collateral" shall mean that portion of Borrowers' Real Property that at any time is owned by a Borrower in fee simple (if any).

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrowers by their respective Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances (including payment intangibles), and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Register" shall have the meaning set forth in Section 17.3(e) hereof.

"Releases" shall have the meaning set forth in Section 5.6(c)(i) hereof.

"Released Parties" shall have the meaning set forth in Section 17.20 hereof.

"Releasing Parties" shall have the meaning set forth in Section 17.20 hereof.

"Reorganization Plan" shall have the meaning set forth in the "Statement of the Transaction" section hereto.

3604386.15

"Reportable Event" shall mean a reportable event described in Section 4043(b) of ERISA and/or in the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding at least sixty-six and two-thirds percent (66-2/3%) of the Commitments.

"Restricted Payment" shall mean and include any payment described in the proviso to Section 7.13.

"Restricted Payment Conditions," with respect to any Restricted Payment, shall mean the following conditions: (i) no Event of Default shall have occurred and be continuing as of the payment date, and none would be caused by or result from such payment being made; (ii) on a pro forma basis, after giving effect to such payment as if made in the last Fiscal Month for which Borrowers have reported financial statements pursuant to Section 10.8, Borrowers shall remain in compliance with all applicable Financial Covenants; and (iii) Agent shall have received at least three (3) Business Days' advance written notice of Borrowers' intent to make such payment, specifying the amount thereof, the payee (if known) and the purpose, and at such time a Designated Officer of the Borrowing Representative shall have certified in writing to Agent Borrowers' compliance with clauses (i) through (iii) above, showing appropriate computations.

"Revolving Credit Advances" shall mean Advances made pursuant hereto other than in connection with the (i) Equipment Term Loan or (ii) issued and undrawn Letters of Credit.

"Revolving Credit Commitment" shall mean the dollar amount set forth below each Lender's name on the signature page to this Agreement for each Lender as its "Revolving Credit Commitment" representing the commitment of such Lender to make Revolving Credit Advances and to fund outstanding Letters of Credit; as it may change from time to time in accordance with Section 17.3(c).

"Revolving Credit Commitments" shall mean the aggregate amount of each Lender's individual Revolving Credit Commitment, which aggregate amount shall equal the Maximum Revolving Credit Amount.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on any list thereof maintained by OFAC, as published from time to time.

"Sanctioned Person" shall mean any Person (i) named on any list of "Specifically Designated Nationals," "Blocked Persons," "Specifically Designated Terrorists," "Specially Designated Narcotics Traffickers" or "Foreign Terrorist Organizations" maintained by OFAC, as published from time to time; (ii) that is (A) an agent of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a Person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Securities" shall mean and include, as to each Borrower, all securities (whether certificated or uncertificated) and other investment property owned by such Borrower, whether now existing or hereafter created, including any held by any intermediary in any "street" name, pursuant to any custody arrangement or otherwise. The term "Securities" specifically includes all securities accounts, security entitlements, commodity contracts and commodity accounts.

"Settlement Date", in respect of settlements among Lenders, if WBCC is not the only Lender, shall mean the Closing Date and thereafter the first Business Day of each calendar month.

3604386.15

"Subordinated Debt" shall mean any Indebtedness of the Borrowers incurred after the Closing Date (including, without limitation, any Indebtedness related to the Junior Lien Facility), provided that (i) such Indebtedness is made expressly subordinate and subject in right and time of payment to the all Obligations pursuant to a Subordination Agreement, in form and substance satisfactory to Agent; (ii) any Liens and rights of any kind such subordinated lender may have or thereafter acquire against any Borrower with respect to such Indebtedness shall not be asserted in any manner until ninety (90) days after all of the Obligations have been indefeasibly paid in full in cash; (iii) any interest accruing with respect to such subordinated Indebtedness shall be only payable-in-kind until all Obligations have been indefeasibly paid in full in cash; (iv) such subordinated Indebtedness shall have a final maturity occurring no sooner than, or a weighted average life less than, the date that is six (6) calendar months following the expiration of the Term; and (v) Agent provides prior written consent to such subordinated Indebtedness (provided, that no prior written consent of Agent shall be required for Indebtedness under the Junior Lien Facility as permitted in Section 7.3(e) hereof).

"Subordination Agreement" shall mean an agreement, satisfactory in form and substance to Agent, in its sole discretion, among (i) Agent, (ii) a creditor holding Indebtedness permitted to be incurred hereunder, and (iii) the Borrowers (whether directly or by consent), setting forth the terms by which such Indebtedness shall be subordinated, in right of payment and claim, to the rights and claims of the Lender Parties in respect of the Obligations and the Collateral.

"Subsidiary" shall mean, as to any Person, a corporation or other entity a majority of whose Voting Equity Interests are owned, directly or indirectly, by such Person. Unless otherwise expressly provided herein, references herein to a "Subsidiary" or the "Subsidiaries" shall mean and refer to Subsidiaries of the Borrowers, including any not in existence on the Closing Date in anticipation of their subsequent creation or acquisition in accordance with the terms hereof.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Term Loan" or "Term Loans" shall mean the term loans made by or on behalf of the Term Loan Lenders to each Borrower pursuant to the Term Loan Agreement in the initial aggregate principal amount of **[Twelve Million Eight Hundred Eight Thousand Eight Hundred Eight and 55/100 Dollars]** ($**[12,808,808.55]**).

"Term Loan Agent" shall mean CSE Mortgage LLC and its successors and assigns.

"Term Loan Agreement" shall mean the Amended and Restated Loan and Security Agreement, dated of even date herewith, by and among Term Loan Agent, Term Loan Lenders and Borrowers, as amended or modified from time to time subject to the provisions of the Intercreditor Agreement.

"Term Loan Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Borrower to Term Loan Agent or any Term Loan Lender, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Term Loan Lender Agreements.

"Term Loan Lender Agreements" shall mean, collectively, the following (as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Term Loan Agreement; (b) all "Other Documents" (as defined therein) at any time executed and delivered by any Borrower with, to or in favor of Term Loan Agent or any Term Loan Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Term Loan Lender Agreement".

3604386.15

"Term Loan Lenders" shall mean, collectively, CSE Mortgage LLC in its individual capacity and the other lenders who are from time to time parties to the Term Loan Agreement as lenders, and their respective successors and assigns, and the lenders with respect to any Refinancing Indebtedness; each sometimes being referred to herein individually as a "Term Loan Lender".

"Test Period" shall have the meaning set forth in Section 8.1 hereof.

"Title Insurance Policy" shall have the meaning set forth in Section 9.1(x) hereof.

"Toxic Substance" shall mean and include any material present on the Real Property that has been shown to have significant adverse effect on human health or that is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. The term "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Unfinanced Capital Expenditures" shall have the meaning set forth in Section 8.1 hereof.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code, as adopted in the State of New York, in effect from time to time.

"Voting Equity Interests" shall mean Equity Interests having ordinary voting power to elect members of the board of directors, partners, managers or comparable governing authority of a Person.

"WBCC" shall have the meaning set forth in the Recitals hereto.

"Working Capital Obligations" shall mean, any time, the aggregate amount of: (i) all then outstanding Revolving Credit Advances and (ii) all amounts then available for drawing under all then outstanding Letters of Credit.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3604386.15

ACKNOWLEDGED AND AGREED:


LEXINGTON PRECISION CORPORATION


By: _____
      Name: _____
      Title: _____



LEXINGTON RUBBER GROUP, INC.



By: _____
      Name: _____
      Title: _____

**EXHIBIT 9.1(d)**
**SECRETARY'S CERTIFICATE**

The undersigned, being the Secretary of LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("Borrower"), hereby gives this certificate to CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CS") pursuant to the terms of that certain Amended and Restated Credit and Security Agreement, dated as of even date herewith (herein, as at any time amended, amended and restated, supplemented or otherwise modified, called the "Credit Agreement"), among Borrower, LEXINGTON PRECISION CORPORATION, CS, individually as a lender and as agent for itself and the other Lenders from time to time party thereto, and such other lenders. Capitalized terms used herein and not defined herein have the meanings assigned to them in the Credit Agreement.

The undersigned hereby certifies that:

1.      Attached hereto as Exhibit "A" is a true and correct copy of the Certificate of Incorporation of Borrower and all amendments thereto as in effect on the date hereof;

2.      Attached hereto as Exhibit "B" is a true and correct copy of the bylaws of Borrower as in effect on the date hereof;

3.      Pursuant to resolutions heretofore adopted by the Board of Directors of Borrower, a true, correct and complete copy of which is set forth on Exhibit "C" attached hereto, each officer of Borrower identified below is duly authorized to execute and/or attest the Credit Agreement and each Other Document to which the Borrower is a party for and on behalf of Borrower, and to bind Borrower accordingly thereby; and the specimen signature of each such officer or other representative inscribed below is his genuine signature:

| Name | Title | Signature |
|---|---|---|
| Michael A. Lubin | Chairman of the Board | _____ |
| Warren Delano | President | _____ |
| [_____] | [_____] | _____ |

3604386.15

IN WITNESS WHEREOF, the undersigned has executed this certificate in his aforesaid capacity as Secretary of Borrower, as of [____ __], 2010.

