**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------------x
                                         :
In re:                                   :        Chapter 11
                                         :
LEXINGTON PRECISION CORP., et al.,       :        Case No. 08-11153 (SCC)
                                         :
          Debtors.                       :        (Jointly Administered)
                                         :
-----------------------------------------------------------------------x
```

<div align="center">

**MEMORANDUM OF LAW**
**IN SUPPORT OF CONFIRMATION OF THE DEBTORS'**
**FOURTH AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS AMENDED**

</div>

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow


WEIL, GOTSHAL & MANGES LLP
1300 I Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
Adam P. Strochak

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT .......................................................................... 1

FACTS ................................................................................................................ 5

ARGUMENT ...................................................................................................... 5

I.    SECTION 1129(a)(1):  THE PLAN COMPLIES WITH THE
      APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE ...................... 6

      A.    The Plan Complies with Section 1122 of the Bankruptcy Code ............... 6

            1.    Classes of Claims Against LPC .................................................. 7

            2.    Classes of Claims Against LRGI ................................................ 8

            3.    Classes of Interests in the Debtors ............................................. 9

      B.    The Plan Complies with Section 1123(a) of  the Bankruptcy Code ........ 10

            1.    Section 1123(a)(1):  Designation of Classes of Claim and
                  Interests ...................................................................................... 10

            2.    Section 1123(a)(2):  Classes that Are Not Impaired by the
                  Plan .............................................................................................. 10

            3.    Section 1123(a)(3):  Treatment of Classes that Are
                  Impaired By the Plan ................................................................... 11

            4.    Section 1123(a)(4):  Equal Treatment Within Each Class .......... 11

            5.    Section 1123(a)(5): Adequate Means for Implementation .......... 11

            6.    Section 1123(a)(6):  Prohibitions on the Issuance of Non-
                  Voting Securities ........................................................................ 12

            7.    Section 1123(a)(7): Provisions Regarding Directors and
                  Officers ....................................................................................... 12

      C.    The Plan Complies with Section 1123(b) of the Bankruptcy Code ........ 13

            1.    Section 1123 (b)(1):  Impairment/ Unimpairment of Claims
                  and Interests ................................................................................ 13

            2.    Section 1123(b)(2):  Assumption/ Rejection of Executory
                  Contracts and Leases ................................................................... 13

            3.    Section 1123(b)(3):  Settlement of Claims and Causes of
                  Action .......................................................................................... 16

            4.    Section 1123(b)(4):  Sale of All or Substantially All Assets ....... 17

            5.    Section 1123(b)(5):  Modification of Creditor Rights................. 17

# TABLE OF CONTENTS
### (continued)

                                                                    **Page**

      6.     Section 1123(b)(6):  Retention of Jurisdiction, Releases, and Exculpation ........................................................................ 17

      7.     Section 1123(c) of the Bankruptcy Code ................................. 22

      8.     Section 1123(d):  Cure of Defaults ......................................... 22

II.    SECTION 1129(a)(2):  THE DEBTORS HAVE COMPLIED WITH THE BANKRUPTCY CODE ...................................................................... 23

    A.    Compliance with Section 1125:  Postpetition Disclosure and Solicitation ............................................................................. 23

    B.    Compliance with Section 1126:  Acceptance of Plan ............................ 24

III.   SECTION 1129(a)(3):  THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW ...................... 26

IV.   SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL ............... 28

V.    SECTION 1129(a)(5):  THE DEBTOR HAS DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS .......................................................... 29

VI.   BANKRUPTCY CODE SECTION 1129(a)(6) IS NOT APPLICABLE ........... 30

VII.  THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(a)(7) OF THE BANKRUPTCY CODE.................................... 31

VIII. SECTION 1129(a)(8):  THE PLAN HAS BEEN ACCEPTED BY IMPAIRED CLASSES, AND, AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED....... 33

IX.   SECTION 1129(a)(9):  THE PLAN PROVIDES FOR  PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS.......................................... 34

    A.    Section 1129(a)(9)(A):  Administrative Expense Claims ...................... 35

    B.    Section 1129(a)(9)(B):  Priority Non-Tax Claims.................................. 36

    C.    Section 1129(a)(9)(C) and (D):  Priority Tax Claims and Secured Tax Claims ............................................................................ 36

X.    SECTION 1129(a)(10):  AT LEAST ONE CLASS OF IMPAIRED CLAIMS HAS ACCEPTED THE PLAN ......................................... 37

XI.   SECTION 1129(a)(11):  THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OR THE NEED FOR FURTHER REORGANIZATION.................................................................. 38

    A.    Legal Standard ..................................................................... 38

# TABLE OF CONTENTS
## (continued)

Page

B.     The Plan Satisfies the Feasibility Requirement ..................................... 40

XII.     SECTION 1129(a)(12):  ALL STATUTORY  FEES HAVE BEEN OR
WILL BE PAID ......................................................................................... 41

XIII.     SECTIONS 1129(a)(13), 1129(a)(14), AND 1129(a)(15) DO NOT
APPLY ....................................................................................................... 42

XIV.     SECTION 1129(b):  THE PLAN SATISFIES THE "CRAM DOWN"
REQUIREMENTS WITH RESPECT TO Class 6, Class 10, Class 11,
Class 12 and class 17 .............................................................................. 43

A.     The Plan Does Not Discriminate Unfairly ............................................ 44

B.     The Plan is Fair and Equitable .............................................................. 45

1.     The Federal Judgment Rate is the Appropriate Postpetition
Interest Rate to Apply to the Class 17 Claims ........................... 46

2.     Application of the Debtors' Proposed Interest Rate on
Deferred Payments Exceeds the Cram-Down Interest Rate
Under the Formula Approach ..................................................... 50

XV.     THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1127 OF
THE BANKRUPTCY CODE ...................................................................... 54

XVI.     RESPONSE TO COMMITTEE OBJECTION ............................................... 55

A.     The Creditors' Committee Objections to the Proposed Interest
Rates Are Invalid .................................................................................... 56

1.     The Federal Judgment Rate is the Appropriate Interest Rate ...... 56

2.     Interest Rate on Deferred Payments ........................................... 57

B.     The Plan Is Confirmable Without a Disputed Claims Reserve ............... 59

CONCLUSION ................................................................................................... 60

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re 11,111, Inc.*,
   117 B.R. 471 (Bankr. D. Minn. 1990) .......................................................................... 44

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......................................................................... 47

*In re Adelphia Commc's Corp.*,
   361 B.R. 337 (S.D.N.Y. 2007) ...................................................................................... 5

*In re Am. Solar King  Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) .......................................................................... 54

*Assocs. Commercial Corp. v. Rash*,
   520 U.S. 953 (1997) ...................................................................................................... 51

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ...................................................................................................... 51

*In re Barney and Carey Co.*,
   170 B.R. 17 (Bankr. D. Mass 1994) .............................................................................. 44

*Beguelin v. Volcano Vision, Inc.*,
   220 B.R. 94 (9th Cir. B.A.P. 1998) ...........................................................................48, 49

*Branch Banking & Trust Co. v. McDow (In re Garriock)*,
   373 B.R. 814 (E.D. Va. 2007) ...................................................................................... 56

*Bursch v. Beardsley & Piper, Div. of Pettibone Corp.*,
   971 F.2d 108 (8th Cir. 1992) ........................................................................................ 48

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) ............................................................................ 44

*In re Byrd Foods, Inc.*,
   253 B.R. 196 (Bankr. E.D. Va. 2000) .......................................................................51, 53

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
   342 B.R. 45 (S.D.N.Y. 2006) ........................................................................................ 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Cent. Virginia Cmty Coll. v. Katz,*
  546 U.S. 356 (2006)..................................................................................... 53

*In re Chateaugay Corp.,*
  89 F.3d 942 (2d Cir. 1996) ........................................................................... 6

*In re Chiapetta,*
  159 B.R. 152 (Bankr. E.D. Pa. 1993) .......................................................... 47

*In re Citadel Broad. Corp.,*
  No. 09-17442 (BRL), 2010 WL. 20100808 (Bankr. S.D.N.Y. May 19, 2010)................. 5

*Colgrove v. Battin,*
  413 U.S. 149 (1973)..................................................................................... 53

*In re Country Manor of Kenton, Inc,*
  254 B.R. 179 (Bankr. N.D. Ohio 2003) ....................................................48, 49

*In re DBSD N. Am., Inc.,*
  419 B.R. 179 (Bankr. S.D.N.Y. 2009) .......................................................... 22

*In re Dana Corp.,*
  No. 06-10354 (BRL), 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007) ................. 15

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re
  Metromedia Fiber Network, Inc.),* 416 F.3d 136 (2d Cir. 2005).................................... 18

*In re Drexel Burnham Lambert Group Inc.,*
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...........................................................38, 39, 40

*In re Drexel Burnham Lambert Group, Inc.,*
  960 F.2d 285 (2d Cir.1992) .......................................................................... 19

*In re Elsinore Shore Assos.,*
  91 B.R. 238 (Bankr. D.N.J. 1988) ................................................................ 29

*In re Frontier Airlines, Inc.,*
  93 B.R. 1014 (Bankr. D. Colo. 1988) ........................................................... 54

*In re Future Energy Corp.,*
  83 B.R. 470 (Bankr. S.D. Ohio 1988)........................................................... 29

# TABLE OF AUTHORITIES
## (continued)

Page

*Gen. Motors Acceptance Corp. v. Valenti (In re Valenti)*,
    105 F.3d 55 (2d Cir. 1997) ..............................................................................51, 53, 58

*In re Godsey*,
    134 B.R. 865 (Bankr. M.D. Tenn. 1991) ....................................................... 48

*In re Hedrick*,
    434 B.R. 762 (Bankr E.D. Va. 2006)............................................................. 57

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935)....................................................................................... 53

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)........................................................6, 23, 38, 44

*In re Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ......................................................................6, 27, 39, 43

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ....................................................27, 38

*In re Lionel L.L.C.*,
    No. 04-17324 (BRL), 2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31, 2008) .................... 5

*In re Martinez*,
    409 B.R. 35 (Bankr. S.D.N.Y 2009)............................................................. 51

*In re Melenyzer*,
    143 B.R. 829 (Bankr W.D. Tex. 1992)......................................................47, 48, 49, 57

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)....................................................................................... 28

*Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*,
    913 F.2d 873 (11th Cir. 1990) ...................................................................... 9

*In re One Times Square Assocs. Ltd. P'ship*,
    159 B.R. 695 (Bankr. S.D.N.Y. 1993) ......................................................... 39

*Onink v. Cardelucci (In re Cardelucci)*,
    285 F.3d 1231 (9th Cir. 2002) ................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

Page

*Pereira v. Foong (In re Ngan Gung Rest.)*,
  254 B.R. 566 (Bankr. S.D.N.Y. 2000) ..................................................... 28

*Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ............................................................. 39

*In re Prudential Energy Co.*,
  58 B.R. 857 (Bankr. S.D.N.Y. 1986) .................................................39, 40

*In re Rivera Echevarria*,
  129 B.R. 11 (Bankr. D.P.R. 1991) ........................................................ 44

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*,
  330 B.R. 394 (Bankr. S.D.N.Y. 2005) .................................................... 19

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
  872 F.2d 3 (3d Cir. 1989) .................................................................. 15

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .............................................................. 27

*In re Texaco Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...............................................27, 39, 40

*Till v. SCS Credit  Corp.*,
  541 U.S. 465 (2004) ...................................................................*passim*

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................... 6, 23

*Troy Sav. Bank v. Travelers Motor Inn, Inc.*,
  215 B.R. 485 (N.D.N.Y. 1997) ............................................................. 9

*In re U.S. Truck Co.*,
  800 F.2d 581 (6th Cir. 1986) .............................................................. 40

*In re U.S. Truck Co., Inc.*,
  47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ............................ 39

*United States v. Reorganized CF&I Fabricators, Inc.*,
  518 U.S. 213 (1996) ....................................................................... 32

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Universal Oil Ltd. v. Allfirst Bank (In re Millennium Seacarriers, Inc.)*,
    419 F.3d 83 (2d Cir. 2005) ...................................................................................... 18

*In re Woodmere Investors Ltd. P'ship*,
    178 B.R. 346 (Bankr. S.D.N.Y. 1995) ........................................................... 38

*In re WorldCom, Inc.*, No. 02-13533 (AJG),
    2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003)....................................... 5, 27

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................... 27

**Statutes and Rules**

11 U.S.C. § 1122(a) ........................................................................................... 6

11 U.S.C. § 1125(b).......................................................................................23, 24

11 U.S.C. § 1126 .......................................................................................*passim*

11 U.S.C. § 1126(c) ........................................................................................... 26

11 U.S.C. § 1129(a)(11) ...................................................................................... 6, 23

11 U.S.C. § 1129(a)(7) ...................................................................................... 31

11 U.S.C. § 1129(a)(9) ...................................................................................... 35

11 U.S.C. § 1129(b).......................................................................................43, 45, 47

11 U.S.C. § 726(a)(5) ...................................................................................... 47

28 U.S.C. § 1961 ........................................................................................... 47

Fed. R. Bankr. P. 3019........................................................................................... 54

**Legislative History**

H.R. Rep. No. 95-595, at 412 (1977) ...................................................................... 6

Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No.
