UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                     :

In re:                                           :          Chapter 11
                                                    :
LEXINGTON PRECISION CORP., et al.,     :          Case No. 08-11153 (SCC)
                                                    :
                 Debtors.                       :          (Jointly Administered)
                                                    :
------------------------------------------------------------------x

**DECLARATION OF MICHAEL A. LUBIN IN
SUPPORT OF CONFIRMATION OF THE DEBTORS'
FOURTH AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED**

STATE OF NEW YORK     )
                                 )    s.s.:
COUNTY OF NEW YORK  )

Michael A. Lubin declares:

        1        I am the Chairman of the Board of Directors of Lexington Precision Corp. and its affiliated debtor, Lexington Rubber Group, Inc. (together the "**Debtors**"), and in that capacity I am familiar with the Debtors' operations, capital structure, financial performance, business plan, and financial projections.  I submit this declaration in support of confirmation of the *Debtors' Fourth Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, as Modified*, dated May 26, 2010 (as modified and amended, the "**Plan**").[1]  I have reviewed and am familiar with the terms and provisions of the Plan, as well as the accompanying disclosure statement (the "**Disclosure Statement**") [Docket No. 895].  I am also familiar with the documents comprising the Plan Supplement [Docket No. 919].

        2        Based on my personal involvement in the negotiation and development of

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

the Plan and discussions with the Debtors' advisors, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code, that the Plan was proposed in good faith, and that the Debtors, acting through their officers, directors, and professionals, have conducted themselves in a manner that complies with applicable law in relation to the formulation and negotiation of, and the solicitation of votes with respect to, the Plan.

I. **The Plan Complies with Section 1129(a) of the Bankruptcy Code**

    A. **Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code**

        3    On the basis of my understanding of the Plan, the events that have occurred throughout the Debtors' chapter 11 cases, and the obligations imposed upon the Debtors as a result of various orders entered during the Debtors' chapter 11 cases and the requirements of the Bankruptcy Code, including those specifically set forth below, I believe that the Plan fully complies with the applicable provisions of the Bankruptcy Code for confirmation of a plan of reorganization.

        (i)    *The Plan Complies with Section 1122/1123(a): Classification of Claims*

        4    The Plan designates 21 classes of Claims and Equity Interests:

        (a)    Class 1 – Other Priority Claims against LPC;

        (b)    Class 2(a) – CapitalSource Secured Claims against LPC;

        (c)    Class 2(b) – CSE Secured Claims against LPC;

        (d)    Class 3 – Secured Tax Claims against LPC;

        (e)    Class 4 – Other Secured Claims against LPC;

        (f)    Class 5 – Senior Subordinated Note Claims;

        (g)    Class 6 – Junior Subordinate Note Claims;

        (h)    Class 7 – General Unsecured Claims against LPC;

        (i)    Class 8 – Convenience Claims against LPC

    (j)    Class 9 – Asbestos-Related Claims

    (k)    Class 10 – Series B Preferred Stock Interests

    (l)    Class 11 – LPC Common Stock Interests;

    (m)    Class 12 – Other Equity Interests in LPC

    (n)    Class 13 – Other Priority Claims against LRGI

    (o)    Class 14(a) – CapitalSource Secured Claims against LRGI;

    (p)    Class 14(b) – CSE Secured Claims against LRGI

    (q)    Class 15 – Secured Tax Claims against LRGI

    (r)    Class 16 – Other Secured Claims against LRGI

    (s)    Class 17 – General Unsecured Claims against LRGi

    (t)    Class 18 – Convenience Claims against LRGI

    5    The Plan's classification scheme was not proposed to create a consenting impaired Class and thereby manipulate voting. I am familiar with the Claims and Equity Interests in each Class, and I believe that all Claims within each Class have the same or substantially similar rights relative to the other Claims in that Class and that, to the extent that two classes contain similarly situated Claims, the Plan provides similar treatment to holders of such Claims in each such class.

    6    With respect to Claims in Class 8 (Convenience Claims against LPC) and Class 18 (Convenience Claims against LRGI), the Debtors estimate that approximately 61.5% in number of all General Unsecured Claims are less than $2,000 in amount (*i.e.*, approximately 430 out of approximately 700 Claims). These Claims, however, only account for approximately 0.5% of the total amount of liquidated General Unsecured Claims (*i.e.*, approximately $274,000 of $53.6 million). The ability to avoid making multiple distributions on account of such relatively small claims will significantly reduce the administrative burden and expense on the

Debtors and the Reorganized Debtors and, as such, separate classification and treatment for such Claims is reasonable and appropriate.

