UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
    In re                                   :        Chapter 11
:
LEXINGTON PRECISION CORP., et al.,    :        Case No. 08-11153 (MG)
:
:        (Jointly Administered)
                               Debtors.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# DECLARATION AND STATEMENT OF KURT L. HARAS IN SUPPORT OF THE DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AS AMENDED

STATE OF NEW YORK    )
                               )    ss:
COUNTY OF NEW YORK    )

KURT L. HARAS, under penalty of perjury, declares and says:

1. I am a Director at W. Y. Campbell & Company ("Campbell"), which is located at One Woodward Avenue, Detroit, Michigan.

2. Campbell is the financial advisor to Lexington Precision Corporation and Lexington Rubber Group, Inc. (collectively, "Lexington" or the "Debtors") pursuant to their Chapter 11 bankruptcy cases.

3. I submit this affidavit in support of the implied interest rate used to calculate the value of the deferred payments to be received by the Class 17 trade creditors pursuant to the Debtors' Fourth Amended Joint Plan of Reorganization (the "Deferred Payments").

4. In evaluating the implied interest rate of 6.02 %, I considered a number of factors including those specific to the Debtors as well as information available from various sources, including recent

bond issues with maturities less than three years derived from Capital IQ, interest rates published by the Federal Reserve, and lending statistics from third-party lending sources. In addition, I also relied on my transaction and financing experience in working with companies similar in size to Lexington. My conclusions also take into account my detailed personal knowledge of Lexington's business as a result of having worked with Lexington since 2007.

5. I also considered several factors in evaluating the risk associated with Lexington meeting its obligations in connection with the Class 17 payment schedule, including Lexington's history in servicing its debt obligations, its cash flow generation, the amount and terms of funded debt at emergence, liquidity available at emergence, capitalization of the business, and its access to capital.

**Ability to Meet Debt Obligations Post Emergence**

a. Throughout the Chapter 11 Cases, Lexington has remained current on its principal and interest payments pursuant to its credit agreement with its senior debt providers. The company has remained current on these obligations despite having incurred significant bankruptcy reorganization costs, having endured unfavorable conditions in the broader economy generally and the automobile industry in particular, and having been precluded from pursuing many new business opportunities due to its Chapter 11 status. In addition, in November 2008, the company also suffered a fire that disrupted operations at one of its key manufacturing facilities. Since April 1, 2008, Lexington has reduced the principal balance of its senior debt by approximately $7.3 million. At emergence, the company's total funded debt (including the $3.5 million of deferred payments due to the Class 17 trade creditors) will be less than the company's senior debt balance when it filed for Chapter 11, and its subordinated debt, which aggregated to over $50 million with accrued interest, will be completely eliminated. With improving conditions in the broader economy and in the company's served markets, coupled with its recent financial

2

performance and absent the burden of funding bankruptcy reorganization costs, I believe Lexington will have sufficient cash flow to meet all its future debt obligations, including the Deferred Payments.

**Cash Flow Generation**

b. Lexington has a history of strong cash flow generation and superior profit margins. The company has weathered significant turbulence in the broader economy and its served markets. In the face of these headwinds, the company has reduced employee staffing levels and consolidated facilities in order to maintain its cash flow despite significant sales declines. These actions have positioned the company to increase earnings and cash flow as automotive production volumes improve and as it expands its business with new and existing customers. For the six month period ended June 30, 2010, the Lexington's earnings before interest, taxes, depreciation and amortization ("EBITDA"), before bankruptcy reorganization costs, was approximately $6.5 million. Based on the company's financial performance for the first six months of 2010 and its expected financial performance for the remaining six months of the year, the company is on track to exceed its 2010 consolidated EBITDA forecast of approximately $13.8 million, which represents a 140 % increase in EBITDA compared to 2009. As a percentage of sales, Lexington's free cash flow (defined as EBITDA minus capital expenditures) for the full year of 2010 (which includes six months of actual results) will be approximately 15%, which I consider to be exceptional for a manufacturing business like Lexington. I believe that the company's strong earnings performance and free cash flow generation significantly reduce the risk of default associated with the company fulfilling all of its obligations, including the Deferred Payments.

