1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    --------------------------------X
                                     :   08-11153
4    In re:                          :
                                     :
5       LEXINGTON PRECISION CORP.    :   May 26, 2010
                                     :
6                         Debtor.    :   One Bowling Green
     --------------------------------X   New York, New York
7

8          TRANSCRIPT OF HEARING ON DEBTOR'S DISCLOSURE STATEMENT
                     AND INTERIM FEE APPLICATIONS
9             BEFORE THE HONORABLE SHELLEY C. CHAPMAN
                     UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:            ADAM STROCHAK, ESQ.
12                              CONRAY C. TSENG, ESQ.
                                Weil, Gotshal & Manges
13                              767 5th Avenue
                                New York, NY 10153
14
     For the Committee:         JONATHAN I. LEVINE, ESQ.
15                              Andrews Kurth
                                450 Lexington Avenue
16                              New York, NY 10017

17   For Wilmington Trust:      GAYLE EHRLICH, ESQ.
                                Sullivan & Worcester, LLP
18                              One Post Office Square
                                Boston, MA 02109
19
     For Capital Source:        AARON R. CAHN, ESQ.
20                              Carter, Ledyard & Milburn, LLP
                                2 Wall Street
21                              New York, NY 10008

22   For Webster Bank:          MICHAEL P. TURNER, ESQ.
                                Day Pitney, LLP
23                              PO Box 1945
                                Morristown, NJ 07962
24
     Court Transcriber:         MARY GRECO
25                              TypeWrite Word Processing Service
                                211 N. Milton Road
                                Saratoga Springs, New York  12866

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

2

1          THE CLERK:   <u>Lexington Precision Corporation</u>.

2          THE COURT:  Good morning.

3          MR. STROCHAK:  Good morning, Your Honor.  Adam

4    Strochak; Weil, Gotshal and Manges for the debtors.  With me is

5    my associate, Conray Tseng and Margaret Mills is behind me.

6    Also present today is Michael Lubin who's the chairman of the

7    debtors.

8          MR. LEVINE:  Good morning, Your Honor.  John Levine

9    of Andrews Kurth on behalf of the official committee of

10   unsecured creditors.

11         MS. EHRLICH:  Gail Ehrlich of Sullivan Worcester on

12   behalf of Wilmington Trust in its capacity as indentured

13   trustee.

14         MR. CAHN:  Good morning, Your Honor.  Aaron Cahn;

15   Carter, Ledyard and Milburn for Capital Source Finance.   With

16   me is Katie Stenberg from Waller Lansden, a firm in Nashville.

17         MR. TURNER:  Michael Turner with Day Pitney for

18   Webster Bank.

19         THE COURT:  All right.  Mr. Strochak?

20         MR. STROCHAK:  Thank you, Your Honor.

21         THE COURT:  Before you start, just let me make sure

22   that we have everything.  I think we do have everything.  Late

23   last night I believe the committee filed a response to the

24   debtor's omnibus reply so we have the objection of the

25   committee, we have the objection of the indentured trustee, we

3

1   have the debtor's omnibus reply, and we have the committee's

2   additional response that included a draft of a proposed letter.

3   So that's the state of what we have.  I think we also received

4   a revised order that was filed at docket 886.

5         MR. STROCHAK:  Yes.  I believe that's everything,

6   Your Honor.

7         THE COURT:  Okay.

8         MR. STROCHAK:  This is Adam Strochak from Weil

9   Gotshal for the debtors.

10        Let me start just very briefly with a few

11  introductory remarks if I could and then I will certainly take

12  my guidance from you as to how you would like to proceed today.

13  We have two matters on the agenda, obviously, the disclosure

14  statement and the fee applications.  The disclosure statement

15  and the plan really represents in our view a tremendously

16  successful outcome in this case and we're very pleased to be

17  here with a plan of reorganization that is largely, although

18  not completely, consensual at this point.

19        I know this case was transferred from Judge Lifland

20  and I know you're received a lot of paper on this, but just a

21  very few words by way of background.

22        Last fall, you know, this case was in a very

23  precarious situation.  We had a plan proposed by the secured

24  creditors that effectively would have liquidated the company.

