WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Adam P. Strochak

Attorneys for the Debtors
and the Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**LEXINGTON PRECISION CORP., <u>et</u> <u>al.</u>,**<br><br>Debtors. | Chapter 11<br><br>Case No. 08-11153(SCC)<br><br>(Jointly Administered) |

**DEBTORS' LIMITED OBJECTION TO THE**
**FINAL FEE APPLICATION OF ANDREWS KURTH LLP**

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lexington Precision Corporation and its affiliated debtor-subsidiary, Lexington Rubber Group, Inc. (together the "**Debtors**") submit this limited objection and respectfully represent as follows:

**Preliminary Statement**

1. The Debtors file this limited objection in response to the final fee application of Andrews Kurth LLP ("**Andrews Kurth**") as counsel to the official committee of unsecured creditors (the "**Committee**") in these chapter 11 cases.

2. The Debtors have successfully emerged from bankruptcy after a chapter 11 process marked by significant litigation and a contentious relationship with the Committee.

As discussed below, the Debtors believe that the Andrews Kurth fee application seeks payment for services that were not necessary, did not serve to maximize the value of the estate, and ultimately did not further the interests of the unsecured creditors the Committee was appointed to represent.  The Debtors do, however, realize that adversaries in a chapter 11 case naturally will have very different subjective views about what work was necessary to further the interests of the respective parties.  Rather than continue the contentiousness that marked the chapter 11 case by prosecuting a full objection to the Andrews Kurth fee application, the Debtors instead file this Limited Objection to one major disbursement which appears on its face to have been unnecessary and duplicative of other services provided to the Committee.  In addition, the Debtors provide below an overview of the key developments in the chapter 11 cases – many of which took place before different judges of this Court – in order to provide context for the Court's evaluation of the Andrews Kurth fee application under section 330 of the Bankruptcy Code.

    3.  Andrews Kurth seeks reimbursement of $91,250.14 in fees paid to an ostensible expert valuation witness with the firm of Pluris Valuation Advisors LLC ("**Pluris**").  As conceded in the fee application, no separate retention application was filed for Pluris under sections 327 or 1103 of the Bankruptcy Code; instead, Andrews Kurth paid the Pluris fees directly as a disbursement and now seeks reimbursement.  The Debtors object to reimbursement of the Pluris fees.  The services Pluris allegedly provided were unnecessary and duplicative of valuation services that were, or should have been, provided by Stout Risius Ross, Inc. ("**SRR**"), the financial advisors retained by the Committee and paid a flat monthly fee.  SRR could have rendered these same services at no additional cost to the estate; indeed, its own engagement letter contemplated that it would in fact provide such services.  Accordingly, reimbursement of the

Pluris fees should be denied because they are not "necessary expenses" of Andrews Kurth under section 330(a)(1)(B).

## Background

4.  On April 1, 2008, the Debtors commenced voluntary cases under chapter 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.  On April 11, 2008, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Committee. By order, dated May 13, 2008, the Court authorized the Committee to retain Andrews Kurth as counsel. By order, dated June 5, 2008, the Court retained SRR as financial advisor to the Committee.

6.  On September 28, 2010, Andrews Kurth filed its final application for the payment of fees and expenses in the amount of $1,867,011.00 and $209,378.18, respectively.

## Pluris's Retention is Duplicative

7.  Section 1103 provides plainly that a committee may, "with the Court's approval," retain "attorneys, accountants, or other agents" to perform services for the committee. There is no mention in that section of any authorization for the retention of expert witnesses, and merely calling a financial advisor an "expert" does not exempt him or her from the requirement that professionals be retained by order of the Court.

8.  More important than the procedural status of the retention, however, is that the services assertedly rendered by Pluris are duplicative of those that were, or should have been, provided by the Committee's properly-retained and estate-paid financial advisor, SRR. The Pluris engagement letter states that the services to be provided were to render an opinion on

the "fair market value of the Series C Preferred stock and the common stock of Lexington" -- securities that would have been issued under the first plan of reorganization proposed by the Debtors in these cases. The Pluris engagement letter further anticipates that Pluris's opinion would be used "as a valuation basis for negotiation, settlement, valuation testimony, or trial purposes during the Bankruptcy Case." The Committee, however, had already retained SRR to "provide expert report and testimony regarding the Debtors' enterprise valuation, *the valuation of any securities proposed to be issued under any chapter 11 plan of reorganization of the Debtors*, confirmation issues, or other matters."[1] In fact, the Committee's retention application states that SRR is "well-qualified and uniquely able to provide financial advisory services."[2] Accordingly, on its face the retention of Pluris is redundant with the retention of SRR and the fees paid to Pluris, for a valuation opinion that was never given as far the Debtors are aware, should not be reimbursed as "necessary" expenses.

