1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

2

3

-----------------------------------X
                                    :   08-11153 (MG)
4    In re:                         :
                                    :   One Bowling Green
5      LEXINGTON PRECISION CORPORATION, :  New York, New York
                                    :
6                        Debtors.   :   July 30, 2009
-----------------------------------X

7

8            TRANSCRIPT OF HEARING REGARDING THIRD APPLICATION OF
            WEIL, GOTSHAL & MANGES, LLP, AS ATTORNEYS FOR THE
              DEBTORS, FOR INTERIM ALLOWANCE OF COMPENSATION
9        FOR PROFESSIONAL SERVICES RENDERED AND REIMBURSEMENT
             OF ACTUAL AND NECESSARY EXPENSES INCURRED FROM
10                DECEMBER 1, 2008 THROUGH MARCH 31, 2009;
         THIRD INTERIM APPLICATION OF STOUT RISIUS ROSS, INC.,
11           UNDER 11 U.S.C. 330 FOR INTERIM ALLOWANCE OF
              COMPENSATION AND REIMBURSEMENT OF EXPENSES AS
12           FINANCIAL ADVISOR TO THE OFFICIAL COMMITTEE OF
         UNSECURED CREDITORS FOR STOUT RISIUS ROSS, INC., OTHER
13           PROFESSIONAL, PERIOD 12/1/2008 TO 3/31/2009,
             FEE: $200,000.00, EXPENSES, $2,048.12 FILED BY
14          PAUL N. SILVERSTEIN; THIRD APPLICATION FOR INTERIM
             PROFESSIONAL COMPENSATION FOR W.Y. CAMPBELL &
15        COMPANY, CONSULTANT, PERIOD 12/1/2008 TO 3/31/2009, FEE
            $200,000.00, EXPENSES $10,609.44, FILED BY W.Y. CAMPBELL
16           & COMPANY; THIRD APPLICATION FOR INTERIM PROFESSIONAL
        COMPENSATION SUMMARY SHEET FOR ANDREWS KURTH, LLP, UNDER 11
17        U.S.C. 330 FOR THIRD INTERIM ALLOWANCE OF COMPENSATION AND
        REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE OFFICIAL COMMITTEE
18        OF UNSECURED CREDITORS FOR ANDREWS KURTH LLP, CREDITOR COMM.
         ATTY. PERIOD 12/1/2008 TO 3/31/2009, FEE $379,157.50, EXPENSES
19        $199,039.04; HEARING REGARDING OBJECTION TO CLAIM NUMBER 262;
        MOTION OF THE DEBTORS FOR AUTHORIZATION TO INCUR SECURED DEBT
20        FROM WESTFIELD BANK, FSB FOR THE PURPOSES OF FINANCING THE
         DEBTORS' INSURANCE PREMIUMS FOR THEIR WORKMENS COMPENSATION
21        LIABILITY, EMPLOYMENT PRACTICES LIABILITY, UMBRELLA LIABILITY,
           AND EXCESS UMBRELLA LIABILITY FILED BY ADAM P. STROCHAK
22            ON BEHALF OF LEXINGTON PRECISION CORPORATION
                   BEFORE THE HONORABLE MARTIN GLENN
23                 UNITED STATES BANKRUPTCY JUDGE

24

25                                    (Appearances on next page.)

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1                                                              2

 2

 3    APPEARANCES:

 4    For Debtors:              ADAM P. STROCHAK, ESQ.
                                Weil, Gotshal & Manges, LLP
 5                              1300 Eye Street NW
                                Suite 900
 6                              Washington, D.C.   2005

 7    For the Creditors'        PAUL SILVERSTEIN, ESQ.
        Committee:              Andrews Kurth
 8                              450 Lexington
                                New York, New York
 9
      For the U.S. Trustee:     ELISABETTA G. GASPARINI, ESQ.
10                              United States Department of Justice
                                Office of the U.S. Trustee
11                              33 Whitehall Street
                                21st Floor
12                              New York, New York  10004

13    For Frank Boder:          DAN SHAKED, ESQ.
                                Shaked & Posner
14                              255 W. 36th Street
                                8th Floor
15                              New York, New York  10018

16    For W.Y. Campbell:        ALLISON BACH, ESQ.
                                Dickinson Wright, PLLC
17                              500 Woodward Avenue
                                Suite 4000
18                              Detroit, Michigan  48226

19

20    Court Transcriber:        RUTH ANN HAGER
                                TypeWrite Word Processing Service
21                              211 N. Milton Road
                                Saratoga Springs, New York  12866
22