                                      _____

Name:   [_____]
Title:    Secretary

3604386.15

EXHIBIT "A"

[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "B"


[BORROWERS' COUNSEL TO PROVIDE]

EXHIBIT "C"


[BORROWERS' COUNSEL TO PROVIDE]

3604386.15

**EXHIBIT 9.1(t)**

**CLOSING CERTIFICATE**

This certificate is delivered pursuant to <u>Section 9.1(t)</u> of that certain Amended and Restated Credit and Security Agreement, dated as of **[_____ ___]**, 2010, among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC., as Borrowers, the Lenders from time to time party thereto, and CAPITALSOURCE FINANCE LLC, as a Lender and as Agent for all such Lenders (as such agreement has been, or may be, amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

Borrowing Representative hereby certifies to Agent that as of the date hereof:

(a)      all representations and warranties set forth in the Credit Agreement and the Other Documents are true and correct;

(b)      Borrowers are in compliance with all terms and provisions set forth in the Credit Agreement and the Other Documents; and

(c)      no Default or Event of Default has occurred and is continuing.

LEXINGTON PRECISION CORPORATION,
as Borrowing Representative

By: _____

Name: _____

Title:_____

Date: [_____ ___], 2010

3604386.15

32

**Exhibit 10.7**

Form of Compliance Certificate

To:     CapitalSource Finance LLC
        4445 Willard Avenue, 12th Floor
        Chevy Chase, MD 20815
        Attention: Business Credit Services/Portfolio Manager

Re:     Lexington Precision Corporation
        Lexington Rubber Group, Inc.: Compliance Certificate dated [_____ __, 20__]

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Credit and Security Agreement, dated as of [_____ ____], 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between LEXINGTON PRECISION CORPORATION, a Delaware corporation ("**LPC**"), LEXINGTON RUBBER GROUP, INC., a Delaware corporation ("**LRG**", and together with LPC, collectively, the "**Borrowers**") and CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("**Lender**"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

Pursuant to Section [10.7] [10.8] of the Credit Agreement, the Designated Officer of Borrowing Representative hereby certifies that:

1.      The financial statements of Borrowers for the period ending [_____ __, 20__] attached hereto as Schedule 1 have been prepared in accordance with GAAP, applied on a basis consistent with prior practices.

2.      The Borrowing Representative has reviewed the terms of the Credit Agreement and the Other Documents and the condition of Borrowers, and based on such review, no Default or Event of Default has occurred or is continuing, except as set forth on Schedule 2 attached hereto, specifying the nature of such Default or Event of Default, when it occurred, and the steps that the Borrowers have taken, are taking, or propose to take with respect thereto.

3.      Attached hereto as Schedule 3 are the calculations that set forth the Borrowers' compliance with the Financial Covenants as of [_____ __, 20__].

**[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]**

3604386.15

       IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this \_\_\_\_ day of _____, 20\_\_.

**LEXINGTON PRECISION CORPORATION,**
as Borrowing Representative

By: _____

Name: _____

Title: _____

3604386.15

## COMMITMENT TRANSFER SUPPLEMENT

COMMITMENT TRANSFER SUPPLEMENT, dated as of _____, 20__, among _____ (the "Transferor Lender"), each Purchasing Lender executing this Commitment Transfer Supplement (each, a "Purchasing Lender"), and CAPITALSOURCE FINANCE LLC ("CS"), as agent for the Lenders (as defined below) under the Credit Agreement (as defined below)

W I T N E S S E T H

WHEREAS, this Commitment Transfer Supplement is being executed and delivered in accordance with Section 17.3 of the Amended and Restated Credit and Security Agreement, dated as of [_____ __], 2010, (as from time to time amended, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "Credit Agreement") among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (therein and herein called "Borrowers"), and CS, the various financial institutions named therein or which hereafter become a party thereto, (together with CS, the "Lenders") and CS as agent for Lenders (in such capacity, "Agent"); and

WHEREAS, each Purchasing Lender wishes to become a Lender party to the Credit Agreement; and

WHEREAS, the Transferor Lender is selling and assigning to each Purchasing Lender rights, obligations and commitments under the Credit Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      All capitalized terms used herein which are not defined shall have the meanings given to them in the Credit Agreement.

2.      Upon receipt by the Agent of four counterparts of this Commitment Transfer Supplement, to each of which is attached a fully completed Schedule and each of which has been executed by the Transferor Lender and Purchasing Lender, Agent will transmit to Transferor Lender and each Purchasing Lender a transfer effective notice, substantially in the form of Schedule II to this Commitment Transfer Supplement (a "Transfer Effective Notice") Such Transfer Effective Notice shall set forth, inter alia, the date on which the transfer effected by this Commitment Transfer Supplement shall become effective (the "Transfer Effective  Date"), which date shall not be earlier than the first Business Day following the date such Transfer Effective Notice is received. From and after the Transfer Effective Date, each Purchasing Lender shall be a Lender party to the Credit Agreement for all purposes thereof.

3.      At or before 12:00 Noon (New York City time) on the Transfer Effective Date each Purchasing Lender shall pay to Transferor Lender, in immediately available funds, an amount equal to the purchase price, as agreed between Transferor Lender and such Purchasing Lender (the "Purchase Price"), of the portion of the outstanding Advances being purchased by such Purchasing Lender (such Purchasing Lender's "Purchased Percentage") and other amounts owing to the Transferor Lender under the Credit Agreement with respect to that portion of the Advances being purchased by such Purchasing Lender. Effective upon receipt by Transferor Lender of the Purchase Price from a Purchasing Lender, Transferor Lender hereby irrevocably sells, assigns and transfers to such Purchasing Lender, without recourse, representation or warranty, and each Purchasing Lender hereby irrevocably purchases, takes and assumes from Transferor Lender, such Purchasing Lender's Purchased Percentage of the Advances and other amounts owing to the Transferor Lender under the Credit Agreement together with all instruments, documents and collateral security pertaining thereto.

3604386.15

35

4.      Transferor Lender has made arrangements with each Purchasing Lender with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by Transferor Lender to such Purchasing Lender of any fees heretofore received by Transferor Lender pursuant to the Credit Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by such Purchasing Lender to Transferor Lender of fees or interest received by such Purchasing Lender pursuant to the Credit Agreement from and after the Transfer Effective Date.

5.      (a)      All principal payments that would otherwise be payable from and after the Transfer Effective Date to or for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender pursuant to the Credit Agreement shall, instead, be payable to or for the account of Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement.

        (b)      All interest, fees and other amounts that would otherwise accrue for the account of Transferor Lender with respect to the Purchasing Lender's Purchased Percentage of the Advances and the other amounts owing to the Transferor Lender from and after the Transfer Effective Date pursuant to the Credit Agreement shall, instead, accrue for the account of, and be payable to, Transferor Lender and Purchasing Lender, as the case may be, in accordance with their respective interests as reflected in this Commitment Transfer Supplement. In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by any Purchasing Lender, Transferor Lender and each Purchasing Lender will make appropriate arrangements for payment by Transferor Lender to such Purchasing Lender of such amount upon receipt thereof from Borrower.

        (c)      Consistent with the terms of Section 17.3 of the Credit Agreement, (i) payments of principal, interest, fees, charges and collections owing to the Purchasing Lender hereafter pursuant to the Credit Agreement shall be made by the Agent without giving effect to any collection days, and (ii) Purchasing Lender shall not be entitled to receive any portion of any fees or charges payable to the Agent for its own account.

6.      Concurrently with the execution and delivery hereof, Transferor Lender will provide to each Purchasing Lender conformed copies of the Credit Agreement and all Other Documents delivered to Transferor lender.

7.      Each of the parties to this Commitment Transfer Supplement agrees that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Commitment Transfer Supplement.