    93-137, § 4-405(a)(8), (1st Sess. 1973) ...................................................... 47

**TABLE OF AUTHORITIES**
**(continued)**

Page

S. Rep. No. 95-989, at 126 (1978)........................................................................... 6, 23

**<u>Other Authorities</u>**

Norton Bankruptcy Law & Practice 2d § 73:7 n.55 (1997 & Supp. 2000) ................................. 48

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation ("**LPC**") and its wholly-owned subsidiary,

Lexington Rubber Group, Inc. ("**LRGI**"), as debtors and debtors in possession (the "**Debtors**"),

submit this Memorandum of Law (the "**Memorandum**") in support of confirmation, pursuant to

section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the Debtors'

proposed Plan (as defined below)[1] and respectfully represent as follows:

## PRELIMINARY STATEMENT

On April 1, 2008 (the "**Commencement Date**"), each of the Debtors commenced

with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  After extensive

negotiations with the Debtors' Prepetition Secured Lenders, the Plan Sponsor, and certain other

parties in interest, the Debtors filed the *Fourth Amended Joint Plan of Reorganization Under*

*Chapter 11 of the Bankruptcy Code, as Modified*, dated May 26, 2010 [Docket No. 894] (as it

may be further amended, modified, or supplemented, the "**Plan**"), the disclosure statement

therefor [Docket No. 895] (as approved, the "**Disclosure Statement**"), and *Plan Supplement for*

*the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy*

*Code, as Modified*, dated June 24, 2010 [Docket No. 919] (the "**Plan Supplement**").

On May 26, 2010, the Court entered an order approving the Disclosure Statement

and authorizing the Debtors to solicit acceptances of the Plan (the "**Disclosure Statement**

**Order**").[2]  Pursuant to the Disclosure Statement Order, the Court established July 2, 2010 as the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] *Order Pursuant to Sections 105, 502, 1125, 1126, and 1128 of the Bankruptcy Code and the Bankruptcy Rules 2002, 3003, 3017, 3018 and 3020 (I) Approving the Proposed Disclosure Statement, (Ii) Approving the Procedures to Solicit Acceptances of Debtors' Proposed Plan, and (iii) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Debtors' Proposed Plan*, dated May 26, 2010 [Docket No. 897].

deadline for parties in interest to (i) vote to accept or reject the Plan and (ii) object to confirmation of the Plan.

The Debtors are pleased that the Plan has earned broad acceptance from creditors. With one exception, every class of creditors entitled to vote has accepted the Plan. The only voting class to reject the Plan is Class 17 – general unsecured creditors of Lexington Rubber Group, Inc. – a class consisting of approximately $4 million in trade claims. Class 17 accepted the Plan in accordance with the numerosity requirement with significantly more than 50%, but rejected by amount. Review of the ballots shows that the rejecting votes were cast largely by claims traders and that the class swung to a no vote because a single trade claim of $610,000, in the hands of an assignee of the original creditor, voted to reject.

The Plan is confirmable under section 1129(b)(2)(B)(i) notwithstanding the rejection by Class 17 and the only material disputed issues remaining are very narrow. The Plan treatment for Class 17 creditors is a series of payments over 27 months equal to 106.75% of the amount of the allowed claim. The interest rate implied by this treatment is 6.02% per year. The Debtors will demonstrate at the Confirmation Hearing that this interest rate satisfies the requirement of section 1129(b)(2)(B)(i) that unsecured creditors in a rejecting class receive the present value, as of the Effective Date, of the allowed amount of their claims. As discussed at pp. 49-53 below, the applicable case law demonstrates that an interest rate of 6.02% in fact exceeds the rate necessary to ensure full payment to Class 17 creditors. Should the Court determine that a different interest rate is required, the Plan remains confirmable because it specifically provides that Class 17 creditors will receive payment of the full amount of their allowed claims plus whatever implied interest rate the Court determines is necessary to constitute

payment in full at present value, and given the modest size of the class there is no feasibility issue no matter what interest rate the Court finds is required.

The Debtors received only two objections to confirmation of the Plan and one of these, filed by the indenture trustee for the senior subordinated notes, has been resolved.  The only unresolved objection is the one filed by the Creditors' Committee (the "**Committee Objection**").[3]  It raises only three, narrow issues.  The first two relate solely to Class 17.  First, the Committee asserts that the implied post-Effective Date interest rate for Class 17 must be increased in order to satisfy section 1129(b)(2)(B)(i).  For reasons discussed at pp. 54-58 below, this objection lacks merit and should be overruled because the evidence will demonstrate that the Plan in fact provides for payment, as of the Effective Date, equal to the allowed amount of Class 17 Claims.  Second, the Creditors' Committee claims that the state judgment rate should be the applicable interest rate applied to Allowed Class 17 Claims for the period from the Commencement Date through the Effective Date.  As explained at pp. 46-49, the federal judgment rate is the appropriate pendency interest rate.  Accordingly, this objection is untenable, and also should be overruled.  Third, the Creditors' Committee requests that the Court re-write the Plan by requiring the Debtors to establish cash reserves for payment of Class 7 and Class 17 claims that elect payments over time.  As discussed at p. 58 below, there is no basis in law or fact to impose this requirement.

As discussed below, and as will be further demonstrated at the Confirmation Hearing, the Plan satisfies all of the confirmation requirements contained in sections 1122, 1123,

---

[3] *Official Committee of Unsecured Creditors' Objection to the Confirmation of Debtors' Fourth Amended Joint Plan of Reorganization*, dated July 2, 2010 [Docket No. 938].

1125, 1126 and 1129 of the Bankruptcy Code.[4]  The Plan provides for the successful

rehabilitation of a business that has been stress-tested by a worldwide financial crisis, a credit

crisis that continues to make traditional debt financing largely unavailable, the collapse of the

North American automobile market, and costly disputes with its bondholders and secured

lenders.  Notwithstanding these challenges, the Debtors will emerge from chapter 11 with strong

cash flow, a de-levered balance sheet, an experienced management team, and a committed and

financially strong equity sponsor.  After a lengthy marketing process and exhaustive efforts to

raise capital, the Plan represents not just the only alternative on the table, it represents the best

possible outcome for all creditors  It satisfies all requirements of the Bankruptcy Code and

should be approved.

In further support of confirmation of the Plan and in opposition to the Committee

Objection, the Debtors have filed contemporaneously herewith:

- *Declaration of Michael A. Lubin in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization, as Modified*, dated July 15, 2010 (the "**Lubin Declaration**");

- *Declaration of Kurt L. Haras in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as Amended*, dated July 15, 2010 (the "**Haras Declaration**");

- *Declaration of Christina F. Pullo of Epiq Bankruptcy Solutions, LLC Certifying Voting on, and Tabulation of Ballots Accepting and Rejecting, the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as Modified*, dated July 9, 2010 (the "**Pullo Declaration**");

- *Declaration of Epiq Bankruptcy Solutions, LLC*, dated June 17, 2010 (the "**Epiq Declaration**," and together with the Lubin Declaration, Haras Declaration, and Pullo Declaration, the "**Declarations**"); and

---

[4] Unless otherwise specified herein, all references to "sections" in this Memorandum shall be construed to refer to sections of the Bankruptcy Code.

- A Witness and Exhibit List setting forth the documents that the Debtors intend to introduce into evidence at the Confirmation Hearing (as defined below).

## FACTS

The pertinent and salient facts relating to the Debtors' chapter 11 cases and the Plan are set forth in the Disclosure Statement, the Plan, and the Declarations. Such facts are incorporated herein as though set forth fully and at length. As necessary, salient facts will be referred to in connection with the discussion of applicable legal principles.

## ARGUMENT

To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See In re Adelphia Commc's Corp.*, 361 B.R. 337, 364-65 (S.D.N.Y. 2007) ("The bankruptcy court must find by a preponderance of the evidence that the plan is in the best interests of the creditors."); *In re Citadel Broad. Corp.*, No. 09-17442 (BRL), 2010 WL 20100808, at *2 (Bankr. S.D.N.Y. May 19, 2010) (stating that "proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence . . . is the applicable evidentiary standard for Confirmation of [a] Plan"); *In re Lionel L.L.C.,* No. 04-17324 (BRL), 2008 WL 905928, at *4 (Bankr. S.D.N.Y. Mar. 31, 2008) ("The Debtors . . . have the burden of proving the elements of sections 1129(a) and 1129(b) by a preponderance of the evidence . . . ."); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, at *136 (Bankr. S.D.N.Y. Oct. 31, 2003) ("A debtor, as the proponent of the Plan, bears the burden of proof under section 1129 of the Bankruptcy Code. A debtor must meet this burden by a preponderance of the evidence.").

Through filings with the Court and additional testimonial evidence which may be adduced at the hearing to be held before the Court on July 21, 2010 (the "**Confirmation**

**Hearing**"), the Debtors will demonstrate, by a preponderance of the evidence, that all applicable

subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

## I.
## SECTION 1129(a)(1):  THE PLAN COMPLIES WITH
## THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y]

with the applicable provisions of [the Bankruptcy Code]."  The legislative history of

section 1129(a)(1) informs that this provision encompasses the requirements of sections 1122

and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan,

respectively.  H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also*

*In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part*

*on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, In re Johns-Manville Corp.*, 843 F.2d 636

(2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

As demonstrated below, the Plan fully complies with the requirements of

sections 1122, 1123, and all other applicable provisions of the Bankruptcy Code.

## A.    The Plan Complies with Section 1122 of the Bankruptcy Code

Section 1122(a) of the Bankruptcy Code states that:

> Except as provided in subsection (b) of this section, a plan may
> place a claim or interest in a particular class only if such claim or
> interest is substantially similar to the other claims or interests of
> such class.

11 U.S.C. § 1122(a).  For a classification structure to satisfy section 1122 of the Bankruptcy

Code, not all substantially similar claims or interests need to be designated in the same class.

Instead, claims or interests designated to a particular class must be substantially similar to each

other.  *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996).

The Plan provides for the separate classification of claims against and interests in the Debtors based upon differences in the legal nature and/or priority of such claims and interests. The Plan designates (a) the following seventeen classes of claims: Class 1 (Other Priority Claims against LPC), Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 6 (Junior Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 8 (Convenience Claims against LPC), Class 9 (Asbestos-Related Claims), Class 13 (Other Priority Claims against LRGI), Class 14(a) (CapitalSource Secured Claims against LRGI), Class 14(b) (CSE Secured Claims against LRGI), Class 15 (Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), Class 17 (General Unsecured Claims against LRGI), Class 18 (Convenience Claims against LRGI); and (b) the following four classes of interests: Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), Class 12 (Other Equity Interests in LPC), and Class 19 (Interests in LRGI).

As indicated below, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.

1.    **Classes of Claims Against LPC**

All Claims entitled to priority treatment under section 507 of the Bankruptcy Code, other than sections 507(a)(2) or (8), against LPC are classified in Class 1. All CapitalSource Secured Claims against LPC arising under the Prepetition Credit Agreement are classified in Class 2(a). All CSE Secured Claims against LPC arising under the Prepetition Loan Agreement are classified in Class 2(b). All Claims against LPC that are entitled to priority treatment under section 507(a)(8) of the Bankruptcy Code are classified in Class 3. All Secured Claims against LPC other than Secured Tax Claims, CapitalSource Secured Claims against LPC,

and CSE Secured Claims against LPC are classified in Class 4.  All Claims arising under the

12% Senior Subordinated Notes issued by LPC are classified in Class 5.  All Claims arising

under the 13% Junior Subordinated Note issued by LPC are classified in Class 6.  All Claims

against LPC other than Administrative Expense Claims, Priority Tax Claims, Other Priority

Claims, Secured Tax Claims, Capital Source Claims, CSE Secured Claims, Senior Subordinated

Note Claims, Junior Subordinated Note Claims, and Asbestos-Related Claims asserted against

LPC are classified in Class 7.  All Unsecured Claims against LPC in the amount of $2,000.00 or

less are classified in Class 8.  All Claims, remedies and liabilities allegedly arising out of or

based upon the presence of or exposure to asbestos are classified in Class 9.