*(ii)    The Plan Complies with Sections 1123(a)(7) and 1129(a)(5): Selection of Directors and Officers and Disclosure Related Thereto*

7    Section 9.2 of the Plan set forth the provisions governing the selection of directors and officers of the Reorganized Debtors.  In the Plan Supplement, the Debtors have identified (a) the initial board of directors of the Reorganized Debtors, (b) the officers for the Reorganized Debtors, and (c) the identity of any insiders who will remain employed by the Reorganized Debtors and the terms of their compensation.  Each director has knowledge of and experience with the Debtors' operations, accounts, and finances or, alternatively, has experience in the manufacturing industries or rehabilitation of financially troubled businesses.

8    The provisions of the Plan and the organizational documents of the Reorganized Debtors for the selection of these officers and directors are consistent with the interests of creditors, equity security holders, and public policy.

*(iii)    The Plan Complies with Section 1123(b)(2): Assumption of Executory Contracts and Leases*

9    The executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan are necessary for the Reorganized Debtors to continue operations post-emergence, and, accordingly, the assumption of such contracts is (a) in the best interests of the Debtors, their estates, and creditors, (b) based upon and within the Debtors' sound business judgment, and (c) necessary to implement the Plan.  The cure amounts set forth in the notice filed in accordance with Section 8.4 of the Plan also reflect the Debtors' good faith assessment, based upon a review of the Debtors' books and records, of the amounts, if any, required to cure any defaults under any executory contracts or unexpired leases to be assumed.  The Debtors will have adequate resources to perform their obligations under the contracts and leases that are being

assumed, as demonstrated by the Debtors' financial projections.

### B. Section 1129(a)(2) of the Bankruptcy Code: The Debtors have Complied with the Bankruptcy Code

10  I believe that during the Debtors' Chapter 11 Cases, the Debtors have complied with all provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, and all orders of this Court. The Debtors have complied with the operating guidelines and financial reporting requirements of the Office of the United States Trustee by timely filing all operating reports and financial statements and maintaining and providing proof of insurance. The Debtors have paid all statutory fees required to be paid during the Chapter 11 Cases and have filed all fee statements required to be filed.

11  The Debtors did not solicit acceptances of the Plan from any holders of Claims or Equity Interests prior to the transmission of the Disclosure Statement.

### C. The Plan Complies with Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

12  The Debtors have proposed the Plan with the purpose of reorganizing and expeditiously distributing value to creditors. The Plan is the product of the months of arms-length negotiations among the Debtors, the Plan Investor, the DIP Lenders, the Prepetition Secured Lenders, and their respective advisors. The Plan reflects the culmination of these negotiations and the substantial input received from each party. The releases and exculpation provisions provided in Sections 10.7, 10.8, 10.9, and 10.10 of the Plan have been agreed to in good faith and represent a valid exercise of the Debtors' business judgment, and are fair and reasonable and in the best interests of the Debtors, their estates, and their creditors. In particular, the Plan Investor Release provided in Section 10.9 of the Plan is necessary because of the following:

  (a) The investment made by the Plan Investor pursuant to the terms of the Stock Purchase Agreement is a material and substantial contribution to the Debtors' estates;

  (b) The Plan Investor's contribution is necessary and integral to the success of the Plan because the Plan Investor's investment provides substantial sources of funds to the Debtors' estates and allows substantial distributions to be made to holders of claims;

  (c) The Plan Investor Release is an important part of the Plan because, without it, the Plan Investor would not have agreed to make this substantial contribution to the Debtors' estates; and

  (d) The breadth of the Plan Investor Release is necessary to the Plan and bears a reasonable relationship to the protection of the Debtors' estates.

**D. The Plan Complies with Section 1129(a)(4):  The Plan Provides that Fees and Expenses are Subject to Court Approval**

  13 All payments made or to be made by the Debtors to their retained advisors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Bankruptcy Court.

**E. The Plan Complies with Section 1129(a)(5): Disclosure Regarding Directors, Officers, and Insiders**

  14 As set forth in the discussion of section 1123(a)(7) of the Bankruptcy Code above, the Plan discloses all information required by section 1129(a)(5) of the Bankruptcy Code.