3

**Balance Sheet Leverage**

    c.   Through the Chapter 11 reorganization process, Lexington will have reduced its total funded debt by approximately $53 million. Immediately following the company's emergence from the Chapter 11 Cases, it will have approximately $33 million of outstanding debt and $5 million of available cash on hand. With net debt of just $28 million and forecasted consolidated 2010 EBITDA of $13.8 million, net debt to EBITDA will be approximately 2.0x, which represents modest leverage for a company like Lexington that has modest capital spending requirements and generates substantial free cash flow. In my experience, a 2.0x net debt-to-EBITDA ratio, coupled with low capital spending, indicates that Lexington should have little difficulty supporting the level of debt contemplated in its Fourth Amended Joint Plan of Reorganization.

**Capitalization / Access to Capital**

    d.   As part of its reorganization, Lexington is raising substantial new cash equity from a large private equity fund and its current DIP lenders. This investment will provide Lexington with additional working capital to service its obligations and to fund future growth. By partnering with a large private equity fund, Lexington will have access to additional capital that historically was not available to the company.

6. In evaluating the implied interest rate required to satisfy the Class 17 general claims, I considered the following: (i) pricing of Lexington's secured debt relative to the market; (ii) the terms of the secured debt, with particular emphasis on financial covenants; (iii) the market for unsecured debt; (iv) corporate bond rates for investment-grade bonds with maturities of three years or less and (v) credit spreads for investment-grade bonds with short-term maturities.

**Pricing of Lexington's Senior Debt is in Excess of Market Rates**

a.  Based on my capital formation experience, Lexington's exit financing with its senior lenders commands a significant premium to interest rates for similar sized businesses and, consequently, is not a valid basis for comparison. This pricing is due in large part to the new investor's desire to reach a consensual deal with the current lenders and to distance Lexington from Chapter 11 before seeking a more attractive financing package. For example, Lexington's revolving credit facility and equipment term loan carries an interest rate of approximately 8.0 % and the interest rates on its Term Loan A and Term Loan B real estate loans, range from 9.5 % to 15.5 %. Based on my experience and recent discussions with various lending institutions, the interest rates on these loans are substantially higher than the rates that would be available in the market for a company with Lexington's credit statistics. Based upon those discussions, I believe the rates are above market by approximately 150 to 700 basis points.  Once Lexington emerges from bankruptcy and assuming continued strong financial performance, it is reasonable to believe that the company will have success in refinancing its debt at a significantly lower cost of capital.

Another reason that the rates on the secured loans are not a valid basis for comparison is the difference in the amortization periods of the company's secured debt and Deferred Payments. In particular, the senior debt has a substantially longer amortization period (e.g., monthly principal payments will be less than 1% of the secured loan principal balance) than the Deferred Payments. This structure favors the Class 17 trade creditors in that the company can continue to make principal payments on Deferred Payments so long as it remains in compliance with the bank covenants. An analysis of these covenants, based on Lexington's current financial performance, indicates that it has substantial room relative to these covenants and that there is little likelihood that the company will be out

5

of compliance during the period the Deferred Payments will be outstanding. Under this structure, the Deferred Payments will be paid in full prior to the maturity of the senior debt. The current agreement between the company and the lenders calls for only 25% of the senior debt principal balance to be paid by the final maturity of the Class 17 trade debt. Taking all of these factors into account, I do not believe that using the company's senior debt rates of interest as a benchmark is an appropriate method in determining the appropriate interest rate for the Deferred Payments.

### Methods Applied to Analyze the Interest Rate

b. One of the challenges in determining a market-based rate of interest is the lack of an active market for trading issues of unsecured debt for small manufacturing companies. It is my conclusion that there lacks an efficient market where pricing on small, unsecured debt issues for small manufacturing companies is ascertainable. Given the lack of market data for such issues, I approached the question of the appropriate interest rate for the Deferred Payments by determining pricing for both unsecured debt and for U.S. Treasury securities with maturities similar to the Class 17 trade debt. I then applied a risk premium to each of these types of securities to adjust for the relative risk related to Lexington as compared to larger corporate issuers and as compared to the interest rate applied to government securities.

### Recent Corporate Bond Issues

i. I reviewed a number of recent corporate bond issues with short term maturities that possessed similar characteristics to the Deferred Payments. Certain criteria used to screen bond issues over the last twelve months include those debt instruments that (i) paid a fixed coupon, (ii) were defined as "investment-grade" debt, and (iii) were unsecured notes. This initial search from Capital IQ generated approximately sixty bond issuances that occurred over the last twelve months.