25  We thought that was a terrible outcome.  Management, Mr. Lubin

4

1   and the rest of the team have worked, you know, extraordinarily

2   hard to attract a plan investment.  We have a plan investment

3   from a very substantial sponsor which will come in largely as

4   equity.  It's up to a $22 million investment.  It really will

5   enable this company to fix the balance sheet problem that

6   caused it to file in April of 2008 in the first place and

7   really put the company on the right foot and to be able to

8   proceed and hopefully be very, very successful going forward.

9          The plan enjoys the support of the senior secured

10  lenders.  We think we'll be able to get substantial support

11  from the trade creditors because it provides for substantial

12  recoveries for the trade both at the parent company and at the

13  subsidiary.  I think as you'll hear today, and as I know you've

14  read in the papers, you know, the fundamental issue with the

15  committee seems to be the recovery for the trade down at the

16  subsidiary debtor.  Our plan proposes almost 107% recovery over

17  a little more than two years.  We think that's a substantial

18  result and an excellent outcome for this class and we hope that

19  they will vote to accept it.  It also offers a cash out option

20  so they can cash out immediately at 51 cents on the dollar if

21  they'd rather take the cash now and not wait.

22          We don't think, you know, paying claims over time is

23  going to present any feasibility issues.  Obviously, this is

24  not a hearing to consider that issue but we're comfortable with

25  where the company is with the cash flow that it's likely to

5

1   have based on its projections that it will be able to satisfy

2   those claims over time.  So we believe there's really an

3   outstanding result for all creditors.

4          You know, the unfortunate part of the story here is

5   that there won't be a return for equity.  When we filed this

6   case, we thought that this would be a solvent company, we'd be

7   able to fix the debt overhang and be able to have a return for

8   equity.  We're not able to achieve that.  The market simply did

9   not -- we just couldn't get a buyer or an investor at the

10  valuation that we thought the company ultimately, you know,

11  ought to be valued at and it's just the realities of the

12  economic climate I think.

13         THE COURT:  Am I remembering correctly that the

14  amount of the claims in class 17, and that's the class that

15  everyone's arguing over -- I believe I read somewhere that the

16  amount of the claims is in the 4 to $5 million range.  Is that

17  correct?

18         MR. STROCHAK:  That's correct, Your Honor.  Yeah,

19  that's correct.

20         So that really is just by way of a very brief summary

21  where we stand today.  We're very pleased to be here and we

22  would like very much to move the process forward, put this plan

23  out for a vote and hopefully by mid-summer, have a confirmation

24  order and be able to take this company out of Chapter 11 after

25  a relatively lengthy stay, certainly longer than we

6

1    anticipated.

2         I'm happy to answer any questions you might have.

3    I'm happy to take my guidance from you as to how you would like

4    to proceed through the hearing.

5         THE COURT:  Yes.  Let's try to figure out what's

6    really left because in my view, and it was crystallized by the

7    filing that the committee made this morning that in response to

8    the original round of objections the debtor made certain

9    revisions to the disclosure statement that in my view satisfied

10   or dealt with the objections.

11        So as I'm sitting here now, and I welcome anyone to

12   tell me that they have a different view, the only open item is

13   what we do about the additional disclosure, if any, for the

14   committee's view of the interest rate for the post confirmation

15   payments class 17.

16        MR. STROCHAK:  I think, Your Honor, there's probably

17   one other issue.  I don't believe that the indentured trustee

18   has told us that we satisfied their objection.  We thought the

19   changes we made to the plan would do it but last they informed

20   us they still had an objection that they wanted to prosecute.

21   So I think we'll have to address that as well.

22        THE COURT:  All right.  We can hear from the

23   indentured trustee.  But other than that, I'm going to look at

24   Mr. Levine, is there any other issue that remains open in your

25   mind from the committee's standpoint?

7

1          MR. LEVINE:  Your Honor, it's just disclosure

2  regarding our position, the class 17 interest rate.  The

3  debtor's revision to the disclosure statement took care of

4  pretty much everything else.

5          THE COURT:  All right.

6          MR. LEVINE:  Subject to indentured trustee, subject –

7  –

8          THE COURT:  All right.  Well, why don't I hear from

9  the indentured trustee and then I'll allow you to make brief

10 arguments with respect to the letter or some other approach to

11 deal with the class 17 issue.