## Overview of Key Chapter 11 Events

9.  From the outset, the Debtors anticipated these cases would be brief and the only work that needed to be accomplished in chapter 11 was to restructure Lexington's balance sheet. Toward that end, the Debtors promptly proposed in June 2008 a plan of reorganization that would have converted prepetition bond debt to equity and paid trade creditors in full, over time. As a result of extensive prepetition discussions with an ad hoc committee of its noteholders, represented by Andrews Kurth, the Debtors were aware that the noteholders likely would challenge the company's valuation. Accordingly, the Debtors anticipated a valuation dispute and expected that issue would be contested at confirmation.

---

[1] *Application for Order Authorizing the Employment of Stout Risius Ross, Inc., as Financial Advisors to the Official Committee of Unsecured Creditors, Effective as of May 13, 2008*, dated May 13, 2008 [Docket No. 104].

[2] *Id.*

10. While the differing views on value may have necessitated the expense of preparing for a contested confirmation hearing, in the Debtors' view the positions taken by the Committee and its counsel added unnecessarily to the cost of these cases. From the outset of the cases, the Committee adopted a scorched-earth litigation strategy, contesting even routine matters such as a request by the Debtors for an extension of time to file their schedules.[3] Less than 60 days into the chapter 11 cases, Andrews Kurth moved to terminate exclusivity, a motion that ultimately was withdrawn when the Debtors in turn moved for a routine extension of exclusivity. Andrews Kurth served extensive discovery in connection with the Committee's opposition to the extension of exclusivity and a full evidentiary hearing was conducted, at great cost to the estate, the result of which was that exclusivity was extended.

11. Even after the Debtors proposed a plan of reorganization that would pay unsecured creditors in full (if the Court accepted the Debtors' valuation), the Committee continued to oppose any continuation of exclusivity. By this time, however, the credit markets had seized up and the debt financing necessary to fund the Debtors' proposed plan was unavailable. The Committee continued to oppose any extension of exclusivity and in June 2009 the Debtors determined to let exclusivity expire without a further request for extension. Once exclusivity did expire, no plan was forthcoming from the Committee, making it clear that the repeated opposition to an extension was not driven by the desire to file a plan of its own but rather was a litigation tactic.

12. During the spring of 2009, the Debtors and the Committee participated in a mediation at the Court's suggestion to try to resolve the valuation dispute. The mediation was unsuccessful, but at the end of that process the Debtors advised the Committee that they would

---

[3] *Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 1007(c) Further Extending the Time to File the Debtors' Schedules, Statement of Financial Affairs, and Related Documents*, dated May 5, 2008 [Docket No. 128].

search for a strategic investor who would provide funding sufficient to pay off the noteholders at the enterprise value the Committee attributed to Lexington.

13. In the fall of 2009, the Debtors' prepetition secured lenders filed a plan that effectively would have liquidated Lexington for their own benefit. Rather than work with the Debtors to squelch a plan that was patently unconfirmable and to identify a strategic investor, the Committee instead finally filed its own competing plan, self-financed with an exorbitantly priced loan from certain noteholders.

14. The Committee's standalone plan proved short-lived. In the winter of 2009, the Committee and the senior lenders proposed a joint plan. This plan proposed to pay trade creditors certain unspecified consideration, but with the clear proviso that the trade creditors would not be permitted to receive any payments whatsoever unless and until the senior lenders had been paid in full.

15. All of Andrews Kurth's work drafting and proposing the plans of reorganization proved unnecessary because the Debtors did exactly what they set out to do in the summer of 2009 and successfully identified a plan investor that purchased the holdings of most of the noteholders who sat on the Committee. That led to the plan eventually confirmed by this Court. Notwithstanding the fact that the Debtors' plan provided for full payment to trade creditors with payments commencing promptly after confirmation and being completed prior to the maturity of the restructured secured debt, Andrews Kurth then prosecuted an objection to the plan over the applicable rate of post-petition interest. This exercise, over a de minimis amount of value, caused the estate to incur still more costs.

16. It is the Debtors view that the Committee's positions in this case, as prosecuted by Andrews Kurth, had the effect of reducing value, making it more difficult for the

management to operate the business. The nature of the Debtors' business is such that customers are reluctant to direct new orders to a company whose future is uncertain. The positions taken by the Committee, and prosecuted by Andrews Kurth, compounded these difficulties. Thus, in addition to the direct costs to the estate in legal fees and expenses, there was a cost to the estate in performance of the business. The Debtors respectfully request the Court takes these circumstances into account in evaluating the reasonableness and necessity of Andrews Kurth's fees and expenses.

WHEREFORE the Debtors respectfully request entry of an order disapproving the expenses related to the retention of Pluris and any excessive fees and expenses.

Dated   October 20, 2010
        New York, New York

/s/ Adam P. Strochak
Richard P. Krasnow
Adam P. Strochak
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for the Debtors
and Debtors in Possession