23

24

25
```

3

1   (Proceedings began at 2:00 p.m.)

2          THE COURT:  Please be seated.  All right.  We're here

3   in Lexington Precision, number 08-11153.

4          Mr. Strochak?

5          MR. STROCHAK:  Good afternoon, Your Honor.  Adam

6   Strochak, Weil Gotshal for the debtors.  The first matter, I

7   believe, is the debtor's motion for approval of insurance

8   premium financing -- secured insurance premium financing under

9   Section 364(c)(2).  This is the renewal of the debtor's

10  insurance programs effective July 1, 2009, for Workers'

11  Compensation employment practices, fiduciary crime umbrella

12  liability, and excess umbrella liability coverage.  The debtors

13  will incur total premiums, annual premiums of about $830,000.00

14  for that insurance coverage and they propose to finance it with

15  secured financing from Westfield Bank in accordance with a

16  standard form agreement for insurance premium financing and

17  they're going to finance $623,000.00 -- well, almost

18  $624,000.00 of the premium or 75 percent of the premium.

19          The agreement, I believe, was attached to the motion.

20  There's been no objection and we'd ask approval for that

21  financing.

22          THE COURT:  Yes, Mr. Strochak.  I reviewed the motion

23  and supporting papers.  No objection having been received, that

24  motion is granted.

25          MR. STROCHAK:  Thank you, Your Honor.  Would you like

4

1   me to hand up an order or do it at the end of the hearing?

2           THE COURT:  At the end of the hearing.

3           MR. STROCHAK:  Okay.  There are two other matters on

4   the agenda.  We have four fee applications, I believe, and then

5   there is the motion for relief from stay of Ms. Ceremelli

6   [Ph.], a claimant.

7           THE COURT:  Let's deal with that next.

8           MR. STROCHAK:  The stay next?

9           THE COURT:  Yes.  I'll turn the podium over to Mr.

10  Shaked who represents Ms. Ceremelli.

11          MR. SHAKED:  Good afternoon, Your Honor.  Dan Shaked

12  appearing as local counsel to Frank Boder in Ohio.  Your Honor,

13  this was commenced by a motion objecting to Ms. Ceremelli's

14  claim which was timely filed.  Ms. Ceremelli has a wrongful

15  termination action pending in the Ohio state court.  The

16  debtors filed a motion objecting to their -- to her claim and

17  we filed responses as well as a motion to keep the automatic

18  stay to bring this case back to Ohio so we can terminate and

19  conclude the proceeding.

20          THE COURT:  But after nine years you're -- they're

21  ready to move ahead?

22          MR. SHAKED:  After nine years I believe everybody is

23  ready to move ahead including the Court in Ohio, especially the

24  Court in Ohio who would like to wrap this up and will put this

25  on its priority list being one of its older cases.

5

1          I'm not sure I want to go into the merits of the case

2   at this point, but one of the things we wanted to discuss would

3   be the motion itself and the <u>Sonnax</u> factors of whether this

4   should be litigated in the Ohio state court as opposed to

5   litigating it here.  I'm not sure whether Your Honor would

6   initially be interested in litigating this type of a case, a

7   complicated wrongful termination problem.

8          THE COURT:  That didn't seem that very complicated to

9   me.

10          MR. SHAKED:  Public policy --

11          THE COURT:  It didn't seem that complicated, Mr.

12   Shaked.

13          MR. SHAKED:  Again, this has been going on for nine

14   years.

15          THE COURT:  Well, more or less, but they -- mostly

16   less, but it's been pending in court for nine years.

17          MR. SHAKED:  Absolutely.

18          THE COURT:  I mean, it's a garden variety wrongful

19   termination claim.

20          MR. SHAKED:  Well, there's a lot of issues here, Your

21   Honor.  All the witnesses are located in Ohio.  There is

22   already counsel in Ohio for both sides.  The debtor's offices

23   and officers are located in Ohio.  To bring this matter back to

24   New York would be at great expense to the debtor and to the

25   claimant.  They would have -- both have to hire additional

6

1   counsel at New York at rates significantly higher.

2          THE COURT:  People appear here pro -- we have the

3   most liberal pro hac rules I think of virtually any court in

4   the country.  Other than during the trial people frequently

5   appear by telephone in pretrial matters so, yes, the trial

6   would have to occur here but, I mean, that doesn't seem -- I

7   mean, we do that all the time.

8          MR. SHAKED:  Well, there's a lot of documents here.

9   There's been 22,500 worth of pages of documents.

10          THE COURT:  I can't imagine for a moment that 22,000

11   pages of documents are going to come into evidence as exhibits

12   in a trial in this matter whether the trial is in Ohio or the

13   trial is here.  There may have been 22,000 pages that were

14   produced in discovery; whether they are all relevant to the

15   matter or not, I don't know.

16          MR. SHAKED:  Well, I mean, Your Honor, this has been

17   going on for a long time.  The Ohio court is familiar with this

18   matter.

19          THE COURT:  Really?  Is it really?  I mean, what --

20   what it looked to me that there was a complaint.  There was an

21   amended complaint, a motion to dis -- for judgment on pleadings

22   that was denied with a very short opinion and then there was a

23   motion to dismiss for lack of prosecution that was denied.

24   There was some squabbling about discovery but there appears to

25   have been very little court activity that's actually occurred

7

1   in the case in Ohio.  Am I wrong?  Tell me if I'm wrong.

2   Explain to me.  Tell me what the significant court activity has

3   been other than the one really the motion for judgment on the

4   pleadings which was denied on the short opinion.

5          MR. SHAKED:  I think there have been a few motions

6   that have been -- some procedural actions there --

7          THE COURT:  Tell me about it.

8          MR. SHAKED:  -- there have been a lot of depositions

9   there.

10          THE COURT:  I'd like to hear about what has consumed

11   the time of the Court in the last nine years in Ohio.

12          MR. SHAKED:  Well, I think the Court is familiar with

13   the company.  It's familiar with --

14          THE COURT:  Tell me what -- point the things in the

15   record that show -- you say the Court is familiar.  Has it been

16   the same judge in the nine years that it's been on file?  Do

17   they --

18          MR. SHAKED:  I don't know that for a fact.

19          THE COURT:  Do they have individual calendar system

20   or -- I mean, you're making a lot of generalities.  I'd like

21   you to be quite specific.  If you believe that there's been

22   substantial court activity in Ohio, point it out to me.

23          MR. SHAKED:  I don't know the number of times they've

24   gone to court.  I know there's a motion to dismiss which was

25   denied.

8

1              THE COURT:  Well, there was a motion for judgment on

2    the pleading.  It was denied in a short opinion.  There was a

3    motion to dismiss for lack of prosecution which showed a very

4    lengthy period of time, but not much happening when the Judge

5    basically said -- threw up his -- appeared in the short opinion

6    to say they're both at fault about discovery.  They have -- go

7    finish discovery with no merits discussion, anything.  So if

8    there's been substantial court activities, substantial amount

9    of time that the Court has given to this matter, point it out

10   to me.

11             MR. SHAKED:  I think that's just one of the issues

12   and in addition --

13             THE COURT:  No, I -- no, no, no.  But that isn't

14   answering my question.  You said there's been substantial court

15   activity.  I want you to give me the specifics of it.  How many

16   court appearances, what issues, the same judge, different

17   judge.

18             MR. SHAKED:  That I don't know, Your Honor.

19             THE COURT:  Okay.  So then you really don't know the

20   answer to that.

21             MR. SHAKED:  I don't know the answer, the number of

22   times.

23             THE COURT:  So you really can't argue that there's

24   been "substantial court activity," correct?

25             MR. SHAKED:  I can argue there's been more court

9

1    activity in the case in Ohio than there's been in New York.

2              THE COURT:  That's because this is the first time I'm

3    hearing, but --

4              MR. SHAKED:  And I think the case --

5              THE COURT:  I wouldn't let cases --

6              MR. SHAKED:  -- whoever is presiding --

7              THE COURT:  I wouldn't let cases go on for nine

8    years, but that's a different issue.

9              MR. SHAKED:  I appreciate that.  In addition --

10             THE COURT:  So you agree it's part of -- that in

11   light of the fact that your client filed a proof of claim in

12   this court that she has submitted to the equitable jurisdiction

13   of this court and that this is part of the core jurisdiction as

14   part of the claims resolution process, correct?

15             MR. SHAKED:  Initially, absolutely.  Then we have the

16   right to seek to vacate stay --

17             THE COURT:  You do.

18             MR. SHAKED:  -- to go back to --

19             THE COURT:  And that's what I'm deciding today.

20             MR. SHAKED:  -- a different jurisdiction.  And

21   another point, Section 157 of Title 28 emphasizes that

22   Bankruptcy Courts have no power to make factual determinations

23   regarding personal injury tort claims.

24             THE COURT:  You didn't even argue that in your papers

25   here.

10

1          MR. SHAKED:  It was mentioned in the papers.

2          THE COURT:  Well, you really haven't responded to the

3    debtor's argument that this -- when the test that's applied in

4    the Second Circuit this doesn't fit in the personal injury

5    context.

6          MR. SHAKED:  Well --

7          THE COURT:  This is the classic wrongful discharge

8    argued as retaliatory termination.  Do you have any cases from

9    Bankruptcy Courts, District Courts or the Second Circuit that

10   would say this is subject to the personal injury exception to

11   this Court's ability to try this case?

12         MR. SHAKED:  I don't have any cases to --

13         THE COURT:  Okay.

14         MR. SHAKED:  -- clearly support that but this does

15   involve the potential personal injury as the company was

16   manufacturing defective products which would cause public harm

17   and danger to the public --

18         THE COURT:  Where does -- wait a second.  Come on,

19   Mr. Shaked.  Do you have any cases that say that a plaintiff in

20   a wrongful termination action -- now you're arguing there could

21   be injury to third parties, that there were defective parts

22   that were sold?  Are you seriously arguing that that invokes

23   the personal injury exception to this Court's jurisdiction?

24   Are you?

25         MR. SHAKED:  I am not.

11

1          THE COURT:  Okay.  If you want to talk about the

2  <u>Sonnax</u> facts, go ahead.

3          MR. SHAKED:  Looks like -- Your Honor, it looks like

4  I'm going to have to overcome a significant hurdle from what

5  I'm hearing from the Court here, with all due respect.

6          THE COURT:  If you want to argue, I -- you know,

7  we -- I've gone ahead and analyzed all the <u>Sonnax</u> factors

8  and -- but I'd like to hear it.  If you want to argue it, go

9  ahead and do it.

10          MR. SHAKED:  Okay.  I can go one by one.  Whether --

11  the first <u>Sonnax</u> factors whether the relief would result in a

12  partial or complete resolution of the issues it's arguable that