8.      By executing and delivering this Commitment Transfer Supplement, Transferor Lender and each Purchasing Lender confirm to and agree with each other and Agent and Lenders as follows: (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, Transferor Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, the Other Documents or any other instrument or document furnished pursuant thereto; (ii) Transferor Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their Obligations under the Credit Agreement or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Lender confirms that it has received a copy of the Credit

Agreement, together with copies of such financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Commitment Transfer Supplement; (iv) each Purchasing Lender will, independently and without reliance upon Agent, Transferor Lender or any other Lenders and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (v) each Purchasing Lender appoints and authorizes Agent to take such action and to exercise such powers under the Credit Agreement as are delegated to the Agent by the terms thereof; (vi) each Purchasing Lender agrees that it will perform all of its respective obligations as set forth in the Credit Agreement to be performed by each as a Lender; and (vii) each Purchasing Lender represents and warrants to Transferor Lender, the other Lenders, Agent and Borrowers that it is either (x) entitled to the benefits of an income tax treaty with the United States of America that provides for an exemption from the United States withholding tax on interest and other payments made by Borrowers under the Credit Agreement and the Other Documents or (y) is engaged in trade or business within the United States of America.

9.      Schedule I hereto sets forth the revised Commitment Percentages of Transferor Lender and Purchasing Lender after giving effect to the transfer contemplated hereby as well as administrative information with respect to each Purchasing Lender.

10.     This Commitment Transfer Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

3604386.15

IN WITNESS WHEREOF, the parties hereto have caused this Commitment Transfer Supplement to be executed by their respective duly authorized officers on the date set forth above.

_____
as Transferor Lender


By:    _____
Name:    _____
Title:    _____



_____
as a Purchasing Lender


By:    _____
Name:    _____
Title:    _____



CAPITALSOURCE FINANCE LLC, as Agent


By:    _____
Name:    _____
Title:    _____

3604386.15

SCHEDULE I TO COMMITMENT TRANSFER SUPPLEMENT

LIST OF OFFICE ADDRESSES FOR NOTICES AND COMMITMENT AMOUNTS

| | | |
|---|---|---|
| [Transferor Lender] | Revised Revolving Credit Commitment Amount | $_____ |
| | Revised Term Loan Commitment Amount | $_____ |
| | Revised Commitment Percentage: | _____% |
| [Purchasing Lender] | Revolving Credit Commitment Amount | $_____ |
| | Term Loan Commitment Amount | $_____ |
| | Commitment Percentage: | _____% |

Addresses for Notices

_____

_____

_____

Attention:
Telephone:
Telecopier:

3604386.15

<u>SCHEDULE II TO COMMITMENT TRANSFER SUPPLEMENT</u>

[Form of Transfer Effective Notice]

To:     _____, as Transferor Lender and
        _____, as Purchasing Lender:

The undersigned, as Agent under the Amended and Restated Credit and Security Agreement dated as of [_____ __], 2010 among LEXINGTON PRECISION CORPORATION and LEXINGTON RUBBER GROUP, INC. (collectively, "Borrowers"), and CAPITALSOURCE FINANCE LLC, a Delaware limited liability company ("CS"), the various financial institutions named therein or which hereafter become a party thereto, (together with CS, the "Lenders") and CS as agent for Lenders (in such capacity, "Agent"), acknowledges receipt of four (4) executed counterparts of a completed Commitment Transfer Supplement in the form attached hereto. [Note: Attach copy of Commitment Transfer Supplement.] Terms defined in such Commitment Transfer Supplement are used herein as therein defined

Pursuant to such Commitment Transfer Supplement, you are advised that the Transfer Effective Date will be [Insert date of Transfer Effective Notice.]

                        CAPITALSOURCE FINANCE LLC,
                        as Agent


                        By:     _____
                        Name:   _____
                        Title:  _____




ACCEPTED FOR RECORDATION
IN REGISTER:

3604386.15

40

## SCHEDULES TO

**AMENDED AND RESTATED**

**CREDIT AND SECURITY AGREEMENT**

among

**LEXINGTON PRECISION CORPORATION**

and

**LEXINGTON RUBBER GROUP, INC.**

as Borrowers

and

**CAPITALSOURCE FINANCE LLC,**
as a Lender and as Agent

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
as additional Lenders

**Closing Date: [July 19], 2010**

3604386.15

## Schedules

| | |
|---|---|
| Schedule 2.6 | Letters of Credit |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Undisputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicts |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

3604386.15

42

**SCHEDULE 2.6**

**LETTERS OF CREDIT**

**SCHEDULE 4.5**

**EQUIPMENT AND INVENTORY LOCATIONS**

**SCHEDULE 4.14(c)**

**<u>LOCATION OF EXECUTIVE OFFICES</u>**

3604386.15

**SCHEDULE 4.16**

**<u>EXCLUDED EQUIPMENT</u>**

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA; QUALIFICATIONS**

3604386.15

**SCHEDULE 5.3**

**FEDERAL TAX IDENTIFICATION NUMBERS**

**SCHEDULE 5.5**

**<u>PRIOR NAMES</u>**

**SCHEDULE 5.6**

**<u>OSHA AND ENVIRONMENTAL COMPLIANCE EXCEPTIONS</u>**

**SCHEDULE 5.7**

**UNDISPUTED INDEBTEDNESS**

**SCHEDULE 5.8**

**<u>LITIGATION</u>**

**SCHEDULE 5.9**

**INDEBTEDNESS**

**SCHEDULE 5.11**

**<u>PLANS</u>**

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

**SCHEDULE 5.14**

**<u>DEFAULTS</u>**

**SCHEDULE 5.17**

**LABOR CONTRACTS**

**SCHEDULE 5.21**

**CONFLICTS**

**SCHEDULE 5.24**

**REAL PROPERTY**

**SCHEDULE 5.25**

**DEPOSIT ACCOUNTS**

**SCHEDULE 6.8**

**POST-CLOSING MATTERS**

**SCHEDULE 7.2**

**<u>PERMITTED ENCUMBRANCES</u>**

**SCHEDULE 7.3**

**OTHER INDEBTEDNESS**

**SCHEDULE 7.4**

**LOANS AND INVESTMENTS**

## <u>Tab J-1</u>

**Ancillary Documents Related to Amended and Restated Secured CSE Loan Agreement**

**None.**

Draft as of
06/21/10

<u>List of Annexes, Exhibits and Schedules</u>

<u>Annexes</u>

Annex One              Definitions

<u>Exhibits</u>

Exhibit 9.1(d)         Secretary's Certificate
Exhibit 9.1(t)         Closing Certificate
Exhibit 10.6           Compliance Certificate
Exhibit 17.3           Commitment Transfer Supplement

<u>Schedules</u>

Schedule 4.5           Equipment and Inventory Locations
Schedule 4.14(c)       Location of Executive Offices
Schedule 4.16          Excluded Equipment
Schedule 5.2           Organizational Data and Numbers; Qualifications
Schedule 5.3           Tax Matters
Schedule 5.5           Prior Names
Schedule 5.6           OSHA and Environmental Compliance
Schedule 5.7           Undisputed Indebtedness
Schedule 5.8           Litigation
Schedule 5.9           Indebtedness
Schedule 5.11          Plans
Schedule 5.12          Material Intellectual Property
Schedule 5.14          Defaulted Indebtedness
Schedule 5.17          Labor Contracts
Schedule 5.21          Conflicts
Schedule 5.24          Real Property
Schedule 5.25          Deposit Accounts
Schedule 6.8           Post-Closing Matters
Schedule 7.2           Permitted Encumbrances
Schedule 7.3           Other Indebtedness
Schedule 7.4           Loans and Investments

## <u>SCHEDULES TO</u>

**AMENDED AND RESTATED**

**LOAN AND SECURITY AGREEMENT**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**

**and**

**CSE MORTGAGE LLC,**
**as a Lender and as Agent**

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**Closing Date: [July 19], 2010**

## **Schedules**

| | |
|---|---|
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Undisputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicts |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

**SCHEDULE 4.5**

**EQUIPMENT AND INVENTORY LOCATIONS**

| Street Address | County | Name and Address of Landlord (if Leased) |
|---|---|---|
| 677 Buffalo Road<br>Rochester, New York 14611 | Monroe | N/A Owned |
| 855 Publishers Parkway<br>Webster, New York 14580 | Monroe | Boulter Industrial Contractors, Inc. |
| 1510 Ridge Road<br>Vienna, OH 44473 | Trumbull | N/A Owned |
| 3565 Highland Park Street NW<br>North Canton, OH 44720 | Stark | N/A Owned |
| 1076 Ridgewood Road<br>Jasper, GA 30143 | Pickens | N/A Owned |
| 663 Bryant Boulevard<br>Rock Hill, SC 29732 | York | N/A Owned |
| 4255 King Graves Road — Building D<br>Vienna, OH 44473 | Trumbull | King Graves Road<br>Storage & Warehouse<br><br>Andrew D. Shuluga<br>131 Huntington Trail<br>Cortland, Ohio, 44410 |
| 139 Confederate Ave.<br>Jasper, GA 30143 | Pickens | William Sellers, Sr.<br>C/O ERA Sunrise Realtyh<br>157 Reinhardt College Parkway<br>Canton, GA 30114 |
| 1076 Ridgewood Road<br>Jasper, GA 30143 | Pickens | office trailers leased from Williams Scotsman, Inc. located on such premises<br><br>Williams Scotsman, Inc.<br>2310 Alcovy Road<br>Dacula, GA 30019<br>Williams Scotsman, Inc<br>Contracts Office<br>8211 Town Center Drive<br>Baltimore, MD 21236 |
| 7901 Cleveland Avenue North Bay C<br>North Canton, OH 44720 | Stark | CSC Partnership<br>PO Box 357<br>Greentown, OH 44630 |

| | | |
|---|---|---|
| 2009 Quimby Ave. SW<br>Canton, OH 44706 | Stark | Canton Erectors, Inc.<br>2009 Quimby Ave. SW<br>Canton, OH 44706 |
| 333 S. Congress St.<br>York, SC 29745 | York | White Rose Realty<br>730 Highway 321 Bypass, Suite 144<br>York, SC 29745 |