> **2.**     **Classes of Claims Against LRGI**

All Claims against LRGI entitled to priority treatment under section 507 of the

Bankruptcy Code, other than sections 507(a)(2) or (8), are classified in Class 13.  All

CapitalSource secured claims against LRGI arising under the Prepetition Credit Agreement are

classified in Class 14(a).  All CSE Secured Claims against LRGI arising under the Prepetition

Loan Agreement are classified in Class 14(b).  All Claims against LRGI that are entitled to

priority treatment under section 507(a)(8) of the Bankruptcy Code are classified in Class 15.  All

Secured Claims against LRGI other than Secured Tax Claims, CapitalSource Secured Claims

against LRGI, and CSE Secured Claims against LRGI are classified in Class 16.  All Claims

against LRGI other than Administrative Expense Claims, Priority Tax Claims, Other Priority

Claims, Secured Tax Claims, Capital Source Claims, and CSE Secured Claims are classified in

Class 17.  All Unsecured Claims against LRGI in the amount of $2,000.00 or less are classified

in Class 18.

3.    **Classes of Interests in the Debtors**

All interests in the issued and outstanding shares of LPC's $8 Cumulative

Convertible Preferred Stock, Series B, are classified in Class 10.  All interests in the shares of

common stock of LPC are classified in Class 11.  All other interests in LPC are classified in

Class 12.  All interests in LRGI are classified in Class 19.

Based on the foregoing, the Debtors submit the classification of Claims and

Interests does not prejudice the rights of holders of such Claims and Interests, is consistent with

the requirements of the Bankruptcy Code and, thus, is appropriate.  *See Olympia & York Florida*

*Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990)

(plan proponent allowed considerable discretion to classify claims and interests according to

facts and circumstances of case so long as classification scheme does not violate basic priority

rights or manipulate voting).

In addition, section 1122(b) of the Bankruptcy Code provides that:

(b) A plan may designate a separate class of claims consisting only
of every unsecured claim that is less than or reduced to an amount
that the court approves as reasonable and necessary for
administrative convenience.

11 U.S.C. § 1122(b); *see also Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485

(N.D.N.Y. 1997) (stating that approval of a convenience class is appropriate where there is a

reasonable business justification).  Creditors have asserted more than 700 unsecured claims

against the Debtors' estates, in the aggregate amount of approximately $53.6 million.[5]  Classes 8

and 18 are *de minimis* convenience classes consisting of unsecured claims in the amount of

$2,000.00 or less.  The Debtors estimate that approximately 430 Claims, in the aggregate amount

---

[5] This estimate does not include (i) unsecured claims that have been disallowed and/or expunged pursuant to the
orders of this Court, or (ii) the Asbestos-Related Claims in Class 9.

of approximately $274,000, are Convenience Claims.  The treatment of such claims as

Convenience Claims will enable the Debtors to avoid having to administer such claims for

purposes of making distributions, thereby reducing their estates' overall expenses.  Accordingly,

the designation of Convenience Claims in Classes 8 and 18 is reasonable and necessary for

administrative convenience.

**B.**  **The Plan Complies with Section 1123(a) of the Bankruptcy Code**

Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which

every chapter 11 plan must comply.  As demonstrated herein, the Plan fully complies with each

enumerated requirement.

**1.**  **Section 1123(a)(1):  Designation of Classes of Claim and Interests**

Section 1123(a)(1) requires that a plan must designate classes of claims and

classes of equity interests subject to section 1122 of the Bankruptcy Code.  As discussed above,

the Plan designates seventeen classes of Claims and four classes of Interests subject to

section 1122.  *See* Plan at Art. IV.  Accordingly, the Plan satisfies the requirements of section

1123(a)(1) of the Bankruptcy Code.

**2.**  **Section 1123(a)(2):  Classes that Are Not Impaired by the Plan**

Section 1123(a)(2) requires a plan to specify which classes of claims or interests

are unimpaired by the Plan.  The Plan specifies that Class 1 (Other Priority Claims against LPC),

Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8

(Convenience Claims against LPC), Class 13 (Other Priority Claims against LRGI), Class 15

(Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), Class 18

(Convenience Claims against LRGI), and Class 19 (Interests in LRGI) are unimpaired by the

Plan.  *See* Plan at Art. IV.  Accordingly, the Plan satisfies the requirements of section 1123(a)(2)

of the Bankruptcy Code.

3.      **Section 1123(a)(3):  Treatment of Classes that Are Impaired By the Plan**

Section 1123(a)(3) requires a plan to specify how it will treat impaired classes of claims or interests.  The Plan sets forth the treatment of Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 6 (Junior Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9 (Asbestos-Related Claims), Class 14(b) (CSE Secured Claims against LRGI), Class 17 (General Unsecured Claims against LRGI), and Class 19 (Interests in LRGI), each of which constitutes an impaired class.  *See* Plan at Art. IV. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

4.      **Section 1123(a)(4):  Equal Treatment Within Each Class**

Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors, in each respective class, is the same as the treatment of each other Claim or Interest in such class.  *See* Plan at Art. IV.  Specifically, the Plan provides that any creditor holding a claim in Class 7, or Class 17, may receive a stream of cash payments or may elect to receive, in lieu thereof, a single cash payment in full satisfaction of such claim, and that each creditor holding a Claim in Class 9 will receive a stream of cash payments.  In addition, any creditor holding a claim in Class 5 may elect to receive, in lieu of a single cash payment, shares of New LPC Common Stock in full satisfaction of such claim.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

5.      **Section 1123(a)(5): Adequate Means for Implementation**

Section 1123(a)(5) requires that a plan provide "adequate means for the plan's implementation."  In addition to the terms of the Plan, the Plan Supplement filed with the Court

on June 24, 2010, contains all additional documents necessary to implement the Plan, including, without limitation, the (a) Charter Amendment, (b) Stock Purchase Agreement, (c) Securityholders Agreement, (d) Amended and Restated Secured CapitalSource Credit Agreement, (e) Amended and Restated Secured CSE Loan Agreement, and (f) Management Incentive Plan.  The Plan, together with the documents and agreements contemplated therein, provide the means for implementation of the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

6.    **Section 1123(a)(6):  Prohibitions on the Issuance of Non-Voting Securities**

Section 1123(a)(6) prohibits the issuance of non-voting equity securities and requires that the Reorganized Debtors' charters to so provide.  As the Plan does not provide for the issuance of nonvoting equity securities and Article IV (A) of the Charter Amendment, contains a provision prohibiting such issuance, the Plan satisfies section 1123(a)(6).  *See* Charter Amendment, Art IV.A.

7.    **Section 1123(a)(7): Provisions Regarding Directors and Officers**

Section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."

(a)    **Directors of the Boards of the Reorganized Debtors**

Section 9.2(a) of the Plan sets forth provisions governing the selection of directors for the Reorganized Debtors that are consistent with the interests of creditors and public policy in accordance with section 1123(a)(7).  Specifically, the Plan provides that the Boards of the Reorganized Debtors will consists of seven members each.  The Plan Investor will appoint the CEO who will also serve as one board member.   The Affiliated Bondholders will designate one

board member.  The DIP Lenders will designate one board member.  The Plan Investor will

designate four board members, of whom, one will be an Independent Director.[6]

Pursuant to the Plan (as disclosed in the Plan Supplement), from and after the

Effective Date, the board shall consist of Michael A. Lubin, Steve Martinez, Ryan McCarthy,

John Kennedy, Michael Chupa, Warren Delano, and William Shulevitz.[7]   Messrs. Chupa and

Kennedy shall be Independent Directors.

### (b)    Officers of the Reorganized Debtors

Section 9.2(b) of the Plan provides that the officers of the Debtors immediately

prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and

after the Effective Date, in accordance with applicable nonbankruptcy law, any employment

agreement with the Reorganized Debtors, and the certificates of incorporation and by-laws of the

Reorganized Debtors.  Accordingly, and as disclosed in the Plan Supplement, the officers of the

Reorganized Debtors shall be as follows:

- Michael A. Lubin, as Chief Executive Officer;

- Warren Delano, as President;

- Dennis J. Welhouse, as Senior Vice President, Chief Financial Officer, and Secretary; and

- Charles R. Jenkins, as Assistant Treasurer.

Based upon the foregoing, the Plan satisfies section 1123(a)(7) of the Bankruptcy

Code.

---

[6] "Independent Director" is defined in the Amended and Restated Secured Credit Agreement and the Amended and Restated Secured CSE Loan Agreement.

[7] Messrs. Lubin and Delano are "insiders," within the meaning of that term as provided in section 101(31) of the Bankruptcy Code.

**C.**    **The Plan Complies with Section 1123(b) of the Bankruptcy Code**

Section 1123(b) sets forth certain permissive provisions that may be incorporated

into a chapter 11 plan.  Each provision of the Plan is consistent with section 1123(b) of the

Bankruptcy Code.

**1.**    **Section 1123 (b)(1):  Impairment/
Unimpairment of Claims and Interests**

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any

class of claims, secured or unsecured, or of interests."  Class 2(a) (CapitalSource Secured Claims

against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior Subordinated Note

Claims), Class 6 (Junior Subordinated Note Claims), Class 7 (General Unsecured Claims against

LPC), Class 9 (Asbestos-Related Claims), Class 10 (Series B Preferred Stock Interests), Class 11

(LPC Common Stock Interests), Class 12 (Other Equity Interests in LPC), Class 14(a)

(CapitalSource Secured Claims against LRGI), Class 14(b) (CSE Secured Claims against LRGI),

and Class 17 (General Unsecured Claims against LRGI) are impaired by the Plan.

Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax Claims against

LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims against LPC),

Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims against LRGI),

Class 16 (Other Secured Claims against LRGI), Class 18 (Convenience Claims against LRGI),

and Class 19 (Interests in LRGI) are not impaired by the Plan.  *See* Plan at Art. IV.  Accordingly,

the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

**2.**    **Section 1123(b)(2):  Assumption/
Rejection of Executory Contracts and Leases**

Section 1123(b)(2) allows a Plan to provide for the assumption, assumption and

assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of

the Bankruptcy Code.  A debtor may assume or assume and assign an executory contract or

unexpired lease if (a) the debtor cures the outstanding defaults under the contract or lease in accordance with section 365(b)(1) of the Bankruptcy Code, and (b) a valid business reason justifies the debtor's decision to assume such executory contract or unexpired lease. *See e.g.*, *In re Dana Corp.*, No. 06-10354 (BRL), 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 3, 39-40 (3d Cir. 1989).

Section 8.1 of the Plan provides that all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court entered on or before the Effective Date, (ii) as to which a motion for approval of the assumption, assumption and assignment, or rejection has been filed and served prior to the Confirmation Date, or (iii) that is specifically designated as a contract or lease to be rejected on Schedule 8.1 to the Plan (filed with the Plan Supplement). The Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 8.1 by deleting therefrom or adding thereto any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either assumed or rejected as of the Effective Date. *See* Plan § 8.1.

Based upon the Lubin Affidavit, the executory contracts and unexpired leases on Schedule 8.1 are necessary for the Reorganized Debtors to continue their operations post-emergence, and, accordingly, the assumption of such contracts and leases is (a) in the best interests of the Debtors, their estates, and creditors, (b) based upon and within the Debtors' sound business judgment, and (c) necessary to implement the Plan. Furthermore, as set forth in Section 8.4 of the Plan, and discussed herein, to the extent the Debtors are in default with regard

to any of their agreements, the Debtors will cure any such default that is indicated on the *Notice of Assumption of Executory Contracts and Unexpired Leases*, filed with the Court on June 23, 2010 [Docket No. 921], by paying the necessary cure amounts on or as soon as reasonably practicable after the Effective Date. Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

3.      **Section 1123(b)(3): Settlement of Claims and Causes of Action**

Section 1123(b)(3)(A) allows a Plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." As the Plan does not settle or adjust any claim or interest that belongs to the Debtors or their estates, section 1123(b)(3)(A) does not apply.