**F. Section 1129(a)(6) is Inapplicable**

  15 The Debtors are not changing any rates that require approval by any governmental agency under the Plan.

**G. The Plans Satisfies Section 1129(a)(7):  The Best Interest Test**

  16 Working with the Debtors' advisors, I supervised the preparation of the liquidation analysis included in Exhibit G of the Disclosure Statement (the "**Liquidation**

**Analysis**"). I believe that the Liquidation Analysis and the assumptions and methodology underlying the Liquidation Analysis are reasonable and that the Liquidation Analysis is a reasonable projection of the values that would be obtained by liquidating the Debtors through a chapter 7 proceeding. The facts and circumstances underlying the assumptions in the Liquidation Analysis have not changed materially since its preparation. Based upon the Liquidation Analysis, the Plan provides each creditor impaired under the Plan a recovery greater than the recovery they would receive in a chapter 7 liquidation of their respective debtor.

      **H.**      **The Plan Satisfies Section 1129(a)(11): The Plan is Not Likely to be Followed by Liquidation or the Need for Further Reorganization**

      17      I am familiar with the financial projections included in Exhibit F to the Disclosure Statement (the "**Projections**"). The Projections, and the assumptions and methodology underlying the Projections, are reasonable and the Projections are the Debtors' best effort to project their future financial performance. The facts and circumstances underlying the Projections have not changed materially since the preparation of the Projections.[2] The Projections demonstrate that the Reorganized Debtors will be able to make all payments required pursuant to the Plan. I further believe that the Reorganized Debtors will be able to repay or refinance any borrowings under the Amended and Restated CSE Secured Loan Agreement and the Amended and Restated CapitalSource Credit Agreement and any and all other indebtedness outstanding as of the Effective Date under the Plan at or prior to the maturity of such indebtedness.

      18      Based upon the foregoing, confirmation of the Plan is not likely to be

---

[2] The Projections do not include the annual management fee of $500,000 that will be paid to the Plan Investor after the Effective Date. However, I believe that such fee does not result in a material change to the Projections and does not affect the Debtors' ability to make payments under the Plan. The management fee amount is less than 2% of the projected EBITDA for 2010 and less than 3% of projected EBITDA for subsequent years.

followed by liquidation or the need for further reorganization.

**I.      The Plan Satisfies Section 1129(a)(12):  Payment of Statutory Fees**

19      It is my understanding that the Debtors have paid all chapter 11 filing and operating fees required to be paid during the Chapter 11 Cases and filed all fee statements required to be filed.  Pursuant to Section 13.5 of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code will be paid on the Effective Date.

**II.     The Plan Satisfies Section 1129(b)'s Cram Down Requirements**

**A.     The Plan Does Not Unfairly Discriminate**

20      As set forth above, the Plan does not provide disparate treatment of any similarly situated Classes where such Class has rejected the Plan or deemed to reject the Plan.

**B.     The Plan is Fair and Equitable**

21      I believe that the Plan is fair and equitable as to Claims in Class 17 (General Unsecured Claims against LRGI).  Creditors in Class 17 (General Unsecured Claims against LRGI) will receive property of a value, as of the Effective Date of the Plan, equal to or greater than their allowed claim.  Specifically, because Class 17 rejected the Plan, holders of Claims in Class 17 (General Unsecured Claims against LRGI) will receive the following distribution:

> (a)     a single Cash payment in an amount equal to 10% of the sum of
>
>> (i)      the amount of the Allowed General Unsecured Claim, and
>>
>> (ii)     interest on such Allowed General Unsecured Claim from the Commencement Date through and including the Effective Date calculated at the federal judgment rate
>
> (together, the "**Allowed Amount**"); and
>
> (b)     an additional nine equal quarterly Cash payments in an amount equal to an amount determined by the Court to be adequate to satisfy in full Allowed Claims in Class 17.

22      I believe that an effective post-Effective Date interest rate of approximately 6.02% with payments stretching over a period of 27 months is adequate to satisfy in full the Allowed Claims in Class 17. The Debtors have proposed this payment structure to create a fixed payment schedule, which avoids the recalculation of interest each time the Debtors make a payment. Because the principal amount owed to unsecured creditors amortizes as quarterly payments are made, the average life of this credit is just 13.5 months.

23      I believe that the post-Effective-Date interest rate of 6.02% provides adequate compensation for any risk of non-payment that a holder of a claim in Class 17 bears during the 27-month repayment period. Based upon the Projections, the risk of non-payment is extremely low. The Projections indicate that, by 2012, the Debtors' projected EBITDA will be $24 million per year, more than *14 times* their annual interest expense. The near-term forecast is similarly robust. For 2010, the Debtors project EBITDA of more than $13 million, more than *five times* annual interest expense. The Debtors are on track to meet this projection, having generated $1.3 million, $1.2 million, and $1.3 million in EBITDA for April, May and June 2010, respectively, and $6.5 million for the first six months of 2010.