This search was further refined to exclude finance companies along with those issues where the maturity exceeded three years. Finance related companies, such as commercial banks or specialty finance companies, were excluded because of the size of the issuers, size of the debt issues and dissimilarity of their operations relative to Lexington. Ultimately, 20 bond issues were selected (see Exhibit A). On average, these bond issues had a maturity of two to three years and an interest rate of 3.0%. Relative to the average coupon of these 20 bond issues, the implied interest rate of 6.02 % on the Deferred Payments represents a premium of more than 300 basis points over the interest rate derived from those bond issues presented in Exhibit A. In addition, the average life of the Deferred Payments is substantially less than three years, and there are quarterly principal and interest payments, whereas the bond issues referenced in the Capital IQ search are structured as balloon payments where the repayment of principal occurs at maturity. I believe the rate premium of more than 300 basis points is more than adequate compensation for the risk of the Deferred Payments.

**Build Up Approach**

ii. The other approach that I utilized to evaluate the appropriateness of the Class 17 interest rate was to construct a cost of capital using the interest rates on U.S. Treasury Notes with similar maturities and adding a risk premium based upon credit spreads on corporate bond issues. As of July 2, 2010, the interest rate on a two-year Treasury Note (which approximates the final maturity of the Deferred Payments) was 0.63 % and the rate on the one-year Treasury Note (which approximates the average life of the Deferred Payments) was 0.31%. These rates would be considered risk-free rates because Treasury securities are viewed by investors as having no default risk. A security that is risk free provides the

7

Pg 8 of 11

investor with a guaranteed rate of return. The credit spread data I reviewed was dated July 2010, was categorized by maturity, and was rated using a system developed by the National Association of Insurance Commissioners (NAIC). A number of factors are considered in estimating a risk premium/credit spread for a corporate bond, including default risk, total leverage and payment history. While there is no formal definition or statistics that guide the NAIC ratings, conversations with traders active in these markets indicate that a company with Lexington's credit statistics would be likely be assigned an NAIC rating of "2." The credit spread for corporate bond issues with a five-year maturity or less and a "2" rating by NAIC was 175 to 325 basis points. By adding the aforementioned credit spreads to the one and two-year Treasury Note rates, the total cost of capital under this build-up approach yields an interest rate that ranges from 2.1% to 3.6% relative to the one-year Treasury and from 2.4% to 3.9% relative to the two-year Treasury. This indicates clearly that the implied interest rate of 6.02% on the Deferred Payments more than adequately compensates the Class 17 trade creditors for the risk on the Deferred Payments.

7. Therefore, based on the above factors, I believe the implied interest rate of 6.02% results in the Class 17 trade creditors receiving at least the full amount of their Claims as of the Effective Date.

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2010, at Detroit, Michigan.