12         MR. STROCHAK:  Thank you, Your Honor.

13         MS. EHRLICH:  Hello, Your Honor.  Gayle Ehrlich on

14 behalf of the indentured trustee.

15         The debtor has endeavored to impose a procedure for

16 determination of the indentured trustee's and its counsel's

17 fees and expenses, and that procedure is unsupported by the

18 indenture.  It is cumbersome, expensive, and unnecessary and I

19 believe we can propose a simpler solution that I would assume

20 would be acceptable to everyone.

21         The indentured trustee will first exercise its rights

22 under the charging lien which makes sense in this case because

23 most of the bondholders will become equity only after that and

24 if to the extent unsatisfied for any reason will the indentured

25 trustee look to the debtors.  That way, Your Honor, we do not

8

1   have to file an application with the Court, have it heard 17

2   days -- have to file it 17 days before confirmation, and get

3   the Court involved in matters that are really third party

4   matters.   The charging liens and rights under the indenture

5   that belong between the indentured trustee and the bondholders.

6          The language we would propose that would be included

7   is nothing in the plan shall affect the charging lien or the

8   indentured trustee's right to administrative expense claim.

9   Payment from debtors providing such claim shall be filed by the

10   administrative expense claim bar date.

11          MR. STROCHAK:  I'm not sure I understand the

12   implications of that.

13          MS. EHRLICH:  We will first exercise our rights under

14   the charge lien.  If in the extent that claims are not

15   satisfied, then we will file administrative expense bar date

16   claim.

17          MR. STROCHAK:  That'll just reduce recovery to the --

18   the cash recover to the bondholders.

19          MS. EHRLICH:  In filing a fee application here 17

20   days before the -- filing a fee application here 17 days before

21   confirmation is an expense, it's cumbersome, and it doesn't

22   address the fact that there's potentially 120 days at least

23   between when we file our fee applications and when they're

24   considered.

25          And in this case, Your Honor, where the bondholders,

9

1   there's an identity, a strong identity between who the

2   bondholders are in this case and who the shareholders of this

3   company are going to be, it makes perfect sense for us to

4   exercise our rights under the indenture and that's how we would

5   like to proceed.

6            THE COURT:  All right.  Well, I have to confess that

7   I'm a little confused.  I didn't think that we were talking

8   about -- my impression from what was filed was that I would

9   make a determination at confirmation as to what the fees are

10  and that there's no 120 days.  But listening to both of you I

11  feel like there's a little bit of ships passing in the night

12  here as to what the real issues are.  I'm not sure that we

13  can't have the language that Ms. Ehrlich is putting forward but

14  also having the applications filed which allow me to make a

15  determination on the reasonableness of the fees.

16            MS. EHRLICH:  Your Honor, we, with all due respect to

17  the Court, we'd prefer that the Court not even be involved, and

18  I think the Court would prefer not to be involved I assume in

19  third party matters.  The reasonableness of these fees under

20  the charging lien is an issue between the bondholders and the

21  indentured trustee.  It doesn't fall under the jurisdiction of

22  the Court.  The only matter that would fall under the

23  jurisdiction of the Court is if we were looking to the debtor

24  for fees.  In that case, we're only looking to the debtor for

25  fees as a fallback position if and to the extent the charging

10

1  lien doesn't satisfy our claims.

2          MR. STROCHAK:  Our view, Your Honor, is that we would

3  much prefer to have this wrapped up all at once at the

4  confirmation hearing rather than have to deal with it after the

5  fact.

6          THE COURT:  Isn't what Ms. Ehrlich is suggesting is

7  not inconsistent with that?  What I'm hearing is that it will

8  be wrapped up at the confirmation, by the confirmation hearing.

9  Is that not correct?

10          MS. EHRLICH:  It will be wrapped up to the -- it will

11 be wrapped up by the effective date because there will be a

12 distribution to the bondholders.  The charging lien will be

13 exercised.  And if and to the extent for whatever reason the

14 charging lien doesn't satisfy the claims, and it's hard to

15 imagine how it won't, but if and to the extent it doesn't, we

16 will timely file an administrative expense claim as provided

17 for every other administrative creditor in this case.