13  the bulk of the discovery is now complete.

14          THE COURT:  Is or is not?

15          MR. SHAKED:  Is.

16          THE COURT:  What about the debtor points out --

17  you've attached a lot of affidavits.  None of those people have

18  been deposed, correct?

19          MR. SHAKED:  They have not been deposed by the

20  debtor.

21          THE COURT:  They haven't been deposed by anybody.

22          MR. SHAKED:  I think they've been deposed --

23          THE COURT:  Put in affidavits.  They haven't been

24  deposed.

25          MR. SHAKED:  Right.

12

1          THE COURT:  Deposition is when somebody --

2          MR. SHAKED:  I understand what a deposition is.

3          THE COURT:  You know what a deposition is.  None of

4   the people were deposed, correct?

5          MR. SHAKED:  Correct.  The debtor is partially if not

6   fully responsible for delaying this case.  Took them seven

7   years to provide discovery documents.  The state court has

8   already determined that the case has merit.

9          THE COURT:  No.  The state court determined -- the

10  state court denied a motion for judgment on the pleadings.  You

11  say in your papers that the Court decided there was a prima

12  facie case.  Denying a motion to dismiss doesn't establish as a

13  prima facie case.  It's just the four corners of the pleadings

14  state a claim.  It doesn't -- you know, prima facie case

15  requires evidence.  There's been no evidence.

16         MR. SHAKED:  You know, we think at this point both

17  parties would want to -- a quick resolution of this matter.  I

18  think the Ohio state court would be the quickest resolution --

19         THE COURT:  You really do?

20         MR. SHAKED:  -- both parties --

21         THE COURT:  When would you like to go to trial?

22         MR. SHAKED:  What's that?

23         THE COURT:  When would you like to go to trial?

24         MR. SHAKED:  I think it'd be soon.

25         THE COURT:  I'll hear from the debtors first, but I

13

1  give parties a very speedy trial.

2          MR. SHAKED:  Okay.

3          THE COURT:  Has the court -- when you say the court

4  will give the parties a very speedy trial in Ohio what is there

5  that shows that?  Has there been a -- I mean, the case has been

6  stayed so there hasn't been any trial setting.  What is it that

7  leads you to believe that this case would be advanced on the

8  Court's calendar?  When would it be tried?

9          MR. SHAKED:  I can't give a specific date.  My

10 understanding is that the oldest cases get a little pressure to

11 move on and get them wrapped up.  This case would probably been

12 finished for now if it wasn't for the debtor's bankruptcy

13 filing.

14         THE COURT:  Why do you say that?  Can you give me

15 some indication that that's true?

16         MR. SHAKED:  Because at the time --

17         THE COURT:  Other than the fact that the debtor's

18 motion to dismiss for the plaintiff's failure to prosecute was

19 denied, what is it that would indicate this case would be done

20 by now?

21         MR. SHAKED:  At that time discovery was moving along

22 quite rapidly.  We received 22 and a half thousand pages of

23 discovery from the debtor.  This is stuff that the claimant has

24 been waiting for for years, for seven years.  Once she has

25 that, that's something to work with and to move this thing

14

 1  closer to trial.  Without that, it was delaying this case

 2  forever but once that information was received that's

 3  information that the debt -- that the claimant can rely on and

 4  use to push this case to trial.  Again, we believe that trying

 5  this case in New York would be a hardship on both parties.

 6  Both the debtor and the claimant would have to spend more money

 7  than they would if this case was in Ohio.  Counsel in New York

 8  would be significantly more expensive than counsel in Ohio.

 9  Debtors -- parties and witnesses would have to travel.  Not

10  everybody is going to testify over the phone.

11          THE COURT:  Nobody is going to testify over the phone

12  but depositions may --

13          MR. SHAKED:  Or depositions.  Somebody would have to

14  appear at trial.  Have to pay for lodging, travel, food.

15          THE COURT:  How long a trial do you estimate?

16          MR. SHAKED:  I don't do wrongful termination actions.

17  I don't know how long a trial of this magnitude would last.  I

18  can't testify to that.

19          THE COURT:  Go ahead.

20          MR. SHAKED:  The cor -- the debtors have a corporate

21  presence in Ohio.  We're dealing with Ohio laws and public

22  policy issues involving -- and the interpretation of Ohio laws

23  which someone who has been working on this for a long time

24  maybe more readily able to deal with and to interpret.

25          THE COURT:  You argued in your papers that Burford

15

1  abstention should apply in the case.  I always thought the

2  Burford abstention dealt with complex state regulatory schemes

3  whether it's natural resources, you know, railroad commissions,

4  utilities where there's a comprehensive state regulatory

5  system, none of which is true here.  Yes, there's state law

6  issues, but Bankruptcy Courts deal with state law issues all

7  the time.  There's no state agency that would adjudicate this

8  claim.  It would be in a court of general jurisdiction in Ohio,

9  correct?

10        MR. SHAKED:  Correct.  It would definitely be in a

11  court of general jurisdiction.

12        THE COURT:  Explain to me why you think Burford

13  abstention should apply.

14        MR. SHAKED:  I think the -- Ohio is trying to

15  regulate public policy and safety of the citizens of its state

16  and the country through these statutes that they have enacted

17  regarding the manufacturing of defective products.  I think

18  it's a public policy which should be applied in the broader

19  scheme as the regulation scheme.  It could easily be expanded

20  to something that's going to affect a federal regulation.

21  Automobile regulations are governed not just by state but I

22  assume by also federal regulations.

23        THE COURT:  So there -- what state or federal

24  regulations apply to the wrongful discharge action that this

25  plaintiff has brought?

16

1          MR. SHAKED:  It's not the wrongful discharge.  It's

2   the public policy violation of the whistleblower statute.  She

3   was whistleblowing her superiors and the CEO of the company was

4   telling her, "I want you to hide documents.  Don't tell anybody

5   about defective products that we have."  She was protecting the

6   public by whistleblowing against this company.  I think that's

7   a major event when it comes to this case.

8          THE COURT:  Okay.  What else?

9          MR. SHAKED:  I think part of the effort here is to

10  cleanse the debtor's unwarranted past practices which we hope

11  the Court can do also as part of this process.

12          THE COURT:  Is your client seeking anything other

13  than damages?

14          MR. SHAKED:  Excuse me?

15          THE COURT:  Is your client seeking anything other

16  than monetary damages?

17          MR. SHAKED:  No.  I think this Court would be better

18  utilized and better focused on the reorganization effort and

19  the Ohio court would be better utilized liquidating a specific

20  claim to make this process in New York work more efficient and

21  move faster.  This may be one of the only missing links in this

22  case.  I'm not that familiar with what's going on in this case.

23          THE COURT:  It's not.

24          MR. SHAKED:  I guess not.

25          THE COURT:  Were that only the case.

17

1          MR. SILVERSTEIN:  We dream about it.

2          MR. SHAKED:  Well, we'll have to be little cog in a

3   big machine.

4          You know, I don't know what else I have to add.

5          THE COURT:  Okay.  Mr. Shaked, thank you.

6          Mr. Strochak?

7          MR. STROCHAK:  Thank you, Your Honor.  Adam Strochak

8   for the debtors.  Let me start if I could with a little bit of

9   background and try to put this matter in the context of these

10  proceedings.  This is a claim Your Honor characterized it as

11  garden variety, run of the mill.  It would be a fair

12  characterization.  It is a common law wrongful termination

13  lawsuit under Ohio common law.  Ms. Ceremelli, I believe, was

14  terminated about 11 years ago and the lawsuit has been pending

15  since --

16          THE COURT:  Time flies.

17          MR. STROCHAK:  -- since 2000, so it's a very old

18  claim and really has absolutely nothing to do with current

19  circumstances at the company.

20          The matter, as Your Honor has indicated, was stalled

21  for a long time in the state court system and we can argue for

22  a long time about whose fault that is, but there's one issue

23  that I did want to address.  Mr. Shaked suggested that part of

24  this delay was attributable to the debtor's failure to produce

25  22,000 pages of documents for seven years.  That's just not

18

1   correct.  What happened is those documents were produced.  The

2   plaintiff objected --

3        THE COURT:  Let me stop you because this case -- my

4   decision isn't going to -- I'm not going to decide who did or

5   didn't give discovery and when they didn't give it.

6        MR. STROCHAK:  Let me jump ahead, then, Your Honor.

7   Ms. Ceremelli's claim is for over two million dollars in

8   damages and she has attached to it a two million-dollar claim

9   for punitive damages.

10        THE COURT:  Well, it was 2,400,000 something with the

11   punitive damages, two million punitive damages of the amount, I

12   think, but ...

13        MR. STROCHAK:  Perhaps I got that wrong, then.  In

14   any event, Your Honor, the existence of a punitive damages

15   claim is one factor that suggests under Sonnax that this matter

16   is appropriate here.  We would almost certainly move to

17   subordinate a punitive damages claim.  That's an issue that

18   this Court would have to resolve if this matter went to trial

19   in Ohio and there ended up being a judgment for punitive

20   damages.  So under the Sonnax factors complete resolution is

21   not possible in the Ohio court.  That's one thing I wanted to

22   point out.

23        This is a large claim in the context of this case.

24   The reason why we objected to this claim in -- I can't recall

25   whether it was December or January of this year -- was we were

19

1   moving forward with the plan of reorganization process.  This

2   was the largest unliquidated disputed claim that we had by a

3   long margin and we put an objection on file so that that would

4   be on file before we got into the plan process in this matter.

5   So that's how we come to be in court today.  It took us six or

6   seven months to get here due to a variety of requests for

7   extension and things like that but we're able to agree on the

8   procedure to get here.  That is, we deal with the lift stay

9   first.

10          I think this is a matter, Your Honor, that the

11  creditors in this case would want some visibility to being as

12  it is the largest unsecured claim in the case that is a

13  disputed unliquidated claim in the case.  And having the trial

14  here is appropriate given the fact that other creditors might

15  have an interest in the resolution of this claim.

16          THE COURT:  So let me ask you.  Mr. Shaked said it's

17  in the plaintiff's interest and the debtor's interest to try it

18  in Ohio.  I take it you don't agree as to the debtor's?

19          MR. STROCHAK:  We certainly do not agree with that,

20  Your Honor.  We think it's in our interests to have it resolved

21  here as part of the claims resolution process in the bankruptcy

22  both as a matter of efficiency.  We're quite confident that it

23  can be resolved efficiently here.  The suggestion that all the