In addition to the owned and leased locations listed above, certain consigned Inventory is located as follows:

Baxter Healthcare
U.S. Highway 221 North
Marion, N.C. 28752

In addition to the owned and leased locations listed above, certain Inventory may. from time to time, be located with metal platers and processors as follows:

Roy Metal Finishing
112 Conestee Road
Conestee, SC 29636 (metal plater - WIP)

Wolverine Plating Corp.
29456 Groesbeck HWY
Roseville, MI 48066 (metal plater - WIP)

Jasco Heat Treating, Inc.
820 Turk Hill RD
Fairport, NY 14450
(heat treatment of inventory-WIP)

Centerless Technology, Inc.
45 Wells Street
Rochester, NY 14611 (grinding of inventory - WIP)

Varland Metal Services, Inc.
3231 Fredonia Avenue
Cincinnati, OH 45229 (metal plater - WIP)

Summit Corporation
1430 Waterbury Road
Thompson, CT 06787 (metal plater - WIP)

Bodycote
620 Buffalo Road
Rochester, NY 14611   (Heat treating)

Craftsman Plating & Tinning
1250 Melrose St.
Chicago, IL 60657   (Plating)

Besdley   Technologies
152 Wacker Road
Statesville, NC 28625   (Thread seal)

Modeen Industries
613 West 11th St.
Erie, PA 16512    (Heat treating)

**SCHEDULE 4.14(c)**

<u>**LOCATION OF EXECUTIVE OFFICES**</u>

| <u>Street Address</u> | <u>County</u> | Name and Address of <u>Landlord (if Leased)</u> |
|---|---|---|
| 800 Third Ave. 15th Floor<br>New York, NY 10022 | New York | Utilized pursuant to a reimbursement agreement with Lubin, Delano & Company, which subleases from Scott-Macon, Ltd. 800 Third Avenue, 16th Floor, New York, NY 10022 |

**SCHEDULE 4.16**

**EXCLUDED EQUIPMENT**

None.

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA AND NUMBERS; QUALIFICATIONS**

A.    **Lexington Precision Corporation ("LPC"):**
1.    State of Organization
- Delaware

2.    States of Foreign Qualification
- Arizona
- Georgia
- New York
- Ohio

3.    Organization Identification Number
- 0640314

4.    Subsidiaries
- Lexington Rubber Group, Inc.

5.    [Approximately 3,300,000 shares of Lexington Precision Corporation common stock outstanding.]

B.    **Lexington Rubber Group, Inc. ("LRG")**
1.    State of Organization
- Delaware

2.    States of Foreign Qualification
- Georgia
- Michigan
- New York
- Ohio
- South Carolina

3.    Organization Identification Number
- 2178808

5.    The authorized capital stock of LRG consists of 10,000 shares of common stock, par value $.01. One (1) share is issued and outstanding and owned by Lexington Precision Corporation.

**SCHEDULE 5.3**

**<u>TAX MATTERS</u>**

<u>Tax Identification Numbers</u>

Lexington Precision Corporation:          22 – 1830121

Lexington Rubber Group Inc.:          13 – 3525759

The Borrowers' tax returns remain open for the applicable statutory limitation periods.


Based on our current knowledge we believe that the accruals for federal and state income taxes are adequate.

**SCHEDULE 5.5**

**PRIOR NAMES***

## Lexington Precision Corporation

-       Prior Names

       •       None

-       Prior Trade Names:
       •       Lexington Machining
       •       Lexington Die Casting

       Current Trade Names

          Lexington
          Lexington Precision

## Lexington Rubber Group, Inc.

-       Prior Names
       •       None

-       Prior Trade Names
       •       Lexington Connector Seals
       •       Lexington Insulators
       •       Lexington Medical
       •       Lexington LSR
       •       Lexington Technologies

       Current Trade Names

          Lexington
          Lexington Precision

* Within the immediately preceding five calendar years.

**SCHEDULE 5.6**

**OSHA AND ENVIRONMENTAL COMPLIANCE**

Any matters disclosed in the following environmental reports with respect to the Real Property listed below, copies of which have been delivered to the Agent:

1.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 1510 Ridge Road, Vienna, Ohio

2.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 11076 Ridgewood Road, Jasper, Georgia

3.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at Highway 5, Ellijay, Georgia

4.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 663 Bryant Boulevard, Rock Hill, South Carolina

5.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 3565 Highland Park Street, NW, North Canton, Ohio

6.      Phase I Environmental Site Assessment dated June 24, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 677 Buffalo Road, Rochester, New York

7.      Report on ASTM Phase I Environmental Site Assessment dated July 11, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 201 Winchester Road, Lakewood, New York.   A new report is currently being prepared by the GRS Group.

New Phase I environmental site assessments are currently being performed by the GRS Group at the request of the Agent.

**SCHEDULE 5.7**

**UNDISPUTED INDEBTEDNESS**

None.

**SCHEDULE 5.8**

<u>**LITIGATION**</u>

A.    Lexington Precision Corporation:

    1.    Autoliv v. Lexington Precision Corporation

    2.    The Chemical Recovery System Site, 142 Locust Street, Elyria, Ohio

    3.    Environmental Products & Services of Vermont, Inc. v. Lexington Precision Corporation

    4.    New York State Department of Environmental Conversation & Lexington Precision Corporation – Administrative Proceeding

B.    Lexington Rubber Group, Inc.:

    1.    Lexington Insulators — The Construction Road Drum Site, 1235 Construction Road, Atlanta, GA

    2.    Lorraine Cerimele v. Lexington Rubber Group, Inc.

**SCHEDULE 5.9**

**INDEBTEDNESS**

**Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG")**

1.  Retirement annuity payable to:
    Dorothy Donohue
    6575 New Market Way
    Raleigh, NC 27615
    $1,000 per month for the remainder of her life

2.  Letter of Credit issued to Lumberman's Mutual Casualty Company et al (Kemper)
    for the principal amount of $26,000, expires June 30, 2010, but will be renewed for one year from July 1, 2010 to June 30, 2011(workers compensation insurance)

3.  Letter of Credit issued to The Travelers Indemnity Company
    for the principal amount of $707,000 (In the process of being renewed from July 1, 2010 to June 30, 2011)

[4.  Notes payable to vendors of LPC and LRG with pre-petition claims for trade accounts payable that are not paid or otherwise satisfied prior to emerging from Bankruptcy.   Amount unknown.][1]

---

[1] We expect the company to emerge without such trade payable debt outstanding; will remove from this schedule once we know this is in fact the case following confirmation hearings.

- 15 -

**SCHEDULE 5.11**

**PLANS**

Lexington Precision Corporation Retirement & Savings Plan (401(k) plan)

Lexington Precision Corporation Retiree Benefit Plan for Certain Former Employees of The Stalwart Rubber Company. This cost the Company about $10,000 per year and currently covers only 5 former employees.

Retiree Benefit Plan for Certain Former Employees of Ness Precision Products. This currently costs the Company about $17,000 per year and covers 17 participants. This plan is closed to new participants.

- 16 -

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

Patents and Patent Applications:
None.

Trademarks and Trademark Applications:

| Name | Filing Date | Application No. | Issue Date | Registration & Serial Nos. | Status | Owner |
|------|-------------|-----------------|------------|----------------------------|--------|-------|
| Lexington | March 16, 2007 | N/A | May 26, 2009 | 3,625,147 (Reg. No.)<br><br>77132880 (Serial No.) | In use | Lexington Precision Corporation |

Copyrights and Copyright Applications:
None.

**SCHEDULE 5.14**

**<u>DEFAULTED INDEBTEDNESS</u>**

None.