Section 1123(b)(3)(B) provides that a plan may "provide for the retention and enforcement by the debtor" of certain claims or interests. The Plan provides that, except as provided in Sections 10.8, 10.9, and 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or that the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Entity, to the extent such Entity asserts a crossclaim, a counterclaim, and/or a Claim for setoff that seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives and (ii) the turnover of any property of the Debtors' estates. *See* Plan § 10.13(a). The Plan further provides that, except as provided in Sections 10.8, 10.9, and 10.10 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Commencement Date, against or

with respect to any Claim left unimpaired by the Plan. *Id.* at § 10.13(b). Accordingly, the Plan appropriately reserves certain claims and causes of action and is consistent with section 1123(b)(3) of the Bankruptcy Code.

4.      **Section 1123(b)(4): Sale of All or Substantially All Assets**

Section 1123(b)(4) provides that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." The Plan does not provide for any such sale and, therefore, section 1123(b)(4) is inapplicable.

5.      **Section 1123(b)(5): Modification of Creditor Rights**

Section 1123(b)(5) provides that a Plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." As set forth in Article IV of the Plan, the Plan modifies the rights of holders of claims in Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 6 (Junior Subordinate Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9 (Asbestos-Related Claims), Class 14(a) (CapitalSource Secured Claims against LRGI), Class 14(b) (CSE Secured Claims against LRGI), and Class 17 (General Unsecured Claims against LRGI).

The Plan also leaves unaffected the rights of holders of claims in Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims against LPC), Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), and Class 18 (Convenience Claims against LRGI). Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

6.      **Section 1123(b)(6):  Retention of Jurisdiction, Releases, and Exculpation**

Section 1123(b)(6) is a "catchall" provision that permits inclusion in the Plan of any appropriate provision as long as such provision is consistent with applicable sections of the Bankruptcy Code.

(a)     **Jurisdiction**

The Plan provides that the Bankruptcy Court will retain jurisdiction as to all matters involving the Chapter 11 Cases, and the Plan, including without limitation, the claims allowance and distribution process.  *See* Plan at Art. XII.  Case law establishes that a bankruptcy court may retain jurisdiction over a debtor or the property of the estate following confirmation. *See Universal Oil Ltd. v. Allfirst Bank (In re Millennium Seacarriers, Inc.*), 419 F.3d 83, 96 (2d Cir. 2005) ("[A] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization.") (quoting *In re Petrie Retail*, 304 F.3d 223 (2d Cir. 2002)).  The provisions of Article XII of the Plan are also appropriate because the Bankruptcy Court would otherwise have had jurisdiction over all of these matters during the pendency of the Debtors' chapter 11 cases.  Accordingly, the retention of the Bankruptcy Court's jurisdiction is consistent with applicable law and, therefore, permissible under section 1123(b)(6) of the Bankruptcy Code.

(b)     **Releases**

The release provisions set forth in Sections 10.8, 10.9 and 10.10 of the Plan comply with the requirements that courts in this jurisdiction apply.  Approval of nondebtor releases requires a finding by the bankruptcy court that unusual circumstances render the release terms important to the success of the plan.  *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005) (citation omitted).  Courts have approved nondebtor releases where

- the estate received substantial consideration,

- the enjoined claims were channeled to a settlement fund rather than extinguished,

- the enjoined claims would indirectly affect the debtor's reorganization by way of indemnity or contribution,

- the plan otherwise provided for the full payment of the enjoined claims, or

- affected creditors provided consent.

*Id.* at 142; *see also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir.1992) (explaining that a third party release may be approved provided "the [release] plays an important part in the debtor's reorganization plan").  All of the foregoing considerations need not apply for a court to find "unusual circumstances" and approve nondebtor releases in a Plan.  *See Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 56-57 (S.D.N.Y. 2006); *Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*, 330 B.R. 394, 438-40 (Bankr. S.D.N.Y. 2005).

The releases in the Debtors' Plan provide as follows:

- <u>Debtors' directors, officers and employees</u>.  Section 10.8 releases the Debtors' directors, officers, and employees from any liability that the Debtors could assert with respect to such individuals' performance of their respective duties, subject to the limitations set forth in the Plan.  Creditors, however, may elect not to provide this release.  Section 10.8 will not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts.

- <u>Plan Investor</u>.  Section 10.9 provides that any holder of a Claim that receives a distribution under the Plan will release the Plan Investor and its advisors and representatives from any claims arising from or related to the Chapter 11 Cases, excluding claims for alleged willful misconduct, gross negligence, intentional fraud, and/or other alleged actions, all as more fully provided in the Plan. Creditors, however, may elect not to provide this release. Section 10.9 will not operate to waive or release any causes

of action (i) arising from any contractual obligations; (ii) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; (iii) arising from Claims for fraud or willful misconduct.

- <u>Other Releases</u>.  Section 10.10 provides for the release of certain claims against (i) the present and former affiliates, agents, financial advisors, attorneys, and representatives of the <u>Debtors</u> who acted in such capacities after the Commencement Date, (ii) the Plan Investor, (iii) the Creditors' Committee, (iv) the Agents, (v) the Prepetition Revolver Lenders, (vi) the Prepetition Term Loan Lenders, and (vii) the DIP Lenders (collectively, the "**Released Parties**").  Specifically, Section 10.10 releases any claims arising out of the Chapter 11 Cases that (a) the Debtors, (b) the Reorganized Debtors, (c) any holder of a Claim or Interest that votes to accept the Plan and does not elect to "opt-out," (d) any holder of a Claim or Interest that is deemed to accept the Plan, or (e) any holder of a Claim or Interest that does not vote to accept the Plan and that does not elect to "opt-out," could assert against the Released Parties.  Section 10.10 shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages, or *ultra vires* acts.

The unique circumstances of these Chapter 11 Cases warrant approval of the releases in Section 10.8, 10.9, and 10.1 of the Plan.

First, the officers, directors and employees of the Debtors share an identity of interest with the Debtors because, to the extent they are found liable on any claims to a third party in their capacity as officers, directors or employees of the Debtors, they would have claims against the Debtors' estates for indemnification.

Second, certain of the Released Parties have made material contributions to the chapter 11 cases by negotiating and funding the Debtors' Plan.  The Plan Investor has agreed, pursuant to the Stock Purchase Agreement, to purchase shares of New LPC Common Stock for an aggregate investment of at least $22 million (including amounts spent to purchase Senior

Subordinated Notes), representing a capital infusion into the Debtors' estates.  Furthermore, the

DIP Lenders provided considerable debtor in possession financing essential to the Debtors'

continued operation throughout their restructuring, and have consented to the satisfaction of their

DIP Loan Claims, in part, through the issuance of shares of New LPC Common Stock, thus

making a new investment in the Debtors that is critical to their reorganization pursuant to the

Plan.  CapitalSource and CSE, as the agents for the Prepetition Secured Lenders, actively

participated in various aspects of these cases, including the negotiation and preparation of the

Plan.  In addition, throughout these chapter 11 cases, the Prepetition Secured Lenders, by and

through Capital Source and CSE, have consented to the Debtors' continued use of their cash

collateral, which enabled the Debtors to effectively operate and maximize value for all parties.

Third, the releases enabled the Debtors to build consensus around their Plan,

which was necessary to ensure its approval.  Over the long course of the Chapter 11 Cases, the

Debtors and the Released Parties have engaged in numerous negotiations over the terms of the

Plan, including the release and exculpation provisions.  Without such agreement, it is unlikely

that the Released Parties (including, without limitation, the Plan Investor) would have consented

to the Plan.  Accordingly, the releases in the Plan are essential to the success of the Plan and the

alternative to granting the releases would be continuation of the Chapter 11 Cases indefinitely,

while the Debtors continued to search for the financing necessary to make a reorganization

feasible.

Fourth, regardless of whether creditors voted to accept or reject the Plan, each

creditor in the voting Classes had an opportunity to opt out of providing the releases.  In fact,

seven creditors have opted out of the releases under the Plan.

Based on these considerations, the Court should find that there are unique circumstances that warrant approval of the releases in the Plan.

### (c)    Exculpations

The exculpation provisions set forth in section 10.7 of the Plan should be approved under the standards established by the Second Circuit.  Section 10.7 of the Plan limits the liability of the professionals and other parties involved in resolution of the Chapter 11 Cases arising out of their participation in the chapter 11 cases.  The exculpation contains an express carve-out for gross negligence or willful misconduct.  This type of provision is standard in large chapter 11 cases and has been approved by other bankruptcy courts in this district.  *See, e.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 219 (Bankr. S.D.N.Y. 2009).

### 7.    Section 1123(c) of the Bankruptcy Code

Section 1123(c) only applies in a case concerning an individual and therefore does not apply to these Chapter 11 Cases.

### 8.    Section 1123(d):  Cure of Defaults

Section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  The Debtors filed on the docket and served upon each affected creditor, a notice of assumption of their executive contract or unexpired lease, which notice sets forth the Debtors' proposed cure amount with respect to such executory contract or expired lease, which was determined by the Debtors in accordance with the underlying agreement and applicable non-bankruptcy law.  All agreed cure amounts will be paid on or as soon as practicable after the Effective Date.  Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

Based upon all of the foregoing, the Plan fully complies with the requirements of sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

## II.
## SECTION 1129(a)(2):  THE DEBTORS HAVE COMPLIED WITH THE BANKRUPTCY CODE

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125, regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. at 149.

As set forth more fully below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126, regarding disclosure and Plan solicitation.

A.    **Compliance with Section 1125:  Postpetition Disclosure and Solicitation**

Section 1125(b) of the Bankruptcy Code provides, in pertinent part:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).  Pursuant to the Disclosure Statement Order, the Bankruptcy Court

approved the Disclosure Statement as containing "adequate information" pursuant to section

1125(b) of the Bankruptcy Code.

On June 2, 2010, the Debtors commenced their solicitation of votes to accept the

Plan.  On July 7, 2010, the Debtors' voting and tabulation agent, Epiq Bankruptcy Solutions,

LLC, filed the Pullo Declaration, which states that Epiq solicited and tabulated votes in

accordance with the Disclosure Statement Order.  Pullo Declaration ¶ 9.  The Disclosure

Statement Order provides that Epiq will transmit (i) to each creditor that was entitled to vote to

accept or reject the Plan,[8] the Disclosure Statement (which includes as an exhibit a copy of the

Plan) and any additional solicitation materials approved by the Court in the Disclosure Statement

Order and (ii) to holders of Claims and Interests that were not entitled to vote to accept or reject

the Plan, certain non-voting materials approved by the Bankruptcy Court in the Disclosure

Statement Order.  The Debtor did not solicit acceptances of the Plan by any holder of Claims or

Interests prior to the transmission of the Disclosure Statement.  In addition, the Pullo Declaration

describes the methodology for the tabulation and results of voting with respect to the Plan.  Pullo

Declaration ¶ 9-10.

The deadline for voting to accept or reject the Plan was July 2, 2010.  The results

of the vote in respect of the Plan are discussed in more detail below.

**B.    Compliance with Section 1126:  Acceptance of Plan**

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a plan of reorganization.  Pursuant to section 1126, only holders of allowed claims or interests in

---

[8] The Disclosure Statement Order authorized the Debtors to send a Voting Solicitation Package to the Authorized Counsel of any holder of an Asbestos-Related Claim based upon the representation of such holder, unless the Debtors received a No Authorization Affidavit prior to the deadline established by the Disclosure Statement Order.

impaired classes that will receive or retain property under a plan on account of such claims or

equity interests may vote to accept or reject such plan.  Section 1126 provides, in pertinent part,

as follows:

> (a)      The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.
>
>            *     *     *
>
> (f)      Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.
>
> (g)      Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126.

As set forth in the Disclosure Statement, the Epiq Declaration and above, the

Debtors solicited acceptances of the Plan from the holders of all Claims against the Debtors in

each class of impaired Claims entitled to receive distributions under the Plan in accordance with

section 1126.  The impaired classes entitled to vote under the Plan are Class 2(a) (CapitalSource

Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior

Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9

(Asbestos-Related Claims), Class 14(a) (CapitalSource Secured Claims against LRGI), Class

14(b) (CSE Secured Claims against LRGI), and Class 17 (General Unsecured Claims against

LRGI).  The Plan reflects that Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax

Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims

against LPC), Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims

against LRGI), Class 16 (Other Secured Claims against LRGI), Class 18 (Convenience Claims

against LRGI), and Class 19 (Interests in LRGI) are unimpaired and, thus, are conclusively

presumed to have accepted the Plan.  The Plan also reflects that Class 6 (Junior Subordinated

Note Claims), Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock

Interests), and Class 12 (Other Equity Interests in LPC) are impaired and that the holders of

Interests or Claims in these Classes will not receive or retain any interest or property pursuant to

the Plan and, therefore, are deemed to have rejected the Plan and are not entitled to vote thereon.

Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance

of a plan by impaired Classes entitled to vote to accept or reject a plan of reorganization:

> A class of claims has accepted a plan if such plan has been
> accepted by creditors, other than any entity designated under
> subsection (e) of this section, that hold at least two-thirds in
> amount and more than one-half in number of the allowed claims of
> such class held by creditors, other than any entity designated under
> subsection (e) of this section, that have accepted or rejected such
> plan.

11 U.S.C. § 1126(c).  As evidenced in the Pullo Declaration, the Plan has been accepted by

creditors in Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured

Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 7 (General Unsecured

Claims against LPC), Class 9 (Asbestos-Related Claims), Class 14(a) (CapitalSource Secured

Claims against LRGI), and Class 14(b) (CSE Secured Claims against LRGI) holding in excess of

two-thirds in amount and one-half in number of the Allowed Claims voted in each such class.

*See* Pullo Declaration, Exhibit A.  The Plan, however, has not been accepted in accordance with

section 1126(c) by the creditors in Class 17 (General Unsecured Claims against LRGI).  *See id.*

As set forth above, the Debtors did not solicit acceptances from the holders of Junior

Subordinated Note Claims (Class 6), Series B Preferred Stock Interests (Class 10), LPC

Common Stock Interests (Class 11), or Other Equity Interests in LPC (Class 12). Nevertheless, as set forth below, and, to the extent applicable, pursuant to section 1129(b) of the Bankruptcy Code, the Plan may be confirmed over the rejection of Class 6, Class 10, Class 11, Class 12, and Class 17 because the Plan does not discriminate unfairly and is fair and equitable with respect to each such Class. Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

<div align="center">

**III.**
**SECTION 1129(a)(3):  THE PLAN HAS BEEN PROPOSED**
**IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW**

</div>

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." The Second Circuit has defined the good-faith standard as requiring a showing that "the plan was proposed with honesty and good intentions." *In re Johns-Manville Corp.*, 843 F.2d at 649 (citing *Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139 (2d Cir. 1984)). In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *151-52; *see also In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907 (Bankr. S.D.N.Y. 1988)); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *Id.*

The Debtors, as the plan proponents, have met their good faith obligation under the Bankruptcy Code. As set forth in the Lubin Declaration, the Debtors proposed the Plan with

the purpose of reorganizing and expeditiously distributing value to creditors.  The Plan (including all documents necessary to effectuate the Plan) is the result of extensive arms-length negotiations among the Debtors, the Plan Investor, the Prepetition Secured Lenders, the DIP Lenders, and their respective advisors.

The Plan provides for a distribution of the value of the Debtors' estates to creditors in accordance with the priorities and provisions of the Bankruptcy Code.  Moreover, the Plan achieves the primary objectives underlying a chapter 11 bankruptcy:  the reorganization of a debtor and the distribution of value to creditors for amounts owing.  *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."); *Pereira v. Foong (In re Ngan Gung Rest.)*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) (stressing the importance of payment of creditors in chapter 11 cases).  The Plan accomplishes these goals by providing the means through which the Debtors and their successors in interest, the Reorganized Debtors, may continue to operate as a viable entity and effectuate prompt distributions to their creditors.  Inasmuch as the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code, the Plan and the related documents have been filed in good faith and the Debtors have satisfied their obligations under section 1129(a)(3).

**IV.**
**SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, the debtor, or a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court.

Pursuant to the interim application procedures established in these Chapter 11 Cases, the Bankruptcy Court has authorized and approved the payment of certain fees and

expenses of retained professionals, subject to final review for reasonableness by the Bankruptcy

Court under section 330.[9]  The Plan further provides that the Bankruptcy Court shall retain

jurisdiction "to hear and determine all applications for awards of compensation for services

rendered and reimbursement of expenses under sections 327, 328, 330, 331 and 503(b) of the

Bankruptcy Code."  *See* Plan Art. XII.  All fees and expenses accrued through the Effective Date

thus remain subject to final review by the Bankruptcy Court for reasonableness pursuant to

sections 327, 328, 330, 331, and 503(b).

       The foregoing procedures for the Bankruptcy Court's review and ultimate

determination of the fees and expenses to be paid by the Debtors satisfy the objectives of

section 1129(a)(4).  *See In re Elsinore Shore Assos.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988)

(requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed"

administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)

("Court approval of payments for services and expenses is governed by various Code provisions

– *e.g.*, §§ 328, 329, 330, 331, and 503(b) – and need not be explicitly provided for in a Chapter

11 plan.").  Based upon the foregoing, the Plan complies with the requirements of

section 1129(a)(4).

## V.
## SECTION 1129(a)(5):  THE DEBTOR HAS DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS

       Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent

disclose the identity and affiliations of the proposed officers and directors of the reorganized

debtor; that the appointment or continuance of such officers and directors be consistent with the

---

[9] *Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals*, dated April 22, 2008 [Docket No. 84].

interests of creditors and equity security holders and with public policy; and that there be

disclosure of the identity and compensation of any insiders to be retained or employed by the

reorganized debtor.

   The Debtors have satisfied the foregoing requirements.  In accordance with the

provisions of the Plan, from and after the Effective Date, the Boards of the Reorganized Debtors

shall consist of Michael A. Lubin, Steve Martinez, Ryan McCarthy, John Kennedy, Michael

Chupa, Warren Delano, and William Shulevitz.  Messrs. Lubin and Delano are "insiders," within

the meaning of that term as provided in section 101(31) of the Bankruptcy Code.  Each proposed

director has knowledge of and experience with the Debtors' operations, accounts, and finances

or, alternatively, has experience in the manufacturing industries or the rehabilitation of

financially troubled businesses.  This experience will assist the Reorganized Debtors in their

operation of their businesses following the Effective Date.

   The Plan Supplement also discloses the proposed officers of the Reorgnized

Debtors:  Michael A. Lubin, as Chief Executive Officer; Warren Delano, as President; Dennis J.

Welhouse, as Senior Vice President, Chief Financial Officer, and Secretary; and Charles R.

Jenkins, as Assistant Treasurer.

   In accordance with section 1129(a)(5)(B), which requires the plan proponent

disclose "the identity of any insider that will be employed or retained by the reorganized debtor,

and the nature of any compensation for such insider," the Debtors' Plan Supplement also

discloses (a) the fact that Messrs. Lubin, Delano, Welhouse, and Jenkins are insiders; and (b) the

nature of the compensation that each shall receive on and after the Effective Date.

## VI.
## BANKRUPTCY CODE SECTION 1129(a)(6) IS NOT APPLICABLE

Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." This provision of the Bankruptcy Code is not applicable to the Chapter 11 Cases as neither the Debtors nor the Reorganized Debtors are or will be subject to any form of rate regulation that would require such regulatory approval to satisfy section 1129(a)(6) of the Bankruptcy Code. Second, by its terms, section 1129(a)(6) of the Bankruptcy Code applies only where a rate change is "provided for in the plan." Here, the Plan provides for no such rate change and section 1129(a)(6) is inapplicable.

## VII.
## THE PLAN SATISFIES THE REQUIREMENTS OF
## SECTION 1129(a)(7) OF THE BANKRUPTCY CODE

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

With respect to each impaired class of claims or interests –

(A)  each holder of a claim or interest of such class –

      (i)      has accepted the plan; or

      (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

11 U.S.C. § 1129(a)(7). Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test" or the "liquidation test." The best interests test focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). Under the best interests test, the court "must

find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under chapter 7 of the Bankruptcy Code]." *Id*. at 440; *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996).

No rejecting creditor or interest holder has objected to the Plan under section 1129(a)(7), but in any event the best interests test is satisfied as to each holder of a Claim or Interest in each unimpaired Class of Claims or Interests, which comprises Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims against LPC), Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), Class 18 (Convenience Claims against LRGI), and Class 19 (Interests in LRGI), as they are deemed to have accepted the Plan.  The best interests test is also satisfied as to each holder of a Claim or Interest in each impaired Class of Claims or Interests, which comprises Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 6 (Junior Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9 (Asbestos-Related Claims), Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), Class 12 (Other Equity Interests in LPC), Class 14(a) (CapitalSource Secured Claims against LRGI), Class 14(b) (CSE Secured Claims against LRGI), and Class 17 (General Unsecured Claims against LRGI).

The Debtors' liquidation analysis is set forth in Exhibit G to the Disclosure Statement (the "**Liquidation Analysis**"), and is supported by the Lubin Declaration.  The Liquidation Analysis demonstrates that the Debtors' creditors would not receive more value in a hypothetical chapter 7 liquidation than they will under the Plan.

Specifically, the Plan provides payment in full to Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims against LPC), Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), Class 17 (General Unsecured Claims against LRGI), and Class 18 (Convenience Claims against LRGI).  The Plan also provides that Interests in Class 19 (Interests in LRGI) shall be unaltered.  Furthermore, holders of Claims in Class 5 (Senior Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), and Class 9 (Asbestos-Related Claims), also retain significant value under the Plan.

In contrast, in a chapter 7 liquidation, holders of Unsecured Claims and Interests likely would receive no recovery at all, in comparison to the substantial recoveries provided by the Plan.  Because the claimants or equity holders in each Class of Claims or Interests will receive under the Plan not less than the amount they would in a chapter 7 liquidation, the Debtors submit that the best interests test is satisfied.

## VIII.
## SECTION 1129(a)(8):  THE PLAN HAS BEEN ACCEPTED BY IMPAIRED CLASSES, AND, AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED

Section 1129(a)(8) of the Bankruptcy Code requires that each Class of Claims or Interests either accept the Plan or not be impaired by the Plan.  As set forth above, holders of claims in Class 1 (Other Priority Claims against LPC), Class 3 (Secured Tax Claims against LPC), Class 4 (Other Secured Claims against LPC), Class 8 (Convenience Claims against LPC), Class 13 (Other Priority Claims against LRGI), Class 15 (Secured Tax Claims against LRGI), Class 16 (Other Secured Claims against LRGI), Class 18 (Convenience Claims against LRGI), and Class 19 (Interests in LRGI) are unimpaired under the Plan and are, therefore, conclusively

presumed to have accepted the Plan pursuant to section 1126(f).  Class 2(a) (CapitalSource

Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior

Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9

(Asbestos-Related Claims), Class 14(a) (CapitalSource Secured Claims against LRGI), and Class

14(b) (CSE Secured Claims against LRGI), which are impaired Classes of Claims eligible to

vote, have affirmatively voted to accept the Plan.  As such, section 1129(a)(8) is satisfied with

respect to these Classes of Claims.

Holders of Claims in Class 6 (Junior Subordinated Note Claims) and Interests in

Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests, and

Class 12 (Other Equity Interests in LPC) will not receive or retain any property on account of

their Claims against or Interests in the Debtors.  Class 6, Class 10, Class 11 and Class 12 are,

therefore, deemed to have rejected the Plan.  Class 17 has voted to reject the Plan.

Notwithstanding the rejection of the Plan by such Classes, however, as set forth in Section XIV

below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the

Bankruptcy Code.

## IX.
## SECTION 1129(a)(9):  THE PLAN PROVIDES FOR
## PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims

entitled to priority under section 507(a) receive specified cash payments under a Plan.  Unless

the holder of a particular claim agrees to a different treatment with respect to such claim,

section 1129(a)(9) requires a plan to provide as follows:

> (A)    with respect to a claim of a kind specified in section
> 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the
> effective date of the plan, the holder of such claim will
> receive on account of such claim cash equal to the allowed
> amount of such claim;

(B)    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive –

> (i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)    with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash –

> (i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

> (ii)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

> (iii)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

## A.    Section 1129(a)(9)(A):  Administrative Expense Claims

With respect to Administrative Expense Claims, in accordance with

section 1129(a)(9)(A) of the Bankruptcy Code, the Plan provides that, except to the extent that

any entity entitled to payment of any Allowed Administrative Expense Claim agrees to less

favorable treatment, or has been paid prior to the Effective Date, on the latest of (i) the Effective

Date, or (ii) the date on which its Administrative Expense Claim becomes an Allowed

Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall

receive, in full satisfaction, settlement, and release of and in exchange for such Allowed

Administrative Expense Claim, Cash equal to the unpaid portion of its Allowed Administrative

Expense Claim without interest.  Notwithstanding the foregoing, (a) any Allowed Administrative

Expense Claim based on a liability incurred in the ordinary course of business by the Debtors

will be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in

the ordinary course of business, and (b) any Allowed Administrative Expense Claim may be paid

on such other terms as may be agreed on between the holder of such Claim and the Debtors.  *See*

Plan at § 2.1.  Thus, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code.