24      During the Chapter 11, we have strengthened our operations dramatically. During 2009, we closed our connector seals plant in Vienna, OH, which was generating significant losses, and transferred our connector seal operations to our other two rubber molding plants, where this business is now generating substantial incremental profits and EBITDA. We have also accomplished a complete turnaround at our machining facility in Rochester, New York, which is on track to produce $1.5 million of EBITDA for this year, compared to negative EBITDA of $275,000 for 2009. These achievements have dramatically improved our overall profitability and substantially reduced the risks associated with possible downturns in the

economy.

25    In addition to these operating improvements, Chapter 11 has allowed us to dramatically improve our capital structure and liquidity.  Upon confirmation of the Plan, our debt will be reduced to just $33 million (from over $80 million on the Commencement Date) and, as a result of substantial equity contribution from the Plan Investor and the DIP Lenders, we will have available cash of about $5 million (after providing for estimated fees and expenses of the Chapter 11 and all payments due under the Plan on or about the Effective Date.  I believe that the amount of debt the Debtors will have upon the consummation of the Plan is very manageable and that the new capital structure will put the Debtors in an excellent position to enhance their profitability by adding new business.

26    The Creditors' Committee has argued that the appropriate post-Effective-Date interest date for Class 17 Claims should be not less than the interest rate on the most junior piece of the Debtors' amended and restated Term Loan B, or 15.5%.  I believe that this argument is incorrect for the following reasons:

   a.   The rates on the restructured secured debt were the result of negotiations between the secured lenders and the Plan Investor, who, in an effort to accelerate the Debtors emergence from chapter 11, made every effort to obtain a consensual agreement. As a result, I believe that the negotiated rates are significantly above the market rates for a company with the credit characteristics of the Reorganized Debtors.  Given the Debtors' strong operating performance, there is an excellent possibility that the secured debt will be refinanced at lower rates after the Debtors leave chapter 11 and the uncertainty of court proceedings is behind us.

   b.   The interest rates on the restructured secured debt are subject to reduction by as much as 150 basis points based upon the financial performance of the Reorganized Debtors; if the Reorganized Debtors meet the 2010 forecast contained in the Disclosure Statement (and they are currently well ahead of that forecast through June), the rates will be reduced by 150 basis points.

   c.   Although the deferred payments to holders of Allowed Claims in

    Class 17 are not backed by collateral, their payment schedule provides that the deferred payments will be satisfied in full before the Term Loan B is scheduled to receive any principal payments at all and, in fact, only about 25% of the entire secured debt will have been paid by the final maturity date of the deferred payments that will be made to Class 17. As a result, the great bulk of the credit risk falls on the secured lenders.

  d. The deferred payments payable to Class 17 are unsecured but they are not subordinated to the secured debt. As a result, the only circumstances in which the secured lenders could possibly prevent the deferred payments from being satisfied ahead of them is in the event of a covenant default; however, the covenants contained in the secured debt are extremely liberal and the likelihood of a default is extremely low. The table below sets forth the pro forma covenant compliance for the Reorganized Debtors, assuming the Plan had been consummated prior to January 1, 2010, based upon their actual financial results for the first six months of 2010 and their forecast for the full year 2010.

|  |  | Pro Forma Calculation | |
| --- | --- | --- | --- |
| Covenant | Limitation | Six Months Ended June 30, 2010 (annualized) | Twelve Months Ending December 31, 2010 |
| 1. Fixed Charge Coverage | Not less than 1.0x | 1.2x | 1.2x |
| 2. Leverage Ratio | Not more than 4.0x | 2.0x | 1.5x |
| 3. Minimum EBITDA | Not less than $8 million | $12.9 million | $14.2 million |

  27 Based upon the foregoing, I believe that the proposed post-Effective Date interest rate of 6.02% provides adequate compensation to holders of Class 17 Claims for the risk of non-payment and, consequently that, the Plan provides those holders with value at least equal to their Allowed Claims as of the Effective Date of the Plan.

### III. The Plan Satisfies Section 1129(d):  Avoidance of Taxes and the Securities Act

  28 The Plan has not been filed for the purpose of the avoidance of taxes or the application of section 5 of the Securities Act of 1933.

  29 In light of the foregoing, I believe that confirmation of the Plan is appropriate, is in the best interests of all parties in interest and should, therefore, be granted.

US_ACTIVE:\43439706\09\26690.0008    11

30    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of July, 2010.

BY:   /s/ Michael A. Lubin
Michael A. Lubin
Chairman
Lexington Precision Corporation
and Lexington Rubber Group, Inc.