8

/s/ Kurt L. Haras
Kurt L. Haras
Director
W. Y. Campbell & Company

10

**Exhibit A – Selected Bond Issuances Completed in the Last 12 Months**

| No. | Offering Date | Maturity Date | Issuer | Ticker | Coupon Rate (%) | Offering Amount | TTM Sales | TTM EBITDA | NTM Sales | NTM EBITDA | Total Debt | Cash | Net Debt | Net Debt/ TTM EBITDA | Net Debt/ NTM EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Aug-04-2009 | Aug-15-2012 | The Dow Chemical Company | NYSE:DOW | 4.9 | $1,250 | $46,584 | $3,572 | $47,100 | n/a | $24,268 | $2,648 | $21,620 | 6.1x | n/a |
| 2 | Aug-20-2009 | Jul-15-2012 | MidAmerican Energy Holdings Company | - | 3.2 | $250 | $11,791 | $3,804 | n/a | n/a | $20,228 | $885 | $19,343 | 5.1x | n/a |
| 3 | Aug-28-2009 | Apr-15-2012 | Berkshire Hathaway Finance Corporation | - | 4.0 | $980 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4 | Sep-09-2009 | Sep-14-2012 | Agilent Technologies Inc. | NYSE:A | 4.5 | $250 | $4,795 | $604 | $4,430 | $719 | $2,153 | $1,499 | $654 | 1.1x | 0.9x |
| 5 | Sep-21-2009 | Oct-01-2012 | GATX Corp. | NYSE:GMT | 4.8 | $300 | $1,172 | $545 | $1,109 | $634 | $2,854 | $35 | $2,818 | 5.2x | 4.4x |
| 6 | Oct-13-2009 | Oct-15-2012 | Anheuser-Busch InBev Worldwide Inc. | - | 3.0 | $1,500 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Oct-14-2009 | Feb-01-2012 | Verizon Wireless Capital LLC | - | 5.3 | $750 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | Nov-09-2009 | Nov-15-2012 | Praxair Inc. | NYSE:PX | 1.8 | $400 | $8,952 | $2,195 | $9,804 | $2,953 | $5,235 | $70 | $5,165 | 2.4x | 1.7x |
| 9 | Nov-17-2009 | Nov-20-2012 | Boeing Co. | NYSE:BA | 1.9 | $700 | $63,008 | $1,549 | $66,602 | $6,513 | $11,038 | $6,446 | $4,592 | 3.0x | 0.7x |
| 10 | Nov-18-2009 | Jun-01-2012 | Fortune Brands Inc. | NYSE:FO | 3.0 | $400 | $6,176 | $993 | $6,726 | $1,412 | $4,477 | $260 | $4,216 | 4.2x | 3.0x |
| 11 | Dec-14-2009 | Dec-21-2011 | Dr Pepper Snapple Group, Inc. | NYSE:DPS | 1.7 | $400 | $5,551 | $1,294 | $5,613 | $1,277 | $3,057 | $282 | $2,775 | 2.1x | 2.2x |
| 12 | Dec-14-2009 | Dec-21-2012 | Dr Pepper Snapple Group, Inc. | NYSE:DPS | 2.4 | $450 | $5,551 | $1,294 | $5,613 | $1,277 | $3,057 | $282 | $2,775 | 2.1x | 2.2x |
| 13 | Jan-06-2010 | Aug-01-2012 | CareFusion Corporation | NYSE:CFN | 4.1 | $250 | $3,653 | $675 | $3,949 | $700 | $1,392 | $970 | $422 | 0.6x | 0.6x |
| 14 | Feb-04-2010 | Feb-10-2012 | Berkshire Hathaway Inc. | NYSE:BRK.A | 1.4 | $600 | $112,493 | $14,740 | $114,443 | n/a | $152,529 | $30,558 | $121,971 | 8.3x | n/a |
| 15 | Feb-04-2010 | Feb-11-2013 | Berkshire Hathaway Inc. | NYSE:BRK.A | 2.1 | $1,400 | $112,493 | $14,740 | $114,443 | n/a | $152,529 | $30,558 | $121,971 | 8.3x | n/a |
| 16 | Feb-05-2010 | Oct-15-2012 | Anheuser-Busch InBev Worldwide Inc. | - | 3.0 | $1,496 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 17 | Mar-04-2010 | Mar-15-2013 | Baxter International Inc. | NYSE:BAX | 1.8 | $300 | $12,562 | $3,594 | $13,537 | $4,039 | $4,151 | $2,811 | $1,340 | 0.4x | 0.3x |
| 18 | Mar-29-2010 | Apr-15-2013 | PSEG Power LLC | - | 2.5 | $300 | $7,233 | $2,415 | n/a | n/a | $3,324 | $64 | $3,260 | 1.3x | n/a |
| 19 | Jun-10-2010 | Jun-14-2013 | Maxim Integrated Products Inc. | NasdaqGS:MXIM | 3.5 | $300 | $1,826 | $568 | $2,280 | $786 | $0 | $859 | ($859) | n/a | n/a |
| 20 | Jun-15-2010 | Jun-15-2012 | Teva Pharmaceutical Finance III, LLC | - | 1.5 | $1,000 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| | | | **Average** | | **3.0** | **$664** | **$26,923** | **$3,506** | **$30,434** | **$2,031** | **$26,019** | **$5,215** | **$20,804** | **3.6x** | **1.8x** |
| | | | **Median** | | **3.0** | **$425** | **$7,233** | **$1,549** | **$6,726** | **$1,277** | **$4,151** | **$885** | **$3,260** | **2.7x** | **1.7x** |

Source: Capital IQ

Footnotes:
NTM - next twelve months
TTM - trailing twelve months
EBITDA - earnings before interest, taxes, depreciation and amortization