18          THE COURT:  But here's my problem.  To the extent

19 that there's a determination of the amount of the fees and that

20 there's a result that the charging lien is not adequate, then a

21 claim comes into the estate and at that point the stakeholders

22 and the Court have not had an opportunity to weigh in on the

23 amount of the fees.  So yes, it's between the noteholders and

24 the trustee but hypothetically if the fees are quite large,

25 larger than I might find would be reasonable, then there's the

11

1   potential for a negative impact on the estate, so --

2          MS. EHRLICH:  But we would follow the procedure that

3   is set forth in the plan for every other administrative claim

4   where we have to file our claim within 60 days following

5   confirmation with a 30 day period for everyone to object.

6          THE COURT:  But at that point, what's my ability to

7   say that the amount of the fees that went against the charging

8   lien were excessive?

9          MS. EHRLICH:  Well, Your Honor, with all due respect,

10  we don't believe that falls within the jurisdiction of the

11  Court because the charging lien is a lien by the trustee on the

12  claims and rights of third parties, not on the claims and

13  rights of this debtor.

14         THE COURT:  Yes, I understand that.  However, it's

15  not that I'm suggesting there would be mischief, but because

16  the determination of one impacts the potential amount of the

17  claim against the estate, I have a concern.

18         MS. EHRLICH:  I'm not understanding how that concern

19  would be affected unless we aren't satisfied through our

20  charging lien.

21         THE COURT:  Yes, that's exactly right.

22         MS. EHRLICH:  And then, Your Honor, you have every --

23  if we're not satisfied through our charging lien, then we look

24  to the estate and the Court has every right to exercise its

25  jurisdiction over us but only if it's not satisfied.  And we

12

 1  have every reason to believe in this case, Your Honor, where

 2  our charging lien is not very high and we have turned to this

 3  debtor and we have presented our fees and we have received no

 4  response from them, that the fastest and cheapest way for us

 5  all to proceed is for us to exercise our rights under the

 6  charging lien.  If for whatever reason, which is unimaginable,

 7  the claims aren't satisfied through that way, then we will look

 8  to the Court and make full disclosure and the Court can rule

 9  for or against it.

10       THE COURT:  Well, and I'll let Mr. Strochak respond,

11  but as long as it's clear that in that unlikely event if the

12  indentured trustee were to file an administrative claims I

13  would have the ability to look at what was submitted against

14  the charging lien and to say that amount was too much, and

15  therefore, I'm not going to allow the administrative claim.  I

16  just need to be able to protect the estate against what I view

17  as excessive charges.

18       MS. EHRLICH:  Absolutely.  If it comes down to a

19  claim against the estate, understandably the Court has the

20  right to exercise its power.

21       THE COURT:  Right.

22       MR. STROCHAK:  I have a couple of concerns, Your

23  Honor.  First of all, there's an election for the bond class

24  whether to take stock or cash.  The plan investor has about 70%

25  of the class.  A substantial portion of the class is held by

13

1   Mr. Lubin and affiliates.  So you know, the vast majority of

2   the bond clients are going to convert into equity.

3              I need to be assured, first of all, that the

4   indentured trustee is not going to impose a lien on the shares

5   that would get distributed and hold them up.  They're not

6   liquid.  They won't trade on an exchange.  So if they're going

7   to hold up a distribution of all those shares pending

8   resolution of their issues, I really would much rather have

9   them resolved at confirmation so we can make distributions

10  without fear that there'll be any delay in distributions of

11  either shares or whatever cash might get distributed.  So

12  that's one issue.

13             THE COURT:  So let's get the answer to that one.

14             MS. EHRLICH:  The answer is this is -- we will have

15  to proportion the charging lien against all distributions.  And

16  this is why I reached out to Weil Gotshal over three weeks ago

17  to discuss this.  But because of this very problem the

18  indentured trustees charging lien should not be compromised.

19  There will have to be some liquidation of stock.  We're willing

20  to discuss this.  We've tried to discuss it but we haven't

21  received any response other than go before the Court 17 days

22  before and somehow compromise your charging lien.

23             MR. STROCHAK:  That's the reason for the proposal

24  that we put in the plan and why we think it makes so much

25  sense.  I mean holding up the stock distributions makes no

14

1   sense here.  It doesn't do anyone any good.  It's not a

2   tremendous of attorneys fees and indentured trustee fees, but

3   it's substantial.  It's a couple of hundred thousand dollars.