24  witnesses are in Ohio is incorrect.  Certainly a large number

25  of them would be in Ohio, but as Your Honor probably recalls

20

1   Mr. Delano and Mr. Lubin, the top executives for the company,

2   are both here.  They want to have a role in participating

3   in this --

4           THE COURT:  They have any personal knowledge --

5           MR. STROCHAK:  -- trial.

6           THE COURT:  Do they have any personal knowledge

7   about -- were they with the company nine years ago?

8           MR. STROCHAK:  I believe they were, Your Honor, and I

9   know they have been very actively involved in defense of the

10  claim prior to bankruptcy so they would want to participate in

11  this matter and I suspect will be called as witnesses.  The

12  matter is not ready for trial.  Discovery -- some discovery has

13  been done.  I don't know if any depositions have been taken in

14  the case but certainly a large majority of the depositions are

15  still outstanding of people --

16          THE COURT:  Mr. Shaked, have any depositions been

17  taken?

18          MR. SHAKED:  I'm not sure, Your Honor.

19          MR. STROCHAK:  I know we have not deposed Ms.

20  Ceremelli yet and I know the affiants have not yet been

21  deposed.  I don't believe it's any hardship in this case to

22  have the trial here on Ms. Ceremelli.  It's a substantial

23  claim.  Certainly there's some travel costs involved, but given

24  the magnitude of the damages that she's seeking having to come

25  to New York for proceedings does not appear to be an

21

 1   insurmountable obstacle in this case.  The suggestion that New

 2   York counsel at higher rates would be necessary is simply

 3   incorrect.  Both parties could have the counsel back in Ohio

 4   who are familiar with this case already participate here in a

 5   trial with local counsel as necessary and as Your Honor has

 6   indicated *pro hac vice* rules are quite liberal here.  So we

 7   don't think that trying the matter in New York is any more

 8   expensive and possibly might be quite cheaper than trying it in

 9   Ohio given the fact that we're confident this Court could come

10   to a speedy resolution.

11         Your Honor looked at me in connection with the

12   discussion of, you know, when we would like to see the case

13   tried.  I -- let me answer that two ways.  First of all, we're

14   happy to proceed.  We think that there is a summary judgment

15   motion that I believe has never been decided in Ohio.  We would

16   probably try and bring that and have this matter adjudicated on

17   summary judgment, although I'm fair less familiar with the

18   merits than our local counsel in Ohio so that's a decision

19   that, you know, would have to be made with some deliberation

20   obviously.  So there's a possibility that we could bring it

21   forward and have some type of summary disposition.  And then if

22   a trial were necessary we think we could proceed relatively

23   expeditiously here.

24         The reason I'm a little tentative about that, Your

25   Honor, is that as you will --

22

1          THE COURT:  We have a pretty full plate coming up.

2          MR. STROCHAK:  Pardon me?

3          THE COURT:  You have a pretty full plate coming up

4   hopefully in the Chapter 11 itself.

5          MR. STROCHAK:  There is that issue, of course.  The

6   other issue is that we have tried very carefully to keep

7   control over administrative expenses in the case.  So until we

8   have a little more clarity as to, you know, where this case may

9   be going in terms of the plan process I wouldn't want to steam

10  full speed ahead on the resolution of this claim.

11         THE COURT:  That's why I say you have a pretty full

12  plate coming up.

13         MR. STROCHAK:  Exactly.  So, you know, our proposal

14  would be to -- if it's going to be heard here would be to, you

15  know, try and work out an appropriate schedule with the

16  plaintiffs that would get us to a resolution.  I'm not quite

17  sure what the dates would be.  We'd have to confer with local

18  counsel handling the case but, you know, hopefully having a

19  agreed-upon schedule that would move this in a deliberate but

20  not super expedited matter just because we wouldn't want to put

21  the -- incur the administrative expenses on this matter.

22         With respect to the Burford abstention argument I

23  think Your Honor is exactly correct.  This is not a matter

24  that's appropriate subject to Burford type of abstention.  It

25  is a run-of-the-mill common law claim.  The issues associated

23

1   with state law is not any particularly unique whistleblower

2   statute or any particularly unique state regulatory scheme.

3   What it is is a matter where plaintiff, Ms. Ceremelli, has

4   alleged that she was -- that her termination was a violation of

5   public policy, that it was retaliatory for her conduct and that

6   retaliation violates Ohio public policy.

7           The statutory predicate for that argument, Your

8   Honor, I believe is the State unfair trade practices statute,

9   that she's asserting that the debtor's conduct violated

10  unfair -- the unfair trade practices statute in Ohio and that's

11  her hook into the public policy.  That's an issue that we do

12  believe is rather unique because we don't think that argument

13  is supportable under state law, but it's not the type of

14  regulatory issue that we believe abstention is necessary.

15          THE COURT:  Well, the complaint got beyond the motion

16  for judgment on the pleadings.

17          MR. STROCHAK:  Pardon me?

18          THE COURT:  The complaint got beyond the motion for

19  judgment on the pleadings.

20          MR. STROCHAK:  That's correct, Your Honor.  So on our

21  summary judgment papers we would be making the argument with

22  respect to the predicate conduct necessary to loop the public

23  policy argument then.

24          THE COURT:  You know, after reading the affidavits

25  that were attached to Mr. Shaked's papers, you know, I have to

24

1   express skepticism whether this is a summary judgment case.  Be

2   that as it may, that's not today's issue.

3            MR. STROCHAK:  Yes, Your Honor.  I mean, obviously

4   the allegations of those affidavits are heavily disputed.

5   There might be a summary judgment separate --

6            THE COURT:  Disputed --

7            MR. STROCHAK:  -- from the allegations of the

8   affidavit.

9            THE COURT:  It would have to be separated from the

10  allegations in the affidavits frankly, but --

11           MR. STROCHAK:  Yes.  That was my point, Your Honor.

12  There might be a -- I believe that there is legal grounds.  I

13  believe that the summary judgment motion the debtor has filed

14  doesn't assert that there's no disputed facts and asserts that

15  even if accepted as true the public policy rationale does not

16  survive as a matter of law.

17           THE COURT:  When was the summary judgment filed in

18  state court?

19           MR. STROCHAK:  I don't have the exact date, Your

20  Honor.  I know it's been out there for a long time and was

21  never decided.

22           THE COURT:  Was it fully briefed?

23           MR. STROCHAK:  I just don't know exactly.  I

24  certainly know we submitted it.  I don't know if the -- if the

25  plaintiff submitted their opposition papers or not.  I just

25

1   don't have that detail at my fingertips.

2           THE COURT:  Mr. Shaked, do you know?

3           MR. SHAKED:  I don't know.  Your Honor, may I say one

4   thing?

5           THE COURT:  Well, let -- anything else?

6           MR. STROCHAK:  I'm just looking over my notes, Your

7   Honor.  I think that's about it.  I mean, obviously I could go

8   through each of the Sonnax factors individually if the Court

9   would welcome more argument but I think I've said what I need

10  to say in response to Mr. Shaked.

11          THE COURT:  All right.  Mr. Silverstein, do you want

12  to be heard?

13          MR. SILVERSTEIN:  No, Your Honor.  I mean, there were

14  colorful pleadings that obviously needs to be resolved, but I

15  don't have anything from this.

16          THE COURT:  Okay.  All right.  Mr. Shaked?

17          MR. SHAKED:  Just very briefly.  This court has a

18  full plate of Lexington Precision.  If this claim dispute is

19  moved to Ohio we can go in two directions at the same time and

20  move it a lot faster.

21          THE COURT:  Mr. Shaked, you misunderstood what I was

22  saying.  I don't have a full plate of Lexington Precision.  I

23  think Lexington has a lot of issues that it has to focus its

24  attention on to try and see whether it can propose a plan and

25  successfully get through the plan process.

1          During that period of time in the Court's view it

2    would be inappropriate to divert management attention to

3    simultaneously having to prepare and defend an action in state

4    court in Ohio.  As far as this Court's time is concerned, I can

5    try this case as soon as the parties would be ready.  The issue

6    is not that.  The issue is whether this debtor at this time

7    during the life of this Chapter 11 case should be devoting its

8    attention to trying to reach an agreement with the Creditors'

9    Committee with its prepetition lenders to getting a plan --

10   disclosure statement and plan proposed and not be diverted by a

11   state court action.  So it really isn't an issue of whether

12   this Court has too much on its plate.

13         All right.  With respect to the motion before me

14   today which is to lift the automatic stay and permit this

15   action to return to state court in Ohio the motion is denied.

16   In reaching its decision the Court has considered the so called

17   Sonnax factors which arise from In Re: Sonnax Industries, 907

18   F.2d 1280 at page 1286 (2d. Cir. 1990).  In Sonnax, the Second

19   Circuit identified a list of nonexclusive factors the Court

20   should consider in deciding whether to lift the stay, commit an

21   action to return to a state court.  Not all of the factors are

22   necessarily relevant in each case and not all of them have to

23   weigh one way or the other.

24         The first factor is whether the relief requested

25   would result in a partial or complete resolution of the issues.

27

1   On this issue I view it as fairly closely balanced.  I think

2   that whatever the results in Ohio it would not fully resolve

3   all of the issues that would have to be dealt with so the

4   matter would still have to come back to this court if for no

5   other reason than the issue of subordination of any punitive

6   damage claim if punitive damages were awarded.

7           While each side blames the other, it's clear that

8   this case has languished for nine years or so in the state

9   court in Ohio with what appears to this Court at least very

10  little activity within the state court.  The moving papers and

11  responding papers here address two specific matters handled by

12  that court, namely the motion for judgment on the pleadings

13  which was denied which really does nothing more than decide

14  that the complaint stated a claim.  Contrary to the plaintiff's

15  argument it does not establish that there's a prima facie

16  showing of an entitlement to relief.  There does appear to be

17  substantial amount of discovery that remains to be done.  The

18  plaintiff has submitted a large number of affidavits.  None of

19  those people have been deposed.  Plaintiff herself has not been

20  deposed.

21          Second Sonnax factor is the lack of any connection

22  with or interference with the bankruptcy case.  The debtor

23  argues and the Court agrees that lifting the stay would

24  distract the debtor's management, which is a relatively small

25  group from the most serious issues on its plate today which is

28