**SCHEDULE 5.17**

**LABOR CONTRACTS**

1.      Lexington Rubber Group, Inc. Rock Hill, South Carolina, Facility — United Steel Workers of America, AFL-CIO Local #1811 -- expires October 19, 2012

**SCHEDULE 5.21**

**<u>CONFLICTS</u>**

None.

NYI-4284652v5

**SCHEDULE 5.24**

**REAL PROPERTY**

| | *Location* |
|---|---|
| | |
| **a. Lexington Precision Corporation** | 800 Third Ave. 15th Floor<br>New York, NY 10022. Leased. |
| | 677 Buffalo Road,<br>Rochester, NY 14611. Owned. |
| | Boulter Industrial Contractors, Inc.,<br>855 Publishers Parkway<br>Webster, NY 14580. Leased. |
| | 201 Winchester Road,<br>Lakewood, NY 14750. Owned; leased by LPC to Premier Lakewood, Inc. |
| **b. Lexington Rubber Group, Inc.** | 1510 Ridge Road,<br>Vienna, OH 44473. Owned. |
| | 3565 Highland Park Street, NW<br>North Canton, OH 44720. Owned. |
| | 1076 Ridgewood Road,<br>Jasper, GA 30143. Owned. |
| | 663 Bryant Blvd.,<br>Rock Hill, SC 29732. Owned. |
| | King Graves Road Storage & Warehouse,<br>4255 King Graves Road — Building D<br>Vienna, OH 44473. Leased. |
| | 139 Confederate Ave.<br>Jasper, GA 30143. Leased. |
| | Williams Scotsman, Inc.<br>1076 Ridgewood Road,<br>Jasper, GA 30143. Leased office trailers<br>located on LRG's owned premises in Jasper, GA. |
| | 7901 Cleveland Ave. Bay C,<br>North Canton, OH 44720. Leased. |
| | 2009 Quimby Ave. SW,<br>Canton, OH 44706. Leased. |
| | 333 S. Congress St.<br>York, SC 29745. Leased. |

LPC also owns premises located at 202 Winchester Road, Lakewood, New York which are not being mortgaged and shall not constitute Real Property as defined in the Loan and Security Agreement.

**SCHEDULE 5.25**

**DEPOSIT ACCOUNTS\***

| Account Number | Bank Depository | Purpose |
|---|---|---|
| Lexington Precision Corporation: | | |
| 390-01616 | Jeffries & Company, Inc. | Brokerage* |
| 59-2300-7889 | First Merit Bank, N.A. | Cash Management |
| 59-2300-7871 | First Merit Bank N.A. | Operating Account |
| 76077 | First Merit Bank, N.A. | Lockbox |
| Lexington Rubber Group, Inc. | | |
| 76076, 76075, 76074 | First Merit Bank, N.A. | Lockbox |
| 7017141311 | Capital One Bank, N.A. | Business checking |
| 7017141346 | Capital One Bank, N.A. | Business Money Market |
| 7017141583 | Capital One Bank, N.A. | Business Money Market |

_____
* Account has less than $1,000

- 22 -

**SCHEDULE 6.8**

**POST-CLOSING MATTERS**

[TBD]

**SCHEDULE 7.2**

**<u>PERMITTED ENCUMBRANCES</u>**

None.

**SCHEDULE 7.3**

**OTHER INDEBTEDNESS**

The Indebtedness listed as Items 1 through 3 on Schedule 5.9.

NYI-4284652v5

**SCHEDULE 7.4**

**LOANS AND INVESTMENTS**

None.

**<u>Tab J-2</u>**

**Ancillary Documents Related to Amended and Restated CapitalSource Credit Agreement**

**None.**

Draft as of
06/21/10

List of Annexes, Exhibits and Schedules

Annexes

Annex One            Definitions

Exhibits

Exhibit 9.1(d)       Secretary's Certificate
Exhibit 9.1(t)       Closing Certificate
Exhibit 10.7         Compliance Certificate
Exhibit 17.3         Commitment Transfer Supplement

Schedules

Schedule 2.6         Letters of Credit
Schedule 4.5         Equipment and Inventory Locations
Schedule 4.14(c)     Location of Executive Offices
Schedule 4.16        Excluded Equipment
Schedule 5.2         Organizational Data and Numbers; Qualifications
Schedule 5.3         Tax Matters
Schedule 5.5         Prior Names
Schedule 5.6         OSHA and Environmental Compliance
Schedule 5.7         Undisputed Indebtedness
Schedule 5.8         Litigation
Schedule 5.9         Indebtedness
Schedule 5.11        Plans
Schedule 5.12        Material Intellectual Property
Schedule 5.14        Defaulted Indebtedness
Schedule 5.17        Labor Contracts
Schedule 5.21        Conflicts
Schedule 5.24        Real Property
Schedule 5.25        Deposit Accounts
Schedule 6.8         Post-Closing Matters
Schedule 7.2         Permitted Encumbrances
Schedule 7.3         Other Indebtedness
Schedule 7.4         Loans and Investments

## <u>SCHEDULES TO</u>

**AMENDED AND RESTATED**

**CREDIT AND SECURITY AGREEMENT**

**among**

**LEXINGTON PRECISION CORPORATION**

**and**

**LEXINGTON RUBBER GROUP, INC.**

**as Borrowers**

**and**

**CAPITALSOURCE FINANCE LLC,**
**as a Lender and as Agent**

**AND ANY OTHER FINANCIAL INSTITUTIONS**
**FROM TIME TO TIME PARTY HERETO,**
**as additional Lenders**

**Closing Date: [July 19], 2010**

**<u>Schedules</u>**

| | |
|---|---|
| Schedule 2.6 | Letters of Credit |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.14(c) | Location of Executive Offices |
| Schedule 4.16 | Excluded Equipment |
| Schedule 5.2 | Organizational Data and Numbers; Qualifications |
| Schedule 5.3 | Tax Matters |
| Schedule 5.5 | Prior Names |
| Schedule 5.6 | OSHA and Environmental Compliance |
| Schedule 5.7 | Undisputed Indebtedness |
| Schedule 5.8 | Litigation |
| Schedule 5.9 | Indebtedness |
| Schedule 5.11 | Plans |
| Schedule 5.12 | Material Intellectual Property |
| Schedule 5.14 | Defaulted Indebtedness |
| Schedule 5.17 | Labor Contracts |
| Schedule 5.21 | Conflicts |
| Schedule 5.24 | Real Property |
| Schedule 5.25 | Deposit Accounts |
| Schedule 6.8 | Post-Closing Matters |
| Schedule 7.2 | Permitted Encumbrances |
| Schedule 7.3 | Other Indebtedness |
| Schedule 7.4 | Loans and Investments |

**SCHEDULE 2.6**

**LETTERS OF CREDIT**

Amended March 20, 2009, and extended for one additional year on July 1, 2009:

| | | | |
|---|---|---|---|
| Lumbermens Mutual Casualty Company | Bank of America | $26,000.00 | Ref. 308265 |
| American Motorists Insurance Company | | | |
| American Manufacturers Mutual | | | |

Amended on June 14, 2007, and extended for one additional year on each of July 1, 2008 and 2009:

| | | | |
|---|---|---|---|
| The Travelers Indemnity Company | Bank of America | $707,000.00 | Ref 3082674 |

## SCHEDULE 4.5

## EQUIPMENT AND INVENTORY LOCATIONS

| Street Address | County | Name and Address of Landlord (if Leased) |
|---|---|---|
| 677 Buffalo Road<br>Rochester, New York 14611 | Monroe | N/A Owned |
| 855 Publishers Parkway<br>Webster, New York 14580 | Monroe | Boulter Industrial Contractors, Inc. |
| 1510 Ridge Road<br>Vienna, OH 44473 | Trumbull | N/A Owned |
| 3565 Highland Park Street NW<br>North Canton, OH 44720 | Stark | N/A Owned |
| 1076 Ridgewood Road<br>Jasper, GA 30143 | Pickens | N/A Owned |
| 663 Bryant Boulevard<br>Rock Hill, SC 29732 | York | N/A Owned |
| 4255 King Graves Road — Building D<br>Vienna, OH 44473 | Trumbull | King Graves Road<br>Storage & Warehouse<br><br>Andrew D. Shuluga<br>131 Huntington Trail<br>Cortland, Ohio, 44410 |
| 139 Confederate Ave.<br>Jasper, GA 30143 | Pickens | William Sellers, Sr.<br>C/O ERA Sunrise Realtyh<br>157 Reinhardt College Parkway<br>Canton, GA 30114 |
| 1076 Ridgewood Road<br>Jasper, GA 30143 | Pickens | office trailers leased from Williams Scotsman, Inc. located on such premises<br><br>Williams Scotsman, Inc.<br>2310 Alcovy Road<br>Dacula, GA 30019<br>Williams Scotsman, Inc<br>Contracts Office<br>8211 Town Center Drive<br>Baltimore, MD 21236 |
| 7901 Cleveland Avenue North Bay C<br>North Canton, OH 44720 | Stark | CSC Partnership<br>PO Box 357<br>Greentown, OH 44630 |

| | | |
|---|---|---|
| 2009 Quimby Ave. SW<br>Canton, OH 44706 | Stark | Canton Erectors, Inc.<br>2009 Quimby Ave. SW<br>Canton, OH 44706 |
| 333 S. Congress St.<br>York, SC 29745 | York | White Rose Realty<br>730 Highway 321 Bypass, Suite 144<br>York, SC 29745 |