**B.**    **Section 1129(a)(9)(B):  Priority Non-Tax Claims**

With respect to the payment of Allowed Other Priority Claims, in accordance

with section 1129(a)(9)(B) of the Bankruptcy Code, the Plan provides that, except to the extent

that a holder of an Other Priority Claim in Class 1 (Other Priority Claims against LPC) or

Class 13 (Other Priority Claims against LRGI) agrees to a less favorable treatment, each such

holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount

equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the

later of (i) the Effective Date and (ii) the date such Claim becomes Allowed.  Thus, the Plan

satisfies section 1129(a)(9)(B) of the Bankruptcy Code.

**C.**    **Section 1129(a)(9)(C) and (D):  Priority Tax Claims and Secured Tax Claims**

With respect to the payment of Priority Tax Claims and Secured Tax Claims, in

accordance with sections 1129(a)(9)(C) and (D) of the Bankruptcy Code, respectively, the Plan

provides that, except to the extent that a holder of an Allowed Priority Tax Claim or Allowed

Secured Tax Claim agrees to a less favorable treatment, each holder shall receive, at the sole

option of the Debtors or the Reorganized Debtors (i) Cash in an amount equal to such Allowed

Priority Tax Claim or Allowed Secured Tax Claim,[10] as soon as practicable after the later of the

Effective Date and the date such Claim becomes Allowed, (ii) equal semi-annual Cash payments

in an aggregate amount equal to such Allowed Priority Tax Claim or Allowed Secured Tax

Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later

of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is

practicable and continuing over a period of eighteen months (but in no event exceeding five

years from and after the Commencement Date), or (iii) such other treatment as shall be

determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim

or Allowed Secured Tax Claim deferred Cash payments having a value, as of the Effective Date,

equal to such Claim.  Thus, the Plan satisfies sections 1129(a)(9)(C) and (D) of the Bankruptcy

Code.

Based upon the foregoing, the Plan satisfies all of the requirements of

section 1129(a)(9) of the Bankruptcy Code.

# X.
## SECTION 1129(a)(10):  AT LEAST ONE CLASS
## OF IMPAIRED CLAIMS HAS ACCEPTED THE PLAN

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance

of the Plan by at least one class of impaired claims, "determined without including any

acceptance of the plan by any insider" if a class of claims is impaired by the Plan.  The Debtors

clearly satisfy this requirement in that seven Classes of impaired Claims entitled to vote on the

---

[10] With regard to Allowed Secured Tax Claims Against LPC and Allowed Secured Tax Claims Against LRGI, the amount of Cash payments will include any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

Plan – Class 2(a) (CapitalSource Secured Claims against LPC), Class 2(b) (CSE Secured Claims against LPC), Class 5 (Senior Subordinated Note Claims), Class 7 (General Unsecured Claims against LPC), Class 9 (Asbestos-Related Claims), Class 14(a) (CapitalSource Secured Claims against LRGI), Class 14(b) (CSE Secured Claims against LRGI) – have affirmatively accepted the Plan, without including the acceptance of the Plan by insiders, if any, in such Classes. *See* Pullo Declaration, Exhibit A. Accordingly, section 1129(a)(10) of the Bankruptcy Code has been satisfied.

## XI.
## SECTION 1129(a)(11):  THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OR THE NEED FOR FURTHER REORGANIZATION

Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation, the Bankruptcy Court determine that the Plan is feasible.  Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  As described below, and as set forth in the Lubin Declaration, the Plan is feasible within the meaning of this provision.

## A.    Legal Standard

The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court to determine whether the Plan is workable and has a reasonable likelihood of success.  *See In re The Leslie Fay Cos*., 207 B.R. at 788; *In re Woodmere Investors Ltd. P'ship*, 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995); *In re Drexel Burnham Lambert Group Inc*., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp*., 68 B.R. at 635.

The Second Circuit has stated that "the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *In re Johns-Manville Corp.*, 843 F.2d at 649; *see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("'It is not necessary that the success be guaranteed, but only that the plan presents a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.'") (quoting 5 Collier on Bankruptcy 1129.02[11], at 1129-54 (15th ed. 1992)); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability."), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).").

The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02, at 1129-36.11 (15th ed. 1984)). Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. *See In re Drexel Burnham*, 138 B.R. at 762 ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.") (citing *In re U.S. Truck*, 47 B.R. at 944).

Applying the foregoing standards of feasibility, courts have identified the following factors, as probative:

(1)     the adequacy of the capital structure;

(2)     the earning power of the business;

(3)     economic conditions;

(4)     the ability of management;

(5)     the probability of the continuation of the same management;

(6)     the availability of prospective credit, both capital and trade;

(7)     the adequacy of funds for equipment replacements;

(8)     the provisions for adequate working capital; and

(9)     any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Leslie Fay*, 207 B.R. at 789 (citing 7 Collier on Bankruptcy ¶ 1129 LH[2], at 1129-82 (15th ed. rev. 1996)); *see also Texaco Inc.*, 84 B.R. at 910; *Prudential Energy*, 58 B.R. at 862-63.  The foregoing list is neither exhaustive nor exclusive.  *In re Drexel Burnham*, 138 B.R. at 763; *cf. In re U.S. Truck Co.*, 800 F.2d 581, 589 (6th Cir. 1986).

**B.      The Plan Satisfies the Feasibility Requirement**

Applying the foregoing legal standards, the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections of their financial performance through the fiscal years ending December 31, 2014 (the "**Projections**"), including projected statements of operations, projected balance sheets, and projected statements of cash flows.  *See* Disclosure Statement, § XI.

As set forth in the Disclosure Statement and the Lubin Declaration, the Projections are premised upon a number of good-faith assumptions, which include, among other things, (i) that the Bankruptcy Court will confirm the Plan, and (ii) that the Effective Date of the Plan and its substantial consummation will take place within ninety days after entry of the Confirmation Order.

As set forth in the Lubin Declaration, these Projections indicate that the Debtors will have sufficient resources to meet all of their obligations under the Plan.  In addition, the Debtors have built appropriate flexibility into their post-Effective Date capital structure so that in the event that general economic or other business conditions are less favorable than expected, the Debtors will be able to maintain appropriate liquidity to meet their obligations and continue their operations.

Further, the Reorganized Debtors will employ Mr. Lubin, the current Chief Executive Officer, Mr. Delano, the current President, Mr. Welhouse, the current Senior Vice President, Chief Financial Officer, and Secretary, and Mr. Jenkins, the current Assistant Treasurer, in those same positions.  Each of the foregoing individuals has significant experience and extensive knowledge regarding the Debtors' businesses and operations and their continued employment will ensure that the Reorganized Debtors will continue to be managed by experienced and qualified individuals.

Based upon the foregoing, the Plan has more than a reasonable likelihood of success and satisfies the feasibility standard of section 1129(a)(11).

## XII.
## SECTION 1129(a)(12):  ALL STATUTORY
## FEES HAVE BEEN OR WILL BE PAID

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at

the hearing on confirmation of the plan."  Section 507 of the Bankruptcy Code provides that

"any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28"

are afforded priority as administrative expenses.  In accordance with sections 507 and

1129(a)(12) of the Bankruptcy Code, the Plan provides for payment of all such fees and charges

on the Effective Date and thereafter as required.  *See* Plan at § 13.5.

## XIII.
## SECTIONS 1129(a)(13), 1129(a)(14),
## AND 1129(a)(15) DO NOT APPLY

Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree

benefits at levels established pursuant to section 1114 of the Bankruptcy Code.  As the Debtors

did not modify any retiree benefits pursuant to section 1114, section 1129(a)(13) is inapplicable.

Nonetheless, the Reorganized Debtors will continue to pay retiree benefits of the Debtors for the

duration of the period for which the Debtors had obligated themselves to provide such benefits

and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits

in accordance with the terms thereof.

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic

support obligations.  The Debtors are not subject to any domestic support obligations, and, as

such, section 1129(a)(14) does not apply.

Section 1129(a)(15) applies only in cases in which the debtor is an "individual"

(as that term is defined in the Bankruptcy Code).  The Debtors are not "individuals," and,

accordingly, section 1129(a)(15) is inapplicable.

## XIV.
## SECTION 1129(b):  THE PLAN SATISFIES
## THE "CRAM DOWN" REQUIREMENTS WITH
## RESPECT TO CLASS 6, CLASS 10, CLASS 11, CLASS 12 AND CLASS 17

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and equity interests accept a plan.  This mechanism is known colloquially as "cram down."

Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).  Thus, under section 1129(b), the Bankruptcy Court may "cram down" a plan over the rejection of a plan by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.  *See, e.g.*, *In re Johns-Manville Corp.*, 843 F.2d at 650.

Four impaired Classes – Class 6 (Junior Subordinated Note Claims), Interests in Class 10 (Series B Preferred Stock Interests), Class 11 (LPC Common Stock Interests), and Class 12 (Other Equity Interests in LPC) – are deemed to have rejected the Plan.  Additionally, Class 17 has voted to reject the Plan.  The Plan should be approved notwithstanding the rejection of the Plan by five Classes because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes.  Accordingly, the Debtors evoke section 1129(b) with respect to Class 6, Class 10, Class 11, Class 12 and Class 17.

A.    **The Plan Does Not Discriminate Unfairly**

The unfair discrimination standard of section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes. *In re Barney and Carey Co.*, 170 B.R. 17, 25 (Bankr. D. Mass 1994). Section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is unfair. *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990). The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618. Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 636, or (ii), taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., Buttonwood Partners*, 111 B.R. at 63; *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

First, Class 6 is comprised of Junior Subordinated Note Claims, of which Mr. Lubin is the sole claimholder. Mr. Lubin affirmatively agreed to the Class 6 treatment as part of the formulation of the Debtors' Plan. Second, all of the Claims classified in Class 10, Class 11, and Class 12 constitute Interests in LPC. The Plan provides for zero distributions on account of Interests in LPC. Thus, the Plan does not provide for disparate treatment of Class 10, Class 11, and Class 12. Accordingly, the Plan does not discriminate unfairly against Class 6, Class 10, Class 11, and Class 12; rather, the Plan effectuates the priorities set forth in the Bankruptcy Code. Class 17 is comprised of all General Unsecured Claims Against LRGI. Class 18 includes

all Convenience Claims against LRGI.  As supported by the Lubin Declaration, the disparate

treatment of Unsecured Claims against LRGI in the Plan is based upon administrative

convenience.  Moreover, a holder of a Claim in Class 17 may reduce such Claim to $2,000 or

less in order to receive the treatment that the Plan provides to holders of Claims in Class 18.

Accordingly, the Plan does not discriminate unfairly against Class 17.

**B.**      **The Plan is Fair and Equitable**

Section 1129(b)(2) of the Bankruptcy Code defines the phrase "fair and

equitable" as follows:

> (B)      As to Unsecured Creditors:  Either (i) each impaired
> unsecured creditor receives or retains under the plan
> property of a value equal to the amount of its allowed claim
> or (ii) the holders of claims and interests that are junior to
> the claims of the dissenting class will not receive any
> property under the plan.

> (C)      As to Equity Interest Holders:  Either (i) each holder of an
> equity interest will receive or retain under the plan property
> of a value equal to the greatest of the fixed liquidation
> preference to which such holder is entitled, the fixed
> redemption price to which such holder is entitled or the
> value of the interest or (ii) the holder of an interest that is
> junior to the nonaccepting class will not receive or retain
> any property under the plan.

11 U.S.C. § 1129(b)(2).  In the instant case, the "fair and equitable" rule is satisfied as to the

holders of Claims in Class 6 and Class 17, and the holders of Interests in Class 10, Class 11, and

Class 12.

As to the Junior Subordinated Note Claims in Class 6, in accordance with section

1129(b)(2)(B), no holder of a junior Claim against or Interest in LPC will receive or retain any

property on account of such holder's Claim or Interest.  Moreover, with respect to the Interests in

LPC, all of which are classified in Class 10, Class 11, and Class 12, section 1129(b)(2)(C) is

satisfied because the Plan provides that all of the Interests in LPC will be cancelled on the

Effective Date, and that holders of such Interests will not receive a distribution.