4   We, based on the information that counsel provided, couldn't

5   come to the conclusion that we could agree to all of it.  I'm

6   sure we're going to agree to some of it.  There may be no

7   dispute at all.  We haven't received any backup for $80,000.00

8   in expenses of the indentured trustee itself.  Counsel has

9   provided information regarding her billings on the case and,

10  you know, we understand them, but we think it's a substantial

11  amount of money.  We're willing to look at it.  Hopefully we

12  can resolve it and won't need to have any contested proceeding

13  at a confirmation hearing.  But we think setting it up in a way

14  that the Court can simply resolve it all at once in connection

15  with confirmation, if there is a dispute when we get there,

16  makes the most sense.  It will benefit every interest in this

17  case.  It seems to me it poses no downside whatsoever for the

18  indentured trustee.

19        THE COURT:  The more I listen to this argument the

20  more it's occurred to me that this is something that is more

21  appropriate for the confirmation hearing.  So I'm inclined to

22  let things remain the way they are, to go with the debtor's

23  proposal, to allow you to have more time to work it out.  And

24  if it isn't worked out by confirmation, you can raise these

25  issues.  Your charging lien is your charging lien.

15

1          MS. EHRLICH:  that is not the way the proposed

2    language reads at this point, Your Honor.  It actually

3    eliminates our charging lien the way they've proposed it.

4          In fact, Your Honor, there's a 17 -- we have to file

5    our fee application in 17 days.  There's no date by which those

6    fee applications have to be objected to.  The standard that the

7    Court is asked to apply is not clear.  Who gets to object is

8    not clear.  And with all due respect, Your Honor, there is a

9    compromise of our charging lien.

10          THE COURT:  Well, there has to be language that makes

11    clear that her charging lien is not compromised.  So that's

12    point number one.

13          Point number two, I think you do need to have a time

14    period by which either you resolve it or I resolve it at

15    confirmation and then we're done.  So --

16          MS. EHRLICH:  Perhaps we can agree on some language.

17          THE COURT:  So perhaps you can agree on some language

18    that covers those points and it melds together both of your

19    constructs in order to get us to the finish line at

20    confirmation.

21          MR. STROCHAK:  That shouldn't be a problem at all.

22          THE COURT:  All right.

23          MS. EHRLICH:  Thank you, Your Honor.

24          THE COURT:  So we will -- why don't we proceed to

25    deal with the class 17 issue and then we can adjourn and I can

16

1  give you some space to work out the language and we can wrap it

2  all up today.  If you're highly confident, you won't need me

3  again.  You can go off and do it and then just send in some

4  revised language.

5          MR. STROCHAK:  Thank you.  We may take you up on your

6  offer, Your Honor, of perhaps a conference room --

7          THE COURT:  Certainly.

8          MR. STROCHAK:  -- and just work through the language.

9          THE COURT:  That's fine.

10         MS. EHRLICH:  Thank you.

11         THE COURT:  All right.  Thank you.

12         All right.  So let's talk about the class 17 interest

13 dispute.  Mr. Strochak, what's your position with respect to

14 the letter that was submitted by the committee?

15         MR. STROCHAK:  Well, the concept of the letter, Your

16 Honor, I suppose if they want to encourage the class to vote

17 against them, I suppose that's a prerogative of the committee.

18 We think it's terribly misguided and unfortunate in this case.

19 But Your Honor will decide whether they can do that or not.

20         If they're going to send a letter out, we do have

21 some specific comments about a few things in their letter, just

22 really relatively small things.  And then we would like to send

23 a letter out to accompany it to set forth our position

24 separately and I have a draft of that which I can provide for

25 review if the Court is inclined to allow that to go forward.

1          THE COURT:  Well, based on the history of the case

2     which admittedly I have not lived through but I've read about

3     and I've heard about.  I do hope, and I do think this plan is

4     confirmable at least based on what I've reviewed now whether or

5     not the class 17 goes for or against.