1    trying to move this bankruptcy case forward, so at this time

2    certainly it would be inappropriate for the Court to lift the

3    stay.

4            The third <u>Sonnax</u> factor is whether the other

5    proceeding involves the debtor as a fiduciary no one argues

6    that it does so that factor is not relevant.

7            Fourth factor is whether specialized tribunal with

8    necessary expertise has been established to hear the cause of

9    action and the answer to that is clearly no.  This is within

10   the court's general jurisdiction in Ohio and it's -- because

11   the proof of claim was filed here it's within this Court's core

12   jurisdiction and it's part of the claims resolution of process.

13   <u>Burford</u> abstention clearly does not apply in a case such as

14   this.  That's basically a common law claim that may involve

15   Ohio law but this court regularly deals with the law of many

16   states in deciding matters before it.  So this factor clearly

17   weighs against lifting the stay.

18           Fifth factor is whether the debtor's insurer has

19   assumed full responsibility for defending the case.  In here,

20   no one contends that there is insurance so that factor weighs

21   against lifting the stay.

22           Sixth factor is whether the action primarily involves

23   third parties.  Again, this factor weighs against lifting the

24   stay.  This is an action against the debtors.

25           Seventh, whether the litigation in another forum

29

1  would prejudice the interests of other creditors.  The debtor

2  here argues it would prejudice other creditors because it would

3  focus the debtors away from managing the stay.  The Ceremelli's

4  argument is it would not prejudice other creditors because

5  litigating it here will require parties to duplicate their

6  efforts in state court wasting valuable resources.  I don't see

7  any duplication.  As best this court can tell there's been

8  22,500 pages of documents produced.  Whether used here or used

9  in Ohio makes no difference whatsoever so the Court believes

10  that this factor weighs against lifting the stay.

11       Eight is whether the judgment claim arising from the

12  other action was subject to equitable subordination to the

13  extent that it includes a punitive damage claim which it does.

14  That would be subject to equitable subordination.  Again, the

15  factor weighs against lifting the stay.

16       And the ninth factor is whether the movant's success

17  in the other proceeding would result in a judicial lien

18  avoidable by the debtor.  There would be no lien.  I could go

19  through the rest of the factors but while some of them I think

20  are closer calls than others on balance the Court concludes in

21  the exercise of discretion it would be inappropriate here to

22  lift the stay and send this case back to the Ohio court.

23       Now, with respect to how we proceed in the first

24  instance counsel for the respective parties need to discuss a

25  plan on how this is to proceed.  In reading the papers I see

30

1  that the parties bifurcated the issue of whether to lift the

2  stay from the claims objection itself.  The claims objection,

3  which I did review, really at least on its face sort of misses

4  the mark in light of the fact that the state court in Ohio -- I

5  mean, the objection really argues that the plaintiff has failed

6  to state a claim.  Well, the court in Ohio essentially decided

7  that quite some time ago when it denied the motion for judgment

8  on the pleadings.  I have no idea what's in the summary

9  judgment motion but from the papers I read this would clearly

10 seem to be -- is a contested matter under 9014 and I'm

11 skeptical about whether summary judgment is going to be

12 possible or whether that's going to be the most fruitful avenue

13 for resolving the matter.

14          On the other hand, at the present time the debtor's

15 attention is it's much more important to be focused on trying

16 to come up with a plan of reorganization, disclosure statement

17 and plan in moving this process going.  I've seen the debtors

18 filed a new motion for use of cash collateral.  It appears that

19 that -- I'll ask you about what the status of that is before we

20 end.  Don't need to respond now.  So there are issues that

21 surely should command the debtor's attention immediately.  So,

22 Mr. Shaked, whether it's you or counsel in Ohio should confer

23 with Mr. Strochak and his colleagues about how to proceed with

24 respect to the claim and the objection to the claim.  There's a

25 contested matter.  Discovery rules generally apply to it, but

31

1   let's see where we get to, but for purposes of today's hearing,

2   the motion to lift the stay is denied.

3          You're welcome to stay or not, Mr. Shaked, but we've

4   got fee applications to deal with.  That's why I took this

5   before we got to the fee app.

6          MR. SHAKED:  All right.  Thank you, Your Honor.

7          THE COURT:  Thank you very much.  I appreciate it.

8          Okay.  Mr. Strochak.

9          MR. STROCHAK:  Thank you, Your Honor.  Would it make

10  sense to address some of your questions about status --

11         THE COURT:  Yeah.  Why --

12         MR. STROCHAK:  -- before the fee objections?

13         THE COURT:  -- don't you do that?

14         MR. STROCHAK:  The fee applications.  I believe we've

15  not yet filed the motion to extend use of cash collateral.  I

16  believe we've called chambers and asked -- inquired about

17  hearing dates.

18         THE COURT:  All right.

19         MR. STROCHAK:  And I don't think it's on file yet.

20  It will be coming very shortly.

21         THE COURT:  All right.

22         MR. STROCHAK:  You know, we're going to be discussing

23  whether the lenders will agree to a consensual extension.  I

24  don't know that we will be in any different place than we were

25  the last time around with the lenders but we will be having --

32

1          THE COURT:  GM and Chrysler --

2          MR. STROCHAK:  -- discussions.

3          THE COURT:  The new GM and new Chrysler and --

4          MR. STROCHAK:  We're still --

5          THE COURT:  And about an hour ago --

6          MR. STROCHAK:  -- the old Lexington.

7          THE COURT:  -- Judge Drain approved the modified plan

8   of <u>Delphi</u> to exit bankruptcy so, you know, that's progress in

9   the auto industry at least, maybe not with Lexington.

10         MR. STROCHAK:  Yeah.  No, I appreciate that, Your

11  Honor.  We've been providing regular updates on the mediation

12  status and where things are right now from the debtor's

13  perspective in terms of moving the case forward is, you know,

14  it's very clear to everyone that we need some type of financing

15  to get this company out of Chapter 11 in a reorganized fashion.

16  The debtors are exploring with a number of investors.  They've

17  had, you know, an active marketing program to attract -- call a

18  plan investor or some type of exit capital for the business.

19  They are -- have had meetings and discussions with about a

20  dozen potential investors over the last several weeks and that

21  process is moving forward.  The mediation is still continuing.

22  Mister --

23         THE COURT:  The updates on the mediation really

24  haven't changed at all in the last several -- I don't know

25  whether anything in the mediation has changed, but the reports

33

1  seem essentially the same to me; no progress.

2      MR. STROCHAK:  No.  That's correct, Your Honor.

3  There's been no -- certainly no concrete progress.  There are

4  discussions going on.  Mr. Preston is still involved.  I know

5  he met with the debtors this week.  I believe he met with

6  members of the committee this week, at least that's what I was

7  told.  We are, you know, trying to move forward in a way where

8  the Committee, my understanding, is also out seeking

9  investments of its own to try and come up with a plan.  We are

10  trying to move forward in a way that will allow a plan investor

11  to come in that will allow payment of -- to the bondholders of

12  the value that they ascribe to the debtors and it will bring in

13  sufficient capital to bridge the gap between what's available

14  in the market and what the debtors need in order to -- in order

15  to finance a plan of reorganization going forward.

16      So that is as best a summary the current status as I

17  can give Your Honor.  You know, we certainly wish as a business

18  matter that there was a way to conclude this faster.  The

19  debtors are actively trying to make it happen but it is a very

20  difficult business problem for them at this point to achieve.

21      THE COURT:  What happened with the transition of

22  the -- was it the seal business -- what was -- what's happening

23  with that?

24      MR. STROCHAK:  The consolidation and transition of

25  the connector seals business is done.  Those operations were

34

1  consolidated into the other plants and moved and that is

2  fundamentally complete at this point if not totally complete,

3  but my understanding is there's nothing really outstanding on

4  that.  The Ohio facility has been shut down and that part of it

5  is done.

6         THE COURT:  And what's the performance of the medical

7  parts business?

8         MR. STROCHAK:  I don't have the exact numbers for

9  medical.  I don't have that breakdown with me, Your Honor.  I

10 know the business over the last -- well, certainly the May

11 numbers were not very good and that is because the debtors made

12 a determination to essentially reduce their inventory

13 substantially so that had a fairly significant effect on the

14 May numbers.  So EBITDA for the entire company in May, I

15 believe, was just a hair over break even if I remember that

16 correctly from the monthly operating report.

17        I believe June was better.  Still not fantastic but

18 better.  The company's cash position is very good.  They

19 have -- actually wrote down the exact numbers on that.  The

20 cash position -- the cash budget for the week ending last

21 Friday was about 2.7 million dollars.  The actual cash was just

22 a hair over four million dollars so they're about 1.2 million

23 over the cash forecast for that period so the cash is holding

24 up well.  They've been very successful in managing costs.

25        I think the administrative expenses for the case now

35

1    Your Honor has the fee applications for December through March

2    which really don't reflect this yet because that was a period

3    of very high activity but really since March the administrative

4    expenses have been significantly reduced in terms of the

5    Chapter 11 case and it's one area that Mr. Silverstein and I

6    agree on.  We've both been as visual as we can be in minimizing

7    the activity in the case and I think the fee applications in

8    the next period will be substantially less in this thing.

9            THE COURT:  Mr. Silverstein, do you want to be heard?

10           MR. SILVERSTEIN:  Yes, if I may very, very briefly.

11   Yes, administrative expenses currently are very low, as far as

12   I understand them.  I'm doing virtually nothing on this case at

13   this point except for a few conversations with the Committee.

14           The cash position is good because the debtor sold a

15   lot of inventory so they converted it into cash, therefore so

16   there's -- you know, it's better than not having --

17           THE COURT:  Better to have the cash than the

18   inventory.

19           MR. SILVERSTEIN:  Exactly.  So it's better than not

20   having cash, but fundamentally nothing has really changed and

21   there is still the basic impasse.  I mean, we're at the

22   interesting stage of the debtors not being able to confirm a

23   plan and at this moment the Committee not being able to confirm