In addition to the owned and leased locations listed above, certain consigned Inventory is located as follows:

Baxter Healthcare
U.S. Highway 221 North
Marion, N.C. 28752

In addition to the owned and leased locations listed above, certain Inventory may. from time to time, be located with metal platers and processors as follows:

Roy Metal Finishing
112 Conestee Road
Conestee, SC 29636 (metal plater - WIP)

Wolverine Plating Corp.
29456 Groesbeck HWY
Roseville, MI 48066 (metal plater - WIP)

Jasco Heat Treating, Inc.
820 Turk Hill RD
Fairport, NY 14450
(heat treatment of inventory-WIP)

Centerless Technology, Inc.
45 Wells Street
Rochester, NY 14611 (grinding of inventory - WIP)

Varland Metal Services, Inc.
3231 Fredonia Avenue
Cincinnati, OH 45229 (metal plater - WIP)

Summit Corporation
1430 Waterbury Road
Thompson, CT 06787 (metal plater - WIP)

Bodycote
620 Buffalo Road
Rochester, NY 14611   (Heat treating)

Craftsman Plating & Tinning
1250 Melrose St.
Chicago, IL 60657   (Plating)

Besdley   Technologies
152 Wacker Road
Statesville, NC 28625   (Thread seal)

Modeen Industries
613 West 11th St.
Erie, PA 16512     (Heat treating)

**SCHEDULE 4.14(c)**

**LOCATION OF EXECUTIVE OFFICES**

| Street Address | County | Name and Address of Landlord (if Leased) |
|---|---|---|
| 800 Third Ave. 15th Floor New York, NY 10022 | New York | Utilized pursuant to a reimbursement agreement with Lubin, Delano & Company, which subleases from Scott-Macon, Ltd. 800 Third Avenue, 16th Floor, New York, NY 10022 |

**SCHEDULE 4.16**

**<u>EXCLUDED EQUIPMENT</u>**

None.

**SCHEDULE 5.2**

**ORGANIZATIONAL DATA AND NUMBERS; QUALIFICATIONS**

A.    **Lexington Precision Corporation ("LPC"):**
1.    State of Organization
- Delaware

2.    States of Foreign Qualification
- Arizona
- Georgia
- New York
- Ohio

3.    Organization Identification Number
- 0640314

4.    Subsidiaries
- Lexington Rubber Group, Inc.

5.    [Approximately 3,300,000 shares of Lexington Precision Corporation common stock outstanding.]

B.    **Lexington Rubber Group, Inc. ("LRG")**
1.    State of Organization
- Delaware

2.    States of Foreign Qualification
- Georgia
- Michigan
- New York
- Ohio
- South Carolina

3.    Organization Identification Number
- 2178808

5.    The authorized capital stock of LRG consists of 10,000 shares of common stock, par value $.01. One (1) share is issued and outstanding and owned by Lexington Precision Corporation.

**SCHEDULE 5.3**

**TAX MATTERS**

Tax Identification Numbers

Lexington Precision Corporation:          22 – 1830121

Lexington Rubber Group Inc.:              13 – 3525759

The Borrowers' tax returns remain open for the applicable statutory limitation periods.


Based on our current knowledge we believe that the accruals for federal and state income taxes are adequate.

**SCHEDULE 5.5**

**PRIOR NAMES \***


**Lexington Precision Corporation**

-        Prior Names

•        None

-        Prior Trade Names:
•        Lexington Machining
•        Lexington Die Casting

Current Trade Names

Lexington
Lexington Precision

**Lexington Rubber Group, Inc.**

-        Prior Names
•        None


-        Prior Trade Names
•        Lexington Connector Seals
•        Lexington Insulators
•        Lexington Medical
•        Lexington LSR
•        Lexington Technologies

Current Trade Names

Lexington
Lexington Precision


\* Within the immediately preceding five calendar years.

**SCHEDULE 5.6**

**OSHA AND ENVIRONMENTAL COMPLIANCE**

Any matters disclosed in the following environmental reports with respect to the Real Property listed below, copies of which have been delivered to the Agent:

1.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 1510 Ridge Road, Vienna, Ohio

2.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 11076 Ridgewood Road, Jasper, Georgia

3.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at Highway 5, Ellijay, Georgia

4.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 663 Bryant Boulevard, Rock Hill, South Carolina

5.      Phase I Environmental Site Assessment dated June 17, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 3565 Highland Park Street, NW, North Canton, Ohio

6.      Phase I Environmental Site Assessment dated June 24, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 677 Buffalo Road, Rochester, New York

7.      Report on ASTM Phase I Environmental Site Assessment dated July 11, 2008 prepared by Bureau Veritas North America, Inc. with respect to the premises at 201 Winchester Road, Lakewood, New York.   A new report is currently being prepared by the GRS Group.


New Phase I environmental site assessments are currently being performed by the GRS Group at the request of the Agent.

**SCHEDULE 5.7**

**UNDISPUTED INDEBTEDNESS**

None.

**SCHEDULE 5.8**

**LITIGATION**

A.    Lexington Precision Corporation:

    1.    Autoliv v. Lexington Precision Corporation

    2.    The Chemical Recovery System Site, 142 Locust Street, Elyria, Ohio

    3.    Environmental Products & Services of Vermont, Inc. v. Lexington Precision Corporation

    4.    New York State Department of Environmental Conversation & Lexington Precision Corporation – Administrative Proceeding

B.    Lexington Rubber Group, Inc.:

    1.    Lexington Insulators — The Construction Road Drum Site, 1235 Construction Road, Atlanta, GA

    2.    Lorraine Cerimele v. Lexington Rubber Group, Inc.

**SCHEDULE 5.9**

**<u>INDEBTEDNESS</u>**

**Lexington Precision Corporation ("LPC") and Lexington Rubber Group, Inc. ("LRG")**

1.　　Retirement annuity payable to:
Dorothy Donohue
6575 New Market Way
Raleigh, NC 27615
$1,000 per month for the remainder of her life

2.　　Letter of Credit issued to Lumberman's Mutual Casualty Company et al (Kemper)
for the principal amount of $26,000, expires June 30, 2010, but will be renewed for one year from July 1, 2010 to June 30, 2011(workers compensation insurance)

3.　　Letter of Credit issued to The Travelers Indemnity Company
for the principal amount of $707,000 (In the process of being renewed from July 1, 2010 to June 30, 2011)

[4.　　Notes payable to vendors of LPC and LRG with pre-petition claims for trade accounts payable that are not paid or otherwise satisfied prior to emerging from Bankruptcy.　Amount unknown.]

- 16 -

**SCHEDULE 5.11**

**PLANS**

Lexington Precision Corporation Retirement & Savings Plan (401(k) plan)

Lexington Precision Corporation Retiree Benefit Plan for Certain Former Employees of The Stalwart Rubber Company. This cost the Company about $10,000 per year and currently covers only 5 former employees.

Retiree Benefit Plan for Certain Former Employees of Ness Precision Products. This currently costs the Company about $17,000 per year and covers 17 participants. This plan is closed to new participants.

NYI-4284669v7

**SCHEDULE 5.12**

**MATERIAL INTELLECTUAL PROPERTY**

Patents and Patent Applications:
None.

Trademarks and Trademark Applications:

| Name | Filing Date | Application No. | Issue Date | Registration & Serial Nos. | Status | Owner |
|------|-------------|-----------------|------------|----------------------------|--------|-------|
| Lexington | March 16, 2007 | N/A | May 26, 2009 | 3,625,147 (Reg. No.)  77132880 (Serial No.) | In use | Lexington Precision Corporation |

Copyrights and Copyright Applications:
None.

NYI-4284669v7

**SCHEDULE 5.14**

**DEFAULTED INDEBTEDNESS**

None.

NYI-4284669v7

**SCHEDULE 5.17**

**LABOR CONTRACTS**

1.      Lexington Rubber Group, Inc. Rock Hill, South Carolina, Facility — United Steel Workers of America, AFL-CIO Local #1811 -- expires October 19, 2012

**SCHEDULE 5.21**

**<u>CONFLICTS</u>**

None.