As to the Claims in Class 17, the Plan provides that holders of Claims in that

Class will receive a cash payment that includes pendency interest, i.e., interest from the

Commencement Date through the Effective Date of the Plan, and a stream of payments in an

amount determined by the Court to be sufficient to constitute payment in full when valued as of

the Effective Date.  Specifically, Section 4.19(b)(ii) of the Plan provides that:

> If Class 17 does not accept the Plan, each holder of an Allowed
> General Unsecured Claim against LRGI will receive the following
> stream of Cash payments:  (a) an initial Cash payment, payable as
> soon as practicable after the later of the Effective Date and the date
> such Claim becomes Allowed, equal to ten percent (10%) of the
> sum of (i) its Allowed General Unsecured Claim against LRGI and
> (ii) postpetition interest from the Commencement Date through
> and including the Effective Date at the rate determined by the
> Bankruptcy Court and (b) an additional nine (9) quarterly
> payments, each in an amount determined by the Bankruptcy Court
> to be adequate to satisfy in full Allowed General Unsecured
> Claims against LRGI.

Plan at § 4.19(b)(ii).  Because Class 17 has rejected the Plan, both the pendency interest rate on

Allowed Class 17 Claims and the interest rate for the deferred payments on such Claims are

subject to the Court's determination.  For the reasons set forth below, the use of the federal

judgment rate to calculate pendency interest, and the 6.02% implied rate on deferred payments

proposed by the Debtors, will provide holders of Claims in Class 17 with payment in full of their

Allowed Claims, and thus, fair and equitable treatment.

1.    **The Federal Judgment Rate is the Appropriate
Postpetition Interest Rate to Apply to the Class 17 Claims**

In a chapter 11 case, where the debtor is solvent, unsecured creditors are entitled

to pendency interest pursuant to sections 726(a)(5) of the Bankruptcy Code.  *Onink v. Cardelucci*

*(In re Cardelucci)*, 285 F.3d 1231, 1234 (9th Cir. 2002).  Under section 726(a)(5) of the

Bankruptcy Code, after all administrative claims, general unsecured claims, tardily-filed general unsecured claims, and fines and/or penalties are satisfied, unsecured creditors shall receive "payment of interest *at the legal rate* from the date of the filing of the petition" on their allowed claims.  11 U.S.C. § 726(a)(5) (emphasis added).  Although the Bankruptcy Code does not define the term "legal rate," multiple courts have construed that term to mean the federal judgment rate set forth in 28 U.S.C. § 1961.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 257 (Bankr. S.D.N.Y. 2007) (stating that "[i]t is by far the better view, in my opinion, that legal rate is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate") (citation and quotations omitted); *Cardelucci*, 285 F.3d at 1236 (affirming chapter 11 plan's provision for pendency interest on allowed claims at the federal judgment rate); *In re Chiapetta*, 159 B.R. 152, 160 (Bankr. E.D. Pa. 1993) (agreeing that the "legal rate of interest" is the federal judgment rate); *In re Melenyzer*, 143 B.R. 829, 834-35 (Bankr W.D. Tex. 1992). Application of the federal judgment rate is warranted because that approach (i) is consistent with the principles of statutory construction and applicable case law, (ii) ensures uniformity with federal law, and (iii) promotes judicial economy.

First, the legislative history of section 726(a)(5) of the Bankruptcy Code indicates that Congress specifically chose the language "interest at the legal rate," by inserting it into the statute to replace the originally proposed language "interest on claims allowed."  *See* Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, § 4-405(a)(8), (1st Sess. 1973).  Thus, in drafting section 726(a)(5), Congress specified what type and amount of interest could be awarded with the specific phrasing "at the legal rate," rather than making a general reference to a creditor's entitlement to interest from a solvent debtor.  *See Cardelucci*, 285 F.3d at 1234.

Moreover, courts have recognized that the use of "the" instead of the indefinite "a" or "an," in section 726(a)(5) of the Bankruptcy Code, indicates that Congress meant for a single, uniform source to be used to calculate postpetition interest, instead of the state judgment rate, which varies by state. *See Cardelucci*, 285 F.3d at 1234; *Melenyzer*, 143 B.R. at 830 n.2. In addition, the use of the phrase "legal rate" indicates that Congress intended the single source to be statutory, in that the commonly understood meaning of "at the legal rate" at the time the Bankruptcy Code was enacted was a rate fixed by statute. *See Cardelucci,* 285 F.3d at 1236; *Melenyzer*, 143 B.R. at 830 n.2; *In re Country Manor of Kenton, Inc*, 254 B.R. 179, 182 (Bankr. N.D. Ohio 2003); 3 Norton Bankruptcy Law & Practice 2d § 73:7 n.55 (1997 & Supp. 2000). Thus, the legislative history and case law interpreting section 726(a)(5) make it plain that the federal judgment rate is the appropriate rate of interest to be applied to general unsecured claims in a solvent debtor case.

Second, use of the federal judgment rate for pendency interest promotes uniformity within federal law. *See Cardelucci*, 285 F.3d at 1234; *see also Beguelin v. Volcano Vision, Inc.*, 220 B.R. 94, 100-01 (9th Cir. B.A.P. 1998) (citing *In re Godsey*, 134 B.R. 865, 867 (Bankr. M.D. Tenn. 1991)). On the filing of the bankruptcy petition, creditors must pursue their rights to the claim in federal court; thus, entitlement to a claim and interest on that claim is a matter of federal law that requires a uniform outcome. *See Bursch v. Beardsley & Piper, Div. of Pettibone Corp.*, 971 F.2d 108, 114 (8th Cir. 1992) ("[O]nce a bankruptcy petition is filed, federal law, not state law, determines a creditor's rights."). Further, because section 502(a) of the Bankruptcy Code effectively provides that an allowed claim is equivalent to a federal money judgment, the federal judgment rate is the appropriate rate for postpetition interest on claims

pursuant to section 726(a)(5).  *See Country Manor*, 254 B.R. at 183; *Cardelucci*, 285 F.3d at

1235; *Melenyzer*, 143 B.R. at 833.

Third, in addition to promoting fairness among creditors, application of the

federal judgment rate is the most judicially efficient and practical manner of allocating the

debtor's estate.  *See Cardelucci*, 285 F.3d at 1236; *Country Manor*, 254 B.R. at 182.  Calculating

the appropriate rate and amount of interest to be paid to numerous creditors with numerous

potentially-applicable rates has the potential to overwhelm the courts with litigation when there

is a relatively simple process available already pursuant to section 726(a)(5) of the Bankruptcy

Code.  *See Cardelucci*, 285 F.3d at 1236.  Stated differently, the use of the federal judgment rate

instead of a state judgment rate provides a predictable and easily ascertainable rate to apply to a

creditor's claim, and thereby facilitates administration of the bankruptcy estate.  *See Country*

*Manor*, 254 B.R. at 182; *Melenyzer*, 143 B.R. at 833; *Cardelucci*, 285 F.3d at 1236; *Beguelin*,

220 B.R. at 101; *Godsey*, 134 B.R. at 867.  As one court noted:

> It is not hard to imagine the administrative nightmare that
> bankruptcy trustees would otherwise face if they were required to
> calculate a different interest rate, based on a different source of
> interest rate, for each creditor.

*Beguelin*, 220 B.R. at 101.

Here, exactly such an "administrative nightmare" would come to pass if the

Debtors were required to determine which state judgment rate might apply to each of the Claims

in Class 17.  If required to pay interest at rates other than the federal judgment rate, the Debtors

would be forced to go through each of the 192 Claims in Class 17, conduct a legal analysis to

determine which state judgment rate could "arguably" apply to the Claim in question, and, in

case of unresolved disputes, litigate the issue in front of this Court.  With respect to many of the

Class 17 Claims, the Debtors' analysis would turn on an entirely hypothetical "action" brought

by each holder of a Claim in Class 17.  In some cases, there might be multiple jurisdictions in

which an action on account of a Class 17 Claim could have been brought.  And, the Debtors

would have no real mechanism to determine the "correct" rate to apply.  Rather, any

determination by the Debtors as to which rate should apply would be wholly arbitrary and

unpredictable.  Moreover, the Debtors' – and the Court's – efforts to select appropriate interest

rates likely would result in considerable delays in distributions to all creditors, and would burden

what would otherwise be a streamlined distribution process pursuant to the proposed Plan.

For each of the foregoing reasons, the Court should fix the rate of pendency

interest under Section 4.19(b)(ii) of the Plan at the federal judgment rate.

**2.      Application of the Debtors' Proposed Interest Rate on Deferred Payments
Exceeds the Cram-Down Interest Rate Under the Formula Approach**

Because Class 17 has rejected the Plan, in accordance with section 1129(b)(2)(B)

of the Bankruptcy Code, holders of Class 17 Claims will receive a stream of cash payments with

a net present value equal to the amount of such holders' Allowed Claims.  *See Till v. SCS Credit*

*Corp.*, 541 U.S. 465, 469 (2004) (where a plan provides for installment payments, a creditor

must receive "disbursements whose total present value equals or exceeds that of the allowed

claim").  The Plan treatment for Class 17 is a stream of quarterly payments over 27 months

totaling 106.75% of the Allowed amount of each Claim in Class 17.  The annual post-Effective

Date interest rate implied by this treatment is 6.02%.[11]  Nevertheless, the interest rate for

deferred payments applicable to the Class 17 Claims is subject to the Court's determination.

---

[11] There is no express rate of interest set forth in the plan treatment for Class 17, so an implied rate must be
calculated.  The Debtors used this formula to simplify the calculation of quarterly payments.  By specifying a fixed
percentage of the allowed claim amount that will be disbursed each quarter, both the Debtors and the creditor can
easily determine exactly what each periodic payment will be as long as the Allowed amount of the Claim is known.

Applicable case law demonstrates that the 6.02% rate proposed by the Debtors is more than sufficient to ensure fair and equitable treatment.

The "formula approach" is the appropriate methodology to determine a cram down rate of interest. *See Till*, 541 U.S. at 479-80; *Gen. Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55, 64 (2d Cir. 1997), abrogated on other grounds by *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, (1997); *see also Pringle*, 2006 WL 2528502, at *7 (W.D.N.Y. Aug. 31, 2006) (requiring bankruptcy court to use the formula approach to assess the present value of deferred payments under debtor's plan). As the United States Court of Appeals for the Second Circuit explained, the formula approach requires a court to start with an established risk-free interest rate, and adjust such rate to account for "the risk to the creditor in receiving deferred payments under the reorganization plan." *Valenti*, 105 F.3d at 64. The prevailing rate for U.S. Treasury notes with a maturity period equivalent to the proposed payment schedule qualifies as an established risk-free interest rate. *Id.* at 64; *In re Byrd Foods, Inc.*, 253 B.R. 196, 204 (Bankr. E.D. Va. 2000); *but see Till*, 541 U.S. at 478-79 (using the national prime rate as the risk-free base rate).

To account for the repayment risk to an unsecured creditor courts typically increase the risk-free rate by a risk premium of one to three percentage points. *Valenti*, 105 F.3d at 64 (citations omitted); *see also In re Martinez*, 409 B.R. 35, 42 (Bankr. S.D.N.Y 2009) (approving a 2% risk premium adjustment); *Pringle*, 2006 WL 2528502, at *7 (directing bankruptcy court to "add a suitable risk premium, such as between one percent and three percent . . . ."). The adjusted rate, however, should not be "so high as to doom the plan." *Till*, 541 U.S. at 480. To determine the appropriate risk premium, courts should consider factors, such as "the

circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479.

Here, application of the formula approach yields a rate that is *less than* the 6.02% implied rate the Debtors propose in the Plan. A two-year treasury security is an appropriate risk-free base rate and the current yield on that security is approximately 0.63%. Consideration of the *Till* risk factors evidences that the quality of the credit under the Plan warrants a minimal risk premium. The "circumstances of the estate" are as follows: (i) on the Effective Date, the Debtors will have reduced their combined indebtedness from over $80 million to just $33 million, (ii) the Reorganized Debtors' current and projected cash flow is strong, (iii) despite an adverse general economy, the Debtors have generated positive cash flow and paid principal and interest on their secured debt throughout these Chapter 11 Cases, and (iv) the Debtors have attracted up to $22 million in new equity to help fund distributions under the Plan and ongoing operations. Based on this analysis, the risk of nonpayment is low, and that the risk premium also should be at the low end of the 1% to 3% range that the case law has established. Adding the risk premium to the risk-free base rate of a two-year treasury security results in a range of cram-down interest rate from 1.63% to 3.63% – well below the 6.02% provided in the Plan. If the Court were to adopt the mid-point of the risk premiums (2.0%), an implied interest rate of 2.63% would be appropriate – 239 basis points *less* than the Plan provides. Furthermore, even if the Court were to use the national prime rate – which is currently 3.25% – as the risk-free rate, adding a 2% risk premium would yield a cram-down rate of 5.25%. Even use of the full 3% risk premium, at the top of the range prescribed by the case law, would imply a rate barely higher than the implied rate in the Plan. Thus, even by conservative estimates, the Plan provides greater value than the formula approach requires.