6          I understand the committee's position.  I've just

7     been trying to bookend the amount that's in dispute which is

8     why I asked you, Mr. Strochak, the amount of claims in the

9     class.  So at $4 million, and although I have some questions

10    about how it is that you all think it's 6% but for the sake of

11    today's proceedings let's say it's now getting 6%, the

12    committee seems to have backed away from a 20 to 25% notion and

13    in the latest submission I think they're talking about 14%.  So

14    the delta is narrowing between the two interest rates.  Mr.

15    Levine is about to rise to tell me I said something wrong.

16         MR. LEVINE:  Respectfully, Your Honor, I don't think

17    we necessarily said that 14 and a half percent is the correct

18    interest rate.  What we point out is that the secured debt

19    which is secured by all the assets of Rubber Group is 14 and a

20    half percent.  The market, or one would expect that for an

21    unsecured piece who has basically a six month short of maturity

22    date would have at the very least a 14 and a half percent

23    coupon, possibly larger.

24         THE COURT:  Understood, understood.  But to run some

25    rough numbers I think in the aggregate we're probably talking

18

1   at most a half million dollars difference.

2           MR. LEVINE:  That sounds pretty accurate, Your Honor.

3           THE COURT:  Sounds pretty accurate?

4           MR. STROCHAK:  That sounds right, ball park, if the

5   goal posts are at six and 14 or so.

6           THE COURT:  Right.  You know, as I'm sitting here now

7   I don't know, you know, how many creditors you expect to take

8   the 51%.  That can have an impact on it.  I guess what I'm

9   trying to say is that I'm not going to let this plan go

10  sideways because of this issue.  I'm hopeful that there could

11  be continuing discussions between the parties, but I guess that

12  will await to see how the vote comes out.

13          So I think they have a right, as unfortunate it may

14  seem, to urge the class not to vote in favor of the plan.  I

15  looked at the letter.  The letter was relatively plain vanilla.

16  I'm not going to allow you to include the word woefully.

17          MR. LEVINE:  Okay, Your Honor.

18          THE COURT:  That's why I went through this sizing

19  exercise.  That doesn't rise to the level of woeful inadequacy

20  in my mind.  I'd like to get away from lots of pieces of paper.

21  So is there a way you can do this either by having them be

22  exhibits to the disclosure statement or having it be language

23  in the disclosure statement where the committee states its view

24  and the debtor responds with its view?  I just have a concern

25  about a number of pieces of paper given the reality of, you

19

1   know, what it is that people are going to read.  I understand

2   that the committee wants to do this in a way that people

3   actually read it and the debtor wants to respond in a way that

4   people read that too.  So can we come up with some exhibit or

5   language in the disclosure statement that addresses that?

6   You're not intending on doing separate mailings?

7          MR. LEVINE:  No, Your Honor.  I mean I think

8   typically from our standpoint it would include the committee's

9   letter and to the extent to the debtor, put a letter in the

10  solicitation package.  Frankly, putting it inside the

11  disclosure statement from experience is very highly unlikely to

12  be read.  I think that class 17 needs to understand what the

13  issue is before they vote.  We're not, you know, necessarily

14  saying this plan is bad.  Actually, we applaud the efforts.

15  What we're saying is to the extent you vote it down, the Court

16  will decide what the appropriate interest rate is.

17         MR. STROCHAK:  I like the idea of attaching the

18  letters as exhibits.  We can put a reference in the discussion

19  about the class.  It'll reference the two letters and it'll be

20  attached as exhibits.  That seems appropriate to me.

21         THE COURT:  Now, all things being equal, I would have

22  it simply be language in the body of the disclosure statement,

23  but I'm going to go with Mr. Strochak's formulation because I

24  think that that increases the chances that it'll be read and

25  won't get lost in the mess of paper that comes in a

20

1  solicitation package.

2           So with that, I find the form of letter acceptable

3  without the word woefully in it, but I'll need to see from you,

4  Mr. Strochak, what you want to put in as a response.  Hopefully

5  you can agree on it and maybe during the period of time that

6  you take to work out the language with the indenture trustee, I

7  can look at what you've prepared, Mr. Levine can look at what

8  you've prepared in response, and then we can wrap it all up at

9  that point.

10          MR. STROCHAK:  I have a copy I can hand up right now.

11  Mr. Levine has received it and reviewed it and he doesn't have

12  any problem with it.