24   a plan because we're missing a certain chunk of exit capital,

25   exit financing with which to do that.  We need to obviously

36

1   reach an agreement with the capital source and I expect the

2   next milestone for Your Honor will be the next cash collateral.

3   I don't think I have anything to add.

4          THE COURT:  Okay.  Thank you.  All right.  Let's move

5   to the fee apps.

6          MR. STROCHAK:  Is there any particular way you'd like

7   to address these, Your Honor?

8          THE COURT:  No, you can go through them.

9          MR. STROCHAK:  I think what might make sense is to

10  start with the objections.

11         THE COURT:  Okay.

12         MR. STROCHAK:  So --

13         THE COURT:  Is it -- no one is here from the U.S.

14  Trustee's Office?

15         MS. GASPARINI:  Yes.

16         THE COURT:  Are you -- I'm sorry.

17         MS. GASPARINI:  Your Honor, good afternoon.

18  Elisabetta Gasparini from the United States Trustee's Office.

19         THE COURT:  I don't think you've been before me

20  before.  Welcome.

21         MS. GASPARINI:  Pardon me?

22         THE COURT:  Have you been -- I don't think you've

23  been before me.

24         MS. GASPARINI:  No, Your Honor.  I'm one of the new

25  trial attorneys here so I've been with the office for about two

37

1   months now.

2          THE COURT:  Nice to have you here.

3          MS. GASPARINI:  Thank you.

4          THE COURT:  Thank you.  I apologize for not

5   recognizing you --

6          MS. GASPARINI:  No problem.

7          THE COURT:  -- but now I know most of the others.

8          MS. GASPARINI:  I have not appeared in front of you.

9          THE COURT:  Thank you, Ms. Gasparini.

10         THE COURT:  All right.  So -- well, let's just go

11  through them one by one.  Okay.  So the first one in the binder

12  is the Andrews Kurth.

13         MR. SILVERSTEIN:  Yes.  I guess I'll take that, Your

14  Honor.

15         THE COURT:  Go ahead, Mr. Silverstein.

16         MR. SILVERSTEIN:  Thank you.  There were two

17  objections: one by the U.S. Trustee and one from the debtor.

18  I'd like to take them one by one.

19         THE COURT:  Okay.

20         MR. SILVERSTEIN:  As far as the U.S. Trustee

21  objection aside from hold-back issues which applies to

22  everyone --

23         THE COURT:  Right.

24         MR. SILVERSTEIN:  -- there was some dispute items

25  that the U.S. Trustee had issues with or questions and we

38

1   basically said, you know, full unconditional surrender.  I

2   think there's $1269.00 in time entries where there were

3   internal inconsistencies.  They didn't have --

4              THE COURT:  Right.  $3,586.33 is --

5              MR. SILVERSTEIN:  Expenses.  Correct.  I think

6   $105.00 of Lexus charges.  So we're -- that will be deleted

7   from the --

8              THE COURT:  Okay.

9              MR. STROCHAK:  -- application of the order.  The

10  issue with the debtor relates to approximately $90,000.00 of

11  expense incurred by the Committee in connection with the

12  Committee's retention of a testifying expert by the name of

13  Pluris Valuation Advisors.  The Committee retained Pluris in

14  December of 2008 to testify with respect to the fair market

15  value of the C receiver preferred stock and the common stock,

16  which the debtor has proposed to issue pursuant to their plan.

17  At that time I think Your Honor will recall we were hot and

18  heavy, so to speak, going towards a contested confirmation

19  hearing.

20             We had dates set for that hearing.  We retained

21  Pluris basically because in a valuation there were really

22  two -- there are two aspects to valuation.  So hypothetically

23  if a determination is made by the Committee's financial advisor

24  SRR that total enterprise value is, for example, hypothetically

25  a million dollars and there are a million shares being issued,

39

1  it does not necessarily follow that each share is worth a

2  dollar.

3          Similarly, because you don't just divide it by the

4  number of shares because there are unique things to certain

5  shares.  Here there was sort of a complex preferred share,

6  preferred stock being issued.  There was common stock being

7  issued with a fairly large insider ownership and we felt it was

8  necessary and appropriate to take it to the second step because

9  once Your Honor made a determination on enterprise value you

10 then have you say, okay, well, what is -- what are you getting

11 under the plan and what is that consideration worth.

12         THE COURT:  And why is it that Stout Risius Ross

13 which had been retained pursuant to order of the Court and its

14 engagement would seem to have covered the issues --

15         MR. SILVERSTEIN:  The --

16         THE COURT:  -- why is it that they weren't doing the

17 work and you have a nonretained -- when I say "nonretained,"

18 nonapproved expert which you've described as a trial --

19         MR. SILVERSTEIN:  Right.

20         THE COURT:  -- expert?

21         MR. SILVERSTEIN:  Well, I'll address --

22         THE COURT:  Go ahead.

23         MR. SILVERSTEIN:  -- the legal issue and the factual

24 issues.  SRR's focus and what they do for a living is they're

25 business valuation experts.  They're business -- they're

40

1  bankers in the auto industry.  You know, similar -- I'll get in

2  trouble for saying this, but similar to W.Y. Campbell in some

3  respects.  They bought bankers and financial advisors as to the

4  value of auto and related businesses.  Their true expertise is

5  not valuing the securities that are being issued under the plan

6  and it was our judgment that in this contested valuation fight

7  we needed that expertise.

8          Mr. Brock principally worked with Pluris.  Pluris

9  prepared an expert report.  Pluris was prepared for a trial.  I

10  think the law is very clear that a testifying expert who is not

11  directly involved in the administration of the case doesn't

12  need to be retained by court order.

13          THE COURT:  I -- you said that but didn't cite any

14  authority.

15          MR. SILVERSTEIN:  I'll give you a coup --

16          THE COURT:  But while Weil Gotshal said --

17  disagreed -- I haven't had the issue before.  Actually asked a

18  couple of my colleagues and they didn't think it was so clear.

19          MR. SILVERSTEIN:  Well, Weil Gotshal does it all the

20  time.  You know --

21          THE COURT:  Well, that doesn't mean that it's --

22          MR. SILVERSTEIN:  I know, but the case -- if you want

23  the cases I can cite a few cases to you.  I don't have --

24          THE COURT:  Let me ask you to -- let me tell you now.

25  You've gave me about as much information for $91,000.00 as I

41

1 would get for $100.00 dinner.

2          MR. SILVERSTEIN:  That's a fair comment.

3          THE COURT:  Where there was a $20.00 per person

4 limit.  So how -- you know, why you think you're going to get

5 approval for $91,000.00 disbursement when I drive people crazy

6 about documenting a dinner for five people.

7          MR. SILVERSTEIN:  Your Honor, I was given the binder

8 last night and one of my comments after looking at the binder

9 this morning was do we have a little more documentation on the

10 $91,000.00.  I mean, I understand --

11          THE COURT:  Well, they didn't even tell -- you know,

12 their invoice says -- breaks it down by the analyst and so a

13 dollar figure hourly rate.  Doesn't say what the hourly rate

14 is, doesn't say --

15          MR. SILVERSTEIN:  Yeah.

16          THE COURT:  -- how many hours people work, what they

17 do, whatever.  It just --

18          MR. STROCHAK:  I can't argue with Your Honor's

19 comment because I have the same comment.  I'm sure it's well

20 justified.  But if we wanted to defer that and bring it back,

21 we can certainly have Your Honor review their report in camera.

22 We can have more detail and Mr. Brock obviously has to tell me

23 specifically what they did because he was doing it with them.

24 I wasn't.  And we can provide that detail.

25          I appreciate that comment.  I don't have a good

42

1  answer for that and I understand, so -- I fully understand.

2  But in terms of the predicates if I can orally tell you the

3  cases --

4          THE COURT:  Well, here's what I'd like you to do

5  because I -- with respect to the $91,226.68 I'm denying it

6  without prejudice.

7          MR. SILVERSTEIN:  Yeah.  I --

8          THE COURT:  Okay.

9          MR. SILVERSTEIN:  I understand.

10          THE COURT:  So I'm not saying you're eating that

11  cost.

12          MR. SILVERSTEIN:  Right.

13          THE COURT:  But, you know, I also thought -- you'll

14  excuse me -- is was a little cute when you paid them a

15  $25,000.00 retainer which you listed in your -- expense word is

16  "miscellaneous items."

17          MR. SILVERSTEIN:  That -- but --

18          THE COURT:  And when you got it --

19          MR. SILVERSTEIN:  You've been in a law firm -- law

20  firms before, Your Honor.  You know that when you put in an

21  expense --

22          THE COURT:  Yeah, but when you need to get court

23  approval for anything you're doing and you don't do it --

24          MR. SILVERSTEIN:  I -- that I understand and when --

25          THE COURT:  And so -- and only the debtor -- one of

43

1   Mr. Strochak's partners sent an email about what it was about

2   and we got a fairly cryptic email response.

3          MR. SILVERSTEIN:  And you got a more detailed email

4   after that, but at that point if you remember, Your Honor, the

5   dynamic was that we --

6          THE COURT:  I understand.

7          MR. SILVERSTEIN:  -- were not getting along

8   particularly well.

9          THE COURT:  So here's what I'm going to suggest is I

10  would like -- I'm going to give you -- if Mr. Strochak wishes,

11  I'd like to see some authority for, you know, trial expert.  He

12  doesn't have to be retained.

13         MR. SILVERSTEIN:  Letter brief okay?

14         THE COURT:  Yeah, letter brief.  And Mr. Strochak --

15  give him a chance to respond.

16         MR. SILVERSTEIN:  Sure.

17         THE COURT:  I'm -- you know, I'm assuming -- I

18  haven't read the cases on it but I'm assuming you're right on

19  that point, okay?

20         MR. SILVERSTEIN:  I think I'm absolutely right on

21  that.

22         THE COURT:  Okay.  I'm not -- I just want to see the

23  authority on it.

24         MR. SILVERSTEIN:  Sure.

25         THE COURT:  Okay.

44

1          MR. SILVERSTEIN:  And --

2          THE COURT:  And we'll give the debtor a chance to

3   respond, but I'm not approving -- even we get over that hump --

4          MR. SILVERSTEIN:  How do you want to deal with --

5          THE COURT:  -- I'm not approving $91,000.00 based on

6   what you've put in here.

7          MR. SILVERSTEIN:  I appreciate that.  How does Your

8   Honor want to deal with that?

9          THE COURT:  Well --

10          MR. SILVERSTEIN:  Do you want an affidavit, do you

11  want --

12          THE COURT:  Let me add for -- you know, the first

13  line of defense on all of this is Ms. Gasparini and the U.S.

14  Trustee's Office because I think they do -- I was surprised we

15  didn't get an objection from you with respect to this huge

16  $91,000.00 item.  I mean, you'll excuse me but you nitpick

17  about -- justifiably you nitpick about a dinner that's over

18  $20.00 or too much in copying and all that, and here was a

19  $91,000.00 item that wasn't included in your objection.  So I

20  want the U.S. Trustee to see --

21          MR. SILVERSTEIN:  That's fine.

22          THE COURT:  -- whatever it wants.  Now let's talk

23  about -- I'm not all that anxious -- I understand you don't

24  want to share a copy of the report with --

25          MR. SILVERSTEIN:  Yeah, I'd prefer not.

45

1          THE COURT:  Okay.  And I'm not all that anxious to