NYI-4284669v7

**SCHEDULE 5.24**

**REAL PROPERTY**

| | _Location_ |
|---|---|
| | |
| **a. Lexington Precision Corporation** | 800 Third Ave. 15th Floor<br>New York, NY 10022. Leased. |
| | 677 Buffalo Road,<br>Rochester, NY 14611. Owned. |
| | Boulter Industrial Contractors, Inc.,<br>855 Publishers Parkway<br>Webster, NY 14580. Leased. |
| | 201 Winchester Road,<br>Lakewood, NY 14750. Owned; leased by LPC to Premier Lakewood, Inc. |
| **b. Lexington Rubber Group, Inc.** | 1510 Ridge Road,<br>Vienna, OH 44473. Owned. |
| | 3565 Highland Park Street, NW<br>North Canton, OH 44720. Owned. |
| | 1076 Ridgewood Road,<br>Jasper, GA 30143. Owned. |
| | 663 Bryant Blvd.,<br>Rock Hill, SC 29732. Owned. |
| | King Graves Road Storage & Warehouse,<br>4255 King Graves Road — Building D<br>Vienna, OH 44473. Leased. |
| | 139 Confederate Ave.<br>Jasper, GA 30143. Leased. |
| | Williams Scotsman, Inc.<br>1076 Ridgewood Road,<br>Jasper, GA 30143. Leased office trailers<br>located on LRG's owned premises in Jasper, GA. |
| | 7901 Cleveland Ave. Bay C,<br>North Canton, OH 44720. Leased. |
| | 2009 Quimby Ave. SW,<br>Canton, OH 44706. Leased. |
| | 333 S. Congress St.<br>York, SC 29745. Leased. |

LPC also owns premises located at 202 Winchester Road, Lakewood, New York which are not being mortgaged and shall not constitute Real Property as defined in the Credit and Security Agreement.

**SCHEDULE 5.25**

**DEPOSIT ACCOUNTS***

| Account Number | Bank Depository | Purpose |
|---|---|---|
| Lexington Precision Corporation: | | |
| 390-01616 | Jeffries & Company, Inc. | Brokerage* |
| 59-2300-7889 | First Merit Bank, N.A. | Cash Management |
| 59-2300-7871 | First Merit Bank N.A. | Operating Account |
| 76077 | First Merit Bank, N.A. | Lockbox |
| Lexington Rubber Group, Inc. | | |
| 76076, 76075, 76074 | First Merit Bank, N.A. | Lockbox |
| 7017141311 | Capital One Bank, N.A. | Business checking |
| 7017141346 | Capital One Bank, N.A. | Business Money Market |
| 7017141583 | Capital One Bank, N.A. | Business Money Market |

_____
* Account has less than $1,000

NYI-4284669v7

**SCHEDULE 6.8**

**POST-CLOSING MATTERS**

[TBD]

NYI-4284669v7

**SCHEDULE 7.2**

**PERMITTED ENCUMBRANCES**

None.

**SCHEDULE 7.3**

**OTHER INDEBTEDNESS**

The Indebtedness listed as Items 1 through 3 on Schedule 5.9.

**SCHEDULE 7.4**

**<u>LOANS AND INVESTMENTS</u>**

None.

**<u>Tab K</u>**

**Management Incentive Plan**

# LEXINGTON PRECISION CORPORATION

## 2010 STOCK INCENTIVE PLAN

Section 1.  PURPOSE OF PLAN

The purpose of this 2010 Stock Incentive Plan ("Plan") of Lexington Precision Corporation, a Delaware corporation (the "Company"), is to enable the Company to attract, retain and motivate the employees and non-employee directors of the Company or any of its subsidiaries by providing for or increasing the proprietary interests of such employees and non-employee directors in the Company.

Section 2.  PERSONS ELIGIBLE UNDER PLAN

Any employee or non-employee director of the Company or any of its subsidiaries (each, a "Participant") shall be eligible to be considered for the grant of Awards (as hereinafter defined) hereunder.  Notwithstanding the foregoing, only employees of the Company or any of its subsidiaries shall be eligible to receive grants of Incentive Stock Options (as hereinafter defined) under the Plan.

Section 3.  AWARDS

(a)     Subject to Section 3(b), the Committee (as hereinafter defined), on behalf of the Company, is authorized under this Plan to enter into any type of arrangement with a Participant that is not inconsistent with the provisions of this Plan and that, by its terms, involves or might involve the issuance of (i) shares of the Common Stock, par value $0.01, of the Company (the "Common Shares") or (ii) a Derivative Security (as such term is defined in Rule 16a-1 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as such rule may be amended from time to time) with an exercise or conversion privilege at a price related to the Common Shares or with a value derived from the value of the Common Shares.  The entering into of any such arrangement is referred to herein as the "grant" of an "Award."

(b)     Awards are not restricted to any specified form or structure and may include, without limitation, sales or bonuses of stock, restricted stock, stock options, reload stock options, stock purchase warrants, other rights to acquire stock, securities convertible into or redeemable for stock, stock appreciation rights, phantom stock, dividend equivalents, performance units or performance shares, and an Award may consist of one such security or benefit, or two or more of them in tandem or in the alternative.

(c)     Awards may be issued, and Common Shares may be issued pursuant to an Award, for any lawful consideration as determined by the Committee, including, without limitation, services rendered by the recipient of such Award.

(d)     Subject to the provisions of this Plan, the Committee, in its sole and absolute discretion, shall determine all of the terms and conditions of each Award granted under

this Plan, which terms and conditions shall be set forth in the applicable award agreement, which terms and conditions need not be identical, and which terms and conditions may include, among other things:

      (i)     a provision permitting the recipient of such Award, including any recipient who is a director or officer of the Company or any of its subsidiaries, to pay the purchase price of the Common Shares or other property issuable pursuant to such Award, or such recipient's tax withholding obligation with respect to such issuance, in whole or in part, by any one or more of the following:

      (A)     the delivery of cash;

      (B)     the delivery of other property deemed acceptable by the Committee;

      (C)     the delivery of previously owned shares of capital stock of the Company (including "pyramiding") or other property;

      (D)     a reduction in the amount of Common Shares or other property otherwise issuable pursuant to such Award (such reduction to be valued on the basis of the aggregate Fair Market Value, on the date of exercise, of the additional Common Shares that would have been delivered to the Participant upon exercise of the Award), provided that the Company is not then prohibited from purchasing or acquiring Common Shares;

      (E)     the delivery of a promissory note of the recipient or of a third party, the terms and conditions of which shall be determined by the Committee; or

      (F)     any other form of legal consideration that may be acceptable to the Committee.

      (ii)     provisions specifying the exercise or settlement price for any option, stock appreciation right or similar Award, or specifying the method by which such price is determined, provided that the exercise or settlement price of any option, stock appreciation right or similar Award shall be not less than the Fair Market Value of a Common Share on the date such Award is granted;

      (iii)     provisions relating to the exercisability and/or vesting of Awards, lapse and non-lapse restrictions upon the Common Shares obtained or obtainable under Awards or under the Plan and the termination, expiration and/or forfeiture of Awards;

      (iv)     a provision conditioning or accelerating the receipt of benefits pursuant to such Award, either automatically or in the discretion of the Committee, upon the occurrence of specified events, including, without limitation, a change of control (as defined by the Committee) of the Company or certain specified affiliates of the Company (as specified by the Committee), an acquisition of a specified percentage of the voting power of the Company, the dissolution or liquidation of the Company, the financial

performance of the Company, a sale of substantially all of the property and assets of the Company or an event of the type described in Section 7 hereof;

(v)    a provision required in order for such Award to qualify (A) as an incentive stock option under Section 422 of the Code (as defined below) (an "Incentive Stock Option"), (B) as "performance based compensation" under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), and/or (C) for an exemption from Section 16 of the Exchange Act; or

(vi)    provisions restricting the transferability of Awards or Common Shares issued under Awards; provided, however, that during the period that the Company is relying on the exemption pursuant to Rule 12h-1(f)(1) of Exchange Act, no Awards or Common Shares issued under this Plan may be sold, exchanged, transferred (including, without limitation, any transfer to a nominee or agent of a Participant, any short position, any 'put equivalent position' (as defined in Rule 16a-1(h) of the Exchange Act) or any 'call equivalent position' (as defined in Rule 16a-1(b) of the Exchange Act)), assigned, pledged, hypothecated or otherwise disposed of, except by will or by the laws of descent and distribution until the earlier of the date the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or the date that the Company is no longer relying on the exemption pursuant to Rule 12h-1(f)(1) of the Exchange Act.