In a footnote to its decision in *Till*, the U.S. Supreme Court noted that, when determining a cram down interest rate in a chapter 11 case "*it might make sense* to ask what rate an efficient market would produce." *Id.* (emphasis added). This dictum is not binding authority,[12] and the case law makes clear that the purpose of the formula rate is to avoid the complex battle of experts that would be necessary to determine what a "market" rate of interest would be for a "forced" loan under a chapter 11 plan. *See Valenti*, 105 F.3d at 63-64. But even if consideration of the "market" were appropriate, the evidence shows that there is no efficient market for unsecured credit for a mid-sized manufacturing company. *See* Haras Declaration at 6. Where no market exists "to assist the court in its analysis, then the establishment of a risk free rate of interest, together with the identification of the particular risk factors . . . is sufficient for [a] court to come to a conclusion as to the plan's treatment of the unsecured creditors." *Byrd*, 253 B.R. at 200.

The interest rate of 6.02% implied by the stream of payments proposed for Class 17 is more than the rate necessary to ensure that creditors in Class 17 receive the full amount of their Allowed Claims as of the Effective Date. Application of the formula approach, as discussed in the case law, results in a *lower* rate. Because holders of Claims in Class 17 will receive property equal to the amount of their Allowed Claims, the Plan is fair and equitable and satisfies section 1129(b)(2)(B)(i) of the Bankruptcy Code.

Based on the foregoing, the Plan is fair and equitable with respect to the Claims in Class 6 and Class 17, and the Interests in Class 10, Class 11, and Class 12.

---

[12] The Supreme Court has consistently ruled that unsupported dicta is not valid precedent. *See, e.g.*, *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (explaining that the court was "not bound to follow . . . dicta in a prior case in which the point now at issue was not fully debated"); *Colgrove v. Battin*, 413 U.S. 149, 157 (1973) ("We cannot . . . accord the unsupported dicta of . . . earlier decisions the authority of decided precedents."); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) (dicta "may be followed if sufficiently persuasive" but is not controlling).

## XV.
## THE PLAN SATISFIES THE REQUIREMENTS
## OF SECTION 1127 OF THE BANKRUPTCY CODE

Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code.  In addition, Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.  On Jul 9, 2010, in accordance with Section 13.11 of the Plan, the Debtors filed modifications to the Plan in accordance with the proposed Confirmation Order, which include certain revisions to the release provisions.  *See* Proposed Confirmation Order, Exhibit A.  None of the modifications constitute material modifications.  Indeed, the technical adjustments have no impact upon the economics of the Plan vis-à-vis any Class of Claims or Interests.  "A modification is material if it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."  8 Collier on Bankruptcy ¶ 3019.03 (15th ed. 1987); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988).  Re-solicitation is appropriate only if "the modification adversely affects the interests of a creditor who has previously accepted the plan, in more than a purely ministerial *de minimis* manner . . . ."  *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988).  Following the entry of the Disclosure Statement Order, the Debtors made certain clarifying modifications to the Plan at the request of certain parties in

interest.  Because the Debtors made no material modifications, the Debtors believe, and no party

has argued to the contrary, that re-solicitation is unnecessary and acceptances of the Plan should

be deemed acceptances thereof.

Furthermore, certain technical and minor modifications may be made to the Plan

at the Confirmation Hearing.  As will be demonstrated at the Confirmation Hearing, such

modifications likely will have no impact on the treatment of any Claims or Interests and, thus,

pursuant to Bankruptcy Rule 3019, all acceptances of the Plan should also be deemed

acceptances of the Plan as it may be modified by the Confirmation Order.

As set forth above, the Plan complies fully with sections 1122 and 1123 of the

Bankruptcy Code.  In addition, the Debtors have complied with section 1125 with respect to the

Plan.  Accordingly, the requirements of section 1127 of the Bankruptcy Code have been

satisfied.

## XVI.
## RESPONSE TO COMMITTEE OBJECTION

Notwithstanding that the Plan is confirmable pursuant to section 1129 of the

Bankruptcy Code, the Creditors' Committee objects to confirmation of the Plan on

unsupportable bases.[13]  With respect to the interest rates set forth in Section 4.19(b)(ii) of the

Plan, the Creditors' Committee asserts that (a) the Plan applies an "incorrect" interest rate in

connection with the deferred payments to Class 17, and (b) the pendency interest rate provided

under the Plan for payments made to holders of claims in Class 17 is too low, and that Class 17

claimants therefore are not receiving value equal to the Allowed amount of their Claims.  Comm.

---

[13] The Committee Objection also incorporates by reference objections to the Disclosure Statement raised in the *Official Committee of Unsecured Creditors' Objection to the Proposed Disclosure Statement in Respect of Debtors' Fourth Amended Joint Plan of Reorganization*, dated May 19, 2010 [Docket No. 879], and the supplement thereto [Docket No. 891] (together, the "**Disclosure Statement Objection**").  The objections that are stated in the Disclosure Statement Objection that are not addressed herein have already been addressed and resolved as part of the hearing on the Disclosure Statement.

Obj. ¶ 2. The Creditors' Committee also objects to confirmation because the Plan does not provide "a cash reserve for the future payments of any disputed claims." *Id.* All of these objections lack merit and should be overruled.

A.    **The Creditors' Committee Objections to the Proposed Interest Rates Are Invalid**

    1.    **The Federal Judgment Rate is the Appropriate Interest Rate**

The Creditors' Committee asserts that the Debtors' Plan "applies the [*sic*] an incorrect interest rate in connection with post-petition interest to Class 17." Comm. Obj. ¶ 2. The sole basis for this claim is found in a footnote to the Disclosure Statement Objection, in which the Creditors' Committee references an unpublished bench ruling for the proposition that the applicable state judgment rate should apply. *Id.* at Exhibit A, n.8. Because there is compelling, published authority supporting application of the federal judgment rate, and relying upon state judgment rates would lead to an administrative nightmare, the Court should overrule the Committee Objection.

As discussed on pp. 46-50, where the debtor is solvent, the federal judgment rate is the appropriate rate for payment of pendency interest on unsecured creditors' claims. *See Cardelucci*, 285 F.3d at 1233; *see also Branch Banking & Trust Co. v. McDow (In re Garriock)*, 373 B.R. 814, 817 (E.D. Va. 2007). In *Cardelucci*, the Court of Appeals for the Ninth Circuit addressed the narrow issue of whether, pursuant to a chapter 11 plan, postpetition interest "is to be calculated using the federal judgment interest rate or is determined by the parties' contract or state law." *Id.* at 1233. Based upon its interpretation of section 726(a)(5) of the Bankruptcy Code, the court determined that "the legal rate" under that statute must be the federal judgment rate (as set forth in 28 U.S.C. § 1961(a)). *Id.* at 1234-35. The court also determined that using the federal judgment rate furthers uniformity within federal law, and promotes judicial economy.

*Id.* at 1235-36.  This ruling provides direct support for application of the federal judgment rate to the payment of Claims in Class 17.

Moreover, multiple courts have rejected application of the state judgment rates in favor of the federal judgment rate to compute postpetition interest.  *See, e.g.*, *In re Hedrick*, 434 B.R. 762, 764 (Bankr E.D. Va. 2006) (explaining that the appropriate interest rate "is the federal judgment rate, not the contract rate or the applicable state judgment rate"); *Cardelucci*, 285 F.3d at 1233 (stating that "applying a single, easily determined interest rate to all claims for post-petition interest ensures equitable treatment of creditors"); *Melenyzer*, 143 B.R. at 832 (observing that, under state judgment rate approach, "some creditors would receive a disproportionately large percentage of the remaining assets compared to their underlying unsecured claims, to the prejudice not of the debtor, but of other, otherwise equally situated, unsecured creditors").  Furthermore, as indicated above, application of state judgment rates would be both an administrative nightmare and, ultimately, wholly unworkable.

Thus, the Committee Objection should be overruled, and the Court should apply the federal judgment rate.

### 2.    Interest Rate on Deferred Payments

The Creditors' Committee also asserts that "[t]he 6.02% per annum post-Effective Date interest to Class 17 is well below the market rate, resulting in such claims not being paid in full."  Comm. Obj. ¶ 2.  The Creditors' Committee appears to argue that there is an active market for the stream of payments that holders of Claims in Class 17 would receive based upon the interest rate applicable to certain secured debt.  This contention not only ignores that the formula approach is the appropriate method of calculating interest on deferred payments, but also fails to recognize that the negotiated rate for certain of the Debtors' secured debt has no bearing on the interest rate applicable to the deferred payments to holders of Allowed Class 17 Claims.

Application of the formula approach to determine the appropriate interest rate for deferred payments to the holders of Class 17 Claims is consistent with controlling authority. *See Till*, 541 U.S. at 479-80; *Valenti*, 105 F.3d at 64. Moreover, as demonstrated at pp. 50-53, under the formula approach, holders of Claims in Class 17 would receive interest at rate of no more than 3.63% (using the true risk-free rate – the rate on U.S. government debt of equivalent duration – and the highest customary risk adjustment). The Plan, however, provides for an implied rate of 6.02%. Thus, the Plan provides for fair and equitable treatment of the holders of Class 17 Claims.

The Creditors Committee misses the mark with its argument that the interest rate of 15.5% payable on Term Loan B under the Amended and Restated Loan Agreement is the minimum amount that should be applicable to Class 17 unsecured claims. The rate applicable under the Amended and Restated Loan Agreement is not a cram down rate. It is a negotiated rate -- just one element in a series of compromises between the Debtors, the Plan Investor and the prepetition secured lenders on both financial and non-financial issues. Moreover, the Amended and Restated Loan Agreement provides for a note having a three-year term, with no principal payments prior to maturity, far different from the Class 17 payment stream, which provides for payment in full nine months before the maturity of the secured debt and has an average life of just over 13.5 months. Regardless, the test under section 1129(b)(2)(B)(i) is not whether the rejecting class is getting the same interest rate as another class. The test is whether the rejecting class is getting the present value of the Allowed amount of its Claims. An interest rate of 6.02% more than satisfies that test.

Because the proposed rate is both fair and equitable, the Creditors' Committee's objection to the interest rate for deferred payments on Allowed Class 17 Claims should be overruled.

**B.      The Plan Is Confirmable Without a Disputed Claims Reserve**

The Creditors' Committee further objects to the Plan on the basis that the Plan does not provide for a claims reserve.  No disputed claims reserve is necessary here, however, because creditors will not be sharing pro rata from a single pool of assets (i.e., the Plan is not a "pot" plan), the Plan is not a plan of liquidation, and, as set forth in the Lubin Declaration, the Projections, which were built on the assumption that all disputed Class 7 and Class 17 Claims (other than the speculative litigation Claim of Lorraine Cerimele, which the Debtors believe will ultimately be disallowed in its entirety) have been Allowed prior to the Effective Date, indicate that the Debtors will not have less than $5 million in cash at the end of any month.  To the extent that Disputed Claims remain unresolved beyond the Effective Date, the Debtors cash position will be increased.  Consequently, it is clear that the Debtors will have sufficient resources to make the "catch-up" payments to holders of Disputed Claims when and if those Claims are Allowed.

There is no requirement in the Bankruptcy Code that a plan must provide a reserve to ensure payment to holders of Disputed Claims, and the Committee cites no authority for its request that the Court impose such a requirement.  The only conceivable statutory basis for the Committee's objection is feasibility under section 1129(a)(11).  The Plan, however, is clearly and demonstrably feasible.  Accordingly, the Court should reject the Committee's attempt to rewrite the Plan in a way that is more to its liking and overrule the Committee's objection to the absence of a claim reserve.

For the foregoing reasons, the Committee Objection should be overruled.

## CONCLUSION

The Plan complies with and satisfies all of the requirements of section 1129 of the

Bankruptcy Code.  The Committee Objection should, therefore, be overruled and the Plan

confirmed.

Dated:  July 15, 2010
         New York, New York

<div style="margin-left:40%">

/s/ Adam P. Strochak
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

– and –

Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
1300 I Street, N.W., Suite 900
Washington, D.C. 20005
Telephone:  (202) 682-7000
Facsimile:    (202) 857-0940

Attorneys for Debtors
and Debtors in Possession

</div>