13          THE COURT:  Okay.

14          MR. LEVINE:  I do want to talk to him about a few

15  issues but it should all be resolvable outside.

16          THE COURT:  Very well.  All right.  So why don't you

17  hand that up to us and then can we use this room?  Put them

18  into this room?  Yes?  All right.  So we can give you space

19  back here in the conference room and then just let someone in

20  my chambers know when you're ready to go back on the record.

21          MR. STROCHAK:  Okay.  So we'll just adjourn and we'll

22  deal with the fee applications when we go back?

23          THE COURT:  Yes, why don't we do it that way?

24  Because the fee applications, I have some observations, but the

25  fee applications will be relatively brief.  All right?  Thank

21

1  you.

2         MR. STROCHAK:  Thank you very much, Your Honor.

3                    [Off the record.]

4         THE COURT:  All right.  We're going to go back on the

5  record and in light of the discussions that were had off the

6  record, we're going to put on the record some of the

7  resolutions of the issues raised by the indentured trustee and

8  also with respect to the letter submissions by the creditors

9  committee and by the debtor.  So Mr. Strochak, do you want to

10  start?

11         MR. STROCHAK:  Thank you, Your Honor.  Thank you for

12  your patience.

13         We've agreed to make some changes to Section 2.3 of

14  the plan regarding indentured trustee fee claims and also to

15  the definition of indentured trustee fee claim.  It's rather

16  lengthy changes to the tax so rather than read it in, you know,

17  I have a sheet that we've all agreed to in the chambers

18  conference.  I think we're all in agreement on the language.

19  What we will do is go back and revise the plan, make conforming

20  revisions to the disclosure statement and share a copy with

21  counsel for the indentured trustee and the committee, and then

22  we'll submit to chambers for entry upon approval of the

23  disclosure statement.

24         With respect to the two letters, I think the parties

25  have agreed to a series of changes to the two proposed letters

22

1   on class 17.  We'll make those changes and those will be

2   submitted as -- they'll be filed as exhibits to the disclosure

3   statement so the Court will be able to see the changes that

4   we've agreed to.

5         THE COURT:  You also have to work with each other to

6   agree on appropriate references in the text of the disclosure

7   statement alerting the readers to the existence of the letters

8   in the exhibit portion of the disclosure statement to state the

9   obvious.

10        MR. STROCHAK:  Exactly, yes.

11        THE COURT:  All right.  And there were some other

12  changes that needed to be put into the record with respect to

13  claims?

14        MR. STROCHAK:  Yeah, I'll have Mr. Tseng handle

15  those.  He's got the -- he's got a handle on those.

16        MR. TSENG:  Good morning, Your Honor.  Conray Tseng;

17  Weil, Gotshal, Manges, counsel to the debtors.

18        There are two minor changes to the disclosure

19  statement order that were made after the filing of the

20  disclosure statement order on I believe it was Tuesday.  The

21  main issue was is that there was no issue to allow claims which

22  were filed as contingent, unliquidated, or disputed.  In terms

23  of proofs of claim, we propose that those claims be allowed in

24  the amount of $1.00 for voting purposes which would be

25  consistent with how scheduled claims which are contingent and

23

1   liquidated disputed are currently allowed to vote.

2           In addition, in terms of creditors with multiple

3   addresses, originally we had proposed that ballots be sent to

4   all addresses which the creditor has.  However, this typically

5   results in multiple ballots returned to the balloting agent.

6   Instead, we propose that a ballot be sent to the primary

7   address that we have on our records and a notice be sent to the

8   secondary addresses indicating that the ballot was sent to the

9   first address and that if they need a new ballot or the first

10  address was incorrect, they would contact our balloting agent

11  and a new ballot would be issued to them.

12          THE COURT:  All right.  Those changes are acceptable.

13          I think the only thing that remains is to go through

14  and make sure that we have agreement on all the dates.  So why

15  don't we put on the record the dates that were discussed for

16  the confirmation hearing and the dates related thereto.

17          MR. STROCHAK:  For purposes of the confirmation

18  hearing, Your Honor, we propose that it's July 14th.  Is there

19  a particular time that works for the Court?