2    read something that they're not reading.

3          MR. SILVERSTEIN:  Fair enough.

4          THE COURT:  So let me hear from Mr. Strochak on this

5    point.

6          MR. SILVERSTEIN:  Okay.  And the point --

7          THE COURT:  The table gets turned often and, you

8    know, whether they're -- what happens to you may happen to them

9    at a later point, so --

10          MR. SILVERSTEIN:  Right.  But before you get to Mr.

11    Strochak --

12          THE COURT:  Yes.

13          MR. SILVERSTEIN:  -- obviously any documentation or

14    any further embellishment as to what they did to show why we

15    spent $91,000.00 and why it was reasonable we will do.  We'll

16    start --

17          THE COURT:  They must keep time records, right?

18          MR. SILVERSTEIN:  I think they do keep time records.

19    What I saw from the documentation was not the kind of time

20    records that we are used to seeing from legal professionals,

21    for example.  And I appreciate --

22          THE COURT:  Not only legal professionals, but I mean,

23    you know, with financial advisors you may not require in the

24    report [unintelligible] if they are retained, but --

25          MR. SILVERSTEIN:  Yes.

46

1        THE COURT:  -- but you still require --

2        MR. SILVERSTEIN:  Yeah.  I understand what Your Honor

3   needs --

4        THE COURT:  Okay.

5        MR. SILVERSTEIN:  -- because that was my only

6   reaction.  I wanted more detail on what the $91,000.00

7   consisted of.  I know that Mr. Brock was supervising that, so I

8   have full confidence that it will end up being satisfactory to

9   Your Honor and to the U.S. Trustee and to the debtors but on

10  the legal issue we'll submit a short letter brief on that.

11       THE COURT:  Okay.  So --

12       MR. SILVERSTEIN:  Unless the Court rules --

13       THE COURT:  Here's what I would like you to do.

14  First you need to consult with Weil and see if you can agree

15  not only on what you're going to give me, but what you're going

16  to give them to look at.  I understand you don't want to give

17  them the reports, but they're entitled to see more than you've

18  given anybody at this point.

19       MR. SILVERSTEIN:  Fair enough.

20       THE COURT:  So far.  And if you can't agree, we'll

21  have a phone calls and we'll see what we --

22       MR. SILVERSTEIN:  I'm sure we can agree.

23       THE COURT:  -- have.  Okay.

24       MR. SILVERSTEIN:  And I'm sure that additional

25  documentation --

47

1          THE COURT:  Because this could turn around later.  I

2    mean, in --

3          MR. SILVERSTEIN:  They've got their testifying

4    expert.

5          THE COURT:  -- you all have the same issue.

6          MR. SILVERSTEIN:  Hopefully we won't need testifying

7    experts but you never know.

8          THE COURT:  I'm really not interested in seeing the

9    report because I don't want to see it on an *ex parte* basis --

10         MR. SILVERSTEIN:  Yeah, and I appreciate that.

11         THE COURT:  -- the report that goes to the merits of

12   all this.

13         MR. SILVERSTEIN:  But I am saying there is a report,

14   there was work and, yes, I understand that Your Honor

15   reasonably wants to see --

16         THE COURT:  Okay.

17         MR. SILVERSTEIN:  -- more documentation, so I suspect

18   we can essentially defer this to I guess the next interim fee

19   application if not sooner.

20         THE COURT:  It doesn't even -- you know --

21         MR. SILVERSTEIN:  I don't know when that will be.  I

22   know that the next fee appli --

23         THE COURT:  You don't have to wait all -- if you want

24   to move it it's a lot of money.

25         MR. SILVERSTEIN:  It's time material.

48

1          THE COURT:  So if you want to advance it --

2          MR. SILVERSTEIN:  Okay.

3          THE COURT:  -- sooner I'm open to doing that.

4          MR. SILVERSTEIN:  That's fine.

5          THE COURT:  Okay.

6          MR. SILVERSTEIN:  Thank you, Your Honor.

7          THE COURT:  All right.

8          MR. SILVERSTEIN:  I don't know if Your Honor has any

9    questions.  You may have some.  The U.S. Trustee and we and the

10   debtors may have missed something else.  You usually pick up

11   things.

12         THE COURT:  You know, yes.  [Unintelligible] question

13   terrific on this.  They --

14         MR. SILVERSTEIN:  In 1982 I used to do that.  It was

15   just the worst part of my job when I was in this district as a

16   law clerk.

17         THE COURT:  But, you know, what I -- because I never

18   know what the U.S. Trustee has dinged you on so I don't like to

19   double dip.

20         MR. SILVERSTEIN:  They did okay.  They dinged a

21   little bit.  I mean, it was $5,000.00 I think on a not so --

22         THE COURT:  Let me -- there was a category that --

23   and I'm not -- I'm going to abide by what the U.S. Trustee did,

24   but I want to identify an issue that's binding.

25         MR. SILVERSTEIN:  Sure.

49

1              THE COURT:  And that's copying charges.

2              MR. SILVERSTEIN:  That's what?

3              THE COURT:  Copying charges.

4              MR. SILVERSTEIN:  Copying charges?

5              THE COURT:  Yeah.  Your page -- you know --

6              MR. SILVERSTEIN:  What are we charging?  I didn't

7    even notice that.  There's a stack --

8              THE COURT:  You copied 10,000 pages.

9              MR. SILVERSTEIN:  I assume that had to do with trial

10   preparation and the like.  I mean, and I would bet my bottom

11   dollar that that was probably done in connection with Mr.

12   Brock's work preparing for trial.  That's --

13             THE COURT:  Okay.  But, you know, don't kill the

14   forest.  You just --

15             MR. SILVERSTEIN:  We'll get a scribe next time.

16             THE COURT:  No.  I'm serious.  I mean, because the --

17   look, I was in the firm for many years.  I know you turn

18   associates loose and they think it's easy to make five copies

19   of everything and --

20             MR. SILVERSTEIN:  Again, I --

21             THE COURT:  -- four of them wind up getting thrown

22   away and only one gets looked at.

23             MR. SILVERSTEIN:  Because mine will likely get thrown

24   away as well.

25             THE COURT:  It's just -- I'm not --

50

1          MR. SILVERSTEIN:  Well, I will look into photocopies.

2          THE COURT:  The dollars aren't that great here, but

3     we look at it and say, why were 10,000 pages copied.

4          MR. SILVERSTEIN:  But I have a very strong feeling

5     that 10,000 copies weren't copied because we were inherently

6     wasteful and silly.  I'm sure there was a legitimate reasons

7     why 10,000 copies were made.  I can inquire and I'm sure we

8     have the dates on which they were made so we can track it down.

9     I can provide the U.S. Trustee an explanation.  I'm sure Your

10    Honor does not want to hear it, but I get the point, Your

11    Honor.  Save trees.

12         THE COURT:  They didn't give you the dates when they

13    made the copies --

14         MR. SILVERSTEIN:  I can find --

15         THE COURT:  -- but you can do that, too.

16         MR. SILVERSTEIN:  I can do that.  I don't need Your

17    Honor to do that.

18         THE COURT:  Okay.

19         MR. SILVERSTEIN:  Any other things that are bothering

20    the Court?

21         THE COURT:  No.  So we have to deal with the hold-

22    back.

23         MR. SILVERSTEIN:  Yeah.  We've -- I think --

24         THE COURT:  You have an agreement on the hold-back

25    issue or --

51

1          MR. SILVERSTEIN:  I think Mr. Strochak can address

2    all -- I think we would prefer ten percent, the U.S. Trustee

3    indicates 20 percent.  I think that Mr. Strochak will probably

4    argue this to both.

5          THE COURT:  Let me hear from Ms. Gasparini on this

6    issue of the hold-back.

7          MS. GASPARINI:  Good afternoon, Your Honor.

8    Elisabetta Gasparini.  I won't go over again the reductions

9    that we agreed to, but we did have some informal inquiries for

10   three of the professionals, specifically Weil Gotshal, W.Y.

11   Campbell, and Andrews Kurth, and we reached agreements.  We

12   appreciate, Your Honor, your comments regarding the expert.  I

13   did review the invoices and the agreement that was attached to

14   the application but we certainly look forward to seeing more in

15   support of that.

16         Having said that we still have an objection regarding

17   the hold-back.  As Your Honor has also heard about the status

18   of the case that doesn't seem to have been much progress in the

19   past few months and the mediation is still where it stands; the

20   parties have not reached an agreement.  Therefore, we think

21   that given the status of the case we request that a 20 percent

22   hold-back is the appropriate figure at this time and we request

23   that there be a 20 percent hold-back in fees until the end of

24   the case.

25         THE COURT:  Thank you.

52

1              MS. GASPARINI:  Thank you.

2              MR. SILVERSTEIN:  Before Mr. Strochak just trying

3    to --

4              THE COURT:  Go ahead.

5              MR. SILVERSTEIN:  You know, historically hold-backs

6    in my experience have been really used to sort of push the

7    lawyers along.  The --

8              THE COURT:  I was thinking about a 50 percent hold-

9    back.  I think you all need a big push.

10             MR. SILVERSTEIN:  Well, but the problem is -- my

11   point, though, is that the lawyers don't need the pushing.

12   Okay.  It's not the lawyers here that are causing the

13   stalemate.  And so, you know --

14             THE COURT:  But they're ones who get blamed for it,

15   though.

16             MR. SILVERSTEIN:  Oh, we get blamed for everything.

17             THE COURT:  You're the ones who --

18             MR. SILVERSTEIN:  But we expect Your Honor to

19   understand, you know, a little bit more about whether we're the

20   problem or whether we're just sort of in the middle.  And I

21   don't think that at this point the lawyers are the problem.

22             THE COURT:  Why do you say that?

23             MR. SILVERSTEIN:  Because it's true and because it's

24   really a business problem.  Remember, this is the case where

25   the debtor's management still says they're not fiduciaries

53

1  because they're solvent and I need not say any more.  It's not

2  the lawyers.

3           THE COURT:  Mr. Strochak.

4           MR. STROCHAK:  I think maybe Mr. Silverstein and I

5  are close to the same page on this.  The fundamental problem

6  with this case seems to be a business one is that a business

7  resolution to the problem of financing, the exit hasn't emerged

8  yet and, you know, respectfully despite our efforts to move the

9  case forward in any direction that we could toward what in the

10 debtor's view is the best resolution for all interested parties

11 it hasn't been able to happen for business purposes.  You know,

12 we have a dispute between the parties in terms of, you know,

13 valuation and if we need to we'll have a trial on valuation

14 someday but I would agree with Mr. Silverstein that this is not

15 a case where antagonism between counsel has delayed the

16 business resolution that's necessary to get the company out of

17 Chapter 11.  You know, for a long time Mr. Silverstein --

18          THE COURT:  For a long time every issue in the case

19 was litigating every extension of time, but --

20          MR. SILVERSTEIN:  There was a reason.

21          THE COURT:  Maybe from your vantage point.

22          MR. STROCHAK:  I agree, Your Honor.  I mean, there

23 certainly are -- you can point to things that happened in this

24 case where administrative expenses might have been lower if

25 counsel had taken different positions on issues.  I'm not

54