(e)    For purposes of any Award under this Plan, unless provided otherwise in the grant of such Award, the "Fair Market Value" of a Common Share or other security on any date (the "Determination Date") shall be equal to the closing price per Common Share or unit of such other security on the Determination Date, as reported in The Wall Street Journal, Western Edition, or, if no closing price was so reported for such day, the closing price for the next preceding business day for which a closing price was so reported, or, if no closing price was so reported for any of the 30 business days immediately preceding the Determination Date, the average of the high bid and low asked prices per Common Share or unit of such other security on the Determination Date in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotations System or such other system then in use, or, if the Common Shares or such other security were not quoted by any such organization on such day, the average of the closing bid and asked prices on such day as furnished by a professional market maker making a market in the Common Shares or such other security selected by the Board of Directors of the Company (the "Board"), or, if no such market was made in the Common Shares or such other security, the value of a Common Share or such other security as determined by the Board in its sole discretion, but in any event consistent with Section 409A of the Code.

(f)    To the extent that the aggregate Fair Market Value (determined at the time of grant) of Common Shares with respect to which Incentive Stock Options are exercisable for the first time by any recipient during any calendar year (under all plans of the Company and its affiliates) exceeds one hundred thousand dollars ($100,000), the Incentive Stock Options or portions thereof which exceed such limit (according to the order in which they were granted) shall be treated as non-qualified stock options.

2010 Stock Incentive Plan

3

Section 4.  STOCK SUBJECT TO PLAN

(a)    The aggregate number of Common Shares that may be issued pursuant to all Incentive Stock Options granted under this Plan shall not exceed [760,000], subject to adjustment as provided in Section 7 hereof.

(b)    At any time, the aggregate number of Common Shares issued and issuable pursuant to all Awards (including all Incentive Stock Options) granted under this Plan shall not exceed [760,000], subject to adjustment as provided in Section 7 hereof.

(c)    For purposes of Section 4(b) hereof, the aggregate number of Common Shares issued and issuable pursuant to Awards granted under this Plan shall at any time be deemed to be equal to the sum of the following:

(i)    the number of Common Shares that were issued prior to such time pursuant to Awards granted under this Plan, other than Common Shares that were subsequently reacquired by the Company pursuant to the terms and conditions of such Awards and with respect to which the holder thereof received no benefits of ownership such as dividends; plus

(ii)    the number of Common Shares that were otherwise issuable prior to such time pursuant to Awards granted under this Plan, but that were withheld by the Company as payment of the purchase price of the Common Shares issued pursuant to such Awards or as payment of the recipient's tax withholding obligation with respect to such issuance; plus

(iii)    the maximum number of Common Shares that are or may be issuable at or after such time pursuant to Awards granted under this Plan prior to such time.

Section 5.  DURATION OF PLAN

No Awards shall be made under this Plan after 10 years after adoption, although Common Shares may be issued after that date pursuant to Awards made prior to such date.

Section 6.  ADMINISTRATION OF PLAN

(a)    This Plan shall be administered by a committee (the "Committee") of the Board, which Committee shall initially consist of the entire Board.   In the event that the Company becomes "publicly held" within the meaning of § 162(m) of the Code, then the Committee shall consist of two or more directors, each of whom:   (i) is a "non-employee director" (as such term is defined in Rule 16b-3 promulgated under the Exchange Act, as such Rule may be amended from time to time), and (ii) is an "outside director" within the meaning of Section 162(m) of the Code.

(b)    Subject to the provisions of this Plan, the Committee shall be authorized and empowered to do all things necessary or desirable in connection with the administration of this Plan, including, without limitation, the following:

2010 Stock Incentive Plan

4

    (i)     adopt, amend and rescind rules and regulations relating to this Plan;

    (ii)    determine which persons are eligible to participate in the Plan and to which of such persons, if any, Awards shall be granted hereunder;

    (iii)    grant Awards to Participants and determine the terms and conditions thereof, including the number of Common Shares issuable pursuant thereto;

    (iv)    determine the extent to which adjustments are required pursuant to Section 7 hereof; and

    (v)    interpret and construe this Plan and the terms and conditions of any Award granted hereunder.

    (c)    All determinations, interpretations and constructions made by the Committee in good faith shall be final, binding and conclusive on all persons.

Section 7.  ADJUSTMENTS

If the outstanding securities of the class then subject to this Plan are increased, decreased or exchanged for or converted into cash, property or a different number or kind of securities, or if cash, property or securities are distributed in respect of such outstanding securities, in either case as a result of a reorganization, merger, consolidation, recapitalization, restructuring, reclassification, dividend (other than a regular, quarterly cash dividend) or other distribution, stock split, reverse stock split or the like, or if substantially all of the property and assets of the Company are sold, then the Committee shall make appropriate and proportionate adjustments in (a) the number and type of shares or other securities or cash or other property that may be acquired pursuant to Incentive Stock Options and other Awards theretofore granted under this Plan, (b) the maximum number and type of shares or other securities that may be issued pursuant to Incentive Stock Options and other Awards thereafter granted under this Plan, and (c) the exercise price, base price, conversion price, purchase price or repurchase price applicable to Incentive Stock Options and other Awards theretofore granted under this Plan.

Section 8.  AMENDMENT AND TERMINATION OF PLAN

The Board may amend or terminate this Plan at any time and in any manner, *provided, however,* that no such amendment or termination shall deprive the recipient of any Award theretofore granted under this Plan, without the consent of such recipient, of any of his or her rights thereunder or with respect thereto, and *provided, further,* that no such amendment shall be effective unless approved by the stockholders of the Company to the extent stockholder approval is necessary to satisfy the requirements of Section 422 of the Code, any applicable state corporate or securities law requirements, or any securities exchange listing requirements.

Section 9.  EFFECTIVE DATE OF PLAN

This Plan shall be effective as of [_____], 2010, the date as of which it was approved by the Board; *provided, however,* that no Common Shares may be issued under

2010 Stock Incentive Plan

this Plan until it has been approved, directly or indirectly, by the affirmative vote of the holders of a majority of the combined voting power of the outstanding voting securities of the Company present, or represented by proxy, and entitled to vote, at a meeting of the Company's stockholders or by written consent in accordance with the laws of the State of Delaware; provided that if such approval by the stockholders of the Company does not occur within one year of the date that this Plan was adopted by the Board, all Awards previously granted under this Plan shall be void.

## Section 10.  SECURITIES LAW COMPLIANCE

(a)    The grant of Awards and the issuance of Common Shares pursuant to Awards shall be subject to compliance with all applicable requirements of federal, state and foreign law with respect to such securities.  Awards may not be issued if the issuance of such Awards would constitute a violation of any applicable federal, state or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Common Shares may then be listed.  In addition, no option may be exercised unless (i) a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), shall at the time of exercise of the option be in effect with respect to the shares issuable upon exercise of the option or (ii) the Common Shares issuable upon exercise of the option may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act.  The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary for the lawful issuance and sale of any Award or Common Shares hereunder shall relieve the Company of any liability in respect of the failure to issue or sell such Award or Common Shares.  Nothing in this Section 10(a) shall be read to require the Company to register under the Securities Act the Plan, any Award, or any Common Shares issued or issuable pursuant to any such Award.

(b)    Without limiting the generality of the foregoing, during the period that the Company is relying on the exemption pursuant to Rule 12h-1(f)(1) of the Exchange Act until the earlier of the date the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or the date that the Company is no longer relying on such exemption, the Company shall provide the following information (the "Financial Information") to each optionholder:

(i)    Information about the risks associated with investment in the options granted pursuant to the Plan; and

(ii)    Financial statements required to be furnished by Part F/S of Form 1-A (Regulation A Offering Statement) under Regulation A of the Securities Act and which are as of a date no more than 180 days before their date of furnishing.

The Company shall provide the Financial Information to each optionholder every six months either by physical or electronic delivery or by written notice to the optionholders of the availability of the Financial Information on an Internet site that may be password protected and of any password needed to access the information.  The Company is not required to provide

2010 Stock Incentive Plan

the Financial Information to any optionholder who does not agree to keep such information confidential.

Section 11.  SECTION 409A COMPLIANCE

It is intended that Awards under this Plan are either exempt from Section 409A of the Code or are structured to comply with the requirements of Section 409A.  The Plan shall be administered and interpreted in accordance with that intent.   Any provision of the Plan that would conflict with the requirements of an Award that is subject to Section 409A shall not apply to such Award.  For Awards subject to 409A, all rights to amend, terminate or modify the Plan or the Award, and all adjustments or modifications to such Award, are subject to the requirements and limitations of Section 409A.  While the Company intends for Awards to either be exempt from or in compliance with Section 409A, neither the Company nor the Committee shall be liable to any person for the tax consequences of any failure to comply with the requirements of Section 409A or any other tax consequences relating to Awards under this Plan.