20          THE COURT:  Well, let's do it at 10:00.

21          MR. STROCHAK:  10:00.  In terms of the response and

22  objection deadline, we would propose that it would be 5 p.m. on

23  July 2nd which is a Friday.  And then in terms of replies to

24  such objections or responses we propose that it be noon on

25  Friday, the Friday before, which would be July 9th.

24

1          THE COURT:  All right.  Those dates work for us.  All

2     right.  So I think that with respect to the approval of the

3     disclosure statement we're concluded.  We'll await receipt of

4     the conformed revised documents and we'll enter the order by

5     the close of business today so that you can start the process.

6          Next we have fee applications on the calendar and

7     there are eight of them by my count.  Is anyone here from the

8     Office of the US Trustee?

9          MR. LEVINE:  Your Honor, Mr. Schwartzberg informed us

10    yesterday he couldn't make it.  We did agree to 10% holdback

11    with him, so I think he felt it wasn't necessary for him to

12    have a replacement come.

13         THE COURT:  All right.  Mr. Strochak, do you want to

14    make any sort of presentation with respect to the fee

15    applications?

16         MR. STROCHAK:  I wasn't intending to unless it would

17    be helpful, Your Honor.

18         THE COURT:  No, that's fine.  I just wanted to give

19    you the opportunity.  The question that I have with respect to

20    the holdback, is it 10%?  Because in Weil's application they

21    indicated that they were agreeing to a 20% holdback.  Has that

22    been superseded by the US Trustee's suggestion of a 10%

23    holdback?  I'll leave it to Mr. Strochak to advocate for

24    getting more money for the members of this firm but I was just

25    confused by what I received in that regard.

25

1          MR. STROCHAK:  Your Honor, with respect to these

2     cases, as you understand the history of these cases have been

3     up and down, the holdback has varied from 5% to 20% throughout

4     the cases.  In this case we propose to do a 20% holdback with

5     the US Trustee being generous and seeing the resolution of

6     these cases and suggested a 10% holdback.  We do not object to

7     the lower holdback.

8          THE COURT:  Okay.  Very well.  I have reviewed the

9     applications.  In addition, there were some omissions of time

10    records that could well have been occasioned by the fact that

11    these fee applications migrated from Judge Lifland's chambers

12    and possibly from someone else's chambers before then.  But I

13    did receive the additional fee detail that I was interested in

14    and I have reviewed them, and I'm going to approve the

15    applications and will go along with the 10% holdback.

16          I just want to make one observation and I'm directing

17    this largely at the committee's counsel, not personally, but in

18    your capacity as committee counsel.  Obviously, there was a

19    great deal of activity that occurred in this case last fall.  I

20    read it in the disclosure statement and I've heard about it

21    today.  At one point you had three plans on file and there was

22    obviously a tremendous amount of work done.  And for that

23    reason, the amount of the fees going to the committee's counsel

24    is rather high in that last quarter under these fee

25    applications.  I'm just going to express my hope and

26

1   expectation that going forward, given the narrowness of the

2   issues that remain open heading into confirmation and the

3   relatively small amount of the dollars, although not

4   insignificant to the holders of those claims, that every effort

5   be made to not engage in needless litigation and to work as

6   much as possible with debtor's counsel to resolve those issues.

7   I'd rather give the money to the creditors than to the

8   professionals.

9          So with that commentary, I'll approve the

10  applications that I have before me.  All right?  I think we

11  need some orders.

12         MR. STROCHAK:  Thank you very much.  I think we'll

13  have to revise the order to reflect the change --

14         THE COURT:  You will.

15         MR. STROCHAK:  -- in the holdback and our fees and

16  we'll submit those.

17         THE COURT:  Right.  All right.  Unless there's

18  anything else --

19         MR. LEVINE:  Your Honor, just it was brought to our

20  attention by accident.  In the fifth interim, there was about

21  $1,500.00 for secretarial overtime which was missed.  We'll

22  take that out.

23         THE COURT:  Very well.

24         MR. LEVINE:  Okay.

25         THE COURT:  Thank you.  I appreciate you pointing

27

1  that out to us.  All right.  Very well.  We're adjourned.

2  Thank you.

3          MR. STROCHAK:  Thank you very much, Your Honor.

4          MR. LEVINE:  Thank you.

5                    * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

1     I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                          _____

6                                      Mary Greco

7 Dated:  July 9, 2010

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25