1   trying --

2           THE COURT:  Let me ask you --

3           MR. STROCHAK:  -- to cast the blame here.

4           THE COURT:  If -- this is a serious concern.  If your

5   motion for use of cash collateral is denied what happens in

6   this case?

7           MR. STROCHAK:  Well, you know, the obvious answer to

8   that in the abstract, Your Honor, is that the debtors can't

9   operate without cash collateral so the case would have to be

10  converted.

11          THE COURT:  Okay.  And if the case were converted to

12  7 what happens to the Committee counsel fees and the debtor's

13  counsel fees?  They drop down and Chapter 7 Trustee and Chapter

14  7 Trustee counsel, you know, those administrative claims get a

15  higher priority.  I wrote an opinion in a case In Re: King,

16  case that converted from 11 to 7, and there's substantial

17  authority about -- first off, the former Chapter 11 counsel

18  faced a risk of disgorgement and there's a lot of authority

19  about deferring their fees to the end of the case if there are

20  other fees at that point.

21          So it's -- you know, I don't have a cash collateral

22  motion.  I mean, we've been through one contested cash

23  collateral already.  It would be a very unfortunate end for

24  this case if that's what transpired but it's not beyond the

25  realm.  Okay.  And so I'm -- you know, I'm uncomfortable

55

1   about -- and this is without fault to any of you, okay.  I'm

2   uncomfortable about given the -- you know, yes, there's cash in

3   the estate.  I understand you say it's above budget.  Not a lot

4   of cash.  Right.  Until the direction of this case becomes

5   clearer I'm really uncomfortable about not having a lar -- you

6   know, fairly substantial hold-back.  I'm actually surprised

7   that the U.S. Trustee only asked for a 20 percent hold-back at

8   this stage and that's -- you know, that could change if you get

9   beyond the next -- you know, you have consensual cash

10   collateral order again and we get beyond that.  But I'm really

11   worried about it.

12          MR. STROCHAK:  We certainly share Your Honor's

13   concerns about, you know, the direction the case is going.  In

14   terms of value it's always been the debtor's view and it

15   continues to be the debtor's view that there's ample value in

16   the estate, particularly with respect to the senior secured

17   debt to the bank lenders.  There is ample value to satisfy

18   their claims and in terms of -- you know, if we ever had to had

19   a -- you know, in this horrible worst case scenario where the

20   case ever converted there would be ample value to satisfy the

21   senior secureds through, you know, some type of sale process in

22   the business.  Then you'd have Chapter 7 administrative

23   expenses which would come before the Chapter 11 administrative

24   expenses, but we're still of the view that there's ample value

25   there to cover whatever it would take to administer even a

56

1    Chapter 7 case and that that would not be a substantial

2    problem.  Now, the recovery for unsecured creditors would be

3    what really got hurt in that situation.

4            So that's our view with respect to the hold-back.

5    We're certainly, you know, cognizant of Your Honor's concerns

6    about the direction the case is going.  You know, we've got a

7    ten percent hold-back now.  It's not the amount of the 20

8    percent that scares us off.  It's been the -- you know, the

9    U.S. Trustee asked for five percent at the outset.  We said

10   okay.  They came back several months ago and said, we'd like

11   you to increase it to ten.  We said okay.  We felt like they

12   were reasonable accommodations and we kind of feel like we're

13   being picked apart here and that -- and that --

14           THE COURT:  I think their position is if you move the

15   case along then they'll relent, you know.  I --

16           MR. SILVERSTEIN:  False premise on that, Your Honor.

17           THE COURT:  It's not.  It's not.

18           MR. STROCHAK:  The -- Your Honor, certainly if Your

19   Honor feels that it's necessary to protect these estates, you

20   know, we're not going to stand up here and stomp our feet over

21   ten percent more.

22           THE COURT:  Mr. Silverstein is but --

23           MR. SILVERSTEIN:  I'm not stomping my feet over it.

24           THE COURT:  I'm teasing, Mr. Silverstein.

25           MR. STROCHAK:  We do think given the posture of the

57

1   case, given the value that's here, and given the circumstances

2   that the reason we are where we are is because of the business

3   problem of financing the exit that it's not necessary at this

4   point.  That's our view on the hold-back, Your Honor.

5        THE COURT:  I'm going to sustain the U.S. Trustee's

6   objection and insist on the 20 percent hold-back as stated.

7   I'm prepared to revisit it after we get through the next cash

8   collateral.  So when we get onto the next fee apps it's fair

9   game again.  One shouldn't presume it because I'm agreeing with

10  the U.S. Trustee that the hold-back now should be 20 percent,

11  that it won't go in the reverse direction, go down if things

12  start to move forward.

13       MR. STROCHAK:  Let me just make sure I understand

14  Your Honor's ruling.  So it's 20 percent with respect to the

15  interim fee applications --

16       THE COURT:  Yes, yes.

17       MR. STROCHAK:  -- that are before Your Honor now.

18       THE COURT:  Right.

19       MR. STROCHAK:  But the hold-back with respect to the

20  ongoing monthly applications that's going to remain the same?

21  That's a ten percent hold-back.

22       THE COURT:  No, I think it should be going forward

23  with 20 -- it's going to be 20 percent until the Court rules

24  otherwise and I'm happy to revisit it.  And if you -- and if

25  as -- you know, if you can get a consensual cash collateral

58

1   order and then you want to bring back this issue of the amount

2   of percentage of the hold-back, I'm happy to hear you all on

3   short notice.  Let's get through this.  I want to get through

4   any cash -- contested cash collateral fi -- or consensual cash

5   collateral agreement before the hold-back going forward is

6   below the 20 percent.

7           MR. STROCHAK:  All right.  Thank you, Your Honor.

8           THE COURT:  Okay.

9           MR. STROCHAK:  I know Mr. Tischler is not here but I

10  hope he doesn't -- I hope he doesn't use this too much to his

11  advantage on a consensual order because I'm certainly motivated

12  now to get one, Your Honor.

13          MR. SILVERSTEIN:  Just reflect the debtor's

14  [inaudible] commitment to counsel.

15          MR. STROCHAK:  No.  My point only, Your Honor, was

16  that we're certainly motivated to do everything we can to try

17  and do it consensually if we can, and so ...

18          THE COURT:  All right.

19          MR. SILVERSTEIN:  What I --

20          THE COURT:  So --

21          MR. SILVERSTEIN:  For the record, what I said was a

22  joke just a second ago.  Thank you.

23          THE COURT:  Go ahead, Mr. Strochak.

24          MR. STROCHAK:  We --

25          THE COURT:  You know where you stand on your fees,

59

1  right?  The only thing you're going to get back, you're going

2  to talk to Mr. Strochak and see if you can work out what you're

3  going to submit to me --

4            MR. SILVERSTEIN:  Yes, yes.

5            THE COURT:  -- and --

6            MR. STROCHAK:  Yes, we can do that.  And as far as --

7            THE COURT:  Testimonial expert.

8            MR. SILVERSTEIN:  As far as this order it's somewhat

9  irrelevant because basically there's no new money coming to

10  anybody anyway so we'll deal with this in due course.

11            THE COURT:  Okay.  Go ahead, Mr. Strochak.

12            MR. STROCHAK:  Shall we return to the Weil Gotshal

13  application?

14            THE COURT:  Yes.

15            MR. STROCHAK:  We were able to work out all the

16  issues with the United States Trustee and we've agreed to the

17  modest reductions that they've asked for in their application

18  so that's fine for us.

19            THE COURT:  Let me just find my notes with respect to

20  it.  They dinged you for $11.69 in expenses, though.

21            MR. STROCHAK:  Well, we agreed to it very quickly,

22  Your Honor.

23            THE COURT:  I do have a question and that it was

24  something that's unclear is what did you bill for travel time.

25  I think we had this discuss -- and it was unclear to me that

60

1 the rule of thumb that I know my colleagues use and that I've

2 used is unless you're working that you bill half-time for

3 travel.

4        MR. STROCHAK:  That's our policy and everything

5 that's in here should be billed at half-time for nonworking

6 travel.

7        THE COURT:  All right.  It was just unclear and

8 that's why I -- just wanted your confirmation that that was so.

9        All right.  Mis -- as I understand it, you've agreed

10 to a $655.50 reduction in fees.

11        MR. STROCHAK:  Yes, Your Honor.

12        THE COURT:  Okay.  So with that, your application is

13 approved.

14        MR. STROCHAK:  Thank you, Your Honor.  We have the

15 two financial advisors remaining, W.Y. Campbell and Stout

16 Ricius.

17        THE COURT:  All right.  Okay.

18        MS. BACH:  Your Honor, this is Allison Bach from

19 Dickinson Wright.  I represent W.Y. Campbell and I'm here today

20 to answer any questions you might have with respect to W.Y.

21 Campbell's third interim fee application.

22        THE COURT:  No.  I see you've agreed with the U.S.

23 Trustee to a reduction of $654.55 in expenses.  Am I correct?

24        MS. BACH:  That's correct.

25        THE COURT:  Okay.  And no adjustment in the fees and

61

1   with the change and expenses the application is approved.

2          MS. BACH:  Thank you, Your Honor.

3          THE COURT:  All right.  Mr. Silverstein, are you

4   dealing with your advisors' application or not?

5          MR. SILVERSTEIN:  I can, yes.

6          THE COURT:  You don't need to.  I mean, it's --

7          MR. STROCHAK:  It's an easy job.

8          THE COURT:  It's an easy job.  There -- there was

9   no -- the U.S. Trustee didn't request --

10         MS. GASPARINI:  No objection on our end.

11         THE COURT:  -- any reduction.  Okay.  SRR submitted

12  time records in half-hour increments.  The expenses in the

13  requests are all reasonable within the U.S. Trustee guidelines

14  and your application is approved as submitted.

15         Okay.  All right.  Is that it for today?

16         MR. STROCHAK:  Looking at the end of the calendar,

17  Your Honor.  It just occurred to me that Your Honor didn't ask

18  for an order on the Ceremelli lift stay.  Is one necessary or

19  certainly the record is clear from Your Honor's decision.

20         THE COURT:  I don't -- all right.  We'll prepare it.

21  You say for the reasons stated on the record the motion to lift

22  the stay is denied.  We'll just prepare it.

23         MR. STROCHAK:  Thank you.  We have orders to submit.

24  I think the fee application ones we'll just need to be adjusted

25  with the final numbers.  So shall we just submit them to

62

1   chambers?

2           THE COURT:  Yes.

3           MR. STROCHAK:  Very good.  And then I have an order

4   on the insurance I'll hand up.

5           THE COURT:  Okay.  Thank you.  Anything else we need

6   to -- okay.  Thank you very much.

7           MR. STROCHAK:  Thank you, Your Honor.

8           (Proceedings concluded at 3:13 p.m.)

9                        *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

1        I certify that the foregoing is a transcript from an

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5

6    _____

7                    RUTH ANN HAGER

8    Dated:   September 24, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25